# EXHIBIT C

KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2100
Facsimile: (212) 556-2222
Arthur Steinberg

WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, Texas 77027
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Alfredo R. Pérez

*Counsel for the Debtors and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
                                                                    :
**In re**                                                           :    Chapter 11 Case No.
                                                                    :
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,   :    **08-13555 (JMP)**
                                                                    :
                          **Debtors.**                              :    **(Jointly Administered)**
                                                                    :
-----------------------------------------------------------------x

**MOTION OF LEHMAN COMMERCIAL PAPER INC. PURSUANT
TO SECTION 105 OF THE BANKRUPTCY CODE AND FEDERAL RULE OF
BANKRUPTCY PROCEDURE 9019 FOR APPROVAL OF
THAT CERTAIN AMENDED AND RESTATED COMPROMISE BY AND AMONG
LEHMAN COMMERCIAL PAPER INC., ALFRED H. SIEGEL, AS CHAPTER 11
TRUSTEE FOR THE SUNCAL DEBTORS, AND THE OFFICIAL COMMITTEE
OF UNSECURED CREDITORS IN THE SUNCAL BANKRUPTCY CASES**

TO THE HONORABLE JAMES M. PECK, UNITED STATES BANKRUPTCY JUDGE:

Lehman Commercial Paper Inc. ("LCPI," together with its affiliated debtors in the

above-referenced chapter 11 cases, the "Debtors," and, collectively with their non-debtor

affiliates, "Lehman"), files this Motion pursuant to Section 105 of Title 11 of the United States

Code ("Bankruptcy Code") and Rule 9019 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), and respectfully represents:

### Preliminary Statement

1.     By this Motion, LCPI seeks approval of a settlement pursuant to the terms set forth in an amended and restated term sheet (the "Amended Term Sheet") by and among (a) LCPI, on its own behalf and as agent for the First Lien Lenders (as defined below), (b) Alfred H. Siegel (the "SunCal Trustee"), the chapter 11 trustee of the estates of LBREP/L-SunCal Master I, LLC (the "SunCal Parent"), and LBREP/L-SunCal McAllister Ranch, LLC, LBREP/L-SunCal McSweeny Farms, LLC, and LBREP/L-SunCal Summerwind Ranch, LLC (collectively, the "SunCal Subsidiaries," and together with the SunCal Parent, the "SunCal Debtors"), which are being jointly administered under case no. 08-15588 (the "SunCal Bankruptcy Cases") in the United States Bankruptcy Court for the Central District of California ("SunCal Court"), and (c) the official committee of unsecured creditors in the SunCal Bankruptcy Cases (the "SunCal Committee"). The Amended Term Sheet is acknowledged and agreed as to certain provisions by one or more First Lien Lenders, and by LCPI, in its capacity as a Second Lien Lender (as herein defined) and a Third Lien Lender (as herein defined). A copy of the Amended Term Sheet is attached hereto as Exhibit A.[1]

2.     By way of brief background, in 2006 and 2007, the SunCal Parent entered into certain credit agreements with LCPI, as agent, pursuant to which the SunCal Parent borrowed approximately $395 million. The SunCal Subsidiaries guaranteed the SunCal Parent's obligations under such credit agreements. On or about September 10, 2008, involuntary chapter

---

[1] The SunCal Trustee has filed (or will soon file) in the SunCal Bankruptcy Cases a motion similar to this Motion seeking approval of the Amended Term Sheet (the "SunCal Approval Motion").

11 cases were filed against the SunCal Debtors. On or about October 9, 2009, the SunCal

Trustee filed a motion in the SunCal Bankruptcy Cases (the "Original Settlement Motion")

seeking the approval of a settlement pursuant to the terms of that certain original term sheet by

and among LCPI, the SunCal Trustee, and the SunCal Committee (the "Original Term Sheet").

Following the filing of the Original Settlement Motion, a dispute arose between LCPI, on the one

hand, and the SunCal Trustee and the SunCal Committee, on the other hand, regarding the

interpretation of a provision in the Original Term Sheet. The parties were initially unable to

resolve their differences.

3.    On June 17, 2010, the SunCal Trustee filed a motion for relief from the

automatic stay in these bankruptcy cases (the "SunCal Stay Relief Motion") [Docket No. 9642]

seeking, among other things, stay relief to sell the real property of the SunCal Debtors (the

"Properties") free and clear of LCPI and the other First Lien Lenders' asserted liens and to deny

LCPI's credit bid rights. The SunCal Trustee also sought permission to commence a complex

litigation against LCPI. At an initial hearing on the SunCal Stay Relief Motion held on July 14,

2010, this Court continued the hearing until August 18, 2010 and suggested to the parties that

they focus their attention on resolving their differences and reaching a settlement, as opposed to

planning for expensive and protracted litigation against each other. As suggested by this Court,

the parties resumed negotiations, and as a result of the renewed discussions, LCPI, the SunCal

Trustee, and the SunCal Committee have now resolved their differences regarding the

interpretation of the Original Term Sheet and have executed the Amended Term Sheet. At a

status conference held on August 18, 2010, LCPI reported to this Court that it was seeking

internal approval to sign the Amended Term Sheet and would shortly thereafter be filing this

Motion for approval thereof.

