WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY  10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Robert Lemons
John B. Strasburger (*pro hac vice* pending)

*Attorneys for Plaintiff*
*Lehman Brothers Holdings Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br><br>Debtors. | Chapter 11 Case No.<br><br>08-13555 (JMP)<br><br>(Jointly Administered) |
| LEHMAN BROTHERS HOLDINGS INC.<br><br>Plaintiff,<br><br>v.<br><br>CRÉDIT AGRICOLE CORPORATE AND INVESTMENT BANK (F/K/A CALYON),<br><br>Defendant. | Adv. Proc. No. 13-_____<br><br>**ADVERSARY COMPLAINT** |

Plaintiff Lehman Brothers Holdings Inc. ("LBHI" or "Plaintiff") as Plan Administrator under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors (the "Plan") on behalf Lehman Brothers Commercial Corporation ("LBCC" and, together with LBHI and its affiliated debtors, the "Debtors") by its undersigned attorneys, alleges the following against defendant, Crédit Agricole Corporate and Investment Bank (f/k/a Calyon) ("CACIB" or "Defendant"):

## I.    NATURE OF ACTION

1.     This action arises from CACIB's refusal to pay LBCC the principal amount of $33,982,184 (the "LBCC Receivable") that CACIB admits it owes to LBCC as a termination payment for certain swap transactions it entered into with LBCC prior to the commencement of LBCC's and LBHI's cases under title 11 of the United States Code (the "Bankruptcy Code"). CACIB terminated the swap transactions on September 16, 2008, the day following LBHI's chapter 11 filing on September 15, 2008 (the "Petition Date"). CACIB then notified LBCC that LBCC was in-the-money under the terms of the parties' agreement in the amount of $33,982,184 as a consequence of the early termination. CACIB, however, refused to pay to LBCC the concededly due and owing LBCC Receivable. As more fully alleged below, CACIB improperly excuses such non-payment on the grounds that a provision in the parties' governing agreement permits withholding payment from LBCC unless and until CACIB receives payment *in full* from LBCC's affiliates, including LBHI, of approximately $250 million allegedly owed by them to CACIB under unrelated agreements.

2.     CACIB's refusal to pay on such grounds is a direct violation of the Bankruptcy Code and impermissible for two alternative reasons, each of which is sufficient to invalidate the contractual provision upon which CACIB relies. First, CACIB's refusal to pay LBCC because of debts allegedly owed by LBCC's affiliates to CACIB effects an unlawful nonmutual setoff in violation of section 553 of the Bankruptcy Code. CACIB owes the LBCC Receivable to LBCC for the benefit of its general creditors, not to LBCC's affiliates for the benefit of their different general creditors. LBCC's affiliates—not LBCC—allegedly owe approximately $250 million to CACIB. Section 553 of Bankruptcy Code permits the exercise of *only* mutual setoffs, meaning the offset of debts owed *to and from the same parties in the same capacity*. As a matter of well-settled law, LBCC and its affiliates are not the same party for

US_ACTIVE:\44186886\58399.0011

purposes of mutuality under section 553.  Thus, the obligations owed to and from CACIB are not mutual and may not be set off.

3.      Second, and in the alternative, conditioning LBCC's right to receive payment upon CACIB's receipt of payment from LBCC's affiliates is the attempted enforcement of an *ipso facto* clause in violation of sections 365(e)(1)(A) and 541(c)(1)(B) of the Bankruptcy Code.  Those statutes prohibit modification of a debtor's rights and deprivation of a debtor's property solely on the grounds of its insolvency or financial condition.  Because LBCC and its affiliates were part of an integrated enterprise prior to the commencement of their insolvency proceedings, the financial condition of LBCC's affiliates necessarily affects the financial condition of LBCC.  Thus, CACIB's withholding of payment admittedly owed to LBCC—in reliance upon the nonpayment of obligations allegedly owed to CACIB by LBCC's debtor affiliates—is an impermissible modification and deprivation of LBCC's right to payment based on its financial condition in violation of sections 365(e)(1)(A) and 541(c)(1)(B) of the Bankruptcy Code.

4.      Plaintiff brings this action to recover the LBCC Receivable for the benefit of the LBCC estate and to obtain: (i) a declaration that CACIB may not effectuate a nonmutual setoff in violation of section 553(a) of the Bankruptcy Code; (ii) in the alternative, a declaration that conditioning LBCC's right to receive the LBCC Receivable on CACIB's receipt of payment from LBCC's affiliates is an attempted enforcement of an *ipso facto* clause in violation of sections 365(e)(1)(A) and 541(c)(1)(B) of the Bankruptcy Code; (iii) an order under section 542 of the Bankruptcy Code requiring CACIB to turn over immediately the full principal amount of the LBCC Receivable that CACIB admits it owes to and, is therefore property of, the LBCC estate under section 541(a)(1) of the Bankruptcy Code; (iv) a declaration that CACIB has

3

violated the automatic stay contained in section 362 of the Bankruptcy Code by having exercised self-help in withholding the property of the LBCC estate and, therefore, must turn over the LBCC Receivable plus all accrued interest thereon; and (v) an order under section 542 of the Bankruptcy Code requiring CACIB to turn over all accrued interest on the LBCC Receivable, as calculated under the Master Agreement.

