Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 08-13555 (JMP)

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6    LEHMAN BROTHERS HOLDINGS, INC., et al.,

7             Debtors.

8    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

9    CASE NO.: 08-01420 (JMP) (SIPA)

10   In the Matter of:

11   LEHMAN BROTHERS, INC.,

12            Debtor.

13   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

14   CASE NO.: 12-10063

15   In the Matter of:

16   LEHMAN BROTHERS AUSTRALIA, LTD.,

17            Debtors.

18   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

19   CASE NO.: 12-01220

20   WILLIAMS-PATE,

21            Plaintiff,

22   v.

23   LEHMAN BROTHERS HOLDINGS, INC., et al.,

24            Defendants.

25   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Page 2

```
1    - - - - - - - - - - - - - - - - - - - - - - - - - - -x

2    CASE NO.: 10-03544

3    LEHMAN BROTHERS FINANCIL PRODUCTS, INC.,

4              Plaintiff,

5    v.

6    THE BANK OF NEW YORK MELLON TRUST CO., NATIONAL ASSOCIATION,

7              Defendants.

8    - - - - - - - - - - - - - - - - - - - - - - - - - - -x

9    CASE NO.: 10-03266

10   LEHMAN BROTHERS HOLDINGS, INC.,

11             Plaintiff,

12   v.

13   JPMORGAN CHASE BANK, N.A.,

14             Defendants.

15   - - - - - - - - - - - - - - - - - - - - - - - - - - -x

16                 United States Bankruptcy Court

17                 One Bowling Green

18                 New York, New York

19

20                 March 13, 2013

21                 10:04 a.m.

22

23   B E F O R E :

24   HON JAMES M. PECK

25   U.S. BANKRUPTCY JUDGE
```

Page 3

1    Presentment of Revised Order Authorizing Debtors to Assume

2    Certain Executory Contracts [ECF No. 34551]

3

4    Motion of FFI Fund, Ltd., et al. to Consolidate Contested

5    Matter with Adversary Proceeding and for Related Relief

6    [ECF No. 35519]

7

8    Motion for Entry of an Order Approving a Settlement

9    Agreement with Certain U.S. Insurers [ECF No. 22]

10

11   Williams-Pate v. LBHI, et al. [Adversary Proceeding

12   No. 12-01220]  Motions to Dismiss

13

14   Lehman Brothers Financial Products, Inc. v. The Bank of New

15   York Mellon Trust Co., National Association [Adversary

16   Proceeding No. 10-03544]  Presentment of Order Granting

17   Interpleader Relief

18

19

20

21

22

23

24

25

Page 4

1    LBHI v. JPMorgan Chase Bank, N.A. [Adversary Proceeding

2    No. 10-03266]  Application of Plaintiffs Lehman Brothers

3    Holdings, Inc. and Official Committee of Unsecured Creditors

4    of Lehman Brothers Holdings, Inc., et al., Pursuant to 11

5    U.S.C. §105(a) and the Hague Convention on the Taking of

6    Evidence Abroad in Civil or Commercial Matters, for Issuance

7    of a Letter of Request for International Judicial Assistance

8    to Take the Sworn Deposition of Bruno Iksil.

9

10   Motion of Fidelity National Title Insurance Company to

11   Compel Compliance with Requirements of Title Insurance

12   Policies [ECF No. 11513]

13

14   Motion of Monti Family Holding Company, Ltd. for Leave to

15   Conduct Rule 2004 Discovery of Debtor Lehman Brothers

16   Holdings, Inc. and Other Entities [ECF No. 16803]

17

18   Cardinal Investment Sub I, L.P. and Oak Hill Strategic

19   Partners, L.P.'s Motion for Limited Intervention in the

20   Contested Matter Concerning the Trustee's Determination of

21   Certain Claims of Lehman Brothers Holdings, Inc., and

22   Certain of Its Affiliates [LBI ECF No. 4634]

23

24

25

1    Motion Pursuant to Federal Rule of Bankruptcy Procedure 9019

2    for Entry of An Order Approving Settlement Agreement [LBI

3    ECF No. 5483]

4

5    Trustee's Twenty-Second Omnibus Objection to General

6    Creditor Claims (Amended and Suspended Claims) [LBI ECF

7    No. 5684]

8

9    Motion of FirstBank Puerto Rico for (1) Reconsideration,

10   Pursuant to Section 502(j) of the Bankruptcy Code and

11   Bankruptcy Rule 9024, of the SIPA Trustee's Denial of

12   FirstBank's Customer Claim, and (2) Limited Intervention,

13   Pursuant to Bankruptcy Rule 7024 and Local Bankruptcy Rule

14   9014-1, in the Contested Matter Concerning the Trustee's

15   Determination of Certain Claims of Lehman Brothers Holdings,

16   Inc. and Certain of Its Affiliates [LBI ECF No. 5197]

17

18   Motion of Elliott Management Corporation for an Order,

19   Pursuant to 15 U.S.C. §§ 78fff-1(B), 78fff-2(B), and 78fff-

20   2(C)(1) and 11 U.S.C. §105(A), (I) Determining the Method of

21   Distribution on Customer Claims and (II) Directing an

22   Initial Distribution on Allowed Customer Claims [LBI ECF No.

23   5129]

24

25   Transcribed by:  Sherri L. Breach, CERT*D-397

Page 6

1   A P P E A R A N C E S :

2   WEIL, GOTSHAL & MANGES, LLP

3        Attorneys for Debtors

4        767 Fifth Avenue

5        New York, New York 10153

6

7   BY:  ZAW WIN, ESQ.

8        JORDAN S. BRYK, ESQ.

9

10  CURTIS, MALLET-PREVOST, COLT & MOSLE, LLP

11       Attorneys for Lehman Brothers Holdings

12       101 Park Avenue

13       New York, New York 10178

14

15  BY:  TURNER P. SMITH, ESQ.

16       MICHAEL J. MOSCATO, ESQ.

17

18  SEWARD & KISSEL, LLP

19       Attorneys for Traxis

20       One Battery Park Plaza

21       New York, New York 10004

22

23  BY:  JUSTIN L. SHEARER, ESQ.

24

25

Page 7

```
 1    REED SMITH, LLP

 2         Attorneys for The Bank of New York Mellon Trust Company

 3         599 Lexington Avenue

 4         New York, New York 10022

 5

 6    BY:  MICHAEL J. VENDITTO, ESQ.

 7

 8    ROPES & GRAY, LLP

 9         Attorneys for FFI Fund, FYI, Oliphant Fund

10         Prudential Tower

11         800 Boylston Street

12         Boston, Massachusetts 02199

13

14    BY:  D. ROSS MARTIN, ESQ.

15

16    QUINN EMANUEL URQUHART & SULLIVAN, LLP

17         Attorneys for Official Creditors' Committee

18         51 Madison Avenue, 22nd Floor

19         New York, New York 10010

20

21    BY:  ANDREW J. ROSSMAN, ESQ.

22

23

24

25
```

Page 8

1    KIRKLAND & ELLIS, LLP

2         Attorneys for Liquidators of Lehman Brothers Australia

3         300 North LaSalle Street

4         Chicago, Illinois 60654

5

6    BY:  JEFFREY W. GETTLEMAN, ESQ.

7         WILLIAM T. PRUITT, ESQ. (TELEPHONIC)

8

9    GROSS, POLOWY, ORLANS

10        Attorneys for McCurdy & Candler

11        900 Merchants Concourse, Suite 116

12        Westbury, New York 11590

13

14   BY:  DENNIS JOSE, ESQ.

15

16   WACHTELL, LIPTON, ROSEN & KATZ

17        Attorneys for JPMorgan Chase Bank, N.A.

18        51 West 52nd Street

19        New York, New York 10019

20

21   BY:  PAUL VIZCARRONDO, ESQ.

22

23

24

25

1   TOMPKINS, MCGUIRE, WACHENFELD & BARRY, LLP

2       Attorneys for Aurora Bank, F.S.B.

3       Four Gateway Center

4       100 Mulberry Street, Suite 5

5       Newark, New Jersey 07102

6

7   BY:  ANDREW P. ZACHARDA, ESQ.

8

9   PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP

10      Attorneys for Citi Defendants

11      1285 Avenue of the Americas

12      New York, New York 10019

13

14  BY:  STEPHEN J. SHIMSHAK, ESQ.

15

16  EISEMAN, LEVINE, LEHRHAUPT & KAKOYIANNIS

17      Attorneys for

18      805 Third Avenue

19      New York, New York 10022

20

21  BY:  ERIC P. HEICHEL, ESQ.

22

23  ALSO APPEARING:

24  RONALD PATE (TELEPHONICALLY)

25

Page 10

1                    P R O C E E D I N G S

2              THE COURT:  Be seated.  Good morning.

3              MR. BRYK:  Good morning, Your Honor.  Jordan Bryk,

4     Weil, Gotshal & Manges on behalf of Lehman Brothers

5     Holdings, Inc. and certain of its affiliates.

6              I'll start with the first item on the agenda,

7     which is uncontested:  The presentment of a revised order

8     authorizing the debtors to assume certain executory

9     contracts.  On February 8th, 2013, the debtors filed a

10    notice of presentment of order authorizing the debtors to

11    assume certain executory contracts.  That's ECF Number

12    34508.

13             On February 11th, 2013, after making certain

14    revisions, the debtors filed a notice of presentment of

15    revised order authorizing the debtors to assume certain

16    executory contracts.  And that's ECF 34551.

17             No objections to the February 11th notice of

18    presentment have been filed.

19             We have been in discussions with the trustee and

20    B.N.Y. Mellon with regard to three contracts listed on the

21    order.  The debtors have recently decided not to pursue the

22    assumption of these three contracts at this time and have

23    consensually agreed with B.N.Y. Mellon to take them off of

24    the order.  I have a mark-up with me of the new order

25    compared to the order that we filed on February 11th.

 1          Your Honor, would you like to see a copy of the

 2   mark-up?

 3          THE COURT:  Yes.

 4          MR. BRYK:  Permission to approach the bench.

 5          THE COURT:  Granted.

 6          Thank you.

 7          Now I assume that removing these three agreements

 8   from the exhibit doesn't prejudice the debtors' ability to

 9   reconsider that decision at some future date; is that

10   correct?

11          MR. BRYK:  That's correct, Your Honor.  The

12   debtors and B.N.Y. are working toward a consensual

13   resolution with regards to these three contracts.

14          THE COURT:  Fine.  This is unopposed and the order

15   will be entered.

16          Thank you.

17          MR. BRYK:  Thank you, Your Honor.

18          And now I'll turn the podium over to the attorneys

19   who will be handling Item Number 2 on the agenda.

20          THE COURT:  Okay.

21          MR. MARTIN:  Good morning, Your Honor.  Ross

22   Martin of Ropes & Gray here for FYI, Ltd., FFI Fund, Ltd.

23   and Oliphant Fund, Ltd.  That's a little bit of a mouthful

24   so I'll call them the Bracebridge-Managed Funds.  They've

25   filed claims in this case, about $250 million or so.

Page 12

1          We're here on a very limited issue -- procedural

2     issue today, Your Honor, to consolidate two pending disputes

3     in this court:  One, an adversary that the estate has filed

4     against various city-related entities, and a claims

5     objection that has been filed and has been on hiatus with

6     respect to Bracebridge.

7          Your Honor, I'm not going to -- unless the Court

8     wants, I'm not going to propose to kind of go through all of

9     the details of the arguments.  I think the pleadings mostly

10    speak for themselves and are relatively short.  I would like

11    to hit a couple of points for emphasis, if I could, just to

12    -- having seen the back and forth between the parties to

13    kind of focus the issue.

14          I really see three things that are the core of the

15    estate's arguments against our consolidation.

16          The first is the notion that the Bracebridge-

17    Managed Funds are trying to jump the line somehow in the

18    claims process.  And I don't think anything could be further

19    from the truth.  One, Lehman has already instigated a claim

20    objection -- almost two years ago now -- and I understand

21    they have the right to put that on hiatus.  But what has

22    happened here is that Lehman has brought the Bracebridge-

23    Managed Funds into a central role in another proceeding that

24    they have.  They've instigated that.  That's far different

25    from other creditors in the case.

Page 13

1           And all we're doing is, rather than trying to jump

2     the line, is to say we want to do this in a coordinated

3     fashion in a litigation that's currently scheduled to last

4     until 2015.  I can assure you my client doesn't see that as

5     jumping the line or moving it along.

