RECEIVED
APR 2 2013
U.S. BANKRUPTCY COURT, SDNY

Judge Peck

Your Honor, I am not, financially, able to hire an attorney. However, I hope that you will read my submission.

Thank you for your time,

Mary E. Fangboner

Mary E. Langevin
19 Fort Charles Place
Bronx, NY  10463
ML10463@gmail.com
March 29, 2013



Honorable James M. Peck
One Bowling Green
New York, New York 10004
Courtroom 601

Mr. Robert J. Lemons, Esq.
Mr. Mark Bernstein, Esq.
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Re:  Chapter 11 – Case No. 08-13555 (JMP)

Particpation in RSU Claims Discovery in Connection with Omnibus Objections to Reclassify Proofs of Claim as Equity Interest:  Mary Langevin – Claim Number:  24675 in the amount of $52,415

Dear Sirs:

In response to the request by Ralph I. Miller, of WEIL, GOTSHAL & MANGES LLP, dated November 19, 2012, please find my submission of documents and communications that support my claim that the monies, currently labeled as "RSU claims" are, in fact, liabilities of LEHMAN BROTHERS ("The Firm")and are owed to me for services rendered.

As I will outline, the evidence is overwhelming, that the balance outstanding and  owed to me are not only unpaid compensation, but also The Firm's liability, which must be paid and settled.  On every dimension, employee-employer, enterprise – investing public-at-large, and the enterprise – regulators, The Firm, in its own documents, recorded and communicated its obligation to pay for services rendered.

From the point of entry into the firm to its declaration of bankruptcy, LEHMAN BROTHERS communicated not only to me, but also to every employee, its investors, the rating agencies, and even the federal government, that the salary reduction plan via the RSU program was compensation.  In Document ML-03, you will find my offer letter dated October 19, 2000.  On page 1, third bullet,

> "At the Firm's option, a portion of your total 2000 and future year's <u>compensation </u>(combined base salary, bonus, and other compensation) will be payable in restricted stock units pursuant to the Firm's employee stock award program as then in effect."

1

I have underlined and noted in bold that The Firm's own words indicate that compensation would be withheld for a period of 5 years. It was not a stock disbursement but a retention of cash, withheld to fuel team cooperation across competing silos within the firm, but more importantly, a balance sheet maneuver to impress the rating agencies, the investment community, and the regulators. Whether the holding vehicle of those monies (for future disbursement) is in cash, certificates of deposit, treasury bonds, an index basket of investments, or a firm-managed vehicle is irrelevant.

During the time period that the monies were withheld from me, LEHMAN BROTHERS communicated the rules via paper documents  Samples of these can be found in exhibits ML-01 and ML-02. Prior to my arrival and during my employment, the tax treatment appears to have been implicitly approved by the IRS. In the October 1994 Stock Award Program (ML-01), page 9, it is quite clear that the federal government considered the eventual payment of the withheld compensation, after 5 years as compensation, not a capital gains event from investment activities. For reference:

- *At the time the RSUs are awarded, there is no taxable event.*
- *When your RSUs vest, you will owe FICA tax on their value. The value of the RSUs subject to the FICA tax will be the number of units vesting multiplied by the price of Lehman Brothers common stock on the date the units vest.*
- *After the restriction period for 1994 RSUs ends, on July 1, 1999, your RSUs convert to common stock. Ordinary income equal to the July 1, 1999 market value of your shares will be reported to the IRS and you will be subject to tax withholding on this amount. **Since the receipt of these shares is treated as compensation paid to you, ordinary income tax rates apply,** rather than the special provisions dealing with capital gains.*
- *On July 1, 1999, when your RSUs convert to common stock, your cost basis for tax purposes will equal the market value of your shares that day. Any subsequent increases in value will be taxed as capital gains when the stock is sold. If the stock price is lower when you sell than it was when the RSUs converted, you will have a capital loss to declare.*

On pages 2 & 12 in the 2001 Stock Award Program (ML-02), LEHMAN BROTHERS repeated the explanation of the transaction mechanism and its ongoing compliance with IRS tax regulations.

