**Hearing Date and Time of April 25, 2013 at 10:00 a.m. (Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jacqueline Marcus

Attorneys for Lehman Brothers Holdings Inc.
and Certain of its Affiliates

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | : | **08-13555 (JMP)** |
| | : | |
| Debtors. | : | **(Jointly Administered)** |

-------------------------------------------------------------------x

**REPLY TO DEBORAH E. FOCHT'S RESPONSE**
**TO PLAN ADMINISTRATOR'S OMNIBUS OBJECTION TO CLAIMS**

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI") as Plan Administrator under the

*Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its*

*Affiliated Debtors* (ECF No. 22737) (the "Plan") for the entities in the above referenced chapter

11 cases (collectively, the "Chapter 11 Estates"), files this reply (the "Reply") to *Creditor's*

*Amended Response to Plan Administrator's Omnibus Objection to Claims Filed by Deborah E.*

*Focht; Creditor's Motion for Order of Allowance and Payment Deeming Claim Nos. 34380,*

*34381, 42914, 42915, 42916, As Timely Filed; Or In The Alternative Motion For Stay, Discovery*

*Requested; And, Extension of Time to File Amended Claims And Response* (ECF No. 36165) (the

"Amended Response") and respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      On January 29, 2013, the Plan Administrator filed its Omnibus Objection to Claims Filed by Deborah E. Focht (ECF No. 34303) (the "Objection").[1]  The Objection seeks to disallow and expunge proofs of claim filed by Deborah E. Focht ("Focht") which were assigned claim numbers 34380, 34381, 42914, 42915, and 42916 by the Court-approved claims and noticing agent (the "Focht Claims").  As set forth in the Objection, the Plan Administrator has identified substantive and/or procedural defects that render each of the Focht Claims unenforceable against the relevant Chapter 11 Estates.

2.      The Focht Claims arise out of a 2002 mortgage loan that was originated by BNC Mortgage LLC ("BNC") and subsequently sold into a securitization trust called Structured Asset Securities Corporation – Amortizing Residential Collateral Trust Mortgage Pass-Through Certificates, Series 2002-BC10.  Out of this simple transaction, Focht has constructed a complex and implausible scheme involving a panoply of Lehman and non-Lehman entities working tirelessly to force a $110,400 mortgage loan into default, which default was somehow supposed to result in the realization, by these parties, of millions in ill-gotten gains.  In support of this fantastic theory, both the Focht Claims and the pleadings filed in support of the Focht Claims are packed with allegations of wrongdoing – most of which is attributed to third parties not before the Court.

3.      While Focht's "theory" of the case is prolix and difficult to follow, the issues before the Court are simple.  Despite Focht's actual notice of the Bar Date, Focht Claims 42914, 42915 and 42916 were filed nearly a month late.  That fact, standing alone, is more than sufficient to justify disallowance of Focht Claims 42914, 42915 and 42916.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Objection.

US_ACTIVE:\44221775\5\58399.0003

4.      Similarly, Focht has failed to allege even a remotely plausible basis for Focht Claims 34381, 42915 and 42916.  These claims are based on hypothetical derivative contracts or insurance policies that are related to the Loan and that allegedly paid LBHI, LBOTC and/or LBDP millions upon the default of the $110,400 Loan.  The Plan Administrator has been unable to locate any insurance policy or derivative contract that is directly related to the Loan and, more importantly, even if there were such an instrument, Focht has failed to explain why she would have any right to payment in connection therewith.  Accordingly, Focht has not and cannot meet her burden of establishing a right to payment from LBHI, LBOTC or LBDP.

5.      Focht's claims against BNC (Focht Claim Nos. 34380 and 42914), which arise out of certain alleged irregularities in connection with the origination of the Loan, suffer from the same deficiency.  The "evidence" supplied in support of these claims is patently insufficient to meet Focht's burden of establishing a right to payment, and the alleged violations of state or federal law that are the subject of these claims are all time-barred by the relevant statutes of limitation.

6.      As a result of the foregoing deficiencies, the Objection should be granted and each of the Focht Claims should be disallowed and expunged.

