WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jacqueline Marcus

*Attorneys for Lehman Brothers Holdings Inc.*
*and Lehman Brothers Special Financing Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| | x | |
| | : | |
| **In re** | : | **Chapter 11** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.*, | : | **Case No. 08-13555 (JMP)** |
| | : | |
| Debtors. | : | **(Jointly Administered)** |
| | : | |
| | : | |
| | x | |

**DECLARATION OF ABHISHEK KALRA**
**IN SUPPORT OF MOTION PURSUANT TO RULE 9019 OF THE**
**FEDERAL RULES OF BANKRUPTCY PROCEDURE FOR APPROVAL**
**OF SETTLEMENT AGREEMENT AND INDEMNITY BETWEEN LEHMAN**
**BROTHERS SPECIAL FINANCING INC. AND BANK OF AMERICA, N.A., AS**
**TRUSTEE, RELATING TO A CREDIT DEFAULT SWAP AGREEMENT [LIBRA CDO]**

Pursuant to 28 U.S.C. § 1746, I, Abhishek Kalra, declare:

1.    I am over the age of 18 years and make these statements of my own

personal knowledge based on my personal experience, my review of relevant business records of

Lehman Brothers Holdings Inc. ("LBHI" or the "Plan Administrator"), Lehman Brothers Special

Financing Inc. ("LBSF"), and/or certain of their affiliates (collectively, the "Chapter 11

Estates"), and/or my consultation with other employees of and advisors to the Chapter 11

Estates.  If called to testify, I could testify to the truth of the matters set forth herein.

2.    I submit this Declaration in support of the *Motion Pursuant to Rule 9019*

*of the Federal Rules of Bankruptcy Procedure for Approval of Settlement Agreement and*

*Indemnity Between Lehman Brothers Special Financing Inc. and Bank of America, N.A., as*

*Trustee, Relating to Credit Default Swap Agreement [Libra CDO]*,  dated March 29, 2013 [ECF

No. 36257] (the "Motion").[1]

3.      I am a managing director with LBHI.  My areas of responsibility include

managing, unwinding and monetizing a portfolio of the Chapter 11 Estates' derivatives

transactions, including with counterparties that are special purpose entities.  In those roles I have

independently reviewed, have become familiar with, and have personal knowledge regarding

many derivatives transactions that the Chapter 11 Estates entered into before their bankruptcies,

including the transactions that are the subject of the Motion.  I participated on behalf of the

Chapter 11 Estates in the negotiations that resulted in the entry of the Settlement Agreement and

related Indemnity Agreement.

4.      I am thus fully familiar with the facts underlying the Motion, which I

approved prior to its filing.  I adopt the representations contained in the Motion, as if set forth in

full and at length in this Declaration.

### The Credit Default Swap Agreement and Indenture

5.      It is my understanding that LBSF and Libra CDO Limited., as Issuer (the

"Issuer") entered into a portfolio of credit default swap transactions (the "Transactions") that

were governed by a 1992 ISDA Master Agreement, Schedule and two Confirmations, dated as of

October 17, 2006, (the "Credit Default Swap Agreement").  Under the Credit Default Swap

Agreement, LBSF agreed to make periodic payments to the Issuer in exchange for the Issuer's

promise to make payments to LBSF in respect of losses incurred on certain specified reference

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

2

obligations.[2]  In effect, LBSF, as swap counterparty, purchased protection from the Issuer, which

sold protection on the creditworthiness of the obligations referenced in the Credit Default Swap

Agreement.  The Issuer also entered into a senior swap agreement (the "Senior Swap

Agreement"), pursuant to which Société Générale, New York Branch (the "Senior Swap

Counterparty") was obligated to advance funds to the Issuer in certain circumstances in order to

help the Issuer meet certain of its obligations to LBSF under the Credit Default Swap

Agreement.  The Senior Swap Agreement was the subject of a settlement agreement between

LBSF, LBHI and the Senior Swap Counterparty dated as of September 20, 2010, relating to,

among other things, the operation of certain provisions of the Credit Default Swap Agreement

and the Senior Swap Agreement (the "SocGen Settlement").  The SocGen Settlement was

approved by the Court on October 21, 2010 [ECF No. 12222].

