# Exhibit A

1  KENT B. GOSS (State Bar No. 131499)
   kgoss@orrick.com
2  VALERIE M. GOO (State Bar No. 187334)
   vgoo@orrick.com
3  T. WAYNE HARMAN (State Bar No. 254089)
   wharman@orrick.com
4  ORRICK, HERRINGTON & SUTCLIFFE LLP
   777 S. Figueroa Street, Suite 3200
5  Los Angeles, CA  90017
   Telephone:  +1-213-629-2020
6  Facsimile:   +1-213-612-2499

7  Attorneys for Plaintiff
   ALFRED H. SIEGEL, LIQUIDATING TRUSTEE
8

9              UNITED STATES BANKRUPTCY COURT

10           CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA

11

| 12 | **In re:** | Case No.    8:08-15588-ES |
|---|---|---|
| 13 | LBREP/L-SunCal Master I LLC | Adv. No.    8:11-01084-ES |
| 14 | Debtor. | **AMENDED COMPLAINT:** |

15  ALFRED H. SIEGEL, LiquidatingTrustee,

16              Plaintiff,

17              v.

18  LBREP LAKESIDE SC MASTER I, LLC,
    a Delaware limited liability company; SCC
19  RANCH VENTURE, LLC, a Delaware
    limited liability company; SC MASTER
20  HOLDINGS, LLC, a Delaware limited
    liability company; SC MASTER PARENT
21  HOLDINGS, LLC, a Delaware limited
    liability company; LAKESIDE CAPITAL
22  PARTNERS II, LLC, a Delaware limited
    liability company; SCC ACQUISITIONS,
23  INC., a California corporation; SCC
    ACQUISITIONS, LLC, a limited liability
24  company; BRUCE ELIEFF, an individual;
    MARK MAGSTADT, an individual;
25  MELVIN T. ANDREWS, an individual;
    RONALD W. LEE, an individual; and
26  DOES 1 through 10, inclusive;

27  Defendants.

28

**AMENDED COMPLAINT:**

1. To Recover Intentionally Fraudulent Conveyance [on Behalf of the Borrower's Creditors];

2. To Recover Constructively Fraudulent Conveyance [on Behalf of the Borrower's Creditors];

3. To Recover Constructively Fraudulently Transferred Property [on Behalf of the Borrower's Creditors];;

4. To Recover Intentionally Fraudulent Conveyance [on Behalf of the Operating Subsidiaries' Creditors];

5. To Recover Constructively Fraudulent Conveyance [on Behalf of the Operating Subsidiaries' Creditors];

6. To Recover Constructively Fraudulently Transferred Property [on Behalf of the Operating

- 1 -

AMENDED COMPLAINT

Subsidiaries' Creditors];

7. For Unlawful Distribution;

8. For Breach of Fiduciary Duty;

9. For Conversion;

10. For Unjust Enrichment;

11. For An Accounting;

12. For Aiding and Abetting; and

13. For Civil Conspiracy;  and

**DEMAND FOR JURY TRIAL**

AMENDED COMPLAINT

OHS WEST:261241825.7

Alfred H. Siegel, solely in his capacity as the duly appointed, qualified and acting liquidating trustee (the "**Trustee**" or "**Plaintiff**") complains as follows:

## INTRODUCTION

1.     This case is brought on behalf of four estates in bankruptcy- the parent holding company and three operating subsidiaries- against their collective parent entities and individuals who, through the use of a joint venture, formed, operated, and controlled the four entities. These entities were formed by Defendants to acquire, develop, and sell commercial real estate. However, instead of operating these companies in good faith as viable, ongoing concerns, Defendants merely used them as vehicles to realize unearned, above-market profits in only two years. Defendants divested the estates of their equity, saddled them with hundreds of millions of dollars of debt, and left them insolvent and unable to pay their debts as they became due.

2.     The Trustee now seeks to recover approximately $144 million that Defendants caused to be improperly and illegally transferred from Debtors to themselves, as full repayment of their equity investments and over $40 million in "profits." This distribution left the four estates insolvent and caused their bankruptcies.

## PARTIES TO THE ACTION

3.     Plaintiff, Alfred H. Siegel, whose business address is 15233 Ventura Boulevard Floor 9, Sherman Oaks, CA 91403-2250, brings this action, in his representative capacity only, on behalf of the following Estates:

a.     LBREP/L SunCal Master I, LLC, currently the debtor in the chapter 11 case styled In Re LBREP/L SunCal Master I, LLC, Case No. 8:08-BK-15588-ES pending in the United States Bankruptcy Court for the Central District of California (hereinafter "**Lehman/SunCal Master**" or "**Borrower**");

b.     LBREP/L SunCal McAllister Ranch, LLC, currently the debtor in the chapter 11 case styled:  "In Re LBREP/L SunCal McAllister Ranch, LLC";

AMENDED COMPLAINT

OHS WEST:261241825.7

1   Case No. 8:08-BK-15637-ES, pending in the United States Bankruptcy Court for

2   the Central District of California (hereinafter "**McAllister**");

3          c.     LBREP/L SunCal McSweeny Farms, LLC, currently the debtor

4   in the chapter 11 case styled: "In Re LBREP/L SunCal McSweeny Farms, LLC";

5   Case No. 8:08-BK-15639-ES pending in the United States Bankruptcy Court for the

6   Central District of California (hereinafter "**McSweeny**"); and

7          d.     LBREP/L SunCal Summerwind Ranch, LLC, currently the

8   debtor in the chapter 11 case styled: "In Re LBREP/L SunCal Summerwind Ranch,

9   LLC"; Case No. 8:08-BK-15640-ES, pending in the United States Bankruptcy

10   Court for the Central District of California (hereinafter "**Summerwind**").

11        McAllister, McSweeny, and Summerwind are collectively referred to herein

12   as the "**Operating Subsidiaries**" and, together with Lehman/Suncal Master, as the

13   "**Debtors**".

14   4.     The Trustee is informed and believes, and on that basis alleges, that

15   defendant LBREP Lakeside SC Master I, LLC ("**LBREP-Lakeside**") is a Delaware

16   limited liability company doing business within this judicial district and with its

17   principal place of business at 3500 West Olive Avenue, Suite 650, Burbank,

18   California 91505.

19   5.     The Trustee is informed and believes, and on that basis alleges, that

20   defendant SC Master Holdings, LLC ("**SC Master**") is a Delaware limited liability

21   company doing business within this judicial district with its principal place of

22   business at 3500 West Olive Avenue, Suite 650, Burbank, California 91505.

23   6.     The Trustee is informed and believes, and on that basis alleges, that

24   defendant SC Master Parent Holdings, LLC ("**SC Master Parent**") is a Delaware

25   limited liability company doing business within this judicial district with its

26   principal place of business at 3500 West Olive Avenue, Suite 650, Burbank,

27   California 91505.  LBREP-Lakeside, SC Master and SC Master Parent shall be

28   referred to collectively herein as the "**LBREP Defendants**."

- 4 -            AMENDED COMPLAINT

7.  The Trustee is informed and believes, and on that basis alleges, that

defendant Lakeside Capital Partners II, LLC ("**Lakeside Capital**") is a Delaware

limited liability company doing business within this judicial district with its

principal place of business at 3500 West Olive Avenue, Suite 650, Burbank,

California 91505.

8.  The Trustee is informed and believes, and on that basis alleges, that

defendant SCC Ranch Ventures, LLC ("**SCC Ranch**") is a Delaware limited

liability company doing business within this judicial district and with a principal

place of business located at 2392 Morse Avenue, Irvine, CA 92614.  Upon

information and belief, SCC Ranch is an affiliate of SCC Acquisitions, Inc. and

SCC Acquisitions, LLC.

9.  The Trustee is informed and believes, and on that basis alleges, that

defendant **SCC Acquisitions, Inc.** is a California corporation doing business within

this judicial district and with a principal place of business located at 2392 Morse

Avenue, Irvine, CA 92614.  Upon information and belief, SCC Acquisitions, Inc. is

the main operating and investing entity for the SunCal Companies.

10.  The Trustee is informed and believes, and on that basis alleges, that

defendant **SCC Acquisitions, LLC** is a limited liability company doing business

within this judicial district and with a principal place of business located at 2392

Morse Avenue, Irvine, CA 92614.

11.  Upon information and belief, SCC Ranch, SCC Acquisitions, Inc. and SCC

Acquisitions, LLC are affiliate companies owned and controlled by common

employees, officers, directors and members, including Bruce Elieff.

12.  Specifically, upon information and belief, Defendants SCC Acquisitions,

Inc., SCC Acquisitions, LLC, and SCC Ranch all do business under the name

SunCal Companies ("**SunCal**").

13.  The Trustee is informed and believes, and on that basis alleges, that

defendant **Bruce Elieff** is a California resident residing in Newport Coast,

AMENDED COMPLAINT

OHS WEST:261241825.7

California.  Upon information and belief, Bruce Elieff was the Manager of
defendant SCC Ranch, which in turn was the Operating Manager of
Lehman/SunCal Master.  Upon information and belief, Bruce Elieff co-managed
controlled the operations of Lehman/SunCal Master.

14.     The Trustee is informed and believes, and on that basis alleges, that
defendant Mark Magstadt ("**Magstadt**") is a California resident residing in Santa
Ana, California.

15.     SCC Ranch, SCC Acquisitions, Inc., and SCC Acquisitions, LLC shall be
referred to collectively herein as the "**SunCal Corporate Defendants**." The
SunCal Corporate Defendants, together with Magstadt and Bruce Elieff, shall be
referred to collectively herein as the "**SunCal Defendants**."

16.     The Trustee is informed and believes, and on that basis alleges, that
defendant Melvin T. Andrews ("**Andrews**") is a California resident residing in Los
Angeles, California.

17.     The Trustee is informed and believes, and on that basis alleges, that
defendant Ronald W. Lee ("**Lee**") is a California resident residing in Pasadena,
California. Lee, together with Andrews and Lakeside Capital, shall be referred to
collectively herein as the "**Lakeside Defendants**."

18.     The Trustee is unaware of the true names of Does 1 through 10 and therefore
sues them by such fictitious names, and he will ask for leave of court to insert their
true names when such have been ascertained.  The Trustee is informed and believes
that each of the Doe Defendants was and is the partner, agent, servant, employee,
officer, director, representative, co-conspirator and/or alter ego of each of the
remaining Defendants, and that each was acting within the scope of his or her
authority as such partner, agent, servant, employee, representative, co-conspirator
and/or alter ego with the actual or ostensible permission and consent of the
remaining Defendants or that such Defendants are the immediate or mediate

- 6 -

1 | transferees of the fraudulent transfer complained of herein or that such Defendants

2 | breached fiduciary duties owed to the Debtors or the creditors of the Debtors.

3 | **STATEMENT OF JURISDICTION AND VENUE**

4 | 19.    The District Court has jurisdiction over this action pursuant to 28 U.S.C. §

5 | 1331, 1334 and 1367 because, *inter alia,* this is a civil proceeding arising under and

6 | relating to cases under title 11 of the United States Code.

7 | 20.    Venue properly lies in this judicial district in that this civil proceeding arises

8 | under title 11 of the United States Code and relates to cases under title 11 currently

9 | pending in this judicial district as provided for in 28 U.S.C. § 1409(a).

10 | 21.    Pursuant to a January 5, 2011 Order of the U.S. District Court for the Central

11 | District of California, this action was referred to the Bankruptcy Court for all pre-

12 | trial proceedings.

13 | **STATEMENT OF STANDING**

14 | 22.    The Plaintiff, as the Trustee, has standing to bring this action pursuant to 11

15 | U.S.C. §§ 323, 1107, 1108, 544, 550, and 551.

16 | 23.    This case arises out of and is related to the chapter 11 case of

17 | Lehman/SunCal Master, and the administratively consolidated chapter 11 cases of

18 | McAllister Ranch LLC, McSweeney Farms LLC and Summerwind Ranch LLC,

19 | originally commenced as involuntary cases filed on September 10 and 11, 2008 (the

20 | "**Petition Dates**"), with orders for relief entered on October 30, 2008, and currently

21 | pending in the United States Bankruptcy Court for the Central District of

22 | California, Santa Ana Division.

23 | 24.    Under Bankruptcy Code §546, the Trustee may file any actions under

24 | Bankruptcy Code §544 within two years of the entry of an order for relief.  Under

25 | Bankruptcy Code §108 (a), the Trustee may file actions asserting non-bankruptcy

26 | claims within two years of the entry of an order for relief.  The orders for relief in

27 | the cases of the Debtors were entered on October 30, 2008.

28 |

- 7 -    AMENDED COMPLAINT

# STATEMENT OF THE CASE

25.     Defendants LBREP-Lakeside and SCC Ranch are the equity owners of Lehman/SunCal Master.  In or about January 2006, Lehman/Suncal Master transferred to Defendants $144 million of monies borrowed ostensibly to develop the real estate projects owned by its Operating Subsidiaries.

26.     Debtors, Lehman/Suncal Master and the Operating Subsidiaries, received little or no consideration for this transfer of funds and the transfer left the Debtors insolvent and without sufficient assets or operating capital to conduct their business.  As a result, the Debtors were forced into bankruptcy.  Trustee now seeks the return of the $144 million and damages for Defendants' breach of fiduciary duties in authorizing the transfer of the $144 million and the loan transaction that facilitated that transfer.

# STATEMENT OF OPERATIVE FACTS

## A.     The Real Estate Projects and Borrower Lehman/SunCal Master's Corporate Structure

27.     Debtor Lehman/SunCal Master was a real estate holding company established by Defendants, and its primary asset was its interest in the Operating Subsidiaries, as the sole equity member of Debtors McAllister, McSweeney, and Summerwind. Lehman/SunCal Master  also was the sole equity member of a fourth entity, a non-debtor, LBREP/L SunCal Patterson Ranch, LLC ("**Patterson Ranch**").

28.     Each of these entities owned real property developments in Southern California bearing their respective names (collectively, the "**Real Properties,**" or the "**Real Estate Projects**").  Each Operating Subsidiary has its own set of creditors and assets.

AMENDED COMPLAINT

*The Joint Venture*

29.     In 2004, the Defendants (comprised of three groups of defendants- the SunCal Defendants, the LBREP Defendants, and the Lakeside Defendants), formed a joint venture for the specific, limited purpose of investing in and developing specific parcels of commercial real estate in California.

30.     SunCal was, at the time of the transactions identified herein, one of California's largest private developers of master-planned communities.

31.     SunCal's business plan involved the acquisition and development of large-scale development sites for sale to homebuilders and commercial developers.

32.     Upon information and belief, SunCal professed to be an expert in developing real estate projects like those involving the Real Properties, including conducting market and financial analyses and managing the development of such projects.

33.     By the Fall of 2004, SunCal had purchased or contracted to purchase the Real Properties, with the intent to develop them into residential subdivisions, with the lots to be sold to third party residential contractors.

34.     In late 2004, the SunCal Defendants, along with the LBREP Defendants and Lakeside Defendants, formed various companies, which Defendants themselves referred to as a "master LLC structure," to own the Real Properties and to manage the Real Estate Projects as part of a joint venture between the LBREP Defendants, the SunCal Corporate Defendants, and Lakeside Capital to develop the Real Estate Projects.

35.     Defendants intended to create a joint venture, agreed to create a joint venture, and both treated and described their involvement in the Real Estate Projects as a joint venture, both among themselves and with third parties, and this is how they represented the structure of the Projects to investors.

36.     For example, in an early presentation to the LBREP Investment Committee, LBREP states that *its* investment in the Real Estate Projects would be made in

- 9 -

OHS WEST:261241825.7

1   partnership with Lakeside Capital Partners (Lakeside) and SunCal Companies, and

2   that the investment would be made *via* the LBREP/SunCal Master.

3       37.     Further, in or around November 2005, Defendants described the Borrower to

4   potential lenders as the vehicle through which a joint venture between the SunCal

5   Defendants and the LBREP Defendants operated.

6       38.     Upon information and belief, and consistent with their prior history of

7   working together on real estate investment projects, the LBREP Defendants were to

8   provide the majority of the financing for the Real Estate Projects, the SunCal

9   Defendants primarily would be the developer and manager of the Real Estate

10  Projects, and the Lakeside Defendants would act as the LBREP Defendants' agent,

11  supervising SunCal and approving SunCal's draw requests for development

12  funding.

13      39.     Upon information and belief, Defendants shared the profits and losses of the

14  joint venture and had a right to joint management and control of the joint venture.

