**EXECUTION VERSION**

$235,000,000

**FIRST LIEN CREDIT AGREEMENT**

among

**LBREP/L-SUNCAL MASTER I LLC,**
as Borrower,

**The Several Lenders**
**from Time to Time Parties Hereto,**

**LEHMAN BROTHERS INC.,**
as Arranger

**LEHMAN COMMERCIAL PAPER INC.,**
as Syndication Agent

and

**LEHMAN COMMERCIAL PAPER INC.,**
as Administrative Agent

**Dated as of January 19, 2006**

## TABLE OF CONTENTS

Page

SECTION 1    DEFINITIONS................................................................................1
1.1    Defined Terms ...............................................................................1
1.2    Other Definitional Provisions ......................................................29

SECTION 2    AMOUNT AND TERMS OF COMMITMENTS..........................29
2.1    Term Loan Commitments ............................................................29
2.2    Procedure for Term Loan Borrowing ..........................................29
2.3    Repayment of Term Loans ..........................................................30
2.4    Revolving Credit Commitments ..................................................30
2.5    Procedure for Revolving Credit Borrowing.................................31
2.6    Repayment of Loans; Evidence of Debt ......................................31
2.7    Fees, etc.......................................................................................32
2.8    Termination or Reduction of Revolving Credit Commitments ....33
2.9    Optional Prepayments .................................................................33
2.10   Mandatory Prepayments ..............................................................33
2.11   Conversion and Continuation Options.........................................36
2.12   Minimum Amounts and Maximum Number of Eurodollar Tranches ...........36
2.13   Interest Rates and Payment Dates................................................37
2.14   Computation of Interest and Fees ...............................................37
2.15   Inability to Determine Interest Rate ............................................38
2.16   Pro Rata Treatment and Payments ..............................................38
2.17   Requirements of Law ...................................................................40
2.18   Taxes............................................................................................41
2.19   Indemnity.....................................................................................44
2.20   Illegality ......................................................................................44
2.21   Change of Lending Office ...........................................................44
2.22   Replacement of Lenders under Certain Circumstances ................45

SECTION 3    LETTERS OF CREDIT..................................................................45
3.1    L/C Commitment ..........................................................................45
3.2    Procedure for Issuance of Letter of Credit...................................46
3.3    Fees and Other Charges ...............................................................46
3.4    L/C Participations ........................................................................46
3.5    Reimbursement Obligation of the Borrower.................................48
3.6    Obligations Absolute ...................................................................48
3.7    Letter of Credit Payments ...........................................................48
3.8    Applications .................................................................................49

SECTION 4    REPRESENTATIONS AND WARRANTIES .............................49
4.1    Financial Condition......................................................................49
4.2    No Change ....................................................................................49

4.3     Corporate Existence; Compliance with Law ....................................................49
4.4     Corporate Power; Authorization; Enforceable Obligations...........................49
4.5     No Legal Bar .......................................................................................................50
4.6     No Material Litigation .......................................................................................50
4.7     No Default............................................................................................................50
4.8     Ownership of Property; Liens ...........................................................................50
4.9     Intellectual Property ..........................................................................................51
4.10    Taxes.....................................................................................................................51
4.11    Federal Regulations ...........................................................................................51
4.12    Labor Matters .....................................................................................................51
4.13    ERISA ..................................................................................................................52
4.14    Investment Company Act; Other Regulations .................................................52
4.15    Subsidiaries .........................................................................................................52
4.16    Use of Proceeds...................................................................................................52
4.17    Environmental Matters.......................................................................................53
4.18    Accuracy of Information, etc .............................................................................54
4.19    Security Documents ............................................................................................54
4.20    Solvency................................................................................................................55
4.21    Entitlements ........................................................................................................55
4.22    Permits and Licenses Related to the Projects .................................................55
4.23    Utilities.................................................................................................................56
4.24    SPE Compliance .................................................................................................56
4.25    Regulation H .......................................................................................................56
4.26    Certain Documents.............................................................................................56

SECTION 5       CONDITIONS PRECEDENT ...................................................................56

5.1     Conditions to Initial Extension of Credit ........................................................56
5.2     Conditions to Each Extension of Credit...........................................................61
5.3     Conditions to Disbursements ............................................................................62

SECTION 6       AFFIRMATIVE COVENANTS ................................................................63

6.1     Financial Statements ..........................................................................................63
6.2     Certificates; Other Information.........................................................................64
6.3     Payment of Obligations......................................................................................66
6.4     Conduct of Business and Maintenance of Existence; Compliance..................66
6.5     Maintenance of Property; Insurance ................................................................66
6.6     Inspection of Property; Books and Records; Discussions ..............................68
6.7     Notices .................................................................................................................69
6.8     Environmental Laws ...........................................................................................70
6.9     Interest Rate Protection .....................................................................................70
6.10    Additional Collateral, etc ..................................................................................70
6.11    Further Assurances.............................................................................................72
6.12    SPE Covenants....................................................................................................72
6.13    Maintenance of Entitlements .............................................................................73
6.14    Major Milestones ................................................................................................73
6.15    Permitted Collateral Asset Sale ........................................................................73

6.16    Development Account .................................................................................74
6.17    Operating Accounts ....................................................................................74
6.18    Collateral Assignment ................................................................................74

SECTION 7      NEGATIVE COVENANTS .................................................................74

7.1     Financial Condition Covenants ..................................................................74
7.2     Limitation on Indebtedness ........................................................................75
7.3     Limitation on Liens ....................................................................................76
7.4     Limitation on Fundamental Changes ..........................................................77
7.5     Limitation on Disposition of Property ........................................................77
7.6     Limitation on Restricted Payments ............................................................79
7.7     Limitation on Capital Expenditures ...........................................................79
7.8     Limitation on Investments ..........................................................................80
7.9     Limitation on Optional Payments and Modifications of Debt Instruments, etc ...............80
7.10    Limitation on Transactions with Affiliates .................................................80
7.11    Limitation on Sales and Leasebacks ...........................................................81
7.12    Limitation on Changes in Fiscal Periods ....................................................81
7.13    Limitation on Negative Pledge Clauses ......................................................81
7.14    Limitation on Restrictions on Subsidiary Distributions .............................81
7.15    Limitation on Lines of Business .................................................................81
7.16    Limitation on Hedge Agreements ...............................................................82
7.17    Limitation on Amendments to Other Documents ........................................82

SECTION 8      EVENTS OF DEFAULT ......................................................................82

SECTION 9      THE AGENTS .....................................................................................85

9.1     Appointment ...............................................................................................85
9.2     Delegation of Duties ...................................................................................85
9.3     Exculpatory Provisions ..............................................................................86
9.4     Reliance by Agents .....................................................................................86
9.5     Notice of Default ........................................................................................86
9.6     Non-Reliance on Agents and Other Lenders ..............................................87
9.7     Indemnification ..........................................................................................87
9.8     Agent in Its Individual Capacity ................................................................88
9.9     Successor Administrative Agent .................................................................88
9.10    Authorization to Release Liens and Guarantees .........................................88
9.11    The Arranger; the Syndication Agent .........................................................88

SECTION 10     MISCELLANEOUS .............................................................................89

10.1    Amendments and Waivers ..........................................................................89
10.2    Notices .......................................................................................................90
10.3    No Waiver; Cumulative Remedies ..............................................................92
10.4    Survival of Representations and Warranties ...............................................93
10.5    Payment of Expenses ..................................................................................93
10.6    Successors and Assigns; Participations and Assignments ...........................94
10.7    Adjustments; Set-off ...................................................................................97

10.8    Counterparts...................................................................................................98
10.9    Severability...................................................................................................98
10.10   Integration...................................................................................................98
10.11   GOVERNING LAW.....................................................................................98
10.12   Submission To Jurisdiction; Waivers...........................................................98
10.13   Acknowledgments.........................................................................................99
10.14   Confidentiality..............................................................................................99
10.15   Release and Subordination of Collateral and Guarantee Obligations.........100
10.16   Accounting Changes....................................................................................101
10.17   Delivery of Lender Addenda.......................................................................102
10.18   WAIVERS OF JURY TRIAL.......................................................................102

ANNEXES:

| | |
|---|---|
| A | Borchard Patterson Project Map |
| B | McAllister Ranch Project Map |
| C | McSweeny Farms Project Map |
| D | Summerwind Ranch Project Map |
| E | Approved Development Budgets |

SCHEDULES:

| | |
|---|---|
| 1.1A | Existing Mortgage Indebtedness |
| 1.1B | Mortgaged Property |
| 1.1C | Third Party Homebuilders |
| 1.1D | Initial Appraisals |
| 4.4 | Consents, Authorizations, Filings and Notices |
| 4.8(c) | Taxes Related to the Projects |
| 4.15 | Subsidiaries |
| 4.19(a) | UCC Filing Jurisdictions |
| 4.19(b) | Mortgage Filing Jurisdictions |
| 4.21(a) | Entitlements |
| 4.21(b) | Major Milestones |
| 7.2(d) | Existing Indebtedness |
| 7.3(f) | Existing Liens |
| 10.6(c) | Competitors |

EXHIBITS:

| | |
|---|---|
| A | Form of First Lien Guarantee and Collateral Agreement |
| B | Form of Compliance Certificate |
| C | Form of Closing Certificate |
| D | Form of First Lien Mortgage |
| E | Form of Assignment and Acceptance |
| F-1 | Form of Legal Opinion of O'Melveny & Myers LLP |
| F-2 | Form of Legal Opinion of Heller Ehrman LLP |

G-1     Form of Term Note
G-2     Form of Revolving Credit Note
H       Form of Prepayment Option Notice
I       Form of Exemption Certificate
J       Form of Lender Addendum
K       Form of Borrowing Notice
L       Form of Disbursement Request
M       Form of Subordination and Non-Disturbance Agreement
N       Form of Intercreditor Agreement
O       Acknowledgements for Qualified Sales Agreements
P       Form of Entitlement Summary

FIRST LIEN CREDIT AGREEMENT, dated as of January 19, 2006, among LBREP/L-SUNCAL MASTER I LLC, a Delaware limited liability company (the "Borrower"), the several banks and other financial institutions or entities from time to time parties to this Agreement (the "Lenders"), LEHMAN BROTHERS INC., as advisor, sole lead arranger and sole bookrunner (in such capacity, the "Arranger"), LEHMAN COMMERCIAL PAPER INC., as syndication agent (in such capacity, the "Syndication Agent"), and LEHMAN COMMERCIAL PAPER INC., as administrative agent (in such capacity, the "Administrative Agent").

