# Exhibit G

1  **WEILAND, GOLDEN,**
   **SMILEY, WANG EKVALL & STROK, LLP**
2  Evan D. Smiley, State Bar No. 161812
   esmiley@wgllp.com
3  Hutchison B. Meltzer, State Bar No. 217166
   hmeltzer@wgllp.com
4  Robert S. Marticello, State Bar No. 244256
   rmarticello@wgllp.com
5  650 Town Center Drive, Suite 950
   Costa Mesa, CA 92626
6  Telephone:  714-966-1000
   Facsimile:   714-966-1002
7
   Attorneys for Alfred H. Siegel,
8  Chapter 11 Trustee

9              **UNITED STATES BANKRUPTCY COURT**

10            **CENTRAL DISTRICT OF CALIFORNIA**

11                **SANTA ANA DIVISION**

12  In re                              | Case No. 8:08-bk-15588-ES

13  LBREP/L-Sun Cal Master I, LLC, et al.,  | Chapter 11

14              Debtor.                 | (Jointly Administered with Case Nos.
                                          8:08-bk-15637-ES; 8:08-bk-15639-ES; and
15  _____    8:08-bk-15640-ES)

16  _____ Affects LBREP/L-SunCal Master I,
    LLC, Only                          **MOTION TO APPROVE AMENDED AND**
                                        **RESTATED COMPROMISE BETWEEN**
17  _____ Affects LBREP/L-SunCal McAllister  **THE TRUSTEE, THE OFFICIAL**
    Ranch, LLC, Only                   **COMMITTEE OF UNSECURED**
                                        **CREDITORS, AND LEHMAN**
18                                      **COMMERCIAL PAPER INC., IN ITS**
    _____ Affects LBREP/L-SunCal        **INDIVIDUAL CAPACITY AND AS**
19  McSweeny Farms, LLC, Only          **ADMINISTRATIVE AGENT FOR THE 1st**
                                        **LIEN LENDERS; MEMORANDUM OF**
20  _____ Affects LBREP/L-SunCal        **POINTS AND AUTHORITIES; AND**
    Summerwind Ranch, LLC, Only        **DECLARATION OF EVAN D. SMILEY IN**
                                        **SUPPORT**
21
    __X__ Affects All Debtors.
22                                      **[The Declaration of Alfred H. Siegel in**
                                        **Support of the Motion to be Filed**
23                                      **Separately]**

24
                                        **DATE:    December 21, 2010**
25                                      **TIME:     9:30 a.m.**
                                        **PLACE:   Courtroom 5A**
26                                                  **411 W. Fourth St.**
                                                    **Santa Ana, CA 92701**
27

28

448323.2                                          MOTION TO APPROVE COMPROMISE

# TABLE OF CONTENTS

                                                                                                    **Page**

I.      INTRODUCTION ............................................................................................ 1

II.     BACKGROUND ............................................................................................. 3

        A.    General Background ......................................................................... 3

        B.    Significant Post-Petition Events ..................................................... 4

              1.    The LCPI Stay Relief Motions ............................................... 4

              2.    Trustee's Use of Cash Collateral .......................................... 5

              3.    The First Compromise Motion ............................................... 6

              4.    The Trustee's Stay Relief Motion ......................................... 7

        C.    Pre-Petition Events Giving Rise to Claims Against LCPI ............. 9

              1.    The First and Second Lien Credit Agreement ...................... 9

              2.    The Third Lien Credit Agreement ....................................... 10

              3.    The Debtors' Alleged Defaults Under The Lien Credit
                    Agreements ........................................................................ 10

III.    PROPOSED SETTLEMENT ....................................................................... 11

IV.     LEGAL ANALYSIS ...................................................................................... 17

        A.    The Probability of Success in The Litigation ............................... 18

        B.    The Difficulties to be Encountered in The Matter of Collection ..... 21

        C.    The Complexity, Expense, Inconvenience, and Delay ................ 22

        D.    The Paramount Interests of Creditors .......................................... 24

        E.    Approval of The Amended Term Sheet Will Not Alter or
              Prejudice The Rights of Third Parties ........................................... 26

V.      CONCLUSION ............................................................................................ 27

DECLARATION OF EVAN D. SMILEY .................................................................. 28

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1

# TABLE OF AUTHORITIES

2

<u>Page</u>

3

## <u>CASES</u>

4

*In re A & C Props.,*
784 F.2d 1377 (9th Cir. 1986).................................................................. 17, 18

5

*In re America West Airlines, Inc.,*
6  214 B.R. 382 (Bankr. D. Ariz. 1997) .................................................. 18

7

*In re Hermitage Inn, Inc.,*
66 B.R. 71 (Bankr. D. Colo. 1986) ...................................................... 18

8

*In re Mickey Thompson Entertainment Group, Inc.,*
9  292 B.R. 415 (B.A.P. 9th Cir. 2003)..................................................... 18

*In re Palmdale Hills Property, LLC,*
10  2009 WL 5812119 (B.A.P. 9th Cir. 2009) .......................................... 8

11

*In re Schmitt,*
12  215 B.R. 417 (B.A.P. 9th Cir. 1997) .................................................... 18

13  *In re World Health Alternatives, Inc.,*
344 B.R. 291 (Bankr. D. Del. 2006) .................................................... 18

14

## <u>STATUTES</u>

15

11 U.S.C. § 1123(a)(5)(D) ......................................................................... 13

16

## <u>OTHER AUTHORITIES</u>

17

Federal Rules of Bankruptcy Procedure 9019(a) ..................................... 16, 17

18

19

20

21

22

23

24

25

26

27

28

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

1 **TO THE HONORABLE ERITHE A. SMITH, UNITED STATES BANKRUPTCY JUDGE:**

2       Alfred H. Siegel (the "Trustee"), the chapter 11 trustee of the jointly administered

3 estates of LBREP/L-SunCal Master I, LLC (the "Parent Debtor"), and LBREP/L-SunCal

4 McAllister Ranch, LLC, LBREP/L-SunCal McSweeny Farms, LLC, and LBREP/L-SunCal

5 Summerwind Ranch, LLC (collectively, the "Subsidiary Debtors," and together with the

6 Parent Debtor, the "Debtors"), submits this Motion (the "Motion") to Approve the Amended

7 and Restated Compromise Between the Trustee, the Official Committee of Unsecured

8 Creditors (the "Committee"), and Lehman Commercial Paper Inc. ("LCPI"), in its individual

9 capacity and as administrative agent for the 1st Lien Lenders. In support of the Motion,

10 the Trustee submits the following memorandum of points and authorities, and the

11 attached Declaration of Evan D. Smiley. The Declaration of Alfred H. Siegel in support of

12 the Motion will be filed separately.

13

14            **MEMORANDUM OF POINTS AND AUTHORITIES**

15 **I.**    **INTRODUCTION**

16       By this Motion, the Trustee requests approval of an amended and restated term

17 sheet (the "Amended Term Sheet") between the Trustee, the Committee, and LCPI, in its

18 individual capacity and as the administrative agent for the first-position secured lenders

19 (the "1st Lien Lenders"), a copy of which is attached hereto as Exhibit "1."

20       On October 9, 2009, the Trustee filed a motion to approve the original term sheet

21 between the Trustee, the Committee, and LCPI (the "Original Term Sheet"). However,

22 following the filing of the compromise motion, a dispute arose between the Trustee and

23 the Committee, on the one hand, and LCPI, on the other hand, regarding the

24 interpretation of the Original Term Sheet. The parties tried, but were initially unable to

25 resolve their disputes, and the Trustee began to pursue other alternatives to administer

26 the Debtors' estates. The Trustee selected a broker to market and sell the Debtors' real

27 property assets, and the Trustee negotiated and entered into an asset purchase

28 agreement with a prospective buyer. The Trustee also filed a motion for relief from the

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

1    automatic stay in LCPI's bankruptcy case pending in the United States Bankruptcy Court

2    for the Southern District of New York (the "New York Bankruptcy Court") to, among other

3    things, sell the properties free and clear of LCPI's asserted liens and to deny LCPI's credit

4    bid rights, which was initially heard on July 14, 2010.  The New York Bankruptcy Court

5    continued the hearing on the Trustee's stay relief motion for one month and strongly

6    suggested to the parties that they resume their settlement discussions in the meantime.

7    As a result of the renewed discussions, the Trustee, the Committee, and LCPI have now

8    resolved their differences regarding the interpretation of the original term sheet.

9        The Amended Term Sheet is fair and reasonable and its approval is in the best

10   interests of the Debtors' bankruptcy estates.  Like the Original Term Sheet, the Amended

11   Term Sheet resolves all of the disputes between the Debtors' estates and LCPI.  The

12   Amended Term Sheet resolves the estates' claims against LCPI, LCPI's stay relief

13   proceeding, the Trustee's stay relief proceeding, and all disputes between the parties

14   related to the use of cash collateral and the sale of the Debtors' real property.  As a result,

15   approval of the Amended Term Sheet will save the estates significant administrative

16   expense and will eliminate the risk associated with litigation.  In large part, the terms of the

17   parties' agreement remain the same.  The parties have, however, made a few important

18   changes to resolve their disputes regarding the interpretation of the original term sheet.

19   The Trustee believes that the Amended Term Sheet is economically better for the

20   Debtors' estates, and the revisions should also resolve certain of the prior objections to

21   the compromise.  The Committee, which entity represents the interests of unsecured

22   creditors, has been involved in the negotiations regarding the Amended Term Sheet and

23   supports its approval by the Court.

24       Under the Amended Term Sheet, the Debtors' real property will be sold through a

25   plan, subject to LCPI's right to credit bid as provided in the Amended Term Sheet.  Upon

26   the entry of a final order granting this Motion, the Debtors' estates will receive over $5.7

27   million in cash.  Of this sum, $3.7 million will immediately be available for use by the

28   Trustee to administer the Debtors' cases and to pursue the estates' claims against other

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1  third parties. The remaining $2.0 million will be used to maintain and preserve the

2  Debtors' real property pending sale, and, thereafter, any surplus will be paid to LCPI.

3  Through the plan contemplated under the Amended Term Sheet, 50% of any net

4  avoidance action or other litigation recoveries will be paid to the Debtors' estates to

5  distribute solely to unsecured trade creditors. The Debtors' estates will also be entitled to

6  3.5% of any net recovery from the sale of the Debtors' real property to a third party,

7  whether through the plan or subsequently by LCPI. Thus, under the Amended Term

8  Sheet, the Debtors' estates have the potential to recover significant funds in the future for

9  distribution to unsecured trade creditors.

10     Based on the foregoing, the Trustee requests that the Court enter an order

11  approving the Amended Term Sheet.

12

13  **II.   BACKGROUND**

14     **A.   General Background**

15     On or about September 10 and 11, 2008 (the "Petition Dates"), involuntary petitions

16  under chapter 11 of the Bankruptcy Code were filed against the Debtors. The Debtors'

17  bankruptcy cases are being jointly administered pursuant to an order of this Court entered

18  on November 13, 2008. On or about October 29, 2008, the Court entered an order

19  approving Alfred H. Siegel's appointment as the chapter 11 trustee.

20     The Parent Debtor is a holding company, established to fund the real estate

21  development projects owned by each of its four operating subsidiaries, *i.e.*, the Subsidiary

22  Debtors and LBREP/L-SunCal Patterson Ranch, LLC.[1] Ninety percent (90%) of the

23  Parent Debtor is owned by LBREP Lakeside SC Master I, LLC ("Lehman Lakeside"),

24  which is an affiliate of Lehman Bros. Real Estate Partners, LP ("LBREP").[2] The remaining

25  equity interests in the Parent Debtor are owned by SCC Ranch Ventures, LLC, which is

26

27  [1] By order entered on July 30, 2010, the Trustee abandoned the Parent Debtor's membership interest in LBREP/L-SunCal Patterson Ranch, LLC.

28  [2] Both LCPI and LBREP are affiliates of Lehman Brothers Holding, Inc.

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

an affiliate of SCC Acquisitions, Inc. d/b/a SunCal Companies. Lehman Lakeside is the

managing member of the Parent Debtor.

The Parent Debtor's primary asset, other than cash, is its interests in its operating

subsidiaries. The Parent Debtor is the sole equity member of the Subsidary Debtors,

each of which, in turn, owns a real estate development project bearing the same name

(each, a "Property" and collectively, the "Properties"). The Parent Debtor also has cash in

accounts with a current aggregate balance of over $13 million, which cash was formerly

held in a "Development Account" established under the LCPI loan documents.

As discussed in further detail below, LCPI, as administrative agent for the 1st Lien

Lenders, asserts a first priority lien against the Properties and the Parent Debtor's cash for

the full amount of the loans to the Parent Debtor and guaranteed by the Subsidiary

Debtors. The second-position secured lenders (the "2nd Lien Lenders") and the third-

position secured lenders (the "3rd Lien Lenders" and collectively with the 1st Lien Lenders

and the 2nd Lien Lenders, the "Lien Lenders") also assert liens against the Properties and

the Parent Debtor's cash. The Trustee estimates that there is approximately $60 million in

non-lender debt based upon the Debtors' schedules and claims filed in the cases.

**B.    Significant Post-Petition Events**

**1.    The LCPI Stay Relief Motions**

On October 2, 2008, LCPI filed four motions for relief from the automatic stay, one

in each individual case (the "LCPI Stay Relief Motions"), which were originally scheduled

for hearing on October 28, 2008. The Court continued the hearing to November 20, 2008,

to allow the Trustee an opportunity to analyze the motions and prepare a response, if

necessary, thereto. Both the Trustee and the Committee opposed the LCPI Stay Relief

Motions, in part, because they disputed the amount and validity of LCPI's security

interests. Following a hearing on October 28, 2008, the Court set the LCPI Stay Relief

Motions for an evidentiary hearing on February 6, 2009 (the "Evidentiary Hearing"). The

Court also set certain related deadlines to designate experts, file expert reports, and file

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

448323.2                                      4                    MOTION TO APPROVE COMPROMISE

1  trial briefs.  To prepare for the Evidentiary Hearing, the Trustee sought discovery from

2  LCPI and certain third parties.

3      The Trustee and LCPI entered into multiple stipulations to continue the Evidentiary

4  Hearing and extend the related deadlines, which were approved by the Court, and the

5  Evidentiary Hearing was ultimately continued to June 19, 2009.  However, in connection

6  with the prior settlement discussions between the Trustee and LCPI, the parties entered

7  into a stipulation to take the Evidentiary Hearing off calendar, and to suspend the related

8  deadlines and discovery, subject to the parties' rights to re-notice and/or reinstate the

9  same.  Absent a settlement, the Trustee expects that LCPI will ultimately re-notice the

10  Evidentiary Hearing and seek stay relief to foreclose on its interests in the Properties and

11  the Parent Debtor's cash.

12                    **2.      Trustee's Use of Cash Collateral**

13      During these cases, the Trustee has been authorized to use cash collateral on

14  substantially the same terms and conditions; solely to pay the expenses necessary to

15  preserve and maintain the value of the Properties and protect these estates from liability.

