Jonathan S. Henes, P.C.
Joseph Serino, Jr., P.C.
Chad J. Husnick
Christopher T. Greco
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

*Attorneys for Lehman Brothers Holdings Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) Case No. 08-13555 (JMP) |
| LEHMAN BROTHERS HOLDINGS INC., *et al.,* | ) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

**DEBTORS' OBJECTION TO CMBS CLAIMS AND**
**REQUEST FOR SUBORDINATION PURSUANT TO**
**SECTIONS 510(a)-(c) OF THE BANKRUPTCY CODE**

Lehman Brothers Holdings Inc. ("***LBHI***") and its affiliated debtors, in the above

referenced chapter 11 cases, as debtors and debtors in possession (collectively, the "***Debtors***"),

respectfully represent:

**PRELIMINARY STATEMENT**

1.      The proofs of claim listed on Exhibits A, B, and C attached hereto (the "***CMBS***

***Claims***") should be subordinated under 11 U.S.C. §§ 510(a)-(c) of the Bankruptcy Code.

2.      The CMBS Claims consist primarily of contingent, unliquidated securities fraud

claims by various entities relating to certain collateralized mortgage-backed securities created

and issued by the Debtors.

3.      The CMBS Claims were filed by several holders of the Debtors' CMBS, including The Carlyle Group, on behalf of certain of its affiliates, Carlyle Mortgage Capital LLC, SASC 2007-BC4 A4 II LLC, SASC 2007-BNC1 LLC, SASC 2007-BC4 A4 LLC, and BNC 2007-4, LLC (collectively, "**Carlyle**"),[1] Federal Home Loan Bank of Pittsburgh ("**FHLB**"),[2] and BRNP Holdings, L.L.C. ("**BRNP**")[3] (collectively, the "**Claimants**").

4.      As set forth below, there are three independent reasons why subordination is warranted.  <u>First</u>, subordination is warranted by a textual analysis of Section 510(b) because the Claimants' claims seek damages arising from the purchase or sale of a security of the Debtors; 510(b) subordination is also supported by and consistent with the legislative history and purpose of the statute.   <u>Second</u>, subordination is warranted pursuant to Section 510(a) because the Claimants have entered into valid and enforceable subordination agreements with respect to the CMBS that are the subject of their claims.   And <u>third</u>, equitable subordination is warranted pursuant to Section 510(c) because the Claimants have two alternative means of recovery: they have an interest in the Trustees' pending claims against the Debtors, and they have a secured interest in the segregated pool of mortgages underlying the CMBS.

## <u>RELIEF REQUESTED</u>

5.      The Debtors file this objection to the CMBS Claims pursuant to Sections 510(a)-(c) of title 11 of the United States Code (the "**Bankruptcy Code**" or "**Code**"), and this Court's order approving procedures for the filing of omnibus objections to proofs of claim filed in these

---

[1]     Carlyle's proofs of claim have been attached to this filing as **<u>Exhibit A</u>** and shall be referred to hereinafter as "Ex. A, Carlyle Claims."

[2]     FHLB's proofs of claim have been attached to this filing as **<u>Exhibit B</u>** and shall be referred to hereinafter as "Ex. B, FHLB Claims."

[3]     BRNP's proof of claim has been attached to this filing as **<u>Exhibit C</u>** and shall be referred to hereinafter as "Ex. C, BRNP Claim."

2

chapter 11 cases (the "***Procedures Order***"), ECF No. 6664, seeking the mandatory subordination of the CMBS Claims.

6.      The Debtors reserve all their rights to object on any basis to any CMBS Claim as to which the Court does not grant the relief requested herein.

## JURISDICTION

7.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## BACKGROUND

### A.      The Debtors' Collateralized Mortgage-Backed Securities

8.      The securities underlying the CMBS Claims at issue are certain of the Debtors' collateralized mortgage-backed securities (the "***CMBS***").

9.      The CMBS were created, issued, marketed, and sold by the Debtors in a process known as "securitization."  As the chart on the following page indicates, the process began with LBHI, a Debtor, collecting varying mortgage loans by either originating them or purchasing them from third-party originators.  (*See, e.g.*, SASCO, Prospectus Supplement (Jan. 8, 2008), at S-15, S-62-66 (describing the pooled mortgage loans).)[4]  After assembling a sufficient collection of mortgages, LBHI then transferred the pooled mortgages to another Debtor entity, Structured Asset Securities Corporation ("***SASCO***"), which served as both the "issuer" and the "depositor"

---

[4]    Because the relevant portions of the offering documents are materially similar, for the purposes of this motion, the Debtors have attached an exemplar prospectus supplement to this filing as **Exhibit E**, which shall be referred to hereinafter as "Ex. E, ProSupp BNC-2007-4."  This prospectus supplement is offered in lieu of submitting all of the relevant offering documents for all three of the Claimants, including certain private placement memoranda, which would have been used in connection with the sale of one of the Carlyle securities (*e.g.*, Structured Asset Securities Corporation Mortgage Loan Trust 2007-BC4) as well as the securities underlying the BRNP claim (SASCO Mortgage Loan Trust 2007-RNP1).  Debtors have no reason to believe that the private placement memoranda contain disclosures that are materially different from the prospectus supplements used to market the other CMBS to the public.

for the eventual CMBS offerings. (*Id.* at S-5; *see also* Ex. A, Carlyle Claims, at 1.)[5] To market

the CMBS, Lehman Brothers Inc., a Debtor affiliate, distributed information to investors, like the

Claimants, through offering documents such as the registration statements, prospectuses and

prospectus supplements. (*See* Ex. E, ProSupp BNC-2007-4, at S-ii, S-68.)



