# EXHIBIT B

(Loan Agreement)

# LOAN AGREEMENT

dated as of

December 30, 2004

between

## THE TOWERS – LAS VEGAS, LLC,

and

## THE TOWERS – LV, LLC

(individually and collectively, the "Borrower")

and

## LEHMAN BROTHERS HOLDINGS INC.

("Lender")

## TABLE OF CONTENTS

**Page**

ARTICLE I      DEFINITIONS AND RULES OF INTERPRETATION ........................2
     Section 1.1.    Definitions.............................................................................2
     Section 1.2.    Rules of Interpretation ........................................................16

ARTICLE II      THE LOAN ...........................................................................17
     Section 2.1.    Commitment to Lend ...........................................................17
     Section 2.2.    Note.....................................................................................17
     Section 2.3.    Debt.....................................................................................17
     Section 2.4.    Other Obligations ...............................................................18
     Section 2.5.    Payments ............................................................................18

ARTICLE III      COLLATERAL SECURITY ................................................19
     Section 3.1.    Collateral ............................................................................19

ARTICLE IV      REPRESENTATIONS AND WARRANTIES.........................19
     Section 4.1.    Warranty of Title.................................................................19
     Section 4.2.    Authority ............................................................................19
     Section 4.3.    Legal Status and Authority ..................................................20
     Section 4.4.    Validity of Documents ........................................................20
     Section 4.5.    Litigation............................................................................20
     Section 4.6.    Status of Property................................................................21
     Section 4.7.    No Foreign Person ..............................................................21
     Section 4.8.    Separate Tax Lot..................................................................22
     Section 4.9.    ERISA Compliance..............................................................22
     Section 4.10.    Leases.................................................................................22
     Section 4.11.    Financial Condition.............................................................22
     Section 4.12.    Business Purposes...............................................................22
     Section 4.13.    Taxes..................................................................................22
     Section 4.14.    Principal Place of Business.................................................23
     Section 4.15.    No Change in Facts or Circumstances .................................23
     Section 4.16.    Disclosure ..........................................................................23
     Section 4.17.    Third Party Representations.................................................23
     Section 4.18.    Illegal Activity ...................................................................23
     Section 4.19.    Franchises, Patents, Copyrights, Etc....................................23
     Section 4.20.    No Event of Default ............................................................23
     Section 4.21.    Regulations U and X ...........................................................23
     Section 4.22.    Intentionally Omitted. .........................................................23
     Section 4.23.    Ownership. .........................................................................23
     Section 4.24.    Options to Purchase ............................................................24
     Section 4.25.    Service Rights .....................................................................24
     Section 4.26.    Violations of Governmental Prohibitions ...........................24
     Section 4.27.    Independent Director ..........................................................24

**ARTICLE V          COVENANTS OF BORROWER**................................................................**24**
    Section 5.1.     Punctual Payment of Loan.............................................24
    Section 5.2.     Intentionally Omitted.....................................................25
    Section 5.3.     Incorporation by Reference.............................................25
    Section 5.4.     Insurance.......................................................................25
    Section 5.5.     Payment of Taxes, Etc...................................................29
    Section 5.6.     Escrow Fund..................................................................30
    Section 5.7.     Condemnation................................................................30
    Section 5.8.     Leases and Rents...........................................................31
    Section 5.9.     Maintenance of Property................................................33
    Section 5.10.    Waste.............................................................................33
    Section 5.11.    Compliance With Legal Requirements.............................33
    Section 5.12.    Books and Records.........................................................34
    Section 5.13.    Payment For Labor and Materials...................................36
    Section 5.14.    Management Agreements................................................36
    Section 5.15.    Performance of Other Agreements..................................37
    Section 5.16.    Change of Name, Identity or Structure...........................37
    Section 5.17.    Existence.......................................................................37
    Section 5.18.    Contracts, Agreements, Permits, Licenses, and Authorizations...............38
    Section 5.19.    Payment of Operating Expenses; Balance of Available Cash Flow Application.........................................................38
    Section 5.20.    Available Cash Flow Application.....................................40
    Section 5.21.    Capital Improvements....................................................40
    Section 5.22.    Brokerage and Management Agreements.........................41
    Section 5.23.    Equipment Leases..........................................................41
    Section 5.24.    Approved Sale Contracts................................................41
    Section 5.25.    Approved Reservation Agreements.................................41
    Section 5.26.    Deposits Under Approved Sale Contracts and Reservation Agreements.....................................................41
    Section 5.27.    ILSA.............................................................................42

**ARTICLE VI         SPECIAL COVENANTS**.........................................................**43**
    Section 6.1.     Property Use..................................................................43
    Section 6.2.     ERISA...........................................................................43
    Section 6.3.     Single Purpose Entity.....................................................44
    Section 6.4.     Restoration....................................................................47
    Section 6.5.     Lockbox.........................................................................51
    Section 6.6.     Notices of Default Under Construction Project Loan Document.............51
    Section 6.7.     Other Debt.....................................................................51
    Section 6.8.     Service Rights................................................................51
    Section 6.9.     Warrants and Options....................................................52
    Section 6.10.    Development of Property................................................52
    Section 6.11.    Construction Project.......................................................52
    Section 6.12.    Condominium Creation...................................................56
    Section 6.13.    Intentionally Omitted.....................................................58
    Section 6.14.    Developer's Fee and the Del American Construction Fee.........................58
    Section 6.15.    Construction Project Management Agreement...................58

**ARTICLE VII      FURTHER ASSURANCES** ....................................................**59**
    Section 7.1.    Further Acts, Etc .....................................................................59
    Section 7.2.    Changes in Tax, Debt, Credit and Documentary Stamp Laws. ............59
    Section 7.3.    Estoppel Certificates ..............................................................60
    Section 7.4.    Splitting of the Loan Documents ...............................................61
    Section 7.5.    Replacement Documents .........................................................61
    Section 7.6.    Recording of Security Instrument/Pledge Agreements, Etc ...........61

**ARTICLE VIII      DUE ON SALE/ENCUMBRANCE** ..........................................**62**
    Section 8.1.    Lender Reliance ....................................................................62
    Section 8.2.    Sale/Encumbrance of the Collateral...........................................62
    Section 8.3.    Sale/Encumbrance of the Property.............................................63
    Section 8.4.    Sale/Encumbrance Defined......................................................63
    Section 8.5.    Lender's Rights.....................................................................63
    Section 8.6.    Release of Condominium Units ................................................64

**ARTICLE IX      PREPAYMENT** .................................................................**65**
    Section 9.1.    Prepayment Before Event of Default...........................................65

**ARTICLE X      DEFAULT** .......................................................................**66**
    Section 10.1.   Events of Default ..................................................................66
    Section 10.2.   Late Payment Charge.............................................................68
    Section 10.3.   Default Interest.....................................................................69

**ARTICLE XI      RIGHTS AND REMEDIES** ....................................................**69**
    Section 11.1.   Remedies.............................................................................69
    Section 11.2.   Application of Proceeds ..........................................................71
    Section 11.3.   Default under Construction Project Loan Documents. ....................71
    Section 11.4.   Right to Cure Defaults ...........................................................72
    Section 11.5.   Actions and Proceedings.........................................................72
    Section 11.6.   Recovery of Sums Required To Be Paid .....................................73
    Section 11.7.   Examination of Books and Records............................................73
    Section 11.8.   Other Rights, Etc...................................................................73
    Section 11.9.   Right to Release Any Portion of the Property, the Pledged Interests
                 and/or Collateral...................................................................74
    Section 11.10. Violation of Laws ..................................................................74
    Section 11.11. Recourse and Choice of Remedies ............................................74
    Section 11.12. Right of Entry ......................................................................75

**ARTICLE XII      ENVIRONMENTAL HAZARDS** ..............................................**75**
    Section 12.1.   Environmental Representations and Warranties............................75
    Section 12.2.   Environmental Covenants........................................................75
    Section 12.3.   Lender's Rights.....................................................................76

**ARTICLE XIII      BANKRUPTCY** ...............................................................**76**
    Section 13.1.   Material Inducement ..............................................................76
    Section 13.2.   No Fraudulent Intent ..............................................................77

Section 13.3.  No Bankruptcy Intent..................................................................77
Section 13.4.  Agreement in Best Interests of Parties; Consideration .............77
Section 13.5.  Waiver of Automatic and Supplemental Stays .........................77
Section 13.6.  Approval Rights Regarding Bankruptcy Proceeding.................78
Section 13.7.  Covenant of Non-Interference and Cooperation........................78

**ARTICLE XIV        INDEMNIFICATION ........................................................79**
Section 14.1.  General Indemnification ...........................................................79
Section 14.2.  Note and/or Intangible Tax .......................................................80
Section 14.3.  ERISA Indemnification .............................................................80
Section 14.4.  Environmental Indemnification .................................................80
Section 14.5.  Duty to Defend; Attorneys' Fees and Other Fees and Expenses ..............81

**ARTICLE XV        NOTICE..............................................................................81**
Section 15.1.  Notices ......................................................................................81

**ARTICLE XVI        SERVICE OF PROCESS.....................................................83**
Section 16.1.  Consent to Service. ....................................................................83
Section 16.2.  Submission to Jurisdiction .........................................................83
Section 16.3.  Jurisdiction Not Exclusive .........................................................83
Section 16.4.  Waiver of Jury Trial...................................................................83

**ARTICLE XVII        APPLICABLE LAW ...........................................................84**
Section 17.1.  Choice of Law............................................................................84
Section 17.2.  Usury Laws ................................................................................84
Section 17.3.  Provisions Subject to Applicable Law .......................................84

**ARTICLE XVIII        SECONDARY MARKET ....................................................84**
Section 18.1.  Transfer of Loan ........................................................................84

**ARTICLE XIX        COSTS ...............................................................................85**
Section 19.1.  Performance at Borrower's Expense ..........................................85
Section 19.2.  Attorney's Fees for Enforcement................................................85
Section 19.3.  Servicer Fee ...............................................................................86

**ARTICLE XX        MISCELLANEOUS PROVISIONS .....................................86**
Section 20.1.  No Oral Change .........................................................................86
Section 20.2.  Liability......................................................................................86
Section 20.3.  Inapplicable Provisions..............................................................86
Section 20.4.  Headings, Etc ............................................................................86
Section 20.5.  Duplicate Originals; Counterparts .............................................86
Section 20.6.  Number and Gender....................................................................86
Section 20.7.  Subrogation ................................................................................86
Section 20.8.  Entire Agreement .......................................................................87
Section 20.9.  Relationship ...............................................................................87
Section 20.10. Rights of Third Parties................................................................87
Section 20.11. Time of the Essence ...................................................................87

Section 20.12. Reliance.................................................................................87
Section 20.13. No Lender Obligations..........................................................88

ARTICLE XXI        WAIVERS .....................................................................88
Section 21.1.  Waiver of Counterclaim.........................................................88
Section 21.2.  Marshaling and Other Matters ...............................................88
Section 21.3.  Waiver of Notice....................................................................88
Section 21.4.  Waiver of Statute of Limitations............................................89
Section 21.5.  Sole Discretion of Lender ......................................................89
Section 21.6.  Survival ..................................................................................89

ARTICLE XXII       RECOURSE OBLIGATIONS.........................................89
Section 22.1.  Exculpation ............................................................................89
Section 22.2.  Reservation of Certain Rights................................................90
Section 22.3.  Exceptions to Exculpation .....................................................90
Section 22.4.  Recourse.................................................................................91
Section 22.5.  Bankruptcy Claims.................................................................93

ARTICLE XXIII      CONDITIONS PRECEDENT ........................................93

ARTICLE XXIV      PREDEVELOPMENT SERVICES AND INTEREST
                   RESERVE........................................................................95
Section 24.1.  Initial Advance.......................................................................95
Section 24.2.  Disbursements from the PDC Account...................................96
Section 24.3.  Additional Covenants of Borrower ........................................97

ARTICLE XXV       ADDITIONAL LOAN ADVANCE ................................98
Section 25.1.  Intentionally Omitted .............................................................98
Section 25.2.  Additional Loan Funding........................................................98
Section 25.3.  Additional Loan Advances ...................................................102
Section 25.4.  Termination of Loan Advances ............................................102
Section 25.5.  Additional Conditions to Additional Loan Advances............102
Section 25.6.  Additional Covenants of Borrower .......................................103

ARTICLE XXVI      INTEREST RESERVE, EXTENSION FEES, SERVICER FEE .......106
Section 26.1.  Interest Reserve Account ......................................................106
Section 26.2.  Extension Fees ......................................................................107
Section 26.3.  Servicer Fee ..........................................................................107

## EXHIBITS AND SCHEDULES

EXHIBIT A        LEGAL DESCRIPTION...........................................................A-1
EXHIBIT B        PREDEVELOPMENT BUDGET .............................................B-1
EXHIBIT C        REQUEST FOR ADVANCE ...................................................C-1
EXHIBIT D        TITLE COMPANY LETTER ..................................................D-1
EXHIBIT E        INTENTIONALLY OMITTED ................................................E-1
EXHIBIT F        CONDOMINIUM SALES AND RESERVATION REPORT ................F-1

**EXHIBIT G**      **REQUEST FOR DISBURSEMENT** ............................................................. G-1

**EXHIBIT H**      **LEASES** ................................................................................................ H-1

**SCHEDULE 1**   **INTENTIONALLY OMITTED** ............................................................... S-1

**SCHEDULE 2**   **LITIGATION**........................................................................................ S-2

**SCHEDULE 3**   **ENVIRONMENTAL REPORT** .............................................................. S-3

**WMLM DRAFT**
**11/8/04**
**100700/931**

## LOAN AGREEMENT

THIS LOAN AGREEMENT (this "**Agreement**" or "**Loan Agreement**") is made as of the ___ day of December, 2004, by **THE TOWERS – LAS VEGAS, LLC**, a Nevada limited liability company ("**Owner**"), and **THE TOWERS – LV, LLC**, a Delaware limited liability company ("**Towers LLC**" or "**Mezzanine Borrower**"), each having its principal place of business at 474 South North Lake Boulevard, Suite 1020, Altamonte Springs, Florida 32701 (individually and collectively, the "**Borrower**"), and **LEHMAN BROTHERS HOLDINGS INC.**, doing business as Lehman Capital, a division of Lehman Brothers Holdings Inc., a Delaware corporation having an office at 399 Park Avenue, 8th Floor, New York, New York 10022 ("**Lender**").

## RECITALS

WHEREAS, Owner is on the date hereof and simultaneously herewith acquiring fee simple title to that certain 9.0185 acre ± parcel of vacant land located in Las Vegas, Nevada, as more particularly described in **Exhibit A** attached hereto and made a part hereof (the "**Land**") including all Improvements and Personal Property located thereon, (the Land, together the Improvements and the Personal Property shall be collectively referred to herein as the "**Property**") from Flamingo Valley View, LLC, a Nevada limited liability company (the "**Seller**"). In connection therewith, Seller has made or is about to make a loan to The Towers - LV, Inc., a Delaware corporation ("**Towers Inc.**") in the original principal amount of $27,500,000.00 (the "**Subordinate Loan**"), which Subordinate Loan is evidenced by a certain Promissory Note, dated December __, 2004, made by Towers Inc. to Seller in the amount of the Subordinate Loan (the "**Subordinate Note**").

WHEREAS, Towers LLC is the sole member of, and collectively holds 100% of the membership interests in, Owner;

WHEREAS, The Towers – LV Member, LLC, a Delaware limited liability company ("**LV Member**") is the sole member of, and holds 100% of the membership interests in, Towers LLC;

WHEREAS, Towers Inc., is a member of, and holds 100% of the membership interests in LV Member;

WHEREAS, Christopher DelGuidice, an individual ("**Principal**"), is the sole shareholder of Towers Inc.;

WHEREAS, Lender (1) is prepared to make a loan (the "**Initial Loan**") to Borrower in the principal amount of up to Thirty Seven Million Five Hundred Thousand Dollars ($37,500,000.00), (2), may, in its sole and absolute discretion (but shall have no obligation to), make additional loan advances of up to $18,835,037.00 (the "**Additional Loan Advances**"), (3), may make an additional loan of up to $14,985,495.00 fund the Interest Reserve Account (as

defined in the Note) subject to the terms hereof and to the terms of the Note, (4), may, upon Borrower's exercise of the First Extension Option make an additional loan in the amount of the First Extension Fee (as defined in the Note) and (5), may, upon Borrower's exercise of the Second Extension Option, make an additional loan in the amount of the Second Extension Fee (as defined in the Note) (the Second Extension Fee together with the Initial Loan, the Additional Loan Advances, the funds utilized to fund the Interest Reserve Account, and the First Extension Fee, the "**Loan**"), in each case pursuant to the terms and conditions of this Agreement, to be evidenced by that certain Secured Promissory Note of even date herewith in the principal amount of up to $79,450,000.00 made by Borrower to Lender (the "**Note**"), or so much thereof as may be advanced pursuant to the terms of this Agreement and the Note, to (i) acquire the Property from Seller, of which Loan proceeds in the approximate amount of $22,093,376.92 will be advanced at Closing, (ii) finance Predevelopment Costs (as defined herein) in the amount of approximately $15,406,623.00, (iii) at Lender's election only, to fund the Interest Reserve Account (as defined herein) in an amount not to exceed $14,985,495.00, (iii) up to $8,129,468.00 shall be available to fund the First Extension Fee and the Second Extension Fee only, subject to the terms hereof and to the terms of the Note; and (iv) if Lender, in its sole and absolute discretion, elects to fund any or all of the Additional Loan Advances to finance any Project Costs approved by Lender in accordance with the Construction Project;

WHEREAS, the Loan shall be secured by inter alia: (1) a pledge of, and security interest in, (a) all membership interests of Towers LLC in Owner (the "**Towers LLC Pledge Agreement**"), (b) all membership interests of LV Member in Towers LLC (the "**LV Member Pledge Agreement**") and (c) all membership interests of Towers Inc. in LV Member (the "**Towers Inc. Pledge Agreement**"), (each of Towers LLC, LV Member and Towers Inc. are sometimes collectively referred to herein as "**Pledgors**") as evidenced by each of those certain Membership Pledge and Security Agreements of even date herewith made by each of the respective Pledgors in favor of Lender (each of the agreements referred to in (a) through (c) above, are sometimes collectively referred to herein as the "**Pledge Agreements**"); and (2) that certain Deed of Trust and Security Agreement, dated of even date herewith, made by Owner to Lawyers Title Nevada, Inc. for the use and benefit of Lender ("**Security Instrument**").

WHEREAS, Lender is willing to provide such Loan to Borrower upon the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the recitals herein and the mutual covenants contained herein, the parties hereto hereby covenant and agree as follows:

## ARTICLE I

## DEFINITIONS AND RULES OF INTERPRETATION

Section 1.1.   **Definitions**.  The following terms shall have the meanings set forth in this Article or elsewhere in the provisions of this Agreement referred to below:

**Accrued Interest**.  As defined in the Note.

**ADA Indemnity**. That certain ADA Indemnity Agreement to be delivered by Mezzanine Borrower in favor of Lender on the CPL Closing Date, in a form satisfactory to Lender.

**ADA**. The Americans with Disabilities Act of 1990, Pub. Law 101-36, 42 U.S.C. §§ 12101, *et seq*., together with any federal, state or local law, rule, ordinance, regulation, order or policy as now or at any time hereafter in effect (a) enacted in connection therewith and (b) concerned with similar subject matter.

**Additional Fee**. As defined in the Note.

**Additional Loan Advances**. As defined in Section 25.3 hereto.

**Affiliate Transaction**. Any contract, agreement or other arrangement between Borrower (or any other Person if such contract, agreement or other arrangement is in any way related to the Property) and any Affiliate of Borrower or any principal of Borrower or pursuant to which any Affiliate of Borrower or any principal of Borrower or any constituent member, partner or stockholder of Borrower or any Affiliate of Borrower or any principal of Borrower (in each case, direct or indirect) will receive any benefit of any kind.

**Affiliate**. When used with reference to any Person, (a) each Person that, directly or indirectly, controls, is controlled by or is under common control with, the Person referred to, (b) each Person which beneficially owns or holds, directly or indirectly, five percent (5%) or more of any class of voting stock of the Person referred to (or if the Person referred to is not a corporation, five percent (5%) or more of the equity interest therein), (c) each Person, five percent (5%) or more of the voting stock (or if such Person is not a corporation, five percent (5%) or more of the equity interest therein) of which is beneficially owned or held, directly or indirectly, by the Person referred to, and (d) each of such Person's officers, directors, joint ventures and partners. The term control (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of the Person in question.

**Agreement**. This Loan Agreement, including the Schedules and Exhibits hereto.

**Approved Reservation Agreement**. An executed reservation agreement reserving the right to purchase a Condominium Unit at the Condominium by a *bona fide* purchaser that is not an Affiliate of Borrower, any Pledgor, any Guarantor or any of their constituent principals ("**Third Party**"), which shall, unless otherwise permitted by Lender in writing, (I) be substantially on a form approved by Lender, and (II) provide for a sales price approved by Lender in its sole and absolute discretion; provided, however, that any reservation agreement with any Third Party shall be deemed an Approval Reservation Agreement, if the sales price for such Condominium Unit is no less than the Minimum Sales Price for such Condominium Unit and is on the form of reservation agreement (without modification) approved by Lender.

**Approved Sale Contract**. An executed contract for the sale of a Condominium Unit at the Condominium to a *bona fide* purchaser that is not an Affiliate of Borrower, any Pledgor or any Guarantor, or any of their constituent principals, which shall, unless otherwise

permitted by Lender in writing, (I) be substantially on a form approved by Lender, and (II) provide for a sales price no less than the Minimum Sales Price for such Condominium Unit.

**Architect**.    Any architect selected by Owner and approved by Lender in its reasonable discretion.

**Architect's Agreement**.    That architect's agreement for the Construction Project to be entered into by and between Owner and Architect, subject to Lender's reasonable approval or any successor architect agreement or agreements the terms and conditions of which shall be approved by Lender in its reasonable discretion.

**Assignment and Consent of Architect**.    That certain Assignment and Consent of Architect to be executed by the Architect, Owner and Lender, as the same may be modified or amended in accordance herewith or therewith.

**Assignment of Leases and Rents**.    That certain Assignment of Leases and Rents of even date herewith given by Owner to Lender, as the same may be modified or amended in accordance with the terms hereof.

**Assignment of Permits**.    That certain Assignment of Permits, Licenses and Agreements of even date herewith given by Borrower to Lender, as the same may be modified or amended in accordance with the terms hereof.

**Available Cash Flow**.    Shall mean all revenues generated from the operation of the Property in excess of (i) Operating Expenses and (ii) interest, principal and any other sums payable or required to be paid to Construction Project Lender pursuant to the terms of the Construction Project Loan.

**Bankruptcy Code**.    Title 11, U.S.C. Section 101, et seq., as amended from time to time or any successor statute thereto

**Bankruptcy Default Party**.    As defined in Section 10.1 herein.

**Bankruptcy Filing**.    As defined in Section 10.1 herein.

**Business Day**.    Any weekday, Monday through Friday, except a legal holiday or a day on which banking institutions in New York, New York are authorized by law to be closed.

**Capitalized Lease**.    A Lease under which the discounts and/or future rental payment obligations of the lessee or obligor thereunder are required to be capitalized on the balance sheet of the lessee or obligor in accordance with GAAP.

**Code**.    The Internal Revenue Code of 1986, as amended.

**Collateral**.    All of the property, rights and interests of Borrower, Guarantor, Indemnitors and Pledgors which are, or are intended to be, subject to the security interests, security title and liens created by any of the other Loan Documents.

**Completion Date**. Shall mean the thirtieth (30th) month anniversary of the closing of the Construction Project Loan.

**Condemnation Proceeds**. As defined in Section 6.4 herein.

**Condominium Act**. Collectively, Nevada Revised Statutes Chapter 116 and Nevada Revised Statutes Chapter 119.

**Condominium**. As defined in Section 6.12 herein.

**Condominium Documents**. All documents, as required by the Condominium Act and otherwise relating to the submission of the residential units constructed or to be construed on the Property to the provisions of said Condominium Act or to the regulations, operation, administration or sale thereof after such submission, including, but not limited to, declarations of condominium, offering circulars, articles of incorporation, if applicable, by-laws and rules and regulations of condominium associations, plats and contracts of sale and deed forms to be used in connection with the sale of the Condominium Units.

**Condominium Unit**. The individual condominium units (including, but not limited to, any appurtenant interest in the common elements) created by the submission of the Property to the provisions of the Condominium Act, including the Residential Units, the Retail Units, the Storage Spaces, the Parking Spaces and the Cabana Spaces.

**Consent and Agreement of Construction Manager**. That certain Consent and Agreement of Construction Manager dated the date hereof by and between Borrower and Construction Project Manager.

**Consent and Agreement of Developer**. That certain Consent and Agreement of Developer dated the date hereof by and between Borrower and Del American.

**Construction Consultant**. As defined in Section 6.11(f) herein.

**Construction Contracts**. Collectively, the General Contractor's Agreements, the Major Subcontracts and the Other Subcontracts.

**Construction Project**. The construction of (i) a building (the "**Tower**") in accordance with the Zoning Approval and any airspace approvals by the Federal Aviation Administration and any other airspace approval required by the Zoning Approval (the "**Airspace Approvals**") containing 542 residential units (each a "**Residential Unit**"), (ii) 2 buildings containing 5 cabanas each ("**Cabana Building**") and 13 cabanas constructed as part of the residential Tower (each cabana in the Cabana Building and the Tower, a "**Cabana Space**"), (iii) retail units (each a "**Retail Unit**") encompassing approximately 16,500 square feet of retail space in the aggregate, (iv) a health club containing approximately 1,400 square feet and 5,800 square feet for social events (the "**Health Club**") which Health Club shall be part of the common elements of the Condominium, (v) storage area of approximately 20,000 square feet (the "**Storage Spaces**"), and (vi) parking, consisting of a garage with one level below grade and the other above ground, and the balance comprising surface parking containing approximately 1023 parking spaces (the "**Parking Spaces**") in the aggregate, all which will be subject to the condominium regime and which is referred to herein as the Condominium, all in accordance with

the Zoning Approval, the Airspace Approval, the Project Budget and the Plans and Specifications, in each case, approved by Lender as provided herein.

**Construction Project Approvals.** As defined in Section 6.11(b) herein.

**Construction Project Lender.** As defined in Section 6.11(f) herein.

**Construction Project Loan.** As defined in Section 6.11(f) herein.

**Construction Project Loan Commitment.** As defined in Section 6.11(f) herein.

**Construction Project Loan Documents.** The documents and instruments executed in connection with the Construction Project Loan made by the Construction Project Lender, including, without limitation, the Construction Project Note and the Construction Project Mortgage, approved by Lender.

**Construction Project Manager.** Construction Management & Development - Nevada LLC.

**Construction Project Management Agreement.** That certain construction management and development agreement with respect to the Construction Project, dated September 13, 2004, by and between Owner and Construction Project Manager.

**Construction Project Manager Fee.** As defined in Section 6.15 herein.

**Construction Project Mortgage.** The mortgage, deed of trust or other security instrument (I) encumbering the Property and (II) securing the Construction Project Loan.

**Construction Project Note.** The secured promissory note evidencing the Construction Project Loan.

**CPL Closing Date.** As defined in Section 6.11(f) herein.

**Current Developer's Fee.** As defined in Section 6.14 herein.

**Debt.** As defined in Section 2.3 herein.

**Default Rate.** As defined in Section 10.3 herein.

**Deferred Developer Fee.** As defined in Section 6.14 herein.

**Del American Construction Fee.** As defined in Section 6.14 herein.

**Direct Construction Costs.** The direct construction costs incurred or to be incurred by the Owner in connection with the Construction Project, and itemized in the Project Budget as approved by Lender, including, without limitation, costs for materials and labor in connection with the Construction Project, General Contractor's fees and Architect's fees.

**Dollars** or **$.** Dollars in lawful currency of the United States of America.

**Entitlements**. As defined in Section 6.11 herein.

**Environmental Indemnity**. That certain Environmental Indemnity Agreement made by Guarantor and Borrower in favor of Lender, as the same may be modified or amended.

**Environmental Law**. Any present and future federal, state and local laws, statutes, ordinances, rules, regulations and the like, as well as common law, relating to protection of human health or the environment, relating to Hazardous Substances, relating to liability for or costs of Remediation or prevention of Releases of Hazardous Substances or relating to liability for or costs of other actual or threatened danger to human health or the environment. "Environmental Law" includes, but is not limited to, the following statutes, as amended, any successor thereto, and any regulations promulgated pursuant thereto, and any state or local statutes, ordinances, rules, regulations and the like addressing similar issues: the Comprehensive Environmental Response, Compensation and Liability Act; the Emergency Planning and Community Right-to-Know Act; the Hazardous Substances Transportation Act; the Resource Conservation and Recovery Act (including but not limited to Subtitle I relating to underground storage tanks); the Solid Waste Disposal Act; the Clean Water Act; the Clean Air Act; the Toxic Substances Control Act; the Safe Drinking Water Act; the Occupational Safety and Health Act; the Federal Water Pollution Control Act; the Federal Insecticide, Fungicide and Rodenticide Act; the Endangered Species Act; the National Environmental Policy Act; and the River and Harbors Appropriation Act. "Environmental Law" also includes, but is not limited to, any present and future federal, state and local laws, statutes, ordinances, rules, regulations and the like, as well as common law: conditioning transfer of property upon a negative declaration or other approval of a governmental authority of the environmental condition of the Property; requiring notification or disclosure of Releases of Hazardous Substances or other environmental condition of the Property to any governmental authority or other person or entity, whether or not in connection with transfer of title to or interest in property; imposing conditions or requirements in connection with permits or other authorization for lawful activity; relating to nuisance, trespass or other causes of action related to Hazardous Substances or other environmental condition of the Property; and relating to wrongful death, personal injury, or property or other damage in connection with Hazardous Substances or other environmental condition of the Property.

**Environmental Liens**. As defined in Section 12.2 herein.

**Environmental Report**. As defined in Section 12.1 herein.

**Equity Requirement**. An amount equal to 8% of the Project Budget (with the value attributable to the land in the Project Budget being determined by an appraisal satisfactory to Lender). The Equity Requirement may be contributed by Borrower or the Principal (1) in cash, and/or (2) land value (based upon an appraisal satisfactory to Lender); provided, however, that the $22,500,000.00 funded from Loan proceeds to purchase the Property shall be deducted from the land value in calculating Borrower's contribution of such Equity Requirement.

**ERISA**. The Employee Retirement Income Security Act of 1974, as amended and in effect from time to time.

**Escrow Fund**. As defined in Section 5.6 herein.

**Event of Default**. As defined in Section 10.1 herein.

**Event**. As defined in Section 19.1 herein.

**First Extension Fee**. As defined in the Note.

**First Extension Interest Reserve Advance**.    As defined in Section 26.1(b) herein.

**First Extension Unfunded Amount**, As defined in Section 26.1(b) herein.

**Force Majeure**. Any (i) strike, (ii) acts of God, fire or other casualty, (iii) civil commotion, (iv) riot, (v) war, (vi) governmental preemption of priorities or other controls in connection with a national or other public emergency (vii) shortage of labor, fuel or material in connection with the foregoing (viii) terrorist attacks, or (ix) any other cause outside the control of the parties that could not be avoided by the exercise of due care.

**GAAP**. As defined in Section 5.12(a) herein.

**General Contractor**. Any general contractor for the Construction Project which has been selected by Owner and approved in writing by Lender, in its reasonable discretion.

**General Contractor's Agreements**. The general contractor's agreement for the Construction Project by and between Owner and General Contractor, the terms and conditions of which shall be reviewed and approved by Lender in its reasonable discretion, or any successor general contractor's agreement or agreements, the terms and conditions of which shall be approved by Lender in its reasonable discretion.

**Governmental Authorities**. The government of the United States of America and any state which is a part thereof, any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body or other entity exercising powers or functions of or pertaining thereto.

**Guarantor**. Christopher DelGuidice, an individual.

**Guaranty**. That certain Guaranty of even date herewith made by Guarantor in favor of Lender, as the same may be modified or amended.

**Hazardous Substances**. Any and all substances (whether solid, liquid or gas) defined, listed, or otherwise classified as pollutants, hazardous wastes, hazardous substances, hazardous materials, extremely hazardous wastes, or words of similar meaning or regulatory effect under any present or future Environmental Laws or that may have a negative impact on human health or the environment, including but not limited to petroleum and petroleum products, asbestos and asbestos-containing materials, polychlorinated biphenyls, lead, radon, Mold, radioactive materials, flammables and explosives.

**Improvements**. With respect to the Property, all of the buildings, structures and improvements now, or to be constructed and thereafter located, on the Land.

**Indebtedness**. All obligations, contingent or otherwise, that in accordance with GAAP should be classified upon an obligor's balance sheet as liabilities, or to which reference

should be made by footnotes thereto, including in any event and whether or not so classified: (a) all debt and similar monetary obligations, whether direct or indirect (including, without limitation, any obligations evidenced by bonds, debentures, notes or similar debt instruments and all subordinated debt); (b) all liabilities secured by any mortgage, pledge, security interest, lien, charge or other encumbrance existing on property owned or acquired subject thereto, whether or not the liability secured thereby shall have been assumed; (c) all guarantees, endorsements and other contingent obligations whether direct or indirect in respect of indebtedness of others, including any obligation to supply funds to or in any manner to invest directly or indirectly in a Person, to purchase indebtedness, or to assure the owner of indebtedness against loss through an agreement to purchase goods, supplies or services for the purpose of enabling the debtor to make payment of the indebtedness held by such owner or otherwise, and the obligation to reimburse the issuer in respect of any letter of credit; and (d) any obligation as a lessee or obligor under a Capitalized Lease including, without limitation, any equipment lease.

**Indemnified Parties** or **Indemnified Party**. As defined in Section 14.1 herein.

**Indemnitors**. Collectively and individually, Borrower and Principal.

**Independent Director.** As defined in Section 6.3 herein.

**Initial Advance**. $37,500,000.00 of Loan proceeds advanced on the date hereof.

**Institutional Lender.** An "**Institutional Lender**" means (a) a savings bank, a savings and loan association, a commercial bank or trust company (b) an insurance company organized and existing under the laws of the United States or any state thereof, (c) a religious, educational or eleemosynary institution, a governmental agency, body or entity, an employee benefit, pension or retirement plan or fund, (d) a commercial credit corporation (such as General Electric Capital Corporation, GMAC, or AT&T Capital Corporation), (e) an investment bank, (f) a commercial bank or trust company acting as trustee or fiduciary of various pension funds or tax-exempt funds, or as trustee (or performing functions equivalent to those of a trustee) in connection with the issuance of any bonds or any other debt financing or a subtrustee of any such commercial bank or trust company acting as such trustee (or performing functions equivalent to those of a trustee)); *provided* that each of the above entities referred to in clauses "a" through "f" or any combination of such entities, shall qualify as an Institutional Lender only if each such entity (1) is not an Affiliate of Borrower or any of its Affiliates, and (2) is subject to (i) or can be subject to the jurisdiction of the courts of the State of New York in any actions and (ii) the supervision of (A) the Comptroller of the Currency or the Department of Labor of the United States or the Federal Home Loan Bank Board or the Insurance Department or the Banking Department or the Comptroller of the State of New York, or the Board of Regents of the University of the State of New York, or the Comptroller of New York City or any successor to any of the foregoing agencies or officials, or (B) any agency or official exercising comparable functions on behalf of any other state within the United States, or (C) in the case of a commercial credit corporation or an investment bank, the laws and regulations of the state of its incorporation or other formation, or (D) any federal, state or municipal agency or public benefit corporation or public authority advancing or insuring mortgage loans or making payments that, in any manner, assist in the financing, development, operation and maintenance of improvements.

**Insurance Premiums**. As defined in Section 5.4(b) herein.

**Insurance Proceeds**. As defined in Section 6.4(b) herein.

**Intercreditor Agreement**. As defined in Section 25.2(a)(xii) herein.

**Interest Reserve Advance**. As defined in Section 26.1 herein.

**Investor**. As defined in Section 18.1 herein.

**Land**. As defined in the Recitals.

**Leases**.    All leases, licenses, occupancy agreements and other agreements affecting the use, enjoyment or occupancy of the Land and/or the Improvements heretofore or hereafter entered into whether before or after the filing by or against Borrower of any petition for relief under the Bankruptcy Code, as amended, modified or extended.

**Legal Requirements**. All Federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of any Governmental Authorities, articles or certificates of incorporation, partnership or limited liability company, by-laws, operating agreements, partnership agreements and other organizational documents, affecting the Pledged Interests or the Property, or any part thereof or the construction, use, alteration or operation thereof, or any part thereof, or the creation of the condominiums, whether now or hereafter enacted and in force, and all material permits, licenses and authorizations and regulations relating thereto, and all material covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Borrower, at any time in force affecting the Pledged Interests or the Property or any part thereof, including, without limitation, any which may (i) require repairs, modifications or alterations in or to the Property or any part thereof, or (ii) in any material way limit the use and enjoyment of the Property or the Pledged Interests.

**Lender's Title Policy**. Lender's title insurance policy issued by Title Company in accordance with policy number 04-01-2020 CLB, which insures Lender's first mortgage lien on the Property.

**Loan**. As defined in the Recitals hereto.

**Loan Agreement**. As defined in the Recitals hereto.

**Loan Documents**.    This Agreement, the Note, the Security Instrument, the Assignment of Leases and Rents, the Assignment of Permits, the Pledge Agreements, the Other Security Documents and all other documents, instruments or agreements now or hereafter executed or delivered by or on behalf of Borrower, the Guarantor, Indemnitors and/or Pledgors in connection with the Loan.

**Loan Party** or **Loan Parties**. As defined in Section 8.2 herein.

**Lockbox**. As defined in Section 6.5 herein.

**Losses**. As defined in Section 14.1 herein.

**Major Subcontracts**.  Any contract or contracts entered into with any single subcontractor or materialman employed by General Contractor or Owner in connection with the Construction Project, as the case may be, and providing for the aggregate payments to such subcontractor or materialman equal to or in excess of $500,000.00.

**Management Agreement**.  A property management agreement that may be entered between Owner and Management Company, the terms and conditions of which shall be approved or disapproved by Lender in its sole and absolute discretion, including, without limitation, any agreement that would require the Management Company to operate the Health Club, the common areas of the Condominium and concierge services.

**Management Company**.  Any management company or other type of company that would provide services under the Management Agreement for the Property or any portion thereof which has been approved by Lender in its sole and absolute discretion.

**Maturity Date**. As defined in the Note.

**Minimum Monthly Interest Amount First Extension Deficiency**.  As defined in Section 26.1(b) herein.

**Minimum Monthly Interest Amount Second Extension Deficiency**.  As defined in Section 26.1(b) herein.

**Minimum Sales Price**.  Shall mean the minimum sales price for each Condominium Unit, including the Residential Units, the Retail Units, any Cabana Space, Storage Space and Parking Space being sold with a Residential Unit or a Retail Unit, as approved by Lender in its sole and absolute discretion.

**Mold**.  Any mold, mildew and fungi (living or dead) or their mycotoxins, spores and other byproducts present in a quantity, of a type, or in such manner, as to pose a potential risk to human health or a potential violation of any Environmental Laws or other legal or regulatory requirements or to indicate significant impairment to the structure where the mold, mildew, fungi or their mycotoxins, spores or other byproducts exist.

**Net Proceeds**. As defined in Section 6.4(b) herein.

**New Management Company**. As defined in Section 5.14 herein.

**Note**. As defined in the Recitals herein.

**Notices**. As defined in Section 15.1 herein.

**Obligations**. The timely payment of the Debt and the performance of the Other Obligations.

**Operating Budget**. As defined in Section 5.12(a)(v) herein.

**Operating Expenses**.  All operating expenses which are incurred by Owner in the normal course of business with respect to the Property and not paid to an Affiliate of Borrower

(except to the extent an Affiliate is providing services at the Property at competitive market rates pursuant to an agreement approved by Lender in its reasonable discretion, excluding (i) the Affiliate Broker's Fee (which may be paid from sales proceeds in accordance with Section 8.6 hereof), and (ii) the Developer's Fee), any Pledgor, any Guarantor or any Indemnitor (provided that such expenditures are not paid from the proceeds of escrowed accounts of borrowed funds or Loan proceeds, or if applicable, Construction Project Loan proceeds), including, but not limited to, expenses for taxes and insurance (but only to the extent deposits have not been made with, or loan advances made by, Lender, or if applicable Construction Project Lender, for taxes and insurance), repairs, maintenance, the management fee, if any, salaries, professional fees, wages, utilities and deposits to tax, insurance and similar reserve accounts to the extent approved by Lender or otherwise in accordance with the Operating Budget approved by Lender if any Operating Budget is required to be submitted under the provisions of this Agreement. From and after the sale of the first Condominium Unit, the Operating Expenses shall not include any operating expenses attributable, or allocated, or with respect, to any Condominium Units or common areas not owned by Owner or sold to a third party.

**Other Charges**. As defined in Section 5.5 herein.

**Other Obligations**. As defined in Section 2.4 herein.

**Other Project Costs**. All debt service relating to the Construction Project operating expenses (including, without limitation, taxes, utilities, and other sums due to maintain the Property during its construction period), leasing commissions and other costs incurred due to maintaining the Property and completing the Construction Project, as the case may be, which are not directly attributable to the Construction Project in each case as approved by Lender and set forth in its respective project budget.

**Other Security Documents**. The Assignment of Leases and Rents, the Assignment of Permits, the Pledge Agreements, the Environmental Indemnity, the Guaranty, the Consent and Agreement of Construction Project Manager, the consent and Agreement of Developer and any further collateral assignment for the benefit of Lender, including, without limitation, UCC-1 financing statements executed and delivered in connection therewith.

**Outside Date**. Shall mean February 15, 2006.

**Owner's Escrow Agent**. Nevada Title Company.

**Ownership Interests**. As defined in Section 8.2 herein.

**P&S Approval Date**. As defined in Section 6.11(c) herein.

**P&S Delivery Date**. As defined in Section 6.11(c) herein.

**PDC Account**. As defined in Section 24.1 herein.

**PDC Deficiency**. As defined in Section 24.3(b) herein.

**PDC Deposit**. As defined in Section 24.1 herein.

**Permitted Exceptions**.  With respect to the Property, (a) the liens and security interests created by any of the Loan Documents; (b) all liens, encumbrances and other matters disclosed in the Lender's Title Policy; (c) liens, if any, for Taxes imposed by any governmental authority not yet due or delinquent; (d) any and all utility or access easements that may exist and that do not materially and adversely affect (i) the marketability of title to the Property, (ii) the fair market value of the Property, (iii) the use of the Property for its use as of the date hereof and its intended use or (iv) Owner's ability to comply with the terms and provisions of any of the Loan Documents; and (e) such other title and survey exceptions as Lender has approved or may approve in writing in Lender's reasonable discretion.

**Person**.  Any individual, corporation, limited liability company, partnership, trust, unincorporated association, business, or other legal entity, and any government or any governmental agency or political subdivision thereof.

**Personal Property**.  All machinery, equipment, fixtures (including, but not limited to, all heating, air conditioning, plumbing, lighting, communications and elevator fixtures) and other property of every kind and nature whatsoever owned by Borrower, or in which Borrower has or shall have an interest, now or hereafter located upon the Property or appurtenant thereto, and usable in connection with the present or future operation and occupancy of the Property and all building equipment, materials and supplies of any nature whatsoever owned by Borrower, or in which Borrower has or shall have an interest, now or hereafter located upon the Property, or appurtenant thereto, or usable in connection with the present or future operation and occupancy of the Property.

**Plans and Specifications**.  The sets of design plans and specifications for the Construction Project to be prepared by the Architect and reviewed and approved by Lender.  The term also includes any material modification of any of such plans, maps, sketches, diagrams, surveys, drawings, specifications or lists of materials if the modification is in writing and is initialed by the Lender and the Owner or the Architect.

**Pledge Agreements**.  As defined in the Recitals hereto.

**Pledged Interests**.  All of (i) the membership interests of Towers LLC in Owner; (2) all of the membership interests of LV Member in Towers LLC; and (3) all the membership interests of Towers Inc. in LV Member.

**Pledgors**.  As defined in the Recitals hereto.

**Policies** or **Policy**.  As defined in Section 5.4(b) herein.

**Predevelopment Budget**.  As defined in Section 24.1 and set forth in Exhibit B

**Predevelopment Costs**.  As defined in Section 24.1 herein.

**Predevelopment Services Contracts**.  Any contract for Predevelopment Services with any provider of Predevelopment Services.

**Predevelopment Services**.  As defined in Section 24.1 herein.

**Project Budget**. As defined in Section 6.11(d) herein.

**Project Budget Amendment**. As defined in Section 6.11(d) herein.

**Property**. As defined in the Recitals hereto.

**Protective Advances**. As defined in Section 5.19(d) herein.

**Purchase Agreement**. As defined in Article XXIII (u).

**Qualified Insurer**. As defined in Section 5.4(b) herein.

**Rating Agency**. As defined in Section 5.4(b) herein.

**Release**. Release of any Hazardous Substance includes but is not limited to any release, deposit, discharge, emission, leaking, spilling, seeping, migrating, injecting, pumping, pouring, emptying, escaping, dumping, disposing or other movement of Hazardous Substances.

**Remediation**. Remediation includes but is not limited to any response, remedial, removal, or corrective action, any activity to cleanup, detoxify, decontaminate, contain or otherwise remediate any Hazardous Substance, any actions to prevent, cure or mitigate any Release of any Hazardous Substance, any action to comply with any Environmental Laws or with any permits issued pursuant thereto, any inspection, investigation, study, monitoring, assessment, audit, sampling and testing, laboratory or other analysis, or evaluation relating to any Hazardous Substances.

**Rents** shall mean all rents, additional rents, revenues, issues, income and profits (including all oil and gas or other mineral royalties and bonuses) from the Property, if any, whether paid or accruing before or after the filing by or against Borrower of any petition for relief under the Bankruptcy Code.

**Restoration**. As defined in Section 5.4(h) herein.

**Second Extension Fee**. As defined in the Note.

**Second Extension Interest Reserve Advance**. As defined in Section 26.1(c) herein.

**Second Extension Unfunded Amount**. As defined in Section 26.1(c) herein.

**Securities**. As defined in Section 18.1 herein.

**Security Instrument**. As defined in the Recitals herein.

**Seller**. As defined in the Recitals hereto.

**Service Rights**. Any agreements, contracts, rights, licenses or other interests of any type (whether exclusive or non-exclusive) granted or given to any Person to provide any products or services to or for or with respect to the Property, any tenant or any occupants of the Property, including any of the same related to telecommunications, internet products or services

(including, but not limited to, personal computer hardware and software) internet hardware and software, internet access services, printers, video display systems, audio sound systems and communication telephonic devices, as well as related and complementary products and services and any substitutes for, and items that are a technological evolution of, any of the foregoing products.

**Servicer Fee**. Servicer Fee means a monthly fee in an amount (a) as long as the Loan is secured by the Security Instrument, calculated as follows: (x) eighteen (18) basis points, multiplied by (y) the outstanding principal balance of the Loan as of such date, divided by 12, or (b) from and after the date the Security Instrument is terminated or released, calculated as follows: (x) twenty (20) basis points multiplied by (y) the outstanding principal balance of the Loan as of such date, divided by 12, which fee is payable by Borrower on a monthly basis, commencing on February 1, 2005, and on each and every first day of the month thereafter. If the date hereof is not the first day of the month, then the Servicer Fee due February 1, 2005 shall be prorated on a per diem basis. The Servicer Fee represents a fee for the basic servicing and administration of the Loan, but such amount shall not include any amounts in connection with Servicer's or Lender's (or any third party engaged by them) review of leases, subordination non-disturbance agreements, property inspections, review of development plans or other plans and specifications, construction draws, casualty or condemnation matters or loan defaults.

**Servicer**. Trimont Real Estate Advisors, Inc., having an office at Monarch Tower, 3424 Peachtree Road NE, Suite 2200, Atlanta, Georgia 30326 or such other servicer as appointed by Lender in its sole and absolute discretion.

**Subordinate Loan**. As defined in the Recitals hereto.

**Subordinate Loan Documents**. The Subordinate Note, the Subordinate Pledge and all other documents, instruments or agreements now or hereafter executed or delivered by or on behalf of Towers Inc. or the Principal in connection with the Subordinate Loan.

**Subordinate Note**. As defined in the Recitals hereto.

**Taxes**. As defined in Section 5.5 herein.

**Terrorism Laws.** Executive Order 13224 issued by the President of the United States of America, the Terrorism Sanctions Regulations (Title 31 Part 595 of the U.S. Code of Federal Regulations), the Terrorism List Governments Sanctions Regulations (Title 31 Part 596 of the U.S. Code of Federal Regulations), the Foreign Terrorist Organizations Sanctions Regulations (Title 31 Part 597 of the U.S. Code of Federal Regulations), and the USA PATRIOT Act (Pub. L. No. 107-56, (2001), and all other present and future federal, state and local laws, ordinances, regulations, policies and any other requirements of any Governmental Authorities (including, without limitation, the United States Department of the Treasury Office of Foreign Assets Control) addressing, relating to, or attempting to eliminate, terrorist acts and acts of war, each as hereafter supplemented, amended or modified from time to time, and the present and future rules, regulations and guidance documents promulgated under any of the foregoing, or under similar laws, ordinances, regulations, policies or requirements of other States or localities.

**Title Company**. Lawyers Title Insurance Corporation.

**Transfer**. As defined in Section 8.2 herein.

**Triggering Event**. As defined in Section 26.1 herein.

**Tri-Party Agreement**. As defined in Section 25.2 hereof.

**UCC**. Uniform Commercial Code of the State of New York.

Section 1.2.    **Rules of Interpretation**.    The following rules of usage apply to the Note, this Agreement, the Security Instrument, the Pledge Agreements and the other Loan Documents:

(a)    Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, words used in this Agreement may be used interchangeably in singular or plural form and the word "**Borrower**" shall mean "each Borrower and any subsequent owner or owners of the Property or Pledged Interests or any part thereof or any interest therein," the word "**Owner**" shall mean "Owner and any subsequent owner or owners of the Property or any part thereof or any interest therein," the word "**Lender**" shall mean "Lender and any subsequent holder of the Note," the word "**person**" shall include an individual, corporation, partnership, trust, unincorporated association, government, governmental authority, and any other entity, the word "**Property**" shall include any portion of the Property and any interest therein, and the phrases "**attorneys' fees**", "**legal fees**" and "**counsel fees**" shall include any and all reasonable attorneys', paralegal and law clerk fees and actual disbursements, including, but not limited to, fees and disbursements at the pre-trial, trial and appellate levels incurred or paid by Lender in protecting its interest in the Property, the Collateral, the Pledged Interests, the Leases and the Rents, if any, and enforcing its rights hereunder.

(b)    Unless otherwise specifically provided herein, references in this Agreement to Section, Exhibits or Schedules are references to Sections, Exhibits or Schedules of this Agreement.

(c)    The headings, subheadings and table of contents used in this Agreement are solely for convenience of reference and shall not constitute a part of this Agreement nor shall they affect any meanings, construction or effect.

(d)    "or" is not exclusive and "include" and "Including" are not limiting.

(e)    "hereby," "herein," "hereof," and "hereunder" refer to this Agreement, as it may be amended, modified or supplemented from time to time in accordance with its terms.

(f)    All accounting terms not otherwise defined herein shall have the meanings assigned to such terms in conformity with GAAP.  Financial statements and other information furnished to Lender pursuant to this Agreement shall be prepared in accordance with GAAP.

(g)    Reference to "writing" include printing, typing, lithography and other means of reproducing words in a tangible visible form (but specifically excluding therefrom electronic-mail transmissions).

(h)    References to notes, mortgages, deeds of trust, deeds to secure debt, agreements and other contractual instruments and documents shall be deemed to include notes given in substitution or exchange for other notes, subsequent amendments, assignments, supplements and other modifications thereto and renewals, recastings, consolidations, spreadings and restatements thereof, but only to the extent such amendments, assignments and other modifications are not prohibited by the terms of this Agreement or any other Loan Document.

(i)    References to Persons include their respective permitted successors and assigns or, in the case of governmental Persons, Persons succeeding to the relevant functions of such Persons.

(j)    Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

(k)    All references to statutes and related regulations shall include any amendments of same and any successor status and regulations.

(l)    In determining operating expenses and revenues, no item of revenue or expense will be counted more than once.

(m)    References to "months," "quarters" or "years" refers, unless the context of this Agreement otherwise requires, to calendar months, calendar quarters or calendar years, respectively.

## ARTICLE II

## THE LOAN

Section 2.1.    **Commitment to Lend**.  Subject to the terms and conditions set forth in this Agreement, Lender (I) agrees to lend to Borrower an amount up to $60,614,963.00 in accordance with the terms hereof and (II) may in its sole and absolute discretion (but with no obligation to do so) lend to Borrower or Mezzanine Borrower an additional amount of up to $18,835,037.00, in each case, in accordance with the terms and conditions of this Agreement and the other Loan Documents.

Section 2.2.    **Note**.  The Loan shall be evidenced by the Note of Borrower of even date herewith payable to the order of Lender with a stated maturity date of January 1, 2008.

Section 2.3.    **Debt**.  This Agreement and the grants, pledges, assignments and transfers made herein, in the Security Instrument (provided, however, that on the date here, the Security Instrument only secures up to $47,625,000.00 of the principal amount of the Loan, any interest accrued thereon, the Additional Fee and any other sums advanced under the Security Instrument), the Pledge Agreements and in any of the other Loan Documents have been given for

the purpose of securing the following, in such order of priority as Lender may determine in its sole discretion (the "**Debt**"):

(a)    the payment of the indebtedness evidenced by the Note in lawful money of the United States of America;

(b)    the payment of default interest, late charges and other sums, as provided in the Note, this Agreement, the Security Instrument or any of the other Loan Documents;

(c)    the payment of Accrued Interest;

(d)    the payment of the Additional Fee;

(e)    the payment of all other moneys agreed or provided to be paid by Borrower in the Note, this Agreement, the Security Instrument, the Pledge Agreements or any of the other Loan Documents;

(f)    the payment of all sums advanced pursuant to this Agreement to protect and preserve the Property and the Pledged Interests, the lien and the security interest created by the Security Instrument, the Pledge Agreements, and any lien or security interest created hereby or in any of the other Loan Documents; and

(g)    the payment of all sums advanced and costs and expenses incurred by Lender in connection with the Debt or any part thereof, any renewal, extension, or change of or substitution for the Debt or any part thereof, or the acquisition or perfection of the security therefor, whether made or incurred at the request of Borrower or Lender.

Section 2.4.    **Other Obligations**.    This Agreement, and the grants, pledges, assignments, and transfers made herein, in the Security Instrument, in the Pledge Agreements, and in any of the other Loan Documents are also given for the purpose of securing the following (the "**Other Obligations**"):

(a)    the performance of all other obligations of the Borrower contained herein;

(b)    the performance of each obligation of each Borrower, each Guarantor, each Indemnitor and each Pledgor contained in any other agreement given to Lender which is for the purpose of further securing the obligations secured hereby, and any amendments, modifications and changes thereto; and

(c)    the performance of each obligation of each Borrower, each Guarantor, each Indemnitor and each Pledgor contained in any renewal, extension, amendment, modification, consolidation, change of, or substitution or replacement for, all or any part of the Note, this Agreement, the Security Instrument, the Pledge Agreements or any of the other Loan Documents.

Section 2.5.    **Payments**.    Unless payments are made in the required amount in immediately available funds at the place where the Note is payable or as otherwise designated by

Lender, remittances in payment of all or any part of the Debt shall not, regardless of any receipt or credit issued therefor, constitute payment until the required amount is actually received by Lender in funds immediately available at the place where the Note is payable (or any other place as Lender, in Lender's sole discretion, may have established by delivery of written notice thereof to Borrower) and shall be made and accepted subject to the condition that any check or draft may be handled for collection in accordance with the practice of the collecting bank or banks. For purposes hereof, a check or draft received by Lender shall not constitute immediately available funds until such check or draft has cleared and the Borrower shall remain liable for all amounts represented by any such checks or drafts which have not cleared. Acceptance by Lender of any payment in an amount less than the amount then due shall be deemed an acceptance on account only, and the failure to pay the entire amount then due shall be and continue to be an Event of Default.

## ARTICLE III

## COLLATERAL SECURITY

Section 3.1.    **Collateral**. The Obligations of Borrower shall be secured by (i) a perfected first priority security interest for the benefit of Lender in the Pledged Interests, and at Lender's option, a security interest in all other Collateral, (ii) a perfected first priority mortgage lien on the Property, subject to Section 25.2(b) hereof, and (iii) such additional collateral from Borrower or other Persons, if any, as Lender from time to time may accept as security for the Obligations of Borrower.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

As a material inducement to Lender to make the Loan to Borrower, Borrower represents and warrants to Lender as follows.

Section 4.1.    **Warranty of Title**. (a) Owner has good and marketable title to the Property and has the right to mortgage, grant, bargain, sell, pledge, assign, warrant, transfer and convey the same and Owner possesses a fee simple absolute estate in the Property encumbered only by the lien of the Security Instrument and that it owns the Property free and clear of all other liens, encumbrances and charges whatsoever except for Permitted Exceptions. Owner shall forever warrant, defend and preserve its title to the Property and the validity and priority of the lien of the Security Instrument and shall forever warrant and defend the same to Lender against the claims of all persons whomsoever.

(b)    Pledgors are the sole owners of their respective Pledged Interests and each Pledgor has the right to grant, bargain, sell, pledge, assign, warrant, transfer and convey its Pledged Interest and each Pledgor owns its respective membership interest free of all liens, encumbrances and charges whatsoever, except for the Loan Documents.

Section 4.2.    **Authority**. Each Borrower (and the undersigned representative of each Borrower, if any) has full power, authority and legal right to execute the Note, this Agreement and the Security Instrument to which it is a party, and each Borrower, and each of the

Pledgors, Guarantor and Indemnitors (and their respective undersigned representative, if any) has the full power, authority and legal right to execute the Pledge Agreements and each of the other Loan Documents to which it is a party and to keep and observe all conditions thereof.

Section 4.3. **Legal Status and Authority**. Each Borrower and each Pledgor (a) is duly organized, validly existing and in good standing under the laws of its state of organization or incorporation; (b) with respect to Owner, it is duly qualified to transact business and is in good standing in the state where the Property is located; and (c) has all necessary approvals, governmental and otherwise, and full power and authority to own, with respect to Owner, the Property and, with respect to each Pledgor, its respective Pledged Interest, and carry on its business as now conducted and proposed to be conducted. Each Borrower and each Pledgor now has and shall continue to have the full right, power and authority to (i) with respect to Owner, operate, lease, develop and encumber the Property, (ii) with respect to each Pledgor, encumber its respective Pledged Interest, (iii) with respect to each Borrower, perform all of the other obligations to be performed by Borrower under the Note, and (iv) with respect to each Borrower and each Pledgor, perform all of the other obligations to be performed by such parties under this Agreement, the Note, the Pledge Agreements and any of the other Loan Documents to which it is a party.

Section 4.4. **Validity of Documents**. (a) The execution, delivery and performance of the Note, this Agreement, the Security Instrument, the Pledge Agreements and any of the other Loan Documents to which Borrower is a party and the borrowing evidenced by the Note (i) are within the organizational power of each Borrower; (ii) have been authorized by all requisite organizational action; (iii) have received all necessary approvals and consents, corporate, governmental or otherwise; (iv) will not violate, conflict with, result in a breach of or constitute (with notice or lapse of time, or both) a default under any provision of law, any order or judgment of any court or governmental authority, the articles of incorporation, by-laws, partnership or operating agreement, trust agreement, or other governing instrument of said Borrower, or any indenture, agreement or other instrument to which said Borrower is a party or by which it or any of its assets or the Property is or may be bound or affected; (v) will not result in the creation or imposition of any lien, charge or encumbrance whatsoever upon any of its assets, except the lien and security interest created hereby or thereby; and (vi) will not require any authorization or license from, or any filing with, any governmental or other body (except the filing of UCC-1 Financing Statements in connection with the Pledge Agreements and the Pledged Interests); and (b) the Note, this Agreement, the Security Instrument, the Pledge Agreements and any other Loan Documents to which it is a party constitute the legal, valid and binding obligations of each respective Borrower.

Section 4.5. **Litigation**. There is no action, suit or proceeding, judicial, administrative or otherwise (including any condemnation or similar proceeding), pending or threatened or contemplated against, or affecting, Borrower, any Guarantor, any Indemnitor, any of the Pledgors or the Property or any part thereof that has not been disclosed to Lender on Schedule 2 attached hereto and made a part hereof, or is not adequately covered by insurance, as determined by Lender in its reasonable discretion.

Section 4.6.   **Status of Property**.

(a)    No portion of the Property and no building or any other portion of the Improvements is located in an area identified by the Secretary of Housing and Urban Development or any successor thereto as an area having special flood hazards pursuant to the National Flood Insurance Act of 1968 or the Flood Disaster Protection Act of 1973, as amended, or any successor law, or, if located within any such area, Owner has obtained and will maintain the insurance prescribed in Section 5.4(a)(i)(y) hereof.

(b)    Borrower will obtain by no later than the earlier of: (x) the CPL Closing Date, all necessary certificates, licenses and other approvals, governmental and otherwise, necessary for the contemplated development and operation of the Property and the conduct of its business and all required zoning, building code, land use, environmental and other similar permits or approvals, all of which when obtained shall be maintained in full force and effect and shall not be subject to revocation, suspension, forfeiture or modification.

(c)    Upon completion of the Construction Project, the Property and the contemplated use and occupancy thereof shall be full compliance with all Legal Requirements, including, without limitation, zoning ordinances, building codes, land use and environmental laws, laws relating to the disabled (including, but not limited to, the ADA) and other similar laws.

(d)    The Property is served by all utilities required for the contemplated use thereof. All utility service is provided by public utilities and the Property has accepted or is equipped to accept such utility service.

(e)    All public roads and streets necessary for service of and access to the Property for the contemplated use thereof have been completed, are serviceable and all-weather and are physically and legally open for use by the public.

(f)    The Property is served by public water and sewer systems.

(g)    The Property is free from damage caused by fire or other casualty.

(h)    Upon completion of the Construction Project, all liquid and solid waste disposal, septic and sewer systems located on the Property shall be in a good and safe condition and repair and in compliance with all Legal Requirements.

(i)    All existing Improvements lie within the boundary of the Property.

(j)    All costs and expenses for any and all labor, materials, supplies and equipment used in the predevelopment of the Property have been paid in full as of the date hereof or will be paid in full from proceeds of the Loan promptly following the closing of the Loan.

Section 4.7.   **No Foreign Person**. Borrower is not a "foreign person" within the meaning of Section 1445(f)(3) of the Code and the related Treasury Department regulations, including temporary regulations.

Section 4.8.    **Separate Tax Lot**.  The Property is assessed for real estate tax purposes as one or more wholly independent tax lot or lots, separate from any adjoining land or improvements not constituting a part of the Property, and no other land or improvements is assessed and taxed together with the Property or any portion thereof.

Section 4.9.    **ERISA Compliance**.

(a)    As of the date hereof, (i) Borrower is not an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA, and (ii) the assets of Borrower do not and will not constitute "plan assets" of one or more such plans for purposes of Title I of ERISA; and

(b)    As of the date hereof, (i) Borrower is not a "governmental plan" within the meaning of Section 3(32) of ERISA, and (ii) transactions by or with Borrower are not and will not be subject to state statutes applicable to Borrower regulating investments of and fiduciary obligations with respect to governmental plans.

Section 4.10.    **Leases**.  There are no Leases which affect the Property and no Person has any possessory right or interest in, or right to occupy, the Property or any portion thereof other than (i) those three leases, numbers 0919, 0920 and 0921, with Clear Channel Outdoor for advertising structures located on the Property, as more particularly described on Exhibit H attached hereto and made a part hereof (collectively, the "**Billboard Leases**") and (ii) that certain Commercial Lease Agreement dated March 5, 2004 between Owner (by assignment from Seller) and KHS&S Contractors ("**KHS&S Lease**").  Borrower represents and warrants to Lender that (i) each of the Billboard Leases is a month to month lease and may be terminated on thirty (30) days notice, (ii) that the KHS&S Lease terminates by its terms on December 31, 2004 and the tenant therewith has no right to renew or extend the term thereof and Lender covenants that it shall not extend such term of the KHS&S Lease or modify the terms of any of the Billboard Leases or the KHS&S Lease without the prior written consent of Lender, which consent may be granted or denied in Lender's sole discretion.

Section 4.11.    **Financial Condition**.    Each Borrower, each Pledgor, each Guarantor and each Indemnitor is solvent, and no bankruptcy, reorganization, insolvency or similar proceeding under any state or federal law with respect to Borrower, any Pledgor, any Guarantor, any Indemnitor or any Affiliate thereof has been initiated.

Section 4.12.    **Business Purposes**.  The Loan evidenced by the Note is solely for the business purpose of Borrower, and is not for personal, family, household, or agricultural purposes.

Section 4.13.    **Taxes**.    Borrower, each Pledgor, each Guarantor and each Indemnitor (i) has filed all federal, state, county, municipal, and city income and other tax returns required to have been filed by them for all tax assessment periods prior to December 31, 2003, (ii) have paid all taxes and related liabilities which have become due pursuant to such returns or pursuant to any assessments received by them, and (iii) are not obligated by any Legal Requirement to have filed as of the date hereof any federal, state, county, municipal, or city income or other tax returns or to have paid as of the date hereof any tax or related liability for any tax assessment period from January 1, 2004 through and including the date hereof.  Neither

Borrower, any Pledgor, any Guarantor nor any Indemnitor knows of any basis for any additional assessment in respect of any such taxes and related liabilities for prior years.

Section 4.14.  **Principal Place of Business**.  Each Borrower's principal place of business, as set forth in the opening paragraph hereof or as changed in accordance with the provisions hereof, is true and correct.

Section 4.15.  **No Change in Facts or Circumstances**.  All information in the documents submitted to Lender in connection with the making of this Loan, including, without limitation, all financial statements, rent rolls, reports and certificates are accurate, complete and correct in all material respects.  There has been no materially adverse change in any condition, fact, circumstance or event that would make any such information materially inaccurate, incomplete or otherwise misleading.

Section 4.16.  **Disclosure**.  Borrower has disclosed to Lender all material facts and has not failed to disclose any material fact that could cause any representation or warranty made herein to be materially misleading.

Section 4.17.  **Third Party Representations**.  Each of the representations and the warranties made by any Pledgor, any Guarantor or any Indemnitor herein, in the Security Instrument, the Pledge Agreements or in any of the other Loan Documents is true and correct in all material respects.

Section 4.18.  **Illegal Activity**.  No portion of the Property has been or will be purchased with proceeds of any illegal activity.

Section 4.19.  **Franchises, Patents, Copyrights, *Etc***.  Each Borrower possesses all franchises, patents, copyrights, trademarks, trade names, servicemarks, licenses and permits, and rights in respect of the foregoing, adequate for the conduct of its business substantially as now conducted without conflict with any rights of others.

Section 4.20.  **No Event of Default**.  No default or event of default beyond any applicable notice and cure period has occurred and is continuing under any document or instrument to which Borrower is bound.

Section 4.21.  **Regulations U and X**.  No portion of the Loan is to be used for the purpose of purchasing or carrying any "margin security" or "margin stock" as such terms are used in Regulations U and X of the Board of Governors of the Federal Reserve System, 12 C.F.R. Parts 221 and 224.  Borrower is not engaged, nor will it engage, principally or as one of its important activities, in the business of extending credit for the purpose of "purchasing" or carrying any "margin security" or "margin stock" as such terms are used in Regulations U and X of the Board of Governors of the Federal Reserve System, 12 C.F.R. Parts 221 and 224.

Section 4.22.  **Intentionally Omitted**.

Section 4.23.  **Ownership**.

(a)     Towers LLC is the sole member of Owner and no other Person owns any legal, equitable or beneficial interest in Owner or has any management rights with

respect to Owner.  Owner owns no assets other than the Property, and no other Person other than Owner owns any legal, equitable or beneficial interest in the Property.

Section 4.24.  **Options to Purchase**.  Neither the Property, the Pledged Interests nor any of the Collateral is subject to any purchase option, buy-sell right, right of first refusal, right of first offer or other similar right to acquire any thereof, except for the rights of the Seller under the Purchase Agreement, which rights are subject and subordinate to the rights of Lender under the Loan Documents, the Loan and the Loan Documents.

Section 4.25.  **Service Rights**.  No Service Rights have been granted to any Person other than from the Owner (including any predecessor in title to Owner, any Management Company, any Affiliate of Owner or any principal of Owner).  There are no Affiliate Transactions in connection with any Service Rights.  Notwithstanding anything to the contrary in the previous sentence, Lender and Borrower agree that Borrower or an Affiliate of Borrower shall be entitled to (i) the Current Developer's Fee and (ii) the Affiliate Broker's Fee in accordance with, and subject to, the terms hereof.

Section 4.26.  **Violations of Governmental Prohibitions**.  Neither the making of the Loan, nor the receipt of the Loan proceeds by Borrower, violates any Legal Requirements applicable to Borrower, including, without limitation, any of the Terrorism Laws.  Neither the making of the Loan, nor the receipt of Loan proceeds by Borrower, any Pledgor, any Guarantor or any Indemnitor, or any principal of any thereof, violates any of the Terrorism Laws.  No holder of any direct or indirect equitable, legal or beneficial interest in Borrower, any Pledgor, any Guarantor or any Indemnitor, or any principal of any thereof is the subject of any of the Terrorism Laws.  No portion of the Loan proceeds will be used, disbursed or distributed by Borrower for any purpose, or to any Person, directly or indirectly, in violation of any Legal Requirements, including, without limitation, any of the Terrorism Laws.

Section 4.27.  **Independent Director**.  Neil Faucett is an independent certified public accountant who will be the Independent Director of Towers Inc. and he satisfies all of the requirements of an Independent Director as set forth in Section 6.3(c) hereof.

## ARTICLE V

## COVENANTS OF BORROWER

Each Borrower covenants and agrees that, until all of the Obligations have been paid and performed in full:

Section 5.1.  **Punctual Payment of Loan**.  Borrower will duly and punctually pay or cause to be paid the principal on the Loan and all interest and fees (including, without limitation, the Accrued Interest and the Additional Fee) provided for in this Agreement, the Security Instrument, the Pledge Agreements, and the Note, all in accordance with the terms of this Agreement, the Security Instrument, the Pledge Agreements, and the Note as well as all other sums owing pursuant to any of the other Loan Documents.

Section 5.2.    **Intentionally Omitted**.

Section 5.3.    **Incorporation by Reference**.  All the covenants, conditions and agreements contained in (a) the Note, (b) the Security Instrument, (c) the Pledge Agreements, and (d), the other Loan Documents are hereby made a part of this Agreement to the same extent and with the same force as if fully set forth herein.

Section 5.4.    **Insurance**.

(a)    Borrower shall obtain and maintain insurance for itself and the Property providing at least the following coverages:

(i)    if and when any Improvements are constructed on the Land, comprehensive all risk insurance on the Improvements and the Personal Property, including contingent liability from Operation of Building Laws, Demolition Costs and Increased Cost of Construction Endorsements, in each case (A) in an amount equal to 100% of the "Full Replacement Cost," which for purposes of this Agreement shall mean actual replacement value (exclusive of costs of excavations, foundations, underground utilities and footings) with a waiver of depreciation, but the amount shall in no event be less than the sum of (i) the outstanding principal balance of the Note, and (ii) if applicable, the outstanding principal balance of the Construction Project Loan, (B) containing an agreed amount endorsement with respect to the Improvements and Personal Property waiving all co-insurance provisions; (C) providing for no deductible in excess of the lesser of $25,000.00 and one (1%) percent of the face value of such policy (except as to windstorms, in which case, a three (3%) percent "value at risk" deductible applies); and (D) containing an "Ordinance or Law Coverage" or "Enforcement" endorsement if any of the Improvements or the use of the Property shall at any time constitute legal non-conforming structures or uses.  The Full Replacement Cost shall be redetermined from time to time (but not more frequently than once in any twelve (12) calendar months) at the request of Lender by an appraiser or contractor designated and paid by Borrower and approved by Lender, or by an engineer or appraiser in the regular employ of the insurer.  After the first such appraisal, additional appraisals may be based on construction cost indices customarily employed in the trade.  No omission on the part of Lender to request any such ascertainment shall relieve Borrower of any of its obligations under this Section.  In addition, Borrower shall obtain (y) flood hazard insurance, if any portion of the Property is currently or at any time in the future located in a federally designated "special flood hazard area" in an amount equal to the lesser of (a) the sum of (i) the outstanding balance of the Note, and (ii) the outstanding principal balance of the Construction Project Loan, or (b) the maximum amount of such insurance available under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994, as each may be amended or such greater amount as Lender shall require; and (z) earthquake insurance in amounts and in form and substance satisfactory to Lender in the event the Property is located in an area with a high degree of seismic activity, provided that the insurance pursuant to clauses (y) and (z) hereof shall be on terms consistent with the comprehensive all risk insurance policy required under this Section 5.4(a)(i) except that the deductible on such insurance shall not be in excess of five percent (5%) of the appraised value of the Property;

(ii)    commercial general liability insurance against claims for personal injury, bodily injury, death or Property damage occurring upon, in or about the Property, such insurance (A) to be on the so-called "occurrence" form with a combined single limit of not less than $1,000,000.00 and a general limit of not less than $2,000,000.00; (B) to continue at not less than the aforesaid limit until required to be changed by Lender in writing by reason of changed economic conditions making such protection inadequate; and (C) to cover at least the following hazards: (1) premises and operations; (2) products and completed operations on an "if any" basis; (3) independent contractors; (4) blanket contractual liability for all written and oral contracts; and (5) contractual liability covering the indemnities contained in Article 14 hereof to the extent the same is available;

(iii)    business income insurance (A) covering all risks required to be covered by the insurance provided for in Section 5.4(a)(i); (B) in an amount equal to 100% of the projected gross income from the Property for a period of twelve (12) months from the date of the loss; and (C) containing an extended period of indemnity endorsement which provides that after the physical loss to the Improvements and Personal Property has been repaired, the continued loss of income will be insured until such income either returns to the same level it was at prior to the loss, or the expiration of twelve (12) months from the date of restoration, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period. The amount of such business income insurance shall be determined based on Borrower's reasonable estimate of the gross income from the Property for the succeeding twelve (12) month period. All insurance proceeds payable to Lender pursuant hereto shall be held by Lender and shall be applied to the obligations secured hereunder from time to time due and payable hereunder and under the Note; provided, however, that nothing herein contained shall be deemed to relieve Borrower of its obligations to pay the obligations secured hereunder on the respective dates of payment provided for in the Note except to the extent such amounts are actually paid out of the proceeds of such insurance;

(iv)    at all times during which any structural construction, repairs or alterations are being made with respect to any Improvements located at the Property (A) owner's contingent or protective liability insurance covering claims not covered by or under the terms or provisions of the above mentioned commercial general liability insurance policy; and (B) the insurance provided for in Section 5.4(a)(i) written in a so-called builder's risk completed value form (1) on a non-reporting basis, (2) against all risks insured against pursuant to Section 5.4(a)(i), (3) including permission to occupy the Property, and (4) with an agreed amount endorsement waiving co-insurance provisions;

(v)    workers' compensation, subject to the statutory limits of the state in which the Property is located, and employer's liability insurance with a limit of at least $1,000,000.00 per accident and per disease per employee, and $1,000,000.00 for disease aggregate in respect of any work or operations on or about the Property, or in connection with the Property or its operation (if applicable);

(vi)    if and when Improvements are constructed on the Land, comprehensive boiler and machinery insurance, if applicable, in amounts as shall be

reasonably required by Lender on terms consistent with the commercial general liability insurance policy required under Section 5.4(a)(ii);

       (vii)    umbrella liability insurance in an amount not less than $50,000,000.00, with the primary $25,000,000.00 on an occurrence basis and the excess $25,000,000.00 on an aggregate basis, on terms consistent with the commercial general liability insurance policy required under Section 5.4(a)(ii). Notwithstanding the foregoing provisions of this clause (vii), prior to the CPL Closing Date, as long as Borrower maintains $25,000,000.00 of umbrella liability insurance on an occurrence and aggregate basis, the provisions of this clause (vii) shall be deemed satisfied, provided, however, that from and after the CPL Closing Date, Borrower shall maintain the insurance otherwise required by this clause (vii);

       (viii)    motor vehicle liability coverage for all owned and non-owned vehicles, including rented and leased vehicles containing minimum limits per occurrence of $1,000,000.00;

       (ix)    such other insurance and in such amounts as Lender from time to time may reasonably request against such other insurable hazards which at the time are commonly insured against for Property similar to the Property located in or around the region in which the Property is located; and

       (x)    if and when Improvements are constructed on the Land, terrorism insurance in such amounts as Lender, from time to time, may reasonably require.

       (b)    All insurance provided for in Section 5.4(a) hereof shall be obtained under valid and enforceable policies (the "**Policies**" or in the singular, the "**Policy**"), and shall be subject to the reasonable approval of Lender as to insurance companies, amounts, forms, deductibles, loss payees and insureds. The Policies shall be issued by financially sound and responsible insurance companies authorized to do business in the state in which the Property is located and approved by Lender. The insurance companies must have an investment grade rating for claims paying ability assigned by Moody's Investors Service, Inc. and Standard & Poor's Corporation, and in the event such insurance companies are rated by Fitch IBCA, Inc. and Duff & Phelps Credit Rating Company, by Fitch Investors Service, Inc. and Duff & Phelps Credit Rating Company, and if there are any Securities (defined in Section 18.1 below) issued which have been assigned a rating by a credit rating agency approved by Lender (a "**Rating Agency**"), the insurance company shall have a claims paying ability rating by such Rating Agency equal to or greater than the rating of the highest class of the Securities (each such insurer shall be referred to below as a "**Qualified Insurer**"). Notwithstanding anything to the contrary in the immediately preceding sentence, Lender agrees to accept the insurance coverage provided by Zurich on the date hereof even though Zurich is not a Qualified Insurer, subject, however, to the right of Lender to require Borrower to provide insurance by a Qualified Insurer as a condition to the Third Funding and thereafter to maintain same in accordance with the terms of this Agreement. The Policies described in Sections 5.4(a)(i), (iii), (iv)(B) and (vi), shall designate Lender and, if applicable, Construction Project Lender as loss payees. Not less than thirty (30) days prior to the expiration dates of the Policies theretofore furnished to Lender pursuant to Section 5.4(a), certified copies of the Policies marked "premium paid" or accompanied by

evidence satisfactory to Lender of payment of the premiums due thereunder (the "**Insurance Premiums**"), shall be delivered by Borrower to Lender; provided, however, that in the case of renewal Policies, Borrower may furnish Lender with binders therefor to be followed by the original Policies when issued.

(c)     Borrower shall not obtain (i) any umbrella or blanket liability or casualty Policy unless, in each case, such Policy is approved in advance in writing by Lender and Lender's interest is included therein as provided in this Agreement and such Policy is issued by a Qualified Insurer, or (ii) separate insurance concurrent in form or contributing in the event of loss with that required in Section 5.4(a) to be furnished by, or which may be reasonably required to be furnished by, Borrower. In the event Borrower obtains separate insurance or an umbrella or a blanket Policy, Borrower shall notify Lender of the same and shall cause certified copies of each Policy to be delivered as required in Section 5.4(a). Any blanket insurance Policy shall specifically allocate to the Property the amount of coverage from time to time required hereunder and shall otherwise provide the same protection as would a separate Policy insuring only the Property in compliance with the provisions of Section 5.4(a).

(d)     All Policies of insurance provided for or contemplated by Section 5.4(a), except for the Policy referenced in Section 5.4(a)(v), shall name Lender, Construction Project Lender, if applicable, and Borrower as the insured or additional insured, as their respective interests may appear, and in the case of property damage, boiler and machinery, flood and earthquake insurance, shall contain a so-called New York standard non-contributing mortgagee clause in favor of Lender providing that the loss thereunder shall be payable to Lender and, if applicable, Construction Project Lender.

(e)     All Policies of insurance provided for in Section 5.4(a) shall contain clauses or endorsements to the effect that:

(i)     no act or negligence of Borrower, or anyone acting for Borrower, or of any tenant under any Lease or other occupant, or failure to comply with the provisions of any Policy which might otherwise result in a forfeiture of the insurance or any part thereof, shall in any way affect the validity or enforceability of the insurance insofar as Lender is concerned;

(ii)     the Policy shall not be materially changed (other than to increase the coverage provided thereby) or canceled without at least thirty (30) days' prior written notice to Lender and any other party named therein as an insured;

(iii)     each Policy shall provide that the issuers thereof shall give written notice to Lender if the Policy has not been renewed thirty (30) days prior to its expiration; and

(iv)     Lender shall not be liable for any Insurance Premiums thereon or subject to any assessments thereunder.

(f)     If requested by Lender in writing, Borrower shall furnish to Lender, on or before thirty (30) days after the close of Borrower's fiscal year, a statement certified by Borrower or a duly authorized officer of Borrower of the amounts of insurance maintained in compliance herewith, of the risks covered by such insurance and of the insurance

company or companies which carry such insurance and, if requested by Lender, verification of the adequacy of such insurance by an independent insurance broker or appraiser acceptable to Lender.

(g)    If at any time Lender is not in receipt of written evidence that all insurance required hereunder is in full force and effect, Lender shall have the right, without notice to Borrower to take such action as Lender deems necessary to protect its interest in the Property, including, without limitation, the obtaining of such insurance coverage as Lender in its sole but reasonable discretion deems appropriate, and all expenses incurred by Lender in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Borrower to Lender upon demand and until paid shall be secured by the Property and Collateral and shall bear interest in accordance with Section 10.3 hereof.

(h)    If the Improvements shall be damaged or destroyed, in whole or in part, by fire or other casualty, Borrower shall give prompt notice of such damage to Lender and, subject to the Intercreditor Agreement and the Construction Project Loan Documents, at Lender's request, Borrower shall promptly commence and diligently prosecute the completion of the repair and restoration of the Property to substantially the condition the Property was in immediately prior to such fire or other casualty, with such alterations as may be approved by Lender (in either case, the "**Restoration**") and otherwise in accordance with Section 6.4 of this Agreement.  Borrower shall pay all costs of such Restoration whether or not such costs are covered by insurance. Lender may, but shall not be obligated to, make proof of loss if not made promptly by Borrower.

(i)    In the event of foreclosure of the Security Instrument or Pledge Agreements, or other transfer of title to the Property in extinguishment in whole or in part of the Debt all right, title and interest of Borrower in and to such policies then in force concerning the Property and all proceeds payable thereunder shall thereupon vest in the purchaser at such foreclosure or Lender or other transferee in the event of such other transfer of ownership interest or title.

Section 5.5.    **Payment of Taxes, *Etc*.**  Borrower shall promptly pay all taxes, assessments, water rates, sewer rents, governmental impositions, and other charges, including without limitation vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Land, now or hereafter levied or assessed or imposed against the Property or any part thereof (the "**Taxes**"), all ground rents, maintenance charges and similar charges, now or hereafter levied or assessed or imposed against the Property or any part thereof (the "**Other Charges**"), and all charges for utility services provided to the Property as same become due and payable. Borrower will deliver to Lender, promptly upon Lender's request, evidence satisfactory to Lender that the Taxes, Other Charges and utility service charges have been so paid or are not then delinquent.  Borrower shall not suffer and shall promptly cause to be paid when due and discharged any lien or charge whatsoever which may be or become a lien or charge against the Property.  Except to the extent sums sufficient to pay all Taxes and Other Charges have been deposited with Lender in accordance with the terms of this Agreement, Borrower shall furnish to Lender paid receipts for the payment of the Taxes and Other Charges prior to the date the same shall become delinquent.

Section 5.6.   **Escrow Fund**.   In addition to the initial deposits with respect to Taxes and Insurance Premiums made by Borrower to Lender on the date hereof to be held by Lender in escrow, Borrower shall deposit with Lender on the first day of each calendar month (a) one-twelfth of an amount which would be sufficient to pay the Taxes payable, or estimated by Lender to be payable, during the next ensuing twelve (12) months and (b) one-twelfth of an amount which would be sufficient to pay the Insurance Premiums due for the renewal of the coverage afforded by the Policies upon the expiration thereof (the amounts in (a) and (b) above shall be called the "**Escrow Fund**").   Borrower agrees to notify Lender immediately of any changes to the amounts, schedules and instructions for payment of any Taxes and Insurance Premiums of which it has obtained knowledge and authorizes Lender or its agent to obtain the bills for Taxes and Other Charges directly from the appropriate taxing authority.   Lender will apply the Escrow Fund to payments of Taxes and Insurance Premiums required to be made by Borrower pursuant to Sections 5.4 and 5.5 hereof.   If the amount of the Escrow Fund shall exceed the amounts due for Taxes and Insurance Premiums pursuant to Sections 5.4 and 5.5 hereof, Lender shall, in its discretion, return any excess to Borrower or credit such excess against future payments to be made to the Escrow Fund.   In allocating such excess, Lender may deal with the person shown on the records of Lender to be the owner of the Property.   If Lender believes that the Escrow Fund is not sufficient to pay the items set forth in clauses (a) and (b) of this Section 5.6 above, Borrower shall promptly pay to Lender, upon demand, an amount which Lender shall estimate as sufficient to make up the deficiency and Lender may immediately readjust the amount of the monthly deposits to the Escrow Fund.   The Escrow Fund shall not constitute a trust fund and may be commingled with other monies held by Lender.   No earnings or interest on the Escrow Fund shall be payable to Borrower.

Notwithstanding the foregoing, Borrower shall not be required to make deposits for Taxes, Other Charges and Insurance Premiums for the Property into the Escrow Fund as set forth above provided that (i) Loan proceeds are available for the payment of same pursuant to the Predevelopment Budget or (ii) Borrower makes such deposits for Taxes, Insurance Premiums and Other Charges into an escrow account established pursuant to the Construction Project Loan Documents.   Borrower shall deliver evidence of the timely payment of the Taxes and Insurance Premiums to Lender or Servicer.

Section 5.7.   **Condemnation**.   Borrower shall promptly give Lender notice of the actual or threatened commencement of any condemnation or eminent domain proceeding affecting the Property, or any portion thereof, and shall deliver to Lender copies of any and all papers served and/or received in connection with such proceedings.   Lender may participate in any such proceedings, and Borrower shall, from time to time, deliver to Lender all instruments requested by it to permit such participation.   Borrower shall, at its expense, diligently prosecute any such proceedings, and shall consult with Lender, its attorneys and experts, and cooperate with them in the carrying on or defense of any such proceedings.   Notwithstanding any taking by any public or quasi-public authority through eminent domain or otherwise (including but not limited to any transfer made in lieu of or in anticipation of the exercise of such taking), Borrower shall continue to pay the Debt at the time and in the manner provided for its payment in the Note and in this Agreement and the Debt shall not be reduced until any award or payment therefor shall have been actually received and applied by Lender, after the deduction of expenses of collection, to the reduction or discharge of the Debt.   Lender shall not be limited to the interest paid on the award by the condemning authority but shall be entitled to receive out of the award interest at the rate or rates provided herein or in the Note.   If the Property or any portion thereof

is taken by a condemning authority, Borrower shall promptly commence and diligently prosecute the Restoration of the Property and otherwise comply with the provisions of Section 6.4 of this Agreement. If the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of the award or payment, Lender shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the award or payment, or a portion thereof sufficient to pay the Debt.

Section 5.8. **Leases and Rents**. (a) Borrower shall not extend, modify, amend (including, without limitation, the Billboard Leases and the KHS&S Lease) or enter into any Leases with respect to, or affecting the Property, or accept any Rents (including security deposits) in connection with such Leases without the prior written consent of Lender, which consent Lender may grant or withhold in its sole discretion.

(b)    Commercial Leases. Except as otherwise consented to by Lender, all Commercial Leases for commercial, retail or professional space at the Property (the "**Commercial Leases**") shall be written on the standard form of lease for such type of space which shall have been approved by Lender (in each case, the "**Commercial Lease Form**"). Upon request, Borrower shall furnish Lender with executed copies of all Commercial Leases. No material changes may be made to the Lender-approved Commercial Lease Form without the prior written consent of Lender, such consent not to be unreasonably withheld. In addition, all proposed Commercial Leases shall provide for rental rates and terms comparable to existing local market rates and terms and shall be arms-length transactions with *bona fide*, independent third party tenants. All proposed Commercial Leases shall be subject to the prior approval of Lender and its counsel, at Borrower's expense. Lender shall respond to Borrower within ten (10) Business Days of submission of a Commercial Lease or renewal of an existing Lease; such submitted Commercial Lease shall be deemed approved if Lender fails to respond within such ten (10) Business Day period. All Commercial Leases shall provide that they are subordinate to the Security Instrument or the Construction Project Mortgage, as applicable, and that the lessee agrees to attorn to Lender in the event Lender forecloses the Security Instrument provided that Lender agrees to provide non-disturbance protection on Lender's standard terms but only with respect to Commercial Leases that Lender has received and approved. Borrower (i) shall observe and perform all the obligations imposed upon the lessor under the Commercial Leases and shall not do or permit to be done anything to impair the value of the Commercial Leases as security for the Debt; (ii) shall promptly send copies to Lender of all notices of default which Borrower shall send or receive thereunder; (iii) shall enforce all of the terms, covenants and conditions contained in the Commercial Leases upon the part of the lessee thereunder to be observed or performed, short of termination thereof; Borrower may terminate, however, Commercial Leases as the result of a default by lessee thereunder; (iv) shall not collect any of the Rents more than one (1) month in advance; (v) shall notify all commercial/retail/professional tenants in writing to deposit all Rents to the Lockbox Account, if applicable; (vi) shall not alter, modify or change the terms of the Commercial Leases without the prior written consent of Lender, such consent not to be unreasonably withheld, or cancel or terminate the Commercial Leases or accept a surrender thereof or convey or transfer or suffer or permit a conveyance or transfer of the Property or of any interest therein so as to effect a merger of the estates and rights of, or a termination or diminution of the obligations of, lessees thereunder; (vii) shall not alter, modify or change the terms of any guaranty, letter of credit or other credit support with respect to the Commercial Leases (the "**Lease Guaranty**") or cancel or terminate such Lease Guaranty without the prior written consent of Lender; (viii) shall provide a monthly list of Commercial

Leases executed in the preceding month with such information as Lender may require, including the amount of tenant allowance granted upon such Commercial Lease, the amount payable by the tenant under such Commercial Lease to Borrower for work performed by Borrower, if any, to the premises demised under such Commercial Lease, the date upon which the tenant under such Commercial Lease accepted, or is anticipated to accept, occupancy of the premises demised under such Commercial Lease on a rent paying basis, and such other information with respect to such Commercial Lease as may be reasonably requested by Lender; and (ix) shall not consent to any assignment of or subletting under the Commercial Leases not in accordance with their terms, without the prior written consent of Lender such consent not to be unreasonably withheld.

(c)    Residential Leases.

(i)    Borrower shall promptly and fully keep, observe and perform, or cause to be kept, observed and performed, all of the material terms, covenants, provisions and agreements imposed upon or assumed by Borrower under any Leases for residential space located at the Property ("**Residential Leases**") to which Borrower is a party, now or hereafter in effect, including any amendments or supplements to such Residential Leases, and Borrower shall not do or fail to do, or permit to be done, any act or thing, the doing or omission of which will give any party a right to terminate any of such Residential Leases or, in the case of any lessee, to abate any rental or other material payment due thereunder. Borrower shall use reasonable efforts to cause each and every lessee and guarantor (if any) of each Residential Lease to which it is a party to perform and observe each and every material covenant, obligation and agreement to be performed or observed on the part of such lessee and/or guarantor under or in respect of each Residential Lease or guaranty thereof.

(ii)    All Residential Leases shall specifically provide that such Residential Leases are subordinate to the lien of the Security instrument and any other mortgage which may affect the Property, and that the lessee agrees to attorn to Lender. Borrower shall not, without the prior written consent of Lender, further assign any such Residential Leases, except to the Construction Project Lender. Borrower hereby agrees that it will use its best efforts to preserve and maintain effective said Residential Leases. Borrower shall collect any Rents from the Residential Leases not more than one (1) month in advance.

(iii)    Borrower covenants that it shall not, without the prior written consent of Lender, which consent shall not be unreasonably withheld, cancel, abridge, surrender or terminate any Residential Lease, or to make any subsequent assignment or pledge of any Residential Lease, or convey or transfer or suffer or permit a conveyance or transfer of the land or of any interest therein so as to effect a merger of the estates and rights of, or a termination or diminution of the obligations of, lessees under any Residential Lease, or consent to subordination of the interest of any lessee under any Residential Lease to any person other than Lender or the Construction Project Lender; *provided, however*, that if no Event of Default has occurred under this Agreement, Borrower shall have the right, without the prior written consent of Lender to: (1) to enter into new, bona-fide, arm's length residential Leases or renewal Residential Leases with third-party lessees on Borrower's standard form of residential lease which has been approved by Lender, at market rates approved by Lender, and for terms of not less than

six (6) months or more than two (2) years; (2) to terminate the Residential Lease of any lessee in default of its Lease; and (3) to amend the Residential Lease of any lessee, if the amendment complies with the standard business practices of the trade for comparable prudently-managed properties. Except as otherwise provided in this Section 5.8, any attempt at cancellation, surrender, termination, change, alteration, modification, assignment, pledge or subordination of any Residential Lease, without the written consent of Lender, shall be null and void.

Section 5.9. **Maintenance of Property**. Borrower shall cause the Property and any and all Improvements and Personal Property located thereon to be maintained in a good and safe condition and repair. Except as specifically set forth in Section 6.11 of this Agreement, the Improvements and the Personal Property shall not be removed, demolished or materially altered without the consent of Lender. Borrower shall promptly repair, replace or rebuild, subject to Section 5.4(h) and 6.4 hereof, any part of the Property and any and all Improvements and Personal Property located thereon which may be destroyed by any casualty, or become damaged, worn or dilapidated or which may be affected by any proceeding of the character referred to in Section 5.7 hereof and shall complete and pay for any structure at any time in the process of construction or repair on the Land. Borrower shall not initiate, join in, acquiesce in, or consent to any change in any private restrictive covenant, zoning law or other public or private restriction, limiting or defining the uses which may be made of all or any portion of the Property or the Improvements, without the consent of Lender. If under applicable zoning provisions the use or contemplated use of all or any portion of the Property or the Improvements is or shall become a nonconforming use, Borrower shall not cause or permit the nonconforming use to be discontinued or abandoned without the express written consent of Lender.

Section 5.10. **Waste**. Borrower shall not commit or suffer any waste of the Property or, except as expressly provided in Section 6.11 hereof, make any change in the use of the Property which will in any way materially increase the risk of fire or other hazard arising out of the operation of the Property, or take any action that might invalidate or give cause for cancellation of any Policy, or do or permit to be done thereon anything that may in any way impair the value of the Property. Borrower shall not, without the prior written consent of Lender, permit any drilling or exploration for or extraction, removal, or production of any minerals from the surface or the subsurface of the Land, regardless of the depth thereof or the method of mining or extraction thereof.

Section 5.11. **Compliance With Legal Requirements**.

(a)     Borrower shall promptly comply with all Legal Requirements.

(b)     Borrower shall, from time to time, upon Lender's written request, provide Lender with evidence satisfactory to Lender that the Property at such time complies with all Legal Requirements or is exempt from compliance with Legal Requirements.

(c)     Notwithstanding any provisions set forth herein or in any document regarding Lender's approval of alterations of the Property, but except as specifically set forth in Section 6.11 of this Agreement, Borrower shall not alter the Property in any manner which would increase Borrower's responsibilities for compliance with Legal Requirements without the prior written approval of Lender. Lender's approval of the Plans and Specifications,

or working drawings for construction of the Improvements on the Property, shall create no responsibility or liability on behalf of Lender for their completeness, design, sufficiency or their compliance with Legal Requirements. Lender may condition any such approval upon receipt of a certificate of compliance with Legal Requirements from an independent architect, engineer, or other person acceptable to Lender.

(d)    Borrower shall give prompt notice to Lender, which notice shall in no event be later than five (5) days after the receipt by any of such Parties, of any notice related to a violation of any Legal Requirements and of the commencement of any proceedings or investigations which relate to compliance with any Legal Requirements.

(e)    Borrower shall take appropriate measures to prevent and will not engage in or knowingly permit any illegal activities at the Property.

Section 5.12.    **Books and Records**.    (a)  Borrower, each Pledgor, each Indemnitor and each Guarantor shall keep adequate books and records of account in accordance with Generally Accepted Accounting Principles, consistently applied, ("**GAAP**"), or in accordance with other methods reasonably acceptable to Lender in its sole discretion, consistently applied and furnish to Lender:

(i)    if and when any Lease is entered into and a tenant takes possession or pays any rent under such Lease, quarterly operating statements of the Property together with a property balance sheet for such quarter, prepared and certified by Borrower in the form required by Lender, detailing the revenues received, the expenses incurred and the net operating income before and after debt service (principal and interest) for the Construction Project Loan and the Loan and major capital improvements for that quarter and containing appropriate year to date information, and containing a comparison for such quarter with the Operating Budget delivered pursuant to Section 5.12(a)(v), within forty-five (45) days after the end of each fiscal quarter;

(ii)    if and when any Lease is entered into and a tenant takes possession or pays any rent under such Lease, monthly certified rent rolls signed and dated by Borrower, detailing the names of all users of the Property, the space used by such user, the rent and any other charges payable under each Lease and the term of each Lease, including the expiration date, and any other information as is reasonably required by Lender, within forty-five (45) days after the end of each fiscal quarter;

(iii)    if and when any Lease is entered into and a tenant takes possession or pays any rent under such Lease, an annual operating statement of the Property detailing the total revenues received, total expenses incurred, total cost of all capital improvements, total debt service and total cash flow, and containing a comparison for such period with the annual budget delivered pursuant to Section 5.12(a)(v), to be prepared and certified by Borrower in the form required by Lender;

(iv)    an annual balance sheet and profit and loss statement of Borrower, each Pledgor, Guarantor and each Indemnitor in the form required by Lender, prepared and certified by the respective Borrower, Pledgor, Guarantor and/or Indemnitor, or if required by Lender, other than the Principal, certified by the respective accountant of

such Borrower, Pledgor and/or Indemnitor, within one hundred twenty (120) days after the close of each fiscal year of each Borrower, each Pledgor, each Guarantor and each Indemnitor, as the case may be;

(v)     if and when any Lease is entered into and a tenant takes possession or pays any rent under such Lease, an annual operating budget presented on a monthly basis consistent with the quarterly and annual operating statements described above for the Property, including cash flow projections for the upcoming year, and all proposed capital replacements and improvements (the "**Operating Budget**"), all in accordance with the terms of this Agreement;

(vi)     copies of the federal income tax returns of Borrower within fifteen (15) days of the date such returns are filed;

(vii)     copies of any and all financial reporting records which Owner is required to deliver to the Construction Project Lender pursuant to the Construction Project Loan Documents; and

(viii)     the certification required pursuant to Section 5.4(f) of this Agreement, if requested by Lender.

(b)     Borrower shall furnish to Lender monthly:

(i)     a property management report for the Property, showing the number of inquiries made and/or applications received from tenants, prospective tenants, purchasers or prospective purchasers of Condominium Units and deposits received from said tenants and purchasers, as the case may be, and any other information requested by Lender, in reasonable detail and certified by Borrower (or an officer or principal of Borrower if Borrower is not an individual) under penalty of perjury to be true and complete; and

(ii)     an accounting of all security and/or earnest money deposits held in connection with any Lease of any part of the Property or the sale of any Condominium Unit, including the name and identification number of the accounts in which such security and/or earnest money deposits are held, the name and address of the financial institutions in which such security and/or earnest money deposits are held and the name of the person to contact at such financial institution, along with any authority or release necessary for Lender to obtain information regarding such accounts directly from such financial institutions.

(c)     Borrower, its Affiliates, Pledgors, Guarantor and Indemnitors shall furnish Lender with such other additional financial or management information as may, from time to time, be reasonably required by Lender in form and substance reasonably satisfactory to Lender.

(d)     Borrower, its Affiliates, Pledgors, Guarantor and Indemnitors shall furnish to Lender and its agents convenient facilities for the examination and audit of any such books and records. Within a reasonable time after request by Lender, Borrower, its Affiliates, Pledgors, Guarantor and Indemnitors shall provide any other information with respect to the

Property and the financial condition of Borrower, its Affiliates, Pledgors, Guarantor and Indemnitors as Lender may from time to time reasonably request.

Section 5.13. **Payment For Labor and Materials**. Borrower shall promptly pay when due all bills and costs for labor, materials, and specifically fabricated materials incurred in connection with the Property and never permit to exist beyond the due date thereof in respect of the Property or any part thereof any lien or security interest, even though inferior to the liens and the security interests hereof, and in any event never permit to be created or exist in respect of the Property or any part thereof any other or additional lien or security interest other than the Permitted Exceptions.

Section 5.14. **Management Agreements**. (a) If the Property or any portion thereof shall be managed under the terms and conditions of the Management Agreement (approved by Lender), the following provisions shall apply. Owner shall (i) diligently perform and observe all of the terms, covenants and conditions of the Management Agreement on the part of Owner to be performed and observed to the end that all things shall be done which are necessary to keep unimpaired the rights of Owner under the Management Agreement and (ii) promptly notify Lender of the giving of any notice to Owner of any default by Owner in the performance or observance of any of the terms, covenants or conditions of the Management Agreement on the part of Owner to be performed and observed and deliver to Lender a true copy of each such notice. Borrower shall not surrender the Management Agreement, consent to the assignment by the Management Company of its interest under the Management Agreement except to the Construction Project Lender, or terminate or cancel the Management Agreement or modify, change, supplement, alter or amend the Management Agreement, in any respect, either orally or in writing, without Lender's prior written consent, and any such surrender of the Management Agreement or termination, cancellation, modification, change, supplement, alteration or amendment of the Management Agreement without the prior consent of Lender shall be void and of no force and effect. If Owner shall default in the performance or observance of any material term, covenant or condition of the Management Agreement on the part of Owner to be performed or observed, then, without limiting the generality of the other provisions of this Agreement, and without waiving or releasing Owner from any of its obligations hereunder, under the Security Instrument or under the Pledge Agreements, Lender shall have the right, but shall be under no obligation, to pay any sums and to perform any act or take any action as may be appropriate to cause all the terms, covenants and conditions of the Management Agreement on the part of Owner to be performed or observed to be promptly performed or observed on behalf of Owner, to the end that the rights of Owner in, to and under the Management Agreement shall be kept unimpaired and free from default. Lender and any person designated by Lender shall have, and are hereby granted, the right to enter upon the Property at any time and from time to time for the purpose of taking any such action. If the Management Company under the Management Agreement shall deliver to Lender a copy of any notice sent to Owner of default under the Management Agreement, such notice shall constitute full protection to Lender for any action taken or omitted to be taken by Lender in good faith, in reliance thereon. Borrower shall, from time to time, obtain from the Management Company under the Management Agreement such certificates of estoppel with respect to compliance by Owner with the terms of the Management Agreement as may be requested by Lender. Any sums expended by Lender pursuant to this Section 5.14 shall be deemed to constitute a portion of the Debt, shall bear interest at the Default Rate from the date such cost is incurred to the date of payment to Lender, shall be evidenced by this Agreement, the Security Instrument, the Pledge Agreements and the

other Loan Documents and shall be immediately due and payable upon demand by Lender therefor. Sums expended by Lender based on Borrower's failure to comply with any Legal Requirements, including, but not limited to the ADA, shall also be deemed to constitute a portion of the Debt, shall be evidenced and secured by this Agreement, the Security Instrument, the Pledge Agreements and the other Loan Documents and shall be immediately due and payable upon demand by Lender therefor.

(b)    Without limitation of the foregoing, if (i) the Management Company shall become insolvent, or (ii) an Event of Default shall occur and be continuing, then Lender, at its option, may terminate such Management Agreement or require Borrower to terminate such Management Agreement and require Borrower to engage a bona-fide, independent third party management agent approved by Lender in its sole discretion (the "**New Management Company**") to replace such Management Company. Borrower shall engage the New Management Company pursuant to a written management agreement that complies with the terms hereof and is otherwise satisfactory to Lender in all respects.

(c)    Lender shall have the right to approve any management agreement or agreements to be entered into by the Condominium during any period Owner or Borrower or an Affiliate thereof is in control of the board of directors of the Condominium.

Section 5.15.    **Performance of Other Agreements**.    Borrower shall observe and perform each and every term to be observed or performed by Borrower pursuant to the terms of any agreement or recorded instrument affecting or pertaining to the Property, or given by Borrower to Lender for the purpose of further securing an obligation secured hereby and any amendments, modifications or changes thereto.

Section 5.16.    **Change of Name, Identity or Structure**.    Borrower shall not, and shall not permit any Pledgor, any Guarantor or any Indemnitor to, change any of their respective names, identities (including any trade name or names) or, if not an individual, any of their respective corporate, partnership, limited liability company or other structure, without first obtaining the prior written consent of Lender, which consent may be withheld by Lender for any reason or no reason. As a condition to the granting of such consent, Lender may require any new or additional members or partners to execute pledge agreements, conditional guarantees, repayment guarantees, environmental indemnities and any other documents required by Lender. Borrower will, and will cause any Pledgors, Guarantor and Indemnitors to, execute and deliver to Lender, prior to, or contemporaneously with, the effective date of any such change, any financing statement or financing statement change required by Lender. At the request of Lender, Borrower shall execute a certificate in form satisfactory to Lender listing the trade name or names under which Borrower intends to operate the Property, and representing and warranting that Borrower does business under no other trade name with respect to the Property.

Section 5.17.    **Existence**.    Each Borrower, each Pledgor, each Guarantor, and each Indemnitor shall continuously maintain their respective existence and their respective rights to do business (i) with respect to Towers LLC and Owner, the state where the Property is located together with its franchises and trade names, and (ii) with respect to each Borrower, each Pledgor, and each Guarantor, the applicable state in which each Borrower, each Pledgor and each Guarantor is organized.

Section 5.18. **Contracts, Agreements, Permits, Licenses, and Authorizations**. Borrower shall, for the benefit of Lender, obtain on or before the CPL Closing Date and thereafter keep current, and to the extent already obtained as of the date hereof, to continue to keep current, as required thereby (i) all contracts and agreements relating to and required for the improvement, refurbishment, use, occupancy or operation of the Property, including, without limitation, all maintenance, service and utility contracts ("**Other Agreements**"); (ii) all authorizations, approvals, permits, variances and land use entitlements relating to or required for the improvement, refurbishment, use, occupancy or operation of the Property, including, without limitation, all easements and license agreements with respect to ingress and egress to the Property; (iii) any other regulatory permits or approvals required for the development of the Property as contemplated hereunder and provide evidence of such compliance with the requirements of this Section 5.18 to Lender upon receipt thereof; (iv) all warranties, guaranties and indemnities (including, without limitation, those for workmanship, materials and performance) which exist or may hereafter exist in favor of Borrower, from, by or against any contractor, subcontractor, manufacturer, supplier, laborer or other service provider relating to the Property; (v) all plans, drawings and specifications for the Improvements; and (vi) all other intangible property owned by Borrower relating to and required for the improvement, refurbishment, use, occupancy or operation of the Property, including, without limitation, all trade names and contract rights (items (ii) through (vi) are collectively, the "**Permits**"). Borrower represents that Borrower has not assigned, sold, pledged, transferred or otherwise encumbered, and will not so assign, sell, pledge, transfer or otherwise encumber, Borrower's interest in the Permits or Other Agreements to any Person other than Lender, and, to the extent required, the Construction Project Lender long as this Agreement shall remain in full force and effect. Borrower shall not agree to any modification or to any termination of the Permits and Other Agreements without the express written consent of Lender. Borrower shall (to the extent required by Lender) make available for inspection at all times by Construction Consultant, Lender and Servicer, copies of all Permits and Other Agreements.

Section 5.19. **Payment of Operating Expenses; Balance of Available Cash Flow Application**.

(a)    Prior to the CPL Date, the Borrower hereby covenants and agrees that Borrower shall pay on a monthly basis when due: (A) all payments of Taxes and Insurance Premiums, and (B) all Operating Expenses of the Property (which for purposes of this Section 5.19(a) only shall include all operating expenses of the Property which would otherwise qualify as Operating Expenses except for the fact that same are being paid from Loan proceeds) for such month pursuant to the Predevelopment Budget; *provided, however,* to the extent any such operating expenses of the Property constitute Predevelopment Costs, in accordance with the Predevelopment Budget, Borrower shall pay such operating expenses in accordance with Article 24 hereof.    Prior to the CPL Closing Date, Borrower covenants that all operating revenue generated from the Property, including any Rents from the Billboard Leases and the KHS&S Leases, shall be used only to pay Taxes, Insurance Premiums and Operating Expenses of the Property and shall at no time be used as a distribution to Guarantor, any member, partner, shareholder, principal of Borrower, any Pledgor or any Affiliate of any thereof.

(b)    From and after the CPL Closing Date, the Borrower hereby covenants and agrees that Borrower shall pay on a monthly basis when due from the operating account or any lockbox agreement established by Construction Project Lender (the "**Operating**

**Account**") or the Lockbox established by Lender, if Construction Project Lender does not require an Operating Account or upon the payment in full of the Construction Project Loan: (A) all amounts due to Construction Project Lender for such month pursuant to the terms of the Construction Project Loan Documents, (B) all escrows for Taxes and Insurance Premiums for such month to the Construction Project Lender pursuant to the Construction Project Loan Documents until such time as the Construction Project Lender no longer requires the payment of escrows for Taxes and Insurance Premiums or the Construction Project Loan is repaid in full, at which time such escrow payments shall be made to Lender pursuant to the Loan Documents, (C) all Operating Expenses for such month, (D) all amounts due Construction Project Lender under the Construction Project Loan Documents, and (C) the balance, if any in accordance with Section 5.20 hereof; provided, however, that the foregoing may be applied in such order as the Construction Project Lender may require pursuant to the Construction Project Loan Documents, if applicable.

(c)     Within thirty (30) days following Lender's written request, Borrower shall provide a detailed accounting, certified by Borrower, of amounts paid pursuant to paragraphs (a) (to the extent not paid from Loan proceeds) and (b) above, a list of vendors and copies of bills paid for Operating Expenses for the immediately preceding month. Lender shall have the right upon notice to Borrower to review Borrower's check register if Lender at any time reasonably believes that Borrower has not promptly paid all Operating Expenses (except for amounts reasonably contested by Borrower or amounts billed in error).

(d)     If Borrower fails to so pay any of the Operating Expenses which are Essential Costs (defined as any costs which Lender determines in the exercise of its reasonable discretion are necessary for the operation of the Property or for the protection of the value thereof), Lender may pay the same, at Borrower's expense, and, in such event, Lender may deduct the amount of cash payment of Essential Costs from any credit due Borrower or hold Borrower liable for the amount of any such Operating Expenses paid by Lender. An amount paid by Lender pursuant to the immediately preceding sentence shall, until repaid in full, be deemed a protective advance (collectively, "**Protective Advances**") and shall be secured by the Security Instrument and the Pledge Agreements.

(e)     In the event (i) Borrower is in receipt of any funds from the Construction Project Lender, or of any funds which the Construction Project Lender has permitted to be paid to, or held by, Borrower (other than the Current Developer's Fee), or (ii) any funds in any reserves required to be maintained by Construction Project Lender shall, at any time, be disbursed to Borrower for any purpose other than the specific purpose for which such reserve was established pursuant to the terms of the Construction Project Loan Documents including, without limitation, any liquidation or termination of such reserves by Construction Project Lender, Borrower shall immediately deposit all such funds into the Operating Account for disbursement, so long as no Event of Default shall have occurred and be continuing hereunder, in accordance with Section 5.19(a) and (b) and 5.20 of this Agreement.

(f)     Borrower hereby covenants and agrees that Borrower shall use all Rents and all proceeds from the sale of any Condominium Unit (including, without limitation, the Residential Units, the Retail Units, Cabana Spaces, Parking Spaces and the Storage Spaces) for the payments required to be made pursuant to Sections 5.19 and 5.20 of this Agreement, as applicable, and that no Rents nor any other funds required to be deposited into the Operating

Account or the Lockbox by this Agreement or any of the other Loan Documents may, at any time, be used for distribution to Guarantor, any member, partner, shareholder or principal of Borrower, any Pledgor or any Affiliate of any thereof or any constituent member or partner of Borrower, any Pledgor or any Affiliate of any thereof until all amounts due pursuant to the Loan Documents have been paid in full, except as otherwise approved in writing by Lender; it being agreed by the parties that the Current Developer's Fee may be paid from Loan proceeds in accordance with the Predevelopment Budget or Construction Project Loan proceeds in accordance with the Project Budget and the Affiliate Broker's Fee may be paid in accordance with, and subject to, Section 8.6 hereof (provided that sufficient Release Consideration is available to pay same).

Section 5.20.   **Available Cash Flow Application.**

(a)     All Available Cash Flow, if any, from the Construction Project shall be applied in the following order of priority provided no Event of Default shall have occurred and be continuing:

First, to the payment of Taxes and Insurance to the extent not paid by Borrower;

Second, for the payment of Operating Expenses approved by Lender;

Third, to Lender, the amount necessary to reimburse Lender for (A) all Protective Advances in accordance with Section 5.19(d) of this Agreement, (B) all costs and expenses incurred by Lender pursuant to Section 19 of this Agreement and (c) all other amounts due under the Loan Documents, other than the interest, Accrued Interest, the principal of the Loan and the Additional Fee, but, including, without limitation, any default interest;

Fourth, to Lender, for payment of Accrued Interest;

Fifth, to Lender, for the payment of current Interest;

Sixth, to Lender, for the payment of the principal of the Loan;

Seventh, to Lender, for the payment of the Additional Fee; and

Eighth, to Borrower, for the payment of the Deferred Developer's Fee.

Section 5.21.   **Capital Improvements.**   Borrower shall not enter into any contract or agreement for, or make any payment in connection, the performance of any capital improvements to the Property including, without limitation, any payments to Borrower, or any shareholder, partner, member, constituent, principal of Affiliate of any thereof, unless such capital improvements are made pursuant to a budget approved in writing by Lender including, without limitation, the Operating Budget (if an Operating Budget is required to be submitted pursuant to the terms of this Agreement) and the Project Budget or the Predevelopment Budget, as the case may be.

Section 5.22.  **Brokerage and Management Agreements**.  Borrower shall not enter into any brokerage agreement or any management agreement for the Property, or any portion thereof, without Lender's prior written consent.  Lender hereby consents to Del American, Inc. acting as the broker in connection with the sale of the Condominium Units, subject, however, to Section 8.6(v)(2)(B) with respect to the payment of the Affiliate Broker's Fee.

Section 5.23.  **Equipment Leases**.  Borrower shall not enter into any equipment lease without Lender's prior written consent, which consent may be withheld or delayed in Lender's reasonable discretion; *provided, however,* Lender's prior written consent shall not be required with respect to any equipment lease which when taken together with all other equipment leases, the aggregate cost of all such equipment leases does not exceed $200,000.00 and the cost of such equipment lease is included in the Operating Budget or the Predevelopment Budget or the Project Budget.

Section 5.24.  **Approved Sale Contracts**.  Borrower shall not (i) assign, sell, pledge, transfer or otherwise encumber Borrower's interest in any of the Approved Sale Contracts to any Person, other than to the Construction Project Lender in accordance with the Construction Project Loan Documents, or (ii) amend, modify or terminate any of the Approved Sale Contracts without first obtaining Lender's prior written consent, in each case for so long as this Loan Agreement shall remain in full force and effect.

Section 5.25.  **Approved Reservation Agreements**.  Borrower shall not assign, sell, pledge, transfer or otherwise encumber Borrower's interest in any of the Approved Reservation Agreements to any Person, other than to the Construction Project Lender in accordance with the Construction Project Loan Documents, without first obtaining Lender's prior written consent so long as this Loan Agreement shall remain in full force and effect.

Section 5.26.  **Deposits Under Approved Sale Contracts and Reservation Agreements**.  Subject to Section 5.26(f) herein, Borrower shall, or shall cause Borrower's Escrow Agent to, promptly deliver to Lender (or, if required by law, such other financial institution or title company acceptable to Lender and located in the State of Nevada; Lender hereby approves Nevada Title Company to act as Borrower's Escrow Agent) any and all monies representing deposits being held by Borrower's Escrow Agent under all contracts of sale or reservation agreements, including, without limitation, the Approved Sale Contracts and Approved Reservation Agreements, with respect to Condominium Units constructed or to be constructed on the Property ("**Contract Deposits**").

(a)    All Contract Deposits delivered to Lender shall be held, to the extent required by applicable law or the Approved Sale Contracts or Approved Reservation Agreements, as applicable, in an interest bearing account or, in the event Lender is not permitted by applicable law to hold the Contract Deposits, into a Nevada account solely designated for that purpose by a licensed title insurance company or an institution whose accounts are insured by a governmental agency or instrumentality, approved by Lender, which account shall bear interest, if required by applicable law or the Approved Sale Contracts or Approved Reservation Agreements, at a rate customarily paid by federally insured institutions from time to time on similar accounts, but not less than the rate required by law, and all interest, if any, earned thereon

will be added to such account ("**CD Account**", and such deposits made to the CD Account together with interest thereon referred to herein as, the "**CD Impounds**").

(b)     Subject to the Construction Project Loan Documents, Borrower hereby grants Lender a security interest in the Borrower's interest in the CD Impounds to secure the payment and performance of the Obligations. The CD Impounds shall be additional security for the Loan until the Loan is indefeasibly paid in full. Borrower shall cooperate and enter into any agreement or agreements which are reasonably required to establish and maintain Lender's security interest in the CD Impounds, including, without limitation, Lender's standard form of deposit account control agreement.

(c)     If at any time a purchaser under an Approved Sale Contract, or under any other sale contract affecting the Property, is no longer entitled to a refund or application of the CD Impound under such Approved Sale Contact, or under such other sale contract affecting the Property, whether as the result of a breach by such purchaser or a termination by such purchaser of the applicable Approved Sale Contract, or such other sale contract affecting the Property, in such manner as to entitle the Borrower to retain the applicable CD Impound (such defaulting or terminating purchaser, a "**Defaulting Purchaser**"), such monies shall be applied in accordance with Section 5.19(a) or (b) hereof; *provided, however,* Lender's right to have any CD Impound monies applied in accordance with Section 5.19(a) or (b) hereof is (i) contingent upon Borrower having a right to such monies, and (ii) the terms of any Approved Sale Contract at issue and any judicial proceeding affecting same.

(d)     If at any time a purchaser of a Condominium Unit constructed or to be constructed on the Property is entitled to a refund of its CD Impound, Borrower shall give written notice to Lender of such entitlement and a copy of and a detailed explanation of such purchaser's claim.

(e)     Except as provided herein or if an Event of Default occurs, no portion of the CD Impounds shall be paid or released to or for the account of, or withdrawn by or for the account of, Borrower or any other Person from the CD Account without the prior written consent of Lender.

(f)     Notwithstanding anything to the contrary contained in Section 5.26 above, Borrower shall not be required to deposit the Contract Deposits with Lender as set forth in Section 5.26 above, provided, that Borrower deposits the Contract Deposits with Construction Project Lender pursuant to the Construction Project Loan Documents. Upon the request of Lender, Borrower shall deliver a schedule of Contract Deposits held by the Construction Project Lender to Lender or Servicer within three (3) Business Days of request therefor by Lender or Servicer.

Section 5.27. **ILSA**. Borrower shall comply with all requirements under the Interstate Land Sales Full Disclosure Act (codified at 15 U.S.C.A. §§1701 et. seq.) ("**ILSA**") in connection with the construction of any Improvements on the Property or the sale or proposed sale of any Condominium Unit constructed or to be constructed upon the Property or the marketing of same. Borrower shall promptly register the Property with the United States Department of Housing and Urban Renewal ("**HUD**") by filing a statement of record or taking any other actions required under ILSA.

# ARTICLE VI

## SPECIAL COVENANTS

As material inducement to make this Loan, Borrower further covenants and agrees with Lender that:

Section 6.1.  **Property Use**.  The Property shall be used only for the development and construction of a residential condominium, with a health club, cabanas, storage and ancillary retail uses and parking permitted by that certain zoning application, APN: 162-19-502-002 approved by the Clark County Board of County Commissioners on August 12, 2004, as revised by that certain Notice of Final Action dated August 26, 2004 (collectively, the "**Zoning Approval**") and all Legal Requirements, and for no other use without the prior written consent of Lender, which consent may be withheld in Lender's sole and absolute discretion.  Borrower represents to Lender that as of the date hereof (i) except for the Zoning Approval, Borrower has not submitted any zoning applications to any Governmental Authority with respect to the Property, and (ii) Borrower has not submitted any requests or applications to amend the Zoning Approval.    Lender acknowledges that Borrower is contemplating development of the approximately 1.4 acre site in the northwest corner of the Property ("**Northwest Parcel**"). Borrower may, subject to Lender's prior written approval, which may be given or denied in Lender's sole and absolute discretion, submit an application for zoning approval of the Northwest Parcel (the "**Northwest Parcel Zoning Request**"); it being agreed by Borrower that in no event may the Northwest Parcel or the Northwest Parcel Zoning Request or any approval thereof adversely affect any permits, approvals, or certificates with respect to the Construction Project and nothing contained herein shall be deemed an approval by Lender to release the Northwest Parcel from the lien of the Security Instrument or an approval to allow Owner to transfer the Northwest Parcel; it being agreed that the Northwest Parcel shall remain as part of the collateral for the Loan until the Loan is paid in full.  Borrower agrees that Lender may condition any approval on Borrower causing the Northwest Parcel to constitute a separate tax lot. If Lender approves the creation of a separate tax lot for the Northwest Parcel, all documentation in connection therewith shall be approved by Lender prior to submission.  Borrower shall execute any Loan Document modification required by Lender in connection with the creation of such separate tax lot.

Section 6.2.  **ERISA**.  (a) Borrower shall not, and shall not permit any of Borrower's members or any Pledgor to, engage in any transaction which would cause any obligation, or action taken or to be taken, hereunder (or the exercise by Lender of any of its rights under the Note, this Agreement, the Security Instrument, the Pledge Agreements or any of the other Loan Documents) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under ERISA.

(b)    Borrower further covenants and agrees to deliver to Lender such certifications or other evidence from time to time throughout the term of the Agreement, as requested by Lender in its sole discretion, that (i) Borrower is not an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA, or a "governmental plan" within the meaning of Section 3(32) of ERISA; (ii) Borrower is not subject to state statutes regulating investments and fiduciary obligations with respect to governmental plans; and (iii) one or more of the following circumstances is true:

(i)      Equity interests in Borrower are publicly offered securities, within the meaning of 29 C.F.R. § 2510.3-101(b)(2);

(ii)      Less than 25 percent (25%) of each outstanding class of equity interests in Borrower is held by "benefit plan investors" within the meaning of 29 C.F.R. § 2510.3-101(f)(2); or

(iii)      Borrower qualifies as an "operating company" or a "real estate operating company" within the meaning of 29 C.F.R. § 2510.3-101(c) or (e) or an investment company registered under The Investment Company Act of 1940.

Section 6.3.   **Single Purpose Entity**.

(a)      Each Borrower, LV Member and Towers Inc. are collectively referred to herein as, the "**SPE Pledgors**") have not and shall not:

(i)      (A) as to Owner, engage in any business or activity other than the ownership, operation and maintenance of the Property, and activities incidental thereto, and (B) as to each SPE Pledgor, engage in any business or activity other than the ownership, operation and maintenance of its respective Pledged Interests, and activities incidental thereto;

(ii)      (A) as to Owner, acquire or own any material assets other than (i) the Property, and (ii) such incidental Personal Property as may be necessary for the operation or development of the Property, and (B) as to each SPE Pledgor, acquire or own any material assets other than its respective Pledged Interests;

(iii)      merge into or consolidate with any person or entity or dissolve, terminate or liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure, without in each case Lender's prior written consent which consent may be withheld in Lender's sole and absolute discretion.

(iv)      fail to preserve its existence as an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization or formation, or without the prior written consent of Lender, amend, modify, terminate or fail to comply with the provisions of its partnership agreement, articles or certificate of incorporation, operating agreement or similar organizational documents, as the case may be, as same may be further amended or supplemented, if such amendment, modification, termination or failure to comply would adversely affect the ability of Borrower to perform its obligations under the Note or, with respect to Borrower and SPE Pledgors, hereunder or under any of the other Loan Documents;

(v)      own any subsidiary or make any investment in, any person or entity without the consent of Lender;

(vi)      commingle its assets with the assets of any of its partners, members, affiliates, principals or of any other person or entity;

(vii)    incur any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation or entering into any equipment lease), other than the Debt and, as to Owner only, subject to the prior written consent of Lender, unsecured trade debt incurred in the ordinary course of its business of owning and operating the Property, provided that such debts are paid when due and as to Towers Inc. only, the Subordinate Loan;

(viii)    fail to avoid becoming insolvent and fail to pay its debts and liabilities from its assets as the same shall become due;

(ix)    fail to maintain its records, books of account and bank accounts separate and apart from those of the partners, members, principals and Affiliates of Borrower, the Affiliates of a partner or member of Borrower, and any other person or entity;

(x)    enter into any contract or agreement with any partner, member, principal or Affiliate of Borrower, any Pledgor, any Guarantor or any Indemnitor, or any partner, member, principal or Affiliate thereof, except upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arms-length basis with third parties other than any partner, member, principal or Affiliate of Borrower, Pledgor, Guarantor or Indemnitor, or any partner, member, principal or Affiliate thereof, subject to Lender's prior written consent;

(xi)    seek the dissolution or winding up in whole, or in part, of Borrower or any Pledgor;

(xii)    maintain its assets in such a manner that it will be costly or difficult to segregate, ascertain or identify its individual assets from those of any partner, member, principal or Affiliate of Borrower, or any general partner, principal or Affiliate thereof or any other person;

(xiii)    hold itself out to be responsible for the debts of another person;

(xiv)    make any loans or advances to any third party, including any of its partners, members, principals or Affiliates;

(xv)    fail to file its own tax returns, except to the extent that its income and loss is reflected in the tax returns of its owner, as permitted by applicable law;

(xvi)    agree to, enter into or consummate any transaction which would render it unable to furnish the ERISA certification or other evidence referred to in Section 6.2(b) hereof;

(xvii)    fail either to hold itself out to the public as a legal entity separate and distinct from any other entity or person or to conduct its business solely in its own name in order not (A) to mislead others as to the identity with which such other

party is transacting business, or (B) to suggest that it is responsible for the debts of any third party (including any of its partners, principals, members or Affiliates);

(xviii) fail to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

(xix)   file or consent to the filing of any petition, either voluntary or involuntary, to take advantage of any applicable insolvency, bankruptcy, liquidation or reorganization statute, or make an assignment for the benefit of creditors;

(xx)   fail to maintain a reasonably sufficient number of employees in light of its contemplated business operations;

(xxi)   fail to allocate fairly and reasonably any overhead expenses that are shared with any of their respective partners, members, principals or Affiliates, any guarantor or indemnitor, or any partner, member, principal or Affiliate of any thereof, including paying for office space and services performed by any employee of any of their respective partners, members, principals or Affiliates, any guarantor or indemnitor, or any partner, member, principal or Affiliate of any thereof;

(xxii) except to the extent required by generally-accepted accounting principles or applicable law, fail to maintain separate financial statements, which shows its assets and liabilities, separate and apart from those of any other person or entity and not have its assets listed on the financial statement of any other entity; or

(xxiii) fail to correct any known misunderstanding regarding its separate identity.

(b)   Towers Inc. has, and shall continue to have, one (1) Independent Director (as defined herein).  A unanimous vote of the Board of Directors of such entity (including the Independent Director) must be required for such entity to:

(1)   file a bankruptcy or insolvency petition or otherwise institute insolvency proceedings or to consent to the institution of involuntary bankruptcy or insolvency proceedings or to cause such entity to do the foregoing;

(2)   dissolve, liquidate, consolidate, merge or sell all or substantially all assets or to cause such entity to do the foregoing;

(3)   amend the articles or certificate of organization, to recommend that the members amend the articles or certificate of organization or to cause such entity to amend its organizational documents to the extent such amendment relates to any of the terms, provisions conditions or restrictions contained in this Section 6.3; and

(4)   withdraw as managing member of such entity.

(c)    As referred to herein, an "**Independent Director**" shall mean a director of Towers, Inc. who is not at the time of appointment and has not been at any time during the preceding two (2) years: (i) a stockholder, director, officer, employee, member or partner of Borrower, Owner, any Pledgor or any Guarantor or any Affiliate of any of them (other than as an Independent Director of (A) one or more of Borrower, Owner or any Pledgor or (B) any Affiliate of any thereof); (ii) a customer, supplier or other person who derives more than 10% of its purchases or revenues from its activities with Borrower, Owner, any Pledgor or any Guarantor; (iii) a person or other entity controlling or under common control with any such stockholder, partner, member, customer, supplier or other person; or (iv) a member of the immediate family of any such stockholder, director, officer, employee, member, partner, customer, supplier or other person. As used herein, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of management, policies or activities of a person or entity, whether through ownership of voting securities, by contract or otherwise. Borrower has appointed Neil Faucett an independent certified public accountant, to be the Independent Director of Towers Inc.

Section 6.4.    **Restoration**.    Subject to the terms and conditions of the Construction Project Loan Documents and the Intercreditor Agreement, if applicable, the following provisions shall apply in connection with the Restoration of the Property:

(a)    If the Net Proceeds (defined below) shall be less than $250,000.00 and the costs of completing the Restoration shall be less than $250,000.00, the Net Proceeds will be disbursed by Lender to Borrower upon Lender's receipt or as otherwise directed by Lender, provided that all of the conditions set forth in Section 6.4(b)(i)(A)(1), (3) and (4), are met and, provided further, that Borrower delivers to Lender a written undertaking to expeditiously commence and to satisfactorily complete with due diligence the Restoration in accordance with the terms of this Agreement.

(b)    If the Net Proceeds are equal to or greater than $250,000.00 or the costs of completing the Restoration is equal to or greater than $250,000.00 Lender shall make the Net Proceeds available for the Restoration in accordance with the provisions of this Section (b). The term "**Net Proceeds**" for purposes of this Section 6.4 shall mean: (i) the net amount of all insurance proceeds received by Lender pursuant to Sections 5.4(a)(i), (iv), (vi) and (ix) of this Agreement as a result of such damage or destruction, after deduction of Lender's reasonable costs and expenses (including, but not limited to, reasonable counsel and/or insurance consultant fees), if any, incurred in collecting same ("**Insurance Proceeds**"), or (ii) the net amount of all awards and payments received by Lender with respect to a taking referenced in Section 5.7 of this Agreement, after deduction of Lender's reasonable costs and expenses (including, but not limited to, reasonable counsel and/or insurance consultant fees), if any, incurred in collecting same ("**Condemnation Proceeds**"), whichever the case may be.

(i)    The Net Proceeds shall be made available to:

(A)    Borrower for the Restoration provided that each of the following conditions are met:

(1)    no Event of Default shall have occurred and be continuing under any of the other Loan Documents;

(2)     Lender shall be satisfied, in its reasonable discretion that, as a result of such casualty or taking, as the case may be, the Construction Project and the Condominium Units will not be adversely affected in any material respect, including, but not limited to (1) a delay in approval of Condominium Documents by any governmental authority, (2) a material increase in the cost or time necessary to complete the Construction Project and the Condominium Units from that which the Borrower had represented to Lender prior to the date of such casualty or taking, (3) a material adverse change in the number or size of Condominium Units, common area or commercial space that may be developed at the Property as a result of such casualty or taking, or (4) more than ten percent (10%) of the proposed purchasers of Condominium Units under Approved Sale Contracts or Approved Reservation Agreements have elected to terminate such Approved Sale Contracts or Approved Reservation Agreements, as the case may be, as a result of such casualty or taking, in the event such termination is permitted under an Approved Sale Contract;

(3)     in the event the Net Proceeds are Insurance Proceeds, less than twenty-five percent (25%) of the total floor area of the Improvements has been damaged, destroyed, or rendered unusable as a result of such fire or other casualty or (2) in the event the Net Proceeds are Condemnation Proceeds, less than fifteen percent (15%) of the land constituting the Property is taken, and such land is located along the perimeter or periphery of the Property, and some portion of the Improvements is located in such land;

(4)     Borrower commence the Restoration as soon as reasonably practicable (but in no event later than thirty (30) days after such damage or destruction or taking, whichever the case may be, occurs) and shall diligently pursue the same to satisfactory completion;

(5)     Lender shall be satisfied that any operating deficits, which will be incurred with respect to the Property as a result of the occurrence of any such fire or other casualty or taking, whichever the case may be, will be covered out of (i) the Net Proceeds, (ii) the insurance coverage referred to in Section 5.4(a)(iii), if applicable, or (iii) by other funds of Borrower;

(6)     the Construction Project Lender has permitted the Restoration and has made that portion of the Net Proceeds held or controlled by such lender to be used for such purposes and has agreed to continue to fund the proceeds of the Construction Project Loan;

(7)     Lender shall be satisfied that (a) the Restoration will be completed on or before the earliest to occur of (1) three (3) months prior to the Maturity Date, (2) three (3) months after the occurrence of such fire or other casualty or taking, whichever the case may be, (3) the earliest date required for such completion, subject to *Force Majeure* as may be provided in such Approved Sale Contract, under the terms of any Approved Sales Contracts or Approved Reservation Agreements which are required to remain in effect in accordance with the provisions of this Subsection 6.4(b)(i)(A)(2) subsequent to the

occurrence of such fire or other casualty or taking, whichever the case may be, or (4) such time as may be required under applicable zoning law, ordinance, rule or regulation in order to repair and restore the Property to the condition required thereunder;

(8)    the Property and the use thereof after the Restoration will be in compliance with and permitted under all applicable zoning laws, ordinances, rules and regulations;

(9)    the Restoration shall be done and completed by Borrower in an expeditious and diligent fashion and in compliance with all applicable governmental laws, rules and regulations (including, without limitation, all applicable Environmental Laws) defined below; and

(10)    such fire or other casualty or taking, as applicable, does not result in the loss of access to the Property or any of the Improvements (except as same may be waived by Lender) thereon; and

(11)    not more than twenty-five percent (25%) of the total amount of space at the Property which was committed to be sold pursuant to Approved Sale Contracts or Approved Reservation Agreements approved by Lender have been terminated or could be subject to cancellation or termination by the purchaser as a result of such damage or destruction or taking.

(ii)    The Net Proceeds shall be held by Lender and, until disbursed in accordance with the provisions of this Section 6.4(b), shall constitute additional security for the Obligations. The Net Proceeds shall be disbursed by Lender to, or as directed by, Borrower, from time to time during the course of the Restoration, upon receipt of evidence satisfactory to Lender that (A) all materials installed and work and labor performed (except to the extent that they are to be paid for out of the requested disbursement) in connection with the Restoration have been paid for in full, and (B) there exist no notices of pendency, stop orders, mechanic's or materialman's liens or notices of intention to file same, or any other liens or encumbrances of any nature whatsoever on the Property arising out of the Restoration which have not either been fully bonded to the satisfaction of Lender and discharged of record.

(iii)    All plans and specifications required in connection with the Restoration shall be subject to prior review and acceptance in all respects by Lender and by an independent consulting engineer selected by Lender (the "**Casualty Consultant**"). Lender shall have the use of such plans and specifications and all permits, licenses and approvals required or obtained in connection with the Restoration. The identity of the contractors, subcontractors and materialmen engaged in the Restoration, as well as the contracts under which they have been engaged, shall be subject to prior review and acceptance by Lender and the Casualty Consultant. All costs and expenses incurred by Lender in connection with making the Net Proceeds available for the Restoration including, without limitation, reasonable counsel fees and disbursements and the Casualty Consultant's fees, shall be paid by Borrower.

(iv)    In no event shall Lender be obligated to make disbursements of the Net Proceeds in excess of an amount equal to the costs actually incurred from time to time for work in place as part of the Restoration, as certified by the Casualty Consultant, minus the Casualty Retainage. The term "**Casualty Retainage**" as used herein shall mean an amount equal to 10% of the costs actually incurred for work in place as part of the Restoration, as certified by the Casualty Consultant, until the Restoration has been completed. The Casualty Retainage shall in no event, and notwithstanding anything to the contrary set forth above, be less than the amount actually held back by Borrower from contractors, subcontractors and materialmen engaged in the Restoration. The Casualty Retainage shall not be released until the Casualty Consultant certifies to Lender that the Restoration has been completed in accordance with the provisions herein and that, if applicable, all approvals necessary for the re-occupancy and use of the Property have been obtained from all appropriate governmental and quasi-governmental authorities, and Lender receives evidence satisfactory to Lender that the costs of the Restoration have been paid in full or will be paid in full out of the Casualty Retainage, provided, however, that Lender will release the portion of the Casualty Retainage being held with respect to any contractor, subcontractor or materialman engaged in the Restoration as of the date upon which the Casualty Consultant certifies to Lender that the contractor, subcontractor or materialman has satisfactorily completed all work and has supplied all materials in accordance with the provisions of the contractor's, subcontractor's or materialman's contract, and the contractor, subcontractor or materialman delivers the lien waivers and evidence of payment in full of all sums due to the contractor, subcontractor or materialman as may be reasonably requested by Lender. If required by Lender, the release of any such portion of the Casualty Retainage shall be approved by the surety company, if any, which has issued a payment or performance bond with respect to the contractor, subcontractor or materialman.

(v)    Lender shall not be obligated to make disbursements of the Net Proceeds more frequently than once every calendar month.

(vi)    If at any time the Net Proceeds or the undisbursed balance thereof shall not, in the opinion of Lender, be sufficient to pay in full the balance of the costs which are estimated by the Casualty Consultant to be incurred in connection with the completion of the Restoration, Borrower shall deposit the deficiency (the "**Net Proceeds Deficiency**") with Lender before any further disbursement of the Net Proceeds shall be made. The Net Proceeds Deficiency deposited with Lender shall be held by Lender and shall be disbursed for costs actually incurred in connection with the Restoration on the same conditions applicable to the disbursement of the Net Proceeds, and until so disbursed pursuant to this Section 6.4(b) shall constitute additional security for the Obligations.

(c)    All Net Proceeds not required to be made available for the Restoration may be retained and applied by Lender toward the payment of the Debt whether or not then due and payable in such order, priority and proportions as Lender in its discretion shall deem proper or, at the discretion of Lender, the same may be paid, either in whole or in part, to Borrower for such purposes as Lender shall designate, in its discretion. If Lender shall receive and retain Net Proceeds, the lien of the Security Instrument and this Agreement shall be reduced

only by the amount thereof received and retained by Lender and actually applied by Lender in reduction of the Debt.

(d)    Notwithstanding anything to the contrary contained in this Section 6.4, from and after the CPL Closing Date, in the event the Property is damaged or destroyed, in whole or in part, by fire or other casualty, or becomes subject to a partial taking referenced in Section 5.7 above, the Property shall be restored in accordance with the terms of the Construction Project Loan Documents. Furthermore, in the event all of the conditions set forth in the Construction Project Loan Documents in order to make the Net Proceeds available to Borrower for the Restoration have been satisfied and the Net Proceeds have been made available to Borrower for Restoration in accordance with the terms of the Construction Project Loan Documents, the conditions set forth in this Section 6.4 for making available of the Net Proceeds to Borrower for the Restoration shall be deemed to have been satisfied. Subject to the rights of Construction Project Lender under the Construction Project Loan Documents and subject to the Intercreditor Agreement, all Net Proceeds not required to be made available for the Restoration may be retained and applied by Lender toward the payment of the Debt whether or not then due and payable in such order, priority and proportions as Lender in its discretion shall deem proper or, at the discretion of Lender, the same may be paid, either in whole or in part, to Borrower for such purposes as Lender shall designate, in its discretion. If Lender shall receive and retain the Net Proceeds, the Loan shall be reduced only by the amount thereof received and retained by Lender and actually applied by Lender in reduction of the Debt.

Section 6.5.    **Lockbox**.  If applicable, subject to the Construction Project Loan Documents, if any income is generated from the Property or any Release Consideration is received, Borrower shall immediately upon written request of Lender, establish and maintain a lockbox account ("**Lockbox**") with Lender into which Borrower agrees to deposit all Rents, CD Impounds from Defaulting Purchasers, Release Consideration and other income from the Property. Borrower shall cooperate and enter into any agreements which are reasonably required to establish and maintain such lockbox account, including, without limitation, Lender's standard form of lockbox, pledge and security agreement and deposit account control agreement.

Section 6.6.    **Notices of Default Under Construction Project Loan Document**.  Borrower will promptly provide Lender with copies of all notices required pursuant to Section 11.3 of this Agreement. If any Person shall give any notice or take any other action in respect of a claimed default (whether or not constituting a default or an event of default) under any of the Construction Project Loan Documents, Borrower shall forthwith give written notice thereof to Lender, describing the notice or action and the nature of the claimed default.

Section 6.7.    **Other Debt**.  Borrower shall not incur or permit to exist any indebtedness for borrowed money or guarantee the obligations of another person or entity other than (A) with respect to the Borrower, the Debt and (B) with respect to Owner, subject to the prior written consent of Lender, unsecured trade debt incurred in the ordinary course of business of owning and operating the Property provided that such debt is paid when due.

Section 6.8.    **Service Rights**.  Borrower shall not give or grant or allow to be given or granted any Service Rights to any Person other than from the Owner (including any Management Company, any Affiliate of Borrower or any Pledgor or any Guarantor or any

principal of Borrower or any Pledgor or any Guarantor), and any Service Rights granted to any Person other than from the Owner shall be null and void *ab initio*.

Section 6.9.  **Warrants and Options**.  No warrants, stock options or similar rights in any tenant, any licensee or any other Person providing any services related to or for the benefit of the Property may be granted to Borrower, Owner, any Pledgor, any Guarantor or any Indemnitor, or any Affiliate or principal thereof, without Lender's prior written consent, which consent may be withheld, in Lender's sole and absolute discretion, and which consent may be conditioned upon, among other things, (i) Lender's receipt of a perfected security interest in such warrants, stock options or similar rights as security for the Debt, or (ii) Lender's receipt and approval of an agreement, satisfactory to Lender in Lender's sole and absolute discretion, granting to Lender a percentage (determined by Lender in its sole and absolute discretion) of the rights granted to such Borrower, Pledgor, Guarantor or Indemnitor, or any Affiliate or principal thereof, in connection with such warrants, stock options or similar rights.

Section 6.10.  **Development of Property**.  Borrower shall obtain prior to the Outside Date in accordance with Section 5.18 hereof, and thereafter maintain (i) all necessary Permits, (ii) all necessary approvals and development rights with respect to the proposed development of the Property, and Borrower shall continue to take all steps necessary to develop the Property within time deadlines and pursuant to development plans satisfactory to Lender in the exercise of Lender's reasonable discretion.  Borrower shall not construct or permit any signal emitting antennae on the building to be constructed on the Property.

Section 6.11.  **Construction Project**.

    (a)  **Entitlements**.  Borrower represents, warrants and covenants to Lender that (1) as of the date hereof, (i) Owner has obtained (A) zoning approval from Clark County for the construction of 542 residential units pursuant to the Zoning Approval and (B) the Airspace Approvals (collectively, the "**Predevelopment Entitlements**"), (ii) Owner is in full compliance with all requirements of the Predevelopment Entitlements and is entitled to all rights and privileges thereunder; (iii) Owner shall at all times maintain the Predevelopment Entitlements in full force and effect throughout the entire term of the Loan; (iv) Owner shall not assign its interest under the Predevelopment Entitlements, except to Construction Project Lender in connection with the consummation of the Construction Project Loan, consent to the assignment by any other party to the Predevelopment Entitlements of its interest under the Predevelopment Entitlements, or terminate or cancel the Predevelopment Entitlements or modify, change, supplement, alter or amend the Predevelopment Entitlements, in any respect, either orally or in writing, without Lender's prior written consent, which may be granted or denied in Lender's commercially reasonable discretion; and (v) Owner has delivered to Lender true and complete copies, including all filed or executed amendments thereto, of the Predevelopment Entitlements, (2) prior to the Outside Date, (i) Borrower shall obtain all necessary permits, certificates, licenses, authorizations, approvals, variances, and other land use entitlements (including, without limitation, building permits for the Construction Project and approvals, waivers or licenses and authorizations for the Condominium Documents) in order to complete the Construction Project (the "**Entitlements**") and all such Entitlements shall be in full force and effect, and not subject to revocation, suspension, forfeiture or modification, other than for standard exceptions under applicable building codes (such as to commencement, progress or completion); provided, however, that under no circumstances shall Borrower permit any

condition to exist that would subject the Entitlements to revocation, suspension, forfeiture or modification, or cause any of the Entitlements to be revoked, suspended, forfeited or modified; (3) Borrower shall, once obtained and thereafter, be in full compliance with all requirements of the Entitlements and shall be entitled to all rights and privileges thereunder; (4) Borrower shall, once obtained, at all times thereafter, maintain the Entitlements in full force and effect; (5) Borrower shall not assign its interest under the Entitlements, except as may be required by the Construction Project Lender in connection with the consummation of the Construction Project Loan, consent to the assignment by any other party to the Entitlements of its interest under the Entitlements, or terminate or cancel the Entitlements or modify, change, supplement, alter or amend the Entitlements, in any respect, either orally or in writing, without Lender's prior written consent, which may be given or denied in Lender's commercially reasonable discretion; and (6) Borrower, upon obtaining Entitlements, shall deliver to Lender a true and complete copy of such Entitlements, including all filed or executed amendments thereto.   In addition, Borrower represents, warrants and covenants that Borrower shall take all necessary action to obtain, and shall diligently pursue the obtaining of, all other approvals, Permits or licenses required for the construction of the Construction Project and the development of the Property.

(b)     **Construction Project Approvals**.  Borrower covenants to Lender that, with respect to all necessary permits, certificates, licenses, authorizations and approvals including, without limitation, all environmental approvals required to be issued by or to be obtained from the appropriate Governmental Authorities pursuant to Legal Requirements in connection with the Plans and Specifications and for the Construction Project (the "**Construction Project Approvals**"), (A) if and to the extent such Construction Project Approvals have been issued or obtained, as of the date hereof, Borrower has delivered copies of same to Lender and shall maintain such Construction Project Approvals in full force and effect throughout the entire term of the Loan, and (B) to the extent such Construction Project Approvals have not been issued or obtained, Borrower shall (i) take all reasonable steps necessary to have such Construction Project Approvals issued by or obtained from the appropriate Governmental Authorities promptly but in no event later than the dates required herewith, and (ii) deliver copies of such Construction Project Approvals to Lender promptly after issuance and receipt of same and maintain such Construction Project Approvals in full force and effect throughout the entire term of the Loan.

(c)     **Plans and Specifications**.  Borrower shall deliver to Lender, on or before October 31, 2005 (the "**P&S Delivery Date**"), a true and complete copy of the Plans and Specifications for the Construction Project to Lender for Lender's review and approval.  Lender shall approve or disapprove the Plans and Specifications (and, in the event of a disapproval, shall deliver to Borrower a list of objections to the applicable Plans and Specifications submitted) within ten (10) days following the applicable P&S Delivery Date (each a "**P&S Approval Date**").  Upon Borrower receiving Lender approval of the Plans and Specifications, Borrower shall submit the Plans and Specifications to the applicable Governmental Authorities for approval and any mandatory changes required by such Governmental Authorities to comply with Legal Requirements (such as, by way of example only, to comply with local building and fire codes) (each a "**Mandatory Governmental Change**") shall be incorporated into the Plans and Specifications without the need for further Lender approval, provided that (i) any Mandatory Governmental Change is immaterial in nature (otherwise Lender's prior written consent must be obtained with respect to such Mandatory Governmental Change, which consent will not be unreasonably withheld or delayed), and (ii) in any case, regardless of whether further Lender

approval is required, written notice containing a detailed description of such Mandatory Governmental Change and a copy of the revised Plans and Specifications which incorporate such Mandatory Governmental Change are to be delivered to Lender within two (2) business days of Borrower's delivery of the revised Plans and Specifications to the Governmental Authority requesting such Mandatory Governmental Change. Lender shall without additional cost or expense have the use of the Plans and Specifications upon the occurrence beyond any applicable notice and cure period of a default under the Loan Documents. Upon notice to Borrower, Lender, Construction Consultant and their respective agents and employees, shall have the right of entry and access to the entire Property in connection with their review of the Plans and Specifications or any other aspect of the Construction Project.

(d)     **Project Budget**. The term **"Project Budget"** shall mean, the itemized statements of Direct Construction Costs and Other Project Costs (the **"Project Costs"**) prepared by Borrower and approved by Lender in connection with the Construction Project setting forth the amounts for each category of Direct Construction Costs and Other Project Costs for the Construction Project. Borrower shall deliver the Project Budget to Lender for Lender's approval on or prior to the December 15, 2005.

(e)     **Construction Consultant**. Borrower acknowledges and agrees that (i) Lender may retain any Person to act as a consultant and only as a consultant to Lender in connection with the Construction Project (the "**Construction Consultant**"), (ii) Construction Consultant shall in no event or under any circumstance have any power or authority to make any decision or to give any approval or consent or to do any other act or thing which is binding upon Lender and any such purported decision, approval, consent, act or thing by Construction Consultant on behalf of Lender shall be void and of no force or effect, unless specifically agreed to by Lender, (iii) Lender reserves the right to make any and all decisions required to be made by Lender under this Agreement and to give or refrain from giving any and all consents or approvals required to be given by Lender under this Agreement and to accept or not accept any matter or thing required to be accepted by Lender under this Agreement, without in any instance being bound or limited in any manner or under any circumstance whatsoever by any opinion expressed or not expressed, or advice given or not given, or information, certificate or report provided or not provided, by Construction Consultant to Lender or any other person or party with respect thereto, (iv) Lender reserves the right to disregard or disagree, in whole or in part, with any opinion expressed, advice given or information, certificate or report furnished or provided by Construction Consultant to Lender or any other person or party, (v) Lender reserves the right to replace Construction Consultant with another consultant at any time and without prior notice to or approval by Borrower, and (vi) Borrower shall pay all fees, costs and expenses incurred by Lender in connection with retaining the Construction Consultant.

(f)     **Construction Project Loan**.

(i)     Borrower shall make a good faith effort to obtain and deliver to Lender by August 31, 2005, but in any case, Borrower shall obtain and deliver, by no later than September 30, 2005 (the date of delivery, which in no case shall be later than September 30, 2005, is referred to herein as the "**Construction Project Loan Commitment Date**"), one or more written commitments (the "**Construction Project Loan Commitment**") issued by an Institutional Lender acceptable to Lender (the "**Construction Project Lender**") pursuant to which the Construction Project Lender

shall make a construction loan to the Owner to finance the Construction Project (the "**Construction Project Loan**"). The Construction Project Loan Commitment shall set forth the material terms of the Construction Project Loan and shall be subject to the review and prior written approval of Lender, including, without limitation, the principal amount of the Construction Project Loan and the required number of presales. Borrower shall execute and deliver the Construction Project Loan Commitment, as approved by Lender, and make all deposits required thereunder (and provide copies of such fully executed Construction Project Loan Commitment and documentary evidence of such deposits required thereunder to Lender simultaneously therewith). Upon execution and delivery of a Construction Project Loan Commitment in accordance with this Section 6.11(f)(i) (the "**CPL Execution Date**"), Borrower shall (i) comply with all of the terms, conditions and provisions of the approved Construction Project Loan Commitment including, without limitation, the payment of any fees due thereunder, and (ii) close the Construction Project Loan in accordance with the approved Construction Project Loan Commitment promptly following the CPL Execution Date, but in no event later than the Outside Date (the date upon which the closing of the Construction Project Loan occurs shall be referenced to herein as the "**CPL Closing Date**").

(ii)     Borrower hereby agrees to execute and deliver an agreement or agreements, modifying certain terms and provisions of this Loan Agreement and the other Loan Documents required by Lender in connection with Owner obtaining the Construction Project Loan, provided, however, that such agreement or agreements shall not increase the financial obligations of Lender or Borrower hereunder or affect the economic terms hereof, except to a de minimus extent and provided further that the Scheduled Maturity Date (as defined in the Note) of the Loan may be extended to a date that is coterminous or occurring after the Construction Project Loan maturity date.

(iii)     In the event the Construction Project Lender allows any sums to be paid to Owner, Borrower or any of their Affiliates, other than the Current Developer's Fee in accordance with this Agreement, such sums shall be paid to Lender immediately and shall be applied in accordance with Section 5.20 hereof.

(g)     **Additional Insurance Policies**. So long as this Agreement shall be in force with respect to construction activity at the Property, the policies of fire insurance shall be in the so-called "All Risk Builders' Risk Completed Value Non-Reporting Form", including collapse coverage, all as may be required by Lender, and in amounts to be determined by Lender and Construction Consultant, which amounts shall in no event be less than 100% of the completed insurable value of the work. All hazard policies shall contain a Standard New York (Non-Contribution) Clause Endorsement or its equivalent and shall otherwise be in form and substance reasonably satisfactory in all respects to Lender and its counsel.

(h)     **Payment of Fees and Expenses**. Borrower shall pay all fees and charges incurred in the procuring and making of the Loan, including, without limitation, reasonable attorneys' fees and disbursements incurred by Lender, inspection and site visits by Servicer, fees and expenses of Construction Consultant, appraisal fees, and fees and expenses relating to examination of title, title insurance premiums, surveys, and mortgage recording, documentary, transfer or other similar taxes and revenue stamps.

(i)    **Construction Contracts/Architect Agreements/Etc**.    Borrower shall deliver to Lender, Servicer and Construction Consultant copies of any Architect's Agreement, any General Contractor's Agreement, any Major Subcontract or any other contract with respect to the Property now in effect or hereafter entered into by Borrower, each of which shall be in a form and substance as approved by Lender in its reasonable discretion.    Borrower shall not agree to any modification or to any termination of any Architect's Agreement, any General Contractor's Agreement, any Major Subcontract or any other contract with respect to the Property without the express prior written consent of Lender.

Section 6.12.    **Condominium Creation**.    (a)    Borrower hereby warrants and covenants to:

(i)    prior to the sale of the first Condominium Unit, submit the Property to the provisions of the Condominium Act and satisfy all of the requirements thereof and of any other applicable law or restriction necessary to create a valid residential condominium regime for the Tower containing 542 Residential Units, the Health Club, the Cabana Spaces, the Storage Spaces, the Retail Units and the Parking Spaces to be constructed on the Property (the "**Condominium**"); provided, that the form of the Condominium Documents, including, without limitation, the Condominium Unit designations, descriptions, floor plans, sale prices and proposed form of contract of sale for the Condominium Units, as well as the description of common elements and breakdown of common interests appurtenant to each Condominium Unit, shall be subject to the written approval of Lender and its counsel prior to such submission;

(ii)    duly perform or cause to be duly performed all obligations of developers or sponsors under the Condominium Documents, and do or cause to be done all things necessary to operate and maintain those portions of the Property as the Condominium, *provided, however,* that Borrower will not record or file the declaration of condominium for the Condominium with the appropriate land records if there shall be a default under this Agreement, the Security Instrument or any Other Security Documents or without Lender's prior written consent, which consent shall not be unreasonably withheld or delayed; comply with all laws, including, but not limited to, securities laws, which may apply to the sale of Condominium Units and furnish such evidence of compliance therewith as Lender may reasonably request;

(iii)    not enter into any contract of sale or reservation agreement for any Condominium Unit other than an Approved Sale Contract or an Approved Reservation Agreement, in either case, which includes a sales price which is not less than the Minimum Sales Price with respect to such Condominium Unit;

(iv)    not enter into any contract of sale for the sale of any Condominium Unit to Borrower, any Pledgor, any Guarantor or any Indemnitor or any of their respective Affiliates without Lender's prior written consent, nor enter into any contract of sale for more than four (4) Condominium Units to the same purchaser;

(v)    subject to Section 5.26 hereof and if applicable, the Construction Project Loan Documents, deliver, or cause to be delivered, to Lender all Contract Deposits;

(vi)    deliver to Lender a certified copy of the recorded declaration for the Condominium upon recordation;

(vii)    the Lender shall not be required to join in any Condominium Documents; and

(viii)    submit to Lender, on a monthly basis, a Condominium Sales and Reservation Report in the form attached hereto as Exhibit F.

(b)    The terms and conditions of the Condominium Documents shall require Lender's consent to any amendment thereto.

(c)    Borrower shall file for an exemption under Nevada Revised Statute Chapter 119, and if such exemption shall be denied, to obtain a license for the Property as required by, and in accordance with, said statute.

(d)    Upon the recording of the declaration of the Condominium, the following covenants of the Borrower shall become operative and be in effect:

(i)    the Borrower shall not, without the prior written consent of the Lender, give any consent or perform any action in furtherance of any modification or amendment of such declaration;

(ii)    the Borrower shall pay all assessments for common charges and expenses and all real estate taxes and assessments and insurance premiums made against or relating to the portion of the Property then owned by the Owner, whether pursuant to such declaration, any by-laws of the Condominium adopted in connection therewith or otherwise, as the same shall become due and payable;

(iii)    the Borrower will comply with all of the terms, covenants and conditions on such party's part to be complied with pursuant to such declaration or any rules and regulations that may be adopted for the Condominium, as the same shall be in force and effect from time to time;

(iv)    the Borrower will not, without the prior written consent of the Lender, which consent shall not be unreasonably withheld, exercise any right it may have to vote for (x) the expenditure of insurance proceeds or condemnation awards for the repair or restoration of the Property or (y) any additions or improvements to the common elements of the Condominium; and

(v)    the terms and conditions of the Condominium Documents shall require Lender's consent to any amendment thereto.

(e)    To the extent available under Nevada law, upon creation of the Condominium, the Borrower shall obtain an endorsement to Owner's title insurance policy insuring the Owner's title to the Property in form acceptable to the Lender in the Lender's sole discretion, which policy shall include, without limitation, insurance against losses arising as a result of the invalidity of the Condominium, with premium and costs related to the title examination and issuance of such policy to be paid by the Borrower.

(f)      Borrower shall pay to Lender upon demand from time to time any and all reasonable fees, costs and expenses incurred by Lender, including, but not limited to, reasonable legal fees and disbursements, with respect to the conversion of the Property or any portion thereof to condominium ownership, the sale of Condominium Units in connection therewith and/or the approvals of Lender in connection with such conversion or sale;

(g)      Borrower shall comply with, or satisfy, each and every term and condition set forth in the Construction Project Loan Documents relating to the Condominium Conversion.

Section 6.13.    **Intentionally Omitted**

Section 6.14.    **Developer's Fee and the Del American Construction Fee**. Provided no Event of Default has occurred and is continuing, Del American, Inc. ("**Del American**") shall be entitled to a developer's fee in connection with the development of the Property in the total aggregate amount of $9,500,000.00 (the "**Developer's Fee**") in accordance with the terms hereof.    Only a portion of the Developer's Fee may be paid current from Construction Project Loan proceeds prior to the payment in full of the Debt in accordance with the Project Budget (the "**Current Developer's Fee**") and the balance of such Developer's Fee shall be deferred until, and may only be paid, after the Debt is paid in full (the "**Deferred Developer's Fee**").  The Current Developer's Fee shall be in an amount equal to the difference between (x) $4,500,000.00, and (y) the amount of the Construction Manager Fee paid to the Construction Project Manager.    The Deferred Developer's Fee shall mean the sum of (x) $5,000,000.00, and (y) the Construction Manager Fee paid to the Construction Project Manager. If and to the extent any of the Deferred Developer's Fee is paid to Borrower or Del American prior to the payment in full of the Debt, Borrower shall or shall cause Del American to immediately deposit with Lender such amounts into an interest bearing escrow account ("**Developer's Escrow Account**"), which amounts shall be held by Lender until the Debt is paid in full.  Promptly after receipt, Borrower shall or shall cause Del American to deposit with Lender any funds it received in excess of the Current Developer's Fee.  Notwithstanding the foregoing, if an Event of Default exists beyond the expiration of any notice and cure period, Lender may apply any amounts in the Developer's Escrow Account to the Debt in such order as Lender determines in its sole and absolute discretion.  In addition to the Developer's Fee, provided no Event of Default has occurred and is continuing, Del American shall be entitled to a construction management fee in the total aggregate amount of $1,000,000.00 (the "**Del American Construction Fee**").  A portion of the Del American Construction Fee in the amount of up to $500,000.00 may only be paid current prior to the payment in full of the Debt in accordance with the Predevelopment Budget and the Project Budget (the "**Current Del American Construction Fee**" and the balance of such Del American Construction Fee shall be deferred until, and may only be paid, after the Debt is paid in full (the "**Deferred Del American Construction Fee**").  If and to the extent any of the Deferred Del American Construction Fee is paid to Borrower or Del American prior to the payment in full of the Debt, Borrower shall or shall cause Del American to immediately deposit with Lender such amounts into the Developer's Escrow Amount, which shall be held by Lender until the Debt is paid in full.

Section 6.15.    **Construction Project Management Agreement**.    Owner has entered into the Construction Project Management Agreement with Construction Project Manager.    Owner agrees that it will not amend, modify or cancel the Construction Project

Management Agreement without Lender's prior written consent nor assign its interest thereunder except to Lender or the Construction Project Lender. Owner represents that there are no defaults existing under the Construction Project Management Agreement on the date hereof. Owner shall observe and perform all of its obligations under the Construction Project Management Agreement. The Construction Project Manager shall be entitled to a fee in an amount not to exceed $2,500,000.00 in accordance, and subject to the terms of, the Construction Project Management Agreement (the "**Construction Manager Fee**"). If the Construction Project Management Agreement is terminated with the consent of Lender, Owner may enter into a successor or replacement construction management agreement ("**New Construction Project Management Agreement**") with the same or new construction project manager approved by Lender (the "**New Construction Project Manager**"), provided that the terms and conditions of such construction management agreement are approved by Lender, including, without limitation, the fees payable thereunder. In addition, upon request, the Borrower shall cause the New Construction Project Manager to deliver a Consent and Agreement of Construction Manager, substantially in the form delivered on the date hereof. If Lender approves the New Construction Project Management Agreement with the New Construction Project Manager, all references from and after the effective date of the New Construction Project Management Agreement in this Agreement to "Construction Project Management Agreement" shall be deemed to mean the "New Construction Project Management Agreement," all references to "Construction Project Manager" shall be deemed to mean the "New Construction Project Manager" and all references to the "Construction Manager Fee" shall be deemed to mean the sum of the fees payable to (i) the Construction Project Manager under the Construction Management Agreement, and (ii) to the New Construction Manager pursuant to the New Construction Management Agreement.

## ARTICLE VII

## FURTHER ASSURANCES

Section 7.1.    **Further Acts, *Etc*.**    Borrower will and shall cause all parties to the Loan Documents to, at the cost of Borrower, and without expense to Lender, do, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, pledge, assignments, notices of assignments, transfers and assurances as Lender shall, from time to time, require, for the better assuring, conveying, assigning, transferring, and confirming unto Lender the Property, the Collateral, or the Pledged Interests and rights hereby mortgaged, granted, bargained, sold, conveyed, confirmed, pledged, assigned, warranted and transferred or intended now or hereafter so to be, or which Borrower may be or may hereafter become bound to convey or assign to Lender, or for carrying out the intention or facilitating the performance of the terms of this Agreement or for complying with all Legal Requirements. Borrower, promptly after demand, will execute and deliver and hereby authorizes Lender to execute in the name of Borrower or without the signature of Borrower to the extent Lender may lawfully do so, one or more financing statements, chattel mortgages or other instruments, to evidence more effectively the security interest of Lender in the Property, Pledged Interests or the Collateral. Borrower grants to Lender an irrevocable power of attorney coupled with an interest for the purpose of exercising and perfecting any and all rights and remedies available to Lender at law and in equity pursuant to this Section 7.1.

Section 7.2.    **Changes in Tax, Debt, Credit and Documentary Stamp Laws**.

(a)     If any law is enacted or adopted or amended after the date of this Agreement which deducts the Debt from the value of the Property, the Pledged Interests, or the Collateral for the purpose of taxation or which imposes a tax, either directly or indirectly, on the Debt or Lender's interest therein or in the Property, the Pledged Interests, or the Collateral, Borrower will pay the tax, with interest and penalties thereon, if any.  If Lender is advised by counsel chosen by it that the payment of tax by Borrower would be unlawful or taxable to Lender or unenforceable or provide the basis for a defense of usury, then Lender shall have the option by written notice of not less than ninety (90) days to declare the Debt immediately due and payable and in such event, Borrower may prepay the Debt, excluding the Additional Fee.

(b)     Borrower will not claim or demand or be entitled to any credit or credits on account of the Debt for any part of the Taxes or Other Charges assessed against the Property, or any part thereof, and no deduction shall otherwise be made or claimed from the assessed value of the Property, or any part thereof, for real estate tax purposes by reason of this Agreement or the Debt.  If such claim, credit or deduction shall be required by law, Lender shall have the option, by written notice of not less than ninety (90) days, to declare the Debt immediately due and payable and in such event, Borrower may prepay the Debt, including the Additional Fee.

(c)     If at any time the United States of America, any state thereof or any subdivision of any such state shall require revenue or other stamps to be affixed to the Note, this Agreement, the Security Instrument, the Pledge Agreements, or any of the other Loan Documents or impose any other tax or charge on the same, Borrower will pay for the same, with interest and penalties thereon, if any.

Section 7.3.   **Estoppel Certificates**.   (a)  After request by Lender, Borrower, within five (5) Business Days of such request, shall furnish Lender or any proposed assignee or transferee of the Loan that is designated by the Lender, with a statement, duly certified by the Borrower as true and correct, setting forth (i) the amount of the original principal amount of the Note, (ii) the unpaid principal amount of the Note, (iii) the amount of all accrued and unpaid interest due under the Note, if any, (iv) the amount of the Additional Fee, (v) the terms of payment and maturity date of the Note, (vi) the date interest and/or principal were last paid, (vii) that, except as provided in such statement, there are no defaults or events which with the passage of time or the giving of notice or both, would constitute an Event of Default under the Note, this Agreement, the Security Instrument, the Pledge Agreements, or any of the other Loan Documents, (viii) that the Note, this Agreement, the Security Instrument, the Pledge Agreements, and the Loan Documents are valid, legal and binding obligations of the Borrower and have not been modified or if modified, giving particulars of such modification, (ix) whether any offsets or defenses exist against the obligations secured hereby or by the Security Instrument or by the Pledge Agreements, or any of the other Loan Documents and, if any are alleged to exist, a detailed description thereof, (x) that all Leases, Approved Sales Contracts and Approved Reservation Agreements are in full force and effect and have not been modified (or if modified, setting forth all modifications), (xi) whether or not, to the best knowledge of Borrower, if applicable, any of the purchasers under the Approved Sale Contracts and Approved Reservation Agreements are in default under such Approved Sale Contracts and Approved Reservation Agreements, and setting forth the specific nature of all such defaults, (xii) if applicable, the amount of contract deposits held by Borrower under each Approved Sale Contract and Approved Reservation Agreement and that such amounts are consistent with the amounts required under

each Approved Sale Contract and Approved Reservation Agreement, (xiii) if applicable, the unpaid principal of the Construction Project Note, (xiv) the rate of interest of the Construction Project Note, (xv) if applicable, the terms of payment and maturity date of the Construction Project Note, (xvi) if applicable, the date installments of interest and/or principal were last paid under the Construction Project Note, (xvii) if applicable, that neither the Construction Project Note nor any of the Construction Project Loan Documents have been modified, (xviii) if applicable, that no default or event of default has occurred under any of the Construction Project Loan Documents, and (xix) as to any other matters reasonably requested by Lender and reasonably related to the Leases, the Approved Sales Contracts and the Approved Reservation Agreements, the obligations secured hereby, the Security Instrument or the Pledge Agreements, the Construction Project Loan, the Property, this Agreement, or any of the Other Security Documents.

(b)     In addition, promptly upon Lender's request, Borrower shall request from the Construction Project Lender and, within five (5) days after Borrower's receipt thereof, shall deliver to Lender, an estoppel certificate executed by the Construction Project Lender but only to the extent, and in the form, required by the Construction Project Loan Documents.

(c)     Upon any transfer or proposed transfer contemplated by Section 18 hereof, at Lender's request, Borrower shall provide an estoppel certificate to the Investor or any prospective Investor in such form, substance and detail as Lender, such Investor or prospective Investor may reasonably require.

Section 7.4.     **Splitting of the Loan Documents**.  This Agreement, the Security Instrument, the Pledge Agreements, any of the other Loan Documents and the Note shall, at any time until the same shall be fully paid and satisfied, at the sole election of Lender, be split or divided into two or more notes and two or more Agreements, each of which shall cover all or a portion of Debt to be more particularly described therein, provided that such a split or division shall not constitute an event of default under the Construction Project Loan Documents.  To that end, Borrower, upon written request of Lender, shall execute, acknowledge and deliver to Lender and/or its designee or designees substitute notes and agreements in such principal amounts, aggregating not more than the then unpaid principal amount of the Note, and containing material terms, provisions and clauses substantially identical to those contained herein and in the Note and this Agreement, the Security Instrument, the Pledge Agreements and the other Loan Documents as may be required by Lender.

Section 7.5.     **Replacement Documents**.  Upon receipt of an affidavit of an officer or authorized signatory of Lender as to the loss, theft, destruction or mutilation of the Note or any other Loan Document which is not of public record, and, in the case of any such mutilation, upon surrender and cancellation of such Note or other Loan Document, Borrower will issue, in lieu thereof, a replacement Note or other Loan Document, dated the date of such lost, stolen, destroyed or mutilated Note or other Loan Document in the same principal amount thereof and otherwise of like tenor.

Section 7.6.     **Recording of Security Instrument/Pledge Agreements, *Etc***.
Borrower forthwith upon the execution and delivery of this Agreement, the Security Instrument and the Pledge Agreements and thereafter, upon Lender's request from time to time, will cause

the Security Instrument, the Pledge Agreements and any of the other Loan Documents including, without limitation, UCC financing statements, creating a lien or security interest or evidencing the lien hereof upon the Property and/or the Pledged Interests and each instrument of further assurance to be filed, registered or recorded in such manner and in such places as may be required by any present or future law in order to publish notice of and fully to protect and perfect the lien or security interest hereof upon, and the interest of Lender in, the Property and the Pledged Interests. Borrower will pay all taxes, filing, registration or recording fees, and all expenses incident to the preparation, execution, acknowledgment and/or recording of the Note, this Agreement, the Security Instrument, the Pledge Agreements, the other Loan Documents, any note or mortgage supplemental hereto, any security instrument with respect to the Property and the Pledged Interests and any instrument of further assurance, and any modification or amendment of the foregoing documents, and all federal, state, county and municipal taxes, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of this Agreement, the Security Instrument or the Pledge Agreements, any security instrument with respect to the Property and/or the Pledged Interests or any instrument of further assurance, and any modification or amendment of the foregoing documents, except where prohibited by law so to do.

## ARTICLE VIII

### DUE ON SALE/ENCUMBRANCE

Section 8.1. **Lender Reliance**. Each Borrower acknowledges that Lender has examined and relied on the experience of Borrower and their respective partners, members, principals and (if Borrower is a trust) beneficial owners in owning and operating properties such as the Property and completing construction projects such as the Construction Project in agreeing to make the Loan, and will continue to rely on the direct and indirect ownership of the Property by Borrower, Pledgors, Guarantor and Indemnitors as a means of maintaining the value of the Property as security for the repayment of the Debt and performance of the other Obligations. Borrower acknowledges that Lender has a valid interest in maintaining the value of the Property and Pledged Interests so as to ensure that, should Borrower default in the repayment of the Debt or the performance of the Obligations, Lender can recover the Debt by enforcement of the Security Instrument, the Pledge Agreements and any of the other Loan Documents.

Section 8.2. **Sale/Encumbrance of the Collateral**. Except solely and expressly with respect to (i) the Security Instrument, (ii) the Pledge Agreements and the other Loan Documents, (iii) any Transfer made to Lender or any Affiliate of Lender, (iv) the sale of Condominium Units in accordance with this Agreement and (v) that certain pledge given by Principal in favor of Seller of all of his shareholder interests in Towers Inc. (the "**Subordinate Pledge**"), but not any transfers or assignments made pursuant to a foreclosure or assignment in lieu of foreclosure or otherwise of such Subordinate Pledge, no part of the ownership interests in the Borrower, the Indemnitors, the Guarantor, or the Pledgors (individually, each a "**Loan Party**" and collectively, the "**Loan Parties**"), nor any direct or indirect interest of any nature whatsoever therein nor any other interest of any nature whatsoever in any Loan Party, whether partnership, stock, membership, equity, beneficial, profit, loss or otherwise (collectively and in the singular, as the context may require, the "**Ownership Interests**") shall in any manner be further sold, conveyed, encumbered, pledged, hypothecated, assigned or otherwise transferred, or permitted to be further sold, conveyed, encumbered, pledged, hypothecated, assigned or

otherwise transferred (each such instance, a "**Transfer**") without the prior consent of Lender, which consent in any and all circumstances may be conditioned or denied for any reason or no reason in the sole and absolute discretion of Lender. The provisions of the foregoing sentence of this Section 8.2 shall apply to each and every such further Transfer, regardless of whether or not Lender has consented to, or waived its rights hereunder with respect to, any such previous Transfer, and irrespective of whether such further Transfer is voluntary, by reason of operation of law or is otherwise made.

Section 8.3.    **Sale/Encumbrance of the Property**.    Borrower shall not sell, convey, mortgage, grant, bargain, encumber, pledge, hypothecate, assign or otherwise transfer all or any portion of the Property, except in connection with the Construction Project Loan Documents, the Subordinate Pledge and the sale of Condominium Units, in accordance with the terms of this Agreement.

Section 8.4.    **Sale/Encumbrance Defined**.    A sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment or transfer within the meaning of this Article 8 shall be deemed to include, but not be limited to, (a) an installment sales agreement wherein Borrower agrees to sell the Property or any part thereof for a price to be paid in installments or subjecting the Property, or any portion thereof, to a cooperative form of ownership; (b) an agreement by Borrower leasing all or a substantial part of the Property for other than actual occupancy by a space tenant thereunder or a sale, assignment or other transfer of, or the grant of a security interest in, the right, title and interest of Borrower in and to any Leases or any Rents; (c) if Borrower, any Pledgor, any Guarantor, any Indemnitor, or any partner or member of Borrower, any Pledgor, any Guarantor or any Indemnitor is a corporation, the voluntary or involuntary sale, conveyance, transfer or pledge of such corporation's stock (or the stock of any corporation directly or indirectly controlling such corporation by operation of law or otherwise) or the creation or issuance of any new stock; and (d) if Borrower, any Pledgor, any Guarantor or any Indemnitor or any partner or member of Borrower, any Pledgor, any Guarantor or any Indemnitor is a limited or general partnership, limited liability company or joint venture, the change, removal or resignation of a general partner, managing partner or managing member, or the transfer or pledge of the partnership or membership interest of any general partner, managing partner or managing member or any profits or proceeds relating to such partnership interest or membership interest or the transfer of any partnership or membership interests in Borrower whether in one transfer or a series of transfers. Notwithstanding the foregoing, but subject to the provisions of Section 8.2 hereof, transfer by devise or descent or by operation of law upon the death of a partner, member or stockholder of any Loan Party shall not be deemed to be a sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, hypothecation, assignment or transfer within the meaning of this Article 8 provided that prior to such transfer, any such transferee (i) shall be approved, if required, by a Rating Agency, (ii) such transferee shall execute and deliver to Lender a pledge agreement in substantially the same form as the Pledge Agreement delivered by such transferee's predecessor in interest and (iii) such legal opinion as Lender may require in its reasonable discretion. Notwithstanding anything contained herein to the contrary, Borrower is permitted to enter into Approved Sale Contracts and Approved Reservation Agreements subject to, and in compliance with, the terms of this Agreement.

Section 8.5.    **Lender's Rights**.    Lender reserves the right to condition the consent required hereunder upon a modification of the terms hereof and on assumption of the Note, this Agreement, the Security Instrument, the Pledge Agreements and each of the other

Loan Documents as so modified by the proposed transferee, delivery of a new pledge agreement, payment of a transfer fee of not less than one percent (1%) of the principal balance of the Note and all of Lender's expenses incurred in connection with such transfer, the approval by a Rating Agency, if required, of the proposed transferee, the proposed transferee's continued compliance with the covenants set forth in Sections 6.2 and 6.3 hereof, or such other conditions as Lender shall determine in its sole discretion to be in the interest of Lender. Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of default hereunder in order to declare the Debt immediately due and payable upon the sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment, or transfer of the Property, the Pledged Interests and/or the Collateral, without Lender's prior written consent. This provision shall apply to every sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment, or transfer of the Property, the Pledged Interests and/or the Collateral regardless of whether voluntary or not, or whether or not Lender has consented to any previous sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment, or transfer of the Property, the Pledged Interests and/or the Collateral; *provided, however,* Borrower shall be permitted to enter into the Approved Sale Contracts, the Approved Reservation Agreements, the Subordinate Loan Documents and the Construction Project Loan Documents subject to, and in compliance with, the terms of this Agreement. Nothing contained in this Section 8.5 shall be deemed to create any right in favor of Borrower but in the event any such right is deemed created, such right shall be specifically reserved to Lender, to be exercised in its sole and absolute discretion.

Section 8.6. **Release of Condominium Units**. (a) Provided no Event of Default has occurred and is continuing, Lender shall permit the sale (the "**Unit Release**") of a Condominium Unit by the Borrower (the "**Individual Unit**") upon Borrower's compliance with the following terms and conditions, in form and substance satisfactory to Lender, and provided such terms and conditions are satisfied, Lender shall deliver to Borrower or the title company or its agent, if the Security Instrument has not been released or terminated on or before the date of the Unit Release, a partial release releasing the Individual Unit from the Security Instrument, a partial release of the Individual Unit from the Assignment of Leases and Rents, UCC-3 Financing Statements terminating Lender's rights with respect to such Individual Unit and such other documents reasonably required to release the Individual Unit from the lien of the Security Instrument and the other Loan Documents:

(i)     The Individual Unit is or will be a separate tax lot and shall not be required to be included within the Property, for purposes of any governmental rule or necessary or appropriate to satisfy or facilitate the requirements or terms of any Leases;

(ii)     Borrower shall have given to Lender a written request for the Unit Release accompanied by all evidence, information and other items required by Lender, including, but not limited to, a copy of the Approved Sale Contract approved by Lender providing for a sales price not less than the Minimum Sales Price for such Individual Unit, not less than three (3) days prior to the desired Unit Release date;

(iii)     Each Individual Unit and the remaining portion of the Property (the "**Remaining Property**"), and the Unit Release and the conveyance shall be in compliance with all applicable zoning, land use and other governmental rules and regulations of all governmental authorities;

(iv)    Borrower shall have delivered to Lender a copy of the closing statement for the sale of the Individual Unit certified by Borrower as true and correct not less than one (1) Business Day prior to the desired Unit Release Date;

(v)    Borrower shall:

(1)    Until such time as the Construction Project Loan is paid in full, pay to the Construction Project Lender a release price (the "**Construction Project Loan Release Consideration**") as required by the Construction Project Loan Documents and approved by Lender;

(2)    At all times following the repayment in full of the Construction Project Loan,

(A)    have delivered a copy of the notice attached hereto as Exhibit D to the title company or its title agent responsible for the closing of title to the Individual Unit and provide Lender with evidence that substantiates delivery of such notice to the title company or its title agent to the reasonable satisfaction of Lender; and

(B)    pay to Lender a release price (the "**Release Consideration**" equal to the greater of the (x) Minimum Sales Price for the Individual Unit, or (y) 100% of the gross sales price for such Individual Unit net of expenses actually incurred by Borrower in connection with the sale of such Individual Unit, up to a maximum expense amount equal to 6% of the gross sales price for such Individual Unit, including a broker's fee to Del American, Inc. in the amount of 1.5% of the gross sales price for such Individual Unit (the "**Affiliate Broker's Fee**"), and real estate prorations as of 11:59 p.m. of the day immediately preceding the closing date of such Individual Unit. The Release Consideration shall be applied by Lender as provided in Section 5.20 hereof.

(vi)    Borrower shall have caused Construction Project Lender to subordinate the lien of its mortgage to the declaration of the Condominium.

(vii)    Borrower shall have satisfied any and all other conditions required to be satisfied for a Unit Release under the Construction Project Loan Documents.

(viii)    Borrower shall pay all of Lender's fees, costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) incurred in connection with the Unit Release of such Individual Unit.

## ARTICLE IX

## PREPAYMENT

Section 9.1.    **Prepayment Before Event of Default**.  The Debt may be prepaid only in strict accordance with the express terms and conditions of the Note including the payment of any prepayment consideration.

# ARTICLE X

# DEFAULT

Section 10.1. **Events of Default**. The occurrence of any one or more of the following events shall constitute an "**Event of Default**":

(a)     if any portion of the Debt is not paid on or before the date upon which same is due or if the entire Debt is not paid on or before the Maturity Date;

(b)     if any of the Taxes or Other Charges is not paid when the same is due and payable except to the extent sums sufficient to pay such Taxes and Other Charges have been deposited with Lender or Construction Project Lender if applicable, in accordance with the terms of this Agreement;

(c)     if the Policies are not kept in full force and effect, or if the Policies are not delivered to Lender upon request or Borrower has not delivered evidence of the renewal of the Policies fifteen (15) days prior to their expiration as provided in Section 5.4(b);

(d)     if Borrower violates or does not comply with any of the provisions of Sections 5.8, 5.27, 6.3, 6.10, 6.11, 6.12 or 6.14 or Articles 8, 12 or 14 of this Agreement;

(e)     if any representation or warranty of Borrower, any Pledgor, any Guarantor, or any Indemnitor, or any general partner, principal, partner, managing member, member or beneficial owner of any thereof, made herein or in the Guaranty or the Environmental Indemnity or the other Loan Documents or in any certificate, report, financial statement or other instrument or document furnished to Lender shall have been false or misleading in any material respect when made;

(f)     if (i) Borrower, any Pledgor, any Guarantor or any Indemnitor (each, a "**Bankruptcy Default Party**") shall commence any case, proceeding or other action (A) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or any Bankruptcy Default Party shall make a general assignment for the benefit of its creditors; or (ii) there shall be commenced against any Bankruptcy Default Party, or the Property, or any part thereof, shall become an asset in, any case, proceeding or other action of a nature referred to in clause (i) above which (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed, undischarged or unbonded for a period of ninety (90) days; or (iii) there shall be commenced against any Bankruptcy Default Party any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets which results in the entry of any order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within ninety (90) days from the entry thereof; or (iv) any Bankruptcy Default Party shall take any action in furtherance of, or indicating its consent to,

approval of, or acquiescence in, any of the acts set forth in clause (i), (ii), or (iii) above; or (v) any Bankruptcy Default Party shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due (individually, each a "**Bankruptcy Filing**");

(g)    if the Property becomes subject to any mechanic's or materialman's or other lien other than a lien for local real estate taxes and assessments not then due and payable and the lien shall remain undischarged of record (by payment, bonding or otherwise) for a period of thirty (30) days after Borrower is notified of same, but in no event later than sixty (60) days after the filing of same;

(h)    if any federal tax lien is filed against the Property, Borrower, any Pledgor, any Guarantor or any Indemnitor and same is not discharged of record within thirty (30) days after same is filed; and

(i)    if (i) Borrower fails to timely provide Lender with the written certification and evidence referred to in Section 6.2(b) hereof, or (ii) Borrower consummates a transaction which would cause this Agreement or Lender's exercise of its rights under this Agreement, the Security Instrument, the Note or any of the other Loan Documents to constitute a nonexempt prohibited transaction under ERISA or result in a violation of a state statute regulating governmental plans, subjecting Lender to liability for a violation of ERISA or a state statute.

(j)    if any default occurs under any Loan Document, including, the Guaranty, the Environmental Indemnity, the Security Instrument and the Pledge Agreements, and such default continues after the expiration of applicable grace periods, if any;

(k)    if Borrower fails to satisfy a covenant to be performed under the terms and provisions of Section 6.11 of this Agreement by the specific date set forth therein for such covenant;

(l)    any default or event of default, after the expiration of applicable notice and cure periods, if any, shall occur and be continuing under any other mortgage, deed of trust, deed to secure debt or other security agreement to which Borrower is a party and which covers any part of the Property or the Pledged Interests, including, but not limited to, the Construction Project Loan Documents;

(m)    if, subject to the Intercreditor Agreement, Borrower or Construction Project Lender shall modify, amend or change any of the terms or conditions of any of the Construction Project Loan Documents without having received the prior written consent of Lender;

(n)    if any survey or inspection required or requested by Lender pursuant to the provisions of this Agreement shows any condition not permitted by the Loan Documents or approved by Lender, and such condition is not remediated to Lender's reasonable satisfaction within sixty (60) days after notice thereof by Lender to Borrower;

(o)    if Borrower executes any chattel mortgage or other security agreement in favor of any party other than the Construction Project Lender pursuant to the

Construction Project Loan Documents with respect to any materials, equipment, furniture or fixtures used in connection with the Property (other than equipment leases in connection with personal property located at the Property which do not exceed $200,000.00 in the aggregate) or with respect to any articles of personal property constituting part of the Property, or if any such materials, equipment, furniture, fixtures or articles of personal property are not substantially in accordance with the Plans and Specifications or are leased or purchased pursuant to any conditional sales contract or other security agreement or otherwise so that the ownership thereof will not vest unconditionally in Borrower free from encumbrances (except those in favor of Construction Project Lender pursuant to the Construction Project Loan Documents) upon being made a part of the Property, or if Borrower does not furnish to Lender on request and after reasonable notice to Borrower the contracts, bills of sale, statements, receipted vouchers or other agreements, under which Borrower claims title to such materials, equipment, furniture, fixtures or articles of personal property;

(p) if for more than ten (10) days after written notice from Lender, Borrower shall continue to be in default under any other term, covenant or condition of the Note, this Agreement, the Security Instrument, the Pledge Agreements or any of the other Loan Documents in the case of any default which can be cured by the payment of a sum of money, or for thirty (30) days after written notice from Lender in the case of any other default, provided that if such default cannot reasonably be cured within such thirty (30) day period and Borrower shall have commenced to cure such default within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended for so long as it shall require Borrower in the exercise of due diligence to cure such default, it being agreed that no such extension shall be for a period in excess of sixty (60) days;

(q) If the Construction Project Loan does not close by December 31, 2005;

(r) If Borrower fails to pay any brokerage commission when such fee is due;

(s) If the Construction Project is not completed by the Completion Date;

(t) If any amendments or modifications are made to the Condominium Documents, other than minor or ministerial changes, without the prior written consent of Lender; and

(u) If any payment is made to Seller or any legal action for collection or foreclosure is commenced by Seller in connection with its loan to Towers Inc. or any of the Subordinate Loan Documents are amended without the prior written consent of Lender.

Section 10.2.  **Late Payment Charge**.  If any installment of principal or interest is not paid on or before the date on which it is due, Borrower shall pay to Lender upon demand an amount equal to the lesser of five percent (5%) of such unpaid portion of the outstanding installment of principal and interest then due or the maximum amount permitted by applicable law, to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment, and such

amount shall be secured by the Security Instrument, the Pledge Agreements and the other Loan Documents.

Section 10.3. **Default Interest**. Borrower does hereby agree that upon the occurrence of an Event of Default, Lender shall be entitled to receive and Borrower shall pay interest on the entire principal amount of the Note at a rate (the "**Default Rate**") equal to the lesser of (i) the Applicable Interest Rate (as defined in the Note) plus five (5%) or (ii) the maximum interest rate that Borrower may by law pay. The Default Rate shall be computed from the occurrence of the Event of Default until the earlier of the date upon which the Event of Default is cured or the date upon which the Debt is paid in full. Interest calculated at the Default Rate shall be added to the Debt, and shall be deemed secured by the Security Instrument, the Pledge Agreements, and Other Security Documents. This clause, however, shall not be construed as an agreement or privilege to extend the date of the payment of the Debt, nor as a waiver of any other right or remedy accruing to Lender by reason of the occurrence of any Event of Default.

## ARTICLE XI

## RIGHTS AND REMEDIES

Section 11.1. **Remedies**. Upon the occurrence of any Event of Default, Borrower agrees that Lender may take such action, without notice or demand, as it deems advisable to protect and enforce its rights against Borrower and in and to the Property, including, but not limited to, the following actions, each of which may be pursued concurrently or otherwise, at such time and in such order as Lender may determine, in its sole discretion, without impairing or otherwise affecting the other rights and remedies of Lender:

(a)    declare the entire unpaid Debt to be immediately due and payable;

(b)    exercise any and all rights set forth in the Security Instrument and/or the Pledge Agreements, including, without limitation, instituting proceedings, judicial or otherwise, for the complete foreclosure of the Security Instrument or the Pledge Agreements, as the case may be, under any applicable provision of law;

(c)    institute proceedings, judicial or otherwise, for the complete foreclosure of the Security Instrument and/or the Pledge Agreements under any applicable provision of law in which case the Property or the Pledged Interests, as the case may be, and the Collateral or any interest therein may be sold for cash or upon credit in one or more parcels or in several interests or portions and in any order or manner;

(d)    with or without entry, to the extent permitted and pursuant to the procedures provided by applicable law, institute proceedings for the partial foreclosure of the Security Instrument and/or the Pledge Agreements for the portion of the Debt then due and payable, subject to the continuing lien and security interest of the Security Instrument and/or the Pledge Agreements, as the case may be, for the balance of the Debt not then due, unimpaired and without loss of priority;

(e)    sell for cash or upon credit the Property, the Pledged Interests and/or the Collateral or any part thereof and all estate, claim, demand, right, title and interest of

Borrower and Pledgors therein and rights of redemption thereof, pursuant to power of sale or otherwise, at one or more sales, as an entity or in parcels, at such time and place, upon such terms and after such notice thereof as may be required or permitted by law;

(f)    institute an action, suit or proceeding in equity for the specific performance of any covenant, condition or agreement contained herein, in the Note, this Agreement, the Security Instrument, the Pledge Agreements or in any of the other Loan Documents;

(g)    recover judgment on the Note either before, during or after any proceedings for the enforcement of this Agreement, the Security Instrument, the Pledge Agreements, or any of the other Loan Documents;

(h)    apply for the appointment of a receiver, trustee, liquidator or conservator of the Property and/or the Pledged Interests and/or the Collateral, without notice and without regard for the adequacy of the security for the Debt and without regard for the solvency of Borrower, any Guarantor, any Indemnitor, any of the Pledgors or of any person, firm or other entity liable for the payment of the Debt;

(i)    exercise any and all rights and remedies granted to a secured party upon default under the Uniform Commercial Code, including, without limiting the generality of the foregoing: (i) the right to take possession of the property secured thereby or any part thereof, and to take such other measures as Lender may deem necessary for the care, protection and preservation of such property, and (ii) request Borrower at its expense to assemble such property and make it available to Lender at a convenient place acceptable to Lender. Any notice of sale, disposition or other intended action by Lender with respect to such property sent to Borrower in accordance with the provisions hereof at least five (5) days prior to such action, shall constitute commercially reasonable notice to Borrower;

(j)    apply any sums then deposited in the Escrow Fund and any other sums held in escrow or otherwise by Lender in accordance with the terms of this Agreement, the Security Instrument, the Pledge Agreements or any of the other Loan Documents to the payment of the following items in any order in Lender's uncontrolled discretion:

(i)    Taxes and Other Charges;

(ii)    Insurance Premiums;

(iii)    Interest and Accrued Interest;

(iv)    The unpaid principal balance of the Note;

(v)    The Additional Fee;

(vi)    All other sums payable pursuant to the Note, this Agreement, the Security Instrument, the Pledge Agreements and the other Loan Documents, including without limitation, any advances made by Lender pursuant to the terms of this Agreement, including, without limitation, advances made pursuant to Section 11.3;

(k)     surrender the Policies maintained pursuant to Article 5 hereof, collect the unearned Insurance Premiums and apply such sums as a credit on the Debt in such priority and proportion as Lender in its discretion shall deem proper, and in connection therewith, Borrower hereby appoints Lender its agent and attorney-in-fact (which is coupled with an interest and is therefore irrevocable) to collect such Insurance Premiums;

(l)     pursue such other remedies as Lender may have under applicable law or may be available under any of the Loan Documents; or

(m)     apply the undisbursed balance of any Net Proceeds Deficiency deposit, together with interest thereon, to the payment of the Debt in such order, priority and proportions as Lender shall deem to be appropriate in its discretion.

In the event of a sale, by foreclosure, power of sale, or otherwise, of less than all of the Property and/or the Pledged Interests and/or the Collateral, the Security Instrument and/or the Pledge Agreements, as the case may be, shall continue as a lien and security interest on the remaining portions of the Property and/or the Pledged Interests and/or the Collateral, as the case may be, unimpaired without loss of priority. Notwithstanding the provisions of this Section 11.1 to the contrary, if any Event of Default as described in clauses (i) or (ii) of Section 10.1(f) shall occur, the entire unpaid Debt shall be automatically due and payable, without any further notice, demand or other action by Lender.

Section 11.2.  **Application of Proceeds**.  The purchase money, proceeds and avails of any disposition of the Property, the Pledged Interests, the Collateral, the Security Instrument, or any part thereof, or any other sums collected by Lender pursuant to the Note, this Agreement, the Pledge Agreements or any of the other Loan Documents, may be applied by Lender to the payment of the Debt in such priority and proportions as Lender in its discretion shall deem proper.

Section 11.3.  **Default under Construction Project Loan Documents**.

(a)     From and after the CPL Closing Date, Borrower shall give Lender immediate notice of any default under the Construction Project Loan Documents and furnish copies and notices of all defaults and events of default thereunder and all other notices or communications received by Borrower pursuant to the Construction Project Loan Documents or in connection with the Construction Project Loan.  Upon the occurrence of any default or event of default (or event or condition which, with notice or the passage of time or both, would constitute a default or event of default under any of the Construction Project Loan Documents), Borrower shall deliver to Lender within one (1) Business Day after the first to occur of (i) receipt by Borrower of notice of such default from the Construction Project Lender, or (ii) the date Borrower obtains actual knowledge of the occurrence of such default, a detailed description of the actions to be taken by Borrower to cure such default and the dates by which each such action shall occur.  Such schedule shall be subject to the approval of Lender.  Borrower shall take all such actions as are necessary to cure such default under the Construction Project Loan Documents by the date approved by Lender, and shall deliver to Lender not less frequently than weekly thereafter until such default is cured, written updates concerning the status of the Property and Borrower's efforts to cure such default.  Lender shall have the right, but not the obligation, to pay any sums or to take any action which Lender deems necessary or advisable to

cure any default or alleged default under the Construction Project Loan Documents (whether or not Borrower is undertaking efforts to cure such default or the same is an event of default under any of the Construction Project Loan Documents or a default or event of default hereunder), and such payment or such action is hereby authorized by Borrower, and any sum so paid and any expense incurred by Lender in taking any such action shall be evidenced by this Agreement and secured by the Loan Documents and shall be immediately due and payable by Borrower to Lender with interest at the Default Rate until paid. Lender shall be authorized to take such actions upon the assertion by the Construction Project Lender of the existence of such default or event of default after reasonably inquiry or determine whether such default or event of default exist. The consent or waiver by the Construction Project Lender of any default or event of default under the Construction Project Loan Documents shall not annul the occurrence of an Event of Default hereunder unless otherwise approved by Lender. Borrower shall permit Lender to enter upon the Property for the purpose of curing any default or alleged default under the Construction Project Loan Documents or hereunder. Borrower shall transfer and assign to Lender any proceeds arising from any foreclosure or sale under power pursuant to the Construction Project Mortgage or any instrument evidencing the indebtedness secured thereby which are in excess of any amount due pursuant to the Construction Project Loan Documents and Borrower hereby authorizes and directs the holder of the Construction Project Loan to pay such excess proceeds directly to Lender up to the amount of the Debt. Nothing herein shall serve to limit or restrict Lender's rights under the Intercreditor Agreement.

(b)    Borrower hereby expressly and irrevocably authorizes and grants to Lender an irrevocable power of attorney coupled with an interest to do, execute, acknowledge and deliver all and every such further acts, deeds, and assurances in the name of Borrower or without the signature of Borrower, to the extent Lender may lawfully do so, in order to cure any and all defaults under the Construction Project Loan Documents.

Section 11.4.    **Right to Cure Defaults**.  Upon the occurrence of any Event of Default or if Borrower fails to make any payment or to do any act as herein provided, Lender may, but without any obligation to do so and without notice to or demand on Borrower and without releasing Borrower from any obligation hereunder, make or do the same in such manner and to such extent as Lender may deem necessary to protect the security hereof.  Lender is hereby authorized to enter upon the Property for such purposes, or appear in, defend, or bring any action or proceeding to protect its interest in the Property and the Collateral or to foreclose upon the Security Instrument and/or the Pledge Agreements or collect the Debt, and the cost and expense thereof (including reasonable attorneys' fees to the extent permitted by law), with interest as provided in this Section 11.4, shall constitute a portion of the Debt and shall be due and payable to Lender upon demand.  All such costs and expenses incurred by Lender in remedying such Event of Default or such failed payment or act or in appearing in, defending, or bringing any such action or proceeding shall bear interest at the Default Rate, for the period after notice from Lender that such cost or expense was incurred to the date of payment to Lender.  All such costs and expenses incurred by Lender together with interest thereon calculated at the Default Rate shall be deemed to constitute a portion of the Debt and be secured by this Agreement, the Security Instrument, Pledge Agreements, and any of the other Loan Documents and shall be immediately due and payable upon demand by Lender therefor.

Section 11.5.    **Actions and Proceedings**.  Borrower hereby grants to Lender the right, and Lender hereby has the right to appear in and defend any action or proceeding brought

with respect to the Property, the Pledged Interests or the Collateral and to bring any action or proceeding, in the name and on behalf of Borrower or Pledgors, which Lender, in its discretion, decides should be brought to protect its interest in the Property, Pledged Interests and the Collateral.

Section 11.6. **Recovery of Sums Required To Be Paid**. Lender shall have the right from time to time to take action to recover any sum or sums which constitute a part of the Debt as the same become due, without regard to whether or not the balance of the Debt shall be due, and without prejudice to the right of Lender thereafter to bring an action of foreclosure, or any other action, for a default or defaults by Borrower existing at the time such earlier action was commenced.

Section 11.7. **Examination of Books and Records**. Lender, its agents, accountants and attorneys shall have the right to examine the records, books, management and other papers of Borrower (and Borrower shall cause Pledgors, Guarantor or Indemnitors or any Affiliate of any thereof to permit Lender to examine any of their respective records, management, books and other papers) which reflect upon their financial condition, at the Property or at any office regularly maintained by any such parties where the books and records are located. Lender and its agents shall have the right to make copies and extracts from the foregoing records and other papers. In addition, Lender, its agents, accountants and attorneys shall have the right to examine and audit the books and records of Borrower (and Borrower shall cause Pledgors, Guarantor or Indemnitors or any Affiliates of any thereof to examine any of their respective records) pertaining to the income, expenses and operation of the Property during reasonable business hours at any office of any such party where the books and records are located. This Section 11.7 shall apply throughout the term of the Note and without regard to whether an Event of Default has occurred or is continuing.

Section 11.8. **Other Rights, _Etc_**.

(a) The failure of Lender to insist upon strict performance of any term hereof shall not be deemed to be a waiver of any term of this Agreement. Borrower shall not be relieved of any of Borrower's obligations hereunder by reason of (i) the failure of Lender to comply with any request of Borrower, any Pledgor, any Guarantor or any Indemnitor to take any action to foreclose this Agreement, the Security Instrument, any Pledge Agreements or otherwise enforce any of the provisions hereof or of the Note or the other Loan Documents, (ii) the release, regardless of consideration, of the whole or any part of the Property, the Pledged Interests and/or the Collateral, or of any person liable for the Debt or any portion thereof, or (iii) any agreement or stipulation by Lender extending the time of payment or otherwise modifying or supplementing the terms of the Note, this Agreement, the Security Instrument, the Pledge Agreements or the other Loan Documents.

(b) It is agreed that the risk of loss or damage to the Property, the Pledged Interests or the Collateral is on Borrower, and Lender shall have no liability whatsoever for decline in value of the Property, the Pledged Interests and/or the Collateral, for failure to maintain the Policies, or for failure to determine whether insurance in force is adequate as to the amount of risks insured. Possession by Lender shall not be deemed an election of judicial relief, if any such possession is requested or obtained, with respect to the Property, any Pledged Interest or Collateral which is not in Lender's possession.

(c)    Lender may resort for the payment of the Debt to any other security held by Lender in such order and manner as Lender, in its discretion, may elect. The rights of Lender under this Agreement shall be separate, distinct and cumulative and none shall be given effect to the exclusion of the others. No act of Lender shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision. Lender shall not be limited exclusively to the rights and remedies herein stated but shall be entitled to every right and remedy now or hereafter afforded at law or in equity.

Section 11.9. **Right to Release Any Portion of the Property, the Pledged Interests and/or Collateral**. Lender may release any portion of the Property, the Pledged Interests and/or the Collateral for such consideration as Lender may require without, as to the remainder of the Property, the Pledged Interests and/or the Collateral in any way impairing or affecting the lien or priority of the Security Instrument or the Pledge Agreements, a the case may be, or improving the position of any subordinate lienholder with respect thereto, except to the extent that the obligations hereunder shall have been reduced by the actual monetary consideration, if any, received by Lender for such release, and may accept by assignment, pledge or otherwise any other property in place thereof as Lender may require without being accountable for so doing to any other lienholder. The Security Instrument and the Pledge Agreements shall continue as a lien and security interest in the remaining portion of the Property and the Pledged Interests and/or the Collateral, as applicable.

Section 11.10. **Violation of Laws**. If the Property is not in compliance with any of the Legal Requirements, Lender may impose additional requirements upon Borrower in connection herewith including, without limitation, monetary reserves or financial equivalents.

Section 11.11. **Recourse and Choice of Remedies**. Notwithstanding any other provision of this Agreement, including, but not limited to Article 22, Lender and other Indemnified Parties are entitled to enforce the obligations of (i) Borrower contained in Sections 14.2, 14.3 and 14.4, (ii) Guarantor with respect to the Guaranty and the Environmental Indemnity, and (iii) Indemnitors with respect to the Environmental Indemnity, in each case, without first resorting to or exhausting any security or collateral and without first having recourse to the Note, the Property, the Pledged Interests or the Collateral, through foreclosure, sale or otherwise, and in the event Lender commences a foreclosure action or sells the Property, the Pledged Interests and/or the Collateral, Lender is entitled to pursue a deficiency judgment with respect to such obligations, as applicable, against Borrower, Guarantor and/or Indemnitors under these provisions and/or the Guaranty or the Environmental Indemnity. The provisions of Article 14, the Guaranty and the Environmental Indemnity, are exceptions to any non-recourse or exculpation provisions in the Note, this Agreement, the Security Instrument and the other Loan Documents and Borrower, Guarantor and Indemnitors, as applicable, are fully and personally liable for such obligations and the liability of Borrower, Guarantor and/or Indemnitors under Article 14 and/or the Guaranty or the Environmental Indemnity, as the case may be, and such liability is not limited to the original principal amount of the Note. Notwithstanding the foregoing, nothing herein shall inhibit or prevent Lender from foreclosing pursuant to this Agreement, the Security Instrument or the Pledge Agreements or exercising any other rights and remedies pursuant to the Note, this Agreement, the Security Instrument the Pledge Agreements and any of the other Loan Documents, whether simultaneously with foreclosure proceedings or in any other sequence. A separate action or actions may be brought and prosecuted against Borrower, whether or not action is brought against any other person or entity or whether or not

any other person or entity is joined in the action or actions. In addition, Lender shall have the right but not the obligation to join and participate in, as a party if it so elects, any administrative or judicial proceedings or actions initiated in connection with any matter addressed in Article 12 or Section 14.4.

Section 11.12. **Right of Entry**. Lender and its agents shall have the right to enter and inspect the Property at all reasonable times and upon reasonable notice to Borrower.

## ARTICLE XII

## ENVIRONMENTAL HAZARDS

Section 12.1. **Environmental Representations and Warranties**. Except as otherwise disclosed by the report listed on Schedule 3 attached hereto and made a part hereof in respect of the Property (the "**Environmental Report**"), a copy of which has/have been provided to Lender, (a) to the best of Borrower's knowledge, after due inquiry, there are no Hazardous Substances or underground storage tanks in, on, or under the Property, except those that are both (i) in compliance with all Environmental Laws and with applicable permits issued pursuant thereto and (ii) fully disclosed to Lender in writing pursuant to the Environmental Report; (b) to the best of Borrower's knowledge, after due inquiry, there are no past, present or threatened Releases of Hazardous Substances in, on, under or from the Property; (c) to the best of Borrower's knowledge, after due inquiry, there is no threat of any Release of Hazardous Substances migrating to the Property; (d) to the best of Borrower's knowledge, after due inquiry, there is no past or present non-compliance with Environmental Laws, or with permits issued pursuant thereto, in connection with the Property; (e) Borrower does not know of, and has not received, any written or oral notice or other communication from any person or entity (including but not limited to a governmental entity) relating to Hazardous Substances or Remediation thereof, of possible liability of any person or entity pursuant to any Environmental Law, other environmental conditions in connection with the Property, or any actual or potential administrative or judicial proceedings in connection with any of the foregoing; and (f) Borrower has truthfully and fully provided to Lender, in writing, any and all information relating to conditions in, on, under or from the Property that is known to Borrower or that is contained in the files and records of any Indemnitor and Borrower, including but not limited to any reports relating to Hazardous Substances in, on, under or from the Property and/or to the environmental condition of the Property.

Section 12.2. **Environmental Covenants**. Borrower covenants and agrees that: (a) all uses and operations on or of the Property, whether by Borrower or any other person or entity, including any tenants thereof, shall be in compliance with all Environmental Laws and permits issued pursuant thereto; (b) there shall be no Releases of Hazardous Substances in, on, under or from the Property; (c) there shall be no Hazardous Substances in, on, or under the Property, except those that are both (i) in compliance with all Environmental Laws and with permits issued pursuant thereto and (ii) fully disclosed to Lender in writing; (d) Borrower shall keep the Property free and clear of all liens and other encumbrances imposed pursuant to any Environmental Law, whether due to any act or omission of Borrower or any other person or entity (the "**Environmental Liens**"); (e) Borrower shall, at its sole cost and expense, fully and expeditiously cooperate in all activities relating to Lender's review of environmental conditions at the Property, including but not limited to providing all relevant information, making

{10283200:8}                              75

knowledgeable persons available for interviews and all other activities pursuant to Section 12.3 below; (f) Borrower shall, at its sole cost and expense, perform, or cause to be performed, any environmental site assessment or other investigation of environmental conditions in connection with the Property, pursuant to any reasonable written request of Lender (including but not limited to sampling, testing and analysis of soil, water, air, building materials and other materials and substances whether solid, liquid or gas), and share with Lender the reports and other results thereof, and Lender and other Indemnified Parties shall be entitled to rely on such reports and other results thereof; (g) Borrower shall, at its sole cost and expense, comply with all reasonable written requests of Lender to (i) effectuate Remediation of any condition in violation of Environmental Laws (including but not limited to a Release of a Hazardous Substance) in, on, under or from the Property; (ii) comply with any Environmental Law; (iii) comply with any applicable environmental directive from any Governmental Authority; and (iv) take any other reasonable action which is necessary for the protection of human health or the environment from Hazardous Substances; (h) Borrower shall not do or allow any tenant or other user of the Property to do any act in respect of environmental matters that increases the dangers to human health or the environment, poses an unreasonable risk of harm to any person or entity (whether off or on the Property), impairs or may impair the value of the Property, is contrary to any requirement of any insurer, constitutes a public or private nuisance, constitutes waste, or violates any covenant, condition, agreement or easement applicable to the Property; and (i) Borrower shall immediately notify Lender in writing upon Borrower obtaining knowledge thereof of (A) any presence or Releases or threatened Releases of Hazardous Substances in, on, under, from or migrating towards the Property; (B) any non-compliance with any Environmental Laws related in any way to the Property; (C) any actual or potential Environmental Lien; (D) any required or proposed Remediation of environmental conditions relating to the Property; and (E) any written or oral notice or other communication which Borrower becomes aware from any source whatsoever (including but not limited to a governmental entity) relating in any way to Hazardous Substances or Remediation thereof, possible liability of any person or entity pursuant to any Environmental Law, other adverse environmental conditions in connection with the Property, or any actual or potential administrative or judicial proceedings in connection with anything referred to in this Article 12.

Section 12.3. **Lender's Rights**.    Lender and any other person or entity designated by Lender, including, but not limited to, any receiver, any representative of a governmental entity, and any environmental consultant designated by Lender or any Indemnified Party, shall have the right, but not the obligation, and Borrower hereby authorizes Lender to enter upon the Property at all reasonable times to assess any and all aspects of the environmental condition of the Property and its use, including but not limited to conducting any environmental assessment or audit (the scope of which shall be determined in Lender's sole and absolute discretion) and taking samples of soil, groundwater or other water, air, or building materials, and conducting other invasive testing. Borrower shall cooperate with and provide access to Lender and any such person or entity designated by Lender.

# ARTICLE XIII

# BANKRUPTCY

Section 13.1. **Material Inducement**.    Each Borrower, each Pledgor, each Guarantor, and each Indemnitor, jointly and severally, acknowledges and agrees that the

representations, warranties, covenants and agreements contained in this Article 13 constitute a material inducement to Lender to enter into this Agreement, the other Loan Documents and the transactions contemplated hereby and thereby and that without the inclusion of this Article 13 herein Lender would not have entered into this Agreement and the other Loan Documents.

Section 13.2. **No Fraudulent Intent**. Each Borrower, each Pledgor, each Guarantor, and each Indemnitor, jointly and severally, hereby acknowledges, warrants, represents and agrees that neither the execution and delivery of this Agreement and the other Loan Documents nor the performance of any actions required hereunder or thereunder is being consummated by Borrower, Pledgors, Guarantor, or Indemnitors, with or as a result of any actual intent by such Persons, or any of them, to hinder, delay or defraud any entity to which such Persons, or any of them, are now or will hereafter become indebted.

Section 13.3. **No Bankruptcy Intent**. Each Borrower, each Pledgor, each Guarantor, and each Indemnitor, jointly and severally, hereby represents, covenants and agrees that neither Borrower nor any of the Pledgors, Guarantor or Indemnitors has any intent (a) to file any voluntary petition in bankruptcy under any Chapter of the Bankruptcy Code or in any manner to seek relief, protection, reorganization, liquidation, dissolution or similar relief for debtors under any local, state, federal or other insolvency laws or laws providing for relief of debtors, or in equity, or directly or indirectly to cause any of the other of such Persons to file any such petition or to seek any such relief, either at the present time, or at any time hereafter, (b) directly or indirectly to cause any involuntary petition under any Chapter of the Bankruptcy Code to be filed against any of such Persons or directly or indirectly to cause any of such Persons to become the subject of any dissolution, liquidation or insolvency proceeding or any other proceeding pursuant to any local, state, federal, or other insolvency laws or laws providing for relief of debtors, or in equity, either at the present time, or at any time hereafter, or (c) directly or indirectly to cause the Property, the Pledged Interests, the Collateral or any portion thereof or any interest of such Persons in the Property, Pledged Interests, or the Collateral to become the property of any bankruptcy estate or the subject of any local, state, federal or other bankruptcy, dissolution, liquidation or insolvency proceedings, either at the present time or at any time hereafter.

Section 13.4. **Agreement in Best Interests of Parties; Consideration**. Each Borrower, each Pledgor, each Guarantor, and each Indemnitor, jointly and severally, hereby acknowledges and agrees that the transactions evidenced by this Agreement and any of the other Loan Documents are in the best interests of such Persons and the creditors of such Persons, and the benefit to inure to such Persons pursuant to this Agreement and the other Loan Documents constitute substantially more than "reasonably equivalent value" (as such term is used in Section 548 of the Bankruptcy Code) and fair consideration, fair value or similar standards contained in the laws of any other jurisdiction whose laws shall be determined or held to apply to the transactions contemplated by this Agreement, in exchange for the benefits to be provided by such Persons to Lender pursuant to this Agreement and the other Loan Documents.

Section 13.5. **Waiver of Automatic and Supplemental Stays**. Each Borrower, each Pledgor, each Guarantor, and each Indemnitor hereby represents, covenants and agrees, in the event of the filing of any voluntary or involuntary petition in bankruptcy by or against Borrower, any Pledgors, any Guarantor, or any Indemnitors, not to assert or request any other party to assert that the automatic stay provided by Section 362 of the Bankruptcy Code shall

operate or be interpreted to stay, interdict, condition, reduce or inhibit the ability of Lender to enforce any rights it has by virtue of this Agreement or any of the other Loan Documents, or any other rights Lender has, whether now or hereafter acquired, against Borrower, any Pledgors, any Guarantor, or any Indemnitors, or against any Collateral; and further, in the event of the filing of any voluntary or involuntary petition in bankruptcy by or against Borrower, any Pledgors, any Guarantor, or any Indemnitors, not to seek a supplemental stay or any other relief, whether injunctive or otherwise, pursuant to Section 105 of the Bankruptcy Code or any other provision of the Bankruptcy Code, to stay, interdict, condition, reduce or inhibit the ability of Lender to enforce any rights it has by virtue of this Agreement or the other Loan Documents, or at law or in equity, or any other rights Lender has, whether now or hereafter acquired against Borrower, Pledgors, Guarantor, and Indemnitors, or against the Property, the Pledged Interests or any Collateral, as the case may be.

Section 13.6.  **Approval Rights Regarding Bankruptcy Proceeding**.  Upon the occurrence and during the continuance of any Event of Default, all rights of each Borrower, each Pledgor, each Guarantor, and each Indemnitor, to exercise their voting interests in their respective Pledged Interests, as the case may be, shall automatically terminate and cease to exist and all such rights shall thereupon be automatically vested in Lender who shall thereupon have the sole and exclusive right to exercise such voting interests.  In the event of any Bankruptcy Filing involving Borrower, any Pledgor, any Guarantor, or any Indemnitor, or all of them, or any of their properties, each Borrower, each Pledgor, each Guarantor, and each Indemnitor, acknowledges and agrees to recognize the rights and powers granted to Lender in this Section 13.6 and agree not to oppose or object on any basis whatsoever to the exercise by Lender of such rights in connection with the Bankruptcy Filings.  Further, upon the commencement of one or more Bankruptcy Filings, each Borrower, Pledgor, Guarantor and Indemnitor, jointly and severally, covenants and agrees: (i) not to propose, approve, vote for, or acquiesce in a plan of reorganization concerning Borrower, any Pledgor, any Guarantor, or any Indemnitor, or all of them, without the consent of Lender; (ii) not to challenge or object on any basis whatsoever to the standing of Lender to be recognized as a creditor and/or party-in-interest in the Bankruptcy Filings; and (iii) not to violate or breach any of the covenants or agreements contained in any of the Loan Documents.

Section 13.7.  **Covenant of Non-Interference and Cooperation**.

(a)   Borrower, Pledgors, Guarantor, and Indemnitors, jointly and severally, covenant and agree that none of them shall take any action of any kind or nature whatsoever, either directly or indirectly, to oppose, impede, obstruct, hinder, frustrate, enjoin or otherwise interfere with the exercise by Lender of any of Lender's rights and remedies, at law or in equity, against or with respect to (i) the Loan, the Collateral, the Pledged Interests, this Agreement, the Security Instrument or any of the other Loan Documents, or (ii) the Construction Project Loan Documents or Lender's rights to cure any defaults thereunder or to purchase the same, at law or in equity, and shall not, either directly or indirectly cause any other Person to take any of the foregoing actions.

(b)   Borrower, Pledgors, Guarantor, and Indemnitors, jointly and severally, covenant and agree to cooperate fully and completely with the exercise by Lender of any of Lender's rights and remedies against or with respect to the Collateral, this Agreement or the other Loan Documents.

# ARTICLE XIV

## INDEMNIFICATION

Section 14.1. **General Indemnification**. Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties (as defined herein) from and against any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, costs, expenses, diminutions in value, fines, penalties, charges, fees, expenses, judgments, awards, amounts paid in settlement, punitive damages, foreseeable and unforeseeable consequential damages, of whatever kind or nature (including but not limited to reasonable attorneys' fees and other costs of defense (the "**Losses**") imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any one or more of the following:  (a) ownership of this Agreement, the Security Instrument, the Pledge Agreements, the Pledged Interests, the Property or any interest therein or receipt of any Rents or revenues; (b) any amendment to, or restructuring of, the Debt, and the Note, this Agreement, the Security Instrument, the Pledge Agreements or any of the Other Loan Documents; (c) any and all lawful action that may be taken by Lender in connection with the enforcement of the provisions of this Agreement, the Security Instrument, the Pledge Agreements, the Note or any of the Other Loan Documents, whether or not suit is filed in connection with same, or in connection with Borrower, any Pledgors any Guarantor or Indemnitor and/or any partner, joint venturer or shareholder thereof becoming a party to a voluntary or involuntary federal or state bankruptcy, insolvency or similar proceeding; (d) any accident, injury to or death of persons or loss of or damage to Property occurring in, on or about the Property or any part thereof or on the adjoining sidewalks, curbs, adjacent Property or adjacent parking areas, streets or ways; (e) any use, nonuse or condition in, on or about the Property or any part thereof or on the adjoining sidewalks, curbs, adjacent Property or adjacent parking areas, streets or ways; (f) any failure on the part of Borrower to perform or be in compliance with any of the terms of this Agreement or any other Loan Documents; (g) performance of any labor or services or the furnishing of any materials or other Property in respect of the Property or any part thereof; (h) the failure of any person to file timely with the Internal Revenue Service an accurate Form 1099-B, Statement for Recipients of Proceeds from Land, Broker and Barter Exchange Transactions, which may be required in connection with the Agreement, or to supply a copy thereof in a timely fashion to the recipient of the proceeds of the transaction in connection with which this Agreement is made; (i) any failure of the Property to be in compliance with any Legal Requirements; (j) the enforcement by any Indemnified Party of the provisions of this Article 14; (k) any and all claims and demands whatsoever which may be asserted against Lender by reason of any alleged obligations or undertakings on its part to perform or discharge any of the terms, covenants, or agreements contained in any Lease; (l) the payment of any commission, charge or brokerage fee to anyone which may be payable in connection with the funding of the Loan evidenced by the Note and secured by this Agreement or any of the other Loan Documents; or (m) any misrepresentation made by Borrower in this Agreement or any of the other Loan Documents; provided, however, Borrower shall not be liable for any Losses due solely to the gross negligence or willful misconduct of any Indemnified Party.  Any amounts payable to Lender by reason of the application of this Section 14.1 shall become immediately due and payable and shall bear interest at the Default Rate from the date loss or damage is sustained by Lender until paid.  For purposes of this Article 14, the term "**Indemnified Parties**" means Lender and any person or entity who is or will have been involved in the origination of the Loan, any person or

entity who is or will have been involved in the servicing of the Loan, any person or entity in whose name the encumbrance created by the Security Instrument or the Pledge Agreement, is or will have been recorded, persons and entities who may hold or acquire or will have held a full or partial interest in the Loan (including, but not limited to, Investors or prospective Investors in the Securities, as well as custodians, trustees and other fiduciaries who hold or have held a full or partial interest in the Loan for the benefit of third parties) as well as the respective directors, officers, shareholders, partners, employees, agents, servants, representatives, contractors, subcontractors, affiliates, subsidiaries, participants, successors and assigns of any and all of the foregoing (including but not limited to any other person or entity who holds or acquires or will have held a participation or other full or partial interest in the Loan or the Property, whether during the term of the Loan or as a part of or following a foreclosure of the Loan and including, but not limited to, any successors by merger, consolidation or acquisition of all or a substantial portion of Lender's assets and business).

Section 14.2.  **Note and/or Intangible Tax**.  Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any tax on the making and/or recording of this Agreement, the Security Instrument, the Pledge Agreements, the Note or any of the other Loan Documents.

Section 14.3.  **ERISA Indemnification**.  Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses (including, without limitation, attorneys' fees and costs incurred in the investigation, defense, and settlement of Losses incurred in correcting any prohibited transaction or in the sale of a prohibited loan, and in obtaining any individual prohibited transaction exemption under ERISA that may be required, in Lender's sole discretion) that Lender may incur, directly or indirectly, as a result of a default under Sections 6.2 or 4.9 or Section 6.3(xvi).

Section 14.4.  **Environmental Indemnification**.  Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses and costs of Remediation (whether or not performed voluntarily), engineers' fees, environmental consultants' fees, and costs of investigation (including but not limited to sampling, testing, and analysis of soil, water, air, building materials and other materials and substances whether solid, liquid or gas) imposed upon or incurred by or asserted against any Indemnified Parties, and directly or indirectly arising out of or in any way relating to any one or more of the following: (a) any presence of any Hazardous Substances in, on, above, or under the Property; (b) any past, present or threatened Release of Hazardous Substances in, on, above, under or from the Property; (c) any activity by Borrower, or any person or entity affiliated with Borrower or any tenant or other user of the Property in connection with any actual, proposed or threatened use, treatment, storage, holding, existence, disposition or other Release, generation, production, manufacturing, processing, refining, control, management, abatement, removal, handling, transfer or transportation to or from the Property of any Hazardous Substances at any time located in, under, on or above the Property; (d) any activity by Borrower, any person or entity affiliated with Borrower or any tenant or other user of the Property in connection with any actual or proposed Remediation of any Hazardous Substances at any time located in, under, on or above the Property, whether or not such Remediation is voluntary or pursuant to court or administrative order, including but not limited to any removal,

remedial or corrective action; (e) any past or present non-compliance or violations of any Environmental Laws (or permits issued pursuant to any Environmental Law) in connection with the Property or operations thereon, including but not limited to any failure by Borrower, any person or entity affiliated with Borrower or any tenant or other user of the Property to comply with any order of any governmental authority in connection with any Environmental Laws; (f) the imposition, recording or filing of any Environmental Lien encumbering the Property; (g) any administrative processes or proceedings or judicial proceedings in any way connected with any matter addressed in Article 12 and this Section 14.4; (h) any past, present or threatened injury to, destruction of or loss of natural resources in any way connected with the Property, including but not limited to costs to investigate and assess such injury, destruction or loss; (i) any acts of Borrower or other users of the Property in arranging for disposal or treatment, or arranging with a transporter for transport for disposal or treatment, of Hazardous Substances owned or possessed by such Borrower or other users, at any facility or incineration vessel owned or operated by another person or entity and containing such or any similar Hazardous Substance; (j) any acts of Borrower or other users of the Property, in accepting any Hazardous Substances for transport to disposal or treatment facilities, incineration vessels or sites selected by Borrower or such other users, from which there is a Release, or a threatened Release of any Hazardous Substance which causes the incurrence of costs for Remediation; (k) any personal injury, wrongful death, or property damage arising under any statutory or common law or tort law theory, including but not limited to damages assessed for the maintenance of a private or public nuisance or for the conducting of an abnormally dangerous activity on or near the Property; and (l) any misrepresentation or inaccuracy in any representation or warranty or material breach or failure to perform any covenants or other obligations pursuant to Article 12. This indemnity shall survive any termination, satisfaction or foreclosure of this Agreement.

Section 14.5. **Duty to Defend; Attorneys' Fees and Other Fees and Expenses**. Upon written request, Borrower shall defend such Indemnified Party (if requested by any Indemnified Party, in the name of the Indemnified Party) by attorneys and other professionals approved by the Indemnified Parties. Notwithstanding the foregoing, any Indemnified Parties may, in their sole and absolute discretion, engage their own attorneys and other professionals to defend or assist them, and, at the option of Indemnified Parties, their attorneys shall control the resolution of claim or proceeding. Upon demand, Borrower shall pay or, in the sole and absolute discretion of the Indemnified Parties, reimburse the Indemnified Parties for the payment of reasonable fees and disbursements of attorneys, engineers, environmental consultants, laboratories and other professionals in connection therewith.

## ARTICLE XV

## NOTICE

Section 15.1. **Notices**. All notices or other written communications hereunder ("**Notices**") shall be deemed to have been properly given (i) upon delivery or refusal of delivery, if delivered in person, (ii) one (1) Business Day (defined below) after having been deposited for overnight delivery with any reputable overnight courier service, or (iii) three (3) Business Days after having been deposited in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

| | |
|---|---|
| If to Borrower: | The Towers – Las Vegas, LLC<br>474 South North Lake Boulevard<br>Suite 1020<br>Altamonte Springs, Florida 32701<br>Attention: Mr. Christopher DelGuidice |
| | and |
| | The Towers - LV, LLC<br>474 South North Lake Boulevard<br>Suite 1020<br>Altamonte Springs, Florida 32701<br>Attention: Mr. Christopher DelGuidice |
| With a copy to: | Murai Wald Biondo Moreno & Brochin, P.A.<br>2 Alhambra Plaza<br>Penthouse 1B<br>Coral Gables, FL 33134<br>Attention: Gerald J. Biondo, Esq. |
| If to Lender: | Mr. David Ridini<br>Lehman Brothers Holdings Inc.<br>399 Park Avenue, 8th Floor<br>New York, New York 10022<br>MTS# VH21/Asset #1107301 |
| With a copy to: | David Broderick, Esq.<br>Lehman Brothers Holdings Inc.<br>399 Park Avenue, 8th Floor<br>New York, New York 10022<br>MTS# VH21/Asset #1107301 |
| And an additional<br>copy to Servicer: | Mr. J. Gregory Winchester<br>Trimont Real Estate Advisors, Inc.<br>Monarch Towers<br>3424 Peachtree Road NE<br>Suite 2200<br>Atlanta, Georgia 30326<br>MTS# VH21/Asset #1107301 |
| And an additional<br>copy to | James J. Thomas, Esq.<br>Windels Marx Lane & Mittendorf, LLP<br>156 West 56th Street<br>New York, New York 10019 |

or addressed as such party may from time to time designate by written notice to the other parties.

Either party by notice to the other may designate additional or different addresses for subsequent notices or communications.

## ARTICLE XVI

## SERVICE OF PROCESS

Section 16.1.  **Consent to Service**.

(a)    Each Borrower will engage an agent for service of process in New York, New York and give prompt notice to Lender of the name and address of any new agent appointed by it, as appropriate.  Borrower further agrees that the failure of its agent for service of process to give it notice of any service of process will not impair or affect the validity of such service or of any judgment based thereon.  If, despite the foregoing, there is for any reason no agent for service of process of Borrower available to be served, and if it at that time has no place of business in New York, New York, then Borrower irrevocably consents to service of process by registered or certified mail, postage prepaid, to it at its address given in or pursuant to the first paragraph hereof.

(b)    Each Borrower initially and irrevocably designates Corporation Service Company, with an address on the date hereof at 80 State Street, Albany, New York 12207, to receive for and on behalf of Borrower service of process in New York, New York with respect to this Agreement.

Section 16.2.  **Submission to Jurisdiction**.  With respect to any claim or action arising hereunder or under the Note, the Security Instrument, the Pledge Agreements or any of the other Loan Documents, Borrower (a) irrevocably submits to the nonexclusive jurisdiction of the courts of the State of New York and the state where the Property is located and the United States District Court located in the Borough of Manhattan in New York, New York and the county in which the Property is located, and appellate courts from any thereof, and (b) irrevocably waives any objection which it may have at any time to the laying on venue of any suit, action or proceeding arising out of or relating to this Agreement or any of the other Loan Documents brought in any such court, irrevocably waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

Section 16.3.  **Jurisdiction Not Exclusive**.  Nothing in this Agreement will be deemed to preclude Lender from bringing an action or proceeding with respect hereto in any other jurisdiction.

Section 16.4.  **Waiver of Jury Trial**.  Each Borrower, each Pledgor, each Guarantor, each Indemnitor and Lender hereby waives its right to a jury trial with respect to any action or claim arising out of any dispute in connection with this Agreement, the Note or any of the Other Loan Documents, any rights or obligations hereunder or thereunder or the performance of such rights and obligations.  Each Borrower, each Pledgor, each Guarantor and each Indemnitor (a) certify that no representative, agent or attorney of Lender has represented, expressly or otherwise, that Lender would not, in the event of litigation, seek to enforce the foregoing waivers and (b) acknowledge that Lender has been induced to enter into this

Agreement, the Pledge Agreements and the other Loan Documents to which it is a party by, among other things, the waivers and certifications contained in this Article XVI. Each Borrower, each Pledgor, each Guarantor, and each Indemnitor acknowledges that it has had an opportunity to review this Article XVI with its legal counsel and that each of them agrees to the foregoing as its free, knowing and voluntary act.

## ARTICLE XVII

## APPLICABLE LAW

Section 17.1. **Choice of Law**. This Agreement shall be governed, construed, applied and enforced in accordance with the laws of Nevada with respect to the creation and enforcement of any liens within said jurisdiction relating to matters of real property law, foreclosure rights and obligations, but otherwise in accordance with the laws of the State of New York and the applicable laws of the United States of America.

Section 17.2. **Usury Laws**. This Agreement and the Note are subject to the express condition that at no time shall Borrower be obligated or required to pay interest on the Debt at a rate which could subject the holder of the Note to either civil or criminal liability as a result of being in excess of the maximum interest rate which Borrower is permitted by applicable law to contract or agree to pay. If by the terms of this Agreement or the Note, Borrower is at any time required or obligated to pay interest on the Debt at a rate in excess of such maximum rate, the rate of interest under the Agreement and the Note shall be deemed to be immediately reduced to such maximum rate and the interest payable shall be computed at such maximum rate and all prior interest payments in excess of such maximum rate shall be applied and shall be deemed to have been payments in reduction of the principal balance of the Note. All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the Debt shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Note until payment in full so that the rate or amount of interest on account of the Debt does not exceed the maximum lawful rate of interest from time to time in effect and applicable to the Debt for so long as the Debt is outstanding.

Section 17.3. **Provisions Subject to Applicable Law**. All rights, powers and remedies provided in this Agreement may be exercised only to the extent that the exercise thereof does not violate any applicable provisions of law and are intended to be limited to the extent necessary so that they will not render this Agreement invalid or unenforceable. If any term of this Agreement or any application thereof shall be invalid or unenforceable, the remainder of this Agreement and any other application of the term shall not be affected thereby.

## ARTICLE XVIII

## SECONDARY MARKET

Section 18.1. **Transfer of Loan**. Lender may, at any time, sell, transfer or assign the Note, this Agreement, the Security Instrument, the Pledge Agreements and the other Loan Documents, and any or all servicing rights with respect thereto, or grant participations therein or issue pass-through certificates or other securities evidencing a beneficial interest in a rated or unrated public offering or private placement (the "**Securities**"). Lender may forward to

each purchaser, transferee, assignee, servicer, participant, investor in such Securities or any Rating Agency rating such Securities (all of the foregoing entities collectively referred to as the "**Investor**") and each prospective Investor, all documents and information which Lender now has or may hereafter acquire relating to the Debt and to Borrower, Pledgors, any Guarantor, any Indemnitor, the Pledged Interests, the Collateral and the Property, whether furnished by Borrower, Pledgors, any Guarantor, any Indemnitor or otherwise, as Lender determines necessary or desirable without consent or notice to Borrower, Pledgors, any Guarantor, any Indemnitor or other use.    Borrower, Pledgors, any Guarantor and any Indemnitor agree to cooperate with Lender in connection with any transfer made or any Securities created pursuant to this Section 18.1, including, without limitation, the delivery of an estoppel certificate required in accordance with Section 7.3 hereof and such other documents as may be reasonably requested by Lender.    Borrower shall furnish and Borrower, Pledgors any Guarantor and any Indemnitor consent to Lender furnishing to such Investors or such prospective Investors or Rating Agency any and all information concerning the Property, the financial condition of Borrower, any Guarantor and any Indemnitor and any and all information concerning the Property, as may be reasonably requested by Lender, any Investor or any prospective Investor or Rating Agency in connection with any sole, transfer or participation interest.    All third party costs and expenses incurred by Lender in connection with any transaction contemplated by this Section 18.1, shall be paid by Lender except that Lender shall have no obligation to pay any costs and expenses which Borrower would be otherwise obligated to pay pursuant to this Agreement had such transaction not occurred.

## ARTICLE XIX

## COSTS

Section 19.1.    **Performance at Borrower's Expense**.    Borrower acknowledges and confirms that Lender may impose certain administrative processing and/or commitment/extension fees in connection with (a) the extension, renewal, modification, amendment and termination of its loans, (b) the release or substitution of collateral therefor, (c) obtaining certain consents, waivers and approvals with respect to the Property, (d) the review of any Lease or proposed lease or the preparation or review of any subordination, non-disturbance agreement, or (e) the occurrence of a default under any of the terms hereof (the occurrence of any of the above shall be called an "**Event**").    Borrower further acknowledges and confirms that it shall be responsible for the payment of all costs of reappraisal of the Property (but not more often than annually at Borrower's expense) or any part thereof, whether required by law, regulation, Lender or any governmental or quasi-governmental authority.    Borrower hereby acknowledges and agrees to pay, immediately, with or without demand, all such reasonable fees (as the same may be increased or decreased from time to time), and any additional fees of a similar type or nature which may be imposed by Lender from time to time, upon the occurrence of any Event or otherwise.    Wherever it is provided for herein that Borrower pay any costs and expenses, such costs and expenses shall include, but not be limited to, all reasonable legal fees and disbursements of Lender.

Section 19.2.    **Attorney's Fees for Enforcement**.    (a) Borrower shall pay all legal fees incurred by Lender in connection with (i) the preparation of the Note, this Agreement, the Security Instrument, the Pledge Agreements and the other Loan Documents and (ii) the items set forth in Section 19.1 above, and (b) Borrower shall pay to Lender on demand any and all

expenses, including legal expenses and attorneys' fees, incurred or paid by Lender in protecting its interest in the Property, the Collateral, the Pledged Interests or any Personal Property or in collecting any amount payable hereunder or in enforcing its rights hereunder with respect to the Property, the Collateral, the Pledged Interests or any Personal Property, whether or not any legal proceeding is commenced hereunder or thereunder and whether or not any default or Event of Default, including without limitation a Bankruptcy Filing, shall have occurred and is continuing, together with interest thereon at the Default Rate from the date paid or incurred by Lender until such expenses are paid by Borrower.

Section 19.3.  **Servicer Fee**.  Borrower hereby agrees to pay the Servicer Fee to Servicer (as defined in the Note) in accordance with the terms of the Note.

## ARTICLE XX

## MISCELLANEOUS PROVISIONS

Section 20.1.  **No Oral Change**.  This Agreement, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

Section 20.2.  **Liability**.  If Borrower consists of more than one Person, the obligations and liabilities of each such Person hereunder shall be joint and several.  This Agreement shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns forever.

Section 20.3.  **Inapplicable Provisions**.  If any term, covenant or condition of the Note or this Agreement is held to be invalid, illegal or unenforceable in any respect, this Agreement shall be construed without such provision.

Section 20.4.  **Headings, *Etc***.  The headings and captions of various Sections of this Agreement are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

Section 20.5.  **Duplicate Originals; Counterparts**.  This Agreement may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original.  This Agreement may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute a single Agreement.  The failure of any party hereto to execute this Agreement, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

Section 20.6.  **Number and Gender**.  Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

Section 20.7.  **Subrogation**.  If any or all of the proceeds of the Note have been used to extinguish, extend or renew any indebtedness heretofore existing against the Property, then, to the extent of the funds so used, Lender shall be subrogated to all of the rights, claims,

liens, titles, and interests existing against the Property heretofore held by, or in favor of, the holder of such indebtedness and such former rights, claims, liens, titles, and interests, if any, are not waived but rather are continued in full force and effect in favor of Lender and are merged with the lien and security interest created herein as cumulative security for the repayment of the Debt, the performance and discharge of Borrower's obligations hereunder, under the Note, the Security Instrument, the Pledge Agreements and the other Loan Documents and the performance and discharge of the Other Obligations.

Section 20.8. **Entire Agreement**.   The Note, this Agreement, the Security Instrument, the Pledge Agreements and the other Loan Documents constitute the entire understanding and agreement between Borrower and Lender with respect to the transactions arising in connection with the Debt and supersede all prior written or oral understandings and agreements between Borrower and Lender with respect thereto. Borrower hereby acknowledges that, except as incorporated in writing in the Note, this Agreement, the Pledge Agreements and the other Loan Documents, there are not, and were not, and no persons are or were authorized by Lender to make, any representations, understandings, stipulations, agreements or promises, oral or written, with respect to the transaction which is the subject of the Note, this Agreement, the Pledge Agreements and the other Loan Documents.

Section 20.9.   **Relationship**.   The relationship between Lender and Borrower is solely that of a lender and borrower, and nothing contained herein or in any of the other Loan Documents shall in any manner be construed as making the parties hereto partners, joint venturers or any other relationship other than lender and borrower.

Section 20.10. **Rights of Third Parties**.   All conditions to the performance of the obligations of Lender under this Agreement, the Pledge Agreements and the other Loan Documents are imposed solely and exclusively for the benefit of Lender and no other Person shall have standing to require satisfaction of such conditions in accordance with their terms, and no other Person shall, under any circumstances, be deemed to be a beneficiary of such conditions, any and all of which may be freely waived in whole or in part by Lender at any time if in its sole and absolute discretion it deems it desirable to do so.

Section 20.11. **Time of the Essence**.   Time is of the essence with respect to each and every covenant, agreement and obligation of the parties hereto under this Agreement and the other Loan Documents.

Section 20.12. **Reliance**.    Borrower recognizes and acknowledges that in accepting the Note, this Agreement, the Security Instrument, the Pledge Agreements and the other Loan Documents, Lender is expressly and primarily relying on the truth and accuracy of the warranties and representations set forth therein and in Article 4 herein without any obligation to investigate the Property or the Collateral and notwithstanding any investigation of the Property by Lender; that such reliance existed on the part of Lender prior to the date hereof; that the warranties and representations are a material inducement to Lender in accepting the Note, this Agreement, the Security Instrument, the Pledge Agreements and the Other Loan Documents; and that Lender would not be willing to make the loan evidenced by the Note, this Agreement, the Security Instrument, the Pledge Agreements and the other Loan Documents and accept the Loan Documents in the absence of the warranties and representations as set forth in Article 4 and as contained in the other Loan Documents.

Section 20.13. **No Lender Obligations**.

(a)     Notwithstanding anything to the contrary in this Agreement, the Security Instrument or the Pledge Agreements, Lender is not undertaking the performance of (i) any obligations under the Leases; or (ii) any obligations with respect to such agreements, contracts, certificates, instruments, franchises, permits, trademarks, licenses and other documents, including, but not limited to, Borrower's organizational documents.

(b)     By accepting or approving anything required to be observed, performed or fulfilled or to be given to Lender pursuant to this Agreement, the Note, the Security Instrument, the Pledge Agreements, or any of the other Loan Documents, including without limitation, any officer's certificate, balance sheet, statement of profit and loss or other financial statement, survey, appraisal, or insurance policy, Lender shall not be deemed to have warranted, consented to, or affirmed the sufficiency, the legality or effectiveness of same, and such acceptance or approval thereof shall not constitute any warranty or affirmation with respect thereto by Lender.

## ARTICLE XXI

## WAIVERS

Section 21.1. **Waiver of Counterclaim**.   If and to the extent permitted by applicable law, Borrower hereby waives the right to assert a counterclaim, other than a mandatory or compulsory counterclaim, in any action or proceeding brought against it by Lender arising out of or in any way connected with this Agreement, the Security Instrument, the Pledge Agreements, the Note, any of the other Loan Documents, or the Obligations.

Section 21.2. **Marshaling and Other Matters**.  Borrower hereby waives, to the extent permitted by law, the benefit of all appraisement, valuation, stay, extension, reinstatement and redemption laws now or hereafter in force and all rights of marshaling in the event of any sale hereunder of the Property or any part thereof or any interest therein. Further, Borrower hereby expressly waives any and all rights of redemption from sale under any order or decree of foreclosure of the Security Instrument and/or the Pledge Agreements on behalf of Borrower, and on behalf of each and every person acquiring any interest in or title to the Property subsequent to the date of the Security Instrument, the Pledge Agreements, as applicable, and on behalf of all persons to the extent permitted by applicable law.

Section 21.3. **Waiver of Notice**.  Borrower shall not be entitled to any notices of any nature whatsoever from Lender except with respect to matters for which the Security Instrument, the Pledge Agreements and this Agreement specifically and expressly provides for the giving of notice by Lender to Borrower and except with respect to matters for which Lender is required by applicable law to give notice, and Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which the Security Instrument, the Pledge Agreements and this Agreement do not specifically and expressly provide for the giving of notice by Lender to Borrower.

Section 21.4. **Waiver of Statute of Limitations**. Borrower hereby expressly waives and releases to the fullest extent permitted by law, the pleading of any statute of limitations as a defense to payment of the Debt or performance of the Other Obligations.

Section 21.5. **Sole Discretion of Lender**. Wherever pursuant to this Agreement (a) Lender exercises any right given to it to approve or disapprove, (b) any arrangement or term is to be satisfactory to Lender, or (c) any other decision or determination is to be made by Lender, the decision of Lender to approve or disapprove, all decisions that arrangements or terms are satisfactory or not satisfactory and all other decisions and determinations made by Lender, shall be in the sole and absolute discretion of Lender and shall be final and conclusive, except as may be otherwise expressly and specifically provided herein.

Section 21.6. **Survival**. The indemnifications made pursuant to Sections 14.2, 14.3 and 14.4 and the representations and warranties, covenants, and other obligations arising under Article 12, shall continue indefinitely in full force and effect and shall survive and shall in no way be impaired by: any satisfaction or other termination of this Agreement, the Security Instrument, the Pledge Agreements or any assignment or other transfer of all or any portion of this Agreement or the Security Instrument, the Pledge Agreements or Lender's interest in the Property or the Pledged Interests (but, in either such case, shall benefit both Indemnified Parties and any assignee or transferee), any exercise of Lender's rights and remedies pursuant hereto including but not limited to foreclosure or acceptance of a deed in lieu of foreclosure, any exercise of any rights and remedies pursuant to the Note, the Security Instrument, the Pledge Agreements or any of the other Loan Documents, any transfer of all or any portion of the Property, the Pledged Interests or the Collateral (whether by Borrower or by Lender following foreclosure or acceptance of a deed in lieu of foreclosure or at any other time), any amendment to this Agreement, the Security Instrument, the Pledge Agreements, the Note or any of the other Loan Documents, and any act or omission that might otherwise be construed as a release or discharge of Borrower from the obligations pursuant hereto.

## ARTICLE XXII

## RECOURSE OBLIGATIONS

Section 22.1. **Exculpation**. Except as otherwise provided herein or in the Guaranty or the Environmental Indemnity, Lender shall not enforce the liability and obligation of the Borrower to perform and observe the obligations contained in the Note, Pledge Agreement, the Security Instrument or this Agreement by any action or proceeding wherein a money judgment shall be sought against the Borrower, except that Lender may bring a foreclosure action, action for specific performance or other appropriate action or proceeding to enable Lender to enforce and realize upon the Property, any Pledge Agreement, any of the other Loan Documents, and the interest in the Property, the Pledged Interests, the Collateral and any other collateral given to Lender created by the Security Instrument, any Pledge Agreement and any of the other Loan Documents; provided, however, that any judgment in any action or proceeding shall be enforceable against the Borrower only to the extent of such Borrower's respective interest in the Property, the Pledged Interests, the Collateral and in any other collateral given to Lender. Lender, by accepting the Note, the Security Instrument, each Pledge Agreement and this Agreement, agrees that it shall not, except as otherwise provided in Section 22.3 and Section 22.4 hereof, the Guaranty and the Environmental Guaranty, sue for, seek or demand any

deficiency judgment against the Borrower in any action or proceeding, under or by reason of or under or in connection with the Note, the other Loan Documents, any Pledge Agreement or the Security Instrument.

Section 22.2. **Reservation of Certain Rights.** The provisions of Section 22.1 shall not (a) constitute a waiver, release or impairment of any obligation evidenced or secured by the Note, the Security Instrument, the other Loan Documents, any Pledge Agreement or this Agreement; (b) impair the right of Lender to name the Borrower as a party defendant in any action or suit for judicial foreclosure and sale under the Security Instrument, any Pledge Agreement or this Agreement; (c) affect the validity or enforceability of any indemnity, guaranty, master lease or similar instrument made in connection with the Note, the Security Instrument, any Pledge Agreement, this Agreement, the Guaranty, the Environmental Indemnity or any other Loan Documents; (d) impair the right of Lender to obtain the appointment of a receiver; or (e) impair the right of Lender to enforce the provisions of Sections 11.11, 14.1, 14.2, 14.3 and 14.4 of this Agreement.

Section 22.3. **Exceptions to Exculpation.** Notwithstanding the provisions of this Article 22 to the contrary, the Borrower and the Guarantor shall be personally liable to Lender for the Losses it incurs due to:

(a)     except as set forth in Section 22.4, Borrower, any Pledgor, any Guarantor or any Indemnitor, or any principal of any thereof commits willful misconduct or gross negligence with respect to the management and operation of the Property, or Borrower's financial affairs;

(b)     Borrower's failure to maintain the Property as required pursuant to the Loan Documents, including but not limited to the failure to comply with any of the provisions of (1) Section 5.4 **[Insurance]** (which shall include the failure to pay any deductible amount pursuant to the Policies), 5.9 **[Maintenance]**, 5.10 **[Waste]**, 5.11, **[Compliance with Laws]**, 5.5 **[Payment of Taxes]** (unless the failure to comply with any of such provisions is due to a lack of sufficient cash flow from the Property (whether from Rents, loan proceeds, insurance proceeds or otherwise) and such lack of sufficient cash flow is not due to an event described in subparagraph (f) of Section 22.4 below), 12.1 **[Environmental Representations and Warranties]** or 12.2 **[Environmental Covenants]** of this Agreement;

(c)     The physical waste or willful destruction of the Property by Borrower, Guarantor, any Pledgor or any Indemnitor, or any principal of any thereof, including, but not limited to, the removal or disposal by Borrower, Guarantor, any Pledgor or any Indemnitor, or any principal of any thereof, of any equipment, fixtures or other property (personal or otherwise) from the Property, in violation of the terms of any of the Loan Documents;

(d)     Borrower's breach of any of the indemnification obligations contained in this Agreement, including, but not limited to, Section 14.2 **[Note/Intangible Tax Indemnification]** or 14.3 **[ERISA Indemnification]** or 14.4 **[Environmental Indemnification]** of this Agreement;

(e)   The failure by Borrower, Guarantor, any Pledgor or any Indemnitor to comply with any of the provisions of Sections 6.2 **[ERISA]** or 6.3 **[Single Purpose Entity]** of this Agreement, if applicable;

(f)   Borrower's failure to comply with any of the provisions of Section 5.13 **[Payment for Labor and Materials]** of this Agreement and, as a result thereof, the Property becomes subject to any mechanic liens or materialman liens regarding work not approved in writing by Lender or not contemplated by an Predevelopment Budget or Project Budget (as such terms are defined in this Agreement) approved by Lender or regarding work for which sufficient cash flow exists from the Property (whether from Rents, loan proceeds, insurance proceeds or otherwise) to pay for such work;

(g)   Borrower's failure to pay any brokerage fee when such fee is due or to obtain Lender's consent prior to entering into any Commercial Lease (as such term is defined in this Agreement); or

(h)   there occurs any violation of the Interstate Land Sales Full Disclosure Act (codified at 15 U.S.C.A. §§ 1701 et seq.) as it relates to the Property including, without limitation, the construction of any improvements thereon, or the sale of any Condominium Units.

Section 22.4.  **Recourse**.   Notwithstanding the foregoing, the agreement of Lender not to pursue recourse liability as set forth in Section 22.1 above SHALL BECOME NULL AND VOID and shall be of no further force and effect in the event:

(a)   if (1) Borrower, Guarantor, any Pledgor or any Indemnitor (each, a "**Bankruptcy Default Party**"), shall file any case, proceeding or other action (i) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (ii) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or any Bankruptcy Default Party shall make a general assignment for the benefit of its creditors; or (2) there shall be commenced against any Bankruptcy Default Party, or the Property or any part thereof shall become an asset in, any case, proceeding or other action of a nature referred to in clause (1) above which is facilitated, coordinated, conducted or directed by any Bankruptcy Default Party, and which (i) results in the entry of an order for relief or any such adjudication or appointment or (ii) remains undismissed or undischarged for a period of ninety (90) days; or (3) there shall be commenced against any Bankruptcy Default Party, or the Property or any part thereof shall become an asset in, any case, proceeding or other action which is facilitated, coordinated, conducted or directed by any Bankruptcy Default Party seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets, and which results in the entry of any order for any such relief which shall not have been vacated or discharged, or stayed or bonded pending appeal within sixty (60) days from the entry thereof;

(b)    Borrower, Guarantor, any Pledgor or any Indemnitor, or any principal of any thereof, fails to (1) permit on-site inspections of the Property by the Lender or its representatives, after applicable notice provisions contained in the Loan Documents; (2) maintain or deliver to Lender such financial statements and other information as required pursuant to this Guaranty or the Loan Documents including, but not limited to, Section 5.12 **[Books and Records]** of this Agreement after applicable notice provisions contained in the Loan Documents; or (3) provide an estoppel certificate in the form required by Section 7.3 **[Estoppel Certificate]** of this Agreement after applicable notice provisions contained in the Loan Documents;

(c)    there exists fraud or an intentional material misrepresentation on the part of Borrower, Guarantor, any Pledgor or any Indemnitor, or any principal of any thereof, in connection with any representation, warranty or submission provided to Lender or its representative, or any intentional material omission or an intentional misrepresentation of fact in any material respect (made fraudulently or otherwise) on the part of Owner, Borrower, Guarantor, any Pledgor or any Indemnitor, or any principal of any thereof, regarding their respective financial conditions, including statements made or materials produced or delivered (1) both prior to or after the making of the Loan, (2) in connection with this Guaranty or the Loan Documents, and (3) which has a material adverse affect on the value of the Property or Collateral;

(d)    Borrower, Guarantor, any Pledgor or any Indemnitor, or any principal of any thereof, or any party acting at the behest of any thereof, challenges the validity or enforceability of any provision of this Guaranty or the Loan Documents and/or Borrower, Guarantor, any Pledgor or any Indemnitor, or any principal of any thereof, or any party acting at the behest of any thereof, asserts defenses to the validity or enforceability of any provision of the Guaranty or the Loan Documents unless such party alleges, in good faith, that no Event of Default has occurred pursuant to the Loan Documents and the Borrower is in full compliance with the Loan Documents;

(e)    there occurs a violation of any of the terms and provisions of Article 8 of this Agreement or Subsections 8(a) or (b) of any of the Pledge Agreements;

(f)    Borrower, Guarantor, any Pledgor or any Indemnitor, or any principal of any thereof, or any party acting at the behest of any thereof, commits any misappropriation, misapplication or conversion of funds (other than by a mistake made on a commercially reasonable basis, in which case Borrower shall be personally liable to Lender for the Losses it incurs with respect thereto), including but not limited to the following: (i) any rents, deposits, sale proceeds, Loan proceeds or other funds or income arising with respect to the Property, the Collateral or any part thereof, or (ii) any proceeds under any insurance policies or awards resulting from condemnation or the exercise of the power of eminent domain by reason of damage, loss or destruction of any portion of the Property;

(g)    in the event Borrower or Guarantor, or any principal of any thereof, or any party acting at the behest thereof, raises a claim or asserts a defense that any of the waivers contained in **[Sections 16.4] [Waiver of Jury Trial]** or **[21.1] [Waiver of Counterclaim]** of this Agreement are not enforceable;

(h)    Borrower, Guarantor, any Pledgor or any Indemnitor, or any principal of any thereof, or any party acting at the behest thereof, asserts that (1) any Loan Document has been modified, amended, cancelled or released other than by a written instrument executed by Lender, (2) any provision of the Loan Documents has been waived because Lender failed to require strict performance of such provision, or (3) the relationship between Borrower and Lender is that of partners, joint ventures or any other relationship other than borrower and lender; and

(i)    the amendment or modification of any of the Construction Project Loan Documents, the Condominium Documents (other than minor or ministerial changes) or any of the organizational or formation documents of Borrower, Guarantor, any Pledgor or any Indemnitor, or any principal of any thereof, without the prior written consent of Lender.

Section 22.5.    **Bankruptcy Claims**.    Nothing herein shall be deemed to be a waiver of any right which Lender may have under Sections 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Code to file a claim for the full amount of the Debt secured by this Agreement, the Security Instrument, the Pledge Agreements and the other Loan Documents or to require that all collateral shall continue to secure all of the Debt owing to Lender in accordance with the Note, this Agreement, the Security Instrument, any Pledge Agreement and the other Loan Documents.

## ARTICLE XXIII

## CONDITIONS PRECEDENT

The obligations of Lender to make the Loan hereunder are subject to the satisfaction of the following conditions precedent on or before the date hereof:

(a)    Borrower shall have executed and delivered to Lender the Note.

(b)    Lender shall have received duly executed copies of this Agreement, the Security Instrument, the Pledge Agreements, the other Loan Documents, and such other documents as Lender or its counsel may reasonably require.

(c)    Lender shall have received (i) certified copies of all action taken by Borrower and Pledgors to authorize the execution, delivery and performance, in accordance with its terms, of this Agreement, the Security Instrument, the Pledge Agreements, the Note, each of the other Loan Documents and any other documents required or contemplated hereunder or thereunder; (ii) a certificate of incumbency with respect to the representatives of the Borrower and Pledgors authorized and directed to execute and deliver each of the Loan Documents to which it is a party; and (iii) certificates of good standing for Borrower and each Pledgor from the appropriate authority in their jurisdictions of organization and from the State of Nevada for Owner.

(d)    Lender shall have received opinions of counsel for Borrower, Pledgors, Indemnitors and Guarantor, addressing such legal issues concerning Borrower and Guarantor, Pledgors, Indemnitors, the Loan, the Property, the Pledged Interests, the Collateral, the Note, this Agreement, the Pledge Agreements and any of the other Loan Documents as Lender may require, including, without limitation, the organization of each Borrower, Guarantor,

Pledgors and Indemnitors, due authorization of the execution and delivery of the Loan Documents, the proper execution and delivery of the Loan Documents, the enforceability of the Loan Documents, conflict of laws, New York Usury Law, non-consolidation, zoning and such other matters as Lender may reasonably request.

(e)   Lender shall have received the Guaranty duly executed by the Guarantor.

(f)   Lender shall have received the Pledge Agreements executed by Pledgors.

(g)   Lender shall have received the Environmental Indemnity duly executed by the Indemnitors.

(h)   Borrower shall, at Borrower's sole cost, have delivered to Lender a Lender's policy insuring Lender's first mortgage lien in a form acceptable to Lender.

(i)   Lender shall have received evidence satisfactory to it that the Property is or will be served by adequate storm sewer, sanitary sewer, telephone, gas, electricity and water service and other necessary utility service.  Borrower shall also deliver to Lender evidence that the Property is not in a wetlands district and a zoning letter providing evidence that the Property is zoned in a classification which will permit the contemplated use.

(j)   Lender shall have received such Uniform Commercial Code, bankruptcy, judgment, federal tax lien, building code violation and other searches of public records as Lender may reasonably require with respect to the Property, each Borrower, Guarantor, Pledgors and Indemnitors and the results of such searches shall be satisfactory to Lender.

(k)   Lender shall have received evidence of any required flood insurance.

(l)   Lender shall have received from Borrower evidence that the Property is benefited by such easements or other rights and vehicular and pedestrian ingress and egress, the installation and maintenance of utilities, and other site improvements as may be necessary for the operation of the Improvements.

(m)   Lender shall have received an updated survey of the Property, prepared at Borrower's sole cost and expense, and in a form and substance reasonably satisfactory to Lender.

(n)   All documents and legal matters in connection with the transactions contemplated by this Agreement shall be satisfactory in form and substance to the Lender.

(o)   Each of the representations and warranties made by Borrower, Pledgors, Guarantor, and Indemnitors, in or pursuant to the Loan Documents shall be true and correct in all material respects on and as of the date when made and on the date hereof.

(p)    No Event of Default shall have occurred and be continuing under any of the Loan Documents.

(q)    No notice of, or any other document or instrument creating, any federal tax lien or lien under Section 412 of the Code or Section 4068 of ERISA shall have been issued, recorded or filed with respect to the assets of either Borrower or the Guarantor.

(r)    Borrower shall have paid or shall pay from Loan proceeds (if permitted under the Predevelopment Budget) all brokerage fees or commissions arising from the making of the Loan, if any, its own expenses and fees incurred in connection with the Loan, and all of Lender's fees and charges incurred in connection with the making of the Loan, including but not limited to attorneys fees and charges, title fees and charges, construction, environmental and engineering consultant's fees and charges, appraisal costs, surveys, recording and filing fees and taxes.

(s)    Lender shall have approved the Predevelopment Budget.

(t)    Lender shall have received a Loan fee in the amount equal to 2% of $37,500,000.00.

(u)    Borrower shall have delivered a written certification executed by Borrower (the "**Purchase Agreement Certification**") to Lender that the Seller pursuant to that certain Land Purchase and Sale Agreement dated as of February 5, 2003, as amended by that certain First Amendment to Land Purchase and Sale Agreement, dated as of May 1, 2004 and as further amended by that certain Second Amendment to the Land Purchase and Sale Agreement, dated June 28, 2004 (collectively, the "**Purchase Agreement**") has either satisfied all conditions precedent under the Purchase Agreement which are the obligation of the Seller to satisfy or, to the extent any of such conditions precedent have not been satisfied, such conditions are set forth on a schedule attached to the Certification.

(v)    Lender shall have received evidence that the Equity Requirement has been invested in the Property.

(w)    Lender shall have reviewed the Consent and Agreement of Construction Manager executed by Borrower and Construction Project Manger.

(x)    Lender shall have reviewed the Consent and Agreement of Developer executed by Borrower and Del American.

## ARTICLE XXIV

## PREDEVELOPMENT SERVICES AND INTEREST RESERVE

Section 24.1.  **Initial Advance**.  (a) Lender shall advance on the date hereof the Initial Advance, which Loan proceeds shall be applied as follows: (i) $22,093,376.92 to pay a portion of the purchase price to acquire the Property from the Seller and related closing costs, and (ii) $15,406,623.08 ("**PDC Deposit**") shall be deposited into an interest bearing accounts held by Lender (the "**PDC Account**") to pay the Predevelopment Costs (as defined herein) in accordance with the Project Budget.  Lender shall make disbursements from the PDC Account,

subject to the terms and conditions hereof, for costs incurred (the "**Predevelopment Costs**") in connection with the predevelopment services relating to the Construction Project ("**Predevelopment Services**"), all as itemized in the Predevelopment Budget attached hereto as Exhibit B which has been approved by Lender (the "**Predevelopment Budget**") upon written request of Borrower. Lender shall not be obligated to make disbursements in an amount of less than $50,000.00 or more frequently than once every thirty (30) days.

(b)    Borrower shall perform the Predevelopment Services for which funds are allocated under Predevelopment Budget.

Section 24.2.    **Disbursements from the PDC Account**

(a)    Each request by Borrower to Lender for a disbursement from the PDC Account shall be in substantially the form attached hereto as Exhibit G and shall be reasonably satisfactory in all respects to Lender and Servicer and shall in each case be signed by a duly authorized representative of Borrower (any such request being hereinafter referred to as a "**Request for Disbursement**"). Each Request for Disbursement shall be delivered to Lender not less than seven (7) Business Days prior to the date upon which a disbursement from the PDC Account is requested. Each Request for Disbursement shall be based upon the Predevelopment Budget and shall include copies of bills, invoices, lien waivers, if appropriate, and such other information and documents as may be reasonably requested or required by Lender or Servicer or Construction Consultant. All requests and requisitions for payment shall be approved by Borrower and recommended for payment by Construction Consultant, if any. Each disbursement from the PDC Account shall be paid to Borrower. Lender shall not be obligated to make aggregate disbursements from the PDC Account in excess of the PDC Deposit, and any interest earned thereon. Lender shall not be obligated to make any disbursement from the PDC Account unless Lender is satisfied, in its reasonable discretion, that the conditions precedent to the making of such advance as set forth in Section 24.3 of this Agreement, have been satisfied by Borrower. Anything in this Agreement or any other agreement made with respect to the Loan to the contrary notwithstanding, any disbursement from the PDC Account or approval or acceptance given by Lender or Construction Consultant, herein or therein, shall not be deemed to be an approval or acceptance by Lender or Construction Consultant of any work performed thereon or approval or acceptance by Lender or Construction Consultant of any work or materials done or furnished with respect thereto or a representation by Lender or Construction Consultant as to the fitness of such work or materials.

(b)    Disbursements from the PDC Account shall be made for the payment of Predevelopment Costs in accordance with the Predevelopment Budget.

(c)    Notwithstanding anything to the contrary contained herein, Lender shall not be obligated to make any disbursement from the PDC Account to Borrower if, in the reasonable opinion of Lender after consultation with Borrower, it is determined by Lender that the balance of the PDF Account yet to be disbursed by Lender pursuant to this Agreement is at any time less (the amount by which it is less being hereinafter referred to as the "**PDC Deficiency**") than the actual sum, as estimated by Lender, which will be required to pay all Predevelopment Costs. Borrower shall, within thirty (30) days after being notified by Lender that there is or will be a PDC Deficiency, deposit with Lender an amount sufficient to eliminate the PDC Deficiency. Any amounts deposited by Borrower with Lender pursuant to the

preceding sentence of this paragraph to cover a PDC Deficiency shall be deposited in an interest bearing account and disbursed by Lender to Borrower prior to any disbursements hereunder and shall be applied by Borrower to cover the payment of Predevelopment Costs and until so disbursed shall be held by Lender. If an Event of Default shall occur and be continuing, Lender, in addition to all other rights which it may have, shall have the absolute and unconditional right in its discretion to apply the undisbursed balance of any PDC Deficiency deposit and any funds remaining from the PDC Deposit, in each case, with any interest thereon, in whole or in part to the payment of the Debt in such order, priority and proportion as Lender in its sole and absolute discretion deems to be appropriate.

Section 24.3. **Additional Covenants of Borrower**. Borrower shall comply with each of the following terms and conditions:

(a)     Borrower shall furnish to Lender from time to time (but not less frequently than as required pursuant to Section 5.12 of this Agreement) (i) current financial statements of Borrower, (ii) information as to Borrower's financial condition, (iii) the names of all persons with whom Borrower, or any other party on behalf of Borrower, has contracted or intends to contract for Predevelopment Services, (iv) a list of all unpaid bills for Predevelopment Services, (v) budgets of Borrower showing estimated Predevelopment Costs and other costs and expenses to be incurred in connection with the Predevelopment Services, (vi) receipted bills or other evidences of payment of all Predevelopment Costs and other costs and expenses incurred in connection with Predevelopment Services, and (vii) such other information relating to Borrower, the Property, the Construction Project, any Pledgors, Guarantor or Indemnitors, any proposed purchaser or other person or party connected with Borrower, the Loan, the Predevelopment Services or any collateral for the Loan or other source of repayment of the Loan, as Lender may reasonably request.

(b)     Borrower shall pay when due all Predevelopment Costs and other costs and expenses incurred by Borrower in connection with Predevelopment Services.

(c)     Borrower shall pay all fees and charges incurred in connection with the PDC Account and the disbursements therefrom, including reasonable attorneys' fees incurred by Lender, inspection and site visits by Servicer, and fees and expenses of Construction Consultant.

(d)     Subject to the terms of this Agreement, including, without limitation, the satisfaction of each and every condition set forth in this Article XXIV, Lender shall disburse from the PDC Account an amount equal to one hundred percent (100%) of the amount contained in any Request for Disbursement approved by Lender.

(e)     Each Request for Disbursement may, at the option of Lender or Servicer, be required to be accompanied by a certificate or report of Construction Consultant or such other party selected by Lender or Servicer to Lender based, should Lender so require, upon a review of the Predevelopment Services rendered prior to the date of such Request for Disbursement, in which such party shall in substance (i) verify that the Predevelopment Services have been performed substantially in accordance with their respective Predevelopment Services Contracts, and (ii) state its estimate of (A) the percentage of Predevelopment Services rendered as of the date of such review, (B) Predevelopment Costs actually incurred for Predevelopment

Services rendered as of the date of such review, (C) the sum necessary to complete performance of all Predevelopment Services in accordance with their respective Predevelopment Services Contracts, and (D) the amount of time from the date of such review which will be required to complete performance of all Predevelopment Services in accordance with their respective Predevelopment Services Contracts.

(f)     Prior to each disbursement from the PDC Account pursuant to this Agreement, Borrower shall, upon request of Lender, furnish Lender with evidence satisfactory to Lender, showing payment of all bills and charges for which disbursements for Predevelopment Costs have been previously made pursuant to this Agreement.  Borrower shall also deliver to Lender, upon request, such bills, receipts, invoices and other evidence as may be reasonably required by Lender to substantiate the actual incurrence by Borrower of Predevelopment Costs.

(g)     Borrower shall, if required by Lender, deliver to Lender a written statement executed by each provider of Predevelopment Services certifying that each such provider has received payment of all monies owed to each such provider by the Borrower to the date of the Request for Disbursement.

(h)     Lender and Construction Consultant shall be of the opinion that all Predevelopment Services can be performed prior to the CPL Closing Date.

(i)     Borrower shall (to the extent required by Lender) have delivered to Lender and Construction Consultant copies of all of the Predevelopment Services Contracts now or hereafter entered into, each of which Predevelopment Services Contracts shall be in form and substance reasonably satisfactory in all respects to Lender.

(j)     Borrower shall observe and perform all of the terms, covenants and conditions of the Predevelopment Services Contracts on Borrower's part to be observed or performed.

(k)     Lender shall not be obligated to make any disbursement from the PDC Account with respect to any provider of Predevelopment Services unless such provider is providing such Predevelopment Services under a signed contract or purchase order and further provided such provider is not an Affiliate of any Borrower, Pledgor or Guarantor or an Affiliate of any of their members, partners or shareholders except with respect to expenses and overhead charges actually incurred by any such affiliated party which may be approved or denied by Lender in its sole and absolute discretion.

(l)     No Event of Default shall have occurred and be continuing under any of the Loan Documents.

## ARTICLE XXV

## ADDITIONAL LOAN ADVANCE

Section 25.1.  **Intentionally Omitted**

Section 25.2.  **Additional Loan Funding**.  (a) Notwithstanding anything to the contrary contained in this Agreement or any other Loan Document, Lender may in its sole and

absolute discretion agree to make (but shall have no obligation to make) Loan advances in addition to the Initial Loan, the First Extension Fee, the Second Extension Fee, and any amounts necessary to fund the Interest Reserve Account, in an amount not to exceed $18,835,037.00 (the "**Additional Loan Advances**"). In the event Lender elects, in its sole and absolute discretion, to make any portion or all of the Additional Loan Advances, Lender may require that any or all of the following conditions, and any other conditions required by Lender, have been satisfied as a condition precedent to making any such Additional Loan Advances (the "**Additional Loan Advances Conditions Precedent**"):

(i)    Lender shall have approved the Plans and Specifications for the Construction Project;

(ii)    Lender shall have approved the Project Budget for the Construction Project;

(iii)    Lender shall have approved the Minimum Sales Price for the Condominium Units;

(iv)    any pre-sale requirements of the Construction Project Lender shall have been satisfied;

(v)    Lender shall have approved the Construction Project Loan Commitment and the Construction Project Lender;

(vi)    the Architect's Agreements, the General Contractor's Agreements and the Major Subcontracts must be executed;

(vii)    all Permits, Predevelopment Entitlements and Entitlements for the development of the Construction Project shall have been obtained and shall be in full force and effect and any conditions with respect thereto must be acceptable to Lender;

(viii)    The General Contractor shall have delivered 100% payment and performance bonds with respect to the Construction Project, which payment and performance bonds shall be in amounts, form and substance and issued by companies satisfactory to Lender, shall name Lender as dual obligee, subject to the rights of the Construction Project Lender under the Construction Project Loan Documents, and shall be fully paid;

(ix)    An intercreditor agreement between Construction Project Lender and Lender must have been executed which (1) provides Lender with (A) notice and cure periods with respect to all defaults under the Construction Project Loan, (B) the right to commence an enforcement action against the collateral securing the Loan without causing a default under the Construction Project Loan, and (C) the right to become the borrower under the Construction Project Loan, and (2) contains such other terms and conditions as are acceptable to Lender (the "**Intercreditor Agreement**");

(x)    Lender shall have received the ADA Indemnity Agreement executed by Mezzanine Borrower and Principal, in a form acceptable to Lender;

(xi)    Borrower shall have executed and delivered all certificates, authorizations, and agreements as reasonably required by Lender;

(xii)    Lender, Construction Project Lender and Subordinate Lender have entered into a Tri-Party Agreement which provides for the subordination of Seller's right to the payment of the Subordinate Loan and the obligations evidenced by the Subordinate Lon Documents to the Loan and the Loan Documents and the Construction Project Loan and the Construction Project Loan Documents, and such other terms and conditions acceptable to Lender ("**Tri-Party Agreement**");

(xiii)    Borrower, at its sole cost and expense, shall have obtained and delivered to Lender an Eagle 9 UCC Insurance Policy insuring Lender's interest in the Pledged Interests under the Pledge Agreements;

(xiv)    Borrower, at its sole cost and expense, but only if the Security Instrument is not released or terminated, shall have the amount of title insurance insuring Lender's mortgage lien increased to an amount equal to the sum of the Initial Advance, the Interest Reserve Advance, a First Extension Interest Reserve Advance, a Second Extension Interest Reserve Advance and the maximum amount of the Additional Loan Advances and otherwise in form and substance acceptable to Lender;

(xv)    Lender shall have received the Completion Guaranty duly executed by the Principal in which Principal guarantees lien free completion of the Construction Project by the Completion Date;

(xvi)    Lender shall have received such Uniform Commercial Code, bankruptcy, judgment, federal tax lien, and other searches of public records as Lender may reasonably require with respect to the Mezzanine Borrower and the Pledgors and the results of such searches shall be satisfactory to Lender;

(xvii)    Lender shall have received and approved all of the Construction Project Loan Documents and the Construction Project Loan shall close and there shall be no unfulfilled requirements to Owner's ability to receive the Construction Project Loan proceeds;

(xviii)    Lender shall have received evidence satisfactory to it that all accounts (however denominated) to be established under the Construction Project Loan Documents, and an amount equal to all funds to be deposited on the date thereof therein, have been transferred and assigned to such accounts and such accounts shall be with a depositary approved by Lender;

(xix)    No Event of Default shall have occurred and be continuing under any of the Loan Documents and no default or event of default shall have occurred and be continuing under or any of the Construction Project Loan Documents;

(xx)    No notice of, or any other document or instrument creating, any federal tax lien or lien under Section 412 of the Code or Section 4068 of ERISA shall have been issued, recorded or filed with respect to the assets of the Owner, Mezzanine Borrower or the Guarantor;

(xxi)   HUD shall have approved the statement of record for the Property and issued an effective date to sell the Condominium Units;

(xxii)   The General Contractor for the Construction Project and the Architect shall have executed a Consent and Agreement of General Contractor and a Consent and Agreement of Architect, respectively, pursuant to which the General Contractor or Architect, as applicable, (a) agrees to perform its contract at no additional cost or expense for the benefit of Lender, its nominee or wholly owned subsidiary, except as otherwise provided in such Consent and Agreement of General Contractor or Consent and Agreement of Architect, as applicable, in the event Lender so elects upon a default under the Loan Documents or a foreclosure of the Pledge Agreements, and (b) grants to Lender certain notice and cure rights, which Consent and Agreement of General Contractor or Consent and Agreement of Architect, as applicable, shall be in a form and substance satisfactory to Lender;

(xxiii)   Lender shall have received an additional Loan fee in the amount equal to 2% of the Additional Loan; and

(xxiv)   Lender shall have received payment of all of its costs and expenses in connection with the Additional Loan Advances, including without limitation, attorney fees and costs.

(b)   Provided that no Event of Default has occurred and is continuing hereunder and that no event has occurred or condition exists which with the giving of notice, the passage of time or both, would constitute such an Event of Default hereunder and provided further that no default exists under the Note, the Security Instrument, the Pledge Agreements or any other Loan Document, and provided further that the Additional Loan Advances Conditions Precedent have been satisfied or will be satisfied on the CPL Closing Date to Lender's satisfaction, Lender agrees on the CPL Closing Date, Lender shall deliver to Borrower or the Construction Project Lender the following documents: (i) a subordination agreement, subordinating the Security Instrument and Lender's rights and remedies thereunder to the Construction Project Loan Documents, subject to the Intercreditor Agreement, or if the Construction Project Lender refuses to make a Construction Project Loan solely due to Lender not releasing or terminating the Security Instrument, then a release or termination of the Security Instrument releasing Lender's mortgage lien on the Property, provided however, that in either case, Borrower, at its sole cost and expense, shall have obtained and delivered to Lender (x) a title policy issued by an insurer acceptable to Lender, insuring the Owner's interest in the Property in an amount equal to sum of the outstanding balance of the Loan and the Construction Project Loan and containing (A) only such exceptions as shall be consented to by Lender and (B) all endorsements required by Lender, including, without limitation, a zoning endorsement and mezzanine endorsement, if available in the state where the Property is located and (y) Eagle 9 UCC Insurance Policy insuring Lender's interests in the Pledged Interests under the Pledge Agreements, (ii) an agreement subordinating Lender's rights under the Assignment of Leases and Rents to the rights of the Construction Project Lender in the Leases and Rents as set forth in the Construction Project Lender's agreement with respect thereto, or if requested by Construction Project Lender, a termination thereof, (iii) an agreement subordinating Lender's rights under the Assignment of Permits to the rights of the Construction Project Lender as set forth in the Construction Project Lender's agreement with respect thereto or, if requested by

Construction Project Lender, a termination thereof, and (iv) and UCC-3 Financing Statements amending or terminating, as the case may be, the UCC-1 Financing Statements naming Borrower as the Debtor filed in connection with the Security Instrument.

Section 25.3. **Additional Loan Advances**. If Lender elects in its sole and absolute discretion to make Additional Loan Advances, each request by Borrower to Lender for an Additional Loan Advance shall be in a form reasonably satisfactory in all respects to Lender and Servicer and shall in each case be signed by a duly authorized representative of Borrower (any such request being hereinafter referred to as a "**Request for Advance**", a copy of which is attached as Exhibit C). Each Request for Advance shall be delivered to Lender not less than seven (7) Business Days prior to the date upon which an Additional Loan Advance is requested. Lender may require that each Request for an Advance be based upon the Project Budget and include copies of bills, invoices, lien waivers, if appropriate, and such other information and documents as may be reasonably requested or required by Lender or Servicer or Construction Consultant. All requests and requisitions for payment shall be approved by Borrower, and recommended for payment by Construction Consultant, if any. Lender shall not be obligated to make any Additional Loan Advances. Anything in this Agreement or any other agreement made with respect to the Loan to the contrary notwithstanding, any Additional Loan Advances or approval or acceptance given by Lender or Construction Consultant, herein or therein, shall not be deemed to be an approval or acceptance by Lender or Construction Consultant of any work performed thereon or approval or acceptance by Lender or Construction Consultant of any work or materials done or furnished with respect thereto or a representation by Lender or Construction Consultant as to the fitness of such work or materials.

Section 25.4. **Termination of Loan Advances**. Notwithstanding anything to the contrary contained in this Agreement, Lender shall (i) have no further obligation to make any advances of the Initial Loan following an Event of Default hereunder or under any of the other Loan Documents, or (ii) have no obligation to make any advance of the Additional Loan Advances unless Lender in its sole and absolute discretion has agreed to fund Loan proceeds constituting Additional Loan Advances and provided further that no Event of Default exists hereunder or under any of the other Loan Documents.

Section 25.5. **Additional Conditions to Additional Loan Advances**.

(a)     The Equity Requirement shall remain invested in the Property until such time as the Loan, together with all interest thereon and other sums due with respect thereto, have been paid in full.

(b)     Each Request for Advance may, at the option of Lender or Servicer, be required to be accompanied by a certificate or report of Construction Consultant or such other party selected by Lender or Servicer to Lender based, should Lender so require, upon a review of the services rendered prior to the date of such Request for Advance, in which such party shall in substance (i) verify that such services have been performed substantially in accordance with the applicable Plans and Specifications, and (ii) state its estimate of (A) the percentage of the Project Costs rendered as of the date of such review, (B) the cost of the Project Costs actually incurred as of the date of such review, (C) the sum necessary to complete performance of the Construction Project in accordance with the applicable Plans and Specifications, and (D) the amount of time from the date of such review which will be required

to complete performance of the Project Costs in accordance with the applicable Plans and Specifications.

(c)     Prior to each advance of the Loan, including the Interest Reserve Advance, the First Extension Interest Reserve Advance, the Second Extension Interest Reserve Loan Advance, the First Extension Fee, the Second Extension Fee or any other Additional Loan Advances, the Title Company shall have issued a written continuation of title showing title to the Property to be vested in Owner or and no exceptions to the title of the Property other than those exceptions previously approved by Lender in writing.

(d)     In the event the Security Instrument has not been terminated or released, prior to the First Extension Interest Reserve Advance, the Second Extension Interest Reserve Loan Advance, the First Extension Fee, the Second Extension Fee, or any other Additional Loan Advances, Borrower shall have delivered, at its sole cost and expense, to Lender, a new lender's title policy issued by an insurer acceptable to Lender or endorsement to the Lender's Title Policy for total coverage of an amount equal to the sum of (A) the then outstanding principal balance of the Loan and (B) the amount of Loan proceeds to be advanced by Lender.

Section 25.6.   **Additional Covenants of Borrower**.  Borrower shall comply with each of the following terms and conditions:

(a)     Borrower shall furnish to Lender from time to time (but not less frequently than as required pursuant to Section 5.12 of this Agreement) (i) current financial statements of Borrower, (ii) information as to Borrower's financial condition, (iii) the names of all persons with whom Borrower, the General Contractor or other parties pursuant to the General Contractor's Agreement has contracted or intends to contract for the construction of the Construction Project or the furnishing of labor or materials in connection therewith, (iv) a list of all unpaid bills for labor and materials with respect to construction of the Construction Project, as applicable, (v) budgets of Borrower showing estimated Project Costs, (vi) lien waivers, receipted bills or other evidences of payment of all Project Costs, and (vii) such other information relating to Borrower, the Property, any Pledgor, any Guarantor or any Indemnitor, or other person or party connected with Borrower, the Loan, the Construction Project or any collateral for the Loan or other source of repayment of the Loan, as Lender may reasonably request.

(b)     Subject to the provisions of Section 5.4 and Section 6.4 hereof, Borrower shall proceed immediately if the Construction Project is partially or totally damaged or destroyed by fire or other casualty with the repair and restoration thereof and shall diligently prosecute the work of repair and restoration to completion, it being agreed that if such casualty is covered by fire or other casualty insurance, Borrower's obligation to proceed with such repair and restoration shall be contingent upon Lender disbursing to Borrower the proceeds of such insurance to pay the cost of such repair and restoration pursuant to Section 6.4 of this Agreement. If Lender agrees to disburse insurance proceeds for such repair and restoration, such insurance proceeds shall be disbursed on the basis of certifications of the Construction Consultant as to costs incurred by Borrower for work in place as part of such repair and restoration and otherwise on terms and conditions satisfactory in all respects to Lender.

(c)     Borrower shall pay all fees and charges incurred in the procuring and making of the Loan and every advance thereof, including, without limitation, reasonable attorneys' fees incurred by Lender, inspection and site visits by Servicer, fees and expenses of Construction Consultant, appraisal fees, and fees and expenses relating to examination of title, title insurance premiums, surveys, and mortgage recording, documentary, transfer or other similar taxes and revenue stamps.

(d)     Borrower shall not assign this Agreement or the moneys to be advanced and disbursed hereunder or convey, assign, pledge, encumber or mortgage any part of the Property without the prior consent of Lender, except as expressly provided herein.

(e)     Borrower shall deliver to Lender, Servicer and Construction Consultant copies of all of the Major Subcontracts now or hereafter entered into.  After the General Contractor's Agreement is executed, Lender shall have the same rights to approve or disapprove a Major Subcontract as Borrower has under said General Contractor's Agreement. Borrower hereby assigns to Lender as additional security for the payment of the Debt and the observance and performance by Borrower of the terms, covenants and provisions of the Loan Documents, all right, title and interest which Borrower may now have or may hereafter acquire in and to the Major Subcontracts.  Borrower shall not agree to any modification or to any termination of any Major Subcontracts without the express prior written consent of Lender; provided, however, that no consent shall be required for any change order, provided that (i) such changes do not alter the basic layout of the Property or change in any material respect the quality or quantity of furnishings used with respect to the Construction Project, (ii) the amount of such change order does not increase the total amount of such contract by more than $175,000.00, (iii) the aggregate amount of all change orders, do not exceed $1,750,000.00 in the aggregate inclusive of the change order being requested, and (iv) the contract is not an Affiliate Transaction (the "**Permitted Change Order**").

(f)     Borrower hereby assigns to Lender as additional security for the payment of the Debt and the observance and performance by Borrower of the terms, covenants and provisions of the Loan Documents all right, title and interest which Borrower may now have or may hereafter acquire in and to the subcontracts.  Borrower shall not agree to any modification or to any termination thereof without the express prior written consent of Lender.

(g)     Borrower shall retain Architect and shall deliver to Lender, Servicer and Construction Consultant fully executed copies of the Architect's Agreements and such other information regarding Architect as Lender and/or Construction Consultant may request. Borrower shall not enter any Architect Agreement for the Construction Project or any portion thereof without having first obtained Lender's approval of said agreement(s).  Borrower shall not agree to any assignment, modification or termination of the Architect's Agreements, without the express prior written consent of Lender, which consent shall not be unreasonably withheld.  Borrower shall deliver to Lender an Assignment and Consent of Architect at the time Owner enters into the Architect's Agreement, if such execution is prior to the CPL Closing Date, otherwise Borrower shall deliver to Lender the Consent and Agreement of Architect in the form required hereunder, at the time Owner executes and delivers the Architect's Agreement.

(h)     Borrower shall observe and perform all of the terms, covenants and conditions of the Architect's Agreements, the General Contractor's Agreements and the Major Subcontracts on Borrower's part to be observed or performed.

(i)     Borrower shall pay when due all costs Project Costs and expenses incurred by Borrower in connection with the Construction Project pursuant to the provisions of this Agreement. Notwithstanding the foregoing, Borrower shall not make any final payment to any contractors, subcontractors and materialmen under Major Subcontracts and other subcontracts (the "**Subcontractors**") until such time as each of the following conditions has been met:

(i)     such Subcontractor has fully performed its contract with Borrower, except for such Subcontractor's responsibility to correct any work, and to satisfy any other requirements which extend beyond final payment;

(ii)     a final certificate of payment has been issued by the Architect and has been approved by Construction Consultant;

(iii)     all governmental and regulatory agencies shall have issued their written approvals of completion of the work done pursuant to such Subcontractor's contract; and

(iv)     such Subcontractor presents to Borrower (i) full and final lien waivers, in a form satisfactory to Lender, and (ii) executed affidavits of payment of debts and claims contemporaneously with such Subcontractor's receipt of final payment or performance bonds, such Subcontractor presents to Borrower a consent of final payment from such surety.

Notwithstanding the foregoing, Borrower shall not make any payments to any Subcontractors until such time as Lender shall have approved such payments.

(j)     Each General Contractor's Agreement shall require (A) each contractor, subcontractor and materialman engaged in the construction of the Construction Project, as applicable, to deliver (x) a conditional lien waiver with respect to each draw request for which monies are due to such contractor, subcontractor or materialman, and (y) an unconditional lien waiver with respect to all previous draw requests certifying that each such contractor, subcontractor and materialman has received payment of all monies owed to each such contractor, subcontractor and materialman for all previous draw requests, and (B) the General Contractor to deliver to Borrower and Lender with each draw request a written statement executed by the General Contractor certifying that (x) the General Contractor and each contractor, subcontractor and materialman has received payment for all monies owed for all previous draw requests, and (y) a conditional lien waiver with respect to the draw request in question.

(k)     Borrower shall make available to Lender and Construction Consultant if any, upon request, all shop and related drawings used in connection with the Plans and Specifications which have been approved by Lender and the construction of the Construction Project at the office and location where the same are kept.

(l)    All contractors, subcontractors or materialmen providing work or materials with respect to the Construction Project shall provide such work or materials under a signed contract or purchase order and such contractor subcontractor or materialmen shall not be an Affiliate of any of Borrower, Pledgors or Guarantors or an Affiliate of any of their members, partners or shareholders.

(m)    The Equity Requirement shall remain invested in the Property until the Debt is paid in full.

## ARTICLE XXVI

### INTEREST RESERVE, EXTENSION FEES, SERVICER FEE

Section 26.1.  **Interest Reserve Account**.  (a) Lender shall make an additional advance of up to $10,125,000.00 to fund the Interest Reserve Account (the "**Interest Reserve Advance**") in the event the Loan is sold and such holder or holders of the Loan elects in writing (the "**Triggering Event**") to require Borrower to pay current (whether or not sufficient Available Cash Flow (as defined in the Note) is available) interest accruing on the outstanding principal balance of the Loan in an amount equal to interest at nine percent (9%) percent per annum on the outstanding principal balance of the Loan for such month ("**Minimum Monthly Interest Amount**").    Borrower hereby irrevocably authorizes Lender upon the occurrence of the Triggering Event to advance Loan proceeds in an amount of up to $10,125,000.00 for deposit into an escrow account held by Lender or Lender's agent or Servicer ("**Interest Reserve Account**"), which account and the funds therein shall be pledged to Lender as additional security for the Loan.    In the event there is insufficient cash in the Interest Reserve Account and from Available Cash Flow to pay the Minimum Monthly Interest Amount, Borrower shall make payment to the holder or holders of the Loan of any such shortfall amount from Borrower equity in accordance with the terms of the Note and failure to make such payment shall be an Event of Default hereunder.    Borrower agrees to promptly execute and deliver to Lender any documents or instruments reasonably required by Lender to evidence or secure its pledge of such account and the funds deposited therein.    The $10,125,000.00 Interest Reserve Advance shall only be used to fund the Interest Reserve Account and if any or all of the $10,125,000.00 is not advanced to fund the Interest Reserve Account (the "**Unfunded Amount**"), Lender shall have no obligation to fund the Unfunded Amount; it being agreed that the Interest Reserve Advance is only to be used to fund the Interest Reserve Account.

(b)    In the event Borrower effectively exercises the First Extension Option (as defined in the Note) in accordance with the terms of the Note and the Triggering Event has occurred and Lender has funded the Interest Reserve Advance, Borrower hereby irrevocably authorizes Lender, upon the occurrence of a "Minimum Monthly Interest Amount First Extension Deficiency", to advance Loan proceeds in an amount of up to $2,250,281.00 for deposit into the Interest Reserve Account (the "**First Extension Interest Reserve Advance**") for payment of the Minimum Monthly Interest Amounts due during the First Extension Period.  In the event there is insufficient cash in the Interest Reserve Account and from available Cash Flow to pay the Minimum Monthly Interest Amount during the First Extension Period, Borrower shall make such payment to the holder or holders of the Loan of any such shortfall amount from Borrower equity in accordance with the terms of the Note and failure to make such payment shall be an Event of Default hereunder.  The First Extension Interest Reserve Advance shall only be

used to fund the Interest Reserve Account and if any or all of the $2,250,281.00 is not advanced to fund the Interest Reserve Account (the "**First Extension Unfunded Amount**"), Lender shall have no obligation to fund the First Extension Unfunded Amount; it being agreed that the First Extension Interest Reserve Advance is only to be used to fund the Interest Reserve Account. For purposes hereof, "**Minimum Monthly Interest Amount First Extension Deficiency**" shall mean if the balance in the Interest Reserve Account on the first day of the First Extension Period is less than the amount Lender determines will be necessary to pay the Minimum Monthly Interest Amounts during the First Extension Period.

(c)    In the event Borrower effectively exceeds the Second Extension Option (as defined in the Note) in accordance with the terms of the Note and the Triggering Event has occurred and Lender has funded the First Extension Interest Reserve Advance, Borrower hereby irrevocably authorizes Lender upon the occurrence of a "**Minimum Monthly Interest Amount Second Extension Deficiency**" to advance Loan proceeds in an amount of up to $2,610,214.00 for deposit into the Interest Reserve Account (the "**Second Extension Interest Reserve Advance**") for payment of the Minimum Monthly Interest Amounts due during the Second Extension Period. In the event there is insufficient cash in the Interest Reserve Account and from available Cash Flow to pay the Minimum Monthly Interest Amount during the Second Extension Period, Borrower shall make such payment to the holder or holders of the Loan of any such shortfall amount from Borrower equity in accordance with the terms of the Note and failure to make such payment shall be an Event of Default hereunder. The Second Extension Interest Reserve Advance shall only be used to fund the Interest Reserve Account and if any or all of the $2,610,214.00 is not advanced to fund the Interest Reserve Account (the "**Second Extension Unfunded Amount**"), Lender shall have no obligation to fund the Second Extension Unfunded Amount; it being agreed that the Second Extension Interest Reserve Advance is only to be used to fund the Interest Reserve Account. For purposes hereof, "Minimum Monthly Interest Amount Second Extension Deficiency" means if the amount in the Interest Reserve Account on the first day of the Second Extension Period is less than the amount Lender determines will be necessary to pay the Minimum Monthly Interest Amounts during the Second Extension Period.

(d)    In the event Lender makes an Interest Reserve Advance, a First Extension Interest Reserve Advance, a Second Extension Interest Reserve Advance, then on the Maturity Date, provided no Event of Default exists, Lender shall calculate the Overpayment (as defined in and in accordance with the Note), if any, and apply such Overpayment, if any, subject to, and in accordance with, the terms of the Note.

Section 26.2.    **Extension Fees**.  In the event Borrower effectively exercises the First Extension Option in accordance with the terms of the Note, Borrower hereby irrevocably authorizes Lender to advance the First Extension Fee and to pay such First Extension Fee to Lender. In the event Borrower effectively exercises the Second Extension Option in accordance with the terms of the Note, Borrower hereby authorizes Lender to advance the Second Extension Fee and to pay to Lender the Second Extension Fee. No loan commitment fee or Additional Fee shall be due to Lender in connection with the Interest Reserve Advance, the First Extension Interest Reserve Advance, the Second Extension Interest Reserve Advance, the First Extension Fee or the Second Extension Fee.

Section 26.3.    **Servicer Fee**.  Borrower hereby agrees to pay the Servicer Fee to Servicer in accordance with the terms of the Note.

**[Remainder of Page Intentionally Left Blank, Signatures to Follow]**

**(Signature page for the Loan Agreement)**

        **IN WITNESS WHEREOF**, the undersigned have duly executed this Agreement as of the date first set forth above.

**BORROWER:**

**THE TOWERS-LAS VEGAS, LLC,**
a Nevada limited liability company

By:    The Towers-LV, LLC,
       a Delaware limited liability company,
       its sole member

       By:    The Towers-LV Member, LLC,
            a Delaware limited liability company, its sole
            member

            By:  The Towers-LV, Inc.,
                a Delaware corporation, its sole member

            By: _____
               Name:  Christopher DelGuidice
               Title:  President

**THE TOWERS-LV, LLC,**
a Delaware limited liability company

By:    The Towers-LV Member, LLC,
       a Delaware limited liability company, its sole
       member

       By:    The Towers-LV, Inc.,
            a Delaware corporation, its sole member

       By: _____
           Name:  Christopher DelGuidice
           Title:  President

**LENDER:**

**LEHMAN BROTHERS HOLDINGS INC.**

By: _____
    Name:
    Title:  Authorized Signatory

**[SIGNATURES CONTINUED ON NEXT PAGE]**

**(Signature page for the Loan Agreement)**

**IN WITNESS WHEREOF**, the undersigned have duly executed this Agreement as of the date first set forth above.

**BORROWER:**

**THE TOWERS-LAS VEGAS, LLC,**
a Nevada limited liability company

By:    The Towers-LV, LLC,
      a Delaware limited liability company,
      its sole member

      By:    The Towers-LV Member, LLC,
            a Delaware limited liability company, its sole member

            By:    The Towers-LV, Inc.,
                  a Delaware corporation, its sole member

                  By:_____
                      Name:  Christopher DelGuidice
                      Title:  President

**THE TOWERS-LV, LLC,**
a Delaware limited liability company

By:    The Towers-LV Member, LLC,
      a Delaware limited liability company, its sole member

      By:    The Towers-LV, Inc.,
            a Delaware corporation, its sole member

            By:_____
                Name:  Christopher DelGuidice
                Title:   President

**LENDER:**

**LEHMAN BROTHERS HOLDINGS INC.**

By:_____
Name:  _Chris McKenna_
Title:  Authorized Signatory

**[SIGNATURES CONTINUED ON NEXT PAGE]**

**(Signature page for the Loan Agreement - Continued)**

The undersigned, while not liable to Lender
for payment of the Debt, are signing this
Agreement to acknowledge their agreement
to the terms hereof:

**PLEDGORS:**

**THE TOWERS – LV MEMBER, LLC,**
a Delaware limited liability company

By:    The Towers-LV, Inc.,
       a Delaware corporation, its sole member

By: _____
       Name:    Christopher DelGuidice
       Title:     President


**THE TOWERS - LV, INC.,**
a Delaware corporation

By: _____
     Name:  Christopher DelGuidice
     Title:   President


**[SIGNATURES CONTINUED ON NEXT PAGE]**

**(Signature page for the Loan Agreement - Continued)**

The undersigned, while not directly liable to Lender for payment of the Debt except as specifically set forth in the Guaranty or the Environmental Indemnity, are signing this Agreement to acknowledge their agreement to the terms hereof:

**INDEMNITOR/GUARANTOR:**

**CHRISTOPHER DELGUIDICE**, individually

**[END OF SIGNATURE PAGE]**

## EXHIBIT A

## LEGAL DESCRIPTION

File No.: **02103684**

### EXHIBIT "A"

All that certain real property situated in the County of Clark, State of Nevada, described as follows:

A portion of land lying within the Northeast Quarter (NE ¼) of the Northeast Quarter (NE ¼) of Section 19, Township 21 South, Range 61 East, M.D.M., Clark County, Nevada, more particularily described as follows:

Commencing at the Section corner common to Sections 17, 18, 19 and 20 in said Township 21 South, Range 61 East, M.D.M., also being on the centerline of Valley View Boulevard;
Thence South 01°29'27" East, along said Section line and the centerline of Valley View Boulevard, a distance of 94.35 feet;
Thence South 88°30'33" West, a distance of 50.00 feet to the West right-of-way line of Valley View Boulevard and the **Point of Beginning**;
Thence South 01°29'27" East, along said West right-of-way line, a distance of 566.56 feet to the North right-of-way line of Nevso Drive;
Thence the next three courses along said North right-of-way line: South 89°25'32" West, a distance of 425.89 feet;
Thence North 84°00'55" West, a distance of 201.31 feet;
Thence North 00°34'28" West, a distance of 7.00 feet to the beginning of a non-tangent curve, concave Northeasterly, having a radius of 15.00 feet and a central angle of 89°14'49" and having at said point a radial line which bears South 00°34'28" East;
Thence Northwesterly along the arc of said curve to the right, a distance of 23.36 feet, to a point of tangency, also the East right-of-way line of Hugh Heffner Drive;
Thence North 01°19'39" West, along said East right-of-way line, a distance of 530.45 feet
Thence North 01°32'06" East, a distance of 20.16 feet to the beginning of a non-tangent curve, concave Southeasterly, having a radius of 24.00 feet and a central angle of 91°28'46" and having at said point a radial line which bears South 89°12'51" West;
Thence Northeasterly along the arc of said curve to the right, a distance of 38.32 feet, to a point of tangency, also the South right-of-way line of Flamingo Road;
Thence North 89°25'20" East, along said South right-of-way line, a distance of 559.53 feet to the beginning of a curve, concave Southwesterly, having a radius of 54.00 feet and a central angle of 89°05'13";
Thence Southeasterly along the arc of said curve to the right, a distance of 83.96 feet, to the **Point of Beginning**.

ALTA Owner's Policy (10-17-92)

File No.: **02103684**

## EXHIBIT "A" Continued

More commonly known as 3821 West Flamingo Road, Las Vegas, Nevada 89103

Assessors Parcel No.: 162-19-502-002

Assessor's Parcel Number:  **162-19-502-002**

# EXHIBIT B

## PREDEVELOPMENT BUDGET

**Towers IV -542 Ultra Luxury High Rise Condos in Las Vegas**
**Pre Development Costs through Dec 2007**

| | Initial Drawdown | Future Interest | Budget Total | Amt Cost to Date | Projected Future Draws | Closing Statement |
|---|---|---|---|---|---|---|
| Prelim Arch / Eng Fees / Testing / Studies | $ 30,000 | $ 120,000 | $ 150,000 | $ 30,000 | $ 120,000 | |
| Construction Management [Del American] | $ 35,815 | $ 214,185 | $ 250,000 | $ 35,815 | $ 214,185 | | scot gets charged in here |
| RE Taxes and Insurance [ 12 months] | $ 39,221 | $ 340,779 | $ 380,000 | $ - | $ 380,000 | $ 39,220.70 |
| Legal Zoning and Approvals | $ 108,910 | $ 31,090 | $ 140,000 | $ 108,910 | $ 31,090 | |
| Appraisals / Market Studies | $ 12,500 | $ - | $ 12,500 | $ 12,500 | $ - | |
| Organizational Costs | $ - | $ 5,000 | $ 5,000 | $ - | $ 5,000 | |
| Administration | $ 10,032 | $ 14,968 | $ 25,000 | $ 10,032 | $ 14,968 | |
| Travel and Entertainment | $ 141,623 | $ 158,377 | $ 300,000 | $ 141,623 | $ 158,377 | |
| Lehman Mezzanine Loan Interest [ $37.5 mil at 10% for 12 months ] | $ - | $ - | $ 3,750,000 | $ - | $ 3,750,000 | |
| Lehman Legal / Borrower legal / Opinions | $ 353,000 | $ 47,000 | $ 400,000 | $ 75,000 | $ 325,000 | $ 278,000.00 |
| Trimont / HUD Fees / Other / Title | $ 39,171 | $ 198,329 | $ 237,500 | $ 9,688 | $ 227,812 | $ 29,482.46 |
| Sub Total Pre Development Costs | $ 770,272 | $ 1,129,728 | $ 5,650,000 | $ 423,568 | $ 5,226,432 | $ 346,703.16 | On closing statement ( net of mis credits) |
| | | | | | | | $ 353,086.49 |
| Land Purchase / Base Price of Site [1] | $ 50,000,000 | $ - | $ 50,000,000 | $ 1,500,000 | $ 48,500,000 | | $ 6,383 |
| Lehman Mezz Loan Fee @ 2% [1] | $ 750,000 | $ - | $ 750,000 | $ - | $ 750,000 | $ 750,000 | To Lehman | $ 346,703.16 |
| Loan and Due Diligence Fees to Lending Institutions [1] | $ 50,000 | $ 250,000 | $ 300,000 | $ 50,000 | $ 250,000 | |
| Marketing [1] | $ 110,702 | $ 1,639,298 | $ 1,750,000 | $ 110,702 | $ 1,639,298 | |
| Sales Gallery [1] | $ 858 | $ 999,142 | $ 1,000,000 | $ 858 | $ 999,142 | |
| Sales Team [1] | $ 26,546 | $ 648,454 | $ 675,000 | $ 26,546 | $ 648,454 | |
| General Legal / Condo Docs [1] | $ 19,922 | $ 180,078 | $ 200,000 | $ 19,922 | $ 180,078 | |
| Architecture / Engineering / Other Design | $ 854,709 | $ 5,520,291 | $ 6,375,000 | $ 854,709 | $ 5,520,291 | |
| Plan Review Fees [1] | $ - | $ 500,000 | $ 500,000 | $ - | $ 500,000 | |
| Pre Construction Services [CM&D] / Plans [1] | $ 193,170 | $ 1,056,830 | $ 1,250,000 | $ 193,170 | $ 1,056,830 | | CM & D goes here not in 2 |
| Mezzanine Brokerage Fee $500k max fee [1 ] | $ 500,000 | $ - | $ 500,000 | $ 500,000 | $ - | | need to draw these |
| Off Site Improvement Contribution [1] | $ 500,000 | $ - | $ 500,000 | $ 500,000 | $ - | | need to draw these |
| Land Brokerage Fee to Sanjurjo Company [1] | $ 300,000 | $ - | $ 300,000 | $ 300,000 | $ - | | need to draw these |
| Total Acquisition and Pre Development Costs | $ 54,076,179 | $ 11,923,821 | $ 69,750,000 | $ 4,479,475 | $ 65,270,525 | |
| Lehman Mezzanine Funding $37.5 mil plus interest accrual | $ 25,576,179 | $ 11,928,743 | $ 41,250,000 | $ - | $ 41,250,000 | |
| Sellers Subordinate Equity Note | $ 27,500,000 | $ - | $ 27,500,000 | $ - | $ 27,500,000 | |
| Del American Cash Equity | $ 1,000,000 | $ - | $ 1,000,000 | $ 4,479,475 | $ (3,479,475) | |
| Total Sources for Pre Development Costs through Nov, 2005 | $ 54,076,179 | $ 11,928,743 | $ 69,750,000 | $ 4,479,475 | $ 65,270,525 | |

Accrued during loan term
[1] The above Items are budgeted in each project but advance funding is necessary
Land Appraisal is $49,500,000

## <u>EXHIBIT C</u>

## REQUEST FOR ADVANCE



(No. _____)

THE TOWERS – LAS VEGAS, LLC, a Nevada limited liability company ("**Owner**") and THE TOWERS – LV, LLC, a Delaware limited liability company ("**Towers LLC**"), each having its place of business at 474 South North Lake Boulevard, Suite 1020, Altamonte Springs, Florida 32701 (collectively, the "**Borrower**"), is the borrower under a certain Loan Agreement (the "**Loan Agreement**") dated _____ __, 2004, entered into with Lehman Brothers Holdings Inc. ("**Lender**"). Borrower hereby certifies to and requests Lender as follows:

(a)    **Predevelopment Costs**. Attached hereto as <u>Schedule A</u> is a true and correct statement of the reimbursable costs of Predevelopment Costs incurred to date, the aggregate advances of the Loan previously made by Lender to Borrower for Predevelopment Costs, and the total advance of the Loan requested hereby for Predevelopment Costs.

(b)    **Request to Lender for Advance**.    Borrower hereby requests Lender to make an advance of the Loan in the amount of $[_____], not to exceed $18,835,037.00.

(c)    **Representations**.    Borrower hereby represents to Lender that (i) all costs for Predevelopment Costs set forth in previous Requests for Advance have been paid in full (ii) all costs for Predevelopment Costs incurred to date, as set forth in this Request for Advance, have been or will be paid in full out of the advance requested hereby, (iii) all of the representations and warranties of Borrower contained in the Loan Documents continue to be true and correct, and (iv) no default exists under the Loan Documents and no event has occurred which but for notice, or lapse of time, or both, would constitute a default under the Loan Documents.

(d)    All terms used in this Request for Advance shall have the meanings given to such terms in the Loan Agreement.

**[Remainder of Page Intentionally Blank; Signatures on Next Page]**

**[Signature Page to Request for Advance]**

**IN WITNESS WHEREOF,** the parties hereto have executed this Request for Advance as of the day and year first above written.

### BORROWER:

**THE TOWERS-LAS VEGAS, LLC,**
a Nevada limited liability company

By:    The Towers-LV, LLC,
       a Delaware limited liability company,
       its sole member

    By:    The Towers-LV Member, LLC,
          a Delaware limited liability company,
          its sole member

        By:  The Towers-LV, Inc.,
            a Delaware corporation, its sole
            member

            By:_____
               Name:  Christopher DelGuidice
               Title:  President

**THE TOWERS-LV, LLC,**
a Delaware limited liability company

By:    The Towers-LV Member, LLC,
       a Delaware limited liability company, its
       sole member

    By:    The Towers-LV, Inc.,
          a Delaware corporation, its sole
          member

        By:_____
           Name:  Christopher DelGuidice
           Title:  President

# SCHEDULE A

## (Statement of Site Work Costs)

**EXHIBIT D**

**TITLE COMPANY LETTER**

[Borrower's Letterhead]

_____ __, 200_

Nevada Title Company

_____

_____

Attention:_____

Re:    Unit No.
       Property:

Dear [_____]:

Reference is made to (a) that certain Loan Agreement dated [_____, 2004 (the "**Loan Agreement**") by and among Lehman Brothers Holdings Inc., doing business as Lehman Capital, a division of Lehman Brothers Holdings Inc. ("**Lender**") and **THE TOWERS – LAS VEGAS, LLC**, a Nevada limited liability company ("**Owner**") and **THE TOWERS – LV, LLC**, a Delaware limited liability company ("**Towers LLC**"), each having its place of business at 474 South North Lake Boulevard, Suite 1020, Altamonte Springs, Florida 32701 (collectively, the "**Original Borrower**"), which Loan Agreement was assumed by _____ ("**Borrower**"); and (b) the loan (the "**Construction Project Loan**") made pursuant to that certain Deed of Trust and Security Agreement, dated _____ (the "**Construction Project Mortgage**"), executed by Owner in favor of _____ ("**Construction Project Lender**"). Terms used but not defined herein shall have the meanings provided in the Loan Agreement.

The Construction Project Loan has been satisfied **[or will be fully satisfied with the sale of the captioned unit whereupon the lien evidenced by the Construction Project Mortgage shall be released.] [After the satisfaction of the Construction Project Loan, until further notice thereafter,]** you are hereby instructed to direct all net proceeds from the sale of the Condominium Unit along with certified copies of the closing statements to Trimont Real Estate Advisors, Inc. on behalf of Lender at Monarch Tower, Suite 2200, 3424 Peachtree Road, N.E., Atlanta, Georgia 30326, Attention: J. Gregory Winchester, within twenty-four (24) hours of your receipt of such aforementioned items. In no event shall you close any sale of any Unit for which proceeds from the sale of a particular Condominium Unit would be less than the Minimum Sales Price set forth for such Condominium Unit in Schedule A attached hereto without the prior written consent of Lender. The wiring instructions for Servicer are as follows:

Wachovia Bank, NA

Atlanta, GA
ABA # _____
Credit: Trimont Real Estate Advisors, Inc. on behalf of LBHI
Account # _____
Reference: _____

Thank you for your cooperation in this matter.

Yours truly,

**[BORROWER]**

By:_____
    Name:
    Title:


**ACCEPTED AND AGREED `TO:**

**NEVADA TITLE INSURANCE COMPANY**

By:_____
    Name:
    Title:
cc:   Mr. Gregory Winchester
      **[add address]**

## SCHEDULE A

### (Minimum Release Price)

# EXHIBIT E

## INTENTIONALLY OMITTED

## EXHIBIT F

## CONDOMINIUM SALES AND RESERVATION REPORT

[_____] Condominium

Through monthly period ending _____, 20__
(to be submitted to Lender monthly and must list all Condominium Units in
the condominium which are under contract or reservation agreements or have closed)

| Unit No. and Type | Date Contract / Reservation Signed | Sales Price | Down Payment/ Escrow Deposit | Closing Date | Method of Payment | | | Purchaser |
|---|---|---|---|---|---|---|---|---|
| | | | | | Cash | Mortgage | Mortgagee | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

True copies of the Approved Sale Contracts or Reservation Agreements for the Condominium Units identified above and not previously delivered to Lender are enclosed herewith. All down payments/escrow deposits are being held by _____ in Account No. _____ and the current balance thereof is $_____.

**[Remainder of Page Intentionally Blank; Certification on Next Page]**

[Certification to Condominium Sales Report]

## BORROWER:

**THE TOWERS-LAS VEGAS, LLC,**
a Nevada limited liability company

By:    The Towers-LV, LLC,
a Delaware limited liability company,
its sole member

        By:    The Towers-LV Member, LLC,
a Delaware limited liability company,
its sole member

                By:  The Towers-LV, Inc.,
a Delaware corporation, its sole
member

                    By:_____
Name:  Christopher DelGuidice
Title:  President

**THE TOWERS-LV, LLC,**
a Delaware limited liability company

By:    The Towers-LV Member, LLC,
a Delaware limited liability company, its
sole member

        By:    The Towers-LV, Inc.,
a Delaware corporation, its Sole
Member

            By:_____
Name:  Christopher DelGuidice
Title:   President

## [NEW BORROWER, AS APPLICABLE]

## EXHIBIT G

## REQUEST FOR DISBURSEMENT

(No. _____)

**THE TOWERS – LAS VEGAS, LLC,** a Nevada limited liability company ("**Owner**") and **THE TOWERS – LV, LLC,** a Delaware limited liability company ("**Towers LLC**"), each having its place of business at 474 South North Lake Boulevard, Suite 1020, Altamonte Springs, Florida 32701 (collectively, the "**Borrower**") is the borrower under a certain Loan Agreement (the "**Loan Agreement**") dated _____ __, 2004, entered into with Lehman Brothers Holdings Inc. ("**Lender**"), and Borrower, hereby certifies to and requests Lender as follows:

(a)    Attached hereto as <u>Schedule A</u> is a true and correct statement of the reimbursable Predevelopment Costs incurred to date, the aggregate advances of the Loan previously made by Lender to Borrower, and the total advance of the Loan requested hereby for Predevelopment Costs.

(b)    **Request to Lender for Disbursement**.  Borrower hereby requests Lender to disburse $_____ from the PDC Account for Predevelopment Costs.

(c)    **Representations**.  Borrower hereby represents to Lender that (i) all Predevelopment Costs set forth in previous Requests for Disbursement have been paid in full (ii) all Predevelopment Costs incurred to date, as set forth in this Request for Disbursement, have been or will be paid in full out of the advance requested hereby, (iii) all of the representations and warranties of Borrower contained in the Loan Documents continue to be true and correct, and (iv) no default exists under the Loan Documents and no event has occurred which but for notice, or lapse of time, or both, would constitute a default under the Loan Documents.

(d)    All terms used in this Request for Disbursement shall have the meanings given to such terms in the Loan Agreement.

Dated: _____, 20____

**[Signature Page to Request for Disbursement]**

IN WITNESS WHEREOF, the parties hereto have executed this Request for Advance as of the day and year first above written.

**BORROWER:**

**THE TOWERS-LAS VEGAS, LLC,**
a Nevada limited liability company

By:    The Towers-LV, LLC,
        a Delaware limited liability company,
        its sole member

      By:    The Towers-LV Member, LLC,
           a Delaware limited liability company,
           its sole member

           By:    The Towers-LV, Inc.,
                a Delaware corporation, its sole
                member

                By:_____
                    Name: Christopher DelGuidice
                    Title: President

**THE TOWERS-LV, LLC,**
a Delaware limited liability company

By:    The Towers-LV Member, LLC,
        a Delaware limited liability company, its
        sole member

      By:    The Towers-LV, Inc.,
           a Delaware corporation, its Sole
           Member

           By:_____
               Name: Christopher DelGuidice
              Title: President

# SCHEDULE A

## Predevelopment Costs incurred to date

## EXHIBIT H

## LEASES

Those three (3) separate individual leases, Lease Numbers 0919, 0920 and 0921 dated on or about January 27, 1998 with Clear Channel Outdoor, as amended by that certain letter agreement dated January 6, 2004 and that tenant estoppel certificate from Clear Channel Outdoor, dated November 4, 2004.

That certain lease dated as of March 5, 2004 with KHS&S Contractors and that tenant estoppel certificate from KHS&S Contractors, dated November 4, 2004.

## SCHEDULE 1

## INTENTIONALLY OMITTED

## SCHEDULE 2

## LITIGATION

None.

## SCHEDULE 3

### ENVIRONMENTAL REPORT

1.    Phase I environmental site assessment report dated July 21, 2003 on a property at
Flamingo Road and Valley View Boulevard, Las Vegas, Nevada prepared for Del
American Incorporated by Terracon.

## AGREEMENT OF MODIFICATION OF LOAN AGREEMENT
## AND OTHER LOAN DOCUMENTS

**THIS MODIFICATION OF LOAN AGREEMENT AND OTHER LOAN DOCUMENTS** (this "**Modification**") is made as of this 16th day of August, 2005, by **THE TOWERS – LAS VEGAS, LLC**, a Nevada limited liability company ("**Owner**"), and **THE TOWERS – LV, LLC**, a Delaware limited liability company ("**Towers LLC**" or "**Mezzanine Borrower**"), each having its principal place of business at 474 South North Lake Boulevard, Suite 1020, Altamonte Springs, Florida 32701 (individually and collectively, the "**Borrower**"), and **LEHMAN BROTHERS HOLDINGS INC.**, doing business as Lehman Capital, a division of Lehman Brothers Holdings Inc., a Delaware corporation having an office at 399 Park Avenue, 8th Floor, New York, New York 10022 ("**Lender**"), and **CHRISTOPHER DELGUIDICE**, having an office at The Towers – Las Vegas, LLC, 474 South North Lake Boulevard, Suite 1020, Altamonte Springs, Florida 32701 ( "**Guarantor**").

## RECITALS:

**WHEREAS** Pursuant to that certain Loan Agreement dated as of the 30th day of December 2004, between Borrower and Lender (the "**Original Loan Agreement**"), Lender made a loan in an original principal amount not to exceed $79,450,000.00 to Borrower (the "**Loan**"); and

**WHEREAS** the Loan was evidenced by that certain Secured Promissory Note dated December 30, 2004, made by Borrower in favor of Lender (the "**Note**") and was secured by inter alia: (1) a pledge of, and security interest in, (a) all membership interests of The Towers-LV, LLC ("**Towers LLC**") in Owner (the "**Towers LLC Pledge Agreement**"), (b) all membership interests of The Towers-LV Member, LLC ("**LV Member**") in Towers LLC (the "**LV Member Pledge Agreement**") and (c) all membership interests of The Towers-LV, Inc. ("**Towers Inc.**") in LV Member (the "**Towers Inc. Pledge Agreement**"), (each of Towers LLC, LV Member and Towers Inc. are sometimes collectively referred to herein as "**Pledgors**") as evidenced by each of those certain Membership Pledge and Security Agreements dated as of December 30, 2004, and made by each of the respective Pledgors in favor of Lender (each of the agreements referred to in (a) through (c) above, are sometimes collectively referred to herein as the "**Pledge Agreements**"); and (2) that certain Deed of Trust and Security Agreement, dated as of December 30, 2004, made by Owner to Lawyers Title Nevada, Inc. for the use and benefit of Lender ("**Deed of Trust**"); (3) that certain Assignment of Leases and Rents, dated December 30, 2004 made by Owner in favor of Lender (the "**Assignment of Leases and Rents**"); and (4) that certain Guaranty of Christopher DelGuidice ("**Guaranty**") in favor of Lender, dated December 30, 2004 (all the foregoing sometimes collectively referred to herein as the "**Security Instruments**"; the Security Instruments, together with the Note, the Loan Agreement and all of the other documents which evidence and/or secure the Loan sometimes collectively referred to herein as the "**Loan Documents**"); and

**WHEREAS** Borrower has requested and Lender has agreed to modify certain terms of the Loan, including increasing the Initial Loan amount by the sum of $12,500,000.00, and reducing the amount of Additional Loan Advances by the sum of $12,500,000.00; and

**WHEREAS** said modifications will also result in increases in the Interest Reserve Advance, First Extension Interest Reserve Advance, Second Extension Interest Reserve

Advance, First Extension Fee, Second Extension Fee and Additional Fee amounts as more specifically set forth herein; and

**WHEREAS** Lender has agreed to said modifications provided: (i) Borrower enters into certain modifications to the Loan Documents, (ii) Guarantor reaffirms its obligations under the Guaranty, (iii) Pledgors reaffirm their obligations under the Pledge Agreements, and (iv) Indemnitors reaffirm their obligations under the Environmental Indemnity Agreement dated December 30, 2004 ("**Indemnity**"), all as amended and modified hereby.

**NOW, THEREFORE**, in consideration of the premises and Ten dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Borrower, Guarantor, Indemnitors, Pledgors (collectively "**Consenting Parties**") and Lender hereby agree as follows:

## ARTICLE I
## TERMS

Section 1.1    Capitalized terms not defined herein shall have the respective meanings ascribed to them in the Original Loan Agreement.  All references in any of the Loan Documents to any Loan Document shall henceforth be construed to mean such Loan Document as modified by this Modification.

## ARTICLE II
## MODIFICATIONS TO THE LOAN AGREEMENT

Section 2.1    <u>Initial Advances</u>.  On December 30, 2004, Lender advanced the Initial Loan to Borrower in the amount of $37,500,000.00, of which (i) $22,093,376.92 was advanced to Borrower for acquisition of the Property and related costs and (ii) $15,406,623.08 was advanced to the PDC Account to pay Predevelopment Costs.

Section 2.2    <u>Initial Loan Amount</u>.  Borrower has requested, and Lender has agreed to increase the Initial Loan amount by the sum of $12,500,000.00, which amount shall be advanced on the date hereof into the PDC Account (as more specifically set forth in Section 2.3 hereof). Accordingly, following the execution of this Modification and the satisfaction of all requirements set forth herein, the aggregate amount of the Initial Loan shall be the sum of $50,000,000.00.  From and after the date of this Modification, all references in the Original Loan Agreement and the other Loan Documents to the defined term "Initial Loan" shall mean and refer to a loan in the amount of $50,000,000.00.

Section 2.3    <u>Additional PDC Account Advance.</u>

(a)    <u>PDC Account.</u> Subject to the satisfaction of the terms and conditions set forth herein and in the other Loan Documents, on the date hereof, Lender shall advance the amount of $12,500,000.00 to the PDC Account, for payment of Predevelopment Costs and certain "hard costs" of the Project, all as more specifically shown on the Predevelopment Budget annexed hereto as Schedule I.  Such Predevelopment Budget shall supercede and replace in its entirety the Predevelopment Budget attached to the Original Loan Agreement, and shall serve as the Predevelopment Budget for all purposes of the Loan Documents, as modified hereby.

(b)    PDC Account Balance. The balance in the PDC Account as of August 10, 2005 is $7,617,226.29.

Section 2.4    Additional Loan Advances. Article XXV of the Original Loan Agreement provides for Additional Loan Advances in the amount of up to $18,835,037.00, to be disbursed at Lender's sole and absolute discretion. The aggregate maximum amount available for Additional Loan Advances is hereby decreased by the sum of $12,500,000.00, such that the aggregate maximum amount available for Additional Loan Advances shall be in an amount not to exceed $6,335,037.00. From and after the date of this Modification, all references in the Original Loan Agreement and the other Loan Documents to the defined term "Additional Loan Advances" shall refer to advances not to exceed the amount of $6,335,037.00.

Section 2.5    Interest Reserve Account.

(a)    Article XXVI of the Original Loan Agreement provides for (i) an Interest Reserve Advance in an amount up to $10,125,000.00; (ii) a First Extension Interest Reserve Advance of an amount up to $2,250,281.00; and (iii) a Second Extension Interest Reserve Advance in an amount up to $2,610,214.00, such that the aggregate amount of Interest Reserve Account funding is an amount not to exceed $14,985,494.00.

(b)    In connection with this Modification, and subject to the satisfaction of all requirements set forth herein and in the Original Loan Agreement, Lender does hereby increase the maximum amounts available for the Interest Reserve Advance, First Extension Interest Reserve Advance and Second Extension Interest Reserve Advance as follows: (i) the Interest Reserve Advance shall be increased by up to $2,812,500.00 such that as of the date hereof the total Interest Reserve Advance available shall be an amount equal to $12,937,500.00; (ii) the First Extension Interest Reserve Advance shall be increased by up to $723,516.00, such that as of the date hereof, the total First Extension Interest Reserve Advance available shall be an amount equal to $2,973,797.00; and (iii) the Second Extension Interest Reserve Advance shall be increased by up to $839,242.00, such that the total Second Extension Interest Reserve Advance available shall be an amount equal to $3,449,456.00.

Section 2.6    Extension Fees. The Original Loan Agreement provides for payment of a First Extension Fee and Second Extension Fee in an amount not to exceed $8,129,468.00 in the aggregate. As of the date hereof and subject to the conditions set forth herein and in the Original Loan Agreement, Lender does hereby make available an additional aggregate amount of up to $2,613,805.00 for the First Extension Fee and for the Second Extension Fee, such that the aggregate maximum amount available for advance for both the First Extension Fee and Second Extension Fee shall be an amount not to exceed 10,743,273.00.


# ARTICLE III
## MODIFICATIONS TO THE NOTE

Section 3.1    Principal. The Principal amount of the Note as defined therein shall be increased by $6,989,063.00, from $79,450,000.00 to $86,439,063.00.

Section 3.2    Additional Fee. All references in the definition of "Additional Fee" set forth in the Note to $18,750,000.00 are hereby amended, by replacing such sum with the sum of

$25,000,000.00, and the definition of "Additional Fee" as so modified shall apply for all purposes of the Note and other Loan Documents.

Section 3.3    <u>Interest Reserve Account</u>. Section 23 of the Note is hereby modified by (i) replacing the sum of $10,125,000.00 as referred to in Section 23(a) of the Note with the sum of $12,937,500.00, (ii) replacing the sum of $2,250,281.00 referred to in Section 23(b) of the Note with the sum of $2,973,797.00 and (iii) replacing the sum of $2,610,214.00 referred to in Section 23(c) of the Note with the sum of $3,449,456.00, and such modification shall apply for all purposes of the Note and other Loan Documents.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES

Section 4.1    <u>Ratification</u>. The obligations of Borrower under the Loan Documents, as the same are hereby modified, including the payment of all amounts due thereunder, are hereby ratified and confirmed in all respects. Except as contained herein, each and every provision, covenant, undertaking, agreement, condition, obligation, liability, right and power in the Loan Documents, shall continue in full force and effect and remain enforceable in accordance with their terms.

Section 4.2    <u>Amounts Due</u>. As of August 10, 2005, the principal amount of the Loan outstanding is $37,500,000.00, and the accrued unpaid interest thereon is $2,151,858.65.

Section 4.3    <u>Additional Representations and Warranties.</u> The Borrower, Guarantor and Pledgors further represent, warrants and covenant:

(a)    <u>Authority.</u>  The execution and delivery of, and performance under, this Modification are within the power and authority of Borrower without the joinder or consent of any other party and have been duly authorized by all requisite action, and are not in contravention of any law, or Borrower or any Consenting Parties' organizational documents or of any indenture, agreement or undertaking to which the Borrower or any consenting party hereto are a party or by which they are bound.

(b)    <u>Other Agreements</u>. The execution and delivery of this Modification does not contravene, result in a breach of, or constitute a default under, any deed of trust, loan agreement, indenture or other contract or agreement to which the Borrower or any party consenting hereto are a party or by which the foregoing or any of their respective properties may be bound (nor would such execution and delivery constitute such a default with the passage of time or the giving of notice or both), and do not violate or contravene any law, order, decree, rule, regulation or restriction to which the parties hereto or the Property is subject.

(c)    <u>Enforceability</u>. This Modification constitutes the legal, valid and binding obligations of the parties hereto, enforceable in accordance with its terms.

(d)    <u>No Default</u>. There exists no ongoing uncured Default or Event of Default under the Loan Documents.

(e)    <u>No Offsets</u>. Borrower acknowledges and agrees that, as of the date hereof, the Loan, as amended hereby, is in full force and effect and neither Borrower nor any consenting party hereto has any offsets, claims, counterclaims, deductions or defenses with respect to any of

its respective obligations under the Loan Documents. The Borrower and Consenting Parties hereto, unconditionally, irrevocably, absolutely and forever waive and surrender any and all defenses, setoffs, claims, counterclaims or deductions against the Lender, the Loan or the enforcement thereof by Lender against Borrower and the Construction Project, arising out of or related to any facts, circumstances, events or happenings occurring on or prior to the date hereof.

(f)    Predevelopment Budget. The Predevelopment Budget attached as Schedule I hereto provides for good faith estimates of all costs and expenses which will be incurred by Borrower in the predevelopment and performance of certain other work specified in the Predevelopment Budget in connection with the Construction Project.

## ARTICLE V
## CONDITIONS

Section 5.1    This Modification shall be void and of no force and effect, and the proceeds of the increase of the Initial Loan and other amounts provided for hereunder shall not be available for advance or other disbursement to or for the account of Borrower unless and until each of the following conditions have been satisfied:

Section 5.2    Loan Documents. The Borrower and Consenting Parties hereto, as applicable, shall have fully executed, notarized (if applicable) and delivered to Lender: (i) this Modification, (ii) the First Amendment to Deed of Trust (the "**First Amendment to DOT**") and (iii) the First Amendment to Assignment of Leases and Rents of even date herewith (the "**First Amendment to ALR**").

Section 5.3    Recording.    Borrower shall have caused to be recorded at Borrower's sole cost and expense, (including the payment of all required mortgage taxes and recording fees), in the appropriate real estate records with the Clerk of Clark County, Nevada, the First Amendment to DOT and the First Amendment to ALR.

Section 5.4    Title Policy. Borrower shall have delivered to Lender, and expense, an endorsement to the existing title policy ("**Title Policy**") which: (i) increases the face amount of the Title Policy by the amount of the increase in the Loan as above described, (ii) appropriately amends the description of the insured Deed of Trust to include the First Modification to DOT, and (iii) dates down the Title Policy (including the then existing endorsements thereto) through the date on which the First Modification to DOT is recorded (and shows no exceptions thereon other than those listed in the title policy issued on the date of the closing other than real estate taxes that are a lien not yet due and payable);

Section 5.5    UCC Searches. Federal, state and local tax and judgment lien searches and searches of the appropriate Uniform Commercial Code filing offices showing no liens, effecting Borrower, Pledgors and Guarantor (except as may be permitted under the Guaranty).

Section 5.6    Opinion of Counsel. A legal opinion, in form and substance reasonably acceptable to Lender, delivered by the firm of Murai Wald Biondo Moreno & Brochin, P.A. addressing, among other things, limited liability company organization of Borrower, authority and good standing and the enforceability of this Modification and the other documents required to be executed and delivered pursuant to this Modification.

Section 5.7    Closing Fee.    Borrower's payment to Lender of a closing fee in the amount of $250,000.00.

Section 5.8    Formation, Authority and Good Standing Documents. The following items:

(a)    Good Standing. Evidence of the due organization and good standing of the Borrower, its managing member(s) and any Guarantor and/or Pledgor who is not a natural person, as certified by the Secretary of State of the State of Nevada;

(b)    Organizational Documents. True, correct and complete copies of any amendments or modifications to any of Borrower's, its managing member's and any Guarantor's and Pledgors' (to the extent applicable) organizational documents executed subsequent to December 30, 2004;

(c)    Authority. Evidence of the due authorization of this transaction by all signatories hereto, including, without limitation, corporate, partnership or limited liability company resolutions (as the case maybe) specifically authorizing this transaction and incumbency certificates with original specimen signatures for the officers signing this Modification and any other documents and instruments contemplated or required by this Modification.

## ARTICLE VI
## RENEWAL AND REAFFIRMATION

Section 6.1    Borrower. The undersigned hereby renew each and every Obligation arising under the Loan Documents and promises to pay and perform all such Obligations as modified by this Modification. The liens evidenced by the Loan Documents are hereby ratified and confirmed as valid, subsisting and continuing to secure such Obligations, as modified hereby. Nothing herein shall in any manner diminish, impair, waive or extinguish the Note, the Obligations or the liens evidenced by the Loan Documents.

Section 6.2    Reaffirmation of Guaranty and Indemnity. The Guarantor, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, hereby consents to and joins in this Modification and hereby declares to and agrees with the Lender that each Guaranty and the Indemnity is and shall continue to be in full force and effect for the benefit of the Lender with respect to the Obligations, as amended by this Modification, and that each Guaranty and the Indemnity is hereby ratified and confirmed in all respects. The Guarantor acknowledges that without this consent and reaffirmation, Lender would not execute this Modification or otherwise consent to its terms.

Section 6.3    Reaffirmation of Pledges. The Pledgors, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, hereby consents to and joins in this Modification and hereby declares to and agrees with the Lender that each Pledge Agreement is and shall continue to be in full force and effect for the benefit of the Lender with respect to the Obligations, as amended by this Modification, and that each Pledge Agreement is hereby ratified and confirmed in all respects. Each Pledgor acknowledges that without this consent and reaffirmation, Lender would not execute this Modification or otherwise consent to its terms.

## ARTICLE VII
## EXPENSES

Section 7.1    Expenses. Borrower covenants and agrees to pay all costs and expenses respecting the preparation, negotiation, execution and delivery of this Modification including, without limitation, all title insurance premiums, transfer and recording taxes and all of the fees and costs of Lender's counsel.

## ARTICLE VIII
## MISCELLANEOUS

Section 8.1    Modification of Loan Documents. To the extent of any conflict between the Loan Documents and this Modification, this Modification shall control. Unless specifically modified hereby, all terms of the Loan Documents shall remain in full force and effect. From and after the date hereof, all references in the Loan Documents to the Loan Agreement shall mean the Loan Agreement as modified by this Modification.

Section 8.2    Binding Effect. This Modification shall bind and benefit the parties hereto and their respective successors and assigns.

Section 8.3    Governing Law. This Modification shall be governed, construed, applied and enforced in accordance with the laws of Nevada with respect to the creation and enforcement of any liens within said jurisdiction relating to matters of real property law, foreclosure rights and obligations, but otherwise in accordance with the laws of the State of New York and the applicable laws of the United States of America.

Section 8.4    Preliminary Statements; Exhibits and Appendices. The preliminary statements, exhibits and appendices to this Modification are an integral part of this Modification and are incorporated into this Modification by reference.

Section 8.5    Counterparts. This Modification may be executed in several counterparts, and by the parties hereto on separate counterparts, and each counterpart, when executed and delivered, shall constitute an original agreement enforceable against all who signed it without production of or accounting for any other counterpart, and all separate counterparts shall constitute the same agreement.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK;
SIGNATURES FOLLOW ON NEXT PAGE]**

**[Signature Page for the Agreement**
**of Modification of Loan Agreement and Other Loan Documents]**

**IN WITNESS WHEREOF**, the parties hereto cause this Agreement to be executed as of the date and year first above written.

**BORROWER:**

**THE TOWERS-LAS VEGAS, LLC,**
a Nevada limited liability company

By:   The Towers-LV, LLC,
      a Delaware limited liability company,
      its sole member

      By:   The Towers-LV Member, LLC,
            a Delaware limited liability company,
            its sole member

            By:   The Towers-LV, Inc.,
                  a Delaware corporation,
                  its sole member

            By: _____
                  Name:   Christopher DelGuidice
                  Title:   President

**THE TOWERS-LV, LLC,**
a Delaware limited liability company

By:   The Towers-LV Member, LLC,
      a Delaware limited liability company,
      its sole member

      By:   The Towers-LV, Inc.,
             a Delaware corporation,
             its sole member

      By: _____
            Name:   Christopher DelGuidice
            Title:   President

**[Signature Page for the Agreement
of Modification of Loan Agreement and Other Loan Documents]**

**LENDER:**

**LEHMAN BROTHERS HOLDINGS INC.,** doing business as Lehman Capital, a division of Lehman Brothers Holdings Inc., a Delaware corporation

By: _____

Name:   **F. ROBERT BRUSCO**
Title:   Authorized Signatory

**[SIGNATURES CONTINUED ON NEXT PAGE]**

**[Signature Page for the Agreement
of Modification of Loan Agreement and Other Loan Documents, continued]**

The undersigned, while not liable to Lender
for payment of the Debt, are signing this
Agreement to acknowledge their agreement
to the terms hereof:

**PLEDGORS:**

**THE TOWERS-LV, LLC,**
a Delaware limited liability company

By:     The Towers-LV Member, LLC,
        a Delaware limited liability company,
        its sole member

       By:     The Towers-LV, Inc.,
           a Delaware corporation,
           its sole member

       By: _____
           Name:  Christopher DelGuidice
           Title:    President

**THE TOWERS – LV MEMBER, LLC,**
a Delaware limited liability company

By:     The Towers-LV, Inc.,
        a Delaware corporation,
        its sole member

By:: _____
    Name:  Christopher DelGuidice
    Title:    President

**THE TOWERS - LV, INC.,**
a Delaware corporation

By: _____
    Name:  Christopher DelGuidice
    Title:    President

**[SIGNATURES CONTINUED ON NEXT PAGE]**

**[Signature Page for the Agreement
of Modification of Loan Agreement and Other Loan Documents, continued]**

The undersigned, while not directly liable to
Lender for payment of the Debt except as
specifically set forth in the Guaranty or the
Environmental Indemnity, are signing this
Agreement to acknowledge their agreement
to the terms hereof:

**INDEMNITORS/GUARANTORS:**

**THE TOWERS-LAS VEGAS, LLC,**
a Nevada limited liability company

By:    The Towers-LV, LLC,
       a Delaware limited liability company,
       its sole member

    By:    The Towers-LV Member, LLC,
           a Delaware limited liability company,
           its sole member

        By:    The Towers-LV, Inc.,
               a Delaware corporation,
               its sole member

        By: _____
               Name:  Christopher DelGuidice
               Title:   President

**THE TOWERS – LV, LLC,**
a Delaware limited liability company

By:    The Towers-LV Member, LLC
       a Delaware limited liability company
       its sole member

    By:    The Towers-LV, Inc.,
           a Delaware corporation,
           its sole member

    By: _____
           Name:  Christopher DelGuidice
           Title:   President

**[SIGNATURES CONTINUED ON NEXT PAGE]**

**[Signature Page for the Agreement**
**of Modification of Loan Agreement and Other Loan Documents, continued]**

**THE TOWERS - LV, INC.,**
a Delaware corporation

By: _____

    Name: Christopher DelGuidice
    Title:  President

_____

**CHRISTOPHER DELGUIDICE**, individually
In his capacity as Indemnitor and Guarantor

**[END OF SIGNATURE PAGE]**

## SECOND MODIFICATION OF LOAN AGREEMENT
## AND OTHER LOAN DOCUMENTS

THIS SECOND MODIFICATION OF LOAN AGREEMENT AND OTHER LOAN DOCUMENTS (this "**Modification**") is made as of this ___ day of November 2005, by **THE TOWERS – LAS VEGAS, LLC**, a Nevada limited liability company ("**Owner**"), and **THE TOWERS – LV, LLC**, a Delaware limited liability company ("**Towers LLC**" or "**Mezzanine Borrower**"), each having its principal place of business at 474 South North Lake Boulevard, Suite 1020, Altamonte Springs, Florida 32701 (individually and collectively, the "**Borrower**"), and **LEHMAN BROTHERS HOLDINGS INC.**, doing business as Lehman Capital, a division of Lehman Brothers Holdings Inc., a Delaware corporation having an office at 399 Park Avenue, 8th Floor, New York, New York 10022 ("**Lender**"), and **CHRISTOPHER DELGUIDICE**, having an office at The Towers – Las Vegas, LLC, 474 South North Lake Boulevard, Suite 1020, Altamonte Springs, Florida 32701 ( "**Guarantor**").

### RECITALS:

**WHEREAS** Pursuant to that certain Loan Agreement dated as of the 30th day of December 2004, between Borrower and Lender (the "**Original Loan Agreement**"), Lender made a loan in an original principal amount not to exceed $79,450,000.00 to Borrower (the "**Original Loan**"); and

**WHEREAS** the Original Loan was evidenced by that certain Secured Promissory Note dated December 30, 2004, made by Borrower in favor of Lender (the "**Original Note**") and was secured by inter alia: (1) a pledge of, and security interest in, (a) all membership interests of The Towers-LV, LLC ("**Towers LLC**") in Owner (the "**Towers LLC Pledge Agreement**"), (b) all membership interests of The Towers-LV Member, LLC ("**LV Member**") in Towers LLC (the "**LV Member Pledge Agreement**") and (c) all membership interests of The Towers-LV, Inc. ("**Towers Inc.**") in LV Member (the "**Towers Inc. Pledge Agreement**"), (each of Towers LLC, LV Member and Towers Inc. are sometimes collectively referred to herein as "**Pledgors**") as evidenced by each of those certain Membership Pledge and Security Agreements dated as of December 30, 2004, and made by each of the respective Pledgors in favor of Lender (each of the agreements referred to in (a) through (c) above, are sometimes collectively referred to herein as the "**Pledge Agreements**"); and (2) that certain Deed of Trust and Security Agreement, dated as of December 30, 2004, made by Owner to Lawyers Title Nevada, Inc. for the use and benefit of Lender ("**Original Deed of Trust**"); (3) that certain Assignment of Leases and Rents, dated December 30, 2004 made by Owner in favor of Lender (the "**Original ALR**"); and (4) that certain Guaranty of Christopher DelGuidice ("**Guaranty**") in favor of Lender, dated December 30, 2004 (all the foregoing sometimes collectively referred to herein as the "**Original Security Instruments**"; the Original Security Instruments, together with the Original Note, the Original Loan Agreement and all of the other documents which evidenced and/or secured the Original Loan sometimes collectively referred to herein as the "**Original Loan Documents**"); and

**WHEREAS** on August 16, 2005, Borrower and Lender entered into that certain Agreement of Modification of Loan Agreement and Other Loan Documents (the "**Modification of Loan Agreement**", together with the Original Loan Agreement, the "**Modified Loan Agreement**") to modify certain terms of the Original Loan, including increasing the Original Loan amount by the sum of $12,500,000.00 ("**Loan Increase**"), reducing the amount of Additional Loan Advances by the sum of $12,500,000.00, and increasing the Interest Reserve

Advance, First Extension Interest Reserve Advance, Second Extension Interest Reserve Advance, First Extension Fee, Second Extension Fee and Additional Fee amounts in connection therewith, for a total loan amount not to exceed $86,439,063.00 (the "**Loan**"); and

**WHEREAS** in connection with the aforementioned loan modification, in addition to the Modification of Loan Agreement, the Borrower and Lender executed (a) the First Amendment to Deed of Trust and Security Agreement ("**First Amendment to Deed of Trust**", together with the Original Deed of Trust, "**Modified Deed of Trust**") and (b) the First Amendment to Assignment of Leases and Rents (the "**First Amendment to ALR**"; together with the Original ALR, the "**Modified ALR**"). The foregoing, together with the Pledges, Environmental Indemnity and Guaranty, as the same were modified by the Modification of Loan Agreement, collectively referred to herein as the "**Modified Security Instruments**"; the Modified Security Instruments, together with the Original Note, (as the same was amended by the Modification of Loan Agreement, (the "**Modified Note**"), the Modified Loan Agreement, and all of the other documents which evidenced and/or secured the Modified Loan, collectively, the "**Modified Loan Documents**");

**WHEREAS** Borrower has requested, and Lender has agreed to extend the Construction Project Loan Commitment Date, the CPL Closing Date and the deadline for submission of the Project Budget (as such terms are defined in the Loan Agreement) (recognizing that such extensions may affect certain other deadlines in connection with the Loan) and

**WHEREAS** Borrower has requested, and Lender has agreed, to allocate $2,000,000.00 from the Loan Increase for construction and completion of a sales center on the Property to market the Condominium. In connection with the foregoing, Lender or Servicer shall withdraw said $2,000,000.00 from the PDC Account, and deposit the same into a separate account designated for payment of costs incurred in connection with construction of said sales center.

**WHEREAS** Lender has agreed to the foregoing provided (i) Borrower enters into certain modifications of the Modified Loan Agreement (as amended hereby, together with any amendments, replacements, substitutions, restatements or supplements made thereto from time to time expressly approved by Lender shall be referred to herein as the "**Loan Agreement**") and the Modified Loan Documents (as amended by this Modification, and as the same may be further amended and modified, the "**Loan Documents**"); and (ii) Guarantor, Indemnitor and Pledgors reaffirm their obligations under the respective Modified Security Instruments, all as modified hereby.

**NOW, THEREFORE**, in consideration of the premises and Ten dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Borrower, Guarantor, Indemnitors, Pledgors (collectively "**Consenting Parties**") and Lender hereby agree as follows:

1.    Definitions. All capitalized terms used herein but not otherwise defined herein shall have the meaning ascribed thereto in the Modified Loan Agreement, as amended hereby.

2.    Recitals. The Recitals set forth above are hereby restated in their entirety and made a material part of this Modification.

3.    References. Effective as of the date hereof, all references in the Modified Loan Documents to (i) the "**Loan Agreement**" shall be deemed to be the Loan Agreement as defined herein; (iii) the "**Assignment of Leases and Rents**" shall be deemed to be the Modified Assignment of Leases and Rents as amended by this Modification, and as the same may be further amended and modified; (iv) the "**Security Instrument**", "**Mortgage**", "**Security Agreement**" or "**Deed of Trust**" shall be deemed to be the Modified Deed of Trust, as amended by this Modification, and as the same may be further amended and modified; (v) the "**Security Instruments**" shall be deemed to be the Modified Security Instruments as amended by this Modification and as the same may be further amended and modified; and (iix) the "**Loan Documents**" shall be as defined herein.

4.    Modifications.

Section 4.1    Loan Agreement, Article I, Defined Terms, the definition of "**Outside Date**" is hereby modified by deleting "February 15, 2006" and by inserting "June 30, 2006" in lieu thereof.

Section 4.2    Loan Agreement, Article VI, Section 6.11(f)(i), shall be deleted in its entirety and replaced with the following:

(f) **Construction Project Loan**.

i.    Borrower shall obtain and deliver, by no later than April 30, 2006 (the date of delivery, which in no case shall be later than April 30, 2006, is referred to herein as the "**Construction Project Loan Commitment Date**"), one or more written commitments (the "**Construction Project Loan Commitment**") issued by an Institutional Lender acceptable to Lender (the "**Construction Project Lender**") pursuant to which the Construction Project Lender shall make a construction loan to the Owner to finance the Construction Project (the "**Construction Project Loan**"). The Construction Project Loan Commitment shall set forth the material terms of the Construction Project Loan and shall be subject to the review and prior written approval of Lender, including, without limitation, the principal amount of the Construction Project Loan and the required number of presales. Borrower shall execute and deliver the Construction Project Loan Commitment, as approved by Lender, and make all deposits required thereunder (and provide copies of such fully executed Construction Project Loan Commitment and documentary evidence of such deposits required thereunder to Lender simultaneously therewith). Upon execution and delivery of a Construction Project Loan Commitment in accordance with this Section 6.11(f)(i) (the "**CPL Execution Date**"), Borrower shall (i) comply with all of the terms, conditions and provisions of the approved Construction Project Loan Commitment including, without limitation, the payment of any fees due thereunder, and (ii) close the Construction Project Loan in accordance with the approved Construction Project Loan Commitment promptly following the CPL Execution Date, but in no event later than the Outside Date (the date upon which the closing of the Construction Project Loan occurs shall be referenced to herein as the "**CPL Closing Date**").

Section 4.3    Loan Agreement, Article VI, Section 6.11(d) is hereby modified by deleting "December 15, 2005" and by inserting "January 15, 2006" in lieu thereof.

Section 4.4    Loan Agreement, Article X, Section 10.1(q), shall be deleted in its entirety and replaced with the following:

(q)    If the Construction Project Loan does not close by June 30, 2006.

Section 4.5    Loan Agreement, Article XXV, Section 25.1, shall be deleted in its entirety and replaced with the following:

Section 25.1. **Sales Center Construction Account**

(a)    Initial Advance.  Lender shall withdraw from the PDC Account on the date hereof $2,000,000.00 from that portion of the Loan Increase not allocated for payment of site improvements, off-site work, permits, and contingency line items (as designated on the Predevelopment Budget attached as Schedule I to the Modified Loan Agreement) and deposit the same into a separate account (the "**Sales Center Construction Account**") designated for construction and completion of a sales center (the "**Sales Center**") for the Project (the "**Work**").  Borrower shall perform the Work for which said funds have been allocated in accordance with the terms hereof.

(b)    Request for Disbursement.  Each request for disbursement from the Sales Center Construction Account shall be in a form or forms specified by Servicer and shall specify (i) the dollar amount for the specific Work for which such payment is requested, (ii) the quantity and price of each item purchased, if the request includes the purchase or replacement of specific items, (iii) the price of all materials (grouped by type or category) other than the purchase or replacement of specific items and (iv) the cost of all contracted labor or other services (if applicable) to each matter for which such request for disbursement is made.  With each request, the Borrower shall, to the extent applicable, certify that any Work that is the subject of the requisition has been completed in accordance with all Legal Requirements and all requirements of the Loan Documents.  Each request for disbursement shall include copies of invoices for all items or materials purchased and all contracted labor or services provided.  Except as otherwise provided herein, each request for an advance shall be made only after full completion, as applicable, of the related Work for which such disbursement is requested.  In no event shall the Borrower be entitled to request more than two (2) disbursement per month from the Sales Center Construction Account.  The Borrower shall provide Lender evidence of completion satisfactory to Lender in its reasonable judgment.

(c)    Disbursement Conditions.  Lender may disburse the amount for all invoices for materials purchased (or to be purchased) and all contracted labor or services directly to the applicable vendors, suppliers, mechanics, materialmen, subcontractors or any other Person or directly to the Borrower and, to the extent the funds are disbursed to the Borrower, the Borrower covenants and agrees to promptly pay such invoices.  The Borrower shall provide evidence reasonably satisfactory to Lender (including, without limitation, access to the Property by Lender, Servicer and an architect and/or engineer specified by Lender for the purpose of an inspection of Work done, at the Borrower's expense, if requested by Lender) that the Work for which the disbursement is being requested has been completed in full (but not in part) in a good and workmanlike

manner and in accordance with all applicable Legal Requirements. Additionally, if required by Lender, Lender may require the Borrower to obtain lien waivers from any vendor, contractor, supplier, materialman, mechanic, subcontractor or any other Person who receives payment for completion of its Work or delivery of its materials. Any lien waiver delivered hereunder shall conform to the requirements of applicable Legal Requirements and the requirements of the Loan Documents and shall cover all Work performed and materials supplied (including equipment and fixtures) for the Property by that vendor, contractor, supplier, subcontractor, mechanic or materialman through the date covered by the current disbursement request. No further disbursements from the Sales Center Construction Account shall be made unless and until the Borrower provides Lender or Servicer with evidence that amounts previously disbursed to the Borrower from Sales Center Construction Account on account of Work to be performed were paid to the appropriate vendors, suppliers, contractors, mechanics, materialmen and/or subcontractors.

(d)     Partial Completion. Lender shall have no obligation and shall not be required to disburse or otherwise release any funds from the Sales Center Construction Account ("**Office Account Proceeds**") unless (i) there is no Event of Default then existing, and (ii) there are sufficient remaining amounts in the Sales Center Construction Account to make the requested disbursement. In addition, Lender shall have no obligation and shall not be required to disburse or release any Office Account Proceeds until (i) Lender shall have received, reviewed and approved any permits, plans or contracts required in connection with the work, and any other information or documentation requested by Lender, including but not limited to construction timetables, budgets, and Borrower's marketing and sales plan for the sale of Condominium Units at the Property, (ii) Lender shall have approved the General Contractor and the General Contractor Agreement (and received, at Lender's option, Assignments and Consent, Estoppel and Recognition Agreements for the foregoing, in a form acceptable to Lender); (iii) evidence of a continuing guaranty of lien free completion of the Work given by Tutor-Saliba Corporation and Perini Building Company, Inc. to Borrower or, as to any other General Contractor, or, in the event of termination or limitation of the aforesaid Guaranty, at Lender's option, the General Contractor shall have delivered 100% payment and performance bonds with respect to the Site Work, which payment and performance bonds shall be in amounts, form and substance and issued by companies satisfactory to Lender, shall name Lender as dual obligee and shall be fully paid; (iv) at Lender's option prior to any disbursement, the Borrower shall provide Lender with a search of title to the Property effective to the date of the disbursement, which search shows that no mechanic's or materialmen's Liens or other Liens of any nature have been placed against the Property since the date hereof and that title to the Property is free and clear of all Liens (other than any Liens previously approved in writing by Lender, if any); and (v) all other conditions specified in the Loan Agreement for the use of Loan proceeds have been satisfied.

(e)     Funding Conditions; Agreement to Complete; Workmanlike Completion. Borrower shall commence the Work for which such advance of Office Account Proceeds have been made available in accordance with a construction timetable ("**Construction Schedule**") reasonably satisfactory to Lender and shall at all times thereafter diligently pursue the completion of the Work as soon as practicable following the commencement of the Work, whether or not there are sufficient remaining Office

Account Proceeds available to do so. Borrower shall complete all Work (and all materials, equipment, fixtures, or any other item comprising a part of any such Work shall be constructed, installed or completed, as applicable) in accordance with the Loan Documents, Legal Requirements, General Contractor's Agreement, and any Construction Schedule and in a good and workmanlike manner, following the commencement of such approved by Lender portion of the Work. In the event Lender determines in its reasonable discretion that any portion of the Work has not been commenced as required herein, any portion of the Work is not being performed or completed in a workmanlike or timely manner, Lender shall have the option to withhold disbursement from the Office Account Proceeds or from any other source for such unsatisfactory portion of the Work, and to proceed under existing contracts or to contract with third parties to complete such portion of the Work and to apply remaining Office Account Proceeds toward the labor and materials necessary to complete the same.

(f)    Lender's Right to Complete. In order to facilitate Lender's completion or making of any Work pursuant to subsection (e) above, Borrower grants Lender the right to enter onto the Property and perform any and all work and labor necessary to complete or make any portion of the Work and/or employ watchmen to protect the Property from damage. All sums so expended by Lender shall be deemed to have been advanced under the Loan to Borrower and secured by the Security Instrument. For this purpose, Borrower appoints Lender its true and lawful attorney-in-fact with full power of substitution to (i) complete or undertake any portion of the applicable Work in the name of Borrower, (ii) make such additions, changes and corrections to the Work as shall be necessary to complete the same in accordance with applicable Legal Requirements or such other conditions previously approved and accepted by Lender; (iii) to employ such contractors, subcontractors, agents, architects and inspectors as shall be required for such purposes; (iv) to pay, settle or compromise all existing bills and claims which are or may become Liens against the Property, or as may be necessary or desirable for the completion of the Work or for clearance of title; (v) to execute all applications and certificates in the name of Borrower or Property Owner which may be required by any of the contract documents; (vi) in its reasonable discretion, to prosecute and defend all actions or proceedings in connection with the Property or the rehabilitation and repair of the Property; and (vii) to do any and every reasonable act which Borrower might do in its own behalf to fulfill the terms of this Agreement.

(g)    No Obligation of Lender. Nothing in this Agreement shall: (i) make Lender responsible for making or completing the Work or any portion thereof; (ii) require Lender to expend funds in addition to the remaining Office Account Proceeds to make or complete any portion of the Work; (iii) obligate Lender to proceed with the Work or any portion thereof; or (iv) obligate Lender to demand from Borrower additional sums to make or complete any portion of the Work.

(h)    Inspections.

(1) Borrower shall and shall cause Property Owner to permit Lender and Lender's agents and representatives (including Servicer, Lender's or Servicer's construction consultant, engineer, architect or inspector) or third parties performing any portion of the Work pursuant to this Section 25.1 to enter onto the Property during normal business hours to inspect the progress of any Work and all materials being used in connection therewith, to examine all plans and shop drawings

relating thereto which are or may be kept at the Property, and to complete any work made pursuant to this section. Borrower shall, and shall cause Property Owner to request all contractors and subcontractors to cooperate with Lender or Lender's representatives or such other Persons described above in connection with inspections or the completion of the Work.

(2)     Lender or Servicer may require an inspection of the Property at the Borrower's expense prior to making a disbursement to verify completion of the Work for which payment is sought. Lender may require that such inspection be conducted by an appropriate independent qualified professional selected by Lender and/or may require a copy of a certificate of completion by an independent qualified professional acceptable to Lender prior to the disbursement of any amounts from the Office Account Proceeds. Borrower shall pay the expense of the inspection as required hereunder, whether such inspection is conducted by Lender or by an independent qualified professional.

(i)     Event of Default. It shall be an Event of Default under this Agreement if (i) at any time prior to the completion of the Work, the Borrower abandons or ceases work with respect to the construction of the Sales Center for a period of thirty (30) consecutive calendar days, unless such cessation (x) results from causes beyond the control of the Borrower and Borrower diligently pursues the reinstitution of Work or (y) arises in the ordinary course of performing the Work as contemplated in the Construction Schedule as is typical for the Work, or (ii) the Borrower fails to complete or have completed each portion of the Work in a good and workmanlike manner within the time allotted and terms set forth in the Predevelopment Budget, Loan Documents, the General Contractor's Agreement, and the Construction Schedule, as the foregoing may be modified by Lender from time to time. Upon the occurrence and during the continuance of an Event of Default the Borrower shall not be entitled to receive any remaining Office Account Proceeds and Lender may use the remaining Office Account Proceeds (or any portion thereof) for any purpose, including completion of the Work, or for any other repair or replacement to the Property or toward payment of the Debt in such order, proportion and priority as Lender may determine in its sole discretion. Lender's right to apply the remaining Office Account Proceeds shall be in addition to all other rights and remedies provided to Lender under this Agreement, any of the other Loan Documents, and at law or in equity.

5.     No Requirement to Disburse.     A portion of the Loan Increase, in the amount of $6,150,000.00 ("**Additional Site Work Funds**") was allocated for payment of site improvements, off-site work, permits, and contingency line items, all as designated on the Predevelopment Budget attached as Schedule I to the Modified Loan Agreement. Borrower and Lender hereby agree that notwithstanding anything contained in the Loan Agreement or Loan Documents to the contrary, Lender shall not be obligated to make any advances of the Additional Site Work Funds. Any election by Lender to disburse Additional Site Work Funds shall be at Lender's sole and absolute discretion, and all shall remain subject to all terms and conditions set forth in the Loan Documents required for such advances. Notwithstanding anything contained in the Loan Documents to the contrary, no Additional Fee shall be due and/or payable on any portion of the Additional Site Work Funds not disbursed to or on behalf of Borrower.

6.    Representations And Warranties

Section 6.1    Ratification. The obligations of Borrower, Guarantor and Pledgors under the Loan Documents, as the same are hereby modified, including the payment of all amounts due thereunder, are hereby ratified and confirmed in all respects. Except as contained herein, each and every provision, covenant, undertaking, agreement, condition, obligation, liability, right and power in the Loan Documents, shall continue in full force and effect and remain enforceable in accordance with their terms.

Section 6.2    Amounts Due. As of November 9, 2005, the principal amount of the Loan outstanding is $50,000,000.00, and the accrued unpaid interest thereon is $3,331,529.70.

Section 6.3    Additional Representations and Warranties.    The Borrower, Guarantor and Pledgors further represent, warrant and covenant:

(a)    Authority.    The execution and delivery of, and performance under, this Modification are within the power and authority of Borrower without the joinder or consent of any other party and have been duly authorized by all requisite action, and are not in contravention of any law, or Borrower or any Consenting Parties' organizational documents or of any indenture, agreement or undertaking to which the Borrower or any consenting party hereto are a party or by which they are bound.

(b)    Other Agreements. The execution and delivery of this Modification does not contravene, result in a breach of, or constitute a default under, any deed of trust, loan agreement, indenture or other contract or agreement to which the Borrower or any party consenting hereto are a party or by which the foregoing or any of their respective properties may be bound (nor would such execution and delivery constitute such a default with the passage of time or the giving of notice or both), and do not violate or contravene any law, order, decree, rule, regulation or restriction to which the parties hereto or the Property is subject.

(c)    Good Standing. Any Borrower, its managing member(s) and any Guarantor and/or Pledgor who is not a natural person, is duly organized and in good standing as certified by the Secretary of State of the State of Nevada.

(d)    Organizational Documents. Neither Borrower, its managing member(s), any Guarantor nor any Pledgor (to the extent applicable) have modified their organizational documents subsequent to August 16, 2005.

(e)    Enforceability. This Modification constitutes the legal, valid and binding obligations of the parties hereto, enforceable in accordance with its terms.

(f)    No Default. There exists no ongoing uncured Default or Event of Default under the Loan Documents.

(g)    No Offsets. Borrower acknowledges and agrees that, as of the date hereof, the Loan, as amended hereby, is in full force and effect and neither Borrower nor any consenting party hereto has any offsets, claims, counterclaims, deductions or defenses with respect to any of its respective obligations under the Loan Documents. The

Borrower and Consenting Parties hereto, unconditionally, irrevocably, absolutely and forever waive and surrender any and all defenses, setoffs, claims, counterclaims or deductions against the Lender, the Loan or the enforcement thereof by Lender against Borrower and the Construction Project, arising out of or related to any facts, circumstances, events or happenings occurring on or prior to the date hereof.

7.    Renewal And Reaffirmation

Section 7.1    Borrower. The undersigned hereby renew each and every Obligation arising under the Loan Documents and promise to pay and perform all such Obligations as modified by this Modification. The liens evidenced by the Loan Documents are hereby ratified and confirmed as valid, subsisting and continuing to secure such Obligations, as modified hereby. Nothing herein shall in any manner diminish, impair, waive or extinguish the Note, the Obligations or the liens evidenced by the Loan Documents.

Section 7.2    Reaffirmation of Guaranty and Indemnity. The Guarantor, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, hereby consents to and joins in this Modification and hereby declares to and agrees with the Lender that each Guaranty and the Indemnity is and shall continue to be in full force and effect for the benefit of the Lender with respect to the Obligations, as amended by this Modification, and that each Guaranty and the Indemnity is hereby ratified and confirmed in all respects. The Guarantor acknowledges that without this consent and reaffirmation, Lender would not execute this Modification or otherwise consent to its terms.

Section 7.3    Reaffirmation of Pledges. The Pledgors, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, hereby consents to and joins in this Modification and hereby declares to and agrees with the Lender that each Pledge Agreement is and shall continue to be in full force and effect for the benefit of the Lender with respect to the Obligations, as amended by this Modification, and that each Pledge Agreement is hereby ratified and confirmed in all respects. Each Pledgor acknowledges that without this consent and reaffirmation, Lender would not execute this Modification or otherwise consent to its terms.

8.    Expenses

Section 8.1    Expenses. Borrower covenants and agrees to pay all costs and expenses respecting the preparation, negotiation, execution and delivery of this Modification including, without limitation, all title insurance premiums, transfer and recording taxes and all of the fees and costs of Lender's counsel.

9.    Miscellaneous

Section 9.1    Modification of Loan Documents. To the extent of any conflict between the Loan Documents and this Modification, this Modification shall control. Unless specifically modified hereby, all terms of the Loan Documents shall remain in full force and effect. From and after the date hereof, all references in the Loan Documents to the Loan Agreement shall mean the Loan Agreement as modified by this Modification.

Section 9.2    <u>Binding Effect</u>. This Modification shall bind and benefit the parties hereto and their respective successors and assigns.

Section 9.3    <u>Governing Law</u>. This Modification shall be governed, construed, applied and enforced in accordance with the laws of Nevada with respect to the creation and enforcement of any liens within said jurisdiction relating to matters of real property law, foreclosure rights and obligations, but otherwise in accordance with the laws of the State of New York and the applicable laws of the United States of America.

Section 9.4    <u>Preliminary Statements; Exhibits and Appendices</u>. The preliminary statements, exhibits and appendices to this Modification are an integral part of this Modification and are incorporated into this Modification by reference.

Section 9.5    <u>Counterparts</u>. This Modification may be executed in several counterparts, and by the parties hereto on separate counterparts, and each counterpart, when executed and delivered, shall constitute an original agreement enforceable against all who signed it without production of or accounting for any other counterpart, and all separate counterparts shall constitute the same agreement.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK;
SIGNATURES FOLLOW ON NEXT PAGE]**

**IN WITNESS WHEREOF,** the parties hereto cause this Agreement to be executed as of the date and year first above written.

<u>**BORROWER:**</u>

**THE TOWERS-LAS VEGAS, LLC,**
a Nevada limited liability company

By:    The Towers-LV, LLC,
  a Delaware limited liability company,
  its sole member

  By:    The Towers-LV Member, LLC,
    a Delaware limited liability company,
    its sole member

    By:    The Towers-LV, Inc.,
      a Delaware corporation,
      its sole member

    By: _____
      Name:   Christopher DelGuidice
      Title:     President

**THE TOWERS-LV, LLC,**
a Delaware limited liability company

By:    The Towers-LV Member, LLC,
  a Delaware limited liability company,
  its sole member

  By:    The Towers-LV, Inc.,
    a Delaware corporation,
    its sole member

  By: _____
    Name:   Christopher DelGuidice
    Title:     President

**[SIGNATURES CONTINUED ON NEXT PAGE]**

[Signature Page for the Second Modification
of Loan Agreement and Other Loan Documents]

**LENDER:**

**LEHMAN BROTHERS HOLDINGS INC.,**
doing business as Lehman Capital, a division of
Lehman Brothers Holdings Inc., a Delaware corporation

By: _____

Name: F. Robert Brusco
Title: Authorized Signatory

**[SIGNATURES CONTINUED ON NEXT PAGE]**

**[Signature Page for the Second Modification of Loan Agreement and Other Loan Documents, continued]**

The undersigned, while not liable to Lender for payment of the Debt, are signing this Agreement to acknowledge their agreement to the terms hereof:

**PLEDGORS:**

**THE TOWERS-LV, LLC,**
a Delaware limited liability company

By:    The Towers-LV Member, LLC,
      a Delaware limited liability company,
      its sole member

      By:    The Towers-LV, Inc.,
            a Delaware corporation,
            its sole member

            By:_____
            Name:  Christopher DelGuidice
            Title:   President

**THE TOWERS – LV MEMBER, LLC,**
a Delaware limited liability company

By:    The Towers-LV, Inc.,
      a Delaware corporation,
      its sole member

By::_____
    Name:  Christopher DelGuidice
    Title:   President

**THE TOWERS - LV, INC.,**
a Delaware corporation

By:_____
    Name:  Christopher DelGuidice
    Title:   President

**[SIGNATURES CONTINUED ON NEXT PAGE]**

**[Signature Page for the Second Modification of Loan Agreement and Other Loan Documents, continued]**

The undersigned, while not directly liable to
Lender for payment of the Debt except as
specifically set forth in the Guaranty or the
Environmental Indemnity, are signing this
Agreement to acknowledge their agreement
to the terms hereof:

**INDEMNITORS/GUARANTORS:**

**THE TOWERS-LAS VEGAS, LLC,**
a Nevada limited liability company

By:     The Towers-LV, LLC,
        a Delaware limited liability company,
        its sole member

        By:     The Towers-LV Member, LLC,
                a Delaware limited liability company,
                its sole member

                By:     The Towers-LV, Inc.,
                        a Delaware corporation,
                        its sole member

                        By: _____
                            Name:  Christopher DelGuidice
                            Title:    President

**THE TOWERS – LV, LLC,**
a Delaware limited liability company

By:     The Towers-LV Member, LLC
        a Delaware limited liability company
        its sole member

        By:     The Towers-LV, Inc.,
                a Delaware corporation,
                its sole member

                By: _____
                    Name:  Christopher DelGuidice
                    Title:    President

**[SIGNATURES CONTINUED ON NEXT PAGE]**

**[Signature Page for the Second Modification of Loan Agreement and Other Loan Documents, continued]**

**THE TOWERS - LV, INC.,**
a Delaware corporation

By: _____
    Name: Christopher DelGuidice
    Title:  President


_____
**CHRISTOPHER DELGUIDICE,** individually
In his capacity as Indemnitor and Guarantor



**[END OF SIGNATURE PAGE]**