# EXHIBIT C

(Lehman Promissory Note)

US_ACTIVE:\43953110\10\58399.0011

## SECURED PROMISSORY NOTE

$79,450,000.00

December 30, 2004
New York, New York

**FOR VALUE RECEIVED**, THE TOWERS - LAS VEGAS, LLC, a Nevada limited liability company ("**Owner**") and THE TOWERS - LV, LLC, a Delaware limited liability company ("**Towers LLC**"), as maker, each having its principal place of business at 474 South North Lake Boulevard, Suite 1020, Altamonte Springs, Florida 32701 (individually and collectively, the "**Borrower**"), hereby unconditionally promise to pay to the order of LEHMAN BROTHERS HOLDINGS INC., doing business as Lehman Capital, a division of Lehman Brothers Inc., a Delaware corporation, having an office at 399 Park Avenue, 8th Floor, New York, New York 10022 ("**Lender**"), or at such other place as the holder hereof may from time to time designate in writing, the principal sum of up to SEVENTY-NINE MILLION FOUR HUNDRED FIFTY THOUSAND and NO/100 Dollars ($79,450,000.00) ("**Principal**") or so much thereof as may be advanced hereunder, in lawful money of the United States of America with interest thereon to be computed on the principal amount outstanding from time to time from the date of this Secured Promissory Note (this "**Note**") at the Applicable Interest Rate (as defined herein), and all other sums due hereunder on the terms and conditions set forth herein.

1. **Defined Terms.**

Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in that certain Loan Agreement, dated of even date herewith, between Borrower and Lender (as the same may be amended, modified, extended, supplemented, restated or replaced from time to time, the "**Loan Agreement**"). Whenever used, the singular number shall include the plural, the plural number shall include the singular, and the words "**Lender**" and "**Borrower**" shall include their respective successors, assigns, heirs, executors and administrators.

"**Accrued Interest**" shall have the meaning as ascribed thereto in Section 3(a) herein.

"**Additional Fee**" shall mean a fee in the amount of $18,750,000.00 owed to Lender by Borrower on the date hereof, but which shall be payable by Borrower at the earlier to occur: (1) the Scheduled Maturity Date, (2) the date upon which prepayment of the Loan is made in full subject to the terms hereof, (3) the date upon which payment of the Additional Fee, or any part thereof, is payable pursuant to the terms of this Note or the Loan Agreement or (4) such earlier date that the Loan is due as a result of acceleration of the Loan or otherwise; provided however, that in the event Lender elects, in its sole and absolute discretion, to advance any portion or all of the Additional Loan Advances, an additional fee in an amount equal to one-half (½) of the amount of such Additional Loan Advances agreed to be funded by Lender shall be owed to Lender by Borrower on the date Lender advances to Borrower any or all of the Additional Loan Advances agreed to be funded by Lender (each an "**Additional Loan Advance Date**") and from and after such Additional Loan Advance Date all references in this Note and the other Loan Documents to "Additional Fee" shall be deemed to mean a fee in an amount equal to the sum of (x) $18,750,000.00 and (y) an amount equal to one-half of the amount of all Additional Loan Advances agreed to be funded by Lender to date.

{10283260:8}

"**Additional Loan Advances**" shall have the meaning ascribed to such term in the Loan Agreement.

"**Applicable Interest Rate**" shall have the meaning ascribed thereto in Section 2 hereof.

"**Available Cash Flow**" shall have the meaning attributed to such term in the Loan Agreement.

"**Borrower**" is defined in the opening paragraph of this Note.

"**Business Day**" means a day on which commercial banks are not authorized or required by law to close in New York, New York.

"**Debt**" is defined in Section 4 hereof.

"**Default Rate**" shall have the meaning ascribed thereto in Section 6 hereof.

"**Deferral**" shall have the meaning ascribed thereto in Section 3 hereof.

"**Event of Default**" shall have the meaning attributed to such term in the Loan Agreement.

"**First Extension Fee**" shall mean an amount equal to (x) 5%, multiplied by (y) the amount of principal advanced by Lender that remains outstanding as of the day of the exercise of the First Extension Option by Borrower.

"**First Extension Option**" shall have the meaning ascribed thereto in Section 24 hereof.

"**First Extension Interest Reserve Advance**" shall have the meaning ascribed thereto in Section 23 hereof.

"**First Extension Period**" means January 1, 2008 through July 1, 2008.

"**Governmental Authority**" means any nation or government, any state or other political subdivision thereof, and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, and any corporation or other entity owned or controlled (through stock or capital ownership or otherwise) by any of the foregoing.

"**Initial Payment Date**" shall mean the first (1st) day of January, 2005.

"**Interest Reserve Account**" shall have the meaning ascribed thereto in Section 23 hereof.

"**LIBOR**" shall mean, with respect to each calendar month during the term of the Loan, the greater of (i) 4%, or (ii) the rate per annum (rounded upward, if necessary, to the nearest one-sixteenth of one percent ($^1/_{16}$%)) of the one month London Interbank Offered Rate for an amount comparable to the then outstanding principal balance of the Note which is printed in *The Wall Street Journal* on the date which is one (1) Business Day prior to the beginning of the applicable month (reflecting the LIBOR Rate in effect two (2) Business Days prior to the

{10283260;8}                                2

beginning of such month) or, if for any reason LIBOR for any month cannot be determined by Lender from *The Wall Street Journal*, the offered rate for an amount comparable to the then outstanding principal balance of the Note set forth on Telerate Page 3750 as of 11:00 a.m., London time, on the date which is two Business Days prior to the beginning of the applicable month.

"**Maturity Date**" shall mean the date which is the earlier of (i) the Scheduled Maturity Date, or (ii) the date on which the Debt becomes due and payable pursuant to the provisions of the Loan Agreement, whether by acceleration or otherwise.

