# EXHIBIT 2

Execution Copy

# SCHEDULE
## to the
## Amended and Restated
## Master Agreement
## dated as of February 1, 2008

between    Lehman Brothers OTC Derivatives    and    Intel Corporation,
Inc., a corporation organized under    a company organized under the
the laws of the State of    laws of the State of Delaware
Delaware("Party A")    ("Party B")

## PART 1. TERMINATION PROVISIONS

(a)    "Specified Entity" means in relation to Party A for the purpose of:-

Section 5(a)(v), Lehman Brothers Commercial Corporation,
Section 5(a)(vi), Lehman Brothers Commercial Corporation,
Section 5(a)(vii), Lehman Brothers Commercial Corporation,
Section 5(b)(iv), none,

and in relation to Party B for the purpose of:-

Section 5(a)(v), none,
Section 5(a)(vi), none,
Section 5(a)(vii), none,
Section 5(b)(iv), none.

(b)    Except as otherwise indicated herein, "Specified Transaction" will have the meaning specified in Section 14 of the Agreement.

(c)    The "Cross Default" provisions of Section 5(a)(vi) will apply to Party A and to Party B.

"Specified Indebtedness" means any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of (i) borrowed money, or (ii) any Specified Transaction (except that, for this purpose only, the words "and any other entity" shall be substituted for the words "and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party)" where they appear in the definition of "Specified Transaction"); provided, that the foregoing shall not apply to Specified Indebtedness in respect of a Specified Transaction unless the relevant counterparty has made demand for payment of such indebtedness and Party A is not contesting in good faith its obligation to pay such amount by appropriate proceedings or other appropriate actions (which may include entering into negotiations in good faith with the relevant counterparty).

"Threshold Amount" means US$100,000,000 or the equivalent in any other currency at spot rates of exchange prevailing from time to time.

Execution Copy

(d)   The "Credit Event Upon Merger" provisions of Section 5(b)(iv) WILL apply to Party A and to Party B, restated as follows:

"Credit Event Upon Merger" shall mean that a Designated Event (as defined below) occurs with respect to a party, any Credit Support Provider of such party or any applicable Specified Entity of such party (in each case, "X"), and such Designated Event does not constitute an event described in Section 5(a)(viii) of this Agreement, but the creditworthiness of X or, if applicable, the successor, surviving or transferee entity of X, is materially weaker than that of X immediately prior to such action (and, in such event, such party or its successor or transferee, as appropriate, will be the Affected Party). For purposes hereof, a Designated Event with respect to X means that, after the execution date hereof, X consolidates or amalgamates with or merges with or into, or transfers all or substantially all its assets (or any substantial part of the assets comprising the business conducted by X as of the execution date hereof) to, or receives all or substantially all the assets or obligations of, another entity.

(e)   The "Automatic Early Termination" provision of Section 6(a) will not apply to Party A and will not apply to Party B; provided, however, that where the Event of Default specified in Section 5(a)(vii)(1), (3), (4), (5), (6) or, to the extent analogous thereto, (8), is governed by a system of law which does not permit termination to take place after the occurrence of the relevant Event of Default, then the Automatic Early Termination provision of Section 6(a) will apply to Party A and Party B for purposes of such Event of Default.

(f)   Payments on Early Termination. For the purpose of Section 6(e) of this Agreement, Market Quotation and the Second Method will apply.

(g)   "Termination Currency" means United States Dollars.

(h)   Additional Termination Event will not apply.

## PART 2. TAX REPRESENTATIONS

(a)   <u>Payer Representations</u>. For the purpose of Section 3(e) of this Agreement, Party A and Party B each make the following representation:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Section 2(e), 6(d)(ii) or 6(e) of this Agreement) to be made by it to the other party under this Agreement. In making this representation, it may rely on (i) the accuracy of any representations made by the other party pursuant to Section 3(f) of this Agreement, (ii) the satisfaction of the agreement contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section

Execution Copy

      4(a)(i) or 4(a)(iii) of this Agreement and (iii) the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement; provided that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) by reason of material prejudice to its legal or commercial position.

(b)    <u>Payee Representations</u>. For the purpose of Section 3(f) of this Agreement, Party A and Party B make the representations specified below, if any:

     (i)    The following representation will apply to Party A:

          Party A represents it is a U.S. person, and treated as a corporation, for United States federal income tax purposes.

     (ii)   The following representation will apply to Party B:

          Party B represents that it is a U.S. person, and treated as a corporation, for United States federal income tax purposes.

