# EXHIBIT 3

# LEHMAN BROTHERS

## Transaction

Date:            August 1, 2008

To:              Intel Corporation
                 c/o Doug M. Lusk
                 Facsimile: (408) 765-1611
                 Telephone: (408) 765-1679

From:            Lehman Brothers, Inc acting as Agent
                 Lehman Brothers OTC Derivatives Inc., acting as Principal
                 Andrew Yare - Transaction Management Group
                 Facsimile:        646-885-9546 (United States of America)
                 Telephone:        212-526-9986

Global Id:       3990242

Dear Sir or Madam:

      This confirmation ("**Confirmation**"), dated as of August 1, 2008, is intended to represent the terms and provisions of the VWAP Prepaid Share Forward Transaction (the "**Transaction**") entered into between Lehman Brothers OTC Derivatives Inc. ("**Lehman**" or "**Party A**") and Intel Corporation ("**Counterparty**" or "**Party B**"). This Confirmation shall constitute a "Confirmation" as referred to in the Agreement specified below. This confirmation is sent on behalf of both Lehman and Counterparty. **Lehman Brothers OTC Derivatives Inc. is not a member of the Securities Investor Protection Corporation.**

      The definitions and provisions contained in the 2002 ISDA Equity Derivatives Definitions (the "**Equity Definitions**"), as published by the International Swaps and Derivatives Association, Inc., are incorporated into this Confirmation. This Confirmation evidences a complete binding agreement between the Counterparty and Lehman as to the terms of the Transaction.

      This Confirmation evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates. This Confirmation shall supplement, form a part of, and be subject to an agreement in the form of the 1992 ISDA Master Agreement (Multicurrency-Cross Border) (the "**Agreement**") executed on February 1, 2008 between Party A and Party B; *provided* that Loss and Second Method shall apply with respect to this Transaction for purposes of Section 6(e) of the Agreement. In the event of any inconsistency between the provisions of that Agreement, and this Confirmation, this Confirmation will prevail for the purpose of this Transaction. The parties hereto agree to use all reasonable efforts promptly (and in all events prior to the Prepayment Date (as defined in Section 1)) to negotiate execute and deliver an agreement in the same form as the Agreement referred to in the preceding sentence, at which point such new agreement shall supersede and become the "Agreement" for purposes of this Confirmation.

      All provisions contained in the Agreement shall govern this Confirmation except as expressly modified below. The Agreement and this Confirmation shall represent the entire agreement and understanding of the parties with respect to the subject matter and terms of the Transaction and shall supersede all prior or contemporaneous written or oral communications with respect thereto.

      If there is any inconsistency between the Agreement, this Confirmation, and the Equity Definitions, the following shall prevail for purposes of the Transaction in the order of precedence indicated: (i) this Confirmation; (ii) the Agreement; and (iii) the Equity Definitions.

1.      The Transaction shall constitute a Share Forward Transaction for purposes of the Equity Definitions.  Set forth below are the terms and conditions which shall govern the Transaction.

General Terms:

| | |
|---|---|
| Agent: | Lehman Brothers Inc. ("**LBI**") is acting as agent on behalf of Lehman and Counterparty for this Transaction.  LBI has no obligations, by guarantee, endorsement or otherwise, with respect to the performance of this Transaction by either party. |
| Trade Date: | August 1, 2008 |
| Buyer: | Counterparty |
| Seller: | Lehman |
| Shares: | Common Stock, $0.001 par value of Counterparty (Ticker: INTC) |
| Forward Price: | The arithmetic average of the 10b-18 VWAP for each Exchange Business Day in the Calculation Period |
| 10b-18 VWAP: | The 10b-18 volume-weighted average price per share of the Shares, as published by Bloomberg (by reference to Bloomberg INTC.Q <Equity> AQR SEC (or any successor thereto)) at 4:15 p.m., New York Time, absent manifest error. For any Exchange Business Day on which a manifest error occurs with respect to the Bloomberg Page specified above, an amount determined in good faith and in a commercially reasonable manner by the Calculation Agent as 10b-18 VWAP. |
| Forward Price Adjustment Amount: | The Table Amount. The Calculation Agent shall provide written or electronic notice to the Counterparty of the Forward Price Adjustment Amount promptly upon determination thereof; *provided* that failure by Calculation Agent to give such notice or notices shall not constitute a default under or breach of the Transaction. |
| Table Amount: | An amount determined with respect to the Reference Spot and the Reference Implied Volatility by the Calculation Agent and derived from the table (the "**Table**") set forth in Schedule A hereto. The Reference Spot will be measured along the horizontal axis. The Reference Implied Volatility (together with the Reference Spot, the "**Table Reference**") will be measured along the vertical axis. The figures appearing in the Table are the Table Amounts for the Table References that tie exactly to the data points included as axis labels on the Table.  For Table References falling between amounts set forth on the vertical and horizontal axes of the Table, the Table Amount will be calculated by the Calculation Agent using bilinear interpolation. If a Table Amount is otherwise not determinable pursuant to the foregoing on the Prepayment Date because one or more relevant Table References falls outside the Table, unless the parties otherwise agree, the Transaction shall automatically terminate (the "**Nullification**"), on the Prepayment Date and the Transaction and all of the respective rights and obligations of Party A and Party B hereunder shall be cancelled and terminated.  Following such termination, each party shall be released and discharged by the other party from and agrees not to make any claim against the other party with respect to any obligations or liabilities of either party arising out of and to be performed in connection with the Transaction either prior to or after the Prepayment Date.  Party A and Party B |

Global Deal ID: 3624221
2

represent and acknowledge to the other that upon Nullification, all obligations with respect to the Transaction shall be deemed fully and finally discharged and any amounts previously transferred from one party to the other with respect to the Transaction shall promptly be returned.

