**Hearing Date: June 13, 2013 at 10:00 a.m.**

KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2100
Facsimile: (212) 556-2222
Arthur Steinberg
Scott Davidson

*Counsel for Lehman Brothers Holdings Inc.
and Certain of its Affiliates*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------- x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | : | Case No.:  08-13555 (JMP) |
| | : | |
| Debtors. | : | (Jointly Administered) |

--------------------------------------------------------------------- x

### LEHMAN BROTHERS HOLDINGS INC.'S AND LEHMAN COMMERCIAL PAPER INC.'S (I) REPLY TO THE RESPONSE OF LBREP LAKESIDE SC MASTER I, LLC TO LEHMAN'S MOTION (A) SEEKING A GOOD FAITH DETERMINATION FOR THE LCPI SETTLEMENT, AND BASED ON THAT GOOD FAITH FINDING AND FOR OTHER REASONS (B) OBJECTING TO THE PROOFS OF CLAIM FILED BY LBREP LAKESIDE, AND (II) OBJECTION TO LBREP LAKESIDE'S CROSS-MOTION TO TRANSFER VENUE

Lehman Brothers Holdings Inc. ("**LBHI**"),[1] as Plan Administrator under the

*Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its*

*Affiliated Debtors* (the "**Lehman Plan**") for the entities in the above-referenced chapter 11 cases,

including LBHI and Lehman Commercial Paper Inc. ("**LCPI**," and with LBHI, "**Lehman**" or

"**Debtors**"), hereby submits this responsive pleading ("**Responsive Pleading**") (i) in reply to the

response ("**Response**") filed by LBREP Lakeside to the Motion, and (ii) in response to LBREP

---

[1]  Capitalized terms not otherwise defined herein have the meanings ascribed to them in the *Motion By Lehman Brothers Holdings Inc. And Lehman Commercial Paper Inc. For An Order (I) Determining That The LCPI Settlement Was Entered Into In Good Faith Pursuant To California Code Of Civil Procedure §§ 877 And 877.6, And, Based On Such Good Faith Finding And For Other Reasons, (II) Disallowing And Expunging Proofs Of Claim Number 28845 And 28846*, dated March 25, 2013 [ECF No. 36164] ("**Motion**").

Lakeside's *Cross-Motion to Transfer for Improper Forum* ("**Cross-Motion**," and, with the Response, the "**Claimant Objection**"); and (iii) in further support of the relief requested in the Motion.

## PRELIMINARY STATEMENT

1.    Claimant is attempting a financial "hold-up" of Lehman based on a hallow, unsustainable, legal argument.  Having been challenged by Lehman, Claimant seeks to retreat by trying to shift the venue for this claims dispute.  Recognizing that the venue "stall tactic" will probably fail, Claimant seeks a delay by arguing for discovery on a matter which it settled, after taking substantial discovery, including discovery from Lehman.[2]  Recognizing that this argument will also probably fail, Claimant argues that there is insufficient proof presented by Lehman to justify the dismissal of its Claims. But, the "insufficient proof" argument also fails because:

(a)    it is Claimant's burden to establish the *bona fides* of its Claims against Lehman, and it is also Claimant's burden to establish that the LCPI Settlement was not a good faith settlement.  It has not, and cannot, do so.

(b)    Lehman has proffered substantially the same set of documents which provided the evidentiary support for the approval of the LCPI Settlement in this Court and the California Bankruptcy Court.  Lehman also included the evidentiary support for the approval of the SunCal Trustee's settlement with Claimant.  There is nothing more that is needed for this Court to dismiss the Claims, and if there were, it is Claimant's burden to so provide (which it has not done).

---

[2]    On page eight of the Claimant Objection, Claimant refers to the discovery taken by it from Lehman.

2.       Claimant has a difficult time arguing the substance because its contentions are vacuous.

*First*:  Both Claimant and Lehman were on the same side of the dispute with the SunCal Trustee. LCPI settled before litigation was formally brought against it.  Claimant settled, after litigation was commenced, and after substantial discovery was done.   The common transaction raised by the SunCal Trustee in both disputes was the alleged fraudulent transfer relating to the 2006 dividend paid by SunCal to Claimant based on loans made by LCPI and others to SunCal.   LCPI and Claimant both contended that the SunCal Trustee's fraudulent transfer allegation had no merit.   The relatively small settlements paid by both LCPI and Claimant reflect that they had the much stronger case than the SunCal Trustee.

*Second*:  Claimant seems to forget that if there was a valid fraudulent transfer claim, Claimant was the actual *recipient* of the fraudulent transfer.   In contrast, LCPI held approximately 28% of the $395 million lender claims against SunCal, of which only approximately 37% ($144 million) was used by SunCal to pay a dividend to its equity holders. Claimant received approximately 90% of the dividend ($130 million), which represented a full return of its capital, plus approximately $36 million in profit.

*Third*:  There was nothing that required SunCal to borrow the money from the lending group, there was nothing that required the equity holders to take a dividend, and there was nothing that prevented the equity holders from putting back the dividend money if SunCal needed it for operations.   It was always SunCal's responsibility, controlled by its dominant equity holder, Claimant, to make sure its loan was "right sized."   If a change in a lending condition,[3] agreed to before the loan was made, resulted in making it more difficult for SunCal to

---

[3]     Arguably, adding a liquidity reserve for a loan did not change whether SunCal had adequate capital to operate. In any event, it is SunCal that bears the responsibility of how to run its business affairs -- not its lenders.

meet its then business projection, it was SunCal and Claimant's ultimate responsibility to decide whether to borrow the money, and how to adjust SunCal's business plan.  For example, Claimant could have taken a smaller dividend, or it could have given the dividend back based on SunCal's liquidity needs.  The fact that Claimant decided to keep substantially the entire dividend was its financial choice, and ultimate burden.

Further, if Claimant breached its fiduciary duty (which it strenuously denied), it cannot -- based on the doctrine of *in pari delicto* -- sue a third party (*i.e.*, Lehman) for its bad acts, or for aiding and abetting its bad acts.  *See, e.g.*, *Parmalat Capital Fin. Ltd. v. Bank of America Corp.*, 412 Fed.Appx. 325, 327 (2d Cir. 2011) ("*In pari delicto* prevents a party from suing others for a wrong in which the party itself participated.").

