```
                                                                    1

 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF NEW YORK
 2

 3    - - - - - - - - - - - -   X

 4    TOLIN,                        :
                                              08cv1811
 5             Plaintiff            :

 6
                 -against-         :
 7                                            United States Courthouse
                                              Brooklyn, New York
 8    WASHINGTON, et al            :
                                              January 9, 2009
 9             Defendants.         :          10:00 o'clock a.m.

10    - - - - - - - - - - - -   X

11
                     TRANSCRIPT OF PROCEEDINGS
12              BEFORE THE HONORABLE JOHN GLEESON
                     UNITED STATES DISTRICT JUDGE
13

14    APPEARANCES:

15
      For the Plaintiff:       JEFFREY BARNES, ESQ.
16

17

18    For the Defendant:       REED SMITH LLP
                               BY:  ANDREW B. MESSITE, ESQ.
19                                  LUANNE K CHU, ESQ.

20

21
      Court Reporter:          Burton H. Sulzer
22                             225 Cadman Plaza East
                               Brooklyn, New York
23                             (718) 613-2481

24    Proceedings recorded by mechanical stenography, transcript
      produced by computer-aided transcription.
25
```

2

```
 1              (Open court-case called-appearances noted.)

 2              THE COURT:  Good morning.  Would you like to be

 3    heard in support of your motion to dismiss?

 4              MR. MESSITE:  I would, your Honor, thank you.  B&C

 5    seeks by this motion to dismiss plaintiff Tolin's four current

 6    causes of action: aiding and abetting fraud, conspiracy to

 7    defraud, aiding and abetting breach of fiduciary duty and a

 8    claim that we violated GBL 349.

 9              I'd like to start with a discussion of the aiding

10    and abetting and conspiracy claims.  I don't think there's any

11    dispute that these claims are dependent upon the existence of

12    a valid underlying fraud claim of Tolin against defendant

13    Washington, the ostensible mortgage broker here.

14              Even accepting Tolin's allegations in the complaint

15    as true for purposes of the motion, these claims can't be

16    sustained.  The fraud that's alleged is that Washington

17    purportedly deceived Tolin into believing he was going to

18    receive a 5.5 percent interest rate mortgage.  He was

19    refinancing an investment property.  None of that is in

20    dispute.

21              There are any number of problems with the underlying

22    fraud claim, and I'd like to focus on the justifiable reliance

23    that Tolin could have had.  In each of Tolin's three pleadings

24    so far he's alleged that Washington advised him in

25    February 2005 that she could get him a new loan at 5.5 percent
```

3

1   and it would take less than a week to do so.

2          Tolin next alleges that a month later, in

3   March 2005, he was presented with certain loan documents,

4   including a loan application which he concededly signed.

5   There is no dispute that the loan application references a

6   loan being sought at 7.75 percent.

7          Given that the loan application Tolin signed and

8   submitted referenced not a 5.5 percent rate but a 7.75 rate --

9          THE COURT:  Was that application 7.55 percent fixed

10  rate.

11         MR. MESSITE:  Yes.  It's hard to understand even at

12  that point how there could be justifiable reliance that he was

13  getting a 5.5 percent interest rate.

14         Again, Tolin is an attorney, not any sort of

15  unsophisticated layman.  A month later, Tolin alleges -- I

16  guess we're talking about May 1st now, several months past the

17  initial conversation where Washington promised that she would

18  get him a 5.5 percent mortgage within a week.

19         Now we're into May and Tolin allegations that he's

20  presented with a second set of loan document, this time the

21  interest rate is filled in, in blank, and they supposedly have

22  a conversation, and Tolin alleges in his first 2 pleadings

23  that Washington tells him that the lender is ensuring that he

24  gets the rate promised.

25         THE COURT:  This is what, alleged in the first

4

1   complaint and, just so I have the chronology down, closes

2   May 3rd?

3           MR. MESSITE:  May 3rd.

4           THE COURT:  When is the second loan application in

5   blank allegedly filled out?

