JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
Jayant W. Tambe
Benjamin Rosenblum

*Attorneys for Lehman Brothers Holdings Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------X
:
In re:                                                         :    Chapter 11
:
LEHMAN BROTHERS HOLDINGS INC., *et al.,*     :    Case No. 08-13555 (JMP)
:
Debtors.                   :    (Jointly Administered)
:
---------------------------------------------------------------X

**REPLY IN FURTHER SUPPORT OF FOUR HUNDRED SECOND OMNIBUS**
**OBJECTION TO CLAIMS 32395 AND 22671 (NO LIABILITY DERIVATIVES CLAIMS)**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI" and the "Plan Administrator"), on behalf of itself as Plan Administrator under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors (the "Plan"), by and through its undersigned counsel, as and for its Reply in Further Support of the Four Hundred Second Omnibus Objection to (i) claim 32395 (the "KG Claim") of Dr. H.C. Tschira Beteiligungs GmbH & Co KG ("KG") and (ii) claim 22671 (the "Stiftung Claim") of Klaus Tschira Stiftung GGmbH ("Stiftung," together with KG, "Claimants"), respectfully represents:

**INTRODUCTION**

1.      Claimants do not dispute that September 15, 2008 is the relevant early Termination Date of the Transactions under Section 6(a) of the Master Agreements.  Nor do

NYI-4525422v1

Claimants dispute that September 15, 2008 is the date of termination of the Transactions under section 562(a) of the Bankruptcy Code.

2.  Claimants' only argument on the merits is that it was not "reasonably practicable" to calculate amounts due "as of" September 15, 2008 because of Claimants' delayed realization that "the full amount of pledged shares would not be returned within the foreseeable future." (Response[1] at ¶ 12.)

3.  Claimants' excuse does not withstand even minimal scrutiny, and is a red herring. Regardless of the physical custody of the Pledged Shares, Claimants could still have produced valuations as of September 15, 2008 using the same methodology that produced valuations as of October 16, 2008. Indeed, it is clear Claimants were perfectly capable of producing "retroactive" valuations as of whatever day they wished. Specifically, the October 16, 2008 valuations appear not to have been prepared until December 1, 2008.

4.  Moreover, the Master Agreements required that the Transactions be valued upon the assumption that the Custody Deeds, and Claimants' obligations thereunder, would have remained available to support replacement transactions.

5.  And in any event, Claimants had the right to substitute "cash and other assets" for the Pledged Shares pursuant to the First Confirmations.

6.  Accordingly, Claimants' ability or non-ability to obtain the Pledged Shares was utterly irrelevant to the timing of their valuation exercise. This is the only argument Claimants

---

[1] Response of Dr. H.C. Tschira Beteiligungs GmbH & Co KG and Klaus Tschira Stiftung GGmbH to LBHI's Four Hundred Second Omnibus Objection to Claims (No Liability Derivatives Claims), dated June 5, 2013 [ECF No. 37755] (the "Response").

All terms used but not defined herein shall have the meaning ascribed to them in the Supplemental Four Hundred Second Omnibus Objection to Claims 32395 and 22671 (No Liability Derivatives Claims), dated Apr. 15, 2013 [ECF No. 36569] (the "Supplemental Objection") or in the Response, as the context may require.

have offered in their brief to attempt to explain their complete failure to calculate amounts due "as of" September 15, 2008. The argument lacks merit, and Claimants have therefore failed to state cognizable claims. The Claims must be disallowed and expunged.

7.  Nor have Claimants demonstrated grounds to warrant the exercise of this Court's discretion to impose a stay – temporary or otherwise – of the proceedings on the Claims. In fact, the dispute between Claimants, on the one hand, and LBHI and LBF, on the other, turns (in the case of LBF) predominantly (or, in the case of LBHI, entirely) on the discrete issue as to the correct date as of when the Transactions are to be valued. Accordingly, an immediate decision on the straightforward merits of this single legal issue, which is not ultimately capable of rational dispute, may in fact promote a consensual resolution and conserve judicial resources.

8.  Accordingly, the Objection has been fully briefed and is ready for final summary disposition as a matter of law at the hearing set for this matter on June 13, 2013.

