# Exhibit 3

# HAARMANN

PROF. DR. WILHELM HAARMANN
Rechtsanwalt Wirtschaftsprüfer Steuerberater
FRANCIS BELLEN
Rechtsanwalt
DR. CHRISTOPH SCHMITT
Rechtsanwalt
MICHAEL GRAF
Diplom-Kaufmann Rechtsanwalt Steuerberater
JANA KLOTZ
Rechtsanwältin Fachanwältin für Arbeitsrecht
ANDRÉ SUTTORP
Rechtsanwalt Steuerberater Diplom-Finanzwirt
ROBERT BASTIAN
Rechtsanwalt
DR. TOBIAS FENCK
Rechtsanwalt
DIRK BREYHAHN *
Rechtsanwalt
MARCUS SEIBOTH *
Rechtsanwalt
INDRA STEHL*
Rechtsanwältin                    *associate

By Post

Linklaters LLP
One Silk Street
London
EC2Y 8HQ

Attention: James Gardener

8 July 2009

Dear Sirs

## KLAUS TSCHIRA STIFTUNG GEMEINNÜTZIGE GMBH

**1.    BACKGROUND**

We refer to the following:

1.1    our letter dated 30 September 2008 addressed to Anthony Victor Lomas, Steven Antony Pearson, Dan Yorman Schwarzmann and Michael John Andrew Jervis as Joint Administrators of Lehman Brothers International (Europe) ("**LBIE**");

1.2    the Master Agreement for Financial Derivatives Transactions (*Rahmenvertrag für Finanztermingeschäfte*) (the "**Master Agreement**") between Klaus Tschira Stiftung gemeinnützige GmbH (the "**Stiftung**") and LBIE dated 9 February 2009;

1.3    a series of share option transactions entered into under the Master Agreement in relations to a total of 8,000,000 shares in SAP AG (the "**Call Options**") consisting of 8 tranches in relation to 1,000,000 shares in SAP AG each (each a "**Tranche**") the first of which already had expired before the appointment of joint administrators over LBIE;

1.3    the Collateral Addendum (the "**Collateral Addendum**") between the Stiftung and LBIE dated 9 February 2005 as amended by an agreement as of the same date with

HAARMANN Partnerschaftsgesellschaft
Rechtsanwälte Steuerberater Wirtschaftsprüfer

Neue Mainzer Straße 75  60311 Frankfurt am Main  Telefon +49 69-92059-0  Fax +49 69-92059-990  Sitz: Frankfurt am Main  AG Frankfurt am Main PR 1574

the name "Amendment to the Collateral Addendum" (the "**Amendment to the Collateral Addendum**");

1.3   the 7,000,000 ordinary shares in SAP AG still posted by the Stiftung as collateral for the remaining 7 Tranches of the Call Options (the "**Collateral Shares**").

2.  **LOSS STATEMENT**

2.1   The Master Agreement and the Call Options have automatically terminated as of 15 September 2008 due to LBIE's insolvency.

2.2   Under the Master Agreement, following early termination each party's obligations under the Call Options were replaced by compensations claims determined in accordance with clauses 8 and 9 of the Master Agreement.

2.3   Under clause 8(1) of the Master Agreement, the solvent party (the "**Party Entitled to Damages**") is entitled to claim a termination payment (a "**Loss**"). Clause 8(2) of the Master Agreement provides that, if the Party Entitles to Damages obtains an overall financial benefit (a "**Benefit**") from the termination, it shall owe the other party a sum "corresponding to the amount of such Benefit, but not exceeding the amount of damages by the other party".

2.4   Clause 8(1) of the Master Agreement sets out the mechanism pursuant to which the Loss is determined.

2.5   Clause 8(1) provides the Party Entitled to Damages with two options to determine its Loss. Under the first option, the Loss is determined based on an amount resulting from replacement transactions which have been entered into without undue delay after the termination of the Master Agreement, including costs and expenses. However, if the Party Entitled to Damages decides to refrain from entering into such replacement transaction, it may calculate the Loss by reference to the amount it would have needed to pay for such replacement transactions on the basis of interest rates, forward rates, exchange rates, market prices, indices and any other calculation basis, as well as costs and expenses.

2.6   The Stiftung has not entered into replacement transactions. Therefore, its Loss is calculated on the basis of the theoretical amount it would need to pay to establish

2

# HAARMANN

those replacement transactions on the date of Termination (as defined in the Master Agreement).

