Hearing Date and Time:  July 25, 2013 at 10:00 a.m. (Prevailing Eastern Time)
Response Deadline:  July 18, 2013 at 4:00 p.m. (Prevailing Eastern Time)

---

**THIS OBJECTION SEEKS TO DISALLOW AND EXPUNGE CERTAIN FILED PROOFS OF CLAIM.  PARTIES RECEIVING THIS NOTICE OF FOUR HUNDRED SEVENTEENTH OMNIBUS OBJECTION TO CLAIMS SHOULD REVIEW THE OMNIBUS OBJECTION TO SEE IF THEIR NAME(S) AND/OR CLAIM(S) ARE LOCATED IN THE OMNIBUS OBJECTION AND/OR IN THE EXHIBITS ATTACHED THERETO TO DETERMINE WHETHER THIS OBJECTION AFFECTS THEIR CLAIM(S).**

**IF YOU HAVE QUESTIONS, PLEASE CONTACT LEHMAN BROTHERS HOLDINGS INC.'S COUNSEL, MAURICE HORWITZ, AT 212-310-8883.**

---

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jacqueline Marcus

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------------x
In re                                          :
                                               :   Chapter 11 Case No.
                                               :
LEHMAN BROTHERS HOLDINGS INC., et al.,         :   08-13555 (JMP)
                                               :
                    Debtors.                   :   (Jointly Administered)
                                               :
-------------------------------------------------------------------x
```

## NOTICE OF HEARING ON FOUR HUNDRED SEVENTEENTH OMNIBUS OBJECTION TO CLAIMS (NO LIABILITY DERIVATIVES CLAIMS)

**PLEASE TAKE NOTICE** that on June 13, 2013, Lehman Brothers Holdings

Inc., as Plan Administrator under the *Modified Third Amended Joint Chapter 11 Plan of Lehman*

*Brothers Holdings Inc. and its Affiliated Debtors* [ECF No. 22738] for the entities in the above

referenced chapter 11 cases, filed its four hundred seventeenth omnibus objection to claims (the

"Four Hundred Seventeenth Omnibus Objection to Claims"), and that a hearing (the "Hearing")

to consider the Four Hundred Seventeenth Omnibus Objection to Claims will be held before the

Honorable James M. Peck, United States Bankruptcy Judge, in Courtroom 601 of the United

States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York,

New York 10004, on **July 25, 2013 at 10:00 a.m. (Prevailing Eastern Time),** or as soon

thereafter as counsel may be heard.

    **PLEASE TAKE FURTHER NOTICE** that any responses to the Four Hundred

Seventeenth Omnibus Objection to Claims must be in writing, shall conform to the Federal Rules

of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, and shall be filed with

the Bankruptcy Court (a) electronically in accordance with General Order M-399 (which can be

found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's filing system,

and (b) by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document

Format (PDF), WordPerfect, or any other Windows-based word processing format (with a hard

copy delivered directly to Chambers), in accordance with General Order M-182 (which can be

found at www.nysb.uscourts.gov), and shall be served in accordance with General Order M-399,

upon (i) the chambers of the Honorable James M. Peck, One Bowling Green, New York, New

York 10004, Courtroom 601; (ii) attorneys for Lehman Brothers Holdings Inc., Weil, Gotshal &

Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Jacqueline Marcus, Esq.

and Maurice Horwitz, Esq.); and (iii) the Office of the United States Trustee for Region 2, 33

Whitehall Street, 21st Floor, New York, New York 10004 (Attn: Tracy Hope Davis, Esq., Susan

Golden, Esq. and Andrea B. Schwartz, Esq.), so as to be so filed and received by no later than

**July 18, 2013 at 4:00 p.m. (Prevailing Eastern Time)** (the "Response Deadline").

**PLEASE TAKE FURTHER NOTICE** that if no responses are timely filed and served with respect to the Four Hundred Seventeenth Omnibus Objection to Claims, the Plan Administrator may, on or after the Response Deadline, submit to the Bankruptcy Court an order substantially in the form of the proposed order annexed to the Four Hundred Seventeenth Omnibus Objection to Claims, which order may be entered with no further notice or opportunity to be heard offered to any party.

Dated:  June 13, 2013
        New York, New York

/s/ Jacqueline Marcus
Jacqueline Marcus
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

US_ACTIVE:\44272286\5\58399.0011

Hearing Date and Time: July 25, 2013 at 10:00 a.m. (Prevailing Eastern Time)
Response Deadline: July 18, 2013 at 4:00 p.m. (Prevailing Eastern Time)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jacqueline Marcus

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
|                                   |   |                         |
|-----------------------------------|---|-------------------------|
| In re                             | : | Chapter 11 Case No.     |
|                                   | : |                         |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | : | **08-13555 (JMP)** |
|                                   | : |                         |
| Debtors.                          | : | (Jointly Administered)  |

------------------------------------------------------------------x

**FOUR HUNDRED SEVENTEENTH OMNIBUS OBJECTION**
**TO CLAIMS (NO LIABILITY DERIVATIVES CLAIMS)**

---

**THIS OBJECTION SEEKS TO DISALLOW AND EXPUNGE CERTAIN FILED PROOFS OF CLAIM.  PARTIES RECEIVING THIS FOUR HUNDRED SEVENTEENTH OMNIBUS OBJECTION TO CLAIMS SHOULD REVIEW THE OMNIBUS OBJECTION TO SEE IF THEIR NAME(S) AND/OR CLAIM(S) ARE LOCATED IN THE OMNIBUS OBJECTION AND/OR IN THE EXHIBITS ATTACHED THERETO TO DETERMINE WHETHER THIS OBJECTION AFFECTS THEIR CLAIM(S).**

**IF YOU HAVE QUESTIONS, PLEASE CONTACT LEHMAN BROTHERS HOLDINGS INC.'S COUNSEL, MAURICE HORWITZ, AT 212-310-8883.**

---

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

            Lehman Brothers Holdings Inc. ("LBHI" or the "Plan Administrator"), as Plan

Administrator pursuant to the *Modified Third Amended Joint Chapter 11 Plan of Lehman*

*Brothers Holdings Inc. and its Affiliated Debtors* (the "Plan") for the entities in the above

referenced chapter 11 cases (together, the "Chapter 11 Estates" and, collectively with their non-

debtor affiliates, "Lehman"), respectfully represents as follows:

**Preliminary Statement**

1.    The Plan Administrator files this four hundred seventeenth omnibus

objection to claims (the "Four Hundred Seventeenth Omnibus Objection to Claims") seeking to

disallow and expunge the claims listed on Exhibit A annexed hereto on the basis that LBHI,

Lehman Brothers Special Financing Inc. ("LBSF") or any other Chapter 11 Estate do not have

any liability for the claims asserted therein.  The proofs of claim identified on Exhibit A (the "No

Liability Claims") consist of:  (i)  contingent and/or unliquidated claims filed by Lehman

Brothers Australia Limited ("LB Australia")[1] or its clients (collectively, the "LB Australia

Creditors") against LBHI and LBSF arising out of collateralized debt obligations and other

financial products that were designed, promoted, marketed, issued or sold to the LB Australia

Creditors (collectively, the  "Financial Products Claims"); and (ii) a contingent and unliquidated

claim filed by LB Australia for contribution arising from any indemnities that may have been

provided by both LB Australia and LBHI to LB Australia's directors and officers in connection

with their role in the operations of LB Australia and the sale of  the collateralized debt

obligations and other financial products that gave rise to the Financial Products Claims (the

"Contribution Claim").

---

[1] As part of proof of claim number 58607, LB Australia has also asserted a liquidated claim based on certain purported guarantees granted by LBHI in favor of its subsidiaries, including LB Australia, and contingent and/or unliquidated claims with respect to any other guarantee granted by LBHI to its other subsidiaries that would otherwise extend in any way to LB Australia (collectively, the "Guarantee Claim").  The Four Hundred Seventeenth Omnibus Objection to Claims does not address the Guarantee Claim and, as further discussed herein, the Plan Administrator reserves all rights with respect to such claim.

US_ACTIVE:\44272286\5\58399.0011

2.      The No Liability Claims assert liabilities that are not valid claims for which LBHI or LBSF can be held responsible.  Specifically, the Financial Products Claims are based upon unsubstantiated allegations and alleged wrongdoing of an entity which is not among the Chapter 11 Estates and for which neither LBHI nor LBSF is liable.  Additionally, the Contribution Claim remains contingent and section 502(e)(1)(B) of  title 11 of the United States Code (the "Bankruptcy Code"), therefore, requires disallowance.  Accordingly, the No Liability Claims do not constitute valid *prima facie* claims, and the Plan Administrator requests that the No Liability Claims be disallowed and expunged in their entirety, with prejudice.

## Jurisdiction

3.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and section 14.1(c) of the Plan.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## Background

4.      Commencing on September 15, 2008 and periodically thereafter (as applicable, the "Commencement Date"), LBHI and certain of its subsidiaries, including LBSF, commenced with this Court voluntary cases under chapter 11 of title 11 of the Bankruptcy Code (the "Chapter 11 Cases").

5.      On October 2, 2009, LB Australia was placed into liquidation proceedings (proceeding no. NSD 538 of 2009) in the Federal Court of Australia, New South Wales District (the "Australia Proceeding").  Mr. Marcus William Ayres and Mr. Stephen Parbery are currently jointly and severally serving as court appointed liquidators (together, the "Liquidators") to oversee LB Australia's liquidation in the Australia Proceeding.

6.      On January 6, 2012, the Liquidators on behalf of LB Australia filed a Verified Petition for Recognition and Chapter 15 Relief, ECF No. 4, *In re Lehman Brothers*

3

*Australia Ltd*., Ch. 15 Case No. 12-10063 (JMP) (Bankr. S.D.N.Y. 2012) (the "LB Australia Chapter 15 Case").  On February 15, 2012, the Court entered the *Order Pursuant to 11 U.S.C. §§ 1504, 1515, 1517 and 1520 Recognizing Foreign Representatives and Foreign Main Proceeding*, ECF No. 15 in the LB Australia Chapter 15 Case, recognizing the Australian Proceeding as a foreign main proceeding and recognizing the Liquidators as foreign representatives.

7.      On December 6, 2011, the Court entered the order confirming the Plan [ECF No. 22737].  The Plan became effective on March 6, 2012 (the "Effective Date").  Pursuant to the Plan, the Plan Administrator is authorized to interpose and prosecute objections to claims filed against the Chapter 11 Estates.

8.      On May 22, 2013, the Liquidators filed a Scheme of Arrangement in the Australian Proceeding (the "Scheme") accompanied by an explanatory statement (the "Explanatory Statement").  A copy of the Explanatory Statement, without exhibits, is attached hereto as Exhibit B.  The Scheme remains subject to the approval of the Federal Court of Australia and the creditors of LB Australia will convene to vote on approval of the Scheme on June 19, 2013.

## Relief Requested

9.      The Plan Administrator files this Four Hundred Seventeenth Omnibus Objection to Claims pursuant to sections 502(b) and 502(e)(1)(B) of the Bankruptcy Code and Bankruptcy Rule 3007(d), and this Court's order approving procedures for the filing of omnibus objections to proofs of claim filed in these chapter 11 cases [ECF No. 6664], seeking to disallow and expunge the No Liability Claims in their entirety.

4

## Chapter 11 Estates' Relationship with LB Australia

10.     LB Australia was incorporated in Australia on October 14, 1994, and was formerly known as Grange Securities Limited ("Grange").  At its inception, Grange was not affiliated with Lehman.  Grange provided investment banking, securities broking, capital raising and fund management within the Australian fixed income and equities markets.  *See* Explanatory Statement at 15.  From late 2002 until late 2007, Grange offered its clients, consisting of Australian pension funds, religious entities, charities, individuals, councils and local government authorities, among other things, collateralized debt obligations (collectively, the "CDOs") and other financial products (together with the CDOs, the "Financial Products").

11.     On or about January 17, 2007, Lehman Brothers Australia Granica Pty Limited, a subsidiary of LBHI, purchased 100% of Grange's issued capital.  *See* Explanatory Statement at 15.  The acquisition was completed on March 7, 2007.  *See Id*.  On December 3, 2007, Grange formally changed its name to "Lehman Brothers Australia Limited."  *See Id*.

12.     Prior to the Commencement Date and after Lehman acquired Grange, LBSF engaged in various credit default swap transactions with Dante Finance Public Limited Company (the "Issuer") pursuant to a 2002 form Master ISDA Agreement, dated October 10, 2002, and an accompanying schedule and other documents confirming evidence of the parties transactions (collectively, the "Credit Default Swap Agreement").  LBHI guaranteed LBSF's obligations under the Credit Default Swap Agreement.  Under the Credit Default Swap Agreement, LBSF agreed to make periodic payments to the Issuer in exchange for the Issuer's promise to make payments to LBSF in respect of losses incurred in respect of certain specified reference obligations.  In effect, LBSF, as the "Swap Counterparty," purchased protection from

5

the Issuer, which sold protection on the creditworthiness of the obligations referenced in the

Credit Default Swap Agreement.

## The Financial Products Claims

13.    On October 30, 2009, LB Australia filed proof of claim number 58607,

asserting, among other things, a Financial Products Claim against LBHI that alleged damages

totaling approximately $1.193 billion (AUD) based on the value of the claims made or expected

to be made by the LB Australia Creditors against LB Australia for, among other things,

negligence, misleading and deceptive conduct, breaches of fiduciary obligations, and breach of

contract in connection with the Financial Products originally sold to the LB Australia Creditors.

14.    The LB Australia Creditors have also filed proofs of claims asserting

Financial Products Claims against LBHI or LBSF for damages in the aggregate amount of

$188,277,267.99 based upon their alleged role in issuing the Financial Products.  With respect to

the Financial Products Claims asserted against LBHI, the LB Australia Creditors have alleged,

among other things, that LBHI:  (i) breached various duties that it owed, including its fiduciary

duty; (ii) was negligent; and (iii) is liable for the representations and warranties made by LB

Australia in connection with the sale of the Financial Products.  The Financial Products Claims

asserted against LBSF allege, among other things, that:  (i) LBSF breached its duties, including

its duty of care, to the LB Australia Creditors as a swap counterparty of the CDOs; (ii) LBSF is

liable for the allegedly misleading and deceptive conduct of LB Australia with respect to the

CDOs for which it was a swap counterparty; and (iii) LBSF  is liable for any losses incurred by

the LB Australia Creditors in connection with the Financial Products because it had knowledge

of and was heavily involved in the manufacturing, marketing and selling of the Financial

Products.  Generally, all of the Financial Products Claims asserted against LBHI or LBSF by the

6

LB Australia Creditors are based on the alleged involvement of LBHI or LBSF in the origination
of the Financial Products.

### The Contribution Claim

15.    LB Australia's Contribution Claim is also a component of proof of claim
number 58607 and was filed in an unliquidated amount.  The Contribution Claim is contingent
upon a claim being made directly against LB Australia's directors or officers, and is based on an
assumption that LB Australia has a right of contribution from LBHI due to an alleged mutual
obligation to indemnify such individuals for their role in the operation of LB Australia and the
sale of the Financial Products.

16.    The Plan Administrator is unaware of any proceedings commenced
against LB Australia's directors and officers in connection with or relating to the Financial
Products, and LB Australia has not made any assertions to the contrary.  Indeed, the Liquidators
state in the Explanatory Statement that "to the best of the Liquidators' knowledge, no person or
entity has commenced proceedings against [LB Australia's] directors or officers."  Explanatory
Statement at 27 – 28.

### The No Liability Claims Should Be Disallowed and Expunged

17.    A filed proof of claim is "deemed allowed, unless a party in interest
objects."  11 U.S.C. § 502(a).  If an objection refuting at least one of the claim's essential
allegations is asserted, the claimant has the burden to demonstrate the validity of the claim.  *See
In re Oneida, Ltd.*, 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009); *In re Adelphia Commc'ns Corp.*,
No. 02-41729 (REG), 2007 Bankr. LEXIS 660 at *15 (Bankr. S.D.N.Y. Feb. 20, 2007); *In re
Rockefeller Ctr. Props.*, 272 B.R. 524, 539 (Bankr. S.D.N.Y. 2000).  Section 502(b)(1) of the
Bankruptcy Code provides, in relevant part, that a claim may not be allowed to the extent that

7

"such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law."  11 U.S.C. § 502(b)(1).  Holders of the No Liability Claims have not satisfied their burden to demonstrate that they are entitled to collect any amounts from LBHI or LBSF under such claims.

A.    *The Chapter 11 Estates are not Liable
       for any Financial Products Claims*

18.    None of the Chapter 11 Estates are liable for the Financial Product Claims asserted by LB Australia or the LB Australia Creditors against LBHI or LBSF.  The Financial Products Claims provide no basis of liability as to any of the Chapter 11 Estates and, upon a review of such claims, the Plan Administrator has determined that the Financial Products Claims are based upon speculative accusations and the requested damages are unsubstantiated and unwarranted.

19.    The Liquidators acknowledged in the Report to Creditors Pursuant to Section 439A of the Act, dated March 19, 2009, a copy of which is annexed hereto without exhibits as Exhibit C, that a vast majority of the Financial Products Claims, approximately 83%, relate to those Financial Products sold to claimants *prior* to Lehman's acquisition of Grange.  *See also*, Explanatory Statement at 28 (stating that "a major proportion of [LB Australia Creditors'] losses occurred in the period prior to March 2007 . . .").  The Chapter 11 Estates cannot be held liable for losses incurred prior to LB Australia becoming a Lehman affiliate.  Moreover, neither LBHI nor LBSF is liable for the actions of LB Australia, an indirect subsidiary of LBHI.  Absent a compelling reason to ignore the corporate separateness of the various Lehman entities, the potential liability of a non-debtor affiliate such as LB Australia does not result in a claim against LBHI or LBSF.  *See De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 70 (2d Cir. 1996) (holding that pleadings were devoid of any specific facts or circumstances supporting plaintiffs'

8

assertions, thus failing to overcome the presumption of separateness afforded to related corporations); *In re Gartner v. Snyder*, 607 F.2d 582 (2d Cir. 1979) (noting New York courts disregard corporate form reluctantly).  Accordingly, the Financial Products Claims asserted by both LB Australia and the LB Australia Creditors should be disallowed and expunged.

20.    Additionally, pursuant to the Agreement and Release between LB Australia and certain insurance companies[2] providing Investment Management Insurance Policies (the "Policies") to Lehman Brothers Inc. or LBHI, dated May 14, 2012 (the "Settlement Agreement"), and approved by this Court's order entered on March 19, 2013 [ECF No. 24 in the LB Australia Chapter 15 Case], if LB Australia's Scheme is approved, the Insurers will pay LB Australia $45 million in insurance proceeds for those claims covered under the Policies that allege breach of professional duties.  In consideration of such payment, LB Australia is required to, among other things, either withdraw its Financial Products Claim or obtain releases in favor of the Insurers from LBHI, LBSF and others.  In accordance with the Settlement Agreement, the Liquidators have indicated that they intend to withdraw the Financial Products Claim portion of proof of claim number 58607.  *See* Explanatory Statement at 28.

21.    Moreover, LB Australia has conceded that there is insufficient evidence to establish a *prima facie* claim against LBHI or LBSF for damages arising from its Financial Products Claim and that its Financial Products Claim is overstated by approximately $1.163 billion (AUD).  *See* Explanatory Statement at 27-28.  Specifically, as stated in LB Australia's Explanatory Statement, the Liquidators have concluded based on an examination of the Financial Products Claim asserted by LB Australia that "there is insufficient evidence (based on the

---

[2] National Union Fire Insurance of Pittsburgh, Pa., Federal Insurance Company, XL Specialty Insurance Company, Arch Insurance Company, AIG Casualty Company, St. Paul Mercury Insurance Company, Birmingham Fire Insurance Company of Pennsylvania, U.S. Specialty Insurance Company, ACE American Insurance Company, Continental Casualty Company, AXIS Reinsurance Company and AXIS Insurance (collectively, the "Insurers").

US_ACTIVE:\44272286\5\58399.0011

information available to the Liquidators) to support the factual assumptions on which the claims

were based.  Accordingly, the Liquidators consider that any attempt by [LB Australia] to pursue

the Financial Products Claim against LBHI lacks reasonable prospects of success." *Id*. at 27.

The Liquidators' conclusion is further buttressed by the September 1, 2012, judgment of Judge J.

Rares of the Federal Court of Australia, New Southern Wales District Registry, in the

representative action brought on behalf of applicants and group members against LB Australia,

captioned *Wingecarribee Shire Council and Ors v. Lehman Brothers Australia Ltd. (in

liquidation)* (No. NSD 2492 of 2007).  In this ruling, the court held that although LB Australia,

when doing business as Grange, is liable to the plaintiffs for their claims in contract, negligence,

breach of fiduciary duty and allegations that Grange engaged in misleading and deceptive

conduct, LB Australia's defenses that certain other Lehman entities were concurrently liable for

wrongdoing lacked substance and such defenses were rejected.

> 22.    The Plan Administrator submits that a fair, accurate and reasonable review

of the Financial Products Claims demonstrates that neither LBHI nor LBSF have any liability or

owe any amounts to holders of such claims.  The Financial Products Claims should, therefore, be

disallowed and expunged in their entirety.

B.    *The Contribution Claim Should be Disallowed*
    *Pursuant to Section 502(e) of the Bankruptcy Code*

> 23.    As of the date hereof, the Liquidators have acknowledged that no person

or entity has commenced proceedings against LB Australia's directors and officers relating to the

Financial Products.  *See* Explanatory Statement at 28.  The Liquidators have also acknowledged

that the Contribution Claim "has no reasonable prospect of success."  *Id*.  In any event, the

Contribution Claim remains contingent and thus subject to disallowance pursuant to section 502

of the Bankruptcy Code.

10

24.    Section 502(e)(1)(B) of the Bankruptcy Code provides, in pertinent part, as follows:

> (e)(1) . . . the court shall disallow any claim for reimbursement or contribution of an entity that is liable with the debtor on or has secured the claim of a creditor, to the extent that . . .
>
> > (B) such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution

11 U.S.C. § 502(e)(1)(B).

25.    The Court in *In re GCO Servs.*, *LLC*, 324 B.R. 459 (ALG) (Bankr. S.D.N.Y. 2005) posited that disallowing contingent indemnification claims pursuant to section 502(e)(1)(B) of the Bankruptcy Code is important "to prevent contingent, unresolved indemnification or contribution claims from delaying . . . a final distribution in a liquidating case." *Id*. at 466. Likewise, the District Court for the Southern District of New York has noted that the language of section 502(e)(1)(B) itself

> indicates that the purpose of disallowing contingent indemnity and contribution claims is precisely because such claims are so contingent . . . Congress apparently sought to achieve the administrative purpose of enabling distributions to unsecured creditors without a reserve for these types of contingent claims when the contingency may not occur until after the several years it often takes to litigate the underlying lawsuit.

*Sorenson v. Drexel Burnham Lambert Group, Inc.*, (*In re Drexel Burnham Lambert Group, Inc.*) 146 B.R. 92, 97 (S.D.N.Y. 1992) (citing *In re Wedtech Corp.*, 85 B.R. 285, 290 (Bankr. S.D.N.Y. 1988)).

26.    In accordance with the express language of section 502(e)(1)(B) of the Bankruptcy Code, courts in this District and elsewhere have applied the following three part test

11

to determine whether a claim may be disallowed pursuant to section 502(e)(1)(B) of the Bankruptcy Code:  (i) the claim must be one for reimbursement or contribution; (ii) the entity asserting such claim must be "liable with the debtor;" and (iii) such claim must be contingent at the time of its allowance or disallowance. *See Drexel*, 146 B.R. at 95 (applying the three part test); *Wedtech*, 85 B.R. at 289 (same); *see also In re Provincetown-Boston Airlines, Inc*., 72 B.R. 307, 309 (Bankr. M.D. Fla. 1987) (same).  Applying this test, the Contribution Claim undoubtedly falls under the purview of section 502(e)(1)(B) of the Bankruptcy Code.  In satisfaction of the first two prongs, the Contribution Claim seeks either reimbursement or contribution for an alleged mutual obligation of LB Australia and LBHI to indemnify LB Australia's directors and officers.  LB Australia expressly states in its filed proof of claim that the Contribution Claim is based on LBHI being co-liable with LB Australia.  *See* Proof of Claim No. 58607.

      27.     Although LBHI disputes LB Australia's allegation that LBHI is in any way co-liable with LB Australia, to the extent that the Contribution Claim is based on such an allegation, this Court must disallow the Contribution Claim on the grounds that it is a claim for contribution that is contingent at this time.  Courts in this District have expressly held that contingent indemnity and contribution claims are subject to mandatory disallowance, so long as the underlying cause of action asserted against the claimant is, as LB Australia alleges, an action for which the debtor could have been liable absent the automatic stay.  *See Drexel*, 146 B.R. at 95-97 (upholding the bankruptcy court decision and disallowing the contingent indemnification claim of the debtors' former officer and employee); *Wedtech*, 85 B.R. at 289 (disallowing the indemnification claims of the debtor's former officers and directors for actions which the debtor may be co-liable).

12

28.    Moreover, the fact that the Liquidators have indicated that they intend to withdraw the Contribution Claim should be treated as an admission by the Liquidators themselves that the Contribution Claim has no merit. *See* Explanatory Statement at 28. The Contribution Claim should, therefore, be disallowed and expunged in its entirety.

29.    The Plan Administrator has determined, after a thorough review, that the No Liability Claims do not contain any valid claims against LBHI, LBSF or the Chapter 11 Estates. Although the Liquidators have indicated their intent to withdraw both their Financial Product Claim and their Contribution Claim as part of the Settlement Agreement, the Chapter 11 Estates should not be dependent upon the effectiveness of the Settlement Agreement to obtain the relief requested herein, particularly given that the Liquidators have admitted that such claims have no value. Accordingly, the Plan Administrator respectfully requests that the Court enter an order disallowing and expunging the No Liability Claims in their entirety.

**Reservation of Rights**

30.    The Plan Administrator reserves all rights with respect to the Guarantee Claim and to object on any basis to the No Liability Claims in the event that the relief requested herein is not granted.

**Notice**

31.    No trustee has been appointed in the Chapter 11 Cases. Notice of this objection has been provided to (i) the United States Trustee for Region 2; (ii) the Securities and Exchange Commission; (iii) the Internal Revenue Service; (iv) the United States Attorney for the Southern District of New York; (v) the claimants holding No Liability Claims; and (vi) all other parties entitled to notice in accordance with the procedures set forth in the second amended order entered on June 17, 2010, governing case management and administrative procedures for these

13

cases [ECF No. 9635]. The Plan Administrator submits that no other or further notice need be

provided.

32.    No previous request for the relief sought herein has been made by the Plan

Administrator or the Chapter 11 Estates to this or any other Court.

WHEREFORE the Plan Administrator respectfully requests entry of an order

granting the relief requested herein and such other and further relief as is just.

Dated:  June 13, 2013
          New York, New York

/s/ Jacqueline Marcus
Jacqueline Marcus
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

14

**EXHIBIT A**

(No Liability Claims)

IN RE: LEHMAN BROTHERS HOLDINGS INC., ET AL., CASE NO: 08-13555 (JMP)

OMNIBUS OBJECTION 417: EXHIBIT A - NO LIABILITY CLAIMS

| | NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | ASSERTED TOTAL CLAIM DOLLARS | AMOUNTS TO BE DISALLOWED | REASON FOR PROPOSED DISALLOWANCE |
|---|---|---|---|---|---|---|---|---|
| 1 | ALRENE PTY LIMITED ATF THE FIRMAN | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-10 | 11099 | $412,000.00 | $412,000.00 | No Liability Claim - Derivative |
| 2 | ARC ENERGY LIMITED | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32672 | $1,651,400.00 | $1,651,400.00 | No Liability Claim - Derivative |
| 3 | ARC ENERGY LIMITED | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 2009-09-22 | 32684 | $780,400.00 | $780,400.00 | No Liability Claim - Derivative |
| 4 | ARMIDALE DUMARESQ COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2008-11-24 | 890 | Undetermined | Undetermined | No Liability Claim - Derivative |
| 5 | BLAND SHIRE COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32671 | $2,745,590.00 | $2,745,590.00 | No Liability Claim - Derivative |
| 6 | BLAND SHIRE COUNCIL | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 2009-09-22 | 32681 | $351,180.00 | $351,180.00 | No Liability Claim - Derivative |
| 7 | BLAYNEY SHIRE COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32670 | $825,700.00 | $825,700.00 | No Liability Claim - Derivative |
| 8 | BLUE MOUNTAINS CITY COUNCIL | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 2009-09-22 | 32639 | $737,478.00 | $737,478.00 | No Liability Claim - Derivative |
| 9 | BLUE MOUNTAINS CITY COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32669 | $4,685,848.00 | $4,685,848.00 | No Liability Claim - Derivative |

* - Indicates claim contains unliquidated and/or undetermined amounts

IN RE: LEHMAN BROTHERS HOLDINGS INC., ET AL., CASE NO. 08-13555 (JMP)

**OMNIBUS OBJECTION 417: EXHIBIT A - NO LIABILITY CLAIMS**

| NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | ASSERTED TOTAL CLAIM DOLLARS | AMOUNTS TO BE DISALLOWED | REASON FOR PROPOSED DISALLOWANCE |
|------|-------------|-------------|-----------|---------|------------------------------|--------------------------|----------------------------------|
| 10 BOYSTOWN | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-14 | 12645 | $3,131,200.00 | $3,131,200.00 | No Liability Claim - Derivative |
| 11 BROKEN HILL CITY COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2008-11-24 | 886 | Undetermined | Undetermined | No Liability Claim - Derivative |
| 12 CABONNE COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32679 | $949,555.00 | $949,555.00 | No Liability Claim - Derivative |
| 13 CABONNE COUNCIL | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 2009-09-22 | 32686 | $234,120.00 | $234,120.00 | No Liability Claim - Derivative |
| 14 CENTRAL TABLELANDS WATER | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32678 | $759,644.00 | $759,644.00 | No Liability Claim - Derivative |
| 15 CENTRAL TABLELANDS WATER | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 2009-09-22 | 32691 | $234,120.00 | $234,120.00 | No Liability Claim - Derivative |
| 16 CITY OF ALBANY COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32640 | $2,823,894.00 | $2,823,894.00 | No Liability Claim - Derivative |
| 17 CITY OF ALBANY COUNCIL | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 2009-09-22 | 32646 | $1,638,840.00 | $1,638,840.00 | No Liability Claim - Derivative |
| 18 CITY OF GERALDTON-GREENOUGH COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32664 | $2,022,965.00 | $2,022,965.00 | No Liability Claim - Derivative |

* - Indicates claim contains unliquidated and/or undetermined amounts

IN RE: LEHMAN BROTHERS HOLDINGS INC., ET AL., CASE NO. 08-13555 (JMP)

OMNIBUS OBJECTION 417: EXHIBIT A - NO LIABILITY CLAIMS

| NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | ASSERTED TOTAL CLAIM DOLLARS | AMOUNTS TO BE DISALLOWED | REASON FOR PROPOSED DISALLOWANCE |
|---|---|---|---|---|---|---|---|
| 19 CITY OF GERALDTON-GREENOUGH COUNCIL | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 2009-09-22 | 32689 | $390,200.00 | $390,200.00 | No Liability Claim - Derivative |
| 20 CITY OF MELVILLE COUNCIL | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 2009-09-22 | 32645 | $4,136,120.00 | $4,136,120.00 | No Liability Claim - Derivative |
| 21 CITY OF MELVILLE COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32676 | $17,521,354.00 | $17,521,354.00 | No Liability Claim - Derivative |
| 22 CITY OF RYDE | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2008-11-24 | 880 | Undetermined | Undetermined | No Liability Claim - Derivative |
| 23 CITY OF SWAN | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-12-29 | 66029 | $7,031,847.85 | $7,031,847.85 | No Liability Claim - Derivative |
| 24 CITY OF SWAN | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 2009-12-29 | 66030 | $1,170,600.00 | $1,170,600.00 | No Liability Claim - Derivative |
| 25 COFFS HARBOUR CITY COUNCIL | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 2009-09-22 | 32642 | $3,293,288.00 | $3,293,288.00 | No Liability Claim - Derivative |
| 26 COFFS HARBOUR CITY COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32688 | $12,439,487.00 | $12,439,487.00 | No Liability Claim - Derivative |
| 27 CRAIG WHITE PTY LTD | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-14 | 12157 | $2,183,600.00 | $2,183,600.00 | No Liability Claim - Derivative |

\* - Indicates claim contains unliquidated and/or undetermined amounts

IN RE: LEHMAN BROTHERS HOLDINGS INC., ET AL., CASE NO: 08-13555 (JMP)

## OMNIBUS OBJECTION 417: EXHIBIT A - NO LIABILITY CLAIMS

| | NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | ASSERTED TOTAL CLAIM DOLLARS | AMOUNTS TO BE DISALLOWED | REASON FOR PROPOSED DISALLOWANCE |
|---|---|---|---|---|---|---|---|---|
| 28 | DENILIQUIN COUNCIL | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 2009-09-22 | 32644 | $546,280.00 | $546,280.00 | No Liability Claim - Derivative |
| 29 | DENILIQUIN COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32687 | $1,610,115.00 | $1,610,115.00 | No Liability Claim - Derivative |
| 30 | FIRMAN, JOHN JOSEPH/FIRMAN, JUDITH ANN/COLLIN, NICHOLAS JAMES/ | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-11 | 11513 | $412,000.00 | $412,000.00 | No Liability Claim - Derivative |
| 31 | GILGANDRA COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32663 | $949,555.00 | $949,555.00 | No Liability Claim - Derivative |
| 32 | GILGANDRA COUNCIL | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 2010-02-19 | 66308 | $468,240.00 | $468,240.00 | No Liability Claim - Derivative |
| 33 | GLENROAD HOLDINGS PTY LIMITED | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-14 | 12156 | $824,000.00 | $824,000.00 | No Liability Claim - Derivative |
| 34 | GOWING BROTHERS LIMITED | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2008-11-24 | 873 | Undetermined | Undetermined | No Liability Claim - Derivative |
| 35 | GOWING WHALE FUND PTY LIMITED | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2008-11-24 | 872 | Undetermined | Undetermined | No Liability Claim - Derivative |
| 36 | GOWINGS BROS LIMITED | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-21 | 24733 | $4,120,000.00 | $4,120,000.00 | No Liability Claim - Derivative |

\* - Indicates claim contains unliquidated and/or undetermined amounts

IN RE: LEHMAN BROTHERS HOLDINGS INC., ET AL., CASE NO. 08-13555 (JMP)

**OMNIBUS OBJECTION 417: EXHIBIT A - NO LIABILITY CLAIMS**

| | NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | ASSERTED TOTAL CLAIM DOLLARS | AMOUNTS TO BE DISALLOWED | REASON FOR PROPOSED DISALLOWANCE |
|---|---|---|---|---|---|---|---|---|
| 37 | GOWINGS WHALE FUND P/L ATF | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-21 | 24732 | $82,400.00 | $82,400.00 | No Liability Claim - Derivative |
| 38 | GUYRA SHIRE COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2008-11-24 | 871 | Undetermined | Undetermined | No Liability Claim - Derivative |
| 39 | HURSTVILLE CITY COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-04 | 10369 | $16,895,860.44 | $16,895,860.44 | No Liability Claim - Derivative |
| 40 | KIAMA MUNICIPAL COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32647 | $3,500,968.00 | $3,500,968.00 | No Liability Claim - Derivative |
| 41 | KIAMA MUNICIPAL COUNCIL | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 2009-09-22 | 32673 | $655,536.00 | $655,536.00 | No Liability Claim - Derivative |
| 42 | LANSELL PTY LTD ATF THE ALEX MARAKOFF SUPERANNUATION FUND | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 31346 | $247,200.00 | $247,200.00 | No Liability Claim - Derivative |
| 43 | LEHMAN BROTHERS AUSTRALIA LIMITED (IN LIQUIDATION) | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-10-30 | 58607 | Undetermined | Undetermined | No Liability Claim - Derivative |
| | The Contribution Claim is included within proof of claim number 58607. Claim 58607 is being expunged solely with respect to its asserted Financial Products Claim and Contribution Claim. The remaining portion of Claim 58607 is not being expunged pursuant to this Objection and is not affected by this Objection. All rights with respect to the remaining portion of Claim 58607 are reserved. | | | | | | | |
| 44 | LEICHHARDT COUNCIL - ABN 92379 942 845 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32666 | $1,651,400.00 | $1,651,400.00 | No Liability Claim - Derivative |
| 45 | LITTLE COLLINS SPRING PTY LIMITED | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-04 | 10371 | $494,400.00 | $494,400.00 | No Liability Claim - Derivative |

* - Indicates claim contains unliquidated and/or undetermined amounts

IN RE: LEHMAN BROTHERS HOLDINGS INC., ET AL., CASE NO: 08-13555 (JMP)

OMNIBUS OBJECTION 417: EXHIBIT A - NO LIABILITY CLAIMS

| | NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | ASSERTED TOTAL CLAIM DOLLARS | AMOUNTS TO BE DISALLOWED | REASON FOR PROPOSED DISALLOWANCE |
|---|---|---|---|---|---|---|---|---|
| 46 | MCCAMISH BROS (ORCHARDS) PTY LTD | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-10 | 11091 | $1,236,000.00 | $1,236,000.00 | No Liability Claim - Derivative |
| 47 | MCMULLEN, DAVID AND FIONA | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32653 | $743,130.00 | $743,130.00 | No Liability Claim - Derivative |
| 48 | MOREE PLAINS SHIRE COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32650 | $5,367,050.00 | $5,367,050.00 | No Liability Claim - Derivative |
| 49 | MOREE PLAINS SHIRE COUNCIL | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 2009-09-22 | 32690 | $390,200.00 | $390,200.00 | No Liability Claim - Derivative |
| 50 | MORTGAGE RISK MANAGEMENT PTY LTD. | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-18 | 19359 | $6,880,400.00 | $6,880,400.00 | No Liability Claim - Derivative |
| 51 | NARRABI SHIRE COUNCIL | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 2009-09-22 | 32643 | $663,340.00 | $663,340.00 | No Liability Claim - Derivative |
| 52 | NARRABRI SHIRE COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32657 | $3,360,599.00 | $3,360,599.00 | No Liability Claim - Derivative |
| 53 | ORANGE CITY COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32649 | $1,651,400.00 | $1,651,400.00 | No Liability Claim - Derivative |
| 54 | PARKES SHIRE COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2008-11-24 | 867 | Undetermined | Undetermined | No Liability Claim - Derivative |

* - Indicates claim contains unliquidated and/or undetermined amounts

IN RE: LEHMAN BROTHERS HOLDINGS INC., ET AL., CASE NO. 08-13555 (JMP)

## OMNIBUS OBJECTION 417: EXHIBIT A - NO LIABILITY CLAIMS

| | NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | ASSERTED TOTAL CLAIM DOLLARS | AMOUNTS TO BE DISALLOWED | REASON FOR PROPOSED DISALLOWANCE |
|---|---|---|---|---|---|---|---|---|
| 55 | PITTWATER COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32648 | $2,163,334.00 | $2,163,334.00 | No Liability Claim - Derivative |
| 56 | PITTWATER COUNCIL | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 2009-09-22 | 32668 | $312,160.00 | $312,160.00 | No Liability Claim - Derivative |
| 57 | PORT MACQUARIE-HASTINGS COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32667 | $13,624,050.00 | $13,624,050.00 | No Liability Claim - Derivative |
| 58 | PORT MACQUARIE-HASTINGS COUNCIL | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 2010-02-19 | 66307 | $2,341,200.00 | $2,341,200.00 | No Liability Claim - Derivative |
| 59 | PORT STEPHENS COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2008-11-24 | 865 | Undetermined | Undetermined | No Liability Claim - Derivative |
| 60 | PRESCARE ABN 85338603114 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-09 | 11002 | $833,505.32 | $833,505.32 | No Liability Claim - Derivative |
| 61 | ROCK BUILDING SOCIETY LIMITED, THE - ABN 16 067 765 717 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32652 | $3,302,800.00 | $3,302,800.00 | No Liability Claim - Derivative |
| 62 | SHIRE OF AUGUSTA-MARGARET RIVER COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32654 | $1,279,835.00 | $1,279,835.00 | No Liability Claim - Derivative |
| 63 | SHIRE OF AUGUSTA-MARGARET RIVER COUNCIL | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 2009-09-22 | 32661 | $273,140.00 | $273,140.00 | No Liability Claim - Derivative |

* - Indicates claim contains unliquidated and/or undetermined amounts

IN RE: LEHMAN BROTHERS HOLDINGS INC., ET AL., CASE NO. 08-13555 (JMP)

OMNIBUS OBJECTION 417: EXHIBIT A - NO LIABILITY CLAIMS

| NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | ASSERTED TOTAL CLAIM DOLLARS | AMOUNTS TO BE DISALLOWED | REASON FOR PROPOSED DISALLOWANCE |
|---|---|---|---|---|---|---|---|
| 64 SUTHERLAND SHIRE COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32665 | $11,146,950.00 | $11,146,950.00 | No Liability Claim - Derivative |
| 65 TENTERFIELD SHIRE COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32656 | $2,477,100.00 | $2,477,100.00 | No Liability Claim - Derivative |
| 66 TENTERFIELD SHIRE COUNCIL | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 2009-09-22 | 32674 | $429,220.00 | $429,220.00 | No Liability Claim - Derivative |
| 67 TOWN OF KWINANA | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 2009-09-22 | 32675 | $1,053,540.00 | $1,053,540.00 | No Liability Claim - Derivative |
| 68 TOWN OF KWINANA | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32677 | $3,963,360.00 | $3,963,360.00 | No Liability Claim - Derivative |
| 69 TRUSTEES OF DE LA SALLE BROTHERS | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-15 | 13059 | $3,282,816.00 | $3,282,816.00 | No Liability Claim - Derivative |
| 70 TUMUT SHIRE COUNCIL & SNOWY WORKS & SVCS | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32651 | $2,840,408.00 | $2,840,408.00 | No Liability Claim - Derivative |
| 71 TUMUT SHIRE COUNCIL & SNOWY WORKS & SVCS | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 2009-09-22 | 32682 | $273,140.00 | $273,140.00 | No Liability Claim - Derivative |
| 72 URALLA SHIRE COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2008-11-24 | 859 | Undetermined | Undetermined | No Liability Claim - Derivative |

* - Indicates claim contains unliquidated and/or undetermined amounts

IN RE: LEHMAN BROTHERS HOLDINGS INC., ET AL., CASE NO: 08-13555 (JMP)

OMNIBUS OBJECTION 417: EXHIBIT A - NO LIABILITY CLAIMS

| | NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | ASSERTED TOTAL CLAIM DOLLARS | AMOUNTS TO BE DISALLOWED | REASON FOR PROPOSED DISALLOWANCE |
|---|---|---|---|---|---|---|---|---|
| 73 | WALCHA COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32662 | $1,073,410.00 | $1,073,410.00 | No Liability Claim - Derivative |
| 74 | WELLINGTON SHIRE COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32658 | $1,279,835.00 | $1,279,835.00 | No Liability Claim - Derivative |
| 75 | WELLINGTON SHIRE COUNCIL | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 2009-09-22 | 32685 | $351,180.00 | $351,180.00 | No Liability Claim - Derivative |
| 76 | WOOLLAHRA MUNICIPAL COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32680 | $7,307,445.00 | $7,307,445.00 | No Liability Claim - Derivative |
| 77 | WOOLLAHRA MUNICIPAL COUNCIL | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 2009-09-22 | 32683 | $1,386,085.00 | $1,386,085.00 | No Liability Claim - Derivative |
| 78 | YASS VALLEY COUNCIL | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 2009-09-22 | 32641 | $273,140.00 | $273,140.00 | No Liability Claim - Derivative |
| 79 | YASS VALLEY COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32655 | $2,109,110.38 | $2,109,110.38 | No Liability Claim - Derivative |
| | | | TOTAL | | | $188,277,267.99 | $188,277,267.99 | |

* - Indicates claim contains unliquidated and/or undetermined amounts

## EXHIBIT B

(Explanatory Statement)

# CLAYTON UTZ



# Explanatory Statement to the Scheme of Arrangement

Between

**LEHMAN BROTHERS AUSTRALIA LIMITED (In Liquidation)**

ACN 066 797 760

and its **SCHEME CREDITORS**

22 May 2013

**Clayton Utz**
Lawyers
1 Bligh Street  Sydney  NSW  2000  Australia
PO Box H3  Australia Square  Sydney  NSW  1215
T +61 2 9353 4000  F +61 2 8220 6700
www.claytonutz.com
Our reference 146/80128177

Stephen Parbery and Marcus Ayres
Liquidators - Lehman Brothers Australia Limited (in Liq)
PPB Advisory
Level 46, MLC Centre, 19 Martin Place
Sydney  NSW  2000  Australia
T +61 2 8116 3000  F+61 2 8116 3111

## Important notices and disclaimers

### General

Scheme Creditors should read this Explanatory Statement in its entirety before making a decision as to how to vote on the resolutions to be considered at the Scheme Meetings. If you are in any doubt as to how to deal with this Explanatory Statement, please consult your legal or financial advisor immediately.

### Purpose of this Explanatory Statement

The purpose of this Explanatory Statement is to explain the terms of the Scheme and its effect on Scheme Creditors. This Explanatory Statement has been provided in connection with the Scheme Meetings for consideration of the terms of the Scheme between LBA and its Scheme Creditors. All Scheme Meetings will commence at **11.00 am** (Sydney time) on **19 June 2013**. For further information on the Scheme Meetings, refer to Section 15.

### ASIC and the Court

A copy of this Explanatory Statement has been provided to ASIC for the purposes of its review and examination as required by section 412 of the Corporations Act. The Liquidators have asked ASIC to provide a statement, in accordance with section 411(17)(b) of the Corporations Act, that ASIC has no objection to the Scheme. If ASIC provides that statement, it will be produced to the Court at the time of the hearing on the Second Court Date. Neither ASIC nor any of its officers take any responsibility for the contents of this Explanatory Statement.

The Court has ordered the convening of the Scheme Meetings pursuant to section 411(1) of the Corporations Act. The fact that under section 411(1) of the Corporations Act the Court has ordered that meetings be convened and has approved this Explanatory Statement required to accompany the Notice of Meetings does not mean that the Court:

(a)     formed any view as to the merits of the Scheme or as to how Scheme Creditors should vote (on this matter, Scheme Creditors must reach their own decisions); or

(b)     has prepared, or is responsible for the content of, this Explanatory Statement.

### Responsibility statement

This Explanatory Statement has been prepared by the Liquidators solely for the use by each Scheme Creditor in evaluating whether or not to vote in favour of the Scheme. No other person has assumed responsibility for the accuracy or completeness of the information contained herein. Nothing in this Explanatory Statement is, or should be relied upon as, an assurance or guarantee as to the benefits of the Scheme over any alternative for Scheme Creditors.

### No professional advice

This Explanatory Statement does not constitute financial product advice and has been prepared without reference to the investment objectives, financial situation, taxation position or particular needs of Scheme Creditors.

Scheme Creditors should not construe any statement made in this Explanatory Statement as investment, tax or legal advice. Each Scheme Creditor's decision on whether to vote for or against the Scheme will depend on an assessment of the Scheme Creditor's individual circumstances. As the financial, legal and taxation consequences of that decision may be different for each Scheme Creditor, it is recommended that Scheme Creditors seek professional financial, legal and taxation advice before making their decisions.

### Forward looking statements

Certain statements in this Explanatory Statement relate to the future. Such statements involve known and unknown risks, uncertainties, assumptions and other important factors that could cause actual events to unfold differently from the forecast results, predictions or estimates expressed or implied by such statements. These

statements reflect views only at the date of this Explanatory Statement.  Given this, Scheme Creditors are cautioned not to place undue reliance on such forward looking statements.

**Notice to Scheme Creditors in jurisdictions outside Australia**
This Explanatory Statement complies with the disclosure requirements applicable in Australia, which may be different to those in other countries.

**Rounding**
A number of figures, amounts, percentages, estimates, calculations of values and fractions in this Explanatory Statement are subject to the effect of rounding.  Accordingly, the actual calculation of these figures may differ from the figures set out.

**Interpretation and defined terms**
Capitalised terms and certain abbreviations used in this Explanatory Statement have the defined meaning set out in the Glossary to this Explanatory Statement.  The documents contained in the appendices to this Explanatory Statement have their own defined terms that may be different from the definitions in the Glossary.

**Privacy and personal information**
The Liquidators and LBA may collect, use and disclose personal information in the process of convening the Scheme Meetings and implementing the Scheme.  This information may include the names, contact details and bank account details of Scheme Creditors and the names and contact details of persons appointed by Scheme Creditors to act as proxies or corporate representatives at Scheme Meetings.

The primary purpose of collecting this information is to assist the Liquidators and LBA in the conduct of the Scheme Meetings and to enable the Scheme to be implemented by the Scheme Administrators in the manner described in this Explanatory Statement.  Personal information may be disclosed to the Registry, other third party service providers, professional advisors to the Liquidators, the Liquidators and PPB Advisory, to ASIC and other regulatory authorities and, in any case, where disclosure is required by law or where Scheme Creditors have consented to that disclosure.

Scheme Creditors who are individuals and the other individuals in respect of whom personal information is collected as outlined above have certain rights to access the personal information that has been collected in relation to them.  Such individuals should contact the Registry in the first instance if they wish to exercise these rights.

The main consequence of not collecting such information would be that the Liquidators and LBA may be hindered in, or prevented from, conducting the Scheme Meetings and implementing the Scheme.

A Scheme Creditor appointing a proxy or a corporate representative should ensure that these matters are communicated to that person.

**Date of this Explanatory Statement**
This Explanatory Statement is dated 22 May 2013.

# Contents

Important dates ...................................................................................................7

Overview of this Explanatory Statement and the Scheme ....................................8

What you should do next.....................................................................................10

Frequently asked questions ...............................................................................12

1.      Background.............................................................................................15
        1.1     Overview of Lehman Brothers Australia Limited..........................15
        1.2     Voluntary administration and liquidation of LBA .........................15
        1.3     Purpose of the Scheme ..............................................................15

2.      Assets and liabilities of LBA .................................................................17
        2.1     Position statement of LBA ..........................................................17
        2.2     Details of assets ........................................................................18
        2.3     Details of contingent assets .......................................................21
        2.4     Details of liabilities ....................................................................33

3.      Litigation ...............................................................................................36
        3.1     Overview of litigation..................................................................36
        3.2     Wingecarribee Action and the associated appeal.......................36
        3.3     US Bankruptcy Court ..................................................................38

4.      Claims Resolution Process ...................................................................40
        4.1     Introduction ...............................................................................40
        4.2     Part A - review and assessment by Scheme Administrators .......41
        4.3     CRP claims assessment and adjudication timetable ...................41
        4.4     Part B - claim adjudication - introduction ...................................41
        4.5     Part B - Section 4 - liability guidelines for Claim CDOs .............42
        4.6     Part B - Section 5 - rules for assessing quantum for Claim CDOs .............46

5.      Implications of the Scheme not proceeding ........................................50
        5.1     Insurance implications ...............................................................50
        5.2     Other implications ......................................................................51

6.      Estimate of dividends under the Scheme and the liquidation .............51
        6.1     Background financial information.................................................51
        6.2     Estimate of dividends under the Scheme ...................................52
        6.3     Estimate of dividends in the liquidation of LBA (without the
                Scheme) ....................................................................................55
        6.4     Comparison of outcomes under the Scheme with outcomes in
                the liquidation (without the Scheme)...........................................58

7.      Why you should vote in favour of the Scheme.....................................59

8.      Why you may consider voting against the Scheme...............................61

9.      Operation of the Scheme ......................................................................63
        9.1     What is a scheme of arrangement?.............................................63
        9.2     Parties, participation and application ..........................................63
        9.3     Purposes and conditions precedent ............................................64
        9.4     Authority of the Liquidators to execute release deeds................64

| | 9.5 | Releases and discontinuance of proceedings | 64 |
| | 9.6 | Trade Creditors | 65 |
| | 9.7 | Claims and adjudication procedure | 65 |
| | 9.8 | Dividend funds and payments | 65 |
| | 9.9 | Scheme Administrators and Independent Adjudicators | 65 |
| | 9.10 | Creditors' Committee | 66 |
| | 9.11 | Meetings of Scheme Creditors | 66 |
| | 9.12 | Termination of the Scheme | 66 |
| | 9.13 | Modification of the Scheme | 66 |
| | 9.14 | Notices | 67 |
| **10.** | **Effect of the Scheme** | | **67** |
| | 10.1 | Payment by the US Insurers | 67 |
| | 10.2 | Payment by QBE | 67 |
| | 10.3 | Continuation of the liquidation | 67 |
| | 10.4 | Scheme Administrators | 67 |
| | 10.5 | Distributions to Scheme Creditors | 68 |
| | 10.6 | Releases of the US Insurer Parties | 68 |
| | 10.7 | Release of the US Broker | 69 |
| | 10.8 | Release of QBE | 69 |
| | 10.9 | Release of LB Asia Holdings | 69 |
| | 10.10 | Relinquishment of claims and release of the Liquidators | 69 |
| | 10.11 | Disposal of proceedings | 70 |
| | 10.12 | Consequences of a breach of the release deeds | 70 |
| | 10.13 | Independent Adjudicators | 71 |
| **11.** | **Scheme Claims and adjudication procedure** | | **71** |
| | 11.1 | Claims Period | 71 |
| | 11.2 | Completing Final Scheme Proof | 72 |
| | 11.3 | Agreement of Final Scheme Proofs of Client Creditors | 72 |
| | 11.4 | Adjudication of claims of Client Creditors | 72 |
| | 11.5 | Adjudication risk | 73 |
| | 11.6 | Notification of Established Scheme Claims and payment of dividends | 73 |
| | 11.7 | Appeal | 73 |
| **12.** | **Payment of dividends** | | **74** |
| | 12.1 | Dividend funds | 74 |
| | 12.2 | Insurance Proceeds Fund | 74 |
| | 12.3 | General Scheme Fund | 74 |
| | 12.4 | Scheme Administrators may withhold dividends of defaulting Scheme Creditors | 75 |
| | 12.5 | Foreign Scheme Creditors | 75 |
| **13.** | **Initial Creditors' Committee** | | **76** |
| **14.** | **Information required by statute** | | **76** |
| | 14.1 | Material interests of directors | 76 |
| | 14.2 | Expected dividend if Scheme were put into effect as proposed | 77 |
| | 14.3 | Expected dividend if LBA were wound up in 6 months | 77 |
| | 14.4 | Names of all known creditors, guaranteed creditors and internal creditors and the debts owed to those creditors | 77 |
| | 14.5 | Copies of financial statements | 77 |

| | | |
|---|---|---|
| 14.6 | Financial report - ASIC Form 507 ........................................... | 78 |
| 14.7 | Obtaining a copy of LBA's register of Scheme Creditors ........................... | 78 |
| 14.8 | No endorsement ............................................................. | 79 |
| 14.9 | Schedule of Hourly Rates ................................................... | 79 |
| 14.10 | LBA as trustee ............................................................. | 79 |

**15.     Voting at the Scheme Meetings ............................................... 80**

| | | |
|---|---|---|
| 15.1 | General ............................................................... | 80 |
| 15.2 | Who is entitled to vote at the Scheme Meetings? ...................................... | 80 |
| 15.3 | Classes of Scheme Creditors for voting on the Scheme ........................... | 80 |
| 15.4 | Items of business at the Scheme Meetings .................................. | 81 |
| 15.5 | Voting Proof of Debt Forms ................................................. | 81 |
| 15.6 | Voting in person or by proxy .............................................. | 83 |
| 15.7 | Modification of the terms of the Scheme ....................................... | 83 |
| 15.8 | Appeals against the decisions on claims for voting purposes ..................... | 83 |
| 15.9 | Notices, documents or questions .............................................. | 83 |

**Glossary ............................................................................ 84**

**Appendix 1 - Scheme of Arrangement ................................................. 98**

**Appendix 2 - Notice of Meetings .................................................... 226**

**Appendix 3 - Schedule of Insurance Policies ......................................... 229**

**Appendix 4 - CRP timeline .......................................................... 232**

**Appendix 5 - Comparison between Common Issues Orders and the CRP ....................... 234**

**Appendix 6 - Calculations and Assumptions for Dividend Estimates under the
Scheme and in the Liquidation of LBA ................................................. 246**

**Appendix 7 - Committee of Inspection ............................................... 259**

**Appendix 8 - Schedule of Scheme Administrators' hourly rates ....................... 260**

**Appendix 9 - Report as to the affairs of LBA (Form 507) ............................. 261**

**Appendix 10 - US Insurers' Agreement and Release ................................... 270**

**Appendix 11 - Mediator's statement (omitting annexures) ............................. 320**

**Appendix 12 - QBE Deed of Release .................................................. 326**

**Important dates**

| Event | Time and date |
|---|---|
| Time and date by which Proxy Forms, Voting Proof of Debt Forms and nomination forms for the Creditors' Committee should be lodged with the Registry by Scheme Creditors | **11.00 am on 17 June 2013** |
| Meetings of Scheme Creditors to approve the Scheme | **11.00 am** on **19 June 2013** |
| *If the Scheme is approved by Scheme Creditors:* | |
| Court hearing for approval of the Scheme (Scheme Creditors are entitled to appear at that Court hearing and object to the proposed Scheme if they wish to do so) | **27 June 2013** |
| *If the Scheme is approved by the Court:* | |
| Court orders are lodged with ASIC, immediately following which the Scheme takes effect | **28 June 2013** or, if later, the Business Day following the date the Court makes orders approving the Scheme |

**Note:** Unless otherwise stated, all times referred to in this Explanatory Statement and the documents contained in its appendices are Australian Eastern Standard Time (Sydney). The dates referred to in the above table are indicative only and are subject to change. The Liquidators reserve the right to vary the times and dates set out above, subject to the Corporations Act and approval of any variations by the Court and/or ASIC where required.

## Overview of this Explanatory Statement and the Scheme

### What is the purpose of this Explanatory Statement?

This Explanatory Statement contains information about the Scheme between LBA and its Scheme Creditors.  Its purpose is to explain the terms and effect of the proposed Scheme and to provide Scheme Creditors with important information to consider before voting on the Scheme at the Scheme Meetings. The Scheme Meetings will commence at **11.00 am** (Sydney time) on **19 June 2013** at the Sofitel Sydney Wentworth (Adelaide Room), 61-101 Phillip Street, Sydney, NSW.

### Purpose and key commercial terms of the Scheme

The purpose of the Scheme is to provide for or otherwise facilitate a compromise between Scheme Creditors, LBA, the US Insurers, QBE and LB Asia Holdings, so as to achieve a settlement of their LBA related claims and proceedings.

The key commercial terms of the Scheme include (amongst other things):

- the payment by the US Insurers of US$45 million (inclusive of GST, if any) to LBA for distribution to Client Creditors in accordance with the provisions of the Scheme;

- Client Creditors, LBA and the Liquidators will provide releases in favour of  the US Insurer Parties;

- the payment by QBE of $3 million (inclusive of GST, if any) to LBA for distribution to Client Creditors in accordance with the provisions of the Scheme;

- Client Creditors and LBA will provide releases in favour of QBE;

- the compromise by LB Asia Holdings of its claims against LBA;

- Client Creditors, LBA and the Liquidators will provide releases in favour of LB Asia Holdings;

- Trade Creditors will receive at least 75 cents in the dollar on the amount of their Established Scheme Claims;

- the Wingecarribee Action and the associated appeal will be dismissed or discontinued;

- a procedure is established, the CRP, for the independent adjudication of the claims of Client Creditors if the Scheme Administrators and any Client Creditor have not been able to agree on the amount of the Client Creditor's Scheme Claim; and

- Scheme Creditors will provide releases in favour of the Liquidators and accept their entitlements under the Scheme in full satisfaction of all claims which they have against LBA.

Generally speaking, a person will be considered a "**Scheme Creditor**" if the person has a claim against LBA (whether present or future, ascertained or contingent) in respect of an unsecured debt of, or an unsecured claim against, LBA, and the circumstances giving rise to such claim arose on or before 26 September 2008.

If approved by both Scheme Creditors and by the Court, the Scheme becomes Effective and will be implemented in addition to, not in replacement of, the liquidation of LBA.  The liquidation will continue.

Any Liquidator Recoveries will become part of the Scheme Assets available for distribution under the Scheme.  Scheme Creditors will not be entitled to any additional or separate distributions out of the liquidation.

**The Liquidators' recommendation**

The Liquidators recommend that Scheme Creditors **vote in favour of the Scheme**, as the Scheme:

- secures a substantial contribution from the US Insurers and QBE to the assets of LBA in the form of upfront payments;

- establishes an efficient procedure under the CRP for determining the claims of Client Creditors;

- facilitates a more cost-effective and expeditious distribution to Scheme Creditors than would be available in the winding up of LBA in the ordinary course; and

- is likely to provide a higher return for Scheme Creditors.

If the Scheme proceeds, Client Creditors will be required to relinquish any claims they may have against the US Insurer Parties, QBE and LB Asia Holdings.  The prospect of success of any individual Client Creditor's claims (if any) against the US Insurer Parties, QBE and LB Asia Holdings is a matter for each Client Creditor to consider.

A Scheme Creditor may form the view that, despite the potential uncertainty and cost of litigation, it would achieve a greater return by pursuing its claims (if any) against the US Insurer Parties, QBE or LB Asia Holdings without the Scheme.  Scheme Creditors should obtain independent legal, financial, taxation and other professional advice in relation to those issues and should read this Explanatory Statement for further information.

Scheme Creditors are not obliged to follow the recommendation of the Liquidators and may decide to vote against the Scheme.

For further details regarding the advantages and disadvantages of the Scheme, refer to Section 7 "Why you should vote in favour of the Scheme" and Section 8 "Why you may consider voting against the Scheme".

## What you should do next

**Read this Explanatory Statement**

Scheme Creditors should carefully read and consider the information in this Explanatory Statement to help them make a decision on how to vote at the Scheme Meetings.

**Consider voting at the Scheme Meetings**

Scheme Creditors who wish to vote on the Scheme may do so:

- by proxy; or

- in person, by attending the Scheme Meetings.

The Scheme Meetings will commence at **11.00 am** (Sydney time) on **19 June 2013** at the Sofitel Sydney Wentworth (Adelaide Room), 61-101 Phillip Street, Sydney, NSW.

To be eligible to vote, Scheme Creditors should ensure that they lodge their duly completed Voting Proof of Debt Form and, if they wish to vote by proxy, their duly completed Proxy Form, in accordance with the instructions on the forms, so that the forms are received by the Registry no later than **11.00 am** (Sydney time) on **17 June 2013**.

The Proxy Form and Voting Proof of Debt Form, as well as a nomination form for the Creditors' Committee, were sent to each known Scheme Creditor together with this Explanatory Statement.  Scheme Creditors who have not received these documents should contact the Registry at:

> *Link Market Services Limited*
> **Address**: Locked Bag A14, Sydney South NSW 1235
> **Ph**: 1300 660 106 (if dialled from within Australia)
> **Ph**: +61 1300 660 106 (if dialled from outside of Australia)
> **Email**: lehman@linkmarketservices.com.au

For voting purposes only, the value of each Scheme Creditor's claim will be determined by the Chairman of the Scheme Meetings having regard to information provided by the Scheme Creditor in its Voting Proof of Debt Form.  Further details of the procedure for admitting Scheme Creditors to vote at the Scheme Meetings are provided in Section 15 "Voting at the Scheme Meetings".

Scheme Creditors who do not vote at the Scheme Meetings or who vote against the Scheme will still be bound by the Scheme and will still have their claims determined under the Scheme, provided that the Scheme is approved by the requisite majority of each class of Scheme Creditors and by the Court.

**Questions**

If you have any questions in relation to the Scheme, you may:

- visit the Liquidators' website at www.ppbadvisory.com;

- direct your questions in writing or by email to the Registry at:

> *Link Market Services Limited*
> **Address**: Locked Bag A14, Sydney South NSW 1235
> **Email**: lehman@linkmarketservices.com.au

- telephone the Registry on 1300 660 106 (if dialled from within Australia) or +61 1300 660 106 (if dialled from outside of Australia) between 9.00 am and 5.00 pm (Sydney time), Monday to Friday.

Similarly, if you have any questions in relation to the lodgement of Proxy Forms, Voting Proof of Debt Forms or nomination forms for the Creditors' Committee, you should also contact the Registry, the contact details of which are set out above.

As the financial, legal and taxation consequences of the Scheme may be different for each Scheme Creditor, it is recommended that Scheme Creditors seek professional financial, legal and taxation advice in relation to the Scheme.

## Frequently asked questions

This Section answers some fundamental questions you may have about the Scheme.  It is not intended to address all relevant issues.  It should be read together with all other Sections of this Explanatory Statement.

| | |
|---|---|
| **What is the Scheme?** | The Scheme is a scheme of arrangement to effect a compromise between LBA and its Scheme Creditors. |
| | If the Scheme proceeds, the claims by Client Creditors will be determined and admitted in accordance with the CRP outlined in Section 4 and the US Insurers and QBE will be obliged to pay US$45 million and $3 million respectively to LBA for distribution to Client Creditors in accordance with the Scheme. |
| | It is a condition of both the payment of US$45 million by the US Insurers and the payment of $3 million by QBE that the Scheme be approved.  Client Creditors and LBA will provide releases in favour of each of the US Insurer Parties and QBE. |
| | Claims by Scheme Creditors (other than Client Creditors) will be determined and established in accordance with the procedure outlined in Section 11. |
| | The Scheme also provides for a release by Client Creditors, LBA and the Liquidators in favour of LB Asia Holdings. |
| **When and where are the Scheme Meetings to be held?** | The Scheme Meetings will commence at **11.00 am** (Sydney time) on **19 June 2013** at the Sofitel Sydney Wentworth (Adelaide Room), 61-101 Phillip Street, Sydney, NSW.  For further details of the Scheme Meetings, see Section 15 and the Notice of Meetings in **Appendix 2**. |
| **What are the classes into which Scheme Creditors will be divided?** | For the purposes of the Scheme Meetings (including voting), Scheme Creditors will be divided into the following classes: |
| | • Client Creditors.  This includes the Applicants, the Group Members and any other creditor of LBA who has a Scheme Claim arising from: |
| | • the provision by LBA of investment advice or investment management services in respect of the acquisition of an investment product; |
| | • any alleged representation by LBA in relation to an investment product or investment management services offered by LBA; or |
| | • the sale by LBA of an investment product; |
| | • Trade Creditors.  All trade creditors of LBA (being the suppliers of goods and services to LBA); |
| | • Released Related Party Creditor, being LB Asia Holdings, a company that is related to LBA and which will receive a release under the Scheme; |
| | • Subordinated Creditor, being LBA Granica, whose claims against LBA have been subordinated in accordance with a subordination deed dated 7 March 2007 between LBA Granica, LBA and ASX Limited; and |
| | • All other Scheme Creditors.  This includes all other creditors of LBA who are not Client Creditors, Trade Creditors, the Released Related Party Creditor or |

| | the Subordinated Creditor. |
|---|---|
| **Why are there different classes of Scheme Creditors who vote separately on the Scheme?** | In making its orders under section 411(1) of the Corporations Act to convene the Scheme Meetings to vote upon the proposed Scheme, the Court decided that the Scheme Creditors fall into 5 distinct classes, whose rights in respect of, or arising from, the proposed Scheme are sufficiently different that they ought to vote on the Scheme separately. |
| **What voting majority is required to approve the Scheme?** | The Scheme will only proceed if:<br><br>• it is approved by the requisite majority of the Scheme Creditors at the Scheme Meetings; and<br><br>• it is approved by the Court on or after the Second Court Date (expected to commence on 27 June 2013).<br><br>The Scheme must be agreed to by a majority in number of each class of Scheme Creditors who are present and voting at the Scheme Meeting (either in person, by proxy or, in the case of corporations, by authorised corporate representative) and whose debts or claims amount in aggregate to at least 75% of the total amount of the debts and claims of the relevant class of Scheme Creditors present and voting at the Scheme Meeting. |
| **How will claims be valued for voting purposes?** | In order to be eligible to vote at the Scheme Meetings, Scheme Creditors should ensure that they lodge their Voting Proof of Debt Forms and, if they wish to vote by proxy, their Proxy Forms, so that the forms are received by the Registry by **11.00 am** (Sydney time) on **17 June 2013**.<br><br>For voting purposes only, the Chairman of the Scheme Meetings will make a "just estimate" of each Scheme Creditor's claims against LBA, where the Corporations Regulations so require.<br><br>For further details, refer to Section 15 of this Explanatory Statement. |
| **Is voting compulsory?** | Voting is not compulsory.  However, the Liquidators recommend that Scheme Creditors vote in favour of the Scheme. |
| **What happens if I do not vote or if I vote against the Scheme?** | If you do not vote at the Scheme Meetings or if you vote against the Scheme you will still be bound by the Scheme and you will still be entitled to have your Scheme Claim determined under the Scheme, provided that the Scheme is approved by the requisite majority of each class of Scheme Creditors and by the Court. |
| **What if I cannot attend the Scheme Meetings?** | If you cannot attend the Scheme Meetings in person, you may complete and return your Proxy Form and Voting Proof of Debt Form in accordance with the instructions on the forms. |
| **What happens if the Scheme is not approved?** | If the Scheme does not proceed, the liquidation of LBA will continue without the Scheme.<br><br>For further details of the implications of the Scheme not proceeding, refer to Section 5. |
| **Who will administer the Scheme?** | The Liquidators and Christopher Clarke Hill will be the Scheme Administrators for the Scheme, having obtained the leave of the Court under section 411(7) of the Corporations Act. |

| | |
|---|---|
| **Do I have a right to appeal a decision by a Scheme Administrator?** | A Scheme Creditor who is aggrieved by any act, omission or decision of a Scheme Administrator may appeal to the Court under section 1321 of the Corporations Act. |
| **How much will creditors be paid and when if the Scheme proceeds?** | Trade Creditors will receive at least 75 cents in the dollar on the amount of their Established Scheme Claims.<br><br>Based on the assumptions set out in Section 6.2, it is anticipated that:<br><br>(a)  Client Creditors should receive a dividend of 40.7 to 49.9 cents in the dollar on the amount of their Established Scheme Claims;<br><br>(b)  Other Creditors should receive a dividend of 35.2 to 44.7 cents in the dollar on the amount of their Established Scheme Claims; and<br><br>(c)  the Subordinated Creditor will not receive a dividend.<br><br>It is anticipated that the Scheme Administrators will be in a position to pay:<br><br>(a)  a dividend to Trade Creditors within 3 months of the Effective Date; and<br><br>(b)  at least an interim dividend to Client Creditors and Other Creditors within 5 months of the Effective Date.<br><br>However, the timing of the payments to Scheme Creditors (other than Trade Creditors) may be delayed if, for example, a significant number of Client Creditors seek a determination of their Scheme Claims by an Independent Adjudicator. |
| **What dividend will creditors receive in the liquidation of LBA if the Scheme does not proceed?** | Based on the assumptions set out in Section 6.3, the Liquidators estimate that all creditors of LBA (save for the Subordinated Creditor) will receive a dividend of 33.2 to 41.6 cents in the dollar on the amount of their admitted claims. |
| **Who can help answer my questions about the Scheme?** | If you have any questions about the Scheme, please direct them to the Registry by email to lehman@linkmarketservices.com.au or telephone the Registry on 1300 660 106 (if dialled from within Australia) or +61 1300 660 106 (if dialled from outside of Australia) between 9.00 am and 5.00 pm (Sydney time), Monday to Friday. |

# 1.    Background

## 1.1    Overview of Lehman Brothers Australia Limited

LBA, formerly known as Grange, carried on investment banking, securities broking, capital raising and funds management activities within the Australian fixed income and equities markets.

In January 2007, LBA Granica contracted to purchase 100% of the issued capital of Grange. That transaction was completed in March 2007.  On 3 December 2007, Grange changed its name to "Lehman Brothers Australia Limited".

The international Lehman Brothers group of companies was headquartered in New York, with regional headquarters in London and Tokyo.  The Australian Lehman Brothers group was part of the broader South East Asia Lehman Brothers group.  LBA was reliant on funding lines from LB Asia Holdings.  Both LBA and LB Asia Holdings were ultimately controlled by LBHI.

LBA was also the trustee of an investment unit trust governed by Australian law, the GCT, and derived fees from its position as trustee.

## 1.2    Voluntary administration and liquidation of LBA

On 15 September 2008, LBHI filed for Chapter 11 bankruptcy protection in the US Bankruptcy Court.  On 19 September 2008, representatives of KPMG in Hong Kong were appointed as the provisional liquidators of LB Asia Holdings.

On 26 September 2008, Stephen James Parbery and Neil Geoffrey Singleton of PPB Advisory were appointed as voluntary administrators of LBA (and a number of its related entities in Australia).

At the adjourned second meeting of creditors on 28 May 2009, the majority of creditors in number and value voted in favour of LBA executing a DOCA.  The DOCA was executed on 12 June 2009, but its validity was later challenged in proceedings commenced in the Court (proceedings NSD 538 of 2009).  On 25 September 2009, the Full Court determined that the DOCA was void and of no effect.

On 2 October 2009, the Court ordered that LBA be wound up.  Messrs Parbery and Singleton were appointed as liquidators of LBA.  On 14 April 2011, Marcus William Ayres of PPB Advisory replaced Neil Singleton as one of the liquidators of LBA.

## 1.3    Purpose of the Scheme

Against the background of:

- the mediation between LBA and the US Insurers and the settlement which resulted from that mediation;

- the mediation and further settlement discussions between LBA and QBE and the settlement which resulted from that process; and

- the potential costs associated with the continuation of the Wingecarribee Action and the consequent delays and impediments to the finalisation of the liquidation,

the Liquidators have propounded the Scheme for the purposes of:

- securing the payment of US$45 million by the US Insurers to LBA for distribution to Client Creditors;

- securing the payment of $3 million by QBE to LBA for distribution to Client Creditors;

- establishing an efficient and cost-effective procedure under the CRP for determining the claims of Client Creditors;

- disposing of the Wingecarribee Action and other legal proceedings so as to achieve significant savings in legal and other costs for LBA's estate; and

- facilitating an earlier distribution to Scheme Creditors than would be available in the winding up of LBA in the ordinary course.

[*The balance of this page has been left blank intentionally.*]

# 2. Assets and liabilities of LBA

## 2.1 Position statement of LBA

As at 15 March 2013, the asset and liability position of LBA is as follows:

| $'000 | Ref | Low case | High case |
|---|---|---|---|
| **Assets** | | | |
| Cash at bank (net of funds held on trust for others) | 2.2(a) | 170,260 | 170,260 |
| Related Party Debtors | 2.2(b) | 78,561 | 84,415 |
| Stock | 2.2(c) | 9,600 | 9,600 |
| Other assets | 2.2(d) | - | - |
| **Total assets** | | **258,421** | **264,275** |
| **Contingent assets** | | | |
| Recoveries from US Insurers (after certain costs) (Note 1) | 2.3(c) | 34,020 | 34,020 |
| Reimbursement of costs incurred in recovering US Settlement Payment | 2.3(c) | 4,450 | 4,450 |
| Recoveries from QBE | 2.3(d) | 3,000 | 3,000 |
| Recoveries from Lion Capital | 2.3(a) | - | - |
| Recoveries from LB Asia (November 2012 Claims) | 2.3(a) | - | - |
| **Total recoveries from contingent assets** | | **41,470** | **41,470** |
| **Total assets** | | **299,891** | **305,745** |
| **Costs** | | | |
| Applicants' costs | | (8,500) | (6,000) |
| Unbilled costs to date and estimated costs to Effective Date | | (2,575) | (2,575) |
| Costs to administer scheme and liquidation | | (8,100) | (5,800) |
| **Total costs** | | **(19,175)** | **(14,375)** |
| **Net assets after priority costs** | | **280,716** | **291,370** |
| **Creditors** | | | |
| Trade Creditors | 2.4(a) | (7,900) | (7,900) |
| Related Party Creditors (not including LBA Granica) | 2.4(b) | (146,000) | (146,000) |
| Client Creditors | 2.4(d) | (495,055) | (441,233) |
| Others | | (2,371) | (206) |
| **Total creditors** | | **(651,326)** | **(595,339)** |
| **Contingent liabilities** | | | |
| Proceeds of the Federation Notes which are the subject of litigation in the US Bankruptcy Court | 2.4(c) | (20,800) | - |
| **Total contingent liabilities** | | **(20,800)** | **-** |
| | | | |
| **Net surplus / (deficiency)** | | **(391,410)** | **(303,969)** |
| | | | |
| **Subordinated Creditor** | | **(87,494)** | **(87,494)** |
| | | | |
| **Total net surplus / (deficiency)** | | **(478,904)** | **(391,463)** |

**Note 1**
Calculated as: the US Settlement Payment of US$45 million divided by 1.0713 USD/AUD (exchange rate as at 15 March 2013), which converts to A$42 million, less $4.45 million in respect of expenses of or incidental to the recovery of the US Settlement Payment and the payment to the Applicants as a contribution to the amount due by the Applicants to IMF ($3.535 million)

## 2.2      Details of assets

(a)          **Cash at bank**

LBA currently holds approximately $178 million in cash in various term deposits and cash accounts.  Of this amount, the Liquidators are holding approximately $8 million on trust for other entities including LBIE.

The cash at hand includes $20.8 million in proceeds realised from the sale of the collateral underlying the Federation Notes, which are the subject of litigation in the US Bankruptcy Court.  For further information on this litigation, refer to Section 3.3.

(b)          **Related Party Debtors**

The Liquidators, on behalf of LBA, have made (or foreshadowed) claims against nine Related Party Debtors.  The key Related Party Debtors are:

- LBA Finance, of which the Liquidators are also deed administrators;

- LBA Holdings, of which the Liquidators are also deed administrators;

- LB Asia;

- LBIE;

- LBSF; and

- LBTC.

The total value of claims made against the Related Party Debtors is estimated by the Liquidators to be between $78.6 million and $84.4 million, the breakdown of which is set out in the table below:

| $'000 | Ref | Low case | High case |
|---|---|---|---|
| LBA Finance | 2.2(b)(i) | 25,506 | 26,661 |
| LBA Holdings | 2.2(b)(i) | 9,304 | 9,456 |
| LB Asia | 2.2(b)(ii) | 2,230 | 4,460 |
| LBIE | 2.2(b)(iii) | 39,767 | 42,080 |
| LBSF | 2.2(b)(iv) | 112 | 116 |
| LBTC | 2.2(b)(v) | 1,642 | 1,642 |
| **Total Related Parties Debtors** | | **78,561** | **84,415** |

(i)          *LBA Finance and LBA Holdings*

The Liquidators, on behalf of LBA, have lodged proofs of debt with the deed administrators of each of LBA Finance and LBA Holdings.

On 28 January 2010, LBA received an interim distribution from LBA Finance in the amount of approximately $2.4 million.  The Liquidators expect to receive a further and final distribution from the deed administrators of LBA Finance in an amount of between $25.5 million and $26.7 million.

So far as LBA Holdings is concerned, the Liquidators expect to receive a final distribution from the deed administrators of that company in the amount of between $9.3 million and $9.5 million.

(ii)     *LB Asia*

The Liquidators, on behalf of LBA, lodged proofs of debt with the liquidators of LB Asia on:

- 6 February 2009, for approximately $6.9 million in respect of intercompany accounts.  The Liquidators estimate that the return on this claim against LB Asia will be between $2.2 million and $4.5 million; and

- 20 November 2012, for approximately $119.7 million in respect of claims arising out of information communicated by LB Asia to LBA in relation to the marketing of investment products issued by various members of the Lehman Brothers group.  For further information on LBA's November 2012 Claims, refer to Section 2.3(a).

(iii)     *LBIE*

The Liquidators, on behalf of LBA, have advanced two claims against LBIE.

First, on 31 July 2012, the Liquidators lodged a proof of debt in respect of five foreign currency bonds which the Liquidators contend were held by LBIE on behalf of LBA.  These bonds have a value of approximately $57.3 million according to the Liquidators' estimate.

The value of this claim is likely to be set off against the intercompany debts owed by LBA to LBIE, the amount of some foreign currency bonds held by LBA on behalf of LBIE, some failed trades and certain house assets, resulting in a net intercompany position of £24.9 million (which converts to approximately $53.8 million as at 15 September 2008) in favour of LBA.  The Liquidators estimate that the return on LBA's claim against LBIE will be between $39.8 million and $42.1 million.

Secondly, on 31 July 2012, the Liquidators, on behalf of LBA as trustee of the GCT, lodged a proof of debt, asserting:

- a proprietary claim in respect of certain investment notes issued by Anthracite Investments (Cayman) Limited, which were acquired by LBA in its capacity as trustee of the GCT.  These notes were transferred by LBA, as trustee of the GCT, to LBIE, and were subsequently dissipated by LBIE.  The Liquidators have estimated the value of this claim to be approximately $9.5 million, being the value of the notes as at the date of their transfer to LBIE; and

- a claim for damages for breach of trust, costs and expenses in the event that the proprietary claim fails, in order to reserve LBA's rights to an unsecured distribution.

The Liquidators estimate that the value of this claim is approximately $7.3 million. The difference between the amount claimed in July 2012 and the expected return on the claim is due to fluctuations in foreign exchange rates between 15 September 2008 (the date on which LBIE entered into external administration) and 15 March 2013 (the date by reference to which the relevant calculations for this estimate are made). The Liquidators have not taken this $7.3 million into account when calculating LBA's asset position, as any recovery made on this claim will be held on trust for the GCT Beneficiaries.

(iv)     *LBSF*

The Liquidators have made a number of claims against LBSF for losses arising out of intercompany transactions. The total amount claimed by LBA as against LBSF is US$443,000. The Liquidators estimate that the return on this claim will be between $112,000 and $116,000.

(v)      *LBTC*

LBA currently holds two LB Treasury Notes, being Australian dollar denominated bonds issued by LBTC and guaranteed by LBHI. The LB Treasury Notes defaulted on 8 October 2008. The Liquidators have filed claims against both the issuer (LBTC) and the guarantor (LBHI) of the LB Treasury Notes for an amount of approximately $5.5 million, being the full value of the LB Treasury Notes held by LBA. The Liquidators estimate that the return on the claim against LBTC will be approximately $1.6 million.

For further information on LBA's claim against LBHI as the guarantor of the LB Treasury Notes, see Section 2.4(b)(v).

(vi)     *Other intercompany claims*

LBA has also lodged claims against other affiliates being Lehman Brothers Japan Inc., LBI and Lehman Brothers Asia Capital Limited. The Liquidators have estimated that the returns on these claims will be nil.

(c)      **Stock**

LBA holds Global Bank Note 2 Notes valued by the Liquidators at approximately $9.6 million.

(d)      **Other assets**

LBA has asserted a claim for US$5.6 million against LB Asia Holdings in relation to the Indonesian Money Dispute (a dispute between LBA and LB Asia Holdings in connection with LBA's acquisition of a 99% shareholding in an Indonesian company, PT Lehman Brothers Securities Indonesia).

An agreement has been reached between the parties in relation to the Indonesian Money Dispute, under which LB Asia Holdings has agreed that the amount of US$5.6 million will be set-off against (in reduction of) the amount of $105 million owing by LBA to that company. For further information, refer to Section 2.4(b)(i) below.

### 2.3        Details of contingent assets

(a)            **Non-insurance claims**

*LB Asia - November 2012 Claims*

As mentioned in Section 2.2(b)(ii) above, LBA made the November 2012 Claims against LB Asia for an amount of approximately $119.7 million.  Following the settlement in respect of the Dante Notes (for further information on this settlement, see Section 3.3 below), the quantum of this claim has been substantially reduced, but its residual value is uncertain.

Given that LBA's ability to pursue the claim will not be affected by the Scheme, this claim and its value are, in the Liquidators' opinion, not material to the question of whether the Scheme should proceed.  Given the uncertainty as to the value of this claim, the Liquidators have assumed no recovery on this claim in their calculation of LBA's asset position.

*Lion Capital - Blue Gum AA Notes*

Claims have been made against Lion Capital arising from the role of Lion Capital as portfolio manager for the investment product, Blue Gum AA Notes.  For reasons similar to those referred to above in relation to LB Asia, the Liquidators have assumed no recovery on these claims in their calculation of LBA's asset position.

(b)            **Overview of insurance claims**

LBA has made claims for indemnity on insurance policies issued:

- in the United States of America, by the US Insurers; and

- in Australia, by QBE,

for liability claims made or foreshadowed by Client Creditors.

A schedule of the policies identifying the limits and periods of cover provided by each individual policy is attached as **Appendix 3**.

The QBE PI Policies indemnify LBA against liability arising from breaches of professional duty in the provision of financial product advice and in dealing in financial products subject to the terms and conditions of the individual policies.

The US Insurance Policies indemnify LBA against liability arising from breaches of duty in the provision of investment advisory and investment management services subject to the terms and conditions of the individual policies.

The policies issued by US Insurers were issued to:

- LBI for the 2006/2007 policy year; and

- LBHI for the 2007/2008 policy year,

and in each case extend to certain other Lehman Brothers group companies.  The US Insurance Policies provide for an aggregate limit of indemnity of US$100 million (in excess of the QBE PI Policies) per policy year for all claims made in each of the 2006/2007 and 2007/2008 policy

years.  Claims on the US Insurance Policies are subject to a per claim deductible of US$3 million (again, in excess of the QBE PI Policies).

The first policy issued by QBE, the 2006/2007 QBE PI Policy, covers the 2006/2007 policy year and has a limit of $10 million in aggregate for all claims.  The second policy issued by QBE, the 2007/2008 QBE PI Policy, covers a period of three months in 2007/2008 and has a limit of $5 million in aggregate for all claims.  Claims on the QBE PI Policies are subject to a per claim deductible of $250,000.

QBE also issued LBA (then Grange) with a directors and officers liability policy, the QBE D&O Policy, which covers the 2006/2007 policy year (by endorsement with run-off cover from 7 March 2007 to 7 March 2013 for acts or omissions of LBA's directors and officers committed prior to 7 March 2007) and has a limit of $10 million in aggregate for all claims.

LBA first notified the US Insurers and QBE of certain of the liability claims by Client Creditors and of circumstances having the potential to lead to further claims by Client Creditors in the 2006/2007 policy year.  Each of the US Insurers and QBE rely upon a number of coverage exclusions, limitations and reservations to resist payment of LBA's claims for indemnity.

The Liquidators and QBE have agreed to settle LBA's claim on the QBE Insurance Policies for a sum of $3 million pursuant to the terms of the QBE Deed of Release.  The Liquidators have agreed with the US Insurers to settle LBA's claim on the US Insurance Policies for a sum of US$45 million pursuant to the terms of the US Insurers' Agreement and Release.  Further details of the Liquidators' engagement with the US Insurers and QBE and the status of those claims are set out in Sections 2.3(c) and 2.3(d) below.

(c)        **US Insurers**

The US Insurers assert that the US Insurance Policies issued by them are governed by New York law and that LBA must establish any entitlement to coverage in accordance with the principles of New York law.  The Liquidators consider that New York law is generally less favourable to an insured, such as LBA, making a claim under an insurance policy than the principles that regulate a claim governed by Australian law.

The US Insurers rely on a number of coverage reservations which, they say, entirely defeat LBA's claims for indemnity under both the 2006/2007 Policies and the 2007/2008 Policies.  Those reservations include reliance on exclusions under the US Insurance Policies which bar recovery for claims arising out of LBA's role as an underwriter, broker or dealer, and claims arising out of acts which, prior to commencement of the relevant policy of insurance, LBA could reasonably have foreseen might lead to claims, including a reverse warranty endorsement excluding claims where LBA had knowledge or information prior to 30 November 2005 of any facts or circumstances that might reasonably be expected to give rise to a claim.  In addition, the US Insurers assert that claims by Non-IMP Client Creditors are not insured under the policies as the policies only cover a claim if the claim arises from the provision of investment advisory or investment management services pursuant to a written contract between LBA and the Client Creditor.

As well as the general coverage reservations applying to both insurance years, eight of the US Insurers who subscribed to the program of cover for the 2006/2007 policy year dispute the extension of cover to LBA on the grounds that the US Broker failed to notify them of, or seek their consent to, the extension of cover to LBA.  The position taken by the eight US Insurers is potentially a complete defence to LBA's claim for indemnity from them under the 2006/2007

Policies.  The aggregate limit of cover provided by the eight US Insurers is US$75 million of the total combined aggregate limit of US$100 million.  In the event that the Scheme does not proceed, the Liquidators will take such steps as they are advised against the US Broker including pursuing a claim for breach of duty.  In this regard, the Liquidators and the US Broker have entered into a tolling agreement extending the limitation period, that is, the period of time in which LBA would have to commence proceedings pursuing the alleged breach of duty.

In relation to LBA's claim against the US Broker for alleged breach of duty, on the evidence currently available to the Liquidators, it appears that the New York office of the Lehman Brothers group notified the US Broker of the proposed acquisition of Grange (which was later renamed LBA) in February 2007, and subsequently instructed the US Broker to have Grange added by endorsement to the 2006/2007 Policies with cover to be in excess of Grange's existing insurance cover with QBE.  The quantum of any claim LBA has against the US Broker arising from the eight US insurers' denial of coverage on this basis is no greater than the amount LBA would otherwise have been entitled to recover under the eight excess insurance policies.  The Liquidators understand that the US Broker will rely on the same coverage reservations relied upon by the eight US insurers in defending any claim for breach of duty.  The US Broker will assert that LBA has no entitlement to indemnity under the 2006/2007 Policies and that it has no liability to LBA.

In addition to the general coverage reservations applying to both insurance years, the US Insurers assert that there is no cover available under the 2007/2008 Policies as all of the notified claims made by Client Creditors are related claims and are aggregated under the 2006/2007 Policies and therefore none of the claims by Client Creditors are insured under the 2007/2008 Policies.

Although the US Insurers rely on this as a basis for denying coverage under the 2007/2008 Policies, the beneficial effect of the US Insurers' position on aggregation is that only one deductible of US$3 million is payable for all Client Creditors' claims aggregated under the 2006/2007 Policies.  If the relatedness/aggregation position adopted by US Insurers is challenged there is the potential that the US Insurers will contend for the application of multiple deductibles (reducing the potential for recovery under any of the US Insurance Policies) including the potential that a US$3 million deductible is payable in respect of each claim by each Client Creditor.  In the event Client Creditors' claims are not related claims and are not capable of aggregation, analysis undertaken by the Liquidators prior to a mediation with US Insurers held in December 2011 suggests that only a small number of claims - totalling less than $30 million - would potentially be the subject of cover under the US Insurance Policies before any account is taken of the other coverage defences raised by the US Insurers.

*Engagement and mediation with US Insurers*

Since the commencement of the external administration of LBA the Liquidators have been engaging with the US Insurers with a view to complying with the terms of the US Insurance Policies and keeping the US Insurers informed in relation to the claims by Client Creditors, including the Wingecarribee Action.

That engagement culminated in a mediation between the Liquidators and the US Insurers conducted in New York on 12 December 2011 by retired US District Court Judge, the Honourable Judge Layn Phillips.

The Liquidators and US Insurers were able to reach agreement on non-monetary settlement terms during the course of the mediation. Those agreed terms included a condition that any settlement be incorporated into a scheme of arrangement, and that full releases be given by LBA in favour of the US Insurer Parties and the US Broker and that LBA's Client Creditors provide a release in favour of the US Insurer Parties. The Liquidators and the US Insurers were not able to reach agreement at the mediation on the amount of any settlement payment.

Following the mediation, and at the Mediator's suggestion, the Mediator provided the parties with his settlement recommendation. The Mediator recommended that the US Insurers settle LBA's claims for indemnity for an amount of US$45 million, subject to the non-monetary terms agreed at the mediation.

In considering the Mediator's settlement recommendation the Liquidators had regard to the following considerations:

- any litigation against the US Insurers and/or the US Broker would involve complex legal issues including jurisdictional issues and the application of New York law;

- any litigation against the US Insurers is likely to involve establishing cover for Client Creditors' claims on a claim-by-claim basis which in turn will involve time intensive factual investigation of individual claims;

- any litigation against the US Insurers is likely to involve proceedings against the US Broker;

- any litigation will most likely delay payment of dividends to Client Creditors and finalisation of the estate and may not produce a better outcome than the recommended settlement payment;

- litigation risks including the risk that LBA may not be successful in any court proceedings and may be liable not only for its own legal costs but (if proceedings were issued in Australia) also for the opponents' legal costs;

- the Mediator's proposal fell squarely within the Liquidators' assessment of an acceptable commercial settlement range having regard to the uncertainty and risks that exist for both LBA and the US Insurers and having regard to the fact that any claim against the US Broker was only worth as much as the value of the claim against the group of eight US Insurers had there been no dispute about the US Insurance Policies covering LBA;

- a commercial settlement with the US Insurers and the establishment of the Scheme is a significant benefit to Client Creditors in terms of certainty of outcome, and the minimisation of costs and delay generally in the administration of LBA's estate; and

- at the time, judgment had not been delivered in the Wingecarribee Action and there was a real risk, having regard to the claims made in that proceeding and the evidence given at the trial, that any judgment would include findings which supported the coverage reservations asserted by the US Insurers.

LBA and the US Insurers accepted the Mediator's settlement recommendation and entered into the US Insurers' Agreement and Release, a copy of which is attached at **Appendix 10**. Pursuant to section 477(2B) of the Corporations Act, LBA's committee of inspection approved

the Liquidators' entry into the US Insurers' Agreement and Release at a meeting held on 21 June 2012.

At the request of LBA and the US Insurers, the Mediator made a statement in relation to the mediation and his settlement recommendation.  A copy of the Mediator's statement dated 14 September 2012 (omitting the annexures which remain confidential to the parties to the mediation) is attached as **Appendix 11**.

At the time of accepting the Mediator's recommendation and entering into the US Insurers' Agreement and Release, the Liquidators considered that the settlement of the claim under the US Insurance Policies in accordance with that agreement was appropriate and reasonable having regard to the merits of the claim and the benefits and certainty provided by settling the claim compared with the risks discussed above if the claim were not settled.  Following the delivery of judgment in the Wingecarribee Action, this remains the Liquidators' view.  If the Scheme does not proceed and further engagement with the US Insurers and US Broker and/or the commencement of proceedings is necessary, the Liquidators expect that the US Insurers and US Broker will rely on factual findings in the Wingecarribee Action to support their coverage reservations and in particular the application of policy exclusions.  The Liquidators consider the settlement with the US Insurers is not only reasonable but advantageous to Client Creditors.

*US Settlement Payment*

Subject to certain contingencies being met, including the entry by LBA into a scheme of arrangement which effects the releases required by the US Insurers, the US Insurers' Agreement and Release obliges the US Insurers to make the following payments to LBA which in aggregate total US$45 million (inclusive of GST, if any):

| National Union | US$10,803,667 |
| Federal | US$4,327,000 |
| XL | US$4,322,000 |
| Arch | US$4,321,000 |
| Travelers | US$4,320,000 |
| Birmingham | US$4,569,000 |
| USSIC | US$4,313,000 |
| Ace | US$3,338,000 |
| Continental | US$3,253,000 |
| Axis Reinsurance | US$1,433,333 |

(The full names of the US Insurers are contained in the definition of "US Insurers" in the Glossary.)

*Preconditions to US Settlement Payment*

The obligations of the US Insurers to make the US Settlement Payment under the US Insurers' Agreement and Release is subject to satisfaction of the following contingencies:

| | |
|---|---|
| (i) | the approval of the making of the US Insurers' Agreement and Release in accordance with the Corporations Act; |
| (ii) | the entry of a final order in the US Bankruptcy Court approving the US Insurers' Agreement and Release; |
| (iii) | LBA, at the discretion of the Liquidators, either: |

- obtaining releases executed by LBI, LBHI and LBSF in favour of the US Insurers; or

- withdrawing the Proof Financial Products/Contribution Claim lodged in the bankruptcy of LBHI; and

| | |
|---|---|
| (iv) | the Scheme (or a similar scheme of arrangement which contains the requisite releases in favour of the US Insurer Parties) being approved by Scheme Creditors and by the Court. |

In relation to **contingency (i)**, LBA's committee of inspection has, as mentioned above, approved the US Insurers' Agreement and Release in accordance with section 477(2B) of the Corporations Act.

In relation to **contingency (ii)**, an order of the US Bankruptcy Court was required to approve the US Insurers' Agreement and Release, to authorise the releases to be given in accordance with the US Insurers' Agreement and Release and to modify the automatic stay imposed by the US Bankruptcy Code to allow payment under the US Insurance Policies.

An application seeking the US Bankruptcy Court's approval of the US Insurers' Agreement and Release was filed on behalf of LBA on 20 February 2013 and heard and granted by the US Bankruptcy Court on 13 March 2013.

In relation to **contingency (iii)**, LBA has filed a proof of claim in the bankruptcy of LBHI asserting, amongst others:

- the *Financial Products Claim*, being contingent and/or unliquidated legal claims arising out of CDOs and other financial products that were designed, promoted, marketed, issued or sold by LBHI and which were promoted, marketed and sold in Australia by LBA to LBA's clients; and

- the *Contribution Claim*, which is a contingent and/or unliquidated claim for contribution arising from any indemnities that may have been provided by both LBA and LBHI to LBA's directors and officers which cover any claims arising out of CDOs and other financial products brought by LBA's clients against those directors and officers.

The Proof Financial Products/Contribution Claim was prepared and filed on 30 October 2009 in a very short period of time as the Liquidators only learnt of the need to file the claim shortly before the bar date on 2 November 2009.

The value of the Financial Products Claim (approximately $1.193 billion) was based on the value of the claims made or expected to be made by Client Creditors against LBA at a time when the Liquidators did not have complete information about the value of the claims against LBA. In the time available, it was not practical for the Liquidators to conduct a detailed analysis of the value of the claims against it.

Where a proof of debt had been lodged by the Client Creditor against LBA, that component of the Financial Products Claim was valued by reference to the amount claimed in the proof of debt. A substantial number of those proofs of debt claimed an amount that was simply based on the face value of the financial products with no allowance for the market value of those products still held by the Client Creditor. This had the effect of significantly overvaluing that component of the Financial Products Claim as it was not practical for the Liquidators to adjust the amounts claimed in those proofs to take into account the then market values of the financial products. The amount of the Financial Products Claim that relates to those proofs of debt was $937.7 million.

Where no proof of debt was lodged by a Client Creditor, that component of the Financial Products Claim was calculated by reference to modelled values of the financial products for those potential claims by Client Creditors. At the time, monthly valuations of the financial products were obtained from an independent third party, and those valuations were used as the basis for the Liquidators' model. The amount of the Financial Products Claim that relates to those claims was $255.3 million.

In respect of the Contribution Claim, it was not possible to estimate the value of that potential claim because the claim would only arise if:

- a claim were made against the directors or officers of LBA (at the time the Proof Financial Products/Contribution Claim was filed no claim had been made against the directors or officers of LBA beyond indefinite assertions by certain LBA Client Creditors);

- LBA was liable to indemnify the directors or officers for that claim;

- LBHI was also liable to indemnify the directors or officers of LBA in respect of the claim; and

- LBA was entitled to contribution from LBHI in respect of any such mutual obligation to indemnify LBA's directors or officers.

The Financial Products Claim was based on various factual assumptions regarding LBHI's role in the design, promotion, marketing, issue and sales of the CDOs and other financial products which had been promoted, marketed and sold in Australia by LBA to LBA's clients.

The Liquidators have further investigated those factual assumptions since 30 October 2009. Following those investigations, the Liquidators have formed the view there is insufficient evidence (based on the information available to the Liquidators) to support the factual assumptions on which the claims were based. Accordingly, the Liquidators consider that any attempt by LBA to pursue the Financial Products Claim against LBHI lacks reasonable prospects of success.

The Contribution Claim was, as noted above, contingent upon a claim being made against the directors or officers of LBA and an assumption that LBA had a right of contribution from LBHI in respect of any indemnity obligation it had to its directors or officers. The Liquidators

have also reached the conclusion that the Contribution Claim has no reasonable prospect of success. This is for the reasons that the directors and officers of LBA do not appear to have been indemnified by LBA and were not parties to the Wingecarribee Action and, to the best of the Liquidators' knowledge, no person or entity has commenced proceedings against those directors or officers.

Further, in respect of the Financial Products Claim, irrespective of its merits, the value of this claim is substantially less than the amount originally claimed by reason of the fact that a major proportion of Client Creditors' loss occurred in the period prior to March 2007 when LBA became part of the Lehman Brothers group. Any liability of LBHI for loss incurred prior to March 2007 in respect of those Financial Products Claims arising from LBHI's negligence could only relate to CDOs originated and arranged by Lehman Brothers group companies. The Liquidators have formed the view that any claims against LBHI by LBA would have significantly lower prospects of success in respect of loss referrable to the period prior to March 2007 when LBA became part of the Lehman Brothers group.

In addition, a large proportion of the underlying claims by Client Creditors against LBA that were the basis of the Financial Products Claim related to the Dante Notes. Since 30 October 2009, there has been a settlement in respect of the Dante Notes (as described in Section 3.3 below). As a result of that settlement, and the fact that the Liquidators now have better information about the value of the claims by Client Creditors, the quantum of the Financial Products Claim has been substantially reduced from the initial amount of $1.193 billion and is now likely to be approximately $30 million plus any amount which may be paid to LBSF in the event that it is successful in its litigation concerning the Federation Notes. See Section 3.3 for further information in relation that litigation.

In view of these matters, the Liquidators propose to withdraw the Proof Financial Products/Contribution Claim immediately after the Release Date in satisfaction of contingency (iii).

The Scheme is the subject matter of **contingency (iv)**.

If the Scheme proceeds, the US Settlement Payment will be paid by the US Insurers within 30 days of LBA's written confirmation that the contingencies in the US Insurers' Agreement and Release have been met.

*Distribution of the US Settlement Payment*

The Scheme provides for the distribution of the US Settlement Payment, after deducting certain costs and expenses and a payment to the Applicants (as described in Section 12.2), to Client Creditors on a pari passu basis by reference to the Established Scheme Claim of each Client Creditor.

*Releases*

If the Scheme proceeds and upon receipt of the US Settlement Payment:

- LBA and the Liquidators will release the US Insurer Parties and the US Broker; and

- each of the Client Creditors will provide releases in favour of the US Insurer Parties.

Pursuant to clause 4.1 of the Scheme, each Client Creditor will appoint each of the Liquidators as its agent and attorney to do all things necessary to effect the release of the US Insurer Parties on its behalf as required by the terms of the US Insurers' Agreement and Release.

For further information on these releases, refer to Section 10.6.

*Direct claims against the US Insurers*

In correspondence and in written and oral submissions to the Court in the Wingecarribee Action, the Applicants assert a right to make a direct claim against the US Insurers under §3420 of the New York Insurance Code, subject to modification of the automatic stay imposed by the US Bankruptcy Code on claims in relation to assets of LBA that are situated in the United States. The Liquidators understand that where a number of liability claimants have competing claims to insurance coverage, under New York law, claimants will recover on a "first in time, first in right" basis, meaning that priority is determined by reference to when a claimant establishes liability against LBA by judgment or settlement.

As the Liquidators understand the application of New York law, if the Scheme does not proceed and the settlement with the US Insurers is terminated, and in the event that the Applicants, having obtained a damages judgment against LBA, proceed to make a direct claim against US Insurers, the Applicants will potentially obtain a priority over other Client Creditors for the amount of damages awarded in the Applicants' favour. The Liquidators understand that the Applicants and the Group Members have agreed to share the proceeds of any insurance recoveries between themselves but not with other Client Creditors. The Liquidators have not been provided with particulars of the agreement between these Client Creditors.

(d)     **QBE**

*QBE PI Policies*

Indemnity was initially sought under the 2006/2007 QBE PI Policy for seven claims settled by LBA prior to the appointment of voluntary administrators on 26 September 2008. In addition to the settled claims, LBA subsequently sought indemnity under the 2006/2007 QBE PI Policy for the Client Creditors' claims.

QBE maintains that a number of exclusions under the policy operate to completely defeat LBA's claims for indemnity. For the claims which were settled by LBA prior to the Liquidators' appointment, QBE relies on LBA's failure to obtain QBE's consent to the settlements and, for all claims, QBE relies on the application of various exclusions including a conflict of interest exclusion and LBA's allegedly conflicted role in acting as buyer and seller of CDOs and underwriter of CDOs.

Although LBA reserved its rights generally under the 2007/2008 QBE PI Policy, LBA principally pressed indemnity under the 2007/2008 QBE PI Policy for a claim commenced by Mr and Mrs Parker in the Supreme Court of Queensland seeking damages of $3.3 million plus interest and costs. This is the claim identified by the Liquidators as most likely to be the subject of cover under the 2007/2008 QBE PI Policy. QBE maintains that the claim falls within the circumstances notified under the 2006/2007 QBE PI Policy and that the claim is excluded from cover under the 2007/2008 QBE PI Policy for that reason as well as the application of the conflict exclusion and other exclusions applying under the 2007/2008 QBE PI Policy.

QBE maintains that LBA faces significant impediments in establishing any entitlement to indemnity under the QBE PI Policies including by reason of certain policy exclusions and alleged non-disclosure by LBA.  The policies contain exclusions which bar recovery for (amongst other things):

- claims based upon a conflict of interest.  QBE relies upon LBA's allegedly conflicted role as buyer and seller of CDOs and underwriter of CDOs; and

- claims based upon any duty or obligation assumed by LBA by way of contract, warranty, guarantee or indemnity.  QBE relies upon guarantees or warranty representations allegedly made by LBA in respect of investment products; and

- claims based upon loss of investment or value of any investments, except to the extent arising from LBA's failure in the implementation of any financial product or financial services advice or related investment decisions.  QBE also relies upon this exclusion.

Should the impediments identified by QBE be overcome, it is QBE's position that cover is only potentially available under the 2006/2007 QBE PI Policy (that is, QBE asserts that the notifications given by LBA under the 2006/2007 QBE PI Policy capture all of the claims made against LBA by Client Creditors) and that there is no potential for cover under the 2007/2008 QBE PI Policy.

*QBE D&O Policy*

In respect of the QBE D&O Policy, the Liquidators consider it appropriate for LBA to provide the release required by QBE for the following reasons:

- the QBE D&O Policy will only benefit LBA if:

  - either:

    - a claim is made against a former director or officer of LBA and LBA has indemnified the director or officer in respect of such claim; or

    - a claim is made by LBA directly against QBE under section 6 of the *Law Reform (Miscellaneous Provisions) Act* 1946 (NSW); and

  - that claim is covered by the policy;

- as far as the Liquidators are aware, no claim has been made against LBA's former directors or officers;

- there are two very broad potential sources of claims that the QBE D&O Policy could theoretically respond to:

  - under the company reimbursement section of the policy, the policy will indemnify LBA if a claim is made against a former director or officer by a Client Creditor or some other third party and LBA has agreed to indemnify the former director or officer.  Whilst certain of the former directors and officers have asserted that LBA agreed to provide indemnities to them, and that they will rely upon those alleged

indemnities if a claim is made against them, the Liquidators have not been provided with evidence which establishes that LBA agreed to indemnify its former directors and officers; and

- under the personal directors' and officers' section of the policy, the policy will indemnify a former director or officer if a claim is made against the former director or officer and the former director or officer is not indemnified by LBA. The most common form of claim that would be covered under this section of the policy is a claim by LBA against a former director or officer for breach of duty owed to LBA;

- in the absence of any claim by the Client Creditors or some other third party against the former directors and officers, and in the absence of evidence which establishes that LBA has agreed to indemnify its former directors and officers in respect of such claim(s), the only claim that LBA could pursue against QBE in respect of the QBE D&O Policy would be a claim for a section 6 of the *Law Reform (Miscellaneous Provisions) Act* 1946 (NSW) charge based upon a liability owed by a former director or officer of LBA to LBA;

- in any such action, LBA would need to establish that the former director or officer of LBA breached duties owed to LBA, that this breach caused LBA to suffer loss and that the liability to LBA is covered by the personal directors' and officers' section of the policy;

- apart from the findings in the Wingecarribee Action, the Liquidators have not identified any evidence that would justify pursuing claims against the former directors and officers of LBA;

- as to the findings of Rares J in the Wingecarribee Action, if it could be established that any former director or officer of LBA knew, or ought to have known, of the conduct of LBA's employees which formed the basis for LBA's liability to Client Creditors, LBA may have a claim for breach of duty owed by the former director or officer of LBA to LBA and therefore may have a basis to recover any losses suffered by LBA by reason of its liability to Client Creditors and the legal or other costs incurred by LBA in defending the claims by Client Creditors;

- any findings in the Wingecarribee Action regarding the knowledge of LBA's former directors and officers would not be binding in respect of any claim against QBE, so those matters would have to be established by the Liquidators by separate proceedings which could be as complex and costly as the Wingecarrribee Action;

- if the Liquidators were able to gather evidence which established a liability of the former directors and officers of LBA for breach of duty and loss caused to LBA in respect of the claims by Client Creditors, the Liquidators would also need to establish that such a claim is covered by the QBE D&O Policy; and

- the QBE D&O Policy excludes cover for (among other things):

  - any claims arising from acts or omissions of LBA that took place after 7 March 2007;

  - breaches connected with rendering or failing to render financial services and/or professional advice; and

- claims made in consequence of the depreciation of any investment, including an investment in derivatives, or any representations or advice given on the performance or characteristics of such investment.

In the absence of any claim against the former directors and officers of LBA by the Client Creditors, and having regard to:

- the uncertainty as to whether LBA has agreed to indemnify its directors and officers against claims made against them;

- the uncertainty and likely cost associated with the Liquidators bringing and maintaining a direct claim against QBE; and

- the risk that the policy would not respond to a claim in any event,

the Liquidators consider that it is appropriate to release QBE under the QBE D&O Policy as well as the QBE PI Policies in return for the QBE Settlement Payment.

*Engagement and mediation with QBE*

The Liquidators first held without prejudice discussions with QBE's legal advisors in early March 2009 with a view to settling the claim against QBE. The discussions were not successful in resolving LBA's claim for indemnity.

The Liquidators are aware that on 5 July 2011, the lawyers acting for the Applicants and Group Members in the Wingecarribee Action wrote to QBE asserting that their clients hold a charge over the proceeds of the QBE Insurance Policies pursuant to section 6 of the *Law Reform (Miscellaneous Provisions) Act* 1946 (NSW). QBE has raised concerns about the Liquidators'/LBA's ability to provide it with a release from direct claims by Client Creditors.

In early December 2011, the Liquidators and QBE participated in a mediation in Sydney conducted by retired High Court judge, the Honourable Mr Ian Callinan AC QC. QBE and the Liquidators were not then able to reach agreement to settle the claim. Subsequently the Liquidators and QBE participated in further without prejudice discussions. This has resulted in an agreement being reached by which QBE is to pay LBA $3 million subject to certain conditions including a condition that the relevant terms of the agreement be incorporated into a scheme of arrangement and that full releases be given by LBA and the Client Creditors in respect of the QBE Insurance Policies.

In considering whether to settle with QBE the Liquidators had regard to the following factors:

- the risks and uncertainties set out above in respect of the claims under the QBE Insurance Policies;

- that any litigation against QBE is likely to be complex, protracted and costly;

- that any litigation against QBE to establish indemnity under the QBE PI Policies is likely to involve establishing cover for Client Creditors' claims on a claim-by-claim basis which in turn will involve a great deal of preparatory work which is yet to be undertaken;

- the settlement amount falls within the Liquidators' assessment of a commercial settlement range having regard to the uncertainties and risks that exist for both LBA and QBE;

- a commercial settlement with QBE produces a benefit to Client Creditors in terms of certainty of outcome, and the minimisation of costs and delay generally in the administration of LBA's estate; and

- the Liquidators expect that any litigation with QBE would be unlikely to be resolved without a trial as there are findings in the Wingecarribee Action, including findings regarding LBA's conflict of interest, which, if proven in any proceedings seeking indemnity from QBE, will be relied upon by QBE to support its coverage defences and there is a real risk that a Court may find in favour of QBE on those issues. In that event, LBA may recover no money from QBE and would be liable for its own legal costs and those of QBE, both estimated to be in the millions of dollars without allowance for the costs of any appellate proceedings.

The Liquidators consider that the settlement of the claim under the QBE Insurance Policies in accordance with the QBE Deed of Release is appropriate and reasonable having regard to the benefits and certainty provided by settling the claim compared with the risks discussed above if the claim were not settled.

*QBE Settlement Payment*

Subject to certain contingencies being met, including the entry by LBA into a scheme of arrangement which effects the releases required by QBE, the QBE Deed of Release obliges QBE to make a payment to LBA of $3 million (inclusive of GST, if any).

*Preconditions to QBE Settlement Payment*

The obligation of QBE to make the QBE Settlement Payment under the QBE Deed of Release is subject to the Scheme (or a similar scheme of arrangement which contains the requisite releases in favour of QBE) being approved by Scheme Creditors and by the Court.

## 2.4　Details of liabilities

(a)　**Claims by Trade Creditors**

By a notice dated 14 September 2012, the Liquidators invited all Trade Creditors to furnish the Liquidators with proofs of debt setting out details of their claims. As at the date of this Explanatory Statement, a total of 103 proofs of debt have been received by the Liquidators from Trade Creditors. The Liquidators expect that the total amount of Established Scheme Claims of Trade Creditors will be approximately $7.9 million.

(b)　**Claims by Related Party Creditors**

As at the date of this Explanatory Statement, the Liquidators are aware of a number of claims (or cross claims) lodged by Related Party Creditors against LBA, the total quantum of which is estimated by the Liquidators to be approximately $146 million. The key Related Party Creditors are discussed below.

(i)        *LB Asia Holdings*

LB Asia Holdings has a claim against LBA arising out of intercompany loans between LBA and this entity.  The Liquidators estimate the gross value of this claim at approximately $105 million and the net value of this claim at approximately $101 million.

As noted at Section 2.2(d), LBA asserts that it has a claim against LB Asia Holdings in respect of the Indonesian Money Dispute.

LBA and LB Asia Holdings have agreed to the following arrangement which is reflected in the terms of the Scheme:

- subject to the Scheme being approved by Scheme Creditors and by the Court, LBA, the Liquidators and Client Creditors will provide releases in favour of LB Asia Holdings.  For further information on those releases, see Section 10.9; and

- LB Asia Holdings will permit without contest the set-off relating to the Indonesian Money Dispute.

The Liquidators are satisfied that they are in a position to recommend releases by Client Creditors in favour of LB Asia Holdings on the basis that:

- although claims have been made by both LBA and some Client Creditors against LB Asia, there have been no claims made by either LBA or any Client Creditor (insofar as the Liquidators are aware) against LB Asia Holdings.  Further, the Liquidators do not consider that there is any legal basis on which LBA could successfully establish a claim against LB Asia Holdings nor are they aware of any legal basis on which any Client Creditor could successfully establish a claim against LB Asia Holdings; and

- as part of the compromise between the two entities, LB Asia Holdings has agreed to resolve the Indonesian Money Dispute on the basis that the full amount claimed by LBA (US$5.6 million) will be set-off against the amount owing by LBA to LB Asia Holdings.

(ii)       *Lehman Brothers Commercial Corporation Asia Limited (In Liquidation)*

Lehman Brothers Commercial Corporation Asia Limited (In Liquidation) has a claim against LBA arising out of intercompany loans between LBA and this entity.  The Liquidators estimate the value of this claim at approximately $24 million.

(iii)     *Lehman Brothers Australia Securities Pty Limited*

Lehman Brothers Australia Securities Pty Limited has a claim against LBA arising out of intercompany loans between LBA and this entity.  The Liquidators estimate the value of this claim at approximately $5.3 million.

(iv)     *Lehman Brothers Securities Asia Limited (In Liquidation)*

Lehman Brothers Securities Asia Limited (In Liquidation) has a claim against LBA arising out of intercompany loans between LBA and this entity.  The Liquidators estimate the value of this claim at approximately $2.6 million.

(v)     *LBHI*

LBHI has a claim against LBA arising out of intercompany loans between LBA and this entity.  The Liquidators estimate the gross value of this claim at approximately US$5.4 million (which converts to approximately $6.3 million as at 26 September 2008).

As mentioned in Section 2.2(b)(v), the Liquidators have filed a cross claim against LBHI as the guarantor of the LB Treasury Notes for an amount of $5.5 million, being the full value of those notes held by LBA.  The Liquidators have reached an in principle agreement with the representatives of LBHI in respect of the intercompany position such that 45% of the $5.5 million claim made by LBA (being approximately $2.5 million) will be applied, by way of set-off, in reduction of LBHI's claim against LBA, producing a net position of $3.8 million in favour of LBHI.

(c)     **Disputed claims**

LBSF has alleged that it has a claim against LBA for an amount of approximately $20.8 million arising from the dispute in respect of the Federation Notes (described in Section 3.3 below).

(d)     **Claims by Client Creditors**

Claims by Client Creditors have arisen out of:

(i)     the provision by LBA of investment advice or investment management services in respect of the acquisition of investment products;

(ii)     alleged representations by LBA in relation to investment products or investment management services offered by LBA; or

(iii)     the sale by LBA of investment products.

As at the date of this Explanatory Statement, the Liquidators are aware of 356 claims by Client Creditors, of which 199 claims have been the subject of proofs of debt lodged with the Liquidators.

Of the 356 Client Creditors, 72 are represented in the Wingecarribee Action.  For more information on this representative action, refer to Section 3.2.

(e)        **Beneficiaries of the GCT**

The GCT Beneficiaries may claim against LBA, as trustee of the GCT, for breach of trust arising out of the transfer of trust assets (in the form of notes issued by Anthracite Investments (Cayman) Limited) by LBA to LBIE.  The GCT Beneficiaries may seek to recover from LBA the value of the notes (as at the date of the transfer to LBIE), less any amount recovered in the liquidation of LBIE by LBA in its capacity as trustee of the GCT.  Having regard to the expected dividend rate to be paid in the liquidation of LBIE, it is anticipated that the total quantum of any such claims will be less than $3 million and may be zero.

(f)        **Subordinated creditor**

LBA Granica, the sole shareholder of LBA, has a claim of approximately $87.5 million against LBA, which arises out of intercompany loans advanced pursuant to a loan agreement dated 7 March 2007 between LBA Granica, LBA and ASX Limited.  This claim has been subordinated to the other liabilities and indebtedness of LBA in accordance with a subordination deed dated 7 March 2007 between the same parties.

# 3.    Litigation

## 3.1    Overview of litigation

LBA is currently involved in, amongst others, the following litigation:

- the Wingecarribee Action and the appeal in respect of the Common Issues Orders and the Declaratory Relief; and

- a number of proceedings in the US Bankruptcy Court (and its appellate court).

## 3.2    Wingecarribee Action and the associated appeal

The Wingecarribee Action is a representative action brought in the Court against LBA by the Applicants and Group Members in relation to claims for losses arising out of their acquisitions of certain investment products from LBA.  The Applicants and the Group Members constitute approximately 20% of known Client Creditors (in number) and their claims represent approximately 28% of known Client Creditors' claims (in value).

On 21 September 2012, Justice Rares delivered his findings in the Wingecarribee Action.  In summary, His Honour found that LBA, in selling and advising on the sales of certain investment products to the Applicants, acted in breach of the contracts it had with the Applicants, engaged in misleading or deceptive conduct, was negligent and was in breach of its fiduciary duties as a financial adviser to the Applicants.  For those reasons, LBA was found to be liable to compensate the Applicants for their losses incurred as a result of their investments.

On 3 and 21 December 2012 and 25 March 2013, Justice Rares made the Common Issues Orders (which determined a number of common questions and answers binding on the Applicants, LBA and Group Members).  On 25 March 2013, Justice Rares granted the Declaratory Relief declaring, amongst other things, the amounts for which the Applicants are entitled to be admitted to prove in the liquidation of LBA.

On 25 March 2013, the Court also granted leave for LBA to appeal in respect of certain of the Common Issues Orders and some aspects of the Declaratory Relief.  The Liquidators have

filed LBA's appeal in respect of both the Common Issues Orders and the Declaratory Relief. The timing of the appeal is a matter for the Full Court, but the Liquidators anticipate that the appeal will most probably be determined in 2014.  It is possible that either party may file an application for leave to appeal to the High Court in respect of any decision of the Full Court.

The Liquidators do not anticipate that the claims of Group Members can be definitively determined until some time after the finalisation of the appeal to the Full Court and any subsequent appeal to the High Court (if leave to appeal is granted).  Even absent an appeal to the High Court, the Liquidators anticipate that the claims of Group Members will not likely be resolved prior to 2015.

Given the range of issues raised by the appeal, and the complexity of the legal and factual matters involved, the Liquidators are not in a position to express any general view on the prospects of the appeal.  The Liquidators obtained legal advice in relation to the appeal.  The Liquidators consider that the appeal to the Full Court was properly commenced, and that the grounds of appeal are reasonably arguable.

The Liquidators estimate that the appeal process may cost in the amount of $1.5 million. This estimate does not take into account the possibility of an application by either party for leave to appeal to the High Court, the costs of such application and any subsequent appeal, the costs of determining the damages claims of Group Members or any liability LBA may have for costs orders that may be made against it if the appeal is unsuccessful.

If the appeal is successful:

- there is potential for significant reduction in LBA's liability to Client Creditors (or some of them); and

- such a reduction will increase the dividend payable to all other creditors of LBA.

However, the Liquidators also acknowledge that additional legal costs will be incurred by LBA in continuing the court proceedings, and ultimately there is a risk that LBA will not be successful in the appeal.

In view of the risks associated with the appeal process, and having regard to:

- the significant time and costs which the court process of adjudicating all of the Group Members' damages claims will take; and

- the effect the Wingecarribee Action has already had, and will continue to have, on the balance of Scheme Creditors which are not participants in that representative action - namely that the adjudication of their claims and any subsequent distributions are delayed pending the conclusion of the Wingecarribee Action,

the Liquidators consider that it would be in the best interests of Scheme Creditors as a whole to have the Wingecarribee Action dismissed or otherwise finally disposed of and replaced by the CRP under which offers will be made to the Client Creditors by the Scheme Administrators and, if a Client Creditor and the Scheme Administrators cannot reach agreement, the Client Creditor's claim will be resolved extra-judicially and in an efficient and cost-effective manner.

*Applicants' payment*

The Scheme also provides for the payment of $3.535 million as a contribution to the amount payable by the Applicants to IMF (the litigation funder of the Applicants) for funding the Wingecarribee Action. The moneys will be paid to the Applicants or, at their direction, to IMF. This payment will be made out of the Insurance Proceeds Fund. For further information on the Insurance Proceeds Fund, refer to Sections 12.1 and 12.2.

The Liquidators consider that this payment to the Applicants in reduction of the amount payable by them to IMF is justified for the following reasons:

- it has the effect of compensating the Applicants for their personal exertion in the conduct of the Wingecarribee Action. That litigation was unlikely to have occurred in the absence of IMF's funding and it has produced benefits for all Client Creditors which are reflected in the CRP;

- the Applicants will be obliged to pay in excess of $3.535 million to IMF; and

- the payment, having regard to its amount, will not have a material impact on the expected dividends payable to Scheme Creditors under the Scheme. More specifically, this payment will only result in a dilution of 0.7 cents in the dollar for Client Creditors and an even smaller dilution of 0.3 cents in the dollar in respect of the expected dividends payable to Other Creditors.

## 3.3    US Bankruptcy Court

There are a number of proceedings in the United States of America in which LBA is either directly involved or which the Liquidators actively monitor because their outcome could directly affect LBA's interests.

### *In re Lehman Brothers Australia Limited*, Case No. 12-10063 in the US Bankruptcy Court

On 15 February 2012, the US Bankruptcy Court made orders under Chapter 15 of the US Bankruptcy Code recognising the Liquidators and the winding up proceedings of LBA in Australia as "foreign representatives" and "foreign main proceedings" respectively. The effect of these orders was to afford LBA certain rights and protections under Chapter 11 of the US Bankruptcy Code.

On 13 March 2013, the US Bankruptcy Court granted the Liquidators' application in this proceeding for the approval of the terms of the US Insurers' Agreement and Release. For information on that application and details of the court approval, see Section 2.3(c).

### *In re Lehman Brothers Holdings Inc,* Case No. 08-13555 in the US Bankruptcy Court

These are the main bankruptcy proceedings under Chapter 11 of the US Bankruptcy Code for LBHI and LBSF. LBA is only interested in one aspect of these proceedings, namely it has filed a limited objection to LBHI's Plan on the basis that the Plan (which was approved by the US Bankruptcy Court on 6 December 2011 and declared effective from 6 March 2012) purported to assume, as executory contracts, the swap agreements which underlie the Dante Notes. LBA's position was that the swap agreements were not capable of assumption because they had been validly terminated as a matter of English law.

The settlement in respect of the Dante Notes (described in the paragraphs below) renders moot LBA's limited objection to the Plan. In due course, the Liquidators expect that the limited objection will be dismissed.

*Dante settlement*

On 19 December 2012, meetings of noteholders took place for the nine series of Dante Notes. A quorum of noteholders was present at all but one of the nine meetings (the meeting for the Endeavour AA series was inquorate). At each of the eight quorate noteholders' meetings, the noteholders resolved to pass an extraordinary resolution authorising the relevant issuer of the Dante Notes and the note trustee to enter into a settlement agreement between (amongst others) the swap counterparty, that is, LBSF, the relevant issuer and the note trustee. The effect of each of the settlement agreements was to:

- resolve the claims of LBSF as the swap counterparty;

- authorise the sale of the collateral underlying the Dante Notes; and

- provide for the distribution of sale proceeds in payment of (amongst others) the note trustee, the swap counterparty and the noteholders.

On 11 January 2013, a meeting of noteholders for the Endeavour AA series was reconvened. A quorum was present at that meeting and the noteholders resolved to pass an extraordinary resolution authorising the relevant issuer of the notes and the note trustee to enter into a settlement agreement with LBSF in substantially the same terms as those described above.

The settlement agreements were entered into and the sale of the collateral took place in February 2013. The minimum sale proceeds amounts required under the settlement agreements were realised for all nine series of the Dante Notes.

On 26 to 27 February 2013, LBA received an aggregate amount of approximately $9 million for the six Dante Notes it held for itself.

**In re Lehman Brothers Holdings Inc. Case No. 11-2967 in the Court of Appeals, Second Circuit and *Dante Noteholders v Lehman Brothers Special Financing, Inc.*, Case No. 11-2784 in the US Bankruptcy Court**

On 18 May 2012, the Court of Appeals for the Second Circuit, the relevant Federal appellate court for the US Bankruptcy Court, heard the combined appeal of LBA and certain other Dante noteholders regarding the decision of the US Bankruptcy Court to refuse leave for LBA (and those other Dante noteholders) to intervene in the Dante Proceedings (see below).

The Liquidators and the other Dante noteholders were successful on the appeal to the Second Circuit Court, with the court delivering its judgment in their favour on 4 October 2012. However, as with the limited objection to the Plan referred to above, the settlement in respect of the Dante Notes should render moot the continued prosecution of these proceedings. The Liquidators have received a request from LBHI to dismiss these proceedings and are considering this request.

***Lehman Brothers Special Financing Inc. v. Bank of NY Mellon Corp.*, Case No. 10-3545 in the US Bankruptcy Court**

These proceedings, the Dante Proceedings, were commenced by LBSF against all of the note trustees and issuers of the Dante Notes.

The settlement in respect to the Dante Notes rendered moot these proceedings for the purposes of the Dante Notes held by LBA and the proceedings have been dismissed with respect to the Dante Notes held by LBA.

***Lehman Brothers Special Financing Inc. v. Bank of America National Association et al*, Case No. 10-3547 in the US Bankruptcy Court**

These proceedings were commenced by LBSF against a number of trustees and issuers of certain notes including the Federation Notes, in respect of which noteholders received payment following the sale of the underlying collateral after the entry of LBHI into bankruptcy under Chapter 11 of the US Bankruptcy Code.

LBSF commenced proceedings seeking to recover those proceeds as against the note trustees and the issuers on the same legal basis as it has alleged that the note trustee was prevented from making payments to the noteholders in the Dante Proceedings (i.e. the Flip Clause contained in the Federation Notes was a breach of the *ipso facto* provisions of the US Bankruptcy Code). LBSF has been actively seeking to identify the noteholders who received payments of the proceeds so that they may be joined as defendants.

These proceedings are currently stayed until 20 July 2013. It is likely that LBSF will seek a further extension of the stay. LBA is not presently a named defendant to these proceedings, but rather a putative member of the defendant class who have received the proceeds of the payment of the underlying collateral. For LBA to become a defendant, LBSF would have to apply to the court to join LBA as a named defendant. Alternatively, LBA could file an application seeking to be joined as a defendant. It is not clear whether the court would grant such an application. If and when the proceedings ultimately progress, the proceedings will be a defendant class action.

## 4.  Claims Resolution Process

The CRP is the process by which claims of Client Creditors will be adjudicated and established under the Scheme.

Unless otherwise stated, all references to parts, sections and clauses in this Section 4 are references to parts, sections and clauses in the CRP, which is set out in Schedule 8 of the Scheme.

### 4.1  Introduction

The CRP operates as follows:

(a)     part A of the CRP sets out the process for submission to and review and assessment of Client Creditors' claims by the Scheme Administrators;

(b)     an offer will then be made to each Client Creditor (which may be nil) and, if the claim cannot be resolved by agreement, it will be referred to an Independent

Adjudicator for determination in accordance with part 9 of the Scheme and part B of the CRP.

## 4.2 Part A - review and assessment by Scheme Administrators

Clause 1 of part A describes the process for submission to the Scheme Administrators by the Client Creditor of a Final Scheme Proof together with a completed questionnaire (verified by a statutory declaration) and other information relating to the Client Creditor's claim.

Clauses 2 to 6 of part A set out the timetable and process for the Scheme Administrators' review of the claim and their issue of a notice specifying the Amount (being the sum for which they are prepared to admit the Client Creditor's claim, which may be nil).

If the Client Creditor notifies the Scheme Administrators that the Amount is accepted, the claim will be admitted for the Amount assessed by the Scheme Administrators.

If the Client Creditor and the Scheme Administrators cannot agree on the amount for which the claim should be admitted, then:

(a)     the Client Creditor can make a Counter-Offer in respect of the amount for which it would agree to be admitted by the Scheme Administrators, and that Counter-Offer may be accepted (in which case the Client Creditor will be admitted for that amount) or rejected (in which case an Independent Adjudicator will be appointed to adjudicate the Client Creditor's claim); or

(b)     the Client Creditor can elect to have an Independent Adjudicator appointed to adjudicate the claim.

If the Client Creditor does not do any of the above within 21 days of its receipt of the Scheme Administrators' notice, the claim will be admitted for the Amount assessed by the Scheme Administrators.

Clauses 11 and 12 of part A provide that following the Independent Adjudicator's determination of a claim under part B and notification of that Determination to the Scheme Administrators, the Scheme Administrators will within 7 days of that notification admit the Client Creditor's claim for the amount specified in the Determination or, in the Scheme Administrators' absolute discretion, for an amount not less than the amount specified in the Determination.

## 4.3 CRP claims assessment and adjudication timetable

A summary of the timetable for the conduct of the CRP is set out in **Appendix 4**.

## 4.4 Part B - claim adjudication - introduction

Clause 10 of part A provides that if the Client Creditor makes an election to have the claim adjudicated or if the Client Creditor's Counter-Offer has been rejected by the Scheme Administrators, the Scheme Administrators will as soon as reasonably practicable procure the appointment of an Independent Adjudicator and the claim will then be dealt with in accordance with part B. This is the process for adjudication specified by part 9 of the Scheme.

Part B is divided into 6 sections. Sections 1, 3 and 6 of part B apply to all claims referred to adjudication by Client Creditors (sections 1 and 3 are largely procedural requirements, while

section 6 provides for the determination of the amount of any set-off in respect of all claims). Sections 4 and 5 of part B apply to any claims made by Client Creditors based on investments in Claim CDOs. Although the majority of claims to be dealt with under the CRP will involve claims relating to investments in Claim CDOs, the CRP is also intended to apply to the determination of claims relating to investment in other investment products. Section 4 of part B sets out guidelines to be followed by the Independent Adjudicator in determining the liability of LBA to Client Creditors in respect of investments in Claim CDOs. Likewise, section 5 sets out rules which the Independent Adjudicator is required to follow in determining the quantum of any claim relating to investment in a Claim CDO.

The guidelines in section 4 and the rules for assessing quantum in section 5 are partly based on the findings in the Wingecarribee Action and on the Common Issues Orders (subject to appeal). As noted below, there are a number of findings which are not adopted in the guidelines and some of the guidelines relate to matters that have not yet been the subject of findings or determinations in the Wingecarribee Action.

**Appendix 5** sets out the Common Issues Orders, and for each matter covered by the Common Issues Orders indicates whether or not the order is the subject of an appeal, and whether or not the order has been adopted (with or without modification) in the guidelines and rules.

The Common Issues Orders (subject to appeal) are binding only in respect of those Client Creditors who are Group Members and the Applicants. The effect of the Scheme, if adopted, will be to give all Client Creditors, whether or not Group Members, the benefit of a number of significant findings in the Wingecarribee Action (including various findings which are currently the subject of appeal).

## 4.5    Part B - Section 4 - liability guidelines for Claim CDOs

Section 4 of part B sets out the matters to be assumed and the guidelines to be followed by the Independent Adjudicator in assessing whether LBA is liable to a Client Creditor in respect of Claim CDOs.

Clauses 16 to 21 deal with introductory matters. Clauses 18 to 20 address the following matters:

(a)        clause 18 acknowledges the judgment of Justice Rares delivered on 21 September 2012 in which His Honour published his findings in the Wingecarribee Action and the Common Issues Orders;

(b)        clause 19 records the fact that LBA has been granted leave to appeal in respect of certain of the Common Issues Orders; and

(c)        clause 20 directs that the Independent Adjudicators are not bound by the Common Issues Orders in determining the claim of any Client Creditor, whether or not a Group Member.

The direction in clause 20 has been given for the following reasons:

(d)        the balance of the clauses in section 4 (clauses 23 to 54) set out matters to be assumed and guidelines which the Independent Adjudicators are required to follow (subject to the matters set out in clause 21) in assessing LBA's liability to a Client Creditor for a claim based on investment in Claim CDOs. The guidelines are based on those aspects of the Common Issues Orders (and the findings made by Justice

Rares underlying them) which LBA has either not appealed from or which, if the relevant Common Issues Order has been appealed from, LBA is generally prepared to concede for the purposes of the Scheme (including the CRP); and

(e)     likewise, section 5 sets out the rules for assessing the quantum of Client Creditors' claims, and those rules are based on the Common Issues Orders relating to quantum and the position taken by LBA in relation to issues relating to quantum that were not determined by the Common Issues Orders (being the adjustment of loss by reference to income received from investing in Claim CDOs, profits on sales of Claim CDOs or from recoveries above the face value of Claim CDOs).  None of the Common Issues Orders in relation to quantum has been appealed by LBA.

Clause 21 makes it clear that the liability guidelines in section 4 are applicable in all instances except where they are irrelevant to the claims of a Client Creditor or shown to be incorrect in the case of a particular Client Creditor.  It follows that there may be cases where the section 4 liability guidelines are not applicable.

The key liability findings of Justice Rares which are reflected in the Common Issues Orders and have been adopted or used as a basis for guidelines under the CRP are summarised below.

(f)     **Misleading or deceptive conduct** - clauses 44 and 45 are based on the Common Issues Orders relating to misleading or deceptive conduct (Common Issues Orders 4.1 and 4.2).  Justice Rares determined that, if it were established that certain representations were made by LBA to the Applicants and Group Members, then in making those representations LBA engaged in misleading or deceptive conduct.  The determination has been extended to all Client Creditors, save that two of the representations the subject of Justice Rares' determination (Common Issues Orders 4.1(a) and 4.1(c)(1)) have been excluded.  The guideline will be relevant to both IMP Client Creditors and Non-IMP Client Creditors.

(g)     **IMP Client Creditors - Unauthorised Investments/Maturity** - clauses 46 to 47 acknowledge that LBA will be liable if the Independent Adjudicator determines that a Claim CDO was not an Authorised Investment.

(h)     **IMP Client Creditors - Derivative Prohibition and Active Secondary Market** - clauses 50 to 52 are guidelines that if the Client Creditor's IMP Agreement contained a prohibition on derivatives or required an active secondary market and the claim relates to an investment in a Claim CDO, then LBA will be liable to the Client Creditor.  These guidelines are based on:

        (i)     Common Issues Order 7.4 and Justice Rares' underlying finding that there was no active secondary market for the "Claim SCDOs" in the Wingecarribee Action;

        (ii)    Common Issues Order 7.6 and Justice Rares' underlying finding that the "Claim SCDOs" in the Wingecarribee Action were "derivatives".  The order and finding are subject to appeal, but the Liquidators are prepared to concede the issue for the purposes of the Scheme.

(i)     **IMP Local Government Authorities (LGAs) and Professional Trustees** - clause 53 is a guideline that in the case of IMP Client Creditors who are LGAs or Professional Trustees in NSW or WA, it is to be assumed, in the absence of circumstances which indicate that the assumption should not apply to that Client

Creditor, that any investment in Claim CDOs was a breach of a duty of care which LBA owed to the Client Creditor. The duty of care is both tortious and contractual. The guideline is based on Common Issues Orders 3.4, 6.2 and 7.2. Those orders (and the findings underlying them) are subject to appeal, but the Liquidators are prepared to concede the issue for the purposes of the Scheme.

(j)     **Non-IMP LGAs and Professional Trustees -** clause 54 is a guideline that, if a Non-IMP Client Creditor who is also a LGA or Professional Trustee in NSW or WA can establish that LBA provided financial advice to the Client Creditor in respect of investment in one or more Claim CDOs, it is to be assumed, in the absence of circumstances which indicate that the assumption should not apply to that Client Creditor, that any investment in Claim CDOs was a breach of LBA's duty of care to the Client Creditor. This guideline is based on Common Issues Orders 2.2 and 3.2. Those orders, and the findings underlying them, are subject to appeal, but the Liquidators are prepared to concede the issue for the purposes of the Scheme.

The principal Common Issues Orders and underlying findings of Justice Rares that are not adopted as guidelines under the CRP are set out below.

**Misleading or deceptive conduct**

(k)     The Common Issues Orders set out certain representations that, if made, will be taken to amount to misleading or deceptive conduct (Common Issues Orders 4.1 and 4.2). All of the relevant representations are adopted save for the representations in Common Issues Orders 4.1(a) and 4.1(c)(1). Those representations refer to the suitability of the Claim CDOs for an investor "with an investment strategy requiring a high level of security for the protection of capital invested". Common Issues Orders 4.1(a) and 4.1(c)(1) are subject to appeal. The non-adoption may affect investors who claim to have had such an investment strategy, and who are not LGAs or Professional Trustees in NSW or WA. It is still open to such a Client Creditor to claim, and seek to establish, that a representation was made to that Client Creditor by LBA that an investment in a Claim CDO was suitable for that Client Creditor and for its investment strategy, and that such a representation was misleading. Any such claim will be determined on its merits by the Independent Adjudicator, without the benefit of any presumption that the representation was misleading.

**Non-IMP Client Creditors' claims**

(l)     **Non-IMP Client Creditors' breach of contract claims -** Common Issues Orders 5.3 and 5.5 are not adopted. The Liquidators are appealing from each of these orders on a number of grounds. Non-IMP Client Creditors who are LGAs or Professional Trustees in NSW or WA will generally have a claim for breach of duty of care in tort under clause 54 of part B of the CRP subject to a reduction for contributory negligence. Non-IMP Client Creditors who are not LGAs or Professional Trustees in NSW or WA are affected by the non-adoption of these findings and orders. It is still open to such a Client Creditor to claim, and seek to establish, that LBA breached a term of a contract between the Client Creditor and LBA which is not covered by the guidelines. Any such claim will be determined on its merits by the Independent Adjudicator, without the benefit of any presumption that the alleged term was a term of the contract, or was breached.

The most significant effect of the non-adoption of Common Issues Orders 5.3 and 5.5 is likely to be in relation to the availability of a contributory negligence defence. Contributory negligence is not a defence to a claim for breach of contract other than for a failure to take reasonable care, but it may be a defence to other claims that Non-IMP Client Creditors may have (e.g. a claim for breach of a duty of care or for misleading or deceptive conduct). The Independent Adjudicators will assume, in respect of other claims which are of a type in respect of which a claim for contributory negligence is or may be available, that there was contributory negligence on the part of the Non-IMP Client Creditor and must reduce the quantum of the Non-IMP Client Creditor's loss or damage for such claim by 15% (clause 63 of part B of the CRP). For the rationale and effect of this 15% discount for contributory negligence, refer to Section 4.6(j) below.

(m)     **Non-IMP Client Creditors' fiduciary duty claims** - Common Issues Order 5.7 is not adopted. The Liquidators are appealing from this order (and all of the key findings in respect of fiduciary duty) on a number of grounds.

The effect of Common Issues Order 5.7 is that, where it is established LBA acted as a financial adviser to a Non-IMP Client Creditor, it is presumed that LBA owed the client fiduciary duties (unless there is a contractual term or some other circumstance that excludes such duties) and LBA breached those duties in selling the Claim CDOs (unless LBA establishes that it obtained informed consent). Although Common Issues Order 5.7 has not been adopted, it is still open to a Non-IMP Client Creditor to claim, and seek to establish, that LBA owed and breached fiduciary duties in selling the Claim CDOs to it. Such a claim will be determined on its merits without the benefit of the presumption described above.

The most significant effect of the non-adoption of Common Issues Order 5.7 is likely to be in relation to the availability of a contributory negligence defence. Contributory negligence is not a defence to a breach of fiduciary duty claim but it may be a defence to other claims that Non-IMP Client Creditors may have (e.g. a claim for breach of a duty of care or for misleading or deceptive conduct). The Independent Adjudicators will assume, in respect of other claims which are of a type in respect of which a claim for contributory negligence is or may be available, that there was contributory negligence on the part of the Non-IMP Client Creditor and must reduce the quantum of the Non-IMP Client Creditor's loss or damage for such claim by 15% (clause 63 of part B of the CRP). For the rationale and effect of this 15% discount for contributory negligence, refer to Section 4.6(j) below.

**IMP Client Creditors' claims**

(n)     **IMP LGAs or Professional Trustees' breach of contract claims** - Common Issues Orders 6.2 and 7.2 are not adopted. The Liquidators are appealing from these orders. IMP Client Creditors who are LGAs or Professional Trustees in NSW or WA will have the benefit of clause 53 of the part B, which recognises a general claim for a breach of a contractual or tortious duty of care where LBA caused them to purchase Claim CDOs. It remains open to such Client Creditors to claim, and seek to establish, the breach of a term of the IMP Agreement which is not addressed by the guidelines, and any such claim will be determined by the Independent Adjudicators on its merits (without the benefit of a presumption of breach).

(o)     **IMP Client Creditors' breach of fiduciary duty claims** - Common Issues Orders 6.4 and 7.8 have not been adopted. The Liquidators are appealing from these orders

on a number of grounds.  It remains open to such Client Creditors to claim, and seek to establish, that LBA owed fiduciary duties to them, which LBA breached. Any such claim will be determined by the Independent Adjudicators, without any presumption that such a duty was owed or breached.

## 4.6    Part B - Section 5 - rules for assessing quantum for Claim CDOs

The key Common Issues Orders and findings of Justice Rares regarding quantum which have been adopted or used as a basis for the rules for assessing quantum in the CRP are summarised below.

**General approach**

(a)    The Liquidators have not appealed from any of Justice Rares' findings on quantum or from Common Issues Order 8, which relates to quantum.  The rules for assessing quantum are intended to be consistent with the findings and order as to quantum.

(b)    In general terms, the rules for assessing quantum determine quantum on the basis of the extent of the capital loss (if any) suffered by the Client Creditor by reason of an investment in a Claim CDO, as measured by the amount by which the amount paid to acquire the Claim CDO exceeds either the amount realised in respect of the Claim CDO (if it is no longer held) or the "left-in-hand" value of the Claim CDO (if it is still held).

(c)    The rules for determining quantum are set out in clause 57.  The approach differs depending on whether the Claim CDO to which the claim relates is still held by the Client Creditor at the Effective Date.  In particular:

*Claim CDOs that are no longer held by the Client Creditor at the Effective Date*

(i)    if the Claim CDO has been sold by the Client Creditor before maturity or redemption, then (provided that the sale was not unreasonable) the quantum of loss is the difference between the amount paid to acquire the Claim CDO and the proceeds of sale;

(ii)    if the Claim CDO has been redeemed at nil value ("wiped out"), then the quantum of loss is the amount paid to acquire the Claim CDO.  All such Claim CDOs are identified by a "0" entry alongside them in Schedule C to the CRP which is set out in Schedule 8 of the Scheme;

(iii)    if a Claim CDO has, as at the Effective Date:

A.    matured;

B.    been unwound (in the sense that the underlying assets have been sold to pay out noteholders); or

C.    been the subject of a settlement agreement pursuant to which noteholders have been paid, or are entitled to be paid, a settlement amount,

the loss or damage suffered (if any) is the amount by which the purchase price of the Claim CDO exceeds its capital value on maturity or unwinding or the settlement amount (as applicable).  Schedule C to the

CRP sets out for all those Claim CDOs which have matured or been unwound, or in respect of which there has been a settlement agreement, the amount received by noteholders in respect of that Claim CDO; and

*Claim CDOs that are still held by the Client Creditor at the Effective Date*

(iv)     for Claim CDOs that are still held at the Effective Date, which are not subject to a settlement agreement, the valuations determined by Justice Rares in the Wingecarribee Action, based on the expert evidence led in those proceedings, will apply.  Those valuations are set out in Schedule D to the CRP.  The quantum of loss is the difference between the amount paid to acquire the Claim CDO and the capital value of the Claim CDO calculated using the amount set out in the last column of Schedule D to the CRP.

**Interest**

(d)     In accordance with paragraph 8.2(f) of the Common Issues Orders, clause 58 of part B relates to interest and, in summary, provides that interest is to be allowed only on a crystallised loss (whether by redemption, sale, maturity or unwinding of a Claim CDO) determined in accordance with clause 57(a), (b) or (c) of part B.

(e)     A claim for such interest is available from the date on which the loss was crystallised up until 26 September 2008, being the date administrators were appointed to LBA, and not thereafter.  This is consistent with the position that would apply in the winding up of LBA in accordance with the Corporations Act.

**Adjustment of loss by reference to income received from investing in Claim CDOs, profits on sales of Claim CDOs or from recoveries above the face value of Claim CDOs**

(f)     Clauses 59 to 61 provide for adjustment of quantum of loss by reference to income received by Client Creditors from investing in Claim CDOs, whether or not the Client Creditor claims loss or damage in respect of the Claim CDO.  Justice Rares held that as a matter of principle damages should be reduced by the amount by which coupon payments received from all funds invested in LBA's structured finance products exceeded the interest that would otherwise have been earned (Common Issues Order 8.2(e)).  The rules for assessing quantum recognise that such an adjustment may potentially apply to reduce or increase loss in any particular case.  By recognising the possibility that the loss may be increased by such an adjustment, and not only reduced, the rules for assessing quantum are in this respect potentially more favourable to Client Creditors than the Common Issues Orders.

(g)     The rules for assessing quantum also recognise that, similarly, an adjustment to loss should be made to reduce loss to reflect profits made on the sale of Claim CDOs or recoveries above the face value of Claim CDOs.

(h)     Justice Rares did not determine the baseline level of income against which the income received from the Claim CDOs should be assessed to determine the nature and extent of any adjustment.  The Common Issues Orders require an assessment to be made in each individual case of the difference between the income that was earned from an investment in the Claim CDOs, and the income that would have been earned from the investments that the Client Creditor would have made but for

LBA's conduct.  In order to avoid the time and expense of such individual assessments, the rules for assessing quantum adopt a figure of BBSW plus 45 basis points as the notional income that Client Creditors would have received if they had not invested in the Claim CDOs. If:

- the profits from the sale of Claim CDOs and recoveries above face value of Claim CDOs, plus the difference between coupon payments earned from the Claim CDOs and the baseline income, is positive, then that positive amount will be deducted from the amount of the Client Creditor's claim; and

- the profits from the sale of Claim CDOs and recoveries above face value of Claim CDOs, plus the difference between coupon payments earned from the Claim CDOs and the baseline income, is negative, then that negative amount will be added to the amount of the Client Creditor's claim.

**Allowance for any recovery from a third party**

(i)      The Independent Adjudicators are directed by clause 64 to deduct from the quantum of a Client Creditor's loss or damage any amount that the Client Creditor has recovered, or has become entitled to recover, from a third party in respect of its investments in Claim CDOs.

In this regard, the Liquidators note that a representative action has recently been commenced by two Client Creditors against certain entities in respect of the ratings assigned by those entities (**Ratings Entities**) to some of the Claim CDOs.

If any Client Creditor recovers, or becomes entitled to recover (by way of judgment or a settlement), an amount from the Ratings Entities, then the amount recovered would fall within the direction in clause 64.  However, given that the representative action was commenced in April 2013, it is unlikely that any such recovery or entitlement to recovery will occur prior to adjudications being made under the Scheme if it becomes Effective.  On that basis, there would be no deduction under clause 64 arising from the representative action.

The commencement of the representative action against the Ratings Entities does not affect the operation of clause 67 of the CRP which provides, consistently with the Common Issues Orders, that LBA does not have any proportionate liability defence in respect of the conduct of the credit rating agencies in rating the Claim CDOs.

**Contributory negligence and proportionate liability**

(j)      As mentioned in Section 4.5(m) above, for any Non-IMP Client Creditor who establishes a claim against LBA that is a type of claim in respect of which a claim for contributory negligence is or may be available (e.g. a claim for breach of a duty of care or for misleading or deceptive conduct), the Independent Adjudicators will assume that there was contributory negligence on its part and will reduce the quantum of its loss or damage (as determined in accordance with clause 57) by 15%.  The Liquidators' reasons for fixing the discount at 15% are as follows:

(i)      a fixed discount rate creates certainty of outcome;

(ii)      it avoids the possibility of different Independent Adjudicators taking different approaches to the extent of any reduction for contributory negligence;

(iii)     it reduces the time which would be involved in the adjudication of claims and in that way reduces costs for the benefit of all Scheme Creditors;

(iv)     it ensures that the dividends payable to Client Creditors will better reflect the relative strengths of the claims of IMP Client Creditors and Non-IMP Client Creditors. In general terms, under an IMP Agreement, the IMP Client Creditor gave LBA authority to make investment decisions on its behalf. If an IMP Client Creditor has a claim based on a breach of its IMP Agreement, other than a breach of any term to exercise reasonable care in performing the services under the IMP Agreement, no issue of contributory negligence could arise. For example, a claim based on a product being an unauthorised investment under the IMP Agreement, would not be subject to a contributory negligence defence by LBA. In contrast, Non-IMP Client Creditors had not given LBA authority to make investment decisions on their behalf. In such cases, there is more scope for LBA to argue that the Non-IMP Client Creditor was contributorily negligent for failing to take reasonable care, for example, for failing to take reasonable care to review material sent to the claimant concerning a Claim CDO, or for failing to take reasonable care to understand the risks attaching to the product and whether such risks were consistent with its investment strategy, prior to investing in that product; and

(v)     the discount of 15% is reasonably modest and the ultimate dividend for each Non-IMP Client Creditor will only be reduced by approximately 10.1%. This is because the discount will have the effect of reducing the total amount of Client Creditors' Scheme Claims and in that way increases each Client Creditor's share of the Insurance Proceeds Fund and the General Scheme Fund.

(k)     For IMP Client Creditors, clause 62 identifies a number of claims which might be made by IMP Client Creditors in respect of which no defence of contributory negligence will be available. In respect of other claims that might be made by a particular IMP Client Creditor, any defence of contributory negligence (if raised in the Scheme Administrators' submissions relating to that Client Creditor) will be determined by the Independent Adjudicator on the facts of the individual case.

(l)     If raised in the Scheme Administrators' submissions in respect of a Client Creditor, the Independent Adjudicator must also determine, in accordance with clauses 65 and 66, the availability of any proportionate liability defence, any apportionment of loss as between LBA and the relevant concurrent wrongdoers and if applicable, the extent to which the quantum of the Client Creditor's claim against LBA should be reduced, taking into account:

(i)     the extent of LBA's responsibility for the loss or damage; and

(ii)     the extent of the relevant concurrent wrongdoer's responsibility for the loss or damage.

     

(m)     Clause 67 provides that a proportionate liability defence is not available to LBA in respect of the conduct of credit rating agencies in rating the Claim CDOs or of LB Asia in relation to the Claim CDOs.

## 5.     Implications of the Scheme not proceeding

### 5.1     Insurance implications

The settlement with the US Insurers and QBE is contingent upon the Scheme proceeding.  If the Scheme does not proceed:

(a)     the US Insurers' Agreement and Release will, assuming no other scheme of arrangement satisfying the relevant contingency under that agreement is propounded, terminate and the US Insurers will not be obliged to pay the US Settlement Payment to LBA;

(b)     the QBE Deed of Release will, assuming no other scheme of arrangement satisfying the relevant contingency under that agreement is propounded, terminate and QBE will not be obliged to pay the QBE Settlement Payment to LBA;

(c)     the Liquidators will seek to resolve or pursue LBA's claims for indemnity on the US Insurance Policies and the QBE PI Policies;

(d)     in the event a resolution with QBE is not able to be reached within a reasonable time, the Liquidators may commence proceedings against QBE;

(e)     in the event a resolution with the US Insurers and the US Broker is not able to be reached within a reasonable time, the Liquidators may commence proceedings against them;

(f)     the Liquidators will need to make a decision about whether to commence proceedings in respect of the US Insurance Policies in Australia or New York and whether to commence proceedings against the US Broker and each of the US Insurers for the 2006/2007 and 2007/2008 policy years or only the US Broker and Chartis/Birmingham (the Primary/Fifth Excess Insurer) for the 2006/2007 policy year, and each of the US Insurers insuring the 2007/2008 policy year;

(g)     if any insurance proceedings in respect of the US Insurance Policies are commenced in Australia, it is possible that the US Insurers will seek to prevent the Liquidators from proceeding in Australia and will commence separate declaratory proceedings in New York;

(h)     unlike the US Settlement Payment which is to be distributed solely to Client Creditors (after deduction of costs and expenses and the payment to the Applicants as a contribution to the amount due by the Applicants to IMF), any monies recovered by LBA from the US Broker either by way of settlement or judgment will not be a payment received by the Liquidators from the US Insurers and the monies will therefore not be subject to distribution in accordance with section 562 of the Corporations Act.  Accordingly, any monies recovered from the US Broker would be available for distribution to all creditors in the liquidation and not solely to the Client Creditors;

(i)      the Liquidators expect that the Applicants in the Wingecarribee Action would secure a damages judgment and may seek to make a direct claim against the US Insurers to recover the amount of the judgment as a priority over the claims of other Client Creditors who are not Group Members;

(j)      the Client Creditors who have asserted a charge over the proceeds of the QBE Insurance Policies pursuant to section 6 of the *Law Reform (Miscellaneous Provisions) Act* 1946 (NSW) may seek to make a direct claim against QBE to recover the proceeds of one or more of those policies as a priority over the claims of other Client Creditors; and

(k)      there are likely to be priority disputes regarding the proceeds of both the US Insurance Policies and the QBE Insurance Policies between the Applicants/Group Members and the other Client Creditors, and those disputes will most likely involve LBA as a necessary party.

## 5.2     Other implications

In addition to the insurance implications set out above, if the Scheme does not proceed:

(a)      subject to the leave of the court, if required, Scheme Creditors may commence or continue any existing or pending legal proceedings against LBA and LB Asia Holdings;

(b)      the Liquidators will pursue the appeal of the Common Issues Orders and the Declaratory Relief;

(c)      the Group Members' claims will need to be determined (and it is unclear whether the Court will do that before the appeal from the Common Issues Orders is decided), and any determination of a Group Member's claim may be the subject of further appeals; and

(d)      the Liquidators will determine the admissibility and value (if any) of the proofs submitted by Scheme Creditors in accordance with ordinary liquidation principles, but distributions to Scheme Creditors will be delayed pending the outcome of the Wingecarribee Action, the appeal of the Common Issues Orders and the Declaratory Relief and any litigation which the Liquidators may commence against the US Insurers and the US Broker and QBE.

# 6.     Estimate of dividends under the Scheme and the liquidation

## 6.1     Background financial information

The Liquidators are of the view that the total value of known liabilities of LBA exceeds the total value of known assets of LBA.

A report as to the affairs of LBA in accordance with Form 507 of the Corporations Act is provided in **Appendix 9**.  The report contains summary details of LBA's assets and liabilities as at 15 March 2013.

## 6.2      Estimate of dividends under the Scheme

**Trade Creditors**

Under the Scheme, Trade Creditors will receive a dividend of at least **75 cents in the dollar** on the amount of their Established Scheme Claims.

The Liquidators anticipate that the Scheme Administrators will be in a position to pay a dividend to Trade Creditors within 3 months of the Effective Date.

**Client Creditors and Other Creditors**

Based on the information available as at the date of this Explanatory Statement and the assumptions set out below, the Liquidators estimate that, under the Scheme:

- Client Creditors will receive a dividend of **40.7 to 49.9 cents in the dollar** on the amount of their Established Scheme Claims;

- Other Creditors will receive a dividend of **35.2 to 44.7 cents in the dollar** on the amount of their Established Scheme Claims; and

- the Subordinated Creditor will not receive any dividend.

These estimates are based on the following estimates and assumptions by the Liquidators:

(a)      it has been estimated that the Insurance Proceeds Fund (consisting of the US Settlement Payment and the QBE Settlement Payment, after deducting the expenses of or incidental to getting in the US Settlement Payment and the payment to the Applicants as a contribution to the amount due by the Applicants to IMF) will be in the amount of approximately $37.0 million.  This estimate is based on, amongst other things, the assumption that the expenses of or incidental to getting in the US Settlement Payment will be $4.45 million comprising:

(i)      legal costs and disbursements incurred by the Liquidators of $3.8 million; and

(ii)      the remuneration of, and other expenses incurred by, the Liquidators of $0.65 million;

(b)      it has been estimated that the total assets available under the Scheme (excluding the US Settlement Payment and the QBE Settlement Payment and without any deduction for contingent liabilities) will be in the range of between $258.4 and $264.3 million;

(c)      it has been estimated that the aggregate amount of the Client Creditors' and Other Creditors' Established Scheme Claims, as calculated in accordance with the Scheme, will be between $587.4 million and $643.4 million.  This estimate has been arrived at by:

(i)      calculating the Scheme Claims of all Client Creditors in accordance with the rules for assessing quantum in clause 57 of the CRP in respect of their Claim CDOs;

(ii)      assuming that:

     A.      Scheme Claims of IMP Client Creditors will be admitted in full;

     B.      Non-IMP Client Creditors will be admitted for:

- (in the high dividend estimate) 80% of their Scheme Claims on the basis that all Non-IMP Client Creditors will be subject to the 15% reduction for contributory negligence and some of the Non-IMP Client Creditors will not be able to establish liability on the part of LBA; and

- (in the low dividend estimate) 85% of their Scheme Claims on the basis that all Non-IMP Client Creditors will be subject to the 15% reduction for contributory negligence; and

     C.      Scheme Claims of Client Creditors, whose status as IMP Client Creditors or Non-IMP Client Creditors is currently unknown to the Liquidators, will be admitted in full;

(iii)     on the basis of the above assumptions, the aggregate amount of all Established Scheme Claims of Client Creditors has been estimated at between $441.2 million and $495.1 million (the accuracy of this calculation is limited by the fact that the Liquidators have incomplete knowledge of all the existing and potential claims of Client Creditors); and

(iv)     estimating the Established Scheme Claims of Other Creditors in accordance with usual liquidation principles, producing an estimate of between $146.2 million and $148.4 million for those claims;

(d)     apart from any litigation concerning the dispute in respect of the Federation Notes, it has been assumed that, after the Release Date, no new legal proceedings will be commenced and no existing legal proceedings will be maintained by any person in respect of any claim against LBA or any other matter arising under or in relation to the Scheme;

(e)     in relation to the dispute with respect to the Federation Notes:

(i)     for the high dividend estimate, it has been assumed that the dispute will be resolved in favour of the noteholders (including LBA and certain Client Creditors);

(ii)     for the low dividend estimate, it has been assumed that the dispute will be resolved in favour of LBSF such that:

     A.      the $20.8 million received by LBA, being proceeds of the underlying collateral, will ultimately be returned to LBSF. Accordingly, this amount has been excluded for the purposes of calculating LBA's assets; and

B.      the funds received by those Client Creditors who were also noteholders, being proceeds of the underlying collateral in the amount of approximately $42 million, will be returned to LBSF.  Accordingly, this amount has been included for the purposes of calculating those Client Creditors' claims against LBA;

(f)     it has been assumed that there will be no appeal against any decision of the Scheme Administrators under section 1321 of the Corporations Act;

(g)     it has been assumed that each of the parties to the US Insurers' Agreement and Release will comply with the terms of the US Insurers' Agreement and Release, and each Scheme Creditor will comply with the terms of the Scheme and the US Scheme Release Deed;

(h)     it has been assumed that each of the parties to the QBE Deed of Release will comply with the terms of the QBE Deed of Release, and each Scheme Creditor will comply with the terms of the QBE Scheme Release Deed;

(i)     it has been assumed that no substantial unanticipated recoveries will be made in the liquidation of LBA;

(j)     it has been assumed that no more than 75 Scheme Claims (of Client Creditors) will be referred to an Independent Adjudicator for determination; and

(k)     based on the assumptions set out above, the Liquidators estimate that the total fees and disbursements required to be paid out of the Scheme Assets in order to effect and implement the Scheme and to complete the liquidation of LBA will be approximately $5.8 million to $8.1 million.

The Liquidators have also made a number of other assumptions relating to, amongst other things, foreign exchange rates, intercompany positions and costs for the purposes of calculating the estimated dividends under the Scheme.  For further information regarding the Liquidators' assumptions and the calculations of the dividend estimates under the Scheme, refer to part 1 of **Appendix 6**.

Client Creditors may receive less than 40.7 to 49.9 cents in the dollar and Other Creditors may receive less than 35.2 to 44.7 cents in the dollar if circumstances outside the control of the Liquidators arise in relation to the Scheme, for instance:

•       if one or more Scheme Creditors appeal the Court order approving the Scheme or commence any other legal proceedings challenging the Scheme or the Scheme Meetings;

•       if any aggrieved person appeals against the acts, omissions or decisions of the Scheme Administrators under section 1321 of the Corporations Act;

•       if, for any reason, the Wingecarribee Action or any other current proceedings involving or against LBA is not dismissed or otherwise disposed of on or shortly after the Effective Date, or if complications arise in relation to the disposal of those proceedings so as to increase the amount of costs and disbursements expected to be paid in connection with those proceedings;

- if any Scheme Creditor commences legal proceedings against the US Insurer Parties, QBE, LB Asia Holdings, LBA or the Liquidators in breach of the releases provided under the Scheme;

- if substantially more than 75 Client Creditors do not reach agreement with the Scheme Administrators on the amount of their Scheme Claims and seek to have their Scheme Claims determined by an Independent Adjudicator; or

- if the claims and adjudication process under the Scheme reveals a number of creditors or claims against LBA that were not known to the Liquidators or not apparent from LBA's books and records and, consequently, the total value of Scheme Claims exceeds the Liquidators' estimate.

Trade Creditors may receive more than 75 cents in the dollar and Client Creditors may receive more than 40.7 to 49.9 cents in the dollar and Other Creditors may receive more than 35.2 to 44.7 cents in the dollar if certain circumstances occur in relation to the Scheme, for instance, if the Liquidators are able to make substantial recoveries in the liquidation of LBA from:

- Lion Capital in respect of Blue Gum AA Notes; or

- LB Asia in respect of the November 2012 Claims.

**Likely timing for payment of dividends under the Scheme**

Subject to the Scheme becoming Effective and the assumptions set out above, the Liquidators anticipate that the Scheme Administrators will be in a position to pay at least an interim dividend to Client Creditors and Other Creditors under the Scheme within 5 months of the Effective Date.

## 6.3    Estimate of dividends in the liquidation of LBA (without the Scheme)

If the Scheme is not approved and the liquidation of LBA proceeds without the Scheme, the availability and the amount of any dividend in the liquidation of LBA (without the Scheme) will depend on the outcome of:

- any litigation commenced by the Liquidators against the US Insurers and/or the US Broker or QBE;

- LBA's current appeal in respect of the Common Issues Orders and the Declaratory Relief (and any further appeal to the High Court) and the Court's final determination of the amount of damages and costs (if any) payable to each Group Member; and

- any action taken against Lion Capital and/or LB Asia (in respect of the November 2012 Claims).

On the basis of the assumptions set out in this Section 6.3 and the assumptions and calculations set out in part 2 of **Appendix 6**, the Liquidators estimate that creditors (other than the Subordinated Creditor) will receive **33.2 to 41.6 cents in the dollar** on their claims in the liquidation of LBA (without the Scheme).

**Insurance**

In relation to the claim against QBE, having regard to:

- the insurance implications of the Scheme not proceeding (as set out in Section 5.1); and

- the considerations taken with respect to the settlement with QBE (as set out in Section 2.3(d)); and

- the Liquidators' expectation that litigation against QBE would be unlikely to be resolved without a trial and the uncertainty and cost of that approach (as explained in Section 2.3(d)),

the Liquidators have formed the view that, as a matter of practicality, it is not possible to predict the outcome of any litigation or to calculate a reliable estimate of the amount that may be recovered from QBE. Therefore, the Liquidators have assumed no recovery from QBE in the liquidation.

As for the claim against the US Insurers and the US Broker, having regard to:

- the insurance implications of the Scheme not proceeding (as set out in Section 5.1);

- the considerations taken with respect to the Mediator's settlement recommendation (as set out in Section 2.3(c)); and

- the diverse range of possible outcomes in such litigation against the US Insurers and the US Broker, any of which may eventuate,

the Liquidators have formed the view that, as a matter of practicality, it is not possible to predict the outcome of the litigation or to calculate a reliable estimate of the amount that may be recovered from the US Insurers and the US Broker. Therefore, the Liquidators have assumed no recovery from the US Insurers or the US Broker in the liquidation.

The Liquidators acknowledge that certain Client Creditors assert a right to make a direct claim against the US Insurers and QBE. Those Client Creditors should seek professional financial and legal advice regarding such claims and their individual circumstances in the liquidation.

**Wingecarribee Action**

In relation to the Wingecarribee Action and the current appeal in respect of the Common Issues Orders and the Declaratory Relief, the Liquidators have assumed, for the purposes of their estimate of expected dividends in the liquidation, that:

(a) the legal costs and other costs of the appeal in respect of the Common Issues Orders and the Declaratory Relief will be $1.5 million; and

(b) the outcome of the appeal will have no material impact on the values at which the Liquidators admit the claims of Client Creditors in the liquidation, such that:

(i) claims of IMP Client Creditors will be admitted in full;

(ii) Non-IMP Client Creditors will be admitted for 80% of their Scheme Claims (for the high dividend estimate) and 85% of their Scheme Claims

(for the low dividend estimate).  These discounts are applied to the claims on the same basis as outlined in Section 6.2(c)(ii)(B) in relation to the estimate of dividends under the Scheme; and

(iii)　　claims of Client Creditors, whose status as IMP Client Creditors or Non-IMP Client Creditors is currently unknown to the Liquidators, will be admitted in full.

In each case, the claims of Client Creditors are calculated in accordance with the rules for assessing quantum in clause 57 of the CRP in respect of their Claim CDOs.

### Other estimates and assumptions

The Liquidators' estimate of 33.2 to 41.6 cents in the dollar in the liquidation of LBA (without the Scheme) is also based on the following estimates and assumptions:

(a)　　it has been estimated that the total assets, without any deduction for contingent liabilities, available for distribution to Scheme Creditors in the liquidation of LBA (without the Scheme) will be in the range of between $258.4 million and $264.3 million;

(b)　　it has been estimated that the aggregate amount of all Scheme Creditors' claims will be in the range of $595.4 million and $651.3 million.  This estimate has been arrived at:

(i)　　by estimating the aggregate amount of all Client Creditors' claims at between $441.2 million and $495.1 million (the accuracy of this estimate is limited by the fact that the Liquidators have incomplete knowledge of all the existing and potential claims of Client Creditors);

(ii)　　by estimating the aggregate amount of all Trade Creditors' claims in accordance with usual liquidation principles, producing an estimate of $7.9 million; and

(iii)　　by estimating the claims of all Other Creditors in accordance with usual liquidation principles, producing an estimate of between $146.2 million and $148.4 million for those claims;

(c)　　in relation to the dispute with respect to the Federation Notes, the Liquidators have relied on the same assumptions as those set out in Section 6.2(e) above;

(d)　　it has been assumed that no substantial unanticipated recoveries will be made in the liquidation of LBA; and

(e)　　the Liquidators estimate that the total fees and disbursements required to be paid out of the Scheme Assets in order to complete the liquidation of LBA will be between $7.9 million and $10.5 million.

The Liquidators have also made a number of other assumptions relating to, amongst other things, foreign exchange rates, intercompany positions and costs for the purposes of calculating the estimated dividend in the liquidation of LBA (without the Scheme).  For further information regarding the Liquidators' assumptions and the calculations of the dividend estimate in the liquidation of LBA, refer to part 2 of **Appendix 6**.

**Likely timing for payment of dividends in the liquidation of LBA**

The Liquidators' assumption is that any litigation against the US Insurers, the US Broker and QBE would not be determined before 2015. Similarly, the claims of Group Members are unlikely to be resolved before 2015. It follows that, while it may be possible for the Liquidators to pay a relatively small interim dividend to Trade Creditors and Other Creditors by 31 December 2013, the timing for payment of the final dividend to all Scheme Creditors will inevitably depend on when the Wingecarribee Action, the associated appeal and all other litigation involving LBA are finally concluded but is likely to occur in 2015 or 2016.

## 6.4 Comparison of outcomes under the Scheme with outcomes in the liquidation (without the Scheme)

The following tables summarise the outcomes under the Scheme in comparison with the alternative of LBA's liquidation (without the Scheme).

**Trade Creditors**

|  | Outcome under the Scheme | Outcome in the liquidation of LBA (without the Scheme) |
|---|---|---|
| **Estimated dividend** | At least 75 cents in the dollar | 33.2 to 41.6 cents in the dollar |
| **Timing of payment of dividend** | Within 3 months of the Scheme becoming Effective | 2015 or 2016 (although a small interim dividend may be paid earlier) |

**Client Creditors**

|  | Outcome under the Scheme | Outcome in the liquidation of LBA (without the Scheme) |
|---|---|---|
| **Estimated dividend** | 40.7 to 49.9 cents in the dollar | 33.2 to 41.6 cents in the dollar |
| **Timing of payment of dividend** | At least an interim dividend within 5 months of the Scheme becoming Effective | 2015 or 2016 (although a small interim dividend may be paid earlier) |

**Other Creditors**

|  | Outcome under the Scheme | Outcome in the liquidation of LBA (without the Scheme) |
|---|---|---|
| **Estimated dividend** | 35.2 to 44.7 cents in the dollar | 33.2 to 41.6 cents in the dollar |
| **Timing of payment of dividend** | At least an interim dividend within 5 months of the Scheme becoming Effective | 2015 or 2016 (although a small interim dividend may be paid earlier) |

# 7.    Why you should vote in favour of the Scheme

The Liquidators consider that the Scheme will produce a superior result for Scheme Creditors than would be achieved in a liquidation alone.

The Liquidators recommend that Scheme Creditors vote in favour of the Scheme for the following reasons.

(a)    **US Settlement Payment and QBE Settlement Payment**: If the Scheme becomes Effective, the US Insurers and QBE will be obliged to make payments of US$45 million and $3 million respectively to LBA for distribution to Client Creditors. This combined significant upfront payment will only be available to Client Creditors if the Scheme is approved (or if another scheme of arrangement is propounded which satisfies the relevant contingencies under the US Insurers' Agreement and Release and the QBE Deed of Release). Without these payments, the estate of LBA (and therefore all Scheme Creditors) would have to bear the risks, delays and costs of commencing litigation against the US Insurers, the US Broker and QBE to recover any funds under or in connection with the US Insurance Policies and the QBE Insurance Policies.

(b)    **Higher estimated return to Scheme Creditors**: The Liquidators estimate that the likely dividend payable to Scheme Creditors in the liquidation of LBA would be in the order of **33.2 to 41.6 cents in the dollar** (this is based on the assumptions in Section 6.3). Under the Scheme, Trade Creditors would receive a dividend of at least **75 cents in the dollar**, Client Creditors are likely to receive a dividend in the order of **40.7 to 49.9 cents in the dollar** and Other Creditors are likely to receive a dividend in the order of **35.2 to 44.7 cents in the dollar** (these estimates are based on the information available as at the date of this Explanatory Statement and on the assumptions described in Section 6.2). The anticipated higher returns available under the Scheme arise principally because (subject to the Scheme becoming Effective) the US Insurers will pay US$45 million and QBE will pay $3 million, which payments will increase the pool of assets available for distribution to Client Creditors.

(c)    **Avoid litigation risks**: if the Scheme does not proceed and the Liquidators decide to pursue proceedings against the US Insurers and the US Broker in an Australian court, there is a risk that the Liquidators would not succeed or would recover substantially less than US$45 million in those proceedings and that LBA would be

liable for the US Insurers' and the US Broker's costs in addition to its own legal costs. These same considerations apply if the Liquidators decide to pursue proceedings against QBE. Similarly, if the Applicants or Group Members decide to bring proceedings against the US Insurers or QBE directly to recover the amount of any damages judgment secured to them in the Wingecarribee Action, they will also face the risk of not succeeding in those proceedings and not achieving any recovery at all. It is also likely that if certain Client Creditors commence proceedings directly against the US Insurers or QBE, LBA would be joined to those proceedings as a necessary party and will bear the risks and costs associated with those proceedings. These litigation risks would be avoided if the Scheme becomes Effective.

(d)     **An efficient claims resolution procedure**: Under the Scheme, each Client Creditor will be required to provide the Scheme Administrators with a completed questionnaire (verified by a statutory declaration) and an outline of its claim identifying the grounds of claim relied upon and the losses claimed in addition to its Final Scheme Proof. The quantum of admissible claims by Client Creditors will then be determined by agreement with the Scheme Administrators in accordance with the CRP or, failing an agreement, by the determination of an Independent Adjudicator.

Without the Scheme, the claims of each Group Member will need to be dealt with in the Wingecarribee Action (unless agreement is reached with the Group Member). This may occur under a claims referral process ordered by the Court, or (depending on the issues outstanding after the appeal) the remaining claims may be determined by the Court. In either case, the Liquidators anticipate the claims of Group Members in the Wingecarribee Action cannot be definitively determined until the appeal from the Common Issues Orders and the Declaratory Relief has been finalised. Moreover, only the claims of Group Members, and not those of any other Client Creditors, will be determined in the Wingecarribee Action. The claims of all other Client Creditors will have to be resolved as part of the liquidation of LBA in the ordinary course.

(e)     **Earlier distributions**: The Scheme Administrators intend to make distributions to Scheme Creditors as soon as reasonably practicable. The Scheme Administrators may, in their discretion, make distributions to Trade Creditors and interim distributions to Client Creditors and Other Creditors prior to the determination of all Scheme Claims. Further information in relation to the Liquidators' estimate of the timing of payments of dividends under the Scheme, and the assumptions underlying that estimate, are set out in Section 6.2. In contrast, under the liquidation (in the absence of the Scheme), it is unlikely that any distribution, apart from a relatively small interim dividend to Trade Creditors and Other Creditors, could be made until:

(i)      the Wingecarribee Action has been finally disposed of and the damages amounts payable to each of the Applicants and Group Members have been finally determined; and

(ii)     the Liquidators have finalised any legal proceedings commenced against the US Insurers and the US Broker and QBE (which are likely to take some years).

(f)     **Liquidator Recoveries will continue**: The Scheme becoming Effective will not impact on the ability of the Liquidators to pursue Liquidator Recoveries and the net

proceeds of any Liquidator Recoveries will be paid to the Scheme Administrators for distribution in accordance with the Scheme. The Liquidators contemplate that there is a possibility for Liquidator Recoveries in relation to claims against:

(i)     Lion Capital arising from its role as portfolio manager for Blue Gum AA Notes; and

(ii)    LB Asia in respect of the November 2012 Claims.

## 8.      Why you may consider voting against the Scheme

Although the Liquidators believe that the advantages of the Scheme outweigh the disadvantages, Scheme Creditors are not obliged to follow the Liquidators' recommendation and may decide to vote against the Scheme. Factors that may lead Scheme Creditors to consider voting against the Scheme are:

(a)     **Client Creditors will relinquish claims against the US Insurer Parties and QBE**: If the Scheme proceeds, Client Creditors will be required to relinquish their claims against the US Insurer Parties and QBE. Client Creditors are further required to waive their rights under section 6 of the *Law Reform (Miscellaneous Provisions) Act* 1946 (NSW) or equivalent statutes that may apply in other jurisdictions in relation to the proceeds of the US Insurance Policies and the QBE Insurance Policies.

The prospects of success of any individual Client Creditor's claims against the US Insurers, QBE and any other party is a matter for each Client Creditor to consider and on which to seek independent legal advice. An individual Client Creditor may form the view that, notwithstanding the potential uncertainty, delay and cost of litigation, it would achieve a greater return by pursuing its claims against the US Insurers and QBE in the absence of the Scheme.

(b)     **LBA cannot obtain further recoveries from the US Insurers or the US Broker or QBE**: Under the Scheme, the US Insurers' Agreement and Release and the QBE Deed of Release, LBA will release the US Insurer Parties, the US Broker and QBE. These releases remove the prospect of obtaining judgment against each of the US Insurers, the US Broker and QBE at trial for an amount that may be in excess of the amounts which the US Insurers and QBE have agreed to pay upon the Scheme becoming Effective. The Liquidators reiterate that the claim against the US Broker is only worth as much as the value of the claim against the US Insurers under the 2006/2007 Policies had there been no dispute by certain of those insurers that the policies covered LBA.

(c)     **Liquidators will withdraw Proof Financial Products/Contribution Claim**: Under the US Insurers' Agreement and Release, in order to secure the US Settlement Payment, LBA's Proof Financial Products/Contribution Claim against LBHI will be withdrawn.

(d)     **Scheme Creditors will relinquish claims against LBA and the Liquidators**: On and from the Effective Date, each Scheme Creditor will receive and accept its entitlements under the Scheme:

•       in lieu of its entitlements to prove in, and receive a dividend from, the liquidation of LBA; and

- in full satisfaction and complete discharge of all claims which they may have against LBA.

The Wingecarribee Action (and LBA's appeal from the Common Issues Orders and the Declaratory Relief) will be dismissed or discontinued.  An individual Group Member/Client Creditor may form the view that, despite the potential uncertainty, delay and cost of litigation, it would achieve a greater return if the Wingecarribee Action ran its full course or if the Client Creditor proved in the liquidation and appealed to the Court in the event that its proof was rejected by the Liquidators.

(e)     **Client Creditors, LBA and the Liquidators will relinquish claims against LB Asia Holdings**: If the Scheme becomes Effective, each Client Creditor will be required to release LB Asia Holdings from any claim arising from, related to or in connection with the acquisition of CDOs, the Wingecarribee Action or the circumstances underlying or otherwise referred to in the Wingecarribee Action. Whether an individual Client Creditor has a relevant claim against LB Asia Holdings and the strength of any such claim will be matters for that individual Client Creditor to consider, with the benefit of independent legal advice if sought by it.

Similarly, under the Scheme, the Liquidators and LBA will release any claims they may have against LB Asia Holdings arising from, related to or in connection with the Wingecarribee Action or other claims made in relation to the acquisition of CDOs.

(f)     **Common Issues Orders**: Under the terms of the CRP, the Common Issues Orders will not be binding on the Independent Adjudicators when determining a Scheme Claim.  However, certain aspects of the Common Issues Orders have been included in the rules for Independent Adjudicators (section 4 in part B of the CRP), which they must follow when adjudicating a Scheme Claim.  For further explanation of the manner in which the CRP departs from the Common Issues Orders in ways that may in some cases be less favourable to Group Members, see Section 4 and **Appendix 5**.

(g)     **Limitation on quantum of claims of Client Creditors**: Under the CRP, the quantum of a Client Creditor's claim in respect of a Claim CDO will be assessed by reference to the purchase price of its Claim CDOs less (depending on the types of Claim CDOs and the maturity and status as at the Effective Date): the redeemed value (if redeemed at nil value); the capital value on their sale (if any); the capital value on maturity or unwinding of the Claim CDOs or any settlement amount; or a fixed amount in respect of a particular Claim CDO still held by the Client Creditor (as applicable).  Client Creditors who are claiming in respect of the acquisition of Claim CDOs will not be permitted to make claims for amounts in excess of the amount of damages calculated in accordance with the CRP.  For example, no additional amount may be claimed in respect of alleged consequential loss or loss of opportunity.

# 9.    Operation of the Scheme

## 9.1    What is a scheme of arrangement?

A scheme of arrangement is a binding agreement (approved by the requisite majority of a company's creditors and by the Court) which varies the rights of the company's creditors. This statutory mechanism, provided for under part 5.1 of the Corporations Act, enables a company to overcome the impracticality of obtaining individual consent from each and every creditor intended to be bound, and allows what is in the proponent's opinion a beneficial arrangement between the company and its creditors to proceed notwithstanding objections by dissenting creditors.

As with any other scheme of arrangement, the Scheme (a copy of which is at **Appendix 1**) is regulated by part 5.1 of the Corporations Act. In particular, pursuant to section 411 of the Act, the Scheme will only proceed if:

- it is approved by the requisite majority of each class of Scheme Creditors at the Scheme Meetings, the convening of which was ordered by the Court; and

- it is then approved by the Court under section 411(4) or section 411(6) of the Corporations Act.

At each Scheme Meeting for each class of Scheme Creditors, a resolution approving the Scheme will be put to the relevant class for consideration and approval. Pursuant to section 411(4) of the Corporations Act, the resolution put to each class of Scheme Creditors at each Scheme Meeting must be passed by the Statutory Majority, namely:

- a majority in number (more than 50%) of Scheme Creditors included in the relevant class present and voting at the Scheme Meeting, either in person or by proxy or (in the case of corporations) by corporate representative; and

- the same majority must have debts or claims against LBA amounting in aggregate to at least 75% of the total amount of debts and claims of the Scheme Creditors included in the relevant class present and voting at the Scheme Meeting.

For further information on the Scheme Meetings and your voting entitlements, see Section 15 of this Explanatory Statement.

The effect of the subsequent Court approval of the Scheme (if obtained) is to render the arrangement binding as between LBA and its Scheme Creditors, even those who have not voted or have voted against the Scheme.

## 9.2    Parties, participation and application

The parties to the Scheme are:

- LBA;

- all Scheme Creditors; and

- the Liquidators and Christopher Clarke Hill (in their capacity as Scheme Administrators).

Each of the parties to the Scheme will agree to be bound by the Scheme and the CRP (including on any appeal under section 1321 of the Corporations Act) and to undertake the various obligations imposed on them by the Scheme in good faith. In particular, if the Scheme becomes Effective, Scheme Creditors are obliged to do anything that the Scheme Administrators consider necessary or desirable to give full effect to the Scheme.

Under the Scheme, where a Scheme Creditor has an Established Scheme Claim (the quantum of which is greater than zero), it will be entitled to a distribution of Scheme Assets. This entitlement under the Scheme will replace the Scheme Creditor's entitlement to prove in, and receive a dividend from, the liquidation of LBA.

For further information on the parties and application of the Scheme, see clause 2.1 and part 3 of the Scheme.

### 9.3      Purposes and conditions precedent

Part 2 of the Scheme sets out the purposes of the Scheme, which are, amongst other things:

(a)        to enable the Liquidators to execute and deliver the US Scheme Release Deed and the QBE Scheme Release Deed on behalf of each Client Creditor so as to obtain the benefit of the US Settlement Payment and the QBE Settlement Payment provided for, respectively, by the US Insurers' Agreement and Release and the QBE Deed of Release;

(b)        to allow all unsecured debts of, and all unsecured claims against, LBA to be ascertained and (if applicable) established;

(c)        to provide a procedure for determining all Scheme Claims in a manner that is transparent, just, expeditious and cost-effective; and

(d)        to provide for a more cost-effective and expeditious distribution of Scheme Assets to Scheme Creditors than would be available in the liquidation of LBA in the ordinary course (without a scheme).

The coming into effect of the Scheme is conditional upon the US Insurers' Agreement and Release and the QBE Deed of Release not being terminated before the Second Court Date and the Court approving the Scheme under section 411(4) or section 411(6) of the Corporations Act.

### 9.4      Authority of the Liquidators to execute release deeds

Under clause 4.1 of the Scheme, each Client Creditor will confer full power and authority on each of the Liquidators to execute as its agent and attorney, and deliver on its behalf, the US Scheme Release Deed and the QBE Scheme Release Deed , so as to satisfy the relevant requirements under each of the US Insurers' Agreement and Release and the QBE Deed of Release, upon which the US Settlement Payment and the QBE Settlement Payment are conditional. This authority given to the Liquidators is irrevocable.

### 9.5      Releases and discontinuance of proceedings

Part 5 of the Scheme provides for various releases:

•          by Client Creditors, LBA and the Liquidators in favour of the US Insurer Parties;

- by Client Creditors in favour of QBE;

- by all Scheme Creditors in favour of the Liquidators; and

- by Client Creditors, LBA and the Liquidators in favour of LB Asia Holdings.

For details of these releases, see Sections 10.6 to 10.10 of this Explanatory Statement.

Under part 10 of the Scheme, Scheme Creditors are, subject to one exception, prohibited from commencing or maintaining proceedings against LBA in respect of their Scheme Claims (including the Wingecarribee Action and any other Recovery Proceeding). In addition, the Liquidators are given authority by each Scheme Creditor to take any step necessary to discontinue or otherwise dispose of any legal proceedings commenced by Scheme Creditors against LBA. For details of this prohibition and the relevant exception, see Section 10.11 of this Explanatory Statement and part 10 and clause 4.2 of the Scheme.

## 9.6    Trade Creditors

Under the Scheme, Trade Creditors will be paid at least 75 cents in the dollar on the amount of their Established Scheme Claims.

## 9.7    Claims and adjudication procedure

A procedure for the proof, determination and adjudication of Scheme Claims is established under parts 6, 7, 8 and 9 of the Scheme as well as the CRP set out in Schedule 8 of the Scheme.

For further information on the CRP and the claims and adjudication procedure, see Sections 4 and 11 of this Explanatory Statement respectively.

## 9.8    Dividend funds and payments

Part 12 of the Scheme provides for the establishment of two funds through which the distribution of Scheme Assets to Scheme Creditors will be made. Part 13 of the Scheme deals with payments to be made under the Scheme. For further information, see Section 12 of this Explanatory Statement.

## 9.9    Scheme Administrators and Independent Adjudicators

Parts 14 and 15 of the Scheme provide for the appointment, removal, resignation, powers, functions, duties and rights of the Scheme Administrators and the Independent Adjudicators respectively. For further information, see Sections 10.4 and 10.13 of this Explanatory Statement.

Under part 16 of the Scheme, the Office Holders, who are the Liquidators, the Scheme Administrators and the Independent Adjudicators, are entitled to an indemnity out of the Scheme Assets against all liabilities incurred by them in respect of any act done or omitted to be done in good faith in the course of implementing the Scheme. This indemnity extends also to all costs and expenses incurred by the Office Holders in:

- defending any proceedings in which it is alleged that the Office Holders are liable in respect any act done or omitted to be done in the course of implementing the Scheme; and

- carrying out their functions in the course of implementing the Scheme.

## 9.10    Creditors' Committee

A Creditors' Committee will be constituted in accordance with part 17 of the Scheme. Provisions for the membership of the Creditors' Committee, its procedures, functions and duties are also contained in part 17.  For further information, see Section 13 of this Explanatory Statement.

## 9.11    Meetings of Scheme Creditors

The procedures for convening and conducting meetings of Scheme Creditors (other than the Scheme Meetings) are provided for under part 18 of the Scheme.

## 9.12    Termination of the Scheme

Pursuant to part 19 of the Scheme, the Scheme will terminate when all the Scheme Assets have been realised and distributed in accordance with the Scheme and once LBA has been deregistered.  The Scheme Administrators will notify Scheme Creditors of the termination by newspaper publication and on their website.  The termination of the Scheme will not affect any rights or obligations which may have arisen under the Scheme as a result of any act or omission which took place prior to the termination.

## 9.13    Modification of the Scheme

It is possible that a Scheme Creditor may propose a modification to the terms of the Scheme at the Scheme Meetings prior to the passing of a resolution to approve the Scheme.

Although it is permissible for a Scheme Creditor to propose a modification and for the Scheme Meetings to consider a resolution to approve a modified Scheme, Scheme Creditors should nevertheless be aware that any modification to the terms of the Scheme could have the following consequences:

(a)    if the proposed modification is material, such that the Court could not be satisfied that no reasonable Scheme Creditor would alter its decision as to how to vote on the Scheme if the modification had been disclosed prior to the Scheme Meetings, the Court may refuse to approve the modified Scheme on this basis.  In those circumstances, the Scheme will not become effective (either in its modified form or in its original form);

(b)    the US Insurers may refuse to pay the US Settlement Payment upon the modified Scheme becoming effective if the modification to the Scheme causes the Scheme to depart significantly from what had been agreed between LBA and the US Insurers. It is a requirement under the US Insurers' Agreement and Release that the Scheme contains specific releases in favour of the US Insurer Parties substantially in the form set out in Exhibit B of the US Insurers' Agreement and Release (a copy of which is at **Appendix 10**).  The requirement may not be satisfied if the terms of the Scheme are substantially modified by Scheme Creditors; and

(c)    QBE may refuse to pay the QBE Settlement Payment upon the modified Scheme becoming effective if the modification to the Scheme causes the Scheme to depart significantly from what had been agreed between LBA and QBE.  It is a requirement under the QBE Deed of Release that the Scheme contains specific

releases in favour of QBE substantially in the form set out in the QBE Deed of Release (a copy of which is at **Appendix 12**). The requirement may not be satisfied if the terms of the Scheme are substantially modified by Scheme Creditors.

### 9.14   Notices

Part 20 of the Scheme provides for the methods in which the Scheme Administrators and Scheme Creditors may communicate and give notices to each other.

## 10.   Effect of the Scheme

### 10.1   Payment by the US Insurers

Subject to the Scheme becoming Effective and one other contingency being met by LBA (namely, the withdrawal of the Proof Financial Products/Contribution Claim lodged with LBHI (see Section 2.3(c) above)), the US Insurers are obliged under the US Insurers' Agreement and Release to make payments to LBA which in aggregate total US$45 million (inclusive of GST, if any).

### 10.2   Payment by QBE

Subject to the Scheme becoming Effective, QBE is obliged under the QBE Deed of Release to pay LBA $3 million (inclusive of GST, if any).

### 10.3   Continuation of the liquidation

If the Scheme proceeds, the winding up of LBA will continue and the Liquidators will continue as the liquidators of LBA.

The Scheme will not have any impact on the investigative powers of the Liquidators. The net proceeds of any Liquidator Recoveries after the Scheme commences will be paid by the Liquidators to the Scheme Administrators to be distributed in accordance with the Scheme. As mentioned in Section 6.2 above, the Liquidators consider that there is a possibility of making recoveries from Lion Capital and/or LB Asia (in respect of the November 2012 Claims).

### 10.4   Scheme Administrators

Subject to the Liquidators and Christopher Clarke Hill executing and delivering the Scheme Administrator Deed Poll (being a deed substantially in the form set out in Schedule 1 of the Scheme), each of those three individuals will be appointed as the initial Scheme Administrators to administer the Scheme in accordance with its terms. The Liquidators have obtained the leave of the Court to act as Scheme Administrators of the Scheme.

The Scheme Administrators have principal responsibility for:

(a)      administering and supervising the implementation of the Scheme; and

(b)      determining and making payments in respect of Scheme Claims in accordance with the relevant rules and procedures under the Scheme including the CRP.

The Scheme Administrators will have power under the Scheme to allow them to perform these functions and will be entitled to be remunerated for, and reimbursed for any costs incurred in, carrying out their functions. The remuneration of the Scheme Administrators will be

determined by the Creditors' Committee or by the Court and will be paid from the Scheme Assets as a priority distribution under the Scheme.

Any person aggrieved by an act, omission or decision of the Scheme Administrators has a right of appeal to the Court under section 1321 of the Corporations Act.  The Court also has a general supervisory role over the Scheme Administrators.

The Scheme Administrators (in their capacity as Scheme Administrators) will not have any of the powers relating to recoveries available to liquidators under the antecedent transaction provisions of the Corporations Act.  Those functions and powers will remain with the Liquidators, and will not be affected by the Scheme, save that the net proceeds of any Liquidator Recoveries will become part of the funds available for distribution to Scheme Creditors.

## 10.5    Distributions to Scheme Creditors

Scheme Creditors will be entitled to have their Scheme Claims against LBA established in accordance with the Scheme.  For further information on the procedure for establishing Scheme Claims, see Section 11.

Distributions of Scheme Assets will be made by the Scheme Administrators to Scheme Creditors on the basis of their Established Scheme Claim (if any) in accordance with the Scheme.  Scheme Creditors will not be entitled to receive any distribution of Scheme Assets other than under the Scheme.  Two dividend funds will be established under the Scheme, through which distributions of Scheme Assets will be made.  For details of those two dividend funds, see Sections 12.1 to 12.3.  For details of the Liquidators' estimate of the timing of payments of dividends under the Scheme, and the assumptions underlying those estimates, see Section 6.2.

## 10.6    Releases of the US Insurer Parties

Under the Scheme and the US Scheme Release Deed, following the Liquidators' receipt of the US Settlement Payment, the US Insurer Parties will be released by Client Creditors, the Liquidators and LBA from all claims, causes of action and liabilities arising from or relating to, amongst other things:

(a)      CDO related claims of Client Creditors;

(b)      the causes of action asserted against LBA in the Wingecarribee Action;

(c)      the 2006/2007 Policies;

(d)      the approval of the Scheme; and

(e)      (in respect of Client Creditors only) any or all rights under section 6 of the *Law Reform (Miscellaneous Provisions) Act* 1946 (NSW) or equivalent statutes applicable in other jurisdictions.  (Section 6 of the *Law Reform (Miscellaneous Provisions) Act* 1946 (NSW) creates a statutory charge over any insurance moneys that are or may become payable in respect of an insured person's liability to pay damages or compensation.)

The precise terms of the releases to be provided by Client Creditors to the US Insurer Parties in connection with the Scheme are set out in the US Scheme Release Deed, annexed as Schedule 4 to the Scheme at **Appendix 1**.

Under the Scheme, each Client Creditor will appoint each of the Liquidators as their agent and attorney with full power to execute the US Scheme Release Deed on their behalf.

## 10.7    Release of the US Broker

If the Scheme becomes Effective, and upon receipt of the US Settlement Payment, the Liquidators and LBA will, pursuant to the US Insurers' Agreement and Release, release the US Broker and its affiliates, predecessors, successors, assigns and reinsurers from all causes of action based upon the 2006/2007 Policies and the 2007/2008 Policies in respect of all claims against LBA that are related to the Wingecarribee Action or other CDO related claims.

## 10.8    Release of QBE

Under the Scheme, the QBE Deed of Release and the QBE Scheme Release Deed, following the Liquidators' receipt of the QBE Settlement Payment, QBE will be released by Client Creditors and LBA from all claims, causes of action and liabilities arising from or relating to, amongst other things:

(a)      the provision by LBA of investment advice or investment management services in respect of investment products;

(b)      the causes of action asserted against LBA in the Wingecarribee Action;

(c)      the QBE Insurance Policies;

(d)      the approval of the Scheme; and

(e)      (in respect of Client Creditors only) any or all rights under section 6 of the *Law Reform (Miscellaneous Provisions) Act* 1946 (NSW) or any equivalent statute applicable in other jurisdictions, or any statutory claim for, or charge over, the proceeds of the QBE Insurance Policies.

The precise terms of the releases to be provided by Client Creditors to QBE in connection with the Scheme are set out in the QBE Scheme Release Deed, annexed as Schedule 9 to the Scheme at **Appendix 1**.

Under the Scheme, each Client Creditor will appoint each of the Liquidators as their agent and attorney with full power to execute the QBE Scheme Release Deed on their behalf.

## 10.9    Release of LB Asia Holdings

If the Scheme becomes Effective, each Client Creditor, LBA and the Liquidators will release LB Asia Holdings from any claim arising from or in connection with the Wingecarribee Action, matters and circumstances underlying that action or other CDO related claims.

## 10.10    Relinquishment of claims and release of the Liquidators

If the Scheme proceeds, Scheme Creditors' claims against LBA will be relinquished and replaced with their entitlements under the Scheme, which are, in summary, to prove their Scheme Claim and receive a dividend in respect of that proven Scheme Claim.

The Liquidators and Neil Geoffrey Singleton (in his capacity as a former liquidator of LBA) will also be released from any claim, cause of action or liability which Scheme Creditors may have against them.

## 10.11    Disposal of proceedings

The Scheme prohibits Scheme Creditors from commencing or maintaining, on or after the Effective Date, any Recovery Proceedings.  Any Recovery Proceeding brought before or after the Effective Date will be dismissed or otherwise disposed of.

If, in contravention of the express prohibition under the Scheme, a Scheme Creditor institutes or maintains a Recovery Proceeding and obtains a judgment or an award relating to a Scheme Claim, that judgment or award will not qualify as an Established Scheme Claim under the Scheme and the Scheme Creditor will not be entitled to receive any distribution under the Scheme on the basis of that judgment.

Except to the extent that LBA has failed to perform any of its payment obligations under the Scheme, Scheme Creditors are prohibited from commencing any proceedings against LBA for the purposes of enforcing payments in respect of any Scheme Claim.

**Wingecarribee Action**

If the Scheme proceeds, and with effect from the Release Date, the Wingecarribee Action, being a LBA Client Creditor Proceeding, will be dismissed or otherwise disposed of.  The Liquidators will be authorised by each Scheme Creditor to achieve such disposal.  Similarly, the Liquidators will withdraw LBA's appeal in respect of the Common Issues Orders and the Declaratory Relief.  For further information on the effect of the Scheme on the Common Issues Orders, refer to Section 4.

In relation to the Declaratory Relief, the Total Established Scheme Claim Amounts of the Applicants will be calculated in accordance with that relief.  For further information on the Total Established Scheme Claim Amounts of the Applicants, see clause 6.1 of the Scheme.

## 10.12    Consequences of a breach of the release deeds

In addition to the covenant to release the US Insurer Parties under the US Scheme Release Deed and the covenant to release QBE under the QBE Scheme Release Deed, each Client Creditor is further obliged, under a further assurances clause in the Scheme, to do anything that the Scheme Administrators consider necessary or desirable to give full effect to the Scheme and the transactions contemplated by the Scheme.

Any Client Creditor who brings or pursues a claim against the US Insurer Parties or QBE on or from the Release Date (and who, in the opinion of the Scheme Administrators, is therefore in contravention of the US Scheme Release Deed or the QBE Scheme Release Deed) will, in addition to any other legal consequences for breach of its contractual obligations, be disqualified from any distribution of Scheme Assets or any other rights under the Scheme unless and until the breach has been rectified to the reasonable satisfaction of the Scheme Administrators.  If, upon the rectification of the breach, Scheme Assets have already been distributed to other Scheme Creditors and there are insufficient Scheme Assets remaining for the purposes of making a distribution to that Scheme Creditor, its entitlement to a distribution under the Scheme will be limited to the Scheme Assets then available.

### 10.13    Independent Adjudicators

Under the Scheme, the Independent Adjudicators will be:

(a)     The Hon Michael McHugh AC QC;

(b)     The Hon Roger Gyles AO QC;

(c)     The Hon Kevin Edmund Lindgren AM, QC;

(d)     Peter Braham SC;

(e)     Peter Brereton SC;

(f)     Elizabeth Cheeseman SC;

(g)     Elizabeth Collins SC;

(h)     Robert Dick SC;

(i)     John Halley SC;

(j)     Ian Pike SC; and

(k)     Jeremy Stoljar SC.

The nominated individuals have indicated that they are prepared to act as Independent Adjudicators. Upon execution and delivery of an Independent Adjudicator Deed Poll (a deed substantially in the form set out in Schedule 3 of the Scheme), each of those individuals will be appointed as Independent Adjudicators on and from the Effective Date.

Once appointed, the Independent Adjudicators will be responsible for the determination and valuation of any Scheme Claim referred to them in accordance with the rules of the Scheme (including the CRP). Where a Client Creditor fails to reach agreement with the Scheme Administrators as to its Scheme Claim and elects for its claim to be adjudicated, that Scheme Claim will be referred to and determined by an Independent Adjudicator. The Independent Adjudicators will receive remuneration from the Scheme Assets for carrying out their functions under the Scheme.

## 11.    Scheme Claims and adjudication procedure

### 11.1    Claims Period

Within 7 Business Days after the Effective Date, the Scheme Administrators will notify each known Scheme Creditor of the commencement of the Claims Period and provide it with a Final Scheme Proof.

During the Claims Period, which is a 42 day period commencing on the day after the Effective Date, subject to any extension by the Scheme Administrators, the Scheme Administrators may endeavour to reach agreement with Scheme Creditors in relation to their claims. If agreement is reached between the Scheme Administrators and the Scheme Creditor during the Claims Period, the Scheme Creditor will not be required to lodge a Final Scheme Proof in order to be entitled to a distribution of the Scheme Assets in respect of the amount agreed.

If no agreement is reached during the Claims Period, the Scheme Creditor (other than Trade Creditors and the Applicants) must lodge a Final Scheme Proof in order to be entitled to any distribution under the Scheme. Final Scheme Proofs must be received by the Scheme Administrators within 42 days after the Effective Date, or such longer period notified by the Scheme Administrators.

Any Scheme Creditors who do not reach agreement with the Scheme Administrators during the Claims Period and do not lodge a valid Final Scheme Proof so that it is received by the Scheme Administrators within the Claims Period (other than Trade Creditors and the Applicants) will not be entitled to any distributions under the Scheme unless the Scheme Administrators exercise their discretion to treat as valid any Final Scheme Proof lodged by the Scheme Creditor after the Claims Period.

The Scheme Administrators may extend the Claims Period by posting a notice on their website.

## 11.2    Completing Final Scheme Proof

Trade Creditors and the Applicants will not be required to submit a Final Scheme Proof.

All other Scheme Creditors who do not reach agreement with the Scheme Administrators during the Claims Period will be required to provide particulars and supporting evidence to prove their claims against LBA in order to be entitled to receive any distributions under the Scheme.

## 11.3    Agreement of Final Scheme Proofs of Client Creditors

For each Client Creditor that submits a valid Final Scheme Proof, the Scheme Administrators and the Client Creditor must endeavour to reach agreement on the Client Creditor's Total Established Scheme Claim Amount in accordance with part A of the CRP.

Part A of the CRP requires each Client Creditor to complete and submit to the Scheme Administrators, in addition to its Final Scheme Proof, a questionnaire, verified by a statutory declaration, together with other information supporting its claim. Following their review of the information received, the Scheme Administrators will, within a prescribed timeframe, notify each Client Creditor of the Amount, being the amount (which may be nil) for which the Scheme Administrators are prepared to admit its claim.

If the Client Creditor notifies acceptance of the Amount, the claim will be admitted for that Amount. If the Client Creditor does not notify the Scheme Administrators that the Amount is accepted or that a Counter-Offer is made or that it elects to have an Independent Adjudicator appointed, then the Scheme Administrators will admit the Client Creditor for the Amount.

The Client Creditor may make a Counter-Offer to the Scheme Administrators. If the Counter-Offer is accepted by the Scheme Administrators, the amount specified in the Counter-Offer will be admitted. If it is not accepted, then the Client Creditor's claim will be referred to an Independent Adjudicator for determination.

## 11.4    Adjudication of claims of Client Creditors

If the Scheme Administrators and a Client Creditor cannot reach agreement on the amount for which the claim should be admitted, then, the Client Creditor's Final Scheme Proof will be referred to an Independent Adjudicator in accordance with part B of the CRP.

Part B of the CRP contains procedures and guidelines to be followed by an Independent Adjudicator once a claim of a Client Creditor has been referred to him or her by the Scheme Administrators.

The maximum period within which the Independent Adjudicator must determine the claims of the relevant Client Creditor is 120 days following his or her acceptance of appointment. Within 7 days of the notification by the Independent Adjudicator of the Determination, the Scheme Administrators will admit the Client Creditor for the amount specified in the Determination or for an amount not less than the amount specified.

A more detailed overview and explanation of the CRP is contained in Section 4.

## 11.5    Adjudication risk

Client Creditors should carefully consider any decision to have their claims determined by an Independent Adjudicator rather than by agreement with the Scheme Administrators.  If a Final Scheme Proof is referred to an Independent Adjudicator, any offer made by the Scheme Administrators during negotiations with the Client Creditor will have been rejected and there is a risk of the Independent Adjudicator making a less favourable determination in respect of the Client Creditor's claims.

At the commencement of the independent adjudication process, a Client Creditor must elect either:

- for each party to pay their own costs (whatever the outcome); or

- for costs to follow the event, such that:

  - if the amount offered by the Scheme Administrators prior to the adjudication process was more favourable than the amount determined by the Independent Adjudicator, the Scheme Administrators' reasonable costs incurred in the adjudication process will be paid by the Client Creditor and may be deducted from any payment made to that Client Creditor; or

  - if the amount offered by the Scheme Administrators prior to the adjudication process was less favourable than the amount determined by the Independent Adjudicator, the Client Creditor's reasonable costs incurred in the adjudication process will be paid by the Scheme Administrators out of the Scheme Assets.

## 11.6    Notification of Established Scheme Claims and payment of dividends

The Scheme Administrators will send to each Scheme Creditor a notice setting out the details of its Established Scheme Claim Amounts and Total Established Scheme Claim Amount.

## 11.7    Appeal

If a Scheme Creditor does not agree with the determination of a Scheme Creditor's:

- Established Scheme Claim Amounts; or

- Total Established Scheme Claim Amount,

the Scheme Creditor may appeal to the Court pursuant to section 1321 of the Corporations Act.

To avoid doubt, on any such appeal in relation to the determination by the Scheme Administrators of a Client Creditor's Established Scheme Claim Amounts or Total Established Scheme Claim Amount following a decision by an Independent Adjudicator in respect of that Client Creditor's claims, the Scheme Creditor bringing the appeal may rely on any ground which would have been available if the relevant decision of the Independent Adjudicator had been a decision of the Scheme Administrators.

## 12. Payment of dividends

### 12.1 Dividend funds

Dividends will be made to Scheme Creditors out of the following funds:

- **Insurance Proceeds Fund** - consisting of the US Settlement Payment, the QBE Settlement Payment and any other amounts received by LBA or the Liquidators from an insurer to which section 562 of the Corporations Act would apply in a winding up; and

- **General Scheme Fund** - consisting of all other Scheme Assets of LBA.

### 12.2 Insurance Proceeds Fund

Dividends from the Insurance Proceeds Fund will be applied by the Scheme Administrators:

- first, in payment to the General Scheme Fund of an amount not exceeding $4.45 million in respect of costs and expenses incurred in recovering the US Settlement Payment;

- secondly, in payment of $3.535 million to the Applicants or, at their direction, to IMF, as a contribution to the amount payable by the Applicants to IMF for funding the Wingecarribee Action; and

- subsequently, in payment of the Total Established Scheme Claim Amounts of Client Creditors on a pari passu basis.

### 12.3 General Scheme Fund

The General Scheme Fund will be applied in the following order:

- payment of all outstanding Pre-Scheme Costs and all outstanding debts and claims that fall within the scope of those debts and claims which would be accorded priority in the winding up of LBA pursuant to section 556 of the Corporations Act (including the costs ordered to be paid to the Applicants in the Wingecarribee Action);

- payment of other Priority Claims;

- payment of Established Trade Creditor Claims at the rate of 75 cents in the dollar; and

- payments of all other Established Scheme Claims (except the Subordinated Claim) on a pari passu basis of up to 75 cents in the dollar.

To the extent that there are any funds remaining in the General Scheme Fund following the above payments, those funds will be applied towards the payment of the balance outstanding of the Established Trade Creditor Claims and other Established Scheme Claims on a pari passu basis.

Each Client Creditor with an entitlement to receive a distribution from the Insurance Proceeds Fund will also be entitled to receive a dividend from the General Scheme Fund in respect of the balance outstanding of its Total Established Scheme Claim Amount after receipt of its dividend from the Insurance Proceeds Fund.

## 12.4    Scheme Administrators may withhold dividends of defaulting Scheme Creditors

The Scheme Administrators may withhold the payment of dividends to a Scheme Creditor as follows:

- if a Scheme Creditor is, in the reasonable opinion of the Scheme Administrators, in breach of the Scheme, the US Scheme Release Deed or the QBE Scheme Release Deed, until such breach has been rectified to the reasonable satisfaction of the Scheme Administrators;

- until any amounts owing by the Scheme Creditor to LBA and not already taken into account in the calculation of the Scheme Creditor's Total Established Scheme Claim Amount have been paid; or

- if the Liquidators have made a claim against the Scheme Creditor in respect of any Liquidator Recoveries, until the relevant Liquidator Recovery is made.

A Scheme Creditor who is aggrieved by a decision of the Scheme Administrators to withhold the payment of a dividend to that Scheme Creditor may appeal to the Court in respect of that decision under section 1321 of the Corporations Act.

## 12.5    Foreign Scheme Creditors

Any dividends to which a Foreign Scheme Creditor would otherwise be entitled under the Scheme will be held on trust by the Scheme Administrators for the benefit of the Foreign Scheme Creditor.  Once the Foreign Scheme Creditor has ratified and agreed to be bound by:

(a)      the Scheme; and

(b)      (if the Foreign Scheme Creditor is a Client Creditor) the US Scheme Release Deed and the QBE Scheme Release Deed,

by completing and duly signing a Ratification Deed Poll and delivering it to the Scheme Administrators, the withheld distributions will be released from trust and distributed to the relevant Foreign Scheme Creditor under the Scheme.

If any Foreign Scheme Creditor does not ratify and agree to be bound by the Scheme within 60 days of the date on which the Scheme Administrators notify the Foreign Scheme Creditor of its Established Scheme Claim Amounts and Total Established Scheme Claim Amount, all

distributions to which that Foreign Scheme Creditor would otherwise be entitled will be released from trust and distributed to other Scheme Creditors in accordance with the Scheme.

## 13.    Initial Creditors' Committee

A Creditors' Committee will be appointed to monitor the implementation of the Scheme and to assist the Scheme Administrators in the exercise of their functions under the Scheme.  The initial Creditors' Committee will be appointed by election at the Scheme Meetings.

A nomination form for the initial Creditors' Committee was sent to each known creditor together with this Explanatory Statement.  Scheme Creditors who have not received the form should contact the Registry at:

> *Link Market Services Limited*
> **Address**: Locked Bag A14, Sydney South NSW 1235
> **Ph**: 1300 660 106 (if dialled from within Australia)
> **Ph**: +61 1300 660 106 (if dialled from outside of Australia)
> **Email**: lehman@linkmarketservices.com.au

Scheme Creditors may nominate themselves or another Scheme Creditor or any third party (designated by notice in writing to the Scheme Administrators), to represent them on the Creditors' Committee by completing and lodging the nomination form so that it is received by the Registry by 11.00 am (Sydney time) on 17 June 2013.

At the election for the initial Creditors' Committee, each Scheme Creditor eligible to vote will be entitled to cast one vote in favour of one nominee for appointment to the initial Creditors' Committee.  Each Scheme Creditor's vote will be given a voting value which will be determined in accordance with the estimate made of that Scheme Creditor's claims for voting purposes.  The nominees who receive votes with, in aggregate, the highest voting value will be appointed to fill up to the maximum number of 7 appointments to the Creditors' Committee.

The appointment of a member to the Creditors' Committee is subject to that appointee executing and delivering to the Scheme Administrators the Creditors' Committee Deed Poll (a deed poll substantially in the form set out in Schedule 5 to the Scheme).  Once appointed, each member of the Creditors' Committee that is a company or some other body corporate must nominate a natural person to be its representative at Creditors' Committee meetings.

LBA currently has a committee of inspection.  The names of the members of this committee of inspection, and who they represent, are listed in **Appendix 7**.

For further details of the functions and powers of the Creditors' Committee, refer to part 17 of the Scheme.

## 14.    Information required by statute

### 14.1    Material interests of directors

As at the date of this Explanatory Statement, no director of LBA has any interest, whether as a director, member or creditor of LBA or otherwise, that is material in relation to the Scheme, and the Scheme has no effect on the interests of any director of LBA that is different to the effect on the like interests of other persons.

If the Scheme proceeds, Glenn Willis, a former director of LBA, will be entitled to receive a dividend from the General Scheme Fund in respect of his outstanding employee entitlements of $206,000. These entitlements are not afforded any priority in the liquidation under section 556 of the Corporations Act and accordingly will receive the same pari passu distribution as Other Creditors from the General Scheme Fund.

## 14.2   Expected dividend if Scheme were put into effect as proposed

Paragraph 8201(b) of Part 2 of Schedule 8 to the Corporations Regulations requires that, if a composition of debts is proposed, this Explanatory Statement set out the expected dividend that would be paid to Scheme Creditors if the Scheme were put into effect as proposed.

For details of the Liquidators' estimate of the dividends to be received by Scheme Creditors who establish their claims against LBA in accordance with the Scheme, refer to Section 6.2.

## 14.3   Expected dividend if LBA were wound up in 6 months

Paragraph 8201(a) of Part 2 of Schedule 8 to the Corporations Regulations requires that the Explanatory Statement set out the expected dividend that would be available to Scheme Creditors if LBA were to be wound up within 6 months after the hearing of the application to the Court to convene the Scheme Meetings.

This requirement is inapplicable to LBA to the extent that LBA is in fact already being wound up. However, the Liquidators' estimate of the ultimate dividend likely to be paid to Scheme Creditors in a liquidation only scenario is set out in Section 6.3.

## 14.4   Names of all known creditors, guaranteed creditors and internal creditors and the debts owed to those creditors

ASIC has confirmed that this Explanatory Statement does not need to contain the information required by paragraphs 8201(c) and 8201(d) of Part 2 of Schedule 8 of the Corporations Regulations.

In relation to information required to be disclosed under paragraph 8201(e), the Liquidators are only aware of one "internal creditor" of LBA (as defined in paragraph 8101 of Part 1 of Schedule 8 of the Corporations Regulations), and that "internal creditor" is LBA Granica, which holds 100% shareholding in LBA. The Liquidators estimate that the amount of the debt owed by LBA to LBA Granica is approximately $87.5 million. The debt is subordinated and it is not expected that LBA Granica will receive a dividend under the Scheme.

## 14.5   Copies of financial statements

Paragraph 8203(b) of Part 2 of Schedule 8 of the Corporations Regulations requires this Explanatory Statement to contain, in respect of LBA, "a copy, certified by a director or secretary of the company to be a true copy, of all financial statements required to be lodged with ASIC by the company, together with a copy of every document required by law to be annexed to the financial statements."

LBA's obligation to lodge financial statements with ASIC has been suspended since it entered into external administration. As such, this Explanatory Statement does not contain any financial statements. ASIC has confirmed that this Explanatory Statement does not need to contain or have annexed to it the information required by paragraph 8203(b) of Part 2 of Schedule 8 of the Corporations Regulations.

### 14.6    Financial report - ASIC Form 507

The report as to affairs of LBA (Form 507) is attached at **Appendix 9**. This report provides summary details of the assets and liabilities of LBA as at 15 March 2013.

ASIC has confirmed that the report as to affairs of LBA in accordance with Form 507, which is required by paragraph 8203(a) of Part 2 of Schedule 8 of the Corporations Regulations to be attached to this Explanatory Statement, does not need to include the following information:

(a)    information referred to in paragraphs 8201(c) and 8201(d) of Part 2 of Schedule 8 of the Corporations Regulations and the addresses of the creditors referred in those paragraphs;

(b)    the names and addresses of sundry debtors of LBA and the debts owed by each of those debtors; and

(c)    the addresses of employees who are also creditors of LBA.

### 14.7    Obtaining a copy of LBA's register of Scheme Creditors

As a condition to ASIC's relief from the disclosure requirements referred to in Sections 14.4 and 14.6, LBA will maintain a register of:

(a)    the names of Scheme Creditors and the amount of debt owed (where known) to each;

(b)    the names of guaranteed creditors and the amount of debt owed (where known) to each; and

(c)    the names of sundry debtors of LBA and the debts owed by each of those debtors.

A Scheme Creditor may obtain a copy of that register free of charge by:

(a)    making a request in writing to the Liquidators; and

(b)    providing a written undertaking only to use the information contained in the register in connection with the exercise of its rights under the Scheme or the proposed Scheme.

Upon receipt of a written request, the Liquidators will provide the Scheme Creditor with a form of undertaking to be completed for the purposes of obtaining a copy of the register.

The Liquidators will provide the Scheme Creditor with a copy of the register within 7 days of their receipt of the Scheme Creditor's completed written undertaking.

Written requests for a copy of the register and the completed written undertakings should be sent to the Liquidators at:

The Liquidators - Lehman Brothers Australia Limited
PPB Advisory
Level 46, MLC Centre
19 Martin Place
SYDNEY  NSW  2000
Attention:  Zoe Wanley/Daisy Fitzgerald

## 14.8      No endorsement

The Important notices and disclaimers Section of this Explanatory Statement contains a statement to the effect that the Court order made under section 411(1) of the Corporations Act is not an endorsement of, or any other expression of opinion on, the Scheme by the Court or ASIC.

## 14.9      Schedule of hourly rates

Stephen James Parbery, Christopher Clarke Hill and Marcus William Ayres of PPB Advisory will act as the Scheme Administrators, and the Court has granted leave permitting the Liquidators to act as Scheme Administrators.  The Scheme Administrators' current schedule of hourly rates is attached as **Appendix 8**.

## 14.10     LBA as trustee

Paragraph 8203(c) of Part 2 of Schedule 8 to the Corporations Regulations requires this Explanatory Statement to state the number of trusts administered by LBA as a trustee, whether LBA carried on any business separate from that of the trust and how Scheme Creditors may obtain a copy of the relevant trust deed, free of charge, prior to the date of the Scheme Meetings.

As mentioned in Sections 1.1 and 2.4(e) above, LBA is the trustee of an investment unit trust, the GCT.  The Liquidators are not aware of any other trusts administered by LBA.

The balance of LBA's business, including its business of providing investment advice and investment management services to clients, was carried out by LBA in its personal (non-trustee) capacity and separate from that of the GCT.

Prior to the date of the Scheme Meetings, a Scheme Creditor may obtain a copy of the trust deed of the GCT by:

(a)        making a request in writing to the Liquidators; and

(b)        providing a written undertaking only to use the information contained in the trust deed in connection with the exercise of its rights under the proposed Scheme.

Upon receipt of the request, the Liquidators will provide the Scheme Creditor with a form of undertaking to be completed for the purposes of obtaining a copy of the trust deed.

Written requests for a copy of the trust deed and the completed written undertakings should be sent to the Liquidators at:

> The Liquidators - Lehman Brothers Australia Limited
> PPB Advisory
> Level 46, MLC Centre
> 19 Martin Place
> SYDNEY  NSW  2000
> Attention:  Zoe Wanley/Daisy Fitzgerald

## 15.    Voting at the Scheme Meetings

### 15.1    General

The Scheme Meetings will commence at 11.00 am (Sydney time) on 19 June 2013 at the Sofitel Sydney Wentworth (Adelaide Room), 61-101 Phillip Street, Sydney, NSW.

### 15.2    Who is entitled to vote at the Scheme Meetings?

Creditors who have a Scheme Claim will be eligible to vote.

Scheme Creditors who do not vote at the Scheme Meetings will still be bound by the Scheme and will still be entitled to have their claims determined under the Scheme, provided that the Scheme is approved by the Statutory Majority of each class of Scheme Creditors and the Court.

If you wish to cast a vote either for or against the Scheme, you will need to vote at the Scheme Meeting at which you are entitled to vote.

### 15.3    Classes of Scheme Creditors for voting on the Scheme

In making its orders under section 411(1) of the Corporations Act to convene the Scheme Meetings, the Court determined that the creditors of LBA fall into 5 classes, whose rights in respect of, or arising from, the Scheme are sufficiently different that they ought to vote on the Scheme separately.

The 5 classes are Client Creditors, Trade Creditors, Released Related Party Creditor, Subordinated Creditor and other Scheme Creditors:

(a)    Client Creditors are the Applicants, the Group Members and any other creditor who has a Scheme Claim arising from:

   (i)    the provision by LBA of investment advice or investment management services in respect of the acquisition of an investment product; or

   (ii)    any alleged representation by LBA in relation to an investment product or investment management services offered by LBA; or

   (iii)    the sale by LBA of an investment product.

   For the avoidance of doubt, a GCT Beneficiary is not a Client Creditor.

(b)    Trade Creditors are all trade creditors of LBA (being the suppliers of goods and services to LBA).

(c)    The Released Related Party Creditor is LB Asia Holdings, a company that is related to LBA and which will receive releases under the Scheme.

(d)    The Subordinated Creditor is LBA Granica, whose claims against LBA have been subordinated in accordance with a subordination deed dated 7 March 2007 between LBA Granica, LBA and ASX Limited.

(e)      All other Scheme Creditors, that is, all other creditors of LBA who are not Client Creditors, Trade Creditors, the Released Related Party Creditor or the Subordinated Creditor.  For instance, the GCT Beneficiaries will fall within this class of Scheme Creditors.

## 15.4      Items of business at the Scheme Meetings

It is intended that the Scheme Meetings will proceed as follows:

- the Scheme Meetings will be opened concurrently at 11.00 am (Sydney time) on 19 June 2013;

- all present Scheme Creditors will attend an address by the Chairman of the Scheme Meetings and a joint question and answer session during which Scheme Creditors will have a reasonable opportunity to ask questions regarding the Scheme;

- the Scheme Meetings (other than the Scheme Meeting for the Client Creditors class) will be adjourned;

- the Scheme Meeting for the Client Creditors class will be held immediately after the adjournment of all the other Scheme Meetings and then adjourned;

- the Scheme Meeting for the Trade Creditors class will be resumed and held immediately after the Scheme Meeting for the Client Creditors class and then adjourned;

- the Scheme Meeting for the Released Related Party Creditor class will be resumed and held immediately after the Scheme Meeting for the Trade Creditors class and then adjourned;

- the Scheme Meeting for the other Scheme Creditors class will be resumed and held immediately after the Scheme Meeting for the Released Related Party Creditor class and then adjourned;

- the Scheme Meeting for the Subordinated Creditor class will be resumed and held immediately after the Scheme Meeting for the other Scheme Creditors class and then adjourned; and

- the Scheme Meetings of all 5 classes of Scheme Creditors will then be resumed and held concurrently to elect the initial Creditors' Committee for the Scheme.

Scheme Creditors are encouraged to attend their respective Scheme Meetings (including the joint question and answer session) from 11.00 am (Sydney time) on 19 June 2013.

## 15.5      Voting Proof of Debt Forms

A Voting Proof of Debt Form was sent to each known creditor of LBA together with this Explanatory Statement.  Scheme Creditors who have not received a Voting Proof of Debt Form should contact the Registry at:

> **Link Market Services Limited**
> **Address**: Locked Bag A14, Sydney South NSW 1235
> **Ph**: 1300 660 106 (if dialled from within Australia)

**Ph**: +61 1300 660 106 (if dialled from outside of Australia)
**Email**: lehman@linkmarketservices.com.au

If you wish to vote at the Scheme Meetings you must lodge your Voting Proof of Debt Form with the Registry in order to establish the amount of your claim against LBA for voting purposes.  You should ensure that you lodge your Voting Proof of Debt Form, in accordance with the instructions on the form, so that it is received by the Registry by 11.00 am (Sydney time) on 17 June 2013.

Your Voting Proof of Debt Form will be adjudicated for voting purposes, and a "just estimate" of your claims will be made by the Chairman of the Scheme Meetings, if so required by the Corporations Regulations.  Any adjudication or estimate of claims (based on your Voting Proof of Debt Form) will be relevant for voting purposes only.  It will not be taken into account in the ultimate determination of your claim under the Scheme.

**Just estimate for Client Creditors**

In order for Client Creditors' claims to be admitted for voting purposes, Client Creditors will need to identify and particularise the factual and legal basis of their claims against LBA.  Client Creditors will also be required to particularise the quantum of their losses.

It is the responsibility of each Client Creditor to ensure that the basis of its claim is properly substantiated in its Voting Proof of Debt Form in order for it to be accepted for voting purposes.  In addition, the Chairman may have regard to prior proofs lodged at earlier meetings of creditors of LBA or any material previously forwarded to the Liquidators.

Decisions by the Chairman in relation to admission of Client Creditor claims for voting purposes will be informed by the judgment in the Wingecarribee Action and the particular issues which it resolves.  However the judgment is only binding with respect to the Applicants and, in respect of the other Client Creditors who are Group Members, is only binding in relation to the Common Issues Orders, leaving a number of other issues to be proved by those Group Members.  Client Creditors (other than the Applicants) seeking to rely on the judgment will therefore still need to provide sufficient details and particulars to substantiate their claims in light of their own individual circumstances.  For example, not all Client Creditors are LGAs or IMP Client Creditors.  Furthermore, each Client Creditor other than the Applicants (whose loss position has already been ascertained) will need to particularise and substantiate the quantum of their loss which is the subject of the Voting Proof of Debt Form.

The Chairman is required to analyse whether the Voting Proof of Debt Form properly discloses the basis of the Client Creditor's claim.  The legal and factual basis of the claim must be fully particularised.  The Chairman will then consider whether liability has been properly established by the Client Creditor.  If not, the Chairman may reject the proof in its entirety.  If the liability is established such that the relevant minimum standard is met, but the value of the claim is uncertain or the claim is contingent, then the Chairman is required to attempt to make a just estimate of the value of the claim based on facts then known as to the claim's value for voting purposes.  That may involve discounting the claim for voting purposes by reference to certain factors, such as contributory negligence.  In some circumstances, where the Chairman is satisfied that there is a claim for some amount, but the actual amount cannot be ascertained, the Chairman may consider admitting a claim for a nominal amount of $1.  Where it is not possible for the Chairman to make a just estimate, the claim may be rejected.

### 15.6 Voting in person or by proxy

Scheme Creditors are entitled to attend the Scheme Meetings and to vote in person or by proxy or, in the case of a corporation, by authorised corporate representative.

A Proxy Form was sent to each known creditor of LBA together with this Explanatory Statement.

Scheme Creditors who wish to vote by proxy should complete and lodge the Proxy Form in accordance with the instructions on the form, so that it is received by the Registry by 11.00 am (Sydney time) on 17 June 2013.  Scheme Creditors who have not received a Proxy Form should contact the Registry at:

> ***Link Market Services Limited***
> **Address**: Locked Bag A14, Sydney South NSW 1235
> **Ph**: 1300 660 106 (if dialled from within Australia)
> **Ph**: +61 1300 660 106 (if dialled from outside of Australia)
> **Email**: lehman@linkmarketservices.com.au

### 15.7 Modification of the terms of the Scheme

Scheme Creditors may make modifications to the terms of the Scheme at the Scheme Meetings prior to the passing of a resolution to approve the Scheme.  However, Scheme Creditors should be aware that there are risks associated with modifying the terms of the Scheme (refer to Section 9.13 for details).

### 15.8 Appeals against the decisions on claims for voting purposes

In accordance with the orders made by the Court to convene the Scheme Meetings, a decision to admit or reject a Voting Proof of Debt Form for voting purposes may be appealed to the Court within 2 Business Days of that decision.

### 15.9 Notices, documents or questions

Completed Proxy Forms, Voting Proof of Debt Forms and nomination forms for the Creditors' Committee should be delivered, posted, faxed or emailed to the Registry using the contact details provided on the forms by 11.00 am (Sydney time) on 17 June 2013.

Any questions in relation to the lodgement of Proxy Forms, Voting Proof of Debt Forms or nomination forms for the Creditors' Committee should be directed to the Registry at:

> ***Link Market Services Limited***
> **Address**: Locked Bag A14, Sydney South NSW 1235
> **Ph**: 1300 660 106 (if dialled from within Australia)
> **Ph**: +61 1300 660 106 (if dialled from outside of Australia)
> **Email**: lehman@linkmarketservices.com.au

**EXHIBIT C**

(Liquidators' March 19, 2009 Report to Creditors)









# REPORT TO CREDITORS
## PURSUANT TO SECTION 439A OF THE ACT

## LEHMAN BROTHERS AUSTRALIA LIMITED (ADMINISTRATORS APPOINTED) ACN 066 797 760

19 March 2009

**S. J. Parbery & N. G. Singleton**
Joint and Several Voluntary Administrators



**Recovery** Forensics Advisory



# Important Notice to the Reader



This Report is formulated on information obtained from books and records of Lehman Brothers Australia Limited (Administrators Appointed) ACN 066 797 760 ("the Company"), (and its related subsidiary and affiliated companies), the Directors, management and interviews with relevant persons.

In reviewing this report, creditors should note the following:

- The statements and opinions given in this report are given in good faith and in the belief that such statements and opinions are not false or misleading. Except where otherwise stated, we reserve the right to alter any conclusions reached, on the basis of any change in, or addition to, information which may become available to us between the date of this report and the date of the Second Meeting of Creditors.

- Neither PPB nor any member or employee thereof undertakes responsibility in any way whatsoever to any person in respect of any errors in this report arising from incorrect information provided to us.

- Our investigations have been limited due to time constraints placed on us by the Corporations Act and access to Lehman Global information. Whilst we have been granted an extension of time in which to prepare this Report, there remain a number of issues where certain assumptions have been required. Where appropriate, we have highlighted these assumptions throughout the report, and to the extent necessary, have considered the possible impact of same when making our recommendation to creditors.

- In considering the options available to creditors and formulating our recommendation, we have necessarily made forecasts on likely asset realisations and forecast total creditor claims. These forecasts and estimates may change as asset realisations progress and claims are received from creditors. Whilst the forecasts and estimates are the result of our best assessment in the circumstances, creditors should note that the ultimate deficiency, and thus the outcome for each creditor, could vary from the information provided in this report.

- In considering the options available to creditors and formulating our recommendation, we have necessarily made assumptions with regards to the possible liability due to certain contingent creditors, namely those entities/persons that have commenced or are contemplating commencing, proceedings against the Company for, amongst other things, misleading and deceptive conduct in offering for sale certain financial products. At no time should any aspect of this report be considered an admission of any liability to any of these entities/persons. The Company has defences to all proceedings and will vigorously defend any and all actions made against it. The only true means to determine whether such liability exists, and the quantum of same, is through the running of legal proceedings. Any assumptions therefore made with respect to liability in this Report are for analytical reference only.

- The major asset of the Company which is available to meet creditor claims is a proprietary book consisting of corporate bonds and CDO's (Collateralised Debt Obligations). The value of these assets is difficult to determine due to a severe lack of liquidity in financial markets at present. Consequently, both the recoverable value of assets, and the value of potential contingent claims, will be materially impacted by future market changes (both improvements and deteriorations).

# Important Notice to the Reader (cont)



- As at the date of this Report, a Deed is in the process of being developed, and we expect prior to the Second Meeting of Creditors, will be formally proposed by Lehman Brothers Asia Holdings Limited (Provisional Liquidators Appointed)("LB Asia Holdings"). Details of this proposed Deed are provided at Section 12 of this Report.

  - If the Deed is approved by creditors, parties who would be bound by the Deed include all actual and contingent creditors of the Company, (including all persons or entities that have contingent or unliquidated claims), irrespective of whether those parties abstain from voting, vote in favour of, or vote against the proposed Deed.

  - The effect of the proposed Deed is that the largest creditor of the Company, LB Asia Holdings, proposes to subrogate the first AUD35 million of its dividend entitlement as an unsecured creditor, in favour of a Deed Pool to be known as the "Contingent Claimants Deed Pool". This is the Pool from which all contingent claimants would be entitled to participate, based on their shortfall calculated by reference to direct losses on investments using a mark to market at 26 September 2008 (the date of the Administrators appointment).

  - In exchange for contributing AUD35 million and creating this deed pool, all claimants (whether they abstain, vote in favour of or vote against the proposed Deed) will be providing a legally enforceable release in favour of:

    - LBA;

    - All other Australian domiciled Lehman Brothers entities;

    - All other Lehman global entities; and

    - The Directors, Officers, and employees of all Lehman Companies.

However, claimants will not be providing a release to other third parties against whom a claim may exist, including but not limited to:

  - Ratings Agencies;

  - Insurers of Lehman Companies (a mechanism is incorporated into the Deed to settle claims against insurers and to provide a release in exchange for that settlement); and

  - Third party advisors.

**If creditors and claimants are unsure as to how the proposed Deed is to operate, require clarification in respect of its operation, or have any queries in relation to the creditors report generally, they should obtain legal and other professional advice they consider appropriate, and contact Marcus Ayres of our office immediately by;**

**Email:** **mayres@ppb.com.au**

**Telephone:  +61 (0)2 8116 3295**

# Contents



| Section | | Page |
|---|---|---|
| 1 | Preamble | 9 |
| 2 | Executive Summary | 10 |
| 3 | Second Meeting of Creditors | 18 |
| 4 | Overview of Company's Operations | 21 |
| 5 | Sale of Assets | 25 |
| 6 | Historical Financial Performance & Position | 26 |
| 7 | Summary of Assets & Liabilities | 28 |
| 8 | Review of Key Assets | 34 |
| 9 | Review of Key Liabilities | 40 |
| 10 | Investigations | 48 |
| 11 | Liquidation Alternative | 55 |
| 12 | Deed Alternative | 58 |
| 13 | Review of Alternatives Available to Creditors | 62 |
| 14 | Receipts and Payments | 64 |
| 15 | Administrators Remuneration | 65 |

Together we unlock value

# Abbreviations



**ANZ** means Australia and New Zealand Banking Group Limited

**Armada Trading** means Armada Trading Pty Limited

**ASIC** means the Australian Securities and Investments Commission

**ASIC Act** means the Australian Securities and Investments Commission Act

**ASX** means the Australian Securities Exchange Limited.

**ATO** means the Australian Taxation Office

**AUD** means the Australian Dollar

**Australian Lehman Group** means Lehman Brothers Australia Holdings Pty Limited and its subsidiary and related companies

**Bond** means a debt security issued by a borrower to the bondholder who is a creditor

**CDO** means Collateralised Debt Obligation which is a financial instrument

**Citigroup** means Citigroup Securities Clearing Australia Limited

**Code** means the Bankruptcy Code of the United States

**Collateral** means a security interest held over identified securities and other assets, available to the issuer of securities

**Committee** means the Committee of Creditors elected at the first meeting of creditors

**Company** means Lehman Brothers Australia Limited

**Contingent Creditor Claimants** means entities or persons that have commenced, or are contemplating commencing, proceedings against the Company for, amongst other things, misleading and deceptive conduct in offering for sale certain financial products

**Contingent Creditor Deed Pool** means the pool of funds set aside under the Deed and which is to be disbursed to Contingent Litigation Creditors

**Corporations Act** means the Corporations Act 2001

**Deed** means Deed of Company Arrangement or "DOCA".

**Euro** means the composite monetary unit used in several European countries

**Federal Court** means Federal Court of Australia

**FRN** means Floating Rate Note

**Grange** means Grange Securities Limited

**Hedge** means an investment position taken up to counteract the risk of another position

**HV1** means HV1 Pty Limited

**HV2** means HV2 Pty Limited

**IASA** means the International Asset Sale Agreement entered into with Nomura Holdings Inc

**IMP** Agreement means Individually Managed Portfolio Agreement

**IRS** means Interest Rate Swap agreement

**ISDA** means International Swaps and Derivatives Association Inc.

**LB Asia** means Lehman Brothers Asia Limited (Provisional Liquidators Appointed)

**LB Australia** means Lehman Brothers Australia Limited (Administrators Appointed) formerly known as Grange Securities Limited

**LB Inc** means Lehman Brothers Incorporated

**LB Japan** means Lehman Brothers Japan Inc

**LB Queensland** means LB Queensland 1 Pty Limited

**LB Singapore** means Lehman Brothers Singapore Pty Ltd.

**LBA Finance** means Lehman Brothers Australia Finance Pty Limited (Administrators Appointed)

**LBA Granica** means Lehman Brothers Australia Granica Pty Limited (Administrators Appointed)

**LBA Holdings** means Lehman Brothers Australia Holdings Pty Limited (Administrators Appointed)

**LBAM** means Lehman Brothers Asset Management Limited, formerly known as Grange Asset Management Limited

**LBARE Holdings** means Lehman Brothers Australia Real Estate Holdings Pty Limited (Administrators Appointed)



# Abbreviations (cont)



**LBHI** means Lehman Brothers Holdings Inc, the ultimate US Holding Company that has filed a voluntary petition for reorganisation pursuant to Chapter 11 of the Bankruptcy Code of the United States

**LBHV1** means LBHV 1 Pty Limited

**LBIE** means Lehman Brothers International (Europe)

**LBRE Australia** means Lehman Brothers Real Estate Australia Pty Limited (Administrators Appointed)

**LBREA Commercial** means Lehman Brothers Real Estate Australia Commercial Pty Limited

**LBSF** means Lehman Brothers Special Financing Inc

**Moody's** means Moody's Investors Services, an international credit rating agency

**Nomura** means Nomura Holdings Inc

**Nomura Australia** means Nomura Australia Holdings Limited

**NPV** means Net Present Value

**Goldfields** means Norton Goldfields Limited

**Ordinary Creditor Deed Pool** means the pool of funds set aside for the benefit of Ordinary Creditors with quantifiable crystallised claims

**PCBIP** means Proposed Cross Border Insolvency Protocol

**PWC** means PriceWaterhouse Coopers, the Provisional Liquidators of various European Lehman entities

**Provisional Liquidators** means the Provisional Liquidator of the Lehman Brothers Asian Entities

**Rangali** means Rangali Pty Limited

**RATA** means Report as to Affairs

**RMBS** means Residential Mortgage Backed Security

**SPV** means Special Purpose Vehicle

**SCRAPL means** Structured Credit Research and Advisory Pty Limited

**Supreme Court** means the Equitable Division of the Supreme Court in each applicable State of Australia

**Swap Agreement** means

**Swap** means an interest rate, currency or equity exchange involving two parties.

**USD** means United States Dollar

**€** means Euro



# Annexure Listing



A    Declaration of Independence and Relevant Relationships

B    Lehman Brothers Australia Group Structure

C    Receipts and Payments for the Administration for the period 26 September 2008 to 18 March 2009

D    Statement of Opinion on Creditor Options

E    Notice of Meeting

F    Proxy and Proof of Debt Forms

G    Administrators time costs for the period 26 September to 5 December 2008

H    Administrators time costs for the period 6 December 2008 to 6 February 2009

I    Administrators time costs for the period 7 February 2009 to 13 March 2009

J    Estimated Future Remuneration under Liquidation and Deed

K    Listing of Officeholders since Incorporation

L    Related Party Creditors

M    Historical Profit and Loss Summary

N    Historical Balance Sheet Summary

O    Position Statement for LBA Holdings

P    Position Statement for LBA Finance

Q    Matrix of Losses suffered by Contingent Claimant Creditors

R    Schedule of Estimated Legal Costs for Litigation

S    Extract from the Company Constitution

T    Extract from the Amended and Restated By-Laws for LBHI

Together we unlock value

7

# Listing of Figures



| No. | Description | Page |
|---|---|---|
| 1 | Summary of Liabilities | 13 |
| 2 | Range of Returns under Liquidation Scenarios | 14 |
| 3 | Range of Returns under Deed Scenarios | 15 |
| 4 | Expected return to Creditors under various scenarios | 17 |
| 5 | Composition of Consideration Paid to Shareholders of Grange on Acquisition | 21 |
| 6 | Company's Auditors since Incorporation | 23 |
| 7 | Secured Creditors | 23 |
| 8 | Summary of Profit and Loss Statements | 26 |
| 9 | Summary of Balance Sheets | 26 |
| 10 | RATA Summary | 28 |
| 11 | Related Party Debtors | 28 |
| 12 | Other Debtors | 29 |
| 13 | Proprietary Book Position | 30 |
| 14 | Listing of Other Assets | 30 |
| 15 | Outstanding Employee Entitlements | 32 |

| No. | Description | Page |
|---|---|---|
| 16 | Summary of Unsecured Creditors | 32 |
| 17 | CDO Structure Chart | 34 |
| 18 | Application of Funds Received from Insurance Contracts under Deed Proposal | 39 |
| 19 | Key Demographics from Contingent Claimant Creditor Model | 44 |
| 20 | Director Salary Package and Fees | 50 |
| 21 | Working Capital Analysis | 52 |
| 22 | Estimate of Assets Available for Distribution | 55 |
| 23 | Estimated Return to Creditors Under Liquidation Scenario – Low | 56 |
| 24 | Estimated Return to Creditors Under Liquidation Scenario – High | 56 |
| 25 | Estimated Return to Creditors Under Deed Scenario – Low | 60 |
| 26 | Estimated Return to Creditors Under Deed Scenario – High | 60 |

Together we unlock value



# 1 Preamble

## 1.1 OBJECT OF ADMINISTRATION

The purpose of the appointment of an administrator is to allow for an independent insolvency practitioner to control the affairs of an insolvent company during a moratorium period.

During the moratorium period, the insolvency practitioner will conduct investigations and will consider the alternatives available for the company's future, and the likely returns from each alternative.

Administrators are empowered by the Corporations Act to assume control of insolvent companies (or those likely to become insolvent), superseding the powers of the directors and officers, to manage the company's affairs, and to deal with its assets in the interests of all creditors.

The intention of a voluntary administration is to maximise the prospects of an insolvent company continuing in existence, or if that is not possible, to achieve a better return to creditors than would result from a winding up, usually achieved through the implementation of a Deed, which is binding on all stakeholders including Contingent Creditor Claimants.

## 1.2 PURPOSE OF REPORT

The purpose of this Report is to inform creditors about the Company's business, property, affairs and financial circumstances in preparation for the second meeting of creditors, and to provide creditors with our opinion as to the course of action which should be adopted.

All figures in this Report are in AUD unless otherwise stated.

## 1.3 ADMINISTRATORS PRIOR INVOLVEMENT

In accordance with Section 436DA of the Corporations Act, a Declaration of Independence and Relevant Relationships was provided with the First Report to Creditors.   Attached at Annexure A is a copy of that document.  There have been no changes in the details recorded in the aforementioned Declaration.

## 1.4 ENGAGEMENT OF FORMER LEHMAN EMPLOYEE

Following our appointment as Administrators, we were successful in completing a sale of the assets held by the Company to Nomura.  At that time, LB Australia had 119 employees, of which all but three were transferred to Nomura Australia in accordance with the IASA.

As we were without full time employees to assist in the administration, and in order to ensure all matters were attended to as efficiently as possible, we engaged Mr Glenn Willis to assist us with the day to day conduct of the administration, but particularly matters surrounding LB Australia and its assets and liabilities.

With effect from 13 February 2009, Mr Willis resigned his consultancy position with LB Australia.  Mr Willis has confirmed that he will be available going forward, without cost to the Administration, to provide advice and assist wherever possible to achieve an optimal outcome for the creditors.

# 2 Executive Summary



## 2.1    APPOINTMENT OF ADMINISTRATORS

On 26 September 2008, Stephen James Parbery and Neil Geoffrey Singleton of PPB were appointed Joint and Several Voluntary Administrators to the following entities within the Australian Lehman Group:

- LBA Holdings
- LB Australia
- LBA Finance
- LBA Granica
- LBREA Commercial
- LB Commercial
- HV1
- HV2
- LBRE Australia
- LBARE Holdings
- LBHV 1

Attached at Annexure B is a corporate structure diagram depicting the position of each of these entities within the Australian Lehman Group.

The appointments were made by the Directors pursuant to Section 436A of the Act as they were of the view that the Companies were, or were likely to become, insolvent following LBHI (LB Australia's ultimate holding company) filing for Chapter 11 protection under the Code on 15 September 2008.

Please note that this Report is written in relation to LB Australia only.

Two separate reports to creditors have been completed for the remaining ten entities in the Australian Lehman Group of Companies over which we have been appointed.  If you are also a creditor of any of these companies and have not received our Report to Creditors, please contact Carol Pang of our office on +61 (0)2 8116 3216 immediately.

## 2.2    REASONS FOR FAILURE

The Australian Lehman Group was reliant on funding lines from LB Asia Holdings, which was ultimately controlled by LBHI (a US domiciled company).

On 15 September 2008 (Australian time), the Directors of the various Australian Lehman Group entities were advised that LBHI was making preparations to file for Chapter 11 protection in the US.  LBHI filed for that protection on 15 September 2008 (United States time).

As a consequence of events in the US, the Directors of the Australian Lehman Group approached PPB on 16 September 2008 to provide advice with respect to what steps it could take in response to LBHI's intended filing (at that time) for Chapter 11 protection.

Subsequently, on 19 September 2008, representatives of KPMG in Hong Kong were appointed Joint Several Liquidators to LB Asia Holdings (and a number of the entities largely domiciled in Hong Kong) which had funded Australian operations and which had significant loans due to it from the Company.

Given the global collapse of the International Lehman Group, on 26 September 2008 the Directors of the various Australian Lehman Group entities resolved that the Australian Lehman Group was also likely to become insolvent in the immediate future and that Group should appoint Voluntary Administrators to the various Australian Lehman Companies.



## 2 Executive Summary (cont)

### 2.3 FIRST MEETING OF CREDITORS

A first meeting of the Company's creditors was held on 9 October 2008.

The purpose of the first meeting of creditors was:

- To provide creditors with preliminary details of the Company's affairs, financial position, and general strategy going forward;

- Remove and replace the incumbent voluntary administrators with one of the creditors own choosing if so desired; and

- Elect a Committee of Creditors.

A nomination was put to the meeting that the incumbent Administrators be replaced by alternate Administrators. This motion did not receive the requisite support from creditors present in person or by proxy, and as such, the motion to replace the Administrators failed.

A motion was also put to the meeting that a Committee of Creditors be formed. This motion did receive the requisite support and resulted in the formation of a Committee consisting of the following creditor representatives:

- Margaret Pavey (Partner Maddocks Lawyers);

- Damien Hodgkinson (Partner KPMG);

- Peter McCabe (FDC Constructions);

- Phillip O'Sullivan (Charterhouse Partnership); and

- Amanda Banton (Partner Piper Alderman).

We note that Mr Baird of Maddocks Lawyers (representing Burwood and Ashfield Councils) has replaced the Committee position held by Ms Pavey who is no longer a member of that firm. Further, Mr O'Sullivan has left the employ of Charterhouse Partnership. Charterhouse Partnership has not nominated a replacement in respect to his position.

### 2.4 EXTENSION OF CONVENING PERIOD

Pursuant to Section 439A(1) of the Act, the Administrators must convene a second meeting of creditors of the Company in order to allow creditors to determine, amongst other things, the future of the Company.

Due to the complexity in the affairs of the Australian Lehman Group, we applied to the Court to extend the convening period to 7 February 2009. Notice that an extension had been granted by the Court was circulated to creditors in our Notice dated 6 November 2008.

Following lengthy discussions with key stakeholders of LB Australia, we determined that it would not be possible to have reached a concluded view with respect to possible options for creditors, and we requested that the Court grant a further extension of six weeks to convene the second meeting. Notice that this further extension to 23 March 2009 had been granted by the Court was circulated to creditors in our Notice dated 2 February 2009.



# 2 Executive Summary (cont)

## 2.5    MEETINGS WITH THE COMMITTEE

On 16 December 2008, a meeting of the Committee was held to advise on the progress of the administration and to discuss the views of Committee members as to the general concept of a Deed which was being formulated at that time.  The Committee agreed in principal at this meeting that there was merit in continuing discussions with relevant stakeholders regarding the option of a Deed.

Following further discussions and meetings with stakeholders, and the continued development of the Deed proposal, a further meeting of the Committee was held on 25 February 2009.  The purpose of this meeting was to provide the Committee with an update on the progress of the administration, particularly discussions with key stakeholders to the proposed Deed, and to provide further and better particulars of matters surrounding the key assets and liabilities of the Company.

## 2.6    CROSS BORDER PROTOCOL

Given the global nature of Lehman's businesses, many assets and activities are spread across a number of jurisdictions.  Consequently, it has become imperative to formulate an operating protocol in order to ensure that the winding up of over 650 Lehman entities involving 16 insolvency practitioners across the world is coordinated.

The Chief Restructuring Officers of LBHI, Alverez and Marsal, have drafted a PCBIP.  The intended consequence of implementing the PCBIP will be to promote the following aspects of the respective administrations:

- Information and data sharing;

- Identification and preservation of assets;

- System facilities access;

- Resources access; and

- Restitution of misdirected funds.

In conjunction with our lawyers, we have reviewed the PCBIP in respect to the Australian Lehman Group and have indicated to Alvarez and Marsal our willingness to execute the agreement subject to the making of a small number of amendments.

At the date of this Report, the protocol had not been executed.

## 2.7    INVESTIGATIONS

We have undertaken an investigation into the affairs of the Australian Lehman Group, the key outcomes of which include:

- There are no indications that the Company was trading whilst insolvent prior to the appointment of Administrators;

- An initial review of payments which might constitute potential unfair preferences made during the relevant period identified that no such payments exist;

- Our investigations did not reveal any uncommercial transactions; and

- We are of the opinion that there are no voidable transactions.



# 2 Executive Summary (cont)

## 2.8   ASSET REALISATIONS

To date the Administrators have realised:

- Cash at bank on appointment ($45.5million)

- The interest in office fixtures and fittings ($1.16 million);

- Goodwill associated with employees which were transferred to Nomura ($2.5 million);

- A bank guarantee retained by the landlord over leased premises in Sydney ($4.6 million);

- Certain of the financial instruments ($26.96 million);

- Coupon payments ($5.1 million); and

- Debtors ($31,747).

We discuss these realisations further at Section 7 of this Report. We also attach at Annexure C a copy of the receipts and payments for the Company for the period 26 September 2008 to 18 March 2009.

## 2.9   LIABILITIES

The Company's known actual and contingent liabilities are summarised as follows:

| Category | Number | Value ($'million) |
|---|---|---|
| Trade Creditors | 104 | 8.7 |
| Lehman Related – Australian | 2 | 5.8 |
| Lehman Related – Asian | 6 | 165.9 |
| Lehman Related – Other Int'l | 4 | 8.1 |
| | 116 | 188.5 |
| Contingent Creditor Claimants | 308 | 625.6 |
| | **423** | **814.1** |

*Figure 1 – Summary of Liabilities*

As you will note, a large portion of the creditor balance consists of Contingent Creditor Claimants. We discuss matters pertaining to these creditors at Section 9 of this Report.

The Company also has a subordinated debt with LBA Granica in the amount of $87.4 million representing principal of $80 million plus interest.

## 2.10   LIQUIDATION

We have conducted an assessment of the likely return to creditors under two liquidation scenarios:

- The first scenario assumes that the Company successfully defends litigation already commenced or threatened by Contingent Creditor Claimants.

- The second scenario assumes that the Company is unsuccessful in defending proceedings brought by



# 2 Executive Summary (cont)



Contingent Creditor Claimants, resulting in settlement with all 308 claimants (we have assumed that 20 out of 308 matters are subject to litigation).

Set out below is our estimate on the range of returns to creditors under the two scenarios:

| Creditor | Low (¢ in dollar) | High (¢ in dollar) |
|---|---|---|
| **Company Successfully defends Litigation** | | |
| Creditors Generally (Excl Subordinated Debt) | 60.2 | 95.8 |
| Contingent Litigation Creditors | Nil | Nil |
| **Company Loses Litigation** | | |
| All Creditors (Excl Subordinated Debt) | 11.0 | 19.2 |

*Figure 2 – Range of Returns under Liquidation Scenarios*

This table highlights that Contingent Creditor Claimants will, if successful, only ever recover a portion of their claim, directly from the Company due to the limited asset pool available, and the large number of claimants participating in that pool.

## 2.11   DEED PROPOSAL

Since our appointment, we have analysed the assets and liabilities of the Company together with the potential for Contingent Creditor Claims to determine the likely outcomes for creditors, and whether any options exist which may either:

- Improve the quantum of the dividend to be paid to creditors; and/or

- Expedite the payment of the dividend to be paid to the creditors.

Following discussions, meetings and negotiations with the Provisional Liquidators of LB Asia Holdings, the largest creditor of LB Australia, and presentations to a number of Contingent Creditor Claimants and their legal advisors, a Deed is in the process of being formulated and proposed by the Provisional Liquidators of LB Asia Holdings for the Company.  We expect that this Deed will be put to the creditors of LB Australia for their consideration at the forthcoming meeting of creditors.

The two key points to this Deed proposal are as follows:

- The Company's proprietary book of investments will continue to be 'closed out' (realised) in an orderly manner by the LB Australia Administrators.  These asset realisations will form the Ordinary Creditor Deed Pool and will be available for distribution to ordinary creditors (i.e. those that have quantifiable crystallised non litigation claims) on a pari passu basis.

- The Provisional Liquidators of LB Asia Holdings will agree to subordinate the first AUD35 million of that company's dividend entitlement to fund the Contingent Creditor Deed Pool, which Contingent Creditor Claimants will have an entitlement to claim in.

The return to the various classes of creditors under the proposed Deed (excluding any available recoveries from insurers) are anticipated to be in accordance with the range detailed in the table below.

**2** **Executive Summary (cont)**



| | Deed Low (¢ in dollar) | Deed High (¢ in dollar) |
|---|---|---|
| Creditors Generally | 61.1 | 96.6 |
| LB Asia Holdings | 34.7 | 70.3 |
| Contingent Creditor Claimants | 5.6 | 5.6 |
| Subordinated Creditors | Nil | Nil |

*Figure 3 – Range of Returns under Deed Scenario*

Importantly, the Deed will provide for a timely return to all classes of creditors as it will avoid protracted litigation.

Attached as Annexure D is our statement made pursuant to Section 439A of the Act.

In summary based on our investigations to date, we make the following comments on the options available to creditors:

- In our opinion it is not in the interests of creditors for the Administration to end. Due to the global collapse of the Lehman group and the subsequent obligation to repay loans and deal with substantive actual and threatened litigation, the Company can no longer be considered solvent.

- In our opinion it is not in the interests of creditors for the Company to be placed into liquidation. Liquidation is unlikely to result in any additional recoveries for creditors and is also likely to result in significant litigation, which brings associated costs and significant delays in dividend quantum and timing.

- In our opinion, it is in the interests of creditors, if they resolve in favour of the Company entering into the Deed being proposed by LB Asia Holdings. We summarise the reasons for that opinion at Section 2.12 below, and in further detail at Section 12 of this Report.

## 2.12   BENEFITS OF DEED PROPOSAL

In our opinion it is in the creditors interests to resolve that LB Australia execute the proposed Deed for the following reasons:

- A certain outcome for all classes of creditor will be achieved, including Contingent Creditor Claimants;

- The Deed provides for available assets to be distributed to creditors in a timely manner;

- The Deed avoids the need for expensive and lengthy litigation which will prevent the distribution of available funds to creditors for many years (subject to the length of time it takes to resolve litigation claims);

- The Deed minimises costs, thereby optimising the available asset pool for distribution to creditors;

- A greater return to third party unsecured creditors is forecasted under the Deed than will likely be achieved under alternative liquidation scenarios;

- A Deed provides an incentive to insurers to settle claims without the need for litigation as an effective, full and final, release mechanism from all future claims is drafted into the document; and

- A Deed provides flexibility for all Contingent Creditor Claimants in allowing them to participate in the claimant pool for a known amount, without having to determine the actual loss which would require the underlying securities to be sold in an illiquid market which may achieve unacceptably low prices. That is, the Deed provides for Contingent Creditor Claimants to retain their securities and



**2** **Executive Summary (cont)**

therefore participate in the future upside (or downside) improvement (or deterioration) in underlying security prices.

We discuss the Deed in further detail at Section 12 of this Report.

## 2.13 SUMMARY OF FORECAST RETURNS TO ALL CLASSES OF CREDITOR

In this report, we have considered the likely pool of assets available from the Company's property (after costs and employee priority claims), which we estimate to have a recoverable value of between $115.4 million and $182.5 million, to meet claims of all classes of creditors under all three of the following scenarios:

- Scenario A: Liquidation – Contingent Claimant Creditors lose litigation against the Company;

- Scenario B: Liquidation and Contingent Claimant Creditors win litigation against the Company; and

- Scenario C: Proposed Deed scenario.

We have also determined the returns by reference to the NPV to take account of the time cost of money, where in scenarios A and B (liquidation), funds would not be available for distribution to creditors for at least 6 years due to delays as a result of litigation.

This modelling detailed in the table below highlights that for:

- Ordinary Creditors, under a liquidation scenario, the likely returns are between 60.2% and 95.8% if Contingent Claimant

Creditors lose litigation, and 11% and 19.2% if Contingent Claimant Creditors win the litigation.

The proposed Deed will provide for a return of between 61.1% and 96.6%, which is a better return than either liquidation scenario. If an NPV analysis is applied, then the return to ordinary unsecured creditors is clearly superior under a Deed.

- Contingent Claimant Creditors, under either of the liquidation scenarios or on an NPV basis, and applying the assumptions set out in the Report, the likely returns (expressed as a percentage of the net loss incurred by claimants at 26 September 2008) is estimated to be as follows:

  - Contingent Claimant Creditors lose litigation, nil return;

  - Contingent Claimant Creditors win litigation, between 8.2% and 14.3% on an NPV basis; or

  - Under a Deed, 4.2% on an NPV basis.

The return to the various classes of creditor on an actual and NPV basis, under low and high case asset pools for liquidation and the proposed Deed scenarios is summarised below.

# 2 Executive Summary (cont)

**PPB** ✳

| | Liquidation Claimants Lose Litigation | | Liquidation Claimants Win Litigation | | Deed |
|---|---|---|---|---|---|
| | Actual (¢ in dollar) | NPV (¢ in dollar) | Actual (¢ in dollar) | NPV (¢ in dollar) | Actual (¢ in dollar) |
| **LOW CASE ASSET POOL ($115.4 MILLION)** | | | | | |
| **Creditor Class** | | | | | |
| Priority Employee | 100 | 100 | 100 | 100 | 100 |
| Unsecured: Other | 60.2 | 44.9 | 11.0 | 8.2 | 61.1 |
| Unsecured: LB Asia | 60.2 | 44.9 | 11.0 | 8.2 | 34.7 |
| Contingent (Subject to Litigation) | Nil | Nil | 11.0 | 8.2 | 5.6 |
| Subordinated | Nil | Nil | Nil | Nil | Nil |
| **HIGH CASE ASSET POOL ($182.5 MILLION)** | | | | | |
| **Creditor Class** | | | | | |
| Priority Employee | 100 | 100 | 100 | 100 | 100 |
| Unsecured: Other | 95.8 | 71.5 | 19.2 | 14.3 | 96.6 |
| Unsecured: LB Asia | 95.8 | 71.5 | 19.2 | 14.3 | 70.3 |
| Contingent (Subject to Litigation) | Nil | Nil | 19.2 | 14.3 | 5.6 |
| Subordinated | Nil | Nil | Nil | Nil | Nil |

*Figure 4 – Expected return to Creditors under various scenarios*

We note that we have not conducted an NPV of the Deed scenario as we expect to distribute most assets to the creditors within the first year.

Together we unlock value



# 3 Second Meeting of Creditors

## 3.1 EXTENSION OF CONVENING PERIOD

Pursuant to Section 439A(1) of the Act, we must convene a second meeting for the Company in order to determine, amongst other things, the future direction of the Company

The second meeting of creditors is normally convened within 25 business days following our appointment as Voluntary Administrators. As indicated at the first meeting of creditors held on 9 October 2008 however, it was our intention to make an application to the Court requesting an extension of the convening period in order to:

- Allow for a thorough investigation to be undertaken;

- Prepare a more comprehensive report to the creditors on the background to the Australian operations, their trading activities and actions of Directors; and

- To properly pursue the various options that may be open to the creditors, including a Deed.

On 22 October 2008, we applied to the Court for that extension. The application was granted and the convening period was extended to 7 February 2009.

Due to the complexity of the Group's affairs, and the lengthy discussions/negotiations that have been taking place between key stakeholders as to the Deed proposal, it was necessary to make a further application to the Court to extend the convening period for a further six weeks.

On 22 January 2008, we applied to the Court for this further extension. This application was granted and the convening period was extended to 23 March 2009.

## 3.2 MEETING DETAILS

The second meeting of creditors for the companies will now be held at 10:00 a.m. on Monday, 30 March 2009 at the following location:

Clayton Utz
Level 34
1 O'Connell Street
Sydney NSW 2000

Attached at Annexure E is the Notice of Meeting, and at Annexure F, proxy and proof of debt forms.

## 3.3 ALTERNATIVES AVAILABLE TO CREDITORS

At the creditors meetings to be held on Monday, 30 March 2009 at 10:00 a.m., the creditors of the Company will be able to consider and vote in respect of the following options:

- End the Administration;

- Wind up the Company and appoint Liquidators; or

- Resolve that the Company execute a Deed.

Creditors are also entitled to propose a motion to adjourn the meeting if they require further time and/or information to make a determination on either of the above three options.

## 3    Second Meeting of Creditors (cont)



### 3.4    ADMINISTRATORS OPINION

It is our opinion that creditors interests are best served by resolving in favour of the Company entering into the Deed being proposed by LB Asia Holdings for the reasons as set out in the Administrators statement attached at Annexure D.

### 3.5    ADMINISTRATORS FEES

The Administrators fees for their work in respect to this matter have been approved by the Committee at the respective Committee meetings as follows:

- At the 16 December 2008 meeting, the Administrators remuneration for the period 26 September to 5 December 2008 in the sum of $494,320.77 (exclusive of GST); and

- At the 25 February 2009 meeting, the Administrators remuneration for the period 6 December 2008 to 6 February 2009 in the amount of $273,111.63 (exclusive of GST).

We have attached at Annexure G and H a summary of time spent by our Partners and staff for the aforementioned periods.

At the forthcoming meeting, creditors will be asked to consider the work conducted by the Administrators, their Partners and staff and consider approval of their remuneration for the following periods:

- 7 February 2009 to 13 March 2009 in the amount of $343,936.90 plus GST (a summary of time spent in respect to this period is attached at Annexure I);

- 14 March 2009 to the date of the second meeting of creditors in the amount of $450,000; and

- Approval of the Deed Administrator or Liquidators future remuneration in the amount of $2 million (Annexure J).

We discuss the Administrators remuneration in further detail at Section 15 of this Report.

### 3.6    COMMITTEE

At the forthcoming meeting, creditors may elect a new Committee to represent the general body of creditors.

We are of the view that there is utility in having a Committee structure in place under both the Deed and liquidation alternatives in view of the likely need to discuss, amongst other matters, the asset realisation programme at regular intervals.

### 3.7    SUBMISSION OF PROOF OF DEBTS AND PROXIES

Any creditor who has already lodged a proof of debt for voting purposes will not need to complete a new proof in the event the level of their debt remains unchanged.  However, proxy forms lodged by creditors for the first meetings held on 9 October 2008 **cannot** be used for the second meeting.

Creditors who are unable to attend the meeting and wish to be represented should ensure that a proxy form, power of attorney (or evidence of appointment of the company representative) is completed.  In accordance with the Act, all corporate creditors are also required to submit a proxy should they wish to be represented at the meeting.

# 3 Second Meeting of Creditors (cont)



Creditors are requested to return the completed proxy form (and if applicable, proof of debt form) which are attached as Annexure F to this Report, by no later than 4:00 p.m. on Thursday 26 March 2009 to one of the following:

By Facsimile: +61(0)2 8116 3111

By email:       lehmans@ppb.com.au

By Mail:        Level 46, MLC Centre
                19 Martin Place
                Sydney NSW 2000

                Attention: Ms Carol Pang

**We note that proxies received after 4:00 p.m. on 27 March 2009 may not be accepted to vote at the meeting.**

We ask that if you submit your proxy and proof by facsimile or electronic means, that you forward the original copy of same within 72 hours.

## 3.8    VOTING RIGHTS

Motions at the second meeting of creditors will be carried if:

- A majority of the creditors voting (whether in person, by attorney or by proxy) vote in favour of that motion; and

- The value of the debts owed by the Company to those voting in favour of the motion are more than half of the total debts owed to all creditors voting at the meeting.

Prior to the meeting, the Chairman will apply the following approach to adjudicating on the admission of creditor claims for voting purposes:

- Each proof of debt will be considered individually;

- Where claims are contingent or unliquidated in nature, the Chairman will consider the basis of that contingent or unliquidated claim and the sufficiency by which that claim has been particularised; and

- With respect to related parties that intend to vote at the second meeting (refer to Section 4.3 of this Report), the Chairman will allow such claimants to vote in accordance with general ledger balances obtained from the Company's accounting records unless that company can otherwise show that such amounts are incorrect by providing supporting documentation.

Certain of the creditors with contingent or unliquidated claims have raised concerns that the Chairman will likely ascribe only a nominal value to their respective claims for voting purposes at this meeting.  The Administrators consider that the approach to be taken to the admission of claims and determination of just estimates for voting purposes is in line with their legal obligations.

**Any adjudication of proofs for voting purposes at the second meeting of creditors is distinctly different to any adjudication made at a later stage by a Deed Administrator or a Liquidator for dividend purposes.**

# 4    Overview of Company's Operations



## 4.1    COMPANY BACKGROUND

### 4.1.1    Share Sale Agreement

The Company was formerly known as Grange and was involved in carrying on investment banking, securities broking, capital raising and funds management activities within the Australian fixed income and equities markets.

In January 2007, LBA Granica whose ultimate parent company is LBHI, contracted to purchase 100% of the issued capital of Grange.  This transaction settled on 7 March 2007.

On 31 July 2007, Grange changed its name to "Lehman Brothers Australia Limited" to reflect its new ownership.

The total consideration payable by LBA Granica to shareholders of Grange was comprised as follows:

|  | AUD ($'million) |
|---|---|
| Cash consideration | 19.4 |
| Consideration in the form of Lehman Brothers Inc common stock (some of which was subject to escrow) | 41.5 |
|  | 60.9 |

*Figure 5 – Composition of Consideration Paid to Shareholder of Grange on Acquisition*

### 4.1.2    Company Profile Post Acquisition

The International Lehman Group of Companies were headquartered in New York, with regional headquarters in London and Tokyo.  The Australian Lehman Group was part of the broader South East Asia Lehman Group with reporting lines to Hong Kong.

The ultimate parent entity in the Australian Lehman Group is LBHI.

The business entities of the Australian Lehman Group were organised into three broad segments:

- Investment Banking;

- Investment Management; and

- Capital Markets.

Those segments included businesses associated with equity, fixed income, trading, investment banking, asset management, private investment management and private equity.

LB Australia was principally focussed on investment banking.

### 4.1.3    Trading Activities

#### 4.1.3.1    Operation of its own proprietary book

The Company was involved in the trading of a variety of fixed income securities.  The Company also acquired a number of CDO instruments from investors at the time it settled disputes regarding alleged breaches of those investors IMP Agreements.

These instruments represent a significant portion of the Company's assets from which creditors claims will be satisfied.

We discuss these assets further at Section 8 of this Report.

# 4 Overview of Company's Operations (cont)



### 4.1.3.2    Custodian Arrangements

The Company provided custodian services to approximately 400 clients whereby it would hold the securities in safe custody and would facilitate trading, payment of coupons and maturities, provision of monthly holding reports and valuations.

These services were a legacy of the former Grange business and were provided at no cost by the Company.  However, the Company generated transactional revenue on trading of client holdings.  During the course of our tenure as Administrators we have continued overseeing this custodian arrangement in conjunction with the Company's back office team who are now employed by Nomura.

In view of the need to close arrangements with these safe keeping clients, we have requested that each source an alternative custodian to take over the Company's role.  To date, all but 100 individual holdings (5% of the custodian book) have been transferred.  We are continuing to make arrangements for the remaining clients that largely hold 'small parcels' that cannot be readily transferred through Austraclear and expect all clients to be transferred out of our safe keeping within the next one to two months.

### 4.1.3.3    Trustee of Norton Goldfields

Norton Goldfields is Australia's fourth largest ASX listed gold producer.    It also has active gold and copper exploration projects.

Lehman Brothers subsidiaries in Asia are the holders of convertible notes issued by Norton Goldfields.  The Company acts as Trustee of the Notes held by the Asian subsidiaries, but does not generate a fee directly from acting in that position.

We are currently seeking advice in relation to retiring as the Trustee as there is no apparent benefit to creditors of any class for the Company to remain as Trustee.

### 4.1.3.4    Trustee of Centauri Trust

The Centauri Trust is an Australian domiciled unit trust described as a capital guaranteed, alternative investment trust available to sophisticated investors.

The Company is the Trustee of the Trust and derives fees in its position as Trustee.

We are currently investigating the value, if any, of the units in the Trust which will determine the appropriate course of action to be taken.  In this regard, we continue to liaise with the Unit Holders and with PWC who are investigating the Cayman Island based companies in which the trust has invested.

### 4.2    STATUTORY INFORMATION

The following statutory details were extracted from the ASIC's national database.

### 4.2.1  Incorporation and Trading Names

The Company was incorporated on 14 October 1994 and used the name Grange until 30 July 2007.

# 4 Overview of Company's Operations (Cont)



## 4.2.2 Principal Place of business & registered office

The Company's principal place of business and registered office was:

Level 25, Governor Philip Tower
1 Farrer Place
Sydney NSW 2000

## 4.2.3 Officeholders

We have attached at Annexure K a listing of the officeholders of the Company since incorporation.

## 4.2.4 Auditors

The Companies Auditors since incorporation were;

| Firm | Appointed | Date Resigned |
|------|-----------|---------------|
| Ernst & Young | 12 April 2007 | Current |
| KPMG | 24 July 2000 | 12 April 2007 |
| Harveys Accountants | 16 September 1999 | 18 October 2000 |
| Grant Thornton | 12 June 1996 | 16 September 1999 |
| Williams Hatchman & Kean | 23 December 1994 | 12 June 1996 |

*Figure 6 – Company's Auditors since Incorporation*

## 4.2.5 Secured Creditors

Records maintained by the Australian Securities and Investment Commission ("ASIC") disclose that the Company has two secured creditors.

| Secured Creditor | Type | Date Created | Date Registered |
|------------------|------|--------------|-----------------|
| ANZ | Fixed and Floating | 30 May 2000 | 13 June 2000 |
| Citigroup | Fixed | 16 July 2007 | 18 July 2007 |

*Figure 7 – Secured Creditors*

The Company's obligations to ANZ have been discharged in full by the Administrators and a request to release this charge has been made.

No debt is due by the Company to Citigroup. The Charge held by Citigroup is to secure any debts that became payable to Citigroup as a result of failed trades and outstanding exposures on bank guarantees.

Upon closure of safe keeping arrangements and the sale of both the LB Australia and LBA Finance proprietary books, we expect Citigroup to release its charge.

## 4.3 RELATED PARTY CREDITORS

The Administrators are required to provide creditors with details of the related parties to the Company that are also creditors of the Company. We set out these persons/entities at Annexure L.

As discussed at Section 3 of this Report, these creditors will be admitted to vote at the forthcoming meeting of creditors in accordance with the Company's records, or in the event further and better particulars are provided and which support admission of that claim for a different amount, then that amount.



# 4 Overview of Company's Operations (cont)



## 4.4    EVENTS LEADING TO APPOINTMENT

As all creditors would be aware the Global Financial Crisis has been characterised by a significant deterioration in worldwide financial markets since September 2007. As the International Lehman Group operates in financial markets that are heavily dependent on stability in these markets, concern in US markets as to the capacity of the US Lehman Group of Companies to continue as a going concern without US Government support became paramount and culminated in a substantial drop in the share price of LBHI (on the New York Stock Exchange) of 80% during the week 5 September to 12 September 2008. In particular:

- A 45% drop in the share price which was associated with reports on 9 September 2008 that negotiations with the Korean Development Bank regarding a potential major investment in the Lehman Group had been halted; and

- The third quarter loss of USD3.9 billion, released to the market on 10 September 2008.

At the same time, the Global Lehman Group announced plans to sell a majority stake in its investment management business and to 'spin-off' the majority of its commercial real estate assets into a new, separate public company. These measures failed to restore investor confidence and the share price declined by a further 7% on Wednesday, 10 September 2008.

At the close of business on 10 September 2008 (United States time), Moody's announced that in the absence of a purchaser for the Global Lehman Group by 15 September 2008, it intended to downgrade the Lehman Group's credit rating. Consequently on 15 September 2008, LBHI filed for Chapter 11 protection in the United States.

LBHI managed substantially all of the material cash resources of the Lehman Group centrally. Accordingly, the failure in LBHI would result in the failure of other Lehman entities throughout the world, including LB Asia Holdings which provided financial support to the Australian Lehman entities. The Australian Lehman Group's viability was thus dependent upon the going concern of both LBHI and LB Asia Holdings.

As a result, the Directors of the Australian Lehman Group approached PPB on 16 September 2008 to provide advice with respect to what steps it could take.

Following this meeting, and the subsequent entry into Chapter 11 protection by LBHI on 15 September 2008 (United States time) and the appointment of Provisional Liquidators to LB Asia Holdings on 19 September 2008, the Directors of the Australian Lehman Group resolved to appoint us as Voluntary Administrators to the Australian Lehman Group.



# 5 | Sale of Assets

## 5.1    SALE OF BUSINESS TO NOMURA

Following our appointment, we immediately commenced discussions with the Provisional Liquidators of the various Lehman Asian companies ("KPMG") who were negotiating a sale of the assets of the Asian Companies under their control to Nomura.

On 8 October 2008 we entered into the IASA, which provided the following benefits to the Company:

- Continued employment for all but three Australian staff thereby reducing priority employee entitlements by an estimated $25 million.

- Assignment of existing property leases to Nomura Australia, resulting in the release of two property guarantees. To date, we have recovered the associated cash collateral behind the guarantee to the Sydney premises with a value of approximately $4.6 million. We have also recovered the bank guarantee papers to the Melbourne premises. The assignment of these leases has assisted with the avoidance of possible creditor claims associated with significant residual lease obligations and financial exposure to 'make good' premises which would have been substantial.

- Acquisitions of fixed assets of the Company at 87.5% of book value along with a goodwill payment resulting in a return to the company of approximately $1.16m and $2.5m respectively.

In addition to the above, we have assigned a number of equipment leases with various suppliers to Nomura Australia. This has also reduced the quantum of potential liabilities due to creditors of the Company.

Together we unlock value

25

# 6 Historical Financial Performance & Position



## 6.1 GENERAL

Attached at Annexure M and N is a summary of the Company's audited Profit and Loss and Balance Sheets respectively for the financial year ended 2006 and the extended reporting period ending 30 November 2007. We have also attached a summary of the management accounts made up to the date of our appointment.

The Company elected to change its reporting period to report for the 17 month period ended 30 November 2007. This election was taken in order to align the Company's reporting period with its ultimate parent entity, LBHI.

## 6.2 HISTORICAL FINANCIAL PERFORMANCE

Set out below is a summary of the profit and loss statements for the aforementioned periods:

| | 26 Sept 2008 ($'000) | 30 Nov 2007 ($'000) | 30 June 2006 ($'000) |
|---|---|---|---|
| Income | 23,864 | 11,783 | 49,461 |
| Expenses | (68,068) | (84,489) | (41,180) |
| | (44,204) | (72,706) | 8,281 |
| Tax (Expense)/Benefit | 0 | 20,385 | (2,621) |
| **Net Profit After Tax** | **(44,204)** | **(52,321)** | **(5,660)** |

*Figure 8 – Summary of Profit and Loss Statements*

We make the following observations in relation to the profit and loss statement:

- There was a substantial decline in gross income from ordinary trading activities between the 2006 financial year and the extended 2007 reporting year due to there being a loss on trading of securities of $15 million compared to the previous reporting period at which time the Company made a profit of $33 million.

- Other income improved significantly, largely as a consequence of intra group revenue of $7.5 million.

- There was a material increase in compensation and benefits which was attributable to an increase in employee expenses from $19 million to $39 million between the 2006 financial year and the 2007 extended reporting year due to a significant increase in employee numbers.

- Finance costs increased from $2.8 million in the 2006 financial year to $16.3 million in the 2007 extended reporting year due to interest payable on increased inter-group borrowings.

## 6.3 HISTORICAL FINANCIAL POSITION

Set out below is a summary of the balance sheets for the aforementioned periods:

| | 26 Sept 2008 ($'000) | 30 Nov 2007 ($'000) | 30 June 2006 ($'000) |
|---|---|---|---|
| Assets | | | |
| Current Assets | 327,789 | 300,563 | 409,222 |
| Non Current Assets | 100,724 | 17,324 | 6,578 |
| | 428,513 | 317,887 | 415,800 |
| Liabilities | | | |
| Current Liabilities | 289,618 | 304,957 | 386,245 |
| Non Current Liabilities | 99 | (13,592) | 15,326 |
| | 289,717 | 291,365 | 401,571 |
| **Net Assets** | **138,797** | **26,522** | **14,229** |

*Figure 9 – Summary of Balance Sheets*



# 6    Historical Financial Performance & Position (cont)



We make the following comments in relation to the Balance Sheets:

- Upon the acquisition of the Company by LBHI, all funding was sourced from LBA Holdings and accordingly the intercompany loan balance increased significantly. The interest rate charged on this loan was set at the one week LIBOR Australia rate.

- There has been a marked decrease in the amount due to trade creditors. This reduction relates to the funding arrangements provided by LB Asia Holdings.

- There has been an increased amount due to related parties.

- The Company also had an additional interest bearing liability with LBA Granica consisting of the subordinated debt. This subordinated debt was utilised for the purpose of meeting ASX capital adequacy requirements and was calculated by reference to the ratio of liquid capital to total risk and ensuring same was no less than 1.2:1.

- In the November 2007 to 26 September 2008 period, intangibles increased by approximately $77 million.

- In the 2007 accounts, non current liabilities are negative due to an accounting line 'Deferred Tax Liabilities' which is a debit balance of $13.7 million i.e. a deferred tax asset of $13.7 million existed at 30 November 2007.

Detailed at Section 6 and 7 of this report we have provided further details in respect of the assets and liabilities of the Company at the date of our appointment.

# 7 Summary of Assets and Liabilities

**PPB**

## 7.1    REPORT AS TO AFFAIRS

Pursuant to Section 438B of the Act, the directors of a company are required to submit a RATA to the Administrators within 7 days of the commencement of the Administration.  A RATA sets out the assets and liabilities of a company as at the date of the appointment of Voluntary Administrators.

The Directors have each provided a RATA which we have summarised below.

We have also reviewed the Company's books and records, and have utilised this information to provide a calculation of the estimated deficiency.

| | Note | Book Value ($'000) | Director ERV ($'000) | Administrators ERV Low ($'000) | High ($'000) |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Cash on Hand | | 1 | 1 | 1 | 1 |
| Cash at Bank | 7.2.1 | 46,455 | 46,455 | 45,179 | 45,179 |
| Debtors | 7.2.2 | 92,737 | 89 | 13,744 | 31,972 |
| Stock | 7.2.3 | 159,477 | 111,634 | 31,393 | 75,068 |
| Plant and Equipment | 7.2.4 | 1,329 | 1,130 | 1,163 | 1,163 |
| Other | 7.2.5 | 34,181 | 6,545 | 0 | 5,279 |
| **Total Assets** | | **334,180** | **165,854** | **91,480** | **158,662** |
| | | | | | |
| **LIABILITIES** | | | | | |
| Employee Entitlements | 7.2.6 | 2,371 | 2,371 | 6,689 | 6,689 |
| Unsecured Creditors | 7.2.7 | 204,520 | 204,520 | 188,500 | 188,500 |
| | | 206,891 | 206,891 | 195,189 | 195,189 |
| **Net Surplus/(Deficiency) b/f administration costs & contingent & subordinated liabilities** | | **127,289** | **(41,037)** | **(103,709)** | **(36,527)** |
| | | | | | |
| Contingent Liabilities | 7.2.8 | 5,000 | 5,000 | 625,600 | 625,600 |
| Subordinated Note | 7.2.9 | 80,000 | 80,000 | 87,399 | 87,399 |
| Total Contingent & Subordinated Liabilities | | 85,000 | 85,000 | 712,999 | 712,999 |
| **Net Surplus/(Deficiency) b/f administration costs after contingent & subordinated liabilities** | 7.2.10 | **42,289** | **(126,037)** | **(816,708)** | **(749,526)** |

*Figure 10 – RATA Summary*

## 7.2    NOTES ON RATA

### 7.2.1  Cash at Bank on Appointment

We have realised $45.5 million which was held in various Citibank custodian accounts representing proceeds from trades settled immediately prior to our appointment.

The difference of $940,000 to the amount disclosed by Directors relates to transactions that took place on the day of our appointment, less a deduction for monies that were reversed by Citi on 9 October 2008.

### 7.2.2  Debtors

#### 7.2.2.1  Intercompany Debtors

The Company has the following amounts due to it from related Companies (all of which are subject to some form of insolvency administration):

| Name | Book Value ($'000) | Director ERV ($'000) | Administrators ERV Low ($'000) | High ($'000) |
|---|---|---|---|---|
| LB Inc | 226 | Nil | Nil | Nil |
| LB Asia | 6,889 | Nil | Nil | Nil |
| LBSF | 527 | Nil | Nil | Nil |
| LBA Holdings | 40,489 | Nil | 5,668 | 10,932 |
| LB Japan | 145 | Nil | Nil | Nil |
| LBA Finance | 43,104 | Nil | 6,896 | 19,828 |
| LBAM | 1,179 | Nil | 1,180 | 1,180 |
| | **92,559** | **Nil** | **13,744** | **31,940** |

*Figure 11 – Related Party Debtors*

**Together we unlock value**



# 7 Summary of Assets and Liabilities (cont)



We have filed proofs of debt with the external administrators of each Global Lehman Company that has called for proofs to be submitted. We will file claims for all other entities when the applicable external administrator calls for proofs to be lodged.

On the basis that all the above entities are subject to external administration, and in the absence of any further information, we have assumed that the recovery of intercompany loans from International Lehman entities is likely to be nil.

In relation to the debts due from LBA Holdings and LBA Finance, we have attached at Annexure O and P a summary setting out how we have arrived at the low and high return noted above. (Please note, these estimates are before professional costs and expenses).

The return to creditors from LBA Finance will be highly dependent on the recoverable value of proceeds from the derivative contracts it holds with LBSF. These contracts have a book value of $48.5 million.

We note the following in respect of this asset;

- Despite requesting preliminary estimates from the Administrators of LBSF on the likely return to creditors, we are yet to receive any indication on such return. We expect, due to the complexity of LBSF's affairs, that this may not be known for some time.

- For the purpose of preparing this Report and the position statement for LBA Finance, we have valued the recoverability of this loan to be between nil (low case) and 50% (best case).

- These contracts will take some time to unwind.

With respect to the debt due from LBAM, we have been provided with financial information that shows that LBAM is sufficiently funded to meet repayment of this debt. We have recently issued demands to that Company for repayment of this debt and understand payment will be made shortly.

### 7.2.2.2   Other Debtors

The Company is due commissions from various investors. The Directors have reported that the balance of such accounts amounts to $178,000.

Detailed below is a summary of progress made with respect to debtor collection efforts:

|                         | No | ($'000) |
|-------------------------|----|---------|
| Collected               | 6  | 32      |
| Write off               | 14 | 120     |
| Balance to Collect      | 25 | 152     |
| Debtors Issued Demands  | 45 | 304     |

*Figure 12 – Other Debtors*

In the interests of completeness, we have issued demands to a larger number of debtors than what was noted by the Directors in the RATA.

We expect difficulties may be faced with collection of the balance of these debtors in view of the relationship each had with the Company. Accordingly, and whilst collection efforts continue, we have assumed for the purposes of this report that future recoveries will be nil.



# 7 Summary of Assets and Liabilities (cont)

## 7.2.3   Stock

The Company holds a variety of assets in its proprietary book (Bonds, COD's and equities).

We set out in the table below a summary of the composition of this portfolio along with our estimated returns on realisation.

| | Book Value ($'000) | Director ERV ($'000) | Administrators ERV Low ($'000) | High ($'000) |
|---|---|---|---|---|
| CDO's | 18,523 | | 16,420 | 23,458 |
| Foreign Bonds | 17,363 | No Data | Nil | 29,330 |
| AUD Bonds | 120,966 | Provided | 14,973 | 19,970 |
| Other | 2,625 | | Nil | 2,310 |
| | 159,477 | 111,633 | 31,393 | 75,068 |

*Figure 13 – Proprietary Book Position*

We have discussed in detail the position of the CDO's and the AUD and foreign currency denominated bonds at Section 8 of this Report.  However, we note that there is a marked difference between our ERV and that of the Directors as we have valued the book more recently to reflect the significant changes to the realisable market value of these assets since our appointment.

The Company also holds 3.5 million units in Central MCS 36 Trust Investment.  The latest valuation from Centro for these units was 66 cents at December 2008.  Due to the significant uncertainty surrounding the position of the Centro Group, for the purposes of this Report, we have valued these holdings between nil (low case) and $2.3 million, being the latest valuation provided by the Company (high case).

## 7.2.4   Plant and Equipment

The Company's furniture and computers had a written down book value of $1.3 million at the date of the Administrators appointment.

We successfully completed a sale of these assets to Nomura on 8 December 2008 at a rate of 87.5% of book value resulting in a return of $1.1 million to the Company.

## 7.2.5   Other Assets

Other assets identified by the RATA and Company records are detailed below:

| | Book Value ($'000) | Director ERV ($'000) | Administrators ERV Low ($'000) | High ($'000) |
|---|---|---|---|---|
| ASX Membership | 250 | Nil | Nil | 250 |
| Loan to Employees | 5,342 | Nil | Nil | Nil |
| PAYG Income Tax | 187 | Nil | Nil | Nil |
| Investment in Subs | 6,471 | 5,824 | Nil | 5,824 |
| Prepaid Other | 394 | 209 | Nil | Nil |
| Deposit Other | 29 | 29 | Nil | 29 |
| Deferred Tax Assets | 20,970 | Nil | Nil | Nil |
| Withholding Tax | 537 | 483 | Nil | Nil |
| | 34,180 | 6,545 | Nil | 5,279 |

*Figure 14 – Listing of Other Assets*

- The ASX Membership Fee related to licensing arrangements and is held by ASIC.  We have made contact with both ASIC and ASX regarding recovery of this fee and are awaiting a response.

  We would expect, in view of the prospective cancellation of licensing arrangements once custodian services are closed,



# 7 Summary of Assets and Liabilities (cont)

that this fee will be returned in due course notwithstanding the Directors have noted these monies are subject to legal dispute.

- Employees were lent money to acquire shares in the Company. Interest on the loans was capitalised at 8.25% annually.

  These loans were limited recourse to the shares. In view of those shares now becoming worthless, we have valued the likely realisable value at nil.

- PAYG Income tax paid is an accounting accrual which is not recoverable in view of the wages to which it relates having been paid to employees.

- Investment in Subsidiaries relates to an accounting treatment for funding arrangements made at the time subsidiary operations in Indonesia were being established.

  The monies in support of this asset were physically paid by LB Asia Holdings. As all statutory matters relating to establishment of that company had not been completed at the time of our appointment, those monies were redirected by the Indonesian authorities back to Hong Kong and are understood to be in a suspense account with Standard Chartered Bank Limited.

  We have flagged our interest in those monies with the Provisional Liquidator of LB Asia Holdings, but have not yet resolved ownership of same.

- Prepaid other relates to prepayments largely for insurance. As we have not cancelled these policies, we have valued likely recoveries at nil.

- Deposit Other relates to rental property bonds paid by the Company on behalf of expatriate employees. We are currently making arrangements to recover these bonds from the respective real estate agents.

- Deferred Tax Assets relate to carried forward tax losses. Such losses would only be recoverable upon the Company turning a profit at some point in the future. Further, accessibility to these losses requires compliance with tax laws.

  In the circumstance, we are of the view that the likelihood of these losses becoming available at some point in the future, is minimal and as such, have valued such amounts as nil for the purposes of this Report.

- Withholding Tax includes prepaid GST and other taxes. As we are still waiting on confirmation from the ATO with respect to the Running Balance Account for the Company prior to our appointment, we have valued the likely recoverable value of this asset at nil for the purposes of this Report.

### 7.2.6   Employee Entitlements

Immediately prior to our appointment as Administrators, the Company employed 119 employees.

Following completion of the IASA, all but 3 employees were transferred across to Nomura in consideration for the payment of $2.5 million.

We have now received a total of 18 claims from employees, including a number of employees that were terminated prior to our appointment and whom had yet to receive their payouts.



# 7 Summary of Assets and Liabilities (cont)



Total claims from these employees amount to $6.7 million comprised as follows:

| Category | Value ($'000) |
|---|---|
| Wages | 24 |
| Payment in Lieu of Notice | 133 |
| Annual Leave | 214 |
| Long Service Leave | 21 |
| Retrenchment | 570 |
| Retention | 1,846 |
| Bonus | 3,464 |
| Other | 417 |
| | 6,689 |

*Figure 15 – Outstanding Employee Entitlements*

Due to the nature and quantum of the claims, we have sought legal advice on the ranking of each particular entitlement in accordance with Section 556 of the Corporations Act.

Following from this advice, we expect to admit approximately $6.3 million as priority unsecured claims with the balance to be admitted as ordinary unsecured.

There is a material increase in the amount due for bonus' (as compared to the Directors estimates) as these amounts contractually require conversion from USD to AUD using the exchange rate at 31 January 2009, at which time the AUD had fallen over 20% from the date at our appointment.

## 7.2.7 Unsecured Creditors

From the books and records of the Company, we have identified 104 unsecured creditors of the Company which can be summarised as follows:

| Category | Number | Value ($'million) |
|---|---|---|
| Trade Creditors | 104 | 8.7 |
| Lehman Companies – Australian | 2 | 5.8 |
| Lehman Companies – Asian | 6 | 165.9 |
| Lehman Companies  – Other Int'l | 4 | 8.1 |
| | 116 | 188.5 |

*Figure 16 – Summary of Unsecured Creditors*

## 7.2.8 Contingent Liabilities

Contingent liabilities relate to claims made, or contemplated, by various parties that acquired investment products through the Company.

We estimate that there are 308 possible Contingent Creditor Claimants with a 'universe' of potential losses in the order of $625.6 million using a mark to market at 26 September 2008 as determined by SCRAPL.

We have discussed in more detail the position of Contingent Liabilities at Section 9.1 of this Report.

## 7.2.9 Subordinated Note

On 7 March 2007, the Company (at that time Grange) entered into a Loan Agreement with LB Granica with a facility limit of $50 million.  The key terms of this loan were as follows:

- Subject to the Subordination Deed (discussed below), the loan required repayment of the principal sum immediately on demand.



# 7 Summary of Assets and Liabilities (cont)



- The Company was to pay interest at an agreed rate on the daily balance of the principal sum, however this interest was subordinated under the Subordination Deed.

The Company also entered into a Subordination Deed on the same date, the key term of which subordinated the repayment of the loan behind any unsubordinated debt due to any other creditor of the Company.

On 2 July 2007 the Company entered into a Supplemental Agreement which amended the terms of the loan agreement by increasing the facility limit from $50 million to $100 million.

As at the date of our appointment, the balance of the subordinated loan account with LB Granica stood at $80 million together with interest payable of $7.4m.

In accordance with the Subordination Deed, this debt will only be paid once all creditors in the administration have received 100 cents in the dollar.

## 7.2.10 Net Surplus/Deficiency

We have estimated that there will be a net deficiency before administration costs but before contingent creditor claims and the subordinated debt in the order of $37 million to $104 million. This deficiency is due to the significant decline in the recoverable value of related party loans, and material changes in the value of the Company's proprietary investment book due to the significant decline in global financial markets.

After inclusion of $625.6 million in contingent creditor claims, and $87.4 million of subordinated debt, this deficiency increases to $750 million to $817 million. This is markedly different to the

estimated deficiency detailed by the Directors in the RATA of $126 million, principally for the following reasons:

- The proprietary book has diminished in value since September 2007 as a result of further deteriorating global economic conditions. The Administrators have also applied a further discount range to the values for this asset, to provide for possible further deterioration in market conditions. In that regard we have used marks to market at 27 February 2009 rather than the date of our appointment, and the date of the Directors RATA, to provide a more accurate reflection of the asset position of the Company.

- Employee claims have increased, largely as a result of the decline of the AUD against the USD (many employee contracts are expressed in USD); and

- The Administrators have incorporated all possible known claims against the Company by persons/entities that acquired products through LB Australia who may have a contingent claim against the Company. As is detailed later in this Report, the ultimate liability to such creditors can only be determined by a Court.



# 8 Review of Key Assets

## 8.1    INVESTMENT IN CDO NOTES

### 8.1.1    General Background

LB Australia and its clients held a significant number of CDO instruments.  Broadly speaking, these CDO instruments were sold using the following structure:



*Figure 17 – CDO Structure Chart*

A summary of the structure's operation is described below:

- Investors acquired notes from the Issuer (SPV), which would then utilise those monies to acquire collateral.

- Collateral took the form of cash/bonds or other low risk style financial instruments.

- The Issuer (SPV) would then use that collateral to acquire an interest in CDO Notes, and would also enter into credit default swap agreements with a counterparty.

- A CDS is the ultimate source of interest and principal payments for each series of notes.

- In order to boost the credit rating of the Notes, the swap agreements would be guaranteed.  This would effectively improve the product rating given by Moody's/Standard and Poor's from, for example, speculative grade BB+, to investment grade AA or similar (using Standard and Poor's grading system).

- In Lehman Brothers originated products, various Lehman entities acted in the following capacities:

  - Calculation and disposal agent (LBIE);

  - Swap counterparty (LBSF); and

  - Guarantor (LBHI).

LB Australia holds an interest in 20 CDO's, of which ten involved LBSF as the swap counterparty (and which will therefore unwind in accordance with the Indenture due to an event of default occurring under the ISDA Agreement).

We note that Federation notes held by the Company have already unwound on 30 October 2008 resulting in a return to the Company of $20.8 million.

# 8   Review of Key Assets (cont)



### 8.1.2   Event of Default – Unwinding of Certain CDO's

As a consequence of the various Lehman entities entering into Chapter 11 protection in the US and other similar style external administrations (applicable to the relevant jurisdiction), the Lehman Originated Notes have been or are capable of being unwound as an event of default under the ISDA agreement has taken place.   As a consequence, noteholders that were previously 'out of the money' become significantly 'in the money' as the waterfall is reversed under the agreements, by which the Trustee is able to seize the underlying collateral and distribute it to the noteholders rather than the swap counterparty (subject to provisions in the Indenture Agreements).

The first schemes to have unwound were Federation series A1 and A2, which achieved a full return of capital to unit holders. This high return is attributable to the collateral being held as cash.

There are several more investment products in a similar situation to Federation Notes.   However, unlike Federation Notes, the underlying collateral in these CDO's is not cash, but securities which are valued in total between 72 to 90 cents in the dollar (depending on the institution from which those Bonds were obtained, maturity dates etc).   The Trustee will also be entitled to deduct costs associated with early termination (such as legal fees) from that collateral prior to distributing it to Noteholders.

### 8.1.3   Difficulties with Early Termination

We are currently involved in discussions with the Trustee and various other parties in an effort to achieve an early termination of the CDO notes where early terminations are available.
There are understood to be several issues impeding the Trustee from initiating early termination, but principally we understand:

- Certain of the Noteholders have indicated to the Trustee that they wish to have the Trustee swap out the Lehman counterparty with a new counterparty so as to 'cure' the event of default under the ISDA Agreement.   Whilst this is necessary under certain CDO's, we understand this is not a requirement under the CDO's held on the Company's proprietary book and, the event of default cannot be cured.

  Notwithstanding the above, the Trustee is concerned about possible ramifications if it acts contrary to certain of the Noteholders interests.

- The Trustee is concerned with the ramifications of electing to seize and realise the collateral at this time (when the market is illiquid) as opposed to another time (when the market may improve).   The consequential concern of the Trustee is that Noteholders may seek to commence action against the Trustee for its actions in realising the collateral at the 'wrong' time.

A consequence of the these matters is that the Trustee is cautious about triggering an early termination event, which would unwind the Note.   The Trustee has also indicated its intention to retain a substantial amount of the collateral for a significant period of time to provide a suitable indemnity in the event proceedings are commenced against it.

As a consequence, Noteholder meetings are being arranged for certain of the CDO's to establish a clear direction upon which the Trustee can rely, and for the Noteholders to negotiate both the amount and time "indemnity" collateral is held by the Trustee.

In addition to the above, we have also recently reviewed legal proceedings with respect to another CDO (unrelated to the

# 8 Review of Key Assets (cont)



CDO's held on the Company's proprietary book), but which might form the precedent for possible claims by LBSF as the swap counterparty in the future.

The United States legal proceedings are in respect to a Complaint for Declaratory and Injunctive Relief against, amongst others, the Trustee of the Ballyrock ABS CDO.

In these proceedings, LBSF is seeking to obtain an injunction against the Trustee distributing the collateral to Noteholders. In this regard, LBSF appears to be relying on, amongst other things:

- The election of the "second method" under the ISDA Agreement to distribute collateral. The "second method" requires the Trustee to distribute the collateral in the normal course notwithstanding the 'in the money party' (LBSF) is in default;

- The terms of the Indenture require the Trustee to find a replacement party for LBSF or entry into a replacement credit default swap agreement in order to maintain continuity; and

- That there is a stay on all proceedings whilst the company is in Chapter 11 and that this stay extends to the proposed unwinding of the CDO.

As noted above, whilst these issues may not be factually relevant to the unwinding of CDO's held on the Company's proprietary book and by certain of the Company's customers, these issues may nonetheless arise and/or may create greater concern for the Trustee which will ultimately affect the estimated timing and quantum of the return to noteholders.

Accordingly, the position in respect of early termination of certain CDO products, and the likely capital return, remains unclear at the date of this report.

We have engaged SCRAPL to independently value the Company's interest in CDO notes at 27 February 2009. SCRAPL has valued Lehman Brothers originated CDO notes by reference to the underlying collateral available to the Noteholders.

We have ascribed a 30% discount to SCRAPL's valuation to arrive at our low estimate, and no discount to arrive at our high estimate.

### 8.1.4    Interest in Non Lehman Originated CDO Notes

The remaining CDO Notes held by the Company are non Lehman originated. Accordingly, at the time of preparing this report there has been no event of default under the ISDA Agreements and therefore there is currently no ability for the Trustee to specify an Early Termination Date and proceed to unwind the schemes and seize the collateral for the benefit of Noteholders.

These CDO instruments have varying degrees of risk and maturity, all of which could impact their value. However, the majority of these CDO's could be considered as being significantly 'out of the money', meaning realisable values in the current environment are likely to be low.

For the purposes of this Report we have engaged SCRAPL to independently value these CDO's using credit market spreads and correlations. We have similarly discounted this valuation by 30% to arrive at low estimates and have used the full value for our high estimate.  If market conditions improve, these



# 8 Review of Key Assets (cont)

products may achieve greater than 100% of the valuation used to arrive at our ERV's for this Report.

Whilst the market for CDO's is highly illiquid at this time, we are currently considering our strategy regarding the sale of these assets. In that regard, we intend to commence a sale and marketing campaign shortly, with a view to reserving our rights if the bids are unfavourable.

We will continue to liaise with the Committee regarding the asset realisation strategy, and price points for acceptance of bids throughout the sale programme. However, we are conscious of the timing of realisations and the need to disburse funds to creditors. It is therefore likely that our selling strategy will vary depending on whether the creditors resolve that the Company is placed into liquidation, or execute a Deed.

## 8.2    INVESTMENT IN BONDS

The Company holds an interest in 23 bonds, largely AUD denominated, but also USD and Euro.

Whilst the market for second tier corporate bonds is both illiquid and volatile at present, we intend to commence a sale and marketing campaign for these assets in the near future, with a view to reserving our rights if the bids are unfavourable.

Further, a number of these bonds have near term maturity dates, so a better result may be achieved at maturity rather than selling at a discount to face value in the present market. We will continue to work with the Committee regarding the asset realisation strategy, and price points for acceptance of bids throughout the sale programme.

For the purposes of this Report we have applied a discount to the valuation of these instruments of between 10% and 30% (depending on the issuer) to arrive at our low estimate, and full value to arrive at our high estimate.

With regards to the foreign currency bonds, we note that these were held by LBIE (due to their foreign currency denomination) and as such, we do not hold the paper for the instruments, although we understand that the Company still retains ownership of same.

We are in discussions with PWC to confirm that LBIE still holds those bonds as our agent, and will seek return of those instruments in due course. However, as we have not yet been informed by PWC formally of the position, we have valued these instruments between 0% (low value) and 100% (high value) of the valuation for the purposes of this report.

## 8.3    INSURANCE

The Company may have the benefit of proceeds of insurance policies which it holds with three separate insurers, both within Australia and overseas. The relevant policies provide professional indemnity cover to the Company, and may provide a return to the estate where claims for breaches of professional duties fall within the terms of cover. For the purposes of this Report, and because of the Company's obligations under the terms of the policies, we refer to the respective insurers as Insurer A, B and C.

We have received advice on the various issues that are relevant to assessing whether or not claims are recoverable under the policies. The advice is subject to legal professional privilege and we are not able to report on the substance of the advice.

## 8  Review of Key Assets (cont)



Notwithstanding the above, we are able to report the following:

- The Company has notified claims and circumstances of claims to Insurer A, and has sought indemnity for claims settled by the Company prior to our appointment.

- Of the settled claims, seven claims totalling $30,306,105 have been submitted to Insurer A under a policy held in 2006/2007, and indemnity has been sought for those claims.

- Insurer A has not confirmed indemnity for the settled claims and is continuing to investigate the claims submitted to it for indemnity and other claims notified to it under the 2006/2007 policy and a subsequent policy held for 3 months in 2007/2008.

- Insurer A has indicated that there are a number of issues to be investigated before it is able to assess whether it has any liability under the insurance policies. Insurer A has also raised several potential exclusions under the policies which may operate to exclude claims in their entirety.

- To date, 33 unsettled claims totalling $215,855,000 have been identified as potentially recoverable under the 2006/2007 policy, and one claim has been identified as potentially recoverable under the 2007/2008 policy. The limit of indemnity under the 2006/2007 policy is $10,000,000 and the limit of indemnity under the 2007/2008 policy is $5,000,000. There is a deductible of $250,000 payable for each and every claim inclusive of legal expenses.

- The Company has notified claims and circumstances of claims to Insurer B. Insurer B is a US company, and cover was provided to the Company under a global arrangement put in place by LBHI to cover its worldwide operations.

- The policies with Insurer B are subject to US law. The Company has obtained advice from US lawyers on aspects of the policy and the application of US law. This advice is subject to legal professional privilege.

- There are a number of complex legal issues and commercial considerations that will need to be taken into account in pursuing a claim for indemnity from Insurer B. It is not presently known whether or not the limits of indemnity for this cover are exhausted by claims made in the US and/or elsewhere against LBHI for its global operations.

- The Company has not identified any claims that are recoverable under the policy issued by Insurer C.

In view of the above, we have for the purposes of preparing this Report based our forecasts on the basis that any return from insurance policies held with Insurers A, B and C will be nil.

In the event the Administrators receive proceeds of any insurance policies, the proposed application of those insurance proceeds (after payment of the Administrators' costs and expenses and remuneration and costs and expenses incurred by the Administrators in seeking to recover any proceeds of insurance) under a Deed is set out below:

**8** Review of Key Assets (cont)



| Insurer | Details | Application of any Recoveries |
|---------|---------|-------------------------------|
| Insurer A | Insured claims settled by the Company prior to the Administration | To the general administration account as the settlements of the claims were paid by LBA. |
| Insurer A | Insured disputed claims | Pari passu distribution to Admitted Litigation Creditors. |
| Insurer B | Insured disputed claims | Pari passu distribution to Admitted Litigation Creditors. |

*Figure 18 – Application of Funds Received from Insurance Contracts*

In liquidation, the proceeds of contracts of insurance are applied in accordance with section 562 of the Corporations Act which provides:

(1) *"Where a company is, under a contract of insurance (not being a contract of reinsurance) entered into before the relevant date, insured against liability to third parties, then, if such a liability is incurred by the company (whether before or after the relevant date) and an amount in respect of that liability has been or is received by the company or the liquidator from the insurer, the amount must, after deducting any expenses of or incidental to getting in that amount, be paid by the liquidator to the third party in respect of whom the liability was incurred to the extent necessary to discharge that liability, or any part of that liability remaining undischarged, in priority to all payments in respect of the debts mentioned in section 556.*

(2) *If the liability of the insurer to the company is less than the liability of the company to the third party, subsection (1) does not limit the rights of the third party in respect of the balance.*

(3) *This section has effect notwithstanding any agreement to the contrary."*

Together we unlock value

# 9 Review of Key Liabilities



**Note: Reference in this section to any quantification of liability due to Contingent Claimant Creditors is for analytical purposes to arrive at a recommendation only. Such quantification should not be considered, in any way whatsoever, to be an admission by the Company that any such liability exists.**

## 9.1 CONTINGENT CREDITOR CLAIMS

The Company has a number of former and existing clients that are considered to be contingent creditors with unliquidated claims in nature by virtue of having already commenced proceedings against the Company, or by having notified a prospective intent to commence proceedings against the Company.

We have detailed below the basis of the contingent creditors argument, and at Sections 9.2.1 and 9.2.3, a summary of similarly based legal action which has already commenced.

Since the appointment of an Administrator to the Company, all proceedings have been stayed pursuant to Section 440D of the Corporations Act and no substantive steps have been taken in the litigation.

### 9.1.1 Contingent Claims Generally

#### 9.1.1.1 Background

Prior to Grange being acquired by the Lehman Brothers Group, Grange had marketed a variety of investment services and products to a number of clients, in particular councils and local government authorities. The key services offered by Grange in its marketing efforts to councils and local governments were:

- Broker Services – these services were offered to councils in circumstances where the council chose to make its own investment decisions and the services offered by Grange were more limited to a brokerage nature: and

- Portfolio Management – these services were provided where Grange offered investment services to councils in circumstances where Grange effectively acted as agent and made investment decisions on behalf of the council in question, usually within a pre determined investment mandate. There were two forms of portfolio management arrangements:

  - Full Discretion – where Grange was granted discretion as to investment decisions; or

  - Reporting Obligations – where Grange had discretion to invest within an investment mandate but was also obliged to report to the principal matters relating to the portfolio performance.

- Most council clients of Grange, and in particular the majority of the Council Claimants, obtained portfolio management services from Grange pursuant to contracts known as IMP's.

A number of individuals, councils and local government authorities have lodged 'belts and braces' claims in the administration of the Company in relation to losses they allege were caused by the Company arising from the investment by the Company, on their behalf, in certain investment products.

There are currently 48 claims brought by councils, other authorities and individuals which all assert similar claims. These claims are valued at $146 million under the Contingent

# 9 Review of Key Liabilities (cont)



Creditor Claimant model (discussed later) which represents 15% of possible claimants or 23% of total claimants in value.

The proofs while differing in levels of detail and factual matters, all appear to take the same (or substantially similar) form. Each proof asserts a number of grounds of liability which are said to substantiate the claim asserted. While there is overlap between some of the bases of claim and the underlying factual matters upon which they are grounded, each ground of liability is asserted separately.

Further, and whilst the merits to each of these claims rely on individual circumstances, the claims in a general sense follow a similar form and structure. Accordingly, whilst any adjudication on proofs submitted by contingent creditors, and all prospective legal action, would need to be commenced against (and defended by the Company) individually, to simplify the Report we will assume all claims share consistent grounds.

We have summarised below the key matters relating to each aspect of the claims that have been made.

### 9.1.1.2 Breach of Duty of Care – Negligence

A claim for negligence is made on the following basis:

- The Company owed a duty of care to exercise the reasonable skill and care to be expected of an experienced financial services provider;

- The duty of care is alleged to have arisen by reason of:

  - Various representations (defined throughout the proofs) alleged to have been made by the Company to the claimant; and

  - By the Company's appointment as the claimants investment advisor under the terms of the IMP which have the Company a wide discretion to acquire investments on behalf of the claimant.

- The Company breached its duty of care by failing to exercise the skill and care of an experienced provider of financial services, including by:

  - Negligently failing to advise the claimant that "synthetic" CDO's were complex financial products not suitable for investors such as the claimant;

  - Negligently failing to advise the claimants that synthetic CDO's were new financial products and high risk investment;

  - Negligently failing to advise the claimant of the commencement of the sub-prime collapse;

  - Negligently failing to give due consideration to matters contain in Part III of the Trustee Act; and

  - Negligently failing to monitor the value of the CDO's invested in by the claimant and advising as to when the CDO's should be sold.

- Accordingly the Company is alleged to have operated negligently under the IMP Agreement

### 9.1.1.3 Voidable Transaction Claim

The voidable transaction claim alleges that:

Together we unlock value

41

# 9 Review of Key Liabilities (cont)



- The claimants investment function was sub-delegated to the Company according to the terms of the IMP Agreement;

- The delegated investment function could only be exercised by the Company within the terms of the IMP Agreement and the Investment Guidelines;

- The Investment Guidelines provided that:

  - All securities invested in must have an "active secondary market"; and

  - Investment in "derivative contracts" was not permitted.

- It is alleged that the CDO's which the Company invested in on behalf of the claimants were "derivative contracts" in which there was no "active secondary market".

### 9.1.1.4  Breach of Fiduciary Duty

The claimants proofs allege that the Company breached the fiduciary duties owed to the claimants.  The apparent basis of the fiduciary duties is the agency relationship arising from the IMP Agreements.

The alleged content of the fiduciary duty owed to the claimants are:

- A duty to avoid conflicts of interest;

- A duty not to enter into a transaction from which they would obtain a pecuniary interest without the consent of the client in question;

- A duty to disclose all pecuniary interests and benefits which the Company obtained from any transaction; and

- A duty to disclose all matters of which the Company was aware relevant to the suitability of CDO's as investment for the Claimants.

It is alleged that the fiduciary duties were breached because, in relation to each of the CDO's acquired on the claimants behalf, the Company, or Australian related entities, acted as underwriter or issuer of the CDO's and LB Australia earned fees in relation to the structuring and sale of CDO's.  It is also alleged that the Company had a commercial interest to place the CDO's and allowed this interest to interfere with its investment decisions for the claimants.

### 9.1.1.5  Breach of Contract

The claimants allege that the Company breached the terms of the IMP agreement by:

- Failing to invest in accordance with the Investment Guidelines by:

  - Not investing in securities with an active secondary market; and

  - Investing in securities which were excluded from the Investment Guidelines as they were "Derivative Contracts".

- Failing to provide advise to the claimants prior to the investment in CDO products;

- Failing to properly manage the claimants investment portfolios;



Together we unlock value



# 9 | Review of Key Liabilities (cont)



- Failing to notify the claimants when also acting as counterparty to a transaction; and

- Failing to provide adequate monthly reports.

It is alleged that these failures amounted to breaches of certain clauses within the IMP Agreements.

### 9.1.1.6   Misleading and Deceptive Conduct

The misleading and deceptive conduct claim alleges that the Company breached the statutory provisions by engaging in conduct in relation to a financial product or financial service which was misleading and deceptive or likely to mislead or deceive.

The breach of the statutory provisions is based on the various representations which were alleged to have been made by the Company.  In addition to the representations being alleged in relation to the Negligence Claim, those alleged representations are also alleged to ground the misleading and deceptive conduct claim.

### 9.1.1.7   Unconscionable Conduct

The Unconscionable Conduct claim alleges:

- By reason of the conduct alleged to have been engaged in by the Company in support of the other aspects of the proof, the Company has breached Section 912A of the Corporations Act; and

- The Company is also alleged to have acted unconscionably for the purposes of section 12CA ad 12CC of the ASIC Act.

### 9.1.1.8   Quantification of Contingent Creditor Losses

The remedies sought by the claimants in their proofs include:

- Rescission of the IMP Agreements by restoring the claimants to their pre-contractual position by a payment of the full face value of the investments plus opportunity costs;

- Damages on an expectation basis calculated by reference to the face value of the investments, less the most recent valuations, plus expected future coupons; and/or

- Orders under statute for the recovery of the full face value of the investments.

The problem with the remedies of rescission and damages asserted by the claimants is that whilst the claimants continue to hold the securities which they invested in, it is very difficult to determine what losses have been suffered.  Further, and until such time as the investments in question have been realised or returned and an amount of the loss crystallised, it is arguable that no loss has presently been suffered by the claimants.

However, and without reference to our views as to the merits of contingent creditor claims, we have interrogated the Company records over the previous six months in order to allow us to develop a model which can put, as best possible, a reasonable assessment on the notional 'universe' of potential losses suffered by all parties that acquired CDO products from the Company as at the date of our appointment.
The model that we have developed incorporates the following assumptions:

# 9 Review of Key Liabilities (cont)



- A valuation of the CDO's at 26 September 2008. The Administrators consider this is the most appropriate date to value the CDO's in view of persisting market volatility;

- The valuation of the CDO's is based on the mid market valuation (the average between the high and low valuation) obtained from independent third parties derived by using models based on credit market spreads and correlations (the industry standard method for providing market valuations and the same approached used by the Company previously).

- A number of the Lehman originated CDO's are expected as at the date of this Report to be unwound, which will allow the Trustee to distribute the underlying collateral to Noteholders. Accordingly, the value of the underlying collateral (less a reasonable margin for Trustee costs) is the most appropriate valuation of these CDO's.

- Losses of the Contingent Claimant Creditors are capped to the face value of the CDO product i.e. we have not included in the model any claim for consequential loss or for recovery of legal costs.

We note that this model was developed using information extracted from the Company's electronic records. Whilst we have used our best endeavours to cross check the accuracy of the model to other information such as client holding statements and proofs of debt received to date, we have not conducted an audit of the over 1,300 transactions that comprise the underlying data to the model. Accordingly, creditors should note that the 'universe' of potential losses suffered by Contingent Litigation Creditors could change from that which has been determined using the model.

The model reveals that the 'universe' of claims against the Company could be in order of $625 million. Of course, there are varying degrees of merit to the claims made in proofs submitted by creditors. Furthermore, and in any event, we are of the view that LB Australia has significant and meritorious defences to the claims that have been/are being contemplated by councils and other investors. However, for the purposes of this Report, we have assumed that the best estimate of contingent creditor claimants on the basis that the Company cannot successfully defend any of the proceedings, would be $625 million.

We have provided a detailed matrix setting out the results of this model at Annexure Q, and have summarised key demographics of the claims below.



*Figure 19 – Key Demographics from Contingent Claimant Creditor Model*

The modelling highlights that:

- 57% of claims would relate to those parties that do not have an IMP Agreement in place;

- 39% of claimants would be Councils;

- The vast majority (83%) of claims would relate to products sold to claimants prior to the acquisition of the Company by LBHI;



# 9 Review of Key Liabilities (cont)



- Only 0.2% of claims would relate to products sold to investors that would be defined under the Corporations Act as being unsophisticated; and

- The vast majority (72%) of claims would relate to non Lehman originated products.

## 9.1.2 Twelve Down and Rangali

Proceedings were commenced by Twelve Down and Rangali against the Company on 21 July 2008. The proceedings were commenced by way of Statement of Claim filed in the Supreme Court of Queensland.

The plaintiffs claim that:

- Representations made on behalf of the Company to the plaintiffs about certain investment products were misleading and deceptive and thus in breach of certain provisions of the ASIC Act and the Corporations Act.

- The financial advice given on behalf of the Company to the plaintiffs was negligent.

Each plaintiff seeks damages of $500,000, plus damages for loss of opportunity (in connection with a business that was to be acquired with the invested funds).

On 21 August 2008, a defence to the claim was filed on behalf of the Company.

On 25 August 2008 the plaintiffs served a Notice to Admit Facts on the Company. However, this Notice to Admit Facts was withdrawn on or about 3 September 2008 following objections raised to it by the Company.

On 12 September 2008, the plaintiffs served a list of documents. On that date the plaintiffs also:

- Foreshadowed an application to have the proceeding moved to the Commercial List of the Supreme Court of Queensland;

- Invited the parties to submit the matter to mediation; and

- Served the Company with an Amended Statement of Claim. Those amendments included the addition of causes of action based upon breach of contract and breach of fiduciary duty.

## 9.1.3 Jon and Pamela Parker

On 2 September 2008, the Parkers commenced proceedings against the Company in the Supreme Court of Queensland.

The Plaintiffs allege that:

- The investment advice given to the plaintiffs by the Company was negligent;

- Statements made to the plaintiffs on behalf of the Company were misleading and deceptive in contravention of the ASIC Act.

- The Company breached fiduciary duties that it owed to the plaintiffs.





# 9  Review of Key Liabilities (cont)

**PPB**

The approximate value of the claim is $3 million.

At the time of serving the Statement of Claim, the plaintiffs indicated that they proposed to have the matter placed into the Supreme Court's Commercial List.    However, prior to the Company taking any action to defend the proceedings the Company was placed into Administration.

### 9.1.4  Wingecarribee

Wingecarribee commenced proceedings against the Company in December 2007.    The proceedings were filed in the Sydney Registry of the Federal Court and were assigned to Docket Justice Rares.

The Proceedings were commenced in reliance on the primary cause of action of misleading and deceptive conduct.  During the course of the proceedings however, the Council amended the pleadings twice.  Secondary causes of action pleaded by Wingecarribee are that:

- The Company breached its IMP Agreement with the Council by acquiring investments that were not permitted investments;

- The Company was negligent in that it failed to exercise the skill and care of an experienced provider of financial services in a number of respects; and

- The Company breached various fiduciary duties it owed to Wingecarribee.

The Claims relate to a variety of investments made on behalf of Wingecarribee by the Company with a total face value of approximately $30 million.  The damages claimed depend on the valuation of those investments from time to time, but as at mid September 2008 were in the vicinity of $16 million.

On 13 February 2009 the matter was brought before the Federal Court again for the purposes of adjourning the proceedings to a date after the end of the second meeting of creditors.

Notwithstanding Justice Rares adjourned the proceedings, his Honour provided that he could see little utility in providing a short adjournment on the grounds that the Administrators (or liquidators) may after the second meeting of creditors, find it difficult to come to a position of any merit by 3 April 2009 when the Court would expect the matter to be progressed.

In light of the above, His Honour gave an ex tempore judgment on how he envisaged the proceedings would proceed, in light of the "public interest" and the potential that there may be a number of other similar claims.  Accordingly, His Honour noted ordered that:

- The proceedings be adjourned for directions to 1 May 2009;

- The respective parties were to confer on or before 17 April 2009 with a view to identifying any consent orders which should be made leading to a speedy resolution of either the whole proceedings or what is perceived to be the major issue or issues of the representation or contractual terms in them going to the making and accuracy of the representations concerning CDO's;

- In the event the parties are unable to formulate consent orders, the applicants are to file and serve written submissions of no more than 10 pages on or before 23 April 2009 and the respondents to file and serve written



# 9 Review of Key Liabilities (cont)

submissions and its proposed orders on or before 20 April 2009;

- The parties have liberty to apply on three days notice.

At the conclusion of his judgment, His Honour stated that in the event he had not accurately described the situation leave has been granted to the parties to restore the matter to the list so that the judgment can be amended to reflect the true position of matters in issue between the parties.

# 10 Investigations



## 10.1  GENERAL

An administrator is obliged to investigate a company's business, property, affairs and financial circumstances leading up to his/her appointment.  These investigations are conducted in order to determine what prospective avenues for recovery are available to a liquidator if the company is placed into liquidation.

The prospective recovery avenues available to a liquidator are then considered against the alternative options creditors have, namely:

- To hand back the Company to the Directors; or

- To approve the execution of a Deed.

The following transactions may be recoverable on the application of the liquidator of a company to the Court:

- A payment made to a creditor, in the six month period prior to the wind up of the company or the appointment of a voluntary administrator, which is an insolvent transaction of the company (unfair preference).

  The purpose of the insolvent transaction recovery provisions are to recover funds from a creditor or related party who has received from the company, in respect of an unsecured debt, more than the creditor would have received from the company in respect of their debt if the transaction in question was set aside and the creditor were to prove for the debt in the winding up of the company

- A payment made to a non-related creditor during the two years prior to the wind up of the company, or the appointment of a voluntary administrator, or four years if a related creditor, which is an insolvent and uncommercial transaction

The purpose of the uncommercial transaction recovery provisions are to recover funds from a creditor or related party where it may be expected that a reasonable person in the circumstance would not have entered into the transaction in question having regard to the benefits of entering into the transaction, the detriment to the company of entering into the transaction, and the respective benefits to other parties to the transaction.

- A payment made to a creditor in the ten years prior to the wind up of the company or the appointment of a voluntary administrator, which is fraudulent; and

- An unfair loan whenever made.  The purpose of the unfair loan recovery provisions is to recover funds from a lender where interest and/or charges on a loan to the company were extortionate or have since become extortionate because of a variation to the loan agreement with the company.

Creditors should note that transactions of this nature may only be recoverable upon the appointment of a Liquidator and are not available in the event that the Company executes a Deed.

In relation to our preliminary investigation at the time of this report, the following should be noted:

- In the time frame available, the investigations conducted should only be regarded as being of a preliminary nature. For instance, if appropriate, a Liquidator is able to conduct a formal examination of Company officers and others concerning the examination affairs of the Company, which



# 10 Investigations (cont)

may reveal pertinent information affecting the conclusions drawn by the Administrators for the purposes of this report; and

- The review has been conducted at a high level and focuses on issues that appear materially relevant to any decision that creditors may make on the Company's future.

The key areas being commented on include:

- Insolvency;

- Transactions with related parties;

- Insolvent Trading;

- Unfair Preferences;

- Uncommercial and Insolvent Transactions;

- Unfair Loans; and

- Directors Duties.

## 10.2   INSOLVENCY

Section 95A of the Act effectively provides that a company is insolvent if, and only if, it is unable to pay all of its debts as and when they become due and payable.  The 'cashflow' test is not however, the sole determining factor on insolvency.

A conclusion as to insolvency must be derived from a proper consideration of the Company's financial position.

Relevant issues include (but are not limited to) the following: -

- A temporary lack of liquidity is not conclusive;

- Regard should be given to:

  - Cash resources;

  - Monies that can be procured by the realisation of assets;

  - Monies that can be procured from borrowing against the security of assets; and

  - Monies that can be procured through equity or capital raising.

- Not all assets of a company may be taken into account when considering its solvency.  For example, where assets which are essential to the continuation of a company's business are proposed to be sold, the proceeds of those assets should not be taken into account.

- It is appropriate to take into account indulgence extended to the company by its creditors as to trading terms.

- It is not appropriate to base an assessment of whether a company can meet its liabilities as and when they fall due on the prospect that the company might be able to trade profitably in the future.

In summary, it is the company's inability, using such resources as are available to it through the use of its assets, or otherwise, to meet its debts as they fall due which indicates insolvency.

A summary of our investigations in respect to insolvent trading is provided at Section 10.5 of this Report.



# 10 Investigations (cont)



## 10.3    BOOKS AND RECORDS

Section 286 of the Corporations Act requires that a company maintains financial records that correctly record and explain its transactions, financial position and performance, and which would enable true and fair financial statements to be prepared and audited.

As the Administrators, we are required to form an opinion as to whether the officers of the Company have complied with the provisions of Section 286 of the Corporations Act.  In certain instances, a breach of Section 286 of the Corporations Act will entitle a liquidator to deem insolvency of the Company which may then be used as grounds to pursue certain actions.

During the course of our investigations we have considered the records provided to us in light of the statutory requirements.  We note in our opinion that the Group appears to have maintained adequate books and records that would satisfactorily allow true and fair financial statements to be prepared and audited and accordingly, deemed insolvency would not be available to a liquidator if appointed.

## 10.4    TRANSACTIONS WITH RELATED PARTIES

As part of our investigations into the Company's affairs we have reviewed the Company's records to establish details of its dealings with its Directors and/or related entities.

### 10.4.1 Dealings with Related Entities

As noted earlier, the main source of the Company's funding was from LB Asia Holdings, and to a lesser extent, LBA Granica through a subordinated facility.  We are of the view that these dealings were not uncommercial and therefore could not be attacked by a liquidator if appointed.

We have also identified one payment of $22,000 that was made to Armada Trading on 27 June 2006 for consultancy services.  We understand that Mr Berg (who is a Director of the Company) is also a director of Armada Trading.

As the payment to Armada was made before any solvency concerns of the Company arose, and were for services rendered. We do not believe this payment could be attacked by a liquidator if appointed.

### 10.4.2 Director Salary

We have reviewed the salary packages and Director Fee paid to the Directors annually, and confirm that we are of the view that same are not unreasonable.

We summarise our findings below:

| | Salary Package ($'000) | Director Fee ($'000) |
|---|---|---|
| Sean Moore | 300,000 | |
| Glenn Willis | 400,000 | |
| Kirk Sweeney | | Nil |
| Tony Berg | | 50,000 |

*Figure 20 – Director Salary Package and Fees*

## 10.5    INSOLVENT TRADING

Section 588G of the Corporations Act provides that the Directors are obliged to prevent a company from incurring debts whilst insolvent.

Together we unlock value

50

# 10 Investigations (cont)



Section 588H of the Corporations Act deals with defences that the Directors may have to any liability for insolvent trading.

We are of the view that the Company was not insolvent at times of relevant material transactions, and as such, there would be no liability to pursue against the directors for insolvent trading.

Our investigations in this regard are summarised hereunder.

## 10.5.1 General

There are many tests that can be applied to determine whether a company is solvent, depending on applicable circumstances and available information.  Such circumstances will have regard to the nature of the debtor's business/industry, the manner or method of payment of debts, credit terms and the nature of the debtor's assets.  In other words, the entirety of the debtor's financial position has to be considered.  Ultimately, however, whether a company was solvent or insolvent at a particular point in time is a question of fact.

The two common 'high level' solvency tests applied are the 'Balance Sheet' solvency test and the 'Working Capital' solvency test.  The 'Balance Sheet' test involves consideration of a company's total assets and liabilities and whether or not there are sufficient assets to discharge liabilities.

Under the 'working capital' test, consideration of the company's current assets and liabilities is taken into account. This means there are sufficient monies available to pay creditors debts as and when they fall due for payment.

'Low level' solvency tests individually may or may not evidence solvency.  However, when collectively considered with other evidence, they may establish an overwhelming assessment of a

company being insolvent.  These tests may include, for example, analysis of bank account balances, related entity funding, returned cheques, correspondence in the form of demands from creditors/investors, payment arrangements entered into, unpaid major creditors such as taxation debts, Board minutes and fundamental industry issues.

## 10.5.2 Balance Sheet Test

As discussed above, the Balance Sheet test involves a consideration of whether or not an entity has sufficient assets to discharge its liabilities.

As outlined in Section 6.3, the Balance Sheets discloses that the Company had a surplus of total assets to total liabilities as at 30 June 2006, 30 November 2007 and 26 September 2008 of $14.2 million, $26.5 million and $138.8 million respectively.
Accordingly, under the Balance Sheet Test, the Company would be considered solvent as at 30 June 2006, 30 November 2007 and 26 September 2008.

## 10.5.3 Working Capital Test

As discussed above, another form of the Balance Sheet Test is to consider the available working capital (current assets less current liabilities) available to an entity and its ability to pledge or sell assets so as to generate sufficient cash flow to pay debts as and when they fall due.

A review of the accounts provided discloses the following working capital position of the Company:





# 10  Investigations (cont)

| | 26 Sept 2008 ($'000) | 30 Nov 2007 ($'000) | 30 June 2006 ($'000) |
|---|---|---|---|
| Current Assets | 327,790 | 300,563 | 409,222 |
| Current Liabilities | 289,618 | 304,957 | 386,245 |
| Working Cap' Surplus/(Deficiency) | 38,172 | (4,394) | 22,977 |

Figure 21– Working Capital Analysis

By reference to the table above, the balance sheets disclose that the Company had a working capital surplus (current assets less current liabilities) as at 30 June 2006, and 26 September 2008 of $22.9 million and $38.1 million.

Please note that these positions also include all related entity assets and liabilities, including the subordinated debt.

Given the above, under the working capital test the Company would have been solvent at 26 September 2008.

## 10.5.4 Further Investigations

From our further investigations, we are of the view that the Company was solvent at all relevant times in view of the very significant cash reserves held by the Company (in excess of $40 million at the date of our appointment) and the financial support provided by LB Asia Holdings, and the significant holding of liquid bonds.

Our investigation of historical trading has not identified any events suggesting the Company did not pay its debts as and when they fell due.

Following notification of pending difficulties with LBHI, and the resultant financial implications this would have on the Company, the Directors took appropriate steps to mitigate any deterioration of assets by:

- Seeking independent professional advice;

- Not engaging in any material transactions in the intervening period between the appointment of external administrators to LBHI and it making the necessary appointment of voluntary administrators to the Company.

Accordingly, and unless we become aware of any contrary information, we are of the view that a liquidator would not be able to make any additional recoveries for the benefit of creditors.

## 10.6    UNFAIR PREFERENCES

We have conducted an investigation of the Company's cashbook for the six months prior to our appointment for the purposes of determining whether there were any transactions which may be recoverable under Part 5.7B of the Act.

Our investigations to date indicate that there are no potential unfair preference claims in view of there being no payments on or after 15 September 2008 at which time the solvency of the Australian Lehman Brothers group came into question.

## 10.7    UNCOMMERCIAL AND INSOLVENT TRANSACTIONS

For an uncommercial transaction to exist at the time of the transaction, it must have the following features:

- A reasonable person would not have entered into the transaction after taking into account the detriment and benefits to the company;

- It was made when the company was insolvent;

# 10  Investigations (cont)



- It must have been entered into two years or less prior to our appointment as Administrators (however if it was a related entity it may be 4 years prior to the commencement of the Administration); and

- The person could have reasonably been aware that the company was insolvent at the time of the transaction or the person did not provide valuable consideration.

We have not identified any transactions of this nature.

## 10.8  UNFAIR LOANS

Section 588FD of the Corporations Act defines a loan as being unfair if:

- The interest on the loan was extortionate when the loan was made, or has since become extortionate because of variation; or

- The charges in relation to the loan were extortionate when the loan was made, or have since become extortionate because of variation.

In determining whether the interest on the loan was extortionate, the Liquidator will take into account the commerciality of the arrangement, including but not limited to:

- The length of the loan term;

- The security being offered, including third party security and the ranking of that security;

- The amount of the loan;

- Any historical relationship had with the Company prior to the loan being granted; and

- The assets of the Company, i.e. whether they are tangible, valuable etc.

We have not identified any loans of this nature.

## 10.9  DIRECTORS' DUTIES

The directors and officers of a company are subject to a civil duty of care and diligence as provided for in Section 180(1) of the Corporations Act, amongst other statutory and common law duties.

Subsection 180(2) of the Corporations Act provides that a director or other officer who makes a "business judgment" is taken to have met the requisite statutory duty and the equivalent requirements in Common Law and in Equity, in respect of the judgment if they:

- Make the judgment in good faith for a proper purpose;

- Do not have a material personal interest in the subject matter of the judgment;

- Inform themselves about the subject matter of the judgement to the extent they would reasonably believe to be appropriate; and

- Rationally believe that the judgment is in the best interest of the company.

Pursuant to Section 1317E of the Corporations Act, if a Court is satisfied that a person has contravened Section 180 of the



**10**  ## Investigations (cont)



Corporations Act, it must make a declaration of that contravention. In the event that a person contravenes Section 1317E of the Corporations Act, a Court may make a compensation order pursuant to Section 1317H of the Corporations Act.

During the course of our investigations we have not identified any actions of the Directors that would be considered a dereliction of duty and a breach of Section 180 of the Corporations Act.

Together we unlock value

# 11 Liquidation Alternative



## 11.1 AVAILABLE ASSETS

Following from the results of our review of assets and liabilites at Sections 7 through 9 of this Report, and our investigations discussed at Section 10 of this Report, it is envisaged that liquidation will derive the same return from asset realisations as would be achieved under the Deed alternative.

We have set out in the table below our estimate of the assets that would be available for distribution to creditors prior to any additional costs being incurred if proceedings are commenced against the Company by Contingent Claimant Creditors.

| | Low ($'000) | High ($'000) |
|---|---|---|
| Cash at Bank | 76,222 | 76,222 |
| Add Future Asset Realisations | | |
| Recovery of Bank Guarantee deposit funds from LBA Holdings | 4,598 | 4,598 |
| Debtors | 13,744 | 31,972 |
| Stock | 31,393 | 75,068 |
| Other | 0 | 5,279 |
| Total Estimated Assets (Excluding future coupon income) | 125,957 | 193,139 |
| Deduct 'Static' Priority Payements | | |
| Administrators Remuneration (Estimated) | 2,800 | 2,800 |
| Legal Fees (Estimated) | 1,500 | 1,500 |
| Employee Entitlements | 6,300 | 6,300 |
| | 10,600 | 10,600 |
| **Total Estimated Assets Available for Distribution** | **115,357** | **182,539** |

*Figure 22 – Estimate of Assets Available for Distribution*

## 11.2    PROSPECTIVE LIABILITIES

Whilst the asset position will remain static under either the liquidation or Deed scenarios, there are two aspects of the liquidation route which will have a material impact on the return to creditors.

### 11.2.1 Legal Costs

It is anticipated that there would be a signficant amount of legal and other professional costs that would be unavoidable in a liquidation secnario in view of the prospective and significant number of legal claims already commenced, and being contemplated by, Contingent Creditor Claimants.

In this regard, we have sought advice from our solicitors with respect to their best estimates of the likely costs involved in defending proceedings against the Company.   From this advice, we have formulated a model (Annexure R) to estimate the likely outcome under two different senarios:

- If the Company were to win five cases, litigants would likely discontinue proceedings in view of the precedent.  On that basis, the Company would incur net irrecoverable costs in the order of $1.6 million; and

- If litigants were to win, the Company would likely defend 20 proceedings before seeking to settle all other claims, resulting in net irrecoverable costs in the order of $26.1 million.

### 11.2.2 Quantum of Claims

Valuation of Contingent Creditor Claims is extremely complex in view of the nature of the alleged losses suffered by claimants. Taking aside any legal issues, there is extreme volatility in the market.  For instance, as can be seen in the model to calculate the 'universe' of claims by Contingent Claimant Creditors:



# 11 Liquidation Alternative (cont)



- Using a mark at 30 June 2008, the 'universe' is approximately $397.5 million; and

- Using a mark at 30 November 2008 indicates that 'universe' would be in the order of $725 million.

For the purposes of consistency, when determining the likely outcome to creditors under a liquidation scenario, we have calculated the 'universe' of potential claims that could be made by Contingent Creditor Claimants using the mark derived at 26 September 2008 (i.e. $625.6 million).

## 11.3   CONTRACTS OF INSURANCE

In liquidation, the proceeds of contracts of insurance are applied in accordance with section 562 of the Corporations Act (refer Section 8.3 of this Report).

As the return to the Company from these policies is uncertain at this juncture, we have excluded any settlement amount from our estimated return to creditors.

## 11.4   MODELLING OF RETURN

Set out in the adjacent tables is our estimate of the return to each class of creditor under the various scenarios.

| LOW CASE - ASSET POOL $115 MILLION | Creditors ($'M) | No. | Liquidation Claimants Lose ($'Million) | % | Claimants Win ($'Million) | % |
|---|---|---|---|---|---|---|
| Assets | | | 115.4 | | 115.4 | |
| Deduct Priority Costs | | | | | | |
| Additional Costs in Litigation (Refer Annexure T) | | | 1.6 | | 26.1 | |
| Amount available for ordinary creditor claims | | | 113.8 | | 89.3 | |
| | | | | | | |
| Creditors | | | | | | |
| Employee Creditors - Unsecured | 0.4 | 3 | 0.2 | 60.2% | 0.0 | 11.0% |
| Trade Creditors | 8.7 | 104 | 5.2 | 60.2% | 1.0 | 11.0% |
| Lehman Brothers Australia Related Parties | 5.8 | 2 | 3.5 | 60.2% | 0.6 | 11.0% |
| Lehman Brothers Asia Holdings | 132.8 | 6 | 80.0 | 60.2% | 14.6 | 11.0% |
| Other Lehman Brothers Asia Companies | 33.1 | 6 | 19.9 | 60.2% | 3.6 | 11.0% |
| Lehman Brothers Overseas Companies | 8.1 | 4 | 4.9 | 60.2% | 0.9 | 11.0% |
| Litigation Claims by Claimants | 625.6 | 308 | Nil | 0.0% | 68.6 | 11.0% |
| LB Granaica (Subordinated Debt)* | 87.4 | 1 | Nil | 0.0% | Nil | 0.0% |
| | | | | | | |
| Total | 901.9 | | 113.8 | | 89.3 | |
| | | | | | | |
| NPV of Return (6 years at 5%) | | | | 44.9% | | 8.2% |

*Figure 23 – Estimated Return to Creditors under Liquidation - Low*

| HIGH CASE - ASSET POOL $182.5 MILLION | Creditors ($'M) | No. | Liquidation Claimants Lose ($'Million) | % | Claimants Win ($'Million) | % |
|---|---|---|---|---|---|---|
| Assets | | | 182.5 | | 182.5 | |
| Deduct Priority Costs | | | | | | |
| Additional Costs in Litigation (Refer Annexure T) | | | 1.6 | | 26.1 | |
| Amount available for ordinary creditor claims | | | 180.9 | | 156.4 | |
| | | | | | | |
| Creditors | | | | | | |
| Employee Creditors - Unsecured | 0.4 | 3 | 0.4 | 95.8% | 0.1 | 19.2% |
| Trade Creditors | 8.7 | 104 | 8.3 | 95.8% | 1.7 | 19.2% |
| Lehman Brothers Australia Related Parties | 5.8 | 2 | 5.6 | 95.8% | 1.1 | 19.2% |
| Lehman Brothers Asia Holdings | 132.8 | 6 | 127.2 | 95.8% | 25.5 | 19.2% |
| Other Lehman Brothers Asia Companies | 33.1 | 6 | 31.7 | 95.8% | 6.4 | 19.2% |
| Lehman Brothers Overseas Companies | 8.1 | 4 | 7.8 | 95.8% | 1.6 | 19.2% |
| Litigation Claims by Claimants | 625.6 | 308 | Nil | 0.0% | 120.2 | 19.2% |
| LB Granaica (Subordinated Debt)* | 87.4 | 1 | Nil | 0.0% | Nil | 0.0% |
| | | | | | | |
| Total | 901.9 | | 180.9 | | 156.4 | |
| | | | | | | |
| NPV of Return (6 years at 5%) | | | | 71.5% | | 14.3% |

*Figure 24 – Estimated Return to Creditors under Liquidation - High*

# 11 Liquidation Alternative (cont)



## 11.5    SUMMARY OF LIKELY RETURN UNDER LIQUIDATION

Under liquidation, creditors are expected to receive the following range of returns:

| Creditor | Low (¢ in dollar) | High (¢ in dollar) |
|---|---|---|
| **Company Successfully defends Litigation** | | |
| Creditors Generally (Excl Subordinated Debt) | 60.2 | 95.8 |
| Contingent Litigation Creditors | Nil | Nil |
| **Company Loses Litigation** | | |
| All Creditors (Excl Subordinated Debt) | 11.0 | 19.2 |

*Figure 2 – Range of Returns under Liquidation Scenarios*

On a net present value basis, assuming proceedings were to take six years to run and applying a 5% opportunity cost, the return to ordinary unsecured creditors is estimated to be in the range of:

- 44.9 cents to 71.5 cents if Contingent Creditor Claimants were unsuccessful in prosecuting their claims; or

- 8.2 cents to 14.3 cents if Contingent Creditor Claimants were successful in prosecuting their claims.

It is noted that the above return does not take into account legal costs Contingent Creditor Claimants may incur if they were to prosecute their claims, a component of which would be irrecoverable, regardless of success.  Such costs could be material and as such, may erode the notionally higher return that could be achieved under a high case.

In view of the above, we suggest that Contingent Claimant Creditors discuss potential ongoing legal costs with their advisor to assist with making a determination on their likely net return in a liquidation scenario.

# 12 Deed Alternative



## 12.1  GENERAL

A Deed is a document which records the terms of a restructuring of a company and which completes the process instituted in the voluntary administration process.

In essence, a Deed is a compromise or arrangement approved by a majority (in both number and value) of the creditors of a company voting at the second meeting of creditors.

The Deed facilitates a company's recovery to a position of solvency and which allows that company to continue in existence, or in certain circumstances where continued existence is not necessary, should provide for creditors to receive a better return than in liquidation.

A voluntary administrator will review all Deed proposals against the liquidation alternative and will only recommend those Deed's that provide a more favorable return (in terms of money, timing of the distribution and/or other benefits conferred on creditors) than would be achieved in liquidation.

Over the course of the administration we have conducted a significant number of presentations with key stakeholders, including a large number of the Contingent Creditor Claimants that have lodged a proof of debt, to provide a framework upon which we could discuss whether a Deed could provide a greater return to all creditors than would occur in liquidation.

Following from these meetings, LB Asia Holdings has developed a proposed Deed which in our view provides creditors with a better return than would be achieved in liquidation.

## 12.2  AVAILABLE ASSETS

As noted at Section 11.1 of this Report, the available assets of the Company are expected to be the same under both a Deed and liquidation scenario. In that regard, we have estimated that total assets availabel for distributino to creditors would be in the range of $115 million to $182 million (refer to Figure 20 for further information).

## 12.3  KEY TERMS OF PROPOSED DEED

A summary of the key terms within the Deed are as follows:

- The Deed Administrators are to be Stephen James Parbery and Neil Geoffrey Singleton.

- The Deed Pool will be comprised of all realisations made by the Administrators/Deed Administrators during the orderly sale and realisation of LB Australia Assets.

- A second Contingent Creditor Deed Pool will be created from the first $35 million dividend entitlement LB Asia Holdings has from the assets of LB Australia.

- Recoveries from contracts of insurance (if any), will be applied in accordance with Figure 18 shown on page 40.

- Any monies derived from asset realisations over $195 million net of professional costs are to be paid to LB Asia until it has been repaid the $35 million contributed to the Contingent Creditor Deed Pool.

**12**  Deed Alternative (cont)



- Employees afforded priority in a liquidation under Section 556 of the Corporations Act will retain that priority under the Deed.

- Creditors will rank pari passu in accordance with their admitted claims to receive a dividend from the Deed Pool.

- Contingent Creditor claimants will rank pari passu according to their admitted claims to receive a dividend from the Contingent Creditor Deed Pool, subject to the following sub conditions:

  ➤ The Litigation Creditor Claims will only be entitled to receive a maximum of 80 cents in the dollar on their admitted claims; and

  ➤ Consequential loss claims and compromised and settled claims pre administration are excluded.

- Admission of Contingent Creditor claims will be based on the model which has referenced CDO products, and the corresponding loss against par value, to their marks at 26 September 2008, such marks having been obtained from an indpendent valuer.

- Contingent Creditors will be entitled to retain their securities such that they will receive the benefit of any upturn in the market from holding those notes.

- All claimants, including Contingent Creditor claimants, will be required to file a claim against the Company to be entitled to a dividend from either the Deed Pool or the Contingent Creditor Deed Pool.

- We refer creditors to Section 8.3 of this Report with respect to the application of proceeds of any settlement reached with insurers. However, as the return to the Company from these policies is uncertain at this juncture, we have excluded any settlement amount from our estimated return to creditors.

- A specific release of the Company's interest in monies advanced to Indonesia by LB Asia and which were recorded in the Company's accounts as a loan from that Company. As noted earlier at Section 7.2.5 of this Report, those monies are currently believed to be sitting in a suspense account with Standard Chartered Bank in Hong Kong.

- Releases are also to be provided by the creditors to:

  ➤ The Company (Lehman Brothers Australia Limited)

  ➤ The Directors, Company officers and employees; and

  ➤ Lehman Brothers affiliated entities, including subsidaries of LBA, LB Inc and all subsidaries including Lehman Brother Asia.

- In respect of release to be granted to Directors, Officers and Employees of LBA, a pre-requisite of the proposed Deed by LB Asia is that releases be provided to a number of parties, including to the Directors of LBA. The reason for this requested release, is that the Provisional Liquidators of LB Asia Holdings, in consideration of making a AUD35 million Deed Pool contribution, want to ensure that the Lehman Global Lehman Group are released from all potential future litigation.



# 12 Deed Alternative (cont)

In repect of any claims that may be brought against Directors of the Compnay, the Directors would be entitled to recourse to the following;

➤ Clause 31 of the Constitution of the Company provides for an indemnity to every officer of the Company. (Refer to Annexure S), accordingly any claim made against the Directors of the Company are essentially claims against the Company and would circumvent the purpose of the Deed.

➤ Article V11 Sections 1-11 of the Amended and Restated By-Laws for LBHI, provides for indemnification to certain parties, including "Subsidary Officer" (Annexure T).

We are aware of the existance of a "Management Liability and Reimbursement Insurance Policy", in the name of LBHI, in support of this indemnity.

▪ No releases will be provided to any insurers until the settlement have been agreed and negotiated.

▪ Releases to thrid parties, including ratings agencies and third party advisors, are specifically excluded from the operation of the Deed.

▪ The Company will be deregistered by the Deed Administrators once the final dividend to creditors has been disbursed.

| LOW CASE - ASSET POOL $115 MILLION | | | Deed | |
|---|---|---|---|---|
| | Creditors ($'M) | No. | Claimants Settle ($'Million) | % |
| Assets | | | 115.4 | |
| Deduct Priority Costs | | | | |
| Additional Costs in Litigation (Refer Annexure T) | | | 0.0 | |
| Amount available for ordinary creditor claims | | | 115.4 | |
| | | | | |
| Creditors | | | | |
| Employee Creditors - Unsecured | 0.4 | 3 | 0.2 | 61.1% |
| Trade Creditors | 8.7 | 104 | 5.3 | 61.1% |
| Lehman Brothers Australia Related Parties | 5.8 | 2 | 3.5 | 61.1% |
| Lehman Brothers Asia Holdings | 132.8 | 6 | 46.1 | 34.7% |
| Other Lehman Brothers Asia Companies | 33.1 | 6 | 20.2 | 61.1% |
| Lehman Brothers Overseas Companies | 8.1 | 4 | 4.9 | 61.1% |
| Litigation Claims by Claimants | 625.6 | 308 | 35.0 | 5.6% |
| LB Granaica (Subordinated Debt)* | 87.4 | 1 | Nil | 0.0% |
| | | | | |
| Total | 901.9 | | 115.4 | |

NPV of Return (6 years at 5%)                                                                          45.6%

*Figure 25 – Estimated Return to Creditors under Deed - Low*

| HIGH CASE - ASSET POOL $182.5 MILLION | | | Deed | |
|---|---|---|---|---|
| | Creditors ($'M) | No. | Claimants Settle ($'Million) | % |
| Assets | | | 182.5 | |
| Deduct Priority Costs | | | | |
| Additional Costs in Litigation (Refer Annexure T) | | | 0.0 | |
| Amount available for ordinary creditor claims | | | 182.5 | |
| | | | | |
| Creditors | | | | |
| Employee Creditors - Unsecured | 0.4 | 3 | 0.4 | 96.6% |
| Trade Creditors | 8.7 | 104 | 8.4 | 96.6% |
| Lehman Brothers Australia Related Parties | 5.8 | 2 | 5.6 | 96.6% |
| Lehman Brothers Asia Holdings | 132.8 | 6 | 93.3 | 70.3% |
| Other Lehman Brothers Asia Companies | 33.1 | 6 | 32.0 | 96.6% |
| Lehman Brothers Overseas Companies | 8.1 | 4 | 7.8 | 96.6% |
| Litigation Claims by Claimants | 625.6 | 308 | 35.0 | 5.6% |
| LB Granaica (Subordinated Debt)* | 87.4 | 1 | Nil | 0.0% |
| | | | | |
| Total | 901.9 | | 182.5 | |

NPV of Return (6 years at 5%)                                                                          72.1%

*Figure 26 – Estimated Return to Creditors under Deed - High*



# 12 Deed Alternative (cont)

## 12.4 MODELLING OF RETURN

Set out in the tables above, are our estimates on the return to each class of creditor under the high low asset realisation scenarios.

## 12.5 SUMMARY OF LIKELY RETURN UNDER DEED

Under the proposed Deed, creditors are expected to receive the following range of returns:

| | Deed Low (¢ in dollar) | Deed High (¢ in dollar) |
|---|---|---|
| Creditors Generally | 61.1 | 96.6 |
| LB Asia Holdings | 34.7 | 70.3 |
| Contingent Creditor Claimants | 5.6 | 5.6 |
| Subordinated Creditors | Nil | Nil |

*Figure 3 – Range of Returns under Deed Scenario*

We have not conducted an NPV analysis of the Deed scenario as we expect the majority of assets to be distributed to creditors within one year.



# 13 Review of Alternatives Available to Creditors

## 13.1 GENERAL

At the creditors meeting scheduled for 30 March 2009 at 10:00 a.m., creditors will be asked to determine the future direction of the Group.

Section 439C of the Act provides that creditors may resolve to either:

1. Approve the entering into of a Deed;

2. End the administration and hand the Company back to the Directors; or

3. Place the Company into liquidation.

It is also within the rights of creditors at the meeting to resolve to adjourn the meeting.

For the purpose of the meeting, the Administrators are required to form an opinion as to the most appropriate option available to creditors. Our opinions in relation to the options are discussed below and are summarised in our Statement of Opinion at Annexure D.

## 13.2 RECOMMENDATION ON ALTERNATIVES

### 13.2.1 End the Administration (not recommended)

If creditors resolve to end the administration, control of the Group would revert back to the Directors. In such circumstances, creditors would have to pursue their own means of recovery against the Group, which in all likelihood would culminate in the Group being wound up.

As the Group is insolvent, we do not recommend that creditors end the administration.

### 13.2.2 Execute Deed (recommended)

It is our recommendation that creditors resolve in favour of executing a Deed for the following reasons:

- A Deed provides for an accelerated return to creditors as compared to the liquidation alternative by circumventing all possible legal action against the Company.

- The Deed avoids the erosion of assets from professional fees and expenses which would be incurred in defending legal proceedings that would be brought against the Company. Whilst approximately 65% of legal costs would be recovered if proceedings were successfully defended, the balance of those costs would not, and would need to be deducted from the estate without recovery.

- The distribution to ordinary creditors (with the exception of LB Asia Holdings which is proposing the Deed), will be marginally greater than our estimated return to creditors if all litigation was successfully defended.

- For contingent creditors, we are of the view that the formation of a Contingent Creditor Deed Pool avoids:

  ➢ The uncertainty of litigation;

  ➢ The costs of pursuing litigation, part of which will be unrecoverable;

  ➢ The inevitability that in the event of litigation being unsuccessful, further losses will be sustained by the





**13** Review of Alternatives Available to Creditors (cont)

plaintiffs following a claim by the Liquidators for costs; and

➢ The delayed timing of a dividend payment, possibly in the order of five or more years (depending on the number and type of claims brought by Contingent Creditors).

### 13.2.3 Wind up the Group

An immediate winding up of the Company would result in the continued realisation of the proprietary book.  However, and in view of the absence of any material voidable transactions, a winding up of the Group would not provide creditors with any superior return to the Deed alternative available.

We would anticipate that significant litigation would be commenced by a large number of 'contingent' creditors which would likely take many years to complete and would lead to a material diminution of assets as a consequence of unavoidable professional costs in defending those actions.  Regardless of whether those proceedings are successfully defended, not all those costs would be recoverable.

In view of the above, we do not recommend that creditors resolve to wind up the Group.

# 14 Receipts and Payments



Attached at Annexure C is a listing of receipts and payments for the Company for the period 26 September 2008 to 28 February 2009.

To date, realisations include the following:

- Cash at bank on appointment ($45,516,318)

- The interest in office fixtures and fittings ($1.16 million);

- Goodwill associated with employees which were transferred to Nomura ($2.5 million);

- Bank deposit funds (supporting a bank guarantee retained by the landlord of leased premises in Sydney)($4.6 million);

- Certain of the financial instruments ($26.96 million);

- Coupon payments ($5.1 million); and

- Debtors ($31,747).

We note that the bank guarantee in respect to the Sydney premises was remitted to a LBA Holdings bank account as those premises were being leased by LBA Holdings rather than LB Australia.  As these monies were being held aside by Citigroup in the LB Australia bank account with Citigroup rather than the LBA Holdings bank account, we are arranging for those monies to be returned to LB Australia.

As you will note, there are substantial cash holdings.

- $64 million is currently invested into 30 day rolling fixed term deposits.

- Approximately $8.5 million is still held by Citigroup and will be remitted to us upon release of the charge in its favour.

Together we unlock value

64



## 15 Administrators Remuneration

### 15.1 Prior Approval of Remuneration by the Committee

The Administrators fees for the period 26 September to 5 December 2008 in the sum of $494,320.77 plus GST were approved by the Committee at the Committee meeting held on 16 December 2008. Attached at Annexure G is a schedule setting out the key tasks undertaken by this office and which comprise this amount.

The Administrators fees for the period 6 December 2008 to 6 February 2009 in the sum of $273,111.63 plus GST were approved by the Committee at the Committee meeting held on 16 December 2008. Attached at Annexure H is a schedule setting out the key tasks undertaken by this office and which comprise this amount.

### 15.2 Approval Being Sought for Current Remuneration

At the forthcoming meeting, creditors will be asked to consider the work conducted by the Administrators, their Partners and staff, for the period 7 February to 13 March 2009 for the Company in the amount of $343,936.90, and to approve payment of their remuneration for that period. In support of this request, we have attached at Annexure I a schedule detailing the calculation of these costs.

Creditors will also be asked to approve the Administrators future fees for the period 14 March 2009 to the end of the administration in the amount of $450,000. This amount is a cap and provides for the possibility that a Deed, if approved by creditors, will not be executed until the 21st day following the Second Meeting of Creditors. If the Deed is executed earlier than the 21st day, we would expect our remuneration calculated

in accordance with our schedule of rates approved by creditors, to be well below this cap.

### 15.3 Future Remuneration

With respect our future 'static' fees i.e. fees that would be incurred regardless of whether the Company is placed into liquidation or executes a Deed, we expect these to be in the order of $2 million until completion of this matter.

In view of the above, at the forthcoming meeting of creditors we will be seeking approval of our remuneration up to the amount of $2 million, and note the following:

- In the event our costs are likely to surpass the budget as a consequence of significant unforeseen circumstances, we would report to the Committee and/or creditors generally to provide a full accounting of those events, the impact of those events on the accrual of time costs, and our further estimate of costs to complete matters; and

- In the instance the Company is placed into liquidation, we will require further approval of our remuneration to manage the defence of legal proceedings that will likely be commenced by a number of Contingent Creditor Claimants. In that regard, we will liaise with the Committee and/or creditors generally regarding our estimate of those costs.

Attached at Annexure J are two schedules setting out the tasks that would be undertaken under both a liquidation and Deed and which comprise the estimate of the future fee approval being sought of $2 million. Such remuneration will be drawn on a monthly basis. We will also circulate to the Committee at that time, supporting information to the remuneration being drawn.



# Execution Page



This Report and the accompanying Annexures are prepared in accordance with Section 439A of the Corporations Act for Lehman Brothers Australia Limited (Administrators Appointed).

Dated this 19th day of March 2009

**N. G. SINGLETON**
Joint and Several Voluntary Administrator

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
In re                                                          :    **Chapter 11 Case No.**
                                                               :
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,    :    **08-13555 (JMP)**
                                                               :
                        **Debtors.**                           :    **(Jointly Administered)**
-------------------------------------------------------------------x

## ORDER GRANTING FOUR HUNDRED SEVENTEENTH OMNIBUS OBJECTION TO CLAIMS (NO LIABILITY DERIVATIVES CLAIMS)

Upon the four hundred seventeenth omnibus objection to claims, dated June 13, 2013 (the "Four Hundred Seventeenth Omnibus Objection to Claims"),[1] of Lehman Brothers Holdings Inc. ("LBHI or the "Plan Administrator") as Plan Administrator pursuant to the *Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors* for the entities in the above referenced chapter 11 cases, pursuant to section 502 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 3007(d) of the Federal Rules of Bankruptcy Procedure, and this Court's order approving procedures for the filing of omnibus objections to proofs of claim [ECF No. 6664] (the "Procedures Order"), seeking disallowance and expungement of the No Liability Claims on the grounds that they assert claims for which LBHI or Lehman Brothers Special Financing ("LBSF") have no liability, all as more fully described in the Four Hundred Seventeenth Omnibus Objection to Claims; and due and proper notice of the Four Hundred Seventeenth Omnibus Objection to Claims having been provided, and it appearing that no other or further notice need be provided; and the Court having found and determined that the relief sought in the Four Hundred Seventeenth Omnibus Objection to Claims is in the best interests of LBHI, LBSF and all parties in interest in the above

---

[1] Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in the Four Hundred Seventeenth Omnibus Objection to Claims.

referenced chapter 11 cases and that the legal and factual bases set forth in the Four Hundred

Seventeenth Omnibus Objection to Claims establish just cause for the relief granted herein; and

after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the relief requested in the Four Hundred Seventeenth Omnibus

Objection to Claims is granted; and it is further

ORDERED that pursuant to sections 502(b) and 502(e)(1)(B) of the Bankruptcy

Code, the No Liability Claims listed on Exhibit 1 annexed hereto are disallowed and expunged in

their entirety with prejudice; and it is further

ORDERED that this Order has no res judicata, estoppel, or other effect on the

validity, allowance, or disallowance of, and all rights to object and defend on any basis are

expressly reserved with respect to, the Guarantee Claim component of the proof of claim

assigned number 58607 by the Court-appointed claims agent; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to this Order.

Dated: July __, 2013
     New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE

US_ACTIVE:\44272286\5\58399.0011

IN RE: LEHMAN BROTHERS HOLDINGS INC., ET AL., CASE NO: 08-13555 (JMP)

OMNIBUS OBJECTION 417:  EXHIBIT 1 - NO LIABILITY CLAIMS

| | NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | ASSERTED TOTAL CLAIM DOLLARS | AMOUNTS TO BE DISALLOWED | REASON FOR PROPOSED DISALLOWANCE |
|---|---|---|---|---|---|---|---|---|
| 1 | ALRENE PTY LIMITED ATF THE FIRMAN | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-10 | 11099 | $412,000.00 | $412,000.00 | No Liability Claim - Derivative |
| 2 | ARC ENERGY LIMITED | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32672 | $1,651,400.00 | $1,651,400.00 | No Liability Claim - Derivative |
| 3 | ARC ENERGY LIMITED | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 2009-09-22 | 32684 | $780,400.00 | $780,400.00 | No Liability Claim - Derivative |
| 4 | ARMIDALE DUMARESQ COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2008-11-24 | 890 | Undetermined | Undetermined | No Liability Claim - Derivative |
| 5 | BLAND SHIRE COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32671 | $2,745,590.00 | $2,745,590.00 | No Liability Claim - Derivative |
| 6 | BLAND SHIRE COUNCIL | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 2009-09-22 | 32681 | $351,180.00 | $351,180.00 | No Liability Claim - Derivative |
| 7 | BLAYNEY SHIRE COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32670 | $825,700.00 | $825,700.00 | No Liability Claim - Derivative |
| 8 | BLUE MOUNTAINS CITY COUNCIL | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 2009-09-22 | 32639 | $737,478.00 | $737,478.00 | No Liability Claim - Derivative |
| 9 | BLUE MOUNTAINS CITY COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32669 | $4,685,848.00 | $4,685,848.00 | No Liability Claim - Derivative |

* - Indicates claim contains unliquidated and/or undetermined amounts

IN RE: LEHMAN BROTHERS HOLDINGS INC., ET AL., CASE NO: 08-13555 (JMP)

OMNIBUS OBJECTION 417: EXHIBIT 1 - NO LIABILITY CLAIMS

| NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | ASSERTED TOTAL CLAIM DOLLARS | AMOUNTS TO BE DISALLOWED | REASON FOR PROPOSED DISALLOWANCE |
|---|---|---|---|---|---|---|---|
| 10  BOYSTOWN | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-14 | 12645 | $3,131,200.00 | $3,131,200.00 | No Liability Claim - Derivative |
| 11  BROKEN HILL CITY COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2008-11-24 | 886 | Undetermined | Undetermined | No Liability Claim - Derivative |
| 12  CABONNE COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32679 | $949,555.00 | $949,555.00 | No Liability Claim - Derivative |
| 13  CABONNE COUNCIL | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 2009-09-22 | 32686 | $234,120.00 | $234,120.00 | No Liability Claim - Derivative |
| 14  CENTRAL TABLELANDS WATER | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32678 | $759,644.00 | $759,644.00 | No Liability Claim - Derivative |
| 15  CENTRAL TABLELANDS WATER | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 2009-09-22 | 32691 | $234,120.00 | $234,120.00 | No Liability Claim - Derivative |
| 16  CITY OF ALBANY COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32640 | $2,823,894.00 | $2,823,894.00 | No Liability Claim - Derivative |
| 17  CITY OF ALBANY COUNCIL | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 2009-09-22 | 32646 | $1,638,840.00 | $1,638,840.00 | No Liability Claim - Derivative |
| 18  CITY OF GERALDTON-GREENOUGH COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32664 | $2,022,965.00 | $2,022,965.00 | No Liability Claim - Derivative |

* - Indicates claim contains unliquidated and/or undetermined amounts

IN RE: LEHMAN BROTHERS HOLDINGS INC., ET AL., CASE NO: 08-13555 (JMP)

OMNIBUS OBJECTION 417:  EXHIBIT 1 - NO LIABILITY CLAIMS

| | NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | ASSERTED TOTAL CLAIM DOLLARS | AMOUNTS TO BE DISALLOWED | REASON FOR PROPOSED DISALLOWANCE |
|---|---|---|---|---|---|---|---|---|
| 19 | CITY OF GERALDTON-GREENOUGH COUNCIL | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 2009-09-22 | 32689 | $390,200.00 | $390,200.00 | No Liability Claim - Derivative |
| 20 | CITY OF MELVILLE COUNCIL | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 2009-09-22 | 32645 | $4,136,120.00 | $4,136,120.00 | No Liability Claim - Derivative |
| 21 | CITY OF MELVILLE COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32676 | $17,521,354.00 | $17,521,354.00 | No Liability Claim - Derivative |
| 22 | CITY OF RYDE | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2008-11-24 | 880 | Undetermined | Undetermined | No Liability Claim - Derivative |
| 23 | CITY OF SWAN | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-12-29 | 66029 | $7,031,847.85 | $7,031,847.85 | No Liability Claim - Derivative |
| 24 | CITY OF SWAN | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 2009-12-29 | 66030 | $1,170,600.00 | $1,170,600.00 | No Liability Claim - Derivative |
| 25 | COFFS HARBOUR CITY COUNCIL | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 2009-09-22 | 32642 | $3,293,288.00 | $3,293,288.00 | No Liability Claim - Derivative |
| 26 | COFFS HARBOUR CITY COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32688 | $12,439,487.00 | $12,439,487.00 | No Liability Claim - Derivative |
| 27 | CRAIG WHITE PTY LTD | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-14 | 12157 | $2,183,600.00 | $2,183,600.00 | No Liability Claim - Derivative |

* - Indicates claim contains unliquidated and/or undetermined amounts

**OMNIBUS OBJECTION 417: EXHIBIT 1 - NO LIABILITY CLAIMS**

| NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | ASSERTED TOTAL CLAIM DOLLARS | AMOUNTS TO BE DISALLOWED | REASON FOR PROPOSED DISALLOWANCE |
|---|---|---|---|---|---|---|---|
| 28 DENILIQUIN COUNCIL | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 2009-09-22 | 32644 | $546,280.00 | $546,280.00 | No Liability Claim - Derivative |
| 29 DENILIQUIN COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32687 | $1,610,115.00 | $1,610,115.00 | No Liability Claim - Derivative |
| 30 FIRMAN, JOHN JOSEPH/FIRMAN, JUDITH ANN/COLLIN, NICHOLAS JAMES/ | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-11 | 11513 | $412,000.00 | $412,000.00 | No Liability Claim - Derivative |
| 31 GILGANDRA COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32663 | $949,555.00 | $949,555.00 | No Liability Claim - Derivative |
| 32 GILGANDRA COUNCIL | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 2010-02-19 | 66308 | $468,240.00 | $468,240.00 | No Liability Claim - Derivative |
| 33 GLENROAD HOLDINGS PTY LIMITED | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-14 | 12156 | $824,000.00 | $824,000.00 | No Liability Claim - Derivative |
| 34 GOWING BROTHERS LIMITED | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2008-11-24 | 873 | Undetermined | Undetermined | No Liability Claim - Derivative |
| 35 GOWING WHALE FUND PTY LIMITED | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2008-11-24 | 872 | Undetermined | Undetermined | No Liability Claim - Derivative |
| 36 GOWINGS BROS LIMITED | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-21 | 24733 | $4,120,000.00 | $4,120,000.00 | No Liability Claim - Derivative |

\* - Indicates claim contains unliquidated and/or undetermined amounts

IN RE: LEHMAN BROTHERS HOLDINGS INC., ET AL., CASE NO: 08-13555 (JMP)

**OMNIBUS OBJECTION 417:  EXHIBIT 1 - NO LIABILITY CLAIMS**

| | NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | ASSERTED TOTAL CLAIM DOLLARS | AMOUNTS TO BE DISALLOWED | REASON FOR PROPOSED DISALLOWANCE |
|---|---|---|---|---|---|---|---|---|
| 37 | GOWINGS WHALE FUND P/L ATF | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-21 | 24732 | $82,400.00 | $82,400.00 | No Liability Claim - Derivative |
| 38 | GUYRA SHIRE COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2008-11-24 | 871 | Undetermined | Undetermined | No Liability Claim - Derivative |
| 39 | HURSTVILLE CITY COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-04 | 10369 | $16,895,860.44 | $16,895,860.44 | No Liability Claim - Derivative |
| 40 | KIAMA MUNICIPAL COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32647 | $3,500,968.00 | $3,500,968.00 | No Liability Claim - Derivative |
| 41 | KIAMA MUNICIPAL COUNCIL | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 2009-09-22 | 32673 | $655,536.00 | $655,536.00 | No Liability Claim - Derivative |
| 42 | LANSELL PTY LTD ATF THE ALEX MARAKOFF SUPERANNUATION FUND | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 31346 | $247,200.00 | $247,200.00 | No Liability Claim - Derivative |
| 43 | LEHMAN BROTHERS AUSTRALIA LIMITED (IN LIQUIDATION) | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-10-30 | 58607 | Undetermined | Undetermined | No Liability Claim - Derivative |

The Contribution Claim is included within proof of claim number 58607.  Claim 58607 is being expunged solely with respect to its asserted Financial Products Claim and Contribution Claim.  The remaining portion of Claim 58607 is not being expunged pursuant to this Objection and is not affected by this Objection.  All rights with respect to the remaining portion of Claim 58607 are reserved.

| | NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | ASSERTED TOTAL CLAIM DOLLARS | AMOUNTS TO BE DISALLOWED | REASON FOR PROPOSED DISALLOWANCE |
|---|---|---|---|---|---|---|---|---|
| 44 | LEICHHARDT COUNCIL - ABN 92379 942 845 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32666 | $1,651,400.00 | $1,651,400.00 | No Liability Claim - Derivative |
| 45 | LITTLE COLLINS SPRING PTY LIMITED | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-04 | 10371 | $494,400.00 | $494,400.00 | No Liability Claim - Derivative |

\* - Indicates claim contains unliquidated and/or undetermined amounts

IN RE: LEHMAN BROTHERS HOLDINGS INC., ET AL., CASE NO: 08-13555 (JMP)

OMNIBUS OBJECTION 417:  EXHIBIT 1 - NO LIABILITY CLAIMS

| NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | ASSERTED TOTAL CLAIM DOLLARS | AMOUNTS TO BE DISALLOWED | REASON FOR PROPOSED DISALLOWANCE |
|---|---|---|---|---|---|---|---|
| 46  MCCAMISH BROS (ORCHARDS) PTY LTD | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-10 | 11091 | $1,236,000.00 | $1,236,000.00 | No Liability Claim - Derivative |
| 47  MCMULLEN, DAVID AND FIONA | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32653 | $743,130.00 | $743,130.00 | No Liability Claim - Derivative |
| 48  MOREE PLAINS SHIRE COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32650 | $5,367,050.00 | $5,367,050.00 | No Liability Claim - Derivative |
| 49  MOREE PLAINS SHIRE COUNCIL | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 2009-09-22 | 32690 | $390,200.00 | $390,200.00 | No Liability Claim - Derivative |
| 50  MORTGAGE RISK MANAGEMENT PTY LTD. | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-18 | 19359 | $6,880,400.00 | $6,880,400.00 | No Liability Claim - Derivative |
| 51  NARRABI SHIRE COUNCIL | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 2009-09-22 | 32643 | $663,340.00 | $663,340.00 | No Liability Claim - Derivative |
| 52  NARRABRI SHIRE COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32657 | $3,360,599.00 | $3,360,599.00 | No Liability Claim - Derivative |
| 53  ORANGE CITY COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32649 | $1,651,400.00 | $1,651,400.00 | No Liability Claim - Derivative |
| 54  PARKES SHIRE COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2008-11-24 | 867 | Undetermined | Undetermined | No Liability Claim - Derivative |

IN RE: LEHMAN BROTHERS HOLDINGS INC., ET AL., CASE NO: 08-13555 (JMP)

OMNIBUS OBJECTION 417:  EXHIBIT 1 - NO LIABILITY CLAIMS

| NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | ASSERTED TOTAL CLAIM DOLLARS | AMOUNTS TO BE DISALLOWED | REASON FOR PROPOSED DISALLOWANCE |
|------|-------------|-------------|-----------|---------|------------------------------|--------------------------|----------------------------------|
| 55 PITTWATER COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32648 | $2,163,334.00 | $2,163,334.00 | No Liability Claim - Derivative |
| 56 PITTWATER COUNCIL | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 2009-09-22 | 32668 | $312,160.00 | $312,160.00 | No Liability Claim - Derivative |
| 57 PORT MACQUARIE-HASTINGS COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32667 | $13,624,050.00 | $13,624,050.00 | No Liability Claim - Derivative |
| 58 PORT MACQUARIE-HASTINGS COUNCIL | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 2010-02-19 | 66307 | $2,341,200.00 | $2,341,200.00 | No Liability Claim - Derivative |
| 59 PORT STEPHENS COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2008-11-24 | 865 | Undetermined | Undetermined | No Liability Claim - Derivative |
| 60 PRESCARE ABN 85338603114 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-09 | 11002 | $833,505.32 | $833,505.32 | No Liability Claim - Derivative |
| 61 ROCK BUILDING SOCIETY LIMITED, THE - ABN 16 067 765 717 | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32652 | $3,302,800.00 | $3,302,800.00 | No Liability Claim - Derivative |
| 62 SHIRE OF AUGUSTA-MARGARET RIVER COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32654 | $1,279,835.00 | $1,279,835.00 | No Liability Claim - Derivative |
| 63 SHIRE OF AUGUSTA-MARGARET RIVER COUNCIL | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 2009-09-22 | 32661 | $273,140.00 | $273,140.00 | No Liability Claim - Derivative |

* - Indicates claim contains unliquidated and/or undetermined amounts

IN RE: LEHMAN BROTHERS HOLDINGS INC., ET AL., CASE NO. 08-13555 (JMP)

**OMNIBUS OBJECTION 417:  EXHIBIT 1 - NO LIABILITY CLAIMS**

| | NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | ASSERTED TOTAL CLAIM DOLLARS | AMOUNTS TO BE DISALLOWED | REASON FOR PROPOSED DISALLOWANCE |
|---|---|---|---|---|---|---|---|---|
| 64 | SUTHERLAND SHIRE COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32665 | $11,146,950.00 | $11,146,950.00 | No Liability Claim - Derivative |
| 65 | TENTERFIELD SHIRE COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32656 | $2,477,100.00 | $2,477,100.00 | No Liability Claim - Derivative |
| 66 | TENTERFIELD SHIRE COUNCIL | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 2009-09-22 | 32674 | $429,220.00 | $429,220.00 | No Liability Claim - Derivative |
| 67 | TOWN OF KWINANA | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 2009-09-22 | 32675 | $1,053,540.00 | $1,053,540.00 | No Liability Claim - Derivative |
| 68 | TOWN OF KWINANA | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32677 | $3,963,360.00 | $3,963,360.00 | No Liability Claim - Derivative |
| 69 | TRUSTEES OF DE LA SALLE BROTHERS | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-15 | 13059 | $3,282,816.00 | $3,282,816.00 | No Liability Claim - Derivative |
| 70 | TUMUT SHIRE COUNCIL & SNOWY WORKS & SVCS | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32651 | $2,840,408.00 | $2,840,408.00 | No Liability Claim - Derivative |
| 71 | TUMUT SHIRE COUNCIL & SNOWY WORKS & SVCS | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 2009-09-22 | 32682 | $273,140.00 | $273,140.00 | No Liability Claim - Derivative |
| 72 | URALLA SHIRE COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2008-11-24 | 859 | Undetermined | Undetermined | No Liability Claim - Derivative |

\* - Indicates claim contains unliquidated and/or undetermined amounts

IN RE: LEHMAN BROTHERS HOLDINGS INC. ET AL., CASE NO: 08-13555 (JMP)

**OMNIBUS OBJECTION 417: EXHIBIT 1 - NO LIABILITY CLAIMS**

| | NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | ASSERTED TOTAL CLAIM DOLLARS | AMOUNTS TO BE DISALLOWED | REASON FOR PROPOSED DISALLOWANCE |
|---|---|---|---|---|---|---|---|---|
| 73 | WALCHA COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32662 | $1,073,410.00 | $1,073,410.00 | No Liability Claim - Derivative |
| 74 | WELLINGTON SHIRE COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32658 | $1,279,835.00 | $1,279,835.00 | No Liability Claim - Derivative |
| 75 | WELLINGTON SHIRE COUNCIL | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 2009-09-22 | 32685 | $351,180.00 | $351,180.00 | No Liability Claim - Derivative |
| 76 | WOOLLAHRA MUNICIPAL COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32680 | $7,307,445.00 | $7,307,445.00 | No Liability Claim - Derivative |
| 77 | WOOLLAHRA MUNICIPAL COUNCIL | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 2009-09-22 | 32683 | $1,386,085.00 | $1,386,085.00 | No Liability Claim - Derivative |
| 78 | YASS VALLEY COUNCIL | 08-13888 (JMP) | Lehman Brothers Special Financing Inc. | 2009-09-22 | 32641 | $273,140.00 | $273,140.00 | No Liability Claim - Derivative |
| 79 | YASS VALLEY COUNCIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 2009-09-22 | 32655 | $2,109,110.38 | $2,109,110.38 | No Liability Claim - Derivative |
| | | | TOTAL | | | $188,277,267.99 | $188,277,267.99 | |