Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 08-13555 (JMP)

4    Adv. Case No. 09-01062

5    - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7    LEHMAN BROTHERS HOLDINGS INC., ET AL.,

8                     Debtors.

9    - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

10    TURNBERRY CENTRA SUB, LLC, et al.,

11                    Plaintiffs,

12           v.

13    LEHMAN BROTHERS HOLDINGS, INC., et al,

14                    Defendants.

15    - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

16                    U.S. Bankruptcy Court

17                    One Bowling Green

18                    New York, New York

19

20                    June 13, 2013

21                    10:04 AM

22

23    B E F O R E :

24    HON JAMES M. PECK

25    U.S. BANKRUPTCY JUDGE

Page 2

1    Hearing re:  Objection to Claim No. 62723 of Banesco

2    Holdings CA [ECF No. 37327]

3

4    Hearing re:  Four Hundred Second Omnibus Objection to Claims

5    32395 and 22671 (No Liability Derivatives Claims) [ECF No.

6    36006]

7

8    Hearing re:  Turnberry Centra Sub, LLC, et al. v. Lehman

9    Brothers Holdings Inc., et al. [Adversary Case No. 09-

10   01062].  Motion to Dismiss.

11

12   Hearing re:  Motion by Lehman Brothers Holdings Inc. and

13   Lehman Commercial Paper Inc. For an Order (i) Determining

14   that the LCPI Settlement was entered into in Good Faith

15   Pursuant to California Code of Civil Procedure paragraphs

16   877 and 877.6, and, Based on Such Good Faith Finding and for

17   Other Reasons, (ii) Disallowing and Expunging Proofs of

18   Claim Number 28845 and 28846 [ECF No. 36163]

19

20   Hearing re:  Debtors' Ninety-Seventh Omnibus Objection to

21   Claims (Insufficient Documentation) [ECF No. 14492]

22

23   Hearing re:  Debtors' One Hundred Twenty-Fifth Omnibus

24   Objection to Claims (Insufficient Documentation) [ECF No.

25   16079]

Page 3

1

2     Hearing re:  Debtors' One Hundred Thirty-Eighth Omnibus

3     Objection to Claims (No Liability Derivatives Claims) [ECF

4     No. 16865]

5

6     Hearing re:  Debtors' One Hundred Ninety-First Omnibus

7     Objection to Claims (Valued Derivative Claims) [ECF No.

8     19888]

9

10    Hearing re:  Three Hundred Twenty-Eighth Omnibus Objection

11    to Claims (No Liability Claims) [ECF No. 29323]

12

13    Hearing re:  Three Hundred Sixtieth Omnibus Objection to

14    Claims (Valued Derivative Claims) [ECF No. 31316]

15

16    Hearing re:  Three Hundred Ninetieth Omnibus Objection to

17    Claims (Valued Derivative Claims) [ECF No. 34044]

18

19    Hearing re:  Three Hundred Ninety-Fourth Omnibus Objection

20    to Claims (Valued Derivative Claims) [ECF No. 34728]

21

22    Hearing re:  Three Hundred Ninety-Eighth Omnibus Objection

23    to Claims (No Liability Derivatives Claims) [ECF No. 34732]

24

25    Hearing re:  Four Hundred Twelfth Omnibus Objection to

Page 4

1  Claims (Duplicative Claims) [ECF No. 37166]

2  Hearing re:  Debtors' Objection to Proof of Claim No. 66099

3  Filed by Syncora Guarantee, Inc. [ECF No. 20087]

4

5  Hearing re:  Plan Administrator's Omnibus Objection to

6  Claims Filed by Deborah E. Focht [ECF No. 34303]

7

8  Hearing re:  Objection to CMBS Claims and Request for

9  Subordination Pursuant to Sections 510(a)-(c) of the

10  Bankruptcy Code [ECF No. 36882]

11

12  Hearing re:  Merits Hearing With Respect to Proofs of Claim

13  Number 57069 and 45833

14

15

16

17

18

19

20

21

22

23

24

25  Transcribed by:  Nicole Yawn, Jamie Gallagher, Pamela Skaw

```
 1   A P P E A R A N C E S :

 2   WEIL, GOTSHAL & MANGES LLP

 3        Attorneys for Debtors

 4        767 Fifth Avenue

 5        New York, NY 10153

 6

 7   BY:  JACQUELINE MARCUS, ESQ.

 8        ALFREDO R. PEREZ, ESQ.

 9        EDWARD MCCARTHY, ESQ.

10

11   JONES DAY

12        Attorneys for Debtors

13        222 East 41st Street

14        New York, NY 10017

15

16   BY:  JAYANT W. TAMBE, ESQ.

17        LOCKE R. MCMURRAY, ESQ.

18

19   KING & SPALDING

20        Attorneys for Debtors

21        1185 Avenue of the Americas

22        New York, NY 10036

23

24   BY:  SCOTT DAVIDSON, ESQ.

25        ARTHUR STEINBERG, ESQ.
```

Page 6

1   SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

2        Attorney for KTS and Dr. Tschira

3        Four Times Square

4        New York, NY 10036

5

6   BY:  GEORGE A. ZIMMERMAN, ESQ.

7

8   MEISTER SEELIG & FEIN, LLP

9        Attorney for Plaintiffs, Turnberry Centra Sub, LLC

10        140 East 45th Street, 19th Floor

11        New York, NY 10017

12

13   BY:  CHRISTOPHER J. MAJOR, ESQ.

14

15   KIRKLAND & ELLIS, LLP

16        555 California Street

17        San Francisco, CA 94104

18

19   BY:  MARK MCKANE, ESQ.

20        MICHAEL ESSER, ESQ. (TELEPHONIC)

21

22

23

24

25

Page 7

1    CHADBOURNE & PARKE, LLP

2          Attorney for Banesco Holdings

3          30 Rockefeller Plaza

4          New York, NY 10112

5

6    BY:  BONNIE DYE, ESQ.

7

8    APPEARED TELEPHONICALLY:

9    NICK MOURADIAN

10   MICHAEL NEUMEISTER

11   CHRISTOPH SCHMITT

12   MITCHELL SOCKETT

13   MICHAEL J. WALSH

14   MICHAIL ZEKYRGIAS

15

16

17

18

19

20

21

22

23

24

25

Page 8

```
 1                  P R O C E E D I N G S
 2           THE CLERK:  All rise.
 3           THE COURT:  Be seated, please.  Good morning.
 4           MS. MARCUS:  Good morning, Your Honor.  Jacqueline
 5    Marcus, Weil, Gotshal & Manges, on behalf of Lehman Brothers
 6    Holdings, Inc. and its affiliates.
 7           The first matter on the agenda this morning,
 8    Your Honor, is an uncontested matter.  It pertains to the
 9    objection to claim number 62723 of Banesco Holdings.
10           Lehman filed an objection to the claim of Banesco
11    and, since that time, has been engaged in discussions with
12    Banesco, and we've agreed to partially resolve the
13    objection.  So we have a form of revised order that Banesco
14    has approved, and it basically provides for the expungement
15    of one of the claims filed by Banesco and adjournment of the
16    hearing with respect to the other claim.
17           If I may, Your Honor, I have a blackline copy of
18    the order?
19           THE COURT:  You can hand that up.
20           Thanks.
21           MS. MARCUS:  And Ms. Dye is here on behalf of
22    Banesco, and I think she's going to confirm that we've
23    reached an agreement on the form of the order.
24           THE COURT:  You're so far away that, even if you
25    say you're in agreement, it won't be picked up by our
```

Page 9

```
 1   recording equipment.

 2            MS. DYE:  So I can come up to the podium?

 3            THE COURT:  I think you're going to have to come

 4   up and speak into a microphone, and please also identify

 5   yourself for the record.

 6            MS. DYE:  My name's Bonnie Dye.  I'm from

 7   Chadbourne & Parke, and we represent Banesco Holdings, and

 8   we agree with the proposed order as handed up to you this

 9   morning, Your Honor.

10            THE COURT:  Thank you.

11            If I could just ask what's going to happen with

12   regard to the portion of this objection that's being

13   deferred to August 15th?

14            MS. MARCUS:  My understanding is that the parties

15   are continuing to discuss resolution of the claim.

16            UNIDENTIFIED SPEAKER:  That's correct.

17            MS. MARCUS:  So hopefully, there will be no need

18   to have a hearing, but I just can't assure the Court about

19   that.

20            THE COURT:  Understood, and, just for clarity --

21   I'm looking at the words in the blackline -- the response

22   deadline is August 15, and the matter is adjourned 'til

23   August 29.

24            MS. MARCUS:  That's correct.

25            THE COURT:  Okay.  That's fine.
```

Page 10

```
 1              MS. MARCUS:  Thank you, Your Honor.

 2              Switching to the contested portion of the

 3   calendar, Your Honor, the next matter, number two, will be

 4   handled by Jay Tambe of Jones Day.

 5              MR. TAMBE:  Good morning, Your Honor.  Jay Tambe

 6   and Locke McMurray, from Jones Day, for debtor Lehman

 7   Brothers Holdings, Inc.

 8              This is LBHI's objection to claims number 32395

 9   and 22671.  To the extent that any of the discussion rolls

10   over to a discussion of the LBHI, LBF Lehman Switzerland

11   settlement, I would defer to Mr. Perez from the Weil firm,

12   because I know he's intimately familiar, as is Your Honor,

13   with that settlement.

14              This hearing, Your Honor, is a legal sufficiency

15   hearing.  It is the basis of our objection that there is no

16   legal basis for the claim that has been submitted in these

17   two claims, 32395 and 22671.

18              Fundamentally, what you have here are a series of

19   derivatives contracts that were governed by the master

20   agreements.  Those contracts each contain automatic early

21   termination provisions so that, as soon as LBHI filed the

22   bankruptcy, each of those derivatives transactions was

23   terminated on September 15th, 2008.  There's no dispute as

24   to any of those issues.  What you have in these claims are

25   valuations that have been submitted not as of the early
```

Page 11

1    termination date, but as of a much later date, October 16th,

2    2008.

3              THE COURT:  What would be the difference in

4    valuation if the valuation had been done as of September 15,

5    2008 as opposed to the October date?

6              MR. TAMBE:  The claimants have not submitted any

7    valuation as of that date.  The debtors position is, as of

8    that date, based on the value of SAP stock, which is the

9    underlying, they, in fact, would have been a receivable to

10   LBF, and therefore, no claim with respect to Lehman Brothers

11   Holdings, Inc.

12             THE COURT:  Okay.

13             MR. TAMBE:  If I could briefly go into the

14   argument, Your Honor?

15             THE COURT:  Sure.

16             MR. TAMBE:  We have a small hearing binder with

17   just a couple of exhibits that I might want to draw your

18   attention to.  If I could hand those up, please?

19             THE COURT:  You may.

20        (Pause)

21             MR. TAMBE:  Your Honor, the following issues are

22   uncontested.  As I said, the early termination date is not

23   contested.  The fact that it was an automatic early

24   termination is uncontested.  It's uncontested that the

25   agreement required, in the first instance, for the

Page 12

1    calculation of the termination amount to be done as of the

2    early termination date, and it's uncontested that, under

3    section 562, September 15th, 2008 is the date on which the

4    contract should be valued, absent certain circumstances, and

5    the issue really is is there a basis to value these

6    contracts on a date other than September 15th, 2008.

7    Namely, is there a basis to value as of October 16th?

8            If I could draw your attention, Your Honor, to Tab

9    7 in the binder I just handed up.  Now, what Tab 7 is is a

10   stock price chart of SAP stock, and I've highlighted on that

11   stock price chart certain key events.  You have

12   September 15th, 2008, the early termination date.  You have

13   October 16th, 2008, which is the date as of which these

14   contracts were valued, and you've got December 1, 2008,

15   which is the date on which the valuation was actually done.

16           So you have a situation here where there is a

17   look-back valuation being done, and there's nothing wrong

18   with that.  We don't take issue with that.

19           However, the look-back doesn't look back to

20   September 15th, 2008.  The look-back only looks back to

21   October 16th.  Looking at the stock price chart, I could

22   speculate as to why that date was picked.  As you could

23   tell, there's a sharp dropoff in the SAP stock price from

24   mid-September to mid-October, and, while it's a complicated

25   set of derivatives transactions, quite simply, as the stock

Page 13

1    price of SAP went down, Lehman was out of the money.  All

2    right?  The stock price of SAP was high.  Lehman was in the

3    money.

4             Now, the rationale that's given for why when the

5    calculation was done in December -- it was done as of 10/16

6    as opposed to 9/15 is that well, it was only on 10/16/2008

7    that the claimants were told that they would not be getting

8    back certain collateral that had been posted with Lehman.

9    The calculation that was done on December 1, 2008 was done

10   on the basis of there being no return of collateral.

11            On December 1, they could just as easily have done

12   exactly the same type of calculation on the basis of no

13   return of collateral, but used the SAP stock price from

14   September 15th, 2008 as opposed to October 16th, 2008.  No

15   reason why they couldn't have used that stock price.

16   There's no reason why they have to do it as of October 16th,

17   2008, and the fact of the matter is it's not like they

18   entered into a replacement transaction on any particular

19   date.  This was a look-back valuation exercise.

20            The contract told them to do it as of 9/15.  562

21   of the bankruptcy code told them to do it as of 9/15.  They

22   chose to do it as of 10/16.

23            THE COURT:  Well, doesn't that get us into the

24   question of whether or not there is a justification to pick

25   a different date on account of the uncertainties surrounding

1    the return of the collateral held by LBIE?

2              MR. TAMBE:  We would expect no, Your Honor,

3    because what they knew on December 1 when they did the

4    valuation is they would not be getting the collateral back.

5    That uncertainty that existed had been resolved by then.

6    Now, the simple question is now that that uncertainty has

7    been resolved, when do you apply that set of facts now to

8    the relevant values.

9              THE COURT:  I understand.

10             MR. TAMBE:  Now, --

11             THE COURT:  But it's their position.

12             MR. TAMBE:  It's their position.

13             THE COURT:  It's their position that there is some

14   justification for picking the 10/16 date, and --

15             MR. TAMBE:  And --

16             THE COURT:  -- you take the position that there is

17   no justification for any date other than September 15?

18             MR. TAMBE:  Absolutely.  I mean, if their

19   rationale is the reason it's 10/16 is because that's when

20   they learned they wouldn't be getting collateral back -- and

21   that's the only justification they've offered -- that's not

22   a reason for them not to calculate this as of 9/15.  Because

23   the test, again, is could they have calculated value, and

24   this was, in all instances, a look-back calculation.  Sure,

25   they could have calculated the value, because the

1    calculation was done, not on 9/15, not on 10/16.  It was

2    done in December.

3         There's a further point that we've made in the

4    papers, and you don't have to reach it, but, if you need to

5    reach it, you could, and that has to do with whether it's

6    appropriate in any event to consider the posting of

7    collateral or whether collateral's available to be posted as

8    a matter of English law when you're doing this valuation,

9    and we've said that there's clear precedent from the Court

10   of Appeals in it (sic) that says under the 1992 master

11   agreement, when you do a valuation calculation, you do it on

12   the basis that all conditions precedent have been satisfied.

13   You assume that the collateral has been posted.  You assume

14   that all those conditions are satisfied.  You do it on a

15   value-clean basis.

16        So, even if you looked at the analysis from that

17   perspective and got to that level -- I don't think you need

18   to -- as a matter of English law, you'd have to calculate it

19   on 9/15, and this issue that they raised about the

20   availability of collateral would, in fact, be irrelevant.

21        THE COURT:  You're mentioning this law, and let me

22   just throw out a law school question that you probably have

23   the answer to.  There is a proceeding in Switzerland.  I

24   don't know all of the proceedings that are going on there,

25   but I've read about them, and I'm sure I'll hear about them

Page 16

1    from counsel for the claimant.

2            Do you know whether or not that proceeding in

3    Switzerland is applying principles of English law that

4    govern the transaction documents or applying Swiss law with

5    reference to the insolvency proceeding of LBF?  That's

6    question one, and question two is do you know if it is

7    permissible in the Swiss proceeding for the Swiss court to

8    consider the application of section 562 under our law,

9    because, as I'm understanding this, we have the law of at

10   least three jurisdictions that are implicated here.

