WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jacqueline Marcus

Attorneys for Lehman Brothers Holdings Inc.
and Certain of its Affiliates

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | : | **08-13555 (JMP)** |
| | : | |
| Debtors. | : | **(Jointly Administered)** |

------------------------------------------------------------------x

**REPLY TO DEBORAH E. FOCHT'S SECOND AMENDED**
**RESPONSE TO PLAN ADMINISTRATOR'S OMNIBUS OBJECTION TO CLAIMS**

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI") as Plan Administrator under the

*Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its*

*Affiliated Debtors* (ECF No. 22737) for the entities in the above referenced chapter 11 cases,

files this reply (the "Further Reply") to *Creditor's Second Amended Response and Opposition to*

*Plan Administrator's Omnibus Objection and Reply to Claims Filed by Deborah E. Focht; and,*

*Creditor's Motion for Order of Allowance and Payment Deeming Claim Nos. 34380 and 34381*

*As Timely Filed; Or In The Alternative Motion For Stay, Discovery, Determinations; and,*

*Extension of Time to File Amended Claims And Response* (ECF No. []*[1]*) (the "Second Amended

Response") and respectfully represents as follows:

---

[1] The Plan Administrator understands that Focht has submitted this document to the Court and that it will
appear on the docket of the above-referenced Chapter 11 Cases shortly.

## PRELIMINARY STATEMENT

1.       It has been four and a half years since the commencement of BNC

Mortgage LLC's ("BNC") Chapter 11 Case.[2]  More than forty-five months have passed since

Focht filed her claims.  The Objection has been pending for nearly five months.  Despite the

benefit of all of this time, Focht remains unable to articulate a plausible basis for her remaining

claims against LBHI [Claim No. 34381] (the "LBHI Claim") and BNC [Claim No. 34380] (the

"BNC Claim," together with the LBHI Claim, the "Remaining Claims").  This failure does not

arise from a lack of effort or sophistication.  In connection with the initial hearing on the

Objection, which took place on April 25, 2013 (the "April 25th Hearing"), Focht, who appears to

be an active investor in residential real property, filed two responses purporting to explain and

expand upon the allegations and complaints set forth in the Focht Claims (the "Initial

Responses") (ECF Nos. 35026 and 36165).  While the Initial Responses are prolix and difficult

to follow, their apparent intent is to establish two theories of liability: Focht generally alleges

that BNC engaged in certain wrongful conduct in connection with the origination of the Loan

and that LBHI conspired to manufacture a default so that it could collect millions under certain

derivative contracts or insurance policies.

2.       Following the disallowance of three of the five Focht Claims at the April

25 Hearing, the Court provided Focht with an additional opportunity to clarify her arguments and

supplement them with actual evidence in support of her theory of the case.  Rather than taking

the Court up on its offer, however, the Second Amended Response and the Affidavit of Deborah

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms
in the Objection and/or the Reply.

US_ACTIVE:\44281613\2\58399.0003

E. Focht filed in connection therewith (the "<u>Affidavit</u>") (ECF No. []³) simply double down on the same warmed-over allegations and implausible theories that were unpersuasive when first raised in the Focht Claims and the Initial Responses.

   3. Following its review of the Second Amended Response and the Affidavit, the Plan Administrator has only been able to identify three issues that warrant a supplemental response.⁴ First, Focht has expanded on her cryptic statement in the Initial Responses that "Lehman took funds" by alleging that she didn't intend to enter into the Loan with BNC and that her actual plan was to purchase the Property outright or with seller-financing through what she calls a "money purchase loan." According to Focht, BNC derailed this transaction by absconding with her purchase money and replacing it with the proceeds of the Loan, which was then wrongfully forced into default. *See* Affidavit, ¶¶6(d), (e). Second, Focht attempts to link BNC to the wrongful conduct that she alleges occurred after the Loan was sold into the securitization trust by challenging BNC's evidence regarding the disposition of Loan and providing documents that she claims demonstrate Lehman's continued involvement with the Loan after the securitization. *See* Affidavit, ¶¶7 – 9, 11. Finally, unwilling to abandon her claim that LBHI held insurance policies or derivative contracts related to the Property, Focht, somewhat inexplicably, attaches excerpts from two title insurance policies, only one of which is related to the Property and neither of which names LBHI as a beneficiary. *See* Affidavit, ¶10.

---

³ The Plan Administrator understands that Focht has submitted this document to the Court and that it will appear on the docket of the above-referenced Chapter 11 Cases shortly.

⁴ The majority of the issues raised in the Second Amended Response, such as the timeliness of the Remaining Claims, Focht's discovery demands, the statute of limitations on her fraud claims under Florida law, the TILA – related claims, and the vast conspiracy that was allegedly perpetrated by third parties following the transfer of the Loan, were addressed in the Objection and the Reply and will not be addressed again herein.

Presumably, her intent is to suggest that if BNC historically was the beneficiary of a title insurance policy, LBHI must also have stood to gain from Focht's default.

4.      As set forth in greater detail below, none of the additional information provided by Focht alters in any way the fundamental deficiencies of the Remaining Claims, namely that they fail to offer a plausible theory of liability on the part of either LBHI or BNC, much less meet Focht's burden of proving same by a preponderance of the evidence. Accordingly, the Plan Administrator respectfully requests that the Remaining Claims be disallowed and expunged with prejudice.

## THE REMAINING CLAIMS SHOULD BE EXPUNGED

### A.  The BNC Claim

5.      In order to bolster the BNC Claim, Focht first argues that she intended to purchase the property outright and that BNC took her money and swindled her into entering into the Loan.  Specifically, Focht alleges that she

> paid funds for the purchase of property through Equity Exchange Services, Inc., in which checks were given to Professional Title Services via $73,769.63, $25,587.36, $10,000.00, $897.51, $69,19, $378.02, which totals $110,701.71… . BNC and Lehman Brothers took my funds and made the loan look like a mortgage refinance dated October 18, 2002, instead of a money purchase loan of the property.

