CONTINUED HEARING DATE AND TIME: June 27, 2013 at 10:00 a.m. (Eastern Time)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

IN RE:                                          Chapter 11
LEHMAN BROTHERS HOLDINGS INC., ET AL.,          : Case No.: 08-13555 (JMP)
    DEBTOR,                               : (Jointly Administered)

------------------------------------------------------------------------x

BNC MORTGAGE LLC,                               Chapter 11
    DEBTOR,                               : Case No.: 09-10137 (JMP)

LEHMAN BROTHERS HOLDINGS INC.
    DEBTOR,                               : Case No.: 08-13555 (JMP)

------------------------------------------------------------------------x

                               : DEBORAH E. FOCHT,
                               : CREDITOR

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

RECEIVED
JUN 20 2013
U.S. BANKRUPTCY COURT
SO DIST OF NEW YORK

**CREDITOR'S SECOND AMENDED RESPONSE AND OPPOSITION TO PLAN
ADMINISTRATOR'S OMNIBUS OBJECTION AND REPLY TO CLAIMS
FILED BY DEBORAH E. FOCHT;
AND,
CREDITOR'S MOTION FOR ORDER OF ALLOWANCE AND PAYMENT
DEEMING CLAIM NOS.: 34380 AND 34381, AS TIMELY FILED; OR IN THE
ALTERNATE MOTION FOR STAY, DISCOVERY, DETERMINATIONS; AND,
EXTENSION OF TIME TO FILE AMENDED CLAIMS AND RESPONSE**

    The Creditor, Deborah E. Focht, (herein "Creditor") files her second amended response

and opposition to the Plan Administrator's Objections and Reply [Docket # 36737 Filed

04/22/2013] to *"Creditor's Amended Response To Plan Administrator's omnibus objection to*

*Claims Filed By Deborah E. Focht; Creditor's Motion For Order of Allowance and Payment*

*Deeming Claim Nos.: 34380, 34381, 42914, 42915, 42916, as Timely Filed; Or In The Alternate*

*Motion For Stay, Discovery Requested; And, Extension Of Time To File Amended Claims And Response",* filed on March 13 2013.

1. The Creditor filed her response and objections to Lehman Brothers Holdings Inc. ("LBHI") or the Plan Administrator's ("Plan Administrator") omnibus objections seeking to disallow and expunge the Creditor's Claims in their entirety. [Docket #36165 Filed 03/25/2013].

2. This Opposition and amendments are a result of receiving the Plan Administrator's *Reply* only two days prior to the hearing, which was continued from April 25, 2013, and due to this Court's Order dated April 30, 2013, [Docket # 36993] granting the Plan Administrators Omnibus Objection, providing relief in favor of the Debtor's only with respect to Focht Claims 42914, 42915 and 42916. And, that the legal and factual bases set forth in the Focht Objection and the Focht Reply established just cause for the relief granted and that due to sufficient cause appearing, also Ordered that the relief requested in the Focht Objection and Reply is granted to the extent provided that the hearing on Focht Claims 34380 and 34381 is adjourned until June 13, 2013, (later adjourned to June 27), or as soon thereafter as counsel may be heard. (Exhibit "Hearing Transcript") [Docket # 37125 - 04/26/2013 - Redacted Transcript access will be restricted through 7/25/2013].

3. The Creditor initially set forth her proof of claims and her pre-petition statement dated September 22, 2009 (defined in section 101(5) of the Bankruptcy Code), as required, in order to preserve her claims [*Claim Nos.: 34380, 34381*] against the Debtors BNC Mortgage Inc., a.k.a. BNC Mortgage LLC, (hereinafter "BNC"), and Lehman Brother Holdings, Inc. ("LBHI"), ("*Statement In Support Of Proof of Claim; Objections And Motions To Lift Automatic Stay [*11 U.S.C. 362*], Order Production of All Documents In Possession of BNC Mortgage Inc., Lehman Brothers Holdings Inc., Etal, Order Blocking Transfer Of Core*

*Assets Under The Bankruptcy Abuse Prevention & Consumer Protection Act, 11 U.S.C.*

*§363(o), Subject Sales Or Transfer By New Purchaser(s) Subject To Provisions of Consumer*

*Claims and Defenses of Consumer Disclosure/Credit Transaction or Contract; And Order*

*Exceptions to Discharge Under 11 U.S.C. § 523 Brought Against Debtors' BNC Mortgage*

*LLC and/or Lehman Brothers Holding Inc., Etal.*").

4. Because this Court already ruled on the Plan Administrator's objections to several claims, the
   Creditors will focus on the remaining proof of *Claim Nos.: 34380 and 34381*. And, on the
   Creditor's opposition of the Plan Administrator's *Reply* and to strike to the Plan
   Administrator's declaration and evidence. [Docket #36165 Filed 03/25/2013].

5. The Creditor requests this court to enter Orders that the Creditor meets the criteria for
   Exceptions to Discharge under 11 U.S.C. § 523, of the Bankruptcy Code.

6. The Creditor also requests for order to deem the Claimant Creditor's claims as timely filed,
   order for allowance and payment of claims, as authorized under 11 U.S.C. § 502, of the
   Bankruptcy Code, and estimated for purpose of allowance under Code § 502(c).

7. Or, in the alternate, the Creditor motions for an enlargement of the time to file motions,
   amend claims and response, for the court to determine amendments, exceptions,
   classification, status and timeliness of the claims, and to order the Debtors to answer
   questions or for discovery purposes, and in support, states the following:

## I – Relief From Automatic Stay

8. The Creditor initially requested relief from the automatic stay pursuant to Rule 4001 of the
   Bankruptcy Rules and 11 U.S.C. § 362 of the Bankruptcy Code. Section 362(a) provides that
   the filing of a bankruptcy petition operates as a stay of collection and enforcement actions.

The Creditor submits that good cause existed to vacate the automatic stay of 11 USC 362, and to allow the Creditor to obtain a retroactive order for the following:

a.  The Creditor requires relief from the automatic stay to join the Debtors in the state court action.  Section 362(d) authorizes the court, upon request of a "party in interest," to grant relief from the stay, "such as terminating, annulling, modifying, or conditioning such stay." 11 U.S.C. § 362(d)(1).  The Creditor is owed money from BNC and Lehman Brothers for the Creditor's purchase of property on what was revealed to instead be a known bad loan, and later revealed to be passing off the purchase as a refinanced loan.

b.  The Creditor is also due for any amount paid, or due of debt claimed, or placed by any judgment obtained against the subject property, plus interest.

c.  The Creditor also requests relief from the stay due to lack of adequate protection.  The Creditor initially motioned for relief from the stay in order to prevent any sales, trust account activity, purchased assets, agreements, etc., or any transfer of the subject loan documents, because the Creditor's money loan purchase was dealt in bad faith, leaving a forged mortgage and a dishonored note, which was not negotiated or delivered in good faith.

d.  The purpose of the automatic stay is to provide debtors with "protection against hungry creditors" and to assure creditors that the debtor's other creditors are not *"racing to various courthouses to pursue independent remedies to drain the debtor's assets." In re Tippett*, 542 F.3d 684, 689-90 (9th Cir. 2008) (citing *Dean v. Trans World Airlines, Inc.*, 72 F.3d 754, 755-56 (9th Cir. 1995)); *see also In re Johnston*, 321 B.R. 262, 273-74 (D. Ariz. 2005).

9. The Creditor requests that this court issue an order for the Debtors to answer questions, due to the lack of notice of the creditor's meeting, or in the alternate, issue an order that the Creditor may proceed and that discovery be had for production of documents, to allow questioning the Debtors involved, in order to properly send interrogatories identifying all parties involved, and for any deposition needed at trial as they are "reasonably calculated to lead to discovery of admissible evidence", to properly amend her claims, and in order to save costs and time. Thereafter, the Creditor shall serve the Debtor parties requests for production within the scope of Rule 26(b), pursuant to Rule 34(a) of the Federal Rules of Civil Procedure, for the Debtors' to produce all documents in its possession which is electronically stored information, under Rule 34(a)(1)(A), which is cost efficient via simply emailing electronically in compatible form Rule 34 (b)(1) (C).

10. The Creditor sought to join the Debtors and maintain her counterclaims and defense in the state court foreclosure action by WFBT, due to the forged loan documents, which names BNC as mortgagee, MERS, as nominee for the mortgagee, of a mortgage forged dated October 18, 2002, and BNC as lender of a void adjustable rate note dated October 17, 2002. LBHI and BNC cannot claim prejudice by this relief from stay since they had control to have the stay request heard and instead waited nearly four years to challenge the Creditor's claims. And, in the interest of judicial economy and efficiency, and that due process would clearly be best served, by providing relief of stay or adjourning this matter pending the discovery proceedings.

11. Any party affected by the stay should be entitled to seek relief. (3 COLLIER'S ON BANKRUPTCY ¶ 362.07[2] (Henry Somers & Alan Resnick, eds. 15th ed., rev. 2009). Relief from stay hearings are limited in scope—the validity of underlying claims is not

litigated. *In re Johnson*, 756 F.2d 738, 740 (9th Cir. 1985). As one court has noted, "[s]tay

relief hearings do not involve a full adjudication on the merits of claims, defenses or

counterclaims, but simply a determination as to whether a creditor has a colorable claim." *In

re Emrich*, 2009 WL 3816174, at *1 (Bankr. N.D. Cal. 2009). Nevertheless, in order to

establish a colorable claim, a movant for relief from stay bears the burden of proof that it has

standing to bring the motion. *In re Wilhelm*, 407 B.R. 392, 400 (Bankr. D. Idaho 2009).

12. The Creditor requires relief from the automatic stay, due to the inability to be heard when

filing her petition. The court has authority under Fed. R. Bankr. P. 9024, which adopts Fed.

R. Civ. P. 60, providing relief from judgment or order due to mistake, inadvertence,

excusable neglect, newly discovered evidence, fraud and other factors.

13. Therefore, the Creditor requests that this court enter order for relief from the automatic stay

or order for discovery proceedings to be had.


**II - Debtors Failed To Provide Adequate Notice And The Creditors Claims May Be Deem
Timely Under the Excusable Neglect Doctrine**

14. The Creditor requests that this court determine or enlarge the time to include the Creditor's

remaining claims # 34380 and # 34381to be decided, which the Debtors' claimed that the

Creditor filed proof of claims one day past the bar date deadline. *"Debtor's Fortieth

Omnibus Objection"*, dated September 13, 2010, Claim # 34380, as seen in Debtor's

("Exhibit A" - #157 BNC Mortgage LLC Case # 09-10137 (JMP) Claim filed 09/23/2009 -

$160,537.26* [Docket 11305 Filed 09/13/2010]) and *"Debtors' One Hundred Fifty-Eighth

Omnibus Objection to Claims"*, dated July 11, 2011, Claim # 343810, also seen in Debtor's

also (Exhibit "A" # 14 Lehman Brothers Holdings Inc.– 08-13555 (JMP) - 09/23/2009 34381

- $1,104,000.00* Late-Filed Claim (* Indicating claim contains unliquidated and/or undetermined amounts). [Docket 18399 Filed 07/11/201]).

15. The Creditor filed her Response to the *"Debtor's Fortieth Omnibus Objection"*, dated September 13, 2010, which also inadvertently responds to the *"Debtor's One Hundred–Fifty Eighth Omnibus Objection"* in *"Creditor's Objection to Notice of Debtors' Fortieth Omnibus Objection Claims (Late-Filed Claims); And, Motion To Compel Production of All Documents and agreements In Possession of BNC Mortgage LLC, Lehman Brothers Holdings Inc., Etal, Pursuant To Rule 2004 of the Federal Rules of Bankruptcy Procedure"*, dated November 4, 2010. [Docket # 12656 Filed 11/5/2010].

16. LBHI or the Plan Administrator's Reply to the Creditor's Response [Docket 36737 filed 04/22/2013] reserved their objections regarding late claims for the remaining claims. However, the this court should order the claims timely because the Debtors should've kept the hearing date after the Creditor already explained the claims delays and technicalities of filing, which cause prejudice to the creditor. And, the second filed claims have already been ' denied, therefore, is amended in this motion as related to the initially filed and remaining claims.

17. The Creditor never received the bar date notice and assumed she was on the list of schedules, and therefore, would receive all notices and orders. The Creditor is not familiar with bankruptcy proceedings and was unaware of bar date filing deadlines, and mostly realizes what is expected from articles on the Internet and later learned from the Epiq DebtorMatrix Docket.

18. LBHI or the Plan Administrator's *Reply* does not provide a proper response nor valid objections to the remaining claims to be decided # 34380 and # 34381. The Debtors' replied

that the claims were received one day late, on September 23, 2009, by Epiq Bankruptcy

Solutions, LLC and the Legal Team. (*"Creditor's Statement and Claims attached to the Plan

Administrator's Omnibus Objection"* as Exhibit "A" "Page 19 – 33 of 120") [Docket #

34303 Filed 01/29/13]. However, the Debtors did not deny that the Creditor sent Epiq and

sent via overnight mail to this court the same day as the Bar date deadline. (Exhibit "R" "

Receipt"). And, the Debtors have not denied the Creditor's Response to Debtor's objections

to timely filed proof of claims, which consisted of the following: (1) That the Creditor's

receipt of express mailing proof of claims to the Court is dated September 22, 2009, which is

the same day as the bar date; (2) that the Epiq Solutions' website provided statements that

Epiq would file the proof of claims to the court if received; and, (3) that Epiq Solutions and

the Lehman legal team received notice of the claims the same day as the bar date. (Exhibit

"R" Receipt and Email).

19. Therefore, the Creditor requests this Court deny any late Claim objections by the Debtor, or

in the alternate, if considered one day late, to enlarge the time for filing under the doctrine of

excusable neglect or any other power the court may have.

### Plan Administrator or LBHI Withdrew All Its Late Claims Objections

20. The proof of claims was filed since September 2009, and the objections the Creditor received

were "Notice(s) of Hearings" for late claims objections. However, the Creditor also received

about eight "Notice(s) of Adjournment of Hearing / Notice of Adjournment of Debtors One

Hundred Fifty-Eighth Omnibus Objection to Claims (Late-Filed Claims)". The last hearing

cancelled by the Debtors was filed under *"Claims For Which Objection Is Withdrawn

Without Prejudice"*, dated 5/31/12. (see Debtors Claims objection withdrawn # 08-13555-

jmp Doc 28283 Filed 05/31/12 – Creditor listed on "Pg 3 of 7" and on" Pg 7 of 7".).

21. confirming the Plan [ECF No. 23023], which became effective on March 6, 2012. LHBI or
the Plan Administrator Debtors, under the Modified Third Amended Joint Chapter 11 Plan of
Lehman Brothers Holdings Inc. and Its Affiliated Debtors for the entities in the above-
referenced chapter 11 cases, had withdrawn, without prejudice, all of its late claim objections
of the Creditor's claims regarding claims listed on its annexed "Exhibit A", which is also
verified in its omnibus objections, stating the following objection withdrawals of the
Creditor's claims:  However, the Creditor already received notice of allowed claims.

22. he Plan Administrator listed "*Focht Claim Grounds for Objection*" (page 9).  The Plan
Administrator's statement admits (under Para. 9 and 10.) that all of the Debtors' 40th and
158th omnibus claims objections were withdrawn without prejudice.  First, on "*May 31, 2012
... as they relate to Focht Claims 34380 and 34381 (ECF No. 28283), filed on September 23,
2009*".  And the remaining objections were withdrawn under "*Debtors' 40th and 158th
omnibus objections, as they relate to Focht Claims 42914, 42915 and 42916 on January 23,
2013 (ECF Nos. 34121 and 34122)*".

23. Therefore, because all of these scheduled hearings were adjourned by the Debtors, because
all late claim objections were withdrawn, and because the Creditor already received notice of
allowed claims, this court should order that the remaining Creditor's claims are deemed
timely filed.

## III - OBJECTION TO PLAN ADMINISTRATOR'S STATEMENTS AND EVIDENCE

24. The Creditor objects to all of the Plan Administrator's *Reply* statements to the remaining
claims, because the Debtors' have not provided any live witness or contact information, and
have not produced any document or any valid proof showing the loan documents were
transferred or delivered properly.

25. The Creditor averred that the Debtors were involved in the transfer of the subject loan documents without providing any consideration or value in return.

26. This court can clearly draw the conclusion that funds were taken and that the mortgage and note documents were materially altered, forged or fraudulent.

27. And the Debtors' statements and evidence still does not negate the fact the Creditor could not possibly sign for or agree to two different loans rate agreements, nor on two different dates.

28. The Creditor also objects to the Debtor's *Reply* that: *"2. The Focht Claims arise out of a 2002 mortgage loan that was originated by BNC Mortgage LLC ("BNC") and subsequently sold into a securitization trust called "Structured Asset Securities Corporation – Amortizing Residential Collateral Trust Mortgage Pass-Through Certificates, Series 2002-BC10"."* Because the Creditor was never given any document or any valid proof showing the loan documents were sent to this trust account nor any valid transfer or delivery of these documents.

29. The Creditor requests an extension of time to file further objections to the Debtor's *Reply* because the Debtor's *Reply* is confusing this case with its *Reply* being intermixed with the other claims, which have already been denied, and therefore, requires a clearer understanding to the Creditor and this court.

30. The Plan Administrator does not appear to be responding to the Creditor's proof of purchase and the right to have the funds returned to the Creditor.

31. The Creditor also objects to the Plan Administrator's *Reply* statements and its Declaration dated April 22, 2013, of Daniel Glanz, Lehman Brothers, Vice president, who has been with Lehman since September of 2001. (Debtor's Exhibit "1" and "Hearing Transcript" [Docket #

37125 - 04/26/2013 - Redacted Transcript Submission Due By 5/28/2013. Transcript access will be restricted through 7/25/2013]).

32. Mr. Glanz was heard during the hearing held on April 25, 2013, submitted in his Declaration in support of the Debtor's or Plan Administrator's Omnibus Objection and the Reply, provided statements and testimony that was not sworn under oath to, and provided no contact information nor from anyone regarding his consultation with employees of LBHI, for the Creditor to contact or even prepare for questioning.

33. The Creditor objects on the grounds that Mr. Glanz has not shown the ability to testify to the facts of the Creditor's claims because his only evidence is unreliable and reveals that he does not have any personal knowledge of the facts. And, because Mr. Glanz is merely the custodian of records basing his review of the business records from a whole loan tracking system at LBHI, which is a database that could easily be manipulated. (Exhibit "1").

34. Mr. Glanz certified under Fed. R. Evid. 803(6) or 902(11), that the *"records attached as Exhibit 1 to this declaration are business records of the regularly conducted activity of LBHI" and that he is "a records custodian qualified to authenticate these records."*

35. The Creditor motions to strike Mr. Glanz's evidence and testimony because he did not personally view any original loan documents. The Creditor objected during the hearing, however, preserves a claim of error to the Debtor's submission of its evidence because she was not afforded ample time before the hearing as the declaration and evidence was only received two days prior to the hearing. And, the Creditor may preserve her claim of error on the rulings of evidence under the Best Evidence Rules, or Rule 103(a), which provides that a party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party, and (1) if the ruling admits evidence, a party, on the record: (A)

timely objects or moves to strike; and (B) states the specific ground, unless it was apparent

from the context; or (2) if the ruling excludes evidence, a party informs the court of its

substance by an offer of proof, unless the substance was apparent from the context.  And

because the evidence violates Rule, 103(a)(1)(A) of The Federal Rules of Evidence and

because Mr. Glanz's evidence document is not reliable and exposes many contradictions, due

to the following:

a.  Mr Glanz's testimony and evidence merely recites an extract, a report from an electronic

"Hold On Tracking" database;

b.  Mr. Glanz's evidence is merely one page with a typed in heading line and another line,

stating "Buyer - The Street / Loan Id - 107127821 / Address City State Zip - 530 Laurel

Road Nokomis FL 34275 / Servicer - Option One Mortgage / Sold Settle Date - 12/30/02

0:00 / Lien Position - 1".  This information does not address the Creditor's claims nor

show proof of any valid transfer or that the loan documents were sold into a trust account.

