Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3

4    - - - - - - - - - - - - - - - - - -x

5    In the Matter of:

6    LEHMAN BROTHERS HOLDINGS, INC.,        CAUSE NO.

7    et al,                                 08-13555(JMP)

8           Debtors.

9    - - - - - - - - - - - - - - - - - -x

10   In re

11   LEHMAN BROTHERS, INC.,                 CAUSE NO.

12          Debtor.                         08-01420(JMP)(SIPA)

13   - - - - - - - - - - - - - - - - - -x

14

15                       U.S. Bankruptcy Court

16                       One Bowling Green

17                       New York, New York

18

19                       July 17, 2013

20                       10:12 AM

21

22   B E F O R E:

23   HON. JAMES M. PECK

24   U.S. BANKRUPTCY JUDGE

25   ECRO:  F. FERGUSON

Page 2

1   HEARING Re Motion of Lehman Brothers Holdings, Inc.,

2   Pursuant to Section 105(a) of the Bankruptcy Code and

3   Bankruptcy Rule 7004(a)(1), to Extend Stay of Avoidance

4   Actions and Grant Certain Related Relief (ECF No. 38118)

5

6   HEARING Re Motion pursuant to Federal Rule of Bankruptcy

7   Procedure 9019 for Entry of Order Approving Settlement

8   Agreement Between the Trustee and Lehman Brothers Securities

9   N.V. (LBI ECF No. 6523)

10

11  HEARING Re Motion Pursuant to Federal Rule of Bankruptcy

12  Procedure 9019 for Order Approving Settlement Agreements

13  Between the Trustee and Lehman Brothers (Luxembourg) S.A.

14  and Lehman Brothers (Luxembourg) Equity Finance S.A. (LBI

15  ECF No. 6601)

16

17  HEARING Re Motion Pursuant to Federal Rule of Bankruptcy

18  Procedure 9019 for Entry of an Order Approving Settlement

19  Agreements (LBI ECF No. 5483)

20

21  HEARING Re Lehman Brothers Holding, Inc. v Ford Global

22  Treasury, Inc. (Adversary Case No. 12-01877), Motion to

23  Dismiss

24

25

1    HEARING Re El Veasta Lampley v Lehman Brothers Holdings,

2    Inc. (Adversary Case No. 13-01354), Pre Trial Conference

3

4    HEARING Re Plan Administrator's Omnibus Objection to Claims

5    Filed by Deborah E. Focht (ECF No. 34303)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sheila Orms

Page 4

```
 1   A P P E A R A N C E S :

 2

 3   WEIL, GOTSHAL & MANGES LLP

 4        Attorneys for Lehman Brothers Holdings, Inc.

 5            Special Financing (LBSF)

 6        767 Fifth Avenue

 7        New York, NY 10153

 8

 9   BY:   JACQUELINE MARCUS, ESQ.

10        ROBERT J. LEMONS, ESQ.

11        LORI R. FIFE, ESQ.

12        MAURICE HORWITZ, ESQ.

13        ZAW WIN, ESQ.

14

15   HUGHES HUBBARD

16        Attorneys for SIPA Trustee

17        One Battery Park Plaza

18        New York, NY  10004-1482

19

20   BY:   JEFFREY M. GREILSHEIMER, ESQ.

21

22

23

24

25
```

Page 5

1   CHAPMAN AND CUTLER, LLP

2        Attorneys for U.S. Bank National Association,

3        as Trustee

4        1270 Avenue of the Americas

5        30th Floor

6        New York, NY   10020

7

8   BY:   LAURA E. APPLEBY, ESQ.

9        FRANKLIN H. TOP, III, ESQ.

10

11  LOWENSTEIN SANDLER, LLP

12        Attorneys for Ameritas Life Insurance

13        1251 Avenue of the Americas

14        New York, NY   10020

15

16  BY:   MICHAEL S. ETKIN, ESQ.

17

18  MCGUIRE WOODS

19        Attorneys for Ford Global Treasury, Inc.

20        77 West Wacker Drive

21        Suite 4100

22        Chicago, IL   60601

23  BY:   AARON MCCOLLOUGH, ESQ.

24

25

Page 6

1    OTHERS PRESENT:

2         QUINTON LYNN SMITH, ESQ. FOR NATIONWIDE LIFE INSURANCE

3            COMPANY AND NATIONWIDE MUTUAL INSURANCE COMPANY

4            (No other information provided)

5

6    TELEPHONIC APPEARANCES:

7    KATHRYN BORGESON, CADWALADER, WICKERSHAM & TAFT LLP FOR

8         CUTWATER ASSET MANAGEMENT CORP.

9    JEFFREY H. DAVIDSON, STUTMAN, TREISTER & GLATT

10   ISSAC K. DEVYVER, REED SMITH LLP FOR BANK OF NEW YORK

11   JEFFREY GETTLEMAN, KIRKLAND & ELLIS, LLP FOR PPB

12   PAUL S. JASPER, SCHNADER HARRISON SEGAL & LEWIS, LLP FOR

13         SAMSUNG FIRE & MARINE INSURANCE COMPANY

14   ALEXANDER DRAEMER, CLIENT, BINGHAM MCCUTCHEN, LLP

15   DEBORAH E. FOCHT

16   KATHERINE L. MAYER, MCCARTER & ENGLISH FOR OCCIDENTAL

17         ENERGY

18   RYAN MORRELL, CARVAL INVESTORS

19   NICK MOURADIAN, CITIGROUP

20   MICHAEL NEUMEISTER, STRUTMAN, TREISTER & GLATT

21   SARA SCHINDLER-WILLIAMS, BALLARD SPAHR LLP FOR FIRST

22         NORTHERN BANK

23   JEREMY D. SCHREIBER, CHAPMAN & CUTLER, FOR FIRST TRUST

24

25

Page 7

1                  P R O C E E D I N G S

2    (Note:  Audio begins mid-sentence:)

3         MS. MARCUS:  -- seeks a six month extension until

4    January 20th, 2014 of the order staying avoidance actions,

5    which is currently scheduled to expire on July 20, and a

6    similar extension of the time for serving the second amended

7    complaint upon the defendants in the distributed action.

8         The plan administrator has filed the declaration of

9    Lawrence Brandman (ph), a managing director of LBHI in

10   support of the motion, and Mr. Brandman is present in court

11   this morning.

12        As reflected on the agenda, there are only three

13   outstanding objections, and one joinder to the motion.  An

14   objection has been filed by Nationwide Life Insurance

15   Company and Nationwide Mutual Life Insurance Company, both

16   of which are defendants in the distributed action and

17   objected to the last extension request.

18        Ameritas Life Insurance Company filed a joinder to

19   Nationwide's objection.  And U.S. Bank and First Trust

20   Strategic High Income Fund II also filed objections.  There

21   were no objections to the extension of the service deadline.

22        All of the objections, Your Honor, raise arguments

23   that the Court has overruled, and even in the light of the

24   passage of an additional six months, none of them

25   demonstrates sufficient prejudice to justify termination of

Page 8

1    the stay at this point.

2            As I have at each of the prior hearings seeking to

3    extend the stay, I'd like to start by reporting on the

4    benefits that the debtors have realized from the ADR process

5    and the stay.

6            As indicated in the 43rd status report filed on

7    June 19th by my partner, Peter Grumberger, as a result of

8    mediation, the debtors have achieved settlements in 264 ADR

9    matters involving 358 counterparties, generating in excess

10   of $1.5 billion for the estates.

11           I note, Your Honor, that Mr. Grumberger just filed

12   his 44th status report just moments ago.

13           Another measure of success is that 101 out of the

14   108 ADR matters in tier 1 that have reached the mediation

15   stage have been settled.  With respect to the avoidance

16   actions specifically, more than 132 avoidance action

17   defendants currently are subject to the SPB ADR procedures.

18   As described in paragraph 21 of the motion, the 150

19   defendants in the non-distributed action, Adversary

20   Proceeding No. 3545, have nearly all been dealt with.  We

21   have reached final resolution with over 110 defendants, and

22   there are pending ADR proceedings with respect to 32

23   defendants.  That leaves nine remaining defendants that are

24   being further evaluated.

25           Adversary Proceeding No. 3547, the distributed

Page 9

1    action is a bit more complicated.  This matter is a

2    defendant class action.  The plan administrator has

3    identified over 170 noteholders who have received $2.8

4    billion of distributions.  Notwithstanding the size and

5    complexity of this action, as described in paragraph 27 of

6    the motion, the plan administrator has made substantial

7    progress here too.

8          Since our last hearing in February, LBSF has served

9    ADR notices upon 100 defendants.  LBSF has also dismissed

10   approximately 40 defendants, and is preparing ADR notices

11   with respect to an additional 20 defendants.  And it's

12   continuing to evaluate approximately 40 additional

13   defendants, some the subject of continuing discovery, and

14   others are the subject of settlement discussions.  Notably,

15   none of the defendants in the distributed action that are

16   not yet subject to the ADR proceedings have filed objections

17   to the motion.

18         The foregoing statistics demonstrate, and I don't

19   think anyone would disagree that the ADR program has been a

20   resounding success.  Absent the stay, much of that success

21   would not have been possible, particularly within the time

22   frame and with so little burden on the Court.

23         At the last hearing, the Court eluded to "the

24   potential for incremental prejudice" --

25         THE COURT:  I like that phrase.

Page 10

1          MS. MARCUS:  You'll like this one too, and said,

2    "This cannot go on indefinitely."  That was the February

3    13th transcript at page 51.

4          We're here today to tell you, Your Honor, that the

5    potential incremental prejudice has not materialized, and

6    that the plan administrator deserves a further six month

7    extension of the stay.

8          Before we get to the merits of the objections, Your

9    Honor, it's important to clarify for the Court as well as

10   for the objectors, the relief that we seek in the motion.

11   The motions seeks a six month extension of the stay that was

12   originally entered by the Court in October 2010, shortly

13   after the avoidance actions were filed.  It is the stay that

14   applies to all avoidance actions, whether or not they

15   involve derivatives matters, and regardless of whether an

16   ADR is pending as to such matter.

17         For purposes of today's hearing, let's call that

18   the avoidance stay.  In addition to the avoidance stay,

19   there's another stay that is triggered by the commencement

20   of an ADR proceeding, pursuant to the SPV ADR procedures

21   order, which was originally entered by the Court in March

22   2011, and amended by order dated July 18th, 2012.

23         That stay, I'll call it the SPV stay, is triggered

24   by the delivery of an SPV derivatives ADR package.  Pursuant

25   to paragraph 2(d) of the amended SPV ADR order, the SPV stay

Page 11

1    continues until settlement or termination of a particular

2    mediation.  The motion before the Court today has nothing to

3    do with the SPV stay.  It is only a request to extend the

4    avoidance stay.

5         I won't spend a lot of time on the objections, Your

6    Honor, because you've heard all of them before, but I will

7    briefly summarize them.

8         The Nationwide parties.  The Nationwide objection

9    is very similar to the prior objection filed by them,

10   although the situation has changed since the last time we

11   were before you.  The Nationwide parties now are the subject

12   of a pending SPV ADR.  Consequently, they are subject to the

13   SPV stay, and even if the Court denies the motion, the

14   Nationwide parties would be stayed from continuing discovery

15   and filing dispositive motions.

