**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------X
                                                            :
In re:                                                      :    Chapter 11
                                                            :
LEHMAN BROTHERS HOLDINGS INC., *et al.,*                    :    Case No. 08-13555 (JMP)
                                                            :
                                    Debtors.                :    (Jointly Administered)
                                                            :
------------------------------------------------------------X

### DECLARATION OF INES PÖSCHEL
### IN SUPPORT OF LBHI'S OPPOSITION TO CLAIMANTS' MOTION TO
### WITHDRAW CLAIMS 32395 AND 22671 PURSUANT TO FED. R. BANKR. P. 3006

I, Ines Pöschel, hereby declare and state as follows under penalty of perjury under the

laws of the United States of America, that the following is true and correct:

1.      I am an attorney at law and partner at the law firm Kellerhals Attorneys at Law in

Zurich, counsel for Lehman Brothers Holdings Inc. ("LBHI") with respect to Lehman Brothers

Finance AG (in liquidation) a/k/a Lehman Brothers Finance SA (in liquidation) ("LBF").  I

submit this declaration in support of LBHI's Opposition to the Motion of Dr. h.c. Tschira

Beteiligungs GmbH & Co. KG and Klaus Tschira Stiftung GmbH ("Claimants") to Withdraw

Claims 32395 and 22671 Pursuant to Rule 3006 of the Federal Rules of Bankruptcy Procedure.  I

have personal knowledge of the matters set forth below.

2.      I am informed that claims 32395 and 22671 (the "Claims") arise out of variable

forward transactions, each referring to underlying shares of SAP AG, executed between

Claimants and LBF (the "Transactions").  I am also informed that the Transactions automatically

terminated on September 15, 2008, and that with regard to payments on early termination,

Claimants contend that (i) it was not reasonably practicable to determine Loss, as that term is

defined in the agreements governing the Transactions, as of September 15, 2008, and (ii) there

were not any commercially reasonable determinants of value as of September 15, 2008. I submit

this declaration to describe to the Court the prejudice inflicted upon LBHI by way of Claimants'

multi-jurisdictional conduct in pursuing their claims.

### Claimants' Valuations of the Transactions as of the Week of 15 September 2008

3.      Claimants' claims into the LBF Estate, of a total of CHF 379'699'144.20 (Dr. h.c.

Tschira Beteiligungs GmbH & Co. KG) and CHF 284'492'050.70 (Klaus Tschira Stiftung

GmbH), have been fully rejected by LBF in the schedule of claims (the "Kollokationsplan") as

published on 3 April 2013. To the contrary, LBF lodges a claim against the Claimants for

payment to LBF based on its own valuations. Claimants have objected against the

Kollokationsplan within the given 20 days period by filing a complaint against LBF with the

presiding Judge in the Zurich District Court, dated 22 April 2008 (the "Swiss Complaint"). As

part of the Swiss Complaint, Claimants have submitted multiple valuations which they have

apparently been in possession of since September 2008. Two of these valuations were conducted

as of 15 September 2008, and one valuation was conducted no later than as of 19 September

2008.

4.      First, Claimants possess a valuation as of 15 September 2008 done by Banca di

Credito Finanziario S.p.A. ("Mediobanca") (the "Mediobanca Valuation"). (A copy of the

Mediobanca Valuation is annexed hereto as Exhibit 1.) In describing the Mediobanca Valuation

in paragraph 151 of the Swiss Complaint, Claimants assert that the Mediobanca employees who

conducted the valuation were former Lehman employees who had structured and implemented

the Transactions with Claimants while at Lehman. Claimants also assert that Mediobanca was

thus most familiar with Claimants' transactions and possessed the necessary expertise to be able

to give a correct assessment of the costs of a substitute transaction shortly after the collapse of Lehman Brothers.

5.      Second, Claimants have been in possession of a valuation as of 15 September 2008 done by Goldman Sachs.  (A copy of the Goldman Sachs valuation is annexed hereto as Exhibit 2.)

6.      Third, Claimants have been in possession of a replacement trade for two of the Transactions as of no later than 19 September 2008, proposed by J.P. Morgan.  (A copy of the E-Mail of J.P. Morgan referring to the valuation is annexed hereto as Exhibit 3.)

**The LBF-LBHI Settlement**

7.      On 27 March 2013, LBF and LBHI executed a Settlement Agreement (the "LBF-LBHI Settlement") [Ex. 1 to ECF No. 36300] resolving their inter-affiliate claims against each other.

8.      From a Swiss procedural point of view, the LBF-LBHI Settlement required approval by the Creditors' Committee, which was granted on 24 April 2013.  Further, two rights were to be granted to all creditors, as follows:

      a.      Any creditor of LBF was allowed to request assignment of the right to pursue all claims of LBF against the LBHI Parties, as that term is defined in the LBF-LBHI Settlement, and the right to object to the LBHI Parties' claims against LBF, subject to deposit of an amount of CHF 7 billion as settlement interest amount as defined by the liquidator of LBF within 20 days after the relevant publication, *i.e.*, no later than 22 May 2013.

      b.      Any creditor of LBF was informed about the so-called realization plan regarding the assignment of claims against affiliates by LBF to LBHI, as

such assignment is called for by the LBF-LBHI Settlement.  According to

the applicable Swiss rules, LBF creditors were entitled to demand an

appealable order from the Swiss Financial Market Supervisory Authority

("FINMA") relating to the LBF-LBHI Settlement within 20 days after

relevant publication, *i.e.*, no later than 22 May 2013.

9.     No creditor of LBF has requested an assignment as per paragraph 8.a above

within the relevant time period.

10.     Claimants were the only creditors – alleged creditors because their claims into

LBF had been turned down – that have asked for such appealable order as per paragraph 8.b.

above, on 22 May 2013.

11.     No other creditor – alleged or acknowledged – has asked for an appealable order

from FINMA.

12.     FINMA is said to be issuing such appealable order in the coming weeks.  The

appealable order is expected to fully approve the LBF-LBHI Settlement, which had been

negotiated between the parties for years and in concurrence with FINMA.  Claimants will have

20 days as from receipt of the order to file a challenge against the order with the Swiss Federal

Administrative Court (such period staying until the end of the Swiss court break until 15 August

2013).

