**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------X
                                                          :
In re:                                                    :     Chapter 11
                                                          :
LEHMAN BROTHERS HOLDINGS INC., *et al.,*                   :     Case No. 08-13555 (JMP)
                                                          :
                            Debtors.                      :     (Jointly Administered)
                                                          :
------------------------------------------------------------X

**DECLARATION OF JONATHAN NASH QC**
**IN SUPPORT OF LBHI'S OPPOSITION TO CLAIMANTS' MOTION TO**
**WITHDRAW CLAIMS 32395 AND 22671 PURSUANT TO FED. R. BANKR. P. 3006**

I, Jonathan Nash QC, hereby declare under penalty of perjury under the laws of the United States of America, that the following is true and correct:

1.      I am a barrister practising from Chambers at 3 Verulam Buildings, Gray's Inn, London WC1R 5NT. I was called to the Bar in 1986 and was appointed Queen's Counsel (the senior rank of barrister in England) in 2006. I specialise in banking law. My current curriculum vitae is annexed hereto as Exhibit 1.

2.      I was recently instructed by Jones Day, solicitors acting on behalf of Lehman Brothers Holdings Inc ("LBHI"), to provide an expert Opinion on English law to assist the Court in connection with a dispute before the United States Bankruptcy Court, Southern District of New York, between LBHI as debtor in a case under Chapter 11 of the US Bankruptcy Code, and two German companies: Dr HC Tschira Beteiligungs GmbH & Co KG ("KG"), and Klaus Tschira Stiftung GmbH ("Stiftung").    I understand from Jones Day that KG and Stiftung now seek permission from the New York Bankruptcy Court to withdraw the claims made against LBHI, with prejudice.

3.      I have been asked to address two specific points of English law in connection with the withdrawal application now made by KG and Stiftung.  Although I am giving this evidence by way of declaration, rather than by way of expert Opinion, the views set out below reflect the evidence I would

have given to the Court as expert, at the hearing of LBHI's objection to KT and Stiftung's claims, on these two specific issues (under cover of a more detailed expert report).

4.      My fee for providing this declaration has been charged at my usual hourly rate of GPB 650.00 per hour. I confirm that I have no financial or other interest in the outcome of this dispute. In recent years I have done a fairly significant amount of work for Lehman entities which are in Chapter 11 administration proceedings before the United States Bankruptcy Court, Southern District of New York ("Lehman Group") (although not, as it happens, instructed by Jones Day), but I am not dependent in any way upon the Lehman Group and I do not regard myself as having a particularly important commercial relationship with any entity in the Lehman Group.

5.      The two questions of English law which I address in this affidavit are:

    i)      when did the Early Termination Date occur in respect of the Terminated Transactions?

    ii)     was it "reasonably practicable" to determine Loss as of 15 September 2008, and were KG and Stiftung bound to do this by the terms of the ISDA Master Agreement (1992)?

**Executive Summary**

6.      In my view, the answers to these two questions as a matter of English law are:

    i)      the Early Termination Date of these Transactions was 15 September 2008; and

    ii)     KG and Stiftung were bound to value their respective Loss by reference to the market value of the Transactions on a collateralised basis on 15 September 2008 if it was possible to determine the market price of the SAP shares on that date.

**Appendix of English case law**

7.      In the course of making this declaration I shall refer to a number of English law authorities. To assist the Court, I exhibit these in full in a separate Appendix to this declaration entitled "Case Law

Appendix to the Declaration of Jonathan Nash QC".  References below to Appendix 1 etc are to this separate document.

**English law analysis**

<u>When did the Early Termination Date occur in respect of the Terminated Transactions?</u>

8.      In my opinion, the Early Termination Date occurred on 15 September 2008, either upon LBHI commencing its case under Chapter 11 of the US Bankruptcy Code (which I understand took place shortly before 2.00am New York time on 15 September 2008) or immediately before that moment.

9.      This conclusion follows from section 6(a) of the ISDA Master Agreement (1992), which reads (in relevant part):

> *"If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8)".*

10.      My understanding is that initiation of the Chapter 11 bankruptcy case falls within either part (4) or part (6), or (by analogy with either of those parts) part (8) of section 5(a)(vii), with the result that an Early Termination Date occurred immediately upon the relevant occurrence (if part (6) is applicable), or at the time immediately preceding it (if part (4) applies).

11.      If Chapter 11 bankruptcy falls within part (6) of section 5(a)(vii) then the point must be clear beyond argument.

12.      If Chapter 11 bankruptcy falls within part (4) this provision simply moves the Early Termination Date to the moment "immediately preceding" the inception of Chapter 11. In my view it is clear that this means the moment – the *scintilla temporis* – immediately before the inception of the Chapter 11 regime.

13.      Firstly, this is the natural and ordinary meaning of the words "immediately preceding" used in the contract.

14.    Secondly, if "immediately preceding" is taken to mean something other than "at the moment immediately before" the specified event, the question arises: what does it mean? Given that the precise time of Early Termination may have quite significant valuation consequences, it is important for the parties to know with certainty when Early Termination occurred: in my view this certainty can only be achieved by giving to the phrase the meaning which I have identified.

15.    Finally, and conclusively in my view, one of the principal purposes of the Automatic Early Termination provision is to allow parties to bring all Transactions to an end immediately before the onset of an insolvency procedure so that the Close-Out netting rules (in section 6) can take effect before the intervention of insolvency. Under the earlier (1987) ISDA Agreements there was no election for Automatic Early Termination – Early Termination simply occurred in all cases of insolvency on the basis of wording which closely follows that used in section 5 of the 1992 ISDA. The User's Guide to the 1992 Master Agreement explains the significance of the change to allow for an election in the following terms:

> "Section 6(a) has been modified from the 1987 Agreement to account for recent changes under relevant U.S. insolvency laws and a practice of some market participants to provide that Automatic Early Termination would not apply to a party in other jurisdictions where they concluded that Automatic Early Termination would not be advantageous. Section 6(a) of the 1992 Agreements has also been modified from the 1987 Agreement to remove certain insolvency events set forth in Section 5(a)(vii) from Automatic Early Termination so that Automatic Early Termination only applies to insolvency events that are likely to occur on a readily determinable date.
> Market participants should carefully balance the advantages and disadvantages of electing Automatic Early Termination as well as considering the enforceability of such provision in an insolvency proceeding. The primary advantage of Automatic Early Termination may be that, by providing that an Early Termination Date in respect of a 1992 Agreement will occur prior to, for example, the filing of an insolvency petition with respect to a counterparty (see Section 5(a)(vii)(4) of the 1992 Agreement), it may be more likely in some jurisdiction that a Non-defaulting Party may exercise its termination rights outside of an insolvency proceeding. Prior to the recent enactment of the protections for "swap agreements" and "qualified financial contracts" under U.S. law, this advantage was the reason many market participants strongly preferred Automatic Early Termination when dealing with U.S. counterparties. It is also conceivable that, in certain jurisdictions, the choice of Automatic Early Termination would be favourably received by an independent third party (e.g. judicial body) because of the relative certainty and objectivity of the timing provided by Automatic Early Termination."

16.    The commercial purpose of Automatic Early Termination is achieved by construing the provision in the way which I have proposed, i.e. that the termination is deemed to occur immediately

before the onset of insolvency. There is no need to posit an earlier Termination Date and, as I have already pointed out, to do so simply leads to uncertainty.

17.    Given the current Motion to withdraw filed by KT and Stiftung, it is not clear whether the Early Termination Date is in dispute in the current proceedings. I have noted that KG and Stiftung have in the past suggested that Early Termination occurred on Sunday, 14 September 2008 (see the letter from the English attorney of KT and Stiftung, Pinsent Masons to Lehman Brothers Finance AG (now in liquidation) dated 30 September 2008, (a copy of which is annexed hereto at Exhibit 2); if that remains their position, then in my opinion they are wrong.

<u>Were KG and Stiftung bound to calculate their respective Loss on the Early Termination Date, or were they entitled to calculate it as of a later date?</u>

18.    The definition of Loss under the ISDA Master Agreement (1992) provides *inter alia*:

*"A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets."*

19.    It follows from this that the Non-defaulting Party (as defined in the ISDA Master Agreement (1992), here meaning KT and Stiftung) is contractually bound to calculate its Loss as of the relevant Early Termination Date (here 15 September 2008) unless it is not *"reasonably practicable"* to do so.

20.    The first point to emphasise here is that what must be *"reasonably practicable"* is a determination of Loss, not the entry into a replacement transaction (if that is the measure of Loss which the Non-defaulting Party has chosen). KG and Stiftung appear to confuse these two different questions in their submissions.

21.    The meaning and effect of section 6 of the ISDA Master Agreement (1992) has been considered in a number of decisions in the English Courts in recent years, particularly arising from the Global Financial Crisis.

22.     I will briefly identify certain key principles which can be extracted from the authorities (with commentary as appropriate).

(1)     Although "Market Quotation" and "Loss" prescribe different valuation techniques, they are intended to achieve a "broadly similar" result.

23.     This has long been accepted to be the effect of ISDA 1992. The point was put in this way by Mance LJ in <u>Australia and New Zealand Banking Group v Societe Generale</u> [2000] 1 All ER (Comm) 682 at para. 15 (see Appendix 1):

> *"It is now common ground that the 'Market Quotation' and 'Loss' clauses aim at broadly similar, although by their nature not always precisely the same, results. The structure of the relevant ISDA terms (set out in the schedule) confirms this. There is a possibility of considerable overlap between the basis of calculation of the amount payable on one and the other basis. Quotations from market dealers may be used to determine loss under the 'Loss' clause, while loss (as defined in the 'Loss' clause) may be used under the 'Market Quotation' clause to determine the settlement amount for any terminated transaction for which a market quotation 'cannot be determined or would not ... produce a commercially reasonable result."*

*24.*     As appears from this quotation, the broad equivalence between Market Quotation and Loss was common ground between the parties in the <u>Societe Generale</u> case, but the point has since been expressly confirmed at both first instance and in the Court of Appeal.

25.     More recently in <u>Anthracite Rated Investments (Jersey) Limited v Lehman Brothers Finance SA</u> [2011] EWHC 1822 (Ch), in a passage which has subsequently been expressly approved by the Court of Appeal[1], Briggs J said (at para. 116) (see Appendix 2):

> *"Loss and Market Quotation are, although different formulae, aimed at achieving broadly the same result, so that outcomes derived from one may be usefully tested by way of cross-check by reference to the other: see per Mance LJ in the Australia case at paras 2, 15 and 22. This derived from a concession in that case, but has subsequently been reaffirmed after adversarial argument in the Peregrine case at para 30, in the Britannia Bulk case at paras 44 to 46 and 51, and in the Pioneer case at paras 98 and 105. It is one of those sensible concessions which has hardened into hornbook law."*

26.     The consequence of this "broad similarity" is that the meaning of "Loss" for the purposes of ISDA 1992 can be illuminated by an understanding of what the result under "Market Quotation" would be, and in my opinion this is particularly the case where (as here) the Non-defaulting Party has chosen to

---

[1] In <u>Lomas & Ors v JFB Firth Rixson Inc & Ors</u> [2012] EWCA Civ. 419 at para. 131 (see Appendix 3).

calculate his Loss by reference to "loss of bargain". The "loss of bargain" measure is likely to require the Non-defaulting Party to value Loss by   reference to the cost (or gain) arising from a replacement transaction in much the same way as he would do if Market Quotation had been elected (although without being bound by the prescriptive provisions of the Market Quotation process). Importantly the valuation of a replacement transaction (whether under Market Quotation or Loss) should be carried out at the date of Early Termination (which is the equivalent of the date of breach rule at common law). This point was made by Briggs J. in <u>Anthracite</u> (supra) at para. 117:

> *"[117] The extended definition of Loss in s 14 of the 1992 Master Agreement nonetheless uses certain words and phrases which were, I think, intended to be illuminated by reference to the general common law (or New York law) meaning. For present purposes the relevant phrase is "loss of bargain". It is precisely for the purpose of identifying the Non-defaulting Party's loss of bargain that Market Quotation requires, and Loss permits, the use of quotations for replacement transactions. This methodology precisely reflects the principle by then well established at common law, namely that where damages are sought for loss of bargain occasioned by the breach (leading to termination) of a commercial contract then, subject only to the availability of a market for the obtaining of a replacement contract, the cost of such a replacement contract as at the breach date is likely to prove the most reliable yardstick for measuring the Claimant's loss of bargain: see in particular Golden Strait Corp v Nippon Yusen Kubishika Kaisha [2007] UKHL 12, [2007] 2 AC 353, [2007] 3 All ER 1 in which, at para 20, Lord Bingham approved the following dictum of Toulson J in Dampskibsselskabet "Norden" A/S v Andre & Cie SA [2003] EWHC 84 (Comm), [2003] 1 Lloyd's Rep 287, at 292 "The availability of a substitute market enables a market valuation to be made of what the innocent party has lost, and a line thereby to be drawn under the transaction."*

 (2)     <u>Where Second Method is adopted, the calculation of the close-out amount payable under section 6(e) of ISDA 1992 is not a calculation of compensatory damages for breach of contract, but rather the valuation of a contractual payment.</u>

27.     Again, this is a principle which is well-established in the case law. It was acknowledged by Flaux J. in <u>Britannia Bulk plc v Pioneer Navigation Ltd</u> [2011] EWHC 692 (Comm), Flaux J.case at para. 37 (see Appendix 4):

> *"I agree with Mr Phillips that Mr Hapgood's attempt to equate the definition of Loss with the common law measure of damages is misconceived. The Second Method is one which, unlike the First Method, is not to be equated with the position at common law. Rather it is a method of calculating close out positions on the termination of a transaction or series of transactions."*

28.     Briggs J. made the same point in <u>Anthracite</u> at para. 116:

*"(3) The termination payment formulae under s 6(e) are not to be equated with, or interpreted rigidly in accordance with, the quantification of damages at common law for*

*breach of contract. They are methods of calculating close-out positions on the termination of a derivative transaction or series of transactions: see the Britannia Bulk case per Flaux J at para 37. This is, in particular, because the Second Method works both ways, and may lead to a close-out payment due to the defaulting party."*

29.    This statement of principle was also approved by the Court of Appeal in the <u>Firth Rixson</u> case.

<u>(3)    The party calculating the close-out amount due under clause 6(e) by reference to a replacement transaction, whether he is valuing under Market Quotation or Loss, is bound to value the transaction on a "clean" rather than a "dirty" basis</u>

30.    This principle requires the valuing party to make certain assumptions about any replacement transaction which is used to value his loss of bargain. It overlaps with the principle just discussed in that it also excludes from consideration the "real world" losses or gains which the Non-defaulting Party may have suffered or achieved as a result of Early Termination.

31.    The "clean" assumption is that the replacement transaction is to be valued as if all conditions precedent to performance of the parties' respective payment and delivery obligations were fulfilled; and on the further assumption that the transaction will continue to maturity, no matter how unrealistic those assumptions are in the "real" world.[2]

32.    In the <u>Societe Generale</u> case the "clean" assumption meant that the close-out amount had to be arrived at disregarding the possibility that a "Trade Event" would be declared bringing the transactions to an end by reason of the existence of the Russian banking moratorium implemented in 1998. This point was made by Mance LJ in the <u>Societe Generale</u> case at para. 29:

*"Returning to the 'Loss' clause which directly governs the present transactions, the position regarding any sum unpaid or any delivery unmade at 'Early Termination' is identical. In that connection, the clause requires satisfaction of every applicable condition precedent to be assumed. As regards loss in connection with the future non-performance of the transaction, the loss requires a party to assess its total losses and costs (or gains) in connection with any terminated transaction, including loss of bargain, cost of funding or certain loss or cost (to which I come in more detail below) associated with any hedge or related trading position. It refers, as I have indicated, to the possibility that such loss or gain may be measured by market quotation—which may be of a less formal nature than that required under the 'Market Quotation' clause (cf the last sentence*

---

[2] The latest authority which considers the scope of the "value clean" principle is the Court of Appeal's decision in <u>Lehman Brothers International (Europe) v Lehman Brothers Finance SA</u> [2013] EWCA Civ 188. However, that decision was concerned with the 2002 Master Agreement and preceded on the basis that there had been a deliberate decision to change the scope of the principle from how it had been interpreted under the 1992 Agreement. I do not think therefore that this decision is particularly relevant for present purposes.

*of section II.G.4 of the ISDA Users' Guide (1993 edn)). <u>Bearing in mind the intention of
the 'Loss' and 'Market Quotation' clauses to arrive at broadly the same results, the
calculation of loss, or loss of bargain, must proceed on the same basis, that is valuing the
transaction according to the nominal value of the payments which would have been
required under it, assuming satisfaction of all conditions precedent."</u>* (emphasis added).*"*

33.    In <u>Anthracite</u>, Briggs J. expressed the principle as follows (at para. 116):

*"The identification of the Non-defaulting Party's loss of bargain arising from the
termination of the Derivative Transaction requires a "clean" rather than "dirty" market
valuation of the lost transaction. This means that the loss of bargain must be valued on
an assumption that, but for termination, the transaction would have proceeded to a
conclusion, and that all conditions to its full performance by both sides would have been
satisfied, however improbable that assumption may be in the real world: see in the
Australia case at paras 5, 22 to 27 and 30-31, the Britannia Bulk case at paras 11 to 14
and 34-35, and in the Pioneer case at paras 112 to 117."*

34.    In <u>Anthracite</u> it was submitted that it was impermissible to value Loss by reference to a
replacement transaction because no such transaction would ever in fact be entered into. Briggs J. rejected
this submission, saying (at para. 129):

*"[129] Mr Russen's final submission was that the cost of a replacement transaction was
unreasonable as a measure of Loss because no such transaction would or could ever be
put in place. But that is, in my judgment, a classic example of "valuing dirty" rather than
clean, ie by reference to the real world following default, rather than the hypothetical
world called for by the authorities on s 6 of the Master Agreement to which I have
referred."*

35.    KG and Stiftung have chosen to determine their respective Loss by reference to "loss of
bargain" which, as the authorities to which I have already referred demonstrate, should normally be
arrived at by pricing a replacement transaction. The question therefore resolves itself into whether it was
*"reasonably practicable"* to price a replacement transaction "as of" 15 September 2008. In fact, on my
understanding KG and Stiftung have never asserted that it was not possible to <u>price</u> a replacement
transaction on that date (they make a different point, that they could not have entered into a replacement
transaction on that date), and in fact it seems certain that it was possible to price such a transaction as of
that day because at least two entities did so for Klaus Tschira - Mediobanca and Goldman Sachs
(Goldman Sachs appears to have done so on a partial basis).   Copies of the Mediobanca valuation and the
Goldman Sachs valuation are annexed hereto at Exhibits 3 and 4 respectively.

36.     On this basis – the availability of a price supported by a quotation from the market – I think it is clear that it was *"reasonably practicable"* to determine Loss on the Early Termination Date, and this was what KG and Stiftung were bound to do.

37.     The response of KG and Stiftung is that they could not determine Loss on the Early Termination Date because they did not know on that date when they would recover the collateral, and they were not able in fact to enter into replacement transactions without access to the collateral. They further purport to determine Loss on the basis of a quotation for an uncollateralised replacement transaction given as of a later date (16 October 2008).

38.     In my view this approach is wrong as a matter of English law for two reasons.

39.     Firstly, contrary to the authorities to which I have referred, it substitutes for the nominal value of a replacement transaction on the Early Termination Date, the value of a different transaction at a later date. This is not the "loss of bargain" measure identified under Loss (as it has been explained in the cases); nor is it warranted by any of the other elements falling within the definition of Loss.

40.     Secondly, the justification put forward by KG and Stiftung appears to me to be a paradigm example of bringing into account the "real world" position of the Non-defaulting Party to arrive at something akin to compensatory damages at common law, rather than making a "clean" valuation of the obligations arising under the Terminated Transactions whether or not they would or could in fact be replaced.

41.     In short, in my view it is contrary to the "value clean" principle as it has been interpreted in the case law to value the transaction on an uncollateralised basis, and/or to value it some four weeks after the Early Termination Date, on the basis that in the "real world" KG and Stiftung were (up until 16 October 2008) in negotiations to obtain the release of the collateral from a third party (LBIE).

Executed at:    Gray's Inn, London, United Kingdom
                24 July 2013

JONATHAN NASH, QC

# Exhibit 1

# Jonathan Nash QC

Call 1986; QC 2006; BA (Oxon)
Email: jnash@3vb.com



Jonathan Nash has a commercial practice specialising in banking and financial services law; insurance and reinsurance; professional negligence; and arbitration (both as counsel and arbitrator). He has considerable experience of conducting litigation in the Commercial Court in London and arbitrations both in the UK and abroad.

Jonathan took silk in 2006 and was quickly identified as one of the leading new QCs in Banking and Finance and Commercial Litigation. He is described in the current legal directories as combining **"an in-depth knowledge and understanding of complex financial transactions with a sharp mind" (Legal 500 2012);** and being **"an impressive and polished adviser, with an easy and effective manner" (Chambers & Partners 2013). "A good team player"**, he is **"a smooth advocate who argues a difficult point well" (Chambers & Partners 2013).**

Jonathan's specialist experience and understanding of complex financial structures has involved him in advising on a wide range of issues arising out of the Global Financial Crisis. These have included valuation disputes following early termination of ISDA- documented derivatives and other credit structures; the recovery of margin security under repo agreements following the administration of Kaupthing in London and the Isle of Man; the setting up of multilateral netting arrangements in the forward freight swap market; and the closing out of positions in many different derivative instruments from "sleeve trades" in the energy derivatives market to "reverse knock-out options" in forex trades; and numerous credit default swaps.

His more general recent commercial practice has covered disputes in areas as diverse as the spread-betting industry, pharmaceuticals, mobile technology and designer fashion.

# Main Practice Areas

- Banking and Financial Services, including all aspects of domestic and international banking, securities, derivatives (futures, options and swaps) and structured products, (with specialist expertise in the ISDA Master Agreement and Definitions) and regulatory issues relating to them.

- Commercial litigation and arbitration, including experience of the gas and electricity industries, pharmaceuticals, railways, telecommunications and mobile technology, television and fashion, with specialist expertise in commercial agency disputes.

- Insurance and reinsurance, acting for insureds, insurers, retrocessionaires and brokers, with experience of all types of quota share and excess of loss programmes and profit-share arrangements.

- Professional Negligence, including in particular acting for solicitors, barristers, accountants, insurance brokers, fund managers, and their PI insurers.

# SELECTED SPECIALIST EXPERIENCE

## Banking and Financial Services

*Lomas v JFB Firth Rixson & Ors*  [2013] 1 BCLC 27  - effect of Events of Default on continuing obligations under the 1992 ISDA Master Agreement - application of insolvency principles to suspended contractual obligations.

*West LB v Nomura Bank International plc*  [2012] All ER (D) 116  - duties of a calculation agent in valuing reference funds.

*NML Capital Limited v The Republic of Argentina*  (2008)  - advising sovereign debt fund in enforcement proceedings against Argentina.

*Kensington International Limited v Republic of Congo*  [2008] 1 Lloyds Rep. 161  - advising sovereign debt fund in enforcement proceedings against Republic of Congo and those who trade with it.

*IFE Fund SA v Goldman Sachs International*  [2007] 2 Lloyds Rep 449  - claim by mezzanine investment fund against arranger of syndicated loan facility for misrepresentation and non-disclosure.

eligible to be syndicated into branches of the relevant agreement by judicial loan documentation.

## Commercial Litigation and Arbitration

*Stokors SA v IG Markets Ltd*  [2013] All ER (D) 300  - claim for compensation for assistance in breach of fiduciary duty in connection with spread betting brokerage.

*Yukos Capital v OJSC Rosneft*  [2013] 1 All ER 213  - application of doctrine of "Act of State" to allegations of unlawful expropriation and interference in judicial process.

*H J Heinz Co Ltd v EFL Inc*  (2010)  - enforcement of foreign arbitral award - allegations that award procured by fraud.

*Brave Bulk Transport v Spot On Shipping*  (2010)  - enforcement of US Judgment debt arising under freight forward swap.

*IPCO (Nigeria) Ltd v Nigerian National Petroleum Corporation*  [2008] EWCA Civ. 1157  - application for enforcement of substantial foreign arbitration award under New York Convention - whether or not English court entitled to order part enforcement of Award.

*Kensington International Limited v Republic of Congo*  [2008] 1 Lloyds Rep. 161  - Whether third parties entitled to rely on privilege against self-incrimination - effect of Fraud Act 2006.

*Pfizer Ltd. v Dainippon Sumitomo Pharma Co. Ltd.*  [2006] All ER (D) 172  - jurisdiction application arising from dispute between pharmaceutical companies - considering the effect of a change of structure within licensee's corporate group.

*Hilcourt (Docklands) Ltd v Teliasonera AB*  [2006] EWHC 508 (Ch)  - application for stay of execution of arbitration award where tenant under long-term lease alleged that lease had been procured by fraud.

*Kurt Geiger Ltd. v Italian Buying Office*  (2006)  - acting for buying agent in shoe industry in commercial agency dispute arising from termination of agency.

Currently (2008) counsel in pharmaceutical arbitration proceeding before the Court of Arbitration of the Bulgarian Chamber of Commerce in Sofia.

Arbitrator (2007) under the London Maritime Arbitrators Association rules in dispute arising from CFR contract for sale of scrap metal.

Counsel in major ad hoc railway arbitration between train operating companies.

## Insurance and Reinsurance

*Re Sompo Japan Insurance Inc*  [2011] All ER(D) 185  - acting for FSA on opposed transfer of insurance undertaking.

*United Insurance Co of Libya v Aon Ltd.* [2007] EWHC 1583 (Comm)  - successful defence of claim against broker brought in respect of reinsurance of Libyan energy risks.

*Tioxide Europe Ltd. v CGU International Insurance plc*  [2005] 2 CLC 329  - claim for indemnity from excess layer insurers arising out of all risks coverage - issues of coverage and notification.

Currently acting for leading broker in dispute concerning placement of reinsurance for Middle East energy risks.

Editor of the insurance section in the current (16th) edition of Bullen & Leake & Jacob's Precedents of Pleadings.

## Professional Negligence

*United Insurance Co of Libya v Aon Ltd.* [2007] EWHC 1583 (Comm)  - successful defence of claim against broker brought in respect of reinsurance of Libyan energy risks.

*SEB Trygg Holding v Manches*  [2006] 2 All ER (Comm) 38  - claim against solicitors for alleged breach of warranty in conduct of arbitration proceedings for German corporation.

The articles and materials at this web site are provided for information purposes only, and not for the purpose of providing legal advice. The articles may not reflect recent developments in the law. If you have a legal problem, you should consult a suitably qualified lawyer. The contents of articles and papers represent the views of the authors, and may not represent the views of other members of chambers.

# Exhibit 2

Enclosure 1.19



**Pinsent Masons**

*BY EMAIL AND POST*

Attention:    Lennie Fuller, Axel Kilian, Eric
Fiechter                                              Our Ref 20\22127755.1\JI02\637791.07000

Lehman Brothers Finance S.A. Netherlands
Antilles Branch
E-Commercepark
E-Zone
Vredenberg
Curacao
Netherlands Antilles

30 September 2008

Dear Sirs

**URGENT**

**SHARE FORWARD TRANSACTIONS UNDER ISDA MASTER AGREEMENTS DATED 16
MAY 2007**

1.      **BACKGROUND**

1.1     As you are aware, we act for Klaus Tschira Stiftung GmbH (the **"Stiftung"**) and DR.
        HC. Tschira Beteiligungs GMBH & CO. KG (the **"KG"**). We refer to the following:

        1.1.1    the share forward transaction governed under the terms of the ISDA Master
                 Agreement dated 16 May 2007 between Lehman Brothers Finance SA
                 (**"LBF"**) and the Stiftung (the **"Stiftung Master Agreement"**);

        1.1.2    the share forward transaction governed under the terms of the ISDA Master
                 Agreement dated 16 May 2007 between LBF and the KG (the **"KG Master
                 Agreement"**) (the Stiftung Master Agreement and the KG Master Agreement
                 together the **"Master Agreements"**); and

        1.1.3    the recent conversations between staff of LBF, employees of KTSG and
                 members of this firm.

2.      **AUTOMATIC EARLY TERMINATION UNDER THE MASTER AGREEMENTS**

2.1     As you are aware, Lehman Brothers Holdings Inc (**"LBHI"**) is designated under each
        Master Agreement as a Credit Support Provider for LBF.

**Pinsent Masons LLP**
CityPoint  One Ropemaker Street  London EC2Y 9AH  United Kingdom
T +44 (0)20 7418 7000  F +44 (0)20 7418 7050  DX 119516 Finsbury Square  www.pinsentmasons.com

Pinsent Masons LLP is a limited liability partnership registered in England & Wales (registered number: OC333653) and regulated
by the Solicitors Regulation Authority. The word 'partner', used in relation to the LLP, refers to a member of the LLP or an employee or consultant
of the LLP or any affiliated firm who has equivalent standing and qualifications. A list of the members of the LLP, and of those non-members
who are designated as partners, is displayed at the LLP's registered office: CityPoint, One Ropemaker Street, London EC2Y 9AH, United Kingdom



2.2    Section 5(a)(vii)(4) of the Master Agreements provides for an Event of Default where a party, or the Credit Support Provider of such party, enters into an insolvency process.

2.3    By a voluntary petition dated 14 September 2008, LBHI filed for Chapter 11 protection in the United States Bankruptcy Court, Southern District of New York. This constitutes an Event of Default under the Master Agreements.

2.4    Since "Automatic Early Termination" is specified in the schedules to the Master Agreements as applying, the Event of Default constituted by the insolvency of LBHI triggered an Early Termination Date as of the time immediately preceding the institution of the relevant proceedings.

2.5    We hereby give you formal notice that our clients consider that the Transactions under the Master Agreement have been terminated and that the Early Termination Date for these Transactions is 14 September 2008.

2.6    Our clients are currently considering their position in relation to their Loss (as defined in the Master Agreements) which has arisen as a result of the early termination of the Transactions and our clients reserve all of their rights in connection therewith.


Yours faithfully

Pinsent Masons LLP.

**Pinsent Masons LLP**


Copy to:
Lehman Brothers Finance S.A
Talstrasse 82
PO Box 2828
CH-8021 Zurich, Switzerland

# Exhibit 3

Prager Dreifuss
Beilage
Annex 3(49)

**MEDIOBANCA**
*Banca di Credito Finanziario S.p.A.*

| | |
|---|---|
| To: | Aeris Capital – Mr. Uwe Feuersenger and Mr. Bernd Kammerlander |
| From: | Mediobanca - Equity Solutions |
| Subject: | Pricing of VFS and VFP for KG and KTS (19/09/2008) |

## I.  Executive Summary

Mediobanca ("the Bank") has been asked by Aeris Capital to price 4 equity derivative structures with the same terms as the following existing transactions:

- Transaction 1: Variable Forward Sale (between LBF NA and Klaus Tschira Stiftung ("KTS"))
- Transaction 2: Variable Forward Sale (between LBF NA and Dr. H.C. Tschira Beteiligungs GmbH and Co. KG ("KG"))
- Transaction 3: Variable Forward Purchase (between LBF NA and KTS)
- Transaction 4: Variable Forward Purchase (between LBF NA and KG)

The details of the existing transactions are outlined in Annex 1. We have priced the four structures at a level where the Bank would have been in a position to enter them as of Friday, the 12th of September and Monday, 15th of September (the "Trade Date") at the closing of XETRA (around 4.35pm London time) for the 12th or at the opening of XETRA (around 8.00pm London time) (the "Trade Time").

## II.  Variable Forward Sale

### Description of the structure

In the two Variable Forward Sale transactions, KG and KTS ("Client") are effectively long a European put option and short a European call option on 59mn SAP AG shares in total. The combination of put and call options (collars) are split in tranches maturing at different dates. The put strike of the transaction with KG is €30.035, the call strike is €56.355 and the average maturity is 6.1 years. The put strike of the transaction with KTS is at €29.38, the call strike is at €55.70 and the average maturity is 3.8 years.

The schedule of dividends agreed with the Client is as follows:

1



| | |
|---|---|
| 11May09 | €0.527 |
| 11May10 | €0.564 |
| 11May11 | €0.603 |
| 11May12 | €0.645 |
| 10May13 | €0.690 |
| 9May14 | €0.739 |

Any deviation from the schedule of dividends will result in a market-standard strike adjustment of the put and call options or a pass-through payment at the Client's election. Therefore, the Bank effectively bears no dividend risk.

To hedge its directional risk, the Bank needs to borrow and sell short up to 59mn SAP shares in the stock lending market (market borrow). These borrow costs need to be included in the price of the structures. The Bank is at risk on level of the borrow costs up to 150bps p.a. but is compensated by the Client if the costs increase above this level.

Finally, the Client has to pledge the total number of shares underlying the transactions in favour of the Bank to cover the Bank's credit risk. If the Client's credit exposure increases substantially (due to a significant decline of the SAP share price or for any other reason), the Client has the right to receive cash collateral to secure its credit exposure.

<u>Assessment of Risks and Pricing</u>

The structures are priced with the most common model used by equity derivatives dealers to value plain vanilla European options, the *Black&Scholes model*.

**Market Parameters of the Black&Scholes Formula:**

**Reference Price**:

The initial delta of all transactions amounts to approximately 40mn shares. The execution of the collars requires the Bank to sell short the initial delta on the Trade Date. The size of the associated block trade amounts to €1.4bn which represents 5 average daily trading days.

The Bank can assume the full risk of the delta placement at a price equal to the closing price of SAP on XETRA on the Trade Date minus a discount of 7%. Therefore, the reference price input in the Black&Scholes formula is calculated as:

2



MEDIOBANCA
*Banca di Credito Finanziario S.p.A.*

For the 12th of September: $(1 - 7\%) \times €37.29$ (closing price as of the Trade Date) = €34.68.

For the 15th of September: $(1 - 7\%) \times €36.56$ (opening price as of the Trade Date) = €34.00.

This discount is justified by the significant size of the block trade, the current lack of appetite of equity investors for such transactions (as evidenced by the very few equity and equity-linked transactions originated by banks over the past 6 months in Europe) and the extreme volatility of equity markets and risk aversion of investors given recent events in the world financial markets. In fact, over the past 2-3 weeks, even well diversified indices like the S&P500 have experienced daily negative moves in the magnitude of 3-5% (-3.0% on the 4th September, -3.4% on the 9th of September, -4.7% on the 15th of September, -4.7% on the 17th of September etc.).

**Volatility and Volatility Skew:**

The Black&Scholes model assumes a single deterministic volatility. To overcome this disadvantage of the model, equity derivatives dealers use the following approach. The volatility levels implied by market quotes of listed option contracts with market-standard maturities and strikes are calculated (implied volatilities). The volatility levels for non-standard strikes and maturities are calculated by interpolation/extrapolation. Over-the-counter options with non-standard strikes and maturities are valued using the Black&Scholes formula with these interpolated/extrapolated volatilities as the input for the volatility.

In the vast majority of cases, the implied volatility of out-of-the-money put options is higher than the implied volatility level of out-of-the-money call options. The difference between both volatilities is referred to as the 'volatility skew'. By entering the Variable Forward Sales, the Bank will have a substantial risk exposure to subsequent increase in the skew (skew exposure). In addition, the exposure to the level of volatility is very dependent –among other factors– to the level of the share price of SAP. As the share price increases (declines), the Bank will have a substantial positive (negative) exposure to the level of implied volatilities (vega exposure).

The longest maturity of listed options with reasonable liquidity is currently the June 2010 contract trading on Eurex. The actively traded options contracts with strike prices that are closest to the contemplated structures are the contracts with strike prices of €28 and €52. We calculated the mid-market implied volatilities at the Trade Time on the Trade Date for the €28 contract as **29.0%** and the €52 contract as **23.5%**. This implies a volatility skew of **0.85%** for two options with strike price difference equal to 10% of the reference price. By linear interpolation of the skew, we find that the at-the-money implied volatility is **26.9%**.

3



MEDIOBANCA
*Banca di Credito Finanziario S.p.A.*

Looking at the implied volatility levels extracted from market quotes of options with maturities of one year to two years, it can be seen that there is only a small difference between the at-the-money volatilities depending on the maturity (term-structure of volatility). In other words, the term structure flattens quickly for medium-term options and is almost flat for maturities around 2 years or longer. Given this and the lack of information justifying a particular term-structure for long-term options, we assume a flat volatility term-structure between June 2010 and the relevant maturities of the transactions.

Typically, the volatility skew observed on equity option markets tends to flatten as the maturity of the option increases. To take this effect into account, the volatility skew was extrapolated to the relevant maturities of the transactions by using a market standard adjustment (whereby the skew of longest tradable contract is multiplied by the square root of the maturity of the tradable contract and subsequently divided by the square root of the maturity of the contemplated transaction). Such computation results in an average mid-market skew for a 10% strike difference of **0.60%** for the KTS maturities and **0.46%** for the KG maturities.

The resulting mid-market implied volatilities are as follows: For the KTS put (call) option the average volatility is **27.8% (23.4%)**, while the average volatility of the KG put (call) is **27.5% (24.0%)**. These volatility levels imply a total mid-market skew of **4.4%** for the KTS collars and **3.5%** for the KG collars.

A trade of significant size in the listed option market would be around 20,000 listed contracts, equivalent to 1mn options. The contemplated transactions are therefore 59x larger in volume. Furthermore, the maturities of the transactions are significantly longer than the longest listed and actively traded option contracts. The average maturity of the KG transactions, for example, is more than 4 years longer than the June 2010 contract described earlier.

Because of the very large size and the long maturity of the transactions, the Bank will be unable to cover its skew and vega exposure with instruments of similar maturities and in the required size. As the vega exposure is highly sensitive to the share price, the Bank could have a substantial vega exposure when instruments of similar maturities become tradable in the future. As there is a significant uncertainty with respect to the level of implied volatilities at this future point in time, the skew needs to be widened to a level which we deem appropriate for the range of the expected



**MEDIOBANCA**
*Banca di Credito Finanziario S.p.A.*

volatilities over the maturities of the transactions. We assume a volatility of 21.1% (**21.5%**) for the KTS (KG) put option and a volatility of **30.0%** (**30.0%**) for the KTS (KG) call option.

**Interest Rate:**

We assume interest rates to be deterministic. We use a zero coupon yield curve (constructed from market quotes on the deposit, futures and swap markets) to calculate by linear interpolation the relevant interest rate for each expiry (see zero coupon yield curve in Annex 2). This ensures that the option transactions are priced at the level where the interest rate risk can be hedged by interest rate swaps and similar instruments.

**Dividends:**

Discrete dividends are taken into account by subtracting the sum of the discounted dividends from the reference price and using this modified reference price as input in the Black&Scholes formula. This is a simple but widely used approach by equity derivatives dealers.

**Borrow Costs:**

The carry on the 'short delta' is calculated by subtracting the borrow costs from the interest rate to expiry. We have asked 2 major investment banks to provide us quotes on 10mn SAP shares for overnight stock lending. The average of these quotes is 45bps. We have taken into account that:

(1) the initial delta is 35mn SAP (i.e. significantly higher than our request in the market). We assume that the costs the Bank will incur on the full size will be increased by a minimum of 10bps p.a.; and

(2) the Bank will bear any increase in the total borrow costs due a decrease in stock lending supply up to 150bps p.a. The Bank would assume this risk if it is compensated by a risk buffer of at least 10bps p.a.

Therefore borrow costs of **65bps** p.a. are included in the pricing.

### Price for Transactions 1 and 2 (Friday 12th of September)

We have calculated the price of Transaction 1 and 2 by following the methodology outlined above. The result is as follows

- Transaction 1: price of €6.04mn to be paid by KTS to Mediobanca
- Transaction 2: price of €11.65mn to be paid by Mediobanca to KG

Therefore the total price of both transactions is €5.61mn payable by Mediobanca to Client.

5



MEDIOBANCA
*Banca di Credito Finanziario S.p.A.*

<u>Price for Transactions 1 and 2 (Monday 15th of September)</u>

We have calculated the price of Transaction 1 and 2 by following the methodology outlined above. The result is as follows

- Transaction 1: price of €14.69mn to be paid by KTS to Mediobanca
- Transaction 2: price of €1.21mn to be paid by KG to Mediobanca

Therefore the total price of both transactions is €15.90mn payable by Client to Mediobanca.

## III.  Variable Forward Purchase

### Description of the structure

In the two Variable Forward Purchase transactions, KG and KTS ("Client") are effectively short a down&in put option with rebate and long a down&in call option on 12.926mn SAP AG shares in total. The down&in call (put) is similar to plain vanilla European call (put) but only comes into existence if the share price trades at or below the barrier level at any time during the life of the option. In addition, the down&in put option pays a rebate at maturity equal to the difference between the strike price and the barrier level if the barrier is triggered. The combination of put and call options (down&in reverse collars) are split in tranches corresponding to the Variable Forward Sale transactions.

The put strike of the transaction with KG is €30.035, the call strike is €56.355, the average barrier level is €26.50 and the average maturity is 6.1 years. The put strike of the transaction with KTS is at €29.38, the call strike is at €55.70, the average barrier level is €26.50 and the average maturity is 3.8 years.

### Assessment of Risks and Pricing

Given the size of the transaction, we use a simple yet flexible model to price this option, a 2-volatility barrier option model. One volatility ("Strike Volatility") is used to price consistently the "underlying" European vanilla option; the other volatility ("Barrier Volatility") is used to model the probability of triggering the barrier.

**Market Parameters of the 2-volatility Barrier Option Model:**

6



MEDIOBANCA
*Banca di Credito Finanziario S.p.A.*

**Reference Price:**

The initial delta of all transactions amounts to approximately 3mn shares. The execution of the down&in reverse collars requires the Bank to buy the initial delta. One needs to look at all four transactions when determining the net delta to hedge on the Trade Date (36mn shares). Therefore, the discount applied to SAP share price is the same as in the pricing of the Variable Forward Sale.

**Volatility and Volatility Skew:**

To determine the Barrier Volatility, We extrapolate the implied volatility to the relevant barrier levels and maturities. However, there is a large uncertainty as to when the barrier could be triggered and hence the implicit vega exposure is difficult to hedge. We assume an average volatility of **29.8%** (**29.5%**) for the KTS (KG) transaction, i.e. a spread of 1.5% compared with the equivalent mid-market implied volatility.

The mid-market Strike Volatilities of the KTS and KG put (call) options are the same as in the Variable Forward Purchase transactions. However, by entering the Variable Forward Purchase the Bank increases its long vega exposure significantly. Therefore, the implied volatility of the call option is adjusted downwards by an additional 1.6% to reflect this additional risk. However, given the lower vega exposure on the put option leg, the Strike Volatility of the put option is also adjusted downwards by 1.4%.

**Interest Rate, Dividends and Borrow Costs:**

The interest rates and dividends assumed in the Variable Forward Purchase transactions are the same as the ones used in the pricing of the Variable Forward Sale. Similarly to the remark on the reference price, one needs to look at all four transactions when determining the net delta that the Bank needs to borrow to hedge its directional risk. Therefore, the same borrow costs as in the pricing of the Variable Forward Sale are assumed.

Price for Transactions 3 and 4 (Friday 12th of September)

We have calculated the price of Transaction 3 and 4 by following the methodology outlined above. The result is as follows

- Transaction 3: price of €5.92mn to be paid by KTS to Mediobanca
- Transaction 4: price of €7.14mn to be paid by KG to Mediobanca



MEDIOBANCA
*Banca di Credito Finanziario S.p.A.*

Therefore the total price of both transactions is €13.06mn payable by Client to Mediobanca

<u>Price for Transactions 3 and 4 (Monday 15th of September)</u>

We have calculated the price of Transaction 3 and 4 by following the methodology outlined above. The result is as follows

- Transaction 3: price of €5.47mn to be paid by KTS to Mediobanca
- Transaction 4: price of €6.85mn to be paid by KG to Mediobanca

Therefore the total price of both transactions is €12.32mn payable by Client to Mediobanca



MEDIOBANCA
_Banca di Credito Finanziario S.p.A._

**Annex 1: Klaus Tschira Data Sheet**

1. **Variable Forward Sale (16th May 2007 ISDA Master & Custody Agreement;  23rd May 2007 Confirmation)**

Dr. h.c. Klaus Tschira Beteiligungs GmbH & Co KG

| | | |
|---|---|---|
| Total no of shares | : | 32mm |
| Total no of tranches | : | 45 |
| Shares per tranche | : | 711,111 |
| | | |
| Initial Price | : | € 36.7250 |
| Put k | : | € 29.38 (i.e. 80% of IP) |
| Call k | : | € 55.70 (i.e. 151.65% of IP) |
| | | |
| Tranche 1 – 15 Expiries | : | 30/1/2012 – 17/2/2012 |
| Tranche 16 – 30 Expiries | : | 26/3/2012 – 13/4/2012 |
| Tranche 31 – 45 Expiries | : | 28/1/2013 – 15/2/2013 |
| | | |
| Deferred Premium | : | € 19,590,581 on 17/2/2012 + 3bd |
| | | € 19,735,522 on 13/4/2012 + 3bd |
| | | € 20,538,575 on 15/2/2013 + 3bd |
| | | **Total = € 59,864,679** |

Klaus Tschira Stiftung

| | | |
|---|---|---|
| Total no of shares | : | 27mm |
| Total no of tranches | : | 45 |
| Shares per tranche | : | 600,000 |
| | | |
| Initial Price | : | € 36.7250 |
| Put k | : | € 29.38 (i.e. 80% of IP) |
| Call k | : | € 55.70 (i.e. 151.65% of IP) |
| | | |
| Tranche 1 – 15 Expiries | : | 30/1/2012 – 17/2/2012 |
| Tranche 16 – 30 Expiries | : | 26/3/2012 – 13/4/2012 |
| Tranche 31 – 45 Expiries | : | 28/1/2013 – 15/2/2013 |
| | | |
| Deferred Premium | : | € 16,529,555 on 17/2/2012 + 3bd |
| | | € 16,651,849 on 13/4/2012 + 3bd |
| | | € 17,329,425 on 15/2/2013 + 3bd |
| | | **Total = € 50,510,830** |

2. **KG Variable Forward Sale Extension (25th Jan 2008 Amendment Letter, 4th Feb 2008 Final Terms Notified)**

Dr. h.c. Klaus Tschira Beteiligungs GmbH & Co KG

| | | |
|---|---|---|
| Total no of shares | : | 32mm |



**MEDIOBANCA**
*Banca di Credito Finanziario S.p.A.*

| | | |
|---|---|---|
| Total no of tranches | : | 45 |
| Shares per tranche | : | 711,111 |
| | | |
| Initial Price | : | - |
| Put k | : | € 30.035 |
| Call k | : | € 56.355 |
| | | |
| Tranche 1 – 15 Expiries | : | 14/4/2014 – 07/5/2014 |
| Tranche 16 – 30 Expiries | : | 27/10/2014 – 14/11/2014 |
| Tranche 31 – 45 Expiries | : | 15/4/2015 – 06/5/2015 |
| | | |
| Deferred Premium | : | € 21,717,693 on 07/5/2014 + 3bd |
| | | € 22,285,706 on 14/11/2014 + 3bd |
| | | € 22,841,967 on 06/5/2015 + 3bd |
| | | **Total = € 66,845,365** |

Klaus Tschira Stiftung

| | | |
|---|---|---|
| Total no of shares | : | 27mm |
| Total no of tranches | : | 45 |
| Shares per tranche | : | 600,000 |
| | | |
| Initial Price | : | € 36.7250 |
| Put k | : | € 29,38 (i.e. 80% of IP) |
| Call k | : | € 55.70 (i.e. 151.65% of IP) |
| | | |
| Tranche 1 – 15 Expiries | : | 30/1/2012 – 17/2/2012 |
| Tranche 16 – 30 Expiries | : | 26/3/2012 – 13/4/2012 |
| Tranche 31 – 45 Expiries | : | 28/1/2013 – 15/2/2013 |
| | | |
| Deferred Premium | : | € 16,529,555 on 17/2/2012 + 3bd |
| | | € 16,651,849 on 13/4/2012 + 3bd |
| | | € 17,329,425 on 15/2/2013 + 3bd |
| | | **Total = € 50,510,830** |



**MEDIOBANCA**
*Banca di Credito Finanziario S.p.A.*

## 3. Variable Forward Purchase (18th April 2008 Confirmation)

### Dr. h.c. Klaus Tschira Beteiligungs GmbH & Co KG

| | | |
|---|---|---|
| Total no of shares | : | 32mm |
| Total no of tranches | : | 45 |
| Shares per tranche | : | 711,111 |
| | | |
| Put k | : | € 30.035 |
| Call k | : | € 56.355 |
| | | |
| Tranche 1 – 15 Expiries | : | 14/4/2014 – 07/5/2014 |
| Tranche 16 – 30 Expiries | : | 27/10/2014 – 14/11/2014 |
| Tranche 31 – 45 Expiries | : | 15/4/2015 – 06/5/2015 |

| | | |
|---|---|---|
| Deferred Premium[1] and Rebate[2] | : | €4,514,415 on 07/5/2014 + 3bd |
| | | €4,514,415 on 14/11/2014 + 3bd |
| | | €4,514,415 on 06/5/2015 + 3bd |
| | | **Total = €13,543,246 + Rebate** |

Max Rebate = 32mm * (€ 30.035 - € 26.5[3])

| | | |
|---|---|---|
| Triggers | : | € 28.00 to € 25.00 |
| | | Tranche 1 to Tranche 45 |
| | | ~ € 0.07 increments per Tranche |
| | | |
| Guaranteed Amounts | : | €7,633,717   30/04/2008 |
| | | €5,909,529   09/05/2008 |

### Klaus Tschira Stiftung

| | | |
|---|---|---|
| Total no of shares | : | 27mm |
| Total no of tranches | : | 45 |
| Shares per tranche | : | 600,000 |
| | | |
| Put k | : | € 29.38 |
| Call k | : | € 55.70 |
| | | |
| Tranche 1 – 15 Expiries | : | 30/1/2012 – 17/2/2012 |
| Tranche 16 – 30 Expiries | : | 26/3/2012 – 13/4/2012 |
| Tranche 31 – 45 Expiries | : | 28/1/2013 – 15/2/2013 |
| | | |
| Deferred Premium | : | €3,809,038 on 17/2/2012 + 3bd |
| | | €3,809,038 on 13/4/2012 + 3bd |
| | | €3,809,038 on 15/2/2013 + 3bd |
| | | **Total = €11,427,144 + Rebate** |

Max Rebate = 27mm * (€ 29.38 - € 26.5)

| | | |
|---|---|---|
| Triggers | : | € 28.00 to € 25.00 |

---

[1] Fixed amount (i.e. option model calculation)
[2] Put strike *minus* Trigger for each Tranche
[3] Average Trigger

11



MEDIOBANCA
Banca di Credito Finanziario S.p.A.

Tranche 1 to Tranche 45
~ € 0.07 Increments per Tranche

Guaranteed Amounts                    :          €6,440,949    30/04/2008
                                                 €4,986,165    09/05/2008



**MEDIOBANCA**
*Banca di Credito Finanziario S.p.A.*

**Annex 2: Zero Coupon Yield Curve**

| Date | Yield |
|------|-------|
| Mon 15Sep08 | 4.36% |
| Mon 15Dec08 | 5.10% |
| Mon 16Mar09 | 5.18% |
| Tue 16Jun09 | 5.11% |
| Tue 15Sep09 | 5.00% |
| Mon 14Sep09 | 5.12% |
| Mon 13Sep10 | 4.77% |
| Mon 12Sep11 | 4.65% |
| Wed 12Sep12 | 4.60% |
| Thu 12Sep13 | 4.58% |
| Fri 12Sep14 | 4.58% |
| Mon 14Sep15 | 4.59% |
| Mon 12Sep16 | 4.62% |
| Tue 12Sep17 | 4.65% |
| Wed 12Sep18 | 4.69% |
| Tue 12Sep23 | 4.85% |
| Tue 12Sep28 | 4.88% |
| Mon 13Sep38 | 4.74% |



MEDIOBANCA
*Banca di Credito Finanziario S.p.A.*

---

## DISCLAIMER

This information document (the "Information Memorandum"), which has been drawn up by Mediobanca, – Banca di Credito Finanziario S.p.A. ("Mediobanca") in its capacity as financial advisor to and in conjunction with **Dr. h.c. Tschira Beteiligungs GmbH & Co. KG and Klaus Tschira Stiftung GGmbH** ("*Klaus Tschira*", and, jointly with the other companies controlled by it or otherwise affiliated to it, the "Group"), as part of the procedure to evaluate two **Equity Derivatives contract between Lehman Brothers and *"Klaus Tschira"*** (the "Transaction Valuation"), contains solely data and information provided by the Group or already in the public domain, and is furnished to potential participants in the Transaction for information purposes only.

Mediobanca (including any other professionals appointed by it) has not carried out any autonomous check, audit and/or independent analysis on the information and data contained in the Information Memorandum. Accordingly, Mediobanca accepts no responsibility for the correctness, accuracy and/or completeness of the information contained in the Information Memorandum or in other documents that will be furnished from time to time in relation to the Transaction Valuation, and disclaims all liability for any omissions from the Information and for statements, express and/or implicit, otherwise deriving from any other form of written or oral communication sent to the recipient of the Information Memorandum, from or on behalf of Mediobanca, in the course of the evaluation which the recipient will want to make with respect to the Transaction Valuation, save in the case of gross negligence and/or willful misconduct.

The information contained in the Information Memorandum have been prepared with the intention of assisting the recipient in making its own assessment of the Transaction Valuation, without any claims to being exhaustive. Such information may be subject to change, amendment or update, which neither Mediobanca nor the Group undertakes or commits to provide. The Information Memorandum must not be taken as the basis for investment decisions by potential counterparties.

With respect to the foregoing, neither Mediobanca nor the Group nor any of the respective members of the management and supervisory governing bodies, general management, staff and advisors may in any way be held responsible for any direct and/or indirect damages that may be suffered by third parties who relied on the statements made in or omitted from the Information Memorandum. All liability deriving directly or indirectly from use of the Information Memorandum is hereby expressly disclaimed.

In furnishing the Information Memorandum, neither the Group nor Mediobanca enters into any obligation to provide the recipient hereof with any further information and/or documentation. Neither receipt of the Information Memorandum on the part of the recipient nor any information contained therein or subsequently disclosed to any party with reference to the Transaction Valuation may be construed as investment advice on the part of Mediobanca.

The Information Memorandum in no way constitutes a proposal to execute a contract or solicitation or advice or recommendation to purchase or sell any financial instrument. The Information Memorandum does not represent an outright offer or a commitment on the part of Mediobanca to subscribe for a financial instrument of any kind.

The Group is furnishing the information contained herein on a strictly confidential basis and on the assumption that it shall be used for the sole purpose of considering participation in the Transaction Valuation. In receiving the Information Memorandum, each recipient acknowledges the confidential nature of the information contained herein, and undertakes not to disclose them in any way or to use it



MEDIOBANCA
*Banca di Credito Finanziario S.p.A.*

for any purpose other than in connection with the Transaction Valuation, in accordance with the terms and conditions of the confidentiality agreement duly executed by each of the recipients.

Mediobanca is part of a leading banking group, the companies of which are involved in a wide range of financial transactions both on a proprietary basis and on behalf of clients. For this reason it is possible that Mediobanca, or one of its subsidiaries and/or associate companies, or one of the clients of Mediobanca or the group it belongs to, might have entered into agreements or own shareholdings or might carry out, or have carried out, transactions which might lead to a potential situation of conflict of interest with respect to the mandate accepted in respect of the transactions described in the Information Memorandum. In the event of any conflicts of interest arising in the performance of said mandate, these shall be handled in such a way as to not prejudice the interests of clients, in conformity with the provisions of Directive 2004/39/CE and the relevant regulations transposing said Directive in Italy, and with the policy for managing conflicts of interest operated by Mediobanca.

For any dispute arising in connection with the Information Memorandum the laws of the Republic of Italy shall apply, and the Court of Milan shall have exclusive jurisdiction.

# Exhibit 4

Prager Dreifuss
Beilage
Annex 3 (47)

| | |
|---|---|
| **Von:** | Cohen, Miles P H. [Miles.Cohen@gs.com] |
| **Gesendet:** | Freitag, 19. September 2008 15:59 |
| **An:** | Bernd Kammerlander |
| **Cc:** | Lanz, Gregor |
| **Betreff:** | Valuation for Collars |
| **Anlagen:** | KT DATA SHEET.doc |

Bernd,

As requested, please find below our valuations for the 2 structures on SAP AG (details provided by you in attached Word document - page 2) which you entered into with Lehman Brothers.

<<KT DATA SHEET.doc>>
Both pricings use the opening spot reference for Monday 15Sep08 for SAP AG: Eur36.56, and assume that the delta is executed at that level.

1. KG Portfolio - Long Eur30.035 European Put & Short Eur56.355 European Call for tranched maturities (Apr 2014 to May 2015)

No of shares: 32mm
**Valuation: GS Receives Eur 33,837,114.21**

2. KTS Portfolio - Long Eur29.38 European Put & Short Eur55.70 European Call for tranched maturities (Jan 2012 to Feb 2013)

No. of shares: 27mm
**Valuation: GS Pays Eur 15,618,014.71**

Both of these valuations are based upon the details provided by you as per the attached Word document.

Please let us know if you have any questions.

Kind regards,
Miles

Goldman, Sachs International
Christchurch Court | 10-15 Newgate Street | London EC1A 7HD
Tel: 020-7552 3057 | Fax: 020-7051 0285
E-mail: miles.cohen@gs.com | cohmll@bloomberg.net

**Miles Cohen**          **Goldman**

Executive Director          **Sachs**
Market Solutions Group

You have requested a quotation(s) that may be used for the purposes of estimating a replacement cost for the transaction(s) outlined below. Unless otherwise noted, the quotation provided is the price at which Goldman Sachs or one of its affiliates ("Goldman Sachs") would have been prepared to execute a transaction at the time as specified in the quotation or, if not specified, at the time at which the quotation was transmitted to you. The quotation should not be construed that Goldman Sachs is prepared to enter into a transaction with you. In the event that you wish to enter into a transaction with Goldman Sachs, you should contact your Goldman Sachs representative to obtain a "firm" price based on specific transaction details, size and current market conditions.

Goldman Sachs does not represent that this information is accurate, complete or current, and Goldman Sachs has no liability with respect thereto. This information and the pricing methodologies used are subject

1

to change without notice and Goldman Sachs has no obligation to update you as to any such changes. This information may not reflect quotations you would receive from other dealers, or even from affiliates or other business units of Goldman Sachs, and does not necessarily reflect quotations you would obtain by using pricing models available from Goldman Sachs or that may be included in the books and records of Goldman Sachs. This information is intended only as a reference and should not be relied upon without further evaluation by you, in consultation with your professional advisors, for the maintenance of your books and records or for legal, tax, accounting, financial reporting, disclosure or other purposes.

© Copyright 2007 The Goldman Sachs Group, Inc. All rights reserved.
This message may contain information that is confidential or privileged. If you are not the intended recipient, please advise the sender immediately and delete this message.
See http://www.gs.com/disclaimer/email for further information on confidentiality and the risks inherent in electronic communication. See http://www.gs.com/disclaimer/email-salesandtrading.html for important risk disclosure, conflicts of interest and other terms and conditions relating to the e-mail and your reliance on information contained in it.

Goldman Sachs International ("GSI") is authorised and regulated by The Financial Services Authority and appears in the FSA register under number 142888. GSI is subject to the FSA rules and guidance, details of which can be found on the FSA's website at http://www.fsa.gov.uk. GSI is registered as a Private Unlimited Company in England and Wales (Company Number 2263951). [VAT registration number GB 447 2649 28]. Registered Office as above.

Beilage
Annex 348

# KT DATA SHEET

1. **Big Hedge (16th May 2007 ISDA Master & Custody Agreement; 23rd May 2007 Confirmation)**

## KG

| | | |
|---|---|---|
| Total no of shares | : | 32mm |
| Total no of tranches | : | 45 |
| Shares per tranche | : | 711,111 |
| | | |
| Initial Price | : | € 36.7250 |
| Put k | : | € 29.38 (i.e. 80% of IP) |
| Call k | : | € 55.70 (i.e. 151.65% of IP) |
| | | |
| Tranche 1 – 15 Expiries | : | 30/1/2012 – 17/2/2012 |
| Tranche 16 – 30 Expiries | : | 26/3/2012 – 13/4/2012 |
| Tranche 31 – 45 Expiries | : | 28/1/2013 – 15/2/2013 |
| | | |
| Deferred Premium | : | € 19,590,581 on 17/2/2012 + 3bd |
| | | € 19,735,522 on 13/4/2012 + 3bd |
| | | € 20,538,575 on 15/2/2013 + 3bd |
| | | |
| | | Total = € 59,864,679 |
| | | |
| Dividend Schedule | : | € 0.492   12/5/2008 |
| | | € 0.527   11/5/2009 |
| | | € 0.564   11/5/2010 |
| | | € 0.603   11/5/2011 |
| | | € 0.645   11/5/2012 |
| | | € 0.690   10/5/2013 |
| | | € 0.739   09/5/2014 |

## KTS

| | | |
|---|---|---|
| Total no of shares | : | 27mm |
| Total no of tranches | : | 45 |
| Shares per tranche | : | 600,000 |
| | | |
| Initial Price | : | € 36.7250 |
| Put k | : | € 29.38 (i.e. 80% of IP) |
| Call k | : | € 55.70 (i.e. 151.65% of IP) |
| | | |
| Tranche 1 – 15 Expiries | : | 30/1/2012 – 17/2/2012 |
| Tranche 16 – 30 Expiries | : | 26/3/2012 – 13/4/2012 |
| Tranche 31 – 45 Expiries | : | 28/1/2013 – 15/2/2013 |
| | | |
| Deferred Premium | : | € 16,529,555 on 17/2/2012 + 3bd |
| | | € 16,651,849 on 13/4/2012 + 3bd |
| | | € 17,329,425 on 15/2/2013 + 3bd |
| | | |
| | | Total = € 50,510,830 |
| | | |
| Dividend Schedule | : | € 0.492   12/5/2008 |
| | | € 0.527   11/5/2009 |
| | | € 0.564   11/5/2010 |
| | | € 0.603   11/5/2011 |
| | | € 0.645   11/5/2012 |
| | | € 0.690   10/5/2013 |
| | | € 0.739   09/5/2014 |

2.   **KG Hedge Extension (25th Jan 2008 Amendment Letter, 4th Feb 2008 Final Terms Notified)**

**KG**

| | | |
|---|---|---|
| Total no of shares | : | 32mm |
| Total no of tranches | : | 45 |
| Shares per tranche | : | 711,111 |
| | | |
| Initial Price | : | - |
| Put k | : | € 30.035 |
| Call k | : | € 56.355 |
| | | |
| Tranche 1 – 15 Expiries | : | 14/4/2014 – 07/5/2014 |
| Tranche 16 – 30 Expiries | : | 27/10/2014 – 14/11/2014 |
| Tranche 31 -- 45 Expiries | : | 15/4/2015 – 06/5/2015 |
| | | |
| Deferred Premium | : | € 21,717,693 on 07/5/2014 + 3bd |
| | | € 22,285,706 on 14/11/2014 + 3bd |
| | | € 22,841,967 on 06/5/2015 + 3bd |
| | | |
| | | Total = € 66,845,365 |
| | | |
| Dividend Schedule | : | € 0.492  12/5/2008 |
| | | € 0.527  11/5/2009 |
| | | € 0.564  11/5/2010 |
| | | € 0.603  11/5/2011 |
| | | € 0.645  11/5/2012 |
| | | € 0.690  10/5/2013 |
| | | € 0.739  09/5/2014 |
| | | € 0.791  08/5/2015 |

**KTS (unchanged)**

| | | |
|---|---|---|
| Total no of shares | : | 27mm |
| Total no of tranches | : | 45 |
| Shares per tranche | : | 600,000 |
| | | |
| Initial Price | : | € 36.7250 |
| Put k | : | € 29.38 (i.e. 80% of IP) |
| Call k | : | € 55.70 (i.e. 151.65% of IP) |
| | | |
| Tranche 1 – 15 Expiries | : | 30/1/2012 – 17/2/2012 |
| Tranche 16 – 30 Expiries | : | 26/3/2012 – 13/4/2012 |
| Tranche 31 -- 45 Expiries | : | 28/1/2013 – 15/2/2013 |
| | | |
| Deferred Premium | : | € 16,529,555 on 17/2/2012 + 3bd |
| | | € 16,651,849 on 13/4/2012 + 3bd |
| | | € 17,329,425 on 15/2/2013 + 3bd |
| | | |
| | | Total = € 50,510,830 |
| | | |
| Dividend Schedule | : | € 0.492  12/5/2008 |
| | | € 0.527  11/5/2009 |
| | | € 0.564  11/5/2010 |
| | | € 0.603  11/5/2011 |
| | | € 0.645  11/5/2012 |
| | | € 0.690  10/5/2013 |
| | | € 0.739  09/5/2014 |

3.   Contingent Unwind (18th April 2008 Confirmation)

**KG**

| | | |
|---|---|---|
| Total no of shares | : | 32mm |
| Total no of tranches | : | 45 |
| Shares per tranche | : | 711,111 |
| | | |
| Put k | : | € 30.035 |
| Call k | : | € 56.355 |
| | | |
| Tranche 1 – 15 Expiries | : | 14/4/2014 – 07/5/2014 |
| Tranche 16 – 30 Expiries | : | 27/10/2014 – 14/11/2014 |
| Tranche 31 – 45 Expiries | : | 15/4/2015 – 06/5/2015 |

Deferred Premium[1] and Rebate[2]    :    € [ ] + Rebate on 07/5/2014 + 3bd
€ [ ] + Rebate on 14/11/2014 + 3bd
€ [ ] + Rebate on 06/5/2015 + 3bd

Total = € [ ] + Rebate

Max Rebate = 32mm * (€ 30.035 - € 26.5[3])

| | | |
|---|---|---|
| Dividend Schedule | : | € 0.492  12/5/2008 |
| | | € 0.527  11/5/2009 |
| | | € 0.564  11/5/2010 |
| | | € 0.603  11/5/2011 |
| | | € 0.645  11/5/2012 |
| | | € 0.690  10/5/2013 |
| | | € 0.739  09/5/2014 |
| | | € 0.791  08/5/2015 |

Triggers    :    € 28.00 to € 25.00
Tranche 1 to Tranche 45
~ € 0.07 increments per Tranche

| | | |
|---|---|---|
| Guaranteed Amounts | : | € 7,633,717  30/04/2008 |
| | | €5,909,529   09/05/2008 |

**KTS**

| | | |
|---|---|---|
| Total no of shares | : | 27mm |
| Total no of tranches | : | 45 |
| Shares per tranche | : | 600,000 |
| | | |
| Put k | : | € 29.38 |
| Call k | : | € 55.70 |
| | | |
| Tranche 1 – 15 Expiries | : | 30/1/2012 – 17/2/2012 |
| Tranche 16 – 30 Expiries | : | 26/3/2012 – 13/4/2012 |
| Tranche 31 – 45 Expiries | : | 28/1/2013 – 15/2/2013 |

Deferred Premium    :    € [ ] + Rebate on 17/2/2012 + 3bd
€ [ ] + Rebate on 13/4/2012 + 3bd
€ [ ] + Rebate on 15/2/2013 + 3bd

---

[1] Fixed amount (i.e. option model calculation)
[2] Put strike *minus* Trigger for each Tranche
[3] Average Trigger

Total = € [ ] + Rebate

Max Rebate = 27mm * (€ 29.38 - € 26.5)

| | | |
|---|---|---|
| Dividend Schedule | : | € 0.492  12/5/2008 |
| | | € 0.527  11/5/2009 |
| | | € 0.564  11/5/2010 |
| | | € 0.603  11/5/2011 |
| | | € 0.645  11/5/2012 |
| | | € 0.690  10/5/2013 |
| | | € 0.739  09/5/2014 |
| Triggers | : | € 28.00 to € 25.00 |
| | | Tranche 1 to Tranche 45 |
| | | ~ € 0.07 increments per Tranche |
| Guaranteed Amounts | : | €6,440,949   30/04/2008 |
| | | €4,986,165   09/05/2008 |

4.  **KTS Written Calls (3rd February 2006 Confirmation; 15th March 2006 Amendment Email; 12th May 2008 Dividend Adjustment Email)**

**KTS**

| | | |
|---|---|---|
| Total no of shares | : | 8mm |
| Total no of tranches | : | 8 |
| Shares per tranche | : | 1,000,000 |
| | | |
| Initial Price | : | - |
| Call k (after dividend adjustment in 2008) | : | € 43.59   Tranche 1+2 |
| | | € 44.84   Tranche 3+4 |
| | | € 46.08   Tranche 5+6 |
| | | € 47.33   Tranche 7+8 |
| | | |
| Tranche 1 Expiry | : | 01/08/2008 |
| Tranche 2 Expiry | : | 31/10/2008 |
| Tranche 3 Expiry | : | 30/01/2009 |
| Tranche 4 Expiry | : | 30/04/2009 |
| Tranche 5 Expiry | : | 03/08/2009 |
| Tranche 6 Expiry | : | 30/10/2009 |
| Tranche 7 Expiry | : | 29/01/2010 |
| Tranche 8 Expiry | : | 03/05/2010 |
| | | |
| Dividend Schedule | : | € 1.36   12/5/2009 |

# Appendix 1

# Australia and New Zealand Banking Group Ltd v Société Générale

Case Nos 1999/7942/A3

QBCM1 1999/1110/A3

Court of Appeal (Civil Division)

17 February 2000

**2000 WL 519**

Before: Lord Justice Kennedy and Lord Justice Mance

Thursday, 17 February 2000

On Appeal from the High Court of Justice Queen's Bench Division

The Honourable Mr Justice Aikens

## Representation

Mr Mark Barnes Q.C. and Mr Andrew Lenon (instructed by Messrs. Weil , Gotshal & Manges) appeared for the Respondents.

Mr Iain Milligan Q.C. and Mr Christopher Hancock (instructed by Messrs. Slaughter and May) appeared for the Appellants.

## JUDGMENT

LORD JUSTICE MANCE:

1. *Introduction*

The defendant, Société Generale ("SG"), appeals against an order of Aikens J dated 21st September 1999, giving summary judgment against SG in a dispute about the proper method of calculation of loss in the event (which occurred) of early termination of three non-deliverable foreign exchange contracts entered into with Australia and New Zealand Banking Group Limited ("ANZ"). Subsequent to the hearing before Aikens J, SG instructed different solicitors (Slaughter and May) as well as fresh Counsel (Mr Milligan Q.C. and Mr Hancock) who appeared before us, and have identified various points not raised before the judge. The relevant facts and the general issue appear with clarity from the notice of appeal submitted on SG's behalf by Slaughter and May:

"1. The Claimant ("ANZ") and the Defendant ("SG") were parties to three non-deliverable forward foreign exchange contracts ("the Transactions") contained in amended Confirmations dated 14th April, 1998, 14th April 1998 and 28th May, 1998 respectively.

2. The Transactions provided for the payment on their respective Settlement Dates, viz. 1st October, 1998, 12th November, 1998 and 25th November, 1998, of a sum in US dollars calculated by reference to their notional amounts, viz. US$10m, US$5m and US$10m respectively, and by reference to the change in the rate of exchange between the US dollar and the Russian rouble between the Trade Date, viz. 6th November, 1997, 12th November, 1997 and 26th November, 1997 respectively, and the Settlement Date. The payment fell to be made by SG to ANZ if the rouble depreciated against the dollar and vice versa.

3. The Transactions were subject to the terms of an ISDA Master Agreement between the parties dated as of 17th February, 1995. The ISDA Master Agreement allowed for Early Termination upon the occurrence, among other things, of an Additional Termination Event (Section 5(b) (v)). A Russian Market Event constituted an Additional Termination Event (Clause 7 of the Confirmations) and a Russian Market Event included a banking moratorium.

4. It is common ground that the Transactions were terminated early, viz. on 24th September, 1998, by SG by virtue of the Russian banking moratorium announced on 17th August, 1998.

5. As a result of the Early Termination of the Transactions the parties were obliged to split the difference between their respective Losses in connection with the Transactions (Sections 6 (d) (ii) and 6 (e)(ii) (2) (B) of the ISDA Master Agreement).

6. Before Aikens J. it was common ground that ANZ's loss was US$16,719,459 and that SG's gain (i.e. a negative Loss) on the Transactions themselves was the same amount, thus splitting the difference on that basis would have given the same amount. The dispute between the parties was as to whether SG was entitled to take account of a loss on three hedging contracts, by virtue of the definition of Loss in Section 14 of the ISDA Master Agreement.

7. The hedging contracts had been concluded between SG and Banque Société Générale Vostok ("Vostok") on 6th, 12th and 26th November, 1997 respectively. Their terms were in all material respects the same as the Transactions, except that the initial rate of exchange differed slightly and the third contract had a notional amount which was US$0.5m greater than the Transaction which it hedged, i.e. US$10.5m not US$10m, and an Effective Date which was one day earlier, i.e. 25th, not 26th, November, 1997.

8. SG calculated that its loss on the hedge contracts had been US$16,245,734, so that its Loss in connection with the Transactions, taking account of the hedge contracts, was US$473,725. Splitting the difference between the Losses, there was a sum of US$8,596,592 due from SG to ANZ. SG paid that sum on 17th May, 1999.

9. Aikens J held that ANZ, was not entitled to bring the loss on its hedge contracts into account and therefore that the balance of US$8,122,867, ie, the difference between US$16,719,459 and US$8,596,592, was still due. He gave summary judgment for that amount.

10. Aikens J. also gave summary judgment for interest at the rates, namely the Applicable Rates, stipulated in the ISDA Master Agreement (Sections 6(d) (ii) and 14) on the basis that the Payment Date occurred two local Business Days after ANZ had notified SG of its Loss and had notified SG that it disagreed with SG's calculation, i.e. on 5th October, 1998. He awarded interest at the Default Rate from that date.

**Calculation of Loss**

11. Section 14 of the ISDA Master Agreement defines the Loss suffered by one party (so far as material) as:

"an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with … that … group of Terminated Transactions …, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or re-establishing any hedge or related trading position (or any gain resulting from any of them)."

12. Aikens J. held that the losses suffered by SG on the hedging contracts were not suffered " *as a result of* " the termination or liquidation of those contracts (Judgment, page 16 at paragraph (5)), but rather as a result of Vostok's inability to pay because of the banking moratorium …"

2. *ISDA standard terms* .

For convenience I set out in the schedule to this judgment the full terms of certain of the standard ISDA provisions relating to (a) payment on maturity (Section 2) and (b) the calculation of the payments to be made upon early termination under both the Loss and the alternative Market Quotation basis. Before us, it was common ground that the Loss and Market Quotation clauses aim at broadly the same result and may to that extent assist construe each other, although the confirmations relating to the transactions between ANZ and SG specified that any payments on early terminations should be settled on the basis of the Loss section.

3. *The issues in outline*

In paragraph 13, the notice of appeal identifies the only issue argued before the judge and raised by the notice of appeal before us, as follows:

"13. Aikens J. was undoubtedly right to conclude that the losses could not be brought into account unless they had been suffered " *as a result of* " terminating or liquidating the hedge contracts. That is what the definition of Loss says. In that sense, therefore, there clearly has to be a close link between the loss and the termination or liquidation. But he was wrong to conclude that such a link did not exist and so were the reasons which he gave for reaching that conclusion."

4. By its Notice of Appeal dated 29 th October 1999 SG also seeks to raise a new point (which I will call the first new point). This involves resiling from the "common ground" stated in the first sentence of paragraph 6 of the notice of appeal, and asserting that ANZ's loss (and SG's corresponding gain) through termination of the transactions with SG amounted not to some $16.72 million, but in each case to about $100,000. The argument is (i) that the Russian banking moratorium itself constituted a Trade Event, (ii) that, under the terms of the confirmations, SG had the right to determine on the relevant Settlement Dates that a Trade Event existed (iii) that the consequence of such a determination would have been to limit SG's obligation to make any payment to ANZ to one of four methods. They would have been (a) payment in dollars to an account in Russia designated by ANZ, or, in descending order if and as ANZ determined such payment to be impossible or impracticable, (b) payment in Russian roubles to an account designated by ANZ, (c) payment between Russian affiliates to which ANZ and SG should assign their rights and obligations under the relevant transaction or (d) the retention by SG of the settlement amount until cessation of the Trade Event and its payment then with accrued interest at a rate to be agreed.

5. SG suggests, and one can see the force of the suggestion in the light of the depth of the Russian financial crisis which the banking moratorium reflected, that any of these methods would have been unattractive. SG wishes to submit that the market value of its transactions with ANZ as at the date of their early termination would have been diminished accordingly; they should have been valued not "clean" (i.e. assuming that payment would have been made by SG to ANZ in dollars in London as provided by the confirmations) but "dirty" (i.e. assuming that SG would or would probably have determined an Event of Change if the transactions had reached their settlement dates, so that the

possible payments for the foreseeable future would have been in accordance with one of the four specified methods); that the parties were accordingly mistaken in proceeding before the judge on the basis that ANZ's loss and SG's gain through their early termination each totalled $16.72 million; and that each's actual loss and gain could be measured by reference to the amount that SG agreed that Vostok should pay SG in respect of the three hedge contracts, that is 0.5% of their value or in absolute terms $83,597.30. The net economic effect, if this figure was ANZ's loss and SG's gain, would be that SG should have paid ANZ that sum, not the $8,596,592 actually paid on 17th May 1999 or the full $16.72m claimed by ANZ.

6. Mr Milligan conceded that, on this new approach, SG could no longer pursue the case it argued before the judge to the effect that its suggested losses on the Vostok hedges should be brought into account. Further, although originally SG sought to put before us fresh evidence to support the suggested value of $83,597.30, Mr Milligan conceded during the hearing that he could not realistically ask us to determine any such value, which might be affected by potentially irrelevant considerations such as Vostok's credit status. He also pointed out that the question whether SG could recover the balance, on this approach overpaid, of the $8,596,592 paid on 17th May 1999 was a quite separate question, which was not on any view before us. He submitted, however, that the first new point was sufficiently meritorious to justify us (a) granting permission to raise it in principle, (b) allowing the appeal and (c) ordering a full trial, at which both parties could deploy whatever factual or expert evidence they wished upon it. In his submission, although it was a point which could and should have been raised below, it was a point of real importance, not only to these parties but to the worldwide derivatives market as a whole; it was an untested point which had arisen in the rare circumstances of a banking moratorium, where commercial parties might well have a limited or mistaken understanding of the allocation of risk intended or achieved by the conditions which they had adopted or agreed; and the failure to appreciate the point was essentially a failure by lawyers, grappling with complex conditions in unfamiliar circumstances.

7. Just before the hearing of the appeal, SG sought to raise a second new point. This was based on the language of the Loss clause requiring each party to determine

> "its total losses and costs (or gain, in which case expressed as a negative number) in connection with … that Terminated Transaction …, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or re-establishing any hedge or related trading position (or any gain resulting from any of them)".

Under the clause that begins "including", Mr Milligan wishes to submit that SG had a right to elect on what basis to measure its loss. It had, he went on, chosen to measure it by reference to its Vostok hedges; and that entitled it to ignore any gain made on the ANZ-SG transactions, and to credit as its gain only the very limited amount of $83,597.30 received from Vostok. Again, on this approach, Mr Milligan did not seek to suggest that SG could pursue the argument which it had run before the judge, to the effect that it was entitled to bring into account the loss of $16,245,734 allegedly made on its hedges.

8. The second new point is, in reality, unnecessary as far as SG is concerned, if it is allowed to raise its first new point. Its attraction for SG is that it offers a partial mitigation against the event of the Court refusing permission to SG to go back on the common assumption before the judge, that ANZ made a loss and SG a gain of $16,719,459 under the ANZ-SG transactions. The Vostok hedges were on largely back-to-back terms with the transactions between ANZ and SG. (Vostok was and is in fact owned by SG, although SG did not guarantee obligations undertaken by Vostok.) The confirmations included similar provisions regarding a Trade Event to those agreed between ANZ and SG. By introducing the concept of election, SG seeks to measure its gain, in connection with the early termination of the ANZ-SG transactions, by reference to what it submits was the diminished value of the Vostok hedges arising from the virtual certainty that a Trade Event would have existed at their settlement dates, and the resulting risk that Vostok's payment obligations to SG would, by determination of an Event of Change, be restricted to one of the four methods. The effect, if SG was not allowed to raise its first new point, would be that, although SG could not, as it would like to, challenge the proposition that ANZ had suffered a loss of $16,719,459, SG could still challenge the proposition that SG had made a like gain. SG's gain would, on SG's case, be $83,597.30, although Mr Milligan's concession that this opened up factual issues means that the actual figure could only be determined by a trial. The figures, on SG's case, would thus be, on ANZ's side, a loss of $16,719,459 (unless SG was permitted to raise its first new point) but, on SG's side, a gain of $83,597.30, so that

SG's liability to ANZ would consist of $8,401,528, only a little less than SG has actually paid.

9.  There is, however, a potentially relevant difference between the ANZ-SG contracts and the SG-Vostok contracts. Whereas under the former, the option to determine an Event of Change belonged to SG which would be the paying party if the rouble fell against the dollar, under the Vostok hedges the like option belonged to SG which would be the receiving party in that event. Despite their corporate relationship, it would by no means appear to follow that SG would on settlement declare an Event of Change as against Vostok, even if it could. I also note in parenthesis that there appears to be no indication that SG did, in fact, determine that an Event of Change had occurred in respect of the one Vostok hedge that actually matured (on 1st October 1998). All this may in turn cast doubt on the factual proposition that SG would have been bound on the relevant settlement dates of the ANZ-SG contracts to have determined that an Event of Change had occurred, if it had not already determined such an Event in order to achieve early termination.

10.  *The issue argued before the judge*

It is appropriate to start with the issue argued before the judge, which is formally before us. SG's submission was that it should be able to bring into account as a loss its losses under the hedges which it effected with Vostok. In support of this, SG relied upon the inclusion, in each of the three confirmations specifically agreed between the parties, of the Russian Market Event clause together with provision that the standard ISDA Loss clause should apply in the event of any early termination. Thus, it was said, the reference to hedging in the Loss clause must contemplate hedging contracts, like those between SG and Vostok, which might be affected by a banking moratorium leading to early termination under the Additional Termination Event clause, and must specifically contemplate the loss which might arise on such contracts upon such a banking moratorium. The judge rejected this argument, on the ground that the meaning of the standard ISDA Loss clause could not depend on terms agreed by the parties under a specific confirmation, and that there is nothing in the ISDA Loss clause to suggest that it is specifically directed to losses flowing from a banking moratorium. I agree with the judge's view.

11.  The Loss clause does however refer in general terms to loss or costs incurred as a result of a party terminating or liquidating any hedge. The judge held that, in circumstances such as the present, it was not the fact of termination or liquidation of the hedging contracts with Vostok that led to SG's losses on those contracts. Rather, it was the fact that, because of the banking moratorium, Vostok could not pay — either on their settlement dates or on their early termination or at any time. By an agreement dated 5th November 1998 a number of foreign exchange contracts between SG and Vostok, including the three hedges, were liquidated for an agreed payment of US$177,000 by Vostok, said to correspond "to the amount market participants were willing to pay to [SG] to be substituted in [SG's] rights against [Vostok] under the unmatured and matured NDFs [i.e. non-deliverable forward contracts]". One of the hedge contracts had already matured, on 1st October 1998. The almost complete lack of value attributed to this contract cannot have been due to any termination. It must, if it accurately reflected its market value, mean that this contract had no substantial value before, on and after its maturity. The fact that its loss of value was reflected by SG and Vostok in an agreement, which they chose to head "re: Early termination of Non-Deliverable Forward Transactions (NDFs)", does *not* mean either that that contract was terminated early or, more importantly, that any such loss of value was attributable to its termination or liquidation, early or late. It must have been due either to the banking moratorium and its effect on the value of contracts with Russian banks such as Vostok, or to a failure to value the contract correctly. Similarly, in relation to the other two contracts, although they had not matured, their loss of value, reflected in their actual early termination on 5th November 1998, must at best, from SG's viewpoint, have resulted from the intrinsic loss of value of such contracts, irrespective of their termination or maturity.

12.  The judge said that, on SG's case, the incidence of this type of loss would be adventitious, since it would depend upon the identity and circumstances of any particular counterparty with whom SG chose to hedge their commitments to ANZ, in circumstances where ANZ would not normally and did not here know whether any hedge had been concluded or with whom. SG's response is that whether or not there is a hedge is always adventitious, but that the Loss clause undoubtedly provides for some form of loss or gain resulting in connection with a hedge to be brought into account — in other words, the existence of a hedge is contractually foreseen and provided for.

13.  The critical question is however for what purpose it is foreseen and how it is provided for. This brings one back to the actual language of the Loss clause, and the scope of the words "as a result of" in the phrase "loss or cost incurred as a result of its terminating, liquidating, obtaining or

re-establishing any hedge or related position (or any gain resulting from any of them)". Here I find myself in full agreement with the judge that (a) it is readily understandable that the parties should agree to share loss or gain arising from the accelerated termination or liquidation or the need to take accelerated steps to obtain or re-establish a hedge, but that (b) it is inherently unlikely that a party in ANZ's position entering into a futures contract with SG would agree to share the risk of the simple collapse in value of a hedge arranged by its counterparty, SG. It must be borne in mind that SG's case at this point proceeds on an assumption that ANZ's loss and SG's gain in connection with the termination of the ANZ-SG contracts was in each case $16,719,459. A result which also brings into account a supposed additional loss, by SG, of $16,245,734 under its own hedges would be by itself surprising. It would become more, not less, surprising, if SG is permitted to raise and succeeds on its first new point, since the effect would logically be that, although SG only owed ANZ less than $100,000 in respect of the ANZ-SG transactions, SG could claim that ANZ should bear half of its suggested loss of $16,245,734 in respect of the Vostok hedges. Needless to say, Mr Milligan did not suggest this before us. In reality, he barely advanced the case which SG put before the judge.

14. Like the judge, I find it unnecessary to go into many of the other arguments raised in the affidavits. The only additional observations that I would make concern the Market Quotation clause, which is under standard ISDA terms an alternative basis for measuring the amount payable by one affected party to the other on early termination. In its evidence, SG suggested that it was with problems like the present in mind that it chose to have the method of assessment set out in the Loss clause inserted in the present contracts, in preference to the alternative Market Quotation clause. Even if that was the basis, there is nothing to show that it was communicated to or shared with ANZ, and it is therefore irrelevant. ANZ's evidence was that it agreed the Loss clause as an appropriate measure in circumstances where market quotations might well not be readily obtainable.

15. Before us, in this area, SG's case has undertaken another metamorphosis. It is now common ground that the Market Quotation and Loss clauses aim at broadly similar, although by their nature not always precisely the same, results. The structure of the relevant ISDA terms (set out in the schedule) confirms this. There is a possibility of considerable overlap between the basis of calculation of the amount payable on one and the other basis. Quotations from market dealers may be used to determine loss under the Loss clause, while loss (as defined in the Loss clause) may be used under the Market Quotation clause to determine the settlement amount for any terminated transaction for which a market quotation "cannot be determined or would not … produce a commercially reasonable result". There is however nothing in the Market Quotation clause which could support an argument similar to that which SG advanced before the judge. Since that argument could, if accepted, have very fundamental effects in shifting major financial and commercial risks, comparison of the Market Quotation and the Loss clauses therefore provides a yet further pointer to the correctness of the judge's conclusion.

16. The result is that I have no hesitation in upholding the correctness of the judge's decision on the point argued below.

17. *SG's applications for permission to rely on two new points*

I turn now to the two new points which SG seeks to advance in this Court. In my judgment, it should not be permitted to raise either of them. They are, as I have indicated, closely linked in their nature and motivation. The first new point aims to re-open what was common ground below regarding ANZ's loss and SG's gain under the ANZ-SG transactions. The second new point, by introducing the concept of election, seeks to make irrelevant the concession regarding SG's gain under the ANZ-SG transactions, and to transfer attention to SG's limited gain of $83,597.30 under the Vostok hedges. But more is on any view needed to show that the value of the Vostok hedges was only $83,597.30. The mere fact that SG accepted a limited payment from Vostok, or indeed that a third party bank (J.P. Morgan) offered only 0.5% to stand in SG's shoes vis-à-vis Vostok, cannot suffice. The argument which SG uses at this point is precisely the same argument as SG wishes to deploy by its first new point, namely that the likelihood that there would be a Trade Event at the settlement date diminished the market value of the relevant transactions — that is the SG-Vostok hedges just as much as the ANZ-SG transactions.

18. This litigation was begun in March 1999, in respect of transactions terminated in September 1998. ANZ's summons under RSC O.14 and O.14A was issued on 1st April 1999 and served with a supporting affidavit of the same date. The new rules came into force later in April 1999. SG paid the sum of $8,596,592 on 17th May 1999. M. Wellers of SG made a witness statement in answer on 11th June 1999, ANZ responded on 5th July 1999 and SG replied on 20th July 1999. The parties agreed to

the resolution by the judge under O.14A of the sole issue then arising. After an oral hearing the judge's judgment on that issue was handed down on 21st September 1999. The first new point was not raised until the notice of appeal dated 29th October 1999, and the second not until 20th January 2000, the day before the hearing before us.

19. Both new points could and should have been raised in the evidence for and on the hearing before the judge. Under the old rules, it was clearly established that a hearing under O.14 (and all the more under O.14A) constitutes a "trial or hearing on the merits": see Supreme Court Practice 1999, note 59/10/8. The basic principle in this situation was that "When a litigant has obtained a judgment in a court of justice … he is by law entitled not to be deprived of that judgment without very solid grounds": see note 59/10/9. When fresh evidence was relied upon, the three conditions stated in *Ladd v. Marshall [1954] 1 WLR 1489* had to be satisfied, that is that the evidence could not have been obtained with reasonable diligence for use at the trial, that it must be such that, if given (and accepted), it would be decisive, and that it must be apparently credible, though it need not be incontrovertible.

20. Mr Milligan's starting point is that he is only asking us to consider certain new submissions of construction and so law. It is only if we accept these that, he submits, there will have to be any investigation of facts or admission of fresh evidence. He points out that that investigation could never have taken place under O.14 or O.14A. All that he is asking therefore is that SG should be put in the same position as if it had raised the new points in its evidence and before the judge. The judge would then have ruled on those points also, and, whoever had lost on them, the case would probably still have come to the Court of Appeal. Assuming SG to be wrong in principle on its new points, the Court of Appeal would have decided no more than that, just as ANZ asks us to do now. Assuming SG to be right on either of its new points, the Court would have had to make an order for a full trial, just as SG accepts it would have to do now. On that basis, SG's failure to raise such points earlier can have caused no real prejudice at all. At most it can have caused a matter of months' delay and some cost, if one assumes SG succeeding on one of its new points before the judge, and the matter being sent for trial without any appeal by ANZ.

21. These were attractively put submissions, but they do not give due weight to ANZ's interest in the judgment which it has obtained after a trial or hearing on the merits. That consideration is in no way reduced under the new rules. Indeed, it is to my mind reinforced by the court's duty actively to manage cases to further the overriding objective of dealing with them expeditiously and fairly, by, amongst other things, "identifying the issues at an early stage" and "deciding promptly which issues need full investigation and trial and accordingly disposing summarily of the others" (CPR 1.1(2)(d) and 1.4(2)(b) and (c)), and the parties' duty to help the court further that overriding objective (CPR 1.3). I would not therefore permit SG now to raise its first new point, even though the financial significance of that point amounts to $8,122.867 with interest if SG wins, plus potentially a further $8,596,592, if SG could establish a claim to recover the sum which, on this hypothesis, was not owed when SG paid it on 17th May 1999. As to the second new point, if that stands alone, its significance is simply to reduce SG's liability to $8,401,528, little less than the $8,596,592 paid on 17 May 1999. The amount in issue on it, therefore, represents the bulk of the additional $8,122,867 which the udge ordered SG to pay to ANZ.

22. *The issues of principle raised by the new points*

I shall however also indicate my views on the issues of principle involved in the two new points, since they were extensively argued before us. The central issue is whether SG could have claimed to value either the ANZ-SG or the SG-Vostok transactions "dirty", that is taking into account any diminution in value due to the possibility or prospect that SG might, if it had not previously determined that a Russian Market Event had occurred constituting an Event of Change, have determined that a Trade Event existed on the relevant settlement dates and so have restricted its payment obligations to whichever ANZ selected of the four methods specified in the confirmations [1] . This is an issue of some complexity, but I have come to the conclusion that Mr Barnes' submission on it is to be preferred. Again it is helpful to look at the position on a Market Quotation basis, since it is common ground that the Loss and Market Quotation bases aim at broadly similar results. The replacement transaction on a Market Quotation basis is one that

> "would have the effect of preserving … the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section

2(a)(i) in respect of such Terminated Transaction … that would, but for the occurrence of the relevant Early Termination Date, have been required after that date".

The provision goes on:

"For this purpose, Unpaid Amounts in respect of the Terminated Transaction … are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included."

Unpaid amounts are however only excluded here, because they are added to the amount calculated by market quotation elsewhere, as a result of ISDA Section 6(e). They too are defined (as set out above) in terms which (by reference to ISDA Section 2(a)(iii)) mean that all conditions precedent must be deemed to have been satisfied. ISDA Section 2(a) is set out earlier in this judgment.

23. Under clauses 5 and 6 of the confirmations payments in dollars by SG to ANZ are to be made in London, and under Section 2(a)(ii) it was on any view contemplated that they would be made in freely transferable dollars. Only in Section 7 of the confirmations are there included special additional terms defining and regulating the Trade Events, Cost Events, Russian Market Events, and Events of Change. Event of Change is defined as:

"The determination by SG that (i) a Trade Event exists on the Settlement Date, or (ii) subsequent to the Trade Date a Russian Market Event or a Cost Event has occurred which has continued for at least two (2) consecutive New York Business Days or until the Settlement Date, whichever comes first."

Under the heading "Occurrence of an Event of Change", there then appears in sub-clause (a) the provision which I have described whereby, if SG determines that a Trade Event exists on the relevant settlement date, its payment obligation on settlement is limited to one of the four specified methods. Sub-clause (d), provides:

"(d) Upon the occurrence of an Event of Change due to a Russian Market Event, an Additional Termination Event shall be deemed to have occurred in respect to such event"

Sub-clause (e) provides that, in the event of an Additional Termination Event within sub-clause (d), both parties shall be Affected Parties and the Loss clause shall apply.

24. If the Market Quotation basis of calculation had been adopted between ANZ and SG, it is clear that it would have been necessary to assume the satisfaction of all conditions precedent both in respect of any amounts unpaid on early settlement and in respect of any future payments on settlement. The task of the Reference Market Makers would not have been to put themselves in the shoes of either of the actual parties under the actual transaction, but to assess the consideration required to enter into a replacement transaction to preserve the economic equivalent of any payment provided by such transaction on a hypothetical basis. One hypothesis is that no Early Termination Event has occurred or been effectively designated, another that "each other applicable condition precedent specified in this Agreement" has been and will be satisfied.

25. An Early Termination Event can only be the result of an Event of Default or of a Termination Event. The non-occurrence of an Event (or Potential Event) of Default is itself a specified condition precedent. Termination Events as such are not specified as conditions precedent. Looking at those specified in ISDA Section 5(b), most of them appear to have no bearing on the value of "the economic equivalent of any payment or delivery … by the parties under Section 2(a)(i)". But we were referred to the first, illegality, to test the parties' arguments. Mr Milligan submitted that, in the event that either party treated a supervening event of illegality, preventing payment under the transaction, as an Early Termination Event, the Market Quotation basis would then require the transaction to be viewed as in effect valueless. On this, I would observe that the illegality would by no means necessarily apply to the payments on Early Termination required by Section 6(e). If it did, they could not be paid for that reason. If it did not, then there is nothing in the Market Quotation clause to indicate that any such illegality must be taken into account in valuing "the economic equivalent of any payment or delivery … by the parties under Section 2(a)(i)".

26. Likewise, coming directly to the difficulty which has arisen in this case, there is nothing in the Market Quotation clause to suggest that "the economic equivalent of any payment or delivery … by the parties under Section 2(a)(i)" must be arrived at by assessing the risk that a Trade Event might exist on the settlement date and that SG might determine that it did. Indeed, if one looks at the structure of the confirmation clause "Occurrence as an Event of Change", it seems clear that its intention was not to alter the value of the contractually required payment or delivery. The provision for the payment of interest in part (4) underlines this. The effect which market participants might or might not regard it as having on the transactions in the present Russian economic crisis is a different matter. Further, to treat the contracts as requiring an assessment of the likelihood of a Trade Event existing and being invoked on settlement, and of the effect of this possibility on the instruments value would appear to introduce a difficult and uncertain area of speculation into a calculation which was clearly intended to be undertaken both quickly and objectively. It would not necessarily even be in SG's own interest to pay dollars to an account in Russia, still less to put itself to the risk of having to retain the settlement amount indefinitely subject to interest "to be agreed".

27. It is true that the contract does not expressly make the absence of a determination of a Trade Event at the settlement date a condition precedent to payment as agreed in clauses 5 and 6 of the confirmations. But it is also true that it is difficult to tie the reference in ISDA Section 2(a)(iii) to "each other applicable condition precedent specified in this Agreement" in to other particular terms. One place where additional conditions precedent may be found is among the specially agreed provisions of the confirmations. The concepts of Trade Event, Cost Event, Russian Market Event, Event of Change and Occurrence of an Event of Change are none of them ISDA concepts, they are tailor-made for these transactions and it is accordingly understandable if their language does not in all respects echo or tie exactly into that of the standard ISDA terms. The effect of Occurrence of an Event of Change is, in specified circumstances, to transmute SG's primary obligation under clauses 5 and 6 to make payment on the settlement date in dollars in London into an obligation to make payment by one of the four specified methods. It is not difficult, therefore, to treat the non-occurrence of an Event of Change as a condition precedent to SG's obligation to make any payment on settlement under Section 2(a)(i). On that basis the language of the Market Quotation clause is precisely satisfied.

28. A possible and more general argument in an opposite direction is that the Occurrence of An Event of Change clause was clearly intended to operate as a restriction of SG's obligations on settlement in the case of a Trade Event at that date. Compare sub-clause (b) whereby any obligations of ANZ to SG on settlement in the case of a Trade Event would have fallen to be paid by ANZ in dollars to a United States account. Why then should SG's obligations on Early Termination be free of, and ANZ free to ignore, any such restriction? For whatever reason, the fact is however that payments on early termination under ISDA Section 6(e) *are* free of any such restriction. Further, it was up to SG to weigh the benefits or disadvantages of early termination, it was under no obligation to invoke early termination, and, if it did so, the situation fell outside any tailor-made clause in the confirmations and within the standard ISDA wording. I have already pointed out that, whatever its actual effect in circumstances such as the present, it cannot have been the purpose of the "Occurrence of An Event of Change" clause in the confirmations to affect the value of the payments due under the transactions.

29. Returning to the Loss clause which directly governs the present transactions, the position regarding any sum unpaid or any delivery unmade at Early Termination is identical. In that connection, the clause requires satisfaction of every applicable condition precedent to be assumed. As regards loss in connection with the future non-performance of the transaction, the loss requires a party to assess its total losses and costs (or gains) in connection with any terminated transaction, including loss of bargain, cost of funding or certain loss or cost (to which I come in more detail below) associated with any hedge or related trading position. It refers, as I have indicated, to the possibility that such loss or gain may be measured by market quotation — which may be of a less formal nature than that required under the Market Quotation clause (cf the last sentence of Section II.G.4 of the ISDA Users' Guide (1993 edition)). Bearing in mind the intention of the Loss and Market Quotation clauses to arrive at broadly the same results, the calculation of loss, or loss of bargain, must proceed on the same basis, that is valuing the transaction according to the nominal value of the payments which would have been required under it, assuming satisfaction of all conditions precedent.

30. I would therefore have held that ANZ's loss and SG's gain on early termination of the ANZ-SG transactions fell to be valued "clean". That is without reference to the possibility that, had no early termination date been determined by SG, SG might still, under clause 7 of the confirmations, have determined on settlement that a Trade Event existed, and so have restricted SG's obligation to pay to

one of the four specified methods. SG's gain under and on any early termination of the Vostok hedges should have been valued accordingly. The suggested value of 0.5% for which SG settled with Vostok was either reached under a misconception as to the true construction of the ISDA early termination provisions as incorporated in the Vostok hedges, or it was arrived at on the basis of extraneous considerations, such as Vostok's diminished credit-rating or an assumption (as expressed by J. P. Morgan when it suggested 0.5%) that all Russian banks engaging in foreign exchange business should be treated as in de facto default.

31. I need say little about SG's second new point. We heard much argument on the interpretation of the phrase

> "including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or re-establishing any hedge or related trading position (or any gain resulting from any of them)".

This phrase divides into three sections: (i) loss of bargain, (ii) cost of funding and (iii) what may loosely be called any hedge loss or cost, with any reverse gain being in each case also to be taken into account. Whether or not the phrase contemplates or allows a true election between (iii) and any other measure of recovery appears to me irrelevant. Under (i), it is common ground that, in so far as ANZ suffered any loss (whether large or small) on the ANZ-SG transactions, SG made a corresponding gain. If (iii) is treated, as Mr Milligan contends, as an alternative basis of assessing SG's gain by reference to any hedge or related trading position which SG may have arranged or may arrange on a back-to-back basis, no different result arises. If ANZ's loss is to be measured "clean", its loss will be large, and on that basis SG's gain on any early termination of the Vostok hedges ought to have measured as a large amount, although SG (on this hypothesis either erroneously or due to extraneous factors) settled with Vostok for a small sum. If ANZ's loss is to be measured "dirty" (and assuming SG were permitted to rely on their first new case), then ANZ's loss will be small, and SG's gain on any early termination of the Vostok hedges would be likely also to be small — though the fact that the Vostok hedges were not precisely back-to-back, since it was SG that had the option under them whether or not to determine that an Event of Change existed on any settlement date, might affect their "dirty" value. If the Vostok hedges yielded less, and SG received less, than would otherwise have been the case, because (for example) Vostok was insolvent or of doubtful credit-worthiness, Mr Milligan accepts that this would have to be ignored (and the hedges would in effect have to be revalued) when calculating loss under the Loss clause.

32 I therefore think it unnecessary to enter into the debate whether the third section of the phrase is an alternative (analogous as Mr Milligan suggested to the second limb of the rule in Hadley v. Baxendale ) for which SG may at will elect; or whether, as Mr Barnes suggested, it covers no more than minor "breakage" costs or arrangement fees involved in arranging the cancellation of some existing or arrangement of some fresh hedge. The ISDA Guide contains a very brief indication that the introduction of this section enables recovery of "breakage costs". But it does not reproduce, explain or in my judgment do full credit to the scope of the actual words used. I also note that ANZ itself when calculating its loss after the early termination treated the third section as a primary measure, and (echoing its words) based its calculations "on the cost that would be incurred by us of obtaining or re-establishing a hedge or related trading position as of the earliest date after 24 September 1998 as is reasonably practicable" (letters of 29th September and 1st October 1998). Whilst this is no guide to construction, it does correspond with my own impression as to the scope of the words. They seem to me wide enough to cover the substantive cost, after an early termination, of obtaining a hedge or trading position to cover a party in respect of the other's unfulfilled obligations; or of a party buying itself out of a related transaction which the terminated transaction was designed to cover, and, likewise, wide enough to cover any substantive gain made on realising any such hedge or trading position. However, it is, as I have indicated, unnecessary to arrive at a final decision on this, since it makes no difference.

33. *Conclusion*

For the reasons that I have given, I would dismiss the appeal from the judge's decision, and I would further refuse SG's applications for permission to rely on each of the two new points not raised below, which it sought to argue before us.

LORD JUSTICE KENNEDY:

I agree.

> Order: Appeal dismissed; application refused; Counsel to submit agreed minute of order.

### Schedule (Isda standard terms)

"2. Obligations

(a) General Conditions.

(i) Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii) Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. …

(iii) Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

…

6 Early Termination

…

(e) *Payments on Early Termination* . If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

…

(ii) *Termination Events*

(1) …

(2) *Two Affected Parties* . If there are two Affected Parties:—

(A) if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B) if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

…

5. (iv) *Pre-Estimate* . The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses."

…

6. 14. Definitions

As used in this Agreement:—

…

" *Loss* " means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidation, obtaining or re-establishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except so as to avoid duplication, if Section 6 (e) (i) (I) or (3) or 6(e) (ii) (2) (A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

" *Market Quotation* " means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number ) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a) (i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included …

8. " *Unpaid Amounts* " owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have become payable but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery …"

---

1. I set on one side the possible problem (not identified in argument before us) that, under the SG-Vostok contract that matured on 1st October 1998, SG (to whom the right belonged) does not appear actually to have declared any Trade Event.

Crown copyright

© 2013 Sweet & Maxwell



# **Appendix 2**

# Anthracite Rated Investments (Jersey) Limited v Lehman Brothers Finance S.A. In Liquidation

# Fondazione Enasarco v Lehman Brothers Finance S.A., Anthracite Rated Investments (Cayman) Limited

Case No: HC10C04780, Case No: HC11C00593

High Court of Justice Chancery Division

15 July 2011

## [2011] EWHC 1822 (Ch)

## 2011 WL 2747597

Before: Mr Justice Briggs

Date: 15/07/2011

Hearing dates: 4th – 6th July 2011

## Representation

Mr Mark Phillips QC and Mr Stephen Robins (instructed by Clifford Chance LLP ) for the Claimant.

Mr Jonathan Russen QC and Ms Rosanna Foskett (instructed by Field Fisher Waterhouse LLP ) for the Defendant.

Mr Mark Hapgood QC and Mr Jasbir Dhillon (instructed by Sidley Austin LLP ) for the Claimant.

Mr Jonathan Russen QC and Ms Rosanna Foskett (instructed by Field Fisher Waterhouse LLP ) for the First Defendant.

Mr Jeremy Goldring (instructed by Clifford Chance LLP ) for the Second Defendant.

## Judgment

Mr Justice Briggs:

## Introduction

1 This judgment follows the combined trial, on agreed facts, of two closely related Part 8 claims. The main common dispute which underlies each claim concerns the meaning and effect of early close-out provisions in two cash settled put options granted by Lehman Brothers Finance S.A. ("LBF") with a guarantee from its ultimate parent company Lehman Brothers Holdings Inc. ("Holdings"), both of which incorporated, with similar (but not quite identical) additions and amendments, the 1992 ISDA Master Agreement. I shall refer to them as "the Derivative Agreements".

2 The Derivative Agreements each formed an important part of two large and complex structures, devised and marketed by Lehman Brothers International Europe ("LBIE"). Each was in

essentially similar terms. Unfortunately for the purposes of concise description, there are both relevant differences in the precise terms and substantial differences in nomenclature. In a nutshell, each structure defined and regulated the issue of instruments (variously described as Bonds and Notes) by a single purpose vehicle issuer having the following features. They were euro denominated, linked to a portfolio of underlying investments, limited recourse but secured, and principal protected. One of the structures also provided a limited degree of interest (or coupon) protection, but it is common ground that this additional feature makes no difference to the issues which I have to decide.

3 The function of the Derivative Agreements in each structure was to provide that principal (and in one structure interest) protection. As investment advisers are taught to warn their clients, investment portfolios can go down in value as well as up. Principal protection is designed to ensure that (subject only to the credit risk of the principal protection provider and any guarantor of its obligations) the investor will on maturity of the instrument receive not less than its original purchase price, even if the value of the underlying portfolio has by then fallen below that level.

4 Principal protection performs at least two important functions in the market. First, it enables a risk-averse investor such as a pension provider to invest in a higher risk (and therefore potentially higher return) portfolio than would otherwise be appropriate, because of the insurance against under-performance provided by the principal protection. Secondly, it enables institutional investors such as banks to invest in types of portfolio which, without principal protection, would attract a credit rating insufficiently high to satisfy Basel II capital adequacy requirements. The investor in one of the structures before the court was a pension provider for Italian workers. The investor in the other structure was a bank. In each case LBF provided the principal protection, guaranteed by Holdings, and the Derivative Agreement constituted the contractual means whereby that principal protection was provided, by a contract with the issuer and, by a charge, to the investors.

5 In functional terms, the two structures were each designed to operate as follows. First, the subscription price for the instruments paid by the investor to the issuer was (subject to a deduction to which I shall return) to be used for subscription for redeemable preference shares in another single purpose vehicle ("Balco"). Balco was to apply the subscription price in the acquisition of the underlying investment portfolio consisting largely, but not entirely, of hedge fund type investments.

6 Second, the issuer was to enter into the Derivative Agreement with LBF, whereby the issuer was to enjoy a put option in relation to its shares in Balco, exercisable upon final maturity of the instruments if the net proceeds of redemption of the Balco preference shares fell short of the original subscription price for the instruments. Since the put option was cash-settled, LBF would thereby become liable to make good that shortfall to the issuer.

7 Third, in preparation for the redemption of the instruments upon maturity, Balco would realise the investment portfolio, and pay the net proceeds to the issuer by way of redemption of its preference shares. Upon maturity of the instruments, they would be redeemed by payment by the issuer to the investor of the proceeds of the redemption of the issuer's preference shares in Balco, together (if necessary to make good any shortfall against the original subscription price) with any payment received from LBF upon exercise of the put option in the Derivative Agreement .

8 Fourth, the *quid pro quo* for the issuer's put option under the Derivative Agreement was the payment by instalments of premium to LBF, funded from cash flow derived from preference share dividend payments by Balco to the issuer. One of the structures made provision for a cash reserve for that purpose, but it was not in the event put in place.

9 Fifth, the issuer's obligations, both to the investor and to LBF under the Derivative Agreement were limited recourse but secured. Thus, pursuant to a series of interrelated trust deeds, the issuer charged all its interest in its preference shares in Balco, and in the Derivative Agreement (and in any cash reserve) to a Trustee, to be held upon trust as security, first for the issuer's obligations to LBF under the Derivative Agreement and secondly as security for the issuer's obligations to the investors. Both the trust deeds and the final terms of the instruments made provision for a reversal of priority (a 'flip') as between LBF and the investors, in the event of a termination of the Derivative Agreement by reason of LBF's default.

10 Thus, the principal protection to the investor consisted in form of the issuer's promise to pay, on maturity, no less than the original subscription price for the instruments. In substance it lay in the investor's security interest in the issuer's rights against LBF under the Derivative Agreement . Save only as mortgagees under a common security structure, there existed no privity between the investor and LBF. The only parties to the Derivative Agreement were the issuer and LBF. The terms of the instruments expressly excluded third party rights.

11 The two series of instruments were issued in 2006 and 2007 respectively, maturing in 2017 and 2023 respectively. I shall refer to them as Series 38 and Series 26. Both structures made detailed bespoke provision for early redemption of the instruments in four specified types of circumstance, namely:

i) the occurrence of a specified tax liability affecting the issuer;

ii) termination of the Derivative Agreement "for any reason";

iii) illegality of performance of its obligations by the issuer, or illegality of its hedging arrangements; and

iv) an event of default by the issuer.

Collectively, those circumstances may loosely be described as matters sufficiently destructive of the ongoing efficacy of the structure as an investment vehicle to warrant its unwinding prior to maturity.

12 Two invariable consequences of early redemption of the instruments were that the investors would lose their principal protection and that the Derivative Agreements would (to use a neutral phrase) come to an end. These two outcomes were achieved in contractual terms by the omission in the formula defining the amount of the issuer's obligation to make an early redemption payment of any requirement to pay a minimum amount equivalent to the original subscription price for the instruments, and by the insertion within the Derivative Agreement of a provision for "Mandatory Early Termination", triggered by the redemption of all outstanding instruments prior to their maturity date. Thus, even if by the time of early redemption the value of the underlying investment portfolio had fallen below the original subscription price for the instruments, the investors would be exposed to that shortfall, without recourse in respect of it either to the issuer, to LBF or to the security property.

13 Mindful that early redemption of the instruments (triggering Mandatory Early Termination of the Derivative Agreements) would cut short a potentially profitable premium income stream, LBF obtained provision for it to receive compensation for the consequence of early redemption in the form of an "Early Termination Cash Settlement Amount" ("ETCSA"), to be paid by the issuer and funded from deductions which the issuer was required to make from the net proceeds of redemption of its Balco preference shares, before onward payment to the investors. The ETCSA under each structure consisted of three elements, namely (i) any arrears of premium; (ii) compensation for early termination; and (iii) LBF's costs of termination. The formula for calculation of the early termination compensation in (ii) above differed radically under each of the two structures, but the differences do not matter for present purposes.

14 Separately and distinctly from Mandatory Early Termination (as summarised above) the 1992 ISDA Master Agreement contains its own detailed and (by now) well known regime for early termination including, but not limited to, early termination upon default. Section 6(e) of the 1992 Master Agreement contains a menu of four alternative formulae for early close-out payments to be made on early termination resulting from an event of default. In both the Derivative Agreements in issue, the parties chose "Second Method and Loss". In the barest outline, that formula calls for the non-defaulting party, acting reasonably and in good faith, to identify its loss or gain arising from the early termination of the Derivative Agreement . Any such loss is to be made good by the defaulting party. Any such gain is to be paid to the defaulting party. The final sentence of the definition of "Loss" in Section 14 of the 1992 Master Agreement entitles, but does not oblige, the non-defaulting party to determine its Loss by reference to quotations of relevant

*Page 4*

rates or prices from one or more leading dealers in the relevant markets.

## The Issues

15 LBF suffered an event of default under each of the Derivative Agreements when, on 15th September 2008, Holdings filed for bankruptcy protection under Chapter 11 of the U.S. Bankruptcy Code in New York. Since it was LBF's Credit Support Provider (as defined in the Master Agreement) this was an Event of Default under Section 5(a)(vii)(4) of the Master Agreement. Since the parties to the Derivative Agreements had elected in favour of Automatic (rather than elective) Early Termination this caused an immediate Early Termination of both Derivative Agreements . That much is common ground.

16 Some time thereafter, both issuers claimed in correspondence to have calculated a substantial Loss as non-defaulting parties based upon quotations of relevant premium rates for substitute put options for the outstanding terms of the two Derivative Agreements. The sums claimed from LBF were &euro;30 million (Series 38) and US$61.5 million odd (Series 26) respectively.

17 LBF responded by denying those claims and claiming an entitlement to, or to an amount equivalent to, the ETCSA under each Derivative Agreement , amounting to &euro;2.8 million and &euro;43.74 million odd respectively. It emerged in correspondence, evidence and then legal submissions that LBF's case was based, upon a contractual entitlement to the ETCSA under the Mandatory Early Termination provisions of the Derivative Agreements or, alternatively, that identical amounts represented the issuers' gains under the Second Method and Loss methodology in Sections 6(e) and 14 of the Master Agreement.

18 The shortest route to an identification of the issues in this case is to be derived from a summary of the steps in LBF's argument, all of which are challenged *in limine* by LBF's opponents.

19 Mr Jonathan Russen QC for LBF put its case as follows:

(1) Automatic Early Termination of the Derivative Agreement triggers an early redemption of the instruments.

(2) Early redemption of the instruments reduces the issuer's liability to the investors to an amount equivalent to the net proceeds of the realisation of the asset portfolio held by Balco, less an amount equivalent to the ETCSA.

(3) The express terms of the Derivative Agreement preserve LBF's right to receive the ETCSA upon early redemption of the instruments, notwithstanding Automatic Early Termination.

(4) Alternatively to (3), (if Automatic Early Termination precludes a subsequent Mandatory Early Termination) the issuer makes a gain by reason of Early Termination of the Derivative Agreement equivalent to the amount of the ETCSA, which it is entitled on early redemption to deduct from the net proceeds of sale of the investment portfolio, but not obliged to pay to the investors.

(5) In any event, the ETCSA constitutes the agreed pre-estimate of loss/gain arising from the combination of Automatic Early Termination of the Derivative Agreement and early redemption of the instruments.

(6) Accordingly the issuer's attempt to calculate Loss by reference to the cost of a replacement transaction is unreasonable, because it produces a fictitious loss widely at variance with the issuer's real gain.

20 The case of the issuers (and the assignee investor under Series 26) is as follows:

(1) Automatic Early Termination of the Derivative Agreement never triggers an early redemption of the instruments, nor does any form of early termination which is itself triggered by LBF's default.

(2) Even if Automatic Early Termination of the Derivative Agreements would otherwise have triggered an early redemption of the instruments, the issuers and their investors have rearranged their affairs so as to avoid that outcome. The issuers will not therefore be able to deduct an amount equivalent to the ETCSA from the amounts payable to the investors.

(3) Automatic Early Termination of the Derivative Agreement necessarily precludes Mandatory Early Termination at any later date. Accordingly LBF has no contractual right to receive the ETCSA.

(4) In the events which have happened the issuers make no such gain as LBF alleges.

(5) The ETCSA is in principle irrelevant to the calculation of the issuers' loss on Automatic Early Termination arising from LBF's default.

(6) Calculation of Loss by reference to the cost of a replacement transaction is conferred as of right upon the non-defaulting party, and sanctioned by a succession of recent cases in the Court of Appeal and the Commercial Court as the appropriate measure for calculating the non-defaulting party's loss of bargain.

21 The determination of the issues thus identified calls for a much closer scrutiny of the complex contractual frameworks than I have thus far outlined. Although no one suggested that the differences between the two structures, still less their different nomenclature, should make any difference to the outcome, I shall, in order to avoid a lack of precision, focus in detail upon one of the two structures and describe the other only where it differs to any material extent. I have found it marginally more convenient to focus upon the second in time of the two structures, namely Series 26, under which Anthracite Rated Investments (Cayman) Limited ("ARIC") was the issuer and the Italian pension provider Fondazione Enasarco ("Enasarco") was the sole investor.

22 It is also necessary to describe in some detail the different routes taken by the issuers and investors under each structure to avoid, or provide a practicable alternative to, early redemption of the instruments following the failure of the Lehman Brothers Group which, of course, included both LBF, Holdings and LBIE.

## The Facts

### Series 26

23 On 14th December 2007 ARIC issued a series of €780,470,000 principal protected notes maturing on 14th June 2023 ("the Notes"). The issue of the Notes constituted Series 26 of a $10 billion secured euro medium term note programme issued by ARIC, the Cayman Islands incorporated special purpose vehicle for a structure designed and marketed by LBIE.

24 Enasarco, a provider of compulsory pensions to Italian workers, subscribed for the whole of the Series 26 Notes on the issue date.

25 The terms and conditions of the Notes were originally set out in a base prospectus ("the Base Prospectus") dated 13th December 2007, as supplemented and amended by the final terms of the Notes ("the Final Terms") contained in an amended and restated offering circular for the Notes ("the Offering Circular ").

26 The relevant Derivative Agreement , described in the Series 26 documentation as the "Principal Protection Transaction" was also made on 14th December 2007 between LBF as Party A and ARIC as Party B. Its bespoke terms appear in a confirmation of that date ("the Confirmation") which incorporated by reference a standard form ISDA 1992 Master Agreement ("the Master Agreement") and a Schedule thereto ("the Schedule"), both made between the same parties on 29th April 2005 and amended and restated on 22nd December 2006. I shall, notwithstanding its definition in the Series 26 documentation, continue to refer to it as the Derivative Agreement .

27 The Confirmation provided for the sale by LBF to ARIC of a single European automatic put option over ARIC's shares in Balco (acquired by subscription of the proceeds of the issue of the Notes), at a strike price equivalent, in relation to the whole of the Series 26 Notes, to the original subscription payment by Enasarco, namely €780,470,000. The option was expressed to expire on the sixth business day before the maturity date of the Notes. LBF's obligation was, upon expiry, to pay the amount (if any) by which the strike price exceeded the aggregate redemption proceeds actually received from Balco by ARIC in respect of its preference shares. LBF sold the put option to ARIC for a premium of 1.4% per annum of the outstanding average principal amount of the Notes, reducing after eight years to 1.03% per annum, and payable quarterly. Being a European option, the put option could only be exercised on, and not before, the expiration date.

28 Under the heading "Early Termination" the Confirmation provided that Mandatory Early Termination was "Applicable", and that ARIC would pay the ETCSA to LBF on the Mandatory Early Termination Date. That was defined as "The Early Redemption Date as specified in the Offering Circular ".

29 The Confirmation then set out a detailed definition of the ETCSA. Alternative formulae were prescribed according to whether or not the Cash Reserve had been established pursuant to the terms of the Notes. Since it was not in fact established, the operative formula is as follows:

> "Where the Mandatory Early Termination Date occurs prior to the Cash Reserve first equalling the Cash Reserve Target Amount, the aggregate of (i) if the Mandatory Early Termination Date occurs after the Effective Date, Premium accrued from and including the last Premium accrued from and including the last Premium Payment Date preceding the Mandatory Early Termination Date (or, if no Premium Payment Dates have occurred, the Effective Date) to but excluding the Mandatory Early Termination Date, (ii) an amount equal to 4 per cent of the initial principal amount of the Notes being redeemed and (iii) the internal and external costs of Party A incurred in connection with terminating this Transaction (in whole or in part and taking into account hedging losses), as determined by the Calculation Agent."

The "Effective Date" referred to in that formula was defined as the first date upon which the Balco preference shares were purchased by ARIC. The Calculation Agent was LBIE.

30 The Schedule to the Master Agreement provided, so far as is relevant for present purposes, as follows. First, in Part 1, it dis-applied to ARIC various standard form Events of Default prescribed in the Master Agreement. Secondly, it elected for Automatic Early Termination pursuant to Section 6(a) of the Master Agreement in relation to bankruptcy default by LBF, but not ARIC. Thirdly, it elected the Second Method and Loss for the purposes of section 6(e) of the Master Agreement, in relation to payments on Early Termination.

31 Part 4(g) of the Schedule identified Holdings as LBF's Credit Support Provider. Part 5(o) dis-applied or amended various of the bankruptcy events of default in relation to ARIC, but not to LBF. Finally, Part 5(q), headed "Limited Recourse" contained an acknowledgement by LBF that its "sole recourse" against ARIC in respect of any payment to be made under the Derivative Agreement was to be "to the net proceeds of the sale or realisation of the assets of Party B in relation to the Notes as may be available after payment of all prior ranking creditors".

32 The election in favour of Automatic Early Termination in the Schedule brought into effect the following relevant part of section 6(a) of the Master Agreement:

> "If, however, "Automatic Early Termination" is specified in the Schedule as applying to a

party, then an Early Termination Date in respect of all outstanding Transactions will occur… as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4)…"

That provision was triggered on 15th December 2008, because the commencement of Chapter 11 proceedings in relation to Holdings was an Event of Default in relation to LBF pursuant to Section 5(a)(vii)(4).

Section 6(c)(ii) of the Master Agreement provides that:

"Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e)."

33 Because of the parties' selection of Second Method and Loss in the Schedule, the payment to be made on Early Termination was, pursuant to Section 6(e)(i)(4) to be as follows:

"If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party."

The term of art "Loss" is defined in Section 14 of the Master Agreement as follows:

" *Loss* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or re-establishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets."

34 The provision in the Confirmation that Mandatory Early Termination should be "Applicable" incorporated by reference Articles 16 and 17 of the 2000 ISDA Definitions. Article 16.1 provided as follows:

"16.1. Mandatory Early Termination. In respect of a Swap Transaction to which "Mandatory Early Termination" is specified to be applicable:

(a) the party which is out-of-the-money will pay to the party which is in-the-money, subject to any applicable condition precedent, the absolute value of the Cash Settlement Amount, determined in accordance with the provisions of Article 17 of these 2000 Definitions, on the Mandatory Early Termination Date; and

(b) with effect from the Mandatory Early Termination Date, the Notional Amount in

respect of the Swap Transaction will be reduced to zero and (other than the amount, if any, payable pursuant to the provisions of subsection (a) above) neither party will be required to make any further payments in respect of that Swap Transaction."

Article 17 provided that the Cash Settlement Amount should be the amount (if any) agreed between the parties; i.e. in the present case, the ETCSA as provided for in the Confirmation.

35 I must turn now to the relevant detailed terms of the Series 26 Notes. The Base Prospectus (dated 13th December 2007) set out, under the heading Terms and Conditions of the Notes, a set of sixteen standard conditions ("the Conditions") applicable to the Notes, subject to amendment or variation in the Final Terms (also unhelpfully called "Terms and Conditions of the Notes") set out in the amended and restated Offering Circular dated 31st January 2008 . I shall refer to them as "the Final Terms". For present purposes the Conditions are relevant to interpretation (if at all) more because of those which are removed by the Final Terms, than because of those which survive. Nonetheless, the following deserve mention.

36 Condition 4 relates primarily to the Mortgaged Property. Condition 4(d) noted that the Trust Deed required that the net proceeds of the realisation or enforcement of the security should be applied in meeting claims of the Trustee, LBF and the Noteholders. Condition 4(e) provided that there was to be no recourse by the Noteholders, LBF or the Trustee against ARIC in relation to any shortfall between the proceeds of the realisation of the security and ARIC's obligations under the Notes, or under the Derivative Agreement .

37 The general introduction to the Conditions (on page 14 of the Base Prospectus) provided that:

"The Noteholders … are bound by and are deemed to have notice of all the provisions of the Trust Deed … "

Condition 6(h) recognised, subject to certain irrelevant restrictions, the *prima facie* right of the issuer to purchase (i.e. buy back) Notes in the open market.

38 Condition 10, headed Events of Default, provided that the Trustee might in its discretion, and was required if so directed by the Noteholders, give notice that the Notes were to be immediately due and repayable, and the security enforceable, in three specified Events of Default. The first was default for a period of 14 days or more in payment of any sum due in respect of the Notes. The second was a failure by the issuer to perform any of its other obligations under the Notes or the Trust Deed, subject to provision for remedy upon notice. The third was the winding up or dissolution of the issuer, save for the purpose of some reconstruction or similar arrangement on terms approved by the Trustee.

39 Of much greater importance for present purposes are certain of the Final Terms, included within the Offering Circular . Its Transaction Summary contained a useful diagram of the Series 26 structure. I have copied it as Figure 1 below.

figure 1

40 Final Term 10 specified 14th June 2023 as the Scheduled Maturity Date. Final Term 11 provided that the Maturity Date was to be the Scheduled Maturity Date, subject to postponement in the event of late receipt by the issuer of the proceeds of the redemption of the Balco shares.

41 By Final Term 16, the Redemption Amount (payable on the Maturity Date) was defined as follows:

"In relation to each Note the Redemption Amount shall be an amount equal to NAV, plus any balance standing to the account of the Cash Reserve, subject to a minimum of the Minimum Redemption Amount."

"NAV" was defined as meaning the net asset value of Balco in relation to the preference shares. The Minimum Redemption Amount was defined, by reference to the defined term "Denomination" as meaning, in effect, the original subscription price for the Notes.

42 Final Term 19 made detailed provision for early redemption of the Notes. Its text is set out in a

rather illogical order. For clarity I shall begin with a full recitation of the relevant parts of the definition of "Early Redemption Event":

" "Early Redemption Event" means the occurrence in the determination of the Calculation Agent of any of the following events:

(i) if the Issuer on the occasion of the next payment due in respect of the Notes would be, or expects at any time to be, required by law to withhold or account for tax on any payment to be made by it on or in connection with the Notes or would suffer, or expects at any time to suffer, or the Balanced Company would suffer, or is expected at any time to suffer, tax in respect of its Income or its Investments or receivables (including, in the case of the Balanced Company, on holding or liquidating any item comprising part of the Fixed Income portfolio or the Equity Portfolio, each as defined in the Offering Circular); or

(ii) if (x) the Principal Protection Agreement is terminated in whole for any reason or (y) the Issuer satisfies the Trustee that the performance of its obligations under the Notes or that any arrangements made to hedge its position under the Notes have or will become unlawful, illegal or otherwise prohibited in whole or in part as a result of compliance with any applicable present or future law, rule, regulation, judgment, order or directive of any governmental, administrative, legislative or judicial authority or power, on in the interpretation thereof; or

(iii) an Event of Default occurs and the Notes are declared to be immediately due and repayable in accordance with condition 10."

As will appear, that part of the definition in subparagraph (ii)(x) is the provision about which there has been the most intensive debate as to its meaning. I will call it "Para (ii)(x)".

43 Final Term 19 begins as follows:

"If an Early Redemption Event is determined by the Calculation Agent to have occurred, the Issuer shall forthwith request the Balanced Company to realise:

(i) any Bond Assets held by the Issuer at such time;

and

(ii) any Balanced Company Shares and the Cash Reserve held by the Issuer at such time."

The text then dis-applied provisions of Condition 6, and set out an alternative regime for early redemption from which, therefore, the bespoke regime in Final Term 19 must be regarded as having been a deliberate and carefully planned departure.

44 The remainder of Final Term 19 is taken up with a detailed definition of the "Early Redemption Amount", the relevant parts of which I set out below:

"Early Redemption Amount" means, subject as provided below, an amount equal to:

(a) the cash realisation proceeds received from the Balanced Company in respect of the redemption of the Balanced Company Shares plus the realisation proceeds from the Bond Assets (if any) net of any expenses incurred in connection with the realisation of the [sic] such assets and

(b) in the case of an Early Redemption Event occurring prior to the Bond Assets Unwind date, physical delivery of any Bond Assets which the Issuer is not able to realise and which are delivered to Noteholders as described above; less

(ii) any internal or external costs or expenses incurred by or on behalf of the Issuer or the Principal Protection Provider in connection with the redemption of the Notes (including, without limitation, in connection with the redemption of the Balanced Company Shares and including, without limitation, any accrued but unpaid premium due to the Principal Protection Provider under the Principal Protection Agreement and the cost of unwinding the Principal Protection Agreement (taking into account hedging losses incurred as a consequence of the Early Redemption of the Notes));

…

If the Notes are redeemed in full pursuant to the occurrence of an Early Redemption Event at any time, the Cash Reserve shall be reduced by an amount equal as a proportion of the Cash Reserve to the proportion that the number of Notes outstanding immediately prior to such early redemption. The amount by which the Cash Reserve is so reduced shall be paid to the Principal Protection Provider under the Principal Protection Agreement in priority to any amounts or payments that may be due to the Noteholders at such time. Where such an early redemption of Notes occurs prior to the Cash Reserve first equalling the Cash Reserve Target Amount, an amount equal to 4 per cent of the initial principal amount of the Notes shall be due to the Principal Protection Provider under the Principal Protection Agreement and, to the extent the Cash Reserve is insufficient, any such shortfall shall be satisfied and paid to the Principal Protection Provider out of the proceeds of redemption of Balanced Company Shares and/or Bond Assets held by the Issuer and the amount payable to Noteholders reduced accordingly."

No Cash Reserve having been duly established, it is the second part of that final paragraph, making provision for the 4% of the principal amount of the Notes, which prevails in the present circumstances. Comparison between the definition of Early Redemption Amount and the definition of the ETCSA under the Confirmation shows that the amounts which the issuer was to deduct from the net proceeds of redemption of the Balco shares on early redemption of the Notes was designed to fund its payment of the ETCSA to LBF.

45 Final Term 23 identified LBIE as the Calculation Agent. Final Term 26 summarised the Mortgaged Property, but in a way which adds nothing to the more detailed provisions of the Trust Deed. In substance, it identified the Balco shares, the Cash Reserve (if any) and ARIC's rights under the Derivative Agreement .

46 Final Term 27, headed "Priority of Interests in Mortgaged Property" provides as follows:

"Subject as provided below, the Trustee shall apply all moneys received by it in connection with the realisation or enforcement of the Mortgaged Property as follows:

(a) first, in payment or satisfaction of the fees, costs, charges, expenses and liabilities incurred by the Trustee or any receiver in relation to the Notes in preparing and executing the trusts under the Supplemental Trust Deed (including any taxes required to be paid, the costs of realising any security and the Trustee's remuneration);

(b) secondly, in meeting the claims (if any) of Lehman Commercial Paper, Inc, under the Issuer Credit Facility;

(c) thirdly, in meeting the claims (if any) of the Derivative Counterparty under the Derivative Agreement;

(d) fourthly, rateably in meeting the claims (if any) of the holders of Notes. If the moneys received by the Trustee are not enough to pay such amounts in full, the Trustee shall apply them pro rata on the basis of the amount due to each party entitled to such payment; and

(e) fifthly, in payment of the balance (if any) to the Issuer.

Provided that if an Event of Default or a Tax Event upon Merger occurs under the Principal Protection Agreement in respect of which the Principal Protection Provider is the Defaulting Party or, as the case may be, the sole Affected Party (each as defined in the Principal Protection Agreement) the claims (if any) of the holders of Notes shall take

priority over the claims (if any) of the Principal Protection Provider. And further provided that the right of the Principal Protection Provider to be paid Date [sic] from the Cash Reserve an amount equal, as a proportion of the Cash Reserve, to the proportion that the number of Notes being redeemed bears to the total number of Notes and in priority to any payments being made to Noteholders shall be limited to the realisation proceeds of the Cash Reserve, except where the redemption occurs prior to the Cash Reserve first equalling the Cash Reserve Target Amount."

47 Final Term 28(1) provided that for as long as Enasarco remained the 100% holder of the Notes, it should have specified rights to give directions to Balco in relation to the management of the underlying investment portfolio, subject to compliance with certain investment guidelines, and to the approval of the Balco Calculation Agent (also LBIE) not to be unreasonably withheld.

48 The final main part of the structure underlying Series 26 consisted of the security provisions, regulated by a series of interlocking trust deeds. They consist of a Principal Trust Deed dated 30th April 2001, a Deed of Amendment dated 13th December 2007 and a Supplemental Trust Deed relating specifically to Series 26 dated 14th December 2007. Each were made between ARIC, defined as "Issuer" but in reality as settlor and HSBC Trustee (C.I.) Limited as Trustee. LBF and LBIE were (among others) added as parties to the Supplemental Trust Deed. No issue of interpretation arose as to the terms of any of them. For present purposes it is sufficient to note the following. First, clause 5.5 of the Principal Trust Deed (as amended and restated) in the Deed of Amendment contains, at clause 7.1.11, a covenant by ARIC in relation to each Series to comply with its obligations under the Derivative Agreement . Thus, a breach by ARIC of the Derivative Agreement would, *ipso facto* , be a breach of the Trust Deed, qualifying as an Event of Default under Condition 10 of the Base Prospectus.

49 Secondly, clause 5.9 of the Supplemental Trust Deed contained the same provisions as to priority between ( *inter alia* ) ARIC and LBF in relation to enforcement against the Mortgaged Property as are set out in Final Term 27, including the reversal of priority or 'flip' in favour of ARIC in the event of a default under the Derivative Agreement in respect of which LBF was the defaulting party.

Events Following Automatic Early Termination of the Derivative Agreement

50 Both Holdings and LBIE went into a form of insolvency process on 15th September 2008. LBF entered special bankruptcy proceedings in Switzerland on 22nd December 2008.

51 One consequence of the entry of LBIE into administration was that it ceased to perform the functions of Calculation Agent under the terms of the Series 26 Notes so that, whether or not the Automatic Early Termination of the Derivative Agreement amounted to an Early Redemption Event within the meaning of Final Term 19, LBIE did not issue any determination that such an event had occurred.

52 By letter dated 16th September 2009, ARIC provided LBF with a statement which specified that its "Loss" under the Derivative Agreement was US$61,507,902, while reserving its right to make an additional claim for expenses. The Loss calculation was based upon a quotation obtained from Credit Suisse International for a replacement transaction, based upon a premium rate of 1.8% (compared with LBF's rate of 1.43% falling to 1.03% after 8 years) and a net present value of the premium stream of &euro;160,313,424, from which ARIC deducted the net present value of the premium stream which would have been payable to LBF but for the termination of the Derivative Agreement of &euro;111,122,566. The difference of &euro;49,190,858 converted into the US dollar amount claimed, using an exchange rate of 1.3303 euros to 1 US dollar. On the same day ARIC filed a claim in LBF's Swiss bankruptcy for the Swiss franc equivalent of its loss, and a proof for the same amount in Holdings' Chapter 11 insolvency.

53 Two days later ARIC and Enasarco entered into a Deed of Purchase and Cancellation whereby ARIC agreed to purchase all the Notes from Enasarco and then cancel them, in exchange for a transfer to Enasarco of its preference shares in Balco, and an assignment of its claims against LBF under the Derivative Agreement . I was told on instructions that this arrangement included, or was accompanied by, an indemnity from Enasarco to ARIC against any net liability to LBF which might be established by reason of a determination in LBF's favour of the issues now raised in these proceedings.

54 A consequence of the Deed of Purchase and Cancellation was that Enasarco rather than ARIC is the claimant in the Part 8 claim against LBF arising out of the Series 26 Notes, although ARIC has been added as a second defendant, and is a co-defendant with Enasarco to LBF's Part 20 claim for a declaration as to its entitlement to the ETCSA, or an equivalent amount.

*Series 38*

55 For reasons already given, I shall confine my description of the facts relevant to this separate structure and Derivative Agreement to those which differ materially from the account given in relation to Series 26. The instruments in this series, described as "Bonds", were issued in four tranches commencing on 29th March 2006 for an aggregate subscription price of &euro;200 million and acquired in total by HSH Nordbank SA, but subsequently assigned to HSH Nordbank AG ("Nordbank"). The issuer was Anthracite Rated Investments (Jersey) Limited ("ARIJ"), the claimant in this Part 8 claim. The Series 38 Bonds were issued pursuant to a Base Prospectus dated 30th November 2006 and Final Terms originally dated 29th March 2006 and (most recently) amended and restated on 16th November 2007. The essential structure whereby the subscription price was invested in preference shares in a (different) Balco, to be used in the acquisition of an investment portfolio, differed in no material respect from the structure of Series 26. As 100% holder of the Bonds, Nordbank was afforded similar rights in relation to the management of that portfolio to those afforded to Enasarco under Series 26. The maturity date for the Bonds was 29th March 2017.

56 Leaving aside differences in nomenclature, there were two main differences in the structure of Series 38, compared with Series 26. The first was that the Derivative Agreement was designed to provide a measure of interest protection as well as principal protection. This took the form of the inclusion of an additional 32 put options expiring on interest payment dates. It has not been suggested that this distinction is of any consequence for present purposes.

57 The second main difference lies in the formula and mechanics for payment of the early termination compensation element of the ETCSA, and the corresponding deductible (in the definition of Early Redemption Amount) from the redemption proceeds of the preference shares in Balco from which it was intended to be funded. The terms of the Bonds made no provision for the establishment of a Cash Reserve, nor for a flat 4% payment to LBF in lieu. Instead, both the Confirmation and Final Term 18 (corresponding with Final Term 19 under Series 26) made provision for a "Discount" to be deductible and then payable to LBF on a sliding scale reducing to zero before the maturity date for the Bonds, the detail of which is of no consequence.

58 Apart from those specific differences, and leaving aside differences in language and nomenclature, Series 38 may for all relevant purposes be assumed to be substantially the same in its terms and structure as Series 26.

59 Save to the extent necessary to accommodate the Discount rather than the Cash Reserve or 4% in lieu as part of the ETCSA, the terms of the Derivative Agreement were the same as those in relation to Series 26. The Derivative Agreement consisted of a Master Agreement dated 29th March 2006, amended and restated on 11th December 2006, a Schedule dated and amended and restated on the same dates, and a confirmation originally dated 29th March 2006 and amended and restated on 26th July 2006 and then 16th November 2007. There were, as I have described, put options in relation both to interest and principal. The provisions as to Automatic Early Termination, Mandatory Early Termination, Events of Default and Loss were all substantially the same. The premium income payable to LBF was of course different, but that difference does not matter.

60 The trust deeds regulating the security provided under the Series 38 structure consisted of a Principal Trust Deed dated 10th October 2001, amended and restated on 30th November 2006 and a Supplemental Trust Deed, specific to Series 38, dated 29th March 2006, amended and restated on 11th December 2006. The trustee was again HSBC Trustee (C.I.) Limited and the settlor, described as "Issuer", was ARIJ. LBF and LBIE were (among others) added as parties to the Supplemental Trust Deed. The trust structure differed in no relevant respect from that which I have described in relation to Series 26.

Events Following Automatic Early Termination

61 Automatic Early Termination of the Derivative Agreement under Series 38 occurred, of

course, on the same day and for the same reasons as in relation to Series 26. As Calculation Agent, LBIE was similarly disabled from determining that an Early Redemption Event had occurred under final Term 18.

62 ARIJ calculated its Loss in September 2009 in the sum of &euro;30 million, again by reference to the estimated cost of obtaining a replacement transaction on terms similar to the Derivative Agreement as at the Early Termination Date.

63 On 14th October 2010, ARIJ, HSBC, Balco and Nordbank entered into a Second Supplemental Trust Deed, designed to permit and facilitate a redemption of ARIJ's preference shares in Balco and the transfer to Nordbank of the redemption proceeds (together with certain illiquid assets in the underlying investment portfolio) subject to a deduction of &euro;10 million to fund any potential liability of ARIJ to LBF under the Derivative Agreement . The payment by ARIJ to Nordbank was expressed to be made not by way of redemption or purchase of the Bonds, but by way of interim distribution on account, leaving the Bonds at least theoretically on foot, and in the hope that a further distribution might be made upon a successful outcome to this litigation. Thus ARIJ and Nordbank have, albeit by a different route, sought to provide against the early redemption of the Bonds while, at the same time, passing back the proceeds of the realisation of the underlying investment portfolio to Nordbank.

## Analysis of the Issues

64 In the remainder of this judgment I shall revert to the detailed terms and nomenclature of Series 26, save where significant differences in the structure of Series 38 requires me to do otherwise. Logically, the first issue is whether the Automatic Early Termination of the Derivative Agreement on 15th December 2008 was an Early Redemption Event pursuant to Final Term 19.

### Early Redemption Event?

65 For LBF, Mr Russen pointed to the simplicity and apparent clarity of the relevant part of the definition of Early Redemption Event in Para (ii)(x) of Final Term 19, which provides that an Early Redemption Event occurs if:

> "The Principal Protection Agreement is terminated in whole for any reason."

It was common ground that the Derivative Agreement had been terminated and that, he said, was the end of the matter.

66 Mr Phillips and Mr Hapgood for ARIJ and Enasarco respectively advanced a barrage of reasons for a contrary conclusion. The deployment of those submissions, and Mr Russen's answers to them, took up more than half the three day oral hearing. They may be summarised as follows:

(1) There was no Early Redemption Event because the Calculation Agent (LBIE) had made no such determination.

(2) The use of the passive verb "is terminated" was inapt to describe Automatic (rather than elective) Early Termination. Thus Para (ii)(x) applied only where the Derivative Agreement was terminated by a party serving notice to that effect, rather than pursuant to its own internal mechanisms.

(3) On its true construction, Para (ii)(x) was inapplicable to any determination of the Derivative Agreement which arose by reason of LBF's default (whether automatically or upon election by ARIC). As the oral hearing progressed, this proved to be Mr Phillips' and Mr Hapgood's main submission.

(4) An interpretation which, by giving rise to an Early Redemption Event, collapsed the structure of the Notes due merely to a default by LBF would be a commercial absurdity. It would be a case of the tail wagging the dog. This was forcefully argued by Mr Phillips.

(5) It was a commercial absurdity for the failure of the Derivative Agreement to lead to the automatic failure of the structure of the Notes, by early redemption. The court should be driven to an interpretation which (however worded) allows the issuer and the investor a choice in the matter, for example to preserve the structure with replacement principal protection. This was Mr Hapgood's preferred commercial interpretation.

(6) Any interpretation which gave rise to the combination of an early redemption of the Notes under Final Term 19 and an Early Termination of the Derivative Agreement under which LBF was the defaulting party would produce irreconcilable conflicts within the terms and conditions of the Notes, and in particular the security structure, which the alternative interpretation at (3) above would avoid.

67 I start by reminding myself of the principles applicable to the interpretation of contractual documentation of this type, my attention having been drawn to *Investors Compensation Scheme Limited v. West Bromwich Building Society [1998] 1 WLR 896* , *Attorney General of Belize & others v. Belize Telecom Limited & another [2009] 1 WLR 1988* , *Chartbrook Limited & another v. Persimmon Homes Limited & another [2009] 1 AC 1101* and *Re Sigma Finance Corp [2010] 1 All ER 571* . Generally, the court's task is to ascertain the meaning which the instrument would convey to a reasonable person having all the background knowledge which would reasonably be available to the audience to whom the instrument is addressed. In the case of a simple bilateral contract, the audience will simply be the parties to the contract. But this formulation is applicable to instruments generally, whether contracts, trust deeds, articles of association or even legislation: see Belize Telecom at paragraph 16. The 'instrument' in the present case is the Offering Circular . The author is the issuer (i.e. ARIC) although it was in all probability drafted by lawyers at the direction of LBIE, which marketed the Notes. Its audience included prospective (and actual) investors including, but not necessarily limited to Enasarco since, even if the Notes were all to be issued to Enasarco (as the Final Terms acknowledge) they were nonetheless capable of being sold on, in whole or in part. The audience also included LBF, Holdings and the Trustee.

68 Specific aspects of the general principles in the cases to which I have referred are, it seems to me, of particular relevance for present purposes. The first is that the meaning which a document would convey to a reasonable addressee is not the same as the meaning of its words.

"The meaning of words is a matter of dictionaries and grammars; the meaning of the document is what the parties using those words against the relevant background would reasonably have been understood to mean. The background may not merely enable the reasonable man to choose between the possible meanings of words which are ambiguous but even (as occasionally happens in ordinary life) to conclude that the parties must, for whatever reason, have used the wrong words or syntax."

See the ICS case per Lord Hoffmann at page 913. The potential for uncertainty created by that dictum is qualified by Lord Hoffmann's acknowledgment that:

"The "rule" that words should be given their "natural and ordinary meaning" reflects the common sense proposition that we do not easily accept that people have made linguistic mistakes, particularly in formal documents."

The documentation which includes Final Term 19 is, plainly, of the utmost formality.

69 Secondly, the ascertainment of the meaning of a particular provision in a complex instrument requires constant attention to the context and purposes of the overall scheme of which it forms part, and an awareness that "even the most skilled drafters sometimes fail to see the wood for the trees". See Re Sigma Finance Corp at paragraph 12.

70 Finally, there is an important difference between a conclusion that the ordinary or grammatical meaning of the language of a particular provision leads to a conclusion that flouts business common sense, and the subjection of a complex and carefully prepared scheme to reinterpretation on the grounds of mere fairness or enhanced reasonableness. The former is

legitimate but the latter is not. In Belize Telecom , at paragraph 16, Lord Hoffmann said that:

> "The court has no power to improve upon the instrument which it is called upon to construe, whether it be a contract, a statute or articles of association. It cannot introduce terms to make it fairer or more reasonable. It is concerned only to discover what the instrument means."

In Chartbrook , at paragraph 20 he said:

> "It is of course true that the fact that a contract may appear to be unduly favourable to one of the parties is not a sufficient reason for supposing that it does not mean what it says. The reasonable addressee of the instrument has not been privy to the negotiations and cannot tell whether a provision favourable to one side was not in exchange for some concession elsewhere or simply a bad bargain."

71 I confess to having found it initially difficult to suspend my disbelief that the phrase "is terminated in whole for any reason" could actually have the very much more restricted meaning for which Mr Phillips and Mr Hapgood have contended, namely "is terminated by notice for any reason other than a default by LBF". But the combined effect of their submissions, and in particular the last one, has made the ascertainment of the meaning of this part of Final Term 19 much more difficult than I had initially appreciated. I shall therefore address their submissions in a little detail.

72 I am not impressed by the submission based upon the absence of an actual determination by LBIE as Calculation Agent. It is well settled that where the working out of a formula regulating the parties' rights under an agreement depends upon something to be done by a third party, the formula, and the rights dependent upon its implementation, do not fall to the ground merely because that party declines or is unable to act. *In extremis* , the court will step in and perform the relevant function: see *Sudbrook Trading Estate Limited v. Eggleton [1983] 1 AC 444* . LBIE's descent into administration strikes me as a good example of the type of machinery breakdown which the House of Lords held could be remedied by the court, so as to avoid the destruction of the parties' bargain.

73 I am no more impressed by the second submission, based upon the supposedly inappropriate use of the passive "is terminated" as a description of automatic termination, rather than termination by notice. It is in my view in no sense a misnomer to describe the Derivative Agreement as being 'terminated' rather than 'terminating' where the operative cause is LBF's default, merely because the parties have pre-elected Automatic Early Termination in such an event. The point appears to me to be an attempted misuse of the discredited grammatical process of linguistic interpretation.

74 It is in fact apparent from looking elsewhere in this complex structure that the drafter used the active and passive versions of the verb to terminate indiscriminately. Mr Phillips' theory was that the drafter used the active 'terminates' to describe Automatic Early Termination and the passive 'is terminated' to describe elective Early Termination. But in clause 5.5 of the Principal Trust Deed as amended and restated on 13th December 2007, the security was stated to become enforceable if:

> "(ii) a Derivative Agreement terminates with sums due to the Derivative Counterparty." (
> *i.e. LBF* )

75 That provision was obviously designed to enable LBF to enforce its prior security on an Early Termination of the Derivative Agreement where ARIC was the defaulting party. Yet the active is used in circumstances where LBF had no right whatsoever to rely upon Automatic (rather than elective) Early Termination.

76 As a second example, in the description of the Derivative Agreement (described as the Redemption Amount and Coupon Protection Agreement) immediately following the Final Terms of Series 38 it is stated that:

"In the event of an early redemption of Bonds in whole or in part, the Redemption Amount and Coupon Protection Agreement will be terminated proportionally and an amount in respect of such termination, equal to the aggregate Discount for all the Bonds so redeemed, will be payable by the Issuer to the Redemption Amount and Coupon Protection Provider."

That is a user-friendly description of Mandatory Early Termination of the Derivative Agreement coupled with payment of the ETCSA, following early redemption of the Bonds. It is wholly automatic, yet the drafter uses the passive 'will be terminated'.

77 The third submission, that termination of the Derivative Agreement constitutes an Early Redemption Event only if it arises otherwise than by LBF's default is much the most formidable of those advanced by Mr Phillips and Mr Hapgood, but it stands and falls upon the validity of the three following submissions relied upon to justify it, and upon considerations militating the other way. The starting point is to look more closely at the consequences of this submission being correct. The Schedule and Confirmation in the Derivative Agreement exclude most of the standard Party B (i.e. ARIC) Events of Default under the Master Agreement. This third submission would therefore, if correct, confine the effect of Para (ii)(x) of Final Term 19 to a very small sub-class of events giving rise to early termination of the Derivative Agreement . Furthermore, Mr Phillips and Mr Hapgood were unable to identify any event which would qualify under their construction as an Event of Default by ARIC (rather than LBF) which would not also give rise to a breach by ARIC of Condition 10, and therefore an Event of Default under Para (iii) of Final Term 19. This is because Condition 10 would be triggered by a failure by ARIC to comply with its obligations under the Trust Deed, and those included a covenant by ARIC to comply with its obligations under the Derivative Agreement . Para (ii)(x) of Final Term 19 would therefore be, on the claimants' construction, not merely very limited in scope, but also redundant.

78 More seriously, if an Early Redemption Event is not triggered under Final Term 19 by a termination of the Derivative Agreement due to LBF's default, then the structure of the Notes contained no provision whereby the Notes could be redeemed early, even at the election of the Noteholders acting unanimously, or by any requisite majority (under the detailed provisions for majority decision-making in the Trust Deed). It would not convert a regime for automatic early redemption upon the failure of the Derivative Agreement into a regime for elective early redemption. Unless the issuer, the trustee and the investors could all agree otherwise, the Notes would continue until final maturity, wholly bereft of principal protection after the Early Termination of the Derivative Agreement .

79 Against that analysis, I have not been persuaded by either Mr Phillips' or Mr Hapgood's submissions based upon supposed commercial absurdity. Taking Mr Phillips' submission first, he said that it was ridiculous to think that the Noteholders would subject themselves to the enforced collapse of the investment structure underlying the Notes merely because of the failure of the principal protection afforded by the Derivative Agreement . On the contrary, they would naturally wish to continue with the underlying investment structure, with replacement principal protection from some other derivative counterparty in the event of LBF's default. To allow the failure of the Derivative Agreement to destroy the underlying investment structure would be to let the tail wag the dog.

80 I disagree. The basis upon which investors were invited to subscribe for fifteen year Notes backed by a relatively high risk investment portfolio was that the Notes would, throughout their life, have the benefit of principal protection from Lehman Brothers. In fact LBF defaulted within a year of the issue of Series 26. The structure contained no mechanism enabling the issuer to replace the Derivative Agreement with LBF by a replacement agreement with some other counterparty. Furthermore, since the likely reason for any default by LBF would be insolvency (including the insolvency of Holdings as Credit Support Provider) the notion that the Loss provisions of the Master Agreement triggered by Early Termination would yield a sum sufficient to enable the issuer to buy alternative principal protection, is, at least in commercial rather than purely theoretical terms, unreal. It is, nearly three years after the Lehman collapse, still uncertain what if any dividend LBF or Holdings will pay to unsecured creditors, and the earliest payment date may still be years away.

81 It is in any event in my view wrong to characterise the principal protection afforded by the Derivative Agreement as the mere tail of a dog. Neither Nordbank nor Enasarco subscribed for

the instruments in order to obtain the benefit of the asset management skills and judgment of the Lehman Group, in relation to the underlying portfolio. As I have described, both structures preserved substantial asset management rights for their respective investors (while they remained owners of 100% of each Series), subject only to a form of veto designed no doubt to avoid causing unplanned exposure to LBF under the Derivative Agreement . As far as I can ascertain, the Lehman backed principal protection formed an important part of the structure both to Nordbank and to Enasarco. It enabled Nordbank to invest in a portfolio with a risk reward profile which would not otherwise have satisfied the Basel II requirements. It enabled Enasarco to seek to obtain long-term investment reward for its pensioners without incurring unacceptable downside risk. These aspects of the importance to the investors of the principal protection afforded by the Derivative Agreements are fully verified by the unchallenged evidence.

82 Faced with a choice between an interpretation of Final Term 19 (or 18) that left the investor saddled with a medium term instrument bereft of principal protection, with no internal mechanism enabling the issuer to put in place replacement protection, let alone fund its cost in the event of LBF's insolvency, or an interpretation under which LBF's failure enabled the investors to recover their investments by early redemption, and choose their own substitute (for LBF) for the future, it seems to me at least equally likely in commercial terms that the investors would prefer the latter, rather than the former. Likelihood is, of course, not the relevant test. But that analysis demonstrates, at least to me, that Mr Phillips' submission based upon commercial absurdity must be rejected.

83 Mr Hapgood's commercial absurdity submission was rather more subtle. He submitted that the real vice of an interpretation of Final Term 19 under which a failure of the Derivative Agreement due to LBF's default led inevitably to early redemption was that it deprived the investors of the choice whether or not to allow the failure of principal protection to give rise to an unwinding of their investment. He pointed out that principal protection might fail at a late stage in the life of the issue, at a time when the underlying portfolio was worth substantially more than the original subscription price, so that the investors might well prefer to continue with the profitable portfolio, rather than risk a diminution in value occasioned by its enforced liquidation. In short, the commercial absurdity in LBF's interpretation of Final Term 19 was its automatic rather than elective effect, in terms of early redemption.

84 There is real force in that submission. With the benefit of hindsight, and in particular the valuation and liquidity difficulties affecting hedge fund portfolios of the type in issue which followed (whether or not caused by) the Lehman collapse, I can envisage that many commercial minds would think that an elective rather than mandatory approach to early redemption would be better, more reasonable, and even fairer.

85 The trouble with Mr Hapgood's submission is that his proposed construction of Final Term 19 does not bring about an elective regime for early redemption. It merely substitutes one mandatory consequence of LBF's default (automatic early redemption) for another (no early redemption). At no time during the hearing, or in the parties' skeleton arguments, was any interpretation of Para(ii)(x) put forward which would in fact remedy the commercial infelicity which Mr Hapgood identifies. Furthermore, Conditions 6(e) and (f) would have done just that, but they were expressly dis-applied by Final Term 19. The choice of automatic rather than elective early redemption appears therefore to have been deliberate.

86 There is in my judgment an alternative escape from what Mr Hapgood fairly describes as the surprising rigidity of the link between early redemption and Early Termination of the Derivative Agreement . It lies in an appreciation of the liberty enjoyed by the investors, the issuer and the Trustee, acting together, to prevent the Early Termination of the Derivative Agreement leading to actual early redemption, by agreeing, as in fact they have done in both the present cases, alterations to their relationship which produce a different result after the happening of the Early Redemption Event. As I shall explain, the liberty of those parties to the structure to agree alterations to it is of course subject to LBF's security rights. But it is precisely where the Derivative Agreement terminates because of LBF's default that its security rights are postponed to those of the investors under the security structure. Postponement of LBF's security rights does not entirely remove them, but it makes them easier for the issuer and the investors to work around.

87 I refer to the parties other than LBF as having a 'liberty' rather than a right to take steps which avoid an Early Redemption Event turning into actual early redemption, because no such

provision is expressed anywhere in the structure. It is simply a liberty which the structure does not prohibit, save where LBF's security rights would otherwise be infringed. Furthermore, against the possibility that the instruments under each series might not be held 100% by a single investor, the terms of each issue, and in particular, the Trust Deeds contain detailed provision enabling a community of investors to participate in amendments to the scheme, by resolutions passed at meetings subject to appropriate rules as to quorum and majority vote.

88 If that is, as I conceive, the real safety valve which protects the investors from the apparent rigidities of the link between Early Termination of the Derivative Agreement and early redemption of the instruments, then I consider that it works better as a means of avoiding (by consent, or by the requisite majority) what would otherwise be an early redemption than as a means for avoiding what (on the claimants' interpretation) would otherwise be the inevitable continuation of the instruments to maturity, without principal protection. In short, it provides for a winding-up rather than the perpetuation of the structure where an important part of it has fallen away, where the parties cannot agree some other acceptable means for its continuation.

89 That conclusion accords with the automatic way in which the circumstances described in paragraphs (i) and (ii) (y) of the definition of Early Redemption Event also operate, in circumstances related to tax or illegality of performance. Like failure of the Derivative Agreement , they are also events which, unless the parties can agree otherwise, are agreed to give rise to an automatic winding up of the structure.

90 Mr Hapgood's final submission was that, on LBF's interpretation, Final Term 19 gave rise to conflicts with other parts of the structure and in particular the security provisions. He gave four examples. I shall deal only with the two of them which I found persuasive. The first was that under the definition of Early Redemption Amount in Final Term 19, ARIC is required to deduct costs of LBF which include its costs of unwinding the Derivative Agreement …

    "taking into account hedging losses incurred as a consequence of the Early Redemption of the Notes."

91 This deductible is of course intended to put ARIC in funds with which to pay amounts due to LBF. It is expressly included as part of the ETCSA under the Confirmation and forms an elective part of the non-defaulting party's calculation of Loss under Section 14 of the Master Agreement. Mr Hapgood's point was that in the event of an early redemption triggered by LBF's default under the Derivative Agreement , Loss would be calculated by reference to ARIC's loss (including hedging losses) and LBF's right would be limited to receiving ARIC's gain, rather than claiming for its own hedging losses. The drafter of Final Term 19 must have assumed, says Mr Hapgood, that an Early Redemption Event would not be triggered by LBF's default under the Derivative Agreement .

92 I accept Mr Hapgood's submission that there is an apparent tension, in the sense that, if early redemption was inevitably triggered by any Early Termination of the Derivative Agreement , circumstances could arise in which LBF could not claim its hedging losses. But to allow that tension to subvert what I conceive to be the plain meaning of Para (ii)(x) in the same Final Term would indeed be to allow the tail to wag the dog. The reference to hedging losses as a deduction from the Early Redemption Amount in Final Term 19 is to hedging losses incurred not as a consequence of the Early Te , but of the early redemption of the Notes which, if the Derivative Agreement has not already terminated, gives rise to Mandatory Early Termination, and a payment to LBF of the ETCSA. The drafter is plainly thinking, at that point in this complicated provision, of deductions sufficient to fund the ETCSA itself. The sensible resolution of the tension identified by Mr Hapgood is not to rewrite the definition of Early Redemption Event, but to include, by implication or interpretation, the phrase "if applicable" after "taking into account" in the sentence upon which Mr Hapgood relies.

93 More seriously, Mr Hapgood points to the final paragraph of Final Term 19, which provides (in summary) that either the Cash Reserve, or the 4% early redemption compensation in lieu, would be payable to LBF in priority to any redemption payment made by ARIC to the Noteholders. In the event of an Early Redemption triggered by LBF's default, such priority would directly conflict with the reversed priority as between LBF and the Noteholders which, both under Final Term 27 and the Trust Deeds, produces the opposite result. Again, Mr Hapgood submits that the drafter of this last paragraph of final Term 19 must have assumed that LBF's default under the Derivative

Agreement could not trigger early redemption of the Notes.

94 This was perhaps Mr Hapgood's best shot. To Mr Phillips' dismay, no equivalent provision appeared in Final Term 18 relating to Series 38. But the question remains whether the resolution of that apparent conflict within the series 26 Final Terms requires a radical writing down of the ambit of Para(ii)(x), so as to prevent a collapse of the principal protection part of the structure from being even capable of bringing about an unwinding of the structure as a whole by early redemption. In my judgment it does not. The present question of interpretation is whether the phrase "the Principal Protection Agreement is terminated in whole for any reason" means that the collapse of the principal protection afforded by the Derivative Agreement was, like a relevant tax event or an illegality of performance, to be an occasion for the unwinding of the structure as a whole, subject to the safety valve constituted by the parties' liberty to preserve it by an agreed amendment. In my judgment that is the clear meaning of that provision.

95 It is perhaps understandable that, when formulating the last part of Final Term 19 the drafter may have lost sight of the wood for the trees, in the sense that, although most of the circumstances giving rise to Early Redemption would entitle LBF to rely on its priority as against the Noteholders, one of them, namely Early Termination of the Derivative Agreement due to its default, would not. In my judgment the solution to that apparent mix-up is, by interpretation or implied term simply to read into that last paragraph a phrase recognising that it is, of course, subject to any priority flip which might be occasioned by such a default. It is comforting, but by no means decisive, that the phrase "for any reason" in Para (ii)(x) entirely accords with that analysis. Nonetheless, my main reasons for concluding that LBF's interpretation on this point is to be preferred arises from my perception that it better accords with the structure and purposes of the two transactions, understood as a whole, than the interpretation for which the claimants contend.

96 I conclude therefore that the Automatic Early Termination of the Derivative Agreement is, under both structures, an Early Redemption Event, notwithstanding that it is triggered by LBF's default.

*Mandatory Early Termination?*

97 The issue under this heading is whether a Mandatory Early Termination Date under the Derivative Agreements occurred by reason of the occurrence of an Early Redemption Event under the Final Terms, thereby triggering a contractual entitlement of LBF to be paid the ETCSA. Notwithstanding indications in the evidence that LBF was minded to abandon its affirmative case under this issue, Mr Russen persisted in it at trial, along the following lines:

(1) The provisions relating to Mandatory Early Termination in the Confirmations under the Derivative Agreements constituted formulae for the triggering of contractual payments by the issuers to LBF, rather than a separate regime for termination.

(2) Those contractual entitlements were specifically preserved by Section 6(c)(ii) of the Master Agreements, notwithstanding the occurrence of an Early Termination Date.

(3) The clear intent displayed by each structure as a whole was that an Early Redemption Event in relation to the Notes (or Bonds) would in due course lead to the occurrence of a Mandatory Early Termination Date under the Derivative Agreements, and thereby trigger LBF's entitlement to the ETCSA.

(4) It was for that purpose irrelevant that the powder trail leading to that outcome was set alight by Automatic Early Termination of the Derivative Agreements due to LBF's default.

98 In my judgment that analysis, and the conclusion contended for, is clearly wrong. My reasons follow.

99 First and foremost, the parties having chosen to provide for LBF's entitlement to the ETCSA upon the happening of a particular type of termination of the Derivative Agreement , those provisions are, almost by definition, inapplicable in circumstances where the Derivative

Agreement has already terminated. There cannot, as Mr Phillips and Mr Hapgood submitted, be two successive terminations of the same agreement.

100 Secondly, and notwithstanding the ingenuity of the argument, I do not consider that Section 6(c)(ii) of the Master Agreement has, or could ever have, the effect of preserving LBF's contingent entitlement to the ETCSA. The obvious purpose of Section 6(c)(ii) is that, upon Early Termination, the parties' on-going mutual obligations are entirely replaced by a single close-out payment, reflecting the fact that the Derivative Agreement has come to an end. The phrase "without prejudice to the other provisions of this Agreement" may be applicable to provisions which are not, by their nature, brought to an end on termination (such as a liability to pay outstanding arrears of premium incurred prior to Early Termination). They have no application to provisions which are triggered by some later termination event which, of itself, necessarily assumes that Early Termination has not already occurred.

101 In that context, the Mandatory Early Termination Date cannot occur at the same time as Early Termination (where relied upon as the trigger for an Early Redemption Event). Pursuant to the Confirmation it occurs only on the Final Redemption Date as defined in Final Term 19. That is five business days after the realisation of all the outstanding Balco preference shares. It is plain from Final Term 19 that this will necessarily occur some time after the happening of the Early Redemption Event triggered by Early Termination of the Derivative Agreement , because the event must first be determined as such by the Calculation Agent, and the underlying portfolio must then be realised so as to fund the redemption of the Balco preference shares.

102 Thirdly, the Mandatory Early Termination Date has not yet been reached in relation to either Derivative Agreement , even though, on my interpretation, an Early Redemption Event has occurred under the Final Terms in each structure. This is because, as I have described, the respective issuer, investor and Trustee under each structure have so re-arranged their affairs as to provide for a different outcome, as they are *prima facie* at liberty to do, if LBF thereby suffers no infringement of its security rights. The Notes under Series 26 were bought back and cancelled by ARIC. This arguably involved an infringement of LBF's postponed security rights because the Balco preference shares were transferred to Enasarco. Since however Enasarco agreed to indemnify ARIC in respect of any successful claim by LBF, it did not cause LBF any real prejudice, and Mr Russen did not suggest that the purchase and cancellation was therefore invalid. Although the investment portfolio underlying Series 38 was itself realised, and the Balco preference shares redeemed, the proceeds were used not to fund early redemption of the Bonds, but to make an interim distribution. This did not (other than perhaps purely technically) infringe LBF's security rights because a sufficient fund (namely &euro;10 million) was left behind, with which to enable ARIJ to make any payment to LBF which might fall due as the result of this litigation.

103 In reaching those conclusions I have taken into account, but not in the end accepted, the following submission by Mr Russen. He said that Final Term 19 plainly provided, as a consequence of an Early Redemption Event however caused, that ARIC would deduct out of the proceeds of the redemption of the Balco shares an amount calculated on a basis clearly designed to put it in funds for the payment to LBF of the ETCSA. Since on both sides' interpretation of Para (ii)(x) an Early Redemption Event could be triggered by some form of Early Termination of the Derivative Agreement , the parties cannot be taken as having intended that an Early Termination, (regardless of its cause) should thereby render the Mandatory Early Termination regime, including payment of the ETCSA, permanently redundant. Why, he asked rhetorically, should the parties have intended ARIC to be left with the windfall constituted by the aggregate of those deductions, if the equivalent ETCSA could never then become payable to LBF? It was, he submitted, irrelevant for the purposes of interpretation that the issuers and investors had, after the event, rearranged their affairs so as to provide for that windfall to be payable to the investors (subject in the case of Series 38 to a reserve, and in the case of Series 26 to an indemnity sufficient to enable the issuer to meet LBF's claim if successful).

104 I recognise the force of that submission. The drafter does appear to have constructed a formula for the Early Redemption Amount in Final Term 19 which reflects an unconscious assumption that ARIC needed to be put in funds to pay the ETCSA to LBF. Under most of the circumstances triggering an Early Redemption Event that would undoubtedly be so. Where the trigger was a tax event, supervening illegality or a default by ARIC under Condition 10 which was not itself an Event of Default under the relevant Derivative Agreement , an ETCSA would in due course ordinarily become payable, precisely because nothing would in the meantime have

brought about an earlier termination of the Derivative Agreement . It is indeed plain that the ETCSA was intended to be LBF's compensation for an early termination of the Derivative Agreement brought about by an original cause consisting of the early redemption of the Notes, where Section 6 of the Master Agreement would provide no formula by way of compensation for Early Termination.

105 It is however commercially absurd to think that the parties intended, in the event of an Early Termination of the Derivative Agreement , to confer upon LBF first, rights to a payment under Section 6(e) of the Master Agreement, and then a right to receive the ETCSA shortly thereafter, when the Early Redemption Event triggered by Early Termination had matured into an Early Redemption Date, and therefore a Mandatory Early Termination Date under the Derivative Agreement . Take, for example, an Early Termination brought about by a default on the part of ARIC. That would immediately trigger LBF's right to compensation for its Loss under Section 6(e). On both parties' interpretations of Early Termination Event that would ordinarily lead to an Early Redemption Date, the occurrence of a Mandatory Early Termination Date and a liability of ARIC to pay, in addition, the ETCSA to LBF.

106 The position is only slightly less absurd on an Early Termination of the Derivative Agreement due to LBF's default. If premium rates for a replacement transaction had by then fallen, then under Section 6(e) LBF might well be entitled to payment of ARIC's gain (since a replacement transaction would be cheaper than the Derivative Agreement itself), and yet in due course LBF would also become entitled to payment of the ETCSA.

107 Mr Russen sought to deal with these absurdities by submitting that, wherever the structure as a whole provided for LBF to receive the ETCSA, that necessarily overrode any additional or inconsistent provision for close-out payment on Early Termination which might be triggered by the same underlying facts. That was, indeed, a major theme in his submissions as a whole. The main difficulty with it is that if (as he submitted and I have indeed concluded) any form of Early Termination of the Derivative Agreement always triggered an Early Redemption Event, and a consequential right for LBF to receive the ETCSA, it is difficult to see for what conceivable purpose the parties consciously chose Second Method and Loss in the Schedule to both Derivative Agreement s, rather than merely deleting them as inapplicable.

108 Mr Russen's only (and I am afraid rather lame) response to that difficulty was that the Schedules appeared to have been prepared earlier than the Confirmations in relation to each Derivative Agreement , at a time when, perhaps, the parties had yet to focus on this point. Not only was that analysis not supported by the factual chronology, but it is in my view misconceived in principle. The structure of complex transactions such as these must be viewed as a whole, regardless of the dates of preparation of different parts of them, if only because the drafter of the last part to be prepared must be taken to have looked at his handiwork alongside other parts of the structure already in existence, to check that they worked in tandem.

109 The answer therefore to this conundrum is simply to recognise that the drafter of Final Term 19 was in at least this respect wearing blinkers in failing to appreciate that, on any interpretation of Para (ii)(x), an Early Redemption Amount might become payable to the Noteholder after an earlier termination of the Derivative Agreement , with the result that no ETCSA would ever be payable to LBF, and the additional result that LBF might in truth either be liable to make a close-out payment to ARIC, or entitled to receive from ARIC, some wholly different and possibly larger payment, for which Final Term 19 provided no sufficient deduction as a funding mechanism. In any case where a close-out between ARIC and LBF under Section 6 of the Master Agreement produced either a payment due to ARIC, or a payment from ARIC smaller than the ETCSA, this would cause no funding difficulty, but rather create a windfall. If a payment due on Early Termination to LBF under Section 6 of the Master Agreement exceeded the amount of the ETCSA (as well it might if, for example, it arose from ARIC's default and LBF incurred a very large loss in closing-out an associated hedge) then ARIC would indeed be underfunded under Final Term 19, but LBF would recover in full out of the proceeds of the redemption of the Balco shares pursuant to its priority under the security structure. As the facts of the two present cases have shown, the occurrence of what might otherwise have been a windfall is by no means beyond the wit of the parties other than LBF to resolve, as they have indeed done by arranging for it to be paid, subject to LBF's claims, to the investors.

110 I had thought during the early part of the oral hearing that to recognise a liberty of the parties other than LBF to put, as it were, a foot in the door between the occurrence of an Early

Redemption Event and the happening of an Early Redemption Date, and therefore a Mandatory Early Termination Date, could risk unfairly and un-commercially depriving LBF of its ETCSA, even in a case where (there being no Early Termination of the Derivative Agreement ) it was *prima facie* clearly entitled to it. But Mr Hapgood easily persuaded me that this was not so. In such a case, the insertion of any such 'foot in the door' would simply leave the Derivative Agreement running on, as between the issuer and LBF, with LBF continuing to earn its contracted premium stream, for the early cutting short of which ETCSA was intended to be a rough and ready form of compensation.

111 I have therefore concluded, without difficulty, that LBF is not, in either case, contractually entitled to receive the ETCSA, since no Mandatory Early Termination Date has occurred, or could ever occur, after Automatic Early Termination of the Derivative Agreements.

*Calculation Of Loss Under Section 6(e) of the Master Agreement*

112 My analysis thus far leads me to the conclusion that the rights and/or liabilities of LBF arising from the Automatic Early Termination of the Derivative Agreements do, as the claimants assert, depend upon the identification of the issuers' Loss as defined by Section 14 of the Master Agreement, taking such account (if any) as is appropriate of the fact that in each case an Early Redemption Event has occurred under the Final Terms of the instruments, but not an Early Redemption Date, or a Mandatory Early Termination Date under the Confirmations. There is no logical consecutive order in which to deal with the remaining issues. Since however it is for the issuers as non-defaulting parties to identify their loss, and since they have chosen to do so by a technique (replacement transaction quotation) which they are *prima facie* entitled to adopt, I consider that the burden lies on LBF to persuade the court that the use of that technique is unreasonable. There is no challenge to the issuers' good faith.

113 It is therefore convenient to begin with an outline of LBF's case that the issuers' use of a replacement transaction quotation was unreasonable. It may, I hope without any unfairness, be summarised as follows:

(1) The issuers' Loss (or gain) is to be determined as at the Early Termination Date, i.e. 15th December 2008, or so soon as reasonably practicable thereafter.

(2) Early Redemption Events occurred in relation to both Series on the same day.

(3) Viewed from that date, and without benefit of hindsight, this would in the ordinary course lead to early redemption of the instruments after deductions by the issuers sufficient to fund the payment of the ETCSA to LBF. I will call it the ETCSA Deduction Fund.

(4) Since the ETCSA would not as a matter of contract be due to LBF, the ETCSA Deduction Fund would represent a windfall gain to the issuers arising from the Early Termination of the Derivative Agreements. It would not be contractually due to the investors.

(5) The subsequent choice of the issuers to pay the ETCSA Deduction Fund to the investors was irrelevant to any determination of Loss as at the Early Redemption Date.

(6) The amount of the ETCSA was in any event a genuine pre-estimate of loss by the parties to the Derivative Agreement , by reference to which the radically different result achieved by the use of a replacement transaction quotation is manifestly unreasonable.

(7) The impossibility within the relevant structures of erecting a replacement for the Derivative Agreements as principal protection for the investors is, of itself, a sufficient reason to treat the use of a replacement transaction quotation as unreasonable.

The Legal Principles

114 The exercise called for in order to resolve the remaining issues is, in substance, the interpretation of standard form provisions of the Master Agreement which have been in widespread and constant use since 1992, and their application to particular facts arising from the embodiment of the Master Agreement in two complex bespoke structures. In Lomas & ors v. JFB Firth Rixson Inc & ors [2010] EWHC 3372 (Ch) , at paragraph 53, I said:

> "The ISDA Master Agreement is one of the most widely used forms of agreement in the world. It is probably the most important standard market agreement used in the financial world. English law is one of the two systems of law most commonly chosen for the interpretation of the Master Agreement, the other being New York law. It is axiomatic that it should, as far as possible, be interpreted in a way that serves the objectives of clarity, certainty and predictability, so that the very large number of parties using it should know where they stand: see Scandinavian Trading Tanker Co v. Flota Petrolera Ecuatoriana [1983] 1 QB 529 ("the Scaptrade") per Robert Goff LJ at 540."

Lomas v. Firth Rixson is subject to a pending appeal, and has (I believe) been reviewed by the Supreme Court in a case still awaiting judgment. Subject to those uncertainties, I adhere to that view.

115 Nonetheless, (as recognised in paragraph 54 of Lomas v. Firth Rixson ) the 1992 Master Agreement has come to be incorporated into a bewildering variety of different types of derivative transactions, so that caution needs to be exercised against a slavish assumption that the meaning of a particular provision of the Master Agreement in one type of transaction is necessarily to be transported lock stock and barrel as its precise meaning in some very different type of transaction. To a large extent the Master Agreement caters for this internally. For example, the definition of Settlement Amount in Section 14 provides in terms that where the use of a Market Quotation would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result, the Settlement Amount is to be determined by reference to that party's Loss. As a further example, the definition of Loss itself expressly contemplates that the method chosen by the non-defaulting party, including the use of replacement transaction quotations, may be inapplicable if it produces an unreasonable result. Thus the overriding control tests of commerciality and reasonableness provide a measure of flexibility within the Master Agreement sufficient to enable it to be applied across a wide range of different types of transaction, in an infinitely variable combination of different circumstances.

116 A significant body of recent case law has developed in relation to the interpretation and application both of Loss and Market Quotation under the 1992 Master Agreement. The decisions to which I was referred are Australia & New Zealand Banking Group Limited v. Société Générale [2000] CLC 833 (CA) ; Peregrine Fixed Income Limited v. Robinson Department Store Public Co Limited [2000] CLC 1 , 328; Britannia Bulk plc v. Pioneer Navigation Limited & ors [2011] EWHC 692 (Comm) ; and Pioneer Freight Futures Company Limited v. TMT Asia Limited [2011] EWHC 778 (Comm) . Those authorities establish the following broad propositions:

> (1) Loss and Market Quotation are, although different formulae, aimed at achieving broadly the same result, so that outcomes derived from one may be usefully tested by way of cross-check by reference to the other: see per Mance LJ in the Australia case at paragraphs 2, 15 and 22. This derived from a concession in that case, but has subsequently been reaffirmed after adversarial argument in the Peregrine case at paragraph 30, in the Britannia Bulk case at paragraphs 44 to 46 and 51, and in the Pioneer case at paragraphs 98 and 105. It is one of those sensible concessions which has hardened into hornbook law.

> (2) The identification of the non-defaulting party's loss of bargain arising from the termination of the Derivative Transaction requires a 'clean' rather than 'dirty' market valuation of the lost transaction. This means that the loss of bargain must be valued on an assumption that, but for termination, the transaction would have proceeded to a conclusion, and that all conditions to its full performance by both sides would have been satisfied, however improbable that assumption may be in the real world: see in the Australia case at

paragraphs 5, 22 to 27 and 30-31, the Britannia Bulk case at paragraphs 11 to 14 and 34-35, and in the Pioneer case at paragraphs 112 to 117.

(3) The termination payment formulae under Section 6(e) are not to be equated with, or interpreted rigidly in accordance with, the quantification of damages at common law for breach of contract. They are methods of calculating close-out positions on the termination of a derivative transaction or series of transactions: see the Britannia Bulk case per Flaux J at paragraph 37. This is, in particular, because the Second Method works both ways, and may lead to a close-out payment due to the defaulting party.

117 The extended definition of Loss in Section 14 of the 1992 Master Agreement nonetheless uses certain words and phrases which were, I think, intended to be illuminated by reference to the general common law (or New York law) meaning. For present purposes the relevant phrase is 'loss of bargain'. It is precisely for the purpose of identifying the non-defaulting party's loss of bargain that Market Quotation requires, and Loss permits, the use of quotations for replacement transactions. This methodology precisely reflects the principle by then well established at common law, namely that where damages are sought for loss of bargain occasioned by the breach (leading to termination) of a commercial contract then, subject only to the availability of a market for the obtaining of a replacement contract, the cost of such a replacement contract as at the breach date is likely to prove the most reliable yardstick for measuring the claimant's loss of bargain: see in particular *Golden Strait Corp v. Nippon Yusen Kubishika Kaisha [2007] 2 AC 353* in which, at paragraph 20, Lord Bingham approved the following dictum of Toulson J in *Dampskibsselskabet "Norden" A/S v. Andre & Cie S.A. [2003] 1 Lloyd's Rep 287* , at 292:

"The availability of a substitute market enables a market valuation to be made of what the innocent party has lost, and a line thereby to be drawn under the transaction."

118 The value of being able to draw a line under the transaction by the use of a breach date basis of valuation of the claimant's loss is that, save in special cases, for example where the claimant is locked into a disadvantageous position by reason of the breach, it provides a neat and precise distinction between matters relevant to the claimant's loss of bargain and matters such as his subsequent dealings, which are for his own risk and benefit and therefore in principle irrelevant to the damage flowing from the defendant's breach. There is a penetrating analysis of these principles in McGregor on Damages (18th ed) at paragraphs 7-106 to 7–168 which suggests that, in certain respects, they are no longer to be regarded as beyond question. Nonetheless the continuing vitality of the principle upheld in the Golden Strait case, in the context of derivatives governed by the ISDA Master Agreement, appears to have been resolutely affirmed by the four ISDA cases to which I have referred, not least because of the requirement laid down in all four of them to "value clean". On its face, the determination of Loss is required to be made as at the Early Termination Date, which broadly corresponds with the breach date used by the common law.

Analysis

119 Armed with those principles, I turn to examine Mr Russen's carefully crafted submissions, to the effect that the claimants' use of quotations for replacement transactions is unreasonable. His first two propositions, that the determination is to be made (if practicable) as at the Early Termination Date, and that an Early Redemption Event occurred on the same day are, in my view, correct. In fact, both the Issuers calculated their Loss nearly a year after the Early Termination Date, and ARIC used a quotation obtained on 6th May 2009. It may be that issues could arise as to whether the market chaos following the Lehman collapse rendered an immediate calculation of Loss impracticable, but I am not asked to resolve any such issues. For present purposes I accept in principle Mr Russen's submission that the requirement to determine loss as soon as practicable after the Early Termination Date means that the steps later taken by the issuers to avoid actual redemption of the instruments after the Early Redemption Event are, subject to one point, irrelevant to the determination. My only reservation is that they demonstrate, albeit after the event, that it could not have been said on the Early Termination Date that the simultaneous occurrence of an Early Redemption Event was bound inevitably to lead to an Early

Redemption Date.

120 I also accept the gist of Mr Russen's third and fourth submissions, namely that, viewed from 15th September 2008, when the Derivative Agreements terminated, it appeared likely that the instruments would be redeemed early, with the issuers making deductions from the net proceeds of the realisation of the Balco preference shares sufficient to fund the ETCSA, but without in fact being under any liability to pay the ETCSA Deduction Fund to LBF, or to anyone else. Viewed strictly from that perspective, the likely outcome applying the rule for remoteness of damage in Hadley v. Baxendale (1854) 9 Exch 341 , was that the issuer would stand to make a windfall gain, approximately equivalent to the ETCSA, by virtue of the Automatic Early Termination of the Derivative Agreements, by comparison with the 'no gain – no loss' outcome for the issuers which would be expected to flow from the running of the instruments, together with the Derivative Agreements, to their maturity dates.

121 In my judgment that is the wrong perspective from which to view the matter, for a number of reasons. The first is that, as between the issuers and LBF, the Derivative Agreements were separate and distinct bargains between them, with their own legal consequences, rather than merely integral parts of a wider bargain between the investors, the issuers and LBF. As already noted, the terms of the instruments expressly excluded third party rights, and LBF was not a party to them. Similarly, the investors were not contracting parties to the Derivative Agreements, albeit that the issuers entered into them for the investors' ultimate benefit.

122 Thus, the provisions of Section 6(e) of the Master Agreements (and the definition of Loss in Section 14) gave the issuers distinct contractual rights to contingent early close-out payments from LBF which were expressed to include payment for loss of bargain. I consider it to be irrelevant to the determination of loss of bargain in that context that the terms of the instruments may have failed to make provision for the issuers to transfer to the investors anything received from LBF by way of loss of bargain, in circumstances where Automatic Early Termination of the Derivative Agreements also led to actual early redemption of the instruments. That failure, which the issuers and the investors have, in different ways, in fact put right, falls squarely within the *res inter alios acta* category of dealings between the non-defaulting party and third parties which ought not in principle to affect the quantum of the non-defaulting party's Loss.

123 Secondly, it is nothing to the point that the Derivative Agreements did in fact form part of a complex structure designed to underpin the instruments as attractive marketable securities. The fact is that the issuers and LBF chose to contract on ISDA terms, and decided to embody a well used standard formula for compensation on early close-out. Part of the purpose of the design of the structure, by LBIE, was to enable its associated company LBF to make money by providing the principal protection on those terms. In those circumstances I consider that it lies ill in the mouth of LBF (through its liquidator) now to categorise as unreasonable a determination of the close-out payment by the issuers which identifies their loss of bargain by the conventional route of ascertaining the price of a replacement transaction in an apparently ready market, *a fortiori* where that method is a right (but not an obligation) conferred upon the non-defaulting party by the express terms of the definition of Loss in Section 14.

124 Thirdly, I consider that Mr Russen's perspective runs counter to the 'value clean' approach to the calculation of the Section 6(e) close-out payment established by the authorities which I have reviewed, the first and most authoritative of which was reported more than five years before the making of the two Derivative Agreements in issue. It is not so much that Mr Russen's perspective fails to assume, as the basis for the determination, that the Derivative Agreements would have run their course to maturity. Rather it is that his formulation seeks to introduce into the determination of Loss extraneous considerations about the contractual structure of the instruments, as between the issuers and the investors, which have no role to play in the determination process.

125 Fourthly, any attempt to rely upon principles of remoteness enshrined in Hadley v. Baxendale seems to me to founder in the present case upon the uncomfortable fact that neither of the issuers did in the end receive the windfall which Mr Russen sought to identify. The rules for remoteness in Hadley v. Baxendale (and later cases) are primarily designed to identify which of the innocent party's actual losses ought to fall within the confines imposed by the law upon recovery of damages from the contract breaker. In the present case the starting point for Mr Russen's submission that the issuers made a gain did not in fact occur at all, however likely it may have appeared as at the date of termination of the Derivative Agreements.

126 Finally, the provisions of Section 6(e) of the Master Agreement are not in substance about the recovery of damages at common law. They provide a contractual formula for the determination by the non-defaulting party of a close-out payment where the Derivative Agreement comes to an early end. True it is that the incorporation of the phrase "loss of bargain" has led to common law principles about the use of the cost of obtaining a replacement transaction to become the normal, and indeed expressly available, method of determination of that head of Loss (or gain). But that limited incursion of common law principles is not in my view a warranty for the wholesale dis-application of the close-out formula, in favour of some more general application of the common law.

127 Mr Russen's next submission was that the ETCSA was, in both cases, the contractually agreed pre-estimate of loss (or gain) in any circumstances in which (as here) Early Termination of the Derivative Agreements triggered an Early Redemption Event. I reject that submission for the following reasons. First, the ETCSA is, to the extent that it is a pre-estimate of anything, a formula directed to identifying LBF's Loss, rather than the Loss (including gain) of the issuer, where the Derivative Agreement terminates due to LBF's default. It is a formula quite simply directed at the wrong party's Loss. Furthermore, it is by no means axiomatic that, in relation to derivatives, one party's loss approximates to the other party's gain.

128 Secondly, the ETCSA is only a contractual compensation formula when there occurs not merely an Early Redemption Event, but also an Early Redemption Date and consequent Mandatory Early Termination of the Derivative Agreement . That has not occurred in the present case, and the ETCSA is therefore of no relevance to the determination of the issuers' Loss pursuant to the Derivative Agreements.

129 Mr Russen's final submission was that the cost of a replacement transaction was unreasonable as a measure of Loss because no such transaction would or could ever be put in place. But that is, in my judgment, a classic example of 'valuing dirty' rather than clean, i.e. by reference to the real world following default, rather than the hypothetical world called for by the authorities on Section 6 of the Master Agreement to which I have referred.

## Outcome

130 The result of the foregoing analysis needs to be expressed in the form of answers to the issues specifically raised by each of the Part 8 Claim Forms. The issues are now identified in the Statements of Agreed Facts and Issues.

*Series 26*

131 Taking the issues as listed in paragraph 55 of the Statement of Agreed Facts and Issues relating to that structure, the answers are as follows:

(1) Yes.

(2) Yes.

(3) Not applicable.

(4) No.

(5) No.

(6) No.

(7) Yes, but see below.

(8) No, but see below.

132 I do not regard Issues (7) and (8) as having been entirely happily framed. In my view, the purchase and cancellation of the Notes in September 2009 did not take place pursuant to any power or provision in Condition 6(h) of the Notes. That condition was designed to qualify what would otherwise have been the complete liberty of ARIC, as issuer, to re-purchase Notes in the market, in circumstances where there was not a single owner of all of them. In the present case the Notes were all purchased by ARIC from Enasarco as the sole owner of all of them, pursuant to an inherent liberty to do so which, for as long as there was a single Noteholder, was unconstrained by any provisions of the Conditions or the Final Terms, provided only that LBF's security rights were not infringed. On the particular facts of the present two cases, and for the reasons already given, they were not. My answers to issues (7) and (8) should therefore be understood subject to that qualification, and should not be assumed to be of any wider application.

*Series 38*

133 I resolve the issues set out in paragraph 54 of the Statement of Agreed Facts and Issues in this case as follows:

(1) Yes.

(2) Yes.

(3) No.

(4) No.

(5) No.

(6) No.

Crown copyright

© 2013 Sweet & Maxwell



# Appendix 3

**Lomas & Ors (Together the Joint Administrators of Lehman Brothers International (Europe)) v JFB Firth Rixson Inc & Ors, FR Acquisitions Corporation (Europe) Ltd, Beig Midco Ltd, KP Germany Zweite GMBH**

**Lehman Brothers Special Financing Inc v Carlton Communications Limited**

**Pioneer Freight Futures Company Limited (In Liquidation) v Cosco Bulk Carrier Company Limited**

**Britannia Bulk Plc (In Liquidation) v Bulk Trading S.A.**

Case No: A2/2011/0070, A2/2011/0070(A), A3/2011/1107, A3/2011/2106, A2/2011/1059

Court of Appeal (Civil Division)

3 April 2012

**[2012] EWCA Civ 419**

**2012 WL 1067815**

Before: The Right Honourable Lord Justice Longmore The Right Honourable Lord Justice Patten and The Right Honourable Lord Justice Tomlinson

Date: 03/04/2012

On Appeal from the High Court of Justice Chancery Division (Companies Court)

In the Matter of Lehman Brothers International (Europe) (in Administration)

In the Matter of the Insolvency Act 1986

On Appeal from the High Court of Justice Queen's Bench Division Commercial Court

The Honourable Mr Justice Briggs & The Honourable Mr Justice Flaux

[2010]EWHC 3372 (Ch), [2011] EWHC 718 (Ch), [2011] EWHC 1692 (Comm) & [2011] EWHC 692 (Comm)

Hearing date: 14th, 15th, 16th, 19th & 20th December 2011

**Representation**

    Mr William Trower QC & Mr Daniel Bayfield (instructed by Linklaters LLP ) for the Appellants.

    Mr Mark Hapgood QC & Mr Henry Forbes Smith (instructed by MacFarlanes LLP ) for the first and second Respondents.

    Mr Robin Dicker QC & Ms Joanna Perkins (instructed by Clifford Chance ) for the Third Respondents.

    Mr Richard Fisher (instructed by Freshfields Bruckhaus Deringer ) for the fourth Respondents.

    Mr Antony Zacaroli QC & Mr Jeremy Goldring (instructed by Allen & Overy LLP ) for the Intervener.

    Mr Jonathan Nash QC (instructed by Weil Gotshal & Manges ) for the Appellants.

Ms Felicity Toube QC (instructed by Hogan Lovells International LLP ) for the Respondent.

Mr Antony Zacaroli QC & Mr Jeremy Goldring (instructed by Allen & Overy LLP ) for the Intervener.

Mr Charles Kimmins QC & Mr Luke Pearce (instructed by Herbert Smith LLP ) for the Appellant.

Mr Richard Jacobs QC & Mr Siddharth Dhar (instructed by Thomas Cooper ) for the Respondent.

Mr James Willan (instructed by Berwin Leighton Paisner LLP ) for the Appellant.

Mr Mark Phillips QC & Mr Stephen Robins (instructed by Watson Farley & Williams LLP ) for the Respondent.


**Approved Judgment**

Lord Justice Longmore:

**Introduction:**

1 This is the judgment of the Court, to which all members have made a substantial contribution.

2 These 4 appeals, two from Briggs J and two from Flaux J, were listed for hearing together and raise a number of questions of construction in relation to derivatives in the form of interest rate swaps and forward freight agreements on the International Swaps and Derivatives Association Inc (formerly the International Swaps Dealers Association Inc.) ("ISDA") form of Master Agreement which was published in 1992 and again in 2002 ("the Master Agreement"). Derivatives have come to occupy the time of many Chancery and Commercial judges and it is necessary to understand what they are. Mr Simon Firth of Linklaters has published an important monograph on the topic which (while we have to bear in mind that Linklaters are the solicitors of the first appellants in these cases) we have found most useful in wrestling with the questions of construction which need to be decided for the purposes of these appeals. He defines a derivative as (para 1-004):—

> "a transaction under which the future obligations of one or more of the parties are linked in some specified way to another asset or index, whether involving the delivery of the asset or the payment of an amount calculated by reference to its value or the value of the index. The transaction is therefore treated as having a value which is separate (although derived) from the values of the underlying asset or index. As a result, the parties' rights and obligations under the transaction can be treated as if they constituted a separate asset and are typically traded accordingly."

3 Although derivatives can be quite complex, the theory behind the ones in issue in these cases is simple. Under the interest rate swaps, one party is to pay a floating rate of interest on a notional sum (notional because there is no actual loan) over a period of (say) 6 months. The other party is to pay a fixed rate of interest on the same notional sum over the same period. At the end of each six month period two calculations are done and one party will be "in the money" and the other "out of the money". That latter party will then pay the other the difference. This contract can be used as a pure speculation or (as in the present cases) be used as a hedge if one of the parties has a long term loan on interest.

4 Similarly the form of a forward freight agreement ("FFA") is that one party agrees to pay a fixed rate of notional freight while the other party agrees to pay a rate derived from an index published (normally) by the Baltic Exchange. The difference at the end of a set period is then payable by one to the other depending on the movement of the index as compared with the fixed rate. This can also be used by parties to protect themselves against fluctuation in shipping rates or as a means of trading in futures.

5 The first question which arises in the first three appeals is whether obligations to make payments pursuant to the agreements subsist after the party to whom payment is due has committed an Event of Default and, if so, for how long. The Master Agreement records that the parties have (or will have) entered into one or more Transactions governed by the Master Agreement and a "Confirmation" confirming the Transactions. There is set out in section 2(a)(i) of the Master Agreement an obligation on each party to make the payment specified in the Confirmation, followed by provisions in section 2(a)(ii) that such payment is to be made on the due date in the place specified in the Confirmation. Section 2(a)(iii) then provides as follows:—

> "Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing …"

6 In broad terms the dispute is whether, when there is a Event of Default on the part of the party due to receive a payment, there is any obligation at all on the counterparty to make a payment and, if so, whether such obligation is initially suspended but then disappears or revives (and, if so, the point at which it disappears or revives) or remains in suspense indefinitely.

7 These issues are determinative of the first appeal which is confined to questions of construction (including implied terms) relating to Section 2 of the Master Agreement . In the second appeal ("Carlton") the claimant also relies on an argument that the operation of Section 2(a)(iii) engages the anti-deprivation principle recently considered by the *Supreme Court in Belmont Park Investments Pty Ltd v BNY Corporate Trustee Securities Ltd [2011] UKSC 38; [2011] Bus. L.R. 1266* .

8 The issue which arises in the third appeal also raises a question of construction concerning the rights of the parties in the event of Termination following an Event of Default. The Master Agreement will typically or often comprise a number of individual transactions which by Section 1(c) of the Master Agreement are deemed to form a single agreement. The Master Agreement gives to the Non-defaulting Party a right to terminate in certain circumstances consequent upon an Event of Default and the parties may opt for Automatic Early Termination ("AET") upon the occurrence of certain "Bankruptcy Events of Default". In the event of Termination the Master Agreement prescribes a regime of "close-out netting". The issue which arises on the third appeal is whether obligations which have arisen or would but for Section 2(a)(iii) have arisen under individual transactions whose natural term has expired prior to the occurrence of AET affecting the single agreement as a whole are subject to close-out netting. As will be seen that issue is in our view concluded by resolution of the issues determinative of the first appeal.

9 The fourth appeal raises a distinct point concerning the operation of the close-out netting provisions consequent upon AET. It concerns the question whether, in certain circumstances, the close-out netting provisions require an assumption to be made that the Defaulting Party would in fact have satisfied the conditions precedent to its entitlement to receive payment from the Non-defaulting Party.

## The outline facts of the First Appeal

10 The problem has arisen in the Lehman Brothers administration. One of the Lehman companies, Lehman Brothers International (Europe) ("LBIE"), was a party to numerous interest rate swap Transactions and went into administration on 15th September 2008. That constituted an Event of Default under each of the agreements for the Transactions; to the extent that the counterparties owed any sums to LBIE on and after that date pursuant to such agreements, the obligation to make any payments either did not come into existence or ceased to exist or was suspended for the duration of the event of default which has continued while the administration is

progressing. In the first of the cases under appeal the administrators wish to collect the sums purportedly owed to LBIE pursuant to 5 transactions made with

i) JFB Firth Rixson Inc ("JFB");

ii) FR Acquisitions Corporation (Europe) Ltd ("FRAC"); both these companies are part of the Firth Rixson group of companies which makes and supplies rings, industrial forgings and other specialised metal products ("Firth Rixson");

iii) BEIG Midco Ltd ("BEIG") part of the Bird's Eye Iglo group of companies; and

iv) KP Germany Zweite GmbH ("KPGZ") part of the Klockner Pentaplast group of companies which make plastic products.

11 The JFB transaction was a sterling interest rate swap evidenced by a Confirmation of 13th November 2007. The FRAC Transaction was a US Dollar interest rate swap evidenced by a Confirmation of 13th November 2007 novated to FRAC on 29th August 2008. The BEIG Transaction was a sterling interest rate swap evidenced by a Confirmation of 30th January 2007. KPGZ made two transactions, a Euro interest rate swap evidenced by a Confirmation of 4th December 2007 and a US Dollar interest rate swap evidenced by a Confirmation of 21st January 2008. All these Transactions had a maturity date after 15th September 2008 when the administrators were appointed and, on that maturity date, large sums were or, but for the Event of Default on LBIE's part, would have been or become due. It is those sums which the administrators seek to recover.

## The Master Agreement

12 The scheme of the Master Agreement (1992) is relevantly as follows:—

i) The Master Agreement and all Confirmations form a single agreement between the parties;

ii) Section 2(a) constitutes the underlying obligation (as already set out) that each party will make payment to the other (in the case of an interest rate swap, one party the amount of fixed rate interest, the other party the amount of the floating rate interest for the relevant period);

iii) Section 2(c) provides for netting where the amounts otherwise payable are in the same currency and in respect of the same transactions;

iv) Section 2(e) provides for a party who defaults in the performance of any payment obligation to pay interest on the overdue amount at what is called "the Default Rate";

v) Section 3 sets out the representations made to each party by the other;

vi) Section 4 sets out certain subsidiary agreements;

vii) Section 5(a) enumerates many different occurrences constituting events of default e.g. failure to make a payment when due if such failure is not remedied on or before the 3rd Local Business Day after notice of failure is given to the non-paying party or failure to comply with other terms of the Agreement if such failure is not remedied on or before the 30th day after notice of failure is given; these are examples of potential events of default

which become actual events of default once the notice period has expired;

viii) Section 5(a)(vii) is the relevant Event of Default for the purposes of this appeal. It is headed "Bankruptcy" and has 9 sub-sections including

"(6) seeks or becomes subject to the appointment of an administrator, provisional liquidator … or other similar official. …"

LBIE had administrators appointed on 15th September 2008. This constituted an immediate Event of Default which has continued to this day. It looks as if it will continue for some time. While the administrators hope that they can ultimately find a surplus of assets over liabilities, they are by no means confident that that will be the position;

ix) Section 5(b) enumerates what are called "Termination Events" including at sub-section (v) any "Additional Termination Event" specified in the Schedule to the ISDA agreement or in any Confirmation. Sometimes the Schedule or the Confirmation will opt for AET if there is an Event of Default, but that was not the position in any of the 5 transactions which are the subject of the first appeal, nor indeed in the transactions with which the second appeal is concerned;

x) Section 6 is entitled "Early Termination" and gives a right to any Non-defaulting party, by giving not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, to designate a day (no earlier than the day the notice is effective) as an Early Termination Date in respect of all outstanding Transactions. If AET has already been selected in the Schedule to the Agreement or the Confirmation, an Early Termination Date will occur immediately, at any rate where the Event of Default is the appointment of an administrator. In cases where no AET has been selected this sub-section makes theoretical the question whether an Event of Default constitutes a repudiation of the Transaction; the answer is that it does not matter whether such Event of Default is a repudiation of the Transaction because the Non-defaulting party always has the option of designating a date when the transaction will terminate. The only restriction (if it be a restriction) is that such termination will apply to "all outstanding Transactions" between the parties rather than merely the Transaction in respect of which there has been an Event of Default;

xi) Section 6(b) deals with the right to terminate following a Termination Event but nothing turns on this sub-section for the purpose of this appeal;

xii) Section 6(c) then deals with the effect of designating an Early Termination Date and provides:—

"(ii) Upon the occurrence or effective designation of an Early Termination Date, no further payments … under section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to section 6(e)."

xiii) Section 6(e) then deals with payments to be made on Early Termination. The details of this sub-section are only marginally relevant to this appeal but, in broad outline, the parties are supposed (in the 1992 Master agreement ) to have elected in the Schedule to the Agreement a payment measure (either "Market Quotation" or "Loss") and a payment method (either "First Method" or "Second Method"). If no election has been made, then

"Market Quotation" is deemed to be the measure and "Second Method" is deemed to be the method. These terms are all defined in the Definitions Section ( Section 14 ) of the Agreement. If Second Method and Market Quotation apply, then an amount will be payable broadly equal to

a) the sum of the "Settlement Amount" determined by the Non-defaulting Party in respect of the Terminated Transactions and the "Unpaid Amounts" owing to the Non-defaulting Party less

b) the "Unpaid Amounts" owing to the Defaulting Party.

An important aspect of these calculations is that, subject to the point which arises in the fourth appeal, the Agreement requires it to be assumed that each applicable condition precedent has been satisfied. Any positive number will be paid to the Non-defaulting Party by the Defaulting Party; the absolute value of any negative number will be paid to the Defaulting Party by the Non-defaulting Party. The terms "Settlement Amount" and "Unpaid Amount" are also defined in the Definitions Section and need not be set out here. The important general point is that, if the Non-defaulting Party elects to designate an Early Termination Date in respect of all transactions, sums due to the Defaulting Party will (subject to any other relevant terms of the Agreement) be brought into account, as they will if the parties have elected for AET. Section 6(e) is often referred to as a provision for "close-out netting";

xiv) Sections 7 and 8 deal with transfers of the Agreement (and interests and obligations thereunder) and the Contractual Currency of the Transactions;

xv) Section 9 has various miscellaneous sub-sections including

"c) Survival of Obligations

Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction."

This provision was subjected to detailed argument both before Briggs J and before us.

13 The important point for the purpose of this appeal is that the Non-defaulting Parties never did designate an Early Termination Date, although they could have done so if they wished. The consequence is that Section 6 of the Agreement was never applied and the transactions were not (and never have been) terminated. This was no accident because, at the time when administrators were appointed, sums were "due" (or likely to become "due") from the Non-defaulting Parties to LBIE. As the months passed more and more sums did become "due" to LBIE and the administrators say that those sums should be paid or (where relevant) brought into account in assessing the overall sums "due" to the parties. The Non-defaulting Parties say that no such sums ever became "due" because their obligation to make the relevant payment under Section 2(a)(i) is and was at all material times (by virtue of Section 2(c)(iii) ) subject to the condition precedent that no Event of Default "has occurred and is continuing".

14 The relevant transactions have now all come to the end of their term (or will shortly do so). Both the administrators and the Non-defaulting Parties want to know their legal position. The Administrators have accordingly applied for directions under paragraph 63 of Schedule B1 of the Insolvency Act 1986 and asked Briggs J to determine a number of questions. The broad upshot of the judge's decision is that, although an obligation on the part of the non-defaulting party came

into existence on the due date of payment, it was suspended and later extinguished at the end of the natural term of each Transaction. As the judge said in para 89 of his judgment, in which he rejected perhaps the most plausible of the implied terms proposed by the administrators (that the condition precedent in section 2(a)(iii)(1) fell away at the end of the natural term of a transaction),

"a payment obligation suspended by section 2(a)(iii) does not survive termination."

We read this as meaning the obligation to pay is suspended while an Event of Default continues and, if the Event of Default is not remedied, is then extinguished at the time when the transaction comes to an end at its maturity date.

## The Arguments

15 Both at first instance and before this court Mr Trower QC for the administrators as applicants and appellants in the first appeal put forward a number of possible implied terms at least one of which was said to be necessary to make the interest swap agreements work as intended. The suggested implied terms were that the condition precedent suspending the obligation to pay during the existence of an Event of Default came to an end

i) on the expiry of such time as was required to enable the Non-defaulting party to elect for early termination and consequent close-out netting; or

ii) on the expiry of a reasonable time if that was a different time; or

iii) on the expiry of (or maturity of) the relevant transactions; or

iv) on the expiry of (or maturity of) all transactions between the parties governed by the Master Agreement .

Mr Trower did not much mind which of his suggestions the court accepted but submitted it was necessary to accept one of them in order to make the contract work as intended. As an ultimate fall-back position, Mr Trower invited the court to accept the submissions made on behalf of ISDA as recorded in paragraph 19 below.

16 Mr Nash QC for Lehman Brothers Special Financing Inc (the appellants in the second appeal) opted for the fourth of the above possibilities.

17 Mr Hapgood QC and Mr Dicker QC for Firth Rixson and BEIG supported the judge's conclusion but submitted with varying degrees of enthusiasm that the judge should have held that the obligation of the Non-defaulting Party to make payment to the defaulting party was extinguished and once for all on maturity namely at termination plus any applicable cure period, if the Event of Default, remained un-remedied.

18 Mr Richard Fisher for KPGZ submitted more radically that, if an Event of Default occurred, no obligation on the part of the Non-defaulting Party came into existence at all so that no right was born, which needed to be either extinguished or revived.

19 ISDA conceived that they themselves had a legitimate interest in the true construction of their standard terms of Agreement and applied for (and were granted) leave to intervene both at first instance and in this court. Mr Zacaroli QC on ISDA's behalf submitted that the payment obligation came into existence on the due date and that the condition precedent (that there be no Event of Default) suspended the payment obligation in section 2(a)(i) . It was, however, wrong both to talk of the condition precedent being extinguished on expiry of a reasonable time or on the maturity of the relevant transaction and to talk of the revival of the obligation to pay at any particular time. The obligation to pay on the Non-defaulting Party remained in suspension until such time as the suspension came to an end either by the correction of the Event of Default or the decision of the Non-defaulting Party to elect for termination. If the Non-defaulting Party never elected for termination, the obligation to pay continued to be suspended and that party took the risk that the

Event of Default would be cured and the obligation to pay would then revive. If therefore the administration of LBIE came to an end without any other Event of Default (such as liquidation) occurring, the obligation of the Non-defaulting party to make payment to section 2(a)(i) would then revive.

20 The parties formulated a series of issues for the court to determine in the light of all these arguments and the judge dutifully resolved those issues in the course of his judgment and in his formal order. We would, however, prefer to approach the case in a somewhat more chronological order than the parties did. We will deal with the arguments in the following order:—

    i) granted that the appointment of administrators on 15th September 2008 constituted an Event of Default, did that have the effect that no amounts ever became due and payable from the Non-defaulting party to the Defaulting party?

    ii) if such amounts did become due but were not payable by virtue of the Event of Default, did they never become payable or would they become payable if the Event of Default was cured?

    iii) if they did become due and payable but were suspended by reason of the Event of Default, did that suspension end at any of the times suggested by the administrators so that the payment obligation then revived?

    iv) conversely, if the suspension did not so end, was the obligation to pay extinguished at the expiry of (or the maturity of) the transactions?

    v) if the obligation did not revive and was not extinguished at the end of the transaction, did it last for ever and, if not, when did it cease to exist?

### *Did the obligation of the Non-defaulting Party ever come into existence?*

21 It is necessary here to draw a distinction between sums due but unpaid before the occurrence of an Event of Default (or, indeed, the fruition of a Potential Event of Default) and sums becoming due after the occurrence of the Event of Default. The parties to the first appeal accepted that sums due but unpaid before the occurrence of the Event of Default must be due and payable and remain due and payable. We do not believe it strictly necessary to decide conclusively in the first appeal whether this is correct but if we had to we would conclude that once such sums were due they should be paid regardless of any subsequent Event of Default. If, moreover, even sums already "due" at the time of the occurrence of an Event of Default did not have to be paid, that might be relevant to the arguments made on the second appeal in relation to anti-deprivation.

22 The question which we do have to resolve in this first appeal is whether sums become due at any time after an Event of Default has occurred. If it is a condition precedent that there be no Event of Default but the defaulting party is "in the money" at the next monthly payment date (or at any subsequent time), is such money due but not payable or does no obligation ever come into existence (as Mr Fisher for KPGZ contends)?

23 The judge dealt with this compendiously as part of what he called the "Once and for All" time point and he concluded that the obligation to pay on the Non-defaulting party was not something which was at once and for ever discharged if a sum became due from that party after an Event of Default. But there are logically two separate questions

    i) Can any obligation arise at all on the part of the Non-defaulting Party once an Event of Default has occurred?

    ii) If any such obligation does arise, is the effect of section 2(a)(iii) that the obligation is destroyed or merely suspended for a period of time?

24 For this purpose it is necessary to set out section 2(a) of the Master Agreement in full. Section 2 is headed "Obligations"; section 2(a) is headed "General Conditions" and provides:—

"(i) Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii) Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii) Each obligation of each party under section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement."

This Section therefore focuses on the payment obligation of the parties but underlying any payment obligation, there is always a debt obligation. This can be seen from the relevant Confirmations. The KPGZ confirmations (with which we have been provided) nominated LBIE as the Floating Amount Payer and KPGZ as the Fixed Amount Payer. LBIE was obliged to pay every six months the floating rate of interest on the notional amount of $100,875,000 to KP and KPGZ was obliged to pay every 6 months a fixed rate of 5.485% per annum to LBIE. The payment dates are the last calendar dates of each June and December from 31st December 2007 up to and including the Termination Date which is defined as the earliest of (i) 9th July 2012 and (ii) the occurrence of the Termination Event. A mutual debt obligation therefore arose on the last day of each June and December from and after December 2007. There was also an obligation to make payment on that date. Thus the debt obligation and the obligation to make payment of the debt arose at the same time.

25 Section 2 of the Master Agreement is, however, all about the payment obligation and does not, in our view, touch the underlying indebtedness obligation. In particular, section 2(i) obliges each party to make each payment specified in the Confirmation and it is that payment obligation which is, by section 2(a)(iii) , made subject to the condition precedent that no event of default has occurred and is continuing.

26 That this is so is demonstrated by the fact that the Master Agreement provides that, in cases where Early Termination occurs and payments have to be made pursuant to section 6(e) by reference to a payment measure which is to be either "Market Quotation" or "Loss", it is to be assumed that each applicable condition precedent has been satisfied. As already explained (see para 12 (xiii) above) that means that in the event of early termination, the net position of the parties is to be calculated. If in fact no debt obligation ever arose, the calculation envisaged as occurring on early termination could never take place since there would be no obligation of the Non-defaulting party to take into account.

27 Nor does Mr Fisher's argument cater conveniently for Potential Events of Default; these are just as likely to occur as actual Events of Default. It would be very odd if no obligation arose if a Potential Event of Default had occurred on or before a due date for payment but that fault was cured the day after the due date. Mr Fisher would no doubt say that the debt and the obligation to pay it did arise but would be extinguished if the Potential Event of Default became an actual Event of Default but it is most unlikely that the parties could have intended that the indebtedness should come into existence for one kind of default but not for the other.

28 A similar argument to that advanced by Mr Fisher was submitted to Gloster J by Mr Jonathan Crow QC in *Pioneer Freight Co Ltd v TMT Asia Ltd [2011] 2 Lloyds Rep 96* , a case about FFAs decided after the decision of Briggs J in the present case, at any rate in his oral reply (see para 72). It was rejected by her for much the same reasons as we have set out. She said in para 91

"Once one approaches the analysis on the basis that, under Section 2(a)(iii), one is only looking at the payment obligation, rather than the debt obligation, the whole machinery makes sense. Thus, the wording of Section 2(a)(iii) makes it clear that the payment obligation is subject to the condition precedent that no Event of Default or Potential Event of Default has occurred "… and is continuing". The natural reading of those words envisages that once a condition precedent is fulfilled, the obligation to pay revives. There is no need for any further creation of the debt obligation itself, as Mr. Crow seeks to suggest"

We would respectfully adopt those observations of Gloster J and hold that the underlying debt obligation is undisturbed by the Event of Default; it is merely the payment obligation which is barred if there is an Event of Default. We turn therefore to the next question which is whether the obligation to pay is extinguished or is merely suspended so that it can and will revive if the Event of Default is cured before termination by either party or on the maturity of the transaction.

*Extinction or Suspension?*

29 This was dealt with by the judge in para 66-74 of his judgment under the heading " Once and for All v Suspension ". The question had already been considered by Flaux J in Marine Trade SA v Pioneer Freight Futures Co Ltd BVI [2010] Lloyds Rep 631 . He had concluded that, once there was an Event of Default, any obligation on the Non-Defaulting Party to pay the Defaulting Party was extinguished rather than suspended. Flaux J had not been referred to an earlier dictum of Austin J of the Supreme Court of New South Wales to the contrary in Enron Australia v TXU Electricity [2003] NSWSC 1169 . In this case that learned judge had said:—

"Since these two conditions are conditions precedent to the payment obligations of the counterparties, if either condition has not been met at any given time there is no payment obligation under any of the trades that have been made under the Agreement. However, a payment obligation will spring up under a pre-existing trade once the relevant condition is satisfied, and in that sense it might be said (with only approximate accuracy) that the payment obligation is "suspended" while the condition remains unfulfilled, and that amounts "accrue" notwithstanding that the condition is unfulfilled."

30 Briggs J gave 3 reasons for concluding "on a fairly narrow balance" that Austin J's suspensory construction was to be preferred. In the third of these appeals Flaux J has declined (in the light of these pending appeals) to express a final opinion but, left to himself, would probably have maintained his original opinion. We consider that on this matter Briggs J was correct.

31 Our first reason for so concluding is that to treat the payment obligation as extinguished is altogether too drastic a remedy in favour of the Non-defaulting Party because the possible Events of Default and potential Events of Default are so many and various. A small underpayment unremedied for three days perhaps as a result of a bona fide underlying dispute as to the amount due was one example given in argument. An unjustified presentation of a petition for the winding-up or liquidation of a company is another. The former is initially a potential Event of Default under section 5(a)(i) but becomes an actual Event of Default if it is not remedied on or before the third Local Business Day after notice of failure to pay is given. The latter is also a potential Event of Default but section 5(a)(vii)(4) requires that such petition should (A) result in an order for winding-up or liquidation or (B) not be

"dismissed, discharged, stayed or restrained … within 30 days of the institution or presentation thereof."

30 days is a comparatively short time for the Defaulting Party to ensure that a winding-up petition is conclusively dismissed or restrained; it would not, for example, allow time for any appeal. Moreover in the 2002 ISDA Master Agreement the time is shortened to 15 days. It would not be reasonable to hold that, if the Defaulting Party is able to remedy the position in either of these cases but only after the short timescale has expired, his rights against the Non-defaulting Party have forever gone and can never revive. It is more natural to hold (as we do) that the obligation to pay is suspended while the relevant Event of Default continues.

32 Secondly, we agree with Briggs J that, granted that the calculations of loss in relation to Early Termination or AET require it to be assumed that any condition precedent has been satisfied, it would be somewhat counter-intuitive to find that in other cases the existence of the relevant condition precedent means that the underlying obligation is extinguished rather than suspended. A deferred election for early termination could cause serious problems of analysis.

33 Thirdly we do not agree with Mr Jacobs QC for Cosco that this question of construction is assisted by remembering that the Master Agreement potentially applies to delivery of chattels (for example financial instruments) as much as to the payment of money pursuant to interest swap or forward freight agreements. It is no doubt true that the value of such chattels may increase during any period for which the delivery obligation may be suspended but, if the Non-defaulting Party thinks that is an unsatisfactory position, he can invoke the rights given by Section 6 in relation to Early Termination.

34 Nor do we think that the question whether the obligation of delivery comes into existence (or is extinguished) if a condition precedent is not satisfied at the date of the accrual of the obligation can be resolved by reference to the general law of the sale of goods (as Flaux J appears to have thought in para 87 of his judgment in the third case under appeal ( Pioneer v Cosco )). That must depend on the terms of any individual contract but in the case of a long-term contract for delivery of goods by instalments (which is the closest analogy) any repudiatory breach would give the innocent party the option to terminate but, if he does not so terminate, the contract stays alive and the innocent party takes the risk that the terms of the contract will on their true construction permit the party in breach to call for delivery at a later date. In a similar way a party who does not accept a repudiatory breach as terminating the contract takes the risk of a frustrating event occurring which will release the guilty party from his obligations, see Avery v Bowden (1855) E&B 714 . We therefore prefer the view expressed in para 11-012 of Firth on Derivatives that the conclusion we have reached (that performance of an obligation of payment or delivery is suspended during the currency of a relevant event of default)

> "is consistent with the treatment of concurrent conditions in, for example, contracts for sale of goods. Under such contracts neither party has to perform if the other party is not ready and willing to do so, as each party's obligations are conditional on simultaneous performance by the other party. However, if a party fails to perform on the due date, the innocent party is not released (unless the contract is validly terminated); if the party in breach subsequently tenders performance, the innocent party must perform its own obligation."

35 We would therefore decide that the payment obligation of the Non-defaulting Parties is suspended (rather than extinguished) during the currency of an Event of Default under the Master Agreement and will revive if the Event of Default is cured at any time before the outstanding Transactions are terminated. The question then arises whether the payment obligation revives at any other time while the contract continues to exist and whether (if not) the obligation is extinguished when the contract arrives at its contractual maturity date.

*Revival otherwise than by curing the Event of Default?*

36 Mr Trower QC for the administrators submitted that, even if the Event of Default was not cured but continuing, there must come a time when the obligation on the Non-defaulting Party to make payment must revive. Otherwise there would be a serious mismatch between the situations of Early Termination or AET on the one hand and the absence of Termination on the other. Also, it would always be in the interest of the Non-defaulting Party to decline to terminate the transaction and keep it in existence in the knowledge that however much the Non-defaulting Party might owe and however much the Defaulting Party might be "in the money", the Defaulting Party could never recover. The Non-defaulting Party would thus receive a totally undeserved windfall. This was so unfair on the Defaulting Party that a term as to the revival of the payment obligation had to be implied into the contract.

37 The judge (para 81) set out the 3 terms which the administrators at that stage of the proceedings sought (as a matter of construction) to imply into the agreements between the parties, any one of which would produce a satisfactory outcome from the administrators' point of view. They are:—

"A. That Section 2(a)(iii) suspends the Non-defaulting Party's payment obligations under condition precedent (1) only for a reasonable time: that is, a time sufficient to enable that party to decide whether to elect for Early Termination, or to continue to perform its payment obligations in full.

B. That section 2(a)(iii) suspends the Non-defaulting Party's obligations under section 2(a)(i) until such time as the Transaction, or alternatively all of the Transactions between the parties governed by the Master Agreement , have run their course (assuming no Early Termination) such that, at the expiry of the natural term of the last Transaction the Non-defaulting Party must either submit to a netting process which calls for payment of all suspended payment obligations or submit to the consequences of an Early Termination as at that date.

C. That the Non-defaulting Party is, under section 6(a), under a constant obligation to exercise its discretion whether or not to designate an Early Termination Date in a manner which is not arbitrary, capricious or unreasonable so that, once it is clear that the other party's default is permanent, or where the Non-defaulting Party decides to re-hedge, it must exercise its discretion in favour of Early Termination."

38 The judge rejected all these possibilities and we agree with him.

Revival after reasonable time

39 The first proposed term is not only not a necessary implication to make the contract work but it is contrary to the express words of section 2(a)(iii) "… and is continuing".

40 It is, of course, the case that when a contract requires something to be done and no time limit for the doing of that act is expressly stipulated, the court will often imply that it should be done within a reasonable time. The paradigm example is perhaps that of a cif seller who has to forward the bills of lading to his buyer within a reasonable time (which may, in some circumstances, be a very short time) see Sanders v Maclean (1883) 11 QBD 327 . But in this case the only act required of the Non-defaulting Party is to make payment, the time for doing of which is set out in the contract which also provides that payment need not be made while the Event of Default is continuing. There is just no reason for any implication that the Non-defaulting Party is to do any other act within any particular time, let alone the act which the clause says he need not do.

41 The suggestion that the scheme of the contract requires the Non-defaulting Party (within a reasonable time) to opt for Early Termination does not hold water. In the first place the parties were able to opt for AET if they wanted to. In the first appeal and the second appeal the parties did not do that. In the second place, the whole point of Section 6 is to give the Non-defaulting Party the option to "designate a date … as an Early Termination Date in respect of all outstanding Transactions". This is a right which is given to the Non-defaulting Party and it is not easy to see why there should be any limitation on the right. It is not an unqualified right because the Defaulting Party can cure the default if he is able to do so within the 20 day notice period which the Non-defaulting Party has to give. It has also to be recalled (see para 12 (x) above) that, if the option is exercised, then the Early Termination date so chosen applies to "all outstanding transactions". It is not an option to terminate one transaction and leave other transactions un-terminated. That will not necessarily be entirely beneficial to the Non-defaulting Party but he has to take that on the chin as the price of the exercise of the option. Mr Trower's proposed implied term would require the Non-defaulting Party (after a reasonable time, whatever that might be) to terminate all outstanding transactions not just the transaction to which the event of default (e.g. non-payment of a particular sum) related. There is just no reason why the Non-defaulting Party should be required to opt in this way.

42 On the facts of the present case, moreover, the Non-defaulting Party needs protection against the continuing insolvency of LBIE. To the extent that the Non-defaulting Party is "out of the money" because the floating rate is (or is likely to be) less than the fixed rate of interest it may be that his loss is more theoretical than real because he can go into the market and obtain another swap transaction on more beneficial terms than the transaction with LBIE; but if the Non-defaulting Party is "in the money" because the floating rate is (or is likely to be) higher than the fixed rate, any new swap obtainable in the market would be likely to be more expensive then

the transaction with LBIE. Although he may have a claim against LBIE for the difference, such a claim will only be as an unsecured creditor in what is likely to be an insolvent administration. The Non-defaulting Party is, however, entitled to be the guardian of his own interest and make his own assessment whether early termination is likely to be to his benefit or not. It cannot have been the intention of the parties that he should be constrained to make a choice in favour of early termination at any particular time, not of his own choosing.

## Revival at the maturity of the Transaction or all outstanding Transactions

43 The question whether this suggested term can be implied into the contract is, in a sense, part of the larger question whether the transaction comes to an end on maturity. In one sense it does since, after the relevant number of months or years have elapsed, no more calculation of amounts due either way will be made any more. But that may not be the end of the matter since there may still be accrued obligations. Mr Trower on behalf of the administrators of LBIE submits that, if there is a single transaction governed by a single Confirmation, that transaction does indeed come to an end and, at that time, any sums due from the Non-defaulting Party to the Defaulting Party must be paid. Mr Hapgood for Firth Rixson and Mr Dicker for BEIG (supported by Mr Fisher for KPGZ on the basis that we have decided his earlier point against him) agreed that the transaction came to an end but drew the opposite conclusion, namely that the condition precedent to payment (that there be no Event of Default) continued in force and that nothing was due from the Non-defaulting Party then or at any future time. The judge accepted this latter submission and we shall shortly have to determine whether he was right to do so. He rejected Mr Trower's submission saying (para 89) that it was more obviously at variance with the language of the Master Agreement than Mr Trower's earlier submission. On this we agree with him.

44 To some extent the reasons why this implication cannot be made are the same as those already given for rejecting the previous implied term. There is just no reason to make the implication since the contract works perfectly well without it. Where, indeed, there was more than one transaction (as there was for KPGZ) it would be unjust if, at the maturity of the first transaction, the Non-defaulting Party had to pay whatever might be due, when market forces might be flowing the other way under the second transaction, since the result of that could well be the Non-defaulting Party would have to pay upfront but, when he came into the money on the second transaction, he would not be able to recover what was due as a result of the Defaulting Party's insolvency.

45 Faced with this dilemma, Mr Trower submitted that the correct implication was that the payment obligation would revive after the end of all the outstanding transactions made between the parties. But it would be surprising to imply a term into any particular transaction which would have to await the maturity or termination of other transactions. That would be to re-write the contract for the parties which it is no business of the court to do. The court will only imply terms if it is necessary to do so or if it would be obvious to any disinterested third party that the contract must have the meaning which the implied terms would give it. But the second suggested implication satisfies neither of those tests.

## Requirement to exercise discretion reasonably

46 The administrators did not pursue this third suggested implied term on the appeal. Had they done so, we would have rejected it because it is even more hopeless than the others. The right to terminate is no more an exercise of discretion, which is not to be exercised in an arbitrary or capricious (or perhaps unreasonable) manner, than the right to accept repudiatory conduct as a repudiation of a contract. We have already commented that the specific right to terminate makes theoretical the question whether an Event of Default constitutes a repudiation of the contract which can be accepted by the innocent party as bringing the contract to an end. But no one would suggest that there could be any impediment to accepting repudiatory conduct as a termination of the contract based on the fact that the innocent party can elect between termination and leaving the contract on foot. The same applies to elective termination. Even if, moreover, it could be said that in some sense a contracting party had a discretion to bring the contract to an end and that such discretion should not be exercised capriciously or arbitrarily, it by no means follows that the same considerations could apply to allowing the contract to continue which does not require any positive act on the part of the Non-defaulting Party.

47 We would therefore reject all the formulations of an implied term put forward on behalf of the

administrators of LBIE in the first appeal. It follows that we reject the similar arguments (although confined, as we understand it to the second formulation) put forward by Mr Nash QC in the second appeal. We turn therefore to the converse question whether the payment obligation comes to an end on the maturity of the relevant transactions.

*Extinction of payment obligation on maturity?*

48 The judge held that, although the payment obligation of the Non-defaulting Party was suspended during the currency of the transaction, the suspension ended on maturity and it was then extinguished. He pointed out that the only alternative to extinction on maturity was that the payment obligation would last indefinitely. By that he presumably meant that it would last until such time as the Non-defaulting Party chose Early Termination and closed out all outstanding transactions or such time as the Event of Default was cured. If the Non-defaulting Party never chose early termination and the Event of Default could never be cured, the obligation would indeed be indefinite but it would be an obligation which could never be called in.

49 The judge gave three reasons for coming to this conclusion (1) that it would not be a reasonable understanding of the Master Agreement to continue it in such a way as to give rise to indefinite contingent liabilities (2) that on its true construction Section 9(c) provided for extinction of the payment obligation (3) that the downside of indefinite contingent liability could not be avoided by Early Termination since the Termination would not be early and it would be impossible to apply the default method for calculating the relevant payments since there could be no market for a replacement swap. The first and third reasons are inter-related so we will consider Section 9(c) first which, as will be remembered by any reader of this judgment, provides:—

> "Survival of Obligations
>
> Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction."

50 The exclusion of Section 6(c)(ii) is readily understandable since that is the provision stating that the effect of designating an Early Termination Date is that no further payment or deliveries are to be made but that amounts, if any, payable by one party to the other will be determined pursuant to Section 6(e) including Market Quotation and Second Method as the default measure and payment method. The obligation to make any resultant payment obviously has to survive the termination of any transaction. In the absence of section 9(c) it could hardly be arguable that no such obligation accrued, but Section 9(c) puts that matter beyond doubt.

51 The previous form of ISDA Agreement published in 1987 under the title of Interest Rate and Currency Exchange Agreement had clause 2(a)(iii) and 9(c) in a slightly different form. Clause 2(a)(iii) had no reference to the second condition precedent in the 1987 form (absence of occurrence or designation of early termination) and provided simply:—

> "(iii) Each obligation of each party to pay any amount due under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or potential Event of Default with respect to the other party has occurred and is continuing and (2) each other applicable condition precedent specified in this Agreement."

Section 9(c) had no reference to Section 2(a)(iii) at all but provided simply:—

> "Survival of Obligations
>
> Except as provided in Section 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Swap Transaction."

52 Since Section 9(c) in the 1987 Agreement made no reference to Section 2(a)(iii) it seems to us impossible to construe Section 9(c) in the 1987 Agreement as providing that any suspended

payment obligation should be extinguished on maturity. The question is whether the new wording of Section 9(c) in the 1992 form of Agreement introduced, for the first time (without saying so expressly), the concept that the payment obligation, suspended as it is once there is an Event of Default, is to be extinguished on maturity.

53 We cannot conclude that, as a matter of construction, so fundamental an alteration has been achieved by the new wording. The judge himself (who had not been referred to the 1987 form) says that Section 9(c) is by no means ideally phrased (para 79) and that it was:—

> "perhaps inelegant language for the purpose of encapsulating the concept that a payment obligation suspended by Section 2(a)(iii) does not survive termination" (para 89).

It is easy to see why, once Section 2(a)(iii) of the 1992 Agreement added the new condition precedent to payment that no Early Termination Date should have occurred or have been designated, Section 9(c) should have added a reference to Section 2(a)(iii) , which now referred to Early Termination for the first time, but it cannot, in our judgment, have been the intention of the framers of the 1992 Agreement to introduce the concept of extinction of the payment obligation by the use of such "non-ideal" and "inelegant" wording. If that had been their intention, they would have made that intention much more explicit than by hiding it in a clause headed "miscellaneous" and phrasing it in such an obscure manner. The reference in Section 9(c) to Section 2(a)(iii) is, in our view, a reference only to Section 2(a)(iii)(2) .

54 This conclusion does not, of course, affect the judge's other reasons for construing the agreement to provide for extinction of the obligation on maturity of the transaction but it must be noted that these other reasons go to support the implication of such a term in the absence of any express term to that effect. The position is that the parties have made no express provision for what is to happen to suspended obligations when the transaction matures and the question is, therefore, whether the court should imply a term that such obligations are indeed to be extinguished.

55 Both the first and third reasons given by the judge do not seem to us, with respect, sufficient reasons to justify an implication that suspended obligations are to be regarded as extinguished. They both amount to saying that indefinite contingent liabilities are inconvenient. No doubt that is so but that consideration forms a slender basis for implying a provision for extinction which the parties have not expressly agreed.

56 We have so far avoided any extended reference to the law on implied terms since it seems to us that, on any view of the law, it is impossible to imply any of the terms suggested by Mr Trower for the administrators. Once one appreciates, however, that the Non-defaulting Parties are seeking to imply a term (albeit a different term) just as much as the administrators are, it is necessary for us to remind ourselves of the latest authoritative pronouncement about implied terms in the judgment of the *Privy Council in Attorney General of Belize v Belize Telecom Ltd [2009] 1 WLR 1988* . The facts of the case are a long way from those of the present appeals but the decision of the Judicial Committee of the Privy Council gives important general guidance. In delivering judgment Lord Hoffmann said:—

> "The question of implication arises when the instrument does not expressly provide for what is to happen when some event occurs. The most usual inference in such a case is that nothing is to happen. If the parties had intended something to happen, the instrument would have said so. Otherwise, the express provisions of the instrument are to continue to operate undisturbed. If the event has caused loss to one or other of the parties, the loss lies where it falls.

> In some cases, however, the reasonable addressee would understand the instrument to mean something else. He would consider that the only meaning consistent with the other provisions of the instrument, read against the relevant background, is that something is to happen. The event in question is to affect the rights of the parties. The instrument may not have expressly said so, but this is what it must mean. In such a case, it is said that the court implies a term as to what will happen if the event in question occurs. But the implication of the term is not an addition to the instrument. It only spells out what the instrument means."

and again:—

> "It follows that in every case in which it is said that some provision ought to be implied in an instrument, the question for the court is whether such a provision would spell out in express words what the instrument, read against the relevant background, would reasonably be understood to mean."

57 The question for the court is, therefore, whether the contracts in the present appeals "mean" that the suspended payment obligation disappears on the maturity of the transaction. Neither the Confirmation nor the Master Agreement so state expressly and we do not consider that the contracts "must" mean that. The parties have just made no provision on the topic and the loss (such as it is) must lie where it falls.

58 It should also be said that termination after the natural maturity date can be "early" termination. It would only be if one assumes that the payment obligation is extinguished at that time that it becomes odd to talk of early termination thereafter. For the reasons given we do not consider that the payment obligation is extinguished; it will still be possible for the Non-defaulting Party to terminate "early" thereafter, if he wishes to do so. If he does not wish to do so, he has to accept the consequence of the contractual obligations continuing to exist.

59 Nor do we follow the judge's third reason that it is impossible to conduct the required calculation (whether "Market Quotation" or otherwise) after the maturity date of the transaction. It merely means that the first part of the calculation results in a nil figure which is then to be compared with the second part of the calculation.

60 We were much pressed with the decision of the *House of Lords in Total Gas Marketing Ltd v Arco British Ltd [1998] 2 Lloyds Rep 209* in which a long term contract for the sale and delivery of natural gas from the Trent Gas Field in the North Sea was conditional on the seller becoming a party to an allocation agreement required by the gas terminal in Norfolk where the raw gas was processed. A clause in the contract gave the seller (Arco) the option to fix the first delivery date within the period 15th September – 15th December 1996 and Arco did so fix it for 31st October 1996. But by the time that date arrived, Arco had not become a party to the allocation agreement and, in the light of a fall in gas prices, the buyer (Total) declared that they were no longer obliged to take delivery. Jonathan Parker J and Nourse LJ decided that Total were not entitled to take that course but the majority of the Court of Appeal and all the members of the House of Lords decided that, once the delivery date had been effectively written into the contract, that date was sufficiently important to compel the conclusion that, if Arco had not become a party to the relevant allocation agreement, Total were entitled to regard themselves as no longer bound.

61 We cannot regard this case as affording any assistance in the different world of derivatives in the form of interest rate swaps and forward freight agreements. In the first place, the condition of becoming a party to the allocation agreement was a contingency on the fulfilment of which the contract itself depended – no obligation to accept and pay for the delivery could come into existence until the contingency occurred. In the present case, the contracts had come into existence and had been partially performed; the question here is whether existing obligations have been extinguished, not (once Mr Fisher's submissions have been rejected) whether they have come into existence at all. Secondly the question whether existing obligations are extinguished can (in the absence of an express term on the matter) only be determined by resorting to implication (in the Belize sense). There was no question of any implication having to be made in Total v Arco .

## Duration

62 We decide therefore that Mr Zacaroli's submissions are correct and that there is no terminus, either by way of extinction or revival, to the condition precedent. It continues in force until the Event of Default is cured. If it is never cured, there continues to be no obligation on the Non-defaulting Party to make payment.

## Conclusion on First Appeal

63 For these reasons, it follows that the Administrators' appeal must fail, save to the extent that this court has accepted ISDA's submissions and thus endorsed their ultimate fall-back position identified in paragraph 15 above. No doubt in the light of our difference from the view of the judge on the question of the extinction of the payment obligation on maturity, it may be necessary to make some amendments to his formal order but that makes no difference to the outcome of the appeal. We will ask the parties to co-operate in drawing up a new order.

## The facts of the second appeal

64 The second appeal ( Lehman Brothers Special Financing Inc ("LBSF") v Carlton Communications Limited ("Carlton") ) concerns two linked interest rate swaps incorporating the terms of the ISDA (1992) Master Agreement which were entered into to enable Carlton to hedge its fixed interest exposure. In the Schedule to the Master Agreement the parties elected against Automatic Early Termination and chose the Second Method and Loss under Section 6(e) .

65 Under the first swap LBSF paid a fixed rate of interest on the notional amount of £250m on 2nd March and 2nd September in each year from 2nd March 2005 to 2nd March 2009. Carlton paid a floating rate based on sterling LIBOR. Under the second swap LBSF was also the fixed rate payer and Carlton the floating rate payer. The payment dates were the same as under the first swap.

66 LBSF was the principal group company engaged in fixed income OTC derivatives business. Its parent company was Lehman Brothers Holdings Inc ("LBHI") which acted as LBSF's Credit Support Provider for both swaps under the terms of the Master Agreement .

67 At the date of the Lehman Group collapse in 2008 only one payment date remained under each of the swaps. LBHI entered Chapter 11 bankruptcy on 15th September followed by LBSF on 3rd October. There were therefore two relevant Events of Default which continued on 2nd March 2009 which was the last payment date. As of then LBSF was in the money and but for the operation of Section 2(a)(iii) would have been entitled to a payment from Carlton of £2,656,649.31.

## The issues on the second appeal

68 The principal issues on the second appeal are the effect of an Event of Default on the subsequent payment obligations of the Non-defaulting Party and whether on the maturity of the swaps in March 2009 those payment obligations were either extinguished or revived. At the trial it was common ground that the non-satisfaction of the condition precedent in Section 2(a)(iii)(1) was suspensory only (as opposed to once and for all) although the judge's analysis in his Firth Rixson judgment meant that in practice this made no real difference to the outcome given that 2nd March 2009 was also the maturity date of the contracts. But Ms Toube QC on behalf of Carlton reserved the right to argue on any appeal that the construction put forward by ISDA of the indefinite survival of the suspended payment obligations was correct.

69 Our decision on these issues in the first appeal concludes them in the second appeal so that the only remaining issue is whether the operation of Section 2(a)(iii) as we have construed it engages either the anti-deprivation principle or the operation of the *pari passu* rule of distribution. These grounds of appeal have been abandoned by the administrators in the first appeal but the judge's analysis of this issue in Firth Rixson is the basis of his decision in Carlton .

70 It is convenient at this point to refer to the convention adopted by both sides in both the first and the second appeals about the ability of the Non-defaulting Party to recover gross any payments due from the defaulting Lehman company after its entry into bankruptcy or administration. Both in this court and before the judge it was agreed that a Non-defaulting Party who wishes to enforce the payment obligations of the Defaulting Party must give credit for what is due under its part of the swap. So in this case Carlton would not be able to prove for what LBSF was liable to pay on 2nd March 2009 by way of fixed rate interest without bringing into account its own contingent liabilities in respect of the floating rate. This agreement was not limited to the floating rate payments due on the same payment date. It also extended to any sums which but for Section 2(a)(iii) would have been payable to the Defaulting Party on an earlier date within the continuing period of default. Those liabilities would also have to be taken into account in

determining the amount for which the Non-defaulting Party might prove.

71 The question whether the non-defaulting party is obliged to give credit in this way against the gross liability of the Defaulting Party remains a live issue in the Cosco appeal where netting under Section 2(c) is relied on by Pioneer as an alternative means of recovery to that provided for under Section 6 of the Master Agreement on the assumption that all of the transactions (including the eight whose expiry dates occurred before the first Event of Default) were brought into account as Terminated Transactions under the wash-out provisions. Although therefore the resolution of this issue is not relevant to the outcome of the Carlton appeal and may not be essential even in the Cosco appeal, we consider that we should summarise our views upon it at this stage if only to put our decision about anti-deprivation into context.

72 In Marine Trade SA Flaux J held that netting under Section 2(c) was not available to the Defaulting Party where the conditions precedent contained in Section 2(a)(iii) were not satisfied as of the date for payment. He confirmed this view in his judgment in Cosco . The basis of his decision was that netting under Section 2(c) applies only where the amount due from the Non-defaulting Party "would otherwise be payable". In that event the obligations of each party in respect of the same transaction "to make payment" of the fixed or floating rates are discharged and replaced by an obligation upon the party not in the money to pay the net balance due.

73 He held that "payable" connoted what he described as an immediately enforceable obligation to pay and not, as Pioneer contended, a contractual debt in respect of which the payment obligation is suspended. The judge's construction of these terms is of course consistent with his view expressed in Marine Trade that the obligation to pay on the part of the Non-defaulting Party was extinguished for all time by the non-satisfaction of the condition precedent on the relevant payment date under the Confirmation. But his construction of Section 2(c) is not dependent on that and remains arguable even if (as we have held) there is an indefinite suspension of the obligation.

74 A contrary view has been expressed by Gloster J in Pioneer Freight Futures Company Limited v TMT Asia Limited [2011] EWHC 1888 ("TMT 2") [2011] 2 Lloyd's Rep. 565 where the calculation of TMT's liability under the FFAs assumed that it was not required to give credit by way of netting under Section 2(c) for sums otherwise due from it to Pioneer during the period of default. She considered that the overall scheme of the 1992 Master Agreement was to provide for netting off of the gross liability of each party at each payment date under Section 2(c) and for a wash-out calculation of a final net figure under Section 6(e)(4) following Automatic Termination of all outstanding Transactions. This will operate retrospectively to take into account under the definition of Loss in Section 14 the parties' total losses and gains derived from the Terminated Transactions including those payments which would have been required to be made before the Early Termination Date "assuming satisfaction of each applicable condition precedent". The calculation will also include an estimate of the prospective losses and gains of the parties consequent on the Early Termination based in part on what would have been payable prospectively over the remainder of the contract by the Non-defaulting Party again on the assumption that the conditions precedent had been satisfied.

75 Against this landscape Gloster J considered that the wording of Section 2(c) with its references to amounts that would otherwise be "payable" should be construed consistently with the commercial purpose of Section 2(a)(iii) which was to mitigate counterparty credit risk for the currency of the swap transactions. To enable the Non-defaulting Party not merely to be relieved from payment during the period of default but also to recover from the Defaulting Party its gross liabilities under the swaps as they fall due would, she said, undermine that purpose:

> "I cannot see that there is any sensible commercial justification or rationale for a construction of section 2 of ISDA 92 which enables a Non-defaulting Party to claim against a Defaulting Party on a gross basis. It appears to be wholly contrary to the ethos of ISDA 92 and clause 10(a) of the relevant FFAs, and the clear commercial purpose of the parties that all amounts outstanding under all Transactions subject to one ISDA 92 Master Agreement should be subject to automatic payment netting in respect of payments due on the same date. It emasculates the netting provisions of section 2(c) in the very circumstances where they may be most needed: namely where a Defaulting Party in the money may have to wait a long time for payment of what is owing to it (for example, until cure of its own Event of Default, or Potential Event of Default, or Early

Termination), and where it may well itself be subject to cash flow constraints, or other financial pressures. On the contrary, it confers a wholly unmerited (in commercial terms) benefit on the Non-defaulting Party. Such a construction would, in my mind, fundamentally change "the financial structure of the relationship"."

76 We endorse this approach to the construction of the Section 2 obligations. The primary obligation set out in Section 2(a)(i) is that:

"Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement."

77 The concluding words are unqualified and subject that primary obligation to pay to the remaining provisions of Section 2 including both Section 2(a)(iii) and Section 2(c) . Although there has been some argument as to the order in which these sub-sections should be applied, the netting provisions in Section 2(c) (which are both automatic and mandatory) state in terms that they are to operate in relation to amounts which "would otherwise be payable" in the same currency and in respect of the same Transaction. The use of the words "would otherwise be payable" take account in our view of the payment requirements specified in each Confirmation regardless of whether the conditions precedent have been satisfied as at the relevant date for payment. They are general words which qualify the terms of payment in the Confirmation ( "would otherwise be payable") so as to convert each party's contractual obligations into ones to pay a net sum. The words "would otherwise" can and, in our view, should be read as the draftsman's indication that Section 2(c) operates irrespective of the terms of each payment obligation and the particular circumstances then prevailing. They are not therefore concerned with whether the amounts specified in the Confirmation have actually become payable ( "are payable") on the date in question. Their purpose is to re-formulate the content of the obligations which arise as at each payment date. This can be contrasted with the definition of Unpaid Amounts in Section 14 which is concerned to capture amounts "that become payable" under the Terminated Transactions or "would have become payable but for Section 2(a)(iii) ". In this context the emphasis is on what actually fell due or would have become due and payable but for the non-satisfaction of the conditions precedent. It is not concerned to re-formulate the obligations but to enforce payment under the wash-out provisions of the net payment obligations which would otherwise have operated.

78 For these reasons we consider that the construction of Section 2(c) adopted by Flaux J in Marine Trade and Cosco is wrong and that the decision of Gloster J is to be followed on this point. The convention adopted in the first and second appeals therefore accurately represents the correct operation of the Master Agreement in relation to contemporaneous payment obligations which fall due during a period of default. In the Cosco appeal a further issue arises as to whether Pioneer can net off against the sums which Pioneer owed to Cosco at the end of December 2008 the sums which would have been due to it from Cosco in the months January to March 2009 but for the operation of Section 2(a)(iii) . As mentioned earlier, this point has also been conceded by the agreement made in the first and second appeals. But in relation to section 2(c) it turns on whether the earlier liabilities are sums which were payable "on the same date".

79 Mr Kimmins QC submitted that a debt which falls due on a particular date but is not then paid remains payable at all times until it is paid. This is undoubtedly true but it is not what Section 2(c) contemplates by its reference to amounts being payable "on any date" or "on the same date". It seems to us that Section 2(c) applies its netting provisions only to the amounts which, under the original terms of the contract, were expressed to be payable on the same date in respect of the same (or at the parties' election) two or more of the relevant Transactions. We shall deal later in this judgment with how (if at all) this affects the outcome of the Cosco appeal.

## Anti-deprivation

80 The challenge to the operation of the Master Agreement on the grounds that it contravenes either the anti-deprivation principle or the *pari passu* rule of distribution between creditors is limited to Section 2(a)(iii) . It is accepted that the close out provisions in Section 6 can produce an obligation to pay on the part of the Non-defaulting Party and take effect regardless of the

occurrence of any Event of Default. As already explained, the court is also asked to consider this issue on the basis that the Defaulting Party will not be liable to pay the sums due to the Non-defaulting Party during a period of default other than on a net basis.

81 The complaint about Section 2(a)(iii) is maintained in the event of our rejection of the suggested implied term that the payment obligation should become enforceable by the Defaulting Party once the period of the contract has come to an end. Had we accepted the submission that the period of suspension was so limited no question of deprivation or of an unequal distribution of assets between creditors could have arisen because on 2nd March 2009 the final payments under the swaps would have become both due and payable. But even had the period of suspension up to the maturity date been longer the result would have been no different. LBSF (and its creditors) would have been obliged to wait for their money if the company was in the money but would not have been required to provide for more than its net liabilities if not.

82 Mr Nash does, however, pursue his arguments on this point if (as we have decided) the correct analysis of the operation of Section 2(a)(iii) is that put forward by Mr Zacaroli on behalf of ISDA. He submits that the deprivation occurred on 2nd March 2009 when but for Section 2(a)(iii) LBSF would have been entitled to a final payment from Carlton. The period of suspension may be indefinite and the only bar to recovery of this money is its supervening bankruptcy. Alternatively he submits that the operation of Section 2(a)(iii) breaches the *pari passu* rule because it suspends the recoverability (and therefore the distribution) of an asset of the bankrupt estate amongst its creditors. If this is right then questions of whether the contractual arrangements were entered into for *bona fide* commercial reasons are, he says, irrelevant. The application of the rule is mandatory: see *British Eagle International Airlines Ltd v Cie Nationale Air France [1975] 1 WLR 758* .

83 Belmont was concerned with a complicated set of provisions as part of which collateral in the form of investments purchased with the subscription monies for notes issued by an SPV was charged by the issuer to secure its obligations to the noteholders and to LBSF under a collateral swap agreement on terms which changed the priorities between LBSF and the noteholders in the event of the former's insolvency. Up to that time LBSF had senior ranking rights in respect of the security. The change in priority was challenged by LBSF on the ground that it deprived the company of property to which it was entitled in its bankruptcy.

84 The key provision was clause 5.5 of a supplemental trust deed which stated that:

> "The Trustee shall apply all moneys received by it under this Deed in connection with the realisation or enforcement of the Mortgaged Property as follows: Swap Counterparty Priority unless … an Event of Default (as defined in the Swap Agreement ) occurs under the Swap Agreement and the Swap Counterparty is the Defaulting Party (as defined in the Swap Agreement ) … in which case Noteholder Priority shall apply."

85 The Supreme Court held that in applying the anti-deprivation rule it was necessary to look at the substance of the agreement rather than its form and to consider whether the provision in question amounted to an illegitimate attempt to evade the relevant bankruptcy law or had some legitimate commercial basis. The ratio of the decision that clause 5.5 was unobjectionable is contained in the following passage from the judgment of Lord Collins of Mapesbury which was expressly concurred in by the majority of the court:

> "102. It would go well beyond the proper province of the judicial function to discard 200 years of authority, and to attempt to re-write the case law in the light of modern statutory developments. The anti-deprivation rule is too well-established to be discarded despite the detailed provisions set out in modern insolvency legislation, all of which must be taken to have been enacted against the background of the rule.
>
> 103. As has been seen, commercial sense and absence of intention to evade insolvency laws have been highly relevant factors in the application of the anti-deprivation rule. Despite statutory inroads, party autonomy is at the heart of English commercial law. Plainly there are limits to party autonomy in the field with which this appeal is concerned, not least because the interests of third party creditors will be involved. But, as Lord Neuberger stressed [2010] Ch 347, para 58, it is desirable that,

so far as possible, the courts give effect to contractual terms which parties have agreed. And there is a particularly strong case for autonomy in cases of complex financial instruments such as those involved in this appeal.

104. No doubt that is why, except in the case of a blatant attempt to deprive a party of property in the event of liquidation ( *Folgate London Market Ltd v Chaucer Insurance plc [2011] EWCA Civ 328* ), the modern tendency has been to uphold commercially justifiable contractual provisions which have been said to offend the anti-deprivation rule: *Money Markets International Stockbrokers Ltd v London Stock Exchange Ltd [2002] 1 WLR 1150* ; Lomas v JFB Firth Rixson Inc [2010] EWHC 3372 (Ch) ; and the judgments of Sir Andrew Morritt C and the Court of Appeal in these proceedings. The policy behind the anti-deprivation rule is clear, that the parties cannot, on bankruptcy, deprive the bankrupt of property which would otherwise be available for creditors. It is possible to give that policy a common sense application which prevents its application to bona fide commercial transactions which do not have as their predominant purpose, or one of their main purposes, the deprivation of the property of one of the parties on bankruptcy.

105. Except in the case of well-established categories such as leases and licences, it is the substance rather than the form which should be determinant. Nor does the fact that the provision for divestment has been in the documentation from the beginning give the answer, nor that the rights in property in question terminate on bankruptcy, as opposed to being divested. Nor can the answer be found in categorising or characterising the property as "property subject to divestment on bankruptcy."

106. If the anti-deprivation principle is essentially directed to intentional or inevitable evasion of the principle that the debtor's property is part of the insolvent estate, and is applied in a commercially sensitive manner, taking into account the policy of party autonomy and the upholding of proper commercial bargains, these conclusions on the present appeal follow.

107. The answer is not to be found in the Noteholders' argument that (a) LBSF's property was a beneficial interest under a trust, of which it was one of a number of beneficiaries (Clause 5.3 of the STD) and that (b) LBSF retains its beneficial interest under the trust to this day. The fact that the security interests were held by the Trustee is not determinative. The court has to look to the substance of the matter, which is that LBSF had a security interest, the content and extent of which altered when it filed for Chapter 11 protection. Nor is it to be found in the fact that the potential for change in priority was in the documentation from the beginning, nor in the "flawed asset" argument or variant of it, that the security interest, or the right under the trust to have the trust property administered in accordance with Swap Counterparty Priority, was inherently qualified or limited, because it applied only for so long as there had been no Event of Default under the Swap Agreement for which the Swap Counterparty was the Defaulting Party.

108. The answer is to be found in the fact that this was a complex commercial transaction entered into in good faith. Although, as a matter of law, the security was provided by the Issuer out of funds raised from the Noteholders, the substance of the matter is that the security was provided by the Noteholders and subject to a potential change in priorities.

109. The security was in commercial reality provided by the Noteholders to secure what was in substance their own liability, but subject to terms, including the provisions for Noteholder Priority and Swap Counterparty Priority, in a complex commercial transaction entered into in good faith. There has never been any suggestion that those provisions were deliberately intended to evade insolvency law. That is obvious in any event from the wide range of non-insolvency circumstances capable of constituting an Event of Default under the Swap Agreement ."

86 This must now be taken as an authoritative statement of the anti-deprivation principle. The court in Belmont rejected the approach suggested by Patten LJ in the Court of Appeal based on what Lord Collins describes as the flawed asset theory preferring instead to consider each

transaction on its merits to see whether the shift in interests complained of could be justified as a genuine and justifiable commercial response to the consequences of insolvency.

87 If this is the touchstone then it is difficult to see how Section 2(a)(iii) of the Master Agreement can be said to offend against the anti-deprivation principle. The suspension of the payment obligations of the non-defaulting party for the duration of the insolvency does no more than to prevent Carlton from having to make payments under a hedging arrangement with a bankrupt counterparty. There is no suggestion that it was formulated in order to avoid the effect of any insolvency law or to give the non-defaulting party a greater or disproportionate return as a creditor of the bankrupt estate. Mr Nash placed some emphasis on the fact that the payment in question fell due at the end of the contract period but this is irrelevant in our opinion to the application of the anti-deprivation principle. The commerciality of the arrangements has to be judged by considering the operation of Section 2(a)(iii) throughout the life of the contract and not solely by reference to the point in time when it comes to operate.

88 Looked at in this way it cannot be said that the suspensory effect of Section 2(a)(iii) engages the anti-deprivation principle. In Firth Rixson Briggs J suggested that a useful test for determining whether the creation *ab initio* of a flaw in an asset amounted to a breach of the anti-deprivation principle when the condition of insolvency was fulfilled might be to ask whether the chose in action represents the *quid pro quo* for something already done, sold or delivered prior to the event of insolvency or is intended to provide the *quid pro quo* for services yet to be rendered:

> "108. In my judgment the critical distinction which emerges from those and other cases may be expressed in the following way. Where the asset of the insolvent company is a chose in action representing the quid pro quo for something already done, sold or delivered before the onset of insolvency, then the court will be slow to permit the insertion, even ab initio, of a flaw in that asset triggered by the insolvency process. By contrast, where the right in question consists of the quid pro quo (in whole or in part) for services yet to be to be rendered or something still to be supplied by the insolvent company in an ongoing contract, then the court will readily permit the insertion, ab initio, of such a flaw, there being nothing contrary to insolvency law in permitting a party either to terminate or adjust what would otherwise be an ongoing relationship with the insolvent company, at the point when it goes into an insolvency process.
>
> 109. Examples of the former type are the royalty stream in Ex p Mackay , which was the quid pro quo for a patent sold outright by the person who later became bankrupt, and the debt owed by Air France to British Eagle, which was for services already rendered by British Eagle to Air France prior to the commencement of its winding up.
>
> 110. Familiar examples of the latter category are leases and licences, where the right to enjoy the underlying asset accrues over time, in exchange, also over time, for payment of rent or fees, and which have always been terminable on bankruptcy without infringing the rule: see the *Perpetual Trustee Co case [2010] 1 BCLC 747* at [64]. A more telling example is the security right enjoyed by LBSF under its swap agreement in priority to the noteholders over collateral for which the noteholders had paid the price, and which was liable to be subordinated to the noteholders' security in the event of LBSF's insolvency. That right was conferred in connection with a swap contract also governed by an ISDA master agreement, pursuant to which LBSF had ongoing obligations at the time when it went into Chapter 11 bankruptcy."

89 In Belmont Lord Walker (at para 131) described this as a valuable contribution to the search for principle although as a test it lacked precision. Lord Mance was more emphatic:

> "176. I would accept that the forfeiture of contractual rights on the bankruptcy of the party enjoying them is in some circumstances capable of constituting a deprivation of property within the principle precluding evasion of the bankruptcy law. This is so not only with accrued rights, but may also be the case with other rights, as, for example, where the bankrupt has performed his part before going bankrupt or the right can fairly be treated as independent of any as yet unperformed obligation. I question, even at common law, whether an insured who enjoys third party liability cover for a period on a claims made basis and goes bankrupt part way through that period could properly be

deprived of the benefit of such cover in respect of claims arising from his activities prior to his bankruptcy. To that extent, s 1(3) of the Third Parties (Rights against Insurers) Act 1930 may well have done no more than reflect what would have been held to be the common law.

177. However, Mr Snowden advanced propositions which would mean that any provision for termination on bankruptcy, which would deprive the trustee or liquidator of the opportunity of continuing the contract and so the bankrupt estate of future potential advantage, would infringe the principle. There is in my opinion no basis for any such rule. Where a contract provides for the performance in the future of reciprocal obligations, the performance of each of which is the quid pro quo of the other, I see nothing objectionable or evasive about a provision entitling one party to terminate if the other becomes bankrupt. That is particularly so, having regard to the purpose and character of the present transaction, viewed rather more broadly than the Court of Appeal did in its detailed reasoning.

…..

179. I see no reason therefore why the law should preclude a commercial party in the position of Saphir (acting for the benefit of Noteholders) from insisting that it would only provide the desired cover so long as LBSF was able, whatever the predicted outcome of the transaction, to perform its part in full. The purpose and effect of such a provision is not to evade the bankruptcy law. It is to protect the natural interest of any contracting party, and particularly someone who is providing in effect credit insurance, that it should not find itself having to perform to its disadvantage, without being able to enforce performance if this would be to its advantage. It is a prudent limitation on the duration and operation of the contract. The result reached by Briggs J in Lomas v JFB Firth Rixson Inc was correct in relation to the mutual contractual obligations with which he was concerned."

90 Lord Collins (at paras 100-101) declined to express a concluded view about the application of the principle to payment obligations under executory contracts other than to note that accrued property rights such as debts must at least be capable of being caught by the rule. But, as already mentioned, there is no suggestion that Section 2(a)(iii) can affect the recovery of sums which became due and payable before the Event of Default.

91 It seems to us that the application of the anti-deprivation principle to contracts of this kind has to be considered on a case specific basis in which the factors suggested by the judge will be relevant as one means of distinguishing between a commercial re-arrangement of rights to reflect the economic consequences of insolvency and an attempt to pre-empt the distribution of assets in a bankrupt estate. Mr Nash submits that there is no commercial justification for the consequences of Section 2(a)(iii) even when it occurs near the outset of the contract period. Its effect is to allow the non-defaulting party to keep the contract open with no obligation to make further payments whereas the defaulting party is kept on risk and cannot close the transaction.

92 We are not persuaded by this. The purpose of Section 2(a)(iii) is to protect the non-defaulting party from the additional credit risk involved in performing its own obligations whilst the defaulting counterparty remains unable to meet its own. The liabilities of the defaulting party are capped (as we have held) under Section 2(c) so that during a period when that party is in the money it will have no exposure and when it is out of the money its liabilities will be net of any countervailing credits which would have fallen due from the non-defaulting party. The fact that the defaulting party is unable to terminate the transaction and so recover what is due to it on a close-out is simply the product of the balance struck between the interests of the non-defaulting party which would otherwise have to pay its net liabilities in full under a non-performing contract and those of the defaulting party whose own net liabilities will take the form at best of a dividend in the liquidation or administration. The indefinite suspension of the payment obligation of the non-defaulting party (like any attempt to balance competing interests) may on one view be criticised as imperfect but it cannot be said to be uncommercial.

93 There is, however, another reason why we consider that an argument based on the anti-deprivation principle cannot succeed in this case. This is simply that the deprivation of which LBSF complains was as much attributable to the bankruptcy of LBHI (the Credit Support

Provider) which took place on 15th September 2008 some three weeks before that of LBSF as it was to that of LBSF. As of 2nd March 2009 when the final payment fell due there was therefore a continuing Event of Default which prevented the satisfaction of the condition set out in Section 2(a)(iii)(1) regardless of the position of LBSF and which operated to the same effect.

94 In these circumstances the anti-deprivation rule cannot protect LBSF from the contractual consequences of its own insolvency.

95 In anticipation of some of those difficulties Mr Nash submitted in the alternative (and as the preferred basis of his argument) that this was in fact a case where Section 2(a)(iii) had the effect of breaching the *pari passu* rule of distribution. The advantage of this argument (if correct) is that the rule (which is given statutory effect in ss. 107 and 328 of the Insolvency Act 1986 ) applies almost without qualification to any property of the bankrupt estate and does not depend for its application on questions of commerciality and good faith: see Belmont at paragraph 75.

96 The relationship between the anti-deprivation principle and the *pari passu* rule is both dependant and autonomous. The former is concerned with contractual arrangements which have the effect of depriving the bankrupt estate of property which would otherwise have formed part of it. The *pari passu* rule governs the distribution of assets within the estate following the event of bankruptcy. It therefore invalidates arrangements under which a creditor receives more than his proper share of the available assets or where (as in British Eagle ) debts due to the company on liquidation were to be dealt with other than in accordance with the statutory regime.

97 The anti-deprivation principle therefore protects the value of the estate from attempts to evade the insolvency laws and, as a consequence, facilitates the application of the *pari passu* rule. But their areas of operation are distinct and it is clear that the *pari passu* rule is only engaged in respect of assets of the estate as at the commencement of the bankruptcy or liquidation. This was why in British Eagle the decisive issue was whether a debt was owed to the company when the resolution for voluntary liquidation was passed.

98 In this case there was no debt payable to LBSF when its bankruptcy commenced. The obligation to pay was subject to a condition precedent that there should be no continuing Event of Default. In the event there were at least two. It follows that Section 2(a)(iii) does not infringe the *pari passu* rule because it operates at most to prevent the relevant debt ever becoming payable. There is therefore no property which is capable of being distributed.

99 LBSF also has the difficulty that Carlton is not a creditor in respect of the final payment which became due on 2nd March 2009. Although we can see how an attempt by a debtor to resist payment (as in British Eagle ) by relying on contractual arrangements which offend against the *pari passu* rule could be defeated by the application of that rule, the circumstances are likely to be unusual. In most cases the *pari passu* rule will be relied on by the liquidator or trustee in bankruptcy to defeat a creditor's reliance on a contractual arrangement which was intended to give him preference in relation to the distribution of the estate. In this case no question of any distribution arises and Carlton's status as a debtor merely serves to confirm that the issue between the parties is not how the £2.65m which fell due on 2nd March should be distributed but whether it is payable at all.

## Conclusions on the second appeal

100 We will therefore dismiss the second appeal.

## The facts of the Third Appeal

101 The third appeal ( Pioneer Freight Futures Company Limited (in liquidation) v Cosco Bulk Carrier Company Limited ) concerns a series of eleven FFAs entered into by Pioneer and Cosco between January 2007 and August 2008. All were subject to the 2007 terms of the Forward Freight Agreement Brokers Association which incorporate by reference the Master Agreement .

102 For convenience the contracts have been sub-divided into three groups. The groups do not follow the order in which the contracts were entered into. The first four contracts, nos 1–4, under which Cosco was seller, called for, variously, performance in the Contract Months January to

December 2008. The second four contracts, nos 5–8, under which Pioneer was seller, called for, variously, performance in the Contract Months January 2008 to March 2009. The final three contracts, nos 9, 10 and 11, under which Pioneer was again seller, called for, variously performance in the Contract Months January 2007 to December 2009.

103 Under the contracts the Settlement Date was the last Baltic Exchange Index publication day of each Contract Month. That is significant because on 14 December 2009 Pioneer passed a resolution for its winding-up. It is common ground that this was an Event of Default under the Master Agreement , the effect of which was to bring about the AET of all outstanding transactions between the parties under the Master Agreement .

104 Seven of the eleven FFAs had October 2008 as a Contract Month. Under four of these, Cosco was the seller and payment was due from Pioneer in an amount of US$ 9,220,955.64. Under the other three of these seven contracts Pioneer was the seller and payment was due from Cosco of US$ 2,544,992.42. With netting, this meant that a balance in favour of Cosco of US$ 6,478,003.22 was due (pursuant to clause 8 of each FFA) on 7 November 2008. Although Pioneer accepts that such sum was due to Cosco, it did not pay it or any part of it.

105 On 11 November 2008 Cosco wrote to Pioneer giving notice of failure to pay this sum and stating that, if Pioneer failed to pay the sum on or before the third business day after receiving the letter, that failure would constitute an Event of Default under sections 5(a)(i) and 5(a)(v)(2) of the Master Agreement . The letter also stated that, by virtue of Section 2(a)(iii) , Cosco would have no obligation to make any payment in respect of any of the FFAs for so long as such Event of Default was continuing.

106 Pioneer did not pay the sum due within that timescale or at all and it is common ground that there was an Event of Default, or Potential Event of Default, following Pioneer's failure to make that payment and that, by virtue of Section 2(a)(iii) , Cosco was not obliged to make any payment falling due to Pioneer in future Contract Months during the currency of the Master Agreement while Pioneer's failure to pay had not been cured.

107 In fact neither party made any further payment under any of the FFAs, and this remained the position until Pioneer went into liquidation in December 2009.

108 The accounting position between the parties as at the end of December 2009 was as follows:—

(1) It is accepted for present purposes that under FFAs nos 1–4 Cosco remained the party in the money until the establishment of the amount due in respect of the last Contract Month under each contract, December 2008. It is accepted that a sum of about US$ 29M is payable by Pioneer to Cosco in respect of these four transactions. That liability has accrued due and Pioneer does not dispute it, although it has not paid it. The parties have left over for further determination whether the figure of US$ 29M in fact requires some slight revision for reasons not relevant to the appeal.

(2) Under FFAs nos 5 and 6 the last Contract Month was also December 2008. For FFAs nos 7 and 8 the last Contract Month was March 2009. It is common ground that but for the application of Section 2(a)(iii) of Master Agreement the total sum of about US$ 23M would have been due from Cosco to Pioneer under these four FFAs.

(3) Under FFAs 9, 10 and 11 Pioneer was again in the money. The last Contract Month was December 2009 so that the last Settlement Date fell after AET had been brought about on 14 December 2009. It is common ground that these three transactions were in consequence subject to the AET provisions and that as a result of the close-out netting procedure a sum of about US$ 22M is due from Cosco to Pioneer in respect of them.

109 In point of form the dispute between the parties concerns the status of FFAs nos 1–8 and whether in particular they too were subject to AET in December 2009. If they were, the effect of applying the close-out provisions in Section 6 of the Master Agreement and the choice by the parties of Second Method and Loss would result in a balance due to Pioneer of a little over US$

16M, being, broadly, the result of deducting from the US$ 45M due from Cosco to Pioneer under FFAs nos 5–11 the US$ 29M due from Pioneer to Cosco under FFAs nos 1–4.

110 Pioneer contends that all eleven of the FFAs were indeed subject to AET in December 2009. Cosco contends that FFAs nos 1–8 were not subject to AET because in each case the last date for performance had passed prior to the Early Termination Date.

111 Flaux J agreed with Cosco. He held that any unperformed obligation under such a Transaction, including obligations that had accrued due to Cosco but had not been paid by Pioneer, and obligations that would have accrued due to Pioneer but for the operation of Section 2(a)(iii) upon Pioneer becoming subject to an Event of Default, were not to be taken into account in arriving at the net sum payable under Section 6(e) .

112 In point of substance Flaux J's conclusion only affects the treatment of FFAs nos 5–8, because notwithstanding he held that FFAs nos 1–4 were not subject to the AET procedure, he nonetheless held that there remained an accrued debt due to Cosco thereunder which Cosco could set off against the sum calculated under Section 6(e) as due under FFAs nos 9, 10 and 11.

113 Pioneer argued before Flaux J that it could in the alternative achieve a result not much less advantageous to it by a simple application of the netting provisions contained in Section 2(c) of Master Agreement . We have already referred to this at paragraphs 71-78 above. We have indicated there our view that Flaux J's approach to this point was wrong. But that will not avail Pioneer since we have also concluded, as indicated at paragraphs 78 and 79 above, that Section 2(c) applies its netting provisions only in relation to contemporaneous payment obligations, that is to say only to amounts which, under the original terms of the contract, were expressed to be payable on the same date in respect of the same (or at the parties' election) two or more of the relevant transactions. Pioneer cannot therefore utilise Section 2(c) to net off against the sums which it owed Cosco at the end of December 2008 the sums which would, but for the operation of Section 2(a)(iii) , have fallen due from Cosco to Pioneer in the months January, February and March 2009.

114 However, in our judgment, Pioneer has no need of this alternative argument. It follows from our conclusions expressed in paragraphs 21-63 above that the view to which Flaux J came concerning the ambit of close-out netting pursuant to Section 6(e) of Master Agreement consequent upon AET taking effect on 14 December 2009 is necessarily wrong. All eleven FFAs were in our view subject to AET, there being no basis for excluding from its ambit transactions in respect of which the last date for performance had passed prior to AET taking effect.

115 Flaux J concluded that the close-out netting calculation under Section 6(e) excluded Transactions "which have already terminated at their natural expiry date" – see paragraph 103 of his judgment at [2011] EWHC 1692 (Comm). Thus Cosco's suspended obligation to pay Pioneer under FFAs nos 5–8 was extinguished because the Event of Default subsisted on the final date for performance of obligations thereunder. Even Pioneer's accrued obligation to pay Cosco under FFAs nos 1–4 was not subject to the close-out calculation because those Transactions had "expired by effluxion of time".

116 These reasons are obviously inconsistent with and unsustainable in the light of our conclusions that:—

i) The underlying debt obligation under Section 2(a)(i) is undisturbed by the Event of Default. It is the payment obligation alone which is suspended.

ii) A Non-defaulting Party's obligation to pay under Section 2(a)(i) is not extinguished merely because an Event of Default exists on the date specified in the contract for performance.

iii) The payment obligation is not extinguished on the maturity of the Transaction, by which we mean the arrival of the last date fixed for contractual performance. The terms of the Master Agreement recognise no concept of expiry by effluxion of time, nor is there any basis upon which it can arise by implication.

iv) It is possible for the Non-defaulting Party to terminate early after the maturity date of the

Transaction. A fortiori, Automatic Early Termination can take place after the maturity date of the transaction where AET has been specified in the Schedule as provided in Section 6(a) of Master Agreement .

117 That is sufficient to dispose of the third appeal. Flaux J considered that his conclusion was supported by one or two linguistic points, but his conclusion was essentially dependent upon his flawed analysis that the Transaction "expired by effluxion of time", as was his approach to the contractual language. It suffices to say that, properly understood in the context of the shape and nature of the transactions as we have determined them to be, neither the phrase "all outstanding Transactions" in Section 6(a) nor the phrase "all Transactions in effect" in the definition of Terminated Transactions used in Section 6(e)(ii) carries any implication that Transactions in respect of which the last date specified for performance has passed are excluded from the close-out mechanism following Early Termination.

118 We also agree with Mr Kimmins and Mr Zacaroli that Flaux J's approach is inconsistent with the "Single Agreement" provision in Section 1(c) of the Master Agreement . That provides:—

"Single Agreement All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions."

The effect of Section 1(c) is that the parties are agreeing that the obligations contained in " all Transactions … entered into" (emphasis added) are not to be treated as separate and distinct, but are made subject to the contractual framework constituted by the Master Agreement , including when an Early Termination Date occurs. This is reinforced and emphasised by the statement that "the parties would not otherwise enter into any Transactions" (emphasis added). On the approach adopted by Flaux J all Transactions are not treated in the same way but are treated differently, some being made part of close-out netting and others being excluded. Mr Zacaroli submitted that the concept of the Single Agreement is one of the main pillars on which the ISDA Master Agreement architecture is built. We can understand why that may be so, and we agree with Mr Zacaroli that there is no basis for any implied limitation on the categories of Transaction intended to comprise the Single Agreement.

119 Flaux J derived linguistic support for his conclusion from the circumstance that the final sentence of Section 6(e) of ISDA provides:—

"The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any set-off."

Set-off is a defined term. Section 14 provides that it means:—

"Set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on such payer."

Flaux J considered that this demonstrated that the wording of the Master Agreement expressly recognises that there may be sums owing under the Master Agreement which are not the subject of close-out netting. The paradigm case is likely we think to be a Set-off of a right to payment under another agreement. We are unsure why the draftsman included reference to a right of Set-off to which the payer of an amount under Section 6 is entitled or subject "arising under this Agreement" but whatever his purpose, which may simply have been an abundance of caution, it is a wholly insubstantial basis upon which to displace our clear conclusion that the shape and nature of the Master Agreement necessarily involves the result that the obligations arising under all eleven of the FFAs were here subject to close-out netting.

**Conclusions on the Third Appeal**

120 We will therefore allow the third appeal. Subject to the point reserved, Pioneer is entitled to US$ 16,554,061.69 together with interest. Again, we shall ask the parties to co-operate in drawing up a new order.

## The Facts of the Fourth Appeal

121 The fourth appeal, wherein Bulk Trading SA ("Bulk") is Appellant and Britannia Bulk plc (in liquidation) ("Britannia Bulk") is Respondent, again concerns a forward freight agreement on the FFABA 2007 Terms incorporating by reference the Master Agreement . The contract in question was made on 24 June 2008 between Britannia Bulk as seller and Bulk as buyer. The details do not matter, save only that (1) the performance months were January – December 2009, (2) for the purposes of payment on Early Termination the parties had selected Loss as the payment measure and Second Method as the payment method and (3) the parties had agreed that Automatic Early Termination would apply to both parties.

122 Administrators were appointed over Britannia Bulk on 31 October 2008. It is now in liquidation. By virtue of Section 5(a)(vii)(6) and section 6(a) of the Master Agreement AET took place immediately upon appointment of administrators. That brought into play the regime prescribed by Section 6(e) for Payments on Early Termination. That regime is summarised at paragraph 8(xiii) above. The fourth appeal raises the point to which that description is there made subject, whether in all circumstances the Master Agreement requires it to be assumed for the purpose of carrying out the relevant calculations that each applicable condition precedent has been satisfied.

123 Section 6(e)(i)(4) of the Master Agreement provides:—


   **"Second Method and Loss.**

   If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party."

Loss is defined in Section 14 . Since the argument turns in part on whether the Loss and Market Quotation methods are intended to achieve essentially similar outcomes we set out as well the definition of the latter which appears in Section 14 immediately after the definition of "Loss".

   **""Loss"** means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or re-establishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

   **"Market Quotation"** means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations

from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section "2(a)(i) in respect of such Terminated transaction or group of Terminated transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined."

124 AET required Bulk as the Non-defaulting Party reasonably to determine in good faith its total loss or gain from the terminated contract. It will be noted that in the second sentence of the definition of Loss, which deals with payments required to have been made on or before the relevant Early Termination Date, of which there were of course none here, an assumption is required that each applicable condition precedent had in fact been satisfied. The same assumption is required when making the quotation prescribed by the definition of Market Quotation. This assumption is not mentioned in the first sentence of the definition of Loss.

125 It is common ground that, had the Event of Default not occurred and the agreement been performed throughout its currency then, on the basis of the forward freight rates available on 31 October 2008, Bulk would have been liable to pay Britannia Bulk substantial sums over the term of the contract. Britannia Bulk says that, because early termination has relieved Bulk of that liability, Bulk has made a gain in respect of which it must make a payment to Britannia Bulk.

126 Bulk, by contrast, says that it has made no gain since, had the early termination not occurred, no payments would have accrued due to Britannia Bulk over the term of the agreement because for the whole of the term Britannia Bulk would have remained affected by bankruptcy and so the condition precedent to payment in Section 2(a)(iii)(1) would not have been fulfilled. Since nothing would have been payable had the contract continued, there is no gain for which Bulk must account.

127 Thus the question may be formulated – is Bulk as the Non-defaulting Party obliged to calculate its loss by reference to sums which would have become due to Britannia Bulk had Britannia Bulk not remained subject to an Event of Default after Automatic Early Termination? Bulk's argument is that it is not so obliged. It points to the omission from the first sentence of the definition of Loss, which is a forward not backward looking provision, of the requirement to make the assumption that each applicable condition precedent has been satisfied.

128 Bulk's argument was rejected by Flaux J in his judgment in this case [2011] EWHC 692 (Comm). [2011] 2 Lloyd's Rep 84 Gloster J came to the same conclusion in a judgment delivered

one week later – see Pioneer Freight Futures Company Limited (in liquidation) v TMT Asia Limited [2011] 2 Lloyd's Law Rep 96 at paragraphs 109-117.

129 In a subsequent decision, Anthracite Rated Investments (Jersey) Ltd v Lehman Brothers Finance SA (in liquidation)[2011] 2 Lloyd's Law Rep 538 , Briggs J said this at paragraph 116 of his judgment:—

> "A significant body of recent case law has developed in relation to the interpretation and application both of Loss and Market Quotation under the 1992 Master Agreement . The decisions to which I was *referred are Australia and New Zealand Banking Group Ltd v Société Générale [2000] CLC 833; [2000] 1 All ER (Comm) 682* ; *Peregrine Fixed Income Ltd (In Liquidation) v Robinson Department Store plc [2000] CLC 1328* ; *Britannia Bulk plc (In Liquidation) v Pioneer Navigation Ltd [2011] 2 Lloyd's Rep 84* ; and *Pioneer Freight Futures Co Ltd v TMT Asia Ltd [2011] 2 Lloyd's Rep 96* . Those authorities establish the following broad propositions:
>
> (1) Loss and Market Quotation are, although different formulae, aimed at achieving broadly the same result, so that the outcomes derived from one may be usefully tested by way of cross-check by reference to the other: see per Mance LJ in the Australia case at paras 2, 15 and 22. This derived from a concession in that case, but has subsequently been reaffirmed after adversarial argument in the Peregrine case at para 30, in the Britannia Bulk case at paras 44 to 46 and 51, and in the Pioneer case at paras 98 and 105. It is one of those sensible concessions which as hardened into hornbook law.
>
> (2) The identification of the Non-defaulting Party's loss of bargain arising from the termination of the Derivative Transaction requires a "clean" rather than "dirty" market valuation of the lost transaction. This means that the loss of bargain must be valued on an assumption that, but for termination, the transaction would have proceeded to a conclusion, and that all conditions to its full performance by both sides would have been satisfied, however improbable that assumption may be in the real world: see in the Australia case at paras 5, 22 to 27 and 30 to 31, the Britannia Bulk case at paras 11 to 14 and 34 to 35, and in the Pioneer case at paras 112 to 117.
>
> (3) The termination payment formulae under section 6(e) are not to be equated with, or interpreted rigidly in accordance with the quantification of damages at common law for breach of contract. They are methods of calculating close-out positions on the termination of a derivative transaction or series of transactions: see the Britannia Bulk case per Flaux J at para 37. This is, in particular, because the Second Method works both ways, and may lead to a close-out payment due to the Defaulting Party."

130 The Australia case was, as is apparent, a decision of the Court of Appeal, Kennedy and Mance LJJ. The Peregrine case was a decision of Moore-Bick J, as he then was.

131 We agree with Briggs J's analysis of the effect of these cases. Mr Zacaroli for ISDA contended that on this point Flaux J (and Gloster J) had reached the correct conclusion. Faced with this unanimity of approach we would hesitate long before reaching a contrary view. We were not persuaded by Mr Willan for Bulk that we should.

132 It seems to us that Flaux J was right to say, at paragraphs 13 and 35 of his judgment, that Bulk's argument is founded upon a fallacy or an impossibility. Where AET applies, as here, there cannot be a relevant Bankruptcy Event of Default without there being AET in consequence. Bulk's argument assumes an Event of Default going forward for the remainder (or here the whole) of the contract period, but that is not possible, since such Event of Default would itself lead to AET. So one cannot posit a contract going ahead in circumstances where Britannia Bulk is in administration. Thus as Flaux J pointed out at paragraph 35 of his judgment:—

> "…Although it is right that the first sentence of the Loss definition does not say in terms "assuming satisfaction of all conditions precedent", it does not need to, because that is the only basis upon which the assessment of the "gain" can proceed, namely on the basis that there was no Bankruptcy Event of Default and thus no Automatic Early

Termination. The gain in connection with the contract being terminated on that basis is indeed the amount of the payments which [Bulk] would have been required to make over the remaining term of the contracts."

133 Gloster J made a slightly different but in our view equally compelling point at paragraph 116 of her judgment in Pioneer v TMT . Dealing with exactly the same arguments as were addressed both to Flaux J and in turn to us, she said this, at page 116 of the report:—

"Fourth, as was submitted by Mr Kimmins and also by leading counsel for the Defaulting Party in Britannia , there is logically no need for the first sentence of the Loss definition in section 14 (relating to composite losses or gains, including loss of bargain) expressly to include the provision "assuming satisfaction of each applicable condition precedent". That is because that assumption is the only basis upon which a "gain" would ever have to be given credit for by the Non-defaulting Party under the Second Method. If Mr Crow were right, the Non-defaulting Party would never have to pay anything in respect of loss of bargain going forward. But the concept of Loss (including a non-defaulting Party's gain), as defined in section 14, clearly envisages that the Non-defaulting Party may have to pay the Defaulting Party something on "wash out" under section 6(e)(i)(4) in respect of loss of bargain. Given that the definition of "Loss" is not equivalent to the common law measure of damages, but rather is a method of calculating close out positions irrespective of which is the party in breach, I see no commercial basis for the position for which Mr Crow contends. In this respect I respectfully concur with the approach adopted by Flaux J in Britannia on this point."

134 We agree with this analysis. Indeed, we can see no answer to it.

135 Mr Willan submitted that the short question is what is meant by the words "total losses and costs or gain … including any loss of bargain" as used in the first sentence of the definition of Loss. He submitted that these words indicated an intention that "real" losses or gains should be looked at, not the nominal value of the obligations ignoring the reality of what had occurred. The judge had, he submitted, fallen into error in starting from the assumption that the words are concerned to describe a wash-out or close-out situation. It is, he submitted, inimical to the structure of the agreement that the Non-defaulting Party should have to pay to the Defaulting Party where, if the situation were reversed so that it was the Non-defaulting Party in the money rather than the Defaulting Party, the Non-defaulting Party could expect no payment from the Defaulting Party.

136 Attractively though these submissions were advanced, we consider that it is they which are in error rather than the judge's approach. The words the meaning of which must be construed appear in the definition of Loss which is itself a concept introduced in Section 6(e) of the Master Agreement , which section is concerned with wash-out or close-out netting. As Gloster J pointed out in Pioneer v TMT , the definition of Loss is a method of calculating close-out positions irrespective of which party is in breach and it does not nor is it intended to produce a result equivalent to the common law measure of damages. Despite the weight of the learning against him on this point, Mr Willan did not accept that the two methods, Loss and Market Quotation, were intended to achieve broadly similar results, but it would as it seems to us be very odd if they were intended to achieve radically different results. Both set out to assess the loss of bargain going forwards and it would we think be a surprising result if they required the making of fundamentally different assumptions as to the prospective satisfaction of conditions precedent which will inevitably lead to radically different outcomes. It was the choice of the parties that a relevant Bankruptcy Event of Default should lead to Automatic Early Termination. The result for which Mr Willan contends is that which would have obtained had the parties not so chosen in their contract and had Bulk elected not to exercise its right to terminate upon the occurrence of an Event of Default. Section 6(a) of the Master Agreement makes express provision for the selection of AET in respect of certain of the Bankruptcy Events of Default enumerated in Section 5(a)(vii) . In these circumstances, it is impossible to regard the result achieved as inimical to the structure of the agreement. The structure of the agreement is such that the result contended for by Bulk could have been but was not chosen by the parties as a possible outcome.

**Conclusions on the Fourth Appeal**

137 We will therefore dismiss the fourth appeal.

Crown copyright

© 2013 Sweet & Maxwell



# **Appendix 4**

# Britannia Bulk plc (in liquidation) v Pioneer Navigation Limited, Atlas Shipping Limited, Bulk Trading S.A.

Case No: 2009 FOLIOS 1087/1331

High Court of Justice Queen's Bench Division Commercial Court

25 March 2011

## [2011] EWHC 692 (Comm)

## 2011 WL 1060073

Before: The Hon Mr Justice Flaux

Date: 25/03/2011

Hearing dates: 1st and 2nd March 2011

## Representation

Mr Mark Phillips QC and Mr Stephen Robins (instructed by Norton Rose LLP for the Claimants in Folio 1087 and instructed by Watson Farley & Williams LLP for the Claimants in Folio 1331).

Mr Mark Hapgood QC and Mr Andrew Baker QC and Mr James Willan (instructed by Berwin Leighton Paisner LLP for the First Defendants in Folio 1087 and the Defendant in Folio 1331).

## Approved Judgment

The Honourable Mr Justice Flaux:

## Introduction

1 This judgment relates to a dispute as to the correct construction of the 1992 Master Agreement of the International Swap Dealers Association , now the International Swaps and Derivatives Association ("ISDA") which concerns the financial consequences of Automatic Early Termination of a series of forward freight agreements ("FFAs") between the parties following the insolvency of the claimant Britannia Bulk. On 11 November 2010 Paul Walker J ordered that the so-called "nil loss" issue raised in the pleadings in 2009 Folio 1331 be tried as a preliminary issue and on 17 December 2010, David Steel J ordered that the same issue raised in 2009 Folio 1087 should be tried at the same time. I heard that trial in both actions on 1 and 2 March 2011.

## The terms of the contracts

2 In order to understand the "nil loss" issue, it is necessary to set out in some detail the relevant contractual provisions. Each of the FFAs in issue incorporated the 2007 Terms of the Forward Freight Agreement Brokers Association ("the FFABA 2007 Terms"). Those Terms incorporated by reference the ISDA 1992 Master Agreement ("the Master Agreement"). An FFA on the FFABA 2007 Terms is a cash-settled contract for differences referenced to the Index rate or rates published by the Baltic Exchange as selected by the parties. A "Settlement Sum" is calculated for each FFA and each Contract Month from the "Contract Rate" agreed between the parties, the "Settlement Rate" for that Contract Month derived from the Baltic Exchange indices, and the number of days in the Month.

3 Clauses 7 and 8 of the FFABA 2007 Terms set out the payment terms for each contract month:

7 **Settlement Sum**

If the Settlement Rate is higher than the Contract Rate, the Seller shall pay the Buyer the Settlement Sum. If the Settlement Rate is lower than the Contract Rate, the Buyer shall pay the Seller the Settlement Sum.

8 **Payment Procedure and Obligations**

Payment of the Settlement Sum is due on the later of two (2) London business days after presentation of payee's invoice (with complete payment instructions) or five (5) London business days after the Settlement Date and for this purpose a "London business day" means a day (other than a Saturday or Sunday) on which commercial banks are open for business in London). The Settlement Sum will be deemed "paid" when it has been received into the bank account designated by the payee.

4 Clause 9 of the FFABA 2007 Terms then incorporates the Master Agreement with specific amendments, as follows:

9. **ISDA Master Agreement:**

This clause 9 applies only if either:

(i) this Confirmation does not already constitute a Confirmation under an existing master agreement entered into by the parties to this Confirmation; or

(ii) the parties agree, either by virtue of clause 20 or otherwise, that the terms of the Master Agreement that is constituted by this clause are to replace any such existing master agreement.

This Confirmation constitutes and incorporates by reference the provisions of the 1992 ISDA(r) Master Agreement (Multicurrency — Cross Border) (without Schedule) as if they were fully set out in this Confirmation and with only the following specific modifications and elections:

…

(e) for the purposes of payments on Early Termination, Loss will apply and the Second Method will apply;

(f) Automatic Early Termination will apply to both parties …

5 As will be seen later, the reference to "Second Method" and to "Loss" was to one of two payment methods and to one of two payment measures set out in the Master Agreement. As to the obligation to make payments during the period when a FFA was extant (i.e. before any Automatic Early Termination), Section 2 of the Mater Agreement set out certain General Conditions to which the payment regime in clauses 7 and 8 of the 2007 FFABA Terms was obviously subject:

2. **Obligations**

*(a) General Conditions.*

(i) Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

…

(iii) Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

6 Section 5 of the Master Agreement sets out various Events of Default and Termination Events. These cases are concerned with so-called "Bankruptcy Events of Default" which trigger Automatic Early Termination:

5. **Events of Default and Termination Events**

*Events of Default.*

(a) The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

*Bankruptcy.*

(vii) The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:

(6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all of its assets …

7 Section 6 then deals with early termination in these terms:

6. **Early Termination**

*Right to Terminate Following Event of Default.*

(a) If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

*Payments on Early Termination.*

(e) If an Early Termination Date occurs, the following provisions shall apply based on

the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

*Events of Default.*

(i) If the Early Termination Date results from an Event of Default:—

(1) *First Method and Market Quotation.* If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2) *First Method and Loss.* If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3) *Second Method and Market Quotation.* If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4) *Second Method and Loss.* If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

…

*Pre-estimate*

(iv) The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

8 First Method and Second Method are not in fact defined in the Mater Agreement, but Loss and Market Quotation together with other relevant expressions are defined in Section 14 :

14. **Definitions**

" **Loss** " means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or re-establishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11 . A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the 'Replacement Transaction') that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included …

*"Settlement Amount"* means, with respect to a party and any Early Termination Date, the sum of:—

(a) The Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined;

and

(b) such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

" **Unpaid Amounts** " owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii) ) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii) ) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the

currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

## Effect of appointment of administrators

9 Administrators were appointed over Britannia Bulk on 31 October 2008, so that by virtue of Sections 5 and 6 of the Master Agreement Automatic Early Termination then occurred immediately. The payment regime which had been in place under clauses 7 and 8 of the FFABA 2007 Terms and Section 2 of the Master Agreement was thus replaced by the regime for Payments on Early Termination in Section 6(e) . Under the Second Method and Loss provision and the definition of Loss, each of the defendants as the Non-defaulting Party was required to reasonably determine in good faith its total loss or gain from the terminated contracts.

## Summary of parties' cases

10 The case for Britannia Bulk is that, had the event of default not occurred and each of the FFAs run to expiry, on the basis of the forward rates available at the time of Automatic Early Termination, each of the defendants would have been liable to pay Britannia Bulk considerable sums over the remaining term of the contracts. It is Britannia Bulk's case that, because early termination has relieved the defendants of those liabilities, the defendants have incurred gains and are required to make payments to Britannia Bulk accordingly.

11 The defendants' case is that in fact they have not made any gain at all, the so-called "nil loss" argument. It is an argument which will require careful analysis in the present judgment, but its essence can be shortly stated. The defendants' case is that, if termination had not occurred, nothing would have been payable to Britannia Bulk under Section 2(a)(i) of the Master Agreement because the condition precedent to payment in Section 2(a)(iii)(1) would not have been fulfilled, since Britannia Bulk would have been affected by bankruptcy throughout the rest of the contractual period. Accordingly, no gain has been made by the defendants from early termination, because nothing would have been payable anyway.

12 As I have said, the nil loss argument is one which requires a close analysis but I should say at the outset that it seems to me that the argument faces two major difficulties. First, despite the ingenious submissions presented by Mr Hapgood QC on behalf of the defendants, the argument is contrary to what was said, albeit strictly obiter, by Mance LJ in *Australia and New Zealand Banking Group Ltd v Societe Generale [2000] CLC 833* and is also contrary to the judgment of Moore-Bick J as he then was, in the later case of *Peregrine Fixed Income Ltd (In Liquidation) v Robinson Department Store Plc [2000] CLC 1328* , where the dicta of Mance LJ were approved and applied.

13 Second and perhaps more importantly, it seems to me that Mr Phillips QC for Britannia Bulk is right that the fundamental fallacy in the nil loss argument is that it is founded on an impossibility. Under the terms of a Master Agreement in which Automatic Early Termination applies (as was the case here), you cannot have a Bankruptcy Event of Default without there being Automatic Early Termination. In other words, the argument assumes an Event of Default going forward for the remainder of the contract period, but that is simply not possible, because any such Event of Default would itself lead to Automatic Early Termination. As Mr Phillips says, that is why the "Loss" assessment which the Non-defaulting Party is obliged to make upon termination is on the basis that the loss or gain is valued "clean", which is what Mance LJ considered was the position in the ANZ case.

14 It is an essential aspect of the nil loss argument that, whereas adopting Second Method and Market Quotation is intended to create what Mr Hapgood described as a "fictional world" with a notional replacement transaction, adopting Second Method and Loss is rooted in the real world of

what actually happened prior to Automatic Early Termination and what would have happened absent Automatic Early Termination. Mr Phillips on the other hand contends that the two payment measures are intended to achieve a broadly similar result, a contention which recommended itself to both Mance LJ and Moore-Bick J. In order to test these rival contentions, it is necessary to look more closely at the four regimes for Payment on Early Termination set out in Section 6 (e) of the Master Agreement and at the effect of Automatic Early Termination.

## First Method and Second Method

15 As I have said, the Master Agreement , somewhat curiously, does not define First Method and Second Method or even explain the difference between them. However, one contrast between them is apparent from the wording of the provisions. First Method only ever involves payments by the Defaulting Party to the Non-defaulting Party where on Early Termination the calculation (whether the payment measure adopted is Market Quotation or Loss) arrives at a positive number, i.e. a loss for the Non-defaulting Party. The Non-defaulting Party never has to make a payment to the Defaulting Party when it has made a gain. This option is explained in Firth: Derivatives Law and Practice (2010) at para 11.157 as follows:

> "First Method reflects the position that applies at common law, where damages are never payable to the party in breach. In other words, if First Method has been chosen and the calculation has a negative value, no payment is due to either party. Such a provision is often referred to as a walkaway clause because it means that the Defaulting Party forfeits the embedded value of the transactions that have been closed out".

16 On the other hand under Second Method the wording of Section 6(e) expressly contemplates (for both the Market Quotation and the Loss payment measures) that the Non-defaulting Party not only has to make a payment if the calculation produces a positive number, but also if the calculation produces a negative number i.e. a gain for the Non-defaulting Party. Firth at para 11.157 explains this option as follows:

> "On the other hand, where Second Method has been selected and the calculation results in a negative value, the Non-defaulting Party must make an equivalent payment to the Defaulting Party".

17 Mr Phillips set out in his written submissions the history of the two methods in the derivatives markets. In the early days of derivatives, most market participants preferred the First Method which applied automatically under the 1987 version of the Master Agreement . This approach was the subject of some criticism and, in the 1992 Master Agreement which I have to consider, the Second Method applies automatically as the default position, unless First Method is expressly chosen.

18 Mr Phillips explained that one of the main factors which had led the market to prefer the Second Method was the change in capital adequacy rules for financial institutions in July 1994, when the Basel Committee on Banking Supervision "adopted the view that netting arrangements with 'walk-away' clauses introduce[d] an undesirable element of instability and uncertainty into netting arrangements" (Gooch & Klein, Documentation for Derivatives (4th ed., 2002), vol.1, p.232) and therefore amended the Basel Accord to provide expressly that "contracts containing walkaway clauses will not be eligible for netting for the purpose of calculating capital requirements pursuant to this Accord".

19 Mr Hapgood objected to reference to the Basel Accord as any sort of aid to the construction of the Master Agreement in the present case, on the basis that his clients were not members of the ISDA and knew nothing about the Basel Accord. The position of banks whose regulators consider that the Second Method reduces their capital requirements was of no concern to companies such as these defendants (or for that matter Britannia Bulk itself), trading FFAs on FFABA Terms. The Master Agreement was just a convenient umbrella agreement adopted in the FFA trade. In one sense, this objection is rather surprising as Mr Hapgood himself, in his Skeleton Argument, asserted that "Market Quotation" was "made available under the Master Agreement simply to facilitate the capital adequacy requirements of the financial institutions

which dominate ISDA's membership" and then referred, in a lengthy footnote, to the amendment to the Basel Accord.

20 Be that as it may, I have to construe the Master Agreement as incorporated in these FFAs and, in doing so, I derive little assistance from the history of why there are two payment methods. In any event, the difference between the two methods is apparent from an analysis of the wording of Section 6(e) , as I have indicated.

21 Furthermore, I am assisted in that analysis by what was said about the two payment methods in Section 6(e) of the Master Agreement by Moore-Bick J in *Peregrine Fixed Income Ltd (In Liquidation) v Robinson Department Store Plc [2000] CLC 1328* at 1335, paragraphs 23 and 24:

> 23 In s. 6(e) the Agreement provides for two fundamentally different methods of handling payments on Early Termination. Under what is termed the 'First Method' the Defaulting Party pays the Non-defaulting Party an amount equal to the value of the outstanding obligations under the transactions which have been terminated less any unpaid amounts owed to him by the Non-defaulting Party. The Defaulting Party recovers nothing in respect of the loss of his bargain, notwithstanding that he may have been 'in the money' at the time of default. This reflects the position under English law following the repudiation of a contract: accrued liabilities are unaffected and the defaulter must compensate the non-defaulter for the loss of any unperformed obligations but he is not entitled to receive anything himself in respect of the lost bargain. Under the 'Second Method' a payment may be made either way depending on whether the net balance of gain and loss favours the Defaulting or Non-defaulting Party. That appears most clearly from s. 6(e)(i)(4) and the definition of Loss from which it is clear that the Non-defaulting Party's 'Loss' in respect of the Terminated Transactions may be a negative amount (i.e. a gain), in which case a payment of that amount must be made to the Defaulting Party.

> 24 These provisions seem to me to support Mr Hapgood's submission that the object of the Second Method of payment (whether combined with Market Quotation or Loss as the basis of measurement) is to move away from a simple breach-based approach towards one under which all the transactions covered by the Agreement are effectively closed out. I think that it would be going too far to say that they are intended in all cases to operate neutrally as between the parties, but the fact that the Non-defaulting Party must account to the Defaulting Party for any gain clearly deprives the Event of Default of most of its characteristics as a breach of contract. However, the parties are free to agree to that and there are no doubt good commercial reasons for doing so. It is interesting to note that in the absence of any other choice s. 6(e) provides that the Second Method is to apply.

## Automatic Early Termination

22 The default position under the Master Agreement is that when an Event of Default occurs, the Non-defaulting Party will have the option of serving a notice under the first sentence of Section 6(a) , so as to give rise to an Early Termination Date. As Mr Phillips points out, where the Non-defaulting Party is in the money, it has a financial incentive to serve such a notice. An Early Termination Date crystallises the Non-defaulting Party's entitlement to compensation for its loss. In contrast, if the Non-defaulting Party is out of the money, it has a financial incentive not to serve such a notice, but to "sit on its hands" and keep the contract on foot, relying on the Defaulting Party's inability to comply with the condition precedent in Section 2(a)(iii)(1) as relieving it from the obligation to make any payments under Section 2(a)(i) , also thereby avoiding having to make any payment to the Defaulting Party on Early Termination.

23 Mr Phillips submits that if, as in the present case, the parties have selected Automatic Early Termination in their contract, then once one of the specified "Bankruptcy Events of Default" occurs, there will be Automatic Early Termination, in which case an out of the money Non-defaulting Party will be required to calculate and pay an appropriate amount to the liquidator, trustee or administrator of the in the money Defaulting Party. In other words, Mr Phillips submits, selection of Automatic Early Termination prevents the Non-defaulting Party from sitting on its hands and relying on non-compliance with the condition precedent in Section 2(a)(iii) .

24 Mr Hapgood denies that, at least where the Loss payment measure has been selected, Automatic Early Termination has such a radically different effect from the position under the first sentence of Section 6(a) . He submits that the real reason for having Automatic Early Termination is to avoid the netting problem i.e. that once a Bankruptcy Event of Default has occurred, the bankruptcy laws of most counties would not permit any set off between different transactions such as Section 2(c) contemplates. Automatic Early Termination seeks to do this by providing that the termination takes effect immediately prior to the presentation of a bankruptcy petition. Whether the provision is effective to circumvent bankruptcy laws is another matter.

25 Mr Hapgood submits that Automatic Early Termination has two effects. First it eliminates the possibility of an Event of Default being cured. Whether, whilst the contract is still on foot, an Event of Default can be cured and an obligation to pay under Section 2(a) can revive, is the subject of differing judicial views. In Marine Trade v Pioneer Freight Futures [2009] EWHC 2656 (Comm); [2010] 1 Lloyd's Rep 631 I expressed the view, obiter, at paragraphs 60 and 61 of my judgment, that the provisions of Section 2(a) are "one time" provisions so that, if the settlement date passes with nothing being payable because of an Event of Default, that obligation to pay does not revive at some later date if the condition precedent is then fulfilled. In contrast, in the Lehman Brothers litigation, *Lomas v JFB Firth Rixson [2010] EWHC 3372 (Ch)* , at paragraphs 72 to 79, Briggs J preferred on balance the view that a payment obligation under Section 2(a)(i) would be suspended whilst the condition precedent was not complied with, but could revive if at any time before the swap agreement came to its natural end, the condition precedent was then complied with. Whichever view is correct, Automatic Early Termination undoubtedly has the effect that an Event of Default can no longer be cured, even if it could be cured when the contract was on foot.

26 Mr Hapgood accepts that the second effect that Automatic Early Termination has, is that the payment obligations of the parties are moved from Section 2 to Section 6 . That is of course the effect of any Early Termination even after election through giving notice but, as Mr Hapgood recognised, the critical difference is that where there is Automatic Early Termination, the Loss calculation occurs automatically, rather than by the election of the Non-defaulting Party.

## Market Quotation and Loss

27 As Mr Phillips submits, the Market Quotation payment measure "provides a rigid and mechanistic approach which produces an objectively verifiable result" whereas the Loss measure is more flexible. As he points out, in a case where a Market Quotation cannot be obtained or would not produce a commercially reasonable result, the Loss measure is the fallback. Peregrine was such a case.

28 In order to determine the "Market Quotation" amount in respect of each Terminated Transaction, the Non-defaulting Party is required to obtain quotations from "Reference Market-makers" for a "Replacement Transaction" which is "a transaction … that would have the effect of preserving … the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction … that would, but for the occurrence of the relevant Early Termination Date, have been required after that date".

29 Accordingly, the task of the Reference Market-makers is to provide estimates of the market value of each Terminated Transaction from the perspective of the Non-defaulting Party and those estimates must assume the satisfaction of each applicable condition precedent, in other words assume that the Event of Default has not occurred. Once the Settlement Amount (i.e. the Market Quotation or in a fallback situation, the Loss) has been calculated, the Non-defaulting Party then has to add the "Unpaid Amounts" owing to it and deduct any Unpaid Amounts owing to the Defaulting Party. The definition of Unpaid Amounts covers both amounts that became payable prior to the Early Termination Date, but were not paid and amounts that would have become payable, but for Section 2(a)(iii) .

30 That calculation then produces a positive or a negative amount. What consequences flow depends obviously upon whether the parties have chosen First Method or Second Method. If it is a positive amount then under both Methods, the Defaulting Party will be liable to pay the Non-defaulting Party. However, if it is a negative amount, equivalent to an overall gain for the

Non-defaulting Party, then only if Second Method applies will the Non-defaulting Party have to pay the Defaulting Party. If First Method applies, then a negative amount is irrelevant.

31 It is in relation to the definition of "Loss" that the biggest divergence in the approach of the parties arises. Mr Phillips submits that Loss is less mechanistic and more flexible than Market Quotation, but that there is an overlap between the two, in the sense that even if the Market Quotation measure has been chosen, the Loss measure is the fallback position. That is recognised within the Loss definition by the words: "except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) … applies", which are the two Market Quotation regimes. Mr Phillips submits that, quite apart from any authority bearing on the point, one would expect the two measures to lead to broadly the same result.

32 Mr Hapgood takes fundamental exception to that proposition. He submits that the words in the first sentence of the Loss definition: "its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain", do not require the defendants to assess matters on the artificial basis that Britannia Bulk was not affected by an Event of Default and would not have been affected by an Event of Default, had there been no Early Termination.

33 He submits that the assessment under the Loss measure is one made in the real world, in contrast to the position under the Market Quotation measure where an artificial replacement transaction is created. He submits that, critically, the "assuming satisfaction of each condition precedent" used twice in the Market Quotation definition is absent in the first sentence of the Loss definition, an indication that the Non-defaulting party does not, in making its calculation under this provision, have to make false artificial assumptions, that the conditions precedent in Section 2(a)(iii) would have been satisfied if termination had not occurred, which they clearly would not. The Loss provision with its mention of "loss of bargain" had, so Mr Hapgood submitted, a "distinctly common law/damages feel". In assessing loss of bargain, one looks at what hypothetically would have happened had the contract not come to an end. Since the defendants would never have been liable to pay anything by virtue of Section 2(a)(iii) , accordingly they made no "gain" from Automatic Early Termination.

34 Attractively though these submissions were presented, I cannot accept them, as they seem to me to contain a fundamental flaw. Taking Mr Hapgood's reference to the real world and asking what would have happened if Automatic Early Termination had not occurred, one rapidly realises that his argument has to assume a contract which is fundamentally different from this one. The argument depends upon the Bankruptcy Event of Default continuing if Automatic Early Termination had not occurred, relieving the defendants of their payment obligation, because the condition precedent in Section 2(a)(iii)(1) could not be satisfied. However, what that overlooks is that, under these contracts, that could never occur, because once there was a Bankruptcy Event of Default, the contracts terminated automatically. It was impossible for there to be a continuing Bankruptcy Event of Default. That is the whole point of Automatic Early Termination. It is an inevitable consequence of a Bankruptcy Event of Default.

35 As Mr Phillips pointed out, once there has been such a Bankruptcy Event of Default, which is a status changing insolvency event, the contract comes to an end. It is simply impossible to have a contract going forward where Britannia Bulk is in administration. Accordingly, although it is right that the first sentence of the Loss definition does not say in terms "assuming satisfaction of all conditions precedent", it does not need to, because that is the only basis upon which the assessment of the "gain" can proceed, namely on the basis that there was no Bankruptcy Event of Default and thus no Automatic Early Termination. The gain in connection with the contract being terminated on that basis is indeed the amount of the payments which the defendants would have been required to make over the remaining term of the contracts.

36 Since the Second Method contemplates, whichever payment measure is selected, that if the calculation produces a negative number (i.e. the equivalent of a gain to the Non-defaulting Party) the Non-defaulting Party will make payment to the Defaulting Party, Mr Hapgood's construction of the Loss definition produces the very odd result that, on his analysis, the only circumstances in which the Non-defaulting Party would have to give credit for a "gain" within the first sentence would be if, under the second sentence of the definition (to which I return below), the Non-defaulting Party was liable to pay the Defaulting Party in respect of payments required to be made before the Early Termination Date, but not made.

37 If the nil loss argument were right, nothing would ever be payable in respect of what might be described as the "gain of bargain" the Non-defaulting Party achieves through Automatic Early Termination, namely the fact that, but for the Bankruptcy Event of Default and consequent Automatic Early Termination, the Non-defaulting Party would have had to make substantial payments to the Defaulting Party. In that context, I agree with Mr Phillips that Mr Hapgood's attempt to equate the definition of Loss with the common law measure of damages is misconceived. The Second Method is one which, unlike the First Method, is not to be equated with the position at common law. Rather it is a method of calculating close out positions on the termination of a transaction or series of transactions.

38 That analysis of the Second Method, whether the payment measure is Market Quotation or Loss, was one which Mr Hapgood himself advanced before Moore-Bick J in Peregrine where at paragraph 22 of the judgment the learned judge said:

> It was fundamental to Mr. Hapgood's argument that the Market Quotation and Loss measures should lead to a broadly similar result, and indeed he relied in part on the difference in the results he said they produced in this case as evidence of the fact that the result produced by the Market Quotation measure is commercially unreasonable. Whether any given result is in fact commercially unreasonable must very largely depend on the extent to which it departs from the result which the parties must be taken to have had in mind, and that, of course, is a matter which has to be determined by reference to the terms of the Agreement. One of the interesting characteristics of the Agreement is that on Early Termination as a result of an Event of Default the Non-defaulting Party may be required to make a payment to the Defaulting Party. Mr. Hapgood submitted that where the parties have specified Automatic Early Termination the occurrence of an Event of Default effectively closes out all their open transactions at once and a payment will then become due from the Non-defaulter to the Defaulter if, taken overall, the Defaulter is "in the money", as was the case here.

39 That argument found favour with the learned judge as is apparent from the passages in paragraphs 23 and 24 of his judgment which I have already quoted. I agree with Moore-Bick J's analysis of the Second Method (whether the Market Quotation or Loss payment measure is adopted) that: "the fact that the Non-defaulting Party must account to the Defaulting Party for any gain clearly deprives the Event of Default of most of its characteristics as a breach of contract" (paragraph 24). It is a misconception to seek to equate the Loss provision with what the position would be if the Non-defaulting Party had a claim for damages at common law, which is the effect of Mr Hapgood's argument before me.

40 Given the clear conclusion I have reached about the meaning of the first sentence of the Loss definition, it is not strictly necessary to consider the parties' rival submissions about the second sentence, not least because ultimately it seems to me that whatever it means has no real impact on the fundamental point I have addressed above. Nonetheless since the point was argued, I will deal with it.

41 Mr Phillips submits that the words in the second sentence of the Loss definition: "Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made", are a reference to Unpaid Amounts. The assumption that the conditions precedent are satisfied is spelt out because (unlike the first sentence) this is looking at past and not future loss of bargain. The assumption avoids any dispute about whether the Defaulting Party was insolvent before Automatic Early Termination (the sort of dispute with which the court was concerned in the Marine Trade case).

42 Mr Hapgood challenged this submission, making the obvious point that if it had been intended to refer to Unpaid Amounts, it would have been easy enough to say so. He submits that the words: "Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made" cover only those payments wrongfully unpaid prior to termination, which should have been paid. In other words, Mr Hapgood submits that the words in brackets mean "assuming, that is to say, that each applicable condition precedent was satisfied at the time".

43 Although I agree that the wording is somewhat awkward and that it could simply have referred to Unpaid Amounts, I prefer Mr Phillips' construction of the sentence. I agree with him that Mr Hapgood's argument that "required to be made" means only those payments which ought to have been made, but were wrongfully not made, does not deal at all with payments withheld under Section 2(a)(iii)(1) . By using the same formula: "assuming satisfaction of each applicable condition precedent" as elsewhere in the contract, it seems to me clear that the sentence is saying that the Non-defaulting Party is not entitled to rely upon any condition precedent, in which case payments withheld under Section 2(a)(iii)(1) have to be brought into account under the second sentence of the Loss provision.

44 Furthermore, in my judgment the overlap point is a further indication that the two payment Measures were intended to achieve a broadly similar result. Given that the definition of Settlement Amount expressly contemplates that, if a Market Quotation cannot be determined or would not produce a commercially reasonable result, the fallback position will be a calculation of Loss, it would be very odd if the two payment measures were not intended to achieve broadly the same result, in terms of the payments that have to be made either way by way of close out, on the termination of a transaction or series of transactions.

45 This was a point which Moore-Bick J in Peregrine also considered was an indication that the two payment measures were broadly intended to achieve the same result: see paragraph 30 of his judgment where he said:

> I think Mr. Hapgood was right in saying that when one is seeking to determine what outcome is broadly contemplated by the Agreement when Market Quotation is used in the calculation of the Settlement Amount and hence the amount payable under Section 6(e)(i)(3) some assistance can be derived from Section 6(e)(i)(4) which is concerned with the alternative calculation based on the Loss payment measure. I say that because Loss is defined in terms which make it clear that loss of bargain is one of the principal heads of damage intended to be covered and both Section 6(e)(i)(3) and Section 6(e)(iv) indicate that the Market Quotation measure and the Loss measure are intended to lead to broadly the same result.

46 The Pre-Estimate provision in Section 6(e)(iv) with its reference to the amount recoverable where Market Quotation applies being a reasonable pre-estimate of loss and being payable for loss of bargain (to which of course the Loss definition expressly refers) is a further indication that the two payment measures were intended to have broadly the same result, as Moore-Bick J also accepted at paragraph 28 of his judgment in Peregrine .

## The earlier authorities

47 Given my firm conclusion that Mr Hapgood's nil loss argument simply fails on the true construction of the Master Agreement , it is not strictly necessary to consider in any detail his submissions as to why, to the extent Mance LJ in the ANZ case and Moore-Bick J in Peregrine reached the same conclusion, they were wrong to do so, since, by definition, if I have rejected his argument on the construction of the Master Agreement , it must follow (i) that the common ground in ANZ was correctly agreed; (ii) that Mr Hapgood's own submissions before Moore-Bick J in Peregrine were correct and (iii) that both judges' analysis was also correct. Nonetheless, given that Mr Hapgood devoted a fair amount of time in his submissions before me to an elegant exposition as to why all three of those points are wrong, and given that this case may go further, I propose to deal briefly with the submissions he made.

48 *Australia and New Zealand Banking Group Ltd v Societe Generale [2000] CLC 833* was a case where, as Mance LJ records at the outset of his judgment: "it was common ground that the Loss and Market Quotation clauses aim at broadly the same result and may to that extent assist [to] construe each other" and as Mr Hapgood points out, Mance LJ referred to that common ground several times in his judgment. The case was somewhat unusual in that it involved Societe Generale ("SG") seeking to raise a number of new points on appeal, the detail of which do not matter, save to note that the Court of Appeal (Kennedy and Mance LJJ) decided that those new points were not open to SG on appeal. Notwithstanding that conclusion, Mance LJ, with whom Kennedy LJ agreed, went on to consider the merits of those new points as they had been

extensively argued.

49 It seems to me that, for present purposes, despite the fact that it was common ground in that case that the Market Quotation and Loss measures were intended to achieve essentially similar results, two sections of the judgment of Mance LJ are of particular relevance. First is the passage in paragraph 24 of his judgment where he deals with what the position would have been, if the Market Quotation basis of calculation had been adopted:

> 24 If the market quotation basis of calculation had been adopted between ANZ and SG, it is clear that it would have been necessary to assume the satisfaction of all conditions precedent both in respect of any amounts unpaid on early settlement and in respect of any future payments on settlement. The task of the reference market makers would not have been to put themselves in the shoes of either of the actual parties under the actual transaction, but to assess the consideration required to enter into a replacement transaction to preserve the economic equivalent of any payment provided by such transaction on a hypothetical basis. One hypothesis is that no early termination event has occurred or been effectively designated, another that 'each other applicable condition precedent specified in this agreement' has been and will be satisfied.

50 Second is the passage towards the end of his judgment at paragraphs 29 and 30, where Mance LJ concludes that, whichever payment measure is used, on the basis that a broadly similar result was intended, the calculation of loss of bargain should proceed on the same basis of assuming that all conditions precedent had been satisfied. He expresses his conclusion in these terms at paragraphs 29 and 30 of his judgment:

> 29 Bearing in mind the intention of the loss and market quotation clauses to arrive at broadly the same results, the calculation of loss, or loss of bargain, must proceed on the same basis, that is valuing the transaction according to the nominal value of the payments which would have been required under it, assuming satisfaction of all conditions precedent.

> 30 I would therefore have held that ANZ's loss and SG's gain on early termination of the ANZ-SG transactions fell to be valued 'clean'.

51 Mr Hapgood submitted that this analysis all proceeded on the basis that it was common ground that the Market Quotation and Loss measures were intended to achieve the same results, and no contrary submissions along the lines of the submissions Mr Hapgood now makes were addressed to the Court of Appeal. This is undoubtedly correct, but Mance LJ engaged nonetheless in a detailed analysis of the provisions and would surely have queried the supposed common ground, if he had thought that there was any basis for doing so.

52 *Peregrine Fixed Income Ltd (In Liquidation) v Robinson Department Store Plc [2000] CLC 1328* is, as Mr Hapgood points out, not a case concerned with derivatives at all, but apparently a case of a long term unsecured loan wrapped up within the terms of the ISDA Master Agreement , as Moore-Bick J recognised at paragraph 20 of his judgment. Nonetheless, given the incorporation of the Master Agreement , the case is still obviously relevant to the issues of construction I have to decide.

53 Mr Hapgood submitted before me that in that case he had advanced three arguments: (i) that the Loss and Market Quotation measures should produce broadly the same outcome; (ii) that the Loss measure produced a valuation of some US$87 million and (iii) that therefore, the Loss measure trumped the Market Quotation measure, as Moore-Bick J accepted at paragraph 37 of his judgment. Mr Hapgood sought to make much before me of the extent to which he would still accept the submissions he advanced in that case, in relation to the Market Quotation measure, but that only served to emphasise the extent to which he was resiling now from what he had argued then in relation to the Loss measure.

54 Ultimately, whatever forensic challenges Mr Hapgood may have faced about the fact that what he was arguing before me was flatly contrary to what he had argued before Moore-Bick J ten years ago, what matters is whether his current argument is right or not. As will be apparent from my previous conclusion about the correct construction of the Master Agreement , I have reached

the firm view that Mr Hapgood's current argument is wrong and it necessarily follows that his argument before Moore-Bick J was correct.

55 Although the decision of Moore-Bick J was influenced by Mr Hapgood's then submissions, his conclusions at paragraphs 22 to 24 and 30 of his judgment to which I have previously referred were in my view, clearly correct. Even if I had not independently reached the same conclusion as a matter of construction of the provisions with which I am concerned, I would still have followed the decision of Moore-Bick J, both because it is clearly right and because of the desirability of consistency and certainty in decisions of the Commercial Court.

## Conclusion

56 It follows that the nil loss argument must fail and the preliminary issue in both actions is resolved in favour of Britannia Bulk.

Crown copyright

© 2013 Sweet & Maxwell

