Thomas B. Hatch
David L. Mitchell
ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, Minnesota 55402-2015
Telephone:    (612) 349-8500
Facsimile:    (612) 339-4181

Hillel I. Parness
ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
601 Lexington Avenue, Suite 3400
New York, NY 10022-4611
Telephone:    212-980-7400
Facsimile:    212-980-7499

*Attorneys for Federal Home Loan Bank of Pittsburgh*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.*, | **Case No. 08-13555 (JMP)** |
| **Debtors**. | **Jointly Administered** |
| | **Objection Deadline: July 25, 2013 at 12:00 p.m. (Prevailing Eastern Time)** |

**RESPONSE OF FEDERAL HOME LOAN BANK OF PITTSBURGH TO DEBTORS' OBJECTION TO CMBS CLAIMS AND REQUEST FOR SUBORDINATION PURSUANT TO SECTIONS 510(a)-(c) OF THE BANKRUPTCY CODE**

Federal Home Loan Bank of Pittsburgh ("FHLB"), a creditor and party in interest in the

captioned cases, by and through its undersigned counsel, as and for its response to the Objection

To CMBS Claims and Request for Subordination Pursuant to Sections 510(a)-(c) of the

84051739.2

Bankruptcy Code dated April 25, 2013 (the "CMBS Objection"), filed by Lehman Brothers Holdings Inc. ("LBHI"), and its debtor affiliates (collectively, the "Debtors"), states as follows:

## BACKGROUND AND FACTS

1. Beginning on September 15, 2008 and periodically thereafter, the Debtors commenced voluntary cases in this Bankruptcy Court under Title 11 of the United State Code (the "Bankruptcy Code").

2. On July 2, 2009, the Court entered an order setting forth the procedures and deadlines for filing proofs of claim in these chapter 11 cases (Docket No. 4271) (the "Bar Date Order").

3. On September 18, 2009, pursuant to the Bar Date Order, FHLB timely filed claims against certain of the Debtors, including its Proof of Claim filed in the Chapter 11 bankruptcy case of debtor Lehman Brothers Holding Inc., Case No. 08-13555, and designated by the Debtors' claims agent as claim #18987 ("Claim #18987"), and its Proof of Claim filed in the Chapter 11 bankruptcy case of debtor Structured Asset Securities Corp., Case No. 09-10558, and designated by the Debtors' claims agent as claim #18988 ("Claim #18988, and together with Claim #18987, the FHLB MBS Claims").

4. As described in the FHLB MBS Claims and in subsequent correspondence with the Debtors, between May 2006 and November 2007, FHLB purchased mortgage-backed securities (MBS) issued by six different trusts (the Trusts). Each of the six MBS reflects an unpaid principal balance and a coupon rate, and represents the right to certain cash flows generated by the residential mortgage loans owned by each Trust. Each MBS, commonly referred to as a bond or certificate, was rated "AAA" at the time of issuance by at least two credit rating agencies, but has nevertheless sustained substantial losses. FHLB claims monetary

84051739.2                                        2

damages in an as-yet-to-be-determined amount stemming from material misrepresentations and omissions in the registration statements, prospectuses, prospectus supplements and related offering documents prepared and distributed by the Debtors in connection with the Debtors' marketing of these MBS, all in violation of various provisions of the Securities Act of 1933 (the "Securities Act"), and the Securities Exchange Act of 1934 (the "Exchange Act"), and various applicable rules and regulations promulgated thereunder.

5.      In their CMBS Objection, the Debtors assert that the FHLB MBS Claims should be subordinated under §§ 510(a), (b), and (c) of the Bankruptcy Code[1].

## DISCUSSION

**Section 510(a) is not applicable because no subordination agreement relating to the MBS claims exists.**

6.      Section 510(a) of the Bankruptcy Code simply provides that a subordination agreement is enforceable in a bankruptcy case to the same extent that such agreement is enforceable under applicable non-bankruptcy law. The Debtors assert that rights to payments from the Trusts which issued the MBS purchased by FHLB were split into multiple tranches with different seniority, with payment distributions to holders of the MBS certificates subject to a "waterfall" where senior (higher) tranches receive the first distributions. The Debtors assert that this establishes a subordination agreement among certificate-holders.

7.      Each of the certificates purchased by FHLB is from a "senior" or "super senior" tranche, and its right to receive payments from the Trusts is therefore not subordinated to any other certificate-holders. The order and priority of payments to be made to each of the certificate-holders is described in the offering materials and set forth in the Pooling and Servicing

---

[1] Under the Debtors' confirmed Chapter 11 plan, the holders of any claims against the Debtors that are subject to section 510(b) of the Bankruptcy Code are not entitled to receive any distributions on account of such claims unless and until all other holders of claims against the Debtors are satisfied in full.

