Jeff J. Friedman
Kevin M. Baum
KATTEN MUCHIN ROSENMAN LLP
575 Madison Avenue
New York, New York 10022
Telephone: (212) 940-8800
Facsimile: (212) 940-8776

*Attorneys for RBC Dominion Securities Inc.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------ x
                                                                         :
In re:                                                                   :  Chapter 11
                                                                         :
LEHMAN BROTHERS HOLDINGS, INC., et al.,                                  :  Case No. 08-13555 (JMP)
                                                                         :
                    Debtor.                                              :  (Jointly Administered)
                                                                         :
------------------------------------------------------------------------ x

**MOTION OF RBC DOMINION SECURITIES INC.
TO COMPEL LEHMAN BROTHERS HOLDINGS, INC.
TO REISSUE CHECKS FOR ALLOWED CLAIM**

RBC Dominion Securities Inc. ("RBC"), by and through its undersigned counsel, hereby moves this Court (this "Motion") for entry of an order pursuant to (a) Rule 9006(b)(2) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), or in the alternative, (b) sections 105(a), 347(b), 1142(b) and 1143 of title 11 of the United States Code (the "Bankruptcy Code") and Bankruptcy Rule 3021, compelling Lehman Brothers Holdings, Inc. ("LBHI" or the "Debtor") to reissue certain distribution checks payable to RBC in respect of its allowed claim against the Debtor. In support of this Motion, RBC respectfully represents as follows:

**Preliminary Statement**

1.  On April 4, 2013, Deborah Nicholas, an employee of RBC, received a letter, dated January 31, 2013 (the "Uncashed Check Notification Letter"), from the Debtor's claims

1

agent, Epiq Bankruptcy Solutions ("Epiq"), concerning an October 1, 2012 distribution check from LBHI (the "October 2012 Distribution Check") that had purportedly been sent to RBC but had not been negotiated. The Uncashed Check Notification Letter advised RBC that if it did not negotiate the October 2012 Distribution Check by March 30, 2013, RBC would forfeit its right to collect the amount of the October 2012 Distribution Check. RBC contacted Epiq twice—first on April 8, 2013 and then again on April 19, 2013—about the Uncashed Check Notification Letter but did not receive a substantive response from Epiq until April 24, 2013.

2. It was only during the course of discussions with Epiq that it became clear that, in addition to the October 2012 Distribution Check, an initial distribution check from LBHI (the "April 2012 Distribution Check," and together with the October 2012 Distribution Check, the "Missing Distribution Checks") purportedly had been previously sent to RBC on April 17, 2012. RBC did not receive either of the Missing Distribution Checks. Epiq further informed RBC that under the confirmed Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings, Inc. and Its Affiliated Debtors (the "Plan"), because of the lapse of time, RBC had forfeited its rights to the first and second distributions, totaling in excess of $307,000, as a result of its failure to negotiate the Missing Distribution Checks.

3. After a number of follow-up calls and email exchanges with Epiq, it has become clear to RBC that Epiq believes it is powerless to reissue the Missing Distribution Checks without an order of this Court. Counsel for RBC also contacted counsel for LBHI asking if they would stipulate to the relief sought in this Motion. Although LBHI's counsel advised that they were investigating, there has been no substantive response since contacting them on June 26th. Accordingly, RBC makes this Motion for an order directing the reissuance of the Missing Distribution Checks.

2

4. The Debtor's unwillingness to reissue the Missing Distribution Checks is inequitable, inconsistent with the language and spirit of the Bankruptcy Code and the Bankruptcy Rules, and will result in a windfall to the Debtor's other creditors at RBC's expense. Moreover, the Plan provision providing for the forfeiture of any distribution with respect to a check not cashed within six months was intended to assure creditors did not sleep on their rights, something RBC has not done. Unlike the creditor who receives a distribution check and then fails to cash it within six months, RBC never received the Missing Distribution Checks. This Court has the authority to compel an equitable result by requiring the Debtor to reissue the Missing Distribution Checks. Simply put, there is no reason that over $307,000 in distributions meant for RBC should be forfeited because they were lost in the mail.

