# INTERNATIONAL SWAPS AND DERIVATIVES ASSOCIATION, INC.

# GUIDELINES FOR COLLATERAL PRACTITIONERS

Copyright © 1996 by International Swaps and Derivatives Association, Inc.

# INTERNATIONAL SWAPS AND DERIVATIVES ASSOCIATION, INC.

# GUIDELINES FOR COLLATERAL PRACTITIONERS

## TABLE OF CONTENTS

**PAGE**

**Chapter One**

**Introduction to the Collateralization of Privately Negotiated Derivatives Transactions**

| | | |
|---|---|---|
| 1. | Origin of the Guidelines | 1 |
| 2. | Objectives of the Guidelines | 2 |
| 3. | Collateral as a Risk Management Tool | 3 |
| | 3.1 Definition and Types of Credit Enhancement | 3 |
| | 3.2 Key Features of Credit Exposure | 4 |
| | 3.3 How Collateral Works in a Swap Transaction | 4 |
| | 3.4 Types of Securities Used and Trends | 5 |
| | 3.5 Benefits and Costs of Using Collateral | 6 |
| 4. | Collateralizing the Trading Relationship | 7 |
| | 4.1 Documenting the Collateralized Relationship | 7 |
| | 4.2 Cross-Product Collateralization | 7 |
| 5. | Organizational Structure of Collateral Groups | 8 |

**Chapter Two**

**Structuring the Collateralized Relationship**

| | | |
|---|---|---|
| 1. | Credit Considerations | 10 |
| | 1.1 Is Collateral a Suitable Credit Enhancement Tool? | 10 |
| | 1.2 Determining the Credit Type of the Counterparty | 11 |
| | 1.3 Determining the Appropriateness of Collateral | 12 |
| | 1.4 Legal Issues that Influence Credit Decisions | 14 |

2.  Transaction Coverage                                                        16
    2.1  Impact of Transaction Coverage on Credit Exposure                      16
    2.2  Cross Product Collateralization                                        16
    2.3  Legal Considerations for Cross Product Collateralization               18
    2.4  Netting Provisions Across Legal Jurisdictions                          18
    2.5  Netting and Cross Product Collateralization                            19

3.  Determining Eligible Collateral for the Counterparty                        19
    3.1  Considerations for Selecting Appropriate Collateral                    19
    3.2  Considerations in Calculating Haircut Rates                            21
    3.3  Collateral Diversification and Optimization                            26
    3.4  Legal Issues                                                           27

4.  Documenting the Collateralized Relationship                                 27
    4.1  Considerations in Selecting Appropriate Documentation                  27
    4.2  Form of Documentation                                                  27
    4.3  Legal Issues                                                           29
    4.4  Structuring the Documentation                                          32

**Chapter Three**

**Implementing the Collateralized Relationship**

1.  Collateral Management                                                       34

2.  Mechanics of Establishing a Collateral Account                              34
    2.1  Establishing a Custodian Arrangement                                   34
    2.2  Establishing Collateral Custody Accounts                               35
    2.3  Establishing Procedures for Collateral Movements                       36

3.  Valuation of Collateral                                                     36
    3.1  Valuation Methodology for Collateral Assets                            36
    3.2  Frequency and Timing of Valuation                                      38
    3.3  Valuation Disputes                                                     38
    3.4  Collateral Inventory and Substitutions                                 39
    3.5  Practical Considerations in Obtaining Collateral Diversification       39

4.  Counterparty Relationship Management                                        40
    4.1  Product Coverage                                                       40
    4.2  Valuation Methodology for Collateralized Transactions                  40
    4.3  Frequency and Timing                                                   41
    4.4  Initial Margin versus Variation Margin                                 41

**Chapter Four**

**Maintaining the Collateralized Relationship**

| | | | |
|---|---|---|---|
| 1. | Implementing a Collateral Agreement | | 42 |
| | 1.1 | Communication Tools | 42 |
| | 1.2 | Incorporating New Agreements into a Collateral Program | 49 |
| | 1.3 | Exposure Monitoring and the Collateral Call Process | 51 |
| | 1.4 | Application of the Collateral Call Process | 52 |
| 2. | Dispute Resolution | | 54 |
| 3. | Distribution Mechanism for Valuation Statements | | 55 |
| 4. | Legal Disclaimer | | 56 |

**Summary Checklist of Issues Concerning the Collateralized Relationship**    57

**Appendix 1:** List of Focus Group Members who contributed to the Guidelines for Collateral Practitioners.    60

**Appendix 2:** Checklist of Tax Issues associated with Collateralization and Discussion of Tax Implications of Using the English Credit Support Annex.    63

### 3.4 Legal Issues

For collateral to be of value to the collateral taker, the taker should accept collateral where a high degree of legal certainty concerning rights to the collateral in the case of client or counterparty default exists. Legal counsel can give advice on how a security interest in the collateral may be perfected, and indicate the steps that should be taken to achieve this (although giving an unqualified opinion on perfection can, in practice, be quite difficult for various reasons). Ideally, these steps should be taken before collateral assets are received or given value. In the event collateral must be liquidated, the legal process involved is best understood in advance and worked into the holding period. Alternatively, you can operate under an outright transfer mechanism. One advantage of this structure is that perfection risk is generally reduced or eliminated (however, there may be disadvantages to this approach, as discussed in Section 1.4 of this Chapter).

## 4. DOCUMENTING THE COLLATERALIZED RELATIONSHIP

### 4.1 Considerations in Selecting Appropriate Documentation

One of the keys to enforcing an interest in collateral, when necessary, is the existence of appropriate documentation of the collateral arrangement. What is appropriate will depend upon the nature of the counterparties, the type of underlying transaction, the operational capabilities of the parties, etc., but it can be valuable to use industry standard forms because they can offer objectivity, consistency and a body of judicial and operational experience and can shorten negotiation because they are more readily accepted. The CSDs take the form of an annex to the ISDA Master Agreement (except the English Deed which, as explained below, is a stand-alone document) each based on a different body of law, or method of taking collateral, from which parties may choose.

