**SILVERMANACAMPORA LLP**
Counsel to Caisse des Dépôts et Consignations,
100 Jericho Quadrangle, Suite 300
Jericho, New York 11753
(516) 479-6300
Ronald J. Friedman
Jay S. Hellman
Brett S. Silverman

| | |
|---|---|
| **Hearing Date:** | **September 26, 2013** |
| **Time:** | **10:00 a.m.** |
| **Objections Due:** | **September 19, 2013** |
| **Time:** | **4:00 p.m.** |

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

In re                                                                     Chapter 11

LEHMAN BROTHERS HOLDING INC., *et al.*           Case No. 08-13555 (JMP)

                                                   Debtors.           (Jointly Administered)
-------------------------------------------------------------------X

### NOTICE OF CAISSE DES DÉPÔTS ET CONSIGNATIONS' SECOND MOTION FOR ENTRY OF AN ORDER TO PERMIT A LATE-FILED PROOF OF CLAIM

**PLEASE TAKE NOTICE**, that a hearing has been scheduled for **September 26, 2013 at 10:00 a.m.** (the "Hearing") or as soon thereafter as counsel may be heard, on the motion of Caisse des Dépôts et Consignations for the entry of an order to permit a late-filed claim against Lehman Brothers Special Financing Inc. ("LBSF" and, together with its jointly administered co-debtors, "Lehman" or the "Debtors") in accordance with Rules 3003(c)(3) and 3002(c)(6) or, alternatively, Rule 9006(b)(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), with such claim being deemed timely filed (the "Motion"), to be held before the Honorable James M. Peck, United States Bankruptcy Judge, in Room 601 of the United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton U.S. Custom House, One Bowling Green, New York, New York 10004.

**PLEASE TAKE FURTHER NOTICE** that the Motion has been filed electronically with the Clerk of the Bankruptcy Court and may be examined and inspected by interested parties on the Court's website (http://www.nysb.uscourts.gov). Please note that a PACER password is needed to access documents on the Court's website. Copies of the Motion may also be obtained by contacting Cooper J Macco, Esq., at SilvermanAcampora LLP at (516) 479-6300.

**PLEASE TAKE FURTHER NOTICE** that responses or objections, if any, to the relief sought in the Motion must be in writing, must conform to the Bankruptcy Rules and the Local Rules, must set forth the name of the objecting party, the basis for the objection and the specific grounds therefor, and must be filed with the Bankruptcy Court, electronically in accordance with General Order M-399 (General Order M-399 and the User's Manual for the Electronic Case Filing System may be found at www.nysb.uscourts.gov, the official website for the Bankruptcy Court) by registered users of the Bankruptcy Court's case filing system, and by all other parties in interest on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format (with a hard copy delivered directly to Chambers), in accordance with General Order M-399, and any responses or objection must be: made in writing; electronically filed with the Court; mailed to Chambers of the Honorable James M. Peck, United States Bankruptcy Judge for the Southern District of New York, Alexander Hamilton U.S. Custom House, One Bowling Green, New York, New York 10004-1408; mailed to SilvermanAcampora LLP, 100 Jericho Quadrangle, Suite 300, Jericho, New York 11753, Attn: Cooper J Macco, Esq.; and mailed to the Office of the United States Trustee, 33 Whitehall Street, 21st Floor, New York, New York  10004, so as to be actually received no later than **September 19, 2013 at 4:00 p.m.**

**PLEASE TAKE FURTHER NOTICE**, that the Hearing may be adjourned from time to time without further notice other than the announcement of such adjournment in open Court.

**PLEASE TAKE FURTHER NOTICE**, that the relief requested in the Motion may be granted without a hearing if no objection is timely filed and served in accordance with the Court's Amended Order Implementing Certain Notice and Case Management Procedures in the Debtors' case [Docket No. 2837].

Dated: Jericho, New York
      August 2, 2013

**SILVERMANACAMPORA LLP**
Counsel to Caisse des Dépôts et
Consignations


s/Ronald J. Friedman
Ronald J. Friedman
Jay S. Hellman
Members of the Firm
100 Jericho Quadrangle, Suite 300
Jericho, New York 11753
(516) 479-6300

**SILVERMANACAMPORA LLP**
Counsel to Caisse des Dépôts et Consignations,
100 Jericho Quadrangle, Suite 300
Jericho, New York 11753
(516) 479-6300
Ronald J. Friedman
Jay S. Hellman
Brett S. Silverman

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

In re                                                  Chapter 11

LEHMAN BROTHERS HOLDING INC., *et al.*                 Case No. 08-13555 (JMP)

                                    Debtors.           (Jointly Administered)
------------------------------------------------------------------------X

### CAISSE DES DÉPÔTS ET CONSIGNATIONS' SECOND MOTION[1]
### FOR ENTRY OF AN ORDER TO PERMIT A LATE-FILED PROOF OF CLAIM

Caisse des Dépôts et Consignations ("CDC"), by and through its undersigned counsel,

SilvermanAcampora LLP, seeks the entry of an order to permit a late-filed claim against

Lehman Brothers Special Financing Inc. ("LBSF" and, together with its jointly administered co-

debtors, "Lehman" or the "Debtors") in accordance with Rules 3003(c)(3) and 3002(c)(6)[2] or,

alternatively, Rule 9006(b)(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules"), with such claim being deemed timely filed (the "Motion"), and respectfully represents as

follows:[3]

---

[1] This is the second motion by which CDC seeks this Court's permission file a belated proof of claim. The Court previously denied the prior motion, **_without prejudice_**, to permit CDC time to obtain and present additional information in response to certain inquiries that the Court raised at the hearing on the first motion.

[2] Rule 3003(c)(3) provides that, notwithstanding the expiration of the time to file a proof of claim in a chapter 11 case, "a proof of claim may be filed to the extent and under the conditions stated in Rule . . . 3002(c)(6)." Rule 3002(c)(6) provides: "If notice of the time to file a proof of claim has been mailed to a creditor at a foreign address, on motion filed by the creditor before or after the expiration of the time, the court may extend the time by not more than 60 days if the court finds that the notice was insufficient under the circumstances to give the creditor reasonable time to file a proof of claim."

[3] This Court has jurisdiction pursuant to 28 U.S.C. §§ 157(a) and 1334, as well as the Standing Order of Reference from the United States District Court for the Southern District of New York (Preska, J.), dated

JSH/1307422.1/060177

### **PRELIMINARY STATEMENT**

1.       This Motion seeks to correct a due process violation and prevent the continuing injustice of allowing the Debtors to discharge CDC's claim (the "Claim") and avoid payment thereon.[4] The Debtors failed to properly serve CDC, a known creditor, with notice of the bar date (the "Bar Date Notice") in the specific manner required by the Master Agreement between CDC and LBSF, and as required by applicable law.

2.       As explained below, pursuant to the clear and unambiguous terms of the Master Agreement, the Debtors were required to send CDC *actual* notice of the bar date (the "Bar Date") at the specific address listed in the Master Agreement.    Although the Debtors sent several other notices to CDC at the specific address set forth in the Master Agreement, the Debtors failed to abide by the specific notice requirements when they mailed the Bar Date Notice to CDC.    That failure was critical because, as explained below, the sheer size and magnitude of CDC, as well as the English/French language barrier, resulted in the improperly addressed Bar Date Notice being returned to sender, unopened.[5]

3.       CDC was a known creditor of LBSF, and LBSF was aware of the Claim, because LBSF listed CDC as a party to an unexpired executory contract (*i.e.* the Master Agreement) on Schedule G of its petition with reference to "Derivative Master Account Number 080494CDDC." Notwithstanding the fact that the information was readily available, LBSF's noticing agent, Epiq

---

January 31, 2012.  This motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§1408 and 1409.

