KLESTADT & WINTERS, LLP
570 Seventh Avenue, 17th Floor
New York, New York 10018
Tel.: (212) 972-3000
Tracy L. Klestadt
John E. Jureller, Jr.
Lauren C. Kiss

**Hearing Date: Sept. 18, 2013, at 10:00 a.m. (EST)**
**Objection Deadline: Sept. 11, 2013 at 4:00 p.m. (EST)**

REUBEN RAUCHER & BLUM
10940 Wilshire Blvd., 18th Floor
Los Angeles, California 90024
Tel.:  (310) 777-1990
Timothy D. Reuben

Attorneys for *Retirement Housing Foundation and its affiliates, Foundation Property Management, Bixby Knolls Towers, Inc., Gold Country Health Center, Inc., Mayflower Gardens Health Facilities, Inc., Mayflower RHF Housing, Inc., Sun City RHF Housing, Holly Hill RHF Housing, Inc., Merritt Island RHF Housing, Inc., Martin Luther Foundation, Inc., Yellowwood Acres, Inc., Bluegrass RHF Housing, Inc., St. Catherine RHF Housing, Inc. and DeSmet RHF Housing, Inc.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| LEHMAN BROTHERS HOLDINGS, INC., *et al.* | : | Case No. 08-13555 (JMP) |
| | : | (Jointly Administered) |
| Debtors. | : | |
| | : | |

------------------------------------------------------------------X

**MOTION OF RETIREMENT HOUSING FOUNDATION AND ITS AFFILIATES FOR A DETERMINATION THAT THE AUTOMATIC STAY DOES NOT BAR COMMENCEMENT OF CERTAIN LITIGATION AGAINST THE DEBTORS RELATED TO POST-PETITION CLAIMS AND/OR GRANTING RELIEF FROM THE AUTOMATIC STAY TO PERMIT COMMENCEMENT OF SUCH LITIGATION; AND SEPARATELY, TO GRANT RHF RELIEF FROM THE AUTOMATIC STAY TO LITIGATE THE TORT CLAIM IN THE CALIFORNIA STATE COURT**

Retirement Housing Foundation and its affiliates[1] (collectively "RHF") hereby file this

motion (the "Motion") for entry of an order declaring that RHF is not prohibited, under 11

U.S.C. §362(a), from commencing an action in California state court seeking a declaratory

---

[1] Retirement Housing Foundation's affiliates include Foundation Property Management, Bixby Knolls Towers, Inc., Gold Country Health Center, Inc., Mayflower Gardens Health Facilities, Inc., Mayflower RHF Housing, Inc., Sun City RHF Housing, Holly Hill RHF Housing, Inc., Merritt Island RHF Housing, Inc., Martin Luther Foundation, Inc., Yellowwood Acres, Inc., Bluegrass RHF Housing, Inc., St. Catherine RHF Housing, Inc. and DeSmet RHF Housing, Inc.

judgment on the issue of the validity of its early termination of certain interest rate derivative swap transactions between RHF and Lehman Brothers Special Financing, Inc. ("LBSF") and Lehman Brothers Holdings, Inc. ("LBHI", and with LBSF as "Lehman").  Alternatively, to the extent the Court determines that the automatic stay, under 11 U.S.C. §362(a) applies, RHF requests that the Court enter an order, pursuant to 11 U.S.C. §362(d), granting RHF relief from the automatic stay to permit RHF to immediately commence such a declaratory judgment action in California state court.

Additionally (although related in many aspects), RHF requests that the Court grant relief from the automatic stay, pursuant to 11 U.S.C. §362(d), to permit RHF to immediately commence litigation in California state court against Lehman with respect to the Tort Claim (as defined later herein) which, *inter alia*, involves the same facts, circumstances and claims as RHF's pending CA Action (defined later herein) and may be used to set-off, pursuant to Section 6(f)(i) of the Master Agreement (defined later herein), any amount that may be owed by RHF to LBSF under the swap.[2]

### PRELIMINARY STATEMENT

1.      On July 3, 2008, just two and a half months prior to Lehman's bankruptcy filings and solely as a result of Lehman's fraudulent actions and its blatant misrepresentations of its then-current financial condition, RHF was compelled to enter into the 2008 Swap (defined later herein) with LBSF to provide 20 year interest rate protection for its long-term bond offerings. LBHI was the credit support provider under the 2008 Swap.  Notwithstanding its representations that it was financially capable of providing this long-term protection to RHF under the 2008 Swaps, Lehman filed its petition for chapter 11 bankruptcy protection on September 15, 2008.

---

[2] RHF has asserted that Lehman in fact owes RHF under the swap, and thus does not concede that it may need to apply any set-off of amounts owed under the Tort Claim.  If RHF's position is upheld, then the Tort Claim is an affirmative claim against Lehman in their respective bankruptcy estates.

2.      On June 11, 2009, RHF duly exercised its rights to early termination of the 2008 Swaps due to the occurrence of an Event of Default under Section 5(a)(vii) of the Master Agreement resulting from Lehman's bankruptcy filing, and duly provided notice of the early termination to Lehman.  Prior to serving the Early Termination Notice, RHF necessarily took all actions required to effectuate the early termination, including (i) serving a notice of default upon Lehman in November 2008, (ii) seeking and eventually receiving approval from its consortium of lending banks as required under its Variable Rate Demand Bonds for which the 2008 Swaps were supposed to provide interest rate protection, (iii) seeking and obtaining approval from its national Board of Directors, and (iv) attempting, unsuccessfully as a result of market conditions caused in part by Lehman's bankruptcy filing, to obtain Market Quotations in compliance with the terms of the Master Agreement.  Thereafter, on July 29, 2009, RHF duly served its termination calculation pursuant to Section 6(d)(i) of the Master Agreement, calculating a total amount due from Lehman to RHF in the sum of $4,952,968, plus fees and expenses.  In addition, RHF provided notice that it asserted a claim of not less than $11,590,728, for which it had a right to setoff pursuant to Section 6(f) of the Master Agreement.

3.      Except for a form letter dated June 22, 2009 under which it purports to reserve its rights, Lehman took no steps to dispute[3] RHF's early termination notice or termination calculation until March 16, 2012, almost three (3) years later when it served its ADR Notice. Now, Lehman is claiming that RHF's Early Termination Notice was ineffective and the 2008 Swaps are somehow "live", resulting in RHF being significantly "out of the money".[4] According to Lehman, its outrageous "out of the money" position results from missed payments

---

[3] Pursuant to section 6(e)(i)(3), RHF as the Non-Defaulting Party had the sole right to determine the settlement amount.  As such, RHF does not concede that Lehman ever had a right to dispute the Termination Calculation unless determined to not be commercially reasonable.

[4] Pursuant to the ADR Order, RHF will not disclose any information asserted by Lehman in the mediation, and Lehman's purported termination calculation has only been asserted in the mediation.

and interest that have accrued since RHF's Early Termination Notice, and the significant pro-Lehman mark-to-market conditions that have persisted since that date.  Significantly, the lengthy delay in contesting the Early Termination Notice and Termination Calculation was the sole result of Lehman's own affirmative actions, or more appropriately inactions.  Lehman caused the situation, and now seeks to reap a benefit from it.  There can be no question that Lehman used the "shield" provided by the bankruptcy case, along with its knowledge of the financial markets, as a "sword" to gain a tactical advantage over its counterparties.  Even now, Lehman still has not taken any action to determine the validity or propriety of RHF's Early Termination Notice or Termination Calculation.  Instead it continues to leave RHF hanging in the balance, and uncertain of its rights and obligations.  RHF's hands have been tied by the ADR procedures, which require that RHF sit and wait to see if Lehman will file an objection to the claims, and therewith the Early Termination Notice, something it still has not done although it is now clear that Lehman intends to do so.

