# Exhibit

# 1

1

**REUBEN RAUCHER & BLUM**
**Timothy D. Reuben [State Bar #94312]**

2

**Stephen L. Raucher [State Bar #162795]**
**Gregory P. Barchie [State Bar #235022]**

3

10940 Wilshire Blvd., 18th Floor
Los Angeles, California 90024

4

Telephone: (310) 777-1990
Facsimile: (310) 777-1989

5

Attorneys for Plaintiffs

6

7

8

### SUPERIOR COURT OF THE STATE OF CALIFORNIA

9

### FOR THE COUNTY OF LOS ANGELES

10

RETIREMENT HOUSING FOUNDATION;
FOUNDATION PROPERTY MANAGEMENT,

11

INC.; BIXBY KNOLLS TOWERS, INC.;
GOLD COUNTRY HEALTH CENTER, INC.;

12

MAYFLOWER GARDENS HEALTH
FACILITIES, INC.; MAYFLOWER RHF

13

HOUSING, INC.; SUN CITY RHF HOUSING;
HOLLY HILL RHF HOUSING, INC.;

14

MERRITT ISLAND RHF HOUSING, INC.;
MARTIN LUTHER FOUNDATION, INC.;

15

YELLOWWOOD ACRES, INC.; BLUEGRASS
RHF HOUSING, INC.; ST. CATHERINE RHF

16

HOUSING, INC., and DESMET RHF
HOUSING, INC.,

17

18

vs.

19

20

LEHMAN BROTHERS HOLDINGS INC.,
LEHMAN BROTHERS SPECIAL

21

FINANCINGS INC., and DOES 1-20, inclusive,

22

Defendants.

CASE NO. _____

**COMPLAINT FOR:**

1. FRAUD AND DECEIT
2. BREACH OF IMPLIED COVENANT
3. FRAUD AND DECEIT
4. NEGLIGENT MISREPRESENTATION
5. INTENTIONAL INTERFERENCE
   WITH PROSECTIVE ECONOMIC
   ADVANTAGE
6. BREACH OF FIDUCIARY DUTY
7. NEGLIGENCE
8. FRAUD AND DECEIT
9. BREACH OF CONTRACT
10. FRAUD IN THE INDUCEMENT
11. NEGLIGENT MISREPRESENTATION
12. DECLARATORY RELIEF
13. RESCISSION

**DEMAND FOR JURY TRIAL**

23

24

25

26

27

28

COMPLAINT

# GENERAL ALLEGATIONS

**I.**    **The Parties**

1.    Plaintiff Retirement Housing Foundation is, and at all times relevant to this Complaint was, a California not-for-profit corporation with its principal place of business in Long Beach, California.

2.    Plaintiff Foundation Property Management, Inc. ("FPM") is, and at all times relevant to this Complaint was, a not-for-profit corporation incorporated and existing under the laws of the State of California and doing business in the County of Los Angeles in the State of California.

3.    Plaintiff Bixby Knolls Towers, Inc. ("Bixby Knolls") is, and at all times relevant to this Complaint was, a not-for-profit corporation incorporated and existing under the laws of the State of California and doing business in the County of Los Angeles in the State of California.

4.    Plaintiff Gold Country Health Center, Inc. ("Gold County") is, and at all times relevant to this Complaint was, a not-for-profit corporation incorporated and existing under the laws of the State of California and doing business in the County of El Dorado in the State of California.

5.    Plaintiff Mayflower Gardens Health Facilities, Inc. ("Mayflower Health") is, and at all times relevant to this Complaint was, a not-for-profit corporation incorporated and existing under the laws of the State of California and doing business in the County of Los Angeles in the State of California.

6.    Plaintiff Mayflower RHF Housing, Inc. ("Mayflower I") is, and at all times relevant to this Complaint was, a not-for-profit corporation incorporated and existing under the laws of the State of California and doing business in the County of Los Angeles in the State of California.

7.    Plaintiff Sun City RHF Housing, Inc. ("Sun City") is, and at all times relevant to this Complaint was, a not-for-profit corporation incorporated and existing under the laws of the State of California and doing business in the County of Riverside in the State of California.

8.      Plaintiff Holly Hill RHF Housing, Inc. ("Holly Hill") is, and at all times relevant to this Complaint was, a not-for-profit corporation incorporated and existing under the laws of the State of Florida and doing business in the State of Florida.

9.      Plaintiff Merritt Island RHF Housing, Inc. ("Merritt Island") is, and at all times relevant to this Complaint was, a not-for-profit corporation incorporated and existing under the laws of the State of Florida and doing business in the State of Florida.

10.     Plaintiff Martin Luther Foundation, Inc. ("Martin Luther") is, and at all times relevant to this Complaint was, a not-for-profit corporation incorporated and existing under the laws of the State of Florida and doing business in the State of Florida.

11.     Plaintiff Yellowwood Acres, Inc. ("Yellowwood") is, and at all times relevant to this Complaint was, a not-for-profit corporation incorporated and existing under the laws of the State of Indiana and doing business in the State of Indiana.

12.     Plaintiff Bluegrass RHF Housing, Inc. ("Bluegrass") is, and at all times relevant to this Complaint was, a not-for-profit corporation incorporated and existing under the laws of the State of Kentucky and doing business in the State of Kentucky.[1]

13.     Plaintiff St. Catherine RHF Housing, Inc. ("St. Catherine") is, and at all times relevant to this Complaint was, a not-for-profit corporation incorporated and existing under the laws of the State of Missouri and doing business in the State of Missouri.

14.     Plaintiff DeSmet RHF Housing, Inc. ("DeSmet") is, and at all times relevant to this Complaint was, a not-for-profit corporation incorporated and existing under the laws of the State of Missouri and doing business in the State of Missouri.

15.     Defendant Lehman Brothers Holdings Inc. ("LBHI") was a Delaware corporation with its principal place of business in New York, New York. LBHI has commenced a voluntary case under Chapter 11, Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") and is authorized to operate its business and manage its property as a debtor in possession pursuant to §§ 1l07(a) and 1108 of the Bankruptcy Code. LBHI was the holding

---

[1] Plaintiffs Retirement Housing Foundation and its affiliates FPM, Bixby Knolls, Gold Country, Mayflower Health, Mayflower I, Sun City, Holly Hill, Merritt Island, Martin Luther, Yellowwood, Bluegrass will be collectively referred to herein as "RHF."

1    company for hundreds of individual corporate entities, including Lehman Brothers Special

2    Financing Inc.

3    16.    Defendant Lehman Brothers Special Financing Inc. ("LBSF") was a Delaware

4    corporation with its principal place of business in New York, New York that has reorganized

5    pursuant to Chapter 11 of the Bankruptcy Code. Prior to, and following the commencement of

6    Lehman's Chapter 11 proceedings, LBSF was Lehman's fixed income derivatives trading

7    business. LBSF creates, trades and manages fixed income derivative contracts to maximize returns,

8    including the liquidation of swap positions at opportune times.  During Lehman's Chapter 11

9    proceedings, LBSF continued to operate its business and manage its fixed income derivative assets

10    as a debtor-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.  LBSF was a

11    wholly-owned subsidiary of LBHI and benefitted from a full guarantee by LBHI.

12    17.    LBHI owned and controlled its subsidiary LBSF, which was involved with RHF's

13    refinancing.  LBHI and LBSF were in fact alter egos of each other and shared a unity of interest,

14    and it would sanction a fraud or promote an injustice not to treat them as alter egos.  Further, these

15    entities in actuality formed a single enterprise.  RHF is informed and believes that these entities

16    commingled funds and assets, used the same offices and employees, disregarded corporate

17    formalities, and were used as mere shells or conduits for the affairs of each other. RHF is informed

18    and believes that LBHI and LBSF (collectively, "Lehman") conducted business in the State of

19    California.

20    18.    The true names and capacities, whether individual, corporate, or otherwise, of

21    Defendants DOES 1 through 20 are unknown to Plaintiffs, and Plaintiffs therefore sue these

22    Defendants by their fictitious names and capacities.  Plaintiffs will amend this Complaint to allege

23    these Defendants' true names and capacities when the same have been ascertained.

24    19.    On Plaintiffs' information and belief, DOES 1 through 20, inclusive, have acted or

25    failed to act in concert with Lehman as alleged herein, and are responsible in some manner for the

26    injuries and damages suffered by Plaintiffs.  On Plaintiffs' information and belief, at all times

27    mentioned herein, each of the Defendants was the agent of each of the remaining Defendants and

28

1  in doing the things herein mentioned was acting within the scope of such agency.  All references to

2  LBHI, LBSF or Lehman herein shall be deemed to include DOES 1 through 20.

3  **II.    The 1998 Plan of Refinancing**

4      20.    Retirement Housing Foundation is a charitable, non-profit foundation devoted to the

5  mission of providing safe and affordable housing and services for senior citizens, persons with

6  disabilities, and low income families.  Although its headquarters are in Long Beach, California,

7  RHF has sponsored, developed and/or managed senior citizen apartments, nursing facilities, and

8  low income housing throughout the country.  Since it was founded in 1961 by two United Church

9  of Christ clergy and a layman with $7,000 and a vision of providing quality housing and services

10  for the underprivileged, RHF has become one of the nation's largest non-profit housing providers

11  with 165 communities in 25 states, as well as the District of Columbia, Puerto Rico and the Virgin

12  Islands.  Retirement Housing Foundation develops and manages its facilities through affiliated

13  entities – each facility is typically owned by a separate affiliate.  Retirement Housing Foundation's

14  retirement communities are non-denominational and Retirement Housing Foundation currently

15  manages over 17,000 residents.

16      21.    Lehman was a global financial-services firm that, through its subsidiaries, provided

17  services in investment banking, equity and fixed-income sales, research and trading, investment

18  management, private equity, and private banking.   At all times relevant prior to Lehman's

19  bankruptcy, Lehman marketed itself as one of the leading investment banking firms, and that it

20  was trustworthy, honest, stable, dependable, in compliance with all laws, well capitalized, and that

21  its public financial statements were fair and accurate. Lehman's public financial statements,

22  including its 10-Ks and 10-Qs, as well as the public comments by its senior officers, were carefully

23  and regularly monitored by analysts, rating agencies, and other sophisticated experts on Wall

24  Street, and these analysts, rating agencies, and other sophisticated experts regularly reported,

25  commented, or published their findings, summaries and/or opinions about Lehman Brother's

26  financial condition.  The findings, comments, or opinions of these analysts, rating agencies, and

27  other sophisticated experts affected both the value of Lehman's publicly traded stock as well as the

28  ability for Lehman to contract with and otherwise do business with third parties and/or

counterparties who regularly relied on the accuracy of Lehman's financial statements either directly or through the findings, comments, or opinions of analysts, rating agencies and other sophisticated experts.

**A.    SAVRS**

22.    To hedge against the risk of fluctuating interest rates and to maintain a conservative financial approach on a long term basis, in December of 1998, based upon a structure designed and recommended by its investment banker Cain Brothers & Co. LLC ("Cain"), RHF issued $130,650,000 in 30 year bonds as Select Auction Variable Rate Securities ("SAVRS"), a Lehman product. SAVRS were supposed to bear interest at a variable rate that would be determined by a purportedly competitive bidding "Dutch" auction held by Lehman every 35 days that was supposed to provide a fair market interest rate. According to Cain, in each auction cycle, Lehman would solicit interest from existing bond holders and potential investors and collect bids from those bond holders and investors that specified a rate at which they would buy and/or sell the SAVRS. Lehman would then allegedly compile each bid and provide the raw data of each bid (and not the identity of the bidders) to a third party auction agent to determine the rate of the SAVRS. The auction rate was supposed to be set through a process in which bids with successively higher rates were accepted until all SAVRS available in the auction were sold. The highest bid at which SAVRS were sold in the auction, the so-called "winning bid" or "clearing rate," would be the interest rate applicable for the next SAVRS period. Every 35 days, a new SAVRS auction would be held and new bids would be compiled by Lehman, from which the SAVRS rate would purportedly be reset at a clearing rate that represented a fair market rate. Lehman would continue to receive fees each auction cycle for orchestrating the auctions and compiling the bids to be submitted to the auction agent.

23.    Cain's structure and plan provided that Lehman would be the only market agent and broker-dealer with respect to RHF's SAVRS, and that Lehman had total control over the auction process. Lehman provided the auction agent with the Maximum Rate – a high rate that would prevail only if there was a "failed" auction due to a lack of bids below the maximum rate. Lehman also provided the auction agent with all bid and sell orders. The auction agent would simply

compile the information received from Lehman and pass that information, including the clearing

rate, on to RHF.  Thus, Lehman could pre-determine what the clearing rate would be and, since it

had sole control over the orders, was in the position to manipulate the auctions and convey the

results of those auctions through the auction agent to RHF.  However, based on the representations

and information received from Cain and Lehman and the contracts associated with the refinancing,

RHF justifiably believed that the auctions would be conducted fairly and properly without

manipulation, and that fair market interest rates would be set. True and correct copies of the

Market Agent Agreement and Broker-Dealer Agreement, dated December 1, 1998, are attached

hereto as Exhibits A and B.[2]

24.     In fact, based on Cain's recommendation of Lehman and Lehman's reputation as a

leading global investment banking firm, RHF placed its trust and confidence in Lehman, believing

that Lehman would perform its duties under the Market Agent and Broker-Dealer agreements

competently, with integrity and in good faith.  As a non-profit housing foundation that lacked

sophistication with SAVRS and Dutch auctions, RHF relied on Lehman's superior expertise and

knowledge.

25.     RHF believed that the benefit of the SAVRS was that, among other things, they

provided bond issuers the low cost and flexibility of variable rate debt and presented a safe

alternative to more traditional and more expensive fixed rate bonds.  Based on representations

made by Cain and Lehman, RHF further believed that it had the option to convert the SAVRS into

true fixed rate bonds at any time to lock in advantageous prevailing fixed rates.

**B.      The 1998 Swap Contract**

26.     With Cain acting as RHF's "swap advisor," RHF and Lehman also entered into a 30

year interest rate swap agreement (the "1998 Swap"), whereby the interest rate of 85% of the

SAVRS would be synthetically fixed, with RHF agreeing to pay a fixed rate of interest of 5.19% to

Lehman in exchange for Lehman paying the SAVRS' variable rates.  Lehman also required RHF

to obtain insurance from ACA Guaranty Corporation ("ACA"), a newly formed "A" rated bond

---

[2] These agreements were executed for several RHF properties.  The Market Agent and Broker-
Dealer agreements attached hereto as Exhibits A and B are representative of all of those signed on
or about December 1, 1998 for the different RHF properties.

insurer, to guarantee the payment of principal and interest on the SAVRS. A true and correct copy of the 1998 Swap agreement, including the ISDA Master Agreement, Schedules and Confirmations related thereto, is attached hereto as Exhibit C.

