# Exhibit 2

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES ACT OF 1933
Release No. 8684 / May 31, 2006

SECURITIES EXCHANGE ACT OF 1934
Release No. 53888 / May 31, 2006

ADMINISTRATIVE PROCEEDING
File No. 3-12310

| In the Matter of<br><br>BEAR, STEARNS & CO. INC.; CITIGROUP GLOBAL MARKETS, INC.; GOLDMAN, SACHS & CO.; J.P. MORGAN SECURITIES, INC.; LEHMAN BROTHERS INC.; MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED; MORGAN STANLEY & CO. INCORPORATED AND MORGAN STANLEY DW INC.; RBC DAIN RAUSCHER INC.; BANC OF AMERICA SECURITIES LLC; A.G. EDWARDS & SONS, INC.; MORGAN KEEGAN & COMPANY, INC.; PIPER JAFFRAY & CO.; SUNTRUST CAPITAL MARKETS INC.; AND WACHOVIA CAPITAL MARKETS, LLC,<br><br>Respondents. | ORDER INSTITUTING ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS AND A CEASE-AND-DESIST ORDER PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933 AND SECTION 15(b) OF THE SECURITIES EXCHANGE ACT OF 1934 |
|---|---|

I.

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act of 1933 ("Securities Act") and Section 15(b) of the Securities Exchange Act of 1934 ("Exchange Act") against Bear, Stearns & Co. Inc.; Citigroup Global Markets, Inc.; Goldman, Sachs & Co.; J.P. Morgan Securities, Inc.; Lehman Brothers Inc.; Merrill Lynch, Pierce, Fenner & Smith Incorporated; Morgan Stanley & Co. Incorporated and Morgan Stanley DW Inc.; RBC Dain Rauscher Inc.; Banc of America Securities LLC; A.G. Edwards & Sons, Inc.; Morgan Keegan & Company, Inc.; Piper Jaffray & Co.; SunTrust Capital Markets Inc.; and Wachovia Capital Markets, LLC ("Respondents").

## II.

In anticipation of the institution of these proceedings, Respondents have submitted Offers of Settlement ("Offers") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over them and the subject matter of these proceedings, Respondents consent to the entry of this Order Instituting Administrative and Cease-and-Desist Proceedings, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order Pursuant to Section 8A of the Securities Act of 1933 and Section 15(b) of the Securities Exchange Act of 1934 ("Order"), as set forth below.

## III.

On the basis of this Order and Respondents' Offers, the Commission finds that:[1]

### A.    RESPONDENTS

Respondent **Bear, Stearns & Co. Inc.**, headquartered in New York, New York, is a broker-dealer registered with the Commission pursuant to Section 15(b) of the Exchange Act.

Respondent **Citigroup Global Markets, Inc.**, headquartered in New York, New York, is a broker-dealer registered with the Commission pursuant to Section 15(b) of the Exchange Act.

Respondent **Goldman, Sachs & Co.**, headquartered in New York, New York, is a broker-dealer registered with the Commission pursuant to Section 15(b) of the Exchange Act.

Respondent **J.P. Morgan Securities, Inc.**, headquartered in New York, New York, is a broker-dealer registered with the Commission pursuant to Section 15(b) of the Exchange Act.

Respondent **Lehman Brothers Inc.**, headquartered in New York, New York, is a broker-dealer registered with the Commission pursuant to Section 15(b) of the Exchange Act.

Respondent **Merrill Lynch, Pierce, Fenner & Smith Incorporated**, headquartered in New York, New York, is a broker-dealer registered with the Commission pursuant to Section 15(b) of the Exchange Act.

---

[1] The findings herein are made pursuant to Respondents' Offers of Settlement and are not binding on any other person or entity in this or any other proceeding.

Respondents **Morgan Stanley & Co. Incorporated and Morgan Stanley DW Inc.** ("**Morgan Stanley**"), headquartered in New York, New York, are both broker-dealers registered with the Commission pursuant to Section 15(b) of the Exchange Act.

Respondent **RBC Dain Rauscher Inc.**, headquartered in Minneapolis, Minnesota, is a broker-dealer registered with the Commission pursuant to Section 15(b) of the Exchange Act.

