# Exhibit 8

**United States Bankruptcy Court/Southern District of New York**
Lehman Brothers Holdings Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5076
New York, NY 10150-5076

| In Re: Lehman Brothers Holdings Inc., et al. Debtors | Chapter 11 Case No. 08-13555 (JMP) (Jointly Administered) |
|---|---|
| Name of Debtor Against Which Claim is Held: Lehman Brothers Special Financing Inc. | Case No. of Debtor: 08-13888 (JMP) |

**PROOF OF CLAIM**

Filed: USBC - Southern District of New York
Lehman Brothers Holdings Inc., Et Al.
08-13555 (JMP)    0000010495

**THIS SPACE IS FOR COURT USE ONLY**

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503. Additionally, this form should not be used to make a claim for Lehman Programs Securities (See definition on reverse side.)

**Name and address of Creditor:** (and name and address where notices should be sent if different from Creditor)

Retirement Housing Foundation (and affiliates as identified in Rider)
911 N. Studebaker Road
Long Beach, CA 90815-4900
Attn: Frank Rossello, CFO/VP of Finance

Telephone number: 562-257-5100    Email Address: frank.rossello@rhf.org

Name and address where payment should be sent (if different from above)

Telephone number:    Email Address:

☐ Check this box to indicate that this claim amends a previously filed claim.

Court Claim Number: _____ (If known)

Filed on: _____

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

1. **Amount of Claim as of Date Case Filed:** $ 11,871,612
   If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete item 4.
   If all or part of your claim is entitled to priority, complete Item 5.
   If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete Item 6.
   
   ☐ Check this box if all or part of your claim is based on a Derivative Contract.*
   ☐ Check this box if all or part of your claim is based on a Guarantee.*
   
   *IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.
   
   ☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is a based on a Derivative Contract or Guarantee.

2. **Basis for Claim:** Breach of Contract, Fraud, etc. (See Attached Rider)
   (See instruction #2 on reverse side.)

3. **Last four digits of any number by which creditor identifies debtor:** _____
   3a. Debtor may have scheduled account as: _____
   (See instruction #3a on reverse side.)

4. **Secured Claim** (See instruction #4 on reverse side.)
   Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
   Nature of property or right of setoff: ☐ Real Estate    ☐ Motor Vehicle    ☐ Other
   Describe: _____
   Value of Property: $_____ Annual Interest Rate _____%
   Amount of arrearage and other charges as of time case filed included in secured claim, if any:
   $_____ Basis for perfection: _____
   Amount of Secured Claim: $_____ Amount Unsecured: $_____

5. **Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any portion of your claim falls in one of the following categories, check the box and state the amount.
   
   Specify the priority of the claim:
   ☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).
   ☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).
   ☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).
   ☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7)
   ☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
   ☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(___).
   
   Amount entitled to priority:
   $_____

6. **Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9):** $_____
   (See instruction #6 on reverse side.)

7. **Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.
8. **Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest. *(See definition of "redacted" on reverse side.)* If the documents are voluminous, attach a summary.
**DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.**
If the documents are not available, please explain:

Date: 9/3/09
Signature: [signed] Frank A. Rossello, Jr. CFO/VP Finance

**FOR COURT USE ONLY**
FILED / RECEIVED
SEP - 4 2009
EPIQ BANKRUPTCY SOLUTIONS, LLC

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---

In re                                                                                  :    Chapter 11
                                                                                              :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,    :    Case No. 08-13555 (JMP)
                                                                                              :    (Jointly Administered)
Debtors.                                                                           :

