# Exhibit

# 10

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| RETIREMENT HOUSING GROUP FOUNDATION, et al., | B230243 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC404726) |
| v. | COURT OF APPEAL - SECOND DIS' |
| RICHARD S. FULD, et al., | F I L E D |
| Defendants and Respondents. | SEP 1 1 2012 |
| | JOSEPH A. LANE            Clerk |
| | Deputy Clerk |

APPEAL from a judgment of the Superior Court of Los Angeles County. William F. Highberger, Judge.  Reversed.

Reuben Raucher & Blum, Timothy D. Reuben, Stephen L. Raucher and Gregory P. Barchie for Plaintiffs and Appellants.

Dechart LLP, Adam J. Wasserman (*pro hac vice*) and Kathleen N. Massey (*pro hac vice*); Dechert LLP and Joshua D.N. Hess for Defendants and Respondents Michael L. Ainslie, John F. Akers, Roger S. Berlind, Thomas H. Cruikshank, Marsha Johnson Evans, Sir Christopher Gent, Roland A. Hernandez, Henry Kaufman and John D. Macomber.

Simpson Thacher & Bartlett LLP, James G. Kreissman and Simona G. Strauss for Defendant and Respondent Christopher M. O'Meara.

Allen & Overy and Todd S. Fishman (*pro hac vice*) for Defendant and Respondent Richard S. Fuld, Jr.

Proskauer Rose LLP and Joshua J. Pollack for Defendant and Respondent Erin M. Callan.

### INTRODUCTION

Following the bankruptcy filing of Lehman Brothers, several charitable foundations filed a complaint against Lehman's former chief executive officer, chief financial officers and members of the board of directors, alleging fraud and related claims in connection with the plaintiffs' investment in certain complex financial transactions in reliance upon the individual defendants' material misrepresentations as to the financial condition of Lehman Brothers in financial statements and elsewhere as well as these individuals' policy and practice of "bid rigging" securities auctions and otherwise manipulating and inflating amounts due from the plaintiffs in connection with these transactions.

The trial court sustained the individual defendants' demurrer without leave to amend and entered a judgment of dismissal as to the individual Lehman defendants.

The plaintiffs appeal. We reverse.

### FACTUAL AND PROCEDURAL SUMMARY

According to the allegations of the second amended complaint, the plaintiffs, including Retirement Housing Group Foundation (Retirement Housing Group), are church-related not-for-profit corporations.[1] Retirement Housing Group's mission is to provide safe and affordable housing and services for senior citizens, persons with disabilities and low income families. Its headquarters are in Long Beach, but it sponsors, develops and manages properties throughout the country.

---

[1] The plaintiffs are Retirement Housing Group Foundation (Retirement Housing Group) and its affiliates Foundation Property Management; Bixby Knolls Towers, Inc.; Gold Country Health Center, Inc.; Mayflower Gardens Health Facilities, Inc.; Mayflower RHF Housing, Inc.; Sun City RHF Housing, Inc.; Holly Hill RHF Housing, Inc.; Merritt Island RHF Housing, Inc.; Martin Luther Foundation, Inc.; Yellowwood Acres, Inc.; Bluegrass RHF Housing, Inc.; St. Catherine RHF Housing, Inc.; and DeSmet RHF Housing, Inc. We include them all in our references to Retirement Housing Group Group.

### Cain Brothers' Plan of Refinancing

In July 1998, Retirement Housing Group issued a written request for proposal to several investment banking firms to solicit proposals to structure a multi-state, multi-facility group that would issue approximately $140 million in taxable and tax exempt bonds to refinance its debt. Cain Brothers, an investment banking and financial advisory firm providing products, services and expertise to the medical care industry, responded with a proposal to structure a highly complicated, long-term, 30-year plan of refinancing for Retirement Housing Group Group, to underwrite bonds to be issued for Retirement Housing Group Group's benefit and to sell those bonds in capital markets. (Cain Brothers' Investment Banking Proposal to Retirement Housing Group was attached as Exhibit A to the complaint.)

In August, Retirement Housing Group Group formally accepted Cain Brothers' proposal and entered into a written Refinancing Agreement.

### Lehman Brothers and the Individual Lehman Defendants

Lehman Brothers was a global financial services firm that, through its subsidiaries, provided services in investment banking, equity and fixed income sales, research and trading, investment management, private equity and private banking. Lehman Brothers marketed itself as one of the leading investment banking firms, representing itself as trustworthy, honest, stable, dependable, in compliance with all laws and well-capitalized, and that its public financial statements were fair and accurate.[2]

---

[2]    According to the operative complaint, Lehman Brothers Holdings, Inc. (Lehman Brothers) owned and controlled its subsidiaries Lehman Brothers, Inc.; Lehman Brothers Special Financing, Inc.; and Lehman Government Securities, Inc., entities which in one role or another became involved in Retirement Housing Group Group's refinancing. All of these Lehman Brothers entities were alter egos of each other and shared a unity of interest such that it would sanction fraud or promote injustice not to treat them as alter egos. These entities also formed a single enterprise. On information and belief, Retirement Housing Group alleged these entities commingled funds and assets, used the

Richard S. Fuld, Jr. was Chairman of the Board and Chief Executive Officer of Lehman Brothers. Christopher M. O'Meara was Chief Financial Officer and Controller of Lehman Brothers from 2004 through December 2007. Erin M. Callan was Chief Financial Officer and Controller of Lehman Brothers from December 2007 through June 2008.

Michael L. Ainslie, John F. Akers, Roger S. Berlind, Thomas H. Cruikshank, Marsha Johnson Evans, Christopher Gent, Roland A. Hernandez, Henry Kaufman and John D. Macomber were all members of the Lehman Brothers Board of Directors.

Fuld, O'Meara, Callan, Ainslie, Akers, Berlind, Cruikshank, Evans, Gent, Hernandez, Kaufman and Macomber were all named as the Individual Lehman Defendants.

### SAVRS

Pursuant to the Refinancing Agreement, based on Lehman Brothers' representations and at Cain Brothers' recommendation, the entirety of Retirement Housing Group Group's bonds were issued as auction rate securities called Select Auction Variable Rate Securities, a product Lehman Brothers offered and marketed as "SAVRS." SAVRS were supposed to bear interest at a variable rate that would be determined by a purportedly competitive bidding "Dutch" auction held by a Lehman Brothers subsidiary every 35 days that was supposed to provide a fair market interest rate. According to Lehman Brothers and Cain Brothers, in each auction cycle, Lehman Brothers would solicit interest from existing bond holders and potential investors and collect bids from those bond holders and investors that specified a rate at which they would buy and/or sell SAVRS.

