# Exhibit

# 11

53211559
Jul 10 2013
04:08PM

1 | Timothy D. Reuben, Esq. [State Bar #94312]
Stephen L. Raucher, Esq. [State Bar #162795]
2 | Gregory P. Barchie, Esq. [State Bar #235022]
**REUBEN RAUCHER & BLUM**
3 | 10940 Wilshire Boulevard, 18th Floor
Los Angeles, California 90024
4 | Telephone: (310) 777-1990
Facsimile: (310) 777-1989
5 |
Attorneys for Plaintiffs
6 |

7 | **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

8 | **FOR THE COUNTY OF LOS ANGELES**

9 | **CENTRAL CIVIL WEST**

10 |

11 | RETIREMENT HOUSING FOUNDATION, et. al.,      CASE NO. BC404726
[Honorable Lee Smalley Edmon, Dept.
12 |      322]

     Plaintiffs,      **NOTICE OF RULINGS ON:**

13 | vs.

14 |      **(1) THE INDIVIDUAL LEHMAN DEFENDANTS' DEMURRER TO PLAINTIFFS' FIFTH AMENDED COMPLAINT;**

CAIN BROTHERS & CO. LLC; ACA
15 | FINANCIAL GUARANTY CORPORATION;
RICHARD S. FULD, JR., et al.

16 |      **(2) DISCOVERY STAY**

     Defendants.

17 |

18 |      Date: July 10, 2013
Time: 11:00 a.m.
19 |      Dept. 322

20 |

21 | AND RELATED CROSS-ACTION      Complaint Filed: December 30, 2008
Trial Date: Not set

22 |

23 |

24 | TO ALL PARTIES AND ATTORNEYS OF RECORD:

25 |      PLEASE TAKE NOTICE THAT, on July 10, 2013, at 11:00 a.m. in Department 322 of the

26 | Los Angeles Superior Court, Central Civil West, Honorable Lee Smalley Edmon presiding, a

27 | Demurrer to Plaintiffs' Fifth Amended Complaint filed by Defendants Richard S. Fuld, Jr.,

28 | Christopher O'Meara, Erin Callan, Michael L. Ainslie, John F. Akers, Roger S. Berlind, Thomas H.

**NOTICE OF RULINGS**

1  Cruikshank, Marsha Johnson Evans, Sir Christopher Gent, Roland A. Hernandez, Henry Kaufman,

2  or John D. Macomber (collectively, "the Individual Lehman Defendants") was heard.  Having

3  considered the moving and opposing papers and arguments of counsel, the Court ruled as follows:

4      1.      As set forth in the its Tentative Ruling, a copy of which is attached hereto as Exhibit

5  A and was adopted in full, the Court sustained the Individual Lehman Defendants' Demurrer.

6      2.      Plaintiffs were granted leave to amend, and were ordered to file and serve a Sixth

7  Amended Complaint on or before August 20, 2013.

8      3.      The Individual Lehman Defendants were ordered to file and serve a responsive

9  pleading to Plaintiffs' Sixth Amended Complaint on or before October 1, 2013.

10     4.      If the Individual Lehman Defendants elect to demurrer to Plaintiffs' Sixth Amended

11  Complaint, the demurrer and opposition thereto shall not exceed 45 pages, and the reply shall not

12  exceed 30 pages.  Despite these expanded page limits, the Court strongly encouraged the parties to

13  keep their briefs as concise as possible.

14     5.      A hearing on a Motion to Quash Service of Summons for Lack of Personal

15  Jurisdiction, which was previously filed and served by certain Individual Lehman Defendants on

16  January 31, 2013, shall be trailed until resolution of any challenges brought by the Individual

17  Lehman Defendants to the Sixth Amended Complaint.

18     The Court further ordered that the discovery stay imposed on February 1, 2013 shall continue

19  with respect to the Individual Lehman Defendants and any depositions until the resolution of any

20  challenges brought by the Individual Lehman Defendants to the Sixth Amended Complaint.

21  However, the Court lifted the discovery stay with respect to written discovery only served between

22  Plaintiffs, Defendant Cain Brothers & Co. LLC and Defendant ACA Financial Guaranty

23  Corporation, and third party subpoenas for documents issued by those same parties.

24     Plaintiffs were directed to give notice.

25  DATED:     July 10, 2013          REUBEN, RAUCHER & BLUM

26

27                                   By
                                        Gregory P. Barchie
28                                      Attorney for Plaintiffs

2
**NOTICE OF RULINGS**

**Retirement Housing Foundation, et al. v. ACA Financial Guaranty Corp, et al.**
BC404726
Wednesday, July 15, 2013
11:00 am

**Individual Lehman Defendants' Demurrer to Plaintiffs' Fifth Amended Complaint**

**Tentative Ruling: SUSTAIN; HEAR FROM THE PARTIES REGARDING WHETHER DEMURRERS SHOULD BE SUSTAINED WITH LEAVE TO AMEND**

---

## I. Introduction

This case is before the Court on a demurrer, brought by the Individual Lehman Defendants to the eighth, ninth, tenth, eleventh, and twelfth causes of action asserted by Plaintiffs (collectively referred to as "RHF"). The operative Fifth Amended Complaint ("5AC") alleges causes of action against the Individual Lehman Defendants for:

- Fraud and Deceit (Eighth Cause of Action)
- Negligent Misrepresentation (Ninth Cause of Action)
- Intentional Interference with Prospective Economic Advantage (Tenth Cause of Action)
- Fraud and Deceit (Eleventh Cause of Action)
- Negligent Misrepresentation (Twelfth Cause of Action)

The Honorable William Highberger sustained the Individual Lehman Defendants' demurrer to Plaintiffs' second amended complaint without leave to amend because Plaintiffs had not adequately alleged facts sufficient to state causes of action against each Individual Lehman Defendant. Plaintiffs appealed, and the Court of Appeal reversed, ordering the court to sustain the demurrers with leave to amend. The Individual Lehman Defendants now demur to the 5AC.

## II. Legal Question

As it must on demurrer, the Court in testing the sufficiency of Plaintiffs' causes of action accepts as true all facts properly pleaded no matter how unlikely or improbable. (*Kervian v. Title Ins. & Trust Co.* (1983) 147 Cal.App.3d 225, 229.) However, the facts are admitted solely and provisionally for the purpose of testing the question of law raised by the demurrer; no binding judicial admission is made by the filing of a demurrer. (*McHugh v. Howard* (1958) 165 Cal.App.2d 169, 173.)

