# Exhibit

# 12

1  **REUBEN RAUCHER & BLUM**
   **Timothy D. Reuben [State Bar #94312]**
2  **Stephen L. Raucher [State Bar #162795]**
   **Gregory P. Barchie [State Bar #235022]**
3  10940 Wilshire Blvd., 18th Floor
   Los Angeles, California 90024
4  Telephone: (310) 777-1990
   Facsimile: (310) 777-1989
5
   Attorneys for Plaintiffs
6

7

8  **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

   **FOR THE COUNTY OF LOS ANGELES**
9

10

| | |
|---|---|
| RETIREMENT HOUSING FOUNDATION; FOUNDATION PROPERTY MANAGEMENT, INC; BIXBY KNOLLS TOWERS, INC.; GOLD COUNTRY HEALTH CENTER, INC.; MAYFLOWER GARDENS HEALTH FACILITIES, INC.; MAYFLOWER RHF HOUSING, INC.; SUN CITY RHF HOUSING; HOLLY HILL RHF HOUSING, INC.; MERRITT ISLAND RHF HOUSING, INC.; MARTIN LUTHER FOUNDATION, INC.; YELLOWWOOD ACRES, INC.; BLUEGRASS RHF HOUSING, INC.; ST. CATHERINE RHF HOUSING, INC., and DESMET RHF HOUSING, INC., | CASE NO. BC404726 [Hon. Lee Smalley Edmon, Dept. 322] **SIXTH AMENDED COMPLAINT FOR:** 1. NEGLIGENCE 2. NEGLIGENT MISREPRESENTATION 3. BREACH OF FIDUCIARY DUTY 4. CONSTRUCTIVE FRAUD 5. FRAUD AND DECEIT 6. NEGLIGENT MISREPRESENTATION 7. UNFAIR COMPETITION 8. FRAUD, DECEIT AND CONSPIRACY TO DEFRAUD 9. NEGLIGENT MISREPRESENTATION 10. INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE 11. FRAUD AND DECEIT 12. NEGLIGENT MISREPRESENTATION |
| Plaintiffs, | |
| vs. | |
| CAIN BROTHERS & CO. LLC; ACA FINANCIAL GUARANTY CORPORATION; RICHARD S. FULD, JR.; CHRISTOPHER M. O'MEARA; ERIN M. CALLAN; MICHAEL L. AINSLIE; JOHN F. AKERS; ROGER S. BERLIND; THOMAS H. CRUIKSHANK; MARSHA JOHNSON EVANS; CHRISTOPHER GENT; ROLAND A. HERNANDEZ; HENRY KAUFMAN; JOHN D. MACOMBER, and DOES 1-10 and 13-140, inclusive, | |
| Defendants. | **DEMAND FOR JURY TRIAL** Complaint Filed:    December 30, 2008 Trial Date:    Not set |
| AND RELATED CROSS-ACTION | |

SIXTH AMENDED COMPLAINT

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### I.    The Parties

1.    Plaintiff Retirement Housing Foundation ("RHF") is, and at all times relevant to this Sixth Amended Complaint was, a California not-for-profit corporation with its principal place of business in Long Beach, California.

2.    Plaintiff Foundation Property Management, Inc. ("FPM") is, and at all times relevant to this Sixth Amended Complaint was, a not-for-profit corporation incorporated and existing under the laws of the State of California and doing business in the County of Los Angeles in the State of California.

3.    Plaintiff Bixby Knolls Towers, Inc. ("Bixby Knolls") is, and at all times relevant to this Sixth Amended Complaint was, a not-for-profit corporation incorporated and existing under the laws of the State of California and doing business in the County of Los Angeles in the State of California.

4.    Plaintiff Gold Country Health Center, Inc. ("Gold Country") is, and at all times relevant to this Sixth Amended Complaint was, a not-for-profit corporation incorporated and existing under the laws of the State of California and doing business in the County of El Dorado in the State of California.

5.    Plaintiff Mayflower Gardens Health Facilities, Inc. ("Mayflower Health") is, and at all times relevant to this Sixth Amended Complaint was, a not-for-profit corporation incorporated and existing under the laws of the State of California and doing business in the County of Los Angeles in the State of California.

6.    Plaintiff Mayflower RHF Housing, Inc. ("Mayflower I") is, and at all times relevant to this Sixth Amended Complaint was, a not-for-profit corporation incorporated and existing under the laws of the State of California and doing business in the County of Los Angeles in the State of California.

7.    Plaintiff Sun City RHF Housing, Inc. ("Sun City") is, and at all times relevant to this Sixth Amended Complaint was, a not-for-profit corporation incorporated and existing under the laws of the State of California and doing business in the County of Riverside in the State of California.

SIXTH AMENDED COMPLAINT

8.    Plaintiff Holly Hill RHF Housing, Inc. ("Holly Hill") is, and at all times relevant to this Sixth Amended Complaint was, a not-for-profit corporation incorporated and existing under the laws of the State of Florida and doing business in the State of Florida.

9.    Plaintiff Merritt Island RHF Housing, Inc. ("Merritt Island") is, and at all times relevant to this Sixth Amended Complaint was, a not-for-profit corporation incorporated and existing under the laws of the State of Florida and doing business in the State of Florida.

10.    Plaintiff Martin Luther Foundation, Inc. ("Martin Luther") is, and at all times relevant to this Sixth Amended Complaint was, a not-for-profit corporation incorporated and existing under the laws of the State of Florida and doing business in the State of Florida.

11.    Plaintiff Yellowwood Acres, Inc. ("Yellowwood") is, and at all times relevant to this Sixth Amended Complaint was, a not-for-profit corporation incorporated and existing under the laws of the State of Indiana and doing business in the State of Indiana.

12.    Plaintiff Bluegrass RHF Housing, Inc. ("Bluegrass") is, and at all times relevant to this Sixth Amended Complaint was, a not-for-profit corporation incorporated and existing under the laws of the State of Kentucky and doing business in the State of Kentucky.

13.    Plaintiff St. Catherine RHF Housing, Inc. ("St. Catherine") is, and at all times relevant to this Sixth Amended Complaint was, a not-for-profit corporation incorporated and existing under the laws of the State of Missouri and doing business in the State of Missouri.

14.    Plaintiff DeSmet RHF Housing, Inc. ("DeSmet") is, and at all times relevant to this Sixth Amended Complaint was, a not-for-profit corporation incorporated and existing under the laws of the State of Missouri and doing business in the State of Missouri.

15.    Defendant Cain Brothers & Co., LLC ("Cain Brothers") is, and at all times relevant to this Sixth Amended Complaint was, a limited liability company organized in Delaware and whose principal place of business is in the State of New York and who does business in the State of California.

16.    Defendant ACA Financial Guaranty Corporation ("ACA") is, and at all times relevant to this Sixth Amended Complaint was, a Maryland corporation whose principal place of business is in the State of New York and who does business in the State of California.

SIXTH AMENDED COMPLAINT

1    17.    Defendant Richard S. Fuld, Jr. ("Fuld") is the former Chairman of the Board of

2  Directors and Chief Executive Officer of Lehman Brothers Holdings, Inc. On Plaintiffs' information

3  and belief, Fuld is, and at all times relevant to this Sixth Amended Complaint was, an individual

4  residing in the State of New York.

5    18.    Christopher M. O'Meara ("O'Meara") is the former Chief Financial Officer,

6  Controller and Chief Risk Officer of Lehman Brothers Holdings, Inc. On Plaintiffs' information and

7  belief, O'Meara is, and at all times relevant to this Sixth Amended Complaint was, an individual

8  residing in the State of New York.

9    19.    Erin M. Callan ("Callan") is the former Chief Financial Officer and Controller of

10  Lehman Brothers Holdings, Inc.  On Plaintiffs' information and belief, Callan is, and at all times

11  relevant to this Sixth Amended Complaint was, an individual residing in the State of New York.

12    20.    Michael L. Ainslie ("Ainslie") is a former member of the Board of Directors of

13  Lehman Brothers Holdings, Inc.  On Plaintiffs' information and belief, Ainslie is, and at all times

14  relevant to this Sixth Amended Complaint was, an individual residing in the State of Florida.

15    21.    John F. Akers ("Akers") is a former member of the Board of Directors of Lehman

16  Brothers Holdings, Inc.  On Plaintiffs' information and belief, Akers is, and at all times relevant to

17  this Sixth Amended Complaint was, an individual residing in the State of Connecticut.

18    22.    Roger S. Berlind ("Berlind") is a former member of the Board of Directors of Lehman

19  Brothers Holdings, Inc.  On Plaintiffs' information and belief, Berlind is, and at all times relevant

20  to this Sixth Amended Complaint was, an individual residing in the State of New York.

21    23.    Thomas H. Cruikshank ("Cruikshank") is a former member of the Board of Directors

22  of Lehman Brothers Holdings, Inc.  On Plaintiffs' information and belief, Cruikshank is, and at all

23  times relevant to this Sixth Amended Complaint was, an individual residing in the State of Texas.

24    24.    Marsha Johnson Evans ("Evans") is a former member of the Board of Directors of

25  Lehman Brothers Holdings, Inc.  On Plaintiffs' information and belief, Evans is, and at all times

26  relevant to this Sixth Amended Complaint was, an individual residing in the District of Columbia.

27    25.    Christopher Gent ("Gent") is a former member of the Board of Directors of Lehman

28  Brothers Holdings, Inc.  On Plaintiffs' information and belief, Gent is, and at all times relevant to

1  this Sixth Amended Complaint was, an individual residing in the United Kingdom.

2    26.    Roland A. Hernandez ("Hernandez") is a former member of the Board of Directors

3  of Lehman Brothers Holdings, Inc. On Plaintiffs' information and belief, Hernandez is, and at all

4  times relevant to this Sixth Amended Complaint was, an individual residing in the State of

5  California.

6    27.    Henry Kaufman ("Kaufman") is a former member of the Board of Directors of

7  Lehman Brothers Holdings, Inc. On Plaintiffs' information and belief, Kaufman is, and at all times

8  relevant to this Sixth Amended Complaint was, an individual residing in the State of New Jersey.

9    28.    John D. Macomber ("Macomber") is a former member of the Board of Directors of

10  Lehman Brothers Holdings, Inc. On Plaintiffs' information and belief, Macomber is, and at all times

11  relevant to this Sixth Amended Complaint was, an individual residing in the District of Columbia.

12    29.    Fuld, O'Meara, Callan, Ainslie, Akers, Berlind, Cruikshank, Evans, Gent, Hernandez,

13  Kaufman and Macomber are hereinafter sometimes referred to collectively as "The Individual

14  Lehman Defendants." Fuld, O'Meara, Callan are hereinafter sometimes referred to collectively as

15  the "Officer Defendants." Fuld, Ainslie, Akers, Berlind, Cruikshank, Evans, Gent, Hernandez,

16  Kaufman and Macomber are hereinafter sometimes referred to collectively as the "Director

17  Defendants."

18    30.    On Plaintiffs' information and belief, each of the Individual Lehman Defendants have

19  done business in the State of California in their personal capacity and/or on behalf of Lehman

20  Brothers Holdings, Inc. and its subsidiaries, including Lehman Brothers, Inc., Lehman Brothers

21  Special Financing, Inc., and Lehman Government Securities, Inc., and their representatives. Lehman

22  Brothers Holdings, Inc. and its subsidiaries are hereinafter sometimes collectively referred to as

23  "Lehman Brothers."

24    31.    The true names and capacities, whether individual, corporate, or otherwise, of

25  Defendants DOES 1 through 10 and 13-140 are unknown to Plaintiffs, and Plaintiffs therefore sue

26  these Defendants by their fictitious names and capacities. Plaintiffs will amend this Sixth Amended

27  Complaint to allege these defendants' true names and capacities when the same have been

28  ascertained.

32.    On Plaintiffs' information and belief, DOES 1 through 10, inclusive, have acted or failed to act in concert with Cain Brothers as alleged herein, and are responsible in some manner for the injuries and damages suffered by Plaintiffs. All references to Cain Brothers herein shall be deemed to include Does 1 through 10.

33.    On Plaintiffs' information and belief, DOES 13 through 20, inclusive, have acted or failed to act in concert with ACA as alleged herein, and are responsible in some manner for the injuries and damages suffered by Plaintiffs. All references to ACA herein shall be deemed to include Does 13 through 20.

34.    On Plaintiffs' information and belief, DOES 21 through 140, inclusive, have acted or failed to act in concert with the Individual Lehman Defendants as alleged herein, and are responsible in some manner for the injuries and damages suffered by Plaintiffs. All references to the Individual Lehman Defendants herein shall be deemed to include Does 21 through 140.

## II.    Cain Brothers' Plan Of Refinancing

35.    RHF is a church-related, non-profit organization devoted to the mission of providing safe and affordable housing and services for senior citizens, persons with disabilities, and low income families. Although its headquarters are in Southern California, RHF has sponsored, developed and/or managed senior citizen apartments, nursing facilities, and low income housing throughout the country.

36.    Cain Brothers is an investment banking and financial and strategic advisory firm that, at all times relevant herein, focused exclusively on the health care industry, and whose client base included nonprofit health care service providers and managed care companies such as Plaintiffs.

37.    On or about July 24, 1998, RHF, from its headquarters in California, issued a written "Request for Proposal" to several investment banking firms including Cain Brothers to solicit proposals "for investment banking services" to "structure" a multi-state, multi-facility group that would issue approximately $140 million in taxable and tax exempt bonds to refinance its existing debt. The Request for Proposal specifically requested proposals that would "keep[] down the costs and the long term cost of the deal," and address RHF's "probable need for credit enhancement," but otherwise provided wide latitude for the solicited investment banking firms to design and structure

SIXTH AMENDED COMPLAINT

1    any proposed plan of refinancing.  Attached as Exhibit A is a true and correct copy of the Request

2    for Proposal sent to Cain Brothers.

3        38.    On or about July 31, 1998, Cain Brothers (along with Ziegler Securities ("Ziegler")

4    and Banc One Capital Markets, Inc. ("Banc One")) responded in writing to RHF's Request for

5    Proposal and proposed to structure a highly complicated, long-term, 30-year plan of refinancing for

6    Plaintiffs, underwrite bonds to be issued for their benefit, and sell those bonds in the capital markets.

7    Within its proposal, among other things, Cain Brothers committed to the dual role of underwriting

8    the bonds and providing Plaintiffs with financial and strategic advice and expertise regarding the

9    development, management, structuring of the long-term complex plan of refinancing. Cain Brothers

10    represented that it had the expertise to safely, efficiently and at a low cost arrange and structure the

11    proposed long term plan of refinancing in accordance with Plaintiffs' stated goals and provide proper

12    financial and strategic advice and expertise over the course of that plan.  A true and correct copy of

13    Cain Brothers' proposal is attached as Exhibit B.

14        39.    Originally Ziegler had intended to submit Cain Brothers' proposal alone, but because

15    certain key Ziegler representatives (Joan Annett, Amy Hayman, and Scott Smith) had recently or

16    were about to defect to Cain Brothers, the initial proposal, Exhibit B, was a joint proposal.  Ziegler

17    soon dropped out of the transaction entirely when Scott Smith left Ziegler for Cain Brothers in the

18    later summer or early fall of 1998, and Cain Brothers thereafter took over Ziegler's respective

19    positions, duties, and responsibilities.  At the time the Financial Advisory Agreement was entered,

20    Banc One was a minority investor in Cain Brothers, but also eventually dropped out, with Cain

21    Brothers assuming its contractual duties and acting as Plaintiffs' sole financial and strategic advisor

22    in connection with the transaction.

23        40.    Cain Brothers' proposal provided that, if it was accepted, Cain Brothers would

24    "function" as "Special Products agents for the RHF Obligated Group refinancing as well [as] . . .

25    sharing in the principal risk portions of the Special Products proposed to be used for the RHF

26    Obligated Group refinancing."  The proposal further promised, among other things, that its plan

27    would "minimize the RHF Obligated Group's cost of capital while actually increasing its flexibility

28    to raise future capital for new growth and expansion activities;" that it would reduce RHF and

SIXTH AMENDED COMPLAINT

1  affiliates' costs of debt; that the interest rate savings available were considerable; and that the plan

2  would "provide the necessary protection to RHF of taking swap counterparty risk." Cain Brothers'

3  proposal further promised to provide Plaintiffs with "post-closing" support. Pursuant to Cain

4  Brothers' proposal, Cain Brothers promised to provide the RHF Group with a broad range of

5  predevelopment, coordination, financial advisory and underwriting tasks and assistance, including

6  but not limited to the following explicit duties:

7          (a)     To be "responsible for overall strategy and structure of the financing";

8          (b)     To be responsible for "negotiating terms of rating and credit enhancement";

9          (c)     To be "responsible for underwriting Cain Brothers principal risk position

10  taken on special products utilized";

11          (d)     To be "responsible for day-to-day coordination of legal team, issuers, credit

12  enhancement and rating process";

13          (e)     To be "responsible for ensuring the bond structure is compatible with the

14  proposed special products structure";

15          (f)     To be "responsible for ensuring the bond structure and special products

16  structure promotes future flexibility for credit, bridge, financing, etc.";

17          (g)     To be "responsible for providing technical analysis of bond sizings, credit

18  enhancement costs, analyses for rating agencies, credit enhancers, etc.;

19          (h)     To be "responsible for ensuring the cost efficiency and risk management of

20  special products structures"; and

21          (i)     To be "responsible for underwriting [Cain Brothers'] principal risk position."

22      41.    Within its proposal, Cain Brothers promised to act as the architect of the low cost and

23  long term plan of refinancing, and proceeded to structure a multi-state, multi-facility group that

24  consisted of RHF and its affiliates FPM, Bixby Knolls, Gold Country, Mayflower Health, Mayflower

25  I, Sun City, Holly Hill, Merritt Island, Martin Luther, Yellowwood, Bluegrass (hereinafter, the "RHF

26  Group") to re-fund existing debt through the issuance of approximately $140 million in taxable and

27  tax exempt municipal bonds. Both prior to and at the time the RHF Group accepted this proposed

28  plan of refinancing, Cain Brothers sought to induce the RHF Group to accept and follow that plan

SIXTH AMENDED COMPLAINT

of refinancing by representing orally and in writing that structuring the RHF Group would increase its access to capital through future refinancing at a lower cost and would achieve an "appropriate" mix of fixed versus variable rate debt.

42.    In or about August 1998, on behalf of itself and its affiliates that would be subject to the plan of refinancing, RHF formally accepted, in writing signed in its California headquarters, Cain Brothers' proposal.  A true and correct copy of the acceptance is attached hereto as Exhibit C. Exhibits A, B and C together, with various oral and written modifications, constituted a binding and enforceable refinancing agreement ("Financial Advisory Agreement").  The modifications included the above-described assumption of all obligations solely by Cain Brothers.

43.    Pursuant to Plaintiffs' and Cain Brothers' express objectives under the Financial Advisory Agreement, Cain Brothers acted as Plaintiffs' financial advisors and designed, structured, managed and implemented an extremely complex transaction involving bonds known as "SAVRS" and an interest rate swap, which Cain Brothers advised would benefit Plaintiffs in numerous ways and eliminate market risks.

44.    Among other things, Cain Brothers made presentations to Plaintiffs regarding its refinancing plan, the SAVRS and associated swap contracts, and the associated insurance agreement at RHF's Long Beach headquarters.

45.    In addition to acting as a financial advisor, the Financial Advisory Agreement also proposed to Plaintiffs that Cain Brothers assume the additional role as principal underwriter.  On or about December 7, 1998, after Cain Brothers had fully designed the structure, negotiated the swap transactions (described below), and advised Plaintiffs regarding the transaction, Cain Brothers also entered into a written Certificate Purchase Agreement with the RHF Group, pursuant to which Cain Brothers (and Banc One which later dropped out of the transaction) acted as "Underwriters," and agreed to make an original bona fide public offering of certificates evidencing proportionate ownership interests in the right to receive installment payments "pursuant to the Official Statement," a document prepared by Cain Brothers describing the offering and related arrangements.  A true and correct copy of the Certificate Purchase Agreement is attached hereto as Exhibit D.

46.    Among other things, the Certificate Purchase Agreement provided that Cain Brothers,

1    as an Underwriter, would "abide by all applicable rules of the Municipal Securities Rulemaking

2    Board." The Rules of the Municipal Securities Rulemaking Board state, among other things, that

3    a financial advisor (i.e., Cain Brothers) owes the issuer of municipal securities (i.e. Plaintiffs) duties

4    and "shall deal fairly with all persons and shall not engage in any deceptive, dishonest, or unfair

5    practice." MSRB R. G-17. Under the Rules, Cain Brothers, as underwriter providing financial

6    advisory services, was required to, among other things, appropriately document and disclose the

7    financial advisory relationship and compensation earned therefrom. MSRB R. G-23. Copies of the

8    terms of MSRB Rules G-17 and G-23 are attached hereto as Exhibit E.    As it turns out, Cain

9    Brothers failed to comply with either of these rules.

10        **A.    SAVRS**

11        47.    Pursuant to Cain Brothers' plan and at Cain Brothers' recommendation, the entirety

12    of the RHF Group's bonds were issued as auction rate securities called Select Auction Variable Rate

13    Securities, a product offered and marketed as "SAVRS" by Lehman Brothers.

14        48.    Lehman Brothers was a global financial-services firm that, through its subsidiaries,

15    provided services in investment banking, equity and fixed-income sales, research and trading,

16    investment management, private equity, and private banking. At all times relevant, Lehman Brothers

17    marketed itself as one of the leading investment banking firms, and that it was trustworthy, honest,

18    stable, dependable, in compliance with all laws, well capitalized, and that its public financial

19    statements, including but not limited to its balance sheet, were true and fair and accurately depicted

20    its financial condition. The Individual Defendants knew that Lehman Brothers' public financial

21    statements, including its 10Ks and 10Qs and Annual Reports as well as the public comments by its

22    senior officers, were carefully and regularly monitored by analysts, rating agencies, and other

23    sophisticated experts on Wall Street, and that these analysts, rating agencies, and other sophisticated

24    experts regularly reported, commented, or published their findings, summaries and/or opinions about

25    Lehman Brother's financial condition. The Individual Defendants also knew that the findings,

26    comments, or opinions of these analysts, rating agencies, and other sophisticated experts affected

27    both the value of Lehman Brothers' publicly traded stock as well as the ability for Lehman Brothers

28    to contract with and otherwise do business with third parties and/or counterparties who, as the

1   Individual Lehman Defendants knew, regularly relied on the accuracy of Lehman Brothers' financial

2   statements either directly or through the findings, comments, or opinions of analysts, rating agencies

3   and other sophisticated experts.

4         49.      Lehman Brothers Holdings, Inc. owned and controlled its subsidiaries Lehman

5   Brothers, Inc., Lehman Brothers Special Financing, Inc., and Lehman Government Securities, Inc.,

6   entities which in one role or another all became involved with Plaintiffs' refinancing.  Lehman

7   Brothers Holdings, Inc., Lehman Brothers, Inc., Lehman Brothers Special Financing, Inc., and

8   Lehman Government Securities, Inc. were alter egos of each other and shared a unity of interest, and

9   it would sanction a fraud or promote an injustice not to treat them as alter egos.  Further, these

10  entities in actuality formed a single enterprise.  Plaintiffs are informed and believe that these entities

11  commingled funds and assets, used the same offices and employees, disregarded corporate

12  formalities, and were used as mere shells or conduits for the affairs of each other.

