# Exhibit

# 13

<u>**Retirement Housing Foundation, et al. v. ACA Finanacial Guaranty Corp, et al..**</u>
BC404726
Wednesday, May 1, 2013
1:30 p.m.

## Defendant Cain Bros. & Co., LLC's Motion for Summary Judgment or, in the Alternative, Summary Adjudication

**Tentative Ruling: <u>DENY.</u>**

---

## I. Introduction

This case is before the Court on a motion for summary judgment, or in the alternative summary adjudication, brought by Defendant Cain Bros. & Co. ("Cain") to each of the four causes of action asserted by Plaintiff Retirement Housing Foundation ("RHF").[1]  The operative Fifth Amended Complaint ("5AC") alleges causes of action against Cain for:

- Negligence (First Cause of Action)
- Negligent Misrepresentation (Second Cause of Action)
- Breach of Fiduciary Duty (Third Cause of Action)
- Constructive Fraud (Fourth Cause of Action)

As it must on this motion for summary judgment/adjudication, the Court construes the evidence and all of the reasonable inferences drawn therefrom in the light most favorable RHF. (*Intrieri v. Superior Court* (2004) 117 Cal.App.4th 72, 81.)  All evidentiary doubts or ambiguities are resolved in favor of RHF.  (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768.) Bearing those principles in mind, and in light of the Court's rulings on the parties evidentiary objections (discussed below)[2], the facts before the court are as follows.

### A.  The 1998 Refinancing

RHF is a tax-exempt non-profit organization that owns numerous low-income and elderly housing facilities.  (AMF 1.)  In 1998, RHF sought to refinance a large portion of its debt, and it solicited various investment banking firms to structure a financing plan among a number

---

[1] The action is technically brought by RHF and a number of other Plaintiffs, all of which are subsidiaries of RHF. Plaintiffs are collectively represented by the same counsel and assert identical interests (at least against Cain). The Court refers to the collective Plaintiffs by reference to the parent company, RHF.

[2] The Court considered all of the relevant evidentiary objections prior to compiling the summary of facts.  The facts are recited first solely to enhance the reader's understanding of the issues involved in this case.

of RHF's subsidiary properties[3] that would issue roughly $140M in taxable and tax-exempt bonds. (AMF 1.) Along with Banc One and Ziegler Securities ("Ziegler", RHF's financial advisor at the time), Cain submitted an "Investment Banking Proposal" in response to RHF's solicitation for bids. (AMF 4; Pltf. SBE, Exh. 3.) RHF selected the Cain/Ziegler/Banc One proposal (AMF 7; Pltf. SBE, Exh. 4) Pursuant to that proposal, RHF ultimately offered approximately $130M in Select Auction Variable Rate Securities ("SAVRS") with Cain as the underwriter.[4] (Decl. of Smith, Exh. A.) The SAVRS were bonds that would be issued at a variable interest rate, which would be set every 35 days at an auction.  (UMF 5.)  SAVRS were a product that was offered and marketed by Lehman Brothers.  (UMF 1; AMF 8.)

In order to keep the variable interest rate lower, RHF obtained bond insurance from Defendant ACA Financial Guaranty Corporation ("ACA"). (UMF 7.) Cain had recommended that RHF obtain bond insurance from ACA as an alternative to RHF obtaining its own "A" credit rating. (Pltf. SBE, Exh. 49.) RHF considered the option of obtaining its own "A" credit rating, but determined that the capital reserve requirements necessary to maintain that rating would be too onerous. (Pltf. SBE, Exh. 4, pp. 1-2.)  With the bonds insured by ACA, RHF would be able to take advantage of lower interest rates because the bonds would seem less risky to investors if the mature value of the bond was insured by an "A"-rated insurer.  By purchasing bond insurance from ACA rather than self-insuring the bonds, RHF was able to avoid the stringent capital reserve requirements imposed by ratings agencies for an "A" credit rating.  Before RHF entered into the agreement, RHF's former (but at the time, current) Chief Financial Officer Stephen Margetic, RHF's consultant Margaret Rice, and Cain Bros. managing director Scott Smith represented to the RHF board of directors that they had done "a lot of checking" into what would happen if ACA's credit rating was compromised. (Decl. of Garbaccio, Exh. 4, p. 4.)

To further insulate themselves from the risks associated with a variable interest rate bond offering, Cain also recommended that RHF engage in an "interest rate swap" with Lehman. (Decl. of Margetic, ¶ 15; Pltf. SBE, Exh. 5, pp. 11-12.) RHF subsequently entered into a "Master Agreement" with Lehman Brothers, which provided for an "interest rate swap" (the "Swap Agreement"). (Pltf. SBE, Exh. 11.) Pursuant to the terms of the Swap Agreement, RHF agreed to pay a fixed interest rate to Lehman Bros. on approximately 87% of the bonds over the course of the 30-year life of the bonds. (*Id*; UMF 11.) Lehman Bros., in turn would pay interest at the variable rate, which was reset every 35 days. (Pltf. SBE, Exh. 11.) On tax-exempt bonds the rate was fixed at 5.19% while the fixed rate for taxable bonds was 5.89%.[5]  (*Id.*) Though the Swap Agreement could mean that RHF's fixed rate to Lehman was actually higher than the

---

[3] The collection of RHF and affiliated subsidiaries involved in this transaction is sometimes collectively referred to in the pleadings and exhibits as the "Obligated Group" (See Decl. of Margetic, ¶ 3.) -- that is, the group of RHF-affiliated organizations that collectively incurred the debt obligations issued under the refinancing program.

[4] In its capacity as the underwriter, Cain purchased the SAVRS for the purpose of publicly offering the bonds.  RHF, however, indemnified Cain, and was financially responsible for making the interest payments to bond-holders. (Decl. of Smith, Exh. A, pp. 97-98; 5AC, Exh. D.)

[5] It appears that the taxable bonds were eventually converted into tax-exempt bonds, bringing the fixed rate down to 5.19% for all of the bonds.

variable rate, RHF's board of directors understood the Swap Agreement to serve as a "hedge or form of insurance policy" against variable rate volatility over the life of the bonds. (Decl. of Garbaccio, Exh. 4, p. 2.)

Under the terms of the Swap Agreement, however, the fixed interest rates could enter an "Alternative Floating Rate Option" costing RHF significantly more in interest if the long term rating of the SAVRS fell below an "A-" rating by *both* Standard & Poor's ("S&P") and Fitch.[6] (*Id.*) Because the SAVRS were insured by ACA, this effectively meant that the contract would enter the "Alternative Floating Rate Option" if ACA's credit rating dropped below an "A-" with both S&P and Fitch. (See, e.g. Decl. of Smith, Exh. A, p. 90 [disclosing that the rating agencies' assessment of the bonds was dependent on rating associated with the bond insurer].) In the event that RHF sought to terminate the Swap Agreement, the value of the agreement (and the termination payout to Lehman Bros.) was to be valued according to the Alternative Floating Rate rather than the variable rate. (*Id.*)

In discussions between Cain and RHF prior to the refinancing, Cain and RHF discussed the possible consequences of an ACA downgrade. (Pltf. SBE, Exh. 5, p. 12; Decl. of Garbaccio, Exh. 4, p. 4.) At a November 1998 meeting of RHF's board of directors, RHF's attorneys from the law firm of Latham & Watkins "explained what happens if [ACA] gets downgraded." (Decl. of Garbaccio, Exh. 4, p. 4.) The directors expressly discussed the possibility that, in the event of an ACA downgrade, RHF might "have to buy [its] way out of the swap." (*Id.*) In the "Official Statement" prepared by Cain and signed by RHF as an official disclosure for the 1998 SAVRS offering, RHF disclosed that ACA's credit rating could eventually be "downgraded or withdrawn entirely" potentially causing "an adverse effect on the market price of the 1998 SAVRS." (Decl. of Smith, Exh. A, p. 90.) And in RHF's 1999 Consolidated Financial Statements, RHF acknowledged that "[u]nder certain circumstances, one or more of the swap agreements may be subject to termination prior to maturity of the SAVRS, in which event the members of the Obligated Group may be obligated to make a substantial payment to" Lehman. (Decl. of Garbaccio, Exh. 7, p. 31.)

RHF's 1999 Consolidated Financial Statements also noted that "the cost of the fixed rate swaps could increase significantly because of the imposition of a higher fixed rate following [certain events] or because of the modification of the variable rate formula payable by" Lehman. (*Id.*) At the time RHF entered into the Swap Agreement, its CFO Stetphen Margetic understood that there was "a risk of a downgrade" which would cause the "floating interest rate on the swap [to] reset." (Decl. of Garbaccio, Exh. 3, pp. 306-307.) Mr. Margetic further understood that RHF "could lose money if the swap had terminated early." (*Id.* at 329.) With that knowledge, Mr. Margetic recommended that RHF enter into the refinancing arrangement.

