**Hearing Date and Time: September 18, 2013, 10:00 a.m. (Prevailing Eastern Tine)**
**Reply Deadline: September 11, 2013 (Prevailing Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Richard W. Slack
Robert J. Lemons
Lauren Hoelzer Helenek

*Attorneys for Lehman Brothers Holdings Inc.*
*and Certain of its Affiliates*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | : | **08-13555 (JMP)** |
| | : | |
| Debtors. | : | **(Jointly Administered)** |

-------------------------------------------------------------------x

### DEBTORS' OPPOSITION TO BAUPOST GROUP, LLC'S MOTION TO QUASH DEBTORS' SUBPOENA ISSUED UNDER FEDERAL RULE OF BANKRUPTCY PROCEDURE 2004

Lehman Brothers Special Financing ("LBSF") and Lehman Brothers Holdings,

Inc. ("LBHI," and together with LBSF, "Lehman") by their undersigned counsel hereby oppose

the motion of Baupost Group, LLC ("Baupost") filed on July 23, 2013 (the "Motion") to quash

the subpoena (the "Subpoena") issued by Lehman on May 23, 2013 pursuant to Federal Rules of

Bankruptcy Procedure 2004 ("Rule 2004").

### PRELIMINARY STATEMENT

1.      Baupost, which purports to hold Giants Stadium's claims in the Lehman

bankruptcy (but refuses to produce any documents to substantiate its representation), seems to

suggest in its Motion that it should be treated differently than other claim holders.  Indeed, in

response to the validly-issued Subpoena, Baupost, through its counsel, has taken the position that it should not have to search for and produce any documents—none whatsoever.  During the quick "meet and confer" concerning the Subpoena, Baupost's counsel refused to discuss any compromise, and never made any offer or proposal to search for or produce any documents.  Baupost's "just say no" posture should be rejected.

2.     The Subpoena is limited in scope and contains only *five* requests for documents (the "Requests") that principally concern (i) the purchase or sale of Giants Stadium's claims to Baupost and (ii) the valuation of two substantially identical interest rate swaps between Giants Stadium and LBSF (the "Swaps") that were the basis for the claims, including any valuations leading up to and in connection with the amendments of such claims, which were filed ***after Baupost purportedly purchased them***.

3.     Both of the above areas of investigation are proper and targeted areas of examination.   Moreover, Baupost is not just a bystander to the issues under Rule 2004 investigation, but rather a participant with firsthand knowledge.

4.     As the Court may be aware, Giants Stadium sent termination notices for the Swaps to LBSF on September 18, 2008, and set the early termination date on that same date.  On October 2, 2008, Giants Stadium sent calculation statements to LBSF, demanding payment of approximately $301 million from LBSF in connection with the Swaps.  On October 29, 2009, Giants Stadium filed proofs of claim for the same $301 million that it had set forth in its calculation statements.

5.     At the Court's suggestion, the parties had settlement discussions beginning in late 2011, which led to a mediation with one of the Court-appointed mediators.  At or about the time of these meetings, Lehman representatives were informed that Baupost had purchased the Giants

US_ACTIVE:\44304918\7\58399.0011

Stadium claims, and Baupost representatives participated in the meetings. During this time, and before the mediation, Lehman expressed its preliminary view to Giants Stadium and Baupost that the payments under the Swaps are receivables to Lehman.

6.      Just before the mediation, three years after submitting the calculation statements and long after the Court's bar date for the filing of proofs of claim relating to derivatives, Baupost sought to improperly inflate the Giants Stadium claim in order to force Lehman to increase reserves and pressure Lehman to enter into an unfair settlement. To this end, Baupost and Giants Stadium filed amended proofs of claim that increased the amounts sought from LBSF and LBHI in the bankruptcy from $301 million to approximately $600 million—an absurd amount that is more than the face value of bonds that the Swaps were intended to hedge.

7.      Although Baupost suggests that it is somehow a bystander to the valuation of the Swaps, it was the holder of the claims when the decision to seek to amend the proofs of claim was made and presumably was involved in determining to seek the nearly $600 million figure set forth in the amended proofs of claim. There are serious questions as to whether (i) the amendment is invalid in light of the bar date; (ii) Baupost and Giants Stadium acted in bad faith in doubling the claims so long after the bar date; (iii) the governing swap documents permit such amendment; and (iv) Baupost and Giants Stadium's valuations made prior to the amendment are inconsistent with the amended claims. In connection with that investigation, Lehman is seeking targeted discovery concerning, among other things, any valuations Baupost prepared in connection with its purchase of the claims and the amendment to the proofs of claim.

