# EXHIBIT A

*Execution Copy*

## TRANSFER OF CLAIM AGREEMENT

SELLER:     Giants Stadium LLC

ADDRESS:    Giants Stadium
            50 East State Highway Route 120
            East Rutherford, New Jersey 07073
            Attention:      Christine Procops
            Telephone:      (201) 460-2852
            Facsimile:      (201) 939-5447
            Email:          procops@giants.nfl.com

BUYER:      Bank of America, N.A. (subject to the right of BUYER to assign its obligations pursuant
hereto)

ADDRESS:    Bank of America Merrill Lynch
            Global Distressed Products
            Bank of America Tower – 3rd Floor
            One Bryant Park
            New York, New York 10036
            Attention:      Gary S. Cohen / Ronald Torok
            Telephone:      (646) 855-7450
            Facsimile:      (646) 736-5233
            Email:          g_cohen@ml.com / ron_torok@ml.com


DATE OF THIS AGREEMENT:        April 27, 2009

DEBTORS:                  Lehman Brothers Special Financing Inc. ("LBSF")
                          Lehman Brothers Holdings Inc. ("LBHI" or the "Guarantor," and
                          together with LBSF, the "Debtors")

BANKRUPTCY CASES:         In re Lehman Brothers Special Financing Inc., Chapter 11 Case No. 08-
                          13888, commenced on October 3, 2008, in the United States Bankruptcy
                          Court for the Southern District of New York or any other court of
                          competent jurisdiction (the "Bankruptcy Court").

                          In re Lehman Brothers Holdings Inc., Chapter 11 Case No. 08-13555,
                          commenced on September 15, 2008 in the Bankruptcy Court.

PETITION DATES:           October 3, 2008 in the bankruptcy case of LBSF (the "LBSF Petition
                          Date").
                          September 15, 2008 in the bankruptcy case of LBHI (the "LBHI Petition
                          Date", and together with the LBSF Petition Date, the "Petition Dates").

BANKRUPTCY COURT:         United States Bankruptcy Court for the Southern District of New York

CLAIM AMOUNT:             $301,828,087.35

**CONFIDENTIAL**

PROOF OF CLAIM AMOUNT:        $301,828,087.35

SELLER hereby represents and warrants that:

(a) (i) a proof of claim, date-stamped by the Bankruptcy Court October 17, 2008, claim number 315 (the "LBSF Proof of Claim"), has been duly and timely filed by SELLER against LBSF in the amount of $301,828,087.35, and a true and complete copy of the LBSF Proof of Claim is attached to this Agreement as Exhibit A1 (such claim is hereinafter referred to as, the "LBSF Claim"); (ii) the LBSF Proof of Claim has not been revoked, withdrawn, amended or modified and no right thereunder has been sold, assigned, transferred, mortgaged, pledged, hypothecated, encumbered, waived or terminated in any respect; (iii) all statements in the LBSF Proof of Claim are true and correct as of the date hereof; and the LBSF Proof of Claim was filed prior to any bar date which may have been established by the Bankruptcy Court for filing such proof of claim; and

(b) (i) a proof of claim, date-stamped by the Bankruptcy Court October 17, 2008, claim number 316 (the "LBHI Proof of Claim", and together with the LBSF Proof of Claim, the "Proofs of Claim"), has been duly and timely filed by SELLER against LBHI in the amount of $301,828,087.35, and a true and complete copy of the LBHI Proof of Claim is attached to this Agreement as Exhibit A2 (such claim is hereinafter referred to as, the "LBHI Claim", and together with the LBSF Claim, the "Claims"); (ii) the LBHI Proof of Claim has not been revoked, withdrawn, amended or modified and no right thereunder has been sold, assigned, transferred, mortgaged, pledged, hypothecated, encumbered waived or terminated in any respect; (iii) all statements in the LBHI Proof of Claim are true and correct as of the date hereof; and (iv) the LBHI Proof of Claim was filed prior to any bar date which may have been established by the Bankruptcy Court for filing such proof of claim.

1.      SELLER, for good and valuable consideration, does hereby irrevocably sell, convey, transfer, assign, grant and convey unto BUYER all of SELLER's rights, title and interest in, to and under:

(a)  each of the above-referenced Claims of SELLER against the Debtors in the above-referenced Bankruptcy Cases (the "Cases"), including, without limitation, "claims" as defined in Section 101(5) of Title 11 of the United States Code, as amended (the "Bankruptcy Code"), any and all right to receive principal, interest and other amounts in respect of the Claims (in each case whether accruing prior to, on or after the date of this Agreement), and, to the extent relating to the Claims, accounts, accounts receivable and other rights and interest of SELLER against the Debtors, including, without limitation, all of SELLER's rights, title and interest in, to and under

(i)  the Proofs of Claim;

(ii)  all rights to receive any cash, interest, fees, expenses, damages, penalties and/or other amounts, and all setoffs and recoupments received, applied or effected by or for the account of SELLER, in respect of or in connection with the Claims; all amounts payable to SELLER under each of the agreements, bills and/or other documents (whether now existing or hereafter arising) which evidence, create and/or give rise to or affect in any material way the Claims, including all amounts payable to SELLER pursuant to Section 6 of the ISDA Master Agreement (FGIC-Insured), dated July 27, 2007, by and between LBSF and SELLER (the "FGIC ISDA Master Agreement") and the ISDA Master Agreement (FSA-Insured), dated July 27, 2007, by and between LBSF and SELLER (the "FSA ISDA Master Agreement"), as applicable, and all correspondence between SELLER and the Debtors with respect to the Claims (such documents, agreements, bills and/or other documents and correspondence are attached to this Agreement as

- 2 -

Exhibit B and collectively are hereinafter referred to as the "Claim Documents"), and including, without limitation, any cash, securities, and or other property distributed to or obtained by SELLER in respect of the Claims and Claim Documents under or pursuant to any plan of reorganization or liquidation in the Cases, any redemption, restructuring or other liquidation, or otherwise (it being understood that any such amounts received in connection with the Claims shall not be subject to any counterclaim, including, without limitation, objections to the Claims based on Section 502(d) of the Bankruptcy Code);

(b)  any and all collateral, claims, suits, causes of action and/or voting rights and other rights and benefits arising under or relating to any of the foregoing; and

(c)  any and all proceeds of any of the foregoing, including, without limitation, all cash, securities or other property distributed or payable on account of, or exchanged in return for, any of the foregoing ("Distributions").

