# EXHIBIT C

**United States Bankruptcy Court/Southern District of New York**

Lehman Brothers Holdings Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5076
New York, NY 10150-5076

| # PROOF OF CLAIM |
|---|

| In Re: | Chapter 11 |
|---|---|
| Lehman Brothers Holdings Inc., et al., | Case No: 08-13555 (JMP) |
| Debtors | (Jointly Administered) |
| Name of Debtor Against Which Claim is Held | Case No. of Debtor |
| Lehman Brothers Special Financing Inc. | 08-13888 |

Filed: USBC - Southern District of New York
Lehman Brothers Holdings Inc., Et Al.
08-13555 (JMP)        0000067782

**NOTE:** This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503. Additionally, this form should not be used to make a claim for Lehman Programs Securities (See definition on reverse side.)

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)

Giants Stadium LLC
Meadowlands Sports Complex
50 State Route 120
East Rutherford, NJ 07073
Attention: Christine Procops

☑ Check this box to indicate that this claim amends a previously filed claim

**Court Claim Number:** 64070
*(If known)*

Filed on: 10/29/2009

Telephone number: (201) 460-2852   Email Address: Procops@giants.nfl.net

Name and address where payment should be sent (if different from above)
Same as above

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

Telephone number:            Email Address:

1. **Amount of Claim as of Date Case Filed:** $ 585,210,327.94

If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete item 4.

If all or part of your claim is entitled to priority, complete Item 5.

If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete Item 6.

☑ Check this box if all or part of your claim is based on a Derivative Contract.*
☐ Check this box if all or part of your claim is based on a Guarantee.*

***IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.**

☑ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is based on a Derivative Contract or Guarantee.

2. **Basis for Claim:** Supplemental statement of Loss pursuant to Section 6(d) of ISDA Master Agreement (FGIC-Insured) and ISDA Master Agreement (FSA-Insured) between Creditor and Debtor
(See instruction #2 on reverse side.)

3. **Last four digits of any number by which creditor identifies debtor:** _____
3a. Debtor may have scheduled account as: _____
(See instruction #3a on reverse side.)

4. **Secured Claim** (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.

Nature of property or right of setoff: ☐ Real Estate   ☐ Motor Vehicle   ☐ Other
Describe:

Value of Property: $_____   Annual Interest Rate _____%
Amount of arrearage and other charges as of time case filed included in secured claim, if any:
$_____   Basis for perfection: _____

Amount of Secured Claim: $_____   Amount Unsecured: $_____

5. **Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim.

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).
☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).
☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).
☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

**Amount entitled to priority:**

$_____

6. **Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9):** $_____
(See instruction #6 on reverse side.)

7. **Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

8. **Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest. *(See definition of "redacted" on reverse side.)* If the documents are voluminous, attach a summary.

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**FOR COURT USE ONLY**

FILED / RECEIVED

DEC 06 2011

EPIQ BANKRUPTCY SOLUTIONS, LLC

| Date: 12/6/11 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.   Christine Procops   Authorized Representative |
|---|---|

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

# INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, there may be exceptions to these general rules.*

**Items to be completed in Proof of Claim form**

**Name of Debtor, and Case Number:**
YOU MUST INDICATE THE SPECIFIC DEBTOR AGAINST WHICH YOUR CLAIM IS ASSERTED, INCLUDING THE THE NAME OF THE DEBTOR AND THE RELATED CASE NUMBER (DEBTORS AND CASE NUMBERS LISTED BELOW), IN THE SPACE ALLOTTED AT THE TOP OF THE CLAIM FORM.

| | | | |
|---|---|---|---|
| 08-13555 | Lehman Brothers Holdings Inc. | 08-13905 | CES Aviation LLC |
| 08-13600 | LB 745 LLC | 08-13906 | CES Aviation V LLC |
| 08-13885 | Lehman Brothers Commodity Services Inc. | 08-13907 | CES Aviation IX LLC |
| 08-13888 | Lehman Brothers Special Financing Inc. | 08-13908 | East Dover Limited |
| 08-13893 | Lehman Brothers OTC Derivatives Inc. | 09-10108 | Luxembourg Residential Properties Loan Finance S.a.r.l. |
| 08-13899 | Lehman Brothers Derivative Products Inc. | 09-10137 | BNC Mortgage LLC |
| 08-13900 | Lehman Commercial Paper Inc. | 09-10558 | Structured Asset Securities Corporation |
| 08-13901 | Lehman Brothers Commercial Corporation | 09-10560 | LB Rose Ranch LLC |
| 08-13902 | Lehman Brothers Financial Products Inc. | 09-12516 | LB 2080 Kalakaua Owners LLC |
| 08-13904 | Lehman Scottish Finance L.P. | 08-13664 | PAMI Statler Arms LLC |

If your claim is against multiple Debtors, complete a separate form for each Debtor.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the Bankruptcy filing. Follow the instructions concerning whether to complete items 4, 5 and 6. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Use this space to report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**4. Secured Claim:**
Check the appropriate box and provide the requested information if the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See DEFINITIONS, below.) State the type and the value of property that secures the claim, attach copies of lien documentation, and state annual interest rate and the amount past due on the claim as of the date of the bankruptcy filing.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. §507(a).**
If any portion of your claim falls in one or more of the listed categories, check the appropriate box(es) and state the amount entitled to priority. (See DEFINITIONS, below.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9)**
State the value of any goods received by the debtor within 20 days before the date of commencement in which the goods have been sold to the debtor in the ordinary course of the debtor's business.

**7. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**8. Documents:**
Attach to this proof of claim form redacted copies documenting the existence of the debt and of any lien securing the debt. You may also attach a summary. You must also attach copies of documents that evidence perfection of any security interest. You may also attach a summary. FRBP 3001(c) and (d). Do not send original documents, as attachments may be destroyed after scanning.

**Date and Signature:**
The person filing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2), authorizes courts to establish local rules specifying what constitutes a signature. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. Attach a complete copy of any power of attorney. Criminal penalties apply for making a false statement on a proof of claim.

## ——— DEFINITIONS ———

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**
A creditor is the person, corporation, or other entity owed a debt by the debtor on the date of the bankruptcy filing.

**Claim**
A claim is the creditor's right to receive payment on a debt that was owed by the debtor on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the Claims Agent at the following address:
**Lehman Brothers Holdings Claims Processing**
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, PO Box 5076
New York, NY 10150- 5076

**Secured Claim Under 11 U.S.C. §506(a)**
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien. A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. §507(a)**
Priority claims are certain categories of unsecured claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor should redact and use only the last four digits of any social-security, individual's tax identification, or financial-account number, all but the initials of a minor's name and only the year of any person's date of birth.

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

**Derivative Contract**
A contract that is any of (i) a "swap agreement" as such term is defined in section 101(53B) of the Bankruptcy Code or (ii) a "forward contract" as such term is defined in section 101(25) of the Bankruptcy Code. A cash-market purchase or sale of a security or loan (i.e. any purchase or sale of a security or loan for settlement within the standard settlement cycle for the relevant market), exchange-traded future or option, securities loan transaction, repurchase agreement in respect of securities or loans, and any guarantee or reimbursement obligations which would otherwise be included in the definition of such terms in the Bankruptcy Code shall not be considered a Derivative Contract for the purposes of this definition nor shall any notes, bonds, or other securities issued by the Debtors or their affiliates (including, but not limited to, Lehman Brothers Holdings Inc., Lehman Brothers Treasury Co. B.V., Lehman Brothers Bankhaus AG, Lehman Brothers Holdings plc, Lehman Brothers Securities N.V., and Lehman Brothers (Luxembourg) Equity Finance S.A.).

**Guarantee**
A promise, representation or agreement to answer for the payment of some debt or the performance of some duty in case of the failure of another person or entity who is liable in the first instance.

**Lehman Programs Securities**
Lehman Programs Securities means those securities included on the Lehman Programs Securities list available on http://www.lehman-docket.com as of July 27, 2009.

## ——— INFORMATION ———

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim, or you may access the Claims Agent's system (http://www.lehman-docket.com) to view your filed proof of claim.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 et seq.), and any applicable orders of the bankruptcy court.

## Supplemental Statement (FGIC-Insured)

The calculation of Loss included as Schedule 1 ("Base Calculation") in the original Statement pursuant to Section 6(d) of the ISDA Master Agreement (FGIC-Insured) identifies elements of "Loss" that were to be provided in a supplemental statement. This is the referenced supplemental statement.

