**EXHIBIT E**

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3

4    - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6    LEHMAN BROTHERS HOLDINGS, INC.,        CAUSE NO.

7    et al,                                 08-13555(JMP)

8            Debtors.

9    - - - - - - - - - - - - - - - - - x

10   In re

11   LEHMAN BROTHERS, INC.,                 CAUSE NO.

12           Debtor.                        08-01420(JMP)(SIPA)

13   - - - - - - - - - - - - - - - - - -x

14

15                    U.S. Bankruptcy Court

16                    One Bowling Green

17                    New York, New York

18

19                    November 14, 2012

20                    10:02 AM

21

22   B E F O R E:

23   HON. JAMES M. PECK

24   U.S. BANKRUPTCY JUDGE

25   ECRO:  MATTHEW

Page 2

1   HEARING re Notice of Final Applications of Retained

2   Professionals for Final Allowance and Approval of

3   Compensation for Professional Services Rendered and

4   Reimbursement of Actual and Necessary Expenses Incurred from

5   September 15, 2008 to March 6, 2012 (ECF Nos. 31901)

6

7   HEARING re Plan Administrator's Cross-Motion to Compel

8   Giants Stadium LLC to comply with Rule 2004 Subpoenas and

9   Objection to Giants Stadium's Motion to Quash the Rule 2004

10  Subpoenas (ECF No. 31652)

11

12  HEARING re Motion to Quash a Subpoena filed by Bruce E.

13  Clark on behalf of Giants Stadium LLC (ECF No. 31339)

14

15  HEARING re Amended Motion of Giants Stadium LLC for Leave to

16  Conduct Discovery of the Debtors Pursuant to Federal Rule of

17  Bankruptcy Procedure 2004 (ECF No. 31105)

18

19  SIPA PROCEDURES

20  HEARING re Motion Pursuant to Federal Rule of Bankruptcy

21  Procedure 9019 for Entry of an Order Approving Settlement

22  Agreement Between the Trustee and Lehman Brothers Finance

23  AG, in Liquidation (a/k/a Lehman Brothers Finance SA, in

24  Liquidation)(LBI ECF No. 5362)

25

Page 3

1    HEARING re Trustee's Motion Pursuant to Section 105(a) of

2    the Bankruptcy Code and Bankruptcy Rules 3007 and 9019(b)

3    for Approval of General Creditor Claim (I) Objections

4    Procedures and (II) Settlement Procedures (LBI ECF No. 5392)

5

6    HEARING re Debtor's Three Hundred Fifty-Seventh Omnibus

7    Objection to Claims (Misclassified Claims (ECF No. 31048)

8

9    HEARING re Objection to Claim No. 17763 Filed by Laurel Cove

10   Development, LLC (ECF No. 29187)

11

12   HEARING re Three Hundred Twentieth Omnibus Objection to

13   Claims (No Liability Rose Ranch LLC Claims)(ECF No. 29292)

14

15   HEARING re Debtor's Three Hundred Twenty-Ninth Omnibus

16   Objection to Claims (Misclassified Claims)(ECF No. 29324)

17

18   HEARING re Motion for an Order Pursuant to Section 105(a) of

19   the Bankruptcy Code and Bankruptcy Rule 9019, Authorizing

20   and Approving the Settlement with Lehman Brothers, Inc. (ECF

21   No. 43)

22

23   HEARING re Turnberry Centra Sub, LLC et al v Lehman Brothers

24   Holdings, Inc., et al (Adversary Case No. 09-01062)

25   Transcribed by:  Sheila Orms and William Garling

Page 4

```
 1   A P P E A R A N C E S :

 2

 3   WEIL, GOTSHAL & MANGES LLP

 4         Attorneys for Lehman Brothers Holdings, Inc.

 5         767 Fifth Avenue

 6         New York, NY 10153

 7

 8   BY:   RICHARD W. SLACK, ESQ.

 9         JACQUELINE MARCUS, ESQ.

10         KYLE ORTIZ, ESQ.

11         CANDACE ARTHUR, ESQ.

12

13   WEIL, GOTHAL & MANGES LLP

14         Attorneys for Lehman Brothers Holdings, Inc.

15         1395 Brickett Avenue

16         Suite 1200

17         Miami, FL   33131

18

19   BY:   EDWARD R. MCCARTHY, ESQ.

20

21

22

23

24

25
```

