**Hearing Date and Time: September 18, 2013 at 10:00 a.m. (Prevailing Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jacqueline Marcus
Richard Slack

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
                                          :
In re                                     :        Chapter 11
                                          :
**LEHMAN BROTHERS HOLDINGS INC., et al.,** :        Case No. 08-13555 (JMP)
                                          :
                     Debtors.             :        (Jointly Administered)
                                          :
------------------------------------------------------------------x

<u>**PLAN ADMINISTRATOR'S OBJECTION**
**TO MOTION OF RETIREMENT HOUSING FOUNDATION**
**AND ITS AFFILIATES FOR A DETERMINATION THAT THE**
**AUTOMATIC STAY DOES NOT BAR COMMENCEMENT OF CERTAIN**
**LITIGATION AGAINST THE DEBTORS RELATED TO POST-PETITION**
**CLAIMS AND/OR GRANTING RELIEF FROM THE AUTOMATIC STAY**</u>

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("<u>LBHI</u>" or the "<u>Plan Administrator</u>"), as Plan

Administrator for Lehman Brothers Special Financing, Inc. ("<u>LBSF</u>") and LBHI under the

Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its

Affiliated Debtors, dated December 5, 2011 (the "<u>Plan</u>"), submits this response to the motion of

Retirement Housing Foundation and its affiliates[1] (collectively, "<u>RHF</u>"), dated August 8, 2013

---

[1] The affiliates include Foundation Property Management, Inc., Bixby Knolls Towers, Inc., Bluegrass RHF Housing, Inc., DeSmet RHF Housing, Inc., Gold Country Health Center, Inc., Holly Hill RHF Housing, Inc., Mayflower RHF Housing, Inc., Mayflower Gardens Health Facility, Inc., Merritt Island RHF Housing, Inc., St. Catherine RHF Housing, Inc., Sun City RHF Housing, Inc., Yellowwood Acres, Inc., and Martin Luther Foundation, Inc.

[ECF No. 39291] (the "Motion").  The Motion seeks entry of an order (1) declaring that the automatic stay does not apply to RHF's commencement of an action in California state court seeking a declaratory judgment on the issue of the validity of its alleged early termination of certain interest rate swap transactions between RHF and LBSF under the bankruptcy safe harbor provisions (the "Declaratory Judgment Action"); (2) granting RHF relief from the automatic stay to permit RHF to commence the Declaratory Judgment Action in California state court to determine the validity of its alleged early termination under the bankruptcy safe harbor provisions if the Court determines that the automatic stay applies to the commencement of such a proceeding; and (3) granting RHF relief from the automatic stay to commence litigation in California state court to determine certain state law tort claims against LBSF and LBHI which underlie the proofs of claim filed by RHF in the above-referenced chapter 11 cases (the "Tort Action").  In response to the Motion, the Plan Administrator respectfully represents as follows:

## PRELIMINARY STATEMENT

1.    RHF seeks to have a California state court decide whether the termination of interest rate swaps was valid under the safe harbor provisions of title 11 of the United State Code (the "Bankruptcy Code").  RHF's obvious strategy is to avoid confronting this Court's previous ruling that an attempted late termination does not have the protection of section 560 of the Bankruptcy Code, which requires a swap counterparty to terminate a transaction "fairly contemporaneously" with the bankruptcy filing in order to be eligible for the safe harbor protections.  *See* Hr'g Tr. at 111-13, *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Sept. 15, 2009) (requiring Metavante Corporation to perform its payment obligations under a "live" derivatives contract) [ECF No. 5261] ("*Metavante*").[2]

_____

[2] A copy of the *Metavante* decision is attached hereto as Exhibit 1.

2.      The dispute underlying the Motion arises from four interest rate swaps between RHF and LBSF that RHF improperly attempted to terminate nearly nine months after LBHI's bankruptcy filing.  LBSF immediately sent written notice to RHF informing RHF that the termination was improper and that the Transactions remained "live," requiring both parties to perform thereunder.  Nevertheless, since October 1, 2008, RHF has failed to perform its payment obligations under the interest rate swaps in clear violation of the terms of such agreements, the automatic stay extant in these cases, and this Court's ruling in *Metavante*.

3.      The Motion also seeks relief from the stay in order to pursue certain state law claims (the "Tort Claims") against LBHI and LBSF in California state court (the "California Court").  Many of the Tort Claims, including a claim for rescission of the swaps, are premised on alleged misrepresentations made by former officers and directors of LBHI and certain of its affiliates concerning LBHI's financial condition immediately prior to LBHI's bankruptcy filing.  Such claims primarily rely on the alleged misuse of the "Repo 105" accounting method by LBHI and certain of its affiliates.  The Tort Claims that RHF seeks to assert in the California Court are essentially the same claims that RHF has already asserted in proofs of claim filed against LBHI and LBSF in these chapter 11 cases and which will be adjudicated as part of the normal claims process.[3]  RHF further contends that when calculating the net amounts owed between the parties, the California Court should triangularly setoff any damage claims RHF has against LBHI (or LBI) on account of the Tort Claims to reduce any amounts that RHF may owe to LBSF under the swap transactions.

4.      In the SIPA Proceeding (defined below) of Lehman Brothers Inc. ("LBI"), this Court held that the Bankruptcy Code prohibits derivative counterparties from exercising

---

[3] Copies of the relevant proofs of claim, claim numbers 10493, 10494, 10495, and 10496 (the "Proofs of Claim"), are attached hereto (without exhibits) as Exhibit 2.

3

triangular setoff rights.  *In re Lehman Bros. Inc.*, 458 B.R. 134, 144 (Bankr. S.D.N.Y. 2011)

(rejecting UBS AG's attempt to exercise triangular setoff rights established by a derivatives

contract).  By filing the Motion, RHF is seeking to avoid this setoff jurisprudence in much the

same way that RHF is seeking to circumvent this Court's jurisprudence regarding the

requirement that swap counterparties must terminate transactions "fairly contemporaneously"

with the bankruptcy filing in order to fall under the safe harbors.

     5.     RHF's forum shopping should be rejected.  Indeed, the idea of forum

shopping to avoid this Court's prior decisions has been soundly condemned by numerous District

Court Judges in the Southern District of New York in their denials of motions to withdraw the

reference made by swap counterparties. *See* Mem. Order at 8-9, *Lehman Bros. Holdings Inc. v.*

*Credit Agricole Corp. & Inv. Bank* (*In re Lehman Bros. Holdings Inc.*), No. 13-3373 (S.D.N.Y.

Aug. 8, 2013) (denying swap counterparty's motion to withdraw the reference); Mem. Order at

6, *Lehman Bros. Commercial Corp. v. Ford Global Treasury, Inc.*, No. 12-8201 (S.D.N.Y. Apr.

8, 2013) (same); Hr'g Tr. at 65, *Mich. State Hous. Dev. Auth. v. Lehman Bros. Derivatives*

*Prods. Inc.*, No. 11-3392 (S.D.N.Y. Sept. 14, 2011) (same); Hr'g Tr., *Ka Kin Wong v. HSBC*

*Bank USA, N.A.*, No. 09-06841 (S.D.N.Y. Oct. 14, 2009) (denying motion to withdraw the

reference filed by certain noteholders in respect of a derivatives transaction).

     6.     Not only have courts in this jurisdiction adopted a policy against forum

shopping, but this Court's prior experience with the core bankruptcy issues that will be raised in

the proposed state court action independently militates in favor of denying RHF relief from the

automatic stay.  Indeed, one of the *Sonnax* Factors (defined below) that courts consider when

deciding whether to grant relief from the automatic stay is the interest of judicial economy.  *See*

*Sonnax Indus., Inc. v. Tri Component Prods. Corp.* (*In re Sonnax Indus., Inc.*), 907 F.2d 1280,

1286 (2d Cir. 1990) ("*Sonnax*").  Here, judicial economy will be best served by having this Court

retain jurisdiction over derivatives issues with which it is more familiar and on which it has

previously ruled.  Furthermore, and as discussed in greater detail below, all other relevant

*Sonnax* Factors weigh in favor of denying relief from the stay, and, therefore, the Court should

deny the Motion.

> 7.    The policies underlying the automatic stay also favor a denial of the

Motion.  For example, if the Court were to grant the relief requested in the Motion, LBHI and

LBSF would be forced to litigate issues common to numerous creditors of the Chapter 11 Estates

(as defined below) in a forum other than this Court.  Such issues include, but are not limited to,

the rights and obligations of LBSF's swap counterparties, the proper methods for valuing swap

transactions, the allegations concerning the "Repo 105" accounting method, and the validity of

agreements entered into immediately prior to LBHI's bankruptcy filing.  One of the purposes of

the automatic stay is to prevent this exact situation by ensuring that the debtor's affairs are

centralized in a single forum to harmonize the disparate interests of a debtor's many creditors

and to avoid conflicting judgments from various courts.  Accordingly, RHF should not be

permitted to hijack these issues for determination in the California Court.

> 8.    It is clear that the automatic stay applies to prevent the commencement of

RHF's Declaratory Judgment Action and it would be inappropriate for the Court to modify the

automatic stay to permit RHF's forum shopping strategy to succeed.

## **BACKGROUND**

**A.    Case Background**

> 9.    On September 15, 2008, and periodically thereafter, LBHI and certain of

its affiliates (together, the "Chapter 11 Estates") commenced voluntary cases (the "Chapter 11

Cases") under chapter 11 of the Bankruptcy Code in this Court.  LBSF commenced a voluntary case under chapter 11 of the Bankruptcy Code on October 3, 2008.

10.    On September 19, 2008, the District Court for the Southern District of New York entered an order adjudicating that customers of LBI were in need of protection under the Securities Investor Protection Act of 1970, as amended ("SIPA"), and appointing James W. Giddens as trustee (the "LBI Trustee") to oversee LBI's liquidation.  LBI is the subject of a separate liquidation proceeding (the "SIPA Proceeding") administered by this Court.

11.    On September 17, 2009, the Court entered the Alternative Dispute Resolution Procedures Order for Affirmative Claims of Debtors Under Derivatives Contracts [ECF No. 5207] (the "ADR Procedures Order").  On April 19, 2010, the Court entered the Order Authorizing the Debtors to Implement Claims Hearing Procedures and Alternative Dispute Resolution Procedures for Claims Against the Debtors [ECF No. 8474] (the "Claims Procedures Order").

12.    On December 6, 2011, the Court entered an order confirming the Plan [ECF No. 23023].  The Plan became effective on March 6, 2012.

13.    On February 21, 2013, the LBI Trustee and each of the Chapter 11 Estates entered into a settlement agreement (the "LBI Settlement Agreement").  Pursuant to the LBI Settlement Agreement, the LBI Trustee released LBHI from any claims that it might have against LBHI and LBSF, including any claims based on alter ego theories of liability.  On April 16, 2013, the Court entered an order approving the LBI Settlement Agreement.  Order Approving Settlement Agreement Between The Trustee And The LBHI Entities ¶ 5(d), *In re Lehman Bros. Inc.*, No. 08-01420 (Bankr. S.D.N.Y. Apr. 16, 2013) [ECF No. 6020].

B.    **The Swap Transactions**

14.    RHF is a party to four interest rate swap transactions with LBSF (the "Transactions") entered into under a 1992 form Local Currency-Single Jurisdiction ISDA Master Agreement (the "Master Agreement," together with a Schedule Guarantee, Credit Support Annex, and Confirmations, the "2008 Swap Agreement").  *See* Declaration of David Colarossi in Support of Plan Administrator's Objection to Motion of Retirement Housing Foundation (the "Colarossi Declaration") at Exh. A.[4]  Under the 2008 Swap Agreement, LBHI acted as "Credit Support Provider" for LBSF's payment obligations with respect to the Transactions.  *See id.* (Guarantee).

15.    The first Transaction is an amortizing interest rate swap with an initial notional value of $91.08 million, in which LBSF pays a floating rate of 67% times USD-LIBOR-BBA and RHF pays a fixed rate of 4.792% (the "LIBOR Swap").[5]  *See* Colarossi Decl. at Exh. B (LIBOR Confirmation).  The other three Transactions (which, as described below, have matured by their terms) are interest rate swaps with notional values totaling approximately $25.5 million, in which LBSF paid a floating rate based on the SIFMA Municipal Swap Index and RHF paid a fixed rate of 2.975% per annum (the "SIFMA Swaps").  Colarossi Decl. at Exh. C (SIFMA Confirmations).

16.    As described more fully below, RHF failed to validly terminate the Transactions.  Accordingly, the SIFMA Swaps matured according to their terms on August 15,

---

[4] Capitalized terms used but not defined herein shall have the meanings given to them in the Master Agreement, attached as Exhibit A to the Colarossi Declaration.

[5] RHF and LBSF had previously entered into a separate ISDA Master Agreement and several swap transactions (the "1998 Swap"), which RHF sought to terminate in 2008 due to its significant out of the money position.  In lieu of RHF's paying LBSF $13,520,000 as a termination payment for those earlier transactions, the parties agreed in the Confirmation for the LIBOR Swap that RHF would pay a higher fixed rate of 4.792% rather than a lower rate of 3.360%.

2010 and the LIBOR Swap, which has a maturity date of September 1, 2028, is still a "live"

trade.  As of September 10, 2013, RHF owed LBSF a total of $31,150,293 representing

$21,603,231 in net unpaid periodic payments for the period since October 1, 2008 that are due

and payable by RHF to LBSF under the terms of the Transactions, plus $9,547,062 in interest

accrued thereon through September 10, 2013 as provided for in the Master Agreement, with

interest continuing to accrue until the payment in full thereof.  *See* Colarossi Decl. ¶ 17 & Exh. A

(Master Agreement) §§ 2(d), 12.  In addition, RHF and LBSF owe continuing ordinary course

periodic payments on the live LIBOR Swap, which payments are worth approximately

$19,897,814 in LBSF's favor as of September 9, 2013.[6]  *Id.* ¶ 17.

## C.    RHF's Ineffective Termination and Commercially Unreasonable Valuation of the Transactions

17.    The Master Agreement's provisions on early termination provide that a

party may terminate the Transactions following an Event of Default, which may result from,

*inter alia*, the filing of a bankruptcy petition by a party or a party's Credit Support Provider.  *See*

*id.* at Exh. A (Master Agreement) §§ 5(a)(vii), 6(a).  In Part 1(f) of the Schedule, the parties

agreed that the "Second Method" and the "Market Quotation" payment measure would govern

payments on early termination.  *Id.* at Exh. A §§ 6(e), 12 & Schedule at Part 1(f).  Accordingly,

upon early termination resulting from an Event of Default, the "out of the money" party is

required to pay the termination amount owed under Section 6(e) of the Master Agreement to the

"in the money" party, regardless of which party has defaulted.  *Id*. at Exh. A § 6(e)(i)(3).

18.    LBHI and LBSF filed their chapter 11 petitions on September 15, 2008

and October 3, 2008, respectively.  At no point in late 2008 or early 2009 – or at *any* point before

June 11, 2009 – did RHF deliver to LBSF a termination notice designating an Early Termination

---

[6] LBSF's claim against RHF relates to amounts owing under both the LIBOR Swap and the SIMFA Swaps.

Date in respect of the Transactions. *See id.* ¶ 8. Moreover, although periodic payment

obligations continued to accrue under the Transactions following the bankruptcy filings of LBHI

and LBSF, RHF, in violation of its obligations under both the Master Agreement and the

Bankruptcy Code, stopped making the payments required of it as of October 1, 2008. *See id.* at

Exh. A (Master Agreement) at § 2(a)(iii).

19.    Thousands of other derivatives counterparties, including non-profits like

RHF, terminated their derivatives transactions within a short time after the bankruptcy filings of

LBHI and LBSF. Following the bankruptcy petitions, RHF claims it sent to LBSF a notice of

default (not an early termination notice) in November 2008. However, LBSF has no evidence of

having received this letter, and RHF did not attach it to the Motion. *Id.* ¶ 9.

20.    On June 11, 2009 – more than 8 months after LBHI and LBSF filed for

bankruptcy – RHF delivered to LBSF a letter (the "Early Termination Notice") that purported to

designate an Early Termination Date under the Master Agreement and to thereby terminate the

Transactions, based upon an Event of Default resulting from the bankruptcy filing of LBSF. *See

id.* at Exh. D (Early Termination Notice).

21.    Although RHF erroneously and misleadingly asserts in its Motion that

LBSF did not provide RHF with notice of its dispute of the validity of the Early Termination

Notice until March 2012,[7] in fact, RHF was on notice of LBSF's dispute of the validity of the

Early Termination Notice as early as June 22, 2009, when LBSF sent RHF a letter in response to

its Early Termination Notice, stating as follows:

---

[7] In the Proposed Complaint (as defined below), RHF actually admits that it was on notice of LBSF's dispute of the validity of the Early Termination Notice as early as June 2009. Proposed Complaint ¶ 125 ("In a form letter dated June 22, 2009, Lehman admitted that section 560 of the Bankruptcy Code does allow a party under certain circumstances to terminate a swap agreement *but purportedly disputed RHF's termination notice, alleging that RHF did not rely on Lehman's insolvency, financial condition or bankruptcy to terminate the 2008 Swap.*") (emphasis added); *see also id.* at ¶ 128.

> The Termination Notice violates the Bankruptcy Code and is accordingly voidable at the election of Lehman. . . . Although the Bankruptcy Code permits a party under certain circumstances to 'liquidate, terminate, or accelerate a swap agreement,' (11 U.S.C. 560), this authorization is available only for terminations effected solely as a result of the insolvency, financial condition or bankruptcy of the debtor (*see, e.g. In re Enron Corp.*, 306 B.R. 465 (Bkrtcy. S.D.N.Y. 2004)). Given the amount of time that has passed since the commencement of the Chapter 11 Case, it is clear that [RHF] ha[s] not relied upon Lehman's insolvency, financial condition or bankruptcy to liquidate, terminate or accelerate the Agreement, but has done so on the basis of some other reason. Consequently, Lehman reserves the right to dispute the validity of the Termination Notice and to treat any putative payment to Lehman under Section 6(d)(i) of the Agreement as a pre-payment of [RHF's] on-going obligations to Lehman as if no Early Termination Date had been declared.

*See id.* at Exh. E (LBSF June 22, 2009 Letter) at 1-2.  LBSF sent this letter to RHF less than two weeks after receiving the Early Termination Notice on June 11, 2009.

22.    Ignoring the notice by LBSF that the termination notice was invalid, more than a month later, on July 29, 2009, RHF delivered a purported early termination calculation statement to LBSF, setting forth RHF's calculation of an early termination payment due as a result of RHF's purported termination of the Transactions (the "Calculation Statement").  *See id.* at Exh. F (Calculation Statement).  RHF explained that it had solicited 14 dealers for market quotations on February 25, March 11, June 5, and June 11, 2009, but none were provided.  *See id.* at Exhs. F & O (March 10, 2010 Letter from Mr. Reuben to LBSF).  Under the Master Agreement, the determining party is required to solicit quotes from exactly four dealers "on or as soon as reasonably practicable after the relevant Early Termination Date" – not 14 dealers, at various intervals, many months before the alleged Early Termination Date.  *See id.* at Exh. A (Master Agreement) §12.

23.    Because RHF obtained no quotations for the Transactions, RHF calculated the purported termination payment under the alternative termination payment measure under the Master Agreement – Loss.  *See id.* at Exh. F (Calculation Statement).  RHF's calculation

acknowledged its Loss on the LIBOR Swap of negative $9,110,573 and on the SIFMA Swaps of

negative $458,391 (negative meaning it owed that amount to LBSF), but then improperly added

back $10,671,513 due to a fictitious "loss of bargain" and an additional $6,558,111 for alleged

"cost of funding" charges.  *See id*. at 5.  RHF thus manipulated the Loss calculation to turn an

amount payable ***to*** LBSF of approximately $9.5 million into an amount payable ***by*** LBSF of

approximately $5.2 million.[8]  *Id*. at 4.

   24. Contrary to its Loss calculation showing that LBSF owed RHF money,

RHF acknowledged in its audited financial statements for the years ended September 30, 2009

and 2008 that it "recorded a reduction in its interest rate swap agreement liability of $16.7

million" and "recognized a gain of" $16.7 million "in derivatives activities during the year ended

September 30, 2009" as a result of RHF's purported termination of the Transactions.  *See*

Colarossi Decl. at Exh. G (RHF's Financial Statements) at 30.

**D.** **Communications Between the Parties Following LBSF's Receipt of the Early
Termination Notice**

   25. The suggestion in RHF's Motion that RHF was in the dark that the late

termination was an issue and that LBSF believed the termination was invalid is belied by the

significant communications between LBSF and RHF concerning the late termination issue.

---

[8] In the Calculation Statement, RHF asserted that it was owed $4,952,968 for its Loss plus $280,884 for expenses purportedly incurred in RHF's termination attempt, for a total of $5,233,852. *See id*. at 1-2.  This figure reflects a credit of $2,707,692 to LBSF for payments RHF acknowledged it owed in the ordinary course under the Transactions prior to its attempted termination. *Id*. at 4.  RHF's Calculation Statement also referred to a claim against LBSF for $11,590,728, which appears to represent the alleged value of RHF's Tort Claim. *Id*. at 2.  LBSF disputes RHF's Loss calculation in its entirety, especially the self-serving use of historical interest rates rather than current market rates, the inclusion of RHF's hypothetical "loss of bargain" and "cost of funding" deductions as well as RHF's inflated claim for expenses and incorrect calculation of missed swap payments due to LBSF prior to RHF's attempted termination.

26.     In August and September 2009, after sending RHF's counsel a request for information,[9] LBSF sent RHF invoices for ordinary course swap payments on the live Transactions – clear and unmistakable notice by LBSF that the termination was invalid and the swaps were live.  *See id.* ¶ 22 & Exh. I (August & September 2009 invoices).  Indeed, the notice was not lost on RHF's counsel who responded on September 4, 2009, stating that the swaps were terminated.  See *id.* ¶ 22 & Exh. J (Sept. 4, 2009 Letter from RHF).

