WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jacqueline Marcus
Richard Slack

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
　　　　　　　　　　　　　　　　　　　　　　　　:
In re　　　　　　　　　　　　　　　　　　　　　: 　　Chapter 11
　　　　　　　　　　　　　　　　　　　　　　　　:
**LEHMAN BROTHERS HOLDINGS INC., et al.,**　: 　　Case No. 08-13555 (JMP)
　　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　Debtors.　　　　　　　　　　: 　　(Jointly Administered)
　　　　　　　　　　　　　　　　　　　　　　　　:
------------------------------------------------------------------x

**DECLARATION OF DAVID COLAROSSI
IN SUPPORT OF PLAN ADMINISTRATOR'S OBJECTION
TO MOTION OF RETIREMENT HOUSING FOUNDATION
AND ITS AFFILIATES FOR A DETERMINATION THAT THE
AUTOMATIC STAY DOES NOT BAR COMMENCEMENT OF CERTAIN
LITIGATION AGAINST THE DEBTORS RELATED TO POST-PETITION
CLAIMS AND/OR GRANTING RELIEF FROM THE AUTOMATIC STAY**

　　　　David Colarossi, pursuant to 28 U.S.C. § 1746, declares as follows:

　　　　1.　　I am over the age of 18 years and make these statements of my own personal knowledge, following my review of the business records of Lehman Brothers Holdings Inc. ("LBHI") and Lehman Brothers Special Financing Inc. ("LBSF") and/or my consultation with employees of LBHI and LBSF.  If called to testify, I could testify to the truth of the matters set forth herein.

　　　　2.　　I submit this Declaration in support of the *Plan Administrator's Objection to Motion of Retirement Housing Foundation and its Affiliates for a Determination that the*

*Automatic Stay Does Not Bar Commencement of Certain Litigation Against the Debtors Related to Post-Petition Claims and/or Granting Relief from the Automatic Stay* (the "Objection").

3.  I am currently an employee of LBHI and have been since December 2, 2009. I reside in New York, New York.

4.  Since September 15, 2008, the date on which LBHI commenced its chapter 11 case, LBSF has diligently sought to unwind its derivative contracts and crystallize amounts receivable to the Chapter 11 Estates.[1] One of my primary areas of responsibility since my hiring has been to manage a portfolio of LBSF's derivatives transactions and interact with counterparties to resolve derivatives disputes. I have personally been involved in thousands of derivatives transactions and have negotiated settlements covering billions of dollars of notional value with counterparties on behalf of the Chapter 11 Estates.

### A. The Transactions

5.  In the course of my responsibilities, I have become familiar with LBSF's interests in four interest rate swap transactions (the "Transactions") with Retirement Housing Foundation and its affiliates[2] (collectively, "RHF") entered into under a 1992 Local Currency-Single Jurisdiction Form ISDA Master Agreement between LBSF and RHF dated as of June 20, 2008 (the "Master Agreement") along with the Schedule, Guarantee, and Credit Support Annex. *See* Exh. A. LBHI acted as "Credit Support Provider" for LBSF's payment obligations with respect to the Transactions. *See id.* (Guarantee).

---

[1] Capitalized terms used but not defined herein shall have the meanings given them in the Objection or the Master Agreement.

[2] The affiliates include Foundation Property Management, Inc., Bixby Knolls Towers, Inc., Bluegrass RHF Housing, Inc., DeSmet RHF Housing, Inc., Gold Country Health Center, Inc., Holly Hill RHF Housing, Inc., Mayflower RHF Housing, Inc., Mayflower Gardens Health Facility, Inc., Merritt Island RHF Housing, Inc., St. Catherine RHF Housing, Inc., Sun City RHF Housing, Inc., Yellowwood Acres, Inc., and Martin Luther Foundation, Inc.

2

6. One of the Transactions is an amortizing interest rate swap with an initial notional value of $91.08 million, in which LBSF pays a floating rate of 67% times one-month USD-LIBOR-BBA and RHF pays a fixed rate of 4.792% (the "LIBOR Swap"). The LIBOR Swap has a maturity date of September 1, 2028. *See* Exh. B (LIBOR Swap Confirmation). The other three Transactions are interest rate swaps with notional values totaling approximately $25.5 million, in which LBSF paid a floating rate based on the SIFMA Municipal Swap Index and RHF paid a fixed rate of 2.975% per annum (the "SIFMA Swaps"). Each of the SIFMA Swaps has a maturity date of August 15, 2010. *See* Exh. C (SIFMA Swaps Confirmations). Lehman's claim against RHF in this dispute relates to amounts owing under both the LIBOR Swap and SIMFA Swaps.

