# EXHIBIT O
# TO THE COLAROSSI DECLARATION



# RRB
## REUBEN RAUCHER & BLUM PC
### ATTORNEYS AT LAW

10940 Wilshire Boulevard, 18th Floor
Los Angeles, California 90024
Phone: (310) 777-1990
Fax: (310) 777-1989
www.rrbattorneys.com

March 10, 2010

**VIA EMAIL (without enclosures) and FEDERAL EXPRESS**

David Colarossi
Lehman Brothers Estate
1271 Avenue of the Americas, 40th Floor
New York, NY 10020
Tel: 646-285-9945

      Re:    **Retirement Housing Foundation et al.**

Dear David:

Although we are still in the process of gathering additional information responsive to your January 27, 2010 request, we wanted to provide you with the enclosed information that we have gathered so far, which should answer most of the questions posed in your email. We appreciate your concurrence that these communications are being made within the context of settlement discussions, and therefore this letter and the information provided are protected under FRE 408.

As you will see from your review of the provided information, the RHF Obligated Group (referred to generally herein as "RHF") worked diligently to reasonably account for and calculate the obligations relating to termination of the Swap Agreement with Lehman Brothers. We believe that RHF's calculations are conservative and fair and are certain they are commercially reasonable.

That said, we must re-emphasize that Lehman's bankruptcy threw RHF into an extremely vulnerable position. RHF is a non-profit organization that is devoted entirely to providing safe and affordable housing for senior citizens and other groups in need of care. It is not in the business of making risky investments. RHF entered into the Swap Agreement for the purpose of maintaining its safe and conservative financial approach on a long term basis, and the Swap was

REUBEN RAUCHER & BLUM

March 10, 2010
Page 2

supposed to provide RHF with the assurance of a fixed interest rate payment on its Variable Rate Demand Bonds for the life of the bonds. Instead, due to Lehman's bankruptcy, the Swap Agreement was worthless – and, even worse, it caused RHF to incur enormous expenses and the hazard of the variable interest rate payments that it had intended to avoid all along.

Furthermore, the severe problems did not arise from Lehman's bankruptcy alone. In December 1998 RHF issued 30 year Select Auction Variable Rate Securities ("SAVRS"), auction rate securities whose rates were set every 35 days through an auction process in which Lehman acted as Market Agent and the sole Broker-Dealer. RHF was supposed to be able to convert the SAVRS into true fixed rate bonds at any time it wished, so as to lock in favorable interest rates. However, in March 2005, when RHF was considering converting the SAVRS, Lehman effectively blocked RHF from doing so by asserting that RHF's cost to terminate the Swap Agreement would be $15,800,000 – compared to the estimate prepared by RHF's advisor Cain Brothers of $405,000. Lehman did not divulge the proprietary method it used to calculate this termination cost. Therefore, RHF was forced to continue operating under the same disadvantageous arrangement, which caused RHF significant financial harm.

This arrangement caused more problems when the bond insurer for the SAVRS, ACA, was downgraded. All of a sudden, Lehman's obligations on the Swap Agreement were basically nullified. RHF was required to continue paying Lehman the same rate for the swap arrangement, but Lehman no longer had any obligation to pay the SAVRS rates (except for a de minimis amount) due to the imposition of an "Alternative Floating Rate." Immediately, with Lehman no longer having any obligation to pay the SAVRS rates, the rates on the SAVRS shot straight up to the point where the auctions consistently "cleared" at rates just barely below the applicable maximum rates – in stark contrast to previous auctions, which rarely if ever approached the maximum rates. RHF contends that Lehman intentionally set absurdly high clearing rates because it could profit by holding SAVRS that held such high interest rates. Indeed, this behavior was in keeping with the wrongful activity detailed in S.E.C.'s May 31, 2006 Order Instituting Administrative and Cease-and-Desist Proceedings, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order Pursuant to Section 8A of the Securities Act of 1933 and Section 15(b) of the Securities Exchange Act of 1934, an Order that Lehman never disclosed to RHF. Thus, in addition to being damaged by Lehman's secret and unfair

