WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
David J. Lender
Lori R. Fife
Alfredo R. Perez

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.*, | : | **08-13555 (JMP)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |

------------------------------------------------------------------x

## NOTICE OF MOTION TO
## CLASSIFY AND ALLOW THE CLAIM FILED BY THE FEDERAL
## HOME LOAN MORTGAGE CORPORATION (CLAIM NO. 33568) IN LBHI CLASS 3

**PLEASE TAKE NOTICE** that on September 13, 2013, Lehman Brothers

Holdings Inc. ("LBHI" or the "Plan Administrator"), as Plan Administrator under the Modified

Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated

Debtors, filed the annexed motion (the "Motion"), seeking to classify and allow proof of claim

number 33568 filed by the Federal Home Loan Mortgage Corporation in LBHI Class 3, and that

a hearing to consider the Motion will be held before the Honorable James M. Peck, United States

Bankruptcy Judge, in Courtroom 601 of the United States Bankruptcy Court for the Southern

District of New York, One Bowling Green, New York, New York 10004 (the "Bankruptcy

Court"), on **October 24, 2013 at 10:00 a.m. (Eastern Time)**, or as soon thereafter as counsel

may be heard (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections to the Motion, if any, shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, shall set forth the name of the objecting party, the basis for the objection and the specific grounds thereof, shall be filed with the Bankruptcy Court (a) electronically in accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's filing system, and (b) by all other parties in interest, on a CD-ROM or 3.5 inch disk, preferably in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers), and shall be served upon: (i) the chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004, Courtroom 601; (ii) attorneys for LBHI, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: David J. Lender, Esq., Lori R. Fife, Esq., and Alfredo R. Perez, Esq.); (iii) the Office of the United States Trustee for Region 2, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, New York 10014 (Attn: Tracy Hope Davis, Esq., Susan Golden, Esq., and Andrea B. Schwartz, Esq.); (iv) all parties who have requested notice in these chapter 11 cases; and (v) all parties with a particularized interest in the Motion, so as to be so filed and received by no later than **October 15, 2013 at 4:00 p.m. (Eastern Time)** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not filed and received by the Objection Deadline, the relief requested in the Motion shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

US_ACTIVE:\44323860\8\58399.0011

**PLEASE TAKE FURTHER NOTICE** that objecting parties are required to

attend the Hearing, and failure to appear may result in relief being granted or denied upon

default.

Dated: September 13, 2013
          New York, New York

/s/ Alfredo R. Perez
David J. Lender
Lori R. Fife
Alfredo R. Perez

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

3

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
David J. Lender
Lori R. Fife
Alfredo R. Perez

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
**In re**                                                          :     **Chapter 11 Case No.**
                                                                   :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*                       :     **08-13555 (JMP)**
                                                                   :
                                        **Debtors.**               :     **(Jointly Administered)**
-------------------------------------------------------------------x

## MOTION TO CLASSIFY AND ALLOW THE CLAIM FILED BY THE FEDERAL HOME LOAN MORTGAGE CORPORATION (CLAIM NO. 33568) IN LBHI CLASS 3

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI" or the "Plan Administrator"), as Plan

Administrator under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers

Holdings Inc. and Its Affiliated Debtors (the "Plan")[1] for the entities in the above-referenced

chapter 11 cases (the "Chapter 11 Estates"), respectfully represents as follows:

### PRELIMINARY STATEMENT

1.      The Federal Home Loan Mortgage Corporation ("Freddie Mac") filed a proof of

claim against LBHI asserting a claim in the approximate amount of $1.2 billion (the "Claim")

based upon LBHI's failure to repay two short-term unsecured loans made by Freddie Mac to

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

LBHI in August 2008.  LBHI does not dispute that Freddie Mac holds a general unsecured

prepetition claim against LBHI for unpaid principal and interest in an amount that approximates

$1.2 billion.

2.        Freddie Mac, however, asserts in its proof of claim that the Claim is entitled to a

"priority recovery" under LBHI's confirmed plan of reorganization.  Freddie Mac's assertion of

a priority treatment is unfounded.  Title 11 of the United States Code (the "Bankruptcy Code")

specifically identifies claims entitled to priority treatment.  The Claim does fall within any

priority claim classification under the Bankruptcy Code.

3.        Notwithstanding the plain language of the Bankruptcy Code, Freddie Mac has

refused to agree to LBHI's offer to allow the claim as a general unsecured prepetition claim in

the amount asserted.  Unless the Court grants the relief requested herein, LBHI will continue to

be required to maintain, on an interim basis, a reserve of over $1.2 billion in cash on account of

the Claim (the "Priority Reserve"), pursuant to the Plan and a stipulation with Freddie Mac.[2]

The Priority Reserve is prejudicial to the thousands of creditors holding allowed claims against

LBHI.  Indeed, these creditors are being deprived of their *pro rata* share of the hundreds of

millions of dollars that would be made available for distribution upon proper classification of

the Claim and the elimination of the excess from the Priority Reserve.

4.        The rationale behind Freddie Mac's assertion of a priority claim is at best unclear.

Freddie Mac appears to be arguing that under 12 U.S.C. § 4617(b)(15)(A)-(D), which was

enacted as part of the Housing and Economic Recovery Act of 2008 ("HERA"):

- subparagraph (A) authorizes the Federal Housing Finance Agency (the "FHFA"),
  as conservator for Freddie Mac (the "Conservator"), to commence an avoidance

---

[2] LBHI reserves its rights to object to the validity, amount, classification, and/or priority of the Claim on any basis
to the extent that the relief requested herein is not granted and to seek any other relief in respect of the Claim or the
Priority Reserve.

2

action to avoid transfers allegedly made *by* LBHI with the intent to hinder, delay, or defraud Freddie Mac;

- subparagraph (D) grants the Conservator a "superior" statutory right that allegedly entitles the Conservator to a "priority recovery" with respect to any amounts avoided by the Conservator; and

- thus, the Claim is entitled to priority treatment under LBHI's plan of reorganization.

(*See* Claim at ¶ 3).

5.      Although HERA may empower the FHFA with certain rights in respect of the recovery of actual fraudulent transfers, it does not provide Freddie Mac with a priority claim against LBHI under the Bankruptcy Code.  If Freddie Mac is successful in avoiding transfers made by LBHI to third parties prior to LBHI's bankruptcy filing, Freddie Mac would have a right of recovery under HERA from the third-party transferees – not from LBHI, the alleged transferor.  12 U.S.C. § 4617(b)(15)(B).  If Congress intended for this provision of HERA to alter the priorities established by the Bankruptcy Code for claims asserted against a debtor, it would have provided for that change under the Bankruptcy Code and/or indicated that intent in the HERA statute.  It did neither.

6.      In addition, Freddie Mac has not commenced an avoidance action or avoided any transfers as a result of such an action and, therefore, Freddie Mac has no "superior" rights to the recovery of any property under HERA, and certainly no "priority right" to the recovery of property from LBHI.  Indeed, in its proof of claim, Freddie Mac does not even identify a single transfer or obligation that would be capable of avoidance by the Conservator or qualify for a priority recovery from LBHI or allege a single fact that would support a contention that LBHI made such a transfer or incurred such an obligation with the actual intent to hinder, delay, or defraud Freddie Mac.  Instead, Freddie Mac merely "checked the box" alleging a priority.

3

7.       The Claim, which is based on two prepetition unsecured loans, is not a priority

claim and Freddie Mac has not – and cannot – allege any facts to support its contention that the

Claim should be classified as a priority claim.  Accordingly, the Plan Administrator requests

that the Court classify the Claim in LBHI Class 3 in accordance with the Plan and allow such

claim pursuant to sections 502, 1122(a), 1142(b), and 105 of the Bankruptcy Code and Rule

3013 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## JURISDICTION

8.       This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157

and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## BACKGROUND

A.      **Chapter 11 Case Background**

9.       Commencing on September 15, 2008 (the "Commencement Date") and

periodically thereafter, LBHI and certain of its subsidiaries commenced with this Court

voluntary cases (the "Chapter 11 Cases") under chapter 11 of the Bankruptcy Code.  The

Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly

administered pursuant to Bankruptcy Rule 1015(b).

10.      On January 19, 2009, the United States Trustee for Region 2 (the "U.S. Trustee")

appointed Anton R. Valukas as Examiner in the Chapter 11 Cases (the "Examiner") and by

order, dated January 20, 2009 [ECF No. 2583], the Court approved the U.S. Trustee's

appointment of the Examiner.  The Examiner has filed his report pursuant to section 1106(b) of

the Bankruptcy Code [ECF No. 7531] (the "Examiner's Report").  The Examiner's Report

includes a section titled, "*Examiner's Analysis of Lehman's Debt to Freddie Mac.*"  According

to the Examiner's Report, the Examiner included this section because the FHFA "requested the

4

Examiner's assistance in investigating [the $1.2 billion unsecured loan from Freddie Mac to LBHI]."  (Examiner's Report at 1951.)

11.      On December 6, 2011, the Court entered an order confirming the Plan [ECF No. 23023] (the "Confirmation Order").  The Plan became effective on March 6, 2012.  The Plan classifies Senior Unsecured Claims in LBHI Class 3 and defines the term "Senior Unsecured Claims" as claims against LBHI that are entitled to contractual rights of priority in payment over claims against LBHI that were filed in respect of certain subordinated securities.  (Plan at §§ 1.145, 3.1.)

**B.      The Prepetition Lending Relationship Between Freddie Mac and LBHI**

12.      As detailed in the FHFA's Office of Inspector General's "*Case Study: Freddie Mac's Unsecured Lending to Lehman Brothers Prior to Lehman Brothers' Bankruptcy*," dated March 14, 2013 (the "FHFA Report"), Freddie Mac had been making significant overnight and short-term loans to LBHI since February 2005.[3]  *See* FHFA Report at 8.  Beginning in January 2008, the loans were made for terms of up to one month, and they often rolled over as they became due.  *Id.*  For example, as stated in the FHFA Report, "the loans made in May 2008 were rolled over in June 2008; they were again rolled over in July, and then again in August. Each time the principal and interest on such loans were repaid by [LBHI], the funds were re-sold (lent) by Freddie Mac to [LBHI] for an additional term."  *Id.*  Since April 2008, Freddie Mac had been making these monthly loans in the aggregate principal amount of $1.2 billion, and each loan had an interest rate of 2.55%, the prevailing "Fed Funds" rate at the time.  *Id.* at 8-9.

---

[3] A copy of the FHFA Report is attached hereto as Exhibit A.

5

13.     The monthly loans that were outstanding on the Commencement Date were made on August 19th and 20th in the amounts of $450,000,000 and $750,000,000, respectively (together, the "Unsecured Loans").  As noted in the Examiner's Report, despite the magnitude of the Unsecured Loans, they "were not governed by a formal written agreement.  Rather, LBHI documented the transactions with 'screenshots' from its accounting system . . . . Freddie Mac also maintained minimal trading records for these transactions."  (Examiner's Report at 1954.)

14.     According to certain trade tickets for the Unsecured Loans, which were attached as exhibits to the Claim, the Unsecured Loans were due to be repaid on an "early return" basis at 9:30 a.m. on September 15, 2008.  (Claim at Exh. A).  Because LBHI commenced its Chapter 11 Case at approximately 2:00 a.m. on the morning of September 15, 2008, the Unsecured Loans were not repaid.

**C.   The Claim**

15.     On September 6, 2008, the FHFA was appointed as Conservator for Freddie Mac pursuant to HERA.  On September 22, 2009, Freddie Mac filed the Claim against LBHI in the aggregate liquidated amount of $1,202,241,875.00 based upon the Unsecured Loans.[4]  The amount of $1,202,241,875.00 represents the $1.2 billion principal amount of the Unsecured Loans plus $2,241,875.00 in accrued interest.[5]

16.     Despite the unsecured nature of the Unsecured Loans, in its proof of claim, Freddie Mac asserted the Claim as a priority claim.  In support of its claimed priority status, Freddie Mac reserved its rights under subparagraph 4617(b)(15)(A) of HERA, which grants the Conservator the right to avoid certain transfers or obligations if they were made or incurred by a

---

[4] A copy of the Claim is attached hereto as Exhibit B.

[5] LBHI retains the right to audit the interest calculation.

6

debtor of Freddie Mac with the actual "intent to hinder, delay, or defraud" Freddie Mac. (Claim at ¶ 3.) In addition, Freddie Mac reserved its rights under subparagraph 4617(b)(15)(D) of HERA and stated that under this subparagraph, "the Conservator's power to avoid a fraudulent transfer is 'superior to any rights of a trustee or any other party (other than any party which is a Federal Agency) under Title 11.'" (*Id.* (quoting 12 U.S.C. § 4617(b)(15)(D)).)

17.     The reservation of rights contained in the Claim suggests that Freddie Mac is potentially interested in avoiding certain unidentified transfers allegedly made by LBHI "with the intent to hinder or delay the 'early return' payment of the $1.2 billion due and owing to Freddie Mac on September 15, 2008." *Id.* However, the Claim does not contain one fact or other description – whether by sworn affidavit or otherwise – that would support the avoidance of any transfer made by LBHI.

18.     Moreover, HERA makes clear that a right of recovery that Freddie Mac may have, if any, would be against the transferee, not against LBHI, the alleged transferor. Therefore, even if Freddie Mac had alleged facts to support all of the required elements of a fraudulent transfer claim under HERA, it still would have no right to a priority recovery from LBHI under HERA.

**D.      The Stipulation Between LBHI and Freddie Mac**

19.     In connection with confirmation of the Plan, Freddie Mac and LBHI entered into a stipulation [ECF No. 22998] (the "Stipulation"). Among other things, the Stipulation provided that LBHI would establish cash reserves on account of the Claim in the amount of $1,202,241,875.00. To ensure that LBHI would only have to reserve $1,202,241,875.00 in cash on an interim basis, the Stipulation includes a broad reservation of rights section that expressly

7

permits LBHI to contest, among other things, the asserted priority of the Claim.  (Stipulation at ¶ 3.)

