## EXHIBIT A-2

**RESERVE FUND AGREEMENT DATED MARCH 7, 2003
(AS AMENDED JANUARY 29, 2007)**

#1984721 v1
108686-64494

Execution Copy

## RESERVE FUND AGREEMENT

This Reserve Fund Agreement (this "Agreement") dated as of March 7, 2003, by and among TOBACCO SETTLEMENT FINANCING CORPORATION, a public body corporate and politic and an instrumentality of the State of New Jersey (the "Issuer"), WACHOVIA BANK, NATIONAL ASSOCIATION, as Trustee, a national banking association (the "Trustee"), and LEHMAN BROTHERS SPECIAL FINANCING INC., a Delaware corporation ("Lehman").

SECTION I.                    DISCLAIMER; DEFINITIONS

Section 1.1 **State Not Obligated.** THE EXECUTION OF THIS AGREEMENT UNDER THE PROVISIONS OF THE ACT SHALL NOT DIRECTLY, INDIRECTLY OR CONTINGENTLY OBLIGATE THE STATE OR ANY POLITICAL SUBDIVISION (OTHER THAN THE ISSUER) THEREOF TO (I) PAY ANY AMOUNTS TO THE ISSUER, OWNER OF THE BONDS OR BENEFITTED PARTIES (AS DEFINED IN THE ACT), OR (II) LEVY OR PLEDGE ANY FORM OF TAXATION WHATSOEVER THEREFOR. NEITHER THE BONDS NOR THIS AGREEMENT IS A DEBT OR LIABILITY OF THE STATE OR ANY AGENCY OR INSTRUMENTALITY THEREOF (OTHER THAN THE ISSUER), EITHER LEGAL, MORAL OR OTHERWISE, AND NOTHING CONTAINED IN THE ACT SHALL BE CONSTRUED TO AUTHORIZE THE ISSUER TO INCUR ANY INDEBTEDNESS ON BEHALF OF OR IN ANY WAY TO OBLIGATE THE STATE OR ANY POLITICAL SUBDIVISION THEREOF (OTHER THAN THE ISSUER).

Section 1.2 For purposes of this Agreement, unless the context clearly indicates otherwise, the words and terms defined in this Section I have the respective meanings given to them herein:

"Act" means the New Jersey Tobacco Settlement Financing Corporation Act, codified at Chapter 18B of Title 52 of the New Jersey Statutes.

"Bond Payment Date" means, with respect to each Deposit Date, each date identified as a "Bond Payment Date" on Exhibit A unless such date is not a Business Day, in which case "Bond Payment Date" means the immediately preceding Business Day; provided that in determining whether any such date is a Business Day no effect shall be given to clause (c) or (d) of the definition of Business Day and provided further, the Bond Payment Date for all or a portion of the amount on deposit in the Reserve Fund may be modified as provided in Section 2.9 hereof.

"Bonds" means the Issuer's $1,659,170,000 Tobacco Settlement Asset Backed Bonds, Series 2003.

1

NYA 591917.8

"Burdened Party" means, (i) in the case of (A) an Issuer Event of Default or a Trustee Event of Default or (B) a termination of this Agreement by the Issuer pursuant to Section 3.1 following a redemption, defeasance or refunding of the Bonds or pursuant to Section 2.8, Lehman and (ii) in the case of a Lehman Event of Default or Lehman Downgrade, the Issuer.

"Business Day" means any day other than (a) a Saturday or Sunday, (b) a day on which the principal corporate trust office of the Trustee is authorized or required by law to close, (c) a day on which banking institutions in the City of New York are authorized or required by law to close, or (d) a day on which any Qualified Securities which may be delivered hereunder are not subject to delivery in the City of New York.

"Calculation Period" means the period from each Deposit Date to the next succeeding Bond Payment Date.

"Closing Date" means March 7, 2003.

"Coupon Payment" means, for any Qualified Security, a payment of interest which is due to be paid thereon prior to the scheduled maturity of such Qualified Security.

"Dealer" means a leading dealer in the relevant markets selected by Lehman in good faith and consented to by the Issuer (such consent not to be unreasonably withheld) (a) from among dealers of the highest credit standing which satisfy all the criteria that Lehman applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from such dealers having an office in the same city.

"Debt Service Payment" means (i) Qualified Swap Payment, (ii) a scheduled payment of principal or sinking fund installment of or interest on the Bonds or (iii) a payment of principal or redemption premium of or interest on the Bonds resulting from an Event of Default (as defined in the Indenture) under the Indenture but excluding (A) any payment in connection with any other redemption of the Bonds (other than a mandatory sinking fund redemption) and excluding (B) any payment required to make a regularly scheduled deposit to the principal account or interest account for the Bonds.

"Default Rate" means a per annum rate equal to the lesser of (a) Three Month LIBOR plus 1% per annum, or (b) the maximum rate permitted by law.

"Delivery Notice" means a notice substantially in the form of Exhibit E or in such other form as provided by the Qualified Dealer and is reasonably acceptable to the Trustee.

"Deposit Date" means each date identified as a "Deposit Date" on Exhibit A unless such date is not a Business Day, in which case "Deposit Date" means the immediately preceding Business Day.

2

NYA 591917.8

"Differential" means the amount, if any, by which the Purchase Price of any Qualified Security delivered hereunder exceeds the Market Value thereof.

"Eligible Securities" means (i) direct obligations of the United States Treasury including only notes, bonds, bills or certificates of indebtedness, (ii) direct obligations of, or obligations guaranteed as to timely payment of principal and interest by, the Federal Home Loan Mortgage Corporation, Fannie Mae, the Federal Home Loan Bank, the Federal Farm Credit System, the Export-Import Bank of the United States, the Federal Financing Bank, the Government National Mortgage Association, the Farmers' Home Administration, the Federal Housing Administration, the Private Export Funding Corporation, the Resolution Trust Company, or the Student Loan Marketing Association, provided that such obligations are rated either (A) at least "Aa3" by Moody's, "AA-" by S&P and "AA-" by Fitch, if such obligations mature in 180 days or more after the date of issuance thereof or (B) "P-1" by Moody's, "A-1+" by S&P and "F-1+" by Fitch, if such obligations mature in less than 180 days after the date of issuance thereof; (iii) commercial or finance company paper (including both non-interest-bearing discount obligations and interest bearing obligations) having short-term ratings of "A-1" by S&P, "P-1" by Moody's and "F1" by Fitch and that are either (x) payable at par on demand or on a specified date at least 191 days, but not more than 270 days, after the date of issuance thereof and that have long-term ratings of "AA" by S&P, "Aa1" by Moody's and "AA" by Fitch, (y) payable at par on demand or on a specified date at least 100 days, but not more than 190 days, after the date of issuance thereof and that have long-term ratings of "A" by S&P, "A1" by Moody's and "A" by Fitch, or (z) payable at par on demand or on a specified date not more than 99 days after the date of issuance thereof.

"Fitch" means Fitch Ratings, Inc.

"Guaranteed Rate" means a rate per annum equal to 4.44%.

"Illegality" means any event due to the adoption of, or any change in, any applicable law after the date on which this Agreement is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of this Agreement or to comply with any other material provision of this Agreement.

"Incipient Illegality" means (a) the enactment by any legislative body with competent jurisdiction over the Issuer of legislation which, if adopted as law, would render unlawful (i) the performance by the Issuer of any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of this Agreement or the compliance by the Issuer with any other material provision of this Agreement or (ii) the performance by the Issuer of any contingent or other obligation which the Issuer has relating to this Agreement, (b) any assertion in any proceeding, forum or action by the Issuer in respect of the Issuer or in respect of any entity

3

located or organized under the laws of the state in which the Issuer is located to the effect that performance under this Agreement or similar agreements is unlawful or (c) the occurrence with respect to the Issuer of any event that constitutes an Illegality.

"Indenture" means the Indenture, dated as of March 1, 2003, by and between the Issuer and the Trustee, as amended and supplemented from time to time in accordance with the terms hereof and thereof.

"Insolvent" means (i) either the Trustee or Lehman as the case may be, shall (1) commence a voluntary case under the federal bankruptcy laws (as in effect on the date of this Agreement or hereafter), (2) file a petition seeking to take advantage of any other law relating to bankruptcy, insolvency, reorganization, winding up or composition or adjustment of debts, (3) consent to any petition filed against it in an involuntary case under such bankruptcy or insolvency or other laws, (4) apply for or consent to the appointment of, or the taking of possession by, a trustee, receiver, custodian, liquidator or the like for itself or for all or a substantial part of its property, (5) admit in writing its inability to pay, or generally not be paying, its debts as they come due, (6) make a general assignment for the benefit of creditors, or (7) take any official action for the purpose of effecting any of the foregoing; or (ii) a case or other proceeding shall be commenced against either the Trustee or Lehman, as the case may be, in any court of competent jurisdiction seeking (1) relief under the federal bankruptcy laws (as in effect on the date of this Agreement or hereafter) or under any other law relating to bankruptcy, insolvency, reorganization, winding up or composition or adjustment of debts, or (2) the appointment of a trustee, receiver, custodian, liquidator or the like for the Trustee or Lehman, as the case may be, or for all or a substantial part of its property, and any such case or proceeding shall continue undismissed and unstayed for a period of 60 consecutive calendar days, or an order granting the relief requested in any such case or proceeding against such party shall be entered and shall remain in effect and unstayed for a period of 60 consecutive days.

"Issuer Event of Default" means the occurrence of an event specified in Section 7.2 hereof.

"LBH" means Lehman Brothers Holdings Inc., which wholly owns and unconditionally guarantees the obligations of Lehman.

