## EXHIBIT G

**Non-Actionable Bid for Termination of Forward Purchase Agreement IRS Compliance Transcript re: Tobacco Settlement Financing Corporation-New Jersey, Relating to: $3,625,794,637.90 Tobacco Settlement Asset-Backed Bonds Series 2007-1 dated January 26, 2009 prepared by First Southwest Company**

#1984721 v1
108686-64494

# Non-Actionable Bid for Termination of Forward Purchase Agreements IRS Compliance Transcript

## Tobacco Settlement Financing Corporation – New Jersey

Relating to:
$3,625,794,637.90
Tobacco Settlement Assset-Backed Bonds
Series 2007-1

**January 26, 2009**

 **First Southwest Company**

# 🇫 | **First Southwest Company**

325 North St. Paul Street
Suite 800
Dallas, Texas 75201-3852

**Michael Marz**
Vice Chairman

214-953-4020  Direct
214-954-4339  Fax

mmarz@firstsw.com

January 26, 2009

Ms. Nancy Feldman, Director
Office of Public Finance
Tobacco Settlement Financing Corporation -
   New Jersey
P.O. Box 005
50 West State Street, 5ᵗʰ Floor
Trenton, New Jersey  08625

RE:    $3,625,794,637.90 Tobacco Settlement Asset-Backed Bonds Series 2007-1

Enclosed please find an IRS Compliance Transcript related to the investment of certain bond proceeds associated with the above-captioned bond issue.

Internal Revenue Code Section 1.148-5(d)(6)(iii)(E) requires the issuer to retain the documents contained in the enclosed compliance transcript as part of the official records for a period of not less than three years after the final maturity of the referenced bonds.

Should you require additional copies or if you have any questions, please contact me at (214) 953-4020.

Respectfully,

Michael J. Marz
Vice Chairman

cc:    Mr. Steven Kantor
       Ms. Angela Rodell

# Non-Actionable Bid for Termination of Forward Purchase Agreements IRS Compliance Transcript

---

## $3,625,794,637.90
## Tobacco Settlement Financing Corporation – New Jersey
## Tobacco Settlement Assset-Backed Bonds
## Series 2007-1

Documents contained herein are in accordance with
Internal Revenue Code 1.148-5 – Arbitrage Regulations
Subsection (d)(6)(iii)(E)

Bid Date:  January 26, 2009

David Brayshaw
(214) 953-4020

# Tobacco Settlement Financing Corporation – New Jersey

## Non-Actionable Bid for Termination of
## Forward Purchase Agreements
## Transcript

### Table of Contents

Notices to Lehman Brothers Special Financing, Inc. ........................................................ I

    Notice of Downgrade to Lehman Brothers Special Financing, Inc.

    Notice of Default to Lehman Brothers Special Financing, Inc.

Authorizing Resolution ................................................................................................. II

Court Order of the United States Bankruptcy Court ...................................................... III

Certifications, Bids Submitted & Market Data.............................................................. IV

    Certificate Regarding Termination of 2007 Agreements

    Bid Tabulation Sheet

    Market Data

Transaction Documents January 29, 2007 ....................................................................V

    Reserve Fund Agreement Transaction Documents

        Reserve Fund Agreement

        Guarantee of Lehman Brothers Holdings Inc.

    Amendment Agreement of 2002 Reserve Fund Agreement

    Amendment Agreement of 2003 Reserve Fund Agreement

    Legal Opinions

        Lowenstein Sandler Opinion – Agreements

        Lehman Brothers Special Financing, Inc. Opinion – Agreements

        Lehman Brothers Holdings Inc. Opinion - Guarantee

Administrative Documents.............................................................................................VI

    Transaction Invoices

        Reserve Fund Agreement

        Amendment Agreement of 2002 Reserve Fund Agreement

        Amendment Agreement of 2003 Reserve Fund Agreement

Distribution List............................................................................................................VII

Transcript prepared by:  Karen Ramey



# /

# *Notices to Lehman Brothers Special Financing, Inc.*

 **First Southwest Company**

TOBACCO SETTLEMENT FINANCING CORPORATION
50 WEST STATE STREET, 5TH FLOOR
TRENTON, NJ 08625

September 18, 2008

Lehman Brothers Special Financing, Inc.
745 Seventh Avenue, 5th Floor
New York, New York  10019
Attention:  Municipal Financial Products – Middle Office

Dear Sir or Madam:

The Tobacco Settlement Financing Corporation (the "Corporation") is party to the following Reserve Fund Agreements with Lehman Brothers Special Financing Inc. ("Lehman Special Financing"):

1.  Reserve Fund Agreement dated as of August 28, 2002 (the "2002 Agreement") by and among the Corporation, Lehman Special Financing and Wachovia Bank, National Association, as trustee.  Lehman Brothers Holdings, Inc. ("Lehman Holdings") is the guarantor of all payments to be made by Lehman Special Financing under the 2002 Agreement pursuant to a "Guarantee of Lehman Brothers Holdings Inc." dated August 27, 2002.

2.  Reserve Fund Agreement dated as of March 7, 2003 (the "2003 Agreement") by and among the Corporation, Lehman Special Financing and Wachovia Bank, National Association, as trustee.  Lehman Holdings is the guarantor of all payments to be made by Lehman Special Financing under the 2003 Agreement pursuant to a "Guarantee of Lehman Brothers Holdings Inc." dated as of March 7, 2003.

3.  Reserve Fund Agreement dated as of January 29, 2007 (the "2007 Agreement") by and among the Corporation, Lehman Special Financing and The Bank of New York (now The Bank of New York Mellon), as trustee. Lehman Holdings is the guarantor of all payments to be made by Lehman Special Financing under the 2007 Agreement pursuant to a "Guarantee of Lehman Brothers Holdings Inc." dated as of January 29, 2007.

The 2002 Agreement, the 2003 Agreement and the 2007 Agreement are collectively referred to herein as the "Agreements". Capitalized terms used but not defined herein shall have the meaning given to such term in the Agreements.

It has come to our attention that Lehman Holdings was downgraded below Baa3 by Moody's Investors Service and below BBB- by Standard & Poor's, a division of The McGraw-Hill Companies on Monday, September 15, 2008.

Pursuant to Section 2.7 of the Agreements, Lehman Special Financing must provide written notice to the Corporation and the Trustee of a ratings downgrade of Lehman Holdings within five (5) business days of such downgrade. Pursuant to Section 2.7 of the Agreements, upon a ratings downgrade of Lehman Holdings, Lehman Special Financing is required to take one of several actions set forth in Section 2.7(b)(a) of each Agreement. In addition, pursuant to Section 7.3 of the Agreements, the downgrade of Lehman Holdings constitutes a "Lehman Event of Default" under the Agreement.

The Corporation reserves its right to exercise any and all remedies under the Agreements, including the right to terminate each Agreement at its option pursuant to Section 2.8, and all rights and remedies under the Agreements and at law or in equity upon the occurrence of a Lehman Event of Default under the Agreements.

The Corporation requests that Lehman Special Financing inform the Corporation as to which action it will take pursuant to Section 2.7(b)(a) of the Agreements and requests that Lehman Special Financing contact the Corporation in order to resolve this matter amicably and in the interests of all parties concerned.

The Corporation can be reached through the New Jersey Department of the Treasury:

Office of Public Finance
Department of the Treasury
State of New Jersey
50 West State Street, 5th Floor
P.O. Box 005
Trenton, New Jersey  08625
Attention: Nancy B. Feldman, Director
Phone: 609-984-4888
Fax: 609-777-1987

Sincerely Yours,

R. David Rousseau
Chairman and President
Tobacco Settlement Financing Corporation

c:    Nancy Feldman, Director, Office of Public Finance
Robert A. Romano, Assistant Attorney General
Robert Ashbaugh, Vice President, Wachovia Bank, National Association
Marie Ladolcetta, The Bank of New York Mellon
Frank Adinolfe, The Bank of New York Mellon
Raul Dipp-Solis, The Bank of New York Mellon
Vanessa Mesa, Assistant Treasurer, The Bank of New York Mellon
T. Courtney Jenkins, Vice President, Lehman Brothers Special Financing Inc.
Douglas I. Youngman, Esq., McDermott, Will & Emery LLP
M. Jeremy Ostow, Esq., McManimon & Scotland, L.L.C.

## MEMORY TRANSMISSION REPORT

|  |  |
|---|---|
| TIME | : 09-18-'08 18:42 |
| FAX NO.1 | : 609-777-1987 |
| NAME | : NJ Public Finance |

|  |  |  |
|---|---|---|
| FILE NO. | : | 838 |
| DATE | : | 09.18 18:34 |
| TO | : ☎ | 916467582988 |
| DOCUMENT PAGES | : | 4 |
| START TIME | : | 09.18 18:34 |
| END TIME | : | 09.18 18:42 |
| PAGES SENT | : | 4 |
| STATUS | : | OK |

***     SUCCESSFUL TX NOTICE     ***

JON S. CORZINE
*Governor*



R. DAVID ROUSSEAU
*State Treasurer*

**State of New Jersey**
**Department of the Treasury**

Office of Public Finance
50 West State Street, 5ᵗʰ Floor
P.O. Box 005
Trenton, New Jersey 08625

Telephone: (609) 984.4888
Facsimile: (609) 777.1987

---

### FACSIMILE TRANSMITTAL SHEET

| ATTN: MUNICIPAL FINANCIAL PRODUCTS -- MIDDLE OFFICE | FROM: |
|---|---|
| COMPANY: LEHMAN BROTHERS HOLDINGS INC. | DATE: SEPTEMBER 18, 2008 |
| FAX NUMBER: 646-758-2988 | TOTAL # OF PAGES INCLUDING COVER: 4 |
| PHONE NUMBER: | |

RE: NJ TOBACCO SETTLEMENT FINANCING CORPORATION

☐ URGENT   ☐ FOR REVIEW   ☐ PLEASE COMMENT   ☐ PLEASE REPLY   ☐ PLEASE RECYCLE

#### NOTES/COMMENTS:

Please see attached.

---

*If you do not receive all the pages, please call back as soon as possible.*

#### Confidential Notice

The information contained in this facsimile transmission may be privileged and confidential information from the New Jersey Department of the Treasury intended for the sole use of the persons or entities named on this transmittal cover sheet. If you are not an intended recipient of this transmission, the dissemination, distribution, copying, or use of the information it contains is strictly prohibited. If you have received this transmission in error, please call the sender immediately to arrange for the return of this information.

MEMORY TRANSMISSION REPORT

|  |  |  |
|---|---|---|
| TIME | : | 09-18-'08 16:34 |
| FAX NO.1 | : | 609-777-1987 |
| NAME | : | NJ Public Finance |

|  |  |  |
|---|---|---|
| FILE NO. | : | 837 |
| DATE | : | 09.18 16:31 |
| TO | : | ☎ 919172650652 |
| DOCUMENT PAGES | : | 3 |
| START TIME | : | 09.18 16:31 |
| END TIME | : | 09.18 16:34 |
| PAGES SENT | : | 3 |
| STATUS | : | OK |

\*\*\*   SUCCESSFUL TX NOTICE   \*\*\*



**TOBACCO SETTLEMENT FINANCING CORPORATION**
**50 WEST STATE STREET, 5th FLOOR**
**TRENTON, NJ 08625**

September 18, 2008

Lehman Brothers Special Financing, Inc.
745 Seventh Avenue, 5th Floor
New York, New York 10019
Attention: Municipal Financial Products — Middle Office

Dear Sir or Madam:

The Tobacco Settlement Financing Corporation (the "Corporation") is party to the following Reserve Fund Agreements with Lehman Brothers Special Financing Inc. ("Lehman Special Financing"):

1.  Reserve Fund Agreement dated as of August 28, 2002 (the "2002 Agreement") by and among the Corporation, Lehman Special Financing and Wachovia Bank, National Association, as trustee. Lehman Brothers Holdings, Inc. ("Lehman Holdings") is the guarantor of all payments to be made by Lehman Special Financing under the 2002 Agreement pursuant to a "Guarantee of Lehman Brothers Holdings Inc." dated August 27, 2002.

2.  Reserve Fund Agreement dated as of March 7, 2003 (the "2003 Agreement") by and among the Corporation, Lehman Special Financing and Wachovia Bank, National Association, as trustee. Lehman Holdings is the guarantor of all payments to be made by Lehman Special Financing under the 2003 Agreement pursuant to a "Guarantee of Lehman Brothers Holdings Inc." dated as of March 7, 2003.

3.  Reserve Fund Agreement dated as of January 29, 2007 (the "2007 Agreement") by and among the Corporation, Lehman Special Financing and The Bank of New York (now The Bank of New York Mellon), as trustee. Lehman Holdings is the guarantor of all payments to be made by Lehman Special Financing under the 2007 Agreement pursuant to a "Guarantee of Lehman Brothers Holdings Inc." dated as of January 29, 2007.

The 2002 Agreement, the 2003 Agreement and the 2007 Agreement are collectively referred to herein as the "Agreements". Capitalized terms used but not defined herein shall have the meaning given to such term in the Agreements.

MEMORY TRANSMISSION REPORT  Pg 12 of 129

|  |  |
|---|---|
| TIME | : 09-18-'08 18:35 |
| FAX NO.1 | : 609-777-1987 |
| NAME | : NJ Public Finance |

|  |  |  |
|---|---|---|
| FILE NO. | : | 839 |
| DATE | : | 09.18 18:34 |
| TO | : | ☎919733577840 |
| DOCUMENT PAGES | : | 4 |
| START TIME | : | 09.18 18:34 |
| END TIME | : | 09.18 18:35 |
| PAGES SENT | : | 4 |
| STATUS | : | OK |

***    SUCCESSFUL TX NOTICE    ***

JON S. CORZINE
*Governor*



R. DAVID ROUSSEAU
*State Treasurer*

**State of New Jersey**
**Department of the Treasury**

Office of Public Finance
50 West State Street, 5th Floor
P.O. Box 005
Trenton, New Jersey 08625

Telephone: (609) 984.4888
Facsimile: (609) 777.1987

---

**FACSIMILE TRANSMITTAL SHEET**

ATTN: RAUL DIPP-SOLIS                     FROM:

COMPANY: BANY OF NEW YORK          DATE: SEPTEMBER 18, 2008
MELLON

FAX NUMBER: 973.357.7840               TOTAL # OF PAGES INCLUDING COVER: 4

PHONE NUMBER:

RE: NJ TOBACCO SETTLEMENT FINANCING CORPORATION

---

☐ URGENT ☐ FOR REVIEW ☐ PLEASE COMMENT ☐ PLEASE REPLY ☐ PLEASE RECYCLE

NOTES/COMMENTS:

Please see attached.

---

If you do not receive all the pages, please call back as soon as possible.

**Confidential Notice**

The information contained in this facsimile transmission may be privileged and confidential information from the New Jersey Department of the Treasury intended for the sole use of the persons or entities named on this transmittal cover sheet. If you are not an intended recipient of this transmission, the dissemination, distribution, copying, or use of the information it contains is strictly prohibited. If you have received this transmission in error, please call the sender immediately to arrange for the return of this information.

**TOBACCO SETTLEMENT FINANCING CORPORATION**
**50 WEST STATE STREET, 5TH FLOOR**
**TRENTON, NJ 08625**

September 29, 2008

Lehman Brothers Special Financing, Inc.
745 Seventh Avenue, 5th Floor
New York, New York 10019
Attention: Municipal Financial Products – Middle Office

        Re:    Default Notice pursuant to Reserve Fund Agreements dated as of
               August 28, 2002, March 7, 2003 and January 29, 2007

Dear Sir or Madam:

      The Tobacco Settlement Financing Corporation (the "Corporation") is party to the following Reserve Fund Agreements with Lehman Brothers Special Financing Inc. ("Lehman Special Financing"):

1. Reserve Fund Agreement dated as of August 28, 2002 (the "2002 Agreement") by and among the Corporation, Lehman Special Financing and Wachovia Bank, National Association, as trustee. Lehman Brothers Holdings, Inc. ("Lehman Holdings") is the guarantor of all payments to be made by Lehman Special Financing under the 2002 Agreement pursuant to a "Guarantee of Lehman Brothers Holdings Inc." dated August 27, 2002.

2. Reserve Fund Agreement dated as of March 7, 2003 (the "2003 Agreement") by and among the Corporation, Lehman Special Financing and Wachovia Bank, National Association, as trustee. Lehman Holdings is the guarantor of all payments to be made by Lehman Special Financing under the 2003 Agreement pursuant to a "Guarantee of Lehman Brothers Holdings Inc." dated as of March 7, 2003.

3. Reserve Fund Agreement dated as of January 29, 2007 (the "2007 Agreement") by and among the Corporation, Lehman Special Financing and The Bank of New York (now The Bank of New York Mellon), as trustee. Lehman Holdings is the guarantor of all payments to be made by Lehman Special Financing under the 2007 Agreement pursuant to a "Guarantee of Lehman Brothers Holdings Inc." dated as of January 29, 2007.

      The 2002 Agreement, the 2003 Agreement and the 2007 Agreement are collectively referred to herein as the "Agreements". Capitalized terms used but not defined herein shall have the meanings given to such terms in the Agreements.

      This notice is given to you pursuant to Section 7.3(c) of each Agreement.

It has come to our attention that the long term senior unsecured debt ratings of Lehman Holdings were downgraded below Baa3 by Moody's Investors Service and below BBB- by Standard & Poor's, a division of The McGraw-Hill Companies on Monday, September 15, 2008. Accordingly, a Lehman Downgrade occurred on such date.

Pursuant to Section 2.7(a) of each Agreement, Lehman Special Financing was required to provide written notice to the Corporation and the Trustee of a Lehman Downgrade within five (5) Business Days of such Lehman Downgrade. Pursuant to Section 2.7(b) of each Agreement, upon a Lehman Downgrade, Lehman Special Financing was required to take one of several actions set forth in Section 2.7(b) of each Agreement.

Pursuant to Section 7.3(c) of each Agreement, we hereby notify you that you have defaulted in the performance of your covenants and obligations set forth in Sections 2.7(a) and 2.7(b) of each Agreement. If such defaults are not cured within five (5) Business Days of this notice, a Lehman Event of Default will have occurred under Section 7.3(c) of each Agreement.

In addition, the occurrence of the Lehman Downgrade on September 15, 2008 constitutes an Event of Default under Section 7.3(f) of each Agreement.

The Corporation hereby reserves its right to exercise any and all rights and remedies under each Agreement, including the right to terminate such Agreement pursuant to Section 7.6(c) of such Agreement, as well as any other rights and remedies available to it at law or in equity upon the occurrence of a Lehman Event of Default under each Agreement. In addition, pursuant to Section 2.8 of each Agreement, the Corporation may elect to terminate such Agreement at any time at its option.

The Corporation can be reached through the New Jersey Department of the Treasury:

Office of Public Finance
Department of the Treasury
State of New Jersey
50 West State Street, 5th Floor
P.O. Box 005
Trenton, New Jersey 08625
Attention: Nancy B. Feldman, Director
Phone: 609-984-4888
Fax: 609-777-1987

Sincerely Yours,

R. David Rousseau
Chairman and President
Tobacco Settlement Financing Corporation

cc:    Nancy Feldman, Director, Office of Public Finance
       Robert A. Romano, Assistant Attorney General
       Robert Ashbaugh, Vice President, Wachovia Bank, National Association
       Raul Dipp-Solis, The Bank of New York Mellon
       Vanessa Mesa, The Bank of New York Mellon
       T. Courtney Jenkins, Vice President, Lehman Brothers Special Financing Inc.
       Douglas I. Youngman, Esq., McDermott, Will & Emery LLP
       M. Jeremy Ostow, Esq., McManimon & Scotland, L.L.C.

MEMORY TRANSMISSION REPORT

| | |
|---|---|
| TIME | :09-29-'08 14:43 |
| FAX NO.1 | :609-777-1987 |
| NAME | :NJ Public Finance |

| | | |
|---|---|---|
| FILE NO. | : | 870 |
| DATE | : | 09.29 14:40 |
| TO | : | ☎919733577840 |
| DOCUMENT PAGES | : | 4 |
| START TIME | : | 09.29 14:43 |
| END TIME | : | 09.29 14:43 |
| PAGES SENT | : | 4 |
| STATUS | : | OK |

***    SUCCESSFUL TX NOTICE    ***

JON S. CORZINE
*Governor*



R. DAVID ROUSSEAU
*State Treasurer*

**State of New Jersey**
**Department of the Treasury**

**Office of Public Finance**
50 West State Street, 5th Floor
**P.O. Box 005**
**Trenton, New Jersey 08625**

**Telephone: (609) 984.4888**
**Facsimile: (609) 777.1987**

## FACSIMILE TRANSMITTAL SHEET

ATTN: RAUL DIPP-SOLIS                    FROM:

COMPANY: BANY OF NEW YORK
MELLON                                   DATE: SEPTEMBER 29, 2008

FAX NUMBER: 973.357.7840                 TOTAL # OF PAGES INCLUDING COVER: 4

PHONE NUMBER:

RE: NJ TOBACCO SETTLEMENT FINANCING CORPORATION

☐ URGENT ☐ FOR REVIEW ☐ PLEASE COMMENT ☐ PLEASE REPLY ☐ PLEASE RECYCLE

NOTES/COMMENTS:

Please see attached.

*If you do not receive all the pages, please call back as soon as possible.*

**Confidential Notice**
The information contained in this facsimile transmission may be privileged and confidential information from the New Jersey Department of the Treasury intended for the sole use of the persons or entities named on this transmittal cover sheet. If you are not an intended recipient of this transmission, the dissemination, distribution, copying, or use of the information it contains is strictly prohibited. If you have received this transmission in error, please call the sender immediately to arrange for the return of this information.

MEMORY TRANSMISSION REPORT

|  |  |
|---|---|
| TIME | :09-29-'08 14:43 |
| FAX NO.1 | :609-777-1987 |
| NAME | :NJ Public Finance |

|  |  |  |
|---|---|---|
| FILE NO. | : | 869 |
| DATE | : | 09.29 14:39 |
| TO | : | ☎916467582988 |
| DOCUMENT PAGES | : | 4 |
| START TIME | : | 09.29 14:42 |
| END TIME | : | 09.29 14:43 |
| PAGES SENT | : | 4 |
| STATUS | : | OK |

***    SUCCESSFUL TX NOTICE    ***

JON S. CORZINE
*Governor*



R. DAVID ROUSSEAU
*State Treasurer*

**State of New Jersey
Department of the Treasury**

**Office of Public Finance
50 West State Street, 5ᵗʰ Floor
P.O. Box 005
Trenton, New Jersey 08625**

**Telephone: (609) 984.4888
Facsimile: (609) 777.1987**

---

## FACSIMILE TRANSMITTAL SHEET

| ATTN: MUNICIPAL FINANCIAL PRODUCTS — MIDDLE OFFICE | FROM: |
|---|---|
| COMPANY: LEHMAN BROTHERS HOLDINGS INC. | DATE: SEPTEMBER 29, 2008 |
| FAX NUMBER: 646.758.2988 | TOTAL # OF PAGES INCLUDING COVER: 4 |
| PHONE NUMBER: | |

RE: NJ TOBACCO SETTLEMENT FINANCING CORPORATION

☐ URGENT ☐ FOR REVIEW ☐ PLEASE COMMENT ☐ PLEASE REPLY ☐ PLEASE RECYCLE

### NOTES/COMMENTS:

Please see attached.

*If you do not receive all the pages, please call back as soon as possible.*

**Confidential Notice**

The information contained in this facsimile transmission may be privileged and confidential information from the New Jersey Department of the Treasury intended for the sole use of the persons or entities named on this transmittal cover sheet. If you are not an intended recipient of this transmission, the dissemination, distribution, copying, or use of the information it contains is strictly prohibited. If you have received this transmission in error, please call the sender immediately to arrange for the return of this information.

MEMORY TRANSMISSION REPORT

|  |  |
|---|---|
| TIME | :09-29-'08 14:42 |
| FAX NO.1 | :609-777-1987 |
| NAME | :NJ Public Finance |

|  |  |  |
|---|---|---|
| FILE NO. | : | 868 |
| DATE | : | 09.29 14:39 |
| TO | : | ☎919736227333 |
| DOCUMENT PAGES | : | 4 |
| START TIME | : | 09.29 14:40 |
| END TIME | : | 09.29 14:42 |
| PAGES SENT | : | 4 |
| STATUS | : | OK |

***    SUCCESSFUL TX NOTICE    ***

JON S. CORZINE
*Governor*



R. DAVID ROUSSEAU
*State Treasurer*

**State of New Jersey
Department of the Treasury**

Office of Public Finance
50 West State Street, 5th Floor
P.O. Box 005
Trenton, New Jersey 08625

Telephone: (609) 984.4888
Facsimile: (609) 777.1987

---

## FACSIMILE TRANSMITTAL SHEET

| ATTN: M. JEREMY OSTOW, ESQ. | FROM: |
|---|---|
| COMPANY: MCMANIMON SCOTLAND | DATE: SEPTEMBER 29, 2008 |
| FAX NUMBER: 973-622-7333 | TOTAL # OF PAGES INCLUDING COVER: 4 |
| PHONE NUMBER: | |

RE: NJ TOBACCO SETTLEMENT FINANCING CORPORATION

☐ URGENT ☐ FOR REVIEW ☐ PLEASE COMMENT ☐ PLEASE REPLY ☐ PLEASE RECYCLE

NOTES/COMMENTS:

Please see attached.

If you do not receive all the pages, please call back as soon as possible.

**Confidential Notice**

The information contained in this facsimile transmission may be privileged and confidential information from the New Jersey Department of the Treasury intended for the sole use of the persons or entities named on this transmittal cover sheet. If you are not an intended recipient of this transmission, the dissemination, distribution, copying, or use of the information it contains is strictly prohibited. If you have received this transmission in error, please call the sender immediately to arrange for the return of this information.

MEMORY TRANSMISSION REPORT

|  |  |
|---|---|
| TIME | :09-29-'08 14:40 |
| FAX NO.1 | :609-777-1987 |
| NAME | :NJ Public Finance |

| | | |
|---|---|---|
| FILE NO. | : | 867 |
| DATE | : | 09.29 14:38 |
| TO | : | ☎912125475444 |
| DOCUMENT PAGES | : | 4 |
| START TIME | : | 09.29 14:38 |
| END TIME | : | 09.29 14:40 |
| PAGES SENT | : | 4 |
| STATUS | : | OK |

*** SUCCESSFUL TX NOTICE ***

JON S. CORZINE
*Governor*



R. DAVID ROUSSEAU
*State Treasurer*

**State of New Jersey**
**Department of the Treasury**

**Office of Public Finance**
50 West State Street, 5ᵗʰ Floor
P.O. Box 005
Trenton, New Jersey 08625

Telephone: (609) 984.4888
Facsimile: (609) 777.1987

**FACSIMILE TRANSMITTAL SHEET**

| ATTN: DOUGLAS YOUNGMAN, ESQ. | FROM: |
|---|---|
| COMPANY: McDermott Will & Emery LLP | DATE: SEPTEMBER 29, 2008 |
| FAX NUMBER: 212.547.5444 | PAGES INCLUDING COVER: 4 |
| PHONE NUMBER: | |

RE: NJ TOBACCO SETTLEMENT FINANCING CORPORATION

☐ URGENT  ☐ FOR REVIEW  ☐ PLEASE COMMENT  ☐ PLEASE REPLY  ☐ PLEASE RECYCLE

NOTES/COMMENTS:

Please see attached.

