WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Robert J. Lemons

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | Case No. 08-13555 (JMP) |
| Debtors. | (Jointly Administered) |

## OBJECTION TO CAISSE DES DÉPÔTS ET CONSIGNATIONS' SECOND MOTION FOR ENTRY OF AN ORDER TO PERMIT A LATE-FILED PROOF OF CLAIM

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Special Financing Inc. ("LBSF") and Lehman Brothers

Holdings Inc. ("LBHI"), as Plan Administrator (the "Plan Administrator") under the Modified

Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated

Debtors (the "Plan"),[1] respectfully submit this response in opposition (the "Objection") to the

second motion, dated August 2, 2013, of Caisse des Dépôts et Consignations ("CDC") for an

order permitting CDC to file a late proof of claim pursuant to Bankruptcy Rule 9006(b)(1), and

respectfully represent as follows:

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

## **Preliminary Statement**

1.      On June 23, 2011, CDC sought authority to file a late claim pursuant to Federal Rule of Bankruptcy Procedure (the "Bankruptcy Rules") 9006(b)(1) (the "First Motion").[2]  The First Motion came nearly two years after the deadline for filing proofs of claim against any of the Debtors in these chapter 11 cases (the "Bar Date"), notice of which was served by the Debtors at three separate CDC locations, and more than one year after CDC learned that it had failed to file claims before the Bar Date.  At a hearing on February 23, 2012 (the "Hearing"), the Court denied the First Motion "without prejudice to further presentations that may be made by CDC concerning its internal processes."  Feb. 23, 2012 Hr'g Tr. at 74:4-5 [ECF No. 25803] (the "February Hearing Transcript").[3]  The Court observed that if CDC could "demonstrate why it is that years went by and they did nothing about a claim they now think is significant," CDC may be able to show good cause for allowing CDC to file its proof of claim.  *Id*. at 74:23-24.[4]

2.      On August 2, 2013, a year and a half after the Court Denied the First Motion, CDC filed its *Second Motion for Entry of an Order to Permit a Late-Filed Proof of Claim* (the "Motion").  [ECF No. 39240].  The Motion merely recites the same argument and substantially the same facts relied upon by the First Motion: that CDC's rights under the Due Process Clause of the Fifth Amendment were violated, despite the fact that it received actual notice of the Bar Date in the manner expressly approved in the Bar Date Order (as defined herein), at three separate locations, and that CDC should be permitted to file a late claim because its nearly two year delay in filing its claim is the result of excusable neglect.  CDC has not

---

[2] The First Motion is attached hereto as Exhibit 1.

[3] A copy of the February Hearing Transcript is attached hereto as Exhibit 2.

[4] The Court entered a written order denying CDC's First Motion on March 2, 2012.  [ECF No. 25992].

US_ACTIVE:\44319619\6\58399.0011

introduced new evidence or otherwise carried its burden to show either that it did not receive
actual notice of the Bar Date or that its failure to file timely its claim is the result of excusable
neglect.  CDC also failed to explain why, after the Court denied the First Motion, it waited a year
and a half to file the instant Motion.  Accordingly, the Plan Administrator respectfully requests
that the Court deny the Motion with prejudice.

### Jurisdiction

3.    This Court has subject matter jurisdiction to consider and determine this
matter pursuant to 28 U.S.C. § 1334 and section 14.1 of the Plan.  This is a core proceeding
pursuant to 28 U.S.C. § 157(b).

### Background

**I.    The Chapter 11 Cases**

4.    On September 15, 2008 and periodically thereafter, the Debtors
commenced with this Court voluntary cases under the Bankruptcy Code.  The chapter 11 cases
have been consolidated for procedural purposes only and are being jointly administered pursuant
to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure.

5.    Lehman Brothers Special Financing Inc. ("LBSF") included an executory
contract with CDC on Schedule G of its amended schedules of assets and liabilities (the
"Schedules"), which contract was described in the Schedules as a "Derivatives Master Account."
[ECF No. 3921].  The Schedules set forth the following address for CDC with respect to such
executory contract: Caisse des Dépôts et Consignations, 56 rue de Lille, 75356 Paris, Cedex 07,
France (the "Scheduled Address").  CDC never filed or communicated any request pursuant to
Bankruptcy Rule 2002(g)(1) designating a mailing address other than the Scheduled Address,
despite having been listed on the Debtors' Schedules since June 15, 2009.  [ECF No. 3921].

US_ACTIVE:\44319619\6\58399.0011

6.      By order dated July 2, 2009 (the "Bar Date Order"), the Court established

(a) September 22, 2009 at 5:00 p.m. as the Bar Date[5] and (b) October 22, 2009 at 5:00 p.m. as

the deadline for the filing of Derivative Questionnaires and Guarantee Questionnaires (each as

defined in the Bar Date Order) against the Debtors in these chapter 11 cases.  [ECF No. 4271 at

2, 7-8].   The Bar Date Order stated that service of the Bar Date Notice "shall be deemed good,

adequate, and sufficient notice if it is served by deposit in the United States mail, first class

postage prepaid, on or before July 8 2009 upon . . . all known holders of claims listed on the

Schedules at the addresses stated therein."  *Id.* at 10.  The Bar Date Order further stated that any

holder of a claim against the Debtors that fails to file a proof of claim in accordance with the Bar

Date Order would "forever be barred, estopped, and enjoined from asserting such claim against

the Debtors (or filing a Proof of Claim with respect thereto) . . . ."  *Id.*  at 9-10.

7.      In addition to providing the Bar Date Notice by mail to all parties known

to the Debtors as having potential claims against the Debtors' estates, the Bar Date Notice was

published in The New York Times (International Edition), The Wall Street Journal (International

Edition), and The Financial Times.

8.      On July 8, 2009, the Debtors provided actual notice of the deadline to file

proofs of claim (the "Bar Date Notice") to, *inter alia*, CDC by first class mail at the Scheduled

Address.  *See* Corrected Aff. of Service of Herb Baer (the "Baer Affidavit") [ECF No. 9395].

The Debtors also delivered the Bar Date Notice to CDC at two additional addresses, one in New

York and another in Paris.  *Id.*  Each envelope in which the Bar Date Notice was delivered had

written on it a notification that legal documents were enclosed, and a request to direct the Bar

Date Notice to the attention of the Addressee, Legal Department or President.  *See* First Mot.,

---

[5] A separate bar date of November 2, 2009 was established for claims based upon Lehman Program Securities (as
defined in the Bar Date Order).

Ex. E.  However, CDC's mailroom personnel (who CDC alleges do not speak or read English)

marked the Bar Date Notice that was sent to the Scheduled Address as undeliverable and

returned it to the Debtors' claims and noticing agent.  *Id.* Ex. 1 ¶ 19; Mot. ¶¶ 36-40.  CDC did

not even open the envelope containing the Bar Date Notice, much less make *any* effort to

determine to whom to route it within CDC.  Mot. ¶¶ 2, 35-39.  Additionally, CDC received and

did not return the additional two Bar Date Notices sent by the Debtors.  *See* Feb. Hr'g Tr. at

62:4-63:23.

    9.    On December 6, 2011, the Court approved and entered an order

confirming the Plan [ECF No. 23023].  The Plan became effective on March 6, 2012.

## II.    CDC's Claim

    10.    LBSF and CDC entered into that certain 1992 International Swaps and

Derivatives Association ("ISDA") Master Agreement dated as of July 29, 1994 (the 1992 ISDA

Master Agreement and schedule thereto collectively referred to as, the "Master Agreement").[6]

The Master Agreement, which is written entirely in English, is governed by New York law.

Master Agreement Part 4(h).  LBHI acted as credit support provider for the payment obligations

of LBSF under the Master Agreement.  Section 12(a) of the Master Agreement stated that any

"notice or other communication in respect of this Agreement may be given in any manner set

forth below . . . to the address . . . (see the Schedule) and will be deemed effective," in the case

of notice by certified or registered mail, "on the date that mail is delivered or its delivery is

attempted." Master Agreement § 12(a)(iv).  Part 4(a) of the Schedule to the Master Agreement

stated that notices or communications, for the purpose of Section 12(a), should be sent to the

following address:

---

[6] A copy of the Master Agreement is attached as Exhibit A to the First Motion.

US_ACTIVE:\44319619\6\58399.0011

Caisse des Dépôts et Consignations, 56 rue de Lille – 75356 Paris
Cedex 07 – France

Part 4(a) additionally stated that notices should be sent to the attention of "Service FMP 20/Back Office Monétaire." Nothing in the Master Agreement indicated that mail sent to the specified address without being directed specifically to the attention of "Service FMP 20/Back Office Monétaire" would not even be opened by CDC.

11.    On September 19, 2008, through a letter written in English, CDC purported to designate an Early Termination Date under the Master Agreement based on the commencement of LBHI's chapter 11 case.  On September 29, 2008, through another letter written entirely in English, CDC sent LBSF notice of the amount allegedly due to CDC by LBSF on such Early Termination Date.[7]  CDC asserts that it is owed an amount not less than $3,077,434 million under the Master Agreement (the "Claim").

## III.    The First Motion

12.    CDC filed the First Motion on June 23, 2011.  *See* First Mot.  CDC claimed it had not received actual notice of the Bar Date because, despite the fact that the Bar Date Notice was sent to the correct address, it was not directed to the attention of "Service FMP 20/Back Office Monétaire" and was accordingly returned to the Debtors by CDC's own mailroom, allegedly because few CDC employees speak English.  Feb. Hr'g Tr. at 64:4-5, 65:10-13; Mot. ¶ 36 n.9.  CDC additionally argued that it should be permitted to file its Claim because its failure timely to do so was a result of excusable neglect.  The Debtors objected to the First Motion.  [ECF No. 19314].

---

[7] A copy of CDC's termination notice and calculation statement is attached as Exhibit A and B, respectively, to the accompanying declaration of Michael Ferraro.

US_ACTIVE:\44319619\6\58399.0011

13.     The Court denied the First Motion at the Hearing.  In denying the First

Motion, the Court expressed concern regarding CDC's "general statement that [it] needed notice

at a particular address in order to function."  Feb. Hr'g Tr. at 74:7-8.  Because the Court had not

been presented with any evidence regarding the way CDC "processes mail . . . who is

responsible for [the Master Agreement], what that individual did or didn't do in connection with

monitoring the [Master Agreement] after termination, what if anything was done by that

individual to pay attention to the bankruptcy, [or] to consult with bankruptcy counsel," the Court

stated that the First Motion would be denied without prejudice to being re-argued if and "when it

may be possible to demonstrate good cause."  Feb. Hr'g Tr. at 74-75.

## Argument

14.     At the Hearing, the Court clearly stated that, if CDC could show how

under the facts and circumstances of its case its failure timely to file a proof of claim was a result

of excusable neglect, it might be able successfully to re-argue its First Motion.  The Motion

currently before the Court, however, is a duplication of the arguments this Court already

rejected, and provides no additional evidence to support the arguments made therein.  In fact, the

Motion does not even address a number of the question raised by the Court at the Hearing, such

as what efforts, if any, the individuals responsible for the Master Agreement made to monitor the

Master Agreement or pay attention to the chapter 11 cases after CDC terminated the Master

Agreement.  *See* Feb. Hr'g Tr. at 74:9-18.  Accordingly, CDC has failed to carry its burden to

show either that it did not receive actual notice of the Bar Date, or that its failure timely to file a

proof of claim is the result of excusable neglect.[8]

---

[8] To the extent not expressly made in this Objection, all arguments advanced in the Debtors' Objection to the First
Motion are incorporated herein.  [ECF No.19314].

## I.    CDC Received Actual Notice of the Bar Date at Three Addresses

15.    The Bar Date Order expressly stated that service of the Bar Date Notice in the manner described therein "shall be deemed good, adequate, and sufficient notice."  Bar Date Order at 10.  In accordance with the Bar Date Order, the Debtors served the Bar Date Notice on CDC at the Scheduled Address, as well as two additional addresses.  CDC argues, however, that such service was constitutionally deficient because the Bar Date Notice sent to the Scheduled Address was not sent to the attention of "Service FMP 20/Back Office Monétaire."  CDC is mistaken.  First, the Debtors provided CDC with actual notice of the Bar Date that did not deprive CDC of its due process rights.  Second, the Court expressly approved the manner of notice employed by the Debtors to provide CDC with actual notice of the Bar Date.  Third, the alleged inability of CDC's employees to read English does not invalidate the Bar Date Notices delivered to CDC.

16.    "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice, reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).  Additionally, Bankruptcy Rule 2002(g)(2) provides that when notice is served on a creditor by mail and that creditor has not filed a request designating a mailing address, then notice shall be mailed "to the address shown on the list of creditors or schedule of liabilities, whichever is filed later."  FED. R. BANKR. P. 2002(g)(2).

17.    The Bar Date Notice provided CDC with actual notice as required by the Due Process Clause of the Fifth Amendment.  There is no requirement "that one identify the specific division of a company on a bankruptcy notice.  Nor is it required by due process.  Once

delivered, it is the responsibility of the creditor to distribute the notice to the appropriate party within its organization." *Nat'l Union Fire Ins. Co. of Pittsburgh v. Broadhead*, 155 B.R. 856, 858-89 (S.D.N.Y. 1993) (citing *In re Drexel Burnham Lambert Grp. Inc.*, 129 B.R. 22, 24 (S.D.N.Y. 1991)).  In *Broadhead*, the defendant filed for bankruptcy and listed the plaintiff on its list of creditors, but failed to specify to whose attention notices should be sent—a clear violation of the contract giving rise to the plaintiff's claim.  The defendant obtained a discharge, and the plaintiff commenced a separate action seeking damages under the contract.  The court expressly held that the notice sent to the plaintiff complied with the Bankruptcy Code and with due process.  155 B.R. at 858-59.[9]  *See also Dependable Ins. Co. v. Horton (In re Horton)*, 149 B.R. 49, 59-60 (Bankr. S.D.N.Y. 1992) (notice complied with due process where it was sent to correct PO Box, but omitted the street address, and despite the fact that it allegedly did not enable the creditor's "mailroom personnel to determine to whom the [n]otice should have been forwarded").[10]

18.    CDC's argument that the Debtors' failure to send the Bar Date Notice to the attention "Service FMP 20/Back Office Monétaire" is the same argument that was rejected by this Court, and it is the same argument that was rejected by the courts in *Broadhead* and

---

[9] Because the notice did not comply with the "unambigious[]" requirements of the notice provision of the contract at issue, the court gave the plaintiff the opportunity to show that it its debt was either nondischargeable or that it could have affected the defendant's bankruptcy proceeding to its advantage, notwithstanding the discharge.  *Id.* at 859. The facts of this case are materially different.  First, the plaintiff in *Broadhead* denied that it had received "*any* notice." *Id.* at 857.  Here, CDC *actually received* all three notices sent to it, but returned the notice sent to the Scheduled Address.  Further, the Bar Date Order specifically approved the manner in which the Bar Date Notice was provided to CDC.  Bar Date Order at 10.  In *Broadhead*, there was no such order.

[10] *National Union Fire Insurance Co. of Pittsburgh v. Main (In re Main)*, 111 B.R. 535, 538 (Bankr. W.D. Pa. 1990), relied upon by CDC in the Motion, is factually distinguishable.  *See* Mot. ¶¶ 62-66.  There, the clerk of the court sent the plaintiff only one notice of the bankruptcy petition to the correct address, but failed to direct the notice to a particular department.  Further, there was no evidence that any notice was ever received.  *Id.*  Further, there was no court order in place specifically approving the notice that was sent by the clerk, as there is in this case.  Last, there was specific evidence of the size, magnitude, and complexity of operations of the plaintiff, which evidence is notably lacking in this case.  *Id.* at 539.

*Horton*.  Further, it is uncontested that CDC received the Bar Date Notice at the Scheduled

Address, as required by the Bar Date Order, and at two additional addresses.  CDC admits that it

did not even open the envelope containing the Bar Date Notice or make any effort to route it

within CDC.  Mot. ¶¶ 35-40.  Nevertheless, CDC insists that due process required the Bar Date

Notice sent to the Scheduled Address to be directed to "Service FMP 20/Back Office

Monétaire."  CDC's arguments are unsupported by applicable law, and should be rejected by this

Court for the second time.

19.    Second, the Bar Date Order unambiguously stated that service of the Bar

Date Notice by "deposit in the United States mail, first class postage prepaid, on or before July 8,

2009" at the Scheduled Address would be "good, adequate, and sufficient notice."  Bar Date

Order at 10.  On July 8, 2009, the Debtors served CDC with the Bar Date Notice at the

Scheduled Address, as required by the Bar Date Order, as well as at two different addresses.

[ECF No. 4349].  The Debtors complied, to the letter, with the directives of the Bar Date Order;

CDC's argument that the Master Agreement's notice provision supersedes the requirements to

comport with the requirements of due process, the requirements of the Bankruptcy Code, and the

requirements of Bar Date Order are unavailing.

20.    Last, CDC's reliance on the argument that its employees' alleged general

inability to speak or read English justifies the fact that it never attempted to direct the Bar Date

Notice sent to the Scheduled Address to the proper department must fail.  *See* Mot. ¶¶ 36, 39.

CDC's the conclusory assertion that "very few CDC employees speak English" is belied by the

fact that the Master Agreement is written entirely in English, and that all correspondence with

respect to the Master Agreement was in English, including CDC's own letters purporting to

terminate the Master Agreement and to notify LBHI of the amount CDC believes it is owed.  *Id.*

¶ 36 n.9; Ferraro Decl. Exs. A & B. Additionally, CDC agreed that the Master Agreement should be governed by the laws of New York State, an English speaking jurisdiction. Now, four years after the Bar Date, CDC should not be permitted to use bare assertions of language barrier as justification for its own failure to open, much less route properly, one of the three Bar Date Notices it actually received.

## II.    CDC's Neglect to File Timely a Proof of Claim Is Not Excusable

21.    LBHI commenced its chapter 11 case on September 15, 2008. CDC purported to designate an Early Termination Date under the Master Agreement based on the commencement of LBHI's chapter 11 case on September 19, 2008. On October 3, 2008, LBSF commenced its chapter 11 case. On July 8, 2009, the Debtors provided CDC with actual notice of the Bar Date at three separate addresses. The Bar Date passed on September 22, 2009.

22.    Almost two years later—and more than one year after CDC was aware that it missed the Bar Date—CDC filed the First Motion. Nearly a year and a half after the Court denied the First Motion, CDC filed this Motion. Without offering any new evidence other than a few statements relating to CDC's internal organization and inefficiencies—and without addressing many of the issues the Court found lacking in the First Motion—CDC asks this Court to find that its failure timely to file a proof of claim is the result of excusable neglect. The Plan Administrator submits that nothing has been added to the First Motion that could support a finding of excusable neglect, and respectfully requests that the Court deny the Motion.

23.    Determining whether neglect of a deadline is excusable is an equitable determination that requires consideration of all relevant circumstances surrounding the failure to file a claim on time, including "the danger of prejudice to the debtor, the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was

11

within the reasonable control of the movant, and whether the movant acted in good faith."

*Pioneer Inv. Serv. Co. v. Brunswick Assocs. L.P.*, 507 U.S. 380, 395 (1993). In applying this

test, the Second Circuit focuses on the third Pioneer factor—the reason for the delay in filing,

including whether the cause of such delay was within the reasonable control of the movant—as

the most critical. *Midland Cogeneration Venture Ltd. P'ship v. Enron Corp. (In re Enron Corp.)*,

419 F.3d 115, 122-24 (2d Cir. 2005). Further, "[t]he burden of proving excusable neglect lies

with the late-claimant." *Id.* at 121.

     a.   **CDC Has Provided No Evidence to**
             **Support an Extraordinary Four-Year Delay**

     24.     As this Court has previously noted, the primary reason for the delay relied

upon by CDC is its own internal inability to process mail.[11] However, sophisticated institutions

like CDC "bear[] responsibility for having systems in place to ensure that legal notice and other

communications reach appropriate personnel." *Drexel Burnham*, 129 B.R. at 25. CDC bears

responsibility for its inability to route mail properly, and this Court should not allow CDC to

deflect its responsibility for failing to file its proof of claim on time onto the Debtors. CDC's

internal mail processing, and its decision to reject receipt of the Bar Date notice at one location

and ignore it at two other locations, is a factor that is entirely within CDC's control that cannot

ground a finding of excusable neglect.

     25.     CDC also argues that it did not learn that the Bar Date passed until May

2010. Mot. ¶ 102. Even if this were true (which it is not, because CDC had actual and

constructive notice for all the reasons articulated above), this argument only serves to undermine

CDC's argument that its delay was not within its reasonable control, as a year of unexplained

---

[11] *See* Feb. Hr'g Tr. at 74:6-18 (THE COURT: ". . . This appears to be a situation of complete and absolute neglect and inexcusable inefficiency.").

US_ACTIVE:\44319619\6\58399.0011

delay elapsed before CDC filed the First Motion.  Accordingly, to the extent that this Court does

not hold CDC accountable for its inefficient mailroom procedures, and notwithstanding the fact

that CDC actually received notice at three locations, CDC has not shown why its delay between

May 2010 and June 23, 2011 was not entirely within its control.  And now, CDC has provided no

excuse for why it took more than a year and a half to file the Motion, which contains only a

handful of arguably new factual assertions, none of which support CDC's argument that its

failure timely to file a proof of claim is the result of excusable neglect, and does not even address

all of the issues raised by the Court at the Hearing.

26.     This Court denied the First Motion without prejudice so that CDC could

have an opportunity to present evidence relating to its internal processes.  Feb. Hr'g Tr. at 74:4-

5.  The Motion currently before the Court does nothing to cure the defects noted by the Court at

the Hearing.  Rather, it only highlights the fact that CDC's neglect was not excusable at all.

Accordingly, the Plan Administrator respectfully submits that CDC has not carried its burden to

show that the reason for CDC's delay suggests that CDC's neglect of the Bar Date is excusable.

b.     The Length of CDC's Delay Is Inexcusably Long

27.     CDC first sought authority to file a late claim one year and nine months

after the Bar Date.  CDC states in its Motion that it learned that the Bar Date passed some time

prior to May 2010.  Mot. ¶ 102.  CDC further states that it sought the assistance of its current

counsel in January 2011.  Mot. ¶ 113.  These mere representations of counsel only serve to

demonstrate the inexcusable nature of CDC's delay: they establish that CDC waited more than

one year after purportedly learning that the Bar Date passed, and more than five months after

contacting its current counsel, to seek authority to file a late claim.  CDC waited an additional

13

year and a half after the denial of its First Motion to file the instant Motion.  CDC's cumulative

delay of nearly four years in seeking authority to file a late claim is simply too long.

28.    CDC suggests that its delay between the denial of the First Motion and the

filing of the instant Motion may be attributed to its conducting an "investigation to properly

respond to this Court's inquiries."  Mot. ¶ 114.  Notwithstanding the fact that CDC has not

submitted any evidence to support this assertion, the Plan Administrator respectfully submits that

CDC's professed excuse is not reasonable given the length of the delay at issue and the paltry

supplementation to the First Motion's factual assertions.

c.    Granting CDC's Motion Would Cause
Substantial Prejudice to the Plan Administrator

29.    Determining whether the Plan Administrator will be prejudiced by

allowing claimants to file claims after the bar date involves consideration of more than the single

claim at issue, but "the impact of permitting exceptions that risk opening the floodgates."  Feb.

Hr'g Tr. at 73:22-23.  Here, CDC neglected to file a proof of claim notwithstanding the fact that

it received the Bar Date Notice at three separate addresses.  Allowing CDC to file a proof of

claim, four years after the Bar Date, risks opening the floodgates for all other similarly situated

parties—*i.e.* parties that indefensibly ignored the Bar Date that now wish to file proofs of claim.

The arguments advanced by CDC through its Motion ignore this consideration entirely.

Accordingly, the Plan Administrator submits that CDC cannot carry its burden to show

excusable neglect.

d.    Good Faith

30.    The Debtors have no evidence that CDC acted in bad faith when it filed

the Motion.  This factor typically weighs in favor of the party moving to file a late claim and

does not outweigh the other *Pioneer* factors that weigh in the Plan Administrator's favor,

particularly whether the reason for the delay was within the control of the moving party,

discussed above, which the Second Circuit has deemed to be the most critical in the determining

of whether a movant's neglect is excusable. *See Enron*, 419 F.3d at 122-23.  Accordingly, the

Motion should be denied.

### Conclusion

31.    CDC received the Bar Date Notice at three separate addresses well in

advance of the Bar Date, yet failed to even open the Bar Date Notice or file a claim prior to the

Bar Date, and waited approximately two years after the Bar Date to request the Court's

permission to file a late claim, and waited almost another year and a half to file a new motion

requesting authorization to file a late claim.  CDC argues now, as it did nearly a year and a half

ago, that the Master Agreement's notice provision enlarges CDC's rights under the Due Process

Clause of the Fifth Amendment, and that its lengthy delay was entirely due to the fact that one of

the three Bar Date Notices that the Debtors sent CDC was not sent to the attention of a specific

department.  Briefly, the Motion currently before the Court corrects none of the infirmities that

doomed the First Motion, and should be denied for the reasons stated herein, and for the same

reasons stated by the Court at the Hearing, but with prejudice this time so that that Plan

Administrator need not waste more funds of the estates' creditors responding to additional

motions by CDC.

