WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, Texas 77002-2755
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Alfredo R. Pérez

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
----------------------------------------------------------------x
In re                                    :    Chapter 11 Case No.
                                         :
LEHMAN BROTHERS HOLDINGS INC., et al.,   :    08-13555 (JMP)
                                         :
                    Debtors.             :    (Jointly Administered)
----------------------------------------------------------------x
```

**NOTICE OF HEARING ON PLAN ADMINISTRATOR'S**
**OBJECTION TO CLASSIFICATION OF SECURITIES LAW**
**<u>PORTION OF CLAIM OF FEDERAL NATIONAL MORTGAGE ASSOCIATION</u>**

**PLEASE TAKE NOTICE** that, on September 27, 2013, Lehman Brothers

Holdings Inc., as Plan Administrator under the Modified Third Amended Joint Chapter 11 Plan

of Lehman Brothers Holdings Inc. and Its Affiliated Debtors for the entities in the above

referenced chapter 11 cases, filed its objection to the classification of the securities law portion

of the claim of Federal National Mortgage Association (the "<u>Objection</u>"), and that a hearing (the

"<u>Hearing</u>") to consider the Objection will be held before the Honorable James M. Peck, United

States Bankruptcy Judge, in Courtroom 601 of the United States Bankruptcy Court for the

Southern District of New York (the "<u>Bankruptcy Court</u>"), One Bowling Green, New York, New

York 10004, on **November 21, 2013 at 10:00 a.m. (Eastern Time)**, or as soon thereafter as

counsel may be heard.

**PLEASE TAKE FURTHER NOTICE** that any responses to the Objection must

be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules

of the Bankruptcy Court, and shall be filed with the Bankruptcy Court (a) electronically in

accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov) by

registered users of the Bankruptcy Court's filing system and (b) by all other parties in interest on

a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect, or any other

Windows-based word processing format (with a hard copy delivered directly to Chambers), in

accordance with General Order M-182 (which can be found at www.nysb.uscourts.gov), and

shall be served in accordance with General Order M-399 upon (i) the chambers of the Honorable

James M. Peck, One Bowling Green, New York, New York 10004, Courtroom 601; (ii)

attorneys for Lehman Brothers Holdings Inc., Weil, Gotshal & Manges LLP, 700 Louisiana,

Suite 1600, Houston, Texas 77002-2755 (Attn: Alfredo R. Pérez, Esq.); and (iii) the Office of the

United States Trustee for Region 2, 201 Varick Street, Suite 1006, New York, New York 10014

(Attn: Tracy Hope Davis, Esq., Susan Golden, Esq., and Andrea B. Schwartz, Esq.); so as to be

so filed and received by no later than **October 28, 2013 at 4:00 p.m. (Eastern Time)** (the

"Response Deadline").

US_ACTIVE:\44338264\1\58399.0008

**PLEASE TAKE FURTHER NOTICE** that if no responses are timely filed and served with respect to the Objection, the Plan Administrator may, on or after the Response Deadline, submit to the Bankruptcy Court an order substantially in the form of the proposed order annexed to the Objection, which order may be entered with no further notice or opportunity to be heard offered to any party.

Dated: September 27, 2013
      Houston, Texas

          /s/ Alfredo R. Perez

          Alfredo R. Pérez

          WEIL, GOTSHAL & MANGES LLP
          700 Louisiana, Suite 1600
          Houston, Texas 77002-2755
          Telephone: (713) 546-5000
          Facsimile: (713) 224-9511

          Attorneys for Lehman Brothers Holdings Inc.
          and Certain of Its Affiliates

US_ACTIVE:\44338264\1\58399.0008

WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, Texas 77002-2755
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Alfredo R. Pérez

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.*, | : | **08-13555 (JMP)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |

-------------------------------------------------------------------x

### PLAN ADMINISTRATOR'S
### OBJECTION TO CLASSIFICATION OF SECURITIES LAW
### <u>PORTION OF CLAIM OF FEDERAL NATIONAL MORTGAGE ASSOCIATION</u>

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("<u>LBHI</u>" and the "<u>Plan Administrator</u>"), as Plan

Administrator pursuant to the Modified Third Amended Joint Chapter 11 Plan of Lehman

Brothers Holdings Inc. and Its Affiliated Debtors (the "<u>Plan</u>") for the entities in the above-

referenced chapter 11 cases (the "<u>Chapter 11 Cases</u>"), respectfully represents as follows:

#### <u>PRELIMINARY STATEMENT</u>

1.    Dissatisfied with its return on certain investments in residential mortgage

backed securities issued by Lehman affiliates, and in spite of the fact that the trustees for such

securities have already filed protective claims on its behalf, Federal National Mortgage

Association ("<u>Fannie Mae</u>") now seeks a third source of recovery for its alleged investment

losses through a securities law claim against LBHI.  This claim, however, seeks to turn the

Bankruptcy Code's (as defined below) well-established priority scheme on its head by elevating

a claim for investment losses into a position of parity with general unsecured claims.  Such a result is manifestly unfair to LBHI's unsecured creditors who (i) did not assume the risks assumed by Fannie Mae in connection with its investment, and (ii) were not eligible for the related rewards.

2.    Moreover, if Fannie Mae's securities law claim is allowed as a general unsecured claim, there is a significant risk that Fannie Mae's aggregate recoveries will exceed its actual losses (if any).  The securities have continued to perform and Fannie Mae has already received over $8 billion in returns with billions more expected to accrue to Fannie Mae over the life of the securities (on an initial investment of just over $12 billion).  Additionally, Fannie Mae (as holder of a senior security) is first in line for any distributions of recoveries by the trustees for "put back" claims on the same securities.  Such recoveries are likely to fully compensate Fannie Mae for any losses because, under the relevant trust agreements, Fannie Mae must be paid *in full* before any amounts are distributed to holders of junior securities.  Any recoveries by Fannie Mae on its securities law claim, therefore, will constitute a windfall at the expense of general unsecured creditors.

3.    In short, Fannie Mae's securities law claim is nothing more than a claim for speculative damages related to Fannie Mae's interest in these residential mortgage backed securities.  Section 510(b) of the Bankruptcy Code operates to prevent the inequitable results described above by providing for the mandatory subordination of claims, such as Fannie Mae's securities law claim, for damages arising out of the purchase or sale of a security of the debtor or an affiliate of the debtor.  Fannie Mae's securities law claim meets all of the requirements of section 510(b) and, therefore, must be subordinated.  If the Court finds that Fannie Mae's securities law claim does not meet the technical requirements of section 510(b), the Court may

2

nonetheless avoid the inequitable results described above by subordinating Fannie Mae's

securities law claim pursuant to section 510(c)(1) of the Bankruptcy Code, which allows for

equitable subordination of claims.

### RELIEF REQUESTED[1]

4.      The Plan Administrator requests that the Private Label Securities Claim (as

defined below) be subordinated pursuant to section 510(b) of title 11 of the United States Code

(the "Bankruptcy Code") and classified in LBHI Class 11.  If the Court determines that section

510(b) is not applicable, the Plan Administrator requests that the Private Label Securities Claim

be subordinated to the other claims in LBHI Class 7 pursuant to section 510(c)(1).