3

4.    LCPI believes that the Amended Term Sheet is a fair and reasonable

compromise, and that its approval is in the best interests of LCPI's bankruptcy estate.  The

Amended Term Sheet resolves all of the disputes between LCPI on its own behalf and as agent

for the First Lien Lenders, on the one hand, and the bankruptcy estates of the SunCal Debtors, on

the other hand. In particular, the Amended Term Sheet resolves all pending litigation between

the parties, all disputes between the parties related to the SunCal Trustee's use of LCPI's and the

other First Lien Lenders' cash collateral, and provides for a consensual process for the sale of the

Properties (which are subject to the lien of LCPI, as agent for the First Lien Lenders).  Approval

of the Amended Term Sheet will save LCPI's bankruptcy estate significant administrative

expense, will eliminate the risk associated with litigation, and will substantially preserve LCPI's

secured claims in the SunCal Bankruptcy Cases for the benefit of LCPI's bankruptcy estate and

creditors.  Moreover, as set forth below, the Amended Term Sheet puts into place an acceptable

structure relating to the disposition of the Properties (i.e., the First Lien Lenders' collateral),

which will help ensure that the Properties are liquidated in a timely, efficient and beneficial

manner (thereby allowing LCPI's share of the proceeds to be available to its bankruptcy estate

much faster than in the absence of a settlement).

5.    Under the Amended Term Sheet, the Properties will be sold through a plan

of reorganization, subject to LCPI's right to credit bid as provided in the Amended Term Sheet.

Pursuant to the Amended Term Sheet, the SunCal Trustee and the SunCal Committee have

agreed, among other things, that (a) the First Lien Lenders will have an allowed secured claim in

the SunCal Bankruptcy Cases equal to the proceeds realized by them from the sale of the

Properties plus certain cash proceeds to be remitted to the First Lien Lenders by the SunCal

Trustee (after each amount is adjusted to account for certain "carve outs" and/or obligations, as

4

set forth in greater detail below), (b) the First Lien Lenders will have an allowed general

unsecured claim in the SunCal Bankruptcy Cases in the amount of their deficiency claims, and

(c) the SunCal Trustee, the SunCal Committee and the SunCal Debtors' estates will provide

broad releases to the First Lien Lenders, LCPI, and their respective officers, directors,

employees, agents and attorneys.[2]

6.    In return, under the Amended Term Sheet, LCPI on its own behalf and as

agent for the First Lien Lenders, has agreed that certain of the First Lien Lenders' cash collateral

will be "carved out" for the benefit of the administration of the SunCal Debtors' estates, and that

certain other cash collateral held by the SunCal Debtors may be used to preserve the Properties

until sale. In addition, the First Lien Lenders have agreed to share with the unsecured, non-lender

creditors in the SunCal Bankruptcy Cases a portion of the proceeds from the sale of the

Properties and certain litigation recoveries.

7.    Specifically, upon the entry of orders granting this Motion and the SunCal

Approval Motion, the SunCal Debtors' estates will receive $5.5 million in cash. Of this sum,

$3.5 million will be available for use by the SunCal Trustee to administer the SunCal Debtors'

cases and to pursue the SunCal Debtors estates' claims against other third parties. The remaining

$2.0 million will be used by the SunCal Trustee to maintain and preserve the Properties' pending

sale (with any unused residual amount to be transferred to the First Lien Lenders after the sale of

the Properties has closed). Also, through the SunCal Debtors' plan of reorganization

contemplated under the Amended Term Sheet, the proceeds of any other recoveries by the

---

[2] The releases specifically do not include a release of LBREP Lakeside SC Master I LLC ("LBREP Lakeside"), SCC Acquisitions, Inc. ("SCC Inc."), SCC Acquisitions, LLC ("SCC LLC"), or SCC Ranch Ventures LLC ("SCC Ranch" and together with SCC Inc. and SCC LLC, "SCC"), or any claims related to the acts of the owners of any of the SunCal Debtors including any transfers of funds to any of the owners by any of the SunCal Debtors.

SunCal Trustee (excluding proceeds from the sale of the Properties and the Yucaipa Funds (as herein described)) will be split 50/50 between (a) the First Lien Lenders on account of their unsecured deficiency claims, and (b) the SunCal Debtors' estates for distribution to the SunCal Debtors' unsecured non-lender creditors.[3]  Finally, the SunCal Debtors' estates will also be entitled to 3.5% of any net recovery from the sale of the Properties to a third party, whether through the plan or subsequently by LCPI (after a credit bid). The Amended Term Sheet recognizes that there could be mechanics liens encumbering the Property that are senior to the lien of the First Lien Lenders. To the extent title insurance is not available to cover such claims, these senior mechanics liens, if any, will either be paid from the proceeds of a third party sale of the Properties, or in the event of an LCPI credit bid, will remain a lien on the Properties. In essence, the 3.5% recovery for the SunCal Debtors estate comes out of the sale proceeds otherwise payable to the First Lien Lenders.  LCPI believes that the concessions made by it under the Amended Term Sheet are reasonable in view of the benefits derived therefrom.

### Relief Requested

8.    By this Motion, LCPI seeks entry of an order pursuant to Section 105 of the Bankruptcy Code and Bankruptcy Rule 9019 approving the Amended Term Sheet and authorizing LCPI's entry into and consummation of the settlement and the transactions contemplated therein.

---

[3] Other than the First Lien Lenders, there are other lender creditors (Second Lien Creditors and the Third Lien Creditors) in the SunCal Bankruptcy Cases which have agreed, pursuant to intercreditor agreements, to turnover their distributions in the SunCal Bankruptcy Cases to the First Lien Lenders, until the First Lien Lenders claims are paid in full. The 50/50 split referenced above reflects the enforcement of the intercreditor agreements to effectuate the contemplated sharing arrangement.

## Background

9.      Commencing on September 15, 2008 and periodically thereafter (as

applicable, the "Commencement Date"), Lehman Brothers Holdings Inc. ("LBHI") and certain

of its subsidiaries filed with this Court voluntary petitions under Chapter 11 of the Bankruptcy

Code. On October 5, 2008, LCPI commenced its voluntary case under the Bankruptcy Code.