## II.    PARTIES

5.    LBHI is a corporation organized and incorporated under the laws of Delaware, with its principal business address at 1271 Avenue of the Americas, New York, New York 10020.  On September 15, 2008, LBHI filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

6.    LBCC is a corporation organized and incorporated under the laws of Delaware, with its principal business address at 1271 Avenue of the Americas, New York, New York 10020.  On October 5, 2008, LBCC filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

7.    On December 6, 2011, the Court approved and entered an order confirming the Plan [ECF No. 23023].  The Plan became effective on March 6, 2012.  Pursuant to the Plan, LBHI, as Plan Administrator, is authorized to prosecute all causes of action held by the Debtors on behalf of their estates.

8.    CACIB is a corporation organized and incorporated under the laws of France and transacts business and maintains an office in the United States at the address of 1301 Avenue of the Americas, New York, New York 10019.

US_ACTIVE:\44186886\58399.0011

## III.    JURISDICTION AND VENUE

9.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and section 14.1 of the Plan.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b).

10.    Venue is proper in accordance with 28 U.S.C. § 1409.

11.    The statutory prerequisites for the relief requested herein are sections 105(a), 362, 365, 541, 542 and 553 of the Bankruptcy Code.  Plaintiff brings this adversary proceeding pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules").

12.    Personal jurisdiction is proper over Defendant pursuant to Bankruptcy Rule 7004(f).

## IV.    FACTUAL ALLEGATIONS

### A.    The Prepetition Transactions and Defendant's Delivery of the Calculation Statements

13.    Prior to the Petition Date, LBCC, LBHI, and other affiliated Lehman Brothers entities ("Lehman") operated together as an integrated enterprise as the fourth largest investment bank in the United States.  For more than 150 years, Lehman was a leader in the global financial markets, serving the needs of corporations, governmental units, institutional clients, and individuals worldwide.  The enterprise was integrated such that the financial condition of one affiliate affected the financial condition of the others.  Each affiliated Lehman entity functioned individually, however, serving its own clients and creditors and maintaining its own corporate form.  Following the Petition Date, the chapter 11 cases of each of the Debtors were consolidated for procedural purposes only; their estates were not substantively consolidated.

US_ACTIVE:\44186886\58399.0011

14.     Prior to the Petition Date, LBCC transacted with CACIB under the terms of a standard form 1992 Multicurrency-Cross Border ISDA Master Agreement, dated September 30, 1997 (the "ISDA Master Agreement").  The parties modified the terms of the ISDA Master Agreement by means of an attached Schedule dated the same date (the "Schedule" and, together with the ISDA Master Agreement, the "Master Agreement").  Ex. A (Master Agreement).

15.     Pursuant to the terms of the Master Agreement, LBHI was the credit support provider for LBCC.  The bankruptcy filing of LBHI constituted an event of default under the Master Agreement permitting CACIB to terminate the transactions governed by the Master Agreement; CACIB did so on September 16, 2008 (the "Early Termination Date").  Ex. A §6(a) (Master Agreement); Ex. B (Early Termination Notice).

16.     Under the terms of the Master Agreement, CACIB was required to calculate a single sum owed from or to LBCC, depending upon which party was in-the-money. Ex. A §6(e) (Master Agreement).  The parties chose the Market Quotation measure, which required CACIB to solicit replacement quotes from specified entities to calculate the amount owed, and Second Method for payment, which required payment to be made to the in-the-money party regardless of whether it was the defaulting party under the terms of the Master Agreement. Ex. A §6(e) & Schedule Part 1(f) (Master Agreement).

17.     CACIB was then required to deliver "as soon as reasonably practicable" to LBCC a calculation statement showing the amount due, as calculated by it, as a consequence of the early termination.  Ex. A §6(d)(i) (Master Agreement).  Payment was due on the day that the notice of the amount payable became effective, which was upon delivery of the calculation statement.  Ex. A §§ 6(d)(ii), 12(a) (Master Agreement).