6           THE COURT:  But -- but let me understand

7     something.  I don't mean to jump into your argument, but --

8           MR. MARTIN:  No.  That's perfectly fine, Your

9     Honor.

10          THE COURT:  -- my understanding is that the

11    parties are probably going to be willing to have you

12    intervene or become a party to the adversary proceeding as

13    it relates to areas that overlap that involve the so-called

14    step-out transactions, as I have read that term in the

15    papers.  But that everything else that relates to the claim

16    objection is essentially extraneous to that litigation

17    issue, if I'm understanding the positions properly.

18          So one of the things I'm not fully understanding

19    is why this isn't simply a consensual arrangement in which

20    issues that, in fact, are squarely within the adversary

21    proceeding involve you, and matters that are extraneous are

22    excluded.  That seems to be an efficient way to deal with

23    it.  But I -- I would like to hear why that doesn't work for

24    you.

25          MR. MARTIN:  Well, I -- that's actually quite

Page 14

1    simple, Your Honor, and I'll -- let me get some concrete

2    examples.

3            So we're going to get extensive document

4    production requests from the estate.  We've gotten them in

5    the rubric of a 2004 exam and even prior to them filing

6    their amended complaint against Citi.  And we're going to

7    have to go through for a -- what they term to be a

8    centerpiece of their action full electronic discovery,

9    talking to our clients, interviewing people, going through

10   all their email for some subset of what they asked for now.

11           We would strongly prefer the efficiency of doing

12   that once, understanding everything that Lehman wants.  We

13   know what the universe of trades are.  The events actually

14   all occur within a week or two of each other, both the

15   failed step-outs and the termination and pricing of the

16   trades.  So we're not -- and otherwise what we're going to

17   face is having to go through the whole electronic discovery

18   process, having to go through depositions, taking days to

19   prepare our clients for depositions, and then do it again

20   later because no matter what we do to try to get everything

21   at once, the estate is likely to come up with additional

22   things they want later.

23           They're already doing discovery with respect to

24   all of these same kinds of things with Citi, all of Citi's

25   trades.  Our trades almost certainly overlap the non-step-

Page 15

1    out trades, the 300 names we -- you know, we have in total,

2    the non-step-out trades, almost certainly overlap with a

3    very large book Citi has.

4            So there is real cost to the client of, you know,

5    duplicative days.  We -- I'm -- I can -- can't be certain,

6    Your Honor, but my guess is when you have two stages of

7    discovery like that, we'll be back later, if we don't do it

8    at once, with disputes where the estate is saying we want to

9    depose someone again and we're saying it's burdensome

10   because you should have done it the first time, or it's --

11   you know, it's -- we think it's clear that it doesn't have

12   to be done again.  If we do it at once, it's efficient for

13   us.  It's efficient for the estate and, frankly, it's

14   efficient for the Court.

15           And it's really no significant burden to them at

16   all.  It's at most one -- even if every trade we have that's

17   not in the step-outs is different from the Citi trades,

18   which is probably not true, it's a one percent increase in

19   the number of trades.

20           THE COURT:  That doesn't necessarily mean it's a

21   one percent difference in the effort and burden to the

22   parties, however.  You're -- I'm -- I'm just quibbling with

23   your mathematical precision.  I don't know that the

24   percentage that your trades bear to the whole represents a

25   fair analogy to the percentage of increased work associated

Page 16

```
 1    with having you as a party to the case.

 2              MR. MARTIN:  Well, we certainly haven't had any

 3    disputes with Citi to this point.  And, you know,

 4    interestingly enough we've -- the Lehman estate has agreed

 5    on the -- you know, with respect to the step-outs to let us

 6    in.  They've sought -- they've indicated that they would

 7    like to ultimately mediate this in any event.  They're going

 8    to have to give us information in connection with that

 9    ultimately anyway.

10              THE COURT:  Your papers suggest an eagerness to

11    mediate.

12              MR. MARTIN:  I'm sorry, Your Honor.  I --

13              THE COURT:  Your papers suggest an eagerness to

14    mediate.

15              MR. MARTIN:  We have been highly eager to mediate,

16    Your Honor.  In fact, that was -- it was our understanding

17    at the time that the reason the claim objection was filed 21

18    months ago was because under the AER procedures for claims,

19    unlike the payables, it starts with a claim objection and we

20    responded expecting that.  And Lehman has the right to -- to

21    conduct it in the way they want, and we've been on hiatus

22    and haven't been pushing it since then.

23              But when brought into a litigation where we know

24    we're going to have some significant number of our folks

25    deposed and have to prepare them and gather all of the
```

Page 17

1    documents for this period, we would like to know we're doing

2    that all at once.  And it frankly cuts down on potential

3    disputes with this Court.  And if -- if they're doing this

4    for Citi anyway, if they have to come up with discovery

5    requests to get at, you know, how Citi priced their trades,

6    which is a big part of their thing, it's going to be the

7    same request to us.  It's not clear to me -- I -- while I

8    hear the Court saying, maybe the one percent of additional

9    names isn't one percent of additional works, I'm not -- I'm

10   actually hard-pressed myself, Your Honor, to understand in

11   what circumstances that would not be the case.

12            We, for example, have looked at the question of

13   what kind of trades are we talking about.  That might be

14   true, for example, if Citi had, say -- to take an extreme

15   example -- all currency derivatives and we had mortgage-

16   backed security-based derivatives, so that, you know, the

17   experts valuing them might be different.  But that's not the

18   case.  Seventy-four percent of the trades that we have in

19   the overall universe are NBS-related derivatives, which are

20   the exact things in the failed step-outs.  It's going to be

21   the same questions that we're getting at overall.

22            THE COURT:  Well, let's -- let's find out why

23   others disagree with you.

24            MR. MARTIN:  That's fine, Your Honor.

25            MR. ROSSMAN:  Good morning, Your Honor.  Andrew

Page 18

1     Rossman with Quinn Emanuel for the official creditors'

2     committee.

3             Your Honor, if I may, I have a couple of pieces of

4     paper that may be illuminating for you, if I could hand them

5     up.

6             THE COURT:  When it comes to pieces of paper, I'm

7     always happy to see them.

8             MR. ROSSMAN:  Okay.

9             THE COURT:  Sure.  It depends on what's on it.  Is

10    it a check?

11        (Laughter)

12            MR. ROSSMAN:  The check comes later, Your Honor.

13    Don't tell anyone.

14            I do have copies to hand out.

15            So, Your Honor, I think it's worth spending a

16    couple of minutes explaining why we brought Bracebridge in,

17    at least for purposes of discovery, into our dispute with

18    Citi.  We're not picking on them.  They're here for a very

19    specific reason.  We think that the Bracebridge step-out

20    novation, which was a transaction that happened on September

21    11th, just four days before the bankruptcy, was -- is an

22    open question in Citi and an open question in -- in the

23    Bracebridge objection that needs to get resolved.  The

24    parties are in agreement on that.

25            And if you -- if you take a minute, Your Honor, I

Page 19

1   just want to explain to you the two significances of that

2   transaction and then I'll -- I'll tell you what our position

3   is with respect to the intervention and why we think it's

4   appropriate for them to intervene on that issue, but not to

5   intervene on all the other issues which bear no relevance to

6   this particular dispute.

7           The first, if you would, you can take a look at

8   the chart because I think it will give you an explanation of

9   exactly what happened.  What we have here are a series of

10  trades.  These are CDS on RMBS, so they're CDS on mortgage-

11  back securitized products.  And Lehman was essentially in

12  the middle of these trades.  Bracebridge sold protection to

13  Lehman.  Lehman, in turn, sold protection to Citibank.

14          So the theory of this novation which made perfect

15  sense at the time, if you look at the second page, was to

16  collapse the trades.  Get Lehman out of the middle and have

17  Bracebridge dealing directly with Citi.  Bracebridge and

18  Citi found each other.  Okay.

19          It understands Bracebridge and Citi were

20  developing a relationship during this time period.

21  Bracebridge and Citi were both looking to eliminate their

22  Lehman exposure and they come up with this trade.  The trade

23  was done.  It was effective.  It was confirmed, consented by

24  all three parties.  Our position is it's good.

25          THE COURT:  I -- I understand that and I also

Page 20

1    understand that from reading the papers.  But this chart

2    appears to relate to that aspect of this controversy that's

3    really undisputed.  You're perfectly happy to have

4    Bracebridge involved because you see the overlap as to the

5    litigation, but what about the different aspects of the

6    transaction?

7              MR. ROSSMAN:  Well --

8              THE COURT:  The different aspects that concern

9    Bracebridge.

10             MR. ROSSMAN:  Right, Your Honor.  We -- we think

11   -- the point that I would make with this is there is a

12   unique aspect where there is overlap and where it's

13   important for us to have Bracebridge participate.  We tried

14   to do it by discovery, by issuing a subpoena.  Whether

15   they're the subject of a subpoena, a 2004 or party

16   discovery, obviously, they've got an obligation to turn over

17   relevant documents and participate.  If they want to come

18   forward and be heard, they may.  We don't object to that, if

19   they want to appear on that particular issue.

20             The point, Your Honor, is that that is a unique

21   issue.  It is one transaction -- one series of transactions,

22   and whether that transaction is effective, in which case

23   those trades remain in the trade population for Bracebridge

24   and in the trade population for Citi and we have to deal

25   with those close-out issues, or whether they are not

Page 21

1   effective is the only issue for which we need Bracebridge to

2   participate, at least for discovery purposes, in this

3   litigation.  What --

4           THE COURT:  I understand, but what they --

5           MR. ROSSMAN:  What they would like to do --

6           THE COURT:  -- what they say -- and I'm interested

7   in your response to this -- is that as to us, Bracebridge,

8   we're in a litigation, but we also have a whole bunch of

9   other trades that don't fit within the step-out model.

10  They're just trades that the estate challenges for whatever

11  reason.

12          MR. ROSSMAN:  Correct.

13          THE COURT:  And it would be really convenient if

14  everything that relates to Bracebridge were brought into

15  this litigation and maybe it would also expedite a

16  resolution through mediation or otherwise so that they would

17  save legal expense and not have to have witnesses to post.

18  I think that's their argument.

19          So what's wrong with that?

20          MR. ROSSMAN:  Well, there may be some incremental

21  savings on Bracebridge's side, but there's even greater

22  burden on the estate's side to have to deal with their

23  claims, which we wouldn't otherwise have to deal with now.

24  They would be in the same position as all the other

25  derivatives, counterparties to whom we objected via an

Page 22

1    omnibus objection.  Those claims are subject to the

2    mediation and ADR order that Your Honor entered and has been

3    enormously successful in this case.  We've settled hundreds

4    of thousands of derivative claims thanks to that without

5    having to bring them before the Court to litigate.

6           What we're trying to do, Your Honor, is to isolate

7    those issues that we think need Your Honor's attention

8    because they stubbornly won't resolve.  So, for example, we

9    settled with ten of the 13 big banks.  We have three

10   remaining big banks, two of which we brought claim

11   objections against:  JPMorgan and Citi.  Those happen to be

12   clearing backs that have taken billions of dollars of

13   collateral that we're also challenging.  We don't think

14   that's a coincidence.  But we don't see those as resolving

15   and we brought those before the Court.

16          But we've tried very hard to resolve everything

17   else.  I think what you heard from Bracebridge's counsel is

18   they want a mediation once we clear up this issue.  And we

19   fully expect that we will have every chance of success in

20   resolving those claims without the need for formal

21   discovery, without the need for depositions, without the

22   need for any proceedings in this court once we resolve the

23   gating issue of whether or not that step-out novation was

24   effective or not effective.

25          THE COURT:  Recognizing that that's the front and

Page 23

1    center issue that everybody acknowledges provides a nexus

2    between Bracebridge and the pending litigation, how would it

3    prejudice the other parties to the litigation if Bracebridge

4    were in the case for all purposes, including the unrelated

5    claim objections?

6              MR. ROSSMAN:  The Bracebridge will require us,

7    Your Honor, to take on approximately 700 new transactions

8    that we have not previously been examining, that we have not

9    been litigate -- other than in, you know, some early

10   discussions with Bracebridge, we have not been litigating

11   those positions.  We have not been building valuations of

12   those positions.

13             And it may be that Citi also has CDS on mortgage-

14   backed securities.  Many people have CDS on mortgage-backed

15   securities, but we don't necessarily know that those are the

16   same 700 that Bracebridge have.  We know that these trades

17   overlap.  We know that these trades are mirror images and

18   Bracebridge and Citi can both participate in those at the

19   same time.