*Page 2 – 2001 Stock Award Program at a Glance*

- *All eligible members of the Firm receive a portion of their compensation in restricted stock units (RSUs). Each RSU represents the right to receive one share of Lehman Brothers common stock five years after the RSU is granted.*
- *RSUs have been awarded to you as part of your 2001 compensation payable for the year's performance. The amount of compensation paid in RSUs increases as the amount of your total compensation rises.*
- *In 2001, a portion of your stock award was priced in September and the balance of your award was priced in December. Generally, the Firm's stock award is made only at one time in the year, at year end.*
- *A portion of your RSU award was priced at $34.98, based on the closing price of Lehman Brothers common stock on September 20, 2001 ($46.64), less a 25 percent discount. The balance of your 2001 RSUs was priced at $47.55 based on the closing price of Lehman Brothers common stock on December 3, 2001 ($63.40), discounted by 25 percent.*
- *On November 30, 2006 the restriction period will end, and you will be entitled to receive one share of Lehman Brothers common stock for each vested RSU you hold. Once your RSUs convert to common stock, they become freely tradable. The RSUs cannot be sold, transferred or pledged before conversion.*

*Page 12 – Tax Treatment of Restricted Stock Units*

2

*<u>Under current tax regulations, you will not be taxed on the value of your RSUs until the convert to common stock</u>. As a result, your RSUs appreciate on a pre-tax basis for the five-year restriction period. (For members of the firm whose employment status changes, special provisions apply. Please see the following section.)*

*Provided below is a summary of the U.S. taxes that are ultimately due under current tax law:*
- *At the time the RSUs are awarded, there is no taxable event.*
- *After the restriction period for 2001 RSUs ends, on November 30, 2006, your RSUs, including any additional RSUs that you receive through dividend reinvestment, convert to common stock. Ordinary income equal to the November 30, 2006 market value of your shares will be reported to the IRS, and you will be subject to tax withholding on this amount. Since the receipt of these shares is treated as compensation paid to you, ordinary income tax rate apply, rather than the special provisions dealing with capital gains.*
- *On November 30, 2006, when your 2001 RSUs convert to common stock, your cost basis for tax purposed will equal the market value of your shares on that day. Any subsequent increases in value will be taxed as capital gains when the stock is sold. If the stock price is lower when you sell your shares that it was when the RSUs converted, you will have a capital loss to declare.*

After the 9/11/2001 events, there was a defined communication strategy to move away from paper dissemination to the Firm's web portal, LehmanLive. As evidenced in exhibit ML-04, LEHMAN BROTHERS ensured that there was some level of program transparency with the Personal Award Summary page. Clearly, the amounts withheld are identified as "Grant Value." The definition of the holding vehicle is Units, not Lehman Brother common stock. At the bottom of the page, the total sum of monies withheld is clearly identified as "totaled $52,415," the amount of my claim, without interest or expenses for the last 4+ years. The printout submitted with my claim clearly shows this as of 1/5/2009 5:34:24 p.m. This is what is owed to me for services performed, during my tenure at Lehman Brothers in the IT department. Even after its declaration of bankruptcy, it is identified as monies withheld, an IOU, a promise to pay.

Year in, year out, LEHMAN BROTHERS went through a very coordinated, highly structured program to manage compensation expense. As a manager, I attended trainings organized by the Human Resource Department to learn and to practice the LEHMAN BROTHERS's script for that year's compensation conversations with my staff. In addition to a minimum of two sessions per year, I was given talking points for every scenario possible, where an employee might dispute their compensation year-end results. Exhibit ML-10 shows a sample of the talking points for the Award Recipient, along with that employee's Blue Sheet, which was for the manager's eyes only. This is a sample of a 1-full page of ten (10) bullet points to explain The Firm's decision to award a relatively small award to a mid-level Vice-President. If you look at the Blue Sheet, because it is printed on blue-colored paper, it is clearly titled, "2007 Compensation Statement." Approximately, in the middle of the page, the Payment Schedule itemizes the Bonus, any Awards, less what bonus amount will be withheld for the RSU plan, and the Total Cash Payment (Before Taxes). Exhibit ML-09 is another employee's Blue Sheet. Clearly, they are of identical format with the same sections: Compensation History, Manager Notes, Equity Summary in USD, Payment Schedule, and Annual Salary.

For my own Compensation Statements, the format was identical to the Blue Sheets, except for the Manager's Notes section, which is omitted. (See exhibits ML-05, ML-06, ML-07 and ML-08). Whether it

3

was during the hiring interviews, the annual compensation exercise, or its 24x7 availability of my personal data (via authentication) on LehmanLive, the message to every employee, myself included, is that our pay was being withheld in order to demonstrate "that we (personally) have skin in the game." Employees could not be trusted to behave properly and honestly, without extracting income, essentially financial conscription.