### The Responses

7.      On February 21, 2013, Focht filed her *Creditor's Response to Plan Administrator's Omnibus Objection to Claims Filed by Deborah E. Focht; Creditor's Motion for Order of Allowance and Payment Deeming Claim Nos.: 34380, 34381, 42914, 42915, 42916, as Timely Filed; or in the Alternative Motion for Discovery and Extension of Time to File Amended Claims and Response* (ECF No. 35026) (the "Initial Response," together with the Amended Response, the "Responses").  The Initial Response indicated that Focht wanted more time to

US_ACTIVE:\44221775\5\58399.0003

respond to the Objection.  Accordingly, on February 22, 2013, the Plan Administrator filed a notice adjourning the hearing on the Objection until March 28, 2013 and extending Focht's response deadline to March 14, 2013 (ECF No. 35209).

8.    On March 14, 2013, the Plan Administrator received a copy of the Amended Response from Focht via email.  The Amended Response was entered on the docket of the above-captioned chapter 11 cases on March 25, 2013.

9.    While the Responses are rambling and convoluted, the statements, arguments, and allegations contained therein can be divided into four categories: (i) Focht's failure to comply with the Bar Date Order, (ii) Focht's demand for discovery from the Chapter 11 Estates, (iii) Focht's allegations of fraud and duress in connection with the Loan, and (iv) various miscellaneous statements or arguments that are irrelevant and/or erroneous and which will not be addressed.  As discussed below in greater detail, the Responses do nothing to alter the fact that each of the Focht Claims is deficient and should be disallowed and expunged.

## THE PLAN ADMINISTRATORS REPLY TO THE RESPONSES

### A.  Focht's Failure to Comply with the Bar Date Order

10.    As set forth in the Objection, the Focht Claims were filed on September 23, 2009 (Focht Claims 34380 and 34381) and October 21, 2009 (Focht Claims 42914, 42915 and 42916).  Focht raises three arguments as to why the Court should excuse Focht's failure to comply with the Bar Date Order.

11.    First, Focht appears to argue that she substantially complied with the Bar Date Order because the Focht Claims were received by Epiq on September 23, 2009 – only one day after the Bar Date.  *See* Init. Resp., ¶1, Amend. Resp. ¶1.  Focht's position is disingenuous and incorrect.  The Plan Administrator is not currently objecting to the two Focht Claims (Focht

4

Claims 34380 and 34381) that were received on September 23, 2009 on the basis that they were late filed.  And, as Focht acknowledges, the remaining Focht Claims (Focht Claims 42914, 42915 and 42916) were received by Epiq on October 21, 2009 – nearly a month after the Bar Date.  *See* Exhibit A to Amend. Resp.

12.      Second, Focht argues that she should be excused from complying with the Bar Date Order because she allegedly never received notice of the Bar Date.  *See* Init. Resp., ¶4, Amend. Resp., ¶4.  This argument is totally implausible in light of the fact that Focht actually filed Focht Claims 34380 and 34381 within one day of the Bar Date on the form obtained from Epiq's website.  Focht must have had actual notice of the Bar Date because she downloaded the proof of claim form and filed Focht Claims 34380 and 34381 such that they were actually received by Epiq within one day of the Bar Date.[2]  *See* Exhibit A to Amend. Resp.  Accordingly, Focht's failure to comply with the Bar Date Order with respect to Focht Claims 42914, 42915 and 42916 cannot be attributed to her alleged failure to receive notice of the Bar Date.

13.      Third, Focht argues that the Court should disregard her failure to comply with the Bar Date Order under a theory of excusable neglect.  *See* Init. Resp., pp. 5,8; Amend. Resp. p. 13.  Rule 9006(b)(1) of the Federal Rules of Bankruptcy Procedure provides that "on motion made after the expiration of the specified period [the court may] permit the act to be done where the failure to act was the result of excusable neglect."  Fed. R. Bankr. P. 9006(b)(1).  The Supreme Court, in interpreting the term "excusable neglect," has held that the term "neglect" in its ordinary sense means "to give little attention or respect to a matter, or . . . to leave undone or unattended to esp[ecially] through carelessness . . . and encompasses both simple, faultless omissions to act and more commonly, omissions caused by carelessness."  *Pioneer Inv. Serv. Co.*

---

[2] Additionally, notice of the Bar Date was published in The New York Times (International Edition), The Wall Street Journal (International Edition), and The Financial Times.