6.    It is also my understanding that under the Indenture dated October 17,

2006 (the "Indenture"),[3] the Issuer issued rated notes that were secured by a pool of collateral

that also secures the Credit Default Swap Agreement.  Through a series of note purchases, LBSF

now owns more than two-thirds of the Class A Notes, which is now the only class of Notes

issued under the Indenture that has a potential economic interest in the collateral.  LBSF also

remains the swap counterparty under the Credit Default Swap Agreement.  The secured parties

under the Indenture include LBSF, in its roles both as a Class A noteholder and as swap

counterparty under the Credit Default Swap Agreement, the Senior Swap Counterparty, other

noteholders of the Class A Notes and other classes of Notes, and Bank of America, N.A., as

---

[2] The descriptions of documents set forth herein are being provided as summaries only.  In the case of an
inconsistency between the summary herein and the documents, the terms of the documents shall control.

[3] Copies of the Credit Default Swap Agreement and the Indenture are attached to the Motion as Exhibits "C" and
"D," respectively.

3

successor by merger to LaSalle Bank National Association solely in its capacity as trustee (the "Trustee") under the Indenture, and other service providers to the Issuer.  The Trustee continues to hold the collateral on behalf of the secured parties under the Indenture and collects the proceeds payable on the collateral.

7.      It is my further understanding that under the Granting Clause of the Indenture, the Issuer granted to the Trustee, for the benefit and security of the secured parties, all of its right, title and interest, whether now owned or hereafter acquired, in, to and under, *inter alia*, the Credit Default Swap Agreement and substantially all other assets of the Issuer.  It is my understanding that the Indenture also irrevocably appointed the Trustee as the true and lawful attorney of the Issuer, with full power (in the name of the Issuer or otherwise) to exercise all rights of the Issuer with respect to, *inter alia*, the Credit Default Swap Agreement and such other assets, and to enforce rights of the Issuer under or arising out of any of, *inter alia*, the Credit Default Swap Agreement and such other assets of the Issuer.

8.      It is the understanding of LBHI and LBSF that under the terms of the Indenture, the Trustee applies payment proceeds received on behalf of the Issuer in accordance with a "waterfall" provision.  *See* Indenture § 11.1.  The waterfall contains a provision that purportedly modifies LBSF's priority of payment rights when an "Event of Default," including the filing of a bankruptcy petition, has occurred with respect to LBSF under the Credit Default Swap Agreement (the "Flip Clause").  If the Flip Clause is effective, LBSF would receive payments, if any, only after payments are made to noteholders.  I understand that such provisions have been found to be unenforceable *ipso facto* provisions by this Court.

### The Dispute

9.      By letter dated October 10, 2008, the Trustee designated that day as the "Early Termination Date" for the Credit Default Swap Agreement, thereby purporting to

4

US_ACTIVE:\44229466\4\58399.0008

terminate the Credit Default Swap Agreement.  As of the date hereof, however, neither party to

the Credit Default Swap Agreement has paid any amounts (including termination payments) that

may have become due to the other party on or after October 10, 2008, as a result of a dispute

between LBSF and the Trustee regarding, among other things, whether the Credit Default Swap

Agreement was validly terminated, and the enforceability of the Flip Clause (the "CDS Payment

Dispute").

10.    On May 5, 2009, LBSF and LBHI filed a complaint against the Trustee,

the Issuer and the Senior Swap Counterparty.  *See* Adversary Proceeding No. 09-01177-JMP.

This adversary proceeding was later consolidated with an adversary proceeding commenced by

the Trustee, the Issuer and the Senior Swap Counterparty.  *See* Adversary Proceeding No. 09-

01178-JMP (together with Adversary Proceeding No. 09-01177-JPM, the "Litigation").  In the

Litigation, LBSF and LBHI sought a declaratory judgment that (i) the Credit Default Swap

Agreement was not validly terminated, (ii) the Credit Default Swap Agreement is an executory

contract that may be assumed and assigned, and (iii) in the alternative, even if the Credit Default

Swap Agreement was validly terminated, the Flip Clause is not enforceable.  The Issuer, the

Trustee, and the Senior Swap Counterparty sought a contrary declaratory judgment.  Cross

motions for summary judgment on the issue of whether the Credit Default Swap Agreement was

properly terminated, were argued on August 26, 2009, and the Bankruptcy Court reserved

judgment.

11.    Although LBSF and LBHI have entered into, and are bound by the

SocGen Settlement with the Senior Swap Counterparty in respect of the Senior Swap Agreement

and the Litigation, they have not settled with the Issuer and the Trustee, and therefore the

Litigation, as it pertains to the Issuer and the Trustee, remains pending.  On March 16, 2012, in

5

furtherance of the SocGen Settlement, LBSF, LBHI and the Senior Swap Counterparty entered

into an agreement (the "Unwind Strategies Agreement") pursuant to which (i) LBSF is

permitted, subject to the Senior Swap Counterparty's prior consent, to enter into a settlement

agreement with the Trustee, in respect of the Litigation, and (ii) the amounts paid to LBSF under

such settlement would be applied by LBSF in a manner consistent with the sharing arrangement

provided for in the SocGen Settlement.