15      40.     Specifically, in October and November 2004, the following companies were

16  formed: Lehman/SunCal Master; three of the Operating Subsidiaries: McAllister,

17  McSweeny, and Patterson Ranch (Summerwind was formed in or around April

18  2005); and Defendants SCC Ranch, LBREP-Lakeside, and SC Master (SC Master

19  Parent was formed in or around August 2005).

20      41.     The organizational structure of Defendants' joint venture, as well as the

21  Debtors, can be seen in the following chart on the next page:

22

23

24

25

26

27

28

- 10 -                              AMENDED COMPLAINT

1

2

3



21  42.   Debtor Lehman/SunCal Master was the holding company that was

22  established to fund the real estate development projects owned by each of the three

23  Operating Subsidiaries (McAllister, McSweeny, Summerwind), as well as Patterson

24  Ranch.

25  43.   Lehman/SunCal Master was directly owned and controlled by its two

26  members, Defendants LBREP-Lakeside and SCC Ranch.

27  44.   At all relevant times herein, Defendant LBREP-Lakeside was the Managing

28  Member of Lehman/SunCal Master, and had sole and exclusive management

AMENDED COMPLAINT

OHS WEST:261241825.7

1   control over Lehman/SunCal Master and the duty to supervise the Operating

2   Member, Defendant SCC Ranch.

3   45.      Upon information and belief, LBREP-Lakeside has two members: Defendant

4   SC Master and Defendant Lakeside Capital.

5   ***The LBREP Defendants***

6   46.      The LBREP Defendants are the affiliated entities that were controlled and

7   operated by common individuals who were also employees of Lehman Brothers

8   Real Estate Partners, L.P. ("LBREP"), which managed and operated several equity

9   funds that invested in real estate transactions. The LBREP Defendants include

10  LBREP-Lakeside, SC Master and SC Master Parent.

11  47.      Upon information and belief, Defendant SC Master is and has been the

12  Managing Member of Defendant LBREP-Lakeside and, at all relevant times herein,

13  controlled and directed the conduct of Defendant LBREP-Lakeside.

14  48.      Upon information and belief, Defendant SC Master Parent is and has been

15  the Managing Member of Defendant SC Master and, at all relevant times herein,

16  controlled and directed the conduct of SC Master and LBREP-Lakeside.

17  49.      Upon information and belief, the LBREP Defendants employed common

18  employees and were operated and controlled by common individuals, and

19  collectively controlled the actions and operations of Debtors.

20  ***The SunCal Defendants***

21  50.      The SunCal Defendants affiliated entities were controlled and operated by

22  common employees and principals, including Defendants Magstadt and Elieff. The

23  SunCal Defendants include Defendants Magstadt, Bruce Elieff, SCC Ranch, SCC

24  Acquisitions, LLC, and SCC Acquisitions, Inc.

25  51.      At all relevant times herein, Defendant SCC Ranch has been the Operating

26  Member of Lehman/SunCal Master and has been primarily responsible for the day-

27  to-day business and affairs of Lehman/SunCal Master, and for carrying out the

28

- 12 -

AMENDED COMPLAINT

1 development of the Real Properties. Defendant SCC Ranch was to faithfully,

2 competently and prudently perform its duties and responsibilities.

3 52.     Upon information and belief, the sole member of SCC Ranch was SCC

4 Acquisitions, LLC, which was owned and controlled by SCC Acquisitions, Inc.

5 53.     Upon information and belief, SCC Ranch, SCC Acquisitions, LLC, and SCC

6 Acquisitions, Inc., employed common employees and were operated and controlled

7 by common individuals, and collectively controlled the actions and operations of

8 Debtors.

9 54.     Upon information and belief, Defendant Bruce Elieff was a Manager and

10 Designated Representative of Defendant SCC Ranch, the President and owner of

11 SunCal Companies, and an authorized representative of Lehman/SunCal Master.

12 55.     Upon information and belief, Defendant Magstadt was the Chief Operating

13 Officer and Designated Representative of Defendant SCC Ranch and an authorized

14 representative of Lehman/SunCal Master.

15 ***The Lakeside Capital Defendants***

16 56.     The Lakeside Capital Defendants include Defendants Lee, Andrews, and

17 Lakeside Capital.

18 57.     Defendant Lakeside Capital was a member of and agent for Defendant

19 LBREP-Lakeside. Pursuant to the Operating Agreement of LBREP-Lakeside,

20 Lakeside Capital was responsible for, *inter alia*, supervising SCC Ranch in

21 connection with its administration of the day to day operations of Lehman/SunCal

22 Master and the Operating Subsidiaries.

23 58.     In addition, Lakeside Capital also was responsible for "diligently monitoring

24 the performance of each [Operating Subsidiary] in respect of compliance with the

25 terms of any existing financing."

26 59.     Defendant Andrews was an authorized signatory and designated

27 representative of LBREP-Lakeside, and was a member, authorized signatory and

28 designated representative of Lakeside Capital.

- 13 -

60.     Upon information and belief, Defendant Lee was an authorized signatory and

designated representative of LBREP-Lakeside, and was a member, authorized

signatory and designated representative of Lakeside Capital.

**B.     The History of the January 2006 Loans**

61.     As part of the acquisition of the Real Estate Projects, each member of the

joint venture was required to make minimal capital contributions to the Projects.

62.     Upon information and belief, almost immediately after making their initial

capital contributions to the Real Estate Projects, Defendants began discussing a

plan to obtain a large loan that would enable Defendants to pull all of their equity

investment out of the deal. Through the Spring and Summer of 2005, the LBREP

Defendants had discussions with lenders regarding a large senior loan for the Real

Estate Projects.

63.     Defendants initially contemplated a $300 million loan to be taken by

Debtors, with the proceeds to be distributed as follows: (i) approximately $60

million to repay existing indebtedness to another Lehman entity, Lehman Ali; (ii)

approximately $75-100 million to Defendants; and (iii) approximately $120 million

to fund the ongoing development needs of the Real Estate Projects (i.e., to pay

debts as they become due) (the "Development Fund").

64.     However, anxious to eliminate any risk for themselves associated with the

Real Estate Projects, Defendants devised a plan to grant themselves a much larger

dividend, which would not only return their equity contributions, but also, would

provide them with unearned profits. They did this by slashing the portion of the

loan proceeds that were to go into the Development Fund, at the direct expense of

the Borrower, the Operating Subsidiaries, and their creditors.

65.     In other words, Defendants took money needed to pay Debtors' debts as they

became due and instead paid it to themselves as a "dividend."

AMENDED COMPLAINT

66.   By early October 2005, Defendants *decreased* the proposed size of the Development Fund to $100 million, and *doubled* the size of the equity dividend to $150 million.

67.   In addition to seeking a full return of their equity investment, Defendants also sought to receive above-market profits, years before the majority of the lots would be sold.

68.   By late October 2005, the LBREP Defendants had decided to restructure the loan as two term loans and a revolving loan (revolver). This restructuring had the effect of eliminating *in its entirety* the distribution of any proceeds to the Development Fund (which, before the restructuring, had been budgeted to receive approximately $100 million).

69.   In or around October 2005, the LBREP Defendants described the restructuring of the loan, stating that it was Defendants' intention for the revolver, and not the term loans, to be used to fund the actual development of the Real Estate Projects and pay their debts as they became due.

70.   Defendants' distribution of the proceeds from the January 2006 Loans to themselves as full repayment of equity contributions and a significant above-market profit meant that all future development costs of the Real Estate Projects would be funded by only two sources: (i) the revolver, and (ii) the anticipated revenue from the sale of the lots by the Operating Subsidiaries.

71.   Upon information and belief, Defendants knew that this would leave Debtors insolvent and/or unable to pay their debts as they became due.

72.   Upon information and belief, Defendants' joint plan and intent was to distribute as much of the loan proceeds to themselves as full equity repayment and profits, and to manipulate the forecasts and budgets to facilitate their plan.

73.   Upon information and belief, by October 23, 2005, Defendants had decided and agreed to pay themselves, collectively, $144 million of the loan proceeds from the January 2006 Loans. In order to make this happen, Defendants needed to take

AMENDED COMPLAINT

money from the Development Fund needed by Debtors to pay their debts as they

became due and remain solvent. In order to free up these proceeds from the loans to

pay themselves, LBREP proposed, on or around October 23, 2005, a revised loan

structure, sizing the revolver at a maximum of $75 million, but contemplating a

revolver as low as $50 million, to fund all of the Real Estate Projects.

74.     However, Defendants knew that this would be insufficient to allow Debtors

to remain solvent and pay their debts as they became due.

75.     For example, in or around October 2005, the LBREP Defendants recognized

that $75 million was inadequate, and that the revolver would need to be at least

$100-125 million.

76.     SunCal also knew that $75 million would be insufficient. In or around

October 2005, after conducting financial analyses of the Debtors' business and cash

needs, the SunCal Defendants determined that $75 million would not permit the

Debtors to pay their debts as they became due, and that to keep from becoming

insolvent, the Debtors would need at least $125 million.

77.     Upon information and belief, despite knowing that a $75 million revolver to

fund the Real Estate Projects would be insufficient to permit Debtors to remain

solvent and pay their debts as they became due, by the beginning of November

2005, Defendants had decided and agreed to proceed with only a $75 million

revolver, and to pay themselves $144 million.

78.     Upon information and belief, by November 2005, Defendants had also

changed the loan structure to require that the Borrower maintain, at all times, a

minimum of $50 million in liquidity. To achieve that, the loan documents

contemplated that at closing, $25 million would be set aside to fund a "Debt Service

Reserve" which the Debtors could not use, but served as the collateral for the loans.

However, the Borrower would need to also set aside an additional $25 million from

some other source. As $144 million was to be withdrawn from the Borrower and

Operating Subsidiaries at closing (along with a significant above-market profit), the

1   only other source for an additional $25 million at closing was the revolver (which

2   was supposed to fund the development of the Real Estate Projects).

3   79.   In or around November 2005, the SunCal Defendants recognized that this

4   might further impair the Debtors' ability to pay their debts as they become due, and

5   expressed their concern that the liquidity covenant ate into the revolver, causing it

6   to be $25 million less.

7   80.   After further review of the financial obligations of Debtors, the SunCal

8   Defendants concluded that the Development Fund revolver should be between $91

9   million and $170 million to cover any delays in sales.

10   81.   Upon information and belief, Defendants were acutely aware at that time that

11   there was a significant probability that there would be delays in the forecasted sales

12   of the lots being developed by Debtors.

13   82.   In or around March 2005,  the LBREP Defendants recognized that, because

14   of the long-term nature and size of the deal, that it would be particularly susceptible

15   to a slowdown in the growth of the real estate market.

16   83.   In or around September 2005, the LBREP Defendants recognized that they

17   needed to be provided with absorption data on a regular basis in light of their

18   awareness of the discussions of the decline of the housing market.

19   84.   In March 2006, the LBREP Defendants identified a number of risks with the

20   California residential real estate market, marking the Inland Empire, Orange

21   County, and Bakersfield all as having a negative short term outlook, and giving

22   Orange County a negative long-term outlook. This assessment was made based on

23   data and projections from December 2005.

24   85.   The rating agencies S&P and Moody's also recognized the risks in the

25   housing market in their first-time ratings of the Borrower and the loan transactions,

26   as well as the reliance of the Borrower and the Operating Subsidiaries on their lot

27   sales projections.

28

---

- 17 -                                          AMENDED COMPLAINT

86.     In its December 12, 2005 report, Moody's stated that its ratings "reflect the

underlying geographic concentration of the projects, wherein a recession and

housing decline in [Southern California], similar to the one that occurred in the

early 1990's, could slow the expected absorption rates of the developed lots and

stretch out the carrying costs for a number of years, resulting in stressed cash flows

and a significant diminution in the initial over collateralization….The projects also

face considerable market risk as there are very few contractual advance lot sales as

in some other land development transactions…." Moody's further noted that the

projects will not begin "generating meaningful cash flow until 2008. This means

that the $75 million revolver will need to be utilized in order to help make debt

service payments;"

87.     In its December 8, 2005 report, S&P noted that "the borrower is highly

reliant upon future lot sales to finance construction and repay loans at maturity…."

88.     Further, when presenting the proposed loans to potential lenders in the Fall of

2005, upon information and belief, Defendants relied heavily on the appraised

values of the Real Properties to demonstrate that the Borrower and Operating

Subsidiaries were solvent (and would remain so after the closing of the loans).

Appraisals of Summerwind and McAllister were conducted by Cushman &

Wakefield ("Cushman") in early August, 2005, and an appraisal of McSweeny was

conducted in early September, 2005. Appraisals of the Real Properties were not

conducted again until March 2006, after the loans had closed.

89.     However, upon information and belief, in the Fall of 2005, the SunCal

Defendants attempted to obtain more favorable projections from Cushman in

advance of the lender and rating agency presentations. For example, in or around

November 2005, the SunCal Defendants discussed internally the possibility of

going back to the appraisers to try and obtain more favorable numbers.

90.     Moreover, upon information and belief, SunCal's budgets and projections for

the Real Estate Projects already were outdated and off schedule by early January

- 18 -                                    AMENDED COMPLAINT

2006, before the loan even closed. For example, in or around January 2006, a third

party consulting company informed the SunCal Defendants that the current budget

needs to be reviewed and amended to reflect higher construction costs, and that the

current construction schedule (developed in September 2005) was outdated in many

areas.

91.     In other words, by the Fall of 2005, Defendants knew or should have known

that (i) there was a very real risk that the absorption rates in the relevant real estate

markets would slow down, which would delay expected lot sales, which would in

turn delay projected incoming cash flow from those sales; (ii) the budgets and

projections for the Real Estate Projects already were outdated and off schedule; (iii)

in light of the market risks and budget inaccuracies, the initial appraisals of the Real

Properties conducted in August and September of 2005 contained inflated values

for the Real Properties; (iv) the proposed $75 million revolver to fund the

Development Fund was severely undersized, and considering the loan liquidity

requirements, would provide the Borrower and the Operating Subsidiaries with

insufficient capital to pay their debts as they became due; and (v) the distribution of

$144 million in equity and profits to Defendants would leave the Borrower and the

Operating Subsidiaries insolvent.

92.     Defendant Magstadt was significantly involved with the underlying real

estate development projects, and therefore, knew or should have known of the

expected progression of the projects and inability to achieve the cash flow

projections necessary to adequately fund the projects.

93.     Defendant Lee was aware of and signed (on behalf of Lakeside Capital) the

funding requests of Borrower and the Operating Subsidiaries, and therefore, had

direct knowledge of the operations, budgets, and cash flow of the Borrower and

Operating Subsidiaries.

94.     Defendants Andrews and Elieff were aware of and participated in

correspondence among Defendants in the fall of 2005 concerning the size and

1   structure of the proposed loans and distributions to Defendants from the proceeds of

2   those loans.

3   95.     Upon information and belief, *zero* lots were sold in 2006, with *zero* revenue

4   from lot sales. Consequently, according to the SunCal Defendants' own projections,

5   the revolver should have been *at least* $170 million.

6   96.     Despite having discussed and been fully aware of the facts and risks,

7   Defendants nevertheless caused Borrower and the Operating Subsidiaries to enter

8   into a loan and make a $144 million distribution to Defendants that left Debtors

9   insolvent and undercapitalized.

10          **C.     The January 2006 Loans**

11  97.     On or around January 19, 2006, Lehman/SunCal Master borrowed a total of

12  $320 million.  The $320 million obligation was structured as:  (1) a revolving credit

13  facility of $75 million (the "**Revolver**") and term loan facility of $160 million

14  under a First Lien Credit Agreement ("**First Lien Term Loan**"); and (2) a $85

15  million term loan facility under a Second Lien Credit Agreement ("**Second Lien**

16  **Term Loan**") (collectively, sometimes hereinafter referred to as the "**January**

17  **2006 Loans**").

18  98.     Defendants caused the obligations of Lehman/SunCal Master under these

19  agreements to be guaranteed by the Operating Subsidiaries, and secured by first and

20  second liens cross collateralized against the Real Properties and other assets.  More

21  specifically, LBREP-Lakeside and SunCal granted LCPI a lien against essentially

22  all of the assets of debtor Lehman/SunCal Master for the full amount of the January

23  2006 Loans (the "**Lehman/SunCal Master Lien**"), as well as liens against

24  essentially all of the assets of each of the Operating Subsidiaries also in the full

25  amount of the January 2006 Loans ("**Lehman/SunCal Subsidiary Liens**").

26  99.     The Trustee is informed and believes, and on that basis alleges, as a result of

27  the January 2006 Loans, the Debtors were collectively saddled with $320 million in

28  secured debt and the significant interest thereon.

- 20 -                          AMENDED COMPLAINT

1    100.   However, Debtors did not receive the benefit of the vast majority of the

2    January 2006 Loan proceeds.  Of the $245 million allegedly loaned to

3    Lehman/SunCal Master under the First and Second Lien Term Loans, a $144

4    million purported "equity distribution" (the "**$144 Million Distribution**") was

5    immediately paid to Defendants.  Upon information and belief, on or around

6    January 20, 2006, approximately $116.3 million was paid to LBREP-Lakeside, and

7    approximately $27.6 million was paid to SCC Ranch.  Upon information and belief,

8    of the $116.3 million paid to LBREP-Lakeside, approximately $108.8 million was

9    paid to SC Master, and $7.5 million was paid to Lakeside Capital.