W I T N E S S E T H :

WHEREAS, the Borrower has requested that the Lenders provide credit facilities, the proceeds of which, together with the proceeds of the loans under the Second Lien Credit Agreement (as defined below) will be used, among other things to: (i) refinance the Existing Mortgage Indebtedness (as defined below) of the Borrower and its Subsidiaries, (ii) finance Land Expenses (as defined below), (iii) pay a dividend to certain investors and (iv) pay related fees and expenses; and

WHEREAS, the Lenders are willing to make such credit facilities available upon and subject to the terms and conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the premises and the agreements hereinafter set forth, the parties hereto hereby agree as follows:

SECTION 1. DEFINITIONS

1.1    Defined Terms. As used in this Agreement, the terms listed in this Section 1.1 shall have the respective meanings set forth in this Section 1.1.

"Administrative Agent": as defined in the preamble hereto.

"Affiliate": as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" of a Person means the power, directly or indirectly, either to (a) vote 10% or more of the securities having ordinary voting power for the election of directors (or persons performing similar functions) of such Person or (b) direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

"Agents": the collective reference to the Syndication Agent and the Administrative Agent.

"Aggregate Appraised Value": the sum of the Appraised Value of all of the Projects. As of the Closing Date, the Aggregate Appraised Value is $977,500,000.

"Aggregate Exposure": with respect to any Lender at any time, an amount equal to (a) until the Closing Date, the aggregate amount of such Lender's Commitments at such time and (b) thereafter, the sum of (i) the aggregate then unpaid principal amount of such Lender's Term Loans and (ii) the amount of such Lender's Revolving Credit Commitment then in effect or, if the Revolving Credit Commitments have been terminated, the amount of such Lender's Revolving Extensions of Credit then outstanding.

"Aggregate Exposure Percentage": with respect to any Lender at any time, the ratio (expressed as a percentage) of such Lender's Aggregate Exposure at such time to the sum of the Aggregate Exposures of all Lenders at such time.

"Agreement": this Credit Agreement, as amended, supplemented or otherwise modified from time to time.

"Agreement Regarding Debtor/Creditor Relationship": the Agreement Regarding Debtor/Creditor Relationship, dated as of the date hereof, by and among LBREP Lakeside SC Master I, LLC, SCC Ranch Ventures LLC, the Borrower, each Subsidiary Guarantor and Lehman Commercial Paper Inc., as the same may be amended, supplemented or otherwise modified from time to time.

"Applicable Margin": for each Type of Loan under each Facility, the rate per annum set forth opposite such Facility under the relevant column heading below:

|  | Base Rate Loans | Eurodollar Loans |
| --- | --- | --- |
| Revolving Credit Facility............................ | 2.25% | 3.25% |
| Term Loan Facility..................................... | 2.25% | 3.25% |

"Applicable Reduction Percentage": on any date of determination, the greater of:

(a)     a fraction (expressed as a percentage), the numerator of which is the Appraised Value of the Borchard Patterson Project or the Summerwind Ranch Project, as applicable (or the portion thereof which the Borrower or its Subsidiaries fail to so acquire), in each case, as of the Closing Date, and the denominator of which is the Aggregate Appraised Value as of the Closing Date; and

(b)     a fraction (expressed as a percentage), the numerator of which is the Appraised Value of the Borchard Patterson Project or the Summerwind Ranch Project, as applicable (or the portion thereof which the Borrower or its Subsidiaries fail to so acquire) on such date, and the denominator of which is the Aggregate Appraised Value of on such date.

"Application": an application, in such form as the relevant Issuing Lender may specify from time to time, requesting such Issuing Lender to issue a Letter of Credit.

"Appraised Value": for any Project, the "Total Net Value" (as defined in the Initial Appraisal) of such Project as determined by the Appraiser in the most recent and available Qualified Appraisal or Qualified Appraised Update minus (a) for any Project that is not a Mortgaged Property, the Option Purchase Price for such Project minus (b) for any Project that is a Mortgaged Property, the portion of such Appraised Value attributable to any portion of such Project released from the Lien of the Mortgages pursuant to Section 10.15.

"Appraiser": Cushman and Wakefield of California, Inc., or such other independent appraisal firm selected by the Administrative Agent in its sole discretion, but in all events which is a member of the Appraisal Institute (or any successor association or body) with an MAI designation or its equivalent, is state certified and has at least 10 years experience appraising residential master developments in Southern California.

"Approvals and Permits": each and all approvals, authorizations, bonds, consents, certificates, entitlements, franchises, licenses, permits, registrations, qualifications, and other actions and rights granted by or filings with any Persons necessary for the improvement and development of the Mortgaged Properties or for the conduct of the business and operations of the Borrower and its Subsidiaries.

"Approved Development Budget": for each Project, that certain budget, attached hereto as Annex E, detailing, among other things, the acquisition cost of such Project, the expected development expenses for such Project, the costs related to development project zoning and subdivision entitlements, the costs related to homebuilder contracts, if any, and including, without limitation, a pro rata portion of the interest payable on the Term Loans and the Second Lien Loans, in each case to be incurred from and after the Closing Date, which the Borrower and its Subsidiaries project to incur during the course of the Approved Development Schedule for such Project.

"Approved Development Schedule": for each Project, that certain acquisition, development and construction schedule associated with such Project previously delivered to the Administrative Agent which estimates the allocation of the expenditures contemplated under the applicable Approved Development Budget over the period from 2006 through 2012. The Borrower shall have the right to update the Approved Development Schedule in accordance with Section 6.2(d), provided, that such update or supplement is consistent with the deadlines (including applicable cure periods) for the Major Milestones set forth on Schedule 4.21(b).

"Arranger": as defined in the preamble hereto.

"Asset Sale": any Disposition of Property or series of related Dispositions of Property (excluding any such Disposition permitted by clause (a), (b) or (c) of Section 7.5).

"Assignee": as defined in Section 10.6(c).

"Assignor": as defined in Section 10.6(c).

"Available Revolving Credit Commitment": with respect to any Revolving Credit Lender at any time, an amount equal to the excess, if any, of (a) such Lender's Revolving Credit

Commitment then in effect over (b) such Lender's Revolving Extensions of Credit then outstanding.

"Base Rate": for any day, a rate per annum (rounded upwards, if necessary, to the next 1/16 of 1%) equal to the greater of (a) the Prime Rate in effect on such day and (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1%. For purposes hereof: "Prime Rate" shall mean the prime lending rate as set forth on the British Banking Association Telerate Page 5 (or such other comparable publicly available page as may, in the reasonable opinion of the Administrative Agent after notice to the Borrower, replace such page for the purpose of displaying such rate if such rate no longer appears on the British Bankers Association Telerate page 5), as in effect from time to time. The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate actually available. Any change in the Base Rate due to a change in the Prime Rate or the Federal Funds Effective Rate shall be effective as of the opening of business on the effective day of such change in the Prime Rate or the Federal Funds Effective Rate, respectively.

"Base Rate Loans": Loans for which the applicable rate of interest is based upon the Base Rate.

"Benefitted Lender": as defined in Section 10.7.

"Board": the Board of Governors of the Federal Reserve System of the United States (or any successor).

"Borchard Patterson Development": the 175-acre master planned community anticipated to be comprised of approximately 775 residential units as contemplated by the Borchard Patterson Development Agreement.

"Borchard Patterson Development Agreement": a development agreement to be entered into by the Borrower and/or LBREP/L-SunCal Patterson Ranch LLC in respect of the development of the Borchard Patterson Project depicted on the map attached hereto as Annex A, and which development agreement shall be reasonably acceptable to the Administrative Agent.

"Borchard Patterson Option Agreement": the Option to Purchase Real Property and Escrow Instructions, dated September 15, 2003, between various individual owners and SunCal, as amended by the First Amendment, dated April 1, 2004, and as further amended by the Second Amendment, dated June 1, 2004, and as further amended from time to time with the consent of the Administrative Agent.

"Borchard Patterson Project": that certain Borchard Patterson Development located in Ventura County, California, depicted on the map attached hereto as Annex A.

"Borrower": as defined in the preamble hereto.

"Borrowing Base Availability": on any date of determination, an amount equal to the sum (without duplication) of (a) 100% of the aggregate amount of Cash and Cash Equivalents on deposit in the Development Account and the Operating Accounts (including any cash capital contributions or Subordinated Affiliate Loans made by any member of the Borrower

and deposited in the Development Account or any of the Operating Accounts) on such date, (b) 75% of the Net Purchase Price of Land Under Contract on such date and (c) 55% of the Aggregate Appraised Value (other than with respect to any Land Under Contract) in effect on such date.

"Borrowing Date": any Business Day specified by the Borrower as a date on which the Borrower requests the relevant Lenders to make Loans hereunder.

"Borrowing Notice": with respect to any request for borrowing of Loans hereunder, a notice from the Borrower, substantially in the form of, and containing the information prescribed by, Exhibit K, delivered to the Administrative Agent.