16  On a number of occasions, such as during the parties' prior settlement discussions, the

17  Trustee and LCPI stipulated to the use of cash collateral.  However, on other occasions,

18  the Trustee has been required to seek authorization to use cash collateral by motion.  In

19  all, the Trustee has filed seven motions for authority to use cash collateral, the majority of

20  which have been opposed by LCPI.

21      Unable to reach an agreement with LCPI regarding the use of cash collateral

22  beyond November 30, 2009 (due to the break down in negotiations related to the Original

23  Term Sheet), the Trustee filed motions for the use of cash collateral through December

24  31, 2009, March 31, 2010, and June, 30, 2010.  LCPI filed a limited objection to each

25  motion, and each motion was granted over LCPI's limited objection.  On May 27, 2010,

26  the Trustee filed a motion for authority to use cash collateral through and including

27  September 30, 2010.  LCPI filed an opposition to the motion.  On June 17, 2010, the

28  Court heard and granted the motion over LCPI's opposition.  On June 25, 2010, the Court

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, CA 92626
Tel 714-966-1000  Fax 714-966-1002

1   entered an *Order Granting Motion for Order Authorizing Use of Cash Collateral Through*

2   *September 30, 2010* (the "Cash Collateral Order").  On July 9, 2010, LCPI filed a notice of

3   appeal of the Cash Collateral Order (the "Appeal").  In light of the Amended Term Sheet,

4   the Trustee and LCPI are currently preparing a stipulation to stay the Appeal until March

5   31, 2011.  If the Amended Term Sheet is approved by this Court and the New York

6   Bankruptcy Court, then the Appeal will be dismissed.

7          As discussed in further detail below, under the Amended Term Sheet, the Trustee

8   will receive $2.0 million in cash collateral solely to maintain and preserve the Properties,

9   thereby avoiding further cash collateral disputes and the Appeal.  The Trustee will also

10  receive $3.7 million, which will enable the Trustee to fully administer these estates, as

11  opposed to only to preserve and maintain the Properties.

12                 **3.      The First Compromise Motion**

13         On October 9, 2009, after months of negotiations, the Trustee filed a motion (the

14  "First Compromise Motion") to approve the Original Term Sheet.  The First Compromise

15  Motion was, for various reasons, opposed by multiple third parties.  The First Compromise

16  Motion was initially heard on November 3, 2009.  This Court continued the hearing on the

17  First Compromise Motion to December 17, 2009.  On November 25, 2009, the Trustee

18  filed an *ex parte* motion to further continue the hearing on the First Compromise Motion

19  for 30-45 days to allow the Trustee an opportunity to resolve the objections to the First

20  Compromise Motion.  On December 2, 2009, the California Bankruptcy Court entered an

21  order granting the Trustee's *ex parte* motion and continuing the hearing on the First

22  Compromise Motion to February 2, 2010.

23         Certain of the issues raised by the parties opposing the First Compromise Motion

24  highlighted an ambiguity in the Original Term Sheet, the interpretation of which resulted in

25  a dispute between the settling parties.  More specifically, the Original Term Sheet required

26  that the Trustee attempt to settle and obtain a release of any mechanic's liens determined

27  to be senior to the liens of LCPI (the "Senior Liens") using LCPI's title insurance and $1.5

28  million of cash collateral set aside for that purpose (the "Senior Lien Reserve Fund").  If all

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

1    the Senior Liens were released, then the Trustee could retain any unused portion of the

2    Senior Lien Reserve Fund.  However, based on the structure of the Original Term Sheet,

3    the title insurance company, Fidelity National Title Insurance Company ("Fidelity"),

4    objected to the First Compromise Motion arguing that it could potentially deny coverage.

5    If Fidelity was correct, the title insurance could not be used to settle any Senior Liens,

6    leaving only the $1.5 million Senior Lien Reserve Fund to resolve the Senior Liens.

7         The dispute between the Trustee and the Committee, on one hand, and LCPI, on

8    the other hand, arose regarding the impact on the Original Term Sheet, if any Senior

9    Liens were not released.  LCPI took the position that the Trustee was entitled to only the

10   $3 million set aside to pay administrative expenses, and that LCPI could foreclose on the

11   Properties.  The Trustee and the Committee, in contrast, believed that, under such

12   circumstances, other benefits under the Original Term Sheet, *e.g.*, the "Trade Creditor

13   Allocation" and the "Trustee's Participation," would remain in tact.  The Trustee, the

14   Committee, and LCPI attempted to resolve the dispute regarding the interpretation of the

15   Original Term Sheet, and the hearing on the First Compromise Motion was continued on

16   multiple occasions to give the parties an opportunity to reach a consensual resolution.

17   However, the parties were unable to resolve their differences.  As a result, on January 25,

18   2010, the Trustee filed a notice of withdrawal of the First Compromise Motion.  By letter

19   dated March 30, 2010, LCPI notified the Trustee of its termination of the proposed

20   settlement.

21        **4.    The Trustee's Stay Relief Motion**

22        Following the break down in negotiations with LCPI, the Trustee began diligently

23   pursuing other alternatives.  The Trustee decided to sell the Properties free and clear of

24   liens and other interests, subject to overbid, and to pursue the estates' claims against

25   LCPI and the other 1st Lien Lenders and certain of LCPI's affiliates.  The Trustee selected

26

27

28

Smiley, Wang Ekvall & Strok, LLP
Welland, Golden,
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1   a broker, whose retention is subject to Court approval,[3] to market and sell the Properties.

2   The Trustee received multiple letters of intent to purchase the Properties, and the Trustee

3   entered into an asset purchase agreement with a prospective buyer, subject to Court

4   approval.  The Trustee also began preparing a motion to authorize the sale of the

5   Properties free and clear of liens and other interests, for approval of overbid procedures,

6   to deny credit bid rights, and for certain related relief.  However, in light of the ruling of the

7   Bankruptcy Appellate Panel of the Ninth Circuit in *In re Palmdale Hills Property,*

8   *LLC*, 2009 WL 5812119 (B.A.P. 9th Cir. 2009), before further pursuing the sale of the

9   Properties, the Trustee decided to seek stay relief in LCPI's bankruptcy case pending

10  before the New York Bankruptcy Court.[4]

11      On June 17, 2010, the Trustee filed a motion in the New York Bankruptcy Court for

12  relief from the automatic stay (the "Trustee's Stay Relief Motion") to, among other things,

13  sell the Properties free and clear of liens, including the asserted lien of LCPI, and to deny

14  LCPI's credit bid rights.  LCPI filed an opposition to the Trustee's Stay Relief Motion.  The

15  Trustee's Stay Relief Motion was initially heard on July 14, 2010.  The New York

16  Bankruptcy Court continued the hearing on the Trustee's Stay Relief Motion to August 18,

17  2010, and strongly suggested to the Trustee, the Committee, and LCPI that they focus

18  their attention on attempting to resolve their differences as opposed to planning for

19  expensive and protracted litigation.  As suggested by the New York Bankruptcy Court, the

20  parties engaged in further settlement discussions following the hearing and were able to

21  resolve their disputes concerning the Original Term Sheet.  At the continued hearing on

22  August 18, 2010, the parties advised the New York Bankruptcy Court of the Amended

23  Term Sheet.  At the request of the parties, the New York Bankruptcy Court continued the

24

25  [3]   On June 16, 2010, the Trustee filed an application to employ the broker he selected, Madison
    Partners.  The hearing on the application to employ Madison Partners was initially held on August 3, 2010,
    and was continued to September 16, 2010.

26  [4]   On September 15, 2008, Lehman Brothers Holdings Inc. ("LBHI") filed a voluntary petition under
    chapter 11 of the Bankruptcy Code in the New York Bankruptcy Court.  Subsequently, 22 affiliates of LBHI,
27  including LCPI, filed voluntary petitions under chapter 11 of the Bankruptcy Code.  The bankruptcy cases of
    LBHI, LCPI and the 21 remaining affiliates of LBHI are being jointly administered under the lead case of
28  LBHI, Case No. 08-13555 (JMP).  Lehman Lakeside is not a debtor.

1 hearing on the Trustee's Stay Relief Motion to September 22, 2010, to allow LCPI to file a

2 motion to approve the Amended Term Sheet to be heard on that same date.  On

3 September 2, 2010, LCPI filed its motion to approve the Amended Term Sheet to be

4 heard on September 22, 2010.

5 **C.    Pre-Petition Events Giving Rise to Claims Against LCPI**

6 The Trustee and his professionals have analyzed the pre-petition transactions

7 between LCPI and the Debtors.  The Trustee determined that the estates hold certain

8 potential claims against LCPI and the 1st Lien Lenders.  The following is a summary of the

9 relevant facts giving rise to the estates' potential claims.  LCPI has indicated that it

10 strongly disputes each of Trustee's claims and assertions.

11 **1.    The First and Second Lien Credit Agreement**

12 The Parent Debtor, as borrower, entered into three Lien Credit Agreements with

13 LCPI (collectively, the "Lien Credit Agreements").  Pursuant to the First and Second Lien

14 Credit Agreements, which were entered into on or around January 19, 2006, the Parent

15 Debtor borrowed a total of $320 million (collectively, the "January 2006 Loans") as follows:

16 (1) a revolving credit facility of $75 million and term loan facility of $160 million under the

17 First Lien Credit Agreement; and (2) a $85 million term loan facility under the Second Lien

18 Credit Agreement.  The Parent Debtor's obligations under First and Second Lien Credit

19 Agreements were guaranteed by the Subsidiary Debtors, and these upstream guaranties

20 were secured by first and second liens against the Properties.  The Subsidiary Debtors

21 also contributed approximately $45 million to repay the existing financing secured by the

22 Properties.  LCPI was a lender under the January 2006 Loans, and acted as the sole

23 administrative agent, and Lehman Brothers, Inc. ("Lehman Brothers"), served as the

24 advisor, sole lead arranger and syndication agent.  Later, Gramercy Warehouse Funding

25 I, LLC, replaced LCPI as the administrative agent under the Second Lien Credit

26 Agreement.

27 Although the Debtors incurred secured debt totaling $320 million, a significant

28 portion of proceeds from the January 2006 Loans was not available to the Debtors for

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1   operations and the development of the Properties.  Specifically, pursuant to the First Lien

2   Credit Agreement, the sum of $144 million was paid directly from escrow to the Parent

3   Debtor's equity owners (the "Dividend").  The sum of $10.6 million was paid from escrow

4   to LCPI for its arrangement and administration fee.  Approximately $62 million was

5   disbursed to Lehman Ali, Inc., to repay previous loans to the Subsidiary Debtors.

6   Approximately $25 million was immediately set aside to fund a "Development Account,"

7   which the Debtors were not permitted to use, but served as the lenders' collateral.

8       **2.**    **The Third Lien Credit Agreement**

9       On February 6, 2007, a Third Lien Credit Agreement was entered into by the

10  Parent Debtor, which provided for an additional $75 million term loan (the "February 2007

11  Loan," collectively with the January 2006 Loans, the "Loans"), guaranteed again by the

12  Subsidiary Debtors and secured by third priority liens against the Properties.  From the

13  $75 million loaned to the Parent Debtor under the Third Lien Credit Agreement, $50

14  million was paid out of escrow directly to LCPI to pay down the obligations under the First

15  Lien Credit Agreement.  Just as with the January 2006 Loans, LCPI was a lender and

16  served as the administrative agent, and Lehman Brothers served as advisor, sole

17  arranger and syndication agent.  Square Mile Structured Debt (One), LLC, and Square

18  Mile Structured Debt (Two), LLC, collectively, replaced LCPI as the administrative agent

19  under the Third Lien Credit Agreements.

20      **3.**    **The Debtors' Alleged Defaults Under The Lien Credit**

21          **Agreements**

22      Pursuant to a Fourth Amendment and Waiver to the First Lien Credit Agreement

23  dated January 31, 2008 (the "Amendment"), the Parent Debtor was required to increase

24  the cash in the Development Account from $25 million to $50 million within 60 days (*i.e.*,

25  by March 31, 2008).  However, the Parent Debtor was unable to increase the amount of

26  funds deposited in the Development Account and, as result, on March 31, 2008, LCPI

27  declared a default.  LCPI also declared defaults because: (a) the Debtors missed an

28  interest payment; (b) the Debtors failed to timely deliver financial statements; and (c) the

1 Debtors failed to pay a $100,000 administrative fee and maintain the necessary liquidity

2 requirements. Based on the alleged defaults, LCPI commenced non-judicial foreclosure

3 proceedings, which were stayed by the commencement of these cases. Trustee believes

4 that each of the defaults declared by LCPI were arguably caused by LCPI's conduct or

5 were within the control of its affiliate, Lehman Lakeside. LCPI strongly disputes this and

6 points to the Lien Credit Agreements, which it asserts were negotiated at arms-length.

7         The foregoing alleged facts were derived from the Lien Credit Agreements and

8 related documents, the closing statement for the January 2006 Loans, and certain other

9 financial information, reports, and documents produced or made available to the Trustee

10 and his counsel. Based on the facts outlined above, the Trustee and the Committee

11 believe that the estates may have the following claims against LCPI and/or the 1st Lien

12 Lenders  (collectively, the "Estate Claims"): (1) equitably subordinate the claims of LCPI

13 and 1st Lien Lenders and cause the liens securing their claims to be transferred to the

14 estates; (2) avoid the security interests held by LCPI and the 1st Lien Lenders against the

15 Properties as fraudulent transfers and preserve those security interests for the benefit of

16 the estates; and (3) recover damages against LCPI for lender liability. The estates'

17 alleged claims against LCPI and the 1st Lien Lenders are more fully set out in the

18 Trustee's opposition to the LCPI Stay Relief Motions, a true and correct copy of which is

19 attached hereto as Exhibit "2."

20         As discussed below, LCPI vigorously disputes the Trustee's allegations and

21 believes that it will prevail on any action on the Estate Claims. LCPI further believes that

22 the Trustee cannot sell the Properties as proposed over its objection and that it will also

23 prevail on the LCPI Stay Relief Motions to foreclose on all real and personal property of

24 the estates, which serves as LCPI's collateral.

25

26 III.    **PROPOSED SETTLEMENT**

27         In an effort to avoid the cost and uncertainty associated with litigating the Estate

28 Claims, the LCPI Stay Relief Motions, the Trustee's Stay Relief Motion, and the disputes

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1 between the parties related to the use of cash collateral and the sale of the Properties, the

2 Trustee, the Committee and LCPI negotiated the Amended Term Sheet.[5] The material

3 terms of the Amended Term Sheet are as follows:

4      1.      **Allowance of LCPI Claim.**  Upon the Settlement Effective Date,[6] the claim of

5 the 1st Lien Lenders, for which LCPI serves as the administrative agent, will be allowed in

6 each of the Debtor's bankruptcy cases in the aggregate amount of $230,006,233.98, plus

7 accrued and unpaid interest through the petition date and legal fees.  (*See* Ex. 1 at ¶ B.)