10.     While the mortgages were deposited in certain non-Debtor securitization trusts

(the "***Trusts***"), (*id.* at S-5), these Trusts—which had no employees, officers or directors—were

nothing more than passive vehicles, (*id.* at S-85). Indeed, the Trusts did not even convey the

CMBS to investors. Rather, the CMBS were provided by the Trusts to the depositor, SASCO,

which then sold them to investors through the underwriters. (*Id.* at S-i ("The certificates offered

by this prospectus supplement will be purchased by Lehman Brothers Inc., as underwriter, from

[SASCO], and are being offered from time to time for sale to the public in negotiated

transactions or otherwise at varying prices to be determined at the time of sale.").) It is for these

---

[5]    Because Carlyle's proofs of claim contain substantially the same content, citations to Exhibit A are directed
       only at the initial proof of claim attached, but apply to all proofs of claim in the exhibit.

reasons that the federal securities rules and regulations recognize the "depositor" as the true "issuer" of the underlying securities, while referring to the Trusts only as "issuing entities" with no reporting or other obligations.[6]  15 U.S.C. § 77b(a)(4); 15 U.S.C. § 78c(a)(8); 17 C.F.R. § 230.191; 17 C.F.R. § 240.3b-19.

### B.    The "Waterfall" Structure of the CMBS

11.    One important feature of the Debtors' CMBS is that each offering involved multiple classes, or "tranches," of securities.  (Ex. E, ProSupp BNC-2007-4, at S-i, S-1-4.) Based on these tranches, distributions of payments from the Trusts to purchasers of the CMBS are subject to a "waterfall" hierarchical structure where the most senior tranches have the first right to cash flows from the mortgage loan pool.  (*Id.* at S-8-11 (discussing priority of interest and principal distributions).)  Excess cash, if any, then flows down to the next tranche, and so forth.  (*Id.*)  By design, the risk and potential return of the different tranches of securities have an inverse relationship with their seniority or place in the waterfall.  (*Id.*)

12.    Beyond controlling the priority of payment distributions, the waterfall structure described in the offering documents also acts as an express subordination agreement by and between all holders of the CMBS: the offering documents plainly state that the rights of holders of certain tranches "will be subordinate to the rights of the holders of senior certificates."  (*See id.* at S-6, S-44; *see also id.* at S-12 (stating that "senior certificates will have a payment priority as a group over all other certificates" and describing "Subordination of Payments" in detail and by class).)

---

[6]    With respect to certificates of interest or shares in an unincorporated investment trust not having a board of directors, the federal securities laws distinguish between the trust as the issuing entity and the "issuer," who is "the person or persons performing the acts and assuming the duties of depositor or manager pursuant to the provisions of the trust or other agreement or instrument under which such securities are issued."  15 U.S.C. § 77b(a)(4).

### C.    The Trusts' "Put-Back" Claims

13.    In addition to the securities claims filed by the Claimants, certain trustees of the CMBS Trusts have also filed claims against the Debtors on behalf of the Trusts and, indirectly, on behalf of the holders of the CMBS like the Claimants.[7]  For example, U.S. Bank N.A. ("**U.S. Bank**"), as indenture trustee for the SASCO Mortgage Loan Trust 2007-RNP1, has filed three claims against Debtors based on the same facts and circumstances underlying Claimant BRNP's claim—namely, that Debtors provided improper instructions to the loan servicer for the mortgage assets underlying the CMBS, thereby breaching their obligations in relevant offering documents and causing certain servicing payments to improperly issue.  (*Compare, e.g.*, Ex. C, BRNP Claim ("BRNP Holdings' damages arise from LBHI and/or LBI's improper instructions to Aurora.  Aurora subsequently allowed the servicers to reimburse themselves for the payments. . . .") *with* Ex. D, Trust Claims ("The Trustee has been advised . . . that Aurora has caused the servicers to advance amounts equal to prior serviced advances to LBHI and/or its affiliated Lehman Brothers, Inc. ('LBI'), and has subsequently allowed the servicers to reimburse themselves from the Trust for those payments.").)