"**Minimum Monthly Interest Amount**" shall have the meaning ascribed thereto in Section 3(e) hereof.

"**Minimum Monthly Interest Amount First Extension Deficiency**" shall have the meaning ascribed thereto in Section 23 hereof.

"**Minimum Monthly Interest Amount Second Extension Deficiency**" shall have the meaning ascribed thereto in Section 23 hereof.

"**Operating Expenses**" shall have the meaning attributed to such term in the Loan Agreement.

"**Other Security Documents**" means all and any of the documents, other than this Note, but including, without limitation, the Loan Agreement, the Security Instrument, the Assignment of Leases and Rents, the Assignment of Permits, the Pledge Agreements, the Guaranty and the Environmental Indemnity now or hereafter executed by Borrower and/or others and by or in favor of Lender, which wholly or partially secure or guarantee payment of this Note, as any of the foregoing may be modified, amended, extended, supplemented, restated or replaced from time to time.

"**Pledge Agreements**" shall have the meaning attributed to such term in the Loan Agreement.

"**Principal**" is defined in the paragraph 1 above.

"**Scheduled Maturity Date**" shall mean January 1, 2008 (the "**Original Scheduled Maturity Date**"), or if the First Extension is effectively exercised by Borrower and the term of the Loan is extended through the First Extension Period, the First Extension Maturity Date, or if the Second Extension Option is effectively exercised and the term of the Loan is extended through the Second Extension Period, the Second Extension Maturity Date.

"**Scheduled Payment Date**" shall mean the Initial Payment Date and the first (1st) day of each succeeding calendar month during the term of the Loan until all amounts are paid hereunder, provided that if the first (1st) day of any such calendar month shall not be a Business Day, the Scheduled Payment Date shall be the next succeeding Business Day.

"**Second Extension Fee**" shall mean an amount equal to (x) 11%, multiplied by (x) the amount of principal advanced by Lender that remains outstanding as of the day of the exercise of the Second Extension Option by Borrower.

"**Second Extension Interest Reserve Advance**" shall have the meaning ascribed thereto in Section 23 hereof.

"**Second Extension Maturity Date**" means December 1, 2008.

"**Second Extension Option**" shall have the meaning ascribed to it in Section 24 hereof.

"**Security Instrument**" shall have the meaning attributed to such term in the Loan Agreement.

"**Servicer**" means Trimont Real Estate Advisors, Inc. having an office at Monarch Tower, 3242 Peachtree Road NE, Suite 2200, Atlanta, Georgia 30326 or such other servicer as appointed by Lender in its sole and absolute discretion.

"**Servicer Fee**" means a monthly fee in an amount (a) as long as the Loan is secured by the Security Instrument, calculated as follows: (x) eighteen (18) basis points, multiplied by (y) the outstanding principal balance of the Loan as of such date, divided by 12 or (b) from and after the date the Security Instrument is terminated or released, calculated as follows: (x) twenty (20) basis points, multiplied by (y) the outstanding principal balance of the Loan as of such date, divided by 12. The Servicer Fee represents a fee for the basic servicing and administration of the Loan, but such amount shall not include any amounts in connection with Servicer's or Lender's (or any third party engaged by them) review of leases, subordination non-disturbance agreements, property inspections, review of development plans or other plans and specifications, construction draws, casualty or condemnation matters or loan defaults.

"**Total Deal Interest**" shall have the meaning ascribed thereto in Section 23 hereof.

2. **Interest Rate.**

The unpaid Principal and the Deferral shall accrue interest monthly at a rate per annum (the "**Applicable Interest Rate**") equal to LIBOR, as established herein, plus 500 basis points, which interest shall compound monthly. Interest payable hereunder by Borrower shall be calculated on the basis of a three hundred sixty (360) day year and the actual number of days elapsed. In no event will the Applicable Interest Rate exceed the maximum rate permitted under applicable law. Any change in the rate of interest hereunder due to a change in the Applicable Interest Rate shall become effective as of the opening of business on the first day on which such change in the Applicable Rate shall become effective. Each determination of Lender of the Applicable Interest Rate shall be conclusive and binding for all purposes, absent manifest error.

3. **Payment Terms.**

All amounts due under this Note shall be payable by Borrower to Lender at the address set forth above, or at such other place as Lender may, from time to time, designate in writing, as follows:

(a) (i) On the Initial Payment Date, interest at the Applicable Interest Rate on the outstanding principal balance of the Note for the period from and including the date of this Note up to and including the calendar day which immediately precedes the Initial

{10283260:8}                                          4

Payment Date, and (ii) thereafter, on each succeeding Scheduled Payment Date, a payment of interest equal to the interest accrued on the outstanding principal balance of this Note at the Applicable Interest Rate from and including (A) the Initial Payment Date, with respect to the first Scheduled Payment Date after the Initial Payment Date, and (B) the immediately preceding Scheduled Payment Date, with respect to each succeeding Scheduled Payment Date thereafter, in each case through the calendar day which immediately precedes the Scheduled Payment Date in question ((i) and (ii) are each, a "**Monthly Interest Payment**"); provided, however, subject to Section 3(e) below, that to the extent Available Cash Flow for the calendar month immediately preceding such Scheduled Payment Date is insufficient to make such Monthly Interest Payment, the difference between (x) the Monthly Interest Payment due on such Scheduled Payment Date, and (y) the Available Cash Flow paid to Lender on such Scheduled Payment Date (individually and collectively, a "**Deferral**") shall be deferred and shall accrue and bear interest from said Scheduled Payment Date at the Applicable Interest Rate compounded monthly until paid (the Deferral, and the interest accrued thereon shall be referred to as the "**Accrued Interest**").