## PART 3. AGREEMENT TO DELIVER DOCUMENTS

For the purpose of Sections 4(a)(i) and 4(a)(ii) of this Agreement, each party agrees to deliver the following documents, as applicable:

(a)    Tax forms, documents or certificates to be delivered are: as provided in Section 4(a)(iii).

(b)    Other documents to be delivered are:

| Party Required to Deliver Document | Form, Document, Certificate | Date by which delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party A and Party B | Evidence of the incumbency and specimen signature of each person executing this Agreement or any other document on its behalf in connection with this Agreement. | Upon execution of this Agreement and, if requested, each Confirmation. | Yes |
| Party A and Party B | Copy of the resolutions of the Board of Directors of such party, certified by the Secretary or an | Upon execution of this Agreement. | Yes |

Execution Copy

| | | | |
|---|---|---|---|
| | Assistant Secretary of such party, authorizing the execution and delivery of this Agreement and each Confirmation. | | |
| Party A and Party B | Copy of annual audited, consolidated financial statements of Lehman Brothers Holdings Inc., in the case of Party A, and Intel Corporation, in the case of Party B, prepared in accordance with generally accepted accounting principles applied on a consistent basis, duly certified by independent certified public accountants of recognized standing selected by the party providing such statements. | Promptly upon request by the other party, after such financial statements become publicly available. | Yes |
| Party A | A duly executed Credit Support Document | Upon execution of this Agreement. | No |

Execution Copy

## PART 4. MISCELLANEOUS

(a) <u>Addresses for Notices</u>. For the purpose of Section 12(a) of this Agreement:

    (i) Addresses for notices or communications to Party A:

        Address: Lehman Brothers OTC Derivatives Inc.
        c/o Lehman Brothers Inc.
        Legal Compliance and Audit Group
        Capital Markets Contracts - Legal
        745 Seventh Avenue, $19^h$ Floor
        New York, New York 10019

        Attention: Documentation Manager

        Telephone No.:212-526-7187

        Facsimile No.: 212-526-7672

        For all purposes.

    (ii) Addresses for notices or communications to Party B:

        Address: 2200 Mission College Boulevard, Treasury Dept., M/S RN6-47, Santa Clara, California, 95054
        Attention: Cash Manager
        Telex No. N/A Answerback: N/A
        Fax No. 408-765-1611

    With a copy of notices and communications pursuant to Sections 5 or 6 to:

        Address: Intel Corporation, 2200 Mission College Boulevard, Legal Dept., M/S SC4-203, Santa Clara, California 95054
        Attention: Director of Corporate Affairs
        Facsimile: 408-765-7636

(b) <u>Process Agent</u>. For the purpose of Section 13(c) of this Agreement:

    (i) Party A appoints as its Process Agent: None.

    (ii) Party B appoints as its Process Agent: None.

(c) <u>Offices</u>. The provisions of Section 10(a) will apply to this Agreement.

Execution Copy

(d)     Multibranch Party. For the purpose of Section 10(c) of this Agreement:

       (i)     Party A is not a Multibranch Party.

       (ii)     Party B is not a Multibranch Party.

(e)     Calculation Agent. The Calculation Agent is Party A, unless otherwise specified in a Confirmation in relation to the relevant Transaction.

(f)     Credit Support Document. Details of any Credit Support Document:

       (i)     Credit Support Document means in relation to Party A: Guarantee of Lehman Brothers Holding Inc. in the form attached hereto.

       (ii)     Credit Support Document means in relation to Party B: Not applicable.

(g)     Credit Support Provider.

       (i)     Credit Support Provider means in relation to Party A: Lehman Brothers Holding Inc.

       (ii)     Credit Support Provider means in relation to Party B: Not applicable.

(h)     Governing Law. This Agreement will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine).

(i)     Netting of Payments. Subparagraph (ii) of Section 2(c) of this Agreement will not apply to any Transactions.

(j)     "Affiliate" will have the meaning specified in Section 14 of this Agreement; provided, however, that Party A acknowledges and agrees that the Intel Corporation Profit-Sharing Retirement Plan, the Intel Corporation Defined Benefit Pension Plan, the Intel Puerto Rico Profit-Sharing Retirement Plan and the Intel Puerto Rico Defined Benefit Pension Plan are not Affiliates of Party B.