Reference Spot: The 10b-18 VWAP on the Prepayment Date starting at 11:30 a.m. New York Time on such date.

Reference Implied Volatility: The arithmetic average of the volatilities for the Reference Options at each Reference Time on the Prepayment Date resulting from the arithmetic average for call option and put option volatilities obtained by linearly interpolating (across Strike Prices based on the Spot Price) the arithmetic averages of the volatilities at such time opposite the captions "real-time implied volatility bid" and "real-time implied volatility ask", as such volatilities are displayed on the page "INTC <Equity> OMON <GO>", on the BLOOMBERG Professional Service, or any successor page, absent manifest error.

Reference Times: 11:00 a.m., 2:00 p.m. New York Time

Reference Options: The listed call and put options expiring on September 20, 2008 with a strike price equal to the then-current price per Share (the "**Spot Price**") or if the Spot Price does not match any of the listed options' strike prices, the two listed options expiring on September 20, 2008 with strike prices (the "**Strike Prices**") that are closest to and exceeding and closest to and less than the Spot Price.

Calculation Period: Each Exchange Business Day from and including the Exchange Business Day immediately following the Prepayment Date to and including the Termination Date.

Termination Date: September 26, 2008; *provided* that Lehman may, in its absolute discretion, accelerate the Termination Date to any Scheduled Trading Day on or after September 22, 2008 upon written notice to the Counterparty (it being understood that such notice shall be given to the Counterparty on or prior to the date that Lehman so accelerates).

Exchange: NASDAQ Global Select Market

Market Disruption Event: The definition of "Market Disruption Event" in Section 6.3(a) of the Equity Definitions is hereby amended by deleting the words "at any time during the one-hour period that ends at the relevant Valuation Time, Latest Exercise Time, Knock-in Valuation Time or Knock-out Valuation Time, as the case may be" and inserting the words "at any time on any Scheduled Trading Day during the Calculation Period or" after the word "material," in the third line thereof.

Notwithstanding anything to the contrary in the Equity Definitions, to the extent that any Scheduled Trading Day in the Calculation Period is a Disrupted Day, the Termination Date shall be postponed and the Calculation Agent in its commercially reasonable and good faith discretion shall extend the Calculation Period and make adjustments to the weighting of each Rule 10b-18 eligible transaction in the Shares on the relevant Exchange Business Days during the Calculation Period for purposes of determining the Forward Price, with such adjustments based on, among other factors, the duration of any Market Disruption Event and the volume, historical trading patterns and price of the Shares.

To the extent that there are 5 consecutive Disrupted Days during the Calculation Period, then notwithstanding the occurrence of a Disrupted Day, Lehman shall have the option in its commercially reasonable and good faith discretion to either determine the weighting of each Rule 10b-18 eligible transaction in the Shares on the relevant Exchange Business Days during the Calculation Period, as applicable, using its good faith estimate of the value for the Share on such 5 consecutive days or elect to further extend the Calculation Period as it deems necessary. All determinations by Lehman to modify the Calculation Period or make any other adjustment as specified herein shall be communicated to Counterparty within one Scheduled Trading Day of the event giving Lehman the right to make such modification or adjustment, and Counterparty shall have the right to object and submit the matter to a review of the Substitute Calculation Agents as described in Section 3(h) herein.

| | |
|---|---|
| Prepayment Amount: | US $1 billion |
| Prepayment Date: | August 29, 2008 |

**Settlement Terms:**

Physical Settlement:  Applicable

Delivery of Shares and Cash:  On the Settlement Date, Lehman will deliver to Counterparty, at or prior to 4:30 p.m. New York Time, the Number of Shares to be Delivered, *plus* an amount in cash equal to the amount (the "**Cash Delivery Amount**") by which the Prepayment Amount exceeds the Final Notional Amount (collectively, the "**Final Delivery Amount**").

If the Number of Shares to be Delivered is a negative number, Counterparty will not be obligated to purchase from Lehman such negative number of Shares.

Under no circumstances will Counterparty be required to return to Lehman any Shares previously delivered.

Number of Shares
to be Delivered:  A number of Shares equal to the difference between (a) the quotient of (i) the Final Notional Amount *divided by* (ii) the Forward Price *minus* the Forward Price Adjustment Amount; *provided* that a number of Shares less than a whole number shall be rounded upward and (b) the number of Shares delivered, if any, pursuant to "Early Share Delivery" on the Early Delivery Date.

Final Notional Amount:  An amount determined by the Calculation Agent pursuant to the following formula:

$$\$750\text{mm} * \frac{\text{Max}(0, \text{Min}(\$25.00 - \text{Forward Price}, \$4.00))}{\$4.00} + \$250\text{mm}$$

Settlement Date:  One (1) Exchange Business Day following the Termination Date.