*Fourth*:  In January 2006, Claimant received approximately $130 million of the $144 million dividend.  In November/December 2012, approximately seven years later, Claimant paid to the SunCal Trustee approximately $14 million, *less* an undisclosed amount paid by an *insurance carrier*.  Any way you slice it, Claimant made a profit on this transaction.  Viewed one way, Claimant simply gave back some of its profits from the dividend. Viewed another way, Claimant merely gave back a portion of its seven year earnings on the $130 million dividend received.  In all circumstances, Claimant was able to keep substantially the entire dividend, which was financed from the loan proceeds of LCPI (and other lenders).  In sharp contrast, LCPI lost over $110 million of principal in its loans to SunCal.

*Fifth*:  LCPI's status as a first lien secured lender to SunCal put it in a different category than Claimant, as the alleged recipient of a fraudulent transfer.  Both entities shared a transaction in common, but the respective rights and obligations that flowed from that transaction were different.  Claimant was an equity investor who already took "all of its money off the

table". LCPI was part of a lender group with real estate collateral in a volatile market, that needed to be sold. Even if the amount of the 2006 dividend was subtracted from the first lien lender debt, the net loan balance owed to the first lien lenders was far greater than the value of their collateral at the time it was ultimately sold. In the end, LCPI had a very large deficiency claim. The settlements reached[4] reflected the different positions which the parties were in at the time of their settlements.

**Sixth**: When this Court and the California Bankruptcy Court evaluated the LCPI Settlement, it necessarily had to make a determination that it was entered into in good faith and represented a reasonable resolution of the dispute with SunCal. That type of "good faith" finding in a settlement approved pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure ("**Bankruptcy Rules**"), which validated the amount of settlement consideration paid by LCPI to SunCal as reasonable, is substantially the same finding that the Court needs to now make as part of the extinguishment of Claimant's contribution claim.

3.      Here, the situation should be not controversial at all. Both LCPI and Claimant paid a relatively small portion of what they were originally sued for (or threatened to be sued for). The settlements reflected a general consensus that there was no material risk of a fraudulent transfer recovery. In that circumstance, in which the defendants both paid relatively minor amounts to get rid of a "telephone book" lawsuit, the Court should have an easy time making the "good faith" finding under California law regarding proportionate fault.

---

[4]     Claimant laments that LCPI may share in a piece of the SunCal Trustee's recovery from it. Having advanced the dividend, and with a very large deficiency claim in the SunCal case, it is hard to understand what is wrong with that result (which result, by the way, was approved by two Bankruptcy Courts as part of the LCPI Settlement). In any event, Claimant's math relating to LCPI's share of the recovery is wrong. At most, LCPI will receive $1.8 million (30% of the First Lien Lenders' maximum recovery) to mitigate its over $110 million loss.

4.      From a granular perspective, Claimant paid back only a portion of its profits.  Accounting for pre-judgment interest, and without regard to the undisclosed insurance contribution, Claimant paid less than 10% of its exposure to the SunCal estate as the direct recipient of an alleged fraudulent transfer.  It is hard to imagine how Claimant can, with a straight face, maintain that it paid a disproportionate amount, as contrasted to a lender to SunCal (LCPI), who lost more than 75% of its principal.  Adding insult to injury, a significant portion of LCPI's principal loan loss ended up with Claimant, and contributed to Claimant's profitable rate of return on its investment.

5.      Under these circumstances, the Court should grant Lehman's objection to the Claims.  There is no need for more hearings.  The  valid creditors of the Debtors' estates are entitled to the money otherwise being tied up in the $20 million Claimant claims reserve.

### RESPONSE

**A.      This Court is the Proper Venue for the Motion**

6.      In its Cross-Motion, Claimant asserts that the California Bankruptcy Court, and not this Court, is the proper venue for the Motion.  Claimant's primary argument for venue transfer is that LCPI agreed in the LCPI Settlement to consent to the jurisdiction of the California Bankruptcy Court with respect to disputes related to the LCPI Settlement.  Section V(4) of the LCPI Settlement provides, in relevant part:

> The ***parties*** hereto agree that the California Bankruptcy Court shall have jurisdiction to hear and to determine all matters, disputes and controversies related to this Term Sheet and the subject matter hereof, and ***each party*** hereby submits to the jurisdiction and venue of the California Bankruptcy Court with respect thereto.  (emphasis added).

7.      Of significance to the Claimant's venue argument: (a) there is no present controversy related to the LCPI Settlement, (b) Claimant is ***not*** a "party" to the LCPI Settlement,

and therefore the clause does not apply to it;[5] and (c) the jurisdiction clause is not an exclusive jurisdiction clause so it does not preclude other venues such as this Court.

8.    Claimant also ignores this Court's Order approving the LCPI Settlement, wherein it states that:

> this Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation and/interpretation of this Order; provided, however nothing contained in this decretal paragraph is intended to reduce the exclusive jurisdiction or the concurrent jurisdiction otherwise vested in the Central District of California in the SunCal Bankruptcy Case.

Motion, Exhibit "D" (September 29 Order) at p. 3.

9.    Clearly, neither Lehman nor this Court agreed to divest this Court of jurisdiction (a) over matters related to the LCPI Settlement, or (b) more broadly, over matters related to claims filed against Lehman.[6]

10.    On page seven of the Claimant Objection, Claimant quotes this Court, but adds in a bracket ("the third party issues") to buttress its argument, even though this Court never said those words, nor does Lehman believe this Court intended to make the point advanced by Claimant. When this Court referenced the California Bankruptcy Court, Lehman believes it was with regard to whether the settlement was fair from SunCal's perspective (as compared to the Debtors' perspective), which issue would be more likely raised by the SunCal creditors in the California Bankruptcy Court.  Also, this Court caveated all of its remarks with "I'm going to give this some more thought."  Claimant Objection, Exhibit "J," at 172:6-18.

11.    Notwithstanding the spin that Claimant puts on it, the Motion is properly characterized as a "claims objection".  An expedient basis to expunge the Claims is, as Lehman

---

[5]    On page 7 of the Claimant Objection, Claimant refers to a clause in this Court's Order approving the LCPI Settlement which explicitly states that the LCPI Settlement terms are limited to the parties only, and Claimant is not a party.

[6]    The original reserve for Claimant's Claims was $280 million. This reserve was lowered in 2013, on consent of Claimant, based on an order of this Court -- not the California Bankruptcy Court.

has argued, for the Court to now make the good faith determination with respect to the LCPI Settlement.