6           MR. MESSITE:  It appears from the allegations in the

7   complaint that that it's two days before the closing.

8           THE COURT:  All right.

9           MR. MESSITE:  Tolin doesn't allege that 5.5 percent

10  was filled into the blank, just that it was presented to him

11  in blank.  Two days later he shows up for the closing.  Even

12  assuming that --

13          THE COURT:  When does it go from 120 to 160, right

14  there in early May?

15          MR. MESSITE:  When he's presented with the second

16  set of loan documents, now $160,000 is referenced.  There's a

17  bit of a disconnect between the initial two pleadings and the

18  current pleading about that figure.  In the first 2 pleadings,

19  Tolin seems to be saying, I didn't want that money, I wanted

20  $120,000.  That was a mistake that was going to be corrected.

21          In the present pleading, the allegation seems to be

22  that somehow that $160,000 was an integral part of him

23  agreeing to the loan.

24          THE COURT:  In the current pleading it's alleged

25  that Washington gets 40 of that 160?

5

1          MR. MESSITE:  No.  I don't think that there's any

2     reference in the existing pleading to the subsequent

3     transaction between Washington and Tolin, but I believe in

4     the --

5          THE COURT:  Am I hallucinating or was there a

6     prior pleading --

7          MR. MESSITE:  In the prior pleadings there's a

8     reference that he lent her a portion of the loan proceeds but

9     it's a lower number -- $10,000.

10         MS. CHU:  Ten.

11         THE COURT:  Yes.

12         MR. MESSITE:  In the first two pleadings there are

13    two references that no longer appear.  The first that is a

14    year before any of this, Tolin agrees to put Washington's

15    home, title to her home in his name for 30 days, and then

16    there's this allegation that post closing he loaned her part

17    of the loan proceeds and then spent much time trying no get

18    those monies repaid.  Those allegations aren't in the present

19    pleading.

20         Tolin shows up on May 3rd.  Even assuming -- and I

21    don't understand how anyone could have justifiable reliance

22    that he was going to get a 5.5 percent fixed rate loan given

23    the facts that he alleges, but there's no dispute that he

24    shows up on May 3rd at the closing and then understands that

25    that's not the loan being presented to him.

6

1        In all three of his pleadings he acknowledges that

2   he understood at the closing that the interest rate that he

3   was going to be obtaining was in excess of nine percent.  How

4   then can Tolin argue that Washington defrauded him?

5        Or, phrased another way, how could Tolin have

6   justifiable reliance at that point that he was going to get a

7   5.5 percent loan once he knew otherwise?  Tolin could have

8   walked away.  Even if Tolin had signed all the loan documents,

9   Tolin still had three days to rescind the loan.  Tolin didn't

10  do any of those things.  This is not a fraud argument.

11       THE COURT:  You say even if he signed?

12       MR. MESSITE:  Even if he signed.  There is no

13  alleges that he had signed all the documents and then somehow

14  understood.  In the course of the closing he realized -- and

15  one would think that, given all the strange occurrences of the

16  prior three months, with the 7.75 application, the blank

17  application, that anyone, particularly a lawyer, would look at

18  the loan documents and see what the actual interest rate was

19  and what the terms were.  And clearly he does, he admits that

20  he understood at the closing that he was getting a nine

21  percent rate.

22       Your Honor, B&C submits respectfully this is not a

23  fraud argument, this is a duress argument.  How can they claim

24  that they entered into this mortgage under false pretenses?

25       They may have shown up, their best case scenario at

7

1    the closing, thinking that, but they didn't enter into this

2    loan transaction or suffer any damages as a result of anything

3    that Washington told them because they understood what the

4    loan was when Tolin entered into it.

5              Counsel for Tolin vigorously disavows any duress

6    argument in their opposition papers and with good reason.  The

7    duress argument is not any better than the fraud argument.

8              There are allegations in the complaint that

9    Washington knew that Tolin was arranging his financial affairs

10   around this closing, with no explanation as to what that

11   means; but, again, this is not Tolin's home.