### DAMAGES MUST, AS A MATTER OF UNDISPUTED FACT AND LAW, BE MEASURED AS OF SEPTEMBER 15, 2008

9.  LBHI and Claimants are in vigorous agreement that the "Automatic Early Termination" provisions of the Master Agreements operated to effect the designation of an Early Termination Date "as of the time immediately preceding" the commencement of LBHI's bankruptcy case. Accordingly, the Early Termination Date occurred on September 15, 2008. (Response at ¶¶ 9 and 24.)

10. The parties are also in vigorous agreement that "Loss" was selected as the means by which the Transactions were to have been valued, (Response at ¶ 23), and that the definition of "Loss" "explicitly states" that "[a] party will determine its Loss **as of the relevant Early Termination Date**, or, if that is **not reasonably practicable**, as of the earliest date thereafter as

is reasonably practicable." *Id.* (quoting the definition of "Loss" in Section 14 of the Master Agreements) (emphases altered).

11. The parties are finally in vigorous agreement that Section 562 of the Bankruptcy Code is similarly determinative as to the time as of when the Transactions were to have been valued. (Response at ¶ 25.) This time is, of course, "**as of the date . . . of such termination, liquidation or acceleration** [but i]f there are not any commercially reasonable determinants of value as of [such date] damages shall be measured as of the earliest subsequent date . . . on which there are commercially reasonable determinants of value." 11 U.S.C. § 562(a)(2), (b).

12. The obvious and ineluctable consequence of the foregoing is that the Transactions were required, by operation of the undisputed contractual language and by operation of the Bankruptcy Code, to have been valued "as of" September 15, 2008 unless (i) it would have been "not reasonably practicable" to have done so, **and** (ii) there were no "commercially reasonable determinants of value" on that date.

13. Claimants propound exactly one reason why the Transactions could not have been valued as of September 15, 2008: they did not know whether the Pledged Shares would be available for replacement transactions until later (specifically October 16, 2008) and that they accordingly did not know until October 16, 2008 whether to value the Transactions by means of "collateralized" replacement transactions or "uncollateralized" replacement transactions. (Response at ¶ 12.) However, Claimants knew with metaphysical certainty as of the open of business on September 15, 2008, throughout the day on September 15, 2008 and as of the close of business on September 15, 2008 that the Pledged Shares were not available for replacement transactions.

NYI-4525422v1

14. Claimants also knew, or should have known, of their duty under the Master Agreements and, for purposes of making a claim against LBHI under the Bankruptcy Code, to value the Transactions as of September 15, 2008 unless (i) it would have been "not reasonably practicable" to do so, **and** (ii) there were no "commercially reasonable determinants of value" on that date. That Claimants may or may not have desired in good faith to retrieve the Pledged Shares in order to effect replacement transactions is utterly irrelevant to this test.

15. Instead, Claimants undertook a protracted process "in the weeks" after September 15, 2008 to contact dealers in an attempt to enter into replacement transactions and to contact LBIE in an attempt to retrieve the Pledged Shares. (Response at ¶¶ 10-11.) In describing these efforts, Claimants seek to impute to LBHI the actions and advice of Mediobanca (appointed advisor to Claimants), which "employed former staff of LBIE's derivatives team" who had "extensive knowledge of the Transactions and valuation expertise." (Response at ¶ 10 & n.1.)

16. More ludicrous are Claimants' efforts to impute to LBHI the "improper and misleading representations" of "Lehman's decision-makers at the highest levels" concerning the forthcoming return of the Pledged Shares. (Response at ¶¶ 5, 24.) The custodian of the Pledged Shares under the Custody Deeds was, of course, LBIE, not LBHI, and LBIE is the entity from whom Claimants naturally and unavoidably attempted to retrieve the Pledged Shares. Claimants are perfectly aware of the separate existence of LBIE, whose former "derivatives team" employees rendered such valuable and irreplaceable assistance to Claimants in their new roles at Mediobanca. To attempt to saddle LBHI with the consequences of "Lehman's own actions" (a reference to actions of LBIE, for the reasons explained above) is improper when no assertion is made that any LBHI employee made any representation whatsoever to Claimants or their representatives concerning the Pledged Shares.