2.7    The Stiftung has obtained a market quotation of ca. EUR 5,940,000 payable to the Stiftung as a premium for granting a replacement of the Call Options per 15th September 2008. The quotation, and the availability of replacement transactions, was subject to the Stiftung posting 7,000,000 SAP AG shares as collateral in the same way as the Collateral Shares. The share price for SAP AG on 15 September 2008 was EUR 38.15.

2.8    On the basis described above, the cost to the Stiftung of establishing the replacement transaction, as at the date of the Administration, would have been EUR 261,110,000, being EUR 267,050,000 (the cost of 7 million SAP shares required to collateralize the transaction) less EUR 5,940,000 (the premium that would have been paid to the Stiftung as consideration for granting the replacement transactions).

2.9    Clause 8(1) further requires that "any financial benefit arising from the termination be taken into account as a reduction of the damages otherwise determined". In this case, the termination of the Call Options has the result that the Stiftung will not be required to deliver the shares (which, as at the date of the Administration, represented a theoretical gain of EUR 267,050,000 (EUR 38.15 x 7 million). However, that gain must be reduced by the amount of the exercise price payable by LBIE that the Stiftung did not receive as a result of the termination, being EUR 321,250,000 (ie the aggregate of EUR 43,750,000 in respect of Tranche 2, EUR 45,000,000 in respect of Tranche 3, EUR 45,000,000 in respect of Tranche 4, EUR 46,250,000 in respect of Tranche 5, 46,250,000 in respect of Tranche 6, EUR 47,500,000 in respect of Tranche 7 and EUR 47,500,000 in respect of Tranche 8). Therefore, as at the date of the Administration (which is the relevant time at which the calculations are to be made in accordance with Clause 8(1)), the Stiftung received no financial benefit. We have assumed, for the purpose of this calculation, that the Call Options would have been exercised by LBIE given that they were "in-the-money" at the relevant time. For completeness, however, we note that if it is assumed that the options were not in fact exercised, the result would also be that no financial benefit would have been derived as a result of the termination (ie because the status quo would have been preserved in that the Stiftung would have kept the shares but would not have received the strike price, which is exactly the same position as results from the termination of the transactions).

3

# HAARMANN

2.10   Clause 8(2) provides that if the Party Entitled to Damages obtains "an overall financial benefit" from the termination it shall owe to the other party "a sum corresponding to the amount of such benefit, but not exceeding the amount of damages incurred by the other party". The clause goes on to say that the calculation of any such financial benefit should be made on the same basis as set out in Clause 8(1) and, as explained above, the application of Clause 8(1) results in no financial benefit to the Stiftung and therefore Clause 8(2) has not application.

2.11   Clauses 8(1) and (2) of the Master Agreements apply to the termination of the Call Options such that the Stiftung is entitled to an amount of EUR 261,110,000 (ie EUR 267,050,000 (the cost of 7 million SAP shares required to collateralize the transaction) less EUR 5,940,000 (the premium that would have been paid to the Stiftung as consideration for granting the replacement transactions). Costs and expenses are payable in addition. We will confirm the position with regard to costs and expenses in due course.

2.12   Apart from this payment obligations the Call Options are at an end and the Collateral Shares can be released and delivered to the Stiftung.

## 3.   COLLATERAL SHARES

3.1.   The Collateral Shares are subject to rights in rem of the Stiftung under German law. According to such rights in rem, the Stiftung has a right for segregation (*Aussonderungsrecht*) in regard to the Collateral Shares against LBIE. Thus, the Collateral Shares do neither form part of LBIE's insolvency estate nor are they to take part in the Administration. Instead, they are to be returned to the Stiftung.

3.2   The right for segregation follows from section 47 of the German Insolvency Code ("**InsO**"). Despite of the Administration of LBIE being placed in the United Kingdom, such right for segregation of the Collateral Shares is applicable and governed by German law and has not been affected by the Administration. This follows from section 351 Clause 1 of the InsO which states that the opening of a foreign insolvency proceeding does not affect any German rights in rem regarding an asset that is situated within the territory of Germany at the time of the opening of the insolvency proceeding. *Lex fori concursus* does not apply in relation to any German rights in rem as it is superseded by Section 351 Clause 1 of the InsO.