11           We have a Swiss proceeding, which deals with the

12   main claim.  We have the U.S. bankruptcy proceeding, which

13   deals with the guarantee claim, and we have a choice of

14   governing substantive law, being the law of England and

15   Wales.  Do I have that right?

16           MR. TAMBE:  That's right, Your Honor.  Let me

17   maybe start with the second question first.

18           It is my understanding that the Swiss tribunal,

19   the Swiss court that's hearing the various Swiss

20   proceedings, will not, in fact, apply 562.  The 562 argument

21   is one that's raised by LBHI as a U.S. debtor --

22           THE COURT:  Yes.

23           MR. TAMBE:  -- in this forum.  The claim against

24   LBHI as guarantor is not present in the Swiss proceedings at

25   all.

Page 17

```
 1            THE COURT:  Okay.  So, if we get to the essence of
 2   today's argument, which we actually haven't reached yet, it
 3   is the request by the claimant that this proceeding be
 4   stayed or deferred for six months in order to defer to the
 5   Swiss tribunal, which you oppose, and one of the reasons
 6   that you oppose it, I take it, is that we're able here to
 7   apply section 562 principles and, based upon the movement of
 8   the stock, make what amounts to a summary judgment
 9   determination that this claimant has no claim.
10            MR. TAMBE:  That's right, Your Honor, and you can
11   make that determination as a threshold matter simply on the
12   basis that they have valued their claim as of the wrong
13   date.  The claim that has been submitted is valued
14   incorrectly, because it was valued as of the wrong date.
15            THE COURT:  Well, it's valued as of a date that,
16   under 562 language, you could argue is a permissible date
17   for valuation and that they would argue is not a permissible
18   date for valuation because of the collateral issue, which
19   you say is irrelevant.
20            MR. TAMBE:  That's right.  We would say, under
21   562, the permissible, the only permissible valuation date is
22   September 15th, 2008, unless they carry the burden of
23   demonstrating that there were no commercially-reasonable
24   determinates (sic) of value of that date, which they have
25   not done.
```

1          THE COURT:  Okay.  Let's continue with the

2    argument.

3          MR. TAMBE:  If I could turn to the stay argument,

4    we start with the premise that they claim that judicial

5    efficiency and avoidance of duplication should militate

6    (sic) this Court (sic) in staying its hand.  What we have

7    before the Court is a fully developed legal argument on 562

8    and the correct date for valuing the termination values.

9    It's our position no further submissions are needed on this.

10         Contrast that with what's going on in Switzerland,

11   where the proceedings have just gotten underway.  Tab 1 of

12   the binder I handed up, Your Honor, has some of the relevant

13   dates in it.  The first four dates deal with the

14   termination, but starting with March 15th, 2033, that's when

15   we filed the omnibus objection objecting to these claims in

16   their entirety.  March 25th, the claimants began the first

17   of multiple proceedings in Switzerland, and this was a

18   declaratory action against Lehman Switzerland in Zurich

19   District Court, so not only the bankruptcy proceeding, but

20   an ancillary or collateral proceeding in the Swiss courts

21   against LBF, not against LBHI.

22         Meanwhile, in this Court, we filed a more detailed

23   omnibus objection.  It was about a week after that that the

24   claimants first challenged Lehman Switzerland's zero

25   valuation of their claim in the LBF Swiss insolvency

Page 19

1    proceeding and then, more recently, less than a month ago,

2    they started yet another proceeding, and what they have done

3    there is object to the LBHI, LBF settlement.

4              So, to the extent they are complaining about

5    duplicative proceedings, they have started the duplicative

6    proceedings.  I mean, they are multiplying the proceedings

7    in Switzerland and saying aha, now we've got multiple

8    proceedings.  You've got to stay your hand here, Judge, even

9    though this is the only forum in which claims against LBHI

10   and LBHI's ability to invoke the protections of the

11   bankruptcy court are relevant.  Those issues aren't being

12   addressed anywhere else.

13             The standard against which any stay should be

14   measured -- and this comes from the Supreme Court decision

15   in Colorado River Water Conservation District.  The Court

16   has an unflagging obligation to exercise the jurisdiction

17   given to it and should stay a proceeding only under

18   exceptional circumstances, and we would submit, Your Honor,

19   they have not made out a case for exceptional circumstances.

20             THE COURT:  I agree.

21             MR. TAMBE:  Then I think I'll stop then with that

22   part of my argument here.  Happy to answer any questions the

23   Court might have, and I'll respond to whatever Mr. Zimmerman

24   has to say.

25             THE COURT:  I'll hear what Mr. Zimmerman has to

Page 20

1     say, but what he has to do is change my mind.

2         MR. ZIMMERMAN:  Good morning, Your Honor.  George

3     Zimmerman, representing KTS and Dr. Tschira, the claimants,

4     with my colleagues, Max Polonsky and Julie Cohen.

5         Let me change the entire order or my argument and

6     address and answer, from our perspective, the questions you

7     raised, because I think, frankly, you raised all the right

8     questions.  First, in the Swiss proceedings -- strike.  The

9     ISDA agreement, the underlying ISDA agreement is governed by

10    English law.  Nobody disputes that.  In the Swiss

11    proceedings, the substantive rights of the parties under the

12    ISDA agreement will be determined by English law.  In the

13    Swiss proceedings, the claimants have submitted a very

14    detailed evidentiary submission, about a hundred pages of

15    law and facts, evidentiary facts to take into account all

16    the factors that English law would look at to determine

17    whether there was a reasonable determinant of value on

18    September 15th, as Lehman says, or October 16th.

19        In those papers, the claimants also indicated --

20    because LBF obviously is going to get a chance to respond --

21    that they will be submitting an expert affidavit on English

22    law, precisely because the English law will be applied.

23    There is two issues about this return of collateral issue.

24    The reason -- and Lehman says that's irrelevant under

25    section 562.  Here's why it's relevant both under English

Page 21

1    law, which governs the ISDA and under section 562.

2            The English law affidavit will say, in sum and

3    substance, that, under English law, the reason there is

4    flexibility, albeit limited, to value either as of the early

5    termination date, or, if it's not reasonably practicable,

6    the earliest date thereafter as is -- the reason for that

7    flexibility is, under English law, to give the non-

8    defaulting party the opportunity to get, to try literally to

9    negotiate and get into and enter into an exact appropriate

10   replacement transaction, and, in fact, the claimants here

11   did -- whenever there's an early termination, a non-

12   defaulting party -- and you know this because you've been

13   involved with this -- can decide right away I don't want to

14   enter into a replacement transaction, and they can get a

15   quote, and you can argue about the quotes.

16           Other times, claimants do try to enter into

17   replacement transaction.  That's what happened here.

18   Claimants led to three market makers with expertise.  This

19   is a very exotic, complicated slope (sic).  It's very large.

20   There was very little market for it, and so, they went to

21   what they thought were the three primary experts in this

22   that could enter into transaction, and, because -- and this

23   is undisputed -- because there were discussions between the

24   claimants and Lehman entities -- and we can debate which

25   Lehman entities -- that led us to believe that the

Page 22

1      collateral would be released quickly, --

2              THE COURT:  That was LBIE, wasn't it?

3              MR. ZIMMERMAN:  No.  Okay, let me -- two answers

4      to that.  First, the submission in Switzerland says that

5      also included LBF, and they have the names of the LBF people

6      who are on the list, but, more to the point, the master

7      custody agreement that governs the placement of the shares

8      was a tripartite agreement, the claimants, LBIE, and LBF --

9      LBIE was just the custodian.

10             The 59 million shares of collateral were

11     specifically for the benefit of LBF, which is defined as the

12     chargee, and, under the terms of the March agreement -- and

13     I'll get you this in a minute.  We can hand it up.  LBF

14     determines when to release the collateral.  LBIE has to get

15     instructions from LBF.

16             So the notion that they have -- and this is one of

17     the dangers of asking for a ruling with no evidentiary

18     record where the evidentiary record is being developed in

19     another proceeding.  So, as a practical matter, it's LBF to

20     whom LBHI is the guarantor who made the determination who

21     first said, you know, we'll release it in short time and

22     then, on October 16th, said you're not going to get it, and

23     the reason that's important is because the English affidavit

24     will also say that the valuation date, because the

25     flexibility I talked about was designed to enable the party

Page 23

1    to literally try to enter into replacement, an exact

2    replacement transaction, which here would be a

3    collateralized transaction -- as, under English law, it's

4    only at the time you learn that you cannot enter that

5    duplicate transaction.  That is the date that's the

6    valuation date.  That's why October 16th was picked, because

7    that -- it's undisputed that's when the claimants learned

8    from LBF and LBIE that the collateral wouldn't be

9    forthcoming, and that's why October 16th was selected.

10            So, with respect, when Lehman gets up here and

11   says I can speculate based on share prices why October 16th

12   was picked, that's not what the record reflects in

13   Switzerland.  The record reflects that that's English law.

14   That's when we found out the collateral was not going to be

15   released.

16            THE COURT:  But let me ask you a very fundamental

17   threshold question.  At least for me, it's a threshold

18   question.

19            MR. ZIMMERMAN:  Yes.

20            THE COURT:  Not withstanding the fact that we are

21   dealing with documents that are governed by English law,

22   there is a law of the case in this bankruptcy estate that I

23   apply safe harbor principles, regardless of the underlying

24   law that governs the ISDA contract, and am I not, under

25   section 562, making judgments that do not speak to the

Page 24

1     question of governing law as to the underlying safe harbor

2     qualified financial contract, but rather dealing with

3     principles of U.S. law that govern such questions?  The law

4     governing commercially-reasonable determinants of value does

5     not speak to as provided by certain English law governed

6     documents.  It rather is an open-ended question, and I

7     believe I have the discretion -- respond to this please --

8     to completely ignore applicable English law, to completely

9     ignore what an expert on English law would say, and to

10    completely ignore properly, under principles of comity, what

11    a Swiss court might say because the Swiss court is applying

12    different standards.  What do you say to that?

13              MR. ZIMMERMAN:  I say the following.  Section 562

14    actually -- and we agree with -- 562 is not going to be an

15    issue in Switzerland, and, even if it was, you're going to

16    decide 562, not a Swiss proceeding.  We get that.

17              562 has two concepts, and it has a legislative

18    history.  The legislative history, which is 2005 W. law,

19    832198, specifically talks about the section 910, which is

20    the section that was added to talk about the valuation date,

21    and what it says, as you well-know, is it's the date of

22    early termination, except if there are no commercially-

23    reasonable determinants of value as of such date.  Damages

24    are to be measured as of the earliest subsequent date or

25    dates in which there are commercially-reasonable

```
 1    determinants, which you just cited.

 2           The legislative history goes on to say -- it talks

 3    about the factors that one would consider in determining

 4    commercial reasonableness, because that, by definition, is a

 5    mixed question of law and fact, and then, it says, quote,

 6    "The references to commercially-reasonable are intended to

 7    reflect existing state law standards relating to a

 8    creditor's actions in determining damages," close quote.

 9           We say -- and I don't think it's in dispute --

10    that the relevant state law standards that govern the

11    creditor's rights under the ISDA agreement here is England.

12    So, even if -- not even if.  If the day comes -- because

13    let's play it out.  Let's be candid.  Let me be candid.

14           If the claimants lose in Switzerland, you're never

15    going to see us again, obviously.  There's no guarantee

16    issue, but, assuming for the moment that they're prevailing,

17    when we come back to you and there are no guarantee

18    defenses, because they basically -- it's an unconditional

19    guarantee, and Lehman waived all defenses, other than, I

20    believe, statute of limitations and payment.  So forget

21    that.

22           Your issue, Judge, will be the 562 issue.  Now,

23    you can do one of two things.  You can conclude that I'm

24    reading the legislative history wrong, or that you disagree

25    that 562 was intended on this particular point -- they're
```

Page 26

1    specifically talking about commercially-reasonable valuation

2    dates -- was intended to incorporate or look to the

3    applicable state law.  Even if you -- either you'll agree

4    with --

5              THE COURT:  Even if I do what the Supreme Court

6    and the Second Circuit does all the time, which is

7    effectively disregard legislative history, --

8              MR. ZIMMERMAN:  Fair enough.  If you disregard the

9    legislative history, Justice Scalia, two issues.  I think

10   even Justice Scalia only disregards if it, on its face,

11   contradicts or renders meaningless the plain words of the

12   statute, and I don't think the statute, as you correctly

13   pointed out, speaks to that issue.  So I don't think it

14   would be appropriate to -- but, even if you do, then what

15   you are being asked to do is today, based on 25 pages of

16   briefing, conclude as a matter of law with no facts, no

17   testing of factual assertions by either party in their

18   pleadings because these are lawyers --

19             THE COURT:  By the way, I'm not going to do that.

20   I'm not deciding that today.  So, in the same way that I

21   summarily agreed --

22             MR. ZIMMERMAN:  Okay.

23             THE COURT:  -- with Mr. Tambe, I'm agreeing with

24   you.  It's not happening today.

25             MR. ZIMMERMAN:  Let me close --

1          THE COURT:  So does that make it easier for you?

2          MR. ZIMMERMAN:  Well, it certainly makes some of

3    it easier, yes.

4          THE COURT:  Right.

5          MR. ZIMMERMAN:  But let me then go to my final

6    point, at least for the moment.  I never say final point.

7    I'll think of something else, but let me go to the next

8    point.

9          What made a path, if I can suggest it, might

10   actually satisfy some of Lehman's issues.  As I said, the

11   status of the Swiss proceedings is the claimants put in the

12   substantive evidentiary brief.  They will, at the

13   appropriate time, put in an expert affidavit on a number of

14   things, including English law.

15         I think Lehman pointed out in their papers

16   correctly that there is some dispute in Switzerland about

17   the amount of bond that has to be posted.  We are not

18   counsel in the Swiss proceedings, but I've been advised of

19   what I'm about to tell you by the client.

20         The bond issue has been fully briefed.  I think it

21   was fully briefed as of last week or the week before.  So

22   the judge is going to make that decision.

23         Once that decision is made, LBF Lehman Switzerland

24   has 90 days to file their papers, and thereafter, claimants

25   have 60 days to file their reply.  So that's a little more

1    than six months, but that's what it is, and, at that point

2    in time, it's fully briefed, the judge then decides what he

3    or she wants to do, whether he's going to rule on the

4    papers, whether he wants more briefing, whether he wants

5    discovery, whatever, or whether he wants the parties to

6    consider settling.  That's kind of the timeframe, and that's

7    the best I can give you.  I can't predict anything beyond,

8    and you're correct.

9           We're not asking for perpetual estate, because I'm

10   not in a position to represent to you when a definitive

11   resolution is going to be.  So I get that, but the factors

12   on determining stays, which obviously is discretionary when

13   it comes to international issues -- we cited the Royal Sun

14   Alliance case, which -- and the language they cited has to

15   do with the issue of whether we were asking you to dismiss

16   because of the Swiss proceedings, and that's when the

17   unflagging obligation of courts to exercise jurisdiction

18   comes in.  We're not asking for that.

19          We're asking for a six-months date.  If you look

20   at the back of the Sun Alliance case, they cite -- they

21   specifically remand to the district court to consider -- you

22   may consider it, district court, whether it's appropriate to

23   stay.  They cite four circuit court of opinions, Eleven,

24   Second, and two Seventh Circuit opinions that stayed in

25   favor of pending foreign proceedings, temporarily, including

Page 29

1   an Eleventh Circuit case that actually stayed -- its Turner

2   Entertainment against Degeto -- that stayed pending, I

3   think, Bermuda actions, notwithstanding the Court mentioned

4   that the Bermuda actions had barely had any progress

5   whatsoever.

6           So what I would respectfully suggest is this.  I

7   agree with Lehman that, at some point, if the claimants are

8   successful in Switzerland, we will get to the 562 issue.