*See* Affidavit, ¶¶6(d)(e).

6.      In support of these allegations, Focht offers a number of cancelled checks.[5]  *See* Exhibit L to the Affidavit.  Focht alleges that the funds represented by these checks were to be used to acquire the Property, but that BNC somehow diverted such funds into its own account and replaced them with the proceeds of the Loan.  Focht's theory suffers from any

---

[5] In addition to the below, the Plan Administrator reserves its right to contest the validity and admissibility of these documents.

number of inconsistencies and deficiencies.  First, all of the checks are made out to Professional

Title Services, not BNC.[6]  Focht offers no evidence or explanation as to how or why Professional

Title Service would have transferred the proceeds of Focht's checks to BNC.  The simpler and

more likely explanation for the disposition of Focht's funds is, of course, that they were

transferred to the Seller of the Property as part of the purchase price.

7.    Indeed, this scenario is consistent with a far more plausible explanation of

the transaction.  According to publically available information from the Sarasota County

Property Appraiser, Focht paid $139,000 for the Property.  This means that she would have been

required to put up a down payment of approximately $28,600 (not including closing costs) on top

of the amounts she received from BNC in connection with the Loan.[7]  *See* Exhibit 1 hereto.

Contemporaneously with her acquisition of the Property, Ms. Focht was also in the process of

closing on a second property located at 1021 Allendale Ave., Sarasota, Florida (the "Allendale

Property").  *See* Exhibit F to the Affidavit; *see also* Deed for the Allendale Property attached

hereto as Exhibit 2.  Professional Title Services also appears to have handled the closing for the

Allendale Property transaction.  *See* Mortgage for Allendale Property attached hereto as Exhibit

3.  BNC provided financing in the amount of $71,200 for the Allendale Property.  *Id*.  The

purchase price for the Allendale Property appears to have been $138,000, meaning that Focht

needed a down payment of approximately $66,800 (plus closing costs) in connection with her

acquisition of the Allendale Property.  *See* Sarasota County Property Appraiser's Report,

---

[6] Professional Title Services appears to have been acting as the escrow agent and document preparation
service in connection with this transaction.  *See* Exhibit A to the Affidavit.

[7] The Sarasota County Property Appraiser's report may be obtained at http://www.sc-
pa.com/search/parcel_detail.asp?year=2013&propid=0383-04-0003.

attached hereto as Exhibit 4.[8]  The down payments described above, together with the various closing costs associated with the two properties, likely account for most or all of the amounts that Focht allegedly deposited with Professional Title Services.  In order to acquire these properties, the proceeds of the two BNC loans and the amounts represented by Focht's checks must have been transferred to the sellers.  Oddly, Focht herself provides evidence in support of this theory.  One of the checks that Focht alleges was to be used for the acquisition of the Property contains a specific reference to "Allendale" on the memo line suggesting that it was specifically earmarked for the Allendale transaction and, therefore, unrelated to Focht's acquisition of the Property.  *See* Exhibit L to the Affidavit (Ck No.1112).

8.      Thus the "evidence" that Focht purports to offer in support of her position actually contradicts her theory of the cases and, instead, undermines her credibility.  Like most people who invest in the residential real property market, Focht financed her acquisitions of the Property and the Allendale Property with a combination of debt and equity.  The checks submitted to Professional Title Services represent the equity portion of Focht's investment in the two properties while the loans from BNC represent the debt.  The fact that Focht's investment did not generate the returns she hoped for is undoubtedly disappointing, but it does not entitle her to an allowed claim against BNC.

9.      Focht next argues that BNC is liable for the alleged wrong doing of the various third parties that were involved with the Loan after it was transferred into the securitization trust.  Focht employs a two part strategy in support this argument.  First, she makes a series of unsupported assertions about certain alleged flaws in the testimony of Lehman employee Daniel Glanz, which testimony was adduced at the April 25 Hearing and attached to

---

[8] The Sarasota County Property Appraiser's report may be obtained at http://www.sc-pa.com/search/parcel_detail.asp?year=2013&propid=0054-13-0027.

US_ACTIVE:\44281613\2\58399.0003

the Reply.  *See* Affidavit, ¶¶9, 11.  This attempt, however, is wholly inadequate as the only

evidence Focht is able to muster in support of her position consists of random statements about

unrelated databases and desperate assertions that have no basis in the record.  *See* Affidavit, ¶11.

This is simply insufficient to overcome Mr. Glanz's testimony and Lehman's business records.

 10. Second, Focht purports to offer evidence of BNC's continued involvement

with the Loan after it was sold into the securitization trust.  This evidence consists primarily of

two exhibits.  The first is a series of corrective assignments executed by Bill Koch, an employee

of an entity called Select Portfolio Servicing, Inc. ("SPS").  *See* Affidavit, ¶7 (b).  This argument

appears to be based on Focht's misunderstanding of two critical points: (i) Mr. Koch is not an

employee of BNC, was not acting on BNC's behalf, and his actions are not attributable to BNC;

and (ii) Mortgage Electronic Registration Systems, Inc. ("MERS") merely held the Mortgage as

nominee for BNC – which is another way of saying that, in order to facilitate the securitization

process, MERS held the legal, but not the beneficial, interest in the Mortgage.  BNC retained the

beneficial interest in the Mortgage and transferred such interest, together with the Note, into the

securitization trust in 2002.  Thus when MERS assigned its interest in the Mortgage to Wells

Fargo in 2009, it was acting on behalf of the securitization trust, not BNC, as BNC no longer

retained an interest in the Mortgage.  More importantly, the Florida State Court must have

already addressed the propriety of the corrective assignments in the Foreclosure Action.  Focht's

attempt to re-litigate the issue in connection with the BNC Claim is, therefore, an improper

collateral attack on the Florida State Court's rulings in the Foreclosure Action.