(Debtor's Exhibit 1 (Business Records)).

c.  Mr. Glanz's declaration verifies that he was not involved with the subject documents in

October 2002, because he states that: *"2. ... From 2007 to the Commencement Date, my

primary responsibility at LBHI was running the whole loan tracking group."* (Exhibit "1"

#2 Pg 2);

d.  Mr. Glanz's did not declare having personal knowledge of the subject loan documents

and instead bases his decision on an explanation of paper work printed out of a database,

declaring that: *"13. Based on my knowledge of and familiarity with the business records

attached here to as Exhibit 1, I offer the following explanation of Exhibit 1.  14. The

whole loan tracking data shows the loan ownership history of a particular loan. The first*

*column represents the buyer. The notation contained in the first column ("The Street") is shorthand for a non-Lehman third party. The second column shows the internal reference number that Lehman assigned to the Loan. These internal identification numbers generally do not correspond to the loan numbers assigned to a loan by the originator or servicer and which may be included on the various loan documents. Columns three through six provide information on the location of the real property related to the Loan. Columns seven and eight, respectively, list the servicer at the time the Loan was sold to a non-Lehman entity and the date of such sale. Column 9 provides the priority of Loan."* (Exhibit "1" #13- 14 Pg 4).

e.  Mr. Glanz declares that the subject "loan" was sold on December 30, 2002 based on a database that could be manipulated: *"3. The system does not continue to track loans once they have been transferred to third parties." (Exhibit "1" #3 Pg 2). "15. Exhibit 1, therefore, shows that the Loan was sold to a third party on December 30, 2002 and that, since that time, none of the Chapter 11 Estates have had a direct interest in the Loan or the Property."* (Exhibit "1" #15 Pg 4). *"17. The system contains no further information on the Loan meaning that there is no record of BNC or LBHI having an interest in the Loan after December 30, 2002."* (Exhibit "1" #17 Pg 4). However, the Creditor was never given any notice of any sale transfers;

f.  And, these assertions conflict with other discovery provide to the Creditor. Mr. Glanz may not even know whether the loan was sold and may have been looking at a pay off belonging to the other property that was mixed up in the discovery records, and after being informed by its affiliate Service Provider, Select Portfolio Servicing, Inc. ("SPS") was collecting on the wrong loan account. (Exhibit "P" "Option One Pay Off");

g. Mr. Glanz's claim that Lehman was no longer involved because the loan was sold December 30, 2002, is also not reliable because discovery produced an earlier Lehman Brothers agreement already claimed between: *"Fairbanks Capital Corp., as Servicer; Lehman Capital, a Division of Lehman Brother holdings, Inc., as Seller; And Aurora Loan Services Inc., As Master Servicer, for Structured Asset Securities Corporation Amortizing Residential Collateral Trust Mortgage Pass-Through Certificates, Series 2002-BC10, "Securitization Servicing Agreement, Dated as of December 1, 2002".* (Exhibit "Q" "Lehman Agreement SSA Dec 1, 2002" # 000146 – discovery produced by WFBT in state court action).

h. Mr. Glanz's claims that: *"17. The system contains no further information on the Loan meaning that there is no record of BNC or LBHI having an interest in the Loan after December 30, 2002."* (Exhibit "1" #17 Pg 4). However, further discovery produced shows the contrary as displayed in the *"MSP Loan Master Maint. & Display"* document dated "12/19/07 - 07:05:41", listing Lehman as "INV HDR", which appears to mean "Investment Holder". And, this date coincides with when SPS already knew it was collecting on the wrong loan account. And, thereafter, SPS would've contacted Lehman Brothers, where instead of discussing the matter with the Creditor, decided to pass this on to another party to file for foreclosure. (Exhibit "M" "INV HDR" # – 001071). The document showing Lehman as an Investment Holder also contradicts Mr. Glanz's testimony during the hearing that *"The Hold On Tracking platform was built to be the system of record to maintain a record of all the loans that Lehman [indiscernible] purchased and either held or sold and it was a place for Lehman to keep track of the*

*loans that it owned, get regular updates on their performance and ultimately track if they*

*were sold, that sale of those mortgages."* (Hearing Transcript).

i.  Lehman Brothers was involved in the sale or transfer of the documents, before and after
    BNC and Lehman Brother filed for bankruptcy, due to the following:

    i.  The mortgage document reveals "Leh" handwritten on the first page of the
        mortgage document. (Exhibit "C" - '"Leh" filed on July 10, 2008, as "original" by
        WFBT, in the state court case);

    ii. There are two "Corporate Assignment of Mortgage" documents, dated September
        26, 2008 and February 13, 2009, (Exhibit "E" "Assignments"), created by SPS
        employee, Bill Koch, each purporting to be assigned from BNC and MERS as
        payee to WFBT, however these assignments violate transfers laws because of the
        following:

    iii. These assignments conflict with Lehman Brother's declaration and statement that
        BNC and Lehman Brothers sold the loan and no longer have a direct interest in the
        Loan or the Property, since December 30, 2002; Mr. Glanz's claims that: *"The*
        *system contains no further information on the Loan meaning that there is no record*
        *of BNC or LBHI having an interest in the Loan after December 30, 2002."* (Exhibit
        "1" or Hearing Transcript). However, further discovery produced shows the
        contrary displayed in the "MSP Loan Master Maint. & Display" document dated
        "12/19/07 - 07:05:41" listing Lehman as "INV HDR, which appears to mean
        "Investment Holder" and is dated prior to filing for bankruptcy on September 15,
        2008. And, this date coincides with when SPS already knew it was collecting on
        the wrong loan account. And, thereafter, SPS would've contacted Lehman

Brothers, instead of resolving the matter with me, decided to pass this on to another party to file for foreclosure. (Exhibit "M" "INV HDR" # Focht – 001071);

iv.   these assignments also show they were conveniently created soon after LHBI filed bankruptcy petition on September 15, 2008, (assignment dated September 26, 2008) and BNC filed bankruptcy petition January 9, 2009 (assignment February 13, 2009);

v.    these assignments would mean that all parties involved were transferring the subject mortgage and note while supposedly in a securitized trust account, but without providing any trust account document these parties are referring to;

vi.   these assignments were created over eight months after WFBT already filed its foreclosure action;

vii.  SPS did not have authority to transfer interest to WFBT on behalf of Lehman, BNC, MERS, nor without my authorization;

viii. these assignments were created after the creditor already alerted BNC, MERS, SPS and WFBT to cease and desist all activity of the subject loan documents;

ix.   these assignments also conflict with MERS Website showing Aurora Bank FSB was named as Note investor on October 18, 2002; (Exhibit "D");

x.    these assignments may also further prove that SPS created two assignments because of collecting on the wrong loan account due to discovery consisting of two properties;

xi.   these assignments may have been the result of a repurchase or due to selling bad loan document(s) to state court's pension funds, which may explain the lawsuit court case against Wells Fargo Bank, N.A., revealing sales and transfers from

Lehman and Wachovia, and in this case may have been on December 19, 2008. (Exhibit "M").

j. Mr. Glanz's declaration and testimony clearly proves that his evidence is unreliable because he basically testified that many people could access and input information into Lehman's database system, including before Lehman even filed for bankruptcy: *"the Hold On tracking essentially is two pieces, the database that stored data and then a software application that <u>allowed users to access the data</u> to view the data and <u>to modify it</u> through their ordinary business dealings. .... The record that I provided here was the only information I was able to find on the loan in question. It's a very brief record, it doesn't state much."* (Hearing Transcript).

36. BNC and Lehman Brothers were knowingly using unreliable databases, after the purchase of the subject loan documents, before and/or after BNC and Lehman Brother filed for bankruptcy. These databases could easily contribute to manipulation of the subject loan and information that the Debtor(s) BNC and LHBI provided. As a result, much time and cost was spent trying to obtain discovery, which only came in spurts, but eventually revealed many other undisclosed information, entities, representatives and databases.

37. The evidence the Creditor was provided through discovery in the state court case, versus the evidence provided by BNC and Lehman Brother's only witness, Mr. Glanz, (Exhibit # 1 or Hearing Transcript), revealed further use of database(s), that BNC, Lehman Brother's and its employees and/or other affiliates had access to, and with the ability to input or alter what was originally agreed to. BNC and Lehman Brothers were shown to be involved in one or more of the following electronic databases and archives:

a. <u>Hold On Tracking</u>:  BNC and LHBI's only witness testified that he merely use a exhibit document from a database system. However, Mr. Glanz only provided one heading and

one line of typed in information, which is only an "extract, a report from a database," that since September of 2001, Mr. Glantz was responsible for the Lehman's Group system called "Hold On Tracking", which is a *"platform built to be the system of record to maintain a record of all the loans that Lehman [indiscernible] purchased and either held or sold and it was a place for Lehman to keep track of the loans that it owned, get regular updates on their performance and ultimately track if they were sold, that sale of those mortgages. Which Lehman business people depended on information that was contained in the Hold On Tracking system to show things like sales or assignments of loans out of the estate to third parties."* ... *"Hold On tracking essentially is two pieces, the database that stored data and then a software application that allowed users to access the data to view the data and to modify it through their ordinary business dealings. Post bankruptcy the system was shut down, it was no longer in use and the database itself was maintained by the estate for the purposes of research and having access to those records. That database was, what we call, it's been put into a read only mode so you couldn't modify the data, all you could do is read from it and generate reports from the system. The record that I provided here was the only information I was able to find on the loan in question. It's a very brief record, it doesn't state much. ..."* ... *"where it identifies the name of the buyer there was no record kept in this system specifically who the buyer was. It just used the generic moniker, the street, which is meant to identify any non-Lehman company. So all this record is really telling you is that on December 30 of 2002, this loan was sold and it was sold to a third party. The name of that third party was not recorded in this system, and then there were no further records maintained on this loan. Generally, once Lehman sold the loan, it did not keep track of it, it had no relationship to it and it just did not interact with that loan any further."* ... *"A. No, I searched not only in this system but we have just electronic archives that we maintain postpetition, did a search for them for both the property address and the loan number, and I was not able to locate any further documentation or any further records."*

b.    Mortgage Electronic Registration Systems, Inc. ("MERS"): MERS system data was found to merely be a database that tracks mortgages and assignment of mortgages. However, the database can be accessed by thousands of employees that MERS or MERSCORP has with Service Providers or other affiliates. To date, BNC and LHBI have not responded as to why the MERS MIN website search displayed "Aurora Bank FSB" (f/k/a Lehman Brothers Bank, FSB) as investor of a "Note, dated October 18, 2002." (Exhibit "D" "MERS MIN").

c.    The "Comments" section that The Florida Bankers Association, Virginia Townes, Esq. served on The Honorable Jennifer D. Bailey, Task Force Chair. The Comments testify that original notes were *"deliberately eliminated to avoid confusion"* after they were *"entered into an electronic format system"*. *In Re: Amendments To Rules Of Civil Procedure And Forms For Use With Rules Of Civil Procedure*, Case No.: 09-1460, February 11, 2010 Comments"). I believe this means MERS and/or New Image and/or Matrix and/or DocX/Lenders Processing Services software system.

    d.    <u>Securities Exchange Commissions ("SEC")</u>:  In 2008, because I did not have any agreement or link to WFTB, from the state court case, I searched the SEC Edgar website.  And the link provided at that time by the SEC Help Department was on July 24, 2008, believing it was *"under the filer name Structured Asset Sec Corp Mort Pass Thr Cert Ser 2002-Bc10 in the EDGAR database (<u>http://www.sec.gov/cgi-bin/browse-edgar?company=Structured+Asset+Sec+Corp+Mort+Pass+Thr+Cert+Ser+2002-Bc10&CIK=&filenum=&State=&SIC=&owner=include&action=getcompany)"*.  This website link displayed *"STRUCTURED ASSET SEC CORP MORT PASS THR CERT SER 2002-BC10 (<u>0001212137</u>)"; "Type: 424B5 | Act: 33 | File No.: <u>333-92140-17</u> | Film No.: 02870684" "SIC: <u>6189</u> - Asset-Backed Securities";* and that it was "Modified: 02/06/2006".  And, at that time was shown the *"Business Address: 3 World Financial Center, New York, NY 10285; State of Incorp.: DE."*  In May of 2013, this same link now displays that it was "<u>Modified: 03/14/2012</u>. *"STRUCTURED ASSET SEC CORP MORT PASS THR CERT SER 2002-BC10" CIK#: <u>0001212137 (see all company filings)</u>"* and now with its *"Business Address: 3 World Financial Center, New York NY 10285, 2125267000"*.  This another database system, where the filer submitted an amended form, however, there are differences, which can only be answered by the filer.  Both of these links show a Prospectus Supplement (To Prospectus dated October 28, 2002).  The date of this prospectus supplement is December 23, 2002.  However, these filing have not shown that the subject loan was placed into this trust account and BNC and LBHI have not submitted any document of these filings.

38. Mr. Glanz claimed that the loan documents were included in a securitization trust account. However, there is no link or document validating this transfer.  And the Creditor did not agree nor authorized the Debtors to take money and manipulate the original agreement.

39. Mr. Glanz provided no valid information or documents whatsoever relating to the sale or purchase or delivery of the Subject Loan.

40. The Federal Rules of Evidence Code 901(a) requires that a proponent of an item of evidence must produce evidence sufficient to support a finding that the item is what the proponent claims it is.  An item of evidence may be authenticated with testimony of a witness with knowledge, along with evidence describing a process or system and showing that it produces an accurate result, pursuant to Rule 901(a)(9).  The Debtors' witness made no attempt to properly authenticate the document, and thus, the Court should find the document is "of dubious evidentiary value", because the exhibit is *"unaccompanied by any extrinsic evidence*

*of authenticity."* See *In re Mahoney*, 369 B.R. 579, 593 (W.D. Tex. 2007). *Mendoza v. Detail Solutions, LLC*, No. 3:10-CV-2436-G, 2012 WL 6115947, at *1 (N.D. Tex. Dec. 10, 2012) (rejecting unauthenticated internet printouts offered in support of summary judgment because the materials did not comply with Federal Rule of Evidence 901).

41. Therefore this court should deny the Plan Administrator's Reply and declare that the Plan Administrator's Debtor's Declaration (Exhibit "1") submitted as being part of the "record", is inadmissible because the evidence can not be reliable, was not properly authenticated, and constitutes inadmissible hearsay, under the Federal Rule of Evidence Code 901 or on the basis of the Best Evidence Rule.

42. And, because the document is inadmissible unless proper under the business records exception, Fed. R. Evid. Rule 803(6), which only provides exceptions to the Rule against Hearsay for Records of a regularly conducted activity for records of an act, event, condition, opinion, or diagnosis, provided that neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness, Rule 803(6)(E). And, Fed. R. Evid. Rule 803(15) provides exceptions to the Rule against Hearsay for statements contained in a document that purports to establish or affect an interest in property if the matter stated was relevant to the document's purpose — unless later dealings with the property are inconsistent with the truth of the statement or the purport of the document.

## IV - **Motion For Order of Allowance and Payment And Deeming Claim Nos. 34380 and 34381, by Deborah E. Focht, as Timely Filed**

43. This Court is authorized to enlarge the time to file claims. The Federal Rules of Bankruptcy Procedures provides that the bankruptcy court *"for cause shown may extend the time within which proofs of claim or interest may be filed."* Fed. R. Bankr. P. 3003(c)(3).

44. Fed. R. Bankr. P. 9006(b)(1) also provides that *"on motion made after the expiration of the specified period [the court may] permit the act to be done where the failure to act was the result of excusable neglect."*

45. This court has authority to enlarge the time for filing claims under Bankruptcy Code § 502(9), which partially states: that *"proof of such claim is not timely filed, except to the extent tardily filed as permitted under paragraph (1), (2), or (3) of section 726 (a) of this title or under the Federal Rules of Bankruptcy Procedure, ...".*

46. Therefore, the Creditor requests that this court enter an order deeming Claim Nos. 34380 and 34381, by Deborah E. Focht. as timely filed.

## V - The Creditor Has Met Burden of Proof By Preponderance of the Evidence

47. The Creditor filed her claims as a result of misconduct and material alterations, and by parties involved in forging documents and fraudulent conveyances, which shows prima facia evidence, and, *inter alia*, of clouding property title, unjust enrichment, illegal transfers of documents, and also demonstrates that the parties involved did not come to this court with clean hands, etc.

48. The Plan Administrator is simply making assumptions in its Omnibus Objections and is filing objections without acknowledging the Creditor's request for hearing and discovery.

49. The Creditor displays *prima facia* evidence of the direct involvement of BNC and Leman Brothers, Mortgage Electronic Registration Systems, Inc., and its affiliates, such as Aurora Bank FSB, and other undisclosed parties and transfers, some of which were partial discovery given to the Creditor by a WFBT or Select Portfolio Servicing, Inc.'s law firms, litigating in the state court case, which is under appeal.  Exhibits attached to this Response include

21

discovery received after the bar date and filing of claims. (see [Docket 34303] Debtor's

Objections and Exhibits attaching Creditor's Statement, Claims and Exhibits):

50. The attached sworn affidavit (Exhibit "2") provides an explanation of filing my proof of

claims along with the reasons necessary to amend my claims and for the following reasons:

(a) my funds were taken by BNC and Lehman Brothers for an invalid mortgage; (b) the loan

service provider was collecting on the wrong loan account; (c) a foreclosure action revealed

that BNC materially altered the loan date and rate term agreement; (d) the documents and

transfers were also manipulated via databases; (e) many unknown entities and representatives

appear and may be involved; (f) BNC and Lehman Brothers materially altered the documents

to have the money mortgage purchase loan transformed into a refinanced loan; (f) the

property has been left with a title cloud and a foreclosure judgment lien against the property.

51. The actions by BNC and Lehman constitute violations of undisclosed misrepresentation,

fraudulent transfers, common law fraud and violations of the Uniform Commercial Code

Securities Act, etc.. And these acts were the cause of damages to the property title and loss

of income and home, and any order or lien relating to foreclosure.

52. The Creditor filed a Statement for relief from the automatic stay in order to join BNC and

Lehman into the state court action, along with motions to obtain discovery due to missing

information, due to many other undisclosed entities or affiliates involved, and motioned to

stop all sales or transfers of the fraudulent loan documents, etc.. The Creditor also asserted

that BNC and Lehman Brothers intentionally created a bad loan(s) in order to collect money

from foreclosure, insurance, derivative agreements and/or government funds.