16        To the extent that the Nationwide parties have

17   issues with the SPV stay, which is what they seem to be

18   complaining about, this hearing is not the proper context in

19   which to address such objections.  The Nationwide objection

20   is largely a collateral attack on the SPV stay, and that is

21   improper for today and should be overruled.

22        To the extent that the Court believes that the

23   Nationwide objection should be addressed in any event, we

24   have the following observations.

25        Nationwide requests what it calls a narrow carve-

Page 12

```
 1    out for discovery and dispositive motions.  The Nationwide

 2    parties, however, are two defendants in a multi-party

 3    action.  If they want relief to pursue their statute of

 4    limitations' issues, other defendants will want to pursue

 5    other defendants and so-called limited issues, and we'll be

 6    going down the slippery slope that will completely undermine

 7    the benefits of the stay.  If the avoidance stay were

 8    terminated, the burden on the Court would be considerable.

 9         The plan administrator's other responses to this

10    argument are in the record of the February hearing, as well

11    as in our reply, and I won't get into them at this point.

12         The Nationwide parties also contend that the stay

13    unilaterally benefits LBSF because the settlement strategy,

14    "freezes the high watermark of the BNY decision."  That's in

15    the Nationwide objection at page 4.  This argument, too, has

16    been addressed and rejected by the Court numerous times

17    before in response to prior objections by U.S. Bank and LB

18    Australia.

19         The BNY decision is out there.  Parties may

20    disagree with it, and if they do, they can raise their

21    arguments in ADR.  Indeed as set forth in Mr. Brandman's

22    declaration, parties have not been reluctant to argue the

23    merits of the BNY decision in mediation.

24         Finally, the Nationwide parties again raise the

25    issue of reciprocal discovery, we've addressed that in our
```

Page 13

1   papers and in the last hearing as well.

2        The U.S. Bank objection.  U.S. Bank in filing its

3   fourth objection to the extension of the stay doesn't say

4   anything that's new, other than that the tipping point has

5   passed, and the Could should not further extend the stay.

6   U.S. Bank asks the Court to accept arguments that the Court

7   has already rejected on numerous prior occasions; however,

8   these arguments are no more compelling today, and fail to

9   establish sufficient prejudice, particularly in light of the

10  substantial progress the plan administrator as demonstrated.

11       Many of the issues raised by U.S. Bank are based on

12  their faulty premise that has been rejected by the Court

13  previously, that the disputes will be resolved more quickly

14  in litigation than they would be through ADR or negotiation.

15  All of their arguments regarding the mere passage of time

16  suffer from this law.  In addition, there are other problems

17  with their alleged prejudice, that are fully addressed in

18  our reply.

19       The only arguably new contention from U.S. Bank is

20  in paragraph 14, that the trustee is in possession of

21  significant funds that remain quote, in judicial limbo.

22  First, the characterization of the funds being in limbo is

23  not appropriate in light of prior decisions of this Court

24  that flip clauses are unenforceable ipso facto provisions.

25       The funds being held by U.S. Bank actually belong

Page 14

1    to the estates.  Moreover, limbo hardly constitutes

2    prejudice sufficient to justify termination of the stay.

3           With respect to First Trust Strategic High Income

4    Fund II, a defendant in the distributed action, they contend

5    that if the stay is extended, that the Court should

6    determine that no further prejudgment interest should

7    accrue.  But First Trust is also the subject of an SPV ADR

8    and therefore, subject to the SPV stay.

9           As a result, the distributed action currently is

10   stayed as to them, whether or not the Court grants the

11   extension of the avoidance stay.

12          As noted in a footnote to its objection, First

13   Trust's objection is similar to an objection previously made

14   by U.S. Bank and rejected by the Court.  U.S. Bank's

15   objection, I think it was a year ago, dealt with the

16   applicability of default interest.  Notwithstanding the

17   slight variation in the argument, the response is the same.

18   As the Court noted, parties who are concerned about the

19   continuing accrual of interest can deal with that risk by

20   paying the amounts owed, and therefore, stopping the accrual

21   of interest.

22          The continuing accrual of prejudgment interest

23   arises from First Trust's failure to pay the amounts due,

24   rather than from the imposition of the avoidance stay.

25   Therefore, the interest does not warrant a denial of the

1    requested extension.

2           In conclusion, Your Honor, the estates have made

3    the requisite showing that an extension of the avoidance

4    stay is warranted under Section 105 of the Bankruptcy Code.

5           As the Court has noted on several occasions, and

6    the objectors did not take issue with, quote, one thing is

7    indisputable; the bankruptcy court has the discretion to

8    manage its docket.  That was from the June 15th, 2011

9    transcript at 39.

10          What we have here are a handful of objectors with

11   their parochial interest in mind who raise vague and

12   amorphous allegations of prejudice.  In determining whether

13   to sustain the objections, however, the Court should take

14   into account more than simply the dispute between the

15   estates and the objectors.  Instead, it should take into

16   account the impact that the relief sought by the objectors

17   would have on the cases, the estate's ability to effectively

18   resolve the numerous pending and potential causes of action,

19   and the resources of the Court.

20          Viewed in light of the interests of all creditors,

21   all avoidance action defendants, and the Court, Your Honor,

22   the relief requested in the motion is necessary and

23   appropriate, and the objections should be overruled.

24          THE COURT:  Thank you.  I'll hear from the

25   objectors.  Before I hear the first argument, I just wanted

Page 16

1   to state something for the record.

2           Lawrence Brandman has filed certain declarations in

3   connection with this hearing and certain other matters that

4   are before the Court.  I'd simply like to declare for record

5   purposes that Mr. Brandman and I are members of a committee

6   which is the ABI advisory committee on the safe harbors.  As

7   a result, I have informal contact with Mr. Brandman on a

8   periodic basis.  We have meetings every once in a while, the

9   next one is scheduled for July 31.

10          In that context, we talk as committee members about

11  issues that relate generally to the adequacy of the safe

12  harbor provisions in their present form, and possible

13  recommendations that we might make to the ABI Commission on

14  reform of Chapter 11.

15          I want to be clear that we have, however, never

16  discussed any issues that are particular to the Lehman

17  Brothers' bankruptcy case.  Although on occasion, matters

18  that relate to the Lehman case come up for discussion within

19  the committee.  I simply wanted to make that clear, and to

20  also point out that none of this impacts my review of the

21  pending motion to extend the stay or my treatment of the

22  declaration provided by Mr. Brandman.

23          MR. SMITH:  Thank you, Your Honor.  Good morning,

24  may it please the Court, Quinton Lynn Smith here on behalf

25  of Nationwide Life Insurance Company and Nationwide Mutual

1    Insurance Company.

2          I would note for the record the last time I was

3    here, I was the sole objector to an extended stay.  I now

4    have two additional parties.

5          THE COURT:  Do you feel better now?

6          MR. SMITH:  It's a 200 percent increase, Your

7    Honor, we're on a roll.

8          In 2010, the Court allowed its first stay in this

9    matter, and at that time, the Lehman parties wanted a stay

10   to allow them to finish service of process, and to identify

11   parties and to identify the nature of the investment

12   interests.

13         I was here at the hearing, although we weren't an

14   objecting party in July of 2012, but I was at the hearing

15   and attendance in July 2012, and at that time, Lehman had

16   shifted by that time.  And I wrote these words in terms of

17   what it sought, it sought a quote, reasonable and modest

18   stay, a year ago.  And a year ago was to start settlement

19   discussions in the derivatives litigation.

20         While in the last nine months, and we're not

21   challenging the facts of what they're alleging or what

22   they're stating in terms of a hundred notices going out in

23   the last five months.  They're contemplating another 20, but

24   it's interesting and important to point out from a timing

25   perspective, Your Honor, that in the declaration His Honor

Page 18

1    referenced, the declarant said there's only three mediations

2    scheduled out of all these.

3           Which begs a huge question, there is no description

4    at all from Lehman ever of what it looks like, in other

5    words, what the end looks like.  When are we going to have a

6    critical mass where we're going to be down to a certain

7    number and now it's time to start the litigation?  They

8    offer no parameters, they offer no description, they offer

9    nothing to the Court.

10          THE COURT:  Can I break in and ask a very basic

11   question?  Currently as I understand it, your clients are in

12   fact involved in an ADR process.  And as described by

13   counsel for Lehman, the ADR procedures order provides for

14   its own stay while mediation is progressing.

15          To what extent as a result do you have standing on

16   behalf of your clients now to complain about an extension of

17   the avoidance stay?

18          MR. SMITH:  I believe that as a result of being

19   tagged with a piece of paper it's now worse.  It's now

20   worse.  Now, we're -- there are two stays, redundant stays

21   if the Court will.

22          THE COURT:  Well, I'm not sure they're redundant,

23   they're two --

24          MR. SMITH:  Overlapping.

25          THE COURT:  -- stays that overlap that mean that

Page 19

```
1    even if you were to be successful in objecting to a broad

2    based extension of the avoidance stay, that at least as to

3    your clients, you would be subject to the ADR stay.

4            MR. SMITH:  Well, I guess I'm compelled to preview

5    a little bit of our strategy on that, Your Honor, because it

6    does respond to His Honor's question.

7            The first of that ADR -- the first ADR order

8    establishing that stay was entered in 2011 and then the

9    current one in that same place is March 2012.  The

10   Nationwide parties were not parties in litigation at that

11   time.  We are now parties in the litigation.

12           By being tagged with an ADR notice, a piece of

13   paper, and hypothetically, I only speak in hypotheticals, it

14   can be an ADR notice that says, give us judgment.  And yet,

15   we will be stuck forever with no -- there's no termination.

16   There's no termination of that stay.

17           THE COURT:  Yes, there is.  It extends for the

18   duration of the mediation.

19           MR. SMITH:  But that's just it, they control that.

20   The mediation can go on for years.  Out of 120 parties, we

21   can be the last one up to bat, three, four, five years.  And

22   that's not an exaggeration, Your Honor.  That's --

23           THE COURT:  Well, I don't know if it's true.  It

24   may or may not be an exaggeration, but it's a rhetorical

25   flourish.
```

Page 20

1          MR. SMITH:  The concern is, Your Honor, and this is

2     what the U.S. Supreme Court has discussed in terms of

3     immoderate stays.  If there is a stay without any

4     demarcation of an end on its face, that's an immoderate

5     stay.  By the way, they don't even respond to that argument

6     in their pleadings.  That it's an immoderate stay.

7          Now, we didn't object to the issuance of that order

8     back in March 2012 because we weren't parties yet.  But the

9     reality is, and our perspective is is a two-step process,

10    and that process includes opposing this stay, and then also

11    moving to lift the stay in the ADR process as to us at

12    least.  Because it is endless and --

13          THE COURT:  Do I understand that you are personally

14    and on behalf of your clients hostile to the notion of good

15    faith mediation to try to resolve this?

16          MR. SMITH:  Absolutely not, Your Honor.

17          THE COURT:  Then why are you being so obdurate

18    about this?

19          MR. SMITH:  Because it is our sincere belief, Your

20    Honor, and I don't mean to come here to be a thorn in the

21    Court's side --

22          THE COURT:  You're not a bit.  You're doing what

23    your clients apparently want you to do, it doesn't mean

24    you're going to prevail.

25          MR. SMITH:  We sincerely believe, Your Honor, that

Page 21

1    by allowing these stays to continue as they have, without

2    even giving us reciprocity, they're allowed to do

3    discovery --

4            THE COURT:  I've heard this argument before about

5    discovery, and their response to it, and I'm actually quite

6    sympathetic to the response, is that issues relating to the

7    statute of limitations or arguments that you might make that

8    there are no viable claims as to you, are arguments that can

9    be readily made to the mediator and evaluated by the

10   mediator.