13.     If the order is appealed, the Swiss Federal Administrative Court will after a

largely written proceeding issue a Judgment which again is appealable to the Swiss Federal

Supreme Court as ultimate instance.  Such proceedings – if no unexpected detours and delays

occur – are expected to be finalized not before 14 to 18 months.

14.    All other conditions to effectiveness of the LBF-LBHI Settlement have been obtained, including (a) all necessary approvals, (b) executed waiver of Aurora Bank, (c) executed waiver of Lehman Brothers Equity Finance S.A. (en faillite) ("LBEF") as part of the executed LBEF-LBF settlement which has been approved by the competent Luxembourg Court (Tribunal d'arrondissement de et à Luxembourg siègeant en matière commercial) and the Creditors' Committee of LBF and is only subject to no creditor of LBF asking for assignment or an appealable order and appeal respectively in order to become effective as required by the LBF-LBHI Settlement.

15.    Claimants' request for the appealable order and expected challenge thereto is an effective and serious block to the consummation of the LBF-LBHI Settlement, which was the result of years of protracted negotiations.

16.    Also, Claimants' expected challenge will effectively delay the distribution of billions of dollars to LBHI's creditors.

17.    In conclusion, there is clear prejudice inflicted upon the LBHI Estate and its creditors due to Claimants' conduct in pursuing its claims.

Executed at:    Zurich, Switzerland
24 July 2013

INES PÖSCHEL

# Exhibit 1



**MEDIOBANCA**
*Banca di Credito Finanziario S.p.A.*

Prager Dreifuss
Beilage
Annex 3 (49)

| | |
|---|---|
| **To:** | Aeris Capital – Mr. Uwe Feuersenger and Mr. Bernd Kammerlander |
| **From:** | Mediobanca - Equity Solutions |
| **Subject:** | Pricing of VFS and VFP for KG and KTS (19/09/2008) |

### I. Executive Summary

Mediobanca ("the Bank") has been asked by Aeris Capital to price 4 equity derivative structures with the same terms as the following existing transactions:

- Transaction 1: Variable Forward Sale (between LBF NA and Klaus Tschira Stiftung ("KTS"))
- Transaction 2: Variable Forward Sale (between LBF NA and Dr. H.C. Tschira Beteiligungs GmbH and Co. KG ("KG"))
- Transaction 3: Variable Forward Purchase (between LBF NA and KTS)
- Transaction 4: Variable Forward Purchase (between LBF NA and KG)

The details of the existing transactions are outlined in Annex 1. We have priced the four structures at a level where the Bank would have been in a position to enter them as of Friday, the 12th of September and Monday, 15th of September (the "Trade Date") at the closing of XETRA (around 4.35pm London time) for the 12th or at the opening of XETRA (around 8.00pm London time) (the "Trade Time").

### II. Variable Forward Sale

Description of the structure

In the two Variable Forward Sale transactions, KG and KTS ("Client") are effectively long a European put option and short a European call option on 59mn SAP AG shares in total. The combination of put and call options (collars) are split in tranches maturing at different dates. The put strike of the transaction with KG is €30.035, the call strike is €56.355 and the average maturity is 6.1 years. The put strike of the transaction with KTS is at €29.38, the call strike is at €55.70 and the average maturity is 3.8 years.

The schedule of dividends agreed with the Client is as follows:

1


MEDIOBANCA
*Banca di Credito Finanziario S.p.A.*

| | |
|---|---|
| 11May09 | €0.527 |
| 11May10 | €0.564 |
| 11May11 | €0.603 |
| 11May12 | €0.645 |
| 10May13 | €0.690 |
| 9May14 | €0.739 |

Any deviation from the schedule of dividends will result in a market-standard strike adjustment of the put and call options or a pass-through payment at the Client's election. Therefore, the Bank effectively bears no dividend risk.

To hedge its directional risk, the Bank needs to borrow and sell short up to 59mn SAP shares in the stock lending market (market borrow). These borrow costs need to be included in the price of the structures. The Bank is at risk on level of the borrow costs up to 150bps p.a. but is compensated by the Client if the costs increase above this level.

Finally, the Client has to pledge the total number of shares underlying the transactions in favour of the Bank to cover the Bank's credit risk. If the Client's credit exposure increases substantially (due to a significant decline of the SAP share price or for any other reason), the Client has the right to receive cash collateral to secure its credit exposure.

<u>Assessment of Risks and Pricing</u>

The structures are priced with the most common model used by equity derivatives dealers to value plain vanilla European options, the *Black&Scholes model*.

**<u>Market Parameters of the Black&Scholes Formula:</u>**

**Reference Price:**

The initial delta of all transactions amounts to approximately 40mn shares. The execution of the collars requires the Bank to sell short the initial delta on the Trade Date. The size of the associated block trade amounts to €1.4bn which represents 5 average daily trading days.

The Bank can assume the full risk of the delta placement at a price equal to the closing price of SAP on XETRA on the Trade Date minus a discount of 7%. Therefore, the reference price input in the Black&Scholes formula is calculated as:



MEDIOBANCA
*Banca di Credito Finanziario S.p.A*

For the 12th of September: (1 – 7%) × €37.29 (closing price as of the Trade Date) = €34.68.
For the 15th of September: (1 – 7%) × €36.56 (opening price as of the Trade Date) = €34.00.

This discount is justified by the significant size of the block trade, the current lack of appetite of
equity investors for such transactions (as evidenced by the very few equity and equity-linked
transactions originated by banks over the past 6 months in Europe) and the extreme volatility of
equity markets and risk aversion of investors given recent events in the world financial markets. In
fact, over the past 2-3 weeks, even well diversified indices like the S&P500 have experienced daily
negative moves in the magnitude of 3-5% (-3.0% on the 4th September, -3.4% on the 9th of
September, -4.7% on the 15th of September, -4.7% on the 17th of September etc.).

**Volatility and Volatility Skew:**
The Black&Scholes model assumes a single deterministic volatility. To overcome this disadvantage
of the model, equity derivatives dealers use the following approach. The volatility levels implied by
market quotes of listed option contracts with market-standard maturities and strikes are calculated
(implied volatilities). The volatility levels for non-standard strikes and maturities are calculated by
interpolation/extrapolation. Over-the-counter options with non-standard strikes and maturities are
valued using the Black&Scholes formula with these interpolated/extrapolated volatilities as the input
for the volatility.