84051739.2                                  3

Agreements applicable to each of the Trusts. The prescribed "waterfall" is administered by the Trustee of each of the Trusts, and an order of the Bankruptcy Court is not required to make it effective.

8. Moreover, the subordination effected by the waterfall does not extend to or have anything to do with the non-contractual claims which are the subject of the FHLB MBS Claims. There are no subordination agreements relating to the MBS Claims between or among holders of the CMBS Claims (as defined in the CMBS Objection), nor are there any subordination agreements relating to the MBS Claims with any of the Trusts which are the "issuing entities" of each issue of MBS or with any representatives of such "issuing entities."

9. Because subordination agreements are essentially inter-creditor agreements, bankruptcy debtors or trustees do not typically succeed to the subordination rights of one of its creditors as against another of its creditors. *Kors, Inc. v. Howard Bank*, 819 F.2d 19 (2nd Cir. 1987; *In re Chicago, S. Shore & S. Bend R.R.*, 146 B.R. 421 (Bankr. N.D. Ill. 1992).

10. In the absence of any subordination agreement between FHLB and the holders of unsecured claims against the Debtors, there is no basis or rationale for employing section 510(a) of the Bankruptcy Code to subordinate the FHLB MBS Claims to those of such unsecured creditors. In sum, section 510(a) cannot create a subordination agreement between the FHLB MBS Claims and the remainder of the Debtors' creditors' claims where none existed before.

**Section 510(c) is not applicable because FHLB has not engaged in any inequitable conduct.**

11. The Debtors assert that the FHLB MBS Claims as well as those of the other Claimants (as defined in the CMBS Objection) should be equitably subordinated to all other unsecured claims. Section 510(c) gives the bankruptcy court power to equitably subordinate a creditor's claim in favor of distributions to satisfy the claim of another creditor. The general rule is that equitable subordination requires a showing by a preponderance of the evidence that (1) a claim holder is engaged in inequitable conduct; (2) misconduct caused injury to a creditor or conferred an unfair advantage to the claim holder; and (3) equitable subordination of the claim is consistent with Bankruptcy Code provisions. Where a bankruptcy court makes no finding that a creditor's transactions with the debtor caused harm to either the debtor or the unsecured creditors, equitable subordination is generally not warranted. The test stated in *Benjamin v. Diamond (Matter of Mobile Steel Co.)*, 563 F.2d 692 (5th Cir. 1977) is the appropriate standard for most equitable subordination cases. In that case, the United States Court of Appeals for the Fifth Circuit stated that three conditions must be satisfied before exercise of the power of equitable subordination is appropriate.

> (i) The claimant must have engaged in some type of inequitable conduct;
> (ii) The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and
> (iii) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act.

*Benjamin v. Diamond (Matter of Mobile Steel Co.)*, 563 F.2d 692, 699-700 (5th Cir. 1977). This test has become the standard test employed by most courts to evaluate claims for equitable subordination. *United States v. Noland, Trustee*, 517 U.S. 535, 538, 116 S.Ct. 1524, 134 L.Ed.2d 748 (1996). Generally, equitable subordination is an extraordinary remedy to be applied

84051739.2                                5

sparingly. *Fabricators, Inc. v. Technical Fabricators, Inc. (Matter of Fabricators, Inc.)*, 926 F.2d 1458, 1464 (5th Cir.1991).

12. While the Debtors acknowledge the general rule as stated by *Mobile Steel Co.* requiring inequitable conduct by a claim holder, they cite to cases where courts have exercised equitable subordination in the absence of inequitable conduct, resulting in "no fault" equitable subordination. See, e.g., *SPC Plastics Corp. v. Griffith (In re Structurlite Plastics, Corp.),* 224 B.R. 27, 35 & n. 6 (6th Cir. BAP 1998). In *United States v. Noland, Trustee,* the United States Supreme Court did specifically reserve ruling on the question of "whether a bankruptcy court must always find creditor misconduct before a claim may be equitably subordinated." *Noland,* 517 U.S. at 543, 116 S.Ct. 1524. But since that time, most courts to have considered "no fault" equitable subordination claims have only equitably subordinated a creditor's claims without a showing of misconduct in a limited set of cases involving tax penalties, stock redemption claims, and punitive damages claims. *SPC Plastics Corp. v. Griffith (In re Structurlite Plastics, Corp.),* 224 B.R. 27, 35 & n. 6 (6th Cir. BAP 1998); *Matter of Lifschultz Fast Freight,* 132 F.3d 339, 349 (7th Cir.1997); *Bayer Corp. v. Mascotech, Inc. (In re Autostyle Plastics, Inc.),* No. 1-98-CV-658, 1999 WL 1005647, at *10 (W.D.Mich. May 25, 1999) "(The cases in which 'no fault subordination' has been applied are limited to cases involving tax penalty claims or stock redemption claims. [Appellant] has not cited, and the Court has not found, any case that has applied 'no fault subordination' to claims such as Appellees' claims, which are simply competing creditor claims.") See also *National Emergency Services v. Williams*, 371 B.R. 166 (E.D. Va. 2007).