**Background**

RBC's Allowed Claim

5. RBC holds an allowed claim [Claim No. 51231] against LBHI in the amount of $5,079,712.40 (the "Allowed Claim") based on a number of bonds either issued or guaranteed by LBHI. A true and accurate copy of the proof of claim on which the Allowed Claim is based is attached hereto as Exhibit A. The proof of claim form for the Allowed Claim indicated that notices and payment should be addressed to "RBC Dominion Securities, 277 Front Street W., 4th Floor, Toronto, Ontario, Canada M5V 2X4 Attn: Lance Longmore" (the "Proof of Claim Address").

The April 2012 Distribution Check

6. According to a copy of certain remittance sheets (the "Remittance Sheets") provided to RBC by Epiq after RBC became aware of the Missing Distribution Checks, RBC was purportedly sent the April 2012 Distribution Check on or about April 17, 2012. True and accurate copies of the Remittance Sheets provided to RBC by Epiq are attached hereto as Exhibit

3

B.  The Remittance Sheet in respect of the April 2012 Distribution Check reflected a distribution in the amount of $183,338.42.

7. Although, the Debtor and Epiq have not provided any evidence indicating that Epiq actually mailed the April 2012 Distribution Check to RBC, even if Epiq did actually mail the April 2012 Distribution Check, it was not received by Lance Longmore, who regularly opens and reviews all mail addressed to his attention, or anyone else at RBC.  See *Declaration of Lance Longmore in Support of Motion of RBC Dominion Securities, Inc. to Compel Lehman Brothers Holdings, Inc. to Reissue Checks for Allowed Claim*, ¶¶ 3-4, attached hereto as Exhibit C.  Nor was the April 2012 Distribution Check cashed.  Further, unlike the October 2012 Distribution Check, to RBC's knowledge, the Debtor and Epiq never advised RBC that they had issued and sent the April 2012 Distribution Check[1] and that RBC risked forfeiting its right to receive this initial distribution.

The October 2012 Distribution Check and Uncashed Check Notification Letter

8. On or about October 1, 2012, Epiq purportedly mailed the October 2012 Distribution Check in respect of the Allowed Claim to the Proof of Claim Address.  According to the Remittance Sheet, this second check was in the amount of $123,720.37.  Whether or not Epiq mailed the October 2012 Distribution Check, RBC did not receive it or cash it.  See Longmore Declaration, ¶ 4.

9. Almost four months later, on January 31, 2013, Epiq claims to have sent the Uncashed Check Notification Letter to RBC at the Proof of Claim Address advising RBC that it

---

[1] As stated above, the Allowed Claim was based on bonds RBC owned that were issued by LBHI or by an LBHI affiliate and guaranteed by LBHI, all of which were contained in the single proof of claim. To the extent RBC received the two initial distributions for some of the bond issues, all of them were made to RBC by wire transfer. Accordingly, RBC was not even expecting distributions for the bonds to be made by check.

4

risked forfeiting the October 2012 distribution if RBC did not negotiate the October 2012 Distribution Check by March 30, 2013. A true and accurate copy of such letter is attached hereto as Exhibit D. Such letter, however, made no mention of the initial distribution or the April 2012 Distribution Check. Based on discussions with Epiq, RBC did not receive the Uncashed Check Notification Letter until a second notification attempt was made by Epiq on or about March 15, 2013. For reasons that are not clear to RBC, Epiq's second attempt to deliver the Uncashed Check Notification Letter to RBC was sent to RBC at an entirely different address: PO Box 50, Toronto, ON M5J 2W7, Canada. (The address on the Uncashed Check Notification Letter itself was the Proof of Claim Address.) While RBC somehow received the Uncashed Check Notification Letter on this second attempt, unfortunately, it was received by Deborah Nicholas of RBC on or about April 4, 2013 — after the March 30th forfeiture deadline described in the letter.

10. RBC promptly responded to the Uncashed Check Notification Letter. On April 8, 2013, Deborah Nicholas called Epiq's general claims department regarding the Uncashed Check Notification Letter, spoke with a representative named "Susan" and requested an escalation of her inquiry and that she be called back. Notwithstanding the request, no one from Epiq returned Ms. Nicholas's call. Accordingly, on April 19, 2013, Ms. Nicholas again called Epiq's general claims department and spoke with a representative name "Liz" and re-submitted her inquiry and again requested an escalation.

11. Five days later, on April 24, 2013, Ms. Nicholas received a call from Lauren Rodriguez, a case manager at Epiq. During that call, Ms. Rodriguez informed Ms. Nicholas that the first and second distributions had been forfeited because of RBC's failure to negotiate the Missing Distribution Checks. This was the first time that RBC learned of the existence of the April 2012 Distribution.