Signing standard forms will not usually be sufficient by itself to give you a good interest in collateral. You will need to take legal advice concerning the best way to hold the collateral and whether any other steps, such as filings or registrations, need to be made in order to defeat claims to the collateral by third parties.

### 4.2 Form of Documentation

*CSDs*
ISDA has, to date, published four standard forms of Credit Support Document:

- the ISDA Credit Support Annex subject to New York law (the "New York Annex"), reflecting the pledge approach;

- the ISDA Credit Support Deed subject to English law (the "English Deed"), reflecting the pledge approach;

- the ISDA Credit Support Annex subject to English law (the "English Annex"), reflecting the title transfer approach; and

27

- The ISDA Credit Support Annex subject to Japanese law (the "Japanese Annex"), which includes two forms of collateral arrangement under Japanese law, one reflecting the pledge approach, the other reflecting the title transfer approach (referred to as "loan collateral" under Japanese law).

Each of these forms is drafted as an annex to the Schedule to the ISDA Master Agreement except for the English Deed, which is a stand-alone document. The English Deed is a standalone document for purely technical reasons and is, in terms of form and content, otherwise very similar to the other CSDs.

*Determining the Appropriate Form*
There are a number of factors which parties may wish to consider in determining the appropriate CSD, the relative importance of which will depend on the particular case. These factors include:

- *Governing law*: you may wish, for practical reasons, to use a CSD governed by the same law as the related Master Agreement. It is not, however, necessarily impossible to have the CSD governed by a different governing law than that governing the Master Agreement, but this should be confirmed in specific cases by your legal advisers.

- *Nature and location of collateral*: broadly speaking, all of the CSDs cover the same type of collateral, namely, cash and government securities (and each can be relatively easily expanded to cover other types of securities). The New York Annex, however, is designed for use only with U.S. dollar cash and securities. There is no currency conversion mechanism in the New York Annex. Also, the New York Annex assumes one day settlement periods, which is appropriate for U.S. Treasury securities but not, for example, for most European government securities. Those who use the New York Annex more broadly adjust for these factors. The Japanese Annex is similarly limited to Japanese Yen cash deposits and securities. The English Deed and English Annex are drafted to cover cash and securities in a variety of currencies as well as in settlement systems with different customary settlement times. They are each primarily drafted with cash in any currency and European government securities in mind.

- *Use of collateral*: it is often important, commercially, for the collateral taker to have relatively unrestricted use of securities received as collateral until they must be returned to the collateral giver. This unrestricted use includes the ability to sell them to a third party in the market, free and clear of any interest of the collateral giver. Other uses would include lending the securities or selling them under a securities repurchase ("repo") agreement or rehypothecating them (that is, repledging them - note that the term "rehypothecation" is often used commercially, in this context, to mean any use of the collateral by the taker. If the taker needs unrestricted use of the collateral, the taker should not use the English Deed, under which the taker is not permitted to use the collateral. The taker may instead prefer to use the New York Annex, the English Annex or the Japanese Annex.

28

- *Enforceability of CSD*: in deciding which form is most appropriate, parties will also need to consider whether the particular CSD chosen would be enforceable in the counterparty's home jurisdiction and in any other relevant jurisdiction.

- *Tax considerations*: tax considerations may affect the choice of CSD. As a general matter, tax is more likely to be of concern in relation to the title transfer approach reflected in the English Annex, although the UK taxation issues have largely been eliminated during the course of bilateral discussions between ISDA and the UK Inland Revenue, summaries of which are available from ISDA. However, tax issues may arise when the English Annex is used in other tax jurisdictions. See the User's Guide to the 1995 ISDA Credit Support Documents under English Law for further discussion of these issues. In general, parties should consult with their legal advisors regarding any tax considerations. For a discussion of taxation issues related to the taking of collateral in the United Kingdom, see also Appendix 2 to these Guidelines.

- *Negative pledges*: if your counterparty has entered into a negative pledge that would prohibit it from granting security, you might be able to put in place an English Annex, based on title transfer, if the negative pledge does not also cover set-off, netting or similar arrangements. The precise wording of the negative pledge should be considered carefully, but parties in the past have chosen to use the English Annex for precisely this reason.

- *Bankruptcy freezes*: CSDs reflecting the pledge or security interest approach may be caught by a bankruptcy stay or freeze (although they are unlikely to be so caught where the pledge is made by a UK or U.S. corporate/bank). The English and Japanese Annexes, reflecting the title transfer approach, might, however, not be caught by such a stay or freeze. For example, the English Annex would not be caught by the freeze imposed by sections 10 and 11 of the UK Insolvency Act 1986 in the event of an administration, a form of reorganization proceeding in the UK. In insolvency proceedings for a U.S. corporation or a U.S. bank, CSDs which are part of an ISDA Master Agreement generally are not subject to an automatic stay or other sort of bankruptcy stay.

The foregoing list is not necessarily exhaustive, but reflects various considerations an institution may wish to take into account when deciding which CSD to use with a particular counterparty.

### 4.3 Legal Issues

*Creation and Perfection of Security*
How does one ensure the validity of the collateral arrangement chosen against a liquidator, bankruptcy trustee or receiver of one's counterparty and against third parties? Where the pledge approach has been chosen, one should ensure that the pledge has been validly created under its governing law (which in many cases will be the law the parties have chosen to govern the pledge document) and has been validly perfected, if necessary, in