[4] The amount of the Claim is $3,077,434.00 (€2,101,500), plus accrued interest, costs, and expenses, and arises out of the early termination of an ISDA Master Agreement between CDC and LBSF (the "Master Agreement").  The amount was calculated by multiplying the value of the Claim in Euros, before accrued interest, costs and expenses, based upon the exchange rate as of September 25, 2008, the Early Termination Date of the Master Agreement, as designated in a letter from CDC advising LBSF of the default under the Master Agreement, which rate was then $1.4643987649 per €1.00.

[5] As more fully set forth herein, CDC is a large institution with numerous offices throughout France, and more than ten (10) offices in Paris alone.  Furthermore, CDC employs more than 73,000 people and receives more than 1,000 pieces of mail per day.  Understandably, and based upon the departmentalized nature of CDC, notification processes, such as the notice required in the Master Agreement, are established and maintained to remedy notice issues that can plague this very large entity.

2

Bankruptcy Solutions, LLC ("Epiq") did not send the Bar Date Notice to the precise address specifically required by the Master Agreement. Consequently, the Bar Date Notice was returned to Epiq as "undeliverable." Despite the returned mail, Epiq did not make any further attempts to provide CDC directly with the Bar Date Notice. Consequently, CDC never filed a proof of claim.

4.      Under the circumstances, CDC respectfully requests that this Court enter the annexed, proposed order permitting CDC to file a proof of claim pursuant to Bankruptcy Rules 3003(c)(3) and 3002(c)(6) or, alternatively, Rule 9006(b)(1), and that, upon such filing, the proof of claim be deemed timely.

## **FACTUAL BACKGROUND**

### The Lehman Brothers' Bankruptcy

5.      On September 15, 2008 (the "LBHI Petition Date"), Lehman Brothers Holdings Inc. ("LBHI") and certain of its subsidiaries filed voluntary petitions for relief under chapter 11 of title 11, United States Code (the "Bankruptcy Code"). LBSF filed a voluntary petition under chapter 11 of the Bankruptcy Code on October 3, 2008.

6.      By Order dated July 2, 2009, this Court established September 22, 2009 as the Bar Date for filing proofs of claims based upon pre-petition claims against the Debtors (the "Bar Date Order"). In addition to the official proof of claim form, the Bar Date Order also required the submission of a Derivative Questionnaire for claims based upon derivative contracts and a Guarantee Questionnaire (collectively, the "Questionnaires") for claims based upon a guarantee, by no later than October 22, 2009 (the "Questionnaire Deadline").

7.      On March 15, 2010 the Debtors filed a Joint Chapter 11 Plan (the "Plan") and Disclosure Statement, and, on April 14, 2010, the Debtors filed a revised version of the Plan.

3

CDC Overview

8.      CDC is a large, public institution with special status under the French Parliament's supervision and guarantee.[6]

9.      CDC was formed in 1816 to safeguard funds (during various financial crises and while the French State faced a significant war debt), including the pension funds and retirement accounts of France's civil servants. Thereafter, in the same spirit of confidence and security, many other missions of public interest have been entrusted to CDC.

10.      CDC and its subsidiaries employ approximately 73,500 people and manage 48 different pension programs for French workers.

11.      CDC occupies numerous office buildings throughout France, including more than ten (10) buildings within the city of Paris alone.  Each CDC location, including all of the locations throughout Paris, accommodates hundreds, if not thousands of employees, who serve CDC in one of its various departments and sub-departments.  Charts reflecting the organizational structure of CDC are collectively annexed hereto as **Exhibit 1**.

12.      On average, CDC receives more than 1,000 pieces of mail per day.  Moreover, nearly all of CDC's mail and other parcels (collectively, "Mail") are delivered to a central mail distribution center (the "Distribution Center").

13.      At the Distribution Center, the Mail is processed according to how such Mail is addressed.  Once processed, the Mail is distributed to the specifically identified department located in one of CDC's various locations throughout France.

14.      Due to the expansive, non-contiguous layout of CDC's offices throughout France, and Paris in particular, CDC has developed very specific Mail processing policies, which include

---

[6] CDC is a public-law institution and, together with its subsidiaries, they form a group of public interests, dedicated to the economic development of France.  CDC is placed under the supervision of the French Parliament pursuant to article L. 518-2 of the French Monetary and Financial Code.

JSH/1307422.1/060177

the requirement that all Mail delivered to CDC must contain a specific identification of the intended personnel, department, or sub-department.

15.     Due to this policy, it is *essential* that mail be addressed to the proper department and/or personnel within CDC so that it can be delivered accurately, a fact well known to the Debtors by virtue of the specific notice requirement set forth in the Master Agreement.

16.     Therefore, to avoid any Mail being returned as "undeliverable," CDC necessarily includes very specific notice provisions in all of its contracts, such as (i) section 12(a) of the Master Agreement, and (ii) section 4(a) of the Schedule thereto.

The Master Agreement

17.     On July 29, 1994, CDC and LBSF entered into the Master Agreement, which was to govern certain future transactions by and between CDC and LBSF.  A copy of the Master Agreement is annexed as Exhibit A to the accompanying Declaration of Jay S. Hellman dated July _, 2013 (the "Hellman Declaration"), which has been annexed hereto as **Exhibit 2**.

18.     In connection with the Master Agreement, LBSF also executed a Guarantee of Lehman Brothers Holdings Inc. ("Guarantee") and a Master Pledge Agreement ("Pledge Agreement"), dated November 4, 1994, whereby LBSF is the "Pledgor" to CDC as "Pledgee." Copies of the Guarantee and the Pledge Agreement are annexed to the Hellman Declaration as Exhibits B and C, respectively.

CDC's Protocol for ISDA Agreements, Including the Master Agreement

19.     Each and every ISDA Agreement that CDC enters into, including the Master Agreement, is handled by three separate departments within CDC: (i) the Legal Department (known at CDC as the Direction Juridique et fiscale); (ii) the Back Office Department ("DBO"); and (iii) the Finance Department (known at CDC as the Pole Finances, Strategie, Filiales et international).

5

20.    Within the Legal Department, ISDA Agreements are handled by both (i) the Project and Financial Department (known at CDC as Droit Financier et Projets), and (ii) the Litigation Department (known at CDC as the Contentieux).  The Legal Department is primarily responsible for negotiating and drafting various ISDA Agreements and other transactional documents entered into by CDC, including the Master Agreement and its related agreements and documents.  Other functions of the Legal Department include interfacing with outside counsel as well as interpreting documents on behalf of CDC.

21.    The Legal Department, when negotiating an ISDA Agreement, or any other agreement or transactional document for that matter (including the Master Agreement in the present case), **always** includes **specific** notice provisions that if not adhered to can cause notice to go undelivered to the intended party.