4.    While Lehman was strategically sitting on its hands and riding the market to RHF's detriment, RHF was taking necessary action to protect its rights.  RHF commenced an action in the California state court, seeking damages from, *inter alia*, the former officers and directors of Lehman with respect to the financing and swap transactions and the fraudulent actions related thereto.  RHF asserted causes of action against, among others, Lehman's former officers and directors for (i) fraud and deceit, (ii) negligent misrepresentations and (iii) intentional interference with prospective economic advantage in connection with the Lehman officers' and directors' misrepresentations regarding the SAVRS auctions (defined later herein), and (iv) fraud and (v) negligent misrepresentation relating to the 2008 Swap and Lehman's financial strength, stability and viability on which RHF relied prior to conducting transactions

4

with Lehman, including the swap transactions entered into in June 2008. The CA Action (as defined herein) is currently pending and ongoing, the parties have exchanged relevant documents and conducted depositions, and the CA Court is well-versed in the facts and circumstances of this matter.

5.      By this Motion, RHF now seeks entry of an order declaring that the automatic stay under 11 U.S.C. §362(a) does not prohibit RHF from immediately commencing a declaratory action in the CA Court to determine the validity of the Early Termination Notice, or in the alternative, granting RHF relief from the automatic stay, pursuant to 11 U.S.C. §362(d), to commence such action.[5]

6.      Additionally, RHF respectfully seeks an order, pursuant to 11 U.S.C. §362(d), granting relief from the automatic stay to permit RHF to immediately commence an action in the CA Court to finally determine the Tort Claim, possibly in conjunction with the pending and ongoing CA Action.[6]

### JURISDICTION AND VENUE

7.      This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334. This Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b).

8.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[5] RHF acknowledges that the Court could alternatively enter an order, pursuant to 11 U.S.C. §105, permitting RHF to commence an adversary proceeding in the Bankruptcy Court pursuant to Bankruptcy Rules 7001 (2) and/or (9) to determine the validity of RHF's early termination of the swap transactions. However, RHF does not seek such relief at this time.

[6] RHF's proposed California complaint, seeking both declaratory relief regarding the Early Termination Notice and redress for the Tort Claim, is attached to the Declaration of Timothy D. Reuben in Support of the Motion (the "Reuben Declaration") as **Exhibit 1** (without the voluminous exhibits). RHF believes that these claims are interrelated such that a court hearing and determining one of these claims would also be in a better and more knowledgeable position to hear and determine the other claims. However, if the Court so determines, these claims can be asserted separately.

9.     The statutory predicates for the relief sought herein are sections 105(a) and 362 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure.

## BACKGROUND

10.     This matter arises from the long tortured history between the parties, and from the dishonesty and manipulation by Lehman of the entities and the markets that it controlled, all to the detriment of RHF.

### i.     *The 1998 Swap Between RHF and Lehman*

11.     RHF is a charitable, non-profit foundation devoted to the mission of providing safe and affordable housing and services for senior citizens, persons with disabilities, and low income families.  Although its headquarters are in Long Beach, California, RHF has sponsored, developed and/or managed senior citizen apartments, nursing facilities, and low income housing throughout the country.  Since it was founded in 1961 by two (2) United Church of Christ clergy and a layman with $7,000 and a vision of providing quality housing and services for the underprivileged, RHF has become one of the nation's largest non-profit housing providers with 165 communities in 25 states, as well as the District of Columbia, Puerto Rico and the Virgin Islands.[7]  RHF develops and manages its facilities through affiliated entities – each facility is typically owned by a separate affiliate.  RHF's retirement communities are non-denominational and currently house over 17,000 residents.

---

[7] Consistent with its faith-based roots and charitable mission, RHF's current CEO, Rev. Dr. Laverne Joseph, does not have a financial background, but instead is an ordained clergy of the United Church of Christ.  A majority of RHF's national board members are also leaders in the United Church of Christ and do not have a financial background.

12.    The subject transaction between RHF and LBSF began with the refinancing of certain RHF affiliates' existing debt on 12 senior living facilities in 5 states, through the issuance of approximately $130 million in taxable and tax exempt municipal bonds.

13.    In December of 1998, based upon a structure designed and recommended by its investment banker Cain Brothers & Co. LLC ("Cain"), RHF issued $130,650,000 in 30 year bonds as Select Auction Variable Rate Securities ("SAVRS"), a Lehman product.  The SAVRS had variable interest rates set every 35 days through a "Dutch" auction process controlled by Lehman, who was both the broker/dealer and market maker for these SAVRS.  With Cain acting as RHF's "swap advisor,"[8] RHF and Lehman also entered into a 30 year interest rate swap agreement (the "1998 Swap"),[9] whereby the interest rate of 85% of the SAVRS would be synthetically fixed, with RHF agreeing to pay fixed rate of interest of 5.19% to Lehman in exchange for Lehman paying the SAVRS' variable rates.  Lehman also required RHF to obtain insurance from ACA Guaranty Corporation ("ACA"), a newly formed "A" rated bond insurer, to guarantee the payment of principal and interest on the SAVRS and the 1998 Swap.

*ii.*    ***Lehman's Manipulation Of Auction Rate Securities***

14.    Despite Lehman's claims that RHF could terminate the 1998 Swap at any time and convert the SAVRS to a true fixed rate, Lehman held absolute control over RHF's ability to exercise any of those options.  RHF was somehow continually "out of the money" on the 1998 Swap because, although undisclosed by Lehman prior to the refinancing, the 1998 Swap was valued by Lehman pursuant to a secret, restrictive valuation methodology developed by Lehman that effectively prevented RHF from being "in the money" despite the fact that the SAVRS' variable rate determined at auction often exceeded the synthetic "fixed" rate.  Even when

---

[8] Cain and Lehman had a close relationship, so close that, in 2000, Lehman obtained an ownership interest in Cain.
[9] This was the first swap that RHF had ever entered into.

variable interest rates began to rise, RHF was told that the overall value of the 1998 Swap was consistently in Lehman's favor at an ever increasing amount of millions of dollars.[10]

15.    Unbeknownst to RHF, Lehman was involved in an illegal price fixing scheme in which it manipulated the SAVRS' rates to its own benefit.   Lehman would pre-select a "winning bid" during each auction cycle to ensure that the SAVRS would trade at below fair market value and maximize their profits and inflate the amount RHF was "out of the money."   Through Lehman's continuing leverage and control over RHF and bad faith conduct, RHF, according to Lehman, was always "out of the money" on the 1998 Swap in an unreasonably excessive amount, and Lehman's conduct interfered with, among other things, RHF's right, at its sole option, to convert the SAVRS into true fixed rate bonds or refinance the SAVRS to take advantage of prevailing fixed interest rates.