27. Pursuant to the 1998 Swap and consistent with its long term 30 year commitment, Lehman unconditionally guaranteed RHF's variable interest and capital payment obligations on the SAVRS that were subject to the agreement, and that such payments would be punctually made when they became due and payable.

28. Under the 1998 Swap, RHF was also to pay fees for Lehman's services for auctioning the SAVRS every thirty-five days.

29. Both prior to and at the time the 1998 Swap was executed, Lehman represented orally and in writing to RHF that the benefit of the interest rate swap was that it permitted RHF to "hedge," or protect itself, against the risks of variable interest rate fluctuations and achieve a lower overall fixed rate than would be available if the SAVRS were issued as true fixed rate obligations.

30. On behalf of Lehman, among other persons, Christopher O'Meara in 1998 communicated directly with RHF and its representatives regarding the SAVRS, the 1998 Swap Contract, and the overall transaction. O'Meara specifically spoke with counsel for RHF, William Kelly, on August 4, 1998 and August 5, 1998.

31. Lehman's strong financial condition and its public credit rating were absolutely material to and relied on by RHF in entering into the 1998 Swap. The 1998 Swap contained material written representations that Lehman's financial statements were true and correct and that Lehman was in no way in default or subject to any Termination Event. One Termination Event was if Lehman fell below a Moody's public rating of Baa3 and an S&P rating of BBB-. The 1998 Swap further provided that Lehman would regularly provide its financial documents to RHF throughout the thirty year term of the 1998 Swap, and Lehman specifically represented that those financial documents would be "true, accurate, and complete in every material respect." The 1998 Swap also provided that Lehman's Board of Directors had authorized "the execution and the delivery of" the 1998 Swap. Cain, as RHF's swap advisor and monitoring agent, dealt directly and communicated with Lehman after the 1998 Swap was signed and regularly received information

1    about Lehman's financial condition and advised RHF about Lehman Brothers and the terms,

2    obligations, and impact of the 1998 Swap.

3    **C.    The Issuance of Additional Bonds**

4    32.    In or about 1999, Cain underwrote additional fixed-rate bonds that were issued for

5    the benefit of the RHF.  At Cain's recommendation (upon which RHF justifiably relied), ACA

6    again served as the bond insurer for these bonds.

7    33.    In or about 2000, Cain underwrote additional fixed-rate bonds that were issued for

8    the benefit of RHF affiliates St. Catherine and DeSmet.  RHF, whose creditworthiness was insured

9    by ACA, guaranteed the bonds issued for the benefit of St. Catherine and DeSmet.[3]

10    **D.    The Undisclosed and Unfair Valuations of the 1998 Swap Contract**

11    34.    Unbeknownst to RHF, the 1998 Swap Contract was valued by Lehman pursuant to

12    a secret, restrictive valuation methodology developed by Lehman that effectively prevented RHF

13    from being "in the money" despite the fact that the SAVRS' variable rate determined at auction

14    often exceeded the synthetic "fixed" rate.

15    35.    In addition, on RHF's information and belief and unbeknownst to RHF, Lehman

16    was involved in an illegal price fixing scheme in which it manipulated the SAVRS' rates

17    determined at auction to its own benefit.  On RHF's information and belief, Lehman would pre-

18    select a "winning bid" during each auction cycle to ensure that the SAVRS would trade at below

19    fair market value and maximize their profits and inflate the amount RHF was "out of the money"

20    under the 1998 Swap Contract.  On RHF's information and belief, Lehman engaged in bid rigging

21    securities auctions and otherwise inflated the amount Lehman was "in the money" under the 1998

22    Swap Contract.

23    36.    On RHF's information and belief, through Lehman's aforementioned continuing

24    bad faith and corrupt conduct, RHF was always "out of the money" on the 1998 Swap Contract in

25    an unreasonably and unfairly excessive amount.  However, since RHF was unaware that the 1998

26    Swap Contract was valued by Lehman pursuant to a secret, restrictive valuation methodology, it

27    did not understand that the calculations on the 1998 Swap Contract may have been inflated in

28

[3] Subsequent references herein to "RHF" additionally include St. Catherine and DeSmet.

1   Lehman's favor or that Lehman was unfairly keeping RHF "out of the money," and RHF

2   continued to pay amounts allegedly owing per the SAVRS and the 1998 Swap Contract. It was not

3   until after RHF was forced to enter into a new swap contract in or about July 2008 that it

4   discovered that Lehman unfairly and wrongfully valued the amounts owed on the 1998 Swap

5   Contract.

6   　　　　37.　　In or about the Spring of 2005, at a time when fixed interest rates were favorable,

7   RHF notified Lehman that it intended to seek to convert the SAVRS to a favorable fixed rate. At

8   the time, the prevailing fixed rate for RHF's blend of taxable and non-taxable bonds was 4.91%, a

9   significant saving over the 5.63% blended rate RHF was paying on the SAVRS interest rate swap.

10  Termination would have also allowed RHF to avoid negative consequences from any downgrading

11  of ACA's credit rating. However, Lehman informed RHF that the cost of terminating the 1998

12  Swap was $15.8 million, which represented the amount RHF was purportedly then "out of the

13  money" on the 1998 Swap based on Lehman's unexplained calculations. Lehman proposed an

14  alternative, but the alternative was another swap agreement at an even higher cost to RHF. As a

15  result of Lehman's actions, RHF was unable to convert to the fixed rate, costing RHF losses in an

16  amount not less than $11,590,728.

17  　　**E.**　　**ACA's Downgrade to Junk Status**

18  　　　　38.　　From 2003 through 2007, in reckless pursuit of higher profits, and despite its

19  obligations to guarantee RHF's capital and interest repayments on the SAVRS and to maintain its

20  "A" rating, ACA guaranteed securities backed by high risk loans, including, among other things,

21  subprime housing mortgages, well in excess of its ability to do so. Consequently, on or about

22  December 19, 2007, Standard & Poor's downgraded ACA's credit rating from "A" to "CCC," or

23  junk status.

24  　　　　39.　　Due to the downgrade, ACA was no longer able to adequately guarantee RHF's

25  capital and interest payment obligations, resulting in a series of extremely negative consequences

26  for RHF.

27

28

**F.      RHF Loses the Protection of the 1998 Swap Agreement, and Its Payment
Obligations for the SAVRS Skyrocket as Lehman Manipulates the Auctions.**

40.      On May 31, 2006, the United States Securities and Exchange Commission
("S.E.C.") issued an Order Instituting Administrative and Cease-and-Desist Proceedings, Making
Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order Pursuant to Section 8A
of the Securities Act of 1933 and Section 15(b) of the Securities Exchange Act of 1934 (the
"S.E.C. Order").

41.      The S.E.C. Order found that Lehman and other broker-dealers committed numerous
Section 17(a)(2) Securities Act violations with respect to auction rate securities, including:

(a) Allowing "open bids" and/or "market bids" in auctions, in which the bidder
indicated that it would buy at whatever rate was set during an auction.  This
practice inflated the clearing rate.

(b) Submitting bids or asking investors to change bids so that the auctions cleared at
different rates than they otherwise would have.

(c) Submitting bids or asking investors to submit bids to prevent the "all-hold rate,"
which is a below-market rate set when all current holders want to hold their
positions so that there are no securities for sale in the auction.

(d) Submitting or revising bids after submission deadlines, which affected the
clearing rate.

(e) Engaging in "price talk" which encouraged bidders to bid only at certain rates,
thereby affecting the clearing rate.

42.      Lehman was censured and fined $1.5 million by the S.E.C. and was ordered to
cease and desist from committing Section 17(a)(2) violations.  Further, Lehman was ordered to
provide all holders of its auction rate securities and the issuers of such securities with a written
description of its material auction practices and procedures.  Moreover, Lehman was required to
certify in writing, through either its chief executive officer or general counsel, that it "implemented
procedures that are reasonably designed to prevent and detect failures by [Lehman] to conduct the
auction process in accordance with the auction procedures disclosed in the disclosure documents

1    and any supplemental disclosures and that [Lehman] is in compliance with Section IV.E. of this

2    Order." Section IV.E. of the SEC order required providing information to customers and issuers,

3    including RHF. The SEC order was summarized on the SEC website and the subject of an SEC

4    press release. The SEC Order was also reported in several trade publications and financial media

5    sources.

6    43. Although RHF was an issuer of the SAVRS and necessarily was affected by

7    Lehman's auction practices and procedures, Lehman never informed RHF of the S.E.C. Order or

8    provided RHF with the S.E.C.-ordered written description of its material auction practices and

9    procedures. Thus, Lehman directly violated the SEC order by this failure to inform RHF.

10    44. Rather, RHF is informed and believes and thereon alleges that Lehman decided to

11    ignore the SEC Order and continue to commit the "violative practices" described in the SEC Order

12    in spite of the fact that Lehman had been ordered both to cease and desist such practices and that

13    Lehman had been ordered to disclose such practices. RHF further is informed and believes and

14    thereon alleges that Lehman deemed the SEC fines as small and insignificant in comparison to the

15    huge fees Lehman was earning through its violative practices and concluded that the fine was a

16    cost of doing a lucrative business, and thus it decided to ignore the SEC Order to stop violative

17    practices or to send information to RHF disclosing those practices; rather, Lehman paid the fine

18    and continued its improper practices. Indeed, trade publications reported in 2007 that despite the

19    SEC Order, Lehman (and others) continued to "manipulate investor purchases" of auction rate

20    securities and that the auctions conducted "[bore] little resemblance to a pure Dutch auction

21    process" and "shouldn't be called auctions because of the dealer's [like Lehman] ability to set

22    rates." In fact, it was widely reported in 2008 when the auction rate securities market deteriorated

23    that broker dealers, including Lehman, had continued to manipulate auctions on auction rate

24    securities like the SAVRS.

25    45. Thereafter, around the time of ACA's downgrade to junk status on or about

26    December 19, 2007, Lehman took the position that the 1998 Agreement had entered an

27    "alternative floating rate" – an amount based on an index rate significantly below the SAVRS rates

28    – an unusual provision that was never explained by Cain in negotiating, executing or delivering the

swap transactions on RHF's behalf, particularly that RHF was unable to cure ACA's downgrade under the terms of the 1998 Swap, and which was a terrible provision for RHF in that it took over any protections or benefits provided under the swaps.  Under the regular operating terms of the 1998 Swap, RHF's monthly interest payments were fixed at 5.19% for tax-exempt bonds, while Lehman was responsible for paying the SAVRS rates.  When the "alternative floating rate" was triggered, however, RHF was still required to pay the regular fixed rates to Lehman, but Lehman was no longer required to pay the SAVRS rates; instead, it only needed to pay the "alternative floating rate," and RHF was required to make up all of the shortfall on the SAVRS.  Thus, under this "alternative floating rate," RHF was required to continue paying Lehman the same fixed rate, but any protection that RHF had received through the 1998 Swap was all but eliminated.

46.    Compounding matters, Lehman continued to control the SAVRS auctions, and, due to the switch to the "alternative floating rate" on the 1998 Swap Contract, it now had no obligation to pay the SAVRS rates, and so could profit by manipulating the SAVRS rates using methods including those prohibited by the S.E.C. in its 2006 Order.  In fact, RHF is informed and believe this is what Lehman did.

47.    Since Lehman no longer had to pay the SAVRS rates, virtually overnight, Lehman caused RHF's SAVRS rates to skyrocket.  Over the previous four years, when Lehman was obligated to pay the SAVRS rates (but also controlled them), the SAVRS rates had rarely exceeded 5% and did not approach the applicable maximum rate.  But, RHF is informed and believes, beginning in December 2007, Lehman manipulated the SAVRS rates – almost all of which RHF was now required to pay due to the triggered "alternative floating rate" – up to very high rates just barely below the maximum rates, outstripping the previous rates by extraordinary amounts, even though RHF had an unblemished history of making all its payments on the SAVRS.

48.    Through its conduit, the auction agent, and/or directly, Lehman made the following representations to RHF in its Long Beach, CA headquarters:

(a) On or about December 11, 2007, RHF was informed in writing by the auction agent, the Bank of New York Trust Company, that the clearing rate for most of that auction period's SAVRS was 15.500%, compared to the applicable

Maximum Rate of 15.611%. On or about January 3, 2008, RHF was informed in writing that funds in the amount of $605,002.30 would be required by January 7, 2008 for the January 16, 2008 debt service payments. RHF thereafter wired this amount on or about January 7, 2008.

(b) On or about January 7, 2008, Seth Konheim, a Vice President at Lehman, sent an email on behalf of Lehman to RHF stating that an additional $874,007.74 was due to Lehman with respect to that auction period. RHF thereafter wired this amount on or about January 9, 2008.

(c) On or about January 15, 2008, RHF was informed in writing by the auction agent, the Bank of New York Trust Company, that the clearing rate for most of that auction period's SAVRS was 12.000%, compared to the applicable Maximum Rate of 12.068%. On or about February 8, 2008, RHF was informed in writing that funds in the amount of $1,754,638.79 would be required by February 11, 2008 for the February 20, 2008 debt service payments. RHF thereafter wired this amount on or about February 11, 2008.

(d) On or about February 19, 2008, RHF was informed in writing by the auction agent, the Bank of New York Trust Company, that the clearing rate for most of that auction period's SAVRS was 9.300%, compared to the applicable Maximum Rate of 9.332%. On or about March 14, 2008, RHF was informed in writing that funds in the amount of $1,457,491.54 would be required by March 17, 2008 for the March 26, 2008 debt service payments. RHF thereafter wired this amount on or about March 17, 2008.

(e) On or about March 25, 2008, RHF was informed in writing by the auction agent, the Bank of New York Trust Company, that the clearing rate for most of that auction period's SAVRS was 7.950%, compared to the applicable Maximum Rate of 7.961%. On or about April 21, 2008, RHF was informed in writing that funds in the amount of $1,355,811.68 would be required by April

21, 2008 for the April 30, 2008 debt service payments. RHF thereafter wired this amount on or about April 21, 2008.

(f) On or about April 29, 2008, RHF was informed in writing by the auction agent, the Bank of New York Trust Company, that the clearing rate for most of that auction period's SAVRS was 8.480%, compared to the applicable Maximum Rate of 8.483%. On or about May 23, 2008, RHF was informed in writing that funds in the amount of $1,406,837.95 would be required by May 27, 2008 for the June 4, 2008 debt service payments. RHF thereafter wired this amount on or about May 27, 2008.

(g) On or about June 3, 2008, RHF was informed in writing by the auction agent, the Bank of New York Trust Company, that the clearing rate for most of that auction period's SAVRS was 7.350%, compared to the applicable Maximum Rate of 7.354%. On or about June 27, 2008, RHF was informed in writing that funds in the amount of $970,161.14 would be required by June 30, 2008 for the July 7, 2008 debt service payments. RHF thereafter wired this amount on or about June 30, 2008.