Respondent **Banc of America Securities LLC**, headquartered in Charlotte, North Carolina, is a broker-dealer registered with the Commission pursuant to Section 15(b) of the Exchange Act.

Respondent **A.G. Edwards & Sons Inc.**, headquartered in St. Louis, Missouri, is a broker-dealer registered with the Commission pursuant to Section 15(b) of the Exchange Act.

Respondent **Morgan Keegan & Company, Inc.**, headquartered in Memphis, Tennessee, is a broker-dealer registered with the Commission pursuant to Section 15(b) of the Exchange Act.

Respondent **Piper Jaffray & Co.**, headquartered in Minneapolis, Minnesota, is a broker-dealer registered with the Commission pursuant to Section 15(b) of the Exchange Act.

Respondent **SunTrust Capital Markets Inc.**, headquartered in Atlanta, Georgia, is a broker-dealer registered with the Commission pursuant to Section 15(b) of the Exchange Act.

Respondent **Wachovia Capital Markets LLC,** headquartered in Charlotte, North Carolina, is a broker-dealer registered with the Commission pursuant to Section 15(b) of the Exchange Act.

### B.     SUMMARY

As part of their broker-dealer businesses, Respondents underwrite, and manage auctions for, auction rate securities.[2] From at least January 1, 2003 through June 30, 2004, in connection with certain auctions, each Respondent engaged in one or more of the practices described in Section III.C.2 below, each of which violates Section 17(a)(2) of the Securities Act. Accordingly, each Respondent violated that provision.

### C.     FACTS

#### 1.    The Auction Rate Securities Market

Auction rate securities are municipal bonds, corporate bonds, and preferred stocks with interest rates or dividend yields that are periodically re-set through auctions, typically every 7, 14, 28, or 35 days. Auction rate bonds are usually issued with maturities of 30 years, but the maturities can range from 5 years to perpetuity. Respondents often market auction rate securities

---

[2] One entity of Morgan Stanley, Morgan Stanley DW Inc., has not underwritten auction rate securities since January 1, 2003.

to issuers as an alternative variable rate financing vehicle, and to investors as an alternative to money market funds. Auction rate securities were first developed in 1984, and the auction rate securities market has grown to well over $200 billion. Mostly institutional investors participate in the auction rate securities markets, although recently smaller investors also have begun participating in the market. Typically, the minimum investment is $25,000.

      a. Auction Mechanics. Auction rate securities are auctioned at par so the return on the investment to the investor and the cost of financing to the issuer between auction dates is determined by the interest rate or dividend yield set through the auctions.[3] According to the disclosure documents (the prospectus or official statement) for each security, the interest rate or dividend yield is set through an auction (commonly referred to as a "Dutch" auction) in which bids with successively higher rates are accepted until all of the securities in the auction are sold. Investors can only submit the following types of orders: 1) a "hold" order, which is the default order for current investors (i.e., the order that is entered for a current holder if the holder takes no action), where a current investor will keep the securities at the rate at which the auction clears; 2) a "hold-at-rate" bid, where a current investor will only keep the securities if the clearing rate is at or above the specified rate; 3) a "sell" order, where a current investor will sell the securities regardless of the clearing rate; or 4) a "buy" bid, where a prospective investor, or a current investor who wants more securities, will buy securities if the clearing rate is at or above the specified rate. Disclosure documents often state that an investor's order is an irrevocable offer.

  The final rate at which all of the securities are sold is the "clearing rate" that applies to all of the securities in the auction until the next auction. Bids with the lowest rate and then successively higher rates are accepted until all of the sell orders are filled. The clearing rate is the lowest rate bid sufficient to cover all of the securities for sale in the auction.[4] If there are not enough bids to cover the securities for sale, then the auction fails, the issuer pays an above-market rate set by a pre-determined formula described in the disclosure documents, and all of the current holders continue to hold the securities, with minor exceptions. If all of the current holders of the security elect to hold their positions without bidding a particular rate, then the clearing rate is the all-hold rate, a below-market rate set by a formula described in the disclosure documents.

      b. Broker-Dealers' Role in Auctions. The issuer of each security selects one or more broker-dealers to underwrite the offering and/or manage the auction process. Investors can only submit orders through the selected broker-dealers. The issuer pays an annualized fee to each broker-dealer engaged to manage an auction (typically 25 basis points for

---

[3] Between auctions, investors might be able to buy or sell auction rate securities in the secondary market at prices greater than, equal to, or less than par.