---

## ADDENDUM TO PROOF OF CLAIM OF
## RETIREMENT HOUSING FOUNDATION AND ITS AFFILIATES

### GENERAL STATEMENT OF CLAIM

1.    Retirement Housing Foundation ("RHF") and its affiliates, Foundation Property Management, Bixby Knolls Towers, Inc., Gold County Health Center, Inc., Mayflower Gardens Health Facilities, Inc., Mayflower RHF Housing, Inc., Sun City RHF Housing, Holly Hill RHF Housing, Inc., Merritt Island RHF Housing, Inc., Martin Luther Foundation, Inc., Yellowwood Acres, Inc., Bluegrass RHF Housing, Inc., St. Catherine RHF Housing, Inc. ("St. Catherine") and DeSmet RHF Housing, Inc. ("DeSmet" and collectively as "RHF Group" or "Claimants") hereby assert a claim against Lehman Brothers Holdings Inc. ("LBHI") and Lehman Brothers Special Financing Inc. ("LBSF" and together with LBHI, the "Debtors" or "Lehman"), and any other applicable affiliated debtor, as a result of damages sustained by RHF as a result of actions and inactions of the Debtors, including but not limited to (i) breach of contract, (ii) fraud, constructive fraud, and/or fraudulent misrepresentation by the Debtors with respect to certain swap transactions between RHF and the Debtors, (iii) negligence of or negligent misrepresentation by the Debtors, (iv) breach of fiduciary duty, (v) breach of the covenant of good faith and fair dealings, and (vi) unfair competition.

2.    As a result of the foregoing, RHF has been damaged in amount not less than $11,871,612. RHF hereby asserts a claim against the Debtors in a contingent and unliquidated amount not less than $11,871,612.

### BASIS FOR THE CLAIM

3.    On September 15, 2008 (the "LBHI Petition Date"), LBHI filed a voluntary petition for reorganization under chapter 11 of the Bankruptcy Code.

4.    On October 2, 2008 (the "LBSF Petition Date"), LBSF filed a voluntary petition for reorganization under chapter 11 of the Bankruptcy Code.

5.    Retirement Housing Foundation ("RHF") is a church related, not-for-profit corporation with its principal place of business in Long Beach, California. RHF is devoted to the mission of providing safe and affordable housing and services for senior citizens, persons with disabilities, and low income families. Although its headquarters are in Southern California, RHF

1

has sponsored, developed and/or managed senior citizen apartments, nursing facilities, and low income housing throughout the country.

6. In or about July 1998, RHF issued a written "Request for Proposal" to several investment banking firms to solicit proposals to structure a multi-state, multi-facility group that would issue approximately $140 million in taxable and tax exempt bonds to refinance its existing debt.

7. Later that Month, in or about July 1998, Cain Brothers responded in writing to RHF's Request for Proposal and proposed to structure a highly complicated, long-term, 30 year plan of refinancing for RHF, underwrite bonds to be issued for their benefit and sell those bonds in the capital markets. Within its proposal, among other things, Cain Brothers also committed to provide RHF and its affiliates advice and expertise over the course of the complex plan.

8. In or about August 1998, on behalf of itself and its affiliates that would be subject to the plan of refinancing, RHF formally accepted Cain Brother's proposal, thus entering into a written refinancing agreement (the "Refinancing Agreement").

9. Pursuant to the Refinancing Agreement, Cain Brothers structured a multi-state, multi-facility group that consisted of RHF and its affiliates (the "RHF Group") to re-fund existing debt through the issuance of approximately $140 million in taxable and tax exempt municipal bonds. Both prior to and at the time the RHF Group accepted Cain Brothers' proposed plan of refinancing, Cain Brothers sought to induce the RHF Group to accept and follow that plan of refinancing by representing orally and in writing that structuring the RHF Group would increase its access to capital through future refinancing at a lower cost and would achieve an "appropriate" mix of fixed versus variable rate debt. To achieve these and other objectives, Cain Brothers designed and recommended, and the Refinancing Agreement implemented, an extremely complex transaction involving bonds called Select Auction Variable Rate Securities, a product offered and marketed as "SAVRS" by LBHI or one of its affiliates and an interest rate swap, which Cain Brothers advised would benefit RHF in numerous ways and eliminate market risks.

10. Lehman was a global financial services firm that, through its subsidiaries, provided services in investment banking, equity and fixed income sales, research and trading, investment management, private equity, and private banking. Lehman marketed itself as one of the leading investment banking firms, and held itself out as trustworthy, honest, stable and dependable.

11. SAVRS were supposed to bear interest at a variable rate that would be determined by a purportedly competitive bidding "Dutch" auction held by a subsidiary of LBHI every 35 days that was intended to provide a fair market interest rate. According to Cain Brothers, in each auction cycle, Lehman would propose a rate for the SAVRS to solicit interest from existing bondholders and potential investors and collect bids from those bondholders and investors that specified a rate at which they would buy and/or sell the SAVRS. Lehman would then allegedly compile each bid and provide the raw data of each bid (and not the identity of the bidders) to a third party auction agent to determine the rate of the SAVRS from the highest, so-called

2

"winning bid." Every 35 days, a new SAVRS auction would be held and new bids would be compiled by Lehman, from which the SAVRS rate would purportedly be reset at a fair market rate. Lehman and Cain Brothers would continue to receive fees each auction cycle for orchestrating the auctions and compiling the bids to be submitted to the auction agent.