Lehman Brothers would then allegedly compile each bid and provide the raw data of each bid (and not the identity of the bidders) to a third party auction agent to determine the rate of the SAVRS. The auction rate was supposed to be set through a process in

---

same offices and employees, disregarded corporate formalities and were used as mere shells or conduits for the affairs of one another.

4

which bids with successively higher rates were accepted until all SAVRS available in the auction were sold. The highest bid at which SAVRS were sold in the auction, the so called "winning bid" or "clearing rate," would be the interest rate applicable for the next SAVRS period. Every 35 days, a new SAVRS auction would be held and Lehman Brothers would compile new bids from which the SAVRS rate would purportedly be reset at a clearing rate that represented a fair market rate, and Lehman Brothers and Cain Brothers would continue to receive fees each auction cycle for orchestrating the auctions and compiling the bids to be submitted to the auction agent.

As the only market agent and broker-dealer for Retirement Housing Group Group's SAVRS, Lehman Brothers had total control over the auction process. It provided the auction agent with the "Maximum Rate"—a high rate that would prevail only if there were a "failed" auction due to a lack of bids below the maximum rate. Lehman Brothers also provided the auction agent with all bid and sell orders. The auction agent would simply compile the information received from Lehman Brothers and pass that information, including the clearing rate, onto Retirement Housing Group Group. Under these circumstances, Lehman Brothers could predetermine what the clearing rate would be and was in the position to manipulate the auctions and convey the results of those auctions through the auction agent to Retirement Housing Group Group since Lehman Brothers had sole control over the orders. However, based on Lehman Brothers' and Cain Brothers' representations, information they provided and contracts associated with the refinancing, Retirement Housing Group Group justifiably believed the auctions would be conducted fairly and properly without manipulation and that fair market interest rates would be set.

### The Swap Contract

Pursuant to Cain Brothers' refinancing plan and recommendation, the interest rate of approximately 85 percent of the SAVRS would be synthetically fixed through an "interest rate swap," another highly complicated, long term, 30-year contract with Lehman Brothers (the Swap Contract). (The Swap Contract was attached as Exhibit B.)

5

Pursuant to the Swap Contract, in each successive auction cycle, Retirement Housing Group Group agreed to pay a stipulated fixed rate of interest on the SAVRS to Lehman Brothers, and Lehman Brothers agreed to pay the holders of the SAVRS interest at the variable rate it determined by auction every 35 days.

Pursuant to the Swap Contract and consistent with its long term 30-year commitment, Lehman Brothers unconditionally guaranteed Retirement Housing Group Group's variable interest and capital payment obligations on the SAVRS, subject to the agreement and that such payments would be made punctually when they became due and payable. Under the Swap Contract, Retirement Housing Group Group was also to make additional payments and pay fees for Lehman Brothers' services for auctioning the SAVRS every 35 days. Both before and at the time of executing the Refinancing Agreement and Swap Contract, Lehman Brothers and Cain Brothers represented orally and in writing to Retirement Housing Group Group that the benefit of the interest rate swap was that it allowed Retirement Housing Group Group to "hedge" or protect itself against the risks of variable interest rate fluctuations and achieve a lower overall fixed rate than would be available if the SAVRS were issued as true fixed rate obligations. (Cain Brothers also represented Retirement Housing Group Group would be "in the money" or earn a windfall under the Swap Contract.)

The 1998 Swap required the parties and any "Credit Support Provider" (Lehman) to provide copies of "all documents evidencing necessary corporate and other authorizations and approvals" of the 1998 Swap and related agreements, "including, where applicable, certified copies of the resolutions of its Board of Directors authorizing the execution and delivery" of such documents. Further, Lehman was to provide Retirement Housing Group with its audited financial statements and Lehman's counsel's "form of opinion" stated that the "execution, delivery and performance" of the Swap were within Lehman's corporate power and "duly authorized by all necessary corporate action."

6

To enhance Retirement Housing Group's creditworthiness, the Refinancing Agreement and Swap Contract required that Retirement Housing Group guarantee its interest and capital payment obligations on the SAVRS including those to Lehman Brothers at the synthetically fixed rate and to holders of a minority of SAVRS not subject to the Swap Contract with a bond insurer. Cain Brothers recommended bond-insurance through ACA Financial Guaranty Corporation as the best option to guarantee the SAVRS as it purportedly offered a safe, long term "A" rated commitment for a one-time up-front fee of approximately $3 million. In order to adequately guarantee interest and capital repayments, ACA needed to maintain this "A" rating. In 1999 and 2000, on Cain Brothers' recommendation, Cain Brothers underwrote additional fixed rate bonds for Retirement Housing Group's benefit, and ACA served as the insurer for these bonds as well.

Contrary to Cain Brothers' advice, the refinancing plan was not safe, low risk, low cost or flexible, and in fact, the guarantees provided by Lehman Brothers and ACA were highly risky and became worthless to Retirement Housing Group's substantial detriment.

Unbeknownst to Retirement Housing Group, Lehman Brothers valued the Swap Contract pursuant to a secret, restrictive valuation methodology it developed that effectively prevented Retirement Housing Group from being "in the money" despite the fact the SAVRS variable rate determined at auction often exceeded the synthetic "fixed" rate. On Retirement Housing Group's information and belief, Lehman Brothers was involved in an illegal price fixing scheme in which it manipulated the SAVRS rates determined at auction to its own benefit such that Lehman Brothers would pre-select a "winning bid" during each auction cycle to ensure the SAVRS would trade at below fair market value and maximize their profits and inflate the amount Retirement Housing Group was "out of the money." On information and belief, Lehman Brothers' board of directors and executives had knowledge of, directed, approved and/or ratified the practice and policies of bid rigging securities auctions and otherwise inflating the amount Lehman Brothers was "in the money" under the Swap Contract, and through Lehman Brothers'

7

bad faith and corrupt conduct, Retirement Housing Group was always "out of the money" on the Swap Contract in an unreasonably and unfairly excessive amount. Because the valuation methodology was secret, it was not until Retirement Housing Group was forced to enter into a new Swap Contract in or about July 2008 that it discovered Lehman Brothers had unfairly and wrongfully valued the amounts owed.