1

**EXHIBIT    A**

The question raised by a demurrer to the complaint is simply whether the complaint alleges facts sufficient to constitute a cause of action. (*Gervase v. Superior Court* (1995) 31 Cal.App.4[th] 1218, 1224.) Additionally, a demurrer is directed to the face of the pleading challenged and related matters subject to judicial notice. (CCP §430.30 (a).) Bearing those principles in mind, the (admittedly lengthy and complex) facts before the Court are as follows.

## III. Statement of Facts

### *The 1998 Refinancing Plan*

On or about July 24, 1998, RHF issued a written "Request for Proposal" to solicit several investment banking firms to propose a design and structure for RHF to refinance its existing debt with taxable and tax exempt bonds (5AC, ¶39). On or about July 31, 1998, Cain Brothers responded to RHF's proposal with a 30-year plan of refinancing which included the following: underwriting bonds to be issued for RHF Group's benefit, selling those bonds in capital markets, being a special products agent, sharing in principal risk portions of the special products used for refinancing, and providing strategic advice to RHF for the plan. In or about August 1998, RHF formally accepted Cain Brother's proposal (5AC, ¶40, ¶42, ¶44).

### *The Use of Lehman SAVRS to Refinance*

Lehman Brothers Holdings, Inc. owned and controlled its subsidiaries Lehman Brothers, Inc., Lehman Brothers Special Financing, Inc., and Lehman Government Securities, Inc., entities which in one role or another, Plaintiffs allege, all became involved with the RHF Group's refinancing (5AC, ¶51).

Lehman Brothers' involvement in the RHF refinancing began when Cain Brothers recommended a complex transaction involving a product marketed by Lehman Brothers, the "SAVRS" bonds, and an interest rate swap (5AC, ¶45). SAVRS are bonds issued as auction rate securities called Select Auction Variable Rate Securities (SAVRS). The purpose of the SAVRS bonds was to bear interest at a variable rate that would be determined by a purportedly competitive bidding "Dutch" auction held by Lehman Brothers every 35 days that was supposed to provide a fair market interest rate (5AC, ¶49).

In each auction cycle, Lehman Brothers would solicit existing bondholders and potential investors, collect bids from those bondholders, and investors would specify a rate at which they would buy or sell the SAVRS. Next, Lehman would compile each bid to produce raw data of each bid to a third party auction agent so the agent could determine the rate of the SAVRS bonds for that auction period (5AC, ¶52). The highest bid at which SAVRS were sold in the auction, the so-called "winning bid" or "clearing rate," would be the interest rate applicable for the next SAVRS period. Lehman Brothers would be the only market agent and broker-dealer with respect to the RHF Group's SAVRS, and would have total control over the auction process (5AC, ¶53).

Lehman was in a position to pre-determine what the clearing rate would be since it had sole control over the orders, and was in a position to manipulate the auctions and convey the results of those auctions through the auction agent to the RHF Group. Based on representations by Cain Brothers and Lehman to the RHF Group, RHF believed that the auctions would be conducted fairly and properly without manipulation (5AC, ¶53).

### The 1998 Swap Contract with Lehman Brothers

In order to protect RHF against the risk of variable interest rate fluctuations, the interest rate of approximately 85% of the SAVRS would be synthetically fixed through an "interest rate swap" (5AC, ¶55). This interest rate swap, "the Swap Contract", was a long-term 30-year contract with Lehman Brothers and the RHF Group (5AC, ¶55). Under the Swap Contract, RHF agreed to pay a stipulated fixed rate of interest on the SAVRS to Lehman Brothers, and Lehman Brothers agreed to pay the holders of the SAVRS interest at the variable rate that it determined every 35 days by auction (5AC, ¶56).

Lehman Brother's unconditionally guaranteed that RHF's variable interest and capital payment obligations on the swapped SAVRS would be punctually made (5AC, ¶57). RHF was also obligated to make additional payments and pay fees to Lehman Brothers for auctioning the SAVRS (5AC, ¶58). The Swap Contract also had an "alternative-floating rate" provision, an amount based on an index rate significantly below the SAVRS rates. The meaning and consequences of this provision were not explained to the RHF in this 1998 swap contract (5AC, ¶96). On behalf of Lehman Brothers, among other persons, Defendant O'Meara in 1998 communicated directly with the RHF group and its representatives regarding the SAVRS swap contract and the overall transaction. She specifically spoke to counsel for the RHF Group on August 4, and August 5, of 1998 (5AC, ¶61).

The Individual Lehman defendants were serving as officers and directors of Lehman Brothers at the time, were well informed of Lehman Brothers' activities and investments and were knowledgeable and/or became aware through public reports of the issuance of SAVRS, and that RHF Group was Lehman Brothers' counterparty under the Swap Contract and related agreements (5AC, ¶62).

### Insuring the SAVRS Bonds with ACA

Cain Brothers recommended that RHF insure the SAVRS bonds with Defendant ACA Insurance (5AC, ¶64). In or about December 1998, ACA Insurance entered into a written bond insurance agreement in which it would insure the SAVRS (5AC, ¶68). ACA agreed it would guarantee payment when due for the principal and interest on the 1998 SAVRS. The guarantee could only be maintained as long as ACA maintained its current investment grade rating, an "A" rating. If this was not maintained, the guarantee was worthless and the SAVRS would fall to "junk" status (5AC, ¶68).

3

ACA's need to maintain an investment grade rating in order for the guarantee to be effective was written in the Swap agreement. The Interest Rate Swap Insurance Policy was dependent on the terms of the Swap Contract. ACA had to maintain an investment rating of at least a BBB-. Below that rating would constitute "a termination event" under the swap contract (5AC, ¶70). ACA assured in writing to RHF that it would maintain its preferred investment grade and its business practices were financially responsible to maintain that rating (5AC, ¶72).

### The 2006 S.E.C. Order

On May 31, 2006, the U.S. Securities and Exchange Commission (SEC) issued an Order, under which it found that a number of banks, including Lehman Brothers, committed numerous Section 17(a)(2) Securities Act violations with respect to auction rate securities (5AC, ¶93). Lehman Brothers never informed RHF of this SEC order, nor did they produce a written description for RHF of their auction procedures (5AC, ¶95). This information showed the RHF refinancing plan was not safe, high risk, and not flexible with regards to the guarantees made by Lehman Brothers and ACA (5AC, ¶81). The Swap Contract with Lehman Brothers was valued pursuant to a secret, restrictive valuation methodology developed by Lehman Brothers that effectively prevented RHF from being "in the money" despite the fact that the SAVRS variable rate determined at auction often exceeded the synthetic "fixed" rate (5AC, ¶82).