13        50.      SAVRS were supposed to bear interest at a variable rate that would be determined

14  by a purportedly competitive bidding "Dutch" auction held by Lehman Brothers every 35 days that

15  was supposed to provide a fair market interest rate.  According to Cain Brothers, in each auction

16  cycle, Lehman Brothers would solicit interest from existing bond holders and potential investors and

17  collect bids from those bond holders and investors that specified a rate at which they would buy

18  and/or sell the SAVRS.  Lehman Brothers would then allegedly compile each bid and provide the

19  raw data of each bid (and not the identity of the bidders) to a third party auction agent to determine

20  the rate of the SAVRS.  The auction rate was supposed to be set through a process in which bids with

21  successively higher rates were accepted until all SAVRS available in the auction were sold.  The

22  highest bid at which SAVRS were sold in the auction, the so-called "winning bid" or "clearing rate,"

23  would be the interest rate applicable for the next SAVRS period.  Every 35 days, a new SAVRS

24  auction would be held and new bids would be compiled by Lehman Brothers, from which the

25  SAVRS rate would purportedly be reset at a clearing rate that represented a fair market rate.  Lehman

26  Brothers would continue to receive fees each auction cycle for orchestrating the auctions and

27  compiling the bids to be submitted to the auction agent.

28        51.      Cain Brothers' structure and plan provided that Lehman Brothers would be the only

1  market agent and broker-dealer with respect to the RHF Group's SAVRS, and that Lehman Brothers

2  had total control over the auction process. Lehman Brothers provided the auction agent with the

3  Maximum Rate – a high rate that would prevail only if there were a "failed" auction due to a lack

4  of bids below the maximum rate. Lehman Brothers also provided the auction agent with all bid and

5  sell orders. The auction agent would simply compile the information received from Lehman

6  Brothers and pass that information, including the clearing rate, on to the RHF Group. Thus, Lehman

7  Brothers could pre-determine what the clearing rate would be and, since it had sole control over the

8  orders, was in the position to manipulate the auctions and convey the results of those auctions

9  through the auction agent to the RHF Group. However, based on the representations and information

10 received from Cain Brothers and Lehman Brothers and the contracts associated with the refinancing,

11 the RHF Group justifiably believed that the auctions would be conducted fairly and properly without

12 manipulation, and that fair market interest rates would be set.

13     52.    According to representations, counsel and advice by Cain Brothers, the benefit of

14 SAVRS to the RHF Group was that, among other things, they provided bond issuers the low cost

15 and flexibility of variable rate debt. As long term securities with purportedly short term features,

16 Cain Brothers represented in writing and orally to the RHF Group that SAVRS presented a safe

17 alternative to more traditional and more expensive fixed rate bonds, provided a "time-tested

18 structure" and "a large distribution market," and did not require the RHF Group to maintain a

19 liquidity facility. Cain Brothers also represented in writing, orally and without qualification that,

20 under the structure more fully described below, the RHF Group had the option to convert the

21 SAVRS into true fixed rate bonds at any time to lock in advantageous prevailing fixed rates.

22     **B.    The 1998 Swap Contract**

23     53.    Pursuant to the Financial Advisory Agreement and Cain Brothers' representations,

24 counsel and advice, the SAVRS were issued in an "appropriate" mix of variable rate and

25 "synthetically" fixed rate bonds, which Cain Brothers claimed would protect the RHF Group against

26 the risk of variable interest rate fluctuations for 30 years. According to Cain Brothers' plan of

27 refinancing, the interest rate of approximately 85% of the SAVRS would be synthetically fixed

28 through an "interest rate swap," another highly complicated, long-term, 30-year contract with

---

12

SIXTH AMENDED COMPLAINT

1    Lehman Brothers that Cain Brothers structured, negotiated and recommended ("the 1998 Swap").
2    A true and correct copy of the 1998 Swap is attached hereto as Exhibit F, in which several of the fees
3    earned by Cain Brothers are described.

4    54.    Pursuant to the 1998 Swap, in each successive auction cycle, the RHF Group agreed
5    to pay a stipulated fixed rate of interest on the SAVRS to Lehman Brothers, and Lehman Brothers
6    agreed to pay the holders of the SAVRS interest at the variable rate that it determined every 35 days
7    by auction.

8    55.    Pursuant to the 1998 Swap and consistent with its long term 30 year commitment,
9    Lehman Brothers unconditionally guaranteed the RHF Group's variable interest and capital payment
10    obligations on the SAVRS that were subject to the agreement, and that such payments would be
11    punctually made when they became due and payable.

12    56.    Under the 1998 Swap, the RHF Group was also to make additional payments.
13    Further, the RHF Group was to pay fees for Lehman Brothers' services for auctioning the SAVRS
14    every thirty-five days.

15    57.    Among other things, Cain Brothers, as Plaintiffs' agent and financial and strategic
16    advisor and pursuant to its duties under the Financial Advisory Agreement, reviewed all swap related
17    documentation, negotiated the language and structure of the swap transactions, including the ISDA
18    Master Agreement, Schedule to the ISDA Master Agreement, Confirmations and Credit Support
19    Annex, coordinated the implementation and closing of all swap transactions, and promised to
20    monitor and provide all relevant documentation relating to the swap transactions, all for Plaintiffs'
21    benefit and purportedly to ensure the cost efficiency and risk management of the plan of refinancing.

22    58.    Both prior to and at the time the Financial Advisory Agreement and the 1998 Swap
23    were executed, Cain Brothers and Lehman Brothers represented orally and in writing to the RHF
24    Group that the benefit of the interest rate swap was that it permitted the RHF Group to "hedge," or
25    protect itself, against the risks of variable interest rate fluctuations and achieve a lower overall fixed
26    rate than would be available if the SAVRS were issued as true fixed rate obligations. Cain Brothers
27    also represented that the RHF Group could earn a windfall under the 1998 Swap, or be "in the
28    money."

13

SIXTH AMENDED COMPLAINT

1     59.    On behalf of Lehman Brothers, among other persons, Defendant O'Meara in 1998

2    communicated directly with the RHF Group and its representatives regarding the SAVRS, the 1998

3    Swap, and the overall transaction.  O'Meara specifically spoke with counsel for the RHF Group,

4    William Kelly, on August 4, 1998 and August 5, 1998.

5     60.    Lehman Brothers' strong financial condition and its public credit rating were

6    absolutely material to and relied on by the RHF Group in entering into the 1998 Swap.  The 1998

7    Swap contained material written representations that Lehman Brothers' financial statements were

8    true and correct and that Lehman Brothers was in no way in default or subject to any Termination

9    Event. One Termination Event was if Lehman Brothers fell below a Moody's public rating of Baa3

10    and an S&P rating of BBB-.  The 1998 Swap further provided that Lehman Brothers would regularly

11    provide its financial documents to the RHF Group throughout the thirty year term of the 1998 Swap,

12    and Lehman Brothers specifically represented that those financial documents would be "true,

13    accurate, and complete in every material respect."   The 1998 Swap also provided that the Lehman

14    Brothers Board of Directors had authorized "the execution and the delivery of" the 1998 Swap. Cain

15    Brothers, as the RHF Group's swap adviser and monitoring agent, dealt directly and communicated

16    with Lehman Brothers after the 1998 Swap was signed and regularly received information about

17    Lehman Brothers' financial condition and advised the RHF Group about Lehman Brothers and the

18    terms, obligations, and impact of the 1998 Swap.

19     61.    As Cain Brothers' plan of refinancing was structured, it was publicly reported in

20    financial trade publications as the largest single bond deal ever sold to finance nursing homes.  On

21    Plaintiffs' information and belief, Fuld, O'Meara, Ainslie, Akers, Berlind, Cruikshank, Kaufman,

22    and Macomber, who were employed and/or were serving as officers and directors of Lehman

23    Brothers at the time, were well-informed of Lehman Brothers' activities and significant financial

24    commitments and were knowledgeable and/or became aware through Lehman Brothers' Board

25    authorization and/or through public reports of the issuance of the SAVRS (a Lehman Brothers

26    product) and that the RHF Group was Lehman Brothers' counterparty under the 1998 Swap and

27    related agreements.

28

SIXTH AMENDED COMPLAINT

**C.    Cain Brothers Recommends That The RHF Group Obtain ACA Bond Insurance**

62.    To enhance the RHF Group's creditworthiness, the Financial Advisory Agreement and the 1998 Swap required that the RHF Group guarantee with a bond insurer the RHF Group's interest and capital payment obligations on the SAVRS.

63.    Cain Brothers recommended that the RHF Group insure the SAVRS with ACA, which is a subsidiary of holding company ACA Capital Holdings, Inc., and a bond insurer founded in 1997 that purported to be the first domestic financial guaranty company to offer an "A" rated guaranty in the United States debt markets.  Cain Brothers expressly promised and represented in the Financial Advisory Agreement to structure bonds "which work very well with an A rating." Cain Brothers further promised to use its expertise in vetting or otherwise investigating ACA (as well as investigating and evaluating any alternatives to ACA) and in negotiating the covenants and terms with ACA.

64.    In 1998, Cain Brothers affirmatively represented and recommended in writing and orally that the transaction should be structured using ACA insurance, which would purportedly lower the RHF Group's credit enhancement costs significantly, and would provide a 30 year commitment, compared to a letter of credit, which Cain Brothers recommended against.  Cain Brothers also represented in writing and orally that ACA would decrease the RHF Group's existing annual debt service requirements, and would increase the RHF Group's debt capacity, which would allow the RHF Group to expand.  According to Cain Brothers, the credit enhancement provided by ACA was significantly better than any alternatives, which included the RHF Group pursuing its own public rating (at the time, the RHF Group had already obtained the minimum investment grade credit assessment from Standard & Poor's of BBB-).

65.    Consistent with its representations regarding the low cost and the flexibility of the SAVRS, Cain Brothers represented to the RHF Group that ACA's bond insurance presented the best option to guarantee the SAVRS because ACA purportedly offered a safe, long term, investment grade rated commitment for a one time up-front fee.

66.    Indeed, according to Joan Annett, a representative for Cain Brothers, RHF was sufficiently creditworthy to garner an investment grade rating on its own, but Cain Brothers

1    recommended a structure that, unbeknownst to Plaintiffs and insufficiently explained by Cain

2    Brothers, was defective in numerous ways, including that Plaintiffs could not replace ACA or stand

3    on their own credit, and was completely dependent on ACA's credit rating. Indeed, unbeknownst

4    to the RHF Group and contrary to its representations, Cain Brothers did not properly vet or

5    investigate ACA, nor did it perform adequate due diligence to find alternatives to ACA.

6         67.     In or about December 1998, on the recommendation of Cain Brothers, the RHF Group

7    and ACA entered into a written bond insurance agreement in which ACA would insure the SAVRS

8    ("Insurance Agreement"). Under the Insurance Agreement, which RHF entered into in its Long

9    Beach headquarters, the RHF Group paid a one-time, up-front premium of approximately $3,000,000

10    to ACA, who in exchange irrevocably and unconditionally agreed and represented that it would

11    effectively "guarantee . . . payment when due of principal (whether at maturity or by mandatory

12    sinking fund redemption) and interest on the 1998 SAVRS." Said guarantee by ACA was to be

13    evidenced in the form of insurance policies and operated to maintain the investment strength of the

14    bonds due to ACA's "A" rating. A true and correct copy of the Insurance Agreement is attached as

15    Exhibit G. However said guarantee could only in fact be maintained as long as ACA maintained an

16    investment grade rating. Without the benefit of ACA's investment grade rating, its guarantee was

17    worthless and the SAVRS would fall to "junk" status.

18         68.     The importance of ACA's obligation to maintain an investment grade rating for its

19    promised guarantee to have value was acknowledged by ACA and stated in various documents

20    associated with the Financial Advisory Agreement, including the Official Statement dated as of

21    December 7, 1998 pertaining to the issuance of the SAVRS, and the Swap Contract, the terms of

22    which both depended on ACA's investment grade rating. The guarantee based on the investment

23    grade rating was the basic consideration that RHF was paying for.

24         69.     ACA's obligations to guarantee the SAVRS and its acknowledgment of its need to

25    maintain an investment grade rating in order for the guarantee to be effective were also expressed,

26    amplified, interpreted and/or supplemented in the written 1998 Swap in Section 1(g)(ii) of the

27    Schedule forming part of the 1998 Swap and also in the endorsement to the Interest Rate Swap

28    Insurance Policy issued by ACA, with the RHF Obligated Group as "Obligor" and Lehman Brothers

1    as "Counterparty." A true and correct copy of this Interest Rate Swap Policy is attached to this

2    Complaint at Exhibit F (the Swap Contract), Exhibit G to Schedule to Master Agreement therein.

3    The Interest Rate Swap Insurance Policy expressly referenced and was dependent on the terms of the

4    Swap Contract. In confirmation of this requirement that for ACA's guarantee to be effective, ACA

5    had to maintain an investment grade rating, the 1998 Swap specifically identifies "a termination

6    event" as ACA's failure to maintain "[a] financial strength rating of at least BBB-." See Ex. B to

7    Complaint, Schedule to the Master Agreement, pg. 3. As ACA was aware, if did not maintain an

8    investment grade rating (BBB- or better), the RHF Group would lose critical protections and suffer

9    great financial harm, and ACA's guarantee would be worthless.

10    70.    Moreover, ACA further acknowledged its obligations by executing a written

11    "Certificate of Bond Insurer as to Official Statement." This Certificate expressly confirmed:

12    The statements contained in the Official Statement under the heading 'SAVRS
       INSURANCE", insofar as such statements constitute summaries of the matters
13    referred to therein, accurately reflect and fairly present the information purported to
       be shown and, insofar as such statements describe ACA, fairly and accurately
14    describe ACA.

15    In turn, the statements in the Official Statement under the SAVRS Insurance heading included the

16    statement that ACA "is required to maintain contingency reserves on its liabilities in certain amounts

17    and for certain periods of time." ACA's contingency reserves had a direct effect on its rating and

18    its ability to maintain the promised guarantee.

19    71.    Thus, both prior to and at the time the Insurance Agreement was executed in or about

20    December 1998, Cain Brothers and ACA assured the RHF Group in writing that, consistent with its

21    preferred investment grade "A" rating, ACA's business practices were financially responsible in

22    order to carefully limit its own risk exposure and maintain its "A" rating. For example, such

23    representations were included, among other places, in promotional materials provided to the RHF

24    Group by Cain Brothers and ACA that stated:

25    (a)    "ACA believes that transactions bearing its guarantee should trade at market

26    levels consistent with the company's 'A' rating."

27    (b)    "ACA's claims-paying resources are sound and are pledged to transactions

28    which the company believes are 'money good' in their own right. By underwriting deals

17
SIXTH AMENDED COMPLAINT

1    with stable and improving credit characteristics and which have very low default

2    expectations, the company is merely facilitating market access and efficiency, not 'making

3    bad deals good.'"

4            (c)     "[ACA] would survive and meet its obligations beyond the third year of

5    ['Great Depression' type] adverse economic conditions."

6            (d)     "ACA underwrites on the basis of insuring transactions which are expected

7    to make full and timely repayment of principal and interest. Nevertheless, given the nature

8    of its target markets, a minimal loss potential exists, and ACA will actively manage its

9    insurance portfolio accordingly to mitigate the effect of any losses that may occur."

10            (e)     "ACA has established a 15% of earned premium loss reserve which is more

11    than twice the industry average. This feature emphasizes the company's financial

12    conservatism and is supportive of a trading range consistent with its 'A' rating."

13            (f)     "Sector-specific underwriting policies and standards have been established

14    and applied for every type of credit considered for ACA insurance. Such policies are

15    intended to provide a basis for the avoidance of loss and will be applied in the context of a

16    rigorous underwriting process which will consider all pertinent risk and credit factors."

17            (g)     "ACA manages the risks it insures by selectively choosing issuers, regardless

18    of size, with favorable demographics that have demonstrated their commitment to meet their

19    debt obligations and that utilize proceeds for essential purposes."

20            72.     Cain Brothers minimized any concerns about ACA and the possibility it would be

21    downgraded with representations regarding the benefits of the entirety of the 1998 plan of

22    refinancing, which included, among other things, the low risk stability offered by ACA insurance,

23    the RHF Group's right to terminate the 1998 Swap, and the potential windfall the RHF Group could

24    earn, and be "in the money."

25            73.     Accordingly, prior to and at the time the Insurance Agreement was executed in or

26    about December 1998, ACA and Cain Brothers continually represented in writing that ACA

27    practiced financial conservatism, supported underwriting policies with very low default expectations,

28    maintained a substantial capital reserve to cover potential losses, and diversified its very conservative

1  insurance portfolio to reduce its exposure to risk. According to ACA and Cain Brothers, the purpose

2  of these policies was, among other things, to mitigate the financial effect of a catastrophic credit

3  event, and continue to meet its contractual obligations under such adverse economic conditions.

4        **D.    Cain Brothers' Post-Closing Support**

5        74.    Pursuant to and consistent with the terms of the Financial Advisory Agreement, Cain

6  promised substantial "post-closing" support to Plaintiffs, which included, among other things, acting

7  as the RHF Group's swap adviser and monitoring agent and communicating with Lehman Brothers

8  regarding the 1998 Swap; participating in the preparation of annual financial statements relating to

9  the swap transactions; providing financial and strategic advice; monitoring and reporting to Plaintiffs

10 regarding the performance, obligations, and potential risks of the swap transactions and ACA's bond

11 insurance (including opportunities to restructure or enhance the performance of the plan of

12 refinancing); and ensuring the continued cost efficiency and risk management of the overall plan of

13 refinancing.

14       **E.    Cain Brothers' Fees Pursuant To The Financial Advisory Agreement**

15       75.    Cain Brothers earned substantial fees as financial advisors in connection with its

16 several duties under the Financial Advisory Agreement. Under the Financial Advisory Agreement,

17 Cain stated that, "in addition to fees charged for the underwriting of the bonds, . . . *Cain Brothers*

18 *. . . earn[ed] fees for structuring, bidding and taking principal risk in the related swaps. The swap*

19 *provider [Lehman] pays these fees directly to . . . Cain Brothers as co-agent[] in the transaction.*"

20 (emphasis in original). The Financial Advisory Agreement stated that, "[b]ecause of the complex

21 nature of the swap transaction, it is difficult to estimate exactly what those fees should be," and Cain

22 Brothers promised to disclose in writing all fees proposed by all bidders on the special products

23 services both before and after payment of Cain Brothers' assumption of the principal risk, which

24 would purportedly "allow[] RHF to determine the lowest effective rate from all bidders if no agent

25 fees were charged and if no principal risk was taken, to determine if indirect costs to RHF are

26 appropriate and appropriately scaled to value added." Cain Brothers also was to earn fees managing

27 the investment and monetization of Plaintiffs' bond proceeds.

28       76.    Cain Brothers' swap-related fees were also integrated into the 1998 Swap itself as

1  well as subsequent swap transactions with Lehman Brothers, so Plaintiffs did not pay those fees

2  directly to Cain Brothers, but rather paid them to Lehman Brothers (who then paid Cain Brothers).

3  Payments for negotiating, executing and delivering of the swap transactions on behalf of Plaintiffs

4  was documented in, among other places, the various Confirmations of the 1998 Swap as well as

5  other swap transactions with Lehman Brothers throughout the following years.

6  **F.    The Issuance Of Additional Bonds**

7  77.    In or about 1999, pursuant to the Financial Advisory Agreement and prior advice and

8  recommendations, Cain Brothers underwrote additional fixed-rate bonds that were issued for the

9  benefit of the RHF Group.  At Cain Brothers' recommendation (upon which the RHF Group

10  justifiably relied), ACA again served as the bond insurer for these bonds under the original Insurance

11  Agreement.  Again, Cain Brothers earned fees as the RHF Group's swap adviser.

12  78.    In or about 2000, pursuant to the Financial Advisory Agreement and prior advice and

13  recommendations, Cain Brothers underwrote additional fixed-rate bonds that were issued for the

14  benefit of RHF affiliates St. Catherine and DeSmet.  The RHF Group, whose creditworthiness was

15  insured by ACA under the Insurance Agreement, guaranteed the bonds issued for the benefit of St.

16  Catherine and DeSmet.  Again, Cain Brothers earned fees as the RHF Group's swap adviser.

17  79.    Notably, at about this time, Cain Brothers officially formed a "strategic partnership"

18  with Lehman Brothers, where Lehman Brothers agreed to buy a 14 percent stake in Cain Brothers.

19  This "strategic partnership" was not disclosed to Plaintiffs.

20  **III.    The Failure Of Cain Brothers' Plan Of Refinancing**

21  80.    The RHF Group's plan of refinancing that Cain Brothers recommended, advised, and

22  implemented was not safe, low risk, low cost, or flexible as Cain Brothers had claimed.

23  Significantly, even though the RHF Group's creditworthiness was purportedly a concern at the time

24  the 1998 plan of refinancing was proposed and implemented, it was the guarantees provided by

25  Lehman Brothers and ACA that were highly risky and that became worthless, and the transaction

26  structure imposed substantial detriments against the RHF Group.

27  **A.    The Undisclosed and Unfair Valuations of the Swap Contract**

28  81.    Unbeknownst to the RHF Group, the 1998 Swap was valued by Lehman Brothers

SIXTH AMENDED COMPLAINT

1    pursuant to a secret, restrictive valuation methodology developed by Lehman Brothers that

2    effectively prevented the RHF Group from being "in the money" despite the fact that the SAVRS'

3    variable rate determined at auction often exceeded the synthetic "fixed" rate.

4    82.    In addition, on Plaintiffs' information and belief and unbeknownst to the RHF Group,

5    Lehman Brothers was involved in an illegal price fixing and/or bid rigging scheme in which it

6    manipulated the SAVRS' rates determined at auction to its own benefit.  On Plaintiffs' information

7    and belief, Lehman Brothers would pre-select a "winning bid" during each auction cycle to ensure

8    that the SAVRS would trade at below fair market value and maximize their profits and inflate the

9    amount the RHF Group was "out of the money" under the Swap Contract.  On Plaintiffs' information

10   and belief, executives at Lehman Brothers had knowledge of, directed, approved, and/or ratified

11   Lehman Brothers' practice and policies of bid rigging securities auctions and otherwise inflating the

12   amount Lehman Brothers was "in the money" under the Swap Contract.

13   83.    Because of Cain's negligence and breaches of fiduciary duty in advising and

14   structuring the transaction and through Lehman Brothers' aforementioned continuing bad faith and

15   corrupt conduct in manipulating the auctions, the RHF Group was always "out of the money" on the

16   1998 Swap in an unreasonably and unfairly excessive amount.  The RHF Group was unaware that

17   the 1998 Swap was valued by Lehman Brothers pursuant to a secret, restrictive valuation

18   methodology, and did not understand that the calculations on the 1998 Swap may have been inflated

19   in Lehman Brothers' favor or that Lehman Brothers was unfairly keeping the RHF Group "out of the

20   money."  Therefore, the RHF Group continued to pay amounts allegedly owing per the SAVRS and

21   the 1998 Swap.

22   84.    Cain Brothers had a continuing duty to "support" the RHF Group and monitor

23   Lehman Brothers, including a duty to disclose and advise the RHF Group of all material facts

24   regarding Lehman Brothers and the 1998 plan of refinancing, including, among other things,

25   information relating to the interest rate swaps and the bidders' proposed rates on the swaps.  Cain

26   Brothers knew or should have known through the exercise of reasonable diligence that, among other

27   things, the way Cain Brothers had advised and structured the transaction resulted in Lehman

28   Brothers' unfair valuation methodology, as well as Lehman's price fixing or bid rigging conspiracy

21

SIXTH AMENDED COMPLAINT

1    and wrongful acts in connection with the auctions.  Cain Brothers failed to disclose these facts to the

2    RHF Group or otherwise properly advise or counsel the RHF Group.  In fact, Cain Brothers had a

3    close relationship with Lehman Brothers, and ultimately Lehman Brothers became a substantial

4    financial investor in Cain Brothers.