---

[6] Under the "Alternative Floating Rate Option," Lehman's obligations to RHF under the Swap Agreement would no longer be determined by the variable rate set at auction, but rather by a different formula based on broader market indices, and likely much lower than the actual variable rate. RHF, however, would still be obligated to the bond-holders for the difference between what Lehman paid under the Alternative Floating Rate and what the bond-holders were due under the variable rate. RHF would also still be obligated under the Swap Agreement to pay Lehman the fixed rate.

(*Id.* at 313; UMF 24.)  RHF took the advice of Cain and Mr. Margetic and effectuated the agreements with Cain, ACA, and Lehman.

### B. The 2001 Credit Rating "Episode"

From execution of the financial restructuring agreements in late 1998 through early 2001, the SAVRS auctions and swaps appear to have operated as RHF expected. (Decl. of Margetic, ¶ 19.) But at a January 4, 2001, board meeting RHF's CEO Laverne Joseph informed the board of directors that "Standard & Poor's [had] placed the ratings of ACA Financial Guaranty Corp. on credit watch with negative implications because the bond insurer [had] failed to raise additional capital ... If they [got] downgraded, the interest rate on the short term paper may be raised, which would increase RHF's costs."

On January 17, 2001, Joseph and RHF's CFO at the time, Michael Dickenson, issued a memo to the RHF board of directors titled "Update on Obligated Group Financing in Light of Recent Developments with ACA." (Decl. of Garbaccio, Exh. 6, p. 1.)  In that memo, Mr. Joseph and Mr. Dickenson informed the board that ACA's credit rating with S&P would be downgraded if ACA was not able to increase its capital reserves by the end of January 2001. (*Id.*)  They further reported that even the threat of a credit downgrade had "effectively eliminated our primary investor group ... ." (*Id.*)  Lehman Bros. had attempted to find alternative "investors able to tolerate a higher level of credit risk," but their "efforts were unsuccessful and the auction conducted [January 16, 2001] failed."  As a result of the failed auction, Joseph and Dickenson reported that interest rates on the unswapped SAVRS had spiked to 14.7% while the "swap agreements effectively fixed the interest rate" on the swapped SAVRS. (*Id.*)

On January 18, 2001, RHF issued a press release with language provided by Cain stating that "[i]n the event that ACA Financial Guaranty Corporation (ACA) is downgraded by Standard & Poor's, [RHF] plans to pursue a refinancing of its Series 1998 [SAVRS] ... RHF's ultimate course of action in the event of an ACA downgrade cannot be determined at this time." (Decl. of Garbaccio, Exh. 11; Decl. of Smith, Exh. C; UMF 29, 30.)  In response to RHF's concerns regarding ACA's credit rating, Cain forwarded several news articles to RHF stating that ACA had received a roughly $45M capital infusion to maintain its credit rating. (Decl. of Garbaccio, Exh. 9, Exh. 20.)  At least one of those articles forwarded to RHF also indicated that ACA intended to shift its investment focus from insuring municipal bond offerings to "insuring asset-backed securities, mortgage-backed securities and collateralized debt obligation businesses" because those markets appeared to have "greater potential for ACA ... ." (*Id.*)

As a result of the increased interest rates on the unswapped SAVRS, RHF paid nearly $150,000 more in interest in February 2001 than it had paid in December 2000, and nearly $130,000 more in March 2001 than December 2000. (UMF 39, 41.)  Though ACA was not downgraded in 2001 and the alternative floating rate was not triggered on the swap contract, the credit scare caused RHF's CEO to obtain a "better understanding" of the alternative floating rate option, and he began to be concerned that the 1998 refinancing "wasn't working the way ... [he] thought it was supposed to." (Decl. of Garbaccio, Exh. 5, pp. 146, 187.)

4

Because the interest rates increased significantly on the swapped portion of the SAVRS as well as the unswapped portion, Lehman approached RHF in March 2001 about possibly refinancing the SAVRS offering because Lehman was losing nearly $1M per month at the time on the swap contract. (Decl. of Dickerson, ¶ 8.) Lehman was effectively losing the difference between the higher variable-rate payments Lehman paid to bond-holders and the lower fixed-rate payments RHF paid to Lehman. (AMF 37.) For RHF, this was termed being "in the money" under the contract, and RHF was "in the money" by as much as $14.2M. (Decl. of Garbaccio, Exh. 25, p. 6; AMF 37.) Lehman noted in its proposal that in the event of an ACA downgrade, "[t]he auctions will likely fail, resulting in them going to their fail rates and the swap paying alternate floating rates. Such an event would cost the Foundation $122 million". (Pltf. SBE, Exh. 111.) RHF declined Lehman's proposal to refinance in a letter from Mr. Dickenson because it would have required significant transaction costs and would have left approximately 25% of the SAVRS insured by ACA under the original framework. RHF was concerned that it did not have a "clear[] handle on the ultimate disposition of the 25%" of the SAVRS that would remain insured with ACA under Lehman's proposal. (Pltf. SBE, Exh. 132.)

Ultimately, RHF concluded that it had "the luxury of time" to consider various refinancing options because interest rates seemed to have stabilized on the SAVRS in light of the "very positive S&P feedback on ACA's recent management and business plan changes."[7] (Id.) Mr. Dickenson concluded that "ACA's long-term future as an "A" rated insurer remains a question mark, but I am now convinced that a down-grade scenario is not in the near term (24 to 36-month) future, barring a melt-down in the performance of their insured portfolio." (Id.) Mr. Dickenson noted that RHF would "of course, continue to monitor ACA closely and prepare for another rating 'episode.'" (Id.)

### C. The 2004 Credit Rating Episode

By the summer of 2001, interest rates on the SAVRS fell below the fixed rate, ultimately falling as low as 2% in April of 2003. (AMF 44-46.) Over time, Lehman recouped the money it had previously lost under the contract, and RHF's position went from "in the money" under the contract to "out of the money" – that is, over the lifetime of the contract to that point, RHF had paid more to Lehman than Lehman had paid to bond-holders. (AMF 48.) In 2003, RHF reported an unrealized loss of 16.5 million under the swap contract. (Decl. of Garbaccio, Exh. 6.) That disclosure noted, however, that "[t]he change in swap values is not a surprise and does not have an impact on financial results from operations."[8] (Id.) The amount that RHF was "out of

---

[7] The "business plan changes" noted by RHF's then CFO appear to be a reference to news reports discussed above noting ACA's shift away from insuring municipal bonds to insuring mortgage-backed securities and collateralized debt obligations.

[8] Indeed, the long-term expectation of all parties appears to have been that RHF would "out of the money" over the anticipated 30-year life of the swap contract. As noted, the swap agreement was designed to function as a hedge or an "insurance policy" for which RHF was willing to pay a long-term premium in order to avoid short-term volatility.

the money" represented the amount of money that RHF would have to pay if it terminated the swap agreement. (UMF 62; AMF 49.)

In 2004, however, Mr. Dickenson's 2001 prediction that any downgrade scenario for ACA was at least 24 to 36 months away proved eerily accurate. In February 2004, RHF's treasurer Brian Magnone reported to then-CFO John von Rusten that the ratings agency Fitch was concerned about ACA's investment in collateralized debt obligations (also known as "derivatives"). (Decl. of Garbaccio, Exh. 31, p. 557.) Magnone noted in a contemporaneous email that Fitch's concerns were largely grounded in the "greater earnings volatility" associated with ACA's derivative insurance because ACA was relying on a "higher risk insured portfolio … ." (Pltf. SBE, Exh. T.) On March 10, 2004, Magnone reported those concerns to RHF's board of directors. (Decl. of Garbaccio, Exh. 32, p.2.) Magnone noted that "ACA's future credit rating could be downgraded" and reminded the board that the troubles with ACA in 2001 "caused a negative financial impact on RHF and the Obligated Group."[9] (Id., pp. 2-4.)

Mr. Magnone responded to Fitch's concerns by reaching out to Mary Munoz, an investment banker at Ziegler, to discuss "options to augment ACA bond insurance." (Decl. of Garbaccio, Exh. 35, p. 1.) Mr. Magnone sought to "discuss [RHF's] options given ACAs [sic] marginal A rating … ." (Id.) Ms. Munoz subsequently contacted another bond insurance company to discuss the possibility of replacement or supplemental bond insurance. (UMF 74.) On April 6, 2004 Magnone reported to then-CFO John von Rusten that Ms. Munoz' investigations revealed RHF could supplement ACA with a "wrap" bond insurer at a cost of approximately $2.5M to $3M. (Decl. of Garbaccio, Exh. 38.)