8.      Furthermore, Lehman is certainly entitled to discovery regarding the current status of the ownership of the claims and the terms of any sale to Baupost—discovery that, to date, it has not received. Baupost's refusal to provide discovery on these issues is akin to a

US_ACTIVE:\44304918\7\58399.0011

securities plaintiff positing that a defendant is not entitled to discovery concerning whether the plaintiff actually holds the securities at issue and the circumstances surrounding any purchase (or sale) of those securities.

9.    Nonetheless, in response to the Subpoena, Sullivan & Cromwell LLP, serving as counsel to both Giants Stadium and Baupost, flatly refused to search for—let alone produce— ***even a single document***, objecting to the Subpoena on the grounds that the Requests "seek irrelevant, cumulative, and unduly burdensome discovery from Baupost." Motion at 1. But such objection ignores the obvious relevance of the targeted documents the Requests seek, and the standard for obtaining Rule 2004 discovery. Not surprisingly, Baupost ultimately asserts nothing more than conclusory statements that the Requests are irrelevant and burdensome. Baupost's obstruction of obviously relevant discovery should be rejected.

## FACTUAL BANKGROUND

10.    In 2007, LBHI assisted Giants Stadium in raising over $700 million for the construction of a new football stadium in New Jersey. Part of the project financing for the stadium consisted of the issuance of auction rate securities, $408 million of which were underwritten by Lehman Brothers Inc. (the "Bonds"). To hedge the interest rate risk on the Bonds, Giants Stadium entered into the Swaps, pursuant to which LBSF agreed to pay Giants Stadium a floating rate and Giants Stadium agreed to pay LBSF a fixed rate of interest.

11.    On September 15, 2008, LBHI commenced in this Court a voluntary case (the "Bankruptcy") under chapter 11 of title 11 of the United States Bankruptcy Code (the "Bankruptcy Code") and on September 18, 2008, Giants Stadium sent notices to LBSF terminating the Swaps.

12.    On October 2, 2008, Giants Stadium sent calculation statements to LBSF demanding a termination payment from LBSF in the amount of $301,025,197.20 (the

US_ACTIVE:\44304918\7\58399.0011

"Calculation Statements").  *See* Declaration of Richard Slack (the "Slack Dec."), ¶ 3.  On

October 17, 2008, Giants Stadium filed proofs of claim against LBHI and LBSF in the amount of

$301,828,087.35 (the "Proofs of Claim" or "Claims").  *See id.*, ¶ 4.  On July 2, 2009, the Court

established September 22, 2009 (the "Bar Date") as the general deadline for filing proofs of

claim and October 22, 2009 as the deadline for completing a "Derivatives Questionnaire" and

uploading supporting documentation and evidence of underlying claim amounts concerning

derivatives.  *See id.*, ¶ 5.  On September 22, 2009, Giants Stadium filed proofs of claim again in

the amount of $301,828,087.35, and also submitted a response to the Derivatives Questionnaire,

in which Giants Stadium asserted claims against the LBSF estate in that same amount.[1]  *See id.*,

¶ 6.

13.    On May 19, 2010, Lehman issued its first Rule 2004 subpoena to Giants Stadium

pursuant to the Order Granting the Debtors Authority to Issue Subpoenas for the Production of

Documents and Authorizing the Examination of Persons and Entities, dated November 23, 2009

("November 23, 2009 Rule 2004 Order"), seeking information to help it assess the Claims.

14.    In late April 2009, Giants Stadium supposedly transferred the Claims to Bank of

America/Merrill Lynch.  *See id.*, Ex. A (Transfer of Claim Agreement).

15.    Although Baupost and Giants Stadium have asserted that Bank of America

subsequently transferred the Claims to Goal Line, a Baupost entity (*see* Motion at ¶ 7), neither

Giants Stadium nor Baupost has provided any documentation concerning that transfer.  *See* Slack

Dec., ¶ 9.

---

[1] On October 29, 2009, Giants Stadium filed proofs of claim in the amount of $301,804,617.14,
amending the interest amount owed under each Swap and superseding proofs of claim filed on
September 22, 2009.  *See id.*, ¶ 7.  These amended claims did not assert a $600 million payable
by LBSF.