All of the foregoing items and types of property and assets described in clauses (a) through (c) above, whether against any Debtors, any affiliate of any Debtor or any other guarantor or other third party liable in respect thereof, are collectively referred to herein as the "Assigned Rights".  SELLER acknowledges and agrees that BUYER does not assume any obligations under the Claim Documents to the Debtors or otherwise.

2.  (a) Subject to the adjustments set forth on Schedule I hereto, the consideration paid by BUYER to SELLER for the Assigned Rights, the sufficiency of which is hereby acknowledged by SELLER, is the initial purchase price specified as Item C on Schedule I hereto (the "Initial Purchase Price"), as it may be adjusted by payment of either the Remaining Purchase Price or the Disallowance Amount, as applicable, pursuant to Schedule I.  Upon receipt by BUYER of each evidence of transfer of claim in the form attached hereto as Exhibit C executed by SELLER (each, an "Evidence of Transfer of Claim") and the execution and delivery of this Agreement by BUYER and SELLER, and subject to the conditions set forth in Section 2(b), BUYER shall immediately pay the Initial Purchase Price to SELLER by wire transfer to SELLER's account specified on Schedule I hereto (the date of such payment, the "Closing Date").

(b)  BUYER's obligation, pursuant to Section 2(a), to pay the Initial Purchase Price to SELLER on the Closing Date shall be subject to the conditions that:

(i) SELLER's representations and warranties in this Agreement shall have been true and correct as of the date of this Agreement and as of the Closing Date and SELLER shall simultaneously be performing its obligations under Section 1;

(ii) SELLER shall have complied in all material respects with all covenants required by this Agreement to be complied with by SELLER on or before the Closing Date; and

(iii) BUYER shall have received, to its reasonable satisfaction, evidence of each of the following:

(A) the release with respect to the Claims and the Assigned Rights of any and all liens held by The Bank of New York in connection with (i) the Indenture of Trust dated as of August 1, 2007, by and between SELLER and The Bank of New York, as trustee thereunder, and (ii) the Pledge, Assignment and Security Agreement entered into as of August 16, 2007 and as from time to

- 3 -

CONFIDENTIAL                                                    GStad_LB_0062435

time amended, by SELLER in favor of The Bank of New York, as pledgor thereunder;

(B) the consent of Financial Guaranty Insurance Company as "Insurer" under the FGIC ISDA Master Agreement ("FGIC") for SELLER to execute and deliver this Agreement and perform its obligations hereunder, and the agreement of FGIC that further assignments of the Assigned Rights and this Agreement shall not require any further consent by FGIC;

(C) the consent of Financial Security Assurance Inc. as "Insurer" under the FSA ISDA Master Agreement ("FSA") for SELLER to execute and deliver this agreement and perform its obligations hereunder, and the agreement of FSA that further assignments of the Assigned Rights and this Agreement shall not require any further consent by FSA;

(D) the obtaining of any other necessary consents for SELLER to execute and deliver this Agreement and perform its obligations hereunder, and the agreement of any party giving such consent that further assignments of the Assigned Rights and this Agreement shall not require any further consent by such party; and

(E) written assurance from any applicable third party of the lack of any other required consents (other than those that have already been obtained as of the Closing Date) required to (i) enter into this Agreement or effect the transactions contemplated hereby and (ii) further assign the Assigned Rights and this Agreement.

(c) SELLER's obligation, pursuant to Section 2(a), to execute and deliver this Agreement and the Evidences of Transfer of Claim to BUYER on the Closing Date shall be subject to the conditions that:

(i) BUYER's representations and warranties in this Agreement shall have been true and correct as of the date of this Agreement and as of the Closing Date and BUYER shall simultaneously be performing its obligations under Section 2(a);

(ii) BUYER shall have complied in all material respects with all covenants required by this Agreement to be complied with by BUYER on or before the Closing Date; and

(iii) BUYER shall have confirmed in writing to SELLER that it has received the consents and approvals required under Section 2(b)(iii).

3.      (a) At BUYER's timely election, either (i) BUYER shall file each Evidence of Transfer of Claim in the relevant Case prior to the bar date for filing proofs of claim in such Case or (ii) BUYER shall notify SELLER that BUYER requires withdrawal of the Proofs of Claim, without prejudice, in which case SELLER shall promptly thereafter withdraw the Proofs of Claim (without prejudice) and BUYER shall file new proofs of claim substantially identical to the Proofs of Claim, except identifying BUYER as the creditor (or with such other changes as may be approved by SELLER as part of the control of disputes and litigation set forth in Section 9), before the bar date for filing proofs of claim in each Case.

- 4 -

(b) SELLER shall promptly withdraw (i) the proof of claim, date-stamped by the Bankruptcy Court October 17, 2008, claim number 219, filed by SELLER against LBSF in the amount of $301,828,087.35 and (ii) the proof of claim, date-stamped by the Bankruptcy Court October 17, 2008, claim number 216, filed by SELLER against LBHI in the amount of $301,828,087.35.