**1.      Supplemental Elements of Loss**

The Base Calculation identifies five important and bargained-for benefits of the Transaction for the Non-Defaulting Party that may be addressed by a supplemental statement. They are listed below, with corresponding calculations:

(i)      **"the option value inherent in floating rate conversion mechanics of the Transaction, which permitted the Non-Defaulting Party to convert the transaction into a fixed/floating interest rate swap at a predetermined rate <u>at any time</u> during its term"**

At termination of the Transaction, the Non-Defaulting Party's Loss included the lost value of its option to convert the Transaction to a fixed/floating interest rate swap. The value of the conversion option can be reflected by the market price on the Early Termination Date of an option to enter into a swap (a "swaption") under which the Non-Defaulting Party would pay the actual bond rates reflected in the Base Calculation and receive LIBOR (this exchange of payments would effectively convert the bond rate swap and result in the Non-Defaulting Party paying the negotiated fixed rate and receiving LIBOR).

However, given the actual rates on the auction rate securities reflected in the Base Calculation, the value of the option to convert the Transaction is an immaterial amount (although still not zero). Accordingly, the Non-Defaulting Party will not supplement the Base Calculation to reflect this option value assuming the claim is allowed. Note that the immaterial value of the option is derived from the actual rates reflected in the Base Calculation, and the value may be higher if different rates had been used.

(ii)     **"the absence of the significant termination events, collateral triggers or covenants relating to the Non-Defaulting Party or its insurer, which we do not expect to be able to achieve again with any replacement counterparty and have a significant commercial and credit benefit to the Non-Defaulting Party"**

We address the economic effect of these items in paragraph (iii) below.

(iii)    **"the fact that any replacement swap is likely to involve a significant credit charge and a significant premium payable to the counterparty over and above the fixed rate corresponding to expected future payments on the auction rate securities"**

The Base Calculation is limited to the value of the payments exchanged in the Transaction assuming there is no risk of counterparty default on those payment obligations. Loss, however, includes the replacement cost/value of the Transaction to the Non-Defaulting Party. The Non-Defaulting Party has determined the credit charge and premium that would have been required by a replacement swap counterparty. There are two elements to this calculation: a credit charge and a capital charge.

**Credit Charge**

At the time of the Transaction, the Non-Defaulting Party was effectively a AAA counterparty by virtue of its swap insurance policies with FGIC. These policies protected Lehman and any assignee of the Transaction from the credit risk of the Non-Defaulting Party. This protection was priced into the Transaction and lasted for its life. When the Transaction was terminated, the Non-Defaulting Party lost the benefit of this credit enhancement. We have determined the value of this credit enhancement by calculating the up-front "credit charge" that the Non-Defaulting Party would have had to pay to enter a replacement Transaction on the Early Termination Date. The calculation is attached as Schedule 1 and yields a supplemental amount of $93.9 million.

**Capital Charge**

When the Transaction was put in place, Lehman was able to hedge its exposure to FGIC in the credit default swap markets (or would have been able had it sought to do so), and given the relative historical stability of the auction rate securities market, Lehman could have hedged substantially all of its interest rate risk in the interest rate swaps market as well. Accordingly, Lehman or an assignee would not have been required to retain the related credit risk or interest rate risk on its balance sheet. The availability of hedging was a benefit to the Non-Defaulting Party reflected in the price of the Transaction.

However, at the time the Transaction was terminated, it was no longer practicable for a financial institution to enter into a hedge of either the credit risk or the interest rate risk for the duration of the Transaction. FGIC's credit ratings had fallen to a level that made its insurance almost worthless, and the auction rate securities market had all but collapsed. Accordingly, any financial institution would have been required to allocate economic capital (also referred to as "risk" capital) against potential losses on the Transaction, and the price at which the financial institution would have been willing to enter into a replacement transaction would have reflected a charge for this capital. The Non-Defaulting Party's indenture required a minimum credit rating for the replacement swap counterparty, and it is possible to calculate the capital charge that would be imposed by such a counterparty. A calculation of this capital charge is attached as Schedule 2 and yields a supplemental amount of $149.9 million (in addition to the $93.9 million above).

(iv) **"the additional losses and costs involved in addressing issues of the dislocation in the credit markets"**

The Non-Defaulting Party was entitled to the replacement value/cost of a swap on auction rate securities that were traded in a market subject to severe disruption. In reviewing the effect of dislocation in the auction rate markets, the Non-Defaulting Party believes that, at the time of the termination of the Transaction, it would have been reasonable to assume that the auction rate securities would go to and remain at their maximum rate. As one independent expert observed near this time:

> In pricing ARS, there are two rates, or yields, that must be estimated: The market yield to maturity (this is the discounting factor in the DCF model) and the stated interest rate. For ARS, the stated interest rate can only be what is or can reasonably be expected to be the fail rate or the maximum rate, whichever pertains at a failed auction according to the fail rate formula found in the prospectus or official statement.[1]

It can be argued that no counterparty would have entered into a replacement swap on any assumption other than that a maximum rate of 22%. If that were the case, the Non-Defaulting Party would have had to make a larger up-front payment to the replacement swap counterparty to reflect the benefit of its bargain. With a view to facilitate settlement discussions, however, the Non-Defaulting Party does not intend at this time to increase its claim further as a result of the effect of the disruption in the auction market, but the Non-Defaulting Party reserves the right to do so later to the extent it determines appropriate.

(v) **"the commercial and ancillary effects of the loss of the critical Transaction during the construction period for the stadium and potential reactions by contractual and financing counterparties, rating agencies, the NFL, the New York Football Giants, Jets Stadium LLC, the New York Jets, the State of New Jersey and others"**

We have not at this time made a claim for these supplemental amounts.

**2.    Revisions to Base Calculation**

The Non-Defaulting Party, in reviewing its submission to prepare for discussions and to prepare this supplemental statement, has identified a mathematical error in its original submission of the FSA-Insured Transaction. The error relates to the inclusion of principal payments in the floating rate payments to be made on April 1, 2028 and April 1, 2029. That error has been corrected in the revised calculation statement attached as Schedule 3 hereto. The effect of the correction of the error, when using Bloomberg swap curve data, is to reduce the Termination Amount in the Base Calculation by $2,405,397.03, and we have adjusted the calculation of the claim accordingly in the next paragraph.

---

[1]    "Auction Rate Securities Pricing: Overpriced and Overdone?", 2009, Corporate Treasury Investment Consulting LLC.

3.      **Revised Calculation of FGIC-Insured Claim Amount**

| | |
|---|---|
| Base Calculation of Termination Amount | $254,631,976.50 |
| Reduction to Base Calculation | -$2,405,397.03 |
| Credit Charge | $93,899,967.08 |
| Capital Charge | $149,938,122.69 |
| Total Termination Amount | $496,064,669.24 |
| Interest on Total Termination Amount at 6.65% from (and including) September 18, 2008 to (but excluding) October 2, 2008 | $1,284,419.84 |
| Reimbursable Expenses per Section 9 of Master Agreement (estimated through end 2011) | $3,638,344.18 |
| Total Claim Amount | $500,987,433.26 |

### Schedule 1
### Incorporating Giants Stadium Credit Risk into Swap Valuation: FGIC Swap

1.    Giants Stadium ("StadCo") had previously valued this swap in its Base Calculation by assuming that:

- A new counterparty would pay an expected floating rate of 10.65% for the life of the replacement swap to StadCo and StadCo would pay the contractual fixed rate of 6.1885% to the new counterparty; and

- Both legs of this transaction should be discounted to the present using discount rates from the prevailing LIBOR swap curve on September 18, 2008[2].

2.    The StadCo Base Calculation showed a replacement value of $254.6 million owed to StadCo. Taking the revision to Base Calculation into account, the Base Calculation amount is $252.2 million.

3.    StadCo has reviewed and determined that:

- The LIBOR discount rate applied to the new professional counterparty's payment to StadCo is appropriate, but

- The discount rate applied to StadCo's fixed rate payment to the new professional counterparty in the replacement swap needs to reflect StadCo's Baa3 credit risk,[3] for which a new counterparty will charge them (at the inception of the original swap, StadCo presented AAA/Aaa counterparty risk).

- The minimum discount rate for the cash flow paid from StadCo to the counterparty would be 7.427%, which is a very conservative assumption for StadCo's general credit risk based on the actual spread over LIBOR used for the May 15, 2008 issuance by StadCo of $100 million of *pari passu* unwrapped floating rate notes to MetLife and HSBC at a floating rate of LIBOR + 285 bps, as adjusted for the tenor of the swap. This is a conservative assumption for StadCo's credit risk at the time of termination, because rates had moved significantly higher between May 15, 2008 and September 18, 2008, and StadCo reserves the right to update as appropriate.[4]

---

[2]    LIBOR swap curve data is collected from Bloomberg, using Bloomberg's standard setting, which is considered as the market convention.