Page 5

1   PAUL WEISS RIPKIND WHARTON & GARRISON LLP

2        Attorneys for Houlihan Lokey Howard & Zukin Capital,

3            Inc.

4        1295 Avenue of the Americas

5        New York, NY  10019

6

7   BY:   ALAN W. KORNBERG, ESQ.

8         PHILLIP Q. WEINTRAUB, ESQ.

9

10  LATHAM & WATKINS LLP

11        Attorneys for Ernest & Young LLP

12        53rd at Third, 855 Third Avenue

13        New York, NY  10022

14

15  BY:   MICHAEL RIELA, ESQ.

16

17  CARMODY MACDONALD

18        Attorneys for Alvarez & Marsal

19        120 S. Central Avenue

20        Suite 1800

21        St. Louis, MO  63105-1705

22

23  BY:   GREGORY D. WILLARD, ESQ.

24

25

Page 6

```
 1   HUGHES HUBBARD
 2         Attorneys for SIPA Trustee
 3         One Battery Park Plaza
 4         New York, NY  10004-1482
 5
 6   BY:   JEFFREY S. MARGOLIN, ESQ.
 7         JEFFREY M. GREILSHEIMER, ESQ.
 8         MEAGHAN C. GRAGG, ESQ.
 9
10   GODFREY KAHN S.C.
11         Attorneys for Fee Committee
12         One East Main Street
13         Suite 500
14         Madison, WI  54701
15
16   BY:   KATHERINE STADLER, ESQ.
17         RICHARD GITLIN, ESQ.
18
19   SULLIVAN & CROMWELL, LLP
20         Attorneys for Giants Stadium
21         125 Broad Street
22         New York, NY  10004
23
24   BY:   THOMAS JOHN WRIGHT, ESQ.
25         BRUCE E. CLARK, ESQ.
```