27.     Again on November 30, 2009, LBSF sent RHF invoices for ordinary course swap payments on the live Transactions.  *See id.* ¶ 23 & Exh. K (October and November 2009 invoices).  Shortly thereafter, on December 2, 2009, RHF's counsel sent LBSF a letter in response to the swap payment invoices and asserted that the swaps were terminated.  *See id.* ¶ 23 & Exh. L (Dec. 2, 2009 RHF letter to LBSF).

28.     On January 22, 2010, a group of the Chapter 11 Estates' employees participated in a conference call with a group of RHF employees, including its outside counsel, during which the parties summarized their respective positions, including LBSF's view that RHF had improperly terminated the Transactions and that the terminations were therefore invalid.  *See id.* ¶ 24.  Five days later, on January 27, 2010, LBSF emailed RHF and its counsel asking for additional information and an explanation for the 9-month delay between the bankruptcy and RHF's attempt to terminate the swap transactions.  *See id.* ¶ 25 & Exh. M (Jan. 27, 2010 email from LBSF to RHF).

29.     One month later, on February 26, 2010, LBSF again sent RHF invoices for ordinary course swap payments on the live Transactions.  *See id.* ¶ 27 & at Exh. N.

---

[9] On August 25, 2009, as part of its due diligence investigation concerning the Transactions, LBSF emailed RHF's counsel asking for information concerning its market quotation process, Loss calculation, replacement swaps, and other information, including RHF's financial statements.  *See* Colarossi Decl. ¶ 21 & Exh. H (Aug. 25, 2009 email from LBSF to RHF).

30.     About six weeks after the group conference call, on March 10, 2010, RHF's counsel sent a letter to LBSF containing RHF's preliminary responses to LBSF's requests for information on the swap transactions and providing the requested documents.  *See id.* ¶ 28 & Exh. O (Mar. 10, 2010 Letter from RHF's counsel to LBSF).

31.     Over a year later, as part of the Plan confirmation process in early November 2011, LBSF and RHF's counsel exchanged emails concerning LBSF's motion to assume the Master Agreement.  *See* Declaration of Eric D. Kasenetz in Support of Plan Administrator's Opposition to Motion of Retirement Housing Foundation (the "Kasenetz Declaration") ¶ 3 & Exh. P (Email chain from Nov. 3-8 between J. Jureller, LBSF, L. McMurray, and E. Kasenetz).  On November 8, 2011, LBSF proposed language for an agreement tolling deadlines of the assumption motion and deferring resolution of disputes between LBSF and another similarly situated counterparty represented by the same counsel concerning the validity of termination of derivative swaps.  *See id.*  LBSF's proposed language contained an acknowledgement that "a dispute exists as to whether [the Master Agreement with the relevant counterparty] has been validly terminated[.]"  *Id.*  RHF's counsel responded to LBSF the same day and stated that "[s]ubject to our clients' respective positions, the language should work for . . .  Retirement Housing Foundation."  *Id.*

32.     A little over a week later, RHF and LBSF executed a stipulation dated November 18, 2011 deferring resolution of LBSF's motion to assume the Master Agreement and LBSF's dispute of the validity of RHF's attempted termination of the Transactions.  The stipulation expressly states that LBSF disputes the validity of RHF's termination of the swaps.  *See id.* ¶ 4 & Exh. Q (Nov. 18, 2011 Stipulation).

33.     All of the foregoing communications concerning LBSF's dispute of

RHF's attempted termination occurred long prior to March 2012.  Accordingly, RHF's statement

in the Motion that LBSF and LBHI "did not actually provide notice of any such purported

dispute until March 2012" is simply untrue. (*See* Motion ¶ 42.)

**E.      The ADR Process**

34.     On March 16, 2012, LBSF served upon RHF, pursuant to the terms of the

ADR Procedures Order, *inter alia*, Derivatives ADR Notice No. 353.  *See* Colarossi Decl. ¶ 30.

The parties participated in a mediation session on February 5, 2013 but were unable to resolve

their dispute.  *Id*.  Although the mediator continued to attempt to facilitate a deal for some time

after the in-person mediation session concluded, that effort was unsuccessful and the mediation

formally ended on July 1, 2013.  *Id*.

**F.      The Motion and the Proposed Declaratory Judgment Action**

35.     On August 8, 2013, RHF filed the Motion.  A proposed complaint for the

Declaratory Judgment Action and the Tort Action (the "Proposed Complaint") was attached as

Exhibit 1 to the Declaration of Timothy D. Reuben in Support of Retirement Housing

Foundation's Motion Re: Automatic Stay, filed August 8, 2013 [ECF No. 39292] (the "Reuben

Declaration").  The Proposed Complaint fails to distinguish between the actions of LBHI and its

affiliates and instead lumps conduct together as if an act by one LBHI affiliate is an act by every

LBHI affiliate.

36.     In support of its Motion, RHF argues, citing section 362(a)(1) of the

Bankruptcy Code, that the automatic stay does not apply to the Declaratory Judgment Action

because "the automatic stay does not bar institution of actions for claims arising post-petition."

Motion ¶¶ 40-41.  RHF further asserts that the Declaratory Judgment Action does not contravene

section 362(a)(3) because "RHF's Early Termination Notice, if upheld, terminated the 2008

Swap and thus there are no estate property rights at issues." *Id.* ¶ 43.

    37.    Next, and in the alternative, RHF seeks relief from the automatic stay for

cause, pursuant to section 362(d)(1), in order to file the Declaratory Judgment Action.  To

establish that cause exists to modify the stay, RHF purportedly applies the twelve factors

enumerated in *Sonnax*.  RHF's principal theories appear to be that cause exists to modify the stay

because (i) the California Court is well-versed in the facts underlying the Tort Claims because

RHF is prosecuting similar claims against certain former officers and directors of LBHI and its

affiliates in a case before the California Court (the "D&O Action"); (ii) resolution of the

Declaratory Judgment Action will neither interfere with the Chapter 11 Cases nor harm the

Chapter 11 Estates' creditors; and (iii) RHF has been harmed by the uncertainty surrounding

RHF's rights and obligations under the Transactions, and RHF will continue to be harmed unless

it is permitted to immediately litigate its rights before the California Court.  *See* Motion ¶¶ 52-

53.

    38.    RHF seeks similar relief from the automatic stay for cause, pursuant to

section 362(d)(1), in order to commence the Tort Action in the California Court against LBSF

and LBHI.  Many of the claims in the Tort Action are already raised in RHF's existing Proofs of

Claim pending in this Court.  *See* Exh. 2 (RHF's Proofs of Claim).  Specifically, many of the

state law causes of action asserted in the Tort Action relate to allegedly false and misleading

statements concerning LBHI's financial condition immediately prior to LBHI's bankruptcy

filing.  *See, e.g.*, Proposed Complaint ¶¶ 176-209, 215-225.  These claims are largely based on

the alleged misuse of the "Repo 105" accounting method.  *See, e.g., id.* ¶¶ 64-115.  Certain of the

claims allegedly arise from the conduct of LBI and its employees, but RHF does not provide an

15

explanation as to why LBSF or LBHI should be liable for such conduct.  *See id.* ¶¶ 143, 151,

158, 165-66, 174-75 (alleging that LBSF and LBHI manipulated the auctions underlying certain

RHF-issued securities, when, in fact, such allegations should be directed at LBI).

39.    The Tort Action seeks to hold LBHI and LBSF jointly liable for the claims

asserted therein on the basis that LBSF and LBHI "were in fact alter egos of each other and

shared a unity of interest, and it would sanction a fraud or promote an injustice not to treat them

as alter egos." *Id.* ¶ 17.  Indeed, as noted above, the Proposed Complaint makes no effort to

distinguish between the actions of LBSF and LBHI, and instead asserts all allegations against

"Lehman," a term defined to include both LBSF and LBHI – even though they are separate legal

entities and separate debtors with separate bankruptcy estates which this Court has not

substantively consolidated. *Id.*  Moreover, many of the acts complained of in the Proposed

Complaint were actually undertaken by LBI, but the Proposed Complaint does not distinguish

any such acts. *See, e.g.*, *id.* ¶¶ 40-52; SEC Order (as defined below) at 1-2 (sanctioning LBI –

not LBSF or LBHI – for certain actions taken in respect of auction-rate securities).

40.    To support its contention that the automatic stay should be modified to

permit the commencement of the Tort Action, RHF argues primarily that (i) efficiency concerns

favor litigation of the Tort Claims before the California Court because the California Court is

already familiar with the facts underlying the Tort Claims as a result of its experience overseeing

the D&O Action, and (ii) litigation of the Tort Claims before this Court could prejudice creditors

and interfere with the Chapter 11 Cases because it could result in a decision that conflicts with

the decision of the California Court in the D&O Action.  *See* Motion ¶ 55.

41.    It is clear from the Motion that RHF intends to litigate in the California

Court not only the causes of action contained in the Declaratory Judgment Action, the Tort

16

Action, and the Proofs of Claim filed by RHF in these Chapter 11 Cases, but also RHF's ability to exercise the triangular setoff rights provided by section 6(f)(i) of the Master Agreement (as amended by the Schedule).  Indeed, RHF states that "[t]he [California] Court's determination of the validity of the Tort Claim[s] will fully resolve it, *as well as the setoff rights with respect to the 2008 Swap if applicable*."  *Id.* ¶ 55(a) (emphasis added).

## THE MOTION SHOULD BE DENIED

42.    RHF seeks to evade the rulings of this Court and other courts in this district by asserting that the automatic stay does not apply, or that, in the alternative, relief from the automatic stay should be granted.  As described more fully below, the Court should deny the relief requested in the Motion because (A) the automatic stay applies to the proposed Declaratory Judgment Action pursuant to sections 362(a)(1), (3) and (6) of the Bankruptcy Code, and (B) RHF has not established that the automatic stay should be modified for cause under section 362(d)(1) of the Bankruptcy Code to permit the commencement of the Declaratory Judgment Action or the Tort Action in the California Court.

**A.    The Automatic Stay Applies to the Declaratory Judgment Action**

43.    Each of sections 362(a)(1), (3), and (6) of the Bankruptcy Code provides an independent ground for prohibiting RHF from commencing the proposed Declaratory Judgment Action in the California Court.

**1.    Section 362(a)(1) Prohibits RHF From Commencing the Declaratory Judgment Action**

44.    Section 362(a)(1) of the Bankruptcy Code provides that the commencement of a bankruptcy case "operates as a stay" of:

> the commencement or continuation . . . [of an] action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title . . . .

17

11 U.S.C. § 362(a)(1).  Courts interpreting section 362(a)(1) have held that this provision stays the commencement of actions or proceedings to recover pre-petition claims, but does not stay the commencement of actions or proceedings to recover post-petition claims.  *Compare Grocery Haulers, Inc. v. Great Atl. & Pac. Tea Co.* (*In re Great Atl. & Pac. Tea Co.*), 467 B.R. 44, 53 (S.D.N.Y. 2012) (holding that the automatics stay applied to the claims at issue because they arose pre-petition) *with In re O'Danny Boy, Inc.*, 35 B.R. 955, 957 (Bankr. S.D. Ohio 1983) (noting "the truism from the statute that judicial action to pursue a tort suit for a post-petition claim is not automatically stayed by operation of section 362 . . . .").

45.     Contrary to RHF's contention, the Declaratory Judgment Action does not seek a recovery on a post-petition claim.  Rather, assuming that RHF is "in the money," RHF's right to payment under the master agreement would be a pre-petition claim because it arises under a pre-petition contract.  *See, e.g.*, *In re Old Carco LLC*, 424 B.R. 633, 648 (Bankr. S.D.N.Y. 2010) ("The Bankruptcy Code expressly provides that claims based upon breaches of pre-petition contracts are pre-petition claims, which are not entitled to administrative priority."). Therefore, the automatic stay applies to the Declaratory Judgment Action under the express terms of section 362(a)(1), which prohibit the "commencement . . . [of an] action or proceeding . . . to recover a claim against the debtor that arose before the commencement of the case . . . ." 11 U.S.C. § 362(a)(1).

46.     Furthermore, the mere fact that RHF could not have commenced the Declaratory Judgment Action prior to LBHI's bankruptcy filing does not mean that the automatic stay does not apply.  Indeed, the District Court for the Southern District of New York has previously held that, so long as a post-petition proceeding arises from a pre-petition claim, the automatic stay prevents the commencement of such a proceeding, even if the proceeding could

not have not been brought prior to the petition date. *See Great Atlantic*, 467 B.R. at 53. In *Great Atlantic*, a creditor argued that the automatic stay did not apply to its proposed suit against the debtor in the District Court for the District of New Jersey because such suit arose from, and could not have been brought prior to, the debtor's post-petition rejection of an executory contract between the debtor and a third party. *Id.* at 51-52. The District Court for the Southern District of New York rejected this argument and ruled in favor of the debtor, holding that the creditor's claim arose pre-petition because it flowed directly from the debtor's rejection of a pre-petition contract. *Id.* at 53. In reaching this holding, the District Court stated:

> I understand Appellant's frustration that it is prevented by the automatic stay from bringing a suit that could not have been brought pre-petition, but that occurs whenever a party seeks damages from the rejection of a contract. Appellant will have to settle for the remedies available to it in the Bankruptcy Court.

*Id.* Despite RHF's efforts to paint the Declaratory Judgment Action as an action related to a post-petition claim, such action, like the one in *Great Atlantic*, arises directly from a dispute over the parties' pre-petition relationship and is inseparable from that pre-petition contract. *See id.* at 52-53. Accordingly, the automatic stay applies to the Declaratory Judgment Action.

47.    In an attempt to obscure the fact that it holds, at most, a pre-petition claim against LBSF, RHF appears to argue that its post-petition right to terminate the Transactions constitutes a post-petition claim. *See* Motion ¶¶ 41-42. This argument is wholly without merit. Indeed, were RHF's position correct – that its alleged right to terminate the Transactions constitutes a post-petition claim that is not subject to the automatic stay – then sections 560 and 362(b)(17) of the Bankruptcy Code would be rendered meaningless. These sections permit a debtor's swap counterparty, without seeking relief from the automatic stay, to terminate its swap agreements with a debtor under specified conditions and to set off any termination payments owing to the debtor. 11 U.S.C. §§ 560, 362(b)(17). There would be no need for these safe

19

harbor provisions, however, if RHF's position were correct – *i.e.*, that its right to terminate the Transactions constitutes a post-petition claim to which the automatic stay does not apply.

48.    RHF's argument is also inconsistent with this Court's previous rulings in *Ballyrock, BNY,* and *Metavante. See Lehman Bros. Special Fin. Inc. v. Ballyrock ABS CDO 2007-1 Ltd.* (*In re Lehman Bros. Holdings Inc.*), 452 B.R. 31, 39-40 (Bankr. S.D.N.Y. 2011) ("*Ballyrock*"); *Lehman Bros. Special Fin. Inc. v. BNY Corp. Tr. Servs. Ltd.* (*In re Lehman Bros. Holdings Inc.*), 422 B.R. 407, 421-22 (Bankr. S.D.N.Y. 2010) ("*BNY*"); *Metavante* at 111-13.  In each of these decisions, the Court stated that a swap counterparty may terminate a swap agreement without violating the automatic stay only because of the safe harbor provided by section 560 of the Bankruptcy Code.  *Ballyrock*, 452 B.R. at 39-40; *BNY*, 422 B.R. at 421; *Metavante* at 107, 109-113 (Exh. 1).

49.    *Metavante*, *BNY*, and *Ballyrock*, represent just a handful of the many derivatives disputes that have arisen – and will continue to arise – in these Chapter 11 Cases. Adopting RHF's interpretation of 362(a)(1) would, therefore, not only contradict the Court's interpretation of the safe harbors in *Metavante*, *BNY*, and *Ballyrock*, but it would subject potentially all swap disputes to litigation in another forum, which would result in piecemeal decisions and conflicting rulings.  The automatic stay was designed to avoid precisely this result and, thus, strong policy considerations weigh in favor of a holding that the automatic stay applies to a swap counterparty who terminates a swap agreement.  *See SEC v. Brennan*, 230 F.3d 65, 70 (2d Cir. 2000) (noting that the automatic stay is intended to "allow the bankruptcy court to centralize all disputes concerning property of the debtor's estate so that reorganization can proceed efficiently, unimpeded by uncoordinated proceedings in other arenas") (internal quotations omitted).

20

50.     *In re Enron*, 306 B.R. 465, 475-77 (Bankr. S.D.N.Y. 2004) lends additional support to the position of LBHI and LBSF that the automatic stay applies to the proposed Declaratory Judgment Action.  In *Enron*, as here, a counterparty to a swap agreement with a chapter 11 debtor sought an order from the bankruptcy court deeming the automatic stay inapplicable so as to allow the counterparty to file a declaratory judgment action in state court.  *Id.* at 469-70.  The proposed declaratory judgment sought a ruling on both the validity of the swap agreement and the proper post-petition date as of which the swap agreement was effectively terminated.  *Id.*  The court ruled that such an action was barred by the automatic stay.  *Id.* at 474.  Significantly, in *Enron*, as here, the swap counterparty's alleged right to terminate the swap arose post-petition.  Indeed, all of the conduct central to the parties' date-of-termination dispute occurred post-petition.  *Id.* at 468.  Accordingly, the holding in *Enron* disposes of RHF's contention that the automatic stay does not apply merely because RHF's alleged right to terminate the swap arose post-petition.  *See id.* at 475-78.

## 2.     Sections 362(a)(3) and 362(a)(6) Prohibit RHF From Commencing the Declaratory Judgment Action

51.     Section 362(a)(3) of the Bankruptcy Code provides, in relevant part, that a bankruptcy petition "operates as a stay, applicable to all entities, of . . . any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate . . ."  11 U.S.C. § 362(a)(3).  Section 362(a)(6) prohibits "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case. . . ."  11 U.S.C. § 362(a)(6).

52.     In *Metavante*, this Court held that, pursuant to section 362(a)(3) of the Bankruptcy Code, the automatic stay applies to any attempt to deprive a Chapter 11 Estate of payments owing under a pre-petition swap agreement because "contract rights are property of the

estate." *Metavante* at 112-13 (Exh. 1). RHF's proposed Declaratory Judgment Action, which

seeks a ruling from a state court that LBSF is not owed any payments under the 2008 Swap

Agreement, constitutes an attempt to exercise control over property of the estate that is nearly

identical to the one prohibited in *Metavante*. Accordingly, the commencement of the

Declaratory Judgment Action is prohibited by the automatic stay under section 362(a)(3) of the

Bankruptcy Code. *See id*.

       53.     Further, even assuming, *arguendo*, that a state court were to rule that

RHF's Early Termination Notice were effective and that LBSF owes RHF certain amounts under

the Transactions,[10] any such ruling would clearly impact property of the estates of LBSF and

LBHI, as it would give rise to claims against their Chapter 11 Estates. Therefore, the act of

seeking a ruling on this issue must constitute either an "act to obtain possession of property of

the estate" under section 362(a)(3), or, at the very least, an act to "collect, assess, or recover a

claim against the debtor that arose before the commencement of the case" under section

362(a)(6). *See Brown v. Chesnut* (*In re Chesnut*), 422 F.3d 298, 302-03 (5th Cir. 2005) (holding

that attempted seizure of property that might later be determined to belong to the estate violated

section 362(a)(3)); *In re Ebadi*, 448 B.R. 308, 315 (E.D.N.Y. 2011) ("Because the Foreclosure

Sale is a substantial step in a process that could lead to a recovery of a deficiency judgment from

the Debtor [as guarantor of the property], it falls within the contours of [section 362(a)(6)].").

       54.     RHF seeks to distinguish the Court's ruling in *Metavante* on the basis that

"RHF's Early Termination Notice, if upheld, terminated the 2008 Swap and thus there are no

estate property rights at issue." Motion ¶ 43. This argument fails for a number of reasons. First,

it assumes that RHF's termination was effective, which it was not. *See Metavante* at 111-13

---

[10] Even if RHF's Early Termination Notice were effective, RHF would have owed LBSF missed periodic payments, a properly calculated termination payment, and accrued interest.

(Exh. 1); *In re Enron Corp.*, No. 01B16034 (AJG), 2005 WL 3874285, at *4 ("if based upon the bankruptcy filing, the election to terminate must be made fairly contemporaneously with the bankruptcy filing"). Second, even assuming, *arguendo*, that the Transactions were properly terminated on June 11, 2009 as suggested by RHF, RHF would have owed periodic payments to LBSF from October 1, 2008 until June 11, 2009. *See Metavante* at 111-13 (Exh. 1). RHF's failure to provide such payments runs afoul of *Metavante* and the automatic stay. *Id.* Third, even assuming that the Transactions were terminated, the Master Agreement would remain an executory contract under which LBSF would have the contractual right to receive not only the missed periodic payments, but a properly calculated termination payment and any interest accrued thereon. *See BNY*, 422 B.R. at 416 ("The language and structure of the ISDA Master Agreement that forms a central part of the Swap Agreement demonstrate that these contracts are executory."); *Metavante* at 109 (stating that the swap agreement was "a garden variety executory contract, one for which there remains something still to be done on both sides.") (Exh. 1); Colarossi Decl. at Exh. A (Master Agreement) § 6(e). LBSF's contractual right to receive such amounts represents property of LBSF's estate and, accordingly, RHF's attempt to obtain a ruling that RHF need not pay such amounts – and thereby need not perform under the Master Agreement – represents an attempt to "exercise control over" property of LBSF's estate under section 362(a)(3). *See Metavante* at 112-13 (Exh. 1).