**B.  RHF's Attempted Termination and Valuation of the Transactions**

7. The Master Agreement's provisions on early termination provide that a party may terminate the Transactions following an Event of Default and that an Event of Default may result from*, inter alia*, the filing of a bankruptcy petition by a party or a party's Credit Support Provider. *See* Exh. A (Master Agreement) §§ 6(a), 5(a)(vii). In Part 1(f) of the Schedule, the parties agreed that the "Second Method" and the "Market Quotation" payment measure would govern payments on early termination. *Id*. §§ 6(e), 12 & Schedule at Part 1(f). Upon early termination resulting from an Event of Default, the "out of the money" party is required to pay the termination amount owed under Section 6(e) of the Master Agreement to the "in the money" party, regardless of which party has defaulted. *Id*. § 6(e)(i)(3). Further, in the event that the chosen Market Quotation measure fails or produces a commercially unreasonable result, the Non-defaulting Party is supposed to revert to the Loss measure. *See id.* § 12 (definition of "Settlement Amount").

3

8.  LBHI and LBSF filed their chapter 11 petitions on September 15, 2008 and October 3, 2008, respectively. To the best of my knowledge, at no point in late 2008 or early 2009 – or at *any* point before June 11, 2009 – did RHF deliver to LBSF a termination notice designating an Early Termination Date with respect to the Transactions. Moreover, although periodic payment obligations continued to accrue under the terms of the Transactions following the bankruptcy filings of LBHI and LBSF, RHF neither terminated nor made any payments.

9.  Thousands of other derivatives counterparties, including non-profits like RHF, terminated their derivatives transactions within a short time after the bankruptcy filings of LBHI and LBSF. Following the bankruptcy petitions, RHF claims it sent to LBSF a notice of default (not an early termination notice) in November 2008. However, LBSF has no evidence of having received this letter, and RHF did not attach it to the Motion.

10. More than eight months after LBHI and LBSF filed for bankruptcy, on June 11, 2009, RHF delivered to LBSF a letter (the "Early Termination Notice") that purported to designate an Early Termination Date under the Master Agreement and to thereby terminate the Transactions, based upon an Event of Default resulting from the bankruptcy filing of LBSF. *See* Exh. D.

11. RHF was on notice of LBSF's dispute of the validity of the Early Termination Notice as early as June 22, 2009, when LBSF sent RHF a letter in response to its Early Termination Notice, stating as follows:

> The Termination Notice violates the Bankruptcy Code and is accordingly voidable at the election of Lehman. . . . Although the Bankruptcy Code permits a party under certain circumstances to 'liquidate, terminate, or accelerate a swap agreement,' (11 U.S.C. 560), this authorization is available only for terminations effected solely as a result of the insolvency, financial condition or bankruptcy of the debtor (*see, e.g. In re*

4

> *Enron Corp.*, 306 B.R. 465 (Bkrtcy.S.D.N.Y. 2004)). Given the amount of time that has passed since the commencement of the Chapter 11 Case, it is clear that [RHF] ha[s] not relied upon Lehman's insolvency, financial condition or bankruptcy to liquidate, terminate or accelerate the Agreement, but has done so on the basis of some other reason. Consequently, Lehman reserves the right to dispute the validity of the Termination Notice and to treat any putative payment to Lehman under Section 6(d)(i) of the Agreement as a pre-payment of [RHF's] on-going obligations to Lehman as if no Early Termination Date had been declared.

*See* Exh. E (June 22, 2009 Letter to RHF) at 1-2. LBSF sent this letter to RHF less than two weeks after receiving the Early Termination Notice on June 11, 2009.

12. More than a month later, on July 29, 2009, RHF delivered a purported early termination calculation statement to LBSF, setting forth RHF's calculation of an early termination payment due as a result of RHF's purported termination of the Transactions (the "Calculation Statement"). *See* Exh. F (Calculation Statement).

13. The Master Agreement requires solicitation of exactly four dealers when conducting a Market Quotation process to value the swap termination payment. *See* Exh. A § 12 (instructing the determining party to solicit quotations from "Reference Market-makers" and defining "Reference Market-makers" as "*four* leading dealers in the relevant market.") (emphasis added). RHF, however, solicited quotations from over three times that number – 14 dealers. *See* Exh. F (Calculation Statement) at 3; Exh. O (March 10, 2010 Letter from Mr. Reuben to LBSF) at 7.

14. The Master Agreement also requires the valuing party to solicit Market Quotations "as of" the date of termination. *See* Exh. A § 12 (definition of "Market Quotation"). In identical fashion, the Master Agreement requires the determining party to "determine its Loss *as of the relevant Early Termination Date*, or, if that is not reasonably practicable, as of the earliest date *thereafter* as is reasonably practicable." *Id.* (definition of "Loss," emphasis added). RHF solicited Market Quotations from fourteen dealers at least four times—on each of February

5

25, March 11, June 5, and June 11, 2009—prior to attempting to terminate the Transactions on June 11, 2009. *See* Exh. F (Calculation Statement) at 3; Exh. O (March 10, 2010 Letter from Mr. Reuben to LBSF) at 7.