REUBEN RAUCHER & BLUM

March 10, 2010
Page 3

calculations of the Swap termination amount, RHF was also damaged by Lehman's unfair manipulations of the SAVRS auctions.[1]

The financial harm suffered by RHF and how it relates to RHF's claim against Lehman are discussed in further detail in the enclosed materials. In order of your requests, the information we are providing is:

1) *Please provide a copy of RHF's most recent financial statements and the amount, if any, at which each derivative transaction was carried on RHF's balance sheet just prior to your proposed termination date (June 11, 2009).*

   Enclosed are the most recent audited financials for the RHF Obligated Group, covering the period up through September 30, 2009. Also enclosed are the balance sheet records as of May 31, 2009, just prior to the termination date of June 11, 2009.

2) *I noticed that RHF did not attempt to terminate the transactions until June 2009. Please provide reasons for the 9-month delay between Lehman's bankruptcy and RHF's attempt to terminate the transactions.*

   It appears to be irrelevant that RHF terminated the Swap transaction in June 2009, and "the 9-month delay" is a mischaracterization of RHF's termination process. Nor do we think there was a "delay" under these circumstances. Nevertheless, since you have asked, the transactions were not terminated sooner for several reasons. First, frankly in the wake of Lehman's bankruptcy filing, it took some time for RHF – which is not knowledgeable or expert about swaps – to evaluate Lehman's complex documents and determine its rights. RHF *did* put Lehman on notice of the Event of Default no later than November 7, 2008. Second, after RHF determined its rights, including the right to terminate the Swap, RHF recognized it was required to seek permission to terminate the Swap from the consortium of banks that provided the letter of credit. Unfortunately, obtaining permission from the banking consortium was an extended process that took a number of months.

---

[1] As you know, these allegations are also currently the subject of a lawsuit against Lehman's Directors and Officers pending in Los Angeles Superior Court.

REUBEN RAUCHER & BLUM

March 10, 2010
Page 4

> 3) *Please provide detailed calculations for each of the following: the gain on value of the 67% LIBOR swap ($9,110,573), the gain on value of the SIFMA swaps ($458,391), loss of bargaining ($10,671,513), cost of funding ($6,558,111) and unpaid amounts (2,707,692 - please include amounts and due dates).*

In order to properly determine the Termination Calculation under the Swap Agreements, RHF retained Scott Mowrey, CPA, of Cohen Miskei and Mowrey. The information requested in this item can be found in the enclosed report of Scott Mowrey, dated July 27, 2009 (the "Mowrey Report"), which shows that RHF's calculations were commercially reasonable. The calculations for the gain on value of the 67% Libor swap are explained at pages 4-7 and Schedules 1A and 1B of the Report, and the calculations for the SIFMA swap are at pages 7-10 and Schedules 2A and 2B. The calculation for RHF's loss of bargain is explained at pages 10-11 and Schedule 3, while the costs of funding are explained at pages 11-12. Finally, the calculation of unpaid amounts is explained at page 12 and Schedule 5 of the Mowrey Report.

In addition to retaining Mr. Mowrey, RHF also retained Marc Margulis of Mammoth Advisors, Inc. to provide an opinion on the net cost or income from termination of the June 20, 2008 swap agreement. As stated in his opinion letter, a copy of which is enclosed, Mr. Margulis determined, in pertinent part as follows:

> [I]t is our opinion that as of any date proximate to the date of this Opinion, but subject to further verification and analysis by us, RHF's lost benefit of the bargain equals or exceeds any gain it might incur from termination of the Agreement. Our opinion, therefore, is that RHF owes Lehman no dollar amount upon termination of the Agreement. Moreover, it is our opinion that RHF has incurred significant, contingent monetary damages including, but necessarily limited to, its lost benefit of the bargain with Lehman, past fees and expenses paid to Lehman, fees and expenses paid to Lehman and other parties upon refunding the original SAVRS through a new issuance of Variable Rate Demand Bonds secured at significant additional cost with letters of credit from banks rather than a bond insurer, and loss of the benefit of the bargain with the bond issuer which fees were paid in advance in full. Therefore, pursuant to new subsection 6 (f) of the

REUBEN RAUCHER & BLUM

March 10, 2010
Page 5

> Agreement, labeled "Set-Off", Lehman is likely, in our opinion, to owe to RHF significant sums of money, which amounts have yet to be fully determined and which amounts are the subject matter, in part, of pending litigation by RHF against Lehman defendants.
>
> Thus, two different forensic experts, both of whom are exceptionally well-qualified, independently came to the same conclusion – that RHF owes Lehman no amount for termination of the Agreement and that there are significant compensatory amounts owed by Lehman to RHF.