## THE COURT SHOULD CLASSIFY AND ALLOW THE CLAIM IN LBHI CLASS 3

**A.     The Claim Is Not Entitled to Priority Under the Bankruptcy Code**

20.     The Claim, which is based on LBHI's failure to repay the Unsecured Loans, is not a priority claim under the Bankruptcy Code.  The Supreme Court has held that claims are entitled to priority treatment only if the Bankruptcy Code expressly provides for such treatment. *See Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.*, 547 U.S. 651, 655 (2006) ("preferential treatment of a class of creditors is in order only when clearly authorized by Congress"); *Nathanson v. N.L.R.B.*, 344 U.S. 25, 29 (1952) ("[I]f one claimant is to be preferred over others, the purpose should be clear from the [Bankruptcy Act].").  Further, both the Supreme Court and the Second Circuit have directed courts to narrowly construe the priorities established by the Bankruptcy Code because doing so promotes the Bankruptcy Code's main aim: "to secure equal distribution among creditors."  *Howard Delivery*, 547 U.S. at 655; *accord Trs. of Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 100 (2d Cir. 1986) ("Because the presumption in bankruptcy cases is that the debtor's limited resources will be equally distributed among his creditors, statutory priorities are narrowly construed.").  Section 507 of the Bankruptcy Code lists the claims and expenses that are entitled to priority treatment.  11 U.S.C. § 507.  Claims based on the Conservator's avoidance powers are not listed in section 507, nor are they mentioned in any other section of the Bankruptcy Code.   Accordingly, the Claim is not entitled to priority treatment under the Bankruptcy Code.  *See Howard Delivery*, 547 U.S. at 655; *Amalgamated*, 789 F.2d at 100.

21.     This conclusion is supported by the Examiner's Report.  At the FHFA's request, the Examiner conducted an extensive investigation into both the origination of the Unsecured

8

Loans and LBHI's failure to repay the Unsecured Loans. (Examiner's Report at 1951.) Like the Plan Administrator, the Examiner concluded that he was "not aware of any basis to treat the Claim as anything other than an unsecured claim that is not contingent, not unliquidated, and not disputed – as indicated on the Debtor's Schedule F (Creditors Holding Unsecured Nonpriority Claims). (Examiner's Report at 1955-56.) Given that Freddie Mac lacks a basis for asserting that the Claim should be treated as something other than an unsecured claim based on two unsecured loans, it is not surprising that Freddie Mac fails to provide any explanation as to why its claim is entitled to priority and, instead, merely reserves its alleged right to a "priority recovery" under HERA. (*See* Claim at ¶¶ 2-3.)

**B.    Section 4617(b)(15) of HERA Does Not Elevate the Priority of the Claim**

22.    Section 4617(b)(15) of HERA provides, in pertinent part, as follows:

a.    subparagraph (A) grants the Conservator the authority to avoid certain fraudulent transfers made with the actual "intent to hinder, delay, or defraud" Freddie Mac, the Conservator, or the FHFA;

b.    to the extent a transfer is avoided by the Conservator pursuant to subparagraph (A), subparagraph (B) grants the Conservator the right to recover "the property transferred, or, if a court so orders, the value of such property," but only from "the initial transferee" or "any immediate or mediate transferee";

c.    subparagraph (C) states that the Conservator may not recover under subparagraph (B) from any good faith transferee that has taken the property transferred for value or from any immediate or mediate good faith transferee of such transfer; and

d.    subparagraph (D) states that "the rights under this paragraph of the conservator or receiver described under subparagraph (A) shall be superior to any rights of a trustee or any other party (other than any party which is a Federal agency) under Title 11."

12 U.S.C. § 4617(b)(15). Nothing in subparagraphs (A) – (D) elevates claims asserted by the Conservator to priority status in a chapter 11 case, and the Bankruptcy Code was not amended at the time of HERA's enactment to provide for such priority treatment of claims asserted by the Conservator.

9

23.     Freddie Mac has argued that HERA grants it a priority right to commence an avoidance action and recover any amounts avoided.  In its proof of claim, Freddie Mac suggests that certain unidentified transfers it might seek to avoid were allegedly made by LBHI with the intent to hinder or delay the repayment of the Unsecured Loans.  The Claim states that:

> the Conservator, on behalf of Freddie Mac, reserves all its rights [to pursue an avoidance action], including with respect to the transfer of any property in which [LBHI] had an interest *to the extent such transfer was made with the intent to hinder or delay the "early return" payment of the $1.2 billion due and owing to Freddie Mac on September 15, 2008.*

(*Id.* at ¶ 3 (emphasis added).)  This reservation of rights represents the only instance in the Claim in which Freddie Mac hints at the kinds of transactions the Conservator might eventually seek to avoid.  Regardless of Freddie Mac's reservation of rights, nothing in section 4617 of HERA purports to alter the priority scheme established by the Bankruptcy Code for claims asserted against a debtor in a chapter 11 case.

## C.    HERA Does Not Grant Freddie Mac a Right of Recovery Against LBHI Because LBHI Was Not a "Transferee"

24.     Even assuming, *arguendo*, that Freddie Mac is able to avoid a transfer made by LBHI on the basis that it was made with the intent to hinder or delay the repayment of the Unsecured Loans, Freddie Mac is not entitled to a right of recovery from LBHI under HERA's express terms.  *See* 12 U.S.C. § 4617(b)(15)(B).  Section 4617(b)(15)(B) of HERA provides as follows:

> (B) Right of recovery
>
> To the extent a transfer is avoided under subparagraph (A), the conservator or receiver may recover, for the benefit of [Freddie Mac], the property transferred, or, if a court so orders, the value of such property (at the time of such transfer) *from* –
>
> > (i)  *the initial transferee* of such transfer or the entity-affiliated party or person for whose benefit such transfer was made; or

10

(ii) *any immediate or mediate transferee of any such initial transferee*

*Id.* (emphasis added). This provision grants the Conservator a right of recovery only from a "transferee," not from an alleged transferor, such as LBHI. Accordingly, even if Freddie Mac successfully prosecutes an action to avoid a transfer made by LBHI, Freddie Mac will not have a right of recovery against LBHI. Therefore, contrary to Freddie Mac's suggestion, HERA does not grant Freddie Mac a priority claim against LBHI. *Id.*

25.     In addition, Freddie Mac has neither commenced an avoidance action nor avoided any transfers as a result of such an action. Therefore, Freddie Mac has no "superior" rights to the recovery of any property under HERA. *Id.* at § 4617(b)(15)(D). As stated, Freddie Mac has failed to identify any transfer that is potentially avoidable by the Conservator – *i.e.*, a transfer allegedly made with the intent to hinder, delay, or defraud Freddie Mac. Indeed, the Claim contains no documentation or other factual allegations to support Freddie Mac's alleged right to avoid a transfer made by LBHI. The Claim merely reserves the Conservator's right to commence an avoidance action at some point in the future against an unknown defendant and in respect of an unidentified transfer.

**D.    The Claim Should Be Allowed As a Senior Unsecured Claim In LBHI Class 3**

26.     For the reasons discussed above, the Claim is not a priority claim and should not be allowed as such under the Plan. Instead, the Claim should be allowed as an LBHI Class 3 Claim under the Plan. Under the Plan, "Senior Unsecured Claims" are classified in LBHI Class 3. The Plan defines the term "Senior Unsecured Claims" as "any Claim against LBHI that is entitled to a contractual right of priority in payment to all Subordinated Claims . . . other than a Senior Affiliate Claim, Senior Affiliate Guarantee Claim and a Senior Third-Party-Guarantee Claim." (Plan at §§ 1.145 and 3.1.) The term "Subordinated Claims" is defined by the Plan to

11

include claims based on various subordinated securities.  (*See, e.g.*, Plan at § 1.161, 1.24, 1.25, and 1.26.)

27.    The Plan Administrator has determined that Freddie Mac is entitled to a contractual right of priority in payment to Subordinated Claims and that the Claim is not a Senior Affiliate Claim, Senior Affiliate Guarantee Claim, or a Senior Third-Party-Guarantee Claim.  Accordingly, the Claim is a Senior Unsecured Claim, and should be allowed as such under the Plan.

28.    By classifying and allowing the Claim in LBHI Class 3, Freddie Mac will receive an initial payment in excess of $166 million, and the remainder of the Priority Reserve will be made available for distribution to LBHI's other creditors.  In contrast, absent the relief requested herein, the Plan Administrator will be forced to continue to maintain the Priority Reserve for a claim that is properly classified in LBHI Class 3.

29.    The continued maintenance of the Priority Reserve is clearly prejudicial to LBHI's other creditors.  This is especially true given that (i) Freddie Mac has failed to substantiate its right to a priority recovery in any way, (ii) over five years have passed since the Commencement Date, and yet, Freddie Mac has still failed to commence an avoidance action, which is a necessary prerequisite to Freddie Mac's alleged right to a "priority recovery" under HERA, and (iii) even if Freddie Mac were to commence an avoidance action, HERA would not grant Freddie Mac a right of recovery from LBHI with respect to the transfers that Freddie Mac would apparently seek to avoid – *i.e.*, transfers allegedly made by LBHI to third parties with the actual intent to hinder, delay, or defraud Freddie Mac.

30.    Accordingly, to avoid prejudice to LBHI's other creditors, and in accordance with the terms of the Plan, the Court should classify the Claim in LBHI Class 3.

12

## RESERVATION OF RIGHTS

31.     In addition to reserving the right to audit the interest calculation, the Plan

Administrator reserves its rights to object to the validity, amount, classification, and/or priority

of the Claim on any basis to the extent that the relief requested herein is not granted.  Further,

the Plan Administrator reserves its rights to request that the Court estimate the Claim for all

purposes, including for purposes of allowance, distributions, or establishing reserves.  The Plan

Administrator also reserves its rights to supplement this motion and to file additional pleadings,

or seek any other relief, in respect of the Claim in this or any other court.  The Plan

Administrator reserves all its rights under Article 8 of the Plan, including its right to assert that,

to the extent that Freddie Mac recovers any amounts as a result of the Conservator's exercise of

its avoidance powers, such recovery must reduce, in whole or in part, the allowed (or allowable)

amount of the Claim or any distributions made thereon.

## NOTICE

32.     No Trustee has been appointed in these Chapter 11 Cases.  The Plan

Administrator has served notice of this objection and motion on (i) the U.S. Trustee; (ii) the

Securities and Exchange Commission; (iii) the United States Attorney for the Southern District

of New York; (iv) FHFA and Freddie Mac; and (v) all other parties entitled to notice in

accordance with the procedures set forth in the second amended order entered on June 17, 2010

governing case management and administrative procedures for these Chapter11 Cases [ECF No.

9635].  The Plan Administrator submits that no other or further notice need be provided.

33.     No previous request for the relief sought herein has been made by the Plan

Administrator or LBHI to this or any other court.

13

WHEREFORE the Plan Administrator respectfully requests entry of an order granting the relief requested herein and such other and further relief as is just.

Dated: September 13, 2013
New York, New York

/s/ Alfredo R. Perez
David J. Lender
Lori R. Fife
Alfredo R. Perez

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

14

# EXHIBIT A

# FEDERAL HOUSING FINANCE AGENCY
# OFFICE OF INSPECTOR GENERAL

## Case Study:
## Freddie Mac's Unsecured Lending to Lehman Brothers Prior to Lehman Brothers' Bankruptcy



**EVALUATION REPORT:  EVL-2013-03**

**DATED:  March 14, 2013**



# FEDERAL HOUSING FINANCE AGENCY
# OFFICE OF INSPECTOR GENERAL

# AT A GLANCE

## Case Study: Freddie Mac's Unsecured Lending to Lehman Brothers Prior to Lehman Brothers' Bankruptcy

## Why FHFA-OIG Did This Evaluation

On September 6, 2008, the Federal Home Loan Mortgage Corporation (Freddie Mac or Enterprise) entered into a conservatorship overseen by its regulator, the Federal Housing Finance Agency (FHFA). That was done after it was determined that Freddie Mac and the Federal National Mortgage Association (Fannie Mae) (collectively, the Enterprises) faced billions of dollars in losses as a result of the collapse of the housing market.

In August 2008, just weeks prior to conservatorship, Freddie Mac provided to Lehman Brothers Holdings Inc. (Lehman) two short-term unsecured loans totaling $1.2 billion. The loans were the last of a series of loans Freddie Mac had been making to Lehman since January 2008.

The August loans were due and payable on September 15, 2008. On that day, however, Lehman filed for bankruptcy and defaulted on its repayment obligation. This resulted in Freddie Mac recording a loss of the entire $1.2 billion.

This report examines the circumstances surrounding Lehman's unsecured loans and the steps Freddie Mac and FHFA have taken—including efforts to recover the loans through the bankruptcy process—in response to Lehman's default. It seeks to identify the lessons learned from these events in an effort to prevent similar problems in the future.

## What FHFA-OIG Found

FHFA-OIG found that in the months following Lehman's default, Freddie Mac determined that a failure of corporate culture at Freddie Mac allowed management to override its counterparty risk management policies, which would have altered the terms of the loans and, in turn, reduced the Enterprise's risk.

Since the default, FHFA and Freddie Mac have taken steps to improve the Enterprise's corporate governance environment and to correct its risk management failures. In addition,

FHFA, acting as Freddie Mac's conservator, is actively engaged in recovering the $1.2 billion loss from Lehman, based on FHFA's determination that Lehman's improper conduct was the direct cause of the loss. (This report does not analyze Lehman's risk management and control systems; nor does it make findings regarding Lehman's conduct or legal liability.)