"Lehman Cure Period" has the meaning specified in Section 7.3(a) hereof.

"Lehman Event of Default" means the occurrence of an event specified in Section 7.3 hereof.

"Market Value" means with respect to any Qualified Security, the market value thereof (including accrued interest thereon) as specified by the Qualified Dealer delivering that security, provided that the Market Value of any Qualified Security shall in no event exceed the Maturity Amount thereof.

4

"Master Settlement Agreement" has the meaning specified in the Indenture.

"Maturity Amount" means, with respect to any Qualified Security, the amount, payable in cash, representing the principal and interest (including any Coupon Payments) due thereon on or prior to its maturity date.

"Moody's" means Moody's Investors Service, its successors and assigns.

"Other Investment Agreements" means the Debt Service Reserve Fund Agreement, dated as of March 7, 2003, by and among Tobacco Settlement Financing Corporation, Wachovia Bank, National Association, Morgan Stanley Capital Services Inc. and Morgan Stanley & Co. Incorporated.

"Pledged Assets" means Collections as defined in the Indenture.

"Purchase and Sale Agreement" means the Purchase and Sale Agreement, dated as of March 1, 2003, by and between the Issuer and the State, as amended, supplemented and in effect from time to time in accordance with the terms and conditions thereof and the provisions of the Act.

"Purchase Price" means, for any Eligible Security delivered hereunder, that price for such security, as set forth in the Delivery Notice, which will produce a rate of return on such security for the period from (and including) the date of its delivery to (but excluding) the maturity date thereof which, assuming reinvestment of the proceeds thereof at a corresponding rate for the remainder of the related Calculation Period, will be equal to the Guaranteed Rate assuming a year of 360 days with twelve thirty day months.

"Qualified Dealer" means Lehman Brothers Inc., its successors or assigns, or any other dealer in Eligible Securities selected by Lehman.

"Qualified Securities" means, for any Deposit Date or subsequent deposit date pursuant to Section 2.3 or 2.4 hereof, Eligible Securities which, (i) mature on or prior to the related Bond Payment Date and (ii) have an aggregate Purchase Price which is as close as possible to but does not exceed the related Scheduled Reserve Amount.

"Qualified Swap" means any Swap (as defined in the Indenture) with respect to which the Issuer has obtained written confirmation (and provided to Lehman a copy of each such confirmation) from each Rating Agency (as defined in the Indenture) then rating the Bonds that the execution of such Swap will not adversely affect the rating on the Bonds assigned by each such Rating Agency or result in the withdrawal or suspension of such rating.

5

"Qualified Swap Payments" means regularly scheduled Parity Swap Payments (as defined in the Indenture) due in connection with any Qualified Swap and payable on parity with the Bonds and shall not include any amount due in connection with the early termination of any Qualified Swap.

"Qualifying Statute" means Sections 52:4D-1 et seq. of the New Jersey Statutes.

"Reserve Fund" means the account created pursuant to Section 4.01 of the Indenture and designated thereunder as the Debt Service Reserve Account.

"Scheduled Reserve Amount" means, for each Deposit Date, the amounts shown on Exhibit A which, under the terms of the Indenture, will be a portion of the Debt Service Reserve Requirement (as defined in the Indenture) applicable to the Bonds on such date, assuming that no withdrawals from the Reserve Fund have been made to make a Debt Service Payment.

"S&P" means Standard & Poor's, a division of The McGraw-Hill Companies, its successors and assigns.

"State" means The State of New Jersey.

"Termination Amount" means an amount, as determined by Lehman reasonably and in good faith on the basis of the arithmetic mean of quotations from at least three Dealers of the amount, if any, that each such Dealer would require the Burdened Party to pay to the Dealer (expressed as a positive number if the Burdened Party is Lehman and a negative number if the Burdened Party is the Issuer) or would pay to the Burdened Party (expressed as a negative number if the Burdened Party is Lehman and a positive number if the Burdened Party is the Issuer) in consideration of such Dealer entering into an agreement with the Burdened Party (with such documentation as Lehman and the Dealer may in good faith agree) which would have the effect of preserving for the Burdened Party the economic equivalent of its rights under this Agreement for the period commencing on the termination date of this Agreement and terminating on the last Bond Payment Date set forth in Exhibit A (assuming for these purposes that this Agreement were not terminating on the termination date and continued in full force through such last Bond Payment Date); provided, however, that:

(i)     if more than three quotations are provided, the Termination Amount will be the arithmetic mean of such quotations, without regard to the quotations having the highest and lowest values,

(ii)     if exactly three quotations are provided, the Termination Amount will be the quotation remaining after disregarding the highest and lowest quotations,

for purposes of clauses (i) and (ii), if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded, and

6

(iii)    if Lehman is unable to obtain three such quotations, the Termination Amount shall be the amount, as reasonably determined in good faith by Lehman, to be the Burdened Party's total losses and costs (expressed as a positive number if the Burdened Party is Lehman and a negative number if the Burdened Party is the Issuer), or gains (expressed as a negative number if the Burdened Party is Lehman and a positive number if the Burdened Party is the Issuer) in connection with a termination of this Agreement, including any loss of bargain, cost of funding or, at the election of Lehman but without duplication, any loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position, and;

provided further, however, that in any event the Termination Amount shall also include (A) any unpaid amounts due as of the date of termination of this Agreement (including any amounts due under Section 7.7 hereof) and (B) if such Termination Amount is being paid in connection with a termination of this Agreement following an Event of Default or if any Termination Amount otherwise due hereunder is not paid when due, the Termination Amount shall also include any incidental costs and expenses incurred by the Burdened Party in connection with such termination and the enforcement of its rights hereunder (including costs of collection and reasonable attorneys' fees). Any determination of the Termination Amount by Lehman shall be conclusive and binding on the parties hereto absent manifest error.

"Three Month LIBOR" as of any date of determination means the rate for deposits in US dollars for a period of three months which appears on the Telerate Page 3750 as of 11:00 a.m., London time, on the day that is two London Business Days before the day for which such determination is being made. If no such rate appears on the Telerate Page 3750 as of such date, Lehman may select another nationally recognized published source to determine Three Month LIBOR.

"Trustee Event of Default" means the occurrence of an event specified in Section 7.1 hereof.

"TSRs" has the meaning specified in the Act.

SECTION II.         PURCHASE AGREEMENT

Section 2.1    Purchase and Sale of Qualified Securities.

(a)    Lehman shall cause a Qualified Dealer to deliver to the Trustee, on any Deposit Date, in accordance with the delivery requirements of Section 2.2 hereof, to the extent such securities are available on the open market, Qualified Securities selected by Lehman or the Qualified Dealer.

7

(b)   If Lehman causes a Qualified Dealer to deliver Qualified Securities, the Trustee shall, out of funds available under the Indenture available for such purpose or as otherwise provided by the Issuer, at the time of the delivery of such Qualified Securities, purchase such Qualified Securities and pay to the Qualified Dealer or Lehman, as applicable, in accordance with Section 2.2(b) hereof, an amount equal to the Purchase Price thereof.

Section 2.2   Delivery; Payment.

(a)   All Qualified Securities delivered hereunder shall be delivered to the Trustee to the account specified in Section 10.1 hereof, in such manner as at the time is generally acceptable for delivery of Qualified Securities.   All Qualified Securities delivered hereunder shall be delivered to the Trustee on a "delivery versus payment" basis and shall be delivered free and clear of all liens and encumbrances.

(b)   (i)   Lehman shall cause the Qualified Dealer to send a Delivery Notice to the Trustee at least one Business Day prior to the delivery of any Qualified Securities which are in book-entry form and at least two Business Days prior to the delivery of any Qualified Securities which are being delivered in certificated form.   The Trustee may conclusively rely on the Qualified Dealer's specification in the Delivery Notice of the Market Value, the Maturity Amount and the Purchase Price of a Qualified Security.

(ii)   Concurrently with the delivery of any Qualified Securities, unless otherwise directed by Lehman in writing, the Trustee shall, subject to clause (iii) below, pay the Qualified Dealer delivering such Qualified Securities, in its individual capacity, the Market Value thereof, and to the Qualified Dealer as agent for Lehman, the Differential, if any.

(iii)   Lehman may in the Delivery Notice, direct the Trustee to pay (A) to the Qualified Dealer, the Market Value of any Qualified Securities delivered to the Trustee hereunder, and (B) to Lehman, the Differential, if any.   Any such payment to Lehman shall be at Lehman's account as set forth in the Delivery Notice.

(iv)   All payments to be made hereunder shall be made in immediately available funds by means of a bank or Federal funds wire.

Section 2.3   Subsequent Deliveries.   If any Qualified Securities delivered by a Qualified Dealer pursuant to Section 2.1 hereof (a) mature prior to the Bond Payment Date for which such Qualified Securities were delivered, or (b) have a Coupon Payment, Lehman shall, upon at least one Business Day's prior written notice to the Trustee in the form of the Delivery Notice, have the right to cause a Qualified Dealer to deliver to the Trustee, at any time on or after the maturity date of such Qualified Securities (or, as applicable, on or after the interest payment date of such Coupon Payment) but prior to the date which is one Business Day before such Bond Payment Date, other Qualified Securities, provided that the Purchase Price thereof does not exceed the Maturity Amount of the securities which have so matured (or as applicable, the

8

amount of the Coupon Payment).  Any such deliveries by the Qualified Dealer shall conform to the requirements of Section 2.2(a) and (b) hereof.  Upon the delivery by the Qualified Dealer of such Qualified Securities, the Trustee shall pay the Purchase Price thereof in the manner required by Section 2.2(b)(ii) hereof.