If you do not receive all the pages, please call back as soon as possible.

**Confidential Notice**
The information contained in this facsimile transmission may be privileged and confidential information from the New Jersey Department of the Treasury intended for the sole use of the persons or entities named on this transmittal cover sheet. If you are not an intended recipient of this transmission, the dissemination, distribution, copying, or use of the information it contains is strictly prohibited. If you have received this transmission in error, please call the sender immediately to arrange for the return of this information.

# //

# *Authorizing Resolution*

 **First Southwest Company**

**Certificate as to Resolution**
**of October 14, 2008**

I, Sharon Alessi, being the duly appointed Secretary of the Tobacco Settlement Financing Corporation (the "Corporation"), hereby certify that, at a meeting of the Board of Directors of the Corporation duly held on the 14th day of October, 2008, the attached resolution was duly adopted and is now in full force and effect.

In witness whereof, I have hereunto set my hand and caused the seal of the Corporation to be affixed on this 16th day of December, 2008.

[SEAL]

Sharon Alessi
Secretary

**AUTHORIZING RESOLUTION**

**OF THE**

**TOBACCO SETTLEMENT FINANCING CORPORATION**

A RESOLUTION OF THE MEMBERS OF THE BOARD OF THE TOBACCO SETTLEMENT FINANCING CORPORATION, AUTHORIZING AND PROVIDING FOR CERTAIN ACTIONS TO BE TAKEN BY THE CORPORATION TO PROTECT ITS RIGHTS AND REMEDIES UNDER THE CERTAIN INVESTMENT AGREEMENTS WITH LEHMAN BROTHERS SPECIAL FINANCING INC; AUTHORIZING THE APPOINTMENT OF A FINANCIAL ADVISOR AND BIDDING AGENT IN CONNECTION THEREWITH; AUTHORIZING THE PROPER OFFICERS OF THE CORPORATION TO DO OTHER ACTS NECESSARY, CONVENIENT AND PROPER FOR CARRYING OUT THE PURPOSES OF THIS RESOLUTION; AND PROVIDING FOR OTHER MATTERS RELATED THERETO.

WHEREAS, the Tobacco Settlement Financing Corporation (the "Corporation") is a body corporate and politic and an instrumentality of the State of New Jersey (the "State") established in, but not of, the Department of the Treasury exercising public and essential government functions, established pursuant to the Tobacco Settlement Financing Corporation Act, constituting Chapter 32 of the Pamphlet Laws of 2002 of the State (the "Act"); and

WHEREAS, pursuant to a Trust Indenture, as supplemented by a Series 2007-1 Supplement, both dated as of January 1, 2007 (collectively, the "Series 2007 Indenture"), by and between the Corporation and The Bank of New York, (the "Series 2007 Trustee"), the Corporation issued $3,436,225,000 in aggregate principal amount of Tobacco Settlement Asset-Backed Bonds, Series 2007-1A Senior Current Interest Bonds (the "Series 2007-1A Bonds"), $126,198,000 Tobacco Settlement Asset-Backed Bonds, Series 2007-1B First Subordinate Capital Appreciation Bonds (the "Series 2007-1B Bonds) and $59,785,081.50 Tobacco Settlement Asset-Backed Bonds, Series 2007-1C Second Subordinate Capital Appreciation Bonds (the "Series 2007-1C Bonds"; the Series 2007-1A Bonds, the Series 2007-1B Bonds and the Series 2007-1C Bonds are hereinafter collectively referred to as the "Series 2007-1 Bonds") the proceeds of which were used to (i) advance refund the Corporation's Tobacco Settlement Asset-Backed Bonds, Series 2002 (the "2002 Bonds"), and Tobacco Settlement Asset-Backed Bonds, Series 2003 (the "2003 Bonds"), (ii) fund certain reserves, and (iii) pay costs of the issuance of the Series 2007 Bonds; and

WHEREAS, in connection with the Series 2007-1 Bonds and pursuant to the Series 2007 Indenture, the Corporation and the Series 2007 Trustee are parties to (i) a Reserve Fund Agreement, dated as of August 28, 2002, among Lehman Brothers Special Financing, Inc.("Lehman"), the Corporation and Wachovia Bank, National Association, as trustee for the 2002 Bonds ("Wachovia"), as amended by an Amendment Agreement dated as of January 29, 2007, among Lehman, the Corporation, U.S. Bank, National Association (U.S. Bank"), as successor as successor to Wachovia, as trustee for the 2002 Bonds and the Series 2007 Trustee, (ii) a Reserve Fund Agreement, dated as of March 7, 2003, among Lehman, the Corporation and Wachovia, as trustee for the

2003 Bonds, as amended by an Amendment Agreement, dated as of January 29, 2007, among Lehman, the Corporation, U.S. Bank, as successor to Wachovia, as trustee for the 2003 Bonds and the Series 2007 Trustee, and (iii) a Reserve Fund Agreement dated as of January 29, 2007, among Lehman, the Corporation and the Series 2007 Trustee (such agreements being hereinafter referred to as individually as a "Lehman Agreement" and collectively as the "Lehman Agreements"); and

WHEREAS, Lehman Brothers Holdings Inc. ("Lehman Holdings") has guaranteed all of the payments to be made by Lehman under each Lehman Agreement pursuant to three instruments, each titled "Guarantee of Lehman Brothers Holdings Inc." and respectively dated as of August 28, 2002, March 7, 2003 and January 29, 2007; and

WHEREAS, on September 15, 2008, Lehman Holdings filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"); and

WHEREAS, as of September 15, 2008, the long term senior unsecured debt ratings of Lehman Holdings were downgraded below Baa3 by Moody's Investors Service and below BBB- by Standard & Poor's, a division of The McGraw-Hill Companies; and

WHEREAS, the Corporation filed a notice with Lehman on September 29, 2008 stating that Lehman had failed to take any of the actions as required by the Lehman Agreements following the rating downgrades of Lehman Holdings within the time period specified in the Lehman Agreements and that such failure would result in a Lehman Event of Default under each Lehman Agreement if not cured within five (5) Business Days; and

WHEREAS, on October 11, 2008, Lehman filed a voluntary petition for relief under Chapter 11 of Title 11 of the Bankruptcy Code; and

WHEREAS, the bankruptcy filings of Lehman Holdings and Lehman and the failure of Lehman to take any of the actions required under each Lehman Agreement within five (5) Business Days after the Corporation's notice of September 29, 2008 all constitute Events of Default under each Lehman Agreement; and

WHEREAS, the Corporation desires to authorize certain actions to enforce and protect any and all rights and remedies available to it under the Lehman Agreements and to receive full benefit of the Lehman Agreements and to enforce and protect the rights of the Series 2007 Bondholders;

NOW, THEREFORE, BE IT RESOLVED BY THE MEMBERS OF THE BOARD OF THE TOBACCO SETTLEMENT FINANCING CORPORATION, as follows:

1.    **Definitions**.    For purposes of this Authorizing Resolution the term "Authorized Officer" shall mean the Chairperson, the Vice Chairperson of the Board, or the President, Vice President, Secretary, or Treasurer of the Corporation, or any other person authorized to act hereunder by appropriate Written Notice to the Trustee. All other terms used herein and not otherwise defined shall have the respective meanings ascribed thereto in the 2007 Indenture or any Lehman Agreement.

**2.    Appointment of Bankruptcy Counsel.**  If the Attorney General's office determines it to be necessary, the Attorney General's office shall select, in accordance with Executive Order No. 26 and pursuant to a competitive bidding process, in consultation with the President of the Board, a firm generally recognized in the legal community as having an expertise in the area of bankruptcy law to serve as Bankruptcy Counsel on such terms as shall be approved by the Attorney General's office.

**3.    Authorizations**.  The Authorized Officers are hereby authorized to take any and all actions, in consultation with Bankruptcy Counsel, if any, the Attorney General's Office and Bond Counsel, to enforce the Corporation's rights under the Lehman Agreements, to receive full benefit of the Lehman Agreements, to protect the rights of the Series 2007 Bondholders and to pursue any remedies available to it at law or in equity, including, without limitation, terminating the Lehman Agreements, causing Lehman to take action under the Lehman Agreements, filing claims against Lehman and/or Lehman Holdings in the bankruptcy proceedings, filing any such other claims or actions against Lehman and Lehman Holdings in any court of competent jurisdiction as may be necessary or advisable, obtaining or entering into replacement Eligible Investments with respect to the funds of the Corporation currently invested under the Lehman Agreements and filing any Notices of Material Event pursuant to Securities and Exchange Commission Rule 15(c)2-12 upon the advice of the Attorney General's Office and Bond Counsel. The Authorized Officers are further authorized to execute and deliver any and all agreements, certificates, instruments and other documents necessary, convenient or desirable in connection with the actions contemplated by this Resolution.

**4.    Appointment of Bond Counsel**.  The Board hereby acknowledges that McManimon & Scotland, L.L.C. has been appointed to serve as Bond Counsel for the purposes set forth in this Resolution on such terms as shall be approved by the Attorney General's office.

**5.    Appointment of Financial Advisor and Bidding Agent**.  In accordance with Executive Order No. 26, First Southwest Company has been selected from a pool of bidding agents established by the State through a competitive RFP/RFQ process in accordance with the rules governing selection from the pool to serve as financial advisor and bidding agent for the purposes of this Resolution, including performing an evaluation of the current value of the Lehman Agreements, serving as bidding agent to solicit bids for the purchase and sale of Eligible Investments as authorized pursuant to Section 3 of this Resolution on terms most favorable to the Corporation and in connection with the termination of the Lehman Agreements and the Board hereby approves the selection of First Southwest Company (the "Financial Advisor and Bidding Agent") as financial advisor and bidding agent to the Authority; provided that the compensation to be paid to First Southwest Company for its services shall not exceed $50,000.

**6.    Office of Public Finance**.  The Corporation hereby engages the services of the Office of Public Finance in the Department of the Treasury to provide advisory services in connection with the actions contemplated by this Resolution.

**7.    Effective Date**.  This Resolution shall take effect immediately upon its adoption by the Board and its approval by the Treasurer of the State in accordance with the Act.

ADOPTED: October 14, 2008



# *Court Order of the*
# *United States Bankruptcy Court*



UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                                    :
In re                                               :        Chapter 11 Case No.
                                                    :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,            :        08-13555 (JMP)
                                                    :
                                    Debtors.        :        (Jointly Administered)
                                                    :
------------------------------------------------------------x

## SUPPLEMENTAL ORDER PURSUANT TO SECTIONS 105 AND 365 OF THE BANKRUPTCY CODE TO ESTABLISH PROCEDURES FOR THE SETTLEMENT OR ASSUMPTION AND ASSIGNMENT OF PREPETITION DERIVATIVE CONTRACTS

Upon the motion, dated November 13, 2008 (the "Motion"), of Lehman Brothers

Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases, as

debtors and debtors-in-possession (collectively, the "Debtors" and, together with their non-

debtor affiliates, "Lehman"),[1] pursuant to sections 105 and 365 of the Bankruptcy Code (the

"Bankruptcy Code") and Rules 6006 and 9019 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules") for entry of an order establishing procedures for the assumption and

assignment (the "Assumption and Assignment Procedures") of derivative contracts (the

"Derivative Contracts")[2] the Debtors entered into with various counterparties (the

"Counterparties") and the settlement of claims arising from the termination of Derivative

Contracts (the "Termination and Settlement Procedures" and together with the Assumption and

Assignment Procedures, the "Procedures"), all as more fully described in the Motion; and

--------------------------------------------------

[1]      The Debtors do not include Lehman Brothers Inc. ("LBI") or any affiliates of LBHI that are not chapter 11 debtors.

[2]      For the avoidance of doubt, Derivative Contracts shall not include contracts or assets transferred to Barclays Capital Inc. or its affiliates pursuant to the terms of that certain Asset Purchase Agreement dated September 16, 2008 (as amended, supplemented, modified or clarified) among LBHI, LBI, LB 745 LLC, and Barclays Capital Inc.

consideration of the Motion and the relief requested therein being a core proceeding pursuant to

28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and

1409; and due and proper notice of the Motion having been provided in accordance with the

procedures set forth in the order entered September 22, 2008 governing case management and

administrative procedures [Docket No. 285] to (i) the United States Trustee for the Southern

District of New York (the "U.S. Trustee"); (ii) the attorneys for the Official Creditors'

Committee (the "Committee"); (iii) the Securities and Exchange Commission; (iv) the Internal

Revenue Service; (v) the United States Attorney for the Southern District of New York; and (vi)

all Counterparties (via mail, fax, or email) in the Debtors' records to the extent that the

Counterparties' last known mail address, fax number, or email address is available to the

Debtors; and (vii) all parties who have requested notice in these chapter 11 cases, and it

appearing that no other or further notice need be provided; and a hearing (the "First Hearing")

having been held on December 16, 2008 to consider the relief requested in the Motion; and an

order having been entered on December 16, 2008 [Docket No. 2257] granting the relief

requested in the Motion (the "Derivatives Procedures Order") except as to the Derivative

Contracts in respect of which the Remaining Objectors (as defined in the Derivatives Procedures

Order) filed an objection (the "Remaining Derivative Contracts"); and the hearing on the Motion

as to the Remaining Derivative Contracts having been adjourned to January 14, 2009 at 10:00

(the "Second Hearing"); and the Second Hearing having been held to consider the relief

requested in the Motion as to the Remaining Derivative Contracts; and all objections to the

Motion filed by the Remaining Objectors, other than those filed by the January Remaining

Objectors (as defined below) having been resolved, withdrawn or overruled at the Second

Hearing; and the Court having previously found and determined at the First Hearing that the

2

relief sought in the Motion is in the best interests of the Debtors, their estates and creditors, and

all parties in interest and that the legal and factual bases set forth in the Motion establish just

cause for the relief granted therein; and after due deliberation and sufficient cause appearing

therefor, it is

ORDERED that the terms of the Derivatives Procedures Order shall be applicable

to Derivative Contracts in respect of which any of the following Remaining Objectors filed an

objection to the Motion: Calyon, Dexia Bank Internationale a Luxembourg SA, Dexia Credit

Local, Dexia Kommunalbank Deutschland AG, Dexia Banque Belgique SA and Banif - Banco

de Investimento, S.A.; and Georgetown University; and it is further

ORDERED that the terms of the Derivatives Procedures Order shall not be

applicable to the Remaining Derivative Contracts in respect of which any of the following

Remaining Objectors filed an objection to the Motion: The Toronto Dominion Bank; Metavante

Corporation; Portfolio Green German; Lincore Limited, E-Capital Profits Limited, and Cheung

Kong Bond Finance Limited; the City and County of Denver, Department of Revenue; First

Choice Power, L.P.; Reliant Energy Power Supply, LLC; EnergyCo, LLC and EnergyCo

Marketing and Trading; Wells Fargo, N.A., as trustee; JA Solar Holdings Co., Ltd.; West

Corporation; Danske Bank A/S, London Branch; BRM Group, Ltd.; SunAmerica Life Insurance

Company, AIG CDS, Inc., Lexington Insurance Company; Carlton Communications Limited;

HarbourView CDO III; Norton Gold Fields Limited; Bank of America, National Association,

Successor by Merger with LaSalle Bank National Association, in its capacity as Trustee under

certain Trust Agreements; The Walt Disney Company; Deutsche Bank Trust 15 Company

Americas and Deutsche Bank National Trust Company; Bank of America, National Association

Successor by Merger with LaSalle Bank National Association, in its Capacity as Trustee under

3

that certain Indenture Dated as of August 16, 2007 among Ceago ABS CDO 2007-1, Ltd., as

Issuer, Ceago ABS CDO 2007-1, LLC, as Co-Issuer and LaSalle Bank National Association, as

Trustee; QVT Financial LP; Bank of America, National Association Successor by Merger with

LaSalle Bank National Association, in its Capacity as Trustee under that Certain Indenture Dated

as of November 29, 2005 among Verde CDO Ltd., as Issuer, Verde CDO, LLC, as Co-Issuer and

LaSalle Bank National Association, as Trustee; Standard Chartered Bank; The Bank of New

York Mellon, The Bank of New York Mellon Trust Company, N.A. and BNY Corporate Trustee

Services Limited; U.S. Bank National Association; Lahde Capital Management Inc.; Instituto de

Credito Oficial; Northcrest, Inc.; Citigroup Inc. and all of its affiliates, including Citibank, N.A.;

BRE Bank SA; Societe Generale, Canadian Imperial Bank Commerce; EPCO Holdings, Inc.;

Bremer Financial Corporation; Occidental Energy Marketing Inc.; and FPL Energy Power

Marketing, Inc. and Florida Power & Light Company (the "January Remaining Objectors"); and

it is further

      ORDERED that, notwithstanding anything to the contrary in the foregoing, the

terms of the Derivatives Procedures Order shall be applicable to Remaining Derivative Contracts

in respect of which the Tobacco Financing Settlement Corporation filed an objection only insofar

as such terms relate to the Termination and Settlement Procedures; and it is further

      ORDERED that the hearing on the Motion regarding the Remaining Derivative

Contracts in respect of which the January Remaining Objectors filed an objection to the Motion

is hereby adjourned to January 28, 2009 at 10:00 a.m. or such later date as may be either

indicated in a notice filed by the Debtors with the Court or ordered by the Court; and it is further

4

ORDERED that all terms of the Derivatives Procedures Order shall continue to

apply and remain in full force and effect without modification, except to the extent expressly

modified by the terms of this Order; and it is further

ORDERED that entry of this Order is without prejudice to the rights of the

Debtors, including, but not limited to, the right to seek further, other, or different relief regarding

the Derivative Contracts pursuant to, among other things, section 365 of the Bankruptcy Code;

and it is further

ORDERED that notice of the Motion as provided therein shall be deemed good

and sufficient notice of such Motion and the requirements of Bankruptcy Rules 6006(a) and 9014

are satisfied.

Dated:  January 15, 2009
       New York, New York

                            */s/ James M. Peck*
                            UNITED STATES BANKRUPTCY JUDGE

5

# IV

# *Certifications, Bids Submitted & Market Data*

 **First Southwest Company**

# CERTIFICATE REGARDING
# TERMINATION OF 2007 AGREEMENTS

The undersigned, Michael Marz, hereby certifies as follows:

1.      That he is a Vice Chairman of First Southwest Company ("First Southwest").

2.      That in January of 2007, First Southwest, acting on behalf of the Tobacco Settlement Financing Corporation (the "Issuer") made a solicitation of bids for and otherwise advised the Issuer in the investment of amounts to be deposited in the Senior Liquidity Reserve Account established under the Indenture dated as of January 1, 2007 (the "Indenture"), between the Issuer and The Bank of New York, as trustee (the "Trustee"), with respect to the Issuer's Tobacco Settlement Asset-Backed Bonds, Series 2007-1A Senior Current Interest Bonds (the "2007-1A Bonds"). As the result of the bidding process, such amounts have been invested pursuant to a Reserve Fund Agreement dated as of January 29, 2007 (the "2007 Agreement"), by and among Lehman Brothers Special Financing Inc. (the "Provider"), the Issuer, and the Trustee.

3.      That in January of 2007, First Southwest Company advised the Issuer in the investment of amounts to be deposited in the Senior Liquidity Reserve Account, with respect to the Issuer's 2007-1A Bonds, by amendment of a Reserve Fund Agreement dated as of August 28, 2002, by and among the Provider, the Issuer, and U.S. Bank, National Association (the "Prior Trustee"). As the result of the amendment, such amounts have been invested pursuant to an Amendment Agreement dated as of January 29, 2007 (the "Amendment Agreement-2002"), by and among the Provider, the Issuer, and the Trustee.

4.      That in January of 2007, First Southwest Company advised the Issuer in the investment of amounts to be deposited in the Senior Liquidity Reserve Account, with respect to the Issuer's 2007-1A Bonds, by amendment of a Reserve Fund Agreement dated as of March 7, 2003, by and among the Provider, the Issuer, and the Prior Trustee. As the result of the amendment, such amounts have been invested pursuant to an Amendment Agreement dated as of January 29, 2007 (the "Amendment Agreement-2003"), by and among the Provider, the Issuer, and the Trustee.

5.      That on October 14, 2008, the Board of Directors of the Issuer adopted a resolution (the "Resolution"), authorizing certain actions in order to receive the full benefit of and to protect the rights of the Issuer and the 2007 Bondholders, and the remedies available to each under the 2007 Agreement, the Amendment Agreement-2002, and the Amendment Agreement-2003 (the "Agreements"), subsequent to the bankruptcy filings of the Provider and Lehman Brothers Holdings Inc. ("Lehman Holdings) and the failure of the Provider and Lehman Holdings to take any of the actions required under the Agreements.

6.      That in connection with the Resolution, First Southwest on January 26, 2009, acting on its recommendation and on behalf of the Issuer solicited five (5) different reasonably competitive providers and received four (4) non-actionable bids for termination of each of the Agreements. The Termination Amount for each of the Agreements was determined by the arithmetic mean of market quotations, without regard to the market quotations having the highest and lowest values. The Issuer would have received a Termination Amount under each of the Agreements as follows: (i) for the 2007 Agreement in the amount of $100,469,617 and earning a rate of 5.002%, the Termination Amount was $42,728,071.35; (ii) for the Amendment

Agreement-2002 in the amount of $31,154,270 and earning a rate of 4.70%, the Termination Amount was $11,438,435.58; and (iii) for the Amendment Agreement-2003 in the amount of $82,835,000 and earning a rate of 4.44%, the Termination Amount was $25,720,720.67.

7.    That the undersigned understands that the foregoing information will be relied upon by the Issuer for the purposes of compliance with the arbitrage yield restriction and rebate requirements applicable to the 2007-1A Bonds.   Such reliance for only such purposes is authorized.  First Southwest makes no representation as to the legal sufficiency of the factual matters certified herein.

IN WITNESS WHEREOF, the undersigned has caused this certificate to be executed as of the 26th day of January, 2009.

**FIRST SOUTHWEST COMPANY**

Michael Marz, Vice Chairman



**First Southwest Company**

$3,436,225,000
Tobacco Settlement Financing Corporation, State of New Jersey
Tobacco Settlement Asset-Backed Bonds
Series 2007-1A Senior Certificates

**Bid Results**

BID DATE:    January 26, 2009    3:00 PM EASTERN
BIDDING AGENT:  Mike Marz - David Brayshaw (214) 953-4040

| Firm | L.T. - Credit Rating | | S.T. - Credit Rating | | Contract | Contract | Contract |
|---|---|---|---|---|---|---|---|
| | S&P | Moody's | S&P | Moody's | $100,469,617 @ 5.002% | $82,835,000 @4.44% | $31,154,270 @ 4.70% |
| Barclays Capital Inc. | AA- | Aa3 | A-1+ | P-1 | $70,326,591.00 | $48,691,798.00 | $19,917,635.00 |
| Citigroup | A+ | Aa3 | A-1 | P-1 | Pass | Pass | Pass |
| Morgan Stanley & Co., USA | A | A2 | A-1 | P-1 | $34,017,000.00 | $18,686,000.00 | $8,815,000.00 |
| Natixis Funding Corporation | A+ | Aa3 | A-1 | P-1 | $49,656,142.69 | $30,941,441.34 | $13,376,871.16 |
| Transamerica (AEGON) | AA | Aa3 | A-1+ | P-1 | $35,800,000.00 | $20,500,000.00 | $9,500,000.00 |
| Arithmetic mean of market quotations, excluding High and Low | | | | | $42,728,071.35 | $25,720,720.67 | $11,438,435.58 |
| A positive number indicates that the FPA is in the money to NJ. Does not included any expenses | | | | | | | |

Bid: Termination of Lheman Brothers Special Financing Inc. CP FPA

Winner:    Non-Actionalbe Bid

FSW Fee:

GRAB                                                                    EquityBBT

# U.S.  TREASURY  ACTIVES                                    Page  1/ 1

Label Format    [ Single Security Inquiry    ▼ ]                       ‹  ›   15:04

| BILLS | | | | | | 30 YR BONDS | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1)02/19/09 | | 0.010 | /010 | | 0.01 | 16)5 | 537 | 127-27 | /27⅝ | 2.45 |
| 2)04/23/09 | | 0.100 | /100 | | 0.10 | 17)4⅜ | 238 | 117-29 | /29 | 3.40 |
| 3)07/23/09 MZ | | 0.315 | /310 | ML | 0.31 | 18)4½ | 538 | 120-19 | /19 | 3.39 |
| 4)01/14/10 | | 0.445 | /440 | | 0.45 | **TIPS** | | | | |
| **2 YR NOTES** | | | | | | 19)TII  5YR | | 96-19⅞ | /25+ | 1.41 |
| 5)1¼ | N10 | 100-27¼ | /27⅜ | | 0.78 | 20)TII 10YR | | 102-02¼ | /20+ | 1.83 |
| 6)0⅞ | D10 | 100-02⅞ | /03 | | 0.83 | 21)TII 20YR MN | | 88-12¼ | /02 | 2.48 |
| 7) WI | 2YR MZ | 0.895 | / 0.890 | MZ | | **Curve Trades** | | | | |
| **3 YR NOTES** | | | | | | 22)2YR VS  5YR | | 82.09 | / -82.84 | |
| 8)1⅛ | D11 | 99-29⅞ | /30⅜ | | 1.14 | 23)2YR vs 10YR | | 181.21 | /-181.79 | |
| 9)1⅛ | 112 | 99-25¾ | /25¾ | MN | 1.19 | 24)5YR vs 10YR | | 98.78 | / -99.20 | |
| **5 YR NOTES** | | | | | | **Other Markets** | | | | |
| 10)2 | N13 | 101-26 | /26 | | 1.61 | 25) US Long(CBT) | 14:54 | 129-04+ | | |
| 11)1½ | D13 | 99-09 | /09¼ | | 1.65 | 26) 10Y Fut(CBT) | 14:54 | 123-22 | | |
| 12) WI | 5YR | 1.725 | / 1.710 | | | 27) 5Yr Fut(CBT) | 14:54 | 118-30⅜ | | |
| **10 YR NOTES** | | | | | | 28) DowJones | 15:04 | 8128.297 | | |
| 13)3⅞ | 518 | 110-09⅞ | /09⅞ | | 2.62 | 29) NASDAQ Cmp | 15:04 | 1488.650 | | |
| 14)4 | 818 TF | 111-16¼ | /16+ | | 2.63 | 30) S&P 500 Ind | 15:04 | 839.130 | | |
| 15)3¾ | N18 | 109-16 | /16 | SC | 2.64 | 31) Nymex wti cr | 14:34 | 45.560 | | |