### Reservation of Rights

32.    In the event that the Court determines to grant the relief requested in the

Motion, the Plan Administrator reserves all of its rights to object to the validity and amount of

any claims that may be filed by CDC.

33.     The Plan Administrator reserves the right to conduct discovery as to the

matters raised in the Motion and to supplement this filing as a result thereof.

**WHEREFORE** the Plan Administrator respectfully requests the Court deny the

Motion with prejudice and grant such other and further relief as is just and proper.

Dated:   September 19, 2013
         New York, New York


/s/ Robert J. Lemons
Robert J. Lemons

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

US_ACTIVE:\44319619\6\58399.0011

# <u>Exhibit 1</u>

**SILVERMANACAMPORA LLP**
Counsel to Caisse des Dépôts et Consignations,
100 Jericho Quadrangle, Suite 300
Jericho, New York 11753
(516) 479-6300
Ronald J. Friedman
Jay S. Hellman
Brett S. Silverman

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
In re                                                          Chapter 11

LEHMAN BROTHERS HOLDING INC., *et al.*          Case No. 08-13555 (JMP)

                                    Debtors.          (Jointly Administered)
------------------------------------------------------------------X

### CAISSE DES DÉPÔTS ET CONSIGNATIONS' MOTION FOR ENTRY OF AN ORDER TO PERMIT A LATE-FILED CLAIM PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 9006(b)(1)

Caisse des Dépôts et Consignations ("CDC"), by and through its undersigned counsel, seeks the entry of an order to permit a late-filed claim against Lehman Brothers Special Financing Inc. ("LBSF," and together with its jointly administered co-debtors, "Lehman" or the "Debtors") in accordance with due process under the United States Constitution and Federal Rule of Bankruptcy Procedure 9006(b)(1), with such claim being deemed timely filed (the "Motion"), and respectfully represents as follows:

### PRELIMINARY STATEMENT

1.      By this motion, CDC respectfully requests that this Court enter an Order extending CDC's time to file a proof of claim and Questionnaires, based upon excusable neglect, pursuant to Bankruptcy Rule 9006(b)(1).

2.      This motion seeks to correct the due process violation that would occur if the Debtors were permitted to discharge the claim of a known creditor who did not receive notice of the Bar Date or Questionnaire Deadlines.  CDC holds a claim against LBSF in the amount of $3,077,434.00 (€ 2,101,500), plus accrued interest, costs and expenses (the "Claim"), arising

out of a certain ISDA Master Agreement (the "Master Agreement") between CDC and LBSF. [1]

3.      LBSF was undeniably aware of the Claim since it listed CDC as a party to an unexpired executory contract on Schedule "G" of its petition with reference to "Derivative Master Account Number 080494CDDC".   Despite the fact that this information was readily ascertainable, LBSF's noticing agent, Epiq Bankruptcy Solutions, LLC ("Epiq"), did not send the Bar Date Notice (defined below) to the precise address specifically required by in the Master Agreement.[2]  Consequently, the Bar Date Notice was returned to Epiq marked "undeliverable." Inexplicably, Epiq did not make any further attempts to provide CDC with the Bar Date Notice and, consequently, CDC never filed a proof of claim.

4.      One of the key principals of bankruptcy is that known creditors be provided with actual notice of important dates and deadlines so that they can participate in the reorganization process and guard against the unjustified discharge of their claims.  This Motion is made to prevent the injustice that would result from allowing the Debtors to escape liability under the Claim, despite their failure to properly serve CDC with the Bar Date Notice.

5.      Under the circumstances, CDC respectfully requests that this Court enter the annexed, proposed order permitting CDC to file a proof of claim pursuant to Federal Rule of Bankruptcy Procedure 9006(b)(1), and that upon such filing, the proof of claim shall be deemed timely filed.

## **BACKGROUND**

6.      CDC is a public institution with special status under the French Parliament's

---

[1] The amount was calculated by multiplying the value of the Claim in Euros, before accrued interest, costs and expenses, based upon the exchange rate as of September 25, 2008, the Early Termination Date of the Master Agreement, designated in a letter from CDC noticing LBSF of the default under the Master Agreement, which rate was then $1.4643987649 per € 1.00.

[2] As more fully set forth herein, CDC is a large institution with numerous offices spread throughout France, and more than ten (10) offices in Paris alone.  Furthermore, CDC employs more than 73,000 people and receives more than 1,000 pieces of mail per day.  Understandably, and on account of the very departmentalized nature of CDC, notification processes, such as the notice required in the Master Agreement, are set up specifically designed to remedy notice issues that plague this very large entity.

060177/873093.3/BSS

supervision and guarantee.[3]

7.    CDC was formed in 1816 for the purpose of safeguarding funds (during various financial crises and while the French State faced a significant war debt) including the pension funds and retirement accounts of France's civil servants. Thereafter, in the same spirit of confidence and security, many other missions of public interest have been entrusted to CDC.

8.    On July 29, 1994, CDC and LBSF entered into the Master Agreement, which was to govern certain future transactions by and between CDC and LBSF.  (A copy of the Master Agreement is annexed as Exhibit "A" to the Declaration of Olivier Ritz dated May 31, 2011 (the "Ritz Declaration"), which has been annexed hereto as **Exhibit "1"**.)

9.    In connection with the Master Agreement, LBSF also executed a Guarantee of Lehman Brothers Holdings Inc. ("Guarantee") and a Master Pledge Agreement ("Pledge Agreement"), dated November 4, 1994, whereby LBSF is the "Pledgor" to CDC as "Pledgee." (Copies of the Guarantee and the Pledge Agreement have been annexed to the Ritz Declaration as Exhibits "B" and "C" respectively.)

10.    CDC and its subsidiaries employ approximately 73,500 people and manage 48 different pension programs for French workers.  CDC is a large institution with numerous offices spread throughout France, including numerous office locations within the city of Paris.  CDC averages more than 1,000 pieces of mail per day.

11.    Due to the massive size and the expansive, non-contiguous layout of CDC's offices throughout Paris, CDC always includes *specific* noticing provisions in all of its contracts and transactional documents which, if not adhered to, can cause notice to go undelivered to its intended party.

12.    The Master Agreement was no exception.  CDC included a specific noticing

---

[3] CDC is a public-law institution and, together with its subsidiaries, they form a group of public interests, dedicated to the economic development of France.  CDC is placed under the supervision of the French Parliament pursuant to article L. 518-2 of the French Monetary and Financial Code.

060177/873093.3/BSS

provision to ensure that any notifications were delivered to the proper departments.  Such a specific noticing provision was included in Part 4(a) of the Schedule ("Schedule") to the Master Agreement, which requires that all communications to CDC in connection with the Master Agreement be directed to:

> Caisse des Dépôts et Consignations
> 56 rue de Lille
> 75356 Paris Cedex-France
> **Attention:  Service FMP 20/Back Office Monétaire**[4]

13.    On September 15, 2008, Lehman Brothers Holdings Inc. ("LBHI") and certain of its subsidiaries filed voluntary petitions for relief under chapter 11 of title 11, United States Code (the "Bankruptcy Code").  LBSF filed a voluntary petition under chapter 11 of the Bankruptcy Code on October 3, 2008.

14.    Pursuant to section 5(a)(vii) of the Master Agreement, it is an event of default if a party to the agreement "institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof." In addition, the bankruptcy of LBHI (as "Credit Support Provider" of LBSF under the provisions of Section 5(a)(vi) of the Master Agreement) is a "Cross Default" under the Master

---

[4] Section 13(c) of the Master Agreement contains noticing procedures for direct disputes between the parties to the Master Agreement and for any business transacted through CDC Capital, Inc. ("CDC Capital").  CDC Capital was an entity through which the CDC transacted certain business. In or about 2007, however, CDC sold all of its interests in CDC Capital.

  Although CDC Capital was no longer affiliated with CDC at the time of the bankruptcy filing, the Bar Date Notice was apparently sent in any event to CDC Capital. Serving CDC Capital, however, was improper under the terms of the Master Agreement, because no business relating to the Claim was conducted through CDC Capital and the Bar Date does not constitute a "dispute" between the parties to the Master Agreement.

060177/873093.3/BSS

Agreement. Upon an event of default (including a "Cross Default"), the Master Agreement provides that "the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions."

15.     On September 19, 2008, CDC sent LBSF notice of its default under the Master Agreement as a result of the bankruptcy filing of LBHI, an affiliate of LBSF, and designated September 25, 2008, as the Early Termination Date for all outstanding transactions. LBSF received the letter on September 24, 2008.

16.     On September 29, 2008, CDC sent LBSF notice of the amount due on the Early Termination Date, which notice was received by LBSF on October 1, 2008.

17.     Pursuant to CDC's rights upon termination of the Master Agreement, the Claim was calculated pursuant to Section 6(d)(ii) of the Master Agreement, which is the principal balance of $3,023,035.26 (€2,101,500), together with interest accrued thereon from and including the Early Termination Date to the date of payment at the Applicable Rate.[5]

18.     CDC is a known creditor of LBSF because the Master Agreement is listed on Schedule "G" of the Debtors' chapter 11 petitions as an unexpired executory derivative contract with reference to Master Derivative Account Number 080494CDDC.  (A copy of the Debtors' Schedule "G" is annexed to the Ritz Declaration as Exhibit "D".)

19.     By Order dated July 2, 2009, this Court established September 22, 2009 (the "Bar Date") as the deadline for filing proofs of claims based upon pre-petition claims against the Debtors (the "Bar Date Order").  In addition to the official proof of claim form, the Order also required the submission by October 22, 2009 of a Derivative Questionnaire for claims based on

---

[5] Pursuant to Section 14 of the Master Agreement, the "Applicable Rate" for this purpose is the "Default Rate", which is CDC's cost of funds plus 1% per annum.  From the Early Termination Date to the date of the notice, CDC's cost of funds was 4.50% and, therefore, the Applicable Rate during such period was 4.285% per annum plus 21.5 basis points. CDC reserved its right to apply a different cost of funds for the purpose of calculating the Applicable Rate from the date of the notice.

060177/873093.3/BSS

derivative contracts and a Guarantee Questionnaire (collectively "Questionnaires") for claims based on a guarantee (the "Questionnaire Deadline").

20.    On March 15, 2010 the Debtors filed a Joint Chapter 11 Plan (the "Plan") and Disclosure Statement and, on April 14, 2010, the Debtors filed a revised version of the Plan.

21.    On May 5, 2010, CDC received an e-mail from LBHI estate's director, Mr. Dermot Doyle, purporting to have authority to settle CDC's claim against LBSF and asking if CDC submitted a proof of claim.  On May 10, 2010, CDC telephoned Mr. Doyle to tell him that it seemed to be that, so far, no proof of claim had been filed and to ask him if any notice had been sent to CDC to inform CDC of the necessity of such proof of claim filing.  Mr. Doyle answered that he would get in touch with the LBHI estate's lawyers.

22.    After conducting an internal investigation, CDC discovered that the Bar Date had passed and contacted LBSF, who provided CDC with a color scan of an unopened envelope which allegedly contained the Bar Date Notice, which was errantly addressed as follows:

> CAISSE DES DEPOTS ET CONSIGN ATIONS [SIC]
> 56 RUE DE LILLE
> 75356 PARIS
> CEDEX 07
> FRANCE

(A copy of the returned envelope holding the Bar Date Notice is annexed to the Ritz Declaration as Exhibit "E".)

23.    As mentioned above, despite being mailed to the proper street  address, the Bar Date Notice was not **specifically** addressed to **Service FMP 20/Back Office Monétaire**, as required by the Master Agreement.  As a result, because the Bar Date Notice could not be routed to the correct personnel at CDC, it was marked to be returned to the sender as undeliverable.  Accordingly, CDC was not aware of the Bar Date, and thus, CDC did not file a proof of claim.

24.    Although CDC had a general understanding that the Debtors had filed for bankruptcy protection, CDC never received notice of the Bar Date Order because such notice

060177/873093.3/BSS

was improperly addressed by Epiq, causing the notice to be returned as undeliverable.

25.    As a result of CDC's justified reliance on the notice provisions in the Master Agreement, as well as its unfamiliarity with bankruptcy proceedings in the United States, CDC was not aware that it did not receive notice of the critical Bar Date, nor was it aware that it should have received such notice.

26.    Although CDC is a large institution, it does very little business within the United States or with entities based in the United States.

27.    CDC does business almost exclusively in the French language.  Very few CDC employees speak English.  In fact, by French law n° 94-665 dated August 4, 1994, relating to the use of French language ("relative à l'emploi de la langue française") all contracts to which CDC is a party must be written in French unless certain exceptions are met.

28.    Consequently, CDC has virtually no familiarity with the bankruptcy laws and procedures in the United States.

29.    CDC is a massive, complex organization with numerous offices distributed throughout France and it is comprised of countless discrete entities and departments.  In Paris alone, CDC occupies more than approximately ten buildings distributed over a large geographical area, each of them accommodating many departments.  As mentioned above, the average mail volume is more than 1,000 pieces per day.  Moreover, CDC's mail and other parcels are delivered to a central location.  Once received, the mail is then routed to the proper departments, in the various locations throughout France.  If the mail is not addressed properly, which includes specifying the relevant department or personnel to receive the mail, such mail is returned to sender as undeliverable.  Accordingly, it is **essential** that mail be addressed to the proper department and personnel within CDC so that it can be delivered accurately.  Therefore, CDC necessarily includes very specific noticing provisions in all of its contracts, such as section 12(a) of the Master Agreement and 4(a) of the Schedule thereto.

30.    Because the Bar Date Notice was not properly directed to the attention of

060177/873093.3/BSS

"**Service FMP 20/Back Office Monétaire**," the CDC mail department that received the envelope could not determine how to properly route it and, therefore, refused delivery.

31.    Although Epiq received the returned mail it appears that, no further attempt was made to verify CDC's address or to attempt to resend the Bar Date Notice.

32.    After conducting an internal investigation once Mr. Doyle raised the Bar Date issues, CDC contacted American counsel to gain an understanding of the situation.

33.    After discussions with American counsel and continued investigations into the facts that caused CDC to miss the Bar Date, CDC retained American counsel to file the instant Motion.

34.    This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157(a) and 1334, as well as the Standing Order of Reference from the United States District Court for the Southern District of New York signed by Acting Chief Judge Robert J. Ward dated July 10, 1984.  This motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicate for the relief requested herein is Bankruptcy Rule 9006(b)(1).

## REQUESTED RELIEF

35.    By this motion, CDC respectfully requests that this Court enter an order extending CDC's time to file a proof of claim and Questionnaires pursuant to Bankruptcy Rule 9006(b)(1), and deem such claim as timely filed.

CDC's Claim Should Not Be Time Barred
Because It Did Not Receive Notice Of The Bar Date

36.    CDC should be permitted to file a late claim due to the Debtors' failure to provide proper notice of the Bar Date as required by the Master Agreement.

37.    Due Process mandates that a known creditor receive actual notice of a bar date before its claim can be discharged in a debtor's bankruptcy.  *In re Enron Corp.*, No. 01-16034 (AJG), 2003 Bankr. LEXIS 2110 (Bankr. S.D.N.Y. July 30, 2003) (allowing late-filed proof of claim for excusable neglect despite finding that creditor received notice of the bar date); *In re*

*Thomson McKinnon Sec., Inc.* 159 B.R. 146 (Bankr. S.D.N.Y. 1993) (allowing a creditor to file a

proof of claim more than two and one-half years after the bar date where the creditor did not

receive actual notice of the bar date); *In re Waterman S.S. Corp.*, 157 B.R. 220, 222 (Bankr.

S.D.N.Y.) (holding that "[w]hen the bar date was sent out, all . . . known to be actual or potential

claimants . . . were entitled to actual personal notice."); *Adam Glass Svc., Inc. v. Federated*

*Dep't. Stores*, 173 B.R. 840 (E.D.N.Y. 1994) (holding that claim of unscheduled creditor who did

not receive notice of the bar date and did not file a proof of claim was not discharged by debtor's

confirmed plan, despite the creditor's knowledge of the pending bankruptcy).    "The statutory

command for notice embodies a basic principle of justice—that a reasonable opportunity to be

heard must precede judicial denial of a party's claimed rights."  *City of New York v. New York,*

*New Haven & Hartford R.R. Co.*, 344 U.S. 293, 297 (1953).

38.    Furthermore, "[a]ctual knowledge of the filing of a bankruptcy petition does not

negate the statutory notice requirements nor does it place a duty on creditors to inquire

regarding time limitations for filing claims."  *In re Spring Valley Farms, Inc.,* 85 B.R. 593, 595

(N.D. Ala. 1988) (emphasis added) (*citing New York, New Haven & Hartford R.R. Co.,* 344 U.S.

at 297); *Adam Glass Svc., Inc. v. Federated Dep't. Stores*, 173 B.R. at 843 ; *In re Joseph B.*

*Dahlkeyer Co., Inc.*, 170 B.R. 853, 861 (Bankr. W.D. Pa. 1994); *In re Uiterwyk Corp.*, 105 B.R.

103, 105 (Bankr. M.D. Fla.).  Thus "claims of creditors who were known to debtor and who had

actual knowledge of the chapter 11 proceeding, but who did not receive the required notice of

the bar date, [are] not discharged upon plan confirmation."  *In re Joseph B. Dahlkeyer Co., Inc.,*

170 B.R. at 861.

39.    Court's have held that, where an address is slightly incorrect, no presumption of

receipt can arise unless "there is sufficient evidence from which to presume that the addressee

nonetheless received the incorrectly addressed notice."  *In re Randbre Corp.*, 66 B.R. 482, 486

(Bankr. S.D.N.Y. 1986) (permitting vacatur of an order expunging a creditor's claim where the

address on the notice for the motion to expunge was mailed contained an extra zero).  Here, the

060177/873093.3/BSS

address was more than slightly incorrect; it completely omitted the routing information that was specified under the Master Agreement and critical to delivery within CDC-a large, public institution. Furthermore, even assuming, *arguendo*, that the Bar Date Notice was only slightly mis-addressed, no presumption of receipt can arise because there is conclusive evidence that CDC never received it, because the Bar Date Notice could not be routed by CDC's mail department. *See* Ritz Declaration.

40.     Here, there is no doubt that CDC was a known creditor of LBSF who did not receive notice of the Bar Date before its expiration. Thus, it would be contrary to fundamental notions of fairness and due process to disallow CDC's claim without an opportunity to participate in the reorganization process. Furthermore, despite CDC's knowledge of the Lehman bankruptcy filing generally, it had no duty to independently inquire about the claims Bar Date and was legally justified in relying on the Debtors' obligation to provide notice thereof.

41.     In *In re Joseph B. Dahlkemper Co.*, *supra*, a creditor did not receive notice of the bar date because the debtor listed the address of its predecessor-in-interest on the schedules and mailed notice of the bar date to that address. *Dahlkemper*, 170 B.R. at 856-57. After the creditor was granted leave to file a proof of claim, the Debtor objected to the claim on several grounds, including that it was time-barred. *Id.* at 858. In addressing the timeliness argument, the court noted that the claims of known creditors in chapter 11 cases could not be discharged unless the creditor had received actual notice of the bar date. *Id.* at 861. However, rather than except this claim from the debtor's discharge, the court held that "no portion of [the creditor's] proof of claim [was] time-barred." *Id.*

42.     Similarly, in *In re Uiterwyk Corp.*, 105 B.R. 103 (Bankr. M.D. Fla. 1989), creditors of the debtor were neither listed on the debtor's schedules nor sent actual notice of the bankruptcy filing or the bar date. Despite the debtor's allegations that the creditors were well aware of the bankruptcy, the court explained "it is clear that under controlling case law, the concept of due process compels the conclusion that even if a creditor is aware of the pendency

10

of a bankruptcy case, it is entitled to receive notice of the bar date to file proof of claims." *Id.* at

105.  Thus, the court concluded that:

> the [creditors] were clearly entitled to be given formal notice of
> these proceedings, especially the bar date fixed by the Court.  For
> this reason, they should be allowed to file their proof of claim and
> to deny their right to file a proof of claim would be denial of due
> process to which they are entitled.

*Id.* (citations omitted).

43.    Here, as in *Dahlkemper* and *Uiterwyk*, CDC was a known creditor of LBSF who

did not receive notice of the Bar Date.  Despite LBSF's knowledge that the Bar Date Notice

mailed to CDC was returned as undeliverable, no further attempt was made to provide the

notice that due process mandates.  Consequently, CDC respectfully requests that it be

permitted to file a proof of claim and that its proof of claim be deemed timely filed.

CDC Should Be Granted An Extension Of Time
To File A Proof Of Claim For Excusable Neglect

44.    In the alternative, CDC respectfully submits that the time for CDC to file a proof

of claim should be enlarged pursuant to Rule 9006(b)(1) because its failure to timely file a proof

of claim was the result of excusable neglect.

45.    Rule 9006(b)(1) empowers the court, in its discretion, to extend a deadline

"where the failure to act was the result of excusable neglect."  Fed. R. Bankr. P. 9006(b).  The

United States Supreme Court has construed the phrase "excusable neglect" as used in Rule

9006 and concluded that "Congress plainly contemplated that the courts would be permitted,

where appropriate, to accept late filings caused by inadvertence, mistake, or carelessness, as

well as by intervening circumstances beyond the party's control."  *Pioneer Inv. Servs. Co. v.*

*Brunswick Assocs. Ltd. Partnership*, 507 U.S. 380, 388 (1993).  The Court added that "what

sorts of neglect will be considered 'excusable,' . . . is at bottom an equitable [determination],

taking account of all relevant circumstances surrounding the party's omission."  *Id.* at 395.

Some relevant factors (but by no means exclusive) include "[1] the danger of prejudice to the

debtor, [2] the length of the delay and its potential impact on judicial proceedings, [3] the reason

060177/873093.3/BSS

for the delay, including whether it was within the reasonable control of the movant, and [4] whether the movant acted in good faith." *Id.* at 395.

46.      Not all factors, however, need favor the moving party. *In re Enron Corp.*, No. 01-16034 (AJG), 2003 Bankr. LEXIS 2110, at *11 (Bankr. S.D.N.Y. 2003).    "[N]o single circumstance controls, nor is a court to simply proceed down a checklist ticking off traits. Instead, courts are to look for a synergy of several factors that conspire to push the analysis one way or the other." *Id.* at *12 (quotation and citation omitted).

<u>Reason For The Delay</u>

47.      This Motion is critically distinguishable from those addressed in the Court's Opinion of May 20, 2010, in that none of the claimants addressed in this Court's Opinion contested actual notice of the Bar Date, a point this Court recognized. *In re Lehman Brothers Holdings Inc.*, 433 B.R. at 119, 122, 127 n.31.  CDC's sole reason for missing the Bar Date is a lack of notice.  Additionally, CDC's status as a foreign creditor with no familiarity with American bankruptcy laws or procedures further excuses any delay because CDC did not have the background to know of or to investigate the Bar Date.  CDC respectfully submits that because it did not receive actual notice of the Bar Date — the first factor of the *Pioneer* analysis weighs overwhelmingly in its favor.

48.      Furthermore, in the two prior instances when this Court has granted motions to file proofs of claim after the Bar Date, the Court found that the "delay was the result of justifiable confusion over the application of the bar date to their particular claims." *Lehman*, 433 B.R. at 127.  CDC respectfully submits that, if confusion over application of the bar dates constitutes excusable neglect, then complete lack of notice of the Bar Date must also form a sufficient basis for excusable neglect.

<u>Prejudice To The Estates</u>

49.      There is no danger that granting this Motion would prejudice the Debtors' estates.  As explained herein, this Motion presents exceptionally narrow circumstances where a

060177/873093.3/BSS

known creditor did not receive actual notice of the Bar Date due to an improperly addressed notice. The Debtors were on actual notice of CDC's claim, as evidenced by the fact that LBSF listed CDC on it's Schedule "G" of unexpired, executory derivatives contracts. There is no danger that granting the relief sought herein will open the floodgates to other similarly situated creditors. It is significant that, as the Court previously observed, of the seven motions addressed in its May 20, 2010 Opinion and the two addressed prior thereto, not one of the nine movants alleged an actual lack of notice. *In re Lehman Brothers Holdings Inc.*, 433 B.R. at 122, 127 n.31 (Bankr. S.D.N.Y. 2010). The dearth of similar motions in these cases of unprecedented size and complexity empirically demonstrates the *de minimis* risk that granting CDC permission to file a late proof of claim under these exceptional circumstances would cause prejudice to the Debtors. Consequently, CDC respectfully submits that the lack of prejudice to the Debtors compels a finding of excusable neglect.