5.      This objection addresses only the subordination of the Private Label

Securities Claim.  The Private Label Securities Claim contains many other defects, which will be

the subject of a future objection in the event that the relief requested herein is not granted.[2]

---

[1] Rule 7001(8) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") does not require the commencement of an adversary proceeding in connection with the relief requested herein because (i) the Private Label Securities Claim (as defined below) has not yet been "allowed" and (ii) the Plan provides for subordination of claims subject to section 510(b).  FED R. BANKR. P. 7001(8) ("The following are adversary proceedings . . . (8) a proceeding to subordinate any *allowed* claim or interest, *except when a . . . chapter 11. . . plan provides for subordination*") (emphasis added).

[2] The Plan Administrator brings this objection to classification separately in an effort to conserve judicial resources.  The applicability to the Private Label Securities Claim of sections 510(b) and (c) of the Bankruptcy Code is a narrow legal issue which, if resolved the Plan Administrator's favor, will resolve most or all of the disputes between the parties without the necessity of costly and time consuming discovery and evidentiary proceedings.  To the extent that the classification issue is not resolved in the Plan Administrator's favor, the Plan Administrator plans to bring a substantive objection that will address the following defects in the Private Label Securities Claim:

- Fannie Mae's securities law claim is brought against LBHI as issuer of securities under sections 11 or 12(a)(2) of the Securities Act, but there is no theory under which LBHI was the issuer of such securities.

- To establish liability under such provisions of the Securities Act, Fannie Mae must prove that the offering materials for the residential mortgage backed securities invested in by Fannie Mae contain an "untrue statement of a material fact or omit[s] to state a material fact" necessary "to make the statements … not misleading."  Lehman's disclosures in the offering materials were broad, thorough, and warned explicitly of many of the precise conditions that eventually caused

3

Accordingly, the Plan Administrator reserves its rights to object to Fannie Mae's claim on any other basis.

## JURISDICTION

6.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## BACKGROUND

7.      Commencing on September 15, 2008 (the "Commencement Date") and periodically thereafter, LBHI and certain of its subsidiaries (collectively, the "Chapter 11 Estates") commenced the Chapter 11 Cases.  Structured Asset Securities Corporation ("SASCO"), a wholly-owned, indirect subsidiary of LBHI, commenced its Chapter 11 Case on February 9, 2009.  The Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b).

8.      On July 2, 2009, this Court entered an order establishing September 22, 2009 as the deadline for persons or entities to file proofs of claim based on prepetition claims (as defined in section 101(5) of the Bankruptcy Code) against the Chapter 11 Estates (ECF No. 4271).  On September 22, 2009, Fannie Mae filed a single claim against LBHI (the "Fannie Mae Claim") [Claim No. 29557].  Fannie Mae never filed a claim against SASCO.

---

the securities to lose market value.  Chief amongst the warnings were the repeated and explicit disclosures that the securities would lose value if housing prices fell (or, in some cases, even if housing prices remained stable but failed to increase).  The unprecedented decline in housing prices that began in 2007 and 2008 is widely considered to be the primary cause of the loss in value experienced by the entire market for residential mortgage backed securities.

- ▪ Even if the offering materials were deemed misleading, there are no damages recoverable to the extent LBHI can show that any loss in value of the securities is attributable to something other than the misleading statements or omissions.  For example, any losses exclusively attributable to the decline in the housing market, the reduction in interest rates or the availability of credit for refinancing could not *also* be attributed to an alleged misrepresentation.  LBHI believes it can prove such macro-economic factors were the cause of Fannie Mae's interest rate losses.

4

9.    On December 6, 2011, the Court entered an order confirming the Plan (ECF

No. 23023).  The Plan became effective on March 6, 2012.  Pursuant to the Plan, the Plan

Administrator is authorized to interpose and prosecute objections to claims filed against the

Chapter 11 Estates.

10.    Under the Plan, general unsecured claims against LBHI are classified in

LBHI Class 7.  Plan at § 4.9.  The Plan classifies claims against LBHI that are subject to section

510(b) in LBHI Class 11, unless such claims arise out of Equity Interests (as such term is defined

in the Plan) in LBHI, in which case they are classified in LBHI Class 12.  Plan at §§ 4.16-4.17.

11.    On January 26, 2012, this Court entered an order allowing that portion of the

Fannie Mae Claim that relates to LBHI's alleged guarantee of the obligations of debtor Lehman

Brothers Special Financing Inc. under that certain ISDA Master Agreement, dated as of May 8,

2003, in the reduced amount of $110,000,000 (the "Settled Derivatives Claims Order") (ECF No.

24670).  The Settled Derivatives Claims Order did not affect (i) the remaining portions of Fannie

Mae's claim, including the Private Label Securities Claim; or (ii) the Plan Administrator's right

to object to the remaining portions of Fannie Mae's claim.

## LEHMAN RESIDENTIAL MORTGAGE BACKED SECURITIES

12.    Prior to the Commencement Date, LBHI and certain of its affiliates were

involved in the business of structuring and issuing residential mortgage backed securities

("RMBS").  Lehman generally created RMBS through a multi-step process that resulted in the

conversion of pools of individual home loans into securities.  *See generally* Declaration of

Zachary Trumpp (the "Trumpp Decl."), attached hereto as Exhibit A.  The first step consisted of

the acquisition, by LBHI, of a large group of loans secured by residential real property.  *Id.* at ¶8.

LBHI would then sell the mortgage loans to SASCO and SASCO would deposit them into

specially created trusts.  *Id.* at ¶¶10-11.

5

13.    Once a pool of loans was placed in a trust and the bond structure for the trust had been determined, the offering documents, listing SASCO as the "Depositor" and the trust as the "Issuing Entity," were filed with the Securities and Exchange Commission (the "SEC"). *Id.* at ¶¶11-14.  The trusts did not have their own employees, officers, or directors. *Id.* at ¶15.

14.    SASCO was a party to all of the agreements that established and governed the operation of the trusts and dictated the use of the trusts' property (the "Trust Agreements"). *Id.* at ¶16.  Pursuant to the Trust Agreements, SASCO, as the Depositor, had ongoing obligations regarding the trusts including, *inter alia*, to perfect the trustees' security interests in the assets (the pools of mortgages) backing the securities; ensure that interest rate cap contracts, swap agreements, or other similar contracts were maintained or replaced; and prepare and file any reports required under the Securities Exchange Act of 1934. *Id.* at ¶17.  The roles and responsibilities of the Depositor, the Trustee, and the Master Servicer, as established in the Trust Agreements, are all described in the offering documents. *Id.* at ¶20.

15.    In exchange for the assignment of the residential loans to the trusts, SASCO received from the trusts securities backed by these loans (hence RMBS). *Id.* at ¶22.  SASCO then sold the RMBS to Lehman Brothers Inc. ("LBI"), the broker-dealer subsidiary of LBHI that acted as the underwriter (or co-underwriter) for the RMBS. *Id.* at ¶25.  SASCO used the funds received from LBI to pay LBHI for the loan pools. *Id.* at ¶26.