The Debtors' Chapter 11 cases have been consolidated for procedural purposes only and are

being jointly administered pursuant to Bankruptcy Rule 1015(b). The Debtors are authorized to

operate their businesses and manage their properties as debtors in possession pursuant to sections

1107(a) and 1108 of the Bankruptcy Code.

10.      On September 17, 2008, the United States Trustee for the Southern

District of New York ( "U.S. Trustee") appointed the statutory committee of unsecured creditors

pursuant to section 1102 of the Bankruptcy Code ( "Creditors' Committee").

11.      On April 14, 2010, the Debtors filed a revised joint chapter 11 plan and

disclosure statement [Docket Nos. 8330 and 8332].

## Lehman's Business

12.      Prior to the events leading up to these chapter 11 cases, Lehman was the

fourth largest investment bank in the United States. For more than 150 years, Lehman had been

a leader in the global financial markets by serving the financial needs of corporations,

governmental units, institutional clients and individuals worldwide.

13.      Additional information regarding the Debtors' businesses, capital

structures, and the circumstances leading to the commencement of these Chapter 11 cases is

contained in the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy

NYC_IMANAGE-1195023.3

Rules for the Southern District of New York in Support of First-Day Motions and Applications

filed on September 15, 2008 [Docket No. 2].

## Jurisdiction

14.    This Court has subject matter jurisdiction to consider and determine this

matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## The History of the SunCal Debt

15.    The SunCal Parent is a holding company established to fund the real estate

development projects owned by each of its operating subsidiaries (i.e., the SunCal Subsidiaries).

Approximately ninety percent (90%) of the SunCal Parent is owned by LBREP Lakeside, which

is an affiliate of Lehman Bros. Real Estate Partners, LP ("LBREP").[4]  The remaining equity

interests in the SunCal Parent are owned by SCC Ranch, which is an affiliate of SCC Inc. d/b/a

SunCal Companies.  LBREP Lakeside is the managing member of the SunCal Parent.

16.    The SunCal Parent's primary asset, other than cash, is its interests in the

SunCal Subsidiaries.  The SunCal Parent is the sole equity member of the SunCal Subsidiaries,

each of which, in turn, owns a real estate development project bearing a similar name (the

Properties).  The SunCal Parent also has cash in accounts with a current aggregate balance of

over $13 million, which funds were formerly held in a "Development Account" and/or

"Operating Accounts" established under the LCPI loan documents.

17.    The SunCal Parent, as borrower, entered into three Lien Credit

Agreements with LCPI (collectively, the "Lien Credit Agreements").  Pursuant to the First and

Second Lien Credit Agreements, which were entered into on or around January 19, 2006, the

---

[4] Both LCPI and LBREP are affiliates of LBHI.

SunCal Parent borrowed a total of $320 million (collectively, the "January 2006 Loans") as

follows: (1) a revolving credit facility of $75 million and term loan facility of $160 million under

the First Lien Credit Agreement entered into with certain lenders party thereto (collectively, the

"First Lien Lenders"); and (2) an $85 million term loan facility under the Second Lien Credit

Agreement entered into with certain lenders party thereto (collectively, the "Second Lien

Lenders"). The SunCal Parent's obligations under the First and Second Lien Credit Agreements

were guaranteed by the SunCal Subsidiaries, and these guaranties were secured by first and

second liens against the Properties. LCPI was a lender under the January 2006 Loans, and acted

as the sole administrative agent, and Lehman Brothers, Inc. ("LBI"), served as the advisor, sole

lead arranger and syndication agent. Later, Gramercy Warehouse Funding I, LLC, replaced

LCPI as the administrative agent under the Second Lien Credit Agreement. As of the date of this

Motion, LCPI (a) holds approximately thirty percent (30%) of the debt outstanding under the

First Lien Credit Agreement in its capacity as a First Lien Lender, and (b) holds approximately

fifteen percent (15%) of the debt outstanding under the Second Lien Credit Agreement in its

capacity as a Second Lien Lender.

18.    As part of the 2006 Loans, among other things, certain loans made by

affiliates of the Debtors were repaid, and a shareholder of the SunCal Parent, who was an

affiliate of the Debtors, received a significant dividend.

19.    On February 6, 2007, a Third Lien Credit Agreement was entered into by

the SunCal Parent and certain lenders party thereto (collectively, the "Third Lien Lenders" and

together with the First Lien Lenders and the Second Lien Lenders, the "Lien Lenders"), which

provided for an additional $75 million term loan (the "February 2007 Loan," and together with

the January 2006 Loans, the "Loans"). The February 2007 Loan was also guaranteed by the

9

SunCal Subsidiaries and secured by third priority liens against the Properties. Just as with the January 2006 Loans, LCPI was a lender and served as the administrative agent, and LBI served as advisor, sole arranger and syndication agent. Square Mile Structured Debt (One), LLC, and Square Mile Structured Debt (Two), LLC, collectively, replaced LCPI as the administrative agent under the Third Lien Credit Agreements. As of the date of this Motion, LCPI holds approximately sixty-five percent (65%) of the debt outstanding under the Third Lien Credit Agreement in its capacity as a Third Lien Lender.

20.    Under certain intercreditor agreements, the Second Lien Lenders and the Third Lien Lenders agreed and confirmed that their liens and right to payment from the SunCal Debtors were subordinated in favor of the First Lien Lenders.