US_ACTIVE:\44186886\58399.0011

18.    CACIB sent LBCC a Statement of Payment on Early Termination of Master Agreement dated March 2, 2009, and received on March 3, 2009 (the "Calculation Statement"), followed by a revised Statement of Payment on Early Termination of Master Agreement dated September 8, 2009 (the "Revised Calculation Statement"). Ex. C (Calculation Statement); Ex. D (Revised Calculation Statement). In its initial Calculation Statement, CACIB notified LBCC that it was due a termination payment from CACIB under the terms of the Master Agreement in the amount of $34,582,751 inclusive of costs associated with rehedging, posted collateral, and unpaid amounts owed by either party. Ex. C at 2 (Calculation Statement). CACIB later reduced the amount of the termination payment owing to LBCC to $33,982,184, the amount reflected in the Revised Calculation Statement. Ex. D at 2 (Revised Calculation Statement). CACIB explained that it calculated the termination payment in accordance with the "Loss" measure (instead of Market Quotation) "(i) in the case of FX Transactions and Currency Option Transactions and (ii) in respect of all other Transactions, due to the fact that the 'Market Quotation' payment measure could not be determined or would not have produced a commercially reasonable result."[1] Ex. D at 2 (Revised Calculation Statement).

B.    **CACIB's Refusal to Pay the LBCC Receivable**

19.    Despite having acknowledged as early as March 2009 that it owed approximately $34 million to LBCC, to date (over four years later), CACIB has made *no* payment to LBCC. Instead, CACIB insists that it has the right pursuant to the "*Set-off*" section in Part 5(a) of the Schedule, which created a new section 6(f) in the Master Agreement, to defer the payment of *any* obligation to LBCC, "until *all* indebtedness and obligations, whether

---

[1] LBHI, on behalf of LBCC, reserves the right to challenge CACIB's calculation of the LBCC Receivable.

7

matured or unmatured, of LBCC and its Affiliates[2] have been paid to [CACIB] *in full*." Ex. D at 2 (Revised Calculation Statement) (quoting Ex. A, Part 5(a) of the Schedule (Master Agreement) (emphasis added)). Specifically, CACIB "intend[s] to defer any such payment" to LBCC until CACIB has received "irrevocable payment *in full* of all amounts owed to [CACIB] by LBCC and its Affiliates." Ex. D at 2 (emphasis added). Thus, instead of making the payment of approximately $34 million to LBCC, as is required by the Master Agreement, CACIB "reiterate[d]," in its Revised Calculation Statement, its "demands for payment [in full] from all Affiliates of LBCC." Ex. D at 2 (Revised Calculation Statement).[3]

20.     CACIB again demanded payment *in full* under section 6(f) of the Master Agreement, as a condition of making any payment to LBCC, in its proofs of claim filed in the chapter 11 cases of LBHI, Lehman Brothers Special Financing Inc. ("<u>LBSF</u>"), LBCC, and Lehman Brothers Commodity Services Inc. ("<u>LBCS</u>"). Ex. E (Proof of Claim No. 27241 (LBHI)); Ex. F (Proof of Claim No. 67848 (Amended Proof of Claim against LBHI)); Ex. G (Proof of Claim No. 27243 (LBSF)); Ex. H (Proof of Claim No. 27244 (LBCC)); Ex. I (Proof of Claim No. 27242 (LBCS)). By its proofs of claim, CACIB alleges that LBSF owes it $191,799,211 for amounts due under a 1992 Multicurrency-Cross Border ISDA Master Agreement between LBSF and CACIB dated December 21, 2006. Ex. G at 12 (Proof of Claim No. 27243). Additionally, CACIB alleges that LBHI owes CACIB $268,635,243 (subsequently

---

[2] "Affiliate" is defined in the Master Agreement as "any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person." Ex. A §14 (definition of Affiliate) (Master Agreement).

[3] Furthermore, CACIB reserved its right to claim legal fees and expenses from LBCC by reason of its enforcement of its rights under the Master Agreement. Ex. D at 3. The Debtors object to any claim for legal fees and expenses on the grounds that such fees and expenses would have been incurred post-petition and are unrecoverable because they were not incurred in connection with the enforcement of valid rights under the Master Agreement.

US_ACTIVE:\44186886\58399.0011

modified to $247,578,723) as guarantor of the $191,799,211 allegedly due from LBSF and of amounts allegedly due from other Lehman entities that are also in insolvency proceedings, including Lehman Brothers International (Europe) ("LBIE") and Lehman Brothers Finance SA ("LBF").   Ex. F (Proof of Claim No. 67848) (modifying original claim against LBHI); Ex. G (Proof of Claim No. 27243).   Specifically, CACIB alleges that (i) LBIE, which is in administration in the United Kingdom, owes CACIB approximately $45 million under various agreements, and (ii) LBF, which is in an insolvency proceeding under the supervision of the Swiss Federal Banking Commission, owes CACIB approximately $8.9 million, and that both LBIE's and LBF's obligations are guaranteed by LBHI.[4]   Ex. E at 4-10 (Proof of Claim No. 27241); Ex. F at 2-3 (Proof of Claim No. 67848).