20             But the others will put us to significant burden.

21   We'll have another party kicking around in the case,

22   throwing discovery requests at us.  And we think all of that

23   -- our hope is, Your Honor, that all of that will be for

24   naught because once Your Honor resolves the question of

25   whether those trades are in the population or whether they

Page 24

1    have been novated out and now it's just between Bracebridge

2    and Citi, we think we can sit down -- we hope we can sit

3    down with Bracebridge like we have with most other parties

4    and resolve those disputes without having to go through that

5    considerable expense.  That's all we're saying.

6            THE COURT:  So would it be a fair characterization

7    of what you've just said that you view the litigation of

8    matters that are extraneous to the step-out transactions to

9    be a burdensome distraction, largely because you don't need

10   to address it now and you believe that it would be most

11   expedient to deal with the areas of overlap, resolve that,

12   and once resolved either way, to then deal with the universe

13   of other trades with Bracebridge?

14           MR. ROSSMAN:  That's correct, Your Honor.

15           THE COURT:  Okay.  I would like to hear from other

16   parties who may be affected by this.

17           MR. SHIMSHAK:  Your Honor, good morning.  Steve

18   Shimshak for the Citi defendants.  We did not submit any

19   objection or statement position in connection with this.

20   It's -- it's I want -- I did want to clarify, it's not

21   correct that Lehman sought to include Bracebridge in the

22   litigation.

23           In fact, in our amended answer, which we filed on

24   the 14th of February, we asserted, after we saw the

25   Bracebridge allegations, an affirmative defense, a failure

Page 25

```
 1    to join a necessary party.  And that led to Bracebridge's

 2    motion to intervene.  So in Lehman's view of the world, they

 3    were fully prepared to try and litigate this matter without

 4    including Bracebridge.

 5            We have some sympathy to the position that Mr.

 6    Ross (sic) and Bracebridge find themselves in.  Lehman has

 7    brought them into the litigation and I think one of the

 8    burdens of that, quite understandably, may be the need to

 9    reach Mr. Ross's (sic) clients' issues.  We don't have an

10    objection to their inclusion or to the additional claims

11    that would be resolved.  We have over 30,000 claims at

12    issue.  An additional 700 in the course of a litigation

13    that, on the existing schedule, will span at least another

14    year does not seem to us to be too burdensome.

15            THE COURT:  Okay.

16            MR. MARTIN:  Just two maybe factual points and one

17    observation.  I'll be very brief, Your Honor.

18            One, there are actually non-step-out trades that

19    we have with Lehman -- not a huge number, I don't want to

20    oversell the point -- that are the same as the step-out

21    ones.  There is some actual overlap between the non-step-out

22    ones and these.  Again, I don't want to oversell the point,

23    but there are some -- some trades that -- that directly

24    overlap.

25            Secondly, just to clarify the numbers, there are
```

Page 26

1    somewhere between -- I think our count was 900 trade --

2    trades because we have three funds, but this is one of those

3    circumstances where, you know, there are 300 names that were

4    -- you know, trades that were done and they were allocated

5    between the three funds.  So there's really -- just so the

6    facts are clear, it's -- it's only an addition of 300 things

7    that, at most, would need to be valued.  Other than that,

8    it's just the arithmetic of splitting it up between the

9    funds.  So I just want to make sure that that fact is clear.

10           And the last point that I -- I want to make is

11   about the mediation.  We -- we remain ready, willing and

12   able to do that.  I find it a little curious that we

13   couldn't, you know, be in this litigation and have a

14   mediation that encompassed the failed step-out trades.

15           I mean, to be quite honest, Your Honor, I've been

16   involved in a number of the mediation and I whole-heartedly

17   agree it's a very successful program.  I find it a little

18   curious to exclude, you know, a disputed fact and legal

19   issue, which is exactly the kind of thing very skilled

20   mediators often help with, you know, whether the step-out

21   happened, to exclude that as opposed to the nuances of

22   pricing of RMBS trades.  It seems to me that if we can get

23   this into a posture where the whole thing is together and

24   get the discovery back and forth between both sides in an

25   efficient, clear manner, that actually will help resolve

Page 27

1      these matters in a -- in an efficient way.

2              That's all I have, Your Honor.

3              Thank you.

4              THE COURT:  Okay.  This is, frankly, difficult

5      because when you're dealing with anything that's objective,

6      it's really more a question of taste.  It sounds to me that

7      Bracebridge and Citi are essentially aligned with respect to

8      the proposition that putting everything into the litigation

9      won't be burdensome, at least to the defendants.  And in

10     order to minimize the intervention I need to accept the

11     truth of the proposition that is more judgment than it is

12     fact; the judgment being that there will be some incremental

13     work, although it's hard to say how much, by virtue of

14     having all of the Bracebridge trades in the case.

15             But more particularly, all issues with Bracebridge

16     might be effectively resolved by agreement if the threshold

17     question of the step-out trades were to be decided,

18     presumably in the context of this litigation as opposed to

19     some stipulation or mediated outcome.

20             At this early stage of the litigation, both sides

21     are really speculating and asking me to speculate with them

22     as to which alternative makes the most sense in terms of

23     efficient case management.  My initial inclination before

24     argument was that it made eminent sense for the overlapping

25     step-out transactions to be heard at the same time in the

Page 28

1    main litigation against Citi.

2          But in hearing the argument in reference to the

3    relatively inconsequential nature of the burden associated

4    with the incremental unrelated trades, and hearing that the

5    defendants themselves are perfectly comfortable dealing with

6    what amounts to a little bit of extra work, I don't see a

7    particular burden on the plaintiff in consolidating the

8    entire dispute as one dispute, and will enter an appropriate

9    order that reflects that decision.

10         MR. MARTIN:  Would you like us to prepare an order

11   with the consent --

12         THE COURT:  Absolute --

13         MR. MARTIN:  -- of the parties, Your Honor?

14         THE COURT:  Absolutely.

15         MR. MARTIN:  We will -- we will do that and we

16   will figure out what the title of the intervention pleading

17   will be in the adversary, Your Honor.  We'll -- we've had

18   some debate about that.  I --

19         THE COURT:  If the hardest part is figuring out

20   the title, it shouldn't be that hard.

21      (Laughter)

22         MR. MARTIN:  I think that's right, Your Honor.

23         Thank you very much.

24         MR. ROSSMAN:  Your Honor, thank you, Your Honor.

25   We will need a pleading on that as required by Rule 24.

Page 29

```
 1              MR. MARTIN:  That's no problem.

 2              THE COURT:  Okay.

 3              Lehman Brothers Australia.

 4              MR. MARTIN:  Your Honor, could we be excused?

 5              THE COURT:  Oh, yes.  Of course.

 6              MR. GETTLEMAN:  Good morning, Your Honor.  Jeffrey

 7    Gettleman representing the liquidators of Lehman Brothers

 8    Australia.  We're here today on the liquidators' motion to

 9    -- seeking approval of a settlement with a group of U.S.

10    Insurers and a settlement agreement, to which there have

11    been no written objections filed.

12              So --

13              THE COURT:  Have there been any other objections

14    asserted?

15              MR. GETTLEMAN:  I -- no objections have come to my

16    attention, Your Honor.

17              THE COURT:  That's even better.

18              MR. GETTLEMAN:  And so I'll be happy to go through

19    the points and -- but I'll also be happy to answer Your

20    Honor's questions, if you have any.

21              THE COURT:  One question I have is why this took

22    so long.  It looked to me as if the essential settlement was

23    worked out maybe nine or ten months ago.

24              MR. GETTLEMAN:  Correct.  The settlement agreement

25    was entered in last May, I believe.  So the -- what's
```

Page 30

1   happened since -- well, you'll -- you'll recall that we were

2   before you on October, I think, with a status report on

3   where things stood with the Australian liquidation.  And,

4   you know, even since between the -- October and now things

5   haven't moved quite as quickly as we expected them to.

6              So, I mean, clearly, I'm not representing them in

7   their Australian proceeding, but -- but having discussions

8   with the clients, you know, it's clear that the discussions

9   regarding their scheme of arrangement, you know, were --

10  took -- took longer than they thought.

11             I can report to you today, just briefly, Your

12  Honor, that the scheme documents are actually going to be

13  filed with the Australian court this Friday.  So we're

14  finally at a point where the scheme can proceed.

15             The other thing that I think took time, or I -- I

16  should say took focus away from this particular settlement

17  was the entry of Justice Rares' reasons, the 450 page

18  opinion that you're aware of.  And I think it just took the

19  parties time to absorb the implications of -- of the ruling

20  and how that might affect the negotiations for the scheme.

21             THE COURT:  How did it effect the negotiations for

22  the scheme?

23             MR. GETTLEMAN:  Well, I -- so I -- well, it

24  actually makes our settlement look more attractive because

25  the settlement was reached with the U.S. Insurers prior to

1    Justice Rares' reasons being published.  And it was

2    certainly based on everyone's assumptions about, you know,

3    risks and so forth of -- and that's where the -- that's

4    where the settlement amount came from.

5            So in hindsight, I mean, Justice Rares -- the

6    trial that Justice Rares' reasons were based on wasn't --

7    didn't directly cover insurance coverage defenses.  But what

8    it did is it found certain facts that would certainly bear

9    on those issues.  And so one could certainly argue that the

10   reasons that -- or at least some of the reasons that

11   appeared in the opinion, you know, could have formed the

12   basis for supporting some of the coverage defenses.

13           So -- so we feel that, you know, it makes our --

14   our settlement even more attractive in hindsight.

15           THE COURT:  Well, I'm still not sure why it took

16   so long for it to be presented here for approval, but it

17   doesn't matter.  It's here now and there are no objections.

18   I've examined it.  It appears to certainly be above the

19   minimum level of a reasonable settlement with Insurers at

20   $45 million.  And unless somebody has anything to say with

21   respect to this, it's approved.

22           MR. GETTLEMAN:  Thank you, Your Honor.

23           THE COURT:  Then it is approved.  I just need an

24   order.

25           MR. GETTLEMAN:  Yes.  I have an order.

Page 32

```
 1            THE COURT:  Maybe you could leave that with

 2   debtors' counsel and everything could be submitted at one

 3   time.

 4            Does that include an electronic copy of it?

 5            MR. GETTLEMAN:  Your Honor --

 6            THE COURT:  Because -- because while -- while

 7   we're happy to have paper, it doesn't do much for the

 8   docket.

 9            MR. GETTLEMAN:  What -- what we were going to do,

10   Your Honor, is to provide your chambers with an electronic

11   copy.

12            THE COURT:  That will be fine.

13            MR. GETTLEMAN:  Okay.

14            THE COURT:  Thank you.

15            MR. GETTLEMAN:  Thank you.

16            MR. WIN:  Good morning, Your Honor.  Zaw Win,

17   Weil, Gotshal & Manges for Lehman Brothers Holding, Inc. and

18   certain of its affiliates.

19            The next matter on the agenda is in the adversary

20   proceeding of Williams-Pate, which is adversary proceeding

21   number 12-01220.

22            THE COURT:  Okay.

23            MR. WIN:  As Your Honor knows, this is now the

24   fourth time that we've been before you on this matter.  This

25   case involves certain claims that were brought by an
```

Page 33

1    individual against Lehman Brothers Holdings, Inc., Aurora

2    Bank and the Law Firm of McCurdy & Candler.

3              As you know, this proceeding has been going on for

4    almost a year.  The defendants -- Lehman Brothers Holdings,

5    Inc. and the two other parties that I just mentioned -- have

6    filed two sets of motions to dismiss.  The last time we were

7    before Your Honor was December 18th where we had a status

8    conference, and at that time Your Honor directed us to

9    comply with a briefing schedule, which required the

10   plaintiff to submit responsive papers by the 6th of this

11   month, which he has not done.

12             So as it stands now, the three motions to dismiss

13   that we -- that the three defendants have filed are

14   uncontested.  So unless Your Honor has any questions, or

15   unless Ms. Williams-Pate is on the line and would like to

16   make any statements, we would ask the Court to enter the

17   motions to dismiss.

18             THE COURT:  Let me find out if the plaintiff, Ms.

19   Williams-Pate, is either represented today or if she is

20   appearing telephonically.

21             MR. PATE:  Yes, sir.  I'm her husband, Ronald

22   Pate.

23             THE COURT:  I'm sorry.  It's hard for me to hear.

24   Could you --

25             MR. PATE:  Yes, sir.  I'm her husband, Ronald

Page 34

1    Pate.  My wife is at work right now, Your Honor.

2              THE COURT:  And, Mr. Pate, I take it you're not a

3    lawyer?

4              MR. PATE:  No, sir, I'm not.

5              THE COURT:  You're -- you're appearing as a spouse

6    to listen in or are you hearing -- are you appearing to say

7    anything with regard to the merits of the litigation?