However, with the investment community, the public message was manipulated in a manner to generate a favorable impression of good relations with employees. In those meetings, it was often touted how supportive employees were with the Firm's mission. It was reputed that ~33% of The Firm was owned by employees, one of the highest for financial firms. The perception management strategy was sophisticated, with communications experts sprinkled in the Human Relations department (for internal employee issues), the Marketing Department (for the external public), and the Finance Department (for the investment community.) With the latter, financial engineering was implemented throughout all levels of the firm, in order to meet the quarterly analyst estimates.

The finesse in which LEHMAN BROTHERS handled compensation expense is further evidenced in the financial statements, audited by Ernst & Young LLP, the Independent Registered Public Accounting Firm, from 2000 – 2007. Excerpts from each year's financial statements are submitted as exhibits ML-11 through ML-18. As part of its marketing pitch as a "Best Operator," LEHMAN BROTHERS engineered the Compensation and Benefits/Net Revenues ratio to stay within a 49% - 50%, to please the rating agencies and investment community.

Table 1.0 Compensation Ratio

| (Data extracts, in millions) | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|---|---|---|---|
| **INCOME STATEMENT** | | | | | | | | | | |
| Total Revenues | 19,894 | 18,989 | 26,447 | 22,392 | 16,781 | 17,287 | 21,250 | 32,420 | 46,709 | 59,003 |
| Net Revenues | 4,113 | 5,340 | 7,707 | 6,736 | 6,155 | 8,647 | 11,576 | 14,630 | 17,583 | 19,257 |
| Compensation & Benefits/Net Revenues | 51% | 51% | 51% | 51% | 51% | 50% | 49% | 49% | 49% | 49% |

Source: Lehman Brothers Annual Reports, 2000-2006 and 2007 10-K

Of course, the details are outlined in Notes, along with the Consolidated Statements of Financial Condition for LEHMAN BROTHERS (Lehman Brothers Holdings Inc. and subsidiaries.). From 2000 to 2005, in the Consolidated Statement of Cash Flows, the amortization of deferred stock compensation appears in the Cash Flows from Operating Activities. This, explicitly, states by the auditors that it is not from a financing or investing activity. Further in the Notes section for Employee Incentive Plans, the language reads, "Eligible employees receive RSU's as a portion of their total compensation in lieu of cash."

This was not a confidential document, for employee eyes-only communication. This was prepared by highly trained, specialized financial professionals for the external consumption by the investing public,

4

regulators, and the rating agencies. It is explicit, conceptually, operationally, and financially, that the employees are owed monies for their services and the payment of that liability will be smoothed out over 5 years time, the vesting period. This is not some complicated option pricing mechanism. It is very clear that The Firm acknowledged that it owed employees those monies and the holding period could be used to incent people internally, while meeting the external results required by investors, suppliers, and regulators, during volatile financial market cycles.

From my analysis, if LEHMAN BROTHERS were to pay a 100% cash bonus, it would never have been able to achieve such a much-praised, though architected, Compensation and Benefits/Net Revenues ratio.

Table 2.0 Compensation Ratio (Revised)

| (Data extracts, in millions) | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|---|---|---|
| INCOME STATEMENT | | | | | | | | | |
| Compensation & Benefits | 2,086 | 2,707 | 3,931 | 3,437 | 3,139 | 4,318 | 5,730 | 7,213 | 8,669 |
| Amortization of deferred stock compensation (CFO) | -221 | -363 | -520 | -544 | -570 | -625 | -800 | -1055 | -1706 |
| Deferred stock awards granted | 417 | 533 | 1003 | 624 | 407 | 999 | 1182 | 1574 | 881 |
| True Compensation Expense (TCE) | 2,282 | 2,877 | 2,282 | 2,877 | 4,414 | 3,517 | 2,976 | 4,692 | 6,112 |
| TCE/Net Revenues | 55% | 54% | 30% | 43% | 72% | 41% | 26% | 32% | 35% |

Source: Source: Lehman Brothers Annual Reports, 2000-2006 and 2007 10-K

Why is this accounting detail even necessary information? Because it is clearly outlined in the Statement of Consolidated Cash Flows, that the monies used to pay dividends to shareholders and for investing activities, such as the purchase of property, equipment and leasehold improvements (Assets) were funded from two sources: (1) monies withheld from employees and (2) the IRS-approved tax benefit for doing so. Essentially, LEHMAN BROTHERS acted as an escrow agent, permitted to use the withheld funds for its own purposes for a period of 5 years, which included the ability to book assets (short-termed and long-lived) on the balance sheet.