US_ACTIVE:\44221775\5\58399.0003

*v. Brunswick Assocs. L.P.*, 507 U.S. 380, 388 (1993). Under *Pioneer*, the determination of whether a claimant's neglect is excusable is an equitable determination in which a court should consider all relevant circumstances surrounding the claimant's omission, such as: "the danger of prejudice to the debtor, the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." *Id.* at 395.

14.    In applying the *Pioneer* factors to determine whether a late-filed proof of claim was the result of "excusable neglect," the Second Circuit has taken a "hard line" approach that does not give the four factors equal weight. *In re Enron Corp.*, 419 F.3d 115, 122-24 (2d Cir. 2005); *see also In re Lehman Bros. Holdings Inc.*, 433 B.R. 113,119-20 (Bankr. S.D.N.Y. 2010), *aff'd.* 445 B.R. 137 (S.D.N.Y. 2011). The third *Pioneer* factor—the reason for the delay in filing, including whether the cause of such delay was within the reasonable control of the claimant—is the most critical. *See Enron*, 419 F.3d at 122-24. The Second Circuit has noted that the reason for this approach is that the other factors delineated in *Pioneer*—prejudice, length of delay and impact on judicial proceedings, and the claimant's good faith—will typically weigh in favor of the claimant, and the court will therefore focus on the reason for the delay in filing. *Id.* at 122 (citing *Silivanch v. Celebrity Cruises, Inc.*, 333 F.3d 355, 368 (2d Cir. 2003)).

15.    This Court has followed the Second Circuit's "hard line" approach in applying the *Pioneer* factors in deciding numerous motions in this case. Only on two occasions, where "creditors consciously endeavored to comply with the bar date and established that their delay was the result of justifiable confusion over the application of the bar date to their particular claims," did this Court find the existence of excusable neglect. *In re Lehman Bros. Holdings Inc.*, 433 B.R. at 127. With respect to all other motions filed in this case seeking to have late

US_ACTIVE:\44221775\5\58399.0003

filed claims deemed timely pursuant to Bankruptcy Rule 9006(b), this Court found that the delay

in filing the late claims was within the control of the various movants and that "reasons offered

by the Movants demonstrate a lack of care or thoughtful attention to the preparation and filing of

their proofs of claim." *Id.*

16.     The burden of establishing excusable neglect is squarely on Focht, not the

Plan Administrator or the Court. *In re Enron Corp.*, 419 F.3d at 121 ("The burden of proving

excusable neglect lies with the late-claimant."). And, in light of the fact that Focht actually did

file Focht Claims 34380 and 34381 within a day of the Bar Date, there is simply no reason why

Focht could not also have filed Focht Claims 42914, 42915 and 42916 at the same time. Indeed,

the Statement in Support of Claims attached to Focht Claims 42914, 42915 and 42916 is

virtually identical to the Statement in Support of Claims attached to Focht Claim 34380, meaning

that the only difference between the two groups of Focht Claims is a few notations on the face of

Focht Claims 42914, 42915 and 42916. Consequently, Focht's failure to comply with the Bar

Date Order with respect to Focht Claims 42914, 42915 and 42916 was entirely within her control

and the Court should follow its prior decisions and disallow Focht Claims 42914, 42915 and

42916 on the basis that they were late filed.