        12.     The Majority of the Controlling Class under the Indenture has the right,

among others, to direct the time, method and place of conducting any proceeding, such as the

Litigation, for any remedy available to the Trustee, pursuant to Section 5.13 of the Indenture,

notwithstanding any other provision of the Indenture.  This right to direct the Trustee with regard

to the Litigation is subject to certain conditions, including the Trustee's right to request

reasonable indemnification.

        13.     LBSF, in its capacity as holder of more than two-thirds of the Class A

Notes, and the Senior Swap Counterparty, at LBSF's request, have instructed the Trustee,

pursuant to a letter dated March 29, 2013, (i) to enter into the Settlement Agreement and to

perform its obligations thereunder in order to resolve the CDS Payment Dispute and the

Litigation and (ii) to liquidate the remaining Collateral Debt Securities (as defined in the

Indenture) owned by the Issuer.  Accordingly, the Controlling Class has provided the necessary

direction.  The Trustee advised LBSF and the Senior Swap Counterparty that it was prepared to

enter into the Settlement Agreement provided that: (i) LBSF executes the Indemnity Agreement,

(ii) the Noteholders have been provided with no less than 45 days prior written notice of the

Settlement Agreement and of the hearing at which objections to the Settlement Agreement will

be considered, (iii) the Noteholders have been provided with no less than 45 days prior written

6

notice of the Wind-Down Provisions (as defined below) and of their opportunity to object to the

liquidation of the remaining Collateral Debt Securities and the Settlement Agreement, and

(iv) the Court approves the terms of the Settlement Agreement, the Wind-Down Provisions and

the Indemnity Agreement pursuant to the terms of Bankruptcy Rule 9019.

**The Settlement Agreement and Indemnity Agreement**

14.    The Settlement Agreement provides for resolution of all disputes relating

to the Credit Default Swap Agreement and the related Indenture among (i) LBSF, (ii) the Issuer,

(iii) Libra CDO, LLC, as co-Issuer, and (iv) the Trustee.  In order to resolve the CDS Payment

Dispute and the Litigation, the Trustee shall pay to LBSF an agreed termination payment from

amounts standing in the Reserve Account and from liquidation proceeds of the remaining

collateral assets.

15.    Amounts standing in the Reserve Account will be applied to pay (a) the

Trustee Amount to the Trustee for its fees and expenses and those of its counsel and financial

advisors, in each case without deduction, set-off or counterclaim and (b) the CDS Payment

Amount to LBSF, in each case to the extent funds standing in the Reserve Account are available

therefor (the "Initial Payments").  LBSF will apply all funds paid to it from the Reserve Account

as an Initial Payment in accordance with the SocGen Settlement and the Unwind Strategies

Agreement.  The remaining collateral assets will be liquidated pursuant to the Wind-Down

Provisions.

16.    The liquidation proceeds will be distributed in accordance with the

Indenture, provided that the Flip Clause will not be given effect to the extent the CDS Payment

Amount exceeds amounts paid to LBSF from the Reserve Account as described above (any such

excess, the "Priority Subsequent Payments").  LBSF will apply all Priority Subsequent Payments

paid to it in accordance with the SocGen Settlement and the Unwind Strategies Agreement.

7

17.     To the extent LBSF is a holder of Class A Notes on the record date with respect to the Distribution Date for such liquidation proceeds, LBSF will be entitled to payments, if any, in such capacity in accordance with the Indenture. LBSF will apply all payments paid to it in its capacity as holder of Class A Notes in accordance with the SocGen Settlement and the Unwind Strategies Agreement. It is not currently anticipated that funds will be available to make payments to the holders of the Class A Notes.

18.     The Parties will exchange a mutual release of all claims related to the Credit Default Swap Agreement, Indenture, the CDS Payment Dispute and the Litigation, provided that LBSF's release is limited to its capacity as counterparty to the Credit Default Swap Agreement and does not deprive LBSF of any of its rights as a holder of Class A Notes.