10   101.   Further, the $144 Million Distribution did not solely represent the return of

11   equity to Defendants.  Upon information and belief, $41.6 million of the $144

12   Million Distribution represented a distribution of unearned profits to Defendants.

13   102.   Upon information and belief, Lakeside Capital oversaw and executed the

14   distribution of the $144 Million from Borrower to Defendants.

15   103.   Upon information and belief, some of the $144 Million Distribution was

16   conveyed, either directly or indirectly to other Defendants, including SC Master

17   Parent and SCC Acquisitions, Inc. Pursuant to Section 7.6(c) of the First Lien Loan

18   Agreement, Borrower was permitted to pay a dividend on the designated Closing

19   Date to one or more of "Bruce Elieff, SunCal, SCC Acquisitions LLC, SCC Ranch

20   Ventures LLC, or LBREP Lakeside SC Master I, LLC, in an aggregate amount not

21   exceeding 144mm." In earlier drafts of the agreement and term sheet, "SunCal" was

22   the defined term for "SCC Acquisitions, Inc."

23   104.   Debtors did not enjoy the benefit of the $144 million Distribution for which

24   they all were liable, nor did they receive any value whatsoever on account of the

25   transfer of the $144 Million Distribution to Defendants.

26   105.   The Trustee is informed and believes, and on that basis alleges, that

27   Defendants LBREP-Lakeside, SCC Ranch, Bruce Elieff, Mark Magstadt, Melvin T.

28   Andrews, Ronald W. Lee, and Does 1 through 10 breached their fiduciary duties to

- 21 -

1   the Debtors and the creditors of the Debtors, by authorizing and committing the

2   Debtors to incur the obligations of the January 2006 Loans, to transfer the $144

3   Million Distribution to Defendants LBREP-Lakeside and SCC Ranch, and to incur

4   the Third Lien Loans (as defined below).

5   106.   Pursuant to the January 18, 2006 Authorizing Resolution of Borrower

6   executed in connection with the January 2006 Loans, Bruce Elieff, Steve Elieff,

7   Bruce Cook, and Ed Nolan (all officers and/or directors of the SunCal Defendants)

8   were all authorized, directed, and empowered to enter into, execute, deliver, and

9   perform on behalf of the Borrower and the Operating Subsidiaries for the purpose

10   of entering into the January 2006 Loans and related transactions. Elieff signed the

11   First and Second Lien Credit Agreements (and related agreements) on Borrower's

12   behalf. Bruce Elieff also was an authorized agent of the Operating Subsidiaries, and

13   signed the First Lien Guarantee and Collateral Agreement (and related agreements)

14   on their behalf.

15   107.   Upon information and belief, Defendants Melvin Andrews and Ronald Lee,

16   as designated representatives of Lakeside Capital, authorized and caused Lakeside

17   Capital to consent to and authorize the January 2006 Loans and related transactions.

18   Andrews and Lee, as designated representatives of LBREP-Lakeside, also

19   authorized and caused Debtors to enter into the January 2006 Loans and related

20   transactions.

21   108.   Upon information and belief, Defendants SC Master Parent, SC Master,

22   LBREP-Lakeside, SCC Acquisitions, Inc. and SCC Ranch entered into Authorizing

23   Resolutions and otherwise authorized and caused Debtors to enter into the loan

24   transactions.

25   109.   In the Lien Credit Agreements, the Borrower also made and agreed to

26   affirmative and negative covenants, including that it would cause the Operating

27   Subsidiaries to comply with these covenants. Further, the Lien Credit Agreements

28   recognize that the Operating Subsidiaries are parties to the overall loan transaction,

AMENDED COMPLAINT

as they define the "Loan Parties" as being "the Borrower and each Subsidiary of the Borrower that is a party to a Loan Document," and each of the Operating Subsidiaries were parties to one or more such loan documents.

110.    The Trustee is informed and believes, and on that basis alleges, that most of the $320 million January 2006 Loan proceeds went to one Lehman-related entity or another.  Besides the $144 Million Distribution, $10.6 million was paid to LCPI for its arrangement and administrative fee.  Approximately $62 million went to repay loans owing to another Lehman entity, Lehman, Ali.  This value received by the Debtors is further offset by the fact that debtor McSweeney paid approximately $21.5 million into escrow prior to closing.

111.    The Trustee is informed and believes, and on that basis alleges, that while the Operating Subsidiaries were forced to grant security interests in the Real Properties to secure the entire $320 million in loans to Lehman/SunCal Master, each Operating Subsidiary received very little of the loan proceeds.  Specifically, McAllister, McSweeny, and Summerwind received only $20 million, $17.7 million, and $24 million, respectively, to repay obligations owed to Lehman Ali.  Moreover, the Subsidiary Debtors subsequently contributed cash (approximately $45 million - apparently from the sale of property) in repayment of the $320 million in loans to Lehman/SunCal Master.

112.    The Trustee is informed and believes, and on that basis alleges, that the only concrete economic benefit received by the Operating Subsidiaries in exchange for securing Lehman/SunCal Master's obligations in connection with the January 2006 Loans (i.e., the repayment of the $320 million in loans) consisted of monies sufficient to repay the much lesser existing obligations owing to Lehman Ali, another Lehman-related entity.

113.    Upon information and belief, the Debtors did not receive reasonably equivalent value for the transfer of the $144 Million Distribution and, in fact, they

AMENDED COMPLAINT

1   received no value whatsoever for such transfer. Nor did the Debtors receive any

2   indirect, intangible economic benefits.

3   114.   Upon information and belief, given the liquidity of the Debtors and market

4   conditions at the time, the transfer of the $144 Million Distribution to Defendants

5   left the Debtors with remaining assets that were unreasonably small in relation to

6   the business and transaction. Upon information and belief, Defendants intended

7   that the Debtors incur, or believed or reasonably should have believed that the

8   Debtors would incur, debts beyond the Debtors' ability to pay as they became due.

9   115.   Upon information and belief, the Debtors were insolvent by the transfer of

10   the $144 Million Distribution to Defendants or were rendered insolvent by such

11   transfer. Had Debtors not made the $144 Million Distribution to Defendants,

12   Debtors would have remained solvent, or would have remained solvent for a longer

13   period of time.

14   116.   The Trustee is informed and believes, and on that basis alleges, that $25

15   million of the January 2006 Loan proceeds were set aside to fund a "Debt Service

16   Reserve" which the Debtors could not use, but served as the collateral for the

17   January 2006 Loans. The requirement to fund this Debt Service Reserve meant that

18   such monies could not be used for the development of the Real Properties, or any

19   other purpose other than the payment of interest on the January 2006 Loans, during

20   a substantial portion of the loan term. Similarly, because of the $50 million

21   liquidity requirement, there was another $25 million on the revolving credit line

22   that was never made available to the Debtors between the January 19, 2006,

23   funding date and March, 2007, resulting in a combined $50 million of lost liquidity

24   for the Debtors.

25   117.   Upon information and belief, the $144 Million Distribution was made at a

26   time when the Debtors were not close to completing the work on the Real Estate

27   Projects, which had to be developed and sold in order for Debtors to be able to pay

28   their debts. However, the amount of funds received from the gross amount of $320

AMENDED COMPLAINT

1   million of the January 2006 Loans was reduced by the paydowns to Lehman Ali

2   ($61.7 million), the requirement to fund the Debt Service Reserve Account ($25

3   million), transaction fees and expenses, the majority of which were paid to other

4   Lehman entities (approximately $11.3 million), and the $144 Million Distribution.

5   Thus, after these reductions in the aggregate amount of $242 million, and after

6   taking into consideration the additional $25 million from the Revolver set aside to

7   meet the loan liquidity requirements, the Debtors had at most only $54 million to

8   carry out the development of the Real Properties, to make interest payments on the

9   January 2006 Loans, and to fund its other business obligations.

10  118.   In or around November 2005 Defendants misrepresented to potential lenders

11  that there would be $104 million in cash available to Debtors for the development

12  of the Projects when the proposed loan closed. This $104 million represented the

13  $25 million Debt Service Reserve, which could not be used for future development

14  expenses, the $75 million Revolver, $25 million of which could not be used for

15  future development expenses due to the liquidity requirements of the loan, and $4

16  million cash. Contrary to Defendants' misrepresentations, at closing, Debtors would

17  have only $54 million available to be used for future development expenses at the

18  Real Estate Projects, which, by LBREP's and SunCal's own projections, would be

19  insufficient to fund future development. For example, total project costs were

20  estimated to be approximately $197.2 million in 2006 alone.

21  119.   Upon information and belief, at the time the $144 Million Distribution was

22  transferred to Defendants, Debtors were only in the beginning stages of developing

23  the Real Properties and could not reasonably expect a source of cash flow until the

24  development projects were completed and sold.  In fact, upon information and

25  belief, Lehman/SunCal Master, through its subsidiary SummerWind, had not

26  completed the acquisition of the SummerWind property; nor had Lehman/SunCal

27  Master acquired the Patterson Ranch property that was contemplated to be

28  purchased with the January 2006 Loan proceeds.

- 25 -                    AMENDED COMPLAINT

1    120.   Upon information and belief, Defendants knew or reasonably should have

2    known at the time the $144 Million Distribution was conveyed that the $144

3    Million Distribution would leave the Debtors without sufficient operating capital to

4    pay debts as they became due or to complete the contemplated development of the

5    Real Properties and would render Debtors insolvent, yet with callous disregard of

6    the greatly diminished prospects for current and future creditors of the Debtors to

7    be repaid, and motivated by the overriding desire to obtain the wrongful $144

8    Million Distribution, Defendants, nonetheless authorized the transfer of the $144

9    Million Distribution.

10           **C.**   **The February 2007 Loans**

11   121.   By July 2006, six months after the closing of the January 2006 Loans, it was

12   clear that lot sales at the Real Estate Projects were going to be significantly delayed

13   due to a slowdown in absorption rates in the relevant markets, and consequently,

14   that Debtors would not see the incoming cash flow that was necessary to fund the

15   Real Estate Projects. As a result, in the Fall of 2006, SunCal and LBREP discussed

16   the likely need to call equity capital to meet the development needs of the Projects,

17   with the expected shortfall to be approximately $*91 million*.

18   122.   Rather than re-invest that much equity into the Real Estate Projects,

19   Defendants sought to have the January 2006 Loans restructured and to receive

20   additional funding via a Third Lien Loan.

21   123.   The Trustee is informed and believes, and on that basis alleges, on February

22   6, 2007, a Third Lien Credit Agreement was entered into by Lehman/SunCal

23   Master, which allegedly provided for an additional $75 million term loan (the

24   "**Third Lien Loan**"), guaranteed once again by the Operating Subsidiaries and

25   secured by third priority liens ("**Third Lien**") against the Real Properties.

26   124.   Upon information and belief, the Third Lien Loan for $75 million was

27   necessary because, as alleged above, the Debtors were left with unreasonably small

28

AMENDED COMPLAINT

08-13555-mg Doc 36870-1 Filed 04/25/13 Entered 04/25/13 15:21:05 Exhibit A
Pg 28 of Page 27 of 76

1    capital to engage in the business of real property development on the scale

2    contemplated by the Debtors.

3    125.   The Trustee is informed and believes, and on that basis alleges, just as with

4    the January 2006 Loans, in the Third Lien Loans LBREP-Lakeside and SCC Ranch

5    negotiated the terms of the Third Lien Loan on behalf of the Debtors.  From the $75

6    million loaned to Lehman/SunCal Master pursuant to the Third Lien Loan, $50

7    million was paid out of escrow directly to pay down obligations on the January

8    2006 Loans.

9    126.   The Trustee is informed and believes, and on that basis alleges, that

10   Defendants exposed Debtors to an unreasonably high probability of default on the

11   January 2006 Loans and the Third Lien Loan.  Defendants negotiated the Fourth

12   Amendment and Waiver to the First Lien Credit Agreement, which required that the

13   cash in the Development Account be increased from $25 million to $50 million by

14   March 31, 2008.  LBREP-Lakeside and SCC Ranch knew or reasonably should

15   have known that the Debtors would be unable to comply with this Amendment and

16   produce an additional $25 million in cash within 60 days.

17   127.   Further, Defendants knew or should have known that the Third Lien Loan

18   was going to provide insufficient funds to permit the Debtors to continue to fund

19   the Real Estate Projects and pay their debts as they became due. For example, in or

20   around April 2007, the LBREP Defendants and their agents recognized that the

21   Borrower would have liquidity problems in 2007 if no sales occurred until later that

22   year, and that the housing market in California had hit a floor.

23   128.   In its July 17, 2008 downgrade of Lehman/SunCal Master and the Loan

24   facilities, S&P explicitly recognized that Lehman/SunCal Master was an

25   "undercapitalized borrower."

26   129.   Upon information and belief, within months of transferring the $144 Million

27   Distribution to Defendants, the Debtors notified their lenders that a substantial

28   additional infusion of cash was needed to be able to continue to develop the Real

- 27 -                          AMENDED COMPLAINT

Properties. Ultimately, the Debtors defaulted on their obligations in connection with the January 2006 Loans and the Third Lien Loan, it became clear that the Loans could not be repaid, and the Debtors abandoned their plans to develop the Real Properties. Finally, in September of 2008, the involuntary petitions were filed against the Debtors.

### D. The Alter Ego Relationships Among Defendants

#### *The LBREP Defendants*

130. The Trustee alleges, upon information and belief, that the LBREP Defendants at all times failed to observe corporate formalities and acted with such a unity of interest and ownership that they rendered themselves as alter egos such that their separate personalities no longer exist. As such, the failure to disregard their corporate "structure" would result in fraud or injustice by allowing them to retain the spoils of their improper actions, as alleged and discussed in more detail below.

131. The complete domination exerted over the finances, business, and policies of LBREP-Lakeside by SC Master, and of SC Master by SC Master Parent, was exercised for the purpose of defrauding Debtors' creditors and unlawfully distributing at least $108.8 million to the LBREP Defendants.

132. Pursuant to the Operating Agreement of LBREP-Lakeside, SC Master Parent was permitted to exercise all rights of SC Master. Upon information and belief, SC Master Parent holds a 98% interest in SC Master. Upon information and belief, SC Master Parent is owned by various LBREP-affiliated equity funds.

133. Upon information and belief, the LBREP Defendants made interest-free loans to each other in connection with the Real Estate Projects.

134. Upon information and belief, SC Master and Lakeside Capital treated the assets of LBREP-Lakeside as their own, and SC Master Parent treated the assets of SC Master as its own. For example, the $108.8 million that was transferred to SC Master as part of the $144 Million Distribution was subsequently transferred directly to SC Master Parent.

- 28 -

AMENDED COMPLAINT

135.    Upon information and belief, LBREP-Lakeside, SC Master, and SC Master Parent were controlled by the same individuals acting for the  LBREP Defendants in structuring the Loans and the $144 Million Distribution were the same and were also principals of LBREP.

(a)    Karen Blakely was an authorized signatory of SC Master and SC Master Parent and a designated representative of SC Master, the Managing Member of LBREP-Lakeside. Blakely was heavily involved in structuring the Loans;

(b)    Frank Cappello was an agent of SC Master, the Managing Member of LBREP-Lakeside, and was heavily involved with the structuring of the Loan, as well as the planned use of the proceeds from the Loan (including the $144 million distribution);

(c)    Rodolpho Amboss was an authorized signatory of SC Master, the Managing Member of LBREP-Lakeside, and SC Master Parent, as well as all three of the members of SC Master and four of the members of SC Master Parent;

(d)    Additionally, Francis Gilhool and Tom Chilton regularly acted on behalf of and represented SC Master, SC Master Parent, and LBREP-Lakeside in connection with the Real Estate Projects, Loans, and $144 Million Distribution.

136.    Upon information and belief, SC Master Parent undercapitalized SC Master, who, along with Lakeside Capital, undercapitalized LBREP-Lakeside, who, along with SCC Ranch, undercapitalized Borrower. All Defendants caused Borrower and Operating Subsidiaries to be undercapitalized.

### The SunCal Defendants

137.    The Trustee alleges, upon information and belief, that Defendants SCC Ranch, SCC Acquisitions, LLC, and SCC Acquisitions, Inc. (the "**SunCal Corporate Defendants**") at all times failed to observe corporate formalities and acted with such a unity of interest and ownership that they rendered themselves as alter egos such that their separate personalities no longer exist.  As such, the failure to disregard their corporate "structure" would result in fraud or injustice by

- 29 -

allowing them to retain the spoils of their improper actions, as alleged and
discussed in more detail below.