"Business Day": (a) for all purposes other than as covered by clause (b) below, a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close and (b) with respect to all notices and determinations in connection with, and payments of principal and interest on, Eurodollar Loans, any day which is a Business Day described in clause (a) and which is also a day for trading by and between banks in Dollar deposits in the interbank eurodollar market.

"Calculation Date": as defined in Section 2.10(d).

"Capital Expenditures": for any period, with respect to the Borrower and its Subsidiaries, the aggregate of all expenditures (whether paid in Cash or other consideration or accrued as a liability), by the Borrower and its Subsidiaries during such period for land development costs and purchases of property, plant or equipment, and any comparable items reflected in the consolidated statement of cash flows of the Borrower and its Subsidiaries.

"Capital Lease Obligations": with respect to any Person, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP; and, for the purposes of this Agreement, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP.

"Capital Stock": any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation) and any and all warrants, rights or options to purchase any of the foregoing.

"Cash": all monetary items treated as cash in accordance with GAAP, consistently applied.

"Cash Equivalents": (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year from the date of acquisition; (b) certificates of deposit, time deposits, eurodollar time deposits or overnight bank deposits having maturities of six months or less from the date of acquisition issued by any Lender or by any commercial bank organized under the laws of the

United States of America or any state thereof having combined capital and surplus of not less than $500,000,000; (c) commercial paper of an issuer rated at least A-2 by S&P or P-2 by Moody's, or carrying an equivalent rating by a nationally recognized rating agency, if both of the two named rating agencies cease publishing ratings of commercial paper issuers generally, and maturing within six months from the date of acquisition; (d) repurchase obligations of any Lender or of any commercial bank satisfying the requirements of clause (b) of this definition, having a term of not more than 30 days with respect to securities issued or fully guaranteed or insured by the United States government; (e) securities with maturities of one year or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government, the securities of which state, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) are rated at least A by S&P or A by Moody's; (f) securities with maturities of six months or less from the date of acquisition backed by standby letters of credit issued by any Lender or any commercial bank satisfying the requirements of clause (b) of this definition; and (g) shares of money market mutual or similar funds which invest exclusively in assets satisfying the requirements of clauses (a) through (f) of this definition.

"Cash From Land Sales": with respect to the Borrower and its Subsidiaries, for any period and without duplication, an amount equal to (a) Cash Proceeds received by the Borrower and its Subsidiaries during such period attributable to real estate transactions recognized for GAAP purposes which occurred during or prior to such period as either (i) a sale of real property, (ii) an option for the purchase of real property, or (iii) a transfer of real property (i.e., title has been transferred) that would be recognized as a sale of real property for GAAP purposes if a sufficient Cash payment had been received on account of such transfer (all amounts described in (i) through (iii) above included only if the Cash received with respect to such transaction is nonrefundable) plus (b) principal collected in Cash during such period by the Borrower and its Subsidiaries on receivables arising from real estate transactions plus (c) Cash received by the Borrower and its Subsidiaries in a prior period in connection with a transaction described in (a)(i) through (iii) above which was previously refundable, but became nonrefundable during the current period minus (d) commissions and closing costs paid by the Borrower and its Subsidiaries during such period and properly allocable to such transactions.

"Cash Proceeds": with respect to any sale of all or a portion of a Mortgaged Property, Cash payments (including any Cash received by way of deferred payment pursuant to, or monetization of, a note receivable or otherwise, but only as and when so received) received from such sale.

"CFD": a community facilities district.

"CFD Special Taxes": during any fiscal year of the Borrower, the aggregate amount of special taxes and assessments levied against the Mortgaged Properties as a result of all Permitted CFDs during such fiscal year.

"CFD Special Taxes Cap": the amount of the special tax levy equal to the special taxes payable by the Borrower and its Subsidiaries with respect to the Mortgaged Properties for the base year that together with ad valorem real estate taxes, and other real property liens and

charges by a Governmental Authority with respect to the Mortgaged Properties, does not exceed 2% of the market value of the homes intended to be sold (projected as of the date of sale of the related CFD bonds), as determined by the Governmental Authority through which the CFD is established, which special tax levy may not be increased by more than 2% per year thereafter. For purposes of this Agreement, such CFD Special Taxes Cap includes any charges for maintenance and services imposed as a charge against real property, including such fees and charges imposed through a landscape and lighting maintenance district, a community facilities district, a community services district or other similar mechanism.

"Change of Control": (a) any sale, transfer or other Disposition by Bruce Elieff and Steve Elieff of any direct or indirect beneficial ownership of the Capital Stock of SCC Ranch Ventures, LLC owned by them on the Closing Date if following such transaction the Capital Stock beneficially owned (directly or indirectly) by Bruce Elieff and Steve Elieff, collectively, is less than 51% of the outstanding Capital Stock of SCC Ranch Ventures, LLC or (b) Bruce Elieff or Steve Elieff fails to control SCC Ranch Ventures, LLC, or (c) SCC Ranch Ventures, LLC ceases to own at least 15% of the Capital Stock of the Borrower, or ceases to be the Operating Member of the Borrower or to otherwise control the Borrower; in the cases of clauses (a) and (b) excluding (i) any Disposition for estate planning purposes so long as Bruce Elieff or Steve Elieff continues to control SCC Ranch Ventures, LLC and (ii) any Disposition arising from the death or legal incapacity of either or both of Bruce Elieff and Steve Elieff. For purposes of this definition, "control" of a Person means the power, directly or indirectly, to direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

"Closing Date": the date on which the conditions precedent set forth in Section 5.1 shall have been satisfied, which date shall be not later than January 19, 2006.

"Code": the Internal Revenue Code of 1986, as amended from time to time.

"Collateral": all Property of the Loan Parties, now owned or hereafter acquired, upon which a Lien is purported to be created by any Security Document.

"Commitment": with respect to any Lender, each of the Term Loan Commitment and the Revolving Credit Commitment of such Lender.

"Commitment Fee Rate": ½ of 1% per annum.

"Commonly Controlled Entity": an entity, whether or not incorporated, that is under common control with the Borrower within the meaning of Section 4001 of ERISA or is part of a group that includes the Borrower and that is treated as a single employer under Section 414 of the Code.

"Compliance Certificate": a certificate duly executed by a Responsible Officer, substantially in the form of Exhibit B.

"Confidential Information Memorandum": the Confidential Information Memorandum dated November, 2005 and furnished to the initial Lenders in connection with the syndication of the Facilities.

"Consolidated Debt Service": for any period, the sum (without duplication) of (a) Consolidated Interest Expense of the Borrower and its Subsidiaries for such period and (b) scheduled payments made during such period on account of principal of Indebtedness of the Borrower or any of its Subsidiaries (including scheduled principal payments in respect of the Term Loans and the Second Lien Loans).

"Consolidated First Lien Debt": on any date of determination, the aggregate outstanding principal amount of the Loans.

"Consolidated First Lien Leverage Ratio": as at the last day of any fiscal quarter of the Borrower, the ratio of (a) Consolidated First Lien Debt on such day minus any Cash or Cash Equivalents on deposit in the Development Account on such day to (b) the Aggregate Appraised Value in effect on such day.

"Consolidated Interest Expense": of any Person for any period, total cash interest expense (including that attributable to Capital Lease Obligations) of such Person and its Subsidiaries for such period with respect to all outstanding Indebtedness of such Person and its Subsidiaries (including, without limitation, all commissions, discounts and other fees and charges owed by such Person with respect to letters of credit and bankers' acceptance financing and net costs of such Person under Hedge Agreements in respect of interest rates to the extent such net costs are allocable to such period in accordance with GAAP).

"Consolidated Total Debt": at any date, the aggregate principal amount of all Indebtedness of the Borrower and its Subsidiaries at such date, determined on a consolidated basis in accordance with GAAP, excluding (to the extent included therein) the amount of any performance bonds and any payment bonds relating to operating expenses for any Project provided for under the Approved Development Budget for such Project, provided, however, that such exclusion of payment bonds from this definition shall not be applicable to the extent of any reimbursement obligations of the Borrower or its Subsidiaries under any such payment bonds which have been drawn and have not been paid in full within 2 Business Days of such drawing day.

"Consolidated Total Debt Leverage Ratio": as at the last day of any fiscal quarter of the Borrower, the ratio of (a) Consolidated Total Debt on such day minus any Cash or Cash Equivalents on deposit in the Development Account on such day to (b) the Aggregate Appraised Value in effect on such day.

"Contractual Obligation": as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its Property is bound.

"Control Investment Affiliate": as to any Person, any other Person that (a) directly or indirectly, is in control of, is controlled by, or is under common control with, such Person and (b) is organized by such Person primarily for the purpose of making equity or debt investments in one or more companies. For purposes of this definition, "control" of a Person means the power, directly or indirectly, to direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

"Default":  any of the events specified in Section 8, whether or not any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"Derivatives Counterparty":  as defined in Section 7.6.

"Development Account":  the securities account established by the Borrower and subject to an account control agreement in favor of the Administrative Agent, in form and substance reasonably satisfactory to the Administrative Agent.

"Development Agreements":  collectively, the Borchard Patterson Development Agreement, the McAllister Ranch Development Agreement, the McSweeny Farms Development Agreement and the Summerwind Ranch Development Agreement.

"Disbursement Request":  a notice substantially in the form of Exhibit L delivered by the Borrower to the Administrative Agent pursuant to Section 5.3 with respect to a proposed withdrawal from the Development Account.

"Disposition":  with respect to any Property, any sale, lease, sale and leaseback, assignment, conveyance, transfer or other disposition thereof; and the terms "Dispose" and "Disposed of" shall have correlative meanings.

"Dollars" and "$":  dollars in lawful currency of the United States of America.

"Domestic Subsidiary":  any Subsidiary of the Borrower organized under the laws of any jurisdiction within the United States of America.

"Entitlement Documents":  as defined in Section 4.21.