8 The 1st Lien Lenders' claim shall be allowed as a secured claim in the amount of the

9 aggregate final credit or third-party bid for the Properties as discussed below, plus any

10 cash collateral received by the 1st Lien Lenders on the Settlement Effective Date, and less

11 the amount of cash paid by the 1st Lien Lenders following the Settlement Effective Date to

12 fund the reasonable and necessary expenses to preserve and maintain the Properties

13 pursuant to paragraph H of the Amended Term Sheet.  The remaining amount of the 1st

14 Lien Lenders' claim will be deemed an allowed general unsecured claim against each of

15 the Debtors. (*See* Ex. 1 at ¶¶ B, F.)

16      2.      Distributions on Settlement Effective Date.

17           a.      Distribution of the Development Account Funds.  The Trustee will

18 retain $5.5 million from the funds originally held in the Development Account (the

19 "Development Account Funds").  Of this amount: (a) $3.5 million (the "Administrative

20 Funds") will be available for the administrative expenses of the estates and for potential

21 distribution to non-lender general unsecured creditors; and (b) $2.0 million (the

22 "Remaining Development Funds") will be retained to pay the operating expenses of the

23 Properties pursuant to an approved budget.  The balance of the Development Account

24 Funds (net of the $5.5 million retained by Trustee) will be transferred to the 1st Lien

25

26      [5]    If there is a conflict between the summary of the compromise set forth in this Motion and the
Amended Term Sheet, the provisions of the Amended Term Sheet shall control.

27      [6]    The Amended Term Sheet contemplates that it will be approved by both this Court and the New
York Bankruptcy Court.  The Settlement Effective Date is the date that the last of the compromise orders
28 becomes a "Final Order" (as defined in the Amended Term Sheet).

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

Case 8:08-bk-15588-ES   Doc 48   Filed 09/21/10   Entered 09/24/10 18:47:57   Exhibit C
Part 17   Page 16 of 46

1  Lenders, and will be included in the calculation of the 1st Lien Lenders' allowed secured

2  claim. (*See* Ex. 1 at ¶ C.1.)  If the Remaining Development Funds are not sufficient, the

3  1st Lien Lenders have agreed, subject to certain conditions and limitations, to the further

4  use of cash collateral to preserve the Properties. (*See* Ex. 1 at ¶ H.)

5         b.   <u>Allocation of the Yucaipa Funds.</u>  The funds currently on deposit with

6  the Yucaipa Valley Water District and paid to the Trustee pursuant to that certain

7  Settlement Agreement and Release Agreement (the "Yucaipa Settlement Agreement")

8  between the Trustee and Oak Valley Partners, L.P. (the "Yucaipa Funds"), will be split

9  50/50 between the Trustee and the 1st Lien Lenders.[7]  The Trustee's 50% portion of the

10  Yucaipa Funds (the "Trustee's YFP") shall be retained by the Trustee free and clear of

11  liens, claims, interests, and encumbrances.  The Trustee's YFP shall constitute additional

12  Administrative Funds and shall be immediately available for use in the administration of

13  the Debtors' cases. (*See* Ex. 1 at ¶ C.2.)

14         3.   <u>Sale of Properties Under the Plan.</u>  The Properties will be sold pursuant to a

15  plan under 11 U.S.C. § 1123(a)(5)(D) in accordance with bidding procedures to be

16  developed by the parties in consultation with a broker of their choosing (the "Approved

17  Broker") and approved by this Court. (*See* Ex. 1 at ¶ E.)  The 1st Lien Lenders shall be

18  entitled to credit bid for the Properties.  The initial credit bid by the 1st Lien Lenders shall

19  be in the aggregate amount of at least $45 million (the "Aggregate Minimum Credit Bid

20  Amount") and the 1st Lien Lenders' credit bid shall not exceed the maximum credit bid

21  amount established by the parties prior to the Settlement Effective Date (the "Aggregate

22  Maximum Credit Bid Amount").  The Aggregate Maximum Credit Bid Amount and the

23  Aggregate Minimum Credit Bid Amount shall be allocated among the Properties by the

24  parties in consultation with the Approved Broker prior to the Settlement Effective Date.

25  Properties sold to the 1st Lien Lenders by way of credit bid shall be sold subject to any

26  _____

27     [7]   On August 13, 2010, the Trustee filed a motion to approve the Yucaipa Settlement Agreement,
which will be heard on September 30, 2010.  If the Yucaipa Settlement Agreement is approved, the Trustee

28  expects to receive $434,000, of which 50% will be paid over to LCPI pursuant to the Amended Term Sheet.

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

1   "Senior Liens" (defined below).  Properties sold to a third party shall be sold free and clear

2   of any liens, claims, encumbrances, or interests (other than certain permitted liens, claims,

3   encumbrances or interests), with such liens, claims, encumbrances, or interests (including

4   the liens of the 1st Lien Lenders) to attach to the sale proceeds.  (*See* Ex. 1 at ¶¶ E, F.)

5       4.      Resolution of Senior Liens.  The Trustee shall reasonably cooperate with the

6   1st Lien Lenders in their efforts to determine whether any liens are superior to the liens of

7   the 1st Lien Lenders against the Properties and to determine the amount of such superior

8   liens (the "Senior Liens").  However, the Trustee shall not be obligated to take any action

9   that would cause the Trustee or the Debtors' bankruptcy estates to incur material cost or

10  liability.[8]  (*See* Ex. 1 at ¶ J.)

11      5.      Distributions Pursuant to the Plan.

12          a.      Distributions of Other Recoveries.  The plan will provide that all

13  proceeds recovered from sources other than the sale of the Properties or the Yucaipa

14  Funds (*e.g.*, from fraudulent transfer litigation) ("Other Recoveries"), subject to the

15  payment of administrative and priority unsecured claims, will be split 50/50 between the 1st

16  Lien Lenders, on the one hand, and the holders of allowed claims other than the 1st, 2nd

17  and 3rd Lien Lenders (collectively, the "Trade Creditors") (on an administratively

18  consolidated pro rata basis), on the other hand, until the Trade Creditors are paid in full

19  (the "50/50 Distribution Scheme").  If, under the Amended and Restated Intercreditor

20  Agreement among the 1st, 2nd and 3rd Lien Lenders (the "Intercreditor Agreement"), Other

21  Recoveries paid to the 2nd and 3rd Lien Lenders must be paid to the 1st Lien Lenders, then

22  the Other Recoveries shall be split 50/50 between the 1st Lien Lenders and the Trade

23

24

25

26

---

27  [8]   This provision is a substantial departure from the Original Term Sheet.  As discussed above, under
    the Original Term Sheet, $1.5 million of the Development Funds was to be set aside for the Trustee to use
    to determine the existence and amount of any Senior Liens and to settle or otherwise obtain a release of

28  such liens.

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

1  Creditors.[9]  If, on the other hand, the Intercreditor Agreement does not require that the 2nd

2  and 3rd Lien Lenders pay Other Recoveries to the 1st Lien Lenders, then the allowed

3  unsecured claims of the 1st Lien Lenders, and, to the extent necessary, the allowed

4  unsecured claims of LCPI, as a 2nd Lien Lender and as a 3rd Lien Lender,[10] shall be

5  assigned to the Debtors' bankruptcy estates on behalf of the Trade Creditors to provide

6  the Trade Creditors with the equivalent of what they would have received under the 50/50

7  Distribution Scheme.[11]  (*See* Ex. 1 at ¶ Q.)

8      b.    Trustee's Participation in the Proceeds.  The Trustee shall be entitled

9  to recover the lesser of (i) the amount necessary to pay the allowed claims of the Trade

10 Creditors, and (ii) 3.5% of the Proceeds (defined below) from the sale of the Properties to

11 a third party through the plan or, if the 1st Lien Lenders acquire the Properties through the

12 plan by way of a credit bid, then from the Proceeds from the subsequent disposition of the

13 Properties by the 1st Lien Lenders (the "Trustee's Participation").  "Proceeds" means all

14 cash or other proceeds from the disposition of each Property, less (i) customary and

15 reasonable costs and expenses of sale, and (ii) the cash or other property used to satisfy

16 any Senior Liens not otherwise satisfied under the plan or the 1st Lien Lenders' title

17

18

19

20

---

21  [9]    A true and correct copy of the Intercreditor Agreement is attached hereto as Exhibit "3."  The Intercreditor Agreement provides that any payments to the 2nd Lien Lenders and the 3rd Lien Lenders must

22  be paid over to the 1st Lien Lenders, until the 1st Lien Lenders are paid in full.  (*See* Ex. 2 at §§ 2.1, 4.2.)  The Intercreditor Agreement also provides that the 2nd and 3rd Lien Lenders cannot benefit from avoidance

23  of the 1st Lien Lender's lien, rather, any proceeds received by the 2nd and 3rd Lien Lenders as a result of the avoidance must be paid over to the 1st Lien Lenders.  (*See id.* at § 6.5.)  The 2nd and 3rd Lien Lenders are

24  not prejudiced by the 50/50 Distribution Scheme because the cash disbursed to the estates would have otherwise been paid to the 1st Lien Lenders as required by the Intercreditor Agreement.  The Trustee is not

25  requesting that the Court make a determination as to the Lien Lenders' rights under the Intercreditor Agreement at this time.

26  [10]   LCPI owns approximately 30% of the first lien debt, approximately 15% of the second lien debt, and approximately 65% of the third lien debt.

27  [11]   Under this alternative, the estates will receive up to 100% of the *pro rata* distribution to the 1st Lien Lenders and LCPI through an assignment of their unsecured claims in order to provide the estates with 50% of the total recovery.  Under either alternative, the 2nd and 3rd Lien Lenders will receive what they are

28  otherwise entitled to receive under the Intercreditor Agreement.

1 insurance policy.[12] The Trustee's Participation shall be immediately due and payable

2 upon the 1st Lien Lenders receipt of the Proceeds. (*See* Ex. 1 at ¶ R.)

3        6.    Trustee Loss Collateral. On the Settlement Effective Date, LCPI on behalf

4 of the 1st Lien Lenders will deliver to the Trustee cash or irrevocable letters of credit

5 acceptable to the Trustee in the aggregate amount of $500,000 (the "Trustee Loss

6 Collateral"). The Trustee Loss Collateral will be used to cover proven losses that occur

7 during the period from the Settlement Effective Date to the date of transfer of title to the

8 Properties (the "Trustee Maintenance Period") based on claims of simple negligence or

9 strict liability in connection with the ownership, operation, maintenance and management

10 of the Properties, to the extent such losses are not covered by insurance and subject to a

11 formula set forth in section G of the Term Sheet. Upon a termination event or the effective

12 date of the plan, Trustee will deliver any remaining Trustee Loss Collateral to LCPI. (*See*

13 Ex. 1 at ¶ G.)

14        7.    Releases. On the Settlement Effective Date, the Trustee shall be deemed to

15 have released the 1st Lien Lenders and LCPI (in its individual capacity and as

16 administrative agent for the 1st Lien Lenders), and, except those entities specifically

17 carved out below, their respective affiliated parties, officers, directors, employees, agents

18 and attorneys, and the 1st Lien Lenders and LCPI (in its individual capacity and as

19 administrative agent for the 1st Lien Lenders) shall be deemed to have released the

20 Debtors' estates and the Trustee and the Trustee's agents and attorneys, in each case for

21 and from all claims (as defined in § 101(5) of the Bankruptcy Code and including any

22 claims that could be brought by or against the Trustee pursuant to the Bankruptcy Code)

23 other than the rights and benefits granted and preserved under the Amended Term Sheet,

24 including, without limitation, the allowed claims set forth in the Amended Term Sheet and

25 the rights to receive distributions based on those allowed claims. The Amended Term

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

---

26

27 [12]   To resolve the parties' dispute concerning the Original Term Sheet, the parties revised the term sheet to make clear that the release of any and all Senior Liens is not a condition to the compromise. Instead, to the extent any Senior Liens are not released, the amount paid to resolve such Senior Liens will

28 be deducted from the Proceeds prior to the calculation of the Trustee's Participation.

1   Sheet does not include a release of any claims or causes of action against any third

2   parties other than the 1st Lien Lenders and LCPI and their respective affiliated parties,

3   officers, directors, employees, agents and attorneys, and specifically does not include a

4   release of Lehman Lakeside, SCC Ranch Ventures, LLC, SCC Acquisitions, Inc., or SCC

5   Acquisitions, LLC, or any claims related to the acts of the owners of any of the Debtors

6   including any transfers of funds by any of the owners of any of the Debtors.  If the

7   Settlement Effective Date does not occur for any reason, the foregoing releases will be of

8   no force or effect.  (See Ex. at ¶ K.)

9       8.     Termination Event.  If a final order confirming the plan is not in effect by

10  February 28, 2011 (or such later date as may be agreed upon by the Trustee, LCPI, and

11  the Committee), then: (a) the 1st Lien Lenders will be granted relief from the automatic

12  stay to immediately foreclose on the Properties, and Trustee (and any party claiming by or

13  through any of the Debtors) shall be prohibited from interfering with such foreclosure; (b)

14  Trustee will retain the Administrative Funds and the Trustee's YFP free from the secured

15  claims of the Lien Lenders; (c) the 1st Lien Lenders will retain the balance of the

16  Development Account Funds; and (d) Trustee shall immediately pay over to the 1st Lien

17  Lenders the unused portion of the Remaining Development Funds, and the Trustee Loss

18  Collateral free of all claims and interests.  (See Ex. 1 at ¶ T.)

19

20  **IV.   LEGAL ANALYSIS**

21      Federal Rule of Bankruptcy Procedure ("Rule") 9019(a) provides:

22          On motion by the trustee and after notice and a hearing, the
            court may approve a compromise or settlement.  Notice shall

23          be given to creditors, the United States trustee, the debtor, and
            indenture trustees as provided in Rule 2002 and to any other

24          entity as the court may direct.

25  Fed. R. Bankr. P. 9019(a).

26      "The bankruptcy court has great latitude in approving compromising agreements."

27  See In re A & C Props., 784 F.2d 1377, 1380-81 (9th Cir. 1986).  In approving a

28

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

1    settlement agreement, the court must find that it is fair and equitable, and the product of

2    good faith negotiations.  *See id.*  To this end, the court must consider the following criteria:

3              (a) the probability of success in the litigation; (b) the difficulties,
               if any, to be encountered in the matter of collection; (c) the
4              complexity of the litigation involved, and the expense,
               inconvenience and delay necessarily attending it; (d) the
5              paramount interest of the creditors and a proper deference to
               their reasonable views in the premises.