14.    The Trustee's claims are based on contractual remedies in the agreements between the Trusts and the Debtor entities, including servicing agreements between LBHI and certain servicers such as Aurora Loan Services LLC, an affiliate of the Debtors.  (*See* Ex. D, Trust Claims, at 1.)  Additionally, certain other Trustees have brought similar claims based on the agreements between the Trusts and SASCO, including claims based on "put-back liability" provisions relating to breaches of certain representations and warranties made by LBHI and/or SASCO, as the depositor, with respect to a Mortgage Loan—provisions which were summarized in

---

[7]    Certain of these proofs of claim have been attached to this filing as **Exhibit D** and shall be referred to hereinafter as "Ex. D, Trust Claims."

the offering documents.  (*See* Ex. E, ProSupp BNC-2007-4, at S-20, S-87.)  Based on these contractual put-back liability provisions, the Trusts are entitled to bring claims against LBHI and/or SASCO for certain breaches of representations and warranties "that materially and adversely affect[] the value of the Mortgage Loan" to force LBHI and/or SASCO to "repurchase the affected Mortgage Loan" or otherwise "cure" the alleged breaches.  (*Id.*)

15.    Like the CMBS Claims, the Trusts' claims against the Debtors have been brought as contingent, unliquidated, unsecured claims.  (*See* Ex. D, Trust Claims, at 1.)  Any recovery that the Trusts realize on their claims against the Debtors will be distributed to applicable holders of the CMBS (including the Claimants) in accordance with the waterfall priority structure described in the offering documents.  (*See* Ex. E, ProSupp BNC-2007-4, at S-9 (making "[f]unds received on the mortgage loans" including "unexpected payments resulting from prepayments or defaults by borrowers, liquidation of defaulted mortgage loans or repurchases of mortgage loans under the circumstances described in this prospectus supplement" subject to the distribution scheme).)

### D.    The Claimants' CMBS Claims

16.    The Claimants have together filed thirteen different proofs of claim against the Debtors relating to eleven debt securities issued by Debtors.  Though the CMBS Claims involve different securities, amounts, and allegations, they all appear to be based in whole or in part on alleged violations of the securities laws, including Sections 11 and 12(a)(2) of the Securities Act of 1933 ("the *Securities Act*"), and Section 10(b) of the Securities Exchange Act of 1934 (the "*Exchange Act*") and Rule 10b-5 promulgated thereunder.[8]

---

[8]    Section 11 of the Securities Act imposes civil liability on sellers of securities for misstatements or omissions of material facts in a securities offering registration statement.  15 U.S.C. § 77k.  In relevant part, Section 12(a)(2) of the Securities Act allows a purchaser of a security to bring a private action against a seller for misstatements or omissions of material facts in a prospectus.  15 U.S.C. § 77l(a)(2).  Section 10(b) of the Exchange Act and

17.    For example, Carlyle has filed ten claims alleging material misrepresentations and omissions in connection with the offering materials for the CMBS in violation of Section 11 and 12(a) of the Securities Act, and Section 10(b) of the Exchange Act.  (*See* Ex. A, Carlyle Claims.) For its part, FHLB lists as the basis for its two claims "[d]amages stemming from material misrepresentations and omissions in Debtor's Registration Statements, Prospectus, and Prospectus Supplements," which presumably refers to claims under Sections 11 and 12(a)(2) of the Securities Act.  (Ex. B, FHLB Claims ("Basis for Claim").)[9]  Finally, BRNP has filed a claim asserting, among other things, violations of Section 10(b) of the Exchange Act.  (Ex. C, BRNP Claim, at 3.)

## ARGUMENT

## I.    THE CMBS CLAIMS MUST BE SUBORDINATED UNDER SECTION 510(b).

18.    Section 510(b) of the Bankruptcy Code provides that claims involving a "security of the debtor or of an affiliate of the debtor" "shall" be "subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security." 11 U.S.C. § 510(b). This mandatory subordination is designed to prevent holders of securities from violating the absolute priority rule by improperly elevating their claims to the level of general unsecured creditors.  *See SeaQuest Gen. Holdings LLC v. S & J Diving Inc.*, 579 F.3d 411, 418-20 (5th Cir. 2009); *Rombro v. Dufrayne*, 461 F.3d 251, 256 (2d Cir. 2006).

19.    In particular, where a claim (a) involves a "security"; (b) is for "damages arising from the purchase or sale of such a security"; and (c) concerns a security "of the debtor or of an

---

Rule 10b-5 prohibit any act or omission resulting in fraud in connection with the purchase or sale of a security. 15 U.S.C. § 78j(b) (Section 10(b)); 17 C.F.R. § 240.10b-5 (Rule 10b-5).  The Debtors reserve all rights to challenge the merits of any and all claims relating to the CMBS, including, without limitation, claims under federal or state securities laws.

[9]    Because FHLB's proofs of claim each contain substantially the same content, citations to Exhibit B are directed only at the initial proof of claim attached, but apply to both proofs of claim in the exhibit.

affiliate of the debtor," Section 510(b) requires that it be subordinated to all claims that are its equal or senior. *See Rombro*, 461 F.3d at 253; *In re Enron*, 341 B.R. 141, 148-49 (Bankr. S.D.N.Y. 2006); *see also In re CIT Group, Inc.*, 460 B.R. 633, 637-638 (Bankr. S.D.N.Y. 2011). Not only do the CMBS Claims duly satisfy each of these elements, subordinating these claims— and preventing the Claimants from "bootstrapping" their discrete claims into the claims of general unsecured creditors—is the very type of remedy the drafters of Section 510(b) intended.