(b) on the Maturity Date, the balance of the principal sum then outstanding and all accrued and unpaid interest thereon, together with any and all other sums due hereunder, including, without limitation, default interest, Accrued Interest, the Additional Fee and all other costs and expenses due hereunder and under the Loan Agreement, all as may be set forth with greater specificity in the applicable terms and provisions of this Note and the Loan Agreement, provided, however, that if the Maturity Date is not a Business Day, such Maturity Date shall be the next succeeding Business Day and interest shall accrue for such period of time at the Applicable Interest Rate.

(c) Except as provided in Section 3(a) above, Borrower is and shall be obligated to pay all amounts which become payable hereunder or under the Loan Agreement and the Other Security Documents absolutely and unconditionally and without any abatement, postponement, diminution or deduction and without any reduction for counterclaim or setoff. In the event that at any time any payment received by Lender hereunder shall be deemed by a court of competent jurisdiction to have been a voidable preference or fraudulent conveyance under any bankruptcy, insolvency or other debtor relief law, then the obligation to make such payment shall survive any cancellation or satisfaction of this Note or return thereof to Borrower and shall not be discharged or satisfied with any prior payment thereof or cancellation of this Note but shall remain a valid and binding obligation enforceable in accordance with the terms and provisions hereof, and such payment shall be immediately due and payable upon demand by Lender.

(d) Borrower shall pay the monthly Servicer Fee, which amount is for the basic servicing and administration of the Loan evidenced by this Note, commencing on February 1, 2005, and thereafter on each and every first day of the month throughout the term of the Note. In addition, Borrower shall pay upon demand all of Servicer's costs and expenses in connection with its review of leases, subordination non-disturbance agreements, property inspections, review of development plans or other plans and specifications, construction draws, casualty or condemnation matters or loan defaults.

(e) Notwithstanding anything to the contrary contained herein or in the Loan Agreement or in any other Loan Document, in the event the Loan is sold or transferred, including, without limitation, to an Affiliate of the Lender named herein, and such holder or holders of the Loan elects in writing (the "**Triggering Event**") to require Borrower to pay to Lender the Minimum Monthly Interest Amount, such Minimum Monthly Interest Amount shall

{10283260:8}    5

be due and payable to Lender commencing on the first day of the month designated in such notice (the "**Minimum Monthly Interest Amount Commencement Date**") and on each Scheduled Payment Date thereafter from Available Cash Flow to the extent available, with any shortfall between such Minimum Monthly Interest Amount and such Available Cash Flow (each a "**Shortfall**") being paid from the Interest Reserve Account in accordance with Section 23 hereof. The "**Minimum Monthly Interest Amount**" shall mean a payment of interest equal to interest accrued on the outstanding principal balance of the Note at the rate of nine (9%) percent per annum for the Monthly Interest Period in question based on a three hundred sixty (360) day year and the actual number of days lapsed. From and after the Minimum Monthly Interest Amount Commencement Date, the words "the Available Cash Flow paid to Lender" in clause (y) of Section 3(a)(i) hereof shall be deemed to mean the Available Cash Flow plus any Shortfall paid to Lender.

4. **Intentionally Omitted.**

5. **Requirements of Law.**

(a) All payments made by Borrower hereunder shall be made free and clear of, and without reduction for or on account of, stamp, use or other taxes, levies, imposts, duties, charges, fees, deductions, reserves or withholdings imposed, levied, collected, withheld or assessed by any Governmental Authority, which are imposed, enacted or become effective after the date hereof, excluding, however, income and franchise taxes of the United States of America or any political subdivision or taxing authority thereof or therein (including any state taxing authority) imposed upon Lender (such income and franchise tax exclusions being referred to herein as the "**Excluded Taxes**") (collectively, "**Governmental Taxes**"). If any Governmental Taxes (other than such Excluded Taxes) are required to be withheld from any amounts payable to Lender hereunder, the amounts so payable to Lender shall be increased to the extent necessary to yield to Lender (after payment of all Governmental Taxes) interest or any such other amounts payable hereunder at the rate or in the amounts specified hereunder. Whenever any Governmental Tax is payable pursuant to applicable law by Borrower, as promptly as possible thereafter, Borrower shall send to Lender an original official receipt, if available, or certified copy thereof showing payment of such Governmental Tax. Borrower hereby indemnifies Lender for any incremental taxes, interest or penalties that may become payable by Lender which may result from any failure by Borrower to pay any such Governmental Tax when due to the appropriate taxing authority or any failure by Borrower to remit to Lender the required receipts or other required documentary evidence.

(b) In the event that any change in any requirement of law (other than with respect to Excluded Taxes) or in the interpretation or application thereof, or compliance by Lender with any request or directive (whether or not having the force of law) hereafter issued from any central bank or other Governmental Authority:

(i) shall hereafter impose, modify or hold applicable any additional cost or reserve, special deposit, compulsory loan or similar requirement, against assets held by, or deposits or other liabilities in or for the account of, advances or loans by, or other credit extended by, or any other acquisition of funds by, any office of Lender;

(ii) shall hereafter have the effect of reducing the rate of return on Lender's capital as a consequence of its obligations hereunder to a level below that which Lender could have achieved but for such adoption, change or compliance (taking into consideration Lender's policies with respect to capital adequacy) by any amount deemed by Lender to be material; or

(iii) shall hereafter impose on Lender any other condition and the result of any of the foregoing is to increase the cost to Lender of making, renewing or maintaining loans or extensions of credit or to reduce any amount receivable hereunder;

then, in any such case, Borrower shall promptly pay Lender, upon demand, any additional amounts necessary to compensate Lender for such additional cost or reduced amount receivable as determined by Lender. If Lender becomes entitled to claim any additional amounts pursuant to this Section 5(b), Lender shall provide Borrower with not more than ninety (90) days written notice specifying in reasonable detail the event by reason of which it has become so entitled and the additional amount required to fully compensate Lender for such additional cost or reduced amount. A certificate as to any additional costs or amounts payable pursuant to the foregoing sentence submitted by Lender to Borrower shall be conclusive in the absence of manifest error.