## PART 5. OTHER PROVISIONS

(a)     Definitions. Unless otherwise specified in a Confirmation, this Agreement, each Confirmation and each Transaction between the parties are subject to the 2000 ISDA Definitions as amended, supplemented, updated, restated, and superseded from time to time (the "2000 Definitions"), as published by the International Swaps and Derivatives Association, Inc. (formerly known as the International Swap Dealers Association, Inc.) ("ISDA"), and will be governed in all respects by the 2000 Definitions. Any reference to a "Swap Transaction" in the 2000 Definitions is deemed to be a reference to a "Transaction" for the purpose of

Execution Copy

interpreting this Agreement or any Confirmation, and any reference to a "Transaction" in this Agreement or any Confirmation is deemed to be a reference to a "Swap Transaction" for the purpose of interpreting the 2000 Definitions.

(b) <u>Inconsistency</u>. In the event of any inconsistency between any of the following documents, the relevant document first listed shall govern with respect to a particular Transaction: (i) the Confirmation of the Transaction, (ii) this Schedule, (iii) the definitions incorporated by reference in a Confirmation or in this Agreement, and (iv) the printed form of ISDA Master Agreement.

(c) <u>Principles and Practices for Wholesale Financial Market Transactions</u>. The parties to this Agreement hereby agree that the Principles and Practices for Wholesale Financial Market Transactions, released by the Federal Reserve Bank of New York and the International Swaps and Derivatives Association, Inc. on August 17, 1995, shall not apply to the relationship between the parties, this Agreement or any Transaction entered into hereunder; provided that in no event shall the inclusion of this subparagraph 5(c) affect the enforceability of the Agreement against either Party A or Party B.

(d) <u>Accuracy of Specified Information</u>. Section 3(d) is hereby amended by adding in the third line thereof after the word "respect" and before the period the words "or, in the case of audited or unaudited financial statements, fairly presents the financial condition of the entity for which such statements are provided."

(e) <u>Change of Account</u>. Section 2(b) is hereby amended by adding the following at the end thereof:

"and provided that, unless the other party consents (which consent shall not be unreasonably withheld), such new account shall be in the same tax jurisdiction as the original account."

(f) <u>Additional Representations</u>. Section 3 is hereby amended by adding at the end thereof the following subsections:

   (g) Party A and Party B each represent to the other that on the date hereof and on each date on which a Transaction is entered into between them that: (a) each Party is an "eligible contract participant" within the meaning of section 1a(12) of the Commodity Exchange Act, as amended; (b) this Agreement and each Transaction is subject to individual negotiation by each Party; and (c) neither this Agreement nor any Transaction will be executed or traded on a "trading facility" within the meaning of section 1a(33) of the Commodity Exchange Act, as amended.

   (h) <u>Intention to Enter Into a "Swap Agreement."</u> Each of Party A and Party B hereby acknowledges and agrees that this Agreement and each Transaction hereunder is intended to be a "swap agreement" as that term is defined in the U.S. Bankruptcy Code (as amended from time to time) and that the rights granted to each party under Section 6 include a contractual

Execution Copy

right to terminate a "swap agreement" and to offset and net out termination values and payments in conjunction therewith.

(g) <u>Set-Off</u>. Each party to this Agreement ("X") agrees that, upon an Early Termination Date resulting from an Event of Default with respect to X, the other party hereto ("Y") may, without prior notice to X, reduce any amount or obligation due and owing (whether or not arising under this Agreement and whether matured or unmatured regardless of the currency, place of payment or booking office of the obligation) to X (the "Original Obligation") by setting off against such amount or obligation any amounts due and owing (whether or not arising under this Agreement and whether matured or unmatured regardless of the currency, place of payment or booking office of the obligation) to Y (or any Affiliate of Y) by X and, for this purpose, may convert one currency into another at the applicable market exchange rate selected by Y on the relevant date. Any such setoff shall automatically satisfy and discharge the Original Obligation to X and, if the Original Obligation exceeds the amount or obligation to be setoff against, the Original Obligation shall be novated and replaced by an obligation to pay X only the excess of the Original Obligation over such amount or obligation.

Any obligation of Y to make payment or delivery to X hereunder shall in any event be conditioned upon and subject to the condition precedent that and shall arise only upon the date that all indebtedness and payment and delivery obligations, whether matured or unmatured, contingent or absolute, of X to Y shall have been fully and finally performed or satisfied.

If an amount or obligation is unascertained, Y may in good faith estimate that amount or obligation and set-off in respect of such estimate, subject to the relevant party accounting to the other when the amount or obligation is ascertained.

Nothing in this provision shall be effective to create a charge or other security interest. This provision shall be in addition to and not in limitation of any other right or remedy (including any right to setoff, counterclaim or otherwise withhold payment) to which any party is at any time otherwise entitled (whether by operation of law, contract or otherwise).

(h) <u>No Fiduciary Relationship</u>. The other party is not acting as a fiduciary for it in respect of this Agreement or any Transaction entered into hereunder and this Agreement reflects an arm's length agreement that was reached between the parties.