Early Share Delivery:  In the event that Party A has not exercised its right to accelerate the Termination Date on or prior to September 25, 2008 pursuant to the "Termination Date" provision above, on the Early Delivery Date, Party A shall have the right to deliver a number of Shares (the "**Early Delivery Amount**") determined in its sole discretion.

| | |
|---|---|
| Early Delivery Date: | September 26, 2008. |
| Settlement Currency: | USD (all amounts shall be converted to the Settlement Currency by the Calculation Agent) |
| Net Share Settlement: | The terms of "Delivery of Shares and Cash" above notwithstanding Party B may, by a separate instruction given to Party A on or prior to the Termination Date, elect that Net Share Settlement shall apply to the Cash Delivery Amount. If Net Share Settlement is applicable, on the day that is three Scheduled Trading Days after the completion of the Net Share Settlement Period (the "**Net Share Settlement Date**") Party A shall deliver (in addition to the Number of Shares to be Delivered previously delivered on the Settlement Date) a number of Shares to Party B (the "**Net Delivery Shares**") equal to the Cash Delivery Amount *divided* by the volume weighted average price at which Party A purchased the Net Delivery Shares. No fractional Shares shall be delivered in connection with Net Share Settlement by Party A, and the value of any fractional Share otherwise deliverable shall be paid in cash to Party B on the Net Share Settlement Date (such value to be determined by multiplying such fractional Share by the volume weighted average price at which Party A purchased the Refund Shares). |
| Net Share Settlement Period: | The period during which Party A makes purchases of the Net Delivery Shares, commencing on the Scheduled Trading Day immediately following the Termination Date and ending on the Scheduled Trading Day on which Party A completes its purchases of the Net Delivery Shares. |
| | All purchases of Net Delivery Shares by Party A shall comply with the terms of Rule 10b-18. |
| Potential Adjustment Events: | |
| Method of Adjustment: | Calculation Agent Adjustment; *provided, however,* that all determinations by the Calculation Agent with respect to the Method of Adjustment shall be communicated to Counterparty within one Scheduled Trading Day of the Potential Adjustment Event giving Lehman the right to make such adjustment, and Counterparty shall have the right to object and submit the matter to a review of the Substitute Calculation Agents as described in Section 3(h) herein. |
| Merger Events/Tender Offers: | |
| Share for Share: | Modified Calculation Agent Adjustment; *provided, however,* that all determinations by the Calculation Agent to make an adjustment as described herein shall be communicated to Counterparty within one Scheduled Trading Day of the Merger Event giving Lehman the right to make such adjustment, and Counterparty shall have the right to object and submit the matter to a review of the Substitute Calculation Agents as described in Section 3(h) herein. |
| Share for Other: | Cancellation and Payment |
| Share for Combined: | Cancellation and Payment |
| Nationalization, Insolvency or Delisting: | Cancellation and Payment |

| Determining Party: | Lehman, *provided, however*, that with respect to the Cancellation Amount determined by the Determining Party, Counterparty shall have the right to object and submit the matter to a review of the Substitute Calculation Agents as described in Section 3(h) herein. |
|---|---|
| Lehman Payment Instructions: | JPMORGAN CHASE BANK<br>ABA # 021000021<br>Swift # CHASUS33XXX<br>A/C # 066626277<br>A/C Name: Lehman Brothers OTC Derivatives |
| Intel Payment Instructions: | Citibank, NY<br>ABA # 021000089<br>Swift # CITIUS33<br>A/C # 40667555<br>A/C Name: Intel Corporation |
| Intel Delivery Instructions: | DTC# 908<br>Agent Bank# 27603<br>Institution ID# 29424<br>A/C# 848386<br>A/C Name: Intel Corporation |

2.      Calculation Agent.      LBI

3.      Additional Mutual Representations, Warranties and Covenants.  In addition to the representations and warranties in the Agreement, each party represents, warrants and covenants to the other party that:

(a)  Eligible Contract Participant.  Each party represents that it is: (i) an "eligible contract participant", as defined in the U.S. Commodity Exchange Act (as amended), and (ii) entering into this Transaction as principal and not for the benefit of any third party.

(b)  Accredited Investor.  Each party acknowledges that the offer and sale of securities under this Transaction is intended to be exempt from registration under the Securities Act of 1933, as amended (the "**Securities Act**"), by virtue of Section 4(2) thereof and the provisions of Regulation D thereunder ("**Regulation D**").  Accordingly, each party represents and warrants to the other that (i) it has the financial ability to bear the economic risk of its investment and is able to bear a total loss of its investment, (ii) it is an "accredited investor" as that term is defined under Regulation D, (iii) it will purchase for investment and not with a view to the distribution or resale thereof, and (iv) the disposition is restricted under this Confirmation, the Securities Act and state securities laws.

(c)  Registered Broker-Dealer.  As a broker-dealer registered with the U.S. Securities and Exchange Commission, LBI, as agent of Lehman and Counterparty, will be responsible for (i) effecting the Transaction, (ii) issuing all required confirmations and statements to Lehman and Counterparty, (iii) maintaining books and records relating to the Transaction as required by SEC regulations, and (iv) receiving, delivering and safeguarding Counterparty's funds and any securities in connection with the Transaction in compliance with SEC regulations.