12. Claimant's argument is essentially that, even though it first invoked this Court's jurisdiction by filing the Claims, this Court should nevertheless defer from adjudicating the claims dispute. This convoluted logic, however, flies in the face of the widely recognized axiom that it is one of the core functions of the *home* Bankruptcy Court to resolve objections to claims asserted against a debtor. *See In re Chateaugay Corp.*, 111 B.R. 67, 71 (Bankr. S.D.N.Y. 1990) (recognizing that restructuring of debtor-creditor relations is at the core of bankruptcy court power and that the court has jurisdiction to allow, disallow, liquidate and estimate aspects of claims based on contract law); *Lesser v. A−Z Assocs. (In re Lion Capital Group)*, 46 B.R. 850, 860 (Bankr. S.D.N.Y. 1985) ("Adjustment of claims against an estate has been and remains central to bankruptcy proceedings."); *In re Mirant Corp.*, 316 B.R. 234, 239-40 (Bankr. N.D. Tex. 2004) ("This procedure for liquidation of claims against a bankruptcy estate and their allowance and disallowance is at the very heart of the bankruptcy court's function and purpose.").

13. The California Bankruptcy Court has no interest in resolving claims filed against Lehman. This Court, on the other hand, is specifically charged with overseeing the administration of Lehman's bankruptcy case, including addressing all objections to claims filed herein. The "good faith" determination directly affects the Claims filed by Claimant against Lehman. It would be inefficient, time consuming and a waste of judicial resources to bifurcate this matter and have two Bankruptcy Courts address different portions of the same relief requested in the Motion. This Court is fully capable of reviewing the "good faith" standard for settlements under California law in order to determine if the LCPI Settlement was entered into in

good faith. This principle was clearly enunciated in the *In re Patriot Coal Corp.* case as follows: "bankruptcy courts routinely apply and interpret other states' laws and regulatory regimes . . . ." *Id.*, 482 B.R. 718, 752 (Bankr. S.D.N.Y. 2012). This case is no different.

14.    Accordingly, this Court, and not the California Bankruptcy Court, is the appropriate forum to address the relief requested in the Motion. Claimant's Cross-Motion should, therefore, be denied.

**B.    The LCPI Settlement Was a Good Faith Settlement**

15.    In its Response to the Motion, Claimant erroneously asserts that Lehman has not satisfied its burden of proving that the LCPI Settlement was entered into in good faith. As stated in the Motion, the objecting party has the burden of proof that the proposed settlement lacks good faith. *See* Cal. Code Civ. P. § 877(6)(d).[7] The objector must show that the settlement "is so far 'out of the ballpark' to [the factors discussed in *Tech-Bilt*] as to be inconsistent with the equitable objectives of the statute." *Tech-Bilt, Inc. v. Woodward Clyde & Assoc.*, 38 Cal. 3d 488, 499-500 (Cal. 1985). In fact, an opponent must demonstrate that "the settlement is ***grossly disproportionate*** to what a reasonable person at the time of the settlement would estimate the settlor's liability to be." *City of Grand Terrace v. Superior Ct.*, 192 Cal. App. 3d 1251, 1262 (1987) (emphasis added).

16.    As set forth in the Motion, both this Court and the California Bankruptcy Court have each already ruled that the LCPI Settlement satisfied the standard for approving

---

[7]    Claimant asserts that Lehman has not met its "foundational burden on proportionate liability . . . ." Claimant Objection, p. 16 n. 22. Claimant is incorrect. As stated in *Mattco Forge, Inc. v. Arthur Young & Co.*, 38 Cal. App. 4th 1337 (Cal. Ct. App. 1995) -- a case relied on by Claimant -- the "party asserting the lack of good faith has the burden of proof on the issue" (*id.* at 1349), and the party bringing the motion is "not compelled to make a showing as to their proportionate liability" (*id.* at 1350 n. 6). Moreover, the Motion was styled after, and contained the same information and support (if not more) as the settlement motion filed by the SunCal Trustee wherein it sought a good faith determination for the Dividend Action Settlement.

settlements set forth in Bankruptcy Rule 9019.  As found by the bankruptcy court in *In re Plant Insulation Co.*, 469 B.R. 843 (Bankr. N.D. Cal. 2012):

> California courts have adopted a test comparable to the Rule 9019 test for determining whether a settlement payment is sufficient to justify a bar against equitable contribution rights.  The California Supreme Court articulated the following standard for determining whether a settlement is in good faith under section 877.6 of the California Civil Code.  "[A] defendant's settlement figure must not be grossly disproportionate to what a reasonable person, at the time of the settlement, would estimate the settling defendant's liability to be."  The party asserting the lack of good faith, who has the burden of proof on that issue should be permitted to demonstrate, if he can, that the settlement is so far "out of the ballpark" in relation to these factors as to be inconsistent with the equitable objectives of the statute.  *Tech-Bilt, Inc. v. Woodward-Clyde & Assoc.*, 38 Cal.3d 488, 499-500, 213 Cal.Rptr. 256, 698 P.2d 159 (1985).  The **Rule 9019 standard is actually more exacting than the section 877.6 standard**, because under Rule 9019 the party proposing the settlement has the burden of proof, while under section 877.6 the party opposing the settlement has the burden of proof.

*Id.* at 885-86 (emphasis added) (citations omitted).

17.    Moreover, the standard under Bankruptcy Rule 9019 includes a good faith component.  *See In re Healthco Intern., Inc.*, 136 F.3d 45, 53 (1st Cir. 1998) ("The 'best interests' standard under Bankruptcy Rule 9019 contemplates a determination by the bankruptcy court as to whether the proposed settlement was negotiated in good faith."); *see also In re Lehman Brothers Holdings Inc.*, 435 B.R. 122, 135 ( S.D.N.Y. 2010) (quoting *Healthco Intern.*).

18.    As both this Court and the California Bankruptcy Court have previously found that the LCPI Settlement satisfied the standard set forth in Bankruptcy Rule 9019, and that standard is "more exacting" then the standard under Section 877.6 of the CCCP, it is clear that the LCPI Settlement easily satisfies the standard articulated by *Tech-Bilt*.  *See Plant Insulation*, 469 B.R. at 886-87.  The Motion should be granted on this basis alone.

19.    Moreover, while Claimant asserts that Lehman has offered no evidence to support its request for a good faith determination, that simply is not correct.[8]  In the Motion, Lehman referenced the Settlement Motion filed in this Court on September 2, 2010 seeking approval of the LCPI Settlement pursuant to Bankruptcy Rule 9019.[9]  *See* Motion, at p. 9.  As part of that Settlement Motion, Lehman filed an extremely detailed declaration by F. Robert Brusco ("**Brusco Declaration**") explaining the facts surrounding the LCPI Settlement and setting forth why the LCPI Settlement was fair, reasonable and appropriate.[10]  Claimant was present at the hearing before the Court on the LCPI Settlement and reviewed the Brusco Declaration at that time.  The Brusco Affidavit, along with the other papers submitted by Lehman herein, provides the evidentiary support needed to obtain a good faith determination for the LCPI Settlement.