12             There is no allegation that the home was in

13   foreclosure, much less that a sale was imminent.  There are

14   simply to be facts pled to explain why he was not exercising

15   his free will in entering into this loan transaction.

16             Moreover, even if those facts had somehow been

17   alleged and there was some reason that Tolin simply had to

18   proceed with the loan transaction, once he understood the

19   terms.  New York law doesn't allow you to accept the proceeds,

20   all which will were concededly used to either payoff his prior

21   mortgage or went directly into Tolin's pockets, you have to

22   immediately disavow that.  It's garden variety ratification.

23   You can't keep the money for three years and then sue and

24   claim, oh, I was forced to enter into this loan transaction.

25             So B&C's position is there is no fraud that could

Burton H. Sulzer, OCR, CRR, CSR, CM

8

1  support an aiding and abetting and conspiracy to defraud claim

2  even if you accept Tolin's version of events here in total.

3          In terms of the breach of fiduciary duty claim --

4  excuse me, the aiding and abetting breach of fiduciary duty

5  claim, Tolin's argument seems to be that a fiduciary duty

6  existed here because of the unique relationship that Tolin and

7  Washington had, their 12-year relationship, which is detailed

8  in -- there is greater detail provided in the first two

9  pleadings as to the odd nature of that relationship, but, in

10  any event, the underpinning for the fiduciary relationship

11  seems to be their personal relationship.

12          In order to have an aiding and abetting a breach of

13  fiduciary duty claim, you have to have knowledge of the

14  fiduciary duty and knowledge of its breach.

15          There is a problem with both of those here. If they

16  have some personal knowledge that transforms the borrower and

17  mortgage broker relationship into a fiduciary one, how were is

18  B&C to know that?  There are certainly no allegations of fact

19  in the complaint that would suggest that B&C had any inkling

20  that they had any sort of personal relationship.

21          Moreover, given the fact that there's no dispute

22  that the loan application that Tolin signed in March sought a

23  7.75 interest rate, how then is B&C to have knowledge that

24  Washington was purportedly promising him he was going to get

25  an interest rate two points -- more than two points lower than

9

1   what he was applying for?

2          That is the ostensible breach of fiduciary duty that

3   he was being promised -- falsely promised an interest rate

4   lower than he was going to get, but there is no allegation

5   that B&C knew and how could they on the facts that Tolin

6   himself alleges?

7          THE COURT:  I understand your argument on that, but

8   it sounds likes an argument Washington would make.

9          I take it your argument wouldn't be any different if

10  those initial loan applications papers set forth 5.5 percent.

11         MR. MESSITE:  If the initial loan application papers

12  had said 5.5 percent, we would be arguing, yes, there is no

13  fiduciary relationship that we could have known of and simply

14  because he applied for a 5.5 percent loan, that doesn't create

15  any knowledge on our part that she was promising and he was

16  going to get it.

17         But I think it's even more egregious here, where the

18  loan application that was submitted has an interest rate that

19  is more two points higher.  And he certainly couldn't have

20  understood that she was promising him that rate under those

21  circumstances.

22         The final claim is the GBL 349 claim, and the claim

23  that he was deceived is still based on the same factual

24  allegation that Tolin deceived -- Tolin was deceived about the

25  loan that he was going to get.

10

1        There is no separate factual predicate for the GBL

2    349 claim and there's no claim that B&C itself did anything.

3    The hook here is that Washington and Gordon, Gordon & Gordon

4    were somehow B&C's agent.  There is no allegation here that

5    B&C controlled the mortgage broker, nor that the mortgage

6    broker had the ability to bind B&C.

7        In fact, just taking Tolin's allegations, it's

8    obvious that Washington didn't have the ability to bind B&C

9    because the loan that B&C offered was in no way, shape or form

10   comparable to the loan Tolin was seeking.

11       The legal argument supporting agency here seems to

12   be that simply because B&C is an out-of-state lender and that

13   Gordon, Gordon & Gordon was a New York mortgage broker, that

14   B&C as a matter of law had to be operating through the local

15   mortgage broker, which makes the mortgage broker B&C's agent.