17.     Claimants' own actions and positions, as well as those of their advisor Mediobanca, give the lie to their stance that September 15, 2008 was a date when it was neither reasonably practicable to value the Transactions nor as of when there were no commercially reasonable determinants of value. Claimants make much of the supposed indeterminacy of the status of the Pledged Shares in their inability to value the Transactions on a "collateralized" or an "uncollateralized" basis. Yet Mediobanca ultimately valued the Transactions on an uncollateralized basis "as per the close of XETRA[2] on the 16th of October 2008" in an e-mail dated December 1, 2008. (*See* Attachment 12 to Guarantee Questionnaire, p. 25 (the "Mediobanca Valuation").)[3, 4]

18.     The Mediobanca Valuation is instructive, and determinative, on both the "reasonably practicable" and "commercially reasonable determinants of value" issues, for two reasons. First, it is perfectly clear that Mediobanca would have been able to apply the same valuation methodology retroactively – using the closing share price for SAP shares on XETRA – on December 1, 2008, that it used to value as of October 16, 2008 as of any date, including September 15, 2008.[5] Second, the Mediobanca Valuation was performed on an

---

[2] XETRA is the electronic securities trading operation for the Frankfurt Stock Exchange that is operated by Deutsche Borse, *see* Deutsche Borse Xetra, http://xetra.com/xetra/dispatch/en/kir/navigation/xetra (last visited June 11, 2013), and is the primary European exchange on which SAP shares trade, *see* SAP Investor Relations, http://www.sap.com/corporate-en/investors/index.epx (last visited June 11, 2013).

[3] A copy of the Mediobanca Valuation is submitted herewith as Exhibit 1 to the accompanying Declaration of Matthew Chow, dated June 11, 2013 ("Chow Decl.").

[4] LBHI alleged, in Paragraph 23 of its Supplemental Objection, that the Mediobanca Valuation "appear[s] not to have been prepared until December 1, 2008." That allegation remains unchallenged by Claimants in their Response.

[5] SAP shares closed at €38.15 on September 15, 2008. (*See* Chow Decl. Ex. 2, Bloomberg Screenshot of XETRA SAP closing price, if available; *see also* Chow Decl. Ex. 3, Attachment 1 to Guarantee Questionnaire for Proof of Claim No. 22672 at ¶ 2.7.) Exhibit 3 sets forth Stiftung's valuation for a number of ISDA-based transactions with LBIE for which Stiftung had, similarly to Claimants in the instant case, posted SAP shares to LBIE as collateral. Stiftung utilizes the closing share price for SAP on September 15, 2008 as part of its valuation, and accordingly appears to have determined it to be "reasonably practicable" to have used that price. For

"uncollateralized" basis, which is precisely the situation Claimants faced, and knew they were facing, throughout the entire day on September 15, 2008. Nothing occurred, other than Claimants' frustrated but irrelevant desire to enter into "collateralized" replacement transactions, between September 16, 2008 and December 1, 2008 or, indeed, on October 16, 2008 to alter the fact, as demonstrated by the Mediobanca Valuation itself, that it was "reasonably practicable" to value the Transactions as of September 15, 2008 and that there were "commercially reasonable determinants of value" – i.e., an XETRA closing price – on September 15, 2008.

19.    Moreover, a correct valuation of the Transactions did not require a determination whether or not the Pledged Shares would have been available for replacement transactions. First, the Response is entirely speculative when it postulates "the strong likelihood that a new counterparty would still have insisted on obtaining the shares as collateral." (Response at ¶ 26.) The undisputed fact remains that the First Confirmations provided Claimants the valuable right to substitute "cash and other assets" for the Pledged Shares.

20.    More importantly, it defies rationality for Claimants to have concluded that the availability or non-availability of the Pledged Shares was relevant to the valuation of the Transactions. The Custody Deeds and the pledge of the Pledged Shares were of course part of the bargained-for exchange for the Transactions to take place under the Stiftung Agreements and the KG Agreements, and were designated "Credit Support Documents" under the Master Agreements. A correct valuation of the Transactions would, by necessity, have needed to

---

(continued…)

the sake of comparison, LBHI has re-priced the LBIE transactions using the October 16, 2008 SAP closing price and has determined that Stiftung's claim against LBIE would have been roughly $120 million **less** if the later date were to have been used. Claimants cannot be permitted to "whipsaw" LBHI by cherry-picking the "as of" dates for valuation under substantially similar contracts and situations.