4

# HAARMANN

3.3   The Collateral Shares are situated within the territory of Germany as they were and are held in collective custody by Clearstream Banking AG in Frankfurt am Main and any rights in rem relating to them are, thus, governed by German law.

3.4   The Stiftung's has not lost its rights in rem relating to the Collateral Shares by entering into the Collateral Addendum. The Collateral Shares have been transferred to LBIE by way of transfer of ownership for security purposes (*Sicherungsübereignung*) which is a special form of security instrument under German law. The *Sicherungsübereignung* is based on a fiduciary relationship (*Treuhandverhältnis*) between the transferor and the transferee. Although the transferee acquires legal title in the securities which are transferred for security purposes, the transferor remains the beneficial owner of such securities. Under German law, not only full ownership but also such beneficial ownership constitutes a right in rem which gives a right for segregation pursuant to Section 47 of the InsO and entitles the securing party to claim retransfer of the security when the purpose of the security transfer (*Sicherungszweck*) has ended as is the case here.

3.5   For completeness please note that the provisions of clause 9(1) of the Collateral Addendum do not oppose LBIE's obligation to retransfer the Collateral Shares.

3.6   As the Stiftung is the party entitled to damages, the legal consequences of clause 9(1) of the Collateral Addendum are subject to a valuation made by the Stiftung. The Stiftung has not made any such valuation.

3.7   As LBIE has been heavily over-collateralized from day one, the Collateral Addendum including its clause 9(1) might be void according to case law of the German Federal Supreme Court.

3.8   If clause 9(1) of the Collateral Addendum would be valid, it would not apply here still. By entering into the Amendment to the Collateral Addendum, the parties have amended the standard provisions of the Collateral Addendum significantly and given the Collateral Addendum a totally new character. Pursuant to such amendments, the Collateral Addendum lost its balanced approach. Instead, LBIE became the only secured party and the Stiftung the only securing party. Moreover, whereas LBIE received collateral to its maximum exposure from day one, the Stiftung lost its right for release of any excess coverage. This leads to the conclusion that when entering into the Collateral Addendum in its form as amended by the Amendment to the Collateral

5

# HAARMANN

Addendum, the parties had obviously the intention to govern solely a potential insolvency on the side of the Stiftung but not a potential insolvency on the side of LBIE. In contrast, clause 9(1) of the Collateral Addendum has originally been designed for bi-lateral collateralizations where exposures of one party are limited by providing of cross-collateral and/or release of excess collateral. Where only one party is entitled to receive collateral whereas the other party does not receive any collateral at all, clause 9(1) of the Collateral Addendum obviously leads to unbalanced results in the event of the secured party's insolvency. As the parties have obviously not been aware of such mismatch, the Amendment to the Collateral Addendum is incomplete. Pursuant to general principles of German Civil Law, an obviously incomplete agreement has to supplemented by way of interpretation (*ergänzende Vertragsauslegung*). Such interpretation has to be made against the background of what the parties would have intended to agree on if they had been aware of the incompleteness. If the Stiftung and LBIE would have been aware of the imbalance the Amendment to the Collateral Agreement inflicted on clause 9(1) of the Collateral Addendum they would undoubtedly either have adjusted clause 9(1) of the Collateral Addendum accordingly or contracted it out entirely. Therefore, clause 9(1) of the Collateral Addendum does not apply here.

4.  **RETURN OF THE COLLATERAL SHARES**

4.1  Under the Amendment to the Collateral Addendum, the Collateral Shares shall serve to secure all present and future, conditional and contingent claims of LBIE existing now or arising in the future under or in connection with the Call Options.

4.2  As explained above, the Master Agreement and the Call Options have terminated and there are no obligations that the Stiftung may now or in the future owe to LBIE. Accordingly, the security purpose of the Collateral Shares is at an end and the Stiftung is entitled to the redelivery of the Collateral Shares.

4.3  Please confirm the basis upon which the Administrators would be prepared to deliver the Collateral Shares to the Stiftung.

# HAARMANN

7

In the case of any queries, please do not hesitate to contact either Christoph Schmitt of HAARMANN Partnerschaftsgesellschaft or Richard Williams and Martin Bishop of Pinsent Masons LLP who are, as you know, representing the Stiftung in LBIE's Administration regarding all matters under English law.

Yours sincerely

Dr. Christoph Schmitt
Partner
HAARMANN Partnerschaftsgesellschaft