9   Since that is inevitable, what you might think about is

10  whether the issue of 562, whether it should consider English

11  law or ignore, whether on these, what I would call a naked

12  record, 562, as a matter of law allows you to make a

13  determination as to whether this was, quote, "commercially-

14  reasonable" or not.

15          If you think briefing on those legal issues would

16  advance the ball since, if we end up before you, you could

17  get that head-start, that's something where I think you

18  could be comfortable that, while there may be a six-month

19  stay, it's not like nothing's going to be going on here, and

20  you can actually -- and the parties and the Court can

21  actually, depending on how the process goes and what the

22  decision ultimately is, may foster progress, but I don't

23  think -- and I took comfort by the fact that you're not

24  going to decide that today.  I do think a six-month stay and

25  then coming back to you and telling you where the parties

Page 30

1    are in six months -- and then, you could do whatever you

2    think is appropriate.  It makes some sense.

3            THE COURT:  Well, I agreed with Mr. Tambe earlier

4    when the issue was was I going to stay this, and I agreed

5    with him that I was not going to.  You're effectively

6    proposing something that amounts to a modified stay, but let

7    me tell you how I view this, and I'd like to get your

8    reactions.

9            I view what's going on in Switzerland as not

10   directly relevant to the claim resolution process in this

11   Court, although you've pointed out that, if you are

12   unsuccessful in the case against LBF in Switzerland, claims

13   here go away.  If you are successful, the 562 issue can

14   effectively be revisited then with reference to the

15   guarantee claim.  It's also possible that we can flip that

16   on its head and that I can deal preemptively with the

17   guarantee issue, under section 552, determine that you're

18   either right or wrong with respect to the existence of

19   commercially-reasonable determinants of value as of

20   October 16 or as of September 15, as argued by the debtor,

21   and you can either win or lose here.

22           If you lose here, that doesn't preclude your

23   ability to argue against LBF that my decision here was

24   predicated upon applicable bankruptcy law that isn't extant

25   for their purposes.  So I'm turning this argument right back

Page 31

1   at you.

2           Why should this proceeding be stayed a moment when

3   I can deal with these issues independently?  Why should I

4   stay these proceedings for a moment when the claims asserted

5   here are, as I understand it, so large that they actually

6   have a significant impact on reserves and distribution

7   rights of other creditors?  I'm not waiting.

8           MR. ZIMMERMAN:  I understand that, and I'm never

9   the one to ask questions when I'm standing at this side of

10  the podium, but I'm not sure --

11          THE COURT:  I reserve the right not to answer any

12  question that you ask.

13      (Laughter)

14          MR. ZIMMERMAN:  I can't do that -- well, I can do

15  that, but then I'm in trouble.  Because I'm not sure -- yes,

16  you're flipping it, but I'm not sure that doesn't get, if

17  I'm understanding you correctly, Judge, to the same place as

18  my modified plan, which is this.  If you are envisioning,

19  hopefully, because we haven't really -- certainly, since we

20  were moving to stay, I hope you understand we didn't fully

21  proof all the merits, because that would be self-defeating.

22          There is a lot to brief on the 562 issue.  The

23  legal issues -- I assume you're not having a trial on the

24  factual issues, but the legal issues, whatever they may be,

25  whatever Lehman thinks they are, whatever the claimants

Page 32

```
 1   think they are -- if that's what you have in mind, I think

 2   your idea is fine and more eloquently stated than my

 3   modified proposal, because it was intended -- my proposal

 4   was intended -- you're right.  If you conclude, heaven

 5   forbid, that we're wrong on 562, then that doesn't -- if

 6   it's a legal analysis, it doesn't interfere or preclude the

 7   claimants from getting whatever they can get in Switzerland.

 8   It just makes sure you never have to see us again.  And so,

 9   assuming we have the opportunity to fully brief all the

10   legal issues and we're not going to have a full-blown trial

11   as to the facts, that is kind of what I was maybe suggesting

12   as an alternative path, and if -- full stop.

13           THE COURT:  Let me hear what Mr. Perez has to say,

14   because he's standing up, even though Weil is not counsel

15   for these purposes.  So I'm going to presumably hear

16   something about --

17           MR. PEREZ:  Switzerland.

18           THE COURT:  -- the LBF proceeding in Switzerland.

19           MR. PEREZ:  Yes, Your Honor.  Just very quickly.

20   As the Court recalled, we were here before the Court on a

21   motion to approve a 9019, which was approved.  That 9019 had

22   several conditions preceding.  It has a drop-dead date of

23   September 30th.

24           We have worked through almost all -- there's one

25   minor condition precedent that we're still working on --
```

1   involves obtaining approval in another estate, and it was

2   based on two things happening in the Swiss proceeding.  One

3   was the co-location plan, which is where the claims were

4   allowed or disallowed.  There were approximately 151 claims

5   that were treated in the co-location plan that were

6   guaranteed and probably another 20 claims that were treated

7   in the co-location plan that were not -- that didn't have

8   guaranteed claims here.  Of those, approximately 15 filed

9   objections, Tschira being one, and that's proceeding.

10            In addition to that, Your Honor, there is what's

11   called the realization plan, and, in essence, the

12   realization plan is the settlement between LBHI and LBF.

13   What Tschira has, in essence, done in Switzerland -- the

14   only party out of the 171 creditors is object and request an

15   order from FINRA asking to have an appealable order so that

16   they can, in essence, run out the clock and not allow us to

17   conclude the settlement.

18            I mean, my interest is first and foremost in

19   making sure that we don't lose because people run out the

20   clock, and there is -- universally, everybody believed that

21   the settlement was a win/win for both parties, and it's

22   obviously a litigation tactic, kind of the best defense is a

23   good offense, in order to object being the single party

24   objecting to the realization plan in order to, in essence,

25   either have the deal go away after four years of trying to

Page 34

1   get it done or, alternatively, negotiate something on behalf

2   of their client.

3           So I just wanted to put that into context,

4   Your Honor, because you can't -- this is part of a whole

5   picture, and I think that's a very important part.  Thank

6   you.

7           THE COURT:  Thank you for that.

8           MR. TAMBE:  If I may, Your Honor, just briefly, a

9   couple of points?  It seems to me where we are now is Your

10  Honor is not prepared to rule today on the application of

11  562, but I would submit that everything that the Court needs

12  to decide that issue is really -- comes out of their papers.

13  It's already in the record.

14          THE COURT:  Well, I'm not so sure that's true, and

15  I'll give you a chance to complete your argument, but I

16  believe there is a question as to what is meant by the

17  language commercially-reasonable determinants of value in a

18  setting that is as exotic as this.  This is probably

19  something that no congressman thought about.  To the extent

20  there is any relevant congressional history on this section,

21  I doubt that anybody was really thinking about the cross-

22  border aspects of section 562 application, and, if such

23  considerations were, in fact, made, this is complicated by

24  the fact that we have three bodies of applicable law

25  potentially to look at and a proceeding, which as Mr. Perez

Page 35

```
 1    has explained, involves billions of dollars for the benefit

 2    of the LBHI estate, billions of dollars in claims

 3    represented by LBF that go away upon the effectiveness of

 4    the settlement and issues being raised by an entity that, as

 5    I understand it, is a foundation with a charitable purpose.

 6    So I assume that, from their perspective, they don't

 7    necessarily want to put themselves in the middle of this

 8    vice, but they're doing that, presumably because they're

 9    trying to get some value.

10           It is obvious from your chart that there is a

11    material difference in outcome based purely upon market

12    movements, depending on whether valuation is performed on

13    September 15, 2008 or October 16, 2008.  What a difference a

14    month makes, but I still need a record to determine whether

15    as of September 15 there were commercially-reasonable

16    determinants of value.  I'm unbiased on this subject, but I

17    believe that, generally speaking, it is a heavy burden for

18    the claimant to show that there were no commercially-

19    reasonable determinants of value on that date or any other

20    date, and I happen to believe that that language deals with

21    markets that are so thoroughly broken that it is not

22    possible as to the underlying asset to come up with a fair

23    valuation.

24           Here -- and this is a major obstacle for the

25    claimant -- the underlying assets are marketable securities
```

Page 36

1   where you can readily determine market value, and there was

2   a market for these securities on September 15, 2008.  On

3   that basis alone, I might be able to rule in your favor, but

4   this is a very important subject, and it's one that I

5   believe requires more than just a superficial assessment.

6          Claimant needs an opportunity to make an argument

7   why October 16 is right.  It may involve the use of experts.

8   Lehman may require experts as well.  I am not going to delay

9   on this.  I do not view this as a derivative of the Swiss

10  proceedings.  I view this as an independent claim matter to

11  be resolved expediently with a briefing schedule to be

12  determined by the parties, including such discovery -- and

13  it should be truly targeted -- that may be needed to address

14  what I view as a very narrow question.

15         With that, I suggest that you meet, confer, and

16  develop an appropriate schedule that takes into account the

17  truly relevant issues, which I view as being very

18  interesting and significant but not terribly fact-intensive,

19  and, as Mr. Zimmerman has requested, he would like an

20  opportunity to submit some further briefing on the subject,

21  and he'll have that right, as will you.

22         MR. TAMBE:  That's fine, Your Honor, and we're

23  happy to confer with them on a briefing schedule.  I would

24  just like to sort of set a parameter so we don't go off and

25  get a six-month briefing and discovery schedule.

Page 37

```
 1              THE COURT:  No, we are not going to allow this

 2    proceeding to extend beyond the break-up date for the LBF

 3    settlement.  This is going to happen on a very accelerated

 4    schedule.  This matter is not going to be held in abeyance

 5    while the claimant postures in Europe to gain financial

 6    advantage.

 7              MR. TAMBE:  I'll confer with Mr. Perez.  We'll

 8    come up with a schedule, with that being said, Your Honor.

 9              THE COURT:  Consider this on a rocket docket.

10              MR. TAMBE:  I'll see if they'll sign, Your Honor.

11              Thank you, Your Honor.

12              MR. ZIMMERMAN:  Thank you.

13              MR. PEREZ:  Thank you.  May I be excused?

14              THE COURT:  Yes.

15         (Pause)

16              MS. MARCUS:  Your Honor, the next matter on the

17    agenda is in the adversary proceeding Turnberry Centra Sub,

18    LLC v. Lehman Brothers Holdings, Inc. and a motion to

19    dismiss.  It will be handled by my colleague, Ed McCarthy.

20         (Pause)

21              MR. MCCARTHY:  Your Honor, Ed McCarthy, here with

22    Jacqueline Marcus and Loren Alexander (ph) and also a

23    company representative, Christie Zull (ph).  We're here on

24    our clients Lehman Brothers Holding, Inc. and Lehman Bank

25    FSB motion to dismiss count three for promissory estoppel of
```

Page 38

1    plaintiff's second amended complaint, and that's adversary

2    proceeding 0901062.

3            Your Honor, these aren't new issues for the Court.

4    These issues are fully briefed once again, and they're

5    before the Court.  We think you'll be hearing some of the

6    same arguments in those briefs and perhaps today, although

7    we'd like to avoid it, but today here before you, I would

8    like to make a few points.

9            First, why the law demands dismissal with

10   prejudice once again.  I want to highlight that, under the

11   circumstances of this case, it is impossible for the

12   plaintiffs, the Soffers, the set forth a credible claim

13   under any of the three required elements for promissory

14   estoppel, and second and important, I want to highlight why

15   a dismissal is so important right now at this time in this

16   case, and I'll do that through talking about the status of

17   the litigation and maybe bring the Court up to speed.  I'll

18   take the points in reverse order, if I may.

19           To date, discovery is proceeding.  We've already

20   produced over 76,000 pages of documents.  Documents have

21   been reviewed, produced, gone through.  Turnberry has also

22   produced approximately 85,000 pages, and there's third

23   parties that are involved that are outside that have

24   produced about 40,000 pages.

25           The parties are in the midst of taking depositions

Page 39

1    this week, over the course of the last months.  Eleven

2    depositions have been taken so far with four Turnberry reps

3    being deposed and six Lehman reps, former and current

4    employees.  There's also been a third party already deposed,

5    but we still have at least six depositions to take, and we

6    have to schedule and complete those depositions in addition

7    to remaining outstanding third-party discovery, which has

8    been a little more burdensome to get.

9            We have not had the opportunity to depose the

10   Soffers yet, the actual plaintiffs in this case.  We've had

11   them set for deposition on several occasions, but those

12   depositions have been taken down and removed for a number of

13   reasons by opposing counsel.  We do expect to depose them

14   later this month, if not early next month, we've been told.

15   We also haven't had a chance to depose a 30(b)(6) witness on

16   this matter in Town Square.  There is work left to be done,

17   and we are working to complete those depositions and the

18   discovery as quickly as possible.

19           We need to confer on other remaining matters,

20   including whether there's going to be any expert retention

21   requested in this case.  My client doesn't see that this

22   case is the type of case that will need experts down the

23   road.  We think the Court is an expert on many of these

24   issues without the need of anybody outside.  Of course, the

25   Soffers may disagree, and we'll need to confer on that.

Page 40

1          I say this because streamlining this case at this

2     point, given the significant discovery that's remaining,

3     given the significant briefing that we expect to occur on

4     summary judgment later this year and not even taking into

5     account any issues that may remain after that for the Court

6     to hear on the facts, you will hear that it makes sense to

7     wait, but this Court shouldn't decide this motion to

8     dismiss.  Wait 'til summary judgment.  It's right around the

9     corner.

10         You'll also hear that there's no harm in waiting.

11    Your Honor, that's simply not true, and it's simply not

12    supported by the law or the facts.

13         Waiting here, asking to wait here would put us in

14    a similar position as we were when the Court had to face the

15    fraudulent inducement claims that you've heard earlier in

16    this case, where it turns into a side show, where the Court

17    can no longer focus on the actual loan documents at issue,

18    the critical claims, the core of these disputes, the actual

19    executed, signed agreements.  What happens here with

20    claimants' promissory estoppel claim is it muddies the

21    otherwise straightforward arguments that are in this case,

22    the otherwise remaining arguments, which are about the

23    actual loan documents, and that's because of the procedural

24    position that this case is already in.

25         Your Court will remember that we've already had

Page 41

1    dismissals and a number of hearings in all of the claims and

2    the cases between these parties, but, in all of the cases

3    before this Court where these parties are present where you

4    have the two Fontainebleau cases, the Mezzanine and the

5    Senior Loan, and, of course, this Town Square case here, the

6    only claim that remains, this promissory estoppel claim

7    that's before the Court today is the only claim where the

8    issues are, once again, as prior claims that have since been

9    dismissed or withdrawn, are outside of the actual loan

10   documents that are the heart of these disputes.

11            THE COURT:  But how does that affect your

12   discovery plan?  In what way is Lehman prejudiced by having

13   these cases include this claim pending summary judgment?

14   I'm just curious as to what the consequences of deferring

15   will --

16            MR. MCCARTHY:  Absolutely, Your Honor.  Well, I

17   mentioned earlier, Your Honor, that Your Honor faced a

18   similar position when we had to hear argument on motion to

19   dismiss regarding the Repo 105 claim.

20            THE COURT:  Right.

21            MR. MCCARTHY:  And I think Your Honor will

22   remember that the primary argument during that argument was

23   about Repo 105.  It took up most of Your Honor's morning one

24   morning.  Then, because we couldn't focus on the actual loan

25   documents, the actual core of these complaints, we had to

Page 42

1    take the time and the Court's time to take up Your Honor's

2    docket with briefing, which was very expensive, and

3    arguments, which took time from you to hear those issues,

4    only to have them withdrawn later and turn the Court's

5    attention to new issues.  Now, namely this, again another

6    speculative claim.

7         So, while most certainly a lot of discovery has

8    already been taken in this case, most of that discovery --

9    not most of it, but a great portion of that discovery

10   focuses on whether there was some far-fetched promise for

11   long-term financing, and not only the far-fetched promise

12   for long-term financing, whether there was this three-way

13   deal between the parties, and this is the only claim that

14   remains that relates to that.  So, when Your Honor does need

15   to face perhaps summary judgment, which we expect to happen

16   later this year, we don't want to have this claim, this

17   promissory estoppel claim, again turn into a side show that

18   we believe it already is and has been once.