 11. The second document appears to be a printout of an unnamed entity's

servicing records.  *See* Affidavit, Exhibit M.  Focht doesn't bother to authenticate this document,

nor does she explain why she believes it is a reliable indicator of Lehman's interest in the Loan.

Moreover, Focht's interpretation of this printout is erroneous. According to Focht, Lehman is listed as "INV HDR," which means "Investment Holder." *See* Affidavit, ¶7(i). A cursory review of the printout reveals Focht's error. Directly beside the term "INV" is the notation "ARC 2002-BC10" – the abbreviation for the securitization trust that acquired the Loan in 2002 (the full name is Structured Asset Securities Corporation – Amortizing Residential Collateral Trust Mortgage Pass-Through Certificates, Series 2002-BC10). Thus, even if the court were to assume that Focht is correct that "INV' means investor, the most plausible reading of the printout is that ARC 2002-BC10, not Lehman, is listed as the investor. The Plan Administrator does not know what the "HDR" next to the word "Lehman" signifies. Given that it includes the address of one of Lehman's former offices, it could be related to a duty retained by Lehman to forward correspondence to the relevant trustee. In sum, Focht cannot satisfy her burden of proving the validity of the BNC Claim by a preponderance of the evidence. The Plan Administrator, therefore, respectfully requests that the BNC Claim be disallowed and expunged in its entirety.

### B. LBHI Claim

12.     The LBHI Claim, filed in the amount of $1,104,000.00, is based on Focht's unsupported allegation that LBHI "[m]ay be Actual Lender holding insurance or Derivative Agreements." Focht has been unable to produce any evidence of the existence of such an insurance policy or derivative contract. This is likely because there is no such insurance policy or derivative contract. *See* April 25, 2013 Hearing Tr. at 23, 25.[9] More importantly, even if Focht could establish the existence of such an insurance policy or derivative contract, she has failed to explain, in any of her voluminous pleadings, why *she* would have any right to payment in connection therewith.

---

[9] An excerpt of the April 25, 2013 Hearing Transcript is attached hereto as Exhibit 5.

US_ACTIVE:\44281613\2\58399.0003

13.     In an apparent effort to resuscitate her argument, Focht offers excerpts from two title insurance policies. *See* Exhibit O to the Affidavit. The first, identified as File Number 19056, appears to relate to the Allendale Property, which is not the subject of the LBHI Claim. Moreover, LBHI is not listed as a beneficiary. The second, identified as Policy Number FO2-0154377, appears to be a vanilla title insurance policy providing coverage to BNC, not LBHI. Focht chose not to include a complete copy of this title insurance policy, so it is impossible to make a definitive statement regarding the coverage. However, it should be noted that title insurance policies generally insure against defects in title (i.e. a latent claim on the related real property that is superior to the borrower's title), not against the borrower's default on its repayment obligations.[10] Further, LBHI is not a beneficiary of this policy and Focht fails even to attempt to explain how LBHI would be entitled to any of the proceeds thereof.

14.     Accordingly, neither of the title insurance policies supports Focht's theory of liability. The Plan Administrator can only assume, therefore, that Focht's intent is to imply that the existence (at least as of October 23, 2002) of these insurance policies is indicative of other derivative contracts or insurance policies held by LBHI. Such conjecture, however, is purely speculative and is contradicted by the testimony of Mr. Glanz, which was based on an actual review of Lehman's records. In sum, Focht cannot satisfy her burden of proving the validity of the LBHI Claim by a preponderance of the evidence. The Plan Administrator, therefore, respectfully requests that the LBHI Claim be disallowed and expunged in its entirety.

## RESERVATION OF RIGHTS

15.     In the event that the Court denies the Objection with respect to the Remaining Claims and/or grants the relief requested in the Initial Responses or the Second

---

[10] It is also worth noting that the insurance coverage available under this policy is 1/10 of the face amount of the LBHI Claim.

9

Amended Response, the Plan Administrator reserves the right to object to the substantive basis

(including the validity and amount) of the Remaining Claims.  Additionally, the Plan

Administrator reserves the right to conduct discovery as to the Remaining Claims and any

matters raised in the Initial Responses, the Second Amended Response or the Affidavit.

## CONCLUSION

For the reasons set forth above, in the Reply, and in the Objection, the Plan

Administrator respectfully requests that the Court enter an order disallowing and expunging the

Remaining Claims in their entirety and granting such other and further relief as is just.

Dated: June 24, 2013
     New York, New York

          /s/ Jacqueline Marcus
          Jacqueline Marcus

          WEIL, GOTSHAL & MANGES LLP
          767 Fifth Avenue
          New York, New York  10153
          Telephone:  (212) 310-8000
          Facsimile:  (212) 310-8007

          Attorneys for Lehman Brothers Holdings
          Inc. and Certain of its Affiliates

**<u>Exhibit 1</u>**
**(Laurel Rd. Appraisal)**



Sarasota County
# Property Appraiser

PA@SC-PA.com

**Bill Furst**

## 2013 Detail Information for Parcel 0383-04-0003

**Ownership**
WELLS FARGO BANK NA TTEE
(STRUC ASSET SEC CORP AMORT
RES COLL TR SERIES 2002-BC10)
C/O POWELL PEARSON LLP
399 CAROLINA AVE STE 100
WINTER PARK, FL, 32789
Incorrect Mailing Address?