53. The Creditor is entitled to payment pursuant to 11 USC § 502 and can testify and submit

evidence (Exhibit "3" amended proof of claims) for the right to file and for allowance of her

claims, as described in her affidavit (Exhibit "2" "Affidavit"), due to the following:

a. Exhibit "A" ("Deed"); Both the Warranty Deed, (Exhibits "A") and the Mortgage

documents, (Exhibits "C") were simultaneously filed by Professional Services of

Sarasota on October 23, 2002, recorded stamped received 04:33 pm. The "Corporate

Warranty Deed" indenture, was signed by the seller as Grantor on September 27, 2002, to

the Creditor, Ms. Focht as Grantee, recorded in Official Records Instrument #

2002175527, 2 Pgs on October 23, 2002, in Karen E. Rushing Clerk of Circuit Court,

Sarasota County, Florida, FMiller - Receipt # 233293 Doc Stamp-Deed. Whereas, the

subject Mortgage document displays BNC as Lender, the Creditor's as borrower

signature date as October 18, 2002, recorded in Official Records Instrument #

2002175528, 21 Pgs on October 23, 2002, in Karen E. Rushing Clerk of Circuit Court,

Sarasota County, Florida, FMiller - Receipt # 233293 Doc Stamp-Mort.

b. Exhibit "B" ("Lehman Took Funds"); A "Loan Disbursement Instructions" document

dated October 18, 2002, displays BNC wire transferred $109,239.18 funds to Lehman

Brothers. (Exhibit "B" "Lehman Took Funds" discovery # 000667). BNC and Lehman

Brothers took my funds and made the loan look like a mortgage refinance dated October

18, 2002, instead of a money purchase loan of the property. (Exhibit "B" "Lehman Took

Funds") and (Exhibit "L" "Funds").

c. Exhibit "C" ("Leh"); The mortgage document reveals "Leh" handwritten on the first page

was altered on page 16 overwritten as dated October 18, 2008. (Exhibit "C" "'Leh"

#000378 + 000972 - filed on July 10, 2008, as "original" by WFBT, in the state court

case), which was filed as an "original" in state court, approximately six months after

foreclosure suit was filed by *"Wells Fargo Bank, N.A., Successor By Merger To Wells*

*Fargo Bank Minnesota, National Association, As Trustee, In Trust For The Holders Of*

*Structured Asset Securities Corporation – Amortizing Residential Collateral Trust*

*Mortgage Pass Through Certificates, Series 2002-BC10"*, in January 2008;

d. Exhibit "D" ("MERS MIN"); information displayed on Mortgage Electronics

Registration Systems, Inc.'s website displayed "Aurora Bank FSB" named as Investor of

'Note', dated October 18, 2002.  This discovery could mean that multiple sales occurred.

And the "original Note" filed by Wells Fargo Trust does not name Aurora nor Well

Fargo, but only names BNC vice president.

e. Exhibit "E" (Two 'Corporate Mortgage Assignment(s)); executed on September 26, 2008

and again on February 13, 2009, both by SPS employee Bill Koch, also known as a

'Robosigner'.  These two "Assignments" supports the Creditor's assertions of collections

on the wrong loan account because:  (a) there was activity circulating two different loan

documents on two different properties; and (b) BNC and Lehman Brother and other

affiliates have documents pertaining to Stipulations, Agreements or sought for Orders

entered into by and between BNC Mortgage LLC ("BNC") and its affiliated debtors,

including Wells Fargo Bank, N.A. ("Wells Fargo"), after Lehman and BNC filed

bankruptcy petitions.  There are two "Corporate Assignment of Mortgage" documents,

dated September 26, 2008 and February 13, 2009, (Exhibit "E" "Assignments"), created

by SPS employee, Bill Koch, each purporting to be assigned from BNC and MERS as

payee to WFBT, however these assignments violate transfers laws because of the

following:

    i.  These assignments conflict with Lehman Brother's declaration and statement that BNC and Lehman Brothers sold the loan and no longer have a direct interest in the Loan or the Property, since December 30, 2002; Mr. Glanz's claims that: *"The system contains no further information on the Loan meaning that there is no record of BNC or LBHI having an interest in the Loan after December 30, 2002."* (Exhibit "1" or Hearing Transcript). However, further discovery produced shows the contrary displayed in the "MSP Loan Master Maint. & Display" document dated "12/19/07 - 07:05:41" listing Lehman as "INV HDR, which appears to mean "Investment Holder" and is dated prior to filing for bankruptcy on September 15, 2008. And, this date coincides with when SPS already knew it was collecting on the wrong loan account. And, thereafter, SPS would've contacted Lehman Brothers, instead of resolving the matter with me, decided to pass this on to another party to file for foreclosure. (Exhibit "M" "INV HDR" # Focht – 001071);

    ii.  these assignments also show they were conveniently created soon after LHBI filed bankruptcy petition on September 15, 2008, (assignment dated September 26, 2008) and BNC filed bankruptcy petition January 9, 2009 (assignment dated February 13, 2009);

    iii.  these assignments would mean that all parties involved were transferring the subject mortgage and note while supposedly in a securitized trust account, but without providing any trust account document these parties are referring to;

    iv.  these assignments were created over eight months after WFBT already filed its foreclosure action;

    v.  SPS did not have authority to transfer interest to WFBT on behalf of Lehman, BNC, MERS, nor without my authorization;

    vi.  these assignments were created after the creditor already alerted BNC, MERS, SPS and WFBT to cease and desist all activity of the subject loan documents;

    vii.  these assignments also conflict with MERS Website showing Aurora Bank FSB was named as Note investor on October 18, 2002; (Exhibit "D");

    viii.  these assignments may also further prove that SPS created two assignments because of collecting on the wrong loan account due to discovery consisting of two properties;

    ix.  these assignments may have been the result of a repurchase or due to selling bad loan document(s) to state court's pension funds, which may explain the lawsuit court case against Wells Fargo Bank, N.A., revealing sales and transfers from Lehman and Wachovia, and in this case may have been on December 19, 2008. (Exhibit "M").

f.  Exhibit "F" ("Wrong Property"); BNC and/or Lehman Brother caused SPS (f.k.a. "Fairbanks Capital Corp.") to collect on the wrong loan account, and thereafter, used an undisclosed and invalid Wells Fargo Trust account name to foreclose on the Creditor, etal., causing loss of income and of the Creditor's homestead.

g.  Exhibit "G" ("Adjustable Rate Note" pgs. 1 – 4); shows a BNC Adjustable Rate Note dated October 17, 2002, endorsed by BNC Vice President, Jame Langford, a *"certified*

*copy"* submitted to the state court by WFTB's second law firm attorney, which was claimed as "original", showing fake or photo-shopped blue ink, approximately six months after filing foreclosure, even though all documents that the Creditor signed were in black ink, and even though there are no documents between the Creditor and this WFBT Trust name. And to date, no documents were ever produced showing any valid transfer to any trust account name;

h.  Exhibit "H" ("Truth Rate"); dated October 18, 2002, show the direct conflict of the Note date and rate terms filed in the foreclosure action as seen in (Exhibit "G" - "Adjustable Rate Note" pgs 1 – 4); And since Lehman Brothers is shown in documents to be an underwriter, therefore was involved or caused forged or fraudulent documents to be delivered, including possibly sold to multiple parties. The mortgage documents are overwritten dated October 18, 2002, and displays BNC as Lender, and MERS as mortgagee, solely as nominee, for BNC and Successors. The Adjustable Rate Note, is dated October 17, 2002, and displays BNC as Lender. However, this documents display different dates and the note conflicts with the Creditor's agreement to the loan. The Creditor evidenced the Federal Truth in Lending Disclosure Statement she possessed, marked as "Final", dated October 17th, 2002, also overwritten to be dated October 18th, and showing different date and rate terms than the subject Adjustable Rate Note filed by WFBT in the state court six months after filing foreclosure. (Exhibit "H" "Rate" or "N").

i.  Exhibit "I" ("Rescission Letter") The Creditor sent demand letters to cease and desist all activity of the documents, including BNC, because the loan purchase was dishonored with fraudulent and forged documents found through discovery. And, the plan administrator's Reply is merely taking laws out of the letter and does not address the

Creditor's proof of claim of fraudulent documents nor collections on the wrong loan account. BNC did not respond and the Creditor called again, and eventually a BNC Representative said that she could see the information on the computer screen but that she could not send the Creditor the information. After the Creditor sent the lawsuit Complaint to BNC, BNC filed for bankruptcy days earlier on January 9, 2009.

j.  Exhibit "J" ("Investigation"); The revelations of this case began when the Creditor questioned why the loan service provider, Select Portfolio Servicing, Inc. ("SPS") a/k/a (Fairbanks Capital Corp.) was overcharging for payments. SPS eventually sent the Creditor "Affidavit of Forgery" and "Identity Theft" forms and letters claiming SPS was investigating the matter. The Creditor asserts that Lehman Brothers and BNC mixed up forged documents with another property's documents, which also caused SPS and WFBT to manufacture a loan default, due to collecting on the wrong loan account, and due to, the ability to obtain funds through credit enhancements via government funds, insurance policy and/or derivative or credit default swap agreements, which could calculate to well over three million dollars or more. And, Lehman Debtors filed admissions to being a party to more than 906,000 derivatives contracts.

k.  Exhibit "K" ("Forgery – 2x's"); The 'Payoff Requirements" documents were signed by the Professional Title Company agent with the Creditor's name forged, both dated October 18, 2002. The Creditor originally attached a forged document to her filed Claims and Statement, and was later given more discovery records since Lehman and BNC filed for bankruptcy, which consisted of a second forged document for "Payoff Requirements". This supports the Creditor's assertion that BNC and Lehman Brothers were secretly creating a "refinance" instead of a "purchase" loan.

l. Exhibit "L" ("Focht Funds"); The Crediter paid funds for the purchase of property through Equity Exchange Services, Inc., in which checks were given to Professional Title Services, via $73,769.63, $25,587.36, $10,000.00, $897.51, $69.19, $378.02, which totals $110,701.71. This transaction also supports proof that BNC and Lehman wanted it to appear as if the Creditor was refinancing a loan instead of purchasing property.

m. Exhibit "M" ("INV HDR" # Focht – 001071); discovery produced displayed in the "MSP Loan Master Maint. & Display" document dated "12/19/07 - 07:05:41" listing Lehman as "INV HDR, appears to mean "Investment Holder", and is dated prior to filing for bankruptcy on September 15, 2008. And, this date coincides with when SPS already knew it was collecting on the wrong loan account. And, thereafter, SPS would've contacted Lehman Brothers, and instead of resolving the matter with the Creditor, decided to pass this on to another party to file for foreclosure;

n. Exhibit "N" ("BNC Beneficiary" - # 000783); The mortgage documents refers to insurance and a "Loan Document Worksheet" regarding the mortgage, which names BNC under the heading "Beneficiary / Trustee…" - "Beneficiary to Read:  BNC Mortgage, Inc. a Delaware corporation, P.O. Box 19656, Irvine, California 92623-9656";

o. Exhibit "O"; BNC and/or Lehman Brothers held an insurance policy (#FO2-0154377), which describes the subject property located at Laurel Road.  However, the discovery consists of policies belonging to two properties, and other information is missing that is required under the "Conditions And Stipulations" which states *"Valid Only If Front Page And Schedules A & B Are Attached."* (Exhibit "O" "Insurance Policies" (000408).

p. Exhibit "P" (Exhibit "P" "Option One Pay Off"); Option One Mortgage Corporation is merely a company that has servicing rights; Mr. Glanz may not even know whether the

loan was sold and may have been looking at a loan pay off belonging to the other

property. (Exhibit "P" "Option One Pay Off").

q.  Exhibit "Q" (""Lehman SSA - # 000146"); Mr. Glanz's exhibit conflicts with discovery

produced from the state court of an agreement between *Fairbanks Capital Corp., as*

*Servicer; Lehman Capital, a Division of Lehman Brother holdings, Inc., as Seller; And*

*Aurora Loan Services Inc., As Master Servicer, for Structured Asset Securities*

*Corporation Amortizing Residential Collateral Trust Mortgage Pass-Through*

*Certificates, Series 2002-BC10,"* a *"Securitization Servicing Agreement"* "Dated as of

December 1, 2002".

r.  Exhibit "R" ("Receipt and Email"); Debtors did not object that the Creditor sent Epiq and

sent via overnight mail to this court the same day as the Bar date deadline. And, the

Debtors have not disputed the Creditor's Response to Debtor's objections to timely filed

proof of claims consisting of the following: (1) That the Creditor's receipt of express

mailing proof of claims to the Court is dated September 22, 2009, which is same day as

the bar date. (2) That the Epiq Solutions' website provided statements that Epiq would

file the proof of claims to the court if received; and, (3) that Epiq Solutions and the

Lehman legal team received notice of the claims the same day as the bar date. (Exhibit

"R" Receipt and Email).

54. The Debtor asserts that under *"Florida law, the statute of limitations for fraud claims is four*

*years. FLA. STAT. ANN. §95.11(3)(j). The four years runs from the time that the "facts*

*giving rise to the cause of action were discovered or should have been discovered with the*

*exercise of due diligence." FLA. STAT. ANN. §95.031(2)(a)."* However, the Debtor does not

explain to this court that the Creditor was unaware of the fraudulent documents until after a

foreclosure action was filed in January 2008, nor was aware of Lehman Brothers'

involvements until long after the foreclosure action. And, *"As a general rule, a statute of*

*limitations begins to run when there has been notice of an invasion of legal rights or a*

*person has been put on notice of his right to a cause of action." See* Kelley v. School Board of

Seminole County, 435 So.2d 804, 806 (Fla.1983).

55. Therefore, the Creditor has provided ample evidence in support of her proof of Claims and

the Claims should not be disallowed and expunged.

## VI - Authorization For Creditor's Right To Payment

56. Under the Bankruptcy Code 11 USC § 502 (c) "There shall be estimated for purpose of

allowance under this section—

> (1) any contingent or unliquidated claim, the fixing or liquidation of which, as the case
> may be, would unduly delay the administration of the case; or

> (2) any right to payment arising from a right to an equitable remedy for breach of
> performance.

57. Under the Bankruptcy Code 11 USC § 502, a "party in interest" may object under

Bankruptcy Code § 502. This becomes a contested matter. *See* Fed. R. Bankr. P. 9014, which

discusses, how the court should handle contested matters. Once the objector produces some

evidence, the mere filing of an objection is insufficient to dispute the validity of a claim, and

the burden shifts to the claimant. The claimant bears the ultimate burden of establishing a

valid claim by a preponderance of the evidence. See In re South Motor Co., 161 B.R. 532,

547 (Bankr. S.D. Fla. 1993). Therefore, the burden of proof is on the debtors because the

Creditor submitted supporting evidence to the court, and the debtor didn't submit supporting

evidence, other than merely making assumptions and statements in its omnibus objections.

58. The Plan Administrator also submitted its *Reply* and presented its only witness, where this Court heard testimony and accepted the Declaration evidence (Exhibit "1") of Mr. Glanz. However, even though the Creditor objects on the grounds that Mr. Glanz never produced reliable evidence, his testimony and evidence still does not address the remaining proof of claims, in that the Debtors forged documents, used databases for manipulation, made the documents appear as a refinance loan instead of a purchase of property, nor has the Debtors denied that the Debtors transferred or sold the loan information intermixed with two different property account information.

59. Therefore, the Creditor has met her burden of proving her claims by a preponderance of the evidence. *See Best Payphones, Inc. v. Verizon N.Y., Inc. (In re Best Payphones, Inc.)*, 2006 U.S. Dist. LEXIS 10297 at *9 (S.D.N.Y. Mar. 14, 2006) ("it is clearly established law that the Rule 3001(f) presumption governs only the burden of production, and that the ultimate burden of proving the claim by a preponderance of the evidence remains with the claimant").

60. Therefore, the Creditor has provided ample evidence in support of the Creditor's Claims and the Focht Claims should not be disallowed and expunged.

61. Also under the Bankruptcy Code 11 USC § 502(h) "*A claim arising* from the recovery of property *under section 522, 550, or 553 of this title shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section, or disallowed under subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition.*"

62. The Creditor was prejudiced in this case after waiting four years to be heard, and thereafter, led to believe that all of the claims were being paid when notices and forms were mailed and timely sent to Epiq Bankruptcy Solutions, LLC.

----- Original Message -----
**From:** Garabato, Sidney
**To:** americanreply@gmx.com
**Cc:** Garabato, Sidney
**Sent:** Tuesday, August 28, 2012 1:40 PM
**Subject:** In re Lehman Brothers Holdings, Inc., et al. - Chapter 11 Inquiry

Dear Debbie:

Epiq Bankruptcy Solutions, LLC ("Epiq") is the official Claims and Noticing agent for the above-referenced Debtors.

We are in receipt of your inquiry based on the following:

| Call Date | Name/Address | Account# | PhoneNumber | Email | Comments |
|---|---|---|---|---|---|
| 08/21/12 | DEBBIE FOCHT 1613 INGRAM AVE SARASOTA FL 34232-3229 | | 941-350-0561 | americanreply@gmx.com | Ms. Focht has requested wire transfer form to be sent to her. Read FAQ 147. |

You Claim # is 34380, 34381, 42914, 42915, 42916 and to get a status of your claim(s), please click here:
http://dm.epiq11.com/LBH/Claim#CreditorName=focht,+d&CreditorNameOperator=true&ds=true&ex=false&maxPerPage=25&page=1.
Please see the below with respect to wire form requests:

63. The Creditor also relied on the Debtor's law firm counsel, saying that claims are paid if you

receive these notices.  And, because these forms were sent to all holders of "allowed" claims,

as seen on the Epiq Bankruptcy Solutions, LLC ("Epiq") website docket, which partially

stated:

> "Notice to Holders of **Allowed** Claims Regarding Plan Distributions

> The required forms were previously **mailed to all holders of allowed claims**.

64. The Creditor responded to all notices of objections that the Debtors have sent.  The Creditor

has not received discovery requested, and therefore, reserves her right to properly respond

and amend her claims after all necessary information is sent to the Creditor.  And the

Creditor was never given required notices of a bar date deadline or notices to attend a

creditors meeting in order to question the Debtors. As a result, the Creditor was further prejudiced, and was diligent in filing and responding as soon as possible, which demonstrates excusable neglect. The Federal Rules of Bankruptcy Procedures F.R.B.P. Rule 9006(b)(1) allows the court to enlarge the time for filing a proof of claim, if the claimant establishes that the delay in filing is due to "excusable neglect." In *Pioneer Investment Services Company v. Brunswick Associates Limited Partnership*, 507 U.S. 380, 113 S. Ct. 1489, 1498 (1993), the United States Supreme Court provided a non-exclusive balancing test which examined the following factors to determine whether a claimant's neglect in filing a timely proof of claim was excusable: 1. The danger of prejudice to the debtor if the untimely filing is allowed; 2. The length of the delay and its potential impact on the judicial proceedings; 3. The reason for the delay, including whether the delay was beyond the reasonable control of the person whose duty it was to perform; and, 4. Whether the creditor acted in good faith.

65. This court had previously allowed creditors to file their claims late because they exhibited "*a reasonable amount of diligence*" to determine the effect of the claims bar date, but missed the deadline because of "justifiable confusion." That these creditors "conscientiously" tried to comply with the deadline, … but were justifiably confused as to which of two claims bar dates applied to their particular claims.

66. Therefore, this court should enter order for an enlargement of time for filing claims, deem all of the Creditor's claims as timely filed, order allowance payment of claims, and/or in the alternative, enlargement of the time to respond to any of the Debtors, LBHI or the Plan Administrator's objections and replies, and after discovery is complete.

CONCLUSION

WHEREFORE, the Creditor respectfully requests entry of an order denying the Plan

Administrator's omnibus objections and reply seeking to disallow and expunge the Claims in

their entirety, strike the debtor's declaration and evidence, and grant the Creditor's motions, for

relief from the Automatic Stay, order Debtors to send all discovery requested; grant relief to

enlarge the time for filing claims, deem all claims timely filed; order allowance of the remaining,

as requested herein, and grant such other further relief as the Court deems just and proper.

Respectfully Submitted by:

Deborah E. Focht
1613 Ingram Ave
Sarasota, FL 34232

## Certificate of Service

Creditor, Deborah E. Focht, hereby, certifies that the Creditor's Second Amended Response And Opposition To Plan Administrator's Omnibus Objection And Reply to Claims Filed By Deborah E. Focht; And, Creditor's Motion For Order Of Allowance and Payment Deeming Claim Nos.: 34380 and 34381, as Timely Filed; Or In The Alternate Motion For Stay, Discovery, determinations; And, Extension Of Time To File Amended Claims And Response, has been mailed, emailed or delivered by express mail, on this 18th day of June, 2013.