11           If you have litigation here, this is one of the

12   great fallacies I think of litigation as a means to an

13   expedient end, it rarely is.  We have matters relating to

14   Lehman Brothers that have been litigated fully and ably, and

15   they end up in the district court and they end up in the 2nd

16   Circuit, and there are matters currently pending in the 2nd

17   Circuit.  This bankruptcy case is about to approach its

18   fifth anniversary in September.

19           There are certain matters relating to the Barclays'

20   sale that was approved in September of 2008 that remain

21   unresolved.  The theory that litigation is a particularly

22   efficient and important way to get to resolution I believe

23   is overstated.  You have certain rights, you can present

24   those, arguments to the mediator, and if the mediation

25   fails, you can present those arguments to me.  And you'll

Page 22

1   either prevail or not prevail with respect to those

2   arguments.

3           But this is true as to you, and I think it's true

4   as to everybody that's complaining about procedures that are

5   designed to facilitate settlement.  Litigation is not

6   necessarily a good alternative to the procedures that are

7   currently in place, and I'm not sure I accept your argument

8   that you need to open up the litigation drawer of your desk

9   and proceed in that manner if you're involved in a good

10  faith litigation right now.

11          So one of the strange things about your argument is

12  that if you are, in fact, engaged in good faith in a

13  mediation, I shouldn't be hearing from you now.  You should

14  be focused on that.  So one of my questions to you is, why

15  are you pressing this issue today?

16          MR. SMITH:  Because by not allowing to even apply

17  the pressure of a statute of limitations argument that would

18  actually be filed and they would have to address, they would

19  have to address it, it is -- and this is sincere belief,

20  Your Honor, this is not -- where there are stays, there

21  tends to be often both parties will want a stay.  In this

22  case, it's just Lehman.

23          U.S. Bank has made its argument and I appreciate

24  the Court has not accepted this argument, but it is a

25  sincere belief by not even allowing -- not the open

Page 23

1     floodgates, but just the statute of limitations argument,

2     not every other defense, but just the statute of limitations

3     argument, by not even being allowed to raise that issue to

4     the Court not the mediator, which is a very different point

5     of leverage, that's a very different point of leverage, then

6     the table of the mediation is tilted toward Lehman.  That's

7     a sincere belief, Your Honor, and I'm not saying that to

8     aggravate the Court, it's a sincere belief.

9          And that's why to use the Court's term, Nationwide

10    is being obdurate about this, it feels going into the

11    mediation, which we will participate in, the Court has

12    ordered us to, and we will participate in.  And we will

13    comply to the letter and the spirit in a reciprocal fashion

14    with that mediation process.  And quite frankly, we hope we

15    get to the top of the line in mediation.  We hope we're not

16    pushed at the end.

17          So we're happy to participate in the ADR process,

18    but there's a sincere belief that going into that process,

19    Your Honor, the table is tilted to their benefit.  They

20    don't feel the heat of anything.  They don't feel the heat

21    of anything.  And telling the mediator good legal arguments

22    doesn't change that, Your Honor.

23          I don't mean to say this to offend the Court, but

24    those are our sincere beliefs.

25          THE COURT:  Okay.

1          MS. APPLEBY:  Good morning, Your Honor, Laura

2     Appleby of Chapman and Cutler on behalf of the First Trust

3     Strategic High Income Fund II.

4          We're here today as defendants in the distributed

5     action asking that the Court, if it were to extend the stay

6     by another six months be fair to all parties here, as we

7     feel that the extension of the stay really only benefits to

8     debtors to the detriment of noteholders, such as our client.

9          The debtors have requested an additional stay under

10    their Section 105 equitable powers, and we feel that under

11    the Section 105 equitable powers that if the Court does

12    extend the stay by another six months, that along with that,

13    it should condition the stay to stop the accrual of

14    prepetition or excuse me, of prejudgment interest.

15         We do believe, of course, at some point that the

16    stay has to end so that these matters can go forward to

17    litigation if they're going to go to litigation.  And as a

18    further matter, debtors' counsel had mentioned that based

19    upon a footnote in our pleadings, that our pleadings are

20    very close to pleadings filed by U.S. Bank of last year.

21         We're not asking here for the Court to determine

22    any interest rate here, we're not asking for the Court to

23    look at the papers to determine any sort of percentages or

24    anything like that.  What we're asking is that if the Court

25    under Section 105 extends the stay to the debtors, that

Page 25

1    along with that, the Court should condition the stay so that

2    it's fair to both the debtors and to noteholders, such as

3    our client, to stop the accrual of prepetition interest.

4           THE COURT:  That's a fairly extraordinary remedy

5    you're asking for.  And let me just ask you this question.

6    Would you be precluded from arguing at some point in the

7    future if you were engaged in litigation that prejudgment

8    interest should be adjusted in some fashion to take into

9    account the fact that the litigation itself has been

10   prolonged by virtue of the stay?  In other words, is there

11   anything about the stay in its present form that takes away

12   that argument to be made later?

13          MS. APPLEBY:  I don't believe so, Your Honor,

14   but --

15          THE COURT:  I don't believe so either.  So why

16   should I do anything now that effectively gives you a right

17   that you wouldn't necessarily have because a Court would

18   only be able to assess the appropriateness of prejudgment

19   interest after judgment, and would only be able to assess

20   the rate and the period of time applicable, based upon the

21   facts presented.  Why should we prejudge that now?

22          MS. APPLEBY:  Because we believe now that not only

23   as Your Honor puts it, you believe that what we're asking

24   for is somewhat unprecedented.  But we also believe that

25   maybe that's the incorrect word to use that --

Page 26

```
 1            THE COURT:  I'm not sure if it's an incorrect word
 2    to use.  We do a lot of unprecedented things in the context
 3    of the Lehman bankruptcy case.  That doesn't mean they're
 4    inappropriate, but this may be.
 5            MS. APPLEBY:  Right.  Well, what we're saying is
 6    that the stay also here is unprecedented.  The stay has gone
 7    on for three years.  The stay seems to be going on for an
 8    indefinite period.  The debtors are, of course, asking for
 9    another six months here, but nothing is to say that in six
10    months they're not going to come back to the Court too, and
11    six months after that to continually ask for further stays.
12    And we just believe that the balance of power right now with
13    respect to the stay is in the debtors' hand.  But by
14    stopping the accrual of prejudgment interest here, we feel
15    that that balances the power between the debtors and the
16    noteholders and others such as First Trust, the First Trust
17    Fund, who may enter and we currently are in ADR proceedings
18    with the debtors.  We were served last month.
19            THE COURT:  Let me just understand what's happening
20    from an economic perspective if I understand your argument.
21    The noteholders that you represent, First Trust Strategic
22    High Income Fund II being the party that you've put into the
23    title of your limited objection, currently holds cash,
24    correct?
25            MS. APPLEBY:  Correct, Your Honor.
```

1          THE COURT:  Has the use of that cash, correct?

2          MS. APPLEBY:  As far as I understand, Your Honor,

3     yes.

4          THE COURT:  And can invest the cash?

5          MS. APPLEBY:  Correct, Your Honor.

6          THE COURT:  And realize the benefits if they're

7     good investments of the use of that cash.  The detriment

8     associated with that is prejudgment interest.  I cannot

9     understand why your client is entitled to what amounts to a

10    double dip benefit; exoneration with respect to the

11    potential obligation to owe prejudgment interest, and the

12    ability to continue to use the cash for free.  You can also

13    resolve the question by paying the money.  You can pay the

14    money, and argue about it later, and then not have the use

15    of the cash, which is a business decision that your client

16    could make.  So I don't understand your argument.

17         MS. APPLEBY:  I think first, Your Honor, with

18    respect to the paying the cash over to Lehman now, we have

19    certain duties and responsibilities to those holders in the

20    fund, and I'm not sure if that's something that we could do

21    at this point.  Because the money is still -- there are

22    issues still with respect to whether or not we owe the money

23    to the debtors.  We understand the debtors' earlier decision

24    with respect to the flip clause or we understand the

25    ramifications of that.  However, if this were to go to

Page 28

```
1   litigation that may be something as it's appealed that would
2   be reversed in favor of the noteholders.
3          THE COURT:  What year do you think that will be?
4   Do you want to speculate as to what year we're talking
5   about?
6          MS. APPLEBY:  Right.  Well, I think --
7          THE COURT:  Assuming the stay were lifted today,
8   and you were litigating questions to final resolution, do
9   you think I'm still alive?
10         MS. APPLEBY:  I would hope so, Your Honor.
11         THE COURT:  I would hope so, too, but we don't
12  know.  So we're talking about, we're talking about a long
13  period of time, the mere fact that issues relating to the
14  Barclays' sale are currently before the 2nd Circuit almost
15  five years after that order was entered, suggests we're
16  talking about a very long time before we get absolute
17  certainty as to some of these questions.  Are you suggesting
18  that there should be a five or eight year period of a
19  holiday from having to pay prejudgment interest?  That
20  doesn't seem fair.
21         MS. APPLEBY:  Not necessarily, Your Honor.  Right
22  now we're before the Court asking for the Court to stay the
23  accrual of interest during the period of the stay requested
24  by the debtors.  Should the stay end and litigation continue
25  or litigation presume, excuse me, that may be a different
```

Page 29

1   matter.

2           THE COURT:  Don't you think you could make the

3   argument, though, and I don't want to make the argument for

4   you, I'm just being hypothetical that, in fact, there is a

5   tolling period that might apply to the running of

6   prejudgment interest, but that's an argument that you would

7   make only if, as, and when it becomes pertinent to make it?

8           MS. APPLEBY:  I think it would be a possibility of

9   an argument that we could make, but going back to the issue

10  at hand, we think that if the Court in its equitable powers

11  under Section 105 is -- intends to extend the stay as the

12  debtors have requested, that that stay should be

13  conditioned, so that's it fair to all the parties, at least

14  during the six month period.  We're only looking at the

15  period in the motion as requested by the debtors.

16          THE COURT:  Okay.  You're looking for a proviso

17  with respect to this particular six month extension; is that

18  right?

19          MS. APPLEBY:  At this point, Your Honor.  I can't

20  say what will happen in six months when we're back before

21  the Court and the debtors have moved for another stay.

22          THE COURT:  Well, we can't predict the future.

23          MS. APPLEBY:  Yes, Your Honor.

24          THE COURT:  Okay.  Is there anything more you want

25  to add?

1          MS. APPLEBY:  Nothing here, Your Honor.  Thank you.

2          THE COURT:  Okay.

3          MR. TOP:  Good morning, Your Honor, Frank Top from

4     Chapman and Cutler on behalf of U.S. Bank National

5     Association, and we're in a slightly different situation

6     than some of the other objectors.  We've actually been

7     involved in a lot of mediations with the debtors.  We've

8     resolved some very successfully.  We've partially resolved

9     some of the transactions at issue, and then we've some

10    mediations that frankly, you know, have gone nowhere.  And,

11    you know, the mediators made recommendations and both sides

12    have declined it, and you know, in those particular

13    instances, it's unfair to those particular noteholders to

14    have to sit around and wait while a stay is in place in

15    order to litigate their rights.  Understanding how Your

16    Honor might rule, they may choose to exercise appellate

17    rights, they may choose not to exercise appellate rights,

18    but that's a right that they ought to have.