In the vast majority of cases, the implied volatility of out-of-the-money put options is higher than
the implied volatility level of out-of-the-money call options. The difference between both volatilities
is referred to as the 'volatility skew'. By entering the Variable Forward Sales, the Bank will have a
substantial risk exposure to subsequent increase in the skew (skew exposure). In addition, the
exposure to the level of volatility is very dependent –among other factors– to the level of the share
price of SAP. As the share price increases (declines), the Bank will have a substantial positive
(negative) exposure to the level of implied volatilities (vega exposure).

The longest maturity of listed options with reasonable liquidity is currently the June 2010 contract
trading on Eurex. The actively traded options contracts with strike prices that are closest to the
contemplated structures are the contracts with strike prices of €28 and €52. We calculated the mid-
market implied volatilities at the Trade Time on the Trade Date for the €28 contract as **29.0%** and
the €52 contract as **23.5%**. This implies a volatility skew of **0.85%** for two options with strike
price difference equal to 10% of the reference price. By linear interpolation of the skew, we find
that the at-the-money implied volatility is **26.9%**.

3



MEDIOBANCA
*Banca di Credito Finanziario S.p.A.*

Looking at the implied volatility levels extracted from market quotes of options with maturities of one year to two years, it can be seen that there is only a small difference between the at-the-money volatilities depending on the maturity (term-structure of volatility). In other words, the term structure flattens quickly for medium-term options and is almost flat for maturities around 2 years or longer. Given this and the lack of information justifying a particular term-structure for long-term options, we assume a flat volatility term-structure between June 2010 and the relevant maturities of the transactions.

Typically, the volatility skew observed on equity option markets tends to flatten as the maturity of the option increases. To take this effect into account, the volatility skew was extrapolated to the relevant maturities of the transactions by using a market standard adjustment (whereby the skew of longest tradable contract is multiplied by the square root of the maturity of the tradable contract and subsequently divided by the square root of the maturity of the contemplated transaction). Such computation results in an average mid-market skew for a 10% strike difference of **0.60%** for the KTS maturities and **0.46%** for the KG maturities.

The resulting mid-market implied volatilities are as follows: For the KTS put (call) option the average volatility is **27.8% (23.4%)**, while the average volatility of the KG put (call) is **27.5% (24.0%)**. These volatility levels imply a total mid-market skew of **4.4%** for the KTS collars and **3.5%** for the KG collars.

A trade of significant size in the listed option market would be around 20,000 listed contracts, equivalent to 1mn options. The contemplated transactions are therefore 59x larger in volume. Furthermore, the maturities of the transactions are significantly longer than the longest listed and actively traded option contracts. The average maturity of the KG transactions, for example, is more than 4 years longer than the June 2010 contract described earlier.

Because of the very large size and the long maturity of the transactions, the Bank will be unable to cover its skew and vega exposure with instruments of similar maturities and in the required size. As the vega exposure is highly sensitive to the share price, the Bank could have a substantial vega exposure when instruments of similar maturities become tradable in the future. As there is a significant uncertainty with respect to the level of implied volatilities at this future point in time, the skew needs to be widened to a level which we deem appropriate for the range of the expected

4



MEDIOBANCA
*Banca di Credito Finanziario S.p.A.*

volatilities over the maturities of the transactions. We assume a volatility of **21.1% (21.5%)** for the KTS (KG) put option and a volatility of **30.0% (30.0%)** for the KTS (KG) call option.

**Interest Rate:**

We assume interest rates to be deterministic. We use a zero coupon yield curve (constructed from market quotes on the deposit, futures and swap markets) to calculate by linear interpolation the relevant interest rate for each expiry (see zero coupon yield curve in Annex 2). This ensures that the option transactions are priced at the level where the interest rate risk can be hedged by interest rate swaps and similar instruments.

**Dividends:**

Discrete dividends are taken into account by subtracting the sum of the discounted dividends from the reference price and using this modified reference price as input in the Black&Scholes formula. This is a simple but widely used approach by equity derivatives dealers.

**Borrow Costs:**

The carry on the 'short delta' is calculated by subtracting the borrow costs from the interest rate to expiry. We have asked 2 major investment banks to provide us quotes on 10mn SAP shares for overnight stock lending. The average of these quotes is 45bps. We have taken into account that:

(1) the initial delta is 35mn SAP (i.e. significantly higher than our request in the market). We assume that the costs the Bank will incur on the full size will be increased by a minimum of 10bps p.a.; and

(2) the Bank will bear any increase in the total borrow costs due a decrease in stock lending supply up to 150bps p.a. The Bank would assume this risk if it is compensated by a risk buffer of at least 10bps p.a.

Therefore borrow costs of **65bps** p.a. are included in the pricing.

Price for Transactions 1 and 2 (Friday 12th of September)

We have calculated the price of Transaction 1 and 2 by following the methodology outlined above. The result is as follows

- Transaction 1: price of €6.04mn to be paid by KTS to Mediobanca
- Transaction 2: price of €11.65mn to be paid by Mediobanca to KG

Therefore the total price of both transactions is €5.61mn payable by Mediobanca to Client.



MEDIOBANCA
*Banca di Credito Finanziario S.p.A.*

Price for Transactions 1 and 2 (Monday 15th of September)

We have calculated the price of Transaction 1 and 2 by following the methodology outlined above. The result is as follows

- Transaction 1: price of €14.69mn to be paid by KTS to Mediobanca
- Transaction 2: price of €1.21mn to be paid by KG to Mediobanca

Therefore the total price of both transactions is €15.90mn payable by Client to Mediobanca.

### III.  Variable Forward Purchase

#### Description of the structure

In the two Variable Forward Purchase transactions, KG and KTS ("Client") are effectively short a down&in put option with rebate and long a down&in call option on 12.926mn SAP AG shares in total. The down&in call (put) is similar to plain vanilla European call (put) but only comes into existence if the share price trades at or below the barrier level at any time during the life of the option. In addition, the down&in put option pays a rebate at maturity equal to the difference between the strike price and the barrier level if the barrier is triggered. The combination of put and call options (down&in reverse collars) are split in tranches corresponding to the Variable Forward Sale transactions.

The put strike of the transaction with KG is €30.035, the call strike is €56.355, the average barrier level is €26.50 and the average maturity is 6.1 years. The put strike of the transaction with KTS is at €29.38, the call strike is at €55.70, the average barrier level is €26.50 and the average maturity is 3.8 years.