13. The FHLB MBS Claims are not claims for tax penalties, stock redemptions, or punitive damages. Moreover, the Debtors have not alleged that FHLB has behaved inequitably

84051739.2                                    6

toward any other creditor. Consequently, under the *Mobile Steel Co.* test, the Debtors cannot prevail on their claim for equitable subordination of the FHLB MBS Claims under section 510(c).

**Section 510(b) is inapplicable because the MBS owned by FHLB do not represent the right to any of the Debtors' assets or cash flows and do not represent any ownership interest in the Debtors.**

14. The Debtors devote most of their argument in the CMBS Objection to section 510(b) of the Bankruptcy Code. Section 510(b) subordinates claims arising out of certain securities transactions, including claims for damages arising from the purchase or sale of a security of the debtor. In a nutshell, the Debtors argue that the MBS purchased by FHLB were securities *of one or more of the Debtors or affiliates* and, therefore, must be subordinated to the claims of all unsecured creditors of the Debtors.

15. Section 510(b) provides, in pertinent part, as follows:

(b) For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security *of the debtor* or of an affiliate of the debtor, *for damages arising from the purchase or sale of such a security,…*, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock. (Emphasis added)

16. In enacting § 510(b), Congress was heavily influenced by the law review article written by Professors John Slain and Homer Kripke, in which they argued that in the event of a business' bankruptcy, shareholders' claims should be subordinated to those of general creditors. John J. Slain and Homer Kripke, *The Interface Between Securities Regulation and Bankruptcy — Allocating the Risk of Illegal Securities Issuance Between Securityholders and the Issuer's Creditors*, 48 N.Y.U. L. Rev. 261 (1973). This is so, Slain and Kripke argued, because shareholders expect to participate in a business's profits and losses, while creditors expect a fixed return on their investment. In light of shareholders' more variable expectations, Slain and

Kripke concluded they should bear a greater risk than creditors of a business's insolvency. *Id*; see also *In re Granite Partners, L.P.*, 208 B.R. 332, 342 (Bankr. S.D.N.Y. 1997) (extrapolating on the teaching of Slain and Kripke to find that "[j]ust as the opportunity to sell or hold belongs exclusively to the investors, the risk of illegal deprivation of that opportunity should too.")

17.     Section 510(b) codifies Slain and Kripke's position that a holder of equity should not have "the ability to participate in the upside of the company as a shareholder and the priority of a creditor if the company [goes] bankrupt."

18.     Section 510(b) distinguishes between claims of holders of *equity* securities and creditor claims. In *Rombro v. Dufrayne (In re Med Diversified)*, 461 F.3d 251 (2d Cir. 2006), the Second Circuit held that the principal policy rationale for section 510(b) requires subordination of claims where the claimant contracted for the risks and rewards of an equity investor rather than a creditor. *Id.* at 259. The crucial difference between creditor and investor expectation is that "[t]he creditor can only recoup her investment; the investor expects to participate in firm profits." *In re Betacom of Phoenix, Inc*., 240 F.3d 823, 830 (9th Cir.2001).

19.     An "equity security" provides the holder with an ownership interest in an entity:

> The term *equity security* is hereby defined to include any stock or similar security, certificate of interest or participation in any profit sharing agreement, preorganization certificate or subscription, transferable share, voting trust certificate or certificate of deposit for an equity security, limited partnership interest, interest in a joint venture, or certificate of interest in a business trust; any security future on any such security; or any security convertible, with or without consideration into such a security, or carrying any warrant or right to subscribe to or purchase such a security; or any such warrant or right; or any put, call, straddle, or other option or privilege of buying such a security from or selling such a security to another without being bound to do so. 17 C.F.R. §240.3a11-1.