12. Shortly thereafter, Daniel Decker, a paralegal employed by RBC, contacted Epiq and suggested that perhaps the Missing Distribution Checks had been incorrectly sent to the PO Box instead of the Proof of Claim Address.

13. On May 13, 2013, Ms. Rodriguez replied to Mr. Decker's email with Epiq's position that it did in fact mail the Missing Distribution Checks to the correct address. Ms. Rodriguez told RBC that it could not reissue the Missing Distribution Checks without a court order. Counsel for RBC contacted LBHI's counsel by email, first on June 26, 2013 and again on July 2, 2013, describing the salient facts and asking that they stipulate to a reissuance of the checks. Coincidentally, one of the attorneys at Weil, Gotshal & Manges LLP to whom the emails were addressed contacted RBC's undersigned counsel on a Lehman matter unrelated to RBC. When he was asked about the emails, he advised RBC's counsel that LBHI was investigating. As it has been more than a month since LBHI's counsel was first contacted, RBC felt compelled to make the instant Motion to minimize any risk of prejudice.

**Argument**

**I. The Missing Distribution Checks Should be Reissued Since the Failure to Negotiate Such Checks Resulted From, At Worst, RBC's Excusable Neglect**

14. RBC's request for an order requiring the Debtor to reissue the Missing Distribution Checks should be granted pursuant to Bankruptcy Rule 9006(b)(2) because RBC's failure to cash the checks originally issued to RBC in connection with the first two disbursements, at worst, resulted from RBC's excusable neglect.

15. Bankruptcy Rule 9006(b)(2) provides, in pertinent part, that

> when an act is required or allowed to be done at or within a specified period by [the Bankruptcy Rules] or by a notice given thereunder or by order of the court, the court for cause shown may at any time in its discretion … on motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect.

6

Fed. R. Bankr. P. 9006(b)(2).

16. The application of Bankruptcy Rule 9002(b)(2) most often arises after a creditor seeks permission to file a proof of claim after the bar date. Yet, notwithstanding the apparent lack of published case law discussing Bankruptcy Rule 9002(b)(2)'s applicability in the context of a post-confirmation distribution dispute like the one presented here, the plain language of the rule is broad enough to cover such a situation. Indeed, this Court has previously directed the Debtor to reissue distribution checks to a creditor pursuant to Bankruptcy Rule 9006(b)(2). See *Order Authorizing Plan Administrator to Reissue Distribution Checks to Traxis Fund LP and Traxis Emerging Market Opportunities Fund LP* [Docket No. 36251]. Although the Court's previous order did not indicate how the Court reached its finding of excusable neglect, a logical approach would be to apply the standards promulgated by courts considering whether to permit a late-filed proof of claim.

17. In Pioneer Inv. Serv. Co. v. Brunswick Assoc. L.P., the leading case interpreting Bankruptcy Rule 9006(b), the Supreme Court held that the determination as to whether a creditor's neglect was "excusable" under Bankruptcy Rule 9006(b) "is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission." 507 U.S. 380, 395 (1993). Such relevant circumstances include (a) the danger of prejudice to the debtor; (b) the length of the delay and its potential impact on judicial proceedings; (c) the reason for delay, including whether it was within the reasonable control of the movant; and (d) whether the movant acted in good faith. Id.

    A.    There Is No Danger of Prejudice to the Debtor

18. Applying the standards for late-filed claims to the distribution dispute before the Court leads to the conclusion that requiring the Debtor to reissue the distribution checks to RBC does not create the danger of prejudice to the Debtor.

19.     When considering this first <u>Pioneer</u> factor in the context of a late-filed claim, this Court noted that the determination regarding the potential prejudice to the Debtor from permitting a late-filed claim is "guided by factors such as the size of a late claim in relation to the estate, whether a disclosure statement or plan has been filed, and the disruptive effect permitting the late claim would have on plan formation." <u>See</u> <u>In re Lehman Brothers Holdings, Inc.</u>, 433 B.R. 113, 120 (Bankr. S.D.N.Y. 2010).  Likewise, in <u>In re Keene Corp.</u>, Judge Bernstein opined that such prejudice, as contemplated by the <u>Pioneer</u> factors

> concern[s] not just the harm to the debtor but also the adverse impact that a late claim may have on judicial administration of the case.  The <u>Pioneer</u> Court did not define "prejudice," but the subsequent cases have identified a number of considerations.  These include the size of the late claim in relation to the estate, whether a disclosure statement or a plan has been filed or confirmed with knowledge of the existence of the claim, the disruptive effect that the late filing would have on a plan close to completion or upon the economic model upon which the plan was formulated and negotiated.