22.    Specifically with respect to the Master Agreement, Part 4(a) of the schedule ("Schedule") to the Master Agreement contains the specific notice provisions for the Master Agreement, and requires that all communications from the Debtors to CDC in connection with the Master Agreement be directed to:

> Caisse des Dépôts et Consignations
> 56 rue de Lille
> 75356 Paris Cedex-France
> **Attention:  Service FMP 20/Back Office Monétaire**

(emphasis supplied) (the "Special Notice Provision").[7]

23.    The Financial Instruments Department (known at CDC as the Departement Instruments Financier) is a sub-department of the DBO.  Within the Financial Instruments Department, a sub-department, the Financial Operation Department (known at CDC as the Operation Financieres) is responsible for handling all ISDA cash and securities transfers upon

---

[7]    The Debtors were fully aware of the Special Notice Provision and, more importantly, the necessity of the Special Notice Provision.  As such, every written correspondence from the Debtors to CDC, **other than the Bar Date Notice**, including post-petition correspondence, was mailed in accordance with the Master Agreement and the Special Notice Provision.

6

JSH/1307422.1/060177

instructions by the Finance Department, which includes those transfers relating to the Master Agreement.

24.    The Finance Department has two sub-departments, the Financial Management Department (known at CDC as the Geston Financiere) and the Intermediation Department (known at CDC as the Intermediation), which are responsible for negotiating, confirming, and terminating ISDA Agreements, with the support of the Legal Department, including the Master Agreement.  Additionally, the Finance Department is responsible for providing the DBO with instructions for cash and securities transfers, both payment and delivery.

25.    From the date of the inception of the Master Agreement, through and including the date it was terminated, the five (5) different sub-departments mentioned above all had specialized roles in the negotiation, creation, execution, maintenance, and transactions relating to the Master Agreement, including the decision to terminate the Master Agreement.

The Termination of the Master Agreement

26.    Pursuant to section 5(a)(vii) of the Master Agreement, it is an event of default if a party to the agreement "institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof." In addition, the bankruptcy of LBHI (as "Credit Support Provider" of LBSF under the provisions of Section 5(a)(vi) of the Master Agreement) is a "Cross Default" under the Master Agreement. Upon an event of default (including a "Cross Default"), the Master Agreement provides that "the other party (the "Non-defaulting Party") may, by not more than 20 days notice

7

to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions."

27.    Upon learning of LBSF's bankruptcy, DBO and the Finance Department engaged in discussions with the Legal Department as to whether CDC should terminate the Master Agreement.  At the time, the Legal Department was counseled by attorneys at the Paris offices of Denton Wilde Sapte ("DWS Paris").  Thereafter, DBO and the Finance Department jointly decided to terminate the Master Agreement.

28.    On September 19, 2008, CDC sent LBSF notice of its default under the Master Agreement as a result of the bankruptcy filing of LBHI, an affiliate of LBSF, and designated September 25, 2008 as the Early Termination Date for all outstanding transactions. LBSF received the letter on September 24, 2008.

29.    On September 29, 2008, CDC sent LBSF notice of the amount due on the Early Termination Date, which notice LBSF received on October 1, 2008.

30.    Pursuant to CDC's rights upon termination of the Master Agreement, the Claim was calculated pursuant to Section 6(d)(ii) of the Master Agreement, which is the principal balance of $3,023,035.26 (€2,101,500), together with interest accrued thereon from and including the Early Termination Date to the date of payment at the Applicable Rate.[8]

Notice of the Bar Date

31.    CDC is a known creditor of LBSF because the Master Agreement is listed on Schedule G of the Debtors' chapter 11 petitions as an unexpired executory derivative contract

---

[8] Pursuant to Section 14 of the Master Agreement, the "Applicable Rate" for this purpose is the "Default Rate", which is CDC's cost of funds plus 1% per annum.  From the Early Termination Date to the date of the notice, CDC's cost of funds was 4.50% and, therefore, the Applicable Rate during such period was 4.285% per annum plus 21.5 basis points. CDC reserved its right to apply a different cost of funds for purposes of calculating the Applicable Rate from the date of the notice.

8

JSH/1307422.1/060177

with reference to Master Derivative Account Number 080494CDDC.  A copy of the Debtors'

Schedule G is annexed to the Hellman Declaration as Exhibit D.

32.     On May 5, 2010, after the Bar Date, CDC received an e-mail from LBHI estate's

director, Mr. Dermot Doyle, purporting to have authority to settle CDC's claim against LBSF.

Mr. Doyle also asked if CDC submitted a proof of claim.  On May 10, 2010, CDC telephoned Mr.

Doyle to tell him that it seemed to be that, so far, no proof of claim had been filed and to ask him

if any notice had been sent to CDC to inform CDC of the necessity of such a filing.  Mr. Doyle

answered that he would get in touch with the LBHI estate's lawyers and would call back.  CDC

never received a return telephone call from Mr. Doyle.

33.     After conducting an internal investigation, CDC discovered that the Bar Date had

passed and contacted LBSF, who provided CDC with a color scan of an unopened envelope

which allegedly contained the Bar Date Notice, which was errantly addressed as follows:

> CAISSE DES DEPOTS ET CONSIGN ATIONS [SIC]
> 56 RUE DE LILLE
> 75356 PARIS
> CEDEX 07
> FRANCE

A copy of the returned envelope that allegedly held the Bar Date Notice is annexed to the

Hellman Declaration as Exhibit E.

34.     As mentioned above, despite being mailed to the proper street address, the Bar

Date Notice was not **specifically** addressed to **Service FMP 20/Back Office Monétaire**, as

required by the Master Agreement.

35.     Due to Epiq's failure to include the Special Notice Provision on the Bar Date

Notice envelope, to which Special Notice Provision Epiq had access, the Bar Date Notice was

unable to be routed out of the Distribution Center.

36.     As described above, the significant volumes of Mail processed by the Distribution

Center, coupled with CDC's expansive operations throughout France, require very specific Mail

9

protocols.  Moreover, because CDC personnel in the Distribution Center are unable to speak or read much English,[9] the required mailing addresses, such as the Special Notice Provision, ensure that the Distribution Center can properly route the voluminous amounts of Mail that CDC receives on a daily basis.

37.    Moreover, Mail associated with ISDA Agreements, such as the Master Agreement, is virtually never sent to CDC without the specific notice provisions.  In that regard, the Bar Date Notice failed to indicate that it was sent with reference to the Master Agreement. Accordingly, Distribution Center personnel who received the Bar Date Notice did not open it but, instead, marked it for return as "undeliverable."  Epiq made no further attempts to verify CDC's proper mailing address, nor did it re-send the Bar Date Notice.

38.    Additionally, despite the fact that Epiq addressed the Bar Date Notice to the attention of either the "President" or "Legal Counsel," no such positions exist within the CDC. *See* **Exhibit 1**.

39.    Lastly, assuming one of the Distribution Center personnel actually opened the Bar Date Notice, which they did not, their general inability to speak or read English, coupled with the Bar Date Notice's failure to indicate which department was the intended recipient, would still have resulted in the Bar Date Notice being returned as undeliverable.

40.    Accordingly, CDC was not aware of the Bar Date, and thus, CDC did not file a proof of claim before the Bar Date had passed.[10]

---

[9] Although CDC is a large institution, it does very little business within the United States or with entities based in the United States.  CDC does business almost exclusively in the French language.  Very few CDC employees speak English.  In fact, by French law nº 94-665 dated August 4, 1994, relating to the use of French language ("relative à l'emploi de la langue française") all contracts to which CDC is a party must be written in French unless certain exceptions are met.