16.    On May 31, 2006, the United States Securities and Exchange Commission ("S.E.C.") found that Lehman and other broker-dealers had committed Section 17(a)(2) Securities Act violations with respect to auction rate securities and the interest rates that were consistently manipulated (the "S.E.C. Order").   A copy of the S.E.C. Order is attached to the Reuben Declaration as **Exhibit 2**.   Under the S.E.C. Order, Lehman was censured, fined $1.5 million, and was ordered to provide all holders and issuers of auction rate securities with a "written description of its material auction practices and procedures" and certify in writing that it had implemented procedures reasonably designed to prevent and detect failures to comply with

---

[10] For instance, in March 2005, at a time when fixed interest rates were favorable, RHF notified Lehman that it intended to seek to convert the SAVRS to a favorable fixed rate.  At the time, the prevailing fixed rate for RHF's blend of taxable and non-taxable bonds was 4.91%, a significant saving over the 5.63% blended rate RHF was paying on the SAVRS interest rate swap.  This would have also allowed RHF to avoid the risk of any downgrading of ACA's credit rating. At the time, Cain estimated that it would cost $405,000 for RHF to terminate the 1998 Swap. However, Lehman then informed RHF that the cost of terminating the 1998 Swap was $15.8 million, which represented the amount RHF was purportedly "out of the money" on the 1998 Swap based on Lehman's unexplained calculations. Lehman proposed an alternative, but the alternative was another swap agreement at an even higher cost to RHF.  Based on these representations, RHF could not convert to a fixed rate.

disclosed auction procedures.  Although RHF was an issuer of SAVRS, it was never informed of the S.E.C. Order or provided the required "written description" by Lehman.

### iii.    RHF's SAVRS Payments Skyrocket as Lehman Manipulates the Auctions

17.    From 2003 through 2007, in reckless pursuit of higher profits, and despite its obligations to guarantee RHF's capital and interest repayments on the SAVRS and to maintain its "A" rating, ACA guaranteed securities backed by high risk loans, including, among other things, subprime housing mortgages, well in excess of its ability to do so.  However, ACA maintained extremely inadequate loss reserves, and was billions of dollars short of what was needed to pay potential claims and cover its continuing losses.  On or about December 19, 2007, Standard & Poor's downgraded ACA's credit rating from "A" to "CCC," or junk status.

18.    After ACA's downgrade to junk status, Lehman informed RHF that the 1998 Swap had entered an "alternative floating rate."  Attached to the Reuben Declaration as **Exhibit 3** is a true and correct copy of one of the Confirmations from the 1998 Swap, which included the "alternative floating rate" provisions (*see* Section I(e)).  Under the regular operating terms of the 1998 Swap, RHF's monthly interest payments were fixed at 5.19% for tax-exempt bonds, while Lehman was responsible for paying the SAVRS rates, which Lehman controlled.  When the "alternative floating rate" was triggered, however, RHF was still required to pay the regular fixed rates to Lehman, but Lehman was not required to pay the SAVRS rates; instead, it only had to pay an "alternative floating rate" – an amount based on an index rate significantly below the SAVRS rates – and RHF was required to make up all of the shortfall on the SAVRS.  Thus, under this "alternative floating rate," RHF was required to continue paying the same fixed rate, but any protection that the RHF Group received through the 1998 Swap was eliminated.

19.     Since Lehman no longer had to pay the SAVRS rates and continued to control and manipulate the SAVRS auctions, RHF's SAVRS rates skyrocketed virtually overnight.  Over the previous four years, when Lehman was obligated to pay the SAVRS rates (but also controlled them), the SAVRS rates had rarely exceeded 5% and did not approach the applicable maximum rate.  However, after ACA was downgraded, Lehman told RHF that it was now required to pay extremely high rates, just barely below the maximum rates, due to the triggered "alternative floating rate."

20.     These ridiculously high rates were not actually obtained through a fair and proper auction process.  In reality the rates were obtained through a materially changed, unfair process as described in the S.E.C. Order by which Lehman set the auction rates just barely below the applicable maximum rates by hundredths or even thousands of percentage points – much higher than they would have been under proper auction procedures.  This wrongful and unfair conduct was evidenced by, among other things, the fact that when the 1998 Swap entered the "alternative floating rate" and Lehman was no longer required to pay the SAVRS rates, the rates for the SAVRS suddenly jumped to rates much higher than previous rates, even though RHF had never missed a payment on the SAVRS and was financially much stronger than when the bonds were issued a decade earlier.  Pre-"alternative floating rate" SAVRS rates did not approach the applicable maximum rates, generally remaining many full percentage points below.  These results could not have occurred under a fair and unmanipulated auction process.

iv.     ___RHF Refinances its SAVRS and Enters into an Onerous New Swap Based On Lehman's False Representations Of Financial Stability.___

21.     Because the skyrocketing costs caused by Lehman's manipulation would have ultimately bankrupted it, RHF was forced to take action.  However, Lehman refused to amend the 1998 Swap to accommodate the elimination of ACA and alternative floating rate, and

demanded that RHF terminate the 1998 Swap and pay it $13,520,000, a termination value it refused to explain.

22.     On June 20, 2008 (the "Effective Date") RHF was forced to refinance the SAVRS and converted them into Variable Rate Demand Bonds ("VRDBs") in the amount of $116,545,000 (the "Transaction").  RHF also was forced to agree to a new swap contract with Lehman (the "2008 Swap"), where it would pay a higher fixed rate of interest to LBSF in exchange for LBSF paying the variable rates on the VRDBs to RHF for payment to bondholders. The new fixed interest rate contained an additional 1.431% which, according to Lehman, compensated it for its claim that RHF was "out of the money" on the 1998 Swap in the amount of $13,520,000.  To be clear, RHF entered into the 2008 Swap for the purpose of maintaining a conservative financial approach on a long term basis, as well as a fixed interest rate payment on its VRDBs for the life of the bonds.  The 2008 Swap term was 20 years.

23.     Pursuant to the Master Agreement of the 2008 Swap, Lehman made a series of representations with respect to its ability to perform under the Transaction.[11]  Moreover, by

---

[11] For instance, in Section 2(a) of the Master Agreement, entitled "Obligations – General Conditions," Lehman represented that, as of July 2008, it was solvent and able to perform its obligations:

> (i) Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement . . . (iii) Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing.

See Master Agreement, § 2(a)(i)-(iii).  Lehman reaffirmed its purported ability to perform under Section 3 entitled "Representations," which provides that "each party represents to the other party (*which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into* …)

(a) *Basic Representations.*

> (ii) *Powers*.  It [the party] has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement to which it is a party and to *perform its obligations* under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance. . .

11

entering into the Transaction each party represented an absence of certain events, including "[n]o event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party." *See* Master Agreement of the 2008 Swap, a copy of which is attached to the Reuben Declaration as **Exhibit 4**, § 3(b)-(c). "Events of default" and "potential events of default" included "failure by the party to make, when due, any payment under this Agreement," breach of the agreement by "failure by the party to comply with or perform any agreement or obligation," "representation[s] . . . [that were] incorrect or misleading in any material respect when made" and, most pertinently, when any party "*becomes insolvent* . . .[or] *institutes . . . a proceeding seeking a judgment of insolvency or bankruptcy*" *See* **Exhibit 4**, § 5(a) (emphasis added).

### v.    *RHF Expeditiously Terminates the 2008 Swap Due to Lehman's Default.*

> "*Lehman's failure resulted in part from significant problems in its corporate governance, including risk management, exacerbated by compensation to its executives and traders that was based predominantly on short term profits.*"[12]

24.    At the time the 2008 Swap was signed in July 2008, Lehman's representations regarding its financial stability were false, as evidenced by the Examiner's Report:

> "*[I]n March 2008, it became clear that Lehman's growth strategy had been flawed, so much so that its very survival was in jeopardy . . . But to buy itself more time, to maintain that critical confidence, Lehman painted a misleading picture of its financial condition.*"[13]

---

(v) ***Obligations Binding***.  Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its ***legal, valid and binding obligations***, enforceable in accordance with their respective terms. . .