49.     RHF is informed and believes and on that basis alleges that these foregoing results – though presented as being obtained through the proper auction process – actually were not obtained through a fair and proper auction process. Instead, Lehman intentionally drove up the rates through manipulation, including through the techniques described in the S.E.C. Order, but concealed from RHF that it was doing so. Lehman continued to claim that the rates were obtained through the regular auction process, when actually the rates were obtained through a materially changed, unfair process by which Lehman set the auction rates just barely below the applicable maximum rates – much higher than they would have been under proper auction procedures. This wrongful and unfair conduct was evidenced by, among other things, the fact that when the alternative floating rate was triggered and Lehman was no longer required to pay the SAVRS rates under the 1998 Swap Contract, the rates for the SAVRS suddenly jumped to rates much higher than previous rates. Moreover, pre-"alternative floating rate" SAVRS rates did not approach the

applicable maximum rates, generally remaining many full percentage points below the applicable maximum rates. But upon imposition of the "alternative floating rate," the SAVRS rates were consistently set at a level just barely below – by hundredths or even thousands of percentage points – the applicable maximum rates. These results could not have occurred under a competitive, fair and unmanipulated auction process.

50.    By intentionally manipulating the auctions to achieve SAVRS rates just barely below the maximum rates, Lehman could and, RHF is informed and believes, did maximize its profits by purchasing or holding SAVRS that paid exorbitantly high rates, even though (as Lehman knew) RHF issuers had never missed a payment on the SAVRS, they continued to be financially strong, and their viability and financial strength was not jeopardized by the downgrade of ACA (even though the downgrade ended up causing RHF substantial harm). Rather than setting or approximating a market rate, the auctions resulted in RHF paying grossly inflated rates that did not reflect its financial situation or the market conditions as a whole.

51.    RHF is informed and believes that, due to the magnitude of the S.E.C. Order, including the fine, the disclosure requirements, and the written certification, that Lehman upper management was knowledgeable of the S.E.C. Order and the material contained therein, and its manipulations of the SAVRS auctions, which continued through 2008. Lehman failed to comply with and follow the S.E.C. Order with regard to RHF.

52.    By virtue of its control of the Cain designed auction process, including how much RHF supposedly owed on the SAVRS, Lehman had sole knowledge of the mechanics and purported results of the auctions. RHF, meanwhile, was in a severely compromised, dependent position and could only rely on Lehman's representations. Thus, RHF had no choice but to accede to the demands for payment, so as not to default with respect to the 1998 Swap Contract or the SAVRS.

**G.    RHF Refinances the SAVRS and Converts Them to Variable Rate Demand Bonds**

53.    In or about December 2007 and January 2008, following ACA's downgrade, and because of the suddenly immense payments under the 1998 Swap and SAVRS and their inability

1   to "cure" the problems arising from ACA's downgrade, RHF was forced to begin to seek to

2   restructure the transaction and re-fund the SAVRS and secure them with letters of credit from

3   banks rather than a bond insurer.

4        54.    As a result, in order to mitigate its losses and avoid potential financial disaster, RHF

5   had to refinance the SAVRS. Moreover, in or about June 2008, Lehman was claiming that RHF

6   was purportedly "out of the money" on the 1998 Swap so that terminating the 1998 Swap would

7   cost RHF in excess of $13 million. At the time, Lehman was viewed as a leader in the financial

8   markets and continued to promote itself as financially stable and adequately capitalized, and

9   therefore contended that its valuation was true, correct and honorable. However, Lehman's

10   valuation was in fact biased and unfair. Because of the design of the original plan of refinancing

11   by Cain and Lehman's actions, RHF was under duress and in a disadvantageous position. Lehman

12   would not agree to amend the 1998 Swap but insisted on new, more burdensome swap agreement.

13   Thus, RHF was then forced by Lehman to terminate the 1998 Swap and enter into a new, different,

14   disadvantageous 20-year term swap agreement with Lehman in connection with the soon to be

15   refinanced bonds (the "2008 Swap"). These agreements were also entered into by RHF in

16   California.

17   **III.    Lehman Materially Misrepresents its Financial Condition in its Public Disclosures**

18        55.    In or about the mid-2000s, Lehman became the market leader in the subprime

19   mortgage industry by, among other things, lending billions of dollars to other financial institutions

20   to fund subprime mortgages, originating its own subprime mortgage loans, and purchasing

21   subprime mortgages to package and sell as asset-backed securities to global investors.

22        56.    Prior to its bankruptcy, Lehman boasted about its "record" and "robust" profits

23   earned from its holdings in the subprime market. In its 2005 Form 10-K filed with the SEC on

24   February 13, 2006, Lehman explained that its holdings in the subprime market represented a

25   significant portion of its business:

26        Fixed Income net revenues were a record $7.3 billion in 2005, increasing 28%
27        compared with 2004 driven by double digit revenue increases from each
           geographic region and record revenues across a number of businesses including
           commercial mortgage and real estate, residential mortgage origination and
28        securitization, and interest rate products. Revenues from our commercial

mortgage and real estate businesses increased substantially in 2005 reaching record levels, as the strong demand for commercial real estate properties, the recovery in certain property markets and relatively low interest rates drove asset sales and robust levels of securitizations. Revenues from our residential mortgage origination and securitization businesses increased in 2005 from the robust levels in 2004, reflecting record volumes and the continued benefits associated with the vertical integration of our mortgage origination platforms . . . The mortgage securitization business was notably strong, with revenues in mortgage products benefitting from the low rate environment as well as the continued vertical integration of our low mortgage origination platforms.

57.    In its 2006 10-K Form filed with the SEC on February 13, 2007, Lehman reported that its fixed income net revenues purportedly continued to grow "to a record $8.4 billion in 2006, an increase of 15% from 2005."

58.    However, Lehman's 2006 10-K Form reported for the first time that, despite its continued growth, it had witnessed a decrease in revenues from its residential mortgage origination and securitization businesses that "was primarily attributable to a softer housing market and lower margins." But nowhere in its 2006 10-K Form did Lehman acknowledge the potential devastating impact of its substantial holdings in the subprime market on its operations as a whole. Instead, Lehman claimed that increased interest rates and a downturn in the housing market would affect only a few of its businesses, and that it maintained "sufficient liquidity to meet all of [its] funding obligations in all market environments."

59.    According to Lehman's 2007 10-K Form, which was filed with the SEC on January 29, 2008 (a mere eight months prior to bankruptcy) and which was provided to RHF pursuant to Lehman's obligations under the 2008 Swap Contract, its overall revenues continued to climb:

On the basis of a record first half and a reasonably successful navigation of difficult market conditions in the second half, we achieved our fourth consecutive year of record net revenues, net income and diluted earnings per common share in 2007. Net income totaled $4.2 billion, $4.0 billion and $3.3 billion in 2007, 2006 and 2005, respectively, increasing 5% in 2007 and 23% in 2006 from the corresponding 2006 and 2005 periods, respectively. Diluted earnings per common share were $7.26, $6.81 and $5.43 in 2007, 2006 and 2005, respectively, up 7% in 2007 and 25% in 2006 from the corresponding prior periods, respectively.

60.    Despite its reported continued growth, financial strength and stability, Lehman acknowledged that the "difficult" latter half of 2007 witnessed a "deterioration within the U.S. subprime residential mortgage asset category, the weakening of the U.S. housing sector became

worse than most observers expected," and a decrease in investor confidence in the subprime

securities market "which, in part, led to many market participants re-pricing assets and taking large

write-downs."  However, Lehman again minimized any risks its own subprime holdings posed to

the overall health of the company, and communicated a fictional and false impression of financial

strength and stability, stating that:

> During the latter half of our 2007 fiscal year, the global capital markets
> experienced a significant contraction in available liquidity as the adverse market
> environment experienced in our third quarter continued into our fourth quarter
> and deteriorated further in November 2007. Despite infusions of liquidity by
> central banks into the financial system, broad asset classes, particularly U.S.
> subprime residential mortgages and structured credit products, remained thinly
> traded throughout this period. Notwithstanding these global market conditions, we
> ended the period with a very strong liquidity position.  At November 30, 2007,
> our liquidity pool was approximately $35 billion, up from approximately $31
> billion at November 30, 2006 and down slightly from approximately $36 billion
> at the end of the third quarter of the 2007 fiscal year. Long-term capital (long-
> term borrowings, excluding borrowings with remaining contractual maturities
> within twelve months of the financial statement date, and total stockholders'
> equity) was at approximately $146 billion at the end of 2007 fiscal year, up from
> approximately $100 billion at November 30, 2006 and $142 billion at the end of
> the third quarter of the 2007 fiscal year.

61.    As early as 2007, at the same time they were reporting robust growth in Lehman's

financial statements, Lehman was acutely aware that the weakening of the United States housing

market and the subprime mortgage crisis would have a devastating impact on the company.  At a

Board of Directors meeting on March 20, 2007, attendees, including Chief Executive Officer

Richard Fuld and Chief Financial Officer Christopher O'Meara, were expressly informed that,

while the subprime mortgage business had previously been an attractive and profitable market for

Lehman, steeply declining housing prices had "led to declining profitability among all industry

participants and . . . that overcapacity had led to reduced pricing and increased risk taking,

lowering overall profitability."   They were also expressly informed that, as a result of this

downturn, "virtually all independent subprime originators have cut back on their operations or

have gone out of business" and "most of the large subprime independents have gone out of

business, have been sold or are selling."

62.    Despite this information and these warnings, Lehman increased its risk appetite and

pursued a strategy in which, among other things, it would continue to aggressively originate

subprime loans and during the crisis despite Lehman's weakening financial condition, Lehman continued originating sub-prime and other risky loans, which would purportedly better the position the company for profitable growth once the industry cycle turned. Lehman's risk appetite continued to increase through the fourth quarter 2007.

63.    Additionally, Lehman's 2007 Annual Report, which was expressly to be provided to RHF pursuant to Lehman's obligations under the 2008 Swap, contained the same statements and representations as the 2007 10-K.  The 2007 Annual Report emphasized Lehman's "financial strength" and claimed "another year of record net revenues, net income, and earnings per share" and a "record performance across each of our business segments as well as in Europe and Asia." As part of the 2007 Annual Report "Financial Highlights," Lehman emphasized its Net leverage ratio, which was stated as 16.1x and which was claimed to be more "useful" and "meaningful" than Lehman's Leverage ratio, which was reported as 30.7x.  The 2007 Annual Report went on to state:

> Our revenues have never been more evenly balanced across our businesses, and we have achieved our best-ever geographic diversification, with half of the Firm's revenue generated outside the Americas.  The result of all this is that we have built a balanced global investment bank – able to withstand the stresses of rapid shifts in world liquidity flows.

The Annual Report went on to emphasize Lehman solid balance sheet and emphasized that:

> We effectively managed our risk, balance sheet, and expenses.  Ultimately, our performance in 2007 was about our "One Firm" sense of shared responsibility and careful management of our liquidity, capital commitments, and balance sheet positions.  We benefitted from our senior level focus on risk management and, more importantly, from a culture of risk management at every level of the firm. (Emphasis added)

A true and correct copy of the very first page of the 2007 Annual Report is attached hereto as Exhibit D.  Notably, this first page snapshot of Lehman's financial condition gives the false impression of financial solvency and stability, as intended by Lehman and is based on and materially similar to the financial data in the 2007 Form 10-K, filed with the SEC.

64.    As market conditions, particularly subprime, deteriorated and the pressures on Lehman to reduce its net leverage ratio increased, Lehman significantly expanded its use of "Repo 105" transactions in 2007 and 2008, which had been previously used for years to temporarily

remove securities inventory from its balance sheet, usually for a period of seven to ten days, and create a materially misleading picture of its financial condition.

65.    Repo 105 transactions were nearly identical to standard repurchase and resale ("repo") transactions that Lehman (and other investment banks) used to secure short-term financing, with a critical difference:  Lehman accounted for Repo 105 transactions as "sales" as opposed to secured financing transactions (as would be the case in a standard repo), solely for misleading financial reporting purpose.  By recharacterizing Repo 105 transactions as a "sale," Lehman temporarily removed the inventory from its balance sheet.  Lehman used the cash from Repo 105 transactions to pay down other liabilities, thereby reducing both the total liabilities and the total assets reported on its balance sheet and lowering its net leverage ratios.

66.    Lehman's Accounting Policy Manual on Repo 105 and Repo 108 expressly stated that to be recharacterized from a secured financing transaction to a sale of inventory, the transaction must be "a true sale at law," and noted that "[w]e generally cannot obtain a true sale opinion under U.S. law."  Thus, according to the Accounting Policy Manual, Repo 105 and Repo 108 contracts "are typically executed by Lehman Brothers International (Europe) ("LBIE") because true sale opinions can be obtained under English law."

67.    Repo 105 transactions and their impact on Lehman's balance sheet was well known within the firm and frequently discussed, including by members of Lehman's highest management:

(a)    In a presentation entitled "Overview of Repo 105 (FID) / 108 (Equities) July 2006," it was stated that "Repo 105 is capped at $17B (1 x leverage) [per Chris O'Meara and Ed Grieb]." (brackets in original).

(b)    In a document entitled "Proposed Repo 105/108 Target Increase for 2007," sent by Chief Financial Officer for Fixed Income Division Joseph Gentile to Financial Controller Edward Grieb on February 10, 2007, it was stated that a benefit of Repo 105 is that it "offers a low cost way to offset the balance sheet and leverage impact of current market conditions."

(c)    In an email to Chief Financial Officer Christopher O'Meara, Co-Chief Administrative Officer Ian Lowitt, among others, dated August 17, 2007,

Kentaro Umezaki, Chief Operating Officer for Fixed Income Division, stated
"[a]lso as an FYI: John Feraca is working on Repo 105 for our IG mortgage and
real estate assets to reduce our Q3 balance sheet."

(d) In an email dated December 21, 2007, Head of Accounting Policy Marie
Stewart stated that "our use of Repo 105 is a conversation at the CFO level at
this point."

(e) In an email to Chief Financial Officer Erin Callan dated January 3, 2008, Global
Product Controller Gerry Reilly, stated that "Repo 105 liquidity was very tight
(this should only be a year end issue but I don't recall it being this material in
the past)."

(f) In an email dated January 31, 2008, Michael McGarvey, a senior vice-president
in the Fixed Income Division, stated that "[e]veryone knows 105 is an off
balance sheet mechanism."

(g) In an email to Clement Bernard, Chief Financial Officer for Fixed Income
Division, dated January 30, 2008, Michael McGarvey stated "[a]lthough it's an
approved policy [Repo 105 is] regarded by many around here as B/S window
dressing (including me). By the way we are now the only large firm on the
street that uses Repo 105."

(h) Prior to the Executive Meeting on March 28, 2008, Bart McDade, Lehman's
"Balance Sheet Czar," emailed to the Executive Committee a presentation
containing a slide titled "Firm Balance Sheet Details," which reported Lehman's
use of $49.1 billion in Repo 105/108 transactions in first quarter 2008.