[4] For example, suppose $100,000 of securities were for sale and the auction received four buy bids. Bid A was for $50,000 at 1.10%, Bid B was for $50,000 at 1.15%, Bid C was for $50,000 at 1.15%, and Bid D was for $25,000 at 1.20%. Under these circumstances, the "clearing rate" would be 1.15%, meaning all of the securities in the auction would pay interest at a rate of 1.15% until the next auction. Bid A would be allocated $50,000, Bids B and C would receive pro-rata allocations ($25,000 each), and Bid D would receive no allocation.

4

the par value of the securities that it manages). The issuer also selects an auction agent to collect the orders and determine the clearing rate for the auction.

Investors must submit orders for an auction to the broker-dealer by a specified time. Many broker-dealers have an internal deadline by which investors must submit their orders to the broker-dealer. This internal deadline allows the broker-dealer sufficient time to process and submit the orders to the auction agent. Other broker-dealers allow investors to submit orders up until the submission deadline, i.e., the deadline for broker-dealers to submit orders to the auction agent. The broker-dealers must submit the orders to the auction agent before the submission deadline, and usually must identify each separate order.

    c. <u>Auction Agents' Role in Auctions</u>. After receiving the orders from the broker-dealers, the auction agent calculates the clearing rate that will apply until the next auction. In practice, however, if there is only one broker-dealer, the broker-dealer can discern the clearing rate before submitting the orders to the auction agent.

The auction agent allocates the securities to the broker-dealers based on the orders they submitted. The auction procedures generally state that orders are filled in the following order: hold orders, hold-at-rate and buy bids with a rate below the clearing rate, hold-at-rate orders with a rate at the clearing rate, and buy bids with a rate at the clearing rate. When there are more bids for securities at the clearing rate than securities remaining for sale, the securities are allocated on a pro rata basis first to the hold-at-rate bidders and then to the buy bidders. Generally, the auction procedures require broker-dealers to follow the same hierarchy in allocating the securities to their customers.

    d. <u>Disclosures Regarding Broker-Dealer Bidding</u>. During the relevant period, the disclosure documents for different securities varied as to what, if anything, they disclosed about broker-dealers bidding in auctions that they were managing. Some disclosure documents did not disclose anything about bidding by broker-dealers. Other disclosure documents disclosed that broker-dealers may bid in auctions with language similar to the following: "[a] broker-dealer may submit orders in Auctions for its own accounts." Still other disclosure documents disclosed that broker-dealers may bid in auctions and may have an information advantage with language similar to the following: "[a] Broker-Dealer may submit orders in Auctions for its own accounts. Any Broker-Dealer submitting an order for its own account in any Auction might have an advantage over other bidders in that it would have knowledge of other orders placed through it for that Auction (but it would not have knowledge of orders submitted by other Broker-Dealers, if any)."

  2. <u>Respondents' Conduct</u>

Each Respondent engaged in one or more of the following violative practices in connection with certain auctions:

    a. <u>Completion of Open or Market Bids.</u> Some investors placed open bids and/or market bids in auctions. When an investor placed an open bid, it allowed the

5

Respondent to designate some or all of the bid's parameters, such as the specific security, rate, or quantity. When an investor placed a market bid, it indicated that it would buy at whatever rate was set during an auction. After viewing other orders in the auction, certain Respondents supplied the bid parameters missing from open bids and/or the rate for market bids. In certain instances, these practices advantaged the investors submitting open bids or market bids by displacing other investors' bids and/or affected the clearing rate.[5]

          b.  Intervention in Auctions. Certain Respondents intervened in auctions by bidding for their proprietary accounts or asking customers to make or change orders without adequate disclosures.[6] In certain instances, the interventions affected the clearing rate. Certain Respondents intervened in one or more of the following three ways:

               b.1  *Bids To Prevent Failed Auctions.* Without adequate disclosure, certain Respondents bid to prevent auctions from failing. Failed auctions occur when there are more securities for sale than there are bids for securities and result in an above-market rate described in the disclosure documents. These Respondents submitted bids to ensure that all of the securities would be purchased to avoid failed auctions and thereby, in certain instances, affected the clearing rate;

               b.2  *Bids To Set a "Market" Rate.* Without adequate disclosure, certain Respondents submitted bids or asked investors to change their bids so that auctions cleared at rates that these Respondents considered to be appropriate "market" rates. In certain instances, this practice affected the clearing rate and/or the Respondents' or investors' bids displaced other investors' bids; and

               b.3  *Bids To Prevent All-Hold Auctions.* Without adequate disclosure, certain Respondents submitted bids or asked investors to submit bids to prevent the all-hold rate, which is the below-market rate set when all current holders want to hold their positions so that there are no securities for sale in the auction. Sometimes certain Respondents did not have any or sufficient inventory to be eligible to submit the hold-at-rate bids they submitted, or changed an investor's bid without obtaining permission. In certain instances, this practice affected the clearing rate;

---

[5] The clearing rate determines the interest rate or yield the issuer must pay to investors until the next auction. In those instances when these practices or any of the practices described in this Order lowered the clearing rate, investors received a lower rate of return on their investments. Conversely, in those instances when the practices raised the clearing rate, issuers had to pay a higher interest rate or yield. To the extent that certain practices affected the clearing rate, investors may not have been aware of the liquidity and credit risks associated with certain securities.

[6] This Order does not prohibit broker-dealers from bidding for their proprietary accounts when properly disclosed.

6

    c. <u>Prioritization of Bids.</u> Before submitting bids to the auction agent, certain Respondents changed or "prioritized" their customers' bids to increase the likelihood that the bids would be filled. As a result of this prioritization and a similar practice known as "cross-trading," certain bids were moved up in the disclosed hierarchy by which different types of bids would be filled.[7] In certain instances, these practices resulted in certain investors' bids displacing other investors' bids when the auction was oversubscribed, affected the clearing rate, and did not conform to disclosed procedures;

    d. <u>Submission or Revision of Bids After Deadlines.</u> Most auctions had an internal deadline that broker-dealers set for investors to submit bids to the broker-dealers and a formal submission deadline set by the offering documents for broker-dealers to submit bids to the auction agent. Certain Respondents at times allowed certain investors to submit or revise bids after these deadlines. In addition, certain Respondents themselves submitted or revised bids after these deadlines. In certain instances, these practices, except when solely done to correct clerical errors, advantaged investors or Respondents who bid after a deadline by displacing other investors' bids, affected the clearing rate, and did not conform to disclosed procedures;

    e. <u>Allocation of Securities.</u> Certain Respondents exercised discretion in allocating securities to investors who bid at the clearing rate instead of allocating the securities pro rata as stated in the disclosure documents. In certain instances, this practice displaced other investors' bids and did not conform to disclosed procedures;

    f. <u>Partial Orders.</u> When an auction is oversubscribed, investors may receive a partial, pro rata allocation of securities rather than receiving the full amount of the securities for which they bid. When this occurred, certain Respondents did not require certain investors to follow through with the purchase of the securities even though the bids were supposed to be irrevocable. Knowing that they would not have to follow through in purchasing partial orders, some investors bid to try to obtain the securities at rates higher than they would have bid if they had known that they risked having to buy partial orders. In certain instances, this practice affected the clearing rate and did not conform to disclosed procedures;

    g. <u>Express or Tacit Understandings To Provide Higher Returns.</u> Based upon an express or tacit understanding reached prior to or during an auction, certain Respondents provided higher returns than the auction clearing rate to certain investors. For example, pursuant to an express or tacit understanding reached prior to or during an auction: (1) certain Respondents

---

[7] One example of prioritization occurred when certain Respondents received a sell order from one customer and a buy order from another customer in the same auction. Rather than submitting each order to the auction agent as required by the disclosure documents, certain Respondents instead netted those orders before submitting them to the auction agent. Cross-trading occurred when certain Respondents actually transferred securities from a customer that wanted to sell to a customer that wanted to buy, rather than submitting the bids in the auction. Pursuant to both practices, these customers that wanted to buy securities were considered to be existing holders so that their orders had a higher priority in the auction than other new customers' bids for securities.