12. According to representations, counsel and advice by Cain Brothers, the benefits of SAVRS to the RHF Group was that, among other things, they provided bond issuers the low cost and flexibility of variable rate debt. As long term securities with purportedly short term features, Cain Brothers represented in writing and orally to the RHF Group that SAVRS presented a safe alternative to more traditional and more expensive fixed rate bonds, provided a "time-tested structure" and "a large distribution market," and did not require the RHF Group to maintain a liquidity facility. Cain Brothers also represented in writing, orally and without qualification that, under the structure more fully described below, the RHF Group had the option to convert the SAVRS into true fixed rate bonds at any time to lock in advantageous prevailing fixed rates.

13. Pursuant to the Refinancing Agreement and Cain Brothers' representations, counsel and advice, the SAVRS were issued in an "appropriate" mix of variable rate and "synthetically" fixed rate bonds, which Cain Brothers claimed would protect the RHF Group against the risk of variable interest rate fluctuations for 30 years. According to Cain Brothers' plan of refinancing, the interest rate of approximately 85% of the SAVRS would be synthetically fixed through an "interest rate swap," another highly complicated, long-term, 30 year contract with Lehman that Cain Brothers negotiated and recommended (the "Swap Contract").

14. Pursuant to the Swap Contract, in each successive auction cycle, the RHF Group agreed to pay a stipulated fixed rate of interest on the SAVRS to Lehman, and Lehman agreed to pay the holders of the SAVRS interest at the variable rate that it determined every 35 days by auction.

15. Pursuant to the Swap Contract and consistent with its long term 30 year commitment, Lehman unconditionally guaranteed the RHF Group's variable interest and capital payment obligations on the SAVRS that were subject to the agreement, and that such payments would be punctually made when they became due and payable.

16. Under the Swap Contract, the RHF Group was also to make additional payments, including, among other things, fees for Lehman's services for auctioning the SAVRS every 35 days. However, as a counterparty to the Swap Contract and as auctioneer of the SAVRS and/or a potential bidder on the rate, Lehman was in the significant position to control, and profit from, the interest rate it was obliged to pay the holders of the SAVRS.

17. Both prior to and at the time the Refinancing Agreement and the Swap Contract were executed, Cain Brothers and Lehman represented orally and in writing to the RHF Group that the benefit of the interest rate swap was that it permitted the RHF Group to 'hedge," or protect itself, against the risks of variable interest rate fluctuations and achieve a lower overall fixed rate than would be available if the SAVRS were issued as true fixed rate obligations. Cain Brothers also represented that the RHF Group could earn a windfall under the Swap Contract, or be "in the money."

18. Both prior to and at the time the Refinancing Agreement and the Swap Contract were executed, Cain Brothers and Lehman represented orally and in writing to the RHF Group that the Swap Contract would be canceled by the RHF Group at any time and at its sole option so that, among other things, the RHF Group could convert the SAVRS to a true fixed rate or refinance the SAVRS. Neither Cain Brothers nor Lehman ever disclosed that the Swap Contract could in any way interfere with that right to convert the SAVRS to fixed rate securities or otherwise refinance the SAVRS.

19. To enhance the RHF Group's creditworthiness, the Refinancing Agreement and the Swap Contract required that the RHF Group guarantee its interest and capital payment obligation on the SAVRS, including those to Lehman at the synthetically fixed rate and to holders of a minority of SAVRS not subject to the Swap Contract, with a bond insurer.

20. Cain Brothers recommended that the RHF Group insure the SAVRS with ACA, which is a subsidiary of holding company ACA Capital Holdings, Inc., and a bond insurer founded in 1997 that purported to be the first domestic financial guaranty company to offer an "A" rated guaranty in the Unites States debt markets.

21. Consistent with its representations regarding the low cost and the flexibility of the SAVRS, Cain Brothers represented to the RHF Group that ACA's bond insurance presented the best option to guarantee the SAVRS because ACA purportedly offered a safe, long term commitment for a one time up-front fee.