Despite its obligations to Retirement Housing Group and in reckless pursuit of higher profits, in 2003 through 2007, ACA guaranteed securities backed by high risk loans, including subprime housing mortgages, well exceeding its ability to do so, and in December 2007, Standard & Poor's downgraded ACA's credit rating from "A" to "CCC" or junk status. As a result, ACA could no longer adequately guarantee Retirement Housing Group's obligations, with extremely negative consequences. Cain Brothers knew or should have known of the facts, but despite its duty to do so, failed to properly disclose, advise or warn Retirement Housing Group.

On May 31, 2006, the United States Securities and Exchange Commission (SEC) issued an Order Instituting Administrative and Cease-and-Desist Proceedings, Making Findings, and Imposing Remedial Sanctions and a Cease and Desist Order Pursuant to Section 8A of the Securities Act of 1933 and Section 15(b) of the Securities and Exchange Act of 1934 (SEC Order). The SEC found Lehman Brothers (and others) had committed numerous Securities Act violations with respect to auction rate securities, including allowing "open bids" and/or "market bids" in auctions in which the bidder indicated it would buy at whatever rate was set during auction; submitting bids or asking investors to change bids so auctions cleared at different rates than they otherwise would have; submitting bids or asking investors to submit bids to prevent the "all-hold" rate which is a below-market rate set when all current holders want to hold their positions so there are no securities for sale at auction; submitting or revising bids after submission deadlines; and engaging in "price talk" which encouraged bidders to bid only at certain rates. The practices inflated the clearing rate.

Lehman Brothers was censured and fined $1.5 million by the SEC and ordered to cease and desist from committing Securities Act violations. Lehman Brothers was further ordered to provide all holders of auction rate securities and issuers of such securities with a written description of its material auction practices and procedures and required to certify in writing through either its chief executive officer or general counsel that it had implemented procedures reasonably designed to prevent and detect failures to conduct the auction process in accordance with disclosed auction procedures.

On information and belief, due to the magnitude of the SEC Order, including the fine, disclosure requirements and written certification, the individual Lehman Defendants were all knowledgeable of the SEC Order and its contents. Neither Lehman Brothers nor Cain Brothers informed Retirement Housing Group of these facts.

Around the time of ACA's downgrade to junk status in December 2007, Lehman Brothers informed Retirement Housing Group the Swap Contract had entered a "safe harbor"—which was anything but safe for Retirement Housing Group. Under the regular terms, Retirement Housing Group's regular monthly interest payments were fixed at 5.19 percent for tax-exempt bonds while Lehman Brothers was responsible for paying the SAVRS rates. However, when the "safe harbor" was triggered, Retirement Housing Group was still required to pay the regular fixed rates to Lehman Brothers but Lehman Brothers only had to pay an "alternative floating rate"—an amount based on an index significantly below the SAVRS rates, and Retirement Housing Group was required to make up all of the shortfall. Thus, any protection Retirement Housing Group was to receive through the Swap Agreement was all but eliminated, and Retirement Housing Group was informed it had no means of curing so it could exit the "safe harbor." Compounding matters, Lehman Brothers had control over the SAVRS auctions and because of the switch to the "safe harbor," it had no obligation to pay SAVRS rates and therefore could profit by manipulating the SAVRS rates. Retirement Housing Group is informed and believes Lehman Brothers did so—virtually overnight, Retirement Housing Group's SAVRS' rates skyrocketed.

9

Over the preceding four years, rates had rarely exceeded 5 percent and did not approach the maximum rate, but beginning in December 2007, Lehman Brothers manipulated the SAVRS rates (almost all of which Retirement Housing Group was required to pay due to the "safe harbor") up to rates "outstripping the previous rates by extraordinary amounts," and Retirement Housing Group paid the amounts demanded.[3] Although these results were presented as being obtained through the proper auction process, Retirement Housing Group is informed and believes the rates were not obtained through a fair and proper auction process. Instead, Lehman Brothers intentionally drove up the rates by manipulation, including techniques described in the SEC Order, but concealed its actions from Retirement Housing Group. This wrongful conduct is evidenced by, among other things, the fact that when the Swap Contract entered the "safe harbor" and Lehman Brothers was no longer required to pay the SAVRS rates under the Swap Contract, the rates suddenly jumped to rates much higher than previous rates, consistently set at a level "just *barely* below—by hundredths or even thousandths of percentage points—the applicable maximum rates." These results could not have occurred under a competitive, fair and unmanipulated auction process.

By intentionally manipulating rates in this manner, Lehman Brothers maximized its profits by purchasing and holding SAVRS that paid exorbitantly high rates even though, as Lehman Brothers knew, Retirement Housing Group had never missed a SAVRS payment, continued to be financially strong and this viability was not jeopardized by ACA's downgrade; rather than approximating a market rate, the auctions resulted in Retirement Housing Group's payment of grossly inflated rates. Because

---

[3]    On December 11, 2007, the auction agent (Bank of New York Trust Company) informed Retirement Housing the clearing rate for most of that auction period's SAVRS was 15.5 percent; on January 3, 2008, Retirement Housing was informed the debt service amount due four days later was $605,002.30. Then on January 7, 2008, Lehman Brothers (through Seth Konheim) advised another $874,007.74 was due for that auction period. On January 15, 2008, Retirement Housing was informed the clearing rate for the auction period was 12 percent, and $1,754,638.79 was due by February 11, 2008. (Retirement Housing further specified the new interest rates and amounts due through June 2008.)

10

Lehman Brothers controlled the auction process, including how much Retirement Housing Group supposedly owed on the SAVRS, it had sole knowledge of the mechanics and purported results of the auctions, while Retirement Housing Group was in a severely compromised position and could only rely on Lehman Brothers' representations and accede to its demands for payment to avoid defaulting on the Swap Contract or SAVRS.

On Retirement Housing Group's information and belief, all of the Individual Lehman Defendants—officers and/or directors of Lehman Brothers, had knowledge of and directed and/or approved of Lehman Brothers' manipulations of the SAVRS auctions as well as the transmittals of results and demands for payments based on undisclosed and unfair manipulation. Further, they ratified the continuance of this course of conduct. Lehman Brothers operated in this matter under the Individual Lehman Defendants' direction and authority, and these defendants accepted and retained the benefits of these activities. Retirement Housing Group's inflated payments increased Lehman Brothers' revenues and helped it to stave off bankruptcy longer than otherwise possible and thereby allowed the Individual Lehman Defendants to increase and extend their compensation.