Additionally, Lehman was involved in a price fixing scheme (5AC, ¶83). Lehman would pre-select at every auction a "winning bid". This would ensure that the SAVRS would trade at below fair market value, maximize their profits, and inflate the amount RHF was "out of the money" under the swap contract (5AC, ¶83). The Lehman Brothers' board of directors and executives had knowledge, directed, approved, and/or ratified Lehman Brothers' practice and policies of bid rigging securities auctions and otherwise inflating the amount Lehman Brothers was "in the money" under the Swap Contract (5AC, ¶83).

RHF did not understand that the calculations on the swap contract may have been inflated in Lehman Brothers' favor or that Lehman was keeping RHF "out of the money". It only discovered this secret valuation when RHF was forced to enter into a new swap contract in or about July 2008 (5AC, ¶84).

### Consequences of the Downgrade of ACA Insurance

On about December 19th, 2007, the credit rating agency Standard & Poor's downgraded ACA's credit from an "A" to a "CCC" or junk status contrary to ACA's original guarantee to the RHF Group (5AC, ¶89). ACA Insurance no longer could guarantee plaintiff's capital and interest payment obligations (5AC, ¶90). RHF lost protections and benefits of the 1998 swap agreement, pursuant to the "Alternative Floating Rate Provision".

### Consequences of the Alternative Floating Rate Provision

Around the time of ACA's downgrade to junk status in 2007, Lehman Brothers took the position that the Swap Contract had an "alternative-floating rate" provision; an amount based on an index rate significantly below the SAVRS rates. This provision also meant RHF was unable to cure the ACA's downgrade under the terms of the Swap Contract took over any protection or benefits provided under the Swap Contract (5AC, ¶96).

Under regular operating terms of the Swap Contract, RHF's monthly interest payments were fixed at 5.19% for tax-exempt bonds, while Lehman Brothers paid the SAVRS rates (5AC, ¶96). When the "alternative floating rate" was triggered, RHF was still required to pay the regular fixed rates to Lehman Brothers, but Lehman Brothers was no longer required to pay the SAVRS rates; it only needed to pay "the alternative floating rate" (5AC, ¶96). RHF needed to then make up for the entire shortfall on the SAVRS (5AC, ¶96). Lehman Brothers continued to control the SAVRS auctions, and due to the enactment of the provision, could manipulate them using methods including those prohibited in the 2006 SEC order, which Lehman did (5AC, ¶98). Since Lehman no longer had to pay the SAVRS rates, the SAVRS rates skyrocketed virtually overnight.

Over the previous four years when Lehman had to pay the SAVRS rates, they had rarely exceeded 5% and did not approach the applicable maximum rate (5AC, ¶99). Beginning in December 2007, Lehman manipulated the SAVRS rates up to very high rates (5AC, ¶99). From 2007 to 2008, each time RHF would ask the auction agent (the Bank of New York Trust Company) what the auction rate was, it consistently would be just below the maximum rate of the clearing rate for most of that auction's period. Instead of 5% (where the clearing rate generally hovered for most of the time that Lehman Brothers was paying the variable rate under the Swap Contract) the clearing rates were now 15.500% -- just below the maximum rate of 15.611% (5AC, ¶100 a.).

### *Use of the Repo 105 and 108 Transactions to Create a Misleading Financial Picture*

To reduce Lehman Brothers' net leverage ratio, the Individual Lehman defendants authorized and/or ratified the significant expansion of use of "Repo 105" transactions. (5AC, ¶146). "Repo 105" and "Repo 108" (collectively "Repo 105") transactions are off-balance sheet devices. They temporarily remove securities inventory from Lehman's balance sheet, for a period of 7 to 10 days, and lower leverage ratios. They are nearly identical to standard repurchase and sale ("repo") transactions used to secure short term financing. However, Lehman accounted for them as "sales" as opposed to financing transactions (which would be the case for a standard "repo") (Court of Appeal Op., pg. 13).

Lehman recharacterized the Repo 105 transactions as "sales" to remove inventory from its balance sheet and used cash from those Repo transactions to pay down their liabilities thereby reducing their total liabilities and the total assets reported on its balance sheet, and lowering its leverage ratios (5AC, ¶147).

In March 2008, Lehman Brothers' investment banking peer Bear Stearns collapsed, which made it clear that Lehman Brothers' next major investment would fail and the Individual Lehman Defendants made no disclosure of this to RHF. There was a meeting discussing the Bearn Stearns' failure and the strategy of using Repo 105 transactions, which Defendants O'Meara, Callan, Kauffman, Akers, Berlind, Evans, and Hernandez attended as members of the Finance and Risk Committee (5AC, ¶155).

## The New 2008 Swap Contract

In or about June 2008, Lehman Brothers was claiming that the RHF Group was purportedly "out of the money" on the Swap Contract so that terminating the Swap Contract would cost the RHF Group in excess of $13 million (5AC, ¶106). [1]

Lehman Brothers would not agree to amend the Swap Contract and instead insisted on a new one. Thus, RHF was forced to terminate the 1998 Swap Contract and enter into a new 2008, 20-year term swap agreement with Lehman Brothers (5AC, ¶107). Under the new swap contract, Lehman Brothers required that Plaintiffs agree to pay a much higher synthetic "fixed" interest rate to avoid immediately paying the $13 million. The same guarantee was given to RHF as was in the first 1998 Swap Contract, as well as a representation to RHF that Lehman Brothers was still adequately capitalized, and had accurately and fairly publicly reported its financial condition and could continue to perform its obligations over the 20-year term of the contract (5AC, ¶108). [2]

## Lehman Brothers Files for Bankruptcy

Lehman Brothers failed to disclose that it was not solvent and was suffering unprecedented losses in its investments, real estate holding and other problems that threatened the existence of the company.

In its 2005 Form 10-K signed by the Individual Lehman Defendants, Fuld, O'Meara, Ainslie, Akers, Berlind, Cruikshank, Evans, Gent, Hernandez, Kaufman, and Macomber (5AC, ¶134), filed with the S.E.C. on February 13, 2006, Lehman Brothers falsely stated that its business was strong. Additionally, even in the 10-K 2006 and 2007 form, Lehman did not

---

[1] Following ACA's downgrade, and due to the immense payments under the "alternative floating rate" provision, and the inability to cure the problems in the ACA downgrade, RHF was forced to restructure the transaction and refund the SAVRS and secure them with letters of credit from banks rather than a bond insurer (5AC, p.29, Paragraph 105).