5        **B.     ACA's Mismanagement And Exposure To Risky Subprime Mortgage-Backed**

6            **Securities**

7        85.    In or about 2003 through 2007, in reckless pursuit of higher profits, and despite its

8    obligations to guarantee Plaintiffs' capital and interest repayments on the SAVRS and to maintain

9    its "A" rating, and contrary to its promises of financial conservatism and responsibility, ACA

10   guaranteed securities backed by high risk loans, including, among other things, subprime housing

11   mortgages, well in excess of its ability to do so.

12       86.    In or about 2005, despite its exposure to the subprime housing market, ACA

13   reaffirmed in writing that its business practices continued to be financially responsible, and that it

14   maintained sufficient equity and loss reserves in line with its preferred investment grade "A" rating.

15   Specifically, in its 2005 quarterly financial reports, ACA represented that:

16           (a)    "[ACA] reported [a] net income of $14.7 million for the first quarter of 2005

17       . . . related to positive mark to market gains on derivatives, as well as continued growth in

18       our structured finance businesses."

19           (b)    "ACA reported a net operating income for the first quarter of 2005 of $8.2

20       million, an increase of 162% over the first quarter of 2004."

21           (c)    "[M]anagment [is] confident that we are still on plan for the full year."

22           (d)    "We believe the unaudited financial information we are making available

23       demonstrates [ACA's] renewed capital position, profitability and growth."

24       87.    Furthermore, in or about May 2005, when RHF was considering re-structuring its

25   debt, Ruben Selles (the executive vice president) and Edward Gilpin (the CFO) of ACA represented

26   to Brian Magnone (vice president) of RHF that ACA was financially stable and thus would not be

27   downgraded.

28       88.    However, contrary to its promises and representations, due to its irresponsible

SIXTH AMENDED COMPLAINT

1   investment policies and underwriting practices, ACA's risk exposure in or about 2005 through 2007

2   was massive. In or about 2007, ACA's stock price dropped 95 percent, which wiped out its equity

3   and resulted in a negative net worth. In or about November 2007, in response to reports that it would

4   be downgraded from its investment grade "A" rating, ACA stated that it would need to raise

5   additional capital to comply with its guaranty obligations.   However, ACA irresponsibly and

6   negligently maintained extremely inadequate loss reserves, and was billions of dollars short of what

7   was needed to pay potential claims and cover its continuing losses. On or about December 19, 2007,

8   the credit rating agency Standard & Poor's downgraded ACA's credit rating from "A" to "CCC,"

9   or junk status. It was during this time that Plaintiffs discovered that ACA's prior representations,

10  including that it conducted itself in a responsible manner and was financially strong, were in fact

11  false.

12      89.     Due to the downgrade, ACA was no longer able to adequately guarantee Plaintiffs'

13  capital and interest payment obligations, resulting in a series of extremely negative consequences

14  for Plaintiffs.

15      90.     On Plaintiffs' information and belief, Cain Brothers, which had a continuing duty to

16  "support" Plaintiffs, including a duty to disclose and advise the RHF Group of all material facts

17  regarding the 1998 plan of refinancing, and which continued to advise the RHF Group up through

18  and following ACA's downgrade, knew or should have known through the exercise of reasonable

19  diligence about the extent of ACA's risky, negligent and irresponsible business practices and the

20  substantial risks presented by ACA's failure, and failed to properly disclose, advise or warn the RHF

21  Group.

22      **C.    Lehman Brothers Admits Manipulating Auctions and Is Ordered by The SEC**

23          **To Cease and Desist, But Defendant Fuld Has Lehman Continue Violative**

24          **Practices**

25      91.     On May 31, 2006, the United States Securities and Exchange Commission ("S.E.C.")

26  issued an Order Instituting Administrative and Cease-and-Desist Proceedings, Making Findings, and

27  Imposing Remedial Sanctions and a Cease-and-Desist Order Pursuant to Section 8A of the Securities

28  Act of 1933 and Section 15(b) of the Securities Exchange Act of 1934 (the "S.E.C. Order").

SIXTH AMENDED COMPLAINT

92.    The S.E.C. Order found that Lehman Brothers (and other broker-dealers) committed numerous Section 17(a)(2) Securities Act violations with respect to auction rate securities, including the following "violative practices":

      (a)    Allowing "open bids" and/or "market bids" in auctions, in which the bidder indicated that it would buy at whatever rate was set during an auction. This practice inflated the clearing rate.

      (b)    Submitting bids or asking investors to change bids so that the auctions cleared at different rates than they otherwise would have.

      (c)    Submitting bids or asking investors to submit bids to prevent the "all-hold rate," which is a below-market rate set when all current holders want to hold their positions so that there are no securities for sale in the auction.

      (d)    Submitting or revising bids after submission deadlines, which affected the clearing rate.

      (e)    Engaging in "price talk" which encouraged bidders to bid only at certain rates, thereby affecting the clearing rate.

93.    Lehman Brothers was censured and fined $1.5 million by the S.E.C. and was ordered to cease and desist from committing Section 17(a)(2) violations. Further, Lehman Brothers was ordered to provide all holders of its auction rate securities and the issuers of such securities with a written description of its material auction practices and procedures. Moreover, Lehman Brothers was required to certify in writing, <u>through either its chief executive officer or general counsel</u>, that it had implemented procedures reasonably designed to prevent and detect failures to conduct the auction process in accordance with disclosed auction procedures.

94.    At the time of the SEC Order, Defendant Fuld was the chief executive officer of Lehman Brothers and Defendant O'Meara was CFO of Lehman Brothers. Defendants Fuld, O'Meara and Callan, as high level executives of Lehman Brothers, had responsibility for, among other things, monitoring public pronouncements about Lehman Brothers that might impact Lehman Brothers in a significant manner and otherwise assuring that Lehman was conducting itself properly. Defendants Fuld, O'Meara and Callan all knew of the SEC order at the time it was announced. The

SIXTH AMENDED COMPLAINT

1  SEC order was summarized on the SEC website and the subject of an SEC press release.  The SEC

2  Order was also reported in several trade publications and financial media sources.  Defendants Fuld,

3  O'Meara and Callan regularly reviewed trade publications or financial media regarding anything

4  published about Lehman Brothers.  Moreover, pursuant to the SEC Order, Fuld was specifically

5  charged with the obligation either to personally certify or to instruct his general counsel to "certify

6  in writing to the staff of the Commission that [Lehman Brothers] has implemented procedures that

7  are reasonably designed to prevent and detect failures by [Lehman Brothers] to conduct the auction

8  process in accordance with the auction procedures disclosed in the disclosure documents and any

9  supplemental disclosures and that [Lehman Brothers] is in compliance with Section IV.E. of this

10 Order."  Section IV.E. of the SEC order required providing information to customers and issuers,

11 including Plaintiffs.

12         95.    Although Plaintiffs were issuers of SAVRS and necessarily had been and would

13 continue to be affected by Lehman Brothers' auction practices and procedures, Defendant Fuld never

14 had Lehman Brothers inform Plaintiffs of the S.E.C. Order or provide Plaintiffs with the S.E.C.-

15 ordered written description of its material auction practices and procedures, despite his knowledge

16 thereof and the requirement that he (or the general counsel pursuant to his direction) certify to the

17 SEC that he had done so.  Thus, Lehman Brothers and Fuld directly violated the SEC order by this

18 failure to inform Plaintiffs even though Fuld either personally certified he had done so to the SEC

19 or directed the general counsel to so certify.  Cain Brothers also failed to warn or otherwise inform

20 Plaintiffs about these practices by Lehman Brothers.

21         96.    Rather, Plaintiffs are informed and believe and thereon allege that Defendants Fuld,

22 O'Meara and Callan decided to ignore the SEC Order and continue to commit the "violative

23 practices" described in the SEC Order in spite of the fact that Lehman Brothers had been ordered

24 both to cease and desist such practices and that Lehman Brothers had been ordered to disclose such

25 practices.  Plaintiffs further are informed and believe and thereon allege that Defendants Fuld,

26 O'Meara and Callan deemed the SEC fines as small and insignificant in comparison to the huge fees

27 Lehman Brothers was earning through its violative practices  and concluded that the fine was a cost

28 of doing a lucrative business, and thus they decided to ignore the SEC Order to stop violative

1   practices or to send information to Plaintiffs disclosing those practices; rather, Lehman Brothers paid

2   the fine (which was authorized by Fuld and O'Meara) and Fuld instructed that the improper practices

3   be continued at Lehman Brothers. Indeed, trade publications reported in 2007 that despite the SEC

4   Order, Lehman Brothers (and others) continued to "manipulate investor purchases" of auction rate

5   securities and that the auctions conducted "[bore] little resemblance to a pure Dutch auction process"

6   and "shouldn't be called auctions because of the dealer's [like Lehman Brothers] ability to set rates."

7   In fact, it was widely reported in 2008 when the auction rate securities market deteriorated that

8   broker dealers, including Lehman Brothers, had continued to manipulate auctions on auction rate

9   securities like the SAVRS.

10      **D.     RHF Loses the Protection of the 1998 Swap Agreement, and Its Payment**

11          **Obligations for the SAVRS Skyrocket as Lehman Brothers Manipulates the**

12          **Auctions.**

13      97.     Thereafter, around the time of ACA's downgrade to junk status on or about December

14   19, 2007, Lehman Brothers took the position that the 1998 Swap had entered an "alternative floating

15   rate" – an amount based on an index rate significantly below the SAVRS rates – an unusual

16   provision that was never fully or properly explained by Cain Brothers in negotiating, executing or

17   delivering the swap transactions on Plaintiffs' behalf, particularly that Plaintiffs were unable to cure

18   ACA's downgrade under the terms of the 1998 Swap Contract, and was a terrible provision for

19   Plaintiffs in that it took away any protections or benefits provided under the 1998 Swap. Under the

20   regular operating terms of the 1998 Swap, the RHF Group's monthly interest payments were fixed

21   at 5.19% for tax-exempt bonds, while Lehman Brothers was responsible for paying the SAVRS

22   rates. When the "alternative floating rate" was triggered, however, the RHF Group was still required

23   to pay the regular fixed rates to Lehman Brothers, but Lehman Brothers was no longer required to

24   pay the SAVRS rates; instead, it only needed to pay the "alternative floating rate," and Plaintiffs

25   were required to make up all of the shortfall on the SAVRS. Thus, under this "alternative floating

26   rate," the RHF Group was required to continue paying Lehman Brothers the same fixed rate, but any

27   protection that the RHF Group had received through the 1998 Swap was all but eliminated and

28   instead the RHF Group had the burden of paying whatever SAVRS rate Lehman Brothers dictated.

SIXTH AMENDED COMPLAINT

98.     Despite Cain Brothers' prior representations that the refinancing plan it had structured and designed was safe and beneficial, after the 1998 Swap entered the "alternative floating rate," Plaintiffs had no means of curing this disastrous situation.

99.     Compounding matters, Lehman Brothers continued to control the SAVRS auctions, and, due to the switch to the "alternative floating rate" on the 1998 Swap, it now had no obligation to pay the SAVRS rates, and so could profit by manipulating the SAVRS rates upward using methods including those prohibited by the S.E.C. in its 2006 Order. In fact, Plaintiffs are informed and believe this is what Lehman Brothers did.

100.    Since Lehman Brothers no longer had to pay the SAVRS rates, virtually overnight, the RHF Group's SAVRS rates skyrocketed. Over the previous four years, when Lehman Brothers was obligated to pay the SAVRS rates (but also controlled them), the SAVRS rates had rarely exceeded 5% and did not approach the applicable maximum rate. But, Plaintiffs are informed and believe, beginning in December 2007, Lehman Brothers manipulated the SAVRS rates – almost all of which the RHF Group was now required to pay due to the triggered "alternative floating rate" – up to very high rates just barely below the maximum rates, outstripping the previous rates by extraordinary amounts, even though the RHF Group had an unblemished history of making all its payments on the SAVRS.

101.    Through its conduit, the auction agent, and/or directly, Lehman Brothers made the following representations to RHF in its Long Beach headquarters:

a.      On or about December 11, 2007, RHF was informed in writing by the auction agent, the Bank of New York Trust Company, that the clearing rate for most of that auction period's SAVRS was 15.500%, compared to the applicable Maximum Rate of 15.611%. On or about January 3, 2008, RHF was informed in writing that funds in the amount of $605,002.30 would be required by January 7, 2008 for the January 16, 2008 debt service payments. RHF thereafter wired this amount on or about January 7, 2008.

b.      On or about January 7, 2008, Seth Konheim, a Vice President at Lehman Brothers, sent an email on behalf of Lehman Brothers to RHF stating that an

SIXTH AMENDED COMPLAINT

1    additional $874,007.74 was due to Lehman Brothers with respect to that

2    auction period. RHF thereafter wired this amount on or about January 9,

3    2008.

4    c.    On or about January 15, 2008, RHF was informed in writing by the auction

5    agent, the Bank of New York Trust Company, that the clearing rate for most

6    of that auction period's SAVRS was 12.000%, compared to the applicable

7    Maximum Rate of 12.068%. On or about February 8, 2008, RHF was

8    informed in writing that funds in the amount of $1,754,638.79 would be

9    required by February 11, 2008 for the February 20, 2008 debt service

10    payments. RHF thereafter wired this amount on or about February 11, 2008.

11    d.    On or about February 19, 2008, RHF was informed in writing by the auction

12    agent, the Bank of New York Trust Company, that the clearing rate for most

13    of that auction period's SAVRS was 9.300%, compared to the applicable

14    Maximum Rate of 9.332%. On or about March 14, 2008, RHF was informed

15    in writing that funds in the amount of $1,457,491.54 would be required by

16    March 17, 2008 for the March 26, 2008 debt service payments. RHF

17    thereafter wired this amount on or about March 17, 2008.

18    e.    On or about March 25, 2008, RHF was informed in writing by the auction

19    agent, the Bank of New York Trust Company, that the clearing rate for most

20    of that auction period's SAVRS was 7.950%, compared to the applicable

21    Maximum Rate of 7.961%. On or about April 21, 2008, RHF was informed

22    in writing that funds in the amount of $1,355,811.68 would be required by

23    April 21, 2008 for the April 30, 2008 debt service payments. RHF thereafter

24    wired this amount on or about April 21, 2008.

25    f.    On or about April 29, 2008, RHF was informed in writing by the auction

26    agent, the Bank of New York Trust Company, that the clearing rate for most

27    of that auction period's SAVRS was 8.480%, compared to the applicable

28    Maximum Rate of 8.483%. On or about May 23, 2008, RHF was informed

SIXTH AMENDED COMPLAINT

1    in writing that funds in the amount of $1,406,837.95 would be required by

2    May 27, 2008 for the June 4, 2008 debt service payments.  RHF thereafter

3    wired this amount on or about May 27, 2008.

4    g.    On or about June 3, 2008, RHF was informed in writing by the auction agent,

5    the Bank of New York Trust Company, that the clearing rate for most of that

6    auction period's SAVRS was 7.350%, compared to the applicable Maximum

7    Rate of 7.354%.  On or about June 27, 2008, RHF was informed in writing

8    that funds in the amount of $970,161.14 would be required by June 30, 2008

9    for the July 7, 2008 debt service payments. RHF thereafter wired this amount

10    on or about June 30, 2008.

11    102.    Plaintiffs are informed and believe and on that basis allege that these foregoing results

12    – though presented as being obtained through the proper auction process – actually were not obtained

13    through a fair and proper auction process as promised and represented by Lehman Brothers. Instead,

14    Lehman Brothers intentionally drove up the rates through manipulation, including through the

15    techniques described in the S.E.C. Order, but concealed from Plaintiffs that they were doing so.

16    Lehman Brothers continued to claim that the rates were obtained through the regular auction process,

17    when actually the rates were obtained through a materially changed, unfair process by which Lehman

18    Brothers set the auction rates just barely below the applicable maximum rates – much higher than

19    they would have been under proper auction procedures.  This wrongful and unfair conduct was

20    evidenced by, among other things, the fact when the alternative floating rate was triggered and

21    Lehman Brothers was no longer required to pay the SAVRS rates under the Swap Contract, the rates

22    for the SAVRS suddenly jumped to rates much higher than previous rates.    Moreover,

23    pre-"alternative floating rate" SAVRS rates did not approach the applicable maximum rates,

24    generally remaining many full percentage points below the applicable maximum rates. But upon

25    imposition of the "alternative floating rate," the SAVRS rates were consistently set at a level just

26    barely below – by hundredths or even thousands of percentage points – the applicable maximum

27    rates. These results could not have occurred under a competitive, fair and unmanipulated auction

28    process.

SIXTH AMENDED COMPLAINT

103.    By intentionally manipulating the auctions to achieve SAVRS rates just barely below the maximum rates, Lehman Brothers could and, Plaintiffs are informed and believe, did maximize its profits by purchasing or holding SAVRS that paid exorbitantly high rates, even though (as Lehman Brothers knew) the Plaintiff issuers had never missed a payment on the SAVRS, they continued to be financially strong, and their viability and financial strength was not jeopardized by the downgrade of ACA (even though the downgrade ended up causing Plaintiffs substantial harm). Rather than setting or approximating a market rate, the auctions resulted in Plaintiffs paying grossly inflated rates that did not reflect their financial situation or the market conditions as a whole.

104.    By virtue of its control of the Cain Brothers designed auction process, including how much the RHF Group supposedly owed on the SAVRS, Lehman Brothers had sole knowledge of the mechanics and purported results of the auctions.    Plaintiffs, meanwhile, were in a severely compromised, dependent position and could only rely on Lehman Brothers' representations. Thus, Plaintiffs had no choice but to accede to the demands for payment, so as not to default with respect to the Swap Contract or the SAVRS.

E.    **The RHF Group Refinances The SAVRS And Converts Them To Variable Rate Demand Bonds**

105.    In or about December 2007 and January 2008, following ACA's downgrade, and because of the suddenly immense payments under the 1998 Swap and SAVRS and their inability to "cure" the problems arising from ACA's downgrade, in order to mitigate its losses and avoid potential financial disaster, the RHF Group was forced to begin to seek to restructure the transaction and re-fund the SAVRS and secure them with letters of credit from banks rather than a bond insurer.

106.    However, in or about the Spring of 2008, Lehman Brothers was claiming that the RHF Group was purportedly "out of the money" on the 1998 Swap, so that terminating it would cost the RHF Group in excess of $13 million. At the time, Lehman Brothers was viewed as a leader in the financial markets and continued to promote itself as financially stable and adequately capitalized, and therefore contended that its valuation was true, correct and honorable.    However, Lehman Brothers' valuation was in fact biased and unfair.    Because of the design of the original plan of refinancing by Cain Brothers and the acts of all Defendants, the RHF Group was under duress and

1  in a disadvantageous position. Lehman Brothers would not agree to amend the Swap Contract but

2  insisted on a new, more burdensome swap agreement. Thus, the RHF Group, St. Catherine and

3  DeSmet were then forced by Lehman Brothers to terminate the 1998 Swap and enter into a new,

4  different, disadvantageous 20-year term swap agreement with Lehman Brothers in connection with

5  the soon to be refinanced bonds ("the 2008 Swap"). These agreements were also entered into by the

6  RHF Group in California. A true and correct copy of the 2008 Swap is attached hereto as Exhibit

7  H.

8    107.    Pursuant to the 2008 Swap, among other things, Lehman Brothers required that

9  Plaintiffs agree to pay a much higher synthetic "fixed" interest rate to avoid immediately paying the

10  alleged $13 million to compensate Lehman Brothers for the purported value of the 1998 Swap at the

11  time of renegotiation. Under the 2008 Swap, in or about July 2008, Lehman Brothers promised to

12  guarantee Plaintiffs' variable interest and capital payment obligations on the new variable rate bonds

13  that were subject to the agreement, reaffirmed that such payments would be punctually made when

14  they became due and payable, and represented that Lehman Brothers was adequately capitalized and

15  had accurately and fairly publicly reported its financial condition and could continue to perform its

16  obligations over the 20 year term of the contract.

17    108.    Cain Brothers, which had a continuing duty of support, including a duty to disclose

18  and advise Plaintiffs of all material facts regarding the RHF Group's 1998 plan of refinancing and

19  the additional bonds issued for the benefit of St. Catherine and DeSmet, knew or should have known

20  through the exercise of reasonable diligence about, among other things, (1) the hidden costs and risks

21  of SAVRS; (2) Lehman Brothers' unfair Swap valuation methodology; (3) Lehman Brothers' unfair

22  SAVRS auction practices; (4) the defective nature of the 1998 plan of refinancing and the Swap

23  Contract, including, among other things, the RHF Group's inability to be anything but "out of the

24  money" under the Swap Contract; (5) the RHF Group's inability to cure the effects of ACA's

25  downgrade; and (5) the RHF Group's inability to exit the "alternative floating rate" under the Swap

26  Contract and Lehman Brothers' concurrent ability to manipulate the SAVRS auctions to its benefit

27  and the RHF Group's detriment. Cain Brothers structured a flawed transaction and failed to

28  adequately disclose or warn of any of this information to Plaintiffs, and instead continually

1    represented that the 1998 plan of refinancing presented a safe alternative to more traditional and

2    more expensive fixed rate bonds and would decrease the cost of any future refinancing by Plaintiffs.

3    **IV.    Lehman Brothers' Own Mismanagement And Exposure To Risky Subprime**

4    **Mortgage-Backed Securities**

5    109.    In or about July 2008, Plaintiffs completed the refinancing of the SAVRS and

6    converted them to Variable Rate Demand Bonds, which were not auction rate securities and were

7    secured with letters of credit from banks rather than a bond insurer.

8    110.    Pursuant to the Master Agreement of the 2008 Swap, Lehman Brothers made a series

9    of representations with respect to its ability to perform thereunder.  For instance, under Section 2(a)

10    of the Master Agreement of the 2008 Swap, entitled "Obligations - General Conditions," Lehman

11    Brothers represented that, as of July 2008, it was solvent and able to perform its obligations:

12    > Each party will make each payment or delivery specified in each Confirmation to be
> made by it, subject to the other provisions of this Agreement . . . (iii) Each obligation
13    > of each party under Section 2(a)(i) is subject to (1) the condition precedent that no
> Event of Default or Potential Event of Default with respect to the other party has
14    > occurred and is continuing.

15    111.    Lehman Brothers reaffirmed its purported ability to perform under Section 3(a) of the

16    Master Agreement of the 2008 Swap, entitled "Representations," which provided that "each party

17    represents to the other party (which representations will be deemed to be repeated by each party on

18    each date on which a Transaction is entered into …)" that:

19    > ***Powers.***  It [the party] has the power to execute this Agreement and any other
> documentation relating to this Agreement to which it is a party, to deliver this
20    > Agreement and any other documentation relating to this Agreement that it is required
> by this Agreement to deliver and to perform its obligations under this Agreement and
21    > any obligations it has under any Credit Support Document to which it is a party and
> has taken all necessary action to authorise such execution, delivery and performance
22    > . . .

23    > ***Obligations Binding.***  Its obligations under this Agreement and any Credit Support
> Document to which it is a party constitute its legal, valid and binding obligations,
24    > enforceable in accordance with their respective terms . . .