On May 5, 2004, Fitch officially placed ACA on a negative credit watch. (UMF 77.) The next day Mr. Magnone followed up with Ms. Munoz to schedule a further discussion about obtaining replacement bond insurance. (Decl. of Garbaccio, Exh. 40.) Ms. Munoz advised that RHF should move forward with obtaining wrap insurance because "ACA won't make it." (UMF 78; Decl. of Garbaccio, Exh. 36, p. RHFOG219438.) On May 7, 2004, Magnone contacted another investment banker, David Fields of UBS Bank, to "estimate [the] breakage fee on [the] swaps." (UMF 75.) Magnone noted in an email to Fields that RHF's "bonds have interest rate swaps that are largely out-of-the-money" which led Mr. Magnone to conclude that "[r]efinancing does not seem like a good move … yet." (Decl. of Garbaccio, Exh. 41.) Magnone indicated that he would prefer to wait until the variable bond rates "escalate up," which would have mitigated the extent to which RHF was "out-of-the-money" and reduced the cost of terminating the swap contract. (Id.) In response, Mr. Fields offered a refinancing proposal from UBS and noted that, under the swap agreement "[i]f ACA gets downgraded your swaps

---

[9] RHF disputes the accuracy of Mr. Magnone's statement. RHF asserts that it did not suffer any appreciable harm from the 2001 credit "episode" (which Mr. Magnone incorrectly described as a downgrade). But irrespective of whether RHF suffered any harm in 2001 from the *swapped* SAVRS, RHF concedes that it was forced to pay several hundred thousand dollars in additional interest payments on the *unswapped* SAVRS in 2001. The relationship between Cain, Lehman, and RHF under the swap agreement notwithstanding, ACA's downgrade clearly caused a "negative financial impact" on RHF in 2001. As discussed in section III below, however, whether that "negative financial impact" constituted an actual harm in the context of the entire agreement is a question for the jury.

convert from rate-based swap to an index-based swap exposing RHF to the inefficiencies of SAVR's [sic] at that time (expect 13% again)." (*Id.*)

During the course of RHF's investigation into alternative financing strategies with Ziegler and UBS, RHF's CFO advised Mr. Magnone to "stay away from Cain Bros." (UMF 94.) RHF had learned in early 2004 that Lehman had made an investment in Cain, and RHF perceived Cain to have a conflict of interest in the potential for restructuring. (UMF 92, 93.) RHF was concerned that "Lehman and affiliate Cain Brothers would have a strong incentive to influence ACAs [sic] downgrade and insolvency." (Decl. of Garbaccio, Exh. 42.)

On May 11, 2004, Fitch downgraded ACA's credit rating to BBB. (UMF 81.) In light of the Fitch downgrade, ACA discontinued Fitch as a rating agency. (Decl. of Garbaccio, Exh. 54, p. 36.) The SAVRS auctions again failed for every 35-day auction period from May through November 2004, forcing higher interest rates on the SAVRS. (*Id.*) Because only one of the two rating agencies had downgraded ACA, however, Lehman paid the increased variable rate for the swapped SAVRS, and RHF paid the increased rates on the unswapped SAVRS. (AMF 50.)

On May 12, 2004, David Fields again contacted Mr. Magnone, noting that ACA was also on a "[n]egative" watch from S&P and that the "ratings action will likely cause your bond-rate swaps to convert to index-based swaps which will expose RHF to SAVR pricing volatility." (Decl. of Garbaccio, Exh. 41.) Striking a similar tone in an email to Mr. Magnone, a managing director at Lehman, Jamie Lister described the security of ACA's rating with S&P as "questionable." (Decl. of Garbaccio, Exh. 44.) Mr. Lister further cautioned that "[i]f ACA does not make progress in securing financing, S&P certainly may downgrade ACA to the BBB category which, as you know, would trigger an Alternative Rate event on the actual rate swaps. In this scenario, Lehman would no longer pay the actual rate on the SAVRS, but would pay the alternative rate" based on a broader market index. (*Id.*)

After the Fitch downgrade, Mr. Magnone requested and received permission to contact Cain regarding the swap contract. (UMF 101.) Although Magnone remained "cautious with Cain Brothers" in light of RHF's conflict of interest concerns, Magnone contacted Scott Smith of Cain in June 2004. Magnone inquired about circumstances that might terminate the swap agreement with Lehman, and whether Smith thought Lehman might be amenable to renegotiating the termination provisions of the swap contract should RHF choose to convert the SAVRS into fixed-rate securities. (Decl. of Smith, Exh. F.) Smith informed Magnone that Lehman had previously "indicated that they [had] little interest in a discounted termination amount" because Lehman was losing money on the swaps (likely due to higher interest rates on the SAVRS) and were "projecting that ACA will be downgraded in the near future." (*Id.*) In a subsequent email, Smith reiterated Lehman's assumption that ACA would be downgraded by S&P, noting that Lehman valued termination of the contract at $15M because it calculated the termination rate on the assumption that the alternative floating rate would take effect. (Decl. of Smith, Exh. G.)

RHF continued to consider its options for refinancing the SAVRS into September 2004, and was informed by Lehman that the termination cost of the swap agreement had risen to $16M. (UMF 113-114.) Magnone reached out to Ziegler to perform an independent assessment of Lehman's termination valuation, and Ziegler confirmed that "Lehmans [sic] numbers are reasonable ... ." (Decl. of Garbaccio, Exh. 48.) However, in September 2004, after ACA received another infusion of capital, S&P reaffirmed its "A" rating for ACA. (Decl. of Garbaccio, Exh. 54, p. 36.) The SAVRS auctions were again successful in December 2004. (*Id.*) Shortly thereafter, Joan Annette of Cain noted that the swap agreement has "saved" RHF because, despite the interest volatility associated with ACA's credit issues, RHF was still paying less in debt service that it would have been without the 1998 refinancing agreement. (Pltf. SBE, Exh. 41.)

Because only Fitch, and not S&P, downgraded ACA's credit rating, the swap agreement never entered the alternative floating rate option during the course of the 2004 credit scare.

### D. Lehman Proposes Another Refinancing Plan

Motivated by a concern that ACA could face another credit scare that would drive interest rates up and cost Lehman money under the terms of the swap agreement,[10] Lehman approached RHF in June 2005 about the possibility of converting the SAVRS to fixed-rate bonds. (Decl. of Garbaccio, Exh. 50.) Under Lehman's proposal, the SAVRS would be converted into fixed-rate securities with a slightly higher fixed rate than RHF was then paying to Lehman, costing an estimated additional $360,270 per year until 2029 (approximately $3.6M in total). (*Id.*) Lehman also offered to pay for a portion of the transaction costs associated with converting the SAVRS to fixed-rate bonds. (*Id.*) In a memo to RHF's CEO and CFO Mr. Magnone noted "[t]he primary benefit to RHF is that converting to a fixed rated would insulate RHF from any risk of ACA downgrades or an ACA bankruptcy." (*Id.*) Magnone conceded in the memo that It was "difficult to assess the possible loss exposure from [ACA's] CDO or derivatives business transactions," but noted that he had recently been reassured by new management at ACA that the insurer was "sensitive to issues that could trigger a downgrade based on their two previous credit rating incidents." (*Id.*) Magnone relied on direct communications with ACA to come to this conclusion. (Decl. of Magnone, ¶ 36.) RHF declined Lehman's offer. "[G]iven the costs to RHF [of Lehman's fixed-rate conversion proposal] it was [RHF's] consensus that RHF should stay with the [SAVRS swap] arrangement at this time, and continue to monitor ACA's performance." (*Id.*)

---

[10] If ACA faced another credit scare without an actual downgrade by S&P, interest rates would have surely risen, but Lehman would have still been obligated to pay the variable interest rate. Lehman would have only benefitted from an additional credit scare if ACA was actually downgraded by S&P, in which case Lehman would have merely been obligated to pay the much lower alternative floating rate.

### *E. The 2007 Credit Rating Downgrade and the Alternative Floating Rate Option*

As the subprime credit crisis began to emerge in 2007, interest rates on the SAVRS began to rise. Throughout 2007, the SAVRS were trading at interest rates higher than the fixed swap rate (Pltf. SBE, Exh. 7), costing Lehman money under the swap agreement and reducing the extent to which RHF was "out of the money." By the fall of 2007, interest rates had jumped and Mr. Magnone noted in a November 2007 email that "Lehman is paying [RHF] 7.388% overall and receiving the 5.19% so they are negative 2.198% on $98,000,000 of SAVRS for an annual cost to Lehman of $2,153,925." (Pltf. SBE, Exh. 288, p. 2.) In light of the changing markets, RHF began "preliminary discussions with Ziegler to issue new bonds." (*Id.*) In addition, Lehman contacted RHF "to again propose some method to do a swap to fix [RHF's] rates" on the SAVRS. (*Id.*) RHF also contacted Cain to inquire into the nature of the swap agreement and the authority ACA might have had to veto a refinancing or a termination of the swap agreement. (Pltf. SBE, Exh. 347-349.)