US_ACTIVE:\44304918\7\58399.0011

16.     At the Court's urging, in late 2011, Giants Stadium and LBSF agreed to mediate. *See id.*, ¶ 11.  Just prior to the scheduled mediation date, and more than three years after filing the Claims and two years after the Bar Date, Giants Stadium filed amended proofs of claim (Claim Nos. 67782 and 68103, the "Amended Claims"), nearly doubling the amount in its original Claims to approximately $600 million, which exceeds by more than $180 million the total face value of the Bonds that the Swaps were intended to hedge.  *See id.*, ¶ 12; *id.*, Ex. C.

17.     Giants Stadium contends that the increase is due to capital and credit charges, for which it apparently failed to account during the previous three years.  Of course, nothing prevented Giants Stadium from including any legitimate charges at the time of its Calculation Statement or original Proofs of Claim.

18.     As a trader in claims and distressed assets, Baupost knew that Lehman would have to reserve for the $600 million in claims made in the bankruptcy.  Baupost also understood that, by increasing its claim, it was adding pressure on Lehman to settle the Claims.  Indeed, by improperly inflating the Claims three years after the Swaps were terminated, Giants Stadium and Baupost have, in fact, caused the estate to hold reserves for the doubled amount.

19.     In an effort to understand the significant amendments to the Claims and to determine how to respond, Lehman sought Rule 2004 discovery from Giants Stadium by issuing a subpoena on April 9, 2012, seeking among other things, information about the Amended Claims and Giants Stadium's relationship with Baupost.  *See id.*, ¶ 14; *id.*, Ex. D.  Giants Stadium moved to quash Lehman's April 9, 2012 subpoena and also moved to seek Rule 2004 discovery from Lehman.  *See id.*, ¶ 15.

20.     On November 14, 2012, the Court heard the parties' motions concerning Rule 2004 discovery.  At the hearing, Lehman made clear its intention to seek discovery from Baupost

and explained that it required discovery from Baupost in two key areas: (i) the sale of the claims to Baupost (and the respective roles of Baupost and Giants Stadium in the prosecution of the Claims); and (ii) Baupost's valuation of the Claims.  *See id*, Ex. E (November 14, 2012 Transcript ("Omnibus Tr.")) at 22-24.

21.    Lehman further explained that it had no transparency into the relationship between and respective interests of Giants Stadium and Baupost and required discovery into those issues to efficiently respond to or litigate the Amended Claims.  *See id.* at 22:20-23:7 ("[W]e haven't had any discovery into that sale. . . .  We need to understand when we're talking to somebody, for example, who is the interest. . . [,] should we be talking to Baupost or not").[2]

22.    In fact, Sullivan & Cromwell, which represents both Giants Stadium and Baupost, represented to the Court and Lehman that Giants Stadium has no relevant discovery about the sale of the Claims to Baupost.  *See id.* at 29:1-9 ("As to the question that came up about the sale between Bank of America and Baupost, my information on that is that Giants Stadium was not involved in that.  . . .  They negotiated it.  And I don't believe we have anything certainly anything material to either produce or to disclose about it.").

23.    At the hearing, counsel for Lehman also explained its reasons for requesting valuation information from Baupost—specifically, that when Baupost considered buying the claims, a "main issue" would have been whether the claim is a payable or receivable and for how much.  *See id.* at 24:5-12.

---

[2] The Court recognized that when there is an "empty creditor" "that appears to have real party in interest status in a bankruptcy case, but who has actually divested itself of all or substantially all of the economics associated with that creditor interest, [the empty creditor] may have other disguised interests that impact that creditor's motivation within the bankruptcy case."  *See id.*, Ex. E at 17:20-18:5.  Giants Stadium has argued that it is not an empty creditor because it retained rights and an economic interest in the sale of the Claims to Bank of America, but has produced no discovery about the subsequent sale of the Claims to Baupost.

US_ACTIVE:\44304918\7\58399.0011

24.    After hearing arguments on the motion, the Court permitted two-way Rule 2004 discovery and ordered the parties to develop a protocol to govern such discovery.  *See id.* at 59:9-21.  The Court, however, expressly recognized that "discovery from third parties and discovery from Giant Stadium and discovery from Goal Line may be more appropriate than discovery from the debtor."  *See id.* at 58:20-24.

25.    Accordingly, on April 1, 2013, Giants Stadium and Lehman executed a Discovery Protocol Agreement, pursuant to which the parties agreed on processes for identifying, noticing, and serving third parties, among other things.  *See id.*, Ex. F.