4.    SELLER represents, warrants and covenants (as of the date of this Agreement and as of the Closing Date) that:

(a) SELLER is duly organized and validly existing under the laws of its jurisdiction of organization, in good standing under such laws, and authorized and empowered (i) to execute and deliver this Agreement and each Evidence of Transfer of Claim relating hereto, and (ii) to perform all of its obligations under this Agreement. Each of this Agreement and the Evidences of Transfer of Claim has been duly authorized, executed and delivered by SELLER and constitutes the valid, legal and binding agreement of SELLER, enforceable against SELLER in accordance with its terms, subject to bankruptcy, insolvency and similar laws of general applicability relating to or affecting creditors' rights and to general equitable principles. No notice to, registration with, consent or approval of, or any other action by, any Governmental Authority (as defined below) or other entity (as defined in the Bankruptcy Code) is or will be required for SELLER to execute and deliver, and perform its obligations under, this Agreement and each Evidence of Transfer of Claim.

(b) SELLER is the sole legal and beneficial owner of the Assigned Rights and has (and upon the consummation of the transactions contemplated hereby shall deliver to BUYER) good title to the Assigned Rights. The Assigned Rights are, in the hands of SELLER as delivered to BUYER, free and clear of: (i) any legal, regulatory or contractual restriction applicable to SELLER (including by way of necessary consent of a third party) on transfer or resale; (ii) any mortgage, pledge, lien, claim, charge, security interest, participation, hypothecation, factoring arrangement or encumbrance, security agreement, security arrangement or adverse claim against title of any kind, purchase or option agreement or put arrangement, subordination agreement or arrangement other than as specified in the Claim Documents, or any similar claim of any nature existing or that would arise by action or inaction of SELLER, or any agreement by SELLER to create or effect any of the foregoing; and (iii) any and all taxes, imposts and duties of any kind, other than taxes on the income of BUYER in respect of the Assigned Rights. SELLER has not previously sold, transferred, assigned or participated, nor has SELLER agreed to sell, convey, transfer, assign or participate, in whole or in part (other than to BUYER under this Agreement), the Assigned Rights.

(c) Neither the execution, delivery and performance of this Agreement and each Evidence of Transfer of Claim, nor consummation of the transactions contemplated hereby and thereby, will violate, contravene or cause a breach or acceleration pursuant to any of SELLER's organizational documents, any statute, law, writ, order, rule, regulation, judgment, injunction, decree or determination affecting SELLER, the Assigned Rights, or, subject to the receipt of the consents and approvals contemplated under Section 2(b)(iii), any contract, agreement, indenture, mortgage, loan agreement, note, ease or other instrument by which SELLER may be bound or to which any of the assets of SELLER may be subject.

(d) No proceedings are (i) pending against SELLER or (ii) to the best of SELLER's knowledge, threatened against SELLER, in each case, before any relevant federal, state or other governmental department, agency, institution, authority, regulatory body, court or tribunal, foreign or domestic (and including arbitral bodies, whether governmental, private or otherwise) (each a "Governmental Authority"), that, in the aggregate, will materially and adversely affect (A) the Assigned Rights, (B) any action taken or to be taken by SELLER under this Agreement or (C) the rights of BUYER created or purported to be created hereby and BUYER's full enjoyment thereof.

- 5 -

CONFIDENTIAL                                                            GStad_LB_0062437

(e)  The basis for the Claims is amounts due and owing by the Debtors to SELLER in respect of the termination of the swap transactions described in the Claim Documents.

(f)  SELLER has fulfilled all of its obligations to the Debtors under, and did not breach any terms or provisions of, any of the Claim Documents, and BUYER shall assume no obligations or liabilities in respect of any Claim or any of the Claim Documents.

(g)  SELLER has not received any notice or information from any Debtor or any official creditors' committee of any dispute over, or intent to object to or seek avoidance of, any Claim or to seek any avoidance recovery from SELLER, and, to SELLER's knowledge, each Claim is a valid, allowable, enforceable, non-contingent, liquidated, unsubordinated and unsecured claim against the relevant Debtor.

(h)  Each Claim, to SELLER's knowledge, is a general unsecured non-priority prepetition claim against the relevant Debtor.

(i)  The Assigned Rights, in the hands of the SELLER as delivered to BUYER, are not subject to any counterclaim, claim or right of setoff, reduction, recoupment, avoidance (by reason of preference, fraudulent conveyance or otherwise), contractual subordination, equitable subordination, or subordination on a basis other than equitable subordination (that is, subordination relative to other claims of the same type, class or tranche).

(j)  No payment has been received by or on behalf of SELLER in full or partial satisfaction of any Claim.

(k)  SELLER did not receive any payments, security interests or other transfers from a Debtor Party (as defined below) during the 91 days prior to the Petition Date for such Debtor Party except payments made (i) either (A) in the ordinary course of business or financial affairs of SELLER and such Debtor Party or (B) on ordinary business terms, and (ii) in respect of indebtedness incurred in the ordinary course of the business or financial affairs of SELLER and such Debtor Party.  For purposes of this Agreement, "Debtor Party" means (A) LBHI, LBSF and each of their respective subsidiaries and affiliates that has a pending case under the Bankruptcy Code and (B) Lehman Brothers Inc. and each of other subsidiary and affiliate of LBHI that has Securities Investor Protection Act proceedings pending.

(l)  SELLER (i) does not, and did not on any Petition Date, hold any funds or property of, or owe any amounts or property to, any Debtor and (ii) has not effected or received, and shall not effect or receive, the benefit of any setoff against any Debtor (it being understood that the calculation of the Claims as described in the Claim Documents does not involve "setoff" for these purposes).

(m)  SELLER is not, and has never been, (i) an insider of any Debtor within the meaning of Section 101(31) of the Bankruptcy Code, (ii) an affiliate of any Debtor within the meaning of Section 101(2) of the Bankruptcy Code or (iii) a member of any creditors' committee appointed in any Case.

(n)  SELLER is, with respect to the Claims, a swap participant within the meaning of that term in Section 101(53C) of the Bankruptcy Code.