[3]    Rating Action: Moody's Publishes Baa3 Underlying Rating of Giants Stadium LLC; Underlying Outlook is Stable, Global Credit Research, 17 Sep 2008, $650 million of senior project revenue bonds rated.

[4]    Note that a discount rate based solely on StadCo's general credit risk at termination of the swap will be lower than the price of the auction rate securities of StadCo underlying the

4.  Accordingly, the Giants Stadium valuation, which incorporates the impact of StadCo's credit riskiness, shows a replacement value of $346.1 million owed to StadCo, i.e., the impact of StadCo's credit risk on the cost of a replacement swap is $93.9 million.

---

terminated swap transaction. The price of the auction rate securities would be a function of StadCo credit risk, *plus* a premium for the severe dislocation in the auction rate securities market, *plus* a premium because of the effective absence of remedies for noteholders caused by the defunct FSA and FGIC insurance policies (which prevented noteholders from independently exercising remedies), *plus* other factors affecting the underlying security. This is best illustrated by the actual trading prices of the identical auction rate securities subject to monthly competitive market pricing at Goldman Sachs.

**Schedule 2**
**Incorporating the Cost of Unhedgeable and Untradeable Market Risk into Swap**
**Valuation: FGIC Swap**

1.  StadCo had previously valued this swap by assuming that:

    •   A new counterparty would pay an expected floating rate of 10.65% for the life of
        the replacement swap to StadCo and StadCo would pay the contractual fixed rate
        of 6.1885% to the new counterparty; and

    •   Both legs of this transaction should be discounted to the present using discount
        rates from the prevailing LIBOR swap curve on September 18, 2008.

2.  The StadCo Base Calculation showed a replacement value of $252.2 million owed to
    StadCo.

3.  StadCo has determined that the cost to StadCo of the credit risk they present to a
    replacement counterparty is an additional $93.9 million.

4.  StadCo has further determined that a replacement counterparty that accepts that the
    expected floating rate will remain 10.65% for the life of the swap contract will require an
    incremental return on the risk (or *economic*) capital it must hold against the not unlikely
    possibility the floating rate (i.e., the rate on the Auction Rate Security) will rise to its
    contractual maximum rate of 22% and stay there.[5]  The counterparty cannot hedge or
    trade away this risk.

    •   StadCo assumes that the replacement counterparty would require an after-tax
        return of 15% on economic capital;

    •   StadCo assumes a corporate tax rate of 35%;

    •   StadCo estimates that the economic capital assessed against this swap would be
        $649.7 million, and to earn a 15% after-tax return, the counterparty would have to
        charge:

    $649.7 \text{ million} \times 1/(100\% - 35\%) \times 15\% = \$149.9 \text{ million}$

---

[5]   In pricing ARS, there are two rates, or yields, that must be estimated: The market yield to
      maturity (this is the discounting factor in the DCF model) and the stated interest rate. For
      ARS, the stated interest rate can only be what is or can reasonably be expected to be the
      fail rate or the maximum rate, whichever pertains at a failed auction according to the fail
      rate formula found in the prospectus or official statement.

      - "Auction Rate Securities Pricing: Overpriced and Overdone?" 2009
        Corporate Treasury Investment Consulting LLC

<u>Supplemental Statement (FSA-Insured)</u>

The calculation of Loss included as Schedule 1 ("Base Calculation") in the original Statement pursuant to Section 6(d) of the ISDA Master Agreement (FSA-Insured) identifies elements of "Loss" that were to be provided in a supplemental statement. This is the referenced supplemental statement.

**1.      Supplemental Elements of Loss**

The Base Calculation identifies five important and bargained-for benefits of the Transaction for the Non-Defaulting Party that may be addressed by a supplemental statement. They are listed below, with corresponding calculations:

(i)      **"the option value inherent in floating rate conversion mechanics of the Transaction, which permitted the Non-Defaulting Party to convert the transaction into a fixed/floating interest rate swap at a predetermined rate <u>at any time</u> during its term"**

At termination of the Transaction, the Non-Defaulting Party's Loss included the lost value of its option to convert the Transaction to a fixed/floating interest rate swap. The value of the conversion option can be reflected by the market price on the Early Termination Date of an option to enter into a swap (a "swaption") under which the Non-Defaulting Party would pay the actual bond rates reflected in the Base Calculation and receive LIBOR (this exchange of payments would effectively convert the bond rate swap and result in the Non-Defaulting Party paying the negotiated fixed rate and receiving LIBOR).

However, given the actual rates on the auction rate securities reflected in the Base Calculation, the value of the option to convert the Transaction is an immaterial amount (although still not zero). Accordingly, the Non-Defaulting Party will not supplement the Base Calculation to reflect this option value assuming the claim is allowed. Note that the immaterial value of the option is derived from the actual rates reflected in the Base Calculation, and the value may be higher if different rates had been used.

(ii)     **"the absence of the significant termination events, collateral triggers or covenants relating to the Non-Defaulting Party or its insurer, which we do not expect to be able to achieve again with any replacement counterparty and have a significant commercial and credit benefit to the Non-Defaulting Party"**

We address the economic effect of these items in paragraph (iii) below.

(iii)   **"the fact that any replacement swap is likely to involve a significant credit charge and a significant premium payable to the counterparty over and above the fixed rate corresponding to expected future payments on the auction rate securities"**

The Base Calculation is limited to the value of the payments exchanged in the Transaction assuming there is no risk of counterparty default on those payment obligations. Loss, however, includes the replacement cost/value of the Transaction to the Non-Defaulting Party. The Non-Defaulting Party has determined the credit charge and premium that would have been required by a replacement swap counterparty. There are two elements to this calculation: a credit charge and a capital charge.

**Credit Charge**

At the time of the Transaction, the Non-Defaulting Party was effectively a AAA counterparty by virtue of its swap insurance policies with FSA. These policies protected Lehman and any assignee of the Transaction from the credit risk of the Non-Defaulting Party. This protection was priced into the Transaction and lasted for its life. When the Transaction was terminated, the Non-Defaulting Party lost the benefit of this credit enhancement. We have determined the value of this credit enhancement by calculating the up-front "credit charge" that the Non-Defaulting Party would have had to pay to enter a replacement Transaction on the Early Termination Date. The calculation is attached as Schedule 1 and yields a supplemental amount of $18.9 million.

**Capital Charge**

When the Transaction was put in place, Lehman was able to hedge its exposure to FSA in the credit default swap markets (or would have been able had it sought to do so), and given the relative historical stability of the auction rate securities market, Lehman could have hedged substantially all of its interest rate risk in the interest rate swaps market as well. Accordingly, Lehman or an assignee would not have been required to retain the related credit risk or interest rate risk on its balance sheet. The availability of hedging was a benefit to the Non-Defaulting Party reflected in the price of the Transaction.

However, at the time the Transaction was terminated, it was no longer practicable for a financial institution to enter into a hedge of either the credit risk or the interest rate risk for the duration of the Transaction. FSA's credit ratings had fallen to a level that made its insurance almost worthless, and the auction rate securities market had all but collapsed. Accordingly, any financial institution would have been required to allocate economic capital (also referred to as "risk" capital) against potential losses on the Transaction, and the price at which the financial institution would have been willing to enter into a replacement transaction would have reflected a charge for this capital. The Non-Defaulting Party's indenture required a minimum credit rating for the replacement swap counterparty, and it is possible to calculate the capital charge that would be imposed by such a counterparty. A calculation of this capital charge is attached as Schedule 2 and yields a supplemental amount of $27.8 million (in addition to the $18.9 million above).

(iv)    **"the additional losses and costs involved in addressing issues of the dislocation in the credit markets"**

The Non-Defaulting Party was entitled to the replacement value/cost of a swap on auction rate securities that were traded in a market subject to severe disruption. In reviewing the effect of dislocation in the auction rate markets, the Non-Defaulting Party believes that, at the time of the termination of the Transaction, it would have been reasonable to assume that the auction rate securities would go to and remain at their maximum rate. As one independent expert observed near this time:

> In pricing ARS, there are two rates, or yields, that must be estimated: The market yield to maturity (this is the discounting factor in the DCF model) and the stated interest rate. For ARS, the stated interest rate can only be what is or can reasonably be expected to be the fail rate or the maximum rate, whichever pertains at a failed auction according to the fail rate formula found in the prospectus or official statement.[1]

It can be argued that no counterparty would have entered into a replacement swap on any assumption other than that a maximum rate of 22%. If that were the case, the Non-Defaulting Party would have had to make a larger up-front payment to the replacement swap counterparty to reflect the benefit of its bargain. With a view to facilitate settlement discussions, however, the Non-Defaulting Party does not intend at this time to increase its claim further as a result of the effect of the disruption in the auction market, but the Non-Defaulting Party reserves the right to do so later to the extent it determines appropriate.