Page 7

1   STAGG, TERENZI, CONFUSIONE & WAHNIK, LLP

2        Attorneys for Laurel Cove Development

3        401 Franklin Avenue

4        Suite 300

5        Garden City, NY   11530

6

7   BY:   CARA M. GOLDSTEIN, ESQ.

8

9   DECHERT, LLP

10        Attorneys for ???

11        1095 Avenue of the Americas

12        New York, NY   10036

13

14   BY:   NICOLE B. HERTHER-SPIRO, ESQ.

15

16   GIBSON DUNN

17        Attorneys for Lehman Brothers Finance AO

18        2100 McKinney Avenue

19        Dallas, TX   75201-6912

20

21   BY:   ROBERT B. KRAKOW, ESQ.

22

23

24

25

Page 8

1   CLEARY GOTTLIEB STEEN & HAMILTON LLP

2        Attorneys for ???

3        One Liberty Plaza

4        New York, NY  10006

5

6   BY:   JOSH E. ANDERSON, ESQ.

7

8   MEISTER SEELIG & FEIN LLP

9        Attorneys for ???

10        2 Grand Central Tower

11        140 East 45h Street

12        19th Floor

13        New York, NY  10017

14

15   BY:   STEPHEN B. MEISTER, ESQ.

16

17   UNITED STATES DEPARTMENT OF JUSTICE

18        Attorney for the Office of the United States Trustee

19        76 Chapel Street, Suite 200

20        Albany, NY 12207

21

22   BY:  SUSAN GOLDEN, ESQ. (TELEPHONICALLY)

23

24   OTHERS PRESENT:

25   THERESA CARPENTER, BREGAL INVESTMENTS, INC.

```
 1    TELEPHONIC APPEARANCES:

 2

 3    ANASTOLY BUSHLER, FARALLON CAPITAL MANAGEMENT

 4    JEFFREY H. DAVIDSON, STUTMAN, TRIESTER & GLATT

 5    NICK LANE, WITNESS, WEIL, GOTSHAL & MANGES LLP

 6    TRISTA S. LYONS, PRO SE

 7    MICHAEL NEUMEISTER, STUTMAN, TREISTER & GLATT

 8    MITCHELL SOCKETT, KING STREET CAPITAL MANAGEMENT, LLC

 9    KATHERINE A. TRADER, PAUL HASTINGS, LLP

10    JEFFREY H. DAVIDSON, STUTMAN, TREISTER & GLATT

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 17

1    would like you to focus on in your presentation.

2         MR. SLACK:  Okay.  So, Your Honor, Richard Slack

3    from Weil Gotshal on behalf of the plan administrator and

4    Lehman.

5         MR. CLARK:  Good morning, Your Honor, Bruce Clark

6    from Sullivan and Cromwell for Giant Stadium.  With me is my

7    colleague Thomas Wright.

8         MR. WRIGHT:  Good morning, Your Honor.

9         THE COURT:  Good morning.  Okay.  It's my

10   recollection and the recollection has been reinforced by

11   reviewing the papers that we last had a discovery argument

12   in connection with 2004 discovery in September of last year,

13   approximately 14 months ago.

14        The papers that I have read provide different

15   perspectives of what has occurred over the last 14 months.

16   But to me one of the revelations is that the claim

17   originally held by Giant Stadium is now held by an entity

18   affiliated with Baupost called Goal Line, and that an

19   intermediate transferee was Bank of America.

20        To me this is a result of -- as a result of this

21   revelation to me this becomes one of the first examples

22   presented to me in this case, although I'm sure there are

23   many others that are invisible to me, of the phenomenon

24   discussed by scholars as the so-called empty creditor.

25        The creditor that appears to have real party in

1    interest status in a bankruptcy case, but who has actually

2    divested itself of all or substantially all of the economics

3    associated with that creditor interest, and it may have

4    other disguised interests that impact that creditor's

5    motivation within the bankruptcy case.

6            Henry (indiscernible) a professor of law at the

7    University of Texas, who for a time had a senior position

8    with the SEC has written extensively on this subject.  And I

9    am personally not only familiar with it, but interested in

10   it.  I bring this up because one of my real concerns here is

11   that the papers disclose apparently heroic good faith

12   efforts to settle disputes between Giant Stadium on the one

13   hand, and Lehman on the other, but uncharacteristically this

14   is one of the few cases presented to me at least on the

15   current docket, I don't know what next year will bring, in

16   which parties that have sincerely attempted to resolve their

17   differences have failed in those efforts.

18           As I understand it, a mediator who is one of the

19   mediators quite skilled in dealing with derivative disputes

20   in the Lehman case participated in at least a one day

21   mediation session, and that that session ended with no

22   agreement, and that thereafter at some point, the parties

23   endeavored to try to restart discussions.  And the current

24   flap, if I can call it that, with respect to discovery is a

25   manifestation of the ongoing antagonism between the parties.

Page 19

1  To me, at least, the discovery dispute represents deflected

2  antagonism and is subtext for what is really the ongoing

3  unresolved business issues among the parties.

4       I will note the obvious, this Court and every other

5  Court in the nation despises discovery disputes that cannot

6  be rationally resolved by experienced counsel, and here we