55. Further, RHF contends that, unlike *Metavante*, RHF "took commercially reasonable actions to 'terminate, liquidate, or accelerate' the 2008 Swap . . . ." Motion ¶ 46. The notion that RHF's nine-month delay in terminating the Transactions was somehow "commercially reasonably" is belied by the fact that thousands of the Chapter 11 Estates' derivatives counterparties, including non-profits like RHF, were able to obtain any necessary

consents and terminate their derivatives transactions within a short time after the bankruptcy

filings of LBHI and LBSF.  *See* Colarossi Decl. ¶ 9.

> **B.**     **The Automatic Stay Should Not Be Modified For Cause Pursuant to Section 362(d)(1)**

56.     Courts will only modify the automatic stay pursuant to section 362(d)(1)

upon a showing of cause.  11 U.S.C. 362(d)(1); *Sonnax*, 907 F.2d at 1285; *In re Lord,* 325 B.R.

121, 129 (Bankr. S.D.N.Y. 2005).  The Second Circuit established a set of twelve factors in

*Sonnax* (the "*Sonnax* Factors") that have become the standard by which courts in the Second

Circuit consider whether to modify the automatic stay.[11]  *See In re Lehman Bros. Holdings Inc.*,

435 B.R. 122, 138 (S.D.N.Y. 2010) ("*Sonnax* . . . is routinely referenced as the leading relief

from stay precedent in this Circuit."), *aff'd sub nom. Suncal Cmtys. I LLC v. Lehman*

*Commercial Paper, Inc.,* 402 F. App'x 634 (2d Cir. 2010).

57.     Although the *Sonnax* Court outlined twelve factors, courts need not

consider each factor, but may consider only the factors that are relevant to the particular case.

*See In re RCM Global Long Term Capital Appreciation Fund, Ltd.*, 200 B.R. 514, 526 (Bankr.

S.D.N.Y. 1996) ("A court should . . . use only the factors that are deemed relevant . . . .").  In

---

[11] The *Sonnax* Factors are:
> (1) whether relief would result in a partial or complete resolution of the issues;
> (2) lack of any connection with or interference with the bankruptcy case;
> (3) whether the other proceeding involves the debtor as a fiduciary;
> (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action;
> (5) whether the debtor's insurer has assumed full responsibility for defending it;
> (6) whether the action primarily involves third parties;
> (7) whether litigation in another forum would prejudice the interests of other creditors;
> (8) whether the judgment claim arising from the other action is subject to equitable subordination;
> (9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor;
> (10) the interests of judicial economy and the expeditious and economical resolution of litigation;
> (11) whether the parties are ready for trial in the other proceeding; and
> (12) impact of the stay on the parties and the balance of harms.

*Sonnax*, 907 F.2d at 1286.

fact, the *Sonnax* Court itself considered only four of the twelve factors as relevant in that case. *Sonnax,* 907 F.2d at 1286.  Additionally, courts need not assign equal weight to each factor, and have discretion in weighing the factors against one another.  *RCM Global*, 200 B.R. at 526 ("A court should apply these factors on a case-by-case basis . . . assigning to each factor whatever weight the court feels is appropriate.").

58.    The Second Circuit has held that the party seeking to lift or modify the automatic stay bears the initial burden to show cause as to why the stay should be modified or lifted and "[i]f the movant fails to make an initial showing of cause . . . the court should deny relief without requiring any showing from the debtor that it is entitled to continued protection." *Sonnax*, 907 F.2d at 1285.  Once the movant has shown cause, the party opposing the motion must show that it is entitled to the continuing protections of the automatic stay.  *See Enron*, 306 B.R. at 476 (citing *In re M.J. & K. Co.*, 161 B.R. 586, 590 (Bankr. S.D.N.Y. 1993)); *see also RCM Global*, 200 B.R. at 526.

59.    RHF has failed to meet its burden of showing that cause exists to modify the automatic stay.  Indeed, for many of the *Sonnax* Factors relevant to the dispute, RHF does little more than recite the applicable factor and conclude that such factor weighs in RHF's favor without providing any analysis.  *See* Motion ¶¶ 52-55.  Further, the four-page Reuben Declaration filed by RHF provides little to no factual support for establishing that the *Sonnax* Factors weigh in RHF's favor.  Nevertheless, assuming, *arguendo*, that RHF has met its initial burden of establishing cause (which it has not), LBSF and LBHI are nonetheless entitled to the continued protections of the automatic stay because all relevant *Sonnax* Factors weigh heavily in

their favor.  The chart attached hereto as Exhibit 3 summarizes the Plan Administrator's analysis of each of the *Sonnax* Factors.[12]

### 1.    Relief Would Not Result in Complete Resolution of the Issues

60.    The first *Sonnax* Factor concerns whether granting relief from the automatic stay would result in a partial or complete resolution of the issues.  In this case, the first *Sonnax* Factor weighs heavily in favor of LBSF and LBHI as there are a host of key legal issues – many of which are core bankruptcy issues – that will have to be resolved, even if the California Court were allowed to reach the merits of the arguments raised in the Declaratory Judgment Action and the Tort Action.

61.    For example, the parties will need to address whether RHF may use any amounts awarded by the California Court in its Tort Action to "set-off, pursuant to Section 6(f)(i) of the Master Agreement . . . any amount that may be owed by RHF to LBSF under the swap." Motion at 2.  In *In re Lehman Bros. Inc.*, 458 B.R. 134, 144 (Bankr. S.D.N.Y. 2011) ("*UBS*"), this Court made clear that RHF would be prohibited from setting off any damages from LBHI against any amounts that it owes to LBSF under the 2008 Swap Agreement, because doing so would constitute a triangular setoff that lacks the essential requirement of mutuality.  In an attempt to avoid this prohibition on triangular setoff, however, RHF apparently plans to assert its Tort Claims jointly against LBSF and LBHI on the basis that these entities were alter egos of one another.  *See* Proposed Complaint ¶ 17.  Presumably, RHF will then argue that if the California Court finds LBSF and LBHI to be alter egos of one another, this will create the requisite mutuality that was lacking in *UBS*.  However, even if the California Court were to make the alter

---

[12] The following *Sonnax* Factors are not relevant to this dispute and are not discussed herein: whether the judgment claim arising from the other action is subject to equitable subordination; and whether RHF's success in the California Court would result in a judicial lien avoidable by the debtor.

26

ego finding sought by RHF, *UBS* is still controlling.  *See In re Eng. Motor Co.*, 426 B.R. 178

(Bankr. N.D. Miss. 2010) (finding that triangular setoff is impermissible in bankruptcy even

where debtors are substantively consolidated).  Accordingly, granting RHF relief from the

automatic stay will not result in a complete resolution of the issues because the parties will still

have to litigate the enforceability of RHF's setoff rights.

        62.    This Court is better suited to rule on whether *UBS* controls RHF's attempt

to exercise its triangular setoff right than the California Court – not only because of its

familiarity with the dispute in *UBS*, but because any additional rulings on triangular setoff has

the potential to impact numerous other swap counterparties of LBHI and its affiliates.

Furthermore, RHF's attempt to hold LBSF and LBHI jointly liable under an alter ego theory of

liability constitutes a collateral attack on the Plan, which incorporated a compromise and

settlement of substantive consolidation issues among the Chapter 11 Estates.  Therefore, this

Court – and not the California Court – should be the forum to resolve whether LBSF and LBHI

were alter egos of one another and, as a threshold matter, whether creditors are precluded from

asserting alter ego claims against the Chapter 11 Estates in light of the Plan's settlement of the

substantive consolidation issue.

        63.    Yet another issue that would have to be decided if RHF were granted

relief from the automatic stay is whether RHF even has standing to bring the alter ego causes of

action that it asserts in its Proposed Complaint.  Under binding Second Circuit precedent,

creditors such as RHF lack standing to assert alter ego claims against a debtor's affiliate.  *See*

*Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130 (2d Cir. 1993); *St. Paul Fire & Marine Ins.*

*Co. v. PepsiCo, Inc.*, 884 F.2d 688, 700-01 (2d Cir. 1989).  Indeed, such claims are property of

the debtor's estate and the trustee or debtor-in-possession has exclusive standing to assert such

claims. *See Murray v. Miner*, 876 F. Supp. 512, 516 (S.D.N.Y. 1995) (holding that because the debtor was incorporated in Delaware, the alter ego claims belonged to the debtor's estate and the debtor had exclusive standing to assert such claims).[13]  This is because "[a]llowing the trustee or debtor-in-possession to pursue [such] claim[s] avoids the prospect of creditors seeking to gain advantage over other creditors by pursuing the alter ego claims on a first-come, first-serve basis." *Duke Energy Trading & Mktg., L.L.C. v. Enron Corp.* (*In re Enron Corp.*), No. 02-3609A, 2003 WL 1889040, at *4 (Bankr. S.D.N.Y. Apr. 17, 2003).

64.    Accordingly, rather than resolve all issues between the parties, permitting the filing of the Tort Action will actually raise an additional threshold issue: namely, whether creditors of LBHI's subsidiaries have standing to pierce the corporate veil between LBHI and its subsidiaries.  The Court should not cede its authority to rule on whether a creditor of the Chapter 11 Estates has standing to assert alter ego claims because a decision on this issue has the potential to impact hundreds, if not thousands, of claims filed against the Chapter 11 Estates.

> **2.    The Declaratory Judgment Action and the Tort Action Are Closely Connected to, and Would Significantly Interfere With, These Bankruptcy Cases and, On Balance, Would Be More Harmful to LBSF and LBHI Than Denial of Relief Would Be to RHF**

65.    The second *Sonnax* Factor, lack of any connection with or interference with the bankruptcy case, and the twelfth *Sonnax* Factor, the impact of the stay on the parties and the balance of harms, strongly militate against providing RHF with relief from the automatic stay.  In *Enron*, 306 B.R. at 475-77, the Bankruptcy Court for the Southern District of New York found that these two factors weighed against relief from the automatic stay under facts incredibly similar to those before the Court today.  Specifically, the Bankruptcy Court held as follows:

---

[13] Like the debtor in *Murray*, LBSF and LBHI are incorporated in Delaware.

> The issues to be determined in the State Court Action appear to be similar to issues already raised in connection with these bankruptcy cases. As [the debtor] points out, issues as to the validity of swap agreements and other contracts, termination thereof, and the amount of termination payments due and owing are issues that [the debtor] is seeking to resolve with all of its various counterparties. The termination payments due in connection with thousands of trading contracts with hundreds of counterparties represent[ ] one of the largest assets of the debtors' estates. The debtors, including [the debtor], have commenced adversary proceedings with various counterparties who elected early termination of their respective swap agreements and similar agreements under the safe harbor provisions contained in the Bankruptcy Code . . . The Court can see no reason for permitting litigation to proceed in state court, where this Court has or will be confronted with similar issues in connection with [the debtor]'s reorganization.

*Enron*, 306 B.R. at 477.

66.     The rationale presented in *Enron* applies equally here. LBSF's affirmative claims against swap counterparties for termination payments and other amounts represent one of the largest assets of LBSF's estate. As *Ballyrock*, *UBS*, *BNY*, *Metavante*, and *In re Lehman Bros. Holdings Inc.*, 433 B.R. 101, 108-12 (Bankr. S.D.N.Y. 2010) ("*Swedbank*") confirm, issues pertaining to setoff, the safe harbors, and the *ipso facto* clauses have already arisen not only in LBSF's case, but many of the other Chapter 11 Cases. *See Ballyrock*, 452 B.R. at 39-40; *UBS*, 458 B.R. at 144; *BNY*, 422 B.R. at 421; *Swedbank*, 433 B.R. at 108-12; *Metavante* at 109-113 (Exh. 1). Likewise, litigation over whether RHF violated the Master Agreement and section 562 of the Bankruptcy Code by conducting a flawed market quotation process and an unreasonable Loss calculation has the potential to impact numerous unresolved derivatives claims in these Chapter 11 Cases. *See* Colarossi Decl. ¶¶ 13-15. As in *Enron*, there is no reason for the Court to permit RHF to litigate issues relevant to swap agreements in state court given that the Court has confronted – and will continue to confront – these same issues. *See Enron*, 306 B.R. at 477.

67.     Similarly, the issues that RHF seeks to litigate in the Tort Action are also common to many creditors. For example, RHF asserts that in the months leading up to LBHI's

bankruptcy, LBHI and LBSF allegedly used "Repo 105" to conceal their true financial condition. *See, e.g.*, Proposed Complaint ¶¶ 73-74. Citing to this alleged fraud, RHF claims that it is entitled to rescission of the 2008 Swap Agreement, which was entered into in June 2008. *Id.* ¶¶ 215-25. Whether the alleged use of "Repo 105" by LBHI and its affiliates would entitle a swap counterparty – or any contract counterparty of the Chapter 11 Estates – to rescission of an agreement entered into in the months prior to LBHI's bankruptcy is an issue common to other creditors of the Chapter 11 Estates. *See* Colarossi Decl. ¶ 32. Accordingly, this Court should retain the authority to decide this issue so as to avoid the potential for conflicting judgments and the prospect of the Chapter 11 Estates having to litigate this issue in multiple forums. *See Enron*, 306 B.R. at 477-78.

68.    Likewise, whether RHF lacks standing to assert the alter ego claims contained in the Tort Action is another issue common to many claimants. Indeed, this Court will need to address this issue in order to resolve, among other things, hundreds of claims filed against LBHI by employees of LBI. *See, e.g.*, Four Hundred and Twenty-Ninth Omnibus Objection to Claims, filed Aug. 12, 2013 [ECF No. 39355]. These employees allege, as RHF does, that the corporate veil separating LBHI and its subsidiaries should be pierced. *See, e.g.*, *id.*

69.    RHF acknowledges that litigation of "the same or similar issues" as those raised in the Tort Action "could be prejudicial" to LBHI, LBSF, and RHF if such issues are litigated in multiple jurisdictions given "the potential for conflicting decisions." Motion ¶ 55(g). RHF incorrectly concludes, however, that this fact cuts in favor of granting relief from the automatic stay so that the California Court may decide both the D&O Action and the Tort Action. In reality, the greater danger to LBSF, LBHI, and their creditors would be granting relief from the automatic stay because doing so would permit RHF to litigate in the California Court

issues common to other creditors. Indeed, granting such relief would encourage other creditors to seek similar relief, and this could ultimately lead to the commencement of litigation in multiple forums concerning similar issues.

70.     Furthermore, granting relief from the automatic stay would permit RHF to prosecute its alleged claim outside the ordinary claims administration. This could turn the entire claims reconciliation process on its head by calling into doubt the effectiveness of the Claims Procedures Order, which was designed to streamline the resolution of the many thousands of claims that were asserted against the Chapter 11 Estates. Similarly, granting the Motion could result in a flood of derivatives counterparties seeking relief from the automatic stay to have their disputes litigated in state court. The ADR Procedures Order was designed to avoid this result by ensuring that derivatives disputes were handled efficiently through mandatory mediation at the election of LBHI and its affiliates. Permitting RHF to litigate its claims before the California Court is also inconsistent with the Plan, which provides that the Plan Administrator shall have the right to "control and effectuate the Claims reconciliation process, including to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors . . . ." (Plan at § 6.1(b)(i).)

71.     Like the swap counterparty in *Enron*, RHF alleges that unless the Court grants RHF's requested relief it will continue to be harmed as a result of the "uncertainty" surrounding the parties' rights and obligations under the Transactions. *Compare Enron*, 306 B.R. at 474 (noting that Enron's swap counterparty sought declaratory relief in state court because of a "position of uncertainty and insecurity") *with* Motion ¶ 52(j) (RHF argues that "[t]he open issue regarding the validity of the Early Termination Notice . . . has created a great deal of uncertainty for RHF"). As in *Enron*, however, this Court should rule that the harms to

LBHI and LBSF discussed above, including the disruption to these Chapter 11 Cases, outweigh the unsubstantiated harm that will allegedly be caused to RHF – a single swap counterparty. *See Enron*, 306 B.R. at 477-78. Accordingly, the second and twelfth *Sonnax* Factors weigh heavily in favor of LBSF and LBHI, just as they weighed in favor of Enron in the *Enron* case.

72. For all the reasons discussed above, the Declaratory Judgment Action and the Tort Action are closely connected to these Chapter 11 Cases. As significantly, the Declaratory Judgment Action and the Tort Action are closely connected to the previous rulings of this Court. Indeed, it is clear that by filing its Motion, RHF is attempting to evade this Court's previous decisions – particularly, *Metavante* and *UBS*.

73. RHF's forum shopping should not be encouraged. The District Court for the Southern District of New York recently criticized an almost identical attempt to forum shop by another disgruntled swap counterparty of one of LBHI's affiliates. The District Court stated as follows:

> The policy against forum shopping supports the maintenance of the reference at this juncture as well. It is clear that in the Lehman bankruptcy proceedings there have been several decisions that implicate the interpretation of rights relevant to the Swap Agreement, including the determination by Judge Peck that the so called 'safe harbor' provisions for swap agreements found in Bankruptcy Code sections 560 and 561 do not create an exception from the non-mutual set-off limitation of section 553 of the Bankruptcy Code. *See In re Lehman Bros. Holdings, Inc.*, 433 B.R. 101, 112 (Bankr. S.D.N.Y. 2010), *aff'd*, 445 B.R. 130 (S.D.N.Y. 2011). This decision appears to have significant implications for [the swap counterparty's] position in the adversary proceeding before Judge Peck, because LBHI contends that the Set-off Provision constitutes a non-mutual set-off agreement and is therefore void under section 553 of the Bankruptcy Code. [The swap counterparty] has argued that the safe harbor provision would apply to the Set-off Provision to allow it to set off non-mutual debts. Thus, it appears that [the swap counterparty] may be attempting to move the initial determination to a potentially more favorable forum. Therefore, the Court's duty to prevent forum shopping counsels against withdrawal of the reference.

32

Mem. Order at 8-9, *Lehman Bros. Holdings Inc. v. Credit Agricole Corp. & Inv. Bank* (*In re Lehman Bros. Holdings Inc.*), No. 13-3373 (S.D.N.Y. Aug. 8, 2013) (denying swap counterparty's motion to withdraw the reference) ("<u>*Credit Agricole*</u>"); *accord* Mem. Order at 6, *Lehman Bros. Commercial Corp. v. Ford Global Treasury, Inc.*, No. 12-8201 (S.D.N.Y. Apr. 8, 2013); Hr'g Tr. at 65, *Mich. State Hous. Dev. Auth. v. Lehman Bros. Derivatives Prods. Inc.*, No. 11-3392 (S.D.N.Y. Sept. 14, 2011).  RHF's attempt to exercise its setoff rights in the California Court by moving for stay relief is analogous to Credit Agricole's attempt to exercise its non-mutual setoff rights in the District Court by moving to withdraw the reference.  This Court should reject RHF's attempt to forum shop, just as the District Court rejected Credit Agricole's attempt to forum shop.  *See Credit Agricole* at 8-10.  Indeed, the close connection between the issues raised in the Declaratory Judgment Action and the Tort Action, on the one hand, and the prior rulings of this Court, on the other, militate against granting RHF relief from the automatic stay under the second *Sonnax* Factor.

> **3.    The Interest of Judicial Economy Weighs Strongly in Favor of LBSF and LBHI, and this Court Has the Necessary Expertise To Hear the Causes of Action Asserted by RHF**

74.    Both the tenth *Sonnax* Factor, which concerns the interest of judicial economy and the expeditious and economical resolution of litigation, and the fourth *Sonnax* Factor, which concerns whether a specialized tribunal with the necessary expertise has been established to hear the cause of action, weigh strongly in favor of denying the relief requested in the Motion.  Indeed, in a recent decision denying a creditor's motion to withdraw the reference to this Court, the District Court for the Southern District of New York observed as follows:

> Efficiency concerns also weigh strongly in favor of the denial of the motion to withdraw the reference.  [The Chapter 11 Cases] are among the most large and complex the District has seen. The bankruptcy court has, in its years of presiding over the management of the [the Chapter 11 Cases] and resolution of myriad controversies in connection with them, developed significant expertise and

background knowledge concerning derivatives and other complex transactions. Its expertise in the interpretation of the Bankruptcy Code provides, furthermore, an important opportunity for highly informed initial analysis of the core issues presented here. . . .

Finally, uniformity favors the bankruptcy court's retention of the adversary proceeding because, as discussed above, it has handled issues of mutuality in setting off debts under these types of derivatives contracts. Courts have found that uniformity of bankruptcy administration is improved where a bankruptcy court retains jurisdiction over claims involving issues of bankruptcy law.

*Credit Agricole* at 8-9.

75.    As stated by the District Court, this Court has developed not only "significant expertise and background knowledge concerning derivatives," but particular expertise with respect to analyzing and interpreting the interplay between the Bankruptcy Code and swap agreements. *Id.* at 8.  In this way, this Court constitutes both a specialized tribunal with the necessary expertise to hear the Declaratory Judgment Action and the most efficient forum for resolving the Declaratory Judgment Action. *See id.*

76.    Similarly, as noted by the District Court, this Court has previously "handled issues of mutuality in setting off debts under . . . derivatives contracts," and, therefore, it would promote both efficiency and uniformity to deny RHF's request to commence the Tort Action. *Id.* at 9.  Indeed, doing so would ensure that this Court – *i.e.*, a court with the necessary expertise – rules on the issue of whether or not RHF may exercise the triangular setoff rights provided by the Master Agreement in the event that RHF is successful on its Tort Claims.

77.    In support of its contention that the interests of judicial economy compel that the stay be lifted so the RHF may pursue the Declaratory Judgment Action, RHF argues that (1) most of RHF's witnesses are located in California, and (2) the California Court "is already familiar with the unique facts and circumstances of this matter . . . ." Motion ¶ 52(h).  RHF's first point is unpersuasive considering that LBHI's witnesses are primarily based in New York.