15. RHF explained in its Calculation Statement that after it received no quotations for the Transactions, RHF calculated the purported termination payment under the alternative termination payment measure under the Master Agreement – Loss. *See* Exh. F (Calculation Statement) at 3. RHF's calculation acknowledged its Loss on the LIBOR Swap of negative $9,110,573 and on the SIFMA Swaps of negative $458,391 (negative meaning it owed that amount to LBSF), but then added back $10,671,513 due to alleged "loss of bargain" and an additional $6,558,111 for alleged "cost of funding" charges. *See id.* at 5. RHF derived a total Loss calculation of $4,952,968 then added $280,884 to that amount for expenses purportedly incurred in RHF's termination attempt, for a total of $5,233,852. *See id.* at 1-2. This total reflects a credit of $2,707,692 to LBSF for payments RHF acknowledged it owed in the ordinary course under the Transactions prior to its attempted termination. *Id.* at 4. RHF's Calculation Statement also referred to a claim against LBSF for $11,590,728, which appears to represent the alleged value of RHF's Tort Claim. *Id.* at 2. LBSF disputes RHF's Loss calculation in its entirety, especially the self-serving use of historical interest rates rather than current market rates, the inclusion of RHF's hypothetical "loss of bargain" and "cost of funding" deductions, as well as RHF's inflated claim for expenses and incorrect calculation of both the gain it realized and the payments it failed to make[3] to LBSF prior to RHF's attempted termination.

16. Contrary to its Loss calculation showing that LBSF owed RHF money, RHF acknowledged in its audited financial statements for the years ended September 30, 2009

---

[3] Specifically, RHF owed LBSF approximately $2.935 million in payments due in the ordinary course under the terms of the Transactions prior to RHF's attempted termination in June 2009, not $2.2 million as RHF asserts.

and 2008 that it "recorded a reduction in its interest rate swap agreement liability of $16.7 million" and "recognized a gain of" $16.7 million "in derivatives activities during the year ended September 30, 2009" as a result of RHF's purported termination of the Transactions. *See* Exh. G (RHF financial statements) at 30.

17.  As of September 10, 2013, RHF owed LBSF a total of $31,150,293 representing $21,603,231 in net unpaid periodic payments that are due and payable by RHF to LBSF under the terms of the Transactions for the period since October 1, 2008, plus $9,547,062 in interest accrued thereon through September 10, 2013 as provided for in the Master Agreement, with interest continuing to accrue until the payment in full thereof. *See* Exh. A (Master Agreement) §§ 2(d), 12. In addition, RHF and LBSF owe continuing ordinary course periodic payments on the live LIBOR Swap, which payments are worth approximately $19,897,814 in LBSF's favor as of September 9, 2013.

### C. LBSF Immediately and Consistently Communicated to RHF Its Position That the Termination Notice Was Ineffective

18.  RHF suggests in the Motion that it did not know that the late termination was an issue or that LBSF believed the termination was invalid. Motion at ¶ 42. This suggestion cannot be reconciled with the facts. There were a significant number of communications between LBSF and RHF concerning the late termination issue from shortly after the attempted termination (beginning with the previously mentioned letter sent by LBSF to RHF on June 22, 2009) until today. I personally was involved in the majority of these communications starting in January 2010, when I took over this matter from another LBHI colleague, Jeremy Vogelmann.

19.  Prior to my involvement with RHF on this matter, to my knowledge and based on information provided to me by Mr. Vogelmann, Mr. Vogelmann had multiple

communications with RHF and its counsel beginning shortly after RHF's attempted termination as described below.

20. About a month after receiving RHF's Calculation Statement, as part of LBSF's due diligence investigation concerning the Transactions, Mr. Vogelmann called and left telephone message for RHF chief financial officer, Frank Rosello ("Mr. Rosello") and RHF treasurer, Brian Magnone ("Mr. Magnone"), on August 4 and August 6, 2009.

21. On August 25, 2009, in response to emails from outside counsel to RHF, Mr. Vogelmann asked for information concerning RHF's market quotation process, Loss calculation, replacement swaps, and other information, including RHF's financial statements. *See* Exh. H.

22. Also in August and September 2009, LBSF sent RHF invoices for ordinary course swap payments on the live Transactions, indicating LBSF's view that the termination was invalid and the swaps were live. *See* Exh. I. Indeed, LBSF's position that the Transactions were live – requiring payment of regular swap payments – was apparently not lost on RHF's counsel, who responded in a letter to LBSF on September 4, 2009, stating that the swaps were terminated. See Exh. J.