4)  *Please provide details of RHF's out-of-pocket expenses ($280,884).*

> RHF's out-of-pocket expenses are noted at page 14 of the Mowrey Report. Certain of these expenses have since increased, and enclosed are invoices relevant to this calculation, with privileged information redacted. As of February 2010, the total of the legal and other costs incurred by RHF related to the enforcement and protection of its rights under the Swap Agreement is as follows:

|  |  |
|---|---|
| Latham & Watkins | $105,243 |
| Klestadt & Winters | $44,130 |
| Ballard Spahr Andrews & Ingersoll | $49,531 |
| Reuben Raucher & Blum | $100,211 |
| Mammoth Advisors | $24,817 |
| Cohen, Miskei & Mowrey | $64,125 |
| Bank Waiver Fees | $15,000 |
| Total | **$403,057** |

> Furthermore, in addition to the foregoing, RHF has brought suit in California against the Lehman directors and officers and others for fraud and negligent misrepresentation in connection with the Swap Agreement and related matters. As of February 2010, RHF has incurred $277,013 in fees and costs for that lawsuit.

5)  *Did RHF replace the Lehman transactions with similar transactions with other counterparties? If so, please provide copies of the confirmations for the replacement*

REUBEN RAUCHER & BLUM

March 10, 2010
Page 6

> *transactions. If not, please explain how RHF has mitigated the interest rate exposure that resulted from their terminations of the Lehman transactions. If RHF has not mitigated that interest rate exposure, please confirm.*
>
> RHF has expended a great amount of time and effort trying to mitigate the interest rate exposure. When Lehman Brothers Holdings Inc. ("LBHI") filed for bankruptcy in September 2008, it created significant confusion at RHF, as it apparently did with many other parties as well. Lehman was incommunicado, and RHF was attempting to determine the status of the swaps.
>
> The status of the swaps and the impact to RHF's bonds and interest costs caused unprecedented angst among RHF's seven letter of credit banks. RHF continued to correspond with its letter of credit banks and others, to attempt to get quotes for a new hedging strategy that would be comparable to the Lehman swaps' 20 year hedge. After substantial effort, it ultimately became clear that no alternative swap arrangement was available, even for a five (much less a 20) year period.
>
> RHF then began researching fixed interest rate caps, which require a paid up-front fee. After well more than a year of trying to mitigate the interest rate exposure, on January 5, 2010, RHF entered into a $32.5 million, 5-year fixed interest rate cap at 5% SIFMA with USBank, for an up-front cost of $483,000. On January 15, 2010, RHF entered into another $32.5 million, 5-year fixed interest rate cap at 5% SIFMA with Bank of the West, for an up-front cost of $458,000. Confirmations of these caps are enclosed.
>
> These caps, of course, do not replace the hedging that was supposed to be provided by the Lehman swaps. Rather, they are stopgap measures that RHF was forced to obtain to mitigate against the hazard caused by the failure of the Lehman swaps. The caps do not cover the full amount covered by the swaps and only last for a duration of five years, and so RHF continues to face potentially unlimited interest rate risk.

6)  *Please provide copies of all communications related to the market quotation process. This would include the bid request sent to each bank, their response, and any related*

REUBEN RAUCHER & BLUM

March 10, 2010
Page 7

> *back and forth communications. Any color on why the banks were unwilling to provide these swaps would be helpful.*

On February 25, 2009, RHF requested quotations for replacements swaps from 14 Reference Market-makers. All 14 declined to bid.

RHF conducted a second request for quotations on March 11, 2009. This time, three of the 14 Reference Market-makers had "no response" while the remaining 11 declined to bid.