Clearly, FHFA and Freddie Mac must follow through on their remedial initiatives. In particular, FHFA should continue to: (1) monitor Freddie Mac's implementation of its counterparty risk management policies and procedures, including (a) ensuring that the independence and decisions of the Enterprise's risk management staff are not overridden by business management staff, and (b) directing Freddie Mac Internal Audit to audit the Counterparty Credit Risk Management function annually; (2) pursue all possible avenues to recover the $1.2 billion in the Lehman bankruptcy proceeding; and (3) develop an examination program and procedures encompassing Enterprise-wide risk exposure to all of Freddie Mac's counterparties.

## What FHFA-OIG Concludes

This case study provides several important lessons that must be followed in order to avoid recurrence of Freddie Mac's serious missteps preceding Lehman's bankruptcy: corporate culture cannot be allowed to override or negate protections afforded by formal controls; key voices, such as risk management officials, must not be marginalized in favor of opportunistic business decisions; and policies and procedures should be adhered to and enforced. Corporate culture is a critical element in effective governance and risk management. Therefore, it needs to be the target of vigilance and oversight, specifically with respect to risk management. Corporate leaders must set the tone at the top.

Further, regulatory oversight, including robust examination and audit programs, is essential to reinforce even the most fundamental and widely embraced controls.

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................... 3

ABBREVIATIONS ................................................................................................................. 4

PREFACE ................................................................................................................................. 5

BACKGROUND ..................................................................................................................... 6

Freddie Mac Loans to Lehman ............................................................................. 8

Counterparty Credit Risk Management at Freddie Mac ...................................... 9

OFHEO's Oversight of Freddie Mac's Counterparty Risk ................................. 14

FHFA's Oversight and Examination of Freddie Mac's Counterparty Risk ......... 14

Freddie Mac's Amendments to Key Investment and Risk Management Policies ................ 15

FHFA's Efforts to Recover the $1.2 Billion in the Lehman Bankruptcy Proceeding ........... 15

Investigations by FHFA and Freddie Mac ........................................................ 15

2008 Freddie Mac Special Investigation ...................................................... 16

FHFA Key Management Assessment ........................................................... 17

Freddie Mac Risk Oversight Inquiry ........................................................... 17

FINDINGS ............................................................................................................................. 19

RECOMMENDATIONS ...................................................................................................... 21

CONCLUSION ...................................................................................................................... 22

OBJECTIVE, SCOPE, AND METHODOLOGY ............................................................... 23

APPENDIX A:  FHFA'S COMMENTS ON FINDINGS AND
RECOMMENDATIONS ...................................................................................................... 25

ADDITIONAL INFORMATION AND COPIES ................................................................ 26

# ABBREVIATIONS

CCRM ................................................................... Counterparty Credit Risk Management

Enterprises....................................................................... Fannie Mae and Freddie Mac

Fannie Mae...................................................... Federal National Mortgage Association

FHFA or Agency.......................................................Federal Housing Finance Agency

FHFA-OIG .....................................Federal Housing Finance Agency Office of Inspector General

Freddie Mac ..............................................................Federal Home Loan Mortgage Corporation

HERA.....................................................................Housing and Economic Recovery Act of 2008

Lehman ..........................................................................Lehman Brothers Holdings Inc.

OFHEO ..............................................................Office of Federal Housing Enterprise Oversight

OG...................................................................................Office of Governance

PSPAs ...................................................................Senior Preferred Stock Purchase Agreements

SVP .................................................................................Senior Vice President

Treasury ....................................................................U.S. Department of the Treasury

**Federal Housing Finance Agency**
**Office of Inspector General**
Washington, DC

# PREFACE

FHFA-OIG was established by the Housing and Economic Recovery Act of 2008 (HERA),[1] which amended the Inspector General Act of 1978.[2] FHFA-OIG is authorized to conduct audits, investigations, and other studies of the programs and operations of FHFA; to recommend policies that promote economy and efficiency in the administration of such programs and operations; and to prevent and detect fraud and abuse in them.

This report is intended to promote the economy and efficiency of FHFA's programs. It examines the steps taken by Freddie Mac and FHFA to remediate corporate governance issues that may have contributed to losses on unsecured loans made by Freddie Mac to Lehman in the period leading up to Lehman's bankruptcy. It seeks to identify the lessons learned from these events in an effort to prevent similar problems in the future.

As of the publication of this report, FHFA is actively engaged in recovering the loss from Lehman, based on FHFA's determination that Lehman's improper conduct was the direct cause of the loss. This report does not analyze Lehman's risk management and control systems; nor does it make any findings regarding legal liability of the firm or any of its employees.

This report was prepared by an FHFA-OIG interdisciplinary team consisting of: David P. Bloch, Director, Division of Mortgage, Investments, and Risk Analysis; Christopher G. Poor, Investigative Counsel; David Z. Seide, Director of Special Projects; and Robert C. Hinkley, Attorney Advisor. FHFA-OIG appreciates the assistance of FHFA and Enterprise staff in completing this report. It has been distributed to Congress, the Office of Management and Budget, and others and will be posted on FHFA-OIG's website, www.fhfaoig.gov.

*George Grob*

George Grob
Deputy Inspector General for Evaluations

---

[1] Pub. Law No. 110-289.

[2] Pub. Law No. 95-452.

# BACKGROUND

The enactment of HERA on July 30, 2008, established FHFA as supervisor and regulator of Fannie Mae and Freddie Mac.  Prior to the enactment of HERA, the Enterprises were regulated by the Office of Federal Housing Enterprise Oversight (OFHEO).

By August 2008, the housing crisis had taken a significant toll on the American economy and financial institutions, which were absorbing billions of dollars in losses on defaulted loans with insufficient collateral.  The Federal Reserve had already bailed out the investment bank Bear Stearns in March and government regulators were concerned with the health of the entire domestic financial system.

On September 6, 2008, Fannie Mae and Freddie Mac entered into **conservatorships** supervised by FHFA out of concern that the deteriorating financial conditions  of the Enterprises threatened the stability of the financial markets.  At the same time, the U.S. Department of the Treasury (Treasury) began to provide financial support to the Enterprises to prevent their insolvency.  Nine days later, Lehman filed for bankruptcy protection.

> **Conservatorship**
> A conservatorship is the legal process in which a person or entity is appointed to establish control and oversight of a company to put it in a sound and solvent condition.  In a conservatorship, the powers of the company's directors, officers, and shareholders are transferred to the designated conservator.

Under the conservatorships, FHFA may "take such action as may be necessary to put the regulated entity in a sound and solvent condition" or carry out the business to preserve and conserve the assets of the regulated entity.  To date, Treasury has invested $71.3 billion to maintain Freddie Mac's solvency.

Leading up to the financial crisis in 2008, Freddie Mac and the investment bank Lehman were two of the largest participants in the financing of the U.S. housing market.  Freddie Mac is a government-sponsored enterprise whose mission is to keep money flowing to mortgage lenders in support of homeownership.[3]  To carry out its function, Freddie Mac purchases mortgages from banks and securitizes them, issuing residential mortgage-backed securities.  For a fee, the Enterprise guarantees these securities, which are sold to investors around the world.

Prior to its bankruptcy filing in September 2008, Lehman was the fourth largest investment bank in the United States with $639 billion in assets.  Lehman traded and underwrote stocks and bonds, traded commodities, was active in the credit derivatives market, and became a major player in both commercial and residential securitization markets.

---

[3] *See* 12 U.S.C. § 1451.

In 2007, Lehman underwrote more mortgage-backed securities than any other firm. Its $85 billion mortgage-backed portfolio was equal to approximately four times its shareholders' equity. Thus, Lehman's high degree of leverage—the ratio of total debt to equity—made it vulnerable to the increasing losses it was incurring in its residential housing and commercial property investments. On June 9, 2008, Lehman announced a $2.8 billion loss for its second fiscal quarter ending May 31, 2008. On September 10, 2008, Lehman posted a third-quarter loss of $3.9 billion, after a $5.6 billion write-down on toxic mortgages in its investment portfolio.

The effect of Lehman's increasing losses, its exposure to the mortgage markets, and its deteriorating financial condition were reflected in the decreasing price of shares of its common stock, as shown in Figure 1.

**Figure 1: Lehman Brothers Closing Stock Price Jan. 2008 – Sept. 2008[4]**



By Thursday, September 11, 2008, Lehman had only $1 billion in cash on hand and was actively seeking assistance from the federal government to avoid bankruptcy. Over the weekend of September 13-14, talks were held among the Federal Reserve, Treasury, and a consortium of banks in an effort to rescue Lehman. But, the talks produced no rescue, and on September 15, 2008, Lehman filed for bankruptcy protection, the largest bankruptcy case in United States history. On the day Lehman filed, it owed Freddie Mac $1.2 billion—the result of short-term unsecured loans made less than a month earlier.

---

[4] Source: Bloomberg.

## Freddie Mac Loans to Lehman

Prior to the bankruptcy, Freddie Mac and Lehman had extensive business relations. Lehman sold mortgages to Freddie Mac and also served as one of Freddie Mac's investment bankers. Lehman underwrote common and preferred stock offerings for Freddie Mac as well as various debt securities offerings.

Additionally, through the first half of 2008, Freddie Mac made significant short-term unsecured loans to Lehman. Freddie Mac had been making what it described as "Fed Funds" available to Lehman on an overnight basis with a limit of $200 million since February 2005.

According to the Federal Reserve Bank of New York, "Fed Funds," or Federal Funds, are unsecured loans of reserve balances at Federal Reserve Banks that depository institutions make to one another. Participants in the Fed Funds market include commercial banks, thrift institutions, agencies, branches of foreign banks in the United States, and government securities dealers. The most common term for a Fed Funds transaction is overnight. A "true" Fed Funds transaction is between member banks of the Federal Reserve System, although the term is also used more loosely to describe any short-term, unsecured loans between financial institutions. Neither Lehman nor Freddie Mac is a member of the Federal Reserve System, and typically the maturity terms of their 2008 transactions were not overnight.[5] Nonetheless, Freddie Mac has historically been a significant supplier of funds to the Fed Funds market with member banks acting as intermediaries.

The term and the size of Freddie Mac Fed Funds loans to Lehman changed in 2008. Rather than periodically making overnight loans to Lehman as had previously been the case, the 2008 loans were made for longer terms (up to one month) and they often rolled over as they became due. Thus, the loans made in May 2008 were rolled over in June 2008; they were again rolled over in July, and then again in August. Each time the principal and interest on such loans were repaid by Lehman, the funds were re-sold (lent) by Freddie Mac to Lehman for an additional term.

The principal amount of the loans to Lehman also grew in 2008. From an initial aggregate principal amount of $800 million in January 2008, the amount increased to $1 billion in February and to $1.2 billion in April. Figure 2 shows the amount and terms of the loans made by Freddie Mac to Lehman for the period January to September 2008 (indicated by the bars on the right side of the graph), as Lehman's stock price deteriorated (indicated in the downward trending line beginning in July 2007).

---

[5] Regardless of any technical definition, this report adopts Freddie Mac's use of the phrase "Fed Funds."

**Figure 2:  Lehman Stock Percentage Change and Freddie Mac's Lehman Fed Funds
Exposure, July 1, 2007 – Sept. 15, 2008[6]**



The last of these transactions involved two loans totaling $1.2 billion.  The first loan was
provided on August 19, 2008, for $450 million.  The second loan was executed on August 20,
2008, for $750 million.[7]  Both loans were scheduled to mature on September 15, 2008, at
9:30 a.m.

## Counterparty Credit Risk Management at Freddie Mac

The Freddie Mac staff responsible for facilitating the Fed Funds loans to Lehman worked on the
Liquidity and Contingency Desk, within Freddie Mac's Investments and Capital Markets
Division.[8]  These personnel are responsible for making Freddie Mac's short-term liquid
investments.  Because Freddie Mac's business generates large amounts of cash from principal
and interest collections, this office often has billions of dollars to invest each day.  Such
investments take into consideration Freddie Mac's short-term cash disbursement needs (to ensure
it always has funds available to pay its bills) as well as the safety and soundness of the

---

[6] Sources:  Yahoo Finance and Algo Research Group.

[7] The interest rate on the loans was 2.55%, the prevailing Fed Funds rate at the time.

[8] Freddie Mac's Investment and Capital Markets Division is responsible for managing Freddie Mac's retained
portfolio of mortgages and securities, hedging against interest rate and other risks, and investing Freddie Mac's
available cash.  This group is led by a senior vice president and includes traders and investment managers.

counterparty in which the funds are invested.  The rate the counterparty is willing to pay is also a consideration.[9]

Responsibility for monitoring the safety and soundness of Freddie Mac's Fed Funds investments rests with the Counterparty Credit Risk Management (CCRM) staff of Freddie Mac's Risk Oversight Division.[10]  The CCRM is headed by the Vice President, Counterparty Credit Risk Management, who reports to the Senior Vice President (SVP), Credit Risk Oversight, who, in turn, reports to the SVP and Enterprise Chief Risk Officer.

Figure 3 illustrates the responsibilities and relationships of the key offices involved in these investment decisions at Freddie Mac.

**Figure 3: Freddie Mac Investment and Credit Risk Management Offices**



_____

[9] The Federal Reserve sets a target level for its Fed Funds rate, and the Federal Reserve's announcements of changes in monetary policy specify the changes in the Federal Reserve's target for that rate.  According to the Federal Reserve Bank of New York, the actual Fed Funds rate is determined by market participants and is not actually "set" by the Federal Reserve.

[10] The Risk Oversight Division had responsibility for "setting counterparty specific counterparty exposure limits and certain terms of business" pursuant to Freddie Mac's Policy 11-104, *Credit Risk Oversight Corporate Policy*.

Like other companies, Freddie Mac typically invests its cash in a manner intended to ensure that such funds will be returned to it in time to pay its obligations as they become due. This requires Freddie Mac to choose counterparties that it deems reliable and capable of meeting their obligations to pay principal and interest when they are due.