Section 2.4    Late Delivery; Failure to Deliver.

(a)    If Lehman fails to cause a Qualified Dealer to deliver Qualified Securities as required hereunder by 4:30 p.m. New York City time on any Deposit Date or during the Lehman Cure Period, the Trustee shall, on each such date, invest the related Scheduled Reserve Amount on an overnight basis in Eligible Investments (as defined in the Indenture) and if Lehman's failure continues beyond the Lehman Cure Period, the Trustee shall invest the related Scheduled Reserve Amount in Eligible Investments (as defined in the Indenture) with the longest reasonably obtainable maturities, provided such maturities are not later than the related Bond Payment Date.

(b)    No failure on Lehman's part to cause a Qualified Dealer to deliver Qualified Securities hereunder shall terminate or affect Lehman's right to cause future sales of Qualified Securities in accordance with this Agreement.

Section 2.5    Notice of Withdrawal from Reserve Fund; Replenishment.

(a)    If at any time the Trustee is required under the Indenture to withdraw any investments or other amounts from the Reserve Fund (including any Qualified Securities), or to otherwise liquidate any investments, to make a Debt Service Payment, the Trustee shall promptly give oral and written notice thereof to Lehman and shall in such notice specify (i) the amount or investments which are to be withdrawn and (ii) the amount which will be in the Reserve Fund after giving effect to such withdrawal; provided, however, that if the Trustee is required to make any withdrawal from the Reserve Fund pursuant to the terms of the Indenture, it shall withdraw any amounts invested hereunder solely on a pro rata basis with all other funds credited to the Reserve Fund which are not subject to the terms of this Agreement (including, without limiting the foregoing, funds which are available pursuant to any Other Investment Agreements, any credit facility, liquidity facility or similar arrangement) and any securities on deposit in or otherwise credited to the Reserve Fund which are not subject to the terms of this Agreement, such that the ratio of the amount invested hereunder to the Debt Service Reserve Requirement (as defined in the Indenture) remains constant.

(b)    If, following the Trustee's withdrawal of funds from the Reserve Fund pursuant to Section 2.5(a) above, within twelve (12) months of such withdrawal, (i) sufficient funds are deposited into the related Reserve Fund to permit the purchase of Qualified Securities hereunder or (ii) the Issuer has notified the Trustee in writing (with a copy to Lehman) that it intends to deposit sufficient funds in the Reserve Fund within twelve (12) months after such withdrawal from the Reserve Fund pursuant to Section 2.5(a) above, then the Trustee shall, within two Business Days of such replenishment of the Reserve Fund, give oral and written notice (a "Reserve Fund

9

NYA 591917 9

Replenishment Notice") to Lehman stating (A) the amount of funds which have been or will be deposited into the Reserve Fund (the "Replenishment Amount") and (B) the date(s) or expected date(s) of such deposit(s). If the Trustee has so delivered a Reserve Fund Replenishment Notice to Lehman, then by no later than the second Business Day after delivery thereof, the Trustee shall purchase any Qualified Securities duly tendered by the Qualified Dealer in accordance with Section 2.2 hereof. In any event, the aggregate purchase price of any Qualified Securities delivered pursuant to this Section 2.5(b) shall not exceed the pro rata portion of the Replenishment Amount relating to the amount by which the Scheduled Reserve Amount was decreased pursuant to Section 2.5(a) above, such that the ratio of the amount invested hereunder to the Debt Service Reserve Requirement (as defined in the Indenture) remains constant.

(c)    If the Reserve Fund is not replenished within twelve (12) months of a withdrawal, Lehman shall not be required or obligated under this Agreement to cause the Qualified Dealer to make any delivery of Qualified Securities with respect to the Replenishment Amount upon the replenishment of the Reserve Fund.

Section 2.6    Direction by Issuer to Trustee. The Issuer hereby irrevocably instructs the Trustee and the Trustee agrees to take the actions and to make the purchases required hereby.

Section 2.7    Lehman Downgrade.

(a)    If during the term of this Agreement the long-term senior unsecured debt ratings of LBH are suspended, withdrawn or fall below "A3" by Moody's, below "A-" in the case of Fitch, if rated by Fitch or "A-" by S&P (in any such case, a "Lehman Downgrade"), Lehman shall provide written notice to the Issuer and the Trustee within five Business Days of such Lehman Downgrade.

(b)    (a)    Upon such Lehman Downgrade, Lehman shall within ten Business Days of such Lehman Downgrade take one of the following actions

(i)    assign and transfer all of this Agreement and its interests hereunder to a transferee reasonably acceptable to the Issuer and rated at least "A-" by S&P, "A-" by Fitch, if rated by Fitch and "A3" by Moody's, provided that in all such instances of transfer the transferee shall assume all of the rights and obligations of Lehman hereunder;

(ii)    have obligations of Lehman hereunder guaranteed by an entity selected by Lehman and reasonably acceptable to the Issuer and rated at least "A-" by S&P, "A-" by Fitch, if rated by Fitch and "A3" by Moody's;

(iii)    deliver collateral to the Trustee comprised of Eligible Securities such that the market value of the collateral will be sufficient to maintain a rating on the Agreement equal to at least "A2" by Moody's, "A" by S&P and, "A" by Fitch, if the Bonds are rated by Fitch; or

(iv)    terminate this Agreement by giving written notice thereof to the Issuer with a copy to the Trustee, whereupon Lehman shall determine the Termination Amount and (i) if the Termination Amount is a negative number, Lehman shall promptly, but no later than one Business Day after written notice that such amount is due, pay such amount, in immediately available funds, to the Issuer and (ii) if the Termination Amount is a positive number, Lehman may demand payment by the Issuer of the Termination Amount in which case the Issuer shall promptly, but no later than one Business Day after notice that such amount is due, pay, in immediately available funds, the Termination Amount to Lehman. If any such amount is not paid when due, the party owing such amount shall pay interest on such amount for each date such amount is due but not paid at the Default Rate. Any amounts due from the Issuer hereunder shall be made from funds available under the Indenture for such purpose or as otherwise provided from the Issuer.

Section 2.8    Issuer Optional Termination.    The Issuer may elect to terminate this agreement at any time at its option. If the Issuer elects to terminate this Agreement, the Issuer shall give ten (10) Business Days prior written notice to Lehman. Lehman shall calculate the Termination Value and (i) if the Termination Amount is a positive number, make demand upon the Issuer for the payment of the Termination Amount; and (ii) if the Termination Amount is a negative number, pay such amount to the Issuer. The Issuer agrees that it shall not be permitted to exercise its right to terminate this Agreement pursuant to this Section 2.8 unless either (i) the Issuer has sufficient funds available to pay any Termination Amount that may be due as provided herein or (ii) the Issuer has demonstrated to Lehman that the Issuer will have sufficient funds available to pay such Termination Amount within one (1) year of the date of termination and Lehman has consented to such termination.

Section 2.9  December 1 Bond Payment Date.  If following December 1, 2004, the Trustee determines that a withdrawal from the Reserve Fund will be required on December 1 of any year (after taking into account (i) actual annual payments and strategic contribution fund payments under the Master Settlement Agreement without reference to any subsequent adjustments and (ii) any earnings on moneys held by the Trustee under the Indenture and payable to the Trustee prior to such December 1 and available thereon to pay debt service on the Bonds), the Trustee shall, upon at least ten (10) Business Days prior to the Business Day next preceding June 1 of such year, specify via writing to Lehman and the Issuer that the Bond Payment Date for such portion of the Reserve Fund, as the Trustee shall specify, shall be the Business Day preceding the next succeeding December 1.

# SECTION III.    DEFEASANCE OR REFUNDING

Section 3.1    Defeasance or Refunding.

(a)    The Issuer may, by giving Lehman at least fifteen Business Days' prior notice, but without the consent of Lehman redeem, defease, repurchase or refund the Bonds (in

11

NYA 601017 o

whole or in part) as provided in the Indenture, provided that if the Issuer takes any such action (other than in respect of any redemption, defeasance, repurchase or refunding which does not affect the Scheduled Reserve Amount) (i) if the Termination Amount is a positive number, the Issuer shall pay Lehman in immediately available funds the Termination Amount and (ii) if the Termination Amount is a negative number, Lehman shall pay such amount to the Issuer. If the Termination Amount is payable pursuant to this Section 3.1, the party owing such amount shall pay such amount promptly but by no later than the later of (A) one Business Day after receipt of notice of the Termination Amount from Lehman or (B) the date of such redemption, defeasance, repurchase or refunding. Such payment shall be made in immediately available funds, to or at the direction of the party to whom such Termination Amount is due.

(b)    Immediately upon payment of the Termination Amount in accordance with this Section 3.1 this Agreement shall terminate. The Issuer agrees that it shall not redeem, defease, repurchase or refund the Bonds unless either (i) the Issuer has sufficient funds available to pay any Termination Amount that may be due as provided herein at or prior to such redemption, defeasance, repurchase or refunding or (ii) the Issuer has demonstrated to Lehman that the Issuer will have sufficient funds available to pay such Termination Amount within one (1) year of the date of termination and Lehman has consented to such termination.