TAC   BILLS   T/0-1   T/1-2   T/2-5   T/5-10   T/10-20   T/20-30   TIPS   STRIPS   AG/OTR   AGENCIES   CURVES

Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900        Singapore 65 6212 1000        U S  1 212 318 2000        Copyright 2009 Bloomberg Finance L P
                                                                                                2 26 Jan 09 15 04 16

GRAB                                                                    Equity **USSW**

| Change Country ▼ | | US GOVT/SWAP/AGENCY COMPOSITE | | | | | | 15.05.01 | |
|---|---|---|---|---|---|---|---|---|---|
| **GV ASI/CHG** | | **SWGV** | **SWAP MID** | **FNMA** | **FN/GV** | **FN/SW** | **FHLMC** | **FH/GV** | **FH/SW** |
| 2Y | 0.826  -0.017 | 66.2  0.8 | 1.491  0.026 | 1.283 | 46.1 -2.7 | -16.6 -4.0 | 1.437 | 62.7 -2.6 | -1.6 -5.6 |
| 3Y | 1.133  0.037 | 65.0  1.0 | 1.845  0.051 | 1.912 | 73.5  1.1 | 8.0 -7.0 | 1.569 | 33.2 | -27.1 -7.1 |
| 4Y | 1.267  0.025 | 63.9  3.2 | 2.110  0.052 | 1.990 | 33.3  1.2 | -10.5 -5.7 | 2.167 | 43.0 -0.2 | 6.4 -5.7 |
| 5Y | 1.649  0.020 | 64.0  3.7 | 2.282  0.044 | 2.329 | 69.3 -2.8 | 6.4 -7.0 | 2.381 | 71.3 -1.5 | 11.4 -6.9 |
| 7Y | 1.991  0.046 | 52.1  3.1 | 2.556  0.054 | 2.843 | 115.1 -0.5 | 20.7 -6.3 | 3.158 | 143.0 -0.7 | 59.7 -6.3 |
| 10Y | **2.641**  0.024 | 19.4 -4.4 | 2.934  0.064 | 3.465 | 81.6 -1.2 | 64.2 | 3.421 | 77.5  0.2 | 59.1 |
| 30Y | **3.387**  0.066 | -17.5  2.6 | **3.211** +0.87 | 4.256 | 85.6 -1.4 | 106.1 -5.5 | 4.190 | 73.9 -5.1 | 97.1 -5.6 |

| DJIA | 8119.1 | +41.5 | S&P 500 | 838.07 | 6.12 | CCMP | 1487.07 | 9.76 | BE500 | 135.68 | 3.71 |
|---|---|---|---|---|---|---|---|---|---|---|---|

| CASH MARKET | | ACTIVE FUTURES | | SWAPTION 1 Y | 3 Y | 5 Y | 7 Y | 10 Y | CAP/FL |
|---|---|---|---|---|---|---|---|---|---|
| 1M LIBOR | 0.40375 | 5 Year | **118-30+** | 1Y | 66.4 | 43.6 | 46.0 | 43.1 | 40.4 | **82.1** |
| 3M LIBOR | 1.13375 | 10 Year | **123-21+** | 2Y | 45.2 | 40.9 | 38.6 | 37.1 | 35.0 | **68.6** |
| 6M LIBOR | 1.67250 | LONG BOND | 123-00+ | 3Y | 39.3 | 36.9 | 35.1 | 33.6 | 31.8 | **57.4** |
| 1Y LIBOR | 1.90625 | 5Y Swap | 117-00+ | 4Y | 36.7 | 34.0 | 33.0 | 31.4 | 29.7 | **50.2** |
| Fed Funds | 0.18750 | 10Y Swap | 127-01  -14+ | 7Y | 33.9 | 32.5 | 31.2 | 29.6 | 28.3 | **45.7** |
| O/N Repo | 0.16000 | 30Y Swap | 153-00+ | 10Y | 29.6 | 28.5 | 27.2 | 25.2 | 25.4 | 35.9 |
| 1W Repo | 0.16000 | | | 10Y | 23.3 | 22.9 | 22.3 | 22.3 | 22.7 | 34.6 |

| Date Time | | | Event | | | Srvey | Actual | Prior | Revised |
|---|---|---|---|---|---|---|---|---|---|
| 1/26 10:00 | US | 1) | Leading Indicators | DEC | | -0.2% | 0.3% | -0.4% | |
| 1/26 10:00 | US | 2) | Existing Home Sales | DEC | | 4.40M | 4.74M | 4.49M | 4.43M |
| 1/26 10:00 | US | 3) | Existing Home Sales MoM | DEC | | -2.6% | 6.5% | 8.4% | -9.4% |
| 1/26 10:30 | US | 4) | Dallas Fed Manf Activity | JAN | | -- | -50.5 | -42.5 | -- |

Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900    Singapore 65 6212 1000    U.S. 1 212 318 2000    Copyright 2009 Bloomberg Finance L.P.
2 25-Jan-09 15.05.01

GRAB                                                                    Equity**NWAX**

202 - Save a copy to your NW list

| Ticker | Bid | Ask | Mid | Chng | Ticker | Bid | Ask | Mid | Chng |
|---|---|---|---|---|---|---|---|---|---|
| US Semi 30/360 | | | | | US SPREADS | | | | |
| 2) 1 YR | 1.2040 | 1.2230 | 1.2135 | +.0180 | 22) 1 YR | 75.34 | 77.24 | 76.39 | -.49 |
| 3) 2 YR | 1.4840 | 1.4940 | 1.4890 | +.0340 | 23) 2 YR | 65.25 | 67.25 | 66.25 | +.82 |
| 4) 3 YR | 1.8420 | 1.8480 | 1.8450 | +.0510 | 24) 3 YR | 64.00 | 66.50 | 65.25 | +1.25 |
| 5) 4 YR | 2.1060 | 2.1060 | 2.1060 | +.0485 | 25) 4 YR | 67.50 | 70.50 | 68.94 | +3.25 |
| 6) 5 YR | 2.2870 | 2.2990 | 2.2930 | +.0555 | 26) 5 YR | 63.00 | 65.00 | 64.00 | +3.70 |
| 7) 6 YR | 2.4400 | 2.4520 | 2.4435 | +.0545 | 27) 6 YR | 58.00 | 61.00 | 59.88 | +3.94 |
| 8) 7 YR | 2.5660 | 2.5711 | 2.5686 | +.0571 | 28) 7 YR | 51.13 | 53.13 | 52.13 | +3.13 |
| 9) 8 YR | 2.6660 | 2.6780 | 2.6710 | +.0610 | 29) 8 YR | 41.00 | 44.00 | 42.44 | +2.94 |
| 10) 9 YR | 2.7500 | 2.7590 | 2.7530 | +.0620 | 30) 9 YR | 29.38 | 32.38 | 31.19 | +4.13 |
| 11) 10 YR | 2.8370 | 2.8370 | 2.8370 | +.0670 | 31) 10 YR | 18.25 | 20.50 | 19.38 | +4.38 |
| 12) 15 YR | 3.1390 | 3.1420 | 3.1375 | +.0675 | 32) 15 YR | 30.25 | 32.25 | 31.25 | +4.19 |
| 13) 20 YR | 3.2060 | 3.2140 | 3.2100 | +.0770 | 33) 20 YR | 18.25 | 20.13 | 19.19 | +3.75 |
| 14) 25 YR | 3.2030 | 3.2230 | 3.2125 | +.0920 | 34) 25 YR | -.38 | 1.38 | .50 | +3.38 |
| 15) 30 YR | 3.2070 | 3.2180 | 3.2110 | +.0870 | 35) 30 YR | -19.00 | -16.00 | -17.50 | +2.50 |

Change on day                                    Change on day
IYC4 I52<GO>                                      IYC4 I48<GO>

Change on Month                                   Change on Month
IYC6 I52<GO>                                      For US Govt Yield Curve, type {IYC1 I25 <GO>}
Pricing based on XDF<GO> settings                 For US swap Curve, type {IYC1 I52 <GO>}

Australia 61 2 9777 8600  Brazil 5511 3048 4500  Europe 44 20 7330 7500  Germany 49 69 9204 1210  Hong Kong 852 2977 6000
Japan 81 3 3201 8900       Singapore 65 6212 1000        U.S. 1 212 318 2000        Copyright 2009 Bloomberg Finance L.P.
                                                                                   2 26-Jan-09 15 06 22

# V

# *Transaction Documents*
# *January 29, 2007*

 **First Southwest Company**

# *Reserve Fund Agreement*
# *Transaction Documents*

 **First Southwest Company**

Execution Copy

## RESERVE FUND AGREEMENT

This Reserve Fund Agreement (this "Agreement") dated as of January 29, 2007, by and among TOBACCO SETTLEMENT FINANCING CORPORATION, a public body corporate and politic and an instrumentality of the State of New Jersey (the "Issuer"), THE BANK OF NEW YORK, a New York State banking corporation organized and existing under the laws of the State of New York (the "Trustee"), and LEHMAN BROTHERS SPECIAL FINANCING INC., a Delaware corporation ("Lehman").

SECTION I.            DISCLAIMER; DEFINITIONS

Section 1.1 **State Not Obligated. THE EXECUTION OF THIS AGREEMENT UNDER THE PROVISIONS OF THE ACT SHALL NOT DIRECTLY, INDIRECTLY OR CONTINGENTLY OBLIGATE THE STATE OR ANY POLITICAL SUBDIVISION (OTHER THAN THE ISSUER) THEREOF TO (I) PAY ANY AMOUNTS TO THE ISSUER, OWNER OF THE BONDS OR BENEFITTED PARTIES (AS DEFINED IN THE ACT), OR (II) LEVY OR PLEDGE ANY FORM OF TAXATION WHATSOEVER THEREFOR. NEITHER THE BONDS NOR THIS AGREEMENT IS A DEBT OR LIABILITY OF THE STATE OR ANY AGENCY OR INSTRUMENTALITY THEREOF (OTHER THAN THE ISSUER), EITHER LEGAL, MORAL OR OTHERWISE, AND NOTHING CONTAINED IN THE ACT SHALL BE CONSTRUED TO AUTHORIZE THE ISSUER TO INCUR ANY INDEBTEDNESS ON BEHALF OF OR IN ANY WAY TO OBLIGATE THE STATE OR ANY POLITICAL SUBDIVISION THEREOF (OTHER THAN THE ISSUER).**

Section 1.2 For purposes of this Agreement, unless the context clearly indicates otherwise, the words and terms defined in this Section I have the respective meanings given to them herein:

"Act" means the New Jersey Tobacco Settlement Financing Corporation Act, codified at Chapter 18B of Title 52 of the New Jersey Statutes.

"Bond Payment Date" means, with respect to each Deposit Date, each date identified as a "Bond Payment Date" on Exhibit A unless such date is not a Business Day, in which case "Bond Payment Date" means the immediately preceding Business Day; provided that in determining whether any such date is a Business Day no effect shall be given to clause (c) or (d) of the definition of Business Day and provided further, the Bond Payment Date for all or a portion of the amount on deposit in the Reserve Fund may be modified as provided in Section 2.9 hereof.

1

"Bonds" means the Issuer's $3,436,225,000.00 Tobacco Settlement Asset-Backed Bonds, Series 2007-1A Senior Current Interest Bonds.

"Burdened Party" means, (i) in the case of (A) an Issuer Event of Default or a Trustee Event of Default or (B) a termination of this Agreement by the Issuer pursuant to Section 3.1 following a redemption, defeasance or refunding of the Bonds or pursuant to Section 2.8, Lehman and (ii) in the case of a Lehman Event of Default or Lehman Downgrade, the Issuer.

"Business Day" means any day other than (a) a Saturday or Sunday, (b) a day on which the principal corporate trust office of the Trustee is authorized or required by law to close, (c) a day upon which commercial banks in the State of New Jersey or the State of New York are permitted or required to remain closed, (d) a day on which the New York Stock Exchange or DTC is closed, or (e) a day on which any Qualified Securities which may be delivered hereunder are not subject to delivery in the City of New York.

"Calculation Period" means the period from each Deposit Date to the next succeeding Bond Payment Date.

"Closing Date" means January 29, 2007.

"Coupon Payment" means, for any Qualified Security, a payment of interest which is due to be paid thereon prior to the scheduled maturity of such Qualified Security.

"Dealer" means a leading dealer in the relevant markets selected by Lehman in good faith and consented to by the Issuer (such consent not to be unreasonably withheld) (a) from among dealers of the highest credit standing which satisfy all the criteria that Lehman applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from such dealers having an office in the same city.

"Debt Service Payment" means (i) Qualified Swap Payment, (ii) a scheduled payment of principal or sinking fund installment of or interest on the Bonds or (iii) a payment of principal or redemption premium of or interest on the Bonds resulting from an Event of Default (as defined in the Indenture) under the Indenture but excluding (A) any payment in connection with any other redemption of the Bonds (other than a mandatory sinking fund redemption) and excluding (B) any payment required to make a regularly scheduled deposit to the principal account or interest account for the Bonds.

"Default Rate" means a per annum rate equal to the lesser of (a) Three Month LIBOR plus 1% per annum, or (b) the maximum rate permitted by law.

"Delivery Notice" means a notice substantially in the form of Exhibit E or in such other form as provided by the Qualified Dealer and is reasonably acceptable to the Trustee.

2

"Deposit Date" means each date identified as a "Deposit Date" on Exhibit A unless such date is not a Business Day, in which case "Deposit Date" means the immediately preceding Business Day.

"Differential" means the amount, if any, by which the Purchase Price of any Qualified Security delivered hereunder exceeds the Market Value thereof.

"Eligible Securities" means (i) direct obligations of the United States Treasury including only notes, bonds, bills or certificates of indebtedness, (ii) direct obligations of, or obligations guaranteed as to timely payment of principal and interest by, the Federal Home Loan Mortgage Corporation, Fannie Mae, or the Federal Farm Credit System; (iii) commercial or finance company paper (including both non-interest bearing discount obligations and interest bearing obligations) payable on demand or on a specified date not more than 270 days after the issuance thereof rated at least A-1 by S&P and P-1 by Moody's.

"Guaranteed Rate" means a rate per annum equal to 5.002%.

"Illegality" means any event due to the adoption of, or any change in, any applicable law after the date on which this Agreement is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of this Agreement or to comply with any other material provision of this Agreement.

"Incipient Illegality" means (a) the enactment by any legislative body with competent jurisdiction over the Issuer of legislation which, if adopted as law, would render unlawful (i) the performance by the Issuer of any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of this Agreement or the compliance by the Issuer with any other material provision of this Agreement or (ii) the performance by the Issuer of any contingent or other obligation which the Issuer has relating to this Agreement, (b) any authorized assertion in any official proceeding, forum or action by an Authorized Officer (as defined in the Indenture) of the Issuer in respect of the Issuer to the effect that performance under this Agreement or any of the Other Investment Agreements is unlawful or (c) the occurrence with respect to the Issuer of any event that constitutes an Illegality.

"Indenture" means the Indenture, dated as of January 1, 2007, by and between the Issuer and the Trustee, as amended and supplemented from time to time in accordance with the terms hereof and thereof.

"Insolvent" means (i) either the Trustee or Lehman as the case may be, shall (1) commence a voluntary case under the federal bankruptcy laws (as in effect on the date of this Agreement or hereafter), (2) file a petition seeking to take advantage of any other law relating to bankruptcy, insolvency, reorganization, winding up or composition or adjustment of debts, (3)

3

consent to any petition filed against it in an involuntary case under such bankruptcy or insolvency or other laws, (4) apply for or consent to the appointment of, or the taking of possession by, a trustee, receiver, custodian, liquidator or the like for itself or for all or a substantial part of its property, (5) admit in writing its inability to pay, or generally not be paying, its debts as they come due, (6) make a general assignment for the benefit of creditors, or (7) take any official action for the purpose of effecting any of the foregoing; or (ii) a case or other proceeding shall be commenced against either the Trustee or Lehman, as the case may be, in any court of competent jurisdiction seeking (1) relief under the federal bankruptcy laws (as in effect on the date of this Agreement or hereafter) or under any other law relating to bankruptcy, insolvency, reorganization, winding up or composition or adjustment of debts, or (2) the appointment of a trustee, receiver, custodian, liquidator or the like for the Trustee or Lehman, as the case may be, or for all or a substantial part of its property, and any such case or proceeding shall continue undismissed and unstayed for a period of 60 consecutive calendar days, or an order granting the relief requested in any such case or proceeding against such party shall be entered and shall remain in effect and unstayed for a period of 60 consecutive days.

"Issuer Event of Default" means the occurrence of an event specified in Section 7.2 hereof.

"LBH" means Lehman Brothers Holdings Inc., which wholly owns and unconditionally guarantees the obligations of Lehman.

"Lehman Cure Period" has the meaning specified in Section 7.3(a) hereof.

"Lehman Event of Default" means the occurrence of an event specified in Section 7.3 hereof.

"Market Value" means with respect to any Qualified Security, the market value thereof (including accrued interest thereon) as specified by the Qualified Dealer delivering that security, provided that the Market Value of any Qualified Security shall in no event exceed the Maturity Amount thereof.

"Master Settlement Agreement" has the meaning specified in the Indenture.

"Maturity Amount" means, with respect to any Qualified Security, the amount, payable in cash, representing the principal and interest (including any Coupon Payments) due thereon or prior to its maturity date.

"Moody's" means Moody's Investors Service, its successors and assigns.

"Other Investment Agreements" means the Reserve Fund Agreement, dated as of August 28, 2002 as amended on January 29, 2007, by and among the Issuer, the Trustee, U.S. Bank, National Association (the "Prior Trustee") and Lehman and the Reserve Fund Agreement, dated

4

as of March 7, 2003, as amended on January 29, 2007, by and among the Issuer, the Trustee, the Prior Trustee and Lehman.

"Pledged Assets" means Collections as defined in the Indenture.

"Purchase and Sale Agreement" means, collectively, the Purchase and Sale Agreement, dated as of August 1, 2002, by and between the Issuer and the State of New Jersey and the Purchase and Sale Agreement, dated as of March 1, 2003, by and between the Issuer and the State of New Jersey, each as amended, supplemented and in effect from time to time.

"Purchase Price" means, for any Eligible Security delivered hereunder, that price for such security, as set forth in the Delivery Notice, which will produce a rate of return on such security for the period from (and including) the date of its delivery to (but excluding) the maturity date thereof which, assuming reinvestment of the proceeds thereof at a corresponding rate for the remainder of the related Calculation Period, will be equal to the Guaranteed Rate assuming a year of 360 days with twelve thirty day months.

"Qualified Dealer" means Lehman Brothers Inc., its successors or assigns, or any other dealer in Eligible Securities selected by Lehman.

"Qualified Securities" means, for any Deposit Date or subsequent deposit date pursuant to Section 2.3 or 2.4 hereof, Eligible Securities which, (i) mature on or prior to the related Bond Payment Date and (ii) have an aggregate Purchase Price which is as close as possible to but does not exceed the related Scheduled Reserve Amount.

"Qualified Swap" means any Swap Contract (as defined in the Indenture) with respect to which the Issuer has obtained written confirmation (and provided to Lehman a copy of each such confirmation) from each Rating Agency (as defined in the Indenture) then rating the Bonds that the execution of such Swap will not adversely affect the rating on the Bonds assigned by each such Rating Agency or result in the withdrawal or suspension of such rating.

"Qualified Swap Payments" means regularly scheduled Senior Swap Payments (as defined in the Indenture) due in connection with any Qualified Swap and payable on parity with the Bonds and shall not include any amount due in connection with the early termination of any Qualified Swap.

"Qualifying Statute" means Sections 52:4D-1 et seq. of the New Jersey Statutes.

"Reserve Fund" means the Senior Liquidity Reserve Account held by the Trustee pursuant to Section 5.01(e) of the 2007 Indenture.

"Scheduled Reserve Amount" means, for each Deposit Date, the amounts shown on Exhibit A which, under the terms of the Indenture, will be a portion of the Senior Liquidity

NYK 1078066-3.071370.0011

Reserve Requirement applicable to the Bonds on such date, assuming that no withdrawals from the Reserve Fund have been made to make a Debt Service Payment.

"S&P" means Standard & Poor's, a division of The McGraw-Hill Companies, its successors and assigns.

"State" means the State of New Jersey.

"Termination Amount" means an amount, as determined by Lehman reasonably and in good faith on the basis of the arithmetic mean of quotations from at least three Dealers of the amount, if any, that each such Dealer would require the Burdened Party to pay to the Dealer (expressed as a positive number if the Burdened Party is Lehman and a negative number if the Burdened Party is the Issuer) or would pay to the Burdened Party (expressed as a negative number if the Burdened Party is Lehman and a positive number if the Burdened Party is the Issuer) in consideration of such Dealer entering into an agreement with the Burdened Party (with such documentation as Lehman and the Dealer may in good faith agree) which would have the effect of preserving for the Burdened Party the economic equivalent of its rights under this Agreement for the period commencing on the termination date of this Agreement and terminating on the last Bond Payment Date set forth in Exhibit A (assuming for these purposes that this Agreement were not terminating on the termination date and continued in full force through such last Bond Payment Date); provided, however, that:

(i)    if more than three quotations are provided, the Termination Amount will be the arithmetic mean of such quotations, without regard to the quotations having the highest and lowest values,

(ii)    if exactly three quotations are provided, the Termination Amount will be the quotation remaining after disregarding the highest and lowest quotations,

for purposes of clauses (i) and (ii), if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded, and

(iii)    if Lehman is unable to obtain three such quotations, the Termination Amount shall be the amount, as reasonably determined in good faith by Lehman, to be the Burdened Party's total losses and costs (expressed as a positive number if the Burdened Party is Lehman and a negative number if the Burdened Party is the Issuer), or gains (expressed as a negative number if the Burdened Party is Lehman and a positive number if the Burdened Party is the Issuer) in connection with a termination of this Agreement, including any loss of bargain, cost of funding or, at the election of Lehman but without duplication, any loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position, and;

6

provided <u>further, however</u>, that in any event the Termination Amount shall also include (A) any unpaid amounts due as of the date of termination of this Agreement (including any amounts due under Section 7.7 hereof) and (B) if such Termination Amount is being paid in connection with a termination of this Agreement following an Event of Default or if any Termination Amount otherwise due hereunder is not paid when due, the Termination Amount shall also include any incidental costs and expenses incurred by the Burdened Party in connection with such termination and the enforcement of its rights hereunder (including costs of collection and reasonable attorneys' fees). Any determination of the Termination Amount by Lehman shall be conclusive and binding on the parties hereto absent manifest error.

"Three Month LIBOR" as of any date of determination means the rate for deposits in US dollars for a period of three months which appears on the Telerate Page 3750 as of 11:00 a.m., London time, on the day that is two London Business Days before the day for which such determination is being made. If no such rate appears on the Telerate Page 3750 as of such date, Lehman may select another nationally recognized published source to determine Three Month LIBOR.

"Trustee Event of Default" means the occurrence of an event specified in Section 7.1 hereof.

"TSRs" has the meaning specified in the Act.


SECTION II.          PURCHASE AGREEMENT

Section 2.1    <u>Purchase and Sale of Qualified Securities</u>.

(a)    Lehman shall cause a Qualified Dealer to deliver to the Trustee, on any Deposit Date, in accordance with the delivery requirements of Section 2.2 hereof, to the extent such securities are available on the open market, Qualified Securities selected by Lehman or the Qualified Dealer.

(b)    If Lehman causes a Qualified Dealer to deliver Qualified Securities, the Trustee shall, out of funds available under the Indenture available for such purpose or as otherwise provided by the Issuer, at the time of the delivery of such Qualified Securities, purchase such Qualified Securities and pay to the Qualified Dealer or Lehman, as applicable, in accordance with Section 2.2(b) hereof, an amount equal to the Purchase Price thereof.

Section 2.2    <u>Delivery; Payment</u>.

(a)    All Qualified Securities delivered hereunder shall be delivered to the Trustee to the account specified in Section 10.1 hereof, in such manner as at the time is generally acceptable for delivery of Qualified Securities. All Qualified Securities delivered hereunder shall be

7

delivered to the Trustee on a "delivery versus payment" basis and shall be delivered free and clear of all liens and encumbrances.

(b)    (i)    Lehman shall cause the Qualified Dealer to send a Delivery Notice to the Trustee at least one Business Day prior to the delivery of any Qualified Securities which are in book-entry form and at least two Business Days prior to the delivery of any Qualified Securities which are being delivered in certificated form.    The Trustee may conclusively rely on the Qualified Dealer's specification in the Delivery Notice of the Market Value, the Maturity Amount and the Purchase Price of a Qualified Security.

(ii)    Concurrently with the delivery of any Qualified Securities, unless otherwise directed by Lehman in writing, the Trustee shall, subject to clause (iii) below, pay the Qualified Dealer delivering such Qualified Securities, in its individual capacity, the Market Value thereof, and to the Qualified Dealer as agent for Lehman, the Differential, if any.

(iii)    Lehman may in the Delivery Notice, direct the Trustee to pay (A) to the Qualified Dealer, the Market Value of any Qualified Securities delivered to the Trustee hereunder, and (B) to Lehman, the Differential, if any.    Any such payment to Lehman shall be at Lehman's account as set forth in the Delivery Notice.

(iv)    All payments to be made hereunder shall be made in immediately available funds by means of a bank or Federal funds wire.

Section 2.3    <u>Subsequent Deliveries</u>.    If any Qualified Securities delivered by a Qualified Dealer pursuant to Section 2.1 hereof (a) mature prior to the Bond Payment Date for which such Qualified Securities were delivered, or (b) have a Coupon Payment, Lehman shall, upon at least one Business Day's prior written notice to the Trustee in the form of the Delivery Notice, have the right to cause a Qualified Dealer to deliver to the Trustee, at any time on or after the maturity date of such Qualified Securities (or, as applicable, on or after the interest payment date of such Coupon Payment) but prior to the date which is one Business Day before such Bond Payment Date, other Qualified Securities, <u>provided</u> <u>that</u> the Purchase Price thereof does not exceed the Maturity Amount of the securities which have so matured (or as applicable, the amount of the Coupon Payment).    Any such deliveries by the Qualified Dealer shall conform to the requirements of Section 2.2(a) and (b) hereof.    Upon the delivery by the Qualified Dealer of such Qualified Securities, the Trustee shall pay the Purchase Price thereof in the manner required by Section 2.2(b)(ii) hereof.