The Length Of The Delay

50.    There is no bright-line rule governing what length of delay should be considered too long. *Id.* at 121. Thus, "the lateness of a claim must be considered in the context of the proceedings as a whole." *Id.* (quotation and citation omitted). The present case presents very little risk of disruption or delay of the bankruptcy proceeding. Indeed, LBSF had actual knowledge of the Claim in the scheme of this reorganization, in which $899 billion of aggregate liquidated claims has been filed. Thus, although the Debtors have filed a plan, allowing CDC's claim does not threaten to derail the reorganization or complicate administration of the estates. Consequently, CDC respectfully submits that the length of the delay in filing its claim is a non-issue.

Good Faith

51.    CDC has at all times acted in good faith. Upon discovering the lack of notice of the Bar Date, CDC undertook to investigate the reasons therefore, to evaluate its options, and to correct the error that occurred as a result of the improper mailing of the Bar Date Notice.

060177/873093.3/BSS

Consequently, CDC respectfully submits that its good faith compels a finding of excusable neglect.

## NOTICE

52.    Notice of this Motion has been provided pursuant to the Amended Order Implementing Certain Notice and Case Management Procedures entered in this proceeding [Docket No. 2837].

53.    No prior request for the relief sought in this Motion has been made by CDC to this or any other Court.

## CONCLUSION

**WHEREFORE,** CDC respectfully requests that this Court: (i) enter the proposed order attached hereto as **Exhibit "2"** granting the relief sought herein, and (ii) grant such other and further relief as the Court may deem just and proper.

Dated: Jericho, New York
      June 23, 2011

**SILVERMANACAMPORA LLP**
Counsel to Caisse des Dépôts et
Consignations,

By: s/ Jay S. Hellman
      Ronald J. Friedman
      Jay S. Hellman
      Brett S. Silverman
100 Jericho Quadrangle, Suite 300
Jericho, New York 11753
(516) 479-6300

14

# Exhibit A

(Multicurrency—Cross Border)

# ISDA.

International Swap Dealers Association, Inc.

# MASTER AGREEMENT

dated as of ....July..29,...1994

|  ("Party A")  |  ("Party B")  |
|---|---|
| Caisse des Depots et Consignations | Lehman Brothers Special Financing, |

......................................................... and ...........................................................................

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:—

1.    **Interpretation**

(a)    *Definitions.* The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)    *Inconsistency.* In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

(c)    *Single Agreement.* All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

2.    **Obligations**

(a)    *General Conditions.*

(i)    Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)    Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii)    Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright © 1992 by International Swap D.

17/01/2006  15:48    0158500413                                    BACK OTC CHANGE                    PAGE  02/

(b)    *Change of Account.* Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    *Netting.* If on any date amounts would otherwise be payable:—

(i)    in the same currency; and

(ii)    in respect of the same Transa-

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)    *Deduction or Withholding for Tax.*

(i)    *Gross-Up.* All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

(1)    promptly notify the other party ("Y") of such requirement;

(2)    pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

(3)    promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

(4)    if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

(A)    the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

(B)    the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

ISDA® 1992

17/01/2006    15:48        0158500413

(ii) *Liability.* If:—

(1) X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2) X does not so deduct or withhold; and

(3) a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)      *Default Interest; Other Amounts.* Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

3.      **Representations**

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:—

(a)      *Basic Representations.*

(i)      *Status.* It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii)      *Powers.* It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

(iii)      *No Violation or Conflict.* Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv)      *Consents.* All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v)      *Obligations Binding.* Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(b)      *Absence of Certain Events.* No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)      *Absence of Litigation.* There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)      *Accuracy of Specified Information.* All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete every material respect.

(e)      *Payer Tax Representation.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)      *Payee Tax Representations.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

4.      Agreements

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)      *Furnish Specified Information.* It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:—

(i)      any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

(ii)      any other documents specified in the Schedule or any Confirmation; and

(iii)      upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)      *Maintain Authorisations.* It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)      *Comply with Laws.* It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)      *Tax Agreement.* It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)      *Payment of Stamp Tax.* Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

ISDA® 1992

organised, managed and controlled, or considered to have its seat, or in which a branch or office through
which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify
the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's
execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp
Tax Jurisdiction with respect to the other party.

5.    **Events of Default and Termination Events**

(a)    *Events of Default.* The occurrence at any time with respect to a party or, if applicable, any Credit
Support Provider of such party or any Specified Entity of such party of any of the following events constitutes
an event of default (an "Event of Default") with respect to such party:—

(i)    *Failure to Pay or Deliver.* Failure by the party to make, when due, any payment under this
Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not
remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii)    *Breach of Agreement.* Failure by the party to comply with or perform any agreement or
obligation (other than an obligation to make any payment under this Agreement or delivery under
Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation
under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance
with this Agreement if such failure is not remedied on or before the thirtieth day after notice of
such failure is given to the party;

(iii)    *Credit Support Default.*

(1)    Failure by the party or any Credit Support Provider of such party to comply with or
perform any agreement or obligation to be complied with or performed by it in accordance
with any Credit Support Document if such failure is continuing after any applicable grace
period has elapsed;

(2)    the expiration or termination of such Credit Support Document or the failing or ceasing
of such Credit Support Document to be in full force and effect for the purpose of this Agreement
(in either case other than in accordance with its terms) prior to the satisfaction of all obligations
of such party under each Transaction to which such Credit Support Document relates without
the written consent of the other party; or

(3)    the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in
whole or in part, or challenges the validity of, such Credit Support Document;

(iv)    *Misrepresentation.* A representation (other than a representation under Section 3(e) or (f))
made or repeated or deemed to have been made or repeated by the party or any Credit Support
Provider of such party in this Agreement or any Credit Support Document proves to have been
incorrect or misleading in any material respect when made or repeated or deemed to have been made
or repeated;

(v)    *Default under Specified Transaction.* The party, any Credit Support Provider of such party or
any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after
giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an
acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults,
after giving effect to any applicable notice requirement or grace period, in making any payment or
delivery due on the last payment, delivery or exchange date of, or any payment on early termination
of, a Specified Transaction (or such default continues for at least three Local Business Days if there
is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or
rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity
appointed or empowered to operate it or act on its behalf);

(vi)    *Cross Default.* If "Cross Default" is specified in the Schedule as applying to the party, the
occurrence or existence of (1) a default, event of default or other similar condition or event (however

described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount and such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) *Bankruptcy*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:—

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption*. The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer:—

(1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)    *Termination Events*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

ISDA® 1992

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

    (i)   *Illegality.* Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party):—

        (1)   to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

        (2)   to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

    (ii)   *Tax Event.* Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

    (iii)   *Tax Event Upon Merger.* The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

    (iv)   *Credit Event Upon Merger.* If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

    (v)   *Additional Termination Event.* If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)    *Event of Default and Illegality.* If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an event of Default.

6.   **Early Termination**

(a)   *Right to Terminate Following Event of Default.* If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will ocꞏur immediately upon the occurrence   ꞏth respect to such party of an Event of Default specifi   ꞏn Section 5(a)(vii)(1), (3), (5), (6) or, ꞏo the extent analogous thereto, (8), anꞏ ꞏs of the time immeoꞏꞏcly preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)   *Right to Terminate Following Termination Event.*

(i)   *Notice.* If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)   *Transfer to Avoid Termination Event.* If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii)   *Two Affected Parties.* If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iv)   *Right to Terminate.* If:—

(1)   a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2)   an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then

continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)    *Effect of Designation.*

(i)   If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)  Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)    *Calculations.*

(i)    *Statement.* On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)  *Payment Date.* An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)    *Payments on Early Termination.* If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)    *Events of Default.* If the Early Termination Date results from an Event of Default:—

(1)   *First Method and Market Quotation.* If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2)   *First Method and Loss.* If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3)   *Second Method and Market Quotation.* If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.  If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party: if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4)   *Second Method and Loss.* If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement.  If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii)   *Termination Events.* If the Early Termination Date results from a Termination Event:—

(1)   *One Affected Party.* If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2)   *Two Affected Parties.* If there are two Affected Parties:—

(A)   if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B)   if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)   *Adjustment for Bankruptcy.* In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)   *Pre-Estimate.* The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

ISDA® 1992

7.    **Transfer**

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that:—

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

8.    **Contractual Currency**

(a)    *Payment in the Contractual Currency.* Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)    *Judgments.* To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)    *Separate Indemnities.* To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)    *Evidence of Loss.* For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

9.    **Miscellaneous**

(a)    *Entire Agreement.* This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)    *Amendments.* No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a ... ...nsmission) and executed by each of the parties or confirmed by an exchange of telexes or electr ...ges on an electronic messaging system.

(c)    *Survival of Obligations.* Without prejudice to Se. ...;(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of an ... .nsaction.

(d)    *Remedies Cumulative.* Except as provided in this Agreement, the rights, power... remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)    *Counterparts and Confirmations.*

(i)    This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(ii)    The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)    *No Waiver of Rights.* A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)    *Headings.* The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

10.    **Offices; Multibranch Parties**

(a)    If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b)    Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c)    If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

11.    Expenses

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document

ISDA® 1992

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

12.    **Notices**

(a)     *Effectiveness*. Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

    (i)   if in writing and delivered in person or by courier, on the date it is delivered;

    (ii)  if sent by telex, on the date the recipient's answerback is received;

    (iii) if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

    (iv)  if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

    (v)   if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)     *Change of Addresses*. Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

13.    **Governing Law and Jurisdiction**

(a)     *Governing Law*. This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)     *Jurisdiction*. With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

    (i)   submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

    (ii)  waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)     *Service of Process*. Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any

reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)      *Waiver of Immunities.* Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

## 14.    Definitions

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

(a)      in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)      in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on that amount is payable, the Default Rate;

(c)      in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)      in all other cases, the Termination Rate.

*"Burdened Party"* has the meaning specified in Section 5(b).

*"Change in Tax Law"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

ISDA® 1992

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have

been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Office"* means a branch or office of a party, which may be such party's head or home office.

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

*"Relevant Jurisdiction"* means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

*"Scheduled Payment Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Set-off"* means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

*"Settlement Amount"* means, with respect to a party and any Early Termination Date, the sum of:—

(a)    the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)    such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

*"Specified Entity"* has the meaning specified in the Schedule.

ISDA® 1992

*"Specified Indebtedness"* means, subject to the Schedule. any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule. (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction. cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Stamp Tax"* means any stamp, registration, documentation or similar tax.

*"Tax"* means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

*"Tax Event"* has the meaning specified in Section 5(b).

*"Tax Event Upon Merger"* has the meaning specified in Section 5(b).

*"Terminated Transactions"* means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies. immediately before that Early Termination Date).

*"Termination Currency"* has the meaning specified in the Schedule.

*"Termination Currency Equivalent"* means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

*"Termination Event"* means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date. the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction. for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

|  |  |
|---|---|
| ("Party A") | ("Party B") |
| Caisse.des.Depots.et.Consignations. | Lehman.Brothers.Special.Financin |
| (Name of Party) | (Name of Party) |

By: ..................................

Name:

Title:

Date:

By: .. Maureen C Daniels ...

Name: Maureen C Daniels

Title: Vice President

Date:

ISDA® 1992

(Multicurrency - Cross Border)

# ISDA

## International Swap and Derivatives Associations, Inc.

### SCHEDULE

### to the

### Master Agreement

### dated as of July 29, 1994

between Caisse des Dépôts et Consignations ("Party A"), a public instrumentality organized under the laws of France and Lehman Brothers Special Financing Inc., a corporation organized under the laws of Delaware ("Party B").

### Part 1. Termination Provisions

(a)    *"Specified Entity"* means in relation to Party A for the purpose of:-

| | |
|---|---|
| Section 5(a)(v) | Not Applicable (N/A) |
| Section 5(a)(vi) | N/A |
| Section 5(a)(vii) | N/A |
| Section 5(b)(iv) | N/A |

and in relation to Party B for the purpose of:-

| | |
|---|---|
| Section 5(a)(v) | Lehman Brothers Holdings Inc. ("Holdings") |
| Section 5(a)(vi) | Holdings |
| Section 5(a)(vii) | Holdings |
| Section 5(b)(iv) | Holdings |

(b)    *"Specified Transaction"* will have the meaning specified in Section 14 of this Agreement.

(c)   The *"Cross Default"* provisions of Section 5(a)(vi) will apply to Party A and Party B and to any Specified Entity and Credit Support Provider of Party B.

> If such provisions apply:-
>
> *"Specified Indebtedness"* will have the meaning specified in Section 14 of this Agreement.
>
> *"Threshold Amount"* means with respect to Party A and Party B, $20,000,000 (or the equivalent in any other currency).

(d)   The *"Credit Event Upon Merger"* provisions of Section 5(b)(iv) will apply to Party A and to Party B and the Credit Support Provider and any Specified Entity of Party B in which case Party B will be the Affected Party.

(e)   The *"Automatic Early Termination"* provision of Section 6(a) will not apply to Party A and will not apply to Party B.

(f)   *Payments on Early Termination.* For the purpose of Section 6(e) of this Agreement:

> (i) Market Quotation will apply.
> (ii) The Second Method will apply.

(g)   *"Termination Currency"* means the currency selected by the non-Defaulting or the non-Affected Party, as the case may be or, in circumstances where there are two Affected Parties, the currency agreed between the Parties within 10 Business Days after which is a freely available contract currency in respect of, at least, one current Transaction. Provided, however, if no such agreement can be reached or if no such contract currency is freely available, the Termination Currency shall be United States Dollars. If U.S. Dollars are unavailable to satisfy the above, then such available convertible currency as Party A and Party B will reasonably agree.

(h)   *Additional Termination Events.* It shall be an additional termination event under Section 5(b)(v) of the Master Agreement if Party B's Credit Support Provider, as defined in Part 4(g) of this Schedule, fails to maintain a rating of (i) Baa3 or higher as determined by Moody's Investors Service Inc.or (ii) BBB- or higher as determined by Standard & Poor's Corporation or (iii) an equivalent investment grade rating determined by a nationally recognized rating agency acceptable by both parties.

## Part 2. Tax Representations

*Representations of Party A:*

(a)   ***Payer Tax Representations.*** For the purpose of Section 3(e) of this Agreement, Party A will make the following representation:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Sections 2(e), 6(d)(ii) or 6(e) of the Agreement) to be made by it to the other party under this Agreement. In making this representation, it may rely on:

   (i)    the accuracy of any representation made by the other party pursuant to Section 3(f) of this Agreement,

   (ii)   the satisfaction of the agreement of the other party contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement; and

   (iii)  the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement, provided that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) by reason of material prejudice to its legal or commercial position.

(b)   ***Payee Tax Representations.*** For the purpose of Section 3(f), Party A makes the following representation(s) specified below: NONE.

### Representations of Party B:

(a)   ***Payer Tax Representations.*** For the purpose of Section 3(e) of this Agreement, Party B will make the following representation:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Sections 2(e), 6(d)(ii) and 6(e) of the Agreement) to be made by it to the other party under this Agreement. In making this representation, it may rely on:

   (i)    the accuracy of any representation made by the other party pursuant to Section 3(f) of this Agreement,

   (ii)   the satisfaction of the agreement of the other party contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement, and

(iii)   the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement, provided that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) by reason of material prejudice to its legal or commercial position.

(b)   ***Payee Tax Representations.***   For the purpose of Section 3(f), Party B makes the representation(s) specified below: NONE.

### Part 3. Documents to be delivered

For the purpose of Sections 4(a)(i) and (ii) of this Agreement, each party agrees to deliver the following documents applicable:-

(a) Tax forms, documents or certificates to be delivered are:-

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered |
|---|---|---|
| Party A and Party B | Such documents as may be reasonably requested by the other party to permit payments without (or with minimal) withholding of Tax. | As soon as reasonably practicable after written demand. |

(b)   Other documents to be delivered are:

(1)   Evidence of the authority and true signature of signatories of this Agreement and each Confirmation on its behalf.

Party required to deliver: Party A & Party B

Date by which to be delivered: Upon execution of this Agreement.

Covered by Section 3(d) Representation: Yes

(2)   Such other documents as the other party may reasonably request in connection with the Agreement and each Transaction.

Party required to deliver: Party A & Party B

Date by which to be delivered: Promptly upon request.

Covered by Section 3(d) Representation: Yes

(3)    A duly executed Guaranty of the Guarantor of Party B substantially in the form of Exhibit I which is attached hereto and incorporated herein.

Party required to deliver: Party B

Date by which to be delivered:        Upon execution of this Agreement.

Covered by Section 3(d) Representation: Yes

(4)    Certificate of signing authority and specimen signatures of each individual executing the Guaranty of the Guarantor of Party B.

Party required to deliver: Party B

Date by which to be delivered:        Upon execution of and delivery of the Guaranty of the Guarantor.

Covered by Section 3(d) Representation: Yes

(5)    Such other written information, as is publicly available, respecting the condition or operations, financial or otherwise, of Party B (and any Specified Entity) as Party A may reasonably request from time to time.

Party required to deliver: Party B

Date by which to be delivered: Promptly upon request.

Covered by Section 3(d) Representation: Yes

## Part 4. Miscellaneous

(a)    *Addresses for Notices:*  For the purpose of Section 12(a) of this Agreement:

Address for notices or communications to Party A where Party A has acted through its Paris office:

Address:        Caisse des Dépôts et Consignations, 56 rue de Lille - 75356 Paris Cedex 07-France

Attention:       Service FMP 20/Back Office Monétaire

Telex No.:       200055            Answerback: CAISSE A PARIS

Facsimile No.:40 49 13 01

Electronic Messaging System Details: N/A

Address for notices or communications to Party A where Party A has acted through
CDC Capital Inc. on behalf of its Paris office:

Address:      Caisse des Dépôts et Consignations, c/o CDC Capital Inc., 9 West
              57th Street, 36th Floor, New York, NY 10019

Attention:    Adrienne Lauer

Telex No.:    N/A              Answerback: N/A

Facsimile No.:212.891.6290  Telephone No.:212.891.6194

Electronic Messaging System Details: N/A

Address for notices or communications to Party B for all purposes:

Address:      Lehman Brothers Special Financing, Inc., Derivative Products Dept.,
              3 World Financial Center, 7th Fl., New York, NY 10285-0700

Attention:    Notice Generation

Telex No.:N/A                  Answerback:N/A

Facsimile No.:212.528.6927    Telephone No.:212.526.8586

Section 12(a) of this Agreement is hereby amended by (i) adding after the words "may
not be given", the words "and shall not be effective if given"; and (ii) adding after the
words "under Section 5 or 6" the words, "or Section 13(c)".

(b)   *Process Agent.* For the purpose of Section 13(c) of this Agreement:

Party A appoints as its Process Agent:      CDC Capital Inc., 9 West 57th Street, 36th
                                            Floor, New York, NY 10019.

Party B appoints as its Process Agent:      N/A

(c)   *Offices.* The provisions of Section 10(a) will not apply to this Agreement.

(d)   *Multibranch Party.* For the purpose of Section 10(c) of this Agreement:

Party A is not a Multibranch Party.

Party B is not a Multibranch Party.

(e)   *Calculation Agent.*  The Calculation Agent is Party A, unless otherwise specified·in a Confirmation in relation to the relevant Transaction.

(f)   *Credit Support Document.*  Details of any Credit Support Document:

"Credit Support Document" includes in relation to Party B (i) the Guarantee of Holdings, in substantially the form attached to this Agreement as Exhibit I (and Holdings is the Specified Entity with respect to such Guarantee). If an obligation of Party B under this Agreement is fully performed by Holdings, such obligation will be deemed to have been fully performed by Party B and (ii) the Master Pledge Agreement in the form annexed hereto as Exhibit II.

(g)   *Credit Support Provider.*

Credit Support Provider means in relation to Party A: N/A
Credit Support Provider means in relation to Party B: Holdings with respect to the Guarantee and Party B with respect to the Master Pledge Agreement.

(h)   *Governing Law.*  This Agreement will be governed by and construed in accordance with the law of the State of New York without reference to choice of law doctrine.

(i)   *Netting of Payments.*  Subparagraph (ii) of Section 2(c) of this Agreement will apply.

(j)   *"Affiliate"* will have the meaning specified in Section 14 of this Agreement.

## Part 5. Other Provisions

(1)   *1991 ISDA Definitions.*

Reference is hereby made to the 1991 ISDA Definitions (the "1991 Definitions") published by the International Swap Dealers Association, Inc., which is hereby incorporated by reference herein. Any terms used and not otherwise defined in the Master Agreement or any Confirmation which are contained in the 1991 Definitions shall have the meaning set forth therein. Notwithstanding anything contained in the Master Agreement to the contrary, if the parties enter into any Specified Transaction, such Specified Transaction shall be subject to, governed by and construed in accordance with the terms of the Master Agreement unless the Confirmation thereto shall specifically state to the contrary. Each such Specified Transaction shall be a Transaction for the purposes of the Master Agreement.

(2)   *Inconsistency.*

In the event of any inconsistency between the provisions of this Schedule and the printed form of Agreement of which it is a part or the 1991 Definitions, the provisions set forth in this Schedule will prevail, and in the event of any inconsistency between the provisions of a Confirmation and this Schedule, the printed form of Agreement or the 1991 Definitions, the provisions set forth in the Confirmation will prevail.

(3)   *Waiver of Right to Trial by Jury*.

Party A and Party B hereby irrevocably waive, to the fullest extent permitted by applicable law, any and all right to trial by jury with respect to any legal proceeding arising out of or relating to this Agreement or any Transaction contemplated hereby.

(4)   *Effective Date*.

The parties hereto in consideration of the mutual agreements contained herein agree that this Agreement is deemed to be effective from the date specified on the front page of this Agreement.

(5)   *Change of Account*.

Section 2(b) of this Agreement is hereby amended by the insertion of the following at the end thereof after the word "change":

> "; provided that if such new account shall not be in the same jurisdiction having the same power to tax as the original account, the party not changing its account shall not be obliged to pay any greater amounts and shall not receive less as a result of such change than would have been the case if such change had not taken place."

(6)   *Cross default*.

The Cross default of Section 5(a)(vi) shall exclude any default that results solely from wire transfer difficulties or an error or omission of an administrative or operational nature (so long as sufficient funds are available), or from the general unavailability or non-transferability of the currency in which such Specified Indebtedness is denominated due to exchange controls or similar or other governmental action (but only if payment is made within three Business Days after such transfer difficulties have been corrected, the error or omission has been discovered or such currency becomes available).

(7)   *Credit Event Upon Merger*.

It is expressly provided that notwithstanding any provision to the contrary in the Agreement, any changes in the organizational form of Party A shall not be construed as an event referred to in Section 5(b)(iv) if upon such event Party A shall be rated at least A by Standard and Poor's Corporation or by Moody's Investor Services, Inc.

(8)    *Set-off.*

Nothing in this clause 8 shall be effective to create a charge or other security interest. Without affecting the provisions of the Agreement requiring the calculation of certain net payment amounts, all payments under this Agreement will be made without set-off or counterclaim; provided, however, that upon the designation or deemed designation of any Early Termination Date, in addition to and not in limitation of any other right or remedy including any right to set-off, counterclaim or otherwise withhold payment or any recourse to any Credit Support Document under applicable law the non-Defaulting Party or non-Affected Party (in either case, "X") may set-off any sum or obligation (whether or not arising under this Agreement and whether matured or unmatured) owed or due by the Defaulting Party or Affected Party (in either case, "Y") to X against any sum or obligation (whether or not arising under this Agreement and whether matured or unmatured) owed or due by X (the "Original Obligation") to Y, and for this purpose, may convert one currency into another at the rate of exchange at which X would be able, acting in a reasonable manner and in good faith, to purchase the relevant amount of such currency.

(9)    *Escrow Payments.*

If by reason of the time difference between the cities in which payments are to be made, it is not possible for simultaneous payments to be made on any date on which both parties are required to make payments hereunder, either party may at its option and in its sole discretion notify the other party that payments on that date are to be made in escrow. In this case deposit of the payment due earlier on that date shall be made by 2:00 pm (local time at the place for the earlier payment) on that date with an escrow agent selected by the notifying party, accompanied by irrevocable payment instructions (a) to release the deposited payment to the intended recipient upon receipt by the escrow agent of the required deposit of the corresponding payment from the other party on the same date accompanied by irrevocable payment instructions to the same effect or (b) if the required deposit of the corresponding payment is not made on that same date, to return the payment deposited to the party that paid it into escrow. The party that elects to have payments made in escrow shall pay the costs of the escrow arrangements and shall cause those arrangements to provide that the intended recipient of the payment due to be deposited first shall be entitled to interest on that deposited payment for each day in the period of its deposit at the rate offered by the escrow agent for that day for overnight deposits in the relevant currency in the office where it holds that deposited payment at 11:00 am (local time on that date) if that payment is not released by 5:00 pm local time on the date it is deposited for any reason other than the intended recipient's failure to make the escrow deposit it is required to make hereunder in a timely fashion.