16.    The RMBS were divided into multiple classes of investment risk, or "tranches."  Distributions of fees, interest, and principal (among other things) relating to the RMBS were subject to a "waterfall" pursuant to which the most senior tranches had the first right to cash flows from the trusts' pool of loans after administrative expenses were deducted. *Id.* at ¶23.  After the senior tranche investors are paid, any surplus flows down to the next subordinate

6

tranche and so on until all of the available funds are distributed or all of the investors have

received the amounts to which they are entitled.  *Id.* at ¶24.  Thus, holders of RMBS in

subordinate tranches assume considerably more risk than holders of RMBS in senior tranches

and are compensated for such increased risk through the possibility of greater returns as a result

of higher interest rates.  *Id.*

17.  Fannie Mae generally acquired the senior-most tranche from LBI and

therefore received payment on its securities ahead of investors in the subordinate tranches.[3]  *Id.*

at ¶27.

18.  SASCO's initial role was to create the RMBS and ensure that they were

properly registered with the SEC, but SASCO had ongoing rights and responsibilities as well.

For example, SASCO could repurchase RMBS—either at the request of the securities holders or

as a mandatory redemption.  *Id.* at ¶17.  SASCO also was required to provide various

representations and warranties related to the RMBS, mainly regarding the characteristics of the

mortgage loan pools in the relevant trust.  *Id.*  Consequently, SASCO bore potential liability for

its characterization of the assets it placed in the trusts under both securities laws (due to the

filings with the SEC) and contract law (due to the representations and warranties it made to the

trustee of the various trusts).

## THE PRIVATE LABEL SECURITIES CLAIM

19.  The Fannie Mae Claim includes seven categories of claims arising out of

Fannie Mae's prepetition business dealings with the Lehman enterprise.  This objection relates

only to the claims in the Fannie Mae Claim that are referred to as *Claims Arising Under Federal*

---

[3]  Fannie Mae also acquired junior tranches of one particular Lehman RMBS (as defined below), as listed in the Private Label Securities Claim.  In that situation, however, Fannie Mae also bought all the senior tranches.  In any event, the Plan Administrator understands that Fannie Mae has subsequently sold such junior tranches.

US_ACTIVE:\44338264\1\58399.0008

*Securities Laws – Private Label Securities* (the "Private Label Securities Claim").  *See* Fannie

Mae Claim, §4.  The Private Label Securities Claim alleges violations of sections 11 and

12(a)(2) of the Securities Act of 1933 (the "Securities Act") related to the alleged marketing or

sale of RMBS.  Specifically, Fannie Mae alleges that it relied on misleading representations or

omissions in the prospectus and prospectus supplement for each of the LBHI-sponsored RMBS

listed in the Fannie Mae Claim (the "Lehman RMBS").  These allegedly misleading

representations or omissions relate to the re-underwriting standards, loan-to-value and debt-to-

income ratios, and the ratings of the securities.

### THE TRUSTS' "PUT-BACK" CLAIMS

20.    Separate from the Private Label Securities Claim filed by Fannie Mae, the

trustees of certain RMBS trusts (the "Trustees") have filed claims (the "Trust Claims") against

LBHI and SASCO on behalf of the RMBS trusts and, indirectly, on behalf of Fannie Mae (and

other, similarly-situated parties).  *See, e.g.,* Proof of Claim No. 20533, filed by U.S. Bank,

National Association, as Trustee, against LBHI; and Proof of Claim No. 20532, filed by U.S.

Bank, National Association, as Trustee, against SASCO.  The Trust Claims are based on

contractual remedies, including "put-back" claims relating to alleged breaches of representations

and warranties made by SASCO, as Depositor, LBHI, as "Seller," and the originators of the

residential mortgages.  *Id*.

21.    The Trust Claims raise many of the same factual issues as those underlying

the Private Label Securities Claim.  Further, any recovery that the RMBS trusts realize on the

Trust Claims will be distributed to Fannie Mae and other investors in accordance with the

waterfall priority structure described in the offering documents.  *See* Trumpp Decl., ¶30.  To the

extent that the trusts have been unable to make payments to the top tranches of the Lehman

RMBS and Fannie Mae was thereby harmed—although, as of the date of this objection, any such

8

impact has been minimal or nonexistent for securities in the top tranches—Fannie Mae is entitled

to priority on any distributions received on account of the Trust Claims.  *Id.* at ¶¶27, 30.

## ARGUMENT

22.  Section 510(b) of the Bankruptcy Code provides for mandatory

subordination of the Private Label Securities Claim because it is a claim for damages arising out

of the purchase or sale of securities of SASCO or an affiliate of SASCO.  If the Court finds that

the Lehman RMBS are outside of the scope of section 510(b), however, the Private Label

Securities Claim should be subordinated under section 510(c)(1) to prevent Fannie Mae from

receiving a windfall at the expense of LBHI's general unsecured creditors.

**1.  Section 510(b) Requires that the Private Label Securities Claim be Subordinated**

23.  Section 510(b) requires that claims for damages, arising from the purchase or

sale of a security of the debtor or an affiliate of the debtor, be subordinated to the claims of other

unsecured creditors.  Specifically, section 510(b) states:

> [A] claim … for damages arising from the purchase or sale of [a
> security of the debtor or an affiliate of the debtor] … shall be
> subordinated to all claims or interests that are senior to or equal the
> claim or interest represented by such security, except that if such
> security is common stock, such claim has the same priority as
> common stock.

11 U.S.C. §510(b).  In order for a claim to be subject to subordination under section 510(b), the

claim must (i) be for damages arising from the purchase or sale; (ii) of a security; and (iii) of (x)

a debtor, or (y) an affiliate of a debtor.  *See, e.g., Rombro v. Dufrayne (In re Med Diversified)*,

461 F.3d 251, 254 (2d Cir. 2006); *In re Enron*, 341 B.R. 149 (Bankr. S.D.N.Y. 2011).

24.  The first two requirements of section 510(b) are easily satisfied by Lehman:

- In order for a claim to "arise from" a securities transaction, it is merely necessary that the
  transaction be part of the causal link leading to the alleged injury.  *See In re Granite
  Partners, L.P.*, 208 B.R. 332, 342 (Bankr. S.D.N.Y. 1997).  The Private Label Securities
  Claim is entirely based on Fannie Mae's alleged damages incurred as a result of its

9

purchase of the Lehman RMBS.  Fannie Mae Claim, ¶4.3.  Thus the Private Label Securities Claim must be a claim for damages arising from a purchase or sale.[4]

▪    The Private Label Securities Claim is premised entirely on the fact that the Lehman RMBS are securities.  If the Lehman RMBS were somehow found to be something other than securities, the Securities Act would not be applicable and Fannie Mae would be unable to maintain the Private Label Securities Claim.  Moreover, section 101(49) of the Bankruptcy Code defines "security" broadly to include notes, bonds, debentures, collateral trust certificates, and any other claims or interests commonly referred to as a security.  11 U.S.C. § 101(49).  Accordingly, the Lehman RMBS are securities for the purposes of section 510(b).

25.  As discussed below, the final requirement of section 510(b)—that the Lehman RMBS are securities *of* a debtor or an affiliate of a debtor—is also satisfied and the Private Label Securities Claim must be subordinated pursuant to section 510(b).