### SunCal Bankruptcy

21.    On or about September 10 and 11, 2008, involuntary petitions under Chapter 11 of the Bankruptcy Code were filed against the SunCal Debtors. On or about October 29, 2008, the SunCal Court entered an order approving Alfred H. Siegel's appointment as the chapter 11 trustee for the SunCal Debtors, and on October 30, 2008, orders for relief were entered in the SunCal Bankruptcy Cases.

22.    At the time of the filing of the SunCal Bankruptcy Cases, numerous events of default existed under the First, Second and Third Lien Credit Agreements. LCPI, as administrative agent for the First Lien Lenders, has asserted a first priority lien against the Properties and the SunCal Parent's cash for the full amount of the Loans extended to the SunCal Parent under the First Lien Credit Agreement (and guaranteed by the SunCal Subsidiaries). Likewise, the Second and Third Lien Lenders have also asserted liens against the Properties and the SunCal Parent's cash for the full amount of their respective Loans. Based on appraisals

10

received by LCPI and offers received by the SunCal Trustee, it is believed that the value of the
Properties is substantially less than the amount of the First Lien Lenders debt.

### LCPI Stay Relief Motion

23.     On or about October 2, 2008, LCPI, in its capacity as agent to the First
Lien Lenders, filed four motions for automatic stay relief (the "LCPI Stay Relief Motions"),
seeking, *inter alia*, to foreclose on the First Lien Lenders' liens in the Properties and cash held
by the SunCal Debtors.  The LCPI Stay Relief Motions were originally scheduled for hearing on
October 28, 2008, but the SunCal Court continued the hearing to November 20, 2008 to allow
the SunCal Trustee an opportunity to analyze the motions and prepare a response thereto.  Both
the SunCal Trustee and the SunCal Committee opposed the LCPI Stay Relief Motions, in part,
because both parties allegedly disputed the amount and validity of LCPI's liens.[5]

24.     In an effort to facilitate an amicable settlement among the parties, the
evidentiary hearing on the LCPI Stay Relief Motions was continued by agreement of the parties
on multiple occasions.  Currently, LCPI and the SunCal Trustee are parties to a stipulation,
pursuant to which they agreed to take the evidentiary hearing related to the LCPI Stay Relief
Motions off the calendar, and further agreed to suspend the related deadlines and discovery,
subject to the parties' rights to re-notice and/or reinstate the same.  Absent a settlement, LCPI
will have no other option but to re-notice the evidentiary hearing and pursue expensive and
protracted litigation in order to obtain the stay relief necessary to foreclose on its interests in the
Properties and the SunCal Parent's cash.

### SunCal Cash Collateral Disputes

---

[5] The arguments and claims of the SunCal Trustee and SunCal Committee regarding the amount and validity of
LCPI's liens are set forth in greater detail herein.

11

25.    Although LCPI and the SunCal Trustee were able to ultimately agree upon the use of the First Lien Lenders' cash collateral during the early stages of the SunCal Bankruptcy Cases, the parties were unable to reach an agreement regarding the use of cash collateral beyond November 30, 2009 (due to the breakdown in negotiations related to the Original Term Sheet, as set forth in greater detail below).  Accordingly, the SunCal Trustee filed motions in the SunCal Bankruptcy Cases for the use of cash collateral through December 31, 2009, March 31, 2010, and June, 30, 2010.  LCPI filed a limited objection to each motion, and each motion was granted over LCPI's limited objection.  On May 27, 2010, the SunCal Trustee filed a Motion for Order Authorizing Use of Cash Collateral Through September 30, 2010 in the SunCal Bankruptcy Cases.  LCPI filed an opposition to the motion.  On June 17, 2010, the SunCal Court heard and granted the motion over LCPI's opposition.  On June 25, 2010, the SunCal Court entered an *Order Granting Motion for Order Authorizing Use of Cash Collateral Through September 30, 2010* (the "Cash Collateral Order").  On July 9, 2010, LCPI filed a notice of appeal of the Cash Collateral Order ( "Appeal").  In light of the Amended Term Sheet, LCPI and the SunCal Trustee are in the process of memorializing a stipulation staying the Appeal pending the outcome of this Motion and the SunCal Approval Motion, which, if granted, will result in the dismissal of the Appeal.

### Original Term Sheet and Settlement Motion

26.    On or about October 9, 2009, after months of negotiations, the SunCal Trustee filed the Original Settlement Motion in the SunCal Bankruptcy Cases seeking the approval of the Original Term Sheet.  The Original Settlement Motion was, for various reasons, opposed by multiple third parties.

12

27.     Thereafter, the SunCal Trustee raised what he saw as an ambiguity in the

Original Term Sheet, the interpretation of which resulted in a dispute between the settling

parties.  Specifically, the Original Term Sheet required that the SunCal Trustee settle and obtain

a release of any mechanic's and similar liens determined to be senior to the liens of LCPI

("Senior Liens") using LCPI's title insurance and $1.5 million of cash collateral set aside for that

purpose.  The title insurance company, Fidelity National Title Insurance Company, objected to

the Original Compromise Motion.  The SunCal Trustee became concerned that there was a

possibility that he might not be able to discharge all of the Senior Liens which he asserted could

have negative ramifications to the SunCal estates under the Original Term Sheet.

28.     LCPI, the SunCal Trustee, and the SunCal Committee attempted to resolve

the dispute regarding the interpretation of the Original Term Sheet, and the hearing on the

Original Settlement Motion was continued on multiple occasions.  Ultimately, on January 25,

2010, the SunCal Trustee filed a notice of withdrawal of the Original Settlement Motion in the

SunCal Bankruptcy Cases.  After being unable to engage the SunCal Trustee to resolve their

differences, by letter dated March 30, 2010, LCPI notified the SunCal Trustee of its termination

of the proposed settlement embodied in the Original Term Sheet and reserved all of its rights

related thereto.