          21.      In each of its proofs of claim, CACIB demanded "irrevocable payment in full" of the amounts allegedly owed to it by Lehman entities, prior to paying LBCC the almost $34 million that CACIB owes to LBCC alone.  Ex. E at 12 (Proof of Claim No. 27241); Ex. G at 12 (Proof of Claim No. 27243); Ex. H at 12 (Proof of Claim No. 27244); Ex. I at 12 (Proof of Claim No. 27242).  Specifically, CACIB contended that *only* "in the event that the conditions precedent to payment under the LBCC Section 6(f) are satisfied as set forth in the Revised LBCC Calculation Statement," would it obligated to pay the LBCC Receivable under the Master Agreement.  Ex. E at 17 (Proof of Claim No. 27241); Ex. G at 17 (Proof of Claim No. 27243); Ex. H at 17 (Proof of Claim No. 27244).  CACIB's position, simply stated, is that until the

---

[4] CACIB also conceded that it owes $77,945,644 to LBI, which is subject to proceedings under the provisions of the Securities Investor Protection Act of 1970 ("SIPA").   CACIB is withholding payment to LBI based on a clause in its agreement with LBI that is virtually identical to the clause in section 6(f) of the Master Agreement with LBCC.  Ex. E at 2-4 (Proof of Claim No. 27241).   Additionally, CACIB had asserted an approximately $15 million claim against LBCS and a guarantee claim against LBHI for that liability.  Ex. E at 15-16 (Proof of Claim No. 27241); Ex. I (Proof of Claim No. 27242).  CACIB later withdrew the LBCS claim and the corresponding guarantee claim against LBHI.  Ex. F at 4 (Proof of Claim No. 67848).

US_ACTIVE:\44186886\58399.0011

conditions in section 6(f) are met, CACIB has no obligation to pay LBCC anything.  Because

each of LBCC's affiliates is a debtor in the United States or in insolvency proceedings

elsewhere, it is unlikely that CACIB *will ever be paid in full* by any of those entities.  As a

consequence, CACIB's refusal amounts to a complete denial of LBCC's right to receipt and

possession of the LBCC Receivable, solely and impermissibly because of the debts allegedly

owed by LBCC's affiliates.

## V.    PLAINTIFF'S CLAIMS ENTITLING IT TO RELIEF

### COUNT I

*Declaratory Judgment That CACIB's Reliance upon Section 6(f) of the Master Agreement is an Unenforceable Attempt to Effectuate a Nonmutual Setoff in Violation of Section 553(a) of the Bankruptcy Code*

22.    Plaintiff repeats and realleges each and every allegation set forth in the

preceding paragraphs 1-21 with the same force and effect as if hereinafter fully set forth at

length.

23.    Despite the fact that the LBCC Receivable has been due and payable from

and after delivery of the Calculation Statement on March 3, 2009, and despite the fact that

CACIB has admitted that it owes LBCC the full amount of the LBCC Receivable in principal,

CACIB is improperly withholding payment from LBCC.

24.    CACIB denies its obligation to LBCC altogether by contending that it is

under no requirement to pay the LBCC Receivable unless and until it has received "irrevocable

payment in full" of debts allegedly owed to it by LBSF, LBHI (as guarantor), and other LBCC

affiliates.  Ex. D at 2 (Revised Calculation Statement); Ex. E at 12 (Proof of Claim No. 27241);

Ex. G at 12 (Proof of Claim No. 27243); Ex. H at 12 (Proof of Claim No. 27244); Ex. I at 12

(Proof of Claim No. 27242).  CACIB relies upon the "*Set-off*" section of the Master Agreement

which provides in relevant part:

US_ACTIVE:\44186886\58399.0011

> Notwithstanding anything to the contrary, any obligation of
> [CACIB] to pay the Early Termination Amount to [LBCC] . . .
> shall be deferred until and payable only upon all indebtedness and
> obligations, whether matured or unmatured, of the Defaulting Party
> or the Affected Party, as the case may be, and its Affiliates to X
> shall have been paid in full.

Ex. A (Part 5(a) Schedule) (creating new section 6(f) of the Master Agreement).

25.    Enforcement of alleged rights of setoff against a debtor are governed by section 553 of the Bankruptcy Code, which permits a creditor "to offset a *mutual* debt owing by such creditor to the debtor that arose before the commencement of the case . . . against a claim of such creditor against the debtor." 11 U.S.C. § 553(a) (emphasis added). "Mutual" debts are defined as debts between the same parties in the same capacity. The requirement that all setoffs be restricted to mutual debts is a fundamental tenet of bankruptcy law, codified in section 553 of the Bankruptcy Code.