8              MR. PATE:  Well, both, Your Honor.  I'm requesting

9    that the case do not -- my wife would like for the case not

10   to be dismissed.  We have litigation pending in Forsyth

11   County Court, which is a quiet title action.  We have been

12   trying to get in contact with Lehman Brothers, but the

13   problem is right now, Your Honor, is that, one, Lehman

14   Brothers, Aurora Loan filed these -- to foreclose on us.

15   Aurora Loan sent papers to us stating that they no longer --

16   Lehman Brothers sent the paperwork stating that Aurora no

17   longer -- never owned the house.  Now we have another

18   company we're dealing with, which is Nationstar who says

19   that Lehman Brothers gave them the loan.

20             So we don't know who we're dealing with right now,

21   but Nationstar came over to our residence last Saturday

22   morning and came through the door and stated that the house

23   had been foreclosed on and the house has not been foreclosed

24   on.  And they -- and we called the police.  The police said

25   they could not get involved.  It was a civil matter, but

Page 35

1    they did have papers showing that Lehman Brothers had

2    transferred this loan to Nationstar.

3          So we're asking that the -- this case be placed on

4    hold pending the outcome of the litigation that is in

5    Forsyth County Court which is a quiet title action.

6          THE COURT:  Are you one of the plaintiffs in that

7    state court litigation in Georgia?

8          MR. PATE:  Yes, sir.

9          THE COURT:  Okay.  I would like to give the

10   attorneys who are here for the defendants an opportunity to

11   comment with regard to what we've just all heard.

12         MR. WIN:  First of all, Your Honor, I'm not sure

13   what they mean when they said that they've tried to contact

14   us.  I did speak to Ms. Williams-Pate yesterday to -- to

15   just make sure that she was aware that the scheduling of

16   this hearing had been moved from 2 p.m. this afternoon to

17   this morning, and she didn't mention anything about this

18   Georgia action to me at that time, nor -- nor have we

19   received any other communication from them.

20         I certainly don't want to put words into their

21   mouth, but I suspect that there may be some confusion

22   between Lehman Brothers Holdings, Inc., which is the party

23   that we represent, and Lehman Brothers Bank, which is the

24   name that Aurora -- Aurora Bank went by before the name was

25   changed a few years ago.  So they may be complete --

Page 36

```
 1   conflating actions that Lehman Brothers Bank takes with

 2   Lehman Brothers Holdings.  But, obviously, they're two

 3   separate entities.

 4           As for Nationstar, I'm not aware of who the

 5   servicer of this property is now.  It may be that it's

 6   Nationstar.  But as set forth in our papers, Lehman Brothers

 7   Holdings disposed of its interest in this property prior to

 8   the bankruptcy, and to my knowledge since then, other than

 9   with respect to this adversary proceeding, has not had

10   anything to do with it.  But I'll turn the podium over to my

11   -- the other defendants.

12           THE COURT:  All right.

13           MR. ZACHARDA:  Good morning, Your Honor.  Andrew

14   Zacharda on behalf of defendant, Aurora Bank, F.S.B.

15           I don't really have anything to add factually to

16   what Mr. Pate has related to the Court.  It may well be that

17   servicing of what is left of this loan transaction is now

18   with Nationstar Mortgage, but none of that should have any

19   bearing on the present motions to dismiss the pending

20   adversary proceedings in this court.

21           If anything, I think that only strengthens our

22   argument, the disclosure that there is also now pending in

23   Forsyth County, Georgia, a quiet title action which

24   essentially would raise all of these same issues in the

25   appropriate forum.  This particular adversary proceeding,
```

Page 37

1    this consolidated adversary proceeding, pertains only to a

2    single mortgage loan transaction affecting one piece of

3    property in Forsyth County, Georgia.

4            And for the reasons we expressed in -- in our

5    motion and in our amended motion papers, those issues have

6    absolutely no connection to the instant bankruptcy case and

7    do not deserve to be in the Southern District.  They deserve

8    to be litigated in the host forum where the property is

9    located.

10           Thank you.

11           THE COURT:  All right.  Thank you.

12           MR. JOSE:  For the record, Judge, Dennis Jose from

13   Gross, Polowy & Orlans representing McCurdy & Candler.

14           Your Honor, we -- we represent the law firm that

15   was handling the foreclosure matter in Forsyth County,

16   Georgia for a period of time.  We are -- we are named as

17   defendants in the adversary complaint and list a variety of

18   generalized speculative causes of action.  We've addressed

19   them one by one in our argument in the motion to dismiss.

20           Judge, at this point, to the extent that there is

21   -- as prior counsel has just suggested, to the extent that

22   there is a litigation in Forsyth County, Georgia, where

23   essentially the same issues are raised, albeit made in the

24   context of a new service that has taken over the loan in

25   either a foreclosed upon or a to be foreclosed upon

Page 38

1   mortgage, I think that's what should be -- should proceed as

2   opposed to these adversary proceedings.

3           I think all parties have set forth their -- their

4   pleadings in quite detail and explained why the complaints

5   or the transferred complaints in the federal court are --

6   are -- do not set forth a course of action or should not be

7   before this Court as a matter of jurisdiction.

8           And, respectfully, Judge, at this point, the

9   debtor who was -- the individual, Ms. Williams-Pate, who was

10  pro se initially and is currently the same way as well, has

11  not set forth any oppositions to our motion to dismiss, not

12  set forth any grounds other than what we have heard today,

13  which clearly point towards at least a remanding or at least

14  a -- at the very least a remanding of the matter to Forsyth

15  County or any other appropriate jurisdiction and dismissal

16  of the adversary complaints here.

17          Therefore, Your Honor, I would just request that

18  the matters be dismissed.

19          THE COURT:  Okay.

20          Mr. Pate, do you have any comments?

21          MR. PATE:  Well, yes, sir.

22          Your Honor, on -- back in May of 2012, on May the

23  7th, Lehman Brothers sent us a correspondence stating that

24  they were the owner of our mortgage.  So, therefore, this

25  matter should not be dismissed.  Yes.  We would be willing

Page 39

```
 1    to dismiss the other defendants, the law firm, but I think

 2    this matter should be stayed pending the outcome if Lehman

 3    Brothers do own our mortgage or not.  That's all we've been

 4    asking them, are they the owners.  They've been sending us

 5    correspondence.  They've been communicating with us.  The

 6    first filing that they did was on May the 7th to respond

 7    back.  That's when we learned that Aurora Loans does not

 8    have our mortgage anymore, and that's when the Court agreed

 9    with us in Forsyth County and said, okay, transfer the

10    matter to Superior Court.

11            But the matter right now that comes abroad (sic)

12    is Nationstar stated that they received our mortgage from

13    Lehman Brothers.  So we would like to have that clarified

14    before the motion is dismissed.  Nationstar came to our home

15    Saturday morning, and we called the police, with paperwork

16    from Lehman Brothers stating that they are -- they were --

17    our mortgage was transferred to them.

18            THE COURT:  Okay.  May I hear from Lehman's

19    counsel?

20            MR. WIN:  Yeah.  I mean, once -- once again, we

21    haven't sent them any correspondence.  Lehman Brothers

22    Holdings, Inc. has not sent them any correspondence to my

23    knowledge representing that we own the loan.  In fact, in

24    our papers we've said, you know, I guess on three separate

25    occasions now that we have no interest in the loan.  So I'm
```

Page 40

1    not sure when he says Lehman Brothers whether he's referring

2    to Lehman Brothers Holdings or some other entity.

3             And -- and I guess second, the pleadings that the

4    Pates have filed in this case raise really three issues:

5    Two issues regarding certain claims that allegedly were

6    filed, unclear where; an issue of quiet title, which it

7    sounds like is now pending in the Georgia litigation; and

8    then, also, an issue involving liable.

9             So with respect to three of those issues, the two

10   issues involving the claim and the issue involving liable,

11   it sounds like there -- there's no contest to our motion to

12   dismiss those three issues.

13            And with respect to the fourth one, now the quiet

14   title action, you know, we have now discovered that it's

15   also pending in Georgia State Court.  And so, you know, it

16   seems to us it's very clear that the first three issues, the

17   three issues that -- you know, the non-quiet title issue

18   should certainly be dismissed since they've not been

19   contested.

20            And with respect to the quiet title issue, you

21   know, with due respect, the -- Ms. Williams-Pate doesn't get

22   two bites at that apple.  That issue is going to be decided

23   in Georgia and there's no reason to hold this case open to

24   have, you know, potentially a conflicting judgment come down

25   in this Court, which is certainly, you know, an odd venue

Page 41

1    for an issue involving title to real property to be decided,

2    particularly one that doesn't involve New York State.

3            THE COURT:   Okay.

4            Here's what I'm going to do.   This litigation has

5    been pending for a considerable period of time.   The

6    plaintiff is unrepresented by counsel, but has appeared

7    today by telephone through her husband, Mr. Pate, who has

8    expressed a desire that the Court withhold its ruling with

9    regard to the pending motions to dismiss pending resolution

10   of a state court quiet title action in Forsyth County,

11   Georgia.

12           The pleadings are extensive and involve two

13   separate federal litigations that have been consolidated

14   here:   The first having been filed some time ago; the second

15   being a District Court matter that was referred here and

16   then consolidated involving essentially the same

17   allegations.

18           The defendants, Lehman Brothers Holdings, Inc.,

19   McCurdy & Candler, LLC, and Aurora Bank, F.S.B. have each

20   filed motions to dismiss.   The motions to dismiss include,

21   as a form of alternative relief, a request that the Court

22   abstain from exercising jurisdiction over the litigation

23   under 1334(c)(1).

24           The litigation itself, by its very nature, does

25   not directly implicate any issues in this Bankruptcy Court.

Page 42

1    The only nexus to the Southern District of New York is the

2    claim made against Lehman Brothers Holdings, Inc., which is

3    a debtor in this Bankruptcy Court, although I would note

4    that Lehman Brothers Holdings' bankruptcy case is in a

5    somewhat different posture from that of most Chapter 11

6    debtors in that a plan of reorganization for LBHI was

7    confirmed on December 26th, 2011, and currently there is a

8    plan administrator that is acting on behalf of the debtors'

9    estate to manage the process of converting assets to cash

10    and making distributions to creditors.

11        In its motion to dismiss, LBHI asserts that it has

12    absolutely no connection to this dispute, having disposed of

13    any interest in the underlying mortgage in 2007 prior to the

14    commencement of the bankruptcy.

15        This is not a factual determination by the Court

16    as much as it is a procedural review based upon the nature

17    of the allegations and the nature of the procedural defenses

18    to those allegations.

19        As a matter of pure pleading, the motions to

20    dismiss are unopposed.  No papers have been filed in

21    opposition to the motions of LBHI, McCurdy & Candler, and

22    Aurora Bank.  However, Mr. Pate, acting as a representative

23    of his wife, has requested that the Court defer

24    consideration.  I appreciate that request, but I am not

25    inclined to further delay a resolution of this matter, at

Page 43

1    least as it relates to procedure.

2            I am going to grant the motion to dismiss as it

3    relates to Lehman Brothers Holdings, Inc. inasmuch as Lehman

4    Brothers Holdings, Inc., as a legal entity, has no

5    connection whatsoever to the underlying dispute.

6            That is not the case as it relates to either

7    McCurdy & Candler and Aurora Bank, F.S.B.  McCurdy &

8    Candler, as a local law firm, appears to have had something

9    to do with the mortgage transaction in question, but I heard

10   Mr. Pate say on the telephone that he really doesn't have

11   any present claim as to McCurdy & Candler.  The problem, of

12   course, is that Mr. Pate is not the plaintiff in this

13   litigation, nor is it clear that Mr. Pate is in a position

14   to act on behalf of his wife when it comes to disposing of

15   litigation claims against McCurdy & Candler since he's not a

16   lawyer.

17           Aurora Bank itself may, in fact, have been known

18   as Lehman Brothers Bank at some point, and so it is

19   possible, but by no means clear, that when Mr. Pate talks

20   about Lehman he's actually talking about Aurora Bank.