In 2006, there was concern within the financial community that firms, not just LEHMAN BROTHERS, were not properly accounting for employee services, where compensation was deferred. The Financial Accounting Standards Board (FASB) completed a revision of FASB Statement No. 123 to address "transactions in which an entity incurs liabilities in exchange for goods or services that are based on the fair value of the entity's equity instruments or that may be settled by the issuance of those equity instruments. "

This Statement focused "primarily on accounting for transactions in which an entity obtains employee services in share-based payment transactions." This was to address "concerns by requiring an entity to recognize the cost of employee services received in share-based payment transactions, thereby reflecting the economic consequences of those transactions in the financial statements." Conceptually, the cost of employee service "will be recognized over the period during which an employee is required to provide service in exchange for the award—the requisite service period (usually the vesting period).

5

..."A public entity will initially measure the cost of employee services received in exchange for an award of liability instruments based on its current fair value; the fair value of that award will be remeasured subsequently at each reporting date through the settlement date. Changes in fair value during the requisite service period will be recognized as compensation cost over that period."

In non-accounting speak, this was an acknowledgment that management of many firms, including LEHMAN BROTHERS, had been smoothing Income Statement results, in order to reduce variability and convey "good news," aka better than analysts' estimates. Although somewhat old, the Ball and Brown Study, "An Empirical Evaluation of Accounting Income Numbers," in the Journal of Accounting Research (Autumn 1968) demonstrated "clear (empirical) association between earnings and stock market reaction....firms whose earnings conveyed good news enjoyed abnormally better stock returns." (White, Sondhi, Fried, The Analysis and Use of Financial Statements, 1994, p. 297).

Since financial statements are an important part of functioning financial markets, FASB's revision, and The Firm's adoption in 2006, was to make very clear "Employee services received in exchange for awards of share-based compensation qualify as assets, though only momentarily—as the entity receives and uses them—although their use may create or add value to other assets of the entity. This Statement will improve the accounting for an entity's assets resulting from receipt of employee services in exchange for an equity award by requiring that the cost of such assets either be charged to expense when consumed or capitalized as part of another asset of the entity (as permitted by U.S. GAAP)."

As any finance professional knows, FASB is the *"designated organization in the private sector for establishing standards of financial accounting that govern the preparation of financial reports by nongovernmental entities. [Its] standards are officially recognized as authoritative by the Securities and Exchange Commission (SEC) (Financial Reporting Release No. 1, Section 101, and reaffirmed in its April 2003 Policy Statement) and the American Institute of Certified Public Accountants (Rule 203, Rules of Professional Conduct, as amended May 1973 and May 1979)."*
*(http://www.fasb.org/jsp/FASB/Page/SectionPage&cid=1176154526495)*

FASB was well aware of the research efforts in academia, along with the actual practice of buying employee services now and pay later. It was very clear that FASB understood, also, the ramifications of non-transparent financial statements. As Sondhi, White and Fried explain, "a monitoring device is needed to ensure that the agreements or contracts between managers – shareholders-creditors are adhered to. ...a firm [is not] an independent entity but rather a 'nexus of contracts'(explicit or implicit) between parties, each motivated by their own self interest. The role of accounting in this scenario is to provide the monitoring device enabling the contracting process to function." (SWF, p. 314).

If the industry accounting standards board, LEHMAN BROTHERS's own accountants, and LEHMAN BROTHERS's own 10-K filing to the SEC, (ML-18), a U.S. government governing entity, acknowledge that my provision of labor is a compensation expense, then it seems pretty clear that there is an unpaid obligation that needs to be settled. Even The Firm's own paperwork demonstrates that fact. While I expect The Firm to contest the existence of any contract, I submit the following:

6

- Offer and acceptance (I executed my offer letter from The Firm and accepted employment – The Firm left me; I never left The Firm.)
- Competent persons (I was rated highly through my employment term and often represented The Firm in many industry events. The Firm was experienced with over 150 years in business.)
- Consideration (The bargain was an exchange: I deliver top quality advise, expertise, and management capabilities in the market data segment within the Information Technology department and The Firm pays me Compensation.
- Sufficiency (Up until its demise, The Firm paid me and I delivered an excellent work product.)