**B.  Discovery from the Chapter 11 Estates**

17.     In the Statement in Support of Claims that was attached to Focht Claims

34380, 42914, 42915 and 42916 and in the Responses, Focht purported to move for discovery

and a stay, presumably of the Foreclosure Action. *See* Statement in Support of Claims, ¶ 29;

Init. Resp. ¶5; Amend. Resp. ¶13. As such relief is both moot and not properly sought in a proof

of claim, the Plan Administrator did not address this demand in the Objection. In light of

Focht's continued insistence on discovery, however, the Plan Administrator reviewed its records

and, other than as set forth in the Declaration of Daniel Glanz, attached hereto as <u>Exhibit A</u> (the "<u>Glanz Declaration</u>"), the Plan Administrator has been unable to locate any documents under its direct control that are related to the Loan or the Property. Further discovery would, therefore, be a waste of time and money and is not warranted in connection with the Focht Claims. *See Flake v. Alper Holdings USA, Inc. (In re Alper Holdings),* 398 B.R. 736, 754 (S.D.N.Y. 2008) (upholding bankruptcy court's decision to rule on proofs of claim without allowing discovery where claimant failed to allege any facts which, if true, would allow it to recover).

**C. Allegations Related to the Origination of the Loan**

18.    Focht's claims against BNC (Focht Claims 34380 and 42914) appear to relate to certain allegedly wrongful acts of BNC in connection with the origination of the Loan. It is, however, difficult to discern from the Focht Claims the specific conduct that Focht believes forms the basis for her claims against BNC. Paragraph 20 of the Amended Response seems to be intended to remedy this confusion by explaining Focht's "evidence" of BNC's culpable conduct. As described below in greater detail, however, all of the alleged evidence set forth in the Amended Response is either irrelevant, related to conduct of third parties that are not before this Court, or related to claims that are time barred by federal and state law.

19.    The following chart summarizes the portion of Focht's alleged evidence that is irrelevant or related to third parties not before this Court.

| Assertion | Explanation |
|---|---|
| **Irrelevant** | |
| "Exhibit 'B' ('Lehman Took Funds') document showing BNC and Lehman Brothers transferring $109,239.18 of the Creditors funds on October 18, 2002." Amend. Resp., ¶20a. | This document appears to be disbursement instructions from BNC to another Lehman entity instructing such entity to disburse the proceeds of the Loan, less certain fees, to Focht. |

US_ACTIVE:\44221775\5\58399.0003

| Assertion | Explanation |
|---|---|
| "Exhibit 'C' ('Leh') document showing 'Leh' handwritten on the mortgage page document, dated October 18, 2002, which was filed as original in state court, approximately six months after foreclosure suit was filed by [Wells Fargo] in January 2008.  Amend. Resp. ¶20b. | Focht fails to explain (i) who filed this document in the Foreclosure Action, (ii) who she believes is responsible for making the notation, (iii) the significance of the handwritten "Leh," or (iv) assuming that "Leh" refers to Lehman, what a handwritten "Lehman" notation would prove. |
| "BNC and Lehman Brother [sic] caused further confusion by withholding all documents showing any transfers and agreements between Wells Fargo and BNC and/or Lehman Brothers before and after filing its bankruptcy case."  Amend. Resp. ¶20j. | As set forth in the Glanz Declaration, the Plan Administrator has reviewed the available records of LBHI and BNC and, other than as set forth in the Glanz Declaration, has been unable to locate any documents relating to the Loan or the Property. |
| "The Creditor asserts that upon information and belief, BNC and Lehman Brother [sic] and other affiliates have documents pertaining to Stipulations, Agreements or sought for Orders [sic] entered into by and between BNC Mortgage LLC ("BNC") and its affiliated debtors, and Wells Fargo Bank, N.A. ('Wells Fargo') after filing its bankruptcy petition."  Amend. Resp. ¶20k. | The Plan Administrator believes that Focht is referring to the many stay-relief stipulations that BNC and Wells Fargo have entered into during the pendency of BNC's Chapter 11 Case.  These stipulations generally allowed Wells Fargo to exercise its rights as a secured lender in connection with various properties with respect to which BNC no longer retained an interest but where BNC's former interest remained in the local property records.  To the extent Focht had an issue with these stipulations, she had an opportunity to object at the time they were filed.  Further, Focht fails to explain how these stipulations have any relevance to the Focht Claims. |
| **Related to Third Parties Not Before this Court** ||
| "Exhibit 'D' ('MERS MIN') information displaying on Mortgage Electronics Registration Systems, Inc.'s website displaying 'Aurora Bank FSB' named as Investor of 'Note,' dated October 18, 2002."  Amend. Resp. ¶20c. | Aurora Bank FSB is not one of the Chapter 11 Estates, nor does Focht explain why information displayed on the MERS website is relevant to her claims against BNC. |
| "Exhibit 'E' (Two 'Corporate Mortgage Assignment(s)') executed on September 26, 2008 and again on February 13, 2009, both by SPS employee Bill Koch, also known as a 'Robosigner'"  Amend. Resp. ¶20d. | Focht does not allege that Mr. Koch is an employee of BNC, nor does she explain why any actions of Mr. Koch, even if wrongful, are attributable to BNC.  Indeed, Focht neglects to provide any explanation for her conclusion that there is a relationship among SPS and Mr. Koch on the one hand, and BNC on the other.  Further, to the extent that Focht believes that the referenced assignments were wrongful, she has already had an opportunity to litigate that issue in the Foreclosure Action. |