19.     If no objections are made to the Motion, upon entry of the Order attached to the Motion by the Bankruptcy Court or if an objection is filed, when the Order has become final and non-appealable or, if a timely appeal is filed, upon dismissal of such appeal or the affirmance of the Order on appeal with no further opportunity to appeal, then: (i) LBSF will execute and file on the docket in the Litigation a Stipulation of Dismissal with Prejudice, dismissing the Issuer, Co-Issuer, and Bank of America, N.A. and LaSalle Bank National Association from the Litigation, and (ii) all proofs of claims filed against LBSF or any of its affiliates in the above captioned cases, including LBHI, in respect of the Credit Default Swap Agreement or Indenture will be withdrawn, with prejudice.

20.     Except as provided in the Indemnity Agreement and subject to the terms of any other indemnity available to any party and the payment to the Trustee of the Trustee Amount, each party will bear its own costs and expenses relating to the Litigation and the Settlement Agreement.

8

21.    As for the Indemnity Agreement, LBSF agrees to pay to the Trustee, on demand for, and to indemnify and hold the Trustee harmless from and against, any and all losses, liabilities, judgments, claims, causes of actions, damages, costs (including court costs), expenses, fees (including reasonable legal fees, costs and expenses), penalties, disbursements, and liabilities of any kind or character whatsoever, and whether brought by or involving any third party or LBSF that directly or indirectly arise out of the Settlement Agreement, any direction provided by LBSF or the Senior Swap Counterparty to the Trustee (including a direction to enter into the Settlement Agreement), or payment to LBSF by the Trustee of a termination payment.

22.    The term of the Indemnity Agreement is limited to six years, and the amount of the indemnity is limited to (i) $55 million in underlying liability plus any interest awarded thereon and (ii) out of pocket expenses of the Trustee.

23.    No indemnity is provided by LBSF if there is a final determination by a court of competent jurisdiction that is not subject to review on appeal that any otherwise covered losses are the result of gross negligence, willful misconduct or fraud by the Trustee or any other indemnified person.

24.    Pursuant to a side letter, the Senior Swap Counterparty will share LBSF's indemnity obligations in a manner consistent with the sharing arrangement provided for in the SocGen Settlement.

## Wind-down and Dissolution of the Issuer

25.    It is my understanding that regardless of whether the Court approves the Motion, the collateral held by the Trustee for the benefit of the secured parties will under no circumstance be sufficient to make any further payments to holders of the Class B Notes, the Class C Notes, Class D Notes and Class X Notes.  In addition, it is not currently anticipated that

9

the Settlement Agreement will result in any payments being made to the holders of the Class A

Notes.  While section 5.5 of the Indenture requires the Trustee to be instructed by the holders of

at least two-thirds of the Controlling Class, the holders of at least two-thirds of all other classes

of notes voting as a single class, and the Credit Default Swap Counterparty in order to liquidate

the remaining collateral assets and distribute the liquidation proceeds in accordance with the

waterfall, this provision was not drafted with the expectation that several classes of noteholders

would have no economic interest in the collateral.  Requiring the Trustee to continue holding the

collateral will not benefit any of the noteholders, and will only result in an unnecessary depletion

of value due to the need to pay periodic expenses such as the fees and expenses of the Trustee, a

premium payable to the Senior Swap Counterparty (the "Super Senior Premium"), and fees and

expenses of the Trustee's professionals and other service providers.  Accordingly, LBSF and the

Trustee have agreed to a mechanism (the "Wind-Down Provisions") pursuant to which the

remaining collateral assets will be liquidated and distributed in accordance with the Indenture

(provided that if the Court approves the Motion the Flip Clause will not be given effect until the

Priority Subsequent Payments are paid in full).

   26.  Specifically, as the Credit Default Swap Counterparty and holder of at

least two-thirds of the Class A Notes (*i.e.*, the only Class of notes with a remaining economic

interest in the collateral), LBSF has, together with the Senior Swap Counterparty, given a

liquidation direction to the Trustee pursuant to Section 5.5 of the Indenture and the Indemnity

Agreement, instructing the Trustee to liquidate the remaining Collateral Debt Securities and

distribute the proceeds in accordance with the applicable provisions of the Indenture (the

"Liquidation Direction").

US_ACTIVE:\44229466\4\58399.0008

27.     The Settlement Agreement provides that following receipt of the

Liquidation Direction, the Trustee will notify the other noteholders that the holders of at least

two-thirds of the Class A Notes and the Senior Swap Counterparty have instructed the Trustee to

liquidate the collateral and distribute the proceeds thereof in accordance with the Indenture.

Other noteholders will be provided with 45 days to object to the liquidation of the collateral.