138.    The complete domination exerted over the finances, business, and policies of
SCC Ranch by SCC Acquisitions, LLC, and of both of these entities by SCC
Acquisitions, Inc., was exercised for the purpose of defrauding Debtors' creditors
and unlawfully distributing at least $27.5 million to the SunCal Defendants.

139.    Upon information and belief, the SunCal Defendants made interest-free loans
to each other in connection with the Real Estate Projects.

140.    Upon information and belief, SCC Acquisitions, Inc., treated the assets of
SCC Acquisitions, LLC and SCC Ranch as its own. For example, the $27.5 million
that was transferred to SCC Ranch as part of the $144 Million Distribution was
almost immediately transferred directly to SCC Acquisitions, Inc.

141.    Upon information and belief, in a Limited Guaranty that it provided LBREP-
Lakeside, SCC Acquisition, Inc. acknowledged that it "will have a direct or indirect
financial interest in the Projects and will benefit from [LBREP-Lakeside's]
investment in the Projects." Further, pursuant to the Second Amendment to the
Operating Agreement of the Borrower, SCC Acquisitions, Inc. provided to the
Borrower a guarantee of any reconciliation payments that SCC Ranch might have
been required to pay under that Operating Agreement.

142.    All of the principal players for the SunCal Defendants that were involved in
structuring the Loans and the $144 Million Distribution, and developing the Real
Properties, were the same. For example:

(a)     Bruce Elieff, the manager and designated representative of SCC
Ranch, also was the owner and President of SunCal. While Elieff was not, upon
information and belief, a member of SCC Acquisitions, LLC, or SCC Ranch,
pursuant to Section 7.6(c) of the First Lien Loan Agreement, Borrower was
permitted to pay him (personally) a dividend on the designated Closing Date, "in an
aggregate amount not exceeding 144mm";

- 30 -

(b)  Mark Magstadt, the Chief Operating Officer and designated representative of SCC Ranch, also was the Chief Operating Officer of the SunCal Companies.

(c)  Bruce Cook, the General Counsel of SunCal and Designated Representative of SunCal Management, also was an authorized signatory of Debtors and General Counsel of SCC Ranch;

(d)  Stephan Elieff, the Chief Investment Officer of SunCal, also was the President of each Operating Subsidiary and Co-Manager of SCC Ranch.

143.  Upon information and belief, Elieff also was the Manager and authorized signatory of SunCal Management, LLC, another SunCal entity that entered into Development Agreements with SCC Ranch (who was represented by Elieff) to manage the development of the properties.

144.  Upon information and belief, SC Master Parent undercapitalized SC Master, who, along with Lakeside Capital, undercapitalized LBREP-Lakeside, who, along with SCC Ranch, undercapitalized Borrower. All Defendants caused Borrower and Operating Subsidiaries to be undercapitalized.

### *Lakeside Capital*

145.  Lakeside Capital and LBREP-Lakeside acted with such a unity of interest and ownership that they rendered themselves as alter egos such that their separate personalities no longer exist.  As such, the failure to disregard their corporate "structure" would result in fraud or injustice by allowing them to retain the spoils of their improper actions.

146.  The complete domination exerted over the finances, business, and policies of LBREP-Lakeside by Lakeside Capital, a member of and agent for Defendant LBREP-Lakeside, was exercised for the purpose of defrauding Debtors' creditors and unlawfully distributing at least $7.5 million to the Lakeside Defendants.

147.  Upon information and belief, SC Master and Lakeside Capital treated the assets of LBREP-Lakeside as their own. Lakeside Capital, who received the $7.5

AMENDED COMPLAINT

OHS WEST:261241825.7

million distribution, has three members: Defendant Lee, Marsha Jennings, and
Lakeside Capital, LLC. The majority owner of Lakeside Capital LLC is Defendant
Andrews.

148.   All of the principal players for the Lakeside Capital Defendants that were
involved in structuring the Loans and the $144 Million Distribution were the same.
For example:

(a)     Melvin Andrews was an authorized signatory and designated
representative of LBREP-Lakeside, and was a member, authorized signatory and
designated representative of Lakeside Capital. Andrews authorized and caused
Lakeside Capital to consent to the Loan, and Borrower to enter into the Loan.
Andrews was aware of and participated in correspondence among Defendants in the
fall of 2005 concerning the size and structure of the proposed loans and
distributions to Defendants from the proceeds of those loans;

(b)     Ronald Lee was an authorized signatory and designated representative
of LBREP-Lakeside, and was a member, authorized signatory and designated
representative of Lakeside Capital. Lee was aware of and signed (on behalf of
Lakeside Capital) the funding requests of Borrower and the Operating Subsidiaries,
and therefore, had direct knowledge of the operations, budgets, and cash flow of the
Borrower and Operating Subsidiaries. Lee authorized and caused Lakeside Capital
to consent to the Loans and Borrower to enter into the Loans.

(c)     Marsha Jennings was an authorized signatory and designated
representative of Lakeside Capital, and was the Executive Vice President of each
Operating Subsidiary. Jennings approved funding requests to Borrower on behalf of
Lakeside Capital and signed the First Lien Loan Closing Certificate (with Andrews
and Lee) for Lakeside Capital. Jennings was responsible for the actual transfer of
the $144 Million Distribution from Debtors to Defendants.

149.   Upon information and belief, SC Master Parent undercapitalized SC Master,
who, along with Lakeside Capital, undercapitalized LBREP-Lakeside, who, along

AMENDED COMPLAINT

08-13555-mg Doc 38870-1 Filed 04/25/13 Entered 04/25/13 11:20:59:4 Exhibit A
Pg 34 of 76 Page 33 of 76

with SCC Ranch, undercapitalized Borrower. All Defendants caused Borrower and

Operating Subsidiaries to be undercapitalized.

## E.     The Relationship Between the Borrower and the Operating Subsidiaries

### *Debtors Were the Alter Egos of One Another*

150.    Upon information and belief, the Debtors all acted with such a unity of

interest and ownership that they rendered themselves as alter egos such that their

separate personalities no longer exist.  As such, the failure to disregard their

corporate structure would result in fraud or injustice by allowing Defendants to

retain the spoils of their improper actions.

151.    As stated herein, Borrower was an instrument for the joint venture

established by the Defendants solely to pool the assets of the Operating

Subsidiaries. The Borrower and Operating Subsidiaries commingled their funds,

and Defendants used the pooled assets of each Operating Subsidiary, which were

kept at the Borrower level, to borrow from one to pay the debts of another. For

example, in or around November 2006, the Lakeside Capital Defendants recognized

that they had previously allowed the Operating Subsidiaries to borrow from one

another and that they treated the Operating Subsidiaries as one project.

152.    Upon information and belief, when lots were sold by each Operating

Subsidiary, and when funds were received by the Borrower pursuant to the Loan

Agreements, the proceeds from such sales and/or loans were transferred to

Borrower, who pooled the funds and used them to pay the debts of all of the

Operating Subsidiaries.  In other words, the Borrower used the assets of each

Operating Subsidiary as its own, and each Operating Subsidiary used the assets of

the Borrower and the other Operating Subsidiaries as its own. As a result, neither

Borrower nor the Operating Subsidiaries respected their corporate forms.

153.    Upon information and belief, all actions taken by the Borrower were not acts

of the Borrower alone, but instead, were acts of the Operating Subsidiaries. For

AMENDED COMPLAINT

example, in the Lien Credit Agreements, the Borrower made numerous

representations and warranties on behalf of both itself and the Operating

Subsidiaries.

154.    Upon information and belief, all of the principal players that were involved

in structuring the Loans and the $144 Million Distribution, and developing the Real

Properties, were also principals of the SunCal Defendants, the LBREP Defendants,

and the Lakeside Capital Defendants, who structured the transaction for their own

benefit.

155.    In light of these facts, Borrower and Operating Subsidiaries should be

considered alter egos and, as such, the transfer of the $144 Million Distribution

from Borrower can therefore be treated as having been made by the Operating

Subsidiaries.

### *Borrower Acted as the Operating Subsidiaries' Agent*

156.    The Borrower also acted as the Operating Subsidiaries' agent in participating

in the Loans and making the transfer of the $144 Million Distribution. As a result,

the $144 Million Distribution can therefore be treated as having been made by the

Operating Subsidiaries, given that the Borrower only had possession of the loan

proceeds, including the $144 Million Distribution, as an agent of the Operating

Subsidiaries.

157.    As a consequence, the $144 Million Distribution was transferred by the

Operating Subsidiaries to LBREP-Lakeside and SCC Ranch.

158.    Borrower entered into the First and Second Lien Credit Agreements

purportedly to obtain additional funds for the development of the Real Properties

owned by the Operating Subsidiaries. As stated above, the Borrower was an entity

set up by Defendants to pool the assets of the Operating Subsidiaries; while the

Borrower received no benefit from the Loans, the Operating Subsidiaries were the

real parties in interest to the Loan transactions and the intended beneficiaries of the

Loan proceeds. The Lien Credit Agreements recognize that the Operating

AMENDED COMPLAINT

1  Subsidiaries are parties to the overall loan transaction, as they define the "Loan

2  Parties" as being "the Borrower and each Subsidiary of the Borrower that is a party

3  to a Loan Document," and each of the Operating Subsidiaries were parties to one or

4  more such loan documents. Borrower was authorized to, and did in fact, act on their

5  behalf.

6  159.   Further, in the Lien Credit Agreements, representations and warranties were

7  made by the Borrower on behalf of the Operating Subsidiaries to induce the lenders

8  and their agents to enter into the loan transaction, including but not limited to

9  representations and warranties: (i) that, among other things, the proceeds of the loan

10  transactions would not be used to violate any law or contractual obligations of the

11  Borrower or the Operating Subsidiaries; (ii) that the use of the proceeds would not

12  result in or require the creation or imposition of any liens on any property or

13  revenue of the Borrower or the Operating Subsidiaries; (iii) regarding the

14  consolidated balance sheet of the Borrower and its consolidated Subsidiaries; (iv)

15  regarding the Borrower and Operating Subsidiaries' corporate structures and

16  compliance with law; (v) that the Borrowers and Operating Subsidiaries were not

17  aware of any threatened or actual litigation; (vi) that the Borrower and Operating

18  Subsidiaries were not in default; (vii) that the Borrower and Operating Subsidiaries

19  had all valid titles or leasehold interests in the relevant properties; (viii) that the

20  Borrower and the Operating Subsidiaries owned or were licensed to use any

21  relevant intellectual property; (ix) that the Borrower and the Operating Subsidiaries

22  had complied or would comply with all tax obligations; (x) that the Borrower and

23  Operating Subsidiaries had complied with numerous environmental concerns; and

24  (xi) that the Borrower and the Operating Subsidiaries were in compliance with

25  certain other covenants in the Lien Credit Agreements.

26  160.   Upon information and belief, the principal collateral for the January 2006 and

27  February 2007 Loans was the properties owned by the Operating Subsidiaries, who

28  pledged their interest in these properties to secure funds for the development of the

AMENDED COMPLAINT

Real Properties. Borrower, acting on behalf of all four of the Operating

Subsidiaries, entered into the Loan Transactions to secure these funds, which

should have been used to fund the development of the Real Properties.

161.   Borrower, on behalf of the Operating Subsidiaries, represented in the Lien

Credit Agreements that the Operating Subsidiaries would provide liens on the Real

Properties as part of the January 2006 Loans. Specifically, Borrower represented

that, "[t]he Guarantee and Collateral Agreement is effective to create in favor of the

Administrative Agent, for the benefit of the Secured Parties, a legal, valid and

enforceable security interest in the Collateral described therein and proceeds

thereof…..[T]he Guarantee and Collateral Agreement shall constitute a fully

perfected Lien on, and security interest in, all right, title, and interest of the Loan

Parties and the Investor Pledgors, as applicable, in such Collateral and the proceeds

thereof, as security for the Obligations (as defined in the Guarantee and Collateral

Agreement )."

162.   As stated herein, the Borrower and Operating Subsidiaries commingled their

funds, and Defendants used the pooled assets of each Operating Subsidiary, which

were kept at the Borrower level, to borrow from one to pay the debts of another.

Consequently, when the Borrower received the proceeds from the January 2006 and

February 2007 Loans, it did so on behalf of the Operating Subsidiaries, as their

agent. In essence, each Operating Subsidiary pledged its asset (the Real Property)

for a portion of the proceeds from the Loans, and Borrower was simply their agent

for the purpose of the Loan transactions.

163.   Upon information and belief, as the borrowers of the loan proceeds,

Operating Subsidiaries had the power, as the principals, to distribute or designate

the receiver of the loan proceeds.

164.   In light of these facts, Borrower should be considered an agent of the

Operating Subsidiaries and, as such, the transfer of the $144 Million Distribution

AMENDED COMPLAINT

from Borrower can therefore be treated as having been made by the Operating
Subsidiaries.

### Operating Subsidiaries As Third Party Beneficiaries

165. In the alternative, the Operating Subsidiaries were the third-party
beneficiaries of the loan transactions that provided the funds to the Borrower that
were included in and comprised the transfer of the $144 Million Distribution.

166. Upon information and belief, the Lien Credit Agreements were intended to
be expressly for the benefit of the Operating Subsidiaries, and provide the
Operating Subsidiaries with sufficient funds to develop the Real Properties.

167. The Lien Credit Agreements recognize that the Operating Subsidiaries are
parties to the overall loan transaction, as they define the "Loan Parties" as being
"the Borrower and each Subsidiary of the Borrower that is a party to a Loan
Document," and each of the Operating Subsidiaries were parties to one or more
such loan documents.

168. Further, in the Lien Credit Agreements, representations and warranties were
made to induce the lenders and their agents to enter into the loan transaction, and
many of these statements include representations and warranties made on behalf of
both the Borrower *and the Operating Subsidiaries*, including but not limited to
representations and warranties: (i) that, among other things, the proceeds of the loan
transactions would not be used to violate any law or contractual obligations of the
Borrower or the Operating Subsidiaries; (ii) that the use of the proceeds would not
result in or require the creation or imposition of any liens on any property or
revenue of the Borrower or the Operating Subsidiaries; (iii) regarding the
consolidated balance sheet of the Borrower and its consolidated Subsidiaries; (iv)
regarding the Borrower and Operating Subsidiaries' corporate structures and
compliance with law; (v) that the Borrowers and Operating Subsidiaries were not
aware of any threatened or actual litigation; (vi) that the Borrower and Operating
Subsidiaries were not in default; (vii) that the Borrower and Operating Subsidiaries

AMENDED COMPLAINT

1   had all valid titles or leasehold interests in the relevant properties; (viii) that the

2   Borrower and the Operating Subsidiaries owned or were licensed to use any

3   relevant intellectual property; (ix) that the Borrower and the Operating Subsidiaries

4   had complied or would comply with all tax obligations; (x) that the Borrower and

5   Operating Subsidiaries had complied with numerous environmental concerns; and

6   (xi) that the Borrower and the Operating Subsidiaries were in compliance with

7   certain other covenants in the Lien Credit Agreements.

8   169.   As stated herein, the Borrower and Operating Subsidiaries commingled their

9   funds, and Defendants used the pooled assets of each Operating Subsidiary, which

10  were kept at the Borrower level, to borrow from one to pay the debts of another.

11  Consequently, when the Borrower received the proceeds from the January 2006 and

12  February 2007 Loans, it did so for the benefit of the Operating Subsidiaries.

13  170.   Thus, the Operating Subsidiaries had an interest in the proceeds from the

14  January 2006 and February 2007 Loans, including the $144 Million Distribution.

15  171.   As a consequence, the Operating Subsidiaries were the third-party

16  beneficiaries of the January 2006 and February 2007 Loans, and stood to benefit

17  from the transfer of those Loan funds to the Borrower.

18                          **FIRST CLAIM FOR RELIEF**

19              **(To Recover Fraudulent Conveyance With Actual Intent**

20      **under 11 U.S.C. §§ 544(b), 550, and Cal. Civ. Code § 3439.04(a)(1))**

21          **(on behalf of Borrower's creditors against all Defendants)**

22  172.   The Trustee re-alleges the foregoing paragraphs as though fully set forth

23  herein.   The Trustee brings this Claim for Relief to avoid the transfer of property

24  transferred with the actual intent to hinder, delay or defraud creditors under 11

25  U.S.C. § 544(b), California Civil Code §§ 3439.04(a)(1) and 3439.07, and 11

26  U.S.C. § 550.

27

28

AMENDED COMPLAINT

OHS WEST:261241825.7

173.    The Trustee brings this Claim for Relief on behalf of, *inter alia*, the following unsecured creditor of the Borrower who had a viable claim which arose on or before September 10, 2008, the time the bankruptcy petition was filed:

(a)    Unsecured creditor Standard & Poor's had a claim for analytical services rendered for Borrower in the amount of $113,000.00, which claim arose on or before December 29, 2005 and which was outstanding as of the time of transfer on January 19, 2006. Standard & Poor's also was an unsecured creditor of Borrower as of September 10, 2008, the time the bankruptcy petition was filed.