"Entitlements" or "Approvals":  those certain Governmental Authorizations which are required to be obtained and maintained (as applicable) in order to allow the completion of the development work for each Project and the sale of each such Project (including, without limitation, the Mortgaged Properties) and portions thereof as legal lots, all as contemplated by the Development Agreements, and including, without limitation, all Governmental Authorizations necessary to permit applicable earthwork, grading, infrastructure, improvements, equipment, drainage, storm water and sewer systems, roadways and other work, labor or materials required to be furnished or actions to be taken by or in connection with amending, modifying, maintaining and perpetuating all of the foregoing, and the documents, instruments, agreements and instruments relating thereto.

"Environmental Laws":  any and all laws, rules, orders, regulations, statutes, ordinances, guidelines, codes, decrees, or other legally enforceable requirements (including, without limitation, common law) of any international authority, foreign government, the United States, or any state, local, municipal or other governmental authority, regulating, relating to or imposing liability or standards of conduct concerning protection of the environment or of human health, or employee health and safety, as has been, is now, or may at any time hereafter be, in effect.

"Environmental Permits": any and all permits, licenses, approvals, registrations, notifications, exemptions and other authorizations required under any Environmental Law.

"ERISA": the Employee Retirement Income Security Act of 1974, as amended from time to time.

"Eurocurrency Reserve Requirements": for any day, the aggregate (without duplication) of the maximum rates (expressed as a decimal fraction) of reserve requirements in effect on such day (including, without limitation, basic, supplemental, marginal and emergency reserves) under any regulations of the Board or other Governmental Authority having jurisdiction with respect thereto dealing with reserve requirements prescribed for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board) maintained by a member bank of the Federal Reserve System.

"Eurodollar Base Rate": with respect to each day during each Interest Period, the rate per annum determined on the basis of the rate for deposits in Dollars for a period equal to such Interest Period commencing on the first day of such Interest Period appearing on Page 3750 of the Telerate screen as of 11:00 A.M., London time, two Business Days prior to the beginning of such Interest Period. In the event that such rate does not appear on Page 3750 of the Telerate screen (or otherwise on such screen), the "Eurodollar Base Rate" for purposes of this definition shall be determined by reference to such other comparable publicly available service for displaying eurodollar rates as may be selected by the Administrative Agent.

"Eurodollar Loans": Loans for which the applicable rate of interest is based upon the Eurodollar Rate.

"Eurodollar Rate": with respect to each day during each Interest Period, a rate per annum determined for such day in accordance with the following formula (rounded upward to the nearest $1/100^{\text{th}}$ of 1%):

$$\frac{\text{Eurodollar Base Rate}}{1.00 - \text{Eurocurrency Reserve Requirements}}$$

"Eurodollar Tranche": the collective reference to Eurodollar Loans under a particular Facility the then current Interest Periods with respect to all of which begin on the same date and end on the same later date (whether or not such Loans shall originally have been made on the same day).

"Event of Default": any of the events specified in Section 8, provided that any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"Excess Cash Flow": for any period, an amount equal to (a) Cash From Land Sales for such period, minus (b) Land Expenses for such period, minus (c) Consolidated Debt Service for such period, minus (d) Tax Distributions made during such period, plus (e) the Net Cash Proceeds received by the Borrower or any of its Subsidiaries during such period from the issuance of any Permitted CFDs.

"Excess Cash Flow Withdrawal": as defined in Section 5.3(a)(i).

"Excluded Foreign Subsidiary":  any Foreign Subsidiary in respect of which either (a) the pledge of all of the Capital Stock of such Subsidiary as Collateral or (b) the guaranteeing by such Subsidiary of the Obligations, would, in the good faith judgment of the Borrower, result in adverse tax consequences to the Borrower.

"Existing Entitlements":  the Entitlements listed on Schedule 4.21(a).

"Existing Equityholders":  collectively, (i) SunCal and each of its Subsidiaries directly or indirectly holding an equity interest in the Borrower as of the Closing Date and (ii) each other Person holding an equity interest in the Borrower as of the Closing Date.

"Existing Mortgage Indebtedness":  the Indebtedness listed on Schedule 1.1A.

"Extensions of Credit":  as to any Lender at any time an amount equal to the sum of (a) the aggregate principal amount of all Loans made by such Lender then outstanding and (b) such Lender's Commitment Percentage of the L/C Obligations then outstanding.

"Facility":  each of (a) the Term Loan Commitments and the Term Loans made thereunder (the "Term Loan Facility") and (b) the Revolving Credit Commitments and the extensions of credit made thereunder (the "Revolving Credit Facility").

"Federal Funds Effective Rate":  for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for the day of such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it.

"Foreign Subsidiary":  any Subsidiary of the Borrower that is not a Domestic Subsidiary.

"Funding Office":  the office specified from time to time by the Administrative Agent as its funding office by notice to the Borrower and the Lenders.

"FQ1", "FQ2", "FQ3", and "FQ4":  when used with a numerical year designation, means the first, second, third or fourth fiscal quarters, respectively, of such fiscal year of the Borrower (e.g., FQ4 2005 means the fourth fiscal quarter of the Borrower's 2005 fiscal year, which ends December 31, 2005).

"GAAP":  generally accepted accounting principles in the United States of America as in effect from time to time.

"Governmental Authority":  any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization (including the National Association of Insurance Commissioners).

"Governmental Authorization":  any permit, approval, license, zoning and other resolution, certificate of occupancy, authorization, plan, directive, consent order, consent decree or similar authorizations of or from any Governmental Authority.

"Guarantee and Collateral Agreement":  the First Lien Guarantee and Collateral Agreement to be executed and delivered by the Borrower, the Investor Pledgors and each Subsidiary Guarantor, substantially in the form of Exhibit A, as the same may be amended, supplemented or otherwise modified from time to time.

"Guarantee Obligation":  as to any Person (the "guaranteeing person"), any obligation, including a reimbursement, counterindemnity or similar obligation, of the guaranteeing person that guarantees or in effect guarantees, or which is given to induce the creation of a separate obligation by another Person (including any bank under any letter of credit) that guarantees or in effect guarantees any Indebtedness, leases, dividends or other obligations (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, any obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any Property constituting direct or indirect security therefor, (ii) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase Property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided, however, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business.  The amount of any Guarantee Obligation of any guaranteeing person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by the Borrower in good faith.

"Hedge Agreements":  all interest rate or currency swaps, caps or collar agreements, foreign exchange agreements, commodity contracts or similar arrangements entered into by the Borrower or its Subsidiaries providing for protection against fluctuations in interest rates, currency exchange rates, commodity prices or the exchange of nominal interest obligations, either generally or under specific contingencies.

"Improvements":  certain master infrastructure improvements to the Mortgaged Properties (or applicable portion thereof) as reflected in the relevant Approved Development Budget, which shall include all construction and development of the infrastructure and all other improvements made in preparation for the development and marketing of the Mortgaged Properties (or applicable portion thereof), including, without limitation, grading, streets, gutters, sewers, utilities, amenities, common areas and landscaping, all as set forth in plans,

specifications, business plans and projections delivered to the Administrative Agent from time to time.

"Indebtedness": of any Person at any date, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of Property or services (other than trade payables incurred in the ordinary course of such Person's business), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to Property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such Property), (e) all Capital Lease Obligations of such Person, (f) all obligations of such Person, contingent or otherwise, as an account party or applicant under acceptance, letter of credit, surety bond or similar facilities, (g) all obligations of such Person, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any Capital Stock of such Person, (h) all Guarantee Obligations of such Person in respect of obligations of the kind referred to in clauses (a) through (g) above, (i) all obligations of the kind referred to in clauses (a) through (h) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on Property (including, without limitation, accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation; (j) for the purposes of Section 8(e) only, all obligations of such Person in respect of Hedge Agreements and (k) all Indebtedness secured by any Lien on any property or asset owned or held by such Person (other than the Permitted CFDs) regardless of whether the Indebtedness secured thereby shall have been assumed by such Person or is nonrecourse to the credit of such Person; provided that, if such Person has not assumed such secured Indebtedness that is nonrecourse to such Person's credit, then the amount of Indebtedness of such Person pursuant to this clause (k) shall be equal to the lesser of the amount of the secured Indebtedness or the fair market value of the assets of such Person which secure such Indebtedness. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness expressly provide that such Person is not liable therefor.

"Indemnified Liabilities": as defined in Section 10.5.

"Indemnitee": as defined in Section 10.5.

"Initial Appraisal": for each Project, that certain "Appraisal of Real Property" specified on Schedule 1.1D for such Project, and prepared by the Appraiser for the Administrative Agent.

"Initial Disbursement Amount": $26,455,921.13.

"Insolvency": with respect to any Multiemployer Plan, the condition that such Plan is insolvent within the meaning of Section 4245 of ERISA.

"Insolvent": pertaining to a condition of Insolvency.

"Intellectual Property": the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including, without limitation, copyrights, copyright licenses, patents, patent licenses, trademarks, trademark licenses, technology, know-how and processes, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"Intercreditor Agreement": that certain Intercreditor Agreement dated as of the date hereof, substantially in the form of Exhibit N attached hereto, entered into by and between the Administrative Agent and the Second Lien Administrative Agent.

"Interest Payment Date": (a) as to any Base Rate Loan, the last day of each March, June, September and December to occur while such Loan is outstanding and the final maturity date of such Loan, (b) as to any Eurodollar Loan having an Interest Period of three months or shorter, the last day of such Interest Period, (c) as to any Eurodollar Loan having an Interest Period longer than three months, each day that is three months, or a whole multiple thereof, after the first day of such Interest Period and the last day of such Interest Period and (d) as to any Loan (other than a Revolving Credit Loan that is a Base Rate Loan), the date of any repayment or prepayment made in respect thereof.