6    *Id.*

7         Generally speaking, the court may defer to a trustee's business judgment in

8    deciding whether to settle a matter.  *See In re Mickey Thompson Entertainment Group,*

9    *Inc.,* 292 B.R. 415, 420 (B.A.P. 9th Cir. 2003).  The court need not conclude that the

10   proposed settlement is the best possible compromise, but only that the settlement is

11   "within the reasonable range of litigation possibilities."  *See In re World Health*

12   *Alternatives, Inc.,* 344 B.R. 291, 296 (Bankr. D. Del. 2006).  Similarly, the court need not,

13   and should not conduct a "mini-trial" on the compromised claims but simply determine that

14   disputes related to those claims exist.  *See In re Schmitt,* 215 B.R. 417, 423 (B.A.P. 9th

15   Cir. 1997) ("When assessing a compromise, courts need not rule upon disputed facts and

16   questions of law, but rather only canvass the issues. A mini trial on the merits is not

17   required.");  *see also In re Hermitage Inn, Inc.,* 66 B.R. 71, 72 (Bankr. D. Colo. 1986)

18   ("[T]he court's assessment does not require resolution of the issues, but only their

19   identification, so that the reasonableness of the settlement may be evaluated.").  It is

20   enough that the court conclude the probability of success is uncertain.  *See, e.g., In re*

21   *America West Airlines, Inc.,* 214 B.R. 382, 386 (Bankr. D. Ariz. 1997).

22        **A.    The Probability of Success in The Litigation**

23        Approval of the Amended Term Sheet will resolve all of the existing disputes

24   between the parties.  The Amended Term Sheet resolves the Estate Claims as well as the

25   LCPI Stay Relief Motion, the Trustee's Stay Relief Motion, and the disputes between the

26   parties related to the use of cash collateral and the sale of the Properties.  Absent the

27   proposed settlement, the Trustee would continue his attempts to liquidate the Properties

28   and distribute the proceeds and other the cash on hand to the unsecured trade creditors;

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1002   Fax 714-966-1002

1   however, to do so, the Trustee would have to prevail on a number of disputes with LCPI

2   as follows:

3   • The Trustee would first have to succeed on the Trustee's Stay Relief Motion

4   before the New York Bankruptcy Court to *attempt* to sell the Properties free and

5   clear of LCPI's liens, deny LCPI's credit bid rights, and to pursue the Estate

6   Claims;

7   • The Trustee would have to succeed on a motion before this Court to sell the

8   Properties free and clear of liens, with such liens to attach to the sale proceeds

9   pending the resolution of the Estate Claims, and to deny the right of LCPI and

10   the 1st Lien Lenders to credit bid;

11   • To distribute the sale proceeds to general unsecured creditors, the Trustee

12   would have to succeed on the Estate Claims to avoid the liens of LCPI and the

13   1st Lien Lenders and to preserve such liens for the benefit of the estates, and to

14   equitably subordinate the claims of LCPI and the 1st Lien Lenders; and

15   • Pending the proposed sale of the Properties, the Trustee would have to

16   succeed in defending against the LCPI Stay Relief Motions, and would have to

17   prevail on the Appeal and continue to obtain authority to use cash collateral to

18   preserve and maintain the Properties over LCPI's objection.

19   The Trustee and his professionals have evaluated the pre-petition transactions

20   between the Debtors and LCPI by reviewing and analyzing the loan and security

21   documents, closing statements, and financial reports surrounding those transactions. The

22   Trustee's counsel and counsel for the Committee have also conducted significant legal

23   research regarding the Estate Claims. The Trustee believes that the Estate Claims have

24   merit and that he can otherwise succeed in the proceedings discussed above. However,

25   the Trustee recognizes that litigation has risk and that he may not prevail. The Trustee's

26   success on the Estate Claims and in each of the above-referenced proceedings will

27   require the resolution of a number of legal and factual issues by this Court, all of which are

28   disputed by LCPI and the 1st Lien Lenders.

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 Fax 714-966-1002

1     LCPI and the 1st Lien Lenders vigorously dispute the Estate Claims. LCPI disputed

2  a number of the Trustee's allegations in connection with the LCPI Stay Relief Motions and,

3  more recently, in opposition to the Trustee's Stay Relief Motion. For example, with

4  respect to the estates' equitable subordination claim, disputes exist regarding the

5  relationship between LCPI and Lehman Lakeside, whether LCPI's pre-petition conduct

6  was inequitable or otherwise actionable and whether such conduct, even if found

7  inequitable, is attributable to the other 1st Lien Lenders. With respect to the estates'

8  fraudulent conveyance claim, disputes exist as to whether the Debtors were insolvent or

9  undercapitalized at the time or because of the Loans and the related transfers and

10  encumbrances.[13] LCPI asserts that, at minimum, the Lien Lenders undisputedly

11  advanced to the Debtors more than the current value of the Properties, and, therefore, the

12  Lien Lenders hold unavoidable liens in an amount that exceeds the value of the

13  Properties. In light of the issues raised by LCPI, the likelihood that the Trustee will

14  succeed on the Estate Claims is, at best, uncertain.[14]

15     For the Estate Claims to have value the Trustee must also succeed in defending

16  against the LCPI Stay Relief Motions. As LCPI is a debtor in its own bankruptcy case, any

17  redress for LCPI's alleged misconduct (and, thus, the repayment of creditors) would likely

18  have to come from the cash on hand or the value in the Properties (as opposed to the

19  payment of money damages), which is not possible if LCPI obtains stay relief and is able

20  to foreclose. In opposition to the LCPI Stay Relief Motions, the Trustee argued that,

21  among other things, that stay relief was not appropriate because the amount and validity

22

23    [13]  LCPI and the 1st Lien Lenders contend, and have contended, that the Debtors' inability to satisfy its
creditors is the result of the collapse of the credit market generally and the real estate market in southern
24  California in particular, all of which and the severity of which could not have been reasonably contemplated
when the Loans were made. LCPI and the 1st Lien Lenders contend that there was nothing inequitable in
25  connection with the loan transactions which were governed and controlled by the loan agreements between
the parties. Accordingly, LCPI and the 1st Lien Lenders contend that the overriding predicate of the estates'
potential claims simply cannot be true: at the time the Loans were made, the Debtors were not insolvent and
26  were not unreasonably capitalized.

27    [14]  Moreover, LCPI asserts that, even if the Trustee is successful in avoiding the Lien Lenders' liens,
absent equitable subordination, their unsecured claims would account for more than 85% of the general
unsecured creditor body, and would receive the overwhelming majority of any funds distributed to unsecured
28  creditors.

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel: 714-966-1000 Fax: 714-966-1002

1  of LCPI's secured claims were in dispute.  However, the Court could conclude that,

2  assuming the Trustee has viable claims against LCPI, such claims should not be

3  considered in the context of stay relief proceedings and could grant the LCPI Stay Relief

4  Motions, which would render the estates' equitable subordination and avoidance claims

5  meaningless and without value to the estates.

6  Uncertainty also exists regarding the Trustee's ability to sell the Properties to a third

7  party free and clear of liens.  To succeed on a motion to sell the Properties free and clear

8  of the 1st Lien Lenders' liens and deny the 1st Lien Lenders' credit bid rights, the Trustee

9  would likely have to demonstrate that the liens of LCPI and the 1st Lien Lenders are

10  subject to a bona fide dispute.  Again, LCPI disputes the Trustee's allegations, and the

11  likelihood the Trustee will succeed in proving that a bona fide dispute exists is uncertain.

12  Moreover, the Trustee must succeed on his stay relief motion before the New York

13  Bankruptcy Court prior to attempting to sell the Properties free and clear of LCPI's liens or

14  denying LCPI's credit bid rights, or the Debtors' estates could be subject to sanctions for

15  the willful violation of the automatic stay.  Based on the initial hearing on the Trustee's

16  Stay Relief Motion, it is far from clear how the New York Bankruptcy Court will ultimately

17  rule in the absence of a settlement.  (*See* Ex. 4, the transcript of the July 14, 2010 hearing

18  on the Trustee's Stay Relief Motion.)  If the New York Bankruptcy Court denies the

19  Trustee's Stay Relief Motion, which is a possibility, the administration of the Debtors'

20  estates will be paralyzed.

21  In short, the likelihood that the Trustee will succeed on the Estate Claims, and in

22  selling the Properties and defending the LCPI Stay Relief Motions is uncertain.  The

23  Trustee must prevail on a number of disputed issues of fact and law, which this Court has

24  yet to resolve, and succeed in obtaining stay relief in another forum.  Accordingly, this

25  factor supports approval of the Amended Term Sheet.

26  **B.**  **The Difficulties to be Encountered in The Matter of Collection**

27  The Trustee will likely be unable to collect money damages from LCPI.  LCPI is a

28  debtor in its own bankruptcy case.  Thus, even if the Trustee obtains a judgment against

1  LCPI, it will simply result in an unsecured claim, and he may be able to recover only a

2  small portion, if any, of the amount awarded.  To the extent that the Trustee seeks to

3  subordinate the 1st Lien Lenders secured claim or avoid the 1st Lien Lenders' liens,

4  collectability is not an issue.  However, if LCPI obtains stay relief, the estates' equitable

5  subordination and avoidance claims would essentially be meaningless, and the Trustee

6  will be unable to recover any value for the estates on account of the Estate Claims.  The

7  likelihood that LCPI will obtain stay relief is greater if the Trustee is not able to prevail on

8  the Trustee's Stay Relief Motion as necessary to move these cases forward or if LCPI is

9  able to prevent the use of cash collateral to preserve the value of the Properties.  Thus,

10  the Trustee faces difficulties in both collecting money damages from LCPI and preserving

11  the claims to recover value from the 1st Lien Lenders' collateral for the benefit of the

12  estates.  Accordingly, this factor supports approval of the Amended Term Sheet.

13  ### C.    The Complexity, Expense, Inconvenience, and Delay

14        It cannot be disputed that approval of the Amended Term Sheet will avoid costly

15  and protracted litigation between the estates and the 1st Lien Lenders.  The Estate Claims

16  will be difficult to prove and expensive to litigate.  The claims against LCPI and the 1st Lien

17  Lenders involve numerous complex and disputed issues of fact and law surrounding the

18  loan transactions between the Debtors and LCPI, LCPI's conduct related to the loan

19  transactions, and the financial condition of the Debtors.  For this reason, litigation of the

20  Estate Claims would likely require significant discovery and a lengthy drawn-out trial.

21  Moreover, the Trustee could be forced to litigate the Estate Claims in New York, resulting

22  in additional administrative expense.

23        The Amended Term Sheet further avoids the costs and risks associated with (i)

24  attempting to sell the Properties to a third party free and clear of the 1st Lien Lenders'

25  liens, (ii) the ongoing disputes regarding the use of cash collateral to maintain the

26  Properties and the Appeal related thereto, and (iii) defending the LCPI Stay Relief

27  Motions, which were set for an evidentiary hearing and would likely necessitate discovery

28  by the Trustee.  If the Trustee were required to litigate each and every dispute with LCPI

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

448323.2                                22            MOTION TO APPROVE COMPROMISE

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

1   to conclusion, the estates could incur millions of dollars in professional fees and costs.  In

2   addition to being expensive and fraught with risk, litigation of the estates' disputes with

3   LCPI would span two separate bankruptcy courts and, in the end, the estates' opportunity

4   to realize value from LCPI's asserted collateral could be permanently lost.  The Amended

5   Term Sheet resolves numerous disputes and contested proceedings with the estates'

6   largest secured creditor, thereby saving the estates substantial administrative expense.

7         Litigation related to the Estate Claims and the other disputes between the parties

8   would significantly delay the conclusion of the Debtors' bankruptcy cases.  Any

9   distributions to general unsecured creditors would likely be based on the outcome of the

10  Estate Claims, which could take significant time to resolve.  Moreover, to sell the

11  Properties free and clear of LCPI's liens and to pursue the Estate Claims, the Trustee

12  would have to obtain stay relief from the New York Bankruptcy Court.  If the New York

13  Bankruptcy Court denies the Trustee's Stay Relief Motion, the administration of the

14  Debtors' cases would be paralyzed as the Trustee would be unable to move the Debtors'

15  cases forward.[15]  The Amended Term Sheet, however, establishes a framework for the

16  sale of the Properties in the near future with the 1st Lien Lenders' consent and for the

17  preservation of the Properties in the meantime.  Furthermore, approval of the Amended

18  Term Sheet will clear the way for Trustee and the Committee to immediately prepare and

19  propose a plan with the support of LCPI and move expeditiously towards confirmation.

20  Thus, approval of the Amended Term Sheet will provide creditors with some certainty

21  regarding the outcome of these cases.

22         Based on the foregoing, this factor supports approval of the Term Sheet.

23

24

25

26  [15]    Rather, the Trustee would be forced to continue to the hold the Properties and request use of cash
    collateral to preserve and maintain the Properties over LCPI's objection.  The longer the Trustee remains in
27  possession of the Properties, which consist of more than 5,000 acres, the greater the holding costs to
    prevent vandalism, remain in compliance with municipal regulations, and otherwise prevent health and
    safety issues from arising.  With erosion and dust control, security and other necessary expenditures, the
28  Trustee would be required to spend several hundred thousand dollars a month.

### D. The Paramount Interests of Creditors

The Amended Term Sheet will provide the estates with immediate funds and the potential for substantial additional cash in the future. First, the Trustee will immediately receive $5.5 million in cash. Of this sum, $3.5 million[16] is guaranteed to the estates and is available to administer the estates and for potential distribution to creditors, and $2.0 million is available to preserve and maintain the Properties.[17] Subject to the Court's approval of the Yucaipa Settlement Agreement, the Trustee will also receive approximately $217,000, which sum represents a 50% share of the Yucaipa Funds. Thus, upon the approval of the Amended Term Sheet, the Trustee will receive a grand total of over $3.7 million of unencumbered and unrestricted cash. Second, any proceeds from the litigation to avoid and recover the Dividend, which could total approximately $144 million, or from other avoidance actions will be split 50/50 with LCPI (or the Lien Lenders). Third, via the "Trustee's Participation," the estates are entitled to receive cash from the sale of the Properties through the proposed plan or LCPI's subsequent disposition of the Properties in the lesser amount of (a) unpaid allowed trade claims, or (b) 3.5% of the recovery by the 1st Lien Lenders.

Without the proposed settlement, the non-lender unsecured creditors could receive nothing. Again, there are a number of hurdles that the Trustee must overcome before the Estate Claims will result in a distribution to the Debtors' unsecured creditors. To sell the Properties to a third party without the 1st Lien Lenders' consent, the Trustee would likely have to prove that a bona fide dispute exists as to the liens of the 1st Lien Lenders justifying the sale of the Properties free and clear and denying the 1st Lien Lender's credit bid rights. To attempt to take action with respect to LCPI's liens, the Trustee must prevail on his stay relief motion before the New York Bankruptcy Court. Even if the Trustee is

---

[16] Under the Original Term Sheet, the Trustee was to receive only $3.0 million to administer the Debtors' estates.

[17] Any unused portion of the $2 million set aside to maintain and preserve the Properties will be paid to LCPI upon the sale of the Properties.