### A.    There Is No Dispute That the CMBS Are "Securities" Under the Code.

20.    Though the CMBS are debt securities rather than equity securities, there is no question that they are "securities" as defined by the Bankruptcy Code. To be sure, the Claimants themselves repeatedly refer to the CMBS as "securities" in all thirteen of the proofs of claim at issue.[10] At their core, the CMBS are bonds, which are specifically included in the definition of "security" in Section 101(49) of the Bankruptcy Code. 11 U.S.C. § 101(49)(A)(i), (iv) (defining "security" to include, among other things, a "note" and a "bond"). It is also well settled that the reference to "claim or interest represented by such security" in Section 510(b) is written "without distinction between equity securities and debt securities." *In re Holiday Mart*, 715 F.2d 430, 434 (9th Cir. 1983); *see In re Coronet Capital Co.*, 1995 WL 429494, at *8 (S.D.N.Y. July 20, 1995) (citation omitted). And courts have routinely applied Section 510(b) to claims arising from debt securities. *See, e.g., In re Geneva Steel Co.*, 281 F.3d 1173 (10th Cir. 2002) (subordinating claims arising from the purchase of bonds).

### B.    The Claimants Concede Their Claims "Arise from the Purchase or Sale" of the CMBS.

21.    Like the fact that the CMBS are "securities," it is beyond dispute that each of the

---

[10]    *See* Ex. A, Carlyle Claims, at 1 (defining and referring to the CMBS as the "Lehman Securities"); Ex. B, FHLB Claims (characterizing the CMBS as "mortgage-backed securities" under "Basis for Claim"); Ex. C, BRNP Claim (repeatedly referring to the CMBS as "securities").

CMBS Claims involves a claim for damages "arising from the purchase or sale" of the CMBS. Not only do the Claimants refer to the CMBS as "securities," they universally concede (and all but insist) that their claims arise from the purchase or sale of those securities.

22.     For example, each of Carlyle's ten proofs of claim is expressly and primarily premised on federal securities fraud claims against Debtors for alleged "material misrepresentations in the sale of a security."  (*See* Ex. A, Carlyle Claims, at 1.)  In particular, Carlyle asserts that

> Lehman is liable for violations of the Securities Act arising out of the sale of the Lehman Securities pursuant to Offering Materials which were materially untrue and misleading.

(*Id.* at 3 (emphasis added).)  Likewise, in both of its proofs of claim, FHLB lists "[d]amages stemming from material misrepresentations and omissions" arising from "Creditor[']s purchase of mortgaged-backed securities" as the sole basis for its claims.  (Ex. B, FHLB Claims ("Basis for Claim") (emphasis added).)  Similarly, BRNP's single proof of claim makes clear that its Section 10(b) claims are based on alleged "misrepresentations and omissions . . . made in connection with the sale of securities to [BRNP]."  (Ex. C, BRNP Claim, at 3 (emphasis added).)

## C.     The CMBS Are Undoubtedly Securities "Of" the Debtors.

23.     Given that the CMBS are plainly "securities" and the CMBS Claims clearly "arise from" purchases or sales of those securities, the only remaining requirement in Section 510(b) is that the securities must be "of the [Debtors] or an affiliate of the [Debtors]."  11 U.S.C. § 501(b). Here, there are at least three reasons why the underlying securities must be considered securities "of the debtor or an affiliate of the debtor."

### 1.     Securities "Issued" By a Debtor are Securities "Of" a Debtor.

24.     When faced with subordinating claims based on mortgage-backed securities like the CMBS, courts deciding whether those securities are "of" the debtor have looked to whether

or not the debtor was the "issuer" of those securities. One such court was the bankruptcy court for the District of Delaware in *In re Washington Mutual, Inc*., 462 B.R. 137 (Bankr. D. Del. 2011). While the *Washington Mutual* court ultimately concluded on an incomplete record that the CMBS were not securities "of" the debtors or their affiliates,[11] the court focused its Section 510(b) analysis on whether or not the debtor entities were the "issuers" of the securities in question. *Id.* at 146-47. Similarly, the court in *In re Granite Partners, L.P.*—another case involving "collateralized mortgage obligations"—subordinated the investors' fraudulent inducement claims under Section 510(b) and, in so doing, expressly stated that a purchaser of a security "based upon false statements uttered by the issuer, holds a subordinated federal securities fraud claim in the issuer's bankruptcy." 208 B.R. 332, 334, 344 n.18 (Bankr. S.D.N.Y. 1997) (emphasis added).