This provision shall survive payment of the Note and the satisfaction of all other obligations of Borrower under this Note, the Loan Agreement, the Pledge Agreements and the Other Security Documents.

6. **Default and Acceleration.**

The whole of (a) the Principal sum of this Note, (b) Additional Fee, Default Interest, Accrued Interest, late charges and other sums, all as provided in this Note, the Loan Agreement, the Security Instrument, the Pledge Agreements or the Other Security Documents, (c) all other monies agreed or provided to be paid by Borrower in this Note, the Loan Agreement or the Other Security Documents, (d) all sums advanced pursuant to the Loan Agreement and any liens and the security interests created thereby, and (e) all sums advanced and costs and expenses incurred by Lender in connection with the Debt or any part thereof, any renewal, extension, or change of or substitution for the Debt or any part thereof, or the acquisition or perfection of the security therefor, whether made or incurred at the request of Borrower or Lender (all the sums referred to in (a) through (e) above shall collectively be referred to as the "**Debt**") shall without further notice become immediately due and payable at the option of Lender on the occurrence of any Event of Default.

7. **Default Interest.**

Borrower does hereby agree that upon the occurrence of an Event of Default, Lender shall be entitled to receive and Borrower shall pay interest on (i) the entire unpaid principal sum of this Note, (ii) the Accrued Interest and (iii) all amounts advanced by Lender pursuant to the terms of the Loan Agreement or the other Loan Documents, at a rate (the "**Default Rate**") equal to the lesser of (i) the Applicable Interest Rate plus five percent (5%), and (ii) the maximum interest rate that Borrower may by law pay. The Default Rate shall be computed from the occurrence of the Event of Default until the earlier of the date upon which the Event of Default is cured or the date upon which the Debt is paid in full. Interest calculated at the Default Rate shall be added to the Debt, and shall be deemed secured by the Security Instrument and the Pledge Agreements. This clause, however, shall not be construed as an

{10283260:8}                                              7

agreement or privilege to extend the date of the payment of the Debt, nor as a waiver of any other right or remedy accruing to Lender by reason of the occurrence of any Event of Default. Interest at the Default Rate shall also be charged on amounts owed by Borrower to Lender pursuant to any judgments entered in favor of Lender with respect to this Note and shall continue to accrue after judgment until collection.

8. **Prepayment.**

This Note may not be prepaid in full or in part prior to the second anniversary of the CPL Closing Date (as such term is defined in the Loan Agreement) (the "**Lockout Period**"). Provided no Event of Default exists, the principal balance of this Note may be prepaid in whole, but not in part, at any time after the expiration of the Lockout Period, upon: (I) not less than thirty (30) days irrevocable prior written notice (the "**Prepayment Notice**") to Lender specifying the Scheduled Payment Date on which prepayment is to be made (the "**Prepayment Date**"); (II) payment of all accrued and unpaid interest on the outstanding principal balance of this Note to and including the Prepayment Date; (III) payment of all other sums then due under this Note, the Security Instrument, the Pledge Agreements, the Loan Agreement and the other Loan Documents, including, without limitation, Accrued Interest and the Additional Fee. If Borrower is unable or otherwise fails to make prepayment on the Prepayment Date designated in such Prepayment Notice, and (ii) Borrower thereafter tenders a prepayment on a date prior to the next Scheduled Payment Date following such Prepayment Date, the prepayment shall only be permitted if such prepayment includes, without limitation, interest at the Applicable Interest Rate through and including the day immediately preceding the Scheduled Payment Date immediately following the designated Prepayment Date. Lender shall not be obligated to accept any prepayment of the principal balance of this Note unless it is accompanied by all sums due in connection therewith and it is made in accordance with the terms hereof. Notwithstanding the foregoing, the principal balance of this Note may be prepaid, in part, without delivery of the Prepayment Notice required under this Section 8, in connection with (a) any partial prepayment made to Lender from Net Proceeds in accordance with Section 6.4 of the Loan Agreement, (b) any partial prepayment made to Lender which is required by Lender pursuant to Section 7.2 of the Loan Agreement, and (c) any partial prepayment made to Lender from Available Cash Flow in accordance with Section 5.20 of the Loan Agreement.

9. **Security.**

This Note is secured by the Security Instrument, the Pledge Agreements and the other Loan Documents. All of the terms, covenants and conditions contained in the Loan Agreement, the Security Instrument, the Pledge Agreements and the Other Security Documents are hereby made part of this Note to the same extent and with the same force as if they were fully set forth herein. Lender shall terminate, release and discharge the Pledge Agreements and all related security interests and other liens only when the Debt is no longer payable hereunder pursuant to the terms hereof.

10. **Savings Clause.**

This Note is subject to the express condition that at no time shall Borrower be obligated or required to pay interest on the principal balance due hereunder or the Deferral or the Accrued Interest at a rate which could subject Lender to either civil or criminal liability as a result of being in excess of the maximum interest rate which Borrower is permitted by applicable

{10283260:8}　　　　　　　　　　　　　　8

law to contract or agree to pay. If by the terms of this Note, Borrower is at any time required or obligated to pay interest on the principal balance due hereunder or the Deferral or the Accrued Interest at a rate in excess of such maximum rate, the Applicable Interest Rate or the Default Rate, as the case may be, shall be deemed to be immediately reduced to such maximum rate and all previous payments in excess of the maximum rate shall be deemed to have been payments in reduction of principal or the Deferral or the Accrued Interest, as the case may be, and not on account of the interest due hereunder. All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the Debt, shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Note until payment in full so that the rate or amount of interest on account of the Debt does not exceed the maximum lawful rate of interest from time to time in effect and applicable to the Debt for so long as the Debt is outstanding. In addition to the foregoing, if any of the terms or provisions of this Note shall be held unenforceable or otherwise void, then such terms or provisions shall be deemed separate from the remaining terms and provisions of this Note and shall in no way affect the validity and enforceability of any of the remaining terms and provisions of this Note, all of which shall remain in full force and effect.