(i) <u>Recording of Communications</u>. Each party hereby notifies the other that telephone conversations between the parties may be recorded, and each party hereby consents to such recording and to such recording being adduced in evidence in court proceedings.

Execution Copy

(j) <u>Severability</u>. If any term, provision, covenant or condition of this Agreement, or the application thereof to any party or circumstance, shall be held to be illegal, invalid or unenforceable (in whole or in part) for any reason, the remaining terms, provisions, covenants and conditions hereof shall continue in full force and effect as if this Agreement had been executed with the illegal, invalid or unenforceable portion eliminated, so long as this Agreement as so modified continues to express, without material change, the original intentions of the parties as to the subject matter of this Agreement and the deletion of such portion of this Agreement will not substantially impair the respective benefits or expectations of the parties hereto; provided, however, that this severability provision will not be applicable if any provision of Section 2, 5, 6 or 13 (or any definition or provision in Section 14 to the extent it relates to, or is used in or in connection with, any such section) is held to be illegal, invalid or unenforceable.

(k) <u>Waiver of Trial by Jury</u>. Each party waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in respect of any Proceedings relating to this Agreement, any Transaction or any Credit Support Document.

(l) <u>Transfer</u>. Notwithstanding Section 7 of this Agreement, Party A may assign its rights and obligations under this Agreement, in whole and not in part, to any affiliate of Holdings effective upon delivery to Party B of the full unconditional guarantee by Holdings, in favor of Party B, of the obligations of such Affiliate.

(m) <u>Transactions</u>. With respect to each Option Transaction, Party B represents to Party A (at all times until termination of this Agreement) that Party B:

   (i) understands that the Option Transactions have not been registered under the Securities Act of 1933, as amended (the "Securities Act") and are being offered and sold in reliance on the exemption to the registration requirements of the Securities Act provided under Section 4(2) thereof:

   (ii) understands and acknowledges that Party A has no obligation to register the Option Transactions under the Securities Act or any other United States federal or state securities law, and that the Option Transactions must be held indefinitely by the purchaser thereof unless subsequently registered under such securities laws or an exemption from such registration is available;

   (iii) agrees that in the event that at some future time it wishes to dispose of the Option Transactions in whole or in part (such disposition currently not being foreseen or contemplated), it will not transfer the same except in a transaction exempt from or not subject to the registration requirements of the Securities Act; and

   (iv) understands that each Confirmation may bear a legend to substantially the following effect:

   **THE SECURITIES REPRESENTED BY THE CONFIRMATION HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT**

Execution Copy

**BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, OR ANY OTHER UNITED STATES FEDERAL OR STATE SECURITIES LAWS; AND SUCH SECURITIES MAY NOT BE SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF APPROPRIATE REGISTRATION UNDER SUCH SECURITIES LAWS OR EXCEPT IN A TRANSACTION EXEMPT FROM OR NOT SUBJECT TO THE REGISTRATION REQUIREMENTS OF SUCH SECURITIES LAWS.**

(n)  <u>Disclosure Statement.</u>  Party B represents to Party A that it has received and read and understands the Notice of Regulatory Treatment and the OTC Option Risk Disclosure Statement delivered by Party B to Party A.

(o)  <u>Outstanding Specified Transactions</u>.  Upon the effectiveness of this Agreement, unless otherwise agreed to in writing by the parties to this Agreement with respect to enumerated Specified Transactions, all Specified Transactions then outstanding between the parties shall be subject to the terms hereof.

(p)  <u>Disclosure of Details</u>.  The parties hereby irrevocably agree that each party may disclose details with respect to this Agreement and the Transactions documented hereunder to, and share information concerning this Agreement and the Transactions documented hereunder with, their respective branches and Affiliates.

(q)  <u>Swap Agreement</u>.  Without limiting any other protections under the Bankruptcy Code (Title 11 of the United States Code) (the "Bankruptcy Code"), the parties hereto intend for:

This Agreement and each Transaction to be a "swap agreement" as defined in the Bankruptcy Code, and the parties hereto to be entitled to the protections afforded by, among other Sections, Section 560 of the Bankruptcy Code.

A party's right to liquidate this Agreement or any Transaction and to exercise any other remedies upon the occurrence of any Event of Default or Termination Event under this Agreement or any Transaction to constitute a "contractual right" as described in Section 560 of the Bankruptcy Code.

Any cash, securities or other property provided as performance assurance, credit support of collateral with respect to this Agreement or any Transaction to constitute "transfers" under "swap agreement" as defined in the Bankruptcy Code.