(d)  LBI hereby represents, warrants and covenants to Counterparty that during the Calculation Period and during any Net Share Settlement Period or Early Termination Net Share Settlement Period it will be the sole purchaser of Shares in the market with respect to this Transaction and will comply with the provisions of Rule 10b-18(b)(1),(2),(3) and (4) of the Securities Exchange Act of 1934, as amended (the "**Exchange Act**"), to the extent that it purchases or hedges any Shares with respect to this Transaction as if it were Counterparty's agent and LBI (or any "affiliated purchaser" as defined in Rule 10b-18 under the Exchange Act ("**Rule 10b-18**")) will not purchase or hedge any Shares with respect to this Transaction beginning on the date hereof and through, and (subject to the following exception) including, the Prepayment Date, except that Counterparty acknowledges and agrees that

Global Deal ID: 3624221

6

Lehman or LBI may, directly or indirectly, purchase Shares on the Prepayment Date; *provided* that the aggregate number of Shares purchased in such transactions on the Prepayment Date shall not exceed 12.5 percent of the ADTV (as defined in Rule 10b-18) limit for that day.  Lehman acknowledges and agrees that Counterparty (or any "affiliated purchaser" as defined in Rule 10b-18 under the Exchange Act) may, directly or indirectly, purchase Shares outside of the Transaction during the Calculation Period and during any Net Share Settlement Period or Early Termination Net Share Settlement Period, *provided* that (i) Counterparty or such "affiliated purchaser" effects such purchases in unsolicited transactions or privately negotiated (off-market) transactions that are not "Rule 10b-18 purchases" (as defined in Rule 10b-18) or (ii) with the prior agreement of Lehman, Counterparty or such "affiliated purchaser" effects such purchases in unsolicited transactions that are not privately negotiated (off-market) and (x) Counterparty receives the agreement of Lehman at least one Scheduled Trading Day before making any such purchases, (y) the aggregate number of Shares Counterparty purchases in such transactions on any day shall not exceed 12.5 percent of the ADTV (as defined in Rule 10b-18) limit for that day and (z) a public announcement (as defined in Rule 165(f) under the Securities Act) of a Merger Transaction shall not have occurred and be continuing on such day or (iii) such purchases are made by Deutsche Bank Securities Inc. or its affiliates in respect of the issuer collar transaction relating to the Shares entered into by Counterparty and Deutsche Bank Securities Inc. on April 17, 2003, as amended (the "**Deutsche Bank Transaction**").  Lehman acknowledges and agrees that Counterparty or any "affiliated purchaser" may, directly or indirectly, purchase Shares outside of the Transaction on the Prepayment Date, *provided* that (i) Counterparty or such "affiliated purchaser" effects such purchases in unsolicited transactions or privately negotiated (off-market) transactions that are not "Rule 10b-18 purchases" (as defined in Rule 10b-18) or (ii) Counterparty or such "affiliated purchaser" effects such purchases in unsolicited transactions that are not privately negotiated (off-market) and (x) the aggregate number of Shares Counterparty purchases in such transactions on the Prepayment Date shall not exceed 12.5 percent of the ADTV (as defined in Rule 10b-18) limit for that day and (y) a public announcement (as defined in Rule 165(f) under the Securities Act) of a Merger Transaction shall not have occurred and be continuing on such day or (iii) such purchases are made by Deutsche Bank Securities Inc. or its affiliates in respect of the Deutsche Bank Transaction.

(e)  Lehman and Counterparty each hereby acknowledges that any transactions by Lehman in any Shares during the life of the Transaction will be undertaken by Lehman as principal for its own account, and not as agent for Counterparty.

(f)  All of the actions to be taken by Lehman and LBI in connection with this Agreement shall be taken by Lehman independently and without any advance or subsequent consultation with Counterparty.

(g)  Each party acknowledges that it is entering into this Confirmation and the Transaction hereunder in good faith and not as part of a plan or scheme to evade the prohibitions of Rule 10b5-1. It is the intent of the parties that the Transaction comply with the requirements of Rule 10b5-1(c)(1) and (2) and shall be interpreted to comply with such requirements.  Counterparty intends any instruction providing that Net Share Settlement shall apply and any instruction under Section 5(d) to receive Shares or Alternative Termination Delivery Units to be made at a time and in a manner to comply with the requirements of Rule 10b5-1(c)(1) and (2).

(h)  If within one Scheduled Trading Day of receipt of notice of an adjustment or modification made to this Transaction by Lehman Counterparty reasonably objects to such adjustment or modification, Lehman and Counterparty shall agree to three leading independent dealers to act as a substitute Calculation Agent in place of Lehman ("**Substitute Calculation Agents**") for that determination.  If Lehman and Counterparty do not agree to the three Substitute Calculation Agents, they must each appoint a third party in order for the third parties to together agree to three Substitute Calculation Agents.  The Substitute Calculation Agents cannot be affiliates of Lehman or Counterparty and must make a determination as to the disputed matter within two Scheduled Trading Days of such appointment.    For any determination, the median determination (after discarding the low and the high determinations) provided by the three Substitute Calculation Agents shall be deemed the final determination.  Unless there is clear error, the determinations of the Substitute Calculation Agents are binding and conclusive.  Each Lehman and Counterparty must pay any costs of the Substitute Calculation Agents equally. Lehman and Counterparty waive any claim they might otherwise have against the Substitute Calculation Agents for errors or omissions made in good faith in making any determination in connection with the Transaction. For the avoidance of doubt, any dispute regarding any Lehman Payment Amount shall not delay any delivery or payment otherwise due.

4.    Additional Representations, Warranties and Covenants of Counterparty.  In addition to the representations, warranties and covenants in the Agreement and those contained herein, as of the Trade Date Counterparty represents, warrants and covenants to Lehman that:

(a)    it is not aware of any third party tender offer for its Shares and is not entering into the Transaction as part of a self tender offer for its Shares;

(b)    it is not entering into the Transaction on the basis of, and is not aware of, any material non-public information with respect to the Shares or in anticipation of, in connection with, or to facilitate, a distribution of its securities;

(c)    it is entering into the Transaction pursuant to a publicly disclosed Share buy-back program; and

(d)    to the extent Counterparty (or any "affiliated purchaser" as defined in Rule 10b-18 under the Exchange Act) intends to purchase any Shares outside of this Transaction during the Calculation Period, such purchases shall be conducted as described in Section 3(d) with respect to Counterparty and any affiliated purchaser of Counterparty.