20.    Claimant argues that the LCPI Settlement was a "significant win" for LCPI.  *See* Claimant Objection, ¶ 35.  It is hard to conceive what a "significant win" could be when LCPI paid the SunCal Trustee a seven figure sum based on a transaction that Claimant previously argued was valid.  Now -- after it has settled with the SunCal Trustee and obtained its

---

[8]    As demonstrated herein and in the Motion, Lehman has set forth a sufficient evidentiary basis for the good faith finding that it seeks.  While Claimant seeks additional discovery in an apparent attempt to delay this matter, all relevant facts are known and this Court can make the requisite findings on the present record.

[9]    While it is true that neither Lehman nor the SunCal Trustee sought a "good faith" determination at the time the Settlement Motion was filed, they did not have to.  In *Greshko v. County of Los Angeles*, 239 Cal. Rptr. 846 (Cal. Ct. App. 1987) -- a case cited in the Motion *and* relied on by Claimant -- the California Court of Appeals found that Section 877.6 of the CCCP "provides no time limit after settlement within which a motion for determination of good faith of the settlement must be brought."  *Id.* at 849.  Lehman had no reason to seek a good faith determination until after Claimant settled its claims with the SunCal Trustee and refused to withdraw the Claims filed in these bankruptcy cases.

[10]    *See Declaration Of F. Robert Brusco In Support Of Motion Of Lehman Commercial Paper Inc. Pursuant To Section 105 Of The Bankruptcy Code And Federal Rule Of Bankruptcy Procedure 9019 For Approval Of That Certain Amended And Restated Compromise By And Among Lehman Commercial Paper Inc., Alfred H. Siegel, As Chapter 11 Trustee For The SunCal Debtors, And The Official Committee Of Unsecured Creditors In The SunCal Bankruptcy Cases*, dated September 20, 2010 [ECF No. 11457], a copy of which is attached hereto, for the Court's convenience, as Exhibit "A."

good faith finding[11] -- Claimant impermissibly seeks to reverse course and argue that the SunCal Trustee's claims have merit.   Claimant is judicially estopped from taking a diametrically opposite position to the one it took in the LBREP Defendants Memo.   *DeRosa v. National Envelope Corp.*, 595 F.3d 99, 103 (2d Cir. 2010) (the elements of judicial estoppel are: "1) a party's later position is 'clearly inconsistent' with its earlier position; 2) the party's former position has been adopted in some way by the court in the earlier proceeding; and 3) the party asserting the two positions would derive an unfair advantage against the party seeking estoppel.").   As demonstrated above, all of the elements of judicial estoppel are met to prevent Claimant from switching sides.

## C.    The Claims Should Be Disallowed and Expunged

21.    Claimant has not disputed that, if this Court finds that the LCPI Settlement was entered into in good faith pursuant to California law, the Claims should be disallowed and expunged.   As demonstrated above and in the Motion, the LCPI Settlement meets that standard and, therefore, the Claims should be disallowed and expunged in their entirety.

22.    As stated in the Motion, Lehman reserves all of its rights to object to the Claims on any ground not set forth herein or in the Motion.

---

[11]    It is not clear whether Claimant believes it received a "good faith" finding that foreclosed LCPI's contribution claim against it.  Assuming that is its contention, Claimant will need to explain how it did not violate the automatic stay in obtaining such a finding.  Claimant can also explain how its 'significant win" theory dovetails with its settlement with the SunCal Trustee, which left it with a full principal return, plus profit.

WHEREFORE, for all of the foregoing reasons as well as the arguments made in the Motion, Lehman respectfully requests that the Court (i) grant the relief requested in the Motion in its entirety; (ii) deny the relief requested in the Cross-Motion; and (iii) grant such other and further relief to Lehman as the Court deems just and proper.

Dated: June 6, 2013
     New York, New York

                KING & SPALDING LLP


                By: /s/ Arthur Steinberg
                    Arthur Steinberg
                    Scott Davidson
                    1185 Avenue of the Americas
                    New York, New York 10036
                    Telephone: (212) 556-2100
                    Facsimile: (212) 556-2222

                    *Counsel for Lehman Brothers Holdings Inc.*
                    *and Certain of its Affiliates*

# EXHIBIT A

**Hearing Date: September 22, 2010 at 10:00 a.m.**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------ x

In re:                                                     :        Chapter 11
                                                           :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,                   :        Case No.: 08-13555 (JMP)
                                                           :
                               Debtors.                    :        (Jointly Administered)

------------------------------------------------------------------------ x

## DECLARATION OF F. ROBERT BRUSCO IN SUPPORT OF MOTION OF LEHMAN COMMERCIAL PAPER INC. PURSUANT TO SECTION 105 OF THE BANKRUPTCY CODE AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019 FOR APPROVAL OF THAT CERTAIN AMENDED AND RESTATED COMPROMISE BY AND AMONG LEHMAN COMMERCIAL PAPER INC., ALFRED H. SIEGEL, AS CHAPTER 11 TRUSTEE FOR THE SUNCAL DEBTORS, AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS IN THE SUNCAL BANKRUPTCY CASES

I, F. Robert Brusco, do hereby declare and depose as follows:

1.        I am employed by LAMCO, LLC ("LAMCO"), a wholly owned subsidiary of LBHI[1] and an affiliate of LCPI, which are both debtors in possession in the above-captioned Chapter 11 cases. LAMCO is the asset manager for LCPI's estate holdings and responsible for the asset management of the SunCal Master Debtors' loans. As an employee of LAMCO, I am the person primarily responsible for the direct management of the SunCal loans and have been involved in these loans since January, 2008.

2.        I make this declaration ("Declaration") in support of the LCPI Settlement Motion. I am over the age of 21 and fully competent to testify to the matters set forth in this Declaration. I am fully familiar with the facts stated herein based upon the information provided

---

[1]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the *Motion of Lehman Commercial Paper Inc. Pursuant to Section 105 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 9019 for Approval of that Certain Amended and Restated Compromise by and Among Lehman Commercial Paper Inc., Alfred H. Siegel, as Chapter 11 Trustee for the SunCal Debtors, and the Official Committee of Unsecured Creditors in the SunCal Bankruptcy Cases*, dated September 2, 2010 [Docket No. 11153] (the "LCPI Settlement Motion").

to me by the Debtors, my counsel, the SunCal Trustee and through my work as an employee of

LAMCO. If called to testify at the September 22, 2010 hearing on the LCPI Settlement Motion,

the following would be my direct testimony.