16       There is no authority to support that position and

17   it's counterintuitive.  The lender does operate through a

18   local agent who closes the loan, but it's not the mortgage

19   broker, it's the closing attorney who actually attends the

20   closings on the lender's behalf.  That is the agent, not the

21   mortgage broker.

22       We respectfully submit that each of these claims are

23   baseless as against B&C and should be dismissed as a matter of

24   law.

25       THE COURT:  Thank you.

11

1          The final approval for this 9.6 percent interest

2    rate loan on May 2nd was issued through Peter Brown.  Who is

3    he?

4          MR. MESSITE:  I believe, your Honor, that that would

5    be someone employed by B&C.

6          THE COURT:  That's B&C attorney?

7          MR. MESSITE:  Not the closing agent.  The closing

8    agent was Charles Liken.  This is just simply a B&C employee.

9          THE COURT:  All right.  I take it your position is

10   that is B&C's agent in this, that the Gordons and Ms.

11   Washington are not acting as agents of B&C?

12         MR. MESSITE:  Not B&C's agent in if way -- they're

13   talking about agent to close the loan.  The agent to close the

14   loan is the closing attorney, Charles Liken, who signed all

15   the loan documents.  I can pass them up if your Honor wants.

16         THE COURT:  No thank you.

17         MR. MESSITE:  My understanding is Peter Browning is

18   simply somebody at B&C internally that approved the loan

19   terms.

20         THE COURT:  He's a B&C employee.

21         MR. MESSITE:  Yes.  He would have nothing to do with

22   the closing of the loan, only the approval of the loan.

23         THE COURT:  All right.  Sir.

24         MR. BARNES:  Good morning, your Honor.

25         THE COURT:  Good morning.

12

1        MR. BARNES:  There were two arguments raised in the

2   motion to dismiss that I have not heard addressed, and I'm

3   assuming them to be abandoned, I want to make sure.  This

4   jurisdiction residence argument as to Mr. Tolin's purported

5   lack of being a resident of Illinois, and the preemption

6   argument.

7        THE COURT:  The subject matter jurisdiction, which

8   is only raised tentatively, appears to have drifted into the

9   wake.  Do you agree?

10       MR. BARNES:  I do, your Honor. That is with the

11  preemption argument?

12       MR. MESSITE:  Your Honor, the preemption argument --

13       THE COURT:  You don't need to argue it.  We can

14  address the merits.

15       MR. BARNES:  Thank you, your Honor.

16       First of all, your Honor, a large part of what.

17  Mr. Messite said has to do with defenses and argument and you

18  can see this throughout his response; meaningless rhetoric,

19  leaps of logic; Tolin will not be able to prove, et cetera, et

20  cetera.  What Mr. Messite seems to be doing is confusing

21  pleading with proof.

22       One of the cases that I want to bring to the court's

23  attention first on the reliance issue that I think governs the

24  disposition of this motion is the Night Securities motion,

25  which we have cited in our response.

13

1       The same kind of procedural error was made in that

2   case, and the court said very specifically: On a motion to

3   dismiss, a plaintiff need only plead that he relied on

4   misrepresentations by the defendant since the reasonableness

5   of his reliance implicates factual issues whose resolution

6   would be inappropriate at this early stage, being a motion to

7   dismiss stage.

8       The same thing applies with regard to whether or not

9   representations were innocently or knowingly and intentionally

10  made as misrepresentations.

11      With respect to aiding and abetting, it is premature

12  in the present procedural context to decide whether

13  fiduciary -- the party -- innocently made false representation

14  on behalf of its principal.  And they go on to discuss also

15  the factual question as to whether or not the special

16  relationship implicated a fiduciary duty.

17      THE COURT:  The false representation in this case

18  being that even though the papers said 9.6 percent it would be

19  5.5 and there would be no adjustable rate?