- 7 -

NYI-4525422v1

account for all elements of the Transactions as they actually existed and under the assumption that all such elements would be duly performed. Claimants cannot, in effect, pick and choose which elements of the Transactions should be included in their valuation exercise. Claimants were accordingly required to assume that the Pledged Shares would have been available in order for Claimants to perform their obligations under hypothetical Custody Deeds under hypothetical replacement transactions.

21. The Transactions are governed by the laws of England and Wales. The Court of Appeal for England and Wales recently considered a nearly identical argument concerning "Loss" under the 1992 ISDA Master Agreement[6] and confirmed the position being taken by LBHI in this brief. Indeed, the Court approvingly stated that "th[e] assumption [that each applicable condition precedent to both parties' performance obligations, including the absence of any Events of Default or Potential Events of Default pursuant to Section 2(a)(iii) of the 1992 ISDA Master Agreement, will have been satisfied] is the only basis upon which a 'gain' would ever have to be given credit for by the Non-defaulting Party under the Second Method," concluding that they agreed with this analysis and "[i]ndeed, we can see no answer to it." *Id.* (quoting *Pioneer Freight Futures Co. (in liquidation) v. TMT Asia Ltd.*, [2011] EWHC 778 Comm, at ¶ 116).

22. Any apparent injustice of such a result in the instant case is illusory. Claimants and LBF agreed upon a pledge of the Pledged Shares to LBIE as an efficacious means of achieving their ends. Contrary to Claimants' blithe collective references to "Lehman" throughout the Response, LBHI is not responsible for the return of the Pledged Collateral. Nor

---

[6] *Lomas v. JFB Firth Rixson Inc.*, [2012] EWCA Civ 419, at ¶¶ 133-34.

should damages against it be inflated on the basis of an "uncollateralized" replacement transaction in supposed consequence of the fact that the Pledged Shares were unavailable for replacement transactions. This is particularly so when the contract, in fact, correctly and logically dictates that such availability or non-availability is irrelevant to the instant valuation exercise.

23. For the same reason that the Mediobanca Valuation as of October 16, 2008 definitively determines that it was "reasonably practicable" to value the Transactions "as of" September 15, 2008, so it provides conclusive evidence of the existence of "commercially reasonable determinants of value" "as of" September 15, 2008 under Section 562 of the Bankruptcy Code. Although it can reasonably be argued whether there can **ever** be no "commercially reasonable determinants of value" under the only Court of Appeals precedent on the issue, *see Crédit Agricole Corp. & Inv. Bank New York Branch v. Am. Home Mortg. Holdings, Inc. (In re Am. Home Mortg. Holdings, Inc.)*, 637 F.3d 246 (3d Cir. 2011) (approving use of discounted cash flow analysis as a "commercially reasonable determinant of value" for financial assets in the context of dysfunctional markets), the court need not go so far in the instant case. Mediobanca and Claimants obviously believe that a retrospective valuation of the Transactions that utilizes "the close of XETRA on the 16th of October 2008" is a "commercially reasonable determinant of value."

24. However, there is no difference between such a "commercially reasonable determinant of value" on October 16, 2008 and September 15, 2008 other than that October 16, 2008 is the date on which Claimants abandoned their irrelevant hope of retrieving the Pledged Shares from LBIE for valuation purposes. Far from carrying their burden of proof as to no

NYI-4525422v1

"commercially reasonable determinants of value," *see* 11 U.S.C. § 562(c)(2), the existence of the Mediobanca Valuation dictates to the contrary.

25. As a result of the foregoing, Claimants have failed to state cognizable claims by failing to value the Transactions on September 15, 2008 and the Claims must be disallowed and expunged.

### THE COURT'S PROMPT RESOLUTION OF THIS ROUTINE QUESTION OF LAW BEST SERVES THE INTERESTS OF JUDICIAL EFFICIENCY AND FAIRNESS

26. Claimants press for an indefinite stay or six-month adjournment, after which Claimants can only promise an "update" on the status of Swiss proceedings.[7] (Response at p. 11.) But the failure of the Claims simply depends on the Court's determination of the proper interpretation of the Master Agreements and the Bankruptcy Code – a routine and simple question of law that is now fully briefed and ready for final summary disposition at the hearing set for this matter on June 13, 2013.

27. Indeed, the U.S. Supreme Court recently held that a stay is not warranted where only questions of law remain to be decided. *Ryan v. Gonzales*, 133 S. Ct. 696, 708, 184 L. Ed. 2d 528 (2013) (denying motion for a stay due to movant's mental incompetence, because "all of [movant's] properly exhausted claims were record based or resolvable as a matter of law, irrespective of [his] competence").