19        We don't want it to turn into the side show that

20   the Repo 105 argument was and took up this time, because

21   that costs money.  We've now had to brief this promissory

22   estoppel claim twice fully, and we're spending a great deal

23   of time on discovery, hearing it, taking depositions, and

24   hearing about the claim.  So it does cost time and money,

25   Your Honor, and not only that.  I think it diverts the

```
 1    Court's attention and the parties' attention from the core

 2    issues.

 3                Now, in the meantime, that delay in waiting to

 4    hear the core issues is harming the -- the delay in stalling

 5    this case in order to focus on things that are outside the

 6    actual documents is allowing other claims to move forward

 7    quicker than this claim against the Soffers.  I think

 8    Your Honor has heard before that there are other cases that

 9    are moving forward faster than this case, and, every time we

10    check, we actually find new cases that the Soffers are

11    involved with that are moving.

12                For instance, just this month, we found out the

13    basis of another claim they're involved with that's here in

14    New York State Court that relates to a deficiency judgment.

15    That case is moving forward towards a damages trial this

16    month here in state court, and that case actually relates to

17    the Town Square matter.

18                It's the matter where the Soffers sued to try to

19    prevent foreclosure, claiming that another lender, just like

20    Lehman here in this claim, supposedly promised long-term

21    financing, and now the damages portion of that claim is set

22    in New York.

23                Your Honor, Lehman deserves a chance to get in

24    line for collection, and streamlining this case now will

25    allow that to happen.  It needs to move this case forward.
```

1    That's why we're so adamant that this promissory estoppel

2    case claim has no support.  It doesn't apply here.  That's

3    why we're so adamant that there's no cases that support

4    their claim.

5            There's no factual cases that are on point and

6    controlling, and that makes sense here, Your Honor.  It's

7    not credible to believe that sophisticated parties like this

8    with in-house and outside counsel would take the time and

9    the expense and the risk of negotiating and executing loan

10   documents that place the Soffers personally as the borrowers

11   for that loan documents, if they didn't expect that those

12   loan documents would control the relationship between the

13   parties.  This isn't even close to what the 2nd Circuit

14   describes as the narrow doctrine of promissory estoppel.

15           There's no injustice here.  What happened here is

16   the Soffers ignored obvious business risks.  They don't like

17   the terms of the deal they negotiated, they executed, and

18   they accepted tens of millions of dollars under.

19           As to the first requirement, Your Honor, of

20   promissory estoppel, we think the case ends here.  There is

21   none, and there could not be a supportable, unconditionable

22   promise for long-term financing, and the primary reason is

23   because of the actual loan documents at issue here.  None of

24   the loan documents mentioned this purported far-fetched

25   three-way deal.  None of the loan documents mention this

Page 45

1    purported long-term financing.

2         This case is about a $95 million loan, a loan that

3    Lehman made to the Soffers personally, and a loan that the

4    Soffers sued Lehman on and started this adversary proceeding

5    on the twice-extended maturity date of that loan in order to

6    try to delay repayment, delay living up to their contractual

7    obligations.  The terms and the nature of that $95 million

8    loan by itself makes this claim unsupportable, and,

9    Your Honor, although this case has gone on for some time, I

10   don't think we've had the opportunity to talk to Your Honor

11   about the very nature of that $95 million loan, this interim

12   financing and why it goes into place in cases like this and

13   deals like this.

14        Interim financing of this nature, this $95 million

15   loan, only goes into place because the property is not ready

16   for long-term financing.  If the property was ready for

17   long-term financing, we wouldn't be here on this $95 million

18   loan.

19        The borrowers and the lenders would have just

20   moved forward with long-term financing, but the interim

21   financing goes into place because more construction needs to

22   happen at their property, which was the case here, or

23   because the lenders need to complete more due diligence

24   before they could ever commit to long-term finance, which

25   was the case here, and it goes into place because parties --

Page 46

1    and this is critical here -- need time to consider whether

2    the property is going to perform, where the leasing will

3    start, and whether the property will bring in income, the

4    net operating income that would support the type of long-

5    term financing we're talking about here, and that's in the

6    record for this Court in the mortgage loan applications.

7    It's a huge condition to ever providing long-term financing.

8    Will the property hit the NOI, the net operating income,

9    that would ever support long-term financing?

10           Your Honor, the nature of these loans themselves,

11   this $95 million loan, because no lender would ever commit

12   to long-term financing when that's in place, makes it

13   unbelievable to state a claim that Lehman made a non-

14   conditional promise for long-term financing.  No lender

15   would have.

16           With that in mind, the actual terms of the $95

17   million loan just put this claim to bed, because their

18   promise -- it not only contradicts, you know, maybe

19   meaningful or just some side terms of the $95 million deal.

20   Their supposed promise for long-term financing contradicts

21   the very core terms of the $95 million loan.

22           It goes to repayment.  In fact, it extinguishes

23   the supposed promise for long-term financing.  Extinguishes

24   all the obligations of the borrowers to repay the loan, and

25   it puts all the obligations of the borrowers right on the

Page 47

1    lender, as if the lender had promised that I'm going to

2    repay the loan myself.

3              Your Honor, of course, the integration clause, as

4    you've rightly decided already once, bolstered our argument

5    here that because the loan documents included a full and

6    complete agreement, that alone makes their argument for

7    long-term financing unsupportable and dismissal is required,

8    but, even without that integration clause, the very terms of

9    the loan documents make it impossible for them to support a

10   credible argument here.

11             This loan is to specific borrowers, the Soffers

12   personally.  If the parties had intended for the terms of

13   this loan to not apply, it would have been easier and much

14   less risky, especially for the Soffers, to use an entity, an

15   STE to be the bulwark of this $95 million loan.  Your Honor,

16   that's not what happened here.

17             My client was very careful in its decision that it

18   needed the Soffers to personally be the borrowers on this

19   loan, and it needed the Soffers to promise to repay this

20   loan in contracts and in writing.  Your Honor, they're not

21   contradicting one term of the agreement.  They're

22   contradicting the entire contract and flipping it on its

23   head.  At law, for that reason alone, the promissory

24   estoppel claim fails.

25             Second reason there could never be a supportable

Page 48

1    promise -- there's no specifics at all, Your Honor.  This

2    complaint contains no specifics that -- specifics that are

3    required at law regarding the supposed long-term financing.

4    The Court already dismissed this claim once.

5            For whatever reason, the Soffers did not take

6    advantage of the opportunity to come to this Court and amend

7    their pleading with factual support.  As the blackline we've

8    provided to the Court and that we've received from

9    plaintiffs' counsel identifies, their amendments are minor,

10   and they're wholly conclusory.   The amendments add zero new

11   factual support.

12           What we're here on, Your Honor, is a redo, a redo

13   of the first motion to dismiss, a redo of their motion to

14   reargue.  We're here on the exact same conclusory facts.

15           Again, the plaintiffs point to the same affidavit

16   of Brett Ersoff, their only factual support, but the Ersoff

17   affidavit, as we've discussed before, merely just recites

18   the same conclusory and bare-bone statements that are in the

19   complaint.

20           For example, Mr. Ersoff states in his affidavit,

21   which is ECF -- attached as ECF No. 63, for the Court.  He

22   states that, quote, "Lehman offered an agreement," and,

23   quote, "Lehman promised."  Those are the details he provides

24   about this supposed unconditional, clear, and unambiguous

25   promise.

Page 49

 1              Nowhere in the Ersoff affidavit or the complaint

 2      does it state the where or the when or the form or,

 3      importantly here, the when, whether it was before, during,

 4      or specifically when after the execution of the $95 million

 5      deal.  In significant instances, the Ersoff affidavit

 6      actually contradicts the complaint as to whether there was a

 7      promise.  For instance, the complaint alleges that it was

 8      Brett Ersoff who promised for long-term financing, but, if

 9      you take a look at the Ersoff affidavit actually, it doesn't

10      say that.  Mr. Ersoff says bare-bones Lehman promised long-

11      term financing.

12              THE COURT:  I'd like you to comment on two

13      paragraphs in the amended -- the second amended complaint.

14      And I agree with you that the changes are relatively minor.

15      But two of the more obvious changes are paragraphs 52 and 53

16      of the second amended complaint.

17              Paragraph 52 reads defendants promised to make the

18      town square loan both before and after the execution of the

19      interim advanced loan agreement.

20              Paragraph 53 reads the purported integration

21      clause in the interim advanced loan agreement for a short

22      term loan of $95 million to Jeffrey Soffer and Jacquelyn

23      Soffer individually was not intended to, and did not have

24      any application to the $625 million town square loan, which

25      was to be made to a single purpose entity established to own

Page 50

1    and operate town square.

2            In effect, those two paragraphs make the same

3    argument you just made that this was a loan to individuals,

4    and as a result, the integration clause really doesn't apply

5    as to a promise made to provide $625 million worth of

6    special purpose entity financing to entities related to the

7    Soffers.

8            To what extent does the allegation both before and

9    after in paragraph 52, and the references to a loan being

10   made to related, but different, parties represent material

11   changes that I should take into account for purposes of

12   evaluating a motion to dismiss?

13           MR. MCCARTHY:  Your Honor, we discuss this a bit

14   when we were here on the motion to reargue.  And I certainly

15   had a chance to consider it further since then.  Your Honor,

16   these are not changes that in any way should change Your

17   Honor's analysis that was made previously on the first

18   motion to dismiss, and the analysis that was made rightly on

19   the motion to reargue.

20           Your first -- these allegation on paragraph 52 and

21   53 are barebones.  We're talking about before and after

22   execution.  It's just like you're putting the word in

23   writing.  Your Honor, they don't provide any factual support

24   for the timing.  They just make a bare bone allegation.  But

25   moreover, I would love to know who this special purpose

Page 51

1    entity is that we're talking about here.  I would love to

2    know if they're a party to this dispute, but they're not.

3              The parties to this dispute are Jeff and Jackie

4    Soffer, who signed the $95 million loan, and who are parties

5    to that loan that absolutely include an integration clause.

6    And they're trying to avoid repaying that loan.  That's why

7    they brought that claim in the first place.  The timing says

8    it all.  And the nature of their claims all the way along

9    says it all.

10             They brought this case against Lehman to avoid

11   repayment.  The $95 million loan that they're parties to,

12   that they signed and include in the integration clause.

13             So, as I see this argument, Your Honor, it really

14   is just a sideshow.  Even if you find that some special

15   purpose entity may have some claim against Lehman moving

16   forward, that's a separate adversary proceeding.  That's

17   separate from the claims against the Soffers here that are

18   at the heart of the dispute, and that are holding up

19   Lehman's collection on its standing loans.

20             So, if they would like to move forward with some

21   claim by a special purpose entity, we can try that case.

22   And we can see if there's other reasons, and I think we'd

23   have plenty of other reasons why it wouldn't -- there is no

24   clear and unconditional promise.  And it would have been

25   unreasonable for that special purpose entity to rely on any

Page 52

1    such promise because of the mortgage loan applications

2    because of the -- a number of other factors which we could

3    address, but that's not the case here.

4           The case here is against Jeff and Jackie Soffer.

5    So, we see this as a total red herring, Your Honor.  It

6    doesn't have any support.  And moreover, the timing that's

7    addressed here, that it's before and after.  As I see this,

8    the timing of the alleged promise, if anything, it makes it

9    more unreasonable for all of the plaintiffs and especially

10   Jeffrey and Jacquelyn Soffer to rely on misrepresentations

11   that were made after they've already negotiated, and

12   executed, and exchanged money -- accepted tens of millions

13   of dollars under the town square loan.

14          Their claim -- their argument is essentially, and

15   they've -- they've essentially laid on the sword on that,

16   right, saying we agree with Your Honor.  We can't get around

17   that that you've said we can't rely on such promises before

18   the execution of the loan.  But now what they're saying is

19   the day the loan was executed, they're allowed to just rely

20   on the exact same promises.  They're not saying that there's

21   something new.  They're saying we knew it was unreasonable

22   before the loan.

23          But now we're able to say, it's not unreasonable

24   any longer notwithstanding the fact that we know the loan

25   has us as the borrowers.  And the loan has the other parties

Page 53

1    to that loan, the Turnberry Centra Sub and all the other --

2    as parties to those loan documents, which are fully

3    integrated again.  They're saying now it's reasonable for us

4    to rely.

5              And, Your Honor, given the breadth of these deals.

6    Given that these parties, including whatever special purpose

7    entity they're appointed to.  And by the way, that special

8    purpose entity would without a doubt have been owned by Jeff

9    or Jackie Soffer, or a combination of both.  We're not

10   talking about some outside entity that had no relationship

11   here.

12             Given the breadth of these deals, given that these

13   parties have -- are experienced businessmen that have

14   borrowed money from financial institutions in the past,

15   where written commitments are always the norm, it would have

16   had -- been unreasonable at any time for the Soffers, or any

17   Soffer-related entity -- and it certainly would have been

18   unforeseeable for Lehman that they would have relied on a

19   supposed handshake deal.

20             And the timing point really is brought to a head

21   by us, I think, in the loan extension agreement to which are

22   before Your Honor.  The $95 million town square loan, yes,

23   was entered into in a specific time in mid-2007.  But the

24   parties, because they knew that they weren't going to be

25   able to put long term financing in place as they thought

Page 54

1   they might originally, extended that loan twice.  And they

2   didn't just extend the repayment provisions.  Coming right

3   from both extension letters which were in January 18, 2008

4   and then July 10, 2008, and there's no allegation here that

5   promises were made after July 10, 2008.  That would have

6   been absolutely unreasonable given where the markets were at

7   that point in time.

8          But coming right from the extension letters,

9   "except as specifically modified and amended herein, all

10  other terms, conditions, and covenants contained in the loan

11  agreement, in all of the loan documents, shall remain in

12  full force and effect."

13         Your Honor, these loan documents don't just take

14  place at one point in time and then we can forget about them

15  and pretend they never existed moving forward.  These loan

16  documents were extended twice at the request of the Soffers,

17  right up until the very day that they brought suit against

18  Lehman to avoid paying that $95 million loan.

19         So, to answer your question in finality, and if I

20  haven't, please let me know, Your Honor, I don't think

21  there's any important in 52 and 53 in the complaint.

22         THE COURT:  All right.

23         MR. MCCARTHY:  The final reason why there could

24  never be a clear and unconditional promise for many entity,

25  whether the Soffers, or the (indiscernible - 01:08:54), or

Page 55

1    anyone else, is because of the mortgage loan applications

2    that are before you -- before the Court.

3            This application, the one we provided Your Honor,

4    is the final one that was exchanged between the parties.

5    It's clearly the document they're relying on and saying that

6    the terms of the agreement, although they don't say what the

7    terms were, were agreed upon, length of time, all the other

8    things.  This is the only document they're relying on.

9            And, Your Honor, there simply -- under New York

10   law, you simply can't support a claim for promissory

11   estoppel any part.  And this goes right to this -- whatever

12   this SPE is, because this is what they were negotiating.

13   Under New York law, with a (indiscernible - 01:09:27)

14   preliminary agreements, these term sheets gives a lender the

15   option to decline to lend, makes any commitment conditional,

16   such language "vitiates any claims by the plaintiffs that

17   the prospective lender have made a clear and unambiguous

18   promise."  And that comes out of In re: 50 Pine.  The

19   Bankruptcy Court for the Southern District of New York in

20   2004.  There, the Court granted a motion to dismiss,

21   notwithstanding there were executed term sheets that were

22   conditional.

23           Here, Your Honor, the parties don't even have

24   executed term sheets.  They just have conditional terms

25   sheets, which were never signed or finalized.  So, I think

Page 56

1    this also goes to this new argument that there's some entity

2    that was negotiating long term financing, or that timing

3    made it different.

4         Each parties were, yes, negotiated for long-term

5    financing, but the writing they're supposedly relying on to

6    say there was a promise makes it explicitly clear that any

7    promise was conditional, and (indiscernible - 01:10:17)

8    where you have a conditional promise, on a motion to

9    dismiss, the promissory estoppel claim fails.