**Situs Address**
530 LAUREL RD, NOKOMIS, FL, 34275

**Parcel Description**



**Associated Personal Property**
No Personal Property

**Parcel Characteristics**
| | |
|---|---|
| Land Area: | 11,708 Sq. Ft. |
| Incorporation: | UNINCORPORATED |
| Delineated District: | N/A |
| Subdivision Code: | 0000 |
| Use Code: | N/A |
| Sec/Twp/Rge: | 31-38S-19E |
| Census: | 121150022032 |
| Zoning: | OPI |

**2013 Values (Available Mid July)**
| | |
|---|---|
| Just (Market) Value: | N/A |
| Land Value: | N/A |
| Improvement Value: | N/A |
| Assessed Value: | N/A |
| Homestead: | N/A |
| Exemptions: | N/A |
| Total Taxable: | N/A |

**Improvements (Preliminary)**
| | |
|---|---|
| Total Building Area: | 1,706 |
| Living Area: | 1,232 |
| Living Units: | 2 |
| Bed / Bath: | 1 Bed/2 Bath/1 Half |
| Pool: | No |
| Year Built: | 1950 |

Property records have been updated with 2013 information. To view 2012 values, please click the 2012 button above.

## Transfer History

| Transaction Date Recorded | Consideration | Transaction Qual. Code | Instrument # | Seller/Grantor | Instrument Type |
|---|---|---|---|---|---|
| 9/19/2011 | $21,100 | 12 | 2011127965 | FOCHT,DEBORAH E | CT |
| 8/6/2004 | $108,400 | 11 | 2004154466 | FOCHT,DEBORAH E | QC |
| 9/27/2002 | $139,000 | 01 | 2002175527 | GREG VINE ENTERPRISES INC, | WD |
| 11/15/1990 | $76,000 | 01 | 2256/0483 | MADDOX ISAAC S | WD |
| 8/1/1978 | $0 | 01 | 1256/1541 | | NA |

Show Transaction Qual. Codes    Show Instrument Types

## Exemptions

**Year Code Description Amount**
No Exemptions Found

*Serving Our Community with Pride and Accountability*

Sarasota County Property Appraiser - Ph. 941.861.8200 Fax. 941.861.8260 - 2001 Adams Lane, Sarasota, FL, 34237 - Disclaimer

**Exhibit 2**
**(Allendale Ave. Deed)**

# This Warranty Deed

Made this 4th day of ~~September~~ October A.D. 2002
by **FRANK NADELL and THERESA M. NADELL,
husband and wife**

RECORDED IN OFFICIAL RECORDS
INSTRUMENT # 2002175539 1 PG (2)
2002 OCT 23 04:41 PM
KAREN E. RUSHING
CLERK OF CIRCUIT COURT
SARASOTA COUNTY,FLORIDA
FMILLER  Receipt#233301
Doc Stamp-Deed:    966.00

hereinafter called the grantor, to
**DEBORAH E. FOCHT**

whose post office address is: 2655 Bay St.
Sarasota, Fl. 34237-7623

**Grantees' Tax Id # :**

hereinafter called the grantee:

(Whenever used herein the term "grantor" and "grantee" include all the parties to this instrument and the heirs, legal representatives and assigns of individuals, and the successors and assigns of corporations)

**Witnesseth,** that the grantor, for and in consideration of the sum of $ 10.00 and other valuable considerations, receipt whereof is hereby acknowledged, hereby grants, bargains, sells, aliens, remises, releases, conveys and confirms unto the grantee, all that certain land situate in **Sarasota** County, Florida, viz:

Lot 19, Block B, BAHIA VISTA HIGHLANDS, as per plat thereof
recorded in Plat Book 1, pages 128 and 129, of the Public
Records of Sarasota County, Florida.

Subject to all valid covenants, restrictions and easements of record.

**Parcel Identification Number: 0054-13-0027**

**Together** with all the tenements, hereditaments and appurtenances thereto belonging or in anywise appertaining.

**To Have and to Hold,** the same in fee simple forever.

**And** the grantor hereby covenants with said grantee that the grantor is lawfully seized of said land in fee simple; that the grantor has good right and lawful authority to sell and convey said land; that the grantor hereby fully warrants the title to said land and will defend the same against the lawful claims of all persons whomsoever; and that said land is free of all encumbrances except taxes accruing subsequent to December 31, **2001**

**In Witness Whereof,** the said grantor has signed and sealed these presents the day and year first above written.

*Signed, sealed and delivered in our presence:*

Name: _Mary Ann Fox_    Name & Address: **FRANK NADELL**    [LS]

Name: **MELISSA CALDWELL**    Name & Address: **THERESA M. NADELL**    [LS]
4738 Charing Cross Cir.
Sarasota, Fl. 34241

Name: _____    Name & Address: _____    [LS]

Name: _____    Name & Address: _____    [LS]

State of **FLORIDA**
County of **SARASOTA**

The foregoing instrument was acknowledged before me this 4th day of ~~September~~ October , 2002 , by

**FRANK NADELL and THERESA M. NADELL, husband and wife**

of 1

**<u>Exhibit 3</u>**
**(Allendale Ave. Mortgage)**

RECORDED IN OFFICIAL RECORDS
INSTRUMENT # 2002175540 22 PGS
2002 OCT 23 04:41 PM
KAREN E. RUSHING
CLERK OF CIRCUIT COURT
SARASOTA COUNTY,FLORIDA
FMILLER Receipt#233301
Doc Stamp-Mort:    249.20
Intang. Tax:    142.40

Return To:

BNC MORTGAGE, INC.
P.O. BOX 19656
IRVINE, CA 92623-9656

This document was prepared by:

RETURN TO: 214
PROFESSIONAL SERVICES OF SARASOTA
6578 N. LOCKWOOD RIDGE RD.
SARASOTA, FLORIDA 34243

[Space Above This Line For Recording Data]