Deborah E. Focht
1613 Ingram Avenue
Sarasota, Florida 34232
americanreply@gmx.com
(941) 350-0561

VIA OVERNIGHT MAIL

United States Bankruptcy Court
Southern District of New York
Alexander Hamilton Customs House
One Bowling Green
New York, NY 10004-1408

The Chambers of The Honorable James M. Peck
One Bowling Green, Courtroom
New York, New York, 10004-1408

cc:  Weil, Gotshal & Manges, LLP
767 Fifth Avenue
New York, New York 10153
Attn: Jacqueline Marcus, Esq.
attorneys for the Plan Administrator,
the Debtors, and certain of its affiliates;

The Office of the United States
Trustee for Region 2
33 Whitehall Street, 21st Floor
New York, New York, 10004
Attn: Tracy Hope Davis, Esq.
Elisabetta G. Gasparini, Esq.
and Andrea B. Schwartz, Esq.

Epiq Bankruptcy Solutions, LLC
Attn: Lehman Brothers Holdings Claims Processing
757 Third Avenue, 3rd Floor
New York, New York 10017

# Exhibit "2"

Sworn Affidavit of
Deborah E. Focht

I, the undersigned, Deborah E. Focht, the Creditor in this action, being first duly sworn, do
hereby state under oath and under penalty of perjury that the following facts are true:

1. I am over 18 years of age and I submit this declaration and evidence exhibited in support of
   my proof of claims dated September 21, 2009, against Bnc Mortgage LLC ("BNC") and
   Lehman Brother Holding's Inc. ("LBHI") bankruptcy case. *In re: Lehman Brothers Holdings
   Inc., et al.*, Chapter 11 - Case No. 08-13555 (JMP) (BNC jointly administered)), by express
   mailed on September 22, 2009 (Exhibit "R") and filed in the case on September 23, 2009, in
   the United States Bankruptcy Court Southern District Court of New York. (Exhibit "3").
2. I could testify to the truth of the matters set forth herein and to the following facts based on
   my personal knowledge and my review of records and information received through
   discovery in the state court case, and what transpired as a result of funds and loan document
   transfers, involving Bnc Mortgage, Inc. and Lehman Brothers. This affidavit is the result of
   the hearing held in the Bankruptcy Court case on April 25, 2013, and an explanation of filing
   my proof of claims along with the reasons necessary to amend my claims. (Exhibit "Hearing
   Transcript" Docket # 37125 - 04/26/2013 - Redacted Transcript access restricted through
   7/25/2013), for the following reasons:  (a) my funds were taken by BNC and Lehman
   Brothers for an invalid mortgage; (b) the loan service provider was collecting on the wrong
   loan account; (c) a foreclosure action revealed that BNC materially altered the loan date and
   rate term agreement; (d) the documents and transfers were also manipulated via databases;
   (e) many unknown entities and representatives appeared and may be involved; (f) BNC and
   Lehman Brothers materially altered the documents to have the money mortgage purchase
   loan transformed into a refinanced loan; (f) the property has been left with a title cloud and a
   foreclosure judgment lien against the property.
4. As a result, the actions by BNC and Lehman constitute violations of undisclosed
   misrepresentation, fraudulent transfers, common law fraud and violations of the Uniform
   Commercial Code Securities Act, etc..  And these acts were the cause of damages to the
   property title, loss of income and home, and any lien order relating to foreclosure.
5. I also filed a Statement for relief from the automatic stay in order to join BNC and Lehman
   into the state court action, along with motions to obtain discovery due to missing
   information, due to many other undisclosed entities or affiliates involved, and motioned to
   stop all sales or transfers of the fraudulent loan documents, etc..  I also assert that BNC and
   Lehman Brothers intentionally created a bad loan(s) in order to collect money from
   foreclosure, insurance, derivative agreements and/or government funds.
6. I can testify or submit evidence of the following (Affidavit Exhibit "2" - "3" amended proof
   of claims):
   a. The Warranty Deed document evidences lien perfection for my security interest in the
      loan purchase for property. (Exhibit "A" "Deed").
   b. A "Loan Disbursement Instructions" document dated October 18, 2002, displays BNC
      wire transferred $109,239.18 funds to Lehman Brothers. (Exhibit "B" "Lehman Took
      Funds" discovery # 000667) and (Exhibit "L" "Funds").
   c. The 'Payoff Requirements' documents were signed by the Professional Title Company
      agent with the Creditor's name forged, both dated October 18, 2002. (Exhibit "K" -

1

"Forgery – 2x's"). This evidences that BNC or Lehman's requested the date change in order to claim that the mortgage was refinanced.

d. I paid funds for the purchase of property through Equity Exchange Services, Inc., in which checks were given to Professional Title Services, via $73,769.63, $25,587.36, $10,000.00, $897.51, $69.19, $378.02, which totals $110,701.71. (Exhibit "L" "Focht Funds").

e. BNC and Lehman Brothers took my funds and made the loan look like a mortgage refinance dated October 18, 2002, instead of a money purchase loan of the property. (Exhibit "B" "Lehman Took Funds") and (Exhibit "L" "Funds").

f. The mortgage document reveals "Leh" handwritten on the first page was altered on page 16 overwritten as dated October 18, 2008. (Exhibit "C" '"Leh" #000378 + 000972 - filed on July 10, 2008, as "original" by WFBT, in the state court case);

g. The "Loan Disbursement Instructions" document shows two forged "Payoff Requirements" documents signed by the Professional Title Company agent with the Creditor's name forged, both dated October 18, 2002. (Exhibit "K" - "Forgery – 2x's"). This also appears that BNC and Lehman's requested the date change in order to claim that the mortgage was refinanced.

h. This case involves mortgage loan documents originated by BNC, which was closed sometime in October 2002. The closing was rushed while I was under duress, seeking medical treatment for post traumatic stress, head, neck and spinal injuries from a car accident, due to the threats of contract's closing deadline, and due to being rushed by BNC many times on different dates to the closing agent's office.

i. The revelations of this case began when I questioned why the loan service provider Select Portfolio Servicing, Inc. ("SPS") a/k/a (Fairbanks Capital Corp.) ("FBC"), was overcharging for payments. SPS eventually sent me "Affidavit of Forgery" and "Identity Theft" forms and letters claiming SPS was investigating the matter. (Exhibit "J" "Investigation"). Near the end of November 2007, I spoke with SPS Representative, Erin Perry, who was disputing the loan rate terms of the loan and I asked her to send me what document she was referring to. She mail me a letter dated December 3, 2007, enclosed with an Adjustable Rate Note showing the wrong rate term agreement, which names a different property address. I sent an email and letter on December 15, 2007, and I called SPS to let them know they were collecting on the wrong loan account. (Exhibit "F" "Wrong Property"). Again, SPS Representatives said they were investigating the matter.

j. Instead of SPS investigating, I found out that the tenants of the property were served complaint and eviction notices from an unknown trust account named, *"Wells Fargo Bank, N.A., Successor By Merger To Wells Fargo Bank Minnesota, National Association, As Trustee, In Trust For The Holders Of Structured Asset Securities Corporation – Amortizing Residential Collateral Trust Mortgage Pass Through Certificates, Series 2002-BC10"* ("WFBT").

k. SPS hired Andrew L. Fivecoat, Esq., of the Albertelli Law Firm to file a foreclosure Complaint on or about January 16, 2008, in Florida in the Twelfth Judicial Circuit Ccourt under Case No: 2008 CA 000791 SC. In this state court action, I was not aware of the party named as Plaintiff ("WFBT"), and to date, no WFBT witness has testified to the authenticity of the documents. And, I have not found a valid WFBT Trust account, that links to me or the loan documents, even after receiving a link to the EDGAR search database Website from the Securities Exchange Commissions Help Department.

l. The mortgage documents are overwritten dated October 18, 2002, and displays BNC as Lender, and MERS as mortgagee, solely as nominee, for BNC and Successors. The Adjustable Rate Note, is dated October 17, 2002, and displays BNC as Lender. However, this documents display different dates and the note conflicts with my agreement to the loan. The Creditor evidenced the Federal Truth in Lending Disclosure Statement she possessed, marked as "Final", dated October 17th, 2002, also overwritten to be dated October 18th, and showing different date and rate terms than the subject Adjustable Rate Note filed by WFBT. (Exhibit "H" "Rate" or "N").

m. It was not until August 11, 2011, at a third motion for summary judgment hearing by WFBT, that SPS's second hired law firm and attorney, Ronnie Bittman, from Powell and Pearson, LLP, handed the court a "certified" copy of similar mortgage and loan exhibits. I was not aware at that time, that the attorney handed the court another page or allonge displaying: *"Pay to the Order, Bnc Mortgage, Inc., Jamie Langford, Vice President"*. (Exhibit "G"). However, the documents that WFBT's attorney was referring to, this page could have come from the pile of mixed up documents. And, I saw the documents claimed as "original" mortgage and note documents in the county record file, exhibiting fake or photo-shopped blue ink, whereas, I only signed paperwork in black ink.

n. The foreclosure Complaint exhibited other revelations that I was unaware of and all attempts for requests of discovery went ignored, including by BNC and thereafter, Lehman Brothers. Because the loan was dishonored with fraudulent dates and rate terms, I sent out a notice to cease and desist all activity. (Exhibit "I" Rescission"). BNC did not respond and I called again, and eventually a BNC Representative said that she could see the information on the computer screen but that she could not send me the information. After I sent my lawsuit Complaint to BNC, BNC already filed for bankruptcy days earlier on January 9, 2009.

o. The discovery information eventually sent to me came in spurts and consisted of mixed documents belong to two different property addresses, proving that SPS was collecting on the wrong property.

7. I submit evidence that Lehman Brothers was involved in the sale or transfer of the documents, before and after BNC and Lehman Brother filed for bankruptcy, due to the following:

a. The mortgage document reveals "Leh" handwritten on the first page of the mortgage document. (Exhibit "C" - "'Leh" filed on July 10, 2008, as "original" by WFBT, in the state court case);

b. There are two "Corporate Assignment of Mortgage" documents, dated September 26, 2008 and February 13, 2009, (Exhibit "E" "Assignments"), created by SPS employee, Bill Koch, each purporting to be assigned from BNC and MERS as payee to WFBT, however these assignments violate transfers laws because of the following:

   i. These assignments conflict with Lehman Brother's declaration and statement that BNC and Lehman Brothers sold the loan and no longer have a direct interest in the Loan or the Property, since December 30, 2002; Mr. Glanz's claims that: *"The system contains no further information on the Loan meaning that there is no record of BNC or LBHI having an interest in the Loan after December 30, 2002."* (Exhibit "1" or Hearing Transcript). However, further discovery produced shows the contrary displayed in the "MSP Loan Master Maint. & Display" document dated "12/19/07 -

07:05:41" listing Lehman as "INV HDR", which appears to mean "Investment Holder" and is dated prior to filing for bankruptcy on September 15, 2008. And, this date coincides with when SPS already knew it was collecting on the wrong loan account. And, thereafter, SPS would've contacted Lehman Brothers, instead of resolving the matter with me, decided to pass this on to another party to file for foreclosure. (Exhibit "M" "INV HDR" # Focht – 001071);

ii.   these assignments also show they were conveniently created soon after LHBI filed bankruptcy petition on September 15, 2008, (assignment dated September 26, 2008) and BNC filed bankruptcy petition January 9, 2009 (assignment February 13, 2009);

iii.  these assignments would mean that all parties involved were transferring the subject mortgage and note while supposedly in a securitized trust account, but without providing any trust account document WFBT attorneys and Lehman Brother's witness, Mr. Glanz, is referring to;

iv.   these assignments were created over eight months after WFBT already filed its foreclosure action;

v.    SPS did not have authority to transfer interest to WFBT on behalf of Lehman, BNC, MERS, nor without my authorization;

vi.   these assignments were created after I already alerted BNC, MERS, SPS and WFBT to cease and desist all activity of the subject loan documents;

vii.  these assignments also conflict with MERS Website showing Aurora Bank FSB was named as Note investor on October 18, 2002; (Exhibit "D");

viii. these assignments may further prove that SPS created two assignments because of collecting on the wrong loan account due to discovery consisting of two properties;

ix.   these assignments may have been the result of a repurchase or due to selling bad loan document(s) to state court's pension funds, which may explain the lawsuit court case against Wells Fargo Bank, N.A., revealing sales and transfers from Lehman and Wachovia, and in this case may have been on December 19, 2008. (Exhibit "M").

8.  I submit evidence that BNC and Lehman Brothers were knowingly using unreliable databases, after the purchase and transfer of the subject loan documents. That these databases contributed to manipulation of the information that the Debtor(s) BNC and LHBI provided. As a result, I spent much time and cost trying to obtain discovery, which only came in spurts, but eventually revealed many other undisclosed information, entities, representatives and databases. Because of the evidence I was provided through discovery in the state court case, because of documents and BNC and Lehman Brother's witness, testimony of Daniel Glanz, Lehman Brothers, Vice president, consisting of 18 paragraphs, dated April 22, 2013. (Exhibit # 1 or Hearing Transcript). These all revealed the use of database(s), that BNC, Lehman Brother's and its employees and/or other affiliates had access to, and with the ability to input or alter what was originally agreed to. As a result, BNC and Lehman Brothers were shown to be involved in one or more of the following electronic databases and archives:

a.  Hold On Tracking: BNC and LHBI's only witness, Mr. Glanz testified that he merely used an exhibit document from a database system. However, Mr. Glanz only provided one heading and one line of typed in information, which is only an *"extract, a report from a database,"* that since September of 2001, Mr. Glantz was responsible for the Lehman's Group system called *"Hold On Tracking",* which is a *"platform built to be the*

*system of record to maintain a record of all the loans that Lehman [indiscernible] purchased and either held or sold and it was a place for Lehman to keep track of the loans that it owned, get regular updates on their performance and ultimately track if they were sold, that sale of those mortgages. Which <u>Lehman business people depended on information that was contained in the Hold On Tracking system</u> to show things like sales or assignments of loans out of the estate to third parties."* ... *"Hold On tracking essentially is two pieces, the <u>database that stored data</u> and then a software application that <u>allowed users to access the data to view the data and to modify it</u> through their ordinary business dealings. Post bankruptcy the system was shut down, it was no longer in use and the <u>database itself was maintained by the estate</u> for the purposes of research <u>and having access to those records.</u> That database was, what we call, it's been put into a read only mode so you couldn't modify the data, all you could do is read from it and generate reports from the system. The <u>record that I provided here was the only information I was able to find on the loan in question.</u> It's a very brief record, <u>it doesn't state much.</u> ..."* ... *"where it identifies the name of the buyer there was no record kept in this system specifically who the buyer was. It just used the generic moniker, the street, which is meant to identify any non-Lehman company. So all this record is really telling you is that on December 30 of 2002, this loan was sold and it was sold to a third party. The name of that third party was not recorded in this system, and then there were no further records maintained on this loan. Generally, once Lehman sold the loan, it did not keep track of it, it had no relationship to it and it just did not interact with that loan any further."* ... *"A. No, I searched not only in this system but we have just electronic archives that we maintain postpetition, did a search for them for both the property address and the loan number, and I was not able to locate any further documentation or any further records."*

b. <u>Mortgage Electronic Registration Systems, Inc. ("MERS")</u>:  MERS system was found to merely be a database that tracks mortgages and assignment of mortgages. However, the database can be accessed by thousands of employees that MERS or MERSCORP has with Service Providers or other affiliates.  To date, BNC and LHBI have not responded as to why the MERS MIN website search displayed "Aurora Bank FSB" (f/k/a Lehman Brothers Bank, FSB) as investor of a "Note, dated October 18, 2002." (Exhibit "D" "MERS MIN").

c. The "Comments" section that The Florida Bankers Association, Virginia Townes, Esq. served on The Honorable Jennifer D. Bailey, Task Force Chair. The Comments testify that original notes were *"deliberately eliminated to avoid confusion"* after they were *"entered into an electronic format system"*. <u>*In Re: Amendments To Rules Of Civil Procedure And Forms For Use With Rules Of Civil Procedure,*</u> Case No.: 09-1460, February 11, 2010 Comments"). This report may also refer to MERS and/or New Image and/or Matrix and/or DocX/Lenders Processing Services software system.

d. <u>Securities Exchange Commissions ("SEC")</u>:  In 2008, because I did not have any agreement or link to WFTB, from the state court case, I searched the SEC Edgar website. And the link provided at that time by the SEC Help Department was on July 24, 2008, believing it was *"under the filer name Structured Asset Sec Corp Mort Pass Thr Cert Ser*

*2002-Bc10 in the EDGAR database (http://www.sec.gov/cgi-bin/browse-edgar?company=Structured+Asset+Sec+Corp+Mort+Pass+Thr+Cert+Ser+2002-Bc10&CIK=&filenum=&State=&SIC=&owner=include&action=getcompany)*". This website link displayed *"STRUCTURED ASSET SEC CORP MORT PASS THR CERT SER 2002-BC10 (0001212137)"; "Type: 424B5 | Act: 33 | File No.: 333-92140-17 | Film No.: 02870684" "SIC: 6189 - Asset-Backed Securities;* and that it was *"Modified: 02/06/2006".* And, at that time was shown the *"Business Address: 3 World Financial Center, New York, NY 10285; State of Incorp.: DE."*

e. In May of 2013, this same link now displays that it was "Modified: 03/14/2012. *"Structured Asset Corp Mort Pass Thr Cert Ser 2002-BC10" "CIK#: 0001212137 (see all company filings)"* now with its *"Business Address: 3 World Financial Center, New York NY 10285, 2125267000".* This is another database system, where the filer submitted an amended form, however, there are differences, which can only be answered by the filer. Both of these links show a Prospectus Supplement (To Prospectus dated October 28, 2002). The date of this prospectus supplement is December 23, 2002. However, these filing have not shown that the subject loan was placed into this trust account and BNC and LBHI have not submitted any document of these filings.

9. According to the information being provided by BNC and LHBI's witness, Mr. Glanz, and after searching the SEC Edgar website, there would be other debtors or creditors and other affiliates that I may be required to file claims against other than BNC and LHBI, which may include names found in the prospectus agreements, such as Structured Asset Securities Corporation Trust Agreement with service providers; Lehman Brothers, delivery of the certificates offered by this prospectus supplement; by Underwriter Lehman Brothers; Lehman Brothers Inc., certificates offered by prospectus supplement and purchased, principal or agent, affiliate of the depositor, the sellers, the master servicer and the cap provider, in connection with market making transactions in the certificates, Cap Provide for interest rate cap agreement with Lehman Brothers Special Financing Inc.; and other line order against the property.