19          Same with the partially mediated transactions,

20    where we've partially settled, but we have noteholders in

21    there that just for whatever reason, don't agree with the

22    debtors' viewpoint on the flip clause, and you know, prefer

23    to litigate it either on principle or because they don't

24    feel they're getting enough.  Those noteholders ought to be

25    able to pursue rights and to litigate that matter and have

Page 31

1    it heard before Your Honor.  And if they choose to exercise

2    appellate rights, exercise appellate rights.

3           The whole notion that these adversary -- these

4    proceedings are so complex that they can't be handled just

5    begs a question, well, why don't we start handling them now.

6    I mean, they are very, very complicated.  There's all sorts

7    of transactions involved in each one, there's also hundreds

8    of defendants in the distributed funds case, and at some

9    point in time, we all need to sit down and figure out how

10   we're going to handle those matters.  Because as successful

11   as the mediation program has been, and again, as I have

12   admitted, we've been very successful at some of our

13   mediations, there are a number of mediations that just don't

14   turn out successfully, and those people ought to be able to

15   pursue their -- whatever rights they feel they have.

16          THE COURT:  Do I understand, just so I'm clear,

17   that your argument is that any extension of the stay should

18   not apply as to noteholders represented by U.S. Bank as

19   trustee, that have participated in mediations that have

20   ended unsuccessfully and are in effect in a different class.

21   The mediation has been pursued in good faith, but has not

22   resulted in a settlement.  Is that the essence of the

23   argument?

24          MR. TOP:  That is one argument.  I do also agree

25   with the attorney from Nationwide that the fact of the stay

Page 32

1    itself creates certain leverages, and that, you know, I

2    believe that, you know, the fact that the stay is in place

3    creates a negative leverage for noteholders in pursuing

4    litigation and that --

5         THE COURT:  Could you explain that, please?

6         MR. TOP:  Well --

7         THE COURT:  What is it about the existence of the

8    litigation stay that favors one side versus the other?

9         MR. TOP:  Because at this point in time, there's no

10   threat that the matter will be litigated before this Court,

11   and that a party litigating that matter, presuming it gets a

12   decision, exercises an appellate right to -- and prevails on

13   an appeal.  That in and of itself creates leverage that, you

14   know -- you know, these facts have no idea how long it's

15   going to take to have this matter resolved, and they may be

16   entitled to some of that money, maybe not.  But they ought

17   to -- they shouldn't have to wait, you know, ten years in

18   order for that to occur.

19        THE COURT:  If I said ten years I'm sorry I said

20   it.  I think I said eight.  And I think what I said was from

21   five to eight years to get finality with respect to

22   appellate issues that might end up in the Supreme Court.

23        My frame of reference is how long it has taken to

24   litigate certain matters that are currently being reviewed

25   by a panel of judges from the 2nd Circuit in connection with

1    the Barclays' sale.  I'm familiar with other litigation,

2    massive litigation in the Lehman case, one involving

3    JPMorgan Chase where the discovery alone has been going on

4    for I think three years.

5            So my perspective is that nobody can predict the

6    duration and the expensive litigation, but that one thing we

7    know unstayed litigation carries with it a host of risks for

8    both sides.  As well as significant uncapped expenses

9    associated with litigation that litigation in the ordinary

10   course is burdensome and distracting, that's why parties in

11   settlement agreements always say, to avoid the burdensome

12   distractions of litigation, we've agreed to settle.

13           Well here, the existence of the stay doesn't avoid

14   the burdens and distractions of litigation.  It merely

15   delays and defers, and perhaps completely avoids if

16   settlements are reached those burdens and distractions.

17           So in what way really is this prejudicial?

18           MR. TOP:  Again, I think it's a matter of time.  I

19   think it's a pure matter of time.  I mean again, we have

20   that one class of noteholders that have tried, and they

21   didn't reach some kind of a resolution.  For those that

22   haven't, you know, again this is very complicated -- very

23   complex adversary proceedings, there's lots of parties to

24   it.  If we don't start determining how we're going to handle

25   that, those adversary proceedings now, when are we going to

Page 34

1    do that?  I mean there are ways of handling it.  There are

2    ways of handling --

3            THE COURT:  Well, I hear you but let me ask you a

4    question because your position is a difficult one for you

5    individually because on the one hand you say this process

6    has been at least in certain instances that you personally

7    are familiar with, this process has been extraordinarily

8    effective and has worked.  And there are some examples where

9    it hasn't worked.

10           You're suggesting with respect to the fact that

11   some mediations have failed and the fact that there are

12   certain litigation rights that are being delayed that we

13   should effectively open up the doors to all litigation with

14   respect to the entire program, trash the ADR program as a

15   result, because parties will become actively involved in

16   litigation, and take the good of the program and throw it

17   out.

18           MR. TOP:  I'm not --

19           THE COURT:  That makes no sense.

20           MR. TOP:  I'm not suggesting that at all.

21           THE COURT:  What are you suggesting then?

22           MR. TOP:  Even if the stay were not in place, we

23   would still participate in mediation if that's what the

24   Court wanted.  The stay of litigation has nothing to do with

25   whether we would participate in mediation.

1          THE COURT:  That's a different question.  Parties

2     in active litigation may choose to mediate, may be directed

3     to mediate, but in multiple examples that I am personally

4     familiar with, parties don't put down their weapons

5     necessarily while they mediate, they do both.  They say,

6     we're not going to change the briefing schedule, we'll

7     mediate all right, but we're going to file our briefs.

8     We're going to put as much pressure on the other side as we

9     can.  We're going to spend as much as we can to make the

10    other side feel that it's punishing not to settle.  They use

11    all available resources to maximize their relative position.

12    Here we have something different, and I would suggest

13    better.

14          We have a level playing field in which what you

15    suggest as a theoretical prejudice is, in fact, no prejudice

16    at all.  Nobody is incurring litigation expense.  Nobody is

17    changing the status quo, but everybody has the right to

18    argue that there is the potential to change the status quo,

19    and to argue that to an independent and unbiased and skilled

20    mediator sounds like a great program to me.  Why isn't it a

21    great program?

22          MR. TOP:  Again, at least with respect to people

23    who have participated in the program, they're -- they

24    participated in good faith, no resolution was reached, and

25    they're just sitting around waiting for their matter to get

1  resolved.  I mean, I don't know when this is ultimately

2  going to get resolved.

3          And in any event, this whole motion that litigation

4  is going to be incredibly expensive, I would presume that

5  before this litigation actually initiated that there would

6  be some kind of ground rules set for the litigation.

7          For example, in the Delta Airline case where we had

8  a lot of tax indemnity agreement type claims, they picked a

9  couple of standard type provisions, and they litigated that

10  first, so people knew where that stood.  I mean, there's all

11  sorts of ways of handling the litigation so that the cost

12  isn't burdensome on either side.  And I think that that

13  would probably be appropriate in these particular cases.

14          But I don't suggest to trash the ADR process, I

15  think it's worked in some cases, I think it hasn't worked in

16  others.  But again, I think a stay against all litigation

17  is, at this point, after three years not appropriate.

18          THE COURT:  If you read the debtors' papers as I

19  did, including Mr. Brandman's declaration, in support of the

20  motion, one of the predicate theories that underlies the

21  success of the ADR program is the existence and continuation

22  for a period of time of the stay.  Do you dispute that?

23          MR. TOP:  Yeah, I don't -- yes, I do.

24          THE COURT:  Well, obviously you're standing here

25  and objecting to --

Page 37

1            MR. TOP:  That's right.

2            THE COURT:  -- an extension of the stay, so I'm

3    giving you rhetorical opportunity to somehow get out of the

4    box you're in, because you're arguing out of both sides of

5    your mouth.  On the one hand you're saying that the program

6    has been quite successful, on the other hand, you're saying

7    as to those that can't resolve their disputes in mediation,

8    they shouldn't have to wait any longer, right?

9            MR. TOP:  That's correct.

10           THE COURT:  Well, if you're balancing some parties

11   that have not succeeded in mediation against a whole

12   portfolio of others that are in a process where the stay is

13   beneficial, are you arguing only with respect to a subclass

14   or are you arguing with respect to the entirety of the stay?

15   I'm trying to understand if what you're looking for is a

16   carve-out or if what you're looking for is no extension of

17   the stay full stop.

18           MR. TOP:  I do not believe a stay is necessary to

19   maintain the integrity of the ADR process, and so, yes, we

20   would be arguing that the stay should be lifted in

21   connection with that.

22           THE COURT:  Okay.  So you are using the carve-out

23   argument as one of your arguments for there being no

24   extension of the stay notwithstanding the fact that you also

25   acknowledge that the ADR program which includes the stay has

Page 38

1    been effective.

2            MR. TOP:  I agree that we have reached resolutions

3    through the ADR process, I don't necessarily agree that it's

4    because the stay has been in place.

5            THE COURT:  Okay.  I think I know enough about your

6    argument, thank you.

7            MR. TOP:  All right.  Thank you, Your Honor.

8            THE COURT:  There's a joinder of Ameritas.  I don't

9    know if you want to say anything?

10           MR. ETKIN:  Your Honor, I don't have anything -- I

11   need to add anything to the arguments.

12           THE COURT:  Okay.

13           MR. ETKIN:  We can file a joinder and support those

14   arguments.

15           THE COURT:  Does anyone else before I hear from

16   debtors' counsel, we have a fairly full courtroom here

17   today, is there anyone else who wishes to be heard with

18   respect to the extension of the stay?

19       (No response)

20           THE COURT:  Okay.  I've heard no response and so

21   this is a good time to hear from debtors' counsel.

22           MS. MARCUS:  Your Honor, unless the Court has

23   further questions for me, I don't have anything else to add.

24           THE COURT:  Okay.  Counsel for Nationwide is

25   correct, there are more supporters of the Nationwide

Page 39

1    position that the stay should not be extended.  I've

2    reviewed the papers, and I've listened with care to the

3    arguments.  I view this as a very difficult issue and it

4    becomes more difficult each time we have one of these

5    hearings relating to a six month extension.

6            One of the embedded issues in the objections is

7    when will this end.  At what point does litigation move

8    forward and at what point do we know that the ADR program

9    has effectively run its course, I can't answer that at the

10   moment, and I don't know that the debtors can either.  And

11   that's part of what makes this a difficult decision.

12           The benefits associated with extending the stay of

13   avoidance actions are obvious.  I accept Mr. Brandman's

14   declaration, really the only evidence that has been offered

15   to support the six month extension of the stay, and I also

16   accept the periodic letters that are received from Lehman's

17   counsel reporting on the progress of the ADR program.  Those

18   letters confirm that this program has produced material

19   economic benefits to the estate, but the program has also

20   correspondingly produced benefits to the counterparties, all

21   of whom avoided the expense, distraction, and burden of

22   litigation.

23           I do not accept the argument made that the stay is

24   anything but neutral.  The only way that the stay may be

25   viewed as favoring the debtor is in the results I've already

Page 40

1    identified.  If the program has produced in excess of $1.5

2    billion in receipts, that suggests that this is beneficial

3    and that's also a good economic reason for the plain

4    administrator to want the stay to be extended.

5         I overrule all of the objections and I am extending

6    the stay of avoidance actions for an additional six month

7    period.  But I do so with a sense that this has to come to

8    an end.  And so the debtors should not assume that when next

9    they make a request to extend the stay, that I will grant

10   the same relief that I am granting today.