#### Assessment of Risks and Pricing

Given the size of the transaction, we use a simple yet flexible model to price this option, a 2-volatility barrier option model. One volatility ("Strike Volatility") is used to price consistently the "underlying" European vanilla option; the other volatility ("Barrier Volatility") is used to model the probability of triggering the barrier.

#### **Market Parameters of the 2-volatility Barrier Option Model:**

6



**MEDIOBANCA**
*Banca di Credito Finanziario S.p.A.*

**Reference Price:**

The initial delta of all transactions amounts to approximately 3mn shares. The execution of the down&in reverse collars requires the Bank to buy the initial delta. One needs to look at all four transactions when determining the net delta to hedge on the Trade Date (36mn shares). Therefore, the discount applied to SAP share price is the same as in the pricing of the Variable Forward Sale.

**Volatility and Volatility Skew:**

To determine the Barrier Volatility, We extrapolate the implied volatility to the relevant barrier levels and maturities. However, there is a large uncertainty as to when the barrier could be triggered and hence the implicit vega exposure is difficult to hedge. We assume an average volatility of **29.8%** **(29.5%)** for the KTS (KG) transaction, i.e. a spread of 1.5% compared with the equivalent mid-market implied volatility.

The mid-market Strike Volatilities of the KTS and KG put (call) options are the same as in the Variable Forward Purchase transactions. However, by entering the Variable Forward Purchase the Bank increases its long vega exposure significantly. Therefore, the implied volatility of the call option is adjusted downwards by an additional 1.6% to reflect this additional risk. However, given the lower vega exposure on the put option leg, the Strike Volatility of the put option is also adjusted downwards by 1.4%.

**Interest Rate, Dividends and Borrow Costs:**

The interest rates and dividends assumed in the Variable Forward Purchase transactions are the same as the ones used in the pricing of the Variable Forward Sale. Similarly to the remark on the reference price, one needs to look at all four transactions when determining the net delta that the Bank needs to borrow to hedge its directional risk. Therefore, the same borrow costs as in the pricing of the Variable Forward Sale are assumed.

<u>Price for Transactions 3 and 4 (Friday 12th of September)</u>

We have calculated the price of Transaction 3 and 4 by following the methodology outlined above. The result is as follows

- Transaction 3: price of €5.92mn to be paid by KTS to Mediobanca
- Transaction 4: price of €7.14mn to be paid by KG to Mediobanca


MEDIOBANCA
*Banca di Credito Finanziario S.p.A.*

Therefore the total price of both transactions is €13.06mn payable by Client to Mediobanca

Price for Transactions 3 and 4 (Monday 15th of September)

We have calculated the price of Transaction 3 and 4 by following the methodology outlined above. The result is as follows

- Transaction 3: price of €5.47mn to be paid by KTS to Mediobanca
- Transaction 4: price of €6.85mn to be paid by KG to Mediobanca

Therefore the total price of both transactions is €12.32mn payable by Client to Mediobanca



**MEDIOBANCA**
*Banca di Credito Finanziario S.p.A.*

**Annex 1: Klaus Tschira Data Sheet**

1. **Variable Forward Sale (16th May 2007 ISDA Master & Custody Agreement;  23rd May 2007 Confirmation)**

Dr. h.c. Klaus Tschira Beteiligungs GmbH & Co KG

| | | |
|---|---|---|
| Total no of shares | : | 32mm |
| Total no of tranches | : | 45 |
| Shares per tranche | : | 711,111 |
| | | |
| Initial Price | : | € 36.7250 |
| Put k | : | € 29.38 (i.e. 80% of IP) |
| Call k | : | € 55.70 (i.e. 151.65% of IP) |
| | | |
| Tranche 1 – 15 Expiries | : | 30/1/2012 – 17/2/2012 |
| Tranche 16 – 30 Expiries | : | 26/3/2012 – 13/4/2012 |
| Tranche 31 – 45 Expiries | : | 28/1/2013 – 15/2/2013 |
| | | |
| Deferred Premium | : | € 19,590,581 on 17/2/2012 + 3bd |
| | | € 19,735,522 on 13/4/2012 + 3bd |
| | | € 20,538,575 on 15/2/2013 + 3bd |
| | | **Total = € 59,864,679** |

Klaus Tschira Stiftung

| | | |
|---|---|---|
| Total no of shares | : | 27mm |
| Total no of tranches | : | 45 |
| Shares per tranche | : | 600,000 |
| | | |
| Initial Price | : | € 36.7250 |
| Put k | : | € 29.38 (i.e. 80% of IP) |
| Call k | : | € 55.70 (i.e. 151.65% of IP) |
| | | |
| Tranche 1 – 15 Expiries | : | 30/1/2012 – 17/2/2012 |
| Tranche 16 – 30 Expiries | : | 26/3/2012 – 13/4/2012 |
| Tranche 31 – 45 Expiries | : | 28/1/2013 – 15/2/2013 |
| | | |
| Deferred Premium | : | € 16,529,555 on 17/2/2012 + 3bd |
| | | € 16,651,849 on 13/4/2012 + 3bd |
| | | € 17,329,425 on 15/2/2013 + 3bd |
| | | **Total = € 50,510,830** |

2. **KG Variable Forward Sale Extension (25th Jan 2008 Amendment Letter, 4th Feb 2008 Final Terms Notified)**

Dr. h.c. Klaus Tschira Beteiligungs GmbH & Co KG

| | | |
|---|---|---|
| Total no of shares | : | 32mm |



**MEDIOBANCA**
*Banca di Credito Finanziario S.p.A.*

| | | |
|---|---|---|
| Total no of tranches | : | 45 |
| Shares per tranche | : | 711,111 |
| | | |
| Initial Price | : | - |
| Put k | : | € 30.035 |
| Call k | : | € 56.355 |
| | | |
| Tranche 1 – 15 Expiries | : | 14/4/2014 – 07/5/2014 |
| Tranche 16 – 30 Expiries | : | 27/10/2014 – 14/11/2014 |
| Tranche 31 – 45 Expiries | : | 15/4/2015 – 06/5/2015 |
| | | |
| Deferred Premium | : | € 21,717,693 on 07/5/2014 + 3bd |
| | | € 22,285,706 on 14/11/2014 + 3bd |
| | | € 22,841,967 on 06/5/2015 + 3bd |
| | | **Total = € 66,845,365** |