20.     In their confirmed Chapter 11 Plan, the Debtors also defined the term "Equity Interest" in a manner that describes an ownership interest in any Debtor:

> <u>Equity Interest</u> means (a) shares of common stock, preferred stock, other forms of ownership interest, or any interest or right to convert into such an equity or ownership

interest or to acquire any equity or ownership interest or any interest or right for which the amount owing is determined by reference to an equity or ownership interest, including, without limitation, vested and/or unvested restricted stock units, contingent stock awards, contingent equity awards, performance stock units, and stock options or restricted stock awards granted under management ownership plans, the LBHI 2005 stock incentive plan or the LBHI employee incentive plan, in any Debtor that was in existence immediately prior to or on the Commencement Date for such Debtor, and (b) Allowed Claims against LBHI arising out of, relating to, or in connection with any of the foregoing that are subject to section 510(b) of the Bankruptcy Code.

21. The MBS purchased by FHLB were not equity securities *of the Debtors,* nor did they represent Equity Interests in any of the Debtors, because they did not provide FHLB with an ownership interest in any Debtor. The Trusts which issued the MBS were established to hold title to the pool of underlying residential mortgages backing the MBS. The mortgage loans generated principal and interest payments that flowed to the Trusts. The MBS certificates purchased by FHLB represented rights to certain portions of such cash flows. The only source of payment on the MBS certificates was the pool of residential mortgage loans.

22. In connection with each of the MBS issues in which FHLB participated, the Debtors obtained a "true sale" opinion which provided that neither LBHI nor any other sponsor/depositor retained any right to the mortgage loans or the cash flows generated from those loans and that the mortgage loans and associated cash flows had been transferred to the Trust. (See, e.g., copies of the true sale opinions for Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates Series 2007-10 and Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-Through Certificates Series 2007-11 attached to the Declaration of Thomas B. Hatch as Exhibits A and B.)

23. As a result, the MBS purchased by FHLB did not provide FHLB with a claim on any of the Debtors' assets or cash flows, nor did they provide FHLB with any ownership interest in the Debtors.

84051739.2                                           9

24. Contrary to the Debtors' assertions in the MBS Objection, the MBS were not *issued* by the Debtors and the "depositor" for each issue of MBS was not in fact the "issuer" of the MBS certificates. The actual "issuer" of each MBS was the non-debtor common law securitization trust set up to hold title to pools of mortgages backing the MBS, *not* the Debtors or affiliates that performed differing functions in offering the MBS to investors.

25. The SEC's Regulation AB is the source of various disclosure items and requirements for filings of "asset-backed securities" under the Securities Act and the Exchange Act. As provided in Regulation AB, "'*issuing entity*' means the trust or other entity created at the direction of the sponsor or depositor that owns or holds the pool assets and in whose name the asset-backed securities supported or serviced by the pool assets are issued."

26. Because each trust—an "issuing entity"—has no employees, officers or directors, the burden of compliance with applicable regulatory and disclosure requirements of the Securities Act and the Exchange Act must necessarily be placed on other parties in the process of creating and marketing an issue of asset-backed securities. Accordingly, for purposes of regulation, "the depositor for the asset-backed securities acting solely in its capacity as depositor to the issuing entity is the 'issuer' for purposes of the asset-backed securities of that issuing entity." 17 C.F.R. §240.3b-19. A regulation that characterizes one or more of the Debtors as an "issuing entity" for regulatory purposes does not make the MBS at issue securities *of the Debtors* for purposes of section 510(a).

27. Courts across circuits agree that a claim should only be subordinated when doing so advances the policies underlying Section 510(b). See, e.g., *In re Am. Wagering, Inc.*, 493 F.3d at 1072, rev'g *In re American Wagering, Inc*., 326 B.R. 449 (B.A.P. 9th Cir. 2005). *Am. Wagering, Inc*. involved a claim by a former consultant for compensation pursuant to a provision

in his employment contract with the debtor corporation entitling him to "4½% of the final evaluation in the form of [debtor company]'s common stock and $150,000 cash upon completion of common offering or IPO." 493 F.3d at 1070. The Ninth Circuit reversed the Bankruptcy Appellate Panel's determination that the consultant's claims were subject to mandatory subordination because so holding "would not serve the underlying purposes of subordination under section 510(b)."

28.     If the claimant is "not an equity holder trying to better his position," but rather a note holder "seeking simple recovery of an unpaid debt," then the policy of allocating greater risk to shareholders is absent and § 510(b) is not implicated. *In re Montgomery Ward Holding Corp.*, 272 B.R. 836, 843-44 (Bankr. D. Del. 2001) (referring to a note issued by a debtor to consummate the repurchase of its own stock). In fact, it has been stated unequivocally that "[s]tatutory subordination does not apply if [the creditor]'s claim is based solely on enforcement of a debt instrument," even if the origin of that debt instrument is payment for stock. *In re Bankest Capital Corp.*, 361 B.R. 263, 268 (Bankr. S.D. Fla. 2006) (referring to a promissory note executed in recognition of a loan); *In re Montgomery Ward Holding Corp.*, 272 B.R. at 841.