188 B.R. 903, 910 (Bankr. S.D.N.Y. 1995).  All of these factors weigh in favor of a finding that the Debtor will not be prejudiced if the Court compels them to reissue the distribution to RBC.

20.     The amount at issue here, approximately $307,000, is extremely small when compared to the Debtor's estate.  According to the Debtor's most recent operating report filed on June 28, 2013 [Docket No. 38263], as of May 31, 2013, LBHI had a claims reserve of approximately $5.9 billion.  Moreover, the amount of the Missing Distribution Checks represents a portion of the total allowed claims that Debtor included as liabilities of its estate.

21.     While the <u>Keene</u> court indicated that prejudice would be implied if the late-filed claims were permitted to be filed after a disclosure statement or plan had been filed or confirmed without knowledge of the existing claims, here there is no such prejudice because the Debtor prepared and filed the Plan with the expectation that it would distribute to RBC (or any holder of these bond or guarantee claims) a full <u>pro rata</u> distribution in respect of the Allowed Claim,

8

which arose out of LBHI issued or guaranteed bonds. Further, the Plan was confirmed months before any distribution was made. Directing the Debtor to reissue the Missing Distribution Checks will not, and cannot, have any conceivable effect on the Debtor's estate or its reorganization. Simply put, the relief requested herein will have little or no effect "on the judicial administration of the case." See Keene, 188 B.R. at 912.

22. Although this Court has previously opined, in the late-filed-claim context, that the Pioneer prejudice factor weighed in favor of disallowing the late-filed claim due to the need to discourage other creditors from seeking similar leniency, the underlying "premise is that granting relief now will open the floodgates, undermine the effectiveness of the Bar Date Order, and further complicate an already cumbersome process." In re Lehman Brothers Holdings, 433 B.R. at 120-21. Such concerns, however, are inapplicable here since the bar date has long passed and there is no reason for a creditor to purposely fail to cash disbursement checks in respect of its claim. The only reason RBC has not cashed the Missing Distribution Checks is because it never received them. Moreover, the effect of requiring the Debtor to reissue the Missing Distribution Checks to RBC would minimally affect the distribution process in light of the fact that RBC will be entitled to take part in the next distribution to creditors—indeed, RBC has received the third distribution in respect of the Allowed Claim. Ultimately, the only real impact from reissuing the Missing Distribution Checks will be RBC receiving the distribution at a later date without any adverse effect on the administration of the Debtor's estate.

23. Finally, if the Court denies this relief sought herein, which is not prejudicial to the Debtor, the only practical result will be that other creditors of LBHI will receive a windfall in the form of larger distributions resulting from the deprivation of a portion of RBC's Allowed Claim.

There is simply no equitable reason why RBC, which has done nothing "wrong," should forfeit its distributions to other LBHI creditors.

> B. The Length of Delay and RBC's Good Faith Weigh in
> Favor of Reissuing the Missing Distribution Checks

24. This Court has previously noted that "there is no bright-line rule governing when the lateness of a claim renders it too late." See id. Although it has been over a year since the April 2012 Distribution was purportedly mailed to RBC, RBC promptly contacted Epiq once RBC received the Uncashed Check Notification Letter and then spent more than a month in communications with Epiq trying to resolve the matter without taking up judicial resources. It is only now, because of Epiq's view that the Plan's provisions regarding uncashed checks cannot be disregarded without an order of the Court and LBHI's unresponsiveness to stipulate to the relief sought herein, that RBC makes the instant motion.

25. RBC has acted promptly to resolve this matter. The fact that the Missing Distribution Checks either were not mailed, mailed to the wrong address or simply got lost in the mail, should not result in the forfeiture of the two distributions by RBC.

> C. The Delay Resulted from Circumstances Outside of RBC's Control

26. The Second Circuit has emphasized that reason-for-delay is the most important Pioneer factor. See, e.g., In re Enron, 419 F.3d 115, 122-23 (2d Cir. 2005). In the context of late-filed claims, this Court has placed great importance on whether the failure to comply with the applicable deadline was "entirely with the control" of the movant. In re Lehman Brothers Holdings, 433 B.R. at 125.