[10] Prior to the execution of the Master Agreement, CDC was affiliated with CDC Capital, Inc. ("CDC Capital"), through which CDC transacted very discrete business.  Section 13(c) of the Master Agreement contains notice procedures, whereby is it was **only** acceptable to notice CDC Capital in the event of a direct dispute between the Debtors and CDC that related **only** to business transacted through CDC Capital.  In or about 2007, prior to the LBHI bankruptcy filing CDC sold all its interests in CDC Capital. Although CDC Capital was no longer affiliated with CDC at the time of the LBHI bankruptcy filing, Epiq

10

JSH/1307422.1/060177

41.     As a result of (i) CDC's justified reliance on the Special Notice Provision in the Master Agreement, (ii) its reliance on the Debtor's awareness and continued post-petition use of the Special Notice Provision (save for the Bar Date Notice), (iii) the language barrier for CDC personnel, and (iv) CDC's unfamiliarity with bankruptcy proceedings in the United States, CDC was simply not aware that it should have, but did not, receive the Bar Date Notice.

Retention of Counsel

42.     After conducting an internal investigation regarding the Bar Date issues, CDC contacted Denton Wilde Sapte's New York offices ("DWS NY").  DWS NY advised CDC it did not wish to represent CDC and file a proof of claim after the Bar Date.

43.     Intent on protecting its rights in connection with the Claim, in March 2011, CDC contacted and retained SilvermanAcampora LLP to file a motion to permit a late-filed proof of claim.

## PROCEDURAL BACKGROUND RELATED TO THIS MOTION

44.     On June 24, 2011, CDC filed a Motion for Entry of an Order to Permit a Late-Filed Proof of Claim Pursuant to Federal Rule of Bankruptcy Procedure 9006(b)(1) (the "First Motion").

45.     On or about August 17, 2011, LBSF filed an Objection to the First Motion (the "Objection").

46.     On January 23, 2012, CDC filed a reply to the Objection re-asserting its position and responding to the specific claims contained in the Objection.

---

served the Bar Date Notice on CDC Capital, an act that, despite the Debtors' contentions in their objection to the First Motion (as defined below), clearly did *not* provide CDC with sufficient notice of the Bar Date.  Service upon CDC Capital was improper for a multitude of reasons (aside from the fact that CDC Capital was no longer affiliated with CDC at the time of the Bar Date Notice or at any point post-petition), including that (i) none of the business relating to the Claim was conducted through CDC Capital, and (ii) the Bar Date did not constitute a "dispute" between the parties to the Master Agreement.

11

47.    On March 2, 2012,[11] the Court denied the First Motion, **without prejudice**, to allow CDC to provide answers to certain questions, including CDC's mail procedures and the why the Bar Date Notice was unopened and returned as "undeliverable."

## REQUESTED RELIEF

48.    By this Motion, CDC respectfully requests that this Court enter an order extending CDC's time to file a proof of claim and Questionnaires pursuant to Bankruptcy Rules 3003(c)(3) and 3002(c)(6) or, alternatively, Rule 9006(b)(1), and deem such claim as timely filed.

## ARGUMENT

### A.    CDC'S CLAIM SHOULD NOT BE TIME BARRED BECAUSE IT DID NOT RECEIVE NOTICE OF THE BAR DATE

CDC Was a Known Creditor that did not Receive Actual Notice

49.    The Motion should be granted because CDC did not receive "actual" notice of the claims Bar Date.

50.    "The statutory command for notice embodies a basic principle of justice – that a reasonable opportunity to be heard must precede judicial denial of a party's claimed rights."[12]

51.    Under applicable bankruptcy law, creditors are entitled to different types of notice depending on whether the creditor is "known" or "unknown."[13]

52.    "According to well-established case law, due process requires that a debtor's **known creditors be afforded actual written notice of the bankruptcy filing and of the bar date.**"[14]    Accordingly, a known creditor must receive actual notice of a bar date before its claim

---

[11] The hearing on the First Motion was adjourned multiple times from the original hearing date of July 20, 2011, until the hearing was held on February 22, 2012.

[12] *City of New York v. New York, New Haven & Hartford R.R. Co.*, 344 U.S. 293, 297 (1953).

[13] *See In re Brunswick Hosp. Ctr., Inc.*, 1997 WL 836684, *3 (Bankr. E.D.N.Y. 1997).

[14]  *Id.* (emphasis supplied) (*citing In re Drexel Burnham Lambert Group, Inc.,* 151 B.R. 674, 680 (Bankr. S.D.N.Y. 1993) (*citing City of New York v. New York, New Haven & Hartford R.R.,* 344 U.S. 293 (1953);

12

can be discharged in a debtor's bankruptcy.[15]

53.     It is undisputed that CDC was a known creditor of LBSF because the Master Agreement was listed on Schedule G of the Debtors' chapter 11 petitions as an unexpired executory derivative contract with specific reference to Master Derivative Account Number 080494CDDC.  Accordingly, because CDC was a known creditor of LBSF, the Debtors were obligated to provide CDC with actual notice of the Bar Date.

54.     For all the reasons set forth herein, CDC did not receive actual notice of the Bar Date before the Bar Date's passage, although the Debtors were required to provide such notice.

<u>Knowledge of the Bankruptcy Proceeding is Not Sufficient Notice</u>

55.     "Actual knowledge of the filing of a bankruptcy petition does not negate the statutory notice requirements nor does it place a duty on creditors to inquire regarding time

---

*In re Golden Distributors, Ltd.,* 182 Bankr. 349 (Bankr. S.D.N.Y. 1991)); *Chemetron Corp. v. Jones*, 72 F.3d 341, 346 (3d Cir. 1995); *Waterman S.S. Corp. v. Aguiar*, 141 B.R. 552, 557 (Bankr. S.D.N.Y. 1992); *In re Brooks Fashion Stores, Inc.*, 124 B.R. 436, 443-44 (Bankr. S.D.N.Y. 1991)); s*ee also In re L.F. Rothschild Holdings, Inc.*, 1992 WL 200834, *3 (S.D.N.Y. Aug. 3, 1992) ("[I]t is well established that a debtor's known creditors are entitled to actual notice of the bar date for filing claims.") (*citing City of New York v. New York, New Haven & Hartford R.R. Co.*, 344 U.S. 293, 296 (1953)); *In re Chateaugay Corp. Reomar, Inc.*, 2009 WL 367490, *5 (Bankr. S.D.N.Y. Jan. 15, 2009) ("[t]o discharge claims of known creditors, due process requires that known creditors receive actual notice"); *In re Victory Mem'l Hosp.*, 435 B.R. 1, *5 (Bankr. E.D.N.Y. 2010) ("all known creditors must be given actual notice of the bar date"). *See also In re Enron Corp.,* 2003 Bankr. LEXIS 2110 (Bankr. S.D.N.Y. 2003); *Grant v. U.S. Home Corp (In re U.S. Home Corp.)*, 223 B.R. 654 (Bankr. S.D.N.Y. 1998); *In re West Cost Video Enters.,* 174 B.R. 906 (Bankr. E.D. Pa. 1994).