*Id.*, § 3(a)(i)-(v) (emphasis added).

[12] The Financial Crisis Inquiry Report: Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States, p. 343 (*see* fcic.law.stanford.edu/report).

[13] Examiner's Report dated March 10, 2011, at 5-6 (*see* jenner.com/lehman/VOLUME%201.pdf).

25.     Despite making an unconditional 20 year guarantee of RHF's variable interest and capital payment obligations on the new bonds in June 2008, Lehman was suffering from unprecedented losses from its own irresponsible risk taking through investments in subprime mortgage backed securities.  On September 15, 2008, less than three (3) months after entering into the Master Agreement, LBHI filed the largest Chapter 11 bankruptcy in history.  LBSF followed suit on October 3, 2008.  Lehman's bankruptcy caught RHF completely by surprise because Lehman had just affirmatively represented, both in the Master Agreement and financial statements disclosed to RHF, as well as oral communications, that it was a strong, viable and adequately capitalized company capable of performing its obligations under the 2008 Swap, a contract that was supposed to provide 20 years of protection and stability to RHF.  After it declared bankruptcy, Lehman failed to make payments or in any manner meet its obligations under the 2008 Swap.  RHF continued to make interest payments to its bond holders and otherwise meet its obligations.

26.     RHF justifiably relied repeatedly and through multiple sources on Lehman's false, deceptive and misleading statements that it continued to be a strong and viable company, that it was adequately capitalized, and that it was honestly and fairly reporting to the public its financial condition.  If Lehman had not made such statements and if Lehman had not concealed that it lacked liquidity and was grossly over-leveraged, grossly overexposed to toxic subprime mortgage-backed securities and overpriced real-estate investments, and was teetering on the edge of bankruptcy, RHF would not have entered into the 2008 Swap Contract, a contract that was supposed to provide years of protection and stability, but instead cost RHF enormous fees and created great, ongoing hazard, with no resulting benefit.

27.     Shortly after LBHI filed for bankruptcy, in a letter dated November 7, 2008, RHF

13

notified Lehman of the Event of Default resulting from LBHI's bankruptcy filing under Section 5(a)(vii) of the 2008 Swap (the "November 2008 Notice").

28.     As discussed further below, RHF proceeded to evaluate the procedure for termination, and ultimately provided notice of Early Termination by letter dated June 11, 2009 (the "Early Termination Notice"). During the process of termination, RHF requested Market Quotations, initially on both February 25, 2009 and March 11, 2009, and then again on both June 5, 2009 and June 11, 2009.[14] In each instance, RHF was informed that all Reference Market-makers, either declined to bid or provided no response.

29.     RHF was also required to obtain, and used commercially reasonable efforts to obtain, consent of its consortium of bank lenders (the "Banks") with respect to the Early Termination. Lehman's default under the 2008 Swap triggered an event of default under RHF's agreements with its Banks. As a result, RHF was required to request waivers from the Banks, who had to go through their own due diligence process (which took several months). The Banks' authorization was ultimately provided in May 2009, and RHF conducted its final two market quotations, and then promptly terminated.

30.     Since the value of the swaps could not be determined by bids, RHF engaged an independent forensic expert to compute their value in a commercially reasonable manner. By letter dated July 29, 2009, RHF provided LBSF with the Early Termination calculation statement prepared by valuation expert W. Scott Mowrey of Cohen, Miskei & Mowrey (the "Calculation Statement"),[15] pursuant to Section 6(d) of the 2008 Swap. Mr. Mowrey's CV is attached to the Reuben Declaration as **Exhibit 5**. RHF also identified a balance due *to* RHF *from* LBSF in the

---

[14] Two quotes were requested each time to avoid any challenge by Lehman regarding their timing. It is indisputable that there was no market for the 2008 Swap.

[15] On October 2, 2008, RHF established an escrow for net swap settlement payments. The escrowed funds were distributed back to RHF for termination and were included in the Early Termination calculation statement.

sum of **$4,952,968** as a result of Lehman's filing for bankruptcy, which constituted an "Event of Default." Pursuant to Section 6(f) of the Master Agreement, which provides a right to setoff upon the occurrence of an Event of Default, the Calculation Statement additionally identified a balance due *to* RHF *from* LBSF in the sum of **$11,590,728**. Accordingly, the total balance owed to RHF from LBSF under the Calculation Statement is **$16,824,580.** A copy of the Calculation Statement, which explains the methodology of its calculations, is attached to the Reuben Declaration as **Exhibit 6**.

31.    As a direct result of Lehman's default, RHF sought to enter into a replacement swap on comparable terms; however, after substantial effort to obtain quotes, it ultimately became clear that no alternative swap arrangement was available, even for a five (5) (much less a 20) year period. As a result, RHF began researching fixed interest rate caps, which required a paid up-front fee. After well more than one (1) year of trying to mitigate the interest rate exposure, on January 5, 2010, RHF entered into a $32.5 million, 5-year fixed interest rate cap at 5% SIFMA with US Bank, for an up-front cost of $483,000 (the "US Bank Swap"). On January 13, 2010, RHF entered into another $32.5 million, 5-year fixed interest rate cap at 5% SIFMA with Bank of the West, for an up-front cost of $458,000 with an effective date of January 15, 2010 (the "Bank of the West Swap"). Confirmations of these caps are attached to the Reuben Declaration as **Exhibit 7**. These caps do not replace the hedging that was supposed to be provided by the Transaction – RHF continues to face potentially unlimited interest rate risk, and the caps do not cover the full amount covered by the 2008 Swaps and only last for five (5) years. Rather, they are stopgap measures that RHF was forced to obtain to mitigate against the failure of the 2008 Swap.

*vi.*    ***RHF Files Claims In The Bankruptcy Proceedings.***

32.     On September 4, 2009, RHF filed a proof of claim against LBSF, Claim Number 10494, (the "Swap Claim") in the amount of $5,233,852 (the $4,952,968 per the Calculation Statement and an additional $280,884 in expenses). A similar claim was filed against LBHI as credit support provider (Claim No. 10493).  RHF filed a second proof of claim on September 4, 2009, Claim Number 10495 (the "Tort Claim") in the amount of $11,871,612 based on breach of contract and fraud.[16]  A similar claim was filed against LBHI (Claim No. 10496).

33.     In a letter dated January 27, 2010, Lehman requested certain additional information regarding RHF's Calculation Statement.  Without waiving any rights, RHF provided the information in a letter dated March 10, 2010, a copy of which is attached to the Reuben Declaration as **Exhibit 9**.  At the same time, RHF specifically requested that Lehman provide the information to support any dispute as to the termination amount calculated by RHF.  To date, Lehman has failed to provide any of the requested information, likely because it cannot dispute RHF's position.

34.     Other than a form letter dated June 22, 2009, in which it purported to generally dispute the Early Termination Notice, Lehman had taken no steps to dispute the Early Termination Notice or Termination Calculation until March 16, 2012, almost three (3) years after the Early Termination Notice and more than two (2) years after RHF provided Lehman with further information as set forth above. Even then, Lehman would only agree to orally "explain" their purported dispute and "alternate" calculations in a conference call among "business people" in April of 2012.