(i) In April and May 2008, a document entitled "Balance Sheet and Disclosure
Scorecard" that included information relating to Lehman's volume of Repo 105
transactions was emailed on a daily basis to several Lehman personnel,
including Chief Financial Officer Erin Callan, Co-Chief Administrative Officer
Ian Lowitt, Chief Risk Officer Christopher O'Meara, Financial Controller
Martin Kelly, Chief Financial Officer for Fixed Income Division Clement

Bernard, Global Product Controller Gerry Reilly, Global Treasurer Paolo Tonucci, and Michael McGarvey, a Senior Vice-President in the Fixed Income Division.

(j) In an email dated July 2, 2008, Michael McGarvey described Lehman's use of Repo 105 transactions as balance sheet "window dressing," that was "based on legal technicalities."

68.    On RHF's information and belief, CFO O'Meara actively managed Lehman's Repo 105 activity and knew that the program caused the company's financial statements to materially misrepresent its financial condition and stated leverage.  O'Meara's involvement in Lehman's Repo 105 program included the following:

(a) As Lehman's CFO, O'Meara was directly involved in establishing firm-wide limits on Repo 105 activity no later than mid-2006 through December 1, 2007.

(b) As Lehman's CFO, an increase in the Repo 105 cap required his authorization, and O'Meara authorized such an increase from $22 billion to $25 billion in February 2007.

(c) O'Meara regularly discussed Repo 105 limits and Lehman's reliance on Repo 105 with senior management, including in mid-to-late 2007, when Lehman increased its use of Repo 105 transactions.

69.    From late 2007 to early 2008, when O'Meara served as Lehman's CFO and/or Chief Risk Officer, the volume of Repo 105 transactions expanded significantly, and rose to $38 billion at the close of Lehman's fourth quarter of 2007.

70.    While serving as CFO of Lehman from December 2007 to June 12, 2008, Callan was also expressly informed of Lehman's Repo 105 practices, and that these transactions caused Lehman's financial statements to materially misrepresent the company's financial condition. During meetings in early 2008 with Lehman's Global Financial Controller, Callan was informed that, among other things, "the large size of the Repo 105 program presented 'headline risk,'" because Lehman's Repo 105 transactions were not disclosed in its publicly filed financial statements, the company had "exposed itself to 'reputational risk' if its use of Repo 105 were to

become public," that "Repo 105 transactions lacked economic substance, and were used to reduce net balance sheet primary at quarter-end," and it was reasonably believed that "none of Lehman's peer investment banks used Repo 105-type transactions."

71.    In addition to signing and authorizing the issuance of materially misleading financial statements, on behalf of Lehman, Callan also made materially misleading statements during Lehman's earnings calls for the first and second quarter of 2008.   During the March 18, 2008 earnings call, Callan reported to analysts a drop in Lehman's net leverage ratio from the fourth quarter 2007 to the first quarter 2008, but did not disclose that the reduction in leverage was partially attributable to an approximately $11 billion increase in quarter-end Repo 105 usage between fourth quarter 2007 and first quarter 2008.   Although specifically asked about the means by which Lehman deleveraged, Callan failed to disclose the company's use of Repo 105 transactions to manage the balance sheet and improve net leverage.

72.    During the preliminary second quarter 2008 earnings call, on behalf of Lehman, Callan focused on Lehman's reduced leverage but failed to mention that Lehman had temporarily removed $50 billion in assets from its balance sheet using Repo 105 transactions.   In addition, at the end of the second quarter of 2008, Lehman proclaimed, based on its reported numbers, that it had its "lowest net leverage ratio in its history as a public company," and that it had reduced the net assets on its balance sheet by $60 billion, and that it had a strong and robust liquidity pool. Fuld stated that Lehman's capital position had "never been stronger," again without disclosure of the Repo 105 transactions, which created a materially misleading financial picture.

73.    Due to the fact that Repo 105 transactions were employed solely to create a distorted and materially misleading financial picture, Lehman regularly increased its use of Repo 105 transactions in the days prior to reporting periods to reduce its publicly reported net leverage and balance sheet.   Then, a few days after the new quarter began, Lehman would borrow the necessary funds to repay the cash borrowing plus interest, repurchase the securities, and restore the assets to its balance sheet.   The only purpose or motive for undertaking Repo 105 transactions at or near each quarter-end was to, temporarily, reach quarter-end balance sheet targets set by Lehman's

senior management in order to report lower leverage and lower net leverage ratios than Lehman actually had.

74.    As a result, the optimistic view of Lehman's financial condition reported in its Form 10-Q and Form 10-K statements was misleading, and concealed accounting manipulations and did not disclose the cash borrowing from the Repo 105 transactions, either by name or characterization – although Lehman had borrowed tens of billions of dollars in these transactions. Even though these transactions were directly responsible for the presented picture of Lehman's financial "health," Lehman's financial statements did not disclose the known obligations to repay the massive debt arising from the Repo 105 transactions.

75.    In Note 1 "Summary of Significant Accounting Policies" of Lehman's 2007 Form 10-K, first quarter 2008 Form 10-Q, and second quarter 2008 Form 10-Q, Lehman stated that it treated repos as "collateralized agreements and financings for financial reporting purpose" which Lehman described were "collateralized primarily by government and government agency securities."    In addition, Lehman further stated in each filing: "Other secured borrowings principally reflect transfers accounted for as financings rather than sales under [Statement of Financial Accounting Standards] 140."    Lehman consistently misrepresented that it treated repo transactions as financing transactions "for financial reporting purposes," without disclosing that Lehman treated some repos as sales.

76.    Lehman's Item 7 "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A") for its 2007 Form 10-K and Forms 10-Q for the first and second quarter 2008 were also misleading with respect to Lehman's liabilities.    The MD&A section to Lehman's 2007 Form 10-K discussed the net leverage ratio without disclosing the role that Repo 105 transactions played in that calculation.    Lehman's disclosure in the Liquidity, Funding, and Capital Resources section of the MD&A should have included a discussion of what was known with respect to the timing and/or amounts of the cash flow created by the repayment of the Repo 105 cash borrowing in the first seven to ten days after quarter-end, but did not.

77.    Lehman temporarily reduced the firm's net balance sheet at quarter-end through Lehman's Repo 105 practice by approximately $38.6 billion (9%) in fourth quarter 2007, $49.1

billion (12%) in first quarter 2008, and $50.38 billion (15%) in second quarter 2008.  As a result of its quarter-end Repo 105 practice from late 2007 through the second quarter 2008, Lehman publicly reported a net leverage ratio that was 1.7 to 1.9 points lower than what its net leverage ratio would have been if Lehman had used ordinary repo transactions instead of Repo 105 transactions, thereby knowingly and intentionally creating a false picture of solvency to counterparties such as RHF.

78.    Lehman never publicly disclosed Lehman's use of Repo 105 transactions, Lehman's accounting treatment for these transactions, the considerable escalation of its total Repo 105 usage in late 2007 and into 2008, or the material impact these transactions had on the firm's publicly reported net leverage ratio.

79.    In March 2008, Lehman's investment banking peer Bear Stearns collapsed under the weight of its involvement in the subprime mortgage industry.  Lehman knew that it was very likely the next major investment bank that would fail, but made no disclosures to RHF or anyone else that its financial statements and representations of solvency were not true.

80.    On March 25, 2008, Lehman's Finance and Risk Committee of the Board of Directors discussed Bear Stearns' failure and the potential impacts on Lehman's business model going forward.  Reviewing Lehman's liquidity position and leverage, the committee members discussed Lehman's Level III assets and plans to reduce the company's leverage which, on RHF's information and belief, included discussions regarding the Repo 105 program.  The findings and conclusions of the Finance and Risk Committee were presented to the Board of Directors later that day which, on RHF's information and belief, included discussions on Lehman's leverage reduction and the Repo 105 program.

81.    On RHF's information and belief, no later than March 2008 – twelve days before signing Lehman's first quarter Form 10-Q – CEO and Chairman of the Board Fuld was informed that Lehman's quarter-end Repo 105 transactions for first quarter 2008 reduced Lehman's net balance sheet by $49.1 billion.  On March 28, 2008, Executive Committee members were provided with materials that expressly discussed Lehman's Repo 105 program and its $49.1 billion quarter-

1  end Repo 105 usage for first quarter of 2008.  At a March 28, 2008 meeting of the Executive

2  Committee, a request was made to freeze Lehman's Repo 105 usage, which was not implemented.

3      82.    On RHF's information and belief, in June 2008, only weeks before he signed

4  Lehman's second quarter Form 10-Q, Fuld had actual knowledge of Lehman's quarter-end Repo

5  105 usage for that quarter, and that he had been expressly informed "of Lehman's quarter-end

6  Repo 105 usage – $38.6 billion at year-end 2007; $49.1 billion at first quarter 2008; and $50.38

7  billion at second quarter 2008."  Despite this express knowledge, Fuld signed the second quarter

8  10-Q, which failed to disclose Lehman's accounting treatment for repo 105 transactions, thus

9  intentionally and materially misrepresenting the company's financial condition.

10      83.    Lehman had an obligation to disclose the Repo 105 transactions in Lehman's

11  periodic reports, and in other public statements and to correct the false picture presented to

12  counterparties (including RHF) who had detrimentally and justifiably relied on them.  Indeed, on

13  RHF's information and belief, Lehman knowingly, and in bad faith publicly filed and presented

14  reports and statements that contained material omissions and/or misrepresentations, and/or

15  intentionally refused to disclose the truth regarding prior false and misleading statements of

16  solvency to RHF and/or any other counterparties or third parties who had detrimentally and

17  justifiably relied on them.  Lehman knew that the impact on the balance sheet by use of Repo 105

18  was not discernible to the financial public and that in particular rating agencies would not know of

19  such Repo 105 use.  Lehman intended to disguise the true facts of its balance sheet from the rating

20  agencies, particularly since Lehman knew that if the true facts were known to the rating agencies,

21  Lehman's public rating would drop immediately, a fact which would then be known by all third

22  parties in the financial community.

23      84.    In addition to the material omissions and active concealment, on RHF's information

24  and belief, Lehman affirmatively misrepresented Lehman's accounting treatment for repos by

25  falsely stating that Lehman treated repo transactions as secured financing transactions rather than

26  sales for financial reporting purposes, despite the fact that Lehman treated its tens of billions of

27  dollars of Repo 105 transactions as true sale transactions.

28

85.     The net leverage ratios Lehman reported in its public filings were misleading and in fact false.  Even a sophisticated reader of Lehman's Forms 10-K and 10-Q would not have been able to ascertain the amount of Lehman's Repo 105 usage, nor even ascertain the fact that Lehman was engaged in these transactions.  The Form 10-K and 10-Q reports were authorized and filed by Lehman with the intention and knowledge that they would be disseminated to the public, including RHF and others in California, to maintain Lehman's image in the global marketplace that it was open for business as usual despite the subprime mortgage crisis, that it remained a leader in the financial markets, and that it was financially and adequately capitalized and solvent.  RHF was not aware of the true state of affairs, but was understandably misled and justifiably relied on Lehman's false financial statements as well as the ratings based thereon.

## IV.    The 2008 Swap Contract

86.     On June 20, 2008, RHF was forced to refinance the SAVRS and converted them into Variable Rate Demand Bonds ("VRDBs") in the amount of $116,545,000.  To hedge against the risk of fluctuating interest rates, RHF agreed to the 2008 Swap with Lehman, where it would pay a higher fixed rate of interest to LBSF in exchange for LBSF paying the variable rates on the VRDBs to RHF for payment to bondholders.  Clearly, had RHF been aware of Lehman's unstable financial condition or known that it had been misrepresenting its financial stability in its public filings and disclosures for years, RHF would not have entered into the 2008 Swap contract.

87.     In fact, at the time that RHF agreed to the 2008 Swap, Lehman was insolvent, was in the midst of imminent financial crises, and/or clearly had knowledge that it could not otherwise meet its future obligations under the 2008 Swap.  Had RHF been aware of Lehman's true financial condition, not only would RHF not have entered into a new swap contract, but RHF would have terminated the 1998 Swap Agreement due to Lehman's insolvency, an Event of Default under the 1998 Swap Agreement.

88.     Pursuant to Section 5(a)(vii) of the ISDA Agreement dated as of December 9, 1998, a party's insolvency is an Event of Default.  See Exhibit C at p.5.  If an Event of Default occurs, under Section 6(a), the non-defaulting party may notice an Early Termination Date in respect of all outstanding Transactions.  Id. at p. 6.  Had RHF known that Lehman was insolvent or potentially

1    insolvent in or about June 2008, RHF would have noticed an Early Termination Date based on this

2    Event of Default.  Accordingly, RHF would have been the non-defaulting party on the 1998 Swap

3    and RHF would have sought a Market Quotation pursuant to Section 6(e)(i).[4]  Id. at p.8.

4    89.    However, rather than inform RHF of its unstable financial condition, under the

5    2008 Swap, in or about July 2008, LBSF promised to guarantee RHF's variable interest and capital

6    payment obligations on the new variable rate bonds that were subject to the agreement, reaffirmed

7    that such payments would be punctually made when they became due and payable, and reaffirmed

8    that Lehman was adequately capitalized and had accurately and fairly publicly reported its

9    financial condition and could continue to perform its obligations over the 20 year term of the

10    contract.  Pursuant to the 2008 Swap Contract, among other things, Lehman required that RHF

11    agree to pay a much higher synthetic "fixed" interest rate to avoid immediately paying the alleged

12    $13 million to compensate Lehman for the purported value of the 1998 Swap Contract at the time

13    of renegotiation.

14    90.    Based on these events, RHF filed suit against Cain, ACA, and individual Lehman

15    officers and directors alleging several causes of action, including claims against Lehman officers

16    and directors for fraud and deceit, negligent misrepresentation, and intentional interference with

17    prospective economic advantage in the Superior Court of California for the County of Los

18    Angeles.  See Retirement Housing Foundation, et. al. v. Cain Brothers & Co. LLC, ACA Financial

19    Guaranty Corporation, Richard S. Fuld, Jr., et al., Case No. BC404726.  This case was filed in

20    December 2008 and the operative Sixth Amended Complaint was filed in August 2013. A true and

21    correct copy of this complaint is attached hereto as Exhibit E.  Recently, on May 1, 2013, the state

22    court issued a 24 page decision denying Cain's Motion for Summary Judgment.  Accordingly, the

23    state court is extremely familiar with the facts of the case and RHF believes that it would aid

24    judicial efficiency for the state court to determine the issues set forth herein.

25

26

27

28    ---

[4] This identical termination procedure as laid out in the ISDA Agreement is explained in
greater detail, infra, relating to RHF's termination of the 2008 Swap. See Section IV(A).