7

provided a higher return by having the investor submit its bid at a lower rate than the investor actually wanted to receive, allowing the auction to clear at the lower rate, buying the securities from the investor after the auction, and then selling the securities back to the investor at below par value; (2) certain Respondents simply displaced an investor's bid and then compensated the investor by selling securities to the investor at below par value in the secondary market; and (3) certain Respondents provided a higher return by delaying the settlement date for certain investors. In certain instances, these practices affected the clearing rate and did not conform to disclosed procedures; and

        h.    Price Talk. Certain Respondents provided different "price talk"[8] to certain investors. In certain instances, some investors received information that gave them an advantage in determining what rate to bid, thereby displacing other investors' bids and/or affecting the clearing rate.

### D.    LEGAL SECTION

Section 17(a)(2) of the Securities Act prohibits material misstatements and omissions in any offer or sale of securities. Negligent conduct can violate Section 17(a)(2). See, e.g., SEC v. Hughes Capital Corp., 124 F.3d 449, 453 (3d Cir. 1997). Each Respondent violated Section 17(a)(2) by engaging in one or more of the practices described in Section III.C.2 above. As a result, Respondents willfully[9] violated Section 17(a)(2) of the Securities Act.

### E.    STRUCTURE OF THE SETTLEMENT

In determining the structure of the settlement and the size of the penalties in this matter, the Commission considered the amount of investor harm and the Respondents' conduct in the investigation to be factors that mitigated the serious and widespread nature of the violative conduct. In particular, the Respondents voluntarily disclosed the practices they engaged in to the Commission staff, upon the staff's request for information, which allowed the Commission to conserve resources. The Commission aims to promote similar voluntary disclosures in industry-wide investigations in the future and to encourage firms to provide comprehensive information to the staff in such investigations. The Commission believes that, after taking into account the factors described above, as well as the importance of deterring future violations of the securities laws, this settlement is appropriate.

---

[8] Price talk is a broker-dealer's estimate of the likely range within which an auction will clear. Often this range is 5-10 basis points. Some broker-dealers update the price talk as auctions progress.

[9] "Willfully" as used in this Order means intentionally committing the act which constitutes the violation, see Wonsover v. SEC, 205 F.3d 408, 414 (D.C. Cir. 2000); Tager v. SEC, 344 F.2d 5, 8 (2d Cir. 1965). There is no requirement that the actor also be aware that he is violating one of the Rules or Acts.

8

For purposes of this settlement, Respondents are divided into two tiers for civil money penalty purposes based on their respective market share and conduct during the relevant period. Tier One consists of the following firms, each of which had a relatively large share of the auction rate securities market and engaged in more types of violative practices than the firms in Tier Two: Bear Stearns, Citigroup Global Markets, Goldman Sachs, J.P. Morgan Securities, Lehman Brothers, Merrill Lynch, Morgan Stanley, RBC Dain Rauscher, and Banc of America Securities. While all Respondents cooperated with the Commission, Banc of America Securities will be assessed a lesser civil monetary penalty because of the quality of its self-monitoring capabilities in the auction rate securities area that it demonstrated to the Commission staff. Tier Two consists of the following firms, each of which had a relatively small share of the auction rate securities market and engaged in fewer types of violative practices than the firms in Tier One: A.G. Edwards, Morgan Keegan, Piper Jaffray, SunTrust Capital Markets, and Wachovia Capital Markets.

### F. RESPONDENTS' REMEDIAL ACTS AND COOPERATION

In determining to accept the Offers, the Commission considered the remedial acts promptly undertaken by the Respondents and the cooperation afforded the Commission staff.

### IV.

In view of the foregoing, the Commission deems it appropriate, and in the public interest, to impose the sanctions agreed to in Respondents' Offers.