22. In or about December 1998, on the recommendation of Cain Brothers, the RHF Group and ACA entered into a written bond insurance agreement in which ACA would insure the SAVRS ( the "Insurance Agreement"). Under the Insurance Agreement, the RHF Group paid a one-time, up-front premium to ACA, who in exchange irrevocably and unconditionally guaranteed interest and capital repayments as specified in the SAVRS in the event that the RHF Group defaulted on that obligation, thus maintaining the investment strength of the bonds.

23. In or about 1999, pursuant to the Refinancing Agreement and prior advice and recommendations, Cain Brothers underwrote additional SAVRS that were issued for the benefit of the RHF Group. At Cain Brothers' recommendation, ACA again served as the bond insurer for these SAVRS under the original Insurance Agreement.

24. In or about 2000, pursuant to the Refinancing Agreement and prior advice and recommendations, Cain Brothers underwrote additional SAVRS that were issued for the benefit of RHF affiliates St. Catherine and DeSmet. The RHF Group, whose creditworthiness was insured by ACA under the Insurance Agreement, guaranteed the SAVRS issued for the benefit of St. Catherine and DeSmet.

25. The additional SAVRS issued in 1999 and 2000 were also subject to interest rate swaps governed by additional swap agreements in which Lehman Brothers again served as the swap provider.

26. The RHF Group's plan of refinancing that Cain Brothers recommended, advised and implemented was not safe, low risk, low cost, or flexible. Significantly, even though the

4

RHF Group's creditworthiness was purportedly a concern at the time the 1998 plan of refinancing was proposed and implemented, it was the guarantees provided by Lehman Brothers and ACA that were highly risky and that became worthless, and the transaction structure imposed substantial detriments against the RHF Group.

27. Despite Cain Brothers' and Lehman's claims that the RHF Group could terminate the Swap Contract at any time and convert the SAVRS to a true fixed rate, in fact Lehman held absolute control over the RHF Group's ability to exercise any of those options. Immediately following the issuance of the SAVRS, the RHF Group was forced by Lehman to carry a substantial debt to Lehman. Unbeknownst to the RHF Group, the Swap Contract was valued by Lehman pursuant to a secret, restrictive valuation methodology developed by Lehman that effectively prevented the RHF Group from being "in the money" despite the fact that the SAVRS's variable rate determined at auction often exceeded the synthetic "fixed" rate. Instead, even when variable interest rates began to rise, the RHF Group was told that the overall value of the Swap Contract was consistently and substantially in Lehman's favor pursuant to Lehman's calculation, and the RHF Group was "out of the money" at an ever increasing amount of millions of dollars.

28. In or about March 2005, at a time when fixed interest rates were favorable, RHF Group notified Lehman that it intended to seek to convert the SAVRS to a favorable fixed rate. At the time, the prevailing fixed rate for RHF's blend of taxable and non-taxable bonds was 4.91%, a significant saving over the 5.63% blended rate RHF was paying on the SAVRS interest rate swap. It would have also allowed RHF to avoid any downgrading of ACA credit rating. At the time, Cain Brothers estimated that it would cost $405,000 for RHF to terminate the Swap Contract. However, Lehman now informed the RHF Group that the cost of terminating the Swap Contract was $15.8 million, which represented the amount the RHF Group was purportedly then "out of the money" on the Swap Contract based on Lehman's unexplained calculations. Lehman proposed an alternative, but the alternative was another swap agreement at an even higher cost to the RHF Group. As a result of Lehman's actions, RHF was unable to convert to the fixed rate, costing RHF losses in an amount not less than $11,590,728.

29. In addition, on information and belief and unbeknownst to the RHF Group, Lehman was involved in a illegal price fixing scheme in which it manipulated the SAVRS' rates determined at auction to its own benefit. On information and belief, Lehman would pre-select a "winning bid" during each auction cycle to ensure that the SAVRS would trade at below fair market value and maximize their profits and inflate the amount the RHF Group was "out of the money" under the Swap Contract.

30. On information and belief, through Lehman's aforementioned continuing leverage and control over the RHF Group and bad faith and corrupt conduct, the RHF Group was always "out of the money" on the Swap Contract in an unreasonably and unfairly excessive amount, and Lehman's conduct interfered with, among other things, the RHF Group's right, at its sole option, to convert the SAVRS into true fixed rate bonds or refinance the SAVRS to take advantage of prevailing fixed interest rates.