In December 2007 and January 2008, because of the suddenly immense payments due under the Swap Contract and SAVRS and their inability to "cure" the problems arising from ACA's downgrade, Retirement Housing Group was forced to seek restructuring of the transaction and re-fund the SAVRS and secure them with letters of credit from banks rather than a bond insurer. To mitigate its losses and avoid potential financial disaster, Retirement Housing Group had to refinance the SAVRS. Moreover, in about June 2008, Lehman Brothers was claiming Retirement Housing Group was "out of the money" on the Swap Contract such that termination would cost Retirement Housing Group more than $13 million. At the time, Lehman Brothers was viewed as a leader in the financial markets and continued to promote itself as financially stable and adequately capitalized and contended its valuation was correct and honorable when in fact it was biased and unfair. Retirement Housing Group was under duress and in a disadvantageous position. Lehman Brothers would not agree to amend the Swap Contract but insisted on

11

new, more burdensome 20-year swap agreements (the New Swap Contract, attached to

the complaint as Exhibit D).  Pursuant to the New Swap Contract, Lehman Brothers

required Retirement Housing Group to pay a much higher synthetic "fixed" interest rate

to avoid immediately paying the $13 million allegedly due to compensate Lehman

Brothers for the purported value of the old Swap Contract.  Under the New Swap

Contract, Lehman Brothers promised to guarantee Retirement Housing Group's variable

interest and capital payment obligations on the new variable rate bonds subject to the

agreement, reaffirming that such payments would be made when due and payable and

reaffirming Lehman Brothers was adequately capitalized and had accurately and fairly

publicly reported its financial condition and could continue to perform its obligations

over the contract's 20-year term.  In July 2008, Retirement Housing Group completed the

refinancing of the SAVRS and converted them to Variable Rate Demand Bonds (not

auction rate securities) secured with letters of credit from banks rather than a bond

insurer.

Two months later, however, Lehman Brothers filed Chapter 11 bankruptcy on

September 15, 2008.

Despite unconditionally guaranteeing Retirement Housing Group's variable

interest and capital payment obligations on the new bonds in July 2008, Lehman Brothers

was suffering unprecedented losses from its own investments in subprime mortgage

backed securities and real estate which threatened its existence.  In public statements, as

the market leader in the subprime mortgage industry, it had boasted about its "record"

and "robust" profits.  Retirement Housing Group quoted passages of Lehman Brothers'

2005, 2006 and 2007 Form 10-Ks filed with the SEC—authorized and signed by the

Individual Lehman Defendants—claiming revenues continued to climb.

The Individual Lehman Defendants failed to disclose and concealed in the 10-K

forms for 2005, 2006 and 2007 that Lehman Brothers was grossly overleveraged and

overexposed to toxic subprime mortgage backed securities and/or other real estate related

investments and its risk exposure in the event of a collapse of the housing market was

massive. When the housing market did collapse, Lehman Brothers began to suffer losses in the billions. Yet, despite claiming liquidity positions sufficient to sustain adverse economic conditions, Lehman Brothers' positions were extremely inadequate.

### Repo 105 Transactions to Create a Materially Misleading Financial Picture

Retirement Housing Group is informed and believes, in order to dramatically and falsely reduce Lehman Brothers' stated leverage, the Individual Lehman Defendants drastically increased Lehman Brothers' use of off-balance sheet devices, known within Lehman Brothers as "Repo 105" and "Repo 108" (collectively "Repo 105") transactions, to temporarily remove securities inventory from its balance sheet, usually for a period of seven to ten days, and to create a materially misleading picture of the firm's financial condition, particularly in late 2007 to 2008.

Repo 105 transactions were nearly identical to standard repurchase and sale ("repo") transactions used to secure short-term financing, but with a critical difference: Lehman Brothers accounted for Repo 105 transactions as "sales" as opposed to secured financing transactions (as would be the case for a standard "repo"), solely for misleading financial reporting purposes. By recharacterizing the Repo 105 transactions as sales, Lehman Brothers removed such inventory from its balance sheets and used the cash to pay down other liabilities, thereby reducing both total liabilities and total assets, lowering its leverage ratios.

Moreover, because Repo 105 transactions were used solely to create a distorted and materially misleading financial picture, Lehman Brothers regularly increased its use of Repo 105 transactions in the days prior to reporting periods to reduce its publicly reported net leverage and balance sheet. Then a few days after a new quarter began, Lehman Brothers would borrow the necessary funds to repay the cash borrowing plus interest, repurchase the securities, and restore the assets to its balance sheets. The only purpose for undertaking these transactions at or near each quarter end was to temporarily reach quarter-end balance sheet targets set by senior Lehman Brothers management in

13

order to report lower leverage and lower net leverage ratios than Lehman Brothers
actually had.

Retirement Housing Group is informed and believes the Individual Lehman
Defendants were knowledgeable of and directed, authorized and/or ratified Lehman
Brothers' escalating use of Repo 105 transactions and the filing of materially misleading
financial statements, which contained no mention of the Repo 105 transactions.

In addition to these material omissions and active concealment, Retirement
Housing Group is informed and believes the Individual Lehman Defendants affirmatively
misrepresented Lehman Brothers' accounting treatment by stating repo transactions as
secured financing transactions when in fact Lehman Brothers treated its tens of billions of
dollars in Repo 105 transactions as true sale transactions (as quoted from notes and
further described and explained in Lehman Brothers 2007 Form 10-K, first quarter 2008
10-Q and second quarter 2008 Form 10-Q). As a result of Lehman Brothers' Repo 105
practice, the Individual Lehman Defendants temporarily reduced the firm's net balance
sheet at quarter end by approximately $38.6 billion (9 percent) in fourth quarter 2007,
$49.1 billion (12 percent) in first quarter 2008 and $50.38 billion (15 percent) in second
quarter 2008. As a further result, Lehman Brothers publicly reported a net leverage ratio
1.7 to 1.9 points lower than what its net leverage ratio would have been if the Individual
Lehman Defendants had used ordinary repo transactions. The Form 10-K and 10-Q
reports were filed by the Individual Lehman Defendants with the intention and
knowledge they would be disseminated to the public.