[2] The 2008 swap contract representation was known to individual Lehman defendants as invalid. In a January 2008 meeting of the Finance and Risk Committee, O'Meara, Callan, Kaufman, Akers, Berlind, Evans, and Hernandez discussed the composition of the firm's net assets, equity, and leverage levels. At that meeting it was shown that Lehman Brothers had continued to grow its repo financing to meet the balance sheet and leverage increases. (5AC, p.43, paragraph 144). Furthermore, Kaufman presented at a January 2008 meeting attended by the other individual Lehman defendants, and discussed the balance sheet growth. Despite reporting dire information about the performance of the industry and Lehman's financial condition, it was recommended that Lehman continue to follow a strategy for growth (5AC, p. 44, Paragraph 145).

acknowledge the potential devastating impact of its substantial holdings in the subprime mortgage market (5AC, ¶136, ¶139). The 2007 10-K form was authorized, signed, and ratified by the Individual Lehman Defendants Fuld, Callan, Ainslie, Akers, Berlind, Cruikshank, Evans Gent, Hernandez, Kaufman, and Macomber (5AC, ¶140).

Two months after the completion of the Plaintiffs' refinancing of the SAVRS and the signing of the New Swap Contract in July 2008, Lehman Brothers sought Chapter 11 protection and filed for bankruptcy.

*The Individual Lehman Defendants as Described in the 5AC*

The Individual Lehman Defendants are Richard S. Fuld, Jr. ("Fuld"), Christopher M. O'Meara ("O'Meara"), Erin M. Callan ("Callan"), Michael L. Ainslie ("Ainslie"), John F. Akers ("Akers"), Roger S. Berlind ("Berlind"), Thomas H. Cruikshank ("Cruikshank"), Marsha Johnson Evans ("Evans"), Sir Christopher Gent ("Gent"), Roland A. Hernandez ("Hernandez"), Henry Kaufman ("Kaufman"), and John D. Macomber ("Macomber").[3]

Individual Lehman Defendants who were officers of Lehman Bros. are: Fuld, the former Chairman of the Board of Directors and CEO of Lehman Brothers Holdings, Inc.; O'Meara, the former CEO and Controller and CEO of Lehman Brothers Holdings, Inc.; and Callan, the former CEO and Controller of Lehman Brother's Holding, Inc. Individual Lehman Defendants who are directors are: Ainslie, Akers, Berlind, Cruikshank, Evans, Gent, Hernandez, Kaufman, and Macomber; each are former members of the Board of Directors of Lehman Brothers Holdings, Inc.

*Fuld*

According to the 5AC, Fuld was "at all times extremely knowledgeable" of all of Lehman Brothers' financial condition, investments, and activities including the 1998 refinancing plan and the 2006 SEC Order. He met regularly with senior management and members of the executive committee (5AC, ¶156).

Fuld authorized, approved, directed and/or ratified the company to continue to grow despite his information in early 2007 that other participants in the subprime mortgage industry were going out of business and cutting back their operations. When Lehman in late 2007 and 2008 had a dismal financial picture, Fuld authorized Lehman to manipulate its financial statements, including the increase of the use of off-balance sheet devices known internally by Lehman as "Repo 105" and "Repo 108" (collectively "Repo 105" transactions) (5AC, ¶116).

---

[3] Specially appearing defendants are Ainslie, Berlind, Callan, Evans, Fuld, Gent, Kaufman, Macomber, and O'Meara. The group of twelve individuals are collectively referred to as the "Individual Lehman Defendants," and they jointly and severally demur to the Fifth Amended Complaint.

Additionally, he falsely reported publicly favorable net leverage numbers and stated the company was strong when it was failing on its own subprime mortgage investments (5AC, ¶116). Fuld and Macomber were provided with materials that expressly discussed Lehman Brothers' Repo 105 program, and its usage for the end-quarter of 2008 (5AC, ¶156). Instead of saying that Lehman's financial statements were materially misrepresented, Fuld falsely stated that Lehman Brothers' capital position had "never been stronger" (5AC, ¶157).

*O'Meara*

O'Meara was one of the RHF Group's contacts at the company during the implementation of the 1998 plan of refinancing, and knew about that plan and the 2006 SEC Order. He had extensive information about Lehman's financial conditions between 2004 and 2008. He actively managed Lehman Brothers' Repo 105 activity and "knowing and intentionally authorized, approved and/or ratified" the increase of such activity in late 2007 and 2008. O'Meara knew that the financial statements did not reflect the true financial condition of Lehman Brothers to Plaintiffs. He was also a stockholder in Lehman Brothers (5AC, ¶117).

O'Meara also continually and regularly apprised the Director Defendants about increasing risk limits and plans to reduce the net leverage, including discussions about Repo 105 Program use (5AC, ¶117).

*Callan*

Callan was also knowledgeable of Lehman Brothers' Repo 105 activity and falsely reported publicly as CFO that Lehman Brothers was reducing its leverage without disclosing the Repo 105 activity. Callan also apprised the Director of Defendants of the increases in Lehman's Brothers' leverage and risk positions and was a stockholder in Lehman Brothers as well (5AC, ¶118).

*Ainslie*

Ainslie, in addition to being a member of the Board of Directors, served on the Lehman Brother's Audit Committee[4]. He was a shareholder in Lehman Brothers (5AC, ¶120)[5].

---

[4] The Audit Committee was tasked with assisting the Board of Directors in fulfilling its oversight of Lehman's financial statements and the quality and integrity of those statements in compliance with legal and regulatory requirements. They received regular reporting from O'Meara and Callan regarding the state of Lehman Brothers' financial condition and knew of and/or ratified the company's accounting manipulations and/or knew that the financial statements were being materially misrepresented. Additionally, its members failed to conduct an adequate investigation into the financial statements and ignored signs that such statements were being reported falsely and were misleading (5AC, ¶129).

[5] In the 5AC, a shareholder in Lehman Brothers is alleged to be a person who had a personal financial interest in maintaining a high stock price for the company by, among other things, representing that Lehman Brothers was solvent (5AC, ¶ 120-128).

*Akers*

Akers chaired the Compensation and Benefits Committee and served on the Finance and Risk Committee[6], in addition to being a member of the Board of Directors.  Like, Ainslie, he was a shareholder in Lehman Brothers (5AC, ¶121).