25    112.    By entering into the 2008 Swap, each party also represented an absence of certain

26    events, including "[n]o event of Default or Potential Event of Default or, to its knowledge,

27    Termination Event with respect to it has occurred and is continuing and no such event or

28    circumstance would occur as a result of its entering into or performing its obligations under this

1    Agreement or any Credit Support Document to which it is a party." See Exhibit H, § 3(b)-(c).

2    "Events of default" and "potential events of default" included "failure by the party to make, when

3    due, any payment under this Agreement," breach of the agreement by "failure by the party to comply

4    with or perform any agreement or obligation," "representation[s] . . . [that were] incorrect or

5    misleading in any material respect when made" and when any party "becomes insolvent . . .[or]

6    institutes . . . a proceeding seeking a judgment of insolvency or bankruptcy."

7    113.    However, despite making an unconditional guarantee of Plaintiffs' variable interest

8    and capital payment obligations on the new bonds in or about July 2008 and affirmatively

9    representing, both in the 2008 Swap and financial statements disclosed to Plaintiffs, that it was a

10    strong, viable and adequately capitalized company capable of performing its obligations under the

11    2008 Swap, a contract that was supposed to provide 20 years of protection and stability to Plaintiffs,

12    Lehman Brothers failed to disclose that *it was not solvent*.   Rather, Lehman Brothers was suffering

13    from unprecedented losses due to, among other things, its investments in subprime mortgage backed

14    securities, real estate, and related investments that doomed the continued existence of the company.

15    Indeed, a mere two months after the completion of Plaintiffs' refinancing of the SAVRS and the

16    signing of the 2008 Swap in July 2008, Lehman Brothers sought Chapter 11 protection in the largest

17    bankruptcy ever filed.

18    **A.    The Individual Lehman Defendants Were Each Extremely Sophisticated and**

19    **Sought To Maintain the False Impression that Lehman Brothers Was**

20    **Financially Strong**

21    114.    Lehman Brothers' collapse resulted from significant failures and omissions in its

22    corporate governance, where senior management – including Defendants Fuld, O'Meara, and Callan

23    – engaged in actionable balance sheet manipulation and public misrepresentations of the company's

24    financial condition that they knew would be relied upon by counterparties (including Plaintiffs) to

25    long-term agreements such as interest rate swaps.

26    115.    **Fuld** was employed by Lehman Brothers since 1969, and served as a member of the

27    Board of Directors of Lehman Brothers from 1990 to 2008, as Lehman Brothers' Chief Executive

28    Officer from 1993 to 2008, and as Chairman of the Board of Directors from 1994 to 2008. Fuld was

1   also a member of the Executive Committee, which had the authority, in the intervals between

2   meetings of the Board of Directors, to exercise all the authority of the Board of Directors that are not

3   reserved for the full Board of Directors under Delaware General Corporation Law or Lehman

4   Brothers' Restated Certificate of Incorporation. Fuld was also a substantial stockholder in Lehman

5   Brothers. Fuld was at all times extremely knowledgeable, sophisticated, and well-informed of all

6   of Lehman Brothers' financial condition, investments and activities, including the 1998 plan of

7   refinancing involving Plaintiffs and the 2006 S.E.C. Order. Fuld authorized, approved, directed

8   and/or ratified the company to embark upon an aggressive growth strategy and commit its own

9   capital in commercial real estate, leveraged lending, and private equity-like investments, which

10  included the origination of subprime and other non-prime mortgages. In early 2007, at a time when

11  Fuld knew that other participants in the subprime mortgage industry were going out of business or

12  cutting back operations, he instead authorized the company to continue to grow its residential

13  mortgage origination business and commercial real estate portfolio. However, in late 2007 and 2008,

14  when the subprime mortgage crisis worsened, Lehman Brothers was burdened with a vast amount

15  of assets that it could not sell and was suffering unprecedented losses. In order to project a

16  completely false and fictional picture of Lehman Brothers' solvency and thereby maintain investor

17  and counterparty confidence and protect his own financial interests, Fuld authorized Lehman

18  Brothers to manipulate its financial statements, including significantly increasing its undisclosed use

19  of off-balance sheet devices, known internally as "Repo 105" and "Repo 108" (collectively "Repo

20  105") transactions, which temporarily removed securities inventory from its balance sheet to

21  intentionally conceal the fact that Lehman Brothers was over-leveraged and over-exposed to toxic

22  subprime mortgage backed securities and/or other real estate-related investments and that its risk

23  exposure in the event of a collapse of the housing market was massive. At the same time, Fuld

24  falsely reported publicly favorable net leverage numbers and represented that Lehman Brothers had

25  "never been stronger," particularly after fellow investment banking giant Bear Stearns failed under

26  the weight of its own subprime mortgage investments. Fuld knew that Lehman Brothers' public

27  rating was based on review of its financial statements, particularly its balance sheet, and intended

28  to provide this false information so that Lehman Brothers would not lose its high public rating. Fuld

SIXTH AMENDED COMPLAINT

1   knew that Lehman Brothers had numerous transactions like the 2008 Swap which required that

2   Lehman Brothers maintain its public rating above a certain level to avoid negative consequences to

3   Lehman Brothers, and so he sought to avoid those negative consequences by presenting false public

4   financial information (including an inaccurate balance sheet) to the rating agencies and "the Street"

5   (i.e., analysts, investors and experts on Wall Street).

6       116.    **O'Meara**, like Fuld, was also a long-time Lehman Brothers' employee, and was one

7   of the RHF Group's contacts at the company during the implementation of the 1998 plan of

8   refinancing and afterwards, and clearly knew about the RHF Group, the 1998 plan of refinancing and

9   related transactions, as well as the 2006 S.E.C. Order. O'Meara served as Lehman Brothers' CFO

10  and Controller from 2004 through November 2007, and from December 2007 to September 2008

11  served as the company's Chief Risk Officer. O'Meara had express and extensive knowledge of

12  Lehman Brothers' financial condition, particularly from 2004 to 2008, and knew that Lehman

13  Brothers' 2007 and 2008 financial statements materially misrepresented its deteriorating financial

14  condition. On Plaintiffs' information and belief, O'Meara actively managed Lehman Brothers' Repo

15  105 activity, and knowingly and intentionally authorized, approved and/or ratified the increase of

16  such activity in late 2007 and 2008 to conceal that financial condition so as to falsely convince

17  counterparties, including Plaintiffs, that Lehman Brothers was materially financially stronger than

18  it really was. O'Meara also continually and regularly apprised the Director Defendants of Lehman

19  Brothers' increasing risk limits and plans to reduce net leverage which, on Plaintiffs' information

20  and belief, included discussions regarding the Repo 105 program. On Plaintiffs' information and

21  belief, during his employment with the company, O'Meara was a stockholder in Lehman Brothers.

22      117.    **Callan** joined Lehman Brothers in 1995, having represented Lehman Brothers as

23  outside counsel the previous 5 years at Simpson Thatcher & Bartlett, and thus she was also at Lehman

24  Brothers during the 1998 refinancing. Prior to becoming Lehman Brothers' CFO from December

25  2007 to June 2008, Callan spent several years in Lehman Brothers' Investment Banking Division,

26  as Managing Director from 2000 and 2003 and as Head of Global Finance Solution Group and

27  Global Finance Analytics Group from 2003 and 2006. Callan then became Head of Global Hedge

28  Fund Coverage in 2006 until she was promoted to CFO in December 2007. Callan was also

SIXTH AMENDED COMPLAINT

1    knowledgeable of Lehman Brothers' Repo 105 activity, and falsely reported publicly during her

2    tenure as CFO that Lehman Brothers was reducing its leverage without disclosing that Repo 105

3    activity. On Plaintiffs' information and belief, Callan also apprised the Director Defendants of the

4    increases in Lehman's Brothers' leverage and risk positions. On Plaintiffs' information and belief,

5    during her employment with the company, Callan was a stockholder in Lehman Brothers.

6        118.    The Director Defendants, as further detailed below, consisted of highly accomplished

7    professionals who purportedly demonstrated high ethical standards and integrity, high intelligence

8    and wisdom, were financially literate, were supposedly willing to raise tough questions in a manner

9    that encouraged open discussion and ask for and use information to make informed judgments and

10   assessments, and possessed skills and experience to provide strategic and management oversight to

11   help maximize the long-term value of Lehman Brothers. Nonetheless, despite being extremely well-

12   informed of, and having access to any information regarding Lehman Brothers' activities,

13   investments and financial condition, the Director Defendants abdicated their fundamental functions

14   and were complicit in the issuance of false and misleading financial statements by, among other

15   things, turning a blind eye to the decisions of senior management and failing to serve as an

16   independent counterbalance to senior management, particularly the Officer Defendants. Despite

17   being well-informed of Lehman Brothers' activities and financial condition, the Director Defendants

18   also turned a blind eye to obvious warning signs that the financial statements they signed, authorized

19   and ratified were materially false and misleading, that Lehman Brothers had taken on too much risk

20   during the subprime mortgage crisis and was grossly over leveraged, and that there had been related

21   corporate malfeasances by senior management, including the Officer Defendants.

22       119.    **Ainslie** was a member of the Board of Directors of Lehman Brothers from 1996 to

23   2008 and served on Lehman Brothers' Audit Committee. Prior to serving on Lehman Brothers'

24   Board of Directors, Ainslie served as the Chief Executive Officer and Director of Sotheby's

25   Holdings from 1984 to 1994, and as President and Chief Executive Officer of the National Trust for

26   Historic Preservation from 1980 to 1984. On Plaintiffs' information and belief, he was also a

27   shareholder in Lehman Brothers and had a personal financial interest in maintaining a high stock

28   price for the company by, among other things, representing that Lehman Brothers was solvent.

SIXTH AMENDED COMPLAINT

120.    **Akers** was a member of the Board of Directors of Lehman Brothers from 1996 to 2008, chaired the Compensation and Benefits Committee, and served on the Finance and Risk Committee. Prior to serving on Lehman Brothers' Board of Directors, Akers was employed by the technology giant International Business Machines Corporation (IBM) for 33 years, and served as IBM's Chief Executive Officer from 1985 to 1993 and Chairman of the Board from 1986 to 1993. Akers is also a former member of the Board of Trustees of the California Institute of Technology and The Metropolitan Museum of Art, and was the former Chairman of the Board of Governors of United Way of America. Currently, Akers is a Director of W.R. Grace & Company. On Plaintiffs' information and belief, he was also a shareholder in Lehman Brothers and had a personal financial interest in maintaining a high stock price for the company by, among other things, representing that Lehman Brothers was solvent.

121.    **Berlind** was a member of the Board of Directors of Lehman Brothers from 1985 to 2008, and served as a member of Lehman Brothers' Audit Committee and Finance and Risk Committee. Since 1976, Berlind has been a theatrical producer or co-producer of over 40 plays and musicals, all of which required accounting and financial knowledge and skills. Berlind was also one of the founders of Carter, Berlind, Potoma & Weill, an investment banking and brokerage firm that later became Shearson Loeb Rhoades. On Plaintiffs' information and belief, he was also a shareholder in Lehman Brothers and had a personal financial interest in maintaining a high stock price for the company by, among other things, representing that Lehman Brothers was solvent.

122.    **Cruikshank** was a member of the Board of Directors of Lehman Brothers from 1996 to 2008, and served as the Chairman of Lehman Brothers' Audit Committee and was determined by the Board of Directors to be an "audit committee financial expert" as defined by Securities and Exchange Commission ("SEC") rules. Cruikshank was also a member of Lehman Brothers' Nominating and Corporate Governance Committee. Prior to serving as a director of Lehman Brothers, Cruikshank was a long time employee of the petroleum industry service giant Halliburton Company, for which he served as its Chairman and Chief Executive Officer from 1989 to 1995, President and Chief Executive Officer of Halliburton from 1983 to 1989, and as a director from 1977 to 1996. On Plaintiffs' information and belief, he was also a shareholder in Lehman Brothers and

SIXTH AMENDED COMPLAINT

1   had a personal financial interest in maintaining a high stock price for the company by, among other

2   things, representing that Lehman Brothers was solvent.

3          123.   **Evans** was a member of the Board of Directors of Lehman Brothers from 2004 to

4   2008, and also served on the Nominating and Corporate Governance Committee (for which she

5   served as Chairman), the Compensation and Benefits Committee, and the Finance and Risk

6   Committee. Previously, Evans was a career officer with the United States Navy, and retired in 1998

7   as a Rear Admiral.   During her naval career, Evans served as superintendent of the Naval

8   Postgraduate School in Monterrey, California from 1995 to 1998 and was the head of the Navy's

9   worldwide recruiting organization from 1993 to 1995. Evans also previously served as the President

10  and Chief Executive Officer of the American Red Cross from 2002 to 2005, and as the National

11  Executive Director of the Girl Scouts of the USA from 1998 to 2002. Evans has also been a Director

12  of Weight Watchers International, the North Highland Company and The Estate of Lehman Brothers

13  Holdings. On Plaintiffs' information and belief, she was also a shareholder in Lehman Brothers and

14  had a personal financial interest in maintaining a high stock price for the company by, among other

15  things, representing that Lehman Brothers was solvent.

16         124.   **Gent** was a member of the Board of Directors of Lehman Brothers from 2003 to

17  2008, and served on its Audit Committee and Compensation and Benefits Committee. Since 2005,

18  Gent has also served as the Chairman of the multinational pharmaceutical, biologics, vaccines and

19  consumer healthcare company GlaxoSmithKline. Until his retirement in 2003, Gent was a member

20  of the Board of Directors of telecommunications giant Vodafone since 1985, and also served as the

21  company's Chief Executive Officer since 1997.   Gent is currently a Non-Executive Director of

22  Ferrari SpA, a member of KPMG's Chairman's Advisory Group and a Senior Adviser at Bain & Co.

23  On Plaintiffs' information and belief, he was also a shareholder in Lehman Brothers and had a

24  personal financial interest in maintaining a high stock price for the company by, among other things,

25  representing that Lehman Brothers was solvent.

26         125.   **Hernandez** was a member of the Board of Directors of Lehman Brothers from 2005

27  to 2008, and served on the Finance and Risk Committee. Hernandez is the retired Chairman and

28  Chief Executive Officer of Telemundo Group, Inc., a Spanish-language television company, where

1    he served from 1998 to 2000.  From 1995 to 1998, Hernandez also served as President and Chief

2    Executive Officer of Telemundo Group, Inc.  Hernandez is currently a Director of Ryland Group,

3    Inc., Vail Resorts, Inc., Sony Corporation, MGM Resorts International, and U.S. Bancorp.

4    Hernandez previously served as a Director of Wal-Mart Stores, Inc., where he served on the

5    company's Audit Committee and was determined to be an "audit committee financial expert" as

6    defined by SEC rules.  On Plaintiffs' information and belief, he was also a shareholder in Lehman

7    Brothers and had a personal financial interest in maintaining a high stock price for the company by,

8    among other things, representing that Lehman Brothers was solvent.

9         126.    **Kaufman** was a member of the Board of Directors of Lehman Brothers from 1995

10   to 2008, and served as Chairman of the Finance and Risk Committee.  Kaufman concurrently served

11   as President of Henry Kaufman & Company, Inc., an investment management and economic and

12   financial consulting firm, since 1988.  For twenty six years, Kaufman was with Salomon Brothers

13   Inc., where he served a managing director, vice chairman, and a member of the executive committee,

14   and was in charge of Salomon Brothers Inc.'s four research departments.  Prior to joining Salomon

15   Brothers, Inc., Kaufman served as an economist at the Federal Reserve Bank of New York.

16   Kaufman is the author of several books, including *On Money and Markets*, *Interest Rates, the*

17   *Markets and the New Financial World*, and *The Road to Financial Reformation*, in which he

18   purports to "reveal[] the mistakes that got us into this debacle [of the 2008 financial crisis], the

19   consequences–as they have not been fully realized–and how to put our derailed economy back on

20   track," including "[i]ntensive official supervision [which] will help make financial conglomerates

21   too good to fail."  On Plaintiffs' information and belief, he was also a shareholder in Lehman

22   Brothers and had a personal financial interest in maintaining a high stock price for the company by,

23   among other things, representing that Lehman Brothers was solvent.

24        127.    **Macomber** was a member of the Board of Directors of Lehman Brothers from 1994

25   to 2008, and served with Fuld on the Executive Committee.  Macomber also served on Lehman

26   Brothers' Compensation and Benefits Committee and Nominating and Corporate Governance

27   Committee.  Macomber has also served as a Principal of JDM Investment Group, a private

28   investment firm, since 1992, was the former Chairman and President of the Import-Export Bank of

1  the United States since 1989 to 1992, and was the Chairman and Chief Executive Officer of Celanese

2  Corporation from 1973 to 1986.  On Plaintiffs' information and belief, he was also a shareholder in

3  Lehman Brothers and had a personal financial interest in maintaining a high stock price for the

4  company by, among other things, representing that Lehman Brothers was solvent.

5       128.  Among other things, Lehman Brothers' Audit Committee, which consisted of

6  **Cruikshank** (the committee chair and an "audit committee financial expert"), **Ainslie**, **Berlind** and

7  **Gent**, was tasked with assisting the Board of Directors in fulfilling its oversight of the quality and

8  integrity of Lehman Brothers' financial statements and compliance with legal and regulatory

9  requirements (like the S.E.C. Order), received regular reporting from O'Meara and Callan regarding

10  the state of Lehman Brothers' financial condition and, on Plaintiffs' information and belief, knew

11  of and/or ratified the company's accounting manipulations (including the Repo 105 program) and/or

12  knew that Lehman Brothers' financial statements materially misrepresented the company's leverage

13  positions during the worsening subprime mortgage crisis.  On Plaintiffs' information and belief,

14  despite their access to company documents and employees, the Audit Committee and its members

15  failed to conduct an adequate investigation into the veracity of Lehman Brothers' financial

16  statements in response to public and internal criticism of Lehman Brothers' financial reporting in

17  2008, but turned a blind eye to obvious red flags that the financial statements were false and

18  misleading.

19       129.  In addition, Lehman Brothers' Finance and Risk Committee, which was tasked with

20  the responsibility of reviewing and advising the Board of Directors on the financial policies and

21  practices of Lehman Brothers, including risk management, and consisted of **Kaufman**, **Akers**,

22  **Berlind**, **Evans**, and **Hernandez**, knew of and/or ratified Lehman Brothers' balance sheet

23  manipulations.  The Finance and Risk Committee members received regular reporting on Lehman

24  Brothers' increasing risk appetite usage and plans to reduce stated leverage which, on Plaintiffs'

25  information and belief, included discussions of the Repo 105 program and the vast accumulation of

26  illiquid commercial and residential real estate assets.  Despite access to company documents and

27  employees, the Finance and Risk Committee, which included Kaufman, a renowned economist who

28  has purported to understand the causes of the 2008 financial crisis, and Hernandez, an "audit

SIXTH AMENDED COMPLAINT

1   committee financial expert," intentionally failed to disclose and/or consciously ignored the risk and

2   illiquidity that Lehman Brothers assumed during the subprime mortgage crisis which severely

3   threatened the company's survival.

4       130.   With Fuld, **Macomber** was a member of the Executive Committee.  Plaintiffs are

5   informed and believe that Macomber was expressly informed, both orally and in writing, and

6   intentionally failed to disclose that Lehman Brothers was severely over-leveraged and over-exposed

7   to subprime mortgage backed securities and/or other real estate-related investments and, despite that

8   knowledge, authorized and/or ratified the issuance of financial statements that concealed Lehman

9   Brothers' deteriorating financial condition and Repo 105 activity.

10       **B.    Lehman Brothers' Financial Statements, Which Were Authorized And Signed**

11          **By The Individual Lehman Defendants, Continually Represented Growth From**

12          **The Company's Subprime Mortgage Business.**

13       131.   In or about the mid-2000s, Lehman Brothers became the market leader in the

14   subprime mortgage industry by, among other things, lending billions of dollars to other financial

15   institutions to fund subprime mortgages, originating its own subprime mortgage loans, and

16   purchasing subprime mortgages to package and sell as asset-backed securities to global investors.

17       132.   Prior to its bankruptcy, Lehman Brothers boasted about its "record" and "robust"

18   profits earned from its holdings in the subprime market.  In its 2005 Form 10-K filed with the SEC

19   on February 13, 2006, Lehman Brothers explained that its holdings in the subprime market

20   represented a significant portion of its business:

21          Fixed Income net revenues were a record $7.3 billion in 2005, increasing 28%
       compared with 2004 driven by double digit revenue increases from each geographic
22          region and record revenues across a number of businesses including commercial
       mortgage and real estate, residential mortgage origination and securitization, and
23          interest rate products.  Revenues from our commercial mortgage and real estate
       businesses increased substantially in 2005 reaching record levels, as the strong
24          demand for commercial real estate properties, the recovery in certain property
       markets and relatively low interest rates drove asset sales and robust levels of
25          securitizations.    Revenues from our residential mortgage origination and
       securitization businesses increased in 2005 from the robust levels in 2004, reflecting
26          record volumes and the continued benefits associated with the vertical integration of
       our mortgage origination platforms . . . The mortgage securitization business was
27          notably strong, with revenues in mortgage products benefitting from the low rate
       environment as well as the continued vertical integration of our low mortgage
28          origination platforms.

133.    The 2005 10-K Form was authorized, signed and ratified by the Individual Lehman Defendants Fuld, O'Meara, Ainslie, Akers, Berlind, Cruikshank, Evans, Gent, Hernandez, Kaufman, and Macomber.

134.    In its 2006 10-K Form filed with the SEC on February 13, 2007, Lehman Brothers reported that its fixed income net revenues purportedly continued to grow "to a record $8.4 billion in 2006, an increase of 15% from 2005."

135.    However, Lehman Brothers' 2006 10-K Form reported for the first time that, despite its continued growth, it had witnessed a decrease in revenues from its residential mortgage origination and securitization businesses that "was primarily attributable to a softer housing market and lower margins." But nowhere in its 2006 10-K Form did Lehman Brothers acknowledge the potential devastating impact of its substantial holdings in the subprime market on its operations as a whole. Instead, Lehman Brothers claimed that increased interest rates and a downturn in the housing market would affect only a few of its businesses, and that it maintained "sufficient liquidity to meet all of [its] funding obligations in all market environments."

136.    The 2006 10-K Form was authorized, signed and ratified by the Individual Lehman Defendants Fuld, O'Meara, Ainslie, Akers, Berlind, Cruikshank, Evans, Gent, Hernandez, Kaufman, and Macomber.

137.    According to Lehman Brothers' 2007 10-K Form, which was filed with the SEC on January 29, 2008 (a mere eight months prior to bankruptcy), its overall revenues continued to climb:

> On the basis of a record first half and a reasonably successful navigation of difficult market conditions in the second half, we achieved our fourth consecutive year of record net revenues, net income and diluted earnings per common share in 2007. Net income totaled $4.2 billion, $4.0 billion and $3.3 billion in 2007, 2006 and 2005, respectively, increasing 5% in 2007 and 23% in 2006 from the corresponding 2006 and 2005 periods, respectively. Diluted earnings per common share were $7.26, $6.81 and $5.43 in 2007, 2006 and 2005, respectively, up 7% in 2007 and 25% in 2006 from the corresponding prior periods, respectively.