Magnone was in direct contact with ACA during this time period and asked for "any updates regarding ACA as they become available." (Pltf. SBE, Exh. 288, p. 3.) Magnone noted that "if ACA slips, then [RHF] would protect ourselves ASAP." (*Id.*) Magnone was concerned about an ACA "slip" in credit rating because the swap agreement included a "downgrade trigger" (the alternative floating rate). (*Id.*, p. 1.) That rate would result in "a huge disconnect in the hedge between [RHF's] costs at the SAVRS auctions (at up to 16% tax-exempt and 18% taxable) and the swap variable rate payments from Lehman." (*Id.*, p. 1.) By Mr. Magnone's November 2007 calculations, an ACA downgrade and invocation of the alternative floating rate option would result in RHF "paying [a] 5.19% fixed swap rate [to Lehman] plus the difference of (previously hedged variable rates) 16% auction rate - 3.81% [Lehman's alternative floating rate] for 17.38% (5.19% + 16% - 3.81% = 17.38%)." (*Id.*)

Roughly a month later on December 19, 2007, S&P downgraded ACA's credit rating from "A" to "CCC" (also known as a "junk" rating). (Pltf. SBE, Exh. 289.) That same day, Scott Smith of Cain suggested that RHF "may want to accelerate our discussion about a bank wrap." By January 2008, Mr. Magnone's calculations from two months earlier proved accurate, with variable interest rates jumping to 16.79% on the swapped SAVRS plus an effective payment of 1.291% to Lehman (the 5.19% fixed rate to Lehman minus Lehman's alternative floating rate). (Pltf. SBE, Exh. S.) RHF's interest costs on the SAVRS exploded and RHF eventually refinanced its swap agreement with Lehman at a substantial cost.[11] (AMF 66.)

RHF brought suit, filing the initial complaint on December 30, 2008. On February 20, 2009, RHF filed a First Amended Complaint alleging Cain as a defendant for the first time.

---

[11] Neither RHF nor Cain submits any evidence as to the terms or cost of the 2008 refinancing with Lehman. The 5AC alleges that Lehman determined RHF to be roughly $13M "out of the money" at the time of the refinancing, but it goes on to allege that Lehman agreed to a higher fixed rate from RHF in order to prevent RHF from immediately paying the $13M termination cost. (See 5AC, ¶¶ 105-108.) It is unclear from the allegations and the evidence what the new fixed rate was under the refinancing, what RHF's increased monthly costs were, and whether RHF was ever required to pay the $13M termination fee.

## II. Evidentiary Objections

Both Cain and RHF submit voluminous documentary evidence, and each offers numerous objections.

### A. RHF's Objections to Cain Bros. Evidence

RHF raises 10 evidentiary objections to the Declaration of Justin Garbaccio, submitted by Cain in support of the motion.

### 1. RHF Objection No. 1 (Decl. of Garbaccio, Exh. 7)

RHF first objects to Exhibit 7 attached to the Garbaccio Declaration on the ground that the exhibit is not supported by personal knowledge and has not been properly authenticated. Exhibit 7 purports to be "a true and correct copy of Retirement Housing Foundation-Obligated Group's Combined Financial Statements for the year ending March 31, 1999." (Decl. of Garbaccio, ¶ 9.) RHF objects that Cain does not offer "evidence showing any representative of RHF or any other Plaintiff identifying or verifying the exhibit." (Obj. to Decl. of Garbaccio, p. 1.) In reply, Cain submits deposition testimony offered by RHF's former Chief Financial Officer Stephen Margetic in which Mr. Margetic was handed the document and identified the document as one RHF prepared. (Decl. of Joseph A. Matteo, Exh. A, pp. 23-24.) RHF further objects to admission of the Margetic deposition testimony on the ground that the Margetic deposition must have been submitted with the original moving papers, and its submission in reply would deny RHF due process. RHF does not dispute that the deposition testimony authenticates Exhibit 7 and establishes a foundation for knowledge.

RHF's objection to the Margetic deposition might be well taken if it were submitted as additional evidence to bolster Cain's substantive arguments in the motion for summary judgment. But the Margetic deposition testimony is offered in response to RHF's evidentiary objection, not as additional substantive evidence.[12]   And in any event, RHF has had an opportunity to respond to Cain's use of the Margetic deposition testimony in its "Objections to the Declaration of Joseph A. Matteo," which the Court declines to construe as an unauthorized surreply.   In light of the Margetic deposition testimony, RHF's objection to Exhibit 7 of the Garbaccio Declaration is OVERRULED.

### 2. RHF Objection No. 2 (Decl. of Garbaccio, Exh. 8)

RHF next objects to Exhibit 8 to the Garbaccio declaration, which is an article from Investment Dealer's Digest dated February 26, 2001 discussing ACA's 2001 credit scare.   RHF objects that the article is hearsay.   Cain responds by contending that the article is not offered

---

[12] The Matteo declaration and its attachments, including a separate portion of the Margetic deposition testimony, is also offered to support Cain's objections to RHF's evidence. The Court addresses this use of the Matteo declaration and attached exhibits below.

for the truth of the matters asserted, but to demonstrate RHF's state of mind - presumably that RHF knew of ACA's mortgage-backed securities investment strategy.  However, nothing in the article or Garbaccio declaration indicates that anyone at RHF ever read the article, and Cain offers nothing to suggest how RHF's "state of mind" could have been affected by an article it was never exposed to.  Cain's suggestion that RHF *should have read* the article because it was "obligated to monitor ACA" does not save the evidence because such speculation does not speak to RHF's actual state of mind.  Additionally, Cain's response that the document is not subject to a hearsay objection because it "relates directly to the operative facts of RHF's claims against Cain" confuses relevance with admissibility.  The Court does not doubt the document's relevance, but the hearsay rule regularly precludes the admission of relevant evidence.  The hearsay objection is SUSTAINED.

### 3.  RHF Objection No. 3 (Decl. of Garbaccio, Exh. 9)

RHF's third objection is essentially identical to the second objection.  The third objection similarly contends that Exhibit 9 to the Garbaccio declaration is unauthorized hearsay not subject to any exception.  Exhibit 9 is a copy of a fax sent from Cain to RHF and RHF's attorneys at Latham & Watkins on February 28, 2001.  The fax included a news article similar in substance to the article in Exhibit 8, detailing ACA's credit rating troubles, a recent infusion of capital, and ACA's plan to refocus its investment strategy in mortgage-backed securities and collateralized debt obligations.  As Cain correctly points out (Resp. to Obj. to Decl. of Garbaccio, p. 1), RHF has also submitted this document as Exhibit 121 of RHF's "Separately Bound Exhibits in Opposition" and authenticated the document in the declaration of Michael Dickerson.  (Decl. of Michael Dickerson, ¶ 6.)  RHF effectively admits the admissibility of Exhibit 9 by seeking to admit the same document itself.  The objection is therefore OVERRULED.

### 4.  RHF Objection No.  4 (Decl. of Garbaccio, Exh. 10)

Exhibit 10 to the Garbaccio declaration is the subject of RHF's next objection.  Exhibit 10 is a news article dated January 29, 2001 discussing the possibility that S&P or Fitch might downgrade ACA's credit rating.  RHF objects that the document is hearsay, and Cain again contends that the article is not offered for the truth of the matters asserted.  Like Exhibit 8, however, there is no indication that RHF ever saw the article and the hearsay objection is SUSTAINED.

### 5.  RHF Objection No. 5 (Decl. of Garbaccio, Exh. 20)

RHF's objection to Exhibit 20 on hearsay grounds is waived.  Like Exhibit 9 to the Garbaccio declaration, Exhibit 20 is also offered for admission by RHF as exhibit 114 to RHF's separately bound exhibits.  The document is authenticated in paragraph 6 of the Dickerson declaration.  RHF's objection to Exhibit 20 is OVERRULED.

### 6.  RHF Objection No. 6 (Decl. of Garbaccio, Exh. 21)

RHF objects to Exhibit 21 to the Garbaccio declaration on the ground that it constitutes inadmissible hearsay.  The document at issue appears to be an email from Cain to various individuals at RHF dated March 23, 2001.  In the email Joan Annett from Cain pasted a news article regarding ACA's credit rating and capitalization.  Cain contends that the email is excepted from the hearsay rule because it constitutes a business record.  Assuming *arguendo* that an email from Cain to RHF constitutes a business record, the entire body of the email appears to be a news article produced from an unidentified outside source.  The document, however, does not appear to be offered to prove the truth of the matters asserted in emailed news article, but rather to show RHF's knowledge of the events discussed in the article.  The objection is OVERRULED, but with the caveat that the email is not considered for the truth of the matters asserted in the email.