26.    After that date, Giants Stadium issued an extremely broad request for documents that was more appropriate for discovery in a contested matter or adversary proceeding once contested issues were identified.   Giants Stadium's request contained twenty-one expansive separate requests, including several requests on the topic of valuation.  *See id.*, Ex. G.  Despite the enormous time it has taken and the substantial burden Giants Stadium's requests imposed on Lehman, Lehman, to date, has produced ***419,346*** pages of documents to Giants Stadium.  *See id.*, ¶ 19.

27.    In contrast, LBSF still has not received any discovery related to the transfer of the Claims to Baupost, and it does not know the terms of Baupost's ownership of and economic interests in the Claims.  *See id.*, ¶ 20; *see also supra* at ¶ 15.

28.    Accordingly, on May 23, 2013, as part of its continuing Rule 2004 discovery, Lehman served the Subpoena on Baupost.  The Subpoena contains only ***five*** targeted requests for documents; it does not seek a 2004 examination:

> (1) "All Documents concerning any valuation of the Transactions, both prior to and following their purported termination on September 18, 2008, including the valuation(s) contained in the Calculation Statements and any proofs of claim (or amended proofs of claim) filed by Giants Stadium in the Lehman Bankruptcy";

US_ACTIVE:\44304918\7\58399.0011

(2) "All Documents concerning any valuation of the [Bonds], both prior to and following September 18, 2008";

(3) "All Documents concerning the purchase or transfer of Giants Stadium's claims in the Lehman Bankruptcy by or to Baupost, Bank of America, and/or Goal Line, including any Documents shared with any purchaser or seller (or prospective purchaser or seller) of Giants Stadium's claims, and Documents concerning the value of the claims";

(4) "Documents reflecting the value of the claims (and amended claims) filed by Giants Stadium in the Lehman Bankruptcy, including any financial statement or other financial Documents reflecting directly or indirectly any value of the claim"; and

(5) "All Documents concerning the respective roles of Giants Stadium and Baupost with respect to the pursuit of claims in the Lehman Bankruptcy in connection with the Transactions, including any Documents concerning the respective portion of any recoveries that Giants Stadium and Baupost may receive pursuant to such claims."

*See* Slack Dec., Ex. H.

29.     On June 7, 2013, Baupost served on Lehman its objections to the Subpoena, in which ***it refused to search for or produce even a single document*** in response to the Requests. *See id.*, Ex. I.  On June 14, 2013, Lehman sent a letter disagreeing with the blanket objection and explaining why the Requests sought relevant and non-duplicative information.  *See id.*, Ex. J.

30.     The parties held a meet and confer on June 24, 2013.  The meeting was short. Baupost's counsel stated at the beginning of the meeting that Baupost was unwilling to produce any documents under any circumstances.  Baupost's counsel made no offer to conduct even a limited search and made no proposals of any kind.  *See id.*, ¶ 24.  In fact, given Baupost's blanket refusal to produce any document under any circumstance, a privilege log was not a topic of discussion.  *Id.*

31.     Since Baupost acquired interests in the Claims, it has been an active participant in matters related to the Claims.  Indeed, both Giants Stadium and Baupost have jointly-participated

9

in mediation and other discussions—both represented by Sullivan & Cromwell. *See id.*, Ex. E at 22:4-14 (". . . Sullivan and Cromwell's been involved, Baupost had been involved, and representatives from Giants Stadium have been involved in the negotiations throughout this period. . . . all parties at some level have been involved in negotiations . . . over the past year.").