(o)  (i)  True and complete copies of all Claim Documents are attached hereto as Exhibit B, and, to SELLER's knowledge, other than the Claim Documents attached hereto as Exhibit B there are no other contracts, documents, stipulations or orders that could materially and adversely affect the Assigned Rights or BUYER's rights hereunder, including, without limitation, any and all documents, correspondence, records, information, and the like (including "Market Quotation" and "Loss" details, price information and third party quotations) that relate to, evidence, define, or are in support of, the

- 6 -

Assigned Rights and/or the amount and/or derivation of the Claims (including all waivers, supplements, forbearances, and amendments thereto) and all schedules and exhibits thereto (but not electronic messages or tape recordings); and (ii) SELLER has not (A) identified, retrieved, cataloged or reviewed, or taken any action to identify, retrieve, catalog or review, any tape recordings or electronic messages relating to or affecting the Claims (other than in connection with responding to unrelated regulatory or governmental inquiries not specifically directed at the Claims), or (B) used or relied on any such tape recordings or electronic messages in establishing, evaluating or prosecuting any of the Claims.

(p)  SELLER: (i) has agreed to the Initial Purchase Price and the Remaining Purchase Price based on its own independent investigation and credit determination and has consulted with such advisors as it believes appropriate and has not relied on any representations made by BUYER; (ii) is a sophisticated seller with respect to the sale of the Assigned Rights; (iii) has adequate information concerning the business and financial condition of each of the Debtors and the other obligors with respect to the Claims and the status of the Cases to make an informed decision regarding the sale of the Assigned Rights; and (iv) has independently and without reliance upon BUYER, and based on such information as SELLER has deemed appropriate, made its own analysis and decision to enter into this Agreement, except that SELLER has relied upon BUYER's express representations, warranties, covenants and indemnities in this Agreement.   SELLER acknowledges that BUYER has not given SELLER any investment advice, credit information, or opinion on whether the sale of the Assigned Rights is prudent.

(q)  SELLER is an "accredited investor" as defined in Rule 501 under the Securities Act of 1933, as amended (the "Securities Act").  Without characterizing the Assigned Rights as a "security" within the meaning of applicable securities laws, SELLER has not made any offers to sell, or solicitations of offers to buy, any portion of the Assigned Rights in violation of any applicable securities laws.

(r)  No part of the Assigned Rights is being sold by or on behalf of one or more "employee benefit plans" (as defined in the Employee Retirement Income Security Act of 1974, as amended ("ERISA")) that is subject to ERISA, a "plan" as defined in Section 4975 of the Internal Revenue Code, or any entity, or other account of any entity, whose assets include (or are deemed for the purpose of ERISA or Section 4975 of the Internal Revenue Code to include) the assets of any such "employee benefit plan" or "plan."

(s)  No broker, finder, person or other entity acting under SELLER's authority is entitled to any broker's commission or other fee in connection with the transactions contemplated by this Agreement for which BUYER could be responsible.

(t)  SELLER is aware that information which may be pertinent to SELLER's decision to transfer the Assigned Rights is available to SELLER and can be obtained from the Bankruptcy Court's files or other publicly available sources.

(u)  SELLER is aware that the consideration received herein for the sale of the Assigned Rights may differ both in kind and amount from any Distributions made with respect to the Claims, including pursuant to any plan or reorganization confirmed by the Bankruptcy Court in the Cases.

(v)  SELLER has not engaged and will not engage in any act, conduct or omission, and SELLER has not had and will not have any relationship or transaction with the Debtors, in each case that could result in BUYER receiving proportionately less in payments or Distributions under, or less favorable treatment (including the timing of payments or Distributions) for, the Assigned Rights than is received by other creditors in respect of other claims of the same class, tranche or type as the Claims.

- 7 -

CONFIDENTIAL                                                    GStad_LB_0062439

(w)  In the event any liens encumber the Assigned Rights, SELLER agrees to timely obtain releases from the parties listed on such report or such filings.

5.     BUYER represents, warrants and covenants (as of the date of this Agreement and as of the Closing Date) that:

(a) BUYER (i) is a duly organized and validly existing national bank, (ii) is in good standing under applicable laws, and (iii) has full power and authority to execute, deliver and perform its obligations under this Agreement.

(b)  BUYER's execution, delivery and performance of this Agreement has not resulted, and will not result, in a breach or violation of any provision of (i) BUYER's organizational documents, (ii) any statute, law, writ, order, rule, or regulation of any Governmental Authority applicable to BUYER, (iii) any judgment, injunction, decree or determination applicable to BUYER or (iv) any contract, indenture, mortgage, loan agreement, note, lease or other instrument by which BUYER may be bound or to which any of the assets of BUYER is subject.

(c)  This Agreement (i) has been duly and validly authorized, executed and delivered by BUYER, and (ii) is the legal, valid and binding obligation of BUYER, enforceable against BUYER in accordance with its terms, subject to bankruptcy, insolvency and similar laws of general applicability relating to or affecting creditors' rights and to general equitable principles.

(d)  Except as provided in the Claim Documents, no notice to, registration with, consent or approval of, or any other action by, any relevant Governmental Authority or other entity is or will be required for BUYER to execute, deliver and perform its obligations under the Agreement (other than the transfer notice, if any).

(e)  Without characterizing the Assigned Rights as a "security" within the meaning of applicable securities laws, BUYER is not purchasing the Assigned Rights with a view towards the sale or distribution thereof in violation of the Securities Act; provided, however, that BUYER may resell the Assigned Rights if such resale is otherwise in compliance with Section 12.

(f)  BUYER acknowledges that the consideration paid under this Agreement for the purchase of the Assigned Rights may differ both in kind and amount from any Distribution.