(v)    **"the commercial and ancillary effects of the loss of the critical Transaction during the construction period for the stadium and potential reactions by contractual and financing counterparties, rating agencies, the NFL, the New York Football Giants, Jets Stadium LLC, the New York Jets, the State of New Jersey and others"**

We have not at this time made a claim for these supplemental amounts.

2.    **Revisions to Base Calculation**

The Non-Defaulting Party, in reviewing its submission to prepare for discussions and to prepare this supplemental statement, has identified a mathematical error in its original submission of the FSA-Insured Transaction. The error relates to the inclusion of principal payments in the floating payments to be made on April 1, 2046 and April 1, 2047. That error has been corrected in the revised calculation statement attached as Schedule 3 hereto. The effect of the correction of the error, when using Bloomberg swap curve data, is to reduce the Termination Amount in the Base Calculation by

---

[1]    "Auction Rate Securities Pricing: Overpriced and Overdone?", 2009, Corporate Treasury Investment Consulting LLC.

$9,688,980.46, and we have adjusted the calculation of the claim accordingly in the next paragraph.

3.    **Revised Calculation of FSA-Insured Claim Amount**

| | |
|---|---|
| Base Calculation of Termination Amount | $46,393,220.62 |
| Reduction to Base Calculation | -$9,688,980.46 |
| Credit Charge | $18,852,885.97 |
| Capital Charge | $27,838,184.05 |
| Total Termination Amount | $83,395,310.18 |
| Interest on Total Termination Amount at 6.65% from (and including) September 18, 2008 to (but excluding) October 2, 2008 | $215,928.68 |
| Reimbursable Expenses per Section 9 of Master Agreement (estimated through end 2011) | $611,655.82 |
| Total Claim Amount | $84,222,894.68 |

**Schedule 1**
**Incorporating Giants Stadium Credit Risk into Swap Valuation: FSA Swap**

1.   Giants Stadium ("StadCo") had previously valued this swap in its Base Calculation by assuming that:

   - A new counterparty would pay an expected floating rate of 9.90% for the life of the replacement swap to StadCo and StadCo would pay the contractual fixed rate of 6.1885% to the new counterparty; and

   - Both legs of this transaction should be discounted to the present using discount rates from the prevailing LIBOR swap curve on September 18, 2008[2].

2.   The StadCo Base Calculation showed a replacement value of $46.4 million owed to StadCo. Taking the revision to Base Calculation into account, the Base Calculation amount is $36.7 million.

3.   StadCo has reviewed and determined that:

   - The LIBOR discount rate applied to the new professional counterparty's payment to StadCo is appropriate, but

   - The discount rate applied to StadCo's fixed rate payment to the new professional counterparty in the replacement swap needs to reflect StadCo's Baa3 credit risk,[3] for which a new counterparty will charge them (at the inception of the original swap, StadCo presented AAA/Aaa counterparty risk).

   - The minimum discount rate for the cash flow paid from StadCo to the counterparty would be 7.427%, which is a very conservative assumption for StadCo's general credit risk based on the actual spread over LIBOR used for the May 15, 2008 issuance by StadCo of $100 million of *pari passu* unwrapped floating rate notes to MetLife and HSBC at a floating rate of LIBOR + 285 bps, as adjusted for the tenor of the swap. This is a conservative assumption for StadCo's credit risk at the time of termination, because rates had moved significantly higher between May 15, 2008 and September 18, 2008, and StadCo reserves the right to update as appropriate.[4]

---

[2]   LIBOR swap curve data is collected from Bloomberg, using Bloomberg's standard setting, which is considered as the market convention.

[3]   Rating Action: Moody's Publishes Baa3 Underlying Rating of Giants Stadium LLC; Underlying Outlook is Stable, Global Credit Research, 17 Sep 2008, $650 million of senior project revenue bonds rated.

[4]   Note that a discount rate based solely on StadCo's general credit risk at termination of the swap will be lower than the price of the auction rate securities of StadCo underlying the

4.      Accordingly, the Giants Stadium valuation, which incorporates the impact of StadCo's
credit riskiness, shows a replacement value of $55.6 million owed to StadCo, i.e., the
impact of StadCo's credit risk on the cost of a replacement swap is $18.9 million.

terminated swap transaction. The price of the auction rate securities would be a function
of StadCo credit risk, *plus* a premium for the severe dislocation in the auction rate
securities market, *plus* a premium because of the effective absence of remedies for
noteholders caused by the defunct FSA and FGIC insurance policies (which prevented
noteholders from independently exercising remedies), *plus* other factors affecting the
underlying security. This is best illustrated by the actual trading prices of the identical
auction rate securities subject to monthly competitive market pricing at Goldman Sachs.

**Schedule 2**
**Incorporating the Cost of Unhedgeable and Untradeable Market Risk into Swap**
**Valuation: FSA Swap**

1.  StadCo had previously valued this swap by assuming that:

    - A new counterparty would pay an expected floating rate of 9.90% for the life of the replacement swap to StadCo and StadCo would pay the contractual fixed rate of 6.1885% to the new counterparty; and

    - Both legs of this transaction should be discounted to the present using discount rates from the prevailing LIBOR swap curve on September 18, 2008.

2.  The StadCo Base Calculation showed a replacement value of $46.4 million owed to StadCo. Taking the revision to Base Calculation into account, the Base Calculation amount is $36.7 million.

3.  StadCo has determined that the cost to StadCo of the credit risk they present to a replacement counterparty is an additional $18.9 million.

4.  StadCo has further determined that a replacement counterparty that accepts that the expected floating rate will remain 9.90% for the life of the swap contract will require an incremental return on the risk (or *economic*) capital it must hold against the not unlikely possibility the floating rate (i.e., the rate on the Auction Rate Security) will rise to its contractual maximum rate of 22% and stay there.[5] The counterparty cannot hedge or trade away this risk.

    - StadCo assumes that the replacement counterparty would require an after-tax return of 15% on economic capital;

    - StadCo assumes a corporate tax rate of 35%;

    - StadCo estimates that the economic capital assessed against this swap would be $120.6 million, and to earn a 15% after-tax return, the counterparty would have to charge:

      $120.6 million $\times$ 1/(100% $-$ 35%) $\times$ 15% = $27.8 million

---

[5]   In pricing ARS, there are two rates, or yields, that must be estimated: The market yield to maturity (this is the discounting factor in the DCF model) and the stated interest rate. For ARS, the stated interest rate can only be what is or can reasonably be expected to be the fail rate or the maximum rate, whichever pertains at a failed auction according to the fail rate formula found in the prospectus or official statement.

         - "Auction Rate Securities Pricing: Overpriced and Overdone?" 2009
           Corporate Treasury Investment Consulting LLC

**United States Bankruptcy Court/Southern District of New York**

Lehman Brothers Holdings Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5076
New York, NY 10150-5076

| In Re: | Chapter 11 |
|---|---|
| Lehman Brothers Holdings Inc., et al.
Debtors. | Case No. 08-13555 (JMP)
(Jointly Administered) |

| Name of Debtor Against Which Claim is Held | Case No. of Debtor |
|---|---|
| Lehman Brothers Holdings Inc. | 08-13555 |

**PROOF OF CLAIM**

Filed: USBC - Southern District of New York
Lehman Brothers Holdings Inc., Et Al.
08-13555 (JMP)        0000068103

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503. Additionally, this form should not be used to make a claim for Lehman Programs Securities (See definition on reverse side.)

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)

Giants Stadium LLC
Meadowlands Sports Complex
50 State Route 120
East Rutherford, NJ 07073
Attention: Christine Procops

Telephone number: (201) 460-2852   Email Address: Procops@giants.nfl.net

Name and address where payment should be sent (if different from above)
Same as above

Telephone number:        Email Address:

☑ Check this box to indicate that this claim amends a previously filed claim.

Court Claim
Number: 64071
(If known)

Filed on: 10/29/2009

**THIS SPACE IS FOR COURT USE ONLY**

**FILED / RECEIVED**
MAY 1 4 2012
EPIQ BANKRUPTCY SOLUTIONS, LLC

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

1.   **Amount of Claim as of Date Case Filed:** $ 585,210,327.94
If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete item 4
If all or part of your claim is entitled to priority, complete Item 5
If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete Item 6.
☑ Check this box if all or part of your claim is based on a Derivative Contract.*
☑ Check this box if all or part of your claim is based on a Guarantee.*

**\*IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.**
☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is a based on a Derivative Contract or Guarantee

2.   **Basis for Claim:** Guarantees of payment under ISDA Master Agreement (FGIC-Insured) and ISDA Master Agreement (FSA-Insured) between Creditor and Lehman Brothers Special Financing Inc., as supplemented
(See instruction #2 on reverse side.)