7  have experienced and skilled counsel on both sides.  The

8  papers are voluminous and include declarations, references

9  to the transcript from September of last year, and involve a

10  level of effort that to me seems disproportionate to the

11  issues that are in dispute.

12       And so I have the following questions.  First, what

13  is the explanation for the increase in the purported claim

14  amount from $301 million to $585 million?  How did that

15  happen, what's the justification for it, and has that been

16  the subject of negotiations between the parties?

17       Secondly, who is Lehman negotiating with when it

18  negotiates?  Are you negotiating with counsel for Giant

19  Stadium or counsel for Goal Line?

20       Third, why is historical counsel for Giant Stadium

21  still here purporting to act on behalf of an historical

22  creditor when, in fact, the real economics in whole or in

23  part, are elsewhere?  To what extent does this represent

24  independent judgment of Sullivan and Cromwell's client and

25  to what extent does it represent Sullivan and Cromwell, and

1    I hate to use the term, as a puppet for other parties that

2    are driving this bus?

3           Those are my questions, and I want them answered

4    before we get into the merits of the discovery dispute,

5    which as I said, appears to me to be largely a strategyn

6    chosen by both sides to get into court.  I don't view it as

7    a real dispute.  I know you do, and you're going to have to

8    justify to me why this isn't one of the biggest wastes of

9    time since this case began.

10          MR. SLACK:  So, Your Honor, starting right with the

11   questions that you've asked.  I think it's fair to say that

12   the debtor that Lehman thinks that the claim amount that was

13   essentially doubled was done purely for negotiating

14   purposes.  In other words, only after this Court back in

15   September sent us back to mediate or essentially to try to

16   resolve it, the claim essentially doubled.

17          We haven't had a stitch of discovery on who made

18   that decision, why it was doubled, what the justification

19   is.  Obviously, they gave us a piece of paper, but unlike

20   the original 301 million, we haven't had any discovery

21   whatsoever under 2004 about that.

22          In terms of whether those matters were the subject

23   of negotiation, let me put it this way.  Obviously the

24   parties had discussion over the amount of the claim, and

25   there was discussion about the amounts of the claim.  I

Page 21

1   don't think it's fair to say, however, that the debtor has

2   insight as to why it was done, what's the timing of it, what

3   the basis of it is.  We haven't had insight into any of

4   that.

5           THE COURT:  Well, let me just ask you a question,

6   and I don't want to know anything about the substance of the

7   negotiations that took place between the parties.  But isn't

8   the first question that somebody sitting down to the

9   negotiating table would ask given this fact pattern, how on

10  earth can you justify an increase from $301 million to $585

11  million, what's that about?  Isn't that the first question?

12  Perhaps not expressed in that way, but I think there would

13  be an element of huge exasperation built in the question.

14          MR. SLACK:  There is that exasperation, and I'm

15  sure those were the subject of discussions, and again, there

16  was a piece of paper that's filed.  There is an amended

17  claim that was filed.  So, I mean, to the extent that

18  there's an amended claim, we could look at it and say here's

19  what's in it.  But in terms of why it was done, who made

20  that decision, why didn't their original financial advisor,

21  Goldman, reach that amount, you know, two and a half years

22  earlier.

23          Again, we haven't had any kind of insight into any

24  of those kinds of questions, and those have not been

25  answered.  And, of course, that's one of the reasons that we

Page 22

1    wanted to continue the investigation.  So that's, I think,

2    at least from our perspective, you may get another

3    perspective the answer to number one.

4         In terms of number two, at some point we were

5    informed once Baupost, Goal Line acquired the interest that

6    Sullivan and Cromwell was going to jointly represent Giant

7    Stadium and Goal Line.  And so there have been

8    representatives, you know, Sullivan and Cromwell's been

9    involved, Baupost has been involved, and representatives

10   from Giant Stadium have been involved in the negotiations

11   throughout this period.

12        Now, that's not to say that every conversation

13   included representatives of all, but all parties at some

14   level have been involved in negotiations over the past year.

15        And I think that's -- I think that that somewhat

16   answers at least what we know about question three, which is

17   why is Sullivan and Cromwell still representing Giants.  My

18   understanding again is that they're jointly representing