With respect to RHF's second point, RHF implies that the California Court's familiarity with the D&O Action, which involves pre-petition facts and state law claims, will somehow be relevant to the law and facts surrounding the validity of the Early Termination Notice, which involves post-petition facts and bankruptcy law. However, RHF never actually explains how the California Court's familiarity with the D&O Action will help it reach a ruling on the Declaratory Judgment Action. *See* Motion ¶ 52(h). The California Court's familiarity with the D&O Action has no bearing on the issues that arise in the Declaratory Judgment Action and, therefore, judicial economy weighs in favor of LBSF and LBHI given this Court's extensive expertise with issues involving swap agreements.

78.    In support of its contention that the California state court represents a specialized tribunal with the expertise necessary to resolve the Declaratory Judgment Action, RHF argues that "[t]he [California] Court is uniquely qualified to resolve the state law contract issues related to the Early Termination Notice," and that the "[California] Court has been actively involved in the litigation of the related [D&O Action]." Motion ¶ 52(d). However, RHF fails to explain why the California Court is "uniquely qualified" to interpret the 2008 Swap Agreement, which is governed by New York law, and why the California Court is "uniquely qualified" to reconcile the 2008 Swap Agreement's provisions with the Bankruptcy Code. This Court already ruled in *Metavante* that "the Bankruptcy Code trumps any state law excuse of nonperformance, [and] Metavante's reliance on New York contract law is misplaced." *Metavante* at 111. Similarly, RHF fails to explain how or why the California Court's familiarity with the D&O Action has any bearing on its expertise when it comes to deciding whether or not the Early Termination Notice was sent in violation of the automatic stay because it was not safe harbored pursuant to section 560 of the Bankruptcy Code. This Court has more expertise than

the California Court when it comes to deciding issues pertaining to derivatives contracts and their treatment under the Bankruptcy Code, and, therefore, the fourth *Sonnax* Factor weighs heavily in favor of LBSF and LBHI.

79.     Moreover, judicial economy will not be served by granting RHF relief from the automatic stay because the Proposed Complaint, on its face, is legally insufficient and, therefore, it is subject to dismissal.  First, as mentioned above, RHF lacks standing to assert the alter ego claims upon which the Proposed Complaint is based.  *See supra* ¶¶ 63-64.  Second, the Proposed Complaint will likely be dismissed because it fails to delineate with particularly the actions of LBSF, LBHI, and LBI – separate entities that have not been substantively consolidated.  For example, in both the Motion and the Proposed Complaint, RHF alleges that the auction process underlying the Select Auction Variable Rate Securities ("<u>SAVRS</u>") was manipulated by "Lehman," who was both the broker-dealer and market maker for these SAVRS.  Motion ¶¶ 13, 15; Proposed Complaint ¶¶ 23, 47.  In support of this allegation, RHF attaches an order issued by the United States Securities and Exchange Commission (the "<u>SEC Order</u>") as Exhibit 2 to the Reuben Declaration and asserts that this SEC Order "found that Lehman and other broker-dealers had committed Section 17(a)(2) Securities Act violations."  Motion ¶ 16; Proposed Complaint ¶ 41.  RHF defines the term "Lehman" as "LBHI and LBSF."  Motion at 2; Proposed Complaint ¶ 17.

80.     Contrary to RHF's misleading assertions, neither LBSF nor LBHI acted as broker-dealer and market maker for the SAVRS,[14] and the SEC Order was not directed at LBSF or LBHI.  Rather, the SEC Order was directed at LBI, and it was LBI which allegedly was engaged in the manipulation of the SAVRS auctions.  *See* SEC Order at 1-2 (sanctioning LBI –

---

[14] Indeed, neither LBSF nor LBHI are broker-dealers registered with the United States Securities and Exchange Commission.

not LBSF or LBHI – for certain actions taken in respect of auction-rate securities).  Many of the

Tort Claims arise from LBI's alleged manipulation of the SAVRS auctions.  *See, e.g.*, Proposed

Complaint ¶¶ 143, 151, 158, 165-66, 174-75.  Inexplicably, however, RHF asserts these claims

against LBSF and LBHI.

      81.     In the Proposed Complaint, RHF does not allege *any* basis – let alone a

meritorious basis – for holding LBSF and LBHI liable for the actions of LBI.  To the extent that

RHF would seek to amend the Proposed Complaint to argue that LBI's corporate veil should be

pierced, such argument would be soundly rejected by a California Court.  Indeed, only LBI,

which is now under the control of the LBI Trustee, has standing to assert such veil-piercing

claims.  *See supra* ¶ 63-64.  Yet, pursuant to section 6.01 of the LBI Settlement Agreement, the

LBI Trustee explicitly released LBHI and LBSF from all forms of veil-piercing claims, and this

Court expressly approved of such releases in the order approving the LBI Settlement Agreement.

Order Approving Settlement Agreement Between The Trustee And The LBHI Entities ¶ 5(d), *In*

*re Lehman Bros. Inc.*, No. 08-01420 (Bankr. S.D.N.Y. Apr. 16, 2013) [ECF No. 6020].

      82.     Accordingly, RHF has not asserted – and cannot assert – any basis for why

LBSF and LBHI should be liable for many of the Tort Claims asserted in the Proposed

Complaint.  Because the Proposed Complaint is insufficient on its face, it would not serve the

interests of judicial economy to grant RHF relief from the automatic stay to pursue the Proposed

Complaint, especially where such pleading will likely be dismissed (i) for lack of standing due to

well-established bankruptcy law, and (ii) for RHF's failure to delineate between the actions of

LBHI, LBSF, and LBI – distinct legal entities in separate bankruptcy proceedings that were not

substantively consolidated.

83.     For all the foregoing reasons, *Sonnax* Factors four and ten weigh in favor

of denying RHF's Motion.

### 4.     Litigation in the California Court Will Prejudice the Interests of Other Creditors

84.     RHF has filed Proofs of Claim in the Chapter 11 Cases against LBSF and

LBHI for claims relating to the swap termination payment and the Tort Claims.  Requiring LBSF

and LBHI to defend RHF's claims in another forum would upend the "strong bankruptcy code

policy that favors centralized and efficient administration of all claims in the bankruptcy court

. . . [and] be unfair to other creditors who must bring their claims in this Court." *In re*

*Residential Capital, LLC*, No. 12-12020 (MG), 2012 WL 3555584, at *4 (Bankr. S.D.N.Y. Aug.

16, 2012) (citing *Pub. Indus. Inc. v. United States* (*In re Cuyahoga Equip. Corp.*), 980 F.2d 110,

117 (2d Cir. 1992)).  Indeed, litigation of RHF's claims outside the ordinary claims

reconciliation process could lead to inconsistent results and, thereby, permit certain creditors to

attain more favorable results than others, despite their being similarly situated.  Here, the

prospect of inconsistent results is particularly troubling because many of RHF's Tort Claims,

such as those related to "Repo 105," have been or could be asserted (in claims against the

Chapter 11 Estates or as a defense to claims by the Chapter 11 Estates) by numerous creditors.

*See* Colarossi Decl. ¶ 32.  Accordingly, "[l]ike many others asserting claims against the Debtors,

[RHF] cannot jump to the head of the line to pursue [its] damages claims in another forum."  *Id.*

at *1, *4 (refusing to lift the stay and stressing that claimant must be "treated as other similarly

situated unsecured creditors; doing so also minimizes the risk of inconsistent results.").

85.     Further, by seeking to exercise its setoff rights in the California Court,

RHF is impermissibly attempting to elevate itself to secured status above other unsecured

creditors in violation of Bankruptcy Code section 506 by asserting a right to setoff approximately

$11 million attributable to the Tort Claims against its obligation to pay LBSF. "'Setoff, in effect,

elevates an unsecured claim to secured status.'" *IRS v. Shultz* (*In re Shultz*), 347 B.R. 115, at *4

(6th Cir. B.A.P. 2006) (quoting *Univ. Med. Ctr. v. Sullivan* (*In re Univ. Med. Ctr.*), 973 F.2d

1065, 1079 (3d Cir.1992)); *see also In re Bousa Inc.*, No. 89-B13380 (JMP), 2006 WL 2864964,

at *1(Bankr. S.D.N.Y. Sept. 29, 2006) (cautioning that "[t]he impact of permitting setoff is

significant and will adversely affect other creditors of the Debtor's estate.  If a setoff is

authorized, the Government will be entitled to a credit of almost $2 million against amounts

otherwise payable to the Debtor, thereby sharply cutting distributions to other unsecured

creditors under the Debtors' confirmed liquidating plan.").

86.    Therefore, because lifting the stay to permit litigation in the California

Court may harm other creditors, this factor weighs in favor of denying the Motion.

### 5.    Neither the Declaratory Judgment Action Nor the Tort Action Involve LBSF or LBHI as a Fiduciary

87.    Neither LBSF nor LBHI acted as fiduciaries to RHF with respect to the

Transactions.  In fact, RHF represented in the each of the confirmations for the Transactions that:

> (a) it is not relying on [LBSF] in connection with its decision to enter into this Transaction, and ***neither party is acting as an advisor to or fiduciary of the other party in connection with this Transaction*** regardless of whether the other party provides it with market information or its views; (b) [RHF] understands the risks of the Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (c) [RHF] has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into the Transaction is appropriate for such party in light of its financial capabilities and objectives.

*See* Colarossi Decl. at Exh. B (LIBOR Swap Confirmation) at 2 & Exh. C (SIFMA Swap

Confirmations) at 2 (emphasis added).  Accordingly, with respect to the Declaratory Judgment

Action and all Tort Claims based on the Transactions, this factor weighs in favor of LBSF and LBHI.

88.    With respect to the remaining Tort Claims, RHF's allegations concern the conduct of LBI as broker-dealer for, and market-maker of, the SAVRS.  *See supra* ¶ 80; Proposed Complaint ¶¶ 143, 151, 158, 165-66, 174-75.  RHF cannot rely on an alleged fiduciary relationship between itself and LBI to establish a fiduciary relationship between itself and LBSF or LBHI.  Moreover, even "in the context of an ordinary broker-client relationship, the broker owes no fiduciary duty to the purchaser of the security." *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 536 (2d Cir. 1999) (citing *Perl v. Smith Barney Inc.*, 230 A.D.2d 664, 666 (N.Y. App. Div. 1996)).   As the Second Circuit recognized in *Press*, "cases that have recognized the fiduciary relationship as evolving simply from the broker-client relationship have limited the scope of the fiduciary duty to the narrow task of consummating the transaction requested. Simply put, the fiduciary obligation that arises between a broker and a customer as a matter of New York common law is limited to matters relevant to affairs entrusted to the broker." *Id.* at 536 (citations omitted).

89.    Thus, because no fiduciary duty to RHF existed, the third *Sonnax* Factor weighs in favor of LBSF and LBHI.

**6.    Neither LBSF nor LBHI Have Insurance Coverage for the Declaratory Judgment Action or the Tort Action**

90.    Neither the Declaratory Judgment Action nor the Tort Action is covered by insurance policies held by LBSF or LBHI.  Colarossi Decl. ¶ 31.  Accordingly, LBSF and LBHI would have to pay all costs and expenses incurred while litigating these actions with out-of-pocket funds from their respective Chapter 11 Estates.  *Id.*  Likewise, any damages that might

be awarded by the California Court would have to be paid by LBSF and LBHI directly, although

they would be treated as prepetition unsecured claims.  *Id.*

91.    Accordingly, the fifth *Sonnax* Factor militates against granting relief from

the automatic stay.

### 7.    Neither the Declaratory Judgment Action Nor the Alter Ego Action Involves Third Parties.

92.    "The court should not grant relief from the stay under the sixth *Sonnax*

Factor if the debtor is the main party to the litigation."  *In re Residential Capital, LLC*, No. 12-

12020 (MG), 2012 WL 3556912, at *3 (Bankr. S.D.N.Y. Aug. 16, 2012) (citing *City Ins. Co. v.*

*Mego Int'l Inc.* (*In re Mego Int'l Inc.*), 28 B.R. 324, 326 (Bankr. S.D.N.Y 1983)).  RHF admits

that "[d]etermination of the declaratory action as to the validity of the Early Termination Notice

should not involve third parties[.]"  Motion ¶ 52(f).  The mere assertion that "RHF will be

compelled to call its bank lenders and advisors as potential witnesses" is irrelevant to this

consideration.  *Id.*

93.    Similarly, RHF does not argue that any third parties will be named as

parties in the Tort Action.  *See* Motion ¶ 55(f).  Indeed, RHF's Proposed Complaint names only

LBHI and LBSF as defendants, along with "Does 1-20."  Proposed Complaint at 1.  Hence,

LBSF and LBHI are the main parties to the Tort Action.  The mere fact that certain officers and

directors of LBHI are named as defendants in the D&O Action has no bearing on whether third

parties are involved in the Tort Action, which RHF proposes to commence as a proceeding that

is separate and distinct from the D&O Action.

94.    Accordingly, the sixth *Sonnax* Factor weighs in favor of LBSF and LBHI,

and does not support granting RHF relief from the automatic stay.

**8.    The Parties Are Not Ready for Trial**

95.    RHF admits that "neither matter is trial ready."  Motion ¶ 55(i).  It is undisputed that no proceedings have even been commenced, nor have the parties begun formal discovery.

96.    Further, RHF's suggestion that "many of the same facts and circumstances [in the Declaratory Judgment Action] have already been subject to litigation in the [D&O Action]," (Motion ¶ 52(i)), is nonsensical, as the validity of RHF's attempted termination of the swap Transactions is not a factor in the D&O Action.  Additionally, the progress of the D&O Action has no bearing on whether RHF's disputes with LBSF and LBHI are ready for trial. RHF's characterization of the status of the D&O Action is also misleading (*see* Motion ¶ 55(i)) – that matter is nowhere near trial-ready as RHF just filed a sixth amended complaint on August 9, 2013, which is still subject to possible dismissal.  *See* Sixth Amended Compl., *Retirement Hous. Found. v. Cain Bros. & Co.*, No. BC404726 (Sup. Ct. Cal. Los Angeles Aug. 9, 2013) [Dkt. No. 656].  Moreover, RHF's claim that "Lehman had taken no steps to dispute the Early Termination Notice or Termination Calculation until March 2012" (Motion ¶ 34) is not only patently false (*see* BACKGROUND, Parts C & D *infra* ¶¶ 21, 25-33) but also irrelevant as to whether the parties are ready for trial on the issue of the validity of RHF's termination attempt and Tort Claims.

97.    The eleventh *Sonnax* Factor, therefore, weighs in favor of LBSF and LBHI and does not support granting RHF's Motion.

## CONCLUSION

98.    For all the reasons discussed above, (A) the automatic stay applies to prevent the commencement of RHF's Declaratory Judgment Action pursuant to sections 362(a)(1), (3), and (6) of the Bankruptcy Code, and (B) it would be inappropriate for the Court to

modify the automatic stay to permit the filing of the Declaratory Judgment Action and the Tort

Action because RHF has not – and cannot – establish that cause exists to modify the stay under

section 362(d)(1) of the Bankruptcy Code.

WHEREFORE the Plan Administrator respectfully requests that the Court deny

the Motion and grant such other and further relief as is just.


Dated:      September 11, 2013
              New York, New York


                                                      /s/ Jacqueline Marcus
                                                    Jacqueline Marcus
                                                    Richard Slack

                                                    WEIL, GOTSHAL & MANGES LLP
                                                    767 Fifth Avenue
                                                    New York, New York 10153
                                                    Telephone: (212) 310-8000
                                                    Facsimile: (212) 310-8007

                                                    Attorneys for Lehman Brothers Holdings Inc.
                                                    and Certain of Its Affiliates

**EXHIBIT 1**

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 08-13555(JMP)

Case No. 08-01420(JMP)(SIPA)

Adv. Case No. 09-01258

Adv. Case No. 08-01743

Adv. Case No. 09-01242

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS HOLDINGS, INC., et al.,

                 Debtors.

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS INC.,

                 Debtor.

- - - - - - - - - - - - - - - - - - - -x

NEUBERGER BERMAN, LLC,

                 Plaintiff,

      -against-

PNC BANK, NATIONAL ASSOCIATION,

LEHMAN BROTHERS INC., AND LEHMAN

BROTHERS COMMERICAL CORPORATION,

                 Defendants.

- - - - - - - - - - - - - - - - - - - -x

VERITEXT REPORTING COMPANY

212-267-6868                                       516-608-2400

2

1     - - - - - - - - - - - - - - - - - - - -x

2     STATE STREET BANK AND TRUST COMPANY,

3                         Plaintiff,

4     LEHMAN COMMERCIAL PAPER INC.,

5             -against-

6                         Defendant.

7     - - - - - - - - - - - - - - - - - - - -x

8     LEHMAN BROTHERS SPECIAL FINANCING INC.,

9                         Plaintiff,

10    BNY CORPORATE TRUSTEE SERVICES, LTD.,

11            -against-

12                        Defendant.

13    - - - - - - - - - - - - - - - - - - - -x

14

15                 U.S. Bankruptcy Court

16                 One Bowling Green

17                 New York, New York

18

19                 September 15, 2009

20                 10:03 a.m.

21

22    B E F O R E:

23    HON. JAMES M. PECK

24    U.S. BANKRUPTCY JUDGE

25

99

1    that it has been presented and will make some judgments as to

2    the identity of the mediators in consultation with counsel for

3    the debtors and for the creditors' committee who have been so

4    active in developing these procedures.

5            I recognize that a lot of people who are in court at

6    this moment are here for the ADR procedures, and I'm going to

7    give people who want to leave an opportunity to leave.  I'm

8    also going to give everybody an opportunity for a break.  But

9    because of the congestion of this docket, I think I'm going to

10   go until 1 o'clock.  So let's take a break for ten minutes, and

11   then resume, and then go until 1 o'clock and then break for

12   lunch.  We're adjourned until then.

13           MR. GRUENBERGER:  Thank you, Your Honor.

14       (Recess from 12:12 p.m. to 12:28 p.m.)

15           THE COURT:  Be seated please.  Number 11, Metavante.

16           MR. SLACK:  Your Honor, Richard Slack from Weil,

17   Gotshal for the debtors.  We're here on the debtors' motion to

18   compel performance of Metavante Corporation.  As Your Honor

19   knows, two months ago we had argument, after fully briefing the

20   issue.  Your Honor is in receipt of letters from both

21   Metavante's counsel and from the debtors, which I think

22   provides the status of where we are in terms of discussions,

23   which is, essentially, that the parties have not had

24   substantial discussions, as the letters which are docketed

25   state.

100

1        The debtors were requested to make a proposal to

2    resolve it, which we did.  We have not received a proposal from

3    Metavante in the two months since the hearing, and Metavante

4    has not responded to our proposal that we've made.

5        Your Honor has mentioned Metavante a couple of times

6    today, and so Your Honor may have a plan for the conference,

7    but it is the debtors' position that this matter should be

8    considered and decided, at the Court's discretion, obviously.

9        THE COURT:  Understood.  I'm ready to rule today.

10        MR. ARNOLD:  May it please the Court, mindful of that

11    comment, I want you to know why we wrote the letter, so that

12    you have in mind that parties do take into account the risks of

13    not settling, and you were quite clear at the hearing on July

14    14th that there was an opportunity for the parties to consider

15    resolving this matter.

16        For the Court's information, neither Lehman nor its

17    counsel have been obdurate, ornery, or in any fashion

18    unprofessional.  Our dealings have been quite, to the contrary,

19    exceptional throughout the history of our relationships.  I

20    reached out to counsel for the debtors to explain how it is

21    that an impending transaction which will close on October 1st

22    would, in my judgment, have a favorable impact on the

23    likelihood of this matter resolving consensually.  That was the

24    singular purpose for us writing the letter to the Court.  We

25    are not here today to reargue the motion.  The Court heard

101

1    extensive oral argument.  It has been well briefed.  The issues

2    have come up again in, frankly, in other instances and motions

3    and adversary proceedings.  I wanted the Court to know that it

4    was not by design, neglect or deliberately ignoring your

5    comments on July 14th that the settlement has not proceeded

6    further than it has.  About a week ago we received a settlement

7    proposal.  I am authorized to state by both Fidelity and

8    Metavante that post-closing of the merged entity we expect to,

9    and intend to, and will make a settlement proposal, but we're

10   also mindful that it hasn't been settled, and if it is the

11   Court's desire to rule on the matter today, we govern ourselves

12   accordingly.  I just wanted the Court to know what I've done

13   since July 14th to try to move this matter on.

14              THE COURT:  Okay.  Thank you for that update.

15              MR. ARNOLD:  Thank you, Your Honor.

16              THE COURT:  The Metavante matter consumed the better

17   part of an afternoon's oral argument.  My best recollection is

18   that we specially listed it on the afternoon before the July

19   omnibus hearing.  Candidly, I don't recall why it was specially

20   listed all by itself, but it's just as well that it happened,

21   because it took a lot of time.

22              It's correct that I encouraged the parties to attempt

23   to resolve this consensually, and I appreciate the fact that

24   large enterprises, particularly those that are involved in

25   major transactions in which acquisitions are literally weeks

102

1   away from being consummated, may be distracted or may have

2   other priorities.  But I also believe that when I suggested

3   that this be listed for the September 15th omnibus hearing it

4   was with the notion that, in effect, time would be up.

5        I'm also mindful of the fact that on today's calendar

6   a matter very similar to this, item 6, has been consensually

7   resolved, involving the payment of fifty percent more dollars

8   to the debtors than are at issue in this current dispute.

9        I am prepared to rule and will do so now.  Recognize

10  that what I'm about to do will take some time and will probably

11  take us to the lunch hour.  If there is anyone here who doesn't

12  want to hear the ruling in this case I'd like you to be free to

13  both leave, because I won't be offended, or, if at some point

14  during my rendition of this ruling you say to yourself this is

15  something I don't need to hear, you're also free to leave at

16  that point.