23. Again on November 30, 2009, LBSF sent RHF invoices for ordinary course swap payments on the live Transactions. *See* Exh. K. Shortly thereafter, on December 2, 2009 RHF's outside counsel sent LBSF a letter in response to the swap payment invoices and asserted that the swaps were terminated. *See* Exh. L.

24. A few weeks into the new year, following back and forth email correspondence with counsel for RHF concerning scheduling, on January 22, 2010, I, along with fellow LBSF employee, Satoko Koyama, participated in a conference call with RHF

8

representatives Mr. Rosello and Mr. Magnone, as well as its outside counsel, during which the parties summarized their respective positions. During this phone conversation, I remember conveying LBSF's view that RHF had improperly terminated the Transactions and that the terminations were therefore invalid.

25. Five days later on January 27, 2010, I emailed RHF's outside counsel and Mr. Rossello asking for additional information and an explanation for the 9-month delay between the bankruptcy and RHF's attempt to terminate the swap transactions. *See* Exh. M.

26. From February 3 to March 5, 2010, I had multiple email communications with counsel for RHF, in which I followed up on LBSF's requests for information from RHF related to its attempted termination and valuation of the Transactions.

27. On February 26, 2010, LBSF sent RHF invoices for ordinary course swap payments on the live Transactions. *See* Exh. N.

28. About six weeks after the group conference call, on March 10, 2010, RHF's outside counsel sent a letter to LBSF containing RHF's preliminary responses to LBSF's requests for information on the swap transactions and providing the requested documents. *See* Exh. O.

29. All of the foregoing communications concerning LBSF's dispute of RHF's attempted termination occurred long prior to March 2012. Accordingly, RHF's statement in the Motion that LBSF and LBHI "did not actually provide notice of any such purported dispute until March 2012" (Motion ¶ 42) is simply untrue.

### D. The ADR

30. On March 16, 2012, LBSF served upon RHF, pursuant to the terms of the ADR Procedures Order, *inter alia*, Derivatives ADR Notice No. 353. The parties participated in

a mediation session on February 5, 2013 but were unable to resolve their dispute. Although the mediator continued to attempt to facilitate a deal for some time after the in-person mediation session concluded, that effort was unsuccessful, and the mediation formally ended on July 1, 2013.

### E. Neither LBSF nor LBHI Have Insurance Coverage for the Declaratory Judgment Action or the Tort Action

31. I have been advised that neither the Declaratory Judgment Action nor the Tort Action is covered by insurance policies held by LBSF or LBHI. Accordingly, LBSF and LBHI would have to pay all costs and expenses incurred while litigating these actions with out-of-pocket funds from their respective Chapter 11 Estates. Likewise, any damages that might be awarded by the California Court would have to be paid by LBSF and LBHI directly, although my understanding is that such damages would be treated as unsecured claims.

### F. A Decision On RHF's Repo 105 Claims Impacts Other Derivatives Counterparties

32. I am aware that RHF's Motion asserts that in the months leading up to LBHI's bankruptcy, LBHI and LBSF allegedly used an accounting tactic called "Repo 105" to conceal their true financial condition. Motion ¶¶ 4, 6, 32 n.16, 36, 37; *see also* Proposed Complaint ¶¶ 73-74. I am personally aware that other creditors have made similar assertions.

### G. Exhibits

33. Attached hereto as Exhibits A - O are true and correct copies of the following documents:

A. The 1992 Local Currency-Single Jurisdiction Form ISDA Master Agreement between LBSF and RHF dated as of June 20, 2008 along with the Schedule, Guarantee, and Credit Support Annex

B. The confirmation for the LIBOR Swap

C. The three confirmations for the SIMFA Swaps

D. RHF's Letter to LBSF dated June 11, 2009 purporting to terminate the Transactions

E. LBSF's June 22, 2009 Letter to RHF

F. RHF's Calculation Statement (RHF's July 29, 2009 Letter to LBSF)

G. RHF's Financial Statements for the years ended September 30, 2008 and September 30, 2009

H. Mr. Vogelmann's Aug. 25, 2009 email to Mr. Jureller, outside counsel to RHF

I. LBSF's invoices to RHF with respect to the Transactions dated August 28 – September 2, 2009

J. Sept. 4, 2009 Letter from Mr. Jureller to LBSF

K. LBSF's invoices to RHF with respect to the Transactions dated November 30, 2009

L. Dec. 2, 2009 Letter from Mr. Jureller to LBSF

M. January 27, 2010 email from Mr. Colarossi to Mr. Jureller and Mr. Rossello

N. LBSF's invoices to RHF with respect to the Transactions dated February 26, 2010

O. March 10, 2010 Letter from Mr. Reuben to LBSF (excluding attachments)

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 11, 2013, in New York, New York.

    /s/ David Colarossi

David Colarossi