On June 5, 2009, RHF performed a third request for quotations. Two of the 14 Reference Market-makers had "no response" and the remaining 12 declined to bid.

Finally, on June 11, 2009, RHF performed a fourth and final request for quotations. Again, there were no bidders, with 10 of the Reference Market-Makers offering no response and the four others declining to bid.

Thus, over at least a six month period, there was no market for the swap, reinforcing the conclusion that the swap had no value. Copies of the results of these quotation requests are enclosed.

7) *Please provide a detailed calculation of the damages claim filed against the Lehman estate ($11,871,612).*

> The damages claim arises in part from Lehman Brothers' unfair calculation of the Swap Agreement termination cost in March 2005, which prevented RHF from converting the SAVRS to true fixed rate bonds. If RHF had been allowed to convert, it could have locked in a 4.91% interest rate, and would have avoided the transactional costs, prepayment penalties, and legal and related costs it was forced to incur for the eventual 2008 SAVRS refinance. The calculation for this damages claim can be found at pages 12-13 of the Mowrey Report.
>
> Page 14 of the Mowrey Report details the legal and related costs related to RHF's enforcement and protection of its rights under the Swap Agreement. However, as

REUBEN RAUCHER & BLUM

March 10, 2010
Page 8

>noted above, these amounts have since increased and now total $403,057. Furthermore, RHF has incurred fees and costs of $277,013 in connection with the California litigation.
>
>Finally, RHF intends to amend its claim for damages to include amounts lost due to Lehman's manipulation of the SAVRS, as well as the broker-dealer fees collected by Lehman for supposedly providing a fair auction process. Preliminarily, RHF estimates damages of $4.3 million in connection with the manipulation of the SAVRS.

As you can see, the information we are providing is substantial, and evidences the fact that RHF's valuation and damages calculations were fair and commercially reasonable. RHF has expended a significant amount of time and money trying to ameliorate the fallout from its dealings with Lehman. Nevertheless, we intend to continue working cooperatively with Lehman to try to resolve these matters.

Along those lines, it is our understanding that the parties are generally in agreement that the default provision terms under the Swap Agreements specifically provide for the Non-Defaulting Party, in this case RHF, to calculate the termination payment, which calculation will hold if it is determined to be commercially reasonable. RHF is providing you with the requested information and documentation to confirm the elements of the termination calculation. Hopefully this will permit the parties to quickly resolve any questions related to such calculation and claim.

However, and without waiving any rights thereto, in the event Lehman believes that the termination calculation is not commercially reasonable or that it has the right to dispute the termination amount with respect to these Swap Agreements, then we hereby request that Lehman provide detailed information supporting its basis for this contention. Further, RHF hereby requests that Lehman provide the following information to support any dispute as to the termination amount calculated by RHF:

1.  A detailed reasoning for Lehman's dispute of the termination amount calculated by RHF, and the basis for each aspect of such termination amount purportedly in dispute, and provide copies of all documents used or referenced with respect thereto.

REUBEN RAUCHER & BLUM

March 10, 2010
Page 9

2.   A detailed calculation of Lehman's proposed termination amount or those aspects of RHF's termination amount which Lehman purportedly disputes, including the method of such calculation under the Swap Agreements, and provide copies of all documents used or referred to in determining such calculation or disputed amount.

3.   Copies of all documents related to any market quotes received with respect to the Swap Agreements, whether or not used in Lehman's calculation, including but not limited to bid requests sent to any lender or third party, their responses, and any communications related thereto, and any internal memorandum related to these market quotations. In the event the market quotes were obtained or determined internally by Lehman, please provide all documents relative thereto.

4.   Copies of all other correspondence or documents related to the calculation or dispute of the termination amount, inclusive of both internal and external communications, including but not limited to letters, emails, notes, and memoranda.

5.   Please provide all documents supporting Lehman's calculation of the proposed termination amount in March 2005 of $15.8 million.

   Thank you for your ongoing cooperation in this matter.

                                              Sincerely,

                                              Timothy D. Reuben

cc:   Weil Gotshal & Manges LLP
      Attn: Shai Waisman, Esq
      767 Fifth Avenue
      New York, NY 10153
      (Attorneys for Lehman Brothers Estate)