Assessing reliability and capability is not only a function of the counterparty's financial condition and credit history—it is also a function of time. That is, the longer the term for which money is lent, the greater the risk (due to the possibility of intervening events) of default.

Freddie Mac relies on its Risk Oversight Division and the CCRM staff to clear suitable counterparties eligible for investments. CCRM has three primary means of managing counterparty risk: (1) determining counterparty eligibility; (2) limiting the duration of investments; and (3) limiting the size of investments. Once CCRM pre-clears a counterparty and establishes the maximum duration and size of loans that may be made to the counterparty, the Liquidity and Contingency Desk is authorized to lend to the counterparty up to the maximum amount and duration. That authorization remains in place until the Liquidity and Contingency Desk is advised otherwise by the Risk Oversight Division.

During 2008, CCRM's oversight of risk with regard to the Lehman loans focused primarily on the term of such loans; namely, whether such loans should be limited to overnight (24 hours) or longer (up to 30 days) terms. In principle, lenders of overnight loans can eliminate their credit exposure every 24 hours because once the loan ends it need not be renewed. On the other hand, the 30-day loans made by Freddie Mac to Lehman could not be called prior to their stated maturity and therefore resulted in longer credit risk exposure to the Enterprise. Indeed, in 2008, some CCRM staff questioned whether Freddie Mac should be making unsecured loans to Lehman at all based on the perceived heightened risk. However, those concerns, which would have reduced the extent of the Enterprise's exposure, were overruled at senior levels within Freddie Mac.

Lehman's financial condition in 2008 was of concern to CCRM staff. In the wake of Bear Stearns' collapse and rescue in mid-March 2008, CCRM staff indicated that they preferred that the duration of the unsecured Fed Funds loans to Lehman be shortened. They made these assertions on three separate occasions. The first such occasion was March 17, 2008, the day after Bear Stearns' rescue was publicly disclosed. On that day, CCRM staff advised personnel on the Liquidity and Contingency Desk that CCRM was limiting the duration of unsecured loans being made to Lehman from 30 days to 24 hours, once the outstanding loans matured.

Under Freddie Mac's policies and procedures, the Risk Oversight Division was responsible for limiting the amount and duration of the Lehman loans. However, it appears that business managers influenced CCRM staff because the staff reversed its position two days later. In an email from the Director of Credit Quality dated March 19, 2008, CCRM advised that, following

a meeting between Freddie Mac's Chief Business Officer and the SVP of Credit Risk Oversight,[11] the maximum 30-day terms for loans to Lehman were to be reinstated.[12]

Three months later, on June 12, 2008, CCRM staff again recommended reducing Freddie Mac's risk exposure to Lehman.  (During the preceding three weeks, the closing price of Lehman's stock had fallen by approximately 30%.)  This time, CCRM staff recommended—and requested approval from the SVP, Credit Risk Oversight, to implement—a reduction of the maximum duration from 30 days.  The SVP responded that he wanted to discuss the matter further with his business counterpart in Freddie Mac's Investment and Capital Markets Division.  Five days later, on June 17, 2008, CCRM staff followed up on its pending request, by recommending that 30-day loans be reduced to 2-week terms.[13]  That recommendation was temporarily accepted, as reflected by the fact that when the Lehman loans were rolled over later in June the duration of the loans was reduced by two weeks.

The third time CCRM staff raised concerns regarding the short-term unsecured loans to Lehman occurred in mid-July 2008.  In the absence of positive news about Lehman's financial condition, on July 11, 2008, CCRM staff downgraded the internal Freddie Mac risk rating assigned to the Lehman debt.  In a July 15, 2008, email to the SVP, Credit Risk Oversight, CCRM staff stated that they believed "a shorter term of one week (instead of 14 days) would be prudent, but it appears upper management is willing to accept this risk."  An internal Freddie Mac email dated July 30, 2008, stated that the recommendation to shorten the duration further had not been approved because "of disagreements at very high levels over terms of the Fed Funds line."

On August 19 and 20, 2008, Freddie Mac entered into two loans with Lehman for an aggregate principal amount of $1.2 billion.  The loans were set to become due on September 15, 2008, at or near the beginning of the business day.

Freddie Mac entered into conservatorship on September 6, 2008.  Three days later, on September 9, Freddie Mac's Risk Oversight Division (which included CCRM) decided to eliminate all unsecured lending to Lehman.  On that day, Freddie Mac decided that the two unsecured loans to Lehman would not be renewed when they became due at the start of the business day on September 15, 2008.  However, Lehman filed a petition under Chapter 11 of the Federal Bankruptcy Code seeking bankruptcy protection on September 15, 2008, before the business day

---

[11] The Director of Credit Quality is a member of the CCRM staff; the SVP of Credit Risk Oversight is the executive overseeing CCRM.

[12] According to interviews conducted in September 2008 by staff under the direction of Freddie Mac's Chief Auditor and Vice President of Audit, various Freddie Mac staffers recalled that when Lehman heard of CCRM's decision to limit the term, a senior person at Lehman contacted senior management at Freddie Mac and challenged the decision.

[13] On the previous day, June 16, 2008, Lehman announced second quarter losses of $3 billion.

began. That filing allowed Lehman to halt payments to all creditors, including Freddie Mac. To date, Lehman has not repaid the $1.2 billion debt owed to Freddie Mac. Figure 4 shows a timeline of the transactions between Freddie Mac and Lehman.

**Figure 4:  Freddie Mac and Lehman Brothers: Countdown to Default**



It is possible that Freddie Mac could have avoided the $1.2 billion loss to Lehman if it had more effectively managed its counterparty risk. For instance, had the duration of the loans been shortened to overnight, as recommended by CCRM staff in mid-March of 2008, Freddie Mac could have halted further loans to Lehman on September 10 or shortly thereafter—potentially ahead of Lehman's September 15 bankruptcy filing. But the record shows that CCRM's risk management recommendations were influenced by Freddie Mac senior business managers.

## OFHEO's Oversight of Freddie Mac's Counterparty Risk

As noted earlier, prior to July 30, 2008, Freddie Mac was regulated by OFHEO. Prior to the Lehman bankruptcy in September 2008, no examination work had been performed by OFHEO related to capital markets counterparties. A senior FHFA official acknowledged to FHFA-OIG staff that there was "a hole in the program," referring to OFHEO's historic lack of counterparty examinations in the capital markets area. The same senior FHFA official is now committed to developing a robust examination program regarding counterparty risk.

## FHFA's Oversight and Examination of Freddie Mac's Counterparty Risk

Following the Lehman default, FHFA examiners conducted a series of targeted examinations related to counterparty credit risk management and management of Freddie Mac's liquidity and contingency portfolio. FHFA's Division of Enterprise Regulation made a number of findings regarding Freddie Mac's operations and recommended that certain actions be taken to better manage counterparty risk. Most importantly, FHFA's work led to a clarification and correction of Freddie Mac's policies to reflect the fact that Fed Funds investments do not carry with them any implied government guarantee.

At the time of the Freddie Mac-Lehman transactions, OFHEO's Division of Enterprise Regulation's supervision manual did not adequately address examination procedures pertaining to the Enterprises' liquidity and funding. Today, FHFA has developed an examination module on liquidity that has undergone field-testing and is scheduled for finalization shortly. Additionally, the Division of Enterprise Regulation has extensively revised its Examination Manual. Although still in draft form, the Credit Risk Management section lays out supervisory policies that address, among other things, establishing and measuring counterparty risk limits, the responsibilities of the board of directors and enterprise risk management, the need for on-going monitoring, and the development of an internal reporting system that rates risk exposure to counterparties based on various critical criteria.

FHFA's Examiner-in-Charge at Freddie Mac has indicated that the monitoring of counterparty risk is a priority for the Agency and that "significant resources" will be dedicated toward the examination of such risk in the 2013 Examination Plan. Additionally, during the second half of 2012, FHFA conducted several targeted examinations relating to various aspects of counterparty risk. An FHFA Freddie Mac core team examiner who was interviewed by FHFA-OIG staff added that FHFA now requires the Enterprises to report on counterparty risk (quantitatively and qualitatively) on a monthly basis. The data are reported and discussed during a subcommittee meeting held monthly at Freddie Mac.

## Freddie Mac's Amendments to Key Investment and Risk Management Policies

Following FHFA's counterparty credit risk management targeted examinations, Freddie Mac re-examined and amended two of its key business policies.  First, the Liquidity and Contingency Policy was amended to reflect that its activities are consistent with FHFA and Treasury guidance.  Most importantly, the amended policy currently suspends unsecured term lending.  Second, the Capital Markets Counterparty Credit Risk Management Policy was revised to, among other things, more clearly define the roles and responsibilities of Freddie Mac staff involved in managing the Enterprise's counterparty credit risk program and sets out a precise definition of Fed Funds including, significantly, that Fed Funds lending in fact constitutes an unsecured investment.

## FHFA's Efforts to Recover the $1.2 Billion in the Lehman Bankruptcy Proceeding

After the Lehman bankruptcy proceeding began, Freddie Mac filed a claim as a Lehman creditor.[14]  Specifically, on September 22, 2009, Freddie Mac filed a **proof of claim**, which included a priority claim for the $1.2 billion owed on the two loans (the Loans Claim) that were not repaid by Lehman.  Freddie Mac is an unsecured creditor and can otherwise expect to be repaid only after secured creditors and creditors with higher priority claims are repaid, but it will be repaid before creditors with lower priority claims are repaid.

> **Proof of Claim**
> A proof of claim is a creditor's written statement filed in a bankruptcy case for purposes of showing the basis and amount of the creditor's claim against the debtor.  By filing a proof of claim against Lehman, Freddie Mac made other creditors and Lehman aware of its claim and its intention to share in any distribution of Lehman's assets from the bankruptcy estate.

On March 6, 2012, Lehman emerged from bankruptcy.  The Lehman bankruptcy reorganization plan recognizes $1.2 billion to be available for payment in full (exclusive of interest) of Freddie Mac's Loans Claim, if it is ultimately allowed.

## Investigations by FHFA and Freddie Mac

Soon after Lehman failed to repay the loans totaling $1.2 billion, Freddie Mac and FHFA each conducted investigations into the circumstances surrounding the default.  Their goal was to

---

[14] Freddie Mac's total claims in the Lehman bankruptcy proceedings were $2.23 billion.  In addition to the $1.2 billion claim for the two August loans were two claims totaling $1.03 billion under existing derivatives contracts between Freddie Mac and Lehman.

understand the events and identify credit risk management issues that led to the default. Based on the investigations, recommendations have been made and management actions have been taken in an effort to reduce the possibility of losses arising from similar circumstances in the future.

Between September 2008 and December 2009, Freddie Mac and FHFA conducted three investigations: (1) a special investigation conducted by Freddie Mac's General Auditor soon after the default occurred (the Special Investigation); (2) an FHFA assessment of the management of Freddie Mac (the FHFA Key Management Assessment); and (3) an inquiry by Freddie Mac's Operational Risk Oversight staff into the Lehman default (the Risk Oversight Inquiry).[15]

All three examinations came to similar conclusions regarding what caused the $1.2 billion default. Specifically, the examinations concluded that although Freddie Mac had taken steps to manage counterparty risk, the risk management policies and procedures in place had been overridden by senior management. As a result of those overrides, risk management staff within CCRM believed that they had been impeded from taking steps that may have eliminated or at least reduced Freddie Mac's counterparty exposure to Lehman.

### 2008 Freddie Mac Special Investigation

The Freddie Mac Special Investigation was led by Freddie Mac's Chief Auditor and Vice President of Audit at the direction of the Enterprise's then-newly installed CEO, David Moffett.[16]

The Special Investigation reached a number of conclusions, including that *de facto* approval was required from senior business management before risk managers could change the amount or duration of Lehman loans. According to Freddie Mac internal corporate policy, the Risk Oversight Division alone had responsibility for setting counterparty-specific exposure limits and certain terms of business.[17] However, the investigation found that, in practice, significant decisions related to changing existing counterparty credit limits and terms required the "approval" of senior business managers before such changes could be implemented. The investigative report acknowledged that credit decisions could not be made in a vacuum and without input from other senior management (including senior managers in Investments and Capital Markets), but the report emphasized that Freddie Mac's policy was predicated on the independence, good judgment, and fortitude of the SVP, Credit Risk Oversight, and others in the

---

[15] To date, the conclusions of these investigations have not been made public.

[16] CEOs of both Enterprises were replaced by FHFA at the inception of the conservatorships.

[17] Freddie Mac Policy 11-104, *Credit Risk Oversight Corporate Policy*.

Risk Oversight Division.  The report found those qualities absent with respect to the loans made in 2008 to Lehman.

### FHFA Key Management Assessment

On September 26, 2008, FHFA's Office of Governance (OG) produced a Freddie Mac Key Management Assessment to gauge the effectiveness of Freddie Mac's management and discern what management failures contributed to Freddie Mac entering into conservatorship.[18]  Although this assessment was not directly related to the handling of the Lehman loans, it uncovered significant problems with Freddie Mac's leadership that may have had an impact.

Notably, Freddie Mac senior business executives fostered a corporate culture in which the most senior person in the Risk Oversight Division, the Chief Enterprise Risk Officer, was excluded and his team's advice was disregarded.  In particular, OG found that multiple senior business executives had disregarded direct advice concerning the risks inherent with the Lehman short-term unsecured loans.  Moreover, OG discovered evidence of deliberate efforts by executives to exclude credit risk management officers from participating in key investment decisions and to restrict credit risk management personnel from interacting with Freddie Mac's previous CEO.  Many Freddie Mac business personnel who were criticized in the Key Management Assessment left the Enterprise after the report's issuance.

### Freddie Mac Risk Oversight Inquiry

Freddie Mac further examined the Lehman loss in a second investigation conducted in late 2008.  Freddie Mac found:  (1) a failure of corporate culture—including the tone from the top of the management structure—resulted in counterparty credit decisions made by risk management personnel being inappropriately overridden by business personnel; (2) a lack of sufficient independence between Credit Risk Oversight and Investments and Capital Markets; and (3) a lack of transparency regarding risk, which resulted in inadequate review of risks, inadequate understanding of risks, and inadequate involvement by higher-level decision makers concerning those risks.