(c)    If pursuant to clause (a) above this Agreement would be terminated in connection with the issuance of bonds to refund the Bonds (the "Refunding Bonds"), the Issuer may, by written notice to Lehman, request that Lehman continue this Agreement and have such Agreement apply to all or a portion of the cash flows relating to the Refunding Bonds. Lehman agrees that if it receives such a request it shall agree to so continue this Agreement with respect to the Refunding Bonds and the Bonds remaining outstanding after such refunding, provided that:

(i)    Lehman receives such request (together with all relevant details relating thereto) at least 30 days in advance of the issuance of the Refunding Bonds;

(ii)    on or prior to the date the Bonds are to be refunded (the "Refunding Date") the Issuer and the trustee of the Refunding Bonds enter into such amendments of this Agreement with Lehman (the "Amended Agreement") as are necessary to have this Agreement pertain to the scheduled reserve amounts, deposit dates and bond payment dates applicable to the Refunding Bonds and to any Bonds which remain outstanding after giving effect to such refunding (the "Amended Cash Flows");

(iii)    if as determined on the Refunding Date, (a) the Termination Amount payable to Lehman with respect to the Scheduled Reserve Amounts, Deposit Dates and Bond Payment Dates which would be remaining hereunder on such date, assuming that the Bonds were not then refunded (the "Original Cash Flows") would be greater than the Termination Amount to Lehman of its investment rights with respect to the Amended Cash Flows or (b) the Termination Amount that would be payable to the Issuer with respect to the Original Cash Flows would be less than the Termination Amount that would be payable to the Issuer with respect to the Amended Cash Flows, the Issuer shall on or before the Refunding Date

NYA 591917.8

pay to Lehman the amount of such difference; provided, however, that with respect to clause (b) above, Lehman may, at its option, elect to receive from the Issuer the amount of such difference or retain investment rights only with respect to such portion of the Amended Cash Flows as would have a Termination Amount payable to the Issuer equal to the Termination Amount payable to the Issuer in respect of the Original Cash Flows;

(iv)  if as determined on the Refunding Date, (a) the Termination Amount that would be payable to Lehman with respect to the Amended Cash Flows would be greater than the Termination Amount that would be payable to Lehman with respect to the Original Cash Flows or (b) the Termination Amount that would be payable to the Issuer with respect to the Original Cash Flows would be greater than the Termination Amount that would be payable to the Issuer with respect to the Amended Cash Flows, Lehman shall on or before the Refunding Date pay to the Issuer the amount of such difference; provided, however, that with respect to clause (a) above, Lehman may, at its option, elect to pay to the Issuer the amount of such difference or retain investment rights only with respect to such portion of the Amended Cash Flows as would have a Termination Amount payable to Lehman equal to the Termination Amount payable to Lehman in respect of the Original Cash Flows;

(v)  the last deposit date under the Amended Agreement is no later than the last Deposit Date hereunder;

(vi)  the Refunding Bonds have a credit rating at least equivalent to the credit rating of the Bonds without giving effect to any bond insurance and are secured in the same manner as the Bonds; and

(vii)  Lehman receives any opinions and other assurances and agreements it may reasonably request to assure that the protections afforded it hereunder will continue under the Amended Agreement.

For any calculation of Termination Amount pursuant to this Section 3.1, Lehman shall be deemed to be the Burdened Party.

Section 3.2    <u>Mandatory Clean Up Call Redemption</u>.  Upon at least ten (10) Business Days prior written notice to Lehman, the Issuer shall have the right to terminate this Agreement, in whole but not in part, in connection with a mandatory clean up call redemption of the Bonds (as provided for in Section 4.06(i) of the Indenture).  In connection with any such termination Lehman shall determine the Termination Amount and (i) if the Termination Amount is a negative number, Lehman shall promptly, but no later than one Business Day after notice that such amount is due, pay such amount, in immediately available funds, to the Issuer and (ii) if the Termination Amount is a positive number, Lehman may demand payment by the Issuer of the Termination Amount in which case the Issuer shall promptly, but no later than one Business Day after notice that such amount is due, pay, in immediately available funds, the Termination Amount to Lehman. If any such amount is not paid when due, the party owing such amount shall pay interest on such amount for each date such amount is due but not paid at the Default Rate. For avoidance of doubt, the Issuer's ability to terminate this Agreement pursuant to this Section 3.2, shall not be contingent on the current or expected future available funds of the Issuer.  If,

13

NYA 591017 8

following any redemption in accordance with this Section 3.2, there are no Bonds outstanding, the Issuer hereby covenants and warrants that so long as it shall have any obligations to Lehman hereunder, the Issuer shall take all necessary action to maintain the Indenture in full force and effect and shall observe, perform and fulfill each agreement and covenant contained in the Indenture as if Lehman were a named beneficiary thereof and shall pay any Termination Amount due hereunder to Lehman on or prior to the next date on which the Issuer receives payment of the Pledged TSRs (as defined in the Indenture).

SECTION IV        REPRESENTATIONS AND WARRANTIES

Section 4.1    Representations and Warranties.    Each party hereto represents and warrants to the other parties hereto at all times during the term of this Agreement that:

(a)    it is duly organized and validly existing under the laws of its jurisdiction, incorporation or establishment;

(b)    it has the power to enter into and perform its obligations under this Agreement (including, in the case of the Issuer, to pay the Termination Amount in accordance herewith and, including, in the case of the Issuer or the Trustee, to enter into and perform its obligations under the Indenture);

(c)    this Agreement has been duly authorized, executed and delivered by it and, assuming the due authorization, execution and delivery hereof by the other parties hereto, constitutes a legal, valid and binding obligation of it enforceable against it in accordance with the terms hereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity regardless of whether enforcement is sought in a proceeding in equity or at law;

(d)    its execution and delivery of this Agreement and its performance of its obligations hereunder do not and will not constitute or result in a default under, a breach or violation of, or the creation of any lien or encumbrance on any of its property under, its charter or by-laws (or equivalent organizational documents), or any other agreement (including in the case of the Issuer and the Trustee, the Indenture), instrument, law, ordinance, regulation, judgment, injunction or order applicable to it or any of its property;

(e)    except as otherwise disclosed in the Official Statement for the Bonds, there is no proceeding pending or threatened against it at law or in equity, or before any governmental instrumentality or in any arbitration, which would materially impair its ability to perform its obligations under this Agreement, and there is no such proceeding pending against it which purports or is likely to affect the legality, validity or enforceability of the Agreement; and

(f)    in the case of the Issuer,

14

NYA 501017 8

(i)    all Deposit Dates, Bond Payment Dates and Scheduled Reserve Amounts as indicated on Exhibit A of this Agreement are true and correct in all respects;

(ii)    any amounts required to be paid by the Issuer under this Agreement are subject to the provisions of the New Jersey Tort Claims Act (N.J.S.A. 59:1-1 et seq.) and the New Jersey Contractual Liability Act (N.J.S.A. 59:13-1 et seq.);

(iii)    it is subject to suit at law or in equity pursuant to paragraph (a) of Section 6 of P.L. 2002, c.32 and accordingly, is not entitled to claim immunity on the grounds of sovereignty from suit;

(iv)    it has delivered to Lehman its most recent annual audited statement of financial condition, if any, and the Issuer has not experienced since the date of its last published financial statement any material adverse change in its business, assets, operations or financial condition which would materially impair the Issuer from performing its obligations hereunder;

(v)    it has not nor does it anticipate that there shall be any occurrence or existence of (1) a default, event of default or other similar condition or event (however described and including any such conditions or events which will become events of default with the passing of time or the giving of notice) in respect of the Issuer under one or more agreements or instruments relating to any long-term indebtedness of the Issuer which has resulted in such long-term indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by the Issuer in making one or more payments on the due date thereof under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vi)    it is solvent and has, and will have after giving effect to this Agreement, sufficient capital to conduct its business and to pay its debts as they become due;

(vii)    it has not experienced any Incipient Illegality with respect to this Agreement;

(viii)    it is not subject to any administrative, governmental or other investigation, special review or order, or pending order or similar event;

(ix)    the Eligible Securities to be delivered pursuant to this Agreement constitute Eligible Investments (as defined in the Indenture);

(x)    the Act authorizes the Issuer to enter into any "ancillary facility", as therein defined, including any forward agreement, with any person under such terms and conditions as the Issuer, with the approval of the State Treasurer, may determine;

15

(xi)    the Issuer has determined that it is appropriate to enter into this Agreement to accomplish the purposes set forth in Section 7.h of the Act;

(xii)    the State Treasurer has approved the terms and conditions, and the execution and delivery by the Issuer, of this Agreement pursuant to Section 6.1 of the Act; and

(xiii)    this Agreement is being entered into pursuant to the Act as an "ancillary facility" thereunder.

(g)    in the case of each of the Issuer and the Trustee:

(i)    the Indenture has been duly authorized, executed and delivered by it;

(ii)    assuming the due authorization, execution and delivery thereof by the other parties thereto, the Indenture and the other Indenture constitute legal, valid and binding obligations of it, enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity regardless of whether enforcement is sought in a proceeding in equity or at law,

(iii)    the Indenture is in full force and effect on the date hereof and no amendment, waiver or course of dealing has amended or terminated any of the terms thereof since the original execution and delivery of the Indenture except such as may have been delivered to Lehman pursuant to Section 6.1(d) hereof, and

(iv)    no "event of default" has occurred and is continuing under the Indenture.