Section 2.4    <u>Late Delivery; Failure to Deliver</u>.

(a)    If Lehman fails to cause a Qualified Dealer to deliver Qualified Securities as required hereunder by 4:30 p.m. New York City time on any Deposit Date or during the Lehman Cure Period, the Trustee shall, on each such date, at the direction of the Issuer (which direction the Issuer covenants and agrees it shall provide), invest the related Scheduled Reserve Amount

8

on an overnight basis in Eligible Investments (as defined in the Indenture) and if Lehman's failure continues beyond the Lehman Cure Period, the Trustee shall invest the related Scheduled Reserve Amount in Eligible Investments (as defined in the Indenture) with the longest reasonably obtainable maturities, provided such maturities are not later than the related Bond Payment Date.

(b)    No failure on Lehman's part to cause a Qualified Dealer to deliver Qualified Securities hereunder shall terminate or affect Lehman's right to cause future sales of Qualified Securities in accordance with this Agreement.

Section 2.5    Notice of Withdrawal from Reserve Fund; Replenishment.

(a)    If at any time the Trustee is required under the Indenture to withdraw any investments or other amounts from the Reserve Fund (including any Qualified Securities), or to otherwise liquidate any investments, to make a Debt Service Payment, the Trustee shall promptly give oral and written notice thereof to Lehman and shall in such notice specify (i) the amount or investments which are to be withdrawn and (ii) the amount which will be in the Reserve Fund after giving effect to such withdrawal; provided, however, that if the Trustee is required to make any withdrawal from the Reserve Fund pursuant to the terms of the Indenture, it shall withdraw amounts invested hereunder solely on a pro rata basis with all other funds credited to the Reserve Fund which are not subject to the terms of this Agreement (including, without limiting the foregoing, funds which are available pursuant to any Other Investment Agreements, any credit facility, liquidity facility or similar arrangement) and any securities on deposit in or otherwise credited to the Reserve Fund which are not subject to the terms of this Agreement, such that the ratio of the amount invested hereunder to the Senior Liquidity Reserve Requirement (as defined in the Indenture) remains constant.

(b)    If, following the Trustee's withdrawal of funds from the Reserve Fund pursuant to Section 2.5(a) above, within twelve (12) months of such withdrawal, (i) sufficient funds are deposited into the related Reserve Fund to permit the purchase of Qualified Securities hereunder or (ii) the Issuer has notified the Trustee in writing (with a copy to Lehman) that it intends to deposit sufficient funds in the Reserve Fund within twelve (12) months after such withdrawal from the Reserve Fund pursuant to Section 2.5(a) above, then the Trustee shall, within two Business Days of such replenishment of the Reserve Fund, give oral and written notice (a "Reserve Fund Replenishment Notice") to Lehman stating (A) the amount of funds which have been or will be deposited into the Reserve Fund (the "Replenishment Amount") and (B) the date(s) or expected date(s) of such deposit(s). If the Trustee has so delivered a Reserve Fund Replenishment Notice to Lehman, then by no later than the second Business Day after delivery thereof, the Trustee shall purchase any Qualified Securities duly tendered by the Qualified Dealer in accordance with Section 2.2 hereof. In any event, the aggregate purchase price of any Qualified Securities delivered pursuant to this Section 2.5(b) shall not exceed the pro rata portion of the Replenishment Amount relating to the amount by which the Scheduled Reserve Amount was decreased pursuant to Section 2.5(a) above, such that the ratio of the amount invested hereunder to the Senior Liquidity Reserve Requirement (as defined in the Indenture) remains constant.

9

(c)    If the Reserve Fund is not replenished within twelve (12) months of a withdrawal, Lehman shall not be required or obligated under this Agreement to cause the Qualified Dealer to make any delivery of Qualified Securities with respect to the Replenishment Amount upon the replenishment of the Reserve Fund.

Section 2.6    <u>Direction by Issuer to Trustee</u>.  The Issuer hereby irrevocably instructs the Trustee and the Trustee agrees to take the actions and to make the purchases required hereby.

Section 2.7    <u>Lehman Downgrade</u>.

(a)    If during the term of this Agreement the long-term senior unsecured debt ratings of LBH are suspended, withdrawn or fall below "A3" by Moody's or "A-" by S&P (in any such case, a "Lehman Downgrade"), Lehman shall provide written notice to the Issuer and the Trustee within five Business Days of such Lehman Downgrade.

(b)    (a)    Upon such Lehman Downgrade, Lehman shall within ten Business Days of such Lehman Downgrade take one of the following actions

(i)    assign and transfer all of this Agreement and its interests hereunder to a transferee reasonably acceptable to the Issuer and rated at least "A-" by S&P and "A3" by Moody's, provided that in all such instances of transfer the transferee shall assume all of the rights and obligations of Lehman hereunder;

(ii)    have obligations of Lehman hereunder guaranteed by an entity selected by Lehman and reasonably acceptable to the Issuer and rated at least "A-" by S&P and "A3" by Moody's;

(iii)    deliver collateral to the Trustee comprised of Eligible Securities such that the market value of the collateral will be sufficient to maintain a rating on the Agreement equal to at least "A2" by Moody's and "A" by S&P; or

(iv)    terminate this Agreement by giving written notice thereof to the Issuer with a copy to the Trustee, whereupon Lehman shall determine the Termination Amount and (i) if the Termination Amount is a negative number, Lehman shall promptly, but no later than one Business Day after written notice that such amount is due, pay such amount, in immediately available funds, to the Issuer and (ii) if the Termination Amount is a positive number, Lehman may demand payment by the Issuer of the Termination Amount in which case the Issuer shall promptly, but no later than one Business Day after notice that such amount is due, pay, in immediately available funds, the Termination Amount to Lehman.  If any such amount is not paid when due, the party owing such amount shall pay interest on such amount for each date such amount is due but not paid at the Default Rate.  Any amounts due from the Issuer hereunder shall

10

be made from funds available under the Indenture for such purpose or as otherwise provided from the Issuer.

Section 2.8    Issuer Optional Termination.    The Issuer may elect to terminate this agreement at any time at its option. If the Issuer elects to terminate this Agreement, the Issuer shall give ten (10) Business Days prior written notice to Lehman. Lehman shall calculate the Termination Value and (i) if the Termination Amount is a positive number, make demand upon the Issuer for the payment of the Termination Amount; and (ii) if the Termination Amount is a negative number, pay such amount to the Issuer. The Issuer agrees that it shall not be permitted to exercise its right to terminate this Agreement pursuant to this Section 2.8 unless either (i) the Issuer has sufficient funds available to pay any Termination Amount that may be due as provided herein or (ii) the Issuer has demonstrated to Lehman that the Issuer will have sufficient funds available to pay such Termination Amount within one (1) year of the date of termination and Lehman has consented to such termination.

Section 2.9 December 1 Bond Payment Date. If the Trustee determines that a withdrawal from the Reserve Fund will be required on December 1 of any year (after taking into account (i) actual annual payments and strategic contribution fund payments under the Master Settlement Agreement without reference to any subsequent adjustments and (ii) any earnings on moneys held by the Trustee under the Indenture and payable to the Trustee prior to such December 1 and available thereon to pay debt service on the Bonds), the Trustee shall, upon at least ten (10) Business Days prior to the Business Day next preceding June 1 of such year, specify via writing to Lehman and the Issuer that the Bond Payment Date for such portion of the Reserve Fund, as the Trustee shall specify, shall be the Business Day preceding the next succeeding December 1.

# SECTION III.    DEFEASANCE OR REFUNDING

Section 3.1    Defeasance or Refunding.

(a)    The Issuer may, by giving Lehman at least fifteen Business Days' prior notice, but without the consent of Lehman redeem, defease, repurchase or refund the Bonds (in whole or in part) as provided in the Indenture, provided that if the Issuer takes any such action (other than in respect of any redemption, defeasance, repurchase or refunding which does not affect the Scheduled Reserve Amount) (i) if the Termination Amount is a positive number, the Issuer shall pay Lehman in immediately available funds the Termination Amount and (ii) if the Termination Amount is a negative number, Lehman shall pay such amount to the Issuer. If the Termination Amount is payable pursuant to this Section 3.1, the party owing such amount shall pay such amount promptly but by no later than the later of (A) one Business Day after receipt of notice of the Termination Amount from Lehman or (B) the date of such redemption, defeasance, repurchase or refunding. Such payment shall be made in immediately available funds, to or at the direction of the party to whom such Termination Amount is due.

11

(b)    Immediately upon payment of the Termination Amount in accordance with this Section 3.1 this Agreement shall terminate.  Such Termination Amount shall constitute a Termination Payment (as defined in the Indenture), payable in accordance with the terms of the Indenture; provided, however that the Issuer agrees that it shall not redeem, defease, repurchase or refund the Bonds unless either (i) the Issuer has sufficient funds available to pay any Termination Amount that may be due as provided herein at or prior to such redemption, defeasance, repurchase or refunding or (ii) the Issuer has demonstrated to Lehman that the Issuer will have sufficient funds available to pay such Termination Amount within one (1) year of the date of termination and Lehman has consented to such termination.

(c)    If pursuant to clause (a) above this Agreement would be terminated in connection with the issuance of bonds to refund the Bonds (the "Refunding Bonds"), the Issuer may, by written notice to Lehman, request that Lehman continue this Agreement and have such Agreement apply to all or a portion of the cash flows relating to the Refunding Bonds.  Lehman agrees that if it receives such a request it shall agree to so continue this Agreement with respect to the Refunding Bonds and the Bonds remaining outstanding after such refunding, provided that:

(i)    Lehman receives such request (together with all relevant details relating thereto) at least 30 days in advance of the issuance of the Refunding Bonds;

(ii)    on or prior to the date the Bonds are to be refunded (the "Refunding Date") the Issuer and the trustee of the Refunding Bonds enter into such amendments of this Agreement with Lehman (the "Amended Agreement") as are necessary to have this Agreement pertain to the scheduled reserve amounts, deposit dates and bond payment dates applicable to the Refunding Bonds and to any Bonds which remain outstanding after giving effect to such refunding (the "Amended Cash Flows");

(iii)    if as determined on the Refunding Date, (a) the Termination Amount payable to Lehman with respect to the Scheduled Reserve Amounts, Deposit Dates and Bond Payment Dates which would be remaining hereunder on such date, assuming that the Bonds were not then refunded (the "Original Cash Flows") would be greater than the Termination Amount to Lehman of its investment rights with respect to the Amended Cash Flows or (b) the Termination Amount that would be payable to the Issuer with respect to the Original Cash Flows would be less than the Termination Amount that would be payable to the Issuer with respect to the Amended Cash Flows, the Issuer shall on or before the Refunding Date pay to Lehman the amount of such difference; provided, however, that with respect to clause (b) above, Lehman may, at its option, elect to receive from the Issuer the amount of such difference or retain investment rights only with respect to such portion of the Amended Cash Flows as would have a Termination Amount payable to the Issuer equal to the Termination Amount payable to the Issuer in respect of the Original Cash Flows;

(iv)    if as determined on the Refunding Date, (a) the Termination Amount that would be payable to Lehman with respect to the Amended Cash Flows would be greater than the Termination Amount that would be payable to Lehman with respect to the

12

Original Cash Flows or (b) the Termination Amount that would be payable to the Issuer with respect to the Original Cash Flows would be greater than the Termination Amount that would be payable to the Issuer with respect to the Amended Cash Flows, Lehman shall on or before the Refunding Date pay to the Issuer the amount of such difference; provided, however, that with respect to clause (a) above, Lehman may, at its option, elect to pay to the Issuer the amount of such difference or retain investment rights only with respect to such portion of the Amended Cash Flows as would have a Termination Amount payable to Lehman equal to the Termination Amount payable to Lehman in respect of the Original Cash Flows;

(v) the last deposit date under the Amended Agreement is no later than the last Deposit Date hereunder;

(vi) the Refunding Bonds have a credit rating at least equivalent to the credit rating of the Bonds without giving effect to any bond insurance and are secured in the same manner as the Bonds; and

(vii) Lehman receives any opinions and other assurances and agreements it may reasonably request to assure that the protections afforded it hereunder will continue under the Amended Agreement.

For any calculation of Termination Amount pursuant to this Section 3.1, Lehman shall be deemed to be the Burdened Party.

Section 3.2    Mandatory Clean Up Call Redemption.    Upon at least ten (10) Business Days prior written notice to Lehman, the Issuer shall have the right to terminate this Agreement, in whole but not in part, in connection with a mandatory clean up call redemption of the Bonds (as provided for in Section 5.04(h) of the Indenture). In connection with any such termination Lehman shall determine the Termination Amount and (i) if the Termination Amount is a negative number, Lehman shall promptly, but no later than one Business Day after notice that such amount is due, pay such amount, in immediately available funds, to the Issuer and (ii) if the Termination Amount is a positive number, Lehman may demand payment by the Issuer of the Termination Amount in which case the Issuer shall promptly, but no later than one Business Day after notice that such amount is due, pay, in immediately available funds, the Termination Amount to Lehman. If any such amount is not paid when due, the party owing such amount shall pay interest on such amount for each date such amount is due but not paid at the Default Rate. For avoidance of doubt, the Issuer's ability to terminate this Agreement pursuant to this Section 3.2, shall not be contingent on the current or expected future available funds of the Issuer. If, following any redemption in accordance with this Section 3.2, there are no Bonds outstanding, the Issuer hereby covenants and warrants that so long as it shall have any obligations to Lehman hereunder, the Issuer shall take all necessary action to maintain the Indenture in full force and effect and shall observe, perform and fulfill each agreement and covenant contained in the Indenture as if Lehman were a named beneficiary thereof and shall pay any Termination Amount due hereunder to Lehman on or prior to the next date on which the Issuer receives payment of the Pledged TSRs (as defined in the Indenture).

13

SECTION IV          REPRESENTATIONS AND WARRANTIES

Section 4.1    <u>Representations and Warranties</u>.    Each party hereto represents and warrants to the other parties hereto at all times during the term of this Agreement that:

(a)    it is duly organized and validly existing under the laws of its jurisdiction, incorporation or establishment;

(b)    it has the power to enter into and perform its obligations under this Agreement (including, in the case of the Issuer, to pay the Termination Amount in accordance herewith and, including, in the case of the Issuer or the Trustee, to enter into and perform its obligations under the Indenture);

(c)    this Agreement has been duly authorized, executed and delivered by it and, assuming the due authorization, execution and delivery hereof by the other parties hereto, constitutes a legal, valid and binding obligation of it enforceable against it in accordance with the terms hereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity regardless of whether enforcement is sought in a proceeding in equity or at law;

(d)    its execution and delivery of this Agreement and its performance of its obligations hereunder do not and will not constitute or result in a default under, a breach or violation of, or the creation of any lien or encumbrance on any of its property under, its charter or by-laws (or equivalent organizational documents), or any other agreement (including in the case of the Issuer and the Trustee, the Indenture), instrument, law, ordinance, regulation, judgment, injunction or order applicable to it or any of its property;

(e)    except as otherwise disclosed in the Official Statement for the Bonds, there is no proceeding pending or threatened against it at law or in equity, or before any governmental instrumentality or in any arbitration, which would materially impair its ability to perform its obligations under this Agreement, and there is no such proceeding pending against it which purports or is likely to affect the legality, validity or enforceability of the Agreement; and

(f)    in the case of the Issuer,

(i)    all Deposit Dates, Bond Payment Dates and Scheduled Reserve Amounts as indicated on Exhibit A of this Agreement are true and correct in all respects;

(ii)    any amounts required to be paid by the Issuer under this Agreement are subject to the provisions of the New Jersey Tort Claims Act (N.J.S.A. 59:1-1 et seq.) and the New Jersey Contractual Liability Act (N.J.S.A. 59:13-1 <u>et seq.</u>);

14

(iii)    it is subject to suit at law or in equity pursuant to paragraph (a) of Section 6 of P.L. 2002, c.32 and accordingly, is not entitled to claim immunity on the grounds of sovereignty from suit;

(iv)    it has delivered to Lehman its most recent annual audited statement of financial condition, if any, and the Issuer has not experienced since the date of its last published financial statement any material adverse change in its business, assets, operations or financial condition which would materially impair the Issuer from performing its obligations hereunder;

(v)    it has not nor does it anticipate that there shall be any occurrence or existence of (1) a default, event of default or other similar condition or event (however described and including any such conditions or events which will become events of default with the passing of time or the giving of notice) in respect of the Issuer under one or more agreements or instruments relating to any long-term indebtedness of the Issuer which has resulted in such long-term indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by the Issuer in making one or more payments on the due date thereof under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vi)    it is solvent and has, and will have after giving effect to this Agreement, sufficient capital to conduct its business and to pay its debts as they become due;

(vii)    it has not experienced any Incipient Illegality with respect to this Agreement;

(viii)    it is not subject to any administrative, governmental or other investigation, special review or order, or pending order or similar event;

(ix)    the Eligible Securities to be delivered pursuant to this Agreement constitute Eligible Investments (as defined in the Indenture);

(x)    the Act authorizes the Issuer to enter into any "ancillary facility", as therein defined, including any forward agreement, with any person under such terms and conditions as the Issuer, with the approval of the State Treasurer, may determine;

(xi)    the Issuer has determined that it is appropriate to enter into this Agreement to accomplish the purposes set forth in Section 7.h of the Act;

(xii)    the State Treasurer has approved the terms and conditions, and the execution and delivery by the Issuer, of this Agreement pursuant to Section 6.1 of the Act; and

(xiii)    this Agreement is being entered into pursuant to the Act as an "ancillary facility" thereunder.

15

(g)    in the case of each of the Issuer and the Trustee:

    (i)    the Indenture has been duly authorized, executed and delivered by it,

    (ii)    assuming the due authorization, execution and delivery thereof by the other parties thereto, the Indenture and the other Indenture constitute legal, valid and binding obligations of it, enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity regardless of whether enforcement is sought in a proceeding in equity or at law,

    (iii)    the Indenture is in full force and effect on the date hereof and no amendment, waiver or course of dealing has amended or terminated any of the terms thereof since the original execution and delivery of the Indenture except such as may have been delivered to Lehman pursuant to Section 6.1(d) hereof, and

    (iv)    no "event of default" has occurred and is continuing under the Indenture.

## SECTION V.    COVENANTS AND ACKNOWLEDGMENTS

Section 5.1    Covenants. Each of Lehman, the Issuer and the Trustee covenants to the other parties to this Agreement that so long as it shall have any obligations under this Agreement it shall:

(a)    maintain in full force and effect all authorizations and agreements of and exemptions, consents, licenses, actions or approvals by, and all filings with or notices to, any governmental or other authority that are required to be obtained or made by such party with respect to this Agreement and will use all reasonable efforts to obtain or make any that may become necessary in the future;

(b)    comply in all material respects with all applicable laws, rules, regulations and orders to which it may be subject if failure so to comply could materially impair its ability to perform its obligations under this Agreement;

(c)    if it is the Issuer or the Trustee, not enter into any amendment or modification of the Indenture which could impair its ability to perform its obligations to Lehman hereunder except nothing contained hereunder shall restrict the Issuer's ability to cause the Issuer to issue additional bonds under the Indenture;

(d)    if it is the Issuer, the Issuer agrees that, during the term of this Agreement, it shall deliver to Lehman its most recently available audited statement of financial condition as such are issued;

16

(e)    if it is the Issuer, it shall not replace this Agreement or withdraw any amounts held in the Debt Service Reserve Fund for purposes of purchasing a surety bond or any similar financial instrument;

(f)    if it is the Issuer, take all necessary action to remain duly organized and validly existing under the laws of its jurisdiction, incorporation or establishment;

(g)    if it is the Issuer, take all necessary action to ensure the continued receipt by it of the Collections (as defined in the Indenture), including, without limitation, the Pledged TSRs (as defined in the Indenture) and application thereof, including, without limitation, the payment of Operating Expenses (as defined in the Indenture) in accordance with the terms of the Indenture; and

(h)    if it is the Issuer, pursuant to the prohibition set forth in Section 10.b of the Act (the "Nonpetition Provision"), prior to the date that is one year and one day after the Issuer no longer has any securities or "ancillary facilities" (as defined in the Act), including this Agreement, outstanding, the Issuer shall not file a voluntary petition under Chapter 9 of the Federal Bankruptcy Code, as amended from time to time.

Section 5.2    Pledges by the State of New Jersey.

(a)    Pursuant to Section 10.a of the Act, the State pledges and agrees with the Issuer and the "benefitted parties" (as defined in the Act), and authorizes and directs the inclusion of such pledge and agreement in "sale agreements", as defined therein, and authorizes and directs the Issuer to include the same in contracts with the owners of the "securities" and "benefitted parties", each as defined therein, substantially as follows, which pledge and agreement is hereby expressly included in this Agreement. Until all such securities and ancillary facilities, together with the interest thereon and all costs and expenses in connection with any action or proceedings by or on behalf of owners of such securities or benefitted parties, are fully paid and discharged, the State will:

(i) irrevocably direct, through the Attorney General, the escrow agent under the Master Settlement Agreement to transfer directly to the Issuer or its assignee the TSRs;

(ii) enforce the Issuer's rights to receive the TSRs to the full extent permitted by the terms of the Master Settlement Agreement;

(iii) not amend the Master Settlement Agreement in any manner that would materially impair the rights of such owners of said securities or of such benefitted parties;

17

(iv) not limit or alter the rights of the Issuer to fulfill the terms of its agreements with such owners or benefitted parties;

(v) not in any way impair the rights and remedies of such owners or benefitted parties or the security for such securities or ancillary facilities (provided, that nothing herein shall be construed to preclude the State's regulation of smoking and taxation and regulation of the sale of cigarettes or the like);

(vi) not fail to enforce the Qualifying Statute; and

(vii) not amend, supersede or repeal the Qualifying Statute in any way that would materially adversely affect the amount of any payment to, or materially impair the rights of, the Issuer, such owners of said securities or such benefitted parties.

(b)    Pursuant to Section 10.b of the Act, the State covenants with such owners of said securities and such benefitted parties, and authorizes and directs the Issuer to include such covenant as an agreement of the State in any contract with such owners and benefitted parties, that the State will not limit or alter the Nonpetition Provision during the period set forth therein.

Section 5.3    Role of Lehman; Independent Judgment.    The Issuer acknowledges and agrees that in connection with its decision to enter into this Agreement and its subsequent negotiation and execution of this Agreement, (i) neither Lehman, nor any of its directors, officers, employees, agents or affiliates (each of the foregoing, including Lehman, a "Lehman Party") has acted as a fiduciary or financial or investment advisor to or agent or other representative of the Issuer, (ii) the Issuer has, to the extent it has deemed necessary, consulted with its own legal, tax, regulatory, accounting, financial and investment advisors in determining the suitability and appropriateness of this Agreement as well as in negotiating the specific terms hereof and has not relied upon any advice from any Lehman Party, with respect to such matters; the Issuer understands the terms, conditions and risks of this Agreement and is capable of assuming such risks; and (iii) the terms and conditions of this Agreement have been individually negotiated by it and the Trustee and are the result of arms-length negotiations among Lehman, the Trustee and the Issuer.

Section 5.4    No Liability.    Each of the Issuer and the Trustee agrees that no Lehman Party shall be liable or responsible for: (i) the payment of any amounts owing on or with respect to the Bonds; (ii) the Trustee's use or application of any moneys payable to the Trustee hereunder; (iii) any acts or omissions of the Issuer or the Trustee under, or with respect to, the Bonds or the Indenture or any related document; or (iv) determining whether the Issuer or the Trustee is in compliance with any applicable statute, regulation or law, the Bonds, the Indenture or any other related document.

Section 5.5    Fixed Rate of Return.    The Issuer has entered into this Agreement for purposes of managing its borrowings or investments by increasing the predictability of its cash

18

flow from earnings on its investments and not for purposes of speculation. The Issuer understands that in consideration of its purchasing Qualified Securities at the Purchase Price on each Deposit Date, the Issuer has minimized the risks resulting from fluctuations in interest rates during the term of this Agreement on the Scheduled Reserve Amounts in the Reserve Fund but has also foregone the possibility of receiving greater returns on the Scheduled Reserve Amounts in the future from such fluctuations.

Section 5.6    Termination Amount. Each of the Issuer and the Trustee understands that if under any of the circumstances provided herein (including upon the occurrence of certain redemptions or a defeasance of the Bonds on or prior to the last Deposit Date), a Termination Amount would be due Lehman, the size of such Termination Amount will vary depending, in large part, on prevailing interest rates at the time such Termination Amount is calculated. In certain market conditions the amount of the Termination Amount owed to Lehman by, as applicable, the Trustee or the Issuer could be substantial.

Section 5.7    Investment Structuring Agent's Fee. Each of the Issuer and the Trustee acknowledges that Lehman shall pay an investment structuring agent fee of $20,000 to First Southwest Company.

Section 5.8    Incorporated Provisions; Modification of Indenture.

(a)    The Issuer agrees that the covenants and other agreements in Sections 5.02, 5.04, 6.01, 6.02, 6.06, 6.07, 6.08. 6.09 and 6.10 of the Indenture (the "Incorporated Provisions") are incorporated herein as fully as if set forth herein and Lehman were a named beneficiary thereof (including, without limitation, the right to consent to certain actions subject to consent under such aforementioned Sections). The Issuer will observe, perform and fulfill each such agreement in the Indenture. If the Indenture ceases to be in effect prior to the termination of this Agreement, the Incorporated Provisions (other than those provisions requiring payments in respect of bonds, notes, warrants or other similar instruments issued under the Indenture) will remain in full force and effect for purposes of this Agreement as though set forth herein until such date on which all of the obligations of the Issuer under this Agreement have been fully satisfied. Any amendment, supplement, modification or waiver of any of the Incorporated Provisions without the prior written consent of Lehman shall have no force and effect with respect to this Agreement if such amendment, supplement, modification or waiver would adversely affect the rights or obligations of Lehman hereunder. Any amendment, supplement or modification for which such consent is obtained or for which such consent is not required shall be part of the Incorporated Provisions for purposes of this Agreement.

(b)    The Issuer shall be required to obtain the consent of Lehman to any amendment, supplement or modification of the Indenture that would adversely affect the rights or obligations of Lehman under this Agreement. The Issuer shall provide Lehman with at least ten (10) days' prior written notice of any proposed amendment, supplement or modification of the Indenture whether or not the proposed amendment, supplement or modification will adversely affect the rights or obligations of Lehman under this Agreement.