(10)    *Calculation Agent.*

In the absence of gross negligence or willful misconduct by Party A in the execution of its duties as Calculation Agent, Party A shall have no liability for, or arising from, errors or omissions in the execution of such duties (other than for (a) amounts received by Party A as a result of any such error or omission and that would not otherwise have been payable to it

and (b) amounts not paid by Party A as a result of any such error or omission and that would otherwise have been payable by it). Amounts determined by the Calculation Agent shall, absent manifest error, be binding upon the parties.

(11)   **_Recorded Conversations._**

Each party may electronically record all telephonic conversations between them in connection with any Transaction under this Agreement.

(12)   **_Additional Events of Default_**

A new Section 5(a)(ix) shall be added to the Master Agreement to read as follows:

"(ix) If any Credit Support Document constituting a security agreement shall for any reason cease to create a valid and perfected lien on or security interest in any material portion of the collateral purported to be covered thereby prior and superior to all other liens, security interests, charges and encumbrances."

In **WITNESS WHEREOF**, the parties have executed this Schedule and Master Agreement by their duly authorized officers as of the date hereof.

Caisse des Dépôts et Consignations           Lehman Brothers Special Financing Inc.
("Party A")                                  ("Party B")

By: _____                   By: _Maureen C Daniels_

Name: _____                   Name: _Maureen C. Daniels_

Title: _____Philippe ANDRIEU_____            Title: _Vice President_
              Responsable
        du Service Post. Marché

# Exhibit B

EXHIBIT I

## GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A") and CAISSE DES
DEPOTS ET CONSIGNATIONS ("Party B") have entered into a Master Agreement dated as of
July 29, 1994, pursuant to which Party A and Party B have entered and/or anticipate entering into
one or more transactions (each a "Transaction"), the Confirmation of each of which supplements,
forms part of, and will be read and construed as one with, the Master Agreement (collectively
referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated
in the Agreement.  For value received, and in consideration of the financial accommodation
accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS
INC., a corporation organized and existing under the laws of the State of Delaware
("Guarantor"), hereby agrees to the following:

(a)   Guarantor hereby unconditionally guarantees to Party B the due and punctual
payment of all amounts payable by Party A under each Transaction when and as Party A's
obligations thereunder shall become due and payable in accordance with the terms of the
Agreement.  In case of the failure of Party A to pay punctually any such amounts, Guarantor
hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts
punctually when and as the same shall become due and payable.

(b)   Guarantor hereby agrees that its obligations under this Guarantee constitute a
guarantee of payment when due and not of collection.

(c)   Guarantor hereby agrees that its obligations under this Guarantee shall be
unconditional, irrespective of the validity, regularity or enforceability of the Agreement against
Party A (other than as a result of the unenforceability thereof against Party B), the absence of any
action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B
with respect to any provisions thereof, the entry by Party A and Party B into additional
Transactions under the Agreement or any other circumstance which might otherwise constitute a
legal or equitable discharge or defense of a guarantor; provided, however, that Guarantor shall be
entitled to exercise any right that Party A could have exercised under the Agreement to cure any
default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold
payment in respect of any Event of Default or Potential Event of Default in respect of Party B or
any Affiliate, but only to the extent such right is provided to Party A under the Agreement. The
Guarantor acknowledges that Party A and Party B may from time to time enter into one or more
Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under
this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to
all such Transactions without the taking of further action by the Guarantor.

(d) Guarantor shall be subrogated to all rights of Party B against Party A in respect of any
amounts paid by Guarantor pursuant to the provisions of this Guarantee; provided, however, that
Guarantor shall not be entitled to enforce or to receive any payments arising out of, or based
upon, such right of subrogation until all amounts then due and payable by Party A under the
Agreement, shall have been paid in full.

(e)   Guarantor further agrees that this Guarantee shall continue to be effective or be
reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or
interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default
as set forth in Section 5(a)(vii) of the Agreement affecting Party A or Guarantor.

(f)  Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment,

-2-

protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection
with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to
take any action against Party A or any other person prior to or contemporaneously with
proceeding to exercise any right against Guarantor under this Guarantee.

Guarantor makes the same representations to and agreements with Party B as those made
by Party A pursuant to Sections 3 and 4 of the Agreement, at the times set forth therein, except
that references therein to "the party" will be deemed to be references to "the Guarantor" and
references therein to "the Agreement" will be deemed to be references to "the Guarantee."
Section 11 of the Agreement is incorporated by reference in this Guarantee except that references
therein to "the Agreement" will be deemed to be references to "the Guarantee."

This Guarantee shall be governed by and construed in accordance with the laws of the
State of New York, without reference to choice of law doctrine.   All capitalized terms not
defined in this Guarantee are defined in the Agreement.

Any notice hereunder will be sufficiently given if given in accordance with the provisions
for notices under the Agreement and will be effective as set forth therein.   All notices hereunder
shall be delivered to Lehman Brothers Holdings Inc., Attention: Treasurer, at 3 World Financial
Center, 28th Floor, New York, New York 10285 (Facsimile No. (212) 526-1467) with a copy to
Lehman Brothers Special Financing Inc., Attention: Senior Vice President, at 3 World Financial
Center, New York, New York 10285-0700 (Facsimile No. (212) 528-6927).

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed in its
corporate name by its duly authorized officer as of the date of the Agreement.

LEHMAN BROTHERS HOLDINGS INC.

By: _____

Title: ___ ASSISTANT VICE PRESIDENT

# Exhibit C

## Exhibit II

**MASTER PLEDGE AGREEMENT,** dated as of November 4, 1994, made by **LEHMAN BROTHERS SPECIAL FINANCING INC.** ("Pledgor") to **CAISSE DES DEPOTS ET CONSIGNATIONS** ("Pledgee").

Pledgor and Pledgee have entered into, or will enter into, that certain ISDA Master Agreement of even date herewith (the "Agreement") pursuant to which Pledgor and Pledgee may enter into Transactions (as defined therein) from time to time. Pledgor agrees to pledge and deliver collateral as security for its obligations under the Agreement pursuant to the terms of this Master Pledge Agreement (as amended from time to time, the "Pledge Agreement"). Each Confirmation of a Transaction shall constitute a supplement to, and be part of, the Agreement and the Pledge Agreement so that the Agreement (as supplemented by Confirmations of Transactions) and the Pledge Agreement (as supplemented by Confirmations of Transactions) will form a single Pledge Agreement between Pledgor and Pledgee.

Accordingly, the parties hereto agree as follows:

1.     **Certain Definitions.** Unless otherwise defined herein, terms defined in the Agreement will have such defined meanings when used herein. In addition, as used in this Agreement, the following terms will have the following meanings.

**"Aggregate Exposure Amount"** means, as of an Exposure Calculation Date, the aggregate Market Quotation (as defined in the Agreement, except as expressly modified hereby) of all Transactions, plus an amount for each Transaction determined by multiplying (A) 0.75 by (B) the average remaining life of such Transaction by (C) the notional amount for such Transaction (indexed, if required by the Confirmation). For purposes hereof, the amount representing the Market Quotation of each Transaction for which Pledgee would on an Exposure Calculation Date receive a payment from Pledgor if such date were an Early Termination Date shall be expressed as a positive number and the market value of each Transaction for which Pledgor would on an Exposure Calculation Date receive a payment from Pledgee if such date were an Early Termination Date shall be deemed to be zero for purposes hereof. The Market Quotation of each Transaction shall be determined by Pledgor in good faith based on its mid-market quotation as of 3:00p.m., New York time (or earlier in the day if the markets relevant to such determination end business earlier on such day) on the Exposure Calculation Date, for a transaction with an effective date of the relevant Exposure Calculation Date having terms (including Unpaid Amounts) duplicating as nearly as possible the Transaction whose Market Quotation is being determined, provided, however, that if the Pledgee disputes the Market Quotation of any such Transaction it may submit value quotations from two (2) Reference Market-makers as prescribed under the definition of "Market Quotation" in the Agreement (notwithstanding the 11:00 a.m. New York time requirement of such definition, such quotations may be obtained within two (2) hours of the Pledgee's receipt of Pledgor's valuation), in which case the market value for such Transaction shall be the arithmetic mean of the three (3) valuations. **"Exposure Amount"** means, as of an Exposure Calculation Date, the market value

(if positive) of a single Transaction.

**"Aggregate Value of the Collateral"** means the sum of the adjusted fair market value of all the Collateral held by or on behalf of Pledgee with respect to all Transactions under which Pledgor shall then have any obligations to Pledgee. The fair market value of each item of Collateral shall be adjusted by multiplying it by 98% in the case of direct U.S. Government obligations, 95% in the case of direct agency obligations and such other percentage or percentages as may be agreed upon in writing by the Pledgor and the Pledgee in the case of all other obligations.

**"Collateral"** means all securities, obligations and other property (including cash) and all additions and substitutions therefor, all of a type agreed to in writing (which may include a Confirmation) by Pledgor and Pledgee, and proceeds thereof which are pledged to and received by Pledgee hereunder, together with all collections, income, distributions and claims in respect thereof, all proceeds of any of the foregoing and all powers and rights of the Pledgor now or hereafter acquired by the Pledgor, including rights of enforcement, under any or all of the foregoing.

**"Equivalent Collateral"** means, with respect to any Collateral, securities of the same class and issue, issuer, series and maturity and the same principal amount and, in the case of mortgage-backed securities, securities backed by the same pool of mortgages as the Collateral.

**"Exposure Calculation Date"** means the first and fifteenth day of each calendar month, or if any such day does not fall on a New York Banking Day, then the following day that is a New York Banking Day and such other date or dates (not exceeding four in number during any calendar month) which is a New York Banking Day and is selected by either party. A New York Banking Day is defined as a day in which banks are open for business in the State of New York and are not otherwise required by law to close.

**"Minimum Amount"** means $250,000.

**"Net Aggregate Exposure Amount"** means the Aggregate Exposure Amount less the Unsecured Amount.

**"Unsecured Amount"** means $0.

2.    **Pledge**. Pledgor hereby grants to Pledgee Collateral, having a fair market value equal to the Net Aggregate Exposure Amount, and thereby grants to Pledgee a first lien on, and security interest in, such Collateral, as collateral security for the prompt and complete payment when due (whether on a Payment Date, on the Early Termination Date or otherwise) of all amounts payable by Pledgor to Pledgee pursuant to each Transaction and any other amount due or to become due by Pledgor to Pledgee pursuant to the Agreement (the "Obligations").

3.    **Form of Collateral.** (a) With respect to any of the Collateral consisting of securities or obligations issued or guaranteed by the government of the United States of America

or any of its agencies or instrumentalities and available only in book-entry form by means of entries on the records of United States of America Federal Reserve Banks, Pledgor shall, unless otherwise provided in the related Confirmation or otherwise agreed to in writing by the Pledgor and the Pledgee, (i) in the case of non-mortgage-backed securities, cause such securities to be transferred pursuant to instructions of Pledgee or (ii) in the case of mortgage-backed securities, cause such securities to be transferred pursuant to instructions of Pledgee.

(b)     With respect to any of the Collateral available in definitive, certificated form, Pledgor shall, unless otherwise provided in the related Confirmation or otherwise agreed to in writing by the Pledgor and the Pledgee, deliver (as instructed by Pledgee) to Pledgee or Pledgee's agent, the certificates for such collateral in suitable form for transfer or accompanied by duly executed instruments of transfer or appropriate undated powers of assignment thereof duly executed in blank. All deliveries of certificated securities shall be made to Pledgee or Pledgee's agent pursuant to instructions of Pledgee.

(c)     With respect to all types of Collateral, the Pledgor shall take all steps available to it that would be necessary to create a perfected first security interest in such Collateral in favor of the Pledgee.

4.     **Distributions, etc.** While this Agreement is in effect, unless there is an Event of Default or a Termination Event with respect to Pledgor or unless the Pledgor has failed to comply with any of its obligations hereunder, Pledgor shall be entitled to receive any income, dividends or interest (whether in the form of cash or otherwise), debenture, other debt instrument, stock certificate (including, without limitation, any certificate representing a distribution in connection with any reclassification, increase or reduction of capital, or issued in connection with any reorganization), option, rights or other property with respect to any of the Collateral and the same shall not constitute additional Collateral. Any sums paid upon or in respect of the Collateral upon the liquidation or dissolution of the issuer shall not constitute additional Collateral. All sums of money and property so paid or distributed in respect of the Collateral which are received by Pledgee shall, until paid or delivered to Pledgor, be held by Pledgee in trust for Pledgor. The Pledgee shall have no liability, however, for any failure by it to collect such payments not forwarded to it by the payor thereof.

5.     **Adjustment of Collateral.** If the Aggregate Value of the Collateral, as of any Exposure Calculation Date, shall be less than the Net Aggregate Exposure Amount, then Pledgor shall, within two (2) New York Banking Days (as that term is defined in Section 1) after written demand by Pledgee or after first becoming aware of such fact, deliver to Pledgee, as Collateral, sufficient Collateral in conformity with Sections 2 and 3 hereof, so that, immediately after delivery of such Collateral, the Aggregate Value of the Collateral shall be at least equal to the Net Aggregate Exposure Amount, provided, however, that Pledgor shall not be required to deliver Collateral to Pledgee hereunder unless the amount to be delivered is at least the Minimum Amount. The Net Aggregate Exposure Amount shall be calculated by Pledgor, and the Aggregate Value of Collateral shall be determined by Pledgor on the basis of the closing sale prices for such Collateral as published in *The Wall Street Journal* with respect to such date (or, in the event no such quote is available, the most recent closing bid prices from a principal market

maker (other than Pledgor or any affiliate of Pledgor) selected, in good faith, by Pledgor) or in
such other manner as the Pledgor and Pledgee shall agree, provided, however, that if Pledgee
disputes the valuation of any Collateral by Pledgor, Pledgee may submit closing bid prices, as of
such Exposure Calculation Date, quoted by two (2) other nationally-recognized sources, in which
case, such value shall be the arithmetic mean of all three (3) closing bid prices. Otherwise, the
calculations hereunder shall be binding upon Pledgee absent manifest error. If on any Exposure
Calculation Date the aggregate amount of Collateral held by Pledgee shall exceed the Net
Aggregate Exposure Amount, Pledgee shall, upon the written request of Pledgor, return to
Pledgor, within two (2) New York Banking Days of the date of Pledgee's receipt of such request,
such Collateral in an amount equal to such excess; provided, however, that Pledgee shall not be
required to return Collateral to Pledgor hereunder unless the amount to be returned is at least the
Minimum Amount. If the Net Aggregate Exposure Amount is zero on such Exposure Calculation
Date, Pledgee shall return to Pledgor within two (2) New York Banking Day's of Pledgee's
receipt of written request from the Pledgor, all Collateral then held by Pledgor.

      6.    **Rights of Pledgee.**  Any or all of the Collateral held by Pledgee hereunder may,
without notice, be registered in the name of Pledgee or its nominee. Pledgee or its nominee may
thereafter upon two (2) New York Banking Days' written notice to Pledgor, exercise rights of
conversion, exchange, subscription or any other rights, privileges or options with respect to such
Collateral, as if it were the absolute owner thereof, all without liability except to account for
property actually received by it, but the Pledgee shall have no duty to exercise any of the aforesaid
rights, privileges or options and shall not be responsible for any failure to do so or delay in so
doing. Pledgee hereby agrees that it shall not repledge, rehypothecate, reassign or enter into
repurchase transactions (collectively, "Repurchase Transactions") with respect to any of the
Collateral, nor shall Pledgee direct any agent acting on its behalf to enter into any such
Repurchase Transactions using the Collateral during any period in which the Pledge Agreement
remains in effect.

      7.    **Remedies.**  In the event that any portion of the Obligations has become due and
payable, and has not been paid, Pledgee may, upon written notice to Pledgor (which may be a
telex, telegram, telecopy or other similar facsimile transmission and all of which Pledgor hereby
agrees is reasonable notice within the meaning of Section 9-504(3) of the Uniform Commercial
Code as in effect in the State of New York), collect the Collateral, or any part thereof, or may
sell, assign, give options to purchase, contract to sell or otherwise dispose of and deliver said
Collateral, or any part thereof, in one or more parcels at public or private sale or sales, at any
exchange, broker's board or at any of Pledgee's offices or elsewhere, upon such terms and
conditions as it may deem advisable and at such prices as it may deem best, for cash or on credit
or for future delivery, without advertisement or demand upon the Pledgor, both of which are
hereby waived by Pledgor, provided, however, that any such sale or disposal shall be in a
commercially reasonable manner. Pledgor shall have the right to prevent any sale, assignment or
other disposal of the Collateral by Pledgee by tendering to Pledgee, at any time prior to such sale,
assignment or other disposal, the full amount due and payable to Pledgee with respect to the
Obligations. Pledgee shall apply the net proceeds of any such collection or sale, after deducting
all reasonable costs and expenses directly related to or incidental to the care and safekeeping of
any or all the Collateral or otherwise or in any way relating to the rights of the Pledgee hereunder,

including reasonable attorneys' fees and legal expenses, to the payment in whole or in part of the Obligations; after so paying over such net proceeds and after the payment by Pledgee of any other amount required by any provision of law, Pledgee shall account for the surplus, if any, to Pledgor. In addition to the rights and remedies granted to it in this Pledge Agreement and in any other instrument or agreement securing, evidencing or relating to any of the Obligations, Pledgee shall have all rights and remedies of a secured party under the Uniform Commercial Code of the State of New York. Pledgor shall be liable for the deficiency if the proceeds of any sale or other disposition of the Collateral are insufficient to pay the entire amount of Obligation then owed by Pledgor to Pledgee and the fees of any attorneys employed by the Pledgee to realize upon such Collateral and collect such deficiency.

8.    **Representations, Warranties and Agreements of Pledgor.**  Pledgor represents to and agrees with Pledgee that (a) Pledgor is and will be the legal, beneficial and owner of record, and have good and marketable title to, the Collateral subject to no pledge, lien, mortgage, hypothecation, security interest, charge, option or other encumbrance whatsoever, except the lien and security interest in favor of pledgee created by this Pledge Agreement; and (b) the pledge, assignment and delivery of the Collateral pursuant to this Pledge Agreement will create a valid first lien on and a perfected first security interest in the Collateral as such Collateral is delivered to Pledgee, and the proceeds thereof, subject to no prior pledge, lien, mortgage hypothecation, security interest, charge, option or encumbrance, or to any agreement purporting to grant to any third party a security interest, charge, option or encumbrance, in the property or assets of any other pledgor which would include any Collateral. The Pledgor will defend Pledgee's right, title and security interest in and to the Collateral and the proceeds thereof against the claims and demands of all persons whomever. The representations made herein shall be made and deemed to be repeated at the times at which the representations of Pledgor in Section 3 of the Agreement are made and deemed to be repeated and also at the time Collateral is delivered to Pledgee pursuant to the terms hereof.

9.    **No Disposition, etc.**  Without the prior written consent of Pledgee, Pledgor agrees that it will not sell, assign, transfer, exchange, or otherwise dispose of or grant any option with respect to, the Collateral, nor will it create, incur or permit to exist any pledge, lien, mortgage, hypothecation, security interest, charge, option or any other encumbrance with respect to any of the Collateral, or any interest therein, or any proceeds thereof, except for the lien and security interest provided for by this Pledge Agreement.

10.    **Specific Performance.**  If Pledgee shall determine to exercise its right to sell any or all of the Collateral pursuant to Section 7 hereof, Pledgor agrees to render to Pledgee any assistance reasonably necessary to make such sale or sales of any portion or all of the Collateral valid and binding and in compliance with any and all courts, arbitrators or governmental instrumentalities, domestic or foreign, having jurisdiction over any such sale or sales, all at Pledgor's expense.

11.    **Right of Substitution.**  Upon written request of Pledgor to return Collateral to Pledgor, so long as no Event of Default or Termination Event with respect to the Pledgor shall have occurred and is continuing, with the prior written consent of Pledgee and so long as such

# Exhibit D

Lehman Brothers Special Financing Inc.

Sch G

Case No. 08-13888 (JMP)

Executory Contracts and Unexpired Leases
G: Derivative Contracts

| Contract Counterparty | Address 1 | Address 2 | Address 3 | City | State | Zip | Country | Contract Description |
|---|---|---|---|---|---|---|---|---|
| c/o Blackrock Advisors, Inc. | 40 E. 52nd Street, 18th Floor | | | New York | NY | 10022 | UNITED STATES | Derivative Master Account Number 1212030026 |
| c/o Blackrock Advisors, Inc. | 40 E. 52nd Street, 18th Floor | | | New York | NY | 10022 | UNITED STATES | Derivative Master Account Number 1212030027 |
| c/o Blackrock Advisors, Inc. | 40 E. 52nd Street, 18th Floor | | | New York | NY | 10022 | UNITED STATES | Derivative Master Account Number 1212030054 |
| c/o Blackrock Advisors, Inc. | 40 E. 52nd Street, 18th Floor | | | New York | NY | 10022 | UNITED STATES | Derivative Master Account Number 1212030025 |
| c/o Blackrock Advisors, Inc. | 40 E. 52nd Street, 18th Floor | | | New York | NY | 10022 | UNITED STATES | Derivative Master Account Number 031705DISP |
| c/o Blackrock Advisors, Inc. | 40 E. 52nd Street, 18th Floor | | | New York | NY | 10022 | UNITED STATES | Derivative Master Account Number 1212030029 |
| c/o Blackrock Advisors, Inc. | 40 E. 52nd Street, 18th Floor | | | New York | NY | 10022 | UNITED STATES | Derivative Master Account Number 1212030010 |
| c/o Blackrock Advisors, Inc. | 40 E. 52nd Street, 18th Floor | | | New York | NY | 10022 | UNITED STATES | Derivative Master Account Number 1212030030 |
| c/o Blackrock Advisors, Inc. | 40 E. 52nd Street, 18th Floor | | | New York | NY | 10022 | UNITED STATES | Derivative Master Account Number 1212030041 |
| c/o Merrill Lynch Investment Managers LLC | 800 Scudders Mill Road | | | Plainsboro NJ | | 8536 | UNITED STATES | Derivative Master Account Number 113005MLI5 |
| c/o Putnam Investments | One Post Office Square | One Post Office Square | | Boston | MA | 2109 | United States | Derivative Master Account Number 030607CRED |
| CAAM GLOBAL BOND FUND | 168 Robinson Rd #22-03 | | Capital Towers 068912 | | | | Singapore | Derivative Master Account Number 092607CRED |
| CABLE & WIRELESS PLC SUPERANNUATION FUND | PIMCO | 840 Newport Center Drive | Suite 100 | Newport Beach | CA | 92660 | UNITED STATES | Derivative Master Account Number 100605CABW |
| Cadbury Corporation | 2150 Route 38 | | | Cherry Hill | NJ | 08002-4302 | United States | Derivative Master Account Number 112096CBCP |
| CAIN BROTHERS & COMPANY LLC | 452 Fifth Ave | | | New York | NY | 10018 | UNITED STATES | Derivative Master Account Number 121598CBB |
| Caisse d' Amortissement de la Dette Sociale | 139, rue de Bercy | | 75572 Paris | Cedex 12 | | | France | Derivative Master Account Number 121097CADL |
| CAISSE DE DEPOT ET PLACEMENT DU QUEBEC | 1000, Place Jean Paul Riopelle | | | Montreal | QC | 0 | Canada | Derivative Master Account Number 052797QJON |
| CAISSE DES DEPOTS ET CONSIGNAT IONS | 56 rue de Lille | | 75356 Paris | Cedex 07 | | | France | Derivative Master Account Number 080494CDDC |

LBSF Schedules 96

# Exhibit E



**Epiq Bankruptcy Solutions, LLC**
757 Third Avenue, 3rd Floor
New York, NY 10017

Legal Documents Enclosed -
Please direct to the attention of the Addressee,
t or President.