### A.  The Lehman RMBS are Securities of SASCO[5]

26.  Although section 101(49) of the Bankruptcy Code defines the term "security," neither it nor section 510(b) provides any guidance with respect to whether a particular security is a security "of the debtor."  However, the plain language of the statute, the economic substance of the RMBS trusts, and the Second Circuit's direction to interpret section 510(b) broadly and according to its purpose mandate a finding that the Lehman RMBS are securities "of the debtor."[6]

---

[4] Moreover, the provisions of the Securities Act that form the basis for the Private Label Securities Claim provide a cause of action (under specified circumstances) only to purchasers or acquirers of securities. *See* 15 U.S.C. §77k(a) (cause of action for a "person acquiring such security"); 15 U.S.C. §77l(a)(2) (cause of action for "the person purchasing such security").  In order for Fannie Mae to have a claim under sections 11 or 12 of the Securities Act, therefore, such claim must be for damages arising from a purchase or sale.

[5] As discussed above, SASCO, an indirect subsidiary of LBHI, is a debtor in the Chapter 11 Cases.

[6] The Second Circuit has directed courts to interpret section 510(b) broadly as a remedial provision. *See Spirnak v. Motors Liquidation Co. GUC Trust (In re Motors Liquidation Co.)*, 2012 U.S. Dist. LEXIS 15838, at *7-8 (S.D.N.Y. Feb. 7, 2012) (citing *Rombro v. Dufrayne (In re Med Diversified)*, 461 F.3d 251, 259 (2d Cir. 2006)).

10

US_ACTIVE:\44338264\1\58399.0008

27.    Courts generally have assumed that the plain meaning of securities "of the debtor" includes securities *issued* by the debtor—whether or not such securities are included in the debtor's capital structure.  *See Allen v. Geneva Steel Co. (In re Geneva Steel Co.)*, 281 F.3d 1173, 1177 (10th Cir. 2002) (section 510(b) subordinates claims for damages arising from the purchase or sale of securities "issued by the debtor"); *In re Rancher Energy Corp.*, 2011 WL 2604763, at *3 (Bankr. D. Colo. June 30, 2011) (same); *Weissmann v. Pre-Press Graphics Co. (In re Pre-Press Graphics Co.)*, 307 B.R. 65, 71 (N.D. Ill. 2004) (same); *Maxwell v. Novell, Inc. (In re marchFirst, Inc.)*, 431 B.R. 436, 442 n.8 (Bankr. N.D. Ill. 2010) (same); *see also*, *O'Cheskey v. Templeton (In re Am. Hous. Found.)*, 2013 WL 1316723, slip op. at *17-19 (Bankr. N.D. Tex. Mar. 30, 2013) (subordinating claims based on claimant's limited partnership interests in entities operated by the debtor); *Jenkins v. Tomlinson (In re Basin Res. Corp.)*, 190 B.R. 824, 826-27 (Bankr. N.D. Tex 1996) (subordinating claims based on claimant's equity interests in joint ventures operated by the debtor).

28.    That the Lehman RMBS were *issued* by a debtor is answered definitively by the Securities Act, which forms the basis for the Private Label Securities Claim.[7]  In the context of mortgage backed securities, the Securities Act defines the "Issuer" of a security as "the person or persons performing the acts and assuming the duties of the depositor or manager pursuant to

---

[7] Where a statute such as the Bankruptcy Code is ambiguous, courts generally look to other statutory sources to try to determine Congress's intent.  *See Granite Partners*, 208 B.R. at 339 ("In searching for Congress's intent, a court may also look to similar language in unrelated statutes that apply to similar persons, things or relationships") (citation omitted); *see also Alfa, S.A.B. de C.V. v. Enron Creditors Recovery Corp. (In re Enron Creditors Recovery Corp.)*, 422 B.R. 423, 437 (S.D.N.Y. 2009), *aff'd*, 651 F.3d 329 (2d Cir. 2011) ("The securities laws, and their interpretations, are thus a natural and logical place to turn for definitions of terms within the Bankruptcy Code that are otherwise undefined.").   The Plan Administrator is mindful of the Second Circuit's warning in in *Enron* "against overreliance on the definition of a term for purposes of one statute when interpreting another."  *Id*.  Because the Private Label Securities Claim is governed by the Securities Act, it is undoubtedly appropriate to refer to the Securities Act for assistance in interpreting securities-related terms that are otherwise undefined in the Bankruptcy Code.

11

the provisions of the trust or other agreement or instrument under which the securities are issued." Securities Act §2(a), 15 U.S.C. §77b(a)(4). That is SASCO with respect to the Lehman RMBS. The federal regulations promulgated under the Securities Act similarly provide that "[t]he depositor for the asset-backed securities acting solely in its capacity as a depositor to the issuing entity is the 'issuer' for purposes of the asset-backed securities of that issuing entity." 17 C.F.R. §230.191(a) ("Rule 191"). Regulation AB establishes what is meant by "depositor" in Rule 191. "Depositor" means the entity that receives or purchases and transfers or sells the pool assets to the issuing entity. *See* Item 1101 of Regulation AB (17 CFR 229.1101). Again, that is clearly SASCO. Thus, SASCO, acting in its capacity as Depositor, is the Issuer of the Lehman RMBS.

29. At least one court in the Southern District of New York already has concluded, albeit in a slightly different context, that Rule 191 is determinative of the question of whether a Depositor is the "Issuer" for an RMBS transaction. *See FHFA v. UBS Americas, Inc.*, 858 F. Supp. 2d 306 (S.D.N.Y. 2012), *aff'd,* 712 F.3d 136 (2d Cir. 2013). The dispute in *UBS* was whether one of the defendants, the depositor, was a proper defendant with regard to a claim under section 12(a)(2) of the Securities Act, which can only be brought against a person who "[o]ffers or sells a security" (this is generally referred to as the "statutory seller requirement"). *Id.* at 333. An issuer is a statutory seller. *See* 17 C.F.R. 230.159A; *accord Citiline Holdings, Inc. v. iStar Financial Inc.*, 701 F. Supp.2d 506, 512 (S.D.N.Y.2010). The defendants argued that "equating an 'issuer' with a 'depositor' does not apply to RMBS." *Id.* at 334.

30. The court, however, rejected the defendants' argument, finding in favor of Fannie Mae's conservator that the defendants' position was

> contradicted by Securities Act Rule 191, which provides that *'[t]he depositor for the asset-backed securities acting solely in its capacity as depositor to the issuing*

12

*entity is the 'issuer' for purposes of the asset-backed securities of that issuing entity.'*  17 CFR 230.191.  To the extent defendants would argue that the Rule's reference to "asset-backed securities" does not encompass RMBS, they are foreclosed from doing so by their reliance elsewhere in their motion on Regulation AB, which likewise governs "asset-backed securities" and was adopted as part of the same rulemaking proceeding that resulted in Rule 191.  *See* Asset–Backed Securities, SEC Release No. 8518, 84 S.E.C. Docket 1624, 2004 WL 2964659, at *9, *2012 (Dec. 22, 2004).

*Id.* (emphasis added).