### SunCal Stay Relief Motion

29.     Following the break down in negotiations among the parties, the SunCal

Trustee began pursuing a strategy aimed at selling the Properties free and clear of liens,

including the liens of the First Lien Lenders, and pursuing the SunCal Debtors' purported claims

against LCPI and the other First Lien Lenders.  To that end, on or about June 17, 2010, the

SunCal Trustee filed the SunCal Stay Relief Motion in these cases, seeking, among other things,

13

stay relief to sell the Properties free and clear of LCPI's asserted liens and to deny LCPI's credit

bid rights. The SunCal Trustee also sought permission to assert affirmative claims against LCPI.

LCPI filed an opposition to the SunCal Stay Relief Motion. The SunCal Stay Relief Motion was

initially heard on July 14, 2010 and continued by this Court to August 18, 2010. The parties

engaged in further settlement discussions following the hearing and were able to resolve their

disputes concerning the Original Term Sheet.

### SunCal Claims Against LCPI

30.     In the SunCal Stay Relief Motion and in the responses of the SunCal

Trustee and the SunCal Committee to the LCPI Stay Relief Motions, the SunCal Trustee and the

SunCal Committee have repeatedly alleged that the SunCal Debtors' estates have numerous

claims against LCPI. Among others, the SunCal Trustee and the SunCal Committee have stated

that they believe that the SunCal Debtors' have claims against LCPI to: (1) equitably subordinate

the claims of LCPI and cause the liens securing LCPI's claims to be transferred to the SunCal

Debtors' estates; (2) avoid the security interests held by LCPI against the Properties as fraudulent

transfers and preserve those security interests for the benefit of the SunCal Debtors' estates; and

(3) recover damages against LCPI for lender liability (the "SunCal Estate Claims").[6]

31.     LCPI disputes each of the SunCal Estate Claims and believes it has valid

defenses to each claim. However, it is clear that litigating these claims would be expensive and

subject to the vagaries and risk of litigation, and until such litigation is resolved, there will be a

stalemate spanning two different bankruptcy courts as to how to deal with the Properties.

---

[6]  The SunCal Trustee has filed proofs of claim in the LCPI bankruptcy case asserting these claims.

NYC_IMANAGE-1195023.3

### The Amended Term Sheet

32.    In an effort to globally resolve the numerous disputes among LCPI, the

SunCal Trustee and the SunCal Committee, including, without limitation, disputes and claims

arising from or relating to the LCPI Stay Relief Motions, the SunCal Stay Relief Motion, the

Appeal and related cash collateral disputes, and the SunCal Estate Claims, and to avoid

protracted, costly and uncertain litigation, LCPI believes it is in the best interests of its estate to

enter into the Amended Term Sheet. The salient terms of the Amended Term Sheet are

summarized as follows:[7]

| | |
|---|---|
| **Allowance of LCPI Claim** | Upon the Settlement Effective Date,[8] the claim of the First Lien Lenders, for which LCPI serves as the administrative agent, will be allowed in each of the SunCal Bankruptcy Cases in the aggregate amount of $230,006,233.98, plus accrued and unpaid interest through the Petition Date and legal fees. (*See* Ex. 1 at ¶ B.) The First Lien Lenders' claim will be allowed as a secured claim in the amount of the aggregate final credit or third-party bid for the Properties as discussed below, plus any cash collateral received by the First Lien Lenders on the Settlement Effective Date, plus the amount of the Yucaipa Funds (as defined below) received by the First Lien Lenders, less any cash paid by the First Lien Lenders pursuant to paragraph H of the Amended Term Sheet. The remaining amount of the First Lien Lenders' claim will be deemed an allowed general unsecured claim against each of the SunCal Debtors. (*See* Ex. 1 at ¶¶ B, F, H.) |
| **Distributions on Settlement Effective Date** | (a) <u>Distribution of the Development Account Funds.</u> The SunCal Trustee will retain $5.5 million from the funds originally held in the Development Account ( "<u>Development Account Funds</u>"). Of |

---

[7] This summary (the "<u>Summary</u>") of the Amended Term Sheet is qualified in its entirety by the terms and conditions of the Amended Term Sheet. The Summary contained in this Motion is intended to be used for information purposes only and shall not in any way affect the meaning or interpretation of the Amended Term Sheet.

[8] As noted, the Amended Term Sheet contemplates that it will be approved by both this Court and the SunCal Court. The Settlement Effective Date is the date that the last of the compromise orders becomes a "Final Order" (as defined in the Amended Term Sheet). Unless there is a stay, the parties intend to close the settlement after the bankruptcy courts have approved the Amended Term Sheet and notwithstanding any appeals filed with respect to such approval orders.

15

this amount: (a) $3.5 million ( "Administrative Funds") will be available for the administrative expenses of the SunCal Debtors' estates and for potential distribution to non-lender general unsecured creditors; and (b) $2.0 million ( "Remaining Development Funds") will be retained to pay the operating expenses of the Properties pursuant to an approved budget. The balance of the Development Account Funds, after the sale of the Properties, will be transferred to the First Lien Lenders. (*See* Ex. 1 at ¶ C.1.) If the Remaining Development Funds are not sufficient, the First Lien Lenders have agreed, subject to certain conditions and limitations, to a further use of their cash collateral to preserve the Properties.