26.    CACIB's refusal to pay the LBCC Receivable, a debt owed to LBCC, unless and until entities *other than LBCC*—LBCC's affiliates—make payment *in full* to CACIB, flies in the face of section 553. It represents a self-help attempt to impermissibly effectuate a nonmutual setoff. To permit CACIB to withhold payment of the LBCC Receivable would impermissibly, and in violation of section 506 of the Bankruptcy Code, elevate, on a dollar-for-dollar basis, CACIB's unsecured claim against LBCC's affiliates to secured status. LBCC and its affiliates are not considered the same party for purposes of section 553 of the Bankruptcy Code. Such a setoff of nonmutual obligations is strictly prohibited by section 553(a) of the Bankruptcy Code. Furthermore, allowing CACIB to effectuate the nonmutual setoff at issue, in reliance upon a contractual provision, would be tantamount to permitting CACIB to contract around section 553 or manufacture mutuality through contract, both of which are impermissible as a matter of law.

27.     There now exists an actual controversy between Plaintiff and Defendant relating to their respective legal rights, duties, and obligations under the Bankruptcy Code, which controversy is ripe for adjudication pursuant to section 28 U.S.C. § 2201.  Accordingly, pursuant to 28 U.S.C. § 2201 and Bankruptcy Rule 7001, Plaintiff requests that the Court enter a declaratory judgment that (i) CACIB's refusal to pay the LBCC Receivable in reliance upon section 6(f) in the Master Agreement effects a nonmutual setoff in violation of 11 U.S.C. § 553(a); (ii) section 6(f) is, therefore, unenforceable; and (iii) LBCC is entitled to full payment of the LBCC Receivable plus interest accrued thereon under the Master Agreement.

## COUNT II

### In the Alternative, Declaratory Judgment That Conditioning LBCC's Right to Payment upon CACIB's Receipt of Payment from LBCC's Affiliates is the Attempted Enforcement of an Ipso Facto Clause in Violation of Sections 365(e)(1)(A) and 541(c)(1)(B) of the Bankruptcy Code

28.     Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs 1-27 with the same force and effect as if hereinafter fully set forth at length.

29.     Part 5(a) of the Schedule, which created a new section 6(f) of the Master Agreement, purports to modify LBCC's right to receive a termination payment in the event that any of LBCC's affiliates owe a debt or obligation, matured or unmatured, to CACIB.

30.     The Master Agreement is an executory contract because obligations remain to be performed by both parties.

31.     The Bankruptcy Code protects debtors, who are parties to an executory contract, from being penalized for their insolvency or financial condition, notwithstanding any contractual provisions or applicable law that would have that effect.  Specifically, Bankruptcy Code section 365(e)(1) prohibits termination or modification of a contract "solely because of a provision in such contract . . . that is conditioned on [*inter alia*] (A) the insolvency or financial

US_ACTIVE:\44186886\58399.0011

condition of the debtor."  11 U.S.C. § 365(e)(1)(A).  Similarly, section 541(c)(1)(B) provides

that "an interest of the debtor in property becomes property of the estate . . . notwithstanding any

provision in the agreement . . . that is conditioned on the insolvency or financial condition of the

debtor."  11 U.S.C. § 541(c)(1)(B).

32.     Because Lehman was an integrated enterprise, the financial condition of

LBCC's affiliates affected the financial condition of LBCC.  CACIB's reliance upon section 6(f)

of the Master Agreement, and the alleged outstanding debts and obligations, matured or

unmatured, owed by LBCC's affiliates, as justification for not paying the LBCC Receivable to

LBCC, is a modification of LBCC's right to payment "conditioned on . . . the financial

condition" of LBCC as one affiliate in the larger integrated enterprise.   11 U.S.C.

§§ 365(e)(1)(A), 541(c)(1)(B).  Accordingly, CACIB's conditioning of LBCC's right to payment

based on the newly-created section 6(f) of the Master Agreement constitutes the exercise an

unenforceable *ipso facto* clause in violation of the Bankruptcy Code.   *See* 11 U.S.C.

§§ 365(e)(1)(A), 541(c)(1)(B).

33.     The modification of LBCC's right to payment in section 6(f) of the Master

Agreement does not fall within the limited "safe-harbor" for *ipso facto* clauses contained in

section 560 of the Bankruptcy Code for certain parties to swap agreements, because section 560

permits only "[t]he exercise of any contractual right of any swap participant or financial

participant to cause the liquidation, termination, or acceleration of one or more swap agreements

because of [the filing of a bankruptcy case]" or the "offset or net out [of] any termination values

or payment amounts."  11 U.S.C. § 560.  Conditioning or modifying LBCC's right to payment

solely as a result of its financial condition does not constitute a "liquidation, termination, or

acceleration" of the agreement, nor is it an "offset or net out" of the parties' positions under

those agreements.   Rather, by eradicating LBCC's right to payment, section 6(f) improperly

modifies LBCC's property interest solely as a result of its financial condition, which is not

within the safe harbor of section 560 and is clearly impermissible under sections 365(e)(1)(A)

and 541(c)(1)(B).