21           In the end, however, the real issue here is which

22   Court should be deciding questions relating to title to

23   residential property located within the State of Georgia.  I

24   am convinced it should not be this Court, but rather the

25   court in Georgia that is currently dealing with the quiet

Page 44

```
 1    title litigation.
 2              Accordingly, I grant the motion to dismiss as to
 3    Lehman Brothers Holdings, Inc., but as to McCurdy & Candler
 4    and Aurora Bank, F.S.B., I make no decision with respect to
 5    the merits of the complaint and, instead, abstain from
 6    further jurisdiction with respect to those complaints.  And
 7    the Court in Georgia can decide any claims to the extent
 8    cognizable with respect to these two defendants.
 9              Mr. Pate, what I've basically said is that I'm not
10    going to hear the litigation anymore.
11              MR. PATE:  Yes, sir.
12              THE COURT:  I'm stepping aside in favor of the
13    state court in Georgia that has jurisdiction of your real
14    estate and that presumably is a much more convenient forum
15    for you and your wife to present your defenses and to be
16    heard.  Is that clear?
17              MR. PATE:  Yes, sir.  It's very clear.
18              THE COURT:  Okay.  Fine.  I'll take an appropriate
19    order.
20              MR. WIN:  Thank you, Your Honor.  We'll confer and
21    submit that proposed order.
22              THE COURT:  Okay.
23              MR. JOSE:  Thank you, Judge.
24              THE COURT:  Thank you.
25              MR. ZACHARDA:  Thank you.
```

Page 45

 1              MR. WIN:  The final matter on the agenda today,

 2      Your Honor -- sorry.  Zaw Win from Weil, Gotshal again.

 3              The final matter on the agenda today is Lehman

 4      Brothers Financial Products, Inc. versus Bank of New York

 5      Mellon.  It's the presentment of an order granting

 6      interpleader, so I'll turn the podium over.

 7              MR. VENDITTO:  good morning, Your Honor.  Michael

 8      Venditto from Reed Smith on behalf of the Bank of New York

 9      Mellon.

10              Your Honor, the Bank of New York Mellon submitted

11      a proposed order granting interpleader relief, which is

12      essentially a procedural order in this adversary proceeding.

13              The debtors commenced this adversary proceeding

14      back in 2010 and has recently negotiated in the course of

15      the derivatives ADR process a settlement with the issuer.

16      The Bank of New York Mellon acts as the custodian of the

17      collateral for some of the parties in the litigation as well

18      as parties who are not party to this litigation.  For that

19      reason, it commenced this interpleader action to join

20      parties who have an interest in the collateral that will be

21      the subject of the proposed settlement so that they could

22      have a forum to raise their concerns and that the Court's

23      ultimate decision would be binding on all affected parties.

24              The purpose of the proposed order was to affect

25      the procedure.  It was negotiated heavily with counsel for

Page 46

1    the debtor to ensure that the parties received adequate

2    notice, and that the bank would continue to hold the

3    collateral pending an ultimate resolution of the settlement

4    procedures by the Court.

5            So the proposed order was submitted, served on the

6    parties to the litigation.  We have not received any

7    objection.  It was originally noticed for settlement or

8    presentment to the Court on March 1st.  No objections were

9    filed.  However, the Court did request a declare -- a

10   declaration from a party having personal knowledge of

11   certain facts to support the recitations in the proposed

12   order.

13           We submitted that declaration to the Court earlier

14   this week.  And since there have been no objections, we

15   respectfully request that the order be entered.

16           THE COURT:  There are no objections.  The

17   declaration deals with the findings of fact set forth in the

18   order and I will enter the order.

19           Thank you.

20           MR. VENDITTO:  Thank you, Your Honor.

21           MR. WIN:  If I could actually just make one point.

22           In paragraph K of the proposed order, the order --

23   the order was submitted several weeks ago, I think, so since

24   that time the Court has further extended the stay of

25   avoidance actions.  So we would just like paragraph K to be

Page 47

1    updated to reflect the entry of that order and the further

2    extension of the --

3              THE COURT:  That's --

4              MR. WIN:  -- order and such.

5              THE COURT:  -- perfectly fine.

6              MR. WIN:  Excuse me.  I misspoke.  There's

7    actually one more matter on the agenda for the Court.  It's

8    the JPMorgan matter.

9              THE COURT:  That's why everybody's in the

10   courtroom.

11      (Laughter)

12             MR. VENDITTO:  Thank you, Your Honor.  We'll

13   submit a revised form of order.

14             THE COURT:  Okay.

15             So let's proceed with the JPMorgan matter.

16             MR. ROSSMAN:  Good morning, Your Honor.

17             THE COURT:  Good morning.

18             MR. VIZCARRONDO:  Good morning, Your Honor.

19             MR. ROSSMAN:  May I proceed, Your Honor?

20             THE COURT:  Please.

21             MR. ROSSMAN:  Andrew Rossman with Quinn Emanuel

22   for the official creditors' committee of JPMorgan.  Sorry.

23   I switched sides for a moment there, Your Honor.  I'm still

24   on the side of the right, the official creditors' committee

25   of Lehman Brothers.

1          Your Honor, we're here on what should be a routine

2     application to take a deposition abroad.  As Your Honor well

3     knows from having issued probably many dozens of them in

4     this case alone, it is the Hague application, it's the

5     United States statute of treaty and fact that permits the

6     obtaining of evidence abroad for a case in the United

7     States.

8          The standard which Your Honor wells know for

9     granting a Hague application is a very permissive one.  It

10    is -- has been found by courts to be the same standard for

11    getting discovery under Rule 26.  So, effectively, you can

12    see this proceeding as the equivalent of a party's effort to

13    quash a subpoena being served on a third party.

14          Now, Your Honor, we are here -- I think it

15    deserves some explanation -- seeking permission to take the

16    deposition in France of an individual named Bruno Iksil.

17    And the reason why this came to light in 2012 and why we are

18    seeking that deposition, I just want to take a couple of

19    minutes to explain it to you, Your Honor.

20          I think the reason why a lot of folks are in the

21    courtroom today is because there were headlines in the

22    spring of 2012 about a scandal coming out of JPMorgan's

23    chief investment office surrounding someone who is referred

24    to colloquially as the London Whale.  That's Bruno Iksil.

25          And, Your Honor, we were, as you would imagine, as

Page 49

1    stewards of the estate's resources, responsible for looking

2    at that and ensuring ourselves as to whether or not there

3    was an overlap with the Lehman case.  And we did that and we

4    were surprised to find that there were two very significant

5    areas of overlap that caused us to engage in further

6    inquiry.

7            As Your Honor knows, this case is about $8.6

8    billion of cash collateral that JPMorgan coerced Lehman into

9    handing over in the last four business days of Lehman's

10   existence before LBHI filed for bankruptcy on Monday,

11   September 15th.  And we allege that there was no appropriate

12   basis for the demand of that collateral.  It wasn't

13   appropriately calculated.  It was outside the realm of the

14   parties' contracts.  It was outside of commercial practice.

15   It was unreasonable and unjustifiable, but that Lehman had

16   no choice; that when faced with a demand by their clearing

17   bank, by the bank that gave them their oxygen every day they

18   had no choice but to turn over that collateral.

19           With respect to Mr. Iksil's deposition, there are

20   two issues that we would like to explore and we are

21   exploring with JPMorgan generally, not just picking on Mr.

22   Iksil, that we think bear on that dispute, Your Honor.

23           One of those issues relates to another collateral

24   dispute that had some similarities that were important and

25   some differences that were important that also happened the

Page 50

1    week of September 9th, 2008.  And the other relates to

2    efforts that JPMorgan either did or did not take to try to

3    hedge or reduce its exposure to Lehman as a counterparty.

4    Those are the two areas and let me -- let me tell you how

5    this came into our radar screen.

6            When we learned about the whale controversy and we

7    were reading, in particular, that there were issues

8    regarding the pricing of derivatives positions within the

9    office of the CIO, we looked further and we -- and we

10   learned a couple of things, Your Honor.

11           We learned that there was -- that this infamous --

12   now infamous trader, Mr. Iksil, was the trader who was

13   responsible for two of the three largest trades that gave

14   rise to a $273.3 million collateral dispute that happened on

15   September 9th, 2008.

16           September 9th, 2008 is a day of enormous

17   significance to us in this case, Your Honor.  It is the day

18   when JPMorgan made its first of two demand for $5 billion of

19   cash collateral.  It is the day on which JPMorgan insisted

20   that Lehman sign overnight a series of brand new legal

21   agreements that affected a seed change in the parties

22   relationship.  So it is a day of great consequence in this

23   case.

24           On the radar screen of the senior managers, and I

25   mean top level managers at JPMorgan, that day were not just

Page 51

1    the $5 billion demand for collateral that they made, but

2    also this $273.3 million collateral dispute.  I'm going to

3    get back to that in a moment, Your Honor.

4              The other issue, just to put it on the table, that

5    we learned about when we were reading headlines and reading

6    Mr. Diamond's congressional testimony and other public

7    statements about the CIO dispute is that what we had

8    previously thought was a sleepy, obscure corner of the bank

9    was actually very actively engaging in trading activity that

10   was designed, among other things, to try to hedge the bank's

11   exposure to crises and to counterparties that it thought

12   were in trouble like Lehman.

13             And, specifically, in testimony that we quote in

14   our papers, Your Honor, Mr. Diamond explains that the CIO's

15   trading strategy, among other things, was designed to

16   protect the bank in an event like a Lehman event.  He called

17   out Lehman specifically.

18             So we asked the question, what did the CIO do in

19   order to hedge Lehman-related exposure.  Now we had asked

20   this question before, Your Honor.  We went back.  We did our

21   diligence.  The first thing we did was we looked at all of

22   our prior discovery requests.  We said if we ask for this --

23   and we did.  We identified them to Mr. Vizcarrondo in a

24   letter back in July of last year, a number of discovery

25   requests that specifically called for information regarding

Page 52

1    the hedging activity related to Lehman, wherever it may be,

2    whatever trading or hedging activity JPMorgan engaged in

3    that were designed to reduce their exposure to Lehman.

4            Why is that relevant?  On a macro level, whether

5    it's done to protect against all counterparty failures or

6    whether it's done specifically for Lehman, it goes directly

7    to whatever losses they claim they had against Lehman.  It

8    goes to the exposure that they claim that they had to Lehman

9    for which they try to justify their collateral demands.  It

10   goes frankly, Your Honor, to their state of mind, their

11   prospective on whether they thought that trying to support

12   Lehman, as they claim they were trying to do, or trying to

13   profit from Lehman, as we claim they were trying to do was

14   what really was going on the week of September 9th through

15   12th.

16           And that's something that comes up in the

17   testimony of all the senior executives.  That's something

18   that we've been trying to explore for some time period, and

19   we have been met with, frankly, not very illuminating

20   answers in terms of what their actions were.

21           And they say, in fact, they have a macro hedge

22   that has nothing to do with Lehman.  It is a general hedge

23   and we shouldn't be allowed to seek discovery of that hedge.

24   Well, their testimony on that is a little bit all over the

25   place, to be honest, Your Honor, and I would contrast the

Page 53

1    testimony of the two co-CEOs of the investment bank, Steve

2    Black and Bill Winters, okay, who go in different directions

3    on this.  And I think we're entitled, in terms of whether

4    they were or were not specifically hedging Lehman, and

5    whether the macro hedge was or was not designed to protect

6    them against Lehman.

7          We also don't know, Your Honor, we don't know

8    whether there was hedging activity at the CIO's office.

9    We've been asking this question.  It's a fairly simple

10   question.  We've been asking this question since July of

11   last year when we first contacted Wachtell and said, we've

12   looked at all our document requests.  They call for this

13   information.  We've looked at our documents that you

14   produced -- and that takes some time, Your Honor, because

15   it's a big production in this case -- and we don't see the

16   documents.  We want you to go back and provide us with this

17   discovery, and we gave them, specifically, the discovery

18   that we expected to see and the document requests that we

19   asked of them.

20         They -- as late as September of last year, they

21   responded with a letter saying they are inquiring whether or

22   not the CIO's office was involved in the macro hedge.  To

23   today's date, they still haven't taken a position as to

24   whether or not the CIO's office was responsible for the

25   macro hedge or not.  Our question is actually broader than

Page 54

1    that.  Our question is, were they responsible for any

2    Lehman-related hedging activity, all of which we think is

3    appropriate for us to seek discovery of, and they haven't

4    given us an answer to that.

5              This is an unusual circumstance, Your Honor, where

6    someone is saying, don't take the deposition of this

7    individual, but they're not coming forward and saying either

8    he's someone without knowledge, as often is the case.

9    You've seen, Your Honor, people who try to take what they

10   call apex depositions, depositions of CEOs and chairman

11   where the people come forward to the court and they provide

12   an affidavit where the guy swears, I don't have any

13   information about that subject.  We don't have that here.