It is curious as to why LEHMAN BROTHERS no longer wants to pay me, for services provided 2003 through 2008. The savings generated from the market data contracts, that I personally negotiated, reduced the Non-Personnel Expense, increased Net Income, and resulted in higher Retained Earnings. The financial effect was to allow for assets to be purchased, along with improved financial ratios, which are the main components of the firm's credit ratings and ultimately, favorably affected its cost of capital and investor attractiveness. I submit that that every piece of evidence contributes to a mosaic view of a contract between The Firm and me. In fact, I think that it passes the legal smell test of the existence of a contract between The Firm and me, along with the outstanding balance that is owed to me. If

*"as US Supreme Court Justice Potter Stewart opined, famously employing a different sense when attempting to define obscenity: "I shall not today attempt further to define the kinds of material I understand to be embraced within that shorthand description; and perhaps I could never succeed in "intelligibly doing so. But I know it when I see it ..." Jacobellis v. Ohio, 378 US 184, 197 (1964).*

I submit, that based on the documents provided, it is quite clear that as an employee, there is a contract for payment. Since it is now almost 10 years since the initial delivery of work product, LEHMAN BROTHERS should pay me for the balance outstanding. Every document submission has demonstrated that my compensation has been withheld.

In my opinion, it is ironic that one major, important element of the moral fiber of LEHMAN BROTHERS was to do the right thing and to work honorably. As this case and claims process has dragged on, often for LEHMAN BROTHERS's convenience, it seems that once-proud firm has lost its anchor. The Firm and its leaders made an exorbitant amount of money, yet the people who built the technology, negotiated its deals, and day-in, day-out, coached excellence amongst it employees, often to the neglect of their own personal lives, are being forced to take financial losses, because it is no longer convenient for LEHMAN BROTHERS to honor its obligations to the suppliers of the intellectual capital that built it and the assets, that continue to generate monies for the estate and to pay the associated legal fees.

According to the terms of the 2001 Lehman Brothers Stock Award Plan (Document ML-02), p. 15, Section: Change in Control ("CIC") Provisions:

Hostile:

- All RSU's vest immediately

7

- Shares of Lehman Brothers common stock will be issued immediately so you may tender your shares with other shareholders

Clearly, the acquisition of The Firm by Barclays Capital, in New York, meets the condition of that clause. The Firm, under the advice of its legal team, chose not to distribute my vested RSU's to my Firm-approved account at Fidelity, as prescribed by its own documents, I was unable to sell [at a loss] into the marketplace in 2008, 2009, 2010, 2011, or 2012. Now, after years of legal maneuvering, the Firm's shares are no longer trading. As I see it, The Firm chose to not only ignore the years of documentation, but also to use its portfolio of resources, built by the sweat of a very loyal workforce, against the very same people, whose intellectual capital created it. The delay tactics, the legal methodology to weary employees, already traumatized, along with re-employment of senior executives, as hired guns, to co-opt them because it insures that they will not testify against the FIRM, demonstrates the capacity and willingness of the FIRM to ignore any legal commitment to its former employees.

It is time for LEHMAN BROTHERS and its attorneys to read its own documents and to do the right thing.

I ask the court to order payment of my claim in full, in the amount of $52,415.


Thank you,

*[signature]*

Mary E. Langevin




[All FASB quotes are from it Summary of Statement No. 123 (revised 2004) located at: http://www.fasb.org/summary/stsum123r.shtml]

| Document Identification | Documents Date | For Attachments to emails and Documents, the Document Name |
|---|---|---|
| ML-01 | October 1994 | Lehman Brothers Stock Award Program |
| ML-02 | October 2001 | Lehman Brothers Stock Award Program |
| ML-03 | October 2000 | Lehmans Brother Offer Letter |
| ML-04 | 9/16/03 | Equity Award Program - LehmanLive |
| ML-05 | 12/16/02 | Lehman Brothers 2002 Total Compensation Statement |
| ML-06 | 12/12/05 | Lehman Brothers 2005 Total Compensation Statement |
| ML-07 | 12/11/06 | Lehman Brothers 2006 Total Compensation Statement |
| ML-08 | 12/10/07 | Lehman Brothers 2007 Total Compensation Statement |
| ML-09 | 12/10/07 | Blue Sheet - Compensation Conversation - Employee #10220916 |
| ML-10 | 12/10/07 | Blue Sheet - Compensation Conversation - Employee #10066483 (including Talking Points) |
| ML-11 | 2/14/01 | Lehman Brothers Annual Report 2000 |
| ML-12 | 2/15/02 | Lehman Brothers Annual Report 2001 |
| ML-13 | 2/17/03 | Lehman Brothers Annual Report 2002 |
| ML-14 | 2/9/04 | Lehman Brothers Annual Report 2003 |
| ML-15 | 2/18/05 | Lehman Brothers Annual Report 2004 |
| ML-16 | 2/17/06 | Lehman Brothers Annual Report 2005 |
| ML-17 | 2/16/07 | Lehman Brothers Annual Report 2006 |
| ML-18 | 1/29/08 | Form 10K Annual Report |