US_ACTIVE:\44221775\5\58399.0003

| Assertion | Explanation |
|---|---|
| "Exhibit 'F' ('Wrong Property') in which BNC and/or Lehman Brother [sic] caused SPS (a.k.a. Fairbanks Capital) to collect on the wrong loan account, and thereafter used an undisclosed and invalid Wells Fargo trust account name to foreclose on the Creditor and others." Amend. Resp. ¶20e. | Focht does not explain the relationship, if any, between BNC and SPS, nor does she explain how or why BNC, which ceased operations in 2007, could or would cause numerous unrelated third parties to take actions in connection with the Loan when BNC disposed of its interest in the Loan approximately six weeks after the Loan's origination in 2002. |
| "Exhibit 'G' ('Adjustable Rate Note' pgs 9 – 4) shows a BNC Adjustable Rate Note dated October 17, 2002, filed in state court by the Wells Fargo Trust's attorney, and claim as original signed in blue ink even though all documents that the Creditor signed were in black ink, and even though there are no documents between the Creditor and Wells Fargo Trust and no documents were ever provided showing any valid transfer to the trust account name." Amend. Resp. ¶20f. | The allegedly wrongful acts described in this section are acts of an attorney for Wells Fargo, not BNC. Also, to the extent that Focht wishes to challenge the assignments, she has already had an opportunity to do so in the Foreclosure Action. |
| "Lehman and BNC put a target on the Creditor's property causing SPS and Wells Fargo to manufacture a loan default due to collecting on the wrong loan account and due to obtaining funds through insurance and/or derivative or credit default swap agreements, which could calculate to well over three million dollars or more[]. The news also reports that the Lehman Debtors were party to more than 906,000 derivative contracts. Derivative Contract Claims [sic]." Amend. Resp. ¶20i. | As above, it is unclear why Focht believes that "Lehman" and BNC control the actions of third parties SPS and Wells Fargo in connection with the Loan when BNC sold its interest in the Loan nearly six years before the Commencement Date. More importantly, to the extent that SPS and Wells Fargo engaged in an any wrongdoing in connection with the alleged "manufacture [of] a loan default," Focht has already had an opportunity to litigate her related claims inasmuch as Wells Fargo and SPS were both parties to the Foreclosure Action. |

20.     Focht also purports to present "evidence" related to two claims that allegedly arise under the Truth in Lending Act ("TILA"), 15 U.S.C.§1601 *et seq.* Focht alleges that she sought to rescind the Loan by delivering a letter to BNC on August 4, 2008. *See* Amend. Resp. ¶20h. Section 1635(a) of TILA provides that in a consumer credit transaction in which a

> security interest . . . is . . . acquired in any property which is used as the principal dwelling of the person to whom credit is extended, the obligor shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or the delivery of the information and rescission

10

forms required under this section together with a statement containing the
material disclosure required under this subchapter, whichever is later. . ..