28.     If fewer than one-third of all noteholders (including LBSF) object to the

liquidation of the collateral on or before the date upon which objections to this Motion are due

(such date the "Liquidation Objection Deadline"), the Trustee will be deemed to have the

consent of at least two-thirds of the noteholders and will liquidate the collateral and distribute the

remaining funds in accordance with the terms of the Indenture.  The Trustee shall not be required

to consider objections to the liquidation of the collateral that are received after the Liquidation

Objection Deadline.

29.     Although the provisions of the Indenture arguably require at least two

thirds of the holders of all classes of notes acting as a single class to provide a direction similar

to the Liquidation Direction, the Parties do not believe that noteholders of classes other than the

Class A Notes will oppose the Liquidation Direction, given that, regardless of the outcome of the

Litigation, the remaining collateral would not be available to such classes in any future

distribution.  Indeed, given that they have no further economic interest in the collateral, holders

of notes other than Class A Notes would be expected to be indifferent regarding the retention or

liquidation of the collateral.  However, if at least one-third of all noteholders (including LBSF),

taken as a single class, objects to the liquidation of the collateral, the Trustee will take no further

action with respect to the Liquidation Direction and will continue to administer the collateral in

accordance with the Indenture unless and until the direction of a two–thirds majority of

11

noteholders (including LBSF) has been obtained or sufficient objections are withdrawn such that

fewer than one-third of all noteholders (including LBSF), taken as a single class, object to the

liquidation. The Wind-Down Provisions summarized above will expedite the wind-down and

dissolution of the Issuer and maximize the value of the remaining collateral assets for the benefit

of the Issuer's economic stakeholders, including LBSF. The payment of the Initial Payments

from the Reserve Account does not implicate the provisions of the Indenture that require a two-

thirds noteholder vote, but rather a different provision of the Indenture, which provides that the

Controlling Class may instruct the Trustee regarding legal proceedings (as it has done).

Consequently, the payment of the Initial Payment from the Reserve Account will not be

dependent upon noteholder vote but only upon the approval by the Court of the Settlement

Agreement and the related Indemnity Agreement.

### The Settlement Agreement and the Indemnity Agreement Are in LBSF's Best Interests and Should Be Approved

30.     The Settlement Agreement and the corresponding Indemnity Agreement

will benefit LBSF and its creditors. First, the settlement will result in a substantial payment to

LBSF's estate. LBSF has determined, in the exercise of its business judgment, that such

payment will adequately compensate the estate for the value of its economic position as swap

counterparty and holder of Class A Notes. Second, the Settlement Agreement will avoid future

litigation concerning the CDS Payment Dispute because the Parties have agreed to release one

another from claims thereunder. Thus, the Settlement Agreement, and by necessity the

Indemnity Agreement, will allow LBSF to capture a substantial amount of the value of the

Transactions and notes for its estate, while avoiding the costs associated with continuation of the

pending litigation.

12

31.     Furthermore, I believe that the use of the Court's equitable authority is justified and appropriate.  Affirmative direction is being provided by the Senior Swap Counterparty, the Credit Default Swap Counterparty and more than two thirds of the holders of the Class A Notes.  Whether or not the Settlement Agreement is approved by the Court and becomes effective, the collateral that remains will in no circumstance be sufficient to make any payments to the holders of classes of notes junior to the Class A Notes.  Holders of the classes of notes junior to the Class A Notes should therefore be indifferent as to whether the remaining collateral is distributed today or at any future date, because they will never receive a payment under the waterfall in either case.  Moreover, any noteholders who disagree with that conclusion will have had the opportunity to lodge an objection with the Trustee and with this Court.

32.     On the other hand, liquidation and distribution of the remaining collateral assets pursuant to the Wind-Down Provisions is manifestly equitable because it prevents the diminution of value that would otherwise result from the continued accrual of the Issuer's administrative expenses and the Super Senior Premium if the collateral remains unliquidated.

33.     For the reasons set forth above, I and my colleagues involved in the management of the Chapter 11 Estates, as well as counsel to the Chapter 11 Estates, have concluded, in our considered business judgment, that the compromises set forth in the Settlement Agreement and the corresponding Indemnity Agreement are "fair and equitable," are well within the "range of reasonableness," and are in the best interests of LBSF's estate and its creditors. We believe the Settlement Agreement and the Indemnity Agreement were entered into in good faith and negotiated at arm's length.  Therefore, the Motion, which seeks approval of the Settlement Agreement and the Indemnity Agreement, should be granted.

US_ACTIVE:\44229466\4\58399.0008

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed on this 24th day of April 2013.

/s/ Abhishek Kalra
Abhishek Kalra

14