174.    The Trustee is informed and believes, and on that basis alleges, the transfer of the $144 Million Distribution by Lehman/Suncal Master to Defendants LBREP-Lakeside and SCC Ranch occurred during the four year period immediately preceding the Petition Dates.

175.    As set forth in Paragraphs 150-171 herein, Borrower and the Operating Subsidiaries were alter egos of each other, or in the alternative, the Borrower was acting as the Operating Subsidiaries' agent in participating in the Loans and making the transfer of the $144 Million Distribution, or in the alternative, the Operating Subsidiaries were the third-party beneficiaries of the loan transactions that provided the funds to the Borrower that were included in and comprised the transfer of the $144 Million Distribution. Consequently, Trustee also brings this Claim for Relief on behalf of, *inter alia*, the following unsecured creditors of the Operating Subsidiaries who had a viable claim which arose on or before September 10, 2008, the time the bankruptcy petition was filed:

(a)    As to Operating Subsidiary McSweeny: Unsecured creditor All American Asphalt had a claim for work performed at the McSweeny property in the amount of $31,403.70, which claim arose on or before December 31, 2005, and which was outstanding as of the time of transfer on January 19, 2006. All American Asphalt also was an unsecured creditor of McSweeny as of September 10, 2008, the time the bankruptcy petition was filed;

- 39 -

AMENDED COMPLAINT

(b)     As to Operating Subsidiary Summerwind: Unsecured creditor Signs &
Pinnick, Inc., had a claim for work performed at the Summerwind property in the
amount of $236,590.20, which claim arose on or before December 23, 2005, and
which was outstanding as of the time of transfer on January 19, 2006. Signs &
Pinnick, Inc., also was an unsecured creditor of Summerwind as of September 10,
2008, the time the bankruptcy petition was filed;

(c)     As to Operating Subsidiary McAllister: Unsecured creditor Parker
Printing, Inc., had a claim for work performed at the McAllister property in the
amount of $43.41, which claim arose on or before January 6, 2006, and which was
outstanding as of the time of transfer on January 19, 2006. Parker Printing, Inc.,
also was an unsecured creditor of McAllister as of September 10, 2008, the time the
bankruptcy petition was filed.

176.    The Trustee is informed and believes, and on that basis alleges, the transfer
of the $144 Million Distribution by Lehman/Suncal Master to Defendants LBREP-
Lakeside and SCC Ranch was made with the actual intent to hinder, delay or
defraud the creditors of the Debtors in that such transfer was made with callous
disregard of the greatly diminished prospects of repayment of the obligations owing
by the Debtors to the present and future creditors of the Debtors, was motivated by
the overriding desire to obtain the wrongful $144 Million Distribution, and in that
such transfer was part of a scheme to enrich Defendants, by controlling all of the
participants to a series of transactions designed to appear as arm's length
negotiations of several credit facilities between a borrower and a lender, but was
instead a series of transactions accomplished with the intent to obtain large equity
returns before any profits were ever realized, at the total risk and expense of the
creditors of the Debtors.

177.    As alleged in Paragraphs 29-96, Defendants conspired to, and did in fact,
defraud the creditors of the Borrower and the Operating Subsidiaries by, inter alia,
(i) obtaining inflated appraised values of the Real Properties using budgets and

- 40 -

AMENDED COMPLAINT

1  projections of future cash flow that Defendants knew or should have known were

2  overstated in light of their knowledge of the state of the housing market, (ii) using

3  these inflated appraised values to obtain the January 2006 Loans, (iii) structuring

4  the January 2006 Loans and $144 Million Distribution to provide Defendants with

5  the complete return of their equity, as well as profits, when no lots had yet been

6  sold, and when the Debtors would be left with insufficient funds to pay their debts

7  as they became due, (iv) issuing the $144 Million Dividend, and (v) establishing a

8  series of entities in an attempt to shield themselves from liability to Borrower, the

9  Operating Subsidiaries, and the creditors of the Debtors.

10  178.  Specifically,

11  (a)  The proceeds of the $144 Million Distribution were transferred to

12  LBREP-Lakeside and SCC Ranch, who subsequently transferred them to SC

13  Master, SC Master Parent, Lakeside Capital, and SCC Acquisitions, Inc., all of

14  whom were insiders. As set forth herein, The LBREP Defendants were alter egos of

15  one another, the SunCal Defendants were alter egos of one another, and the

16  Lakeside Defendants were alter egos of one another. The Real Estate Projects were,

17  in reality, a joint venture between the LBREP Defendants, the SunCal Defendants,

18  and the Lakeside Defendants. This is how Defendants treated and described the

19  Real Estate Projects, both among themselves and with third parties, and this is how

20  they represented the structure of the Projects to investors. All of the principals

21  involved in the structuring of the Loans and the $144 Million Distribution were

22  affiliated with Defendants, who all benefited directly from the $144 Million

23  Distribution;

24  (b)  Borrower did not retain possession or control of $144 Million

25  Distribution after the transfer, and in fact, was left insolvent and without the ability

26  to pay its debts as they became due;

27  (c)  Upon information and belief, Defendants concealed from and

28  misrepresented to lenders the amount of money that actually would be available to

AMENDED COMPLAINT

1  Borrower and the Operating Subsidiaries for the development of the Real Estate

2  Projects upon closing of the January 2006 Loans. Upon information and belief,

3  Defendants also misrepresented to lenders the bases for the appraised values of the

4  Real Properties;

5          (d)    The $144 Million Distribution was a transfer of substantially all the

6  Borrower's assets;

7          (e)    Borrower did not receive reasonably equivalent value for the transfer

8  of the $144 Million Distribution and, in fact, received no value whatsoever for such

9  transfer.  Nor did the Borrower receive any indirect, intangible economic benefits;

10         (f)    Borrower either was insolvent or became insolvent shortly after the

11  $144 Million Distribution was made;

12         (g)    The $144 Million Distribution occurred at the same time that

13  substantial debt was incurred by Borrower (in the form of the January 2006 Loan);

14  179.   The Trustee is informed and believes, and on that basis alleges, Defendants

15  did not receive the transfer of the $144 Million Distribution by Lehman/Suncal

16  Master in good faith.

17  180.   By reason of the foregoing, the transfer of the $144 Million Distribution by

18  Lehman/Suncal Master to Defendants LBREP-Lakeside and SCC Ranch is

19  avoidable and the Trustee is entitled to recover the $144 Million Distribution from

20  such Defendants and all subsequent transferees pursuant to 11 U.S.C. § 544(b),

21  California Civil Code §§ 3439.04(a)(1) and 3439.07, and 11 U.S.C. § 550.

22  181.   In addition, in light of Defendants' fraudulent conveyance, the Trustee is

23  informed and believes, and on that basis alleges, that the Defendants were unjustly

24  enriched as a result of the transfer of the $144 Million Distribution by

25  Lehman/Suncal Master.  The Trustee requests that all monies unjustly received and

26  retained at the expense of the Debtors be recovered and returned to the Debtors as

27  restitution.

28

AMENDED COMPLAINT

182.   By reason of the foregoing and the wrongful acquisition or detention of the $144 Million Distribution, the Trustee is, as a matter of justice, entitled to the imposition of a constructive trust as of the date of the transfer of the $144 Million Distribution by Lehman/Suncal Master to Defendants for the benefit of the Estates as of the Petition Date.

## SECOND CLAIM FOR RELIEF

### (To Recover Constructive Fraudulent Conveyance
### under 11 U.S.C. §§ 544(b), 550 and Cal. Civ. Code §§ 3439.04(a)(2))
### (on behalf of Borrower's creditors against all Defendants)

183.   The Trustee re-alleges the foregoing paragraphs as though fully set forth herein.  The Trustee brings this Claim for Relief to avoid and recover a constructively fraudulent transfer of property under 11 U.S.C. §§ 544(b) and 550 and California Civil Code §§ 3439.04(a)(2), and 3439.07.

184.   The Trustee brings this Claim for Relief on behalf of, *inter alia*, the following unsecured creditor of the Borrower who had a viable claim which arose on or before September 10, 2008, the time the bankruptcy petition was filed:

(a)      Unsecured creditor Standard & Poor's had a claim for analytical services rendered for Borrower in the amount of $113,000.00, which claim arose on or before December 29, 2005 and which was outstanding as of the time of transfer on January 19, 2006. Standard & Poor's also was an unsecured creditor of Borrower as of September 10, 2008, the time the bankruptcy petition was filed.

185.   As set forth in Paragraphs 150-171 herein, Borrower and the Operating Subsidiaries were alter egos of each other, or in the alternative, the Borrower was acting as the Operating Subsidiaries' agent in participating in the Loans and making the transfer of the $144 Million Distribution, or in the alternative, the Operating Subsidiaries were the third-party beneficiaries of the loan transactions that provided the funds to the Borrower that were included in and comprised the transfer of the $144 Million Distribution. Consequently, Trustee also brings this Claim for Relief

AMENDED COMPLAINT

on behalf of, *inter alia*, the following unsecured creditors of the Operating

Subsidiaries who had a viable claim which arose on or before September 10, 2008,

the time the bankruptcy petition was filed:

(a)     As to Operating Subsidiary McSweeny: Unsecured creditor All

American Asphalt had a claim for work performed at the McSweeny property in the

amount of $31,403.70, which claim arose on or before December 31, 2005, and

which was outstanding as of the time of transfer on January 19, 2006. All American

Asphalt also was an unsecured creditor of McSweeny as of September 10, 2008, the

time the bankruptcy petition was filed;

(b)     As to Operating Subsidiary Summerwind: Unsecured creditor Signs &

Pinnick, Inc., had a claim for work performed at the Summerwind property in the

amount of $236,590.20, which claim arose on or before December 23, 2005, and

which was outstanding as of the time of transfer on January 19, 2006. Signs &

Pinnick, Inc., also was an unsecured creditor of Summerwind as of September 10,

2008, the time the bankruptcy petition was filed;

(c)     As to Operating Subsidiary McAllister: Unsecured creditor Parker

Printing, Inc., had a claim for work performed at the McAllister property in the

amount of $43.41, which claim arose on or before January 6, 2006, and which was

outstanding as of the time of transfer on January 19, 2006. Parker Printing, Inc.,

also was an unsecured creditor of McAllister as of September 10, 2008, the time the

bankruptcy petition was filed.

186.    The Trustee is informed and believes, and on that basis alleges, the transfer

of the $144 Million Distribution by Lehman/Suncal Master occurred during the

four year period immediately preceding the Petition Dates.

187.    As alleged in Paragraphs 29-96, Defendants conspired to, and did in fact,

defraud the creditors of the Borrower and the Operating Subsidiaries by, inter alia,

(i) obtaining inflated appraised values of the Real Properties using budgets and

projections of future cash flow that Defendants knew or should have known were

- 44 -

1 overstated in light of their knowledge of the state of the housing market, (ii) using

2 these inflated appraised values to obtain the January 2006 Loans, (iii) structuring

3 the January 2006 Loans and $144 Million Distribution to provide Defendants with

4 the complete return of their equity, as well as profits, when no lots had yet been

5 sold, and when the Debtors would be left with insufficient funds to pay their debts

6 as they became due, (iv) issuing the $144 Million Dividend, and (v) establishing a

7 series of entities, in an attempt to shield themselves from liability to Borrower, the

8 Operating Subsidiaries, and the creditors of the Debtors.

9 188. The Trustee is informed and believes, and on that basis alleges, creditors

10 existed at the time of the transfer of the $144 Million Distribution by

11 Lehman/Suncal Master to Defendants LBREP-Lakeside and SCC Ranch that

12 remained unpaid as of the Petition Dates.

13 189. The Trustee is informed and believes, and on that basis alleges, the Debtors

14 received no value or less than reasonably equivalent value in exchange for the

15 transfer of the $144 Million Distribution by Lehman/Suncal Master.

16 190. The Trustee is informed and believes, and on that basis alleges, at the time of

17 the transfer of the $144 Million Distribution by Lehman/Suncal Master, the Debtors

18 were engaged or were about to engage in a business or a transaction for which the

19 remaining assets of the Debtors were unreasonably small in relation to the business

20 or transaction.

21 191. The Trustee is informed and believes, and on that basis alleges, at the time of

22 the transfer of the $144 Million Distribution by Lehman/Suncal Master, the Debtors

23 intended to incur, or believed or reasonably should have believed that they would

24 incur, debts beyond their ability to pay as they became due.

25 192. The Trustee is informed and believes, and on that basis alleges, that Debtors

26 did not receive reasonably equivalent value in return for the transfer of the $144

27 Million Distribution by Lehman/Suncal Master and that Defendants did not receive

28 the transfer of the $144 Million Distribution in good faith.

  AMENDED COMPLAINT

193.   By reason of the foregoing, the transfer of the $144 Million Distribution by Lehman/Suncal Master to Defendants Lakeside and SCC Ranch is avoidable, and therefore, the Trustee is entitled to recover the $144 Million Distribution from such Defendants and all subsequent transferees pursuant to 11 U.S.C. §§ 544(b) and 550 and California Civil Code §§ 3439.04(a)(2), and 3439.07.

194.   In addition, in light of Defendants' fraudulent conveyance, the Trustee is informed and believes, and on that basis alleges, that the Defendants were unjustly enriched as a result of the transfer of the $144 Million Distribution by Lehman/Suncal Master.  The Trustee requests that all monies unjustly received and retained at the expense of the Debtors be recovered and returned to the Debtors as restitution.

195.   By reason of the foregoing and the wrongful acquisition or detention of the $144 Million Distribution, the Trustee is, as a matter of justice, entitled to the imposition of a constructive trust as of the date of the transfer of the $144 Million Distribution by Lehman/Suncal Master to Defendants for the benefit of the Estates as of the Petition Date.

### THIRD CLAIM FOR RELIEF

**(To Recover Constructive Fraudulent Transfer of**
**Property under 11 U.S.C. §§ 544(b), 550 and Cal. Civ. Code §§ 3439.05)**
**(on behalf of Borrower's creditors against all Defendants)**

196.   The Trustee re-alleges the foregoing paragraphs as though fully set forth herein.  The Trustee brings this Claim for Relief to recover a constructively fraudulent transfer of property under 11 U.S.C. §§ 544(b) and California Civil Code §§ 3439.05, and 3439.07.

197.   The Trustee brings this Claim for Relief on behalf of, *inter alia*, the following unsecured creditor of the Borrower who had a viable claim which arose on or before September 10, 2008, the time the bankruptcy petition was filed:

AMENDED COMPLAINT

1   (a)   Unsecured creditor Standard & Poor's had a claim for analytical

2   services rendered for Borrower in the amount of $113,000.00, which claim arose on

3   or before December 29, 2005 and which was outstanding as of the time of transfer

4   on January 19, 2006. Standard & Poor's also was an unsecured creditor of

5   Borrower as of September 10, 2008, the time the bankruptcy petition was filed.

6   198.   As set forth in Paragraphs 150-171 herein, Borrower and the Operating

7   Subsidiaries were alter egos of each other, or in the alternative, the Borrower was

8   acting as the Operating Subsidiaries' agent in participating in the Loans and making

9   the transfer of the $144 Million Distribution, or in the alternative, the Operating

10   Subsidiaries were the third-party beneficiaries of the loan transactions that provided

11   the funds to the Borrower that were included in and comprised the transfer of the

12   $144 Million Distribution. Consequently, Trustee also brings this Claim for Relief

13   on behalf of, *inter alia*, the following unsecured creditors of the Operating

14   Subsidiaries who had a viable claim which arose on or before September 10, 2008,

15   the time the bankruptcy petition was filed:

16   (a)   As to Operating Subsidiary McSweeny: Unsecured creditor All

17   American Asphalt had a claim for work performed at the McSweeny property in the

18   amount of $31,403.70, which claim arose on or before December 31, 2005, and

19   which was outstanding as of the time of transfer on January 19, 2006. All American

20   Asphalt also was an unsecured creditor of McSweeny as of September 10, 2008, the

21   time the bankruptcy petition was filed;

22   (b)   As to Operating Subsidiary Summerwind: Unsecured creditor Signs &

23   Pinnick, Inc., had a claim for work performed at the Summerwind property in the

24   amount of $236,590.20, which claim arose on or before December 23, 2005, and

25   which was outstanding as of the time of transfer on January 19, 2006. Signs &

26   Pinnick, Inc., also was an unsecured creditor of Summerwind as of September 10,

27   2008, the time the bankruptcy petition was filed;

28

- 47 -

AMENDED COMPLAINT

(c)      As to Operating Subsidiary McAllister: Unsecured creditor Parker

Printing, Inc., had a claim for work performed at the McAllister property in the

amount of $43.41, which claim arose on or before January 6, 2006, and which was

outstanding as of the time of transfer on January 19, 2006. Parker Printing, Inc.,

also was an unsecured creditor of McAllister as of September 10, 2008, the time the

bankruptcy petition was filed.