"Interest Period": as to any Eurodollar Loan, (a) initially, the period commencing on the borrowing or conversion date, as the case may be, with respect to such Eurodollar Loan and ending one, two, three or six months thereafter, as selected by the Borrower in its notice of borrowing or notice of conversion, as the case may be, given with respect thereto; and (b) thereafter, each period commencing on the last day of the next preceding Interest Period applicable to such Eurodollar Loan and ending one, two, three or six months thereafter, as selected by the Borrower by irrevocable notice to the Administrative Agent not later than 11:00 A.M., New York City time, on the date that is three Business Days prior to the last day of the then current Interest Period with respect thereto; provided that, all of the foregoing provisions relating to Interest Periods are subject to the following:

(1)    if any Interest Period would otherwise end on a day that is not a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless the result of such extension would be to carry such Interest Period into another calendar month in which event such Interest Period shall end on the immediately preceding Business Day;

(2)    any Interest Period that would otherwise extend beyond the Revolving Credit Termination Date or beyond the date final payment is due on the Term Loans shall end on the Revolving Credit Termination Date or such due date, as applicable; and

(3)    any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period.

"Investments": as defined in Section 7.8.

"Investor Pledgors": the collective reference to SCC Ranch Ventures LLC, a Delaware limited liability company, and LBREP Lakeside SC Master I LLC, a Delaware limited liability company.

"Issuing Lender": any Revolving Credit Lender from time to time designated by the Borrower as an Issuing Lender with the consent of such Revolving Credit Lender and the Administrative Agent.

"Land Buyer": any third party home builder listed on Schedule 1.1C or such other Person otherwise approved by the Administrative Agent, which approval shall not be unreasonably withheld.

"Land Expenses": in respect of any portion of any Project, the costs and expenses set forth in the Approved Development Budgets reasonably allocable to such portion of such Project including, without limitation, general and administrative expenses, marketing expenses, land acquisition and development costs (consisting of land acquisition and development costs and impact fees minus all reimbursements from Permitted CFDs), and carry costs (consisting of management and other fees, CFD Special Taxes, taxes, insurance costs, Capital Expenditures, and property owners association subsidies and reserve funding) relating to such portion of such Project.

"Land Under Contract": any portion of the Mortgaged Properties subject to a Qualified Sales Agreement with a Land Buyer.

"L/C Commitment": $15,000,000.

"L/C Fee Payment Date": the last day of each March, June, September and December and the last day of the Revolving Credit Commitment Period.

"L/C Obligations": at any time, an amount equal to the sum of (a) the aggregate then undrawn and unexpired amount of the then outstanding Letters of Credit and (b) the aggregate amount of drawings under Letters of Credit that have not then been reimbursed pursuant to Section 3.5.

"L/C Participants": with respect to any Letter of Credit, the collective reference to all the Revolving Credit Lenders other than the Issuing Lender that issued such letter of Credit.

"Lehman Entity": any of Lehman Commercial Paper Inc. or any of its affiliates (including Syndicated Loan Funding Trust).

"Lender Addendum": with respect to any initial Lender, a Lender Addendum, substantially in the form of Exhibit J, to be executed and delivered by such Lender on the Closing Date as provided in Section 10.17.

"Lenders": as defined in the preamble hereto.

"Letters of Credit": as defined in Section 3.1(a).

"Lien": any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including, without limitation, any conditional sale or other title retention agreement and any capital lease having substantially the same economic effect as any of the foregoing).

"Loan": any loan made by any Lender pursuant to this Agreement.

"Loan Documents": this Agreement, the Security Documents, the Intercreditor Agreement, the Agreement Regarding Debtor/Creditor Relationship, the Applications and the Notes.

"Loan Parties": the Borrower and each Subsidiary of the Borrower that is a party to a Loan Document.

"Major Collateral Sale": a Permitted Collateral Asset Sale which contemplates either (i) a gross sales price in excess of $75,000,000 or (ii) the sale of more than five hundred (500) residential home lots.

"Major Milestones": as defined in Section 4.21(b).

"Majority Facility Lenders": with respect to any Facility, the holders of more than 50% of the aggregate unpaid principal amount of the Term Loans or the Total Revolving Extensions of Credit, as the case may be, outstanding under such Facility (or, in the case of the Revolving Credit Facility, prior to any termination of the Revolving Credit Commitments, the holders of more than 50% of the Total Revolving Credit Commitments).

"Majority Revolving Credit Facility Lenders": the Majority Facility Lenders in respect of the Revolving Credit Facility.

"Marketing Agreement": any marketing agreement entered into by the Borrower with an Affiliate of the Borrower relating to one or more of the Mortgaged Properties in accordance with Section 7.10.

"Material Adverse Effect": (a) a material adverse effect on the business, operations, properties, assets or condition (financial or otherwise) of the Borrower and its Subsidiaries, taken as a whole, (b) the material impairment of the ability of the Loan Parties to perform the Obligations, (c) a material adverse effect upon the legality, validity, binding effect or enforceability against a Loan Party of a Loan Document to which it is a party, (d) a material adverse effect upon the rights, remedies and benefits, available to, or conferred upon, the Agents or any Lender under any Loan Document, (e) a material adverse effect upon the value of the Mortgaged Properties, and (f) a material adverse effect upon the Entitlements (including any Major Milestones), when taken as a whole, and the intended development of the Mortgaged Properties as contemplated by the Approved Development Budgets.

"Material Environmental Amount": an amount or amounts payable by the Borrower and/or any of its Subsidiaries, in the aggregate in excess of $1,000,000, for: costs to comply with any Environmental Law; costs of any investigation, and any remediation, of any

Material of Environmental Concern; and compensatory damages (including, without limitation damages to natural resources), punitive damages, fines, and penalties pursuant to any Environmental Law.

"Materials of Environmental Concern":  any gasoline or petroleum (including crude oil or any fraction thereof) or petroleum products, polychlorinated biphenyls, urea-formaldehyde insulation, asbestos, pollutants, contaminants, radioactivity, and any other substances or forces of any kind, whether or not any such substance or force is defined as hazardous or toxic under any Environmental Law, that is regulated pursuant to or could give rise to liability under any Environmental Law.

"McAllister Ranch Development":  the 2,071-acre master planned community anticipated to be comprised of approximately 6,087 residential units as contemplated by the McAllister Ranch Development Agreement.

"McAllister Ranch Development Agreement":  that certain Development Agreement, dated as of March 30, 2004, by and between County of Kern and Jasman Development L.P., as assigned by that certain Notification, Acknowledgement and Assignment Agreement, dated as of April 26, 2005, by and between County of Kern, Jasman Development L.P., as assignor, and LBREP/L-SunCal McAllister Ranch LLC, as assignee, each as may be amended, supplemented or otherwise modified from time to time.

"McAllister Ranch Project":  that certain McAllister Ranch Development located in Kern County, California, depicted on the map attached hereto as Annex B.

"McSweeny Farms Development":  the 673-acre master planned community anticipated to be comprised of 1,640 residential units as contemplated by the McSweeny Farms Development Agreement.

"McSweeny Farms Development Agreement":  that certain Development Agreement, dated as of April 1, 2004, by and between City of Hemet, as the city, and Rancho San Patricio, LLC and McSweeny Land Venture, LLC, collectively as the owner, as assigned by that certain Partial Assignment and Assumption of Development Agreement, dated as of February 17, 2005, by and between Rancho San Patricio, LLC and McSweeny Land Venture, LLC, collectively as assignor, and LBREP/L-SunCal McSweeny Farms LLC, as assignee, each as may be amended, supplemented or otherwise modified from time to time.

"McSweeny Farms Project":  that certain McSweeny Farms Development located in Riverside County, California, depicted on the map attached hereto as Annex C.

"Minimum Liquidity Amount":  (i) initially, $50,000,000 and (ii) thereafter, at any time the Revolving Credit Commitments are to be permanently reduced pursuant to Section 2.10(e), an amount equal to the product of (x) the Minimum Liquidity Amount in effect immediately prior to such reduction, multiplied by (y) a fraction, the numerator of which is the aggregate Revolving Credit Commitments in effect immediately prior to such reduction minus the amount of such reduction, and the denominator of which is the aggregate Revolving Credit Commitments in effect immediate prior to such reduction.

"Moody's":  Moody's Investors Service, Inc.

"Mortgaged Properties":  the real properties listed on Schedule 1.1B, together with any additional real properties acquired after the Closing Date, as to which the Administrative Agent for the benefit of the Secured Parties shall be granted a Lien pursuant to one or more Mortgages.

"Mortgages":  each of the mortgages and deeds of trust made by any Loan Party in favor of, or for the benefit of, the Administrative Agent for the benefit of the Secured Parties, substantially in the form of Exhibit D (with such changes thereto as shall be advisable under the law of the jurisdiction in which such mortgage or deed of trust is to be recorded), as the same may be amended, supplemented or otherwise modified from time to time.

"Multiemployer Plan":  a Plan that is a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Net Cash Proceeds":  (a) in connection with any Asset Sale or any Recovery Event, the proceeds thereof in the form of cash and Cash Equivalents (including any such proceeds received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but only as and when received) of such Asset Sale or Recovery Event, net of attorneys' fees, accountants' fees, investment banking fees, amounts required to be applied to the repayment of Indebtedness secured by a Lien expressly permitted hereunder on any asset which is the subject of such Asset Sale or Recovery Event (other than any Lien pursuant to a Security Document) and other customary fees and expenses actually incurred in connection therewith and net of taxes paid or reasonably estimated to be payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements), (b) in connection with any issuance or sale of equity securities or debt securities or instruments or the incurrence of loans, the cash proceeds received from such issuance or incurrence, net of attorneys' fees, investment banking fees, accountants' fees, underwriting discounts and commissions and other customary fees and expenses actually incurred in connection therewith and (c) in connection with any Purchase Price Refund, the cash amount thereof, net of any expenses incurred in the collection thereof.