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1  able to sell the Properties free and clear to a third party, the proceeds will still be subject

2  to the liens of the 1st Lien Lenders, and any disputes with respect to those liens will need

3  to be resolved *before* the proceeds could be distributed to general unsecured creditors.

4  While the New York Bankruptcy Court may terminate the stay to allow the Trustee to sell

5  the Properties, it appeared to be far less inclined to allow the Trustee to proceed with the

6  Estate Claims at this time.  (*See* Ex. 4 at pg. 67, line 21-pg. 68, line 4, and pg. 76, lines 6-

7  19.)

8         The Trustee's success on the Estate Claims, defending against the LCPI Stay

9  Relief Motions, and selling the Properties over LCPI's objection is uncertain, and there are

10 numerous complex issues that impact the unsecured creditors' potential distribution.  If the

11 Trustee is unsuccessful, any cash or value in the Properties would be transferred solely to

12 the 1st Lien Lenders on account of their secured claims.  As asserted by LCPI, to the

13 extent that the Trustee is successful in avoiding the 1st Lien Lenders' liens, but not

14 subordinating their claims, the 1st Lien Lenders would still hold significant unsecured

15 claims against the estates and would be entitled to share in any distributions to unsecured

16 creditors on a *pro rata* basis.  Similarly, the 2nd and 3rd Lien Lenders would be entitled to

17 distributions on account of any unsecured deficiency claims (although such disbursements

18 may have to be paid to the 1st Lien Lenders until paid in full).  Moreover, it is likely that,

19 absent substantive consolidation, any unencumbered cash held by the Parent Debtor

20 would first have to be used to repay the Parent Debtor's creditors, which would include the

21 claims of the Lien Lenders, including any unsecured or subordinated claims of the 1st Lien

22 Lenders, before such cash could be used to repay the Subsidiary Debtors' creditors.

23 Thus, the proposed settlement not only provides these estates with immediate cash and

24 the potential for significant distributions in the future, but also provides a mechanism to

25 disburse those funds to the unsecured trade creditors.

26

27

28

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

**E.    Approval of The Amended Term Sheet Will Not Alter or Prejudice The
Rights of Third Parties**

The Amended Term Sheet does not alter or prejudice the rights of any non-parties.
The Amended Term expressly provides that it is not intended to affect the rights of the 2nd
or 3rd Lien Lenders, except LCPI, or any other person who is not a party to the Amended
Term Sheet.  (*See* Ex. 1 at ¶ B.)  The confirmation of the plan contemplated by the
Amended Term Sheet (and the sale of the Properties through that plan) will be the subject
of a separate and fully noticed proceeding before this Court.  Thus, the approval of the
Amended Term Sheet does not require the adjudication of any issues related to the
confirmation of the plan, the proposed distributions under the Plan, or the sale of the
Properties; rather, such issues will be brought before the Court in due course, and all
parties retain any existing rights related thereto.  All interested parties will have a full and
fair opportunity to be heard in connection with confirmation of the plan and the sale of the
Properties.

In sum, the proposed settlement is fair and equitable, and in the best interests of
the estates.  The Amended Term Sheet resolves multiple proceedings, thereby saving the
estates significant administrative expense.  The Amended Term Sheet entitles the estates
to $5.7 million to administer these cases and preserve the Properties.  Of this sum, the
estates are guaranteed $3.7 million upon approval of the Amended Tern Sheet, even if
the proposed plan is not confirmed.  The Amended Term Sheet also entitles the estates to
significant additional sums from any subsequent disposition of the Properties by LCPI or
from the pursuit of avoidance actions against third parties.  The estates are not settling all
claims arising from the facts outlined above, but only the estates' claims against LCPI and
the 1st Lien Lenders.  The estates are retaining their claims against other third parties to
avoid and recover the Dividend, and, due to the proposed settlement, the estates will have
funds to pursue such claims.  Therefore, there is a real possibility that the estates will
receive significant cash in the future to distribute to unsecured trade creditors.

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1   Accordingly, the Trustee respectfully requests that the Court approve the Amended Term

2   Sheet.

3

4   **V.    CONCLUSION**

5        Based on the foregoing, the Trustee respectfully requests that the Court approve

6   the Amended Term Sheet, and such other and further relief as the Court deems just and

7   proper.

8

9   Dated:  September 21, 2010            WEILAND, GOLDEN,
                                          SMILEY, WANG EKVALL & STROK, LLP
10

11                                        By: _____

12                                            ROBERT S. MARTICELLO
                                              Attorneys for Alfred H. Siegel
13                                            Chapter 11 Trustee

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

448323.2                        27                MOTION TO APPROVE COMPROMISE

# DECLARATION OF EVAN D. SMILEY

I, Evan D. Smiley, declare as follows:

1.      I am a member of the law firm of Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP (the "Firm"), counsel for Alfred H. Siegel (the "Trustee"), the chapter 11 trustee of the of the jointly administered estates of LBREP/L-SunCal Master I, LLC, LBREP/L-SunCal McAllister Ranch, LLC, LBREP/L-SunCal McSweeny Farms, LLC, and LBREP/L-SunCal Summerwind Ranch, LLC.  I make this declaration in support of the Motion to Approve the Amended and Restated Compromise Between the Trustee, the Official Committee of Unsecured Creditors (the "Committee"), and Lehman Commercial Paper Inc. ("LCPI"), in its individual capacity and as administrative agent for the 1st Lien Lenders (the "Motion").  All terms as defined in the Motion are incorporated herein by this reference.  I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath.

2.      A true and correct copy of the Amended Term Sheet is attached hereto as Exhibit "1."

3.      A true and correct copy of the Trustee's opposition to the LCPI Stay Relief Motions is attached hereto as Exhibit "2."

4.      On the Trustee's behalf, on June 17, 2010, the Firm caused a motion to be filed in the New York Bankruptcy Court for relief from the automatic stay (the "Trustee's Stay Relief Motion") to, among other things, sell the Properties free and clear of liens, including the asserted lien of LCPI, and to deny LCPI's credit bid rights.  The Trustee's Stay Relief Motion was initially heard on July 14, 2010.  Attached hereto as Exhibit "4" is a true and correct copy of relevant excerpts from the transcript of the July 14, 2010 hearing on the Trustee's Stay Relief Motion.

5.      The New York Bankruptcy Court continued the hearing on the Trustee's Stay Relief Motion from July 14, 2010, to August 18, 2010.  At the continued hearing on August 18, 2010, counsel for LCPI advised the New York Bankruptcy Court of the Amended Term

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1  Sheet.  At the request of the parties, the New York Bankruptcy Court continued the

2  hearing on the Trustee's Stay Relief Motion to September 22, 2010, to allow LCPI to file a

3  motion to approve the Amended Term Sheet to be heard on that same date.  On

4  September 2, 2010, LCPI filed its motion to approve the Amended Term Sheet, which will

5  be heard on September 22, 2010.

6          6.      On the Trustee's behalf, attorneys with the Firm and I have reviewed and

7  analyzed thousands of pages of documents related to the Loans and the Debtors'

8  operations, which were produced or made available by Lehman Lakeside and SunCal

9  Management, or to which the Trustee had access pursuant to his appointment.  Also, in

10 cooperation with the Committee's counsel, attorneys with the Firm have conducted

11 significant legal research regarding the Estate Claims.  The decision to reach this

12 compromise with LCPI was made with the cooperation and coordination of the Committee,

13 who worked with the Firm and the Trustee to analyze the Estate Claims.

14         I declare under penalty of perjury that the foregoing is true and correct.

15         Executed on this 21st day of September, 2010, at Costa Mesa, California.

16

17                                                    _____

18                                                    Evan D. Smiley

19

20

21

22

23

24

25

26

27

28

Weiland, Golden,
Smiley, Wang Ekvall & Strok, LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

# EXHIBIT 1

<u>BINDING AMENDED AND RESTATED TERM SHEET AMONG
LCPI AS ADMINISTRATIVE AGENT FOR THE 1st LIEN LENDERS, LCPI AS THE 2ND
LIEN LENDER, LCPI AS THE 3RD LIEN LENDER, THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS, AND THE CHAPTER 11 TRUSTEE</u>

    This Binding Amended And Restated Term Sheet dated as of August 18, 2010 (this "<u>Term Sheet</u>") is by and among ALFRED H. SIEGEL, solely in his capacity as the chapter 11 trustee (the "<u>Trustee</u>") of the administratively-consolidated estates of LBREP/L-SunCal Master I LLC ("<u>Parent Debtor</u>"), LBREP/L-SunCal McAllister Ranch LLC ("<u>McAllister Ranch</u>"), LBREP/L-SunCal McSweeny Farms LLC ("<u>McSweeny Farms</u>"), and LBREP/L-SunCal Summerwind Ranch LLC ("<u>Summerwind Ranch</u>"; with McAllister Ranch, McSweeny Farms and Summerwind Ranch being referred to collectively as the "<u>Subsidiary Debtors</u>," and together with the Parent Debtor, as the "<u>Debtors</u>") in their respective bankruptcy cases (the "<u>SunCal Bankruptcy Cases</u>") now pending in the United States Bankruptcy Court for the Central District of California (the "<u>California Bankruptcy Court</u>"); THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS of the Debtors (the "<u>Creditors' Committee</u>"); LEHMAN COMMERCIAL PAPER INC. ("<u>LCPI</u>"), in its capacity as administrative agent for the first-position secured lenders of the Debtors (the "<u>1st Lien Lenders</u>"); and is acknowledged and agreed as to certain provisions by one or more 1st Lien Lenders; by LCPI in its capacity as a second-position secured lender of the Debtors ("<u>LCPI 2nd Lien Lender</u>"); and by LCPI in its capacity as a third-position secured lender of the Debtors ("<u>LCPI 3rd Lien Lender</u>"), in order to reach interim agreement with respect to the distribution of certain funds, to establish certain parameters for a chapter 11 plan of reorganization for the Debtors and otherwise to establish the terms for globally resolving all disputes between the parties to this Term Sheet. Notwithstanding any references to the contrary contained herein, each and every reference in this Term Sheet to "Trustee" shall mean and refer to ALFRED H. SIEGEL solely and exclusively in his capacity as the chapter 11 trustee of the administratively-consolidated estates of the Debtors, and in no other capacity, and in no event whatsoever shall ALFRED H. SIEGEL have any personal liability of any kind, nature or amount as a result of this Term Sheet, including, without limitation, any performance, failure of performance, breach, default or other circumstance arising from or related to this Term Sheet, the implementation thereof, or the transactions contemplated herein.

    That certain Binding Term Sheet Among LCPI As Administrative Agent For The 1st Lien Lenders, The Official Committee Of Unsecured Creditors, And The Chapter 11 Trustee, dated September 23, 2009 (the "<u>Original Term Sheet</u>"), is hereby superseded, amended, restated and replaced in its entirety by the terms hereof, and the Original Term Sheet is and shall be null and void and of no further binding force or effect.

**<u>DEAL TERMS</u>**

  **<u>The Amended Compromise Motion</u>**

    A.  1. The Trustee will seek approval of this compromise by filing an amended motion (the "<u>Amended Compromise Motion</u>") under Federal Bankruptcy Rule 9019 within ten (10) calendar days of the Trustee's actual receipt of a copy of this Term Sheet fully executed by all non-Trustee parties hereto. The Trustee shall file the Amended Compromise Motion in all of the SunCal Bankruptcy Cases and LCPI shall

1

30

concurrently file the Amended Compromise Motion in the LCPI bankruptcy case (the "LCPI Bankruptcy Case", and together with the SunCal Bankruptcy Cases, the "Bankruptcy Cases") pending in the United States Bankruptcy Court for the Southern District of New York (the "New York Bankruptcy Court", and together with the California Bankruptcy Court, the "Bankruptcy Courts") to obtain approval of this Term Sheet. The orders approving the Amended Compromise Motions (the "Compromise Orders") must be obtained, entered in the respective Bankruptcy Courts and become "Final Orders" (as defined in paragraph A(2) below), by no later than November 1, 2010, unless this date is extended by mutual agreement of the Trustee, LCPI and the Creditors' Committee. If the Compromise Orders have not become Final Orders on or before November 30, 2010, this Term Sheet, and the terms and provisions hereof and thereof shall become null and void and of no further force and effect, in which case the parties hereto shall have no further obligations hereunder or to each other with respect to the subject matter hereof. Immediately upon the last of the Compromise Orders becoming a Final Order, this Term Sheet shall be binding on LCPI, the Trustee, the Creditors' Committee and each other party hereto (such date being referred to herein as the "Settlement Effective Date"). All parties hereto acknowledge that all other parties hereto intend to and will rely on the binding nature of this Term Sheet as of the Settlement Effective Date in moving forward with the Bankruptcy Cases. The terms of this Term Sheet will be incorporated into one or more plans of reorganization to be filed by the Trustee (the "Plan") in consultation with, or jointly with, the Creditors' Committee in the California Bankruptcy Court with respect to the SunCal Bankruptcy Cases. The Trustee and the Creditors' Committee shall work together in good faith with LCPI to ensure that the Plan is consistent with this Term Sheet. If LCPI believes that the Plan filed does not materially conform to this Term Sheet, then LCPI shall have the right to object to the Plan solely with respect to the alleged material nonconformity with the Term Sheet, and the Trustee and the Committee agree that the Plan shall be modified, consistent with any ruling of the Bankruptcy Courts to make it conform materially with the Term Sheet. The Plan shall be subject to LCPI's reasonable consent prior to filing, provided such consent shall not be withheld if the Plan is in a form and substance materially consistent with the Term Sheet.

2. "Final Order" means an order or judgment of either of the Bankruptcy Courts entered on the Bankruptcy Court's docket where either: (a) the time to appeal or to seek review, remand, rehearing, or a writ of certiorari has expired and as to which no timely filed appeal or petition for review, rehearing, remand, or writ of certiorari is pending, or (b) if such an appeal or petition has been timely filed, there is no stay pending appeal or other injunction or court order in place which prohibits the enforcement of the Term Sheet.

3. Subject to the Settlement Effective Date, the Trustee and the Creditors' Committee shall stipulate to LCPI being granted immediate relief from the automatic stay for the sole and only purpose of allowing LCPI in its capacity as administrative agent for the 1st Lien Lenders to record a new notice of default on behalf of the 1st Lien Lenders with respect to the Parent Debtor and Subsidary Debtors so as to allow LCPI to re-commence the period within which a foreclosure sale may be conducted

2

with respect to such first position lien. This stipulation shall not include relief from stay for any other or further foreclosure or enforcement actions such as, but not limited to, recording of a notice of sale or the holding of a trustee's sale.