25.     This focus on the "issuer" of a security is an established part of subordination under Section 510(b) going to the very core of the statute's purpose. *See, e.g., In re Holiday Mart, Inc.*, 715 F.2d at 433-34 (stating that purchasers of securities "alone assume the risk of fraud or securities act violations by the issuers of the securities they purchase, and there is no reason to ask general creditors who did not purchase [securities] to share in any part of that risk") (emphasis added); *In re NAL Fin. Group, Inc.*, 237 B.R. 225, 233 (Bankr. S.D. Fla. 1999) (stating that the two types of risk "allocated in § 510(b)" are "the risk of the debtor's insolvency" and "the risk of illegality in the issuance of the debtor's securities") (emphasis added); *see also*

---

[11]     Additionally, the facts of *Washington Mutual* are distinguishable. To begin, none of the claimants in *Washington Mutual* agreed, as the Claimants do here, that the debtors were the issuers of the securities in question. *See infra* Section C(2). Beyond that, on a motion for reconsideration, it became clear that Judge Walrath had not been provided with the applicable federal securities laws and regulations which show clearly that the "depositor" is the "issuer" of collateral-trust certificates, like the CMBS, and that the trusts are merely "issuing entities." Judge Walrath was not required to and did not rule on the reconsideration motion. But, after reviewing these authorities and hearing oral argument on the motion, Judge Walrath stated that the court's prior decision was "not law of the case." *See* Hr'g Tr., May 7, 2012, Page 125, line 14, a copy of which is annexed hereto as **Exhibit F**.

John J. Slain and Homer Kripke, *The Interface Between Securities Regulation and Bankruptcy—Allocating the Risk of Illegal Securities Issuance Between Security Holders and the Issuer's Creditors,* 48 N.Y.U. L. Rev. 261, 286 (1973) (hereinafter, "***Slain and Kripke***") (same).

26.     As such, whether or not any of the Debtors or their affiliates was the "issuer" of the CMBS is of central importance.

2.     <u>The Claimants Acknowledge that the Debtors are the Issuers of the CMBS.</u>

27.     There can be little dispute here over who the "issuers" of the CMBS in question are: the Claimants all concede that the "issuer" is either a Debtor or a Debtor affiliate.  For example, in each of the ten proofs of claim it filed with this Court, Carlyle—the largest Claimant and owner of nearly 98% of the total value of the CMBS Claims (as identified on the Claims forms)—states candidly at the very outset that "[t]his claim arises from and relates to one or more of the following four securitization transactions" wherein "Carlyle purchased Mortgage Pass-Through Certificates <u>issued by Lehman</u> . . . ."  (*See* Ex. A, Carlyle Claims, at 1 (emphasis added).)  As used in Carlyle's proofs of claim, the term "Lehman" includes none other than the "debtors-in-possession, Lehman Brothers Holdings Inc. . . . and Structured Asset Securities Corporation."  (*Id.*)  Carlyle goes on to explain that "[i]n each of the subject transactions," SASCO "acted as the depositor" and "<u>issued the Lehman Securities to investors</u>, including Carlyle."  (*Id.* (emphasis added).)  Leaving little doubt of its meaning, Carlyle states once more at the close of its legal claims that it "was a purchaser of securities <u>issued and sold by Debtors</u>."  (*Id.* at 3-4 (emphasis added).)

28.     Importantly, Carlyle places no emphasis in any of its proofs of claim on the actions of the Trusts as the "issuing entities."  Nor does Carlyle suggest at any point that the CMBS are securities "of" the Trusts.  To the contrary, Carlyle focuses on the substantial

involvement of LBHI and SASCO, (*id.* at 1), and refers to the CMBS throughout its proofs of claim using its own defined term—the "Lehman Securities," (*see id.* at 1-4).  Because it was the Debtors who originated and collected the underlying mortgages, formed the Trusts, underwrote the offerings, and issued and marketed the CMBS, Carlyle's characterization of the CMBS as "Lehman Securities" reflects the simple reality that the Debtors, not the Trusts, controlled and managed every step of the securitization process here.

29.     FHLB and BRNP make comparable admissions.  Though otherwise threadbare in detail, FHLB's proofs of claim purport to be based on "[d]amages stemming from material misrepresentations and omissions in <u>Debtor's</u> <u>Registration Statements</u>, Prospectus, and Prospectus Supplements."  (Ex. B, FHLB Claims ("Basis for Claim") (emphasis added).) Federal law states that only the "issuer" of a security is required to file a registration statement for that security.  15 U.S.C. § 78l(g)(1).  Because FHLB's claims are premised on the "Debtor's Registration Statements," they can only relate to the Debtor's securities.  Similarly, BRNP admits both that SASCO is an affiliate of LBHI and that LBHI "sold" the CMBS in question. (Ex. C, BRNP Claim, at 2.)

3.     <u>SASCO Is the "Issuer" of the CMBS under Federal Securities Laws.</u>

30.     The federal securities laws agree with the Claimants' admission that Debtor SASCO was the "issuer" of the CMBS.  Both the Securities Act and the Exchange Act provide, in relevant part, that "the term 'issuer' means the person or persons performing the acts and assuming the duties of depositor or manager pursuant to the provisions of the trust or other agreement or instrument under which such securities are issued . . . ."  15 U.S.C. § 77b(a)(4); 15 U.S.C. § 78c(a)(8).  Similarly, SEC Rules 191 and 3b-19, the applicable federal regulations promulgated under the Securities Act and the Exchange Act, state that "[t]he depositor for the asset-backed securities acting solely in its capacity as depositor to the issuing entity is the

'issuer' for purposes of asset-backed securities of that issuing entity."  17 C.F.R. § 230.191; 17

C.F.R. § 240.3b-19.