11. **No Oral Change.**

This Note may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

12. **Joint and Several Liability.**

If Borrower consists of more than one person or party, the obligations and liabilities of each person or party shall be joint and several.

13. **Waivers.**

Borrower and all others who may become liable for the payment of all or any part of the Debt do hereby severally waive presentment and demand for payment, notice of dishonor, protest and notice of protest and non-payment and all other notices of any kind. No release of any security for the Debt or extension of time for payment of this Note or any installment hereof, and no alteration, amendment or waiver of any provision of this Note, the Loan Agreement or the Other Security Documents made by agreement between Lender or any other person or party shall release, modify, amend, waive, extend, change, discharge, terminate or affect the liability of Borrower, and any other person or entity who may become liable for the payment of all or any part of the Debt, under this Note, the Loan Agreement or the Other Security Documents. No notice to or demand on Borrower shall be deemed to be a waiver of the obligation of Borrower or of the right of Lender to take further action without further notice or demand as provided for in this Note, the Loan Agreement or the Other Security Documents. If Borrower is a partnership or limited liability company, the agreements herein contained shall remain in force and applicable, notwithstanding any changes in the individuals comprising the partnership or members comprising the limited liability company, and the term "**Borrower**", as used herein, shall include any alternate or successor partnership or limited liability company, but any predecessor partnership or limited liability company and their partners or members shall not thereby be released from any liability. If Borrower is a corporation, the agreements contained

{10283260:8}    9

herein shall remain in full force and applicable, notwithstanding any changes in the shareholders comprising, or the officers and directors relating to, the corporation, and the term "**Borrower**" as used herein, shall include any alternative or successor corporation, but any predecessor corporation shall not be relieved of liability hereunder. Nothing in the foregoing sentence shall be construed as a waiver of any prohibition or restriction on transfers of interests in such partnership, limited liability company or corporation which may be set forth in the Loan Agreement or any Other Security Document.

14.   **Transfer.**

Upon the transfer of this Note by Lender, Lender may deliver all the collateral mortgaged, granted, pledged or assigned pursuant to the Loan Agreement, the Security Instrument, the Pledge Agreements and the Other Security Documents, or any part thereof, to the transferee who shall thereupon become vested with all the rights herein or under applicable law given to Lender with respect thereto, and Lender shall thereafter forever be relieved and fully discharged from any liability or responsibility in the matter; but Lender shall retain all rights hereby given to it with respect to any liabilities and the collateral not so transferred. Lender shall provide notice to Borrower of a transfer of this Note; *provided, however,* the failure of Lender to provide such notice shall not impair the effectiveness of any transfer of this Note.

15.   **Waiver of Trial by Jury.**

BORROWER AND LENDER HEREBY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER IN CONTRACT, TORT OR OTHERWISE, RELATING DIRECTLY OR INDIRECTLY TO THE LOAN EVIDENCED BY THIS NOTE, THE APPLICATION FOR THE LOAN EVIDENCED BY THIS NOTE, THIS NOTE OR THE OTHER SECURITY DOCUMENTS OR ANY ACTS OR OMISSIONS OF THE OTHER PARTY, THEIR RESPECTIVE OFFICERS, EMPLOYEES, DIRECTORS OR AGENTS IN CONNECTION THEREWITH. THIS WAIVER IS KNOWINGLY, INTENTIONALLY AND VOLUNTARILY MADE BY BORROWER AND LENDER, AND BORROWER AND LENDER ACKNOWLEDGE THAT NEITHER THE OTHER PARTY NOR ANY OTHER PERSON ACTING ON BEHALF OF THE OTHER PARTY HAS MADE ANY REPRESENTATIONS OF FACT TO INDUCE THIS WAIVER OF TRIAL BY JURY OR HAS TAKEN ANY ACTIONS THAT IN ANY WAY MODIFY OR NULLIFY ITS EFFECT. BORROWER AND LENDER FURTHER ACKNOWLEDGE THAT THEY HAVE BEEN REPRESENTED (OR HAVE HAD THE OPPORTUNITY TO BE REPRESENTED) IN THE SIGNING AND ACCEPTING OF THIS NOTE AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL, SELECTED OF ITS OWN FREE WILL, AND THAT THEY HAVE HAD THE OPPORTUNITY TO DISCUSS THIS WAIVER WITH COUNSEL. BORROWER AND LENDER FURTHER ACKNOWLEDGE THAT THEY HAVE READ AND UNDERSTAND THE MEANING AND RAMIFICATIONS OF THIS WAIVER PROVISION.

16.   **Authority.**

Borrower (and the undersigned representative of each Borrower) represents that it has full power, authority and legal right to execute and deliver this Note, the

Loan Agreement and the Other Security Documents, to perform its obligations hereunder and thereunder, and that this Note and the Other Security Documents constitute valid and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

17. **Applicable Law.**

This Note shall be governed, construed, applied and enforced in accordance with the laws of the State of New York and the applicable laws of the United States of America.

18. **Jurisdiction and Service of Process.**

(a) With respect to any claim or action arising hereunder or under the Loan Agreement or the Other Security Documents, Borrower (i) irrevocably submits to the nonexclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York, New York; (ii) agrees that all such claims or actions may be heard and determined in such courts of the State of New York or, to the extent permitted by law, in such federal court; and (iii) irrevocably waives any (A) objection which it may have at any time to the laying of venue of any suit, action or proceeding arising out of or relating to this Note brought in any such court and (B) any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

(b) Borrower will maintain a place of business or an agent for service of process in New York, New York, and give prompt notice to Lender of the address of such place of business and of the name and address of any new agent appointed by it, as appropriate. Borrower further agrees that the failure of its agent for service of process to give it notice of any service of process will not impair or affect the validity of such service or of any judgment based thereon. If, despite the foregoing, there is for any reason no agent for service of process on Borrower available to be served, and if it at that time Borrower has no place of business in New York, New York, then Borrower irrevocably consents to service of process by registered or certified mail, postage prepaid, to it at its address given in Section 20 of this Note.