All payments for, under or in connection with this Agreement or any Transaction, all payments for any securities or other assets and the transfer of such securities or other assets to constitute "transfers" under a "swap agreement" as defined in the Bankruptcy Code.

# PART 6: ADDITIONAL TERMS FOR FX TRANSACTIONS AND CURRENCY OPTIONS

(a) **Incorporation and Amendment of 1998 FX and Currency Option Definitions**

    (i) <u>Incorporation of 1998 FX and Currency Option Definitions</u>. The 1998 FX and Currency Option Definitions, as amended or supplemented from time to time (the "1998 Definitions"), published by the International Swaps and Derivatives Association, Inc., the Emerging Markets Traders Association and The Foreign Exchange Committee, are hereby incorporated by reference with respect to any "Currency Option Transactions" and "FX Transactions" as defined by the 1998 Definitions, except as otherwise specifically provided herein or in the Confirmation.

    (ii) <u>Amendment of 1998 FX and Currency Option Definitions</u>. The following amendments are made to the 1998 Definitions:

        Section 2.1 of the 1998 Definitions is amended by adding the following as Section 2.1(b):

        **Currency Obligation.** "Currency Obligation" means the undertaking of a party hereunder to receive or deliver an amount of currency, including a netted Currency Obligation, and including any Currency Obligation previously entered into by the parties.

(b) **Confirmations**. Any confirmation (whether provided by mail, facsimile or other electronic means) in respect of any FX Transaction or Currency Option Transaction into which the parties may enter, or may have entered into prior to the date hereof, that fails by its terms to expressly exclude the application of this Agreement shall (to the extent not otherwise provided for in this Agreement) (i) constitute a "Confirmation" as referred to in this Agreement, even where not so specified in such confirmation; and (ii) supplement, form a part of, and be subject to this Agreement, and all provisions in this Agreement will govern such Confirmation except as expressly modified therein.

(c) **Netting and Related Provisions**. Section 2(c) shall not apply to FX Transactions or Currency Option Transactions. In lieu thereof, the following shall apply:

    (i) <u>Netting, Discharge and Termination of FX Transactions</u>. The following provisions shall apply to FX Transactions:

        Unless otherwise agreed by the parties, whenever an FX Transaction is entered into between the parties which creates a Currency Obligation in the same currency and for the same Settlement Date as an existing Currency Obligation between the parties, such Currency Obligations shall

Execution Copy

automatically and without further action be netted, individually canceled and simultaneously replaced through novation by a new Currency Obligation under which the party having the obligation to deliver the greater aggregate amount of currency shall be obligated to deliver the excess of such greater aggregate currency amount over such lesser aggregate currency amount. Such new Currency Obligation shall be considered a "Currency Obligation" under this Agreement.

(ii) <u>Netting, Discharge and Termination with Respect to Currency Option Transactions</u>. The following provisions shall apply to Currency Option Transactions:

Unless otherwise agreed by the parties, any Call or Put written by a party will automatically be terminated and discharged, in whole or in part, as applicable, against a Call or a Put, respectively, having the same identical terms, written by the other party; and, upon the occurrence of such termination or discharge, neither party shall have any further obligation to the other party in respect of the parts so terminated and discharged (except for the obligation of either party to pay any Premium due, but not paid, thereunder); and the remaining portion of any Currency Option Transaction, which is partially discharged and terminated, shall continue to be a Currency Option Transaction under this Agreement.

(d) **Inconsistencies**. In the event of any conflict between:

(i) the terms of a Deliverable FX Transaction Confirmation and this Agreement, the terms of this Agreement shall supersede;

(ii) the terms of a Deliverable FX Transaction Confirmation, where the Confirmation explicitly states that it shall so prevail and has been signed by both parties, its terms shall supersede the terms of this Agreement;

(iii) the terms of a Currency Option Transaction or a Non-Deliverable FX Transaction Confirmation and this Agreement, the terms of the Confirmation shall supersede.

(e) **Definitions.** <u>Section 14</u> is hereby amended as follows:

The definition of "Terminated Transactions" shall be deemed to include Currency Obligations.

Execution Copy

IN WITNESS WHEREOF, Party A and Party B have caused this Schedule to be duly executed to be effective as of the date first written above.

| **LEHMAN BROTHERS OTC DERIVATIVES INC.** | **INTEL CORPORATION** |
|---|---|
| *Party A* | *Party B* |
| Name: Allyson M. Carine | Name: Douglas M. Lusk |
| Title: Authorized Signatory | Title: Authorized Signatory |
| Date: | Date: |

LEGAL OK