5.    Suspension of Calculation Period and Termination.

(a)    If Counterparty concludes that it will be engaged in a distribution of the Shares for purposes of Regulation M, Counterparty agrees that it will, on one Scheduled Trading Day's written notice, direct Lehman not to purchase Shares in connection with hedging any Transaction during the "restricted period" (as defined in Regulation M).  If on any Scheduled Trading Day Counterparty delivers written notice (and confirms by telephone) by 8:30 a.m. New York Time (the "**Notification Time**") then such notice shall be effective to suspend the Calculation Period, as the case may be, as of such Notification Time.  In the event that Counterparty delivers notice and/or confirms by telephone after the Notification Time, then the Calculation Period, as the case may be, shall be suspended effective as of 8:30 a.m. New York Time on the following Scheduled Trading Day or as otherwise required by law or agreed between Counterparty and Lehman. The Calculation Period shall be suspended and the Termination Date extended for each Scheduled Trading Day in such restricted period and Lehman agrees that upon receipt of notice from Counterparty, Lehman will not effect any transactions in Shares that would give rise to a violation of Regulation M.

(b)    In the event the Calculation Period is suspended pursuant to Section 5 (a) above during the regular trading session on the Exchange, the Calculation Agent, in its commercially reasonable and good faith discretion shall, in calculating the Forward Price, extend the Calculation Period and make adjustments to the weighting of each Rule 10b-18 eligible transaction in the Shares on the relevant Exchange Business Days during the Calculation Period for purposes of determining the Forward Price, with such adjustments based on, among other factors, the duration of any such suspension and the volume, historical trading patterns and price of the Shares, but in no event shall the Calculation Period be extended by more than five (5) Exchange Business Days in the aggregate.  If the Calculation Period is extended by more than five (5) Exchange Business Days, then Counterparty shall have the right to terminate this Agreement with settlement of this Transaction subject to Cancellation and Payment.  All determinations by Lehman to suspend or extend the Calculation Period shall be communicated to Counterparty within one Scheduled Trading Day of the event giving Lehman the right to suspend or extend the Calculation Period, and Counterparty shall have the right to object and submit the matter to a review of the Substitute Calculation Agents as described in Section 3(h) herein.

(c)    Counterparty shall have the right to terminate the Transaction at any time from the date hereof and through, and including, 11:30 a.m. New York Time on the Prepayment Date without any cost or financial consequence to Counterparty.  During the period after 11:30 a.m. New York Time on the Prepayment Date and during the Calculation Period, Counterparty shall have the right to terminate the Transaction, but settlement of the Transaction will be subject to Cancellation and Payment (except in the case of a Nullification as provided above); *provided* that with respect to the determination of Cancellation Amount, Party A shall be the Determining Party and Section 3(h) hereof shall not apply.  With respect to such determination, the Determining Party shall act in good

faith and use commercially reasonable procedures in order to produce a commercially reasonable result in accordance with Section 12.8(b) of the Equity Definitions.

(d)    Early Termination.  In the event that (i) an Early Termination Date (whether as a result of an Event of Default or a Termination Event) occurs or is designated with respect to the Transaction, (ii) the Transaction is cancelled or terminated upon the occurrence of an Extraordinary Event (other than a Merger Event or Nationalization in which the consideration or proceeds to be paid to holders of Shares consists solely of cash) or (iii) the Transaction is cancelled pursuant to Section 5(b) or 5(c) of this Confirmation, if Lehman would owe any amount to Counterparty pursuant to Section 6(d)(ii) of the Agreement or any Cancellation Amount pursuant to Article 12 of the Equity Definitions (any such amount, a "**Lehman Payment Amount**"), then on the date on which any Lehman Payment Amount is due, in lieu of any payment of such Lehman Payment Amount, Lehman shall (x) deliver to Counterparty a number of Shares (or, in the case of a Merger Event, a number of units, each comprising the number of amount of the securities or property that a hypothetical holder of one Share would receive in such Merger Event (each such unit, an "**Alternative Termination Delivery Unit**")) comprising Lehman's Hedge Positions in respect of the Transaction as of the relevant Early Termination Date or the date on which the Transaction is otherwise terminated or cancelled; *provided* that in no event will the number of Shares delivered be in excess of an amount equal to (a) the Final Notional Amount (calculated based upon the Calculation Period ending on the relevant Early Termination Date) *divided by* (b) the Agreed Value and (y) pay to Counterparty an amount in cash equal to any excess of the Lehman Payment Amount over the aggregate Agreed Value of such Shares or Alternative Termination Delivery Units so delivered; *provided* that in determining the composition of any Alternative Delivery Unit, if the relevant Merger Event involves a choice of consideration to be received by holders, such holder shall be deemed to have elected to receive the maximum possible amount of cash.  "**Agreed Value**" means a price per share equal to the Forward Price (calculated based upon the Calculation Period ending on the relevant Early Termination Date) minus the Forward Price Adjustment Amount.  Clause (y) of this paragraph (d) notwithstanding, Party B may, by a separate instruction given to Lehman on or prior to the relevant termination date (howsoever called), elect to receive the portion of the Lehman Payment Amount consisting of cash (the "**ET Cash Amount**") in Shares or Alternative Termination Delivery Units; *provided* that Shares or Alternative Termination Delivery Units, as the case may be, remain outstanding and continue to be freely tradable on the relevant Exchange.  If Party B gives such instruction to Lehman on or prior to the relevant termination date (howsoever called), Lehman shall be under no obligation to deliver the ET Cash Amount or any value with respect thereto on the day that the Lehman Payment Amount is otherwise due.  If Party B gives such instruction, then on the day that is three Scheduled Trading Days after the completion of the Early Termination Net Share Settlement Period (the "**ETNS Settlement Date**") Party A shall deliver a number of Shares or Alternative Termination Delivery Units to Party B (in either case, the "**ETNS Shares**") equal to the ET Cash Amount *divided by* the volume weighted average price at which Party A purchased the ETNS Shares.  No fractional Shares or fractional Alternative Termination Delivery Units shall be delivered in connection with this provision by Party A, and the value of any fractional Share or Alternative Termination Delivery Unit otherwise deliverable shall be paid in cash to Party B on the ETNS Settlement Date (such value to be determined by multiplying such fractional Share by the volume weighted average price at which Party A purchased the Refund Shares).  For purposes hereof, "**Early Termination Net Share Settlement Period**" means the period during which Party A makes purchases of the ETNS Shares, commencing on the Scheduled Trading Day immediately following the date on which any Lehman Payment Amount is otherwise due and ending on the Scheduled Trading Day on which Party A completes its purchases of the Net Delivery Shares.