3.      Except as otherwise indicated, all facts set forth in this Declaration are

based upon my personal knowledge, my review of the relevant documents, information provided

to me by counsel or employees working under my supervision, or my opinion based upon my

experience, knowledge, and information concerning the SunCal loans and the Amended Term

Sheet.

4.      Pursuant to the LCPI Settlement Motion, LCPI seeks approval of a

settlement pursuant to the terms set forth in an amended and restated term sheet (the "Amended

Term Sheet") by and among (a) LCPI, on its own behalf and as agent for the First Lien Lenders,

(b) Alfred H. Siegel (the "SunCal Trustee"), the chapter 11 trustee of the SunCal Debtors, and

(c) the official committee of unsecured creditors in the SunCal Bankruptcy Cases (the "SunCal

Committee"). A copy of the Amended Term Sheet is attached to the LCPI Settlement Motion as

Exhibit "A."

5.      As further explained below, in 2006 and 2007, the SunCal Parent entered

into certain credit agreements with LCPI, as agent, pursuant to which the SunCal Parent

borrowed approximately $395 million. The SunCal Subsidiaries guaranteed the SunCal Parent's

obligations under such credit agreements. On or about September 10, 2008, involuntary chapter

11 cases were filed against the SunCal Debtors. On or about October 9, 2009, the SunCal

Trustee filed a motion in the SunCal Bankruptcy Cases (the "Original Settlement Motion")

seeking the approval of a settlement pursuant to the terms of that certain original term sheet by

and among LCPI, the SunCal Trustee, and the SunCal Committee (the "Original Term Sheet").

Following the filing of the Original Settlement Motion, a dispute arose between LCPI, on the one hand, and the SunCal Trustee and the SunCal Committee, on the other hand, regarding the interpretation of a provision in the Original Term Sheet. The parties were initially unable to resolve their differences.

6.    On June 17, 2010, the SunCal Trustee filed the SunCal Stay Relief Motion seeking, among other things, stay relief to sell the real property of the SunCal Debtors (the "Properties") free and clear of LCPI and the other First Lien Lenders' asserted liens and to deny LCPI's credit bid rights. The SunCal Trustee also sought permission to commence a complex litigation against LCPI. At an initial hearing on the SunCal Stay Relief Motion held on July 14, 2010, this Court continued the hearing until August 18, 2010 and suggested to the parties that they focus their attention on resolving their differences and reaching a settlement, as opposed to planning for expensive and protracted litigation against each other. As suggested by this Court, the parties resumed negotiations, and as a result of the renewed discussions, LCPI, the SunCal Trustee, and the SunCal Committee have now resolved their differences regarding the interpretation of the Original Term Sheet and have executed the Amended Term Sheet. At a status conference held on August 18, 2010, LCPI reported to this Court that it was seeking internal approval to sign the Amended Term Sheet and would shortly thereafter be filing the LCPI Settlement Motion.

## A.    The Properties

7.    The Properties consist of three real estate development projects located in California:

LBREP/L-SunCal McAllister Ranch ("McAllister Ranch") is located near Bakersfield in Kern County, California. I understand that McAllister Ranch is designed to be a community featuring a golf course, lake, and approximately 6,087 homes across 2,070 acres.

LBREP/L-SunCal McSweeny Farms, LLC ("McSweeney Farms") is located near Hemet in Riverside County, California. I understand that McSweeney Farms is scheduled to include 1,640 lots over 643 acres.

LBREP/L-SunCal Summerwind Ranch, LLC ("Summerwind Ranch") is located near Climesa in Riverside County, California. I understand that Summerwind Ranch will contain 3,683 lots over 2,591 acres.

## B.    The Loan Facilities

8.    The SunCal Parent is a holding company established to fund the real estate development projects owned by each of its operating subsidiaries (*i.e.*, the SunCal Subsidiaries). Approximately ninety percent (90%) of the SunCal Parent is owned by LBREP Lakeside, which is an affiliate of Lehman Bros. Real Estate Partners, LP ("LBREP"). The remaining equity interests in the SunCal Parent are owned by SCC Ranch, which is an affiliate of SCC Inc. d/b/a SunCal Companies. LBREP Lakeside is the managing member of the SunCal Parent.

9.    The SunCal Parent's primary asset, other than cash, is its interests in the SunCal Subsidiaries. The SunCal Parent is the sole equity member of the SunCal Subsidiaries, each of which, in turn, owns a real estate development project bearing a similar name. The SunCal Parent also has cash in accounts with a current aggregate balance of over $13 million, which funds were formerly held in a "Development Account" and/or "Operating Accounts" established under the LCPI loan documents.

10.    The SunCal Parent, as borrower, entered into three Lien Credit Agreements with LCPI (collectively, the "Lien Credit Agreements").

11.    Pursuant to the First and Second Lien Credit Agreements, which were entered into on or about January 19, 2006, the SunCal Parent borrowed a total of $320 million (collectively, the "January 2006 Loans") as follows: (1) a revolving credit facility of $75 million and term loan facility of $160 million under the First Lien Credit Agreement entered into with

the First Lien Lenders); and (2) an $85 million term loan facility under the Second Lien Credit Agreement entered into with the Second Lien Lenders. The SunCal Parent's obligations under the First and Second Lien Credit Agreements were guaranteed by the SunCal Subsidiaries, and these guaranties were secured by first and second liens against the Properties. LCPI was a lender under the January 2006 Loans, and acted as the administrative and syndication agent, and Lehman Brothers Inc. ("LBI"), served as the sole lead arranger and bookrunner. Later, Gramercy Warehouse Funding I, LLC, replaced LCPI as the administrative agent under the Second Lien Credit Agreement. As of the date of the LCPI Settlement Motion, LCPI (a) holds approximately $69 million (or approximately thirty percent (30%)) of the debt outstanding under the First Lien Credit Agreement in its capacity as a First Lien Lender, and (b) holds approximately $13 million (or approximately fifteen percent (15%)) of the debt outstanding under the Second Lien Credit Agreement in its capacity as a Second Lien Lender.