20      MR. BARNES:  It goes even further than that.  As we

21  said in paragraph 29 of our second amended complaint, which

22  superseded the other two that were discussed at some length,

23  miss Washington said, when she presented these papers to my

24  client, Oh, that was a mistake.  We specifically said that --

25  Mr. Messite seems to have glossed over that, but she said

14

1  that's a mistake, just sign it.  We need to get this loan

2  going or some such language.

3          In other words, it was a mistake.  You're going to

4  get your 5.5 regardless of what this says.  Then we go to

5  closing and at the last minute, when Mr. Tolin has rearranged

6  all his financial affairs around this closing, oh, guess what,

7  take it or leave it.

8          So the misrepresentations were merely on multiple

9  levels.  There was the original 5.5 --

10         THE COURT:  What is the significance of "take it or

11  leave it?"

12         MR. BARNES:  The significance of it is, Judge, that

13  at that point Mr. Tolin has relied on somebody he's known for

14  12 years, who is acting as an agent of the lender by virtue of

15  their own conditional loan approval that they will were

16  obviously --

17         THE COURT:  Let me interrupt you for a second.  What

18  is it that he's being told to take or leave?

19         MR. BARNES:  The loan with the escalation, the

20  variable rate with the six point escalation.

21         THE COURT:  So he's being given a choice -- he's a

22  lawyer, right?

23         MR. BARNES:  Yes, sir.

24         THE COURT:  He's being given a choice, take a 9.6

25  percent mortgage loan with the adjustable rate, escalation

15

1    rate, or leave it.  That's the "take it or leave it"?

2              MR. BARNES:  Correct.

3              THE COURT:  And is that fraudulent?  Is that duress?

4    He obviously took it, and he's a lawyer --

5              MR. BARNES:  Understood.

6              THE COURT:  A logical question anybody would ask is,

7    Well, gee, what are you complaining about?

8              Your arguments placed significance on the fact that

9    those are the only options he had.  Fair enough.  But what

10   does that mean, does that mean he was coerced into this or is

11   the fact that he was presented with only those two options

12   somehow fraud?

13             MR. BARNES:  If you weave together the fiduciary

14   relationship that's coming out of this 12-year relationship

15   with Washington acting as an agent of Gordon, Gordon & Gordon

16   and leading him down the path for months and months and months

17   on the 5.5, then you go to closing and you've got 9.66 with a

18   six point escalation on a variable rate instead of the fixed

19   rate he was promised, that's akin to -- it is a fraud because

20   it's a constructive fraud, it's a breach of fiduciary duty and

21   it's a situation that comes about because of repeated

22   fraudulent misrepresentations, all of which --

23             THE COURT:  From whence does the fiduciary duty

24   arise?

25             MR. BARNES:  The special relationship he had with

Burton H. Sulzer, OCR, CRR, CSR, CM

16

1  Washington over 12 years.

2          THE COURT:  A personal relationship?

3          MR. BARNES:  Not so much personal.  We have alleged

4  a 12 year relationship that they had, and what will come out

5  in discovery is that they had other business dealings where

6  Washington had acted for him as a broker.

7          THE COURT:  What are the facts that warrant -- so

8  she takes advantage of that relationship, she says, I'm going

9  to get you 5.5 percent.  The 7.5 percent is a mistake.  That's

10 the first loan application.  And they get to the closing and

11 the 9.6 percent is a mistake, you're really going to get 5.5

12 percent -- right?

13         MR. BARNES:  He walked into the closing believing he

14 was going to get 5.5 until he looked at the documents and, Oh,

15 I'm sorry.

16         THE COURT:  I understand your claim to be he also

17 walked out thinking he was going to get 5.5 percent; is that

18 right?  She wasn't going to fix it later?

19         MR. BARNES:  I don't think that has been alleged at

20 this point.

21         THE COURT:  It's a weaker claim against the bank

22 than I thought.  Okay, so he gets it.  He feels terrible, he's

23 got to pay that much more and he has the escalation clause.