28. Additionally, "[t]he proponent of a stay bears the burden of establishing its need." *Clinton v. Jones*, 520 U.S. 681, 708 (1997) (holding "District Court abused its discretion in

---

[7] Claimants also suggest that a stay is necessary to permit "informal efforts to resolve the Tschira Entities' claims against LBHI, which efforts have not yet begun and which the Tschira Entities would welcome." (Response at ¶ 4.) Of course, continuing litigation does not prevent settlement discussions from taking place, but more importantly, LBHI does not believe such settlement discussions will be necessary in the aftermath of a substantive ruling in this matter and, even if they are, LBHI does not believe those discussions will be productive in the absence of a substantive ruling in this matter.

deferring trial until after President left office"). Here, Claimants completely failed to offer any legal authority or supporting circumstances regarding the standards governing the imposition of an indefinite stay or six-month adjournment pending litigation in a foreign proceeding. And even in briefly discussing "international comity principles," Claimants cite to just one case – and specifically, only the *dicta* therein – despite the court's decision that "[b]ecause the propriety of a temporary stay was not raised in the district court, we do not decide whether the entry of such a stay would have been appropriate." *Royal & Sun Alliance Ins. Co. of Canada v. Century Int'l Arms, Inc.*, 466 F.3d 88, 96 (2d Cir. 2006) (holding absence of exceptional circumstances precluded international comity abstention).

29.     The rules that govern the imposition of stays support a denial in this case. The controlling principle is that despite its discretion to stay this action pending resolution of the Swiss proceedings, the Court has a "heavy" and "'virtually unflagging obligation . . . to exercise the jurisdiction given' to it, and should stay a proceeding only under 'exceptional circumstances.'" *See Aerotel, Ltd. v. IDT Corp.*, 486 F. Supp. 2d 277, 283, 286 (S.D.N.Y. 2007) (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)).

30.     **International Comity.** Claimants make a grave error in their off-hand supposition that "LBHI's obligations as guarantor are completely derivative of LBF's [and a]ccordingly the Swiss Proceeding either will moot this case (if LBF prevails), or conclusively determine this case (if [Claimants] prevail) . . . ." (Response at ¶ 17.) This supposed case thus

NYI-4525422v1

becomes the basis for proclaiming the Objection "duplicative" to the Swiss Proceedings. *Id.*[8] Nothing could be further from the truth, for multiple reasons.

31.     First, under no circumstances will LBHI concede, nor should the Court concede, that foreign proceedings in which neither LBHI nor the Court is participating will "conclusively determine" the Claims. As demonstrated above, resolution of the Claims depends in very significant if not overwhelming part on the Court's application of Section 562 of the Bankruptcy Code, which, of course, does not operate in Switzerland and plays no role in the Swiss Proceedings. Yet Claimants conveniently ignore the impact of Section 562 when they posit that "LBHI's objection here completely mirrors LBF's arguments in the [purportedly] more advanced Swiss Proceedings . . . ." (Response at ¶ 17.)

32.     Second, the Swiss Proceedings have zero precedential effect outside LBF's bankruptcy as a matter of established Swiss doctrine. In fact, even if LBF were forced to recognize claims by Stiftung and KG, this would not preclude LBF from seeking an affirmative recovery from them on the Transactions.

33.     Third, the relative interests of the two jurisdictions warrant a denial of a stay. Switzerland and its courts have no interest whatsoever in resolving LBHI's rights and obligations under the guarantee at issue. LBHI, as a reorganized Chapter 11 debtor in this Court, has the right to have the Plan implemented by, and under the supervision of, this Court. Of course, as is the case with every Chapter 11 plan of reorganization, a crucial component of the Court's

---

[8] Claimants quickly temper their bold statement by reminding the Court, as they must, that a "conclusive" determination in the Swiss Proceedings will be "subject to any 'guarantee' obligations LBHI may have." (Response at ¶ 17.) Claimants seek to minimize this obvious inconvenience by noting that LBHI has asserted "none of which." Claimants misunderstand the thrust of the Objections – their Claims (based on LBHI's guarantees) must be disallowed and expunged in their entirety because they have failed to calculate their Claims pursuant to the Master Agreements and Section 562 of the Bankruptcy Code. Moreover, Paragraph 31 of the Supplemental Objection "expressly reserve[d] the right to further object to [the Claims] on any other basis."

ongoing jurisdiction under the Plan is to exercise "exclusive jurisdiction . . . [to] hear and determine an objection to or motion to estimate Claims." Plan, at Section 14.1(c).