10        Your Honor, I could walk through that

11   (indiscernible - 01:10:24) application, but I won't.  You

12   have it before you, and in our briefing we've outlined the

13   numerous times where there's conditions that even if the

14   term sheet was signed, which was an in bold requirement on

15   the last page of that (indiscernible - 01:10:37)

16   application, it still has many conditions that would have

17   needed to have been met in order for the promise to be

18   unconditional.

19        I will point out just one.  On page 7 of that

20   application that's before your Court, Lehman's obligations

21   were always subject to due diligence.  And Mr. Meister

22   pointed this out when he was looking at that mortgage loan

23   application in this Court on the motion to reargue.  This

24   looks like a conditional promise to me.

25        Your Honor, a conditional promise cannot and does

Page 57

1    not support a promissory estoppel claim.  And, in essence,

2    gives us grounds alone to dismiss that claim right now.

3              The Courts are dealing with the argument, Your

4    Honor.  There are other new argument in addition to timing

5    that they've raised here that he parties had some courses

6    dealing -- make more reasonable for them to see this as a

7    promise that was unconditional.  I've struggled to

8    understand this argument.

9              And when I've looked at it now, I think I have an

10   understanding of what they're doing.  But as Lehman sees it,

11   any dealing between these lenders and developers was the

12   same as the course of dealing with all lenders and

13   developers of this size, that no lender in their right mind

14   would agree to extend funds like this.  And there's no

15   allegation that Lehman ever did extend funds like this,

16   without there first being written documents that put the

17   terms of their agreement in writing.

18             In other -- the flip side, no borrower or

19   guarantor would ever accept funds or accept liability, and

20   there's no argument here that the Soffers ever did without

21   first having your agreement in writing with the terms of

22   that agreement in executed, enforceable documents.

23             So, instead what the Soffers are saying, they're

24   not saying that Lehman agreed -- lent money in the past

25   without executed documents.  What they're saying is, we were

Page 58

1    always successful in the past, Your Honor.  When the parties

2    started negotiating deals in the past, we were always able

3    to reach an agreement.  Whenever the parties started their

4    negotiations in the past and the times were great, we were

5    able to get to the point where we started negotiating loan

6    documents, which never even happened here.  We were able to

7    execute those loan documents.  And only then were we able to

8    exchange money under the terms of those loan documents.

9            When times were good and the market was great, the

10   parties were always able to come to terms on their

11   agreements.

12           Your Honor, the Ersoff (ph) affidavit supports

13   this reading.  He doesn't say there's any unique

14   relationship between these parties.  What Mr. Ersoff says in

15   the affidavit they relied upon in tacit or complaint, and

16   this is at paragraph 2 of his affidavit, he says the Soffers

17   were valued clients, without a doubt.  And he says "the

18   relationship with these clients, and others like them."

19           The relationship between the Soffers and Lehman,

20   and all valued clients were such that they would come to

21   terms "on an oral and informal basis, and documents would

22   then be prepared at a later time."  He's saying that the

23   relationship between these parties, and all valued clients

24   at Lehman were such that, yes, we would kind of shake hands,

25   and say let's move forward and negotiate.  But then you

Page 59

1    would always have final written documents prepared.  And

2    only then would money be exchanged under those documents.

3              Your Honor, what they're trying to do is

4    supplement their wholly conclusory arguments and allegations

5    regarding there being an unconditional promise, which they

6    don't have, with wholly conclusory and, in fact,

7    contradicted arguments about there being a course of

8    dealing.  At best, they're saying because of their past

9    success when the market was great, this Court should allow

10   them to ignore business risks here.

11             Your Honor, the law is clear --

12             THE COURT:  I don't think they're saying that.  I

13   think what they're saying is for purposes of a motion to

14   dismiss, they should be entitled to put forth some evidence

15   to show that the relationships between Lehman as lender and

16   the Soffers as borrower were in a special category,

17   particularly as it relates to the linkage of the Aventura

18   Mall Securitization, which you haven't mentioned today, but

19   I've certainly heard enough about that already, and these

20   other transactions.

21             So, this was all part and parcel of an integrated

22   relationship.

23             MR. MCCARTHY:  Your Honor --

24             THE COURT:  What I'm saying is, they're not asking

25   me to believe that they're right.  They're simply asking me

Page 60

1      to give them a chance to try to prove that.

2              MR. MCCARTHY:  Your Honor, I don't disagree with

3      you that that's what they're saying, give us a chance, allow

4      us to get to summary judgment.  To get that chance, at law,

5      they need to state a valid claim in their complaint and they

6      haven't.  That's why we're here today.

7              In allowing them to go forward and try to state

8      that argument to you about this three-way deal with the

9      Aventura Mall, and the Fontainebleau loan, and the Town

10     Square loan when that argument is absolutely contradicted by

11     the terms of not only the $95 million loan, but the terms of

12     the fully integrated Aventura Mall loan, which doesn't

13     reference this long term financing, the terms of the

14     Fontainebleau loan documents, which are before you, which

15     certainly doesn't reference this long term financing.

16             Your Honor, at law, when the supposed promise that

17     they're relying on contradicts the core terms of enforceable

18     written agreements, there's no allegation that those

19     agreements aren't enforceable by the way, you cannot have a

20     promissory estoppel plan.  So, while they would love the

21     chance, I think, and you'll probably hear that they want the

22     chance to move towards summary judgment, Your Honor, at law,

23     they are not entitled to.

24             There are many cases, the predominant cases on

25     promissory estoppel, dismissed claims at the motion to

Page 61

1    dismiss stage where the supposed long term -- the supposed

2    promise contradicted the core terms of the written executed

3    agreements.  And that is the case here.  Your Honor --

4              THE COURT:  Why don't we hear from counsel for the

5    Soffers at this point.  I think we have spent more Court

6    time on these pathetic claims than they are worth.

7              MR. MCCARTHY:  Thank you, Your Honor.

8              THE COURT:  I feel like a character in Groundhog's

9    Day.

10             MR. MAJOR:  Your Honor, Chris Major, from Meister,

11   Seeling & Fein on behalf of the plaintiffs in this action.

12             The plaintiffs, by the way, Your Honor, which

13   include the SPE that is the party that was to receive the

14   loan, it's the first named party.  It's Turnberry Centra

15   Sub, so I'm surprised that Mr. McCarthy is at this stage of

16   the case, having sat through 11 depositions, and reviewed

17   all of those hundreds of thousands of pages of documents,

18   and having spent such time, having moved against the

19   pleadings repeatedly is not aware of what the SPE is, it is

20   the title owner of Town Square.  I didn't realize it was

21   such a mystery.

22             What I'd like to focus on at the start, Your

23   Honor, is we just listened to Mr. McCarthy's summary

24   judgment argument.  And him saying that I was going to stand

25   up and ask for our opportunity at summary judgment doesn't

Page 62

1     mean that's not a valid point.

2             We're in the process of taking depositions.  We've

3     got six to go, as Mr. McCarthy stated.  And by the way, Your

4     Honor, if you were to dismiss this claim today, not a single

5     one of those depositions will go away.  Every single

6     deponent who's scheduled to be deposed is either being

7     deposed, with respect to the non-parties, exclusively for

8     the Fontainebleau adversary proceedings, or it's the

9     Soffers, Mr. Ersoff, who we've yet to have a date prompt

10    from Lehman, and Mr. Walsh, I believe, who are going to be

11    deposed on all of the deals anyway.

12            What they're basically asking is for the Court to

13    rule today, before we finish discovery, so we're limited in

14    asking a few of the questions that we would ask in some of

15    those depositions.

16            THE COURT:  I don't think that's exactly right.  I

17    mean, we've been -- with respect to the arguments you're

18    making, we've been dealing with your right to pursue

19    promissory estoppel claims for a very long time.  This is at

20    least the third hearing that we're having full blown oral

21    argument over these claims: the original motion to dismiss,

22    the motion for reconsideration, and the right to file an

23    amended -- further amended complaint, and now this motion to

24    dismiss.

25            And my reference to Bill Murray in Groundhog Day

Page 63

1    is not intended to be entirely facetious.  Each argument is

2    essentially the same.  We are not really advancing the

3    process of judicial economy by taking this to the level of a

4    triplicate, instead of simply dealing with it neatly.  I

5    dismissed these claims once.  There was a request to file

6    for reconsideration, which I denied, or to file an amended

7    complaint.

8            What we're doing here is not bridging to summary

9    judgment.  We are testing the sufficiency of allegations

10   based on promissory estoppel.  They've been thoroughly

11   briefed multiple times.  And the fundamental question for me

12   is, to what extent does your second amended complaint

13   represent a cure of earlier deficiencies noted by the Court?

14   I'd like you to focus on that.

15           MR. MAJOR:  I'll get right into that, Your Honor.

16           The -- when the Court dismissed the claims the

17   first time, the Court had one ground for dismissing our

18   promissory estoppel claim, and that was the integration

19   clause in the $95 million loan document.  We argued, and the

20   Court has disagreed with us, we understand that, that the

21   $95 million loan agreement integration clause was limited to

22   that specific loan and didn't cover outside loans.

23           We asked for one opportunity to re-plead in order

24   to correct what the Court found to be a defect in the

25   pleading.  And that was the right to plead that the promises

Page 64

1   were made after the integration clause was executed in

2   July of 2007.

3           The Court granted us that right.  And when the

4   Court did it, the Court wrote Lehman opposes granting leave

5   to amend on grounds that the proposed amendment would be

6   futile because plaintiffs will never be able to meet all of

7   the legal requirements applicable to a claim of promissory

8   estoppel.  The Court continued, it is premature for the

9   Court to foreclose the right of the plaintiffs to pursue

10  this claim, even if the likelihood of being able to

11  demonstrate reasonable reliance is uncertain or remote.

12          We corrected the integration clause defect, which

13  is the only one that's been identified by the Court by --

14          THE COURT:  Yes, but you didn't provide any facts.

15  You simply said before and after.  You didn't say anything

16  that a rational observer could say, has any likelihood of

17  success.  There's a plausibility standard that applies every

18  time I'm considering a motion to dismiss.  You knew you were

19  going to be tested on this again.  You knew that any

20  deficient pleading was going to give rise to a further

21  motion to dismiss.  And these amendments are, with respect,

22  grease bare.  You don't say much.

23          My conclusion is you don't say much because you

24  don't have much to say.

25          MR. MAJOR:  Your Honor, we have alleged the

Page 65

1    specific terms of the loan that were promised.  They were

2    promised over a more than one year period.  We're not

3    required under the rules to plead every single date on which

4    the promise was made.

5            THE COURT:  If you want to prevail here, you need

6    to do more than you did.  You need to do more than just say

7    conclusory things.  You need chapter and verse.  You haven't

8    provided it, nor have you said today that you can.  And my

9    assumption is that if you could have done it, you would have

10   done it.  And the reason that you did what you did was to

11   try to get past an obstacle.  My challenge to you is, what

12   would you say if you could say more?

13           MR. MAJOR:  Your Honor, if I can get into the

14   depositions that have been taken, these promises were made

15   from the period of time that started in 2007 and they were

16   made into the first part of 2008.

17           THE COURT:  Not plausible.  Not plausible in the

18   context of a $95 million personal loan that includes an

19   integration clause.  It is not plausible that sophisticated

20   parties would rely upon anything not in writing.  Not

21   plausible that sophisticated developers would simply say,

22   okay, because you just said that to me, we have a handshake

23   deal, I'm going with you.  I'm not going to look at other

24   alternatives.  Not plausible.

25           We are not dealing with a consumer loan.  We're

Page 66

1    not dealing with boilerplate documents.  We're dealing with

2    a very sophisticated transaction.  A reason why the

3    integration clause in enforceable.  A reason why I enforced

4    it.  And to make the statement, statements were made before

5    and after without specificity, raises credibility issues.

6            MR. MAJOR:  Your Honor, the specific terms of the

7    loan were promised repeatedly by Lehman to Turnberry, $625

8    million, a ten year term, the interest, the method of

9    calculating the interest, the terms of the loan.

10   Mr. McCarthy has cited to the fact that there may be

11   conditions to closing that loan.  That's not what the

12   promissory estoppel test is, it's whether the promise --

13           THE COURT:  That's not the basis for a promissory

14   estoppel claim that these individual defendants can assert

15   when they have an integrated $95 million loan that they owe.

16   This is not a credible position you're taking.

17           MR. MAJOR:  Your Honor --

18           THE COURT:  The $625 million take out financing

19   deal never happened.  And if it was going to happen, it

20   would only happen as counsel for Lehman has argued, if all

21   conditions were fulfilled.  You have not asserted a

22   cognizable promissory estoppel claim.

23           The motion to dismiss is granted.  And I strongly

24   urge the parties to go back to the settlement table, and act

25   like grown ups in this case.  Enough is enough.

Page 67

1          MR. MCCARTHY:  Thank you, Your Honor.

2          MS. MARCUS:  Your Honor, the final matter on the

3     calendar today, number 4, will be handled by Arthur

4     Steinberg on behalf of Lehman.

5          MR. STEINBERG:  Good morning, Your Honor.  Arthur

6     Steinberg from King & Spalding on behalf of Lehman

7     Commercial Paper, Inc. and LBHI.  And this is an objection

8     to claims 2885 -- 28845 and 28846.

9          In essence of the claims that were filed were an

10    unspecified contribution and indemnity claim arising out of

11    a 2006 dividend that was paid to the claimant, LBREP.  And

12    it was paid by SunCal, which is one of the debtors in the

13    California Bankruptcy Court.

14          And Lehman was part of a lending syndicate that

15    provided first, second, and then ultimately third lien loans

16    to, in part, finance that dividend, but also significantly

17    in part to finance SunCal's development of three residential

18    real estate projects in California.

19          And so, we were sued -- we were almost sued.  They

20    had to come to Your Honor to ask for permission to try to

21    invalidate our claim and to assert equitable subordination

22    claims.  And in September of 2010, Your Honor approved the

23    settlement that we had.  And then we went to the California

24    Bankruptcy Court and the California Bankruptcy Court

25    approved that settlement as well, too.

1           THE COURT:  I was assuming I would never see you

2    again.

3           MR. STEINBERG:  Well, Your Honor, I hope to see

4    you in lots of matters.

5           THE COURT:  I understand.  But at least in this

6    setting, I was assuming that it was over.

7           MR. STEINBERG:  Well, I actually thought it would

8    be over as well, too.

9           Subsequently, the SunCal trustee sued to recapture

10   the dividend from the claimant.  And they entered into a

11   settlement after discovery was had.

12          And when you look at the relative settlements that

13   we both reached, we reached the -- the inevitable conclusion

14   is that the SunCal trustee had a weak claim, so that the

15   amount that the first lender group, who was owed $235

16   million had to pay in the form of use of cash collateral,

17   giving up some recoveries, was about 11 and a half to $12

18   million of value.

19          The claimant was 90 percent -- received

20   approximately 90 percent of the dividend.  The dividend was

21   $144 million received in 2006.  Seven years later in

22   December of 2012, they gave back collectively -- the full

23   giveback was $16 million.  The claimant's share was 14 -- or

24   $13.8 million.

25          I think we say in our papers that if you kept $130

Page 69

1    million and you just kept the money in an interest account

2    and you got 1.9 percent on your money, that's essentially

3    what they gave back.

4            And by the way, what they gave back of $13.8

5    million specifically to the claimant, had some insurance

6    component, meaning that some insurance component paid some

7    of that $13.8 million.  They've never disclosed how much of

8    it was actually paid by insurance to reflect what their out

9    of pocket is.

10           Now, there are seven fundamental principles that I

11   think we actually agree on, which kind of shape the

12   underlying facts that I just talked about.  One is that Your

13   Honor may recall that when we went to Your Honor to approve

14   the LCPI settlement with the SunCal trustee, there was an

15   argument that they were raising that the lender to a

16   dividend and the recipient of a dividend should be deemed to

17   be joint tortfeasors for purposes of state law.