2002175540

# MORTGAGE

MIN 100122200000209228

Loan No.: **ANA7345FOCH**

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated **October 17, 2002**    ,
together with all Riders to this document.
**(B) "Borrower"** is **DEBORAH   FOCHT** , a single woman

Borrower is the mortgagor under this Security Instrument.
**(C) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
**(D) "Lender"** is **BNC MORTGAGE, INC., A DELAWARE CORPORATION**

FLORIDA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS        Form 3010  1/01

VMP -6A(FL) (0005).01
Page 1 of 16        Initials:
VMP MORTGAGE FORMS - (800)521-7291

OFFICIAL RECORDS INSTRUMENT # 2002175540 22 pgs

Lender is a **corporation**
organized and existing under the laws of **Delaware**
Lender's address is **P.O. BOX 19656, IRVINE, CA 92623-9656**

**(E) "Note"** means the promissory note signed by Borrower and dated **October 17, 2002**
The Note states that Borrower owes Lender **seventy-one thousand two hundred and 00/100**
Dollars
(U.S. $ **71,200.00**         ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than **November 1, 2032**
**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the
Property."
**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [x] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [x] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [x] Other(s) [specify] |

**Prepayment Waiver Rider**

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
**(L) "Escrow Items"** means those items that are described in Section 3.
**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

Initials:

OFFICIAL RECORDS INSTRUMENT # 2002175540 22 PGS

**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

### TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the COUNTY          [Type of Recording Jurisdiction] of SARASOTA, FLORDIA          [Name of Recording Jurisdiction]:

LOT 19, BLOCK B, BAHIA VISTA HIGHLANDS, AS PER PLAT THEREOF RECORDED IN PLAT BOOK 1, PAGES 128 AND 129, OF THE PUBLIC RECORDS OF SARASOTA COUNTY, FLORIDA.

Parcel ID Number:                                    which currently has the address of
1021 SOUTH ALLENDALE AVENUE                                             [Street]
SARASOTA                          [City], Florida 34237          [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

VMP®-6A(FL) (0005).01                    Page 3 of 16          Initials: [signature]          Form 3010  1/01

PDF file created from a TIFF image by tiff2pdf - 2002175540.pdf  http://www.clerk.co.sarasota.fl.us/oprapp/cache/2002175540.pdf

OFFICIAL RECORDS INSTRUMENT # 2002175540 22 pgs

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment



Page 4 of 16

Initials: 

Form 3010  1/01

PDF file created from a TIFF image by tiff2pdf - 2002175540.pdf    http://www.clerk.co.sarasota.fl.us/oprapp/cache/2002175540.pdf

OFFICIAL RECORDS INSTRUMENT # 2002175540 22 PGS

can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest

  -6A(FL) (0005).01                Page 5 of 16          Initials:         Form 3010   1/01

OFFICIAL RECORDS INSTRUMENT # 2002175540 22 pgs

shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

 -6A(FL) (0005).01

Page 6 of 16

Initials: 

Form 3010    1/01

PDF file created from a TIFF image by tiff2pdf - 2002175540.pdf    http://www.clerk.co.sarasota.fl.us/oprapp/cache/2002175540.pdf

OFFICIAL RECORDS INSTRUMENT # 2002175540 22 pgs

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

 

OFFICIAL RECORDS INSTRUMENT # 2002175540 22 pgs

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

 -6A(FL) (0005).01          Page 8 of 16          Initials:           Form 3010   1/01

PDF file created from a TIFF image by tiff2pdf - 2002175540.pdf    http://www.clerk.co.sarasota.fl.us/oprapp/cache/2002175540.pdf

OFFICIAL RECORDS INSTRUMENT # 2002175540 22 pgs

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

 

OFFICIAL RECORDS INSTRUMENT # 2002175540 22 PGS

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of

OFFICIAL RECORDS INSTRUMENT # 2002175540 22 Pgs

any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers



OFFICIAL RECORDS INSTRUMENT # 2002175540 22 PGS

unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the

OFFICIAL RECORDS INSTRUMENT # 2002175540 22 pgs

purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.



OFFICIAL RECORDS INSTRUMENT # 2002175540 22 Pgs

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.  Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise).  The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property.  The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure.  If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument.  Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Attorneys' Fees.**  As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

**25. Jury Trial Waiver.**  The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

 

DF file created from a TIFF image by tiff2pdf - 2002175540.pdf      http://www.clerk.co.sarasota.fl.us/oprapp/cache/2002175540.pdf

OFFICIAL RECORDS INSTRUMENT # 2002175540 22 PGS

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

_____ (Seal)

Mary Ann Fylow

_____ DEBORAH FOCHT    AKA DEBORAH E. FOCHT    -Borrower

Cathy J. Haitz
CATHY J. HAITZ

2655 BAY STREET
SARASOTA, FL 34237    (Address)

_____ (Seal)
-Borrower

_____ (Address)

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Address)

_____ (Address)

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Address)

_____ (Address)

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Address)

_____ (Address)

6/19/2013 4:33 PM

OFFICIAL RECORDS INSTRUMENT # 2002175540 22 pgs

**STATE OF FLORIDA,**
Sarasota County, ss:
The foregoing instrument was acknowledged before me this 18th of October, 2002 by
**DEBORAH FOCHT**

AKA Deborah E Focht

who is personally known to me or who has produced FL. Dr. Lic as identification.