10. I submit evidence that BNC and Lehman Brothers held insurance contracts, may have held derivative contract agreements with mortgage loans originated by BNC, and may have collected money, because of the following:

a. Mr. Glanz's stated that he was not aware of " *any records regardless of whether it's with reference to this loan that Lehman maintains that purport to connect the insurance contracts or derivative contracts with mortgage loans that had been originated by BNC at any time?"* (Exhibits "1" and "Hearing Transcript").

b. Lehman Brother's own filing in this case states *"As of the Petition Date, the Lehman Debtors were party to more than 906,000 derivatives contracts."*

c. The mortgage documents refers to insurance and a "Loan Document Worksheet" regarding the mortgage, names BNC under the heading "Beneficiary / Trustee..." - "Beneficiary to Read: BNC Mortgage, Inc. a Delaware corporation, P.O. Box 19656, Irvine, California 92623-9656." (Exhibit "N" "BNC Beneficiary" - # 000783);

d. BNC and/or Lehman Brothers held an insurance policy (#FO2-0154377), which describes the subject property located at Laurel Road. However, the discovery consists of policies belonging to two properties, and other information is missing that is required

under the "Conditions And Stipulations" which states *"Valid Only If Front Page And Schedules A & B Are Attached."* (Exhibit "O" "Insurance Policies" (000408). *"Condition And Stipulations – continued: Proof of Loss or Damage.": "5. ... In addition to and after the notices required under Section 3 of these Conditions and Stipulations have been provided the Company, a proof of loss or damage signed and sworn to by the Insured claimant shall be furnished to the company within 90 days after the insured claimant shall ascertain the facts giving rise to the loss or damage. ... If the Company is prejudiced by the failure of the insured claimant to provide the required proof of loss or damage, the Company's obligation to the insured under the policy shall terminate, including any liability or obligation to defend, prosecute or continue any litigation, with regard to the matter or matters requiring such proof of loss or damage."*

e. The discovery sent to me in the state court case was all intermixed records belonging to two different properties, and provides the proof that BNC and Lehman passed on mixed documents and caused the wrong loan account to be collected on. (i.e. Exhibit "O" "Insurance Policies" -#000593).

f. C-Span Washington Journal reported on May 15, 2009, the Professor and Director of the Center Department of Homeland Security and of the University of Maryland Law School, Michael Greenberger, talked about the Administration's plan to change rules regarding "derivatives" (financial contracts). C-SPAN: http://www.c-spanvideo.org/program/286360-4 where Mr. Greenberger stated (Excerpts): *"So what the Banks decided to do was to create bets on whether or not the mortgages would be paid off. ..., they would insure the value of whatever payments were made and the returns. ... They got paid off if there was a mortgage failure. So that puts them in a position of being happy when people don't pay their mortgages ... Your going to try and do whatever you can to prevent mortgages from being paid off, modified and everything else. ... For every loan that doesn't get paid off, we've got three times the amount of bets relating to that loan. ..., because every lose is going to be compensated three times the value, maybe more, ..., if someone doesn't pay their mortgage, I've got a bet that needs to be paid off. And that is where we have trillions and trillions of dollars at stake here. It's on the bets and not on the real economic world. ... ."*

11. I submit evidence that BNC and LHBI's only Witness, Mr. Glanz's (Exhibits "1" and "Hearing Transcript") claims that the loan was sold on December 30, 2002, and that Option One Mortgage Corporation ("Option One") was the service provider, must be incorrect because of the following:

a. BNC never sent any notice of any sale or transfer of interest in the loan;

b. BNC never sent any notice that the loan was placed in a securitization trust;

c. And if the subject loan was in a trust account, the Note endorsement page (Exhibit "G") would show further endorsements chain relating to the trust.

d. Option One is merely a company that has servicing rights;

e. Mr. Glanz may not even know whether the loan was sold and may have been looking at a loan pay off belonging to the other property. (Exhibit "P" "Option One Pay Off").

f. Mr. Glanz may have been looking at a database that was manipulated due to the fact that the discovery information sent to me consisted of mixed up records belonging to two different properties, or could have been manipulated by anyone who had access to Lehman's database system, before or after BNC and LHBI filed bankruptcy, in order to hide the forgery, the mix up and collection of the wrong loan account.

g. And, Mr. Glanz'z exhibit conflicts with discovery produced from the state court of an agreement between *"Fairbanks Capital Corp., as Servicer; Lehman Capital, a Division of Lehman Brother holdings, Inc., as Seller; And Aurora Loan Services Inc., As Master Servicer, for Structured Asset Securities Corporation Amortizing Residential Collateral Trust Mortgage Pass-Through Certificates, Series 2002-BC10," a "Securitization Servicing Agreement" "Dated as of December 1, 2002".* (Exhibit "Q" "Lehman SSA # 000146).

12. After I saw a Suggestion of Bankruptcy filed in the state court by the Akerman Senterfitt Attorney representing BNC in this bankruptcy court. I eventually filed a proof of claim, because WFBT continued to threaten the foreclosure action, instead of voluntarily dismissing its action, even after a state court order stated there was no default seen. And because the Representatives were causing damages and loss of income that I have not recouped.

13. I periodically checked the Epiq DebtorMatrix Docket for this case, and it was years later that the Debtors' BNC and LHBI filed objections to my claims for filing past the bar date deadline, however, there has not been any dispute to my Response to Debtor's objections of attempting to timely file my initial proof of claims, which consists of the following: (1) That the Creditor's receipt of express mailing proof of claims to the Court is dated September 22, 2009, which is same day as the bar date. (2) that the Epiq Solutions' website provided statements that Epiq would file the proof of claims to the court if received; and, (3) that Epiq Solutions and the Lehman legal team received notice of the claims the same day as the bar date. (Exhibit "R" Receipt and Email).

14. Thereafter, I was not given notice for the meeting of the creditors or the bar date notice, and believed at that time that I was already on a list. And most of the amended evidence presented was provided during the state court, which I didn't receive until after filing my proof of claims. As a result, it is difficult to amend my claims and follow the procedures.

15. I filed Proof of Claims and Statement requesting discovery from Lehman Brothers and BNC, which have remained unanswered, however, I can also testify or submit evidence of testimony, investigations and official consent orders regarding all of the entities or representatives involved, including the following:

a. I heard Eric Stein on C-Span testifying at a Congressional hearing before the Senate Committee Banking, Housing and Urban Affairs on October 16, 2008, that BNC used wite-out and forged documents;

b. The New York U.S. Bankruptcy Court Ruled that MERS's Business Model Is Illegal, was reported in the HuffPost Social News, L. Randall Wray, [also see *In re Agard*, Case No. 810-77338-reg, Feb. 10, 2011, USBC Eastern District of New York, Grossman, J., Memorandum Decision];

c. Testimony by James Kawalski, Jr., Esq., was before the Committee On The Judiciary United States House of Representatives, December 2, 2010, and he conducted a Deposition of SPS employee, Mindy Leetham, dated January 15, 2008, in *The Bank Of New York v. Paulette Willians, Etal*, under Case No.: 16-2006-CA-1564. There is also a court Order noting this "Deposition of Mindy Leetham", ordering dismissal of that case because the bank's *"admitted lack of standing was glaring, straightforward and clear, and doomed the Bank's case from the outset commenced"*. *The Bank of New York v. Williams*, Case No.: 1D07-2626, April 10, 2008, (Fla. 1st DCA).

d. MERS signed a consent Order to Cease and Desist *"certain deficiencies and unsafe or unsound practices by MERS and MERSCORP."* *In the Matter of: MERS and MERSCORP Inc.*, April 13, 2011, Stipulation, and *MERSCORP, Inc., and Mortgage Electronic Registration Systems, Inc.,* Reston, Virginia, April 12, 2011, with The Comptroller of the Currency of the United States of America, Board of Governors of the Federal Reserve System, Federal Deposit Insurance Corporation, the Office of Thrift Supervision, and the Federal Housing Finance Agency.

e. Aurora Bank also signed a cease and desist agreement. *In The Matter of Aurora Bank FSB*, OTS Docket No. 06069, April 13, 2011, by The Office of Thrift Supervision (OTS) "Stipulation And Consent To Issuance Of a Consent Order," Order No.: NE-11-16, Aurora Bank FSB, Wilmington, Delaware (Association).

f. Wells Fargo Bank, N.A., are again under investigation and also signed Cease and Desist Orders agreeing to cease and desist from using fraudulent documents they create to foreclose. *In the Matter of: Wells Fargo & Company of San Francisco, and Wells Fargo Financial, Inc., of Des Moines*, Docket Nos. 11-094-B-HC1 11-094-I-HC1 11-094-B-HC2 11-094-I-HC2, Board of Governors of the Federal Reserve System, July 20, 2011; and Wells Fargo NJ Order to Show Cause Administrative Order - Signed 12-20-10, *In The Matter of Residential Mortgage Foreclosure Pleading And Document Irregularities*, Docket No. F-059553-10, Mary C. Jacobson, Pj. Ch., Superior Court of New Jersey Chancery Division Mercer County.

**I understand that I am swearing or affirming under oath to the truthfulness of the claims made in this petition and that the punishment for knowingly making a false statement includes fines and/or imprisonment.**

Dated June 17, 2013

Submitted by:

Deborah E. Focht
1613 Ingram Avenue
Sarasota, Florida 34275
(941) 350-0561

<u>Certificate of Service</u>

      Creditor, Deborah E. Focht, hereby, certifies that the, Creditor's Affidavit shall be mailed, emailed and/or delivered by express mail, on or soon after this 17th day of June, 2013.

*Deborah E. Focht*

Deborah E. Focht
1613 Ingram Avenue
Sarasota, Florida 34232
americanreply@gmx.com
(941) 350-0561

VIA OVERNIGHT MAIL

United States Bankruptcy Court
Southern District of New York
Alexander Hamilton Customs House
One Bowling Green
New York, NY 10004-1408

The Chambers of The Honorable James M. Peck
One Bowling Green, Courtroom
New York, New York, 10004-1408

cc:  Weil, Gotshal & Manges, LLP
767 Fifth Avenue
New York, New York 10153
Attn: Jacqueline Marcus, Esq.
attorneys for the Plan Administrator,
the Debtors, and certain of its affiliates;

The Office of the United States
Trustee for Region 2
33 Whitehall Street, 21st Floor
New York, New York, 10004
Attn: Tracy Hope Davis, Esq.
Elisabetta G. Gasparini, Esq.
and Andrea B. Schwartz, Esq.

Epiq Bankruptcy Solutions, LLC
Attn: Lehman Brothers Holdings Claims Processing
757 Third Avenue, 3rd Floor
New York, New York 10017

<u>Certificate of Sworn Affidavit</u>

STATE OF FLORIDA
COUNTY OF SARASOTA

Sworn to and subscribed, before me this __17__ day of __June_____, 2013,
by __Deborah E. Focht_____ (name of person making statement), and is:
Personally Known __✓__, OR Produced Identification _____ Type of Identification Produced
_____.

_____
(Signature of Notary Public - State of Florida)

NANCY E. ALVIS
Comm# DD0906783
Expires 7/12/2013
Florida Notary Assn., Inc

_____
(Print, Type, or Stamp Commissioned Name of Notary Public)

11

# Exhibit "3"

**United States Bankruptcy Court/Southern District of New York**
Lehman Brothers Holdings Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5076
New York, NY 10150-5076

| In Re: Lehman Brothers Holdings Inc., et al. Debtors. | Chapter 11 Case No. 08-13555 (JMP) (Jointly Administered) |
|---|---|
| Name of Debtor Against Which Claim is Held Bnc Mortgage LLC | Case No. of Debtor 09 - 10137 (JMP) |

# PROOF OF CLAIM

Filed: USBC - Southern District of New York
Lehman Brothers Holdings Inc., Et Al.

08-13555 (JMP)          0000034380

THIS SPACE IS FOR COURT USE ONLY

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)

Deborah E. Focht
530 E. Laurel Road
Nokomis, FL 34275

☐ Check this box to indicate that this claim amends a previously filed claim.

Court Claim Number: _____
  (If known)

Filed on: _____

Telephone number: (941) 350-0561     Email Address: americanreply@gmail.co

Name and address where payment should be sent (if different from above)

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

Telephone number: _____     Email Address: _____

1. **Amount of Claim as of Date Case Filed:** $ 160,537.26+

If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete item 4.
If all or part of your claim is entitled to priority, complete Item 5.
If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete Item 6.
☑ Check this box if all or part of your claim is based on a Derivative Contract.*
☑ Check this box if all or part of your claim is based on a Guarantee.*

**\*IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.**

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is a based on a Derivative Contract or Guarantee.

2. **Basis for Claim:** wrongful foreclosure for paid fraudulent loan
   (See instruction #2 on reverse side.)

3. **Last four digits of any number by which creditor identifies debtor:** FOCH
   3a. Debtor may have scheduled account as: # 2002175528
   (See instruction #3a on reverse side.)

4. **Secured Claim** (See instruction #4 on reverse side.)
   Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
   Nature of property or right of setoff: ☐ Real Estate   ☐ Motor Vehicle   ☐ Other
   Describe: _____
   Value of Property: $ _____   Annual Interest Rate _____%
   Amount of arrearage and other charges as of time case filed included in secured claim, if any:
   $ _____   Basis for perfection: _____
   Amount of Secured Claim: $ _____   Amount Unsecured: $ _____

5. **Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

**Amount entitled to priority:**

$ _____

6. **Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9):** $ _____
   (See instruction #6 on reverse side.)

7. **Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

8. **Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest. *(See definition of "redacted" on reverse side.)* If the documents are voluminous, attach a summary.
DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

FOR COURT USE ONLY

**FILED / RECEIVED**

SEP 23 2009

EPIQ BANKRUPTCY SOLUTIONS, LLC

| Date: 9/21/09 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any. _Deborah E. Focht_ |
|---|---|

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

**United States Bankruptcy Court/Southern District of New York**
Lehman Brothers Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5076
New York, NY 10150-5076

**PROOF OF CLAIM**

| In Re: Lehman Brothers Holdings Inc., et al., Debtors. | Chapter 11 Case No. 08-13555 (JMP) (Jointly Administered) |
|---|---|
| Name of Debtor Against Which Claim is Held **Lehman Brothers Holdings Inc., et al.** | Case No. of Debtor Case No. 08-13555 (JMP) |

Filed: USBC - Southern District of New York
Lehman Brothers Holdings Inc., Et Al.
08-13555 (JMP)          0000034381

0000034381

THIS SPACE IS FOR COURT USE ONLY

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)

Deborah E. Focht
530 E. Laurel Road
Nokomis, FL 34275

Telephone number: (941) 350-0561    Email Address: americanreply@gmail.co

☐ Check this box to indicate that this claim amends a previously filed claim.

Court Claim Number:_____
(If known)

Filed on:_____

Name and address where payment should be sent (if different from above)

Telephone number:          Email Address:

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

1. **Amount of Claim as of Date Case Filed:** $ $1,104,000.00+
If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete item 4.
If all or part of your claim is entitled to priority, complete Item 5.
If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete Item 6.
☑ Check this box if all or part of your claim is based on a Derivative Contract.*
☑ Check this box if all or part of your claim is based on a Guarantee.*

**\*IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.**
☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is a based on a Derivative Contract or Guarantee.

2. **Basis for Claim:** May be Actual Lender holding Insurance or Derivative Agreements
(See instruction #2 on reverse side.)

3. **Last four digits of any number by which creditor identifies debtor:** FOCH
3a. **Debtor may have scheduled account as:** # 2002175528
(See instruction #3a on reverse side.)

4. **Secured Claim** (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
Nature of property or right of setoff: ☐ Real Estate   ☐ Motor Vehicle   ☐ Other
Describe:_____
Value of Property: $_____ Annual Interest Rate _____%
Amount of arrearage and other charges as of time case filed included in secured claim, if any:
$_____ Basis for perfection: _____
Amount of Secured Claim: $_____   Amount Unsecured: $_____

5. **Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.**

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries or commissions (up to $10,950) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

Amount entitled to priority:

$_____

6. **Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9):** $_____
(See instruction #6 on reverse side.)

7. **Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.
8. **Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest. (See definition of "redacted" on reverse side.) If the documents are voluminous, attach a summary.
DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

FOR COURT USE ONLY

**FILED / RECEIVED**

SEP 23 2009

EPIQ BANKRUPTCY SOLUTIONS, LLC

| Date: 9/21/09 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any. *Deborah E. Focht* |
|---|---|

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

# Exhibit "A"

# Corporate Warranty Deed

This Indenture, made this 27th day of September . A.D. 2002 . Between

GREG VINE ENTERPRISES, INC.

whose post office address is: 1730 PINES WAY
NOKOMIS, FLORIDA 34275
P.O. Box 1750 Venice Fl. 34284
a corporation existing under the laws of the
State of FLORIDA , Grantor and
DEBORAH E. FOCHT

whose post office address is: 2655 Bay St.
Sarasota, Fl. 34237- 7623

Grantees' Tax Id # :

Grantee,

RECORDED IN OFFICIAL RECORDS
INSTRUMENT # 2002175527 2 PGS
2002 OCT 23 04:33 PM
KAREN E. RUSHING
CLERK OF CIRCUIT COURT
SARASOTA COUNTY, FLORIDA
FMILLER Receipt#233293
Doc Stamp-Deed:   973.00



2002175527

Witnesseth, that the said Grantor, for and in consideration of the sum of ( Ten & NO/100 ) Dollars, to it in hand paid by the said Grantee, the receipt whereof is hereby acknowledged, has granted, bargained and sold to the said Grantee forever, the following described land, situate, lying and being in the County of Sarasota , State of Florida, to wit:

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF

Subject to all valid covenants, restrictions and easements of record.

PARCEL #0383-04-0003

Subject to covenants, restrictions and easements of record. Subject also to taxes for 2002    and subsequent years.

And the said Grantor does hereby fully warrant the title to said land, and will defend the same against the lawful claims of all persons whomsoever.

In Witness Whereof, the said Grantor has caused this instrument to be executed in its name by its duly authorized officer and caused its corporate seal to be affixed the day and year first above written.

GREG VINE ENTERPRISES, INC.

Signed and Sealed in Our Presence:

By: Greg Vine s Pres

its

GREG VINE

PRESIDENT

(Corporate Seal)

Witness Print Name: CATHY J. HAITZ

Witness Print Name: Barbara A. Shepard

State of FLORIDA
County of SARASOTA

The foregoing instrument was acknowledged before me this 27th day of September 02 , by Greg Vine as President of GREG VINE ENTERPRISES, INC.

a corporation existing under the laws of the State of FLORIDA on behalf of the corporation. He/She is personally known to me or has produced Florida Drivers License as identification.

Notary Public
Print Name:
My Commission Expires:

OFFICIAL NOTARY SEAL
BARBARA A SHEPARD
NOTARY PUBLIC STATE OF FLORIDA
COMMISSION NO. DD108229
MY COMMISSION EXPIRES
MAR. 26, 2005

PREPARED BY: MARY ANN PIGLOW
RECORD & RETURN TO:
PROFESSIONAL TITLE SERVICES OF SARASOTA
6378 N. Lockwood Ridge Rd., Parkway Collection
Sarasota, Florida 34243

CWD-1
6/99

OFFICIAL RECORDS INSTRUMENT # 2002175527 2 PGS

## Exhibit "A"

The North 180 feet of that part of the North 1/2 of the NW 1/4 of the NW 1/4 of the NW 1/4 of Section 31, Township 38 South, Range 19 East, lying West of the Seaboard Airline Railway right-of-way, being more particularly described as follows: Commence at the NW corner of said Section 31, Township 38 South, Range 19 East, also being the Point of Beginning; thence N 89 degrees 41' 54" E, along the North line of said Section 31, a distance of 55.63 feet to the Westerly right-of-way line of the said Railway; thence S 11 degrees 56' 44" E, along Railway right-of-way line, a distance of 183.77 feet; thence S 89 degrees 41' 54" W, a distance of 94.39 feet to the Westerly line of said Section 31; thence N 00 degrees 13' 38" E, along said Westerly Section Line a distance of 180.00 feet to the Point of Beginning, LESS that part of the above described which lies Southerly of the Maintained right-of-way of Laurel Road, according to the Map thereof filed in Road Plat Book 3 at page 20, of the Public Records of Sarasota County, Florida, and Northerly of the following described right-of-way line: Commence at the Northeast corner of Section 36, Township 38 South, Range 18 East, Sarasota County, Florida, which is certified to the Florida Department of Natural Resources by Corner Record Document #7886, being also the Point of Intersection of a circular curve concave to the North, having a radius of 68,750.00 feet and a central angle of 00 degrees 26' 54", thence run South 88 degrees 35' 35" West from said corner, along the North line of said Section 36 for a Tangent Distance of 268.98 feet to the Point of Curvature of said curve, thence run South 01 degrees 24' 25" East along a radial line, for a distance of 35.00 feet to the Point of Beginning of the herein described curve concave to the North, having a radius of 68,785.00 feet, and a central angle of 00 degrees 16' 35"; thence run Easterly along the arc of said curve for a distance of 331.83 feet to the intersection with the Westerly right-of-way line of the Seaboard Coastline Railroad and the end of said right-of-way line.