11        I will need a showing beyond that of the Brandman

12   declaration.  I'm not sure what that showing needs to

13   include, but at some point six month stays when tied

14   together become multi-year stays, and a multi-year stay

15   becomes difficult to justify.

16        I believe that what may be required, as we approach

17   the end of 2013, is a particularized and focused agreement

18   of parties to the litigation to extend the stay or to

19   voluntarily agree to defer litigation activity to

20   accommodate ongoing ADR activities.  Part of the problem

21   here is that this is a stay that is being judicially imposed

22   as to a class of defendants that are presumed by the debtors

23   not to be objectors.  The debtors' papers include references

24   to that inference.

25        I do not know whether that is a reasonable

1    inference.  I do not know whether the objections that we've

2    seen today are outliers or actually representative of

3    attitudes that might be supported by those affected by the

4    stay.

5         So while I am not saying this is the last and final

6    extension of the stay, I am saying that it is likely going

7    to be more difficult to get a further extension, absent good

8    cause shown and particular evidence presented as to how the

9    stay truly benefits the ADR process and how the stay is not

10   prejudicing parties affected by the stay.

11        I will entertain an appropriate order, and my dicta

12   does not need to be in the order.

13        MS. MARCUS:  Thank you, Your Honor.  We'll submit

14   an order at the conclusion of the hearing.

15        Your Honor, we're going a little bit out of order

16   and we're going to proceed to a matter that's on the SIPC

17   calendar next.

18        THE COURT:  Okay.

19        MS. MARCUS:  Mr. Greilsheimer will handle that.

20        MR. GREILSHEIMER:  Good morning, Your Honor, Jeff

21   Greilsheimer, Hughes, Hubbard and Reed for the SIPA Trustee.

22        I'm here on matters two, three and four on the

23   agenda.  Matters two and three are settlements with

24   affiliates.  The first one is a settlement with Lehman

25   Brothers Securities, which is the Curasel (ph) based entity.

Page 42

1      It resolves an $11 million customer claim for an allowed

2      claim of a little under two and a half million dollars.

3      There have been no objections.  The settlement also includes

4      full releases, mutual releases between the two parties.  We

5      ask that it be approved.

6                THE COURT:  It's approved.

7                MR. GREILSHEIMER:  Agenda item three is a motion

8      for approval for settlements between the trustee and Lehman

9      Brothers Equity Finance, a Luxembourg entity, and Lehman

10     Brothers Luxembourg.

11               The first of those is a $58 million customer claim

12     that is being resolved for a $5 million customer claim.

13     Again, full mutual release is being exchanged.  The second

14     settlement with LB Luxembourg resolves $13 billion worth of

15     stock trading -- stock lending transactions between the two

16     entities.  It results in a $158 million general creditor

17     claim against LBI.  We ask that both of those settlements be

18     approved as well.

19               THE COURT:  They're approved.

20               MR. GREILSHEIMER:  Item number four is the

21     settlement with Bankhouse (ph).  LBHI has filed an

22     objection.  We've had a number of discussions over the last

23     several months and the last week or so.  The parties have

24     agreed that we should try and resolve the objection

25     consensually.  It may take a little bit of discovery,

Page 43

1    whether it be informal or formal discovery.  The parties

2    would like to try and put together a protocol to do that

3    consensually, and perhaps come back to the Court in October

4    if we are unable to reach a consensual resolution of the

5    objection.

6              THE COURT:  It sounds like a good approach.

7              MR. GREILSHEIMER:  Thank you, Your Honor.  That's

8    it on items two, three and four.

9              THE COURT:  That means that you can be excused.

10             MR. GREILSHEIMER:  Thank you very much, Your Honor.

11             MS. MARCUS:  The next matter on the agenda, Your

12   Honor, is the Ford Global adversary proceeding and there's a

13   motion to dismiss that's before the Court.

14             MR. MCCOLLOUGH:  Good morning, Your, Aaron

15   McCollough from McGuire Woods for Ford Global Treasury.

16             We're here on a motion to dismiss certain counts of

17   the complaint filed by Lehman Brothers Commercial Corp and

18   Lehman Brothers Holdings, Inc. as plan administrator, and

19   specifically we're seeking to dismiss Count II of the

20   complaint, which is an automatic stay claim and Count III of

21   the complaint which is a turnover count.

22             We're also seeking to dismiss a portion of Count I

23   insofar as it seeks damages under Section 562 of the

24   Bankruptcy Code.  Count I also includes a claim for damages

25   calculated under state law, but we're not seeking to dismiss

Page 44

1    that claim through this membership.  So that will proceed

2    regardless of how this motion is ultimately resolved.

3              THE COURT:  Let me ask you a question about the

4    calculation of damages under state law.  Would the granting

5    of your motion to dismiss under 562 preclude any damage

6    calculations consistent with 562 standards?

7              MR. MCCOLLOUGH:  Well, I think, Your Honor, our

8    view is that the 562 calculation is really consistent with

9    the calculation that's required under the ISDA master

10   agreement, and it's a calculation that satisfies the ISDA

11   settlement provisions would also satisfy 562.  So I don't

12   think they're mutually inconsistent.

13             THE COURT:  Then why are you pressing a motion to

14   dismiss on 562?

15             MR. MCCOLLOUGH:  Well, if they are --

16             THE COURT:  I assume you're pressing it because you

17   see an economic advantage in doing so.

18             MR. MCCOLLOUGH:  Well, Your Honor, if they are

19   consistent we think it's redundant to have two separate

20   claims seeking damages under two different theories.  If

21   there --

22             THE COURT:  That's not the reason you're doing it.

23   You would only be doing it because it's economically

24   advantageous to do it.

25             MR. MCCOLLOUGH:  Well, that's the other reason.  If

Page 45

1    they produce different results, as we must assume Lehman

2    believes by pleading them in the alternative, we're seeking

3    to dismiss 562 damages because we view that 562 is not

4    applicable to this proceeding.

5         THE COURT:  I understand that's your belief

6    otherwise you wouldn't be pressing the argument, but you

7    wouldn't be pressing the argument unless you viewed it as

8    economically advantageous to do so; otherwise, it's just a

9    theoretical proposition.

10        MR. MCCOLLOUGH:  Well, I think, Your Honor, our

11   view is that the settlement provisions of the ISDA are very

12   carefully structured, very detailed, and they provide

13   certainty to parties and how they respond and how they

14   address them.  562 has very sparse legislative history, it's

15   not a provision that's been litigated frequently, and so

16   there's greater uncertainty as to how --

17        THE COURT:  Including uncertainty as to whether it

18   applies in the instance of this motion to dismiss.

19        MR. MCCOLLOUGH:  That's correct, Your Honor, that's

20   correct.  So we are seeking to dismiss just the 562

21   component, but not the state law component.

22        Your Honor, if I may put the motion in context by

23   just walking through some of the background --

24        THE COURT:  Including the failed mediation?

25        MR. MCCOLLOUGH:  I'm sorry?

Page 46

1          THE COURT:  Including the failed mediation?

2          MR. MCCOLLOUGH:  Sure, sure, including the failed

3     mediation.  The --

4          THE COURT:  You recognize that this is one of the

5     very few outliers of a mediation that has failed, and that

6     the amount involved is not that great.

7          MR. MCCOLLOUGH:  I --

8          THE COURT:  Both as to Ford and as to Lehman which

9     makes the Court without wanting to know any of the specifics

10    somewhat skeptical as to how the parties were unable to

11    reach an accommodation here, unless one side or the other is

12    being very difficult.

13         MR. MCCOLLOUGH:  Well, Your Honor, we have

14    certainly --

15         THE COURT:  I view based upon your pleadings that

16    your client is being difficult, because your pleadings

17    suggest a scorched earth approach to this litigation.  I

18    don't like that.  I'm letting you know that now.

19         MR. MCCOLLOUGH:  Well, Your Honor, I certainly

20    don't -- it's not our intent to take a scorched earth

21    approach, and in terms of the mediation we certainly had

22    hoped to resolve it in mediation and participated in good

23    faith.  A separate Ford entity that also had a claim that

24    was mediated under the SPV ADR procedures reached a

25    consensual resolution in that matter, and we, for various

Page 47

1    reasons, were not able to reach a --

2              THE COURT:  I don't need to know the reasons.

3              MR. MCCOLLOUGH:  Sure.  But we couldn't in this

4    matter, and I think because of a statute of limitations

5    issue, Lehman filed a complaint promptly after the close of

6    mediation.

7              THE COURT:  Okay.

8              MR. MCCOLLOUGH:  The background, Your Honor, is

9    that we had a portfolio for an exchange transactions with

10   Lehman Brothers prepetition, Lehman Brothers Commercial

11   Corp.  Although the amounts in dispute in this litigation I

12   agree are in the grand scheme of Lehman matters fairly

13   modest, the portfolio itself was significant.  It was over

14   $2 billion of notional value and it involved a dozen at

15   least currencies, so it was not a small portfolio.

16             Now, after Lehman Brothers Holdings filed its

17   bankruptcy case, Ford terminated its transactions and in

18   accordance with the ISDA went out and sought quotations from

19   four different banks, but given the market conditions at the

20   time and the size of the portfolio was told that it would

21   not be able to receive any actionable quotations in

22   response.

23             So Ford promptly went out sought to replace the

24   transactions on an individual basis because it could not do

25   so on a portfolio basis.  And within a week, it had replaced

Page 48

1    all but one of the transactions.

2         THE COURT:  So you acknowledge that one of the

3    transactions is post-petition?

4         MR. MCCOLLOUGH:  Yeah, we do.  We do.  There was

5    one fairly modest transaction that was post-petition.

6         THE COURT:  At some point you're going to have to

7    explain to me whether your motion to dismiss applies to that

8    transaction.  Does it?

9         MR. MCCOLLOUGH:  It does.  It does, Your Honor.  It

10   applies to all of them.  We feel that the operative facts

11   for all transactions, even the transaction that was replaced

12   post-petition, the operative facts are still -- all occurred

13   prepetition, which means that all of the parties' rights

14   with respect to termination, all of the parties' rights with

15   respect to calculation of damages approved and were fixed in

16   the prepetition period.  So that when LBCC filed, even if

17   one of these transactions had not been replaced prior to

18   that date, all of the parties' rights were already fixed

19   with respect to those.

20        THE COURT:  Okay.  I'm not going to take you out of

21   order by focusing too much on the prepetition question, but

22   you have to recognize that I am aware that there is nothing

23   in the applicable section or in its legislative history to

24   the extent that's even meaningful to look at that supports

25   your argument.

Page 49

1        MR. MCCOLLOUGH:  Well, Your Honor, I agree that the

2    statute on its face does not state that it should or should

3    not apply to prepetition transactions.  It just says what it

4    says without --

5        THE COURT:  And I understand you make a statutory

6    construction argument in the context of a motion to dismiss

7    as to why it should not apply to this situation.

8        MR. MCCOLLOUGH:  Your Honor --

9        THE COURT:  Suffice it to say without going into it

10   deeply that I am not granting this motion to dismiss today

11   or maybe ever.  This is the sort of issue that shouldn't

12   really arise in the context of a motion to dismiss.  It's

13   frankly too important.

14       If this is going to be the first case that decides

15   whether or not the section of the Bankruptcy Code in

16   question applies to transactions that arise just before a

17   bankruptcy filing, as opposed to just after a bankruptcy

18   filing, I want to do so in the context of a full record,

19   that would include such discovery as the parties wish to

20   conclude, and either an evidentiary hearing or summary

21   judgment briefing.