<u>Klaus Tschira Stiftung</u>

| | | |
|---|---|---|
| Total no of shares | : | 27mm |
| Total no of tranches | : | 45 |
| Shares per tranche | : | 600,000 |
| | | |
| Initial Price | : | € 36.7250 |
| Put k | : | € 29.38 (i.e. 80% of IP) |
| Call k | : | € 55.70 (i.e. 151.65% of IP) |
| | | |
| Tranche 1 – 15 Expiries | : | 30/1/2012 – 17/2/2012 |
| Tranche 16 – 30 Expiries | : | 26/3/2012 – 13/4/2012 |
| Tranche 31 – 45 Expiries | : | 28/1/2013 – 15/2/2013 |
| | | |
| Deferred Premium | : | € 16,529,555 on 17/2/2012 + 3bd |
| | | € 16,651,849 on 13/4/2012 + 3bd |
| | | € 17,329,425 on 15/2/2013 + 3bd |
| | | **Total = € 50,510,830** |



**MEDIOBANCA**
*Banca di Credito Finanziario S.p.A.*

## 3.  Variable Forward Purchase (18th April 2008 Confirmation)

Dr. h.c. Klaus Tschira Beteiligungs GmbH & Co KG

| | | |
|---|---|---|
| Total no of shares | : | 32mm |
| Total no of tranches | : | 45 |
| Shares per tranche | : | 711,111 |
| | | |
| Put k | : | € 30.035 |
| Call k | : | € 56.355 |
| | | |
| Tranche 1 – 15 Expiries | : | 14/4/2014 – 07/5/2014 |
| Tranche 16 – 30 Expiries | : | 27/10/2014 – 14/11/2014 |
| Tranche 31 – 45 Expiries | : | 15/4/2015 – 06/5/2015 |

Deferred Premium[1] and Rebate[2]  :
      €4,514,415 on 07/5/2014 + 3bd
      €4,514,415 on 14/11/2014 + 3bd
      €4,514,415 on 06/5/2015 + 3bd
      **Total = €13,543,246 + Rebate**

Max Rebate = 32mm * (€ 30.035 - € 26.5[3])

| | | |
|---|---|---|
| Triggers | : | € 28.00 to € 25.00 |
| | | Tranche 1 to Tranche 45 |
| | | ~ € 0.07 increments per Tranche |
| | | |
| Guaranteed Amounts | : | €7,633,717   30/04/2008 |
| | | €5,909,529   09/05/2008 |

Klaus Tschira Stiftung

| | | |
|---|---|---|
| Total no of shares | : | 27mm |
| Total no of tranches | : | 45 |
| Shares per tranche | : | 600,000 |
| | | |
| Put k | : | € 29.38 |
| Call k | : | € 55.70 |
| | | |
| Tranche 1 – 15 Expiries | : | 30/1/2012 – 17/2/2012 |
| Tranche 16 – 30 Expiries | : | 26/3/2012 – 13/4/2012 |
| Tranche 31 – 45 Expiries | : | 28/1/2013 – 15/2/2013 |

Deferred Premium  :
      €3,809,038 on 17/2/2012 + 3bd
      €3,809,038 on 13/4/2012 + 3bd
      €3,809,038 on 15/2/2013 + 3bd
      **Total = €11,427,144 + Rebate**

Max Rebate = 27mm * (€ 29.38 - € 26.5)

| | | |
|---|---|---|
| Triggers | : | € 28.00 to € 25.00 |

---

[1] Fixed amount (i.e. option model calculation)
[2] Put strike *minus* Trigger for each Tranche
[3] Average Trigger



MEDIOBANCA
*Banca di Credito Finanziario S.p.A.*

|  |  | Tranche 1 to Tranche 45 |  |
|--|--|--|--|
|  |  | ~ € 0.07 Increments per Tranche |  |
| Guaranteed Amounts | : | €6,440,949 | 30/04/2008 |
|  |  | €4,986,165 | 09/05/2008 |



**MEDIOBANCA**

---

**Annex 2: Zero Coupon Yield Curve**

| Date | Yield |
|------|-------|
| Mon 15Sep08 | 4.36% |
| Mon 15Dec08 | 5.10% |
| Mon 16Mar09 | 5.18% |
| Tue 16Jun09 | 5.11% |
| Tue 15Sep09 | 5.00% |
| Mon 14Sep09 | 5.12% |
| Mon 13Sep10 | 4.77% |
| Mon 12Sep11 | 4.65% |
| Wed 12Sep12 | 4.60% |
| Thu 12Sep13 | 4.58% |
| Fri 12Sep14 | 4.58% |
| Mon 14Sep15 | 4.59% |
| Mon 12Sep16 | 4.62% |
| Tue 12Sep17 | 4.65% |
| Wed 12Sep18 | 4.69% |
| Tue 12Sep23 | 4.85% |
| Tue 12Sep28 | 4.88% |
| Mon 13Sep38 | 4.74% |



**MEDIOBANCA**
*Banca di Credito Finanziario S.p.A.*

## DISCLAIMER

This information document (the "Information Memorandum"), which has been drawn up by Mediobanca, – Banca di Credito Finanziario S.p.A. ("Mediobanca") in its capacity as financial advisor to and in conjunction with **Dr. h.c. Tschira Beteiligungs GmbH & Co. KG and Klaus Tschira Stiftung GGmbH** (*"Klaus Tschira"*, and, jointly with the other companies controlled by it or otherwise affiliated to it, the "Group"), as part of the procedure to evaluate two **Equity Derivatives contract between Lehman Brothers and** *"Klaus Tschira"* (the "Transaction Valuation"), contains solely data and information provided by the Group or already in the public domain, and is furnished to potential participants in the Transaction for information purposes only.

Mediobanca (including any other professionals appointed by it) has not carried out any autonomous check, audit and/or independent analysis on the information and data contained in the Information Memorandum. Accordingly, Mediobanca accepts no responsibility for the correctness, accuracy and/or completeness of the information contained in the Information Memorandum or in other documents that will be furnished from time to time in relation to the Transaction Valuation, and disclaims all liability for any omissions from the Information and for statements, express and/or implicit, otherwise deriving from any other form of written or oral communication sent to the recipient of the Information Memorandum, from or on behalf of Mediobanca, in the course of the evaluation which the recipient will want to make with respect to the Transaction Valuation, save in the case of gross negligence and/or willful misconduct.