29.     The key inquiry under section 510(b), then, is "whether the claimant had the potential benefit of the proceeds of the enterprise deriving from ownership of the securities." *In re Betacom of Phoenix, Inc.*, 240 F.3d 823, 829 (9th Cir.2001). FHLB's ownership of MBS marketed by the Debtors provided it with no beneficial interest whatsoever in any of the Debtors.

30.     Many courts suggest that certificates similar to those issued by securitization trusts are debt, not equity. To begin with, "as many courts have observed, pass-through certificates are structurally similar in form and function to bonds issued under an indenture." *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, F. Supp. 2d 2011 WL 6034310, at

*7 (S.D.N.Y. 2011). The Second Circuit has explained that "[i]t is these stakes—the 'bonds' or 'certificates'—that are ordinarily referred to as commercial mortgage-backed securities." *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 200 (2d Cir. 2005); see also *CW Capital Asset Mgmt., LLC v. Chi. Props., LLC*, 610 F.3d 497, 499 (7th Cir. 2010) (Posner, J.) (describing mortgage-backed securities governed by securitization pooling and servicing agreements ("PSAs"), as "giant bond[s]"). Indeed, the Second Circuit has characterized PSAs governing securitization trusts as "similar to bond indentures in many respects." *Greenwich Fin. Servs. Distressed Mortg. Fund 3 LLC v. Countrywide Fin. Corp.*, 603 F.3d 23, 29 (2d Cir. 2010). Unsurprisingly, several courts in the Southern District of New York have equated mortgage-backed securities governed by PSAs with debt securities. See *Ellington*, 2011 WL 6034310, at *7 (holding that a New York statute applying to "bonds" covers pass-through certificates governed by a PSA); see also *Trust for Certificate Holders of Merrill Lynch Mortg. Passthrough Certificates Series 1999-C1 v. Love Funding Corp.*, No. 04 Civ. 9890 (SAS), 2005 WL 2582177, at *1 (S.D.N.Y. Oct. 11, 2005) ("These certificates are essentially bonds secured by a pool of commercial mortgages that the [securitization] Trust has purchased from lenders.").

31.   These decisions reflect the fact that "[t]he shareholder is an adventurer in the corporate business; he takes the risk, and profits from success. The creditor, in compensation for not sharing the profits, is to be paid independently of the risk of success, and gets a right to dip into the capital when the payment date arrives." *Comm-'r v. O.P.P. Holding Corp.*, 76 F.2d 11, 12 (2d Cir. 1935).

32.   Thus, the MBS at issue are not debt or equity securities of any of the Debtors, and they are more typically characterized as debt securities issued by the Trusts. From the perspective of the Debtors, the MBS in question were simply *products* marketed by them in a

vibrant public market for asset-backed securities. (See pages 4, 14-16 of the February 2008 "Overview of the CMBS Business" prepared by LBHI annexed to the Declaration of Thomas B. Hatch as Exhibit C.).

33.     In sum, section 510(c) is inapplicable because the MBS owned by FHLB are not securities of the Debtors—they do not represent the right to any of the Debtors' assets or cash flows and do not represent any ownership interest in the Debtors.

34.     As the Debtors have failed to set forth any legally or factually sufficient basis for subordinating the FHLB MBS Claims, the Court should dismiss the CMBS Objection with respect to the FHLB MBS Claims.

## CONCLUSION

WHEREFORE, Federal Home Loan Bank of Pittsburgh respectfully requests that this Court enter an Order (a) overruling the CMBS Objection in respect of the FHLB MBS Claims, and (b) granting such other and further relief as the Court deems just and appropriate under the circumstances.

Dated: July 24, 2013.                    Respectfully submitted,

**ROBINS, KAPLAN, MILLER & CIRESI L.L.P.**

Thomas B. Hatch
David L. Mitchell
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402-2015
Telephone:    612-349-8500
Facsimile:    612-339-4181
Email:        tbhatch@rkmc.com
              dlmitchell@rkmc.com

**ROBINS, KAPLAN, MILLER & CIRESI L.L.P.**

By: /s/ Hillel I. Parness
Hillel I. Parness
601 Lexington Avenue, Suite 3400
New York, NY 10022-4611
Telephone:    212-980-7400
Facsimile:    212-980-7499
Email:        hiparness@rkmc.com

*Attorneys for Federal Home Loan Bank of Pittsburgh*

# Exhibit A

84051739.2