27. Here, both of the Missing Distribution Checks failed to reach RBC, and RBC had no part in such a result. The fact that Epiq mailed the Uncashed Check Notification Letter to an alternate address demonstrates that Epiq acknowledged that there seemed to be a problem in

10

reaching RBC. RBC cannot be responsible for such a delay since until April 4, 2013, RBC was unaware of the existence of the Missing Distribution Checks.

28. Given the circumstances presented here, a balancing of the equities coupled with the application of the Pioneer factors militates in favor of finding that "excusable neglect," within the meaning ascribed to such term by Bankruptcy Rule 9006(b)(2), is present. As a result, the Court should require the Debtor to reissue the Missing Distribution Checks to RBC.

II. **Alternatively, Under Sections 105(a), 1142(b), 1143 and 347(b) of the Bankruptcy Code and Bankruptcy Rule 3021, RBC's Right to Receive Distributions from the Debtor's Estate Should Not Be Time-Barred**

29. Section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

30. Bankruptcy Rule 3021 provides that, "[a]fter a plan is confirmed, distribution shall be made to creditors whose claims have been allowed." Fed. R. Bankr. P. 3021.

31. Section 1142(b) of the Bankruptcy Code provides that

> [t]he court may direct the debtor and any other necessary party to execute or deliver or to join in the delivery of any instrument required to effect a transfer of property dealt with by a confirmed plan, and to perform any other act, including satisfaction of any lien, that is necessary for the consummation of the plan.

11 U.S.C. § 1142(b). Sections 105(a) and 1142(b) of the Bankruptcy Code and Bankruptcy Rule 3021 collectively empower this Court order the Debtor to reissue the Missing Distribution Checks to RBC in respect of the Allowed Claim.

32. Section 1143 of the Bankruptcy Code provides that

> If a plan requires presentment or surrender of a security or <u>the performance of any other act as a condition to participation in distribution under the plan, such action shall be taken not later than five years after the date of the entry of the order of confirmation.</u> Any entity that has not within such time presented or surrendered such entity's security or taken any such other action that the plan requires may not participate in distribution under the plan.

11

11 U.S.C. § 1143 (emphasis added).

33. Section 347(b) of the Bankruptcy Code provides that

[a]ny security, money, or other property remaining unclaimed at the expiration of the time allowed in a case under chapter 9, 11, or 12 of this title for the presentation of a security or the performance of any other act as a condition to participation in the distribution under any plan … becomes property of the debtor or of the entity acquiring the assets of the debtor under the plan, as the case may be.

11 U.S.C. § 347(b).

34. Taken together, section 1143 of the Bankruptcy Code first provides that if some act is required of a creditor holding an allowed claim in order for that creditor to participate in a distribution under a confirmed chapter 11 plan, that act must be performed within five years of the confirmation of the debtor's plan. If no such action is timely taken, section 347(b) of the Bankruptcy Code then requires that the creditor's distribution will become the property of the debtor or other entities acquiring the assets of the debtor under the plan, as the case may be.

35. The phrase "some act," as used in section 1143 of the Bankruptcy Code, includes acts as simple as "presenting one's self and cashing a check." See In re Rodman, Inc., 50 B.R. 313, 314 (Bankr. W.D. Ok. 1985). Indeed, the House and Senate reports regarding section 347(b) of the Bankruptcy Code, which contains nearly identical language to section 1143, states that "conditions to participation under a plan include such acts as cashing a check…." H.R. Rep. No. 595, 95th Cong., 1st See. 337 (1977); S. Rep. 689, 95th Cong., 2d Sees. 47; see also; TLI, Inc. v. Lynn (In re TLI, Inc.), 213 B.R. 946, 956 (N.D. Tex. 1997); 2 Collier on Bankruptcy ¶ 347.04[5] (16th ed.).

36. There are relatively few cases discussing whether the five-year time period prescribed by sections 1143 and 347(b) of the bankruptcy can be reduced or expanded under the provisions of a plan of reorganization. However, "[i]n general, there is a five-year window for a

12

person to claim funds on deposit for distribution pursuant to a Chapter 11 plan." <u>In re Sterling Fin. Servs. of Fla. – 1, Inc.</u>, 374 B.R. 327, 329 (Bankr. M.D. Fl. 2007).