[15]  *In re Enron Corp.*, No. 01-16034 (AJG), 2003 Bankr. LEXIS 2110 (Bankr. S.D.N.Y. July 30, 2003) (allowing late-filed proof of claim for excusable neglect despite finding that creditor received notice of the bar date); *see also In re XO Commc'ns, Inc.*, 301 B.R. at 792 ("If a creditor is 'known' to a debtor, actual notice of a debtor's bankruptcy filing and bar date must be given to the creditor in order to achieve a legally effective discharge of the creditor's claim."); *In re Thomson McKinnon Sec., Inc.* 159 B.R. 146 (Bankr. S.D.N.Y. 1993) (allowing a creditor to file a proof of claim more than two and one-half years after the bar date where the creditor did not receive actual notice of the bar date); *In re Waterman S.S. Corp.*, 157 B.R. 220, 222 (Bankr. S.D.N.Y. 1993) (holding that "[w]hen the bar date was sent out, all . . . known to be actual or potential claimants . . . were entitled to actual personal notice."); *Adam Glass Svc., Inc. v. Federated Dep't. Stores*, 173 B.R. 840 (E.D.N.Y. 1994) (holding that claim of unscheduled creditor who did not receive notice of the bar date and did not file a proof of claim was not discharged by debtor's confirmed plan, despite the creditor's knowledge of the pending bankruptcy); *Brunswick Hosp. Ctr., Inc* , 1997 WL 836684 at *3 (*quoting In re Best Prods. Co., Inc.*, 140 B.R. 352 (Bankr.S.D.N.Y.1992))( "A known creditor must receive proper, adequate notice before its claim is barred forever."); *see also In re Joseph B. Dahlkeyer Co., Inc.*, 170 B.R. 853 (Bankr. W.D. Pa. 1994) (claims of known creditors in chapter 11 cases could not be discharged unless the creditor had received actual notice of the bar date).

JSH/1307422.1/060177

limitations for filing claims."[16]  Thus, "claims of creditors who were known to debtor and who had

actual knowledge of the chapter 11 proceeding, but who did not receive the required notice of

the bar date, [are] not discharged upon plan confirmation."[17]

56.    In *In re Uiterwyk Corp.*,[18] creditors of the debtor were neither listed on the

debtor's schedules, nor sent actual notice of the bankruptcy filing or of the bar date.  Despite the

debtor's allegations that the creditors were well aware of the bankruptcy, the court explained "it

is clear that under controlling case law, the concept of due process compels the conclusion that

even if a creditor is aware of the pendency of a bankruptcy case, it is entitled to receive notice of

the bar date to file proof of claims."[19]  Thus, the court concluded that:

> the [creditors] were clearly entitled to be given formal notice of
> these proceedings, especially the bar date fixed by the Court.  For
> this reason, they should be allowed to file their proof of claim and
> to deny their right to file a proof of claim would be denial of due
> process to which they are entitled.[20]

57.    Despite CDC's general knowledge of the Debtors' bankruptcy proceeding, it had

no knowledge of the Bar Date, nor did CDC have an independent duty to inquire about the Bar

Date and, therefore, CDC was justified in relying upon the Debtors' obligation to provide actual

notice thereof pursuant to the provisions of the Master Agreement and under applicable law.

---

[16] *In re Spring Valley Farms, Inc.,* 85 B.R. 593, 595 (N.D. Ala. 1988) (emphasis added) (*citing New York, New Haven & Hartford R.R. Co.,* 344 U.S. at 297); *In re XO Commc'ns, Inc.,* 301 B.R. at 792, n.5 ("knowledge of a corporate reorganization petition does not necessarily enable a creditor to estimate the bar date.") (*quoting In re Medaglia*, 52 F.3d 451 (2d Cir. 1995).*See also In re Brunswick Hosp. Ctr., Inc.,* 1997 WL 836684 at *3 (*quoting In re Somar Concrete, Inc.*, 102 B.R. 44, 50 (n. 4) (Bankr.D.Md.1989) ("[T]he creditor with actual knowledge of the bankruptcy case has a burden of inquiry in an individual case while a creditor with knowledge of a corporate Chapter 11 case suffers no prejudice unless it has actual knowledge of the bar date.")); *Adam Glass Svc., Inc. v. Federated Dep't. Stores*, 173 B.R. at 843 ; *In re Joseph B. Dahlkeyer Co., Inc.*, 170 B.R. 853, 861 (Bankr. W.D. Pa. 1994); *In re Uiterwyk Corp.*, 105 B.R. 103, 105 (Bankr. M.D. Fla.).

[17] *Dahlkeyer*, 170 B.R. at 861.

[18] *In re Uiterwyk Corp.,* 105 B.R. at 105.

[19] *Id.* at 105.

[20] *Id.* (citations omitted).

14

CDC was a Known Creditor that did not
<u>Receive Legally Sufficient Notice by Publication</u>

58.     Notice by publication is not legally sufficient notice for known creditors of a debtor.[21]   "Notice by publication satisfies the requirements of due process when the names, addresses and interests of potential parties are ***unknown***."[22]

59.     In their prior objection to the First Motion, the Debtors asserted that they provided the Bar Date Notice to CDC by publication when they ran advertisements in the International Editions of the Wall Street Journal, Financial Times, and New York Times.

60.     Despite the Debtors' efforts, however, notice by publication is not legally sufficient notice for known creditors, and thus, because CDC was clearly a known creditor, the Debtors cannot foreclose CDC's right to file its Claim against the Debtors.

CDC Was a Known Creditor that did not Receive
<u>Legally Sufficient Notice Pursuant to the Master Agreement</u>

61.     Actual notice ***must*** be "legally sufficient" notice, and, as such, for all the reasons set forth below, none of the attempted service methods that the Debtors used to serve the Bar Date Notice upon CDC were legally sufficient pursuant to either (i) the terms of the Master Agreement or (ii) prevailing legal authority, and, as such, the Court should allow CDC to file the Claim, and that Claim should be deemed timely.

62.     In *In re National Union Fire Ins. Co. of Pittsburgh, P.A. v. Main* ("*Main*"),[23]

---

[21] *See Brunswick Hosp.,Ctr. Inc.*, 1997 WL 836684 at *3 ("notice by newspaper publication does not satisfy the minimum due process protections to which known creditors are entitled."); *see also Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 319–20, 70 S.Ct. 652, 94 L.Ed. 865 (1950); *In re Allegheny Int'l*, 158 B.R. 356, 359 (Bankr. W.D.Pa. 1993) (notice by publication in national newspapers is insufficient to give actual notice of bankruptcy filing to known creditors); *In re Grand Union Co.*, 204 B.R. 864, 872 (Bankr. D. Del. 1997) (published notice of claims bar date notice is inadequate for known creditors) ("[C]onstructive notice by publication is not reasonable notice to creditors whose names, addresses and interests are known to the debtor").

[22] *In re Thomson McKinnon Secs. Inc.*, 130 B.R. 717, 719 (Bankr. S.D.N.Y. 1991) (emphasis supplied); *see also Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950).

[23] 111 B.R. 535 (Bankr. W.D. Pa. 1990).

JSH/1307422.1/060177

National Union, a large, complex corporation that operated different divisions of its organization on different floors of its primary location, entered into an indemnity agreement with the debtors. Aware of the complexity of its own business and the importance of the delivery of notices to the proper personnel, National Union required the inclusion of a specific notice requirement in all of its agreements, including the indemnity agreement it entered into with Main.  Paragraph 10(b) of the indemnity agreement required that any notices pertaining to the indemnity agreement be sent to:

> National Union Fire Insurance Company of Pittsburgh, PA
> 70 Pine Street, 21st Floor
> New York, New York 10270
> Attention: Division Manager, Comprehensive Financial Risk
> Division

63.     Despite the special notice requirement in the indemnity agreement, notice of the bankruptcy was served on National Union's general administrative office, without (i) indicating the 21st Floor, or (ii) the special "attention" line: "Division Manager of the Comprehensive Financial Risk Division" (the division responsible for the indemnity agreement).  As a result, the notice of the bankruptcy was routed to National Union's centralized mailroom, which it shared with its parent corporation and which serviced many different divisions on many different floors of the building.  Furthermore, the notice presumably sent by the Clerk of the Court to National Union did not indicate what, if any, interest National Union had with the debtors' case.  Accordingly, without (i) the special notice requirement, (ii) the identity of which floor to route the notice, or (iii) any indication of National Union's interest in the matter, the notice of the bankruptcy could not be delivered to the proper parties, if received at all.