---

[16] This claim arises from damages sustained by RHF as a result of actions and inactions of Lehman, including but not limited to (i) breach of contract, (ii) fraud, constructive fraud, and/or fraudulent misrepresentation by Lehman with respect to certain swap transactions between RHF and the Debtors, (iii) negligence of or negligent misrepresentation by Lehman, (iv) breach of fiduciary duty, (v) breach of the covenant of good faith and fair dealings, and (vi) unfair competition.  These claims are set forth more fully in the Tort Claim, attached to the Reuben Declaration as **Exhibit 8**.

35.    Now, while apparently putting blinders on as to its own actions and inactions over the 3-4 year period, Lehman is claiming that RHF's early termination notice was ineffective and that the 2008 Swap is somehow "live".  As a result, Lehman claims that RHF is significantly "out of the money" due to alleged missed payments and interest fees that have accrued since the Early Termination Notice date, as well as a significantly more disadvantageous mark-to-market for RHF than June 2009.  Lehman's position is nothing less than outrageous.

*vii.*    ***California State Court Action***

36.    In or about December 2008, RHF commenced an action in the Superior Court of the State of California, County of Los Angeles ("CA Court"), against Cain, ACA, and the former Officers and Directors of Lehman (the "CA Action").  By its complaint (the "California Complaint"), RHF asserts causes of action against, among others, Lehman's former officers and directors for (i) fraud and deceit, (ii) negligent misrepresentations, and (iii) intentional interference with prospective economic advantage in connection with the Lehman officers' and directors' misrepresentations regarding the SAVRS auctions, and (iv) fraud and (v) negligent misrepresentation relating to the Swaps and Lehman's financial strength, stability and viability on which RHF relied prior to conducting transactions with Lehman, including the swap transactions entered into in June 2008.[17]  The CA Action is currently pending and the parties have exchanged relevant documents and conducted depositions, and the CA Court is well-versed in the facts and circumstances of this matter.[18]

37.    The causes of action asserted in the CA Action are very similar to the claims

---

[17] Although the directors and officers initially successfully demurred to RHF's complaint, that ruling was overturned on appeal.  The Court of Appeal Opinion in this regard is attached to the Reuben Declaration as **Exhibit 10**.  The directors and officers subsequently demurred again, and the Notice of the trial court's ruling on that demurrer, which granted leave to amend, is to the Reuben Declaration as **Exhibit 11**.  Also attached to the Reuben Declaration as **Exhibit 12** is the current operative pleading in the CA Action (without exhibits).

[18] For example, attached to the Reuben Declaration as **Exhibit 13** is a copy of the CA Court's extensive order denying Cain's Motion for Summary Judgment, which demonstrates the CA Court's extensive knowledge of and investment of time in this complicated case.

asserted against Lehman in the Tort Claim, involving the same witnesses, facts and circumstances.

## RELIEF REQUESTED

38.     By this Motion, RHF now respectfully seeks an order of this Court, declaring that the automatic stay, pursuant to 11 U.S.C. §362(a), does not prohibit RHF from commencing a declaratory action in the CA Court with regard to the validity of RHF's Early Termination Notice.   In the alternative, if the Court determines that the stay applies, RHF respectfully requests that this Court grant RHF relief from the automatic stay, pursuant to 11 U.S.C. §362(d), to permit RHF to immediately commence an action in the CA Court for declaratory judgment on this issue.

39.     Additionally, but related in many aspects, RHF respectfully requests that the Court enter an order, pursuant to 11. U.S.C. §362(d), to permit RHF to immediately commence an action against Lehman before the CA Court to finally determine the Tort Claim, which asserts similar claims as the pending CA Action, and for which RHF may have a contractual right to set-off under the 2008 Swap.

### I.      The Automatic Stay does not apply to Post-Petition Claims.

40.     Section 362(a) of the Bankruptcy Code prohibits the commencement or continuation of actions that were or could have been commenced against the debtor before it filed a bankruptcy petition. *See 11 U.S.C. §32(a)(1); see also Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 996 (5th Cir. 1985). The basis for the automatic stay is to provide the debtor with breathing room from the claims of its creditors, and "allows the bankruptcy court to centralize all disputes concerning property of the debtor's estate in the bankruptcy court so that reorganization can proceed efficiently, unimpeded by uncoordinated proceedings in other arenas." *Grocery Haulers, Inc. v. The Great Atl. & Pac. Tea Company, Inc. (In re The Great Atl.*

*& Pac. Tea Co.*), 467 B.R. 44, 51 (S.D.N.Y. 2012).  As such, the automatic stay is limited to

actions which arose pre-petition.  *Jeld-Wen, Inc. v. Van Brunt (In re Grossman's Inc.)*, 607 F.3d

114, 122 (3d Cir. 2010).

      41.    Importantly, however, the automatic stay does not bar institution of actions for

claims arising post-petition.  *Bellini Imports, Ltd. v. Mason & Dixon Lines, Inc.*, 944 F.2d 199,

201 (4th Cir. 1991) ("The stay is limited to actions that could have been instituted before the

petition was filed or that are based on claims that arose before the petition was filed…[the stay]

does not include actions arising post-petition.").  In the instant matter, RHF's right to early

termination of the 2008 Swap was solely based upon an Event of Default arising from Lehman's

bankruptcy filing.  By its very nature, the claim could only arise post-petition.  Further, unlike a

claim arising from the debtor's rejection of an executory contract that is held to arise pre-

petition, a counterparty to a derivative transaction has certain post-petition rights under the "safe-

harbor" provisions of section 560 of the Bankruptcy Code that are outside the stay, including the

right to terminate the swap as a result of the bankruptcy filing, and the right to "offset or net out

any termination values or payment amounts arising under or in connection with the termination

values or payment amounts arising under or in connection with the termination, liquidation, or

acceleration of one or more swap agreements."  *See In re Lehman Brothers Holdings, Inc.*, 445

B.R. 130 (S.D.N.Y. 2011).[19]

      42.    RHF seeks to commence an immediate action in the CA Court based upon this

---

[19] It is anticipated that Lehman may argue that the 2008 Swaps were executory contracts, which have not yet been assumed or rejected by the Debtors; however, the determination of whether the 2008 Swaps could ever be assumed or rejected is entirely dependent upon the validity of the Early Termination Notice, *i.e.* if the Early Termination Notice was valid there are no swaps to assume or reject by the Debtors.  Moreover, non-debtor counterparties have a right to protection pending the debtor's decision to assume or reject.  *See McLean Indus., Inc. v. Med. Lab. Automation, Inc. (In re McLean Indus. Inc.)*, 96 B.R. 440, 449 (Bankr. S.D.N.Y. 1989).  *R & O Elevator Co. v. Harmon*, 93 B.R. 667, 673 (D. Minn. 1988) (citing *N.L.R.B. v. Bildisco and Bildisco*, 465 U.S. 513, 531 (1984)).  Case law confirms that, pending assumption or rejection of an executory contract, a debtor can only enforce the contract if it performs.  *See Cont'l Energy Assocs L.P. v. Hazelton Fuel Mgmt. Co. (In re Cont'l Energy Assocs. L.P.)*, 178 B.R. 405, 408 (Bankr. M.D. Pa 1995).

post-petition claim, seeking a declaratory judgment that the Early Termination Notice was valid and proper. Lehman has delayed taking any action, assuming *arguendo* that it has any right to contest the adequacy of notice or calculation in the first place, regarding its purported dispute of the Early Termination Notice for almost four (4) years[20], and in fact, did not actually provide notice of any such purported dispute until March 2012. It is also apparent that Lehman used, and continues to use, its knowledge of the financial market conditions to decide when and how to object to the Early Termination Notice, all to RHF's detriment. Only now has Lehman argued that the 2008 Swap is somehow "live", despite never being able to perform under the 2008 Swaps at any time to date, and without any ability to perform on the swap for the remainder of the 20 year term. Without knowledge of any such dispute, and believing that it properly terminated the 2008 Swap, RHF has been unable to protect its interests in the event the Early Termination Notice is ultimately determined to not be valid. Consequently RHF needs to seek an immediate determination regarding the validity of the Early Termination Notice.