A.    **Payments Due Upon Event of Default**

91.    The 2008 Swap consists of several interrelated documents including an ISDA Master Agreement (the "Master Agreement"), and a Schedule to the Master Agreement (the "Schedule"), which amends and supplements the terms of the Master Agreement.  The Master Agreement contemplated that the parties would enter into Transactions[5] governed by the Master Agreement, each evidenced by a confirmation, which also became part of the 2008 Swap.  A true and correct copy of the 2008 Swap, including all of its parts, is attached hereto as Exhibit F.

92.    LBSF and RHF executed 4 transaction confirmations governed by the 2008 Swap. Three of the transaction confirmations were SIFMA Municipal Swap Index transactions which, absent Events of Default or other Termination Events, terminated by their own terms on August 15, 2010. The fourth transaction confirmation was a LIBOR swap which, absent Events of Default or other Termination Events, terminated by its own terms on September 1, 2028.  However, due to an Event of Default caused by Lehman's bankruptcy, RHF sent a Notice of Termination to LBSF, which terminated all of the SIFMA swaps and the LIBOR swap on June 11, 2009.

93.    Pursuant to the 2008 Swap, LBSF paid a floating rate and RHF paid a fixed rate. LBSF required that RHF, among other things, agree to pay a much higher synthetic "fixed" interest rate to avoid immediately paying the alleged $13 million to compensate Lehman for the purported value of the old 1998 Agreement at the time of renegotiation.  Based on the 2008 Swap terms, when prevailing market interest rates rise above the fixed interest rate, LBSF's position decreases in value.  When prevailing market interest rates fall below the fixed interest rate, LBSF's position increases in value.

94.    The standard language contained in the ISDA Master Agreement in the 2008 Swap states that the swap "will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine)."  <u>See</u> Exhibit F at Schedule, Part 3(e). The parties additionally submitted to the <u>non-exclusive</u> jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York

---

[5] Capitalized terms not defined herein have the meaning given to such terms in the Master Agreement.

City.  See Exhibit F at Master Agreement, ¶11(b). However, the form Master Agreement expressly does not "preclude[] either party from bringing Proceedings in any other jurisdiction."   Id. Therefore, California courts have jurisdiction over issues arising from the 2008 Swap.

95.    Under the 2008 Swap, LBSF made a series of representations with respect to its ability to perform thereunder.  For instance, under Section 2(a) of the Master Agreement of the 2008 Swap, entitled "Obligations - General Conditions," LBSF represented that, as of July 2008, it was solvent and able to perform its obligations:

> Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement . . . (iii) Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing.

96.    Lehman reaffirmed its purported ability to perform under Section 3(a) of the Master Agreement, entitled "Representations," which provided that "each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into …)" that:

> **Powers.**  It [the party] has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorize such execution, delivery and performance . . .

> **Obligations Binding.**  Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms . . .

97.    By entering into the Transaction, each party also represented an absence of certain events, including "[n]o event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party."  See Exhibit F at Schedule, § 3(b).

98.    Under the 2008 Swap, "Events of default" and "potential events of default" included "failure by the party to make, when due, any payment under this Agreement," breach of

the agreement by "failure by the party to comply with or perform any agreement or obligation," "representation[s] . . . [that were] incorrect or misleading in any material respect when made" and when any party "becomes insolvent . . . [or] institutes . . . a proceeding seeking a judgment of insolvency or bankruptcy." See Exhibit F at Master Agreement, § 5(a).

99.    Upon the occurrence of an Event of Default, the Non-defaulting Party may designate an Early Termination Date in respect of the outstanding Transactions under the Agreement. See Exhibit F at Master Agreement, § 6(a).

100.    The parties agreed in Part 1(f) of the Schedule that any payments due and owed upon an Event of Default would be calculated in accordance with "Market Quotation" and would be measured by the "Second Method." Section 6(e)(i)(3) of the Master Agreement states:

> If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Unpaid Amounts owing to the Non-defaulting Party less (B) the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-Defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

101.    The Master Agreement defines "Market Quotation" as "an amount determined on the basis of quotations from Reference Market-makers." See Exhibit F at Master Agreement, section 12 at p. 13. The Master Agreement sets out details of how to calculate a Market Quotation. The Non-defaulting party must seek quotations from "dealers in the relevant market selected by the party determining a Market Quotation." Id. at p. 14, definition of "Reference Market-makers." Reference Market-makers are asked to provide quotations for an amount that they would pay or be paid to enter into a replacement transaction "that would have the effect of preserving for [the Non-defaulting Party] the economic equivalent of any payment or delivery" expected under the Swap terminated by the Event of Default. Id. at p. 13, definition of "Market Quotation." If three quotations cannot be provided, "it will be deemed that the Market Quotation . . . cannot be determined." Id.

102.    If the Market Quotation "cannot be determined" then the payment upon an Event of Default shall be calculated by the "Loss" method. Id. at p. 14, definition of "Settlement Amount."

103.    Section 12 of the Master Agreement defines "Loss" as the

amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them).

**B.    Lehman Files for Bankruptcy**

104.    At the time the 2008 Swap was signed in July 2008, Lehman was not solvent. Despite making an unconditional guarantee of RHF's variable interest and capital payment obligations on the new bonds in July 2008, Lehman was suffering from unprecedented losses from its own irresponsible risk taking through investments in subprime mortgage backed securities.

105.    As late as September 10, 2008, Lehman was continuing to report that it was solvent, and valued its shareholder equity at $28 billion.  In reality, Lehman was in a deep capital hole, and had, among other things, continually grossly overvalued its real estate holdings by $60 to 70 billion as well as used Repo 105 to conceal its lack of equity.

106.    On September 15, 2008, fewer than three months after entering into the 2008 Swap and only seventh months after Lehman sent its Annual Report to shareholders stating that it had "effectively managed [its] risks, balance sheet and expenses" and was "able to withstand the stresses of rapid shifts in the world liquidity flows," LBHI filed the largest Chapter 11 bankruptcy in history.  LBSF followed suit, filing Chapter 11 bankruptcy on October 3, 2008.

107.    After it filed bankruptcy, Lehman failed to make payments or in any manner meet its obligations under the 2008 Swap Contract which had been signed just three months earlier.  To avoid defaulting on the refinanced bonds, RHF made interest payments to its bond holders without any protection afforded under the 2008 Swap Contract. On October 2, 2008, RHF established an escrow for net swap settlement payments.

**C.    RHF Justifiably Relied on Lehman's False Representations, Misleading Statements and fraudulent Concealment of Lehman's Financial Condition**

108.    Lehman's bankruptcy caught RHF completely by surprise because Lehman had just affirmatively represented, both in the Master Agreement and financial statements disclosed to

RHF, as well in oral communications, that it was a strong, viable and adequately capitalized company capable of performing its obligations under the 2008 Swap, a contract that was supposed to provide 20 years of protection and stability to RHF. Despite these representations, Lehman was aware of materially adverse facts concerning its leverage, liquidity, mortgage-backed asset portfolio and the mortgage markets in general. Despite such knowledge, Lehman failed to take the necessary steps to lower Lehman's exposure or to disclose the risks to its customers and clients, including RHF. Each of the public statements alleged above, and the concealment of materially adverse facts about Lehman's financial condition were directed at California entities, from which Lehman derived a substantial portion of its business.

109.    RHF justifiably relied repeatedly and through multiple sources on Lehman's false, deceptive and misleading statements that it continued to be a strong and viable company, that it was adequately capitalized, and that it was honestly and fairly reporting to the public its financial condition. If Lehman had not made such statements and if Lehman had not concealed that it lacked liquidity and was grossly over-leveraged, grossly overexposed to toxic subprime mortgage-backed securities and overpriced real-estate investments, and was teetering on the edge of bankruptcy, RHF would not have entered into the 2008 Swap Contract, a contract that was supposed to provide years of protection and stability, but instead cost RHF enormous fees and created great, ongoing hazard, with no resulting benefit.

110.    Specifically, Laverne Joseph, President and CEO of Retirement Housing Foundation together with Frank Rossello, its then Controller and co-CFO, and Brian Magnone, its then Director of Treasury and co-CFO, relied on multiple misrepresentations, misleading statements and active concealment by Lehman throughout 2007 and 2008, including but not limited to false statements and fraudulent non-disclosures in its financial statements. These misrepresentations and fraudulent concealments relied on by Joseph, Rossello and Magnone came both directly from Lehman personnel as well as indirectly from Lehman through third party advisers retained or consulted by RHF who were tasked with reviewing Lehman's financial statements. The misrepresentations, misleading statements, and fraudulent non-disclosures relating to Lehman's financial condition were both oral and in writing and were made both directly

and indirectly to RHF and also to its retained representatives (including, attorneys Ursula Hyman and Carlos Alvarez of Latham & Watkins and investment bankers Mary Munoz and Scott Determan of Ziegler Securities, Michael Tedesco of Merrill Lynch, John Kayser of BlackRock and representatives of Cain including Scott Smith and Joanna Manthei).  In addition, RHF relied on bankers who provided a line of credit for the 2008 transaction, including but not limited to lead bank KBC (Barbara Readick, its representative) and participant banks including but not limited to Bank of the West, U.S. Bank, Comerica Bank, and Sovereign Bank.  These banks, before agreeing to a letter of credit, had to approve the 2008 Swap.  Each of these financial institutions had direct access to Lehman's financial information and the expertise to evaluate it and did review and evaluate Lehman's false financial information, and based thereon informed Magnone that Lehman, based on its financials, was strong and viable and thus approved the 2008 Swap.  The Banks' research, review and approval was another reason Joseph, Rossello and Magnone justifiably believed and relied on Lehman's false representation of its financial condition, since had it been truly reported, these banks would not have approved the 2008 Swap.

111.   In addition to direct misrepresentations to RHF, the public false, deceptive and misleading financial statements and the aforementioned public statements by Lehman executives on Lehman's behalf also constituted an indirect fraud, such that the rating agencies did not sufficiently downgrade Lehman and analysts and public commentators were also fooled and did not report Lehman had failed or was about to fail.  Joseph, Rossello and Magnone and their third party advisers also repeatedly relied on information from public rating agencies and analysts who routinely reviewed Lehman's financials and either publicly rated or otherwise commented on Lehman's financial condition.  Brian Magnone in particular regularly followed any information about Lehman's financial strength, and was thus misled by the reports issued by Lehman Brothers.  Because of those many and continued misrepresentations deceptions and concealments, RHF did not exercise rights under the 1998 Swap, but rather entered into the unfair and burdensome 2008 Swap on or about July 3, 2008.

112.   Even more specifically, on June 20, 2008, Greg Shlionsky, Senior Vice President Municipal Derivatives of Lehman, participated in a phone call with Brian Magnone to finalize the

2008 Swap.  At no time did Mr. Schlionsky ever inform Mr. Magnone that Lehman's financials were false, deceptive, and misleading, that its balance sheet had been manipulated by use of Repo 105, or that its public rating was based on false financials.  In addition, the language of the 2008 Swap had been the subject of negotiation between RHF and its representatives (Ziegler and Latham) on the one hand and Lehman and its representatives on the other hand on multiple occasions throughout April, May, and June of 2008, and at no time did Mr. Schlionsky or any other Lehman representative ever inform any representative of RHF that Lehman's financials were deceptive, misleading or false in any way or that Lehman was actually insolvent or becoming insolvent.  To the contrary, affirmations of Lehman's financial strength and stability were made by reference to Lehman's public financial statements repeatedly in those meetings and the exchange of documents of drafts and documents between the sides, which culminated in the 2008 Swap, which stated in part as follows:

**3.    Representations**

 Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into) that:

*  *  *

(b)    **Absence of Certain Events.**   No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement of any Credit Support Document.

*  *  *

(d)    **Accuracy of Specified Information**.    All applicable information that is furnished in writing on or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

Lehman's "annual report" – which contained the false, deceptive, and misleading financial information referenced above was expressly listed in the 2008 Swap Schedule as "Covered by Section 3(d)."  Thus, in writing in the final 2008 Swap and all its drafts, Lehman expressly and

directly represented to all the aforementioned representatives of RHF, all of whom reviewed these

provisions of the 2008 Swap on multiple occasions and relied on the above representations before

the 2008 Swap was signed by Laverne Joseph and Deborah Stouff both on and before July 2, 2008,

that the financial information, including the balance sheet, in Lehman's annual report was true,

accurate and complete in every material respect.

113.   In addition, Lehman's true financial condition constituted an "Event of Default or

Potential Event of Default" as well as a "Termination Event," so 3(b) also was a false

representation and fraudulent concealment which Joseph, Rossello and Magnone  read and relied

on in July of 2008 before signing the 2008 Swap.  Lehman's insolvency or potential insolvency is

an express Event of Default or Potential Event of Default, and was also a Termination Event under

both the 1998 Swap and the 2008 Swap.  Indeed, per both swaps, if Lehman's public rating falls

below BBB- by S&P and Baa3 by Moody's Investor Service, Inc., RHF had a right to terminate

the swap with Lehman as the defaulting party.  If the true nature of Lehman's financial condition

had been revealed, Lehman would have been either actually insolvent or potentially insolvent and

also fallen below the two contractual ratings requirements, which were negotiated terms in both the

1998 Swap and the 2008 Swap.  Thus, RHF also was aware of Lehman's public ratings and relied

thereon to its detriment.  Had Lehman supplied true and correct financials with no Repo 105 or

other misrepresentations, Lehman's ratings would have fallen below the levels required by both

the 1998 Swap and the 2008 Swap, and RHF never would have signed the 2008 Swap, but instead

placed Lehman in default under the 1998 Swap.