Accordingly, pursuant to Section 8A of the Securities Act and Section 15(b) of the Exchange Act, it is hereby ORDERED that:

A. Respondents Bear Stearns, Citigroup Global Markets, Goldman Sachs, J.P. Morgan Securities, Lehman Brothers, Merrill Lynch, Morgan Stanley, and RBC Dain Rauscher each:

1. Be, and hereby is, censured;

2. Shall cease and desist from committing or causing any violations and any future violations of Section 17(a)(2) of the Securities Act; and

3. Shall, within 10 days of the entry of this Order, pay a civil money penalty of $1,500,000 to the United States Treasury;

B. Respondent Banc of America Securities:

1. Be, and hereby is, censured;

2. Shall cease and desist from committing or causing any violations and any future violations of Section 17(a)(2) of the Securities Act; and

       3.    Shall, within 10 days of the entry of this Order, pay a civil money penalty of $750,000 to the United States Treasury;

C.    Respondents A.G. Edwards, Morgan Keegan, Piper Jaffray, SunTrust Capital Markets, and Wachovia Capital Markets each:

       1.    Be, and hereby is, censured;

       2.    Shall cease and desist from committing or causing any violations and any future violations of Section 17(a)(2) of the Securities Act; and

       3.    Shall, within 10 days of the entry of this Order, pay a civil money penalty of $125,000 to the United States Treasury;

D.    Payments of such civil money penalties shall be: (A) made by United States postal money order, certified check, bank cashier's check or bank money order; (B) made payable to the Securities and Exchange Commission; (C) hand-delivered or mailed to the Office of Financial Management, Securities and Exchange Commission, Operations Center, 6432 General Green Way, Stop 0-3, Alexandria, VA 22312; and (D) submitted under cover letter that identifies the Respondent in these proceedings, the file number of these proceedings, a copy of which cover letter and money order or check shall be sent to Kenneth R. Lench, Division of Enforcement, Securities and Exchange Commission, 100 F Street N.E., Washington, D.C. 20549-8549.

E.    Not later than 6 months after the entry of this Order, each Respondent shall provide all of its customers who hold auction rate securities ("Holders") and the issuers of such securities ("Issuers") with a written description of the Respondent's material auction practices and procedures. In addition, commencing not later than 6 months after the entry of this Order, each Respondent shall, at or before the completion of the applicable transaction, provide all customers who are first-time purchasers, and all broker-dealers who are purchasers, of auction rate securities from the Respondent ("Purchasers") with a written description of the Respondent's material auction practices and procedures. A Respondent may fulfill the foregoing requirements to provide such written description to Holders and Purchasers by sending a written notification (e.g., via e-mail, subject to applicable legal requirements) or, with respect to Purchasers, by including a written notification with the trade confirmation, that a written description of the Respondent's material auction practices and procedures is available on a specified web page of the Respondent's website accessible to such Holders and Purchasers. Such written notification must be set forth prominently in such a manner as to call it to the attention of the reader and also state that a written description of the Respondent's material auction practices and procedures will be sent to the Holder or Purchaser upon request. In addition, not later than 6 months after the entry of this Order, each Respondent shall send a written description of the Respondent's material auction practices and procedures accompanied by a list of all auction rate

securities for which the Respondent serves as broker-dealer (including related CUSIP numbers) to each Nationally Recognized Municipal Securities Information Repository ("NRMSIR") and appropriate State Information Depository ("SID"), if any. Respondents may use the facilities of DisclosureUSA for such purpose with respect to auction rate securities that are municipal securities.

Furthermore, commencing not later than 3 months after the entry of this Order, each Respondent shall at all times make a description of its then-current material auction practices and procedures available to (1) all customers and broker-dealers who are participating through such Respondent in an auction of auction rate securities on the portion of its website that is accessible to such customers and broker-dealers and is related to such auction and (2) the general public on another portion of its website accessible to the general public.

As used in this Section, "auction rate securities" means, with respect to a Respondent, auction rate securities sold in auctions managed by such Respondent.

F.     Not later than 6 months after the date of this Order, unless otherwise extended by the staff of the Commission for good cause shown, each Respondent's chief executive officer or general counsel shall certify in writing to the staff of the Commission that Respondent has implemented procedures that are reasonably designed to prevent and detect failures by Respondent to conduct the auction process in accordance with the auction procedures disclosed in the disclosure documents and any supplemental disclosures and that the Respondent is in compliance with Section IV.E. of this Order.

By the Commission.

Nancy M. Morris
Secretary

11