31. In or about 2007, ACA's stock price dropped 95 percent, which wiped out its equity and resulted in a negative net worth. In or about November 2007, in response to reports that it would be downgraded from its investment grade "A" rating, ACA stated that it would need to raise additional capital to comply with its guaranty obligations. On or about December 19, 2007, the credit agency Standard & Poor's downgraded ACA's credit rating from "A" to "CCC," or junk status. This resulted in an immediate and significant increase to interest rates on the SAVRS paid by the RHF Group. The rates fluctuated subsequent to the downgrade and reached a high of 14.7% in December 2007.

32. In or about December 2007 and January 2008, following ACA's downgrade, the RHF Group sought to restructure the transaction and re-fund the SAVRS and secure them with letters of credit from banks rather than a bond insurer.

33. Further complicating the matter, in or about February 2008, the auction rate securities market that Lehman ran, and which Lehman represented and promised was stable, failed.

34. Moreover, in or about June 2008, Lehman was claiming that the RHF Group was purportedly "out of the money" in excess of $13 million. At the time, Lehman was viewed as a leader in the financial markets and promoted itself as financially stable, and therefore contended that its valuation was correct and honorable. However, Lehman's valuation was in fact biased and unfair. Nonetheless, because of the design of the original plan of refinancing, the RHF Group, under duress and in a disadvantageous position, was forced to terminate the Swap Contract, as well as the interest rate swaps in connection with the SAVRS issued in 1999 and 2000 for the benefit of, among others, St. Catherine and DeSmet. The RHF Group, St. Catherine and DeSmet were then forced to renegotiate a new, disadvantageous 20-year term swap agreement with Lehman in connection with the soon to be refinanced bonds (the "New Swap Contract").

35. Pursuant to the New Swap Contract, among other things, Lehman required that the RHF Group pay a much higher synthetic "fixed" interest rate to avoid paying over the alleged $13 million to compensate Lehman for the purported value of the old Swap Contract at the time of negotiation. Under the New Swap Contract, in or about July 2008, Lehman reaffirmed its prior unconditional guarantees of Plaintiffs' variable interest and capital payment obligations on the new variable rate bonds that were subject to the agreement, that such payments would be punctually made when they became due and payable, and that Lehman could continue to perform its obligations over the 20 year term of the contract.

36. In or about July 2008, the RHF Group completed the refinancing of the SAVRS and converted them to Variable Rate Demand Bonds, which were not auction rate securities and were secured with letters of credit from banks rather than a bond insurer.

37. Despite reaffirming its unconditional guarantee of the variable interest and capital payment obligations on the new bonds in or about July 2008, Lehman was suffering from unprecedented losses from its own investments in subprime mortgage backed securities that were threatening the existence of the company and its subsidiaries.

38. In or about 2002, Lehman became the market leader in the subprime mortgage industry by, among other things, lending billions of dollars to other financial institutions to fund subprime mortgages, originating its own subprime mortgage loans, and purchasing subprime mortgages to package and sell as asset-backed securities to global investors.

39. In its public statements, Lehman boasted about its "record" and "robust" profits earned from its holdings in the subprime market. In its 2005 Form 10-K filed with the Securities and Exchange Commission ("SEC") on February 13, 2006, Lehman explained that its holdings in the subprime market represented a significant portion of its business:

> Fixed Income net revenues were a record $7.3 billion in 2005, increasing 28% compared with 2004 driven by double digit revenue increases from each geographic region and record revenues across a number of businesses including commercial mortgage and real estate, residential mortgage origination and securitization, and interest rate products. Revenues from our commercial mortgage and real estate businesses increased substantially in 2005 reaching record levels, as the strong demand for commercial real estate properties, the recovery in certain property markets and relatively low interest rates drove asset sales and robust levels of securitizations. Revenues from our residential mortgage origination and securitization businesses increased in 2005 from the robust levels in 2004, reflecting record volumes and the continued benefits associated with the vertical integration of our mortgage origination platforms.

40. In its 2006 10-K Form filed with the SEC on February 13, 2007, Lehman's fixed income net revenues purportedly continued to grow "to a record $8.4 billion in 2006, an increase of 15% from 2005."