The Individual Lehman Defendants also made misleading public statements
misrepresenting and concealing Lehman Brothers' Repo 105 usage. For example, during
the March 18, 2008, earnings call, Individual Lehman Defendant Callan informed
analysts of a drop in Lehman Brothers' net leverage ratio from the fourth quarter 2007 to
first quarter 2008, but did not disclose the reduction in leverage was partially attributable
to an increase of approximately $11 billion in quarterly Repo 105 usage. Similarly, in the
preliminary second quarter 2008 earnings call, Callan focused on reduced leverage

14

without mentioning the temporary removal of $50 billion from Lehman Brothers' balance
sheet using Repo 105 transactions. In addition, at the end of the second quarter of 2008,
based on reported numbers, Lehman Brothers proclaimed it had its "lowest net leverage
ratio in its history as a public company" and CEO Fuld stated Lehman Brothers' capital
position had "never been stronger" without disclosing the Repo 105 transactions, creating
a materially misleading and in fact false financial picture. Even a sophisticated reader of
Lehman Brothers' Forms 10-K and 10-Q would not have been able to ascertain the fact
of, let alone, the amount of Lehman Brothers' Repo 105 usage. The Individual Lehman
Defendants had an obligation to disclose Lehman Brothers' Repo 105 practice, but
instead they knowingly and in bad faith caused Lehman Brothers to publicly file and
present reports and statements containing material omissions and/or misrepresentations.

After Lehman Brothers filed bankruptcy, it failed to make payments or in any way
meet its obligations under the New Swap Contract signed just three months earlier; to
avoid defaulting on its refinanced bonds, Retirement Housing Group made interest
payments to bondholders without any of the protection afforded under the New Swap
Contract. Prior to and at the time of the renegotiated New Swap Contract, Lehman
Brothers' officers and directors were aware of these materially adverse facts yet failed to
disclose them. The concealment of such materially adverse facts was done with the
Individual Lehman Defendants' knowledge and approval and under their direction and
authority.

Retirement Housing Group justifiably relied on Lehman Brothers' statements that
it continued to be a strong and viable company that was adequately capitalized and was
honestly and fairly reporting to the public its financial condition. If Lehman Brothers had
not made such statements, which were directed and approved by the Individual Lehman
Defendants, and had not concealed that Lehman Brothers lacked liquidity and was
grossly overleveraged, grossly overexposed to toxic subprime mortgage-backed securities
and overpriced real estate investments and was teetering on the edge of bankruptcy,
Retirement Housing Group would not have entered into the New Swap Contract, a

15

contract that was supposed to provide years of protection and stability, but instead cost
Retirement Housing Group enormous fees and created great, ongoing hazard with no
resulting benefit.

Retirement Housing Group alleged a number of claims against Cain Brothers and
ACA. As to the Individual Lehman Defendants, Retirement Housing Group alleged two
fraud causes of action, two negligent misrepresentation causes of action and claims for
intentional interference with prospective economic advantage and declaratory relief.
More particularly, it its twelfth cause of action, Retirement Housing Group alleged fraud
based on Lehman's secret manipulation of the SAVRS auctions during the period from
December 2007 through June 2008 and misrepresentation of the clearing rates and
amounts purportedly owed, with the Individual Lehman Defendants' knowledge,
direction and approval and subsequent ratification of the ongoing wrongful course of
conduct. In its fifteenth cause of action, Retirement Housing Group alleged fraud based
on the Individual Lehman Defendants' intentional misrepresentations leading it to enter
into the New Swap Contract in July of 2008. It its thirteenth and sixteenth causes of
action for negligent misrepresentation, Retirement Housing Group alleged that if the
foregoing misrepresentations were not intentionally misleading, they were at least made
with no reasonable grounds for believing them to be true.

In its fourteenth cause of action for intentional interference with prospective
economic advantage, Retirement Housing Group alleged Lehman Brothers knew of
Retirement Housing Group's economic relationship with holders and potential holders of
the SAVRS with the probability of future economic benefit, the Individual Lehman
Defendants knew of and directed and/or approved of Lehman's intentional manipulation
of the SAVRS auctions, and this conduct and these misrepresentations actually disrupted
Retirement Housing Group's relationship with holders and potential holders of SAVRS
by grossly inflating the rates Retirement Housing Group purportedly owed on the
SAVRS. In its seventeenth cause of action for declaratory relief, Retirement Housing

16

Group sought indemnity for amounts Lehman Brothers claimed it was owed under the swap agreements.

The Individual Lehman Defendants filed demurrers to all causes of action alleged against them. One (Roland Hernandez, a Lehman Director) also filed a motion for sanctions pursuant to Code of Civil Procedure section 128.7 with respect to the allegations the Director Defendants (as opposed to Officer Defendants) were knowledgeable of, and directed, authorized and/or ratified Lehman Brothers' use of Repo 105 transactions. Hernandez did not file a supporting declaration but relied on the voluminous report of the court-appointed bankruptcy examiner in the Lehman bankruptcy.

After conducting informal interviews of Lehman's officers and directors (among others), the bankruptcy examiner stated: "Lehman's failure to disclose the use of an accounting device to significantly and temporarily lower leverage, at the same time that it affirmatively represented those 'low' leverage numbers to investors as positive news, created a misleading portrayal of Lehman's true financial health. Colorable claims exist against the senior officers who were responsible for balance sheet management and financial disclosure, who signed and certified Lehman's financial statements and who failed to disclose Lehman's use and extent of Repo 105 transactions to manage its balance sheet." Hernandez had reportedly denied knowledge of the transactions, and the bankruptcy examiner believed him (and other directors). In opposition to the Motion for Sanctions, Retirement Housing Group also filed excerpts from various articles and books regarding Lehman Brothers' conduct prior to its bankruptcy.

Retirement Housing Group filed opposition to the demurrer and the Individual Lehman Defendants filed their replies.

Prior to the hearing, the trial court prepared a tentative ruling indicating the court's intention to sustain the Individual Lehman Defendants' Demurrer without leave to amend despite the fact the trial court's consideration of the demurrer to the second amended

17

complaint was the "first judicial test of the sufficiency of the pleading."[4]  At the hearing,
the trial court again acknowledged that no court had yet ruled on the adequacy of
Retirement Housing Group's allegations, and "one of the easiest ways to be reversed by
the California Court of Appeal[] is to sustain a demurrer without leave to amend the first
time a court has occasion to test a pleading and to exercise discretion to deny leave to
amend."