*Berlind*

Berlind served as a member of the Audit Committee and the Finance and Risk Committee.  Berlind, like Akers and Ainslie, was a shareholder (5AC, ¶122).

*Cruikshank*

Cruikshank was Chairman of the Lehman Brothers' Audit Committee and was determined by the Board of Directors to be an "audit committee financial expert" as defined by the SEC rules. He also served on the Nominating and Corporate Governance Committee. He was also a shareholder in Lehman Brothers (5AC, ¶123).

*Evans*

Evans also served on the Nominating and Corporate Governance Committee (as Chairman), the Compensation and Benefits Committee, and the Finance and Risk Committee. Evans was a shareholder in Lehman Brothers (5AC, ¶124).

*Gent*

Gent served on the Audit Committee and Compensation and Benefits Committee and was also a shareholder in Lehman Brothers (5AC, ¶125).

*Hernandez*

Hernandez served on the Finance and Risk Committee and was a shareholder in Lehman Brothers (5AC, ¶126).

*Kaufman*

Kaufman was Chairman of the Finance and Risk Committee and was a shareholder in Lehman Brothers (5AC, ¶127).

---

[6] The Finance and Risk Committee was tasked with the responsibility of reviewing and advising the Board of Directors on financial policies and practices of Lehman Brothers, including risk management. They knew of and/or ratified Lehman Brothers' balance sheet manipulations. They received regular reporting on Lehman Brothers' increased risk and plans to reduce the reported leverage with Repo 105 transactions. They intentionally failed to disclose and/or consciously ignored the risk that Lehman Brothers assumed during the subprime mortgage crisis (5AC, ¶130).

*Macomber*

Macomber served with Fuld on the Executive Committee and served on the Compensation and Benefits Committee and Nominating and Corporate Governance Committee of Lehman Brothers. He was a shareholder in Lehman Brothers (5AC, ¶128).

He was expressly informed, both orally and in writing, and intentionally failed to disclose Lehman Brothers' bad financial condition. Additionally, he authorized and/or ratified the issuance of financial statements that concealed Lehman Brothers' dire financial state and Repo 105 transaction use (5AC, ¶131).

## V. Analysis

The Individual Lehman Defendants demur on the ground that the 5AC does not state sufficient facts to constitute a cause of action against them.   RHF argues that it has properly pled each element of their five causes of action against the Individual Lehman Defendants. At this stage in the litigation, since Plaintiffs are not required to prove their claims, only to properly plead them, RHF contends that it has met this burden and the demurrer should be overruled entirely.

### A. *Judicial Notice*

Defendants' unopposed request for judicial notice filed along with the demurrer is GRANTED.

However, in reply, Defendants also filed a supplemental request for Judicial Notice of pages 7, 8, 732, 733, 734, 945-947 of the Report of Anton R. Valukas, filed in *In re Lehman Brothers Holdings, Inc.,* No. 08-13555 (Bankr. S.D.N.Y.) (Dkt. No. 7531 Mar. 11, 2010)) ("Bankruptcy Examiner's Report").

The report is judicially noticeable pursuant to Evidence Code 452(d)(2). Evidence Code 452 (d) states that records of any court of record of the U.S. or of any state of the U.S. are subject to judicial notice. Here, the examiner's report is a record of the U.S. Bankruptcy Court Southern District of New York within the Chapter 11 case *In Re Lehman Brothers Holdings Inc., et al*.  The document is a record of a court of the United States and is properly subject to judicial notice

Plaintiffs object to Defendants' request for supplemental judicial notice, asserting that Defendants seek to use its contents to demonstrate that the information within that report is true.  But "[t]aking judicial notice of a document is not the same thing as accepting the truth of its contents or accepting a particular interpretation of its meaning". (*Fremont Indemnity Co. v. Fremont General Corp.* (2007) 148 Cal.App.4th 97, 113.)  Irrespective of the purpose for which any party might like to use the document, the Court does not take notice of the truth of the statements made in the document.

The supplemental request for judicial notice is also GRANTED.

### B. *Fraud and Negligent Misrepresentation*

As against the Individual Lehman Defendants, Plaintiffs brings two causes of action for fraud and two causes of action for negligent misrepresentation relating to two different categories of alleged misrepresentation. The first pair is found in causes of action eight (fraud and deceit) and nine (negligent misrepresentation) and concerns alleged misrepresentations concerning the results of the SAVRS auctions. (See 5AC, ¶¶ 228-240.) The second pair is found in causes of action 11 and 12 and concerns alleged misrepresentations relating to the 2008 refinancing. (5AC, ¶¶ 249-267.) Plaintiffs also assert a cause of action for intentional interference with economic advantage, which is discussed separately below.

Though causes of action for fraud and negligent misrepresentation require differing levels of knowledge and intent, both causes of action require a false representation. (*Small v. Fritz* (2003) 30 Cal.4th 167, 173.) "Each element in a cause of action for fraud or negligent misrepresentation must be factually and specifically alleged. [Citation.] The policy of liberal construction of pleadings is not generally invoked to sustain a misrepresentation pleading defective in any material respect." (*Cadlo v. Owens-Illinois, Inc.* (2004) 125 Cal.App.4th 513, 519.) "This particularity requirement necessitates pleading facts which 'show how, when, where, to whom, and by what means the representations were tendered.'" (*Stansfield v. Starkey* (1990) 220 Cal. App. 3d 59, 73 [emphasis in original; quoting *Hills Trans. Co. v. Southwest* (1968) 266 Cal.App.2d 702, 707].)

Though fraud and negligent misrepresentation claims carry heightened pleading requirements, Plaintiffs' ability to prove their allegations is not a matter that concerns the court in reviewing a demurrer. (*Nagy v. Nagy* (1989) Cal.App.3d 1262, 1267.) A demurrer raises issues of law, not fact, regarding the form or content of the complaint. (*Donabedian v. Mercury Ins. Co.* (2004) 116 Cal.App.4th 45, 64.)

### 1. Statements Regarding The Auction Results

Causes of action eight and nine for fraud and negligent misrepresentation both center on Lehman's alleged manipulation of the SAVRS auctions from December 2007 through June 2008. RHF alleges that Lehman directly and/or with an auction agent, made misrepresentations of the auction results. Because Plaintiffs at the time were not aware of the falsity of these representations, they believed them to be true and relied on them. As a result, Plaintiffs allege they suffered damages from the unfairly inflated payments on the SAVRS (Opp., p.25).