138.    Despite its reported continued growth, financial strength and stability, Lehman Brothers acknowledged that the "difficult" latter half of 2007 witnessed a "deterioration within the U.S. subprime residential mortgage asset category, the weakening of the U.S. housing sector became worse than most observers expected," and a decrease in investor confidence in the subprime

securities market "which, in part, led to many market participants re-pricing assets and taking large write-downs." However, Lehman Brothers again minimized any risks its own subprime holdings posed to the overall health of the company, and communicated a fictional and false impression of financial strength and stability, stating that:

> During the latter half of our 2007 fiscal year, the global capital markets experienced a significant contraction in available liquidity as the adverse market environment experienced in our third quarter continued into our fourth quarter and deteriorated further in November 2007. Despite infusions of liquidity by central banks into the financial system, broad asset classes, particularly U.S. subprime residential mortgages and structured credit products, remained thinly traded throughout this period. Notwithstanding these global market conditions, we ended the period with a very strong liquidity position. At November 30, 2007, our liquidity pool was approximately $35 billion, up from approximately $31 billion at November 30, 2006 and down slightly from approximately $36 billion at the end of the third quarter of the 2007 fiscal year. Long-term capital (long-term borrowings, excluding borrowings with remaining contractual maturities within twelve months of the financial statement date, and total stockholders' equity) was at approximately $146 billion at the end of 2007 fiscal year, up from approximately $100 billion at November 30, 2006 and $142 billion at the end of the third quarter of the 2007 fiscal year.

139. The 2007 10-K Form was authorized, signed and ratified by the Individual Lehman Defendants Fuld, Callan, Ainslie, Akers, Berlind, Cruikshank, Evans, Gent, Hernandez, Kaufman, and Macomber.

140. Additionally, Lehman Brothers' 2007 Annual Report, which was expressly to be provided to Plaintiffs pursuant to Lehman Brothers' obligations under the 2008 Swap and which was signed by Fuld on February 15, 2008, contained the same statements and representations as the 2007 10-K. The 2007 Annual Report emphasized Lehman Brothers' "financial strength" and claimed "another year of record net revenues, net income, and earnings per share" and a "record performance across each of our business segments as well as in Europe and Asia." As part of the 2007 Annual Report "Financial Highlights," Lehman Brothers emphasized its Net leverage ratio, which was stated as 16.1x and which was claimed to be more "useful" and "meaningful" than Lehman Brothers' Leverage ratio, which was reported as 30.7x. The 2007 Annual Report went on to state:

> Our revenues have never been more evenly balanced across our businesses, and we have achieved our best-ever geographic diversification, with half of the Firm's revenue generated outside the Americas. The result of all this is that we have built a balanced global investment bank – able to withstand the stresses of rapid shifts in world liquidity flows.

The Annual Report went on to emphasize Lehman Brothers solid balance sheet and emphasized that:

SIXTH AMENDED COMPLAINT

1    We effectively managed our risk, balance sheet, and expenses.  Ultimately, our
2    performance in 2007 was about our "One Firm" sense of shared responsibility and
     careful management of our liquidity, capital commitments, and balance sheet
3    positions.  We benefitted from our senior level focus on risk management and, more
     importantly, from a culture of risk management at every level of the firm.  (Emphasis
4    added)

5    Included in this "senior level focus" and "risk management at every level of the Firm" were each of

6    the material misrepresentations made by the Individual Lehman Defendants as described further

7    below.  A true and correct copy of the very first page of the 2007 Annual Report is attached hereto

8    as Exhibit I.  Notably, this first page snapshot of Lehman Brothers' financial condition gives the

9    false impression of financial solvency and stability, as intended by the Individual Lehman

10   Defendants and is based on and materially similar to the financial data in the 2007 Form 10-K,

11   signed by Defendants Callan, Fuld, Ainslie, Akers, Berlind, Cruikshank, Evans, Gent, Hernandez,

12   Kaufman, and Macomber.

13   **C.    The Individual Lehman Defendants Used "Repo 105" and "Repo 108"**

14   **Transactions to Create a Materially Misleading Picture of the Firm's Financial**

15   **Condition**

16   141.    As early as 2007, at the same time they were reporting robust growth in Lehman

17   Brothers' financial statements, the Individual Lehman Defendants were acutely aware that the

18   weakening of the United States housing market and the subprime mortgage crisis would have a

19   devastating impact on the company.  At a Board of Directors meeting on March 20, 2007 that Fuld,

20   O'Meara, Ainslie, Akers, Berlind, Cruikshank, Evans, Gent, Hernandez, Kaufman and Macomber

21   attended, these Defendants were expressly informed that, while the subprime mortgage business had

22   previously been an attractive and profitable market for Lehman Brothers, steeply declining housing

23   prices had "led to declining profitability among all industry participants and . . . that overcapacity

24   had led to reduced pricing and increased risk taking, lowering overall profitability."  Fuld, O'Meara,

25   Ainslie, Akers, Berlind, Cruikshank, Evans, Gent, Hernandez, Kaufman and Macomber were also

26   expressly informed that, as a result of this downturn, "virtually all independent subprime originators

27   have cut back on their operations or have gone out of business" and "most of the large subprime

28   independents have gone out of business, have been sold or are selling."

1    142.    Despite this information and these warnings, Fuld, O'Meara, Ainslie, Akers, Berlind,

2    Cruikshank, Evans, Gent, Hernandez, Kaufman and Macomber nevertheless authorized Lehman

3    Brothers to <u>increase</u> the company's risk appetite and pursue a strategy in which, among other things,

4    it would continue to aggressively originate subprime loans and during the crisis despite Lehman

5    Brothers' weakening financial condition, Fuld, O'Meara, Ainslie, Akers, Berlind, Cruikshank,

6    Evans, Gent, Hernandez, Kaufman and Macomber authorized Lehman Brothers to continue

7    originating sub-prime and other risky loans, which would purportedly better position the company

8    for profitable growth once the industry cycle turned.

9    143.    However,   the Individual Lehman Defendants immediately saw signs that their

10    strategy was failing and the subprime crisis could have a spillover effect upon Lehman Brothers'

11    other business lines. At a September 11, 2007 meeting of the Finance and Risk Committee, O'Meara

12    informed committee members Kaufman, Akers, Berlind, Evans and Hernandez that the subprime

13    crisis had worsened significantly, stating "[c]ontagion from the sub-prime mortgage loan market

14    gradually spread to other mortgage loan markets . . . and eventually to the general credit market" and

15    that these difficulties "contributed to the failure of certain high profile hedge funds exposed to the

16    sub-prime mortgage loan market and other highly levered [sic] credit products" and caused

17    "numerous mortgage originators . . . fil[ing] for bankruptcy or . . . discontinu[ing] operations."

18    O'Meara also reiterated that the crisis had caused "numerous mortgage originators" "have filed for

19    bankruptcy or have discontinued operations."   As a result, O'Meara informed Kaufman, Akers,

20    Berlind, Evans and Hernandez that, on or about July 2007, Lehman Brothers had scaled back its

21    strategy and "discontinued origination of sub-prime mortgages." O'Meara also informed  Kaufman,

22    Akers, Berlind, Evans and Hernandez that Lehman Brothers was vulnerable to substantial losses,

23    noting that Lehman Brothers' "stress tests consistently forecasted greater stressed losses than actual

24    losses."

25    144.    At a January 29, 2008 meeting of the Finance and Risk Committee, O'Meara, Callan,

26    Kaufman, Akers, Berlind, Evans, and Hernandez discussed the "composition of the Firm's net assets,

27    equity and leverage levels," "the increase in the Firm's risk appetite limit" from $2.5 billion in first

28    quarter 2007 to the current $3.7 billion, and that Lehman Brothers' "Level 3 assets have grown as

45

SIXTH AMENDED COMPLAINT

1   a proportion of the inventory of the Firm," which were "primarily concentrated in residential and

2   commercial mortgages, in light of the reduction in market liquidity and price transparency for such

3   assets."   Materials were distributed to the Defendants present at the meeting and Fuld that

4   acknowledged that "turmoil in the credit markets that [were] discussed in the September [2007]

5   Finance and Risk Committee has continued, with significant volatility in spreads and tight liquidity

6   positions," while at the same time Lehman Brothers' risk appetite continued to increase through the

7   fourth quarter 2007.  Those same materials also noted that Lehman Brothers has "<u>been able to grow</u>

8   <u>repo financing to meet the balance sheet and leverage increases</u>, without reducing the term of that

9   financing." (Emphasis added).

10      145.    As committee chair, Kaufman presented the Finance and Risk Committee's report

11   to the Board of Directors at a meeting held later on January 29, 2008 and attended by Fuld, Callan,

12   Ainslie, Akers, Berlind Cruikshank, Evans, Gent, Hernandez, Kaufman and Macomber.  Kaufman

13   "discussed balance sheet growth, particularly in mortgage and loan assets, and noted the increase in

14   the Firm's leverage at fiscal year-end."  However, the materials distributed at the Board of Directors

15   meeting noted that "very few of the top financial issuers have been able to escape damage from the

16   subprime fallout" and that those issuers recently reported several billions in credit losses and write-

17   downs.  The materials also noted that "economic growth slowing down in all major markets," "U.S.

18   housing crisis more severe than previously anticipated," "outlook uncertainty is much higher than

19   usual."  Despite these dire warnings and Lehman Brothers' deteriorating financial condition, it was

20   still recommended for Lehman Brothers to increase risk appetite limit in 2008 and continue to

21   "pursue a countercyclical growth strategy . . . to improve its competitive position and, over time,

22   generate superior returns for our shareholders."

23      146.    As market conditions, particularly subprime, deteriorated and the pressures on

24   Lehman Brothers to reduce its net leverage ratio increased, the Individual Lehman Defendants

25   authorized and/or ratified the significant expansion of use of "Repo 105" transactions, which had

26   been previously used for years to temporarily remove securities inventory from its balance sheet,

27   usually for a period of seven to ten days, and create a materially misleading picture of its financial

28   condition, in late 2007 to 2008.

147.    Repo 105 transactions were nearly identical to standard repurchase and resale ("repo")
transactions that Lehman Brothers (and other investment banks) used to secure short-term financing,
with a critical difference: Lehman Brothers accounted for Repo 105 transactions as "sales" as
opposed to secured financing transactions (as would be the case in a standard repo), solely for
misleading financial reporting purposes.  By recharacterizing the Repo 105 transaction as a "sale,"
Lehman Brothers removed the inventory from its balance sheet.  Lehman Brothers used the cash
from the Repo 105 transaction to pay down other liabilities, thereby reducing both the total liabilities
and the total assets reported on its balance sheet and lowering its leverage ratios.

148.    Moreover, due to the fact that Repo 105 transactions were employed solely to create
a distorted and materially misleading financial picture, Lehman Brothers regularly increased its use
of Repo 105 transactions in the days prior to reporting periods to reduce its publicly reported net
leverage and balance sheet.  Then, a few days after the new quarter began, Lehman Brothers would
borrow the necessary funds to repay the cash borrowing plus interest, repurchase the securities, and
restore the assets to its balance sheet.  The only purpose or motive for undertaking Repo 105
transactions at or near each quarter-end was to, temporarily, reach quarter-end balance sheet targets
set by senior Lehman Brothers management in order to report lower leverage and lower net leverage
ratios than Lehman Brothers actually had.

149.    As a result, the optimistic view of Lehman Brothers' financial condition reported in
its 2007 Annual Report, Form 10-Q and Form 10-K statements, which were signed, authorized
and/or ratified by the Individual Lehman Defendants, was misleading, and concealed accounting
manipulations and did not disclose the cash borrowing from the Repo 105 transactions, either by
name or characterization – although Lehman Brothers had borrowed tens of billions of dollars in
these transactions.  Even though these transactions were directly responsible for the presented picture
of Lehman Brothers' financial "health," Lehman Brothers' financial statements did not disclose the
known obligations to repay the massive debt arising from the Repo 105 transactions.

150.    In Note 1 "Summary of Significant Accounting Policies" of Lehman Brothers 2007
Form 10-K, first quarter 2008 Form 10-Q, and second quarter 2008 Form 10-Q, Lehman Brothers
stated that it treated repos as "collateralized agreements and financings for financial reporting

SIXTH AMENDED COMPLAINT

1    purpose" which Lehman Brothers described were "collateralized primarily by government and

2    government agency securities." In addition, Lehman Brothers further stated in each filing: "Other

3    secured borrowings principally reflect transfers accounted for as financings rather than sales under

4    [Statement of Financial Accounting Standards] 140." On Plaintiffs' information and belief, the

5    Individual Lehman Defendants consistently misrepresented that it treated repo transactions as

6    financing transactions "for financial reporting purposes," without disclosing that Lehman Brothers

7    treated some repos as sales.

8        151.    Lehman Brothers' Item 7 "Management's Discussion and Analysis of Financial

9    Condition and Results of Operations" ("MD&A") for its 2007 Form 10-K and Forms 10-Q for the

10   first and second quarter 2008 were also misleading with respect to Lehman Brothers' liabilities. The

11   MD&A section to Lehman Brothers' 2007 Form 10-K discussed the net leverage ratio without

12   disclosing the role that Repo 105 transactions played in that calculation. Lehman Brothers'

13   disclosure in the Liquidity, Funding, and Capital Resources section of the MD&A should have

14   included a discussion of what was known with respect to the timing and/or amounts of the cash flow

15   created by the repayment of the Repo 105 cash borrowing in the first seven to ten days after

16   quarter-end, but did not.

17       152.    On Plaintiffs' information and belief, the Individual Lehman Defendants temporarily

18   reduced the firm's net balance sheet at quarter-end through Lehman Brothers' Repo 105 practice by

19   approximately $38.6 billion (9%) in fourth quarter 2007, $49.1 billion (12%) in first quarter 2008,

20   and $50.38 billion (15%) in second quarter 2008. As a result of its quarter-end Repo 105 practice

21   from late 2007 through the second quarter 2008, Lehman Brothers publicly reported a net leverage

22   ratio that was 1.7 to 1.9 points lower than what its net leverage ratio would have been if the Lehman

23   Brothers had used ordinary repo transactions instead of Repo 105 transactions, thereby knowingly

24   creating a false picture of solvency to counterparties such as Plaintiffs and to the rating companies.

25       153.    The Individual Lehman Defendants never publicly disclosed Lehman Brothers' use

26   of Repo 105 transactions, Lehman Brothers' accounting treatment for these transactions, the

27   considerable escalation of its total Repo 105 usage in late 2007 and into 2008, or the material impact

28   these transactions had on the firm's publicly reported net leverage ratio.

154.    In March 2008, Lehman Brothers' investment banking peer Bear Stearns collapsed under the weight of its involvement in the subprime mortgage industry.  Bear Stearns' failure made it clear that Lehman Brothers' countercyclical strategy approved by the Individual Lehman Defendants had failed.  The Individual Lehman Defendants knew that Lehman Brothers was very likely the next major investment bank that would fail, but made no disclosures to Plaintiffs or anyone else that the Firm's financial statements and their representations of Lehman Brothers' solvency were not true.

155.    On March 25, 2008, O'Meara, Callan, Kaufman, Akers, Berlind, Evans and Hernandez discussed Bear Stearns' failure and the potential impacts on the Lehman Brothers' business model going forward at a meeting of the Finance and Risk Committee.  Reviewing Lehman Brothers' liquidity position and leverage, the committee members  discussed Lehman Brothers' Level III assets and plans to reduce the company's leverage which, on Plaintiffs' information and belief, included discussions regarding the Repo 105 program.  At a Board of Directors meeting later that day attended by Fuld, O'Meara, Callan, Ainslie, Akers, Berlind, Cruikshank, Evens, Gent, Hernandez, Kaufman, and Macomber, Kaufman, Callan and O'Meara presented the findings and conclusions of the Finance and Risk Committee to the Board of Directors which, on Plaintiffs' information and belief, included discussions on Lehman Brothers' leverage reduction and the Repo 105 program.

156.    On Plaintiffs' information and belief, no later than March 2008 – twelve days before signing Lehman Brothers' first quarter Form 10-Q – CEO and Chairman of the Board Fuld was informed that Lehman Brothers' quarter-end Repo 105 transactions for first quarter 2008 reduced Lehman's net balance sheet by $49.1 billion.  Fuld met regularly with senior management and members of the Executive Committee, which consisted of himself, Callan, Defendant Macomber and others, to discuss the state of the company.  On Plaintiffs' information and belief, on or about March 28, 2008, Executive Committee members Fuld, Callan and Macomber as well as Chief Risk Officer O'Meara were provided with materials that expressly discussed Lehman Brothers' Repo 105 program and its $49.1 billion quarter-end Repo 105 usage for first quarter of 2008.  On Plaintiffs' information and belief, at a March 28, 2008 meeting of the Executive Committee that Callan and

1 Macomber attended, a request was made to freeze Lehman Brothers' Repo 105 usage, which was

2 not implemented.

3      157.  On Plaintiffs' information and belief, in June 2008, Lehman's "Balance Sheet Czar"

4 Bart McDade spoke to Fuld about reducing Lehman Brothers' use of Repo 105 transactions.

5 McDade discussed with Fuld, who was familiar with the term Repo 105, Lehman Brothers' $38.6

6 billion Repo 105 volume at year-end 2007 and $49.1 billion Repo 105 volume at first quarter-end

7 2008. At this meeting, McDade advised Fuld that Lehman Brothers should reduce its Repo 105

8 usage to $25 billion.

9      158.  On Plaintiffs' information and belief, in June 2008, only weeks before he signed

10 Lehman Brothers' second quarter Form 10-Q, Fuld had actual knowledge of Lehman Brothers'

11 quarter-end Repo 105 usage for that quarter, and that he had been expressly informed that "of

12 Lehman's quarter-end Repo 105 usage – $38.6 billion at year-end 2007; $49.1 billion at first quarter

13 2008; and $50.38 billion at second quarter 2008." Despite this express knowledge, Fuld failed to

14 disclose that Lehman Brothers' financial statements materially misrepresented the company's

15 financial condition and its accounting treatment for repo transactions. Instead, Fuld falsely stated

16 that Lehman Brothers' capital position had "never been stronger," again without disclosure of the

17 Repo 105 transactions, which created a materially misleading financial picture.

18      159.  On Plaintiffs' information and belief, O'Meara actively managed Lehman Brothers'

19 Repo 105 activity and knew that the program caused the company's financial statements to

20 materially misrepresent its financial condition and stated leverage. O'Meara's involvement in

21 Lehman Brothers' Repo 105 program includes the following:

22        •  As Lehman Brothers' CFO, O'Meara was directly involved in establishing

23 firm-wide limits on Repo 105 activity no later than mid-2006 through December 1, 2007.

24        •  As Lehman Brothers' CFO, an increase in the Repo 105 cap required his

25 authorization, and O'Meara authorized such an increase from $22 billion to $25 billion in

26 February 2007.

27        •  O'Meara regularly discussed Repo 105 limits and Lehman Brothers' reliance

28 on Repo 105 with senior management, including in mid-to-late 2007, when Lehman Brothers

SIXTH AMENDED COMPLAINT

increased its use of Repo 105 transactions.

• As CFO and Chief Risk Officer, O'Meara continually worked with members of Lehman Brothers' Finance and Risk Committee, which consisted of Defendants Kaufman, Berlind, Evans and Hernandez, to discuss and set balance sheet targets and net leverage ratio targets and, on Plaintiffs' information and belief, discussed the Repo 105 program.

• O'Meara knew that the purpose of, and a consequence of, undertaking Repo 105 transactions was balance sheet reduction, particularly at quarter-end, and between April 2008 and September 2008, when O'Meara was Lehman Brothers' Chief Risk Officer, regularly received Daily Balance Sheet and Disclosure Scorecards wherein the consolidated balance sheet routinely tracked the reduction to Lehman Brothers' balance sheet caused by Repo 105.

160.    From late 2007 to early 2008, when O'Meara served as Lehman Brothers' CFO and/or Chief Risk Officer, the volume of Repo 105 transactions expanded significantly, and rose to $38 billion at the close of Lehman Brothers' fourth quarter of 2007.

161.    While serving as CFO of Lehman Brothers from December 2007 to June 2008, Callan was also expressly informed of Lehman Brothers' Repo 105 practices, and that these transactions caused Lehman Brothers' financial statements to materially misrepresent the company's financial condition.  During meetings in early 2008 with Lehman Brothers' Global Financial Controller, Callan was informed that, among other things, "the large size of the Repo 105 program presented 'headline risk,'" because Lehman Brothers' Repo 105 transactions were not disclosed in its publicly filed financial statements, the company had "exposed itself to 'reputational risk' if its use of Repo 105 were to become public," that "Repo 105 transactions lacked economic substance, and were used to reduce net balance sheet primary at quarter-end," and it was reasonably believed that "none of Lehman Brothers' peer investment banks used Repo 105-type transactions."  As early as January 3, 2008, Callan was informed by Lehman's Global Product Controller that "repo 105 liquidity was very tight."

162.    Callan was further informed of the potential risks or problems with Lehman Brothers' use of Repo 105 transactions during a March 28, 2008 Executive Committee meeting, which on

1    Plaintiffs' information and belief Defendants Fuld and Macomber also attended, where a request was

2    made to freeze Lehman Brothers' Repo 105 usage and the related materials expressly discussed

3    Lehman Brothers' $49.1 billion quarter-end Repo 105 usage for first quarter of 2008.  Starting in

4    April 2008, Callan also received the Daily Balance Sheet and Disclosure Scorecard, through which

5    she was informed on a regular basis of the impact of Repo 105 transactions on Lehman Brothers'

6    firm-wide balance sheet.  Despite this knowledge, on April 9, 2008, Callan signed Lehman Brothers'

7    quarterly report without disclosing the amount of Lehman Brothers' Repo 105 transactions or the

8    company's reliance thereon.

9        163.    In addition to signing and authorizing the issuance of materially misleading financial

10    statements, Callan also made materially misleading statements during Lehman Brothers' earnings

11    calls for the first and second quarter of 2008.  During the March 18, 2008 earnings call, Callan

12    reported to analysts a drop in Lehman Brothers' net leverage ratio from the fourth quarter 2007 to

13    the first quarter 2008, but did not disclose that the reduction in leverage was partially attributable to

14    an approximately $11 billion increase in quarter-end Repo usage between fourth quarter 2007 and

15    first quarter 2008.  Although specifically asked about the means by which Lehman Brothers

16    deleveraged, Callan failed to disclose the company's use of off-balance sheet repo transactions to

17    manage the balance sheet and improve net leverage.

18        164.    During the preliminary second quarter 2008 earnings call, Callan focused on Lehman

19    Brothers' reduced leverage but failed to mention that Lehman Brothers had temporarily removed $50

20    billion in assets from its balance sheet using Repo transactions.  In addition, at the end of the second

21    quarter of 2008, Lehman Brothers proclaimed, based on its reported numbers, that it had its "lowest

22    net leverage ratio in its history as a public company," and that it had reduced the net assets on its

23    balance sheet by $60 billion, and that it had a strong and robust liquidity pool.  Fuld stated that

24    Lehman Brothers' capital position had "never been stronger," again without disclosure of the Repo

25    105 transactions, which created a materially misleading financial picture.