### 7.  RHF Objection No. 7 (Decl. of Garbaccio, Exh. 26)

Exhibit 26 to the Garbaccio declaration is a compilation of "Retirement Housing Foundation and Subsidiaries Consolidated Financial Statements with Independent Auditors' Report Thereon for the years ending November 30, 2005, 2004 and 2003." (Decl. of Garbaccio, ¶ 28.) RHF objects for a lack of personal knowledge and a lack of authentication. However, as Cain correctly notes, RHF has admitted the source and authenticity of the documents in a binding admission.  (See Decl. of Garbaccio, Exh. 55, p. 9 (RFA 13).)  The objection is OVERRULED.

### 8.  RHF Objection No. 8 (Decl of Garbaccio, Exh. 27)

RHF's eighth objection is to a 2004 article from BusinessWire.com dated February 19, 2004 relating to ACA's credit rating.  RHF objects that the article is hearsay to which Cain responds with the same arguments offered in response to objection no. 2 (relating to Exh. 8) and objection no. 4 (relating to Exh. 10).  Again, nothing in the article or the declaration of Mr. Garbaccio indicates that anyone at RHF ever saw the article, and the objection is SUSTAINED for the reasons discussed in those two earlier objections.

### 9.  RHF Objection No. 9 (Decl. of Garbaccio, Exh. 45)

RHF also objects to admission of a portion of the deposition transcript of Scott Smith, Managing Director at Cain.  RHF asserts that the testimony is inadmissible hearsay and that it is not rendered admissible by Code of Civil Procedure section 2025.620(b) because that section only permits introduction of deposition testimony given by an adverse party or its agent.  Mr. Smith is the agent of Cain and not adverse to Cain in this litigation.  Cain responds that the testimony was taken under oath at a deposition and subject to examination by RHF and that it is rendered admissible by Code of Civil Procedure section 2025.620(a).  That section allows for introduction of deposition testimony against anyone present or on notice of the prior deposition, irrespective of whether the deponent was adverse to the party offering the

testimony. However, that section is limited to evidence "impeaching the testimony of the deponent as a witness, or for any other purpose permitted by the Evidence Code." Cain does not offer any provision of the Evidence Code for which Mr. Smith's deposition testimony would be permissible. (Compare, e.g. Evid. Code § 1290, et seq. [providing for admission of deposition testimony taken *"in another action"* in certain circumstances].) Cain's reliance on section 2025.620(a) is unavailing and the objection is SUSTAINED.

### 10. RHF Objection No. 10 (Decl. of Garbaccio, Exh. 54)

RHF's final objection is to Exhibit 54 to the Garbaccio declaration on the basis of authenticity and personal knowledge. That Exhibit consists of another set of RHF's "Consolidated Financial Statements," this time "for the years ending November 30, 2004, 2003, and 2002." (Decl. of Garbaccio, ¶ 56.) As with RHF's objection no. 7 (relating to Exh. 26) RHF has admitted the genuine nature of the document in a binding admission. (Decl. of Garbaccio, Exh. 55, p. 8 (RFA 11).) The objection is OVERRULED.

### B. *Cain Bros.' Objections to RHF's Evidence*

Cain objects to portions of each of the five declarations submitted in support of RHF's opposition to the motion. In objecting to each of those five declarations, Cain repeatedly finds fault with various descriptions of RHF's exhibits on the ground that they constitute improper secondary evidence. (See Evid. Code §§ 1520, 1521.) That rule, however is generally concerned with secondary evidence of a document that is not otherwise produced. Indeed, secondary evidence need only be excluded where a genuine dispute exists over the content of an absent original or admission would be unfair. (Evid. Cod § 1521.) The Court does not find it unfair under the circumstances for RHF or its declarants to describe documents that the Court is readily able to read for itself. And in any event, such descriptions are not used to *prove* the content of a writing – they are offered to *characterize* a writing already proven by an admissible original or copy. (Compare Evid. Code § 1523 [oral testimony not permitted to *prove* the content of an unavailable original].) The Court, therefore, does not address Cain's numerous secondary evidence objections further.

### 1. Declaration of Michael Dickenson

In total, Cain objects to 12 items in the declaration of Michael Dickenson. Eight of those objections are solely on the ground that Mr. Dickenson's statements are inconsistent with prior deposition testimony that he did not recall the information he now offers in the declaration. Cain provides in reply a copy of the relevant portions of the Dickenson deposition as Exhibit C to the Matteo declaration. As with the discussion of the Margetic deposition transcript in discussion of RHF's first objection, RHF again asserts that Cain improperly failed to include the Dickenson deposition transcript in its initial moving papers. (See, e.g. Pltf. Resp. to Cain Obj., p. 6.) But as before, Cain does not offer the deposition testimony to advance its substantive arguments. In this context, Cain offers the prior deposition testimony for the purpose of

impeaching Mr. Dickenson's statements in the declaration, and the deposition testimony is admissible. (Code Civ. Proc. § 2025.620(a).)

Nonetheless, as RHF correctly notes, the fact that Mr. Dickenson did not recall the information at the time of his August 21, 2012 deposition is not necessarily inconsistent with a later declaration indicating that he now recalls. The impeachment evidence offered in the deposition testimony is not so inconsistent with prior testimony so as to prohibit consideration of the declaration. Indeed, as Cain's own cited authority suggests, the impact of Mr. Dickenson's prior testimony goes to the weight of his declaration, not its admissibility. (*Preach v. Monter Rainbow* (1993) 12 Cal.App.4th 1441, 1451 ["In determining whether any triable issue of material fact exists, the trial court may, in its discretion, give great weight to admissions made in deposition and disregard contradictory and self-serving affidavits of the party"].) Nor does Mr. Dickenson's deposition testimony that he did not recall at the time of the deposition necessarily mean he has no personal knowledge. (Compare Evid. Code § 702 [generally requiring personal knowledge of a subject before testifying to it] with Evid. Code § 771 [permitting witnesses to refresh their personal knowledge by reference to written documents].) Cain's objections 2, 3, 5, 7, 8, 9, 10, and 12 are OVERRULLED.

Cain's remaining objections numbered 1, 6, and 11 are also OVERRULED. Mr. Dickenson's description of Cain's motion as containing "false conclusions" is not an improper opinion. Nor is his description of Cain's relationship to RHF as that of a "financial adviser" contrary to Judge Highberger's June 8, 2011 order. That order merely held that Cain and RHF did not have a separate financial advisory contract. (See Cain Obj. Dickenson Decl. No. 1.) And Cain's objections no. 6 and 11 reflect a dispute over what the evidence will ultimately show, not issues of admissibility.

However, Cain's objection no. 4 to the Dickenson declaration on the ground that it misstates evidence is well taken. Cain objects to paragraph 5 of the Dickenson declaration, in which Mr. Dickenson describes an email attached as RHF's Separately Bound Exhibit ("SBE") 107. Mr. Dickenson describes that email as a "request [for] financial advice from Cain … ." (Decl. of Dickenson, ¶ 5.) Review of Exhibit 107 does not reveal a request for any form of advice, financial or otherwise. Rather, in that email Mr. Dickenson merely asks Cain not to disclose any "RHF-related information" to any "outside sources … ." (RHF SBE 107.) Objection no. 4 is SUSTAINED on the ground that Mr. Dickenson's description of the email as a request for financial advice misstates the evidence.

### 2. Declaration of Stephen Margetic

In objecting to various portions of the Margetic declaration, Cain repeats in objections 15-18, 20, and 21 its contention that prior deposition testimony that Mr. Margetic did not recall certain facts should preclude admission of statements in the declaration recalling those facts. Those objections are OVERRULED for the reasons discussed above. Cain's additional hearsay objections in objections 15-17 are also OVERRULED. The objected-to descriptions of advice

14

given by a financial advisor are not offered to prove the accuracy of that advice, but rather to demonstrate the effect the advice had on RHF.

Objections 26, 27, 30, 31, 33, 34, and 38 also assert that various portions of Mr. Margetic's testimony are controverted by his prior deposition testimony and should not be admitted. The portions of deposition testimony relied upon by Cain for these objections refer to affirmative deposition testimony rather than mere statements that Mr. Margetic did not recall. Nonetheless, to the extent that the cited-to deposition testimony can be characterized as actually inconsistent with Mr. Margetic's declaration, no inconsistency is so grievous as to prohibit admission of the declaration. These objections go to the weight of Mr. Margetic's declaration, not its admissibility, and they are OVERRULED.