## ARGUMENT

32.      The scope of examination under Rule 2004 may relate to "the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate, or to the debtor's right to a discharge." Fed. R. Bankr. P. 2004(b). "The purpose of a Rule 2004 examination is to assist a party in interest in determining the nature and extent of the bankruptcy estate, revealing assets, examining transactions and assessing whether wrongdoing has occurred." *In re Recoton Corp.*, 307 B.R. 751, 755-56 (Bankr. S.D.N.Y. 2004) (holding that "[a]ny third party who has a relationship with a debtor may be made subject to a Rule 2004 investigation" and "[t]he Rule 2004 discovery sought by the Committee is thus *prima facie* consistent with the Rule's above-stated purposes of allowing the Committee to obtain information necessary to determine whether claims beneficial to the estates exist and whether to pursue such claims."). Courts routinely have held that the "scope of a Rule 2004 examination is very broad." *In re Drexel Burnham Lambert Grp., Inc.*, 123 B.R. 702, 711 (Bankr. S.D.N.Y. 1991) (permitting Rule 2004 discovery based on the requested purpose of claims amendment and claims litigation). "'In general, a large latitude of inquiry should be allowed in the examination of persons closely connected with the bankrupt in business dealings, or otherwise, for the purpose of discovering assets and unearthing frauds, upon any reasonable surmise that they have assets of the debtor.'" *Id.* at 708-09 (quoting *In re Foerst*, 93 F. 190, 191 (S.D.N.Y. 1899)); *see also In re Countrywide Home Loans, Inc.*, 384 B.R. 373, 400 (Bankr. W.D. Pa. 2008) (holding that the "scope of Rule 2004 examinations is

US_ACTIVE:\44304918\7\58399.0011

recognized as broad, unfettered and in the nature of a 'fishing expedition'" and denying motion to quash Rule 2004 discovery) (internal citations omitted).

33.     Under Federal Rule of Civil Procedure 45(a)(3)(A)(iv), the subject of a Rule 2004 examination may "move to have the subpoena quashed if it . . . requires the disclosure of privileged material, or subject[s] someone to undue burden," among other things.  *In re Parikh*, 397 B.R. 518, 525-26 (Bankr. E.D.N.Y. 2008) (finding that "had the motion for a protective order [from the subpoena] been timely made, it would have been denied") (internal citations omitted)).   Requests that are narrowly tailored to seek documents that relate to the examiner are not burdensome.  *See In re Davis*, 452 B.R. 610, 618 (Bankr. E.D. Mich. 2011) (finding that a Rule 2004 subpoena was not unduly burdensome where the examiner was "not asking for an open-ended examination, either of documents . . . or of representatives . . ., but instead has carefully tailored its requests to those documents, policies and procedures . . . that relate to the Debtor's account).

34.     Importantly, the party moving to quash the subpoena bears the burden of proof and that burden is a heavy one.  *See In re Cnty. of Orange*, 208 B.R. 117, 121 (Bankr. S.D.N.Y. 1997) ("The mere assertion that a subpoena is burdensome, without evidence to prove the claim, cannot form the basis for an 'undue burden' finding."); *see also In re Parikh*, 397 B.R. at 525 ("The burden of persuasion is on the movant.").   "'Whether a subpoena imposes an undue burden depends on such factors as relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularly [sic] with which the document are described and the burden imposed.'"  *In re Parikh*, 397 B.R. at 524-25 (internal citations omitted).

US_ACTIVE:\44304918\7\58399.0011

I.    **BAUPOST'S VALUATIONS, THE PROOFS OF CLAIM, AND THE AMENDED PROOFS OF CLAIM ARE RELEVANT TO POTENTIAL CAUSES OF ACTION AGAINST GIANTS STADIUM AND DEFENSES TO THE AMENDED CLAIMS**

35.    Baupost purchased the Claims when they were asserted in the amount of roughly $301 million—before Giants Stadium and Baupost amended the Claims to seek nearly double that amount.   *See supra* at ¶¶ 5-7.   Giants Stadium has produced nothing to support the amendment of its claims three years after serving the Calculation Statements and filing the proofs of claim and derivatives questionnaire.   The facts here suggest that the amendment was a purely tactical maneuver to force the estate to reserve a higher amount for the Claims and apply undo pressure to settle the Claims.   *See supra* at ¶¶ 6-7, 18.   Whether Baupost independently generated or received as a potential purchaser of the Claims any valuations that would support or contradict the Claims or the Amended Claims is relevant to LBSF's determination of the validity of the Claims and Amended Claims and any possible abuse of the claims process.   Notably, because Bank of America, Baupost, and Giants Stadium were on opposite sides of the sale, no privilege applies to documents shared during that process and before Baupost purchased the Claims.

36.    Abuse of the claims process aside, the validity and appropriateness of the amendment is central to Lehman's Rule 2004 investigation and is an appropriate topic for Rule 2004 discovery.   *See Matter of M4 Enters., Inc.*, 190 B.R. 471, 477 (Bankr. N.D. Ga. 1995) (permitting Rule 2004 discovery when the examiner sought discovery concerning the method of reaching valuations of claims).   As the Court commented at the November 14, 2012 hearing, "if I were on the receiving end of a claim like that, even if we were taking about hundreds of dollars instead of millions of dollars, the first question I would ask [is], how on earth could you be claiming that much more."   *See* Slack Dec., Ex. E (Omnibus Tr.) at 27:3-7.