(g)  BUYER: (i) is a sophisticated entity with respect to the purchase of the Assigned Rights; (ii) is able to bear the economic risk associated with the purchase of the Assigned Rights; (iii) has adequate information concerning the business and financial condition of each of the Debtors and the other obligors in respect of the Assigned Rights and the status of the Cases to make an informed decision regarding the purchase of the Assigned Rights; (iv) has such knowledge and experience, and has made investments of a similar nature, so as to be aware of the risks and uncertainties inherent in the purchase of rights and assumption of liabilities of the type contemplated in this Agreement; and (v) has independently and without reliance upon SELLER, and based on such information as BUYER has deemed appropriate, made its own analysis and decision to enter into this Agreement, except that BUYER has relied upon SELLER's express representations, warranties, covenants, and indemnities in this Agreement.  BUYER acknowledges that SELLER has not given it any investment advice, credit information, or opinion on whether the purchase of the Assigned Rights is prudent.

(h)  Except as otherwise provided in this Agreement, BUYER has not relied and will not rely on SELLER to furnish or make available any documents or other information regarding the

- 8 -

CONFIDENTIAL                                             GStad_LB_0062440

credit, affairs, financial condition, or business of any Debtor, or any other matter concerning any Debtor.

(i)  BUYER acknowledges, without limiting any obligation of SELLER under this Agreement, that (i) SELLER currently may have, and later may come into possession of, information with respect to the Assigned Rights, any Debtor, any obligor in respect of the Assigned Rights, or any of their affiliates that is not known to BUYER and that may be material to a decision to acquire the Assigned Rights (the "Buyer Excluded Information"), (ii) BUYER has determined to purchase the Assigned Rights notwithstanding its lack of knowledge of the Buyer Excluded Information and (iii) SELLER shall have no liability to BUYER, and BUYER waives and releases any claims that it might have against SELLER, whether under applicable securities laws or otherwise, with respect to the nondisclosure of the Buyer Excluded Information in connection with the transactions contemplated hereby; provided, however, that the Buyer Excluded Information shall not and does not affect the truth or accuracy of SELLER's representations or warranties under this Agreement.

(j)  No broker, finder, person or other entity acting under BUYER's authority is entitled to any broker's commission or other fee in connection with the transactions contemplated by this Agreement for which SELLER could be responsible.

(k)  Either (a) no interest in the Assigned Rights is being acquired by or on behalf of a person or entity that is, or at any time while the Assigned Rights are held thereby will be, one or more benefit plans within the meaning of ERISA, or (b) the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds), and PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers) is applicable with respect to the purchase and holding of the Assigned Rights and the exercise of BUYER's rights thereunder.

(l)  BUYER is an "accredited investor" as defined in Rule 501 under the Securities Act.

(m)  No proceedings are (i) pending against BUYER or (ii) to the best of BUYER's knowledge, threatened against BUYER, before any relevant Governmental Authority that, in the aggregate, will materially and adversely affect any action taken or to be taken by BUYER under this Agreement.

(n)  BUYER's obligations under this Agreement constitute and at all times will constitute valid and enforceable general unsecured obligations of the BUYER.

6.      Each of BUYER and SELLER acknowledges that the other may possess material non-public information concerning the Assigned Rights and/or any Debtor.  Each of BUYER and SELLER further acknowledges that it has not requested to receive such information and has nevertheless determined to proceed with the transaction contemplated herein, and has expressly not relied on information received from the other party except as expressly set forth in the representations set forth in this Agreement.  Neither party shall have any liability to the other, and each waives and releases any claims that it might have against the other (whether under applicable securities laws or otherwise), arising out of the non-disclosure of such information; provided, however, that nothing in this paragraph shall limit, contradict or render untrue any representation or warranty made by SELLER in Section 4.

- 9 -

CONFIDENTIAL

7. BUYER hereby grants to SELLER a participation interest in each Claim to the extent that the allowed amount of such Claim exceeds $301,828,087.35, including any and all Distributions attributable or payable on account of such excess amount (with respect to either the LBSF Claim or the LBHI Claim, a "Participation Interest"). For the avoidance of doubt, BUYER is hereby the owner of the Assigned Rights underlying any Participation Interest, and shall have all rights (including voting and litigation control rights) with respect to the Assigned Rights except for the rights provided for the Claims in general in Section 9. BUYER shall pay over to SELLER any Distributions received with respect to a Participation Interest within 5 business days of receipt; provided, however, that in the event that any disgorgement of such Distributions, or withholding of further distributions on the Claims pursuant to Bankruptcy Code Section 502(j) or similar remedy, is subsequently ordered, SELLER shall pay such disgorgable amount to BUYER within 5 business days of written demand (and if the disgorgement or reconsideration relates only to Distributions in respect of amounts subject to a Participation Interest, SELLER shall have the right to control litigation and settlement of such disgorgement dispute; BUYER shall not settle any such disgorgement or reconsideration dispute on the implicated Distributions that are partially subject to a Participation Interest except in a commercially reasonable manner). SELLER agrees that the Participation Interest gives it no direct rights against the Debtors with respect to the Assigned Rights.

8. SELLER agrees that if SELLER shall hereafter actually receive any Distributions or any notices or other documents on account or in respect of the Assigned Rights, SELLER shall accept and hold the same on behalf of and in trust for BUYER, and shall deliver the same forthwith to BUYER in the same form received, with the endorsement of SELLER (without recourse) where necessary or appropriate, within six (6) business days. SELLER acknowledges and agrees that all Distributions are the property of BUYER; provided, however, that if any amounts are due hereunder from BUYER to SELLER, SELLER may setoff any cash Distributions that it receives against such amounts. SELLER agrees to execute and deliver, or to cause to be executed and delivered, all such instruments and documents, and to take all such action as BUYER may reasonably request, promptly upon the request of BUYER, in order to effectuate the intent and purpose of, and to carry out the terms of, this Agreement, and to cause BUYER to become the legal and beneficial owner and holder of the Assigned Rights.

9. (a) BUYER shall, following its receipt of any objection to any portion of any Claim that is filed with the Bankruptcy Court or other applicable court, provide a copy of the same to SELLER. BUYER shall also provide SELLER with a copy of all other written materials that BUYER receives from the Bankruptcy Court or other applicable court, or from the proponent to any such objection, that specifically relate to any Claim.