3.   **Last four digits of any number by which creditor identifies debtor:** _____
3a.   Debtor may have scheduled account as: _____
(See instruction #3a on reverse side.)

4.   **Secured Claim (See instruction #4 on reverse side.)**
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
Nature of property or right of setoff:   ☐ Real Estate   ☐ Motor Vehicle   ☐ Other
Describe: _____
Value of Property: $ _____   Annual Interest Rate _____%
Amount of arrearage and other charges as of time case filed included in secured claim, if any:
$ _____   Basis for perfection: _____

**Amount of Secured Claim:** $ _____   **Amount Unsecured:** $ _____

5.   **Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.**

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries or commissions (up to $10,950) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C § 507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C § 507(a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(__).

**Amount entitled to priority:**
$ _____

6.   **Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9):** $ _____
(See instruction #6 on reverse side.)

7.   **Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.
8.   **Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest. (See definition of "redacted" on reverse side.) If the documents are voluminous, attach a summary.
**DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.**
If the documents are not available, please explain.

**FOR COURT USE ONLY**

| Date:
12/6/11 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.
Christine Procops   Authorized Representative |
|---|---|

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

# INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, there may be exceptions to these general rules.*

## Items to be completed in Proof of Claim form

**Name of Debtor, and Case Number:**
YOU MUST INDICATE THE SPECIFIC DEBTOR AGAINST WHICH YOUR CLAIM IS ASSERTED, INCLUDING THE THE NAME OF THE DEBTOR AND THE RELATED CASE NUMBER (DEBTORS AND CASE NUMBERS LISTED BELOW), IN THE SPACE ALLOTTED AT THE TOP OF THE CLAIM FORM.

| | | | |
|---|---|---|---|
| 08-13555 | Lehman Brothers Holdings Inc. | 08-13905 | CES Aviation LLC |
| 08-13600 | LB 745 LLC | 08-13906 | CES Aviation V LLC |
| 08-13885 | Lehman Brothers Commodity Services Inc. | 08-13907 | CES Aviation IX LLC |
| 08-13888 | Lehman Brothers Special Financing Inc. | 08-13908 | East Dover Limited |
| 08-13893 | Lehman Brothers OTC Derivatives Inc. | 09-10108 | Luxembourg Residential Properties Loan Finance S.a.r.l. |
| 08-13899 | Lehman Brothers Derivative Products Inc. | 09-10137 | BNC Mortgage LLC |
| 08-13900 | Lehman Commercial Paper Inc. | 09-10558 | Structured Asset Securities Corporation |
| 08-13901 | Lehman Brothers Commercial Corporation | 09-10560 | LB Rose Ranch LLC |
| 08-13902 | Lehman Brothers Financial Products Inc. | 09-12516 | LB 2080 Kalakaua Owners LLC |
| 08-13904 | Lehman Scottish Finance L.P. | 08-13664 | PAMI Statler Arms LLC |

If your Claim is against multiple Debtors, complete a separate form for each Debtor.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the Bankruptcy filing. Follow the instructions concerning whether to complete items 4, 5 and 6. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Use this space to report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**4. Secured Claim:**
Check the appropriate box and provide the requested information if the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See DEFINITIONS, below.) State the type and the value of property that secures the claim, attach copies of lien documentation, and state annual interest rate and the amount past due on the claim as of the date of the bankruptcy filing.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. §507(a).**
If any portion of your claim falls in one or more of the listed categories, check the appropriate box(es) and state the amount entitled to priority. (See DEFINITIONS, below.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9)**
State the value of any goods received by the debtor within 20 days before the date of commencement in which the goods have been sold to the debtor in the ordinary course of the debtor's business.

**7. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**8. Documents:**
Attach to this proof of claim form redacted copies documenting the existence of the debt and of any lien securing the debt. You may also attach a summary. You must also attach copies of documents that evidence perfection of any security interest. You may also attach a summary. FRBP 3001(c) and (d). Do not send original documents, as attachments may be destroyed after scanning.

**Date and Signature:**
The person filing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2), authorizes courts to establish local rules specifying what constitutes a signature. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. Attach a complete copy of any power of attorney. Criminal penalties apply for making a false statement on a proof of claim.

---

## DEFINITIONS

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**
A creditor is the person, corporation, or other entity owed a debt by the debtor on the date of the bankruptcy filing.

**Claim**
A claim is the creditor's right to receive payment on a debt that was owed by the debtor on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the Claims Agent at the following address:

**Lehman Brothers Holdings Claims Processing**
**c/o Epiq Bankruptcy Solutions, LLC**
**FDR Station, PO Box 5076**
**New York, NY 10150- 5076**

**Secured Claim Under 11 U.S.C. §506(a)**
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien. A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. §507(a)**
Priority claims are certain categories of unsecured Claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor should redact and use only the last four digits of any social-security, individual's tax identification, or financial-account number, all but the initials of a minor's name and only the year of any person's date of birth.

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

**Derivative Contract**
A contract that is any of (i) a "swap agreement" as such term is defined in section 101(53B) of the Bankruptcy Code or (ii) a "forward contract" as such term is defined in section 101(25) of the Bankruptcy Code. A cash-market purchase or sale of a security or loan (i.e. any purchase or sale of a security or loan for settlement within the standard settlement cycle for the relevant market), exchange-traded future or option, securities loan transaction, repurchase agreement in respect of securities or loans, and any guarantee or reimbursement obligations which would otherwise be included in the definition of such terms in the Bankruptcy Code shall not be considered a Derivative Contract for the purposes of this definition nor shall any notes, bonds, or other securities issued by the Debtors or their affiliates (including, but not limited to, Lehman Brothers Holdings Inc., Lehman Brothers Treasury Co. B.V., Lehman Brothers Bankhaus AG, Lehman Brothers Holdings plc, Lehman Brothers Securities N.V., and Lehman Brothers (Luxembourg) Equity Finance S.A.).

**Guarantee**
A promise, representation or agreement to answer for the payment of some debt or the performance of some duty in case of the failure of another person or entity who is liable in the first instance.

**Lehman Programs Securities**
Lehman Programs Securities means those securities included on the Lehman Programs Securities list available on http://www.lehman-docket.com as of July 27, 2009.

---

## INFORMATION

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim, or you may access the Claims Agent's system (http://www.lehman-docket.com) to view your filed proof of claim.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 *et seq.*), and any applicable orders of the bankruptcy court.

SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
Theodore A.B. McCombs

*Attorney for Giants Stadium LLC*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | : Chapter 11 |
| | : |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | : Case No. 08-13555 (JMP) |
| | : |
| Debtors. | : Jointly Administered |
| | : |

## <u>DECLARATION OF THEODORE A.B. MCCOMBS</u>

THEODORE A.B. McCOMBS hereby declares:

1. I am a member of the Bar of the State of New York and an associate at the law firm Sullivan & Cromwell LLP, counsel to Giants Stadium LLC ("Giants Stadium") and Goal Line Partners, L.L.C. ("Goal Line") in the above-captioned matter.

2. On December 6, 2011, I sent by hand-delivery courier two amended Proofs of Claim to Epiq Bankruptcy Solutions, LLC, Attn: Lehman Brothers Holdings Claims Processing, 757 Third Avenue, 3rd Floor, New York, NY 10017, on behalf of Giants Stadium and Goal Line. These Proofs of Claim amended Claim Nos. 64070, against Lehman Brothers Special Financing, Inc. ("LBSF"), and 64071, against Lehman Brothers Holdings, Inc. ("LBHI"). Both claims relate to the termination of certain interest-rate swap transactions between Giants Stadium and LBSF, for which LBHI served as guaranty. On December 9, 2011, I completed amended Derivative and Guarantee Questionnaires for the LBSF and LBHI amended claims, respectively.

3. Through no fault of Giants Stadium or Goal Line, Epiq Bankruptcy Solutions, as Claims Agent for Debtors in these proceedings, processed only the amended direct claim against LBSF, now Claim No. 67782. Further inquiry with the Claims Agent indicated that the Claims Agent has no record of the amended guarantee claim against LBHI. The Claims Agent has indicated to Giants Stadium it will process a re-submitted amended Proof of Claim, but will not date the amendment to December 6, 2011, when Giants Stadium submitted the amendment.