19   Giants and Baupost and Goal Line in connection with this.

20        What I can say is again, we haven't had any

21   discovery into that sale.  We haven't seen the actual

22   transfer papers between Baupost, and I guess it's Bank of

23   America.  We did see the original papers between Giants and

24   Bank of America.  That's one of the things we asked for

25   again in our two thousand and --

Page 23

1          THE COURT:  Why is that even relevant at this

2    point?

3          MR. SLACK:  The only thing that potentially is

4    relevant is exactly I think the questions that you're

5    asking.  We need to understand when we're talking to

6    somebody, for example, who is the interest.  Who should we

7    be talking to Baupost or not.  And that was part of it.

8          The other thing is, Baupost and Giant Stadium were

9    on opposite sides of that deal.  I think we were entitled to

10   see what was disclosed during those negotiations, and we've

11   asked to see that.  And we -- they're not privileged, and we

12   should have access to it.

13         THE COURT:  Well, whether you should or should not

14   have access to it, I'm just going to make the general

15   observation that ordinarily when claims are transferred and

16   the Lehman case has been one of the largest unregulated

17   trading markets and distressed claims in the world during

18   the past four years.  There's a routine that I'm familiar

19   with not from being a Judge, but having been a practitioner,

20   and you're not likely to find very much of value in the back

21   and forth relating to that claim tread, at least as it

22   relates to the value for purposes of any objection you might

23   file.

24         These are trades between so-called big boys, and

25   everybody makes their own judgments as to the likelihood of

1    success in future litigation with regard to the claim.  You

2    may or may not be ultimately entitled to obtain that

3    information, but even if you do, in my view, it's a big so

4    what.

5           MR. SLACK:  Might be.  Look, you know, what you're

6    saying obviously from experience makes sense.  What I would

7    say, Your Honor, is that this is a little bit unlike other

8    claims, in that it's obviously a very large one.  It's

9    obviously unliquidated.  It's obviously the main issues that

10   somebody looking to buy it are going to be asking themselves

11   are, at the end of the day, is it a receivable or is it a

12   payable, and if so, how much.

13          So I think, you know, it's a little bit different

14   than, you know, a claims market with liquidated claims.

15   But, you know, that's just the tiniest piece of what, you

16   know, we were seeking in our 2004.

17          So, Your Honor, would you like to hear the answers

18   to those questions from counsel, or would you like me to go

19   ahead with my argument?  I mean --

20          THE COURT:  I'd like to hear what counsel for Giant

21   Stadium has to say about the big picture questions that I

22   raised.  And one of the reasons why I'm focused on this is

23   that I am concerned about more than the discovery dispute

24   that has been presented to me, I'm frankly concerned as to

25   why we're having the dispute at all, and why this claim is

Page 25

1    different from other claims, so many of which have already

2    found their way into formal claims objections.

3            And I'm interested in that question, but before

4    getting to it, Mr. Slack, I'd like to hear comments from --

5            MR. SLACK:  Okay.

6            THE COURT:  -- counsel for Giant Stadium as to some

7    of the preliminary questions that I asked.

8            MR. SLACK:  Sure.

9            MR. CLARK:  Thank you, Your Honor.  Again, Bruce

10   Clark for Giant Stadium.

11           Trying to take your questions in order, as to the

12   increase in the amount of the claim, when the claim was

13   originally filed, it was filed with five, I believe there

14   were five caveats as to items that have yet to be

15   quantified.  And when the claim was revised at least two of

16   those items were the cause of the increase from 301 to 585

17   million.

18           One of them reflects the amount of a capital

19   charge, which the person stepping into the shoes of Lehman,

20   in our view, would've had to incur, in order to protect

21   themselves by way of reserves against the likelihood of a

22   further default.  And the other was a difference in the

23   credit charge.  That difference came about because the

24   original deal with Lehman involved raps by insurance

25   companies, either Figik (ph) or FSA, both of whom at the

Page 26

1   time of the transaction reviewed were rated as AAA credits

2   in the market.  And at the time of the putting out of the

3   proof of claim, the amended proof of claim, we quantified an

4   additional amount because those protections were gone.  And

5   the amount that one would have to pay to get the equivalent

6   protection was greatly increased.

7          And I am not, I've got to say, I'm not trying to