17       LBSF requests that the Court compel Metavante to

18  perform its obligations under that certain 1992 ISDA Master

19  Agreement dated as of November 20, 2007, defined as the "Master

20  Agreement".  And that certain trade confirmation dated December

21  4, 2007, defined as the "Confirmation", and together with the

22  Master Agreement, the "Agreement".

23       The Master Agreement provides the basic terms of the

24  parties' contractual relationship and contemplates being

25  supplemented by trade confirmations that provide the economic

103

1    terms of the specific transactions agreed to by the parties.

2    Under the Master Agreement, Metavante and LBSF entered into an

3    interest rate swap transaction, the terms of which were

4    documented pursuant to the Confirmation.

5         LBHI is a credit support provider for LBSF's payment

6    obligations under the Agreement.

7         Due to declining interest rates the value of LBSF's

8    position under the Agreement has increased.  As of May 2009,

9    under the payment terms of the Agreement, Metavante owed LBSF

10   in excess of 6 million dollars, representing quarterly payments

11   due November, 2008, February, 2009 and May, 2009, plus default

12   interest in excess of 300,000 dollars.

13        It is possible that due to current market conditions

14   and to the quarterly payment schedule prescribed by the

15   Agreement the amounts that Metavante owes to LBSF as of today

16   are even higher than those stated in the motion.  Metavante has

17   refused to make any payments to LBSF.  In fact, it has refused

18   to perform its obligations under the Agreement, as of November

19   3, 2008.  Instead, Metavante claims that LBSF and LBHI, via the

20   filing of their respective Chapter 11 cases, each caused an

21   event of default under the Agreement.

22        Metavante argues that due to such events of default it

23   has the right, but not the obligation, under the safe harbor

24   provisions of the Bankruptcy Code, to terminate all outstanding

25   derivative transactions under the Agreement.  Metavante also

104

1  maintains that it is not otherwise required to perform under

2  the Agreement.

3          The parties presented their arguments to the Court at

4  a hearing held on July 14, 2009.  Notably at the hearing

5  counsel to Metavante stated that, quote, "the opportunity to

6  settle the matter", is a possibility.  The reference in the

7  transcript is page 58, lines 18 to 19.  The Court took the

8  matter under advisement and suggested that it be calendared for

9  the September 15, 2009 omnibus hearing for purposes of either a

10 bench ruling or a status conference on any progress the parties

11 may have made towards a resolution.

12         I want to make clear that I am proceeding with this

13 ruling because I view the letter described by counsel for

14 Metavante, which talked about a possible settlement

15 counterproposal occurring sometime after the closing of a

16 merger on October 1, as being an insufficient commitment to a

17 timely settlement.

18         On September 14, 2009 the Court received letters from

19 counsel to each of the parties.  Counsel to Metavante requests

20 an adjournment to October 14.  Counsel states that an

21 adjournment will facilitate the parties' settlement

22 negotiations but explains that Metavante may not make a

23 counterproposal to LBSF's September 5, 2009 settlement proposal

24 until after the proposed October 1, 2009 closing of a merger.

25 Counsel also suggests that an adjournment will allow the Court

105

1   to put the motion on the same track as two other motions

2   currently pending before the Court.  Which motions, counsel

3   claims, raise similar issues to the motion?  Counsel to LBSF

4   and LBHI maintain that inasmuch as Metavante has done nothing

5   since July 14, 2009 to settle this matter other than asking

6   LBSF and LBHI to make a settlement proposal, the parties are no

7   closer to settlement than they were at the hearing, and,

8   therefore, the status conference should go forward as planned.

9        While each of the matters reference by counsel to

10  Metavante may have overlapping issues with those presented in

11  the current dispute, each matter involves its own distinct set

12  of fats.  Moreover, each of the two referenced matters is in

13  its infancy.  No response has been filed in either one, which

14  may further delay resolution here.

15       This is a dispute that has been fully briefed and

16  argued and is ripe for determination.  Moreover, I note that

17  the settlement that was achieved with MEG Energy that was

18  referenced this morning indicates that parties who are willing

19  to settle can, and do.

20       Under the Agreement LBSF is obligated to pay the

21  floating three month USD LIBOR BBA interest rate on a notional

22  amount of 600 million dollars, which notional amount declines

23  over time, beginning in May, 2010.  Metavante, in turn, is

24  obligated to pay a fixed interest rate, 3.865 percent, on the

25  notional amount.  The Agreement is set to expire on February 1,

106

1    2012.  The Agreement defines event of default to include the

2    bankruptcy of any party or credit support provider.  Under the

3    terms of the Agreement, upon an event of default the non-

4    defaulting party may designate an early termination date.  Upon

5    termination a final payment is calculated and paid in order to

6    put the parties into the same economic position as if the

7    termination had not occurred.

8          In the instant case Metavante has refused to perform

9    under the Agreement on account of the event of default that has

10   occurred, and is continuing, on account of the bankruptcies of

11   LBSF and LBHI.  Metavante has not, however, attempted to

12   terminate the Agreement.  Instead, Metavante entered into a

13   replacement hedge covering the period from November 3, 2008

14   through February 1, 2010.

15         LBSF and LBHI argue that the Agreement is an executory

16   contract because material performance, specifically payment

17   obligations, remain due by both LBSF and Metavante.  Under

18   Bankruptcy Code Section 365(a) a debtor in possession may,

19   "subject to the court's approval, assume or reject any

20   executory contract".  The case law makes clear, however, that

21   while a debtor determines whether to assume or reject an

22   executory contract the counterparty to such contract must

23   continue to perform.

24         LBSF and LBHI further argue that the safe harbor

25   provisions do not excuse Metavante's failure to perform.

107

1    Indeed, the safe harbor provisions permit qualifying non-debtor

2    counterparties to derivative contracts to exercise certain

3    limited contractual rights triggered by, among other things, a

4    Chapter 11 filing.  They're available, however, only to the

5    extent that a counterparty seeks to one, liquidate, terminate

6    or accelerate its contracts or two, net out its positions.  All

7    other uses of ipso facto provisions remain unenforceable under

8    the Bankruptcy Code.

9           Notably, Metavante does not dispute that it has failed

10   to perform under the Agreement.  Instead, Metavante argues that

11   the occurrence of an event of default under the Agreement gives

12   rise to its right, as the non-defaulting party, to terminate

13   under the safe harbor provisions.  According to Metavante the

14   occurrence of an event of default does not, however, create the

15   obligation for it to terminate under the safe harbor

16   provisions.  Metavante emphasizes the term, quote, "condition

17   precedent" set forth in Sections 2(a), 1 and 3 of the

18   Agreement, which subject payment obligations to the condition

19   precedent that no event of default with respect to the party

20   has occurred and is continuing.

21          Metavante argues that under New York State contract

22   law a failure of a condition precedent excuses a party's

23   obligation to perform.  Metavante states that its unequivocal

24   right to suspend payments until the termination of the

25   Agreement is fundamental to the manner in which swap parties

108

1    government themselves.  Metavante takes issue with LBSF and

2    LBHI in asking the Court to treat the Agreement like a garden

3    variety executory contract, arguing that it cannot be compelled

4    to pay because LBSF and LBHI cannot provide the essential item

5    of value Metavante bargained for, namely an effective

6    counterparty.

7         Metavante further argues on information and belief

8    that LBSF and LBHI also are in default under certain

9    unspecified indebtedness that allegedly may have created a

10   cross default under the Agreement, asserting, as a result, an

11   alleged need to engage in the discovery process.

12        It is clear that the filing of bankruptcy petitions by

13   LBHI and LBSF constitute events of default under the Agreement.

14   Specifically, Section 5(a)(vii) of the Agreement provides that

15   it shall constitute an event of default should a party to the

16   Agreement or any credit support provider of such party

17   institute a proceeding seeking a judgment of insolvency or

18   bankruptcy, or any other relief under any bankruptcy insolvency

19   law or similar law affecting creditors' rights.

20        Section 2(a)(i) and 3 of the Agreement, in turn,

21   subject payment obligations to the condition precedent that no

22   event of default with respect to the other party has occurred

23   and is continuing.  It is also clear, however, that the safe

24   harbor provisions, primarily Bankruptcy Code Sections 560 and

25   561, protect a non-defaulting swap counterparty's contractual

109

1   rights solely to liquidate, terminate or accelerate one or more

2   swap agreements because of a condition of the kind specified in

3   Section 365(e)(1), or to "offset or net out any termination

4   values or payment amounts arising under or in connection with

5   the termination, liquidation or acceleration of one or more

6   swap agreements".  That language comes from Section 560.

7        In the instant matter Metavante has attempted neither

8   to liquidate, terminate or accelerate the Agreement, nor to

9   offset or net out its position as a result of the events of

10   default caused by the filing of bankruptcy petitions by LBHI

11   and LBSF.  Metavante simply is withholding performance, relying

12   on the conditions precedent language in Sections 2(a)(i) and

13   (iii) under the Agreement.

14        The question presented in this matter and the issue

15   that was argued by the parties at the hearing is whether

16   Metavante's withholding of performance is permitted, either

17   under the safe harbor provisions or under terms of the

18   Agreement itself.  It is not.

19        Although complicated at its core the Agreement is, in

20   fact, a garden variety executory contract, one for which there

21   remains something still to be done on both sides.  Each party

22   to the Agreement still is obligated to make quarterly payments

23   based on a floating or fixed interest rate of a notional

24   amount, it being understood that the net obligor actually makes

25   a payment after the parties respective positions are calculated

VERITEXT REPORTING COMPANY

212-267-6868                               516-608-2400

110

1   on a quarterly basis, in February, May, August and November of

2   each calendar year.

3            Under relevant case law it is clear that while an un-

4   assumed executory contract is not enforceable against a debtor,

5   see NLRB v. Bildisco & Bildisco, 465 US 513 at 531, such a

6   contract is enforceable by a debtor against the counterparty.

7   See McLean Industries, Inc. v. Medical Laboratory Automation,

8   Inc., 96 B.R. 440 at 449 (Bankr. S.D.N.Y. 1989).  Metavante

9   relies on In re Lucre, Inc., 339 BR 648 (WD Mich.) for the

10  proposition that a debtor's uncured pre-petition breach of its

11  executory contract, here the event of default caused by the

12  bankruptcy filings of LBHI and LBSF, will, in and of itself,

13  justify continued nonperformance by the non-debtor

14  counterparty, and mere commencement of bankruptcy proceedings

15  and the imposition of the automatic stay does not empower the

16  debtor to compel performance from a non-debtor party.

17           The Court rejects the Lucre decision as nonbinding and

18  non-persuasive.  While Metavante's argument for the events of

19  default caused by the bankruptcy filings of LBHI and LBSF do

20  create an obligation for it to terminate the Agreement under

21  the safe harbor provisions, that's a tenable argument.  Its

22  conduct of riding the market for the period of one year, while

23  taking no action whatsoever, is simply unacceptable and

24  contrary to the spirit of these provisions of the Bankruptcy

25  Code.

111

1       First, inasmuch as the Bankruptcy Code trumps any

2    state law excuse of nonperformance, Metavante's reliance on New

3    York contract law is misplaced.  Moreover, legislative history

4    evidences Congress's intent to allow for the prompt closing out

5    or liquidation of open accounts upon the commencement of a

6    bankruptcy case.  Citation is to the Congressional history of

7    this, H.R. Rep. 97-420 at 1 (1982), as well as its stated

8    rationale that the immediate termination for default and the

9    netting provisions are critical aspects of swap transactions

10    and are necessary for the protection of all parties in light of

11    the potential for rapid changes in the financial markets.

12    Citation to the Senate Report number 101-285 at 1 (1990).

13       The safe harbor provisions specifically permit

14    termination solely, quote, "because of a condition of the kind

15    specified in Section 365(e)(1) that is the insolvency or

16    financial condition of the debtor and the commencement of a

17    bankruptcy case.  See also In re Enron Corp., 2005. WL 3874285,

18    at *4, Judge Gonzalez's case, 2005.  Noting that a

19    counterparty's action under the safe harbor provisions must be

20    made fairly contemporaneously with the bankruptcy filing, less

21    the contract be rendered just another ordinary executory

22    contract.

23       The Court finds that Metavante's window to act

24    promptly under the safe harbor provisions has passed, and while

25    it may not have had the obligation to terminate immediately

112

1    upon the filing of LBHI or LBSF, its failure to do so, at this

2    juncture, constitutes a waiver of that right at this point.

3            Metavante's references to defaults under certain

4    unspecified indebtedness that allegedly may have created a

5    cross default under the Agreement are of no moment.  First,

6    Metavante failed to set forth the basis, either in its papers

7    or at the hearing, for its information and belief that such a

8    default may have occurred.  Its assertion that such a default

9    may have occurred indicates that Metavante is not aware of any

10   such default, and, therefore, did not rely on that default in

11   its refusal to perform under the Agreement or lacks knowledge

12   of what that default may be.

13           Additionally, the argument that LBSF or LBHI may have

14   defaulted under other specified indebtedness, as that term is

15   defined in the Agreement, relies upon the financial condition

16   of bankruptcy debtors to withhold performance.  That is also

17   unenforceable as an ipso facto clause that may not be enforced

18   under the Bankruptcy Code Section 365(e)(1)(A).

19           LBSF and LBHI are entitled to continued receipt of

20   payments under the Agreement.  Metavante's attempts to control

21   LBSF's right to receive payment under the Agreement constitute,

22   in effect, an attempt to control property of the estate.  See

23   In re Enron Corp., 300 B.R. 201 at 212 (S.D.N.Y. 2003),

24   recognizing that contract rights are property of the estate and

25   that therefore those rights are protected by the automated

113

1    stay.

2            This is a violation of the automatic stay imposed by

3    Code Section 362.  Accordingly, for the reasons set forth in

4    LBSF's and LBHI's papers, for the reasons stated on the record

5    at the hearing and for the reasons stated on the record today,

6    pursuant to Bankruptcy Code Sections 105(a), 362 and 365,

7    Metavante is directed to perform under the Agreement until such

8    time as LBSF and LBHI determine whether to assume or reject.

9    That's the ruling of the Court.

10           MR. KRASNOW:  Good afternoon, Your Honor.  Richard

11   Krasnow, Weil, Gotshal & Manges, for the Chapter 11 debtors.

12   We are close to the end of this morning's agenda, but not quite

13   there as yet.  The next item, Your Honor, is number 12.  It is

14   the motion of DnB Nor Bank described in the agenda.  Your

15   Honor, that matter has been fully submitted to the Court, fully

16   briefed, arguments held on November 5th, and today is the

17   scheduled status conference.

18           THE COURT:  Okay.  I'm ready to rule on that, but

19   given the hour I'm not going to take the time to do that now.

20   But we'll issue a short memorandum in due course.  So as to not

21   create any undue suspense for those parties who are here in

22   connection with the DnB Nor matter, I am deciding that in favor

23   of the debtors and against DnB Nor, denying DnB Nor's motion

24   for allowance of an administrative expense claim, substantially

25   for the reasons set forth in the committee's papers.

170

1

2                              C E R T I F I C A T I O N

3

4          I, Clara Rubin, certify that the foregoing transcript is a true

5     and accurate record of the proceedings.

6     **Clara Rubin**  Digitally signed by Clara Rubin
                        DN: cn=Clara Rubin, o, ou,
                        email=digital1@veritext.com,
7                       c=US
                        Date: 2009.09.24 13:56:39 -04'00'

8     Clara Rubin

9     AAERT Certified Electronic Transcriber (CET**D-491)

10    Also transcribed by:     Pnina Eilberg (CET**D-488)

11

12    Veritext LLC

13    200 Old Country Road

14    Suite 580

15    Mineola, NY 11501

16

17    Date: September 17, 2009

18

19

20

21

22

23

24

25

**EXHIBIT 2**

**United States Bankruptcy Court/Southern District of New York**
Lehman Brothers Holdings Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5076
New York, NY 10150-5076

# PROOF OF CLAIM

| In Re: Lehman Brothers Holdings Inc., et al. Debtors. | Chapter 11 Case No. 08-13555 (JMP) (Jointly Administered) |
|---|---|
| Name of Debtor Against Which Claim is Held Lehman Brothers Holdings, Inc. | Case No. of Debtor 08-13555 (JMP) |

Filed: USBC - Southern District of New York
Lehman Brothers Holdings Inc., Et Al.
08-13555 (JMP)          0000010493

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503. Additionally, this form should not be used to make a claim for Lehman Programs Securities (See definition on reverse side.)

**THIS SPACE IS FOR COURT USE ONLY**

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)

Retirement Housing Foundation (and affiliates as identified in Rider)
911 N. Studebaker Road
Long Beach, CA 90815-4900
Attn: Frank Rossello, CFO/VP of Finance

Telephone number: 562-257-5100     Email Address: frank.rossello@rhf.org

☐ Check this box to indicate that this claim amends a previously filed claim.

**Court Claim Number:** _____
     (If known)

Filed on: _____

Name and address where payment should be sent (if different from above)

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

Telephone number:          Email Address:

1. **Amount of Claim as of Date Case Filed:** $ 5,233,852

If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete item 4.
If all or part of your claim is entitled to priority, complete Item 5.
If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete Item 6.
☑ Check this box if all or part of your claim is based on a Derivative Contract.*
☑ Check this box if all or part of your claim is based on a Guarantee.*

**\*IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OR A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.**

☑ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is a based on a Derivative Contract or Guarantee.

2. **Basis for Claim:** Termination of Interest Rate Swap Transaction (See Rider)
   (See instruction #2 on reverse side.)

3. **Last four digits of any number by which creditor identifies debtor:** _____
   **3a. Debtor may have scheduled account as:** _____
   (See instruction #3a on reverse side.)

4. **Secured Claim** (See instruction #4 on reverse side.)
   Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
   Nature of property or right of setoff: ☐ Real Estate   ☐ Motor Vehicle   ☐ Other
   Describe: _____
   Value of Property: $_____ Annual Interest Rate _____%
   Amount of arrearage and other charges as of time case filed included in secured claim, if any:
   $_____ Basis for perfection: _____
   **Amount of Secured Claim:** $_____ **Amount Unsecured:** $_____

5. **Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.**

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(____).

**Amount entitled to priority:**

$_____

6. **Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9):** $_____
   (See instruction #6 on reverse side.)

7. **Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.
8. **Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest. *(See definition of "redacted" on reverse side.)* If the documents are voluminous, attach a summary.
**DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.**
If the documents are not available, please explain:

**FOR COURT USE ONLY**

FILED / RECEIVED

SEP - 4 2009

EPIQ BANKRUPTCY SOLUTIONS, LLC

| Date: 5/3/09 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any. |
|---|---|

Frank A. Rossello, Jr.
CFO/VP Finance

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | : | Case No. 08-13555 (JMP) |
| | : | (Jointly Administered) |
| Debtors. | : | |

-----------------------------------------------------------------

## RIDER TO PROOF OF CLAIM OF RETIREMENT HOUSING FOUNDATION

Retirement Housing Foundation and its affiliates, Foundation Property Management, Bixby Knolls Towers, Inc., Gold County Health Center, Inc., Mayflower Gardens Health Facilities, Inc., Mayflower RHF Housing, Inc., Sun City RHF Housing, Holly Hill RHF Housing, Inc., Merritt Island RHF Housing, Inc., Martin Luther Foundation, Inc., Yellowwood Acres, Inc., Bluegrass RHF Housing, Inc., St. Catherine RHF Housing, Inc. and DeSmet RHF Housing, Inc. (collectively as "RHF" or "Claimants") hereby assert claims against certain debtors in the above captioned bankruptcy cases, as set forth in the attached official proof of claim form, this Rider and the exhibits hereto (collectively, the "Proof of Claim").

1.      On September 15, 2008 (the "LBHI Petition Date"), Lehman Brothers Holdings Inc. ("LBHI") and certain of its affiliates filed voluntary petitions under chapter 11 of title 11 of the United States Code, as amended (the "Bankruptcy Code").

2.      On October 3, 2008 (together with the LBHI Petition Date, the "Petition Date"), Lehman Brothers Special Financing Inc. ("LBSF," and together with LBHI, the "Debtors") and certain other affiliates of LBHI filed voluntary petitions under chapter 11 of the Bankruptcy Code.

3.      The Debtors' bankruptcy cases are jointly administered for procedural purposes under *In re Lehman Brothers Holdings Inc.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y.).

4.      RHF and LBSF entered into that certain ISDA Master Agreement, dated as of June 20, 2008 (including the associated Schedule and Credit Support Annex (the "Master Agreement"). A copy of the Master Agreement is attached hereto as Exhibit "A." LBSF's obligations under the Master Agreement are guaranteed by LBHI, as Credit Support Provider[1], pursuant to that certain Guarantee annexed as Exhibit "B" to the Schedule to the Master Agreement.

5.      As a result of LBHI and LBSF seeking relief under the Bankruptcy Code, an Event of Default has occurred under Section 5(a)(vii) of the Master Agreement and such Event of Default is still continuing.

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Master Agreement.

6.      As of the Petition Date, RHF had a contingent and unliquidated claim against LBSF and LBHI on account of the Master Agreement. As described more fully below and in the Exhibits attached hereto, such claim is no longer contingent and has been liquidated pursuant to the terms of the Master Agreement.

7.      On or about June 11, 2009, RHF sent notice to LBSF and LBHI that Pursuant to Section 6(a) (Right to Terminate Following Event of Default) of the Master Agreement, RHF designated June 11,2009 as the Early Termination Date in respect of all outstanding Transactions.

8.      On or about June 29, 2009, RHF sent a statement of the amount due in respect of the Early Termination Date as required by Section 6(d)(i) of the Master Agreement (the statement and all exhibits thereto, the "Calculation Statement"). A copy of the Calculation Statement is attached hereto as Exhibit "B." As detailed in Exhibit 1 to the Calculation Statement, RHF calculated that the Early Termination Amount payable by LBSF (or LBHI as guarantor) to RHF under Section 6(e)(i) in respect of the Early Termination Date is $4,952,968 (the "Calculation Amount").