With regard to the failure of corporate culture, the report found that executive management's views on lending to Lehman were neither documented nor clearly communicated.  Furthermore, Risk Oversight Division personnel improperly perceived communications through others as factual executive direction when executive management provided no such direction.  Risk management was also ineffective because of the perception of staff in Credit Risk Oversight that senior management would override their decisions.  Finally, the inquiry cited the absence of

---

[18] A key management assessment of each Enterprise is required under HERA.

documentation of escalation to senior credit and business managers of the differing opinions concerning the Enterprise's exposure to Lehman.

Finally, the report found that Freddie Mac had taken a number of steps to prevent losses of a similar nature from recurring.  These steps included:  (1) the CEO reinforcing (in the fourth quarter of 2008) the authority of the Chief Credit Officer to determine specific exposure limits for counterparties; (2) establishing a Senior Executive Credit Committee; and (3) assigning to that committee the responsibility for making explicit credit decisions based on CCRM staff's independent review.

# FINDINGS

1. ***Corporate Governance/Culture*. Former senior business managers at Freddie Mac decided to disregard recommendations made by the Enterprise's risk management staff to reduce the duration of the loans from one month to overnight.**

The $1.2 billion loss on the Lehman loans was facilitated by a corporate culture at Freddie Mac that overrode existing written policies and procedures. This left those responsible for credit risk oversight within the Enterprise reluctant to move forcefully in this direction, due to the perception that their decisions to reduce the amount or duration of the Lehman loans would be overridden. As a consequence, Freddie Mac did not move to revoke Lehman's short-term unsecured credit with the Enterprise until Lehman filed for bankruptcy and it was too late.[19]

2. ***Corrective Action*. FHFA and Freddie Mac have taken appropriate steps to remediate the corporate governance/culture issues identified in this report.**

FHFA has made progress in its efforts to stabilize the corporate governance/culture environment at Freddie Mac. The individuals responsible for the governance failures discussed in this report are no longer employed by Freddie Mac. FHFA has worked to ensure that credit risk management is now an independent organization within Freddie Mac that no longer seeks advice/approval from the business units (including Investments and Capital Markets) before making risk management decisions, and the Senior Executive Team has been replaced by a Senior Executive Credit Committee.

3. ***Risk Management*. FHFA has taken steps to enhance Freddie Mac's counterparty risk and operational risk management, but ongoing enforcement must be maintained.**

FHFA and Freddie Mac have taken a number of steps outlined in this report to remediate the counterparty credit risk management failures that may have contributed to the $1.2 billion default. Both will need to remain vigilant to ensure policies and procedures in this area are enforced and the corporate culture does not override such enforcement.

---

[19] FHFA-OIG is continuing to review the circumstances that led Freddie Mac senior business managers to disregard recommendations made by the risk management staff.

4.  ***Recovery of Funds*.  FHFA has made potentially helpful efforts to recover the $1.2 billion from the Lehman bankruptcy estate.**

To its credit, FHFA, through the Office of General Counsel, has worked to improve the chances of Freddie Mac's recovery in the Lehman bankruptcy proceeding.  In particular, it is possible that Freddie Mac may ultimately recover $1.2 billion; on the other hand, Freddie Mac stands to recover no less than $251 million.

# RECOMMENDATIONS

FHFA and Freddie Mac have already taken steps to address the shortcomings in Freddie Mac's risk management and control systems discussed in this report.  Clearly, they need to follow through on these remedial initiatives.  In particular, FHFA should:

1. Continue to monitor Freddie Mac's implementation of its counterparty risk management policies and procedures:

   a. ensuring that the independence and decisions of the Enterprise's risk management staff are not overridden by business management staff, and

   b. directing Freddie Mac Internal Audit to audit the CCRM function annually.

2. Continue to pursue all possible avenues to recover the $1.2 billion in the Lehman bankruptcy proceedings.

3. Continue to develop an examination program and procedures encompassing Enterprise-wide risk exposure to all of Freddie Mac's counterparties.[20]

---

[20] On September 18, 2012, FHFA-OIG issued an audit report concerning FHFA's oversight of the Enterprises' management of their mortgage sales and servicing counterparties.  *See* FHFA-OIG, *FHFA's Oversight of the Enterprises' Management of High-Risk Seller/Servicers* (AUD-2012-007) (Sept. 18, 2012).  That report recommended that FHFA issue standards for the Enterprises to develop comprehensive contingency plans for high-risk and high-volume seller/servicers, and that the Agency finalize its examination guidance regarding contingency planning.  FHFA agreed, and its implementation of the contingency planning recommendation will help to prevent a future Lehman-like event from recurring.

# CONCLUSION

Much can be learned from the events that led up to the serious missteps at Freddie Mac preceding the Lehman bankruptcy, the dysfunctional corporate culture at the time of the bankruptcy, and the aggressive and systematic responses by Freddie Mac and FHFA executives in its wake.  The lessons learned are applicable to Freddie Mac, Fannie Mae, their counterparties, and FHFA.

The lessons are:

- Corporate culture cannot be allowed to override or negate the formal controls put into place to provide protections.

- Marginalization of key voices can have significant adverse impacts, especially the subordination of risk management to opportunistic business decisions.

- Policies and procedural requirements should be adhered to and enforced.

- Regulatory oversight, including robust examination and audit programs, are essential to re-enforce even the most fundamental and widely embraced controls.

Corporate culture itself is a critical element in effective governance and risk management. Corporate leaders must set the tone at the top.  There needs to be constant vigilance and oversight by such leaders to ensure that the culture supports the governance and risk management functions rather than undermines them.

# OBJECTIVE, SCOPE, AND METHODOLOGY

The objective of this evaluation was to assess what actions FHFA has taken to:

1. Assess the causes of the $1.2 billion loss due to Lehman's default;

2. Assess the measures put in place to prevent a recurrence of such losses in the future;

3. Recover the $1.2 billion from the Lehman bankruptcy estate;

4. Remediate the corporate governance issues identified in the wake of the $1.2 billion loss; and

5. Enhance Freddie Mac's counterparty and operational risk management.

To address its objective, FHFA-OIG interviewed senior FHFA officials who were responsible for monitoring and examining Freddie Mac at the time of the controversial loans to Lehman as well as officials from FHFA's Office of General Counsel. FHFA-OIG staff also interviewed senior personnel in Freddie Mac's Internal Audit Department.

FHFA-OIG reviewed documents related to the Lehman loans including, but not limited to: Lehman's bankruptcy pleadings, the report of the examiner in the Chapter 11 proceedings, and a database of documents collected from Freddie Mac and other custodians. Additionally, FHFA-OIG examined Freddie Mac Liquidity and Contingency policies and Counterparty Credit Risk Management policies that were in effect during the pendency of the Lehman transactions and afterwards. Likewise, FHFA-OIG examined FHFA's revised policies and examination modules addressing Counterparty Credit Risk Management for the Liquidity and Contingency portfolio of Freddie Mac and a series of written communications between FHFA and Freddie Mac following the conclusion of examination work conducted by the Agency.

FHFA-OIG also reviewed FHFA written materials such as a key management assessment, findings memoranda, reports of examinations for the credit risk and capital markets groups, Freddie Mac audit reports, and Freddie Mac's preliminary Special Investigation.

FHFA-OIG also reviewed Office of Management and Budget Circular A-123 provisions and requirements relating to management control systems as a benchmark for assessing Freddie Mac's controls relevant to these transactions.

As of the publication of this report, FHFA is actively engaged in recovering the $1.2 billion loss from Lehman, based on FHFA's determination that Lehman's improper conduct was the direct cause of the loss. This report does not analyze Lehman's risk management and control systems; nor does it make any findings regarding legal liability of the firm or any of its employees.

This evaluation was conducted under the authority of the Inspector General Act, and is in accordance with the *Quality Standards for Inspection and Evaluation* (January 2012), which was promulgated by the Council of the Inspectors General on Integrity and Efficiency.  These standards require FHFA-OIG to plan and perform an evaluation that obtains evidence sufficient to provide reasonable bases to support the findings and recommendations made herein.  FHFA-OIG believes that the findings and recommendations discussed in this report meet these standards.

The performance period for this evaluation was from August 2011 to November 2012.

# APPENDIX A:
# FHFA's Comments on Findings and Recommendations



**Federal Housing Finance Agency**

### MEMORANDUM

TO:          George Grob, Deputy Inspector General for Evaluations

FROM:       Jon D. Greenlee, Deputy Director, Division of Enterprise Regulation
                       Alfred Pollard, General Counsel

SUBJECT:   FHFA Response – *Freddie Mac's Unsecured Lending to Lehman Brothers Prior to Lehman's Bankruptcy* (EVL 2012-019)

DATE:        February 21, 2013

---

This memorandum transmits the Federal Housing Finance Agency's (FHFA or Agency) management responses to the recommendations in the FHFA-OIG's draft report, *Case Study: Freddie Mac's Unsecured Lending to Lehman Brothers Prior to Lehman's Bankruptcy*, EVL 2012-019. We appreciated the opportunity to provide feedback on this report and the FHFA-OIG findings in the critical area of counterparty risk management.

The draft report describes events that resulted in the $1.2 billion unsecured loan made from Freddie Mac to Lehman Brothers in 2008, which was not yet due at the time of Lehman's entry into bankruptcy protection on September 15, 2008, and no portion of it has been repaid. We agree with the critical importance of a strong risk management function at the Enterprises, and will continue to focus on issues raised in the draft report. We have no additional comments on the report's audit recommendations.

cc:    Edward DeMarco, Acting Director
       Richard Hornsby, Chief Operating Officer
       Bruce Crandlemire, Senior Advisor for IG Operations
       John Major, Internal Controls and Audit Follow-Up Manager

# ADDITIONAL INFORMATION AND COPIES

For additional copies of this report:

    Call FHFA-OIG at:  202-730-0880

    Fax your request to:  202-318-0239

    Visit the FHFA-OIG website at:  www.fhfaoig.gov

To report alleged fraud, waste, abuse, mismanagement, or any other kind of criminal or noncriminal misconduct relative to FHFA's programs or operations:

    Call our Hotline at:  1-800-793-7724

    Fax your written complaint to:  202-318-0358

    Email us at:  oighotline@fhfaoig.gov

    Write to us at:  FHFA Office of Inspector General
                     Attn:  Office of Investigations – Hotline
                     400 Seventh Street, S.W.
                     Washington, DC  20024

# EXHIBIT B

---

**United States Bankruptcy Court/Southern District of New York**
Lehman Brothers Holdings Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5076
New York, NY 10150-5076

# PROOF OF CLAIM

| In Re: Lehman Brothers Holdings Inc., et al. Debtors. | Chapter 11 Case No. 08-13555 (JMP) (Jointly Administered) |
|---|---|

UNIQUE IDENTIFICATION NUMBER: 1000221282

| Name of Debtor Against Which Claim is Held | Case No. of Debtor |
|---|---|
| **Lehman Brothers Holdings Inc.** | 08-13555 |

Filed: USBC - Southern District of New York
Lehman Brothers Holdings Inc., Et Al.
08-13555 (JMP)          0000033568

T

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503. Additionaly, this form should not be used to make a claim for Lehman Programs Securities (See definition on reverse side.)

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)

LBH (CREDITOR.DBF,CREDNUM)CREDNUM # 1000221282******
FEDERAL HOME LOAN MORTGAGE CORPORATION
ATTN: MARK LANDMAN
LANDMAND, CORSI, BALLAINE & FORD P.C.
120 BROADWAY
NEW YORK, NY 10271

Telephone number: 212-238-4800   Email Address: mlandman@lcbf.com

☐ Check this box this claim amends a previously filed claim.

Court Claim Number:_____
   (If known)

Filed on: _____

Name and address where payment should be sent (if different from above)
George Kielman, Esq.
Federal Home Loan Mortgage Corporation
8200 Jones Branch Dr. - MS 202
McLean, VA  22102          George Kielman@
Telephone number: 703-903-2640   Email Address: freddiemac.com

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

**1.    Amount of Claim as of Date Case Filed:** $ 1,202,241,875  (interest as of 9/15/08)
If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete item 4.
If all or part of your claim is entitled to priority, complete Item 5.
If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete Item 6.
☐ Check this box if all or part of your claim is based on a Derivative Contract.*
☐ Check this box if all or part of your claim is based on a Guarantee.*

*IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.

☒  Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is a based on a Derivative Contract or Guarantee.

**2.    Basis for Claim:**   see attached Addendum and exhibits
   (See instruction #2 on reverse side.)

**3.    Last four digits of any number by which creditor identifies debtor:** _____
   3a. Debtor may have scheduled account as: _____
   (See instruction #3a on reverse side.)