SECTION V.        COVENANTS AND ACKNOWLEDGMENTS

Section 5.1    Covenants.  Each of Lehman, the Issuer and the Trustee covenants to the other parties to this Agreement that so long as it shall have any obligations under this Agreement it shall:

(a)    maintain in full force and effect all authorizations and agreements of and exemptions, consents, licenses, actions or approvals by, and all filings with or notices to, any governmental or other authority that are required to be obtained or made by such party with respect to this Agreement and will use all reasonable efforts to obtain or make any that may become necessary in the future;

(b)    comply in all material respects with all applicable laws, rules, regulations and orders to which it may be subject if failure so to comply could materially impair its ability to perform its obligations under this Agreement;

16

NYA 591917.8

(c)     if it is the Issuer or the Trustee, not enter into any amendment or modification of the Indenture which could impair its ability to perform its obligations to Lehman hereunder except nothing contained hereunder shall restrict the Issuer's ability to cause the Issuer to issue additional bonds under the Indenture;

(d)     if it is the Issuer, the Issuer agrees that, during the term of this Agreement, it shall deliver to Lehman its most recently available audited statement of financial condition as such are issued;

(e)     if it is the Issuer, it shall not replace this Agreement or withdraw any amounts held in the Debt Service Reserve Fund for purposes of purchasing a surety bond or any similar financial instrument;

(f)     if it is the Issuer, take all necessary action to remain duly organized and validly existing under the laws of its jurisdiction, incorporation or establishment;

(g)     if it is the Issuer, take all necessary action to ensure the continued receipt by it of the Collections (as defined in the Indenture), including, without limitation, the Pledged TSRs (as defined in the Indenture) and application thereof, including, without limitation, the payment of Operating Expenses (as defined in the Indenture) in accordance with the terms of the Indenture; and

(h)     if it is the Issuer, pursuant to the prohibition set forth in Section 10.b of the Act (the "Nonpetition Provision"), prior to the date that is one year and one day after the Issuer no longer has any securities or "ancillary facilities" (as defined in the Act), including this Agreement, outstanding, the Issuer shall not file a voluntary petition under Chapter 9 of the Federal Bankruptcy Code, as amended from time to time.

Section 5.2    <u>Pledges by the State of New Jersey</u>.

(a)     Pursuant to Section 10.a of the Act, the State pledges and agrees with the Issuer and the "benefitted parties" (as defined in the Act), and authorizes and directs the inclusion of such pledge and agreement in "sale agreements", as defined therein, and authorizes and directs the Issuer to include the same in contracts with the owners of the "securities" and "benefitted parties", each as defined therein, substantially as follows, which pledge and agreement is hereby expressly included in this Agreement. Until all such securities and ancillary facilities, together with the interest thereon and all costs and expenses in connection with any action or proceedings by or on behalf of owners of such securities or benefitted parties, are fully paid and discharged, the State will:

17

NYA 591917.8

(i) irrevocably direct, through the Attorney General, the escrow agent under the Master Settlement Agreement to transfer directly to the Issuer or its assignee the TSRs;

(ii) enforce the Issuer's rights to receive the TSRs to the full extent permitted by the terms of the Master Settlement Agreement;

(iii) not amend the Master Settlement Agreement in any manner that would materially impair the rights of such owners of said securities or of such benefitted parties;

(iv) not limit or alter the rights of the Issuer to fulfill the terms of its agreements with such owners or benefitted parties;

(v) not in any way impair the rights and remedies of such owners or benefitted parties or the security for such securities or ancillary facilities (provided, that nothing herein shall be construed to preclude the State's regulation of smoking and taxation and regulation of the sale of cigarettes or the like);

(vi) not fail to enforce the Qualifying Statute; and

(vii) not amend, supersede or repeal the Qualifying Statute in any way that would materially adversely affect the amount of any payment to, or materially impair the rights of, the Issuer, such owners of said securities or such benefitted parties.

(b)    Pursuant to Section 10.b of the Act, the State covenants with such owners of said securities and such benefitted parties, and authorizes and directs the Issuer to include such covenant as an agreement of the State in any contract with such owners and benefitted parties, that the State will not limit or alter the Nonpetition Provision during the period set forth therein.

Section 5.3    <u>Role of Lehman; Independent Judgment</u>.  The Issuer acknowledges and agrees that in connection with its decision to enter into this Agreement and its subsequent negotiation and execution of this Agreement, (i) neither Lehman, nor any of its directors, officers, employees, agents or affiliates (each of the foregoing, including Lehman, a "Lehman Party") has acted as a fiduciary  or financial or investment advisor to or agent or other representative of the Issuer, (ii) the Issuer has, to the extent it has deemed necessary, consulted with its own legal, tax, regulatory, accounting, financial and investment advisors in determining the suitability and appropriateness of this Agreement as well as in negotiating the specific terms hereof and has not relied upon any advice from any Lehman Party, with respect to such matters; the Issuer understands the terms, conditions and risks of this Agreement and is capable of assuming such risks; and (iii) the terms and conditions of this Agreement have been individually negotiated by it and the Trustee and are the result of arms-length negotiations among Lehman, the Trustee and the Issuer.

18

NYA 591917.8

Section 5.4    <u>No Liability</u>.  Each of the Issuer and the Trustee agrees that no Lehman Party shall be liable or responsible for: (i) the payment of any amounts owing on or with respect to the Bonds; (ii) the Trustee's use or application of any moneys payable to the Trustee hereunder; (iii) any acts or omissions of the Issuer or the Trustee under, or with respect to, the Bonds or the Indenture or any related document; or (iv) determining whether the Issuer or the Trustee is in compliance with any applicable statute, regulation or law, the Bonds, the Indenture or any other related document.

Section 5.5    <u>Fixed Rate of Return</u>.  The Issuer has entered into this Agreement for purposes of managing its borrowings or investments by increasing the predictability of its cash flow from earnings on its investments and not for purposes of speculation.  The Issuer understands that in consideration of its purchasing Qualified Securities at the Purchase Price on each Deposit Date, the Issuer has minimized the risks resulting from fluctuations in interest rates during the term of this Agreement on the Scheduled Reserve Amounts in the Reserve Fund but has also foregone the possibility of receiving greater returns on the Scheduled Reserve Amounts in the future from such fluctuations.

Section 5.6    <u>Termination Amount</u>.  Each of the Issuer and the Trustee understands that if under any of the circumstances provided herein (including upon the occurrence of certain redemptions or a defeasance of the Bonds on or prior to the last Deposit Date), a Termination Amount would be due Lehman, the size of such Termination Amount will vary depending, in large part, on prevailing interest rates at the time such Termination Amount is calculated.  In certain market conditions the amount of the Termination Amount owed to Lehman by, as applicable, the Trustee or the Issuer could be substantial.

Section 5.7    <u>Investment Structuring Agent's Fee</u>.  Each of the Issuer and the Trustee acknowledges that Lehman shall pay an investment structuring agent fee of $480,693.93 to Investment Management Advisory Group, Inc., d/b/a IMAGE, pursuant to Section 15 of the Authorizing Resolution adopted by the Board of the Issuer on February 10, 2003.

Section 5.8    <u>Incorporated Provisions; Modification of Indenture</u>.

(a)    The Issuer agrees that the covenants and other agreements in Sections 4.03, 4.04, 4.05, 4.06, 5.01, 5.02, 5.03, 5.07, 5.08 and 5.09 of the Indenture (the "Incorporated Provisions") are incorporated herein as fully as if set forth herein and Lehman were a named beneficiary thereof (including, without limitation, the right to consent to certain actions subject to consent under such aforementioned Sections).  The Issuer will observe, perform and fulfill each such agreement in the Indenture.  If the Indenture ceases to be in effect prior to the termination of this Agreement, the Incorporated Provisions (other than those provisions requiring payments in respect of bonds, notes, warrants or other similar instruments issued under the Indenture) will remain in full force and effect for purposes of this Agreement as though set forth herein until such date on which all of the obligations of the Issuer under this Agreement have been fully satisfied.  Any amendment, supplement, modification or waiver of any of the Incorporated

19

Provisions without the prior written consent of Lehman shall have no force and effect with respect to this Agreement if such amendment, supplement, modification or waiver would adversely affect the rights or obligations of Lehman hereunder. Any amendment, supplement or modification for which such consent is obtained or for which such consent is not required shall be part of the Incorporated Provisions for purposes of this Agreement.

(b)    The Issuer shall be required to obtain the consent of Lehman to any amendment, supplement or modification of the Indenture that would adversely affect the rights or obligations of Lehman under this Agreement. The Issuer shall provide Lehman with at least ten (10) days' prior written notice of any proposed amendment, supplement or modification of the Indenture whether or not the proposed amendment, supplement or modification will adversely affect the rights or obligations of Lehman under this Agreement.

## SECTION VI    CLOSING CONDITIONS

Section 6.1    <u>Closing Conditions</u>

On or prior to the Closing Date the following shall occur:

(a)    delivery to Lehman and Issuer of an opinion of counsel to the Trustee, in the form of <u>Exhibit B</u>;

(b)    delivery to Lehman and Trustee of an opinion of counsel to the Issuer, in the form of <u>Exhibit D</u>;

(c)    delivery to Issuer and Trustee of an opinion of counsel to Lehman, in the form of <u>Exhibit C</u> and a bankruptcy opinion of special counsel to Lehman, in the form of <u>Exhibit F</u>;

(d)    delivery to Lehman by the Issuer of a copy of the official statement for the Bonds;

(e)    delivery to Lehman by the Issuer of a true and correct copy of the Indenture as in full force and effect on the date hereof;

(f)    delivery to Lehman of a copy of any consent received by the Issuer to enter into this Agreement; and

(g)    delivery to Lehman of a copy of the statutory or regulatory authority, if any, pursuant to which the Issuer is authorized to enter into this Agreement and a certified copy of any resolution or resolutions of the Issuer pursuant to which the Issuer is authorized to enter into this Agreement.