19

SECTION VI          CLOSING CONDITIONS

Section 6.1     Closing Conditions

On or prior to the Closing Date the following shall occur:

(a)     delivery to Lehman and Issuer of an opinion of counsel to the Trustee, in the form of Exhibit B;

(b)     delivery to Lehman and Trustee of an opinion of counsel to the Issuer, in the form of Exhibit D;

(c)     delivery to Issuer and Trustee of an opinion of counsel to Lehman, in the form of Exhibit C and a bankruptcy opinion of special counsel to Lehman;

(d)     delivery to Lehman by the Issuer of a copy of the official statement for the Bonds;

(e)     delivery to Lehman by the Issuer of a true and correct copy of the Indenture as in full force and effect on the date hereof;

(f)     delivery to Lehman of a copy of any consent received by the Issuer to enter into this Agreement; and

(g)     delivery to Lehman of a copy of the statutory or regulatory authority, if any, pursuant to which the Issuer is authorized to enter into this Agreement and a certified copy of any resolution or resolutions of the Issuer pursuant to which the Issuer is authorized to enter into this Agreement.

SECTION VII          DEFAULTS; TERMINATION

Section 7.1     Trustee Events of Default.  The occurrence of any of the following events shall constitute a Trustee Event of Default:

(a)     the Trustee shall fail for any reason (other than because such cash is not available because the Trustee withdrew funds from the Reserve Fund in order to make a Debt Service Payment for the Bonds on a Bond Payment Date) to apply any funds in the Reserve Fund to purchase, at the Purchase Price therefor, any Qualified Securities delivered by the Qualified Dealer in accordance with this Agreement;

20

(b)     the Trustee shall default in the performance of any other material covenant or obligation under this Agreement and such default is not cured within five Business Days of notice thereof from Lehman or the Issuer;

(c)     any material representation or warranty of the Trustee contained in this Agreement proves to have been incorrect, false or misleading in any material respect as of the date on which it was made; or

(d)     the Trustee is at any time Insolvent.

Section 7.2   Issuer Events of Default.  The occurrence of any of the following events shall constitute an Issuer Event of Default:

(a)     the amount in the Reserve Fund available to purchase Qualified Securities on any Deposit Date is less than the Scheduled Reserve Amount (other than because such cash is not available because the Trustee withdrew funds from the Reserve Fund in order to make a Debt Service Payment for the Bonds on a Bond Payment Date) unless (1) such failure is cured within 10 Business Days after written notice of such failure is given to the Issuer by Lehman and (2) the Issuer pays interest on the Purchase Price at the Default Rate from and including the date any such Qualified Securities were duly tendered to the Trustee to but excluding the date such Qualified Securities were actually purchased by the Trustee;

(b)     the Issuer shall default in the performance of any material covenant or obligation under, or incorporated by reference in, this Agreement, other than as described in clause (a) above and such default is not cured within five Business Days of notice thereof from Lehman or the Trustee;

(c)     any material representation or warranty of the Issuer contained in this Agreement proves to have been incorrect, false or misleading in any material respect;

(d)     the Issuer (1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6)(A) seeks or becomes subject to the appointment of an

21

administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets or (B) there shall be appointed or designated with respect to it, an entity such as an organization, board, commission, authority, agency or body to monitor, review, oversee, recommend or declare a financial emergency or similar state of financial distress with respect to it; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts;

(e)    the Issuer consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity (or, without limiting the foregoing, if an entity such as an organization, board, commission authority, agency or body succeeds to the principal functions of, or powers and duties granted, to the Issuer) and, at the time of such consolidation, amalgamation, merger or transfer either (i) the resulting or surviving or transferee entity fails to assume all the obligations of the Issuer under this Agreement or by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement or (ii) the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of the Issuer;

(f)    the interest and principal outstanding under the Bonds shall be declared due and payable at any time prior to the scheduled maturity thereof;

(g)    there shall be an investment of the Scheduled Reserve Amount attributable to the Bonds other than pursuant to this Agreement; or

(h)    a Trustee Event of Default has occurred and is continuing and the Trustee has not resigned or been replaced with a successor trustee reasonably acceptable to Lehman within 30 days of demand therefor pursuant to Section 7.4(b).

Section 7.3    Lehman Events of Default.  The occurrence of any of the following events shall constitute a Lehman Event of Default:

(a)    Lehman shall fail, on any Deposit Date, to cause a Qualified Dealer to deliver Qualified Securities and such failure is not cured within five Business Days after written notice thereof to Lehman from the Trustee or the Issuer (the "Lehman Cure Period");

(b)    any material representation or warranty of Lehman contained in this Agreement proves to have been incorrect, false or misleading in any material respect as of the date on which

22

it was made or Lehman shall default in the performance of any covenant or obligation under this Agreement;

(c)    Lehman shall default in the performance of any other material covenant or obligation under this Agreement and such default is not cured within five Business Days of written notice thereof from the Trustee or the Issuer;

(d)    Lehman is at any time Insolvent;

(e)    Lehman consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity (or, without limiting the foregoing, if an entity such as an organization, board, commission authority, agency or body succeeds to the principal functions of, or powers and duties granted, to Lehman) and, at the time of such consolidation, amalgamation, merger or transfer either (i) the resulting or surviving or transferee entity fails to assume all the obligations of Lehman under this Agreement or by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement or (ii) the long-term senior unsecured debt rating of the resulting or surviving or transferee entity is below A3 by Moody's or A- by S&P; or

(f)    LBH's senior unsecured debt rating falls below Baa3 by Moody's or BBB- by S&P.

Section 7.4    <u>Remedies Upon Occurrence of a Trustee Event of Default</u>.  Upon the occurrence of a Trustee Event of Default, Lehman shall have the right to:

(a)    cause a Qualified Dealer to redeliver to the Trustee or, if such Qualified Securities have not been purchased by the Trustee within five (5) Business Days, sell to any other purchaser the Qualified Securities which were to be delivered in connection with any Deposit Date and which have not theretofore been delivered to and purchased by the Trustee and make demand for the payment of its losses (calculated in accordance with Section 7.7 hereof) arising out of the Trustee's failure to purchase such Qualified Securities; and/or

(b)    make demand upon the Issuer, with a copy to the Trustee, to replace the Trustee within thirty (30) days with a replacement Trustee reasonably acceptable to Lehman; and/or

(c)    in the event that the Trustee has not resigned or been replaced by the Issuer in accordance with a demand by Lehman pursuant to clause (b) above within thirty (30) days of such demand, immediately terminate this Agreement by giving notice thereof to the Trustee with a copy to the Issuer and, subject to Section 8.2 hereof, (i) if the Termination Amount is a positive number, make demand upon the Trustee for the payment of the Termination Amount, and (ii) if the Termination Amount is a negative number, pay such Termination Amount to the Trustee.

23

If the Termination Amount is payable pursuant to this Section 7.4(c), subject again to Section 8.2, the party owing such amount shall promptly, but by no later than one Business Day after notice that such amount is due from the party to whom such Termination Amount is due, pay such amount, in immediately available funds, to the party to whom such Termination Amount is due. If any such amount is not paid when due, the party owing such amount shall pay interest on such amount for each date such amount is due and not paid at the Default Rate. Any amounts payable pursuant to Section 7.7 hereof shall be payable upon demand as provided therein.

Section 7.5    Remedies Upon Occurrence of Issuer Event of Default.    Upon the occurrence of an Issuer Event of Default, Lehman shall have the right to:

(a)    cause a Qualified Dealer to redeliver to the Trustee or sell to any other purchaser the Qualified Securities which were to be delivered in connection with any Deposit Date and which have not theretofore been delivered to and purchased by the Trustee and make demand for the payment of its losses (calculated in accordance with Section 7.7 hereof) arising out of the Trustee's failure to purchase such Qualified Securities; and/or

(b)    immediately terminate this Agreement by giving notice thereof to the Issuer with a copy to the Trustee, and (i) if the Termination Amount is a positive number, make demand upon the Issuer for the payment of the Termination Amount and (ii) if the Termination Amount is a negative number, pay such amount to the Issuer.

If a Termination Amount is payable pursuant to clause (b) above, the party owing such amount shall promptly, but by no later than one Business Day after notice that such amount is due from the party to whom such Termination Amount is due, pay such amount, in immediately available funds, to or at the direction of the party to whom such Termination Amount is due. If any such amount is not paid when due, the party owing such amount shall pay interest on such amount for each date such amount is due but not paid at the Default Rate.

Section 7.6    Remedies Upon Occurrence of a Lehman Event of Default.    Upon the occurrence of a Lehman Event of Default, the Issuer shall have the right to:

(a)    if such default is a default under Section 7.3(a), apply the Scheduled Reserve Amount to purchase Eligible Investments (as defined in the Indenture) in accordance with Section 2.4 hereof and make demand for the payment of its losses in connection therewith, calculated as provided in Section 7.7(b);

(b)    if such default is a default under Section 7.3(a) and Lehman has failed to pay the Issuer's losses (as described in Section 7.7(b)) upon demand therefor, immediately terminate this Agreement by giving notice thereof to Lehman with a copy to the Trustee; and

(c)    if such default is a default under Sections 7.3(b) or (c) hereof immediately terminate this Agreement by giving notice thereof to Lehman with a copy to the Trustee,

24

whereupon Lehman shall determine the Termination Amount and (i) if the Termination Amount is a negative number, Lehman shall promptly, but no later than one Business Day after notice that such amount is due, pay such amount, in immediately available funds, to the Issuer and (ii) if the Termination Amount is a positive number, Lehman may demand payment by the Issuer of the Termination Amount in which case the Issuer shall promptly, but no later than one Business Day after notice that such amount is due, pay, in immediately available funds, the Termination Amount to Lehman.  If any such amount is not paid when due, the party owing such amount shall pay interest on such amount for each date such amount is due but not paid at the Default Rate. Notwithstanding anything to the contrary in this Agreement, if Lehman fails to determine the Termination Amount within three Business Days of notice from the Issuer or the Trustee of the occurrence of a Lehman Event of Default then the Issuer (or if so directed by the Issuer, the Trustee) shall make such determination as if it were Lehman and the amount as so determined by the Issuer (or the Trustee) shall for purposes of this Section 7.6 be deemed the Termination Amount.

Section 7.7    <u>Loss Amount if Failed or Late Purchase</u>.

(a)    If the Trustee fails to apply any funds in the Reserve Fund to purchase any Qualified Securities delivered by a Qualified Dealer in accordance with this Agreement or (b) if on any Deposit Date the amount in the Reserve Fund available to purchase Qualified Securities is less than the Scheduled Reserve Amount, the Trustee, in the case of clause (a) or the Issuer in the case of clause (b), shall pay to Lehman, as liquidated damages for its losses and not as a penalty, on written demand by Lehman, the sum of (w) interest on the Purchase Price of such Qualified Securities which the Qualified Dealer tendered for delivery to, but were not purchased by, the Trustee for each day from and including the delivery date thereof to but excluding the date on which such securities are resold to a third party or to the Trustee, (x) subject to Section 7.4(a) hereof or to Section 7.2(a) hereof, as applicable, the excess, if any, of the Purchase Price of such Qualified Securities over the amount received by the Qualified Dealer upon such resale of the securities (the "Shortfall Amount"), (y) interest on the Shortfall Amount from and including the resale date to but excluding the date on which the Trustee or the Issuer, as applicable, compensates Lehman for its losses as described herein, and (z) any incidental costs and expenses incurred by Lehman in connection with the Trustee's failure to so purchase such Qualified Securities.  Interest shall accrue at a rate per annum equal to the Default Rate for purposes of clauses (w) and (y).  Notwithstanding the foregoing, if Lehman does not on any date cause the delivery of Qualified Securities because the amount in the Reserve Fund is less than the Scheduled Reserve Amount, the Loss Amount shall equal the sum of (y) the amount, if any, by which the aggregate Purchase Price of the Qualified Securities which Lehman could have caused to be delivered exceeds the market value thereof (as reasonably determined by Lehman as of the date such tender was to be made) and (z) interest on such amount at the Default Rate for each date from the date such securities could have been delivered to the next succeeding Bond Payment Date plus any amounts specified in clause (x) above.

25

(b)    If there is a Lehman Event of Default as described in Section 7.3(a) hereof, the amount of losses payable by Lehman upon written demand therefor pursuant to Section 7.6(a) hereof shall equal the excess, if any, of (i) interest the Trustee would have earned on the related Scheduled Reserve Amount had the Scheduled Reserve Amount been invested in Qualified Securities at the Guaranteed Rate (the "Guaranteed Interest") over (ii) the interest the Trustee actually earned by investing the related Scheduled Reserve Amount in Investment Securities in accordance with Section 2.4 hereof (or if the Trustee fails to invest such Scheduled Reserve Amount in Investment Securities in accordance with Section 2.4 hereof, the amount of interest the Trustee would have earned on such Scheduled Reserve Amount had the Trustee complied with the requirements of Section 2.4 hereof).

Section 7.8    <u>Application of Excess Funds</u>.    The Issuer hereby directs the Trustee and the Trustee agrees that if at any time any amounts are due Lehman from the Issuer in connection with an Issuer Event of Default, the Trustee shall, upon demand from Lehman, and without further direction or instruction from the Issuer, apply any funds available under the Indenture which are not subject to the lien of the Indenture (including any funds which would otherwise be released to the Issuer) to the payment of such amounts.

Section 7.9    <u>Limited Rights Against the Reserve Fund</u>.    Neither Lehman nor any Qualified Dealer shall have any right to any amounts held in the Reserve Fund except as expressly provided herein upon the delivery of a Qualified Security in accordance with this Agreement.

Section 7.10    <u>No Waiver; Remedies Cumulative</u>.    No failure or delay on Lehman's part in exercising any right or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right or remedy preclude any other or further exercise thereof or the exercise of any other right or remedy.    Lehman's rights and remedies hereunder are cumulative and not exclusive of any rights or remedies provided by law, this Agreement or otherwise.    None of the terms or provisions of this Agreement may be waived, modified or amended except in a writing duly signed by the Trustee, the Issuer and Lehman.

Section 7.11    <u>No Set Off</u>.    Each of the Issuer, the Trustee and Lehman expressly waive any right to set off claims and apply property held by any other party in respect of this Agreement against any obligations owing to it from the other party hereunder.

Section 7.12    <u>Limited Liability</u>

(a)    Neither the board of directors of the Issuer, the members of the board of directors, the State, nor any person executing this Agreement on behalf of the Issuer shall be liable personally hereunder or be subject to any personal liability or accountability solely by reason of the entering of this Agreement.    No personal liability shall be incurred by any member, director, officer, official or employee of the State or the Issuer or any person executing this Agreement for any covenants or provisions hereof or for any claims based hereon.

26

(b)    Notwithstanding any other provision of this Agreement to the contrary, the obligations of the Issuer hereunder to pay the Purchase Price for any Qualified Security are limited to and payable solely from amounts available in the Reserve Fund.

## SECTION VIII    THE TRUSTEE

Section 8.1    <u>Acceptance by Trustee</u>.  By execution and delivery of this Agreement, the Trustee accepts its duties and obligations hereunder, as an addition to its duties and obligations as Trustee under the Indenture.

Section 8.2    <u>Liability of the Trustee; Consultation with Legal Counsel</u>.

(a)    The Trustee shall not be liable to any person for any Termination Amount due hereunder arising from any action taken or neglected to be taken in performing or attempting to perform its obligations hereunder or preserving or seeking to preserve the funds it maintains under the Indenture or to purchase the Qualified Securities tendered pursuant to this Agreement, except for actions arising from its negligence or willful misconduct or for a Trustee Event of Default under the Agreement.

(b)    The Trustee may consult with counsel reasonably satisfactory to it with respect to any question relating to its duties or responsibilities hereunder or otherwise in connection herewith and, except as expressly provided herein, shall not be liable for any action taken, suffered, or omitted by the Trustee in good faith upon the advice of such counsel (provided that such counsel shall be selected with reasonable care).  The Trustee may act through its officers, employees, agents and attorneys.

Section 8.3    <u>Payment of Trustee Fees</u>.  Lehman has no liability or responsibility for payment of the Trustee's fees or expenses for its services hereunder, including any such fees or expenses arising out of or in connection with the liquidation of the Qualified Securities as provided herein.

Section 8.4    <u>Trustee Cooperation</u>.

(a)    The Trustee shall not act in contravention of its obligations hereunder or invest amounts in the Reserve Fund other than pursuant to this Agreement and the Other Investment Agreements.

(b)    The Trustee shall not make any payments or distributions from the Reserve Fund other than payments or distributions (i) required by this Agreement, (ii) to pay principal of, redemption premium and interest on the Bonds or (iii) to the extent not inconsistent with the terms of this Agreement to make payments required by the Indenture and the Other Investment Agreements.

27

Section 8.5    <u>Successor Trustee</u>.  If the Trustee shall resign or be discharged from its duties and obligations under the Indenture, the Issuer shall appoint a successor Trustee pursuant to the terms of the Indenture.  The Issuer agrees that if the Trustee fails for any reason to perform its duties to Lehman under this Agreement in accordance with the terms hereof, or is at any time Insolvent or breaches in any material respect its representations and warranties to Lehman hereunder, the Issuer shall promptly, upon request of Lehman, appoint a successor Trustee reasonably acceptable to Lehman.

## SECTION IX. ADDITIONAL SECURITY

Section 9.1    <u>Additional Security and Source of Payment for Issuer's Obligations</u>.

(a)    In order to secure the Issuer's timely and full performance of its obligations hereunder, the Issuer hereby pledges and grants to Lehman a lien on and pledge of the Pledged Assets and the proceeds thereof, such lien to be immediately subordinate to the lien of the Bondholders under the Indenture and to be on parity with the lien securing payment under the Other Investment Agreements.  The Issuer represents to Lehman that this Agreement constitutes an Ancillary Contract (as defined in the Indenture) and that all payments due from the Issuer hereunder (including, without limitation, any Termination Amount) constitute Termination Payments (as defined in the Indenture).

(b)    The Issuer will not voluntarily create or permit to be created any lien which is superior to or on a parity with the obligation of the Issuer to make payments to Lehman under this Agreement without the prior written consent of Lehman other than as provided herein or in respect of the Bonds or Refunding Bonds or as otherwise contemplated by the Indenture; <u>provided</u>, <u>that</u>, to the extent permitted under the Indenture, the Issuer may create or permit the creation of any such lien subordinate to the obligation of the Issuer to make payment to Lehman under this Agreement.

## SECTION X  MISCELLANEOUS

Section 10.1    <u>Notices and Delivery Instructions</u>.   All notices, demands or other communications hereunder shall be given or made in writing and shall be delivered personally, or sent by certified or registered mail, postage prepaid, return receipt requested, or overnight delivery service, telex or telecopy to the party to whom they are directed at the following addresses, or at such other addresses as may be designated by notice from such party to all other parties:

<u>To Lehman:</u>

Lehman Brothers Special Financing Inc.
745 Seventh Avenue, 5th Floor
New York, NY  10019

28

Attention:      Municipal Financial Products - Middle Office
Telephone:     212-526-2240
Fax:             646-758-2988

[WIRING INSTRUCTIONS]

JPMorgan Chase
ABA: 021000021
for the Account of Lehman Brothers Special Financing Inc.
Account No. 066 143 543

To the Trustee:

The Bank of New York
Corporate Trust
385 Rifle Camp Road, 3rd Floor
West Paterson, New Jersey 07424
Attention: Marie Ladolcetta/Frank Adinolfe
Telephone: 973-357-7827
Telecopy: 973-357-7840

PTC ELEGIBLE SECURITIES

BYORK / CUST / BERKELEY BK
ACCOUNT # 866305 TSF Senior Liquidity
ATTN: Frank Adinolfe 973-357-7044

FED ELIGIBLE SECURITIES

BK OF NYC / ABA # 021000018
CUSTODY A/C # TAS 866305
ACCOUNT: TSF Senior Liquidity
ATTN: Frank Adinolfe 973-357-7044

DTC SECURITIES

DTC # 901 / THE BANK OF NEW YORK
CUSTODY A/C #TAS866305 – TSF Senior Liquidity
RE: Tobacco – Attn: F. Adinolfe 973-357-7044

To the Issuer:

29

Tobacco Settlement Financing Corporation
Office of the State Treasurer
State House
125 West State Street
Trenton, New Jersey 08625
Attention:      State Treasurer
Telephone:    (609) 292-6748
Fax:               (609) 984-3888

Any notice, demand or other communication given in a manner prescribed in this Section shall be deemed to have been delivered on receipt.

Section 10.2   Binding Effect; Transfer.  This Agreement shall be binding upon and inure to the benefit of the Trustee, the Issuer and Lehman and upon their respective permitted successors and transferees.   Lehman shall be entitled to transfer all or any portion of this Agreement and its interests hereunder, to any subsidiary or affiliate of Lehman, or to any office, branch or subsidiary of any affiliate of Lehman upon notice to the Issuer and the Trustee, provided that LBH shall provide sufficient evidence, in the reasonable opinion of the Issuer, that the guarantee of LBH shall extend to the transferee, unless the transferee entity's long-term senior unsecured debt rating is  "A-" or above, in the case of S&P and "A3" or above, in the case of Moody's, and Lehman shall otherwise be able to transfer all or any portion of this Agreement only (i) with the consent of the Issuer (such consent not to be unreasonably withheld or delayed) and notice to the Trustee and (ii) upon receipt of a Rating Confirmation (as defined in the Indenture) from each Rating Agency (as defined in the Indenture); provided, however, that such consent shall not be required if such transfer is to any entity rated at least "A-" and "A3" by S&P and Moody's, respectively, and provided further that in all such instances of transfer the transferee shall assume all of the rights and obligations of Lehman hereunder.  Neither the Issuer nor the Trustee may transfer this Agreement without the prior written consent of Lehman and the other party hereto.

Section 10.3   Limitation.  Nothing expressed or implied herein is intended or shall be construed to confer upon any person, firm or corporation other than the parties hereto, any right, remedy or claim by reason of this Agreement or any term hereof, and all terms contained herein shall be for the sole and exclusive benefit of the parties hereto, and their successors and permitted transferees.

Section 10.4   Severability.  If one or more provisions of this Agreement or the applicability of any such provisions to any set of circumstances shall be determined to be invalid or ineffective for any reason, such determination shall not affect the validity and enforceability of the remaining provisions or the applicability of the same provisions or any of the remaining provisions to other circumstances.

30

Section 10.5 <u>Amendments, Changes and Modifications</u>. This Agreement may be amended or any of its terms modified only by a written document authorized, executed and delivered by each of the parties hereto. The Issuer and the Trustee hereby agree that any amendment to this Agreement shall conform to the requirements of Section 6.09 of the Indenture and Section 7 of the Act. The Issuer shall notify each Rating Agency (as defined in the Indenture) of any such amendment or modification.

Section 10.6 <u>Counterparts</u>. This Agreement may be executed in one or more counterparts and when each party hereto has executed at least one counterpart, this Agreement shall become binding on all parties and such counterparts shall be deemed to be one and the same document.

Section 10.7 <u>Termination</u>. Unless earlier terminated pursuant to Sections 2.7, 2.8, 3.1, 3.2, 7.4, 7.5 or 7.6 hereof, this Agreement shall terminate on the later of the last Bond Payment Date set forth in <u>Exhibit A</u> and the date on which the Trustee and the Issuer have satisfied all of their obligations hereunder.

Section 10.8 <u>Entire Agreement</u>. This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

Section 10.9 <u>Governing Law; Venue</u>.

(a)     This Agreement shall be governed by and construed in accordance with the laws of the State, without regard to conflict of law principles.

(b)     Lehman, the Trustee and the Issuer each hereby irrevocably submits to the exclusive jurisdiction of the courts of the State for the purpose of any suit, action or other proceeding arising out of this Agreement, or any of the agreements or transactions contemplated hereby, at the election of the party initiating any such suit, action or other proceeding, which is brought by or against Lehman, the Trustee or the Issuer, and the parties each hereby irrevocably agrees that all claims in respect of any such suit, action or proceeding may be heard and determined by any such court and each of Lehman, the Trustee and the Issuer acknowledges that it is subject to suit in such courts with respect to enforcement of its obligations hereunder

Section 10.10 <u>Nonpetition Covenant</u>. Notwithstanding any prior termination of this Agreement, Lehman and the Trustee covenant and agree that they shall not, prior to the date which is one year and one day after the termination of this Agreement, acquiesce petition or otherwise invoke or cause the Issuer to invoke the process of any court or government authority for the purpose of commencing or sustaining a case against the Issuer under any federal or state bankruptcy, insolvency or similar law or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of the Issuer or any substantial part of its property, or ordering the winding up or liquidation of the affairs of the Issuer; *provided*, that the

31

foregoing shall not limit the right of Lehman to name the Issuer as a party in any action or suit or in the exercise of any other remedy in respect of this Agreement.

NYK 1078066-3.071370.0011

IN WITNESS WHEREOF, the Trustee, the Issuer and Lehman have caused this Reserve Fund Agreement to be executed by their respective duly authorized officers, all as of the date and year first above written.

TOBACCO SETTLEMENT FINANCING CORPORATION

By: _____

Name:  Michellene Davis
Title:  Vice President

THE BANK OF NEW YORK, as Trustee

By: _____

Name:  Marie Ladolcetta
Title:   Assistant Vice President

LEHMAN BROTHERS SPECIAL FINANCING INC.

By:_____
Name:
Title:

32

IN WITNESS WHEREOF, the Trustee, the Issuer and Lehman have caused this Reserve Fund Agreement to be executed by their respective duly authorized officers, all as of the date and year first above written.

TOBACCO SETTLEMENT FINANCING CORPORATION

By:_____
Name:  Michellene Davis
Title:  Vice President


THE BANK OF NEW YORK, as Trustee

By:_____
Name:
Title:


LEHMAN BROTHERS SPECIAL FINANCING INC.