ADDRESS SERV

RETURN
TO SENDER

NEW YORK, NY

INTERNATIONAL

FIRST CLASS MAIL
U.S. POSTAGE
**PAID**
NEW YORK, NY
PERMIT #4427

PLI NON DISTRIBUABLE
Boîte inaccessible
Boîte non identifiable
Non réclamé
Refusé
Bât/Rés
**Anomalie d'adresse:**
N° dans la voie
Voie
Commune

PND

Nam            ddress of Creditor: (and name and address where notices should be sent if
different from Creditor)
    DBH (MERGE2.DBF,SCHED_NO) SCHEDULE #: 888008400*****
    CAISSE DES DEPOTS ET CONSIGNAT IONS
    56 RUE DE LILLE
    75356 PARIS
    CEDEX 07
    FRANCE

# Exhibit 2

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

In re                                                              Chapter 11

LEHMAN BROTHERS HOLDING INC., *et al.*,                            Case No. 08-13555 (JMP)

                                                                   (Jointly Administered)

                           Debtors.
-------------------------------------------------------------X

### ORDER GRANTING CAISSE DES DÉPÔTS ET CONSIGNATIONS' MOTION TO PERMIT A LATE-FILED CLAIM PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 9006(b)(1)

Upon Caisse des Dépôts et Consignations' ("CDC") Motion to Permit a Late-Filed Claim and Questionnaires Pursuant to Federal Rule of Bankruptcy Procedure 9006(b)(1) (the "Motion")[1] requesting permission to file a late-filed claim and deem such claim timely-filed; and the Court having jurisdiction pursuant to sections 157 and 1334 of title 28, United States Code to consider the Motion and the relief requested therein; and the Debtors' cases having been automatically referred to this Court by the Standing Order of Reference from the United States District Court for the Southern District of New York dated July 10, 1984; and venue being proper in this Court pursuant to Sections 1408 and 1409 of title 28 of the United States Code; and due and proper notice of the Motion having been provided; and it appearing that no other or further notice is required; and the Court having heard argument on the record at the hearing before the Court, on July 20, 2011 (the "Hearing"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein, and after due deliberation and sufficient cause appearing therefor; it is hereby

**ORDERED** that the Motion is granted in its entirety; and it is further

**ORDERED** that to the extent any objections to the Motion have not been withdrawn or otherwise resolved, they are hereby overruled; and it is further

**ORDERED** that CDC shall file a proof of claim within 10 days of this Order, which proof of claim shall be deemed to have been timely filed; and it is further

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

**ORDERED** that the Debtors shall retain all of their rights to object to CDC's proof of claim on any basis other than timeliness, and that CDC shall retain all of its rights to respond to any such objection.

Dated: July __, 2011
      New York, New York

 

HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE

060177/871833.1/BSS

# **Exhibit 2**

Page 1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 08-13555 (JMP)

5   - - - - - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7

8   LEHMAN BROTHERS HOLDINGS INC., et al.,

9

10              Debtors.

11

12  - - - - - - - - - - - - - - - - - - - - - - - -x

13

14              United States Bankruptcy Court

15              One Bowling Green

16              New York, New York

17

18              February 22, 2012

19              10:02 AM

20

21  B E F O R E:

22  HON. JAMES M. PECK

23  U.S. BANKRUPTCY JUDGE

24

25

1

2    MOTION Pursuant to Section 8.4 of the Modified Third Amended

3    Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its

4    Affiliated Debtors and Sections 105(a), 502(c) and 1142(b) of

5    the Bankruptcy Code to Estimate the Amount of Claims filed by

6    Indenture Trustee on Behalf of Issuers of Residential Mortgage-

7    Backed Securities for Purposes of Establishing Reserves [ECF

8    No. 24254]

9

10   MOTION of Lehman Brothers Holdings Inc. for Authority to Use

11   Non-Cash Assets in Lieu of Available Cash as Reserves for

12   Disputed Claims Pursuant to Section 8.4 of the Debtors'

13   Confirmed Chapter 11 Plan [ECF No. 24726]

14

15   DEBTORS' Two Hundred Twenty-First Omnibus Objection to Claims

16   (Duplicative of Indenture Trustee Claims) [ECF No. 20860]

17

18   MOTION of Jeremy R. Kramer for Reconsideration of the

19   Reclassifications of His Compensation Claim as an Equity

20   Interest [ECF No. 25307]

21

22   MOTION of Caisse Des Depots Et Consignations to Permit a Late-

23   Filed Claim Against Lehman Brothers Special Financing Inc. [ECF

24   No. 18039]

25

Page 3

1

2    SYMPHONY ASSET MANAGEMENT LLC's Motions to Deem Proof of Claim

3    Timely Filed {ECF Nos. 12074, 12075, 12076 and 12078] (This

4    matter has been adjourned to March 22, 2012 at 10:00 a.m.)

5

6    DEBTORS' Twenty-Eighth Omnibus Objection to Claims (Valued

7    Derivative Claims) [ECF No. 9983] (This matter has been

8    adjourned to March 22, 2012 at 10:00 a.m.)

9

10   DEBTORS' Thirty-Fourth Omnibus Objection to Claims

11   (Misclassified Claims) [ECF No, 10286] (This matter has been

12   adjourned to April 26, 2012 at 10:00 a.m.)

13

14   DEBTORS' Thirty-Fifth Omnibus Objection to Claims (Valued

15   Derivative Claims) [ECF No. 11260] (This matter has been

16   adjourned to March 22, 2012 at 10:00 a.m.)

17

18   DEBTORS' Fortieth Omnibus Objection to Claims (Late-Filed

19   Claims) [ECF No. 11305] (The hearing on the claims listed on

20   Exhibit 1 has been adjourned to March 22, 2012 at 10:00 a.m.)

21

22   DEBTORS' Forty-First Omnibus Objection to Claims (Late-Filed

23   Claims) [ECF No. 11306] (The hearing on the claims listed on

24   Exhibit 2 is adjourned to March 22, 2012 at 10:00 a.m.)

25

1

2      DEBTORS' Forty-Second Omnibus Objection to Claims (Late-Filed

3      Lehman Programs Securities Claims) [ECF No. 11307] (The hearing

4      on the claims listed on Exhibit 3 is adjourned to March 22,

5      2012 at 10:00 a.m.)

6

7      DEBTORS' Forty-Third Omnibus Objection to Claims (Late-Filed

8      Lehman Programs Securities Claims) [ECF No. 11308] (The hearing

9      on the claims listed on Exhibit 4 has been adjourned to March

10     22, 2012 at 10:00 a.m.)

11

12     DEBTORS' Sixty-Third Omnibus Objection to Claims (Valued

13     Derivative Claims) [ECF No. 11978] (This matter has been

14     adjourned to March 22, 2012 at 10:00 a.m.)

15

16     MOTION of John Dmuchowski to Permit Filing of Claims as of

17     September 23, 2009 [ECF No. 12006] (This matter has been

18     adjourned to March 22, 2012 at 10:00 a.m.)

19

20     CATHAY UNITED BANK'S Response in Opposition to Debtors'

21     Fortieth Omnibus Objection to Claims (Late-Filed Claims) as to

22     Claim No. 35181 and Motion to Have Claim No. 35181 Deemed

23     Timely Filed [ECF No. 12037] (This matter is adjourned.)

24

25

Page 5

1

2    MOTION of Pearl Assurance Limited to Deem Proofs of Claim to Be

3    Timely Filed [ECF No. 12072] (This matter is adjourned.)

4

5    DEBTORS' Seventy-First Omnibus Objection to Claims (Valued

6    Derivative Claims) [ECF No. 13230] (This matter has been

7    adjourned to March 22, 2012 at 10:00 a.m.)

8

9    DEBTORS' Eighty-Fourth Omnibus Objection to Claims (Valued

10   Derivative Claims) [ECF No. 13955] (This matter has been

11   adjourned to March 22, 2012 at 10:00 a.m.)

12

13   DEBTORS' Eighty-Sixth Omnibus Objection to Claims (No Liability

14   Claims) [ECF No. 14440] (The hearing on the claims listed on

15   Exhibit 5 is adjourned to May 31, 2012 at 10:00 a.m.)

16

17   DEBTORS' Eighty-Seventh Omnibus Objection to Claims (No

18   Liability Claims) [ECF No. 14442] (The hearing on the claims

19   listed on Exhibit 6 is adjourned to May 31, 2012 at 10:00 a.m.)

20

21   DEBTORS' Eighty-Eighth Omnibus Objection to Claims (No

22   Liability Claims) [ECF No. 14450] (The hearing on the claims

23   listed on Exhibit 7 is adjourned to May 31, 2012 at 10:00 a.m.)

24

25

Page 6

1

2    DEBTORS' Eighty-Ninth Omnibus Objection to Claims (No Liability

3    Claims) [ECF No. 14452] (The hearing on the claims listed on

4    Exhibit 8 is adjourned to May 31, 2012 at 10:00 a.m.)

5

6    DEBTORS' Ninetieth Omnibus Objection to Claims (No Liability

7    Claims) [ECF No. 14453] (The hearing on the claims listed on

8    Exhibit 9 is adjourned to May 31, 2012 at 10:00 a.m.)

9

10   DEBTORS' Ninety-Second Omnibus Objection to Claims (No Blocking

11   Number LPS Claims) [ECF No. 14472] (The hearing on the

12   Objection as to claims listed on Exhibit 10 is adjourned to

13   March 22, 2012 at 10:00 a.m.)

14

15   DEBTORS' Ninety-Fifth Omnibus Objection to Claims (Valued

16   Derivative Claims) [ECF No. 14490] (This matter has been

17   adjourned to March 22, 2012 at 10:00 a.m.)

18

19   DEBTORS' Ninety-Sixth Omnibus Objection to Claims (Duplicative

20   LPS Claims) [ECF No. 14491] (This matter has been adjourned to

21   March 22, 2012 at 10:00 a.m. as to the claim on Exhibit 11

22   attached hereto.)

23

24

25

Page 7

 1

 2    DEBTORS' Ninety-Seventh Omnibus Objection to Claims

 3    (Insufficient Documentation) [ECF No. 14492] (The hearing on

 4    the objection to the claims identified on Exhibit 12 has been

 5    adjourned to March 22, 2012 at 10:00 a.m.)

 6

 7    DEBTORS' One Hundred Third Omnibus Objection to Claims (Valued

 8    Derivative Claims) [ECF No. 15003] (This matter has been

 9    adjourned to March 22, 2012 at 10:00 a.m.)

10

11    DEBTORS' One Hundred Tenth Omnibus Objection to Claims (Pension

12    Claims) [ECF No. 15010] (The Debtors have withdrawn without

13    prejudice their objections as to claim number 5343 Of Edward

14    Lill and claim number 9581 of Richard Locke [ECF No. 25328}.

15    The hearing on the objection to the claims identified on

16    Exhibit 13 has been adjourned to March 22, 2012 at 10:00 a.m.)

17

18    DEBTORS' One Hundred Eleventh Omnibus Objection to Claims (No

19    Liability Claims) [ECF No. 14491] (This matter is not going

20    forward.  The hearing on the objection to the claims identified

21    on Exhibit 14 has been adjourned to March 22, 2012 at 10:00

22    a.m.)

23

24

25

Page 8

1

2    DEBTORS' One Hundred Twelfth Omnibus Objection to Claims

3    (Invalid Blocking Number LPS Claims) [ECF No. 15014] (This

4    matter has been adjourned to March 22, 2012 at 10:00 a.m. as to

5    the claims on Exhibit 15 attached hereto.)

6

7    DEBTORS' One Hundred Seventeenth Omnibus Objection to Claims

8    (No Liability Non-Debtor Employee Claims) [ECF No. 15363] (This

9    matter has been adjourned to March 22, 2012 at 10:00 a.m. as to

10   the claims on Exhibit 16 attached hereto.)

11

12   DEBTORS' One Hundred Twentieth Omnibus Objection to Claims (No

13   Blocking Number LPS Claims) [ECF No. 16074] (The hearing on the

14   Objection as to the Unresolved Response is adjourned to March

15   22, 2012 at 10:00 a.m.)

16

17   DEBTORS' One Hundred Twenty-First Omnibus Objection to Claims

18   (To Reclassify Proofs of Claim as an Equity Interest) [ECF No.

19   16075] (The hearing on the objection to the claims identified

20   on Exhibit 17 has been adjourned to March 22, 2012 at 10:00

21   a.m.)

22

23

24

25

Page 9

1

2    DEBTORS' One Hundred Twenty-Second Omnibus Objection to Claims

3    (No Liability Claims) [ECF No. 16046] (The hearing on the

4    claims listed on Exhibit 18 is adjourned to April 26, 2012 at

5    10:00 a.m.)

6

7    DEBTORS' One Hundred Twenty-Fifth Omnibus Objection to Claims

8    (Insufficient Documentation) [ECF No. 16079] (This matter has

9    been adjourned to March 22, 2012 at 10:00 a.m.)

10

11   DEBTORS' One Hundred Twenty-Ninth Omnibus Objection to Claims

12   (No Liability Derivatives Claims) [ECF No. 16114] (This matter

13   has been adjourned to March 22, 2012 at 10:00 a.m.)

14

15   DEBTORS' One Hundred Thirty-Second Omnibus Objection to Claims

16   (Valued Derivatives Claims) [ECF No. 16117] (This matter has

17   been adjourned to March 22, 2012 at 10:00 a.m.)

18

19   DEBTORS' One Hundred Thirty-Sixth Omnibus Objection to Claims

20   (Misclassified Claims) [ECF No. 16867] (The hearing on the

21   objection to the claims identified on Exhibit 19 has been

22   adjourned to March 22, 2012 at 10:00 a.m.)

23

24

25

Page 10

1

2    DEBTORS' One Hundred Thirty-Eighth Omnibus Objection to Claims

3    (No Liability Derivatives Claims) [ECF No. 16865] (This matter

4    has been adjourned to March 22, 2012 at 10:00 a.m.)

5

6    DEBTORS' One Hundred Fortieth Omnibus Objection to Claims

7    (Duplicative of Indenture Trustee Claims) [ECF No. 16853] (The

8    hearing on the claims of Banque Safdie (Claim No. 33557) and

9    Glitnir Banki hf (Claim No. 27419) is adjourned to March 22,

10   2012 at 10:00 a.m.)

11

12   DEBTORS' One Hundred Forty-Third Omnibus Objection to Claims

13   (Late-Filed Claims) [ECF No. 16856] (The hearing on the

14   Objection to the claims listed on Exhibit 20 is adjourned to

15   March 22, 2012 at 10:00 a.m.)

16

17   DEBTORS' One Hundred Fifty-First Omnibus Objection to Claims

18   (No Liability Claims) [ECF No. 17478] (The hearing on the

19   claims listed on Exhibit 21 is adjourned to April 26, 2012 at

20   10:00 a.m.)

21

22   DEBTORS' One Hundred Fifty-Fifth Omnibus Objection to Claims

23   (Valued Derivatives Claims) [ECF No. 17468] (This matter has

24   been adjourned to March 22, 2012 at 10:00 a.m.)

25

1

2    DEBTORS' One Hundred Fifty-Sixth Omnibus Objection to Claims

3    (No Liability Derivatives Claims) [ECF No. 17469] (This matter

4    has been adjourned to March 22, 2012 at 10:00 a.m.)

5

6    DEBTORS' Objection to Proofs of Claim Filed by 2138747 Ontario

7    Ltd. and 6785778 Canada Inc. (Claim Nos. 33583 and 33586) [ECF

8    No. 18397] (The hearing on the Objection has been adjourned to

9    March 22, 2012 at 10:00 a.m.)

10

11   DEBTORS' One Hundred Fifty-Eighth Omnibus Objection to Claims

12   (Late-Filed Claims) [ECF No. 18399] (The hearing on the

13   Objection as to the claims of Deborah Focht (Claim Nos. 34381,

14   42915, 42916) has been adjourned to March 22, 2012 at 10:00

15   a.m.)

16

17   DEBTORS' One Hundred Fifty-Ninth Omnibus Objection to Claims

18   (Invalid Blocking Number LPS Claims) [ECF No. 18407] (The

19   hearing on the Objection as to the claim of Corner Banca SA

20   (Claim No. 45218) has been adjourned to March 22, 2012 at 10:00

21   a.m.)

22

23

24

25

Page 12

1

2    DEBTORS' One Hundred Sixtieth Omnibus Objection to Claims

3    (Settled Derivatives Claims) [ECF No. 18444] (The hearing on

4    the Objection as to the claims of HBK Master Fund L.P. (Claim

5    Nos. 19275 and 19276) has been adjourned to March 22, 2012 at

6    10:00 a.m.)

7

8    DEBTORS' One Hundred Sixty-Second Omnibus Objection to Claims

9    (Valued Derivatives Claims) [ECF No. 18405] (This matter has

10   been adjourned to March 22, 2012 at 10:00 a.m.)

11

12   DEBTORS' One Hundred Sixty-Third Omnibus Objection to Claims

13   (No Liability Derivatives Claims) [ECF No. 18409] (This matter

14   has been adjourned to March 22, 2012 at 10:00 a.m.)

15

16   DEBTORS' One Hundred Seventy-Third Omnibus Objection to Claims

17   (No Liability Employee Claims) [ECF No. 19399] (The hearing on

18   the objection to claims identified on Exhibit 22 has been

19   adjourned to March 22, 2012 at 10:00 a.m.)

20

21   DEBTORS' One Hundred Seventy-Fourth Omnibus Objection to Claims

22   (To Reclassify Proofs of Claim as Equity Interests) [ECF No.

23   19390] (The hearing on the objection to the claims identified

24   on Exhibit 23 has been adjourned to March 22, 2012 at 10:00

25   a.m.)

Page 13

1

2    DEBTORS' One Hundred Seventy-Fifth Omnibus Objection to Claims

3    (No Liability Pension Claims) [ECF No. 19391] (The hearing on

4    the objection to the claims identified on Exhibit 24 has been

5    adjourned to March 22, 2012 at 10:00 a.m.)

6

7    DEBTORS' One Hundred Seventy-Seventh Omnibus Objection to

8    Claims (No Liability Non-Debtor Employee Claims) [ECF No.

9    19393] (The hearing on the objection to the claims identified

10   on Exhibit 25 has been adjourned to March 22, 2012 at 10:00

11   a.m.)

12

13   DEBTORS' One Hundred Seventy-Eighth Omnibus Objection to Claims

14   (Misclassified Claims) [ECF No. 19377] (The hearing on the

15   objection to the claims identified on Exhibit 26 has been

16   adjourned to March 22, 2012 at 10:00 a.m.)

17

18   DEBTORS' One Hundred Seventy-Ninth Omnibus Objection to Claims

19   (No Liability Derivatives Claims) [ECF No. 19378] (This matter

20   has been adjourned to March 22, 2012 at 10:00 a.m.)

21

22   DEBTORS' One Hundred Eighty-Second Omnibus Objection to Claims

23   (Valued Derivatives Claims) [ECF No. 19398] (This matter has

24   been adjourned to March 22, 2012 at 10:00 a.m.)

25

Page 14

1

2    DEBTORS' One Hundred Eighty-Third Omnibus Objection to Claims

3    (No Liability CMBS Claims) [ECF No. 19407] (This matter has

4    been adjourned to June 28, 2012 at 10:00 a.m.)

5

6    DEBTORS' One Hundred Eighty-Fifth Omnibus Objection to Claims

7    (Compound Claims) [ECF No. 19714] (The Debtors have withdrawn

8    without prejudice their objections as to claim number 94952

9    (Anthony Nahum) [ECF No. 25244].  The hearing on the objection

10   to the claims identified on Exhibit 27 has been adjourned to

11   March 22, 2012 at 10:00 a.m.)

12

13   DEBTORS' One Hundred and Eighty-Sixth Omnibus Objection to

14   Claims (Misclassified Claims) [ECF No. 19816] (The hearing on

15   the objection has been adjourned to June 28, 2012 at 10:00

16   a.m.)

17

18   DEBTORS' One Hundred and Eighty-Seventh Omnibus Objection to

19   Claims (Misclassified Claims) [ECF No. 19817] (The hearing on

20   the objection has been adjourned to June 28, 2012 at 10:00

21   a.m.)

22

23

24

25

Page 15

```
 1
 2   DEBTORS' One Hundred and Eighty-Eighth Omnibus Objection to
 3   Claims (Duplicative LPS Claims) [Docket No. 19871] (This matter
 4   has been adjourned to March 22, 2012 at 10:00 a.m. as to the
 5   claims on Exhibit 28 attached hereto.)
 6
 7   DEBTORS' One Hundred and Eighty-Ninth Omnibus Objection to
 8   Claims (No Liability Repo Claims) [ECF No. 19870] (The hearing
 9   on the Unresolved Responses has been adjourned to March 22,
10   2012 at 10:00 a.m.)
11
12   DEBTORS' One Hundred Ninetieth Omnibus Objection to Claims (No
13   Liability Security Claims) [ECF No. 19873] (The hearing on the
14   Unresolved Response has been adjourned to March 22, 2012 at
15   10:00 a.m.)
16
17   DEBTORS' One Hundred and Ninety-First Omnibus Objection to
18   Claims (Valued Derivatives Claims) [ECF No. 19888] (This matter
19   has been adjourned to March 22, 2012 at 10:00 a.m.)
20
21   DEBTORS' One Hundred Ninety-Second Omnibus Objection to Claims
22   (Partially Settled Guarantee Claims) [ECF No. 19875] (The
23   hearing on the Objection as to the claim of Red River HYPI,
24   L.P. and JP Morgan Chase Bank, N.A. (Claim No. 22276) is
25   adjourned to April 26, 2012 at 10:00 a.m.)
```

Page 16

```
 1

 2    DEBTORS' One Hundred and Ninety-Eighth Omnibus Objection to

 3    Claims (Late-Filed Claims) [ECF No. 19902] (The hearing on the

 4    Objection as to the Unresolved Responses is adjourned to March

 5    22, 2012 at 10:00 a.m.)

 6

 7    DEBTORS' One Hundred and Ninety-Ninth Omnibus Objection to

 8    Claims (No Liability Claims) [ECF No. 19903] (The hearing on

 9    the Unresolved Responses is adjourned to April 26, 2012 at

10    10:00 a.m.)

11

12    DEBTORS' Two Hundredth Omnibus Objection to Claims (No

13    Liability Claims) [ECF No. 19921] (The hearing on the

14    Unresolved Responses and the claim of Paul, Weiss, Rifkind,

15    Wharton & Garrison, LLP (Claim No. 14176) is adjourned to March

16    22, 2012 at 10:00 a.m.)

17

18    DEBTORS' Objection to Proof of Claim No. 66099 Filed by Syncora

19    Guarantee, Inc. [ECF No. 20087] (The hearing on the objection

20    to the claim identified above has been adjourned to March 22,

21    2012 at 10:00 a.m.)

22

23    DEBTORS' Objection to Proof of Claim Number 29702 [ECF No.

24    20100] (The hearing has been adjourned to March 22, 2012 at

25    10:00 a.m.)
```

Page 17

1

2    DEBTORS' Two Hundred Nineteenth Omnibus Objection to Claims

3    (Valued Derivatives Claims) [ECF No. 20787] (This matter has

4    been adjourned to March 22, 2012 at 10:00 a.m.)

5

6    DEBTORS' Objection to Claim Nos. 22886, 23011, 23024

7    (Duplicative of Indenture Trustee Claims) [ECF No. 20836] (This

8    matter has been adjourned to March 22, 2012 at 10:00 a.m.)

9

10   DEBTORS' Two Hundred Twenty-Fourth Omnibus Objection to Claims

11   (Late-Filed Claims) [ECF No. 20864] (This matter has been

12   adjourned to March 22, 2012.)

13

14   DEBTORS' Two Hundred Twenty-Eighth Omnibus Objection to Claims

15   (No Liability Derivatives Claims) [ECF No. 20886] (This matter

16   has been adjourned to March 22, 2012 at 10 a.m.)

17

18   DEBTORS' Two Hundred Thirty-Second Omnibus Objection to Claims

19   (Valued Derivatives Claims) [ECF No. 21727] (This matter has

20   been adjourned to March 22, 2012 at 10 a.m.)

21

22   DEBTORS' Two Hundred Thirty-Third Omnibus Objection to Claims

23   (Valued Derivatives Claims) [ECF No. 21727] (This matter has

24   been adjourned to March 22, 2012 at 10 a.m.)

25

1

2   DEBTORS' Two Hundred Forty-Seventh Omnibus Objection to Claims

3   (No Liability Claims) [ECF No. 21727] (The hearing on the

4   objection to the claims identified on Exhibit 29 has been

5   adjourned to March 22, 2012 at 10 a.m.)

6

7   DEBTORS' Two Hundred Thirty-Eighth Omnibus Objection to Claims

8   (Late-Filed Claims) [ECF No. 23242] (The hearing on the

9   Objection as to the Unresolved Response is adjourned to March

10  22, 2012 at 10 a.m.)

11

12  DEBTORS' Two Hundred Forty-First Omnibus Objection to Claims

13  (No Liability Claims) [ECF No. 23247] (The hearing on the

14  Objection as to the claims listed on Exhibit 30 has been

15  adjourned to March 26 (sic), 2012 at 10 a.m.)

16

17  DEBTORS' Two Hundred Forty-Sixth Omnibus Objection to Claims

18  (Valued Derivatives Claims) [ECF No. 23253] (This matter has

19  been adjourned to March 22, 2012 at 10 a.m.)

20

21  DEBTORS' Two Hundred Forty-Fifth Omnibus Objection to Claims

22  (No Liability Claims) [ECF No. 23251] (This matter has been

23  adjourned to March 22, 2012 at 10 a.m.)

24

25

1

2    DEBTORS' Objection to the Claim of American Investors Life

3    Insurance Co., Inc. (Claim No. 65963) [ECF No. 24110] (The

4    hearing on the Objection has been adjourned to March 22, 2012

5    at 10 a.m.)