31.  The conclusion that the Depositor is the Issuer for the purposes of asset backed securities is also compelled by the legal and business reality of the Lehman RMBS. SASCO acquired the mortgage loans from LBHI, deposited the mortgage loans into the RMBS trusts, created and registered the Lehman RMBS, filed the required disclosure documents with the SEC and, through LBI, marketed and sold the Lehman RMBS to Fannie Mae.  *See* Trumpp Decl. at ¶¶10, 11, 13, 17 and 25.  Thus, SASCO, not the RMBS trusts, is the entity responsible for the creation and distribution of the Lehman RMBS and the disclosures on which Fannie Mae allegedly relied.

32.  The Private Label Securities Claim, therefore, is a claim for damages arising from the purchase or sale of a security "of" a debtor (SASCO) and must be subordinated pursuant to section 510(b).

### B.  If the Lehman RMBS Are Not Securities of SASCO, They Must Be Securities of Affiliates of SASCO

33.  If the Court determines that federal securities law defining "Issuer" is not applicable, and that the Lehman RMBS are not securities "of" SASCO, then the Lehman RMBS must be securities "of" the RMBS trusts.  In that event, subordination of the Private Label Securities Claims under Section 510(b) of the Bankruptcy Code is still required because the RMBS trusts are affiliates of SASCO and, therefore, the Lehman RMBS are securities of an affiliate of a debtor.

13

34. The Bankruptcy Code defines "affiliate" to include "a person substantially all of whose property is operated under an operating agreement with the debtor." 11 U.S.C. §101(2)(C). Therefore, each RMBS trust is an "affiliate" of SASCO if (i) it is a person, and (ii) substantially all of whose property is operated under an operating agreement with SASCO.

### i. The RMBS Trusts Are "Persons"

35. Section 101(41) of the Bankruptcy Code defines the term "person" as, *inter alia*, a corporation. 11 U.S.C. §101(41). A business trust is one of the enumerated entities that the Bankruptcy Code includes in the definition of corporation. 11 U.S.C. §101(9)(A)(v). The term "business trust" is not defined by the Bankruptcy Code.

36. In *In re Secured Equip. Trust of Eastern Air Lines, Inc.*, 38 F.3d 86 (2d Cir. 1994), the Second Circuit considered whether a trust was a "business trust" in the context of an eligibility determination under section 109 of the Bankruptcy Code. *Id.* at 87. The trust in question was created to obtain $500 million in financing, secured by a portion of Eastern's fleet of aircraft. *Id.* The trust sold certificates to third-party investors and used the cash to purchase aircraft from Eastern, which it leased back to Eastern in return for rental payments equal to the payments the trust owed on the certificates. *Id.* It was undisputed that the transaction was a secured financing. *Id.*

37. The Second Circuit opined that "a basic distinction between a business trust and other trusts is that business trusts are created for the purpose of carrying on some kind of business, whereas the purpose of a non-business trust is to protect and preserve the res." *Id.* at 89 (internal citations omitted). To determine whether a particular trust is a business trust, the Second Circuit instructed courts to "focus on the trust documents and the totality of the circumstances." *Id.* at 90–91. Based largely on the undisputed conclusion of the lower courts

14

that the trust's "[i]ndenture makes it clear that the Trust was not established to run a business enterprise, but was merely created to serve as a vehicle to facilitate a secured financing by Eastern," the Second Circuit determined that the trust was not a business trust. *Id.* at 90-91.

38.    The facts distinguishing the trust at issue in *Eastern* from the RMBS trusts compel a different result:

- Unlike the trust in *Eastern*, the RMBS trusts were established to, and did, engage in business. Each RMBS trust is the beneficial owner of thousands of mortgage loans, and each loan requires careful management in order to maximize returns for holders of the Lehman RMBS.[8] Additionally, the RMBS trusts operate as parties to swap agreements and other hedging instruments that protect the returns anticipated by the investors. *See* Trumpp Decl., ¶17.

- The trust indenture in *Eastern* provided for any excess income generated by the collateral to be returned to Eastern—reinforcing the Second Circuit's conclusion that the secured equipment trust was created for the sole purpose of facilitating the secured financing transaction. *See In re Secured Equipment Trust of Eastern Air Lines, Inc.*, 153 B.R. 409, 411 (Bankr. S.D.N.Y. 1993). In contrast, excess amounts generated by the mortgage loans are not paid to SASCO, but instead are retained by the holders of the residual interests in the RMBS trusts. *See* Trumpp Decl., ¶27.

- The trust at issue in *Eastern* held the aircraft as collateral to secure Eastern's obligations under the lease. Moreover, the holders of certificates benefited from an "unconditional" guarantee of payment from Eastern. *In re Ionosphere Clubs, Inc.*, 134 B.R. 528, 529 (Bankr. S.D.N.Y. 1991). Accordingly, recoveries (through the lease payments or the enforcement of the guarantee) for certificate holders in *Eastern* were dependent on the operation of Eastern's business and not the business of the trust. In contrast, SASCO actually sold the mortgage loans to the RMBS trusts (without recourse) and recoveries for the holders of Lehman RMBS are entirely dependent on the income generated by the mortgage loans—not on SASCO's business or SASCO's guarantee of the obligations of the RMBS trusts. *See* Trumpp Decl., ¶21.

Unlike in *Eastern*, therefore, the RMBS trusts were clearly engaged in business and meet the criteria established by the Second Circuit for a "business trust."

---

[8] That such management was contracted out to third parties is of no moment. Most large companies concentrate management functions at a few top tier entities which then provide operational services to the remainder of the corporate family.

US_ACTIVE:\44338264\1\58399.0008

39. Because the RMBS trusts are business trusts, they meet the Bankruptcy Code's definition of "corporations" and, consequently, "person." As "persons," the RMBS trusts satisfy the first prong of the Bankruptcy Codes definition of "affiliate."[9]

### ii. *Substantially all of the Property of the RMBS Trusts Is Operated Under an Operating Agreement with SASCO*

40. The RMBS trusts also satisfy the second prong of the "affiliate" definition: substantially all of their property is operated under an operating agreement with a debtor. *See* 11 U.S.C. §101(2)(C). At the time the Lehman RMBS were issued, the RMBS trusts' property was operated under an agreement to which SASCO was a party (*i.e.*, the Trust Agreements). The Trust Agreements govern every aspect of the administration of the RMBS trusts' property, including the collection of principal and interest on the mortgages, the maintenance of appropriate insurance, record-keeping, and the distribution of funds to securities holders. *See* Trumpp Decl., ¶17.

41. An agreement providing for the management of an entity's property is an "operating agreement" for the purposes of determining whether an entity is an affiliate of a debtor under section 101(2)(C). *See Jenkins v. Tomlinson (In re Basin Res. Corp.)*, 190 B.R. 824, 825-27 (Bankr. N.D. Tex. 1996) (joint venture is affiliate of debtor where debtor was manager of joint venture's properties); *In re Minton Group, Inc.*, 27 B.R. 385, 389 (Bankr. S.D.N.Y. 1983), *aff'd*, 46 B.R. 222 (S.D.N.Y. 1985) (limited partnership was affiliate of debtor where debtor operated business and managed property under limited partnership agreement); *In re Reynolds*, 13 B.R. 658, 659 (Bankr. N.D. Ga. 1981) (non-debtor business was affiliate where

---

[9] Even if the RMBS trusts are not "business trusts," they still qualify as "corporations" under the Bankruptcy Code because they are "association[s] having a power or privilege that a private corporation, but not an individual or partnership, possess[]." 11 U.S.C. §101(9)(A)(i). The RMBS trusts have transferable shares, centralized management, and limited liability, all indicia of a "private corporation" that an individual or partnership does not possess.