(b) Allocation of the Yucaipa Funds. The funds currently on deposit with the Yucaipa Valley Water District and paid to the SunCal Trustee pursuant to that certain Settlement Agreement and Release Agreement ( "Yucaipa Settlement Agreement") between the SunCal Trustee and Oak Valley Partners, L.P. ( "Yucaipa Funds"), will be split 50/50 between the SunCal Trustee and the First Lien Lenders.[9] As to the SunCal Trustee's 50% portion of the Yucaipa Funds ( "Trustee's YFP"), such funds will be transferred or otherwise retained by the SunCal Trustee free and clear of liens, claims, interests, and encumbrances. The Trustee's YFP will constitute additional Administrative Funds and shall be immediately available for use in the administration of the SunCal Debtors' cases. (*See* Ex. 1 at ¶ C.2.)

**Sale of Properties Under the Plan**    The Properties will be sold pursuant to a plan of reorganization in the SunCal Bankruptcy Cases in accordance with bidding procedures to be developed by the parties in consultation with a broker of their choosing ( "Approved Broker") and approved by the SunCal Court. (*See* Ex. 1 at ¶ E.) The First Lien Lenders will be entitled to credit bid for the Properties. The initial credit bid by the First Lien Lenders will be in the aggregate amount of at least $45 million ( "Aggregate Minimum Credit Bid Amount") and the First Lien Lenders' credit bid will not exceed the maximum credit bid amount established by the parties prior to the Settlement Effective Date ( "Aggregate Maximum Credit Bid Amount"). The Aggregate Maximum Credit Bid Amount and the Aggregate

---

[9]    On August 13, 2010, the SunCal Trustee filed a motion to approve the Yucaipa Settlement Agreement, which will be heard on September 30, 2010. If the Yucaipa Settlement Agreement is approved, the SunCal Trustee expects to receive approximately $434,000, of which 50% will be paid over to LCPI pursuant to the Amended Term Sheet.

16

Minimum Credit Bid Amount will be allocated among the Properties by the parties in consultation with the Approved Broker prior to the Settlement Effective Date. Properties sold to the First Lien Lenders by way of credit bid will be sold subject to any Senior Liens . Properties sold to a third party will be sold free and clear of any liens, claims, encumbrances, or interests (other than certain permitted liens, claims, encumbrances or interests), with all other liens, claims, encumbrances, or interests (including the lien of the First Lien Lenders) to attach to the sale proceeds. (*See* Ex. 1 at ¶¶ E, F.)

**Resolution of Senior Liens**    The SunCal Trustee will reasonably cooperate with the First Lien Lenders in their efforts to determine whether any liens are superior to the liens of the First Lien Lenders against the Properties and to determine the amount of such superior liens. However, the SunCal Trustee will not be obligated to take any action that would cause the SunCal Trustee or the SunCal Debtors' bankruptcy estates to incur material cost or liability. (*See* Ex. 1 at ¶ J.)

**Distributions Pursuant to the Plan**    (a) <u>Distributions of Other Recoveries.</u> The plan will provide that all proceeds recovered from sources other than the sale of the Properties or the Yucaipa Funds (e.g., from litigation against other third parties) ("Other Recoveries"), subject to the payment of administrative and priority unsecured claims, will be split 50/50 between the First Lien Lenders, on the one hand, and the holders of allowed claims against the SunCal Debtors other than the First, Second and Third Lien Lenders (collectively, the "Trade Creditors") (on an administratively consolidated pro rata basis), on the other hand, until the Trade Creditors are paid in full (the "50/50 Distribution Scheme"). If, under the Amended and Restated Intercreditor Agreement among the First, Second and Third Lien Lenders (the "Intercreditor Agreement"), Other Recoveries paid to the Second and Third Lien Lenders must be paid to the First Lien Lenders, then the Other Recoveries will be split 50/50 between the First Lien Lenders and the Trade Creditors. If, on the other hand, the Intercreditor Agreement does not require that the Second and Third Lien Lenders pay Other Recoveries to the First Lien Lenders, then the allowed unsecured claims of the First Lien Lenders, and, to the extent necessary, the allowed unsecured claims of LCPI, as a Second Lien Lender and as a Third Lien Lender, will be assigned to the SunCal Debtors' bankruptcy estates on behalf of the Trade Creditors to provide the Trade Creditors with the equivalent of what they would have received under the 50/50 Distribution Scheme. (*See* Ex. 1 at ¶ Q.)

17

    (b) <u>SunCal Trustee's Participation in Recovery.</u> The SunCal Trustee will be entitled to recover the lesser of (i) the amount necessary to pay the allowed claims of the Trade Creditors, and (ii) 3.5% of the Proceeds (defined below) from the sale of the Properties to a third party through the plan or, if the First Lien Lenders acquire the Properties through the plan by way of a credit bid, then from the Proceeds from the subsequent disposition of the Properties by the First Lien Lenders (the "<u>Trustee's Participation</u>").  "<u>Proceeds</u>" means all cash or other proceeds from the disposition of each Property, less (i) customary and reasonable costs and expenses of sale, and (ii) the cash or other property used to satisfy any Senior Liens not otherwise satisfied under the plan or under the First Lien Lenders' title insurance policy.  The SunCal Trustee will be entitled to the Trustee's Participation only upon actual receipt of Proceeds by the First Lien Lenders.  (*See* Ex. 1 at ¶ R.)