34.    There now exists an actual controversy between the parties on this issue

relating to their respective legal rights, duties, and obligations under the Bankruptcy Code, which

controversy is ripe for adjudication pursuant to section 28 U.S.C. § 2201.   Accordingly, pursuant

to 28 U.S.C. § 2201 and Bankruptcy Rule 7001, Plaintiff requests that the Court enter a

declaratory judgment that (i) section 6(f) in the Master Agreement constitutes an unenforceable

*ipso facto* clause that violates 11 U.S.C. §§ 365(e)(1) and 541(c)(1)(B) of the Bankruptcy Code,

and (ii) LBCC is entitled to payment of the LBCC Receivable plus accrued interest thereon

under other provisions of the Master Agreement.

## COUNT III

### *Turnover of the LBCC Receivable Pursuant to Section 542(b) of the Bankruptcy Code*

35.    Plaintiff repeats and realleges each and every allegation set forth in the

preceding paragraphs 1-34 with the same force and effect as if hereinafter fully set forth at

length.

36.    On September 15, 2008 and October 5, 2008, LBHI and LBCC,

respectively, filed petitions for relief under chapter 11 of the Bankruptcy Code.   As alleged

above, as a consequence of LBHI's filing, CACIB terminated the swap transactions under the

Master Agreements, effective as of the Early Termination Date (September 16, 2008).   Ex. B

(Early Termination Notice).   Thereafter, on March 3, 2009, Defendant delivered to LBCC the

first calculation statement disclosing that CACIB owed LBCC approximately $34 million,

14

excluding interest, as a result of the early termination of the transactions.  Ex. C (Calculation Statement).

37.    The LBCC Receivable is property of the LBCC estate under section 541(a) of the Bankruptcy Code.  As alleged above, CACIB's reliance upon section 6(f) of the Master Agreement to deprive LBCC of the LBCC Receivable solely because of its financial condition is in violation of sections 365(e)(1)(A) and 541(c)(1)(B) of the Bankruptcy Code.

38.    The parties agreed that pursuant to the Master Agreement, CACIB was required to pay the LBCC Receivable no later than March 3, 2009, the date on which the first Calculation Statement was delivered.  Ex. A §§ 6(d)(ii), 12 (Master Agreement).

39.    Section 542(b) of the Bankruptcy Code expressly provides that "an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor."  11 U.S.C. § 542(b) (emphasis added).  Because CACIB does not have a valid right of setoff under section 553, or any other valid defense to payment, CACIB was required to pay the LBCC Receivable to LBCC under section 542(b) of the Bankruptcy Code, and its failure to do so was in express violation of the Bankruptcy Code.

40.    Accordingly, pursuant to section 542(b) of the Bankruptcy Code, Plaintiff requests an order compelling and directing CACIB to turn over the LBCC Receivable, which amounts to at least $33,982,184 in principal, as it constitutes property of the bankruptcy estate under section 541(a) of the Bankruptcy Code.

US_ACTIVE:\44186886\58399.0011

<u>COUNT IV</u>

*Declaratory Judgment That CACIB Violated the Automatic Stay and an Order Requiring Turnover of the LBCC Receivable and Accrued Interest Thereon*

41.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs 1-40 with the same force and effect as if hereinafter fully set forth at length.

42.    Pursuant to section 362(a)(3) of the Bankruptcy Code, the filing of a voluntary case under chapter 11 of the Bankruptcy Code operates to stay "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate" absent an order of the bankruptcy court granting relief from the stay.  11 U.S.C. § 362(a)(3).

43.    The LBCC Receivable constitutes property of LBCC's estate and CACIB's withholding of payment therefore constituted, and continues to constitute, an impermissible "act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."  11 U.S.C. § 362(a)(3).

44.    Moreover, section 362(a)(7) expressly prohibits the unilateral exercise of a right of "setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor."  11 U.S.C. § 362(a)(7).  Thus, even if CACIB had a valid right of setoff under section 553(a) of the Bankruptcy Code (which it does not), section 362(a)(7) expressly prohibits it from exercising any such right unless it first promptly seeks relief from the automatic stay, which CACIB entirely failed (for over four years) to do.

45.    The exception to the automatic stay for swap participants in section 362(b)(17) to "offset or net out any termination value, payment amount, or other transfer

US_ACTIVE:\44186886\58399.0011

obligation arising under or in connection with 1 or more such [swap agreements]" does not extend to protect the exercise of nonmutual setoffs, such as the purported setoff described herein.