14   We don't have an affidavit from Mr. Iksil.

15             This is not a situation where they say there are

16   other people who are prepared to cover that landscape, and

17   here they are and here's their knowledge.  They haven't said

18   that, Your Honor.  They haven't even told us at all whether

19   or not the CIO's office is engaged in that activity, which

20   seems from the public record they clearly are.  So the idea

21   that we should refrain from taking this deposition because

22   they're going to supply us with that information otherwise

23   is, one, where they haven't been forthcoming enough to

24   achieve that burden.

25             Now, Your Honor, I want to talk about the other

Page 55

1    subject that -- that drew us to focus on Mr. Iksil, which

2    are the trades themselves.  The trades -- if I may, the

3    trades at issue here really boil down to three.  They are

4    CDS trades on tranches of corporate debt.  They are the same

5    types of trades that Mr. Iksil and others at the CIO were

6    engaged in in 2012 in the trades that lost the bank billions

7    of dollars and grabbed all the headlines.

8            We're not asking about 2012, Your Honor.  We're

9    not fishing around generally.  We're asking very

10   specifically about these trades.  We believe that Mr. Iksil

11   is knowledgeable about the third trade, but two of the

12   three, the two that are by far the largest movers in terms

13   of value here were his trades.  And he not only knew about

14   those trades, but he was the contact person that Lehman had

15   when this controversy arose.

16           This was -- until we learned about the CIO's

17   office, this was a subject of great curiosity to us because

18   what happened on September 9th, 2008 is JPMorgan's chief

19   risk officer, John Hogan, called Lehman's chief risk officer

20   and said, we have $273.3 million difference in our position

21   versus your position.  You must accept our position.  You

22   must post collateral according to our marks.

23           And Lehman was insistent.  The Lehman traders who

24   knew about these positions were absolutely convinced that

25   their marks were right and JPMorgan's were wrong, and they

Page 56

1   cited trading evidence of the value of those positions.  A

2   firm called Market and other data sources called Creditex

3   (ph) where all of the broker dealers on Wall Street rely on

4   those pricing fees for their daily mark to market of

5   collateral.

6           And those data sources completely agreed with

7   Lehman.  Lehman even showed JPMorgan, you've got other

8   trades on the same reference obligations that agree with our

9   prices.  So somewhere you guys have it wrong, will you admit

10  it.  And for weeks Lehman was trying to resolve this dispute

11  because it was collateral that should have been coming to

12  Lehman.  And for weeks they were not getting responses.  The

13  person that Lehman was reaching out to principally as

14  contact on this at the trading level was Bruno Iksil.

15          And if you look at the documents that were cited

16  in our application, Your Honor, we didn't pluck his name out

17  of a hat.  Exhibit C is a JPMorgan document, bottom of

18  Exhibit C has a very little -- very little spreadsheet on

19  the bottom.  It has three trades in it, and two of those

20  trades, it says trader is Luis Baria (ph) and Bruno Iksil.

21  Mr. Iksil is senior to Mr. Baria as I understand it.  The

22  second one, the trader is Luis Baria and Bruno Iksil.  These

23  are JPMorgan's documents.  Their records show these are his

24  trades.  Okay.

25          We have one of the documents that we attached in

Page 57

1    this case is a series of Bloomberg messages.  You know,

2    traders communicate by instant message by their Bloomberg

3    screens.  It's a series of Bloomberg messages between the

4    Lehman trader and Mr. Iksil.  And they're going back and

5    forth on the question of this trade.  And this is on the

6    date when this was ultimately resolved.  There had been a

7    series.  There had been phone calls.  There had been

8    messages before this where the Lehman trader was trying to

9    get JPMorgan to own up to this issue and resolve it.

10           And it finally gets resolved only on the 10th, the

11   day after the collateral was posted.  And on the 10th you

12   have Zyheid Hassan (ph) engaged in a long exchange with Mr.

13   Iksil who directs him to Mr. Baria and then an exchange with

14   Mr. Baria, and within minutes you'll see, Your Honor, that

15   JPMorgan admits that its marks were wrong and the collateral

16   has to go back.

17           And what we don't know and what we would like to

18   know is, were those marks wrong because the trading

19   positions were inappropriately marked because they were

20   valued in the CIO's favor as seemed to be the practice in

21   2012 that got JPMorgan in a heap of trouble.  And we have

22   good reason to suspect that because JPMorgan's own task

23   force report concludes that there was rampant mismarking,

24   mismarking by a senior trader.  We would assume that they're

25   referring to Mr. Iksil in that.  And that it was done

Page 58

1    because he has a different view of what is fair value than

2    what the accounting standards are or what the mark to market

3    standards are on Wall Street.  So we have good reason to ask

4    that question.

5            JPMorgan says there are no problems with the

6    marks.  The trading marks were fine.  This was an

7    operational glitch, essentially, is what they're saying.  I

8    don't think, Your Honor, that we have to take JPMorgan's

9    word for it.  I think we're entitled to explore that

10   question.  But in either event, it's relevant to this case,

11   and in either event, Mr. Iksil is a knowledgeable person on

12   that subject.

13           If it's true that, as they say, the marks were

14   right in the trader's book and they were wrong in the

15   collateral manager's book, then Mr. Iksil is going to help

16   us establish that.  Mr. Iksil would presumably testify that

17   he had the marks right in his book and that his book agreed

18   with Lehman's book, and that JPMorgan's collateral managers

19   had it all wrong and they were demand collateral that they

20   didn't have a right to demand on September 9th.  That sounds

21   familiar to our story, Your Honor, demanding collateral that

22   they weren't entitled to based on their view of risk

23   exposures that Lehman didn't agree with.

24           Now if it's -- of course, as we also think is a

25   possibility here, Your Honor, that the positions were wrong,

Page 59

```
 1    the underlying positions were wrong, just like they were

 2    wrong in 2012, and I think we're clearly entitled to see

 3    that as well.

 4           Now on the 9th with no diligence, okay, no effort

 5    to try to resolve the difference in these trades, Mr. Hogan

 6    puts his demand into Lehman and Lehman, having no choice,

 7    posts the collateral.

 8           Now this episode is important for a couple of

 9    reasons, Your Honor.  Number one, it demonstrates, of

10    course, the power that JPMorgan had over Lehman.  Okay.

11    Number two, it shows that there is a process on Wall Street

12    for demanding collateral, particularly with respect to

13    derivative transactions.  Okay.  It wasn't identified at the

14    time by JPMorgan, okay, but JPMorgan says in hindsight, the

15    reason why we needed the first $5 billion, the first 5

16    billion chunk of collateral is because, among other things,

17    we had risk exposure with respect to derivative

18    transactions.  Okay.

19           Our position, Your Honor, is it's entirely

20    inappropriate for them to wake up one day in the middle of

21    some 75,000 derivative trades and say, we want additional

22    collateral on top of the collateral that is posted every

23    single day pursuant to the parties' agreements.  There's a

24    well-functioning machine on Wall Street for handling that

25    issue.  That's the IZDA Master Agreements and the credit
```

Page 60

1    support annexes under them, and they specify how collateral

2    is to pass on a daily basis based on the marks of the

3    underlying positions.

4           And when that machine has a glitch in it, when the

5    parties' positions disagree, there is a well-accepted

6    practice for resolving that.  They get together.  They

7    compare their marks, and if they still can't resolve it,

8    they go to a third party and ask the third party to value

9    it.  That's not just my view of how it works.  That's what

10   John Hogan testified to in his deposition that that is, in

11   fact, how it works.

12          So our point is let's contrast how the system was

13   supposed to work, how the system worked with respect to the

14   $273.3 collateral dispute.  There is a process.  There are

15   marks.  Lehman gets an opportunity to say whether or not its

16   marks or JPMorgan's marks are right, and then the collateral

17   passes on that basis.  Okay.  They jump that process on

18   September 9th and demanded the 273.3.

19          But even there, Lehman had an opportunity the next

20   day to ramp up the pressure and go back to them and say,

21   look, we know we had to give you the collateral because we

22   had no choice, but here's where you're wrong.  Please

23   clarify this.  And Mr. Iksil ultimately agreed with us; that

24   we were right on the position that the collateral came back.

25   That's not an opportunity that they afforded us with respect

1    to the $8.6 billion of cash that they claim they needed that

2    there -- that they have kept for four-and-a-half-years and

3    that they're now trying to justify in hindsight with

4    inflated claims for derivatives exposure and for clearing

5    exposure.

6            THE COURT:  Mr. Rossman, you're -- you're kind of

7    making your opening argument for a trial that we're not yet

8    having in the context of a discovery dispute that wouldn't

9    exist if this were a witness who worked domestically for

10   JPMorgan or was still employed by JPMorgan.

11           And so I'm -- I don't want to get in the way of

12   your rhetoric, but I think we're getting a little beyond the

13   focus of what we're talking about.  I'm -- I've read the

14   papers and the declarations.  I'm familiar with the issue.

15   And I would like this not to be an opportunity for

16   grandstanding.

17           MR. ROSSMAN:  Well, Your Honor, I -- I don't mean

18   to get too carried away with my arguments.  I think you can

19   tell that I feel strongly about what happened in this case,

20   and the creditors' committee and the estate feels strongly

21   about this case.  But let me get to the discovery issue.

22           THE COURT:  I understand.  This is a -- this is an

23   incredibly narrow question which should not become an

24   opportunity to argue the merits of the case.  The question

25   is focused:  To what extent do you actually need the

Page 62

```
1    deposition of Bruno Iksil to obtain evidence you don't

2    already have.

3              MR. ROSSMAN:  We don't have any evidence, Your

4    Honor.  Okay.

5              THE COURT:  You had a whole bunch of material that

6    you attached to your -- to declarations suggesting that you

7    have ample evidence already regarding the $273.3 million

8    dispute with regard to variation margin that by very

9    definition is not the subject matter of the litigation.

10             MR. ROSSMAN:  Your Honor, the evidence is at

11   different levels and it's worth understanding it.  They have

12   given us discovery at the investment banking level.  Okay.

13   So like chief risk officer Mr. Hogan, for example, the folks

14   who were making the demand that the 273.3 be paid that day.

15   Okay.  So they've searched the email inboxes of those folks

16   and we have some documents from that.  Okay.

17             We have our own files and we've searched those.

18             But as far as I understand, they have not searched

19   the files yet, prior to our asking JPMorgan, for the inboxes

20   and the documents from the CIO's office.  Okay.  That's the

21   area we haven't seen.  We have not seen at the trading

22   level, we have not seen at the CIO's office either

23   information about this $273.3 million margin dispute or

24   information, other than bits and pieces that by happenstance

25   have to be -- happen to have been in our documents, okay,
```

Page 63

1   primarily, nor have we seen what, if anything, the CIO is

2   doing to hedge Lehman-related exposure.

3            And, Your Honor, I do want to take a moment on the

4   grandstanding point.  I assume you're referring to my -- my

5   making my case here.  And I -- forgive me if I feel strongly

6   about it, and I -- and I do and I want to make it.

7            They accused me of a different kind of

8   grandstanding.  Okay.  They accused all of us of a different

9   kind of grandstanding, which is to try to make public

10  statements about this.  If Your Honor looks at the record,

11  and I'm sure Your Honor has in these motions, we didn't

12  start back in July of 2012 with a motion.  We didn't start

13  with a press conference.  We --

14            THE COURT:  I saw you --

15            MR. ROSSMAN:  -- didn't file any --

16            THE COURT:  I saw that you sent a letter to Mr.

17  Vizcarrondo requesting certain discovery.

18            MR. ROSSMAN:  Well, there's more than a letter.

19  There were something on the order of 30 back and forth

20  misses, and we had enumerable lengthy meet and confers on

21  this issue.  We tried to get it from them voluntarily.

22            THE COURT:  But let's try to focus in on the real

23  discovery dispute.  To what extent do you have an ongoing

24  discovery effort with JPMorgan concerning a turnover of

25  documents from the CIO and the deposition of current

Page 64

1    JPMorgan employees, rather than going after Mr. Iksil, a

2    non-party witness in France?  In other words, how does this

3    targeted discovery fit into the overall discovery of this

4    issue which, quite candidly, I view as not central to the

5    case?

6              MR. ROSSMAN:  Well, Your Honor, I want to take up

7    both of those.  Okay.  We've asked for extremely targeted

8    discovery.  We've asked for a 30(b)(6), and we've asked for

9    four individuals who appear to us to be the four most

10   knowledgeable individuals on the subject.  Okay.  I

11   understand that two of them are JPMorgan employees.  Two of

12   them are not JPMorgan employees.  I also understand from

13   Wachtell that all of them are abroad and are likely to be

14   deposed abroad.