15 U.S.C. §1635(a).  This right of rescission, however, does not apply to Focht.  First, Focht fails

to allege that the Property is her "principal dwelling" so it is unclear whether section 1635(a) is

even applicable.  Second, to the extent Focht had a right of rescission under TILA, such right

likely expired on or about October 23, 2002 – three business days after the Loan was

consummated.  Third, even if Focht were somehow able to establish that she did not receive the

disclosure required by TILA, her right of rescission would still have expired on or about October

23, 2005 pursuant to section 1635(f) of TILA, which provides that "[a]n obligor's right of

rescission shall expire three years after the date of consummation of the transaction or upon the

sale of the property, whichever occurs first, notwithstanding the fact that the information and

forms required under this part have not been delivered to the obligor."  15 U.S.C. §1635(f).

Focht delivered her letter purporting to rescind the Loan on or about August 4, 2008 – nearly

three years after the extended rescission period expired.[3]  Finally, even if the Court were to

permit Focht to rescind the Loan, section 1635(b) of TILA requires that she return the proceeds

of the Loan to BNC.  15 U.S.C. §1635(b).  Focht provides no indication that she is willing, or

even able, to perform the required exchange.  In sum, Focht's claim for rescission under section

1636(a) of TILA is entirely without merit and should be disregarded.

          21.      Focht's second TILA-related claim relates to certain alleged

inconsistencies between the "date and rate terms" of the Note and the Truth-In-Lending

Disclosure Statement that she purportedly received in connection with the Loan.  *See* Amend.

---

[3] Moreover, in order to preserve its rights under section 1635(a), a borrower must actually commence an
action seeking rescission; mere notice is insufficient. *See Williams v. Wells Fargo Home Mortgage, Inc.*
410 Fed.Appx. 495, 499 (3d Cir. 2011).  The Foreclosure Action, which was commenced on or about
January 16, 2008, also falls well outside this limitations period.

US_ACTIVE:\44221775\5\58399.0003

Resp. ¶20g.  Pursuant to section 1640(e) of TILA, however, "[p]rivate actions for damages based on TILA violations are subject to a one-year statute of limitations."  *Grimes v. Fremont General Corp.*, 785 F. Supp. 2d 269, 285 (S.D.N.Y. 2011); *see also* 15 U.S.C. §1640(e) ("[A]ny action under this section may be brought in any United States district court, or other court of competent jurisdiction, within one year from the date of occurrence of the violation").  "It is well-settled law that in 'close-end credit' transactions, like the one at issue, the 'date of occurrence of [the] violation' is no later than the date plaintiff enters the loan agreement, or possibly, when defendant performs by transmitting the funds to plaintiff."[4]  *Grimes*, 785 F. Supp. at 285 (internal citations and quotations omitted); s*ee also Johnson v. Scala*, No. 05-CV-5529, 2007 WL 2852758, at *3 (S.D.N.Y. Oct. 1, 2007) ("Case law supports the notion that the statute of limitations for TILA claims does not start running upon the discovery of the non-disclosure, but, rather, upon the funding of the loan.").  Accordingly, to the extent that Focht ever had a claim for damages under the TILA, the time period within which she was required to assert such claim expired on or about October 18, 2003 – nearly five years before the Commencement Date – and Focht is now barred from seeking to recovery TILA-related damages from BNC's Chapter 11 Estate.

22.    Notably, the Responses do not even purport to contain evidence in support of Focht's allegations that (i) she was under duress when she entered into the Loan, or (ii) the date and/or the signature on certain of the Loan Documents were altered or forged.  *See* Amend. Resp. ¶19.  Further, Focht misstates the relevant inquiry under Florida's statute of limitations. *See* Amend. Resp. ¶ 21.  Florida law does not require that a party have actual knowledge of the

---

[4] "A closed-end credit transaction is one where the finance charge is divided into the term of the loan and incorporated into time payments, and includes a completed loan such as a mortgage or a car loan." *Grimes*, 785 F. Supp. at 285 n. 22.

12

facts giving rise to a cause of action in order for the limitations period to begin to run.  Instead, it is only necessary that such facts "should have been discovered with the exercise of due diligence."  *See* FLA. STAT. ANN. §95.031(2)(a).  Thus even if the Plan Administrator conceded that BNC engaged in forgery or took advantage of Focht's alleged duress during the closing (and it does not and Focht has produced no evidence to the contrary), Focht must have been aware of same at the closing since she would have personally experienced the duress and she is unquestionably able to recognize her own signature on the Loan Documents.  Accordingly, the "facts" that give rise to Focht's fraud-related claims must have been discoverable to Focht at the closing of the Loan through the exercise of any diligence whatsoever, much less the due diligence required by the statute.  Moreover, to the extent that Focht believes that the Loan is unenforceable for any reason, she already had the opportunity to litigate the matter in the Foreclosure Action and, in issuing the Foreclosure Judgment, the Florida State Court must have found that her contentions were meritless.