199.    The Trustee is informed and believes, and on that basis alleges, that Debtors

did not receive reasonably equivalent value in return for the transfer of the $144

Million Distribution by Lehman/Suncal Master and that Defendants did not receive

the transfer of the $144 Million Distribution in good faith.

200.    As alleged in Paragraphs 29-96, Defendants conspired to, and did in fact,

defraud the creditors of the Borrower and the Operating Subsidiaries by, inter alia,

(i) obtaining inflated appraised values of the Real Properties using budgets and

projections of future cash flow that Defendants knew or should have known were

overstated in light of their knowledge of the state of the housing market, (ii) using

these inflated appraised values to obtain the January 2006 Loans, (iii) structuring

the January 2006 Loans and $144 Million Distribution to provide Defendants with

the complete return of their equity, as well as profits, when no lots had yet been

sold, and when the Debtors would be left with insufficient funds to pay their debts

as they became due, (iv) issuing the $144 Million Dividend, and (v) establishing a

series of entities, in an attempt to shield themselves from liability to Borrower, the

Operating Subsidiaries, and the creditors of the Debtors.

201.    The Trustee is informed and believes, and on that basis alleges, at the time of

the transfer of the $144 Million Distribution by Lehman/Suncal Master, the Debtors

were either insolvent and/or were rendered insolvent as a result of the transfer of

the $144 Million Distribution by Lehman/Suncal Master.

202.    The Trustee is informed and believes, and on that basis alleges, creditors

existing at the time of or prior to the transfer of the $144 Million Distribution by

AMENDED COMPLAINT

Lehman/Suncal Master and that those creditors remained unpaid as of the Petition

Date.

203.   By reason of the foregoing, the transfer of the $144 Million Distribution by

Lehman/Suncal Master to Defendants is avoidable, and, therefore, the Trustee is

entitled to recover the $144 Million Distribution from such Defendants and all

subsequent transferees pursuant to 11 U.S.C. §§ 544(b) and California Civil Code

§§ 3439.05, and 3439.07.

204.   In addition, in light of Defendants' fraudulent conveyance, the Trustee is

informed and believes, and on that basis alleges, that the Defendants were unjustly

enriched as a result of the transfer of the $144 Million Distribution by

Lehman/Suncal Master.  The Trustee requests that all monies unjustly received and

retained at the expense of the Debtors be recovered and returned to the Debtors as

restitution.

205.   By reason of the foregoing and the wrongful acquisition or detention of the

$144 Million Distribution, the Trustee is, as a matter of justice, entitled to the

imposition of a constructive trust as of the date of the transfer of the $144 Million

Distribution by Lehman/Suncal Master to Defendants for the benefit of the Estates

as of the Petition Date.

## FOURTH CLAIM FOR RELIEF

### (To Recover Fraudulent Conveyance With Actual Intent

### under 11 U.S.C. §§ 544(b), 550, and Cal. Civ. Code § 3439.04(a)(1))

### (on behalf of the Operating Subsidiaries' creditors against all Defendants)

206.   The Trustee re-alleges the foregoing paragraphs as though fully set forth

herein.  The Trustee brings this Claim for Relief to avoid the transfer of property

transferred with the actual intent to hinder, delay or defraud creditors under 11

U.S.C. § 544(b), California Civil Code §§ 3439.04(a)(1) and 3439.07, and 11

U.S.C. § 550.

- 49 -

1  207.   The Trustee brings this Claim for Relief on behalf of, *inter alia*, the

2  following unsecured creditors of the Operating Subsidiaries who had a viable claim

3  which arose on or before September 10, 2008, the time the bankruptcy petition was

4  filed:

5         (a)     As to Operating Subsidiary McSweeny: Unsecured creditor All

6  American Asphalt had a claim for work performed at the McSweeny property in the

7  amount of $31,403.70, which claim arose on or before December 31, 2005, and

8  which was outstanding as of the time of transfer on January 19, 2006. All American

9  Asphalt also was an unsecured creditor of McSweeny as of September 10, 2008, the

10  time the bankruptcy petition was filed;

11        (b)     As to Operating Subsidiary Summerwind: Unsecured creditor Signs &

12  Pinnick, Inc., had a claim for work performed at the Summerwind property in the

13  amount of $236,590.20, which claim arose on or before December 23, 2005, and

14  which was outstanding as of the time of transfer on January 19, 2006. Signs &

15  Pinnick, Inc., also was an unsecured creditor of Summerwind as of September 10,

16  2008, the time the bankruptcy petition was filed;

17        (c)     As to Operating Subsidiary McAllister: Unsecured creditor Parker

18  Printing, Inc., had a claim for work performed at the McAllister property in the

19  amount of $43.41, which claim arose on or before January 6, 2006, and which was

20  outstanding as of the time of transfer on January 19, 2006. Parker Printing, Inc.,

21  also was an unsecured creditor of McAllister as of September 10, 2008, the time the

22  bankruptcy petition was filed.

23  208.   The Trustee re-alleges paragraphs 150-171 as though fully set forth herein.

24  Based on these allegations, the Trustee is informed and believes that it has standing

25  to bring this Claim for Relief on behalf of the unsecured creditors of the Operating

26  Subsidiaries because: (i) the Borrower and Operating subsidiaries operated in such

27  a way, with such a unity of control and interest and in such a way that it would be

28  an injustice not to confer standing here, that the $144 Million Distribution can be

AMENDED COMPLAINT

1  treated as having been made by the Operating Subsidiaries as the initial transferor;

2  or in the alternative (ii) the Borrower was at all relevant times acting as the

3  Operating Subsidiaries' agent and the Operating Subsidiaries had control over the

4  Borrower and the direction of the loan proceeds that resulted in the transfer of the

5  $144 Million Distribution such that the $144 Million Distribution can be treated as

6  having been made by the Operating Subsidiaries as the initial transferor; or in the

7  alternative (iii) the Operating Subsidiaries were the express and intended third-party

8  beneficiaries of the loans that provided the funds for the $144 Million Distribution

9  and therefore stood to benefit from the transfer of those loan funds to the Borrower

10  such that they have standing to bring this Claim for Relief even if they were not the

11  original transferor of the $144 Million Distribution.

12  209.  The Trustee is informed and believes, and on that basis alleges, the transfer

13  of the $144 Million Distribution by Lehman/Suncal Master to Defendants LBREP-

14  Lakeside and SCC Ranch occurred during the four year period immediately

15  preceding the Petition Dates.

16  210.  The Trustee is informed and believes, and on that basis alleges, the transfer

17  of the $144 Million Distribution by Lehman/Suncal Master to Defendants LBREP-

18  Lakeside and SCC Ranch was made with the actual intent to hinder, delay or

19  defraud the creditors of the Operating Subsidiaries in that such transfer was made

20  with callous disregard of the greatly diminished prospects of repayment of the

21  obligations owing by the Operating Subsidiaries to the present and future creditors

22  of the Operating Subsidiaries, was motivated by the overriding desire to obtain the

23  wrongful $144 Million Distribution, and in that such transfer was part of a scheme

24  to enrich Defendants by controlling all of the participants to a series of transactions

25  designed to appear as arm's length negotiations of several credit facilities between a

26  borrower and a lender, but was instead a series of transactions accomplished with

27  the intent to obtain large equity returns before any profits were ever realized, at the

28  total risk and expense of the creditors of the Operating Subsidiaries.

AMENDED COMPLAINT

OHS WEST:261241825.7

211.   As alleged in Paragraphs 29-96, Defendants conspired to, and did in fact, defraud the creditors of the Borrower and the Operating Subsidiaries by, inter alia, (i) obtaining inflated appraised values of the Real Properties using budgets and projections of future cash flow that Defendants knew or should have known were overstated in light of their knowledge of the state of the housing market, (ii) using these inflated appraised values to obtain the January 2006 Loans, (iii) structuring the January 2006 Loans and $144 Million Distribution to provide Defendants with the complete return of their equity, as well as profits, when no lots had yet been sold, and when the Debtors would be left with insufficient funds to pay their debts as they became due, (iv) issuing the $144 Million Dividend, and (v) establishing a series of entities, in an attempt to shield themselves from liability to Borrower, the Operating Subsidiaries, and the creditors of the Debtors.

212.   Specifically,

(a)     The proceeds of the $144 Million Distribution were transferred to LBREP-Lakeside and SCC Ranch, who subsequently transferred them to SC Master, SC Master Parent, Lakeside Capital, and SCC Acquisitions, Inc., all of whom were insiders. As set forth herein, The LBREP Defendants were alter egos of one another, the SunCal Defendants were alter egos of one another, and the Lakeside Defendants were alter egos of one another. The Real Estate Projects were, in reality, a joint venture between the LBREP Defendants, the SunCal Defendants, and the Lakeside Defendants. This is how Defendants treated and described the Real Estate Projects, both among themselves and with third parties, and this is how they represented the structure of the Projects to investors. All of the principals involved in the structuring of the Loans and the $144 Million Distribution were affiliated with Defendants, who all benefited directly from the $144 Million Distribution;

AMENDED COMPLAINT

1    (b)    Debtors did not retain possession or control of $144 Million

2 Distribution after the transfer, and in fact, were left insolvent and without the ability

3 to pay their debts as they became due;

4    (c)    Upon information and belief, Defendants concealed from and

5 misrepresented to lenders the amount of money that actually would be available to

6 Borrower and the Operating Subsidiaries for the development of the Real Estate

7 Projects upon closing of the January 2006 Loans. Upon information and belief,

8 Defendants also misrepresented to lenders the bases for the appraised values of the

9 Real Properties;

10    (d)    The $144 Million Distribution was a transfer of substantially all the

11 Operating Subsidiaries' assets, and as a result of the Lehman/SunCal Subsidiary

12 Liens, the Operating Subsidiaries pledged their remaining assets as collateral for the

13 Loans;

14    (e)    Operating Subsidiaries did not receive reasonably equivalent value for

15 the transfer of the $144 Million Distribution and, in fact, received no value

16 whatsoever for such transfer.  Nor did the Operating Subsidiaries receive any

17 indirect, intangible economic benefits;

18    (f)    Operating Subsidiaries either were insolvent or became insolvent

19 shortly after the $144 Million Distribution was made;

20    (g)    The $144 Million Distribution occurred at the same time that

21 substantial debt was incurred by Operating Subsidiaries (in the form of the January

22 2006 Loan and related Liens);

23 213.   The Trustee is informed and believes, and on that basis alleges, Defendants

24 did not receive the transfer of the $144 Million Distribution by Lehman/Suncal

25 Master in good faith.

26 214.   By reason of the foregoing, the transfer of the $144 Million Distribution by

27 Lehman/Suncal Master to Defendants LBREP-Lakeside and SCC Ranch is

28 avoidable and the Trustee is entitled to recover the $144 Million Distribution from

- 53 -

AMENDED COMPLAINT

such Defendants and all subsequent transferees pursuant to 11 U.S.C. § 544(b),

California Civil Code §§ 3439.04(a)(1) and 3439.07, and 11 U.S.C. § 550.

215.    In addition, in light of Defendants' fraudulent conveyance, the Trustee is

informed and believes, and on that basis alleges, that the Defendants were unjustly

enriched as a result of the transfer of the $144 Million Distribution by

Lehman/Suncal Master.  The Trustee requests that all monies unjustly received and

retained at the expense of the Debtors be recovered and returned to the Debtors as

restitution.

216.    By reason of the foregoing and the wrongful acquisition or detention of the

$144 Million Distribution, the Trustee is, as a matter of justice, entitled to the

imposition of a constructive trust as of the date of the transfer of the $144 Million

Distribution by Lehman/Suncal Master to Defendants for the benefit of the Estates

as of the Petition Date.

## FIFTH CLAIM FOR RELIEF

### (To Recover Constructive Fraudulent Conveyance

### under 11 U.S.C. §§ 544(b), 550 and Cal. Civ. Code §§ 3439.04(a)(2))

### (on behalf of the Operating Subsidiaries' creditors against all Defendants)

217.    The Trustee re-alleges the foregoing paragraphs as though fully set forth

herein.  The Trustee brings this Claim for Relief to avoid and recover a

constructively fraudulent transfer of property under 11 U.S.C. §§ 544(b) and 550

and California Civil Code §§ 3439.04(a)(2), and 3439.07.

218.    The Trustee brings this Claim for Relief on behalf of, *inter alia*, the

following unsecured creditors of the Operating Subsidiaries who had a viable claim

which arose on or before September 10, 2008, the time the bankruptcy petition was

filed:

(a)    As to Operating Subsidiary McSweeny: Unsecured creditor All

American Asphalt had a claim for work performed at the McSweeny property in the

amount of $31,403.70, which claim arose on or before December 31, 2005, and

which was outstanding as of the time of transfer on January 19, 2006. All American

Asphalt also was an unsecured creditor of McSweeny as of September 10, 2008, the

time the bankruptcy petition was filed;

(b)     As to Operating Subsidiary Summerwind: Unsecured creditor Signs &

Pinnick, Inc., had a claim for work performed at the Summerwind property in the

amount of $236,590.20, which claim arose on or before December 23, 2005, and

which was outstanding as of the time of transfer on January 19, 2006. Signs &

Pinnick, Inc., also was an unsecured creditor of Summerwind as of September 10,

2008, the time the bankruptcy petition was filed;

(c)     As to Operating Subsidiary McAllister: Unsecured creditor Parker

Printing, Inc., had a claim for work performed at the McAllister property in the

amount of $43.41, which claim arose on or before January 6, 2006, and which was

outstanding as of the time of transfer on January 19, 2006. Parker Printing, Inc.,

also was an unsecured creditor of McAllister as of September 10, 2008, the time the

bankruptcy petition was filed.

219.   The Trustee re-alleges paragraphs 150-171 as though fully set forth herein.

Based on these allegations, the Trustee is informed and believes that it has standing

to bring this Claim for Relief on behalf of the unsecured creditors of the Operating

Subsidiaries because: (i) the Borrower and Operating subsidiaries operated in such

a way, with such a unity of control and interest and in such a way that it would be

an injustice not to confer standing here, that the $144 Million Distribution can be

treated as having been made by the Operating Subsidiaries as the initial transferor;

or in the alternative (ii) the Borrower was at all relevant times acting as the

Operating Subsidiaries' agent and the Operating Subsidiaries had control over the

Borrower and the direction of the loan proceeds that resulted in the transfer of the

$144 Million Distribution such that the $144 Million Distribution can be treated as

having been made by the Operating Subsidiaries as the initial transferor; or in the

alternative (iii) the Operating Subsidiaries were the express and intended third-party

AMENDED COMPLAINT

1     beneficiaries of the loans that provided the funds for the $144 Million Distribution

2     and therefore stood to benefit from the transfer of those loan funds to the Borrower

3     such that they have standing to bring this Claim for Relief even if they were not the

4     original transferor of the $144 Million Distribution.

5     220.   The Trustee is informed and believes, and on that basis alleges, the transfer

6     of the $144 Million Distribution by Lehman/Suncal Master occurred during the

7     four year period immediately preceding the Petition Dates.

8     221.   As alleged in Paragraphs 29-96, Defendants conspired to, and did in fact,

9     defraud the creditors of the Borrower and the Operating Subsidiaries by, inter alia,

10     (i) obtaining inflated appraised values of the Real Properties using budgets and

11     projections of future cash flow that Defendants knew or should have known were

12     overstated in light of their knowledge of the state of the housing market, (ii) using

13     these inflated appraised values to obtain the January 2006 Loans, (iii) structuring

14     the January 2006 Loans and $144 Million Distribution to provide Defendants with

15     the complete return of their equity, as well as profits, when no lots had yet been

16     sold, and when the Debtors would be left with insufficient funds to pay their debts

17     as they became due, (iv) issuing the $144 Million Dividend, and (v) establishing a

18     series of entities, in an attempt to shield themselves from liability to Borrower, the

19     Operating Subsidiaries, and the creditors of the Debtors.The Trustee is informed

20     and believes, and on that basis alleges, creditors existed at the time of the transfer of

21     the $144 Million Distribution by Lehman/Suncal Master to Defendants LBREP-

22     Lakeside and SCC Ranch that remained unpaid as of the Petition Dates.

23     222.   The Trustee is informed and believes, and on that basis alleges, the Operating

24     Subsidiaries received no value or less than reasonably equivalent value in exchange

25     for the transfer of the $144 Million Distribution by Lehman/Suncal Master.

26     223.   The Trustee is informed and believes, and on that basis alleges, at the time of

27     the transfer of the $144 Million Distribution by Lehman/Suncal Master, the

28     Operating Subsidiaries were engaged or were about to engage in a business or a

AMENDED COMPLAINT

transaction for which the remaining assets of the Debtors were unreasonably small in relation to the business or transaction.