"Net Purchase Price":  with respect to any Mortgaged Property, the actual purchase price (net of closing costs and any projected Land Expenses required in connection with such closing) which the Borrower or its Subsidiaries expect to receive in Cash at the closing under a Qualified Sales Agreement for such Mortgaged Property.

"Non-Excluded Taxes":  as defined in Section 2.18(a).

"Non-U.S. Lender":  as defined in Section 2.18(d).

"Note":  any promissory note evidencing any Loan.

"Obligations":  the unpaid principal of and interest on (including, without limitation, interest accruing after the maturity of the Loans and Reimbursement Obligations and interest accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to the Borrower, whether or not a claim

for post-filing or post-petition interest is allowed in such proceeding) the Loans, the Reimbursement Obligations and all other obligations and liabilities of the Borrower to the Administrative Agent or to any Lender or any Qualified Counterparty, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with, this Agreement, any other Loan Document, the Letters of Credit, any Specified Hedge Agreement or any other document made, delivered or given in connection herewith or therewith, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses (including, without limitation, all fees, charges and disbursements of counsel to the Administrative Agent or to any Lender that are required to be paid by the Borrower pursuant hereto) or otherwise; provided, that (i) obligations of the Borrower or any Subsidiary under any Specified Hedge Agreement shall be secured and guaranteed pursuant to the Security Documents only to the extent that, and for so long as, the other Obligations are so secured and guaranteed and (ii) any release of Collateral or Subsidiary Guarantors effected in the manner permitted by this Agreement shall not require the consent of holders of obligations under Specified Hedge Agreements.

"Operating Accounts":  any one or more securities accounts or deposit accounts to be established by the Borrower or a Subsidiary of the Borrower with a financial institution acceptable to the Administrative Agent, which shall at all times be subject to a control agreement in favor of the Administrative Agent, in form and substance reasonably satisfactory to the Administrative Agent.

"Operating Agreement":  the Operating Agreement of the Borrower, dated as of November 5, 2004, by and among SCC Ranch Ventures LLC, as Operating Member, and LBREP Lakeside SC Master I LLC, as LBL Manager, as the same may be amended, supplemented or otherwise modified from time to time in accordance with this Agreement.

"Option Purchase Price":  on any date of determination, the amount payable by the Borrower or any of its Subsidiaries on such date pursuant to the Borchard Patterson Option Agreement or the Summerwind Ranch Purchase Agreement to acquire fee title in the Borchard Patterson Project or the remaining portion of the Summerwind Ranch Project which was not acquired by the Borrower and its Subsidiaries on or prior to the Closing Date, as applicable.

"Other Taxes":  any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

"Participant":  as defined in Section 10.6(b).

"Payment Default":  the failure by the Borrower to pay (a) any principal of any Loan in accordance with Section 2.6(a) or (b) any interest with respect to the Loans or the Second Lien Loans (which amount of interest with respect to the Second Lien Loans has been expressly notified to the Administrative Agent by the Second Lien Administrative Agent) within five days after any such interest becomes due in accordance with the terms of this Agreement or the Second Lien Credit Agreement, as applicable.

"Payment Office":  the office specified from time to time by the Administrative Agent as its payment office by notice to the Borrower and the Lenders.

"PBGC":  the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA (or any successor).

"Permitted CFDs":  any one or more community facility districts established for the benefit of a Project after the Closing Date, the terms of which have been reviewed and approved by the Administrative Agent to the extent not consistent with the Approved Project Budget and the Approved Project Schedule, the proceeds of which are available to directly pay or to reimburse the Borrower or its Subsidiaries, as applicable, for Land Expenses contemplated by the Approved Development Budgets, and which do not result in CFD Special Taxes in excess of the CFD Special Taxes Cap.

"Permitted Collateral Asset Sale":  any transaction (or series of transactions) constituting an arm's-length sale of all or a portion of the Mortgaged Properties to a third party in the ordinary course of business pursuant to a Qualified Sales Agreement.

"Permitted Exceptions":

(a)    any involuntary Liens with respect to which Borrower or any of its Subsidiaries satisfies each of the following requirements:  (i) Borrower or such Subsidiary contests the validity of such involuntary Lien in good faith by appropriate legal proceedings; (ii) Borrower or such Subsidiary gives written notice to the Administrative Agent of Borrower's intent to contest or object to the same; (iii) Borrower or such Subsidiary demonstrates to the Administrative Agent's satisfaction that such proceedings will conclusively operate to prevent the sale of any part of the Collateral to satisfy the involuntary Lien prior to final determination of such proceedings; and (iv) Borrower or such Subsidiary takes any and all other actions (including, without limitation, obtaining bonds, title insurance endorsements, or other security) as the Administrative Agent may deem necessary or appropriate in order to prevent the sale of any Collateral to satisfy the involuntary Lien and prevent any impairment of any such Collateral;

(b)    all items shown in Schedule B Part 1 of any title insurance policy related to the Mortgaged Properties;

(c)    all Qualified Sales Agreements so long as such Purchase Agreements satisfy the terms and conditions of Section 6.15; and

(d)    such other permitted exceptions pursuant to any Mortgage or as otherwise consented to by the Administrative Agent in writing.

"Person":  an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"Plan": at a particular time, any employee benefit plan that is covered by ERISA and in respect of which the Borrower or a Commonly Controlled Entity is (or, if such plan were terminated at such time, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Pledged Stock": as defined in the Guarantee and Collateral Agreement.

"Prepayment Amount": as defined in Section 2.16(d).

"Prepayment Date": as defined in Section 2.16(d).

"Prepayment Option Notice": as defined in Section 2.16(d).

"Pro Forma Balance Sheet": as defined in Section 4.1.

"Projects": collectively, the Borchard Patterson Project, the McAllister Ranch Project, the McSweeny Farms Project and the Summerwind Ranch Project.

"Projections": as defined in Section 6.2(h).

"Property": any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, including, without limitation, Capital Stock.

"Purchase Price Refund": any amount received by the Borrower or any Subsidiary as a result of a purchase price adjustment or similar event in connection with any acquisition of Property by the Borrower or any Subsidiary.

"Qualified Appraisal": the Initial Appraisal and any other real estate appraisal conducted in accordance with the Uniform Standards of Professional Appraisal Practice (as promulgated by the Appraisal Standards Board of the Appraisal Foundation) and all Requirements of Law applicable to the Administrative Agent undertaken by the Appraiser, and providing an assessment of "Total Net Value" and the "As-Is" value (each as defined in the Initial Appraisal) of the Projects, the form and substance of such appraisal to be reviewed and approved by the Administrative Agent in its reasonable judgment. The "As-Is" value of the asset shall comply with all applicable laws, rules and regulations, including the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA), as amended, and the Uniform Standards for Professional Appraisal Practice (USPAP). The data of value for the "As-Is" value in such appraisal report shall be within three months of the date of acquisition of each Project and shall not include any prospective assumptions or conclusions.

"Qualified Appraisal Update": the most recent quarterly update of the Initial Appraisal or other Qualified Appraisal prepared by the Appraiser and delivered in accordance with Section 6.2(d), the form and substance of such update to be reviewed and approved by the Administrative Agent in its reasonable judgment.

"Qualified Counterparty": with respect to any Specified Hedge Agreement, any counterparty thereto that (a) at the time such Specified Hedge Agreement was entered into, was a

Lender or an affiliate of a Lender or (b) if otherwise, has appointed the Administrative Agent as its agent with respect to the Collateral substantially on the terms set forth in Section 9.

"Qualified Land Buyer Purchase Agreement": an arm's-length definitive and binding purchase agreement between the Borrower or one or more of its Subsidiaries and a Land Buyer pursuant to which a non-refundable deposit of 10% (or more) of the aggregate purchase price (subject only to a refund in the event of a material default by the Borrower or its Subsidiaries, as applicable, or a failure of a customary closing condition) contemplated for the subject Mortgaged Properties and which (i) by its terms expressly obligates the Land Buyer to purchase the subject Mortgaged Properties subject only to customary closing conditions and after the expiration of the due diligence period thereunder, does not permit the Land Buyer to terminate the Agreement except upon the material default of the Borrower or its Subsidiaries, as applicable, or a failure of a customary closing condition, or (ii) is otherwise reasonably acceptable to the Administrative Agent; provided, however, such purchase agreement shall not qualify as a "Qualified Land Buyer Purchase Agreement" until the due diligence period thereunder has expired.

"Qualified Other Sales Agreement": an arm's-length definitive and binding purchase agreement between the Borrower or one or more of its Subsidiaries and a third party home builder (other than a Qualified Land Buyer Purchase Agreement) which satisfies the criteria of a Qualified Land Buyer Purchase Agreement except that the due diligence period has not expired, the 10% deposit may not be non-refundable and customary closing conditions may include items unique to the particular transaction or reflective of due diligence issues raised by the purchaser, or which otherwise has been approved by the Administrative Agent, which approval shall not be unreasonably withheld.

"Qualified Sales Agreement": any Qualified Land Buyer Purchase Agreement or Qualified Other Sales Agreement.

"Recovery Event": any settlement of or payment in respect of any property or casualty insurance claim or any condemnation proceeding relating to any asset of the Borrower or any of its Subsidiaries.

"Register": as defined in Section 10.6(d).

"Regulation H": Regulation H of the Board as in effect from time to time.

"Regulation U": Regulation U of the Board as in effect from time to time.

"Reimbursement Obligation": the obligation of the Borrower to reimburse each Issuing Lender pursuant to Section 3.5 for amounts drawn under Letters of Credit issued by such Issuing Lender.

"Reinvestment Deferred Amount": with respect to any settlement of or payment in respect of any property or casualty insurance claim relating to an asset of the Borrower or any of its Subsidiaries, the aggregate Net Cash Proceeds received by the Borrower or any of its Subsidiaries in connection therewith that are not applied to prepay the Term Loans or reduce the

Revolving Credit Commitments pursuant to Section 2.10(c) as a result of the delivery of a Reinvestment Notice.