## Allowance of Claim of LCPI; Claims Filed by 2nd and 3rd Lien Lenders

B.    Upon the Settlement Effective Date, the claim of the 1st Lien Lenders in the aggregate amount of $230,006,233.98 plus accrued and unpaid interest calculated through September 10, 2008 (the "Petition Date"), and accrued and unpaid legal fees shall be allowed in each of the SunCal Bankruptcy Cases; provided, however, the 1st Lien Lenders' allowed secured claims against the Subsidiary Debtors shall be in the amount of the 1st Lien Lenders' final credit bid under 11 U.S.C. Section 1123(a)(5)(d) pursuant to the Plan, as set forth in and adjusted in accordance with paragraphs E and F below (or, in the case of one or more successful bids by any third-party purchasers at the related sales pursuant to the Plan, the aggregate amount of such successful third-party bids), plus any amounts received by the 1st Lien Lenders as described in paragraph D below, and minus any amounts paid by the 1st Lien Lenders as described in paragraph H below. Any amount not deemed a portion of the 1st Lien Lenders' allowed secured claim shall be deemed an allowed unsecured claim against all of the Debtors as further described in paragraph F below. Proofs of claim have been filed in the Bankruptcy Cases by second position lenders (the "2nd Lien Lenders") and third position lenders (the "3rd Lien Lenders", with the 1st Lien Lenders, the 2nd Lien Lenders and the 3rd Lien Lenders being referred to collectively as the "Lenders"). The Lenders have alleged that their loans to the Parent Debtor are guaranteed by each of the Subsidiary Debtors. This Term Sheet is not intended to affect the rights, if any, of (a) the 2nd Lien Lenders other than LCPI 2nd Lien Lender, (b) the 3rd Lien Lenders other than LCPI 3rd Lien Lender, or (c) any other Person (as defined in the First Lien Credit Agreement dated January 19, 2006 (as amended) among LCPI, Parent Debtor, the 1st Lien Lenders, and certain other parties (the "First Lien Credit Agreement"), except to the extent that a Person is a party hereto, with such Person's rights being affected to the extent expressly provided herein).

## Distributions Upon Settlement Effective Date

C.    1.    On the Settlement Effective Date, the Trustee will retain $3.5 million from those certain Parent Debtor funds previously held by First Bank & Trust and subsequently transferred to the Trustee for the benefit of the Debtors' estates, which funds are currently subject to the liens and rights of the 1st Lien Lenders (the "Development Account Funds"), for use by the Trustee in administration of the SunCal Bankruptcy Cases. The $3.5 million of the Development Account Funds retained by the Trustee pursuant to this Term Sheet for use by the Trustee in administration of the SunCal Bankruptcy Cases shall hereinafter be referred to as the "Administrative Funds". The Administrative Funds shall be immediately available to the Trustee to pay administrative claims owing in the SunCal Bankruptcy Cases. In addition, upon the effective date of the Plan, any portion of the Administrative Funds not used to pay administrative claims as provided in the previous sentence or used or reserved to pay post-confirmation fees and costs of professionals of the Debtors' estates and/or

3

quarterly fees payable to the Office of the United States Trustee and court costs shall be available to make distributions to non-Lender creditors in respect of unsecured claims. In addition to the $3.5 million in Administrative Funds, the Trustee shall also retain $2.0 million of the Development Account Funds (the "Remaining Development Funds"), which Remaining Development Funds may be used by the Trustee solely to fund the ongoing current expenses of maintaining the real property owned by McAllister Ranch, McSweeny Farms, and Summerwind Ranch (together, the "Properties") pursuant to cash collateral orders of the California Bankruptcy Court in a manner consistent with the budget attached as Exhibit "A" hereto (the "Approved Budget"), subject to the budget variances allowed pursuant to Paragraph G below, or otherwise for uses for which the Trustee obtains the 1st Lien Lenders' consent (not to be unreasonably withheld) or which are approved by the California Bankruptcy Court after notice to the 1st Lien Lenders. The Approved Budget shall include quarterly fees payable to the Office of the United States Trustee and court costs. Any unused Remaining Development Funds will be transferred to the 1st Lien Lenders within five business days of the date that the Debtors no longer hold title to the Properties.

2. The funds currently on deposit with the Yucaipa Valley Water District and to be paid to the Trustee pursuant to that certain Settlement and Release Agreement (the "Yucaipa Settlement") between the Trustee and Oak Valley Partners, L.P. (the "Yucaipa Funds"), shall be split 50/50 between the 1st Lien Lenders and the Trustee. The Trustee's 50% portion of the Yucaipa Funds shall be referred to herein as the "Trustee's YFP"; and the 1st Lien Lenders' 50% portion of the Yucaipa funds shall be referred to herein as the "1st Lien Lenders' YFP." Following the entry of an order approving the Yucaipa Settlement by the California Bankruptcy Court (the "Yucaipa Settlement Order") and the Trustee's receipt of the Yucaipa Funds, the Yucaipa Funds shall be segregated by the Trustee from other funds in his possession relating to the Debtors and held by the Trustee, subject to the asserted liens, claims, interests and encumbrances of the 1st Lien Lenders. On the Settlement Effective Date, (a) the 1st Lien Lenders' YFP shall be paid to the 1st Lien Lenders free and clear of any claims or interests of the Trustee, the Debtors, the Debtors' estates and any party claiming by or through the Debtors, and (b) the asserted liens, claims, interests and encumbrances of the 1st Lien Lenders in the Trustee's YFP shall be avoided and preserved for the benefit of the Detbors' bankruptcy estates pursuant to 11 U.S.C. §§ 544 and 551, and the the Trustee's YFP shall immediately be available for use by the Trustee in the administration of the SunCal Bankruptcy Cases. The Trustee's YFP shall constitute additional funds of the Trustee and shall be treated as additional Administrative Funds (as Administrative Funds is defined in paragraph C).

Notwithstanding the foregoing, (a) if the Yucaipa Settlement is approved by the California Bankruptcy Court and the Trustee receives possession of the Yucaipa Funds but the Settlment Effective Date does not occur by the deadline set forth in paragraph A(1) above , then the Yucaipa Funds shall be segregated by the Trustee subject to the asserted liens, claims, interests and encumbrances of the 1st Lien Lenders, which liens, claims, interests and encumbrances may be challenged by the Trustee in accordance with applicable law and procedure and shall not be distributed or used without further order of the California Bankruptcy Court obtained on proper

4

notice and hearing, and (b) if the Yucaipa Settlement is not approved by the California Bankruptcy Court, the respective rights of the parties to the Term Sheet to all the funds currently held by the Yucaipa Valley Water District shall be preserved. Notwithstanding the foregoing, nothing herein shall be deemed an admission regarding the existence or validity of any lien or right asserted by the 1st Lien Lenders in the funds currently held by the Yucaipa Valley Water District.

D.  Upon the Settlement Effective Date, the Trustee shall immediately transfer to the 1st Lien Lenders, free and clear of any claims or interests of the Trustee, the Debtors, the Debtors' estates and any party claiming by or through the Debtors, (a) all Development Account Funds less the aggregate $5.5 million in Administrative Funds and Remaining Development Funds to be retained by the Trustee pursuant to paragraph C above and (b) the 1st Lien Lenders' YFP (all of the funds to be transferred to the 1st Lien Lenders hereafter referred to as the "1st Lien Lenders Retained Settlement Funds").

## Sale Of Properties Under The Plan

E.  The 1st Lien Lenders acting collectively in concert shall be the initial bidder with respect to each of the Properties and, subject to paragraph F below, shall credit-bid their allowed secured claims with respect to each Property in accordance with the bidding procedures set forth in paragraphs F and P below, as such bidding procedures may be further drafted and agreed upon by the parties hereto in consultation with a real property broker acceptable to each of the parties hereto (the "Approved Broker") and otherwise approved by the California Bankruptcy Court to the extent required (together, the "Bidding Procedures"). Properties for which the 1st Lien Lenders are determined to be the winning bidders pursuant to, in accordance with, and as more particularly described in the Bidding Procedures (the "Winning Bidders"), and which are purchased by the 1st Lien Lenders by way of credit bid, shall be transferred to the 1st Lien Lenders subject to (i) the lien of the 1st Lien Lenders, (ii) Senior Liens (hereinafter defined), and (iii) liens, claims, encumbrances or interests that satisfy clause (b), (c) and/or (d) of the definition of "Permitted Exceptions" set forth in the First Lien Credit Agreement (items described in this clause (iii), "Permitted Liens") Properties for which one or more third parties are determined to be the Winning Bidders shall be sold under the Plan pursuant to 11 U.S.C. Section 1123(a)(5)(d) free and clear of liens, claims, encumbrances or interests other than Permitted Liens.

F.  The initial credit bids by the 1st Lien Lenders shall be in an aggregate amount which shall be at least equal to $45 million (the "Aggregate Minimum Credit Bid Amount") and shall not exceed a maximum amount (the "Aggregate Maximum Credit Bid Amount"), with such Maximum Credit Bid Amount to be determined prior to the Settlement Effective Date by the 1st Lien Lenders in consultation with the Approved Broker. The Aggregate Minimum Credit Bid Amount and the Aggregate Maximum Credit Bid Amount shall be respectively allocated among the three Properties by the parties hereto in consultation with the Approved Broker prior to the Settlement Effective Date (the Aggregate Maximum Credit Bid Amount as so allocated in each case, the "Allocated Maximum Credit Bid Amount"). The 1st Lien Lenders shall be

5

entitled to increase their respective credit bid for each Property to an amount, to be determined prior to the Settlement Effective Date by the parties hereto in consultation with the Approved Broker, in excess of the highest competing bid for such Property, if any, up to the Allocated Maximum Credit Bid Amount with respect to such Property and up to the Aggregate Maximum Credit Bid Amount in the aggregate for all of the 1st Lien Lenders' credit bids with respect to the Properties (in each case with no set-offs, reductions or other defenses) in their discretion in accordance with the overbid procedures set forth herein. If one or more of the Properties are successfully bid upon by a qualified bidder (as the same may be more particularly described in the Bidding Procedures, each a "Qualified Bidder"), the Trustee may, subject to the right of the 1st Lien Lenders to submit a greater bid, sell such Property(ies) to such third party free and clear of all Liens (including the lien of the 1st Lien Lenders) other than Permitted Liens (hereinafter defined). Any Senior Liens and the lien of the 1st Lien Lenders shall each attach to any monies (other than the Trustee's Participation under paragraph R) received from the sale to a third party and such monies, net of any ordinary course sales costs and subject to the rights of any holders of Senior Liens, shall be paid to the 1st Lien Lenders. Payment of the Trustee's Participation to the Trustee shall only be made at such time when all Senior Lien claims have been resolved (through settlement, payment or otherwise) or Fidelity has accepted responsibility for all remaining Senior Liens. The 1st Lien Lenders shall have an allowed unsecured claim as set forth in paragraph B above. For the avoidance of doubt, in accordance with paragraph B above, the calculation of the 1st Lien Lenders' allowed unsecured claim shall take into account (1) the 1st Lien Lenders' aggregate credit bids for those Properties that were included in their winning bids pursuant to and in accordance with the Bidding Procedures (as the same may be more particularly described in the Bidding Procedures, each a "Winning Bid") minus any liabilities (including, without limitation, liabilities in respect of any Senior Liens) assumed by the 1st Lien Lenders in connection with the transfer of title to such Properties to the 1st Lien Lenders pursuant to such Winning Bids and (2) any proceeds received by the 1st Lien Lenders from the sale pursuant to the Plan of any of the Properties that were not included in the 1st Lien Lenders' Winning Bids to one or more third parties.

### Use of Remaining Development Funds; Trustee Loss Collateral

G.    During the period from the Settlement Effective Date until the transfer of title of all of the Properties to the 1st Lien Lenders and/or to any third party(ies), either pursuant to the Plan or by way of a foreclosure by the 1st Lien Lenders (the "Trustee Maintenance Period"), the Trustee shall be authorized to pay all expenses incidental to the ownership, operation and maintenance of the Properties from the Remaining Development Funds in amounts not to exceed those on the Approved Budget (plus a variance of 10% on a line-item basis of the amounts set forth therein), without the further consent of the 1st Lien Lenders. Immediately upon the Settlement Effective Date, LCPI on behalf of and as agent for the 1st Lien Lenders shall deliver to the Trustee cash or one or more irrevocable letters of credit acceptable to the Trustee in his reasonable discretion (together, the "Trustee Loss Collateral") in the aggregate amount of $500,000 (in the case of cash, to be held in escrow and released solely in accordance with the terms and conditions of this Term Sheet). During the Trustee

Maintenance Period, in the event the Trustee incurs proven losses (not otherwise covered by insurance) based upon claims of simple negligence or strict liability in connection with his ownership, operation, maintenance and management of the Properties, but not in the event of any gross negligence or gross malfeasance on the part of the Trustee, the Trustee shall have the right to draw and recover from the Trustee Loss Collateral an amount not to exceed in the aggregate the lesser of (i) the amount of such losses multiplied by a fraction, the numerator of which is the amount of the 1st Lien Lenders Retained Settlement Funds actually paid over to the 1st Lien Lenders (including any unused Remaining Development Funds actually paid over to the 1st Lien Lenders pursuant to paragraph C above) and the denominator of which is the aforementioned amount plus $5.5 million[1], and (ii) the full amount of the Trustee Loss Collateral, and in the event such recovery from the Trustee Loss Collateral is insufficient to cover such losses, the Trustee shall have the right, but not the obligation, to apply Administrative Funds to cover such losses. Upon the earlier to occur of (i) a Termination Event or (ii) the effective date of the Plan, the Trustee shall deliver any remaining cash Trustee Loss Collateral to LCPI for the benefit of the 1st Lien Lenders. Further, LCPI on behalf of and as agent for the 1st Lien Lenders hereby fully and forever releases and discharges the Trustee both in his capacity as trustee and in his individual capacity with respect to any acts or omissions occurring or claims arising in any way related to the subject matter hereof or the Trustee's actions or duties with respect to the Debtors or the Properties prior to the conclusion of the Trustee Maintenance Period, except to the extent of any gross negligence or gross malfeasance on the part of the Trustee.

H.   To the extent that the Remaining Development Funds are inadequate to fund the Trustee's reasonable and necessary expenses with respect to the ownership, preservation and maintenance (but not development) of the Properties through and including January 31, 2011, the 1st Lien Lenders agree to pay for such reasonable and necessary expenses to the extent they are (i) consistent in nature and amount with expenses provided for in prior cash collateral budgets approved by the California Bankruptcy Court and (ii) in an aggregate amount not to exceed fifty percent (50%) of the amount of the 1st Lien Lenders Retained Settlement Funds actually received by the 1st Lien Lenders. These expenses shall be paid within ten (10) days following written request accompanied by reasonable back-up documentation by the Trustee to LCPI and LCPI's good faith determination that such expenses are reasonable and necessary; however, if there is a dispute as to the reasonableness or necessity of any of the expenses incurred by the Trustee, the California Bankruptcy Court shall retain jurisdiction to hear and determine the Trustee's motion to compel payment of such expenses. Pending payment of such expenses by the 1st Lien Lenders, the Trustee shall be authorized to use the Administrative Funds for the purposes set forth in this paragraph H.