31.    Here, it is undisputed that SASCO acted as the "depositor" in relation to the

CMBS.  (*See* Ex. A, Carlyle Claims, at 1 (stating that SASCO, "a wholly-owned indirect

subsidiary of LBHI, acted as the depositor")).)  The Trusts, on the other hand, are merely the

"issuing entities"—a term which is defined separately as "the trust or other entity created at the

direction of the sponsor or depositor that owns or holds the pool assets and in whose name the

asset-backed securities supported or serviced by the pool assets are issued."  17 C.F.R. §

229.1101(f); *see also* Talcott J. Franklin & Thomas F. Nealon III, *Mortgage and Asset Backed*

*Securities Litigation Handbook* Appendix A (2011) (stating in the definition of "Depositor" that

"the Depositor is considered the statutory issuer of CMBS, although technically CMBS are

issued by the Trust").

32.    In light of the Claimants' concessions and the fact that the very federal laws upon

which the Claimants' claims are based characterize SASCO, a Debtor entity, as the "issuer" of

the securities, the CMBS must be securities "of" the Debtors.  As such, because the CMBS

Claims arise from a purchase or sale of securities of the Debtors or their affiliates, Section 510(b)

mandates that they be subordinated.[12]

### D.    Subordination Advances the Underlying Purpose of Section 510(b).

33.    Though the phrase "of the debtor" in Section 510(b) is unambiguous and a

---

[12]    Even if the securities are found not to be direct securities "of" the Debtors, the CMBS Claims still must be
subordinated under Section 510(b) as the CMBS are certainly securities "of an affiliate" of the Debtors.  11
U.S.C. § 510(b).  Given the broad definition of "affiliate" employed by the Code, *see* 11 U.S.C. 101(2), even if
the CMBS are deemed to be securities "of" the issuing entity Trusts, those Trusts are subject to trust
agreements, which serve as operating agreements with Debtors, rendering the Trusts affiliates of the Debtors.
Ex. E, ProSupp BNC-2007-4, at S-85-93.

reviewing court is not permitted to consider the purpose or intent of the statute,[13] to the extent the

Court considers statutory intent relevant, subordination of the Claimants' claims here is perfectly

consistent with the primary purpose of Section 510(b).

34.    Section 510(b) was enacted to "prevent disappointed shareholders from

recovering their investment loss by using fraud and other securities claims to <u>bootstrap their way</u>

<u>to parity with general unsecured creditors</u> in a bankruptcy proceeding." *In re Telegroup, Inc.*,

281 F.3d. 133, 142 (3d Cir. 2002) (emphasis added); *In re Enron Corp.*, 341 B.R. at 158; *In re*

*Motors Liquidation Co.*, 09-50026 REG, 2012 WL 1886755, at *5 (S.D.N.Y. May 21, 2012).   In

other words, its purpose is to protect the standard allocation of risk between securities investors

and creditors from being reallocated on an *ad hoc* basis by securities investors bringing

securities-based claims.  *See Granite Partners*, 208 B.R. at 336.  In their article, *The Interface*

*Between Securities Regulation and Bankruptcy*, professors John J. Slain and Homer Kripke make

clear that securities holders, and not creditors, ought to bear the risk of illegality in any securities

issuances in which they invest.  Slain & Kripke, at 286-88

35.    While the majority of the policy interpretations of Section 510(b) have dealt with

equity securities,[14] the intent to prevent "bootstrapping" is equally applicable in the context of

---

[13]    *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) (stating that courts "always turn first to one, cardinal canon before all others" when interpreting a statute and "presume that a legislature says in a statute what it means and means in a statute what it says there."); *SeaQuest*, 579 F.3d at 418 (examining Section 510(b) and explaining that "[a] court should only turn to legislative history if the statute is ambiguous").

[14]    Since equity is the context in which the issue is most often raised, much of the case law analyzing the purpose of Section 510(b) deals solely with equity securities, and not debt securities—let alone complex debt securities like the CMBS.  In particular, some formulations of the policy considerations underlying Section 510(b) examine (i) whether the claimant took on the risk and return expectations of a securities holder in the Debtors' enterprise and (ii) whether the claimant seeks to recover contributions to the Debtors' equity pool.  *See, e.g.*, *In re Med Diversified, Inc.*, 461 F.3d 251, 256 (2d Cir. 2006).