(c) Borrower initially and irrevocably designates Corporation Service Company, with offices on the date hereof at 80 State Street, Albany, New York 12207 ("**New York Agent**") to receive for and on behalf of Borrower service of process in New York, New York, with respect to this Note. Lender shall provide to Borrower at its address set forth in Section 20 below, with a copy of any service of process given by Lender to New York Agent, *provided* the failure of Lender to deliver such copy to Borrower shall not impair the effectiveness of the service of process.

(d) Nothing in this Note will be deemed to preclude Lender from bringing an action or proceeding with respect hereto in any other jurisdiction.

19. **Counsel Fees.**

In the event that it should become necessary to employ counsel to collect the Debt or to protect or foreclose the security therefor, Borrower also agrees to pay all reasonable fees and expenses of Lender, including, without limitation, reasonable attorney's fees for the services of such counsel whether or not suit be brought.

{10283260:8}                                11

20. **Notices.**

All notices or other written communications hereunder shall be deemed to have been properly given (i) upon delivery, if delivered in person, (ii) one (1) Business Day after having been deposited for overnight delivery with any reputable overnight courier service, or (iii) three (3) Business Days after having been deposited in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

| | |
|---|---|
| If to Borrower: | The Towers-Las Vegas, LLC<br>474 South North Lake Boulevard<br>Suite 1020<br>Altamonte Springs, Florida 32701<br>Attention: Mr. Christopher DelGuidice |
| | and |
| | The Towers-LV, LLC<br>474 South North Lake Boulevard<br>Suite 1020<br>Altamonte Springs, Florida 32701<br>Attention: Mr. Christopher DelGuidice |
| With a copy to: | Murai Wald Biondo Moreno & Brochin, P.A.<br>2 Alhambra Plaza<br>Penthouse 1B<br>Coral Gables, FL 33134<br>Attention: Gerald J. Biondo, Esq. |
| If to Lender: | Mr. David Ridini<br>Lehman Brothers Holdings Inc.<br>399 Park Avenue, 8th Floor<br>New York, New York 10022<br>MTS# VH21/Asset #1107301 |
| With a copy to: | David Broderick, Esq.<br>Lehman Brothers Holdings Inc.<br>399 Park Avenue, 8th Floor<br>New York, New York 10022<br>MTS# VH21/Asset #1107301 |

{10283260:8}                                    12

|  |  |
|---|---|
| And an additional copy to Servicer: | J. Gregory Winchester<br>Trimont Real Estate Advisors, Inc.<br>Monarch Towers<br>3424 Peachtree Road NE<br>Suite 2200<br>Atlanta, Georgia 30326<br>MTS# VH21/Asset #1107301 |
| And an additional copy to | James J. Thomas, Esq.<br>Windels Marx Lane & Mittendorf, LLP<br>156 West 56th Street<br>New York, New York 10019 |

or addressed as such party may from time to time designate by written notice to the other parties.

21. **Recourse.**

Each of the terms and provisions of Article XXII of the Loan Agreement are incorporated herein and made a part hereof as if such terms and provisions were fully set forth in this Section 21 of this Note. Notwithstanding any provisions of Article XXII of the Loan Agreement, or this Section 21 of the Note due to such incorporation, to the contrary, Christopher DelGuidice shall be personally liable to Lender as provided in, and subject to the terms of, both the Guaranty (as defined in the Loan Agreement), and when executed, the Completion Guaranty (as defined in the Loan Agreement).

22. **Miscellaneous.**

(a) Wherever pursuant to this Note (i) Lender exercises any right given to it to approve or disapprove, (ii) any arrangement or term is to be satisfactory to Lender, or (iii) any other decision or determination is to be made by Lender, the decision of Lender to approve or disapprove, all decisions that arrangements or terms are satisfactory or not satisfactory and all other decisions and determinations made by Lender, shall be in the sole and absolute discretion of Lender and shall be final and conclusive, except as may be otherwise expressly and specifically provided herein.

(b) Wherever pursuant to this Note it is provided that Borrower pay any costs and expenses, such costs and expenses shall include, but not be limited to, reasonable legal fees and disbursements of Lender and Servicer, (including reimbursement for the expenses of in-house staff of Servicer).

(c) This Note may, at the option of Lender, at its sole cost and expense, at any time until the same shall be fully paid and satisfied, be split or divided into two or more notes. To that end, Borrower, upon written request of Lender, shall execute and deliver to Lender and/or its designee or designees substitute notes in such principal amounts, aggregating not more than the then unpaid principal amount of this Note and the then outstanding amount of other obligations and containing terms, provisions and clauses substantially similar to those contained herein and such other documents and instruments as may

{10283260:8}            13

be required by Lender, provided Borrower's payment obligations hereunder are not affected, except to a *de minimis* extent. Lender shall bear its own costs and any reasonable out-of-pocket costs incurred by Borrower, including the cost of any additional title insurance policies and/or recording fees arising from such a split.

(d)     Borrower acknowledges that Lender may, at Lender's sole cost and expense, securitize this Note or any replacement notes, or otherwise sell, assign, transfer or convey, by pledge or otherwise, this Note or any replacement notes and all or any portion of Lender's interest therein or in the Loan evidenced hereby to third parties. In such event, in order to maximize the proceeds of such securitization or other sale, assignment, transfer or conveyance, Borrower shall fully cooperate with Lender and Lender shall bear any reasonable out-of-pocket costs incurred by Borrower in connection therewith.