6.    **Collateral.**  Party A and Party B agree that the provisions of this Section 6 will apply with respect to the Transaction to the same extent as if the Parties had executed a 1994 standard form ISDA Credit Support Annex (ISDA Agreements Subject to New York Law Only) to the Schedule to the Agreement (the "CSA").  Paragraphs 1 through 12 of the CSA are incorporated herein by reference, and terms defined in the CSA shall have the meanings accorded them therein, subject in each case to the elections and modifications set out below and with references to paragraph 13 in the CSA referring instead to this Section 6.  Subject to the foregoing, the following CSA elections and variables shall apply to the Transaction:

(a)  **Security Interest for "Obligations".**  The term "Obligations" as used in the CSA includes no additional obligations with respect to either Party.

(b)  Credit Support Obligations.

    (i)      Delivery Amount, Return Amount and Credit Support Amount.

        (A) "Delivery Amount" has the meaning specified in Paragraph 3(a).

        (B) "Return Amount" has the meaning specified in Paragraph 3(b).

    (ii)     Eligible Collateral. The following items will qualify as "Eligible Collateral":

| ELIGIBLE COLLATERAL | REMAINING MATURITY FROM THE VALUATION DATE | VALUATION PERCENTAGE |
| --- | --- | --- |
| USD Cash | Not applicable | 100% |

    (c)    Other Eligible Support. There shall be no "Other Eligible Support" for either party for purposes of the CSA, unless agreed in writing between the Parties.

    (d)    Credit Support Amount.

        (A)    "Independent Amount" shall not apply for purposes of the CSA

        (B)    "Threshold" means, with respect to Party A, USD 0.

        (C)    "Secured Party's Exposure" means USD 1 billion, (a) reduced on the Early Delivery Date by an amount equal to (i) the Forward Price that would be determined as if the Exchange Business day prior to the Early Delivery Date were the Termination Date *minus* the Forward Price Adjustment Amount *multiplied by* (ii) the number of Shares delivered on such date and (b) reduced to zero on the Settlement Date upon the delivery by Party A to Party B of the Final Delivery Amount; *provided* that if Party B has elected Net Share Settlement to apply, on the Settlement Date, the Secured Party's Exposure shall be deemed reduced by an amount equal to (x) the Forward Price minus the Forward Price Adjustment *multiplied by* (y) the Number of Shares to be Delivered and on the Net Share Settlement Date the Secured Party's Exposure shall be deemed reduced to zero. Paragraph 4(b) notwithstanding, Party B shall be deemed to have made a demand for Eligible Credit Support on the Trade Date and the Transfer of Eligible Credit Support by Party A with respect to such demand shall occur at or prior to 3:00 p.m. New York Time on the Prepayment Date (*provided* that Party B shall have paid the Prepayment Amount as provided above in this Confirmation at or prior to 11:30 a.m. New York Time on such date). The foregoing notwithstanding, until satisfaction of Party B's obligation to pay the Prepayment Amount to Party A on the Prepayment Date, the Secured Party's Exposure shall be deemed to be zero. Party A shall be deemed to make demand for the relevant Return Amount on the New York Business Days immediately preceding each of the Early Delivery Date, if any, the Settlement Date and the Net Share Settlement Date, if any, in each case, prior to the Notification Time, *provided* that the Secured Party shall have no obligation to return any Posted Credit Support until such time as the Early Delivery Amount or Final Delivery Amount or portion thereof consisting of the Number of Shares to be Delivered, as the case may be, shall have been delivered to Party B. Paragraph 4(b) notwithstanding, the Transfer of the Return Amount with respect to each of the Early Delivery Date, Settlement Date and Net Share Settlement Date shall be made by Party B on each such date, *provided* that the Early Delivery Amount, Final Delivery Amount or portion thereof consisting of the Number of Shares to be Delivered, as the case may be, shall have been received by Party B at or prior to 3:00 p.m. New York Time on such date; otherwise, such Transfers shall occur on the next Local Business Day (and the Interest Rate for the periods after such earlier date shall be as provided in clause (i) of the definition of Interest Rate).

(D)      "Minimum Transfer Amount" means, with respect to Party A, USD 0.

(E)      Rounding. The Delivery Amount and the Return Amount will be rounded up and down to the nearest integral multiple of USD 10,000, respectively.