12.    On or about February 6, 2007, a Third Lien Credit Agreement was entered into by the SunCal Parent and certain lenders party thereto (collectively, the "Third Lien Lenders" and together with the First Lien Lenders and the Second Lien Lenders, the "Lien Lenders"), which provided for an additional $75 million term loan (the "February 2007 Loan," and together with the January 2006 Loans, the "Loans"). The February 2007 Loan was also guaranteed by the SunCal Subsidiaries and secured by third priority liens against the Properties. Just as with the January 2006 Loans, LCPI was a lender and served as the administrative agent. Square Mile Structured Debt (One), LLC, and Square Mile Structured Debt (Two), LLC, collectively, replaced LCPI as the administrative agent under the Third Lien Credit Agreements. As of the date of the LCPI Settlement Motion, LCPI holds approximately sixty-five percent

(65%) of the debt outstanding under the Third Lien Credit Agreement in its capacity as a Third Lien Lender.

13.     Under certain intercreditor agreements, the Second Lien Lenders and the Third Lien Lenders agreed and confirmed that their liens and right to payment from collateral pledged by the SunCal Debtors were subordinated in favor of the First Lien Lenders.

## C.    The SunCal Bankruptcy

14.     On or about September 10 and 11, 2008, involuntary petitions under Chapter 11 of the Bankruptcy Code were filed against the SunCal Debtors. On or about October 29, 2008, the SunCal Court entered an order approving Alfred H. Siegel's appointment as the Chapter 11 trustee for the SunCal Debtors, and on October 30, 2008, orders for relief were entered in the SunCal Bankruptcy Cases.

15.     At the time of the filing of the SunCal Bankruptcy Cases, I was aware that there were defaults under the First, Second and Third Lien Credit Agreements. LCPI, as administrative agent for the First Lien Lenders, has asserted a first priority lien against the Properties and the SunCal Parent's cash for the full amount of the Loans extended to the SunCal Parent under the First Lien Credit Agreement (and guaranteed by the SunCal Subsidiaries). Likewise, the Second and Third Lien Lenders have also asserted liens against the Properties and the SunCal Parent's cash for the full amount of their respective Loans. Based on appraisals received by LCPI and offers received by the SunCal Trustee, I believe that the value of the Properties is substantially less than the amount of the First Lien Lenders debt.

## D.    The LCPI Stay Relief Motions

16.     On or about October 2, 2008, LCPI, in its capacity as agent to the First Lien Lenders, filed the LCPI Stay Relief Motions, seeking, among other things, to foreclose on

the First Lien Lenders' liens in the Properties and cash held by the SunCal Debtors. The LCPI

Stay Relief Motions were originally scheduled for hearing on October 28, 2008, but the SunCal

Court continued the hearing to November 20, 2008 to allow the SunCal Trustee an opportunity to

analyze the motions and prepare a response thereto. Both the SunCal Trustee and the SunCal

Committee opposed the LCPI Stay Relief Motions, in part, because both parties allegedly

disputed the amount and validity of LCPI's liens.

17.     In an effort to facilitate an amicable settlement among the parties, the

evidentiary hearing on the LCPI Stay Relief Motions was continued by agreement of the parties

on multiple occasions. Currently, LCPI and the SunCal Trustee are parties to a stipulation,

pursuant to which they agreed to take the evidentiary hearing related to the LCPI Stay Relief

Motions off the calendar, and further agreed to suspend the related deadlines and discovery,

subject to the parties' rights to re-notice and/or reinstate the same. Absent a settlement, I believe

LCPI will have no other option but to re-notice the evidentiary hearing and pursue expensive and

protracted litigation in order to obtain the stay relief necessary to foreclose on its interests in the

Properties and the SunCal Parent's cash.

**E.     SunCal Cash Collateral Disputes**

18.     Although LCPI and the SunCal Trustee were able to ultimately agree upon

the use of the First Lien Lenders' cash collateral during the early stages of the SunCal

Bankruptcy Cases, the parties were unable to reach an agreement regarding the use of cash

collateral beyond November 30, 2009 (due to the breakdown in negotiations related to the

Original Term Sheet, as discussed further below). Accordingly, the SunCal Trustee filed motions

in the SunCal Bankruptcy Cases for the use of cash collateral through December 31, 2009,

March 31, 2010, and June, 30, 2010.  LCPI filed a limited objection to each motion, and each

motion was granted over LCPI's limited objection. On May 27, 2010, the SunCal Trustee filed a

*Motion for Order Authorizing Use of Cash Collateral Through September 30, 2010* in the

SunCal Bankruptcy Cases. LCPI filed an opposition to the motion. On June 17, 2010, the

SunCal Court heard and granted the motion over LCPI's opposition. On June 25, 2010, the

SunCal Court entered the Cash Collateral Order. On July 9, 2010, LCPI filed a notice of appeal

of the Cash Collateral Order ( "Appeal"). In light of the Amended Term Sheet, LCPI and the

SunCal Trustee are in the process of memorializing a stipulation staying the Appeal pending the

outcome of the LCPI Settlement Motion and the SunCal Approval Motion, which, if granted,

will result in the dismissal of the Appeal.

**F.    LCPI's Claim in the SunCal Master Debtors' Bankruptcy Case**

        19.    LCPI and the first lien lenders have a claim in the SunCal Master Debtors'

bankruptcy cases of approximately $235 million. In 2008, the Properties were appraised at $62

million ("Appraised Amount"). Indeed, the SunCal Trustee was prepared to take a "stalking

horse" bid for the Properties at $41 million. In all events, it is the position of the First Lien

Lenders, which includes LCPI, that they are the true economic owners of the Properties.

**G.    The Original Term Sheet with the SunCal Master Debtors**

        20.    As referenced above, in the fall of 2009, the Trustee filed the Original

Settlement Motion to approve the Original Term Sheet. The Original Term Sheet essentially

provided that: (a) the Trustee would sell the Properties free and clear of liens and claims,

including without limitation, the Senior Liens, and the first lien lenders would make an initial

credit bid of $62 million, which was also the last appraised value of the Properties; (b) the

Trustee would be paid (i) $3 million (essentially to cover anticipated administrative expenses in

the SunCal Master Debtors' cases) from the first lien lenders' cash collateral (ii) up to $1.5

million to pay mechanic's liens to the extent the holders held superior liens to the first lien

lenders in the Properties and there was no available title insurance to cover same, (iii) 3.5% of

the net proceeds received by the first lien lenders relating to a future sale of the Properties, (iv)

up to $2 million of cash collateral to preserve the Properties until sale, and (v) 50% of the Other

Recoveries until the SunCal Master Debtors' trade creditors were paid in full; and (c) in addition

to the Properties, the balance of the cash collateral and the residual bankruptcy estate would be

transferred to the first lien lenders. The Original Settlement Motion was, for various reasons,

opposed by multiple third parties.