24         Whatever abuse of the relationship, breach of the

25 fiduciary duty might cause us to hold Miss Washington

Burton H. Sulzer, OCR, CRR, CSR, CM

17

1   accountable for something.  What are the facts that warrant

2   charging this to the bank's account?

3          MR. BARNES:  The bank was the one that gave the

4   approval the day before the closing, which was not disclosed.

5   They're the ones that railroaded this.  They are the ones that

6   gave the 9 --

7          THE COURT:  Stop.  They gave the approval of the

8   loan that he signed the day before the closing.

9          MR. BARNES:  Yes.

10         THE COURT:  What is the significance of the day

11  before the closing?

12         MR. BARNES:  Because they knew the closing was

13  coming up, they knew he was going to be forced into a position

14  of taking it or leaving, and that's what they shoved through.

15         THE COURT:  So what?  He's a lawyer and he took it.

16         MR. BARNES:  When you say he's a lawyer, again that

17  goes to the reliance argument -- if we were here on summary

18  judgment and there was deposition testimony --

19         THE COURT:  You have to allege a plausible claim.

20  I'm trying to assist you and articulate it in a way that makes

21  it seem more plausible to me than these kind of pleadings do.

22         The claim isn't making any sense to me.  He's a

23  lawyer.  He shows up an at a closing.  Now, I suppose it would

24  be nicer if he had some more time, maybe a couple of days

25  ahead of time, to decide whether he was going to take that 9.6

18

1   percent loan, but he doesn't get it, which is bad, but it's

2   not fraud.

3          I mean, I will accept your allegation as fair, but

4   that is not fraud.  He takes it, he knows he's going to pay

5   that.  Three years later he sues and says he's defrauded by

6   the bank because, you mentioned, they only approved it the day

7   before.  What else, what are the other dimensions of the

8   fraudulent conduct by B&C?

9          MR. BARNES:  Because my client had to assume that

10  when Washington was acting on behalf of the lending quoting

11  the rate, the rate was coming from the lender.  The lender was

12  B&C all along.  The lender was B&C when the 7.75 was signed;

13  the lender was B&C when the day before the closing they gave

14  the 9.6.

15         THE COURT:  He found out he was wrong.  Whatever

16  assumptions he had, he walked into the closing and he found

17  out, according to his own allegations, he was wrong.

18         How does that translate into fraud by B&C?

19         MR. BARNES:  Because again, Judge, we're not

20  claiming direct fraud against B&C, they're on an aiding and

21  abetting claim.  This whole fraudulent transaction could not

22  have been accomplished without their aid and assistance.

23         This is the only loan that they ever approved.  They

24  gave it the day before the closing with no disclosure before

25  the closing.  They are a cog go in the wheel.

Burton H. Sulzer, OCR, CRR, CSR, CM

19

1          THE COURT:  They are certainly necessary because

2   without the mortgage loan I suppose we wouldn't be here.

3          MR. BARNES:  There is no direct fraud claim against

4   them, it's only aiding and abetting.

5          THE COURT:  It seems to me your theory is they're

6   aiding and abetting because of that, because without their

7   presence on the scene as the mortgage lender, Washington

8   couldn't have ripped off her friend, your client, Tolin, and

9   that is not fraud.

10          Granted, a mortgage lender had to be part of this,

11   but why does that brush them with the fraud that you allege

12   against Washington?  It might be my fault, but I have a

13   complete blind spot on your theory.

14          MR. BARNES:  Because, Judge, again, what I'm hearing

15   is, I'm hearing the court trying to justify the substantiation

16   of a direct fraud claim against B&C through a direct

17   representation of them rather than an aiding and abetting,

18   which comes out of the Sidley Austin kind of cases, the cog in

19   the wheel thing.

20          THE COURT:  If I understood what you just said I

21   would tell you whether you're right, but I didn't understand

22   it.  Let's stick with this case.  I'm just repeating myself.

23          Any more argument you would like to make?

24          MR. BARNES:  As I was listening to you earlier, if

25   we're going on the duress route --

20

1        THE COURT:  Are we?  It's your case.  We're going on

2   a duress route?