34.  **Judicial Efficiency.** The "promotion of judicial efficiency, including whether the two actions have parties and issues in common and the possibility of prompt resolution," *Aerotel*, 486 F. Supp. 2d at 283, also warrants denial of a stay.

35.  There is no prospect of a "prompt resolution" of the Swiss Proceedings. Claimants and LBF are embroiled in proceedings over the level of indemnity that must be posted with the court by Claimants and once this has been decided is amenable to two levels of appeal. Only after these costs have been posted need LBF file responsive papers, after which will follow another round of briefing.

36.  Claimants' supposed concern with "judicial economy and efficiency" and purported aversion to "duplicative" litigation are curious. Claimants have neglected to inform the Court that **Claimants** have commenced not less than two additional and separate proceedings in Switzerland over and above the Swiss Proceedings, which belies Claimants' pleas against facing "the costs of litigating the same issue in two different forums on different schedules." (Response at ¶ 20.)[9]

37.  First, Claimants commenced a separate proceeding on March 25, 2013 against LBF in the Zurich District Court seeking a declaration that they owe nothing to LBF in respect of the Transactions. These proceedings were in effect "conciliation proceedings" and, no

---

[9] Additionally, one of the few cases cited by Claimants makes clear that "circumstances that routinely exist in connection with parallel litigation cannot reasonably be considered exceptional circumstances, and therefore the mere existence of an adequate parallel action, by itself, does not justify the dismissal of a case on grounds of international comity abstention." *Royal & Sun Alliance Ins. Co. of Canada v. Century Int'l Arms, Inc.*, 466 F.3d 88, 95 (2d Cir. 2006).

NYI-4525422v1

agreement having been reached, it is now up to Claimants to file actual claims before the end of July 2013. Thus Claimants have simultaneously commenced proceedings of a sort but have not commenced "actual" proceedings as yet. Either interpretation of this state of affairs weighs against a stay. LBF, moreover, is challenging the Zurich District Court's jurisdiction even over the "conciliation proceedings."

38.     Second, this Court is well aware of the settlement (the "Settlement") between LBHI and LBF, which the Court approved in LBHI's Chapter 11 case and in LBF's Chapter 15 proceeding on April 25, 2013.[10] The Settlement included the allowance of a 9.55 billion Swiss Franc (roughly equivalent to $8.75 billion) claim by LBHI against LBF, the assignment of certain LBF claims against former LBHI affiliates to LBHI, the release of an approximate $15.4 billion claim by LBF against LBHI (which had been originally in the amount of nearly $60 billion) and the immediate pay-out of a substantial cash dividend to substantially all of LBF's creditors other than LBHI.

39.     In addition to having been approved by this Court in both this case and in LBF's Chapter 15 proceeding, the Settlement has been approved by LBF's creditors' committee. There is exactly one obstacle that exists to consummation of the Settlement, which is Claimants' very recent petition before the Swiss Financial Markets Supervisory Authority ("FINMA") either to disapprove the Settlement or to enter an appealable order that would permit Claimants to prosecute an appeal of the approval of the Settlement through the Swiss judicial system.

---

[10] *In re Lehman Bros. Holdings Inc.*, Ch. 11 No. 08-13555, Order Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure for Approval of Settlement Agreement with Lehman Brothers Finance AG (in Liquidation), dated Apr. 25, 2013 [ECF No. 36866]; *In re Lehman Bros. Fin. AG*, Ch. 15 No. 09-10593, Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019, Authorizing and Approving the Settlement Between LBF and the LBHI Parties, dated Apr. 25, 2013 [ECF No. 54].

Claimants are thus holding the Settlement and LBF's creditors, which include LBHI and many of Claimants' fellow derivatives counterparties to LBF – who differ from Claimants only in that they hold legitimate claims against LBF – hostage to potentially years of baseless and pretextual litigation in an effort to increase their negotiation leverage relative to their supposed claims against LBHI and LBF. This is not the sort of concern for "judicial economy and efficiency" that this Court should condone.