18           At that point in time, they were arguing New York

19   law and we were -- we did letter briefing to Your Honor on

20   the New York law and California law.  But we will accept the

21   notion that for purposes of the California statute, that we

22   are joint tortfeasors, even though it doesn't fit within the

23   natural paradigm of what -- how most people can -- joint

24   tortfeasors act.

25           So, the first principle is that we're joint

Page 70

1    tortfeasors.  And the second that we both will agree that

2    California law applies in that Section 877 and 877.6 of the

3    California Code, Civil Procedure.

4         The third is that we raised this point, they don't

5    challenge it, but I think it's worth saying is that you can

6    ask for the good faith finding in connection with a

7    settlement.  You don't have to do it the same time as the

8    settlement is approved.  There's no deadline as to when you

9    could ask for approvement (sic) -- for approval of the good

10   faith finding.  And that's the Gretchco (ph) case, which is

11   cited in both our papers, and their papers for given

12   propositions.

13        The fourth is that we agree what the standard is

14   for good faith.  It was set by the California Supreme Court

15   in the Tech-Bilt (ph) case.  And we argued that the

16   proposition of what you have to consider for the good faith

17   finding was essentially the same type of consideration that

18   you have to look at for approval of a Bankruptcy Rule 9019

19   settlement.  In their surreply, they take issue with that

20   and say that there's this kind of nuanced position that you

21   have to look at what the relative damages between the two

22   joint tortfeasors.

23        I don't think that necessarily applies in our

24   circumstance.  But all that we actually did was replicate

25   what they did when they went for their good faith finding

Page 71

1    when they settled their case.  And on Exhibit H to our

2    moving papers, we set forth -- we included their memorandum

3    of law that they presented to the California Court.

4              There, they make the same unremarkable

5    propositions that we agree with when we file our papers.  We

6    essentially cribbed a lot of what their law was, so that

7    there would be no disagreement on the issue.  They say once

8    the settling party has moved for a good faith determination

9    under the Section 877.6, the opponent bears the burden of

10   proving that the settlement was not in good faith.  So, we

11   agree with that and it's their burden to be able to show

12   that.

13             The burden is a high hurdle, that's their words.

14   The opponent, asserting the lack of the good faith can only

15   meet this burden by demonstrating that the settlement is so

16   far out of the ball park as to be inconsistent with the

17   equitable objectives of the statute.  The so far out of the

18   ballpark is to me, and using of the words reasonable or

19   reasonable view, is the same thing as you have to find in

20   the 9019 the lowest range of reasonableness.

21             And then this is the significant thing that they

22   say, which I think contradicts their papers.  In fact, an

23   opponent must demonstrate that the settlement is grossly

24   disproportionate to what a reasonable person at the time of

25   the settlement would estimate the settlers' liability to be.

Page 72

1          Then in their argument section, they say Courts

2    only need to consider whether a settlement is grossly

3    disproportionate to what a reasonable person at the time of

4    the settlement would estimate the settling defendant's

5    liability to be.  So, they're not asking -- they're not

6    saying in their papers when they went in front of the

7    California Court to say that you need to reflect what the

8    proportionate liability of each of the potential joint

9    tortfeasors.  They say that the only test, which is what we

10   said in our papers, the only test, and it comes from Pepco

11   -- the only test that needs to be done is whether the

12   settlement that we paid is grossly disproportionate to what

13   a reasonable person would think that we should have to pay.

14          Well, that's what you do in a 9019 settlement.

15   You notice it out to all of the creditors, and the issue

16   will be is whether we pay a reasonable amount in view of

17   what the exposure was.  We were never arguing that we

18   couldn't pay.  So, there was no collectability factor.  And

19   clearly cost and expense is a factor involved.

20          But Tech-Bilt also says that you need to factor

21   when the settlement was breached.  So, we think we've met

22   the standard and the standard is in Bankruptcy Rule 9019.

23          We cite in our papers the Plant (ph) case.  And

24   the Plant case actually says what I've just said.  It said

25   California courts have adopted a test comparable to

Page 73

```
 1    Bankruptcy Rule 9019 for determining whether a settlement

 2    payment is sufficient to justify a bar against equitable

 3    contribution rights.

 4             And while they weren't dealing with equitable --

 5    that specific provision, they were trying to show what the

 6    analysis would be in that circumstance.  And they even say

 7    that the 9019 standard is actually more exacting because the

 8    proponent of the settlement has the burden of proof, while

 9    under the California statute, the objector has the burden to

10    show that the settlement was not in good faith.

11             So, we think -- and by the way, the Hicks-Muse

12    (ph) case that we cite says that if the applicable state

13    law, which would comport with the good faith standard under

14    Bankruptcy Rule 9019, the bankrupt, who is the settling

15    party, may prevail on its contentions, but the settlement

16    order will collaterally estop anybody from re-litigating the

17    issue.

18             So, that is the essence of our argument.  And I

19    think even if that wasn't the case, it is obvious based on

20    the facts that Lehman in this case, LCPI entity lost 80

21    percent of its principal of its loan.  The equity players

22    here recovered the full investment, plus a profit.  They are

23    holding the proceeds of the loan that we never got repaid.

24             We, to date, have never asked them to pay the pro

25    rata portion of what we had.  The notion that under these
```

Page 74

1    circumstances that they're asking us to say that they

2    overpaid vis-à-vis us is, I think, unusual.  We were the

3    lender to a borrower who made a dividend.  They received the

4    dividend.  They were the recipient of the fraudulent

5    transfer.  They were the initial transferee, if it was a

6    fraudulent transfer.

7           We lent $320 million in first and second lien

8    positions for part of a lending group.  Lehman's share of

9    that $320 million was $82 million, and that, if you back out

10   the dividend of $144 million, that's roughly 45 percent of

11   the overall loan that was made.  So, we were an actual

12   lender to actually support the development of the project.

13          They were challenging our loan because the

14   (indiscernible - 01:37:27) had gotten the dividend and they

15   say that that left the company undercapitalized.  But it was

16   the borrower who made the decision to take the loan.  It was

17   the borrower who made the decision to issue a dividend.  The

18   equity claimant here is 90 percent controlling of the

19   borrower.  They didn't have to take the dividend.  They

20   didn't have to take the loan.  They could have put the

21   dividend back as the company was running into financial

22   trouble.  They chose not to do anything.

23          But fundamentally, the settlements that we both

24   reached reflected the fact that they were, in the context of

25   what we were sued for, they were de minimis settlements.  We

Page 75

1    were sued for telephone book numbers.  They essentially gave

2    back the interest carrier -- portion of the interest carrier

3    of the money that they had received.  They didn't touch

4    anything else.

5              We gave up cash collateral usage to maintain our

6    property.  But for the purpose of which I argued to Your

7    Honor almost three years ago is we needed to get to a sale.

8    This was a volatile piece of real estate.  We wanted to get

9    to the market before the California market had dropped.

10   With the benefit of hindsight --

11             THE COURT:  You might have waited.

12             MR. STEINBERG:  I might have waited.  Someone else

13   -- you know -- and by the way, the person who bought at the

14   auction was -- they were part of the consortium that bought

15   at the auction.  And the auction price for this property was

16   70 million -- around 70 -- $71 million.

17             So, the equity at the time of the first, second,

18   and third lien loan, and at the time of the filing of the

19   SunCal bankruptcy had almost $400 million of secured debt

20   ahead of it by virtue of the process of the sale, and then

21   buying in at the auction price, they buy it for $70 million

22   with no secured debt in front of it.  That was their

23   investment for $70 million.

24             They made a very good business deal.  They made a

25   smart judgment.  They got out of $144 million dividend case

Page 76

1    paying relatively a de minimis amount.  Before you even

2    factor in their insurance obligation, the notion that under

3    those circumstances they have a contribution or indemnity

4    claim against the lender at -- is, I think -- is unfounded,

5    and Your Honor could easily see that there's no reason to

6    take discovery on this, these types of good faith

7    determinations are made by affidavit.  They may bear

8    determination by the affidavit.

9            I'm not even sure whether they think they have a

10   good faith determination as against LCPI in the context of

11   their getting a good faith settlement.  Because I think as

12   we mentioned in our papers, to do that, I think they needed

13   to move to lift the automatic stay.  But if you --

14           THE COURT:  Mr. Steinberg, let me ask you a

15   question because you're making some persuasive arguments,

16   but they're not based upon a record.  And I hear what you're

17   saying and I have no reason to question what you're saying.

18           But even assuming that the good faith

19   determination we're talking about is one to occur in a

20   somewhat expedited fashion based upon declarations, or

21   affidavits, or stipulations of fact, or representations of

22   fact of some sort in a fashion that would otherwise be

23   acceptable to a Court, what's before me today on the basis

24   of which I can dispose of these claims by finding that 877.6

25   of the California Procedural Code is satisfied in a setting

Page 77

1    in which both settlements took place with no good faith

2    findings, at least no explicit good faith findings other

3    than those inherent in a Bankruptcy Court approval of a 9019

4    settlement.

5          And at least there's the argument that some

6    comparative assessment should be made in order to determine

7    good faith, coupled with the argument that liquidity

8    constraints somehow are at issue here, some $50 million that

9    limited the ability to use the financing.  I don't know how

10   much of this is smoke and how much of this is real.  I don't

11   know how serious this whole fight over good faith is going

12   to be lodged.  And, at bottom, there's an aspect of this you

13   haven't addressed at all, which is forum selection.

14         My working premise is that the claimant believes

15   that there's a better chance of getting a result that they

16   will find useful by having this heard before Bankruptcy

17   Judge Smith in Santa Ana.  And that the debtor entity

18   believes that this is -- I shouldn't say what you believe,

19   but you'll tell me, that this is all part of an organized

20   claims administration process that properly should be heard

21   and decided here.  And that it's a relatively simple matter

22   and that they should simply have their claims expunged

23   without further adieu.

24         MR. STEINBERG:  Let me try to address Your Honor's

25   questions.

Page 78

1      What's before Your Honor today, attached to our

2   moving papers, are the settlement papers that we had filed

3   to approve the settlement before Your Honor, the settlement

4   papers to approve the settlement before Judge Smith and the

5   settlement papers that they had submitted to approve their

6   settlement with their good faith finding before Judge Smith.

7      Those papers contain all of the factual

8   allegations that I have talked about which is the amount of

9   the loans that were made, the basis of the settlement, the

10   value of a settlement, what they paid in the context of

11   settling their case.

12      So the relative loss that we've suffered, the

13   amount of the loans that we suffered and their relative

14   contribution and their dividend are not disputed.  They're

15   all set forth in pleadings that are before Your Honor and,

16   if you review their papers, they don't contest any of the

17   numerics, the facts.

18      They will say they paid $13.8 million in a

19   settlement.  I will say you have to factor in insurance.

20   They will say, I'm not telling you what the insurance is.

21   But that number is $13.8 million.  We, out of the $16

22   million that the overall equity contributed, the amount of

23   our loans, the amount of our recovery from the auction sale,

24   is -- the amount of our loans, and they know what the

25   recovery of the auction sale is.  They haven't challenged

Page 79

1    that.  They've accepted our notion that our contribution is

2    between eleven and $12 million, as a first lien lender

3    group, and LCPI is 30 percent of that first lien lender

4    group.

5            So there's no issue as to the numbers.  There's no

6    issue about that we were a lender to the fraudulent transfer

7    and there's no issue that both of us took the position that

8    there was no fraudulent transfer and there's no issue about

9    what we were sued for versus what we settled at.  So you can

10   see the dramatic difference between the ad damnum clause in

11   the proposed complaint and their actual complaint versus the

12   actual amount that was there.  And there's no issue about

13   the timing of when everything occurred.

14           So all of the factual information here is before

15   Your Honor already as attached to our moving papers and they

16   don't contest that.

17           The issue about the form selection clause, the

18   clause -- when they originally filed their change of venue

19   allegation, they thought that the term sheet where we had

20   consented to jurisdiction meant that we had to litigate this

21   issue in California.

22           In their reply, they agree they recognized that it

23   was a non-exclusive jurisdiction.  In fact, they cite in

24   their papers that when Your Honor approved the settlement,

25   you specifically reserved jurisdiction to handle the

1    disputes in the case.

2            What they don't recognize in their papers, or have

3    not acknowledged in their papers, is that Your Honor was

4    very particular and was required to be that particular

5    because he did have objectors to the settlement and they

6    wanted to say, judge, approve the settlement but it's

7    limited to the parties to the term sheet.  SunCal trustee

8    and LCPI debtor don't do anything to affect my rights.

9    Whether it was Valpost (ph) who had the second lien or

10   whether it was a LBREP who claimed to have this potential

11   contribution claim.  Limit the order to the parties.

12           So, they're not a party.  They continually try to

13   argue that they weren't a party and they weren't going to be

14   bound by anything.  So, therefore, a clause in a term sheet

15   that talks about that there's a consent for our jurisdiction

16   into California doesn't have any relevance.

17           But, as a practical matter, it didn't have any

18   relevance anyway because I don't have a dispute with the

19   SunCal trustee.  I've consummated my settlement.  There's

20   nothing to go there.  And, if you think about it, what

21   they're really asking to have happen here is to have a non-

22   debtor, LBREP, file an action in the SunCal Bankruptcy Court

23   against another non-debtor to handle a portion of a claims

24   resolution here.

25           I didn't have to move under the California statute

Page 81

1    for the good faith finding.  I could simply say that based

2    on the admitted facts, there's no contribution claim.

3    There's no indemnity claim.  I just said it was cleaner

4    because by virtue of having a good faith settlement that was

5    approved by two courts, I essentially got to the same

6    position anyway and that their statement in their reply that

7    you need to take into account the concerns of the priorities

8    between the joint tortfeasors, that is not the basis upon

9    which they set the standard to the judge when they went for

10   their good faith finding.

11          With regard to the liquidity concern, I think you

12   just -- we don't dispute that there was a change in the

13   liquidity covenant that took place before the loan.  That's

14   true.  Then the borrower had the decision whether to borrow

15   the money or not borrow the money.  Then the borrower had

16   the decision to decide whether it could meet its projections

17   or it couldn't meet its projections.

18          They moved in front of the California Bankruptcy

19   Court and said that as a result of the -- at the time that

20   the dividend took place, there were current appraisals to

21   say that the property was worth $970 million.  In the

22   context of litigating their resolution, they have this --

23   they had the issue as to whether the projections made sense

24   or not made sense.

25          They ended up still settling for a de minimis

Page 82

1    amount in the context of what they were suing for.  But, in

2    this case, the borrower had the decision to whether to take

3    the loan or not take the loan.  The equity had the ability

4    that if liquidity had gotten tight to give back the money.

5             They claim that they gave back a portion of the

6    money.  They only gave back a portion of their profit.  They

7    didn't give back the full profit.  That comes from their

8    papers before.  And they still made their profit on their

9    investment because they held this money for seven years.

10            So you have, the liquidity concern is, I think, a

11   smoke allegation.  It doesn't matter.  It didn't affect them

12   in how they settled, whether they said that they paid a few

13   million dollars more, that either their insurance carrier

14   paid or they didn't pay.  But in the context of this case,

15   they were sued for $144 million.  You factor in pre-judgment

16   interest, they settled for less than ten percent of a

17   dividend, which is really an open and shut case.  They had a

18   90 percent discount on the issue of essentially solvency.