Notary Public

MARY ANN FULLER
COMMISSION NUMBER
DD0I7009
MY COMMISSION EXPIRES
DEC. 14 2005

PDF file created from a TIFF image by tiff2pdf - 2002175540.pdf    Pg 32 of 47p://www.clerk.co.sarasota.fl.us/oprapp/cache/2002175540.pdf

OFFICIAL RECORDS INSTRUMENT # 2002175540 22 pgs

Loan No.: ANA7345FOCH

**ADJUSTABLE RATE RIDER**
**(LIBOR 6-Month Index - Rate Caps)**

**THIS ADJUSTABLE RATE RIDER** is made this     **17th day of October, 2002** , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to     **BNC MORTGAGE, INC., A DELAWARE CORPORATION**     (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

**1021 SOUTH ALLENDALE AVENUE, SARASOTA, FL 34237**
[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT.  THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.**  In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial interest rate of     **7.400%**. The Note provides for changes in the interest rate and the monthly payments, as follows:

**"4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
**(A) Change Dates**
The interest rate I will pay may change on the first day of     **November, 2004** , and on that day every     **6th**     month thereafter. Each date on which my interest rate could change is called a "Change Date."
**(B) The Index**
Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for 6-month U.S. dollar-denominated deposits in the London market based on quotations of major banks, as published in the "Money Rates" section of The Wall Street Journal. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."
If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

---

ADJUSTABLE RATE RIDER-LIBOR 6 MONTH INDEX-Single Family-                                    Rev. 10/95
Page 1 of 2

Borrower Initials

FLADJR1

DF file created from a TIFF image by tiff2pdf - 2002175540.pdf    http://www.clerk.co.sarasota.fl.us/oprapp/cache/2002175540.pdf

**OFFICIAL RECORDS INSTRUMENT # 2002175540 22 Pgs**

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **Seven And 100/1000** percentage points ( **7.100** %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125 %). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **9.400** % or less than **7.400** %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **ONE AND 00/100** percentage point(s) ( **1.00** %) from the rate of interest I have been paying for the preceding **6** months. My interest rate will never be greater than **14.400** % or less than **7.400** %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice. "

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in pages 1 and 2 of this Adjustable Rate Rider.

_____ (Seal)                    _____ (Seal)
**DEBORAH FOCHT**          - Borrower                                          - Borrower
AKA DEBORAH E. FOCHT

_____ (Seal)                    _____ (Seal)
                           - Borrower                                          - Borrower

_____ (Seal)                    _____ (Seal)
                           - Borrower                                          - Borrower

---

**ADJUSTABLE RATE RIDER-LIBOR  6 MONTH INDEX**-Single Family-                    Rev. 10/95
Page 2 of 2

Borrower Initials : _____  _____  _____  _____  _____  _____

FLADJR2

6/19/2013 4:33 PM

DF file created from a TIFF image by tiff2pdf - 2002175540.pdf    http://www.clerk.co.sarasota.fl.us/o/app/cache/2002175540.pdf

OFFICIAL RECORDS INSTRUMENT # 2002175540 22 pgs

# 1-4 FAMILY RIDER
## Assignment of Rents

Loan Number    **ANA7345FOCH**

THIS 1-4 FAMILY RIDER is made this **17th day of October, 2002**, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Note to

**BNC MORTGAGE, INC., A DELAWARE CORPORATION**

("Lender") of the same date and covering the property described in the Security Instrument and located at:

### 1021 SOUTH ALLENDALE AVENUE, SARASOTA, FL 34237
[Property Address]

**1-4 FAMILY COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT.** In addition to the Property described in the Security Instrument, the following items are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, panelling and attached floor coverings now or hereafter attached to the Property, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this 1-4 Family Rider and the Security Instrument as the "Property."

**B. USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**C. RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required by Covenant 5 of the Security Instrument.

**D. ASSIGNMENT OF LEASES.** Upon Lender's request, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph 6, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**E. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until (i) Lender has given Borrower notice of default pursuant to paragraph 22 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

---

**1-4 FAMILY RIDER/ASSIGNMENT OF RENTS**

B-RD14-1

6/19/2013 4:33 PM

DF file created from a TIFF image by tiff2pdf - 2002175540.pdf    http://www.clerk.co.sarasota.fl.us/oprapp/cache/2002175540.pdf

**OFFICIAL RECORDS INSTRUMENT # 2002175540 22 pgs**

If Lender gives notice of breach to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and  managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the  Property without any showing as to the inadequacy of the Property as security.

If  the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Covenant 9 of the Security Instrument.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not and will not perform any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**F.  CROSS-DEFAULT PROVISION.**  Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

BY SIGNING BELOW,  Borrower accepts and agrees to the terms and provisions contained in this 1-4  Family Rider.


_Deborah E. Focht_ _____ (Seal)          _____ (Seal)
**DEBORAH FOCHT**              Borrower                                              Borrower
AKA DEBORAH E. FOCHT

_____ (Seal)          _____ (Seal)
                              Borrower                                              Borrower

_____ (Seal)          _____ (Seal)
                              Borrower                                              Borrower


**1-4 FAMILY RIDER/ASSIGNMENT OF RENTS**

Page 2 of 2

R 8014 2

PDF file created from a TIFF image by tiff2pdf - 2002175540.pdf    http://www.clerk.co.sarasota.fl.us/oprapp/cache/2002175540.pdf

OFFICIAL RECORDS INSTRUMENT # 2002175540 22 pgs

RECORDING REQUESTED BY, AND
WHEN RECORDED MAIL TO:

**BNC MORTGAGE, INC.**
**P.O. BOX 19656**
**IRVINE, CALIFORNIA 92623-9656**

(Space above this line for Recorder's use)

## PREPAYMENT CHARGE WAIVER RIDER

Loan No.:       **ANA7345FOCH**
Application No.: **ANA7345FOCH**

THIS PREPAYMENT CHARGE WAIVER RIDER (the "Prepayment Rider") is made this **17th day of October, 2002** , and is incorporated into and shall be deemed to amend and supplement (i) that certain Mortgage, Deed of Trust or Security Deed of the same date (the "Security Instrument") given by Borrower, as trustor or mortgagor, in favor of **BNC   MORTGAGE,   INC.,   A DELAWARE CORPORATION**

("Lender"), as beneficiary or mortgagee, and (ii) that certain promissory note (the "Note") of the same date executed by Borrower in favor of Lender. To the extent that the provisions of this Prepayment Rider are inconsistent with the provisions of the Security Instrument and/or the Note, the provisions of this Prepayment Rider shall prevail over and shall supersede any such inconsistent provisions of the Security Instrument and/or the Note.