# Exhibit "B"



## LOAN DISBURSEMENT INSTRUCTIONS

BNC Mortgage, Inc.

| | |
|---|---|
| **To:** LEHMAN BROTHERS | **From:** BNC MORTGAGE |
| 101 HUDSON ST | 1063 MCGAW AVE |
| JERSEY CITY, NJ 07302 | IRVINE, CA 92614 |
| **App. No.:** ANA7346FOCH | **Loan No.:** ANA7346FOCH |
| **Borrower:** DEBORAH E. FOCHT | **Funding Date:** October 18, 2002 |
| **Borrower:** | **Loan Amount:** 110,400.00 |
| **Address:** 530 LAUREL ROAD | **City:** NOKOMIS, FL 34275 |

---

### 1. Title Insurance Company          Wire Amount:          109,239.18

| | |
|---|---|
| **Bank Name:** AMERICAN BANK | **ABA Routing No.:** 063113727 |
| **City / State:** BRADENTON, FL. | |
| **Credit to Account Name:** | **ABA Routing No.:** |
| | **Credit to Account No.:** |
| **Futher Credit to:** PROFESSIONAL TITLE SERV. | **Futher Credit to Acct. No.:** 1099638 |
| **Phone Number:** (941)358-6280 | **Reference:** 19037/FOCHT |
| **Attn:** MARY ANN FIGLOW | |

---

### 2. Loan Servicer          Wire Amount:          344.82

Option One Mortgage

Wire consists of the following:

| | | |
|---|---|---|
| | 274.82 | Prepaid Interest |
| | | Total Impounds |
| | 70.00 | Tax Service |
| | | MERS Registration |

---

### 3. BNC Origination Fees          Wire Amount:          816.00

Yield Spread Premium: 0.00

---

### 4. Loan Information

| | |
|---|---|
| **Interest Rate:** 6.400 | **Margin:** 6.35 |
| **Credit Rating Risk:** A+ SA | **LTV:** 79.42 |
| **Property Value for LTV:** 139,000.00 | **Term:** 360          **Maturity Date:** 11/01/2032 |
| **Kind:** 2 YEAR FIXED 1/7 | **Program:** FULL-DOC |
| **TRW Fico:** 647 | **P&I:** 690.36 |

### Approved for Disbursement

| | |
|---|---|
| **BNC Funder:** MIA COOKS | **Date:** 10/18/2002 |
| **BNC Representative:** | **Date:** 10/18/2002 |

Focht-000667

Exhibit "Lehman Took Funds"

# Exhibit "C"

Return To:

BNC MORTGAGE, INC.
P.O. BOX 19656
IRVINE, CA 92623-9656

This document was prepared by

RETURN TO: 214
PROFESSIONAL SERVICES OF SARASOTA
6278 N. LOCKWOOD RIDGE RD.
SARASOTA, FLORIDA 34243

RECORDED IN OFFICIAL RECORDS
INSTRUMENT # 2002175528 21 PGS
2002 OCT 23 04:33 PM
KAREN E. RUSHING
CLERK OF CIRCUIT COURT
SARASOTA COUNTY,FLORIDA
FMILLER Receipt#233293
Doc Stamp-Mort:    386.40
Intang. Tax:    220.80

LH020C

2002175528

——————[Space Above This Line For Recording Data]——————

# MORTGAGE

MIN 10012220000000209152

Loan No.: AKA7346FOCH

Leh

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated October 17, 2002 together with all Riders to this document.

(B) "Borrower" is DEBORAH E. FOCHT , a single woman

Borrower is the mortgagor under this Security Instrument.

(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(D) "Lender" is BNC MORTGAGE, INC., A DELAWARE CORPORATION

FLORIDA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS    Form 3010  1/01

-6A(FL) (0005).01
Page 1 of 16

VMP MORTGAGE FORMS - (800)521-7291

Focht-000378

Exhibit "Mortgage Leh"

STATE OF FLORIDA,

    The foregoing instrument was acknowledged before me this *18th* of *October 2002* by DEBORAH E. FOCHT

*Sarasota* County ss:

who is personally known to me or who has produced *Fl. Dr. Lic* as identification.

Notary Public



  -6A(FL) (0005).01      Page 15 of 15      Form 3010  1/01

Focht-000972

Exhibit "Mortgage Leh"

# Exhibit "D"

 

## 1 record matched your search:

[Need help?](#)

| | | |
|---|---|---|
| MIN:1001222-0000020915-2 | Note Date:10/18/2002 | MIN Status:Active |
| Servicer: Select Portfolio Servicing Inc | | Phone:(801) 293-2583 |
| Salt Lake City, UT | | |
| Investor: Aurora Bank FSB | | Phone:(308) 220-2123 |
| Scottsbluff, NE | | |

[Return to Search](#)

For more information about MERS please go to [www.mersinc.org](http://www.mersinc.org)

Copyright© 2006 by MERSCORP, Inc.

Exhibit "MER MIN"

# Exhibit "E"

Recording Requested By:
SELECT PORTFOLIO SERVICING, INC.

When Recorded Return To:

BILL KOCH
SELECT PORTFOLIO SERVICING, INC.
3815 SW TEMPLE
SALT LAKE CITY, UT 84115

### CORPORATE ASSIGNMENT OF MORTGAGE

Sarasota, Florida    SELLER'S SERVICING #: 0003829042    "FOCHT"
DIVESTOR #:
MERS #: 100122200000208182

Date of Assignment: September 22nd, 2008
Assignor: MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR BNC MORTGAGE, INC
at 3815 SW TEMPLE, SALT LAKE CITY, UT 84115
Assignee: WELLS FARGO BANK, N.A., SUCCESSOR BY MERGER TO WELLS FARGO BANK MINNESOTA,
NATIONAL ASSOCIATION, AS TRUSTEE, IN TRUST FOR THE HOLDERS OF STRUCTURED ASSET
SECURITIES CORPORATION - AMORTIZING RESIDENTIAL COLLATERAL TRUST MORTGAGE PASS
THROUGH CERTIFICATES, SERIES 2002-BC10 at 3815 SW TEMPLE, SALT LAKE CITY, UT 84115
Executed By: DEBORAH E. FOCHT To: MERS AS NOMINEE FOR BNC MORTGAGE, INC., A DELAWARE
CORPORATION
Date of Mortgage: 10/17/2002 Recorded: 10/23/2002 In Book/Reel/Liber: 2258 Page/Folio: 484 as Instrument No.:
2002175528 In Sarasota, Florida

Property Address: 530 LAUREL ROAD, NOKOMIS, FL 34275

KNOW ALL MEN BY THESE PRESENTS that in consideration of the sum of TEN and NO/100ths DOLLARS and
other good and valuable consideration, paid to the above named Assignor, the receipt and sufficiency of which is
hereby acknowledged, the said Assignor hereby assigns unto the above-named Assignee, the said Mortgage
together with the Note or other evidence of indebtedness (the "Note"), said Note having an original principal sum of
$110,400.00 with interest, secured thereby, together with all moneys now owing or that may hereafter become due
or owing in respect thereof, and the full benefit of all the powers and of all the covenants and provisos therein
contained, and the said Assignor hereby grants and conveys unto the said Assignee, the Assignor's beneficial
interest under the Mortgage.

TO HAVE AND TO HOLD the said Mortgage and Note, and also the said property unto the said Assignee forever,
subject to the terms contained in said Mortgage and Note.

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR BNC MORTGAGE, INC
On _____ SEP 2 6 2008

By: _____
Bill Koch, Assistant Secretary

WITNESS _____
Ana Nikolakovic

WITNESS _____
Marco Villagran

STATE OF Utah
COUNTY OF Salt Lake

On SEP 2 6 2008 , before me, KIMBERLY CLARK, a Notary Public in and for Salt Lake in the State of Utah,
personally appeared Bill Koch, Assistant Secretary , MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.
AS NOMINEE FOR BNC MORTGAGE, INC personally known to me (or proved to me on the basis of satisfactory
evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me
that he/she/they executed the same in his/her/their authorized capacity, and that by his/her/their signature on the
instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal,

_____
KIMBERLY CLARK
Notary Expires: 12/11/2011

NOTARY PUBLIC
KIMBERLY CLARK
3315 South 92 West
Salt Lake City Utah 84115
My Commission Expires
December 11, 2011
STATE OF UTAH

(This area for notarial seal)

Prepared By:    Jeff Pross, RICHMOND MONROE GROUP 15311 HIGHWAY 13, BRANSON WEST, MO 65737 417-733-9412

*FDC*ROCMERC*09/22/2008 11:11:33 AM* ASR03MMRC0000000000003274*6* FLSRFAS* 0003829042 FLSTATE_MORT_ASSIGN_ASSN *ADFACKMRC*

Focht-000418

Recording Requested By:
SELECT PORTFOLIO SERVICING, INC.

When Recorded Return To:

BILL KOCH
SELECT PORTFOLIO SERVICING, INC
3815 SW TEMPLE
SALT LAKE CITY, UT 84115

**CORPORATE ASSIGNMENT OF MORTGAGE**

Sarasota, Florida SELLER'S SERVICING #: 0063898042 "FOCHT"
INVESTOR #:
MERS #: 100122200000209182

Date of Assignment: February 13th, 2009
Assignor: MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR BNC MORTGAGE, INC at 3815 SW TEMPLE, SALT LAKE CITY, UT 84115
Assignee: WELLS FARGO BANK, N.A., SUCCESSOR BY MERGER TO WELLS FARGO BANK MINNESOTA, NATIONAL ASSOCIATION, AS TRUSTEE, IN TRUST FOR THE HOLDERS OF STRUCTURED ASSET SECURITIES CORPORATION - AMORTIZING RESIDENTIAL COLLATERAL TRUST MORTGAGE PASS THROUGH CERTIFICATES, SERIES 2002-BC10 at 3815 SW TEMPLE, SALT LAKE CITY, UT 84115
Executed By: DEBORAH E. FOCHT To: MERS AS NOMINEE FOR BNC MORTGAGE, INC., A DELAWARE CORPORATION
Date of Mortgage: 10/17/2002 Recorded: 10/23/2002 in Book/Reel/Liber: 2258 Page/Folio: 484 as Instrument No.: 2002175528 in Sarasota, Florida

Property Address: 530 LAUREL ROAD, NOKOMIS, FL 34275

KNOW ALL MEN BY THESE PRESENTS that in consideration of the sum of TEN and NO/100ths DOLLARS and other good and valuable consideration, paid to the above named Assignor, the receipt and sufficiency of which is hereby acknowledged, the said Assignor hereby assigns unto the above-named Assignee, the said Mortgage together with the Note or other evidence of indebtedness (the "Note"), said Note having an original principal sum of $110,400.00 with interest, secured thereby, together with all moneys now owing or that may hereafter become due or owing in respect thereof, and the full benefit of all the powers and of all the covenants and provisos therein contained, and the said Assignor hereby grants and conveys unto the said Assignee, the Assignor's beneficial interest under the Mortgage.

TO HAVE AND TO HOLD the said Mortgage and Note, and also the said property unto the said Assignee forever, subject to the terms contained in said Mortgage and Note.

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR BNC MORTGAGE, INC
On FEB 13 2009
By: [signature]
Bill Koch, Assistant Secretary

WITNESS [signature]
Ana Novakovich

WITNESS [signature]
Kimberly Clark

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. CORPORATE SEAL 1999 DELAWARE

STATE OF Utah
COUNTY OF Salt Lake

On FEB 13 2009, before me, SHIRLEY TUITUPOU, a Notary Public in and for Salt Lake in the State of Utah, personally appeared Bill Koch, Assistant Secretary, Select Portfolio Servicing, Inc., f/k/a Fairbanks Capital Corp. personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that by his/her/their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal,
[signature]
SHIRLEY TUITUPOU
Notary Expires: 11/12/2012 #576792

SHIRLEY TUITUPOU
Notary Public State of Utah
My Commission Expires on:
November 12, 2012
Comm. Number: 576792

(This area for notarial seal)

Prepared By: Jeff Prose, RICHMOND MONROE GROUP 15811 HIGHWAY 13, BRANSON WEST, MO 65737 417-739-8412

*ROCYROCAMRC*02/13/2009 08:28:43 AM* AMRC*MRC*0000000000000000000*2149* FLSARAS* 0063898042 FLSTATE_MORT_ASSIGN_ASSN *ACKYACKAMRC*

Focht-000416

Exhibit "Assignments" 2 of 2

# Exhibit "F"



December 03, 2007

Deborah Focht
1613 Ingram Ave
Sarasota, FL 34232

RE: Loan Number 0003999042

Dear Deborah Focht :

Thank you for your recent request for copies of your mortgage loan documents.  In response to your request, we enclose the following:

      Note

Are you aware that Select Portfolio Servicing, Inc. (SPS) has updated our website?  As an SPS customer, you may register at www.spservicing.com where, based on the status of your mortgage loan, you will be able to access your account information.  The account information that you may access on our website includes:

- Make your monthly mortgage payment online or sign up for automatic deduction/ACH.
- Update your Contact Information.
- Review/Request Payment Histories.
- Submit Evidence of Insurance.
- View your 1098 Year End Tax Information.
- View your monthly mortgage statements.
- Sign up for email reminders and notifications.
- Request a Payoff Quote.
- Submit a Financial Statement to be reviewed for a Repayment Plan.

If you have any questions regarding this correspondence and the enclosed documents, or the servicing of your mortgage loan, please contact our Customer Service Department at (800) 258-8602, Monday through Friday between the hours of 7 am and 8 pm Eastern Time.

Sincerely,
Customer Service Department

Esta carta contiene información importante concerniente a sus derechos. Por favor, hágala traducir. Nuestros representantes bilingues están a su disposición para contestar cualquier pregunta llamando al teléfono 1-800-831-0118 y marque la opción 2.

      This communication is intended for informational purposes only
          and is not an attempt to collect a debt.

CS006 026/001

Exhibit "Wrong Property" 1 of 2

 

### ADJUSTABLE RATE NOTE
(LIBOR 6-Month Index-Rate Caps)

Loan. No. ANA7345FOCH

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

October 17, 2002                    IRVINE                    CALIFORNIA
[Date]                              [City]                    [State]

1021 SOUTH ALLENDALE AVENUE, SARASOTA, FL 34237
[Property Address]

**1. BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $  71,200.00        ( his amount is called "Principal"), plus interest, to the order of the Lender. The Lender is UNC MORTGAGE, INC., A DELAWARE CORPORATION . I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of     7.400    % . The interest rate I will pay will change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3. PAYMENTS**

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on     December 1, 2002   . I will make these payments every month until I have paid all of the principal and interest. and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on     November 1, 2032    , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at    OPTION ONE MORTGAGE CORPORATION, 3 ADA, IRVINE, CA 92618      or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $   492.98    . This amount may change.

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The interest rate I will pay may change on the first day of     November, 2004    , and on that day every     6th month thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for 6-month U.S. dollar-denominated deposits in the London market based on quotations of major banks, as published in the "Money Rates" section of The Wall Street Journal. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding Seven And 100/1000 percentage points (    7.100   %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125 %). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.



FLORIDA ARM PROGRAMS                                                     Rev. 11/95

Page 1 of 3

Borrower Initials  __ __ __ __ __

Exhibit "Wrong Property" 2 of 2

# Exhibit "G"

 

**ADJUSTABLE RATE NOTE**
(LIBOR 6-Month Index-Rate Caps)

Loan No. ANA7346FOCH

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

October 17, 2002                        IRVINE                        CALIFORNIA
    [Date]                        [City]                        [State]

530 LAUREL ROAD, NOKOMIS, FL  34275
[Property Address]

**1.  BORROWER'S PROMISE TO PAY**
In return for a loan that I have received, I promise to pay U.S. $  110,400.00      (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is  BNC MORTGAGE, INC., A DELAWARE CORPORATION  . I will make all payments under this Note in the form of cash, check or money order.
I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2.  INTEREST**
Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of      6.400      % . The interest rate I will pay will change in accordance with Section 4 of this Note.
The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3.  PAYMENTS**
(A) Time and Place of Payments
I will pay principal and interest by making a payment every month.
I will make my monthly payments on the first day of each month beginning on      December 1, 2002      . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on      November 1, 2032      , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
I will make my monthly payments at   OPTION ONE MORTGAGE CORPORATION, 3 ADA, IRVINE, CA 92618      or at a different place if required by the Note Holder.
(B) Amount of My Initial Monthly Payments
Each of my initial monthly payments will be in the amount of U.S. $   690.56      . This amount may change.
(C) Monthly Payment Changes
Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

**4.  INTEREST RATE AND MONTHLY PAYMENT CHANGES**
(A) Change Dates
The interest rate I will pay may change on the first day of      November, 2004      , and on that day every      6th      month thereafter. Each date on which my interest rate could change is called a "Change Date."
(B) The Index
Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for 6-month U.S. dollar-denominated deposits in the London market based on quotations of major banks, as published in the "Money Rates" section of The Wall Street Journal. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."
If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.
(C) Calculation of Changes
Before each Change Date, the Note Holder will calculate my new interest rate by adding  Six And 350/1000 percentage points (      6.350      %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125 %). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date
The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

FLORIDA ARM PROGRAMS                                                                                    Rev. 11/95

Page 1 of 3

Borrower Initials  _____  _____  _____  _____  _____

FLADIN1

Exhibit "Adjustable Rate Note" 1 - 4



**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than    8.400    % or less than 6.400    % . Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than one percentage point ( 1.0%) from the rate of interest I have been paying for the preceding   6   months. My interest rate will never be less than    6.400    % or greater than the lesser of (i)    13.400    % or (ii) the highest interest rate allowed by law.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5.  BORROWER'S RIGHT TO PREPAY; PREPAYMENT CHARGE**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

If within    twenty-four    (    24    ) months after the date of execution of the Security Instrument (as defined below) I make a full Prepayment or partial Prepayment(s), I will at the same time pay to the Note Holder a Prepayment charge equal to six (6) months' advance interest on the amount of the Prepayment that, when added to all other amounts prepaid during the 12-month period immediately preceding the date of the Prepayment, exceeds twenty percent (20%) of the original Principal amount of this Note.

**6.  LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.  BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of 10    calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be    6 %    of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8.  GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.  OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

Exhibit "Adjustable Rate Note" 2 - 4

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. SECURED NOTE**

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument.

**12. DOCUMENTARY TAX**

The state documentary tax due on this Note has been paid on the Mortgage securing this indebtedness.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

| | | | |
|---|---|---|---|
| _Deborah E. Focht_ (Seal) | | _____ (Seal) | |
| DEBORAH E. FOCHT  Borrower | | Borrower | |
| | | | |
| _____ (Seal) | | _____ (Seal) | |
| Borrower | | Borrower | |
| | | | |
| _____ (Seal) | | _____ (Seal) | |
| Borrower | | Borrower | |

[SIGN ORIGINAL ONLY]

Exhibit "Adjustable Rate Note" 3 - 4

·7

PAY TO THE ORDER OF

WITHOUT RECOURSE
BNC MORTGAGE INC

JAMIE LANGFORD
VICE PRESIDENT

# Exhibit "H"

Exhibit "Truth Rate"

CREDITOR:
BNC MORTGAGE, INC.
P.O. BOX 19656
IRVINE, CA 92623-9656
LOAN NO.: ANA7346FOCH
DATE: 10/17/2002
Preliminary : X Final

**TRUTH-IN-LENDING DISCLOSURE STATEMENT**
(THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

BORROWERS:DEBORAH E. FOCHT
*Type of Loan:* 2 YEAR FIXED 1/1

ADDRESS: 2655 BAY STREET
CITY/STATE/ZIP: SARASOTA, FL 34237
PROPERTY: 530 LAUREL ROAD NOKOMIS FL 34275

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | AMOUNT FINANCED | TOTAL OF PAYMENTS |
|---|---|---|---|
| The cost of your credit as a yearly rate. | The dollar amount the credit will cost you. | The amount of credit provided to you or on your behalf. | The amount you will have paid after you have made all payments as scheduled. |
| 8.409 % | $ 188,538.06 | $ 104,734.18 | $ 293,272.24 |

PAYMENT SCHEDULE:

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | monthly PAYMENTS ARE DUE BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | monthly PAYMENTS ARE DUE BEGINNING |
|---|---|---|---|---|---|
| 24 | $690.56 | 12/01/2002 | | | |
| 335 | $823.54 | 12/01/2004 | | | |
| 1 | $812.90 | 11/01/2032 | | | |

DEMAND FEATURE: [X] This loan does not have a Demand Feature. [ ] This loan has a Demand Feature as follows:

VARIABLE RATE FEATURE: This Loan has a Variable Rate Feature. Variable Rate Disclosures have been provided to you earlier.