22       So I'm just letting you know now that I've read

23   enough of your papers to know that you have an argument, but

24   I'm not going to rule on that argument in the context of a

25   motion to dismiss.  And denying that motion to dismiss, it's

Page 50

1    completely without prejudice to your ability to reurge the

2    very same theories or other theories that you may come up

3    with after the case has progressed more.

4           MR. MCCOLLOUGH:  I understand, Your Honor.  I don't

5    want to waste more time on 562 if that's -- if it's not a

6    useful endeavor.

7           I do have one point that I would make that if

8    you'll indulge me maybe.

9           THE COURT:  I will indulge you.

10          MR. MCCOLLOUGH:  The reference to legislative

11   history is right, the legislative history is very sparse.

12   There is one statement in the legislative history there that

13   I think does touch on this issue, and --

14          THE COURT:  I think you mention that in your reply

15   papers.

16          MR. MCCOLLOUGH:  I think we mentioned some of the

17   legislative history but there's one provision I don't think

18   we focused on in our papers that I would note to you here.

19   And I'm happy to -- I have a copy if you'd like to look at

20   it.

21          THE COURT:  I don't know that I want to look at it

22   yet, but you can certainly --

23          MR. MCCOLLOUGH:  Okay.

24          THE COURT:  -- tell me about it.

25          MR. MCCOLLOUGH:  Sure.  There's a discussion of --

Page 51

1    although it's expected, and I'm quoting from the center

2    report 256, 109th Conference report 10931, "Although it is

3    expected that in most circumstances damages would be

4    measured as of the date or dates of either rejection or

5    liquidation, termination or acceleration in certain unusual

6    circumstances, such as dysfunctional markets or liquidation

7    of very large portfolios, there may be no commercially

8    reasonable determinance of value for liquidating any such

9    agreements or contracts, or for liquidating all such

10   agreements and contracts in a large portfolio on a single

11   day."

12          That's a statement that we did include in the

13   papers that discusses, you know, what 562 -- how it would be

14   applied in dysfunctional markets.  But it's the next

15   sentence that I think is notable.  It goes on to say, "It is

16   expected the measuring damages as a date or dates before the

17   date of liquidation, termination or acceleration will occur,

18   only in very unusual circumstances."

19          And it's that word before I think is notable.

20   Because what I think 562 is really intended to do is prevent

21   trustees, debtors, or counterparties from seeking to

22   terminate or reject a derivative contract nunc pro tunc to a

23   date before, including the petition date.  I think Collier's

24   notes that there was a concern prior to enactment of 562

25   that parties may sort of time rejection or termination, but

Page 52

1   purport to make it retroactive, which would undermine market

2   -- the market participant's ability to evaluate their risk.

3           And so 562 eliminates that prospect by saying

4   damages are a calculation as of this future date, not as of

5   the petition date.  And I think the inclusion of that word

6   before in the legislative history makes clear that what

7   Congress was doing was not trying to impinge upon state

8   court rights and the rights in the ISDA agreement or other

9   market standard agreements to calculate damages as of that

10  later date, what they're trying to do is prevent debtors,

11  trustees, and counterparties from relying on equitable

12  bankruptcy principles to make it retroactive.

13          THE COURT:  You don't know that.

14          MR. MCCOLLOUGH:  Pardon?

15          THE COURT:  You're assuming a lot in your argument,

16  and I've indulged you the point of giving an opportunity to

17  make an argument on a point that I've already told you I

18  have no intention of ruling on in the context of a motion to

19  dismiss.

20          The question of whether the date or dates of

21  liquidation, termination or acceleration are dates that

22  speak to a prepetition or post-petition period happens to be

23  a question that no one yet knows the answer to.  And the

24  facts surrounding the termination of this particular ISDA,

25  which presumably will be developed in discovery, and the

Page 53

1    timing of that relative to the filing date of this

2    particular Lehman affiliate's bankruptcy may be material in

3    assessing the proper interpretation of 562 in this context.

4         I know that the perpetual or BNY corporate trustee

5    decision however you want to refer to it has been alluded to

6    in the context of this morning's hearing already, and there

7    is briefing on it in connection with this motion to dismiss

8    as well.  But I will simply make this observation.

9    Arguments of a general nature as to applying 562 to

10   prepetition conduct cannot be made on a general basis when

11   the argument is being made in the context of the Lehman

12   bankruptcy filings.  And there is other litigation pending

13   before me in reference to the Ballyrock case, where certain

14   statements made in the perpetual decision are being further

15   examined.  That is another reason why this is not a suitable

16   subject for resolution on a motion to dismiss.

17        So you've lost without prejudice as to that

18   argument.

19        MR. MCCOLLOUGH:  Well, I thank you for indulging

20   me.  Thank you for your patience.  I can still address, if

21   Your Honor would like, the other two aspects of the motion

22   which are the request to dismiss the automatic stay and the

23   turnover count.  Frankly, I don't have much.  I think these

24   issues were fairly well briefed and the parties' positions

25   are pretty clear.

1        THE COURT:  They are.  Let me ask you why you care

2   about these particular arguments, and one of the things that

3   occurs to me, and I'd like to hear your response to this,

4   whatever arguments you may make today about the automatic

5   stay and its applicability to a reorganized debtor would

6   seem not to apply as to the entire period of time during

7   which the debtor was a Chapter 11 debtor, and before the

8   effective date of the plan.

9        Because there is an argument that there was a

10  wrongful retention of an asset of the estate, why shouldn't

11  the debtor, the reorganized debtor, be able to make

12  arguments that are set forth currently in the complaint?

13       MR. MCCOLLOUGH:  Well, I'll say that this argument

14  about the continuation of the stay and the besting of the

15  assets post effective date and the post effective date LBCC

16  I think are not the primary arguments here.  I'll answer

17  your question which is that the reason why it still warrants

18  dismissal is that that's not the count that the complaint

19  asserts.

20       The complaint asserts a -- seeks a declaratory

21  judgment that the stay is being violated, which in our view,

22  is not the case because the stay is not applicable.  The

23  count is not seeking a remedy for some prior damage.  But

24  it's really, I think, sort of a moot point because in our

25  view, whether the stay applies or not, whether at one point

Page 55

```
 1    or whether or not there's a bankruptcy estate anymore, and I
 2    think the answer is there's not, this was never an asset of
 3    the bankruptcy estate.  This is not a dispute about
 4    ownership of any identifiable funds, this is not a dispute
 5    about, you know, whether a liquidated non-contingent matured
 6    claim has to be paid.  This is a dispute about the
 7    interpretation of a contract.
 8             And we think there is authority and common sense
 9    that says that can't be the basis of an automatic stay
10    claim.  The common sense approach which is -- I'm sorry, the
11    authority which is probably more interesting to Your Honor
12    is in the reference in fraudulent transfer context in the
13    avoidance action context where the debtor or the trustee
14    makes a claim and seeks to have the transferred asset be
15    deemed an asset of the estate for purposes of the automatic
16    stay.  And Courts are uniform in New York, Southern District
17    of New York District Court and Bankruptcy Court that if a --
18    that the assertion of an avoidance action does not create a
19    property interest of the estate, in the asset that was
20    transferred by the estate to the third party.
21             It's only when the asset is actually recovered and
22    the debtor obtains title to those funds, the debt becomes an
23    asset the estate.  Until that happens, the debtor just
24    has a claim for recovery.  And a claim is not a right or an
25    interest in the property claimed.
```

Page 56

1          So I think we did make that point in our papers,

2     and I would just reiterate it here, and for that reason, we

3     think the -- regardless of the continuation of the automatic

4     stay post effective date, the claim should be dismissed

5     because there really is no asset that was or could be a part

6     of the estate that Ford could be deemed to have exercised

7     control over.

8          THE COURT:  Well, this is not the only case on my

9     docket involving derivatives.  And during the course of the

10    bankruptcy case itself, from time to time, the debtors would

11    bring motions or adversary proceedings asserting that there

12    had been a stay violation associated with the retention,

13    wrongful retention of property in derivatives transactions

14    that were as to Lehman in the money transactions.

15          In what way is this different?

16          MR. MCCOLLOUGH:  Well, Your Honor, I don't know the

17    circumstances of the prior matters whether it was disputed

18    as a matter of contract interpretation that the amounts

19    demanded by Lehman were payable or not.  If it was an

20    undisputed amount that was sitting in an escrow account or

21    was cash collateral or, you know, whatever the case may have

22    been, when you have an undisputed fixed payment obligation,

23    then I think then it may fall within the automatic stay.

24          What this is, is something I think at least on --

25    if I'm describing those circumstances correctly, and I don't

Page 57

1    know if I am, but I don't think that applies here.

2            THE COURT:  Let's just one example, so we don't

3    have to talk --

4            MR. MCCOLLOUGH:  Sure, sure.

5            THE COURT:  -- hypothetically.  I'm trying to

6    understand your position.

7            In a reported decision involving Bank of America I

8    found that the 362(b)(17) exception to the automatic stay

9    did not apply.  And that matter ultimately was resolved.

10   There, be it they had cash collateral; here, you have cash.

11   There is a dispute as to whether or not you should be

12   holding that cash.  You've known about that dispute for a

13   really long time.  You knew about that dispute before there

14   was mediation, you knew about the dispute before there was

15   litigation.  You knew about that dispute effectively

16   throughout the entire bankruptcy case.  I think that's the

17   timeline we're talking about.

18           MR. MCCOLLOUGH:  Well, I think, Your Honor, as an

19   initial point that I think the first time a different amount

20   was asserted as owing was actually several years after our

21   payment to Lehman in 2008 was made.  So there was a lengthy

22   period before there was any dispute or before Ford was aware

23   of any alternative calculation that Lehman might be

24   asserting.

25           THE COURT:  When did you first learn about it?

Page 58

1          MR. MCCOLLOUGH:  It was -- the first time we heard

2     a demand for a number was an ADR notice that was served on

3     Ford.

4          THE COURT:  Was when?

5          MR. MCCOLLOUGH:  An ADR notice that was served on

6     Ford.  I don't know what -- it was probably -- it was more

7     than a year ago, I don't know what the exact date of the ADR

8     notice.

9          THE COURT:  Okay.

10          MR. MCCOLLOUGH:  It was more than a year ago.  But,

11     Your Honor, I think the difference is that what we're

12     talking about and Your Honor says that there's cash that's

13     being disputed, but it's -- there's no dispute about who

14     owns the cash.  Ford owns its cash, Lehman does not, by

15     making a demand own or have an interest in any identifiable

16     cash.  There's no prejudgment attachment, there's no --

17     there's nothing that identifies any specific funds unlike in

18     the cash collateral situation that could possibly form the

19     basis for an interest of the estate to attach.

20          Instead, there's just a general demand for payment.

21     And, Your Honor, I would suggest that if a general demand

22     regarding a disputed contractual interpretation could be the

23     basis of an automatic stay claim and this is different from

24     I think a cash collateral situation.  It really causes

25     serious problems for a lot of issues which I've been not

Page 59

1    talking about, but core, non-core bankruptcy court

2    jurisdiction issues.