The information contained in the Information Memorandum have been prepared with the intention of assisting the recipient in making its own assessment of the Transaction Valuation, without any claims to being exhaustive. Such information may be subject to change, amendment or update, which neither Mediobanca nor the Group undertakes or commits to provide. The Information Memorandum must not be taken as the basis for investment decisions by potential counterparties.

With respect to the foregoing, neither Mediobanca nor the Group nor any of the respective members of the management and supervisory governing bodies, general management, staff and advisors may in any way be held responsible for any direct and/or indirect damages that may be suffered by third parties who relied on the statements made in or omitted from the Information Memorandum. All liability deriving directly or indirectly from use of the Information Memorandum is hereby expressly disclaimed.

In furnishing the Information Memorandum, neither the Group nor Mediobanca enters into any obligation to provide the recipient hereof with any further information and/or documentation. Neither receipt of the Information Memorandum on the part of the recipient nor any information contained therein or subsequently disclosed to any party with reference to the Transaction Valuation may be construed as investment advice on the part of Mediobanca.

The Information Memorandum in no way constitutes a proposal to execute a contract or solicitation or advice or recommendation to purchase or sell any financial instrument. The Information Memorandum does not represent an outright offer or a commitment on the part of Mediobanca to subscribe for a financial instrument of any kind.

The Group is furnishing the information contained herein on a strictly confidential basis and on the assumption that it shall be used for the sole purpose of considering participation in the Transaction Valuation. In receiving the Information Memorandum, each recipient acknowledges the confidential nature of the information contained herein, and undertakes not to disclose them in any way or to use it



MEDIOBANCA
*Banca di Credito Finanziario S.p.A.*

for any purpose other than in connection with the Transaction Valuation, in accordance with the terms and conditions of the confidentiality agreement duly executed by each of the recipients.

Mediobanca is part of a leading banking group, the companies of which are involved in a wide range of financial transactions both on a proprietary basis and on behalf of clients. For this reason it is possible that Mediobanca, or one of its subsidiaries and/or associate companies, or one of the clients of Mediobanca or the group it belongs to, might have entered into agreements or own shareholdings or might carry out, or have carried out, transactions which might lead to a potential situation of conflict of interest with respect to the mandate accepted in respect of the transactions described in the Information Memorandum. In the event of any conflicts of interest arising in the performance of said mandate, these shall be handled in such a way as to not prejudice the interests of clients, in conformity with the provisions of Directive 2004/39/CE and the relevant regulations transposing said Directive in Italy, and with the policy for managing conflicts of interest operated by Mediobanca.

For any dispute arising in connection with the Information Memorandum the laws of the Republic of Italy shall apply, and the Court of Milan shall have exclusive jurisdiction.

# Exhibit 2

Prager Dreifuss
Beilage
Annex (2) 47)

| | |
|---|---|
| **Von:** | Cohen, Miles P H. [Miles.Cohen@gs.com] |
| **Gesendet:** | Freitag, 19. September 2008 15:59 |
| **An:** | Bernd Kammerlander |
| **Cc:** | Lanz, Gregor |
| **Betreff:** | Valuation for Collars |
| **Anlagen:** | KT DATA SHEET.doc |

Bernd,

As requested, please find below our valuations for the 2 structures on SAP AG (details provided by you in attached Word document - page 2) which you entered into with Lehman Brothers.

<<KT DATA SHEET.doc>>
Both pricings use the opening spot reference for Monday 15Sep08 for SAP AG: Eur36.56, and assume that the delta is executed at that level.

1. KG Portfolio - Long Eur30.035 European Put & Short Eur56.355 European Call for tranched maturities (Apr 2014 to May 2015)

No of shares: 32mm
**Valuation: GS Receives Eur 33,837,114.21**

2. KTS Portfolio - Long Eur29.38 European Put & Short Eur55.70 European Call for tranched maturities (Jan 2012 to Feb 2013)

No. of shares: 27mm
**Valuation: GS Pays Eur 15,618,014.71**

Both of these valuations are based upon the details provided by you as per the attached Word document.

Please let us know if you have any questions.

Kind regards,
Miles

Goldman, Sachs International
Christchurch Court | 10-15 Newgate Street | London EC1A 7HD
Tel: 020-7552 3057 | Fax: 020-7051 0285
E-mail: miles.cohen@gs.com | cohmil@bloomberg.net

**Miles Cohen**                    **Goldman**
Executive Director                  **Sachs**
Market Solutions Group

You have requested a quotation(s) that may be used for the purposes of estimating a replacement cost for the transaction(s) outlined below. Unless otherwise noted, the quotation provided is the price at which Goldman Sachs or one of its affiliates ("Goldman Sachs") would have been prepared to execute a transaction at the time as specified in the quotation or, if not specified, at the time at which the quotation was transmitted to you. The quotation should not be construed that Goldman Sachs is prepared to enter into a transaction with you. In the event that you wish to enter into a transaction with Goldman Sachs, you should contact your Goldman Sachs representative to obtain a "firm" price based on specific transaction details, size and current market conditions.

Goldman Sachs does not represent that this information is accurate, complete or current, and Goldman Sachs has no liability with respect thereto. This information and the pricing methodologies used are subject

to change without notice and Goldman Sachs has no obligation to update you as to any such changes. This information may not reflect quotations you would receive from other dealers, or even from affiliates or other business units of Goldman Sachs, and does not necessarily reflect quotations you would obtain by using pricing models available from Goldman Sachs or that may be included in the books and records of Goldman Sachs. This information is intended only as a reference and should not be relied upon without further evaluation by you, in consultation with your professional advisors, for the maintenance of your books and records or for legal, tax, accounting, financial reporting, disclosure or other purposes.