37. Moreover, a distribution of funds is only truly unclaimed by a creditor

> when the disbursement agent, which may be the reorganized debtor, has done everything he is required to do to distribute the funds, reasonable notice of the availability of the funds has been given to the intended recipient <u>and the intended recipient has done nothing for a period of time sufficient to evince a lack of interest in the funds or an abandonment of his rights to the funds.</u>

<u>In re IBIS Corp.</u>, 272 B.R. 883, 890 (Bankr. E.D. Va. 2001) (emphasis added). The <u>IBIS</u> court noted that "a check mailed to a creditor at the creditor's last known address, not returned by the Postal Service and not cashed within a reasonable period of time is unclaimed." <u>Id.</u>  The <u>IBIS</u> court, however, opined that such findings are generally disfavored. In particular, the court stated that "[o]f course, checks issued earlier than five years after confirmation and neither cashed nor returned would not revert to the debtor until the expiration of the five-year deadline." <u>Id.</u>

38. Thus, when applying the plain language of sections 1143 and 347(b) of the Bankruptcy Code, courts have demonstrated a clear preference for permitting holders of allowed claims the maximum amount of time possible to take action to receive a distribution of a debtor's property in respect of such holders' rightful entitlements under the debtor's confirmed plan. Likewise, case law supports the proposition that a bankruptcy court should not find that a creditor forfeited its right to a distribution unless such creditor has clearly demonstrated an intention to abandon its claim to such distribution.

39. Here, it is undisputed that RBC is a legitimate creditor holding an Allowed Claim and entitled to receive distributions under the Plan. After reviewing the Uncashed Check Notification Letter, RBC learned that Missing Distribution Checks had not been received, RBC promptly notified Epiq and requested such checks be reissued. The Debtor and Epiq waited months to send a notice to RBC; a notice that was then re-sent and received at a different address

13

than the Proof of Claim Address. And when RBC finally received a copy of the Uncashed Check Notification Letter on April 4, 2013, the purported forfeiture as to the October 2012 Distribution Check had occurred a mere five days earlier on March 30, 2013.

40. This is not a case where all of the assets in the estate have been distributed and others would be prejudiced if RBC now had to be paid. The Debtor clearly has the means to reissue the distributions to RBC. As noted above, as of May 31, 2013, LBHI had a claims reserve of approximately $5.9 billion.

41. Finally, RBC has in no way conveyed, either through its words or its actions, the notion that it wished or intended to abandon its right to receive distributions on account of the Allowed Claim. Indeed, RBC affiliates have received a significant number of distributions in respect of their allowed claims against LBHI and its affiliated debtors. The reason for the Missing Distribution Checks is, frankly, a mystery, but the Plan's provision regarding the forfeiture of distributions if checks are not negotiated within six months could not have been intended to cover situations where the creditor never received the check. It was intended to prevent creditors from sleeping on their rights. RBC has acted diligently as one would expect a banking institution and its affiliates to act.

42. Upon learning of the existence of the Missing Distribution Checks, RBC acted promptly and has only resorted to this motion when it became clear that there was no available remedy to this situation without an order of this Court. Rigidly applying the Plan's distribution provisions on these facts is inequitable and overrides the protections afforded creditors by sections 1143 and 347(b) of the Bankruptcy Code. RBC is entitled to payment in the amount of the Missing Distribution Checks, and the Debtor and Epiq should be directed to reissue such checks or otherwise furnish payment to RBC in the relevant amount.

**Conclusion**

WHEREFORE, RBC requests entry of an order pursuant to (a) Bankruptcy Rule 9006(b)(2), or alternatively, (b) sections 105(a), 347(b), 1142(b) and 1143 of the Bankruptcy Code and Bankruptcy Rule 3021, directing the Debtor to reissue to RBC checks for the Missing Distribution Checks, and granting such other relief as is necessary or appropriate.

Dated: New York, New York
       July 29, 2013

                                            KATTEN MUCHIN ROSENMAN LLP
                                            *Attorneys for RBC Dominion Securities Inc.*


                                            By:  */s/ Jeff J. Friedman*
                                                 Jeff J. Friedman
                                            575 Madison Avenue
                                            New York, New York 10022-2585
                                            Telephone: (212) 940-8800
                                            Facsimile: (212) 940-8776