64.     The Bankruptcy Court found that "[e]ven if National Union did receive it (as it presumably did), the notice was not adequate to reasonably apprise it of the bankruptcy proceeding so as to afford it the opportunity to object in a timely manner to the discharge of

16

Debtors and their debts."[24]

65.    The Bankruptcy Court further found that:

[c]onsidering the size of National Union and the magnitude and complexity of its operations, it is reasonable to expect that National Union, upon receipt of the notice in its mail room, would not have been able to determine the person within the corporation to whom the notice should have been forwarded in order to determine what action, if any, should be taken with regard to the notice.[25]

66.    Thus, the Bankruptcy Court held that:

Under these circumstances, *it must be concluded that National Union did not receive notice which was reasonably calculated to apprise it of Debtors' bankruptcy case* so as to permit it to file its complaint in a timely manner. The notice received by National Union was not acted upon by it in a timely manner because it was unable to determine, in light of the manner in which it was addressed, what interest it had in the bankruptcy proceeding.[26]

67.    Similarly, in *National Union Fire Ins. Co. of Pittsburgh, P.A. v. Broadhead* ("*Broadhead*"),[27] National Union, the creditor, and the debtor Craig A. Broadhead entered into an indemnity agreement which, among the terms and conditions, required all notices be sent to National Union at a specific address and include a specific "attention" line that read: "Attention: Special Programs Division".

68.    For all the reasons set forth in *Main*, above, National Union required the specific "attention" line so any notices regarding the indemnity agreement with Broadhead could be routed to the correct division.

---

[24] *Id.* at 538.

[25] *Id.* at 539.

[26] *Id.* (emphasis supplied)

[27] 155 B.R. 856 (S.D.N.Y. 1993).

17

69.     Upon filing his bankruptcy petition, Broadhead scheduled National Union as an unsecured creditor, but when he listed National Union's address he failed to list the specific "attention" line – "Attention Special Programs Division" as required by the indemnity agreement.

70.     In 1990, the Bankruptcy Court for the District of Utah issued an order discharging Broadhead from his debts.  Thereafter, National Union, which denied receiving any notice of the bankruptcy proceeding, commenced a diversity action under, among other documents, the indemnity agreement.

71.     In 1992, relying primarily on *Main*, the District Court for the Southern District of New York granted summary judgment in favor of National Union, finding that National Union's claim was not discharged because it was not given adequate notice of the bankruptcy proceeding.  Subsequent to the entry of the summary judgment, Broadhead filed a motion seeking, among other things, to vacate the judgment based upon "excusable neglect."

72.     In its initial analysis of the facts, the District Court, citing *In re Drexel Burnham Lambert Group Inc.*[28] stated that:

> There is no statutory requirement, however, that one identify the specific division of a company on a bankruptcy notice.  Nor is it required by due process.  Once delivered, it is the responsibility of the creditor to distribute the notice to the appropriate party within its organization.[29]

73.     However, the District Court did not stop there.  It further analyzed the parties' negotiated contractual obligations, and the specific notice requirements of the indemnity agreement.  The District Court found that "[a]lthough the notice complied with due process, ***it did not comply with the indemnity agreement***."[30]  Based on this finding, the District Court held that:

---

[28] 129 B.R. 22 (S.D.N.Y. 1991).

[29] *Id.* at 858-859, *citing Drexel*, 129 B.R. at 24.

[30] *Id.* at 859 (emphasis supplied).

18

> [i]n vindication of its contract rights, National Union is entitled to
> the opportunity to demonstrate that it could have affected the
> outcome of the bankruptcy proceeding to its advantage if it had
> received the notice for which it contracted.[31]

74.    The facts of both *Main* and *Broadhead* are virtually identical to the facts here.

75.    *First*, like National Union, CDC is a massive and complex organization.  As such, and like National Union, CDC includes very specific notice requirements in all of its agreements, such as the Special Notice Provision contained in the Master Agreement, which governs the form and manner of notice for any action pertaining to the Master Agreement.  Indeed, the Special Notice Provision is even more important for CDC in light of  CDC's web of office locations, departments and sub-departments that are spread throughout France.

76.    *Second*, both National Union and CDC were known creditors of their respective debtors.

77.    *Third*, similar to the debtors in *Main* and *Broadhead*, the Debtors here were well aware of the Special Notice Provision contained in the Master Agreement.  But, despite their knowledge and continued post-petition use of the Special Notice Provision (such as a letter that LBSF sent to CDC on July 7, 2009),[32] the Debtors failed to include the entire Special Notice Provision when they listed CDC on their schedules, a task which could have easily been accomplished.  Thus, because CDC was receiving mail from LBSF through the Debtors' use of the Special Notice Provision, ***except for the Bar Date Notice***, it follows that the Debtors' did not provide CDC with actual or even legally sufficient notice of the Bar Date.  Therefore, pursuant to the holdings of both *Main* and *Broadhead*, the Debtors failed to provide legally sufficient notice of the Bar Date, which resulted in CDC's inability to file a claim.

---

[31] *Id.* at 859.

[32] On July 7, 2009, LBSF sent correspondence to CDC using the Special Notice Provision (the "LBSF Letter").  A copy of the LBSF Letter is annexed hereto as **Exhibit 3**.

19

78.     *Fourth*, as in *Main* and *Broadhead*, it is clear that the Bar Date Notice is a communication that relates to the Master Agreement and, therefore, pursuant to the terms of the Master Agreement the Special Notice Provision controlled the method and manner of service of the Bar Date Notice.

79.     *Finally*, similar to National Union in both the *Main* and *Broadhead* cases, CDC did not receive notice at its negotiated, contractual mailing address and, as a result, the notice went undelivered.

80.     Despite the obvious similarities to the facts of both *Main* and *Broadhead*, in their objection to the First Motion, the Debtors relied on *Drexel*, which is entirely misplaced given the facts and holdings of both *Main* and *Broadhead*.  Indeed, in *Drexel*, the claimant amended the underlying partnership agreement on which the debtor was a guarantor.  The *Drexel* Court used its equitable power and found that although the claimant was a known creditor entitled to actual notice of the claims' bar date, the claim should be disallowed under, among other things, "the general rule that subsequent modification of an underlying partnership agreement, absent consent, discharges the guarantor.  Here, there is no partnership agreement, or unilateral modification thereof, only the Master Agreement.  Accordingly, the holdings of both *Main* and *Broadhead* are far more instructive than *Drexel*.[33]

---

[33] *See Drexel Burnham Lambert Group,* 151 B.R. 674 (Bankr. S.D.N.Y. 1993).