43.    By this Motion, RHF does not seek to assert control over property of the Lehman estate as prohibited under Section 362(a)(3). Section 362(a)(3) "operates as a stay, applicable to all entities, of – (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11. U.S.C. §362(a)(3). RHF's Early Termination Notice, if upheld, terminated the 2008 Swap and thus there are no estate property rights at issue.

44.    Further, upon the final determination of such issue by the CA Court, if permitted hereunder, the parties' claims against each other will have more clarity.

45.    The RHF Transaction is distinguishable from this Court's opinion in *Metavante*.

---

[20] Although Lehman has exercised its right to mediation under the ADR Order, the mediation is deemed confidential and thus does not result in a formal objection to the claim, or by reference the Early Termination Notice.

*See In re Lehman Bros. Holdings Inc.*, September 15, 2009. In its *Metavante* decision, the Court found that Metavante violated section 362(a)(3) of the Bankruptcy Code by unilaterally not performing under the swap because such action interfered with Lehman's property rights under an executory contract, i.e. the non-terminated swap. In *Metavante*, the issue before this Court was whether the swap counterparty, Metavante, was entitled to *not perform* under the swap because its counterparty, LBSF, could no longer meet the "conditions precedent" to the swap, as set forth under Section 2(a)(iii), and therefore permit it to ride the market until either the market changed in its favor or the swap matured or terminated. The Court was not asked to determine the reasonableness or timeliness of an Early Termination Notice, as *Metavante never exercised its right to terminate the swap.*[21]

46.    Metavante consciously decided not to "terminate, liquidate or accelerate" its swap, whereas, in direct contrast, RHF did elect to terminate the Transaction as a result of the Lehman bankruptcy. On November 7, 2008, RHF served its notice of default upon Lehman. Thereafter, as set forth above, RHF took commercially reasonable actions to "terminate, liquidate or accelerate" the 2008 Swap, including obtaining required approval of the Banks and seeking a replacement swap. Upon meeting the necessary conditions precedent to terminating the 2008 Swap, RHF immediately served the Early Termination Notice. It is evident that RHF was never playing the market in any manner; to the contrary, LBSF clearly played the market, and continues to do so, by strategically waiting four (4) years to contest the Early Termination Notice and Termination Calculation.

---

[21] Metavante chose to not exercise its right to Early Termination because, admittedly, it was "out of the money" at the time of the Event of Default. Metavante did not make any required payments under the swap, and refused to perform based upon LBSF's default, which, it argued, was a condition precedent to Metavante's own obligations. *Id.* at 107. The Bankruptcy Court held that Metavante was required to either terminate as a result of the bankruptcy, or failing to do so perform under the swap. *Id.* at 111-12. In doing so, the Court commented *in dicta* (since Metavante never terminated) that any termination more than one (1) year after the bankruptcy filing was outside the scope of the Safe Harbor Provision, and thus resulted in the waiver of rights thereunder. *Id.*

47.    This was not a transaction entered into by RHF for speculative purposes.  RHF entered into the 2008 Swap solely to provide long-term, 20 year interest rate protection of the VRDBs.    However, RHF's plan was forever altered when Lehman filed for bankruptcy protection less than three (3) months into the 2008 Swap despite its representations of financial stability.

48.    Since the claim arising from the Early Termination Notice was a post-petition claim, it is respectfully requested that the Court enter an order declaring that the automatic stay does not apply to RHF's commencement of a declaratory action in the California Court to determine the validity of Early Termination Notice.

## II.    "Cause" Exists To Grant RHF Relief From The Automatic Stay To Permit The CA Court To Determine The Validity Of The Early Termination Notice.

49.    If the Court determines that the automatic stay under section 362(a) of the Bankruptcy Code does apply to this matter, then RHF respectfully requests that the Court grant relief from the automatic stay for "cause", pursuant to 11 U.S.C. §362(d), to permit RHF to commence such a declaratory action in the CA Court to finally decide the issue of the validity of the Early Termination Notice.

50.    Section 362(d)(1) of the Bankruptcy Code provides that the stay may be modified or lifted "for cause, including the lack of adequate protection of an interest in property of such party in interest." 11 U.S.C. §362(d)(1).  Since neither the statute nor legislative history defines "cause," in *In re Sonnax Indus.*, 907 F.2d 1280, 1285 (2d. Cir. 1990), the court found that bankruptcy courts are empowered to make such a determination on a case-by-case basis.

51.    The court is accorded broad discretion to modify the automatic stay. *Sonnax*, 907 F.2d at 1288. A very fact-specific inquiry, weighing a number of factors, is required in determining a motion on such grounds.  *Id.*  The common factors employed by this Circuit,

coined the *Sonnax* factors, include:

> (1) whether relief would result in a partial or complete resolution of the issues; (2) lack of any connection with or interference with the bankruptcy case; (3) whether the other proceeding involves the debtor as a fiduciary; (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action; (5) whether the debtor's insurer has assumed full responsibility for defending it; (6) whether the action primarily involves third parties; (7) whether litigation in another forum would prejudice the interests of other creditors; (8) whether the judgment claim arising from the other action is subject to equitable subordination; (9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor; (10) the interests of judicial economy and the expeditious and economical resolution of litigation; (11) whether the parties are ready for trial in the other proceeding; and (12) impact of the stay on the parties and the balance of harms.

*Id. at 1286; see also* In re MarketXT Holdings Corp., No. 04-12078, 2009 WL 2957809, at *4 (Bankr. S.D.N.Y. July 20, 2009) (citing *Sonnax*); *In re Bally Total Fitness of Greater N.Y.*, 402 B.R. 616, 623 (Bankr. S.D.N.Y. 2009) (same). "Not all of these factors will be relevant in every case." *Mazzeo v. Lenhart* (*In re Mazzeo*), 167 F.3d 139, 143 (2nd Cir. 1999).

52.    The applicable factors in this case weigh in favor of granting a lifting of the stay:

(a)    Relief would result in full resolution of the issue: The CA Court's determination of the validity of the Early Termination Notice will fully resolve the issue. The CA Court is well-versed in the facts and circumstance of this matter and is competent to make a determination on these state law contract issues. Thereafter, if the Early Termination Notice is upheld as valid, then this will significantly narrow any claim issue required to be heard before this Court. Further, as set forth more fully below, if the Court permits RHF to finally determine the Tort Claim in the CA Court, then this will further narrow any issues related to set-off rights and/or claim determination. This factor weighs in favor of RHF.

(b)    No interference with bankruptcy case: A grant of relief from the automatic stay will not interfere with the Debtors' bankruptcy cases. The Debtors' chapter 11

plan has been confirmed, and the Debtors are now solely concentrating on collection of assets and claims determination. The commencement of the declaratory action in the CA Court, on these unique facts, will not interfere with Lehman's current objectives.  In fact, it will bring this matter to a conclusion more quickly.  After all, for four years, Lehman has refused to address the issue.  *See In re Wapotish*, 2009 WL 1916965, at *2 (Bankr. N.D. Ill. July 1, 2009) (court considered whether "there will be *greater interference* with bankruptcy case if stay is not lifted because matters will have to be litigated in bankruptcy court" *(emphasis added)*); *see also In re Dryja*, 425 B.R. 608, 612 (Bankr. D. Colo. 2010) (in deciding to lift the stay the court reasoned that the interference with the bankruptcy court would be minimal because although the state court would decide on how certain property would be divided, the bankruptcy court would still retain its jurisdiction to adjudicate the impact of the state court's division of property on the bankruptcy case.)  This factor weighs in favor of RHF.