114.   Moreover, pursuant to Paragraph 4(a) and the attached Schedule of the 1998 Swap,

Lehman had a continuing duty to provide RHF "as soon as reasonably practicable" its financial

documents, including its "most recent publicly available annual report," "unaudited consolidated

financial statements," and "each regular financial or business reporting document that is distributed

or made generally available," all of which were reaffirmed as "true, accurate and complete in every

material respect."  This standard language in all ISDA contracts of the continuing obligation to

provide documents was known to Lehman, but Lehman knew that truthful financial statements

would put it in default under its obligations to counterparties, as falling under a BBB- S&P rating

1    or a Baa3 Moody's rating constituted both an Event of Default by Lehman and a Termination

2    Event, giving RHF substantial rights.

3        115.    Specific instances of reliance by RHF in signing the 2008 Swap and not exercising

4    rights under the 1998 Swap include but are not limited to the following:

5        a.    Written representations in Lehman Brothers' 2007 Annual Report (including

6    but not limited to Exhibit D), which was directly reviewed and justifiably

7    relied on by Brian Magnone in or about April and May of 2008, which

8    reported Lehman's Financial Highlights, showing upward trends in net

9    revenue, total assets and long-term capital and reported the Firm's net

10    leverage ratio, among other financial statistics referencing Lehman's

11    positive financial condition, and which was authorized and approved by

12    Lehman;

13        b.    Written representations that Lehman knew were in its contracts and which

14    were read and relied on by Joseph, Rossello, and Magnone on or about July

15    3, 2008; these statements were contained within the 2008 Swap at Sections 3

16    and 4 together with the attached Schedule at (g) (ii) (regarding Lehman's

17    credit rating) and also in Part 2 which designated Documents from Lehman

18    (specifically including its 2007 Annual Report) as true, accurate and

19    complete in every material respect;

20        c.    Direct oral misrepresentations, misleading statements and concealments

21    from Lehman personnel regarding Lehman's financial information, directly

22    to Brian Magnone including but not limited to the following:

23        (1)    Greg Shlionsky's June 20, 2008 oral statements and representations

24    to Brian Magnone on their telephonic conference setting the 2008

25    Swap terms and the 1998 Swap valuations, that Lehman was not in

26    default and had rights entitling it to $13 million under the 1998

27    Swap, but failing to disclose that Lehman in fact was in default and

28    insolvent and that its credit rating was based on false financials;

(2)      Statements to Brian Magnone by Lehman representatives on April 16, 2008 on a telephonic conference call negotiating 2008 Swap terms and ACA issues and failing to acknowledge Lehman was in default, but requiring a gross revenue pledge from RHF which would not have been required if Lehman's financials as reflected in its 2007 Annual report and its 2007 10K and 2008 10Qs had been true and accurate;

(3)      Senior Vice President of Municipal Derivatives of Lehman Corey Long's December 14, 2007 telephonic communication to Brian Magnone regarding Lehman's position regarding the refinancing of the 1998 Swap, which rejected a proposed restructure from Magnone and failed to acknowledge that due to the true financial condition of Lehman, Lehman was in default and could not take such a position;

(4)      Corey Long's November 13 and 15, 2007 telephonic communications to Brian Magnone that the 1998 swap was not in default and that Lehman continued to be in control, so RHF had no rights to terminate without a substantial multi-million dollar payment to Lehman and otherwise had to keep the 1998 swap in place, without disclosing the true facts, that Lehman was falsifying its financials through the use of Repo 105, amongst other things, and was in fact in default and subject to at termination event;

(5)      Huberto Gutierrez of Lehman High Yield Trading's telephonic communication on July 26, 2007 to Brian Magnone, that Lehman continued to be sound and solvent.

d.      Written and oral representations by Lehman representatives McDermott Will & Emory and Lehman employees during negotiations of the 2008 Swap documentation that continuously transmitted the drafts containing false representations about the truth and completeness of Lehman's

financials, that Lehman's public rating was true and correct and based on accurate and complete information, and that Lehman was not in default under the 1998 Swap, including but not limited to: written transmissions of drafts of the 2008 Swap repeating these representations and those referenced above on June 13, 2008, June 18, 2008, June 19, 2008 (twice), June 20, 2008 (twice), June 25, 2008, June 27, 2008 and June 30, 2008 from Douglas Youngman to representatives of the RHF Group, including Carlos Alvarez and Ursula Hyman of Latham & Watkins and Scott Determan and Tom Costello of Ziegler;

e.    Kathleen Kalaher's email on June 25, 2008 to Hyman and Costello, reviewed by Magnone, affirming that Lehman would execute the ISDA agreement constituting the 2008 Swap, which contained the false and misleading representations about Lehman's finances;

f.    Oral representations in June or July of 2008 by "top Lehman management" to "top management at BlackRock" that Lehman was financially sound, which were reported to Magnone in July 2008 by RHF's advisers John Kayser and Michael Tedesco and before July by Tedesco;

g.    Representations by Lehman described above that were reviewed and repeated on September 25, 2007 and continuing on October 1, 2007 by Scott Smith of Cain to Brian Magnone that Lehman was sound and maintained its A rating, so that as a result no collateral needed to be posted by Lehman; this advice was based on Cain's investigation and review regarding Lehman's financial condition and representations that was specifically instigated by inquiries about the 1998 Swap by Magnone who relied on Cain to directly review Lehman's financial information at that time; on information and belief, Cain, then RHF's swap adviser, regularly reviewed and was aware of public information disseminated by Lehman about its financial condition through Annual Reports, 10Ks and/or 10Qs, and Cain

1    never reported that Lehman was insolvent or had false financials or that

2    RHF had termination rights while acting as RHF's monitoring agent,

3    structuring agent, and swap adviser and advising RHF on its rights under the

4    1998 Swap;

5    h.    Multiple oral and written recommendations, statements and representations

6    during the twelve months prior to signing the 2008 Swap and particularly in

7    June and July of 2008 to Brian Magnone and Frank Rossello by Mary

8    Munoz, Scott Determan, John Kautz, Aaron Schroeder, and John Costello as

9    well as others at Ziegler, RHF's swap adviser and representative for the

10    2008 Swap, who negotiated the 2008 Swap and advised RHF to enter into it

11    based, among other things, on their expertise and knowledge of Lehman's

12    public financial information (from Annual Reports, 10Ks and/or 10 Qs) and

13    public statements on conference calls by Lehman senior management;

14    Ziegler, a sophisticated investment banking firm, who specializes in

15    identifying, analyzing, defining, measuring, and then mitigating financial

16    risk, reviewed and/or was aware of Lehman's credit rating and public

17    statements about its financial condition and would never have advised RHF

18    to enter into the 2008 Swap with Lehman or negotiated its terms as it did

19    had Ziegler not been convinced by the public information disseminated

20    through Lehman's 2007 Annual Report, 2007 10K, and 2007 and/or 2008

21    10Qs that Lehman was financially strong, solvent, and an appropriate swap

22    counterparty for a 20 year commitment involving $100 million;

23    i.    Indirectly from Lehman, oral and written representations to Brian Magnone

24    in May, June and July of 2008 by RHF's banks, including Bank of the

25    West's Astrid Kramarz, Bank of America's Charmaine Atherton and

26    Barbara Readick of KBC Bank, based on their respective bank's review of

27    statements made by Lehman's senior management about Lehman's public

28    financials, so that Kramarz, Atherton and Readick informed RHF that the

1    banks   approved   RHF   signing   the   2008   Swap   based   on   Lehman's

2    representations that it was a solvent and reliable swap counterparty;

3          j.    Indirect oral and written representations by Lehman described above about

4    Lehman's financial condition to the Standard & Poor's and Moody's rating

5    agencies,   which   were   then   repeated   to   all   the   RHF   representatives

6    referenced above by the rating agencies in their public ratings of Lehman,

7    which were directly then included in the drafting of the ratings requirements

8    in the 2008 Swap.

9    **D.    RHF Terminates the Swap**

10    116.    Because RHF entered into the 2008 Swap effectively as insurance against real long-

11    term risk, it was particularly important to RHF to have a financially stable counterparty and credit

12    support provider for the life of the 2008 Swap. Accordingly, on November 7, 2008, RHF sent a

13    Notice of Default to LBSF.  A true and correct copy of RHF's Notice of Default is attached hereto

14    as Exhibit G.

15    117.    As a not-for-profit foundation devoted to providing affordable housing, RHF had

16    little experience in the swap market and with bankrupt hedging counterparties.  Despite its lack of

17    expertise, after Lehman's default, RHF began to evaluate its alternatives and obligations in order

18    to protect its rights in light of Lehman's surprising bankruptcy and the resulting economic tumult.

19    Specifically, RHF retained Ziegler Capital Markets, an expert in swaps, to follow the precise terms

20    of the 2008 Swap and obtain Market Quotations from leading dealers in the relevant market on

21    February 25, 2009, March 11, 2009 and June 5, 2009 to determine the amount payable from one

22    party to the other upon early termination stemming from an Event of Default.  In each instance,

23    RHF was informed that all of the dealers either declined to bid or provided no response.

24    118.    In order to be in a position to utilize sections 6(d)-(e) of the Master Agreement,

25    RHF was required, pursuant to the covenants with its lenders entered into simultaneously with the

26    2008 Swap, to obtain the consent of its consortium of bank lenders ("Banks") with respect to the

27    Early Termination, and used commercially reasonable efforts to obtain such consent.  Lehman's

28    default under the 2008 Swap triggered an event of default under RHF's agreements with its Banks.

As a result, RHF was required to request waivers from the Banks, who had to go through their own due diligence process (which took several months). The Banks' authorization was ultimately provided in May 2009.

119. Thereafter, RHF promptly provided Notice of Early Termination to LBSF by letter dated June 11, 2009. A true and correct copy of the Notice of Early Termination is attached hereto as Exhibit H.

120. Also on June 11, 2009, pursuant to section 6(e) of the Master Agreement, RHF, through swap expert Ziegler, requested a Market Quotation to determine the amounts payable from one party to the other upon termination following an Event of Default. RHF followed the procedure outlined in section 12 of the Master Agreement, which required that RHF obtain quotations from Reference Market-makers, *i.e.*, four leading dealers in the relevant market. See Exhibit F, Section 12 of the Master Agreement, definition of "Market Quotation" and "Reference Market-makers." Despite having requested two Market Quotations at this time to avoid any challenge by Lehman regarding its timing, RHF was informed that all Reference Market-makers either declined to bid or provided no response.

### E.  Termination Payment Calculation

121. Because RHF was unable to determine a Market Quotation for the 2008 Swap, RHF, in accordance with the Master Agreement, proceeded to calculate a termination payment pursuant to the Loss method for the 2008 Swap. To do so, RHF engaged an independent forensic expert to compute its value in a commercially reasonable manner.

122. By letter dated July 29, 2009, RHF provided LBSF with the Early Termination Calculation Statement ("Calculation Statement") prepared by valuation expert W. Scott Mowrey of Cohen, Miskei & Mowrey pursuant to Section 6(d) of the Swap. RHF also identified a balance due to RHF from LBSF in the sum of $4,952,968 as a result of Lehman's filing for bankruptcy, which constituted an "Event of Default." Pursuant to Section 6(f) of the Master Agreement, which provides a right to set-off upon the occurrence of an Event of Default, the Calculation Statement additionally identified a balance due to RHF from LBSF in the sum of $11,590,728. Accordingly,

the total balance owed to RHF from LBSF under the calculation statement is $16,824,580.[6]  A true

and correct copy of the Calculation Statement is attached hereto as Exhibit I.

**F.    The Bankruptcy Code Allows for Termination**

123.    RHF sought only to maintain a financially stable and effective counterparty for the

life of the Swap, as evidenced by its desire to maintain the original terms of the 2008 Swap with a

replacement counterparty.   Solely because Lehman's bankruptcy deprived RHF of an effective

counterparty, and consistent with its rights under 11 U.S.C. § 560, RHF terminated the 2008 Swap.

124.    Such postpetition terminations are explicitly permitted under the Bankruptcy Code.

Specifically, section 560 of the Bankruptcy Code preserves the rights of a non-defaulting

counterparty to a swap agreement to terminate the contract based upon a condition specified in

section 365(e)(1) of the Bankruptcy Code.[7]   The conditions listed in section 365(e)(1) of the

Bankruptcy Code include, among other things, the filing of a bankruptcy petition.

125.    In a form letter dated June 22, 2009, Lehman admitted that section 560 of the

Bankruptcy Code does allow a party under certain circumstances to terminate a swap agreement

but purportedly disputed RHF's termination notice, alleging that RHF did not rely on Lehman's

insolvency, financial condition or bankruptcy to terminate the 2008 Swap.

---

[6] The funds held in escrow as of October 2, 2008 (see ¶ 107) were distributed back to RHF for termination and were included in the Calculation Statement.

[7] The Agreement is a "swap agreement" within the meaning of the Bankruptcy Code. Under section 101(53B) of the Bankruptcy Code a "swap agreement" means:

(A) an agreement (including terms and conditions incorporated by reference therein) which is a rate swap agreement, basis swap, forward rate agreement, commodity swap, interest rate option, forward foreign exchange agreement, spot foreign exchange agreement, rate cap agreement, rate floor agreement, rate collar agreement, currency swap agreement, cross-currency rate swap agreement, currency option, any other similar agreement (including an option to enter into any of the foregoing);
(B) any combination of the foregoing; or
(C) a master agreement for any of the foregoing together with all supplements.

1          **G.      Post-Termination Events**

2          126.   In September 2009, RHF filed proofs of claim against LBSF and LBHI in the

3    Lehman Bankruptcy Proceeding, In re: Lehman Brothers Holdings Inc., United States Bankruptcy

4    Court for the Southern District of New York, Case No. 08-13555.

5          127.   Several months later, in an email dated January 27, 2010, Lehman requested

6    additional information regarding RHF's Calculation Statement.   RHF provided the requested

7    information in a letter dated March 10, 2010.  At the same time, RHF specifically requested that

8    Lehman provide the information to support any dispute as to the termination amount calculated by

9    RHF.  Lehman did not provide any of the requested information supporting a dispute as to the

10   termination amount calculated by RHF.

11         128.   On October 25, 2011, as part of Lehman's Plan of Reorganization pursuant to its

12   Chapter 11 proceedings, Lehman filed a plan supplement listing the 2008 Swap with RHF on a

13   schedule of executory contracts that Lehman intended to assume pursuant to the plan in effect,

14   asserting thereby for the first time that the swap had not been terminated.  Soon thereafter, on or

15   about November 18, 2011, LBSF and RHF entered into a Stipulation which stated RHF's objection

16   to LBSF's assumption of the 2008 Swap and confirmed the parties' agreement to defer issues

17   concerning whether RHF's termination of the 2008 Swap was valid and enforceable. A true and

18   correct copy of the Stipulation is attached hereto as Exhibit J.

19         129.   RHF is informed and believes that LBSF contends that RHF owes LBSF a multi-

20   million dollar amount.

21                            **FIRST CAUSE OF ACTION**

22         **(Fraud and Deceit Re 2005 Misrepresentations by RHF Against Lehman and Does 1-20)**

23         130.   RHF hereby repeats and re-alleges Paragraphs 1 through 129 of this Complaint as

24   though set forth in full at this point.

25         131.   In or about March 2005, at a time when fixed interest rates were favorable, RHF

26   notified Lehman that it intended to seek to convert the SAVRS to a favorable fixed rate.  At the

27   time, the prevailing fixed rate for RHF's blend of taxable and non-taxable bonds was 4.91%, a

28   significant saving over the 5.63% blended rate RHF was paying on the SAVRS interest rate swap.

1    Termination would have also allowed RHF to avoid any negative consequences from the

2    downgrading of ACA credit rating.  However, Lehman informed RHF that the cost of terminating

3    the 1998 Swap was $15.8 million, which represented the amount RHF was purportedly then "out

4    of the money" on the 1998 Swap based on Lehman's unexplained calculations.  On RHF's

5    information and belief, at the time these representations were made, they were in fact false.

6        132.    On RHF's information and belief, Lehman made the above-described

7    misrepresentations regarding the cost of terminating the 1998 Swap knowing they were false and

8    with the intent to deceive RHF and to induce RHF to rely on them so that RHF would not

9    terminate the 1998 Swap.