41. However, Lehman's 2006 10-K Form reported for the first time that, despite its continued growth, it had witnessed a decrease in revenue from its residential mortgage origination and securitization businesses that were "primarily attributable to a softer housing market and lower margins." But nowhere in its 2006 10-K Form did Lehman acknowledge the potential devastating impact of its substantial holdings in the subprime market on its operations as a whole. Instead, Lehman claimed that increased interest rates and a downturn in the housing market would affect only a few of its businesses, and that it maintained "sufficient liquidity to meet all of [its] funding obligations in all market environments."

42. According to Lehman's 2007 10-K Form, which was filed with the SEC on January 29, 2008, its overall revenues continued to climb:

> On the basis of a record first half and a reasonably successful navigation of difficult market conditions in the second half, we achieved our fourth consecutive year of record net revenues, net income and diluted earnings per common share in 2007. Net income totaled $4.2 billion, $4.0 billion and $3.3 billion in 2007, 2006 and 2005, respectively, increasing 5% in 2007 and 23% in 2006 from the corresponding 2006 and 2005 periods, respectively. Diluted earnings per common share were $7.26, $6.81 and $5.43 in 2007, 2006 and 2005, respectively, up 7% in 2007 and 25% in 2006 from the corresponding prior periods, respectively.

7

43. Despite its reported continued growth, Lehman acknowledged that the "difficult latter half of 2007 witnessed a "deterioration within the U.S. subprime residential mortgage asset category, the weakening of the U.S. housing sector became worse than most observers expected," and a decrease in investor confidence in the subprime securities market "which, in part, led to many market participants re-pricing assets and taking large write-downs." However, Lehman again minimized any risks its own subprime holdings posed to the overall health of the company, stating:

> During the latter half of our 2007 fiscal year, the global capital markets experienced a significant contraction in available liquidity as the adverse market environment experienced in our third quarter continued into our fourth quarter and deteriorated further in November 2007. Despite infusions of liquidity by central banks into the financial system, broad asset classes, particularly U.S. subprime residential mortgages and structured credit products, remained thinly traded throughout this period. Notwithstanding these global market conditions, we ended the period with a very strong liquidity position. At November 30, 2007, our liquidity pool was approximately $35 billion, up from approximately $31 billion at November 30, 2006 and down slightly from approximately $36 billion at the end of the third quarter of the 2007 fiscal year. Long-term capital (long-term borrowings, excluding borrowings with remaining contractual maturities within twelve months of the financial statement date, and total stockholders' equity) was at approximately $146 billion at the end of 2007 fiscal year, up from approximately $100 billion at November 30, 2006 and $142 billion at the end of the third quarter of the 2007 fiscal year.

44. Lehman failed to disclose in their 10-K Forms from 2005, 2006, or 2007 that their risk exposure in the event of a collapse of the housing market was massive. Indeed, when the housing market did collapse in or about 2007 and its holdings in the subprime market began defaulting at a record pace, Lehman suffered losses in the amount of billions of dollars. Moreover, despite claiming that it maintained liquidity positions sufficient to sustain adverse economic conditions, those positions were extremely inadequate to cover its continuing losses.

45. After Lehman filed for bankruptcy relief, Lehman was unable to meet its obligations under the New Swap Contract. To avoid defaulting on the refinanced bonds, the RHF Group made interest payments to its bond holders without any protection afforded under the New Swap Agreement.

46. As a result of actions and inactions of the Debtors, including but not limited to (i) breach of contract, (ii) fraud, constructive fraud, and/or fraudulent misrepresentation by the Debtors with respect to certain swap transactions between RHF and the Debtors, (iii) negligence of or negligent misrepresentation by the Debtors, (iv) breach of fiduciary duty, (v) breach of the covenant of good faith and fair dealings, and (vi) unfair competition, the RHF Group has been harmed and is therefore entitled to damages in an amount not less than $11,871,612.

47. Due to the voluminous records related to the RHF Group's claims described herein, the RHF Group has not attached all of the potential documentary evidence that supports

8

its claims. As such, the RHF Group expressly reserves all rights to supplement the documentation attached hereto as the same becomes necessary.

48. The claims asserted herein against the Debtors shall in no way limit any other claims possessed by the RHF Group against any entity other than the Debtors, including any claims arising after the Petition Date.

**H A N D   D E L I V E R Y**

RECEIVED BY: _[signature]_   DATE: 9/4/09   TIME: 4:27