The court commented that Retirement Housing Group had treated all of the
Individual Lehman Defendants "like they are peas in a pod.  And that does tend to
undercut the belief that there's really something going on here as opposed to just an effort
to go after E&O insurance or some other collateral purpose that's not a proper way to
proceed in litigation."  In urging the trial court to allow the filing of a third amended
complaint, counsel for Retirement Housing Group argued the simultaneous consideration
of the Motion for Sanctions "put in all that other normally extraneous evidence [at the]
pleading stage [ ]," including the bankruptcy examiner's findings as to Fuld, O'Meara
and Callan as "absolutely responsible[, t]hey knew, they put out false statements,
etcetera, etcetera.  [¶] That's the independent evidence.  I actually have more than most
people would when they are outside of the major company, in order to plead specific

---

[4]    The trial court noted Retirement Housing Group had filed its original complaint in
December 2008, naming ACA as the only defendant.  Then, as a matter of right,
Retirement Housing Group filed a first amended complaint in February 2009, adding as
defendants both Cain Brothers and the Individual Lehman Defendants.  In March 2009,
the Individual Lehman Defendants filed a notice of removal to the United States District
Court for the Central District and later filed a motion to transfer to the Southern District
of New York.  On Retirement Housing Group's motion, the matter was remanded to the
Superior Court for Los Angeles County in September 2009 and assigned to the Complex
Civil Litigation Program.  In October 2009, the Individual Lehman Defendants filed
demurrers to the first amended complaint.  Some of these defendants also challenged the
court's exercise of personal jurisdiction over them, but the trial court decided the
demurrers first.  Pursuant to the trial court's Initial Status Conference Order, all discovery
and motion activity was stayed; at the May 2010 status conference, Retirement Housing
Group requested and was granted leave to file a second amended complaint which was
filed that same day.

18

facts about, certainly, some of those defendants." Throughout the argument, counsel for Retirement Housing Group acknowledged the trial court's indication of the need for greater specificity, particularly as to the individuals and the elements of fraud as well as recent developments with respect to the declaratory relief cause of action and requested the opportunity to amend to provide greater detail. At the conclusion of the hearing, the tentative "remain[ed] merely a tentative," and the parties were invited to file supplemental briefs. Retirement Housing Group again requested the opportunity to amend, noting that in *Openwave Sys. v. Fuld* (N.D. Cal. 2009) 2009 U.S. Dist. LEXIS 48206, in considering a motion to dismiss, the court rejected the contention that similar claims against the individual Lehman defendants for fraud, negligent misrepresentation and fraudulent concealment were "barred on their face" "under the more stringent federal pleading standards" and granted leave to amend. "On this first test of the pleadings, Plaintiffs thus seek the same opportunity to amend their complaint to include allegations particular to each Individual Lehman Defendant, which they can do."

Ultimately, essentially adopting the tentative ruling as the order, the trial court sustained without leave to amend the Individual Lehman Defendants' Demurrer. Other than statements attributed to former Lehman CFO Callan and former Lehman CEO Fuld, the trial court noted, the "entirety of the claim is on information and belief," and the "rest of the pleading is an entirely conclusory allegation . . . based on the generalized surmise that these individual defendants were knowing participants in the making by themselves of or by conscious ratification of fraudulent statements or by knowing direction of their subordinates to distort the periodic 'SAVRS' auctions with the intent of harming these very plaintiffs. Notwithstanding the large size of Lehman's operations (which as plaintiffs noted produced 'the largest bankruptcy in history' . . .), plaintiffs assert that these individual defendants planned and/or ratified intentional acts specifically intending to defraud and harm these plaintiffs."

The trial court ruled the "core problem" with the negligent misrepresentation claims was that the individual defendants owed no duty to the plaintiffs; Lehman's

19

obligations derived "purely from its contractual relations." "The specific fraud claims which plaintiffs attempt to plead are so far from the target as to demonstrate that these claims are without any particularized factual basis at the time of filing as against any of these individuals. . . ." The claim for intentional interference fails because there is no assertion these defendants were aware of the relationship between plaintiffs and holders of the SAVRS debt, no assertion the individuals engaged in any independently wrongful act and no assertion the behavior was undertaken for the specific purpose of disrupting plaintiffs' relations with holders of the SAVRS paper. Finally, as evidenced by the pleading on information and belief, the claim for declaratory relief fails given the absence of present controversy with Lehman's representative seeking indemnification.

The trial court then entered judgment of dismissal on all claims of the Second Amended Complaint alleged against the Individual Lehman Defendants (Counts Twelve, Thirteen, Fourteen, Fifteen, Sixteen and Seventeen).

Retirement Housing Group appeals.


### DISCUSSION

"On appeal from an order dismissing an action after the sustaining of a demurrer, we independently review the pleading to determine whether the facts alleged state a cause of action under any possible legal theory. (*McCall v. PacifiCare of Cal., Inc.* (2001) 25 Cal.4th 412, 415 [106 Cal. Rptr. 2d 271, 21 P.3d 1189]; *Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 967 [9 Cal. Rptr. 2d 92, 831 P.2d 317].) We may also consider matters that have been judicially noticed. (*Committee for Green Foothills v. Santa Clara County Bd. of Supervisors* (2010) 48 Cal.4th 32, 42 [105 Cal. Rptr. 3d 181, 224 P.3d 920].) We give the complaint a reasonable interpretation, 'treat[ing] the demurrer as admitting all material facts properly pleaded,' but do not 'assume the truth of contentions, deductions or conclusions of law.' (*Aubry*, at p. 967; accord, *Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1126 [119 Cal. Rptr. 2d 709, 45 P.3d 1171].) We

20

liberally construe the pleading with a view to substantial justice between the parties.
(Code Civ. Proc., § 452; *Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081
[6 Cal. Rptr. 3d 457, 79 P.3d 569]; see *Kotlar v. Hartford Fire Ins. Co.* (2000) 83
Cal.App.4th 1116, 1120 [100 Cal. Rptr. 2d 246].)