"Directors and officers of a corporation are not rendered personally liable for its torts merely because of their official positions, but may become liable if they directly ordered, authorized or participated in the tortious conduct." (*Wyatt v. Union Mortgage Co.* (1979) 24 Cal.3d 773, 785.) "[A]n officer or director will not be liable for torts in which he does not

personally participate, of which he has no knowledge, or to which he has not consented. …
While the corporation itself may be liable for such acts, the individual officer or director will be
immune unless he authorizes, directs, or in some meaningful sense actively participates in the
wrongful conduct." (*Frances T. v. Village Green Owners Assn.* (1986) 42 Cal.3d 490, 503-04
[quoting *Teledyne Industries, Inc. v. Eon Corporation* (S.D.N.Y. 1975) 401 F.Supp. 729, 736-37].)
A director or officer's personal participation "may be shown not solely by direct action but also
by knowing consent to or approval of unlawful acts." (*PMC, Inc. v. Kadisha* (2000) 78
Cal.App.4th 1368, 1380.)

        The Individual Lehman Defendants contend that Plaintiffs have failed to allege sufficient
direction, authorization, or participation in the alleged auction results misrepresentations.
(Dem., pp15-17.) In opposition, Plaintiffs contend that they need not allege that any Individual
Lehman Defendant made a false misrepresentation about the auction results. (Opp., p. 32.)
Indeed, Plaintiffs contend that the auction results allegations "have never been based on the
assertion that the directors and officers personally communicated the results." (Opp., p. 31.)
Plaintiffs note that the 5AC alleges that "Lehman Brothers intentionally drove up the [auction]
rates through manipulation, including through the techniques described in the SEC Order, but
concealed from Plaintiffs that they were doing so." (Opp., p. 34 [quoting 5AC, ¶ 101.) Plaintiffs
then cite to paragraph 233 of the 5AC to demonstrate that "this scheme was approved and/or
ratified by the Individual Lehman Defendants." (Opp., p. 34.)

        This point made in opposition, however, is merely demonstrative of the 5AC's
shortcomings. As the Court of Appeal noted in this case, in order for Plaintiffs to state an
adequate cause of action, they must "allege more specifically each defendant's role in the
conduct underlying [their] claims" for fraud and negligent misrepresentation. (Court of Appeal
Op., p. 25.) It has not done so.

        Although the 5AC broadly describes the role that each Individual Lehman Defendant
played within the Lehman organization, its allegations regarding the allegedly false
misrepresentations are broad, repeatedly alleging that "Lehman" knew of false
representations, and authorized, directed, and/or ratified false statements to be made and the
auctions to be manipulated. But such sweeping allegations are insufficient. Plaintiffs must
allege for each individual Lehman Defendant -- not just "Lehman" -- how, when, where, to
whom, and by what means he or she authorized, directed, and/or ratified the release of false
statements, and for the manipulation of the SAVRS auctions.

        To demonstrate that the Individual Lehman Defendants knew of or consented to the
manipulation of the SAVRS auctions and the false auction statements, Plaintiff relies on each
individual defendant's corporate role and the 2006 SEC order. But Plaintiffs' assertion that
each of the Individual Lehman Defendants must have known of the alleged auction
manipulation and subsequent false statements by virtue of their role as a director or officer of
the company (see 5AC,¶ ¶ 233, 240) is precisely the sort of conclusory allegation of ultimate
fact that the demanding pleading requirements for fraud and misrepresentation prohibit. (*Gil
v. Bank of America* (2006) 138 Cal.App.4th 1371, 1381 ["general and conclusory allegations that

[a defendant] participated in a fraudulent scheme" are insufficient, particularly where the defendant's participation is merely implied "by virtue of his office"]; see also *Starbird v. Lane* (1962) 203 Cal.App.2d 247, 257 [bare allegations that a defendant "controlled and directed" the alleged fraud were "the most general conclusions" and insufficient to support a claim of fraud].)

To support their claim that each individual defendant must have known, Plaintiffs contend that each defendant "knew of the manipulation of the SAVRS as a result of the 2006 SEC order." (Opp., p. 34.) The 5AC alleges that "due to the magnitude of the SEC Order, including the fine, the disclosure requirements, and the written certification, that the Individual Lehman Defendants were all knowledgeable of the SEC Order and the material contained therein, and Lehman Brother's manipulations of the SAVRS auctions, which continued through 2008." (5AC, ¶ 103.) Even assuming Plaintiffs' allegation that each defendant knew about the 2006 SEC Order to be true, the fact that each Individual Lehman Defendant had knowledge of the 2006 SEC Order does not support the conclusory allegation that each one had knowledge that Lehman Brothers was improperly manipulating the SAVRS auctions with respect to RHF in 2007 and 2008.[7]

The 2006 SEC Order "highlighted that auction dealers had placed support bids to prevent failed auctions and specifically noted that the Order did not prohibit such conduct as long as it was disclosed." (*In re Merrill Lynch Aucton Rate Sec. Litig.* (2010) 704 F.Supp.2d 378, 391 [discussing the same order, which was directed at several banks, including both Lehman Brothers and Merrill Lynch].) But Plaintiffs' argument demands an inference that is not supported by their allegations: that each of the individual Lehman Defendants must have known about manipulative auction practices in 2007 and 2008 because the 2006 SEC order suggested prior practices. As Judge Thrash of the Northern District of Georgia has observed with respect to this exact argument:

> "[T]he inference that the Plaintiffs ask the Court to draw is simply too weak and convoluted. It requires the Court to assume that the Defendants continued manipulative auction practices after the SEC investigation, that the same corporate officials that were providing training on how to sell auction rate securities also knew that the manipulative auction practices were continuing, and that those corporate officials intentionally or recklessly failed to disclose the manipulative auction practices … . While this inference is possible, the Plaintiffs do not provide sufficient allegations to make it anything more than a weak and convoluted inference."

(*Zisholtz v. SunTrust Banks, Inc.* (N.D. Ga. 2009) 2009 WL 3132907, 5.)

---

[7] With respect to the claims of auction manipulation, Plaintiffs allege six specific misrepresentations, the earliest of which occurred on December 11, 2007 and the latest on June 3, 2008. (5AC, ¶ 100.)