26        165.    On or about the same time, there was also widespread public comment in the financial

27    industry that Lehman Brothers was manipulating its numbers well prior to the closing of the 2008

28    Swap.  Most prominent was David Einhorn, a highly respected hedge fund manager who ran and

1    founded a $6 billion hedge fund called Greenlight Capital, who began speaking out against Lehman

2    Brothers' accounting practices as early as November 2007 and accused Lehman Brothers of hiding

3    multi-billion dollar losses and proclaimed that Lehman had vastly overvalued assets and

4    underreported its problems.  In April 2008, Einhorn had announced that he was shorting Lehman

5    Brothers based on these beliefs.  At the May 21, 2008 Ira W. Sohn Investment Research Conference,

6    Einhorn gave a speech noting that for levered entities such as Lehman Brothers, "the incentive to

7    fudge is greater," decried "dishonest public disclosures and outright lies by unscrupulous corporate

8    managements," and that "there was no reasonable explanation" how Lehman Brothers' publicly

9    reported numbers could move as they did.  Criticizing Callan's March 18, 2008 earnings call,

10    Einhorn stated: "She used the word 'incredibly' 8 times.  I would use 'incredible' in a different way

11    to describe the report."  And after analyzing Lehman Brothers' public financials and Callan's

12    inability to support them, Einhorn commented:  "For the last several weeks, Lehman has been

13    complaining about short-sellers.  Academic research and our experience indicate that when

14    management teams do that, it is a sign that management is attempting to distract investors from

15    serious problems.  I think there is enough evidence to show how Lehman answered the difficult

16    question as to whether to tell the truth or suffer the consequences."  Einhorn's claim that Lehman

17    was "fudging" its financials was widely discussed in financial circles, such that the Individual

18    Lehman Defendants were aware of Einhorn's accusations.  In fact, Callan communicated directly

19    with Einhorn on or about May 20, 2008 regarding Einhorn's concerns about the veracity of

20    statements made by Callan and Lehman Brothers and Callan's inability to explain Lehman Brothers'

21    10-Q and stated his belief that Lehman Brothers "is doing an enormous disservice to our financial

22    markets."  Einhorn specifically shared his belief that Lehman Brothers' crisis management "mostly

23    means denying the reality of [Lehman Brothers'] balance sheet and calling for investigations of

24    short-sellers who have the temerity to think for themselves."

25        166.    In May 2008, a whistleblower within Lehman Brothers, Senior Vice President

26    Matthew Lee, sent a letter to Lehman Brothers senior management, including Callan and O'Meara,

27    discussing how the company was committing violations relating to balance sheets and accounting

28    ("the Lee Letter").  Noting that the company's Code of Ethics stated that "it is critically important

1  that financial statements and related disclosures be free of material errors," Lee reported, among

2  other things, that "senior management is not in sufficient control of [Lehman Brothers] assets to be

3  able to establish that its financial statements are presented to the public and governmental agencies

4  in a 'full, fair accurate and timely manner,'" the existence of tens of billions of dollars of

5  "unsubstantiated balances," and "senior level internal audit personnel do not have the professional

6  expertise to properly exercise the audit functions they are entrusted to manage." In a resulting

7  internal investigation by Lehman Brothers' management, Lee specifically raised concerns about

8  Lehman Brothers' Repo 105 practice, including Lehman Brothers' removal of $50 billion of

9  inventory off its balance sheet through Repo 105 transactions at the end of the second quarter of

10  2008.

11     167.    On or about June 4, 2008, the Lee Letter was expressly discussed with Cruikshank,

12  the chairman of Lehman Brothers' Audit Committee, who asked for a full and thorough investigation

13  into Lee's concerns. At a Board of Directors meeting dated June 19, 2008, which Fuld, O'Meara,

14  Ainslie, Akers, Berlind, Cruikshank, Evans, Gent, Hernandez, Kaufman, and Macomber attended,

15  Cruikshank reported on the questions raised in the Lee Letter. In advance of the Audit Committee

16  Meeting dated July 22, 2008, Cruikshank, Ainslie, Berlind, Gent and Fuld received a "Presentation

17  to the Audit Committee Employment Letter Review" which further discussed the Lee Letter and

18  Lehman Brothers' subsequent investigation related thereto.

19     168.    On Plaintiffs' information and belief, despite the public and internal commentary and

20  that Lehman Brothers was manipulating its numbers, neither Cruikshank nor any other member of

21  the Audit Committee or the Director Defendants engaged in an independent investigation into the

22  accusations of the Lee Letter, nor did they publicly disclose, or privately disclose to Plaintiffs, the

23  truth about Lehman Brothers' financial condition, i.e., that contrary to their public financial

24  statements, Lehman Brothers was insolvent.

25     169.    On Plaintiffs' information and belief, even though Lee expressly questioned the

26  competency of senior management "to establish that its financial statements are presented to the

27  public and governmental agencies in a 'full, fair accurate and timely manner,'" none of the Directors,

28  who had access to company documents and employees, independently reviewed and audited Lehman

1  Brothers' financial statements for their accuracy and/or adequately responded or disclosed those

2  statements' material misrepresentations regarding Lehman Brothers' financial condition. Rather,

3  the Director Defendants authorized and signed Lehman Brothers' second quarter 2008 Form 10-Q,

4  which removed $50 billion in assets from its balance sheet using Repo 105 transactions, without

5  sufficient inquiry.

6       170.    The Individual Lehman Defendants had an obligation to disclose the Repo 105

7  practice in Lehman Brothers' periodic reports, and in other public statements and to correct the false

8  picture presented to counterparties (including Plaintiffs) who had detrimentally and justifiably relied

9  on them.  But, the Individual Lehman Defendants took no action to ensure Lehman Brothers

10  presented accurate and complete financial statements, periodic reports, and other public statements

11  or to correct their prior misrepresentations.  Indeed, on Plaintiffs' information and belief, the

12  Individual Lehman Defendants knowingly, and in bad faith caused Lehman Brothers to publicly file

13  and present reports and statements that contained material omissions and/or misrepresentations,

14  and/or intentionally refused to disclose the truth regarding prior false and misleading statements of

15  solvency to Plaintiffs and/or any other counterparties or third parties who had detrimentally and

16  justifiably relied on them.

17       171.    In addition to the material omissions and active concealment, on Plaintiffs'

18  information and belief, among other things, the Individual Lehman Defendants affirmatively

19  misrepresented Lehman Brothers' accounting treatment for repos by stating that Lehman Brothers

20  treated repo transactions as secured financing transactions rather than sales for financial reporting

21  purposes, despite the fact that Lehman Brothers treated its tens of billions of dollars of Repo 105

22  transactions as true sale transactions.

23       172.    On Plaintiffs' information and belief, the Individual Lehman Defendants were

24  knowledgeable of and directed, authorized, and/or ratified Lehman Brothers' use of the Repo 105

25  transactions and the filing of materially misleading financial statements, which contained no mention

26  that Lehman Brothers engaged in the Repo 105 transactions.

27       173.    The net leverage ratios, among other things, which Lehman Brothers reported in its

28  public filings were misleading and in fact false.  Even a sophisticated reader of Lehman Brothers'

1   2007 Annual Report, Forms 10-K and 10-Q would not have been able to ascertain the amount of

2   Lehman Brothers' Repo 105 usage, nor even ascertain the fact that Lehman was engaged in these

3   transactions. The Form 10-K and 10-Q reports were authorized and filed by the Individual Lehman

4   Defendants with the intention and knowledge that they would be disseminated to the public,

5   including Plaintiffs and others in California, to maintain Lehman Brothers' image in the global

6   marketplace that it was open for business as usual despite the subprime mortgage crisis, that it

7   remained a leader in the financial markets, and that it was financially and adequately capitalized and

8   solvent. Each of the Individual Lehman Defendants also knew and specifically acknowledged in the

9   2007 Annual Report which they authorized that Lehman Brothers' credit ratings were based on its

10  public financial information, including the leverage ratios, and that a reduction in Lehman Brothers'

11  credit ratings would, among other things, trigger provisions under standard provisions in Lehman

12  Brothers' contracts like the 1998 Swap that would permit counterparties like Plaintiffs to terminate

13  or require Lehman Brothers to post significant additional collateral.

14          **D.      Lehman Brothers Files Bankruptcy**

15          174.    As late as September 10, 2008, Lehman Brothers was continuing to report that it was

16  solvent, and valued its shareholder equity at $28 billion. In reality, Lehman Brothers was in a deep

17  capital hole, and had, among other things, continually grossly overvalued its real estate holdings by

18  $60 to 70 billion to conceal its lack of equity.

19          175.    On September 15, 2008, just seven months after Fuld signed the Annual Report

20  stating Lehman Brothers had "effectively managed our risk, balance sheet, and expenses" and was

21  "able to withstand the stresses of rapid shifts in the world liquidity flows," and only five days after

22  again reporting it was solvent, Lehman Brothers filed Chapter 11 bankruptcy.

23          176.    After it filed bankruptcy, Lehman Brothers failed to make payments or in any manner

24  meet its obligations under the 2008 Swap which had been signed just three months earlier. To avoid

25  defaulting on the refinanced bonds, Plaintiffs made interest payments to its bond holders without any

26  protection afforded under the 2008 Swap.

27          177.    Prior to and at the time Plaintiffs renegotiated the 2008 Swap and Lehman Brothers

28  unconditionally guaranteed Plaintiffs' variable interest and capital payment obligations on the

SIXTH AMENDED COMPLAINT

1    refinanced bonds that were subject to the agreement, Lehman Brothers' officers and directors were

2    aware of materially adverse facts concerning its leverage, liquidity, mortgage-backed asset portfolio

3    and the mortgage markets in general.  Despite such knowledge, Lehman Brothers' officers and

4    directors failed to take the necessary steps to lower Lehman Brothers' exposure or to disclose the

5    risks to its customers and clients, including Plaintiffs.  Each of the public statements alleged above,

6    and the concealment of materially adverse facts about Lehman Brothers' financial condition, were

7    done with the knowledge and approval of the Individual Lehman Defendants, and Lehman Brothers

8    and its subsidiaries operated in this manner under their direction and authority.  Further, such

9    statements and concealment were directed at California entities, from which Lehman Brothers

10   derived a substantial portion of its business.

11          **E.      Plaintiffs Justifiably Relied on the Individual Lehman Defendants' False**

12                  **Representations, Misleading Statements and Fraudulent Concealment of**

13                  **Lehman Brothers' Financial Condition.**

14          178.    Plaintiffs justifiably relied repeatedly and through multiple sources on Lehman

15   Brothers' false, deceptive and misleading statements that it continued to be a strong, solvent, and

16   viable company, that it was adequately capitalized, and that it was honestly and fairly reporting to

17   the public and to Plaintiffs its financial condition.  If Lehman Brothers had not made such

18   statements, which were directed, authorized, and/or approved by each of the Individual Lehman

19   Defendants, and if Lehman Brothers had not concealed that it lacked liquidity and was grossly

20   over-leveraged, grossly overexposed to toxic subprime mortgage-backed securities and overpriced

21   real-estate investments, had engaged in deceptive accounting manipulations to conceal its true

22   financial condition, and was teetering on the edge of bankruptcy, Plaintiffs would not have entered

23   into the 2008 Swap, a contract that was supposed to provide years of protection and stability, but

24   instead cost Plaintiffs enormous fees and created great, ongoing hazard, with no resulting benefit.

25          179.    Specifically, Laverne Joseph, President and CEO of Retirement Housing Foundation

26   together with Frank Rossello, its then Controller and co-CFO, and Brian Magnone, its then Director

27   of Treasury and co-CFO, relied on multiple misrepresentations, misleading statements and active

28   concealment by Lehman Brothers throughout 2007 and 2008, including but not limited to false

1    statements and fraudulent non-disclosures in its financial statements. These misrepresentations and

2    fraudulent concealments relied on by Joseph, Rossello and Magnone came both directly from

3    Lehman Brothers personnel as well as indirectly from Lehman Brothers through third party advisers

4    retained or consulted by Plaintiffs who were tasked with reviewing Lehman Brothers' financial

5    statements. The misrepresentations, misleading statements, and fraudulent non-disclosures relating

6    to Lehman Brothers' financial condition were both oral and in writing and were made both directly

7    and indirectly to Plaintiffs and also to their retained representatives (including, attorneys Ursula

8    Hyman and Carlos Alvarez of Latham & Watkins and investment bankers Mary Munoz and Scott

9    Determan of Ziegler Securities, Michael Tedesco of Merrill Lynch, John Kayser of BlackRock and

10    representatives of Cain Brothers including Scott Smith and Joanna Manthei). In addition, Plaintiffs

11    relied on bankers who provided a line of credit for the 2008 transaction, including but not limited

12    to lead bank KBC (Barbara Readick, its representative) and participant banks including but not

13    limited to Bank of the West, U.S. Bank, Comerica Bank, and Sovereign Bank. These banks, before

14    agreeing to a letter of credit, had to approve the 2008 Swap. Each of these financial institutions had

15    direct access to Lehman Brothers' financial information and the expertise to evaluate it and did

16    review and evaluate Lehman Brothers' false financial information, and based thereon informed

17    Magnone that Lehman Brothers, based on its financials, was strong and viable and thus approved

18    the 2008 Swap. The Banks' research, review and approval was another reason Joseph, Rossello and

19    Magnone justifiably believed and relied on Lehman Brothers' false representation of its financial

20    condition, since had it been truly reported, these banks would not have approved the 2008 Swap.

21          180.    In addition to direct misrepresentations to Plaintiffs, the public false, deceptive and

22    misleading financial statements that were signed and ratified by the Individual Lehman Defendants

23    and the aforementioned public statements of Fuld, O'Meara, and Callan also constituted an indirect

24    fraud, such that the rating agencies did not sufficiently downgrade Lehman Brothers and analysts and

25    public commentators were also fooled and did not report Lehman Brothers had failed or was about

26    to fail. Joseph, Rossello and Magnone and their third party advisers also repeatedly relied on

27    information from public rating agencies and analysts who routinely reviewed Lehman Brothers'

28    financials and either publicly rated or otherwise commented on Lehman Brothers' financial

1 condition. Brian Magnone in particular regularly followed any information about Lehman Brothers'

2 financial strength, and was thus misled by the reports issued by Lehman Brothers. Because of those

3 many and continued misrepresentations deceptions and concealments, Plaintiffs did not exercise

4 rights under the 1998 Swap, but rather entered into the unfair and burdensome 2008 Swap on or

5 about July 3, 2008.

6   181. Even more specifically, on June 20, 2008, Greg Shlionsky, Senior Vice President

7 Municipal Derivatives of Lehman Brothers, participated in a phone call with Brian Magnone to

8 finalize the 2008 Swap. At no time did Mr. Schlionsky ever inform Mr. Magnone that Lehman

9 Brothers' financials were false, deceptive, and misleading, that its balance sheet had been

10 manipulated by use of Repo 105, or that its public rating was based on false financials. In addition,

11 the language of the 2008 Swap had been the subject of negotiation between Plaintiffs and their

12 representatives (Ziegler and Latham) on the one hand and Lehman Brothers and its representatives

13 on the other hand on multiple occasions throughout April, May, and June of 2008, and at no time

14 did Mr. Schlionsky or any other Lehman Brothers representative ever inform any representative of

15 Plaintiffs that Lehman Brothers' financials were deceptive, misleading or false in any way or that

16 Lehman Brothers was actually insolvent or becoming insolvent. To the contrary, affirmations of

17 Lehman Brothers' financial strength and stability were made by reference to Lehman Brothers'

18 public financial statements repeatedly in those meetings and the exchange of documents of drafts and

19 documents between the sides, which culminated in the 2008 Swap, which stated in part as follows:

20   **3.**  **Representations**

21   Each party represents to the other party (which representations will be deemed to be

22   repeated by each party on each date on which a Transaction is entered into) that:

23   * * *

24   (b)  **Absence of Certain Events.** No Event of Default or Potential Event of

25   Default or, to its knowledge, Termination Event with respect to it has occurred and

26   is continuing and no such event or circumstance would occur as a result of its

27   entering into or performing its obligations under this Agreement of any Credit

28   Support Document.

SIXTH AMENDED COMPLAINT

\* \* \*

(d)    **Accuracy of Specified Information**.    All applicable information that is furnished in writing on or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

Lehman Brothers' "annual report" – which contained the false, deceptive, and misleading financial information referenced above and was signed, ratified and/or authorized by the Individual Lehman Defendants, was expressly listed in the 2008 Swap Schedule as "Covered by Section 3(d)." Thus, in writing in the final 2008 Swap and all its drafts, Lehman Brothers expressly and directly represented to all the aforementioned representatives of Plaintiffs, all of whom reviewed these provisions of the 2008 Swap on multiple occasions and relied on the above representations before the 2008 Swap was signed by Laverne Joseph and Deborah Stouff both on and before July 2, 2008, that the financial information, including the balance sheet, in Lehman Brothers' annual report was true, accurate and complete in every material respect.

182.    In addition, Lehman Brothers' true financial condition constituted an "Event of Default or Potential Event of Default" as well as a "Termination Event," so 3(b) also was a false representation and fraudulent concealment which Joseph, Rossello and Magnone read and relied on in July of 2008 before signing the 2008 Swap. Lehman Brothers' insolvency or potential insolvency is an express Event of Default or Potential Event of Default, and was also a Termination Event under both the 1998 Swap and the 2008 Swap. Indeed, per both swaps, if Lehman Brothers' public rating falls below BBB- by S&P and Baa3 by Moody's Investor Service, Inc., Plaintiffs had a right to terminate the swap with Lehman Brothers as the defaulting party. If the true nature of Lehman Brothers' financial condition had been revealed, Lehman Brothers would have been either actually insolvent or potentially insolvent and also fallen below the two contractual ratings requirements, which were negotiated terms in both the 1998 Swap and the 2008 Swap. Thus, Plaintiffs also were aware of Lehman Brothers' public ratings and relied thereon to their detriment. Had Lehman Brothers supplied true and correct financials with no Repo 105 or other misrepresentations, Lehman Brothers' ratings would have fallen below the levels required by both the 1998 Swap and the 2008

SIXTH AMENDED COMPLAINT

1   Swap, and Plaintiffs never would have signed the 2008 Swap, but instead placed Lehman Brothers

2   in default under the 1998 Swap.

3       183.    The above quoted written direct material representations constitute standard language

4   in the ISDA Master Agreement form, so that the Individual Lehman Defendants knew that Lehman

5   Brothers' financials were to be represented as "true, accurate and complete in every material respect"

6   to every and any counterparty with whom Lehman Brothers entered into a swap.

7       184.    Moreover, pursuant to Paragraph 4(a) and the attached Schedule of the 1998 Swap,

8   Lehman Brothers had a continuing duty to provide Plaintiffs "as soon as reasonably practicable" its

9   financial documents, including its "most recent publicly available annual report," "unaudited

10  consolidated financial statements," and "each regular financial or business reporting document that

11  is distributed or made generally available," all of which were reaffirmed as "true, accurate and

12  complete in every material respect." This standard language in all ISDA contracts of the continuing

13  obligation to provide documents was known to the Individual Lehman Defendants, and thus when

14  they approved, signed and ratified the false and misleading financials of Lehman Brothers, they knew

15  that they had a duty to provide truthful and complete financials and that counterparties such as

16  Plaintiffs would rely on these financials.  But the Individual Lehman Defendants knew that truthful

17  financial statements would put them in default under their obligations to counterparties, as falling

18  under a BBB- S&P rating or a Baa3 Moody's rating constituted both an Event of Default by Lehman

19  Brothers and a Termination Event, giving Plaintiffs substantial rights.

20      185.    Specific instances of reliance by Plaintiffs in signing the 2008 Swap and not

21  exercising rights under the 1998 Swap include but are not limited to the following:

22          a.    Written representations in Lehman Brothers' 2007 Annual Report (including

23              but not limited to Exhibit I), which was directly reviewed and justifiably relied on by Brian

24              Magnone in or about April and May of 2008, which reported Lehman Brothers' Financial

25              Highlights, showing upward trends in net revenue, total assets and long-term capital and

26              reported the Firm's net leverage ratio, among other financial statistics referencing Lehman

27              Brothers' positive financial condition, and which was signed by Defendant Fuld and

28              authorized and approved by all of the other Individual Lehman Defendants;

SIXTH AMENDED COMPLAINT

b.    Written representations that the Individual Lehman Defendants knew were in Lehman Brothers' contracts and which were read and relied on by Joseph, Rossello, and Magnone on or about July 3, 2008; these statements were contained within the 2008 Swap at Sections 3 and 4 together with the attached Schedule at (g) (ii) (regarding Lehman Brothers' credit rating) and also in Part 2 which designated Documents from Lehman Brothers (specifically including its 2007 Annual Report) as true, accurate and complete in every material respect;

c.    Direct oral misrepresentations, misleading statements and concealments from Lehman Brothers personnel regarding Lehman Brothers' financial information, which the Individual Lehman Defendants knew would occur based on their false financials, directly to Brian Magnone including but not limited to the following:

(1)    Greg Shlionsky's June 20, 2008 oral statements and representations to Brian Magnone on their telephonic conference setting the 2008 Swap terms and the 1998 Swap valuations, that Lehman Brothers was not in default and had rights entitling it to $13 million under the 1998 Swap, but failing to disclose that Lehman Brothers in fact was in default and insolvent and that its credit rating was based on false financials;

(2)    Statements to Brian Magnone by Lehman Brothers representatives on April 16, 2008 on a telephonic conference call negotiating 2008 Swap terms and ACA issues and failing to acknowledge Lehman Brothers was in default, but requiring a gross revenue pledge from Plaintiffs which would not have been required if Lehman Brothers' financials as reflected in its 2007 Annual report and its 2007 10K and 2008 10Qs had been true and accurate;

(3)    Senior Vice President of Municipal Derivatives of Lehman Brothers Corey Long's December 14, 2007 telephonic communication to Brian Magnone regarding Lehman Brothers' position regarding the refinancing of the 1998 Swap, which rejected a proposed restructure from Magnone and failed to acknowledge that due to the true financial condition of Lehman Brothers, Lehman Brothers was in

default and could not take such a position;

(4)    Corey Long's November 13 and 15, 2007 telephonic communications to Brian Magnone that the 1998 swap was not in default and that Lehman Brothers continued to be in control, so Plaintiffs had no rights to terminate without a substantial multi-million dollar payment to Lehman Brothers and otherwise had to keep the 1998 swap in place, without disclosing the true facts, that Lehman Brothers was falsifying its financials through the use of Repo 105, amongst other things, and was in fact in default and subject to at termination event;

(5)    Huberto Gutierrez of Lehman High Yield Trading's telephonic communication on July 26, 2007 to Brian Magnone, that Lehman Brothers continued to be sound and solvent.

d.    Written and oral representations by Lehman Brothers representatives McDermott Will & Emory and Lehman Brothers employees during negotiations of the 2008 Swap documentation that continuously transmitted the drafts containing false representations about the truth and completeness of Lehman Brothers' financials, that Lehman Brothers' public rating was true and correct and based on accurate and complete information, and that Lehman Brothers was not in default under the 1998 Swap, including but not limited to: written transmissions of drafts of the 2008 Swap repeating these representations and those referenced above on June 13, 2008, June 18, 2008, June 19, 2008 (twice), June 20, 2008 (twice), June 25, 2008, June 27, 2008 and June 30, 2008 from Douglas Youngman to representatives of the RHF Group, including Carlos Alvarez and Ursula Hyman of Latham & Watkins and Scott Determan and Tom Costello of Ziegler;

e.    Kathleen Kalaher's email on June 25, 2008 to Hyman and Costello, reviewed by Magnone, affirming that Lehman Brothers would execute the ISDA agreement constituting the 2008 Swap, which contained the false and misleading representations about Lehman Brothers' finances;

f.    Oral representations in June or July of 2008 by "top Lehman management" to "top management at BlackRock" that Lehman Brothers was financially sound, which were

1  reported to Magnone in July 2008 by Plaintiffs' advisers John Kayser and Michael Tedesco

2  and before July by Tedesco;

3         g.     Representations by the Individual Lehman Defendants described above that

4  (on information and belief) were reviewed and in fact were repeated on September 25, 2007

5  and continuing on October 1, 2007 by Scott Smith of Cain Brothers to Brian Magnone that

6  Lehman Brothers was sound and maintained its A rating, so that as a result no collateral

7  needed to be posted by Lehman Brothers; this advice was based on Cain Brothers'

8  investigation and review regarding Lehman Brothers' financial condition and representations

9  that was specifically instigated by inquiries about the 1998 Swap by Magnone who relied on

10  Cain Brothers to directly review Lehman Brothers' financial information at that time; on

11  information and belief, Cain Brothers, then the RHF Group's swap adviser, regularly

12  reviewed and was aware of public information disseminated by Lehman Brothers about its

13  financial condition through Annual Reports, 10Ks and/or 10Qs, and Cain Brothers never

14  reported that Lehman Brothers was insolvent or had false financials or that the RHF Group

15  had termination rights while acting as the RHF Group's monitoring agent, structuring agent,

16  and swap adviser and advising the RHF Group on its rights under the 1998 Swap;

17         h.     Multiple oral and written recommendations, statements and representations

18  during the twelve months prior to signing the 2008 Swap and particularly in June and July

19  of 2008 to Brian Magnone and Frank Rossello by Mary Munoz, Scott Determan, John Kautz,

20  Aaron Schroeder, and John Costello as well as others at Ziegler, the RHF Group's swap

21  adviser and representative for the 2008 Swap, who negotiated the 2008 Swap and advised

22  Plaintiffs to enter into it based, among other things, on their expertise and knowledge of

23  Lehman Brothers' public financial information (from Annual Reports, 10Ks and/or 10 Qs)

24  and public statements on conference calls by Fuld, Callan, and O'Meara; Ziegler, a

25  sophisticated investment banking firm, who specializes in identifying, analyzing, defining,

26  measuring, and then mitigating financial risk, reviewed and/or was aware of Lehman

27  Brothers' credit rating and public statements about its financial condition and would never

28  have advised Plaintiffs to enter into the 2008 Swap with Lehman Brothers or negotiated its

SIXTH AMENDED COMPLAINT

terms as it did had Ziegler not been convinced by the public information disseminated through Lehman Brothers' 2007 Annual Report, 2007 10K, and 2007 and/or 2008 10Qs that Lehman Brothers was financially strong, solvent, and an appropriate swap counterparty for a 20 year commitment involving $100 million;

i.    Indirectly from the Individual Lehman Defendants, oral and written representations to Brian Magnone in May, June and July of 2008 by the RHF Group banks, including Bank of the West's Astrid Kramarz, Bank of America's Charmaine Atherton and Barbara Readick of KBC Bank, based on their respective bank's review of the Individual Lehman Defendants' statements about Lehman Brothers' public financials, so that Kramarz, Atherton and Readick informed Plaintiffs that the banks approved Plaintiffs signing the 2008 Swap based on Lehman Brothers' representations that it was a solvent and reliable swap counterparty;

j.    Indirect oral and written representations by each of the Individual Lehman Defendants described above about Lehman Brothers' financial condition to the Standard & Poor's and Moody's rating agencies, which were then repeated to all the Plaintiffs representatives referenced above by the rating agencies in their public ratings of Lehman Brothers, which were directly then included in the drafting of the ratings requirements in the 2008 Swap.