Cain's additional hearsay objections in objection nos. 28, 29, 32, 35, and 36 also relate to statements made by Joan Annette, who was a Senior Vice President for Cain at the time, regarding Cain's efforts of due diligence before selection of ACA as a bond insurer and the low-risk nature of the 1998 refinancing. The statements are not offered to prove the truth of Ms. Annette's out-of-court statements. Indeed, RHF's case relies in large part on its contentions that those statements were demonstrably false. In any event, the statements by Ms. Annette regarding a bond transaction she was directly involved in are authorized admissions of a party-opponent, and they are exempt from the hearsay rule. (Evid. Code §§ 1220, 1222.) The objections are OVERRULED.

Objections 20 and 22-25 all assert that Mr. Margetic's characterization of the 1998 refinancing plan as "Cain's proposal" misstates the evidence because the proposal was made jointly by Cain, Ziegler Securities, and Banc One. While the statements admittedly emphasize Cain's role in the proposal, they do not misstate the evidence. The objections are OVERRULED.

Cain's remaining objections assert irrelevance (Cain Obj. Margetic Decl. Nos. 13, 14, 19), improper opinion (Cain Obj. Margetic Decl. No. 40), and the repeated objection that RHF's description of Cain as a financial advisor is inconsistent with Judge Highberger's prior order (Cain Obj. Margetic Decl. No. 37). These objections are OVERRULED.

### 3. Declaration of Brian Magnone

Cain next brings 45 separate evidentiary objections to the declaration of Brian Magnone. But Cain's numerous objections are largely without merit. Cain's repeated arguments, for example, that Mr. Magnone, who is vice president and treasurer of RHF, somehow has no personal knowledge of financial decisions at RHF during his tenure there are unexplained. (See Cain Obj. Magnone Decl. Nos. 45, 46, 51, 56, 57, 60-63, 65, 66, 73, 82, 85, & 86.) Similarly, Cain offers numerous objections on the ground of improper opinion, but the portions of the declaration objected to on this ground are generally either Mr. Magnone's

description of Cain's motion or Mr. Magnone's description of RHF's financial dealings.[13] (See Cain Obj. Magnone Decl. Nos. 41-48, 52, 53, 56-59, & 62-65.) Nor are Cain's hearsay objections to Mr. Magnone's description of conversations he had with individuals at ACA and others about ACA's financial security and the security of the swap agreement persuasive. (Cain Obj. Magnone Decl. Nos. 48, 67-71, 73-77, & 81-83.) Those statements are not offered to prove the truth of those representations. As with Mr. Margetic's declaration, RHF's case rests in large part on the assertion that those representations were *false*. And as previously discussed, Cain's objections on the ground that portions of Mr. Magnone's declaration are impeached by prior testimony (Cain Obj. Magnone Decl. Nos. 78-80, 85) go to the weight of that evidence. Finally, the Court does not find Cain's relevancy objections are supported in the record.

Cain objects to the admission of Exhibit S to RHF's SBEs, which Mr. Magnone describes as a "chart [he] created tracking the interest rates on the swapped and unswapped SAVRS, and the weighted average of the entirety of Plaintiffs' SAVRS, over each auction cycle from January 1999 to July 2008." (Decl. of Magnone, ¶ 11.) Cain objects that Mr. Magnone offers no foundation for the chart and that "Mr. Magnone's failure to include the documents which provide the factual basis for this demonstrative require its exclusion." (Cain Obj. Magnone Decl. No. 59.) RHF responds that the foundation for the chart is set forth in Mr. Magnone's declaration that his description of the interest rates paid on the SAVRS is "[b]ased on [his] personal knowledge and review of Plaintiffs' business records and those produced by BNY Melon, Plaintiffs' auction agent ... ." (Decl. of Magnone, ¶ 11; Pltf. Resp. to Cain Obj., p. 31.) RHF asserts that the BNY Melon documents have been produced to Cain and notes three such documents which Cain submits as Exhibits 16-18 of the Garbaccio declaration.

As RHF correctly notes, courts generally have broad authority to admit demonstrative evidence. (*People v. Kynette* (1940) 15 Cal.2d 731, 755–756 [overruled on other grounds in *People v. Snyder* (1958) 50 Cal.2d 190, 197].) Cain does not dispute the accuracy of the numbers as summarized from the original documents, and it appears that Cain has equal access to the original documents. (Evid. Code § 1521(a).) The foundation of the chart is established in Mr. Magnone's declaration that he compiled the chart from his personal knowledge and reference to the documents produced by the auction agent, BNY Melon.

Accordingly, Cain's objections to the Magnone declaration (Nos. 41-86) are OVERRULED.

### 4. Declaration of David K. A. Mordecai

Cain begins its objections to the Mordecai declaration by offering a general objection that Mr. Mordecai (an expert for RHF) does not set forth the materials he relied upon or his assumptions. The objection that Mr. Mordecai does not set forth his assumptions is

---

[13] To the extent that Mr. Magnone's description of RHF's financial dealings (and the nature of the financial instruments used in those dealings) can be construed as "opinion," such opinions appear to be based on his personal knowledge as treasurer and vice president of RHF and are helpful to a clear understanding of his testimony. (Evid. Code § 800.)

unexplained and too vague to sustain an objection. As to the assertion that Mr. Mordecai does not set forth his sources of information, RHF rightly notes several portions of the declaration in which Mr. Mordecai states that he reviewed the swap contract, the "Official Statement" for the SAVRs offering, publicly available data related to ACA from Bloomberg News, allegations in and exhibits attached to the 5AC, and the deposition of Cain's managing director Scott Smith. (See Pltf. Resp. to Cain Obj., p. 42 [citing to relevant portions of the Mordecai declaration].)

The majority of Cain's specific objections to the Mordecai declaration assert that he either lacks foundation, offers an improper expert opinion, or both. (Cain Obj. Mordecai Decl. Nos. 1, 4, 5, 8, 10, 12-19.) As noted, Mr. Mordecai adequately sets forth the foundation for his knowledge for most of his opinions related to the 1998 refinancing. And the vast majority of Mr. Mordecai's opinions are the typical subject of expert opinion. Cain's generally unexplained objections that Mr. Mordecai's expert opinion is "improper" are without merit. To the extent that Mr. Mordecai describes RHF's role in the refinancing, he generally does so in generic terms, describing, in his expert opinion, how the swaps would work for a typical party in RHF's shoes. Nonetheless, Cain's objection 17 correctly points out an instance where Mr. Mordecai asserts RHF's subjective intent "to maintain the swaps for the full, 30-year term, or until some future refinancing of the SAVRS." (Decl. of Mordecai, ¶ 9.) Mr. Mordecai offers no foundation for his knowledge of RHF's subjective intent and Cain's objection 17 to the Mordecai declaration is SUSTAINED. The remaining objections asserting lack of foundation or improper opinion numbered 1, 4, 5, 8, 10, 12-16, 18, & 19 are OVERRULED.

Cain also objects to Mr. Mordecai's description of "unrealized losses" as not constituting "any monetary harm." (Cain Obj. Mordecai Decl., Nos. 2, 11.) Cain asserts that the Mr. Mordecai's assertion of no "monetary harm" constitutes an improper legal conclusion. The statements in question, however, appear to be conclusion of fact, not of law and the objections on this ground are OVERRULED. Cain's remaining objections that various portions of the declaration misstate the evidence, are irrelevant, vague, or incomplete are likewise OVERRULED.

### 5. Declaration of Gregory Barchie

Finally, Cain objects to two portions of the declaration of Gregory Barchie. Cain's first objection is to the introduction of documents produced by Cain in discovery (included in opposition as SBE, Exh. 305), which Cain contends are not authenticated merely by the fact of production. While Cain is correct that production is not itself an act of authentication, Mr. Barchie indicates that the documents were authenticated at the March 21, 2013 deposition of Cain's person most knowledgeable on the subject, Joanna Manthei. (Decl. of Barchie, ¶ 6(g).) Cain objects that Mr. Barchie does not include or cite to any portion of the transcript in which Ms. Manthei authenticated the document. Nonetheless, at least for the purpose of motion practice, an attorney's declaration that a document produced in discovery was properly authenticated by the opposing party at deposition is generally sufficient to authenticate the document. (See *Greenspan v. LADT, LLC* (2010) 191 Cal.App.4th 486, 523 [noting that authentication by attorney declaration "is routine in law and motion practice" and holding that

a document produced in discovery was sufficiently authenticated by attorney's declaration that the document was authenticated by opposing party in deposition].) Cain's objection to SBE 305 is OVERRULED.