37.    But, even setting aside the amendment, the calculation of termination payments under the Swaps is at the center of any potential objection or adversary litigation.  Any valuation that Baupost performed with respect to the Bonds, the Swaps, or the Claims, both as a potential purchaser of the Claims and as the eventual owner of the Claims, is potentially relevant to the validity of the valuation method underlying the Amended Claims.[3]

38.    Even were discovery governed by the Federal Rules of Civil Procedure, Rule 26's relevancy requirements still would support the discovery sought here.  Under Rule 26(b)(1), parties "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense" and "[r]elevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."  Fed. R. Civ. P. 26(b)(1).  As the Supreme Court has explained, 26(b)(1) has been "construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case."  *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978).  Indeed, the "breadth of relevance, as defined for discovery purposes by [Rule] 26(b)(1), has been frequently noted."  *Fletcher v. Atex, Inc.*, 156 F.R.D. 45, 48 (S.D.N.Y. 1994) (collecting cases on the "liberal standard"); *see also During v. City Univ. of New York*, 2006 WL 2192843 (S.D.N.Y. Aug. 1, 2006) ("The Second Circuit has recognized that Rule 26 relevance is an 'obviously broad rule' that is 'liberally construed.'  Discovery is relevant if there is 'any

---

[3] Baupost relies heavily on a statement from the Court at the November 14, 2012 hearing for its assertion that any valuations it may have are irrelevant. *See* Motion at ¶ 26 (quoting the Court as stating "You may or may not be ultimately entitled to obtain that information, but even if you do, in my view, it's a big so what") (emphasis omitted).  Such statement, however, was made without the benefit of the comprehensive facts set forth in opposition to the Motion.  As discussed herein, the documents sought are directly relevant to the basis for and propriety of the amendment, among other things.

US_ACTIVE:\44304918\7\58399.0011

possibility that the information sought may be relevant to the subject matter of the action.'") (internal citations omitted).

39.    Here, the Requests easily would meet Rule 26's relevancy requirements.  Each of Lehman's narrowly-tailored Requests bears directly on the proper valuation of the Swaps in the Amended Claims, the propriety of the amendment of the Claims, and the holding of claims by the parties involved.

40.    Giants Stadium has attempted to obscure its burden on this motion by arguing that Lehman has failed to show good cause.  Lehman has shown more than would be required for a finding of good cause.  Good cause has been found where the subject matter of the examinations was the validity of proofs of claim, including, as suspected here, "possible existence of abuse in the proof of claim process."  *In re Subpoena Duces Tecum*, 461 B.R. 823, 829 (Bankr. C.D. Cal. 2011) *appeal dismissed*, 2:11-CV-02229-JHN, 2011 WL 7140067 (C.D. Cal. Aug. 1, 2011) (denying motion to quash on relevancy grounds).  Indeed, the good cause showing is not a high hurdle; courts have made findings of good cause for Rule 2004 discovery based on unsworn representations of necessity by attorneys.  *See In re Metiom*, *Inc.*, 318 B.R. 263, 267 (S.D.N.Y. 2004) (upholding the bankruptcy court's decision to rely on unsworn representations of counsel in denying a motion to quash Rule 2004 discovery).  As explained above, as previously stated in court, and as reaffirmed in the Declaration of Richard W. Slack, the documents sought are material and relevant to understanding the basic information concerning the ownership of the Claims, the circumstances surrounding the amendment, and the reasons behind and reasonableness of the calculations made in the amendment.  *See supra* at ¶¶ 7, 8, 23, 27.  Baupost is not merely a passive bystander, but almost certainly was an active participant in the decision to improperly amend the Claims that seek to double the amount set forth in the original Proofs of

US_ACTIVE:\44304918\7\58399.0011

Claim filed more than three years earlier.  *See* Slack Dec., Ex. E (Omnibus Transcript) at 22-24;

*id.*, ¶ 27.