(b) SELLER (or its designee) shall have the right to control any dispute or litigation (i) related to any Indemnified Claim (as defined below) at all times following the date of this Agreement, and (ii) specifically related to either of the Claims (as opposed to any dispute or litigation that generally affect claims of their type or class) that either (A) affect the allowance of either of the Claims or (B) if resolved adversely to BUYER, could affect the amount of Remaining Purchase Price or Disallowance Payment payable pursuant to Schedule I; provided, however, that: (I) such control of SELLER over any dispute or litigation related to the allowance of the claims shall expire on the first anniversary of the first date on which the plans of reorganization of both Debtors have been confirmed by the Bankruptcy Court (such date, the "Expiration Date") and, on and after the Expiration Date, BUYER shall have such right of control (unless BUYER, in its sole discretion, otherwise elects to extend the control of SELLER beyond the Expiration Date); and (II) notwithstanding the foregoing clause (I), if at any time prior to the Expiration Date there is a dispute or litigation related to the allowance of the Claims, SELLER will agree, for voting purposes only, with the Debtors to any estimation of the amount of the Claims that is equal to

- 10 -

or greater than 50% of the Claim Amount, provided that such estimation agreement expressly provides that the estimation shall be nonbinding and inadmissible in claims allowance proceedings. The party controlling disputes and/or litigation at any time shall (x) have the right to select counsel reasonably acceptable to the other party (it being acknowledged that both counsel who participated in the negotiation of this Agreement are acceptable), (y) bear the cost of such litigation and (z) actively consult with the other party over the course of, and with respect to decisions in, any such disputes or litigation (with the consulted party bearing any costs of its own counsel).

(c)   SELLER shall at all times control all settlements with respect to any dispute or litigation with respect to which SELLER (or its designee) has control for purposes of Section 9(b) until the Expiration Date; provided, however, that SELLER shall enter into settlements only in good faith (with respect to BUYER) as though SELLER were the full economic beneficiary of the Claims.

10.      Subject to the control rights set forth in Section 9 and in addition to the sale contemplated by this Agreement, SELLER hereby irrevocably appoints BUYER as its true and lawful attorney-in-fact with respect to the Claims and authorizes BUYER to act in SELLER's name, place and stead, to demand, sue for, compromise and recover all such sums of money which are, or may hereafter become due and payable for, or on account of, the Claims herein assigned, to vote the Claims, to file proofs of claim with respect to the Claims and/or to otherwise effectuate the intent of this Agreement and SELLER hereby grants unto BUYER full authority to do all things necessary to enforce the Claims and SELLER's rights thereunder. Subject to the preceding sentence, to the extent of SELLER's control rights set forth in Section 9 hereof, BUYER hereby irrevocably appoints SELLER as its true and lawful attorney-in-fact with respect to the Claims and authorizes SELLER to act in BUYER's name, place and stead, to demand, sue for, compromise and recover all such sums of money which are, or may hereafter become due and payable for, or on account of, the Claims herein assigned, to file proofs of claim with respect to the Claims and/or to otherwise effectuate the intent of this Agreement. Subject to Section 9(b), BUYER hereby grants unto SELLER (without recourse to or obligation of SELLER) full authority to do all things necessary to enforce the Claims and BUYER's rights thereunder. SELLER and BUYER shall cooperate reasonably to coordinate their activities and carry out the purposes of this Agreement.

11.      (a)   SELLER agrees to indemnify and hold BUYER and its officers, directors, employees, agents and controlling persons harmless from and against any and all losses, claims, damages, costs, expenses and liabilities, including, without limitation, reasonable attorneys' fees and expenses, which result from (i) any claim asserted by any Debtor that any amount is payable by BUYER to any Debtor under or with respect to any Claim Document or any Claim (such claim, an "Indemnified Claim"), other than amounts payable as a result of the action or inaction of BUYER after the date hereof, or (ii) any breach by SELLER of any of representation, warranty, covenant or agreement of SELLER set forth herein.

(b) If SELLER is required to pay any amount to BUYER under Section 11(a) for any breach by SELLER of any representation, warranty, covenant or agreement of SELLER under this Agreement, then SELLER shall be required in addition to pay to BUYER an amount equal to interest on the amount of such payment, calculated at a rate of 1.0% per annum from the date of the loss giving rise to such indemnification to the date of payment.

(c) To the extent BUYER finally recovers any amount in respect of the price paid for any Claim from SELLER under Sections 11(a) and 11(b) for breach by SELLER of any representation, warranty, covenant or agreement of SELLER under this Agreement, then any amount BUYER would be entitled to recover from SELLER pursuant to the procedures set forth on Schedule I hereto in respect of such Claim shall be reduced by the amount of such recovery under Sections 11(a) and 11(b).

- 11 -

(d)    BUYER agrees to indemnify and hold SELLER and its officers, directors, employees, agents and controlling persons harmless from and against any and all losses, claims, damages, costs, expenses and liabilities, including, without limitation, reasonable attorneys' fees and expenses, which result from any breach by BUYER of any of representation, warranty, covenant or agreement of BUYER set forth herein.

12.    BUYER may sell, assign, grant a participation in, encumber, hypothecate or otherwise transfer all or any portion of the Assigned Rights, this Agreement, its rights under this Agreement, or any interest in any of the foregoing without SELLER's prior consent and SELLER shall thereafter perform its obligations directly for the benefit of such transferee; provided, however, that: (a) such sale, assignment, participation, encumbrance, hypothecation or transfer shall comply with any applicable requirements in the Claim Documents and shall not violate any applicable laws, rules or regulations, including, without limitation, any applicable securities laws, rules or regulations; (b) notwithstanding any such sale, assignment, participation, encumbrance, hypothecation or transfer, unless SELLER otherwise consents in writing (which consent SELLER shall not unreasonably withhold, condition or delay), BUYER's obligations to SELLER under this Agreement shall remain in full force and effect until fully paid, performed and satisfied; and (c) any buyer, assignee, participant in, pledgee or transferee of BUYER's rights and obligations under this Agreement must agree to substantially the same terms as BUYER, *mutatis mutandis*, as those described in Section 9, Section 11(c) and this Section 12. SELLER may not sell, assign, grant a participation in, encumber, hypothecate or otherwise transfer all or any portion of its rights under this Agreement without BUYER's prior written consent, provided that no such consent shall be necessary in connection with the grant of, or execution of, any security interest created for financing purposes in a substantial portion of the assets of BUYER generally.