4. The amended LBHI Proof of Claim should be dated as of December 6, 2011, because Giants Stadium and Goal Line submitted it to the Claims Agent on that date. Giants Stadium and Goal Line have always amended the direct and guarantee claims together, because the guarantee claim against LBHI is entirely derivative of the direct claim against LBSF—the amounts are identical, and even the supporting documentation attached to each Proof of Claim is near-identical. The Proof of Claim cover sheets for each amended claim were both signed on December 6, 2011, and there is no dispute that the Claims Agent received the amended Guarantee Questionnaire on December 9, 2011. There is therefore no prejudice to Debtors or the estate in dating the amended LBHI Proof of Claim to December 6, 2011, as Debtors did not lack notice of the amended amount of the guarantee claim against LBHI.

Executed on this fourteenth day of May, 2012, in New York, New York.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Theodore A.B. McCombs


_____   _____
(notary public's complete name)   (signature dated)

_____   _____
(notary jurisdiction)   (Notary commission expires)

Notary Stamp and Seal

LISA DIPIETRANTONIO
Notary Public, State of New York
No. 01DI6044245
Qualified in Bronx County
Certificate filed in New York County
Commission Expires July 30, 2014

Supplemental Statement (FGIC-Insured)

The calculation of Loss included as Schedule 1 ("Base Calculation") in the original Statement pursuant to Section 6(d) of the ISDA Master Agreement (FGIC-Insured) identifies elements of "Loss" that were to be provided in a supplemental statement. This is the referenced supplemental statement.

**1.    Supplemental Elements of Loss**

The Base Calculation identifies five important and bargained-for benefits of the Transaction for the Non-Defaulting Party that may be addressed by a supplemental statement. They are listed below, with corresponding calculations:

(i)    **"the option value inherent in floating rate conversion mechanics of the Transaction, which permitted the Non-Defaulting Party to convert the transaction into a fixed/floating interest rate swap at a predetermined rate <u>at any time</u> during its term"**

At termination of the Transaction, the Non-Defaulting Party's Loss included the lost value of its option to convert the Transaction to a fixed/floating interest rate swap. The value of the conversion option can be reflected by the market price on the Early Termination Date of an option to enter into a swap (a "swaption") under which the Non-Defaulting Party would pay the actual bond rates reflected in the Base Calculation and receive LIBOR (this exchange of payments would effectively convert the bond rate swap and result in the Non-Defaulting Party paying the negotiated fixed rate and receiving LIBOR).

However, given the actual rates on the auction rate securities reflected in the Base Calculation, the value of the option to convert the Transaction is an immaterial amount (although still not zero). Accordingly, the Non-Defaulting Party will not supplement the Base Calculation to reflect this option value assuming the claim is allowed. Note that the immaterial value of the option is derived from the actual rates reflected in the Base Calculation, and the value may be higher if different rates had been used.

(ii)    **"the absence of the significant termination events, collateral triggers or covenants relating to the Non-Defaulting Party or its insurer, which we do not expect to be able to achieve again with any replacement counterparty and have a significant commercial and credit benefit to the Non-Defaulting Party"**

We address the economic effect of these items in paragraph (iii) below.

(iii)    **"the fact that any replacement swap is likely to involve a significant credit charge and a significant premium payable to the counterparty over and above the fixed rate corresponding to expected future payments on the auction rate securities"**

The Base Calculation is limited to the value of the payments exchanged in the Transaction assuming there is no risk of counterparty default on those payment obligations. Loss, however, includes the replacement cost/value of the Transaction to the Non-Defaulting Party. The Non-Defaulting Party has determined the credit charge and premium that would have been required by a replacement swap counterparty. There are two elements to this calculation: a credit charge and a capital charge.

## Credit Charge

At the time of the Transaction, the Non-Defaulting Party was effectively a AAA counterparty by virtue of its swap insurance policies with FGIC. These policies protected Lehman and any assignee of the Transaction from the credit risk of the Non-Defaulting Party. This protection was priced into the Transaction and lasted for its life. When the Transaction was terminated, the Non-Defaulting Party lost the benefit of this credit enhancement. We have determined the value of this credit enhancement by calculating the up-front "credit charge" that the Non-Defaulting Party would have had to pay to enter a replacement Transaction on the Early Termination Date. The calculation is attached as Schedule 1 and yields a supplemental amount of $93.9 million.

## Capital Charge

When the Transaction was put in place, Lehman was able to hedge its exposure to FGIC in the credit default swap markets (or would have been able had it sought to do so), and given the relative historical stability of the auction rate securities market, Lehman could have hedged substantially all of its interest rate risk in the interest rate swaps market as well. Accordingly, Lehman or an assignee would not have been required to retain the related credit risk or interest rate risk on its balance sheet. The availability of hedging was a benefit to the Non-Defaulting Party reflected in the price of the Transaction.

However, at the time the Transaction was terminated, it was no longer practicable for a financial institution to enter into a hedge of either the credit risk or the interest rate risk for the duration of the Transaction. FGIC's credit ratings had fallen to a level that made its insurance almost worthless, and the auction rate securities market had all but collapsed. Accordingly, any financial institution would have been required to allocate economic capital (also referred to as "risk" capital) against potential losses on the Transaction, and the price at which the financial institution would have been willing to enter into a replacement transaction would have reflected a charge for this capital. The Non-Defaulting Party's indenture required a minimum credit rating for the replacement swap counterparty, and it is possible to calculate the capital charge that would be imposed by such a counterparty. A calculation of this capital charge is attached as Schedule 2 and yields a supplemental amount of $149.9 million (in addition to the $93.9 million above).

(iv)     **"the additional losses and costs involved in addressing issues of the dislocation in the credit markets"**

The Non-Defaulting Party was entitled to the replacement value/cost of a swap on auction rate securities that were traded in a market subject to severe disruption. In reviewing the effect of dislocation in the auction rate markets, the Non-Defaulting Party believes that, at the time of the termination of the Transaction, it would have been reasonable to assume that the auction rate securities would go to and remain at their maximum rate. As one independent expert observed near this time:

> In pricing ARS, there are two rates, or yields, that must be estimated: The market yield to maturity (this is the discounting factor in the DCF model) and the stated interest rate. For ARS, the stated interest rate can only be what is or can reasonably be expected to be the fail rate or the maximum rate, whichever pertains at a failed auction according to the fail rate formula found in the prospectus or official statement.[1]

It can be argued that no counterparty would have entered into a replacement swap on any assumption other than that a maximum rate of 22%. If that were the case, the Non-Defaulting Party would have had to make a larger up-front payment to the replacement swap counterparty to reflect the benefit of its bargain. With a view to facilitate settlement discussions, however, the Non-Defaulting Party does not intend at this time to increase its claim further as a result of the effect of the disruption in the auction market, but the Non-Defaulting Party reserves the right to do so later to the extent it determines appropriate.

(v)      **"the commercial and ancillary effects of the loss of the critical Transaction during the construction period for the stadium and potential reactions by contractual and financing counterparties, rating agencies, the NFL, the New York Football Giants, Jets Stadium LLC, the New York Jets, the State of New Jersey and others"**

We have not at this time made a claim for these supplemental amounts.

2.      **Revisions to Base Calculation**

The Non-Defaulting Party, in reviewing its submission to prepare for discussions and to prepare this supplemental statement, has identified a mathematical error in its original submission of the FSA-Insured Transaction. The error relates to the inclusion of principal payments in the floating rate payments to be made on April 1, 2028 and April 1, 2029. That error has been corrected in the revised calculation statement attached as Schedule 3 hereto. The effect of the correction of the error, when using Bloomberg swap curve data, is to reduce the Termination Amount in the Base Calculation by $2,405,397.03, and we have adjusted the calculation of the claim accordingly in the next paragraph.

---

[1]     "Auction Rate Securities Pricing: Overpriced and Overdone?", 2009, Corporate Treasury Investment Consulting LLC.

3.    **Revised Calculation of FGIC-Insured Claim Amount**

| | |
|---|---|
| Base Calculation of Termination Amount | $254,631,976.50 |
| Reduction to Base Calculation | -$2,405,397.03 |
| Credit Charge | $93,899,967.08 |
| Capital Charge | $149,938,122.69 |
| Total Termination Amount | $496,064,669.24 |
| Interest on Total Termination Amount at 6.65% from (and including) September 18, 2008 to (but excluding) October 2, 2008 | $1,284,419.84 |
| Reimbursable Expenses per Section 9 of Master Agreement (estimated through end 2011) | $3,638,344.18 |
| Total Claim Amount | $500,987,433.26 |

**Schedule 1**
**Incorporating Giants Stadium Credit Risk into Swap Valuation: FGIC Swap**

1.  Giants Stadium ("StadCo") had previously valued this swap in its Base Calculation by
    assuming that:

    - A new counterparty would pay an expected floating rate of 10.65% for the life of
      the replacement swap to StadCo and StadCo would pay the contractual fixed rate
      of 6.1885% to the new counterparty; and

    - Both legs of this transaction should be discounted to the present using discount
      rates from the prevailing LIBOR swap curve on September 18, 2008[2].