8   duck this, but I am not the person who has studied this in

9   the last month and really can give you a better answer.  But

10  that's my understanding of the two principal reasons that

11  the amount was increased between the first claim and the

12  second claim.

13         THE COURT:  Okay.

14         MR. CLARK:  As to --

15         THE COURT:  Has that information which you just

16  shared with me previously been shared with Lehman when --

17         MR. CLARK:  Yes.

18         THE COURT:  Okay.

19         MR. CLARK:  I mean, as Mr. Slack said, it's in the

20  -- a description of that much is in the amended proof of

21  claim, and neither Weil nor we particularly want to go --

22  and should go into the specifics of the conversations.  But

23  the conversations during the settlement talks centered on

24  this and a lot of other points.

25         I don't know if the question you asked why did you

1    increase the 301 to 585 was the first question that came up.

2    But it certainly was a question that was explored.

3              THE COURT:  Assumingly if I were on the receiving

4    end of a claim like that, even if we were talking about

5    hundreds of dollars instead of millions of dollars, the

6    first question I would ask, how on earth could you be

7    claiming that much more.

8              MR. CLARK:  I think --

9              THE COURT:  How did this claim double?

10             MR. CLARK:  I think you're being more courteous

11   than the words I heard when the question was asked.

12             THE COURT:  Okay.  Well then --

13             MR. CLARK:  And clearly that was asked.

14             THE COURT:  Well, I'm in court so I have to be

15   courteous.

16             MR. CLARK:  Right.  But that -- I mean, my best

17   recollection is that was discussed.  As Mr. Slack said, a

18   lot of the conversations in these settlement talks took

19   place with different people from the interested parties at

20   different times, and neither of us was party to all of them

21   by any means.

22             THE COURT:  Okay.

23             MR. CLARK:  I'd be astonished if that was not

24   talked at length.

25             Second, who was Lehman negotiating with, I agree

Page 28

1    with what Mr. Slack said.  I think I just said the same

2    thing, but they were negotiating with people from Sullivan

3    and Cromwell.  We are representing both Baupost and Giant

4    Stadium.  They were all negotiating with people from Baupost

5    at the same time, and Giant Stadium people as well.  And

6    there were a variety of people on the Lehman side.  I mean,

7    there must have been 20 that I met at one time or another.

8          So it was a very active negotiation or series of

9    negotiations over that time period.

10         THE COURT:  One of my fundamental questions is

11   whether Giant Stadium has continuing economic interest in

12   this claim or is a so-called empty creditor.  Is it an empty

13   creditor?

14         MR. CLARK:  No, it's not.  The reason it's not is

15   because the sale papers between Giant Stadium and Bank of

16   America which the debtors do have, and which they did ask

17   questions about in the deposition, make it clear that Giant

18   Stadium has a contingent interest in the result of the

19   negotiation or resolution of the claim.  It depends on how

20   much is paid or how much is not paid.  They do have a

21   material interest one way or another.

22         THE COURT:  So as a kicker?

23         MR. CLARK:  It's either a kicker or a pay back or a

24   clawback, one or the other.

25         THE COURT:  Okay.

1            MR. CLARK:  Okay.  As to the question that came up

2    about the sale between Bank of America and Baupost, my

3    information on that is that Giant Stadium was not involved

4    in that.  That was a transaction between Bank of America and

5    Baupost.  They negotiated it.  And I don't believe we have

6    anything certainly anything material to either produce or to

7    disclose about it.  That is not a transaction that to my

8    knowledge, I just heard Mr. Slack say, they have information

9    about, but neither do we.

10            THE COURT:  All right.

11            MR. CLARK:  Have I addressed the preliminary

12    questions?  I thought I took the list down right.

13            THE COURT:  I think you have, although Mr. Slack

14    seems to want to interject at this point.  Do you want to

15    proceed with your main argument?

16            MR. SLACK:  Yeah, please, thank you, Your Honor.

17            THE COURT:  And understand there is this other

18    question which in effect wraps all the other questions.  Why

19    are we here with a discovery dispute as to a claim, that's

20    whether it's $301 million claim or a $585 million claim

21    appears at least in the Court's view to be more or less

22    indistinguishable from any number of other derivative type

23    claims in this bankruptcy case, and in effect, is a righted

24    question, are you gentlemen both serious about this dispute?