9.      In addition to the Calculation Amount, Section 9 of the Master Agreement provides that the Debtors will indemnify and hold harmless RHF for and against all reasonable out-of-pocket expenses, including legal expenses, incurred by RHF by reason of the enforcement or protection of its rights under the Master Agreement. To date, such expenses total $280,884.

10.     Therefore, a total amount of $5,233,852 ($4,952,968 plus $280,884) is currently due and owing from the Debtors to RHF.

11.     According to the terms of the Master Agreement, RHF has the right to set-off or apply any obligation of LBSF owed to RHF, whether or not matured or contingent and whether or not arising under the Master Agreement, against any obligation of RHF owed to LBSF. RHF has a number of claims in the nature of tort against LBSF and LBHI, which are described in an additional proof of claim. By separating the claims based on the Master Agreement and the tort claims into two separate proofs of claim RHF does not waive any rights and, in particular, expressly reserves all set-off rights provided in the Master Agreement.

12.     RHF reserves the right to (a) amend, update, or supplement this Proof of Claim (including, without limitation, to add additional amounts due and owing) at any time and in any respect; (b) file additional proofs of claim; and (c) file a request for payment of administrative or priority expenses in accordance with Bankruptcy Code sections 503 and 507. RHF reserves the right to amend this Proof of Claim (and any other proofs of claims it may file in the Debtors' chapter 11 cases) by virtue of its right to offset or recoup the amount thereof under Bankruptcy Code section 553 against any claims, defenses, or offsets the Debtor may assert against RHF.

13.     By filing this Proof of Claim, RHF (a) does not submit to the jurisdiction of this Court for any purpose other than with respect to this Proof of Claim, (b) does not waive (and expressly reserves) all of its procedural and substantive defenses to any claim that may be

asserted against it by the Debtors, their estates, any successor entities, or any other person, including, without limitation, any defense based upon the lack of jurisdiction of this Court to entertain any such claim, (c) does not waive (and expressly reserves) any right to any security, held by or on behalf of RHF or any right of RHF to claim specific assets or any other claim, right, or right of action that RHF has or might have against the Debtors, their estates, any successor entities, or any other person, whether such claim, right, or action arises prior to, upon, or after the Petition Date, and (d) does not waive (and expressly reserves) any and all other rights that RHF may have pursuant to applicable law or agreement.

| **United States Bankruptcy Court/Southern District of New York** | | **PROOF OF CLAIM** |
|---|---|---|

**United States Bankruptcy Court/Southern District of New York**
Lehman Brothers Holdings Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5076
New York, NY 10150-5076

**PROOF OF CLAIM**

| In Re: Lehman Brothers Holdings Inc., et al. Debtors. | Chapter 11 Case No. 08-13555 (JMP) (Jointly Administered) |
|---|---|
| **Name of Debtor Against Which Claim is Held** Lehman Brothers Special Financing Inc. | **Case No. of Debtor** 08-13888 (JMP) |

Filed: USBC - Southern District of New York
Lehman Brothers Holdings Inc., Et Al.
08-13555 (JMP)          0000010494

**THIS SPACE IS FOR COURT USE ONLY**

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503. Additionally, this form should not be used to make a claim for Lehman Programs Securities (See definition on reverse side.)

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)

Retirement Housing Foundation (and affiliates as identified in Rider)
911 N. Studebaker Road
Long Beach, CA 90815-4900
Attn: Frank Rossello, CFO/VP of Finance

Telephone number: 562-257-5100   Email Address: frank.rossello@rhf.org

☐ Check this box to indicate that this claim amends a previously filed claim.

**Court Claim Number:** _____
(*If known*)

Filed on: _____

Name and address where payment should be sent (if different from above)

Telephone number: _____  Email Address: _____

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

**1. Amount of Claim as of Date Case Filed:** $ 5,233,852

If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete item 4.
If all or part of your claim is entitled to priority, complete Item 5.
If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete Item 6.

☑ Check this box if all or part of your claim is based on a Derivative Contract.*
☐ Check this box if all or part of your claim is based on a Guarantee.*

*IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.

☑ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is a based on a Derivative Contract or Guarantee.

**2. Basis for Claim:** Termination of Interest Rate Swap Transaction (see Rider)
(See instruction #2 on reverse side.)

**3. Last four digits of any number by which creditor identifies debtor:** _____
   **3a. Debtor may have scheduled account as:** _____
   (See instruction #3a on reverse side.)

**4. Secured Claim** (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
Nature of property or right of setoff:  ☐ Real Estate   ☐ Motor Vehicle   ☐ Other
Describe: _____
Value of Property: $_____  Annual Interest Rate _____%
Amount of arrearage and other charges as of time case filed included in secured claim, if any:
$_____  Basis for perfection: _____
**Amount of Secured Claim:** $_____   **Amount Unsecured:** $_____

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(c). If any portion of your claim falls in one of the following categories, check the box and state the amount.**

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(_____).

**Amount entitled to priority:**

$_____

**6. Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9):** $_____
(See instruction #6 on reverse side.)

**7. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.
**8. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest. (*See definition of "redacted" on reverse side.*) If the documents are voluminous, attach a summary.
DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

FILED / RECEIVED
SEP - 4 2009
EPIQ BANKRUPTCY SOLUTIONS, LLC

Date: 9/3/69

Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.

Frank A. Rossello, Jr.
CFO/VP Finance

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------

In re                                              :        Chapter 11
                                                   :
LEHMAN BROTHERS HOLDINGS INC., *et al.,*           :        Case No. 08-13555 (JMP)
                                                   :        (Jointly Administered)
Debtors.                                           :
---------------------------------------------------------------------

### RIDER TO PROOF OF CLAIM OF RETIREMENT HOUSING FOUNDATION

Retirement Housing Foundation and its affiliates, Foundation Property
Management, Bixby Knolls Towers, Inc., Gold County Health Center, Inc., Mayflower Gardens
Health Facilities, Inc., Mayflower RHF Housing, Inc., Sun City RHF Housing, Holly Hill RHF
Housing, Inc., Merritt Island RHF Housing, Inc., Martin Luther Foundation, Inc., Yellowwood
Acres, Inc., Bluegrass RHF Housing, Inc., St. Catherine RHF Housing, Inc. and DeSmet RHF
Housing, Inc. (collectively as "RHF" or "Claimants") hereby assert claims against certain
debtors in the above captioned bankruptcy cases, as set forth in the attached official proof of
claim form, this Rider and the exhibits hereto (collectively, the "Proof of Claim").

1.      On September 15, 2008 (the "LBHI Petition Date"), Lehman Brothers Holdings
Inc. ("LBHI") and certain of its affiliates filed voluntary petitions under chapter 11 of title 11 of
the United States Code, as amended (the "Bankruptcy Code").

2.      On October 3, 2008 (together with the LBHI Petition Date, the "Petition Date"),
Lehman Brothers Special Financing Inc. ("LBSF," and together with LBHI, the "Debtors") and
certain other affiliates of LBHI filed voluntary petitions under chapter 11 of the Bankruptcy
Code.

3.      The Debtors' bankruptcy cases are jointly administered for procedural purposes
under *In re Lehman Brothers Holdings Inc.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y.).

4.      RHF and LBSF entered into that certain ISDA Master Agreement, dated as of
June 20, 2008 (including the associated Schedule and Credit Support Annex (the "Master
Agreement"). A copy of the Master Agreement is attached hereto as Exhibit "A." LBSF's
obligations under the Master Agreement are guaranteed by LBHI, as Credit Support Provider[1],
pursuant to that certain Guarantee annexed as Exhibit "B" to the Schedule to the Master
Agreement.

5.      As a result of LBHI and LBSF seeking relief under the Bankruptcy Code, an
Event of Default has occurred under Section 5(a)(vii) of the Master Agreement and such Event
of Default is still continuing.

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Master Agreement.

1

6.    As of the Petition Date, RHF had a contingent and unliquidated claim against LBSF and LBHI on account of the Master Agreement. As described more fully below and in the Exhibits attached hereto, such claim is no longer contingent and has been liquidated pursuant to the terms of the Master Agreement.

7.    On or about June 11, 2009, RHF sent notice to LBSF and LBHI that Pursuant to Section 6(a) (Right to Terminate Following Event of Default) of the Master Agreement, RHF designated June 11,2009 as the Early Termination Date in respect of all outstanding Transactions.

8.    On or about June 29, 2009, RHF sent a statement of the amount due in respect of the Early Termination Date as required by Section 6(d)(i) of the Master Agreement (the statement and all exhibits thereto, the "Calculation Statement"). A copy of the Calculation Statement is attached hereto as Exhibit "B." As detailed in Exhibit 1 to the Calculation Statement, RHF calculated that the Early Termination Amount payable by LBSF (or LBHI as guarantor) to RHF under Section 6(e)(i) in respect of the Early Termination Date is $4,952,968 (the "Calculation Amount").

9.    In addition to the Calculation Amount, Section 9 of the Master Agreement provides that the Debtors will indemnify and hold harmless RHF for and against all reasonable out-of-pocket expenses, including legal expenses, incurred by RHF by reason of the enforcement or protection of its rights under the Master Agreement. To date, such expenses total $280,884.

10.    Therefore, a total amount of $5,233,852 ($4,952,968 plus $280,884) is currently due and owing from the Debtors to RHF.

11.    According to the terms of the Master Agreement, RHF has the right to set-off or apply any obligation of LBSF owed to RHF, whether or not matured or contingent and whether or not arising under the Master Agreement, against any obligation of RHF owed to LBSF. RHF has a number of claims in the nature of tort against LBSF and LBHI, which are described in an additional proof of claim. By separating the claims based on the Master Agreement and the tort claims into two separate proofs of claim RHF does not waive any rights and, in particular, expressly reserves all set-off rights provided in the Master Agreement.

12.    RHF reserves the right to (a) amend, update, or supplement this Proof of Claim (including, without limitation, to add additional amounts due and owing) at any time and in any respect; (b) file additional proofs of claim; and (c) file a request for payment of administrative or priority expenses in accordance with Bankruptcy Code sections 503 and 507. RHF reserves the right to amend this Proof of Claim (and any other proofs of claims it may file in the Debtors' chapter 11 cases) by virtue of its right to offset or recoup the amount thereof under Bankruptcy Code section 553 against any claims, defenses, or offsets the Debtor may assert against RHF.

13.    By filing this Proof of Claim, RHF (a) does not submit to the jurisdiction of this Court for any purpose other than with respect to this Proof of Claim, (b) does not waive (and expressly reserves) all of its procedural and substantive defenses to any claim that may be

2

asserted against it by the Debtors, their estates, any successor entities, or any other person, including, without limitation, any defense based upon the lack of jurisdiction of this Court to entertain any such claim, (c) does not waive (and expressly reserves) any right to any security, held by or on behalf of RHF or any right of RHF to claim specific assets or any other claim, right, or right of action that RHF has or might have against the Debtors, their estates, any successor entities, or any other person, whether such claim, right, or action arises prior to, upon, or after the Petition Date, and (d) does not waive (and expressly reserves) any and all other rights that RHF may have pursuant to applicable law or agreement.

3

| United States Bankruptcy Court/Southern District of New York | **PROOF OF CLAIM** |
|---|---|

Lehman Brothers Holdings Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5076
New York, NY 10150-5076

| In Re: Lehman Brothers Holdings Inc., et al. Debtors. | Chapter 11 Case No. 08-13555 (JMP) (Jointly Administered) |
|---|---|
| Name of Debtor Against Which Claim is Held **Lehman Brothers Special Financing Inc.** | Case No. of Debtor **08-13888 (JMP)** |

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503. Additionally, this form should not be used to make a claim for Lehman Programs Securities (See definition on reverse side.)

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)

Retirement Housing Foundation (and affiliates as identified in Rider)
911 N. Studebaker Road
Long Beach, CA 90815-4900
Attn: Frank Rossello, CFO/VP of Finance

Telephone number: 562-257-5100   Email Address: frank.rossello@rhf.org

Name and address where payment should be sent (if different from above)

Telephone number:       Email Address:

Filed: USBC - Southern District of New York
Lehman Brothers Holdings Inc., Et Al.
08-13555 (JMP)        0000010495

☐ Check this box to indicate that this claim amends a previously filed claim.

**Court Claim Number:** _____
(If known)

Filed on: _____

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

**THIS SPACE IS FOR COURT USE ONLY**

1. **Amount of Claim as of Date Case Filed:** $ 11,871,612
If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete item 4.
If all or part of your claim is entitled to priority, complete Item 5.
If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete Item 6.
☐ Check this box if all or part of your claim is based on a Derivative Contract.*
☐ Check this box if all or part of your claim is based on a Guarantee.*
***IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.**
☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is a based on a Derivative Contract or Guarantee.

2. **Basis for Claim:** Breach of Contract, Fraud, etc. (See Attached Rider)
(See instruction #2 on reverse side.)

3. **Last four digits of any number by which creditor identifies debtor:** _____
3a. **Debtor may have scheduled account as:** _____
(See instruction #3a on reverse side.)

4. **Secured Claim** (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
Nature of property or right of setoff: ☐ Real Estate   ☐ Motor Vehicle   ☐ Other
Describe: _____
Value of Property: $_____ Annual Interest Rate _____%
Amount of arrearage and other charges as of time case filed included in secured claim, if any:
$_____ Basis for perfection: _____
**Amount of Secured Claim:** $_____ **Amount Unsecured:** $_____

5. **Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.**

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).
☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).
☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).
☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(____).

**Amount entitled to priority:**

$_____

6. **Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9):** $_____
(See instruction #6 on reverse side.)

7. **Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.
8. **Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest. (See definition of "redacted" on reverse side.) If the documents are voluminous, attach a summary.
DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

| Date: 5/3/09 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any. Frank A. Rossello, Jr. CFO/VP Finance |
|---|---|

FOR COURT USE ONLY

**FILED / RECEIVED**

**SEP - 4 2009**

EPIQ BANKRUPTCY SOLUTIONS, LLC

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------

In re                                              :        Chapter 11
                                                   :
LEHMAN BROTHERS HOLDINGS INC., *et al.,*           :        Case No. 08-13555 (JMP)
                                                   :        (Jointly Administered)
Debtors.                                           :
------------------------------------------------------------------

## ADDENDUM TO PROOF OF CLAIM OF
## RETIREMENT HOUSING FOUNDATION AND ITS AFFILIATES

### GENERAL STATEMENT OF CLAIM

1.       Retirement Housing Foundation ("RHF") and its affiliates, Foundation Property
Management, Bixby Knolls Towers, Inc., Gold County Health Center, Inc., Mayflower Gardens
Health Facilities, Inc., Mayflower RHF Housing, Inc., Sun City RHF Housing, Holly Hill RHF
Housing, Inc., Merritt Island RHF Housing, Inc., Martin Luther Foundation, Inc., Yellowwood
Acres, Inc., Bluegrass RHF Housing, Inc., St. Catherine RHF Housing, Inc. ("St. Catherine") and
DeSmet RHF Housing, Inc. ("DeSmet" and collectively as "RHF Group" or "Claimants") hereby
assert a claim against Lehman Brothers Holdings Inc. ("LBHI") and Lehman Brothers Special
Financing Inc. ("LBSF" and together with LBHI, the "Debtors" or "Lehman"), and any other
applicable affiliated debtor, as a result of damages sustained by RHF as a result of actions and
inactions of the Debtors, including but not limited to (i) breach of contract, (ii) fraud,
constructive fraud, and/or fraudulent misrepresentation by the Debtors with respect to certain
swap transactions between RHF and the Debtors, (iii) negligence of or negligent
misrepresentation by the Debtors, (iv) breach of fiduciary duty, (v) breach of the covenant of
good faith and fair dealings, and (vi) unfair competition.

2.       As a result of the foregoing, RHF has been damaged in amount not less than
$11,871,612.  RHF hereby asserts a claim against the Debtors in a contingent and unliquidated
amount not less than $11,871,612.

### BASIS FOR THE CLAIM

3.       On September 15, 2008 (the "LBHI Petition Date"), LBHI filed a voluntary
petition for reorganization under chapter 11 of the Bankruptcy Code.

4.       On October 2, 2008 (the "LBSF Petition Date"), LBSF filed a voluntary petition
for reorganization under chapter 11 of the Bankruptcy Code.

5.       Retirement Housing Foundation ("RHF") is a church related, not-for-profit
corporation with its principal place of business in Long Beach, California.  RHF is devoted to the
mission of providing safe and affordable housing and services for senior citizens, persons with
disabilities, and low income families. Although its headquarters are in Southern California, RHF

has sponsored, developed and/or managed senior citizen apartments, nursing facilities, and low income housing throughout the country.

6.     In or about July 1998, RHF issued a written "Request for Proposal" to several investment banking firms to solicit proposals to structure a multi-state, multi-facility group that would issue approximately $140 million in taxable and tax exempt bonds to refinance its existing debt.

7.     Later that Month, in or about July 1998, Cain Brothers responded in writing to RHF's Request for Proposal and proposed to structure a highly complicated, long-term, 30 year plan of refinancing for RHF, underwrite bonds to be issued for their benefit and sell those bonds in the capital markets. Within its proposal, among other things, Cain Brothers also committed to provide RHF and its affiliates advice and expertise over the course of the complex plan.

8.     In or about August 1998, on behalf of itself and its affiliates that would be subject to the plan of refinancing, RHF formally accepted Cain Brother's proposal, thus entering into a written refinancing agreement (the "Refinancing Agreement").

9.     Pursuant to the Refinancing Agreement, Cain Brothers structured a multi-state, multi-facility group that consisted of RHF and its affiliates (the "RHF Group") to re-fund existing debt through the issuance of approximately $140 million in taxable and tax exempt municipal bonds. Both prior to and at the time the RHF Group accepted Cain Brothers' proposed plan of refinancing, Cain Brothers sought to induce the RHF Group to accept and follow that plan of refinancing by representing orally and in writing that structuring the RHF Group would increase its access to capital through future refinancing at a lower cost and would achieve an "appropriate" mix of fixed versus variable rate debt. To achieve these and other objectives, Cain Brothers designed and recommended, and the Refinancing Agreement implemented, an extremely complex transaction involving bonds called Select Auction Variable Rate Securities, a product offered and marketed as "SAVRS" by LBHI or one of its affiliates and an interest rate swap, which Cain Brothers advised would benefit RHF in numerous ways and eliminate market risks.

10.     Lehman was a global financial services firm that, through its subsidiaries, provided services in investment banking, equity and fixed income sales, research and trading, investment management, private equity, and private banking. Lehman marketed itself as one of the leading investment banking firms, and held itself out as trustworthy, honest, stable and dependable.

11.     SAVRS were supposed to bear interest at a variable rate that would be determined by a purportedly competitive bidding "Dutch" auction held by a subsidiary of LBHI every 35 days that was intended to provide a fair market interest rate. According to Cain Brothers, in each auction cycle, Lehman would propose a rate for the SAVRS to solicit interest from existing bondholders and potential investors and collect bids from those bondholders and investors that specified a rate at which they would buy and/or sell the SAVRS. Lehman would then allegedly compile each bid and provide the raw data of each bid (and not the identity of the bidders) to a third party auction agent to determine the rate of the SAVRS from the highest, so-called

2

"winning bid." Every 35 days, a new SAVRS auction would be held and new bids would be compiled by Lehman, from which the SAVRS rate would purportedly be reset at a fair market rate. Lehman and Cain Brothers would continue to receive fees each auction cycle for orchestrating the auctions and compiling the bids to be submitted to the auction agent.

12.     According to representations, counsel and advice by Cain Brothers, the benefits of SAVRS to the RHF Group was that, among other things, they provided bond issuers the low cost and flexibility of variable rate debt. As long term securities with purportedly short term features, Cain Brothers represented in writing and orally to the RHF Group that SAVRS presented a safe alternative to more traditional and more expensive fixed rate bonds, provided a "time-tested structure" and "a large distribution market," and did not require the RHF Group to maintain a liquidity facility. Cain Brothers also represented in writing, orally and without qualification that, under the structure more fully described below, the RHF Group had the option to convert the SAVRS into true fixed rate bonds at any time to lock in advantageous prevailing fixed rates.

13.     Pursuant to the Refinancing Agreement and Cain Brothers' representations, counsel and advice, the SAVRS were issued in an "appropriate" mix of variable rate and "synthetically" fixed rate bonds, which Cain Brothers claimed would protect the RHF Group against the risk of variable interest rate fluctuations for 30 years. According to Cain Brothers' plan of refinancing, the interest rate of approximately 85% of the SAVRS would be synthetically fixed through an "interest rate swap," another highly complicated, long-term, 30 year contract with Lehman that Cain Brothers negotiated and recommended (the "Swap Contract").

14.     Pursuant to the Swap Contract, in each successive auction cycle, the RHF Group agreed to pay a stipulated fixed rate of interest on the SAVRS to Lehman, and Lehman agreed to pay the holders of the SAVRS interest at the variable rate that it determined every 35 days by auction.

15.     Pursuant to the Swap Contract and consistent with its long term 30 year commitment, Lehman unconditionally guaranteed the RHF Group's variable interest and capital payment obligations on the SAVRS that were subject to the agreement, and that such payments would be punctually made when they became due and payable.

16.     Under the Swap Contract, the RHF Group was also to make additional payments, including, among other things, fees for Lehman's services for auctioning the SAVRS every 35 days. However, as a counterparty to the Swap Contract and as auctioneer of the SAVRS and/or a potential bidder on the rate, Lehman was in the significant position to control, and profit from, the interest rate it was obliged to pay the holders of the SAVRS.

17.     Both prior to and at the time the Refinancing Agreement and the Swap Contract were executed, Cain Brothers and Lehman represented orally and in writing to the RHF Group that the benefit of the interest rate swap was that it permitted the RHF Group to 'hedge," or protect itself, against the risks of variable interest rate fluctuations and achieve a lower overall fixed rate than would be available if the SAVRS were issued as true fixed rate obligations. Cain Brothers also represented that the RHF Group could earn a windfall under the Swap Contract, or be "in the money."