**4.    Secured Claim** (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
Nature of property or right of setoff: ☐ Real Estate   ☐ Motor Vehicle   ☐ Other

Describe: _____
Value of Property: $_____   Annual Interest Rate _____%
Amount of arrearage and other charges as of time case filed included in secured claim, if any:
$_____   Basis for perfection: _____

Amount of Secured Claim: $_____   Amount Unsecured: $_____

**6.    Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9) is: $_____**
   (See instruction #6 on reverse side.)

**7.    Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.
**8.    Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest. (See definition of "redacted" on reverse side.) If the documents are voluminous, attach a summary.
DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

**5.    Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(____).

Amount entitled to priority:

$_____

*See attached re 12 USC 4617(b) (15) priority

FOR COURT USE ONLY

FILED BANKRUPTCY COURT S.D.N.Y. SEP 22 P 1:07

| Date: 9-18-09 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.  Raymond G. Romano, EVP Chief Credit Officer      Raymond G. Romano |
|---|---|

Penalty for presenting fraudulent claim:  Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

# INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, there may be exceptions to these general rules.*

## Items to be completed in Proof of Claim Form

**Name of Debtor, and Case Number:**
YOU MUST INDICATE THE SPECIFIC DEBTOR AGAINST WHICH YOUR CLAIM IS ASSERTED, INCLUDING THE THE NAME OF THE DEBTOR AND THE RELATED CASE NUMBER (DEBTORS AND CASE NUMBERS LISTED BELOW), IN THE SPACE ALLOTTED AT THE TOP OF THE CLAIM FORM.

| | | | |
|---|---|---|---|
| 08-13555 | Lehman Brothers Holdings Inc. | 08-13905 | CES Aviation LLC |
| 08-13600 | LB 745 LLC | 08-13906 | CES Aviation V LLC |
| 08-13885 | Lehman Brothers Commodity Services Inc. | 08-13907 | CES Aviation IX LLC |
| 08-13888 | Lehman Brothers Special Financing Inc. | 08-13908 | East Dover Limited |
| 08-13893 | Lehman Brothers OTC Derivatives Inc. | 09-10108 | Luxembourg Residential Properties Loan Finance S.a.r.l. |
| 08-13899 | Lehman Brothers Derivative Products Inc. | 09-10137 | BNC Mortgage LLC |
| 08-13900 | Lehman Commercial Paper Inc. | 09-10558 | Structured Asset Securities Corporation |
| 08-13901 | Lehman Brothers Commercial Corporation | 09-10560 | LB Rose Ranch LLC |
| 08-13902 | Lehman Brothers Financial Products Inc. | 09-12516 | LB 2080 Kalakaua Owners LLC |
| 08-13904 | Lehman Scottish Finance L.P. | 08-13664 | PAMI Statler Arms LLC |

If your Claim is against multiple Debtors, complete a separate form for each Debtor.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the Bankruptcy filing. Follow the instructions concerning whether to complete items 4, 5 and 6. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Use this space to report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**4. Secured Claim:**
Check the appropriate box and provide the requested information if the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See DEFINITIONS, below.) State the type and the value of property that secures the claim, attach copies of lien documentation, and state annual interest rate and the amount past due on the claim as of the date of the bankruptcy filing.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. §507(a).**
If any portion of your claim falls in one or more of the listed categories, check the appropriate box(es) and state the amount entitled to priority. (See DEFINITIONS, below.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9)**
State the value of any goods received by the debtor within 20 days before the date of commencement in which the goods have been sold to the debtor in the ordinary course of the debtor's business.

**7. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**8. Documents:**
Attach to this proof of claim form redacted copies documenting the existence of the debt and of any lien securing the debt. You may also attach a summary. You must also attach copies of documents that evidence perfection of any security interest. You may also attach a summary. FRBP 3001(c) and (d). Do not send original documents, as attachments may be destroyed after scanning.

**Date and Signature:**
The person filing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2), authorizes courts to establish local rules specifying what constitutes a signature. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. Attach a complete copy of any power of attorney. Criminal penalties apply for making a false statement on a proof of claim.

---

## DEFINITIONS

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**
A creditor is the person, corporation, or other entity owed a debt by the debtor on the date of the bankruptcy filing.

**Claim**
A claim is the creditor's right to receive payment on a debt that was owed by the debtor on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the Claims Agent at the following address:
**Lehman Brothers Holdings Claims Processing**
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, PO Box 5076
New York, NY 10150- 5076

**Secured Claim Under 11 U.S.C. §506(a)**
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien. A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. §507(a)**
Priority claims are certain categories of unsecured claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor should redact and use only the last four digits of any social-security, individual's tax identification, or financial-account number, all but the initials of a minor's name and only the year of any person's date of birth.

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

**Derivative Contract**
A contract that is any of (i) a "swap agreement" as such term is defined in section 101(53B) of the Bankruptcy Code or (ii) a "forward contract" as such term is defined in section 101(25) of the Bankruptcy Code. A cash-market purchase or sale of a security or loan (i.e. any purchase or sale of a security or loan for settlement within the standard settlement cycle for the relevant market), exchange-traded future or option, securities loan transaction, repurchase agreement in respect of securities or loans, and any guarantee or reimbursement obligations which would otherwise be included in the definition of such terms in the Bankruptcy Code shall not be considered a Derivative Contract for the purposes of this definition nor shall any notes, bonds, or other securities issued by the Debtors or their affiliates (including, but not limited to, Lehman Brothers Holdings Inc., Lehman Brothers Treasury Co. B.V., Lehman Brothers Bankhaus AG, Lehman Brothers Holdings plc, Lehman Brothers Securities N.V., and Lehman Brothers (Luxembourg) Equity Finance S.A.).

**Guarantee**
A promise, representation or agreement to answer for the payment of some debt or the performance of some duty in case of the failure of another person or entity who is liable in the first instance.

**Lehman Programs Securities**
Lehman Programs Securities means those securities included on the Lehman Programs Securities list available on the http://www.lehman-docket.com as of July 27, 2009.

---

## INFORMATION

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim, or you may access the Claims Agent's system (http://www.lehman-docket.com) to view your filed proof of claim.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 *et seq.*), and any applicable orders of the bankruptcy court.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

In re

LEHMAN BROTHERS HOLDINGS INC., et al.,

Debtors.

Chapter 11 Case No.
08-13555 (JMP)

(Jointly Administered)

------------------------------------------------------------x

## ADDENDUM TO PROOF OF CLAIM OF
## FEDERAL HOME LOAN MORTGAGE CORPORATION

1.     Federal Home Loan Mortgage Corporation in conservatorship (hereinafter

referred to as "Freddie Mac") is a government-sponsored enterprise that not only plays a critical

role in the United States mortgage finance market but also is inextricably interwoven into the

nation's financial system.  On September 6, 2008, the Federal Housing Finance Agency

("FHFA"), an independent agency of the United States Government, was appointed as Freddie

Mac's conservator (the "Conservator").  The goal of the conservatorship is to restore confidence

in Freddie Mac, enhance its capacity to fulfill its mission and mitigate the systemic risk that has

contributed to the instability in the current market.  Freddie Mac is filing this proof of claim in

these chapter 11 cases at the direction of the Conservator.

2.     In August 2008, Freddie Mac made two separate transactions for the transfer of

funds totaling $1.2 billion through the Federal Reserve System from Freddie Mac's account at

the Federal Reserve Bank of New York to Lehman Brothers Holdings Inc.'s ("LBHI," or the

"Debtor") account with Citibank.  The transactions were executed on August 19th and August

20th in the amounts of $450,000,000 and $750,000,000, respectively, and brokered through

Tullet Prebon, an interdealer broker.  A copy of the supporting documents is attached hereto as

Exhibit A. Pursuant to the terms of the transaction, LBHI was scheduled to repay the funds on an "early return" basis; that is, prior to the opening of the capital markets, together with accrued interest on September 15, 2008. In order to effect an "early return" repayment of the loan, LBHI was to set aside the repayment amount and request the requisite wire transfer prior to September 15, 2008 so that the transfer could be made on an "early return" basis prior to the opening of the capital markets on September 15, 2008. Such transfer was not initiated, however, and, to date, Freddie Mac has not received payment of the $1.2 billion plus $2,241,875.00 in accrued interest. See Exhibit B. Accordingly, Freddie Mac is asserting a claim for $1,202,241,875.00 which includes interest as of September 15, 2008.[1]

3.        Pursuant to 12 U.S.C. § 4617(b), as amended by P.L. 110-289, the Conservator has the powers necessary to locate and protect Freddie Mac's assets, which as a matter of law, have been taken over by the Conservator. Pursuant to 12 U.S.C. § 4617(b)(15)(A), the Conservator is authorized to "avoid a transfer of any interest of an entity-affiliated party, or any person determined by the conservator ... to be a debtor of the regulated entity, in property, or any obligation incurred by such party or person that was made within 5 years of the date on which the Agency was appointed conservator ..., if such party or person voluntarily or involuntarily made such transfer or incurred such liability with the intent to hinder, delay, or defraud the regulated entity, the Agency, the conservator, or receiver." Section 4617(b)(15)(D) further states that the Conservator's power to avoid a fraudulent transfer is "superior to any rights of a trustee or any other party (other than any party which is a Federal agency) under Title 11." Therefore, the Conservator, on behalf of Freddie Mac, reserves all its rights pursuant to its

---

[1] Freddie Mac has filed a separate Proof of Claim for $885,839,087.33 related to derivative transactions and loan servicing related obligations.

statutory authorization, including with respect to the transfer of any property in which the Debtor

had an interest to the extent such transfer was made with the intent to hinder or delay the "early

return" payment of the $1.2 billion due and owing to Freddie Mac on September 15, 2008, for

which claim is made hereunder, with any recovery on account of such claim being entitled to a

priority recovery under Section 4617(b)(15)(D).

       4.      In addition to the foregoing, by way of this Proof of Claim, Freddie Mac adopts

and reasserts each and every claim scheduled by the Debtor as payable to Freddie Mac.

       5.      Freddie Mac is filing this proof of claim in anticipation of the claims bar date (the

"Bar Date"), which has been set as September 22, 2009, pursuant to the Court's July 2, 2009

Order pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3)

Establishing the Deadline for Filing Proofs of Claim, Approving the Form and Manner of Notice

Thereof and Approving the Proof of Claim Form.  Freddie Mac reserves the right to amend,

modify, and/or supplement this proof of claim at any time, including, without limitation, for the

purpose of asserting additional claims, whether arising from the transactions or documents

described in Freddie Mac's proof of claim, this attachment, or otherwise.  Freddie Mac also

reserves its rights to assert any and all rights of setoff that it may have against the Debtor in

respect of its claims, including, without limitation, the right to set off its claims against any

claims that the Debtor (or any successor, assignee or person claiming through the Debtor, as the

case may be) may assert against Freddie Mac or its successors or assigns, whether or not arising

under the transactions set forth in this proof of claim.  Freddie Mac also reserves its right to

pursue claims (including, but not limited to, the claims described herein) against the Debtor

based upon additional or alternative legal theories, and reserves the right to assert administrative

expense claims.

                              

6.      Freddie Mac further reserves its right to seek to have the reference withdrawn
with respect to the subject matter of these claims, any objection or other proceedings commenced
with respect thereto, or any other proceedings commenced in this case or otherwise involving
Freddie Mac.  By filing this proof of claim, neither Freddie Mac nor the Conservator intends to
submit to the jurisdiction of the Bankruptcy Court for any purpose other than the allowance of
this claim for purposes of these chapter 11 cases.

```
TID                                08192008-003463
Account Id                         MS FED FUNDS
Status String                      PROC_DLVR/CONF
Txn Class                          Funds Delivers
Type Code                          1600
Amount                             $450,000,000.00
(3000) Adj Reason Code
(3000) As of Adj Date
(3100) Sender's ABA                021039513
(3100) Sender's Tele Name          FHLMC INVESTOR PI
(3320) Sender Reference            08192008 003463
(3400) Receiver's ABA              021000089
(3400) Receiver's Tele Name        CITIBANK NYC
(3600) Business Function Code      FFS
(3600) SWIFT Transaction Type Code
(3700) Charges: Detail
(3700) Charges: Currency Code 1
(3700) Charges: Senders Charges 1
(3700) Charges: Currency Code 2
(3700) Charges: Senders Charges 2
(3700) Charges: Currency Code 3
(3700) Charges: Senders Charges 3
(3700) Charges: Currency Code 4
(3700) Charges: Senders Charges 4
(3710) Inst Amt: Currency Code 1
(3710) Inst Amt: Amount
(3720) Exchange Rate
(4000) Intermediary's FI Id Code
(4000) Intermediary's FI Ident
(4000) Intermediary's FI Name
(4000) Intermediary's FI Addr
(4100) Benef's FI Id Code
(4100) Benef's FI Ident
(4100) Benef's FI Name
(4100) Benef's FI Addr
(4200) Beneficiary Id Code         D
(4200) Beneficiary Ident           40615202
(4200) Beneficiary Name            LEHMAN BROTHERS HOLDING
(4200) Beneficiary Addr
(4320) Ref for Beneficiary
(4400) Acct Db Drwdown Id Code
(4400) Acct Db Drwdown Ident
(4400) Acct Db Drwdown Name
(4400) Acct Db Drwdown Addr
(5000) Originator Id Code          D
(5000) Originator Ident            487100
(5000) Originator Name             FM MSA FED FUNDS
(5000) Originator Addr
(5100) Origin's FI Id Code
(5100) Origin's FI Ident
(5100) Origin's FI Name
(5100) Origin's FI Addr
(5200) Instructing FI Id Code
(5200) Instructing FI Ident
(5200) Instructing FI Name
(5200) Instructing FI Address
(5400) Account Cr in Drwdown
(6000) Origin. to Benef. info      OVERNIGHT FED FUNDS
(6100) Receiver's FI Info
(6110) Drwdown Db Acct Adv Code
(6110) Drwdown Db Acct Adv Info
(6200) Intermediary FI Info
(6210) Intermediary's FI Adv Code
(6210) Intermediary's FI Adv Info
(6300) Benef's FI Info
(6310) Benef's FI Adv Code
(6310) Benef's FI Adv Info
(6400) Beneficiary Info
(6410) Beneficiary Adv Code
(6410) Beneficiary Adv Info
(6420) Beneficiary MOP
(6420) Beneficiary Mop Info
(6430) Payment Limitation
(6500) FI to FI Info
(9000) Free Text
IMAD                               20080819B1Q8283C000105
Message Disposition
Acceptance Timestamp
OMAD
Error field
Cost Center                        NA
GL Account Cash                    NA
GL Account Offset                  NA
Group Id
Trade ID
XRef No.                           ALAD.487  .-1762   .S
Repetitive ID                      MS LBHC CI
Counterparty ID
Settlement Date                    08/19/2008
Process Date                       08/19/2008
Priority                           5
```

```
MEMO
SAFEID       08/19/08 14:15:18.836 PEND_DLVR/HOLD Created
F354356      08/19/08 17:14:49.266 PEND_DLVR Released
F354356      08/19/08 17:14:54.346 PROC_DLVR/UNACK Delivered
safeid       08/19/08 17:16:02.410 PROC_DLVR/CONF Confirmed, IMAD:20080819B1Q8263C000105
```

```
Compliance Audit
08192008 17:14:54 OFAC Rules Passed (4200) Beneficiary Name          BROTHERS|(90000006)*LEHMAN:OCCURS;
```