## SECTION VII    DEFAULTS; TERMINATION

**Section 7.1**    <u>Trustee Events of Default</u>.  The occurrence of any of the following events shall constitute a Trustee Event of Default:

(a)    the Trustee shall fail for any reason (other than because such cash is not available because the Trustee withdrew funds from the Reserve Fund in order to make a Debt Service Payment for the Bonds on a Bond Payment Date) to apply any funds in the Reserve Fund to purchase, at the Purchase Price therefor, any Qualified Securities delivered by the Qualified Dealer in accordance with this Agreement;

(b)    the Trustee shall default in the performance of any other material covenant or obligation under this Agreement and such default is not cured within five Business Days of notice thereof from Lehman or the Issuer;

(c)    any material representation or warranty of the Trustee contained in this Agreement proves to have been incorrect, false or misleading in any material respect as of the date on which it was made; or

(d)    the Trustee is at any time Insolvent.

**Section 7.2**    <u>Issuer Events of Default</u>.  The occurrence of any of the following events shall constitute an Issuer Event of Default:

(a)    the amount in the Reserve Fund available to purchase Qualified Securities on any Deposit Date is less than the Scheduled Reserve Amount (other than because such cash is not available because the Trustee withdrew funds from the Reserve Fund in order to make a Debt Service Payment for the Bonds on a Bond Payment Date) unless (1) such failure is cured within 10 Business Days after written notice of such failure is given to the Issuer by Lehman and (2) the Issuer pays interest on the Purchase Price at the Default Rate from and including the date any such Qualified Securities were duly tendered to the Trustee to but excluding the date such Qualified Securities were actually purchased by the Trustee;

(b)    the Issuer shall default in the performance of any material covenant or obligation under, or incorporated by reference in, this Agreement, other than as described in clause (a) above and such default is not cured within five Business Days of notice thereof from Lehman or the Trustee;

(c)    any material representation or warranty of the Issuer contained in this Agreement proves to have been incorrect, false or misleading in any material respect;

(d)    the Issuer (1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment,

21

NYA 591917.8

arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6)(A) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets or (B) there shall be appointed or designated with respect to it, an entity such as an organization, board, commission, authority, agency or body to monitor, review, oversee, recommend or declare a financial emergency or similar state of financial distress with respect to it; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts;

(e)    the Issuer consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity (or, without limiting the foregoing, if an entity such as an organization, board, commission authority, agency or body succeeds to the principal functions of, or powers and duties granted, to the Issuer) and, at the time of such consolidation, amalgamation, merger or transfer either (i) the resulting or surviving or transferee entity fails to assume all the obligations of the Issuer under this Agreement or by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement or (ii) the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of the Issuer;

(f)    the interest and principal outstanding under the Bonds shall be declared due and payable at any time prior to the scheduled maturity thereof;

(g)    there shall be an investment of the Scheduled Reserve Amount attributable to the Bonds other than pursuant to this Agreement; or

(h)    a Trustee Event of Default has occurred and is continuing and the Trustee has not resigned or been replaced with a successor trustee reasonably acceptable to Lehman within 30 days of demand therefor pursuant to Section 7.4(b).

22

Section 7.3    <u>Lehman Events of Default</u>. The occurrence of any of the following events shall constitute a Lehman Event of Default:

(a)    Lehman shall fail, on any Deposit Date, to cause a Qualified Dealer to deliver Qualified Securities and such failure is not cured within five Business Days after written notice thereof to Lehman from the Trustee or the Issuer (the "Lehman Cure Period");

(b)    any material representation or warranty of Lehman contained in this Agreement proves to have been incorrect, false or misleading in any material respect as of the date on which it was made or Lehman shall default in the performance of any covenant or obligation under this Agreement;

(c)    Lehman shall default in the performance of any other material covenant or obligation under this Agreement and such default is not cured within five Business Days of written notice thereof from the Trustee or the Issuer;

(d)    Lehman is at any time Insolvent;

(e)    Lehman consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity (or, without limiting the foregoing, if an entity such as an organization, board, commission authority, agency or body succeeds to the principal functions of, or powers and duties granted, to Lehman) and, at the time of such consolidation, amalgamation, merger or transfer either (i) the resulting or surviving or transferee entity fails to assume all the obligations of Lehman under this Agreement or by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement or (ii) the long-term senior unsecured debt rating of the resulting or surviving or transferee entity is below A3 by Moody's or A- by S&P; or

(f)    LBH's senior unsecured debt rating falls below Baa3 by Moody's or BBB- by S&P.

Section 7.4    <u>Remedies Upon Occurrence of a Trustee Event of Default</u>.  Upon the occurrence of a Trustee Event of Default, Lehman shall have the right to:

(a)    cause a Qualified Dealer to redeliver to the Trustee or, if such Qualified Securities have not been purchased by the Trustee within five (5) Business Days, sell to any other purchaser the Qualified Securities which were to be delivered in connection with any Deposit Date and which have not theretofore been delivered to and purchased by the Trustee and make demand for the payment of its losses (calculated in accordance with Section 7.7 hereof) arising out of the Trustee's failure to purchase such Qualified Securities; and/or

(b)    make demand upon the Issuer, with a copy to the Trustee, to replace the Trustee within thirty (30) days with a replacement Trustee reasonably acceptable to Lehman; and/or

23

(c)    in the event that the Trustee has not resigned or been replaced by the Issuer in accordance with a demand by Lehman pursuant to clause (b) above within thirty (30) days of such demand, immediately terminate this Agreement by giving notice thereof to the Trustee with a copy to the Issuer and, subject to Section 8.2 hereof, (i) if the Termination Amount is a positive number, make demand upon the Trustee for the payment of the Termination Amount, and (ii) if the Termination Amount is a negative number, pay such Termination Amount to the Trustee.

If the Termination Amount is payable pursuant to this Section 7.4(c), subject again to Section 8.2, the party owing such amount shall promptly, but by no later than one Business Day after notice that such amount is due from the party to whom such Termination Amount is due, pay such amount, in immediately available funds, to the party to whom such Termination Amount is due. If any such amount is not paid when due, the party owing such amount shall pay interest on such amount for each date such amount is due and not paid at the Default Rate. Any amounts payable pursuant to Section 7.7 hereof shall be payable upon demand as provided therein.

Section 7.5    Remedies Upon Occurrence of Issuer Event of Default.    Upon the occurrence of an Issuer Event of Default, Lehman shall have the right to:

(a)    cause a Qualified Dealer to redeliver to the Trustee or sell to any other purchaser the Qualified Securities which were to be delivered in connection with any Deposit Date and which have not theretofore been delivered to and purchased by the Trustee and make demand for the payment of its losses (calculated in accordance with Section 7.7 hereof) arising out of the Trustee's failure to purchase such Qualified Securities; and/or

(b)    immediately terminate this Agreement by giving notice thereof to the Issuer with a copy to the Trustee, and (i) if the Termination Amount is a positive number, make demand upon the Issuer for the payment of the Termination Amount and (ii) if the Termination Amount is a negative number, pay such amount to the Issuer.

If a Termination Amount is payable pursuant to clause (b) above, the party owing such amount shall promptly, but by no later than one Business Day after notice that such amount is due from the party to whom such Termination Amount is due, pay such amount, in immediately available funds, to or at the direction of the party to whom such Termination Amount is due. If any such amount is not paid when due, the party owing such amount shall pay interest on such amount for each date such amount is due but not paid at the Default Rate.

Section 7.6    Remedies Upon Occurrence of a Lehman Event of Default.    Upon the occurrence of a Lehman Event of Default, the Issuer shall have the right to:

(a)    if such default is a default under Section 7.3(a), apply the Scheduled Reserve Amount to purchase Eligible Investments (as defined in the Indenture) in accordance with

24

NYA 591917.8

Section 2.4 hereof and make demand for the payment of its losses in connection therewith, calculated as provided in Section 7.7(b);

(b)    if such default is a default under Section 7.3(a) and Lehman has failed to pay the Issuer's losses (as described in Section 7.7(b)) upon demand therefor, immediately terminate this Agreement by giving notice thereof to Lehman with a copy to the Trustee; and

(c)    if such default is a default under Sections 7.3(b) or (c) hereof immediately terminate this Agreement by giving notice thereof to Lehman with a copy to the Trustee, whereupon Lehman shall determine the Termination Amount and (i) if the Termination Amount is a negative number, Lehman shall promptly, but no later than one Business Day after notice that such amount is due, pay such amount, in immediately available funds, to the Issuer and (ii) if the Termination Amount is a positive number, Lehman may demand payment by the Issuer of the Termination Amount in which case the Issuer shall promptly, but no later than one Business Day after notice that such amount is due, pay, in immediately available funds, the Termination Amount to Lehman. If any such amount is not paid when due, the party owing such amount shall pay interest on such amount for each date such amount is due but not paid at the Default Rate. Notwithstanding anything to the contrary in this Agreement, if Lehman fails to determine the Termination Amount within three Business Days of notice from the Issuer or the Trustee of the occurrence of a Lehman Event of Default then the Issuer (or if so directed by the Issuer, the Trustee) shall make such determination as if it were Lehman and the amount as so determined by the Issuer (or the Trustee) shall for purposes of this Section 7.6 be deemed the Termination Amount.

Section 7.7    <u>Loss Amount if Failed or Late Purchase</u>.