By: _____
Name:   T. Courtney Jenkins
Title:    Vice President

32

**EXHIBIT A**

| Deposit Date[*] | Bond Payment Date[*] | Deposit Amount |
|---|---|---|
| 01/29/07 | 05/31/07 | $100,469,617.50 |
| 05/31/07 | 11/30/07 | $100,469,617.50 |
| 11/30/07 | 05/30/08 | $100,469,617.50 |
| 05/30/08 | 11/28/08 | $100,469,617.50 |
| 11/28/08 | 05/29/09 | $100,469,617.50 |
| 05/29/09 | 11/30/09 | $100,469,617.50 |
| 11/30/09 | 05/28/10 | $100,469,617.50 |
| 05/28/10 | 11/30/10 | $100,469,617.50 |
| 11/30/10 | 05/31/11 | $100,469,617.50 |
| 05/31/11 | 11/30/11 | $100,469,617.50 |
| 11/30/11 | 05/31/12 | $100,469,617.50 |
| 05/31/12 | 11/30/12 | $100,469,617.50 |
| 11/30/12 | 05/31/13 | $100,469,617.50 |
| 05/31/13 | 11/29/13 | $100,469,617.50 |
| 11/29/13 | 05/30/14 | $100,469,617.50 |
| 05/30/14 | 11/28/14 | $100,469,617.50 |
| 11/28/14 | 05/29/15 | $100,469,617.50 |
| 05/29/15 | 11/30/15 | $100,469,617.50 |
| 11/30/15 | 05/31/16 | $100,469,617.50 |
| 05/31/16 | 11/30/16 | $100,469,617.50 |
| 11/30/16 | 05/31/17 | $100,469,617.50 |
| 05/31/17 | 11/30/17 | $100,469,617.50 |
| 11/30/17 | 05/31/18 | $100,469,617.50 |
| 05/31/18 | 11/30/18 | $100,469,617.50 |
| 11/30/18 | 05/31/19 | $100,469,617.50 |
| 05/31/19 | 11/29/19 | $100,469,617.50 |
| 11/29/19 | 05/29/20 | $100,469,617.50 |
| 05/29/20 | 11/30/20 | $100,469,617.50 |
| 11/30/20 | 05/28/21 | $100,469,617.50 |
| 05/28/21 | 11/30/21 | $100,469,617.50 |
| 11/30/21 | 05/31/22 | $100,469,617.50 |
| 05/31/22 | 11/30/22 | $100,469,617.50 |
| 11/30/22 | 05/31/23 | $100,469,617.50 |
| 05/31/23 | 11/30/23 | $100,469,617.50 |
| 11/30/23 | 05/31/24 | $100,469,617.50 |
| 05/31/24 | 11/29/24 | $100,469,617.50 |
| 11/29/24 | 05/30/25 | $100,469,617.50 |

[*]    If any Deposit Date or Bond Payment Date specified above is not a Business Day, such date will be the immediately preceding Business Day; provided, however, that with respect to any date specified as a Bond Payment Date, the determination of whether such date is a Business Day shall be made without giving effect to clauses (c) and (d) of the definition of Business Day.

A-1

**EXHIBIT A**

| Deposit Date[*] | Bond Payment Date[*] | Deposit Amount |
|---|---|---|
| 05/30/25 | 11/28/25 | $100,469,617.50 |
| 11/28/25 | 05/29/26 | $100,469,617.50 |
| 05/29/26 | 11/30/26 | $100,469,617.50 |
| 11/30/26 | 05/28/27 | $100,469,617.50 |
| 05/28/27 | 11/30/27 | $100,469,617.50 |
| 11/30/27 | 05/31/28 | $100,469,617.50 |
| 05/31/28 | 11/30/28 | $100,469,617.50 |
| 11/30/28 | 05/31/29 | $100,469,617.50 |
| 05/31/29 | 11/30/29 | $100,469,617.50 |
| 11/30/29 | 05/31/30 | $100,469,617.50 |
| 05/31/30 | 11/29/30 | $100,469,617.50 |
| 11/29/30 | 05/30/31 | $100,469,617.50 |
| 05/30/31 | 11/28/31 | $100,469,617.50 |
| 11/28/31 | 05/28/32 | $100,469,617.50 |
| 05/28/32 | 11/30/32 | $100,469,617.50 |
| 11/30/32 | 05/31/33 | $100,469,617.50 |
| 05/31/33 | 11/30/33 | $100,469,617.50 |
| 11/30/33 | 05/31/34 | $100,469,617.50 |
| 05/31/34 | 11/30/34 | $100,469,617.50 |
| 11/30/34 | 05/31/35 | $100,469,617.50 |
| 05/31/35 | 11/30/35 | $100,469,617.50 |
| 11/30/35 | 05/30/36 | $100,469,617.50 |
| 05/30/36 | 11/28/36 | $100,469,617.50 |
| 11/28/36 | 05/29/37 | $100,469,617.50 |
| 05/29/37 | 11/30/37 | $100,469,617.50 |
| 11/30/37 | 05/28/38 | $100,469,617.50 |
| 05/28/38 | 11/30/38 | $100,469,617.50 |
| 11/30/38 | 05/31/39 | $100,469,617.50 |
| 05/31/39 | 11/30/39 | $100,469,617.50 |
| 11/30/39 | 05/31/40 | $100,469,617.50 |
| 05/31/40 | 11/30/40 | $100,469,617.50 |
| 11/30/40 | 05/31/41 | $100,469,617.50 |

[*]    If any Deposit Date or Bond Payment Date specified above is not a Business Day, such date will be the immediately preceding Business Day; provided, however, that with respect to any date specified as a Bond Payment Date, the determination of whether such date is a Business Day shall be made without giving effect to clauses (c) and (d) of the definition of Business Day.

A-2

**EXHIBIT B**

[LETTERHEAD OF COUNSEL TO TRUSTEE]

January __, 2007

Tobacco Settlement Financing Corporation
Office of the State Treasurer
State House
125 West State Street
Trenton, NJ 08625

Lehman Brothers Special Financing Inc.
745 Seventh Avenue, 5th Floor
New York, NY 10019

Re:    $3,436,225,000.00 Tobacco Settlement Asset-Backed Bonds, Series 2007-1A Senior
       Current Interest Bonds

Ladies and Gentlemen:

    We have acted as counsel to The Bank of New York, as Trustee (the "Trustee"), in connection with the execution and delivery by the Trustee of the Reserve Fund Agreement dated as of January __, 2007 (the "Agreement") by and among Tobacco Settlement Financing Corporation (the "Issuer"), the Trustee, and Lehman Brothers Special Financing Inc. ("Lehman"). Capitalized terms used herein and not defined herein have the respective meanings given to them in the Agreement.

    In rendering this opinion, we have examined, among other things, copies of the Agreement and the Indenture.

    In connection with the foregoing, we have also examined originals or copies satisfactory to us of all such corporate records, agreements, certificates and other documents as we have deemed relevant and necessary as a basis for the opinions hereinafter expressed. In such examination we have assumed the genuineness of all signatures, the authenticity of all documents submitted to us as originals, and the conformity with the original documents of all documents submitted to us as copies.

    In giving the opinions expressed below we do not purport to be experts in or generally familiar with or qualified to express legal opinions based on the laws of any jurisdiction other than the federal laws of the United States of America and the laws of the State of New Jersey (the "State").

B-1

Based upon the foregoing examination and review, we are of the opinion that:

(i)     The Trustee has full legal right, power and authority to enter into the Agreement.

(ii)    The Agreement has been duly authorized, executed and delivered by the Trustee.

(iii)   The Trustee's execution and delivery of the Agreement and the performance of its obligations thereunder do not and will not conflict with or constitute or result in a default under, a breach or violation of, or the creation of any lien or encumbrance on any of its property under the Indenture, or any other agreement, instrument, judgment, injunction or order applicable to it or any of its property.

(iv)    The execution and delivery by the Trustee of the Agreement and the performance of its obligations thereunder do not and will not constitute or result in a default under, a breach or violation of, or the creation of any lien or encumbrance on any of its property under, its charter or by-laws, or the Indenture, or any other agreement, instrument, judgment, injunction or order applicable to it or any of its property.

(vi)    The Indenture is a legal, valid and binding obligation of the Trustee, enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

We are furnishing this opinion to you solely for your benefit and no other person is entitled to rely hereon. This opinion is not to be used, circulated, quoted or otherwise referred to for any other purpose.

Very truly yours,

B-2

**EXHIBIT C**

[LETTERHEAD OF COUNSEL TO LEHMAN]

January __, 2007

Tobacco Settlement Financing Corporation
Office of the State Treasurer
State House
125 West State Street
Trenton, NJ 08625

The Bank of New York
Corporate Trust
385 Rifle Camp Road, 3rd Floor
West Paterson, New Jersey 07424

Re:    $3,436,225,000.00 Tobacco Settlement Asset-Backed Bonds, Series 2007-1A Senior
Current Interest Bonds

Ladies and Gentlemen:

I have acted as counsel to Lehman Brothers Special Financing Inc. ("Lehman") in
connection with the execution and delivery by Lehman of the Reserve Fund Agreement dated as
of January __, 2007 (the "Agreement") by and among Lehman, The Bank of New York, as
Trustee (the "Trustee"), and Tobacco Settlement Financing Corporation (the "Issuer").
Capitalized terms used herein and not defined herein have the respective meanings given to them
in the Agreement.

In connection with the opinions expressed below, I have examined, or have had examined
on my behalf, a copy of the Agreement executed by Lehman and such other agreements,
instruments, documents and records of Lehman and certificates and statements by public officials
and officers of Lehman as I have deemed necessary or appropriate as a basis for the opinions
hereinafter expressed.

Based on the foregoing but subject to the assumptions, exceptions, qualifications and
limitations hereinafter expressed, I am of the opinion that:

1.      Lehman is a corporation duly incorporated, validly existing and in good standing
under the laws of the State of Delaware and has the corporate power and authority
to execute and deliver the Agreement and to perform its obligations thereunder.

2.  The Agreement has been duly and validly authorized, executed and delivered by Lehman and constitutes the legal, valid and binding obligation of Lehman, enforceable against Lehman in accordance with its terms.

The foregoing opinions are subject to the following assumptions, exceptions, qualifications and limitations:

A.  My opinion in paragraph 2 above is subject to the effect of any bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally (including, without limitation, the effect of statutory or other laws regarding fraudulent or other similar transfers) and general principles of equity, regardless of whether enforceability is considered in a proceeding in equity or at law.

B.  I am a member of the Bar of the State of New York and render no opinion on the laws of any jurisdiction other than the State of New York, the United States of America and the General Corporation Law of the State of Delaware.

C.  My opinions are limited to the present laws and to the facts as they presently exist. I assume no obligation to revise or supplement this opinion should the present laws of the jurisdictions referred to in paragraph B above be changed by legislative action, judicial decision or otherwise.

D.  This letter is rendered to you in connection with the Agreement and the transactions related thereto and may not be relied upon by any other person or by you in any other context or for any other purpose. This letter may not be quoted in whole or in part, nor may copies thereof be furnished or delivered to any other person, without the prior written consent of Lehman, except that you many furnish copies hereof (i) to your independent auditors and attorneys, (ii) to any United States, state or local authority having jurisdiction over you or over Lehman, (iii) pursuant to the order or any legal process of any court of competent jurisdiction or any governmental agency, and (iv) in connection with any legal action arising out of the Agreement.

E.  I have assumed with your permission (i) the genuineness of all signatures by the Issuer and the Trustee, (ii) the authenticity of documents submitted to me as originals and the conformity with the original documents of all documents submitted to me as copies, and (iii) the due execution and delivery, pursuant to due authorization, of the Agreement by each party other than Lehman.

Notwithstanding anything to the contrary contained herein, the undersigned acknowledges that this opinion is a government record subject to release under the Open Public Records Act (N.J.S.A. 47:1A-1 *et. seq.*). The foregoing opinions are given on the express understanding that the undersigned is an officer of Lehman Brothers Inc. and shall in no event incur any personal liability in connection with the said opinions.

NYK 1078066-3.071370.0011

Very truly yours,

**EXHIBIT D**

[LETTERHEAD OF COUNSEL TO ISSUER]

January __, 2007

The Bank of New York
Corporate Trust
385 Rifle Camp Road, 3rd Floor
West Paterson, New Jersey 07424

Lehman Brothers Special Financing Inc.
745 Seventh Avenue, 5th Floor
New York, NY 10019

Re:     $3,436,225,000.00 Tobacco Settlement Asset-Backed Bonds, Series 2007-1A Senior
        Current Interest Bonds

Ladies and Gentlemen:

I have acted as counsel to Tobacco Settlement Financing Corporation (the "Issuer") in connection with its execution and delivery of the Reserve Fund Agreement dated as of January __, 2007 (the "Agreement"), by and among Lehman Brothers Special Financing Inc. ("Lehman"), The Bank of New York, as Trustee (the "Trustee"), and the Issuer and its execution and delivery of the Indenture (as defined in the Agreement). Capitalized terms used herein and not defined herein have the respective meanings given to them in the Agreement.

In rendering this opinion, we have examined, among other things, copies of the Agreement and the Indenture.

In connection with the foregoing, we have also examined originals or copies satisfactory to us of all such corporate records, agreements, certificates and other documents as we have deemed relevant and necessary as a basis for the opinions hereinafter expressed. In such examination we have assumed the genuineness of all signatures, the authenticity of all documents submitted to us as originals, and the conformity with the original documents of all documents submitted to us as copies.

In giving the opinions expressed below we do not purport to be experts in or generally familiar with or qualified to express legal opinions based on the laws of any jurisdiction other than the laws of the State of New Jersey (the "State").

Based upon the foregoing examination and review, we are of the opinion that:

(i)      The Issuer has full legal right, power and authority to enter into the Agreement and the Indenture and to authorize and direct the Trustee, pursuant to the Agreement, to make purchases of the Qualified Securities in accordance with the terms therein.

(ii)      The Agreement and the Indenture have been duly authorized, executed and delivered by the Issuer.

(iii)      The Agreement is a legal, valid and binding obligation of the Issuer, enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(iv)      The Issuer's execution and delivery of the Agreement and the performance of its obligations thereunder do not and will not conflict with or constitute or result in a default under, a breach or violation of, or the creation of any lien or encumbrance on any of its property under its charter or by-laws (or any equivalent organization documents) the Indenture, or any other agreement, instrument, law, ordinance, regulation, judgment, injunction or order applicable to it or any of its property.

(v)      The Indenture is a legal, valid and binding obligation of the Issuer, enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(vi)      All consents, authorizations and approvals requisite for its execution, delivery and performance of this Agreement have been obtained and remain in full force and effect and all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with, any governmental authority, regulatory body or any other entity is required for such execution, delivery or performance.

(vii)      Any amounts required to be paid by the Issuer under the Agreement are subject to the provisions of the New Jersey Tort Claims Act (N.J.S.A. 59:1-1 et seq.) and the New Jersey Contractual Liability Act (N.J.S.A. 59:13-1 et seq.).

(viii)      The Issuer is subject to suit at law or in equity pursuant to paragraph (a) of Section 6 of P.L. 2002, c.32 and accordingly, the Issuer is not entitled to claim immunity on the grounds of sovereignty from suit.

(ix)      The Eligible Securities to be delivered pursuant to the Agreement constitute Eligible Investments as defined in the Indenture.

(x)      The Agreement constitutes an ancillary facility as defined in the Act.

I am furnishing this opinion to you solely for your benefit and no other person is entitled to rely hereon. This opinion is not to be used, circulated, quoted or otherwise referred to for any other purpose.

Very truly yours,

**EXHIBIT E**

## Lehman Brothers Special Financing Inc.
## Notice of Tender
### Under the [ _____ ] Agreement
### Dated as of:  [ _____ ]

To:          _____, as [Escrow
             Agent/Trustee]
             Attention:      _____
             Fax:      _____
             Phone:      _____

From:        Lehman Brothers Inc. ("LBI")
             Attention:      _____
             Fax:      _____
             Phone:      _____

Date:        [ _____ ]
Re:          [ _____ ]

| Date and Price | |
| --- | --- |
| Purchase Date: | [ _____ ] |
| Specified Purchase Price: | [ _____ ] |

**Specific Government Obligations**

| Cusip | Type | Maturity | Coupon | Face Amount | Maturity Amount | Accrued Interest |
| --- | --- | --- | --- | --- | --- | --- |
| [ _____ ] | [ _____ ] | [ _____ ] | [ _____ ] | [ _____ ] | [ _____ ] | [ _____ ] |

**Delivery vs. Payment (Book Entry Delivery)**

On the Purchase Date, LBI will deliver Face value      [ _____ ]      [BILLS/NOTES] maturing [ _____ ]

to:
             [ _____ ]
             [ _____ ]
             Re:
             [ _____ ]

On the Purchase Date, LBI will receive [ _____ ]
             **Chase NYC/Lehman**
             **ABA: 021000021**
             **A/C #066206677**

# LEHMAN BROTHERS

## GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS SPECIAL FINANCING INC. ("Lehman") has entered into a Reserve Fund Agreement dated as of January 25, 2007 (the "Agreement") by and among TOBACCO SETTLEMENT FINANCING CORPORATION (the "Issuer"), THE BANK OF NEW YORK, as Trustee (the "Trustee"). For value received, and in consideration of the financial accommodations accorded to Lehman by the Borrower under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a)      Guarantor hereby unconditionally guarantees to the Issuer the due and punctual payment of all amounts payable by Lehman under the Agreements when and as Lehman's obligations thereunder shall become due and payable in accordance with the terms of the Agreement. In case of the failure of Lehman to pay punctually any such amounts, Guarantor hereby agrees, upon written demand by the Issuer, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable. In the event that any amounts paid by Lehman under the Agreement are rescinded or must otherwise be returned for any reason whatsoever, the Guarantor shall remain liable hereunder in respect of such amounts as if such payment had not been made.

(b)      Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c)      Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of the Agreement against Lehman (other than as a result of the unenforceability thereof against the Borrower), the absence of any action to enforce Lehman's obligations under the Agreement, any waiver or consent by the Borrower with respect to any provisions thereof, or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defense of payment or statute of limitations, neither of which are waived); provided, however, that Guarantor shall be entitled to exercise any right that Lehman could have exercised under the Agreement to cure any default in respect of its obligation under the Agreement or to set off, counterclaim or withhold payment in respect of any default or potential default in respect of the Borrower, but only to the extent such right is provided to Lehman under the Agreement.

(d)      This Guarantee shall remain in full force and effect until such time as Party B shall receive written notice of termination. Termination of this Guarantee shall not affect Guarantor's liability hereunder as to obligations incurred or arising out of Transactions entered into prior to the termination hereof.

(e)      Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that the Borrower exhaust any right to take any action against Lehman or any other person prior to or

contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

This Guarantee shall remain in full force and effect and be binding upon the Guarantor and its successors and permitted assigns and inure to the benefit of the Corporation and its successors and permitted assigns until all amounts payable by Lehman under the Agreement have been satisfied in full.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York, without reference to choice of law doctrine.  All capitalized terms not defined in this Guarantee are defined in the Agreement.

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed in its corporate name by its duly authorized officer as of the date of the Agreement.

LEHMAN BROTHERS HOLDINGS INC.

By: _____
JAMES J. KILLERLANE, VICE PRESIDENT

# *Amendment Agreement of 2002 Reserve Fund Agreement*

 **First Southwest Company**

Execution Copy
[2002 Bonds]

## AMENDMENT AGREEMENT

Amendment Agreement (this "Amendment Agreement") dated as of January 29, 2007 by and among U.S. BANK, NATIONAL ASSOCIATION (as successor to Wachovia Bank, National Association) (the "Prior Trustee"), TOBACCO SETTLEMENT FINANCING CORPORATION (the "Issuer"), THE BANK OF NEW YORK (the "Trustee") and LEHMAN BROTHERS SPECIAL FINANCING INC. ("Lehman").

WHEREAS, the Issuer has previously issued its Tobacco Settlement Asset Backed Bonds, Series 2002 (the "2002 Bonds") in the aggregate principal amount of $1,801,455,000 under an Indenture, dated as of August 1, 2002 (the "2002 Indenture"), between the Issuer and the Prior Trustee, in its capacity as successor trustee under the 2002 Indenture; and

WHEREAS, in connection with the issuance of the 2002 Bonds, Lehman, the Issuer and the Prior Trustee, in its capacity as successor trustee under the 2002 Indenture, entered into a Reserve Fund Agreement, dated as of August 28, 2002, as amended and supplemented from time to time (as amended and supplemented prior to the date hereof, the "Original Agreement" and as amended hereby, the "Agreement"); and

WHEREAS, the Issuer has determined to refund certain of its outstanding indebtedness by refunding the 2002 Bonds through the issuance of its $3,622,208,081.50 Tobacco Settlement Asset-Backed Bonds, Series 2007-1 (the "2007 Bonds"); and

WHEREAS, the 2007 Bonds were issued pursuant to a Trust Indenture, dated as of January 1, 2007 (the "2007 Indenture"), between the Issuer and the Trustee, as trustee; and

WHEREAS, in connection with the refunding of the 2002 Bonds, the Issuer and Lehman desire to amend the Original Agreement as hereinafter provided to cause the Original Agreement to remain in effect with respect to a portion of the Senior Liquidity Reserve Account established under the 2007 Indenture and to substitute the Trustee for the Prior Trustee as a party thereto; and

NOW, THEREFORE, in consideration of the foregoing and of the mutual covenants hereinafter set forth, the parties agree that the Original Agreement shall be and hereby is amended as follows:

1.    Amendments. The Trustee, the Issuer and Lehman hereby agree to amend the Original Agreement as follows.

(a)    Definitions.    Section 1.2 of the Original Agreement shall be amended by replacing the following definitions in their entirety as follows:

"Bonds" means the Issuer's $3,436,225,000.00 Tobacco Settlement Asset-Backed Bonds, Series 2007-1A Senior Current Interest Bonds.

"Business Day" means any day other than a Saturday, Sunday or day upon which commercial banks in the State or the State of New York are permitted or required to remain closed or a day on which the New York Stock Exchange or DTC is closed.

"Debt Service Payment" means (i) Qualified Swap Payment, (ii) a scheduled payment of principal or sinking fund installment of or interest on the Bonds or (iii) a payment of principal or redemption premium of or interest on the Bonds resulting from an Event of Default (as defined in the Indenture) under the Indenture but excluding (A) any payment in connection with any other redemption of the Bonds (other than a mandatory sinking fund redemption) and excluding (B) any payment required to make a regularly scheduled deposit to the principal account or interest account for the Bonds.

"Indenture" means the Trust Indenture, dated as of January 1, 2007, between the Issuer and the Trustee.

"Other Investment Agreements" means the Reserve Fund Agreement, dated as of January 29, 2007, by and among the Trustee, the Issuer and Lehman and the Debt Service Reserve Fund Agreement, dated as of March 7, 2003, as amended on January 25, 2007, by and among the Issuer, the Trustee, the Prior Trustee and Lehman.

"Purchase and Sale Agreement" means, collectively, the Purchase and Sale Agreement, dated as of August 1, 2002, by and between the Issuer and the State of New Jersey and the Purchase and Sale Agreement, dated as of March 1, 2003, by and between the Issuer and the State of New Jersey, each as amended, supplemented and in effect from time to time.

"Qualified Swap" means any Swap Contract (as defined in the Indenture) with respect to which the Issuer has obtained written confirmation (and provided to Lehman a copy of each such confirmation) from each Rating Agency (as defined in the Indenture) then rating the Bonds that the execution of such Swap will not adversely affect the rating on the Bonds assigned by each such Rating Agency or result in the withdrawal or suspension of such rating.

"Qualified Swap Payments" means regularly scheduled Senior Swap Payments (as defined in the Indenture) due in connection with any Qualified Swap and payable on parity with the Bonds and shall not include any amount due in connection with the early termination of any Qualified Swap.

"Reserve Fund" means the Senior Liquidity Reserve Account held by the Trustee pursuant to Section 5.01(e) of the 2007 Indenture.

(b)    All references in the Agreement to the "Debt Service Reserve Requirement" shall be deemed to be references to the "Senior Liquidity Reserve Requirement."

(c)    Section 3.2 is hereby amended by replacing the reference to "Section 4.06(f) of the Indenture" with a reference to "Section 5.04(h) of the Indenture."

- 2 -

(d)     Section 5.1(g) is hereby deleted in its entirety and replaced by the following:

> "(g)    if it is the Issuer, take all necessary action to ensure the continued receipt by it of the Collections (as defined in the Indenture), including, without limitation, the Pledged TSRs (as defined in the Indenture) and application thereof, including, without limitation, the payment of Termination Payments in accordance with the terms of the Indenture."

(e)     Section 5.7(a) is hereby amended by replacing the references to "Sections 4.03, 4.04, 4.06, 5.01, 5.02, 5.03, 5.07, 5.08 and 5.09 of the Indenture" with references to "Sections 5.02, 5.04, 6.01, 6.02, 6.06, 6.07, 6.08. 6.09 and 6.10 of the Indenture."

(f)     Section 9.1(a) is hereby deleted in its entirety and replaced by the following:

> "(a)    In order to secure the Issuer's timely and full performance of its obligations hereunder, the Issuer hereby pledges and grants to Lehman a lien on and pledge of the Pledged Assets and the proceeds thereof, such lien to be immediately subordinate to the lien of the Bondholders under the Indenture and to be on parity with the lien securing payment under the Other Investment Agreements. The Issuer represents to Lehman that this Agreement constitutes an Ancillary Contract (as defined in the Indenture) and that all payments due from the Issuer hereunder (including, without limitation, any Termination Amount) constitute Termination Payments (as defined in the Indenture)."

(g)     Section 10.1 is hereby amended to amend and replace the notice and payment instructions with respect to Lehman in their entirety as follows:

> Lehman Brothers Special Financing Inc.
> 745 Seventh Avenue, 5th Floor
> New York, NY 10019
> Attention:    Municipal Financial Products - Middle Office
> Telephone:    212-526-2240
> Fax:          646-758-2988
>
> [WIRING INSTRUCTIONS]
>
> JPMorgan Chase
> ABA: 021000021
> for the Account of Lehman Brothers Special Financing Inc.
> Account No. 066 143 543

(h)     Section 10.1 is hereby amended to amend and replace the notice and payment instructions with respect to the Trustee in their entirety as follows:

> The Bank of New York
> Corporate Trust
> 385 Rifle Camp Road, 3rd Floor

NYK 1077868-4.071370.0011

West Paterson, New Jersey 07424
Attention: Marie Ladolcetta/Frank Adinolfe
Telephone: 973-357-7827
Telecopy: 973-357-7840

**PTC ELEGIBLE SECURITIES**

BYORK / CUST / BERKELEY BK
ACCOUNT # 866305 TSF Senior Liquidity
ATTN:  Frank Adinolfe 973-357-7044

**FED ELIGIBLE SECURITIES**

BK OF NYC / ABA # 021000018
CUSTODY A/C # TAS 866305
ACCOUNT:  TSF Senior Liquidity
ATTN: Frank Adinolfe 973-357-7044

**DTC SECURITIES**

DTC # 901 / THE BANK OF NEW YORK
CUSTODY A/C #TAS866305 – TSF Senior Liquidity
RE: Tobacco – Attn: F. Adinolfe 973-357-7044

(i)    Exhibit A to the Agreement is hereby deleted in its entirety and replaced by Exhibit A hereto.