6

7    OMNIBUS Application of (I) Individual Members of Official

8    Committee of Unsecured Creditors and (II) Indenture Trustees

9    Pursuant to Section 1129(a)(4), or, Alternatively, Sections

10    503(b)(3) and 503(b)(4) of the Bankruptcy Code for Payment of

11    Fees and Reimbursement of Expenses [ECF No. 24762] (The hearing

12    on the Objection has been adjourned to March 22, 2102 at 10:00

13    a.m.)

14

15    LEHMAN BROTHERS HOLDINGS INC.'s and Creditors' Committee's Two

16    Hundred Twenty-Ninth Omnibus Objection to JPMorgan's Asset

17    Management Fund Claims (No Liability, Misclassified and

18    Duplicative Claims) [ECF No, 21293] (This matter has been

19    resolved.)

20

21    MOTION of Pictet & Cie and Bank Julius Baer & Co. Ltd. to

22    Enlarge the Time Period for the Filing of Claim Number 64249 by

23    One Day [ECF No. 21979} (This matter has been withdrawn.)

24

25    Transcribed by:  Sara Davis

```
 1

 2    A P P E A R A N C E S :

 3    WEIL GOTSHAL & MANGES LLP

 4          Attorneys for Debtors and

 5           Debtors-in-Possession

 6          767 Fifth Avenue

 7          New York, NY 10153

 8

 9    BY:   GARRETT A. FAIL, ESQ.

10          MARK BERNSTEIN, ESQ.

11          LORI R. FIFE, ESQ.

12

13

14    WEIL GOTSHAL & MANGES LLP

15          Attorneys for Debtors and

16           Debtors-in-Possession

17          200 Crescent Court

18          Suite 300

19          Dallas, TX 75201

20

21    BY:   ERIN D. ECKOLS, ESQ.

22          MATTHIAS KLEINSASSER, ESQ.

23

24

25
```

 1

 2    SILVERMAN ACAMPORA LLP

 3         Attorneys for Caisse Des Depots

 4          et Consignations

 5         100 Jericho Quadrangle

 6         Suite 300

 7         Jericho, NY 11753

 8

 9    BY:    JAY S. HELLMAN, ESQ.

10         BRETT S. SILVERMAN, ESQ.

11

12

13    THE MICHAELSON LAW FIRM

14         Attorneys for Morgan Lawrence (ph.),

15          Nicole Lawrence (ph.), Brian Monahan (ph.),

16          Donald Borghuna (ph.)

17         11 Broadway, Suite 615

18         New York, NY 10004

19

20    BY:    ROBERT N. MICHAELSON, ESQ.

21

22

23

24

25

Page 22

```
 1

 2    HINCKLEY ALLEN SNYDER LLP

 3          Attorneys for Citibank &

 4           Wilmington Trust

 5          28 State Street

 6          Boston, MA 02109

 7

 8    BY:    JENNIFER V. DORAN, ESQ.

 9

10    CHAPMAN & CUTLER LLP

11          Attorneys for U.S. Bank, N.A., as Trustee

12          111 West Monroe Street

13          Chicago, IL 60603

14

15    BY:    FRANKLIN H. TOP III, ESQ.

16          JAMES HEISER, ESQ. (TELEPHONICALLY)

17

18    MILBANK TWEED HADLEY & MCCLOY LLP

19          Attorneys for the Official Committee

20           of Unsecured Creditors

21          One Chase Manhattan Plaza

22          New York, NY 10005

23

24    BY:    EVAN R. FLECK, ESQ.

25
```

1

2    LOEB & LOEB LLP

3         Attorneys for Wells Fargo Bank

4         345 Park Avenue

5         New York, NY 10154

6

7    BY:   WALTER H. CHURCHAK, ESQ.

8

9

10   NIXON PEABODY LLP

11        Attorneys for Deutsche Bank National

12         Trust Co. as Trustee

13        437 Madison Avenue

14        New York, NY 10022

15

16   BY:   CHRISTOPHER M. DESIDERIO, ESQ.

17

18

19   KAPLAN & LANDAU LLP

20        Attorneys for Jeremy Kramer

21        1005 Avenue of the Americas

22        27th Floor

23        New York, NY 10018

24

25   BY:   EUGENE N. KAPLAN, ESQ.

Page 24

```
 1

 2   ALVAREZ & MARSAL NORTH AMERICA, LLC

 3          Senior Vice-President and Co-Treasurer

 4           of Lehman Brothers Holdings Inc.

 5          600 Lexington Avenue

 6          6th Floor

 7          New York, NY 10022

 8

 9   BY:   STEVEN J. COHN

10

11   GITLIN & COMPANY, LLC

12          Chairman of Fee Committee

13          1 State Street, #1750

14          Hartford, COURT 06103

15

16   BY:   RICHARD A. GITLIN

17

18   STUTMAN TREISTER & GLATT

19          Attorneys for The Baupost Group

20   BY:   MICHAEL NEUMEISTER, ESQ. (TELEPHONICALLY)

21          JEFFREY H. DAVIDSON, ESQ. (TELEPHONICALLY)

22

23   GENOVESE JOBLOVE & BATTISTA PA

24          Attorneys for Jamie H. Murcia

25   BY:   ROBERT F. ELGIDELY, ESQ. (TELEPHONICALLY)
```

Page 25

```
 1
 2   AKIN GUMP STRAUSS HAUER & FIELD LLP
 3         Attorneys for Sunshine Enterprises, LP
 4   BY:   NATALIE E. LEVINE, ESQ. (TELEPHONICALLY)
 5
 6   CLEARY GOTTLIEB STEEN & HAMILTON LLP
 7         Attorneys for Goldman Sachs Bank, USA
 8          and Goldman Sachs International, LP
 9   BY:   BENJAMIN MEEKS, ESQ. (TELEPHONICALLY)
10
11   MONARD-D'HULST ADVOCATEN
12         Attorneys for Roger VanDebroek
13   BY:   THOMAS VANDERSMISSEN, ESQ. (TELEPHONICALLY)
14
15   KING STREET CAPITAL MANAGEMENT LLC
16   BY:   MITCHELL C. SOCKETT, ESQ. (TELEPHONICALLY)
17
18   GSO CAPITAL PARTNERS
19   BY:   ANTHONY BORRECA (TELEPHONICALLY)
20
21   FARALLON CAPITAL MANAGEMENT
22   BY:   ANATOLY BUSHLER (TELEPHONICALLY)
23
24   WATERSTONE CAPITAL MANAGEMENT LLP
25   BY:   DAVID DUBACK (TELEPHONICALLY)
```

1

2    CANYON PARTNERS

3    BY:    RAJ IYER (TELEPHONICALLY)

4

5    ANGELO GORDON & CO. LP

6    BY:    DANIELLE LEONE (TELEPHONICALLY)

7

8    UBS SECURITIES LLC

9    BY:    DENNIS J. RUGGERE (TELEPHONICALLY)

10

11    CITIGROUP

12           For CitiGroup Global Markets

13    BY:    BILL J. SCHWARTZ (TELEPHONICALLY)

14

15    GRANTHAM MAYO VAN OTTERLOO & CO.

16    BY:    WEI WANG (TELEPHONICALLY)

17

18    VARDE PARTNERS, CREDITOR

19    BY:    SCOTT HARTMAN (TELEPHONICALLY)

20

21    TIMOTHY B. WILKINSON

22           Claimant Pro Se (TELEPHONICALLY)

23

24    MICHAEL BURROW

25           Claimant Pro Se (TELEPHONICALLY)

08-13555-mg   Doc 40104   Filed 09/19/13   Entered 09/19/13 15:43:21   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 27 of 57

Page 27

```
 1                    P R O C E E D I N G S

 2          THE COURT:  Be seated.  Good morning.

 3          MR. BERNSTEIN:  Good morning, Your Honor.  Mark

 4   Bernstein from Weil, Gotshal, Manges on behalf of Lehman

 5   Brothers Holdings Inc. and its affiliated Chapter 11 debtors.

 6          We have two reserved motion on the agenda this morning

 7   and then three contested claims matters.  The first reserved

 8   motion is the motion of the debtors to estimate the amount of

 9   claims filed by indenture trustees related to residential

10   mortgage-backed securities.  As Mr. Perez reported at the prior

11   hearing, the debtors and the indenture trustees have met and

12   have discussed and have agreed on a reserve for these

13   particular claims of five billion dollars, in the aggregate,

14   for the claims of U.S. Bank, Wilmington Trust, Deutsche Bank

15   and Wells Fargo.

16          Separately, the debtors have agreed on reserves for

17   Bank of America and HSBC.  And those are not included in this

18   order; the five billion just really for those first four

19   trustees.

20          Yesterday, he debtors filed a revised form of order

21   which indicates the five-billion dollar reserve number and

22   allocates it ninety-five percent for the claims against LBHI

23   and five percent for the claims against SASCo.  In addition,

24   the debtors have agreed with the indenture trustees to seek to

25   mediate the amounts -- the allowed amounts of the claims to
```

08-13555-mg    Doc 40104    Filed 09/19/13    Entered 09/19/13 15:48:25    Main Document
08-13555-jmp    Doc 28803    Filed 09/13/13    Entered 09/13/13    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 20 of 57
Pg 20 of 57

Page 28

1    finally resolve the matter altogether.  And that -- there's a

2    paragraph in the order directing the parties to mediate at --

3    with a mediator, either selected by the parties if they can

4    agree or selected by the Court.

5            I'm happy to answer any questions Your Honor might

6    have on this.  Otherwise, this is going forward on an

7    uncontested basis and we respectfully request Your Honor grant

8    the motion estimating the reserve at five billion.

9            THE COURT:  The motion's granted.

10           MR. BERNSTEIN:  Thank you, Your Honor.

11           The next item on the agenda will be handled by my

12   colleague, Mr. Fail.

13           MR. FAIL:  Good morning, Your Honor.  Garrett Fail;

14   Weil, Gotshal for the debtors.

15           The next motion is the motion of Lehman Brothers

16   Holdings Inc. for authority to use non-cash assets in lieu of

17   available cash as reserved for disputed claims.  Of the

18   approximately 11,900 holders of disputed claims that were

19   served with the motion, only five filed responses.  I'm happy

20   to report, Your Honor, that four of the five objections have

21   been resolved.  The debtors have been informed that Mr. Coreth,

22   Golden State Tobacco Securitization Corporation, Commerce Bank

23   and U.S. Bank are no longer prosecuting their objections.

24           The debtors were not able to reach a resolution of the

25   fifth objection which was filed by Mr. Jamie Murcia who holds a

08-13555-mg    Doc 40104    Filed 09/19/13    Entered 09/19/13 15:43:21    Main Document
                        Pg 29 of 57
LEHMAN BROTHERS HOLDINGS INC., et al.

Page 29

1      1.4 million dollar disputed claim.  LBHI has agreed to adjourn

2      the hearing with respect to Murcia's -- Mr. Murcia's claim only

3      to the March omnibus hearing.  The debtors are hopeful that

4      they will be able to reach a resolution of this objection prior

5      to that date to obviate the need for a contested hearing.  As a

6      result, the motion is going forward uncontested this morning.

7              The approach of this motion was expressly contemplated

8      by Section 8.4 of the Chapter 11 plan confirmed in December.

9              THE COURT:  Let me break in and ask you a question

10     that may be obvious to everybody, but it's not obvious to me.

11     How does it work for Mr. Murcia's opposition to be reserved to

12     another hearing when I'm being asked to approve a procedure

13     that applies across the board?  Is it the position that this is

14     specific to Mr. Murcia and that, at least in respect of his

15     claim as a disputed claim, that his claim, pending resolution,

16     will still be treated as reserved by cash assets?

17             MR. FAIL:  The debtors will reserve 100 percent of the

18     pro rata share of distributions in cash for Mr. Murcia's 1.4

19     mill -- approximate 1.4 million-dollar claim, pending another

20     agreement on a reserve, disallowance of the claim or order of

21     the Court with respect to an ability to substitute non-cash

22     assets for that claim.

23             THE COURT:  So the curiosity, it seems, is that

24     because he has a relatively small claim, he ends up, by virtue

25     of not resolving his objection, with cash reserves while

08-13555-jmp    Doc 28803    Filed 09/19/13    Entered 09/19/13 15:48:21    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.

Page 30

1    everybody else in the case gets non-cash reserves.  That seems

2    bi -- that seems strange to me.

3            MR. FAIL:  A higher percentage of cash reserves.

4    There will be a twenty-five percent -- a minimum of twenty-five

5    percent reserved on an aggregate basis for all of the claimants

6    and that aggregate is pooled.  And it's higher at different

7    subsidiary debtors that -- as set forth in the Cohn

8    declaration, Your Honor.  So that money is pooled.

9            So to the extent that other claims that are currently

10   disputed become subsequently allowed after the first

11   distribution date and before the second, cash will be available

12   for those claimants as it would for Mr. Murcia.  In the

13   interim, though, to avoid a contested fight over what is in

14   this case a relatively small claim, in the unique circumstances

15   of these cases, we thought it best to proceed on a consensual

16   basis.

17           THE COURT:  Okay.  I mean, I was perfectly prepared to

18   deal with everything on a contested basis today.  So we can

19   deal with it in a month.

20           MR. FAIL:  Okay.  Thank you, Your Honor.

21           The debtors believe that using a partial non-cash

22   reserve for disputed claims is a preferred means to accelerate

23   distributions to the thousands of holders of allowed claims.

24   If the motion is approved, the six participating debtors

25   estimate that they will be able to distribute approximately 2.8

1    billion dollars more than they would otherwise to holders of

2    allowed claims in the initial distribution alone.

3           As described in the motion, the relief requested also

4    benefits holders of currently disputed claims that subsequently

5    become allowed because they will benefit -- because they will

6    be entitled to receive a catch-up distribution at the higher

7    percentage paid on the initial distribution.  The procedures

8    established provide adequate, reasonable protection for the

9    holders of disputed claims.  In order to substitute non-cash

10   assets, two conditions must be satisfied on a distribution

11   date:  The applicable debtor must reserve at least twenty-five

12   percent of the required reserve amount in cash so there will be

13   a minimum cash reserve; and the value of the participating

14   debtor's non-cash assets must be at least 2.5 times that amount

15   of the debtor's required reserve not covered by the minimum

16   cash reserve.

17          Non-cash assets will be used first to pay catch-up

18   distributions to holders of disputed claims that become

19   allowed.  And then, to replenish the fund -- replenish and fund

20   the minimum cash reserve before further distributions are made

21   to holders of previously allowed claims.  The motion does not

22   apply to administrative, priority or secured claims.  All

23   disputed claim holders will be entitled to receive the interest

24   earned on their reserve amount as if the entire amount has been

25   reserved in cash.  So there is no change with respect to the

08-13555-mjp    Doc 40104    Filed 09/19/13    Entered 09/19/13 15:48:31    Main Document
08-13555-jmp    Doc 28803    Filed 09/19/13    Entered 09/19/13 15:48:21    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg Pg 32 of 57

Page 32

1      interest provision in the plan.

2             Additionally, the plan administrator will evaluate

3      the -- each debtor's assets and claims prior to each

4      distribution date and the plan administrator may establish

5      additional minimum conditions prior to substituting non-cash

6      assets as reserves.  The relief requested is supported by the

7      Cohn declaration.  Mr. Cohn is a managing director with Alvarez

8      & Marsal and a senior vice-president and co-treasurer of Lehman

9      Brothers Holdings Inc.

10            The declaration illustrates the mechanics of the

11     motion, assuming values as of January 27th, 2012, and it

12     provides further support for the protections that are

13     established by the motions for disputed claim holders.  For

14     instance, in the illustrative example set forth on Exhibit D,

15     the asset-to-reserve ratio for LBHI is in excess of 20:1.  And

16     for LCPI, it's 190:1.

17            The other participating debtors will retain a minimum

18     asset-to-reserve ratio of 2.5:1 but a minimum cash reserve

19     significantly greater than twenty-five percent; fifty percent

20     for LBSF, seventy percent for LOTC and ninety percent for LBCS.

21     Mr. Cohen is present in the courtroom today and I would move

22     for the admission of his declaration into evidence.

23            THE COURT:  Is there any objection to that?

24            I hear no objection.  It's admitted.

25     (Steven Cohn's declaration was hereby received into evidence as

 1    a Debtors' Exhibit, as of this date.)

 2              MR. FAIL:  Thank you, Your Honor.

 3              The motion is also supported by the creditors'

 4    committee which filed a statement in support at Docket 25546.

 5    On February 20th, we filed a revised proposed order.  The order

 6    contained clean-up and technical changes, mainly relating to

 7    amounts other than plan adjustment that are reallocated

 8    pursuant to settlements incorporated into the plan.  The

 9    changes make clear that any reallocated amounts for the LCPI

10    settlement amount, the LBSF settlement amount and the LBSF

11    additional settlement amount that would be reserved for

12    disputed claims in the classes that are allowed to receive a

13    share of those plan settlement reallocations will continue to

14    be reserved in cash.

15              In addition, to resolve one of the objections to the

16    motion, LBHI agreed that it would provide notice of its

17    intention to substitute non-cash assets in compliance with the

18    requirements of the motion and the proposed order in advance of

19    any distribution made, subsequent to the initial distribution.

20    Under the unique circumstances of these cases, the debtors

21    respectfully request that the Court grant the relief requested.

22              THE COURT:  We're proceeding on an unopposed basis, so

23    this becomes easy to do.  But I would like to hear from counsel

24    for the creditors' committee in reference to the statement that

25    was filed, which is have read, because we're dealing with a

Page 34

1  fairly significant adjustment in the treatment of disputed

2  claims, fully consistent with Section 8.4 of the plan, but with

3  specifics that were not built into the plan.  And so, I'm

4  particularly interested in hearing what the creditors'

5  committee has to say about its independent review of this

6  process.

7          MR. FAIL:  Thank you, Your Honor.

8          MR. FLECK:  Good morning, Your Honor.  Evan Fleck of

9  Milbank, Tweed -- shouldn't have done that -- on behalf of the

10 official committee.

11         As Mr. Fail noted, and as Your Honor noted, we do

12 support -- the committee supports the relief requested in the

13 motion and we filed a statement on the docket.  When the plan

14 provision was initially contemplated, the committee was

15 supportive of it.  At that time, it was really just a concept

16 that maybe at some time in the future, it will make sense to

17 use some of the non-cash assets of the estates and they're

18 significant, to provide for protection and reserve when

19 distributions ultimately -- when we reach that phase of the

20 case.  And it wasn't until after the plan discussions really

21 took place in earnest and the confirmation process that we

22 thought, together with the debtors, about potentially invoking

23 that provision and coming up with the mechanism that's the

24 subject of the motion.

25         And as with many other motions, we've come up before

Page 35

1    the Court and told Your Honor that we took a lot of time and we

2    weren't initially, as a committee, convinced that this was the

3    right way to proceed.  And together with the committee's

4    financial advisors, we spent a great deal of time working with

5    A&M to crunch the numbers and make sure that not only were the

6    and are the allowed claimants protected by the relief requested

7    in the motion, but also those parties who had disputed claims

8    because the committee recognizes that those parties, some of

9    them will ultimately have allowed claims; they are part of the

10   creditors' committee's constituency and the committee owes

11   fiduciary duties to those parties as well.

12          And after taking those analyses into account,

13   ultimately the committee did decide this relief does make sense

14   and protects the interests of all parties.  And, as Your Honor

15   noted, it was contemplated by the plan and ultimately with

16   the -- in connection with the motion, parties were given

17   adequate notice of the relief that was requested.

18          The committee, often, through counsel and financial

19   advisors, we received inquiries from parties in interest in the

20   cases and often their views about relief requested.  In the

21   case of this motion, there were questions raised by creditors

22   but the overwhelming majority of the inquiries that the

23   committee received and that its advisors received was positive.

24   People wanted do know the mechanism by which the catch-up

25   distributions and subsequent distributions would be made and

08-13555-mg    Doc 40104    Filed 09/19/13    Entered 09/19/13 15:48:21    Main Document
08-13555-mg    Doc 20803    Filed 09/19/13    Entered 09/19/13 15:48:21    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 30 of 47
Pg 30 of 57

Page 36

1    how'd they be protected, but after they understood the process,

2    there was overwhelming support.

3         The committee -- there are two primary reasons why the

4    committee is supportive of the relief, Your Honor.  First, it's

5    because of the substantial benefits that go to allowed --

6    holders of allowed claims.  I think that's manifest from the

7    motion; distributions are going to be larger.  And as I argued

8    to the Court in connection with the LBF motion a few weeks ago,

9    it's important to the committee that part of the bargain that

10   we think was at issue in this plan settlements that so many

11   creditors in these cases made and the compromises they reached

12   in connection with resolving their claims and not pursuing

13   litigation in these case was that the initial distribution, and

14   all distributions, would be meaningful.  And they would be the

15   largest distributions that were appropriate under the plan.

16   And those creditors were aware that this provision was in the

17   plan, believed it was appropriate and in the committee's view,

18   it was their rational expectation that some of the non-cash

19   assets of these estates would be used for reserve purposes so

20   that the initial distribution could be as large as possible and

21   as appropriate under the circumstances, while still taking into

22   account and protecting the interests of the disputed claim

23   holders.

24        In consultation with counsel and its financial

25   advisors, the committee concluded that the risk to the holders

08-13555-mg    Doc 40604    Filed 09/19/13    Entered 09/19/13 15:43:21    Main Document
08-13555-jmp    Doc 20503    Filed 09/13/13    Entered 09/13/13 19:03:55    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 32 of 57
Pg 113 of 154

Page 37

1    of disputed claims in this process is remote.  So many things

2    in this case, we've said there's no such thing as a riskless

3    transaction; we think that's true here as well.  But the risks

4    that exist here are reasonable and appropriate under the

5    circumstances.  It's set forth more fully in the declaration of

6    Steven Cohn in support of the motion, but the committee

7    believes that LBHI has proposed reasonable measures to protect

8    the interest of the disputed claim holders.  In the committee's

9    opinion, it will ensure that any potential prejudice to those

10   holders, as I said, is remote.

11          Although LBHI can come back to the Court and propose

12   additional minimum conditions, with respect to the minimum

13   asset-to-reserve ratio, there will -- they would be required to

14   provide due notice to the holders of disputed claims and this

15   Court's approval would be required if LBHI ever seeks to reduce

16   the minimum terms and conditions that are proposed in the

17   motion.  That was a very important component of the process for

18   the committee.

19          Additionally, Your Honor, under the priority scheme

20   for subsequent distributions, the available cash that's

21   generated from non-cash assets will be used first to satisfy

22   the catch-up distributions and then to fund the minimum cash

23   reserve for the outstanding disputed claims.  And in the

24   committee's view, they're comfortable that that will endure

25   that the holders of disputed claims that subsequently become

08-13555-mg    Doc 40104    Filed 09/19/13    Entered 09/19/13 15:43:21    Main Document
08-13555-jmp    Doc 28803    LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 158 of 174
Pg 38 of 47

Page 38

1    allowed claims will receive the pro rata share of distributions

2    to which they're entitled.  Significantly, the holders of

3    disputed claims will be -- will continue to be entitled to the

4    accrual of interest that would have been earned on the entire

5    amount of the reserves as if they consisted entirely in cash.

6            And more important to the committee's determination

7    that the request is reasonable under the circumstances, the

8    committee's advisors have analyzed all the variables that will

9    impact the sufficiency of available cash to cover the disputed

10   claim that subsequently become allowed and to fund the minimum

11   cash reserve, and have concluded that there is no risk of

12   insufficient available cash to satisfy catch-up distributions.

13   As we've set forth in the committee's statement, the

14   committee's advisors together with the debtors' advisors have

15   analyzed the outstanding disputed claims; the debtors'

16   projections of the amounts in which such claims may be allowed

17   as well as the committee's own projections; the value of the

18   participating debtors' non-cash assets; the estimated cost of

19   the post-effective date administration of the participating

20   debtors' estate; and the near-term cash events that are

21   expected to generate non-cash assets.  And based upon those

22   analyses, the committee has concluded that a significant

23   cushion will exist for the protection of holders of disputed

24   claims, thereby making the risks that are attendant to the

25   motion remote and appropriate under the circumstances.

08-13555-mg    Doc 40164    Filed 09/19/13    Entered 09/19/13 15:48:21    Main Document
08-13555-jmp    Doc 20803    Filed 09/13/13    Entered 09/17/13 09:05    Main Document

LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 39 of 57

Page 39

         1          And for those reasons, Your Honor, the committee is

         2    supportive of the relief requested and asks that the order be

         3    entered.

         4          THE COURT:  I appreciate your comments and they're

         5    very helpful.  But I, without quibbling, want to ask you about

         6    your reference to there being no risk to the inability of the

         7    debtor to make catch-up distributions versus what I think was

         8    your opening salvo that it's virtually impossible for

         9    transactions to made riskless.