16

debtor was general manager of, and designated to operate, the business).  Given that (i) the

RMBS trusts are "persons," and (ii) the Trust Agreements provide for the management of

substantially all of the RMBS trusts' property, the RMBS trusts are "affiliates" of SASCO.

42.  In sum, even if the Court finds that the Lehman RMBS are not securities of

SASCO, the Lehman RMBS must then be securities of an affiliate of SASCO—and, therefore,

subject to mandatory subordination under section 510(b).

### C.  The Policy Underlying Section 510(b) Supports Subordination of the Private Label Securities Claim

43.  Section 510(b) is a key aspect of the Bankruptcy Code's absolute priority

rule that prevents claimants whose claims are based on the purchase or sale of the securities of a

debtor (or an affiliate of a debtor) from converting such claims into general unsecured claims and

thereby appropriating a share of the debtor's estate that would otherwise be available for

distribution to general unsecured creditors.  *See In re Enron Corp.*, 341 B.R. 141, 158 (S.D.N.Y.

2006) (citing *In re Telegraph*, 281 F. 3d 133, 142 (3d Cir. 2002) ("Congress enacted §510(b) to

prevent disappointed [investors] from recovering their investment loss by using fraud and other

securities claims to bootstrap their way to parity with general unsecured creditors in a bankruptcy

proceeding."); *Allen v. Geneva Steel Co. (In re Geneva Steel Co.)*, 281 F.3d 1173, 1180-81 (10th

Cir. 2002) ("'When an investor seeks *pari passu* treatment with the other creditors, he disregards

the absolute priority rule [] and attempts to establish a contrary principle that threatens to

swallow up this fundamental rule of bankruptcy law.'") (quoting *In re Granite Partners, L.P.*,

208 B.R. 332, 344 (Bankr. S.D.N.Y. 1997)); *In re Holiday Mart, Inc.*, 715 F.2d 430, 433-34 (9th

Cir. 1983) ("Purchasers of [securities], like the purchasers of stock, alone assume the risk of

fraud or securities act violations by the issuers of the securities they purchase, and there is no

17

reason to ask general creditors who did not purchase [securities] to share in any part of the risk.").

44.    The Private Label Securities Claim is precisely the type of claim that section 510(b) is intended to subordinate.  Rather than entering into a transaction with Lehman involving a simple exchange of goods or services, Fannie Mae expressly bargained for, and received, securities issued by SASCO.  By investing in the Lehman RMBS, Fannie Mae purchased the right to participate in the upside of the Lehman RMBS—if the mortgage loans' performance met or exceeded expectations, Fannie Mae would receive a handsome profit on its investment.  On the other hand, Fannie Mae also assumed the risk that if the mortgage loans underperformed expectations, for any reason, it could lose some or all of its investment.  Holders of general unsecured claims against LBHI (or SASCO), conversely, never stood to gain from the performance of the Lehman RMBS, nor did they assume the attendant risk.  Accordingly, the Private Label Securities Claim should be subordinated pursuant to section 510(b).

**2.    Even if the Court Finds that Section 510(b) Is Not Applicable, the Private Label Securities Claim Should Still Be Subordinated Pursuant to Section 510(c)(1)**

45.    If the Private Label Securities Claim is not subordinated, there is a real risk that Fannie Mae will recover *more* than its actual losses.  Separate and apart from the Private Label Securities Claim, Fannie Mae has two avenues for recovering its investment in the Lehman RMBS.  First, the mortgage loans that comprise the *res* of the RMBS trusts continue to generate revenues that are distributed pursuant to the waterfall provisions of the Trust Agreements.  Fannie Mae, as the holder of the senior tranches of such securities, receives distributions ahead of all other holders of Lehman RMBS.  To date, Fannie Mae has received nearly all of the amounts to which it is entitled under the Lehman RMBS.  Second, to the extent Fannie Mae suffers any actual damages in connection with its interests in the Lehman RMBS

18

(which to date have been minimal or nonexistent), it will, as holder of the senior tranches of such securities, be first in line for distributions of any recovery on account of the Trust Claims. Such recovery will significantly offset any losses Fannie Mae experiences. *See* Trumpp Decl., ¶30. Any amounts that Fannie Mae receives on account of the Private Label Securities Claim, therefore, are likely to be in excess of any actual losses incurred in connection with the Lehman RMBS. Accordingly, if the Private Label Securities Claim is not subordinated, Fannie Mae will obtain a windfall at the expense of other general unsecured creditors.

46.   In order to prevent this inequitable result, even if the Court finds that section 510(b) is inapplicable, the Court should equitably subordinate the Private Label Securities Claim pursuant to section 510(c)(1).[10]

47.   Section 510(c)(1) allows the Court, "under principles of equitable subordination," to "subordinate . . . all or part of an allowed claim to all or part of another allowed claim . . . ." *See* 11 U.S.C. § 510(c)(1). While equitable subordination often involves a showing that a creditor has engaged in inequitable conduct, *see., e.g.*, *United States v. Noland*, 517 U.S. 535, 538-39 (1996) (citing *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 700 (5th Cir. 1977)); *Geltzer v. Bay Harbour Mgmt. LC (In re BH S&B Holdings LLC)*, 807 F. Supp. 2d 199 (S.D.N.Y. 2011), such a showing is not required for subordination under section 510(c)(1). Indeed, in certain circumstances, equitable subordination is appropriate even absent a finding of fault or inequitable conduct. *See, e.g., SPC Plastics Corp. v. Griffith (In re Structurlite Plastics Corp.)*, 224 B.R. 27, 35 (6th Cir. B.A.P. 1998) (affirming no-fault equitable subordination of redemption of former stockholders' interests); *In re Emergency Monitoring Techs.*, 366 B.R. 476, 506-08 (Bankr. W.D. Pa. 2007) (subordinating stock redemption claim that

---

[10] The Plan Administrator is not requesting "categorical" subordination. Rather, the Plan Administrator's request for subordination under section 510(c)(1) applies only to the Private Label Securities Claim.

US_ACTIVE:\44338264\1\58399.0008

effectively elevated equity interest to debt and diluted distribution to other creditors).  No-fault

equitable subordination is appropriate following a claim-specific inquiry into "the nature and

origin of the claim" and "the substance of the transaction, as opposed to its form." *Structurlite*

*Plastics*, 224 B.R. at 35-36.[11]

48.    Congress intended for courts to retain the power to subordinate claims where,

based on the specific facts and circumstances, it would be equitable to do so.  *See, e.g.,*

*Montgomery Ward Holding Corp. v. Schoeberl (In re Montgomery Ward)*, 272 B.R. 836, 845

(Bankr. D. Del. 2001) (preserving debtor's right to equitably subordinate under section 510(c)(1)

where claims arising from stock redemption plan could not be subordinated under section

510(b)), *abrogated on other grounds by Baroda Hill Invs., Ltd. v. Telegroup, Inc. (In re*

*Telegroup, Inc.)*, 281 F.3d 133, 142 (3d Cir. 2002).