|  |  |
|---|---|
| **Trustee Loss Collateral** | On the Settlement Effective Date, LCPI on behalf of the First Lien Lenders will deliver to the SunCal Trustee cash or irrevocable letters of credit acceptable to the SunCal Trustee in the aggregate amount of $500,000 (the "<u>Trustee Loss Collateral</u>").  The Trustee Loss Collateral will be used to cover proven losses that occur during the period from the Settlement Effective Date to the date of transfer of title to the Properties (the "<u>Trustee Maintenance Period</u>") based on claims of simple negligence or strict liability in connection with the ownership, operation, maintenance and management of the Properties, to the extent such losses are not covered by insurance and subject to a formula set forth in section G of the Amended Term Sheet.  Upon a termination event or the effective date of the plan, the SunCal Trustee will deliver any remaining Trustee Loss Collateral to LCPI. (*See* Ex. 1 at ¶ G.) |
| **Releases** | As of the Settlement Effective Date, (a) the SunCal Debtors' estates through the SunCal Trustee will be deemed to have released the First Lien Lenders and LCPI (in its individual capacity and in its capacity as administrative agent for the First Lien Lenders), and, except with respect to those entities specifically carved-out below, their respective affiliated parties, officers, directors, employees, agents and attorneys, and (b) LCPI (in its individual capacity as a First Lien Lender and in its capacity as administrative agent for the First Lien Lenders but not in any other capacity) and the First Lien Lenders will be deemed to have released the SunCal Debtors' estates and the SunCal Trustee and the SunCal Trustee's agents and attorneys, in each case for and |

18

from all claims (as defined in Section 101(5) of the Bankruptcy
Code and including any claims that could be brought by or against
the SunCal Trustee pursuant to the Bankruptcy Code) other than
the rights and benefits granted and preserved under the Amended
Term Sheet including without limitation the allowed claims set
forth in the Amended Term Sheet and the rights to receive
distributions based on those allowed claims. Notwithstanding the
foregoing and for the avoidance of doubt, the releases to be given
by the SunCal Trustee will not include claims and causes of action
against any third parties other than the First Lien Lenders and
LCPI and their respective affiliated parties, officers, directors,
employees, agents and attorneys acting in their capacities as
lenders, agents, loan administrators or advisors thereto, and such
releases specifically do *not* include a release of LBREP Lakeside,
SCC Inc., SCC LLC, or SCC Ranch or any claims related to the
acts of the owners of any of the SunCal Debtors including any
transfers of funds to any of the owners by any of the SunCal
Debtors. If the Settlement Effective Date does not occur for any
reason, the foregoing releases will be of no force or effect.

**Termination Event**      If a final order confirming the plan is not in effect by February 28,
2011 (or such later date as may be agreed upon by LCPI, the
SunCal Trustee, and the SunCal Committee), then: (a) the First
Lien Lenders will be granted relief from the automatic stay to
immediately foreclose on the Properties, and the SunCal Trustee
(and any party claiming by or through any of the SunCal Debtors)
shall be prohibited from interfering with such foreclosure; (b) the
SunCal Trustee will retain the Administrative Funds and the
Trustee's YFP free from the secured claims of the Lien Lenders;
(c) the First Lien Lenders will retain the balance of the
Development Account Funds and its share of the Yucaipa Funds;
and (d) the SunCal Trustee will immediately pay over to the First
Lien Lenders the unused portion of the Remaining Development
Funds, and the Trustee Loss Collateral free of all claims and
interests. (*See* Ex. 1 at ¶ T.)

## The Settlement Meets the Legal Standard
## Established Under Bankruptcy Rule 9019 and Is in the Best Interests of LCPI's Estates

33.      The proposed settlement is in the best interests of LCPI's estates and

should be approved under Bankruptcy Rule 9019, which provides, in part, that "[o]n motion by

the [debtor-in-possession] and after notice and a hearing, the court may approve a compromise or

19

settlement." FED. R. BANKR. P. 9019(a). This rule empowers bankruptcy courts to approve

settlements "if they are in the best interests of the estate." Vaughn v. Drexel Burnham Lambert

Group, Inc. (In re Drexel Burnham Lambert Group, Inc.) 134 B.R. 499, 505 (Bankr. S.D.N.Y.

1991); see also Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v.

Anderson, 390 U.S. 414, 424 (1968); Fisher v. Pereira (In re 47-49 Charles St., Inc.), 209 B.R.

618, 620 (S.D.N.Y. 1997); In re Ionosphere Clubs, Inc., 156 B.R. 414, 426 (S.D.N.Y. 1993),

aff'd, 17 F.3d 600 (2d Cir. 1994). A decision to accept or reject a compromise or settlement is

within the sound discretion of the Court. Drexel Burnham Lambert Group, 134 B.R. at 505; see

also 9 Collier on Bankruptcy ¶ 9019.02 (15th ed. rev. 2001). The settlement need not result in

the best possible outcome for the debtor, but must not "fall beneath the lowest point in the range

of reasonableness." Drexel Burnham Lambert Group, 134 B.R. at 505. See also Cosoff v.

Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983); In re Spielfogel, 211 B.R.

133, 144 (Bankr. E.D.N.Y. 1997). Indeed, courts have long considered compromises to be "a

normal part of the process of reorganization." TMT Trailer Ferry, 390 U.S. at 424 (quoting Case

v. Los Angeles Lumber Prods. Co., 308 U.S. 106, 130 (1939).

      34.     The decision to approve a particular compromise lies within the sound

discretion of the bankruptcy court. Nellis v. Shugrue, 165 B.R. 115, 123 (S.D.N.Y. 1994).

Additionally, a court may exercise its discretion "in light of the general public policy favoring

settlements." In re Hibbard Brown & Co., Inc., 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998).

However, the analysis must focus on the question of whether a particular compromise is "fair

and equitable, and in the best interest of the estate." In re Best Products, 165 B.R. 35, 50 (Bankr.

S.D.N.Y. 1994) (internal citations omitted).