46.    Similarly, the exception to the automatic stay for master netting agreement participants in section 362(b)(27) to "offset or net out any termination value, payment amount, or other transfer obligation arising under or in connection with 1 or more such master netting agreements" does not extend to protect the exercise of nonmutual setoffs, such as the purported setoff described herein.

47.    CACIB's wanton disregard of the Bankruptcy Code and this Court's authority and discretion to permit setoffs is a violation of the automatic stay contained in sections 362(a)(3) and 362(a)(7) of the Bankruptcy Code.

48.    There now exists an actual controversy between the parties on this issue relating to their respective legal rights, duties, and obligations under the Bankruptcy Code, which controversy is ripe for adjudication pursuant to section 28 U.S.C. § 2201. Accordingly, pursuant to 28 U.S.C. § 2201 and Bankruptcy Rule 7001, Plaintiff requests that the Court enter a declaratory judgment that CACIB acted in violation of sections 362(a)(3) and 362(a)(7) of the Bankruptcy Code, and an order requiring CACIB to turn over the LBCC Receivable and accrued interest thereon to LBCC.

## COUNT V

### *Demand for Payment of All Accrued Interest*

49.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs 1-48 with the same force and effect as if hereinafter fully set forth at length.

50.    As alleged hereinabove, CACIB was required to pay the LBCC Receivable at least by March 3, 2009, the date that the first Calculation Statement was delivered.

US_ACTIVE:\44186886\58399.0011

Ex. A §§ 6(d)(ii), 12(a)(i) (Master Agreement).    Additionally, CACIB was required to pay

interest to LBCC "in the Termination Currency, from (and including) the relevant Early

Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate."  Ex.

A §6(d)(ii) (Master Agreement).  The "Applicable Rate" is the Termination Rate for obligations

from the Early Termination Date until the date of delivery of the Calculation Statement, and it is

the Default Rate for all obligations after the date of delivery of the Calculation Statement until

the date payment is received in full.    Ex. A §14 (Applicable Rate definition) (Master

Agreement).

            51.        The "Termination Rate" is a blended rate per annum "equal to the

arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as

certified by such party) if it were to fund or of funding such amounts."  Ex. A §14 (Termination

Rate definition) (Master Agreement).  Lehman has certified that LBCC's cost of funds is equal to

or greater than Overnight USD LIBOR + 12.5%.  Ex. J (Certificate dated September 8, 2010).

Using LBCC's cost of funds and an estimate from market information for CACIB's cost of

funds, the Termination Rate is estimated to be Overnight USD LIBOR + 6.52610% from

September 16, 2008 to October 16, 2008, or alternatively (as explained below), Overnight USD

LIBOR + 6.61950% from September 16, 2008 to March 3, 2009.

            52.        "Default Rate," is defined as the "rate per annum equal to the cost

(without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were

to fund or of funding the relevant amount plus 1% per annum."   Ex. A §14 (Default Rate

definition) (Master Agreement).   As stated, LBCC's cost of funds is equal to or greater than

Overnight USD LIBOR + 12.5%. Ex. J (Certificate dated September 8, 2010).  Thus, in this case

the Default Rate is Overnight USD LIBOR + 13.5%.

US_ACTIVE:\44186886\58399.0011

53.     Interest at the Applicable Rate "will be calculated on the basis of daily compounding and the actual number of days elapsed." Ex. A §6(d)(ii) (Master Agreement). Such interest continues to accrue, as provided for in the Master Agreements, until payment is made in full. Ex. A §§ 6(d)(ii), 14 (Master Agreement).

54.     CACIB was required to deliver the calculation statement to LBCC "[o]n or as soon as reasonably practicable following the occurrence of an Early Termination Date." Ex. A §§ 6(d)(i), 14 (Master Agreement). CACIB, however, failed to deliver the Calculation Statement until March 3, 2009. A delay of nearly six months is not "[o]n or as soon as reasonably practicable." Ex. A §6(d)(i) (Master Agreement). Consequently, CACIB should not benefit from application of the lower Termination Rate until March 3, 2009. LBCC is entitled to Default Rate interest from October 16, 2008, thirty days after the Early Termination Date, which is the latest date by which the Calculation Statement should have been received. Accordingly, LBCC is entitled to, as of this date, accrued interest in the amount of $29,519,975, calculated at the Termination Rate from (and including) the Early Termination Date to (but excluding) October 16, 2008 (the date by which the Calculation Statement should have been received), and calculated at the Default Rate from (and including) October 16, 2008, to (but excluding) March 25, 2013. Interest will continue to accrue at the Default Rate from (and including) March 25, 2013, until LBCC receives payment of the LBCC Receivable in full.