15             So the idea that there's some enormous burden

16   associated with having to take depositions abroad is not one

17   that I think has any traction in this case at all.  Okay.

18             THE COURT:  Well, the distinction here, and the

19   only reason that we're having this argument is that you're

20   seeking leave of court to take a deposition pursuant to the

21   Hague Convention, which you wouldn't need to do, presumably,

22   if you were dealing with a JPMorgan employee.  JPMorgan

23   would simply produce those witnesses or fly them in.

24             MR. ROSSMAN:  That's right, Your Honor.  And they

25   have said for the two that are JPMorgan employees, they've

Page 65

1    said, we don't -- we want to talk to you about taking

2    depositions at all.  Let's give us -- you know, let us give

3    you the documents first.  But those two we represent and, if

4    need be we'll produce then.  And the third, who is not a

5    JPMorgan employee, they've said they will also represent

6    him.  So they'll make him available, if necessary.

7              What they have said to us is they don't represent

8    Mr. Iksil.  They don't represent Mr. Iksil.  He's got

9    separate counsel.  And if we want to take his deposition,

10   we've got to serve him in France.  That's what they told us

11   to do months ago.

12             THE COURT:  Have you been in touch with Mr.

13   Iksil's separate counsel?

14             MR. ROSSMAN:  We -- we don't even know who Mr.

15   Iksil's separate counsel is.  It hasn't been identified to

16   us.  Okay.  So we've tried to locate him.  We think we

17   understand where we can serve him.  And we're asking the

18   Court's permission to serve a subpoena on a witness who is

19   knowledgeable.

20             Now I looked at the federal rules up and down.

21   I'm not aware that there's an infamy exception to your

22   obligation to provide testimony under Rule 26.  Now there

23   may be other people who are knowledgeable, but that's true

24   with respect to this case generally.  JPMorgan hasn't just

25   accepted taking one person's deposition on a particular

Page 66

1    subject.  They've taken 144 depositions and still counting

2    in this case and many of -- several of them multiple times

3    until they're satisfied.

4           So it's appropriate for us to seek testimony from

5    all people who are knowledgeable, and it's appropriate for

6    us to select the individuals that we want testimony from.

7    We -- we are confident that Mr. Iksil is as knowledgeable

8    about these subjects as the other three people that we've

9    identified, or more knowledgeable since they're his trades,

10   and JPMorgan hasn't done anything, anything in the eight

11   months that we've been negotiating with them over this

12   discovery to show us documents or provide us with affidavits

13   to convince us otherwise.  They've had ample opportunity to

14   do that, Your Honor.

15          And I don't want to accuse them of foot-dragging,

16   but it's certainly a process that's taking a very long time

17   and in their opposition they have not come forward with any

18   evidence.  They're simply taking pot shots at our evidence.

19   They still haven't squarely answered the question of whether

20   the CIO's office was engaged in Lehman-related hedging

21   activity.  They haven't answered the question of whether

22   there are other people who are more knowledgeable than Mr.

23   Iksil on the 273.  I don't think that there could be because

24   he is directly relevant.

25          And I want to just answer one more thing that Your

Page 67

1    Honor raised, which is very important here, okay, which is

2    what is this dispute, this $273 million dispute that

3    happened on the 9th, was resolved in Lehman's favor on the

4    10th, what does that have to do with our overall case?

5           If you look, Your Honor, there is -- one of the

6    documents that we produced in this case was -- I'll get it

7    in a moment -- was an email from John Hogan, and Mr. Hogan's

8    email -- I'll find it in a second.  Mr. Hogan's email, which

9    is Exhibit G in our motion papers, was sent the afternoon of

10   September 9th, and this is between the time, okay, after --

11   after the $5 billion demand was made and the $3 million was

12   posted that day, and an additional $600 million was posted

13   the next two days, Your Honor.  It was between that time

14   frame, so this is a crucial time period.

15          JPMorgan is down in Washington, D.C.  They had

16   meetings that morning with top government officials.  They

17   made their demand and, of course, that night they make their

18   demand for the new agreements.  Mr. Hogan writing to Steve

19   Black, co-chairman of the investment bank, Barry Zubrow

20   (ph), who is the chief risk officer globally of the bank,

21   okay, has four items in his email.

22          The top two priority items are, get us the $3

23   billion in cash that we're supposed to get based on the

24   collateral demand that we just made, and I spoke to Chris

25   O'Mera (ph), who is Lehman's chief risk officer, and told

Page 68

1    him that we needed to clean up the margin dispute today.

2    That was the $273.3 million.  They insisted on that money.

3    That was their M.O. for doing business.  Get the cash first,

4    worry about justifying it later.

5            And once last thing that I want to make sure Your

6    Honor understands.  Our point -- this is a point we're going

7    to make in our case in why this discovery is relevant -- is

8    that Lehman fully collateralized JPMorgan, fully

9    collateralized for all of the derivative-related exposures

10   through and including close of business on Friday, September

11   12th, under these ISDAs (sic).  If they had any concern at

12   all that there was some trade or transaction where there

13   were differences in value between Lehman values and JPMorgan

14   and JPMorgan thought it was in the right, it policed that

15   vigilantly and made sure that it had every last dollar.

16           So all of a sudden to slap an additional billions

17   of dollars of exposures, which we think are not real

18   exposures, on top of that demand collateral and then keep it

19   is the essence of what we think is wrong with JPMorgan's

20   conduct here and that's why this episode is important.

21           Your Honor, I'll just say in conclusion, we are

22   anxious to get our hands on the documents that we've been

23   asking for for a long time.  We're anxious to take the

24   depositions of JPMorgan witnesses who JPMorgan can produce.

25   At this stage all we're asking you to do is to authorize us

 1      to issue a subpoena.

 2              THE COURT:  I understand.

 3              MR. ROSSMAN:  Thank you, Your Honor.

 4              THE COURT:  Let's hear from JPMorgan.

 5              MR. VIZCARRONDO:  Good morning, Your Honor.

 6              THE COURT:  Good morning.

 7              MR. VIZCARRONDO:  If Lehman is genuinely

 8      interested in getting more information about this margin

 9      dispute, which is not alleged in the complaint, they note

10      about in the outset of discovery.  They've, in fact,

11      questioned some witnesses about it.

12              And the documents that they are relying on for

13      this application are documents they've had for more than two

14      years, including documents identifying Mr. Iksil,

15      identifying -- and -- and the very documents they're relying

16      on show that Mr. Iksil says, I don't know about this -- this

17      trade.  I don't know about this dispute.  It's not me.  But

18      I'll put you in touch with people who do.  He did, and it

19      was quickly resolved in Lehman's favor.

20              But they've had those documents for two years.

21      They've known about Iksil's whatever involvement, non-

22      involvement he -- he had.  They've known about the other

23      people in CIO and whatever involvement they had.  The only -

24      - the only thing that's changed in the last two years is

25      that Iksil is now the London Whale, so now they want to go

Page 70

```
 1    to France to question Mr. -- Mr. Iksil.

 2             If they are genuinely interested in understanding

 3    the reason for JPMorgan's, I'll admit, error, which

 4    JPMorgan, you know, conceded and -- and cured, you know,

 5    rather -- rather quickly, if they want to take -- take

 6    further testimony to understand it, I think it's explained

 7    in the documents they have, but if they want to, we can

 8    produce for them a JPMorgan employee who is in New York, one

 9    of the person's who they've -- who they've asked to depose.

10    We can produce them as a -- as a JPMorgan -- as a 30(b)(6)

11    witness or testify as to his personal knowledge.

12             And then after that deposition if there's a

13    genuine further issue as to Mr. Iksil, then perhaps the

14    Court can revisit it.  But there's no showing on the

15    application that they've made now that there's any reason or

16    basis to have us trace to France to take -- take a

17    deposition from Mr. Iksil.

18             I agree that -- that -- well, the standard here is

19    essentially the same as the standard for any -- any

20    discovery issue.  It has to -- if there's a dispute, then

21    they do have some burden of showing that what they're asking

22    for is -- is seeking relevant evidence or evidence that's

23    likely to -- to lead to relevant evidence.  They haven't

24    shown that in these papers.  They haven't -- again, the very

25    documents that they rely on, if anything, show Mr. Iksil
```

Page 71

1    saying -- and the Lehman person accepting the fact that Mr.

2    Iksil did not have any involvement in these trades.  He's

3    not the person, and the person who did have involvement got

4    back to them and it was resolved promptly.

5           And as to the -- is this hedge, it's macro hedge,

6    again, there's absolutely no -- there's absolutely no --

7    nothing in their papers at all connecting Mr. Iksil to any

8    macro hedge that JPMorgan may have -- may have put on in

9    order not to -- as, again, it's plain from the public record

10   -- not to protect against any risks specific to Lehman, but

11   against a market collapse or substantially adverse reaction

12   to some unexpected disaster, such as a Lehman collapse, a

13   Merrill Lynch collapse, an AIG collapse, a tsunami, that was

14   another example that was given.

15          Again, nothing to do, we -- we submit, to any

16   issue that's -- that's genuinely in this case, but they've

17   made no showing that Mr. Iksil has any relationship to it

18   all.

19          So we ask Your Honor to deny the application.  We

20   have -- we've had negotiations with them for seven or eight

21   months, as Mr. Rossman has said, about document production.

22   I'm not going to go with the -- with the who shot John on

23   it.  I will say there have been substantial gaps in time

24   between the proposal that we would make to try to reach an

25   agreement as to the proper scope of document discovery and

Page 72

1    then there would be gaps of a month, in some cases two

2    months before they got back to us.

3           There was finally an agreement last month or early

4    this month.  We have started to make discovery, document

5    discovery to them.  We expect to complete it before the end

6    of the month.  We believe that those documents will show

7    them that there's no basis for taking Mr. Iksil's

8    deposition.  But, again, if -- if there's any basis to take

9    a deposition at this point, we will arrange for a 30(b)(6)

10   deposition or a deposition of -- of this one person who is

11   in New York so at least we can try to -- try to approach

12   this on some reasonable basis.

13          THE COURT:  Mr. Vizcarrondo, do you believe that

14   the discovery requested of Mr. Iksil is being pursued in bad

15   faith because of the notoriety that surrounds this

16   individual?

17          MR. VIZCARRONDO:  I'm not going to use the word,

18   bad faith.  I think it's apparent that that's a motivation

19   of theirs.  They -- they don't deny it.  They admit it in

20   their reply papers.  Their only response was that it's not a

21   violation of Rule 11 for them to seek discovery for that

22   person -- for that purpose.  I commend them for making an

23   application that does not violate Rule 11.

24          But I -- I think they concede that that is -- that

25   that is a purpose in their seeking this -- this discovery.

Page 73

1              MR. ROSSMAN:  We disagree with that --

2              THE COURT:  I'm -- I'm not --

3              MR. ROSSMAN:  -- vehemently, Your Honor.

4              THE COURT:  -- speaking to you quite yet.  I --

5     you can have an opportunity to respond.

6              And assuming for the sake of discussion that Mr.

7     Iksil were an otherwise anonymous employee that no longer

8     worked for JPMorgan, but had the very same functions within

9     the chief investment office unit, would you be fighting this

10    hard to prevent this discovery because the irony here is

11    that the very visible and public fight over what really is

12    an otherwise ordinary deposition in a massive case has,

13    frankly, put unwanted attention on this very subject matter.

14             So if Mr. Iksil were a completely anonymous former

15    employee would you be fighting in the same way?

16             MR. VIZCARRONDO:  Yes, Your Honor.

17             THE COURT:  Why?

18             MR. VIZCARRONDO:  Because we believe this has

19    nothing to do with this case.  Yes.  We believe it has

20    absolutely nothing to do with this case and we would oppose

21    taking -- taking Mr. Iksil's deposition -- look, I can't --

22    I cannot -- I cannot ignore the fact that Mr. Iksil is not a

23    anonymous employee.  He's an employee, a former employee

24    that, obviously, there's been much public discussion about.

25    It's no secret that he separated from JPMorgan on not

Page 74

1   amicable terms.  I -- I think it's fair to say -- again, I

2   don't want to get into, you know, too disparaging statements

3   about what their motives may be.

4            But I do suspect that part of it is to try to see

5   if Mr. Iksil will make in his deposition disparaging

6   comments generally about JPMorgan, about Mr. Diamond, about

7   whoever that somehow or other will then wind up in the

8   public record.  We have concern about that.