23.    Since Focht's fraud claims are time barred by Florida law, she cannot establish that she holds a valid and enforceable right to payment from BNC in connection therewith and, accordingly, she cannot meet her burden of proving such claims by a preponderance of the evidence.  *See Best Payphones, Inc. v. Verizon N.Y., Inc. (In re Best Payphones, Inc.)*, 2006 U.S. Dist. LEXIS 10297 at *9 (S.D.N.Y. Mar. 14, 2006) ("it is clearly established law that the Rule 3001(f) presumption governs only the burden of production, and that the ultimate burden of proving the claim by a preponderance of the evidence remains with the claimant").  Thus Focht has provided no evidence in support of the Focht Claims and the Focht Claims should be disallowed and expunged.

13

## RESERVATION OF RIGHTS

24.    In the event that the Court denies the Objection with respect to the Focht Claims and/or grants the relief requested in the Responses, the Plan Administrator reserves the right to object to the substantive basis (including the validity and amount) of each of the Focht Claims.  Additionally, the Plan Administrator reserves the right to conduct discovery as to the Focht Claims and any matters raised in the Responses.

## CONCLUSION

WHEREFORE, for the reasons set forth above, and in the Objection, the Plan Administrator respectfully requests that the Court enter an order disallowing and expunging the Focht Claims in their entirety and granting such other and further relief as is just.

Dated: April 22, 2013
        New York, New York

/s/ Jacqueline Marcus
Jacqueline Marcus

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

Attorneys for Lehman Brothers Holdings
Inc. and Certain of its Affiliates

US_ACTIVE:\44221775\5\58399.0003

**Exhibit A**
**(Declaration of Daniel Glanz)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jacqueline Marcus

Attorneys for Lehman Brothers Holdings Inc.
and Certain of its Affiliates

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
                                                  :
**In re**                                         :    **Chapter 11 Case No.**
                                                  :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,      :    **08-13555 (JMP)**
                                                  :
                              **Debtors.**        :    **(Jointly Administered)**
                                                  :
-------------------------------------------------------------------x

### DECLARATION OF DANIEL GLANZ IN SUPPORT OF PLAN ADMINISTRATOR'S OMNIBUS OBJECTION TO CLAIMS FILED BY DEBORAH E. FOCHT

Daniel Glanz hereby declares under penalty of perjury pursuant to section 1746 of title 28 of the United States Code:

1.      I am over 18 years of age and I can testify to the following facts based on my personal knowledge, my review of the business records of LBHI[1] and BNC and/or my consultation with employees of LBHI.  I submit this Declaration in support of the Objection and the Reply.  If called to testify, I could testify to the truth of the matters set forth herein.

2.      I am currently a Vice President at LBHI and my responsibilities include portfolio management.  As portfolio manager, I oversee the disposition of residential real estate assets of LBHI and its subsidiaries, including BNC.  I also use and consult on the contents of

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the Objection (as defined below).

Lehman's whole loan tracking database.  I started working at LBHI in September 2001 and have

been continuously employed by LBHI, or one of its affiliates, since that time.  From 2007 to the

Commencement Date, my primary responsibility at LBHI was running the whole loan tracking

group.

3.    I assisted in designing and implementing various components of Lehman's

whole loan tracking system and have been responsible for managing the system.  This system

tracks loans that are owned by LBHI or one of its wholly-owned subsidiaries and also shows the

transfer of loans to and from third parties to Lehman entities.  The system does not continue to

track loans once they have been transferred to third parties.