224. The Trustee is informed and believes, and on that basis alleges, at the time of the transfer of the $144 Million Distribution by Lehman/Suncal Master, the Operating Subsidiaries intended to incur, or believed or reasonably should have believed that they would incur, debts beyond their ability to pay as they became due.

225. The Trustee is informed and believes, and on that basis alleges, that Operating Subsidiaries did not receive reasonably equivalent value in return for the transfer of the $144 Million Distribution by Lehman/Suncal Master and that Defendants did not receive the transfer of the $144 Million Distribution in good faith.

226. By reason of the foregoing, the transfer of the $144 Million Distribution by Lehman/Suncal Master to Defendants LBREP-Lakeside and SCC Ranch is avoidable, and therefore, the Trustee is entitled to recover the $144 Million Distribution from such Defendants and all subsequent transferees pursuant to 11 U.S.C. §§ 544(b) and 550 and California Civil Code §§ 3439.04(a)(2), and 3439.07.

227. In addition, in light of Defendants' fraudulent conveyance, the Trustee is informed and believes, and on that basis alleges, that the Defendants were unjustly enriched as a result of the transfer of the $144 Million Distribution by Lehman/Suncal Master. The Trustee requests that all monies unjustly received and retained at the expense of the Operating Subsidiaries be recovered and returned to the Operating Subsidiaries as restitution.

228. By reason of the foregoing and the wrongful acquisition or detention of the $144 Million Distribution, the Trustee is, as a matter of justice, entitled to the imposition of a constructive trust as of the date of the transfer of the $144 Million Distribution by Lehman/Suncal Master to Defendants for the benefit of the Estates as of the Petition Date.

AMENDED COMPLAINT

**SIXTH CLAIM FOR RELIEF**

**(To Recover Constructive Fraudulent Transfer of**

**Property under 11 U.S.C. §§ 544(b), 550 and Cal. Civ. Code §§ 3439.05)**

**(on behalf of the Operating Subsidiaries' creditors against all Defendants)**

229.   The Trustee re-alleges the foregoing paragraphs as though fully set forth herein.  The Trustee brings this Claim for Relief to recover a constructively fraudulent transfer of property under 11 U.S.C. §§ 544(b) and California Civil Code §§ 3439.05, and 3439.07.

230.   The Trustee brings this Claim for Relief on behalf of, *inter alia*, the following unsecured creditors of the Operating Subsidiaries who had a viable claim which arose on or before September 10, 2008, the time the bankruptcy petition was filed:

(a)      As to Operating Subsidiary McSweeny: Unsecured creditor All American Asphalt had a claim for work performed at the McSweeny property in the amount of $31,403.70, which claim arose on or before December 31, 2005, and which was outstanding as of the time of transfer on January 19, 2006. All American Asphalt also was an unsecured creditor of McSweeny as of September 10, 2008, the time the bankruptcy petition was filed;

(b)      As to Operating Subsidiary Summerwind: Unsecured creditor Signs & Pinnick, Inc., had a claim for work performed at the Summerwind property in the amount of $236,590.20, which claim arose on or before December 23, 2005, and which was outstanding as of the time of transfer on January 19, 2006. Signs & Pinnick, Inc., also was an unsecured creditor of Summerwind as of September 10, 2008, the time the bankruptcy petition was filed;

(c)      As to Operating Subsidiary McAllister: Unsecured creditor Parker Printing, Inc., had a claim for work performed at the McAllister property in the amount of $43.41, which claim arose on or before January 6, 2006, and which was outstanding as of the time of transfer on January 19, 2006. Parker Printing, Inc.,

also was an unsecured creditor of McAllister as of September 10, 2008, the time the

bankruptcy petition was filed.

231.   The Trustee re-alleges paragraphs 152-173 as though fully set forth herein.

Based on these allegations, the Trustee is informed and believes that it has standing

to bring this Claim for Relief on behalf of the unsecured creditors of the Operating

Subsidiaries because: (i) the Borrower and Operating subsidiaries operated in such

a way, with such a unity of control and interest and in such a way that it would be

an injustice not to confer standing here, that the $144 Million Distribution can be

treated as having been made by the Operating Subsidiaries as the initial transferor;

or in the alternative (ii) the Borrower was at all relevant times acting as the

Operating Subsidiaries' agent and the Operating Subsidiaries had control over the

Borrower and the direction of the loan proceeds that resulted in the transfer of the

$144 Million Distribution such that the $144 Million Distribution can be treated as

having been made by the Operating Subsidiaries as the initial transferor; or in the

alternative (iii) the Operating Subsidiaries were the express and intended third-party

beneficiaries of the loans that provided the funds for the $144 Million Distribution

and therefore stood to benefit from the transfer of those loan funds to the Borrower

such that they have standing to bring this Claim for Relief even if they were not the

original transferor of the $144 Million Distribution.

232.   The Trustee is informed and believes, and on that basis alleges, that the

Operating Subsidiaries did not receive reasonably equivalent value in return for the

transfer of the $144 Million Distribution by Lehman/Suncal Master and that

Defendants did not receive the transfer of the $144 Million Distribution in good

faith.

233.   As alleged in Paragraphs 29-96, Defendants conspired to, and did in fact,

defraud the creditors of the Borrower and the Operating Subsidiaries by, inter alia,

(i) obtaining inflated appraised values of the Real Properties using budgets and

projections of future cash flow that Defendants knew or should have known were

AMENDED COMPLAINT

1   overstated in light of their knowledge of the state of the housing market, (ii) using

2   these inflated appraised values to obtain the January 2006 Loans, (iii) structuring

3   the January 2006 Loans and $144 Million Distribution to provide Defendants with

4   the complete return of their equity, as well as profits, when no lots had yet been

5   sold, and when the Debtors would be left with insufficient funds to pay their debts

6   as they became due, (iv) issuing the $144 Million Dividend, and (v) establishing a

7   series of entities, in an attempt to shield themselves from liability to Borrower, the

8   Operating Subsidiaries, and the creditors of the Debtors.

9   234.   The Trustee is informed and believes, and on that basis alleges, at the time of

10  the transfer of the $144 Million Distribution by Lehman/Suncal Master, the

11  Operating Subsidiaries were either insolvent and/or were rendered insolvent as a

12  result of the transfer of the $144 Million Distribution by Lehman/Suncal Master.

13  235.   The Trustee is informed and believes, and on that basis alleges, creditors

14  existing at the time of or prior to the transfer of the $144 Million Distribution by

15  Lehman/Suncal Master and that those creditors remained unpaid as of the Petition

16  Date.

17  236.   By reason of the foregoing, the transfer of the $144 Million Distribution by

18  Lehman/Suncal Master to Defendants is avoidable, and, therefore, the Trustee is

19  entitled to recover the $144 Million Distribution from such Defendants and all

20  subsequent transferees pursuant to 11 U.S.C. §§ 544(b) and California Civil Code

21  §§ 3439.05, and 3439.07.

22  237.   In addition, in light of Defendants' fraudulent conveyance, the Trustee is

23  informed and believes, and on that basis alleges, that the Defendants were unjustly

24  enriched as a result of the transfer of the $144 Million Distribution by

25  Lehman/Suncal Master.  The Trustee requests that all monies unjustly received and

26  retained at the expense of the Operating Subsidiaries be recovered and returned to

27  the Operating Subsidiaries as restitution.

28

AMENDED COMPLAINT

OHS WEST:261241825.7

238.   By reason of the foregoing and the wrongful acquisition or detention of the $144 Million Distribution, the Trustee is, as a matter of justice, entitled to the imposition of a constructive trust as of the date of the transfer of the $144 Million Distribution by Lehman/Suncal Master to Defendants for the benefit of the Estates as of the Petition Date.

## SEVENTH CLAIM FOR RELIEF

### (Unlawful Distribution under Applicable Law)

### (against all Defendants)

239.   The Trustee re-alleges the foregoing paragraphs as though fully set forth herein.  The Trustee brings this Claim for Relief to recover unlawful payment of dividends under applicable law, including Delaware Limited Liability Company Act § 18-607.

240.   The Trustee is informed and believes, and on that basis alleges, at the time of the transfer of the $144 Million Distribution by Lehman/Suncal Master, the liabilities of each of the Debtors exceeded the fair value of each such Debtor.

241.   The Trustee is informed and believes, and on that basis alleges, at the time of the transfer of the $144 Million Distribution by Lehman/Suncal Master to Defendants LBREP-Lakeside and SCC Ranch, such Defendants and each subsequent transferee of the proceeds of the $144 Million Distribution knew or had substantial reason to know that, after the transfer of the $144 Million Distribution, the liabilities of each of the Debtors exceeded the fair value of each such Debtor and that such transfer was therefore in violation of the Delaware Limited Liability Company Act, § 18-607(a).

242.   By reason of the foregoing, Defendants are liable for the amount of the transfer of the $144 Million Distribution by Lehman/Suncal Master to Defendants LBREP-Lakeside and SCC Ranch.  As members who received an unlawful distribution in violation of  the Delaware Limited Liability Company Act, § 18-607(a), Lakeside and SCC Ranch are liable for the amount of the transfer pursuant

AMENDED COMPLAINT

to Delaware Limited Liability Company Act, § 18-607(b). In light of the

allegations above and the fact that the Defendants acted with such a unity of interest

and ownership that separate personalities of the individuals and entities no longer

exists, the failure to disregard their corporate "structure" would result in fraud or

injustice and, as alter egos of each other, the Defendants are therefore all subject to

liability to the amount of the transfer pursuant to Delaware Limited Liability

Company Act, § 18-607(b).

243.   In addition, in light of Defendants' unlawful distribution, the Trustee is

informed and believes, and on that basis alleges, that the Defendants were unjustly

enriched as a result of the transfer of the $144 Million Distribution by

Lehman/Suncal Master. The Trustee requests that all monies unjustly received and

retained at the expense of the Debtors be recovered and returned to the Debtors as

restitution.

244.   By reason of the foregoing and the wrongful acquisition or detention of the

$144 Million Distribution, the Trustee is, as a matter of justice, entitled to the

imposition of a constructive trust as of the date of the transfer of the $144 Million

Distribution by Lehman/Suncal Master to Defendants for the benefit of the Estates

as of the Petition Date.

## EIGHTH CLAIM FOR RELIEF

### (For Breach of Fiduciary Duty)

### (against all Defendants)

245.   The Trustee re-alleges the foregoing paragraphs as though fully set forth

herein.

246.   The Trustee is informed and believes, and on that basis alleges, that under

California Corporations Code and other applicable authority LBREP-Lakeside and

SCC Ranch, as the managing member and operating member respectively, of debtor

Lehman SunCal Master, which is the 100% member of the remaining Debtors, have

- 62 -

OHS WEST:261241825.7

1   fiduciary duties to the Debtors and the creditors of the Debtors.  These fiduciary

2   duties include, among other things, duties of care and loyalty.

3   247.   LBREP-Lakeside and SCC Ranch, in turn, are managed by and through the

4   individual Defendants Bruce Elieff, Mark Magstadt, Melvin T. Andrews, Ronald

5   W. Lee, and Does 1 through 10.  In addition, as alleged above and upon information

6   and belief, the other Defendants at all times acted as alter egos of LBREP-Lakeside

7   and SCC Ranch.  As such, all Defendants similarly fiduciary duties to the Debtors

8   and the creditors of the Debtors, including but not limited to duties of care and

9   loyalty.

10  248.   The Trustee is informed and believes, and on that basis alleges, that

11  Defendants breached their fiduciary duties to Debtors and their creditors, by, among

12  other things set out in more detail above, causing the Debtors to agree to and make

13  the transfer of the $144 Million Distribution by Lehman/Suncal Master to

14  Defendants LBREP-Lakeside and SCC Ranch without receiving for the Debtors

15  any reasonably equivalent value for the transfer of the $144 Million Distribution,

16  and agreeing to onerous and overbearing loan terms which left insufficient funds

17  for the development of the Real Properties, the conduct of the business of the

18  Debtors, or the repayment of and debt service upon the January 2006 Loans and the

19  Third Lien Loan, or repayment of the other obligations of the Debtors.

20  249.   The Trustee is informed and believes, and on that basis alleges, these

21  breaches caused the insolvency of the Debtors and their inability to pay their debts

22  as they came due and the consequent financial damage to the Debtors in an amount

23  to be proven at trial of this matter.  LBREP-Lakeside and SCC Ranch, as members

24  of debtor Lehman SunCal Master, are liable for these breaches of fiduciary duties,

25  and the other Defendants are subject to alter ego liability as a result of these

26  breaches of fiduciary duties.

27  250.   By reason of the foregoing, the Trustee is entitled to damages in an amount

28  to be proven at trial.  Because the conduct of Defendants was malicious, oppressive

AMENDED COMPLAINT

1    and in open disregard for the rights of others, the Trustee is entitled to exemplary

2    damages in an amount to be proven at trial.

3    251.   In addition, in light of Defendants' breach of their preexisting fiduciary

4    duties to Debtors and their creditors, the Trustee is informed and believes, and on

5    that basis alleges, that Defendants were unjustly enriched as a result of the transfer

6    of the $144 Million Distribution by Lehman/Suncal Master.  The Trustee requests

7    that all monies unjustly received and retained at the expense of the Debtors be

8    recovered and returned to the Debtors as restitution.

9    252.   By reason of the foregoing and the wrongful acquisition or detention of the

10    $144 Million Distribution, the Trustee is, as a matter of justice, entitled to the

11    imposition of a constructive trust as of the date of the transfer of the $144 Million

12    Distribution by Lehman/Suncal Master to Defendants for the benefit of the Estates

13    as of the Petition Date.

14                          **<u>NINTH CLAIM FOR RELIEF</u>**

15                                  **(Conversion)**

16                             **(against all Defendants)**

17    253.   The Trustee re-alleges the foregoing paragraphs as though fully set forth

18    herein.

19    254.   The Trustee is informed and believes, and on that basis alleges, that as a

20    proximate result of the transfer of the $144 Million Distribution by Lehman/Suncal

21    Master to Defendants LBREP-Lakeside and SCC Ranch, such Defendants and all

22    subsequent transferees of the proceeds of the $144 Million Distribution

23    substantially interfered with and/or exerted wrongful dominion and control over the

24    property which Debtors had ownership of and right to possess.  The $144 Million

25    Distribution was a conversion of an identifiable and definite sum of money.

26    255.   The $144 Million Distribution was a wrongful act and/or a wrongful

27    disposition of the Debtors' property rights.  As alleged herein, the $144 Million

28

1 | Distribution was a fraudulent conveyance and any purported authorization was, in

2 | fact, obtained fraudulently.

3 | 256. Defendants' conversion damaged the Debtors in an amount equal to the value

4 | of said property by wrongfully exerting dominion and control over property to the

5 | exclusion of Debtors' ownership and possession rights.

6 | 257. In doing the acts alleged herein, Defendants, and each of them, acted

7 | willfully and with oppression, fraud, and malice, entitling Plaintiff to punitive

8 | damages.

9 | 258. In addition, in light of Defendants' conversion, the Trustee is informed and

10 | believes, and on that basis alleges, that the Defendants were unjustly enriched as a

11 | result of the transfer of the $144 Million Distribution by Lehman/Suncal Master.

12 | The Trustee requests that all monies unjustly received and retained at the expense

13 | of the Debtors be recovered and returned to the Debtors as restitution.

14 | 259. By reason of the foregoing and the wrongful acquisition or detention of the

15 | $144 Million Distribution, the Trustee is, as a matter of justice, entitled to the

16 | imposition of a constructive trust as of the date of the transfer of the $144 Million

17 | Distribution by Lehman/Suncal Master to Defendants for the benefit of the Estates

18 | as of the Petition Date.

19 | **TENTH CLAIM FOR RELIEF**

20 | **(Unjust Enrichment)**

21 | **(against all Defendants)**

22 | 260. The Trustee re-alleges the foregoing paragraphs as though fully set forth

23 | herein.

24 | 261. The transfer and conveyance of the $144 Million Distribution from

25 | Lehman/Suncal Master (directly or indirectly) to defendants unjustly enriched such

26 | Defendants and all subsequent transferees of the proceeds of the $144 Million

27 | Distribution. Specifically, Defendants and subsequent transferees received a

28 | benefit, the use and enjoyment of all or some portion of the $144 Million

AMENDED COMPLAINT

Distribution, and unjustly retained that benefit at the expense of the Debtors' lawful

right to possess and use that property.

262.   The Trustee requests that all monies unjustly received and retained at the

expense of the Debtors be recovered and returned to the Debtors as restitution and,

until such recovery, be held in a constructive trust for the benefit of Debtors.