"Reinvestment Event": any settlement or payment in respect of any property or casualty insurance claim relating to an asset of the Borrower or any of its Subsidiaries in respect of which the Borrower has delivered a Reinvestment Notice.

"Reinvestment Notice": a written notice executed by a Responsible Officer stating that no Default or Event of Default has occurred and is continuing and that the Borrower (directly or indirectly through a Subsidiary) intends and expects to use all or a specified portion of the Net Cash Proceeds of a Recovery Event to repair damage to the Collateral subject of such Reinvestment Event.

"Reinvestment Prepayment Amount": with respect to any Reinvestment Event, the Reinvestment Deferred Amount relating thereto less any amount expended prior to the relevant Reinvestment Prepayment Date to repair damage to the Collateral subject of such Reinvestment Event.

"Reinvestment Prepayment Date": with respect to any Reinvestment Event, the earliest of (a) the date on which the Borrower shall have determined not to repair damage to the Collateral subject of such Reinvestment Event with all or any portion of the relevant Reinvestment Deferred Amount, (b) the date that is the 90th day after the date of such Reinvestment Event if the Borrower has failed to deliver to the Administrative Agent a written update to the Approved Development Budget for the related Mortgaged Property subject of such Reinvestment Event, in form and substance satisfactory to the Administrative Agent or (c) the date that is the 270th day after the date of such Reinvestment Event if the Borrower has delivered to the Administrative Agent a written update to the Approved Development Budget for the related Mortgaged Property subject of such Reinvestment Event, in form and substance satisfactory to the Administrative Agent, prior to the date that is 90 days after the date of such Reinvestment Event.

"Related Fund": with respect to any Lender, any fund that (x) invests in commercial loans and (y) is managed or advised by the same investment advisor as such Lender, such Lender, an affiliate of such Lender or an affiliate of such investment advisor.

"Reorganization": with respect to any Multiemployer Plan, the condition that such plan is in reorganization within the meaning of Section 4241 of ERISA.

"Reportable Event": any of the events set forth in Section 4043(c) of ERISA, other than those events as to which the thirty day notice period is waived under subsections .27, .28, .29, .30, .31, .32, .34 or .35 of PBGC Reg. § 4043.

"Requested Withdrawal Date": as defined in Section 5.3(a)(i).

"Required Dedication": a dedication or conveyance of a portion of the Mortgaged Properties at the direction of a Governmental Authority or a public utility to (a) such Governmental Authority (or any designee of such Governmental Authority), or (b) a utility provider, for parks, schools, public streets, utility easements and installations, slopes or other

rights-of-way; _provided_, that any such dedication or conveyance (individually and/or taken together with all other such dedications and conveyances) could not reasonably be expected to (i) have a Material Adverse Effect or (ii) impair the Administrative Agent's first priority Lien on the remaining Mortgaged Properties.

"Required Lenders": at any time, the holders of more than 50% of (a) until the Closing Date, the Commitments and (b) thereafter, the sum of (i) the aggregate unpaid principal amount of the Term Loans then outstanding and (ii) the Total Revolving Credit Commitments then in effect or, if the Revolving Credit Commitments have been terminated, the Total Revolving Extensions of Credit then outstanding.

"Required Prepayment Lenders": the Majority Facility Lenders in respect of each Facility.

"Requirement of Law": as to any Person, the Operating Agreement and Certificate of Formation or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its Property or to which such Person or any of its Property is subject.

"Requirements": with respect to any Project, any and all obligations, other terms and conditions, requirements, and restrictions in effect now or in the future by which the Borrower or any of its Subsidiaries or any or all of such Project is bound or which are otherwise applicable to any or all of such Project, construction of any improvements thereon, or occupancy, ownership, or use of such Project (including, without limitation, such obligations, other terms and conditions, restrictions, and requirements imposed by (i) any law, ordinance, regulation, or rule (federal, state, or local); (ii) any Approvals and Permits; (iii) any Permitted Exceptions; (iv) any condition, covenant, restriction, easement, right of way, or reservation applicable to the Mortgaged Property; (v) insurance policies; (vi) any other agreement, document, or instrument to which Borrower or any of its Subsidiaries is a party or by which the Borrower or any of its Subsidiaries or any or all of such Project or the business or operations of the Borrower or any of its Subsidiaries is bound; or (vii) any judgment, order, or decree of any arbitrator, other private adjudicator, or Governmental Authority to which the Borrower or any of its Subsidiaries is party or by which the Borrower or any of its Subsidiaries or such Project is bound).

"Responsible Officer": the manager, co-manager, general counsel or chief financial officer of SCC Ranch Ventures LLC, the operating member the Borrower, but in any event, with respect to financial matters, the chief financial officer of the Borrower.

"Restricted Payments": as defined in Section 7.6.

"Revolving Credit Commitment": as to any Lender, the obligation of such Lender, if any, to make Revolving Credit Loans and participate in Letters of Credit, in an aggregate principal and/or face amount not to exceed the amount set forth under the heading "Revolving Credit Commitment" opposite such Lender's name on Schedule 1 to the Lender Addendum delivered by such Lender, or, as the case may be, in the Assignment and Acceptance pursuant to which such Lender became a party hereto, as the same may be changed from time to

time pursuant to the terms hereof. The original aggregate amount of the Total Revolving Credit Commitments is $75,000,000.

"Revolving Credit Commitment Period": the period from and including the Closing Date to the Revolving Credit Termination Date.

"Revolving Credit Facility": as defined in the definition of "Facility" in this Section 1.1.

"Revolving Credit Lender": each Lender that has a Revolving Credit Commitment or that is the holder of Revolving Credit Loans.

"Revolving Credit Loans": as defined in Section 2.4.

"Revolving Credit Note": as defined in Section 2.6(e).

"Revolving Credit Percentage": as to any Revolving Credit Lender at any time, the percentage which such Lender's Revolving Credit Commitment then constitutes of the Total Revolving Credit Commitments (or, at any time after the Revolving Credit Commitments shall have expired or terminated, the percentage which the aggregate amount of such Lender's Revolving Extensions of Credit then outstanding constitutes of the Total Revolving Extensions of Credit then outstanding).

"Revolving Credit Termination Date": January 19, 2009.

"Revolving Extensions of Credit": as to any Revolving Credit Lender at any time, an amount equal to the sum of (a) the aggregate principal amount of all Revolving Credit Loans made by such Lender then outstanding and (b) such Lender's Revolving Credit Percentage of the L/C Obligations then outstanding.

"S&P": Standard & Poor's, a division of the McGraw Hill Companies, Inc.

"SEC": the Securities and Exchange Commission (or successors thereto or an analogous Governmental Authority).

"Second Lien Administrative Agent": the administrative agent under the Second Lien Credit Agreement.

"Second Lien Credit Agreement": the Second Lien Credit Agreement dated as of the date hereof among the Borrower, the Second Lien Lenders, and Lehman Commercial Paper Inc., as administrative agent, as amended, supplemented or otherwise modified from time to time in accordance with the Intercreditor Agreement.

"Second Lien Lenders": the several banks and other financial institutions or entities from time to time party to the Second Lien Credit Agreement.

"Second Lien Loan Documents": the "Loan Documents" as defined in the Second Lien Credit Agreement.

"Second Lien Loans": the term loans made under and in accordance with the Second Lien Credit Agreement.

"Secured Parties": as defined in the Guarantee and Collateral Agreement.

"Security Documents": the collective reference to the Guarantee and Collateral Agreement, the Mortgages and all other security documents hereafter delivered to the Administrative Agent granting a Lien on any Property of any Person to secure the obligations and liabilities of any Loan Party under any Loan Document.

"Single Employer Plan": any Plan that is covered by Title IV of ERISA, but which is not a Multiemployer Plan.

"Solvent": with respect to any Person, as of any date of determination, (a) the amount of the "present fair saleable value" of the assets of such Person will, as of such date, exceed the amount of all "liabilities of such Person, contingent or otherwise", as of such date, as such quoted terms are determined in accordance with applicable federal and state laws governing determinations of the insolvency of debtors, (b) the present fair saleable value of the assets of such Person will, as of such date, be greater than the amount that will be required to pay the liability of such Person on its debts as such debts become absolute and matured (taking into account all financing alternatives and asset sales reasonably available to such Person), (c) such Person will not have, as of such date, an unreasonably small amount of capital with which to conduct its business, and (d) such Person will be able to pay its debts as they mature.  For purposes of this definition, (i) "debt" means liability on a "claim", (ii) "claim" means any (x) right to payment, whether or not such a right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured or (y) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured or unmatured, disputed, undisputed, secured or unsecured and (iii) contingent liability and debt shall be computed as that amount that can be reasonably expected to become actual and matured in light of the circumstances.

"Specified Hedge Agreement": any Hedge Agreement entered into by the Borrower or any Subsidiary Guarantor and any Qualified Counterparty.