---

[1] As an example only, in the case of an $800,000 loss, if the amount of 1st Lien Lenders Retained Settlement Funds actually paid over to the 1st Lien Lenders is $8.5 million, then the numerator will be $8.5 million, the denominator will be $14 million (i.e. $8.5 million plus $5.5 million), the resulting fraction will be 8.5/14 (= 0.6071428571) and the Trustee's recovery would be $485,714.29 ($800,000 multiplied by 0.6071428571) which is less than $500,000 (i.e., the full amount of the Trustee's Loss Collateral).

7

36

**Information Regarding Title Insurance Policy**

I.     LCPI has heretofore provided the Trustee with a complete copy of that certain Title
       Insurance Policy number 27-44-94-120334 (the "Title Insurance Policy") issued by
       Fidelity National Title Insurance Company ("Fidelity") for the benefit of LCPI as
       administrative agent for the 1st Lien Lenders for the Properties.  Promptly upon
       execution of this Term Sheet LCPI will provide the Trustee with all documents and
       information reasonably related to the Title Insurance Policy and any and all claims
       made by the 1st Lien Lenders thereunder so as to allow the Trustee to comply with the
       requirements of paragraphs J and K below and otherwise to proceed with such
       matters to conclusion.

**Resolution of Senior Liens; Availability of Title Insurance**

J.     The Trustee shall reasonably cooperate with the 1st Lien Lenders in their efforts to
       determine whether any Liens are superior to the 1st Lien Lenders' lien in the
       applicable Properties and to determine the proper amount of any such superior Liens
       ("Senior Liens"); provided, however, the Trustee shall not be obligated to take any
       action that would cause the Trustee or the Debtors' bankruptcy estates to incur
       material cost or liability.

**Release**

K.     1.  As of the Settlement Effective Date, (A) the Debtors' estates through the Trustee
       shall be deemed to have released the 1st Lien Lenders and LCPI (in its individual
       capacity and in its capacity as administrative agent for the 1st Lien Lenders), and,
       subject to the second-to-last sentence of this paragraph K, their respective affiliated
       parties, officers, directors, employees, agents and attorneys, and (B) LCPI (in its
       individual capacity as a 1st Lien Lender and in its capacity as administrative agent for
       the 1st Lien Lenders but not in any other capacity) and the 1st Lien Lenders will be
       deemed to have released the Debtors' estates and the Trustee and the Trustee's agents
       and attorneys, in each case for and from all claims (as defined in Section 101(5) of
       the Bankruptcy Code and including any claims that could be brought by or against the
       Trustee pursuant to the Bankruptcy Code) other than the allowance of the Lenders'
       claims as set forth in paragraph B above and the rights to receive distributions based
       on those allowed claims.  Notwithstanding the foregoing and for the avoidance of
       doubt, the releases to be exchanged shall not include claims and causes of action
       against any third parties other than the 1st Lien Lenders and LCPI and their respective
       affiliated parties, officers, directors, employees, agents and attorneys acting in their
       capacities as lenders, agents, loan administrators or advisors thereto, and such
       releases specifically shall *not* include a release of LBREP Lakeside SC Master I LLC
       ("LBREP Lakeside"); SCC Acquisitions, Inc. ("SCC Inc."); SCC Acquisitions, LLC
       ("SCC LLC"); or SCC Ranch Ventures LLC (collectively with SCC Inc. and SCC
       LLC, "SCC") or any claims related to the acts of the owners of any of the Debtors
       including any transfers of funds by any of the owners of any of the Debtors.
       Notwithstanding anything above, nothing in this paragraph K shall be deemed a
       release of the respective parties' obligations under this Term Sheet.  If the Settlement

8

Effective Date does not occur for any reason, the foregoing releases shall be of no force or effect.

2. As to the matters released pursuant to paragraph K(1) above, the parties hereby expressly waive all rights under the provisions of Section 1542 of the Civil Code of the State of California and any similar rights in any state or territory or under any similar statute or regulation of the United States or any of its agencies. Section 1542 of this California Civil Code reads as follows:

**"A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."**

Each party waives and relinquishes any rights and benefits that any of them may have under California Civil Code Section 1542 pertaining to the subject of their releases set forth in paragraph K(1) above, and acknowledges that it is aware that it may hereafter discover facts in addition to or different from those which it now knows or believes to be true with respect to the matters released pursuant to paragraph K(1) above, but its intention hereby is to fully, finally and forever waive and release the claims released pursuant to paragraph K(1) above. Each party represents, warrants and agrees that this waiver is a material term of this Term Sheet, without which neither party would have entered into this Term Sheet.

## Support of the Plan

L.    LCPI hereby agrees that, subject to its receipt of a Disclosure Statement and other solicitation materials in respect of the Plan, which Disclosure Statement and other solicitation materials (i) implement this Term Sheet and (ii) are not otherwise materially inconsistent with such terms, it being recognized that this Term Sheet shall not constitute an agreement by LCPI to take any step or action that would violate any provision of applicable bankruptcy law or any other applicable laws, and to the extent any provision hereof shall be construed as constituting such a violation, such provision shall be deemed stricken herefrom and of no force and effect without liability to any of the parties, LCPI will, as promptly as practicable following the California Bankruptcy Court's approval of the Disclosure Statement and solicitation materials, present the Plan and related materials to the 1st Lien Lenders and recommend that the 1st Lien Lenders vote to accept the Plan, provided that to the extent the Plan contains additional terms and provisions unrelated to the substantive provisions of the Term Sheet, such additional terms and provisions are reasonably acceptable to LCPI and the 1st Lien Lenders. Also, subject to the occurrence of the Settlement Effective Date, LCPI and those other 1st Lien Lenders who have signed this Term Sheet agree, prior to the occurrence of a Termination Event, not to vote in favor of any other plan that fails to incorporate the substantive provisions of this Term Sheet until such time (if any) as the provisions set forth in <u>paragraph T</u> below are in effect.

M.    All 1st Lien Lenders who are on the "steering committee" are parties to this Term Sheet. All parties to this Term Sheet agree, prior to the occurrence of a Termination

Event, to support confirmation of the Plan provided the same is consistent in all material respects with the terms of this Term Sheet and does not contain material terms and provisions which have not been approved by LCPI and the "steering committee" of 1st Lien Lenders. Notwithstanding anything to the contrary contained herein, nothing in this Term Sheet shall constitute a representation or warranty by LCPI that the 1st Lien Lenders will vote in favor of the Plan by the requisite majorities under the Bankruptcy Code to obtain acceptance of the Plan by the class of 1st Lien Lenders nor shall LCPI have any liability in respect of such voting by the 1st Lien Lenders (subject to LCPI's obligation to recommend approval as provided above).

N.     Nothing contained in this Term Sheet shall limit or interfere, in any way, with the ability of any 1st Lien Lender or member of the "steering committee" to transfer or assign its interests under the First Lien Credit Agreement. However, if such transferor or assignor has signed this Term Sheet, its transferees or assignees shall be bound by the provisions of this Term Sheet to the same extent such transferor or assignor was bound thereby. The transfer or assignment of all or part of such transferor's or assignor's interests under the First Lien Credit Agreement shall constitute a novation, whereby, such transferor or assignor shall automatically receive a release of its obligations under this Term Sheet by and to the same extent that its transferee or assignee is bound by the provisions of this Term Sheet.

**Key Plan Provisions**.

O.     The 1st Lien Lenders will be classified as a separate class under the Plan.

P.     The Plan will provide that the Trustee will sell the Properties (including without limitation any related personal property) pursuant to 11 U.S.C. Section 1123(a)(5)(d) and in accordance with the terms and conditions of this Term Sheet and the Bidding Procedures to the 1st Lien Lenders and/or one or more successful third party Qualified Bidders, as the case may be, free and clear of Liens other than (i) Permitted Liens in the case of a sale to a third party Qualified Bidder or (ii) Senior Liens, Permitted Liens and the Liens of the 1st Lien Lenders in the case of a sale to the 1st Lien Lenders pursuant to a credit bid.

Q.     1.  The Plan will provide that until such time as the earliest to occur of (a) all holders of allowed claims, other than the Lenders, have been paid in full the allowed amounts of their respective claims according to their respective legal priorities, (b) the Lenders have been paid the full amount of their allowed claims, or (c) this Term Sheet terminates in accordance with the terms hereof, any recovery of proceeds from any avoidance action, litigation (including, without limitation, litigation in respect of any claims of fraudulent conveyance), asset disposition (excluding the sale of the Properties), or other recovery by the Trustee prior to or after Plan confirmation (the "Other Recoveries"), after payment in full of all allowed administrative and other priority unsecured claims in all four of the SunCal Bankruptcy Cases (collectively, the "Unsecured Priority Claims"), shall be split 50/50 between the 1st Lien Lenders (based on the understanding of the parties hereto that, and only if, all such proceeds

10

would be distributed to the 1st Lien Lenders under the Intercreditor Agreement, defined below in this paragraph) and the holders of allowed claims other than the Lenders (the "Trade Creditors", which term excludes any and all claims by the Lenders). The portion of the Other Recoveries that is allocated to the Trade Creditors (the "Trade Creditor Allocation") shall be distributed to Trade Creditors pursuant to a confirmed administratively-consolidated chapter 11 plan on a pro rata basis among those Trade Creditors based on the allowed amount of their respective claims. Distributions to Trade Creditors shall be made out of a single fund consisting of Other Recoveries that shall be administered by an appropriate fiduciary. This division of Other Recoveries shall be enforceable in the Bankruptcy Courts and any court of competent jurisdiction notwithstanding (1) the effect or terms of any agreement among the Lenders; (2) that assets, claims or causes of action may be held or pursued on behalf of one or only some of the Debtors; and (3) that Parent Debtor has few if any creditors other than the Lenders. After all Trade Creditors of the Debtors' estates are paid in full, the balance of the funds in the Debtors' estates, if any, shall be distributed to the Lenders in accordance with their respective priorities but subject to that certain Amended and Restated Intercreditor Agreement among the 1st Lien Lenders, the 2nd Lien Lenders and the 3rd Lien Lenders dated as of February 6, 2007 (the "Intercreditor Agreement"). If the foregoing allocations are either altered without the consent of the parties hereto or not approved by one or both of the Bankruptcy Courts, then any allowed unsecured claim of the 1st Lien Lenders (the "Assigned 1st Lien Lenders' Claim") shall be deemed assigned to the Debtors' bankruptcy estates for the benefit of all non-Lender claims, free and clear of any claims, liens or interests of the 1st Lien Lenders, but without representation or warranty and only for the purpose of effectuating the 50/50 distribution scheme provided for in this paragraph Q. To the extent that the Assigned 1st Lien Lenders' Claim does not provide the Debtors' estates with the equivalent of what they otherwise would have received under the 50/50 distribution scheme, then any allowed unsecured claim of (x) LCPI 2nd Lien Lender (the "Assigned LCPI 2nd Lien Lender's Claim") and (y) LCPI 3rd Lien Lender (the "Assigned LCPI 3rd Lien Lender's Claim", and collectively with the Assigned 1st Lien Lenders' Claim and the Assigned LCPI 2nd Lien Lender's Claim, the "Assigned Lenders' Claims") shall each be deemed assigned to the Debtors' bankruptcy estates for the benefit of all non-Lender claims, free and clear of any claims, liens or interests of the 1st Lien Lenders, LCPI 2nd Lien Lender and LCPI 3rd Lien Lender, but without representation or warranty and only to the extent necessary to provide the Debtors' estates with the equivalent of what they otherwise would have received pursuant to this paragraph Q. The proceeds from the Assigned Lenders' Claims shall be distributed first, to all unpaid Unsecured Priority Claims and second, to all Trade Creditors on a pro rata basis. After all of the Unsecured Priority Claims (to the extent that same were not previously paid out of the Administrative Claims) and Trade Creditors are paid in full, the remaining proceeds from (i) the Assigned 1st Lien Lenders' Claim shall be paid to the 1st Lien Lenders, (ii) the Assigned LCPI 2nd Lien Lender's Claim shall be paid to the 2nd Lien Lenders, and (iii) the Assigned LCPI 3rd Lien Lender's Claim shall be paid to the 3rd Lien Lenders.

R.    In addition, the Trustee shall be entitled to, and shall recover and receive from the Proceeds (hereinafter defined) of dispositions of the Properties, the lesser of (1) the amount sufficient to pay in full the allowed amount of the claims of the holders of allowed claims other than the Lenders to the extent not previously paid, and (2) 3.5% of such Proceeds (the "Trustee's Participation"); provided that, at the time of any such subsequent disposition the holders of allowed claims other than the Lenders shall not have otherwise been paid the full allowed amount of their claims. The Trustee's Participation in each portion of any Proceeds that consists of cash shall be immediately due and payable to the Trustee from the 1st Lien Lenders in cash upon the 1st Lien Lenders' receipt of such portion of the applicable Proceeds. The Trustee's Participation shall be transferred to the Trustee free and clear of Lender liens for the sole benefit of all allowed non-Lender unsecured claims. As used herein, "Proceeds" shall mean all cash and other property constituting proceeds of the disposition of each Property, including the proceeds from the sale of any of the Properties under paragraph E to a party other than the 1st Lien Lenders (but excluding any transfer of a Property to the 1st Lien Lenders pursuant to a credit bid) and including the proceeds from any disposition of the Property by the 1st Lien Lenders or any of their affiliates following their acquisition thereof pursuant to a credit bit, whether such proceeds are received in a single lump sum or on a piecemeal basis over time, less (a) customary and reasonable costs and expenses of the sale, and (b) cash and other property used to satisfy any Senior Liens not otherwise satisfied under the Title Insurance Policy or the Plan. For the avoidance of doubt, in the case of such property actually received that consists of promissory notes, equity interests (direct or indirect) in any entities taking title to the Properties and/or other deferred or contingent payment arrangements or mechanisms, the Trustee shall be entitled to receive, at the time such promissory notes, equity interests and/or deferred or contingent payment arrangements or mechanisms are received or implemented by the 1st Lien Lenders or their applicable affiliates or principals, a profits participation or similar contractual right to receive the applicable amount representing the Trustee's Participation from all cash actually received by such entities taking title to each Property from the disposition of such Property and by the Lenders and their applicable affiliates and principals in respect of such promissory notes, which profits participation or similar right shall be provided for in the operating, partnership, or similar governing documents of such entities and in such promissory notes or other deferred or contingent payment documentation (as the case may be), in a form and substance reasonably acceptable to the Trustee with Trustee being a direct contracted beneficiary of such provisions with the legal right to contractually enforce same. The California Bankruptcy Court shall retain jurisdiction with respect to the determination of the value of any component of each Proceeds. Without limiting the foregoing, if the 1st Lien Lenders form a joint venture with, or borrow funds from, any party, including any 1st Lien Lender or affiliates of a 1st Lien Lender to obtain funding necessary to develop one or more of the Properties or to maintain and/or operate the Properties prior to any disposition, the funds required to repay such unaffiliated equity or debt, as the case may be, shall reduce dollar-for-dollar the Proceeds for the applicable Properties. The 1st Lien Lenders agree to act in good faith to carry out the terms of this paragraph R and to effectuate this participation interest of the Trustee.