Even under this equity-focused calculus, the CMBS Claims must still be subordinated.  Indeed, the Claimants took on the risk and return expectations of a specific type of collateralized securities holder here—the CMBS and attendant upside and downside protection—rather than that of a simple creditor of the Debtors.  Since proceeds from securitization have been expressly found to contribute to a debtor's "equity cushion," *In re*

debt securities like the CMBS.  In particular, subordination operates to prevent claimants already entitled to a pool of segregated collateral from seeking underlined additional recovery from the assets meant for general unsecured creditors.  For example, in *In re Commercial Financial Services, Inc.*, the court found that the "inequitable consequence of permitting" a claimant—who was already entitled "to be repaid from pools of Loans that were transferred by [the debtor] into a remote entity"—to "make a claim against [the debtor's] *unsegregated assets*," and thus "dilut[e] the general unsecured creditors' potential recovery yet a second time" was a compelling factor in favor of subordination.  268 B.R. at 599-600 (emphasis in original).

36.    This is the exact situation here.  The Claimants concede that they are entitled to repayment from certain segregated collateral—*i.e.*, the stream of mortgage principal and interest payments.  (*See* Ex. A, Carlyle Claims, at 1 ("The Lehman Securities are asset-backed securities, backed by the cash flows derived from pools of residential mortgage loans.").)  In addition, because the issuing entity Trusts themselves have already advanced claims against the Debtors— and any recovery by the Trusts will flow to the Claimants on a *pro rata* basis as contemplated by the waterfall structure—the Claimants are also entitled to a portion of any recovery the Trusts may receive from their claims based on put-back liability.  (Ex. E, ProSupp BNC-2007-4, at S-9.)  Unsatisfied with these two distinct forms of recovery, the Claimants now seek—by way of securities claims against the Debtors—to promote itself to the status of an unsecured creditor to gain access to the unsegregated pool of assets meant for the Debtors' true unsecured creditors.

37.    Notably, this outstrips even traditional bootstrapping in the equity security context.  Rather than merely swimming up a capital structure to which they were already a party,

---

*Commercial Fin. Servs., Inc.*, 268 B.R. 579, 594 (Bankr. N.D. Okla. 2001), the Claimants now seeks to recover a contribution to the equity pool presumably relied upon by creditors in deciding whether to extend credit to the Debtors.

the Claimants seek to break into the Debtors' capital structure from the outside by simply asserting some garden-variety securities fraud claims. But "the risk of illegality in securities issuances should be borne by those investing in securities and not by general creditors." H.R. Rep. No. 95-595, 95th Cong. 1st Sess. at 195-96 (1977) (citing Slain & Kripke); Slain & Kripke, at 286-88; *Granite Partners, L.P.*, 208 B.R. at 336 ("[I]nvestors alone bear the risk of illegality in the issuance of securities."). Therefore, even if the Claimants have "watched their investment gamble turn sour," they cannot now wield their securities claims to offensively and improperly "shift [their] losses" to the Debtors' general unsecured creditors. *In re Geneva Steel Co.*, 281 F.3d. at 1180.

## II.   SECTION 510(a) ALSO MANDATES SUBORDINATION OF THE CMBS CLAIMS.

38.     Section 510(a) of the Bankruptcy Code provides an alternate ground for subordinating the CMBS Claims. Under Section 510(a), a "subordination agreement is enforceable" in bankruptcy "to the same extent that such agreement is enforceable under applicable nonbankruptcy law." 11 U.S.C. § 510(a). As such, agreements between claim holders to subordinate their claims to one another continue to be binding even in bankruptcy. *See In re Kors, Inc.*, 819 F.2d 19, 24 (2d Cir. 1987).

39.     Here, the Claimants' claims are subject to such agreements. As mentioned previously, the CMBS were intentionally split into multiple tranches with differing seniority, and payment distributions to CMBS holders are subject to a hierarchical "waterfall" structure where the senior tranches receive distributions first. (*See* Ex. E, ProSupp BNC-2007-4, at S-i, S-1-4 (listing the different tranches).) This waterfall structure governs not only the "order of priority" for how distributions would be made, but also serves as the basis for an express subordination agreement between certificate holders:

17

> The rights of holders of the Class M1, Class M2, Class M3, Class M4, Class M5, Class M6, Class M7, Class M8, Class M9, Class B1, Class B2 and Class B3 Certificates to receive payments of principal and interest <u>will be subordinate to the rights of the holders of certificates having a senior priority of payment</u>, as described in this Summary of Terms under "Enhancement of Likelihood of Payment on the Certificates-Subordination of Payments" below.

(*Id.* at S-6 (emphasis added).)    This subordination agreement is explained and reinforced repeatedly throughout the offering documents.  (*Id.* at S-44 (stating that the rights of holders of certain tranches "will be subordinate to the rights" of more senior tranches); *see also id.* at S-12 (describing "Subordination of Payments" in detail by class).)  Use of this type of "waterfall" hierarchy to internally subordinate claims is common in securitizations.  *See Republic Bank & Trust Co. v. Bear Stearns & Co.*, 683 F.3d 239, 244 (6th Cir. 2012) ("Often, a single trust issues different levels, or 'tranches,' of certificates, normally based on subordination rights . . . .").