(e)     This Note may be executed in several counterparts, each of which counterpart shall be deemed an original instrument and all of which together shall constitute a single Note. The failure of any party hereto to execute this Note, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

23.     **Interest Reserve Account**.

(a)     If a Triggering Event occurs, Borrower hereby irrevocably authorizes Lender to make a Loan advance in an amount not to exceed $10,125,000.00 (the "**Interest Reserve Advance**") and deposit the Interest Reserve Advance into an escrow account held by Lender or Lender's agent or Servicer (the "**Interest Reserve Account**") for payment of the Minimum Monthly Interest Amounts. Borrower hereby irrevocably authorizes Lender and/or Lender's agent or Servicer to disburse monthly from the Interest Reserve Account the amount of any Shortfall to pay Lender the Minimum Monthly Interest Amount. The Interest Reserve Account and all funds therein shall be pledged to Lender, and Borrower shall, upon request of Lender, promptly execute and deliver to Lender any documents or instruments required by Lender to establish, evidence and secure its pledge of such account and the funds therein, including, without limitation, an account control agreement. Funds in the Interest Reserve Account shall not be disbursed for any purpose other than to pay Lender the Minimum Monthly Interest Amount. In the event there is insufficient cash in the Interest Reserve Account and from Available Cash Flow to pay the Minimum Monthly Interest Amount, Borrower shall pay to the then Lender such shortfall from Borrower equity and failure to make a Minimum Monthly Interest Amount payment, or any portion thereof, on the earlier of (i) its due date, provided Lender has given at least seven (7) days prior written notice to Borrower of there being insufficient funds in the Interest Reserve Account to pay such Minimum Monthly Interest Amount (once given, such notice shall be deemed given with respect to all other Minimum Monthly Interest Amounts due during the initial term of the Loan), or (ii) within five (5) days subsequent to its due date, shall be an Event of Default hereunder, under the Loan Agreement and the other Loan Documents.

(b)     In the event Borrower effectively exercises the First Extension Option in accordance with the terms hereof and the Triggering Event has occurred and Lender has funded the Interest Reserve Advance, Borrower hereby irrevocably authorizes Lender upon the occurrence of a "Minimum Monthly Interest Amount First Extension Deficiency" to advance Loan proceeds in an amount of up to $2,250,281.00 for deposit into the Interest Reserve Account (the "**First Extension Interest Reserve Advance**") for payment of the Minimum Monthly

{10283260:8}                               14

Interest Amounts due during the First Extension Period. In the event there is insufficient cash in the Interest Reserve Account and from available Cash Flow to pay the Minimum Monthly Interest Amount during the First Extension Period, Borrower shall make such payment to the holder or holders of the Loan of any such shortfall amount from Borrower equity and failure to make such payment, or any portion thereof, on the earlier of (i) its due date, provided Lender has given at least seven (7) days prior written notice to Borrower of there being insufficient funds in the Interest Reserve Account to pay such Minimum Monthly Interest Amount (once given, such notice shall be deemed given with respect to all other Minimum Interest Amounts due during the First Extension Period), or (ii) within five (5) days subsequent to its due date, shall be an Event of Default hereunder, under the Loan Agreement and the other Loan Documents. For purposes hereof, "**Minimum Monthly Interest Amount First Extension Deficiency**" shall mean if the balance in the Interest Reserve Account on the first day of the First Extension Period is less than the amount Lender determines will be necessary to pay the Minimum Monthly Interest Amounts during the First Extension Period.

(c)     In the event Borrower effectively exercises the Second Extension Option in accordance with the terms hereof and the Triggering Event has occurred and Lender has funded the First Extension Interest Reserve Advance, Borrower hereby irrevocably authorizes Lender upon the occurrence of a "Minimum Monthly Interest Amount Second Extension Deficiency" to advance Loan proceeds in an amount of up to $2,610,214.00 for deposit into the Interest Reserve Account (the "**Second Extension Interest Reserve Advance**") for payment of the Minimum Monthly Interest Amounts due during the Second Extension Period. In the event there is insufficient cash in the Interest Reserve Account and from available Cash Flow to pay the Minimum Monthly Interest Amount during the Second Extension Period, Borrower shall make such payment to the holder or holders of the Loan of any such shortfall amount from Borrower equity and failure to make such payment, or any portion thereof, on the earlier of (i) its due date, provided Lender has given at least seven (7) days prior written notice to Borrower of there being insufficient funds in the Interest Reserve Account to pay such Minimum Monthly Interest Amount (once given, such notice shall be deemed given with respect to all other Minimum Interest Amounts due during the Second Extension Period), or (ii) within five (5) days subsequent to its due date, shall be an Event of Default hereunder, under the Loan Agreement and the other Loan Documents. For purposes hereof, "**Minimum Monthly Interest Amount Second Extension Deficiency**" shall mean if the amount in the Interest Reserve Escrow Account on the first day of the Second Extension Period is less than the amount Lender determines will be necessary to pay the Minimum Monthly Interest Amounts during the Second Extension Period.