(e)  Valuation and Timing.

(i)      "Valuation Agent" means Party B.

(ii)      "Valuation Date" means each Local Business Day.

(iii)      "Valuation Time" means the close of business in the city of the Valuation Agent on the Local Business Day immediately preceding each Valuation Date or date of calculation, as applicable.

(iv)      "Notification Time" means by 12:00 noon, New York time, on a Local Business Day.

(f)  Conditions Precedent. With respect to Party A, any Additional Termination Event (if Party A is the Affected Party with respect to such Termination Event) will be a "Specified Condition".

(g)  Substitution.

(i)      "Substitution Date" has the meaning specified in Paragraph 4(d)(ii).

(ii)      Consent.  Inapplicable.

(h)  Dispute Resolution.

(i)      "Resolution Time" means 12:00 noon, New York time, on the Local Business Day following the date on which notice is given that gives rise to a dispute under Paragraph 5.

(ii)      Value.  For the purpose of Paragraphs 5(i)(C) and 5(ii), the Value of Posted Credit Support other than Cash will be calculated as the sum of (I) (x) the mean of the high bid and low asked prices quoted on such date by any principal market maker for such Eligible Collateral chosen by the Disputing Party, or (y) if no quotations are available from a principal market maker for such date, the mean of such high bid and low asked prices as of the first day prior to such date on which such quotations were available, plus (II) the accrued interest on such Eligible Collateral (except to the extent Transferred to a party pursuant to any applicable provision of this Agreement or included in the applicable price referred to in (I) of this clause (A)) as of such date; multiplied by the Valuation Percentage.

(iii)      The provisions of Paragraph 5 will apply.

(i)  Holding and Using Posted Collateral.

(i)      Eligibility to Hold Posted Collateral; Custodians.

Party B will not hold Posted Collateral through a Custodian pursuant to Paragraph 6(b).

(ii)      Use of Posted Collateral. The provisions of Paragraph 6(c) will apply to Party B.

(iii)      Notwithstanding the foregoing, Party B hereby agrees to invest the initial Eligible Collateral in one or more of the following (each of which, a "Permitted Investment"):

(A) demand deposit accounts or money market accounts, including those accounts managed by any commercial bank or trust company which is organized under the laws of the United States or of any State thereof the credit of which is rated not less than A or the equivalent rating by Standard and Poor's Corporation or Moody's Investors Services, Inc.;

(B) securities (i) which are commonly known as "commercial paper," (ii) which are due and payable within thirty (30) days from the date of issue, (iii) which have been issued by any corporation organized under the laws of the United States or of any State thereof and (iv) the ratings for which, at the time of the acquisition thereof by Counterparty, are not less than "P-l" if rated by Moody's Investors Services, Inc., and not less than "A-1" if rated by Standard and Poor's Corporation; and

(C) United States Treasury obligations maturing in 30 days or less from the date of issue.

The amounts so invested, and earnings thereon, shall remain invested in such Permitted Investments until the exercise of remedies with respect to the Posted Credit Support pursuant to Paragraph 8 of the CSA or until the Posted Credit Support is Transferred by Party B to Party A as provided above. If such funds are commingled with funds of Party B, Party B shall identify Permitted Investments of the Eligible Collateral made on behalf of Party A using separate notional accounts comprised of entries in its treasury recordkeeping system. Such entries shall include the invested amount of Eligible Collateral, all earnings thereon and all other additions thereto and withdrawals therefrom in accordance with this Agreement. No later than January 31, 2009, Party B shall provide a statement to Party A setting forth the amount of earnings on the Eligible Collateral that Party A is required to include in its income for U.S. federal income tax purposes in accordance with Paragraph 10(c) (provided that under no circumstances shall Party B be liable for Party A's income or other taxes).

(j) Distributions and Interest Amount.

(i) Interest Rate. The Interest Rate for any day means the greater of (i) a rate per annum at which any Posted Collateral is actually invested by Party B and (ii) a rate per annum equal to the Federal Funds Rate as of that date, as published by Bloomberg (by reference to Bloomberg FOMC <GO> screen) for the most recent date.

(ii) Transfer of Interest Amount. The Transfer of the Interest Amount will be made on the Settlement Date, and on any Local Business Day when Posted Collateral in the form of Cash is Transferred to the Pledgor pursuant to Paragraph 3(b).

(iii) Alternative to Interest Amount. The provisions of Paragraph 6(d)(ii) will apply.

(k) Additional Representations. None.

(l) Other Eligible Support and Other Posted Support.

(i) "Value" shall have no meaning with respect to either party with respect to Other Eligible Support and Other Posted Support.

(ii) "Transfer" shall have no meaning with respect to either party with respect to Other Eligible Support and Other Posted Support.

(m) Agreement as to Single Secured Party and Pledgor. Party A and Party B agree that (a) the term "Secured Party" as used in the CSA means only Party B, (b) the term "Pledgor" as used in the CSA means only

Party A, (c) only Party A makes the pledge and grant in Paragraph 2, the acknowledgment in the final sentence of Paragraph 8(a) and the representations in Paragraph 9 and (d) only Party A will be required to make Transfers of Eligible Credit Support hereunder.

7.      Governing Law.   The Agreement, this Confirmation and all matters arising in connection with the Agreement and this Confirmation shall be governed by, and construed and enforced in accordance with, the laws of the State of New York (without reference to its choice of laws doctrine).