21.    Thereafter, the SunCal Trustee raised what he saw as an ambiguity in the

Original Term Sheet, the interpretation of which resulted in a dispute between the settling

parties. Specifically, the Original Term Sheet required that the SunCal Trustee settle and obtain

a release of any mechanic's and similar liens determined to be senior to the liens of LCPI

("Senior Liens") using LCPI's title insurance and $1.5 million of cash collateral set aside for that

purpose. The title insurance company, Fidelity National Title Insurance Company, objected to

the Original Settlement Motion. I am aware that the SunCal Trustee became concerned that

there was a possibility that he might not be able to discharge all of the Senior Liens. The

Original Term Sheet contemplated what would occur if the SunCal Trustee could not discharge

all of the Senior Liens, and the SunCal Trustee became concerned that, based on an

interpretation of that provision, there could be negative ramifications to the SunCal estates.

22.    LCPI, the SunCal Trustee, and the SunCal Committee attempted to resolve

the dispute regarding the interpretation of the Original Term Sheet, and the hearing on the

Original Settlement Motion was continued on multiple occasions. Ultimately, on January 25,

2010, the SunCal Trustee filed a notice of withdrawal of the Original Settlement Motion in the

SunCal Bankruptcy Cases. After being unable to engage the SunCal Trustee to resolve their differences, by letter dated March 30, 2010, LCPI notified the SunCal Trustee of its termination of the proposed settlement embodied in the Original Term Sheet and reserved all of its rights related thereto.

**H.    SunCal Stay Relief Motion**

23.    On or about June 17, 2010, the SunCal Trustee filed the SunCal Stay Relief Motion in these cases, seeking, among other things, stay relief to sell the Properties free and clear of LCPI's asserted liens and to deny LCPI's credit bid rights. The SunCal Trustee also sought permission to assert affirmative claims against LCPI. LCPI filed an opposition to the SunCal Stay Relief Motion. The SunCal Stay Relief Motion was initially heard on July 14, 2010 and continued by this Court to August 18, 2010. The parties engaged in further settlement discussions following the July 14, 2010 hearing and were able to resolve their disputes concerning the Original Term Sheet.

**I.    SunCal Claims Against LCPI**

24.    In the SunCal Stay Relief Motion and in the responses of the SunCal Trustee and the SunCal Committee to the LCPI Stay Relief Motions, the SunCal Trustee and the SunCal Committee have repeatedly alleged that the SunCal Debtors' estates have numerous claims against LCPI. Among others, the SunCal Trustee and the SunCal Committee have stated that they believe that the SunCal Debtors' have claims against LCPI to: (1) equitably subordinate the claims of LCPI and cause the liens securing LCPI's claims to be transferred to the SunCal Debtors' estates; (2) avoid the security interests held by LCPI against the Properties as fraudulent transfers and preserve those security interests for the benefit of the SunCal Debtors' estates; and (3) recover damages against LCPI for lender liability (collectively, the "SunCal Estate Claims").

25.    LCPI disputes each of the SunCal Estate Claims. I believe that LCPI has valid defenses to each claim. However, I further believe that litigating these claims would be expensive and subject to the vagaries and risk of litigation, and until such litigation is resolved, there will be a stalemate spanning two different bankruptcy courts as to how to deal with the Properties.

## J.    The Settlement Set Forth in the Amended Term Sheet Should Be Approved

26.    The salient terms of the Amended Term Sheet are set forth in paragraph 32 of the LCPI Settlement Motion.

27.    I believe that the Amended Term Sheet is a fair and reasonable compromise, and its approval is in the best interests of LCPI's bankruptcy estate. The Amended Term Sheet resolves all of the disputes between LCPI on its own behalf and for the other First Lien Lenders, on the one hand, and the bankruptcy estates of the SunCal Debtors, on the other hand. In particular, the Amended Term Sheet resolves all pending litigation between the parties, all disputes between the parties related to the SunCal Trustee's use of LCPI's and the other First Lien Lenders' cash collateral, and provides for a consensual process for the sale of the Properties (which are subject to the lien of LCPI, as agent for the First Lien Lenders). I believe that approval of the Amended Term Sheet will save LCPI's bankruptcy estate significant administrative expense, will eliminate the risk associated with litigation, and will substantially preserve LCPI's secured claims in the SunCal Bankruptcy Cases for the benefit of LCPI's bankruptcy estate and creditors. Moreover, as discussed below, I believe that the Amended Term Sheet puts into place an acceptable structure relating to the disposition of the Properties (*i.e.*, the First Lien Lenders' collateral), which will help ensure that the Properties are liquidated in a

timely, efficient and beneficial manner (thereby allowing LCPI's share of the proceeds to be available to its bankruptcy estate much faster than in the absence of a settlement).

28.     Under the Amended Term Sheet, the Properties will be sold through a plan of reorganization, subject to LCPI's right to credit bid as provided in the Amended Term Sheet. Pursuant to the Amended Term Sheet, the SunCal Trustee and the SunCal Committee have agreed, among other things, that (a) the First Lien Lenders will have an allowed secured claim in the SunCal Bankruptcy Cases equal to the proceeds realized by them from the sale of the Properties plus certain cash proceeds to be remitted to the First Lien Lenders by the SunCal Trustee (after each amount is adjusted to account for certain "carve outs" and/or obligations, as set forth in greater detail in the LCPI Settlement Motion), (b) the First Lien Lenders will have an allowed general unsecured claim in the SunCal Bankruptcy Cases in the amount of their deficiency claims, and (c) the SunCal Trustee, the SunCal Committee and the SunCal Debtors' estates will provide broad releases to the First Lien Lenders, LCPI, and their respective officers, directors, employees, agents and attorneys.[2]

29.     In return, under the Amended Term Sheet, LCPI on its own behalf and as agent for the First Lien Lenders, has agreed that certain of the First Lien Lenders' cash collateral will be "carved out" for the benefit of the administration of the SunCal Debtors' estates, and that certain other cash collateral held by the SunCal Debtors may be used to preserve the Properties until sale. In addition, the First Lien Lenders have agreed to share with the unsecured, non-lender creditors in the SunCal Bankruptcy Cases a portion of (a) the proceeds from the sale of the Properties, and (b) their right to certain recoveries.