3        MR. BARNES:  A take it or leave it is a kind of

4   duress, I would agree on it.

5        THE COURT:  Is it the kind of duress that you think

6   is cognizable as a cause of action here?

7        MR. BARNES:  I'm not aware that New York has any

8   cause of action for adding and abetting duress.

9        THE COURT:  It's a weird duress claim, that he is

10  subjected to the sort of compulsion that would constitute

11  duress under the applicable contract law, whatever that is, I

12  assume it's New York, and then he waits three years -- a

13  lawyer to wait three years after spending the money to

14  complain about it.  But, you tell me, is that claim in the

15  case or not?

16       MR. BARNES:  Which claim, the duress?

17       THE COURT:  Duress.

18       MR. BARNES:  Yes, under paragraph 22 it is.  It

19  would have to be.

20       THE COURT:  Okay.  Anything else you want to say in

21  support of that facet of the cause of action?

22       MR. BARNES:  Other than that we have alleged it for

23  pleading purposes?

24       THE COURT:  Yes.

25       MR. BARNES:  On that specific issue, not at this

```
                                                              21

 1   time.

 2           THE COURT:  All right.  Anything further in

 3   opposition to the motion?

 4           MR. BARNES:  Other than what is in the moving

 5   papers?

 6           THE COURT:  Yes.  The opposition papers.

 7           MR. BARNES:  I just wanted to address the agency

 8   argument very quickly.

 9           THE COURT:  Go ahead.

10           MR. BARNES:  Again, what Mr. Messite's saying, there

11   was an agent to close the loan.  As you asked, who is this guy

12   Brenner?  There are no cases that I've seen cited by B&C that

13   says the agency principle is exclusive and applicable only as

14   to the type of theory he's talking about.

15           Agency is a broad concept, which is why I brought in

16   and cited the case law on ratification, which is why I cited

17   the case law with regard to an agent acting on behalf of the

18   principle, an agent in this context being the one who, through

19   Gordon, Gordon & Gordon, brought this loan in and made this

20   loan part of the transaction.

21           Washington being an agent of Gordon, at least as far

22   as my client knew, Gordon being an agent of B&C, pursuant to

23   the conditional loan approval they were at agent.  There is no

24   case law saying -- on exclusivity saying they can't be an

25   agent, that Gordon and Washington can't be agents of B&C for
```

22

1   purposes of this transaction, there is no case law to that

2   effect.

3            THE COURT:  Whose agent is a mortgage broker, the

4   mortgage lender's agent or the borrower's agent?

5            MR. BARNES:  I've seen cases in other situations

6   that I'm handling around the country where they have been hit

7   with both hats, depending on how they act because they're

8   getting -- they may be getting a commission or some kind of

9   incentive from the lender for pushing the loans through,

10  because they're pushing high loans through because they are

11  getting a high commission because they are going all to be

12  securitized and also getting paid by the borrower.

13           THE COURT:  I don't understand your claim though,

14  which is why I asked the question about from whence arises the

15  fiduciary relationship.

16           It doesn't seem to me that your claim rests on a

17  fiduciary relationship running from Washington to Tolin,

18  arising out of her role as a mortgage broker.

19           It's arising out of her 12-year relationship with

20  your client, right?

21           MR. BARNES:  Yes.

22           THE COURT:  Which makes it for difficult, in my

23  view, for you to tag the breach of that -- even assuming that

24  there is fiduciary relationships running all over the lot,

25  from the mortgage broker to the plaintiff, the mortgage lender

23

1  through the mortgage broker to the plaintiff -- assuming that

2  is true, it makes it for difficult, it seems to me, for you to

3  charge to the account of B&C this breach that you allege since

4  the nature of the fiduciary relationship isn't even the broker

5  to borrower relationship, it's this personal thing going on

6  between Tolin and Washington.

7          Do you agree with that?

8          MR. BARNES:  Not entirely.  What I'm trying --

9          THE COURT:  How are they supposed to know that the

10 mortgage broker has this relationship with Tolin, such that

11 even though the bank keeps saying a higher interest rate he's

12 going to get a lower interest rate?