40. To the contrary, an honest concern for judicial economy and efficiency would be promoted by an immediate ruling on the Objections. An immediate determination by this Court that the appropriate date for valuation of the Transactions is September 15, 2008 – a question of law that is ripe for decision – would both eliminate the Claims and promote settlement discussions between Claimants and LBF. Absent such a ruling, LBHI believes, on the basis of several interactions with Claimants[11] and long before LBF had reached its final conclusion as to the value of the Transactions, that Claimants will not recede from their intractable and irrational position that the Transactions were properly valued as of October 16, 2008.

41. **Fairness and the Order in Which Suits Were Filed.** The "considerations of fairness to all parties and possible prejudice to any of them, including the order in which the suits were filed and issues of convenience," *Aerotel*, 486 F. Supp. 2d at 283, also warrant denial of a stay.

42. Claimants should not be permitted to abrogate this Court's discretion to themselves by unilaterally deeming the Swiss Proceedings "more advanced" and, in some vague

---

[11] Contrary to Claimants' protestations, LBHI has engaged in a number of communications by telephone and e-mail concerning the Transactions in late 2011 and early 2012 with representatives of Claimants' advisor, Aeris Capital.

sense, more important than the Objections. (Response at ¶ 17.) In fact, the Objections were originally filed on March 15, 2013 and, due to extensions requested by Claimants and granted by LBHI, Claimants have had nearly two months to prepare their Response. LBHI has been prepared to submit this matter to the Court for final disposition since no later than the date it filed the Supplemental Objection on April 15, 2013.

43. The Swiss Proceedings were, by contrast, commenced on or about April 22, 2013 – one week following the filing of the Supplemental Objection – and have – by Claimants' account – apparently progressed to a degree while Claimants have sought to delay their day of reckoning in this Court. Yet, Claimants' request for a minimum six-month stay is clearly facetious because Claimants cannot predict – nor do they even try to suggest – with any certainty when the Swiss Proceedings will be resolved. Indeed, Claimants emphasize the "extensive" nature of their Swiss pleading, which includes "an evidentiary submission," as well as a forthcoming expert report. (Response at ¶ 2.) However, as set forth above, the parties will not even "join issue" before the matter of indemnity costs is resolved, which may take up to a year if appealed. In contrast, the Claims pending before this Court have been fully briefed on one routine and straightforward question of law, and are ready for final summary disposition at the hearing set for this matter on June 13, 2013.

44. Nor did Claimants commence their onslaught of other proceedings in Switzerland until after the Objections were filed. The "conciliation proceedings" were commenced on March 25, 2013 and Claimants' challenge to the Settlement were commenced on May 21, 2013.

45. Finally, Claimants fault LBHI for taking four years to challenge the Claims in court. This has no bearing on the prejudice that will be done going forward through the imposition of an indefinite stay or six-month adjournment. Four years ago, the Plan was not

NYI-4525422v1

approved, and LBHI had thousands of claims to resolve. Today, the Plan is approved, and Claimants hold one of the few largest unresolved claims and are not only holding up the receipt by the LBHI estate of a hard-fought recovery from the LBF estate, but also holding up one of the largest claim reserves remaining at the LBHI estate. It would be unfair and prejudicial not only to LBHI, but also to all creditors, to stay this case when all that needs to be resolved is a routine and straightforward question of U.S. bankruptcy law.

## CONCLUSION

46. By operation of the express terms of the Master Agreements, the Transactions automatically terminated as of September 15, 2008. As required by the express terms of the parties' written agreements and the statutory requirements of the Bankruptcy Code, the Claimants were bound to calculate the amounts due under the Master Agreements as of September 15, 2008. The Claimants have instead calculated such amounts as of October 16, 2008. The Claims should be disallowed and expunged.

47. LBHI hereby expressly reserves the right to further object to such claims, or any other claims filed by the Claimants, on any other basis.

NYI-4525422v1

WHEREFORE, LBHI respectfully requests that the Court (i) disallow and expunge claim numbers 32395 and 22671 and (ii) award such further relief as the Court deems just and proper.

Dated: June 11, 2013
      New York, New York

JONES DAY

*/s/ Jayant W. Tambe*
Jayant W. Tambe
Benjamin Rosenblum
222 East 41st Street
New York, New York  10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

*Attorneys for Lehman Brothers Holdings Inc.*