19            They were right.  They just got out of a case

20   because it cost them some money.  This is not the kind of

21   case where you sit there and try to figure out who was

22   potentially at fault.  We were both right.  We paid a

23   relatively small amount of money considering all that could

24   have happened and the cost and expense of litigation and so

25   did they.

```
 1              And to argue now that after they paid a small

 2    amount when they're still sitting with a profit, while we

 3    lost 80 percent of our principal and they're sitting with

 4    our money that we lent in a dividend, we haven't -- we

 5    didn't ask for it back.  But this is a case where the equity

 6    is sitting with the loan proceeds that were never repaid

 7    back by the borrower.  And they want to say that in the

 8    context of this case there's a proportionality that needs to

 9    be allocated based on their having paid $13.8 million before

10    insurance.  That doesn't make any sense at all.

11              THE COURT:  I understand what you've just said,

12    Mr. Steinberg.  But is that actually the analysis?  Because

13    whether they ended up benefiting from the proceeds of the

14    loan or not probably is irrelevant to the question of

15    whether the claims of the trustee against each party were

16    settled in a manner properly within the ballpark.

17              So it seems to me that the question and it's

18    probably a simple one, is recognizing that these claims were

19    probably not very strong to begin with and, as a result,

20    were settled for pennies on the dollar.  Both of the alleged

21    joint tortfeasors got off cheap.  Cheap in the sense that as

22    a percentage of the claimed exposure, it was a small

23    percentage.

24              In that setting, how does one assess relative

25    contributions?
```

1             MR. STEINBERG:  Well, I think, Your Honor, that

2    the Tech-Bilt case, and as they say in their own papers, you

3    look at what a reasonable person should pay in the context

4    of their liability to the plaintiff.  Did they pay their

5    fair share to the plaintiff.  If they did, they're released

6    out of potential contribution and indemnity claims.  That's

7    the basis upon which we had to get these settlements

8    approved.

9             Did we pay a fair share to the SunCal trustee in

10   the context of the settlement that had been agreed to?  The

11   Court found that it was reasonable, fair and adequate.

12   That's --

13            THE COURT:  So here's the question, I think -- or

14   at least, here's a question I am about to articulate.  Where

15   you have a settlement with the SunCal trustee that is

16   approved in the New York Bankruptcy Court and a separate

17   settlement with the SunCal trustee that is approved by the

18   California Bankruptcy Court and the settlements are made by

19   parties that are arguably, in fact, you've stipulated to

20   this, joint tortfeasors for purposes of the California Code,

21   Section 877 and 877.6, does a good faith finding need to be

22   made at all if there are existing, separate 9019 findings

23   that the settlements, viewed separately, necessarily are

24   fair?

25            MR. STEINBERG:  Your Honor, I think the answer to

Page 85

1    that question is that normally the good faith finding is

2    sought before you know the full story.  While one party

3    settles, there are other parties that the litigation is

4    going forward and in order to encourage that settlement,

5    they are asking for releases of indemnity and contribution

6    claims.

7           This is an easier case for everybody because you

8    don't have to sort of speculate what the potential ability

9    of the plaintiff to pay.  You actually know what everybody

10   paid here and now you're assessing back as to whether, at

11   the time you approved it, it was reasonable.

12          But the standard is the 9019 standard, especially

13   -- what happens in these cases where they raise the

14   proportionality issue is when somebody doesn't pay anything

15   and the trustee just drops the case and says, for costs, you

16   know, so I don't have to incur potential costs, I've now

17   think that this claim has no potential merit.  And now

18   someone goes to approve the settlement and someone says, all

19   right, but you've now pended off contribution rights and the

20   plaintiff not -- didn't get anything and you're jointly and

21   severally liable for this debt.  You're putting a greater

22   burden on the non-settling defendants.

23          We accepted what they've said about the joint

24   tortfeasor thing.  But we didn't have the same claim against

25   us.  When we -- ours was a challenge to our claim as whether

Page 86

1    it was a good claim or not a good claim, as a secured basis

2    because a portion of our loan proceeds had been paid on a

3    dividend.

4              Theirs was that they had received a dividend at a

5    time that the trustee was alleging is a fraudulent transfer.

6    It's an apple and an orange.  It's not two apples and

7    therefore it doesn't fit within the normal paradigm.

8              In a circumstance where you have the settlement

9    actually done, you understand that it's been approved with

10   notice to everybody and someone has made a finding that is

11   reasonable, that your contribution to this estate is

12   reasonable.  And it's not being discounted for ability to

13   pay, or anything like that.  It was just determined that the

14   claims as valued against us were worthy of the settlement

15   that we had just reached.

16             And Your Honor may remember that this was also --

17   came with the endorsement of the creditors' committee as

18   well, too.  So there was -- the creditors were represented

19   as well as the trustee, all who had made the determination

20   that we had paid our fair share in the context of resolving

21   our claim.

22             They also agreed down the road to agree -- that

23   their settlement on their dividend recap was acceptable.

24   The fact of the matter is, Your Honor, you asked us to focus

25   in on the liquidity issue.  The trustee didn't believe that

Page 87

```
 1    even that was a good fact for them.  It may have been a good

 2    fact but it didn't get them very far based on the settlement

 3    that he reached.

 4          It may have been something that he banged the

 5    table with and said therefore you should pay another million

 6    dollars when you owe us $144 million.  But it wasn't

 7    anything more than that.  It wasn't like they took this fact

 8    and said I'm taking a claim and now you have to pay fifty

 9    percent.  And they came back and they said they had paid

10    fifty percent of the dividend.

11          This is the unusual case where you have two de

12    minimis settlements and someone saying, I paid a little more

13    of my de minimis than you when we're not in the same

14    position.  The trustee settles with us as you -- just to

15    recollect from what happened in 2010, I have property that

16    was worth nothing close to what the aggregate debt in this

17    case, which in the first, second and third lien debt, were

18    $395 million.  The trustee had an appraisal saying it was

19    worth $50 million.

20          So we said to the trustee, assume that the

21    dividend was no good.  You know, assume -- knock out $144

22    million of my secured claim.  I'm still owed $250 million.

23    Your property is worth -- you say that the property is worth

24    twenty percent to twenty-five percent of what would be

25    otherwise my valid secured claim.  Where are you going on
```

Page 88

1    this litigation?  You don't have anything as against us.  We

2    need to sell the property.  It's on your watch.  We're just

3    burning cash collateral to maintain properties that are

4    bringing into the market.  And that's what should happen

5    here.  That was the basis of our settlement.

6            That's a totally different analysis when you look

7    -- they were naked.  They had gotten the money.  Either they

8    -- he has a good claim or he doesn't have a good claim.  He

9    determined that he potentially didn't have a good claim.

10   But this is not a case where there was a construction on a

11   building and the issue is whether the carpenter or the

12   electrician created the default that led to a fire then had

13   to handle proportionate liability.  You never really would

14   have handled proportionate liability based on this before.

15   You would have looked to see whether we had an exposure

16   based on our conduct that would justify that -- our

17   settlement.

18           And both you, Your Honor, and the California

19   Court, both made that determination that it was a fair

20   settlement.  I think the California Court said it was well

21   within the range of reasonableness here.  No one objected

22   and we have the support of the committee.  Everybody

23   understood our settlement was a good deal for the estate.

24           THE COURT:  Okay.  So Mr. Steinberg, in this

25   setting, you've both told me that there is an agreement

Page 89

```
 1    among the parties that this proportionality requirement of

 2    Section 877.6 applies.  Yet, it's really being misapplied

 3    because the circumstances of these separate settlements do

 4    not fit the paradigm for joint tortfeasor analysis.

 5            In that context, how, if at all, should a court

 6    make the judgment that the settlements are in good faith for

 7    purposes of that California Code Section?

 8            MR. STEINBERG:  Your Honor, I actually said that

 9    the proportionality aspect doesn't apply in our case and

10    that Your Honor still should be able to make the

11    determination based on what they've cited in their brief,

12    which is, I'll read it again.  "Courts only need consider

13    whether a settlement is grossly disproportionate to what a

14    reasonable person at the time of the settlement would

15    estimate the settling defendants' liability to be."

16            That's not a proportionality of whether I'm more

17    at fault than they're at fault.  He set forth the test.

18    They've set forth the test of what needed to be applied to

19    them and I'm saying to Your Honor, apply the same test here.

20    That is the Bankruptcy Rule 9019 test.  And it's actually

21    already been applied.  It should apply here as well.

22            If Your Honor doesn't want to apply the California

23    statute, if you recognize that I really have said to you

24    that parts of it is an apple and an orange, you could look

25    at this straight because the settlements have actually
```

Page 90

1    occurred.

2         Is there a valid contribution claim based on what

3    they paid and what they received versus what we paid and

4    what we received in the context of how we settled the case?

5    You could get to the same spot without reference to the

6    California statute either because the facts aren't in

7    dispute.

8         THE COURT:  Understood.  But how we you get to

9    that result?  How would you determine that there is no valid

10   contribution and indemnity claim?  How do you, today, as a

11   matter of law erase their claim?

12        MR. STEINBERG:  Because we know what the result

13   was of what they paid.  We know the result of what we paid.

14   We know what our loss was.  We know what their loss was.  We

15   know what the claims were that were asserted against us.  We

16   know what the claims were that was asserted against them.

17   That's all the facts that you need to know to see whether

18   there is a contribution claim.

19        Your Honor has it easier because many times you're

20   asked to look at this stuff before you have the full

21   picture.  You have all the picture here.  No one is

22   quarrelling as to what that picture is.

23        The issue is something that they have.  They've

24   agreed that the California statute applied.  They've set

25   forth what the test is.  The test doesn't have what

Page 91

1   proportionality, at least as far as they asserted it in the

2   California Bankruptcy Court and we're saying to Your Honor

3   that the case law that we cited says that the 9019 standard

4   is the California standard for purposes of assessing this

5   situation.

6           And Your Honor has ruled and the California Court

7   has ruled that the 9019 standard has been met a fortiori it

8   should be met here as well.  You have all of what's needed

9   to make these resolutions and this certainly belongs before

10  Your Honor as a claims resolution matter.

11          THE COURT:  So, let me sum up and then give Mr.

12  McKane an opportunity to say a few words because I can see

13  how impatient he is to jump up and have his day in court.

14          Your position, in summary, is that where a

15  bankruptcy court has approved a settlement under a 9019

16  standard in New York and a California bankruptcy court has

17  approved a separate settlement under 9019 standards in

18  California that, as a matter of law, it is not possible in

19  interpreting Section 8.776 of the California Code to find

20  that either settlement is grossly disproportionate with

21  respect to liability because each settlement has been

22  separately approved by a court of competent jurisdiction

23  applying an appropriate standard.

24          MR. STEINBERG:  I'm not sure whether I would go

25  that far, Your Honor.  I would first add that the California

1    Bankruptcy Court also approved our settlement.

2           I do think that if there was a collectability

3    aspect of our settlement, as the reason why our settlement

4    would be approved, then I think that that may skew the

5    factors a little because it would be something other than

6    whether a reasonable person would say that's a fair estimate

7    of our liability.

8           But in our case we didn't have a collectability

9    issue and what all that any -- either of Your Honor or the

10   California Bankruptcy Court had to determine was that

11   whether we were paying a fair share based on the claims that

12   had been asserted against us.

13          When a settlement is tailored for approval on only

14   that basis and is approved on that basis then I would agree

15   with you that that is the 90 -- that 9019 finding is the

16   same finding that you'd have to make as a good faith

17   finding.

18          THE COURT:  Now, it's Mr. McKane's turn.

19       (Pause)

20          MR. MCKANE:  I apologize for interrupting, Your

21   Honor.  For the record, Mark McKane of Kirkland and Ellis on

22   behalf of LBREP Lakeside and while it's always nice to see

23   you, I did not think I would see you on this matter after

24   2010.

25          And the reason why, and I want to go first to,

Page 93

1    rather than prepared remarks, is to address everything

2    that's been said to date in this argument, especially with

3    some of the issues that you raised.

4            Let's go first to the notion of is this something

5    real or is this smoke.  And I respect that you would ask

6    that question.  What I would note is that Judge Smith in

7    California would be in a better position to know that

8    because Judge Smith didn't just evaluate our settlement.

9    She also evaluated their settlement.  She also lived with

10   the underlying allegations for multiple years and dealt with

11   the discovery as those -- as the claim that was about to be

12   asserted and was then settled, the LCPI claim, and then the

13   claim that was brought against us was litigated was handled.

14           And to the extent that there's any question about

15   what is this joint tortfeasor aspect, the trustee in that

16   case asserted a breach of fiduciary duty claim against both

17   of us.  He threatened to bring it against them.  That was

18   one of the reasons why they settled out.  He then brought it

19   against us.  There's the joint tortfeasor.  That's why

20   they're not stipulating -- that's why they agreed to that

21   concept.

22           But to the thing that you've said at the end, as

23   you tried to package what Mr. Steinberg is trying to do

24   here, and you said, yourself, like, you know, let me try to

25   get this right and you characterized it as best you could

Page 94

1   because you're focused on are you asking as a matter of law

2   this is true.  You have to ask that question because we're

3   here at this sufficiency hearing.

4           We here on the basis of my claim on a Rule 12(b)

5   standard and the basis on which they're trying to knock us

6   out on a Rule 12(b) standard is this good faith finding

7   under California law, that's 877 and 877.6 which by its

8   statute is an evidentiary-based statute.  And so the

9   disconnect that you're struggling with is how can I deal

10  with an evidentiary-based basis on what's supposed to be a

11  sufficiency of the claim analysis.

12          And to their argument, which is a 9019 ruling, by

13  definition equals an 877.6 finding.  Here's why that's not

14  right.  When you evaluated this case, and approving it

15  whether it was a good deal for LCPI, you evaluated the gives

16  and gets between the settling parties, that you know, LCPI

17  and the SunCal trustee, without regard to third parties.

18          And, in fact, you put that in your order, properly

19  so.  We asked for you to put that in your order.  So did

20  Vander (ph) for Scadden (ph) on behalf of the second liens

21  because it was -- that was the matrix in which you were

22  evaluating that analysis.

23          So true what's straight up 9019 analysis when we

24  settled out, we, LCPI -- sorry, LBREP Lakeside, when we

25  settled our claim against the SunCal trustee.  So you could

Page 95

1    have a evaluation under 9019 when between the settling

2    parties you may say that's a fair deal.

3            The question that is unanswered, the question that

4    Tech-Bilt required, and Tech-Bilt's a California Supreme

5    Court case, is, is there proportionate liability?  To get a

6    good faith finding to cut-off the claims between joint

7    tortfeasors, this isn't my language.  This is the Tech-Bilt

8    decision.  And, Your Honor, I really encourage you to take a

9    look at it and specifically it's 380 Cal.3d 488 and look at

10   499.  This is the 1985 case.  It defines what good faith is

11   in California as it relates to 877.6.  And it specifically

12   goes to whether the amount of the settlement is within the

13   reasonable range between the settlement tortfeasors'

14   proportionate share of comparative liability for the

15   plaintiff's interest.

16           What is -- and there's other cases as well, and I

17   think we cited in our papers, it's about did they get a

18   great deal because they under paid thereby requiring us to

19   over pay.  And then the question is, is it out of the

20   ballpark?  Not my language.  That's Tech-Bilt's language.

21           All of those facts have to be evaluated on a

22   record.  And when, you know, respectfully, to the advocacy,

23   but when Mr. Steinberg gets up here and argues facts, and

24   suggests, for example that we had ninety percent of the

25   position that we took out all of our equity, that we didn't

Page 96

1    put money back in, those are demonstrably not true.

2            And while you may not know that, Judge Smith does

3    because Judge Smith saw that record.  They know that we

4    actually didn't make money on the deal.  We lost money.

5    LBREP Lakeside put $38 million back in after taking out the

6    dividend.  And that we didn't earn a profit.  And that when

7    we put forward our record getting the good faith finding in

8    front of her, it wasn't just a stale record.  It was

9    affidavits.  It was affidavit-based after discovery,

10   including affidavits from me and the mediator in the case.

11   And it was done on a record after they settled up, which is

12   fine, which is what the process should be.

13           So our position is, you know, 9019 does not

14   automatically equal an 877.6 finding.  It's an

15   (indiscernible -- 02:11:44) question whether if everybody

16   got a 9019, is it possible?  We believe it is because they

17   can under pay and we can over pay.  And our point on this

18   is, you know, there's a conflation of facts and a conflation

19   of standards.

20           The California law on this isn't just Tech-Bilt.

21   But there are other cases as well.  And, in particular, you

22   know, another case to look at is the Mattco Forge case that

23   we cited.  And in that case an appellate court in California

24   reversed the trial court's decision granting a 90 -- sorry,

25   an 80 -- a good faith finding, under 87.6 because there

Page 97

1    wasn't evidence of disproportionate liability.  There wasn't

2    an evaluation between the two, the settling parties and the

3    non-settling parties.  And without that, the appellate court

4    said, you don't have a sufficient record to enter that

5    finding.  And so that's the Mattco Forge case, that's 3 --

6    38 Cal.App.4th 1337.  That's a Second District decision out

7    of California from '95.