For value received, the receipt and sufficiency of which are hereby acknowledged, Section 5 of the Note is amended to read in its entirety as follows:

**"5. BORROWER'S RIGHT TO PREPAY**
I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.
I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes."

---

PREPAYMENT CHARGE WAIVER RIDER (ADJ)

Page 1 of 2

FLPWVRI

DF file created from a TIFF image by tiff2pdf - 2002175540.pdf    http://www.clerk.co.sarasota.fl.us/oprapp/cache/2002175540.pdf

OFFICIAL RECORDS INSTRUMENT # 2002175540 22 pgs

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Prepayment Rider.

_____          _____
Borrower                                                            Borrower
**DEBORAH FOCHT**   AKA DEBORAH E. FOCHT

_____          _____
Borrower                                                            Borrower


_____          _____
Borrower                                                            Borrower


_____  (Space below this line for Acknowledgment)  _____


_____
**PREPAYMENT CHARGE WAIVER RIDER (ADJ)**

Page 2 of 2

FLPWVR2

6/19/2013 4:33 PM

**Exhibit 4**
**(Allendale Ave. Appraisal)**

Parcel : 0054-13-0027                    http://www.sc-pa.com/search/parcel_detail.asp?year=2013&propid...



## Sarasota County
# Property Appraiser

PA@SC-PA.com

# Bill Furst

## 2013 Detail Information for Parcel 0054-13-0027

**Ownership**
FOCHT DEBORAH E
BALKE DARLENE
MARCOLINA SHARON
1613 INGRAM AVE
SARASOTA, FL, 34232
Incorrect Mailing Address?

**Situs Address**
1021 ALLENDALE AVE, SARASOTA, FL, 34237

**Parcel Description**

**Parcel Characteristics**
| | |
|---|---|
| Land Area: | 5,475 Sq. Ft. |
| Incorporation: | CITY OF SARASOTA |
| Delineated District: | N/A |
| Subdivision Code: | 0351 |
| Use Code: | N/A |
| Sec/Twp/Rge: | 28-36S-18E |
| Census: | 121150005031 |
| Zoning: | RSF4 |

**Associated Personal Property**
No Personal Property

**2013 Values (Available Mid July)**
| | |
|---|---|
| Just (Market) Value: | N/A |
| Land Value: | N/A |
| Improvement Value: | N/A |
| Assessed Value: | N/A |
| Homestead: | N/A |
| Exemptions: | N/A |
| Total Taxable: | N/A |

**Improvements (Preliminary)**
| | |
|---|---|
| Total Building Area: | 1,752 |
| Living Area: | 1,672 |
| Living Units: | 2 |
| Bed / Bath: | 2 Bed/2 Bath |
| Pool: | No |
| Year Built: | 1925 |

Property records have been updated with 2013 information. To view 2012 values, please click the 2012 button above.

## Transfer History

| Transaction Date | Recorded Consideration | Transaction Qual. Code | Instrument # | Seller/Grantor | Instrument Type |
|---|---|---|---|---|---|
| 8/6/2004 | $108,700 | X3 | 2004154465 | FOCHT,DEBORAH E | QC |
| 10/4/2002 | $138,000 | 01 | 2002175539 | NADELL,FRANK | WD |
| 2/22/2000 | $81,400 | 01 | 2000053203 | HEYRMAN BROOK TTEE, | WD |
| 2/19/1998 | $100 | 11 | 3069/0477 | HEYRMAN BROOK TTEE | OT |
| 10/7/1997 | $100 | 11 | 3021/1347 | MURPHY KEVIN C | WD |
| 2/21/1997 | $81,000 | 01 | 2941/2010 | MOSCONE ROBERT J JR | WD |
| 11/18/1991 | $100 | 11 | 2348/1427 | MOSCONE ROBERT J & KATHRYN | QC |
| 7/17/1990 | $70,000 | 01 | 2227/1385 | BURCHARD NORMA L | WD |
| 6/1/1987 | $0 | 11 | 1962/1572 | | NA |

Show Transaction Qual. Codes                    Show Instrument Types

## Exemptions

**Year Code Description Amount**
No Exemptions Found

*Serving Our Community with Pride and Accountability*

Sarasota County Property Appraiser - Ph. 941.861.8200 Fax. 941.861.8260 - 2001 Adams Lane, Sarasota, FL, 34237 - Disclaimer