SECURITY: You are giving a security interest in the property located at: 530 LAUREL ROAD NOKOMIS FL 34275

ASSUMPTION: Someone buying this property [X] cannot assume the remaining balance due under original mortgage terms [ ] may assume, subject to lender's conditions, the remaining balance due under original mortgage terms.

FILING / RECORDING FEES: $ 70.00

PROPERTY INSURANCE: Property hazard insurance in the amount of $ 0.00 with a mortgagee clause to the lender is a required condition of this loan. Borrower may purchase this insurance from any insurance company acceptable to the lender.
Hazard insurance [ ] is [X] is not available through the lender at an estimated cost of $0.00 for a year term.

LATE CHARGES: If your payment is more than 10 days late, you will be charged a late charge of 6.000 % of the overdue payment.

PREPAYMENT: If you pay off your loan early, you
[X] may [ ] will not have to pay a penalty.
[ ] may [X] will not be entitled to a refund of part of the finance charge.

See your contract documents for any additional information regarding non-payment, default, required repayment in full before scheduled date, and prepayment refunds and penalties.

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

10-18-02

DEBORAH E. FOCHT
BORROWER/DATE

BORROWER/DATE

BORROWER/DATE

BORROWER/DATE

VMP-788 (0004)
VMP MORTGAGE FORMS - (800)521-7291
© 2000 CBF Systems, Inc. The contents of this form in whole or in part are protected under the copyright laws of the United States.
Page 1 of 2
4/00

# Exhibit "I"

August 4, 2008

BNC Mortgage, Inc.
P.O. Box 19656
Irvine, CA 92623-9656

BNC Mortgage, Inc.
1901 Main Street
Irvine, CA 92614

Mortgage Electronics Registration Systems Inc., (MERS)
P.O. Box 2026
Flint, MI 48501-2026

Select Portfolio Servicing, Inc.
P.O. Box 65250 / Mail code 1000
Salt Lake City, Utah 84165-0250

Re:  BNC Mortgage, Inc., Original Loan # ANA7346FOCH
     Select Portfolio Servicing (a.k.a. Fairbanks Capital) Loan # 12720137

Dear Sir or Madam:

Please accept this letter of **NOTICES** and **DEMANDS**, on behalf of a mortgage loan contract (# ANA7346FOCH), dated October 4, 17 and/or 18, 2002, for the property recorded on October 23, 2002, under Official Instrument # 2002175528, OF THE PUBLIC RECORDS OF SARASOTA COUNTY, FLORIDA, listing "Exhibit "A"" (see attached Exhibit).

You are hereby notified of the following:

**I HEREWITH DEMAND CANCELLATION OF THIS INVALID MORTGAGE LOAN CONTRACT,** which was signed, under DURESS, with no MEETING OF THE MINDS or any CONSIDERATION realized, created by original maker, **BNC MORTGAGE, INC.,** but VOID due to unknown and deceptive DUPLICATE TERM RATES, and recording a materially defective mortgage, consisting of several dates and violations found under the Truth In Lending Act (TILA), Regulation Z, the Consumer Protection Act, the Homeowner's Equity Protection Act (HOEPA), the Florida Deceptive and Unfair Trade Practices Act (FUTPA), along with many other law violations.

A parallel case of a class action suit was explained and ruled by the U.S. District Court under Case No. 05C0454 in *Andrews v. Chevy Chase Bank, FSB*, citing the Truth in Lending Act ("TILA"), 15 U.S.C. 1601 et seq., and a number of respects, exhibiting conflicting Adjustable Rate Rider ("ARR") and a deficient Truth in Lending Disclosure Statement ("TILDS"), which determined a right of rescission relief of a TILA plaintiff and of attorneys' fees and costs under section 1635. 15 U.S.C. § 1640(3).

1

Relief from contract law violations can be found under Florida Statute § 672.302(1), (2), and as seen in cases *Pendleton v. Witcoski*, 836 So. 2d 1025; (Florida 1st DCA 2002); *Leo v. MacLeod*, 752 So. 2d 627 (Florida 2nd DCA 1999); the Florida Supreme Court, in *David v. Richman*, 528 So.2d 25, 27, and under the Constitution of the State of Florida, Article I, Section 2.

**I HEREBY GIVE NOTICE OF A COUNTERCLAIM** against "**WELLS FARGO BANK, N.A., SUCCESSOR BY MERGER TO WELLS FARGO BANK MINNESOTA, NATIONAL ASSOCIATION, AS TRUSTEE, IN TRUST FOR THE HOLDERS OF STRUCTURED ASSET SECURITIES CORPORATION – AMORTIZING RESIDENTIAL COLLATERAL TRUST MORTGAGE PASS THROUGH CERTIFICATES, SERIES 2002-BC10",** and **SELECT PORTFOLIO SERVICING, INC.** (a.ka. FAIRBANKS CAPITAL) (under loan # 0003999042), and any **REPRESENTATIVES** involved, due to the foreclosure prosecution that was filed on January 15, 2008, under Case #: 2008 CA 000791 SC, in Sarasota South County, Civil Circuit Court # 11, R. L. Administration Center, 4100 S. Tamiami Trail, Venice, FL 34293.

**I HEREBY DEMAND A FULL SATISFACTION** of the MORTGAGE AND NOTE, **REIMBURSEMENT** OF ALL FUNDS I have paid on this loan, plus any other damages, and I give **NOTICE** to CEASE and DESIST all calls and claims to collect on this DISHONORED Note, and that any further attempts to enforce this UNCONSCIONABLE mortgage lien will constitute aiding and abetting, and in violation pursuant to Florida Statutes § 501.201, Florida's Organized Fraud § 817.034(f) and Florida Rico Act § 895.01-895.06.

Please also consider this as a **NOTICE** of filing A LIS PENDENS, with the intent to **QUIET TITLE,** pursuant to Florida Statutes 65.031 and § 65.061.

Please forward this notice to any affiliate that I am unaware of that has any interest in this case, as liability extends to an assignee, therefore, any claims should be filed against any new purchaser naming itself as owner of the promissory note sold by BNC MORTGAGE, INC, ET AL, which may have filed and recorded a petition within a United States Bankruptcy District Court.

Please send a certified response within 30 days as to what your intentions are regarding each of the notices and demands listed above, including any updated address and contact information needed, in order to prevent unnecessary costs.

Sincerely,

Deborah E. Focht
530 E. Laurel Avenue
Nokomis, Florida 34275
(941) 350- 0561

2

cc:    Select Portfolio Servicing, LP
       Attn: Legal Dept
       P.O. Box 551170
       Jacksonville, FL 32255

       Albertelli Law
       Andrew L. Fivecoat, Esq.
       777 South Harbour Island Blvd.
       Suite 940
       Tampa, FL  33602

3

Exhibit "Rescission Letter" 3 - 3

# Exhibit "J"

**PAYOFF REQUIREMENTS:**

It is a condition to the funding of this loan that the debts listed on the **CONDITIONAL LOAN APPROVAL** be paid. Indicate payoffs on the HUD-1 Settlement Statement or provide other satisfactory evidence of payoff.

**DEBTS OR LIENS REQUIRED TO BE PAID THROUGH ESCROW**

*Estimated Payoff Amount:

TOTAL

$0.00

*All liens of record must be paid in accordance with mortgagee's Pay off Demand Statement.
If you have any questions regarding any of these instructions, please contact the Funding Department at (949) 260-6000.

**BORROWER ACKNOWLEDGMENT:** I/We have read and acknowledged receipt of these closing instructions.

| | | | |
|---|---|---|---|
| Borrower   **DEBORAH FOCHT** | Date | Borrower | Date |

| | | | |
|---|---|---|---|
| Borrower | Date | Borrower | Date |

| | | | |
|---|---|---|---|
| Borrower | Date | Borrower | Date |

**ACKNOWLEDGED AND AGREED:**

| | | | |
|---|---|---|---|
| Settlement Agent   **CATHY** | Date | Title Officer | Date |

SPECIFIC CLOSING INSTRUCTIONS

Page 3 of 3

Exhibit "Forgery" 1 of 2

**PAYOFF REQUIREMENTS:**

It is a condition to the funding of this loan that the debts listed on the **CONDITIONAL LOAN APPROVAL** be paid. Indicate payoffs on the HUD-1 Settlement Statement or provide other satisfactory evidence of payoff.

**DEBTS OR LIENS REQUIRED TO BE PAID THROUGH ESCROW**                    *Estimated Payoff Amount:

**TOTAL**                                                                                    $0.00

*All liens of record must be paid in accordance with mortgagee's Pay off Demand Statement.

If you have any questions regarding any of these instructions, please contact the Funding Department at (949) 260-6000.

BORROWER ACKNOWLEDGMENT: I/We have read and acknowledged receipt of these closing instructions.

| | | | |
|---|---|---|---|
| Borrower   DEBORAH E. FOCHT | Date | Borrower | Date |
| Borrower | Date | Borrower | Date |
| Borrower | Date | Borrower | Date |

ACKNOWLEDGED AND AGREED:

| | | | |
|---|---|---|---|
| Settlement Agent  MARY ANN IGLOW | Date  10-18-02 | Title Officer MARY ANN IGLOW | Date  10-18-02 |

SPECIFIC CLOSING INSTRUCTIONS

Inc??la                                        Page 3 of 3

Focht-000748

Exhibit "Forgery" 2 of 2

# Exhibit "K"



**SPS** | SELECT
*Portfolio*
SERVICING, inc.

October 23, 2007

Deborah Focht
1613 Ingram Ave
Sarasota, FL 34232

RE: Loan Number 0003999042

Dear Customer:

Thank you for your recent inquiry regarding your mortgage loan.  We will
conduct a thorough investigation of your mortgage loan and will contact
you when our review is complete.

We value you as a customer and appreciate this opportunity to serve you.
If you have any questions or additional concerns, please contact our
Customer Service Department at (800) 258-8602 Monday through Friday
between the hours of 7:00 am and 8:00 pm Eastern Time.

Sincerely,

Customer Service Department

Esta carta contiene información importante concerniente a sus derechos.
Por favor, hágala traducir. Nuestros representantes bilingues están a
su disposición para contestar cualquier pregunta llamando al teléfono
1-800-831-0118 y marque la opción 2.

This communication is intended for informational purposes only
and is not an attempt to collect a debt.

CS050 007/RS6

Exhibit "Investigation"

# Exhibit "L"

Oct-19-02 07:51P                                                                    P.07

**DEBORAH E. FOCHT**    84-05
3655 BAY ST.
SARASOTA, FL 34237-7623

Pay to the order of *Professional Title*    $ 69.19

*Sixty nine 19/100*    Dollars

**Bank of America.**

For LAUREL RD    *Deborah E. Orlt*

⑈063100277⑈ 003516090472⑈ 1111
18057

---

Northern Trust Bank of Florida, N.A.

OFFICE SARASOTA    SC    264253

DATE October 07    02    63-965600

PAY TO THE ORDER OF **PROFESSIONAL TITLE SERVICES**    $ 10,000.00

**Ten Thousand Dollars and Zero Cents**    DOLLARS

TO CLOSE ACCOUNT 200004552
REMITTER

**Cashier's Check**    AUTHORIZED SIGNATURE

⑈264253⑈ ⑈066009650⑈10 10000 10 1⑈

---

Northern Trust Bank of Florida, N.A.

OFFICE SARASOTA    KPB    264228

DATE October 07    02    63-965600

PAY TO THE ORDER OF ***PROFESSIONAL TITLE SERVICES***    $ 25,587.36

**Twenty Five Thousand Five Hundred Eighty Seven Dollars**
**and Thirty Six Cents**    DOLLARS

EESI/FOCHT
REMITTER

**Cashier's Check**    AUTHORIZED SIGNATURE

⑈264228⑈ ⑈066009650⑈10 10000 10 1⑈

---

OCT-16-2002  16:12                                96%              P.07        Focht-000777

Oct-19-02 07:50P                                                    P.04

Northern Trust Bank of Florid: N.

OFFICE SARASOTA          SC                              264254
                                                        63-665/660
                                    DATE October 09    02

PAY TO THE ORDER OF  ***PROFESSIONAL TITLE SERVICES **  |  $    897.51
**Eight Hundred Ninety Seven Dollars and Fifty One Cents**        DOLLARS

                                    Two signatures required for amount over $50,000.00

TO CLOSE ACCOUNT 8000B4552
REMITTER
Cashier's Check
    90 5 6  #264254#  :066009650: 10 10000 10 1#

Northern Trust Bank of Florida N.A.
                                                        264229
OFFICE  SARASOTA          KPB                           63-665/660
                                    DATE October 07    02

PAY TO THE ORDER OF  ***PROFESSIONAL TITLE SERVICES** |  $   73,769.63
**Seventy Three Thousand Seven Hundred Sixty Nine Dollars**       DOLLARS
**and Sixty Three Cents**

                                    Two signatures required for amount over $50,000.00

FECHT/FOCHT
REMITTER
Cashier's Check
    1 90 5 6  #264229#  :066009650: 10 10000 10 1 #

DEBORAH E. FOCHT      8403                        1112
2853 BAY ST.                                      63-17/611 A
SARASOTA, FL 34237-7823    Date  2/18/02          1545

Pay to the
order of  Professional Title          |  $ 378.02
Three Hundred Seventy Eight 00      Dollars  0

Bank of America.

to  ALLENDALE          Deborah E. Focht

:063100277: 003516090472#  1112
    1 90 5 6
On   Monday  Debbie will bring
              in the add ck of 10 2 49
              & I will fax it to you.

OCT-18-2002  16:18                                P.04

Focht-000621

Exhibit "Focht Funds" 1-2

# Exhibit "M"

```
MAS1 LOAN Q003999042     MSP LOAN MASTER MAINT. & DISPLAY    12/19/07    07:05:41
      NAME D  FOCHT       TYPE 13 1ST MTG,CONVEN W/O INS  (ARM)        GROUP
--- INV1 -- INVESTOR, SERVICE FEES-------------------------------------------
INV CAT  INV LOAN NO  SALE/REPURCH  --- FNMA LASER ---  FNMA DEL
P01 001  0010117620   FLAG  DATE  CD   DATE  CHANGED   STATUS
                        _    ____  __   ____           0 (0-9)
INV ARC 2002-BC10                       (MMDDYY)
HDR LEHMAN                     GUAR FEE    ----SERVICE FEE----
    745 SEVENTH AVENUE         RATE       % RATE  OR $ AMOUNT
    5TH FLOOR                  00.00000 %   .500000     0.00
    NEW YORK, NY 10019         PLS CLT    FRC    SC ACC CD  INT IN ADV BAL
                                 __       ___    __  __            .00
CONTRACT/POOL NO   INV SCHED DEF INT    INV ACT DEF INT    INV SCHED PRIN BAL
LB002            _____    _____      105,460.46
---THIRD PARTY SERVICE FEES---      FHLMC   ------EXCESS SERVICE FEES-----
CORRESPONDENT  PLAN  1ST REMIT      INACT   ORIG SERV FEE:    _____
   CODE        CODE   DATE            _      UNAMORT SERV FEE: _____
    ___        ___    ____           GSE    ORIGINAL TERM:        ___
                     (MMYY)          ON _   REMAINING TERM:       ___
CORR/PLAN:                                  OPTION: _  DOC CUST: 0000000020
----------------------------------------------------------------------------
LOAN IS IN FORECLOSURE. F/C STOP = 1   012 DAYS TO PROJECTED LEGAL DATE
```

Focht-001071

Exhibit "Lehman HDR 12/19/07"

# Exhibit "N"

## LOAN DOCUMENT WORKSHEET (con't)

Page 2 of 2

### VESTING...

DEBORAH E. FOCHT, A SINGLE WOMAN AS HER SOLE AND SEPARATE PROPERTY.

### BORROWERS AKA's...

### LEGAL DESCRIPTION...

LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HERETO AS EXHIBIT A.

ABBREVIATED LEGAL DESCRIPTION:

### BENEFICIARY/TRUSTEE...

BENEFICIARY TO READ: BNC MORTGAGE, INC., A DELAWARE CORPORATION, P.O. BOX 19656, IRVINE, CALIFORNIA 92623-9656

TRUSTEE TO READ:

### CLOSING INSTRUCTIONS TO ESCROW...

### PAYMENT SCHEDULE...

### AGGREGATE PAYMENT SCHEDULE...

| # OF PAYMENTS | AMOUNT | DUE DATE | DESCRIPTION | AMOUNT | # OF PMTS | DUE DATE |
|---|---|---|---|---|---|---|
| 24 | 699.56 | 12/31/2002 | | | | |
| 335 | 693.54 | 12/31/2004 | | | | |
| 1 | 812.90 | 11/31/2033 | | | | |

### APR...

| 8.41 | APR | | 194,734.16 | AMOUNT FINANCED |
|---|---|---|---|---|

Focht-000783

Exhibit "BNC Beneficiary"

# Exhibit "O"

Commonwealth Land Title Insurance Company
201 South Orange Ave, Suite 1330
Orlando, FL 32801
Main: 407-481-8383 Fax: 407-481-0821 Fax: 407-481-0864 Legal: 800-432-8512

# Commonwealth® Land Title Insurance Company

A LandAmerica Financial Group Company

October 17, 2002

BNC MORTGAGE, INC., ISAOA
P.O. BOX 19656
IRVINE, CA 92623-9656

Contact: CLOSING DEPARTMENT
Phone:                          Fax:

Contact: Mary Ann Figlow
Phone:                          Fax:

Borrower: FOCHT                 File Number: 19056

                                1021 S. ALLENDALE
Dear Sir/Madam:                 SARASOTA, FL.

When title insurance of Commonwealth Land Title Insurance Company is specified for your protection in connection with closings of real estate transactions in which you are to be the lessee or purchaser of an interest in land or a lender secured by a mortgage (including any other security instrument) of an interest in land, Commonwealth Land Title Insurance Company, subject to the Conditions and Exclusions set forth below, hereby agrees to reimburse you for actual loss incurred by you in connection with such closings when conducted by said Issuing Agent or Approved Attorney when such loss arises out of:

1. Failure of said Issuing Agent or Approved Attorney to comply with your written closing instructions to the extent that they relate to (a) the status of the title to said interest in land or the validity, enforceability and priority of the lien of said mortgage on said interest in land, including the obtaining of documents and the disbursement of funds necessary to establish such status of title or lien, or (b) the obtaining of any other document specifically required by you, but not to the extent that said instructions require a determination of the validity, enforceability or affectiveness of such other document, or (c) the collection and payment of funds due you, or

2. Fraud or dishonesty of said Issuing Agent or Approved Attorney in handling your funds or documents in connection with such closings.

If you are a lender protected under the foregoing paragraph, your borrower in connection with a loan secured by a mortgage on a one to four family dwelling shall be protected as if this letter were addressed to your borrower.