3            If a motion in a Chapter 11 case can resolve a

4    breach of contract action, a state law breach of contract

5    dispute, I think it poses serious questions about how that

6    would be treated after Stern v Marshall and under Marathon

7    and Grantsenaro (ph), but I don't think it's -- I don't

8    think we're dealing with that here, because what we're

9    talking about is an unliquidated, disputed, contingent,

10   unmatured claim.  And I just don't see how Lehman can get to

11   the point that they have an interest in any identifiable

12   funds that would constitute an interest of the bankruptcy

13   estate.

14           THE COURT:  Okay.

15           MR. MCCOLLOUGH:  The other claim, Your Honor, is

16   the 542 claim, and we've noted the authority that 542 should

17   not be used to liquidate a disputed breach of contract

18   claim, and we think that authority is pretty expansive and

19   persuasive.

20           In its opposition papers, Lehman really didn't take

21   issue with that.  It focused on jurisdiction and core and

22   noncore issues, which frankly we just think are not relevant

23   to the decision as to whether Count III of the complaint

24   states a claim upon which relief can be granted under the

25   standards in 12(b)(6).

Page 60

```
 1              There's no jurisdiction core/noncore analysis in

 2     the 12(b)(6) standard.  Either it states a claim or it

 3     doesn't.  And it's our view that it does not.  So we would

 4     ask the Court to follow the other authority from this

 5     district that concludes that a 542 claim should not be used

 6     to liquidate a disputed breach of contract claim.

 7              THE COURT:  Okay.  Thank you.

 8              MR. MCCOLLOUGH:  That's all I have, Your Honor.

 9              MR. LEMONS:  Good morning, Your Honor, Robert --

10     excuse me, excuse me.  Robert Lemons from Weil Gotshal and

11     Manges on behalf of LBHI and LBCC.

12              In light of the colloquy you just had with Ford

13     Global's counsel I'm going to be very brief, Your Honor.

14     Suffice to say that we, of course, disagree with Ford Global

15     and believe that 562 on its face and for good policy reasons

16     does apply to Ford's termination.  But that as Your Honor

17     has stated will be litigated fully if the parties don't

18     settle first.

19              I don't think there's any need for Your Honor to

20     deal with the motion with respect to the automatic stay or

21     turnover actions, since their existence or non-existence

22     doesn't change the case going forward.  There's going to be

23     the same discovery, the same briefing.  I don't think they

24     need to be dealt with on a dispositive basis at this time.

25              Having said that, though, I do want to spend just a
```

Page 61

1    minute discussing the points about the automatic stay that

2    Ford Global's counsel just made.  I thought it was

3    interesting that Your Honor brought up some of the earlier

4    derivatives litigation that we've had in this case.  I

5    wasn't thinking about the Bank of America case, although

6    that does raise the same issue, but I was thinking, Your

7    Honor, about the Metavanta case.

8             THE COURT:  So was I.

9             MR. LEMONS:  Which is --

10            THE COURT:  So was I.  I didn't mention Metavanta

11   because it wasn't -- everybody talks about it, but it never

12   rose to the level of anything written down that was taken

13   from the transcript.  But it's an important decision.

14            MR. LEMONS:  And, of course, I agree with that,

15   Your Honor, and just --

16            THE COURT:  What, that it's an important decision

17   or that it was just in the transcript?

18            MR. LEMONS:  Yes.  But I think a very important

19   fact about Metavanta that addresses one of the points that

20   Ford Global's counsel raised is that in Metavanta there

21   wasn't a specific fund or cash collateral sitting in an

22   account.  There, as I'm sure Your Honor recalls, there was a

23   counterparty, Metavanta who simply refused to perform under

24   the swap agreement because it did not believe that Section

25   365(e) of the Bankruptcy Code applied to it.

Page 62

1          Here, Your Honor, I would argue we have exactly the

2   same situation.  We've got Ford Global who is refusing to

3   perform and pay amounts that are due under the swap

4   agreement, and one of the bases for its refusal to perform

5   is that it believes that Section 562 of the Bankruptcy Code

6   does not apply to it.

7          So, Your Honor, I think that Metavanta in this case

8   are really on all fours.  And so notwithstanding the fact

9   that I don't think Your Honor needs to rule on either of

10   these issues today, if Your Honor, you know, does feel like

11   you need to rule on any of these issues, I think there's

12   really no basis to accept Ford Global's argument about the

13   automatic stay.

14          THE COURT:  Remind me about one aspect of

15   Metavanta, it was a while ago.  It's my recollection that it

16   arose in the context of a motion in which Lehman was seeking

17   to, among other things, enforce the automatic stay as to

18   Metavanta.  Am I right about that?

19          MR. LEMONS:  That's correct, Your Honor.  In

20   Metavanta, there was a swap that had not been terminated and

21   Metavanta owed periodic payments to Lehman under the swap,

22   except for it tried to rely on Section 2(a)(3).

23          THE COURT:  I recall it well.

24          MR. LEMONS:  So unless Your Honor has any more

25   questions, I don't have anything else to add.

1              THE COURT:  No, that's fine, thank you.

2              I think what makes the most sense is to simply deny

3      the motion to dismiss in its entirety without prejudice, as

4      to all of these arguments.  And to give the parties an

5      opportunity to more fully explore the issues in discovery,

6      the very same legal issues or perhaps new ones can be

7      identified for purposes of dispositive motion practice, I'll

8      simply state the obvious which I think is implicit in the

9      comment made by counsel for Ford Global.

10             In the context of the Lehman Brothers' bankruptcy,

11     and certain in the context of Ford Motor Company and all of

12     its affiliates, while we're talking about dollars that one

13     would pay close attention to, if we were dealing in a

14     different context, we're not talking about all that much

15     money for these enterprises.

16             The legal issues particularly those arising under

17     562 are unsettled and the parties, even though they have

18     been through a failed mediation might consider meeting and

19     conferring to see if it's possible through each business, a

20     resolution here with or without the involvement of the

21     mediator here who is last entrusted with that assignment.

22             If Ford is not inclined to return to the settlement

23     table, I'm not going to direct it or even strongly encourage

24     it.  I'm simply suggesting it.  As I stated a little bit

25     earlier, I conclude that Ford doesn't want to pay this money

Page 64

1    because there's already been a motion to withdraw reference,

2    there's already been a fairly significant briefing process

3    with respect to the motion to dismiss, and there is the

4    obvious conclusion to be drawn here that Ford views this as

5    a simple breach of contract matter to be determined under

6    state law principles of damage calculation, and that Lehman

7    views this as a bankruptcy matter that may include enhanced

8    recoveries due to a violation of the automatic stay which

9    has been alleged, and an alternative means to calculate

10   damages pursuant to 562.

11            I think the parties should simply take those risks

12   into account and see if it's possible to reach a solution.

13   If not, it will be a fascinating matter for me to write on,

14   and I look forward to doing that if you fail to reach a

15   settlement.

16            Somebody has to be the first to write about 562.

17            MR. LEMONS:  Thank you, Your Honor.

18            THE COURT:  Okay.  Thank you.  I'll entertain an

19   order denying the motion to dismiss without prejudice for

20   the reasons stated on the record.

21            MS. MARCUS:  Thank you, Your Honor.

22            MR. LEMONS:  Your Honor, may we be excused?

23            THE COURT:  Yes.  And anyone else who wishes to be

24   excused now may be excused.

25            MS. MARCUS:  Your Honor, the next matter on the

Page 65

1   agenda is a pretrial conference, excuse me, in the matter of

2   El Veasta Lampley versus Lehman Brothers Holdings, Inc. and

3   it's going to be handled by my colleague, Zaw Win.

4          MR. WIN:  Good morning, Your Honor, Zaw Win, Weil

5   Gotshal & Manges for Lehman Brothers Holdings, Inc.

6          As my colleague just mentioned, the next matter is

7   a pretrial conference in Adversary Proceeding No. 13-01354.

8   This matter was commenced by Ms. Lampley on or about May

9   29th.  LBHI filed its motion to dismiss on July 8th, and I

10  think the primary issue before the Court today is to come up

11  with a briefing and hearing schedule for LBHI's motion to

12  dismiss.

13         We, LBHI, reached out to Ms. Lampley earlier this

14  week to try to come up with a consensual briefing schedule.

15  We didn't get a response from her, although she did send me

16  an e-mail this morning.  It was a little bit cryptic, and

17  I'm not sure if she was saying in the e-mail that she was

18  planning to appear by phone for this hearing, or she was not

19  planning to appear.

20         THE COURT:  Let's find out, is Ms. Lampley either

21  on the telephone or in the courtroom or otherwise

22  represented?

23     (No response)

24         THE COURT:  There's no response.

25         MR. WIN:  The proposal that we made to Ms. Lampley

Page 66

1    was that her opposition papers would be due on July 31st by

2    4 p.m. and then Lehman would file its reply, if any, on

3    August 14th by 4 p.m., and that we could go forward with the

4    motion to dismiss on August 21st.  Does that sound like a

5    reasonable solution for the Court?

6            THE COURT:  If it's acceptable to the plaintiff,

7    it's acceptable to me.  But you don't know if it's

8    acceptable?

9            MR. WIN:  Exactly our problem, Your Honor.

10           THE COURT:  That's an acceptable schedule, but it

11   would be desirable if it were in fact consensual.  To the

12   extent that you are in contact with the plaintiff, it would

13   be desirable to confirm that the proposed schedule is

14   acceptable.  If it's acceptable to her, it will be

15   acceptable to me.  If it's not acceptable to her, and there

16   are adjustments proposed that are acceptable to Lehman, that

17   will also be acceptable to me.

18           If it is not acceptable to her, and the proposals

19   made to adjust the schedule are not acceptable to Lehman,

20   we'll probably need to have a further conference to try to

21   resolve the dispute.  But what you have suggested on its

22   face sounds reasonable.

23           MR. WIN:  Thank you, Your Honor.

24           The last matter on today's agenda is a continuation

25   of the debtors' objections to claims filed by Deborah Focht.

Page 67

1    As the Court may recall, we previously had a hearing on this

2    matter on April 25th, and at that hearing, the Court agreed

3    to disallow three out of Ms. Focht's five claims.  The basis

4    for that disallowance was that those claims were filed late.

5           And Ms. Focht was given the opportunity to provide

6    additional evidence with respect to her two remaining

7    claims, which are Claim No. 34380, which is filed against

8    BNC Mortgage, and Claim No. 34381, which was filed against

9    Lehman Brothers Holdings, Inc.

10          Since the April 25th hearing, Ms. Focht has

11   submitted an opposition -- I'm sorry, a second amended

12   response which is listed at ECF No. 38147 and an opposition

13   and motion to strike which was served on the plan

14   administrator on Monday, although I haven't seen it hit the

15   docket yet, so I'm not sure if it's assigned a docket

16   number.

17          The plan administrator has also filed its response

18   to Ms. Focht's second amended response, which is listed at

19   ECF No. 38138.  I think one of the problems the plan

20   administrators had in responding to Ms. Focht's claims is

21   that they're kaleidoscopic in nature.  It seems like each

22   time Ms. Focht submits an additional pleading she changes

23   her theory of the claims a little bit.  Presumably she's

24   trying to hit on an alignment that's plausible and that

25   would actually support relief on her behalf.

Page 68

1           The down side of this activity, of course, is that

2    it's very difficult one, to pen down specifically what she's

3    alleging with respect to these claims, and two, to respond

4    to that.  And I think what I'd like to do at this point then

5    is to try to really focus in on specifically what she's

6    alleged with respect to each claim, and then maybe deal with

7    each claim sequentially so that we don't get confused with

8    some of the other issues that have been raised that we

9    certainly would argue are not pertinent.