© *Copyright 2007 The Goldman Sachs Group, Inc. All rights reserved.*
*This message may contain information that is confidential or privileged. If you are not the intended recipient, please advise the sender immediately and delete this message.*
*See http://www.gs.com/disclaimer/email for further information on confidentiality and the risks inherent in electronic communication. See http://www.gs.com/disclaimer/email-salesandtrading.html for important risk disclosure, conflicts of interest and other terms and conditions relating to the e-mail and your reliance on information contained in it.*

*Goldman Sachs International ("GSI") is authorised and regulated by The Financial Services Authority and appears in the FSA register under number 142888. GSI is subject to the FSA rules and guidance, details of which can be found on the FSA's website at http://www.fsa.gov.uk. GSI is registered as a Private Unlimited Company in England and Wales (Company Number 2263951). [VAT registration number GB 447 2649 28]. Registered Office as above.*

Prager Dreifuss
Beilage
Annex 348

# KT DATA SHEET

1. **Big Hedge (16th May 2007 ISDA Master & Custody Agreement;  23rd May 2007 Confirmation)**

## KG

| | | |
|---|---|---|
| Total no of shares | : | 32mm |
| Total no of tranches | : | 45 |
| Shares per tranche | : | 711,111 |
| | | |
| Initial Price | : | € 36.7250 |
| Put k | : | € 29.38 (i.e. 80% of IP) |
| Call k | : | € 55.70 (i.e. 151.65% of IP) |
| | | |
| Tranche 1 – 15 Expiries | : | 30/1/2012 – 17/2/2012 |
| Tranche 16 – 30 Expiries | : | 26/3/2012 – 13/4/2012 |
| Tranche 31 – 45 Expiries | : | 28/1/2013 – 15/2/2013 |
| | | |
| Deferred Premium | : | € 19,590,581 on 17/2/2012 + 3bd |
| | | € 19,735,522 on 13/4/2012 + 3bd |
| | | € 20,538,575 on 15/2/2013 + 3bd |
| | | |
| | | Total = € 59,864,679 |
| | | |
| Dividend Schedule | : | € 0.492  12/5/2008 |
| | | € 0.527  11/5/2009 |
| | | € 0.564  11/5/2010 |
| | | € 0.603  11/5/2011 |
| | | € 0.645  11/5/2012 |
| | | € 0.690  10/5/2013 |
| | | € 0.739  09/5/2014 |

## KTS

| | | |
|---|---|---|
| Total no of shares | : | 27mm |
| Total no of tranches | : | 45 |
| Shares per tranche | : | 600,000 |
| | | |
| Initial Price | : | € 36.7250 |
| Put k | : | € 29.38 (i.e. 80% of IP) |
| Call k | : | € 55.70 (i.e. 151.65% of IP) |
| | | |
| Tranche 1 – 15 Expiries | : | 30/1/2012 – 17/2/2012 |
| Tranche 16 – 30 Expiries | : | 26/3/2012 – 13/4/2012 |
| Tranche 31 – 45 Expiries | : | 28/1/2013 – 15/2/2013 |
| | | |
| Deferred Premium | : | € 16,529,555 on 17/2/2012 + 3bd |
| | | € 16,651,849 on 13/4/2012 + 3bd |
| | | € 17,329,425 on 15/2/2013 + 3bd |
| | | |
| | | Total = € 50,510,830 |
| | | |
| Dividend Schedule | : | € 0.492  12/5/2008 |
| | | € 0.527  11/5/2009 |
| | | € 0.564  11/5/2010 |
| | | € 0.603  11/5/2011 |
| | | € 0.645  11/5/2012 |
| | | € 0.690  10/5/2013 |
| | | € 0.739  09/5/2014 |

2. **KG Hedge Extension (25th Jan 2008 Amendment Letter, 4th Feb 2008 Final Terms Notified)**

**KG**

| | | |
|---|---|---|
| Total no of shares | : | 32mm |
| Total no of tranches | : | 45 |
| Shares per tranche | : | 711,111 |
| | | |
| Initial Price | : | - |
| Put k | : | € 30.035 |
| Call k | : | € 56.355 |
| | | |
| Tranche 1 – 15 Expiries | : | 14/4/2014 – 07/5/2014 |
| Tranche 16 – 30 Expiries | : | 27/10/2014 – 14/11/2014 |
| Tranche 31 – 45 Expiries | : | 15/4/2015 – 06/5/2015 |
| | | |
| Deferred Premium | : | € 21,717,693 on 07/5/2014 + 3bd |
| | | € 22,285,706 on 14/11/2014 + 3bd |
| | | € 22,841,967 on 06/5/2015 + 3bd |
| | | |
| | | Total = € 66,845,365 |
| | | |
| Dividend Schedule | : | € 0.492  12/5/2008 |
| | | € 0.527  11/5/2009 |
| | | € 0.564  11/5/2010 |
| | | € 0.603  11/5/2011 |
| | | € 0.645  11/5/2012 |
| | | € 0.690  10/5/2013 |
| | | € 0.739  09/5/2014 |
| | | € 0.791  08/5/2015 |

**KTS (unchanged)**

| | | |
|---|---|---|
| Total no of shares | : | 27mm |
| Total no of tranches | : | 45 |
| Shares per tranche | : | 600,000 |
| | | |
| Initial Price | : | € 36.7250 |
| Put k | : | € 29.38 (i.e. 80% of IP) |
| Call k | : | € 55.70 (i.e. 151.65% of IP) |
| | | |
| Tranche 1 – 15 Expiries | : | 30/1/2012 – 17/2/2012 |
| Tranche 16 – 30 Expiries | : | 26/3/2012 – 13/4/2012 |
| Tranche 31 – 45 Expiries | : | 28/1/2013 – 15/2/2013 |
| | | |
| Deferred Premium | : | € 16,529,555 on 17/2/2012 + 3bd |
| | | € 16,651,849 on 13/4/2012 + 3bd |
| | | € 17,329,425 on 15/2/2013 + 3bd |
| | | |
| | | Total = € 50,510,830 |
| | | |
| Dividend Schedule | : | € 0.492  12/5/2008 |
| | | € 0.527  11/5/2009 |
| | | € 0.564  11/5/2010 |
| | | € 0.603  11/5/2011 |
| | | € 0.645  11/5/2012 |
| | | € 0.690  10/5/2013 |
| | | € 0.739  09/5/2014 |