20

JSH/1307422.1/060177

Service at Alternate Mailing Addresses was
Not Sufficient for Actual and Legally Sufficient Service

81.    In their objection to the First Motion, the Debtors asserted that, even if the notice provided to CDC at the scheduled address was not "sufficient or reasonable under the circumstances," service was nevertheless proper and CDC received "actual" notice because the Bar Date Notice was also served upon CDC at (i) CDC Capital, and (ii) an alternate CDC office in Paris, France (collectively, the "Alternative Mailings").[34]  The Debtors further asserted that the Alternative Mailings created a rebuttable presumption that CDC could not overcome.[35]  Lastly, relying predominantly upon *Drexel*, the Debtors asserted that CDC, once in receipt of the Alternative Mailings, was responsible for routing it to the proper personnel within its organization.[36]

82.    Despite the Debtors' assertions, the Alternative Mailings were neither "actual" nor "legally sufficient" service of the Bar Date Notice and, thus, they were defective because (i) as stated above, CDC Capital was no longer affiliated with CDC on or at any time after the LBHI Petition Date, and (ii) it is clear from *Main* and *Broadhead* that the Master Agreement, and specifically, the Special Notice Provision, dictated the method and manner of service of the Bar Date Notice.  As such, service at an ancillary CDC office in Paris was completely improper and not legally sufficient under the circumstances.

83.    Despite LBSF's knowledge that the Bar Date Notice mailed to CDC was returned as undeliverable, no further attempt was made to provide the notice that due process requires.

---

[34] *See* Objection, at ¶14.

[35] *See id.*, at ¶16.

[36] *See id.*, at ¶¶17-18 (also *citing In re Petroleum Prod. Mgmt. Co.*, 240 B.R. 407, 414-415 (Bankr. D. Kan. 1999)).

21

84. Courts have held that, where an address is slightly incorrect, no presumption of receipt can arise unless "there is sufficient evidence from which to presume that the addressee nonetheless received the incorrectly addressed notice."[37]

85. Here, the address was more than slightly incorrect, it completely omitted the routing information that was specified under the Master Agreement and critical to delivery within CDC - a large, public institution.

86. Furthermore, even assuming, *arguendo*, that the Bar Date Notice was only slightly mis-addressed, no presumption of receipt can arise because the Bar Date Notice could not be routed by CDC's mail department at its Distribution Center, and was returned to Epiq.[38]

87. The failure to abide by the specific notice provisions in the Master Agreement dooms the Debtors' arguments, as well as the aforementioned deficiencies with the Alternate Mailings.[39]

88. For all the reasons set forth above, none of the alleged methods of service of the Bar Date Notice employed by the Debtors constitutes actual notice to a known creditor, such as CDC. Thus, it would be contrary to the bankruptcy law's fundamental notions of fairness and due process to deny CDC the opportunity to participate in the Debtors' reorganization process.

---

[37] *In re Randbre Corp.*, 66 B.R. 482, 486 (Bankr. S.D.N.Y. 1986) (permitting vacatur of an order expunging a creditor's claim where the address on the notice for the motion to expunge was mailed contained an extra zero).

[38] *See* Hellman Declaration at Exhibit E.

[39] *See e.g. National Union Fire Ins. Co. of Pittsburgh, P.A. v. Broadhead*, 155 B.R. 856, 859 (S.D.N.Y. 1993) ("Although the notice complied with due process, it did not comply with the indemnity agreement, which unambiguously required Broadhead to include in the address "Attention Special Programs Division." In vindication of its contract rights, National Union is entitled to the opportunity to demonstrate that it could have affected the outcome of the bankruptcy proceeding to its advantage if it had received the notice for which it contracted."); *see also IHS of Brunswick, Inc. v. State of Michigan*, 219 B.R. 324 (Bankr. S.D. Ga. 1998) (debtor failed to provide legally sufficient notice to invoke discharge when debtor did not comply with contract that designated the manner of notice); *In re Green River Biodiesel, Inc.*, 2010 WL 3905214 (Bankr. N.D. Ala. Sept. 24, 2010) (notices provided to alternative addresses were not legally sufficient when parties had entered into contract specifying the location for notice to be sent and debtor failed to send notice to the specified location).

JSH/1307422.1/060177

89.    Therefore, the Motion should be granted pursuant to Bankruptcy Rules 3003(c)(3) and 3002(c)(6).

**B.    CDC CAN ESTABLISH EXCUSABLE NEGLECT**

90.    In the alternative, CDC respectfully submits that the time to file a proof of claim should be enlarged pursuant to Bankruptcy Rule 9006(b)(1) because its failure to timely file a proof of claim was the result of excusable neglect.

91.    Bankruptcy Rule 9006(b)(1) empowers the Court, in its discretion, to extend a deadline "where the failure to act was the result of excusable neglect."[40]

92.    In *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*,[41] the United States Supreme Court construed the phrase "excusable neglect" as used in Bankruptcy Rule 9006 and concluded "Congress plainly contemplated that the courts would be permitted, where appropriate, to accept late filings caused by inadvertence, mistake, or carelessness, as well as by intervening circumstances beyond the party's control."[42]

93.    The Court added that "what sorts of neglect will be considered 'excusable,' . . . is at bottom an equitable [determination], taking account of all relevant circumstances surrounding the party's omission."[43]

94.    The *Pioneer* Court set out four (4) factors to determine if excusable neglect exists: (i) "the danger of prejudice to the debtor", (ii) "the length of the delay and its potential impact on the judicial proceeding", (iii) "the reason of the delay, including whether it was in reasonable control of the movant", and (iv) "whether the movant acted in good faith."[44]

---

[40] FED. R. BANKR. P. 9006(b).

[41] 507 U.S. 380 (1993).

[42] *Id. at* 388.

[43] *Id.* at 395.

[44] *Id.* at 395.

23

95.    Bankruptcy Rule 9006(b)(1) allows the enlargement of the bar date at the discretion of the Court.  The relevant provision of Bankruptcy Rule 9006(b)(1) reads, in part:

> [W]hen an act is required or allowed to be done at or within a specified period . . . by order of the court, the court for cause shown may at any time in its discretion . . . permit the act to be done where the failure to act was the result of excusable neglect.

96.    The Second Circuit takes a "hard line" approach in applying *Pioneer*, giving most weight to the reason for the delay, including whether the delay was within the reasonable control of the movant.[45]

97.    The remedy of allowing a late-filed claim is an equitable one,[46] and not all *Pioneer* factors need favor the moving party.[47]

98.    Moreover, "no single circumstance controls, nor is a court to simply proceed down a checklist ticking off traits.  Instead, courts are to look for a synergy of several factors that conspire to push the analysis one way or the other."[48]

99.    As demonstrated below, the *Pioneer* factors weigh in favor of CDC.  Therefore, the Motion should be granted.

### The Reason for the Delay was Not in the Reasonable Control of the Movant

100.    CDC had no reasonable control over the delay because the Debtors, by failing to comply with the Master Agreement, caused the delay.

101.    In their objection to the First Motion, the Debtors cited to various cases that were all inapposite.  This was not an "office mix-up," nor was it a "clerical mistake," it was clearly the Debtors' error both by their failure to list CDC's address in accordance with Master Agreement and the Special Notice Provision, and by their failure to re-serve the returned Bar Date Notice.

---

[45] *In re Lehman Brothers Holdings, Inc.*, 433 B.R. 113, 120 (Bankr. S.D.N.Y. 2010).

[46] *Pioneer*, 507 U.S. at 395.

[47] *In re Enron Corp.*, No. 01-16034 (AJG), 2003 Bankr. LEXIS 2110, at *11 (Bankr. S.D.N.Y. 2003).

[48] *Id.* at *12 (quotation and citation omitted).

24

102.    After learning that the Bar Date had passed, in May 2010 CDC conducted an investigation into the matter, including consultations with in-house and outside counsel regarding CDC's rights and potential remedies.