(c)    <u>Debtors as fiduciary</u>:  This factor does not apply with respect to adjudication of the validity of the Early Termination Notice, but, as discussed *infra*, does weigh in favor of RHF with respect to the Tort Claim.

(d)    <u>Specialized tribunal</u>:  The CA Court is uniquely qualified to resolve the state law contract issues related to the Early Termination Notice.  Indeed, the CA Action is pending before the CA Court's Complex Civil Litigation Program.  That program is designed to provide more effective and efficient case resolution for cases that require unusual amounts of judicial time because of legal or factual complicated issues.  The CA Court has been actively involved in the litigation of the related CA Action (with similar claims as the Tort Claim), which case is at a more advanced stage, including a motion for summary judgment, discovery and depositions. *See Sonnax*, 907 F.2d at 1286 (court should consider whether another tribunal with

24

necessary expertise exists to hear cause of action) (citing *In re Curtis*, 40 Bankr. 795, 799-800 (Bankr. D. Utah 1984)); *In re Metz,* 165 B.R. 769, 772 (Bankr. E.D.N.Y. 1994) (lifting the stay based on the *Sonnax* factors, and specifically based on the fact that the "expertise of the bankruptcy court is unnecessary"); *In re Morris*, No. 10-60113, 2010 WL 2197717, at *3 (Bankr. N.D.N.Y. May 27, 2010) ("state court is the proper tribunal to hear the state law causes of action against [the Debtors] as one of several defendants"); *see generally In re Dryja,* 425 B.R. at 611. This factor weighs in favor of RHF and the granting of relief from the automatic stay.

(e)    <u>Insurance defense</u>:    Upon information and belief, this factor is not an issue.

(f)    <u>The action primarily involves third parties</u>: Determination of the declaratory action as to the validity of the Early Termination Notice should not involve third parties; however, if the matter is litigated, RHF will be compelled to call its bank lenders and advisors as potential witnesses with regards to the conditions precedent to the termination of the 2008 Swap, the actions taken by RHF in meeting these conditions precedent, and the effect of the termination.  Further, as set forth more fully below in (IV), the Tort Claim will also involve third parties, including those presently defendants in the CA Action, including Lehman's former officers and directors.  Again, this factor should weigh in favor of RHF.

(g)    <u>The pending litigation would not affect or prejudice the other creditors of the Debtors</u>: This factor should weigh in favor of RHF.  No other creditors will be prejudiced by this matter being decided by the CA Court.  The facts and circumstances of this matter are unique, including (i) the timing of the commencement of the 2008 Swap just three (3) months prior to Lehman's bankruptcy filings, (ii) the underlying bond offering and the requirements under the lending agreements, including the Banks' required approval of the early termination,

(iii) the knowledge and sophistication of the parties, and the actions taken by RHF with respect to the termination in June 2009. The facts are unique, and the determination of the validity of the Early Termination Notice will be determinative on such facts.

(h)   <u>Interest of judicial economy</u>:  The interests of judicial economy and the expeditious and economical resolution of the litigation compel that the stay be lifted so as to decide this distinct issue before the CA Court.  Lehman has already delayed this matter for more than four (4) years, all to the detriment of RHF; it cannot now argue that it is in the interest of judicial economy to continue this delay.  Further, the CA Court is already familiar with the unique facts and circumstances of this matter, and any affirmative claim by Lehman under the 2008 Swap will necessarily be subject to RHF's setoff rights under the Tort Claim.

Moreover, as noted above, RHF will be compelled to call its bank lenders as potential witnesses with regards to the conditions precedent to the termination of the 2008 Swap, and the actions taken by RHF in meeting these conditions precedent.  Those witnesses are overwhelmingly located in California, including the following:

- Barbara Readick, First Vice President and Regional Manager, KBC Bank (Los Angeles, CA);

- Tiena Johnson-Hall, former VP-Regional Manager Community Lending, US Bank (Los Angeles, CA);

- Charmaine Atherton, SVP Community Development Banking - So. California, Bank of America Merrill Lynch (Los Angeles, CA); and

- Astrid Kramarz, Senior Relationship Manager / Vice President, Bank of the West, REID/Healthcare Lending (Trinidad, CO).

In addition, all of the key RHF personnel who will be witnesses – including Brian Magnone, RHF's Vice President/Treasurer, and Frank Rossello, RHF's CFO and Vice President/Finance -- work out of RHF's Long Beach, California headquarters.

(i)    The parties are ready for trial:  RHF believes that it validly terminated the 2008 Swap more than four (4) years ago.  Since then, it entered into replacement swaps to provide interest rate protection under VRDBs, albeit under less protective terms than under the 2008 Swap.  In direct contrast, Lehman took no action to dispute the Early Termination Notice or Termination Calculation until March 2012, despite RHF voluntarily providing Lehman with further requested information regarding the Early Termination Notice and Termination Calculation in March 2010.  Now, four (4) years later, Lehman claims the Early Termination Notice was invalid and the 2008 Swap is "live."  During this time period, RHF believed, and still believes, that the 2008 Swap was properly terminated, and thus RHF was unable to protect its interests in the event the termination is deemed invalid; Lehman cannot now try to capitalize upon its own inactions to RHF's detriment. The open issue regarding the validity of the Early Termination Notice and Termination Calculation has created a great deal of uncertainty for RHF for more than four (4) years, including uncertainty as to its financial stability if Lehman's assertions are upheld.  While Lehman has taken no action before this Court on the 2008 Swap, RHF is, and has been, ready to seek a declaratory judgment as to the validity of the Early Termination Notice.   In fact, many of the same facts and circumstances have already been subject to litigation in the California Action.  This factor weighs in favor of RHF.

(j)    Balancing of harms weighs heavily in favor of RHF:  After more than four (4) years, Lehman has still taken no action to resolve its purported dispute of the Early Termination Notice and Termination Calculation.  Now, Lehman alleges that the swap is

27

somehow "live" despite it never being able to meet its obligations thereunder, and Lehman seeks to assert that RHF is significantly "out of the money" under the 2008 Swap, which amounts accrued solely as a result of the delay.  The open issue regarding the validity of the Early Termination Notice and Termination Calculation has created a great deal of uncertainty for RHF for more than four (4) years, including uncertainty as to its financial stability if Lehman's assertions are upheld.  Any further delay only adds to the uncertainty for RHF.  As such, the balancing of the harms clearly weighs in favor of RHF, and equity compels that RHF be permitted to immediately commence the declaratory action in the CA Court to determine, once and for all, the validity of the Early Termination Notice.

53.    It is respectfully submitted that the applicable *Sonnax* factors weigh in favor of RHF in this matter.  RHF respectfully requests that the Court enter an order granting relief from the automatic stay for "cause" to permit RHF to commence a declaratory action in the CA Court to determine the validity of the Early Termination Notice.

### III.    "Cause" Exists to Grant Relief From The Automatic Stay To Permit RHF To Commence An Action Against Lehman On The Tort Claim In The CA Courts.