10        133.    RHF, at the time the above-described representations were made, was ignorant of

11    the falsity of the representations and justifiably and reasonably believed them to be true and relied

12    thereon to its detriment.

13        134.    RHF in fact placed confidence and reliance in Lehman until after July 2008, when

14    RHF first discovered that Lehman unfairly and wrongly valued the amounts owed on the 1998

15    Swap.

16        135.    As a proximate result of this fraud and deceit, RHF has suffered general and special

17    damages in that RHF was unable to convert to the fixed rate, costing RHF losses in an amount not

18    less than $11,590,728.

19        136.    On RHF's information and belief, in making, directing, approving, and/or ratifying

20    the above-described fraudulent representations and conduct, Lehman acted with fraud, oppression

21    and malice, in that its conduct was despicable and was carried on with a willful and conscious

22    disregard for the rights of RHF; and in that its conduct subjected RHF to cruel and unjust hardship

23    in conscious disregard of its rights or otherwise causing injury to RHF.  Thus, RHF is therefore

24    entitled to the assessment of punitive damages against Lehman in an amount to be proven at trial.

25

26

27

28

COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### SECOND CAUSE OF ACTION

**(Breach of Implied Covenant of Good Faith and Fair Dealing**

**by RHF Against Lehman and Does 1-20)**

137.    RHF hereby repeats and re-alleges Paragraphs 1 through 129 of this Complaint as though set forth in full at this point.

138.    There is an implied covenant of good faith and fair dealing in contract, including the 1998 Swap.  This covenant embraces a pledge that neither party will do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

139.    On RHF's information and belief, Lehman breached the implied covenant of good faith and fair dealing by, without limitation, misstating the cost of terminating the 1998 Swap, frustrating RHF's ability to exercise its early termination right.

140.    RHF in fact placed confidence and reliance in Lehman until after July 2008, when RHF first discovered that Lehman unfairly and wrongly valued the amounts owed on the 1998 Swap.

141.    As a proximate result of this breach of the implied covenant of good faith and fair dealing, RHF has suffered general and special damages in that RHF was unable to convert to the fixed rate, costing RHF losses in an amount not less than $11,590,728.

### THIRD CAUSE OF ACTION

**(Fraud and Deceit Re SAVRS Auctions by RHF Against Lehman and Does 1-20)**

142.    RHF hereby repeats and re-alleges Paragraphs 1 through 129 of this Complaint as though set forth in full at this point.

143.    From approximately December 2007 through June 2008, Lehman intentionally made the above-described representations regarding the purported results of the SAVRS auctions, including how much RHF purportedly owed.  However, on RHF's information and belief, at the time these representations were made, they were in fact false, as the purported auction results were

1   not the results obtained through the proper auction process at all, but instead were based on

2   inflated rates created by Lehman's undisclosed and unfair manipulation of the SAVRS auctions.

3         144.   On RHF's information and belief, Lehman made the above-described

4   misrepresentations regarding the purported SAVRS auctions knowing they were false and with the

5   intent to deceive RHF and to induce RHF to rely on them so that RHF would pay to Lehman

6   amounts pertaining to the SAVRS auctions that far exceeded the amounts that would have been

7   owed if the auctions were conducted in a fair, proper, and reasonable manner.

8         145.   RHF, at the time the above-described representations were made, was ignorant of

9   the falsity of the representations and justifiably and reasonably believed them to be true and relied

10   thereon to its detriment.

11         146.   As a proximate result of this fraud and deceit, RHF has suffered and will continue

12   to suffer general and special damages in the form of, among other things, unfairly inflated

13   payments on the SAVRS during the period of approximately December 2007 to June 2008, the

14   exact amount of which will be proven at trial.

15         147.   On RHF's information and belief, Lehman had knowledge of and/or directed and/or

16   approved and/or ratified of Lehman's intentional manipulation of the auctions of RHF's SAVRS,

17   the intentional transmittals to RHF of so-called auction results that in fact were based on unfair and

18   undisclosed manipulation, and the resulting demands for payment. Further, on information and

19   belief, Lehman was aware of the intentional auction manipulations and attendant

20   misrepresentations and payment demands by Lehman, and ratified the continuance of this

21   wrongful course of conduct. Moreover, Lehman accepted and retained the benefits of this conduct,

22   as RHF inflated payments increased profits for Lehman and allowed it to stave off bankruptcy

23   longer than otherwise possible.

24         148.   On RHF's information and belief, in making, directing, approving, and/or ratifying

25   the above-described fraudulent representations and conduct, Lehman acted with fraud, oppression

26   and malice, in that its conduct was despicable and was carried on with a willful and conscious

27   disregard for the rights of RHF; and in that its conduct subjected RHF to cruel and unjust hardship

28

1   in conscious disregard of its rights or otherwise causing injury to RHF.  Thus, RHF is therefore

2   entitled to the assessment of punitive damages against Lehman in an amount to be proven at trial.

3   **FOURTH CAUSE OF ACTION**

4   **(Negligent Misrepresentation Re SAVRS Auctions by RHF Against Lehman and**

5   **Does 1-20)**

6   149.   RHF hereby repeats and re-alleges Paragraphs 1 through 129 of this Complaint as

7   though set forth in full at this point.

8   150.   From approximately December 2007 through June 2008, Lehman made the above-

9   described representations regarding the purported results of the SAVRS auctions, including how

10  much RHF purportedly owed.   However, on RHF's information and belief, at the time these

11  representations were made, they were in fact false and Lehman had no reason to believe they were

12  true, as the purported auction results were not the results obtained through the proper auction

13  process at all, but instead were based on inflated rates created by Lehman's undisclosed and unfair

14  manipulation of the SAVRS auctions.

15  151.   On   RHF's   information   and   belief,   Lehman   made   the   above-described

16  misrepresentations regarding the purported SAVRS auctions with the intent to induce RHF to rely

17  on them so that RHF would pay to Lehman amounts pertaining to the SAVRS auctions that far

18  exceeded the amounts that would have been owed if the auctions were conducted in a fair, proper,

19  and reasonable manner.

20  152.   RHF, at the time the above-described representations were made, was ignorant of

21  the falsity of the representations and justifiably and reasonably believed them to be true and relied

22  thereon to its detriment.

23  153.   As a proximate result of these negligent misrepresentations, RHF has suffered and

24  will continue to suffer general and special damages in the form of, among other things, unfairly

25  inflated payments on the SAVRS during the period of approximately December 2007 to June

26  2008, the exact amount of which will be proven at trial.

27  154.   Lehman owed a duty of care to refrain from acting in a manner that created an

28  unreasonable risk of injury to third parties, including Lehman's counterparties such as RHF.  On

RHF's information and belief, Lehman directed the manipulation of the auctions of RHF's SAVRS, the transmittals to RHF of so-called auction results that in fact were based on unfair and undisclosed manipulation, and the resulting demands for payment. Moreover, Lehman accepted and retained the benefits of this conduct, as RHF's inflated payments increased profits for Lehman and allowed it to stave off bankruptcy longer than otherwise possible.

## FIFTH CAUSE OF ACTION

**(Intentional Interference with Prospective Economic Advantage by RHF**

**Against Lehman and Does 1-20)**

155.    RHF hereby repeats and re-alleges Paragraphs 1 through 129 of this Complaint as though set forth in full at this point.

156.    RHF had an economic relationship and prospective economic relationship with holders and potential holders of SAVRS that had a probability of future economic benefit to RHF. RHF expected to obtain financing through the SAVRS at rates which reasonably reflected market rates and were the result of fairly and properly conducted SAVRS auctions, through which the returns that holders and potential holders received on the SAVRS would be determined.

157.    Lehman was aware of this relationship.

158.    On RHF's information and belief, from approximately December 2007 through June 2008, Lehman intentionally manipulated RHF's SAVRS auctions and made the above-described representations regarding the purported results of the SAVRS auctions, including how much RHF purportedly owed, with the design of disrupting RHF's relationship with holders and potential holders of SAVRS by grossly inflating the rates that RHF purportedly owed on the SAVRS.

159.    Lehman's conduct and misrepresentations actually disrupted RHF's relationship with holders and potential holders of SAVRS by grossly inflating the rates that RHF purportedly owed on the SAVRS.

160.    As a proximate result of Lehman's intentional interference, RHF has suffered and will continue to suffer general and special damages in the form of, among other things, unfairly

1  inflated payments on the SAVRS during the period of approximately December 2007 to June

2  2008, the exact amount of which will be proven at trial.

3      161.   On RHF's information and belief, Lehman intentionally manipulated the auctions of

4  RHF's SAVRS, the intentional transmittals to RHF of so-called auction results that in fact were

5  based on unfair and undisclosed manipulation, and the resulting demands for payment.  Moreover,

6  Lehman accepted and retained the benefits of this conduct, as RHF's inflated payments increased

7  profits for Lehman and allowed it to stave off bankruptcy longer than otherwise possible.

8      162.   On RHF's information and belief, in making, directing, approving, and/or ratifying

9  the above-described intentional interference, Lehman acted with fraud, oppression and malice, in

10 that its conduct was despicable and was carried on with a willful and conscious disregard for the

11 rights of RHF; and in that their conduct subjected RHF to cruel and unjust hardship in conscious

12 disregard of its rights or otherwise causing injury to RHF.  On RHF's information and belief,

13 Lehman authorized and ratified these acts of fraud, oppression and malice. Thus, RHF is therefore

14 entitled to the assessment of punitive damages against Lehman in an amount to be proven at trial.

15                          **SIXTH CAUSE OF ACTION**

16           **(Breach of Fiduciary Duty by RHF Against Lehman and Does 1-20)**

17     163.   RHF hereby repeats and re-alleges Paragraphs 1 through 129 of this Complaint as

18 though set forth in full at this point.

19     164.   As set forth above, Lehman was the broker-dealer and market agent with respect to

20 RHF's SAVRS and had total control over the auction process.

21     165.   As the broker-dealer and market agent for RHF's SAVRS, and by virtue of RHF

22 having placed its trust and confidence in the fidelity and integrity of Lehman and having relied on

23 Lehman's superior expertise and knowledge, Lehman owed fiduciary duties of loyalty and care to

24 RHF.

25     166.   On RHF's information and belief, from approximately December 2007 through

26 June 2008, Lehman intentionally manipulated RHF's SAVRS auctions and made the above-

27 described representations regarding the purported results of the SAVRS auctions, including how

28 much RHF purportedly owed.

167.    RHF, at the time the above-described representations were made, was ignorant of the falsity of the representations and justifiably and reasonably believed them to be true and relied thereon to its detriment.

168.    Despite having voluntarily accepted the trust and confidence of RHF, Lehman abused this relationship of trust and confidence of RHF by the above-described wrongful conduct, breaching its fiduciary duty.

169.    RHF in fact placed confidence and reliance in Lehman until after July 2008, when RHF first discovered that Lehman unfairly and wrongly valued the amounts owed on the 1998 Swap.

170.    As a direct and proximate result of Lehman's breach of fiduciary duty, RHF has suffered and will continue to suffer general and special damages, the exact amount of which will be proven at trial.

171.    Lehman acted with fraud, oppression and malice, in that its conduct was despicable and was carried on with a willful and conscious disregard for the rights of RHF; and in that its conduct subjected RHF to cruel and unjust hardship in conscious disregard of its rights or otherwise causing injury to RHF.    On RHF's information and belief, Lehman authorized and ratified these acts of fraud, oppression and malice.    Thus, RHF is therefore entitled to the assessment of punitive damages against Lehman in an amount to be proven at trial.

### SEVENTH CAUSE OF ACTION

### (Negligence by RHF Against Lehman and Does 1-20)

172.    RHF hereby repeats and re-alleges Paragraphs 1 through 129 of this Complaint as though set forth in full at this point.

173.    Lehman, as the broker-dealer and market agent for RHF's SAVRS, had a duty to exercise reasonable care in conducting the auction process fairly and properly, without manipulation.

174.    On RHF's information and belief, Lehman negligently failed to exercise reasonable care in conducting the auction process, by, among other things, using unfair SAVRS auction practices and bid rigging securities auctions.

175.    As a proximate result of Lehman's negligence, RHF has suffered and will continue to suffer general and special damages in the form of, among other things, unfairly inflated payments on the SAVRS during the period of approximately December 2007 to June 2008, the exact amount of which will be proven at trial.

### EIGHTH CAUSE OF ACTION

**(Fraud and Deceit at Termination of the 1998 Swap by RHF**

**Against Lehman and Does 1-20)**

176.    RHF hereby repeats and re-alleges Paragraphs 1 through 129 of this Complaint as though set forth in full at this point.

177.    On RHF's information and belief, in or about June 2008, Lehman misrepresented that RHF was supposedly "out of the money" on the 1998 Swap Contract so that terminating the 1998 Swap would cost RHF in excess of $13 million.  Because of the design of the original plan of refinancing by Cain and Lehman, RHF was under duress and in a disadvantageous position.  Moreover, Lehman would not agree to amend the 1998 Swap.

178.    On RHF's information and belief, Lehman was aware of its unfair and fraudulent calculations of purported swap contract obligations, and of materially adverse facts concerning its financial condition, mortgage-backed asset portfolio and the mortgage markets in general that threatened its continued existence.  Despite such knowledge, Lehman failed to take the necessary steps to lower Lehman's exposure or disclose the risks and consequences of its conduct to RHF.  The misrepresentations about Lehman's swap practices and financial strength and concealment of materially adverse facts about Lehman's swap practices and financial condition were done with the knowledge and approval of Lehman.

179.    On RHF's information and belief, these misrepresentations and concealment were made with the intent to deceive RHF and to induce RHF to terminate the 1998 Swap.

180.    In June 2008, in reliance on Lehman's representations regarding the swap valuations and its financial strength, stability and viability, RHF terminated the 1998 Swap agreement.

181.   RHF, at the time the above-described representations were made, was ignorant of the falsity of the representations and justifiably and reasonably believed them to be true and relied thereon to its detriment.

182.   Had Lehman not concealed its own insolvency, RHF would have been entitled to terminate the 1998 Swap Agreement based on Lehman's Event of Default, which would have allowed RHF, as the non-defaulting party, to follow the Early Termination procedures outlined in the ISDA Agreement.   In effect, RHF's position would have been reversed – RHF would have been the non-defaulting party instead of the defaulting party under the 1998 Swap and RHF would not have allegedly owed $13 million to Lehman.   Rather, RHF would have determined the loss of bargain to it, which was in excess of $1,000,000.

183.   On RHF's information and belief, Lehman accepted and retained the benefits of this deceitful conduct, since, by claiming that RHF was the defaulting party on the 1998 Swap and not Lehman, Lehman controlled the conditions under which RHF was forced to terminate the 1998 Swap.

184.   As a proximate result of Lehman's fraud and deceit, RHF has suffered and will continue to suffer general and special damages in the form of, among other things, payments under the 1998 Swap that would have been obtained by RHF, pursuant to the 1998 Swap's Early Termination procedures, had RHF known that Lehman was insolvent, and thereby the defaulting party.