""""Where the complaint is defective, '[i]n the furtherance of justice great liberality
should be exercised in permitting a plaintiff to amend his [or her] complaint . . . .""""
(*Aubry v. Tri-City Hospital Dist., supra*, 2 Cal.4th at pp. 970–971.) We determine
whether the plaintiff has shown 'in what manner he [or she] can amend [the] complaint
and how that amendment will change the legal effect of [the] pleading.' (*Goodman v.
Kennedy* (1976) 18 Cal.3d 335, 349 [134 Cal. Rptr. 375, 556 P.2d 737].) '[L]eave to
amend should *not* be granted where . . . amendment would be futile.' (*Vaillette v.
Fireman's Fund Ins. Co.* (1993) 18 Cal.App.4th 680, 685 [22 Cal. Rptr. 2d 807]; see
generally *Caliber Bodyworks, Inc. v. Superior Court* (2005) 134 Cal.App.4th 365, 373–
374 [36 Cal. Rptr. 3d 31].)" (*Sandler v. Sanchez* (2012) 206 Cal.App.4th 1431, 1436-
1437, original italics.)

Regarding individual liability of corporate officers and directors, the court in
*PMC, Inc. v. Kadisha* (2000) 78 Cal.App.4th 1368, 1379-1382, explained: "Corporate
director or officer status neither immunizes a person from personal liability for tortious
conduct nor subjects him or her to vicarious liability for such acts. (*Frances T. v. Village
Green Owners Assn.* (1986) 42 Cal. 3d 490, 505 [229 Cal. Rptr. 456, 723 P.2d 573, 59
A.L.R.4th 447] (hereafter *Frances T.*); 18B Am.Jur.2d (1985) Corporations, § 1877.) As
the Supreme Court held in *United States Liab. Ins. Co. v. Haidinger-Hayes, Inc.* (1970) 1
Cal. 3d 586, 595 [83 Cal. Rptr. 418, 463 P.2d 770]: 'Directors or officers of a
corporation do not incur personal liability for torts of the corporation merely by reason of
their official position, unless they participate in the wrong or authorize or direct that it be
done. They may be liable, under the rules of tort and agency, for tortious acts committed
on behalf of the corporation. [Citations.]' As the Supreme Court explained in *Frances T.*:
'It is well settled that corporate directors cannot be held *vicariously* liable for the

21

corporation's torts in which they do not participate. Their liability, if any, stems from their own tortious conduct, not from their status as directors or officers of the enterprise. [Citation.] "[A]n officer or director will not be liable for torts in which he does not personally participate, of which he has no knowledge, or to which he has not consented. . . . While the corporation itself may be liable for such acts, the individual officer or director will be immune unless he authorizes, directs, or in some meaningful sense actively participates in the wrongful conduct." [Citation.] [¶] Directors are jointly liable with the corporation and may be joined as defendants if they personally directed or participated in the tortious conduct. [Citations.] [ ] Directors are liable to third persons injured by their own tortious conduct regardless of whether they acted on behalf of the corporation and regardless of whether the corporation is also liable. [Citations.] This liability does not depend on the same grounds as "piercing the corporate veil," on account of inadequate capitalization for instance, but rather on the officer or director's personal participation or specific authorization of the tortious act. [Citation.]' (*Frances T., supra,* 42 Cal.3d at pp. 503-504, original italics, fn. omitted.) . . . .

"A corporate director or officer's participation in tortious conduct may be shown not solely by direct action but also by knowing consent to or approval of unlawful acts. (*Frances T., supra,* 42 Cal.3d at pp. 503-504; *Spahn v. Guild Industries Corp.* (1979) 94 Cal.App.3d 143, 157, fn. 9 [156 Cal. Rptr. 375]; *Murphy Tugboat v. Shipowners & Merchants Towboat* (N.D.Cal. 1979) 467 F.Supp. 841, 852, affd. (9th Cir. 1981) 658 F.2d 1256; 18B Am.Jur.2d, *supra,* Corporations, § 1877; 3A Fletcher Cyclopedia of the Law of Private Corporations (perm. rev. ed. 1994) § 1135.) . . . . In *Spahn v. Guild Industries Corp., supra,* 94 Cal.App.3d at page 157 and footnote 9, the Court of Appeal held officers and directors of a corporation were personally liable for fraud committed by a managerial employee because they knew about and allowed the tortious conduct to occur. In addition, corporate directors and officers may be held personally liable, as conspirators, for violating their own duties towards persons injured by the corporation's

22

tort. (*Doctors' Co. v. Superior Court* [(1989)]49 Cal.3d [39,] 48; *Wyatt v. Union Mortgage Co.* [(1979)]24 Cal. 3d [773,] 785.)

"The legal fiction of the corporation as an independent entity was never intended to insulate officers and directors from liability for their own tortious conduct. (*Frances T., supra*, 42 Cal.3d at pp. 507-508; *Michaelis v. Benavides* (1998) 61 Cal.App.4th 681, 688 [71 Cal. Rptr. 2d 776].) The Supreme Court has held: 'The legal fiction of the corporation as an independent entity--and the special benefit of limited liability permitted thereby--is intended to insulate stockholders from personal liability for corporate acts and to insulate officers from liability for corporate contracts; . . .' (*Frances T., supra*, 42 Cal.3d at pp. 507-508.) A corporate officer or director, like any other person, owes a duty to refrain from injuring others. In the context of a negligence claim, the Supreme Court has held that, like any other person, 'directors individually owe a duty of care, independent of the corporate entity's own duty, to refrain from acting in a manner that creates an unreasonable risk of personal injury to third parties.' (*Frances T., supra*, 42 Cal.3d at p. 505.) Stated differently, the Supreme Court held: '*Like any other citizen, corporate officers have a societal duty to refrain from acts that are unreasonably risky to third persons even when their shareholders or creditors would agree that such conduct serves the institution's best interests*. . . . "The only duty which an executive officer of a corporation owes to a third person, whether he be an employee of the corporation or a complete stranger, is the same duty to exercise due care not to injure him which any person owes to another. If an injury is sustained by a third party as the result of the independent negligence of the corporate officer, or as the result of a breach of the duty which that officer, as an individual, owes to the third party, then the injured third party may have a cause of action for damages against the officer personally." [Citation.]' (*Frances T., supra*, 42 Cal.3d at p. 506, fn. 12.) *If a corporate officer or director were not liable for his or her own tortious conduct, he or she 'could inflict injuries upon others and then escape liability behind the shield of his or her representative character, even though the corporation might be insolvent or irresponsible.*' (*Frances T., supra*, 42

23

Cal.3d at p. 505, [italics added].)

   "The California Supreme Court has held that the rule imposing liability on an officer or director for participation in or authorization of tortious conduct has its roots in agency law. (*Frances T., supra*, 42 Cal.3d at pp. 504-505; *Seagate Technology v. A.J. Kogyo Co.* (1990) 219 Cal.App.3d 696, 702 [268 Cal. Rptr. 586].) Directors and officers are agents of the corporate principal. (*Frances T., supra*, at p. 505; see *APSB Bancorp. v. Thornton Grant* (1994) 26 Cal.App.4th 926, 931 [31 Cal. Rptr. 2d 736].) And an agent is liable for her or his own acts, regardless [of] whether the principal is also liable. (*Frances T., supra*, at p. 505; Civ. Code, § 2343.) Civil Code section 2343 provides: 'One who assumes to act as an agent is responsible to third persons as a principal for his acts in the course of his agency, in any of the following cases, and in no others: [¶] . . . [¶] 3. When his acts are wrongful in their nature.' This rule applies to officers and directors. (*Frances T., supra*, 42 Cal.3d at p. 505; *Mears v. Crocker First Nat. Bank* (1948) 84 Cal.App.2d 637, 642 [191 P.2d 501].)

   "All persons who are shown to have participated in an intentional tort are liable for the full amount of the damages suffered. [Citations.] This rule applies to intentional torts committed by . . . those acting in their official capacities as officers or directors of a corporation, even though the corporation is also liable. (*Vacco Industries, Inc. v. Van Den Berg* (1992) 5 Cal.App.4th 34, 53, fn. 20 [6 Cal. Rptr. 2d 602] [corporate shareholders and officers personally liable for misappropriation of trade secrets]; *Klein v. Oakland Raiders, Ltd.* (1989) 211 Cal.App.3d 67, 76-79 [259 Cal. Rptr. 149] [sole general partner could be personally liable for conspiring to violate the Sherman Act on behalf of limited partnership]; *Golden v. Anderson* [(1967)] 256 Cal.App.2d [714,] 719-720 [corporate officers conspired to interfere with contractual relationship]; *Joanaco Projects, Inc. v. Nixon & Tierney Constr. Co.* [(1967)] 248 Cal.App.2d [821,] 832-833 [corporate stockholders participated in fraud]; *Price v. Hibbs* (1964) 225 Cal.App.2d 209, 222 [37 Cal. Rptr. 270] [corporate officials conspired to induce breach of contract and to defraud]; *Granoff v. Yackle* (1961) 196 Cal.App.2d 253, 256-257 [16 Cal. Rptr. 394]

24

[corporate officers personally liable for misappropriation of another's money or property]; *McClory v. Dodge* [(1931)] 117 Cal.App. [148,] 152-154 [corporate directors personally liable for misappropriation of plaintiff's stock when they knew or should have known conduct was wrongful]; *Vujacich v. Southern Commercial Co.* (1913) 21 Cal.App. 439, 442-443 [132 P. 80] [director who knew or had reason to know of corporation's misappropriation of another's money was personally liable]; Civ. Code, § 2343; 3A Fletcher Cyclopedia of the Law of Private Corporations, *supra*, § 1135.)" (Italics added; and see *Seagate Technology v. A.J. Kogyo Co., Ltd, supra,* 219 Cal.App.3d at p. 702, quoting *Frances T., supra,* 42 Cal.3d at p. 505 ["directors are not subordinate agents of the corporation; rather, their role is as their title suggests: they are policymakers who direct and ultimately control corporate conduct"].)

Here, as in *Openwave Sys. v. Fuld, supra,* 2009 U.S. Dist. LEXIS 48206, the Individual Lehman Defendants challenge Retirement Housing Group's complaint primarily on the basis that Retirement Housing Group cannot state its claims against them with particularity. However, as the court in *Openwave Systems* (applying California law) observed, if Retirement Housing Group can amend its complaint to allege more specifically each defendant's role in the conduct underlying its claims, it may be able to state its fraud and negligent misrepresentation claims (and in turn its intentional interference claim arising out of the allegedly fraudulent conduct) as to some or all of these individuals. Similarly, Retirement Housing Group has asserted the existence of additional facts in support of its declaratory relief cause of action.

Retirement Housing Group repeatedly requested the opportunity to amend the complaint based on the availability of further, more specific facts, as evidenced by the bankruptcy examiner's extensive findings as to the conduct of each of the individual Lehman defendants (submitted in connection with Hernandez's Motion for Sanctions pursuant to Code of Civil Procedure section 128.7). We conclude it was an abuse of discretion for the trial court to deny Retirement Housing Group leave to amend its

25

complaint at this first judicial test of its pleadings.[5]  (*McDonald v. Superior Court* (1986) 180 Cal.App.3d 297, 304 ["Liberality in permitting amendment is the rule . . . if a fair prior opportunity to correct the substantive defect has not been given"].)

## DISPOSITION

The judgment and order sustaining without leave to amend the Individual Lehman Defendants' Demurrer to Retirement Housing Group's Second Amended Complaint are reversed.  The matter is remanded to the trial court with directions to enter a new order sustaining the Individual Defendants' Demurrer with leave to amend and allowing Retirement Housing Group to file its third amended complaint within 30 days. Retirement Housing Group is entitled to its costs of appeal.

WOODS, J.

We concur:

PERLUSS, P. J.                           JACKSON, J.

_____

5     To the extent Retirement Housing Group has pled certain facts on information and belief, we note the following: "It sometimes happens that a plaintiff or defendant lacks knowledge and the means of obtaining knowledge of facts material to his or her cause of action or defense.  Usually the matters are peculiarly within the knowledge of the adverse party, and the pleader can learn of them only from the statements of others.  In this situation, the pleader may plead what he or she believes to be true as a result of information (hearsay) the pleader has received.  [Citation.]  The [C]ode does not expressly state that allegations in a complaint may be made on information and belief, but recognizes the practice by providing, in the verification statute, for verification on information and belief.  [Citation.]" (4 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 398, pp. 537-538, citing Code Civ. Proc., § 446, additional citations omitted.)