The closest Plaintiffs come to supporting the inference that any Individual Lehman Defendant knew that Lehman continued its practice of failing to disclose auction manipulation in 2007 or 2008 is Plaintiffs' allegation that "the S.E.C. Order required either Lehman Brothers' chief executive officer (Defendant Fuld) or general counsel (who regularly reported to the Board of Directors) to certify compliance" with the 2006 Order. (5AC, ¶ 103.)  But the 5AC does not allege that it was in fact Fuld who certified compliance (and therefore had reason to know of Lehman's failure to disclose). By the very terms of Plaintiffs' allegations, it could have just as equally been Lehman's general counsel, who is not a defendant in this case.  And the fact that Lehman's general counsel reported to the Board of Directors (as is the case in virtually every corporate setting) does not suggest that the general counsel ever informed the Board that Lehman was continuing a practice of failing to disclose in violation of the 2006 SEC Order.

Plaintiffs' contention that their eighth and ninth causes of action sufficiently plead participation by each one of the Individual Lehman Defendants boils down to the argument that "[a] defendant cannot avoid liability by closing his eyes to wrongdoing."  (Opp., p. 35 [citing *Viacom Int'l., Inc. v. YouTube, Inc.* (2d Cir. 2012) 676 F.3d 19.)  But as the *Viacom* court explained, willful blindness demands that defendant "was aware of a high probability of the fact in dispute and consciously avoided confirming that fact."  (*Viacom*, *supra*, 676 F.3d at 38.) Plaintiffs have not alleged any facts to suggest that any of the Lehman Defendants "was aware of a high probability" that anyone at Lehman was making false statements to Plaintiffs.

It is not enough to say, as Plaintiffs repeatedly do, that "Lehman" committed various tortious acts and then simply allege that the "scheme was approved and/or ratified by the Individual Lehman Defendants."  (See, e.g., *Swartz v. KPMG LLP* (9th Cir. 2007) 476 F.3d 756, 765 [claims for fraud insufficiently pled where "[t]he complaint is shot through with general allegations that the 'defendants' engaged in fraudulent conduct" but fails to allege any individualized conduct].)  The fact that Plaintiffs do not contend that any of Individual Lehman Defendants actually made the misrepresentations does not relieve them of their obligation to allege with particularity what specific role each individual defendant played in directing, authorizing, or participating in the alleged misrepresentations.

For each of the *individual* defendants, Plaintiffs must allege how, when, where, to whom, and by what means he or she authorized, directed, and/or ratified the alleged manipulation of the SAVRS auctions.  (See *Stansfield v. Starkey*, *supra*, 220 Cal.App.3d at 73.) They have not done so and the eighth and ninth causes of action fail to allege fraud and negligent misrepresentation with sufficient particularity.

## 2.  The Refinancing of RHF with Lehman

Plaintiffs' 11th and 12th causes of action for fraud and negligent misrepresentation, respectively, focus on Plaintiffs' 2008 refinancing transaction with Lehman.  Plaintiffs contend that the Individual Lehman Defendants made various misrepresentations that induced Plaintiffs to enter into the 2008 refinancing agreement to their detriment.  These statements can be

lumped into one of two categories: (1) statements regarding the cost of terminating the swap agreement (that terminating the swap agreement in its entirety would be very expensive), and (2) statements made publicly and in SEC filings regarding Lehman's financial stability. (See 5AC, ¶¶ 251, 260.)

### a.  The Swap Valuation Statements

Plaintiffs allege that at the time they entered into this New Swap Contract in 2008, Lehman misrepresented the amount that Plaintiffs were supposedly "out of the money" on the Swap Contract and that Lehman was strong and stable. At the time these representations were being made, RHF alleges that Lehman knew them to be false. (5AC, ¶¶ 250, 260).  Defendants state that Plaintiffs fail to plead that any Individual Lehman Defendant made any statement about the cost of terminating the 1998 swap contract (Dem., p.18). However, Plaintiffs respond that their claim is not based on whether the Individual Lehman Defendants personally made statements but rather on the Individual Lehman Defendants' knowledge, direction, and approval of the practices which misrepresented the extent to which Plaintiffs were "out of the money." (Opp., p. 35; 5AC, ¶251, 261).

As with Plaintiffs' claims relating to the auction results, Plaintiffs fail to offer any particularized allegations that any Individual Lehman Defendant knew of, participated in, or authorized any statement relating to the valuation of the swap contract in 2008.  Using similarly general and conclusory language as discussed above, Plaintiffs contend, for instance, that "Lehman Brothers' board of directors and executives had knowledge of, directed, approved, and/or ratified Lehman Brothers' practice and policies of bid rigging securities auctions and otherwise inflating the amount Lehman Brothers was 'in the money' under the Swap Contract." (Opp., p. 36 [quoting 5AC, ¶ 83.) But again, Plaintiffs are asserting causes of action against individual defendants. How, for example, did Cruikshank learn that anyone at Lehman was making false representations to Plaintiffs about the value of the swap contract? When did O'Meara learn of it?  In what manner did Callan authorize such conduct?  The 5AC fails to offer allegations that would answer any of these questions, all of which are necessary to state a cause of action for fraud or negligent misrepresentation.  Instead, the 5AC simply presumes the answers by virtue of each defendant's corporate role.  As the Court of Appeal previously held in this case, such allegations are insufficient.[8]

### b.  Statements Regarding Lehman's Financial Condition

Plaintiffs' alternative theory of fraud and negligent misrepresentation in the 11th and 12th causes of action are that the Individual Lehman Defendants made fraudulent representations in public statements and through their filings to the SEC. Between 2005 and

---

[8] Indeed, in the 5AC, the allegations relating to the auction results and the swap agreement valuations are largely unchanged from the 2AC, which both Judge Highberger and the Court of Appeal found deficient.  The vast majority of Plaintiffs' substantive changes to the 5AC deal with the Individual Lehman Defendants' alleged involvement in the Repo 105 transactions and the allegedly false representations Defendants made with respect to Lehman's financial condition by failing to disclose Lehman's reliance on "off-book" Repo 105 transaction.

2008, the 10-K forms that Lehman Brothers sent to the SEC were authorized, signed, and ratified by the Individual Lehman Defendants Fuld, O'Meara, Ainslie, Akers, Berlind, Cruikshank, Evans, Hernandez, Kaufman, and Macomber (5AC, ¶134). These forms communicated a fictional and false impression of financial strength and stability. Plaintiffs contend that they detrimentally relied upon such statements in refinancing the swap agreement in 2008.

Unlike the allegations relating to the auction result statements and the swap valuations, the 5AC sets forth in great detail numerous representations made in documents filed with the SEC and in public statements regarding Lehman's financial condition. Moreover, the 5AC alleges which individuals signed which documents (thereby adopting their contents) or made the statements. Additionally, the 5AC details the various meetings at which the Individual Lehman Defendants discussed the off-balance-sheet Repo 105 transactions, as well as the names of the individual defendants who attended each of those meetings. It is unnecessary to recount each of the 10 pages of new allegations going to this point, but they are not simply puffery. They are specific, detailed, and sufficient to allege that each of the individual Lehman defendants made material statements about Lehman's financial condition with knowledge or reason to know of the statement's falsity. (See generally, 5AC, ¶¶ 141-171.)

But false statements made with either knowledge or reason to know of the falsity are not the only elements of fraud or negligent misrepresentation. Both fraud and negligent misrepresentation include elements of reliance. (See *Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638 [fraud]; *Fox v. Pollack* (1986) 181 Cal. App. 3d 954, 962 [negligent misrepresentation].) "It is settled that a plaintiff, to state a cause of action for deceit based on a misrepresentation, must plead that he or she actually relied on the misrepresentation." (*Mirkin v. Wasserman* (1993) 5 Cal.4th 1082, 1088; *Small v. Fritz, supra*, 30 Cal.4th at 184.) And though it is true, as Plaintiff argues (Opp., p. 38), that the law will sometimes presume that reliance is justified when a misrepresentation is material (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal. 4th 951, 977) reliance requires that a plaintiff *actually hear or read* the alleged misrepresentations. (*Mirkin, supra*, 5 Cal.4th at 1089 [going on to reject the so-called "fraud-on-the-market theory of reliance for California common-law fraud claims despite the availability of that doctrine in federal securities fraud claims].)

The case of *Caldo v. Owens-Illinois, Inc.* (2004) 125 Cal.App.4th 513 is instructive on this point. In reviewing the trial court's order sustaining a demurrer to causes of action for fraud and deceit, the Court of Appeal conceded that the plaintiffs had adequately pled that the defendant knowingly made a false representation. (*Id.* at 519-20.) Nevertheless, the plaintiffs failed to allege that they were actually aware of the specific representations at issue in that case, and the Court of Appeal held that they had failed state a cause of action for fraud. (*Id.* at 520.) Moreover, the Court noted that to the extent the plaintiffs contended that they became of the false representations indirectly through some third party, they were required to plead with particularity from whom they became aware of the misrepresentation. (*Id.*)

Nowhere in the 5AC do Plaintiffs allege that they actually became aware of any of the alleged misrepresentations described in paragraphs 141-171 prior to the 2008 refinancing, let

alone when, how, or from whom.  And to the extent that Plaintiffs assert they became aware of the representations through some third party, they have failed to identify who that third party was or when they found out.

C. *Intentional Interference with Economic Advantage*:

The Individual Lehman Defendants also claim that Plaintiffs fail to plead intentional interference with economic advantage (5AC, ¶¶ 241-248.)  The elements of a cause of action for intentional interference with prospective economic advantage are (1) an economic relationship between the plaintiff and a third party, with the probability of a future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) the defendant's intentional and wrongful conduct designed to interfere with or disrupt this relationship; (4) interference with or disruption of this relationship; and (5) economic harm to the plaintiff proximately caused by the defendant's wrongful conduct. (*Sole Energy Co. v. Petrominerals Corp.* (2005) 128 Cal.App.4th 212,241)

According to Plaintiffs, the Individual Lehman Defendants interfered with Plaintiffs' economic relationship with "the holders and potential holders of SAVRS… ." (5AC, ¶ 242.)  The economic relationship Plaintiffs need to allege is an economic relationship between Plaintiffs and the SAVRS bond holders, with the probability of future economic benefit to Plaintiffs. The Plaintiffs were the issuers of the SAVRS and the holders were affected by the auction practices and procedures of Lehman (5AC, ¶95).  Plaintiffs allege that "Lehman Brothers intentionally manipulated the RHF Group's SAVRS auctions … with the design of disrupting Plaintiffs' relationship with the holders and potential holders of the SAVRS by grossly inflating the rates that Plaintiffs purportedly owed on the SAVRS." (5AC, ¶ 244.)

But as discussed above, Plaintiffs have not adequately alleged that any the Individual Lehman Defendants directed, approved, or participated in the alleged auction manipulations that allegedly constituted the "interference."  Plaintiffs effectively concede that the viability of their claim for intentional interference with economic advantage hinges on their eighth and ninth causes of action for fraud and negligent misrepresentation.  (See Opp., p. 43 [arguing that the individual defendants may be held liable for acts of intentional interference by Lehman Brothers because "Defendants had knowledge of and directed and/or approved of Lehman Brothers' intentional manipulation of the auctions of he RHF Group's SAVRS"].)  The Court of Appeal came to the same conclusion, noting that Plaintiffs' ability to "allege more specifically each defendant's role in the conduct" in the fraud and negligent misrepresentation causes of action would likely be determinative of Plaintiffs' ability to plead their "intentional interference claim arising out of the allegedly fraudulent conduct … ."  (Court of Appeal Op., p. 25.)

While there are allegations of economic harm ultimately from the payments and costs of terminating the 1998 Swap Contract and entering into the new 2008 Swap Contract (5AC, ¶177), there are no allegations that each Individual Lehman Defendant was aware of, directed, or participated in the alleged undisclosed manipulation of the SAVRS auctions.

**VI. Conclusion**

In light of the foregoing, the demurrers of each of the Individual Lehman Defendants are SUSTAINED.  Hear from the parties regarding whether the demurrers should be sustained with leave to amend.

1

## PROOF OF SERVICE BY E-SERVICE

2

<u>Retirement Housing Foundation, et al. v. ACA Financial Guraranty Corporation, et al.</u>
LASC Case No. BC 404726

3

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

4

5

    I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is **10940 Wilshire Boulevard, 18th Floor, Los Angeles, California 90024**.

6

    On **July 10, 2013**, I served the foregoing document described as:

7

8

**NOTICE OF RULINGS ON: (1) THE INDIVIDUAL LEHMAN DEFENDANTS' DEMURRER TO PLAINTIFFS' FIFTH AMENDED COMPLAINT; (2) DISCOVERY STAY**

9

10

on all interested parties in this action by electronic transmission on the recipients designated on the Transaction Receipt located on the LexisNexis File & Serve website (https://litigator.lexisnexis.com/FileAndServe) pursuant to the Court Order establishing the case website and authorizing service of documents.

11

12

    I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

13

    Executed on **July 10, 2013**, at Los Angeles, California.

14

15

Nathalie Quach

16

17

18

19

20

21

22

23

24

25

26

27

28