## FIRST CAUSE OF ACTION

### (Negligence By All Plaintiffs Against Cain Brothers and Does 1-10)

186.    Plaintiffs hereby repeat and re-allege Paragraphs 1 through 185 of this Sixth Amended Complaint as though set forth in full at this point.

187.    Cain Brothers, as the RHF Group's investment banker and financial advisor in connection with the Financial Advisory Agreement, had a duty to exercise reasonable care in the rendition of financial services to Plaintiffs, which included a duty to properly structure the transaction and to disclose to Plaintiffs all material facts regarding the 1998 plan of refinancing.

188.    On Plaintiffs' information and belief, Cain Brothers negligently failed to exercise reasonable care in the rendition of financial services to Plaintiffs by, among other things, designing

65

SIXTH AMENDED COMPLAINT

1  a risky and flawed plan of refinancing and failing to adequately disclose the defects in the plan,

2  including Lehman Brothers' unfair valuation methodology with respect to the Swap Contract;

3  Lehman Brothers' unfair SAVRS auction practices; the RHF Group's inability to cure the effects of

4  ACA's downgrade; the RHF Group's inability to exit the "alternative floating rate" provision under

5  the Swap Contract and Lehman Brothers' concurrent ability to manipulate the SAVRS auctions to

6  its benefit and the RHF Group's detriment; and ACA's risky business practices and mismanagement.

7      189.    As a proximate result of Cain Brothers' negligence, Plaintiffs have suffered and will

8  continue to suffer general and special damages in the form of, among other things, lost benefits under

9  their Financial Advisory Agreement with Cain Brothers, costs incurred re-funding the SAVRS and

10  bonds that were issued for the benefit of the RHF Group, St. Catherine and DeSmet, and liability,

11  losses and expenses under the Swap Contracts and on the SAVRS, the exact amount of which will

12  be proven at trial, but in excess of $20,000,000.

13                            **SECOND CAUSE OF ACTION**

14      **(Negligent Misrepresentation By All Plaintiffs Against Cain Brothers and Does 1-10)**

15      190.    Plaintiffs hereby repeat and re-allege Paragraphs 1 through 185 of this Sixth Amended

16  Complaint as though set forth in full at this point.

17      191.    On Plaintiffs' information and belief, prior to and at the time the Financial Advisory

18  Agreement, the Swap Contract and the Insurance Agreement were executed in or about the latter half

19  of 1998, Cain Brothers, through its representatives Joan Annett (a Senior Vice President) and Scott

20  Smith (a Managing Director), made and assumed the above-described written and oral

21  representations regarding, among other things, that the 1998 plan of refinancing would be designed

22  in a safe and reasonable manner, that the 1998 plan of refinancing presented a safe alternative to

23  more traditional and more expensive fixed rate bonds and would decrease the cost of any future

24  refinancing by the RHF Group, and that the "Dutch" auctions held by Lehman Brothers every 35

25  days would provide a fair market interest rate on the SAVRS. On Plaintiffs' information and belief,

26  prior to and at the time the Financial Advisory Agreement, the Swap Contract and the Insurance

27  Agreement were executed in or about the latter half of 1998, Cain Brothers, through its

28  representatives Joan Annett and Scott Smith, made and assumed the above-described written and

SIXTH AMENDED COMPLAINT

1  oral representations regarding, among other things, that ACA engaged in responsible business

2  practices and financial conservatism consistent with its preferred investment grade "A" rating, and

3  that the use of ACA as an insurer and the structure of the insurance as it related to the refinancing

4  as a whole minimized risk and provided flexibility.

5       192.    However, on Plaintiffs' information and belief, at the time these written and oral

6  promises and representations were made, they were in fact false.

7       193.    When Cain Brothers made the above-described representations, it had no reasonable

8  ground for believing them to be true, and made the representations with the intention of inducing the

9  RHF Group to act in reliance on them and enter into the Financial Advisory Agreement, the Swap

10 Contract, the Insurance Agreement, other contracts associated with the Official Statement Dated as

11 of December 7, 1998, and to issue SAVRS, and further to issue additional bonds for the benefit of

12 St. Catherine and DeSmet that were also subject to interest rate swaps with Lehman Brothers.

13      194.    Plaintiffs, at the time the above-described representations were made by Cain

14 Brothers, were ignorant of the falsity of Cain Brothers' representations and reasonably believed them

15 to be true. In justifiable reliance on these representations, Plaintiffs, among other things, entered into

16 a Financial Advisory Agreement with Cain Brothers, the Swap Contract with Lehman Brothers, and

17 the Insurance Agreement with ACA, and issued additional bonds for the benefit of St. Catherine and

18 DeSmet that were also subject to interest rate swaps with Lehman Brothers.

19      195.    As a proximate result of Cain Brothers' negligent misrepresentations, Plaintiffs have

20 suffered and will continue to suffer general and special damages in the form of, among other things,

21 lost benefits under their Financial Advisory Agreement with Cain Brothers, costs incurred re-funding

22 the SAVRS and bonds that were issued for the benefit of the RHF Group, St. Catherine and DeSmet,

23 and liability, losses and expenses under the Swap Contracts and on the SAVRS, the exact amount

24 of which will be proven at trial, but in excess of $20,000,000.

25                                 **THIRD CAUSE OF ACTION**

26        **(Breach of Fiduciary Duty By All Plaintiffs Against Cain Brothers and Does 1-10)**

27      196.    Plaintiffs hereby repeat and re-allege Paragraphs 1 through 185 of this Sixth Amended

28 Complaint as though set forth in full at this point.

197. By virtue of the investment banking and financial advisor relationship that existed between Cain Brothers and Plaintiffs, Cain Brothers owed to Plaintiffs a fiduciary duty, and by virtue of Plaintiffs having placed confidence in the fidelity and integrity of Cain Brothers and in entrusting Cain Brothers with, among other things, the RHF Group's 1998 plan of refinancing and the issuance of bonds for the benefit of St. Catherine and DeSmet, a fiduciary relationship existed at all times relevant to this Sixth Amended Complaint between Cain Brothers and Plaintiffs.

198. On Plaintiffs' information and belief, prior to and at the time the Financial Advisory Agreement, the Swap Contract and the Insurance Agreement were executed in or about the latter half of 1998, Cain Brothers, through its representatives Joan Annett (a Senior Vice President) and Scott Smith (a Managing Director), made and assumed the above-described written and oral representations regarding, among other things, that the 1998 plan of refinancing would be designed in a safe and reasonable manner, that the 1998 plan of refinancing presented a safe alternative to more traditional and more expensive fixed rate bonds and would decrease the cost of any future refinancing by the RHF Group, and that the "Dutch" auctions held by Lehman Brothers every 35 days would provide a fair market interest rate on the SAVRS. On Plaintiffs' information and belief, prior to and at the time the Financial Advisory Agreement, the Swap Contract and the Insurance Agreement were executed in or about the latter half of 1998, Cain Brothers, through its representatives Joan Annett and Scott Smith, made and assumed the above-described written and oral representations regarding, among other things, that ACA engaged in responsible business practices and financial conservatism consistent with its preferred investment grade "A" rating, and that the use of ACA as an insurer and the structure of the insurance as it related to the refinancing as a whole minimized risk and provided flexibility.

199. Despite having voluntarily accepted the trust and confidence of Plaintiffs with regard to, among other things, the RHF Group's 1998 plan of refinancing and the issuance of bonds for the benefit of St. Catherine and DeSmet, and in violation of this relationship of trust and confidence, Cain Brothers abused the trust and confidence of Plaintiffs by, among other things, designing a risky and flawed plan of refinancing and failing to adequately disclose the defects in the plan, including Lehman Brothers' unfair valuation methodology with respect to the Swap Contract; Lehman

1  Brothers' unfair SAVRS auction practices; the RHF Group's inability to cure the effects of ACA's

2  downgrade; the RHF Group's inability to exit the "alternative floating rate" provision under the

3  Swap Contract and Lehman Brothers' concurrent ability to manipulate the SAVRS auctions to its

4  benefit and the RHF Group's detriment; and ACA's risky business practices and mismanagement.

5  　　　　200.　Plaintiffs in fact placed confidence and reliance in Cain Brothers until late 2007 and

6  early 2008, when Plaintiffs' costs in connection with the SAVRS spiraled out of control and

7  Plaintiffs re-funded the SAVRS and bonds.

8  　　　　201.　By failing to make the foregoing disclosures regarding the 1998 plan of refinance,

9  Cain Brothers breached their fiduciary duties to Plaintiffs.

10  　　　　202.　As a proximate result of Cain Brothers' breaches of fiduciary duty, Plaintiffs have

11  suffered and will continue to suffer general and special damages in the form of, among other things,

12  lost benefits under the Financial Advisory Agreement with Cain Brothers, costs incurred re-funding

13  the SAVRS and bonds that were issued for the benefit of the RHF Group, St. Catherine and DeSmet,

14  and liability, losses and expenses under the Swap Contracts and on the SAVRS, the exact amount

15  of which will be proven at trial, but in excess of $20,000,000.

16  　　　　203.　On Plaintiffs' information and belief, Cain Brothers' officers, directors and/or

17  managing agents acted with fraud, oppression and malice, in that their conduct was despicable and

18  was carried on with a willful and conscious disregard for the rights of Plaintiffs; and in that their

19  conduct subjected Plaintiffs to cruel and unjust hardship in conscious disregard of Plaintiffs' rights

20  or otherwise causing injury to Plaintiffs. On Plaintiffs' information and belief, Cain Brothers had

21  advance knowledge and authorized and ratified these acts of fraud, oppression and malice performed

22  by its officers, directors, and/or managing agents. Thus, Plaintiffs are therefore entitled to the

23  assessment of punitive damages against Cain Brothers in an amount to be proven at trial.

24  　　　　　　　　　　**FOURTH CAUSE OF ACTION**

25  　　　　**(Constructive Fraud By All Plaintiffs Against Cain Brothers and Does 1-10)**

26  　　　　204.　Plaintiffs hereby repeat and re-allege Paragraphs 1 through 185 of this Sixth Amended

27  Complaint as though set forth in full at this point.

28  　　　　205.　Cain Brothers' conduct as alleged herein constituted constructive fraud against

1  Plaintiffs.

2        206.   As a proximate result of Cain Brothers' constructive fraud, Plaintiffs have suffered

3  and will continue to suffer general and special damages in the form of, among other things, lost

4  benefits under the Financial Advisory Agreement with Cain Brothers, costs incurred re-funding the

5  SAVRS and bonds that were issued for the benefit of the RHF Group, St. Catherine and DeSmet,

6  and liability, losses and expenses under the Swap Contracts and on the SAVRS, the exact amount

7  of which will be proven at trial, but in excess of $20,000,000.

8        207.   On Plaintiffs' information and belief, Cain Brothers' officers, directors and/or

9  managing agents acted with fraud, oppression and malice, in that their conduct was despicable and

10  was carried on with a willful and conscious disregard for the rights of Plaintiffs; and in that their

11  conduct subjected Plaintiffs to cruel and unjust hardship in conscious disregard of Plaintiffs' rights

12  or otherwise causing injury to Plaintiffs.  On Plaintiffs' information and belief, Cain Brothers had

13  advance knowledge and authorized and ratified these acts of fraud, oppression and malice performed

14  by its officers, directors, and/or managing agents. Thus, Plaintiffs are therefore entitled to the

15  assessment of punitive damages against Cain Brothers in an amount to be proven at trial.

16                                   **FIFTH CAUSE OF ACTION**

17          **(Fraud & Deceit By The RHF Group Against ACA and Does 13-20)**

18        208.   Plaintiffs hereby repeat and re-allege Paragraphs 1 through 185 of this Sixth Amended

19  Complaint as though set forth in full at this point.

20        209.   On Plaintiffs' information and belief, prior to and at the time the Insurance Agreement

21  was executed in or about December 1998, ACA made and assumed the above-described

22  representations regarding, among other things, its purported responsible business practices and

23  financial conservatism consistent with its preferred investment grade "A" rating and that it would

24  enhance Plaintiffs' creditworthiness by effectively "guarantee[ing] . . . payment when due of

25  principal (whether at maturity or by mandatory sinking fund redemption) and interest on the 1998

26  SAVRS." These representations were made with the intent to induce Plaintiffs to enter into the

27  Insurance Agreement.  However, at the time these promises were made, ACA had no intention of

28  performing them.

SIXTH AMENDED COMPLAINT

210.    At the time ACA made these promises, the RHF Group was ignorant of ACA's hidden intention not to perform these promises. In the exercise of due diligence, the RHF Group could not have discovered ACA's hidden intention.

211.    Furthermore, ACA made and assumed the above-described misrepresentations in 2005 regarding its purportedly strong financial position, that it conducted itself in a responsible manner, that it was financially strong, and that it was sensitive to issues that could trigger a downgrade. In or about May and/or June 2005, Gilpin continually assured Plaintiffs' representative Brian Magnone orally and in writing that ACA was stable and would continue to be stable because ACA was growing its business slowly, and ACA had received sufficient equity capital the previous year from an investment from Bear Stearns. Gilpin also told Magnone that ACA guaranteed only the safest, lowest risk AAA-rated tranches that were unaffected by market changes and volatility and that ACA maintained more than adequate capital to cover any potential loss exposure from CDOs. Gilpin stressed that ACA's current management team was sensitive to issues that caused ACA's prior credit issues, including the failure to maintain adequate loss reserves consistent with its "A" rating, and that ACA's current business model was designed to prevent those issues from arising again.

212.    Also in or about May and/or June 2005, Gilpin and Roseman, ACA's CEO and President, expressly represented orally and in writing to Magnone that ACA had hired a new auditor and implemented new accounting procedures that were intended to satisfy generally accepted accounting standards in the CDO industry and would not affect ACA's financial position or shareholders' equity, and that ACA was financially stable and maintained adequate loss reserves consistent with its "A" rating.

213.    As late as August 2007, Gilpin and Roseman orally represented and reaffirmed to Magnone that ACA was "well capitalized," was "open for business," was "financed to term," that ACA's A rating from Standard & Poor's would remain intact, that there was "no liquidity issues on [ACA's exposure] to mark to markets," which were rated "above AA levels of risk" and that ACA's capital levels were adequate and consistent with its "A" rating.

214.    However, ACA, Gilpin and Roseman concealed that ACA faced massive risk and

71
SIXTH AMENDED COMPLAINT

1  held extremely inadequate reserves.  On Plaintiffs' information and belief, ACA knew of the falsity

2  of these representations, due to its massive over-exposure to extremely risky subprime mortgage-

3  backed securities, but the RHF Group was ignorant of and could not have reasonably discovered

4  their falsity.

5      215.    When ACA made the above-described representations prior to and at the time the

6  Insurance Agreement was executed in or about December 1998, it had no reasonable ground for

7  believing them to be true, and made the representations with the intention of inducing the RHF

8  Group to act in reliance on it and enter into an agreement with ACA regarding bond insurance.

9      216.    On Plaintiffs' information and belief, ACA's 2005 misrepresentations and

10  concealment were made with the intent to deceive Plaintiffs and similarly situated entities and to

11  induce them to rely on the misrepresentations and concealment so that such entities would not

12  restructure their debt in a manner that did not rely on ACA.

13      217.    In reliance on the 1998 promises made by ACA, the RHF Group entered into an

14  Insurance Agreement with ACA, and paid a premium based on ACA's irrevocable and unconditional

15  guarantee to provide interest and capital repayments as specified in the SAVRS, minimize a

16  perceived risk that the RHF Group would default on those obligations, and maintain the investment

17  strength of the SAVRS.  Furthermore, in reliance on ACA's 2005 misrepresentations and

18  concealment of its precarious financial situation, the RHF Group did not at that time seek to

19  restructure its financing so that it would not be reliant on ACA for its "A" rating.

20      218.    ACA has now failed and refused, and continues to fail and refuse, to perform the

21  above-described promises made to the RHF Group.

22      219.    As a proximate result of ACA's failure to perform its promises made regarding,

23  among other things, its responsible business practices and financial conservatism consistent with its

24  investment grade "A" rating, the RHF Group has suffered and will continue to suffer general and

25  special damages in the form of, among other things, lost benefits under its Insurance Agreement with

26  ACA and costs incurred re-funding the SAVRS that were issued for the benefit of the RHF Group

27  and were formerly insured by ACA, the exact amount of which will be proven at trial, but in excess

28  of $20,000,000.

SIXTH AMENDED COMPLAINT

220.    Further, as a proximate result of ACA's 2005 misrepresentations and concealment, the RHF Group has suffered and will continue to suffer general and special damages in the form of, among other things, increased costs that it otherwise could have saved if it restructured its financing so that it was not reliant on ACA for its "A" rating, the exact amount of which will be proven at trial, but in excess of $20,000,000.

221.    It was not until the time that ACA was downgraded in December 2007 that Plaintiffs discovered that ACA's prior representations, including that it conducted itself in a responsible manner, that it was financially strong, and that it was sensitive to issues that could trigger a downgrade, were in fact false.

222.    On Plaintiffs' information and belief, in making the above described misrepresentations, ACA's officers, directors and/or managing agents acted with fraud, oppression and malice, in that their conduct was despicable and was carried on with a willful and conscious disregard for the rights of the RHF Group; and in that their conduct subjected the RHF Group to cruel and unjust hardship in conscious disregard of Plaintiffs' rights or otherwise causing injury to the RHF Group. On Plaintiffs' information and belief, ACA had advance knowledge and authorized and ratified these acts of fraud, oppression and malice performed by its officers, directors, and/or managing agents. Thus, the RHF Group is therefore entitled to the assessment of punitive damages against ACA in an amount to be proven at trial.

### SIXTH CAUSE OF ACTION

### (Negligent Misrepresentation By The RHF Group Against ACA and Does 13-20)

223.    Plaintiffs hereby repeat and re-allege Paragraphs 1 through 185 of this Sixth Amended Complaint as though set forth in full at this point.

224.    On Plaintiffs' information and belief, prior to and at the time the Insurance Agreement was executed in or about December 1998, ACA made and assumed the above-described representations regarding, among other things, its purported responsible business practices and financial conservatism consistent with its preferred investment grade "A" rating and that it would enhance Plaintiffs' creditworthiness by effectively "guarantee[ing] . . . payment when due of principal (whether at maturity or by mandatory sinking fund redemption) and interest on the 1998

1    SAVRS." These representations were made with the intent to induce Plaintiffs to enter into the

2    Insurance Agreement. However, at the time these promises were made, they were in fact false.

3    225.    Furthermore, ACA made and assumed the above-described misrepresentations in

4    2005 regarding its purportedly strong financial position, that it conducted itself in a responsible

5    manner, that it was financially strong, and that it was sensitive to issues that could trigger a

6    downgrade. In or about May and/or June 2005, Gilpin continually assured Plaintiffs' representative

7    Brian Magnone orally and in writing that ACA was stable and would continue to be stable because

8    ACA was growing its business slowly, and ACA had received sufficient equity capital the previous

9    year from an investment from Bear Stearns. Gilpin also told Magnone that ACA guaranteed only the

10    safest, lowest risk AAA-rated tranches that were unaffected by market changes and volatility and that

11    ACA maintained more than adequate capital to cover any potential loss exposure from CDOs.

12    Gilpin stressed that ACA's current management team was sensitive to issues that caused ACA's

13    prior credit issues, including the failure to maintain adequate loss reserves consistent with its "A"

14    rating, and that ACA's current business model was designed to prevent those issues from arising

15    again.

16    226.    Also in or about May and/or June 2005, Gilpin and Roseman, ACA's CEO and

17    President, expressly represented orally and in writing to Magnone that ACA had hired a new auditor

18    and implemented new accounting procedures that were intended to satisfy generally accepted

19    accounting standards in the CDO industry and would not affect ACA's financial position or

20    shareholders' equity, and that ACA was financially stable and maintained adequate loss reserves

21    consistent with its "A" rating.

22    227.    As late as August 2007, Gilpin and Roseman orally represented and reaffirmed to

23    Magnone that ACA was "well capitalized," was "open for business," was "financed to term," that

24    ACA's A rating from Standard & Poor's would remain intact, that there was "no liquidity issues on

25    [ACA's exposure] to mark to markets," which were rated "above AA levels of risk" and that ACA's

26    capital levels were adequate and consistent with its "A" rating.

27    228.    When ACA made the above-described representations prior to and at the time the

28    Insurance Agreement was executed in or about December 1998, it had no reasonable ground for

74

SIXTH AMENDED COMPLAINT

1  believing them to be true, and made the representations with the intention of inducing the RHF

2  Group to act in reliance on it and enter into an agreement with ACA regarding bond insurance.

3      229.  On Plaintiffs' information and belief, when ACA made the above-described

4  representations in 2005 it had no reasonable ground for believing them to be true, and made them

5  with the intent to induce Plaintiffs and similarly situated entities to rely on the representations so that

6  such entities would not restructure their debt in a manner that did not involve ACA.

7      230.  The RHF Group, at the time the above-described representations were made by ACA,

8  was ignorant of the falsity of ACA's representations and believed them to be true.  In justifiable

9  reliance on these representations, the RHF Group, among other things, entered into an Insurance

10  Agreement with ACA and, in or around 2005, did not seek to restructure its financing so that it

11  would not be reliant on ACA for its "A" rating.

12      231.  It was not until the time that ACA was downgraded in December 2007 that Plaintiffs

13  discovered that ACA's prior representations, including that it conducted itself in a responsible

14  manner and was financially strong, were in fact false.

15      232.  As a proximate result of ACA negligent misrepresentations, the RHF Group has

16  suffered and will continue to suffer general and special damages in the form of, among other things,

17  lost benefits under its Insurance Agreement with ACA, costs incurred re-funding the SAVRS that

18  were issued for the benefit of the RHF Group and were formerly insured by ACA, and increased

19  costs that it otherwise could have saved if it restructured its financing so that it was not reliant on

20  ACA for its "A" rating,  the exact amount of which will be proven at trial, but in excess of

21  $20,000,000.

22  **SEVENTH CAUSE OF ACTION**

23  **(Unfair Competition Contrary to Business & Professions Code §17200 et seq.,**

24  **By The RHF Group Against ACA and Does 13-20)**

25      233.  Plaintiffs hereby repeat and re-allege Paragraphs 1 through 184 of this Sixth Amended

26  Complaint as though set forth in full at this point.

27      234.  The conduct of ACA as alleged herein constitutes unlawful, unfair and/or fraudulent

28  business practices and unfair competition with the RHF Group in violation of Sections 17200 et seq.

1   of the California Business & Professions Code.

2       235.    In addition, on Plaintiffs' information and belief, ACA has been unjustly enriched as

3   a direct and proximate result of its actions as alleged herein, and the RHF Group is entitled to

4   recover such amount that ACA has been unjustly enriched by its unfair actions toward the RHF

5   Group.

6                           **EIGHTH CAUSE OF ACTION**

7           **(Fraud, Deceit, and Conspiracy to Defraud By All Plaintiffs Against**

8                         **Fuld, O'Meara and Does 21-30)**

9       236.    Plaintiffs hereby repeat and re-allege Paragraphs 1 through 185 of this Sixth Amended

10  Complaint as though set forth in full at this point.

11      237.    From approximately December 2007 through June 2008, Lehman Brothers

12  intentionally made the above-described representations regarding the purported results of the SAVRS

13  auctions, including how much Plaintiffs purportedly owed. However, on Plaintiffs' information and

14  belief, at the time these representations were made, they were in fact false, as the purported auction

15  results were not the results obtained through the proper auction process at all, but instead were based

16  on inflated rates created by Lehman Brothers' undisclosed and unfair manipulation of the SAVRS

17  auctions.

18      238.    On Plaintiffs' information and belief, Lehman Brothers' made the above-described

19  misrepresentations regarding the purported SAVRS auctions knowing they were false and with the

20  intent to deceive Plaintiffs and to induce Plaintiffs to rely on them so that Plaintiffs would pay to

21  Lehman Brothers amounts pertaining to the SAVRS auctions that far exceeded the amounts that

22  would have been owed if the auctions were conducted in a fair, proper, and reasonable manner.

23      239.    Plaintiffs, at the time the above-described representations were made, were ignorant

24  of the falsity of the representations and justifiably and reasonably believed them to be true and relied

25  thereon to their detriment.

26      240.    As a proximate result of this fraud and deceit, Plaintiffs have suffered and will

27  continue to suffer general and special damages in the form of, among other things, unfairly inflated

28  payments on the SAVRS during the period of approximately December 2007 to June 2008, the exact

1    amount of which will be proven at trial.

2    241.    On Plaintiffs' information and belief, Fuld and O'Meara and Does 21 through 30

3    conspired to defraud and/or had knowledge of and/or directed and/or approved and/or ratified

4    Lehman Brothers' intentional manipulation of the auctions of the RHF Group's SAVRS, the

5    intentional transmittals to Plaintiffs of so-called auction results that in fact were based on unfair and

6    undisclosed manipulation, and the resulting demands for payment.    Further, on information and

7    belief, the Individual Lehman Defendants became aware of the intentional auction manipulations and

8    attendant misrepresentations and payment demands by Lehman Brothers, and ratified the

9    continuance of this wrongful course of conduct.    Lehman Brothers and its subsidiaries, which it

10    controlled, operated in this manner under the Individual Lehman Defendants' direction and authority.

11    Moreover, the Individual Lehman Defendants accepted and retained the benefits of this conduct, as

12    Plaintiffs' inflated payments increased profits for Lehman Brothers and allowed it to stave off

13    bankruptcy longer than otherwise possible.

14    242.    On Plaintiffs' information and belief, in conspiring, making, directing, approving,

15    and/or ratifying the above-described fraudulent representations and conduct, Fuld and O'Meara,

16    acted with fraud, oppression and malice, in that their conduct was despicable and was carried on with

17    a willful and conscious disregard for the rights of Plaintiffs; and in that their conduct subjected

18    Plaintiffs to cruel and unjust hardship in conscious disregard of their rights or otherwise causing

19    injury to Plaintiffs. On Plaintiffs' information and belief, Fuld and O'Meara had advance knowledge

20    and authorized and ratified these acts of fraud, oppression and malice performed by themselves.

21    Thus, Plaintiffs are therefore entitled to the assessment of punitive damages against Fuld and

22    O'Meara in an amount to be proven at trial.

23    **NINTH CAUSE OF ACTION**

24    **(Negligent Misrepresentation By All Plaintiffs Against**

25    **Fuld and O'Meara and Does 21-30)**

26    243.    Plaintiffs hereby repeat and re-allege Paragraphs 1 through 185 of this Sixth Amended

27    Complaint as though set forth in full at this point.

28    244.    From approximately December 2007 through June 2008, Lehman Brothers made the

1    above-described representations regarding the purported results of the SAVRS auctions, including

2    how much Plaintiffs purportedly owed.  However, on Plaintiffs' information and belief, at the time

3    these representations were made, they were in fact false and Lehman Brothers had no reason to

4    believe they were true, as the purported auction results were not the results obtained through the

5    proper auction process at all, but instead were based on inflated rates created by Lehman Brothers'

6    undisclosed and unfair manipulation of the SAVRS auctions.

7        245.    On Plaintiffs' information and belief, Lehman Brothers' made the above-described

8    misrepresentations regarding the purported SAVRS auctions with the intent to induce Plaintiffs to

9    rely on them so that Plaintiffs would pay to Lehman Brothers amounts pertaining to the SAVRS

10   auctions that far exceeded the amounts that would have been owed if the auctions were conducted

11   in a fair, proper, and reasonable manner.

12       246.    Plaintiffs, at the time the above-described representations were made, were ignorant

13   of the falsity of the representations and justifiably and reasonably believed them to be true and relied

14   thereon to their detriment.

15       247.    As a proximate result of this fraud and deceit, Plaintiffs have suffered and will

16   continue to suffer general and special damages in the form of, among other things, unfairly inflated

17   payments on the SAVRS during the period of approximately December 2007 to June 2008, the exact

18   amount of which will be proven at trial.

19       248.    Fuld and O'Meara individually owed a duty of care, independent of Lehman Brothers'

20   own duty, to refrain from acting in a manner that created an unreasonable risk of personal injury to

21   third parties, including Lehman Brothers' counterparties such as Plaintiffs.  On Plaintiffs'

22   information and belief, Fuld and O'Meara had knowledge of and directed and/or approved of

23   Lehman Brothers' manipulation of the auctions of the RHF Group's SAVRS, the transmittals to

24   Plaintiffs of so-called auction results that in fact were based on unfair and undisclosed manipulation,

25   and the resulting demands for payment.  Further, Fuld and O'Meara were aware of the intentional

26   auction manipulations and attendant misrepresentations and payment demands by Lehman Brothers,

27   and ratified the continuance of this wrongful course of conduct.  Lehman Brothers and its

28   subsidiaries, which it controlled, operated in this manner under the Individual Lehman Defendants'

SIXTH AMENDED COMPLAINT

1  direction and authority.  Moreover, Fuld and O'Meara accepted and retained the benefits of this

2  conduct, as Plaintiffs' inflated payments increased profits for Lehman Brothers and allowed it to

3  stave off bankruptcy longer than otherwise possible.

### TENTH CAUSE OF ACTION

5  **(Intentional Interference with Prospective Economic Advantage By All Plaintiffs Against**

6  **Fuld, O'Meara and Does 21-30)**

7  249.    Plaintiffs hereby repeat and re-allege Paragraphs 1 through 185 of this Sixth Amended

8  Complaint as though set forth in full at this point.

9  250.    Plaintiffs had an economic relationship and prospective economic relationship with

10  holders and potential holders of SAVRS that had a probability of future economic benefit to

11  Plaintiffs.  Plaintiffs expected to obtain financing through the SAVRS at rates which reasonably

12  reflected market rates and were the result of fairly and properly conducted SAVRS auctions, through

13  which the returns that holders and potential holders received on the SAVRS would be determined.

14  251.    Lehman Brothers was aware of this relationship.

15  252.    On Plaintiffs' information and belief, from approximately December 2007 through

16  June 2008, Lehman Brothers intentionally manipulated the RHF Group's SAVRS auctions and made

17  the above-described representations regarding the purported results of the SAVRS auctions,

18  including how much Plaintiffs purportedly owed, with the design of disrupting Plaintiffs'

19  relationship with holders and potential holders of SAVRS by grossly inflating the rates that Plaintiffs

20  purportedly owed on the SAVRS.

21  253.    Lehman Brothers' conduct and misrepresentations actually disrupted Plaintiffs'

22  relationship with holders and potential holders of SAVRS by grossly inflating the rates that Plaintiffs

23  purportedly owed on the SAVRS.

24  254.    As a proximate result of Lehman Brothers' intentional interference, Plaintiffs have

25  suffered and will continue to suffer general and special damages in the form of, among other things,

26  unfairly inflated payments on the SAVRS during the period of approximately December 2007 to

27  June 2008, the exact amount of which will be proven at trial.

28  255.    On Plaintiffs' information and belief, Fuld and O'Meara had knowledge of and

SIXTH AMENDED COMPLAINT

1    directed and/or approved of Lehman Brothers' intentional manipulation of the auctions of the RHF

2    Group's SAVRS, the intentional transmittals to Plaintiffs of so-called auction results that in fact

3    were based on unfair and undisclosed manipulation, and the resulting demands for payment. Further,

4    Fuld and O'Meara were aware of the intentional auction manipulations and attendant

5    misrepresentations and payment demands by Lehman Brothers, and ratified the continuance of this

6    wrongful course of conduct. Lehman Brothers and its subsidiaries, which it controlled, operated in

7    this manner under the Individual Lehman Defendants' direction and authority. Moreover, Fuld and

8    O'Meara accepted and retained the benefits of this conduct, as Plaintiffs' inflated payments increased

9    profits for Lehman Brothers and allowed it to stave off bankruptcy longer than otherwise possible.

10        256.    On Plaintiffs' information and belief, in making, directing, approving, and/or ratifying

11    the above-described intentional interference, Fuld and O'Meara acted with fraud, oppression and

12    malice, in that their conduct was despicable and was carried on with a willful and conscious

13    disregard for the rights of Plaintiffs; and in that their conduct subjected Plaintiffs to cruel and unjust

14    hardship in conscious disregard of their rights or otherwise causing injury to Plaintiffs. On

15    Plaintiffs' information and belief, Fuld and O'Meara had advance knowledge and authorized and

16    ratified these acts of fraud, oppression and malice performed by themselves. Thus, Plaintiffs are

17    therefore entitled to the assessment of punitive damages against Fuld and O'Meara in an amount to

18    be proven at trial.

19                        **ELEVENTH CAUSE OF ACTION**

20                    **(Fraud And Deceit By All Plaintiffs Against**

21                **The Individual Lehman Defendants and Does 21-140)**

22        257.    Plaintiffs hereby repeat and re-allege Paragraphs 1 through 185 of this Sixth Amended

23    Complaint as though set forth in full at this point.

24        258.    Prior to and at the time Plaintiffs entered into the 2008 Swap Contract, the Individual

25    Lehman Defendants made and assumed the above-described representations regarding, among other

26    things, Lehman Brothers' financial condition, its strength, stability and viability. However, at the

27    time these representations were made, they were in fact false and deceptive and concealed material

28    facts, and these statements and fraudulent concealments were known to be false and misleading by

SIXTH AMENDED COMPLAINT

1  the Individual Lehman Defendants.  The Individual Lehman Defendants made, ratified and/or

2  authorized this fraud and concealment with the express intent of causing counterparties like Plaintiffs

3  to rely thereon.

4      259.  The Individual Lehman Defendants were aware of materially adverse facts concerning

5  Lehman Brothers' financial condition, mortgage-backed asset portfolio and the mortgage markets

6  in general that threatened its continued existence.  Despite such knowledge, the Individual Lehman

7  Defendants failed to take the necessary steps to lower Lehman Brothers' exposure or disclose the

8  risks and consequences of its conduct to Plaintiffs.  The misrepresentations about Lehman Brothers'

9  financial strength and concealment of materially adverse facts about Lehman Brothers' financial

10 condition were done with the knowledge and approval of the Individual Lehman Defendants, and

11 Lehman Brothers operated in this manner under their direction and authority.

12     260.  On Plaintiffs' information and belief, these misrepresentations and concealments were

13 made with the intent to deceive Plaintiffs and similarly situated entities and to induce them to agree

14 to pay Lehman Brothers more than it was actually owed and to continue to enter into or maintain

15 long-term agreements with Lehman Brothers and avoid and cover up Lehman Brothers' default

16 under agreements such as the 1998 Swap.

17     261.  In June 2008, in reliance on Lehman Brothers' representations regarding the swap

18 valuations and its financial strength, stability and viability, the RHF Group, St. Catherine and

19 DeSmet terminated the 1998 Swap and related swaps and renegotiated a new, long term swap

20 agreement with Lehman Brothers in connection with the refinanced bonds, in which Lehman

21 Brothers unconditionally guaranteed Plaintiffs' variable interest and capital payment obligations on

22 the refinanced bonds that were subject to the agreement.

23     262.  Plaintiffs, at the time the above-described representations were made, were ignorant

24 of the falsity of the representations and justifiably and reasonably believed them to be true and relied

25 thereon to their detriment.

26     263.  In justifiable reliance on the representations and concealments made by the Individual

27 Lehman Defendants, Plaintiffs were induced to enter the 2008 Swap and paid Lehman Brothers and

28 others fees for, among other things, the 2008 Swap, which was unfairly valued in favor of Lehman

1  Brothers.

2      264.    On Plaintiffs' information and belief, all of the Individual Lehman Defendants, each

3  of whom was an officer and/or director of Lehman Brothers, had knowledge of and directed and/or

4  approved of Lehman Brothers' misrepresentations regarding its financial strength and concealment

5  of materially adverse facts regarding its financial condition.  Lehman Brothers and its subsidiaries,

6  which it controlled, operated in this manner under the Individual Lehman Defendants' direction and

7  authority.  Moreover, the Individual Lehman Defendants accepted and retained the benefits of this

8  conduct, as Plaintiffs' fees and payments with respect to the 2008 Swap increased profits for Lehman

9  Brothers and allowed it to stave off bankruptcy longer than otherwise possible, thereby allowing the

10  Individual Lehman Defendants to increase and extend their compensation.

11      265.    As a proximate result of the Individual Lehman Defendants' fraud and deceit,

12  Plaintiffs have suffered and will continue to suffer general and special damages in the form of,

13  among other things, fees and payments for the 2008 Swap and lost benefits under the 1998 Swap and

14  the 2008 Swap, the exact amount of which will be proven at trial.

15      266.    On Plaintiffs' information and belief, in making the above-described representations,

16  the Individual Lehman Defendants, as the officers and directors of Lehman Brothers, acted with

17  fraud, oppression and malice, in that their conduct was despicable and was carried on with a willful

18  and conscious disregard for the rights of Plaintiffs; and in that their conduct subjected Plaintiffs to

19  cruel and unjust hardship in conscious disregard of their rights or otherwise causing injury to

20  Plaintiffs.  On Plaintiffs' information and belief, each of the Individual Lehman Defendants had

21  advance knowledge and authorized and ratified these acts of fraud, oppression and malice performed

22  by themselves. Thus, Plaintiffs are therefore entitled to the assessment of punitive damages against

23  the Individual Lehman Defendants in an amount to be proven at trial.

24                          **TWELFTH CAUSE OF ACTION**

25                  **(Negligent Misrepresentation By All Plaintiffs Against**

26                  **The Individual Lehman Defendants and Does 21-140)**

27      267.    Plaintiffs hereby repeat and re-allege Paragraphs 1 through 185 of this Sixth Amended

28  Complaint as though set forth in full at this point.

SIXTH AMENDED COMPLAINT

268.    Prior to and at the time Plaintiffs entered into the 2008 Swap, the Individual Lehman Defendants made and assumed the above-described representations regarding, among other things, Lehman Brothers' financial condition, stability and viability.    However, at the time these representations were made, the Individual Lehman Defendants had no reasonable grounds for believing these representations to be true.

269.    Lehman Brothers' officers and directors were aware of materially adverse facts concerning Lehman Brothers' financial condition, mortgage-backed asset portfolio and the mortgage markets in general that threatened its continued existence.    Despite such knowledge, Lehman Brothers' officers and directors failed to take the necessary steps to lower Lehman Brothers' exposure or disclose the risks and consequences of its conduct to Plaintiffs.    The misrepresentations about Lehman Brothers' financial strength and failures to disclose materially adverse facts about Lehman Brothers' financial condition were done with the knowledge and approval of the Individual Lehman Defendants, and Lehman Brothers operated in this manner under their direction and authority.

270.    On Plaintiffs' information and belief, these misrepresentations and failures to disclose were made with the intent to induce Plaintiffs and similarly situated entities to agree to pay Lehman Brothers more than it was actually owed and to continue to enter into long-term agreements with Lehman Brothers.

271.    In June 2008, in reliance of Lehman Brothers' representations regarding its financial strength, stability and viability, the RHF Group, St. Catherine and DeSmet terminated their old swap agreements and renegotiated a new, long term swap agreement with Lehman Brothers in connection with the refinanced bonds, in which Lehman Brothers unconditionally guaranteed Plaintiffs' variable interest and capital payment obligations on the refinanced bonds that were subject to the agreement.

272.    Plaintiffs, at the time the above-described representations were made, were ignorant of the falsity of the representations and justifiably and reasonably believed them to be true and relied thereon to their detriment.

273.    In justifiable reliance on the representations made by the Individual Lehman Defendants, Plaintiffs were induced to enter the 2008 Swap and paid Lehman Brothers and others

SIXTH AMENDED COMPLAINT

1  fees for, among other things, the 2008 Swap, which was unfairly valued in favor of Lehman

2  Brothers.

3      274.    All of the Individual Lehman Defendants, each of whom was an officer and/or

4  director of Lehman Brothers, individually owed a duty of care, independent of Lehman Brothers'

5  own duty, to refrain from acting in a manner that created an unreasonable risk of injury to third

6  parties, including Lehman Brothers' counterparties such as Plaintiffs. On Plaintiffs' information and

7  belief, all of the Individual Lehman Defendants, each of whom was an officer and/or director of

8  Lehman Brothers, had knowledge of and directed and/or approved of Lehman Brothers'

9  misrepresentations regarding its financial strength and its failure to disclose materially adverse facts

10  regarding its financial condition. Lehman Brothers and its subsidiaries, which it controlled, operated

11  in this manner under the Individual Lehman Defendants' direction and authority. Moreover, the

12  Individual Lehman Defendants accepted and retained the benefits of this conduct, as Plaintiffs' fees

13  and payments with respect to the 2008 Swap increased profits for Lehman Brothers and allowed it

14  to stave off bankruptcy longer than otherwise possible, thereby allowing the Individual Lehman

15  Defendants to increase and extend their compensation.

16      275.    As a proximate result of the Individual Lehman Defendants' negligent

17  misrepresentations, Plaintiffs have suffered and will continue to suffer general and special damages

18  in the form of, among other things, fees and payments for the 2008 Swap and lost benefits under the

19  2008 Swap, the exact amount of which will be proven at trial.

20      WHEREFORE, Plaintiffs pray for judgment against Cain Brothers, ACA, and the Individual

21  Lehman Defendants as follows:

22  On the First Cause of Action:

23      1.    For compensatory damages, according to proof, but in excess of $20,000,000.

24  On the Second Cause of Action:

25      1.    For compensatory damages, according to proof, but in excess of $20,000,000.

26  On the Third Cause of Action:

27      1.    For compensatory damages, according to proof, but in excess of $20,000,000.

28      2.    For exemplary and punitive damages, according to proof.

84

SIXTH AMENDED COMPLAINT

On the Fourth Cause of Action:

    1.    For compensatory damages, according to proof, but in excess of $20,000,000.

    2.    For exemplary and punitive damages, according to proof.

On the Fifth Cause of Action:

    1.    For compensatory damages, according to proof, but in excess of $20,000,000.

    2.    For exemplary and punitive damages, according to proof.

On the Sixth Cause of Action:

    1.    For compensatory damages, according to proof, but in excess of $20,000,000.

On the Seventh Cause of Action:

    1.    For such amount as ACA has been unjustly enriched as a result of its tortious conduct toward the RHF Group.

On the Eighth Cause of Action:

    1.    For compensatory damages, according to proof, but in excess of $10,000,000.

    2.    For exemplary and punitive damages, according to proof.

On the Ninth Cause of Action:

    1.    For compensatory damages, according to proof, but in excess of $10,000,000.

On the Tenth Cause of Action:

    1.    For compensatory damages, according to proof, but in excess of $10,000,000.

    2.    For exemplary and punitive damages, according to proof.

On the Eleventh Cause of Action:

    1.    For compensatory damages, according to proof, but in excess of $20,000,000.

    2.    For exemplary and punitive damages, according to proof.

On the Twelfth Cause of Action:

    1.    For compensatory damages, according to proof, but in excess of $20,000,000.

On All Causes of Action:

    1.    That Plaintiffs be awarded their costs;

    2.    That Plaintiffs be awarded reasonable attorney's fees pursuant to contract and/or law;

    3.    That Plaintiffs be awarded pre-judgment and post-judgment interest as permitted by

1    law; and

2         4.       For such other relief as this Court deems just and proper.

3

4    DATED: August 7, 2013                    REUBEN RAUCHER & BLUM

5                                             By: _____
6                                                 Timothy D. Reuben
                                             Attorneys for Plaintiffs
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SIXTH AMENDED COMPLAINT

1

## **DEMAND FOR JURY TRIAL**

2          The Plaintiffs demand a trial by jury of all issues and claims in this action triable before a

3    jury.

4

5    DATED: August 7, 2013                          REUBEN RAUCHER & BLUM

6                                                   By: _____

7                                                        Timothy D. Reuben
                                                        Attorney for Plaintiffs
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SIXTH AMENDED COMPLAINT