Cain's second objection to the Barchie declaration asserts that Mr. Barchie's description in paragraph 7 of this Court's March 22, 2013 order denying RHF's request for *ex parte* relief lacks personal knowledge and foundation, and that it offers inadmissible hearsay. This Court's March 22, 2013 order is the law of the case, not hearsay. Additionally, Cain offers no rationale to suggest why Mr. Barchie would lack personal knowledge of the Court's order delivered at a hearing Mr. Barchie attended. The assertion that Mr. Barchie lacks foundation to characterize a hearing he attended is equally puzzling. Cain's objection to paragraph 7 of the Barchie declaration is OVERRULED.

**III. Analysis**

Cain brings the motion for summary judgment on the sole ground that each of Plaintiffs' claims is time-barred by the statute of limitations in light of the undisputed facts in evidence.

*A. Standard of Review*

A motion for summary judgment seeks a determination by the court that an entire action or defense to an action has no merit. (Code Civ. Proc. § 437c(a).) "A defendant has met its burden of showing that a cause of action has no merit if it has shown that one or more elements of the cause of action cannot be established, or that there is a complete defense to that cause of action." (*Whitmire v. Ingersoll-Rand Co.* (2010) 184 Cal.App.4th 1078, 1083.) "Initially, the moving party bears a burden of production to make a prima facie showing of the nonexistence of any genuine issue of material fact. If he carries his burden of production, he causes a shift: the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a genuine issue of material fact." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 845.)

"There is a genuine issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Id.*) Courts must review all the evidence and all of the reasonable inferences drawn therefrom in the light most favorable to the non-moving party. (*Intrieri v. Superior Court* (2004) 117 Cal.App.4th 72, 81.) All evidentiary doubts or ambiguities must be resolved in favor of the non-moving party. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768.) When considering a statute of limitations defense on summary judgment, courts must bear in mind that "resolution of the statute of limitations issue is normally a question of fact" and summary judgment is only appropriate "where the uncontradicted facts established through discovery are susceptible of only one legitimate inference...." (*Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1112.)

### B. Statute of Limitations

The nature of Cain's statute of limitations argument is relatively simple to grasp (even if the facts are not): the vast majority of relevant facts and alleged wrongdoing occurred anywhere between 10 and 5 years prior to the time RHF added Cain as a defendant to this action in 2009. RHF's primary defense to this argument is an assertion that the statute of limitations did not begin to run until at least December 2007 when ACA was actually downgraded by S&P and the swapped SAVRS entered the alternative floating rate option. Cain responds by asserting that RHF suffered actual harm well before 2007, and that the statute of limitations began to run as early as 1998 when the refinancing agreements were executed, but no later than 2004 when Fitch downgraded ACA.

"Civil actions, without exception, can only be commenced … after the cause of action shall have accrued … ." (Code Civ. Proc. § 312.) "When damages are an element of a cause of action, the cause of action does not accrue until the damages have been sustained." (*City of Vista v. Robert Thomas Securities* (2000) 84 Cal.App.4th 882, 886.) "If the last element to occur is the element of damage, the statute of limitations begins to run upon the occurrence of "appreciable and actual harm, however uncertain in amount," that consists of more than nominal damages. (*Van Dyke v. Dunker & Aced* (1996) 46 Cal.App.4th 445, 452 [quoting *City of San Diego v. U.S. Gypsum Co.* (1994) 30 Cal. App. 4th 575, 582.) "[T]he *fact* of damage rather than the *amount* is the relevant consideration." (*Adams v. Paul* (1995) 11 Cal. 4th 583, 589.) "In addition, the character or quality of the injury must be manifest and palpable." (*Id.*) "Mere threat of future harm, not yet realized, is not enough." (*United States Liability Ins. Co. v. Haidinger-Hayes, Inc.* (1970) 1 Cal.3d 586, 597.)

Each of RHF's causes of action against Cain (negligence, negligent misrepresentation, breach of fiduciary duty, and constructive fraud) requires damage as an element of the cause of action. (*City of Vista, supra,* 84 Cal.App.4th at 887.) "The resulting damage [for those causes of action] must be 'actual monetary loss.'" (*Id.* [quoting *Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1240.)

### 1. Cain Has not Made a Prima Facie Showing that RHF Was Injured at the Point of Entry into the Swap Agreement

Cain asserts that RHF suffered actual harm, beginning the statute of limitations, at the inception of the swap agreement in 1998 because "RHF alleges no tortious act by Cain taking place any later than 1998." (MSJ, p. 17.) Even assuming that is true (RHF disputes that claim), the causes of action did not accrue upon commission of the last tortious act so long as RHF had not yet suffered any appreciable harm. Cain cites to *Hensley v. Caietti* (1993) 13 Cal.App.4th 1165 and *Turley v. Woodbridge* (1991) 230 Cal.App.3d 586 for the proposition that RHF was injured at the "point of entry" into the swap agreement. (MSJ, p. 18, Reply, p. 6.) However, as RHF correctly notes, those cases are distinguishable. Neither *Hensley* nor *Turley* stand for the proposition that a party suffers an immediate pecuniary harm merely by entering into a

contract that may ultimately prove injurious. Rather, both cases involved claims of attorney malpractice by plaintiffs who had "enter[ed] into a binding contract resolving marital property and support issues ... ." (*Hensley, supra*, 1165 Cal.App.4th at 1175 [discussing holding in that case as well as *Turley*].) Of particular importance was the fact that the divorce contracts deprived those plaintiffs of their "fair share of community property" by "contractual allocation [that] was effective immediately." (*Id.*) That is, in both cases, the specific terms of the contracts effectuated an immediate loss of property upon signing.

Cain's citation to the non-binding federal district court case of *Garamendi v. SDI Vendome S.A.*, (2003) 276 F.Supp.2d 1030 does not change this analysis. Like *Hensley* and *Turley*, *SDI Vendome* involved an act (fraudulently induced transfer of shares) that resulted in an immediate economic loss. (*Id.* at 1038.) Moreover, the plaintiff in that case (the California Insurance Commissioner) affirmatively alleged economic damages that occurred *prior to* the transfer of the shares - namely expenses incurred in negotiations leading up to the fraudulently induced transfer. (*Id.*) Neither *Hensley*, nor *Turley*, nor *SDI Vendome* serve to obviate the general rule that RHF's causes of action require an actual monetary loss before the causes of action accrue. Rather, all three merely address unique factual scenarios not present here in which the pecuniary loss occurred immediately upon entry into a contract (or before).

The swap agreement, by contrast, involved no immediate monetary loss by RHF upon execution of the agreement. In reply, Cain suggests that RHF suffered monetary loss at the inception of the swap agreement "including but not limited to the costs and fees it incurred in consummating the 1998 plan of refinancing and its loss of the contractual rights and protections it claims to believe it had under the swap contract." (Reply, p. 6.) However, Cain has not made a prima facie showing of pecuniary loss. Cain offers no authority for the proposition that the intangible "loss of contractual rights and protections" constitutes an "actual monetary loss" requisite to accrue the causes of action. And even assuming for the sake of argument that the transaction costs incurred in executing the swap agreement constitute an appreciable harm,[14] Cain does not cite to any evidence in the record of what those costs were. Cain bears the burden of producing *prima facie* evidence to establish its defense. But in reply, Cain does not point to any evidence it has produced to demonstrate such a monetary loss, and the Court cannot assume evidence in Cain's favor on Cain's motion for summary judgment. (*Saelzler v. Advanced Group 400, supra*, 25 Cal.4th at 768.)

### 2. Whether RHF Suffered Harm Before 2007 Is a Triable Question of Fact

Cain also asserts that RHF suffered additional harm in both 2001 and 2004 when interest rates on the SAVRS spiked in light of ACA's credit woes. Cain notes that "RHF became obligated to pay higher interest rates to SAVRS investors as a result of ACA's financial

---

[14] But see the Court's discussion below on the nature of harm associated with the initial costs of the transaction under *City of Vista v. Robert Thomas Securities* (2000) 84 Cal.App.4th 882. That Court expressly considered initial transaction costs in the context of an investment that provided for an uncertain return, and held that the transaction costs did not constitute harm as a matter of law because a reasonable trier of fact could find that a reasonable return on the investment could effectively negate any initial economic costs.

problems" and that "[o]nly a portion of these increased costs was defrayed by the Swap Contract." [15] (MSJ, p. 18.) Cain further contends that RHF suffered harm because it "wanted to terminate the Swap Contract, but was prevented from doing so by the termination payment" and because "RHF recorded huge losses on the Swap Contract beginning in 2003 … ." (MSJ, p. 18.) In opposition, RHF contends that it did not suffer any harm until at least December 2007 because the swap contract hedged the swapped SAVRS until ACA was downgraded by S&P. (Opp., p. 14.) RHF argues that it was only required to pay elevated interest rates on the unswapped SAVRS in 2001 and 2004 and that the extent to which RHF was "out of the money" only constituted an unrealized loss prior to terminating the swap agreement in 2008.

RHF's citation to *City of Vista*, *supra*, to support its claim that a triable issue of fact exists on the question of when RHF suffered an appreciable harm is particularly persuasive. In that case, the plaintiff City of Vista was essentially in the reverse role of RHF: it was the purchaser of complex bond securities that were subject to possible variance over time in their rate of return. (*City of Vista*, *supra*, 84 Cal.App.4th at 884.) After the City of Vista had purchased the securities, the City's treasurer determined that the investments were unauthorized by law and sought recession from the broker that sold the City the bond interests. (*Id.* at 885.) The City asserted that it was improperly induced to buy the securities by false representation from the defendant broker as to the nature of the securities and the level of risk associated with them. (*Id.*) The City of Vista further asserted price collusion in the initial transaction because the transaction involved an unnecessary number of dealers, each of whom charged a markup. (*Id.*)

The defendant securities broker in *City of Vista* successfully moved for summary judgment in the trial court on statute of limitations grounds, arguing that the City knew of the flaws in the bond deal several years before it brought suit. (*Id.* at 885-86.) The Court of Appeal reversed, holding that there was a triable issue of fact as to when the City suffered an actual monetary loss. The Court of Appeal was particularly persuaded by the fact that, given the variable nature of the bond yields over time it was "generally impossible to know the ultimate outcome" of the bond investment until the bonds neared maturity. (*Id.* at 887.) Significantly, the Court of Appeal rejected the broker's argument that the City had suffered damage from the

---

[15] For the first time in reply, Cain argues that RHF suffered actual harm because, under the structure of the agreement, it was RHF that directly paid interest to bond holders and Lehman merely reimbursed RHF for the amount. Cain cites to *Jordache Enterprises, Inc. v. Brobeck, Phleger & Harrison* (1998) 18 Cal.4th 739, 754 for the proposition that RHF suffered actual "out-of-pocket" harm as a matter of law every time it paid a higher rate on the swapped SAVRS irrespective of whether that amount was subsequently reimbursed. (Reply, p. 4.) But that case concerned damages from alleged attorney malpractice that the plaintiff ultimately sought to recoup under an insurance policy in a coverage action. (*Id.* at 742-43.) Irrespective of who actually wrote the check to a bondholder, the swap agreement was not an agreement for "indemnity" in the traditional sense. There was no traditional claims process or need for litigation to indemnify under the Swap Agreement. RHF's interest obligations under the Swap Agreement were not merely "remedied or reduced" prior to the invocation of the alternative floating rate option. Rather, the Swap Agreement did what the name suggests; it *swapped* payment obligations between RHF and Lehman. This is not a case, as in *Jordache*, where the potential for indemnity was uncertain. Under the Swap Agreement, the payment amount was both certain and swift. The Court does not find RHF's technical payments to bondholders under the swapped SAVRS to be an "immediate harm," and in any event, the argument is not properly raised for the first time in reply.

alleged markups because "Vista would not have suffered damage had it received interest payments sufficient to cover its initial payment and provide a reasonable return." (*Id.*) That is to say, unlike cases where the fact of damage is certain and only the amount is ambiguous, the variable rate of return on the bonds left a triable issue of fact as to when the City had been harmed at all.

Here, the question of when RHF suffered an actual pecuniary harm is likewise subject to sufficient dispute to refer the matter to the trier of fact. It may be the case, for example, that RHF was forced to pay higher interest rates on the unswapped SAVRS during the 2001 interest spike, but that same interest spike also resulted in significant unrealized benefit to RHF, putting RHF "in the money" by more than $14M. By 2003, RHF saw unprecedented low interest rates on the unswapped SAVRS, but those same low interest rates also transformed RHF's $14M unrealized gain into a $16.5M unrealized loss. Indeed, the wide swings in RHF's position under the swap agreement only underscores the need to decide this question at trial rather than summary judgment. The exact moment when RHF can be said to have finally suffered an economic loss is a question of fact that the jury must decide.[16]

### 3. This Result Does not Give RHF Unilateral Authority to Toll the Statute of Limitations

In reply, Cain contends that a finding that RHF suffered no economic loss until 2007 would effectively give RHF unilateral authority to decide when its cause of action accrued. (Reply, pp. 6-7.) The Court, however, makes no such finding. It leaves that question for the jury. But even if the jury so finds, Cain's concerns are not supported by the facts of this case. Cain's reliance on *Apple Valley Unified School District v. Vavrinek, Trine, Day & Co.* (2002) 98 Cal.App.4th 934, for this proposition is misplaced. That case involved a school district that sued an accounting firm for malpractice after the accounting firm's audit procedures allegedly caused the school district to pay funds to a charter school that was not entitled to the money. (*Id.* at 937.) In *Apple Valley*, there was no reasonable dispute that the school district was fully aware of at least sufficient facts to put it on notice of the accounting issues. But importantly, neither was there any reasonable dispute that the school district had sustained actual monetary damages when it paid money to the charter school that was not entitled to it. Indeed, the district was sufficiently aware of those facts to revoke the school's charter in November 1998 and refer the matter to the California Department of Education in March 1999. (*Id.* at 939.) The matter was then referred to the State Controller who issued a report faulting the charter school and the district in January 2000. (*Id.* at 939-40.)

---

[16] Cain has also failed to make a prima facie showing that RHF suffered an "actual monetary loss" when it declined to refinance with Lehman in either 2001 or 2005. It may be that RHF's decision not to refinance at the time *ultimately* resulted in some appreciable harm, but Cain offers no evidence to suggest that refusal resulted in any immediate harm. Indeed, Cain's contention on this point more resembles a defense for "avoidable consequences" (see, e.g., *State Dep't. of Health Svcs. v. Superior Court* (2003) 31 Cal.4th 1026, 1042-48) than a statute of limitations defense. But Cain's motion is limited to the statute of limitations  That RHF may have failed to reasonably *avoid* future harm in 2001 or 2005 is analytically distinct from whether it actually suffered harm at the time.

The school district in *Apple Valley* did not bring suit until December 2000, more than two years after it was fully aware of all the facts necessary to support the cause of action. (*Id.* at 941.) The Court of Appeal found that a two-year statute of limitations applied (Code Civ. Proc. § 339(1)) and that the action was time-barred. The Court of Appeal rejected the school district's contention that it did not suffer an actual injury until the Controller issued its report in January 2000 because the "District would have a unilateral ability to delay the accrual of its cause of action indefinitely." (*Id.* at 953.) That is, under the school district's theory in that case, it could have waited to refer the matter to the Department of Education for years - all the while knowing every fact and having suffered all the monetary loss it was going to sustain - and never face the statute of limitations.

This case is markedly different. In *Apple Valley* the question of when the school district suffered the alleged monetary injury was abundantly clear: it suffered the damage when it made discrete, identifiable overpayments to the charter school. Nothing about the damages in this case is discrete or easily identifiable. Nor is this a case in which RHF could have sat idly by *ad infinitum,* waiting to terminate the swap agreement and bring suit against Cain at any time of its choosing. Rather, the nature of RHF's claims against Cain are necessarily predicated on ACA's downgrade because RHF contends that Cain failed to disclose critical information about ACA. Had RHF unilaterally terminated the swap agreement in the absence of an ACA downgrade, it is not at all clear how RHF's theory of liability would survive.

### B. Remaining Issues are Not Ripe for Decision

Because the Court finds that, given the facts presented, it is unable to determine when RHF suffered any alleged harm as a matter of law, it need not decide the parties' remaining disputes over the exact limitations periods attaching to the four causes of action, the applicability of the discovery rule, or the applicability of the continuing violation doctrine. The relevance of any of those disputes necessarily hinges on the jury's determination of when RHF's causes of accrued (or whether RHF has any viable causes of action at all). If, for instance, a jury determines that RHF did not suffer any actual monetary harm until December 2007 (or later), then the action was timely filed against Cain in February 2009 even under a two-year statute of limitations. Conversely, were a jury to find that RHF suffered monetary loss as early as 1998, the import of a two-year versus a four-year limitations period would depend on the factual questions of delayed discovery or continuing harm, which are more properly decided first by the jury.

These remaining arguments do not appear ripe for decision. To decide them at this juncture would unduly deprive the jury of its role as trier of fact and constitute an improper advisory opinion.

## IV. Conclusion

In light of the foregoing, Defendant Cain Bros. & Co.'s motion for summary judgment is DENIED.  Because the question of when RHF was allegedly harmed is essentially identical for each of the four causes of action against Cain, the alternative motions for summary adjudication of causes of action one through four are DENIED.  The parties' evidentiary objections are SUSTAINED IN PART and OVERRULED IN PART as discussed in section II above.