## II.    THAT SOME OF BAUPOST'S DOCUMENTS MAY BE PRIVILEGED DOES NOT OBVIATE ITS OBLIGATIONS TO SEARCH FOR RESPONSIVE DOCUMENTS

41.    Next, Baupost objects to "requests for valuation and other information created *after* Goal Line's acquisition of certain rights in the Claims" on the grounds of privilege and asserts that "[a]ny valuation or other information concerning the Claims that Debtors now seek is thus *per se* protected by the work produce doctrine."  Motion at ¶¶ 27, 29 (emphasis in original).

42.    *Per se* objections based on privilege and work product should be dismissed when no specific evidence of privileged or protected documents has been presented.  *See In re Countrywide Home Loans, Inc.*, 384 B.R. at 400 (dismissing *per se* objections to Rule 2004 subpoena based on attorney-client and work product privileges when moving party failed to provide evidence of privileged documents and instructing that if the movant believed there were specific documents protected by privilege, the court would hear a particularized motion concerning those documents); *see also In re Dinubilo*, 177 B.R. 932, 944 (E.D. Cal. 1993) (explaining trial court ruling that claims of "privilege or work product needed to be made on [sic] question-by-question basis and can only be determined after questions are asked and a response is refused on specific grounds") (internal quotations omitted).  Moreover, Baupost provides no evidence that supports its *per se* privilege assertion.

43.    Based on its *per se* objection, Baupost has taken the extreme position that any collection or review of documents after its purchase of the Claims is unduly burdensome because all such documents are privileged.  Motion at ¶ 27.  Baupost's objection to the Subpoena on privilege grounds, however, does not obviate its obligation to review potentially privileged documents in an effort to locate non-privileged responsive documents.  Indeed, the creation of a

US_ACTIVE:\44304918\7\58399.0011

privilege log is "the usual and customary practice [to] prevent[] the disclosure of any privileged communications" and object to Rule 2004 discovery on the grounds of attorney-client and/or work product privilege.  *In re Subpoena Duces Tecum*, 461 B.R. at 831.

44.    Indeed, Baupost provides no support for its assertion that responding to the Subpoena would be "unnecessarily burdensome."    Motion at ¶ 25.  Such a "conclusory statement, without an elaboration, is insufficient" to defeat a request for Rule 2004 discovery.  *In re Subpoena Duces Tecum*, 461 B.R. at 831.  In any event, however, Lehman is prepared to accept any such documents on a non-waiver basis, thus obviating the need to produce a privilege log if creating such a log would be burdensome.  Lehman also is prepared to discuss other reasonable ideas to limit any burden under Rule 2004 if Baupost alters its current position that it will not search for or produce a single document.

## III.    THE REQUESTS DO NOT SEEK TO DUPLICATE DISCOVERY ALREADY OBTAINED

45.    Baupost also objects to the Requests on the grounds that they are "unreasonably cumulative or duplicative of discovery that Debtors have already obtained from another source."  Motion at ¶ 30.  Baupost's arguments on this point are fatally flawed.  First, as explained above, Sullivan & Cromwell, acting as counsel for Giants Stadium, already has represented to the Court that Giants Stadium does not have any documents relevant to the transfer or sale of the claims between Bank of America and Baupost.  *See supra* at ¶ 22.  Thus, it does not matter how many of the Requests have language similar to Lehman's document requests to Giants Stadium because there were no documents produced in response to the latter that would render the information sought by the Requests "duplicative."  Giants Stadium's "voluminous production[]" (Motion at ¶ 30) thus does not support Baupost's argument.

46.     Moreover, Baupost surely has responsive documents separate and apart from those kept by Giants Stadium.  When it purchased the Claims, Baupost entered into what was a presumably a complicated and arms-length transaction with Bank of America—an entity from whom Lehman has received no discovery.  The Subpoena thus requests documents that are not already in Lehman's possession.  Even if Giants Stadium was involved in the transaction, it would be highly unusual for parties to a claim sale to share all of their valuations, even after the deal is complete and the parties are mutually-aligned in prosecuting the claim.

47.     Ultimately, Baupost is attempting to hide behind the sheer number of documents produced by Giants Stadium, but that does not change the fact that LBSF has not received *from any party* the documents that it has requested from Baupost.

## CONCLUSION

For the reasons stated herein, Lehman respectfully requests that the Court deny the Motion.

Dated: September 5, 2013
New York, New York

By: /s/ Richard W. Slack
    Richard W. Slack
    Robert J. Lemons
    Lauren Hoelzer Helenek

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Lehman Brothers Holdings Inc.
and Lehman Brothers Special Financing Inc.*

US_ACTIVE:\44304918\7\58399.0011