13. All representations, warranties, covenants and agreements contained herein shall survive the execution and delivery of this Agreement and shall inure to the benefit of the successors and assigns of any party hereto; provided, however, that the obligations of SELLER and BUYER contained herein shall continue and remain in full force and effect until fully paid, performed and satisfied (including, if applicable, until payment of the Remaining Purchase Price). This Agreement shall be governed by the laws of the State of New York. Each party submits to the jurisdiction of the federal or state courts located in the Borough of Manhattan and agrees that any litigation relating to this Agreement shall be brought only in such courts.

14.    (a)  Each party agrees that, without the prior consent of the other party, it shall not disclose the contents of this Agreement to any entity, except that any Party may make any such disclosure (i) as required to implement or enforce this Agreement; (ii) if required to do so by any law, regulation, court or legal proceeding; (iii) to any Governmental Authority or self-regulatory entity having or asserting jurisdiction over it, or, in the case of SELLER, to the NFL or its representatives or advisors, provided that in the event that SELLER discloses the contents of this Agreement to the NFL (or its representative or advisors), then such disclosure shall be subject to the terms and conditions of a customary confidentiality agreement; (iv) to any current or potential direct or indirect owners or creditors of SELLER, or the agents, representatives or counsel of such owners or creditors, provided that in the event that SELLER discloses the contents of this Agreement to such potential direct or indirect owners or creditors of SELLER (or the agents, representatives or counsel thereof) such disclosure shall be subject to the terms and conditions of a customary confidentiality agreement; (v) if its attorneys advise it that it has a legal obligation to do so or that failure to do so may result in it incurring a liability to any other entity; (vi) to its professional advisors and auditors; and/or (vii) as set forth in Section 14(b).

(b)    BUYER may disclose the contents of this Agreement to any proposed transferee, assignee, participant or other entity proposing to enter into contractual relations with BUYER in respect of the Assigned Rights or any part of them.

- 12 -

CONFIDENTIAL                                              GStad_LB_0062444

(c)      BUYER agrees to comply with the requirements of the Claim Documents regarding confidentiality.

15.      SELLER HEREBY WAIVES ANY NOTICE REQUIREMENT IMPOSED BY BANKRUPTCY RULE 3001(e), AND CONSENTS TO THE SUBSTITUTION OF BUYER FOR SELLER FOR ALL PURPOSES IN EACH CASE, INCLUDING, WITHOUT LIMITATION, FOR VOTING AND DISTRIBUTION PURPOSES WITH RESPECT TO THE CLAIMS. SELLER AND BUYER AGREE THAT BUYER MAY FILE THIS AGREEMENT, ANY EVIDENCE OF TRANSFER OF CLAIM OR ANY OTHER APPROPRIATE NOTICE WITH THE BANKRUPTCY COURT PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 3001(e).

16.      (a) This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof, and supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations with respect to such subject matter, all of which have become merged and finally integrated into this Agreement.

(b) This Agreement may be executed by telecopy in multiple counterparts and all of such counterparts taken together shall be deemed to constitute one and the same instrument. Transmission by telecopier of an executed counterpart shall be deemed to constitute due and sufficient delivery of such counterpart. Each fully executed counterpart of this Agreement shall be deemed to be a duplicate original.

(c) The relationship between SELLER and BUYER shall be that of seller and buyer. Neither is a trustee or agent for the other, nor does either have fiduciary obligations to the other. This Agreement shall not be construed to create a partnership or joint venture between the parties.

(d) The illegality, invalidity, or unenforceability of any provision of this Agreement under the law of any jurisdiction shall not affect its legality, validity or enforceability under the law of any other jurisdiction nor the legality, validity or enforceability of any other provision.

*[Remainder of page left intentionally blank]*

- 13 -

**CONFIDENTIAL**

IN WITNESS WHEREOF, each of the undersigned has duly executed this Agreement by its duly authorized representative as of the date first written above.

SELLER:

**GIANTS STADIUM LLC**

By: _____
Name:  Christine Procops
Title:  Authorized Representative

BUYER:

**BANK OF AMERICA, N.A.**

By: _____
Name:
Title:

Signature Page to Claims Purchase Agreement

**CONFIDENTIAL**

**GStad_LB_0062446**

BOA                     Fax 646+855+0106          Apr 24 2009 01:43pm P001/008

IN WITNESS WHEREOF, each of the undersigned has duly executed this Agreement by its duly authorized representative as of the date first written above.

<u>SELLER</u>:

**GIANTS STADIUM LLC**

By:_____
Name:
Title:

<u>BUYER</u>:

**BANK OF AMERICA, N.A.**

By:_____
Name: Frank Kotsen
Title: Manging Director

## SCHEDULE I

### PURCHASE PRICE CALCULATION AND PROCESS

| | | |
|---|---|---|
| A. | Claim Amount: | $301,828,087.35 |
| B. | Purchase Rate: | 21.5% |
| C. | Initial Purchase Price (A x B x 50%): | $32,446,519.39 |

Remaining Purchase Price Provisions:

In the event that the final amount allowed by the Bankruptcy Court pursuant to entry of an order of the Bankruptcy Court (i) which has not been reversed, stayed, modified or amended and (ii) as to which (A) any appeal, rehearing or other review has been finally determined in a manner that does not affect such order or (B) the time to appeal or seek a rehearing or other review of has expired and no appeal, motion for reconsideration has been timely filed (a "Final Order") in respect of either the LBSF Claim or the LBHI Claim (such amount with respect to either the LBSF Claim or the LBHI Claim, the "Allowed Amount") exceeds $150,914,043, then BUYER shall within five business days pay to SELLER (in accordance with the wire instructions on this Schedule I) an additional amount (such amount, the "Remaining Purchase Price") equal to (a) the difference between (x) the Allowed Amount of such Claim (up to $301,828,087.35) multiplied by 10.75% and (y) $16,223,259.50 plus (b) interest on the Remaining Purchase Price at a rate of 1.0% per annum from the Closing Date to the date of payment of the Remaining Purchase Price (such date, the "Final Payment Date").

Claims Disallowance Provisions:

In the event that all or any portion of either the LBSF Claim or the LBHI Claim is disallowed, in whole or in part, for any reason whatsoever pursuant to a Final Order of the Bankruptcy Court or other applicable court (a "Disallowance") or if either the LBSF Claim or the LBHI Claim, as a result of any action or omission on the part of SELLER or any of its affiliates, is classified in a manner so that it is subordinated to any other general unsecured non-priority prepetition claims against the relevant Debtor, and the amount of such Claim thereafter that has not been disallowed or so classified (the "Residual Claim Amount") is less than $150,914,043, then SELLER shall within five business days, upon demand by BUYER (provided, that no demand shall be required against SELLER if an insolvency proceeding is pending for SELLER), immediately repay (in accordance with the wire instructions on this Schedule I) (any such payment, a "Disallowance Payment") to BUYER an amount equal to (i) (A) (x) the difference between $150,914,043 and the Residual Claim Amount, less (y) any portion of the Claim as to which a Disallowance Payment has previously been made, multiplied by (B) 10.75%, plus (ii) interest thereon calculated at a rate equal to 1.0% per annum from the Closing Date to the date of such Disallowance Payment.

For the avoidance of doubt, there may be more than one Remaining Purchase Price adjustment and/or Disallowance Payment, and, to the extent that additional allowances or disallowances occur at the same time, they shall be settled on an aggregate (or net) basis.

SELLER's Wire Instructions:

Bank: JPMorgan Chase
Routing No: 021000021
Account Number: 750532012
Account Reference: Giants Stadium LLC Control Account

CONFIDENTIAL

<u>EXHIBIT A1</u>

**[LBSF PROOF OF CLAIM]**

CONFIDENTIAL

GStad_LB_0062449

## EXHIBIT A2

**[LBHI PROOF OF CLAIM]**

**CONFIDENTIAL**

EXHIBIT B

**[ATTACH ALL CLAIM DOCUMENTS]**

CONFIDENTIAL

EXHIBIT C

**[EVIDENCES OF TRANSFER OF CLAIM]**

CONFIDENTIAL

## EVIDENCE OF TRANSFER OF CLAIM

TO:  Clerk, United States Bankruptcy Court, Southern District of New York

AND TO: Giants Stadium LLC

Giants Stadium LLC, a limited liability company organized under the laws of New Jersey, with offices located at Meadowlands Sports Complex, 50 State Route 120, East Rutherford, NJ 07073 ("SELLER"), for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and pursuant to the terms of a Transfer of Claim Agreement dated as of the date hereof, does hereby certify that it has unconditionally and irrevocably sold, transferred and assigned to Bank of America, N.A., its successors and assigns, with offices located at Bank of America Tower, 3rd Floor, One Bryant Park, New York, NY 10036 ("BUYER"), all right, title and interest in and to the claims of SELLER against Lehman Brothers Holdings Inc., and its affiliates in the amount of $301,828,087.35 (the "Claim") in the United States Bankruptcy Court, Southern District of New York, Case No. 08-13555 (JMP).

SELLER hereby waives any notice or hearing requirements imposed by Rule 3001 of the Federal Rules of Bankruptcy Procedure, and stipulates that an order may be entered recognizing this Assignment of Claim as an unconditional assignment and BUYER herein as the valid owner of the Claim. You are hereby requested to make all future payments and distributions, and to give all notices and other communications, in respect to the Claim to BUYER.

IN WITNESS WHEREOF, dated as of the ____ day of April, 2009.

**GIANTS STADIUM LLC**


By:_____
    Name:
    Title:


**BANK OF AMERICA, N.A.**


By:_____
    Name:
    Title:

CONFIDENTIAL

## EVIDENCE OF TRANSFER OF CLAIM

TO:  Clerk, United States Bankruptcy Court, Southern District of New York

AND TO: Giants Stadium LLC

Giants Stadium LLC, a limited liability company organized under the laws of New Jersey, with offices located at Meadowlands Sports Complex, 50 State Route 120, East Rutherford, NJ 07073 ("SELLER"), for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and pursuant to the terms of a Transfer of Claim Agreement dated as of the date hereof, does hereby certify that it has unconditionally and irrevocably sold, transferred and assigned to Bank of America, N.A., its successors and assigns, with offices located at Bank of America Tower, 3rd Floor, One Bryant Park, New York, NY 10036 ("BUYER"), all right, title and interest in and to the claims of SELLER against Lehman Brothers Special Financing Inc., and its affiliates in the amount of $301,828,087.35 (the "Claim") in the United States Bankruptcy Court, Southern District of New York, Case No. 08-13888 (JMP).

SELLER hereby waives any notice or hearing requirements imposed by Rule 3001 of the Federal Rules of Bankruptcy Procedure, and stipulates that an order may be entered recognizing this Assignment of Claim as an unconditional assignment and BUYER herein as the valid owner of the Claim. You are hereby requested to make all future payments and distributions, and to give all notices and other communications, in respect to the Claim to BUYER.

IN WITNESS WHEREOF, dated as of the ____ day of April, 2009.

**GIANTS STADIUM LLC**

By:_____
    Name:
    Title:

**BANK OF AMERICA, N.A.**

By:_____
    Name:
    Title:

CONFIDENTIAL