2.  The StadCo Base Calculation showed a replacement value of $254.6 million owed to
    StadCo. Taking the revision to Base Calculation into account, the Base Calculation
    amount is $252.2 million.

3.  StadCo has reviewed and determined that:

    - The LIBOR discount rate applied to the new professional counterparty's payment
      to StadCo is appropriate, but

    - The discount rate applied to StadCo's fixed rate payment to the new professional
      counterparty in the replacement swap needs to reflect StadCo's Baa3 credit risk,[3]
      for which a new counterparty will charge them (at the inception of the original
      swap, StadCo presented AAA/Aaa counterparty risk).

    - The minimum discount rate for the cash flow paid from StadCo to the
      counterparty would be 7.427%, which is a very conservative assumption for
      StadCo's general credit risk based on the actual spread over LIBOR used for the
      May 15, 2008 issuance by StadCo of $100 million of *pari passu* unwrapped
      floating rate notes to MetLife and HSBC at a floating rate of LIBOR + 285 bps, as
      adjusted for the tenor of the swap. This is a conservative assumption for StadCo's
      credit risk at the time of termination, because rates had moved significantly higher
      between May 15, 2008 and September 18, 2008, and StadCo reserves the right to
      update as appropriate.[4]

---

[2]    LIBOR swap curve data is collected from Bloomberg, using Bloomberg's standard
       setting, which is considered as the market convention.

[3]    Rating Action: Moody's Publishes Baa3 Underlying Rating of Giants Stadium LLC;
       Underlying  Outlook is Stable, Global Credit Research, 17 Sep 2008, $650 million of
       senior project revenue bonds rated.

[4]    Note that a discount rate based solely on StadCo's general credit risk at termination of the
       swap will be lower than the price of the auction rate securities of StadCo underlying the

4.    Accordingly, the Giants Stadium valuation, which incorporates the impact of StadCo's credit riskiness, shows a replacement value of $346.1 million owed to StadCo, i.e., the impact of StadCo's credit risk on the cost of a replacement swap is $93.9 million.

---

terminated swap transaction. The price of the auction rate securities would be a function of StadCo credit risk, *plus* a premium for the severe dislocation in the auction rate securities market, *plus* a premium because of the effective absence of remedies for noteholders caused by the defunct FSA and FGIC insurance policies (which prevented noteholders from independently exercising remedies), *plus* other factors affecting the underlying security. This is best illustrated by the actual trading prices of the identical auction rate securities subject to monthly competitive market pricing at Goldman Sachs.

## Schedule 2
### Incorporating the Cost of Unhedgeable and Untradeable Market Risk into Swap Valuation: FGIC Swap

1.  StadCo had previously valued this swap by assuming that:

    - A new counterparty would pay an expected floating rate of 10.65% for the life of the replacement swap to StadCo and StadCo would pay the contractual fixed rate of 6.1885% to the new counterparty; and

    - Both legs of this transaction should be discounted to the present using discount rates from the prevailing LIBOR swap curve on September 18, 2008.

2.  The StadCo Base Calculation showed a replacement value of $252.2 million owed to StadCo.

3.  StadCo has determined that the cost to StadCo of the credit risk they present to a replacement counterparty is an additional $93.9 million.

4.  StadCo has further determined that a replacement counterparty that accepts that the expected floating rate will remain 10.65% for the life of the swap contract will require an incremental return on the risk (or *economic*) capital it must hold against the not unlikely possibility the floating rate (i.e., the rate on the Auction Rate Security) will rise to its contractual maximum rate of 22% and stay there.[5]  The counterparty cannot hedge or trade away this risk.

    - StadCo assumes that the replacement counterparty would require an after-tax return of 15% on economic capital;

    - StadCo assumes a corporate tax rate of 35%;

    - StadCo estimates that the economic capital assessed against this swap would be $649.7 million, and to earn a 15% after-tax return, the counterparty would have to charge:

        $649.7 million $\times$ 1/(100% $-$ 35%) $\times$ 15% = $149.9 million

---

[5]    In pricing ARS, there are two rates, or yields, that must be estimated: The market yield to maturity (this is the discounting factor in the DCF model) and the stated interest rate. For ARS, the stated interest rate can only be what is or can reasonably be expected to be the fail rate or the maximum rate, whichever pertains at a failed auction according to the fail rate formula found in the prospectus or official statement.

    - "Auction Rate Securities Pricing: Overpriced and Overdone?" 2009
       Corporate Treasury Investment Consulting LLC

## Supplemental Statement (FSA-Insured)

The calculation of Loss included as Schedule 1 ("Base Calculation") in the original Statement pursuant to Section 6(d) of the ISDA Master Agreement (FSA-Insured) identifies elements of "Loss" that were to be provided in a supplemental statement. This is the referenced supplemental statement.

**1.     Supplemental Elements of Loss**

The Base Calculation identifies five important and bargained-for benefits of the Transaction for the Non-Defaulting Party that may be addressed by a supplemental statement. They are listed below, with corresponding calculations:

(i)     **"the option value inherent in floating rate conversion mechanics of the Transaction, which permitted the Non-Defaulting Party to convert the transaction into a fixed/floating interest rate swap at a predetermined rate <u>at any time</u> during its term"**

At termination of the Transaction, the Non-Defaulting Party's Loss included the lost value of its option to convert the Transaction to a fixed/floating interest rate swap. The value of the conversion option can be reflected by the market price on the Early Termination Date of an option to enter into a swap (a "swaption") under which the Non-Defaulting Party would pay the actual bond rates reflected in the Base Calculation and receive LIBOR (this exchange of payments would effectively convert the bond rate swap and result in the Non-Defaulting Party paying the negotiated fixed rate and receiving LIBOR).

However, given the actual rates on the auction rate securities reflected in the Base Calculation, the value of the option to convert the Transaction is an immaterial amount (although still not zero). Accordingly, the Non-Defaulting Party will not supplement the Base Calculation to reflect this option value assuming the claim is allowed. Note that the immaterial value of the option is derived from the actual rates reflected in the Base Calculation, and the value may be higher if different rates had been used.

(ii)    **"the absence of the significant termination events, collateral triggers or covenants relating to the Non-Defaulting Party or its insurer, which we do not expect to be able to achieve again with any replacement counterparty and have a significant commercial and credit benefit to the Non-Defaulting Party"**

We address the economic effect of these items in paragraph (iii) below.

(iii) **"the fact that any replacement swap is likely to involve a significant credit charge and a significant premium payable to the counterparty over and above the fixed rate corresponding to expected future payments on the auction rate securities"**

The Base Calculation is limited to the value of the payments exchanged in the Transaction assuming there is no risk of counterparty default on those payment obligations. Loss, however, includes the replacement cost/value of the Transaction to the Non-Defaulting Party. The Non-Defaulting Party has determined the credit charge and premium that would have been required by a replacement swap counterparty. There are two elements to this calculation: a credit charge and a capital charge.

**Credit Charge**

At the time of the Transaction, the Non-Defaulting Party was effectively a AAA counterparty by virtue of its swap insurance policies with FSA. These policies protected Lehman and any assignee of the Transaction from the credit risk of the Non-Defaulting Party. This protection was priced into the Transaction and lasted for its life. When the Transaction was terminated, the Non-Defaulting Party lost the benefit of this credit enhancement. We have determined the value of this credit enhancement by calculating the up-front "credit charge" that the Non-Defaulting Party would have had to pay to enter a replacement Transaction on the Early Termination Date. The calculation is attached as Schedule 1 and yields a supplemental amount of $18.9 million.

**Capital Charge**

When the Transaction was put in place, Lehman was able to hedge its exposure to FSA in the credit default swap markets (or would have been able had it sought to do so), and given the relative historical stability of the auction rate securities market, Lehman could have hedged substantially all of its interest rate risk in the interest rate swaps market as well. Accordingly, Lehman or an assignee would not have been required to retain the related credit risk or interest rate risk on its balance sheet. The availability of hedging was a benefit to the Non-Defaulting Party reflected in the price of the Transaction.

However, at the time the Transaction was terminated, it was no longer practicable for a financial institution to enter into a hedge of either the credit risk or the interest rate risk for the duration of the Transaction. FSA's credit ratings had fallen to a level that made its insurance almost worthless, and the auction rate securities market had all but collapsed. Accordingly, any financial institution would have been required to allocate economic capital (also referred to as "risk" capital) against potential losses on the Transaction, and the price at which the financial institution would have been willing to enter into a replacement transaction would have reflected a charge for this capital. The Non-Defaulting Party's indenture required a minimum credit rating for the replacement swap counterparty, and it is possible to calculate the capital charge that would be imposed by such a counterparty. A calculation of this capital charge is attached as Schedule 2 and yields a supplemental amount of $27.8 million (in addition to the $18.9 million above).

(iv) **"the additional losses and costs involved in addressing issues of the dislocation in the credit markets"**

The Non-Defaulting Party was entitled to the replacement value/cost of a swap on auction rate securities that were traded in a market subject to severe disruption. In reviewing the effect of dislocation in the auction rate markets, the Non-Defaulting Party believes that, at the time of the termination of the Transaction, it would have been reasonable to assume that the auction rate securities would go to and remain at their maximum rate. As one independent expert observed near this time:

> In pricing ARS, there are two rates, or yields, that must be estimated: The market yield to maturity (this is the discounting factor in the DCF model) and the stated interest rate. For ARS, the stated interest rate can only be what is or can reasonably be expected to be the fail rate or the maximum rate, whichever pertains at a failed auction according to the fail rate formula found in the prospectus or official statement.[1]

It can be argued that no counterparty would have entered into a replacement swap on any assumption other than that a maximum rate of 22%. If that were the case, the Non-Defaulting Party would have had to make a larger up-front payment to the replacement swap counterparty to reflect the benefit of its bargain. With a view to facilitate settlement discussions, however, the Non-Defaulting Party does not intend at this time to increase its claim further as a result of the effect of the disruption in the auction market, but the Non-Defaulting Party reserves the right to do so later to the extent it determines appropriate.

(v) **"the commercial and ancillary effects of the loss of the critical Transaction during the construction period for the stadium and potential reactions by contractual and financing counterparties, rating agencies, the NFL, the New York Football Giants, Jets Stadium LLC, the New York Jets, the State of New Jersey and others"**

We have not at this time made a claim for these supplemental amounts.

2. **Revisions to Base Calculation**

The Non-Defaulting Party, in reviewing its submission to prepare for discussions and to prepare this supplemental statement, has identified a mathematical error in its original submission of the FSA-Insured Transaction. The error relates to the inclusion of principal payments in the floating payments to be made on April 1, 2046 and April 1, 2047. That error has been corrected in the revised calculation statement attached as Schedule 3 hereto. The effect of the correction of the error, when using Bloomberg swap curve data, is to reduce the Termination Amount in the Base Calculation by

---

[1]    "Auction Rate Securities Pricing: Overpriced and Overdone?", 2009, Corporate Treasury Investment Consulting LLC.

$9,688,980.46, and we have adjusted the calculation of the claim accordingly in the next paragraph.

3.    **Revised Calculation of FSA-Insured Claim Amount**

| | |
|---|---|
| Base Calculation of Termination Amount | $46,393,220.62 |
| Reduction to Base Calculation | -$9,688,980.46 |
| Credit Charge | $18,852,885.97 |
| Capital Charge | $27,838,184.05 |
| Total Termination Amount | $83,395,310.18 |
| Interest on Total Termination Amount at 6.65% from (and including) September 18, 2008 to (but excluding) October 2, 2008 | $215,928.68 |
| Reimbursable Expenses per Section 9 of Master Agreement (estimated through end 2011) | $611,655.82 |
| Total Claim Amount | $84,222,894.68 |

**Schedule 1**
**Incorporating Giants Stadium Credit Risk into Swap Valuation: FSA Swap**

1.  Giants Stadium ("StadCo") had previously valued this swap in its Base Calculation by
    assuming that:

    •   A new counterparty would pay an expected floating rate of 9.90% for the life of
        the replacement swap to StadCo and StadCo would pay the contractual fixed rate
        of 6.1885% to the new counterparty; and

    •   Both legs of this transaction should be discounted to the present using discount
        rates from the prevailing LIBOR swap curve on September 18, 2008[2].

2.  The StadCo Base Calculation showed a replacement value of $46.4 million owed to
    StadCo.  Taking the revision to Base Calculation into account, the Base Calculation
    amount is $36.7 million.

3.  StadCo has reviewed and determined that:

    •   The LIBOR discount rate applied to the new professional counterparty's payment
        to StadCo is appropriate, but

    •   The discount rate applied to StadCo's fixed rate payment to the new professional
        counterparty in the replacement swap needs to reflect StadCo's Baa3 credit risk,[3]
        for which a new counterparty will charge them (at the inception of the original
        swap, StadCo presented AAA/Aaa counterparty risk).

    •   The minimum discount rate for the cash flow paid from StadCo to the
        counterparty would be 7.427%, which is a very conservative assumption for
        StadCo's general credit risk based on the actual spread over LIBOR used for the
        May 15, 2008 issuance by StadCo of $100 million of *pari passu* unwrapped
        floating rate notes to MetLife and HSBC at a floating rate of LIBOR + 285 bps, as
        adjusted for the tenor of the swap.  This is a conservative assumption for StadCo's
        credit risk at the time of termination, because rates had moved significantly higher
        between May 15, 2008 and September 18, 2008, and StadCo reserves the right to
        update as appropriate.[4]

---

[2]   LIBOR swap curve data is collected from Bloomberg, using Bloomberg's standard
      setting, which is considered as the market convention.

[3]   Rating Action: Moody's Publishes Baa3 Underlying Rating of Giants Stadium LLC;
      Underlying Outlook is Stable, Global Credit Research, 17 Sep 2008, $650 million of
      senior project revenue bonds rated.

[4]   Note that a discount rate based solely on StadCo's general credit risk at termination of the
      swap will be lower than the price of the auction rate securities of StadCo underlying the

4.      Accordingly, the Giants Stadium valuation, which incorporates the impact of StadCo's
        credit riskiness, shows a replacement value of $55.6 million owed to StadCo, i.e., the
        impact of StadCo's credit risk on the cost of a replacement swap is $18.9 million.

---

terminated swap transaction.  The price of the auction rate securities would be a function
of StadCo credit risk, *plus* a premium for the severe dislocation in the auction rate
securities market, *plus* a premium because of the effective absence of remedies for
noteholders caused by the defunct FSA and FGIC insurance policies (which prevented
noteholders from independently exercising remedies), *plus* other factors affecting the
underlying security.  This is best illustrated by the actual trading prices of the identical
auction rate securities subject to monthly competitive market pricing at Goldman Sachs.

## Schedule 2
### Incorporating the Cost of Unhedgeable and Untradeable Market Risk into Swap Valuation: FSA Swap

1.  StadCo had previously valued this swap by assuming that:

    - A new counterparty would pay an expected floating rate of 9.90% for the life of the replacement swap to StadCo and StadCo would pay the contractual fixed rate of 6.1885% to the new counterparty; and

    - Both legs of this transaction should be discounted to the present using discount rates from the prevailing LIBOR swap curve on September 18, 2008.

2.  The StadCo Base Calculation showed a replacement value of $46.4 million owed to StadCo. Taking the revision to Base Calculation into account, the Base Calculation amount is $36.7 million.

3.  StadCo has determined that the cost to StadCo of the credit risk they present to a replacement counterparty is an additional $18.9 million.

4.  StadCo has further determined that a replacement counterparty that accepts that the expected floating rate will remain 9.90% for the life of the swap contract will require an incremental return on the risk (or *economic*) capital it must hold against the not unlikely possibility the floating rate (i.e., the rate on the Auction Rate Security) will rise to its contractual maximum rate of 22% and stay there.[5] The counterparty cannot hedge or trade away this risk.

    - StadCo assumes that the replacement counterparty would require an after-tax return of 15% on economic capital;

    - StadCo assumes a corporate tax rate of 35%;

    - StadCo estimates that the economic capital assessed against this swap would be $120.6 million, and to earn a 15% after-tax return, the counterparty would have to charge:

    $120.6 \text{ million} \times 1/(100\% - 35\%) \times 15\% = \$27.8 \text{ million}$

---

[5] In pricing ARS, there are two rates, or yields, that must be estimated: The market yield to maturity (this is the discounting factor in the DCF model) and the stated interest rate. For ARS, the stated interest rate can only be what is or can reasonably be expected to be the fail rate or the maximum rate, whichever pertains at a failed auction according to the fail rate formula found in the prospectus or official statement.

- "Auction Rate Securities Pricing: Overpriced and Overdone?" 2009
  Corporate Treasury Investment Consulting LLC