25            So much has gone into a 2004 examination request

1    and resisting that request and efforts to make it

2    reciprocal, that it raises more questions in the Court's

3    mind than it answers as to what's going on here.  Now, I

4    want to know what's going on here.

5             MR. SLACK:  Well, Your Honor, as I think you know

6    from the docket, the debtor has taken 2004 discovery with

7    respect to, you know, hundreds of counterparty, derivative

8    counterparties and we haven't had these issues.  I mean, if

9    you think about the number of years that I've been before

10   you on matters, if we've had a couple of discovery disputes,

11   that's a lot.

12            And so I think we have a record frankly of these

13   kinds of situations, and this just hasn't gone the way of

14   the other ones.  Because we have frankly been obstructed,

15   and we have a -- you know, we had a situation a year ago,

16   and that -- what happened a year ago in September is we had

17   another discovery dispute, and unfortunately, we had -- you

18   know, we listened to the Court tell us that frankly you

19   didn't like that discovery dispute.

20            THE COURT:  I'll be very consistent.  I'm not

21   likely to like any discovery dispute that you present to me.

22            MR. SLACK:  But what happened in that hearing is

23   important for today.  What happened in that hearing which

24   concerned a motion to compel Giant Stadium with respect to

25   privilege is Giant Stadium said, Your Honor, they won't talk

1    to us about the merits.  They won't sit down with us and

2    talk.  And I said, Your Honor, I was concerned.  And my

3    concern was, we were in the middle of an investigation that

4    we had not finished, and we needed a little more time to get

5    it done, as long as we had cooperation.

6         And I said I didn't want a gotcha.  I didn't want

7    to sit down in negotiations, talk about our preliminary

8    views of the merits, and then have, and be faced with the

9    argument that Giant Stadium says, well, obviously you know

10   the merits, you've had discussions with us on the merits,

11   you don't need anymore 2004 discovery.  And I sought a

12   commitment from Giants that we wouldn't be faced with that

13   argument.

14        And the Court responded as follows, says, "You

15   don't even need that commitment because I'm going to give

16   you a gotcha from the bench, a no gotcha.  If you choose to

17   have a conversation that could lead to some kind of

18   productive business-like resolution to this, doing that will

19   not constitute a waiver of any of your discovery rights or

20   your rights to continue with your investigation as you see

21   fit."

22        Now, I'd point out that at that time when the Court

23   gave us the assurance that, yes, we could enter into the

24   negotiations, so to speak, talk about the merits even though

25   we hadn't finished, that we weren't going to be faced with

Page 32

1    exactly the argument we're being faced with today.  Giant

2    Stadium stayed silent.  They didn't raise their hand and

3    say, Your Honor, you can't do that, they're not entitled to

4    any discovery.  They didn't say any of that.  They stayed

5    silent.

6            THE COURT:  Well, I understand what happened.  I

7    actually remember it and my memory was further refreshed by

8    looking at the transcript.  And I know that there's a point

9    that you've emphasized in your papers, and you're

10   emphasizing it again now.

11           But it's 14 months later.  You've had some further

12   discovery, and you've had further business discussions, and

13   you've had a mediation session.  Without going into the

14   substance of what was discussed in the various sessions, it

15   appears to me at least, that inevitably there has been a

16   sharing of information in positions by the parties, or there

17   could not have been open and good faith negotiations.

18           So today, almost Thanksgiving 2012, you must know

19   much more about the claims and the defenses to those claims

20   than you knew 14 months ago.  It just seems to me impossible

21   that you are in effectively the same position today that you

22   were then.

23           So that's one concern I have relative to your

24   position.  Another that I have is that Giant Stadium argues

25   in effect without using this hackneyed expression, what's

Page 57

1    that they had an affirmative claim, they would assert it.

2    Lehman has not been shy about asserting such claims in the

3    past.  Additionally, it seems fairly obvious that if Lehman

4    had sufficient information available to it that would

5    support not just a shotgun approach objection but a specific

6    and tailored objection to the claim, it would file it.

7           Throughout this case, Lehman has been active in

8    filing and pursuing objections to claims, and in fact, part

9    of this morning's agenda relates to objections to claims.

10   And so I view this as an exceptional case.  And, in fact,

11   that was one of the reasons I asked a number of questions at

12   the outset to determine to what extent the issues that

13   related to this discovery dispute were exceptional and

14   unique, and to what extent this was just another example of

15   a derivatives dispute, this one happening to have the

16   negative gloss of active discovery disputes, as opposed to

17   active negotiations leading to a settlement.

18          I believe a continuing 2004 discovery under the

19   circumstances makes sense, although the fact that this is

20   occurring 14 months after our last discovery dispute is a

21   terribly negative fact.  One conclusion to be drawn from the

22   mere timing of this, is that this dispute is taking too long

23   to resolve, and that despite best efforts, reasonable people

24   are unable to get to yes, and they should.

25          And so I'm going to propose that counsel meet and

Page 58

1    confer in an effort to develop what I'll call a reciprocal

2    discovery protocol, and it is not necessarily limited to

3    2004.  I believe that one of the things that distinguishes

4    the dispute that I've heard a lot about this morning from

5    other disputes, is that there is no foreseeable outcome here

6    in which Lehman is not objecting, or bringing affirmative

7    claims relief.

8         This is not a situation in which Lehman is engaging

9    in a 2004 process to later shake hands, and say here's the

10   money.  I also believe even though everybody has denied this

11   that the 2004 dance that we're engaged in necessarily has

12   tactical aspects to it.  And so here's what I am directing.

13        Between now and the first of the year, I would like

14   the parties to develop and agreed discovery protocol that

15   will be applicable whether we're dealing with 2004 discovery

16   or claims related discovery.  It would be extraordinarily

17   wasteful for the discovery that's taken in 2004 to be

18   replicated again.  And in the case of Ms. Prokopse, that's

19   already happening.  Enough already.

20        I recognize that the 2004 sword is more properly

21   used by the debtor than by the creditor in this instance.

22   And so discovery from third parties and discovery from Giant

23   Stadium and discovery from Goal Line may be more appropriate

24   than discovery from the debtor.  But that does not mean that

25   some discovery from the debtor is not also to be part of

Page 59

1    this process.

2         One of the mysteries from the perspective of the

3    Court is that this third party discovery and discovery from

4    others is so critical from the debtor's perspective in being

5    able to formulate its own position with respect to the

6    claim.  But I accept the representations made that ongoing

7    2004 discovery is needed in order for the debtor to complete

8    its investigation to use its words.

9         I would ask the parties to report the results of

10   these efforts at the December omnibus hearing.  You don't

11   have to the point of an agreement, in fact, you could be to

12   the point of no agreement.  I'd like to know that, in which

13   case I will then be able to either rule or take this matter

14   under advisement, but I have I think provided sufficient

15   guidance here to suggest that what I consider to be an

16   appropriate result is reasonable discovery going in both

17   directions with the understanding that the need for that

18   discovery is more obviously greater for the debtor.  And

19   this is not an example of gotcha because I am indicating in

20   agreement that continued 2004 discovery is appropriate for

21   the debtor and the debtor's benefit.

22        I'm also noting the time's up in effect.  This has

23   to come to a conclusion.  And I don't expect there to be

24   another discovery dispute between the parties until there's

25   active litigation between you.  And I hope that doesn't

1  occur at that point either.  So I'll hear from you next

2  time.

3          MR. CLARK:  Your Honor, just a question of

4  clarification.  How does the January 1st deadline fit with

5  the next omnibus hearing?  I'm not --

6          THE COURT:  I don't know.

7          MR. CLARK:  Okay.

8          THE COURT:  I'm just looking for a status report at

9  the next omnibus hearing.  And if it doesn't fit well for

10  the parties, it can always be put off, and then we can make

11  that a telephone conference.

12          MR. CLARK:  Thank you, Your Honor.

13          MS. MARCUS:  Your Honor, the December hearing is

14  December 19th.

15          THE COURT:  18th?

16          MS. MARCUS:  19th.

17          THE COURT:  That seems like a perfect date for a

18  status report.

19          MR. MARGOLIN:  The omnibus hearing is on December

20  12th, Your Honor.

21          THE COURT:  Why am I hearing different dates?

22          MS. MARCUS:  Sorry.  Sorry, Your Honor.  December

23  12th, sorry about that.

24          THE COURT:  December 12th is a perfect date, too.

25  Either one's fine.