3

18.     Both prior to and at the time the Refinancing Agreement and the Swap Contract were executed, Cain Brothers and Lehman represented orally and in writing to the RHF Group that the Swap Contract would be canceled by the RHF Group at any time and at its sole option so that, among other things, the RHF Group could convert the SAVRS to a true fixed rate or refinance the SAVRS.  Neither Cain Brothers nor Lehman ever disclosed that the Swap Contract could in any way interfere with that right to convert the SAVRS to fixed rate securities or otherwise refinance the SAVRS.

19.     To enhance the RHF Group's creditworthiness, the Refinancing Agreement and the Swap Contract required that the RHF Group guarantee its interest and capital payment obligation on the SAVRS, including those to Lehman at the synthetically fixed rate and to holders of a minority of SAVRS not subject to the Swap Contract, with a bond insurer.

20.     Cain Brothers recommended that the RHF Group insure the SAVRS with ACA, which is a subsidiary of holding company ACA Capital Holdings, Inc., and a bond insurer founded in 1997 that purported to be the first domestic financial guaranty company to offer an "A" rated guaranty in the Unites States debt markets.

21.     Consistent with its representations regarding the low cost and the flexibility of the SAVRS, Cain Brothers represented to the RHF Group that ACA's bond insurance presented the best option to guarantee the SAVRS because ACA purportedly offered a safe, long term commitment for a one time up-front fee.

22.     In or about December 1998, on the recommendation of Cain Brothers, the RHF Group and ACA entered into a written bond insurance agreement in which ACA would insure the SAVRS ( the "Insurance Agreement").  Under the Insurance Agreement, the RHF Group paid a one-time, up-front premium to ACA, who in exchange irrevocably and unconditionally guaranteed interest and capital repayments as specified in the SAVRS in the event that the RHF Group defaulted on that obligation, thus maintaining the investment strength of the bonds.

23.     In or about 1999, pursuant to the Refinancing Agreement and prior advice and recommendations, Cain Brothers underwrote additional SAVRS that were issued for the benefit of the RHF Group. At Cain Brothers' recommendation, ACA again served as the bond insurer for these SAVRS under the original Insurance Agreement.

24.     In or about 2000, pursuant to the Refinancing Agreement and prior advice and recommendations, Cain Brothers underwrote additional SAVRS that were issued for the benefit of RHF affiliates St. Catherine and DeSmet. The RHF Group, whose creditworthiness was insured by ACA under the Insurance Agreement, guaranteed the SAVRS issued for the benefit of St. Catherine and DeSmet.

25.     The additional SAVRS issued in 1999 and 2000 were also subject to interest rate swaps governed by additional swap agreements in which Lehman Brothers again served as the swap provider.

26.     The RHF Group's plan of refinancing that Cain Brothers recommended, advised and implemented was not safe, low risk, low cost, or flexible. Significantly, even though the

4

RHF Group's creditworthiness was purportedly a concern at the time the 1998 plan of refinancing was proposed and implemented, it was the guarantees provided by Lehman Brothers and ACA that were highly risky and that became worthless, and the transaction structure imposed substantial detriments against the RHF Group.

27.    Despite Cain Brothers' and Lehman's claims that the RHF Group could terminate the Swap Contract at any time and convert the SAVRS to a true fixed rate, in fact Lehman held absolute control over the RHF Group's ability to exercise any of those options. Immediately following the issuance of the SAVRS, the RHF Group was forced by Lehman to carry a substantial debt to Lehman. Unbeknownst to the RHF Group, the Swap Contract was valued by Lehman pursuant to a secret, restrictive valuation methodology developed by Lehman that effectively prevented the RHF Group from being "in the money" despite the fact that the SAVRS's variable rate determined at auction often exceeded the synthetic "fixed" rate. Instead, even when variable interest rates began to rise, the RHF Group was told that the overall value of the Swap Contract was consistently and substantially in Lehman's favor pursuant to Lehman's calculation, and the RHF Group was "out of the money" at an ever increasing amount of millions of dollars.

28.    In or about March 2005, at a time when fixed interest rates were favorable, RHF Group notified Lehman that it intended to seek to convert the SAVRS to a favorable fixed rate. At the time, the prevailing fixed rate for RHF's blend of taxable and non-taxable bonds was 4.91%, a significant saving over the 5.63% blended rate RHF was paying on the SAVRS interest rate swap. It would have also allowed RHF to avoid any downgrading of ACA credit rating. At the time, Cain Brothers estimated that it would cost $405,000 for RHF to terminate the Swap Contract. However, Lehman now informed the RHF Group that the cost of terminating the Swap Contract was $15.8 million, which represented the amount the RHF Group was purportedly then "out of the money" on the Swap Contract based on Lehman's unexplained calculations. Lehman proposed an alternative, but the alternative was another swap agreement at an even higher cost to the RHF Group. As a result of Lehman's actions, RHF was unable to convert to the fixed rate, costing RHF losses in an amount not less than $11,590,728.

29.    In addition , on information and belief and unbeknownst to the RHF Group, Lehman was involved in a illegal price fixing scheme in which it manipulated the SAVRS' rates determined at auction to its own benefit. On information and belief, Lehman would pre-select a "winning bid" during each auction cycle to ensure that the SAVRS would trade at below fair market value and maximize their profits and inflate the amount the RHF Group was "out of the money" under the Swap Contract.

30.    On information and belief, through Lehman's aforementioned continuing leverage and control over the RHF Group and bad faith and corrupt conduct, the RHF Group was always "out of the money" on the Swap Contract in an unreasonably and unfairly excessive amount, and Lehman's conduct interfered with, among other things, the RHF Group's right, at its sole option, to convert the SAVRS into true fixed rate bonds or refinance the SAVRS to take advantage of prevailing fixed interest rates.

5

31.     In or about 2007, ACA's stock price dropped 95 percent, which wiped out its equity and resulted in a negative net worth. In or about November 2007, in response to reports that it would be downgraded from its investment grade "A" rating, ACA stated that it would need to raise additional capital to comply with its guaranty obligations. On or about December 19, 2007, the credit agency Standard & Poor's downgraded ACA's credit rating from "A" to "CCC," or junk status. This resulted in an immediate and significant increase to interest rates on the SAVRS paid by the RHF Group. The rates fluctuated subsequent to the downgrade and reached a high of 14.7% in December 2007.

32.     In or about December 2007 and January 2008, following ACA's downgrade, the RHF Group sought to restructure the transaction and re-fund the SAVRS and secure them with letters of credit from banks rather than a bond insurer.

33.     Further complicating the matter, in or about February 2008, the auction rate securities market that Lehman ran, and which Lehman represented and promised was stable, failed.

34.     Moreover, in or about June 2008, Lehman was claiming that the RHF Group was purportedly "out of the money" in excess of $13 million. At the time, Lehman was viewed as a leader in the financial markets and promoted itself as financially stable, and therefore contended that its valuation was correct and honorable. However, Lehman's valuation was in fact biased and unfair. Nonetheless, because of the design of the original plan of refinancing, the RHF Group, under duress and in a disadvantageous position, was forced to terminate the Swap Contract, as well as the interest rate swaps in connection with the SAVRS issued in 1999 and 2000 for the benefit of, among others, St. Catherine and DeSmet. The RHF Group, St. Catherine and DeSmet were then forced to renegotiate a new, disadvantageous 20-year term swap agreement with Lehman in connection with the soon to be refinanced bonds (the "New Swap Contract").

35.     Pursuant to the New Swap Contract, among other things, Lehman required that the RHF Group pay a much higher synthetic "fixed" interest rate to avoid paying over the alleged $13 million to compensate Lehman for the purported value of the old Swap Contract at the time of negotiation. Under the New Swap Contract, in or about July 2008, Lehman reaffirmed its prior unconditional guarantees of Plaintiffs' variable interest and capital payment obligations on the new variable rate bonds that were subject to the agreement, that such payments would be punctually made when they became due and payable, and that Lehman could continue to perform its obligations over the 20 year term of the contract.

36.     In or about July 2008, the RHF Group completed the refinancing of the SAVRS and converted them to Variable Rate Demand Bonds, which were not auction rate securities and were secured with letters of credit from banks rather than a bond insurer.

37.     Despite reaffirming its unconditional guarantee of the variable interest and capital payment obligations on the new bonds in or about July 2008, Lehman was suffering from unprecedented losses from its own investments in subprime mortgage backed securities that were threatening the existence of the company and its subsidiaries.

6

38.    In or about 2002, Lehman became the market leader in the subprime mortgage industry by, among other things, lending billions of dollars to other financial institutions to fund subprime mortgages, originating its own subprime mortgage loans, and purchasing subprime mortgages to package and sell as asset-backed securities to global investors.

39.    In its public statements, Lehman boasted about its "record" and "robust" profits earned from its holdings in the subprime market. In its 2005 Form 10-K filed with the Securities and Exchange Commission ("SEC") on February 13, 2006, Lehman explained that its holdings in the subprime market represented a significant portion of its business:

> Fixed Income net revenues were a record $7.3 billion in 2005, increasing 28% compared with 2004 driven by double digit revenue increases from each geographic region and record revenues across a number of businesses including commercial mortgage and real estate, residential mortgage origination and securitization, and interest rate products. Revenues from our commercial mortgage and real estate businesses increased substantially in 2005 reaching record levels, as the strong demand for commercial real estate properties, the recovery in certain property markets and relatively low interest rates drove asset sales and robust levels of securitizations. Revenues from our residential mortgage origination and securitization businesses increased in 2005 from the robust levels in 2004, reflecting record volumes and the continued benefits associated with the vertical integration of our mortgage origination platforms.

40.    In its 2006 10-K Form filed with the SEC on February 13, 2007, Lehman's fixed income net revenues purportedly continued to grow "to a record $8.4 billion in 2006, an increase of 15% from 2005."

41.    However, Lehman's 2006 10-K Form reported for the first time that, despite its continued growth, it had witnessed a decrease in revenue from its residential mortgage origination and securitization businesses that were "primarily attributable to a softer housing market and lower margins." But nowhere in its 2006 10-K Form did Lehman acknowledge the potential devastating impact of its substantial holdings in the subprime market on its operations as a whole. Instead, Lehman claimed that increased interest rates and a downturn in the housing market would affect only a few of its businesses, and that it maintained "sufficient liquidity to meet all of [its] funding obligations in all market environments."

42.    According to Lehman's 2007 10-K Form, which was filed with the SEC on January 29, 2008, its overall revenues continued to climb:

> On the basis of a record first half and a reasonably successful navigation of difficult market conditions in the second half, we achieved our fourth consecutive year of record net revenues, net income and diluted earnings per common share in 2007. Net income totaled $4.2 billion, $4.0 billion and $3.3 billion in 2007, 2006 and 2005, respectively, increasing 5% in 2007 and 23% in 2006 from the corresponding 2006 and 2005 periods, respectively. Diluted earnings per common share were $7.26, $6.81 and $5.43 in 2007, 2006 and 2005, respectively, up 7% in 2007 and 25% in 2006 from the corresponding prior periods, respectively.

7

43.     Despite its reported continued growth, Lehman acknowledged that the "difficult latter half of 2007 witnessed a "deterioration within the U.S. subprime residential mortgage asset category, the weakening of the U.S. housing sector became worse than most observers expected," and a decrease in investor confidence in the subprime securities market "which, in part, led to many market participants re-pricing assets and taking large write-downs." However, Lehman again minimized any risks its own subprime holdings posed to the overall health of the company, stating:

> During the latter half of our 2007 fiscal year, the global capital markets experienced a significant contraction in available liquidity as the adverse market environment experienced in our third quarter continued into our fourth quarter and deteriorated further in November 2007. Despite infusions of liquidity by central banks into the financial system, broad asset classes, particularly U.S. subprime residential mortgages and structured credit products, remained thinly traded throughout this period. Notwithstanding these global market conditions, we ended the period with a very strong liquidity position. At November 30, 2007, our liquidity pool was approximately $35 billion, up from approximately $31 billion at November 30, 2006 and down slightly from approximately $36 billion at the end of the third quarter of the 2007 fiscal year. Long-term capital (long-term borrowings, excluding borrowings with remaining contractual maturities within twelve months of the financial statement date, and total stockholders' equity) was at approximately $146 billion at the end of 2007 fiscal year, up from approximately $100 billion at November 30, 2006 and $142 billion at the end of the third quarter of the 2007 fiscal year.

44.     Lehman failed to disclose in their 10-K Forms from 2005, 2006, or 2007 that their risk exposure in the event of a collapse of the housing market was massive. Indeed, when the housing market did collapse in or about 2007 and its holdings in the subprime market began defaulting at a record pace, Lehman suffered losses in the amount of billions of dollars. Moreover, despite claiming that it maintained liquidity positions sufficient to sustain adverse economic conditions, those positions were extremely inadequate to cover its continuing losses.

45.     After Lehman filed for bankruptcy relief, Lehman was unable to meet its obligations under the New Swap Contract. To avoid defaulting on the refinanced bonds, the RHF Group made interest payments to its bond holders without any protection afforded under the New Swap Agreement.

46.     As a result of actions and inactions of the Debtors, including but not limited to (i) breach of contract, (ii) fraud, constructive fraud, and/or fraudulent misrepresentation by the Debtors with respect to certain swap transactions between RHF and the Debtors, (iii) negligence of or negligent misrepresentation by the Debtors, (iv) breach of fiduciary duty, (v) breach of the covenant of good faith and fair dealings, and (vi) unfair competition, the RHF Group has been harmed and is therefore entitled to damages in an amount not less than $11,871,612.

47.     Due to the voluminous records related to the RHF Group's claims described herein, the RHF Group has not attached all of the potential documentary evidence that supports

8

its claims.  As such, the RHF Group expressly reserves all rights to supplement the documentation attached hereto as the same becomes necessary.

48.    The claims asserted herein against the Debtors shall in no way limit any other claims possessed by the RHF Group against any entity other than the Debtors, including any claims arising after the Petition Date.

**HAND DELIVERY**

RECEIVED BY: _____  DATE: 9/4/09  TIME: 4:27

| United States Bankruptcy Court/Southern District of New York | **PROOF OF CLAIM** |
|---|---|

Lehman Brothers Holdings Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5076
New York, NY 10150-5076

| In Re:<br>Lehman Brothers Holdings Inc., et al.<br>Debtors. | Chapter 11<br>Case No. 08-13555 (JMP)<br>(Jointly Administered) |
|---|---|
| Name of Debtor Against Which Claim is Held<br>Lehman Brothers Holdings, Inc. | Case No. of Debtor<br>08-13555 (JMP) |

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503. Additionally, this form should not be used to make a claim for Lehman Programs Securities (See definition on reverse side.)

Filed: USBC - Southern District of New York
Lehman Brothers Holdings Inc., Et Al.
08-13555 (JMP)        0000010496

**THIS SPACE IS FOR COURT USE ONLY**

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)

Retirement Housing Foundation (and affiliates as identified in Rider)
911 N. Studebaker Road
Long Beach, CA 90815-4900
Attn: Frank Rossello, CFO/VP of Finance

Telephone number:  562-257-5100    Email Address: frank.rossello@rhf.org

☐ Check this box to indicate that this claim amends a previously filed claim.

Court Claim Number:_____
    (If known)

Filed on: _____

Name and address where payment should be sent (if different from above)

Telephone number:        Email Address:

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

**1.    Amount of Claim as of Date Case Filed:** $ 11,871,612

If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete item 4.
If all or part of your claim is entitled to priority, complete Item 5.
If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete Item 6.

☐ Check this box if all or part of your claim is based on a Derivative Contract.*
☐ Check this box if all or part of your claim is based on a Guarantee.*

**\*IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.**

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is a based on a Derivative Contract or Guarantee.

**2.    Basis for Claim:** Breach of Contract, Fraud, etc. (See Attached Rider)
    (See instruction #2 on reverse side.)

**3.    Last four digits of any number by which creditor identifies debtor:** _____
    **3a.  Debtor may have scheduled account as:** _____
        (See instruction #3a on reverse side.)

**4.    Secured Claim** (See instruction #4 on reverse side.)
    Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
    Nature of property or right of setoff: ☐ Real Estate   ☐ Motor Vehicle   ☐ Other
    Describe: _____
    Value of Property: $_____ Annual Interest Rate _____%
    Amount of arrearage and other charges as of time case filed included in secured claim, if any:
    $_____ Basis for perfection: _____
    Amount of Secured Claim: $_____ Amount Unsecured: $_____

**5.    Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(____).

**Amount entitled to priority:**

$_____

**6.    Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9): $**_____
    (See instruction #6 on reverse side.)

**7.    Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

**8.    Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest. *(See definition of "redacted" on reverse side.)* If the documents are voluminous, attach a summary.

DO NOT SEND ORIGINAL DOCUMENTS.  ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

FOR COURT USE ONLY

FILED / RECEIVED

SEP - 4 2009

EPIQ BANKRUPTCY SOLUTIONS, LLC

| Date:<br>9/3/09 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.<br><br>Frank A. Rossello, Jr.<br>CFO/VP Finance |
|---|---|

*Penalty for presenting fraudulent claim:  Fine of up to $500,000 or imprisonment for up to 5 years, or both.  18 U.S.C. §§ 152 and 3571.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------

In re                                           :       Chapter 11
                                                :
LEHMAN BROTHERS HOLDINGS INC., *et al.,*        :       Case No. 08-13555 (JMP)
                                                :       (Jointly Administered)
Debtors.                                        :
                                                :

---------------------------------------------------------------------

### ADDENDUM TO PROOF OF CLAIM OF
### RETIREMENT HOUSING FOUNDATION AND ITS AFFILIATES

### GENERAL STATEMENT OF CLAIM

     1.      Retirement Housing Foundation ("RHF") and its affiliates, Foundation Property Management, Bixby Knolls Towers, Inc., Gold County Health Center, Inc., Mayflower Gardens Health Facilities, Inc., Mayflower RHF Housing, Inc., Sun City RHF Housing, Holly Hill RHF Housing, Inc., Merritt Island RHF Housing, Inc., Martin Luther Foundation, Inc., Yellowwood Acres, Inc., Bluegrass RHF Housing, Inc., St. Catherine RHF Housing, Inc. ("St. Catherine") and DeSmet RHF Housing, Inc. ("DeSmet" and collectively as "RHF Group" or "Claimants") hereby assert a claim against Lehman Brothers Holdings Inc. ("LBHI") and Lehman Brothers Special Financing Inc. ("LBSF" and together with LBHI, the "Debtors" or "Lehman"), and any other applicable affiliated debtor, as a result of damages sustained by RHF as a result of actions and inactions of the Debtors, including but not limited to (i) breach of contract, (ii) fraud, constructive fraud, and/or fraudulent misrepresentation by the Debtors with respect to certain swap transactions between RHF and the Debtors, (iii) negligence of or negligent misrepresentation by the Debtors, (iv) breach of fiduciary duty, (v) breach of the covenant of good faith and fair dealings, and (vi) unfair competition.

     2.      As a result of the foregoing, RHF has been damaged in amount not less than $11,871,612.  RHF hereby asserts a claim against the Debtors in a contingent and unliquidated amount not less than $11,871,612.

### BASIS FOR THE CLAIM

     3.      On September 15, 2008 (the "LBHI Petition Date"), LBHI filed a voluntary petition for reorganization under chapter 11 of the Bankruptcy Code.

     4.      On October 2, 2008 (the "LBSF Petition Date"), LBSF filed a voluntary petition for reorganization under chapter 11 of the Bankruptcy Code.

     5.      Retirement Housing Foundation ("RHF") is a church related, not-for-profit corporation with its principal place of business in Long Beach, California.  RHF is devoted to the mission of providing safe and affordable housing and services for senior citizens, persons with disabilities, and low income families. Although its headquarters are in Southern California, RHF

1

has sponsored, developed and/or managed senior citizen apartments, nursing facilities, and low income housing throughout the country.

6.      In or about July 1998, RHF issued a written "Request for Proposal" to several investment banking firms to solicit proposals to structure a multi-state, multi-facility group that would issue approximately $140 million in taxable and tax exempt bonds to refinance its existing debt.

7.      Later that Month, in or about July 1998, Cain Brothers responded in writing to RHF's Request for Proposal and proposed to structure a highly complicated, long-term, 30 year plan of refinancing for RHF, underwrite bonds to be issued for their benefit and sell those bonds in the capital markets. Within its proposal, among other things, Cain Brothers also committed to provide RHF and its affiliates advice and expertise over the course of the complex plan.

8.      In or about August 1998, on behalf of itself and its affiliates that would be subject to the plan of refinancing, RHF formally accepted Cain Brother's proposal, thus entering into a written refinancing agreement (the "Refinancing Agreement").

9.      Pursuant to the Refinancing Agreement, Cain Brothers structured a multi-state, multi-facility group that consisted of RHF and its affiliates (the "RHF Group") to re-fund existing debt through the issuance of approximately $140 million in taxable and tax exempt municipal bonds. Both prior to and at the time the RHF Group accepted Cain Brothers' proposed plan of refinancing, Cain Brothers sought to induce the RHF Group to accept and follow that plan of refinancing by representing orally and in writing that structuring the RHF Group would increase its access to capital through future refinancing at a lower cost and would achieve an "appropriate" mix of fixed versus variable rate debt. To achieve these and other objectives, Cain Brothers designed and recommended, and the Refinancing Agreement implemented, an extremely complex transaction involving bonds called Select Auction Variable Rate Securities, a product offered and marketed as "SAVRS" by LBHI or one of its affiliates and an interest rate swap, which Cain Brothers advised would benefit RHF in numerous ways and eliminate market risks.

10.     Lehman was a global financial services firm that, through its subsidiaries, provided services in investment banking, equity and fixed income sales, research and trading, investment management, private equity, and private banking. Lehman marketed itself as one of the leading investment banking firms, and held itself out as trustworthy, honest, stable and dependable.

11.     SAVRS were supposed to bear interest at a variable rate that would be determined by a purportedly competitive bidding "Dutch" auction held by a subsidiary of LBHI every 35 days that was intended to provide a fair market interest rate. According to Cain Brothers, in each auction cycle, Lehman would propose a rate for the SAVRS to solicit interest from existing bondholders and potential investors and collect bids from those bondholders and investors that specified a rate at which they would buy and/or sell the SAVRS. Lehman would then allegedly compile each bid and provide the raw data of each bid (and not the identity of the bidders) to a third party auction agent to determine the rate of the SAVRS from the highest, so-called

2

"winning bid." Every 35 days, a new SAVRS auction would be held and new bids would be compiled by Lehman, from which the SAVRS rate would purportedly be reset at a fair market rate. Lehman and Cain Brothers would continue to receive fees each auction cycle for orchestrating the auctions and compiling the bids to be submitted to the auction agent.

12.    According to representations, counsel and advice by Cain Brothers, the benefits of SAVRS to the RHF Group was that, among other things, they provided bond issuers the low cost and flexibility of variable rate debt. As long term securities with purportedly short term features, Cain Brothers represented in writing and orally to the RHF Group that SAVRS presented a safe alternative to more traditional and more expensive fixed rate bonds, provided a "time-tested structure" and "a large distribution market," and did not require the RHF Group to maintain a liquidity facility. Cain Brothers also represented in writing, orally and without qualification that, under the structure more fully described below, the RHF Group had the option to convert the SAVRS into true fixed rate bonds at any time to lock in advantageous prevailing fixed rates.

13.    Pursuant to the Refinancing Agreement and Cain Brothers' representations, counsel and advice, the SAVRS were issued in an "appropriate" mix of variable rate and "synthetically" fixed rate bonds, which Cain Brothers claimed would protect the RHF Group against the risk of variable interest rate fluctuations for 30 years. According to Cain Brothers' plan of refinancing, the interest rate of approximately 85% of the SAVRS would be synthetically fixed through an "interest rate swap," another highly complicated, long-term, 30 year contract with Lehman that Cain Brothers negotiated and recommended (the "Swap Contract").

14.    Pursuant to the Swap Contract, in each successive auction cycle, the RHF Group agreed to pay a stipulated fixed rate of interest on the SAVRS to Lehman, and Lehman agreed to pay the holders of the SAVRS interest at the variable rate that it determined every 35 days by auction.

15.    Pursuant to the Swap Contract and consistent with its long term 30 year commitment, Lehman unconditionally guaranteed the RHF Group's variable interest and capital payment obligations on the SAVRS that were subject to the agreement, and that such payments would be punctually made when they became due and payable.

16.    Under the Swap Contract, the RHF Group was also to make additional payments, including, among other things, fees for Lehman's services for auctioning the SAVRS every 35 days. However, as a counterparty to the Swap Contract and as auctioneer of the SAVRS and/or a potential bidder on the rate, Lehman was in the significant position to control, and profit from, the interest rate it was obliged to pay the holders of the SAVRS.

17.    Both prior to and at the time the Refinancing Agreement and the Swap Contract were executed, Cain Brothers and Lehman represented orally and in writing to the RHF Group that the benefit of the interest rate swap was that it permitted the RHF Group to 'hedge," or protect itself, against the risks of variable interest rate fluctuations and achieve a lower overall fixed rate than would be available if the SAVRS were issued as true fixed rate obligations. Cain Brothers also represented that the RHF Group could earn a windfall under the Swap Contract, or be "in the money."

3

18.    Both prior to and at the time the Refinancing Agreement and the Swap Contract were executed, Cain Brothers and Lehman represented orally and in writing to the RHF Group that the Swap Contract would be canceled by the RHF Group at any time and at its sole option so that, among other things, the RHF Group could convert the SAVRS to a true fixed rate or refinance the SAVRS. Neither Cain Brothers nor Lehman ever disclosed that the Swap Contract could in any way interfere with that right to convert the SAVRS to fixed rate securities or otherwise refinance the SAVRS.

19.    To enhance the RHF Group's creditworthiness, the Refinancing Agreement and the Swap Contract required that the RHF Group guarantee its interest and capital payment obligation on the SAVRS, including those to Lehman at the synthetically fixed rate and to holders of a minority of SAVRS not subject to the Swap Contract, with a bond insurer.

20.    Cain Brothers recommended that the RHF Group insure the SAVRS with ACA, which is a subsidiary of holding company ACA Capital Holdings, Inc., and a bond insurer founded in 1997 that purported to be the first domestic financial guaranty company to offer an "A" rated guaranty in the Unites States debt markets.

21.    Consistent with its representations regarding the low cost and the flexibility of the SAVRS, Cain Brothers represented to the RHF Group that ACA's bond insurance presented the best option to guarantee the SAVRS because ACA purportedly offered a safe, long term commitment for a one time up-front fee.

22.    In or about December 1998, on the recommendation of Cain Brothers, the RHF Group and ACA entered into a written bond insurance agreement in which ACA would insure the SAVRS ( the "Insurance Agreement"). Under the Insurance Agreement, the RHF Group paid a one-time, up-front premium to ACA, who in exchange irrevocably and unconditionally guaranteed interest and capital repayments as specified in the SAVRS in the event that the RHF Group defaulted on that obligation, thus maintaining the investment strength of the bonds.

23.    In or about 1999, pursuant to the Refinancing Agreement and prior advice and recommendations, Cain Brothers underwrote additional SAVRS that were issued for the benefit of the RHF Group. At Cain Brothers' recommendation, ACA again served as the bond insurer for these SAVRS under the original Insurance Agreement.

24.    In or about 2000, pursuant to the Refinancing Agreement and prior advice and recommendations, Cain Brothers underwrote additional SAVRS that were issued for the benefit of RHF affiliates St. Catherine and DeSmet. The RHF Group, whose creditworthiness was insured by ACA under the Insurance Agreement, guaranteed the SAVRS issued for the benefit of St. Catherine and DeSmet.

25.    The additional SAVRS issued in 1999 and 2000 were also subject to interest rate swaps governed by additional swap agreements in which Lehman Brothers again served as the swap provider.

26.    The RHF Group's plan of refinancing that Cain Brothers recommended, advised and implemented was not safe, low risk, low cost, or flexible. Significantly, even though the

4

RHF Group's creditworthiness was purportedly a concern at the time the 1998 plan of refinancing was proposed and implemented, it was the guarantees provided by Lehman Brothers and ACA that were highly risky and that became worthless, and the transaction structure imposed substantial detriments against the RHF Group.

27.    Despite Cain Brothers' and Lehman's claims that the RHF Group could terminate the Swap Contract at any time and convert the SAVRS to a true fixed rate, in fact Lehman held absolute control over the RHF Group's ability to exercise any of those options. Immediately following the issuance of the SAVRS, the RHF Group was forced by Lehman to carry a substantial debt to Lehman. Unbeknownst to the RHF Group, the Swap Contract was valued by Lehman pursuant to a secret, restrictive valuation methodology developed by Lehman that effectively prevented the RHF Group from being "in the money" despite the fact that the SAVRS's variable rate determined at auction often exceeded the synthetic "fixed" rate. Instead, even when variable interest rates began to rise, the RHF Group was told that the overall value of the Swap Contract was consistently and substantially in Lehman's favor pursuant to Lehman's calculation, and the RHF Group was "out of the money" at an ever increasing amount of millions of dollars.

28.    In or about March 2005, at a time when fixed interest rates were favorable, RHF Group notified Lehman that it intended to seek to convert the SAVRS to a favorable fixed rate. At the time, the prevailing fixed rate for RHF's blend of taxable and non-taxable bonds was 4.91%, a significant saving over the 5.63% blended rate RHF was paying on the SAVRS interest rate swap. It would have also allowed RHF to avoid any downgrading of ACA credit rating. At the time, Cain Brothers estimated that it would cost $405,000 for RHF to terminate the Swap Contract. However, Lehman now informed the RHF Group that the cost of terminating the Swap Contract was $15.8 million, which represented the amount the RHF Group was purportedly then "out of the money" on the Swap Contract based on Lehman's unexplained calculations. Lehman proposed an alternative, but the alternative was another swap agreement at an even higher cost to the RHF Group. As a result of Lehman's actions, RHF was unable to convert to the fixed rate, costing RHF losses in an amount not less than $11,590,728.

29.    In addition , on information and belief and unbeknownst to the RHF Group, Lehman was involved in a illegal price fixing scheme in which it manipulated the SAVRS' rates determined at auction to its own benefit. On information and belief, Lehman would pre-select a "winning bid" during each auction cycle to ensure that the SAVRS would trade at below fair market value and maximize their profits and inflate the amount the RHF Group was "out of the money" under the Swap Contract.

30.    On information and belief, through Lehman's aforementioned continuing leverage and control over the RHF Group and bad faith and corrupt conduct, the RHF Group was always "out of the money" on the Swap Contract in an unreasonably and unfairly excessive amount, and Lehman's conduct interfered with, among other things, the RHF Group's right, at its sole option, to convert the SAVRS into true fixed rate bonds or refinance the SAVRS to take advantage of prevailing fixed interest rates.

31.    In or about 2007, ACA's stock price dropped 95 percent, which wiped out its equity and resulted in a negative net worth. In or about November 2007, in response to reports that it would be downgraded from its investment grade "A" rating, ACA stated that it would need to raise additional capital to comply with its guaranty obligations. On or about December 19, 2007, the credit agency Standard & Poor's downgraded ACA's credit rating from "A" to "CCC," or junk status. This resulted in an immediate and significant increase to interest rates on the SAVRS paid by the RHF Group. The rates fluctuated subsequent to the downgrade and reached a high of 14.7% in December 2007.

32.    In or about December 2007 and January 2008, following ACA's downgrade, the RHF Group sought to restructure the transaction and re-fund the SAVRS and secure them with letters of credit from banks rather than a bond insurer.

33.    Further complicating the matter, in or about February 2008, the auction rate securities market that Lehman ran, and which Lehman represented and promised was stable, failed.

34.    Moreover, in or about June 2008, Lehman was claiming that the RHF Group was purportedly "out of the money" in excess of $13 million. At the time, Lehman was viewed as a leader in the financial markets and promoted itself as financially stable, and therefore contended that its valuation was correct and honorable. However, Lehman's valuation was in fact biased and unfair. Nonetheless, because of the design of the original plan of refinancing, the RHF Group, under duress and in a disadvantageous position, was forced to terminate the Swap Contract, as well as the interest rate swaps in connection with the SAVRS issued in 1999 and 2000 for the benefit of, among others, St. Catherine and DeSmet. The RHF Group, St. Catherine and DeSmet were then forced to renegotiate a new, disadvantageous 20-year term swap agreement with Lehman in connection with the soon to be refinanced bonds (the "New Swap Contract").

35.    Pursuant to the New Swap Contract, among other things, Lehman required that the RHF Group pay a much higher synthetic "fixed" interest rate to avoid paying over the alleged $13 million to compensate Lehman for the purported value of the old Swap Contract at the time of negotiation. Under the New Swap Contract, in or about July 2008, Lehman reaffirmed its prior unconditional guarantees of Plaintiffs' variable interest and capital payment obligations on the new variable rate bonds that were subject to the agreement, that such payments would be punctually made when they became due and payable, and that Lehman could continue to perform its obligations over the 20 year term of the contract.

36.    In or about July 2008, the RHF Group completed the refinancing of the SAVRS and converted them to Variable Rate Demand Bonds, which were not auction rate securities and were secured with letters of credit from banks rather than a bond insurer.

37.    Despite reaffirming its unconditional guarantee of the variable interest and capital payment obligations on the new bonds in or about July 2008, Lehman was suffering from unprecedented losses from its own investments in subprime mortgage backed securities that were threatening the existence of the company and its subsidiaries.

6

38.    In or about 2002, Lehman became the market leader in the subprime mortgage industry by, among other things, lending billions of dollars to other financial institutions to fund subprime mortgages, originating its own subprime mortgage loans, and purchasing subprime mortgages to package and sell as asset-backed securities to global investors.

39.    In its public statements, Lehman boasted about its "record" and "robust" profits earned from its holdings in the subprime market. In its 2005 Form 10-K filed with the Securities and Exchange Commission ("SEC") on February 13, 2006, Lehman explained that its holdings in the subprime market represented a significant portion of its business:

Fixed Income net revenues were a record $7.3 billion in 2005, increasing 28% compared with 2004 driven by double digit revenue increases from each geographic region and record revenues across a number of businesses including commercial mortgage and real estate, residential mortgage origination and securitization, and interest rate products. Revenues from our commercial mortgage and real estate businesses increased substantially in 2005 reaching record levels, as the strong demand for commercial real estate properties, the recovery in certain property markets and relatively low interest rates drove asset sales and robust levels of securitizations. Revenues from our residential mortgage origination and securitization businesses increased in 2005 from the robust levels in 2004, reflecting record volumes and the continued benefits associated with the vertical integration of our mortgage origination platforms.

40.    In its 2006 10-K Form filed with the SEC on February 13, 2007, Lehman's fixed income net revenues purportedly continued to grow "to a record $8.4 billion in 2006, an increase of 15% from 2005."

41.    However, Lehman's 2006 10-K Form reported for the first time that, despite its continued growth, it had witnessed a decrease in revenue from its residential mortgage origination and securitization businesses that were "primarily attributable to a softer housing market and lower margins." But nowhere in its 2006 10-K Form did Lehman acknowledge the potential devastating impact of its substantial holdings in the subprime market on its operations as a whole. Instead, Lehman claimed that increased interest rates and a downturn in the housing market would affect only a few of its businesses, and that it maintained "sufficient liquidity to meet all of [its] funding obligations in all market environments."

42.    According to Lehman's 2007 10-K Form, which was filed with the SEC on January 29, 2008, its overall revenues continued to climb:

On the basis of a record first half and a reasonably successful navigation of difficult market conditions in the second half, we achieved our fourth consecutive year of record net revenues, net income and diluted earnings per common share in 2007. Net income totaled $4.2 billion, $4.0 billion and $3.3 billion in 2007, 2006 and 2005, respectively, increasing 5% in 2007 and 23% in 2006 from the corresponding 2006 and 2005 periods, respectively. Diluted earnings per common share were $7.26, $6.81 and $5.43 in 2007, 2006 and 2005, respectively, up 7% in 2007 and 25% in 2006 from the corresponding prior periods, respectively.

7

43.    Despite its reported continued growth, Lehman acknowledged that the "difficult latter half of 2007 witnessed a "deterioration within the U.S. subprime residential mortgage asset category, the weakening of the U.S. housing sector became worse than most observers expected," and a decrease in investor confidence in the subprime securities market "which, in part, led to many market participants re-pricing assets and taking large write-downs." However, Lehman again minimized any risks its own subprime holdings posed to the overall health of the company, stating:

> During the latter half of our 2007 fiscal year, the global capital markets experienced a significant contraction in available liquidity as the adverse market environment experienced in our third quarter continued into our fourth quarter and deteriorated further in November 2007. Despite infusions of liquidity by central banks into the financial system, broad asset classes, particularly U.S. subprime residential mortgages and structured credit products, remained thinly traded throughout this period. Notwithstanding these global market conditions, we ended the period with a very strong liquidity position. At November 30, 2007, our liquidity pool was approximately $35 billion, up from approximately $31 billion at November 30, 2006 and down slightly from approximately $36 billion at the end of the third quarter of the 2007 fiscal year. Long-term capital (long-term borrowings, excluding borrowings with remaining contractual maturities within twelve months of the financial statement date, and total stockholders' equity) was at approximately $146 billion at the end of 2007 fiscal year, up from approximately $100 billion at November 30, 2006 and $142 billion at the end of the third quarter of the 2007 fiscal year.

44.    Lehman failed to disclose in their 10-K Forms from 2005, 2006, or 2007 that their risk exposure in the event of a collapse of the housing market was massive. Indeed, when the housing market did collapse in or about 2007 and its holdings in the subprime market began defaulting at a record pace, Lehman suffered losses in the amount of billions of dollars. Moreover, despite claiming that it maintained liquidity positions sufficient to sustain adverse economic conditions, those positions were extremely inadequate to cover its continuing losses.

45.    After Lehman filed for bankruptcy relief, Lehman was unable to meet its obligations under the New Swap Contract. To avoid defaulting on the refinanced bonds, the RHF Group made interest payments to its bond holders without any protection afforded under the New Swap Agreement.

46.    As a result of actions and inactions of the Debtors, including but not limited to (i) breach of contract, (ii) fraud, constructive fraud, and/or fraudulent misrepresentation by the Debtors with respect to certain swap transactions between RHF and the Debtors, (iii) negligence of or negligent misrepresentation by the Debtors, (iv) breach of fiduciary duty, (v) breach of the covenant of good faith and fair dealings, and (vi) unfair competition, the RHF Group has been harmed and is therefore entitled to damages in an amount not less than $11,871,612.

47.    Due to the voluminous records related to the RHF Group's claims described herein, the RHF Group has not attached all of the potential documentary evidence that supports

8

its claims. As such, the RHF Group expressly reserves all rights to supplement the documentation attached hereto as the same becomes necessary.

48.    The claims asserted herein against the Debtors shall in no way limit any other claims possessed by the RHF Group against any entity other than the Debtors, including any claims arising after the Petition Date.

**H A N D   D E L I V E R Y**

RECEIVED BY: _____

DATE: 9/6/09

TIME: 4:27

## **EXHIBIT 3**

| *Sonnax* Factor | Summary of Analysis[1] |
|---|---|
| Factor 1: partial or complete resolution of the issues | Many of the key legal issues to be resolved are core bankruptcy issues, including triangular setoff issues and whether RHF has standing to pierce the corporate veil between LBHI and its affiliates. *See Opp.* at ¶¶ 59-63. |
| Factor 2: lack of any connection/interference with the bankruptcy case | Certain of the issues that RHF seeks to litigate are pure bankruptcy issues that have already been the subject of decisions by this Court, including the validity of termination under the Bankruptcy Code's safe harbors, triangular setoff issues, and issues relating to the scope of the Bankruptcy Code's safe harbors. *See Opp.* at ¶¶ 64-72. |
| Factor 3: debtor as fiduciary | Neither LBSF nor LBHI acted as a fiduciary to RHF with respect to the Transactions. *See Opp.* at ¶¶ 86-88. |
| Factor 4:  specialized tribunal with the necessary expertise | This Court represents a specialized tribunal with significant expertise relating to the Bankruptcy Code and derivatives – expertise that is critical to deciding issues raised in the Declaratory Judgment Action – and is the most efficient forum for resolving such issues. *See Opp.* at ¶¶ 73-77. |
| Factor 5: insurance coverage | Neither the Declaratory Judgment Action nor the Tort Action is covered by insurance policies held by LBSF or LBHI. *See Opp.* at ¶¶ 89-90. |
| Factor 6: involvement of third parties | RHF concedes that the Declaratory Judgment Action should not involve third parties.  (Motion at ¶ 52(f).).  Further, LBSF and LBHI are the main parties to the Tort Action. *See Opp.* at ¶¶ 91-93. |

---

[1] Capitalized terms used but not defined herein shall have the meanings given to them in the *Plan Administrator's Objection to Motion of Retirement Housing Foundation and its Affiliates for a Determination that the Automatic Stay Does Not  Bar Commencement of Certain Litigation Against the Debtors Related to Postpetition Claims and/or Granting Relief from the Automatic Stay* ("Opp.").

| *Sonnax* Factor | Summary of Analysis[1] |
|---|---|
| Factor 7: prejudice to other creditors | RHF has filed proofs of claim against LBSF and LBHI for claims relating to the swap termination payment and the Tort Claims. Requiring LBSF and LBHI to defend RHF's claims in another forum would upend the Bankruptcy Code policy favoring centralized and efficient administration of claims – especially where, as here, other creditors raise similar issues. To the extent that granting the relief requested in the Motion leads other creditors to seek similar relief, this could result in certain creditors attaining more favorable results than others, despite their being similarly situated. *See Opp.* at ¶ 83-84.<br><br>Further, by seeking to exercise its setoff rights in the California Court, RHF is impermissibly attempting to elevate itself to secured status (to the prejudice of other creditors) by asserting an impermissible triangular setoff right. *See Opp.* at ¶ 85. |
| Factor 8: judgment claims subject to equitable subordination | This factor is not relevant to this dispute. |
| Factor 9: judicial liens avoidable by the debtor | This factor is not relevant to this dispute. |
| Factor 10: judicial economy | Judicial economy will be served by having this Court decide the Declaratory Judgment because this Court has extensive experience with the Bankruptcy Code and derivatives contracts. In addition, judicial economy will not be served by permitting RHF to litigate claims in the California Court where the Proposed Complaint, on its face, is legally insufficient insofar as (i) RHF does not differentiate between the actions of LBHI and LBSF (or LBI), and (ii) RHF has no standing to pierce the corporate veil between LBHI and its subsidiaries. *See Opp.* at ¶¶ 73-82. |
| Factor 11: ready for trial | RHF admits that the Tort Action is not ready for trial. (Motion at ¶ 55(i).); *see also Opp.* at ¶¶ 94-96. |
| Factor 12: impact on the parties and balance of harms | Many of the issues that RHF seeks to litigate before the California Court were raised by RHF in its proofs of claim and are issues common to many creditors. Permitting RHF to litigate these issues outside of the ordinary claims administration process not only disrupts the claims process, but encourages other creditors to attempt the same. This could lead to multiple litigations of similar issues in various jurisdictions and would be harmful to LBHI and LBSF, who would be forced to litigate such issues in multiple forums and face the prospect of conflicting decisions. *See Opp.* at ¶¶ 64-70. |