| Field | Value |
|---|---|
| TID | 08202008-004807 |
| Account Id | MS FED FUNDS |
| Status String | PROC_DLVR/CONF |
| Txn Class | Funds Delivers |
| Type Code | 1600 |
| Amount | $750,000,000.00 |
| (3000) Adj Reason Code | |
| (3000) As of Adj Date | |
| (3100) Sender's ABA | 021039513 |
| (3100) Sender's Tele Name | FHLMC INVESTOR PI |
| (3320) Sender Reference | 08202008 004807 |
| (3400) Receiver's ABA | 021000089 |
| (3400) Receiver's Tele Name | CITIBANK NYC |
| (3600) Business Function Code | PFS |
| (3600) SWIFT Transaction Type Code | |
| (3700) Charges: Detail | |
| (3700) Charges: Currency Code 1 | |
| (3700) Charges: Senders Charges 1 | |
| (3700) Charges: Currency Code 2 | |
| (3700) Charges: Senders Charges 2 | |
| (3700) Charges: Currency Code 3 | |
| (3700) Charges: Senders Charges 3 | |
| (3700) Charges: Currency Code 4 | |
| (3700) Charges: Senders Charges 4 | |
| (3710) Inst Amt: Currency Code 1 | |
| (3710) Inst Amt: Amount | |
| (3720) Exchange Rate | |
| (4000) Intermediary's FI Id Code | |
| (4000) Intermediary's FI Ident | |
| (4000) Intermediary's FI Name | |
| (4000) Intermediary's FI Addr | |
| (4100) Benef's FI Id Code | |
| (4100) Benef's FI Ident | |
| (4100) Benef's FI Name | |
| (4100) Benef's FI Addr | |
| (4200) Beneficiary Id Code | D |
| (4200) Beneficiary Ident | 40615202 |
| (4200) Beneficiary Name | LEHMAN BROTHERS HOLDING |
| (4200) Beneficiary Addr | |
| (4320) Ref for Beneficiary | |
| (4400) Acct Db Drwdown Id Code | |
| (4400) Acct Db Drwdown Ident | |
| (4400) Acct Db Drwdown Name | |
| (4400) Acct Db Drwdown Addr | |
| (5000) Originator Id Code | D |
| (5000) Originator Ident | 487100 |
| (5000) Originator Name | FN MSA FED FUNDS |
| (5000) Originator Addr | |
| (5100) Origin's FI Id Code | |
| (5100) Origin's FI Ident | |
| (5100) Origin's FI Name | |
| (5100) Origin's FI Addr | |
| (5200) Instructing FI Id Code | |
| (5200) Instructing FI Ident | |
| (5200) Instructing FI Name | |
| (5200) Instructing FI Address | |
| (5400) Account Cr in Drwdown | |
| (6000) Origin. to Benef. info | OVERNIGHT FED FUNDS |
| (6100) Receiver's FI Info | |
| (6110) Drwdown Db Acct Adv Code | |
| (6110) Drwdown Db Acct Adv Info | |
| (6200) Intermediary FI Info | |
| (6210) Intermediary's FI Adv Code | |
| (6210) Intermediary's FI Adv Info | |
| (6300) Benef's FI Info | |
| (6310) Benef's FI Adv Code | |
| (6310) Benef's FI Adv Info | |
| (6400) Beneficiary Info | |
| (6410) Beneficiary Adv Code | |
| (6410) Beneficiary Adv Info | |
| (6420) Beneficiary MOP | |
| (6420) Beneficiary Mop Info | |
| (6430) Payment Limitation | |
| (6500) FI to FI Info | |
| (9000) Free Text | |
| IMAD | 20080820B1Q8284C000032 |
| Message Disposition | |
| Acceptance Timestamp | |
| OMAD | |
| Error field | |
| Cost Center | NA |
| GL Account Cash | NA |
| GL Account Offset | NA |
| Group Id | |
| Trade ID | |
| XRef No. | ALAD.487  .-1767  .S |
| Repetitive ID | MS LBHC CI |
| Counterparty ID | |
| Settlement Date | 08/20/2008 |
| Process Date | 08/20/2008 |
| Priority | 5 |

```
MEMO
SAFEID          08/20/08 10:52:51.513 PEND_DLVR/HOLD Created
F351598         08/20/08 11:40:19.356 PEND_DLVR Released
F351598         08/20/08 11:41:16.513 PROC_DLVR/UNACK Delivered
safeid          08/20/08 11:42:26.250 PROC_DLVR/CONF Confirmed, IMAD:20080820B1Q8284C000032
```

```
Compliance Audit
08202008 11:41:16 OPAC Rules Passed (4200) Beneficiary Name          BROTHERS|(90000006)*LEHMAN:OCCURS;
```



ATTN: TOMMY FUQUA
A/C FREDDIE MAC FED FUNDS
1551 PARK RUN DR
MAIL STOP D5N
MCLEAN, VA 22102-3110

Invoice Date :                Page :    1

Reference :        24404/15/28/00/0808-117695

**The following deals were arranged by the EURODOLLAR CASH division.**

| Date | Deal # | Counterparty | From | To | Days | Rate | Notional Amount | | Amount |
|------|--------|--------------|------|-----|------|------|-----------------|---|--------|
| 01-Aug-08 | 73130 | SOCIETE GENERALE-NEW YORK. | 8/01/08 | 8/15/08 | 14 | 2.28000 LN | 250,000,000.00 | US | 2,100.00 |
| 05-Aug-08 | 75243 | RBS CITIZENS BANK NA - RI | 8/05/08 | 8/15/08 | 10 | 2.20000 LN | 300,000,000.00 | US | 1,800.00 |
| 20-Aug-08 | 86093 | US CENTRAL CU-LENEXA | 8/20/08 | 9/15/08 | 26 | 2.50000 LN | 500,000,000.00 | US | 7,800.00 |
| 21-Aug-08 | 86985 | UNION BK OF CAL-L.A. | 8/21/08 | 9/15/08 | 25 | 2.43000 LN | 200,000,000.00 | US | 3,000.00 |
| 25-Aug-08 | 88685 | BK OF IRELAND-STAMFORD | 8/25/08 | 9/15/08 | 21 | 2.37500 LN | 200,000,000.00 | US | 2,520.00 |
| 26-Aug-08 | 89518 | NATIXIS - NY | 8/26/08 | 9/15/08 | 20 | 2.35000 LN | 150,000,000.00 | US | 1,800.00 |
| 28-Aug-08 | 91244 | BCO BILBAO VIZ ARG SA-NY | 8/28/08 | 9/15/08 | 18 | 2.37000 LN | 250,000,000.00 | US | 2,700.00 |
| 29-Aug-08 | 92082 | WESTERN CORP FCU-SAN DIMAS | 8/29/08 | 9/15/08 | 17 | 2.37000 LN | 400,000,000.00 | US | 4,080.00 |

SHORT DATES          BROKERAGE SUBTOTAL :                44,790.00

BROKERAGE TOTAL IN USD :                44,790.00

# Freddie Mac | NEW TRADE

| | | PMG:          AMM | Trade Ops:          JSL |
|---|---|---|---|

**MSA-FRB**
Trade No. 1080, Vs. 1
Aug 19, 2008 18:05:07 GMT

**LEND**   **LBHC**   **CASH/FEDF**         **2.55000 Sep 15, 2008**

| Asset ID: | B5A0703R7 | Payment Delay: | 0 | Trade Date: | Aug 19, 2008 |
|---|---|---|---|---|---|
| Ticker: | LBHC | Date Convention: | ACT/360 | Settle Date: | Aug 19, 2008 |
| Coupon: | 2.55000 | Accrual Date: | Aug 19, 2008 | Counterparty: | LBHC |
| Coupon Type: | MAT | First Coupon Date: | Sep 15, 2008 | LEHMAN BROTHERS HOLDINGS INC. | |
| Frequency: | ZERO | Next Pay Date: | Sep 15, 2008 | Counterparty Cont | MARTIN WALSH |
| Reset Term: | | Odd First Pmt: | ☐ Yes ☑ No | | |
| Maturity Date: | Sep 15, 2008 | AMT: | ☐ Yes ☑ No | Original Par: | 450,000,000.000 |
| Issue Date: | Aug 19, 2008 | ERISA: | ☐ Yes ☐ No | Factor: | 1.000000000 |
| Min Trade Size: | N/A | 144A: | ☐ Yes ☑ No | Factor Date: | |
| Min Trade Increment: | N/A | Notional: | ☐ Yes ☑ No | Current Par: | 450,000,000.000 |

**General Use**
  Early Return for Trust
**Delivery Instructions**
  FEDFUND/MS LBHC CI
  *BANK NAME:*          CITIBANK NYC
  *ABA#:*                021000089
  *A/C#:*                40615202
  *A/C NAME:*           LEHMAN BROTHERS HOLDING
  *BANK TO BANK:*      OVERNIGHT FED FUNDS
**Miscellaneous Information**
  TrdPurpose:        MSA
**Fifo Information**

| trade | relation | amount |
|---|---|---|
| 710 | SPEC | -450,000,000.00 |

| | |
|---|---|
| Price: | 100.000 |
| | 100.000000000 |
| Principal: | (450,000,000.00) |
| Interest: | 0.00 |
| Total Charges: | 0.00 |
|   Broker Commission: | (7,290.00) |
| Net Money: | (450,000,000.00) |
| Currency: | USD |
| Net Cash Flow: | OUT |

| | |
|---|---|
| Exchange rate: | |
| Discount: | |
| Option Type: | |

| | |
|---|---|
| Prepay: | 100.00 |
| Yield: | 2.550 |
| YTC: | |
| Duration: | 0.07406 |
| Convexity: | 0.00000 |

| S & P | Moody | DBRS |
|---|---|---|
| | | |
| **Fitch** | **NAIC** | |
| | | |

| | | |
|---|---|---|
| Discretionary: | ☐ Yes | ☑ No |
| Liquid: | ☑ Yes | ☐ No |
| Segregate: | ☑ Yes | ☐ No |
| Release: | ☐ Yes | ☑ No |

| | | |
|---|---|---|
| Exec: | 2008-08-19 17:35:38 GMT | |
| Exec Source: | | Auth Time |
| Executing Broker: | | PREB |
| | | PREBON |

*Mortgage Securities Account (MSA-FRB)*   *Trade No. 1080, Vs. 1*

*FreddieMac*

Created: Sep 15, 2008 16:25:29 GMT

A/C# NA

Copyright © 2008 BlackRock Inc. All Rights Reserved.

NO CUSTODIAN

# Freddie Mac | NEW TRADE

**MSA-FRB**
Trade No. 710, Vs. 1
Sep 12, 2008 22:30:48 GMT

PMG:      rm_mat    Trade Ops:      rm_mat

## MAT   LBHC CASH/FEDF

**2.55000 Sep 15, 2008**

| | | | |
|---|---|---|---|
| Asset ID: | B5A0703R7 | Trade Date: | Sep 15, 2008 |
| Ticker: | LBHC | Settle Date: | Sep 15, 2008 |
| Coupon: | 2.55000 | Broker: | |
| Coupon Type: | MAT | | UNKNOWN |
| Frequency: | ZERO | Broker Contact: | rm_mat |
| Reset Term: | | | |
| Maturity Date: | Sep 15, 2008 | Original Par: | 450,000,000.000 |
| Issue Date: | Aug 19, 2008 | Factor: | 1.000000000 |
| Min Trade Size: | N/A | Factor Date: | |
| Min Trade Increment: | N/A | Current Par: | 450,000,000.000 |

| | | |
|---|---|---|
| Payment Delay: | | 0 |
| Date Convention: | | ACT/360 |
| Accrual Date: | | |
| First Coupon Date: | | Sep 15, 2008 |
| Next Pay Date: | | |
| Odd First Pmt: | ☐ Yes | ☑ No |
| AMT: | ☐ Yes | ☐ No |
| ERISA: | ☐ Yes | ☐ No |
| 144A: | ☐ Yes | ☐ No |
| Notional: | ☐ Yes | ☑ No |

**Fifo Information**

| trade | relation | amount |
|---|---|---|
| 1080 | SPEC | -450,000,000.00 |

| | |
|---|---|
| Price: | 100.000 |
| | 100.000000000 |
| Principal: | 450,000,000.00 |
| Interest: | 0.00 |
| Commission: | 0.00 |
| Net Money: | 450,000,000.00 |
| Currency: | USD |
| Net Cash Flow: | IN |

| | |
|---|---|
| Exchange rate: | |
| Discount: | |
| Option Type: | |

| | |
|---|---|
| Prepay: | 0.00 |
| Yield: | |
| YTC: | |
| Duration: | 0.00000 |
| Convexity: | 0.00000 |

| S & P | Moody | DBRS |
|---|---|---|
| Fitch | NAIC | |

| | | |
|---|---|---|
| Discretionary: | ☐ Yes | ☑ No |
| Liquid: | ☑ Yes | ☐ No |
| Segregate: | ☐ Yes | ☑ No |
| Release: | ☑ Yes | ☐ No |

| | |
|---|---|
| Exec: | 2008-09-12 22:30:48 GMT |
| Exec Source: | Auth Time |

**Mortgage Securities Account (MSA-FRB)**
Trade No. 710, Vs. 1

FreddieMac

Created: Sep 15, 2008 18:23:39 GMT

A/C# NA

Copyright © 2008 BlackRock Inc. All Rights Reserved.

NO CUSTODIAN



# Freddie Mac | NEW TRADE

| | |
|---|---|
| **MSA-FRB**<br>Trade No. 1084, Vs. 1<br>Aug 20, 2008 14:45:31 GMT | PMG:  _(signature)_   AMM   Trade Ops:   TEF |

## LEND   LBHC   CASH/FEDF                    2.55000 Sep 15, 2008

| | | | | |
|---|---|---|---|---|
| **Asset ID:** | **B5A070KA5** | **Payment Delay:** | 0 | |
| **Ticker:** | **LBHC** | **Date Convention:** | ACT/360 | |
| **Coupon:** | 2.55000 | **Accrual Date:** | Aug 20, 2008 | |
| **Coupon Type:** | MAT | **First Coupon Date:** | Sep 15, 2008 | |
| **Frequency:** | ZERO | **Next Pay Date:** | Sep 15, 2008 | |
| **Reset Term:** | | **Odd First Pmt:** | ☐ Yes ☑ No | |
| **Maturity Date:** | Sep 15, 2008 | **AMT:** | ☐ Yes ☑ No | |
| **Issue Date:** | Aug 20, 2008 | **ERISA:** | ☐ Yes ☐ No | |
| **Min Trade Size:** | N/A | **144A:** | ☐ Yes ☑ No | |
| **Min Trade Increment:** | N/A | **Notional:** | ☐ Yes ☑ No | |

**Trade Date:** Aug 20, 2008
**Settle Date:** Aug 20, 2008
**Counterparty:** LBHC
LEHMAN BROTHERS HOLDINGS INC.
**Counterparty Cont** MARTY WALSH

**Original Par:** 750,000,000.000
**Factor:** 1.000000000
**Factor Date:**
**Current Par:** 750,000,000.000

**General Use**
  Early Return for Trust
**Delivery Instructions**
  FEDFUND/MS LBHC CI
  **BANK NAME:**  CITIBANK NYC
  **ABA#:**  021000089
  **A/C#:**  40615202
  **A/C NAME:**  LEHMAN BROTHERS HOLDING
  **BANK TO BANK:**  OVERNIGHT FED FUNDS
**Miscellaneous Information**
  **TrdPurpose:**  MSA
**Fifo Information**

| trade | relation | amount |
|---|---|---|
| 711 | SPEC | -750,000,000.00 |

**Price:** 100.000
100.000000000
**Principal:** (750,000,000.00)
**Interest:** 0.00
**Total Charges:** 0.00
  Broker Commission: (11,700.00)
**Net Money:** (750,000,000.00)
**Currency:** USD
**Net Cash Flow:** OUT

**Exchange rate:**
**Discount:**
**Option Type:**

**Prepay:** 100.00
**Yield:** 2.550
**YTC:**
**Duration:** 0.07132
**Convexity:** 0.00000

| S & P | Moody | DBRS |
|---|---|---|
| **Fitch** | **NAIC** | |

**Discretionary:** ☐ Yes ☑ No
**Liquid:** ☑ Yes ☐ No
**Segregate:** ☑ Yes ☐ No
**Release:** ☐ Yes ☑ No

**Exec:**  2008-08-20 13:49:44 GMT
**Exec Source:**  Auth Time
**Executing Broker:**  PREB
PREBON

_(vertical text, right margin)_ **Mortgage Securities Account (MSA-FRB)**   Trade No. 1084, Vs. 1   FreddieMac

_(vertical text, left margin)_ Created: Sep 15, 2008 16:25:46 GMT

A/C# NA                    Copyright © 2008 BlackRock Inc. All Rights Reserved.                    NO CUSTODIAN

# Freddie Mac

## NEW TRADE

**MSA-FRB**
Trade No. 711, Vs. 1
Sep 12, 2008 22:30:48 GMT

| PMG: | rm_mat | Trade Ops: | rm_mat |

**MAT**   **LBHC**
**CASH/FEDF**

**2.55000 Sep 15, 2008**

| | | | |
|---|---|---|---|
| Asset ID: | B5A070KA5 | Payment Delay: | 0 |
| Ticker: | LBHC | Date Convention: | ACT/360 |
| Coupon: | 2.55000 | Accrual Date: | |
| Coupon Type: | MAT | First Coupon Date: | Sep 15, 2008 |
| Frequency: | ZERO | Next Pay Date: | |
| Reset Term: | | Odd First Pmt: | ☐ Yes ☑ No |
| Maturity Date: | Sep 15, 2008 | AMT: | ☐ Yes ☑ No |
| Issue Date: | Aug 20, 2008 | ERISA: | ☐ Yes ☐ No |
| Min Trade Size: | N/A | 144A: | ☐ Yes ☑ No |
| Min Trade Increment: | N/A | Notional: | ☐ Yes ☑ No |

| | | |
|---|---|---|
| Trade Date: | Sep 15, 2008 |
| Settle Date: | Sep 15, 2008 |
| Broker: | |
| | UNKNOWN |
| Broker Contact: | rm_mat |
| Original Par: | 750,000,000.000 |
| Factor: | 1.000000000 |
| Factor Date: | |
| Current Par: | 750,000,000.000 |

### Fifo Information

| trade | relation | amount |
|---|---|---|
| 1084 | SPEC | -750,000,000.00 |

| | |
|---|---|
| Price: | 100.000 |
| | 100.000000000 |
| Principal: | 750,000,000.00 |
| Interest: | 0.00 |
| Commission: | 0.00 |
| Net Money: | 750,000,000.00 |
| Currency: | USD |
| Net Cash Flow: | IN |

| | |
|---|---|
| Exchange rate: | |
| Discount: | |
| Option Type: | |

| | |
|---|---|
| Prepay: | 0.00 |
| Yield: | |
| YTC: | |
| Duration: | 0.00000 |
| Convexity: | 0.00000 |

| S & P | Moody | DBRS |
|---|---|---|
| | | |
| Fitch | NAIC | |
| | | |

| | | |
|---|---|---|
| Discretionary: | ☐ Yes | ☑ No |
| Liquid: | ☑ Yes | ☐ No |
| Segregate: | ☐ Yes | ☑ No |
| Release: | ☑ Yes | ☐ No |

| | |
|---|---|
| Exec: | 2008-09-12 22:30:48 GMT |
| Exec Source: | Auth Time |

**Mortgage Securities Account (MSA-FRB)**
Trade No. 711, Vs. 1

FreddieMac

Created: Sep 15, 2008 16:24:05 GMT

A/C# NA

Copyright © 2008 BlackRock Inc. All Rights Reserved.

NO CUSTODIAN

```
09/17/2008  13:53    201-557-5902         TULLETT PREBON                    PAGE 01/02
                                                                              S2
    TLR0012            85363 V.00        DETAILS
sal date:  8/19/08  Val date:  8/19/08  Due date:  9/15/08   Ent date:  8/19/08
sal number: 85363   Batch #:  999  Section #: 15  Type: 74  Chg date:  8/19/08
umber of Days   27
ELLER   FREDDIE MAC MSA FED FUNDS      BUYER   LEHMAN BROS HLDG INC (NY)
urr1:  US            Thru1:  PYN       Curr2:                Thru2: PYN
                     Dsk 20 EURODOLLAR                      Dsk 27 FED FUNDS
ro:                                    Bro:
roker 20052       WALSH, MARTIN        Broker 20257      FARMER,KEVIN
ebate:             .00  RD 000         Rebate:            .00  RD 000
roker                                  Broker
orres BRO:         .00                 Corres BRO:        .00  Swap#
ate:    000255       Amount:           Code:           Old deal#:
Rate:               SPrice:   450,000,000  BRate:              BPrice:
el amt:                                Del amt:
ay FEDERAL RESERVE BK-N.Y.             Repay FEDERAL RESERVE BK-N.Y.
nstruction ACC FHLMC INVESTOR PI       Instruction
/C FREDDIE MAC MSA FED FUNDS           A/C CITIBANK NA-NY
nstruction ABA 0210-3951-3 ACC 487100  Instruction ABA 0210-0008-9
AV .                                   FAV LEHMAN BROS HLDG INC (NY)
nstruction *EARLY RETURN BY 9:30AM     Instruction ACC 40615202
pecial instr.
F9=NO RE-TLX
                                            F10=Pay Ins.
                                     F6=Retlx F7=Tlx mnt F8=Tlx Inq
```

09/17/2008   13:53   201-557-5902              TULLETT PREBON                    PAGE  02/02
                            86087 V.00        DETAILS                                    S2
Deal date:  8/20/08  Val date:  8/20/08  Due date:  9/15/08  Ent date:  8/20/08
Deal number:  86087  Batch #:  999  Section #:  15  Type: 74  Chg date:  8/20/08
Number of Days   26
SELLER  FREDDIE MAC MSA FED FUNDS           BUYER    LEHMAN BROS HLDG INC (NY)
Curr1:  US              Thru1:  PYN         Curr2:                   Thru2: PYN
Bro:                 Dsk 20 EURODOLLAR      Bro:                 Dsk 27 FED FUNDS
Broker 20052          WALSH, MARTIN         Broker 20257       FARMER,KEVIN
Rebate:              .00  RD 000            Rebate:         .00  RD 000
Broker                                      Broker
Corres BRO:           .00                   Corres BRO:          .00  Swap#
Rate:    000255      Amount:               Code:           Old deal#:
SRate:               SPrice:   750,000,000
Del amt:                                    BRate:               BPrice:
Pay FEDERAL RESERVE BK-N.Y.                 Del amt:
Instruction ACC FHLMC INVESTOR PI           Repay FEDERAL RESERVE BK-N.Y.
A/C FREDDIE MAC MSA FED FUNDS               Instruction
Instruction ABA 0210-3951-3 ACC 487100      A/C CITIBANK NA-NY
FAV .                                       Instruction ABA 0210-0008-9
Instruction *EARLY RETURN BY 9:30AM         FAV LEHMAN BROS HLDG INC (NY)
Special instr.                              Instruction ACC 40615202
 F9=NO RE-TLX

                                                    F10=Pay Ins.
                                          F6=Retlx F7=Tlx mnt F8=Tlx Inq

| Fund | Trd Num | CUSIP | Ticker/Coupon/Maturity | Counterparty | Tran Type | Orig. Face | Net Money | Group/Type | Trade Price | Trade Date | Settle Date | Int @ Mat | Maturity |
|------|---------|-------|------------------------|--------------|-----------|-----------|-----------|------------|-------------|------------|-------------|-----------|----------|
| MSA-FRB | 1080 | B5A0703R7 | LBHC 2.550 09/15/2008 | LBHC | LEND | 450,000,000.00 | -450,000,000.00 | CASH/FEDF | 100 | 8/19/2008 | 8/19/2008 | -860,625.00 | 9/15/2008 |
| MSA-FRB | 1084 | B5A070KA5 | LBHC 2.550 09/15/2008 | LBHC | LEND | 750,000,000.00 | -750,000,000.00 | CASH/FEDF | 100 | 8/20/2008 | 8/20/2008 | -1,381,250.00 | 9/15/2008 |

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x
                              :

In re                            :        Chapter 11 Case No.
                                :

LEHMAN BROTHERS HOLDINGS INC., *et al.*,  :        08-13555 (JMP)
                                :

              Debtors.        :        (Jointly Administered)
                                :
                                :
-------------------------------------------------------------------x

**ORDER PURSUANT TO SECTIONS 105(a), 502, 1122(b), AND 1142(b)
OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3013
CLASSIFYING AND ALLOWING THE CLAIM FILED BY THE FEDERAL
HOME LOAN MORTGAGE CORPORATION (CLAIM NO. 33568) IN LBHI CLASS 3**

Upon the motion, dated September 13, 2013 (the "Motion"),[1] of Lehman Brothers

Holdings Inc., as Plan Administrator under the Modified Third Amended Joint Chapter 11 Plan

of Lehman Brothers Holdings Inc. and Its Affiliated Debtors (the "Plan"), pursuant to sections

105(a), 502, 1122(a), and 1142(b) of title 11 of the United States Code and Rule 3013 of the

Federal Rules of Bankruptcy Procedure, seeking to classify and allow proof of claim number

33568 filed by the Federal Home Loan Mortgage Corporation (the "Claim") in LBHI Class 3, as

more fully set forth in the Motion; and the Court having jurisdiction to consider the Motion and

the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Amended

Standing Order of Reference M-431, dated 31, 2012 (Preska, C.J.); and consideration of the

Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b);

and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and

proper notice of the Motion having been provided in accordance with the procedures set forth in

the second amended order entered June 17, 2010 governing case management and administrative

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion.

US_ACTIVE:\44323860\8\58399.0011

procedures [ECF No. 9635]; and it appearing that no other or further notice need be provided; and the Court having found and determined that the relief sought in the Motion is in the best interests of the Chapter 11 Estates, their creditors, and all parties in interest and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is:

ORDERED that the relief requested in the Motion is granted to the extent provided herein; and it is further

ORDERED that the Claim shall (i) be allowed against LBHI in the fixed, liquidated amount of [$1,202,241,875.00]; and (ii) be classified as an unsecured claim under the Plan in LBHI Class 3; and it is further

ORDERED that LBHI shall no longer be required to maintain the reserve for the Claim required by paragraph 2 of the Stipulation and the Claim shall be treated in accordance with section 8.4 of the Plan and the *Order Authorizing Use of Non-Cash Assets in Lieu of Available Cash as Reserves for Disputed Claims Pursuant to Section 8.4 of the Debtors' Confirmed Joint Chapter 11 Plan* [ECF No. 25641]; and it is further

ORDERED that this Court shall retain jurisdiction with respect to all matters arising from or related to this Order.

Dated: [ ], 2013
    New York, New York


_____
UNITED STATES BANKRUPTCY JUDGE

2