(a)    If the Trustee fails to apply any funds in the Reserve Fund to purchase any Qualified Securities delivered by a Qualified Dealer in accordance with this Agreement or (b) if on any Deposit Date the amount in the Reserve Fund available to purchase Qualified Securities is less than the Scheduled Reserve Amount, the Trustee, in the case of clause (a) or the Issuer in the case of clause (b), shall pay to Lehman, as liquidated damages for its losses and not as a penalty, on written demand by Lehman, the sum of (w) interest on the Purchase Price of such Qualified Securities which the Qualified Dealer tendered for delivery to, but were not purchased by, the Trustee for each day from and including the delivery date thereof to but excluding the date on which such securities are resold to a third party or to the Trustee, (x) subject to Section 7.4(a) hereof or to Section 7.2(a) hereof, as applicable, the excess, if any, of the Purchase Price of such Qualified Securities over the amount received by the Qualified Dealer upon such resale of the securities (the "Shortfall Amount"), (y) interest on the Shortfall Amount from and including the resale date to but excluding the date on which the Trustee or the Issuer, as applicable, compensates Lehman for its losses as described herein, and (z) any incidental costs and expenses incurred by Lehman in connection with the Trustee's failure to so purchase such Qualified Securities. Interest shall accrue at a rate per annum equal to the Default Rate for purposes of clauses (w) and (y). Notwithstanding the foregoing, if Lehman does not on any date cause the

25

NYA 591917.8

delivery of Qualified Securities because the amount in the Reserve Fund is less than the Scheduled Reserve Amount, the Loss Amount shall equal the sum of (y) the amount, if any, by which the aggregate Purchase Price of the Qualified Securities which Lehman could have caused to be delivered exceeds the market value thereof (as reasonably determined by Lehman as of the date such tender was to be made) and (z) interest on such amount at the Default Rate for each date from the date such securities could have been delivered to the next succeeding Bond Payment Date plus any amounts specified in clause (x) above.

(b)    If there is a Lehman Event of Default as described in Section 7.3(a) hereof, the amount of losses payable by Lehman upon written demand therefor pursuant to Section 7.6(a) hereof shall equal the excess, if any, of (i) interest the Trustee would have earned on the related Scheduled Reserve Amount had the Scheduled Reserve Amount been invested in Qualified Securities at the Guaranteed Rate (the "Guaranteed Interest") over (ii) the interest the Trustee actually earned by investing the related Scheduled Reserve Amount in Investment Securities in accordance with Section 2.4 hereof (or if the Trustee fails to invest such Scheduled Reserve Amount in Investment Securities in accordance with Section 2.4 hereof, the amount of interest the Trustee would have earned on such Scheduled Reserve Amount had the Trustee complied with the requirements of Section 2.4 hereof).

Section 7.8    Application of Excess Funds.  The Issuer hereby directs the Trustee and the Trustee agrees that if at any time any amounts are due Lehman from the Issuer in connection with an Issuer Event of Default, the Trustee shall, upon demand from Lehman, and without further direction or instruction from the Issuer, apply any funds available under the Indenture which are not subject to the lien of the Indenture (including any funds which would otherwise be released to the Issuer) to the payment of such amounts.

Section 7.9    Limited Rights Against the Reserve Fund.  Neither Lehman nor any Qualified Dealer shall have any right to any amounts held in the Reserve Fund except as expressly provided herein upon the delivery of a Qualified Security in accordance with this Agreement.

Section 7.10    No Waiver; Remedies Cumulative.  No failure or delay on Lehman's part in exercising any right or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right or remedy preclude any other or further exercise thereof or the exercise of any other right or remedy.  Lehman's rights and remedies hereunder are cumulative and not exclusive of any rights or remedies provided by law, this Agreement or otherwise.  None of the terms or provisions of this Agreement may be waived, modified or amended except in a writing duly signed by the Trustee, the Issuer and Lehman.

Section 7.11    No Set Off.  Each of the Issuer, the Trustee and Lehman expressly waive any right to set off claims and apply property held by any other party in respect of this Agreement against any obligations owing to it from the other party hereunder.

26

Section 7.12    <u>Limited Liability</u>

(a)    Neither the board of directors of the Issuer, the members of the board of directors, the State, nor any person executing this Agreement on behalf of the Issuer shall be liable personally hereunder or be subject to any personal liability or accountability solely by reason of the entering of this Agreement. No personal liability shall be incurred by any member, director, officer, official or employee of the State or the Issuer or any person executing this Agreement for any covenants or provisions hereof or for any claims based hereon.

(b)    Notwithstanding any other provision of this Agreement to the contrary, the obligations of the Issuer hereunder to pay the Purchase Price for any Qualified Security are limited to and payable solely from amounts available in the Reserve Fund.

# SECTION VIII    THE TRUSTEE

Section 8.1    <u>Acceptance by Trustee</u>.    By execution and delivery of this Agreement, the Trustee accepts its duties and obligations hereunder, as an addition to its duties and obligations as Trustee under the Indenture.

Section 8.2    <u>Liability of the Trustee; Consultation with Legal Counsel</u>.

(a)    The Trustee shall not be liable to any person for any Termination Amount due hereunder arising from any action taken or neglected to be taken in performing or attempting to perform its obligations hereunder or preserving or seeking to preserve the funds it maintains under the Indenture or to purchase the Qualified Securities tendered pursuant to this Agreement, except for actions arising from its gross negligence or willful misconduct or for a Trustee Event of Default under the Agreement.

(b)    The Trustee may consult with counsel reasonably satisfactory to it with respect to any question relating to its duties or responsibilities hereunder or otherwise in connection herewith and, except as expressly provided herein, shall not be liable for any action taken, suffered, or omitted by the Trustee in good faith upon the advice of such counsel. The Trustee may act through its officers, employees, agents and attorneys.

Section 8.3    <u>Payment of Trustee Fees</u>.    Lehman has no liability or responsibility for payment of the Trustee's fees or expenses for its services hereunder, including any such fees or expenses arising out of or in connection with the liquidation of the Qualified Securities as provided herein.

Section 8.4    <u>Trustee Cooperation</u>.

27

(a)    The Trustee shall not act in contravention of its obligations hereunder or invest amounts in the Reserve Fund other than pursuant to this Agreement and the Other Investment Agreements.

(b)    The Trustee shall not make any payments or distributions from the Reserve Fund other than payments or distributions (i) required by this Agreement, (ii) to pay principal of, redemption premium and interest on the Bonds or (iii) to the extent not inconsistent with the terms of this Agreement to make payments required by the Indenture and the Other Investment Agreements.

Section 8.5    <u>Successor Trustee</u>.  If the Trustee shall resign or be discharged from its duties and obligations under the Indenture, the Issuer shall appoint a successor Trustee pursuant to the terms of the Indenture.  The Issuer agrees that if the Trustee fails for any reason to perform its duties to Lehman under this Agreement in accordance with the terms hereof, or is at any time Insolvent or breaches in any material respect its representations and warranties to Lehman hereunder, the Issuer shall promptly, upon request of Lehman, appoint a successor Trustee reasonably acceptable to Lehman.

## SECTION IX. ADDITIONAL SECURITY

Section 9.1    <u>Additional Security and Source of Payment for Issuer's Obligations</u>.

(a)    In order to secure the Issuer's timely and full performance of its obligations hereunder, the Issuer hereby pledges and grants to Lehman a lien on and pledge of the Pledged Assets and the proceeds thereof, such lien to be immediately subordinate to the lien of the bondholders under the Indenture and to be on parity with the lien securing payment under the Other Investment Agreements.  The Issuer represents to Lehman that this Agreement constitutes an "ancillary facility" under the Act and an Ancillary Contract (as defined in the Indenture) and that all payments due from the Issuer hereunder (including, without limitation any Termination Amount) constitute Operating Expenses (as defined in the Indenture) payable pursuant to Section 4.03 of the Indenture.

(b)    The Issuer will not voluntarily create or permit to be created any lien which is superior to or on a parity with the obligation of the Issuer to make payments to Lehman under this Agreement without the prior written consent of Lehman other than as provided herein or in respect of the Bonds or Refunding Bonds or as otherwise contemplated by the Indenture; <u>provided</u>, <u>that</u>, to the extent permitted under the Indenture, the Issuer may create or permit the creation of any such lien subordinate to the obligation of the Issuer to make payment to Lehman under this Agreement.

## SECTION X  MISCELLANEOUS

Section 10.1    <u>Notices and Delivery Instructions</u>.    All notices, demands or other communications hereunder shall be given or made in writing and shall be delivered personally, or

sent by certified or registered mail, postage prepaid, return receipt requested, or overnight delivery service, telex or telecopy to the party to whom they are directed at the following addresses, or at such other addresses as may be designated by notice from such party to all other parties:

**To Lehman:**

Lehman Brothers Special Financing Inc.
745 Seventh Avenue, 5th Floor
New York, NY 10019
Attention:        Municipal Financial Products - Middle Office
Telephone:        212-526-2240
Fax:              646-758-2988

**To the Trustee:**

Wachovia Bank, National Association
Structured Finance Trust Services
401 South Tryon Street – NC1179
Charlotte, NC 28288

Attention: Robert Ashbaugh
Telephone: (704) 383-9568
Telecopy: (704) 383-6039

**FOR DELIVERY OF BOOK-ENTRY GOVERNMENT OBLIGATIONS:**

FIRST UNION CHAR/1050
ABA #: 053000219
NCS #: 1076017171

**FOR DELIVERY OF DTC OBLIGATIONS**

Participant #: 929
A/C NCS #: 1076017171

**FOR DELIVERY OF CASH**

First Union National Bank
ABA #: 053000219
A/C #: 5000000016439

29

Attn: Robert Ashbaugh, SFTS
Ref: NJ Tobacco 2003


To the Issuer:


Tobacco Settlement Financing Corporation
Office of the State Treasurer
State House
125 West State Street
Trenton, New Jersey 08625
Attention:      State Treasurer
Telephone:    (609) 292-6748
Fax:               (609) 984-3888


Any notice, demand or other communication given in a manner prescribed in this Section shall be deemed to have been delivered on receipt.

Section 10.2    Binding Effect; Transfer.    This Agreement shall be binding upon and inure to the benefit of the Trustee, the Issuer and Lehman and upon their respective permitted successors and transferees.    Lehman shall be entitled to transfer all or any portion of this Agreement and its interests hereunder, to any subsidiary or affiliate of Lehman, or to any office, branch or subsidiary of any affiliate of Lehman upon notice to the Issuer and the Trustee, provided that LBH shall provide sufficient evidence, in the reasonable opinion of the Issuer, that the guarantee of LBH shall extend to the transferee, unless the transferee entity's long-term senior unsecured debt rating is  "A-" or above, in the case of S&P, "A3" or above, in the case of Moody's and "A-" or above, in the case of Fitch (if the Bonds are then rated by Fitch), and Lehman shall otherwise be able to transfer all or any portion of this Agreement only (i) with the consent of the Issuer (such consent not to be unreasonably withheld or delayed) and notice to the Trustee and (ii) upon receipt of a Rating Confirmation (as defined in the Indenture) from each Rating Agency (as defined in the Indenture); provided, however, that such consent shall not be required if such transfer is to any entity rated at least "A-", "A3", or "A-" by S&P, Moody's or Fitch, respectively, and provided further that in all such instances of transfer the transferee shall assume all of the rights and obligations of Lehman hereunder.    Neither the Issuer nor the Trustee may transfer this Agreement without the prior written consent of Lehman and the other party hereto.

Section 10.3    Limitation.    Nothing expressed or implied herein is intended or shall be construed to confer upon any person, firm or corporation other than the parties hereto, any right, remedy or claim by reason of this Agreement or any term hereof, and all terms contained herein shall be for the sole and exclusive benefit of the parties hereto, and their successors and permitted transferees.

NYA 591917.8

Section 10.4  <u>Severability</u>.  If one or more provisions of this Agreement or the applicability of any such provisions to any set of circumstances shall be determined to be invalid or ineffective for any reason, such determination shall not affect the validity and enforceability of the remaining provisions or the applicability of the same provisions or any of the remaining provisions to other circumstances.

Section 10.5  <u>Amendments, Changes and Modifications</u>.  This Agreement may be amended or any of its terms modified only by a written document authorized, executed and delivered by each of the parties hereto.  The Issuer and the Trustee hereby agree that any amendment to this Agreement shall conform to the requirements of Section 4.05 of the Indenture and Section 7 of the Act. The Issuer shall notify each Rating Agency (as defined in the Indenture) of any such amendment or modification.

Section 10.6  <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts and when each party hereto has executed at least one counterpart, this Agreement shall become binding on all parties and such counterparts shall be deemed to be one and the same document.

Section 10.7  <u>Termination</u>.  Unless earlier terminated pursuant to Sections 2.7, 2.8, 3.1, 3.2, 7.4, 7.5 or 7.6 hereof, this Agreement shall terminate on the later of the last Bond Payment Date set forth in <u>Exhibit A</u> and the date on which the Trustee and the Issuer have satisfied all of their obligations hereunder.

Section 10.8  <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

Section 10.9  <u>Governing Law; Venue</u>.

(a)    This Agreement shall be governed by and construed in accordance with the laws of the State, without regard to conflict of law principles.

(b)    Lehman, the Trustee and the Issuer each hereby irrevocably submits to the non-exclusive jurisdiction of the United States District Court for the District of the State for the purpose of any suit, action or other proceeding arising out of this Agreement, or any of the agreements or transactions contemplated hereby, at the election of the party initiating any such suit, action or other proceeding, which is brought by or against Lehman, the Trustee or the Issuer, and the parties each hereby irrevocably agrees that all claims in respect of any such suit, action or proceeding may be heard and determined by any such court and each of Lehman, the Trustee and the Issuer acknowledges that it is subject to suit in such courts with respect to enforcement of its obligations hereunder

31

NYA 901017 8

Section 10.10 <u>Nonpetition Covenant</u>. Notwithstanding any prior termination of this Agreement, Lehman and the Trustee covenant and agree that they shall not, prior to the date which is one year and one day after the termination of this Agreement, acquiesce petition or otherwise invoke or cause the Issuer to invoke the process of any court or government authority for the purpose of commencing or sustaining a case against the Issuer under any federal or state bankruptcy, insolvency or similar law or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of the Issuer or any substantial part of its property, or ordering the winding up or liquidation of the affairs of the Issuer; *provided*, that the foregoing shall not limit the right of Lehman to name the Issuer as a party in any action or suit or in the exercise of any other remedy in respect of this Agreement.

32

NYA 501017 R

IN WITNESS WHEREOF, the Trustee, the Issuer and Lehman have caused this Reserve Fund Agreement to be executed by their respective duly authorized officers, all as of the date and year first above written.

TOBACCO SETTLEMENT FINANCING CORPORATION

By: _____

    John E. McCormac
    Chairperson


WACHOVIA BANK, NATIONAL ASSOCIATION, as Trustee

By: _____
Name:
Title:


LEHMAN BROTHERS SPECIAL FINANCING INC.

By: _____
Name:
Title:

IN WITNESS WHEREOF, the Trustee, the Issuer and Lehman have caused this Reserve Fund Agreement to be executed by their respective duly authorized officers, all as of the date and year first above written.

TOBACCO SETTLEMENT FINANCING CORPORATION

By:_____

     John E. McCormac
     Chairperson

WACHOVIA BANK, NATIONAL ASSOCIATION, as Trustee

By:_____
Name:
Title:

LEHMAN BROTHERS SPECIAL FINANCING INC.

By:_____
Name:
Title:

IN WITNESS WHEREOF, the Trustee, the Issuer and Lehman have caused this Reserve Fund Agreement to be executed by their respective duly authorized officers, all as of the date and year first above written.

TOBACCO SETTLEMENT FINANCING CORPORATION

By: _____
Name:  John E. McCormac
Title:  Chairperson


WACHOVIA BANK, NATIONAL ASSOCIATION, as Trustee

By: _____
Name:
Title:


LEHMAN BROTHERS SPECIAL FINANCING INC.

By: _____
Name:  T. Courtney Jenkins
Title:    Vice President

**EXHIBIT A**

| Deposit Date* | Bond Payment Date* | Scheduled Reserve Amount |
|---|---|---|
| 03/07/03 | 05/30/03 | $82,835,000 |
| 05/30/03 | 11/28/03 | $82,835,000 |
| 11/28/03 | 05/31/04 | $82,835,000 |
| 05/28/04 | 11/30/04 | $82,835,000 |
| 11/30/04 | 05/31/05 | $82,835,000 |
| 05/31/05 | 05/31/06 | $82,835,000 |
| 05/31/06 | 05/31/07 | $82,835,000 |
| 05/31/07 | 05/30/08 | $82,835,000 |
| 05/30/08 | 05/29/09 | $82,835,000 |
| 05/29/09 | 05/31/10 | $82,835,000 |
| 05/28/10 | 05/31/11 | $82,835,000 |
| 05/31/11 | 05/31/12 | $82,835,000 |
| 05/31/12 | 05/31/13 | $82,835,000 |
| 05/31/13 | 05/30/14 | $82,835,000 |
| 05/30/14 | 05/29/15 | $82,835,000 |
| 05/29/15 | 05/31/16 | $82,835,000 |
| 05/31/16 | 05/31/17 | $82,835,000 |
| 05/31/17 | 05/31/18 | $82,835,000 |
| 05/31/18 | 05/31/19 | $82,835,000 |
| 05/31/19 | 05/29/20 | $82,835,000 |
| 05/29/20 | 05/31/21 | $82,835,000 |
| 05/28/21 | 05/31/22 | $82,835,000 |
| 05/31/22 | 05/31/23 | $82,835,000 |
| 05/31/23 | 05/31/24 | $82,835,000 |
| 05/31/24 | 05/30/25 | $82,835,000 |
| 05/30/25 | 05/29/26 | $82,835,000 |
| 05/29/26 | 05/31/27 | $82,835,000 |
| 05/28/27 | 05/31/28 | $82,835,000 |
| 05/31/28 | 05/31/29 | $82,835,000 |
| 05/31/29 | 05/31/30 | $82,835,000 |
| 05/31/30 | 05/30/31 | $82,835,000 |
| 05/30/31 | 05/31/32 | $82,835,000 |
| 05/28/32 | 05/31/33 | $82,835,000 |
| 05/31/33 | 05/31/34 | $82,835,000 |

\* If any Deposit Date or Bond Payment Date specified above is not a Business Day, such date will be the immediately preceding Business Day; provided, however, that with respect to any date specified as a Bond Payment Date, the determination of whether such date is a Business Day shall be made without giving effect to clauses (c) and (d) of the definition of Business Day.

A-1

<u>**EXHIBIT A**</u>

| | | |
|---|---|---|
| 05/31/34 | 05/31/35 | $82,835,000 |
| 05/31/35 | 05/30/36 | $82,835,000 |
| 05/30/36 | 05/29/37 | $82,835,000 |
| 05/29/37 | 05/31/38 | $82,835,000 |
| 05/28/38 | 05/31/39 | $82,835,000 |
| 05/31/39 | 05/31/40 | $82,835,000 |
| 05/31/40 | 05/31/41 | $82,835,000 |
| 05/31/41 | 05/30/42 | $82,835,000 |
| 05/30/42 | 05/29/43 | $82,835,000 |

If any Deposit Date or Bond Payment Date specified above is not a Business Day, such date will be the immediately preceding Business Day; provided, however, that with respect to any date specified as a Bond Payment Date, the determination of whether such date is a Business Day shall be made without giving effect to clauses (c) and (d) of the definition of Business Day.

A-2