2.    Novation.  With effect from and including the date hereof and in consideration of the mutual representations, warranties and covenants contained in this Amendment Agreement and other good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged by each of the parties), the Prior Trustee is hereby released and discharged from any and all further obligations with respect to the Original Agreement and the Prior Trustee's respective rights against each of the other parties thereunder are cancelled hereby, provided that such release and discharge shall not affect any rights, liabilities or obligations of Lehman, the Prior Trustee or the Issuer with respect to payments or other obligations due and payable or due to be performed on or prior to the date hereof, and all such payments and obligations shall be paid or performed by the Issuer, Lehman or the Prior Trustee in accordance with the terms of the Original Agreement.

In respect of the Agreement as amended hereby, the Issuer, Lehman and the Trustee each undertake the express obligations towards the other and acquire rights against each other as specified in the Agreement as amended hereby (and, for the avoidance of doubt, as if the Trustee were the Prior Trustee and with the Issuer remaining the Issuer and Lehman remaining Lehman, save for any rights, liabilities or obligations of Lehman, the Issuer or the Prior Trustee with respect to payments or other obligations due and payable or due to be performed on or prior to the date hereof).

- 4 -

3.    <u>Transfer Direction to Prior Trustee</u>.  The Issuer hereby instructs the Prior Trustee to transfer the Eligible Securities held under the Original Agreement to the Trustee on the date hereof.

4.    <u>Fee Payment</u>.  In connection with this Amendment Agreement, the Issuer shall pay to Lehman an amount equal to $47,872.45 on the date hereof.

5.    <u>Representations</u>.  Each party represents to the other party that:

(a)    it is duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation;

(b)    it has the power to execute and deliver this Amendment Agreement and to perform its obligations under this Amendment Agreement and has taken all necessary action to authorize such execution, delivery and performance;

(c)    the person signing this Amendment Agreement on its behalf is duly authorized to do so;

(d)    it has obtained all governmental and other consents and authorizations that it is required to obtain in connection with its execution and delivery of this Amendment Agreement, all such consents and authorizations are in full force and effect and all conditions of any such consents and authorizations have been complied with;

(e)    the execution, delivery and performance of this Amendment Agreement will not violate or conflict with any law, ordinance, charter, by-law or rule applicable to it, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(f)    its obligations under this Amendment Agreement constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application, regardless of whether enforcement is sought in a proceeding in equity or at law);

(g)    it has made its own independent decision to enter into this Amendment Agreement based upon its own judgment and upon advice from such advisors as it has deemed necessary;

(h)    it is not relying on any communication (written or oral) of the other party as a recommendation to enter into this Amendment Agreement; it being understood that explanations related to the terms and conditions of this Amendment Agreement shall not be considered a recommendation to enter into this Amendment Agreement;

(i)    it is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms and conditions of this Amendment Agreement;

(j)    in the case of the Issuer and the Trustee, Lehman is not acting as a fiduciary for or as an advisor to it in respect of this Amendment Agreement; and

- 5 -

(k)      in the case of the Issuer and the Trustee no "event of default" or event which would with the passage of time or the giving of notice constitute an event of default has occurred and is continuing under the Indenture.

6.     <u>Agreement Ratified and Confirmed</u>.   Except as expressly amended by this Amendment Agreement, the Agreement is in all respects ratified and confirmed and the terms, provisions and conditions thereof are and shall remain in full force and effect. From and after the date hereof, all references to the Agreement shall mean the Agreement as amended by the terms hereof.

7.     <u>Governing Law</u>.  This Amendment Agreement shall be governed by and construed in accordance with the laws of the State of New Jersey without giving effect to the conflict of law principles thereof.

8.     <u>Counterparts</u>.  This Amendment Agreement may be executed in counterparts, each of which shall be deemed an original.

9.     <u>Guarantee</u>.  The Guarantee of Lehman Brothers Holdings Inc. ("Holdings"), pursuant to which Holdings guaranteed the obligations of Lehman under  the Original Agreement, remains in full force and effect with respect to the obligations of Lehman under the Agreement as amended hereby.

10.     <u>Effective Date</u>. This Amendment Agreement shall take effect on January 29, 2007.

NYK 1077868-4.071370.0011

IN WITNESS WHEREOF, the parties have executed this Amendment Agreement as of the date first above written.

U.S. BANK, NATIONAL ASSOCIATION, as Prior Trustee

By: _Frances S. Beam_
Name:  FRANCES S. BEAM
Title:  VICE PRESIDENT


THE BANK OF NEW YORK, as Trustee


By:_____
Name:
Title:


TOBACCO SETTLEMENT FINANCING CORPORATION

By:_____
Name: Michellene Davis
Title:   Vice President


LEHMAN BROTHERS SPECIAL FINANCING INC.


By:_____
Name:   T. Courtney Jenkins
Title:   Vice President


- 6 -

IN WITNESS WHEREOF, the parties have executed this Amendment Agreement as of the date first above written.

U.S. BANK, NATIONAL ASSOCIATION, as Prior Trustee

By:_____
Name:
Title:


THE BANK OF NEW YORK, as Trustee

By:_____
Name: Marie Ladolcetta
Title:  Assistant Vice President


TOBACCO SETTLEMENT FINANCING CORPORATION

By:_____
Name: Michellene Davis
Title:  Vice President


LEHMAN BROTHERS SPECIAL FINANCING INC.

By:_____
Name:   T. Courtney Jenkins
Title:  Vice President

NYK 1077868-4.071370.0011

IN WITNESS WHEREOF, the parties have executed this Amendment Agreement as of the date first above written.

U.S. BANK, NATIONAL ASSOCIATION, as Prior Trustee

By:_____
Name:
Title:


THE BANK OF NEW YORK, as Trustee


By:_____
Name:  Marie Ladolcetta
Title:  Assistant Vice President



TOBACCO SETTLEMENT FINANCING CORPORATION
By:_____
Name:  Michellene Davis
Title:  Vice President



LEHMAN BROTHERS SPECIAL FINANCING INC.


By:_____
Name:   T. Courtney Jenkins
Title:   Vice President

NYK 1077868-4.071370.0011

IN WITNESS WHEREOF, the parties have executed this Amendment Agreement as of the date first above written.

U.S. BANK, NATIONAL ASSOCIATION, as Prior Trustee

By:_____
Name:
Title:

THE BANK OF NEW YORK, as Trustee

By:_____
Name:
Title:

TOBACCO SETTLEMENT FINANCING CORPORATION

By:_____
Name: Michellene Davis
Title:   Vice President

LEHMAN BROTHERS SPECIAL FINANCING INC.

By:_____
Name:   T. Courtney Jenkins
Title:   Vice President

- 7 -

EXHIBIT A

| Deposit Date[*] | Bond Payment Date[*] | Scheduled Reserve Amount | Interest Amount, based on 4.70% per annum, 30/360 day year |
|---|---|---|---|
| 08/28/02 | 05/30/03 | $31,154,270 | $1,110,390.12 |
| 05/30/03 | 11/28/03 | $31,154,270 | $732,125.35 |
| 11/28/03 | 05/31/04 | $31,154,270 | $732,125.35 |
| 05/31/04 | 11/30/04 | $31,154,270 | $732,125.35 |
| 11/30/04 | 05/31/05 | $31,154,270 | $732,125.35 |
| 05/31/05 | 11/30/05 | $31,154,270 | $732,125.35 |
| 11/30/05 | 05/31/06 | $31,154,270 | $732,125.35 |
| 05/31/06 | 11/30/06 | $31,154,270 | $732,125.35 |
| 11/30/06 | 05/31/07 | $31,154,270 | $732,125.35 |
| 05/31/07 | 11/30/07 | $31,154,270 | $732,125.35 |
| 11/30/07 | 05/30/08 | $31,154,270 | $732,125.35 |
| 05/30/08 | 11/28/08 | $31,154,270 | $732,125.35 |
| 11/28/08 | 05/29/09 | $31,154,270 | $732,125.35 |
| 05/29/09 | 11/30/09 | $31,154,270 | $732,125.35 |
| 11/30/09 | 05/31/10 | $31,154,270 | $732,125.35 |
| 05/31/10 | 11/30/10 | $31,154,270 | $732,125.35 |
| 11/30/10 | 05/31/11 | $31,154,270 | $732,125.35 |
| 05/31/11 | 11/30/11 | $31,154,270 | $732,125.35 |
| 11/30/11 | 05/31/12 | $31,154,270 | $732,125.35 |
| 05/31/12 | 11/30/12 | $31,154,270 | $732,125.35 |
| 11/30/12 | 05/31/13 | $31,154,270 | $732,125.35 |
| 05/31/13 | 11/29/13 | $31,154,270 | $732,125.35 |
| 11/29/13 | 05/30/14 | $31,154,270 | $732,125.35 |
| 05/30/14 | 11/28/14 | $31,154,270 | $732,125.35 |
| 11/28/14 | 05/29/15 | $31,154,270 | $732,125.35 |
| 05/29/15 | 11/30/15 | $31,154,270 | $732,125.35 |
| 11/30/15 | 05/31/16 | $31,154,270 | $732,125.35 |
| 05/31/16 | 11/30/16 | $31,154,270 | $732,125.35 |
| 11/30/16 | 05/31/17 | $31,154,270 | $732,125.35 |
| 05/31/17 | 11/30/17 | $31,154,270 | $732,125.35 |
| 11/30/17 | 05/31/18 | $31,154,270 | $732,125.35 |

[*] If any Deposit Date or Bond Payment Date specified above is not a Business Day, such date will be the immediately succeeding Business Day; provided, however, that with respect to any date specified as a Bond Payment Date, the determination of whether such date is a Business Day shall be made without giving effect to clauses (c) and (d) of the definition of Business Day.

A-1

| Deposit Date* | Bond Payment Date* | Scheduled Reserve Amount | Interest Amount, based on 4.70% per annum, 30/360 day year |
|---|---|---|---|
| 05/31/18 | 11/30/18 | $31,154,270 | $732,125.35 |
| 11/30/18 | 05/31/19 | $31,154,270 | $732,125.35 |
| 05/31/19 | 11/29/19 | $31,154,270 | $732,125.35 |
| 11/29/19 | 05/29/20 | $31,154,270 | $732,125.35 |
| 05/29/20 | 11/30/20 | $31,154,270 | $732,125.35 |
| 11/30/20 | 05/31/21 | $31,154,270 | $732,125.35 |
| 05/31/21 | 11/30/21 | $31,154,270 | $732,125.35 |
| 11/30/21 | 05/31/22 | $31,154,270 | $732,125.35 |
| 05/31/22 | 11/30/22 | $31,154,270 | $732,125.35 |
| 11/30/22 | 05/31/23 | $31,154,270 | $732,125.35 |
| 05/31/23 | 11/30/23 | $31,154,270 | $732,125.35 |
| 11/30/23 | 05/31/24 | $31,154,270 | $732,125.35 |
| 05/31/24 | 11/29/24 | $31,154,270 | $732,125.35 |
| 11/29/24 | 05/30/25 | $31,154,270 | $732,125.35 |
| 05/30/25 | 11/28/25 | $31,154,270 | $732,125.35 |
| 11/28/25 | 05/29/26 | $31,154,270 | $732,125.35 |
| 05/29/26 | 11/30/26 | $31,154,270 | $732,125.35 |
| 11/30/26 | 05/31/27 | $31,154,270 | $732,125.35 |
| 05/31/27 | 11/30/27 | $31,154,270 | $732,125.35 |
| 11/30/27 | 05/31/28 | $31,154,270 | $732,125.35 |
| 05/31/28 | 11/30/28 | $31,154,270 | $732,125.35 |
| 11/30/28 | 05/31/29 | $31,154,270 | $732,125.35 |
| 05/31/29 | 11/30/29 | $31,154,270 | $732,125.35 |
| 11/30/29 | 05/31/30 | $31,154,270 | $732,125.35 |
| 05/31/30 | 11/29/30 | $31,154,270 | $732,125.35 |
| 11/29/30 | 05/30/31 | $31,154,270 | $732,125.35 |
| 05/30/31 | 11/28/31 | $31,154,270 | $732,125.35 |
| 11/28/31 | 05/31/32 | $31,154,270 | $732,125.35 |
| 05/31/32 | 11/30/32 | $31,154,270 | $732,125.35 |
| 11/30/32 | 05/31/33 | $31,154,270 | $732,125.35 |
| 05/31/33 | 11/30/33 | $31,154,270 | $732,125.35 |
| 11/30/33 | 05/31/34 | $31,154,270 | $732,125.35 |
| 05/31/34 | 11/30/34 | $31,154,270 | $732,125.35 |
| 11/30/34 | 05/31/35 | $31,154,270 | $732,125.35 |
| 05/31/35 | 11/30/35 | $31,154,270 | $732,125.35 |
| 11/30/35 | 05/30/36 | $31,154,270 | $732,125.35 |
| 05/30/36 | 11/28/36 | $31,154,270 | $732,125.35 |
| 11/28/36 | 05/29/37 | $31,154,270 | $732,125.35 |
| 05/29/37 | 11/30/37 | $31,154,270 | $732,125.35 |

A-2

| Deposit Date* | Bond Payment Date* | Scheduled Reserve Amount | Interest Amount, based on 4.70% per annum, 30/360 day year |
|---|---|---|---|
| 11/30/37 | 05/31/38 | $31,154,270 | $732,125.35 |
| 05/31/38 | 11/30/38 | $31,154,270 | $732,125.35 |
| 11/30/38 | 05/31/39 | $31,154,270 | $732,125.35 |
| 05/31/39 | 11/30/39 | $31,154,270 | $732,125.35 |
| 11/30/39 | 05/31/40 | $31,154,270 | $732,125.35 |
| 05/31/40 | 11/30/40 | $31,154,270 | $732,125.35 |
| 11/30/40 | 05/31/41 | $31,154,270 | $732,125.35 |

A-3

# *Amendment Agreement of 2003 Reserve Fund Agreement*

 **First Southwest Company**

Execution Copy
[2003 Bonds]

## AMENDMENT AGREEMENT

Amendment Agreement (this "Amendment Agreement") dated as of January 29, 2007 by and among U.S. BANK, NATIONAL ASSOCIATION (as successor to Wachovia Bank, National Association) (the "Prior Trustee"), TOBACCO SETTLEMENT FINANCING CORPORATION (the "Issuer"), THE BANK OF NEW YORK (the "Trustee") and LEHMAN BROTHERS SPECIAL FINANCING INC. ("Lehman").

WHEREAS, the Issuer has previously issued its Tobacco Settlement Asset Backed Bonds, Series 2003 (the "2003 Bonds") in the aggregate principal amount of $1,659,170,000 under an Indenture, dated as of March 1, 2003 (the "2003 Indenture"), between the Issuer and the Prior Trustee, in its capacity as successor trustee under the 2003 Indenture; and

WHEREAS, in connection with the issuance of the 2003 Bonds, Lehman, the Issuer and the Prior Trustee, in its capacity as successor trustee under the 2003 Indenture, entered into a Reserve Fund Agreement, dated as of March 7, 2003, as amended and supplemented from time to time (as amended and supplemented prior to the date hereof, the "Original Agreement" and as amended hereby, the "Agreement"); and

WHEREAS, the Issuer has determined to refund certain of its outstanding indebtedness by refunding the 2003 Bonds through the issuance of its $3,622,208,081.50 Tobacco Settlement Asset-Backed Bonds, Series 2007-1 (the "2007 Bonds"); and

WHEREAS, the 2007 Bonds were issued pursuant to a Trust Indenture, dated as of January 1, 2007 (the "2007 Indenture"), between the Issuer and the Trustee, as trustee; and

WHEREAS, in connection with the refunding of the 2003 Bonds, the Issuer and Lehman desire to amend the Original Agreement as hereinafter provided to cause the Original Agreement to remain in effect with respect to a portion of the Senior Liquidity Reserve Account established under the 2007 Indenture and to substitute the Trustee for the Prior Trustee as a party thereto; and

NOW, THEREFORE, in consideration of the foregoing and of the mutual covenants hereinafter set forth, the parties agree that the Original Agreement shall be and hereby is amended as follows:

1.    Amendments. The Trustee, the Issuer and Lehman hereby agree to amend the Original Agreement as follows.

(a)    Definitions.    Section 1.2 of the Original Agreement shall be amended by replacing the following definitions in their entirety as follows:

"Bonds" means the Issuer's $3,436,225,000.00 Tobacco Settlement Asset-Backed Bonds, Series 2007-1A Senior Current Interest Bonds.

"Business Day" means any day other than a Saturday, Sunday or day upon which commercial banks in the State or the State of New York are permitted or required to remain closed or a day on which the New York Stock Exchange or DTC is closed.

"Indenture" means the Trust Indenture, dated as of January 1, 2007, between the Issuer and the Trustee.

"Other Investment Agreements" means the Reserve Fund Agreement, dated as of January 29, 2007, by and among the Trustee, the Issuer and Lehman and the Debt Service Reserve Fund Agreement, dated as of August 28, 2002, as amended on January 25, 2007, by and among the Issuer, the Trustee, the Prior Trustee and Lehman.

"Purchase and Sale Agreement" means, collectively, the Purchase and Sale Agreement, dated as of August 1, 2002, by and between the Issuer and the State of New Jersey and the Purchase and Sale Agreement, dated as of March 1, 2003, by and between the Issuer and the State of New Jersey, each as amended, supplemented and in effect from time to time.

"Qualified Swap" means any Swap Contract (as defined in the Indenture) with respect to which the Issuer has obtained written confirmation (and provided to Lehman a copy of each such confirmation) from each Rating Agency (as defined in the Indenture) then rating the Bonds that the execution of such Swap will not adversely affect the rating on the Bonds assigned by each such Rating Agency or result in the withdrawal or suspension of such rating.

"Qualified Swap Payments" means regularly scheduled Senior Swap Payments (as defined in the Indenture) due in connection with any Qualified Swap and payable on parity with the Bonds and shall not include any amount due in connection with the early termination of any Qualified Swap.

"Reserve Fund" means the Senior Liquidity Reserve Account held by the Trustee pursuant to Section 5.01(e) of the 2007 Indenture.

(b)     All references in the Agreement to the "Debt Service Reserve Requirement" shall be deemed to be references to the "Senior Liquidity Reserve Requirement."

(c)     Section 3.2 is hereby amended by replacing the reference to "Section 4.06(i) of the Indenture" with a reference to "Section 5.04(h) of the Indenture."

(d)     Section 5.8(a) is hereby amended by replacing the references to "Sections 4.03, 4.04, 4.06, 5.01, 5.02, 5.03, 5.07, 5.08 and 5.09 of the Indenture" with references to "Sections 5.02, 5.04, 6.01, 6.02, 6.06, 6.07, 6.08. 6.09 and 6.10 of the Indenture."

(e)     Section 9.1(a) is hereby deleted in its entirety and replaced by the following:

"(a)     In order to secure the Issuer's timely and full performance of its obligations hereunder, the Issuer hereby pledges and grants to Lehman a

- 2 -

lien on and pledge of the Pledged Assets and the proceeds thereof, such
lien to be immediately subordinate to the lien of the Bondholders under the
Indenture and to be on parity with the lien securing payment under the
Other Investment Agreements. The Issuer represents to Lehman that this
Agreement constitutes an Ancillary Contract (as defined in the Indenture)
and that all payments due from the Issuer hereunder (including, without
limitation, any Termination Amount) constitute Termination Payments (as
defined in the Indenture)."

(f)     Section 10.5 is hereby deleted in its entirety and replaced by the following:

"Amendments, Changes and Modifications. This Agreement may be amended or
any of its terms modified only by a written document authorized, executed and
delivered by each of the parties hereto. The Issuer and the Trustee hereby agree
that any amendment to this Agreement shall conform to the requirements of
Section 6.09 of the Indenture and Section 7 of the Act. The Issuer shall notify
each Rating Agency (as defined in the Indenture) of any such amendment or
modification."

(g)     Section 10.1 is hereby amended to amend and replace the notice and payment
instructions with respect to Lehman in their entirety as follows:

Lehman Brothers Special Financing Inc.
745 Seventh Avenue, 5th Floor
New York, NY 10019
Attention:     Municipal Financial Products - Middle Office
Telephone:    212-526-2240
Fax:               646-758-2988

[WIRING INSTRUCTIONS]

JPMorgan Chase
ABA: 021000021
for the Account of Lehman Brothers Special Financing Inc.
Account No. 066 143 543

(h)     Section 10.1 is hereby amended to amend and replace the notice and payment
instructions with respect to the Trustee in their entirety as follows:

The Bank of New York
Corporate Trust
385 Rifle Camp Road, 3rd Floor
West Paterson, New Jersey 07424
Attention: Marie Ladolcetta/Frank Adinolfe
Telephone: 973-357-7827
Telecopy: 973-357-7840

- 3 -

**PTC ELEGIBLE SECURITIES**

BYORK / CUST / BERKELEY BK
ACCOUNT # 866305 TSF Senior Liquidity
ATTN:  Frank Adinolfe 973-357-7044

**FED ELIGIBLE SECURITIES**

BK OF NYC / ABA # 021000018
CUSTODY A/C # TAS 866305
ACCOUNT:  TSF Senior Liquidity
ATTN: Frank Adinolfe 973-357-7044

**DTC SECURITIES**

DTC # 901 / THE BANK OF NEW YORK
CUSTODY A/C #TAS866305 – TSF Senior Liquidity
RE: <u>Tobacco – Attn: F. Adinolfe 973-357-7044</u>

      (i)     Exhibit A to the Agreement is hereby deleted in its entirety and replaced by Exhibit A hereto.

      2.    <u>Novation.</u>  With effect from and including the date hereof and in consideration of the mutual representations, warranties and covenants contained in this Amendment Agreement and other good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged by each of the parties), the Prior Trustee is hereby released and discharged from any and all further obligations with respect to the Original Agreement and the Prior Trustee's respective rights against each of the other parties thereunder are cancelled hereby, provided that such release and discharge shall not affect any rights, liabilities or obligations of Lehman, the Prior Trustee or the Issuer with respect to payments or other obligations due and payable or due to be performed on or prior to the date hereof, and all such payments and obligations shall be paid or performed by the Issuer, Lehman or the Prior Trustee in accordance with the terms of the Original Agreement.

      In respect of the Agreement as amended hereby, the Issuer, Lehman and the Trustee each undertake the express obligations towards the other and acquire rights against each other as specified in the Agreement as amended hereby (and, for the avoidance of doubt, as if the Trustee were the Prior Trustee and with the Issuer remaining the Issuer and Lehman remaining Lehman, save for any rights, liabilities or obligations of Lehman, the Issuer or the Prior Trustee with respect to payments or other obligations due and payable or due to be performed on or prior to the date hereof).

      3.    <u>Transfer Direction to Prior Trustee</u>.  The Issuer hereby instructs the Prior Trustee to transfer the Eligible Securities held under the Original Agreement to the Trustee on the date hereof.

- 4 -

4.     <u>Fee Payment</u>. In connection with this Amendment Agreement, the Issuer shall pay to Lehman an amount equal to $232,720.89 on the date hereof.

5.     <u>Representations</u>. Each party represents to the other party that:

(a)     it is duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation;

(b)     it has the power to execute and deliver this Amendment Agreement and to perform its obligations under this Amendment Agreement and has taken all necessary action to authorize such execution, delivery and performance;

(c)     the person signing this Amendment Agreement on its behalf is duly authorized to do so;

(d)     it has obtained all governmental and other consents and authorizations that it is required to obtain in connection with its execution and delivery of this Amendment Agreement, all such consents and authorizations are in full force and effect and all conditions of any such consents and authorizations have been complied with;

(e)     the execution, delivery and performance of this Amendment Agreement will not violate or conflict with any law, ordinance, charter, by-law or rule applicable to it, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(f)     its obligations under this Amendment Agreement constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application, regardless of whether enforcement is sought in a proceeding in equity or at law);

(g)     it has made its own independent decision to enter into this Amendment Agreement based upon its own judgment and upon advice from such advisors as it has deemed necessary;

(h)     it is not relying on any communication (written or oral) of the other party as a recommendation to enter into this Amendment Agreement; it being understood that explanations related to the terms and conditions of this Amendment Agreement shall not be considered a recommendation to enter into this Amendment Agreement;

(i)     it is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms and conditions of this Amendment Agreement;

(j)     in the case of the Issuer and the Trustee, Lehman is not acting as a fiduciary for or as an advisor to it in respect of this Amendment Agreement; and

(k)     in the case of the Issuer and the Trustee no "event of default" or event which would with the passage of time or the giving of notice constitute an event of default has occurred and is continuing under the Indenture.

- 5 -

6.    <u>Agreement Ratified and Confirmed</u>.    Except as expressly amended by this Amendment Agreement, the Agreement is in all respects ratified and confirmed and the terms, provisions and conditions thereof are and shall remain in full force and effect. From and after the date hereof, all references to the Agreement shall mean the Agreement as amended by the terms hereof.

7.    <u>Governing Law</u>. This Amendment Agreement shall be governed by and construed in accordance with the laws of the State of New Jersey without giving effect to the conflict of law principles thereof.

8.    <u>Counterparts</u>.    This Amendment Agreement may be executed in counterparts, each of which shall be deemed an original.

9.    <u>Guarantee</u>.    The Guarantee of Lehman Brothers Holdings Inc. ("Holdings"), pursuant to which Holdings guaranteed the obligations of Lehman under the Original Agreement, remains in full force and effect with respect to the obligations of Lehman under the Agreement as amended hereby.

10.    <u>Effective Date</u>. This Amendment Agreement shall take effect on January 29, 2007.

- 6 -

IN WITNESS WHEREOF, the parties have executed this Amendment Agreement as of the date first above written.

U.S. BANK, NATIONAL ASSOCIATION, as Prior Trustee

By: _____
Name: FRANCESS BEAM
Title: VICE PRESIDENT

THE BANK OF NEW YORK, as Trustee

By: _____
Name:
Title:

TOBACCO SETTLEMENT FINANCING CORPORATION

By: _____
Name: Michellene Davis
Title:   Vice President

LEHMAN BROTHERS SPECIAL FINANCING INC.

By: _____
Name:   T. Courtney Jenkins
Title:   Vice President

- 7 -

NYK 1077767-5.071370.0011

IN WITNESS WHEREOF, the parties have executed this Amendment Agreement as of the date first above written.

U.S. BANK, NATIONAL ASSOCIATION, as Prior Trustee

By:_____
Name:
Title:

THE BANK OF NEW YORK, as Trustee

By:_____
Name:  Marie Ladolcetta
Title:   Assistant Vice President

TOBACCO SETTLEMENT FINANCING CORPORATION

By:_____
Name: Michellene Davis
Title:   Vice President

LEHMAN BROTHERS SPECIAL FINANCING INC.

By:_____
Name:   T. Courtney Jenkins
Title:   Vice President

- 7 -

NYK 1077767-4.071370.0011

IN WITNESS WHEREOF, the parties have executed this Amendment Agreement as of the date first above written.

U.S. BANK, NATIONAL ASSOCIATION, as Prior Trustee

By:_____
Name:
Title:

THE BANK OF NEW YORK, as Trustee

By:_____
Name:  Marie Ladolcetta
Title:  Assistant Vice President

TOBACCO SETTLEMENT FINANCING CORPORATION

By:_____
Name:  Michellene Davis
Title:  Vice President

LEHMAN BROTHERS SPECIAL FINANCING INC.

By:_____
Name:  T. Courtney Jenkins
Title:  Vice President

- 7 -

NYK 1077767-4.071370.0011

IN WITNESS WHEREOF, the parties have executed this Amendment Agreement as of the date first above written.

U.S. BANK, NATIONAL ASSOCIATION, as Prior Trustee

By:_____
Name:
Title:

THE BANK OF NEW YORK, as Trustee

By:_____
Name:
Title:

TOBACCO SETTLEMENT FINANCING CORPORATION

By:_____
Name: Michellene Davis
Title:   Vice President

LEHMAN BROTHERS SPECIAL FINANCING INC.

By: _____
Name:   T. Courtney Jenkins
Title:   Vice President

- 7 -

EXHIBIT A

| Deposit Date* | Bond Payment Date* | Scheduled Reserve Amount |
|---|---|---|
| 03/07/03 | 05/30/03 | $82,835,000 |
| 05/30/03 | 11/28/03 | $82,835,000 |
| 11/28/03 | 05/31/04 | $82,835,000 |
| 05/28/04 | 11/30/04 | $82,835,000 |
| 11/30/04 | 05/31/05 | $82,835,000 |
| 05/31/05 | 05/31/06 | $82,835,000 |
| 05/31/06 | 05/31/07 | $82,835,000 |
| 05/31/07 | 05/30/08 | $82,835,000 |
| 05/30/08 | 05/29/09 | $82,835,000 |
| 05/29/09 | 05/31/10 | $82,835,000 |
| 05/28/10 | 05/31/11 | $82,835,000 |
| 05/31/11 | 05/31/12 | $82,835,000 |
| 05/31/12 | 05/31/13 | $82,835,000 |
| 05/31/13 | 05/30/14 | $82,835,000 |
| 05/30/14 | 05/29/15 | $82,835,000 |
| 05/29/15 | 05/31/16 | $82,835,000 |
| 05/31/16 | 05/31/17 | $82,835,000 |
| 05/31/17 | 05/31/18 | $82,835,000 |
| 05/31/18 | 05/31/19 | $82,835,000 |
| 05/31/19 | 05/29/20 | $82,835,000 |
| 05/29/20 | 05/31/21 | $82,835,000 |
| 05/28/21 | 05/31/22 | $82,835,000 |
| 05/31/22 | 05/31/23 | $82,835,000 |
| 05/31/23 | 05/31/24 | $82,835,000 |
| 05/31/24 | 05/30/25 | $82,835,000 |
| 05/30/25 | 05/29/26 | $82,835,000 |
| 05/29/26 | 05/31/27 | $82,835,000 |
| 05/28/27 | 05/31/28 | $82,835,000 |
| 05/31/28 | 05/31/29 | $82,835,000 |
| 05/31/29 | 05/31/30 | $82,835,000 |
| 05/31/30 | 05/30/31 | $82,835,000 |
| 05/30/31 | 05/31/32 | $82,835,000 |
| 05/28/32 | 05/31/33 | $82,835,000 |
| 05/31/33 | 05/31/34 | $82,835,000 |

---

* If any Deposit Date or Bond Payment Date specified above is not a Business Day, such date will be the immediately preceding Business Day; provided, however, that with respect to any date specified as a Bond Payment Date, the determination of whether such date is a Business Day shall be made without giving effect to clauses (c) and (d) of the definition of Business Day.

A-1
NYK 1077767-5.071370.0011

| Deposit Date* | Bond Payment Date* | Scheduled Reserve Amount |
|---|---|---|
| 05/31/34 | 05/31/35 | $82,835,000 |
| 05/31/35 | 05/30/36 | $82,835,000 |
| 05/30/36 | 05/29/37 | $82,835,000 |
| 05/29/37 | 05/31/38 | $82,835,000 |
| 05/28/38 | 05/31/39 | $82,835,000 |
| 05/31/39 | 05/31/40 | $82,835,000 |
| 05/31/40 | 05/31/41 | $82,835,000 |

A-2

NYK 1077767-5.071370.0011

# *Legal Opinions*

 **First Southwest Company**

# Lowenstein
# Sandler
### ATTORNEYS AT LAW

January 29, 2007

Tobacco Settlement Financing Corporation
Trenton, NJ

The Bank of New York
West Paterson, New Jersey 07424

Attorney General
State of New Jersey
Trenton, New Jersey 08625

Bear, Stearns & Co.
New York, New York

> **Re:** **$3,436,225,000.00 Tobacco Settlement Asset-Backed Bonds, Series 2007-1A**
> **Senior Current Interest Bonds**

Ladies and Gentlemen:

We have acted as New Jersey counsel to Lehman Brothers Special Financing Inc. ("Lehman") in connection with the execution and delivery by Lehman of the (i) Reserve Fund Agreement dated as of January 25, 2007 by and among Lehman, Tobacco Settlement Financing Corporation (the "Issuer") and The Bank of New York, as Trustee (the "Trustee"), (ii) the Amendment Agreement dated as of January 25, 2007 (the "2002 Amendment Agreement") by and among U.S. Bank, National Association (as successor to Wachovia Bank, National Association) (the "Prior Trustee"), the Issuer, the Trustee and Lehman amending the Reserve Fund Agreement dated as of August 28, 2002 by and among the Prior Trustee, the Issuer and Lehman (the "2002 Reserve Fund Agreement"), and (iii) the Amendment Agreement dated as of January 25, 2007 (the "2003 Amendment Agreement," and together with the Reserve Fund Agreement, the 2002 Amendment Agreement and the 2003 Amendment Agreement, the "Agreements") by and among U.S. Bank, National Association (as successor to Wachovia Bank, National Association) (the "Prior Trustee"), the Issuer, the Trustee and Lehman amending the Reserve Fund Agreement dated as of March 7, 2003 by and among the Prior Trustee, the Issuer and Lehman (the "2003 Reserve

Tobacco Settlement Financing Corporation                                     January 29, 2007
The Bank of New York
Attorney General, State of New Jersey
Bear Stearns & Co.
Page 2

Fund Agreement"). Capitalized terms used herein and not defined herein have the respective meanings given to them in the Agreement.

In connection with the opinion expressed below, we have relied upon the opinions of counsel to Lehman, dated January 29, 2007. We have examined a copy of the Agreement executed by Lehman and such other matters as we have deemed necessary or appropriate as the basis for the opinion hereafter expressed.

Based upon and subject to the foregoing, but subject to the assumptions, exceptions, qualifications and limitations hereinafter expressed, we are of the opinion that the Agreement constitutes the legal, valid and binding obligation of Lehman, enforceable against Lehman in accordance with the laws of the State of New Jersey.

The opinion expressed herein is subject to the following assumptions, exceptions, qualifications and limitations:

1.      Our opinion is subject to the effect of any bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally (including, without limitation, the effect of statutory or other laws regarding fraudulent or other similar transfers) and general principles of equity, regardless of whether enforceability is considered in a proceeding in equity or at law.

2.      We express no opinion as to provisions of the Agreement specifying that amendments or waivers must be made in writing, to the extent of any subsequent oral agreement modifying the Agreement.

3.      We are admitted only to the Bar of the State of New Jersey. Accordingly, our opinion set forth above is expressed only insofar as the laws of the State of New Jersey may apply and we express no opinion as to the law of any other jurisdiction.

4.      This opinion is solely for your benefit. Neither this letter nor any opinion expressed herein may be relied upon by, nor may copies be delivered or disclosed to, any other person or entity without our prior consent, except that you may furnish copies hereof (i) to your independent auditors and attorneys, (ii) to any United States, state or local authority having jurisdiction over your or over Lehman, (iii) pursuant to the order or



Tobacco Settlement Financing Corporation                        January 29, 2007
The Bank of New York
Attorney General, State of New Jersey
Bear Stearns & Co.
Page 3

any legal process of any court of competent jurisdiction or any governmental agency, and
(iv) in connection with any legal action arising out of the Agreement.

5.      We undertake no obligation to update this letter for changes in laws, rules or
regulations, any or all of which may be amended with retroactive effect, or events or
circumstances occurring after the date of this letter.

6.      We have assumed, with your permission, (i) the genuineness of all signatures by
each party other than Lehman, (ii) the authenticity of documents submitted to us as
originals and the conformity to authentic original documents of all documents submitted
to us as copies, and (iii) the due execution and delivery, pursuant to due authorization, of
the Agreement by each party other than Lehman.

Notwithstanding anything to the contrary contained herein, the undersigned acknowledges that
this opinion is a government record under the Open Public Record Act, (N.J.S.A. 47:1A-1 et
seq.).

Very truly yours,

*Lowenstein Sandler PC*



# LEHMAN BROTHERS

January 29, 2007

Tobacco Settlement Financing Corporation
Trenton, NJ


The Bank of New York
West Paterson, NJ


Lowenstein Sandler PC
Roseland, NJ


Ladies and Gentlemen:

I have acted as counsel to Lehman Brothers Special Financing Inc., a Delaware corporation ("Lehman"), and am familiar with matters pertaining to the execution and delivery of (i) the Reserve Fund Agreement (the "Reserve Fund Agreement") dated as of January 25, 2007 by and among Lehman, Tobacco Settlement Financing Corporation (the "Issuer") and The Bank of New York, as Trustee (the "Trustee"), (ii) the Amendment Agreement dated as of January 25, 2007 (the "2002 Amendment Agreement") by and among U.S. Bank, National Association (as successor to Wachovia Bank, National Association) (the "Prior Trustee"), the Issuer, the Trustee and Lehman amending the Reserve Fund Agreement dated as of August 28, 2002 by and among the Prior Trustee, the Issuer and Lehman (the "2002 Reserve Fund Agreement"), and (iii) the Amendment Agreement dated as of January 25, 2007 (the "2003 Amendment Agreement," and together with the Reserve Fund Agreement, the 2002 Amendment Agreement and the 2003 Amendment Agreement, the "Agreements") by and among U.S. Bank, National Association (as successor to Wachovia Bank, National Association) (the "Prior Trustee"), the Issuer, the Trustee and Lehman amending the Reserve Fund Agreement dated as of March 7, 2003 by and among the Prior Trustee, the Issuer and Lehman (the "2003 Reserve Fund Agreement").

In connection with this opinion, I have examined, or have had examined on my behalf, an executed copies of the Agreements, certificates and statements of public officials and officers of Lehman and such other agreements, instruments, documents and records as I have deemed necessary or appropriate for the purposes of this opinion.

Except as expressly set forth herein, no independent investigation (including, without limitation, conducting any review, search or investigation of any public files, records or dockets) has been undertaken to determine the existence or absence of the facts that are material to my opinions, and no inference as to my knowledge concerning such facts should be made.

When used herein the phrase "to my knowledge" means to my actual knowledge without independent investigation.

References in this letter to "Applicable Laws" are to those laws, rules and regulations of the State of New York and the United States of America which, in my experience, are normally applicable to transactions of the type contemplated by the Agreements. References in this letter to "Governmental Authorities" are to executive, legislative, judicial, administrative or regulatory bodies of the State of New York and the United States of America. References in this letter to "Governmental Approval" are to any consent, approval, license, authorization or validation of, or filing, recording or registration with, any Governmental Authority pursuant to Applicable Laws.

Based on the foregoing but subject to the assumptions, exceptions, qualifications and limitations hereinafter expressed, I am of the opinion that:

1.    Lehman is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware.

2.    The execution, delivery and performance of the Agreements are within Lehman's corporate power, have been duly authorized by all corporate action and do not conflict with any provision of Lehman's certificate of incorporation or by-laws.

3.    The Agreements have been duly executed and delivered and each constitutes a legal, valid and binding obligation, enforceable against it in accordance with their respective terms.

4.    No Governmental Approval is required in connection with the execution, delivery and performance of the Agreements, except those that have been obtained and, to my knowledge, are in effect.

The foregoing opinions are subject to the following assumptions, exceptions, qualifications and limitations:

A.    My opinion in paragraph 3 above is subject to: (i) bankruptcy, insolvency, reorganization, receivership, moratorium or similar laws affecting creditors' rights generally (including, without limitation, the effect of statutory or other laws regarding fraudulent or other similar transfers or conveyances); (ii) general principles of equity, regardless of whether enforceability is considered in a proceeding in equity or at law; (iii) laws and considerations of public policy that may limit the enforceability of provisions (a) regarding indemnification and contribution rights and obligations, (b) regarding the waiver or limitation of rights to trial by jury, oral amendments to written agreements or rights of setoff, (c) relating to submission to jurisdiction, venue or service of process, and (d) purporting to prohibit or restrict, or require the consent of the "account debtor" (as defined in Section 9-102 of the Uniform Commercial Code as in effect in the State of New York (the "NYUCC" )) for, the creation, perfection or enforcement of a security interest in "accounts" or "general intangibles" (in each case, as defined in Section 9-102 of the NYUCC).

B.     I am a member of the Bar of the State of New York and render no opinion on the laws of any jurisdiction other than the laws of the State of New York and the General Corporation Law of the State of Delaware. Except as described, I have not examined, or had examined on my behalf, and I do not express any opinion with respect to, Delaware law.

C.     My opinions are limited to the present laws and to the facts as they presently exist, and no opinion is to be inferred or implied beyond the matters expressly so stated. I assume no obligation to revise or supplement this opinion should the present laws of the jurisdictions referred to in paragraph B above be changed by legislative action, judicial decision or otherwise.

D.     This letter is rendered solely to you solely for your benefit in connection with the Agreements and the transactions related thereto and may not be relied upon by any other person, entity or agency or by you in any other context or for any other purpose. This letter may not be circulated, used or quoted in whole or in part, nor may copies thereof be furnished or delivered to any other person, without the prior written consent of Lehman, except that you may furnish copies hereof (i) to your independent auditors and attorneys, (ii) to any United States, state or local authority having jurisdiction over you or over Lehman, (iii) pursuant to the order of any legal process of any court of competent jurisdiction or any governmental agency, and (iv) in connection with any legal action arising out of the Agreements.

E.     I have assumed with your permission (i) the genuineness of all signatures by each party other than Lehman, (ii) the authenticity of documents submitted to me as originals and the conformity to authentic original documents of all documents submitted to me as copies, (iii) the accuracy of the matters set forth in the documents, agreements and instruments I reviewed, (iv) that each party other than Lehman is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization, (v) the due execution and delivery, pursuant to due authorization, of the Agreements by each party other than Lehman, and (vi) that the Agreements are the legal, valid, binding and enforceable obligation of each party other than Lehman, enforceable against each such party in accordance with its terms.

F.     My opinion in paragraph 3 is subject to the qualification that certain provisions contained in the Agreements may not be enforceable, but such unenforceability will not render the Agreements invalid as a whole or substantially interfere with the practical realization of the principal benefits provided thereby.

The foregoing opinions are given on the express understanding that the undersigned is an officer of Lehman Brothers Inc. and shall in no event incur any personal liability in connection with the said opinions.

Very truly yours,

# LEHMAN BROTHERS

January 29, 2007

Tobacco Settlement Financing Corporation
Trenton, NJ

The Bank of New York
West Paterson, NJ

Ladies and Gentlemen:

I have acted as counsel to Lehman Brothers Holdings Inc., a Delaware corporation ("LBH"), and am familiar with matters pertaining to the execution and delivery of the guarantee of LBH (the "Guarantee") delivered in connection with the Reserve Fund Agreement (the "Agreement") dated as of January 25, 2007 by and among Lehman Brothers Special Financing Inc. ("LBSF"), Tobacco Settlement Financing Corporation (the "Issuer") and The Bank of New York, as Trustee (the "Trustee").

In connection with this opinion, I have examined, or have had examined on my behalf, an executed copies of the Guarantee, the Agreements, certificates and statements of public officials and officers of Lehman and such other agreements, instruments, documents and records as I have deemed necessary or appropriate for the purposes of this opinion.

Except as expressly set forth herein, no independent investigation (including, without limitation, conducting any review, search or investigation of any public files, records or dockets) has been undertaken to determine the existence or absence of the facts that are material to my opinions, and no inference as to my knowledge concerning such facts should be made.

When used herein the phrase "to my knowledge" means to my actual knowledge without independent investigation.

References in this letter to "Applicable Laws" are to those laws, rules and regulations of the State of New York and the United States of America which, in my experience, are normally applicable to transactions of the type contemplated by the Agreements. References in this letter to "Governmental Authorities" are to executive, legislative, judicial, administrative or regulatory bodies of the State of New York and the United States of America. References in this letter to "Governmental Approval" are to any consent, approval, license, authorization or validation of, or filing, recording or registration with, any Governmental Authority pursuant to Applicable Laws.

Based on the foregoing but subject to the assumptions, exceptions, qualifications and limitations hereinafter expressed, I am of the opinion that:

1.    LBH is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware.

2.     The execution, delivery and performance of the Guarantee are within LBH's corporate power, have been duly authorized by all corporate action and do not conflict with any provision of LBH's certificate of incorporation or by-laws.

3.     The Guarantee has been duly executed and delivered and each constitutes a legal, valid and binding obligation, enforceable against it in accordance with their respective terms.

4.     No Governmental Approval is required in connection with the execution, delivery and performance of the Guarantee, except those that have been obtained and, to my knowledge, are in effect.

The foregoing opinions are subject to the following assumptions, exceptions, qualifications and limitations:

A.     My opinion in paragraph 3 above is subject to: (i) bankruptcy, insolvency, reorganization, receivership, moratorium or similar laws affecting creditors' rights generally (including, without limitation, the effect of statutory or other laws regarding fraudulent or other similar transfers or conveyances); (ii) general principles of equity, regardless of whether enforceability is considered in a proceeding in equity or at law; (iii) laws and considerations of public policy that may limit the enforceability of provisions (a) regarding indemnification and contribution rights and obligations, (b) regarding the waiver or limitation of rights to trial by jury, oral amendments to written agreements or rights of setoff, (c) relating to submission to jurisdiction, venue or service of process, and (d) purporting to prohibit or restrict, or require the consent of the "account debtor" (as defined in Section 9-102 of the Uniform Commercial Code as in effect in the State of New York (the "NYUCC" )) for, the creation, perfection or enforcement of a security interest in "accounts" or "general intangibles" (in each case, as defined in Section 9-102 of the NYUCC).

B.     I am a member of the Bar of the State of New York and render no opinion on the laws of any jurisdiction other than the laws of the State of New York and the General Corporation Law of the State of Delaware. Except as described, I have not examined, or had examined on my behalf, and I do not express any opinion with respect to, Delaware law.

C.     My opinions are limited to the present laws and to the facts as they presently exist, and no opinion is to be inferred or implied beyond the matters expressly so stated. I assume no obligation to revise or supplement this opinion should the present laws of the jurisdictions referred to in paragraph B above be changed by legislative action, judicial decision or otherwise.

D.     This letter is rendered solely to you solely for your benefit in connection with the Guarantee and the transactions related thereto and may not be relied upon by any other person, entity or agency or by you in any other context or for any other purpose. This letter may not be circulated, used or quoted in whole or in part, nor may copies thereof be furnished or delivered to any other person, without the prior written consent of LBH, except that you may furnish copies hereof (i) to your independent auditors and attorneys, (ii) to any United States, state or local authority having jurisdiction over you or over LBH, (iii) pursuant to the order of any legal

process of any court of competent jurisdiction or any governmental agency, and (iv) in connection with any legal action arising out of the Guarantee.

E.      I have assumed with your permission (i) the genuineness of all signatures by each party other than Lehman, (ii) the authenticity of documents submitted to me as originals and the conformity to authentic original documents of all documents submitted to me as copies, (iii) the accuracy of the matters set forth in the documents, agreements and instruments I reviewed, (iv) that each party other than Lehman is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization, (v) the due execution and delivery, pursuant to due authorization, of the Agreements by each party other than Lehman, and (vi) that the Agreements are the legal, valid, binding and enforceable obligation of each party other than Lehman, enforceable against each such party in accordance with its terms.

F.      My opinion in paragraph 3 is subject to the qualification that certain provisions contained in the Guarantee may not be enforceable, but such unenforceability will not render the Guarantee invalid as a whole or substantially interfere with the practical realization of the principal benefits provided thereby.

The foregoing opinions are given on the express understanding that the undersigned is an officer of Lehman Brothers Inc. and shall in no event incur any personal liability in connection with the said opinions.

Very truly yours,

# VI

## Administrative Documents

 **First Southwest Company**

# INVOICE

**First Southwest Company**
Structured Products

Invoice #2464

ATTENTION:

Nancy Feldman / Mr. David Moore

Tobacco Settlement Financing Corporatio

P. O. Box 005

Trenton, New Jersey 08625

Phone:

---

*Billing Info:*

| | | | |
|---|---|---|---|
| Product Type: | Forward Purchase Agreement | Bid Date: | 1/26/2009 |
| Fund Type: | Termination | Settlement Date: | 1/26/2009 |
| | | Maturity Date: | 1/26/2009 |

---

*Relating To:*    **Tobacco Settlement Finance Corporation of New Jersey**

i3,622,208,082.00    Tobacco Settlement Asset-Backed Bonds, Series 2007-1

Comment:   Termination valuation rebid and analysis - 2007 Reserve Fund Agreement.

---

*Payment Info:*

Invoice Date:    01/26/2009

**Total Amount Due:**    **$4,000.00**

Please wire fee to:

JP Morgan Chase Bank, TX
1717 Main Street
Dallas, TX 75201
ABA 021-000-021
*Swift Address CHASUS33
FFC: First Southwest Company
Account# 1822155345

Ref 4247001

---

Sincerely,

David R Brayshaw            Michael J Marz

David Brayshaw            Michael J. Marz

---

# ⊟ First Southwest Company

*325 North St. Paul Steet • Suite 800 • Dallas, Texas 75201 • (214) 953-4040*

# INVOICE

### First Southwest Company
### Structured Products
### Invoice #2465

ATTENTION:

Ms. Nancy Feldman / Mr. David Moore

Tobacco Settlement Financing Corporatio

P. O. Box 005

Trenton, New Jersey 08625

Phone:

---

**Billing Info:**

| | | | | |
|---|---|---|---|---|
| Product Type: | Forward Purchase Agreement | | Bid Date: | 1/26/2009 |
| Fund Type: | Termination | | Settlement Date: | 1/26/2009 |
| | | | Maturity Date: | 1/26/2009 |

---

**Relating To:**   **Tobacco Settlement Finance Corporation of New Jersey**

3,622,208,082.00   Tobacco Settlement Asset-Backed Bonds, Series 2007-1

Comment:  Termination valuation rebid and analysis -  Amendment Agreement of 2002 Reserve Fund Agreement.

---

**Payment Info:**

Invoice Date:    01/26/2009

**Total Amount Due:**         **$4,000.00**

**Please wire fee to:**

JP Morgan Chase Bank, TX
1717 Main Street
Dallas, TX 75201
ABA 021-000-021
*Swift Address CHASUS33
FFC: First Southwest Company
Account#  1822155345

Ref 4247001

---

Sincerely,

*David R Brayshaw*          *Michael G Marz*

David Brayshaw          Michael J. Marz

---

## First Southwest Company

*325 North St. Paul Steet  • Suite 800 • Dallas, Texas 75201 • (214) 953-4040*

# INVOICE

First Southwest Company
Structured Products
Invoice #2466

ATTENTION:

Ms. Nancy Feldman / Mr. David Moore

Tobacco Settlement Financing Corporatio

P. O. Box 005

Trenton, New Jersey 08625

Phone:

---

**Billing Info:**

| | | | |
|---|---|---|---|
| Product Type: | Forward Purchase Agreement | Bid Date: | 1/26/2009 |
| Fund Type: | Termination | Settlement Date: | 1/26/2009 |
| | | Maturity Date: | 1/26/2009 |

---

**Relating To:**  **Tobacco Settlement Finance Corporation of New Jersey**

;3,622,208,082.00  Tobacco Settlement Asset-Backed Bonds, Series 2007-1

Comment:  Termination valuation rebid and analysis -  Amendment Agreement of 2003 Reserve Fund
Agreement.

---

**Payment Info:**

Invoice Date:  01/26/2009

**Total Amount Due:**            **$4,000.00**

**Please wire fee to:**

JP Morgan Chase Bank, TX
1717 Main Street
Dallas, TX 75201
ABA 021-000-021
*Swift Address CHASUS33
FFC: First Southwest Company
Account# 1822155345

Ref 4247001

---

Sincerely,

*David R Brayshaw*          *Michael G Marz*

David Brayshaw              Michael J. Marz

---

# ⊟ **First Southwest Company**

*325 North St. Paul Steet • Suite 800 • Dallas, Texas 75201 • (214) 953-4040*

# *VII*

## *Distribution List*

 **First Southwest Company**

# TOBACCO SETTLEMENT FINANCING CORPORATION
## TOBACCO SETTLEMENT ASSET-BACKED BONDS, SERIES 2007

### Termination of Forward Purchase Agreements
### Distribution List

**ISSUER**
Office of Public Finance
P.O. Box 005
50 West State Street, 5th Floor
Trenton, New Jersey 08625

Nancy Feldman
Director
Tel: 609-984-8229
Fax: 609-777-1987
Email: nancy.feldman@treas.state.nj.us

David Moore
Manager
Tel: 609-341-9304
Fax: 609-777-1987
Email: david.moore@treas.state.nj.us

**FINANCIAL ADVISOR**
First Southwest Company
250 W. 57th St., Suite 1420
New York, New York 10107

Steven J. Kantor
Managing Director
Tel: 212-642-4350
Fax: 212-642-4357
Email: skantor@firstsw.com

Angela Rodell
Senior Vice President
Tel: 212-642-4350
Fax: 212-642-4357
Email: arodell@firstsw.com

**BROKER**
First Southwest Company
325 North St. Paul Street, Suite 800
Dallas, Texas 75201

Mike Marz
Tel: 214-953-4020
Fax: 214-954-4339
Email: mmarz@firstsw.com

Karen Ramey
Analyst
Tel: 214-953-4020
Fax: 214-954-4339
Email: kramey@firstsw.com