        10          Is this a remote risk or is there, in the opinion of

        11    the committee's professionals, no risk that this set-up will

        12    result in a shortfall for any of the disputed creditors in the

        13    future?

        14          MR. FLECK:  Your Honor, we believe that there's a very

        15    remote risk.  I guess that's option number 3, because, as I

        16    said, we think that -- we're very comfortable with the

        17    committee's analyses with respect to the value of the non-cash

        18    assets.  We've tested the debtors' determination and analyses

        19    with respect to the valuation of those assets.  We think

        20    they're good and they can be relied upon, and they've been

        21    relied upon throughout these cases.

        22          We can't predict every circumstance that comes up

        23    along the way, so therefore --

        24          THE COURT:  Your partner seems anxious to say a few

        25    words.  And I'm going to let him do that.

08-13555-mg    Doc 40104    Filed 09/19/13    Entered 09/19/13 15:48:21    Main Document
Pg 40 of 47

08-13555-jmp    Doc 28803    Filed 06/12/12    Entered 06/12/12 15:48:21    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 40 of 47

1          MR. FLECK:  Okay.

2          UNIDENTIFIED SPEAKER:  Your Honor, I picked up on how

3     you precisely phrased this in terms of whether there's a remote

4     risk or no risk with respect to a potential shortfall or the

5     inability to make distributions to creditors in the future.

6     And I'm going to answer it two ways.

7          We believe there is no risk that a creditor will bear

8     a permanent risk of non-payment as a result of this.  There is

9     a remote risk that -- and we believe it's a very small risk --

10    that a subsequent distribution date -- there may be

11    insufficient cash assets to true up everybody whose claims have

12    been allowed in the interim, and therefore they would have to

13    wait to the next one when those non-cash assets were

14    liquidated.  But we believe that is extremely remote.  We ran

15    numerous hypotheticals on that and in the, you know, ninety-

16    five-plus percent of cases, there wasn't even the delay of

17    payment.

18          THE COURT:  Okay.  Appreciate that.

19          UNIDENTIFIED SPEAKER:  Thanks.

20          THE COURT:  I also recognize that my question was

21    deliberately designed to get at what risks we're talking about.

22    And I'm satisfied that the difficult question has been

23    answered -- by both of you.

24          I do have a question, though, for Mr. Fail, and

25    perhaps also for Mr. Cohn.  And it has to do with the

1   resolution of all objections with the exception of Mr. -- or

2   maybe it's Ms. Murcia's objection which continues.  I'd like to

3   know more about the process that led these various objectors

4   to, in effect, give up and whether or not any concessions were

5   made to them in order to get them to withdraw their objections

6   at this point.

7           MR. FAIL:  Your Honor, Garrett Fail, again.

8           With respect to U.S. Bank and to the extent that any

9   of the parties are present or on the telephone and wish to add,

10  supplement or correct, you know, they should feel free -- with

11  respect to U.S. Bank, our conversations were productive

12  immediately following the filing of the Cohn declaration which

13  was filed after the objection deadline.  So, after parties, I

14  think, after all of the parties had a chance to review the Cohn

15  declaration and we had a chance to explain it and discuss it

16  with them and the committee's statement in support was filed,

17  circulated to them and discussed, I think that's one area that

18  went a very long -- two things that went a long way to resolve

19  the objections.

20          With respect to U.S. Bank, Your Honor, I don't know if

21  I names them originally, but that was -- to resolve that

22  objection, we agreed to -- the debtors agreed to provide

23  advance notice of subsequent applications of the relief

24  required in the motion.  That is the only thing.  In connection

25  with none of these resolutions were any claim settlements

08-13555-mg    Doc 40104    Filed 09/19/13    Entered 09/19/13 15:48:21    Main Document
08-13555-jmp    Doc 28803    Filed 09/13/13    Entered 09/13/13 15:48:21    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 42 of 57

Page 42

1  reached; no claims allowed; no compromise on the debtors' or

2  any parties in interest's ability to object to these claims

3  which are -- may be disputed.

4         With respect to the remaining three claims, if my math

5  is correct, the debtors entered into reserve stipulations which

6  provided for a minimum cash reserve percentage higher than

7  twenty-five percent, but a floor that would be maintained for

8  each of the claims.  Which, again, in the context of these

9  cases, were each relatively small and in the aggregate,

10  compared to the amount of and the number of and the size of the

11  aggregate pool of disputed claims and the cash that would be

12  required to be reserved, are relatively minimal; it wouldn't

13  have an effect on the -- significant effect on the distribution

14  to creditors.

15         THE COURT:  Okay.  Is there anyone else who wishes to

16  say anything in reference to this inquiry?

17         MR. TOP:  Your Honor, Frank Top on behalf of U.S.

18  Bank.  We did withdraw our objection based upon the statements

19  that the debtors are going to be providing, particularly as

20  part of future distributions.  We were not as concerned about

21  this upcoming distribution, particularly since we're primarily

22  an LBHI creditor and the ratios currently are so large.  But we

23  are, of course, you know, concerned about future distributions

24  and we felt that the -- at least the statement that, you know,

25  the debtors -- that someone's actually looking at these ratios

08-13555-mg   Doc 40104   Filed 09/19/13   Entered 09/19/13 15:43:21   Main Document
Pg 49 of 57

08-13555-mg   Doc 28803   Filed 09/19/12   Entered 09/19/12 15:43:21   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 49 of 57

Page 43

1    and that these ratios are being complied with in connection

2    with future distributions will be helpful, not only to U.S.

3    Bank, but to all creditors of the estates, so that they can

4    take a look at that and review that in advance of a

5    distribution and take whatever action they view as appropriate

6    at that particular point in time.

7            We also took some comfort with the fact that the plan

8    administrator doesn't have to use these particular ratios; it

9    could be more conservative if the plan administrator so

10   chooses.  And so we would hope that, you know, to the extent

11   that market conditions got to the point where, lo and behold,

12   there might be another Lehman event or something like that

13   that's so drastic that the plan administrator would use his

14   discretion appropriately, that -- be a little bit more

15   conservative if that -- those types of events ever occurred.

16           So, no, we don't think that there's no risk, but we

17   think so long as people are provided with information in

18   advance of future distributions to allow them to protect

19   themselves, to a certain extent, and that the plan

20   administrator uses his discretion appropriately, that we got

21   comfortable enough with the motion to withdraw our objection.

22           Thanks.

23           THE COURT:  Okay.  I have a question for Mr. Cohn, if

24   he's present.  It's a very, very -- Mr. Cohn, you can hear the

25   question and then you can stand up and answer.  There's no need

08-13555-mjp   Doc 40164   Filed 09/19/13   Entered 09/19/13 15:48:21   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 144 of 57

Page 44

1   to be sworn at this point.

2          It's really -- I guess it's my own inability to fully

3   appreciate the financial models that are embedded in the

4   conclusions set forth in your declaration and in the proposal.

5   I'd like to know a little bit more about how the ratio of 2.5:1

6   was developed.

7          I assume that there was a sensitivity analysis of some

8   sort done and that different ratios may have been tested as

9   part of the process in coming up with the 2.5.  But, obviously,

10  the 2.5 bears no relationship to the 190:1 ratio that appears

11  at LBHI.  And in part because this structure is so complicated,

12  at least from my perspective, and must have evolved over time

13  with a balancing between maximizing present distributions to

14  allowed claimants and protecting the interests of future

15  claimants that are subject to dispute, I'm just interested in

16  knowing how this process went and how you ended up in the place

17  that has been proposed.

18          MR. COHN:  Sure.  We actually --

19          THE COURT:  You can come to the microphone.

20          MR. COHN:  My name is Steven Cohn.

21          We actually looked at a couple of different options.

22  We looked at roughly 2-and-a-half to 1 and 3:1 and the concept

23  that we used in determining that or looking at this was almost

24  an asset-based lending concept.  In other words, if we -- if

25  the estate were to go out and borrow money based on the assets,

1    what kind of advance rate would a bank provide to us in terms

2    of the asset?  Similar to an asset-based loan that uses

3    accounts receivable or inventory as security, you might get

4    eighty percent of the accounts receivable or you might get

5    sixty percent of inventory.  These being a combination of

6    assets that are liquid that actually throw off cash, as in

7    loans, whether they be real estate loans or commercial loans,

8    and assets that don't throw off money such as private equity

9    investments or, you know, other things that we need to wait for

10   to monetize.  So, a combination of things and we thought we

11   needed to be a little bit more conservative than what a bank

12   would actually do on liquid inventory and receivables because

13   that's an on-going business.  So we wanted something somewhat

14   more conservative than that.

15           We looked and two and a half; we looked at three.  We

16   thought that two and a half was a reasonable floor in terms of

17   protection.  As you've noticed from the exhibit, it only

18   applies to the three smaller entities at this point in time.

19   And we would expect that, over time as their assets decline,

20   their actual reserves of cash will increase.  I think at the

21   moment, it's about fifty percent for LBSF.  We would think,

22   actually, by the time of the distribution, it'll actually be a

23   higher percentage cash reserve because their assets continue to

24   come down as cash is collected.  So the two-and-a-half-times

25   number which will be the trigger will actually generate a much

08-13555-mg    Doc 40104    Filed 09/19/13    Entered 09/19/13 15:48:05    Main Document
08-13555-jmp    Doc 28803    Filed 09/19/13    Entered 09/19/13 15:48:05    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 340 of 57
Pg 46 of 57

Page 46

1    higher -- not much, but maybe ten-point higher cash reserve at

2    this point, but the time we get to a distribution.

3            So that was really the thought process.  We thought

4    twenty-five percent on the other side, as a cash reserve, was

5    really kind of the absolute minimum.  In other words, we are

6    conscious of our obligations to disputed claimants as well as

7    allowed claimants and that, really, using something less than

8    twenty-five percent was not prudent.  And we reserved the

9    rights, at least as my understanding goes, that if as the

10   assets decline in the estate or we're not happy with the

11   quality of the assets, to say you know what, our minimum

12   threshold will be thirty-five percent on the second or third or

13   fourth distribution in order to make sure that there is

14   sufficient assets available to pay the disputed claimants as

15   they become allowed.

16           THE COURT:  And I take it that in this process, you

17   had some interaction with the professionals for the committee

18   and shared your work product or at least thinking with them and

19   that they tested it as well?

20           MR. COHN:  Yes.  We spent a considerable amount of

21   time with FTI who are the financial advisors on this piece of

22   the business with -- of the committee.  They took us through

23   their analysis; they asked us to do a little bit more.  We had

24   done some work -- the only thing that's not included were our

25   estimates of cash flow on a go-forward basis, which is really

08-13555-mg   Doc 40104   Filed 09/19/13   Entered 09/19/13 15:43:21   Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 40 of 47

08-13555-jmp   Doc 28303   Filed 09/19/13   Entered 09/19/13 15:43:21   Main Document
Pg 40 of 47

Page 47

```
 1   what the committee's advisors wanted to understand.  In other

 2   words, how much cash would be generated between now and the

 3   next distribution date and they made their own estimates and we

 4   shared with them whether we thought they were in the ballpark

 5   or not.  They were using conservative numbers and they were --

 6   and they actually shared with us a preliminary form of the

 7   exhibits that they shared with the committee.  So, yes, we had

 8   the opportunity both to work with them and to give them some

 9   constructive criticism as to how their presentation should go.

10              THE COURT:  Okay.  Thank you very much for that.

11              Anything more?

12              MR. FAIL:  No, Your Honor.

13              THE COURT:  Okay.  This is approved.  I'm satisfied

14   based upon the materials that I've reviewed and the statements

15   that have been made on the record, including the comments of

16   counsel, both counsel for the committee who happen to be

17   present today and Mr. Cohn's statements in response to my

18   questions, that the structure that's been set up here provides

19   what I'll term adequate protection for the disputed claims.

20   And I believe that the process that has been described

21   represents a creative and appropriate balancing of the needs of

22   creditors whose claims have been allowed with those creditors

23   that have claims that are subject to dispute.

24              Candidly, I'm surprised that there is a remaining

25   objection that is being carried and, to the extent that this is
```

08-13555-mg    Doc 40164    Filed 09/19/13    Entered 09/19/13 15:48:21    Main Document
08-13555-jmp    Doc 20803    Filed 09/13/13    Entered 09/13/13 15:48:21    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 49 of 57
Pg 49 of 57

Page 48

1    being heard as a separate matter in March, I'm frankly loathe

2    to disparately protect one creditor that happens to be

3    unwilling to make concessions in the objections that had been

4    lodged.  Notwithstanding the very persuasive evidence that has

5    been presented concerning adequate protection, such opposition

6    should not result in more favorable treatment.

7           I'm in effect telegraphing what I would do with that

8    objection if it were being heard today.  To the extent the

9    parties wish to be guided by that, that may be helpful.

10          It's approved and I'll enter the order.

11          MR. FAIL:  Thank you very much, Your Honor.  I'll turn

12   the podium over to my colleagues who will continue with the

13   rest of the claims agenda.

14          THE COURT:  Okay.

15          MR. KLEINSASSER:  Your Honor, Matthias Kleinsasser

16   with Weil, Gotshal for the debtors.  I'm going to handling

17   agenda item 3.

18          Your Honor, this item concerns the 221st omnibus

19   objection.  That objection seeks to expunge claims of

20   individual noteholders, each of which is covered by a proof of

21   claim filed by an indenture trustee.

22          Today, Your Honor, we're moving against claim 67675,

23   which is held by Ms. Annetta Pugia.  That claim which, Your

24   Honor, I'm going to call the new claim, is virtually identical

25   to claim 35260 which Ms. Pugia filed on September 28th, 2009.

1    Your Honor, I'm going to refer to the claim 35260 as the

2    original claim.

3             The debtors previously identified the original claim

4    as duplicative of the indenture trustee claim 21805 filed by

5    Bank of New York Mellon and included the original claim on the

6    twenty-seventh omnibus objection.  The Court overruled Ms.

7    Pugia's objection to the twenty-seventh omnibus objection and

8    the original claim was expunged pursuant to an order of this

9    Court entered on September 21st, 2010.

10            Ms. Pugia subsequently filed the new claim, Your

11   Honor, on October 3rd, 2011.  The new claim is subject to the

12   221st omnibus objection and the new claim is the one we're

13   moving against now.  The new claim is essentially the same

14   claim as the original claim, Your Honor, and actually purports

15   to amend the original claim.  The asserted amount is almost

16   exactly the same, approximately 23,000 dollars, and it's based

17   on the same security as the original claim.

18            The debtors have identified the new claim as

19   duplicative of indenture trustee claim, 21805, the same

20   indenture trustee claim that covered the original claim.

21   Specifically, Your Honor, the security on which the new claim

22   is based has a QCIP of 52519Y209, which is covered by the

23   indenture trustee claim.

24            Ms. Pugia filed two responses to the 221st omnibus

25   objection; one on October 24th, 2011 at docket number 21560,

08-13555-jmp    Doc 28803    Filed 09/19/13    Entered 09/19/13 15:48:21    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 50 of 57

Page 50

1   and an identical response on February 8th, 2012 at docket

2   number 25111.  These responses do not address the merits of the

3   221st omnibus objection.  The bases of these responses is that

4   Ms. Pugia invested money with the debtors who shortly

5   thereafter were found to be financially unsound.

6          The responses request that the Court overrule the

7   objection because the investment made by Ms. Pugia represent a

8   lot of money to her.  Without meaning any disrespect to Ms.

9   Pugia, Your Honor, who I understand to be appearing pro se in

10  this case, the debtors would point out that she has not

11  addressed the merits of the 221st omnibus objection;

12  specifically, that the new claim is duplicative of the

13  indenture trustee claim.

14         Because the security serving as to the basis for the

15  new claim is covered by the indenture trustee claim, we

16  respectfully request that the Court overrule Ms. Pugia's

17  responses and grant the 221st omnibus objection with respect to

18  claim 67675.

19         THE COURT:  Is Annetta Pugia in court or is she

20  present by telephone?

21         I hear no response.  I've reviewed the claimant's

22  written submission and agree with the characterization of

23  counsel that it does not deal with the merits of the objection

24  under the circumstances.  And given the fact that Ms. Pugia is

25  not here to prosecute her response, I'm overruling her

Page 51

1    objection and granting the omnibus objection to claim with

2    respect to her claim.

3           MR. KLEINSASSER:  Thank you, Your Honor.  I'm now

4    going to turn the podium over to my colleague, Ms. Eckols.

5           Thank you.

6           MR. FAIL:  Your Honor, Garrett Fail again.  Just one

7    scheduling note.  I think there's -- I know there's an item on

8    the calendar today for a status conference in connection with a

9    motion filed by the members of the creditors' committee for

10   reimbursement.  Mr. Gitlin is here, chair of the fee committee,

11   and has a scheduling conflict.

12          So if, at a certain point it pleases the Court, we

13   could adjourn briefly the claims hearing and have the status

14   conference.  Alternatively, if that doesn't work for the Court

15   we'll just proceed with the claims agenda.

16          THE COURT:  Well, I see Mr. Gitlin in the front row.

17   Ordinarily I don't change the order of business to accommodate

18   the needs of one individual, unless there's an extraordinary

19   need for that individual to be present.  And in Mr. Gitlin's

20   case, that's true; he does need to be present for the

21   conference.  If I had been advised of this prior to the

22   commencement of today's hearing, we might have taken the status

23   conference first and avoided the interruption of the calendar.

24          When -- not that his personal business should become

25   public knowledge, but when does Mr. Gitlin need to leave the

08-13555-mg    Doc 40804    Filed 09/19/13    Entered 09/19/13 15:48:21    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 52 of 57

Page 52

1    courtroom?

2           MR. GITLIN:  Your Honor, if necessary, I could stay.

3    Unfortunately, I have made serious commitments today in another

4    town.  If I could leave the courtroom about a quarter to 12 or

5    12, I could still make it.

6           THE COURT:  Oh, that won't be a problem.

7           MR. FAIL:  Thank you, Your Honor.

8           MS. ECKOLS:  Good morning, Your Honor.  Erin Eckols

9    for the debtors.  I'm going to be handling the last two

10   contested claims items.  Agenda item 4 is the motion of Jeremy

11   Kramer for reconsideration of the reclassification as an equity

12   interest.

13          I believe Mr. Kramer's counsel is in the courtroom and

14   making his way up to the podium.

15          THE COURT:  Okay.

16          MR. KAPLAN:  Good morning, Your Honor.  Eugene Kaplan

17   for Jeremy Kramer.

18          This is a motion for reconsideration of Mr. Kramer's

19   claim which was reclassified as an equity interest in default.

20   Mr. Kramer --

21          THE COURT:  He voluntarily defaulted.  He knowingly

22   didn't take a position.  How can you possibly come back now?

23          MR. KAPLAN:  Well, I think, first of all the fact

24   that -- even if he voluntarily defaulted, that's not a basis

25   to --

Page 53

1              THE COURT:  Yes, it is.

2              MR. KAPLAN:  It's one basis.

3              THE COURT:  He's a sophisticated claimant who,

4       according to the papers, knew full well that he had an

5       opportunity to object.  Extended the time with the consent of

6       the debtor and chose to take a dive.

7              MR. KAPLAN:  He is a sophisticated investment

8       professional.  He's not a lawyer.  He's not a bankruptcy

9       lawyer.

10             THE COURT:  He certainly is in a position to protect

11      his interest.  It's a large claim.  He worked at Neuberger

12      Berman.  He, presumably, knows a lot about what goes on in

13      bankruptcies or is in the position to learn about it.

14             He was in consultation directly with debtors' counsel

15      and made an informed decision, at least informed well enough

16      for his purposes to not take a position.  He could have hired

17      counsel, he chose not to.

18             MR. KAPLAN:  He could have.

19             THE COURT:  He's now hiring counsel too late.

20             MR. KAPLAN:  He hired counsel after he had spoken with

21      his --

22             THE COURT:  He's hiring counsel after he observed that

23      others similarly situated were able to improve their position

24      by fighting.

25             MR. KAPLAN:  But those others were members of the same

08-13555-jmp    Doc 28803    Filed 03/21/12    LEHMAN BROTHERS HOLDINGS INC., et al.    Main Document
Pg 54 of 77

Page 54

1    group with which he is affiliated at Neuberger Berman, with

2    whom he consulted initially and who expressed no interest in

3    joining with him.

4            THE COURT:  So what?

5            MR. KAPLAN:  And --

6            THE COURT:  So what?

7            MR. KAPLAN:  He did not --

8            THE COURT:  He's an individual.  He's in the position

9    to take a fight if he chooses to.

10           MR. KAPLAN:  He did not know enough --

11           THE COURT:  He chose not to.

12           MR. KAPLAN:  He did not know enough to --

13           THE COURT:  He could have learned.  He could have

14    informed himself, he didn't.

15           MR. KAPLAN:  He could have, that's true.  But even

16    if -- even that being so does not mean that his default cannot

17    be vacated and put him back into the position of litigating his

18    claim.

19           THE COURT:  Well, he has a 60(b) obligation to bear,

20    how does he do that?

21           MR. KAPLAN:  Well, he has demonstrated that the claim

22    has merit.  He has demonstrated, I think quite clearly, that

23    the debtors are not at all prejudiced by restoring his claim.

24    And I think he has demonstrated, certainly, that he did not act

25    in bad faith.  That under 60(b) his -- it certainly wasn't a

Page 55

1    conscious decision to default, it was a --

2          THE COURT:  Oh, yes, it was.

3          MR. KAPLAN:  I think it was a lackadaisical sort of

4    choice.

5          THE COURT:  But, wait.  But, wait.  We're not talking

6    about somebody who was unconscious.  We're talking about

7    someone who made a knowing decision not to take issue with the

8    omnibus objection that affected his right.  He did that

9    knowingly.  He may not have done it with the advice of counsel,

10   and, presumably, he didn't retain counsel because he didn't

11   think it was worth spending the money to engage counsel to

12   fight the fight.

13         MR. KAPLAN:  No, I don't -- I think he sought out

14   others in the Straus Group to work with him and they, because

15   they had not been named in this objection, for whatever reason

16   the debtor chose not to name them and isolate Mr. Kramer, they

17   decided that there was nothing that they had to deal with at

18   that time.  When they then were served with the next or the

19   118th objection, they went out and got counsel and -- over the

20   course of months they got counsel and proceeded to fight the

21   objection.  He did not have that opportunity.

22         As you will see, Judith Kenney who was not a member of

23   the Strauss Group but who was at Neuberger, she filed pro se

24   papers and then later joined the group that I represent with

25   respect to the 118th objection and joined in.  But putting Mr.

08-13555-mg    Doc 40104    Filed 09/13/13    Entered 09/19/13 15:48:21    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 56 of 57

Page 56

1    Kramer in with his fellows does no more than put him where Ms.

2    Kenny is and the others are, which is giving them a chance to

3    fight for their claims.

4            As I said, the tripartite test by the Second Circuit,

5    under 60(b) is not a win or take all of each element.  It's

6    looking at the totality of the circumstances and here, given

7    that there is some merit to the claim that is going forward,

8    given that the debtor is put in no worse a position with

9    respect to Mr. Kramer's claim then with respect to other claims

10   of the same nature, the only question is the excusability (sic)

11   of the default.

12           And while Mr. Kramer may not have been litigious at

13   the time and may not have thought much of the claim enough to

14   go out and retain counsel at that time.  He has thought about

15   it subsequently.  He has retained counsel.  He's put in a

16   position with everybody else.  It certainly wasn't this, sort

17   of, conscious, deliberate, willful, nasty, sort of, default

18   that Lehman attempts to characterize it as.  He was a pro se

19   who didn't really understand what he was doing and gave up his

20   rights and now thinks better of it.  And given where we are in

21   this process, nobody's really hurt by allowing him to come back

22   and argue his claim.

23           THE COURT:  On the prejudice point, let me press you a

24   little bit because the history of the claims objection docket

25   in this case is one of people just like your client, Mr.

Page 57

1   Kramer, who default -- knowingly default -- receive notice of

2   an omnibus claims objection and who say nothing and do nothing,

3   and these matters go forward on an uncontested basis and

4   billions of dollars in claims have been disallowed as a result

5   of that process.

6          If what you say becomes the law of the case, every

7   single person who made the same kind of decision that Mr.

8   Kramer made can come back into court and restart the process.

9   That's prejudice, not only to the debtors but to me.

10          MR. KAPLAN:  I think that Mr. Kramer presents a

11   special case.

12          THE COURT:  Why?

13          MR. KAPLAN:  Because --

14          THE COURT:  I think he actually presents a case that's

15   less special.  He is a pro se who is sophisticated.  He's a pro

16   se that sophisticated people go to for financial advice.  He's

17   the kind of person who has access to smart advisors.  He could

18   have obtained you earlier and made an economic decision.

19   According to your statements and your pleadings, if he had a

20   group, he would have hired counsel but he didn't want to do it

21   on his own.  That's his choice.

22          MR. KAPLAN:  Going back to what Your Honor started

23   with, which is the prejudice, I think that the instance of

24   these Neuberger claimants that I represent present, as I said,

25   a special case, because they are far different from the

08-13555-mg    Doc 40104    Filed 09/19/13    Entered 09/19/13 15:48:21    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 58 of 77

Page 58

```
 1   ordinary Lehman employees who voluntarily joined the Lehman pay
 2   scheme.  So I think that for that reason, the number of
 3   claimants who could reopen their claims were this to become law
 4   of the case, would be a very finite universe and would not
 5   reopen the floodgates as the debtor supposes.
 6        THE COURT:  I understand your argument, but I
 7   disagree.  This is not limited to the Straus Group, what used
 8   to be Neuberger Berman.  This is a process that has been
 9   ongoing for a very long time with great success, and I believe
10   that you have a very difficult burden in overcoming the
11   prejudice argument associated with your request for
12   reconsideration.  But I'll hear what the debtors have to say --
13   probably not much more than I've already said.
14        MS. ECKOLS:  Your Honor, I'm going to keep it
15   incredibly brief.  The debtors' position is set forth at length
16   in its response at docket number 25377, and I believe most of
17   the key points have already been discussed here.
18        Mr. Kramer's decision not to oppose the
19   reclassification was deliberate and it was willful for purposes
20   of Rule 60(b), and this is fatal to his request for
21   reinstatement.  The key enquiry in the Second Circuit -- it was
22   whether Mr. Kramer made a conscious decision not to respond,
23   and it is clear that his decision was conscious and knowing and
24   intentional.  It is not an issue on the Second Circuit.  It's
25   not a requirement of bad faith or good faith.  That is
```

08-13555-mg    Doc 40164    Filed 09/19/13    Entered 09/19/13 15:48:21    Main Document
08-13555-jmp    Doc 28803    Filed 09/19/13    Entered 09/19/13 15:48:21    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 69 of 57

Page 59

1    irrelevant for this.  He admits he received notice.  He admits

2    he received an adjournment.  He admits he consulted with co-

3    workers and attorneys.  He admits that he decided not to retain

4    counsel and ultimately not to oppose the seventy-third omnibus

5    objection.

6         As Your Honor noted, he attempts to paint himself as

7    an unsophisticated pro se creditor, when in reality he is a

8    sophisticated investment advisor that is in charge of managing

9    billions of dollars in investments.  He could have filed a

10   response on his own.  We have dozens, maybe hundreds, of pro se

11   people in these cases who file their own documents.  He didn't

12   even need to retain an attorney in order to oppose the seventy-

13   third omni.  He made a deliberate decision and he should be

14   held to that decision.

15        Briefly, Mr. Kramer has not met his burden of

16   establishing a meritorious defense in lieu of his asserting his

17   own defense to the seventy-third omni.  He attempts to borrow a

18   response filed by certain individuals, allegedly co-workers

19   that are similarly situated to him, in opposing the 118th

20   omnibus objection.  To carry his burden to proffer a

21   meritorious defense, Mr. Kramer must offer his own defense, not

22   point to another's.  He cannot bootstrap his claim onto the

23   response of other claimants to another objection no more than

24   the debtors could seek to expunge claims that are on one

25   objection pursuant to another.

Page 60

1          And finally, Your Honor, as to the prejudice point,

2     Mr. Kramer cannot carry his burden on this factor.  As Your

3     Honor noted, there are thousands of other claimants whose

4     claims have been disallowed or reclassified because the

5     claimants failed to oppose the debtors' objections.  Granting

6     this motion would encourage others to seek relief whose

7     circumstances are no more sympathetic than Mr. Kramer's at

8     significant cost to the debtors and to this Court.

9          For those reasons, we respectfully request that the

10    motion be denied.

11         THE COURT:  The motion is denied and the reasons, I

12    think, are clear from the colloquy on the record.  Mr. Kramer

13    may be within a class of claimants that currently is contesting

14    reclassification of compensation claims based upon so-called

15    restricted stock units.  The outcome of that litigation is at

16    the moment completely unclear.  But it's too late for Mr.

17    Kramer to join that party.  It has -- as members of its

18    class -- individuals each of whom opposed reclassification.

19    Many of those individuals did so by simply writing letters

20    saying, I oppose reclassification.  All it took to get a ticket

21    of admission to that particular ongoing litigation was

22    something that one could classify as a real objection.  By

23    electing not to object, Mr. Kramer has waived the right to get

24    back in.

25         And I find that there has been a failure to satisfy

1    the standards under 60(b), not only because of the knowing

2    decision not to object, but because of the significant

3    prejudice that would arise by reason of allowing parties who

4    have knowingly chosen not to oppose reclassification or

5    disallowance to get back in.  Finality is important in

6    bankruptcy.  The motion is denied.

7            MS. ECKOLS:  Your Honor, moving to agenda item number

8    5, that is the motion of Caisse Des Depots Et Consignations to

9    permit a late-filed claim against Lehman Brothers Special

10   Finance.  I am not sure if their counsel is here --

11           MR. HELLMAN:  Yes.

12           MS. ECKOLS:  You'll forgive me for butchering your

13   client's name.

14           MR. HELLMAN:  That's okay.  I do the same.

15           Good morning, Your Honor, Jay Hellman,

16   SilvermanAcampora.  For ease of reference perhaps we can just

17   call the client CDC.

18           Your Honor, with me is my colleague, Brett Silverman,

19   and before the Court is CDC's motion for the allowance of a

20   late-filed claim in a sum of not less than 3,077,434 dollars.

21           Judge, there are a couple of issues that are not in

22   dispute with respect to the motion.  The first is that there is

23   an ISDA master agreement between the parties and LBHI is a

24   guarantor on that agreement.

25           The question really is in this case what constitutes

08-13555-mg    Doc 28803    Filed 08/23/13    Entered 08/27/13 15:43:09    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.    Pg 62 of 77

Page 62

1    sufficient notice of a bar date to a known creditor.  And I say

2    known creditor because CDC is listed on schedule G of the

3    petition as having an unexpired executory contract.

4            THE COURT:  Mr. Hellman, I've read the papers and I'm

5    familiar with the issues, and I'd like you to deal with

6    response of the debtor that points out that your client

7    received actual notice at two addresses.

8            MR. HELLMAN:  Sure.

9            THE COURT:  You're dealing with a notice provision in

10   an ISDA agreement in treating that as if it governs the

11   obligations of the debtor to provide actual notice of the bar

12   date.  Well, I have a problem with that position and you need

13   to know that now.

14           MR. HELLMAN:  Okay.  I understand, Judge.  The issue

15   though is that any notices with respect to the agreement have

16   to be sent to a specific particular address in France.

17           THE COURT:  So what?

18           MR. HELLMAN:  The reason is --

19           THE COURT:  So what?  I mean, I'm frankly astounded; I

20   read your papers and it's as if inefficiency in France should

21   be elevated to a procedural due process right.

22           MR. HELLMAN:  Well, it's inefficiency on the debtors'

23   side as well, Judge.  There's a contract that governs the

24   relationship of the parties that specifically says notice needs

25   to be sent to a very particular address.  If that notice is not

Page 63

1    sent to that very particular address, the chances are --

2    because it's a quasi-governmental agency in France that spans

3    many, many blocks -- they're not going to get that notice.  And

4    the cases that we cite in the reply specifically address issues

5    where there is for example a national union and indemnity

6    agreement that says notice has to be sent to a very particular

7    address.  And there's very good reasons for that and that's

8    what we're expressing in the papers.  Notice to the --

9            THE COURT:  I understand that, but there is a

10    fundamental problem with your position where notice appears to

11    have been actually given at two other addresses, one in New

12    York and one in Paris.  And where the notice address in Paris,

13    but for the back office reference, has led to the rejection of

14    the receipt of mail that, if opened, could have ended up in the

15    right place.  I don't understand how you can take the position

16    you're taking with a straight face.

17            MR. HELLMAN:  With respect to the -- because the case

18    law tells us that when there's a specific notice provision in a

19    contract, we're entitled to notice at that particular address.

20    And, yes, the reason why we had that provision in the agreement

21    is for exactly this reason, because we would not get the

22    notice.  It would wind up getting rejected and we'd wind up in

23    this very position, unfortunately.

24            THE COURT:  What took so long to get here?

25            MR. HELLMAN:  There --

08-13555-mg    Doc 40104    Filed 09/19/13    Entered 09/19/13 15:48:21    Main Document
08-13555-jmp    Doc 28803    LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 164 of 77
Pg 64 of 57

Page 64

         1              THE COURT:  This is now 2012.

         2              MR. HELLMAN:  Sure.  They're primarily -- first of

         3     all, it's, as I said, Judge, it's a quasi-governmental agency.

         4     The wheels don't move very quickly, but when they do, we're

         5     talking about primarily French-speaking employees.  With --

         6              THE COURT:  But they have an office on 57th Street.

         7     Wouldn't that -- don't they?

         8              MR. HELLMAN:  But they don't.  That office had no

         9     dealings with respect to this contract.  But be that as it may,

        10     that office was -- the client that exists now, CDC, separated

        11     from that office in New York in 2007, so it ceased to exist as

        12     a CDC proper, if you will, here today, entity.

        13              MR. HELLMAN:  But notice to the New York address under

        14     the contract is not sufficient.  Notice to some alternate

        15     address in France is not sufficient, specifically because we

        16     have this contract that says, if you going to notify us about

        17     anything dealing with the ISDA agreement including presumably

        18     the notice of the bar date because that's the basis of our

        19     claim, then notice has to be sent to a specific address to make

        20     sure that we get it.  Otherwise, we're in this very position.

        21              THE COURT:  Now are you saying -- and this is actually

        22     a fairly interesting question -- that parties can contract

        23     around the notice provisions of the bankruptcy rules and that

        24     parties can by separate contract impose notice obligations that

        25     wouldn't otherwise exist as a matter of law on debtors?

Page 65

1        MR. HELLMAN:  It appears to be that way, Judge.  If

2    you look at the reply that we submitted, there are cases in

3    support of that proposition that the parties had a contract.

4    So even though there are notice provisions under the Bankruptcy

5    Code that may provide for certain due process rights, if the

6    parties have a specific agreement, a specific contract, that

7    says notice has to be sent to that address -- that very

8    specific address -- that's a requirement.  We have to have

9    actual notice to a known creditor in that situation.

10        THE COURT:  But you actually did receive three copies

11    of the bar date notice.  One that was rejected by the mail

12    office, or mailroom of that location, and two that

13    presumptively were received, plus there was publication notice,

14    plus your client terminated the contract promptly after the

15    commencement of the Chapter 11 case, and then completely

16    ignored the fact that there was a bankruptcy that was

17    publicized all over the world including France?

18        MR. HELLMAN:  Let's take that in a couple of pieces.

19    The first part is, yes, there were notices that were sent to

20    other addresses that presumably were not returned.  But we're

21    talking about again a quasi-governmental agency in France that

22    has 73,000 employees and receives thousands of pieces of mail

23    per day.  Hence the requirement in the contract that there's a

24    very, very specific address that has to be complied with and

25    that's where notice has to be sent, and that unfortunately is

1    the one that was returned.

2         With respect to the publication, the case law that we

3    cite in the papers in both the motion and the reply say, if

4    there's a known creditor and you know that address, publication

5    is insufficient.  And with respect to -- really, the bottom

6    line is even though due process may have been satisfied, the

7    point is, is that the contract had a very specific notice

8    provision that they have to comply with and if they don't, then

9    case law provides that we have the ability to file a late

10   claim.

11        I understand from counsel that their position -- even

12   if we get past this sort of tricky issue -- we still have the

13   four-factor Pioneer tests to take a look at that would allow

14   the late-filed claim.  And I understand counsel's position

15   would mostly be, as we saw from the last go-around, the

16   prejudice to the debtor and to the Court for everybody else who

17   may have to come here and want to file a late claim.  I know

18   the Court had a couple of decisions that were rendered in May

19   of 2010, I think it was.  But our situation again is different

20   because we have a very specific contractual obligation on the

21   part of the debtor to provide us with notice.

22        And irrespective of the early termination, that really

23   dealt with -- if we look at the contract carefully -- it really

24   deals with the termination of the transactions and not

25   necessarily the contract.  The contract provisions are still

Page 67

1   operative.  It's just there's no transactions any longer

2   because of the bankruptcy filing.

3            THE COURT:  Who within your client made the decision

4   to terminate the ISDA agreement?

5            MR. HELLMAN:  I'm sorry, Judge.  Could you repeat?

6            THE COURT:  Who within your client made the decision

7   to terminate?

8            MR. HELLMAN:  That I couldn't answer.  It's a

9   bureaucracy.  It could have been anybody from -- I'm sure it

10  was somebody from a position of authority but I couldn't say

11  who.

12           THE COURT:  Okay.  So, in effect, you argue that

13  because you represent an organization that appears to be

14  inefficiently managed that it should get some kind of special

15  break in this bankruptcy.  Am I misunderstanding your argument?

16           MR. HELLMAN:  Yeah, I don't know that that's

17  necessarily the argument, Judge.  I think that the point is

18  and, yes, it's not effectively managed because of -- well, I

19  can't say it's not effectively managed.  What I can say is,

20  again, it's a quasi-governmental agency with thousands of

21  employees.  And the point that we're making is not that it's

22  not managed properly.  The point we're making is because of the

23  enormity of this agency, the contract had very, very specific

24  mailing requirements for notice.  And if those are not complied

25  with, the mail's going to be rejected and come back and it's

08-13555-mg    Doc 40164    Filed 09/19/13    Entered 09/19/13 15:48:21    Main Document
08-13555-jmp    Doc 28803    LEHMAN BROTHERS HOLDINGS INC., et al.    Main Document
Pg 145 of 154
Pg 68 of 77

Page 68

1    going to put us in this very position.

2         THE COURT:  Do you know what procedures exist within

3    your client to deal with errant mail, because given the vast

4    number of addresses in Paris and the significant volume of mail

5    that comes, the problem that we're now identifying quite late

6    must happen literally every day.

7         MR. HELLMAN:  I can't -- I have no idea of how they

8    handle errant mail.  Presumably, as in this case, it's returned

9    as undeliverable.  Hence -- and they have every contract or

10   every dealing they have, has specific notice requirements to

11   make sure that it gets to the very right -- the correct

12   address.

13        THE COURT:  With respect to your argument, this seems

14   to me to be undue reliance upon strict compliance by parties

15   you have no control over with respect to a notice provision

16   that may or may not be observed.

17        MR. HELLMAN:  If I can make one other point, Judge,

18   and my colleague reminds me:  The debtor -- it's not that the

19   debtor didn't know of the notice requirements of the address.

20   Our reply contains other correspondence that was sent by the

21   debtor to that very specific address after the bar date notices

22   were sent.  So the debtor is well aware that they have to send

23   information to this particular address in order for us to

24   receive it.

25        THE COURT:  Presumably, information is sent to that

Page 69

 1    particular address so that somebody who knows something about

 2    this transaction can take action with respect to it?

 3            MR. HELLMAN:  Correct.

 4            THE COURT:  Do you know who that person is?

 5            MR. HELLMAN:  I do not.

 6            THE COURT:  Okay.  Thank you.

 7            MR. HELLMAN:  Thank you, Your Honor.

 8            MS. ECKOLS:  Your Honor, the debtors' position as to

 9    CDC's motion is set forth at length in its response at docket

10    number 19314.  I'm not going to address -- repeat all those

11    arguments, but I want to address a few specific points.

12            CDC's due process and excusable neglect arguments boil

13    down to the same question:  Can a sophisticated organization

14    that engaged in complex derivatives transactions with the

15    debtors assert that it did not receive actual notice of the bar

16    date when notice was admittedly delivered to three different

17    addresses.  The answer has to be "no".  The only alleged defect

18    that CDC claims with debtors' service of the bar date notice is

19    that the address that was listed in the debtors' schedules --

20    the address that one of the three notices to CDC was sent to --

21    did not include an attention to the specific department that

22    was provided in the master agreement between the parties.  It's

23    not an issue of whether the street address was incorrect.  The

24    street address was correct, as CDC acknowledges.

25            CDC's entire argument is based on the premise that

Page 70

1    because it is a large organization with many departments and

2    offices, that it need not conduct any due diligence whatsoever

3    regarding the mail it receives if the sender does not direct it

4    to a specific department within CDC.  The bottom line is that

5    CDC's alleged lack of notice is the result of CDC's internal

6    mail-handling guidelines and its decision not to open the

7    envelope that contained the bar date notice.

8              As set forth in the affidavit accompanying the

9    debtors' response, the debtor served CDC with the bar date

10   notice at three different addresses, two in Paris and one in

11   New York.  Two of those bar date notices were sent to the

12   addresses that were specified in a derivatives contract between

13   CDC and LBSF, one in Paris and one in New York.

14             The address on the bar date notice that was sent to

15   Paris was correct, but it didn't include the attention line

16   that specified that it should be routed within CDC to the Back

17   Office Monetaire.

18             The envelope did, however, contain the following

19   legend:  "Legal documentation enclosed.  Please direct to

20   attention of addressee, president or legal department."  When

21   CDC received this envelope, it did not route it to its legal

22   department or even open it to try to determine what department

23   it should go to.  Instead, CDC stamped it "Return to Sender"

24   without even looking at it.  This was a decision that was

25   entirely within CDC's control.  Having refused to open its

Page 71

1   mail, CDC cannot now claim that its refusal to accept the

2   actual notice that the debtors' mailed to the correct street

3   address, deprives it of due process or gives rise to an

4   excusable neglect defense.

5         As to CDC's due process argument, CDC's argument

6   conflates notice that complies with due process with notice

7   that strictly complies with the ISDA.  Due process does not

8   require compliance with those contract provisions.  There are

9   two different standards.  Due process as set forth in Mullane

10  and its progeny requires that notice be reasonably calculated

11  to apprise parties of the pendency of the action.  To satisfy

12  due process, notice does not need to be provided in the way

13  that a creditor prefers or in a way that is specified in a

14  contract.  Taking the movant's argument to its logical

15  conclusion, the debtors could have served a bar date notice on

16  every single office of CDC, but CDC would not be deemed to have

17  received actual notice unless at least one of those notices was

18  addressed to the department listed in the master agreement.

19  Serving CDC with the bar date notice at three separate

20  addresses -- street addresses that CDC does not dispute were

21  correct -- was reasonably calculated to provide CDC with notice

22  and fully complies with the due process.

23        Your Honor, the Drexel decision discussed in the

24  debtors' response is on point.  I don't want to repeat that

25  discussion except to note that the court in Drexel determined

08-13555-mg    Doc 40164    Filed 09/19/13    Entered 09/19/13 15:48:21    Main Document
08-13555-mg    Doc 20803    Filed 09/19/13    Entered 09/19/13 15:48:21    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 72 of 57

Page 72

1    that Barclays received actual notice even though no notice was

2    served on its London office, which was allegedly the proper

3    office for handling the notice.  In that case, the court

4    determined that notice that was served on Barclays' offices in

5    Connecticut, New York, and Australia, was sufficient and that

6    it was the responsibility of Barclays' employees to route the

7    notice to the proper department within the Barclays

8    organization.  Here CDC is not even arguing that the bar date

9    was not sent to the proper office.  Rather, CDC admits that

10   notice was delivered to the proper street address, but it

11   claims that it had no obligation to open the envelope and

12   determine which department should handle it or apparently to

13   forward it to its legal department as directed on the envelope.

14   This argument fails under Drexel and is contrary to Mullane.

15        And, briefly, the case that CDC relies on -- the

16   National Union case -- specifically actually provided that the

17   notice provided by the debtors, despite having not complied

18   with the contractual provisions, did in fact comply with due

19   process.

20        Moving to excusable neglect, it's based on the same

21   facts as CDC's due process argument and falls far short of

22   Pioneer's excusable neglect standard.  As Your Honor is aware,

23   the most important Pioneer factor in the Second Circuit is

24   whether the reason for the delay and the extent to which it was

25   within the reasonable control of the movant.  Here, CDC argues

08-13555-mg    Doc 40104    Filed 09/19/13    Entered 09/19/13 15:48:21    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg 79 of 157

Page 73

1    that the reason for its delay in its filing was entirely the

2    fault of the debtors in not directing the notice to a special

3    department or specific department within CDC.  However, it was

4    CDCs decision to not open the envelope containing the bar date

5    notice, and it was CDC's decision not to direct the notice to

6    the legal department as was directed on the envelope.  It was

7    CDC's decision to simply stamp the envelope "Return to Sender"

8    without conducting any diligence.

9            CDC is a sophisticated party that entered into complex

10   derivative transactions with LBSF.  It should be sophisticated

11   enough to open its mail and direct it within its organization.

12   And CDC's decision whether or not to do so is within its

13   reasonable control under Pioneer.

14           Lastly, as to prejudice, CDC makes the same argument

15   that other claimants have brought before this Court in its

16   claiming excusable neglect.  Specifically, that it's only one

17   claim, that this is a massive bankruptcy, and that in the grand

18   scheme of things this claim will have a negligible impact on

19   the debtors but a major one on CDC.  As Your Honor has noted

20   when dealing with other claimants seeking leniency on the bar

21   date, the prejudice to the debtors cannot be traced to the

22   filing of any one single claim but to the impact of permitting

23   exceptions that risk opening the floodgates.

24           Having failed to carry its burden on excusable neglect

25   and because CDC received notice that complied with due process,

08-13555-mg    Doc 28803    Filed 09/19/13    Entered 09/19/13 15:43:21    Main Document
LEHMAN BROTHERS HOLDINGS INC., et al.
Pg Pg 74 of 77

Page 74

1    the motion should be denied.

2          THE COURT:  I agree.  The motion should be denied and

3    that's based upon the present record.  I'm going to deny the

4    motion, however, without prejudice to further presentations

5    that may be made by CDC concerning its internal processes.

6          One of the aspects about this that troubles me is that

7    there is a general statement that CDC needed notice at a

8    particular address in order to function.  I have a hard time

9    accepting that.  I have absolutely no showing that has been

10   made by the movant concerning what CDC is really all about in

11   terms of the way it processes mail, who deals with it, who is

12   responsible for this contract, what that individual did or

13   didn't do in connection with monitoring the contract after

14   termination, what if anything was done by that individual to

15   pay attention to the bankruptcy, to consult with bankruptcy

16   counsel or even think about it after terminating the contract.

17   This appears to be a situation of complete and absolute neglect

18   and inexcusable inefficiency.

19         For that reason, based upon the showing, there's

20   absolutely no basis to grant the motion.  That doesn't mean

21   that it may not be possible at some time -- with great

22   embarrassment, presumably, to the people involved -- to

23   demonstrate why it is that years went by and they did nothing

24   about a claim they now think is significant.

25         The motion is denied without prejudice to being re-

1    urged if as in when it may be possible to demonstrate good

2    cause.  I see no basis for good cause on the present record.

3         MS. ECKOLS:  Thank you, Your Honor, and I believe that

4    concludes today's contested claims agenda.

5         THE COURT:  Okay.  We're going to clear the courtroom

6    except for those who are going to stay for the chambers

7    conference.  We could go into chambers but I think there are

8    probably too many people involved.

9         So we'll take a five-minute break and then everybody

10   who's involved in the chambers conference can come forward.

11   I'll return in five minutes.

12        MS. ECKOLS:  Thank you, Your Honor.

13        (Whereupon these proceedings were concluded at 11:16 AM)

14

15

16

17

18

19

20

21

22

23

24

25

Page 76

1

2                          I N D E X

3

4                        E X H I B I T S

5      DEBTORS              DESCRIPTION          PAGE

6      No number           Steven Cohn's          32

7                          declaration

8

9                          RULINGS

10                                                Page      Line

11     Debtors' motion to estimate the reserve    28         9

12       at five billion granted

13     Debtors' motion for authority to use non-cash  48     10

14       assets in lieu of available cash granted

15     Ms. Pugia's objection overruled and omnibus  50      25

16       objection to Ms. Pugia's claim granted

17     Motion of Jeremy R. Kramer denied          60        11

18     Caisse Des Depots Et Consignations' motion  74        3

19       denied without prejudice to any further

20       presentations concerning internal processes

21

22

23

24

25

1
2                    C E R T I F I C A T I O N
3
4    I, Sara Davis, certify that the foregoing transcript is a true
5    and accurate record of the proceedings.
6
7
8

   _____
9
   SARA DAVIS
10
   AAERT Certified Electronic Transcriber CET**D 567
11
12
   ALSO TRANSCRIBED:
13
   PNINA EILBERG
14
   AAERT Certified Electronic Transcriber CET**D 488
15
   SHARON MYER
16
   AAERT Certified Electronic Transcriber CET**D 638
17
18
   Veritext
19
   200 Old Country Road
20
   Suite 580
21
   Mineola, NY 11501
22
23
   Date:  February 23, 2012
24
25