49.    Here, the only equitable result is subordination.  As discussed above, the

Private Label Securities Claim is precisely the type of claim that Congress intended to

subordinate under section 510(b)—*i.e.*, a claim for damages arising from the purchase or sale of

securities.  If this Court finds that, technically, these highly complex securities are neither

securities "of the debtor" nor securities "of an affiliate of the debtor" pursuant to section 510(b),

the Court can remedy this form-over-substance result through the application of section

510(c)(1).  Moreover, the Private Label Securities Claim is an attempt by Fannie Mae to dip yet

another ladle into the pool of available funds and advance its own parochial interests—which are

---

[11] In *Jezarian v. Raichle (In re Stirling Homex Corp.)*, the Second Circuit approved no-fault equitable subordination.  579 F. 2d 213 (2d Cir. 1978) (subordinating claims of defrauded stockholders without a showing of fault).  *Stirling Homex*, however, is a pre-Bankruptcy Code case and, therefore, was not governed by section 510(b).  In *Noland*, the Supreme Court explained that "Congress 'intended that the term 'principles of equitable subordination' [in section 510(c)] follow *existing* case law' . . . ." 517 U.S. at 539 (quoting 124 Cong. Rec. 32398, 33998 (1978)) (emphasis added).  *Stirling Homex* has never been revisited by the Second Circuit and is still cited by courts implementing no-fault equitable subordination. *See, e.g.*, *Structurlite Plastics*, 224 B.R. at 35-36.

20

already protected by the Trust Claims and the distributions Fannie Mae is receiving directly from

the Lehman RMBS—at the expense of all other unsecured creditors.  Section 510(c)(1) provides

the Court with a means to prevent what is surely an inequitable result.

## NOTICE

50.   No trustee has been appointed in the Chapter 11 Cases.  The Plan

Administrator has served notice of this objection, in accordance with the procedures set forth in

the second amended order entered on June 17, 2010 governing case management and

administrative procedures (ECF No. 9635), on: (i) the Federal Housing Financing Agency, (ii)

Fannie Mae; (iii) the United States Trustee for Region 2; (iv) the Securities and Exchange

Commission; (v) the Internal Revenue Service; (vi) the United States Attorney for the Southern

District of New York; and (vii) all parties who have requested notice in these chapter 11 cases.

The Plan Administrator submits that no other or further notice need be provided.

51.   Except as described above, no previous request for the relief sought herein

has been made by the Plan Administrator or the Chapter 11 Estates to this or any other Court.

WHEREFORE the Plan Administrator respectfully requests entry of an order

granting the relief requested herein and such other and further relief as is just.

Dated:  September 27, 2013
         Houston, Texas

/s/ Alfredo R. Perez
Alfredo R. Pérez

WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, Texas 77002-2755
Telephone: (713) 546-5000
Facsimile: (713) 224-9511

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

21

**Exhibit A**

**(Trumpp Declaration)**

WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, Texas 77002-2755
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Alfredo R. Pérez

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
| | | |
|---|---|---|
| In re | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.* | : | **08-13555 (JMP)** |
| | : | |
| Debtors. | : | **(Jointly Administered)** |
-------------------------------------------------------------------x

**DECLARATION OF ZACHARY TRUMPP IN SUPPORT OF PLAN
ADMINISTRATOR'S OBJECTION TO CLASSIFICATION OF SECURITIES LAW
<u>PORTION OF CLAIM OF FEDERAL NATIONAL MORTGAGE ASSOCIATION</u>**

Pursuant to 28 U.S.C. §1746, I, Zachary Trumpp, declare:

      1.      I am over 18 years of age and have personal knowledge of all of the facts set forth in this declaration and if called upon to testify as a witness, I could testify to the truth of the matters set forth herein.

      2.      I submit this Declaration in support of the *Plan Administrator's Objection to Classification Claim of Federal National Mortgage Associations*, (the "<u>Objection</u>").[1]

      3.      I am currently employed by Lehman Brothers Holdings Inc. ("<u>LBHI</u>").  I was previously employed by Aurora Loan Services LLC ("<u>Aurora</u>").

      4.      As the Vice President of Loss Management at Aurora, one of my responsibilities was the development and operation of a department that was responsible for identifying

---

[1] All capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Objection.

residential mortgage loans with the potential for breaches, having the potential breaches reviewed either internally or externally by a forensic due diligence provider, determining which breaches were material and adverse, and pursuing remedies on claims on behalf of Aurora and LBHI against third-party residential mortgage loan sellers and originators.    This work was performed on LBHI's whole loan portfolio and the universe of residential mortgage backed securitizations sponsored by LBHI.    During my tenure in this position, my team resolved several billion dollars-worth of claims on behalf of Aurora, LBHI, and LBHI-sponsored securitizations. As such, I have direct and personal knowledge of the Lehman RMBS.

5.    In my role at LBHI, I am responsible for evaluating certain claims asserted against the Chapter 11 Estates as well as the pursuit and resolution of claims of the Chapter 11 Estates against third parties that sold loans to LBHI.    In this role, I have continued to develop first-hand experience with the structure and operating documents of the RMBS trusts.

6.    I am generally familiar with the Private Label Securities Claim filed by Fannie Mae.

## The Private Label Securities Claim

7.    The Private Label Securities Claim is based on alleged violations of the Securities Act of 1933 in connection with the sale of Lehman RMBS to Fannie Mae.    Prior to the Commencement Date, LBHI and certain of its affiliates were involved in the business of structuring and issuing RMBS, which occurred through a multi-step process, described below.

8.    LBHI acquired large groups of loans secured by residential real property.    These loans were generally acquired pursuant to "Purchase and Flow" agreements between Lehman Brothers Bank, FSB (n/k/a Aurora Commercial Corporation) ("LBB"), and originators of loans, and "Assumption and Assignment" agreements between LBB and LBHI.    *See, e.g.,* Assumption

2

and Assignment Agreement (BNC Mortgage Loan Trust Mortgage Pass-Through Certificates Series 2006-2) dated Oct. 1, 2006, attached hereto as Exhibit A.

9.      Some of these loans were originated by subsidiaries of LBHI, such as Aurora Loan Services, LLC.  *See* SASC 2006-BC2 Supplemental Prospectus at S-70, attached hereto as Exhibit B.  The remaining loans came from third-party originators such as Green Point Mortgage Funding, First Franklin Financial Corp., and Wells Fargo Home Mortgage Corp.  *See, e.g.,* Lehman XS Trust Series 2006-8 Supplemental Prospectus, attached hereto as Exhibit C.

10.      LBHI then sold the residential loans to SASCO pursuant to "Mortgage Loan Sale and Assignment" agreements.  *See, e.g.,* Mortgage Loan Sale and Assignment Agreement, (BNC Mortgage Loan Trust 2006-2; Mortgage Pass-Through Certificates, Series 2006-2), dated Oct. 1, 2006, attached hereto as Exhibit D.

11.      SASCO deposited the loans it bought from LBHI into trusts, which are described as "issuing entities".  *See* SASC 2007-WF1 Supplemental Prospectus at cover, S-3, S-86, attached hereto as Exhibit E; SASCO 2007-WF1 Trust Agreement, art. II § 2.01 (p. 63), attached hereto as Exhibit F.

12.      SASCO received "Certificates" from the trusts in return for the loans.  *See* SASC 2007-WF1 Supplemental Prospectus at S-86.

13.      SASCO then registered the Certificates with the Securities and Exchange Commission.  *Id.*  These certificates are commonly known as RMBS.

14.      The Prospectus and Supplemental Prospectus for each of the RMBS listed in the Fannie Mae Claim list SASCO as the Depositor.  *See, e.g.,* SASC 2007-WF1 Prospectus at 1; SASC 2007-WF1 Supplemental Prospectus at 1; each as included in Exhibit E.

15.      The trusts did not have their own employees, officers or directors.  *See* SASC

3

2007-WF1 Supplemental Prospectus at S-84.

16.    The trusts relevant to Fannie Mae Claim were established by Trust Agreements to which SASCO was a party, as well as, among others, the Master Servicer and the Trustee.  *See, e.g.,* SASCO 2007-WF1 Trust Agreement, cover page.  The Trust Agreements govern every aspect of the administration of the RMBS trusts' property, including the collection of principal and interest on the mortgages, *see, e.g., id.* at art. IV § 4.01(d) (p.86), the maintenance of appropriate insurance, *see, e.g., id.* at art. IX § 9.18 (p. 172), record-keeping, *see, e.g., id.* at art. IX § 9.19 (p. 173), and the distribution of funds to securities holders, *see, e.g., id.* at art. IX § 5.01 – 5.09 (pp. 98-120).

17.    The Trust Agreements established the responsibilities of the parties, including SASCO.  For example, SASCO was required to perfect the trustees' security interests in the assets backing the securities; ensure that interest rate cap contracts, swap agreements, or other similar contracts were maintained or replaced; and prepare and file any reports required under the Exchange Act of 1934.  *See* SASC 2007-WF1 Prospectus at 71-76, 114-15.  SASCO's role was to create the RMBS and ensure that they were properly registered with the SEC, but SASCO had ongoing rights and responsibilities as well.  SASCO could repurchase RMBS—either at the request of the securities holders or as mandatory redemption.  *Id.* at 44.  SASCO was also required to provide various representations and warranties related to the RMBS, mainly regarding the characteristics of the assets in the relevant trust.  *Id.* at 87.

18.    The Trustee's responsibilities included examining documents provided to the trust and, in certain instances, remitting complaints regarding the assignment of a mortgage loan.  *See, e.g.,* SASCO 2007-WF1 Trust Agreement, art. VI §6.01(b), (d) (pp. 121-22).

19.    The loans held by the trusts were serviced by primary servicers under the

US_ACTIVE:\44331365\3\58399.0011

supervision of a Master Servicer.  *See, e.g.,* SASC 2007-WF1 Supplemental Prospectus at S-3.
The Master Servicer, at a minimum, was required to supervise primary mortgage servicers and
collect monthly reports.  *Id.* at S-70, S-73.  The primary servicers were responsible for, among
other things, collecting monthly remittances of principal and interest from the borrowers,
collecting taxes and remitting them to taxing authorities, making advances with regard to
delinquent payments, and providing monthly loan-level reports to the Master Servicer.  *Id.* at S-
73 – S-74.

20.    The roles of the Depositor, the Trustee, and the Master Servicer, as established in
the Trust Agreements, are all described in the offering documents.  *See, e.g., id.* at S-55 – S-56.

21.    The assignment of residential loans to the trusts was intended to be a true sale, not
a financing.  SASCO gave control of the loans to the various trustees.  *See, e.g.* SASCO 2007-
WF1 Trust Agreement at art. II § 2.01 (p. 63).  For example, section 2.01(a) of the Trust
Agreement for RMBS trust SASCO 2007-WF1 provides as follows: "[c]oncurrently with the
execution and delivery of this Agreement, the Depositor does hereby transfer, assign, set over,
deposit with and otherwise convey to the Trustee, without recourse . . . all the right, title and
interest of the Depositor in and to the Mortgage Loans."  *Id.*

22.    In exchange for the assignment of residential loans to the trusts, SASCO received
securities backed by these loans.

23.    The securities issued by these trusts have structures that are described in the Trust
Agreements and offering documents.  The RMBS issued with respect to each trust are divided
into multiple classes, or "tranches."  The top tranches are labeled "A."  *See, e.g.,* SASC 2007-
WF1 Supplemental Prospectus at S-1, S-2. Distributions from a trust are subject to a "waterfall"
where the most senior tranches have the first right to cash flows from the trusts' pool of loans

5

(after administrative expenses are deducted).  *See generally, for example,* SASCO 2007-WF1 Trust Agreement at art. V § 5.01 – 5.02 (pp. 98-112).

24.    After the senior tranche security holders are paid in full, any surplus flows down to the next subordinate tranche and so on until all of the available funds are distributed or all of the security holders have received the amounts to which they are entitled.  Holders of RMBS in subordinate tranches, therefore, assume considerably more risk than holders of RMBS in senior tranches and are compensated for such increased risk through the possibility of greater returns.

25.    SASCO then sold the RMBS to Lehman Brothers Inc. ("LBI").  SASC 2007-WF1 Supplemental Prospectus at S-102-103.  LBI is a direct subsidiary of LBHI.  *Id.* at S-55.  LBI was the underwriter or co-underwriter for all the RMBS listed in the Fannie Mae Claim.  *See, e.g., id* at 56.  LBI sold the RMBS to buyers, including Fannie Mae.

26.    SASCO used the proceeds from the sale of the RMBS to LBI to pay LBHI for the loans.

27.    Fannie Mae almost exclusively holds "A" RMBS—that is, the top tranche—and therefore receives payment on these securities ahead of holders of RMBS in all of the other tranches.  *See, e.g., id*. at S-33 - S-38.  Any excess amounts generated by the mortgage loans are not paid to SASCO, but instead are retained by the holders of the residual interests in the RMBS trusts.  *See, e.g., id.* at S-12 ("any remaining excess cashflow will be paid to various certificates not offered by this prospectus supplement, including residual certificates").

28.    Fannie Mae also acquired junior tranches of one particular Lehman-Issued RMBS, SASC 2007 BC-3.  In that situation, however, Fannie Mae also acquired all of the senior tranches.  *See* Schedule 3 to Fannie Mae's Proof of Claim.

29.    The trustees for the RMBS trusts filed the Trust Claims against LBHI and/or

SASCO.   The Trust Claims are based on contractual remedies, including "put-back" claims relating to alleged breaches of representations and warranties made by SASCO, as Depositor, LBHI, as "Seller," and the originators of the residential mortgages.

30.    The Trust Claims raise many of the same factual issues as those underlying the Private Label Securities Claim.   Any recovery that the Trustees realize on their claims will be distributed to applicable holders of the Lehman-Issued RMBS in accordance with the waterfall priority structure described in the offering documents.   Such recovery should significantly offset any losses Fannie Mae experiences.

31.    My understanding is that, to date, Fannie Mae continues to receive payments on the RMBS it still holds, and as of March 2013 Fannie Mae had received approximately $8.3 billion in principal and interest payments.


I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Dated:  September 27, 2013

/s/ Zachary Trumpp

Zachary Trumpp