NYC_IMANAGE-1195023.3

35.     While a court must "evaluate ... all ... factors relevant to a fair and full assessment of the wisdom of the proposed compromise," Anderson, 390 U.S. at 424-25, a court need not conduct a "mini-trial" of the merits of the claims being settled, W.T. Grant Co., 699 F.2d at 608, or conduct a full independent investigation.  Drexel Burnham Lambert Group, 134 B.R. at 496. "[T]he bankruptcy judge does not have to decide the numerous questions of law and fact.... The court need only canvass the settlement to determine whether it is within the accepted range of reasonableness." Nellis, 165 B.R. at 123 (internal citations omitted).

36.     The court may give weight to the "informed judgments of the ... debtor-in-possession and their counsel that a compromise is fair and equitable, and consider the competency and experience of counsel who support the compromise." Drexel Burnham Lambert Group, 134 B.R. at 505 (internal citations omitted); see also In re Purofied Down Prods. Corp., 150 B.R. 519, 522 (S.D.N.Y. 1993); accord In re Ashford Hotels Ltd., 226 B.R. 797, 802 (Bankr. S.D.N.Y. 1998) ("Significantly, that test does not contemplate that I substitute my judgment for the Trustee's, but only that I test his choice for reasonableness.... If the Trustee chooses one of two reasonable choices, I must approve that choice, even if, all things being equal, I would have selected the other.") (internal citations omitted).

37.     LCPI, in its business judgment, has determined that the Amended Term Sheet (and the settlement embodied therein) provides the best framework for globally resolving the numerous disputes by and among LCPI, the SunCal Trustee and the SunCal Committee, including, without limitation, disputes and claims arising from or relating to the LCPI Stay Relief Motions, the SunCal Stay Relief Motion, the Appeal and related cash collateral disputes, and the SunCal Estate Claims.

21

38.     As discussed above, the SunCal Trustee has alleged that the SunCal

Debtors' estates have claims to equitably subordinate LCPI's secured claims, avoid LCPI's liens,

and to recover damages against LCPI for lender liability (i.e., the SunCal Estate Claims).  The

SunCal Estate Claims are resolved by the Amended Term Sheet by and through the release of

such claims by the SunCal Debtors' estates, as well as the grant of an allowed secured claim to

LCPI, as agent for the First Lien Lenders, in an amount equal to the successful bid for the

Properties, plus any cash collateral received by the First Lien Lenders on the Settlement

Effective Date, plus the amount of the Yucaipa Funds received by the First Lien Lenders.

39.     In exchange for the release of the SunCal Estate Claims, the grant of the

allowed secured claim (including the right to credit bid such claim), and the other benefits

received by LCPI and the First Lien Lenders under the Amended Term Sheet, LCPI, as agent for

the First Lien Lenders, has agreed to "carve out" certain amounts of its collateral and transfer

that collateral to the SunCal Trustee for the benefit of the SunCal Debtors' estates (i.e., the

Administrative Funds, the Trustee's YFP, amounts payable under the 50/50 Distribution Scheme

and the Trustee's Participation).  Additionally, LCPI, as agent for the First Lien Lenders, has

agreed to allow the SunCal Trustee to use certain additional cash collateral to maintain the

Properties prior to their disposition (i.e., the Remaining Development Funds) and has agreed to

post the Trustee's Loss Collateral.

40.     While LCPI believes that it has valid defenses to each of the SunCal

Estate Claims, in order to successfully defend the SunCal Estate Claims, LCPI would be required

to engage in expensive and protracted litigation with the SunCal Trustee and the SunCal

Committee.  Additionally, absent the settlement set forth in the Amended Term Sheet, LCPI and

the other First Lien Lenders would not be able to recover their collateral (i.e., the Properties and

cash) or the proceeds of their collateral in the foreseeable future (if at all). Absent the settlement, if LCPI wishes to obtain the Properties, LCPI will be required to pursue the LCPI Stay Relief Motions in the SunCal Bankruptcy Cases and convince the SunCal Court that lifting the automatic stay is appropriate. Again, this litigation would likely be expensive and protracted, and would come with many of the same aforementioned uncertainties. By contrast, the Amended Term Sheet not only provides a framework for LCPI and the other First Lien Lenders to obtain the benefit of their collateral through an imminent plan sale of the Properties, it also preserves LCPI's credit bidding rights and gives LCPI significant input with respect to the conduct of the sale of the Properties. In short, the Amended Term Sheet provides a framework that will facilitate the sale of the Properties in the near future (with a substantial portion of the sale proceeds to be paid to LCPI ) in a manner that has a material, direct and tangible benefit to LCPI's estate.

41.    Based on the foregoing, the Amended Term Sheet is reasonable and in the best interests of LCPI and its estate and creditors, and, as a result, the Court should authorize and approve LCPI's entry into the Amended Term Sheet and its performance of its obligations thereunder.

## Notice

42.    No trustee has been appointed in these chapter 11 cases. LCPI has served notice of this Motion in accordance with the procedures set forth in the amended order entered on June 17, 2010 governing case management and administrative procedures [Docket No. 9635] on (i) the U.S. Trustee; (ii) the attorneys for the Creditors' Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; (vi) counsel to the SunCal Trustee; (vii) counsel to the SunCal

NYC_IMANAGE-1195023.3

Committee; and (viii) all parties who have requested notice in these chapter 11 cases.  LCPI

submits that no other or further notice need be provided.

43.     No previous request for the relief sought herein has been made by LCPI to

this Court.

WHEREFORE LCPI respectfully request that the Court grant the relief requested

herein and such other and further relief as it deems just and proper.

Dated:  September 2, 2010
        New York, New York

/s/ Alfredo R. Pérez
WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, Texas 77027
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Alfredo R. Pérez

KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2100
Facsimile: (212) 556-2222
Arthur Steinberg

*Counsel for the Debtors and Debtors-in-Possession*