55.     In the alternative, should this Court find that the first Calculation Statement was timely delivered, LBCC is entitled to accrued interest in the amount of $27,872,793, calculated at the Termination Rate from (and including) the Early Termination Date to (but excluding) March 3, 2009 (the date on which the Calculation Statement was received), and at the Default Rate from (and including) March 3, 2009 to (but excluding)

US_ACTIVE:\44186886\58399.0011

March 25, 2013.  Interest will continue to accrue at the Default Rate from (and including) March 25, 2013, until LBCC receives payment of the LBCC Receivable in full.

56.    The accrued interest constitutes property of the bankruptcy estate under section 541(a) of the Bankruptcy Code.  Accordingly, Plaintiff requests an order pursuant to section 542 of the Bankruptcy Code, compelling and directing CACIB to pay interest on the LBCC Receivable: (i) in the amount of $29,519,975, calculated at the Termination Rate from (and including) the Early Termination Date to (but excluding) October 16, 2008, the date by which the Calculation Statement should have been delivered, and at the Default Rate from (and including) October 16, 2008, to (but excluding) March 25, 2013; or in the alternative (ii) in the amount of $27,872,793, calculated at the Termination Rate from (and including) the Early Termination Date to (but excluding) March 3, 2009, the date on which the Calculation Statement was delivered, and at the Default Rate from (and including) March 3, 2009, to (but excluding) March 25, 2013; and (iii) in an undetermined amount to be calculated at the Default Rate from (and including) March 25, 2013, to (but excluding) the date that LBCC receives payment of the LBCC Receivable in full.

## **PRAYER FOR RELIEF**

WHEREFORE Plaintiff respectfully requests that judgment be entered as follows:

A.    On Count I, a declaratory judgment that CACIB's withholding of the LBCC Receivable unless and until it receives payment in full of all indebtedness and obligations, matured or unmatured, from LBCC's affiliates effects an unenforceable nonmutual setoff which is not permitted under, and constitutes a violation of, section 553(a) of the Bankruptcy Code;

B.    On Count II, and in the alternative, a declaratory judgment that the provision in section 6(f) of the Master Agreement conditioning CACIB's obligation to pay the LBCC Receivable upon CACIB's receipt of payment in full of all indebtedness and obligations,

US_ACTIVE:\44186886\58399.0011

matured or unmatured, from LBCC's affiliates is the attempted enforcement of an *ipso facto* clause in violation of sections 365(e)(1)(A) and 541(c)(1)(B) of the Bankruptcy Code;

C.    On Count III, a judgment that the LBCC Receivable is property of the LBCC bankruptcy estate under section 541(a) of the Bankruptcy Code and requiring CACIB to turn over, under section 542 of the Bankruptcy Code, the principal amount of the LBCC Receivable, which amounts to no less than $33,982,184;

D.    On Count IV, a judgment finding CACIB violated the automatic stay by withholding the LBCC Receivable and attempting to enforce section 6(f) of the Master Agreement in violation of the prohibition of *ipso facto* clauses and nonmutual setoffs in the Bankruptcy Code, and that, as a result, CACIB is required to turn over the LBCC Receivable plus all interest accrued thereon;

E.    On Count V, a judgment requiring CACIB to turn over accrued interest on the LBCC Receivable under section 542 of the Bankruptcy Code, (i) in the amount of $29,519,975, calculated at the Termination Rate from (and including) the Early Termination Date to (but excluding) October 16, 2008, the date by which the Calculation Statement should have been delivered, and at the Default Rate from (and including) October 16, 2008, to (but excluding) March 25, 2013; or in the alternative (ii) in the amount of $27,872,793, calculated at the Termination Rate from (and including) the Early Termination Date to (but excluding) March 3, 2009, the date on which the Calculation Statement was delivered, and at the Default Rate from (and including) March 3, 2009 to (but excluding) March 25, 2013; and (iii) in an undetermined amount to be calculated at the Default Rate from (and including) March 25, 2013, to (but excluding) the date that LBCC receives payment of the LBCC Receivable in full; and

F.    For such other and further relief as is just.

US_ACTIVE:\44186886\58399.0011

Dated: New York, New York
March 25, 2013

    */s/ John B. Strasburger*
    Robert Lemons, Esq.
    John B. Strasburger, Esq. (*pro hac vice* pending)
    WEIL, GOTSHAL & MANGES LLP
    767 Fifth Avenue
    New York, NY 10153-0019
    Telephone: (212) 310-8000
    Facsimile:  (212) 310-8007

    *Attorneys for Debtor and Plaintiff*
    *Lehman Brothers Holdings Inc.*

US_ACTIVE:\44186886\58399.0011