9            THE COURT:  Okay.

10           Mr. Rossman, did you want to defend your honor?

11           MR. ROSSMAN:  I certainly would, Your Honor.

12           I'm going to go out of order.

13           First, I want to deny with every bone in my body

14   the idea that we're doing this in any way in bad faith or

15   with a gear --

16           THE COURT:  I didn't accuse you of doing anything

17   in bad faith.  I --

18           MR. ROSSMAN:  I understand.

19           THE COURT:  -- was asking Mr. Vizcarrondo if that

20   was his view.

21           MR. ROSSMAN:  Oh, Your Honor, I didn't take you as

22   accusing me.

23           MR. VIZCARRONDO:  And I did not accuse Mr. Rossman

24   of bad faith.

25           MR. ROSSMAN:  I did not accuse -- I did not take

Page 75

1    you as accusing me, Your Honor.  I -- I did not take Mr.

2    Vizcarrondo as vindicating me.  Maybe I'll -- maybe I'll put

3    it that way.

4              THE COURT:  Do you feel the need to vindicate

5    yourself now?

6              MR. ROSSMAN:  I do, Your Honor, because this is

7    important.  Okay.  We cite a Second Circuit case and we cite

8    it for a simple legal proposition, okay, which is, of

9    course, you know, core proceedings are supposed to take

10   place in a public place.  And there is nothing wrong as long

11   -- as you're filing something that's consistent with Rule

12   11, there is nothing wrong with taking a position that may

13   bring public scrutiny on your adversary.  Okay.

14             That wasn't our purpose here.  Okay.  If that were

15   our purpose here, then eight or nine months ago we would

16   have started with a motion.  If they had been able to

17   control Mr. Iksil or been able to persuade his counsel to

18   appear for deposition, there wouldn't be anyone in the

19   gallery.  Okay.  We wouldn't be here in court.  We would

20   take that deposition.

21             And if there were concerns that Mr. Vizcarrondo

22   had about the contents of that deposition, if there is

23   anything there that's truly either a secret or confidential

24   information or that they thought fit within the terms of our

25   protective order, then they would have had the right to

Page 76

1    designate it as such, and it couldn't be public unless and

2    until Your Honor decided to unseal it.

3              Now, Your Honor, in a case where they have spent

4    years bashing Lehman and bashing Lehman personnel, you know,

5    at every opportunity, throwing out phrases like, goat pooh,

6    even if they're non-sequiturs, Your Honor, okay, where they

7    went out of their way to file on the public record the

8    declarations of New York Fed President Timothy Geithner and

9    former Secretary of the Treasury Henry Paulson.  They filed

10   those unsealed, we didn't.  Okay.  And they have been using

11   that, citing them in their papers so that they can feed, you

12   know, frankly, those papers to the members of the media so

13   that they can get their story out.  The idea that they would

14   even suggest, even suggest that we're doing this, you know,

15   for the publicity of it is really pretty outrageous.

16             Now I think Your Honor put your finger right on

17   the right issue here, which is if this weren't Bruno Iksil,

18   if this were some, you know, unknown employee, whether he

19   was a former employee represented by them or not represented

20   by them, there would be no fuss, no muss.  We would take the

21   deposition and we would move on with life.

22             They're taking the stand here, frankly, creating

23   the publicity by taking the stand.  If you'll remember, Your

24   Honor, I -- I raised this issue in one of our last

25   conferences and was very surprised to learn that they were

Page 77

1    opposing it.  I didn't think they would.  Okay.  But they

2    have made the publicity by opposing it.  I don't know what

3    point they're trying to make.

4         What I -- the point that I want to make, Your

5    Honor, is we think he clearly does have relevant testimony.

6    He doesn't get shielded because he's a person of public

7    interest.  Okay.  We've had testimony of multiple CEOs and

8    chairmen of major corporations in this case.  High level

9    government officials have given testimony.  There have been

10   a lot of folks who have seen this case as important enough

11   to be willing to provide their testimony.  Mr. Iksil should

12   not be shielded from that, okay, merely because he's created

13   some other problem for JPMorgan.  We want to ask him

14   questions.  I have not seen a showing that Mr. Iksil is not

15   knowledgeable.

16        One point that I want to make on that, Your Honor,

17   is whether these are Mr. Iksil's trades, as JPMorgan's own

18   spreadsheet shows, or they were someone else within Mr.

19   Iksil's operation.  My understanding is Mr. Baria is a more

20   junior trader who reports to and is supervised by Mr. Iksil.

21   That's why Mr. Iksil contacted him to resolve this problem.

22   Either way, Mr. Iksil is a person knowledgeable about these

23   subjects.  He's the person standing between Lehman and the

24   resolution of this dispute.

25        So in the ordinary circumstances, there would be

Page 78

1    no question at all that we would take this deposition.  So I

2    think, essentially, what JPMorgan is asking Your Honor to do

3    is to find that there's a London Whale exception to the

4    Federal Rules of Civil Procedure.

5          I have not heard that he is too busy.  I have not

6    heard that he is incarcerated.  I have not heard that there

7    is any reason why he is unable to give testimony.  And in a

8    case where JPMorgan has literally circled the globe seeking

9    every last bit of testimony that they can try to get, third

10   parties and former Lehman employees to assist them in their

11   case, the idea that this one additional deposition is, you

12   know, the deposition that broke the camel's back and the one

13   that we shouldn't take is fairly absurd, Your Honor.

14         We want to take this deposition.  If the

15   deposition has information in it that they think, frankly,

16   should be subject to a protective order, they have their

17   remedies under the protective order.  We want to ask the

18   questions, Your Honor.

19         And the last thing I'll say is I still haven't

20   heard an answer on the question of what the CIO's office was

21   doing with respect to hedging activity.  And I would think

22   by now they probably have a pretty decent view of what the

23   CIA -- CIO's office was up to.

24         Thank you, Your Honor.

25         THE COURT:  That last letter is an important

Page 79

1    distinction.  It's not the CIA.

2        (Laughter)

3            THE COURT:  This is actually a completely routine

4    discovery dispute that happens to have attracted a great

5    deal of attention because of the visibility of the proposed

6    witness and because this proposed witness no longer works

7    for JPMorgan and resides in France, thereby making it

8    necessary for the plaintiffs to come to court and seek an

9    ordinary course order under the Hague Convention to compel

10   this witness's appearance at a deposition to take place in

11   France.

12           I don't have to tell the experienced lawyers in

13   the room that the Federal Rules of Civil Procedure are

14   extraordinarily liberal when it comes to discovery, nor do I

15   have to remind them that this is the first occasion, at

16   least to my recollection, in which there has been actual

17   litigation over whether or not a particular deposition

18   should be taken.  There have been some discovery disputes in

19   the case leading up to this, but those disputes have been,

20   for the most part, resolved by the agreement of counsel

21   following consultation with the Court or have been the

22   subject of other motion practice.  But this is the first

23   instance, to my recollection, in which there has been issue

24   joined with respect to whether or not a deposition should be

25   taken.

Page 80

1              I hate to say this, but I rather suspect that the

2      evidence to be offered by Mr. Iksil will pale in comparison

3      to the arguments that have been made as to whether or not

4      the deposition should be taken at all.  This case has been

5      progressing for a number of years now through the discovery

6      phase.  The parties themselves are deeply steeped in the

7      facts of the case and the theories that they will be

8      pursuing either at the time of dispositive motions or trial.

9              I consider it inappropriate, except in a clear

10     case of abuse, to cut off discovery of a witness that has

11     fingerprints all over a particular transaction.  And in this

12     instance, Mr. Iksil's fingerprints are on the $273.3 million

13     transaction in question that took place on a date of some

14     significance to the case.

15             In saying that, I note that the $273.3 million

16     transaction is not really what this case is about at all.

17     But it's not for me to define how the plaintiffs should

18     endeavor to prove their case, nor is it for me at this point

19     to make the judgment that this deposition is unnecessary.

20             It may turn out to be unnecessary after it's

21     taken.  The testimony may prove to be worthless, but it

22     could also turn out that the testimony is of some

23     incremental value or may lead to the discovery of other

24     evidence that may be admissible.

25             So the request of the plaintiffs is granted.

Page 81

1              MR. ROSSMAN:  Thank you, Your Honor.

2              THE COURT:  We're adjourned.

3              MR. VIZCARRONDO:  Thank you, Your Honor.

4         (Whereupon, proceedings were concluded at 11:53 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 82

I N D E X

RULINGS

| DESCRIPTION | PAGE | LINE |
|---|---|---|
| Presentment of Revised Order | | |
| Authorizing Debtors to Assume | | |
| Certain Executory Contracts | 11 | 14 |
| Motion of FFI Fund, Ltd., et al. to | | |
| Consolidate Contested Matter with | | |
| Adversary Proceeding and for Related | | |
| Relief | 28 | 8 |
| Motion for Entry of an Order Approving | | |
| a Settlement Agreement with Certain U.S. | | |
| Insurers | 30 | 20 |
| Williams-Pate v. LBHI, et al. | | |
| Motions to Dismiss | 44 | 2 |

Page 83

1                              I N D E X

2

3                                RULINGS

4    DESCRIPTION                                    PAGE      LINE

5

6    Lehman Brothers Financial Products, Inc.

7    v. The bank of New York Mellon Trust, Co.,

8    National Association Presentment of Order

9    Granting Interpleader Relief                    46        16

10

11   LBHI v JPMorgan Chase Bank, N.A.

12   Application of Plaintiffs Lehman Brothers

13   Holdings, Inc. and Official Committee of

14   Unsecured Creditors of Lehman Brothers

15   Holdings, Inc., et al, Pursuant to

16   11 U.S.C. §105(a) and the Hague Convention

17   on the Taking of Evidence Abroad in Civil

18   or Commercial Matters, for Issuance of a

19   Letter of Request for International

20   Judicial Assistance to Take the Sworn

21   Deposition of Bruno Iksil                       80        25

22

23

24

25

Page 84

1                          I N D E X

2

3                          RULINGS

4    DESCRIPTION                              PAGE      LINE

5

6    Motion of Fidelity National Title

7    Insurance Company to Compel Compliance

8    with Requirements of Title Insurance

9    Policies                                  --        --

10

11   Motion of Monti Family Holding

12   Company, Ltd. for Leave to Conduct

13   Rule 2004 Discovery of Debtor Lehman

14   Brothers Holdings, Inc. and Other

15   Entities                                  --        --

16

17   Cardinal Investment Sub I, L.P. and

18   Oak Hill Strategic Partners, L.P.'s

19   Motion for Limited Intervention in

20   the Contested Matter Concerning the

21   Trustee's Determination of Certain

22   Claims of Lehman Brothers Holdings,

23   Inc., and Certain of Its Affiliates       --        --

24

25

Page 85

1                           I N D E X

2

3                           RULINGS

4     DESCRIPTION                             PAGE      LINE

5

6     Motion Pursuant to Federal Rule of

7     Bankruptcy Procedure 9019 for Entry of

8     An Order Approving Settlement Agreement    --        --

9

10    Trustee's Twenty-Second Omnibus Objection

11    to General Creditor Claims

12    (Amended and Suspended Claims)             --        --

13

14    Motion of FirstBank Puerto Rico for

15    (1) Reconsideration, Pursuant to

16    Section 502(j) of the Bankruptcy Code

17    and Bankruptcy Rule 9024, of the SIPA

18    Trustee's Denial of FirstBank's Customer

19    Claim, and (2) Limited Intervention,

20    Pursuant to Bankruptcy Rule 7024 and

21    Local Bankruptcy Rule 9014-1, in the

22    Contested Matter Concerning the Trustee's

23    Determination of Certain Claims of Lehman

24    Brothers Holdings, Inc. and Certain of

25    Its Affiliates                             --        --

Page 86

1                          I N D E X

2

3                          RULINGS

4    DESCRIPTION                              PAGE     LINE

5

6    Motion of Elliott Management Corporation

7    for an Order, Pursuant to 15 U.S.C.

8    §§ 78fff-1(B), 78fff-2(B), and

9    78fff-2(C)(1) and 11 U.S.C. §105(A),

10   (I) Determining the Method of

11   Distribution on Customer Claims and

12   (II) Directing an Initial Distribution

13   on Allowed Customer Claims               --       --

14

15

16

17

18

19

20

21

22

23

24

25

1              C E R T I F I C A T I O N

2

3    I, Sherri L. Breach, CERT*D-397, certified that the

4    foregoing transcript is a true and accurate record of the

5    proceedings.

6

7

8

     SHERRI L. BREACH

9

     AAERT Certified Electronic Reporter & Transcriber

10

     CERT*D -397

11

12

13

     Veritext

14

     200 Old Country Road

15

     Suite 580

16

     Mineola, NY 11501

17

     Date:  March 14, 2013

18

19

20

21

22

23

24

25