4.    The whole loan tracking system had two components – a database where

the raw data is stored and a web based application that allowed users to input and review

information.  Transactions were generally entered by users on a real-time, or close to real time,

basis.  Other users were able to review data additions or updates before they were saved to the

database.  Individuals in Lehman's middle office group were responsible for inputting

information into the whole loan tracking system.

5.    For every transaction there was a minimum set of required data fields.

Each data field contains limits and constraints.  The database validated those fields if they were

within acceptable ranges for the fields.

6.    The whole loan tracking system had a series of internal controls to ensure

that all the information contained in the database was accurate.  Prior to the Commencement

Date, the system was regularly reconciled with Lehman's other databases, including the RAMP

and MTS databases which contained loan transfer and other loan information, and a group of

Lehman employees was responsible for addressing any variances that were identified in that

2

reconciliation.  In addition, the whole loan tracking system was reconciled with the loan custodians who held loan documents on Lehman's behalf.  Because of these controls, whole loan tracking was the single source of loan ownership and transfer information that was regularly relied upon by Lehman employees in the course of their regularly conducted business.

7.      The system was shut down following the Commencement Date.  At that time a snapshot was taken of the database and now there is a read-only copy of that data that can be used for historical whole loan tracking.  The system itself no longer exists and instead the information has been frozen in time.  Thus, the information exists for research purposes only.  I currently maintain the snapshot of the whole loan tracking system as it existed at the time of the bankruptcy and, as detailed herein, I am aware of and familiar with the information that populates the system.

8.      I am the custodian of records for the whole loan tracking system at LBHI. I am authorized to authenticate the whole loan tracking records attached hereto as <u>Exhibit 1</u>.

9.      Under FED. R. EVID. 803(6) or 902(11), as applicable, I certify that the records attached as Exhibit 1 to this declaration are business records of the regularly conducted activity of LBHI and I am a records custodian qualified to authenticate these records.

10.      I certify that these records attached hereto as Exhibit 1 were made at or near the time of the occurrence of the of the matters set forth in the records by a person with knowledge of those matters or from information transmitted by a person with knowledge of those matters.

11.      I certify that these records were kept in the course of regularly conducted business activity at LBHI.

US_ACTIVE:\44221775\5\58399.0003

12.     I also certify that the records were made by the regularly conducted activity as a regular practice of LBHI.

13.     Based on my knowledge of and familiarity with the business records attached here to as Exhibit 1, I offer the following explanation of Exhibit 1.

14.     The whole loan tracking data shows the loan ownership history of a particular loan.  The first column represents the buyer.  The notation contained in the first column ("The Street") is shorthand for a non-Lehman third party.  The second column shows the internal reference number that Lehman assigned to the Loan.  These internal identification numbers generally do not correspond to the loan numbers assigned to a loan by the originator or servicer and which may be included on the various loan documents.  Columns three through six provide information on the location of the real property related to the Loan.  Columns seven and eight, respectively, list the servicer at the time the Loan was sold to a non-Lehman entity and the date of such sale.  Column 9 provides the priority of Loan.

15.     Exhibit 1, therefore, shows that the Loan was sold to a third party on December 30, 2002 and that, since that time, none of the Chapter 11 Estates have had a direct interest in the Loan or the Property.

16.     In 2002, when the Loan was sold to a third party, Lehman's whole loan tracking system was still in its development phase and it captured less information about the Loan than would have been the case in later years.

17.     The system contains no further information on the Loan meaning that there is no record of BNC or LBHI having an interest in the Loan after December 30, 2002.

4

18.     Additionally, in connection with Focht's request for information regarding the Loan, the Plan Administrator conducted a search of records under its direct control and, other than as set forth herein, did not locate any documents related to the Loan or the Property.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed on this 22nd day of April 2013.

/s/ Daniel Glanz
Daniel Glanz

5

**<u>Exhibit 1</u>**
**(Business Records)**

| Buyer | Loan Id | Address | City | State | Zip | Servicer | Sold Settle Date | Lien Position |
|-------|---------|---------|------|-------|-----|----------|-----------------|---------------|
| THE STREET | 107127821 | 530 LAUREL ROAD | NOKOMIS | FL | 34275 | OPTION ONE MORTGAGE | 12/30/02 0:00 | 1 |