**ELEVENTH CLAIM FOR RELIEF**

**(Accounting)**

**(Alleged Against All Defendants)**

263.   The Trustee re-alleges the foregoing paragraphs as though fully set forth

herein.

264.   The Trustee is informed and believes, and on that basis alleges, that a

relationship exists as between Defendants and Debtors such that Debtors are

entitled to an accounting.  As alleged and discussed above, Defendants owed a

fiduciary duty to Debtors and/or the creditors of Debtors, and these fiduciary duties

in and of themselves entitle the Trustee to an accounting.

265.   Further, the Trustee is informed and believes, and on that basis alleges, that

each of the Defendants received, either directly or indirectly, portions of the $144

Million Distribution, benefits, profits, distributions, compensation, and other

payments of money from the Debtors to which Defendants are not justly entitled.

266.   In addition, the Trustee seeks a constructive trust as one of its remedies to the

allegations and claims for relief herein, and if the $144 Million Distribution is the

corpus of that constructive trust, the Trustee is entitled to an accounting of

Defendants, as involuntary trustees of that money, to trace the funds and determine

how the funds have been spent, what they have been invested in and what the

Trustee is entitled to from each of the Defendants.

267.   The Trustee does not seek a sum certain, as the Trustee is entitled to *at least*

$144 million, but may be entitled to additional sums to the extent Defendants

invested their ill-gained money or otherwise received profits from that money.

AMENDED COMPLAINT

268. The Trustee is entitled to and hereby demands an accounting from each Defendant of all such benefits received from Debtors to determine the sums certain which each of the Defendants are obliged to surrender, and hereby demands repayment of the same.

## TWELFTH CLAIM FOR RELIEF

### (Vicarious Liability – Aiding and Abetting)

### (Alleged Against All Defendants)

269. The Trustee re-alleges the foregoing paragraphs as though fully set forth herein.

270. The Trustee is informed and believes, and on that basis alleges, that each Defendant (i) knew of the conduct of each of the other Defendants with regard to the structuring of the January 2006 and February 2007 Loans and $144 Million Distribution, the decision to enter into those Loans and Lien transactions, and the $144 Million Distribution; (ii) knew that the other defendants' conduct was a breach of the other Defendants' duty; and (iii) gave substantial assistance or encouragement to the other Defendants to so act.

271. In the alternative, the Trustee is informed and believes, and on that basis alleges, that each Defendant: (i) gave substantial assistance to the other Defendants in accomplishing a tortious result; and (ii) each Defendant's conduct, considered separately, constitutes a breach of duty.

272. The principals representing each corporate Defendant, along with each of the individual Defendants, participated in the structuring of the January 2006 and February 2007 Loans and $144 Million Distribution, the decision to enter into those Loans and Lien transactions, and the $144 Million Distribution. Specifically,

(a)     The LBREP Defendants: The LBREP Defendants were represented in the underlying transactions by common individuals, including Karen Blakely, Frank Cappello, Tom Chilton, Rodolpho Amboss, Francis Gilhool, and others, who, upon information and belief, all participated in the underlying transactions,

1   provided input into the structure of the January 2006 and February 2007 Loans and

2   $144 Million Distribution, authorized these transactions on behalf of the LBREP

3   Defendants and the Debtors, distributed the funds to LBREP, Lakeside Capital, and

4   SunCal from the $144 Million Distribution, were fully aware of the corporate

5   structure of the Borrower and Operating Subsidiaries, as well as the fiduciary duties

6   owed by each of the members of those entities, and/or participated in the

7   development of the Real Estate Projects. These individuals corresponded with the

8   Lakeside Defendants and the SunCal Defendants about these issues and knew of

9   their conduct, knew that their conduct was a breach of the fiduciary duties owed to

10  Borrower and the Operating Subsidiaries, and encouraged and assisted these

11  breaches for their own benefit and the benefit of LBREP and the LBREP

12  Defendants;

13          (b)     The Lakeside Defendants: Melvin Andrews, Ronald Lee, and Marsha

14  Jennings, other representatives or agents of the Lakeside Defendants, and Darren

15  Fancher, upon information and belief, all participated in the underlying

16  transactions, provided input into the structure of the January 2006 and February

17  2007 Loans and $144 Million Distribution, authorized these transactions on behalf

18  of Lakeside Capital and the Debtors, distributed the funds to the LBREP

19  Defendants, the Lakeside Capital Defendants, and the SunCal Defendants from the

20  $144 Million Distribution, were fully aware of the corporate structure of the

21  Borrower and Operating Subsidiaries, as well as the fiduciary duties owed by each

22  of the members of those entities, and/or participated in the development of the Real

23  Estate Projects. The Lakeside Defendants corresponded with representatives from

24  the LBREP Defendants and the SunCal Defendants about these issues and knew of

25  their conduct, knew that their conduct was a breach of the fiduciary duties owed to

26  Borrower and the Operating Subsidiaries, and encouraged and assisted these

27  breaches for their own benefit;

28

- 68 -                                        AMENDED COMPLAINT

(c)     The SunCal Defendants: The SunCal Defendants were represented in the underlying transactions by common individuals, including Bruce Elieff, Mark Magstadt, Ed Nolan, Stephan Elieff, Bruce Cook, Saif Qureshi, and others, who, upon information and belief, all participated in the underlying transactions, provided input into the structure of the January 2006 and February 2007 Loans and $144 Million Distribution, authorized these transactions on behalf of the SunCal Defendants and the Debtors, distributed the funds to the LBREP Defendants, the Lakeside Defendants, and the SunCal Defendants from the $144 Million Distribution, were fully aware of the corporate structure of the Borrower and Operating Subsidiaries, as well as the fiduciary duties owed by each of the members of those entities, and/or participated in the development of the Real Estate Projects. These individuals corresponded with the LBREP Defendants and the Lakeside Defendants about these issues and knew of their conduct, knew that their conduct was a breach of the fiduciary duties owed to Borrower and the Operating Subsidiaries, and encouraged and assisted these breaches for their own benefit.

273.   The Trustee is informed and believes, and on that basis alleges, that each of the Defendants aided and abetted in or are otherwise vicariously liable for the wrongful actions alleged herein, including fraudulent transfer, breach of their own and each others' fiduciary duties owed to Debtors, conversion and unjust enrichment.

274.   The Trustee is informed and believes, and on that basis alleges, that the object of the aiding and abetting and other misconduct alleged herein was to benefit themselves, both directly and indirectly, by misappropriating the Debtor's funds for themselves or their affiliates.

275.   The Trustee is informed and believes, and on that basis alleges, that as a proximate result of the defendants' wrongdoing, the Defendants damaged the Debtor in an amount that is currently uncertain at least in the amount of $144 million, to be determined at trial.

276. In doing the acts alleged herein, Defendants, and each of them, acted willfully and with oppression, fraud, and malice, entitling Plaintiff to punitive damages.

277. In addition, in light of Defendants' aiding and abetting, the Trustee is informed and believes, and on that basis alleges, that the Defendants were unjustly enriched as a result of the transfer of the $144 Million Distribution by Lehman/Suncal Master. The Trustee requests that all monies unjustly received and retained at the expense of the Debtors be recovered and returned to the Debtors as restitution.

278. By reason of the foregoing and the wrongful acquisition or detention of the $144 Million Distribution and the Defendants' aiding and abetting thereto, the Trustee is, as a matter of justice, entitled to the imposition of a constructive trust as of the date of the transfer of the $144 Million Distribution by Lehman/Suncal Master to Defendants for the benefit of the Estates as of the Petition Date.

## THIRTEENTH CLAIM FOR RELIEF

### (Vicarious Liability – Civil Conspiracy)

(Alleged Against All Defendants)

279. The Trustee re-alleges the foregoing paragraphs as though fully set forth herein.

280. The Trustee is informed and believes, and on that basis alleges, that each of the Defendants conspired with each other or are otherwise vicariously liable for the wrongful actions alleged herein, including fraudulent transfer, breach of their own and each others' fiduciary duties owed to Debtors, conversion and unjust enrichment.

281. The Trustee is informed and believes, and on that basis alleges, that LBREP-Lakeside and SCC Ranch owed fiduciary duties to Borrower as the two members of Borrower, that each corporate Defendant owed a duty to Debtors as the alter ego of

AMENDED COMPLAINT

OHS WEST:261241825.7

1    LBREP-Lakeside and/or SCC Ranch, and/or that each Defendant owed independent

2    duties to Debtors.

3    282.    The Trustee is informed and believes, and on that basis alleges, that the

4    object of the conspiracy and other misconduct alleged herein was to benefit

5    themselves, both directly and indirectly, by misappropriating the Debtor's funds for

6    themselves or their affiliates.

7    283.    Specifically, as alleged in Paragraphs 29-96, Defendants conspired to defraud

8    the creditors of the Borrower and the Operating Subsidiaries by, inter alia, (i)

9    obtaining inflated appraised values of the Real Properties using budgets and

10    projections of future cash flow that Defendants knew or should have known were

11    overstated in light of their knowledge of the state of the housing market, (ii) using

12    these inflated appraised values to obtain the January 2006 Loans, (iii) structuring

13    the January 2006 Loans and $144 Million Distribution to provide Defendants with

14    the complete return of their equity, as well as profits, when no lots had yet been

15    sold, and when the Debtors would be left with insufficient funds to pay their debts

16    as they became due, (iv) issuing the $144 Million Dividend, and (v) establishing a

17    series of entities, in an attempt to shield themselves from liability to Borrower, the

18    Operating Subsidiaries, and the creditors of the Debtors.

19    284.    Further, as alleged in Paragraphs 130-149, (i) the LBREP Defendants were

20    alter egos of one another, including LBREP-Lakeside; (ii) Lakeside Capital was the

21    alter ego of LBREP-Lakeside; and (iii) the SunCal Corporate Defendants were the

22    alter egos of one another.

23    285.    The Trustee is informed and believes, and on that basis alleges, that as a

24    proximate result of the defendants' wrongdoing, the Defendants damaged the

25    Debtor in an amount that is currently uncertain at least in the amount of $144

26    million, to be determined at trial.

27

28

AMENDED COMPLAINT

286.   In doing the acts alleged herein, Defendants, and each of them, acted willfully and with oppression, fraud, and malice, entitling Plaintiff to punitive damages.

287.   In addition, in light of Defendants' civil conspiracy, the Trustee is informed and believes, and on that basis alleges, that the Defendants were unjustly enriched as a result of the transfer of the $144 Million Distribution by Lehman/Suncal Master.  The Trustee requests that all monies unjustly received and retained at the expense of the Debtors be recovered and returned to the Debtors as restitution.

288.   By reason of the foregoing and the wrongful acquisition or detention of the $144 Million Distribution and the Defendants' civil conspiracy thereto, the Trustee is, as a matter of justice, entitled to the imposition of a constructive trust as of the date of the transfer of the $144 Million Distribution by Lehman/Suncal Master to Defendants for the benefit of the Estates as of the Petition Date.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, the Trustee respectfully request that the Court enter judgment and grant the following relief:

<u>**On The First, Second, Third, Fourth, Fifth and Sixth Claims for Relief**</u>

<u>**(Fraudulent Transfer)**</u>

1.   Avoidance of the transfer of the $144 Million Distribution by Lehman/Suncal Master to Defendants and judgment against Defendants for the amount of the $144 Million Distribution.

2.   A determination that the Trustee may pursue other immediate or mediate transferees not named in this action after obtaining the judgment prayed for herein pursuant to Bankruptcy Code § 550.

3.   Judgment against Defendants preserving for the benefit of the chapter 11 estates of the Debtors the avoidance of the transfer of the $144 Million Distribution pursuant to 11 U.S.C. § 551.

- 72 -

AMENDED COMPLAINT

4.      Judgment against Defendants that all monies unjustly received and retained

at the expense of the Debtors be recovered and returned to the Debtors as restitution

and, until such recovery, be held in a constructive trust for the benefit of Debtors.

5.      Judgment against Defendants that any proceeds of the $144 Million

Distribution  be subjected to a constructive trust for the benefit of the Trustee.

6.      Judgment against Defendants for an accounting of all benefits received from

Debtors and judgment for all such amounts found to be improperly taken by

Defendants.

### On The Seventh Claim for Relief (Unlawful Distribution)

7.      Judgment against Defendants for the amount of the $144 Million

Distribution.

8.      Judgment against Defendants that all monies unjustly received and retained

at the expense of the Debtors be recovered and returned to the Debtors as restitution

and, until such recovery, be held in a constructive trust for the benefit of Debtors.

9.      Judgment against Defendants that any proceeds of the $144 Million

Distribution  be subjected to a constructive trust for the benefit of the Trustee.

10.     Judgment against Defendants for an accounting of all benefits received from

Debtors and judgment for all such amounts found to be improperly taken by

Defendants.

### On The Eighth Claim for Relief (Breach of Fiduciary Duty)

11.      Judgment against Defendants for the amount of the $144 Million

Distribution plus all other consequential damages caused by the breaches of

fiduciary duty of Defendants.

12.     Judgment against Defendants that all monies unjustly received and retained

at the expense of the Debtors be recovered and returned to the Debtors as restitution

and, until such recovery, be held in a constructive trust for the benefit of Debtors.

13.     Judgment against Defendants that any proceeds of the $144 Million

Distribution  be subjected to a constructive trust for the benefit of the Trustee.

AMENDED COMPLAINT

OHS WEST:261241825.7

1    14.    Judgment against Defendants for an accounting of all benefits received from

2    Debtors and judgment for all such amounts found to be improperly taken by

3    Defendants.

4    15.    An award of punitive damages against Defendants.

5    **On The Ninth and Tenth Claims for Relief (Conversion, Unjust Enrichment)**

6    16.    Judgment against Defendants for the amount of the $144 Million

7    Distribution.

8    17.    Judgment against Defendants that all monies unjustly received and retained

9    at the expense of the Debtors be recovered and returned to the Debtors as restitution

10   and, until such recovery, be held in a constructive trust for the benefit of Debtors.

11   18.    Judgment against Defendants that any proceeds of the $144 Million

12   Distribution  be subjected to a constructive trust for the benefit of the Trustee.

13   19.    Judgment against Defendants for an accounting of all benefits received from

14   Debtors and judgment for all such amounts found to be improperly taken by

15   Defendants.

16   20.    An award of punitive damages against Defendants.

17                **On The Eleventh Claim for Relief (Accounting)**

18   21.    Judgment against Defendants for an accounting of all benefits received from

19   Debtors and judgment for all such amounts found to be improperly taken by

20   Defendants.

21   **On The Twelfth and Thirteenth Claims for Relief (Vicarious Liability – Aiding**

22            **and Abetting and Vicarious Liability – Civil Conspiracy)**

23   23.    Judgment against Defendants for the amount of the $144 Million Distribution

24   plus all other consequential damages caused by the breaches of fiduciary duty and

25   other wrongful conduct of Defendants.

26   24.    Judgment against Defendants that all monies unjustly received and retained

27   at the expense of the Debtors be recovered and returned to the Debtors as restitution

28   and, until such recovery, be held in a constructive trust for the benefit of Debtors.

- 74 -                                    AMENDED COMPLAINT

1    25.    Judgment against Defendants that any proceeds of the $144 Million

2    Distribution  be subjected to a constructive trust for the benefit of the Trustee.

3    26.    Judgment against Defendants for an accounting of all benefits received from

4    Debtors and judgment for all such amounts found to be improperly taken by

5    Defendants.

6    27.    An award of punitive damages against Defendants.

7                     **On The Fourteenth Claim for Relief (Accounting)**

8    28.    Judgment against Defendants for an accounting of all benefits received from

9    Debtors and judgment for all such amounts found to be improperly taken by

10    Defendants.

11                           **On All Claims for Relief**

12    29.    An award of all pre-judgment interest, and costs and attorneys fees incurred

13    in connection with this action and any and all such other relief as may be deemed

14    appropriate by the Court.

15
16    Dated:    September 23, 2011        ORRICK, HERRINGTON & SUTCLIFFE LLP

17                                  By: /s/ Valerie M. Goo
18                                       VALERIE M. GOO

19                                  Special Counsel for Plaintiff
                                     ALFRED H. SIEGEL,
20                                  LIQUIDATING TRUSTEE

21

22

23

24

25

26

27

28

                                    - 75 -                    AMENDED COMPLAINT

OHS WEST:261241825.7

1

## DEMAND FOR JURY TRIAL

2  Plaintiff hereby demands a jury trial on all of the above claims for relief.

3

4

5  Dated:      September 23, 2011      ORRICK, HERRINGTON & SUTCLIFFE LLP

6
                                       By: /s/ Valerie M. Goo
7                                            VALERIE M. GOO

8                                       Special Counsel for Plaintiff
                                        ALFRED H. SIEGEL,
9                                       LIQUIDATING TRUSTEE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 1 -                                      AMENDED COMPLAINT