"Subordinated Affiliate Loans": loans made to the Borrower by any member of the Borrower which are subordinated to the Obligations in a manner satisfactory to Administrative Agent and which are (a) loans made by such member "in lieu" of capital contributions or arising from a default of another member of the Borrower, in each case pursuant to the Borrower's Operating Agreement; provided, that such loans shall by their terms provide that they may only be repaid in such amounts and at such times as Restricted Payments are otherwise permitted hereunder, (b) Gap Loans and Cost Overrun Loans (each as defined in the Borrower's Operating Agreement) in accordance with the Borrower's Operating Agreement; provided, that such loans shall by their terms provide that they may only be repaid in such amounts and at such times as Restricted Payments are otherwise permitted hereunder or with the proceeds of Revolving Credit Loans and/or with draws from the Development Account or Operating Accounts, in each case to the extent the proceeds of such Gap Loans or Cost Overrun

Loans were used to fund Land Expenses in accordance with the Approved Development Budgets, or (c) loans the proceeds of which are used to cash collateralize letters of credit obtained from a third party financial institution and permitted pursuant to Section 7.2(i); provided, that such loans shall by their terms provide that they may only be repaid in such amounts or at such times as Restricted Payments are otherwise permitted hereunder or with the proceeds of such loans to the extent the applicable cash collateral arrangements have terminated or expired; provided, that in all events the loans described in clauses (a), (b) and (c) shall be on such terms as are satisfactory to Administrative Agent and, without limiting the foregoing, with respect to the Gap Loans, Cost Overrun Loans, Default Loans and Member Loans (each as defined in the Borrower's Operating Agreement), shall be on terms consistent with the terms relating thereto as set forth in the Borrower's Operating Agreement as in effect as of the date hereof.

"Subordination and Non-Disturbance Agreement": a subordination and non-disturbance agreement executed by a homebuilder party to a Qualified Sales Agreement, the Borrower and the Administrative Agent with respect to a portion of the Mortgaged Properties subject to a Qualified Sales Agreement, substantially in the form of Exhibit M (with such changes as are acceptable to the Administrative Agent in its reasonable discretion).

"Subsidiary": as to any Person, a corporation, partnership, limited liability company or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Borrower.

"Subsidiary Guarantor": each Subsidiary of the Borrower that is a party to the Guarantee and Collateral Agreement.

"Summerwind Ranch Development": the 2,588-acre master planned community anticipated to be comprised of approximately 3,683 residential units as contemplated by the Summerwind Ranch Development Agreement.

"Summerwind Ranch Development Agreement": a development agreement to be entered into by the Borrower and/or LBREP/L-SunCal Summerwind Ranch LLC in respect of the development of the Summerwind Ranch Project depicted on the map attached hereto as Annex D, and which development agreement shall be reasonably acceptable to the Administrative Agent.

"Summerwind Ranch Project": that certain Summerwind Ranch Development located in Riverside County, California, depicted on the map attached hereto as Annex D.

"Summerwind Ranch Purchase Agreement": the Purchase Agreement and Escrow Instructions, dated as of December 22, 2003, between SCC Ranch Ventures LLC (as

assignee of Oak Valley Partners, L.P. pursuant to the Assignment and Assumption of Purchase Agreement dated as of April 18, 2005) and SunCal, as amended by the First Amendment, dated as of July 22, 2004, and as further amended from time to time with the consent of the Administrative Agent.

"SunCal":  SCC Acquisitions, Inc., a California corporation.

"Syndication Agent":  as defined in the preamble hereto.

"Syndication Date":  the date on which the Syndication Agent completes the syndication of the Facilities and the entities selected in such syndication process become parties to this Agreement.

"Tax Distributions":  Restricted Payments made pursuant to Section 7.5(d).

"Term Loan":  as defined in Section 2.1.

"Term Note":  as defined in Section 2.6(e).

"Term Loan Commitment":  as to any Lender, the obligation of such Lender, if any, to make a Term Loan to the Borrower hereunder in a principal amount not to exceed the amount set forth under the heading "Term Loan Commitment" opposite such Lender's name on Schedule 1 to the Lender Addendum delivered by such Lender, or, as the case may be, in the Assignment and Acceptance pursuant to which such Lender became a party hereto, as the same may be changed from time to time pursuant to the terms hereof.  The original aggregate amount of the Term Loan Commitments is $160,000,000.

"Term Loan Percentage":  as to any Lender at any time, the percentage which such Lender's Term Loan Commitment then constitutes of the aggregate Term Loan Commitments (or, at any time after the Closing Date, the percentage which the aggregate principal amount of such Lender's Term Loans then outstanding constitutes of the aggregate principal amount of the Term Loans then outstanding).

"Total Extensions of Credit":  at any time, the aggregate amount of the Extensions of Credit of the Lenders outstanding at such time.

"Total Revolving Credit Commitments":  at any time, the aggregate amount of the Revolving Credit Commitments then in effect.

"Total Revolving Extensions of Credit":  at any time, the aggregate amount of the Revolving Extensions of Credit of the Revolving Credit Lenders outstanding at such time.

"Transferee":  as defined in Section 10.15.

"Type":  as to any Loan, its nature as a Base Rate Loan or a Eurodollar Loan.

"Wholly Owned Subsidiary": as to any Person, any other Person all of the Capital Stock of which (other than directors' qualifying shares required by law) is owned by such Person directly and/or through other Wholly Owned Subsidiaries.

"Wholly Owned Subsidiary Guarantor": any Subsidiary Guarantor that is a Wholly Owned Subsidiary of the Borrower.

1.2    Other Definitional Provisions.  (a)  Unless defined or otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in the other Loan Documents or any certificate or other document made or delivered pursuant hereto or thereto.

(b)    As used herein and in the other Loan Documents, and any certificate or other document made or delivered pursuant hereto or thereto, accounting terms relating to the Borrower and its Subsidiaries not defined in Section 1.1 and accounting terms partly defined in Section 1.1, to the extent not defined, shall have the respective meanings given to them under GAAP.

(c)    The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(d)    The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(e)    All calculations of financial ratios set forth in Section 7.1 shall be calculated to the same number of decimal places as the relevant ratios are expressed in and shall be rounded upward if the number in the decimal place immediately following the last calculated decimal place is five or greater.  For example, if the relevant ratio is to be calculated to the hundredth decimal place and the calculation of the ratio is 5.126, the ratio will be rounded up to 5.13.

## SECTION 2. AMOUNT AND TERMS OF COMMITMENTS

2.1    Term Loan Commitments.  Subject to the terms and conditions hereof, the Lenders severally agree to make term loans (each, a "Term Loan") to the Borrower on the Closing Date in an amount for each Lender not to exceed the amount of the Term Loan Commitment of such Lender.  The Term Loans may from time to time be Eurodollar Loans or Base Rate Loans, as determined by the Borrower and notified to the Administrative Agent in accordance with Sections 2.2 and 2.11.

2.2    Procedure for Term Loan Borrowing.  (a)  The Borrower shall deliver to the Administrative Agent a Borrowing Notice (which Borrowing Notice must be received by the Administrative Agent prior to 10:00 A.M., New York City time, one Business Day prior to the anticipated Closing Date) requesting that the Term Loan Lenders make the Term Loans on the Closing Date.  The Term Loans made on the Closing Date shall initially be Base Rate Loans, and

connection with the development of the related Project as contemplated by the applicable Development Agreement.

7.6    <u>Limitation on Restricted Payments</u>.  Declare or pay any dividend on, or make any payment on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement or other acquisition of, any Capital Stock of the Borrower or any Subsidiary, whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash or property or in obligations of the Borrower or any Subsidiary, or enter into any derivatives or other transaction with any financial institution, commodities or stock exchange or clearinghouse (a "<u>Derivatives Counterparty</u>") obligating the Borrower or any Subsidiary to make payments to such Derivatives Counterparty as a result of any change in market value of any such Capital Stock (collectively, "<u>Restricted Payments</u>"), except that:

(a)    any Subsidiary may make Restricted Payments to the Borrower or any Subsidiary Guarantor;

(b)    the Borrower may make Restricted Payments in the form of common stock or common limited liability company membership interests of the Borrower;

(c)    the Borrower may pay a dividend on the Closing Date to one or more of Bruce Elieff, SunCal, SCC Acquisitions, LLC, SCC Ranch Ventures, LLC or LBREP Lakeside SC Master I, LLC, in an aggregate amount not exceeding $144,000,000;

(d)    the Borrower may make Restricted Payments to the holders of the Capital Stock of the Borrower; <u>provided</u> that, (i) except for Restricted Payments made with any Excess Cash Flow as permitted by Section 2.10(d), no Restricted Payment shall be permitted pursuant to this Section 7.6(d) unless the amount of the proposed Restricted Payment has first been offered to the Lenders (and the Second Lien Lenders) as an optional prepayment of the Term Loans in accordance with Section 2.16(d) and, to the extent any portion of the Restricted Payment is not paid to the Lenders (and/or the Second Lien Lenders) in accordance with Section 2.16(d), such remaining amount may be paid to the holders of the Capital Stock of the Borrower and (ii) immediately prior to and after giving effect to such Restricted Payment, no Default or Event of Default shall have occurred and be continuing; and

(e)    the Borrower may make Restricted Payments to the beneficial owners of the Capital Stock of the Borrower for the purposes of permitting such beneficial owners to pay federal and state income tax obligations with respect to income allocated to them from the Borrower and its Subsidiaries; <u>provided</u>, <u>that</u> the amount of such Restricted Payments made with respect to any fiscal year of the Borrower shall not exceed forty-five percent (45%) of the consolidated taxable income of the Borrower and its Subsidiaries allocated to the beneficial holders for such fiscal year (calculated in accordance with U.S. federal and applicable state tax laws).

7.7    <u>Limitation on Capital Expenditures</u>.  Make or commit to make any Capital Expenditure, except Capital Expenditures of the Borrower and its Subsidiaries in accordance with the Approved Development Budgets solely with respect to the Projects.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

LBREP/L-SUNCAL MASTER I LLC

By: _____

Name: Bruce Elieff
Title: Authorized Signatory

LEHMAN BROTHERS INC.,
as Arranger

By: _____

Name:  Francis X. Gilhool
Title:  Authorized Signatory

LEHMAN COMMERCIAL PAPER INC.,
as Syndication Agent

By: _____

Name:  Francis X. Gilhool
Title:  Authorized Signatory

LEHMAN COMMERCIAL PAPER INC.,
as Administrative Agent

By: _____

Name:  Francis X. Gilhool
Title:  Authorized Signatory

[First Lien Credit Agreement]