The 1st Lien Lenders will, at their sole expense, provide a report and accounting to the Trustee or the Trustee's successor-in-interest as soon as possible following receipt of Proceeds and shall provide semi-annual financial reports relating to the Properties. In addition, the 1st Lien Lenders will provide such documents and other information reasonably requested by the Trustee or the Trustee's successor in interest to monitor the 1st Lien Lenders' compliance with this paragraph R. LCPI shall provide the Trustee with information reasonably necessary to verify the amount of Proceeds. Finally, the Plan may contain such other reasonable provisions as may be required to effectuate the performance of the terms of this paragraph R.

S.    Intentionally omitted.

### Certain Rights and Releases Upon Termination Event

T.    If a Final Order confirming the Plan shall not have been obtained by February 28, 2011 (or such later date as may be mutually agreed upon by the Trustee, LCPI and the Creditors' Committee, such later date in no event to be later than March 31, 2011) (a "Termination Event"), then:

   i.    The 1st Lien Lenders immediately will be granted relief from stay to foreclose on the Properties. The Bankruptcy Court will grant this relief upon the presentation of an order by LCPI, accompanied by a declaration signed by an authorized representative of LCPI, confirming that a Termination Event has occurred. No party in interest, including without limitation the Trustee and the Creditors' Committee, shall be entitled to or permitted (A) to challenge the presentation of or entry of the order granting LCPI relief from stay with respect to the Properties, except to the extent no Termination Event has in fact occurred or (B) to challenge or otherwise interfere with the foreclosure of the Properties. Upon the entry of such order, the Trustee shall cooperate with the 1st Lien Lenders' foreclosure actions.

   ii.   The Trustee shall retain the Administrative Funds and the Trustee's YFP free from the secured claims of the Lenders.

   iii.  The 1st Lien Lenders shall retain the 1st Lien Lenders Retained Settlement Funds and the Trustee shall immediately pay over to the 1st Lien Lenders (A) the unused portion of the Remaining Development Funds, and (B) the unused portion of the Trustee Loss Collateral, in each case free and clear of any claims or interests (including without limitation any right to recovery) of the Trustee, the Debtors, the Debtors' estates and any party claiming by or through the Debtors.

   iv.   Intentionally omitted.

   v.    LCPI and the 1st Lien Lenders shall in no event be deemed to have waived any right to object to the substantive consolidation of the Debtors' cases.

   vi.   Intentionally omitted.

vii. Except as provided in this paragraph T, this Term Sheet shall be of no further force or effect, including any obligation contained in paragraphs L and M.

**No Substantive Consolidation**

U.    The parties hereto acknowledge and agree that neither any provision of this Term Sheet nor any of the transactions contemplated herein, including without limitation the contemplated terms and provisions of the Plan, do nor shall (i) effect substantive consolidation of any one or more of the Debtors with any one or more of the other Debtors, (ii) suggest that any such substantive consolidation is or might be possible, or (iii) affect the right of the 1st Lien Lenders to object to the substantive consolidation of any one or more of the Debtors with any one or more of the other Debtors. However, nothing here shall constitute a waiver of the rights of the parties to seek substantive consolidation of one or more of the Debtors if such is necessary or appropriate in the interests of creditors.

**Miscellaneous Provisions**

V.    1.  Upon the last of the Compromise Orders becoming a Final Order, this Term Sheet shall be binding upon the parties hereto and their respective heirs, representatives, transferees, successors and assigns. Notwithstanding the foregoing, this Term Sheet and the rights and obligations hereunder may not be assigned by a party hereto without the prior written consent of the other parties.

2.  LCPI will use reasonable efforts to obtain by September 30, 2010, an agreement from the 1st Lien Lenders tolling the statute of limitations within which the Trustee must file a complaint against the 1st Lien Lenders based on the operative facts alleged in the draft attached to his proof of claims previously filed in the LCPI chapter 11 case or to avoid the 1st Lien Lenders' asserted lien against the funds currently held by the Yucaipa Valley Water District until March 31, 2011.

3.  In the event of any dispute between the parties hereto arising out of the subject matter of this Term Sheet, the prevailing party in such action shall be entitled to have and to recover from the other party its reasonable attorneys' fees and other reasonable expenses (including expert witness fees) in connection with such action or proceeding in addition to its recoverable court costs.

4.  This Term Sheet shall be construed in accordance with the laws of the State of California in effect at the time of the execution of this Term Sheet except to the extent superseded by the laws of the United States. The parties hereto agree that the California Bankruptcy Court shall have jurisdiction to hear and to determine all matters, disputes and controversies related to this Term Sheet and the subject matter hereof, and each party hereby submits to the jurisdiction and venue of the California Bankruptcy Court with respect thereto. Notwithstanding the foregoing, if the California Bankruptcy Court will not accept jurisdiction or otherwise hear any such matter, then such matter shall be heard by the Orange County Superior Court for the

State of California, and each party hereby submits to the jurisdiction and venue of such court with respect thereto.

5. This Term Sheet contains the entire understanding between the parties relating to the transactions and matters contemplated hereby and all prior or contemporaneous agreements, term sheets, understandings, representations and statements, oral or written are merged herein and shall be of no further force or effect.

6. If any term, provision, condition or covenant of this Term Sheet or the application thereof to any party or circumstances shall, to any extent, be held invalid or unenforceable, the remainder of this Term Sheet, or the application of such term, provision, condition or covenant to persons or circumstances other than those as to whom or which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Term Sheet shall be valid and enforceable to the fullest extent permitted by law.

7. Any alteration, change or modification of or to this Term Sheet, in order to become effective, shall be made by written modification hereof executed by all of the parties hereto.

8. This Term Sheet and any modifications, amendments or supplements thereto may be executed in several counterparts, and all so executed shall constitute one agreement binding on all parties hereto, notwithstanding that all parties are not signatories to the original or the same counterpart. The parties may also deliver executed copies of this Term Sheet to each other by facsimile or by electronic delivery (e.g., .pdf), which facsimile or electronic signatures shall be binding upon the parties as if they were originals.

9. The parties hereto each agree in good faith to undertake such further actions and deliver such further documentation as may be reasonably necessary in order to facilitate the transactions contemplated in this Term Sheet and to implement the terms hereof, provided that no party shall be obligated to incur expenses or liabilities in connection therewith which exceed those expenses and liabilities which they would otherwise incur complying with the express terms hereof.

[Signatures appear on the following page]

15

44

Dated:_____

_____

Alfred H. Siegel, solely in his capacity as the Chapter 11 Trustee
of the administratively consolidated estates
of LBREP/L-SunCal Master I LLC,
LBREP/L-SunCal McAllister Ranch LLC,
LBREP/L-SunCal McSweeny Farms,
and LBREP/L-SunCal Summerwind Ranch

[Signatures continue on the following page]

THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS
of LBREP/L-SunCal Master I LLC,
LBREP/L-SunCal McAllister Ranch LLC,
LBREP/L-SunCal McSweeny Farms,
and LBREP/L-SunCal Summerwind Ranch

By: _____

    Lennar Homes of California, Inc., solely in its capacity as chairperson

    By:_____      Dated:_____

    _____

[Signatures continue on the following page]

LEHMAN COMMERCIAL PAPER INC., as
administrative agent of the 1st Lien Lenders
to LBREP/L-SunCal Master I LLC,
LBREP/L-SunCal McAllister Ranch LLC,
LBREP/L-SunCal McSweeny Farms,
and LBREP/L-SunCal Summerwind Ranch


By:_____          Dated:_____
    Name:
    Title:  Its Authorized Signatory


[Signatures continue on the following page]

ACKNOWLEDGED AND AGREED
SOLELY AS TO THE
AGREEMENTS MADE BY THE
1ST LIEN LENDERS HEREIN:


1ST LIEN LENDER:

[_____]


By:_____          Dated:_____
    Name:
    Title:

ACKNOWLEDGED AND AGREED
SOLELY AS TO THE
AGREEMENTS MADE BY
LCPI 2nd LIEN LENDER HEREIN:


LCPI 2nd LIEN LENDER:

[_____]


By:_____                          Dated:_____
    Name:
    Title:

ACKNOWLEDGED AND AGREED
SOLELY AS TO THE
AGREEMENTS MADE BY
LCPI 3rd LIEN LENDER HEREIN:


LCPI 3rd LIEN LENDER:

[_____]


By:_____          Dated:_____
   Name:
   Title:

EXHIBIT "A"

BUDGET

[See Attached]

EXH. A

| In re:<br>LBREP/L-SUNCAL MASTER I, LLC, et al.<br><br>Debtor(s). | CHAPTER 11 |
| --- | --- |
| | CASE NUMBER 8:08-bk-15588-ES |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
**650 Town Center Drive, Suite 950, Costa Mesa, CA 92626**

The foregoing document described **MOTION TO APPROVE THE AMENDED AND RESTATED COMPROMISE BETWEEN THE CHAPTER 11 TRUSTEE, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, AND LEHMAN COMMERCIAL PAPER INC., IN ITS INDIVIDUAL CAPACITY AND AS ADMINISTRATIVE AGENT FOR THE 1st LIEN LENDERS; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF EVAN D. SMILEY IN SUPPORT** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On **September 21, 2010** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒ Service information continued on attached page

**II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL** (indicate method for each person or entity served):
On **September 21, 2010** I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*

☒ Service information continued on attached page

**III. SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **September 21, 2010** I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. *Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.*

Hon. Erithe Smith
United States Bankruptcy Court
411 W. 4th Street
Santa Ana, CA 92701

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| September 21, 2010 | Margaret Sciesinski | /s/ Margaret Sciesinski |
| --- | --- | --- |
| Date | Type Name | Signature |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

| In re:<br>LBREP/L-SUNCAL MASTER I, LLC, et al.<br><br>                                Debtor(s). | CHAPTER 11<br><br>CASE NUMBER 8:08-bk-15588-ES |
|---|---|

## I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")**

Joey R Abramson   jralaw1@pacbell.net
Thomas Scott Belden   sbelden@kleinlaw.com, ecf@kleinlaw.com
Joseph P Buchman   jbuchman@bwslaw.com
Kathleen A Cashman-Kramer   kcashman@psdslaw.com
Tara Castro Narayanan   tara.narayanan@msrlegal.com
Scott C Clarkson   sclarkson@lawcgm.com
Geoffrey Crisp   geoffrey@smgarberlaw.com, michelle@smgarberlaw.com
Jonathan S Dabbieri   dabbieri@shlaw.com
Keith S Dobbins   kdobbinslaw@aol.com
Lei Lei Wang Ekvall   lekvall@wgllp.com
Marc C Forsythe   kmurphy@goeforlaw.com
Heather Fowler   heather.fowler@lw.com, colleen.rico@lw.com
Steven M Garber   steve@smgarberlaw.com
Robert P Goe   kmurphy@goeforlaw.com, rgoe@goeforlaw.com;mforsythe@goeforlaw.com
Marshall F Goldberg   mgoldberg@glassgoldberg.com
Kelly C Griffith   bkemail@harrisbeach.com
Michael J Hauser   michael.hauser@usdoj.gov
Gil Hopenstand   gh@lnbrb.com
Christopher W Keegan   ckeegan@kirkland.com, emilee@kirkland.com;alevin@kirkland.com
Yale K Kim   ykim@allenmatkins.com
Kerri A Lyman   klyman@irell.com
John T Madden   jmadden@wgllp.com
Eve A Marsella   emarsella@lawcgm.com
Robert S Marticello   Rmarticello@wgllp.com
Robert C Martinez   rmartinez@mclex.com
Hutchison B Meltzer   hmeltzer@wgllp.com
Joel S. Miliband   jmiliband@rusmiliband.com
James M Miller   jmiller@millerbarondess.com
Ramon Naguiat   rnaguiat@skadden.com
Kurt Ramlo   kurt.ramlo@dlapiper.com, evelyn.rodriguez@dlapiper.com
Craig M Rankin   cmr@lnbrb.com
Daniel H Reiss   dhr@lnbrb.com
Todd C. Ringstad   becky@ringstadlaw.com
Martha E Romero   Romero@mromerolawfirm.com
Mark C Schnitzer   mschnitzer@rhlaw.com
Alfred H Siegel   ahstrustee@horwathcal.com, asiegel@ecf.epiqsystems.com
Gerald N Sims   jerrys@psdslaw.com
Evan D Smiley   esmiley@wgllp.com
Autumn D Spaeth   aspaeth@wgllp.com
Derrick Talerico   dtalerico@loeb.com, kpresson@loeb.com;ljurich@loeb.com
Andrew Troop   andrew.troop@cwt.com, scott.griffin@cwt.com;jill.kaylor@cwt.com
United States Trustee (SA)   ustpregion16.sa.ecf@usdoj.gov
Michael D Warner   echou@warnerstevens.com
David R Zaro   dzaro@allenmatkins.com

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                        **F 9013-3.1**

| In re:<br>LBREP/L-SUNCAL MASTER I, LLC, et al.<br><br>Debtor(s). | CHAPTER 11<br><br>CASE NUMBER 8:08-bk-15588-ES |
| --- | --- |

## II. SERVED BY U.S. MAIL

LBREP/L SunCal Master I LLC
3500 West Olive Ave., Suite 650
Burbank, CA 91505-5501
Debtor

LBREP/L SunCal Master I LLC
2392 Morse Avenue
Irvine, CA 92614-6234
Debtor

Christopher R. Mordy, Esq
Peterson & Price, APC
655 West Broadway, Suite 1600
San Diego, CA 92101-3301

Van C. Durrer, II, Esq.
Skadden Arps Slate Meagher & Flom LLP
300 S. Grand Avenue, Suite 3400
Los Angeles, CA 90071-3137

Adam J. Soibelman
Stone Rosenblatt Cha
21550 Oxnard Street, Main Plaza, #200
Woodland Hills, CA 91367

Emily E. Culler, Esq.
O'Melveny & Myers, LLP
400 South Hope Street
Los Angeles, CA 90071

Paul Couchot, Esq.
Winthrop Couchot
660 Newport Center Dr., 4th Floor
Newport Beach, CA 92660

Martin B. Greenbaum, Esq.
Greenbaum Law Group LLP
840 Newport Center Drive, Suite 720
Newport Beach, CA 92660

Alan J. Friedman, Esq.
Irell & Manella LLP
840 Newport Center Drive, Suite 400
Newport Beach, CA 92660-6324

General Electric Capital Corporation
c/o Steven R. Glass, Esq.
Glass & Goldberg
21700 Oxnard St., Suite 430
Woodland Hills, CA 91367

David F. Anderson, Esq.
Houser & Mouzes, APC
18826 North Lower Sacramento Rd., Suite H
P.O. Box 1397
Woodbridge, CA 95258-1397

William D. Coffee, Esq.
Songstad & Randall LLP
2201 Dupont Drive #100
Irvine, CA 92612

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                 F 9013-3.1