40.     In the face of this type of express subordination agreement between all CMBS holders, allowing the Claimants—whose claims occupy both senior and subordinate tranches, and which, together, represent only a subset of CMBS holders at large—to proceed as if their claims are all unsegregated general unsecured claims would effectively permit the Claimants to sidestep the deliberate internal subordination scheme contemplated by the offering documents. By receiving distributions <u>directly</u> as unsecured creditors rather than in turn according to their place in the waterfall, the Claimants not only bypass the established hierarchy of distributions, but, by so doing, reduce the recovery of all remaining CMBS holders as well.

41.     Moreover, in the event put-back liability is triggered, the Trusts—and only the Trusts—have the contractual right to bring claims against the proper Debtor entities, including the right to require "cure" of any breaches or repurchase of certain defective loans.  (*See* Ex. E, ProSupp BNC-2007-4, at S-20, S-87.)  As discussed above, the Trusts have brought such claims as unliquidated, unsecured claims.  If the Trusts realize any recovery based on their claims, each

holder of an applicable CMBS will receive its *pro rata* portion of the Trusts' recovery according to the priority scheme in the offering documents.  (*Id.* at S-9 (stating that distribution of payments resulting from defaults and repurchase proceeds are to be distributed as if they were payments of principal).)  But in order for the distribution scheme to have the intended effect, the Trusts' claims must take priority over <u>all</u> claims of the CMBS holders—including the Claimants' claims.  This is particularly true here, where some of the Trusts' claims involve the same factual allegations as the CMBS Claims brought by one of the Claimants, BRNP.  (*Compare, e.g.*, Ex. C, BRNP Claim *with* Ex. D, Trust Claims.)  While BRNP's purported causes of action are different from those advanced by the Trusts, elevating BRNP's claims to the status of general, unsecured claims would result in a double recovery to BRNP at the direct expense of others.  Not only would this unnecessarily dilute the recoveries of all other unsecured creditors, it would once again violate the express subordination scheme amongst the CMBS holders who stand to recover from the Trusts' claims.

42.    Because Section 510(a) makes express subordination agreements enforceable in the Debtors' bankruptcy, the Claimants' claims must be subordinated to the entirety of the Trusts' claims and patterned after the waterfall structure contemplated by the offering documents.

## III.    SUBORDINATION IS ALSO WARRANTED UNDER SECTION 510(c).

43.    Outside of mandatory subordination under Sections 510(b) and (a), an alternative ground for subordination is Section 510(c)(1), which allows the Court "under principles of equitable subordination" to "subordinate . . . all or part of an allowed claim to all or part of another allowed claim . . . ."  *See* 11 U.S.C. § 510(c)(1).[15]

---

[15]    Note, while equitable subordination typically involves a showing that a creditor has engaged in inequitable conduct, *see, e.g., In re BH S & B Holdings*, 420 B.R. 112, 156 (Bankr. S.D.N.Y. 2009), *aff'd sub nom.*, 807 F.

44.     Here, the only equitable result is subordination.  The Claimants—like all CMBS holders—already have two separate routes to recovery.  <u>First</u>, the Claimants will receive a *pro rata* share of any recovery the Trusts receive on their claims against the Debtors.  This is a remedy that is expressly contemplated by the relevant offering documents, and part of the bargain the Claimants agreed to when purchasing the CMBS.  (Ex. E, ProSupp BNC-2007-4, at S-9.)  <u>Second</u>, the Claimants' investments are secured by the collateralized future payments from the segregated pool of mortgages underlying the CMBS.

45.     Despite these different forms of recovery, the Claimants now seek to be counted among the Debtors' general unsecured creditors.  This would give the Claimants access to a form of recovery <u>above and beyond</u> the segregated forms of recovery for which it bargained and to which it is already entitled.  More than that, absent subordination of the CMBS Claims here, the actual risks of illegality that the Claimants should have assumed as securities purchasers will have been unilaterally foisted upon the Debtors general, unsecured creditors.

46.     In light of the foregoing, the Court should also subordinate the CMBS Claims under principles of equity.

## <u>CONCLUSION</u>

47.     Pursuant to Sections 510(a)-(c) of the Bankruptcy Code, the Debtors respectfully request that the Court subordinate the CMBS Claims to the claims of the general unsecured creditors.

---

Supp. 2d 199 (S.D.N.Y. 2011), this is not a prerequisite.  *See In re Emergency Monitoring Techs.*, 366 B.R. 476, 506-08 (W.D. Pa. 2007); see also *In re Structurlite Plastics*, 224 B.R. 27 (6th Cir. 1998) (affirming no fault equitable subordination).

New York, New York
Dated:  April 25, 2013

/s/ Jonathan S. Henes, P.C.

Jonathan S. Henes, P.C.
Joseph Serino, Jr., P.C.
Chad J. Husnick
Christopher T. Greco
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York  10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:        jonathan.henes@kirkland.com
              joseph.serino@kirkland.com
              chad.husnick@kirkland.com
              christopher.greco@kirkland.com

*Attorneys for Lehman Brothers Holdings Inc.*