(d)     In the event Lender makes an Interest Reserve Advance, a First Extension Interest Reserve Advance and/or a Second Extension Interest Reserve Advance, on the Maturity Date, provided no Event of Default exists, Lender shall calculate the Overpayment (as defined below) and reduce the amount of the Additional Fee due Lender under the Note by the Overpayment if and only if such Overpayment was paid or will be paid to Lender simultaneously with such reduction. The Overpayment shall be calculated by Lender as follows: first, Lender shall calculate the total amount of interest due over the term of the Loan as if no Interest Reserve Advance (and no First Extension Interest Reserve Advance and no Second Extension Interest Reserve Advance) was funded by Lender but otherwise in accordance with the terms of the Note, including taking into account all payments and prepayments when made during the term of the Loan, other than any payments made from the Interest Reserve Account, and taking into account all Accrued Interest (the "**Total Deal Interest**"); second, Lender shall calculate the actual

interest due through the term of the Loan taking into account the Interest Reserve Advance actually funded by Lender, the First Extension Interest Reserve Advance if and to the extent actually funded by Lender, and the Second Extension Interest Reserve Advance if and to the extent actually funded by Lender, and all payments and prepayments when made during the term of the Loan, including any payments made from the Interest Reserve Account, and taking into account all Accrued Interest (the "**Actual Interest**"), and lastly, Lender shall deduct the Total Deal Interest from the Actual Interest and such positive difference, if any, is referred to herein as the "**Overpayment**".

24. **Extension Options**.

(a) The Borrower shall have the right to extend the Original Scheduled Maturity Date of the Loan to the First Extension Maturity Date (the "**First Extension Option**") by giving written notice to Lender of the exercise of the First Extension Option no earlier than one hundred twenty (120) days and no later than fifteen (15) days prior to the Original Scheduled Maturity Date, provided that the following conditions precedent are satisfied: (i) no Event of Default exists either at the time of the exercise of the First Extension Option or on the Original Scheduled Maturity Date, (ii) Borrower has delivered to Lender, at its sole cost and expense, a new Lender's title insurance policy issued by an insurer acceptable to Lender or endorsement to Lender's Title Policy (as defined in the Loan Agreement) in accordance with the terms of Section 25.5(d) of the Loan Agreement and (iii) at the time the First Extension Option is exercised, the First Extension Fee is paid to Lender (Borrower hereby authorizes Lender to advance Loan proceeds for the payment of the First Extension Fee and to pay same to Lender upon the exercise of the First Extension Option by Borrower), which First Extension Fee shall be deemed earned and nonrefundable upon the exercise by Borrower of the First Extension Option, irrespective of whether the Loan is extended through the First Extension Period. The First Extension Option shall be irrevocable once exercised by Borrower. If the First Extension Option is timely and effectively exercised in accordance with this Section 24(a) hereof, the term of the Loan shall be extended through the First Extension Maturity Date upon all of the terms and conditions contained herein, except that Borrower shall have no right or option to extend the term of the Loan, except as provided in Section 24(b) below.

(b) If the Loan is extended through the First Extension Period in accordance with Section 24(a) above, the Borrower shall have the right to extend the then Scheduled Maturity Date to the Second Extension Maturity Date (the "**Second Extension Option**") by giving written notice to Lender of the exercise of the Second Extension Option no earlier than one hundred twenty (120) days and no later than fifteen (15) days prior to the First Extension Maturity Date, provided that the following conditions precedent are satisfied: (i) no Event of Default exists either at the time of the exercise of the Second Extension Option or on the First Extension Maturity Date, (ii) Borrower has delivered to Lender, at its sole cost and expense, a new Lender's title insurance policy issued by an insurer acceptable to Lender or endorsement to Lender's Title Policy in accordance with Section 25.5(d) of the Loan Agreement and (iii) at the time the Second Extension Option is exercised, the Second Extension Fee is paid to Lender (Borrower hereby authorizes Lender to advance Loan proceeds for the payment of the Second Extension Fee and to pay the same to Lender upon the exercise of the Second Extension Option by Borrower), which Second Extension Fee shall be deemed earned and nonrefundable upon the exercise by Borrower of the Second Extension Option, irrespective of whether the Loan is extended through the Second Extension Period. The Second Extension shall be irrevocable once exercised by Borrower. If the Second Extension Option is timely and effectively exercised

in accordance with this Section 24(b), the term of the Loan shall be extended through the Second Extension Maturity Date upon all of the terms and conditions contained herein, except that Borrower shall have no right or option to extend the term of the Loan beyond the Second Extension Maturity Date.

**[SIGNATURE PAGE FOLLOWS]**

**(Signature Page to Secured Promissory Note)**

**IN WITNESS WHEREOF,** Borrower has duly executed this Note as of the day and year first above written.

**BORROWER:**

**THE TOWERS-LAS VEGAS, LLC,**
a Nevada limited liability company

By:   The Towers-LV, LLC,
      a Delaware limited liability company,
      its sole member

   By:   The Towers-LV Member, LLC,
         a Delaware limited liability company, its sole member

      By:   The Towers-LV, Inc.,
            a Delaware corporation, its sole member

            By: _____
            Name: Christopher DelGuidice
            Title: President

**THE TOWERS-LV, LLC,**
a Delaware limited liability company

By:   The Towers-LV Member, LLC,
      a Delaware limited liability company, its sole member

   By:   The Towers-LV, Inc.,
         a Delaware corporation, its sole member

         By: _____
         Name: Christopher DelGuidice
         Title: President

## ACKNOWLEDGEMENTS

STATE OF NEVADA      )
                     ) ss.:
COUNTY OF Clark      )

      On this 17th day of November, 2004, before me, the undersigned, a NOTARY PUBLIC in and for said County and State, personally appeared **Christopher DelGuidice** personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged that he executed it.

WITNESS my hand and official seal

[Notary Seal: JANE D. GREY, Notary Public State of Nevada, No. 99-54255-1, My appt. exp. May 1, 2007]

_____
NOTARY PUBLIC in and for said County and state


STATE OF NEVADA      )
                     ) ss.:
COUNTY OF Clark      )

      On this 17th day of November, 2004, before me, the undersigned, a NOTARY PUBLIC in and for said County and State, personally appeared **Christopher DelGuidice** personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged that he executed it.

WITNESS my hand and official seal

[Notary Seal: JANE D. GREY, Notary Public State of Nevada, No. 99-54255-1, My appt. exp. May 1, 2007]

_____
NOTARY PUBLIC in and for said County and state