8.      Counterparty hereby agrees (a) to check this Confirmation carefully and immediately upon receipt so that errors or discrepancies can be promptly identified and rectified and (b) to confirm that the foregoing (in the exact form provided by Lehman) correctly sets forth the terms of the agreement between Lehman and Counterparty with respect to the Transaction to which this Confirmation relates, by manually signing this Confirmation or this page hereof as evidence of agreement to such terms and providing the other information requested herein and immediately returning an executed copy to Lehman, Facsimile No. 646-885-9546.

9.      Regulatory Provisions.     (a) Party B represents and warrants that it has received and read and understands the Notice of Regulatory Treatment and the OTC Option Risk Disclosure Statement.

        (b) The Agent will furnish Party B upon written request a statement as to the source and amount of any remuneration received or to be received by the Agent in connection with this Transaction evidenced hereby.

*[Remainder of page intentionally left blank. Signature page to follow]*

Yours faithfully,

**LEHMAN BROTHERS OTC DERIVATIVES INC.**

By: _____
Authorized Signatory

Anatoly Kozlov
Authorized Signatory

Agreed and Accepted By:

**LEHMAN BROTHERS INC.**

By: _____
Name:   Anatoly Kozlov
Title:    Authorized Signatory

**INTEL CORPORATION**

By: _____
Name:
Title:    Doug M. Lusk
          Assistant Treasurer

## SCHEDULE A

### TABLE

**Reference Spot**

| | $16.00 | $17.00 | $18.00 | $19.00 | $20.00 | $21.00 | $22.00 | $23.00 | $24.00 | $25.00 | $26.00 | $27.00 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **14.00%** | $0.000 | $0.000 | $0.000 | $0.000 | $0.000 | $0.000 | $0.000 | $0.000 | $0.000 | $0.000 | $0.000 | $0.000 |
| **16.00%** | $0.000 | $0.000 | $0.000 | $0.000 | $0.000 | $0.000 | $0.000 | $0.000 | $0.000 | $0.000 | $0.000 | $0.000 |
| **18.00%** | $0.000 | $0.000 | $0.000 | $0.000 | $0.000 | $0.000 | $0.011 | $0.015 | $0.007 | $0.000 | $0.000 | $0.000 |
| **20.00%** | $0.000 | $0.000 | $0.000 | $0.000 | $0.000 | $0.008 | $0.023 | $0.033 | $0.039 | $0.000 | $0.000 | $0.000 |
| **22.00%** | $0.000 | $0.000 | $0.000 | $0.000 | $0.000 | $0.016 | $0.035 | $0.051 | $0.066 | $0.029 | $0.000 | $0.000 |
| **24.00%** | $0.008 | $0.008 | $0.008 | $0.009 | $0.010 | $0.025 | $0.048 | $0.071 | $0.093 | $0.060 | $0.000 | $0.000 |
| **26.00%** | $0.022 | $0.023 | $0.024 | $0.020 | $0.021 | $0.034 | $0.062 | $0.092 | $0.120 | $0.093 | $0.000 | $0.000 |
| **28.00%** | $0.026 | $0.028 | $0.030 | $0.026 | $0.029 | $0.044 | $0.077 | $0.113 | $0.149 | $0.125 | $0.044 | $0.000 |
| **30.00%** | $0.031 | $0.033 | $0.035 | $0.032 | $0.035 | $0.055 | $0.092 | $0.136 | $0.178 | $0.158 | $0.081 | $0.000 |
| **32.00%** | $0.036 | $0.038 | $0.041 | $0.037 | $0.043 | $0.065 | $0.108 | $0.159 | $0.206 | $0.193 | $0.117 | $0.038 |
| **34.00%** | $0.042 | $0.045 | $0.048 | $0.045 | $0.051 | $0.078 | $0.125 | $0.182 | $0.235 | $0.225 | $0.153 | $0.070 |
| **36.00%** | $0.047 | $0.050 | $0.053 | $0.051 | $0.061 | $0.090 | $0.141 | $0.205 | $0.264 | $0.260 | $0.192 | $0.108 |
| **38.00%** | $0.052 | $0.055 | $0.059 | $0.058 | $0.069 | $0.103 | $0.158 | $0.230 | $0.293 | $0.295 | $0.231 | $0.149 |
| **40.00%** | $0.050 | $0.053 | $0.056 | $0.059 | $0.074 | $0.116 | $0.178 | $0.256 | $0.322 | $0.328 | $0.272 | $0.188 |
| **42.00%** | $0.056 | $0.059 | $0.063 | $0.067 | $0.084 | $0.130 | $0.197 | $0.281 | $0.351 | $0.362 | $0.311 | $0.229 |
| **44.00%** | $0.062 | $0.066 | $0.069 | $0.074 | $0.095 | $0.144 | $0.217 | $0.307 | $0.380 | $0.395 | $0.351 | $0.272 |
| **46.00%** | $0.068 | $0.072 | $0.076 | $0.082 | $0.106 | $0.159 | $0.238 | $0.333 | $0.409 | $0.429 | $0.390 | $0.315 |
| **48.00%** | $0.074 | $0.079 | $0.083 | $0.091 | $0.118 | $0.175 | $0.259 | $0.359 | $0.438 | $0.462 | $0.429 | $0.358 |
| **50.00%** | $0.081 | $0.086 | $0.091 | $0.099 | $0.130 | $0.191 | $0.280 | $0.385 | $0.468 | $0.496 | $0.468 | $0.401 |

Volatility

LEHMAN BROTHERS HOLDINGS INC.
745 SEVENTH AVENUE, NEW YORK, NEW YORK 10019