---

[2]   As set forth in the LCPI Settlement Motion, the releases specifically do not include a release of LBREP Lakeside SC Master I LLC ("LBREP Lakeside"), SCC Acquisitions, Inc. ("SCC Inc."), SCC Acquisitions, LLC ("SCC LLC"), or SCC Ranch Ventures LLC ("SCC Ranch" and together with SCC Inc. and SCC LLC, "SCC").

30.     Specifically, upon the entry of orders granting the LCPI Settlement
Motion and the SunCal Approval Motion, the SunCal Debtors' estates will receive $5.5 million
in cash. Of this sum, $3.5 million (the "Administrative Fund") will be available for use by the
SunCal Trustee to administer the SunCal Debtors' cases.  The remaining $2 million will be used
by the SunCal Trustee to maintain and preserve the Properties' pending sale (with any unused
residual amount to be transferred to the First Lien Lenders after the sale of the Properties has
closed).   The First Lien Lenders are also sharing the Yucaipa Funds with the SunCal Trustee.

31.     Also, through the SunCal Debtors' plan of reorganization contemplated
under the Amended Term Sheet, the proceeds of any other recoveries by the SunCal Trustee
(excluding proceeds from the sale of the Properties and the Yucaipa Funds) will be split 50/50
between (a) the First Lien Lenders, and (b) the SunCal Debtors' estates for distribution to the
SunCal Debtors' unsecured non-lender creditors.

32.     The Amended Term Sheet recognizes that the 50/50 split will be achieved
either through the enforcement of an intercreditor agreement in favor of the First Lien Lenders,
or if such remedy is not available, to the extent necessary, by the assignment for the benefit of
unsecured non-Lender creditors of unsecured claims of LCPI and/or the First Lien Lenders to the
SunCal Trustee.

33.     Finally, the SunCal Debtors' estates will also be entitled to 3.5% of any
net recovery from the sale of the Properties to a third party (the "Trustee Participation"), whether
through the plan or subsequently by LCPI (after a credit bid).  The Amended Term Sheet
recognizes that there could be mechanics liens encumbering the Property that are senior to the
lien of the First Lien Lenders. To the extent title insurance is not available to cover such claims,
these senior mechanics liens, if any, will either be paid from the proceeds of a third party sale of

the Properties, or in the event of an LCPI credit bid, will remain a lien on the Properties. In essence, the 3.5% recovery for the SunCal Debtors estate comes out of the sale proceeds otherwise payable to the First Lien Lenders. I believe that the concessions made by LCPI under the Amended Term Sheet are reasonable in view of the benefits derived therefrom.

34.    I believe that that the Amended Term Sheet (and the settlement embodied therein) provides the best framework for globally resolving the numerous disputes by and among LCPI, the SunCal Trustee and the SunCal Committee, including, without limitation, disputes and claims arising from or relating to the LCPI Stay Relief Motions, the SunCal Stay Relief Motion, the Appeal and related cash collateral disputes, and the SunCal Estate Claims.

35.    As discussed above and in the LCPI Settlement Motion, the SunCal Trustee has alleged that the SunCal Debtors' estates have claims to equitably subordinate LCPI's secured claims, avoid LCPI's liens, and to recover damages against LCPI for lender liability (*i.e.*, the SunCal Estate Claims). The SunCal Estate Claims are resolved by the Amended Term Sheet by and through the release of such claims by the SunCal Debtors' estates, as well as the grant of an allowed secured claim to LCPI, as agent for the First Lien Lenders, in an amount equal to the successful bid for the Properties, plus any cash collateral received by the First Lien Lenders on the Settlement Effective Date, plus the amount of the Yucaipa Funds received by the First Lien Lenders.

36.    In exchange for the release of the SunCal Estate Claims, the grant of the allowed secured claim (including the right to credit bid such claim), and the other benefits received by LCPI and the First Lien Lenders under the Amended Term Sheet, LCPI, as agent for the First Lien Lenders, has agreed to "carve out" certain amounts of its collateral and transfer that collateral to the SunCal Trustee for the benefit of the SunCal Debtors' estates (*i.e.*, the

Administrative Funds, the Trustee's share of the Yucaipa Funds, amounts payable under the 50/50 Allocation that would otherwise have been paid to LCPI and the First Lien Lenders, and the Trustee's Participation). Additionally, LCPI, as agent for the First Lien Lenders, has agreed to allow the SunCal Trustee to use certain additional cash collateral to maintain the Properties prior to their disposition (i.e., the Remaining Development Funds) and has agreed to post the Trustee's Loss Collateral.

37.    As previously stated, while I believe that LCPI has valid defenses to each of the SunCal Estate Claims, in order to successfully defend the SunCal Estate Claims, I believe that LCPI would be required to engage in expensive and protracted litigation with the SunCal Trustee and the SunCal Committee. Additionally, absent the settlement set forth in the Amended Term Sheet, I believe that LCPI and the other First Lien Lenders would not be able to recover their collateral (i.e., the Properties and cash) or the proceeds of their collateral in the foreseeable future. I believe that, absent the settlement, if LCPI wishes to obtain the Properties, LCPI will be required to pursue the LCPI Stay Relief Motions in the SunCal Bankruptcy Cases and convince the SunCal Court that lifting the automatic stay is appropriate. Again, I believe this litigation would likely be expensive and protracted, and would come with many of the same aforementioned uncertainties. By contrast, I believe that the Amended Term Sheet not only provides a framework for LCPI and the other First Lien Lenders to obtain the benefit of their collateral through an imminent plan sale of the Properties, it also preserves LCPI's credit bidding rights and gives LCPI significant input with respect to the conduct of the sale of the Properties.

38.    In sum, I believe the Amended Term Sheet provides a framework that will (a) facilitate the sale of the Properties in the near future (with a substantial portion of the sale proceeds to be paid to LCPI ) in a manner that has a material, direct and tangible benefit to

LCPI's estate; (b) minimize further erosion of the First Lien Lenders' cash collateral; and (c) minimize further legal expenditures relating to the SunCal matter in general.

39.    Based on the foregoing and the arguments made in the LCPI Settlement Motion, I believe that the Amended Term Sheet is reasonable and in the best interests of LCPI and its estate and creditors, and should be approved.

40.    I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

41.    Executed this 20th day of September, 2010 at New York, New York.


_____/s/ F. Robert Brusco_____
F. Robert Brusco