13         MR. BARNES:  Well --

14         THE COURT:  What is it about the facts that you've

15 alleged that make it plausible that B&C could even have been

16 aware of that?

17         MR. BARNES:  We have alleged that in paragraph 20.

18 At all times material B&C engaged various agents such as

19 defendant GGG herein for the purpose of causing borrowers to

20 execute mortgage loans for the sole purpose of resale; thereby

21 defendant B&C relied on these local brokers to gain borrower

22 confidence ab initio so that the borrowers would feel

23 comfortable dealing and closing the loan with the local

24 broker.

25         THE COURT:  So what?  What's wrong with that?

24

1    What's wrong with anything that you just read?

2          MR. BARNES:  Nothing, as long as they are up front

3    and honest.

4          THE COURT:  What is it that you just read that makes

5    it plausible that B&C was aware of Washington's defrauding

6    your client?

7          They like to have mortgage brokers to get mortgage

8    loans that they can bundle and sell.  They like mortgage

9    brokers because they instill confidence in the potential

10   borrowers in the community.

11         So what?

12         MR. BARNES:  B&C allegedly gives him a 7.75 percent

13   loan, which the broker says is a mistake, and even assuming

14   they didn't know that, they are telling him, through the

15   broker, you've got 7.75, but yet the only thing they approve

16   the day before the closing is 9.66 on a variable.

17         They're saying one thing and they're changing it the

18   day before the closing and saying something else that is light

19   years different.

20         THE COURT:  Is the 7.5 in an application for a loan?

21         MR. BARNES:  Yes.

22         THE COURT:  So it's an unapproved application for a

23   loan that Washington give your client, correct?

24         MR. BARNES:  Yes.

25         THE COURT:  So the connection between that and B&C

25

1  saying you can get a 7.75 percent loan eludes me.

2          MR. BARNES:  The presumption is the lender all along

3  was B&C.

4          THE COURT:  Whose presumption?

5          MR. BARNES:  That was the only lender ever

6  discussed.

7          THE COURT:  The presumption is they're the lender,

8  but I asked what you it was about those facts that suggested

9  that B&C said you could have a 7.5 percent loan.

10         MR. BARNES:  7.75 --

11         THE COURT:  I'm sorry, whatever it was.

12         MR. BARNES:  That B&C was the only lender ever

13 mentioned by Washington to my client.  There was no other

14 lender mentioned.

15         THE COURT:  It wasn't an approved loan for 7.75, was

16 it?

17         MR. BARNES:  That's what Washington told my client

18 he had been approved for, that amount.  That's where the rate

19 came from, albeit that she said it was a mistake.

20         THE COURT:  I understand.  Thank you, sir.

21         Anything further?

22         MR. MESSITE:  I'd like to clarify two factual

23 issues.  Your Honor asked about the mistake allegation and

24 seemed to be inquiring whether plaintiff was arguing that he

25 signed the documents and that Tolin had told him -- Washington

26

1  had told Tolin at closing that the document he was signing was

2  a mistake.

3          The only allegation of mistake is seven weeks

4  earlier, when she's first presented -- in March, it's the 7.75

5  percent rate that she tells Washington allegedly is the

6  mistake, nothing like that at closing.

7          With respect to that same March 8, 7.75 percent,

8  there is no allegation that on March 8th, Tolin was even told

9  by Washington that he had been approved for any rate, much

10 less the 7.75.

11         The only allegation is that that rate is a mistake

12 and that she would secure a mortgage at the promised rate.

13 It's paragraph 29 of the current pleading.

14         I don't have anything further.

15         THE COURT:  Understood.  Thank you.  Thank you both.

16 I will take the motion under advisement.

17         MR. BARNES:  Thank you very much.  Have a good

18 weekend.

19         THE COURT:  Thank you.

20         * * * * * * * * * * * * *

21

22

23

24

25

Burton H. Sulzer, OCR, CRR, CSR, CM