8            And I also -- and encourage the Court to look at

9    the Horton versus Superior Court case, 194 Cal.App.3rd 727,

10   that's a Fifth District decision our of '87 where again in

11   making the determination the Court said the judge is not

12   required to determine whether the settlement is reasonable

13   between the settling parties but rather he's required to

14   determine whether the settlement is reasonable viz a viz the

15   non-settling parties.

16           And that's my point here.  Under 877.5, if you're

17   going to cut-off contribution and equitable indemnification

18   claims under California law, you've got to be able to

19   evaluate both of those settlements.  And our settlement,

20   yes, we paid $13.8 million.  Right, we used cash and

21   insurance proceeds to do so.  Nothing wrong with using

22   insurance proceeds, we paid those premiums.  That's part of

23   what we gave up.

24           THE COURT:  How much of that was insured?

25           MR. MCKANE:  It was approximately forty-five

Page 98

1   percent.  That was a deal that was negotiated with the

2   insureds.

3            MR. STEINBERG:  I didn't hear that.  Say it again.

4            MR. MCKANE:  Forty-five percent.

5            MR. STEINBERG:  Forty-five percent insurance.

6            MR. MCKANE:  Right.  Their payment -- and, Your

7   Honor, if -- I can be more precise.  I don't know that

8   number immediately on the top of my head.  But their

9   settlement, you know, when Mr. Steinberg wants to for

10  advocacy purposes, he takes on the entire first lien group.

11  He's not the first lien group entirely.  He's thirty percent

12  of that is the position of LCPI.  At most what they put in

13  is 3.8 million.  That's what we broke down in our opposition

14  brief.

15           So it's not eleven to twelve million.  It's not --

16  it's not exactly the same.  And we're not in a situation

17  where it's apples to oranges.  We're both joint tortfeasors.

18  That was the allegation.  They like to introduce the concept

19  of apples to oranges because they also lost in the loan.

20  But what they were settling out, that we are saying was

21  inequitable was the liability arising out of the way they

22  structured the loan.  And that's what we took issue with.

23  That's the $50 million issue was it really a $75 million

24  loan or was there a restriction put on at the last minute.

25           Remember, I'm not the borrower.  I'm one of the

Page 99

```
 1    equity owners of the borrower.

 2              THE COURT:  So --

 3              MR. MCKANE:  So you're saying, so what.

 4              THE COURT:  So I just have a better understanding

 5    as to the economics here --

 6              MR. MCKANE:  Yes.

 7              THE COURT:  -- why the parties are energized about

 8    this fight.  This is not a lot of money in the context of

 9    Lehman Brothers.

10              MR. MCKANE:  No, it's not, Your Honor.

11              THE COURT:  It's not even a lot of money in the

12    context of SunCal.  So it's hard for me to judge the

13    motivation for this at this point and what the problem is in

14    simply walking away from this now.  This is, with respect to

15    everybody involved, very old news.  And, to the extent that

16    we're dealing with what amounts to a 12(b)(6) standard on

17    claim disallowance, based on the argument that as a matter

18    of law, you can't bring a claim for contribution and

19    indemnity because of these settlements, you're resisting

20    that.

21              MR. MCKANE:  Absolutely.

22              THE COURT:  Let's just say, for the sake of

23    discussion, that I agreed with you.  What would you be

24    looking for next?

25              MR. MCKANE:  Your Honor, frankly, I think that's
```

Page 100

1    the ultimate getting item.  We have -- I'm not going to go

2    into the substance of settlement discussions.  I will only

3    point to what they said to you their papers which was I was

4    told to take my toys and go home.  Right?

5            I actually think getting past that issue may

6    enable us to resolve this issue and never see you again as

7    it relates to this dispute.  We'd obviously like to see you

8    in other settings.  But -- with -- but that's it.

9            THE COURT:  Both you and Mr. Steinberg seem to

10   agree on that.

11           MR. MCKANE:  Yeah, we do.

12           THE COURT:  That's very sweet.  I appreciate it.

13           MR. MCKANE:  We enjoy this.  I can't believe it's

14   taken this much time and I apologize.

15           But I think if we were to get past that, my point

16   is only this.  I -- thank you for accepting hopefully the

17   point on it's a matter of law.

18           You also cannot accept just those two points.

19   Right?  What they paid versus what we were paid.  We've

20   never been able to take discovery of them as it relates to

21   this last minute restriction.  I have emails from our files

22   from Lehman loan personnel that indicate that it was put on

23   at the last minute.  That would be the focus of any

24   discovery.  But --

25           THE COURT:  But --

Page 101

1          MR. MCKANE:  -- frankly, I think --

2          THE COURT:  -- let's --

3          MR. MCKANE:  -- more important --

4          THE COURT:  -- break in for a second and say --

5     because I have a -- my reaction to that is, is so what?

6          MR. MCKANE:  Right. I actually think --

7          THE COURT:  Because the underlying facts of the

8     claims brought by the SunCal trustee against each of you are

9     what they are.

10         MR. MCKANE:  Right.

11         THE COURT:  They've been settled out.  And they've

12    been settled out for relatively modest sums.  So we all know

13    from experience that that which makes for a good settlement

14    isn't necessarily what makes for a good litigation victory.

15    Settlements take into account all manner of puts and calls.

16         MR. MCKANE:  Uh-huh.

17         THE COURT:  So you get to a certain practical

18    judgment.  We'd rather pay the money than spend however much

19    more we need to spend in litigation expense, risk and

20    uncertainly.  Life's too short.  Let's move on.

21         That's my point right now, too.

22         MR. MCKANE:  Agreed.

23         THE COURT:  Why are you fighting over this?

24         MR. MCKANE:  Right.

25         THE COURT:  Why is this still a matter that

Page 102

```
1     requires your time and the time of your associates?

2              MR. MCKANE:  Yeah.

3              THE COURT:  Why are we in court today fighting

4     over this legal principle?  What's the real economics?

5              MR. MCKANE:  Right.  The real economics are not

6     large, as you sense, and there has been an inability between

7     my client, which is a former affiliate of his client, to be

8     able to come to rest on a number, I think because of this --

9     either because of a fundamental legal disconnect, which is

10    possible, or stubbornness, which is also possible.

11             But I would like to think that getting a ruling on

12    this one way or another will bring the parties closer

13    together to resolve this matter.  That's the goal.

14             THE COURT:  Well, let me say that as a -- just as

15    a matter of principle within the context of this massive

16    bankruptcy, I don't believe that parties ever contemplated

17    that when they obtained orders of separate bankruptcy courts

18    approving their separate settlements that there were

19    reserved rights of indemnity and contribution.

20             And certainly I never assumed and I doubt that

21    Judge Smith ever assumed that there would be further finger

22    pointing and claims made as between the settling parties

23    after the settlements were approved.  We are now years later

24    in the context of a settled process that has been in place

25    in this Court for years relating to claims allowance,
```

Page 103

1    expungement, reconciliation and the like.

2              MR. MCKANE:  Uh-huh.

3              THE COURT:  I'm not sending this to California.

4              MR. MCKANE:  Understood.

5              THE COURT:  I am capable, as is Judge Smith, of

6    applying settled law to a bankruptcy context and I know more

7    about the claims process at this juncture than any other

8    bankruptcy judge in any district in this country.

9              So as to your request that this be transferred to

10   Santa Ana, California, that request is denied.

11             As to the question of whether I can as a matter of

12   law decide now whether parallel 9019 approvals constitute

13   compliance with the good faith standards of 877.6, I suspect

14   I can go either way.

15             MR. MCKANE:  Uh-huh.

16             THE COURT:  I believe that to argue 877.6 at this

17   point is to go over the line of advocacy.  In the ordinary

18   course of bankruptcy administration, 9019 settlements are

19   designed to be final.  And unless that are expressly

20   reserved rights, that's the end of the matter.

21             The technical question which you are raising is

22   one that I believe I could decide in Mr. Steinberg's favor

23   and that that would not be an abuse of discretion and it

24   would not be reversed.

25             I also believe that it would be foolish for your

Page 104

1    clients to spend another nickel on legal expenses to deal

2    with this theoretical question.

3           But I am also troubled that you are raising an

4    issue that bankruptcy judges in approving 9019 settlements

5    don't generally take into consideration and the Lehman

6    Brothers, SunCal duality is something that I have lived with

7    for about four and a half years.

8           These are highly unusual cases in that there have

9    been dueling jurisdictional demands made on both Courts

10   throughout the administration of these cases.  This is

11   simply the latest and I presume last gasp of that.

12          While I am very clear in determining that this

13   Court is the one Court to deal with claims against the

14   Lehman estate, I am less clear as to whether the record is

15   sufficient to make a confident determination as to

16   proportionate liability to the extent that proportionate

17   liability is even a material question to ask about.

18       (Pause)

19          THE COURT:  So what I'm going to do is to give the

20   parties an opportunity to make some further submissions on

21   this point.  I don't want to burden you with the need to

22   further appear.

23          I would like Mr. Steinberg, in a very succinct

24   fashion, and it can be by means of a letter brief, to point

25   me, bullet point by bullet point, to all of the factors that

Page 105

1    would support my determination that the settlement is in

2    good faith and, as a result, there are no contribution and

3    indemnity claims as a matter of law.

4             And I would like Mr. McKane to do the same for his

5    client to prove, if he can, the opposite.

6             I'll take the question under advisement and will

7    issue an order within a matter of weeks after your

8    submission of these letter briefs and I suggest that they be

9    submitted simultaneously without further reply within

10   fifteen days.

11       (Pause)

12            THE COURT:  In the process of your doing this

13   modest incremental work, I think it would be desirable for

14   the parties to spend a moment or two together thinking about

15   whether it is worth spending even one more hour of attorney

16   time to deal with this issue.

17            I candidly find it shocking that this much effort

18   and talent have gone into a matter of virtually no economic

19   significance to either side.  And it's as to that that I am

20   most troubled.  I understand that sometimes dispute

21   resolution seems illusive or parties take hardnosed

22   positions and continue to fight the good fight.  But I am

23   unable to see any material, economic issue involved in this

24   regardless of the outcome.

25       (Pause)

1          THE COURT:  So somebody should blink and if you

2     don't, I'll blink for you.

3          MR. STEINBERG:  Your Honor, may I just ask one

4     question?  I understand what you said but in Mr. McKane's

5     brief -- this will just help tailor what I'm going to put in

6     the letter brief if we get to that stage, and I would ask

7     that because I actually have a vacation for next week, if we

8     can have 21 days instead of 15 days to do that.

9          THE COURT:  That's fine with me.

10         MR. STEINBERG:  Okay.  The one thing that he said,

11    and I don't really mean to try to pin him down, but I write

12    a different brief if this is what he said.  He said that the

13    joint tortfeasor aspect of what happened here is that he was

14    sued for breach of fiduciary duty and that we were sued for

15    breach of fiduciary duty and that's the overlap that creates

16    the issue.

17         If that's the case, then I write one type of brief

18    which is a little different than what I've written before

19    because, frankly, I'm not even sure if I was sued -- if my

20    client was sued for breach of fiduciary duty, but if they

21    did, I'm pretty sure that that one was a throw away type

22    argument.  But if that's what he thinks that he over paid to

23    the extent that my client under paid for that, then I'm

24    writing a brief that's directed to that issue only.  And if

25    that's what it is, then I ask Mr. McKane to just clarify

Page 107

1      that's what he was talking about.

2             MR. MCKANE:  Well, I'll start with the fact that

3      I'd heard seven things that he stipulated to at the

4      beginning, one of them was they were joint tortfeasors and

5      we were operating under that.

6             When he backtracked on that, I tried to highlight

7      one aspect in which we were joint tortfeasors and that was

8      the draft complaint that was attached to the opposition to

9      the motion for him to foreclose on the loans, in which count

10     six said, under breach of fiduciary duty that we were one of

11     the defendants and he was going to be one of the defendants.

12     That was one aspect of it.

13            But it was in response to his, I perceived,

14     retreating from his initial position that he agreed that for

15     the purposes of this motion, we were joint tortfeasors that

16     I brought that up.  It was a rebuttal point.

17            MR. STEINBERG:  I take it, again, because I said I

18     didn't want to pin him down, is that he doesn't think that

19     --  because we're doing simultaneous briefing, that he

20     doesn't think that that if I -- that his brief is going to

21     be limited to the joint tortfeasor aspect of a breach of

22     fiduciary duty and he's looking at this in a larger way.

23     And if that's what -- if that's what you just said, then I

24     understand what I have to brief.

25            THE COURT:  Okay.  I'm just looking for a --

Page 108

1          MR. MCKANE:  Yeah.

2          THE COURT:  -- succinct statement as to why each

3     of you win.  Don't repeat your existing briefing but you can

4     point me to sections of your briefs or to cases that you

5     think I should pay particular attention to.

6          With no offense, this is an interesting but

7     seemingly unimportant dispute.

8          MR. STEINBERG:  And I take it that if I said to

9     Mr. McKane that we should both limit ourselves to ten pages

10    that would be okay?

11         THE COURT:  Oh, I'd like you --

12         MR. MCKANE:  Absolutely.

13         THE COURT:  -- to limit yourselves to five pages.

14         MR. STEINBERG:  And the five pages, I just wanted

15    to be able to -- I didn't -- I thought Your Honor was

16    looking for something short and so five pages is fine with

17    us.

18         THE COURT:  Do I here four pages?

19      (Laughter)

20         THE COURT:  Five pages it'll be.

21         MR. STEINBERG:  Thank you.

22         THE COURT:  Okay.

23         MR. MCKANE:  Thanks, Your Honor.

24         THE COURT:  We're adjourned.

25    (Whereupon these proceedings were concluded at 12:36 PM)

Page 109

1                         I N D E X

2                         R U L I N G

3

4                                              PAGE        LINE

5     Turnberry Centra Sub, LLC, et al. v.      66          23

6     Lehman Brothers Holdings Inc., et al.

7     [Adversary Case No. 09-01062].

8     Motion to Dismiss.

9

10    Motion by Lehman Brothers Holdings Inc.   105          6

11    and Lehman Commercial Paper Inc. For an

12    Order (i) Determining that the LCPI

13    Settlement was entered into in Good

14    Faith Pursuant to California Code of

15    Civil Procedure paragraphs 877 and 877.6,

16    and, Based on Such Good Faith Finding

17    and for Other Reasons, (ii) Disallowing

18    and Expunging Proofs of Claim Number 28845

19    and 28846

20

21

22

23

24

25

Page 110

```
 1                    C E R T I F I C A T I O N

 2

 3      I, Nicole Yawn, certify that the foregoing transcript is a

 4      true and accurate record of the proceedings.

 5

 6      Nicole          Digitally signed by Nicole Yawn
                        DN: cn=Nicole Yawn, o, ou,
 7      Yawn            email=digital1@veritext.com,
                        c=US
                        Date: 2013.06.14 15:02:04
 8                      -04'00'

 9

        I, Pamela A. Skaw, certify that the foregoing transcript is

10

        a true and accurate record of the proceedings.

11

12      Pamela          Digitally signed by Pamela A
                        Skaw
13      A Skaw          DN: cn=Pamela A Skaw, o, ou,
                        email=digital1@veritext.com,
14                      c=US
                        Date: 2013.06.14 15:02:39
15                      -04'00'

16

        I, Jamie Gallagher, certify that the foregoing transcript is

17

        a true and accurate record of the proceedings.

18      Jamie           Digitally signed by Jamie
                        Gallagher
19      Gallagher       DN: cn=Jamie Gallagher, o, ou,
                        email=digital1@veritext.com,
                        c=US
20                      Date: 2013.06.14 15:03:22 -04'00'

21      Veritext

22      200 Old Country Road

23      Suite 580

24      Mineola, NY 11501

25      Date:  June 14, 2013
```