**<u>Exhibit 5</u>**
**(Transcript of April 25 Hearing)**

Page 1

1    STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 08-13555-JMP

4    - - - - - - - - - - - - - - - - - - - -x

5    In the Matter of:

6

7    LEMAN BROTHERS HOLDINGS INC., et al.,

8

9              Debtors.

10

11   - - - - - - - - - - - - - - - - - - - -x

12

13                        United States Bankruptcy Court

14                        One Bowling Green

15                        New York, NY 10004-1408

16                        April 25, 2013

17                        10:00 AM

18

19   B E F O R E:

20   HON. JAMES M. PECK

21   U.S. BANKRUPTCY JUDGE

22

23

24

25   ECRO:  TIFFANY

Page 2

1    HEARING re Doc #36007 - Four Hundred Third Omnibus Objection to

2    Claims

3

4

5    HEARING re Doc #34303 - Plan Administrator's Omnibus Objections

6    to Claims filed by Deborah Focht

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Theresa Pullan

Page 3

1    A P P E A R A N C E S :

2

3    WEIL, GOTSHAL & MANGES LLP

4          Attorneys for Debtors

5          767 Fifth Avenue

6          New York, NY   10153

7

8    BY:   ZAW WIN, ESQ.

9

10

11   TELEPHONIC APPEARANCES:

12

13   DEBORAH E. FOCHT

14

15

16

17

18

19

20

21

22

23

24

25

Page 23

th

1   telling you is that on December 30  of 2002, this loan was sold

2   and it was sold to a third party.  The name of that third party

3   was not recorded in this system, and then there were no further

4   records maintained on this loan.  Generally, once Lehman sold

5   the loan, it did not keep track of it, it had no relationship

6   to it and it just did not interact with that loan any further.

7   Q.   So following the date of sale which is listed here as

8   December 30th, 2002, were you able to uncover any documents or

9   other evidence that would suggest that Lehman had anything else

10  to do with this loan?

11  A.   No, I searched not only in this system but we have just

12  electronic archives that we maintain postpetition, did a search

13  for them for both the property address and the loan number, and

14  I was not able to locate any further documentation or any

15  further records.

16          MR. WIN:  Thank you.

17          THE COURT:  I have a question Mr. Glanz.  Are there

18  any records regardless of whether it's with reference to this

19  loan that Lehman maintains that purport to connect the

20  insurance contracts or derivative contracts with mortgage loans

21  that had been originated by BNC at any time?

22          THE WITNESS:  Not that I'm aware of.

23          THE COURT:  All right.  Thank you.  Ms. Focht, do you

24  have any questions you would like to ask of Mr. Glanz?

25          MS. FOCHT:  Your Honor, I don't want to, I believe

Page 24

1   that I misunderstood what was going on, but I could barely hear

2   him, I'll just say that and [indiscernible].  The court

3   reporter probably did and I can listen to it later on.

4           THE COURT:  We're unable to hear you.  We're unable

5   to hear you in a manner sufficient to record what you're saying

6   on the record of this hearing.  Are you speaking on a regular

7   land line?

8           MS. FOCHT:  Yes.

9           THE COURT:  Can you please speak up as, I don't want

10  you to scream into your phone and I'm not suggesting that it's

11  your phone's fault, but our equipment here is not picking you

12  up very clearly.

13          MS. FOCHT:  Thank you, Your Honor.  I was wondering

14  if he said that there were no records.  Is that what he was

15  saying, he had no records?

16          THE COURT:  He's saying that the only records that

17  relate to your loan within the entire data entry system

18  maintained by Lehman Brothers is a one line statement which

19  reads, if you don't have it in front of you, buyer, the street,

20  that means the loan was sold to an entity, a financial

21  institution, or a securitization trust or some third party that

22  is not Lehman related, that's what that term, the street,

23  means.  There's a loan I.D. number which is 107127821; there's

24  an address, 530 Loral Road; there's a city, Nokomis, Florida;

25  there's a zip code, 34275; there's a servicer listed, Option

Page 25

1    One Mortgage is the name of the servicer; there's a sold

2    settled date which is 12/30/02.  And there's another line, the

3    last line it says lien position and it says one, I assume that

4    means it's a first lien mortgage.  Is that right, Mr. Glanz?

5              MR. GLANZ:  Correct, Your Honor.

6              THE COURT:  All right.  So that's the only

7    information that is available in the Lehman system.  I also

8    asked Mr. Glanz a much more general question which was whether

9    regardless of whether we're talking about your loan, but

10   talking about all loans that may have been originated by BNC to

11   any and all borrowers that may have obtained financing through

12   that source, did Lehman Brothers maintain any records that were

13   identified as either insurance contracts or derivate contracts

14   that would be identified to a particular loan.  And the answer

15   was no.  That means based upon this inquiry that I'm satisfied

16   that there is no discovery to be had here because there are no

17   documents and I am satisfied that Mr. Glanz is a credible and

18   responsible witness who is able to provide information

19   concerning the records of Lehman Brothers.

20             Is there anything more that you, however, would wish

21   to ask Mr. Glanz?

22             MS. FOCHT:  Yes, Your Honor, thank you.  I am blaming

23   myself because I have completely different paperwork

24   [indiscernible] and it doesn't name Option One and I'm just

25   wondering is there another person I can speak to who would have

Page 26

1    access to records and who was providing records to Wells Fargo

2    [indiscernible] or any other source regarding Care Bank,

3    Capital Corp, regarding Aurora Loan Services, regarding Lehman

4    Capital, which is a division of Lehman Brothers Holdings Inc.,

5    and that would have been dated as of September 1st, 2002

6    [indiscernible] servicing agreement.

7            THE COURT:  Mr. Glanz, do you understand the

8    question?

9            MR. GLANZ:  I'm not entirely sure what the question

10   for me is, Your Honor.

11           THE COURT:  Ms. Glanz, excuse me, Ms. Focht, do you

12   have the ability to travel to New York to participate in a

13   further hearing because I find that unless we're able to fix

14   our equipment that your participation by telephone is

15   insufficient for our purposes to be able to hear and respond to

16   what you have to say.  I want you to have a full and fair

17   hearing, but I must tell you, I don't think that at least I'm

18   able to understand all that you're trying to do here.  It may

19   be that you are seeking discovery unrelated to the bankruptcy

20   cases and if that's true, that's not anything you'll be able to

21   get through this bankruptcy court.

22           I also have an understanding that the property in

23   question has been foreclosed, that you mentioned in your last

24   question the financial institution Wells Fargo.  I understand

25   that Wells Fargo was a trustee for securitization trust that