CONDITIONS AND EXCLUSIONS

A.    Commonwealth Land Title Insurance Company will not be liable to you for loss arising out of

   1.    Failure of said Issuing Agent or Approved Attorney to comply with your closing instructions which require title insurance protection inconsistent with that set forth in the title insurance binder or commitment issued by Commonwealth Land Title Insurance Company. Instructions which require the removal of specific exceptions to title or compliance with the requirements contained in said binder or commitment shall not be deemed to be inconsistent. This paragraph shall not be applicable when such binder or commitment has not been required by the lender prior to closing.

   2.    Loss or impairment of your funds in the course of collection or while on deposit with a bank due to bank failure, insolvency or suspension, except such as shall result from failure of said Issuing Agent or the Approved Attorney to comply with your written closing instructions to deposit the funds in a bank which you designate by name.

Focht-000593

Exhibit "BNC Insurance Policies"

### Policy of Title Insurance

#### Commonwealth Land Title Insurance Company

**Order Number:** 42140345CA

**Policy Number:** FO2-0154377

**Reference Number:** 19057

**Amount of Insurance:** $110,400.00

Date of Policy: The date shown below or the date of recording of the instruments referred to in Item 4, whichever is the later.

October 23, 2002 at 4:33 PM

1. Name of Insured

   BNC MORTGAGE, INC., its successors and/or Assigns

2. The estate or interest in the land described herein and which is covered by this policy is:
   Fee Simple

3. Title to the estate or interest in the land is vested in:
   DEBORAH E. FOCHT

4. The insured mortgage and the assignments, thereof, if any, are described as follows:

   Mortgage given by DEBORAH E. FOCHT, a single woman, in favor of BNC MORTGAGE, INC., dated Oveober 17, 2002, recorded October 23, 2002 in Official Records Instrument No. 2002175528, in the amount of $110,400.00, of the Public Records of Sarasota County, Florida.

5. The Land referred to in this policy is described as follows:
   (See attached Exhibit A for legal description)

Professional Title Services of Sarasota

6378 North Lockwood Ridge Road
Sarasota, FL 34243

This policy is invalid unless a cover sheet and Schedule B are attached.

Policy FO2-0154377 [ALTA Loan Policy (10/17/1992)]

Page 1 of 8
Focht-000401

Exhibit "BNC Insurance Policies"

## Commonwealth Land Title Insurance Company

ENDORSEMENT

Attached to and made a part of Policy Number: FO2-0154377

The Company insures the owner of the indebtedness secured by the insured mortgage against loss or damage sustained by reason of:

1. The invalidity or unenforceability of the lien of the insured mortgage resulting from the provisions therein which provide for changes in the rate of interest.

2. Loss of priority of the lien of the insured mortgage as security for the unpaid principal balance of the loan, together with interest as changed in accordance with the provisions of the insured mortgage, which loss of priority is caused by the changes in the rate of interest.

"Changes in the rate of interest", as used in this endorsement, shall mean only those changes in the rate of interest calculated pursuant to the formula provided in the insured mortgage at Date of Policy.

This endorsement does not insure against loss or damage based upon (a) usury, or (b) any consumer credit protection or truth in lending law.

This endorsement is made a part of the policy and is subject to all of the terms and provisions thereof and of any prior endorsements thereto, except that the insurance afforded by this endorsement is not subject to Section 3(d) of the Exclusions From Coverage. Except to the extent expressly stated, it neither modifies any of the terms and provisions of the policy and any prior endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the face amount thereof.

IN WITNESS WHEREOF, the Company has caused this endorsement to be issued and valid when signed by an authorized officer or licensed agent of the Company.

Professional Title Services of Sarasota

Authorized Officer or Licensed Agent

Endorsement - Variable Rate Mortgage ALTA 6

Exhibit "BNC Insurance Policies"

## CONDITIONS AND STIPULATIONS · continued

**5.   PROOF OF LOSS OR DAMAGE.**

In addition to and after the notices required under Section 3 of these Conditions and Stipulations have been provided the Company, a proof of loss or damage signed and sworn to by the Insured claimant shall be furnished to the Company within 90 days after the Insured claimant shall ascertain the facts giving rise to the loss or damage. The proof of loss or damage shall describe the defect in, or lien or encumbrance on the title, or other matter insured against by this policy which constitutes the basis of loss or damage and shall state, to the extent possible, the basis of calculating the amount of the loss or damage. If the Company is prejudiced by the failure of the Insured claimant to provide the required proof of loss or damage, the Company's obligations to the Insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such proof of loss or damage.

In addition, the Insured claimant may reasonably be required to submit to examination under oath by any authorized representative of the Company and shall produce for examination, inspection and copying, at such reasonable times and places as may be designated by any authorized representative of the Company, all records, books, ledgers, checks, correspondence and memoranda, whether bearing a date before or after Date of Policy, which reasonably pertain to the loss or damage. Further, if requested by any authorized representative of the Company, the Insured claimant shall grant its permission, in writing, for any authorized representative of the Company to examine, inspect and copy all records, books, ledgers, checks, correspondence and memoranda in the custody or control of a third party, which reasonably pertain to the loss or damage. All information designated as confidential by the Insured claimant provided to the Company pursuant to this Section shall not be disclosed to others unless, in the reasonable judgment of the Company, it is necessary in the administration of the claim. Failure of the Insured claimant to submit for examination under oath, produce other reasonably requested information or grant permission to secure reasonably necessary information from third parties as required in this paragraph, unless prohibited by law or governmental regulation, shall terminate any liability of the Company under this policy as to that claim.

**6.   OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS; TERMINATION OF LIABILITY.**

In case of a claim under this policy, the Company shall have the following additional options:

(a)   To Pay or Tender Payment of the Amount of Insurance or to Purchase the Indebtedness.

(i)   to pay or tender payment of the amount of insurance under this policy together with any costs, attorneys' fees and expenses incurred by the Insured claimant, which were authorized by the Company, up to the time of payment or tender of payment and which the Company is obligated to pay; or

(ii)   to purchase the indebtedness secured by the insured mortgage for the amount owing thereon together with any costs, attorneys' fees and expenses incurred by the Insured claimant which were authorized by the Company up to the time of purchase and which the Company is obligated to pay.

If the Company offers to purchase the indebtedness as herein provided, the owner of the indebtedness shall transfer, assign, and convey the indebtedness and the insured mortgage, together with any collateral security, to the Company upon payment therefor.

Upon the exercise by the Company of either of the options provided for in paragraphs (a)(i) or (ii), all liability and obligations to the Insured under this policy, other than to make the payment required in those paragraphs, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, and the policy shall be surrendered to the Company for cancellation.

(b)   To Pay or Otherwise Settle With Parties Other than the Insured or With the Insured Claimant.

(i)   to pay or otherwise settle with other parties for or in the name of an Insured claimant any claim insured against under this policy, together with any costs, attorneys' fees and expenses incurred by the Insured claimant which were authorized by the Company up to the time of payment and which the Company is obligated to pay; or

(ii)   to pay or otherwise settle with the Insured claimant the loss or damage provided for under this policy, together with any costs, attorneys' fees and expenses incurred by the Insured claimant which were authorized by the Company up to the time of payment and which the Company is obligated to pay.

Upon the exercise by the Company of either of the options provided for in paragraphs (b)(i) or (ii), the Company's obligations to the Insured under this policy for the claimed loss or damage, other than the payments required to be made, shall terminate, including any liability or obligation to defend, prosecute or continue any litigation.

**7.   DETERMINATION AND EXTENT OF LIABILITY.**

This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the Insured claimant who has suffered loss or damage by reason of matters insured against by this policy and only to the extent herein described.

(a)   The liability of the Company under this policy shall not exceed the least of:

(i)   the Amount of Insurance stated in Schedule A, or, if applicable the amount of insurance as defined in Section 2(c) of these Conditions and Stipulations;

(ii)   the amount of the unpaid principal indebtedness secured by the insured mortgage as limited or provided under Section 8 of these Conditions and Stipulations or as reduced under Section 9 of these Conditions and Stipulations, at the time the loss or damage insured against by this policy occurs, together with interest thereon; or

(iii)   the difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance insured against by this policy.

(b)   In the event the Insured has acquired the estate or interest in the manner described in Section 2(a) of these Conditions and Stipulations or has conveyed the title, then the liability of the Company shall continue as set forth in Section 7(a) of these Conditions and Stipulations.

(c)   The Company will pay only those costs, attorneys' fees and expenses incurred in accordance with Section 4 of these Conditions and Stipulations.

**8.   LIMITATION OF LIABILITY.**

(a)   If the Company establishes the title, or removes the alleged defect, lien or encumbrance, or cures the lack of a right of access to or from the land, or cures the claim of unmarketability of title, or otherwise establishes the lien of the insured mortgage, all as insured in a reasonably diligent manner by any method, including litigation and the completion of any appeals therefrom, it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused thereby.

(b)   In the event of any litigation, including litigation by the Company or with the Company's consent, the Company shall have no liability for loss or damage until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals therefrom, adverse to the title or to the lien of the insured mortgage, as insured.

(c)   The Company shall not be liable for loss or damage to any Insured for liability voluntarily assumed by the Insured in settling any claim or suit without the prior written consent of the Company.

(d)   The Company shall not be liable for: (i) any indebtedness created subsequent to Date of Policy except for advances made to protect the lien of the insured mortgage and secured thereby and reasonable amounts expended to prevent deterioration of improvements, or (ii) construction loan advances made subsequent to Date of Policy, except construction loan advances made subsequent to Date of Policy for the purpose of financing in whole or in part the construction of an improvement to the land which at Date of Policy were secured by the insured mortgage and which the insured was and continued to be obligated to advance at and after Date of Policy.

**9.   REDUCTION OF INSURANCE; REDUCTION OR TERMINATION OF LIABILITY.**

(a)   All payments under this policy, except payments made for costs, attorneys' fees and expenses, shall reduce the amount of the insurance pro tanto. However, any payments made prior to the acquisition of title to the estate or interest as provided in Section 2(a) of these Conditions and Stipulations shall not reduce pro tanto the amount of the insurance afforded under this policy except to the extent that the payments reduce the amount of the indebtedness secured by the insured mortgage.

(b)   Payment in part by any person of the principal of the indebtedness, or any other obligation secured by the insured mortgage, or any voluntary partial satisfaction or release of the insured mortgage, to the extent of the payment, satisfaction or release, shall reduce the amount of insurance pro tanto. The amount of insurance may thereafter be increased by accruing interest and advances made to protect the lien of the insured mortgage and secured thereby, with interest thereon, provided in no event shall the amount of insurance be greater than the Amount of Insurance stated in Schedule A.

(c)   Payment in full by any person or the voluntary satisfaction or release of the insured mortgage shall terminate all liability of the Company except as provided in Section 2(a) of these Conditions and Stipulations.

**10.   LIABILITY NONCUMULATIVE.**

It is expressly agreed that the lien of the insured mortgage is prior to the title or interest in subsection of the indebtedness secured by the insured mortgage, or any part thereof, it is expressly understood that the amount of insurance under this policy shall be reduced by any amount the Company may pay under any policy insuring a mortgage to which exception is taken in Schedule B or to which the Insured has agreed, assumed, or taken subject, or which is hereafter executed by an Insured and which as a charge of lien on the estate or interest described or referred to in Schedule A, and the amount so paid shall be deemed a payment under this policy.

**11.   PAYMENT OF LOSS.**

(a)   No payment shall be made without producing this policy for endorsement of the payment unless the policy has been lost or destroyed, in which case proof of loss or destruction shall be furnished to the satisfaction of the Company.

(b)   When liability and the extent of loss or damage has been definitely fixed in accordance with these Conditions and Stipulations, the loss or damage shall be payable within 30 days thereafter.

**12.   SUBROGATION UPON PAYMENT OR SETTLEMENT.**

(a)   The Company's Right of Subrogation.

Whenever the Company shall have settled and paid a claim under this policy, all right of subrogation shall vest in the Company unaffected by any act of the Insured claimant.

The Company shall be subrogated to and be entitled to all rights and remedies which the Insured claimant would have had against any person or property in respect to the claim had this policy not been issued. If requested by the Company, the Insured claimant shall transfer to the Company all rights and remedies against any person or property necessary in order to perfect this right of subrogation. The Insured claimant shall permit the Company to sue, compromise or settle in the name of the Insured claimant and to use the name of the Insured claimant in any transaction or litigation involving these rights or remedies.

If a payment on account of a claim does not fully cover the loss of the Insured claimant, the Company shall be subrogated to all rights and remedies of the Insured claimant after the Insured claimant shall have recovered its principal, interest, and costs of collection.

(b)   The Insured's Rights and Limitations.

Notwithstanding the foregoing, the owner of the indebtedness secured by the insured mortgage, provided the priority of the lien of the insured mortgage or its enforceability is not affected, may release or substitute the personal liability of any debtor or guarantor, or extend or otherwise modify the terms of payment, or release a portion of the estate or interest from the lien of the insured mortgage, or release any collateral security for the indebtedness.

When the permitted acts of the insured claimant occur and the insured has knowledge of any claim of title or interest adverse to the title to the estate or interest or the priority or enforceability of the lien of the insured mortgage, as insured, the Company shall be required to pay only that part of any losses insured against by this policy which shall exceed the amount, if any, lost to the Company by reason of the impairment by the insured claimant of the Company's right of subrogation.

(c)   The Company's Rights Against Non-insured Obligors.

The Company's right of subrogation against non-insured obligors shall exist and shall include, without limitation, the rights of the insured to indemnities, guaranties, other policies of insurance or bonds, notwithstanding any terms or conditions contained in those instruments which provide for subrogation rights by reason of this policy.

The Company's right of subrogation shall not be avoided by acquisition of the insured mortgage by an obligor (except an obligor described in Section 1(a)(ii) of these Conditions and Stipulations) who acquires the insured mortgage as a result of an indemnity, guarantee, other policy of insurance, or bond and the obligor will not be an insured under this policy, notwithstanding Section 1(a)(i) of these Conditions and Stipulations.

**13.   ARBITRATION.**

Unless prohibited by applicable law, arbitration pursuant to the Title Insurance Arbitration Rules of the American Arbitration Association may be demanded if agreed to by both the Company and the Insurer. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the Insured arising out of or relating to this policy, and service of the Company in connection with its issuance or the breach of a policy provision or other obligation. Arbitration pursuant to this policy and under the Rules in effect on the date the demand for arbitration is made or, at the option of the insured, the Rules in effect at Date of Policy shall be binding upon the parties. The award may include attorneys' fees only if the laws of the state in which the land is located permit a court to award attorneys' fees to a prevailing party. Judgment upon the award rendered by the Arbitrator(s) may be entered in any court having jurisdiction thereof.

The law of the situs of the land shall apply to an arbitration under the Title Insurance Arbitration Rules.

A copy of the Rules may be obtained from the Company upon request.

**14.   LIABILITY LIMITED TO THIS POLICY; POLICY ENTIRE CONTRACT.**

(a)   This policy together with all endorsements, if any, attached hereto by the Company is the entire policy and contract between the insured and the Company. In interpreting any provision of this policy, this policy shall be construed as a whole.

(b)   Any claim of loss or damage, whether or not based on negligence, and which arises out of the status of the lien of the insured mortgage or of the title to the estate or interest covered hereby or by any action asserting such claim, shall be restricted to this policy.

(c)   No amendment of or endorsement to this policy can be made except by a writing endorsed hereon or attached hereto signed by either the President, a Vice President, the Secretary, an Assistant Secretary, or validating officer or authorized signatory of the Company.

**15.   SEVERABILITY.**

In the event any provision of this policy is held invalid or unenforceable under applicable law, the policy shall be deemed not to include that provision and all other provisions shall remain in full force and effect.

**16.   NOTICES, WHERE SENT.**

All notices required to be given the Company and any statement in writing required to be furnished the Company shall include the number of this policy and shall be addressed to: Consumer Affairs Department, P.O. Box 27567, Richmond, Virginia 23261-7567.

Inquiries regarding policy coverage and assistance in resolving complaints, should be directed to the Company at (407) 481-8181. Claims must be reported in accordance with Conditions and Stipulations.

ALTA Loan Policy (10/17/92) Cover Page
with Florida Modifications
Form 1191-26

**ORIGINAL**

Valid only if Face Page and Schedules A and B are attached

Focht-000408

Exhibit "BNC Insurance Policies"

# Exhibit "P"

www.optionemortgage.com



**OPTION ONE**
M O R T G A G E
Start Here. Finish Here.

January 27, 2003

Deborah Focht
2655 Bay Street
Sarasota, FL 34237-

Re:  Loan Number:        0010117612
     Property Address:  1021 S Allendale Ave.
                        Sarasota FL 34237

Dear Deborah Focht :

Your above referenced loan has been paid in full.  The enclosed
check number 599428 for $51.62 represents the total overage
due to you after the payoff.

We at Option One Mortgage Corporation thank you for allowing us to
serve your mortgage banking needs.

Option One is dedicated to providing the best customer service
possible.  Should you have any questions, please contact us at
(800)648-9605.

Sincerely,


Susan Warner
Payoff Department


JAT/bm
Enclosure


CA303 001 SW3

Corporate Offices •3 Ada •Irvine •California •92618-2304
P.O. Box 57054 •Irvine •California •92619-7054 •800.648.9605 •Fax 949.790.8505

Exhibit "Option One Payoff"

# Exhibit "Q"

*EXECUTION*

FAIRBANKS CAPITAL CORP.,

as Servicer,

LEHMAN CAPITAL, A DIVISION OF LEHMAN BROTHERS HOLDINGS INC.,

as Seller

and

AURORA LOAN SERVICES INC.,

as Master Servicer

Structured Asset Securities Corporation
*Amortizing Residential Collateral Trust*
*Mortgage Pass-Through Certificates, Series 2002-BC10*

SECURITIZATION SERVICING AGREEMENT

Dated as of December 1, 2002

000146

Exhibit "Lehman Agreement SSA Dec 1, 2002"

# Exhibit "R"

----- Original Message -----
From: AmericanReply@comcast.net
To: LehmanTeam@weil.com
Cc: Atty Diane Harvey
Sent: Tuesday, September 22, 2009 4:48 PM
Subject: To Epiq Bankruptcy Solutions, LLC + Lehman Lehman Team

To: Epiq Bankruptcy Solutions, LLC And the Legal Team
Re: Lehman Brothers Bankruptcy Proof Of Claims

I have attached my proof of claims for the Lehman Brothers bankruptcy
proceedings and regarding BNC Mortgage LLC.

I tried to contact Epiq Systems and the Lehman Law Firm
and was given many numbers, but none have provided an email or
have been able to help me submit my claims and the website for the
questionaire doesn't work either (see below).

As a result, I have sent the Claims out by Overnight Mail, and should
there be a problem accepting my proof of claims, please let me know
so I can write a letter to the Judge to explain what happened.

Thank You,
Deborah E. Focht
530 E. Laurel Road
Nokomis, FL 34275
(941) 350-0561

---

contact
An unexpected error occurred. Sorry for the inconvenience, we'll have a look soon and try to
prevent this from happening again.
Back to Home

©Epiq Systems, Inc.


contact

For questions related to this web site, please call Epiq Bankruptcy Solutions, LLC ("Epiq") at:

U.S.: 1-866-879-0688
Non-U.S.: 1-503-597-7691

Please note that Epiq is not permitted to give legal advice. Please direct legal inquiries to the
following:

Weil, Gotshal & Manges LLP
Lehman Legal Hotline:
Phone: 1-212-310-8040
Email: LehmanTeam@weil.com

©Epiq Systems, Inc.


Exhibit "Filed Proof Of Claims" 2-2



Exhibit "Filed Proof Of Claims" 1-2