10           THE COURT:  That's fine.  Before we proceed, I just

11    want to confirm that Deborah Focht is, in fact, on the

12    telephone or is in fact present in the courtroom.

13           MS. FOCHT:  I'm on the phone, Your Honor.

14           THE COURT:  Okay.  Before we go into the

15    presentation from debtors' counsel, I'd like to reiterate

16    something that I said at the last hearing in April I believe

17    it was, which is, it is virtually impossible for a claimant

18    in the position of Deborah Focht to effectively represent

19    herself on the telephone.  I said previously that it was

20    important if you cared about this to be physically present

21    in the courtroom.  And I'm simply noting that in appearing

22    by telephone you necessarily are at a disadvantage here.

23           I can't look at you.  I can't judge your

24    credibility.  I can't explain things to you with respect to

25    identified exhibits.  You are unable to introduce evidence,

1     and I will make it clear now that everything attached to

2     your pleadings do not constitute evidence.

3            For that reason, I am at a disadvantage too in

4     being able to effectively evaluate your case.  I state that

5     before we go into this, because I viewed the last hearing as

6     unacceptable in terms of the time that was dedicated to it,

7     and the lack of clarity that came out of it, and I'm not

8     going to tolerate that again.

9            Let's proceed.

10           MR. WIN:  Thank you, Your Honor.

11           So I'd like to start with Claim No. 34381 which was

12    filed against LBHI in the amount of $1,104,000.  On the face

13    of that claim, Ms. Focht lists as her basis "may be actual

14    lender holding insurance or derivative agreements."

15           Based on that, we focused on Ms. Focht's theory

16    which we understand as being that Ms. Focht believes that

17    LBHI holds insurance policies or derivatives contract that

18    for some reason would trigger a payment to LBHI on the

19    occurrence of Ms. Focht's default under loan.

20           As an initial matter, we'd just like to point out

21    one, that Ms. Focht has never been able to establish the

22    existence of any of these policies.  Two, that there was

23    testimony at the previous hearing, and a declaration

24    submitted by Daniel Gland (ph) from Lehman Brothers

25    suggesting that he had done a search of Lehman's records and

Page 70

1    had been unable to locate any relevant policies or

2    contracts.  And three, that even if such a contract or

3    policy did exist, Ms. Focht has presented no evidence or no

4    argument even as to why she would have any right to payment

5    in connection therewith.

6           Ms. Focht apparently attempting to address some of

7    those concerns, Ms. Focht did submit some documents in

8    connection with one of the pleadings that she filed after

9    the April 25th hearing; however, that pleading just included

10   as an attachment two title insurance policies, one of which

11   was not even related to the property, neither of which

12   listed LBHI as the beneficiary, and both of which, based on

13   our review, looked to be title insurance policies.  And

14   again, based on our understanding of the way a title policy

15   insurance works, is that it insures defects in title.  So

16   for example, it would provide a benefit if some party

17   emerged that had a greater right to the property than the

18   older of the policies, so if someone that had a superior

19   interest in the property records.

20          They're not based, and they don't provide a benefit

21   in the situation that Ms. Focht is alleging where there has

22   been a default by the borrower.  These aren't policies that

23   pay out based on a borrower's default.

24          So based on that, the debtors would ask the Court

25   to disallow the claim against LBHI based on Ms. Focht's

Page 71

1    failure to provide any basis for the claim.

2            THE COURT:  We're just dealing now with one of the

3    two claims.

4            MR. WIN:  That's correct, Your Honor.

5            THE COURT:  Could you just identify that one by

6    number, is that 34380?

7            MR. WIN:  That's correct.  Claim 34381 which was

8    filed against LBHI.

9            THE COURT:  34381 is the claim against LBI -- LBHI?

10           MR. WIN:  LBHI, correct.

11           THE COURT:  Okay.  Ms. Focht, what's your response

12   to this?

13           MS. FOCHT:  Yes, I would like to say that I am

14   unable to go to New York, and my understanding was that I

15   was supposed to have a deposition taken from Lehman

16   Brothers, and they opted not to do that.  That was my

17   understanding of the last hearing, so I provided an

18   affidavit, which is Exhibit No. 2.  That's the best I could

19   come up with trying to follow what your orders were.  That's

20   a sworn affidavit.

21           And then second, I would like to say that I was

22   motion -- requiring a motion as to whether my claims were

23   timely filed.  And I had belief at that time that I was

24   receiving an order for that, but that didn't -- the Judge

25   did not order that.

Page 72

1           And then third, I am unable to amend my claim

2     because the plan says that we have to get Court authority

3     for that as well.  Hello?

4           THE COURT:  I'm going to confess that while you are

5     coming through loud and I can hear your words, I don't

6     understand a word you've said.  I don't understand what

7     you're saying.

8           MS. FOCHT:  My understanding was that Lehman was

9     supposed to -- Lehman, the debtors -- I'm sorry, the debtors

10    was supposed to take a deposition in place of my traveling

11    to New York, since I am unable to travel to New York from

12    injuries and due to lack of funds, and that was the first

13    part of what you were mentioning when you started this

14    hearing.

15          The second was, I was under the impression that

16    according to the hearing, that you wanted me to have a

17    deposition taken from Lehman Brothers, and they opted not to

18    do that.  And in place of that deposition is why I filed the

19    affidavit, the sworn affidavit, Exhibit No. 2.  At least

20    this is what I felt that you were requesting.

21          THE COURT:  Maybe counsel for Lehman can help act

22    as an interpreter.

23          MR. WIN:  I'll do my best, Your Honor.

24          I think the first point that she raised was the

25    issue of why LBHI didn't take her deposition in connection

1    with this matter, and my response to that would be, I mean,

2    in all these claims objections, the debtors have a

3    responsibility to weigh the expense of the litigation

4    against the issues that are really properly raised in the

5    matter, and obviously with an eye towards keeping costs

6    down.  So in this situation we did consider taking Ms.

7    Focht's deposition, but we didn't consider at least with

8    respect to the arguments that we've raised to date, all of

9    them are really legal arguments, and we didn't believe that

10   taking Ms. Focht's deposition justified the expense based on

11   the evidence that could be adduced.

12        I think Ms. Focht's second point is that she did

13   attach what she terms is a declaration to one of her papers,

14   and we wouldn't dispute that.  There is a declaration.  We

15   don't believe that the declaration contains any information

16   that wasn't already included in her other pleadings, and

17   that we haven't already taken into consideration.  But there

18   was a declaration that was produced by Ms. Focht.

19        Then I guess with respect to the last two points

20   she's made, I'm a little confused.  I think she's still

21   talking about the timeliness of the remaining claims.  And

22   as we pointed out in our papers, even though those claims

23   technically received by Epiq a day after the bar date, the

24   debtors are not, at least at this point, and don't

25   anticipate challenging the remaining two claims on the basis

Page 74

1   that they were late filed.  So I think that's really a moot

2   issue.

3          And then last with respect to her request to amend

4   the claims, she's right that under the plan, parties are

5   required to get approval from the Court in order to amend

6   their claims.  And I think at this point, I think there are

7   probably significant legal hurdles to do that, but she

8   hasn't even started that process.

9          She hasn't filed a motion, she hasn't requested

10  that the Court give her authorization to amend those claims.

11  So I don't think that issue is really before the Court at

12  this point.  But she really hasn't addressed the issues that

13  we've just discussed with respect to the LBHI claim.  And in

14  the interest of time, I'd really like to focus particularly

15  on that claim at this point and see if we can resolve that

16  before we move on to some of these other issues.

17          THE COURT:  Ms. Focht, as I --

18          MS. FOCHT:  Your Honor, may I just state that --

19          THE COURT:  Just wait one moment.  As I stated a

20  little earlier, telephonic participation in this hearing is

21  inadequate.  I am not going to continue this hearing today

22  on that basis.  I'm going to do the following.

23          Claims 34380 and 34381 are going to be disallowed

24  unless you are able to appear in person or through competent

25  counsel live in this courtroom at the next scheduled hearing

Page 75

1    on claims, and present a cogent, credible and well-supported

2    argument why the claims should not be disallowed.

3            If you fail to do that, they will be disallowed.

4    Do you understand what I have said?

5            MS. FOCHT:  Yes, Your Honor.  I would also like to

6    point out that my other option should be -- a motion for

7    relief from stay in order to resolve this issue, because I

8    have no other way to resolve the issue.

9            THE COURT:  You are making no sense to me.  This

10   has nothing to do with a motion for relief from stay.  This

11   has to do with objections made to your claims.  Your claims

12   are on the verge of being disallowed unless you do something

13   in person in this courtroom.  Participating by telephone is

14   not going to be permitted in the future as to you.  It

15   doesn't work.  You're going to have to show up in person or

16   with competent counsel that you have engaged.  Your papers

17   do not make sense to me.  I have read them.  And unless you

18   can make a credible case, the debtors' request that these

19   claims be disallowed will be granted.

20           You should obtain a date right now.  What's the

21   next scheduled date for claims?

22           MR. WIN:  August 29.

23           THE COURT:  August 29.  You'll be on the calendar

24   then.  If you're not here, your claims will be disallowed.

25           MS. FOCHT:  What about a transfer over here into

Page 76

1    the district and State of Florida?

2          MR. WIN:  I think she's requesting a change of

3    venue to a court in Florida, I didn't catch which one she

4    said.

5          THE COURT:  You have filed a claim in the Lehman

6    Brothers bankruptcy case, which is pending in the Southern

7    District of New York.  You have to participate here.  And

8    you can't do it by telephone because you are not effectively

9    making yourself clear, both in the things you say over the

10   loud speaker, and in the papers that you have filed.

11         I am giving you your last chance to respond, but

12   you have to respond in person.  That concludes today's

13   hearing.

14         MR. WIN:  Thank you, Your Honor.

15         MS. MARCUS:  Thank you, Your Honor.

16   (Proceedings concluded at 12:08 PM)

17

18

19

20

21

22

23

24

25

Page 77

1                          I N D E X

2

3                        R U L I N G S

4

5    DESCRIPTION                                          PAGE

6    Debtors' motion for extension of stay                 37

7

8    Settlement of Lehman Brothers Securities              41

9

10   Motion for approval for settlements between           41

11   the trustee and Lehman Brothers Equity Finance

12   entity, and Lehman Brothers Luxembourg

13

14   Lehman Brothers Holding, Inc. v Ford Global           63

15   Treasury, Inc. (Adversary Case No. 12-01877),

16   Motion to Dismiss

17

18   Plan Administrator's Omnibus Objection to             74

19   Claims Filed by Deborah E. Focht

20

21

22

23

24

25

Page 78

1                  C E R T I F I C A T I O N

2

       I, Sheila G. Orms, certify that the foregoing is a correct

3     transcript from the official electronic sound recording of

4     the proceedings in the above-entitled matter.

5

6     Dated:  July 18, 2013

7        Sheila Orms        Digitally signed by Sheila Orms
                            DN: cn=Sheila Orms, o, ou,
                            email=digital1@veritext.com,
8                            c=US
                            Date: 2013.07.18 16:42:18 -04'00'

9     Signature of Approved Transcriber

10

11

     Veritext

12

     200 Old Country Road

13

     Suite 580

14

     Mineola, NY 11501

15

16

17

18

19

20

21

22

23

24

25