### 3.    Contingent Unwind (18th April 2008 Confirmation)

#### KG

| | | |
|---|---|---|
| Total no of shares | : | 32mm |
| Total no of tranches | : | 45 |
| Shares per tranche | : | 711,111 |
| | | |
| Put k | : | € 30.035 |
| Call k | : | € 56.355 |
| | | |
| Tranche 1 – 15 Expiries | : | 14/4/2014 – 07/5/2014 |
| Tranche 16 – 30 Expiries | : | 27/10/2014 – 14/11/2014 |
| Tranche 31 – 45 Expiries | : | 15/4/2015 – 06/5/2015 |
| | | |
| Deferred Premium[1] and Rebate[2] | : | € [ ] + Rebate on 07/5/2014 + 3bd |
| | | € [ ] + Rebate on 14/11/2014 + 3bd |
| | | € [ ] + Rebate on 06/5/2015 + 3bd |
| | | |
| | | Total = € [ ] + Rebate |
| | | |
| | | Max Rebate = 32mm * (€ 30.035 - € 26.5[3]) |
| | | |
| Dividend Schedule | : | € 0.492  12/5/2008 |
| | | € 0.527  11/5/2009 |
| | | € 0.564  11/5/2010 |
| | | € 0.603  11/5/2011 |
| | | € 0.645  11/5/2012 |
| | | € 0.690  10/5/2013 |
| | | € 0.739  09/5/2014 |
| | | € 0.791  08/5/2015 |
| | | |
| Triggers | : | € 28.00 to € 25.00 |
| | | Tranche 1 to Tranche 45 |
| | | ~ € 0.07 increments per Tranche |
| | | |
| Guaranteed Amounts | : | € 7,633,717   30/04/2008 |
| | | €5,909,529   09/05/2008 |

#### KTS

| | | |
|---|---|---|
| Total no of shares | : | 27mm |
| Total no of tranches | : | 45 |
| Shares per tranche | : | 600,000 |
| | | |
| Put k | : | € 29.38 |
| Call k | : | € 55.70 |
| | | |
| Tranche 1 – 15 Expiries | : | 30/1/2012 – 17/2/2012 |
| Tranche 16 – 30 Expiries | : | 26/3/2012 – 13/4/2012 |
| Tranche 31 – 45 Expiries | : | 28/1/2013 – 15/2/2013 |
| | | |
| Deferred Premium | : | € [ ] + Rebate on 17/2/2012 + 3bd |
| | | € [ ] + Rebate on 13/4/2012 + 3bd |
| | | € [ ] + Rebate on 15/2/2013 + 3bd |

---

[1] Fixed amount (i.e. option model calculation)
[2] Put strike *minus* Trigger for each Tranche
[3] Average Trigger

Total = € [ ] + Rebate

Max Rebate = 27mm * (€ 29.38 - € 26.5)

Dividend Schedule                :        € 0.492  12/5/2008
                                          € 0.527  11/5/2009
                                          € 0.564  11/5/2010
                                          € 0.603  11/5/2011
                                          € 0.645  11/5/2012
                                          € 0.690  10/5/2013
                                          € 0.739  09/5/2014

Triggers                         :        € 28.00 to € 25.00
                                          Tranche 1 to Tranche 45
                                          ~ € 0.07 increments per Tranche

Guaranteed Amounts               :        €6,440,949   30/04/2008
                                          €4,986,165   09/05/2008

4.  **KTS Written Calls (3rd February 2006 Confirmation; 15th March 2006 Amendment Email; 12th May 2008 Dividend Adjustment Email)**

<u>**KTS**</u>

| | | |
|---|---|---|
| Total no of shares | : | 8mm |
| Total no of tranches | : | 8 |
| Shares per tranche | : | 1,000,000 |
| | | |
| Initial Price | : | - |
| Call k (after dividend adjustment in 2008) | : | € 43.59   Tranche 1+2 |
| | | € 44.84   Tranche 3+4 |
| | | € 46.08   Tranche 5+6 |
| | | € 47.33   Tranche 7+8 |
| | | |
| Tranche 1 Expiry | : | 01/08/2008 |
| Tranche 2 Expiry | : | 31/10/2008 |
| Tranche 3 Expiry | : | 30/01/2009 |
| Tranche 4 Expiry | : | 30/04/2009 |
| Tranche 5 Expiry | : | 03/08/2009 |
| Tranche 6 Expiry | : | 30/10/2009 |
| Tranche 7 Expiry | : | 29/01/2010 |
| Tranche 8 Expiry | : | 03/05/2010 |
| | | |
| Dividend Schedule | : | € 1.36   12/5/2009 |

# Exhibit 3

Beilage
Annex 51

| | |
|---|---|
| **Von:** | daniel.little@jpmorgan.com |
| **Gesendet:** | Freitag, 19. September 2008 20:24 |
| **An:** | Bernd Kammerlander |
| **Cc:** | karl.auersperg@jpmorgan.com; Jana.Hecker@jpmorgan.com |
| **Betreff:** | Update |
| **Anlagen:** | Form of Opinion.doc.zip |

Dear Mr. Kammerlander,
All three accounts have now been opened. We are ready to go with a total return swap on Monday if you would like. We would require an initial 25% cash collateral and we could then execute. We would then make mark to market margin calls (minimum of EUR 250,000) to be received within 24 hours of being called. Before trading we would require the standard confirmation of the trading entities authority and capacity to enter into such a trade.

We received word back from PWC on your shares and they are getting ready to make a communication to the market shortly. We will revert with a time for any call.

In case it helps, we have also attached a template form of opinion of counsel.

We are looking forward to receiving the contracts so that we can move forward.
Best regards,
Dan

(See attached file: Form of Opinion.doc.zip)

Daniel Little
Vice President
JPMorgan International Bank Limited
125 London Wall
London EC2Y 5AJ

Phone: 44 (0)20 7742 7614
Mobile Phone: 44 (0)78 7944 3902
Fax: 44 (0)20 7742 7641
Email: daniel.little@jpmorgan.com

Generally, this communication is for informational purposes only and it is not intended as an offer or solicitation for the purchase or sale of any financial instrument or as an official confirmation of any transaction. In the event you are receiving the offering materials attached below related to your interest in hedge funds or private equity, this communication may be intended as an offer or solicitation for the purchase or sale of such fund(s). All market prices, data and other information are not warranted as to completeness or accuracy and are subject to change without notice.
Any comments or statements made herein do not necessarily reflect those of JPMorgan Chase & Co., its subsidiaries and affiliates.

This transmission may contain information that is privileged, confidential, legally privileged, and/or exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of the information contained herein (including any reliance

thereon) is STRICTLY PROHIBITED. Although this transmission and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by JPMorgan Chase & Co., its subsidiaries and affiliates, as applicable, for any loss or damage arising in any way from its use. If you received this transmission in error, please immediately contact the sender and destroy the material in its entirety, whether in electronic or hard copy format. Thank you.
Please refer to http://www.jpmorgan.com/pages/disclosures for disclosures relating to UK legal entities.