103.    This Motion is critically distinguishable from those addressed in this Court's Opinion of May 20, 2010, in that none of the claimants there contested actual notice of the Bar Date, a point this Court recognized.[49]  CDC's sole reason for missing the Bar Date is the lack of notice.    Additionally, CDC's status as a foreign creditor with no familiarity with American bankruptcy laws or procedures further excuses any delay because CDC did not have the background to know of or to investigate the Bar Date.  CDC respectfully submits that because it did not receive actual notice of the Bar Date, the first *Pioneer* factor weighs overwhelmingly in CDC's favor.

104.    Furthermore, in the two prior instances when this Court has granted creditor motions to file proofs of claim after the expiration of the Bar Date, the Court found that the "delay was the result of justifiable confusion over the application of the bar date to their particular claims."[50]  CDC respectfully submits that, if confusion over application of the Bar Date constitutes excusable neglect, then a complete lack of notice of the Bar Date surely must also provide a sufficient basis to find excusable neglect.

**Prejudice to the Debtors' Estates is Not Substantial**

105.    To determine if prejudice exists, courts in this District have looked at:

> [T]he size of the late claim in relation to the estate, whether a disclosure statement or plan has been filed or confirmed with knowledge of the existence of the claim, the disruptive effect that the late filing would have on a plan close to completion or upon the economic model upon which the plan was formulated and negotiated.[51]

---

[49] *In re Lehman Brothers Holdings Inc.*, 433 B.R. at 119, 122, 127 n.31.

[50] *Lehman*, 433 B.R. at 127.

[51] *In re Keene Corp.*, 188 B.R. 903, 910 (Bankr. S.D.N.Y. 1995).

25

JSH/1307422.1/060177

106.     In their objection to the First Motion, the Debtors suggested that granting the First Motion would open the Court to similar claims from other claimants.  Due to the specific nature of the facts of this matter, however, including the Debtors' failure to comply with the specific, contractual notice provisions in the Master Agreement, it is unlikely that other claimants will follow suit and file similar motions or even satisfy *Pioneer*.

107.     Additionally, the Debtors had knowledge, and even used, the Special Notice Provision post-petition, as evidenced by the LBSF Letter, yet the Debtors failed to provide legally sufficient notice of the Bar Date to CDC.  Furthermore, the Debtors and Epiq were keenly aware that the Bar Date Notice had been returned as undeliverable, but they both failed to investigate why it was returned as undeliverable, which would have revealed that they needed to re-serve the Bar Date Notice using the Special Notice Provision.

108.     The Debtors are attempting to capitalize on their error to the detriment of a legitimate, known creditor, but they should not be permitted to insulate themselves from liability based upon their failure to comply with their contractual notice obligations.  Certainly, the prejudice to the Debtors does not overshadow the fact that the Debtors were the cause of the present issue before this Court.  The Debtors cannot, and should not, be able to shield themselves from their obligation to provide legally sufficient notice.

109.     Moreover, this Motion presents exceptionally narrow circumstances in which a known creditor did not receive actual notice of the Bar Date due to an improperly addressed mailing, as well as other legally insufficient attempts at service, such as notice by publication, or the Alternate Mailings.  The Debtors were on actual notice of CDC's Claim, as evidenced by the fact that LBSF listed CDC on its Schedule G of unexpired, executory derivatives contracts.  There is no danger that granting the relief sought herein will open the floodgates to other unidentified, similarly situated creditors.

JSH/1307422.1/060177

110.    It is significant that, as the Court previously observed, of the seven motions addressed in its May 20, 2010 opinion and the two motions addressed prior thereto, not one of the nine movants alleged an "actual" lack of notice.[52]

111.    The dearth of similar motions in these cases of unprecedented size and complexity empirically demonstrates the *de minimis* risk that granting CDC permission to file a late proof of claim under these exceptional circumstances would cause prejudice to the Debtors. Consequently, CDC respectfully submits that the lack of prejudice to the Debtors compels a finding of excusable neglect.

***The Length of the Delay and Potential Impact***

112.    Although it has been over three years since the Bar Date, CDC did not become aware of the Bar Date until after communicating with Mr. Doyle, as set forth above. Then, as more fully described above, CDC took reasonable steps to communicate with counsel to protect its rights.

113.    Because CDC was unfamiliar with the United States bankruptcy laws, as well as any American law firm willing to file the First Motion, CDC needed additional time to retain competent counsel. However, once CDC contacted SilvermanAcampora LLP to analyze the file, the merits of its claim, and the arguments to support its claim in January 2011, the First Motion, and, subsequently, the Reply were filed in a relatively short period.

114.    Although the Court denied the First Motion, that denial was without prejudice. SilvermanAcampora LLP then embarked on an investigation to properly respond to this Court's inquiries. That process involved substantial time in light of, among other things, the internal investigation required by CDC, the departure of key personnel from CDC during the time between the First Motion and the instant Motion, and the English/French language barrier.

---

[52] *In re Lehman Brothers Holdings Inc.*, 433 B.R. at 122, 127 at n.31 (Bankr. S.D.N.Y. 2010).

27

115.    If the Court grants this Motion, the potential impact on the LBHI proceeding, if any, is minimal.  CDC's claim is minimal when compared to the claims of other creditors and the amount of funds to be distributed in the Debtors' cases.  Moreover, to date, only three distributions have been made. Therefore, the length of delay is not unreasonable for an international claimant who failed to receive proper and legally sufficient notice of the Bar Date in accordance with the Debtors' contractual obligations under the Master Agreement and its Special Notice Provision.  Thus, the Motion should be granted.

116.    There is no bright-line rule governing what length of delay should be considered too long.[53]  Thus, "the lateness of a claim must be considered in the context of the proceedings as a whole."[54] The present case presents very little risk of disruption or delay of the bankruptcy proceeding.  Indeed, LBSF had actual knowledge of the Claim in the scheme of this reorganization, in which $899 billion of aggregate liquidated claims has been filed.  Thus, although the Debtors have filed a plan, allowing CDC's claim does not threaten to derail the reorganization or complicate administration of the estates.

117.    Therefore, CDC respectfully submits that the length of the delay in filing its claim is a non-issue.

***Good Faith Requirement***

118.    CDC has at all times acted in good faith.

119.    Upon discovering the lack of notice of the Bar Date, CDC undertook to investigate the reasons therefor, to evaluate its options, and to correct the error that occurred as a result of the improper mailing of the Bar Date Notice.

120.    The Debtors, through their objection to the First Motion, have acknowledged that bad faith is not an issue in this matter.

---

[53] *In re Lehman Brothers Holdings Inc.*, 433 B.R. at 121.

[54] *Id.* (quotation and citation omitted).

28

121.    Consequently, CDC respectfully submits that its good faith compels a finding of excusable neglect.

### NOTICE

122.    Notice of this Motion has been provided pursuant to the Amended Order Implementing Certain Notice and Case Management Procedures entered in this proceeding [Docket No. 2837].

### CONCLUSION

**WHEREFORE,** CDC respectfully requests that this Court: (i) enter the proposed order attached hereto as **Exhibit 3** granting the relief sought herein, and (ii) grant such other and further relief as the Court may deem just and proper.

Dated: Jericho, New York
       August 2, 2013

**SILVERMANACAMPORA LLP**
Counsel to Caisse des Dépôts et
Consignations


By:    s/Ronald J. Friedman
       Ronald J. Friedman
       Jay S. Hellman
       Members of the Firm
       100 Jericho Quadrangle, Suite 300
       Jericho, New York 11753
       (516) 479-6300

29

JSH/1307422.1/060177