54.    Additionally, but related, RHF respectfully requests that the Court grant relief from the automatic stay for "cause", pursuant to 11 U.S.C. §362(d), to permit RHF to commence an immediate action against Lehman in CA Court to finally determine the Tort Claim.

55.    The applicable *Sonnax* factors in this case weigh in favor of granting a lifting of the stay in this instance:

(a)    <u>Relief would result in full resolution of the issue</u>:  The CA Court's determination of the validity of the Tort Claim will fully resolve it, as well as the setoff rights with respect to the 2008 Swap if applicable.

28

By its Tort Claim, RHF has asserted an affirmative claim against Lehman for damages sustained by RHF as a result of actions and inactions of Lehman, including but not limited to (i) breach of contract, (ii) fraud, constructive fraud, and/or fraudulent misrepresentation by Lehman with respect to certain swap transactions between RHF and the Debtors, (iii) negligence of or negligent misrepresentation by Lehman, (iv) breach of fiduciary duty, (v) breach of the covenant of good faith and fair dealings, and (vi) unfair competition. The Tort Claim involves the same facts and circumstances, same witnesses and parties, and same legal arguments as asserted in the pending CA Action. The CA Court is now fully familiar with this litigation, after hearing various motions in the CA Action. It will be able to fully determine the issue without opening the door to the possibility of conflicting decisions if the Tort Claim is litigated in this Court.

Further, to the extent it is determined that RHF is "out of the money" on the 2008 Swap, RHF has the contractual right under the Master Agreement to assert a set-off of amounts due under the Tort Claim as against any "out of the money" position that may be owed to Lehman under the 2008 Swap. Section 6(f)(i) of the Master Agreement (as amended by the Schedule) states:

> *(f) Set-off.*
>
> *(i) In addition to any rights of set-off a party may have as a matter of law or otherwise, upon the occurrence of an Event of Default or an Additional Termination Event and the designation of an Early Termination Date pursuant Section 6 of the Agreement with respect to a party ("X"), the other party ("Y") will have the right (but not be obligated) without prior notice to X or any other person to set-off or apply any obligation of X owed to Y (and to any Affiliate of Y)(**whether or not matured or contingent and whether or not arising under this Agreement**, and regardless of the currency, place of payment or booking office of the obligation) against any obligation of Y (and any Affiliate of Y) owed to X (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation.) (emphasis added)*

29

The litigation of this matter by the CA Court will not only resolve the Tort Claim in full, but also narrow any issues related to the claims under the 2008 Swap.  This factor weighs in favor of RHF.

(b)    <u>No interference with the bankruptcy case</u>:  A grant of relief from the automatic stay will not interfere with the Debtors' bankruptcy cases.  The Debtors' chapter 11 plan has been confirmed, and the Debtors are now solely concentrating on claims determination and collection of assets.  Permitting RHF to commence an action in the CA Court on the Tort Claim will have no interference with Lehman's current objectives.  The CA Court is already hearing and deciding the same facts and legal issues in the pending and ongoing CA Action, and permitting RHF to bring Lehman into the CA Action will avoid duplication of the litigation and possible conflicting results.  This factor weighs in favor of RHF.

(c)    <u>Debtors as fiduciary</u>:  Among the claims proposed to be alleged against Lehman is a cause of action for breach of fiduciary duty.  RHF alleges that, as the broker-dealer and market agent for RHF's SAVRS, and by virtue of RHF having placed its trust and confidence in the fidelity and integrity of Lehman and having relied on Lehman's superior expertise and knowledge, Lehman owed fiduciary duties of loyalty and care to RHF.  Where the debtor is to be sued as a fiduciary, this factor weighs in favor of the lifting the stay.  *In re Godt*, 282 B.R. 577, 585 (E.D.N.Y. 2002) (client's motion to lift automatic stay to sue attorney for malpractice properly granted where claim based on fiduciary attorney-client relationship).

(d)    <u>Specialized tribunal</u>: As noted above, the CA Court has been actively litigating the related CA Action against, among others, former officers and directors of Lehman and the case is pending before pending before the CA Court's Complex Civil Litigation Program.  The CA Action is at a more advanced stage, including motions and appeals, and discovery and

depositions. The CA Court is fully familiar with the claims, which are similar to those already asserted against other defendants in the CA Action, and will be well prepared to decide the Tort Claims in conjunction with the pending action. *See, e.g., In re Morris*, 2010 WL 2197717. This factor weighs in favor of RHF and the granting of relief from the automatic stay.

(e)     <u>Insurance defense</u>:  Upon information and belief, this factor is not an issue.

(f)     <u>The action primarily involves third parties</u>:  A final determination on the Tort Claim will likely involve third parties.  As noted herein, the CA Action has already been pending on similar claims against former officers and directors of Lehman, Cain and ACA.  A conflicting determination in one court could likely be prejudicial to such parties in the other court. *See, e.g., In re Morris*, 2010 WL 2197717.  Again, this factor should weigh in favor of RHF.

(g)     <u>The pending litigation would not affect or prejudice the other creditors of the Debtors</u>:  No other creditors of the bankruptcy estates will be prejudiced or affected by the Tort Claim being litigated to final decision in the CA Court.  However, the litigation of the same or similar issues based upon the same facts and legal arguments could be prejudicial to the Debtors, RHF and the other CA Action defendants as a result of the potential for conflicting decisions. This factor should point in favor of RHF.

(h)     <u>Interest of judicial economy</u>:  The interests of judicial economy and the expeditious and economical resolution of the litigation compel that the stay be lifted so as to decide the Tort Claims in the CA Court.  The CA Court is already fully knowledgeable and familiar with the long history between the parties in this matter.

(i)     <u>The parties are ready for trial</u>:  Although neither matter is trial ready, the CA Action has progressed, including motion and appellate practice, exchange of discovery, and conduct of certain depositions.  Further, a final determination on the Tort Claim will be

necessary to finally determine the claim under the 2008 Swap, if it is determined that RHF is "out of the money".  This factor weighs in favor of RHF.

(j)    <u>Balancing of harms</u>:  RHF is a non-profit organization that has been subject to financial uncertainty solely as a result of Lehman's actions.  RHF has taken actions to assert and protect its rights as against, among others, the former officers and directors of Lehman in the CA Action, and has diligently proceeded with the action.  RHF has also asserted its rights under the Tort Claim, which is based upon the same facts and circumstances and similar legal arguments as in the CA Action.  To date, Lehman has taken no action on the Tort Claim.  To permit further delay, and then chance conflicting decisions on the issues, would create increasing prejudice upon RHF.  Further, if the stay is lifted, Lehman can assert any defenses in the CA Action, and not be subject to a possible adverse decision without its active participation.  It is submitted that a balancing of the harms weighs in favor of RHF on this factor.

WHEREFORE, RHF respectfully requests that the Motion be granted in all respects, together with such other and further relief as this Court deems just and proper.

Dated:  August 8, 2013

KLESTADT & WINTERS, LLP

By: */s/ John E. Jureller, Jr.*
Tracy L. Klestadt
John E. Jureller, Jr.
Lauren C. Kiss
570 Seventh Avenue, 17th Floor
New York, NY 10018-1603
(212) 972-3000 (Telephone)
(212) 972-2245 (Facsimile)

REUBEN RAUCHER & BLUM

Timothy D. Reuben
Stephen L. Raucher
10940 Wilshire Blvd., 18th Floor
Los Angeles, CA 90024
(310) 777-1990 (Telephone)
(310) 777-1989 (Facsimile)

*Attorneys for Retirement Housing Foundation and its affiliates*