185.   On RHF's information and belief, in making the above-described representations, Lehman acted with fraud, oppression and malice, in that its conduct was despicable and was carried on with a willful and conscious disregard for the rights of RHF; and in that its conduct subjected RHF to cruel and unjust hardship in conscious disregard of their its rights or otherwise causing injury to RHF.   On RHF's information and belief, Lehman knew of, authorized and ratified these acts of fraud, oppression and malice. Thus, RHF is therefore entitled to the assessment of punitive damages against Lehman in an amount to be proven at trial.

1

### NINTH CAUSE OF ACTION

2

### (Breach of Contract – 1998 Swap by RHF Against Lehman and Does 1-20)

3      186.    RHF hereby repeats and re-alleges Paragraphs 1 through 129 of this Complaint as

4  though set forth in full at this point.

5      187.    A valid and enforceable contract – the 1998 Swap – existed between Lehman and

6  RHF.  Among other things, pursuant to Section 3(d) of the 1998 Swap, each party represented that

7  "all applicable information that is furnished in writing by or on behalf of it to the other party and is

8  identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information,

9  true, accurate and complete in every material respect."

10     188.    The Schedule, in turn, required Lehman to provide, among other documents:  (i) "a

11  copy of the most recent publicly available annual report (and each annual report thereafter) of (a)

12  Party A and its Credit Support Provider (if any), with respect to Party A . . . in each case

13  containing in all cases audited consolidated financial statements for each fiscal year during which

14  this Agreement is in effect . . . ." and (ii) "a copy of each regular financial or business reporting

15  document that is distributed or made generally available by each party . . . in accordance with the

16  disclosure requirements of any applicable statue [sic], rule, regulation or judicial decree and made

17  available for public inspection."

18     189.    RHF performed all conditions and covenants as required under the 1998 Swap,

19  except those excused by the breach and/or nonperformance of Lehman.

20     190.    As set forth above, Lehman's annual reports and financial statements were not

21  "true, accurate and complete in every material respect."  Accordingly, Lehman breached Section

22  3(d) of the 1998 Swap.

23     191.    As a proximate result of Lehman's breach, RHF has suffered and will continue to

24  suffer general and special damages in the form of, among other things, payments under the 1998

25  Swap that would have been obtained by RHF, pursuant to the 1998 Swap's Early Termination

26  procedures, had RHF known that Lehman's financial statements were materially inaccurate,

27  thereby creating an Event of Default allowing RHF to terminate the 1998 Swap.

28

COMPLAINT

### TENTH CAUSE OF ACTION

### (Fraud in the Inducement Re: 2008 Swap By RHF

### Against Lehman and Does 1-20)

192.     RHF hereby repeats and re-alleges Paragraphs 1 through 129 of this Complaint as though set forth in full at this point.

193.     On RHF's information and belief, at the time RHF entered into the 2008 Swap Contract, Lehman misrepresented the amount that RHF was supposedly "out of the money" on the 1998 Swap Contract.  Furthermore, prior to and at the time RHF entered into the 2008 Swap Contract, Lehman made and assumed the above-described representations regarding, among other things, Lehman's financial strength, stability and viability.   However, at the time these representations were made, they were in fact false, and were known to be false by Lehman.

194.     On RHF's information and belief, Lehman was aware of its unfair and fraudulent calculations of purported swap contract obligations, and of materially adverse facts concerning its financial condition, mortgage-backed asset portfolio and the mortgage markets in general that threatened its continued existence.  Despite such knowledge, Lehman failed to take the necessary steps to lower Lehman's exposure or disclose the risks and consequences of its conduct to RHF. The misrepresentations about Lehman's swap practices and financial strength and concealment of materially adverse facts about Lehman's swap practices and financial condition were done with the knowledge and approval of Lehman.

195.     On RHF's information and belief, these misrepresentations and concealment were made with the intent to deceive RHF and similarly situated entities and to induce RHF to agree to pay Lehman more than it was actually owed and to continue to enter into long-term agreements with Lehman.

196.     In June 2008, in reliance on Lehman's representations regarding the swap valuations and its financial strength, stability and viability, RHF terminated its 1998 Swap agreement and renegotiated a new, long term swap agreement with Lehman in connection with the refinanced bonds, in which Lehman unconditionally guaranteed RHF's variable interest and capital payment obligations on the refinanced bonds that were subject to the agreement.

197.    RHF, at the time the above-described representations were made, was ignorant of the falsity of the representations and justifiably and reasonably believed them to be true and relied thereon to its detriment.

198.    In justifiable reliance on the representations made by Lehman, RHF was induced to enter the 2008 Swap Contract and paid Lehman and others fees for, among other things, the 2008 Swap Contract, which was unfairly valued in favor of Lehman.

199.    As a proximate result of Lehman's fraud and deceit, RHF has suffered and will continue to suffer general and special damages in the form of, among other things, fees and payments for the 2008 Swap Contract and lost benefits under the 2008 Swap Contract, the exact amount of which will be proven at trial.

200.    On RHF's information and belief, in making the above-described representations, Lehman acted with fraud, oppression and malice, in that its conduct was despicable and was carried on with a willful and conscious disregard for the rights of RHF; and in that its conduct subjected RHF to cruel and unjust hardship in conscious disregard of their its rights or otherwise causing injury to RHF.  On RHF's information and belief, Lehman knew of, authorized and ratified these acts of fraud, oppression and malice. Thus, RHF is therefore entitled to the assessment of punitive damages against Lehman in an amount to be proven at trial.

## ELEVENTH CAUSE OF ACTION

### (Negligent Misrepresentation By RHF Against Lehman and Does 1-20)

201.    RHF hereby repeats and re-alleges Paragraphs 1 through 129 of this Complaint as though set forth in full at this point.

202.    On RHF's information and belief, at the time RHF entered into the 2008 Swap Contract, Lehman misrepresented the amount that RHF was supposedly "out of the money" on the 1998 Swap Contract.  Furthermore, prior to and at the time RHF entered into the 2008 Swap Contract, Lehman made and assumed the above-described representations regarding, among other things, Lehman's financial strength, stability and viability.  However, at the time these representations were made, Lehman had no reasonable grounds for believing these representations to be true.

203.    On RHF's information and belief, Lehman was aware of Lehman's unfair and fraudulent calculations of purported swap contract obligations, and of materially adverse facts concerning Lehman's financial condition, mortgage-backed asset portfolio and the mortgage markets in general that threatened its continued existence.  Despite such knowledge, Lehman failed to take the necessary steps to lower its exposure or disclose the risks and consequences of its conduct to RHF.  The misrepresentations about Lehman's swap practices and financial strength and failures to disclose materially adverse facts about Lehman's swap practices and financial condition were done with the knowledge and approval of Lehman.

204.    On RHF's information and belief, these misrepresentations and failures to disclose were made with the intent to induce RHF and similarly situated entities to agree to pay Lehman more than it was actually owed and to continue to enter into long-term agreements with Lehman.

205.    In June 2008, in reliance of Lehman's representations regarding the swap valuations and its financial strength, stability and viability, RHF terminated its old swap agreements and renegotiated a new, long term swap agreement with Lehman in connection with the refinanced bonds, in which Lehman unconditionally guaranteed RHF's variable interest and capital payment obligations on the refinanced bonds that were subject to the agreement.

206.    RHF, at the time the above-described representations were made, was ignorant of the falsity of the representations and justifiably and reasonably believed them to be true and relied thereon to its detriment.

207.    In justifiable reliance on the representations made by Lehman, RHF was induced to enter the 2008 Swap Contract and paid Lehman and others fees for, among other things, the 2008 Swap Contract, which was unfairly valued in favor of Lehman.

208.    As a proximate result of Lehman negligent misrepresentations, RHF has suffered and will continue to suffer general and special damages in the form of, among other things, fees and payments for the 2008 Swap Contract and lost benefits under the 2008 Swap Contract, the exact amount of which will be proven at trial.

209.    Lehman owed a duty of care to refrain from acting in a manner that created an unreasonable risk of injury to third parties, including Lehman's counterparties such as RHF.  On

RHF's information and belief, Lehman had knowledge of and directed and/or approved of its misrepresentations regarding its financial strength and its failure to disclose materially adverse facts regarding its financial condition and swap valuations.   Moreover, Lehman accepted and retained the benefits of this conduct, as RHF's fees and payments with respect to the 2008 Swap Contract increased profits for Lehman and allowed it to stave off bankruptcy longer than otherwise possible.

## TWELFTH CAUSE OF ACTION

### (Declaratory Relief By RHF Against Lehman and Does 1-20)

210.    RHF hereby repeats and re-alleges Paragraphs 1 through 129 of this Complaint as though set forth in full at this point.

211.    An actual controversy has arisen and now exists between RHF, on the one side, and Lehman, on the other side, regarding whether the 2008 Swap has been terminated.

212.    RHF contends that RHF's termination complied with all of the requirements of the Master Agreement and effectively terminated the Swap on June 11, 2009.  RHF further contends that Lehman was in default under the 2008 Swap and that RHF is the non-defaulting party.  RHF further contends that it properly conducted a Market Quotation pursuant to sections 6(e) & 12 of the Master Agreement and calculated Loss in a commercially reasonable manner.

213.    RHF is informed and believes and therefore alleges that Lehman contends that RHF's aforementioned termination of the 2008 Swap was ineffective and that the 2008 Swap remains in full force and effect and otherwise also contests that RHF's loss calculation is commercially reasonable.

214.    A judicial declaration is necessary and appropriate at this time under the circumstances so that RHF may ascertain its rights with respect to Lehman.  Accordingly, RHF seeks a declaration that (i) RHF's termination of the 2008 Swap valid and enforceable, (ii) RHF's termination of the 2008 Swap was effective as of June 11, 2009, and (iii) after termination of the 2008 Swap, RHF properly conducted a Market Quotation and calculated Loss in a commercially reasonable manner pursuant to sections 6(e) and 12 of the Master Agreement.

### THIRTEENTH CAUSE OF ACTION

**(Rescission of the 2008 Swap by RHF Against Lehman and Does 1-20)**

215.    RHF hereby repeats and re-alleges Paragraphs 1 through 129 of this Complaint as though set forth in full at this point.

216.    RHF alleges this cause of action for rescission of the 2008 Swap based upon fraud in the alternative.

217.    In or about June 2008, Lehman claimed that RHF was purportedly "out of the money" on the 1998 Swap so that terminating the 1998 Swap would cost RHF in excess of $13 million.  Because of the original plan of refinancing by Cain and Lehman, RHF was under duress and in a disadvantageous position.  As a result, RHF was forced by Lehman to terminate the 1998 Swap and enter in the new, different, and disadvantageous 20-year 2008 Swap Agreement with Lehman in or about July 2008.

218.    Prior to execution of the 2008 Swap, Lehman knowingly and falsely represented that it was financially stable, when in fact Lehman was not solvent.

219.    At the time the representations were made and at the time RHF entered into the 2008 Swap, RHF did not know the representations were false, but believed them to be true and relied upon them.  Had RHF known that Lehman was not solvent, RHF would not have entered the 2008 Swap Agreement.

220.    In fact, had RHF known that Lehman was insolvent at that time, RHF would have terminated the 1998 Swap Agreement due to Lehman's Event of Default and RHF would not have allegedly owed Lehman in excess of $13 million.

221.    Instead, because of Lehman's fraud and deceit regarding its financial condition, RHF entered the 2008 Swap in or about July 2008.

222.    Then, in September 2008, Lehman filed for bankruptcy, and Lehman was unable to perform under the 2008 Swap, causing RHF to lose all of the protection that it had bargained for in July 2008.

223.    As a result of the 2008 Swap Agreement, RHF has suffered and will continue to suffer substantial harm and injury if the 2008 Swap is not rescinded.

224.    RHF intends service of the summons and complaint in this action to serve as notice of rescission of the 2008 Swap, and hereby demands that Lehman restore to RHF the consideration furnished by RHF.

225.    As a result of entering into the 2008 Swap, RHF has incurred expenses in addition to those alleged above.

### **PRAYER FOR RELIEF**

WHEREFORE, RHF requests entry of judgment in its favor and against Lehman as follows:

On the First Cause of Action:

1.  For compensatory damages, according to proof, but in excess of $5,000,000.

2.  For exemplary and punitive damages, according to proof.

On the Second Cause of Action:

1.  For compensatory damages, according to proof, but in excess of $5,000,000.

On the Third Cause of Action:

1.  For compensatory damages, according to proof, but in excess of $1,000,000.

2.  For exemplary and punitive damages, according to proof.

On the Fourth Cause of Action:

1.  For compensatory damages, according to proof, but in excess of $1,000,000.

On the Fifth Cause of Action:

1.  For compensatory damages, according to proof, but in excess of $1,000,000.

2.  For exemplary and punitive damages, according to proof.

On the Sixth Cause of Action:

1.  For compensatory damages, according to proof, but in excess of $1,000,000.

2.  For exemplary and punitive damages, according to proof.

On the Seventh Cause of Action:

1.  For compensatory damages, according to proof, but in excess of $1,000,000.

On the Eighth Cause of Action:

1.  For compensatory damages, according to proof, but in excess of $5,000,000.

2.  For exemplary and punitive damages, according to proof.

On the Ninth Cause of Action:

1.  For compensatory damages, according to proof, but in excess of $5,000,000.

On the Tenth Cause of Action:

1.  For compensatory damages, according to proof, but in excess of $1,000,000.

2.  For exemplary and punitive damages, according to proof.

On the Eleventh Cause of Action:

1.  For compensatory damages, according to proof, but in excess of $1,000,000.

On the Twelfth Cause of Action:

1.  Declaring RHF's termination of the 2008 Swap valid and enforceable.

2.  Declaring RHF's termination of the 2008 Swap effective as of June 11, 2009.

3.  Declaring that after termination of the 2008 Swap, RHF properly conducted a Market Quotation and calculated Loss in a commercially reasonable manner pursuant to sections 6(e) and 12 of the Master Agreement.

On the Thirteenth Cause of Action:

1.  For an order rescinding the 2008 Swap Agreement.

2.  For all other damages available to RHF, according to proof, but in excess of $1,000,000.

On All Causes of Action:

1.  That RHF be awarded its costs;

2.  That RHF be awarded reasonable attorney's fees pursuant to contract and/or law;

3.  That RHF be awarded pre-judgment and post-judgment interest as permitted by law; and

4.  For such other relief as this Court deems just and proper.

DATED: _____                            REUBEN RAUCHER & BLUM

                                           _____
                                           *Attorneys for Plaintiffs*

COMPLAINT

1

### DEMAND FOR JURY TRIAL

2
    Plaintiffs demand a trial by jury of all issues and claims in this action triable before a jury.

3

4
DATED: _____                                    REUBEN RAUCHER & BLUM

5

6
                             _____

7
                             *Attorneys for Plaintiffs*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT