Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

4    In the Matter of:

5                                    08-13555(JMP)

6    LEHMAN BROTHERS HOLDINGS INC.,     (Jointly Administered)

7    ET AL.,

8                    Debtors.

9    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

10   In the Matter of:

11                                   08-01420(JMP)(SIPA)

12   LEHMAN BROTHERS INC.,

13                    Debtor.

14   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

15   MICHIGAN STATE HOUSING DEVELOPMENT

16   AUTHORITY,

17                    Plaintiff,

18           v.                        Adv. Case No. 09-01728

19   LEHMAN BROTHERS SPECIAL FINANCING

20   INC., ET AL.,

21                    Defendants.

22   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

23

24

25

Page 2

1    LEHMAN BROTHERS HOLDINGS INC.,

2    ET AL.,

3                    Plaintiffs,

4         v.                          Adv. Case No. 13-01340

5    INTEL CORP.,

6                    Defendant.

7    - - - - - - - - - - - - - - - - - - - - - - - - - x

8    FIRSTBANK PUERTO RICO,

9                    Plaintiff,

10        v.                          Adv. Case No. 10-04103

11   BARCLAYS CAPITAL, INC.,

12                   Defendant.

13   - - - - - - - - - - - - - - - - - - - - - - - - - x

14   EL VEASTA LAMPLEY,

15                   Plaintiff,

16        v.                          Adv. Case No. 13-01354

17   LEHMAN BROTHERS HOLDINGS INC.,

18                   Defendant.

19   - - - - - - - - - - - - - - - - - - - - - - - - - x

20                   U.S. Bankruptcy Court

21                   One Bowling Green

22                   New York, New York

23

24                   September 18, 2013

25                   10:02 AM

Page 3

1    B E F O R E :

2    HON JAMES M. PECK

3    U.S. BANKRUPTCY JUDGE

4

5

6    Hearing re:  Motion of Retirement Housing Foundation and Its

7    Affiliates for a Determination that the Automatic Stay Does

8    Not Bar Commencement of Certain Litigation Against the

9    Debtors related to Post-Petition Claims and/or Granting

10   Relief from the Automatic Stay to Permit Commencement of

11   Such Litigation; and Separately, to Grant RHF Relief from

12   the Automatic Stay to Litigate the Tort Claim in the

13   California State Court [ECF No. 39291]

14

15   Hearing re:  Motion of RBC Dominion Securities Inc. to

16   Compel Lehman Brothers Holdings, Inc. to Reissue Checks for

17   Allowed Claim [ECF No. 39062]

18

19   Hearing re:  Trustee's Motion to Establish Supplemental

20   Procedures for Remaining Customer Distributions Pursuant to

21   SIPA Section 78fff-(2)(b) [LBI ECF No. 7144]

22

23   Hearing re:  Trustee's Motion to Establish Claims Hearing

24   Procedures and Alternative Dispute Resolution Procedures for

25   General Creditor Claims Pursuant to Section 105 of the

1    Bankruptcy Code, Bankruptcy Rule 9014, and General Order M-

2    452 [LBI ECF No. 7146]

3

4    Hearing re:  Trustee's Motion for an Order Pursuant to

5    Section 503(a) of the Bankruptcy Code and Bankruptcy Rule

6    3003(c)(3) Establishing the Deadline for Filing Requests for

7    Payment of Certain Administrative Expenses and Procedures

8    Relating Thereto and Approving the Form and Manner of Notice

9    Thereto [LBI ECF No. 7147]

10

11   Hearing re:  Motions for Partial Summary Judgment

12

13   Hearing re:  Pre-Trial Conference and Defendant's Motion to

14   Dismiss Plaintiffs' Bankruptcy Claims and for a

15   Determination that Plaintiffs' Contract Claim is Non-Core

16

17   Hearing re:  Motion for Civil Contempt Sanctions

18

19   Hearing re:  Pre-Trial Conference

20

21   Hearing re:  Motion of Fidelity National Insurance Company

22   to Compel Compliance with Requirements of Title Insurance

23   Policies [ECF No. 11513]

24

25   Hearing re:  Motion of Monti Family Holding Company, Ltd for

Page 5

1    Leave to Conduct Rule 2004 Discovery of Debtor Lehman

2    Brothers Holdings Inc. and Other Entities [ECF No. 16803]

3

4    Hearing re:  Motion of Giants Stadium LLC for Leave to

5    Conduct Discovery of LBI Pursuant to Federal rule of

6    Bankruptcy Procedure 2004 [ECF No. 36874]

7

8    Hearing re:  Motion of Baupost Group, LLC to quash Debtors'

9    Subpoena Issued Under Federal Rule of Bankruptcy Procedure

10   2004 [ECF No. 38941]

11

12   Hearing re:  Motion of FirstBank Puerto Rico for (1)

13   Reconsideration, Pursuant to Section 502(j) of the

14   Bankruptcy Code and Bankruptcy Rule 094,k of the SIPA

15   Trustee's Denial of FirstBank's Customer Claim, and (2)

16   Limited Intervention, Pursuant to Bankruptcy Rule 7024 and

17   Local Bankruptcy Rule 9014-1, in the Contested Matter

18   Concerning the Trustee's Determination of Certain Claims of

19   Lehman Brothers Holdings Inc. and Certain of Its Affiliates

20   [LBI ECF No. 5197]

21

22

23

24

25   Transcribed by:  Dawn South and Sheila Orms

Page 6

```
 1   A P P E A R A N C E S :

 2   WEIL, GOTSHAL & MANGES LLP

 3        Attorneys for the Debtors

 4        767 Fifth Avenue

 5        New York, NY 10153-0119

 6

 7   BY:  MAURICE HORWITZ, ESQ.

 8        JACQUELINE MARCUS, ESQ.

 9        RICHARD W. SLACK, ESQ.

10        SUNNY J. THOMPSON, ESQ.

11        ZAW WIN, ESQ.

12        EVERT J. CHRISTENSEN, JR., ESQ.

13

14   KLESTADT & WINTERS, LLP

15        Attorneys for Retirement Housing Foundation

16        570 Seventh Avenue

17        17th Floor

18        New York, NY 10018

19

20   BY:  TRACY L. KLESTADT, ESQ.

21        JOHN E. JURELLER, JR., ESQ.

22

23

24

25
```

Page 7

```
 1   REUBEN RAUCHER & BLUM P.C.

 2        Attorney for Retirement Housing Foundation

 3        10940 Wilshire Boulevard

 4        18th Floor

 5        Los Angeles, CA 90024

 6

 7   BY:  TIMOTHY D. REUBEN, ESQ.

 8

 9   KATTEN MUCHIN ROSENMAN LLP

10        Attorney for Dominion Securities, Inc.

11        575 Madison Avenue

12        New York, NY 10022-2585

13

14   BY:  JEFF J. FRIEDMAN, ESQ.

15

16   HUGHES HUBBARD

17        Attorneys for the SIPA Trustee

18        One Battery Park Plaza

19        New York, NY 10004-1482

20

21   BY:  JASON C. BENTON, ESQ.

22        JEFFREY S. MARGOLIN, ESQ.

23        MICHAEL E. SALZMAN, ESQ.

24

25
```

```
 1   SECURITIES INVESTOR PROTECTION CORPORATION

 2        805 15th Street, N.W.

 3        Suite 800

 4        Washington, D.C. 20005-2215

 5

 6   BY:  KENNETH J. CAPUTO

 7

 8   JONES DAY

 9        Attorneys for Debtors

10        222 East 41st Street

11        New York, NY 10017-6072

12

13   BY:  ROBERT W. GAFFEY, ESQ.

14        MAHESH V. PARLIKAD, ESQ.

15

16   MILBANK, TWEED, HADLEY & MCCLOY LLP

17        Attorney for the Official Committee

18        One Chase Manhattan Plaza

19        New York, NY 10005-1413

20

21   BY:  DAVID S. COHEN, ESQ.

22

23

24

25
```

1  WILMER CUTLER PICKERING HALE AND DORR LLP

2       Attorneys for the Michigan State Housing and

3       Development Authority

4       1875 Pennsylvania Avenue, NW

5       Washington, D.C. 20006

6

7  BY:  CRAIG GOLDBLATT, ESQ.

8       DANIELLA SPINELLI, ESQ.

9

10  STATE OF MICHIGAN

11       Attorney for the Michigan State Housing and

12       Development Authority

13       State Operations Division

14       22nd Floor G. Mennen Williams Building

15       525 West Ottawa Street

16       Lansing, MI 48909

17

18  BY:  JENNIFER M. JACKSON, ESQ.

19

20  CLEARY GOTTLIEB STEEN & HAMILTON LLP

21       Attorney for Barclays Capital, Inc.

22       One Liberty Plaza

23       New York, NY 10006-1470

24

25  BY:  BOAZ S. MORAG, ESQ.

Page 10

1    WILLIAMS & CONNOLLY, LLP

2          Attorney for (not identified)

3          725 Twelfth Street, N.W.

4          Washington, D.C. 20005

5

6    BY:  JOHN BUCKLEY, ESQ.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2                THE COURT:  Good morning, be seated,

3      please.

4                UNIDENTIFIED SPEAKER:  Good morning.

5                UNIDENTIFIED SPEAKER:  Good morning, Your Honor.

6                MR. HORWITZ:  Good morning, Your Honor, Maurice

7      Horwitz, Weil Gotshal & Manges on behalf of Lehman Brothers

8      Holdings, Inc. and certain of its affiliates.

9                We have two contested matters on this morning's

10     agenda.

11               The first is the motion of Retirement Housing

12     Foundation and its affiliates for determination that the

13     automatic stay does not bar commencement of certain

14     litigation against the debtors.

15               This -- counsel for Retirement Housing Foundation

16     is in the courtroom and I'll turn the podium over to them to

17     make their initial remarks.

18               THE COURT:  Okay.  Before anybody speaks I think

19     we should note that this hearing marks the fifth anniversary

20     of Lehman week, and that it also marks the first Lehman

21     hearing in the refurbished courtroom where it all began.

22     That means that those of you with a sense of history will

23     never be able to see that old courtroom.  You can't go home

24     again.

25               Let's proceed.

Page 12

1            MR. KLESTADT:  Good morning, Your Honor, Tracy

2    Klestadt of Klestadt & Winters, along with my partner John

3    Jureller, and associate Lauren Kiss (ph) for Retirement

4    Housing.  If I may introduce to Your Honor Timothy Reuben of

5    Reuben Raucher & Blum, our co-counsel who'll be making our

6    presentation.

7            THE COURT:  Okay.  Fine.

8            MR. RUEBEN:  Good morning, Your Honor.  Thank you

9    for allowing me as pro hac vice.

10            Your Honor, there are essentially two issues

11    before you in our motion.  The first issue has to do with

12    the right to file a debt relief action in the state court.

13            It is our position that the law and Your Honor's

14    jurisprudence is clear, that the exception to the automatic

15    stay, which allows termination and acceleration of the swap

16    should allow similarly here where the sole issue is

17    termination in the debt relief action that we're talking

18    about, the right to proceed and seek debt relief in the

19    state court.

20            Now, we believe there's no case precisely on point

21    on this particular issue, Your Honor.  The closest is the

22    Enron case, which we have cited.

23            We do believe that the jurisprudence of the Enron

24    case gives direct indication that such an approach would be

25    appropriate.

Page 13

```
 1              THE COURT:  What do you mean by such an approach?

 2              MR. RUEBEN:  The approach of filing a debt relief

 3    action to determine termination.

 4              In the Enron cases I am sure Your Honor is aware

 5    the plaintiff, Marta (ph), did not come to court and ask

 6    permission, and then proceeded to seek a debt relief action

 7    outside the precise and narrow grounds that are allowed by

 8    the statute.

 9              Essentially, as is reflected in the language of

10    the opinion, Marta's debt relief action was based on

11    uncertainty and insecurity of Marta's position, not on

12    bankruptcy.  In other words --

13              THE COURT:  Let's break in for a second now,

14    because we don't have don't look to Enron, we can deal with

15    deal the Lehman case as a case that stands for the

16    proposition that there is an appropriate single forum to

17    resolve all issues that relate to Lehman's counterparty

18    obligations in derivative transactions.  And for the last

19    five years the single court where all such matters have been

20    consolidated is the court you're now standing in.

21              Why shouldn't this be the one and only place for

22    all such matters to be resolved?  And what's so special

23    about your client?  You try to distinguish your client, but

24    it sure does seem a lot like Metavante.

25              MR. RUEBEN:  Well, first of all, as we indicate to
```

Page 14

```
 1    Your Honor, we don't believe Metavante does apply because

 2    our --

 3              THE COURT:  Now, we're not talking about the

 4    specific holding, we're talking about an individual

 5    counterparty attempting to distinguish itself from the class

 6    of every other counterparty on the planet that dealt with

 7    Lehman affiliates, and in effect trying to get the home

 8    court advantage by taking this to Los Angeles instead of

 9    having you come on a plane as you did I guess yesterday to

10    come here.  I've taken that flight, it's not that hard.

11              MR. RUEBEN:  Respectfully, Your Honor, it's not

12    just the lawyer that takes the flight.

13              THE COURT:  It's not that hard for your client

14    either.

15              MR. RUEBEN:  Well --

16              THE COURT:  It's not that hard for witnesses who

17    can be deposed.  It's not that hard, this isn't a forum non-

18    conveyance case.

19              MR. RUEBEN:  Correct.

20              THE COURT:  This is a case of proper

21    administration five years in of the largest bankruptcy in

22    history where transactions of this sort routinely are

23    addressed, and I have absolutely no knowledge of the judges

24    in California, I assume they're quite competent and

25    experienced, but they don't deal with things of this sort on
```

Page 15

1    a routine basic, and even if they do there is the potential

2    for inconsistent outcomes, which I suspect is what is seek.

3              MR. RUEBEN:  I'm sorry, Your Honor, it is not what

4    we seek.  We are not looking inconsistent outcomes, in fact

5    the jurisprudence of Court and prior cases that this Court

6    has indicated its position are certainly part of the law.

7              But the actual determination of the termination

8    issue, which I'm not aware that this Court has done, the

9    question of fact that has to be determined under New York

10   state law, the California court is more than adequate.

11             In fact not to suggest that this Court isn't, of

12   course this Court is perfectly fantastic for that purpose,

13   but the California court deals with New York State court

14   theory -- New York State law issues all the time.

15             The termination issue, which is the narrow issue

16   of the debt relief claim, is a New York State determination.

17             The bankruptcy issue, which is now before Your

18   Honor, is whether or not we are correct, and we believe we

19   are, that the precise language of the statute, as narrowly

20   construed by Your Honor and prior case law, allows the

21   proceeding of a debt relief claim to determine that

22   termination question, which is now challenged.

23             There is no case that I'm aware of where

24   termination has been essentially stymied through the

25   arguments that have been made by counsel here -- by opposing

Page 16

1    counsel.  We had the right under the expectation to proceed

2    to terminate, we started that process in November, as is

3    reflected in the evidence, and there's no law -- excuse me

4    there's no law that suggests that we cannot proceed with a

5    direct debt relief claim.  In fact the argument is to the

6    contrary.

7            It is true that we also have the right, I think

8    Enron suggests as much, to seek that debt relief in this

9    Court.  But there's no intent to find a, as I think Your

10   Honor is suggesting, a friendlier forum.

11           THE COURT:  Well, there is a suggestion in the

12   papers that this is, with all respect, all example of

13   blatant forum shopping, and whether or not it is or it isn't

14   will not affect the outcome, the outcome will be affected by

15   strict application of application Sonnax factors, which

16   we'll get to at some point.

17           If you're talking about the interpretation of the

18   November 2008 letter that was faxed to Lehman, I took a look

19   at that letter and there is on the first page underlined

20   language indicating that it's not a termination.  It's not a

21   termination by its own terms.

22           MR. RUEBEN:  You are correct, Your Honor,

23   absolutely true.  It was a notice of default, not a

24   termination.  In fact RHF -- Retirement Housing Foundation,

25   my client, did not have the right at that point to terminate

Page 17

```
 1   the swaps or if it did it faced default on a $120 million
 2   obligation.  It was required, as is reflected in the papers,
 3   to go through a process of going around to the banks.  It
 4   was a difficult time for the banks as Your Honor knows, and
 5   get express permission.  That process, which we proceeded
 6   with, took months of effort.
 7           There is no evidence that the termination was for
 8   any purpose other than for the bankruptcy of Lehman.
 9           My client is not expert in swaps.  My client is a
10   foundation that runs senior centers.  They proceeded as well
11   as they could.  The suggestion to the contrary is without
12   evidence.
13           The sole reason being bankruptcy, I would suggest
14   to Your Honor, it falls precisely within the exception that
15   we're talking about, determination.  And the question really
16   for Your Honor, which I think Enron gives guidance to, but I
17   hear Your Honor that this is a unique situation before Your
18   Honor.
19           When we have terminated, and they now say that we
20   have not terminated, and they say that in the situation that
21   we're in now five years into the bankruptcy proceeding what
22   is my client to do?
23           They contend termination, we feel very strongly
24   about the evidence, but it has to be a factual
25   determination.
```

1            THE COURT:  Well, this isn't getting to the

2    merits, this is a procedural motion.

3            But do you look to the November 2008 letter that

4    I've just referenced as evidence of termination or do you

5    look to that letter as evidence of simply giving notice of a

6    default?  And if it's simply notice of a default what is the

7    evidence of termination?

8            MR. RUEBEN:  The notice of default only, Your

9    Honor, and the evidence that the process that we had to

10   undertake for termination began.  It did take months.  The

11   actual termination, as I think is uncontested, was a

12   termination letter in June.  So as --

13           THE COURT:  In June of what year?

14           MR. RUEBEN:  2009, Your Honor.

15           So essentially what we needed to do and we

16   proceeded to do was go through the process of contacting the

17   banks, arguing with the banks, telling them that that's what

18   we intended to do, and persuading them and their various

19   committees, and there was a consortium of banks, to allow us

20   to terminate.

21           After they allowed us to terminate we then

22   proceeded with a termination letter and a calculation.  We

23   hired a forensic in order to do the calculation, because we

24   didn't of course have the expertise to do that.  That

25   forensic is also in Los Angeles I might add.  And therefore

Page 19

1    we terminated.

2            Since that time the matter has been under Your

3    Honor's wing and nothing has really happened until recently

4    when during the mediation process, which we can't talk about

5    what happened, but suffice it to say we learned a different

6    approach that Lehman was taking with respect to us.

7            Now, since that time in these public proceedings

8    Lehman has suggested that RHF, Retirement Housing

9    Foundation, owes them $31 million in interest because of the

10   years that have gone by.  Well, that's untenable.  From our

11   client's point of view that simply in addition puts them

12   into bankruptcy, but on top of all that we can't allow that

13   process to proceed, we have to resolve the issue of

14   termination and which is why we're asking for the right to

15   do so now.

16           With respect to our understanding of the

17   procedural right we wanted to obviously seek Your Honor's

18   approval that we have the right to proceed with the debt

19   relief action.

20           THE COURT:  But let's take a look at your motion

21   then.  Does the automatic stay apply?

22           MR. RUEBEN:  The answer to the question is for the

23   debt relief action only we contend not, Your Honor.

24           THE COURT:  What do you mean when you keep saying

25   debt relief action?  What is the action you're referring to?

Page 20

1          MR. RUEBEN:  The debt relief action is solely on

2     the issue of termination.  The only question is --

3          THE COURT:  Well, let's just define our terms.

4     What do you mean by the term "debt relief action?"  It's a

5     term that I generally don't use in this court.  I don't know

6     what you mean by it.

7          MR. RUEBEN:  I'm sorry, Your Honor.

8          We would file a complaint that would seek an order

9     and ruling on the factual question of whether or not under

10    the swap and the swap language Retirement Housing Foundation

11    terminated the swap through its efforts as of June of 2009.

12         THE COURT:  I mean you must know, because you

13    prepared for this hearing, that there are a variety of

14    adversary proceedings pending in this court that touch on,

15    if not the center of that question, the fringes of that

16    question.  There are all manner of issues that have arisen

17    within the last five years on the question of the

18    termination of swap agreements.  It's a rather routine

19    matter here.

20         MR. RUEBEN:  But with respect to the matter that

21    we are representing to Your Honor it's a unique factual

22    question as to what our client had to do, and I've already

23    described the process.

24         THE COURT:  How can the question be unique if the

25    issue is driven by an interpretation of a standard form ISDA

Page 21

1    agreement?

2              MR. RUEBEN:  Because the facts -- it's a factual

3    question.  You know, there are witnesses and the processes

4    that we went through that we would put forward as an

5    evidentiary proceeding.

6              THE COURT:  Well, you may try to distinguish your

7    situation from other situations, but your situation

8    necessarily arises out of some standard documentation; isn't

9    that true?

10             MR. RUEBEN:  Well, there's no question that it's a

11   standard ISDA form, Your Honor, but the termination process

12   is purely factual and will require its own set of evidence,

13   testimony, et cetera, that is why we submit to Your Honor

14   that it is a factual determination.

15             THE COURT:  Well, of course what you're saying is

16   true, but it's also true for -- I don't know what the exact

17   number is -- the hundreds of disputes that have arisen

18   between Lehman and counterparties, many of those being in

19   the ADR program, and the adversary proceedings, some of them

20   decided, some of them pending, that go to the question of

21   how properly to interpret what for each counterparty is a

22   set of what they assert to be unique facts.

23             What distinguishes your situation from their

24   situation?  It seems to me not very much, it's just that you

25   have some different facts to allege.

Page 22

1           MR. RUEBEN:  Well, but the different facts are --

2           THE COURT:  Isn't that true in every case?

3           MR. RUEBEN:  I obviously don't have mastery of all

4    of the cases before Your Honor, but I would say by way of

5    example we're not UBS or any of the major banks.  That fact

6    alone would take, us I submit, outside of the vast majority

7    of those disputes.

8           THE COURT:  But are you suggesting that there

9    should be different rules that apply to less sophisticated

10   counterparties?

11          MR. RUEBEN:  I think that there are different

12   facts that are interpreted differently based on the

13   counterparty expertise.

14          A perfect example.  A perfect example is the

15   allegation that Lehman Brothers makes right here saying

16   Retirement Housing Foundation played the market.  That is

17   respectfully not supportable at all.  As I said, RHF doesn't

18   know how to -- can't play the market and is not essentially

19   allowed to play the market.  I think that's a very different

20   factual scenario and undercuts what Lehman suggests, whereas

21   we contend if anyone was playing the market here it would

22   have been Lehman Brothers, they're the experts.

23          But on a factual basis I do think that my example

24   takes us out of the typical situation.

25          Moreover, the efforts that RHF undertook in order

Page 23

1      to terminate, which are unique to them, and the complex

2      transaction that they were in, does make this particular

3      case different on its own merits.  And I submit to Your

4      Honor it would only be a unique determination.  There's no

5      way that the determination of termination by RHF could be

6      applicable to the other multitude of cases that Your Honor

7      has referenced.

8            THE COURT:  Well, let's deal with the specifics of

9      your motion, and let's assume for the sake of discussion

10     that the automatic stay applies, and let's also assume for

11     the sake of discussion that you're seeking what amounts to

12     an exceptional ruling, because at this stage in this

13     proceeding you are the only attorney representing any

14     counterparty that is seeking to have the questions

15     surrounding termination of the swap agreement determined in

16     a state court.  In fact to stay the question -- to state the

17     question is almost to test everybody's ability to maintain a

18     straight face in the courtroom.

19            You're talking about having a state court

20     determine questions of termination rights with respect to

21     Lehman Brothers.  Do you understand what we're talking

22     about?  This is Lehman Brothers.

23            MR. RUEBEN:  I understand, Your Honor.

24            THE COURT:  And you're talking about having a

25     state court in California deal with Lehman Brothers.  Why on

1   earth is that appropriate?  Because it seems to me that to

2   state the question takes one to the point of noting how

3   ludicrous the question becomes.

4           MR. RUEBEN:  Respectfully, Your Honor --

5           THE COURT:  That's why I'm asking the question so

6   to press you so that you know how I think about this.  I

7   think that you are pushing the envelope where it breaks.

8           MR. RUEBEN:  We're certainly not attempting to

9   break an envelope.

10          THE COURT:  Understand.  What you are asking for

11  makes no administrative sense in this bankruptcy.

12          But make your argument and see if you can persuade

13  me that I should have not only a false straight face but a

14  real one.

15          MR. RUEBEN:  I will make my best effort, Your

16  Honor.

17          THE COURT:  Okay.

18          MR. RUEBEN:  And I hear you loud and clear, but

19  let me take the other point, which is the fact that we are

20  the only one who's making this request.  It tends to support

21  the argument that what happens with us will not impact

22  everybody else.  Apparently that is worth commenting on.

23          Now, let's talk about the reality of our facts.

24  The reality of our facts is we have a litigation that's been

25  going on for years in California.  We have, as we indicated

Page 25

1    in our papers, had multiple proceedings in California

2    because the Lehman swaps are a piece of an entire financing

3    transaction involving other parties, et cetera.  I have

4    personally participated, for example, in mediations in

5    California in connection with the matters there as well as

6    in mediation here.  And I will tell you, and this I know

7    something about, the way that this case can ultimately be

8    settled is putting everybody in the same port.  That's just

9    my experience after years of settling cases.

10          So one of the enhancements to Retirement Housing

11   Foundation, in fact all the parties, is the likelihood of a

12   resolution.  It goes up far, far higher once we're all in

13   the same court.

14          In addition, the underlying tort claims, which

15   would only be liquidated -- only liquidated, is still

16   subject obviously to the plan and the Bankruptcy Court's

17   determination, will take weeks of testimony and a

18   significant effort to try the matter.

19          Why is it not as efficient, in fact arguably more

20   Efficient, to let the complex court in California which does

21   this kind of thing and which was set up for this kind of

22   complex case, judges who are very highly respected in the

23   California state system are put into the complex court and

24   they deal with complex cases.  They have more facilities and

25   more ability to handle a large and complex trial.  That is

Page 26

1    in my view a benefit not only to this Court but allows the

2    efficiency of the claim to proceed.

3            This claim has been going on for a while.  We

4    indicated, for example, Mr. Magnone (ph), who's a principal

5    witness for RHF for the Lehman matter and for the rest of

6    the related matters has already been deposed for four days

7    in the case, but his deposition is not completed.  It is in

8    the process of being completed.

9            So we're farther along in the process of

10   litigating that complex transaction.

11           THE COURT:  Yes, but what we're talking about here

12   by your own argument is a relatively tight set of issues

13   that relate to termination.

14           MR. RUEBEN:  You're -- as I said when I started,

15   the first issue before Your Honor is the question of our

16   contention that the termination debt relief claim, as I've

17   describe it seeking just an order of determination, is not

18   subject to the stay.  The rest is subject to the stay

19   entirely.  And the -- therefore the second issue that we are

20   proposing to Your Honor is to seek relief from the stay to

21   try the whole ball of wax, the whole matter all at once with

22   respect to the state court -- in the state court with

23   respect to all of the claims against Lehman, including the

24   order on termination as well as the tort claims which we

25   have there.  Liquidate those tort claim, determine the

Page 27

1    termination issue, it then comes essentially back to this

2    Court for adjudication as to how to handle those results.

3          THE COURT:  Did Retirement Housing Foundation file

4    a proof of claim in this case?

5          MR. RUEBEN:  Yes, Your Honor.

6          THE COURT:  Why is this not all part of the same

7    claim process that is being centrally administered here?

8          MR. RUEBEN:  Well, as I suggested to Your Honor,

9    it is certainly part of the claims process.  In fact we're

10    -- we are moving on several --

11          THE COURT:  But if it's part of the claims process

12    what is the rationale for having a state court in California

13    take any part of that load?

14          MR. RUEBEN:  Because --

15          THE COURT:  Mr. Klestadt, is there something you

16    want to add?

17          MR. KLESTADT:  Yeah, Your Honor, if I may on that

18    point about the proof of claim.

19          THE COURT:  This is actually usually a one person

20    argument at a time, but in deference to your long experience

21    in this court I'll give you a chance to interrupt.

22          MR. KLESTADT:  Thank you, Your Honor.

23          MR. RUEBEN:  Thank you, Your Honor.

24          MR. KLESTADT:  With regard to the proof of claim,

25    Your Honor, yes, there is an affirmative claim that has been

Page 28

1   filed against the estate, and normally that proof of claim

2   would be viewed as prima facie valid, but that would be a

3   static proof of claim, Your Honor, not subject necessarily

4   to adjustment.

5           Here, Your Honor, Lehman is claiming that the

6   underlying trade is still live.  And whether or not the

7   proof of claim that's been filed is an affirmative claim or

8   instead my client owes money to Lehman keeps varying because

9   of the passage of time.

10          Your Honor, this -- you started the hearing by

11  noting it, this is now the fifth anniversary of the case.

12          THE COURT:  And nobody has yet wished me a happy

13  anniversary.

14          MR. KLESTADT:  Happy anniversary.

15          MR. RUEBEN:  Happy anniversary, Judge.

16          THE COURT:  Thank you very much.

17          MR. KLESTADT:  But, Your Honor, Lehman could

18  choose to "play the market," if you will, and not bring a

19  claims objection and not bring an action to determine the

20  validity of the termination for another two or three years

21  while Marta petitions may then continue to favor at Lehman

22  even more.

23          So my client thought it would be appropriate now

24  that the ADR process as concluded to bring the matter before

25  Your Honor to try to move it along.  We believe that the

Page 29

1    state court is certainly able to do so, but --

2             THE COURT:  I think we should really only have one

3    lawyer arguing at a time --

4             MR. KLESTADT:  But that --

5             THE COURT:  -- and you've gone beyond the

6    clarification that a proof of claim was filed that has been

7    static.  I view that as not a particularly meaningful

8    distinction.

9             The fact is that your client has chosen, as it

10   well should have chosen, to participate in this bankruptcy

11   and is now seeking an exit, which is why you're here, and

12   that exit is blocked by me.

13            MR. REUBEN:  Well, Your Honor, respectfully we did

14   -- we come to you and we are not seeking an exit because we

15   know anything or any adjudication comes back to Your Honor

16   and to the plan.  So this is far from an exit from this

17   Court.

18            What it does do for this Court is allow for the

19   adjudication and determination factually of what happened

20   both in the tort claims that we have asserted and with

21   respect to the termination and then it comes right back to

22   this Court for further appropriate allocation, determination

23   based on the Superior Court in California's actual findings.

24            THE COURT:  Sounds like an incredibly inefficient

25   process you're proposing.

1              MR. REUBEN:  And it really is not, and the reason

2      I say to you it is not is from RHF's point of view --

3      Retirement Housing Foundation's point of view we're doing it

4      all any way in the California court.  It's all coming in,

5      all the evidence, all the witnesses, et cetera.

6              THE COURT:  Well, it's all coming in in the

7      context of a litigation that you started against non-

8      debtors.

9              MR. REUBEN:  Correct, Your Honor, absolutely.

10             THE COURT:  Which was your right, but it's not

11     necessarily the obligation of this Court to throw another

12     ripe defendant in front of you.

13             MR. REUBEN:  It's not an obligation obviously of

14     this Court, it's this Court's determination as to what is

15     appropriate, and we would submit it is appropriate because

16     it is a far more efficient process to not have this Court

17     have to determine any of the same factual determinations

18     again after the Superior Court in California determines them

19     with respect to Lehman.  Two trials is less efficient than

20     one.

21             THE COURT:  Can you address the Sonnax factors?

22             MR. RUEBEN:  I have tried to do that to a large

23     extent in this argument, but I'll make the point that this

24     we contend is unique, it is a factual case that won't impact

25     anyone else.

Page 31

```
 1                 I'll give you one simple example of that.  The

 2      tort claims and one of the defenses to the swap contract,

 3      all prepetition by the way, so it is subject to your

 4      jurisdiction, are based on California fraud claims.

 5                 California fraud requires by way of example

 6      reliance.  The reliance of RHF is a unique factual

 7      determination.

 8                 I would submit that the California court not only

 9      it's not a convenience, although convenience is a factor,

10      but is more capable of determining reliance, and the

11      reliance of RHF has no impact at all on any of the many

12      matters that are before this Court.

13                 So by way of example the determination in

14      California would not have an impact on any other bankruptcy

15      matter.

16                 Moreover, we simply seek to liquidate the claims.

17      That is a determination that would make it more efficient

18      and give to Your Honor the liquidated claims to rule as you

19      feel appropriate.

20                 THE COURT:  Well, you must know this, my job is to

21      liquidate claims, that's what I do.

22                 MR. RUEBEN:  I understand and I respect that Your

23      Honor not only liquidates claims but manages the entire

24      estate.

25                 What I'm suggesting to Your Honor, as I indicated
```

Page 32

```
1    earlier, is that the liquidation of claims can also be

2    handled by another court and unique facts and provided to

3    Your Honor to deal with the result.  That's a more efficient

4    process.

5             And I will repeat once again if I may, the

6    mediations in both cases have failed.

7             THE COURT:  By the way that puts you in a very

8    special category.  That means you represent a party that is

9    in the distinct minority relative to the entire ADR program

10   that has been running with remarkable success here, and that

11   factor alone, which I don't hold against you, does not put

12   you in the best light right now.  Because ordinarily parties

13   that engage in ADR settle and they settle because they're

14   acting reasonably.

15            Because Lehman has been so successful in resolving

16   so many of these claims in ADR that's a very strong

17   indication that Lehman is not the impossible party and it

18   suggests strongly, but of course I make no finding here,

19   that you may be representing a particularly difficult

20   client, or perhaps you're particularly difficult.

21            MR. RUEBEN:  My wife would agree with that, but

22   putting that issue aside, Your Honor, I have represented

23   this particular client for over 20 years, I have settled for

24   this client almost all of the cases for them, and I pride

25   myself in settling in ADR or in mediation, it is a normal
```

Page 33

```
1    process.  That's my representation to you.

2              One indication about this particular case is the

3    stark disparity between our respective positions where our

4    client we submit Lehman owes us in the 5 million to $10

5    million and Lehman says that we owe them $50 million.

6    That's a big bridge to cross.

7              THE COURT:  It is, but in the context of this case

8    with all respect it's not a lot of money.

9              MR. RUEBEN:  It's not a lot of money in the

10   context of this case, Your Honor, but that is why for our

11   client it's everything.

12             So understanding that we are not Bank of America,

13   UBS, whatever, we are just a small charity that tries to

14   provide senior housing.  That kind of disparity is massive

15   for us.

16             THE COURT:  Is it a 501(c)(3) organization or is

17   it simply a non-profit corporation?

18             MR. RUEBEN:  501(c)(3).

19             THE COURT:  Okay.

20             MR. RUEBEN:  And with respect to what I've

21   submitted to Your Honor about the Sonnax factors, I would

22   suggest that it is obviously Your Honor's determination, but

23   the uniqueness of this situation is a big massive process,

24   this Lehman five year continuing thing that Your Honor has

25   been handling, there are going to be unique situations that
```

Page 34

1    come up that justify special treatment, and we are

2    respectfully trying to submit to Your Honor that this is one

3    such example.

4              And I will tell you that -- and I reaffirm this

5    point -- that the likelihood of resolution is so much

6    enhanced when you have everybody in the transaction in one

7    big mediation, and that has been my experience over and over

8    again.  Things don't always settle the first time you go to

9    mediation and sometimes you have to bring in the other

10   people, and that's why we have these complex mediations.

11             But settling just with Lehman with this disparity

12   would -- was a challenge given the respective positions.

13             THE COURT:  All right.  We don't have to -- we

14   don't have to spend more time on the mediation aspects of

15   this.

16             Is there anything more?

17             MR. RUEBEN:  Your Honor, we have adequately argued

18   our points in the papers and I am certainly prepared to

19   respond to Your Honor, but I have tried my best to explain

20   our position.

21             THE COURT:  Okay.  Fine, thank you, Mr. Rueben.

22             MR. RUEBEN:  Thank you.

23             Mr. Slack?

24             MR. SLACK:  Good morning, Your Honor, Richard

25   Slack from Weil, Gotshal.

1              And let me start by saying the courtroom looks

2    great and --

3              THE COURT:  Thank you very much, I agree.

4              MR. SLACK:  -- happy to be here finally after

5    spending at least a few months in the other courtroom.  So

6    congratulations.

7              Your Honor, I'm going to try to be somewhat brief

8    and try to be responsive as much as I can to the arguments

9    that were made.

10             The first thing is that Retirement Housing talks

11   about the termination issue as if it's a state court issue,

12   when in fact what's really going on here is that Retirement

13   Housing seeks to have a California state court decide

14   several core bankruptcy issues instead of this Court.

15             In particular Retirement Housing wants a

16   California court to decide whether its attempt to terminate

17   nine months after the bankruptcy is protected under the

18   bankruptcy safe harbors.

19             Now certainly there will be facts that go into

20   that, but it is essentially a bankruptcy issue and not a

21   statewide issue as to whether or not the termination here is

22   appropriate.

23             And what makes that issue it seems to us

24   particularly egregious is that this Court has already

25   addressed that topic, putting aside for the moment the

Page 36

1  argument that we think the Metavante decision applies here.

2  Certainly this Court has already addressed this topic and

3  has ruled at least as a matter of the safe harbor that a

4  termination needs to be done fairly contemporaneously with

5  the bankruptcy in order to have the protection of Section

6  560 of the Bankruptcy Code.

7       This Court is so obviously the right court to

8  decide whether that ruling applies to Retirement Housing

9  that it's frankly hard to fathom any basis for an argument

10  that a California state court should either be interpreting

11  the bankruptcy safe harbors or applying Metavante.

12       Now, one of the things that we spent some time

13  listening to in argument and certainly dealing within their

14  briefing was this take that Retirement Housing tried to

15  paint of Lehman saying that somehow -- and they say in their

16  motion -- quote, "Lehman did not actually provide notice of

17  any such purported dispute until March 2012," and then in

18  their reply they state "that Lehman did not take any action"

19  -- and that's a quote -- "did not take any action regarding

20  the invalid termination with Retirement Housing."  That's

21  just not true.

22       What happened here is that immediately after their

23  Termination, nine months after the fact, Lehman sent a

24  letter.  That letter was unambiguous in stating that the

25  termination in Lehman's view was invalid under the

Page 37

```
 1    Bankruptcy Code.  It didn't say maybe it's invalid, it says

 2    it is invalid.  That certainly had to put Retirement Housing

 3    more than on notice that there was an issue here.

 4             Lehman then sent invoices, you owe us money under

 5    the live swap.

 6             Now, in their reply they say, well, Lehman only

 7    sent three months of invoices.

 8             Well, first thing, Your Honor, as you know the

 9    issues that Lehman faced in trying to get out invoices, but

10    it begs the question, how many invoices did they need?  Were

11    they going to pay if they got four or six or eight?  The

12    fact is Lehman sent three months of invoices and maybe more.

13    And they understood what they mean because their lawyers

14    wrote back and said, hey, these swaps are terminated we

15    don't -- we don't owe you the money.  So they understood

16    there was an issue with termination.

17             Lehman then had a voluntary exchange of

18    Information, which Your Honor I think recognizes as the

19    preferred method for everybody here if we can do that,

20    including information related directly to the nine-month

21    delay that they had in terminating.

22             There were communications between the principals,

23    and then there was a stipulation relating to the assumption

24    motion.  Because one of the contracts that Lehman seeks to

25    assume is the Retirement Housing swap, and in that the
```

Page 38

1    stipulation specifically says that Lehman is disputing the

2    validity of the termination.

3              And finally, Your Honor, in this time when they

4    say nothing is happening we had a mediation under the court-

5    ordered mediation process, and the fact that it failed I

6    think, Your Honor, is a rarity.

7              You know, you get the reports from the estate and

8    from the mediators every month, and I think from the last

9    report of the completed mediations the success rate is over

10   90 percent.

11             So frankly, to call the mediation process

12   essentially nothing as if nothing is happening for four

13   years is insulting to the Lehman employees who spent the

14   effort preparing for it, attending, and participating in the

15   mediation, and frankly the Court which adopted the process.

16             Your Honor, I would state that with respect to the

17   argument here there is really two issues I agree.

18             The first issue is whether the automatic stay

19   applies.  And the second is whether if it applies whether

20   the Court should lift the stay to allow them to proceed.

21             With respect to the automatic stay applying I

22   would just point out, Your Honor, that the Enron case is

23   really right on point here, and the argument that Retirement

24   Housing makes in their reply is essentially as follows.

25   Because they believe that it falls under the safe harbor 560

Page 39

1    the idea of terminating then they should be able to bring a

2    lawsuit challenging that termination without violating the

3    stay.  And I would suggest, Your Honor, that that is absurd.

4              The idea that anybody who believes that the safe

5    harbors don't apply can then bring those cases anywhere

6    outside the Bankruptcy Court makes absolutely no sense.

7              Your Honor, moving to the Sonnax factors and the

8    specific issues here.

9              There really are -- you know, while we go through

10   all the Sonnax factors, Your Honor, and we have a chart

11   which we attached to our brief as Exhibit 3 which I think is

12   a good road map, at least from our perspective as to apply

13   the Sonnax factors, it's clear that a couple of the Sonnax

14   factors really overwhelm in our view the decision here.

15             The idea that factor 2, which talks about the

16   lack of any connection or interference with the bankruptcy

17   case.

18             Well, it's absolutely clear that the declaratory

19   judgment that they're seeking on the validity of the

20   termination goes right to the heart of many of the issues

21   that Your Honor has dealt with over the years, including the

22   Metavante type of issues, and we think that factor certainly

23   overwhelms.

24             Similarly factor 10, which talks about judicial

25   economic, I think in that same vain, Your Honor.

Page 40

1          There's no question that Your Honor with the

2      experience that you have in dealing with derivatives

3   and in order to have frankly consistent results amongst all

4   counterparties it makes sense for Your Honor to make the

5   decisions with respect to the bankruptcy safe harbors and

6   the application of the bankruptcy safe harbors.

7          Now, with respect to what I call the tort claim,

8   the idea that they want to bring Lehman into a case in

9   California that's ongoing effectively.  Your Honor, I would

10   say the same two Sonnax factors really overwhelm the

11   decision here.

12          The first, Your Honor, which I think is important,

13   is that the only way that LBSF and LBHI can gain any

14   consistency and security in a decision is for Your Honor to

15   be deciding issues relating to Repo 105 and the like.

16          Because let's say LBHI and LBSF get sent to

17   California to litigate, and let's say that we win, now

18   somebody else brings a lawsuit relating to Repo 150 which

19   affects a number of different counterparties or anybody who

20   has a contract with Lehman over the two to three-month

21   period potentially could make these kinds of arguments,

22   Lehman would have to and LBSF would have to relitigate that

23   either in this court or another court.  And the only way to

24   have consistent decisions on that issue for Your Honor to be

25   the one to decide.

Page 41

1           And it even works if Lehman loses it they get all

2     the risk but none of the benefit.  Because if you lose it as

3     Your Honor knows people are going to be arguing that that

4     decision is collateral estoppel.

5           So Lehman gets all the risk if you send us to

6     another court and none of the benefit because we'd have to

7     litigate over if we win.

8           Similarly, Your Honor, in terms of, as Your Honor

9     Noted, there's a proof of claim process here, and what they

10    really want to do is jump the line.  There's no reason why

11    these proofs of claims can't be decided along with every

12    other proof of claim in the case, and they've made no

13    justification for essentially jumping the line here.

14          And it's particularly egregious, Your Honor, when

15    they admit and concede that they're going to have to come

16    back to this Court any way to decide issues such as setoff.

17          One last I think very important point that we talk

18    about in our briefs.  The complaint at issue here,

19    especially on the tort claims, alleges that LBHI, LBSF, and

20    all the other Lehman entities are alter egos with one

21    another.  The complaint really can't survive without being

22    able to attribute the conduct of, for example, LBI to LBHI

23    and LBSF, and that's because it was LBI that actually sold

24    the notes that are at issue that they're saying they were

25    defrauded on.

Page 42

1           The alter ego issues are integrally related to the

2    bankruptcy plan whether you have separate debtors, but also

3    to the real estate leases that were issued between LBI and

4    LBHI in a settlement.

5           And also, Your Honor, there's bankruptcy law that

6    says the alter ego claims belong to the debtor, not to them.

7           Those are issues that Your Honor should decide and

8    needs to decide, not a California State Court.

9           So at the end of the day this complaint is so

10   intertwined with the plan and with bankruptcy law that

11   there's no way that a California state court should be the

12   one deciding it.

13          Your Honor, though I don't think it is the

14   critical point here I have to -- I have to make one last

15   comment.

16          Throughout their papers and -- they make a point

17   that it's going to be difficult for them to litigate in New

18   York, that there's all these witnesses in California, et

19   cetera, et cetera, and they have an affidavit with all these

20   complaints that they filed in California, et cetera.  The

21   one complaint that they don't submit to the Court is about a

22   100-page complaint filed in the Southern District of New

23   York by Retirement Housing that relates to the Repo 150

24   issue.

25          They clearly, Retirement Housing, is going to be

Page 43

1   litigating and they're actively litigating in the Southern

2   District on the Repo 105 issue against other defendants.

3   And not only is it obviously not inconvenient for them, but

4   the MDL, which sent this case here, obviously believes that

5   it's efficient to have the Repo 105 issues decided in the

6   Southern District.

7           So yes, there is a case in California with a lot

8   of state law claim, but Repo 105 there's a huge case in the

9   Southern District.  Retirement Housing is actively

10  participating, the witnesses are obviously showing up,

11  counsel here at the table are showing up, it is simply not a

12  burden to have a court in the Southern District decide

13  critical issues of bankruptcy law, which is what this case

14  is all about.

15          So thank you.  Unless you have any questions, Your

16  Honor.

17          THE COURT:  Thank you.

18          Mr. Reuben, do you have anything more?

19          MR. RUEBEN:  Just a few points, Your Honor.  Thank

20  you for the time that you've given to this matter.  Let me

21  start with the last one first.

22          The multi-district litigation, that particularly

23  case was originally filed in California, sent to the

24  District Court here through the multi-district panel

25  process.  At the end of discovery and summary judgment, as I

Page 44

1    understand it, it then goes back to California for trial.

2              So the fact that we were required to come out here

3    didn't keep us from proceeding in that matter, but it goes

4    back to trial in California any way.

5              However it does lead to another point that counsel

6    made, and that is the Repo 105 issues.

7              Repo 105 issues are being litigated in the multi

8    district matter.  The Repo 105 issues are against Ernst &

9    Young and there are many cases involved.  There's class

10   action and that kind of thing, as well as individual laymen

11   defendants who are not part of the debtor, they're the

12   individuals.

13             Therefore, the Repo 105 issues will be litigated

14   in multiple jurisdictions in each of those particular

15   matters unless all of the cases get dismissed pursuant to

16   summary judgment or something like that.

17             To suggest -- and the repo 105 issues will be

18   litigated in the California court as well.

19             So to say that the Repo 105 issues are unique to

20   this court is not accurate.

21             The other thing I might add to that is that a

22   determination or a win shall we call it by my client in the

23   California court is not in any way applicable to any other

24   potential plaintiff because of the unique requirements that

25   as I suggested reliance by the individual, the California

1    court, the California state actions require individual

2    reliance, there's no fraud on the market theory that's

3    available.  So there's no possibility that the California

4    determination can impact what is here in this court or other

5    cases for that matter.

6            I should add perhaps the point about jumping the

7    line.  We only came to this Court after five years with

8    respect to this because of Lehman's position on the

9    termination.  We felt we're not trying to jump the line and

10   we've never come to this Court before this time, but we do

11   believe that Lehman's position is in the effect of playing

12   the market and it is appropriate with the plan done with

13   five years and that the stay be not used as a sword against

14   us, and that's what we contend is happening here.

15           And let me conclude if I can with a question.

16   The question which is, under the bankruptcy provision that

17   allows the narrow exception to the automatic stay here, that

18   is the determination, acceleration, et cetera exception, how

19   is it to be determined in a situation where there is a

20   termination based on our position and they dispute other

21   than seeking through an adjudicatory process the result?

22   And why isn't that a necessary element of termination and

23   therefore not suggest to the stay?

24           With that, Your Honor, unless Your Honor has more

25   questions we submit.

1          THE COURT:  Okay, thank you.

2          It's interesting that this argument occurs on the

3     morning of an omnibus hearing.  I note from the agenda it is

4     the 64th omnibus hearing in these cases, that includes in

5     the afternoon session a number of adversary proceedings, and

6     the adversary proceedings do not directly touch on this

7     issue but are consistent with the consolidation of

8     proceedings in one court with reference to the orderly

9     administration of the Lehman estate.

10          If anything the passage of time has in my mind

11     made it even more critically important that there be a

12     centralized approach to dealing with the many and sundry

13     legal issues that have arisen within these cases and that

14     still need to be addressed.

15          Perhaps most convincing to me in this morning's

16     argument is the reference to Section 560 of the Bankruptcy

17     Code, which is the safe harbor relating to the right to

18     liquidate, terminate, or accelerate a swap agreement.

19          The Metavante decision has been referenced in

20     Passing, and the degree to which it is applicable to the

21     present dispute does not need to be identified for purposes

22     of this bench ruling other than to say that it is one

23     example of how this Court in the last five years has been

24     asked to deal with any number of issues that have arisen

25     under the safe harbors as to which there is no controlling

1   precedence but for the decisions that had been made here.

2          I say that to note that there is an integrity

3   aspect to this that needs to be observed, and that is not to

4   say that I am the last word on this subject; far from it.  I

5   am however the starting point in a process in which safe

6   harbor determinations percolate through the federal system.

7          I am reminded as I speak to you of a decision that

8   I rendered in a completely unrelated case, Quebecor, in

9   which I interpreted in the context of some litigation

10  546(e), that decision was appealed to the District Court and

11  affirmed and appealed to the Second Circuit Court of Appeals

12  and affirmed.

13         What it demonstrates is that from a systemic

14  perspective it is appropriate for issues relating to these

15  provisions of the Bankruptcy Code to be addressed within the

16  federal system, and I believe it highly inappropriate for

17  matters of this sort to be sent to any state court, no

18  matter how sophisticated.

19         Largely for that reason the request made by motion

20  of the Retirement Housing Foundation and its affiliates for

21  various determinations relating to the automatic stay and

22  seeking the right to pursue litigation in California is

23  denied.

24         It is denied not only for the reasons that I have

25  stated in reference to the safe harbors, but also in

Page 48

1    reference to jurisdiction economy and concerns as to the

2    uniformity of application of the law in this the largest

3    bankruptcy in history.

4           I heard and considered the arguments made by

5    counsel for Retirement Housing Foundation that the facts

6    applicable to the termination of this particular swap are

7    one of a kind.  That may be, but every other counterparties'

8    attempts to somehow distinguish itself from governing law as

9    it has developed similarly are based on unique facts.

10          The underlying documentation, the ISDA standard

11   form, is the same in virtually every one of these cases.

12   The question of whether or not the automatic stay applies

13   for purposes of Section 560 happens to be a question that I

14   had previously addressed, and that was addressed in the

15   Metavante case.

16          But perhaps most importantly it is sensible from a

17   case administration perspective to avoid having any of these

18   issues broken off into separate litigations in separate

19   parts of the country.

20          The fact that there is an MDL relating to Repo 105

21   pending in the Southern District of New York is an example

22   of how our system functions to promote efficiency.

23          In appropriate cases it makes sense for litigation

24   to be consolidated, and in the case of bankruptcy practice

25   generally consolidation is the norm.  It is the norm because

Page 49

1     Congress has determined that bankruptcy in particular is one

2     of those legal disciplines where it makes sense for a single

3     court to exercise broad jurisdiction, albeit limited by

4     Article I of the constitution.

5            For these reasons the motion is denied.

6            MR. REUBEN:  Thank you, Your Honor.

7            MR. HORWITZ:  Thank you, Your Honor.

8            Maurice Horwitz, Weil, Gotshal & Manges on behalf

9     of Lehman Brothers Holdings, Inc.

10            The next item on the agenda is the motion of RBC

11     Dominion Securities, Inc. to compel Lehman Brothers

12     Holdings, Inc. to reissue checks for allowed claims.

13            Counsel to RBC should be -- is here, I'll turn the

14     podium over.

15            MR. SLACK:  Your Honor, if I may could I be

16     excused at least until this afternoon?

17            THE COURT:  You may be excused until this

18     afternoon.

19            MR. SLACK:  Thank you, Your Honor.

20            MR. FRIEDMAN:  Good morning, Your Honor, Jeff

21     Friedman of Katten Muchin Rosenman for RBC Dominion

22     Securities, Inc., and my colleague, Kevin Baum, is at

23     counsel table with me.

24            Your Honor, RBC Dominions Securities has an

25     undisputed allowed claim in this case for approximately

Page 50

1    $5 million against LBHI based on guarantees of securities

2    issued by LBHI's affiliates.  RBC also has allowed claims

3    based on so-called program securities issued by LBHI.

4           In April of this year RBC received at an address

5    different than the one in its proof of claim a notice from

6    Epiq on behalf of LBHI, that the time to request reissuance

7    of a check that Epiq had sent to RBC in October 2012 was

8    going to expire on March 30th, 2013.  That letter was

9    purportedly originally sent to RBC in January of 2013 and

10   was resent to this different address in mid-March.

11          When RBC contacted Epiq to look into getting the

12   check reissued RBC learned for the first time that two

13   checks purportedly had been sent to them representing the

14   first two plan distributions on the allowed claim.  One for

15   about $183,000 in mid-April of 2012 and then another about

16   five and a half months later for about $124,000.

17          RBC in declarations from both the individual

18   addressee on RBC's proof of claim and from the individual

19   whose group at RBC would ultimately be responsible for

20   negotiating the checks for bankruptcy claims such as these

21   state that they did not receive either of the two checks.

22   And frankly, Your Honor, following an investigation we don't

23   know why that's so.

24          The one inference I think can fairly be drawn from

25   those affidavits and from our own investigation is that

Page 51

```
 1    nobody at RBC opened envelopes with checks for 183,000 and

 2    $124,000 in them, saw the checks, and did nothing about

 3    them.  And that's about all I can say in terms of explaining

 4    what might have happened.  There are numerous possibilities

 5    as to what happened with the checks.

 6            There is, Your Honor, a provision in Section 8.9

 7    of the Lehman plan confirmed by this Court that provides if

 8    a distribution check isn't cashed within 180 days of its

 9    issuance the amount represented by that check is forfeited.

10            By the time RBC finally learned that it was

11    missing the two checks the 180-day periods for both checks

12    had already elapsed.

13            After some back and forth with Epiq by RBI

14    personnel it became clear that Epiq and Lehman believed that

15    they could not reissue the missing checks to RBC absent an

16    order of this Court, and so RBC engaged our firm to file

17    this motion, and RBC by this motion seeks the reissuance of

18    the checks for money which Lehman doesn't dispute that RBC

19    would have been entitled to and had we caught this in time

20    checks would have been reissued.

21            We believe that it is appropriate to evaluate the

22    relief we seek under an excusable neglect standard.

23            Clause 2 of Bankruptcy Rule 9006(b)(1), which we

24    discuss in the motion, clearly gives the Court discretion to

25    grant relief under an excusable neglect standard.
```

Page 52

1          We believe that RBC satisfies this standard under

2     either the Pioneer Investor Services case from the Supreme

3     Court or under a slightly more lenient standard that this

4     Court has used with respect to motions to reconsider

5     disallowance of claims, which is the test in the American

6     Alliance case, which was a case decided by the Second

7     Circuit subsequent to Pioneer and which we cite in our

8     reply.

9          We think because there was a timely filed claim by

10    RBC that was allowed but now effectively as to the two

11    missing payments it's been effectively disallowed that the

12    American Alliance test is perhaps a more appropriate test to

13    excusable neglect.  Nevertheless we think we can satisfy

14    either Pioneer or American Alliance.

15         The Supreme Court in Pioneer noted that the

16    Court's determination of whether excusable neglect exists is

17    quote, "at bottom an equitable one taking account of all

18    relevant circumstances surrounding the party's omission."

19         There are four factors that Pioneer uses and three

20    factors that American Alliance uses in determining whether

21    excusable neglect exists.

22         Pioneer focuses on the length of the delay in

23    seeking the relief we seek here; whether the reason for the

24    delay was within the control of the entity seeking the

25    relief; whether the entity acted in good faith; and whether

Page 53

1   there is prejudice to the debtor.

2           American Alliance looks at whether the reason for

3   the delay was willful, i.e., something more than mere

4   negligence; whether the claimant would have a meritorious

5   defense if the motion were granted; and whether there is

6   prejudice to the debtor.

7           LBHI in addressing these factors focuses most

8   heavily on the length of the delay suggesting that RBC

9   waited some 15 months to file this motion because that's

10  when the mailbox rule would deem RBC to have received the

11  first check.

12          As RBC points out in its reply, however, the

13  mailbox rule is not really at issue here because the

14  excusable neglect doctrine assumes that the relevant notice

15  was actually or constructively received, otherwise there

16  would be a due process issue and the Court wouldn't have to

17  reach excusable neglect.

18          So as a matter of common sense however, Your

19  Honor, a Rule 9006(b) motion based on excusable neglect is

20  never made until after the moving party realizes that

21  there's been an error, that there's been some omission.

22          Judge Lifland in the FairPoint Communications

23  case cited in our reply and Judge Gropper in the Journal

24  Register case cited in our reply found that motions filed

25  promptly after actual knowledge of the failure satisfied

Page 54

1    that prong of the test.  And as I indicated, RBC, as soon as

2    it received the second attempted notifying that it was about

3    to lose a check if it didn't request reissuance in time

4    acted very promptly, and I don't think that's seriously in

5    dispute, and once they went through their internal

6    investigation that started in April, spoke with Epiq, they

7    hired us to file this motion.

8              THE COURT:  Can I ask a very basic question?  One

9    of the things that has been very heavily publicized since

10   the Lehman plan went effective in March of last year has

11   been the timing and the amount of distributions to parties

12   in interest in the case.  Even people who aren't receiving

13   distributions have paid attention to the fact that there

14   were distributions being made as of particular times during

15   the year in 2012.

16             How is it that RBC apparently ignored the fact

17   that it was due a distribution and then didn't find it?

18   That's something that just amazes me.

19             MR. FRIEDMAN:  Your Honor, let me address that,

20   because that was going to be my next point, which is whether

21   the delay was somehow within our control, because Your Honor

22   asked the same question I asked, which is how could you not

23   know --

24             THE COURT:  How could this have happened?

25             MR. FRIEDMAN:  Right.  And we asked that same

Page 55

1  question.

2          Again, Your Honor, going back to the notion that

3  we just don't know what happened to these two particular

4  checks, I do want to address that, because I think the

5  answer to Your Honor's question is the very reason I think

6  excusable neglect exists in that state -- in this case.

7          LBHR argues that the reason for the delay was

8  within our control because the distributions were announced

9  on the website maintained by Epiq,  Therefore, according to

10  LBHI, RBC should have been on the lookout as Your Honor

11  suggests for distribution checks.

12          Putting aside that there is no legal compulsion

13  and it wasn't formal notice of these distributions, but as

14  you just said publicity --

15          THE COURT:  I read about it in the newspaper.

16          MR. FRIEDMAN:  Well, but again, the timing is not

17  really the issue as you'll understand in a moment.

18          So that there was no particular reason RBC had to

19  look at the Lehman website, and whether they did or didn't I

20  don't even know, but I do know this, and that is until it

21  received the third distribution check from Lehman on its

22  claim in April of 2013 every distribution in respect of

23  RBC's bankruptcy claims in these cases and in proceedings in

24  foreign jurisdictions came to RBC by a wire transfer.  So it

25  was simply not obvious to RBC that it was missing the two

Page 56

1    checks that it was missing here.

2            So whatever neglect may exist here because RBC

3    failed to figure out it was missing the distributions

4    represented by these two checks on its guarantee claims,

5    whatever that was it certainly wasn't willful.  They had no

6    desire not to get their money as soon as possible.

7            More to the point, Your Honor, some of these wire

8    distributions, the wire distributions inspect to program

9    securities issued by LBHI came on the distribution dates in

10   April of 2012, October of 2012, and April of 2013.

11           So the mindset at RBC and, I'm not saying there

12   was no error, I'm saying they shouldn't have been more

13   careful, but the mindset at RBC was we're receiving wire

14   transfers.  Nobody was looking for checks.  And until they

15   got the notice that the checks had been issued, which was

16   too late, nobody knew that they were looking for checks on

17   the claims based on the guarantees by LBHI.

18           THE COURT:  Okay.  Thanks.

19           MR. FRIEDMAN:  Okay.  They've received 19 wired in

20   total and one check in respect of its bankruptcy claims

21   prior to making this motion.

22           So we think both of those factors explain the

23   delay and that the delay factor under either American

24   Alliance or Pioneer favors RBC's position.

25           Both Pioneer and American Alliance, Your Honor, do

Page 57

1      both take into account prejudice to the debtor, and LBC

2      makes two arguments on prejudice, and I don't think -- I

3      don't think they really believe there's serious prejudice to

4      the estate if the estate has to rewrite these checks for

5      $300,000 or thereabout.

6              And the first is that if the Court grants this

7      motion the floodgates will somehow open because there are

8      other uncashed checks.  And to that I can only respond, Your

9      Honor, that excusable neglect is a fact specific analysis

10     and we can't speak to the circumstances surrounding the

11     uncashed checks of any other recipient.

12             But to our knowledge, and I think LBHI will agree,

13     this is only the second motion of its kind made in this

14     case.

15             And that turns us to LBHI's second argument, which

16     is that sometime in the future LBHI says they may not have

17     the financial wherewithal to reissue checks, and that's

18     true.  At some point, we're not there yet, but at some point

19     in the future it will have liquidated the claims, finished

20     the litigation, and really be down to its last few dollars

21     in terms of a distribution and it won't be possible to

22     reissue a check.  But they don't seriously contend that

23     that's the case now.  They acknowledge they're sitting on

24     billion of dollars, there are thousands of claim disputes,

25     and they can afford to reissue this check.  It's not -- it's

Page 58

1    not a money issue and it's certainly not, you know, an issue

2    of the equities.

3           So we don't believe that there is really prejudice

4    to the estate on the facts here.  They're not -- we don't

5    believe the floodgates will open and we don't believe that

6    the cost to the estate is a factor here.

7           Now the remaining Pioneer factor, Your Honor, is

8    good faith, and LBHI isn't contesting RBC's good faith here.

9    RBC, as I said, has every reason to want to receive

10   distributions to which it's entitled as quickly as it can

11   and acted promptly as it could once it had actual knowledge

12   that it was missing the distribution checks.

13          You know, looking at the third American Alliance

14   factor, Your Honor, which is whether RBC has a meritorious

15   defense that justifies reconsideration, RBC has an

16   undisputed allowed claim for $5 million.

17          So we think whether excusable neglect is tested

18   under Pioneer or under the Second Circuit is a somewhat more

19   lenient test in American Alliance that this Court has used,

20   RBC has met those tests and the factors militate in favor of

21   the Court granting relief to RBC.

22          And in closing, Your Honor, I'd just like to come

23   back for one moment to the Supreme Court statement in

24   Pioneer that the determination for granting relief under the

25   excusable neglect provision of 9006(b) is an equitable one.

Page 59

1          Although we recognize what Section 8.9 of the plan

2     states no one has suggested that the results sought here by

3     LBHI is in any sense of the word equitable.  Neither other

4     creditors of the estate are banking on this money, nor were

5     the debtors counting on this money, this is RBC's money, and

6     if the Court denies the motion it's eventually going to be

7     reallocated and almost unnoticeable to other creditors and

8     will simply be a windfall for them that nobody was

9     expecting.  Nobody is buying claims in this case, nobody is

10    holding claims in the hopes that people won't cash checks.

11          You know, and by way of an anecdote on this point,

12    Your Honor, my firm is currently representing a debtor in a

13    case before Judge Gerber where there's some 50,000 consumer

14    creditors who received one-half percent distributions on

15    their claim, 10, $20 checks.  Four years into it we were

16    reissuing checks even if people told us they had the check.

17    They didn't deny receiving it, they just forgot to cash it.

18    We thought it was the right thing to do, the creditors'

19    committee thought it was the right thing to do, and we've

20    reissued over 200 checks in that period.  The administrative

21    cost to our estate, which is significantly smaller, was

22    simply negative.

23          THE COURT:  I appreciate the anecdote, but it may

24    be that an individual is a more sympathetic character than

25    RBC.

1          MR. FRIEDMAN:  Well, Your Honor, again if RBC knew

2     it was looking for checks it probably would have been more

3     careful, and if there is some negligence here that's about

4     the only place I could really find it, and I think that

5     negligence on the facts where they had been receiving wire

6     transfers is excusable.

7          You know, Section 8.9 of the plan is one of those

8     plan provisions that finds its way into a plan that's

9     virtually impossible to object to at confirmation.  If

10    someone walked into Your Honor's courtroom in confirmation

11    and said, well, this plan is fine, except that I don't think

12    six months is enough to cash a check.  I mean you would have

13    been laughed out of court.

14         So, you know, there is nothing magical about the

15    six-month time limit that is in 8.9.  If Lehman had put 9

16    months in its plan or 12 months in its plan I don't think

17    the Court would have said boo about it, but I don't think it

18    would have made any difference.

19         So we think the denial of the motion on the facts

20    here would be an extremely harsh result and at bottom in the

21    words of the Supreme Court an inequitable one.

22         So we ask that the Court find the existence of

23    excusable neglect on the very specific facts here and grant

24    RBC's motion.

25         THE COURT:  Thank you.

Page 61

1              MR. FRIEDMAN:  Thank you.

2              MR. HORWITZ:  Good morning, Your Honor, Maurice

3     Horwitz, Weil, Gotshal & Manges on behalf of Lehman Brothers

4     Holdings, Inc. as plan administrator.

5              Your Honor, these are -- one can't say that

6     Section 8.9 of the plan was drafted for one particular set

7     of circumstances, but these are very much the type of

8     circumstances that this section was drafted for.

9              First of all there's no dispute -- the plan

10    administrator doesn't dispute that RBC's one claim that

11    currently exists on the claims register, and that is claim

12    number 51231, is currently an allowed claim.

13             Section 8.9 of the plan only applies to allowed

14    claims.  And it's intended to apply in situations when a

15    creditor receives a distribution check and does not cash it

16    within 180 days.

17             THE COURT:  But let's break in on this, because we

18    had -- we had a similar argument in the Traxis matter a

19    number of months ago and my impression is that one of the

20    reasons that the plan administrator is so diligently

21    policing this provision is to in effect avoid waiving it and

22    that by virtue of making an issue out of it each time it

23    comes up to the extent there are checks out there in the

24    pipeline that haven't been negotiated you're not going to be

25    at some point in the process compelled to cover them all by

Page 62

1    reissuing checks.

2            Let's assume that that's part of the thinking, you

3    don't have to agree or disagree with me on this.  In the

4    case of RWC they argue we have fact specific reasons to

5    distinguish ourselves from the class of really negligent

6    creditors who show up two years from now and say we want to

7    negotiate our checks.  In that sense what's wrong with just

8    agreeing that they satisfy the standard and avoiding what

9    amounts to all this time and trouble spent over the

10   reissuance of checks?

11           MR. HORWITZ:  Your Honor, the plan administrator

12   -- I don't think that waiver is necessarily a concern, but

13   the plan administrator is concerned about fulfilling its

14   obligation following this very complex plan to the letter as

15   best as possible.  And the plan administrator does not

16   believe that it has the discretion to make that -- the

17   determination that a party has met the excusable neglect

18   standard.

19           THE COURT:  Let's just say to make your job easier

20   this morning that I'm satisfied based upon the argument just

21   made that while they were negligent and they should have

22   been paying closer attention and they did this over a longer

23   period of time than a really prudent financial institution

24   might be expected to find out that there was a problem, but

25   they acted as soon as they had that ah ha moment and they

Page 63

1   can't explain why they didn't get the checks, and let's just

2   say that it's nobody else's money but theirs, because that's

3   clear, and this is happening now in a manner that really

4   doesn't prejudice any other party in interest, and I just

5   said same result in Traxis, they get -- you get to reissue

6   the check, and that way you don't have to continue arguing,

7   will that satisfy you if I said all that?

8           MR. HORWITZ:  Your Honor, I think that the Traxis

9   matter is somewhat distinguishable.

10          Of course if this Court were to say that this -

11  on these facts RBC is entitled to a finding of excusable

12  neglect the plan administrator would reissue those checks.

13          THE COURT:  I'm going to say that.  So the

14  question becomes to what extent do you want to develop the

15  record further for purposes of being able to show it to some

16  other creditor in six months or a year?

17          MR. HORWITZ:  Well that is -- that is the one

18  thing that the plan administrator would need, because we've

19  got -- you know, we've had now two instances of a motion

20  being filed requesting reissuance of a check, but these --

21  these are not the only instances where creditors have made

22  this request beyond the 180-day period, it's something that

23  happens periodically and the plan administrator does need to

24  know to what extent it can exercise the discretion that the

25  Court is exercising right now in determining that on these

Page 64

1    facts RBC is different from some other creditor down the

2    road.

3           The plan administrator does not reissue checks

4    exercising this kind of discretion unless -- and the only

5    instance I'm aware of -- unless the plan administrator knows

6    that the check was just sent completely to the wrong

7    address.  In that case the plan administrator can -- the

8    plan administrator reads Section 8.9 as says that the

9    180-day period begins running once the check is issued, and

10   if the check was -- we know the check went to the wrong

11   address it wasn't really issued at that time.

12          So I mean if this is going to be another instance

13   where a creditor has made a satisfactory finding for

14   excusable neglect it's -- it would just be -- unless the

15   plan administrator has more guidance we will likely oppose

16   the next motion that a creditor files, we'll likely tell the

17   next creditor that to request a reissuance  you have to file

18   a motion because we don't have the discretion to make that

19   determination.

20          THE COURT:  Well, in effect that becomes an

21   administrative burden, and I'd like to think that in a world

22   in which discretion can be exercised without major adverse

23   consequences by thoughtful parties that are acting

24   reasonably that it would be possible for the plan

25   administrator to be able to make a judgment that particular

Page 65

1    facts given the history now of two examples that have been

2    litigated either fit or don't fit an excusable neglect

3    standard for purposes of reissuance.

4           And in situations of genuine doubt based upon the

5    passage of time, based upon the negotiation of other checks

6    trying to come up with distinguishing factors that might

7    apply, or actual knowledge as a result of some kind of

8    communication with the plan administrator suggesting

9    negligence that borders on inexcusable negligence that there

10   could be some ability to avoid having every single one of

11   these situations become yet another test case.  That maybe

12   with enough of these under everybody's belt we can know that

13   some things are out of bounds and some things may be in

14   bounds.

15          Alternatively, without suggesting that the plan be

16   modified in any respect, because I don't think there's a

17   need for that, it might be possible for the plan

18   administrator to develop a set of guidelines to the extent

19   that anybody seeks to get what amounts to a special

20   expectation from the application of Section 8.9.  But these

21   are just random comments on my part in reference to your

22   question.

23          But the idea would be to avoid or minimize

24   litigation that can be resolved in a conference room or over

25   the telephone as opposed to in here.

1           MR. HORWITZ:  Well, I don't have --

2           THE COURT:  Now you're speechless.

3           MR. HORWITZ:  If I could I could ask another

4   question, but since that's not my place, I'll --

5           THE COURT:  Well, let's do this, I think it's fair

6   -- I think it's fair to say that I'm sensitive to the

7   problem that the plan administrator has, but I'm more

8   sensitive to the problem that RBC has, and so I am going to

9   grant the motion, overrule the plan administrator's

10  objection, and provide that it is appropriate under these

11  circumstances for the plan administrator to issue

12  replacement checks.

13          MR. HORWITZ:  Thank you, Your Honor, I have

14  nothing further.  Unless RBC has anything further.

15          MR. FRIEDMAN:  No, thank you, Your Honor.

16          We did attach an order to our motion, but I can

17  submit it on -- over the web to Your Honor's chambers if --

18          THE COURT:  It probably makes the most sense to

19  coordinate orders through debtors' counsel, that's the

20  easiest way for me to process them.

21          MR. FRIEDMAN:  Will do, Your Honor.  Thank you.

22          THE COURT:  Okay.  Thank you.

23          MR. HORWITZ:  Thank you.  That concludes this

24  morning's calendar.

25          THE COURT:  Except for the SIPA case.

Page 67

1          MR. HORWITZ:  Oh, sorry, yes.

2     (Pause.)

3          MR. BENTON:  Good morning, Your Honor.  Jason

4    Benton, Hughes, Hubbard & Reid, counsel for the LBI trustee.

5          On the agenda today for the SIPA liquidation is

6    the trustee's motion for approval of three orders.

7    Specifically these orders are a motion to establish

8    supplemental procedures for remaining customer

9    distributions; a motion to establish claims hearing and

10   alternative dispute resolution procedures, the vast majority

11   of general creditor claims; and a motion for an

12   administrative expense parte.

13          The motions and related orders all have a shared

14   goal, Your Honor, that goal is to move from the customer

15   distribution process and directly into the resolution of the

16   general estate as quickly as we can and as economically as

17   we can.  And I'm happy to report to Your Honor that there

18   are no pending objections to these motions.

19          Mr. Caputo from SIPC is in the courtroom today and

20   I can report to Your Honor that SIPC supports all three

21   motions.

22          We also have Mr. Freelinghousen (ph), the

23   declarant with respect to the customer motion here in case

24   that's necessary.

25          With that said, Your Honor, as I mentioned these

Page 68

1   are unopposed motions and we would respectfully request that

2   the Court enter them.

3          We're happy to proceed however the Court wishes.

4   I'm prepared to give a short summary of the three motions or

5   me or my colleague, Mr. Saltzman with respect to the

6   customer distribution motion, he could answer any questions

7   you might have.

8          THE COURT:  I have no questions, this is very much

9   a matter of your record to the extent you want to state

10  anything that ends up in the transcript and be able to

11  display it at some future time in the event that there is a

12  question concerning the procedure leading to the entry of

13  these orders, but you don't have to do that on my account.

14  You're pretty much at your own discretion as to what you

15  want to say about each of those motions, so I leave it to

16  you.

17         MR. BENTON:  Well, Your Honor, I think that we've

18  adequately stated what we have to state about it in the

19  papers.

20         I mean I would say to repeat again that the

21  trustee's goal here with respect to all three of these

22  motions is to put in place a comprehensive plan, to really

23  move from the customer distribution process, and resolve as

24  quickly as practicable the general estate, and we're trying

25  to do that through these motions and in particular through

Page 69

1    alternative dispute resolution mechanisms and in organized

2    and hopefully an economical system with respect to claims

3    hearing and mediation and negotiation.

4              THE COURT:  Well, as to each of the three

5    uncontested matters that you have identified I'm prepared to

6    enter orders without further discussion.  I leave it to the

7    parties if they wish to say anything more, but otherwise I'm

8    prepared to simply enter the orders and we can adjourn, but

9    I leave it to you if you wish to prolong this morning's

10   hearing.

11             MR. BENTON:  No, thank you, Your Honor.

12             I would note just for the record we submitted with

13   respect to the administrative expense bar date motion a

14   revised order on Monday.  We also with respect to the

15   supplemental customer distribution motion submitted a

16   revised order yesterday.  And in fact since the -- since we

17   submitted that revised order we've been in communication

18   with another customer and so we have a revised order to

19   submit today removing one more customer from that list.

20             THE COURT:  Fine.  Okay.

21             MR. BENTON:  Thank you very much, Your Honor.

22             THE COURT:  Thank you.  With that we're adjourned.

23        (Recess.)

24             THE COURT:  Be seated, please.  Good afternoon.

25             MR. SLACK:  Good afternoon, Your Honor.  Richard

Page 70

1    Slack from Weil, Gotshal for LBSF.

2         Your Honor, the first matter on for this

3    afternoon's hearing are motions for summary judgment by both

4    LBSF and Michigan State Housing Development Authority

5    sometimes referred to as MSHDA in connection with adversary

6    proceeding 09-01728.  And the primary issues on both motions

7    before the Court are one, whether a provision in a swap

8    agreement that plainly and unambiguously alters the rights

9    of LBSF based on LBSF's bankruptcy filing is an invalid ipso

10   facto clause, and two, whether that clause is saved by

11   Section 560 of the Bankruptcy Code, the bankruptcy safe

12   harbor.

13        Specifically, Your Honor, the offending clause

14   here unambiguously changes the methodology for determining a

15   settlement amount upon termination of the swaps.  The clause

16   is completely unnecessary to allow MSHDA to terminate the

17   swap at issue.  In fact MSHDA unquestionably has terminated,

18   they have actually terminated.  And there's nothing that

19   prevents the parties from determining the settlement amount.

20        The issue here is not whether parties can take the

21   act of determining the settlement amount, the issue is

22   whether the parties use one methodology or another for doing

23   that.

24        As such the clause is a classic ipso facto clause

25   along the lines that this Court has already invalidated in

Page 71

1    Metavante and B&Y.  And in both of those decisions the Court

2    found the clauses that were triggered based on Lehman's

3    bankruptcy were invalid ipso facto clauses.

4              The primary issue, we think today, concerns the

5    safe harbor and the scope of the safe harbor 560 of the

6    Bankruptcy Code.

7              As I will discuss there are three legs, all of

8    which support LBSF's position here concerning the scope of

9    the safe harbor.  The plain language of the safe harbor, all

10   of the cases, literally each and every case that has

11   interpreted the safe harbor, and finally the legislative

12   history, which sets forth the purpose that the safe harbors

13   have.  And at the end of the day none of those three legs,

14   the plain language, the cases, or the legislative history

15   support an interpretation that's forwarded by MSHDA.

16             The safe harbor itself does not talk about

17   protecting the methodology used to calculate settlement

18   amounts, no case holds that the methodology for determining

19   settlement amounts is safe harbored, and the legislative

20   history, as we'll go through, talks about a number of very

21   specific problems that the safe harbor was designed to

22   solve, and none of those specific problems when we go

23   through the safe harbor deal with the methodology for

24   determining settlement amounts.

25             THE COURT:  I hear you, Mr. Slack, although I

Page 72

1    might as well tell you right at the outset this is one of

2    the more subtle questions on the ipso facto issue to be

3    presented in the last five years, and it's a very

4    interesting question, and I will note that this is the one

5    and only time in any Lehman case that my decision and Latoya

6    Jackson has been cited by any party.

7        (Laughter.)

8            MR. SLACK:  Your Honor, I think that -- I think

9    this is a, as you say a solid question, but I think at the

10   end of the day it's a clear question.

11           The facts necessary for determining whether the

12   modification clause is an ipso facto clause and whether it's

13   protected by the safe harbor are not in dispute.

14           The background of the relationship between LBSF

15   and MSHDA is set out in both our memorandum of law and in

16   the accompanying declaration of Locke McMurry (ph).

17           Briefly, Your Honor, MSHDA and Lehman Brothers'

18   Derivative Products, sometimes referred to as LBDP, entered

19   into an ISDA master and pursuant to ISDA master entered into

20   20 interest rate swap transactions.

21           Because LBDP was a triple A rated derivatives

22   trading vehicle there were unique provisions that were

23   written into the swaps with LBDP, and in particular the

24   credit agencies required that in order to maintain its

25   triple A rating LBDP was required to have provisions in the

Page 73

1    swaps for the termination and settlement of all the

2    transactions at mid-market, and that included -- and those

3    were upon the currents of certain triggering events, which

4    included bankruptcy filings of LBDP and LBHI.

5           Thus LBDP and MSHDA had agreed in the swap

6    agreements that if there was a termination event based on a

7    bankruptcy filing that the swaps would be unwound on a close

8    of business mid-market basis.  That was before the

9    bankruptcy filing.

10          On September 15th, 2008 LBHI filed its petition

11   and that event constituted a trigger event under the swaps

12   with MSHDA.

13          On September 15th had the swaps been terminated,

14   and had the mid-market calculation that was set forth in the

15   agreements been applied, MSHDA would have owed approximately

16   $52 million to LBDP.

17          Now, rather than terminate and owe a large

18   termination payment MSHDA instead opted to enter into an

19   assignment agreement with LBSF such that the swaps were all

20   signed from LBDP to LBSF and continued unterminated.  Thus

21   the assignment agreement actually allowed MSHDA to avoid a

22   $52 million payment to LBDP.

23          Now, it may help, Your Honor, I have a chart,

24   nothing more than the assignment agreement language, if I

25   could approach.

Page 74

1          THE COURT:  I think Mr. Goldblatt is -- would like

2     one as well.

3          MR. GOLDBLATT:  Thank you, Your Honor.

4          THE COURT:  Thank you.

5          MR. SLACK:  Paragraph 2 of the assignment

6     agreement provided quote, "Upon the termination of the

7     agreement as assigned and amended pursuant to the terms

8     hereof and notwithstanding any other provision hereof or

9     thereof, any settlement amount payable by the counterparty

10    shall be determined by LBSF pursuant to Part 1(i)(2) of the

11    schedule for the agreement."  And there's an unless.

12         But what the first part, Part 1(i)(2) of the

13    schedule to the agreement unquestionably there's no dispute

14    is a mid-market calculation of the settlement amount.

15         So under all circumstances, till we get to the

16    Unless, this clause provides that a mid-market standard is

17    used.  But there are two exceptions.

18         And so it goes on and says, "Unless an event of

19    default described in Section 5(a)(1) or Section 5(a)(7) of

20    the agreement has occurred with respect to LBSF as the

21    defaulting party, in which event the settlement amount shall

22    be determined pursuant to Section 6 of the agreement as if

23    LBSF is the defaulting party."

24         Those two exceptions are first a failure to pay

25    and second a bankruptcy event.

Page 75

1              In those two limited circumstances the mid-market

2     calculation becomes a standard market quotation calculation.

3              So after LBSF filed its bankruptcy petition on

4     October 3rd MSHDA terminated and applied the provision

5     modifying the methodology for determining the settlement

6     amount under the swap, thus instead of applying the mid-

7     market methodology it attempted to use regular market

8     quotation, and based on that market quotation it determined

9     that it owed only 36 million to LBSF where mid-market would

10    have required a payment of 59 million.

11             The wind fall to MSHDA in a two-week period is

12    obvious.  Had the assignment agreement not been entered into

13    MSHDA would have owed a mid-market termination amount of

14    over 50 million.  Two weeks later by virtue of applying a

15    clause that clearly changed LBSF's rights based on its

16    bankruptcy MSHDA took the position that it could save

17    $20 million.

18             So I'm going to talk now about the -- really what

19    I think are the two issues.  The first issue is whether the

20    modification provision is an unenforceable ipso facto

21    clause.

22             As I just said, Your Honor, the clause here

23    provided for a general rule and then two exceptions, one of

24    which is the bankruptcy.  Thus paragraph 2 clearly changes

25    LBSF's rights based on its filing bankruptcy.

Page 76

1           And what's interesting, Your Honor, is MSHDA's

2    opening brief on its motion for summary judgment never

3    contends that the clause here is not an ipso facto clause.

4    They make that argument in their reply, but in their opening

5    brief they don't even contend that it's not an ipso facto

6    clause.

7           Now, in its reply it actually has two arguments

8    that it makes.  First it argues that the clause really

9    provides one method for doing things if there's no

10   bankruptcy filing and another method for doing things if

11   there is, and therefore they say there's no change.

12          First, Your Honor, this argument doesn't withstand

13   the plain reading of the clause itself which clearly has one

14   general rule with two exceptions.

15          But more importantly, Your Honor, this was already

16   addressed specifically in the B&Y case.  In the B&Y case you

17   had a clause again where the party said you had one method

18   for going through the waterfall if there was an event of

19   default where Lehman was in bankruptcy and another where

20   there wasn't, and they said so there's no change, they're

21   just two separate methodologies.  And this Court held that

22   where you had a very similar type of clause and trigger

23   provision that in fact it was an ipso facto clause.

24          The second argument they make about this not being

25   an ipso facto clause is they say, well, there are many

Page 77

1    different events, here there are too, but there are other

2    events some of which may be non-ipso facto triggers.  I

3    would argue that all of these are ipso facto triggers, since

4    even the failure to pay is likely -- has to do with the

5    financial condition of the debtor.

6           But let's assume that's true for a second.  The

7    fact is, is that just because there are non-ipso facto

8    triggers doesn't cleanse the ipso facto triggers in a

9    clause.  And again, Your Honor had already dealt with this

10   type of clause in Metavante.

11          In Metavante the Court was looking at whether

12   2(a)(3) of the master agreement was an invalid ipso facto

13   clause, and like here 2(a)(3) stated that if there was an

14   event of default that the non-defaulting party could choose

15   not to perform under the swaps.  And the Court found that

16   where the trigger for 2(a)(3) was an ipso facto trigger,

17   i.e., the filing of the bankruptcy, it was an ipso facto

18   clause notwithstanding that there could be other theoretical

19   non-ipso facto triggers for 2(a)(3).  And of course that

20   ruling makes a lot of sense.

21          Parties shouldn't be able to avoid and evade the

22   ipso facto provisions simply by building in non-ipso facto

23   triggers into a clause.  It'd be much too easy for

24   counterparties in a contract to alter the rights of a debtor

25   by doing that.

Page 78

1           So, Your Honor, the next question is whether this

2    clause is protected by the safe harbors.  And as I mentioned

3    there are three legs, and I'm going to talk about each of

4    the three legs separately.

5           The first leg is the plain language of the clause

6    itself.  And again, when I'm looking at this it may make

7    some sense to take a look at the text, the text of the

8    relevant statutory part.  May I approach, Your Honor?

9           THE COURT:  Yes.

10          MR. SLACK:  Section 560 only safe harbors, quote,

11   "the exercise of any contractual right", and then it says if

12   you -- a little bit later -- "to cause the liquidation,

13   termination, or acceleration of one or more swap

14   agreements."

15          The key language here is the phrase "to cause

16   the," which signifies that the safe harbor covers the act of

17   liquidation, the act of termination, and the act of

18   acceleration.  The safe harbor is thus concerned with

19   allowing a counterparty to terminate a swap, it doesn't

20   address the methodology for going so.  And MSHDA's argument

21   here is that the safe harbor protects not just the right to

22   terminate, liquidate, and accelerate, but also protects the

23   ancillary issue of the method for determining the amount

24   that you get when you terminate.

25          Had Congress intended to provide a safe harbor for

Page 79

1       ancillary matters it could have done so, it could have

2       written the clause that MSHDA would like.  It didn't do

3       that.

4              In fact what MSHDA is really arguing is that

5       Congress misspoke when it wrote the language "to cause the"

6       before liquidation, termination, or acceleration, and

7       instead what it should have used was the word "regarding."

8       Had it used the word "regarding" it would have read, any

9       contractual right regarding the liquidation, termination, or

10      acceleration or one or more swap agreements, then it would

11      have covered the kinds of things that MSHDA is saying it

12      covers.  But Congress didn't write it that way, they wrote

13      it differently.  They wrote "to cause the."  The act of.

14      And it is only the act of which is safe harbor.

15             Now, when we get to the cases and we get to the

16      legislate earth first history, Your Honor, you're going to

17      see that that's exactly what Congress intended and there was

18      a reason for it based on the public policy.

19             Now there's good reasons why Congress didn't

20      exempt every contractual right regarding the termination,

21      liquidation, or acceleration of swap agreements.

22             As this Court has discussed both in the B&Y

23      decision and the Valley Rock (ph) decision, you know, there

24      are great economic incentives prebankruptcy for parties to

25      negotiate ipso facto clauses.  It's good for the

Page 80

1  counterparties and for the future debtors who don't know

2  they're going to be debtors.  People don't like to think

3  that they're going to go into bankruptcy, and those kind of

4  clauses get put in -- you know, get put in pretty regularly.

5  And as this Court knows the Bankruptcy Code is designed to

6  enable debtors in possession to effectively reorganize for

7  the benefit of all the creditors.

8           The policy here should be to limit the safe

9  harbors to make sure that parties don't get to put in

10 punitive ipso facto clauses into contracts.

11          Now, MSHDA spends a lot of time in its briefs

12 talking about the dictionary definition of the word

13 liquidate, and what I would say is the definition of the

14 word liquidate, whether it means to calculate or it means

15 something else, and we think it means something else --

16          THE COURT:  Did you --

17          MR. SLACK:  -- but the issue is --

18          THE COURT:  -- did you say what I just think I

19 heard?

20          MR. SLACK:  Whether it means to -- whether

21 liquidate means to calculate or something else.

22          THE COURT:  Okay, you said calculate.  Good.

23          MR. SLACK:  Yeah, sorry.  I hope I said that,

24 that's what I intended to say.

25          THE COURT:  I hope that's what you said.

Page 81

1           MR. SLACK:  But the issue is a red herring here.

2     It's completely irrelevant.  And that's because the word --

3     whether the word "liquidation" means calculation all that

4     the safe harbor would protect is the act of calculation, not

5     the methodology for doing so.

6           Under MSHDA's interpretation of Section 560

7     parties could put any provision they want into a swap

8     agreement no matter how punitive to the debtor and it's

9     covered by the safe harbor.

10          And I'd like to consider an example that I think

11    makes the point.  Consider a provision that deals directly

12    with the liquidation of collateral.  So let's say you have a

13    swap agreement and that swap agreement where one party has

14    posted collateral.  There's no question under the safe

15    harbor that parties are permitted to liquidate that

16    collateral as part of -- as part of termination,

17    liquidation, acceleration.

18          So let's say there was a clause in the master

19    agreement, because as we know there's -- the credit support

20    annex to the master agreement talks about liquidating

21    collateral -- so let's say the parties put a clause in the

22    schedule that says upon the bankruptcy of a debtor the

23    counterparty can take all the collateral, no matter how much

24    -- how much those securities are worth for $1.  Under

25    MSHDA's reading of the safe harbor because that is a

Page 82

1    methodology forgetting the collateral liquidator, which

2    clearly you can do under the safe harbor, that methodology

3    is safe harbor.

4              I would argue that it's not, Your Honor.  I would

5    argue that you cannot have a punitive measure that changes

6    the rights of the debtor based on a bankruptcy that goes to

7    the methodology for either terminating, liquidating, or

8    accelerating.

9              THE COURT:  But, Mr. Slack, your use of the term

10   "punitive" and your example almost proves too much.  Because

11   what I think the Michigan Authority is saying is that in

12   using -- and I'll use your words - "to cause the

13   liquidation" -- although they certainly don't emphasize the

14   words "to cause" in their argument -- but in using

15   liquidation along with termination and acceleration 560

16   covers more than just the triggering event of being able to

17   take action but extends to -- maybe methodology isn't the

18   right term -- extends to the means to achieve the result.

19   And if it's punitive I absolutely buy your argument.  It

20   becomes indistinguishable from the ruling in perpetual,

21   because instead of having a certain rank and a waterfall it

22   flips.  That's punitive.  But if there are commercially

23   accepted ways of valuing positions that are generally

24   recognized in the marketplace those aren't necessarily

25   punitive they happen to produce a variance and outcome from

Page 83

 1    Lehman's perspective in this example, but just because

 2    there's a variance doesn't mean it's punitive.

 3              MR. SLACK:  Well, it certainly was punitive here,

 4    Your Honor, in the sense that the difference between a mid-

 5    market calculation and a market quotation calculation was

 6    approximately $20 million here.  So whether you use the word

 7    punitive or you just use the word that it's certainly -- you

 8    know, words that it certainly benefited the counterparty

 9    here pretty dramatically the point is, is that Lehman's

10    rights were changed by virtue of, and you know, the clause

11    or I should say the ipso facto language in 365(e)(1) doesn't

12    require a punitive change, it just requires a change to the

13    right.

14              So I happen to think that the word punitive was

15    referring to the fact that it was advantageous and greatly

16    so to the counterparty and nothing more.  But I do think

17    Lehman's rights have changed as a result of this clause.

18              Now, one last point on the plain language of the

19    safe harbor.  And if you read the briefs filed by MHSHDA

20    carefully and it -- when it says that liquidate means to

21    calculate they realize that's not enough.  In other words,

22    just safe harboring liquidation for them isn't enough.

23              What they say in their opening brief, for example,

24    and it's on page 1, they say "the case presents an important

25    but straightforward question, whether swap counterparties

Page 84

1    may rely on the Bankruptcy Code safe harbor provisions to

2    protect their contractual right to terminate and calculate

3    the settlement payment," -- and here's the language -- "in

4    accordance with the contract's terms."  In other words,

5    calculating isn't enough.  They can -- there's nobody who's

6    saying that the parties here can't calculate, perform

7    calculations, they need the safe harbor to mean more than

8    just what it says on its face.  They need it to say in

9    accordance with the contract's terms.  They need more.  They

10   need to be able to say we need ancillary rights in the

11   contract that are also safe harbored.

12           THE COURT:  But, Mr. Slack, this is actually a

13   difficult linguistic exercise, because if you have a

14   contractual right to liquidate -- and that's actually in the

15   title of Section 560 -- it says, "contractual right to

16   liquidate."  And if we just look at those four words it's in

17   the contract.  You have a right to do something pursuant to

18   contract.

19           So one of my problems with your argument as I'm

20   thinking about it is what does it mean to cause the

21   liquidation unless you're doing so in a manner that is

22   prescribed in a writing?  It's not just out there in the air

23   some place, it's specified in a contract.

24           MR. SLACK:  Right.  So you can't have a

25   contractual provision that would prevent a counterparty from

Page 85

1    terminating, taking the act of termination, preventing a

2    counterparty from taking the act of liquidating, or

3    preventing a party from taking the act of accelerating,

4    because those are what is safe harbored.

5            And what's interesting is when you said the

6    contractual right to liquidate it is not exactly that,

7    right, it is the contractual right to cause the liquidation,

8    and the to cause the liquidation is in fact taking the act

9    of.

10           When you look at the language here they didn't

11   write regarding liquidation, termination, or acceleration,

12   and that's a very key difference.  Because the whole idea of

13   not having ancillary rights -- and we're going to get to the

14   cases because I think the cases give a good example of

15   exactly what we're talking about here and support this.

16           THE COURT:  Okay.  I don't want to get in the way

17   of your argument, but I also want to better understand this

18   issue which is frankly troubling me, because when we look at

19   the words, "It's the exercise of any contractual right of

20   any swap participant or financial participant to cause the

21   liquidation," and I'm just going to stop there.  Obviously

22   there's a lot more, but we're focused on know to "cause the

23   liquidation."  Contractual right to cause the liquidation.

24           What kind of contractual right would there be to

25   cause a liquidation that wouldn't have some specificity

Page 86

1    built into it?

2            MR. SLACK:  Well, the question is whether it has

3    specificity built into it, the only thing that is safe

4    harbored is the termination, acceleration, and liquidation,

5    not the -- not anything else.

6            Because again, if you think about the risk you'd

7    have if you could just build into any clause any change you

8    want as long as it's in a swap agreement, that wasn't what

9    the -- what Congress either intended nor what the cases say.

10           And so in fact, Your Honor, let me talk about the

11   cases.  Every case to interpret the scope of 560 has agreed

12   that the scope is limited to the act of liquidation,

13   termination, and acceleration and not ancillary matters, and

14   the cases that we cite, Calpine, Enron, and of course your

15   own cases in Valley Rock and B&Y, but let's talk about the

16   Calpine case here.

17           The facts of Calpine are instructive.  That's a

18   case by Judge Lifland here in the Southern District.  And

19   Calpine had entered into a master purchase agreement with

20   Reliant Energy and executed a forward transaction for the

21   purchase and sale of various energy products there under.

22           So you had a master agreement, it wasn't a swap

23   agreement, but it was a master agreement.

24           And ten days after Calpine went into bankruptcy

25   Reliance sent a notice of termination and designated an

Page 87

1     early termination date.  It then sent a payment letter

2     saying that Reliant was owed two million by Calpine.

3               Now, under the plain terms of the agreement

4     Calpine had only two days to dispute the calculation.  If

5     Calpine didn't respond to the letter within two days it

6     became final.

7               And so what Reliance sought to do was to enforce

8     this provision which provided a methodology for determining

9     settlement amounts and a process for doing that and argued

10    that Calpine waived its right to dispute this amount by not

11    complying with the contract.

12              Now, relying on the safe harbor which at that --

13    which for forward contracts was 556, but it has identical

14    language as Your Honor knows talking about to cause the

15    termination, liquidation, acceleration.  The Bankruptcy

16    Court held that it was not safe harbored holding that the

17    safe harbor quote "is limited to enforcing only those terms

18    that trigger termination upon the occurrence of one of the

19    three specified conditions set forth in Section 365(e)(1) of

20    the Code.  Accordingly, contractual rights that are merely

21    ancillary or incidental to an ipso facto clause are not

22    enforceable."

23              And Calpine presents a case virtually I identical

24    here, because a counterpart there like here argued that this

25    two-day process was part of -- part and parcel of getting to

Page 88

```
 1    a number.  In other words, they say we couldn't get

 2    certainty on our number unless this process was in place.

 3    So the only way we get certainty in order to net out and be

 4    able to do the things that the safe harbor says we can do is

 5    to have this two-day period apply and be safe harbored.  And

 6    the Court said, no, the process here is not safe harbor.

 7    The only thing that's safe harbored is the act of

 8    terminating.

 9              Now, the legislative history, Your Honor, we've

10    talked about the plain language and the case law, and both

11    of them I think support a narrow reading of the safe harbor.

12    But the legislative history is equally supportive.  And what

13    I'd like to do here --

14              UNIDENTIFIED SPEAKER:  Thank you.

15              MR. SLACK:  Your Honor, I hope this is a helpful

16    aid more than anything else, but what we've put together,

17    Your Honor, if I could approach, is what I hope is the

18    legislative history of 560 both from 1990 and 2005 in one

19    place.  It certainly cites what both sides have put in and

20    everything else that we can find with respect to --

21              THE COURT:  Sure, please approach.

22              MR. SLACK:  So, Your Honor, the -- a lot of what

23    we cite, obviously is in our briefs.  But what I'd like to

24    do is walk through a couple of parts of what is a very

25    lengthy 1990 legislative history, and a very, very short
```

Page 89

1    2005 legislative history.

2            So in 1990, when they put in the safe harbor, they

3    had hearings, and if you turn to tab 1, which is the House

4    hearing, and on the first really three pages in is a

5    statement by Senator Heflin, and he starts out by saying,

6    "There's a concern that if one of the parties to a swap

7    agreement files for bankruptcy under the current Bankruptcy

8    Code, the non-defaulting party is left with the substantial

9    risk, and depending on the size of the swap agreement, could

10   cause a rippling effect which would undermine the stability

11   in the financial markets."

12           That's --

13           THE COURT:  I don't know Senator Heflin, but just

14   reading those words make me think that somebody else wrote

15   his speech.

16           MR. SLACK:  The important thing here, though, Your

17   Honor, whoever wrote it, there's a theme throughout --

18           THE COURT:  I don't mean to be disparaging of

19   legislative history, it's just that I think we all know a

20   lot more now than we did in 1989, or at least I know a lot

21   more, than I knew in 1989 that -- there's a legislative

22   process in which legislative history is of uncertain value

23   to courts now being asked to interpret the words

24           But that having been said, please proceed.

25           MR. SLACK:  Well, I think the important thing,

Page 90

1    Your Honor, you can put the weight that you think is

2    appropriate on it.  The key is, is that it's absolutely

3    consistent with the -- with the plain language and the case

4    law.

5             And in particular, Your Honor, what the

6    legislature history was concerned with, was the effects on

7    the market as a whole.  And the legislative history was not

8    concerned with whether MSHDA got $20 million because they

9    were able to use one methodology rather than another.  And

10   this a theme that you see throughout the legislative

11   history.

12            When you -- if you turn, Your Honor, now the pages

13   at the top are what I'm going to be talking about.  This

14   is --

15            THE COURT:  I don't mean to argue with you about

16   what you just said, but I'm just going to give you a real

17   time reaction to it.  One could argue that the stability of

18   the financial markets depend, to some extent, on commercial

19   predictability, and that being able to strictly enforce

20   provisions of a contract in liquidation support the swap

21   market and all that goes with it, so that parties on both

22   sides of the trade know exactly what to expect.

23            MR. SLACK:  I think that's right, Your Honor.  I

24   don't disagree, except -- what -- except you can't take that

25   too far.  In other words, it's clear that Congress did not

Page 91

1    say that any term that's in a swap agreement is safe harbor.

2    We know, for example, that even though 2(a)(3) is there and

3    says what it says, this Court has held that that's an ipso

4    facto, even though we have a provision in a -- agreement

5    that essentially modifies a waterfall provision.

6              We know that notwithstanding that it's in a

7    contract, and that, you know, the parties there again

8    related to a swap agreement, the expectation may or may not

9    have been that they are valid, but this Court has held if

10   it's an ipso facto, so be it, that's where it ends, so.

11             THE COURT:  I stand by those rulings.  I'm simply

12   saying that for purposes of looking at this highlighted

13   excerpt from 1989, the opening statement of Senator Heflin,

14   referencing that which would undermine the stability of the

15   financial markets is a broad enough reference that it could

16   actually support the argument made by your adversary.

17             MR. SLACK:  I think that in context, that's not

18   the case.  And I think that when you look at the legislative

19   history, there's nothing in the legislative history that

20   suggests that Congress was worried about changes within the

21   swap agreements, changing rights as opposed to the act of

22   terminating liquidating and accelerating.

23             And, in fact, Your Honor, the next thing I was

24   going to go was if -- they had testimony from a number of

25   witnesses, and obviously we're not going to go through each

Page 92

1    one, but there was a witness from ISDA, and that testimony

2    starts from Mr. Brickel (ph) on page 14, and I was going to

3    turn to page 24.

4            And again, what he goes through are specific

5    problems on page 24 that the legislation in 1990 was set to

6    remedy.  And if you go through the next few pages, starting

7    at 24, what you find is the problem that he was worried

8    about is first, the automatic stay.  In other words, there

9    was a worry that the automatic stay would apply to

10   terminating, and therefore, a counterparty simply wouldn't

11   be able to terminate these.  Well, that's exactly the point.

12   That goes to the act of terminating.  What they were worried

13   about here was allowing the counterparty to be able to take

14   the act of terminating.

15           The next thing that Mr. Brickel was worried about

16   on page 30 is very similar.  And he writes, "This provision

17   essentially assures counterparties that they will not be

18   exposed to an effort by a bankruptcy trustee to assume

19   agreements under Section 365 of the Bankruptcy Code."

20           In other words, we don't want these swaps staying

21   out not knowing whether people can terminate or not

22   terminate until the debtor decides whether to assume or

23   reject them.

24           Those are the particular kinds of worries and

25   concerns that are built in, and they are a recurring theme.

Page 93

1    Another recurring theme which I won't -- which we cite in

2    our briefs is the idea of cherry-picking.  They talk about

3    the debtor assuming some and not others.  It's the same

4    issue, though.  Allowing the termination is what solves

5    these problems.  There's never a discussion about the

6    methodology underneath them.

7            So, Your Honor, unless you have other questions

8    for me, I want to turn to one last issue that doesn't relate

9    to the safe harbor or whether or not this particular clause

10   is an ipso facto.

11           THE COURT:  Are we done with the legislative

12   history component?

13           MR. SLACK:  We are.

14           THE COURT:  Okay.

15           MR. SLACK:  MSHDA also has sought summary judgment

16   on the breach of contract and unjust enrichment claims, and

17   I'll be brief about these, but there has been no discovery

18   in this case at all with respect to that.  And as the 2nd

19   Circuit has stated, in only the rarest cases may summary

20   judgment be granted against a plaintiff who has not been

21   afforded the opportunity to conduct discovery.

22           The parties all agree that the issue of whether

23   this is an ipso facto and whether it's covered the safe

24   harbor are ripe for summary and adjudication.  The parties

25   disagree about the other claims because there has been no

Page 94

1    discovery.

2           Now, MSHDA says that essentially a gotcha here.

3    What they say is that at the oral argument in the district

4    court that my partner Harvey Miller said that the case was

5    ripe for summary judgment.  And what Mr. Miller was talking

6    about was, the ipso facto issue that we've talked about.

7           The main issue before the district court on the

8    motion to withdraw the reference was a question of whether

9    the Court is the appropriate forum in the first instance to

10   determine this issue.  And when he said he believed the

11   question of enforceability of the second clause of paragraph

12   2 of the assignment agreement to be a legal issue, all he

13   was talking about was that clause and not the whole case.

14          So in any event, Your Honor, I'm not going to

15   spend any more time on that, but I don't think that summary

16   judgment's appropriate on those other issues.  Thank you,

17   Your Honor.

18          THE COURT:  Thank you very much.

19          Mr. Goldblatt.

20          MR. GOLDBLATT:  Good afternoon, Your Honor, Craig

21   Goldblatt along with my colleague, Danielle Spinelli and

22   Jennifer Jackson from the Michigan Attorney General's Office

23   on behalf of the Michigan State Housing and Development

24   Authority.

25          I agree with some, but not all of what Mr. Slack

1    had to say.

2              THE COURT:  That you agree with some is a terrific

3    start.

4              MR. GOLDBLATT:  We'll touch on those areas.

5              Your Honor, we're here as Mr. Slack said, on

6    cross-motions for summary judgment on the counterclaims that

7    the Lehman entities have asserted against MSHDA.

8              The central question presented is the scope of the

9    bankruptcy safe harbors for derivative transactions.

10   Section 560 of the Bankruptcy Code protects the exercise of

11   any contractual right to cause the liquidation, termination,

12   or acceleration of a swap agreement.

13             That language encompasses the contractual

14   provision that is at issue here, which addresses how to

15   liquidate the trade, in the event of bankruptcy.

16             Mr. Slack's argument is that such a provision is

17   merely ancillary to the liquidation and therefore falls

18   outside the scope of the safe harbor.

19             At the outset I should say, our position is,

20   first, consistent with the statutory language, any

21   contractual right that directs the liquidation of a swap

22   agreement is safe harbored, but second, even if there were

23   such a thing as an ancillary right that might fall outside

24   the scope of the safe harbor, the provision at issue here is

25   essential to directing how to liquidate the trade in event

Page 96

1    of bankruptcy, and therefore is by no means ancillary.

2            Now, to put this dispute in context, I think it

3    does make sense to describe a bit about how the trade in

4    question and how the provisions at issue came to be.  And

5    this recitation, I expect, is much like what Mr. Slack had

6    to say.

7            The original transactions here were 20 interest

8    rate swaps that MSHDA entered into with Lehman Brothers'

9    derivatives products, LBDP.  And LBDP is a triple rate A

10   rated entity.  The purpose of the swaps was to hedge MSHDA's

11   exposure to variations and interest rates, and thereby

12   permit it to use variable rate instruments to finance its

13   efforts to provide affordable housing in the State of

14   Michigan.

15           And as Mr. Slack described, LBDP derivatives work

16   somewhat differently from the typical derivatives contract

17   with which I'm sure the Court is familiar over the many

18   years of this bankruptcy case.

19           As Your Honor is aware, when your typical swap

20   agreement is terminated on account of bankruptcy, the non-

21   defaulting party calculates the settlement amount.  When the

22   market quotation methodology is applicable, it does so

23   essentially by determining the market price for a

24   replacement trade.

25           LBDP's transactions had an unusual element, which

Page 97

1  obligated LBDP not MSHDA upon termination to close out the

2  trades, and for it to calculate the settlement amount, not

3  at the market standard replacement cost of the trade, but

4  instead at a mid-market price, which essentially as Mr.

5  Slack described, split the difference between the bid and

6  ask prices of the position.

7          Now, that provision was important to LBDP's triple

8  A rating, that's why it's here.  And the reason as Mr. Slack

9  described, is it's because this more standard market

10 quotation methodology would expose a dealer to the risk that

11 if it had two offsetting trades, it would have to cover the

12 bid ask spread.

13         The mid-market methodology that was in this trade,

14 and as I understand, most LBDP, if not all LBDP trades,

15 therefore permitted LBDP to have the triple A ratings.  It

16 didn't have this exposure to the bid ask spread that the

17 other Lehman entities faced.

18         Now, LBHI's September 15th, 2008 bankruptcy was a

19 trigger event, that would have required LBDP to close out

20 the trade within three days.  But instead of doing that,

21 LBDP approached MSHDA, and as I understand it, several other

22 similarly situated entities, largely public housing finance

23 authorities that had LBDP derivatives, and proposed that the

24 agreements be assigned out of LBDP to Lehman Brothers

25 special financing or LBSF, which was not yet a debtor.

Page 98

1           And as Your Honor is acutely aware, probably more

2       than anyone, thinking back to September 15th, 2008, no one

3       knew what the future would hold.  Because LBSF, however, is

4       not a triple A rated entity, the terms of the assignment are

5       in many ways more like a standard ISDA documentation.

6           That is, it provided that in the event of non-

7       payment for an LBSF bankruptcy, which are the most common

8       types of default, the familiar market quotation methodology

9       would apply.

10          So in response to the question that Your Honor

11      asked of Mr. Slack, is this provision the application of

12      market quotation commercially reasonable, is it the kind of

13      thing that you would ordinarily, or is an attempt to single

14      out the debtor for its treatment, the answer is no, the

15      market quotation methodology applied is the standard LBSF

16      forum.

17          It was at mid-market when it was within LBDP

18      because there were special reasons applicable to LBDP.  It

19      was triple A rating.  LBSF wasn't.  Those reasons didn't

20      apply, and so instead, in the event of bankruptcy or payment

21      default, the market standard non-punitive market quotation

22      methodology was applicable to determine the settlement

23      amount in the event of one of those defaults.

24          Now, the agreement, to be fair, did leave in place

25      the mid-market methodology and the -- along with all of the

1    requirements that LBSF, be the market who calculates it, for

2    termination on other sort of far less common ground.  Such

3    as, for example, a merger without assumption of the

4    agreement, and there were a handful of other types of

5    defaults as to which the mid-market methodology would apply.

6         But even then, it worked just like the LBDP

7    agreement, they had to calculate it and tell us the amounts

8    due.

9         Now, the -- this happened, the assignment

10   agreement I think significantly was entered into on

11   September 16th, 2008.  The agreement was prepared by the

12   Lehman entities who, at the time, of course, had access to

13   the nation's most sophisticated bankruptcy counsel.

14        As it turned out, LBSF did ultimately file for

15   bankruptcy on October 3rd, 2008.  And so MSHDA then closed

16   out the agreement according to the contractual terms.  It

17   determined that the transaction was in the money to LBSF, in

18   an amount of approximately $36 million.  And in November of

19   2008, MSHDA sent LBSF $36 million, in accordance with the

20   terms of the contract.

21        Now, just by way of context here, Your Honor,

22   MSHDA's original claim against the Lehman entities, which is

23   not at issue in connection with today's summary judgment

24   proceedings, arises out of the fact that Lehman improperly

25   demanded and obtained payment from MSHDA's bond trustee of a

Page 100

```
 1    $2.3 million payment for services under the agreement after

 2    MSHDA had terminated it.  That's not at issue here.

 3              What is at issue is LBSF's counterclaim back

 4    against MSHDA, and that's the claim on which the parties

 5    have filed cross motions for summary judgment, where they

 6    argue that essentially MSHDA breached the contract by

 7    adhering exactly to the terms of the agreement as it was

 8    written.

 9              In LBSF's view, the contractual methodology that

10    applied to the liquidation of trades in the event of

11    bankruptcy is an invalid ipso facto clause.

12              Of course, if the provision of the agreement

13    telling you how to liquidate trades in the event of

14    bankruptcy are stricken from the agreement, the agreement

15    just doesn't tell you how you're supposed to liquidate the

16    positions.

17              The only other provisions, which are expressly

18    inapplicable to bankruptcy terminations would have required

19    LBSF to calculate the damages using the mid-market

20    methodology within three days of the event of default.  And

21    LBSF, of course, didn't do that because those provisions

22    didn't apply.

23              And LBSF's argument here at bottom is, you really

24    shouldn't worry about the terms of the agreement, we should

25    instead now rewrite the agreement to take the midmarket
```

Page 101

1    methodology and to essentially, instead of having either of

2    the parties perform the calculation, leave it to this court.

3    And they argue that if one were to do that, we'd owe them an

4    additional $23 million plus prejudgment interest.

5              Now, that position is simply incorrect.

6              Now, Your Honor asked where I agree with Mr.

7    Slack, let me see if I can clear up one bit of confusion

8    right away.  The contractual provisions on which MSHDA

9    relied is an ipso facto clause.  There is no question that

10   the basis for termination was LBSF's bankruptcy.  And if

11   this weren't the swap -- if it weren't for the safe harbor

12   issue, you can't do that.  The only basis for terminating

13   that we asserted was the bankruptcy, and but for Section

14   560, a provision that says you can terminate this agreement

15   upon bankruptcy is unenforceable against a debtor in

16   bankruptcy.  No argument from us in that regard.

17             The provision in substance said, in the event of

18   bankruptcy you can terminate and here's how you calculate

19   your damages if you do that.  This is an ipso facto

20   provision, it's all an ipso facto provision.

21             The point here isn't whether or not we have an

22   ipso facto clause, we do, it's about the meaning of the safe

23   harbors.

24             THE COURT:  How do you read the words "to cause

25   the liquidation" so that it embraces the methodology of

Page 102

1    calculation?

2              MR. GOLDBLATT:  Sure, Your Honor.  So let me, if I

3    may, take a stab at it.  We highlight a slightly different

4    collection of words than Mr. Slack, but in substance here is

5    -- there are a couple of answers to the question, but let me

6    try each of them.

7              Okay.  The -- as we see the relevant language in

8    Section 560, it's -- the provision provides -- it protects

9    the exercise of any contractual right to cause the

10   liquidation, termination, or acceleration of one or more

11   swap agreement, and it continues, or to net out any

12   termination values of payments -- of payment amounts arising

13   under or in connection with the termination, liquidation, or

14   acceleration of one or more swap agreements.  I'm sorry, I

15   read that very poorly, but it says, essentially, the

16   exercise of the contractual right to cause the liquidation

17   or to net out any termination values of payment amounts

18   arising under or in connection with the termination,

19   liquidation, or acceleration of one or more swap agreements

20   shall not be stayed, avoided, or otherwise limited by

21   operation of any provision of this title.

22              Now, this title, and the context of course is

23   Title 11, and the point of this statutory language is that

24   nothing in the Bankruptcy Code operates to stay, avoid, or

25   otherwise limit the applicable contractual rights.

Page 103

```
 1              Now, the proposition that the language to cause

 2    has the meaning -- it can't possibly have the meaning that

 3    Mr. Slack ascribes to it, and there are basically two

 4    reasons.

 5              One, it doesn't make any sense to say you can

 6    cause the liquidation without doing the liquidation.  What

 7    it means to cause the liquidation, is to liquidate.  That's

 8    just context and common sense.  The notion that -- and

 9    indeed, Your Honor, to -- if you take that linguistic

10    argument seriously, it says you can cause the termination,

11    but why can't you terminate.

12              If you can do it, you can do it.  And it would be

13    bizarre to ascribe to Congress such an intent.  And the

14    second reason that has to be right comes from the language

15    itself, which it goes on to say, you can set off the

16    applicable amounts, right, that's expressly protected by the

17    safe harbor.  And so if you couldn't go about the process of

18    liquidating it and coming to a sum certain, that second

19    sentence that we were just describing that's in the 560

20    wouldn't make any sense because you need to go through the

21    process.  Just as a matter of common sense, you need to

22    actually reduce it to a dollar figure, in order to do the

23    netting out that is expressly safe harbored.

24              THE COURT:  Yes, but what Mr. Slack would be

25    saying, and I expect he will say this himself after you're
```

Page 104

1    done, and I'm just going to try to channel him for a moment,

2    what I think he would be saying is that you have the

3    unfettered right to cause the liquidation, meaning to

4    liquidate, but not at a penalty as prescribed by the

5    bankruptcy clause here, but rather at the non-bankruptcy

6    method for calculation.  I think that's what he might say.

7                MR. GOLDBLATT:  I think that's what he's saying,

8    and I have a number of different responses to that.

9                First of all the premise that it's a penalty is

10   false.  It's a different number, but it's a commercially

11   reasonable number.  It's a number that's used in a lot of

12   other contexts.  It's -- there is not here an intent to

13   single out bankruptcy for worst treatment.

14               So factually even if one were to read the Code

15   that way, we still win this case.

16               Second, Your Honor, I guess I would submit, and I

17   appreciate this may not be Your Honor's view is that even if

18   this -- here's how I understand the Code.

19               There's a prohibition on ipso facto clauses,

20   right, that comes through 365(e) and 541(c) and the like.

21   And then there's the safe harbor.  And the safe harbor

22   carves -- basically says, if you're within the four walls of

23   that safe harbor, that principle of no ipso facto, no harm

24   the debtor, doesn't apply, just doesn't apply.

25               And so I would contend that if you're within the

Page 105

```
 1    scope of the safe harbor, if you're one of the things that

 2    falls within enumeration of the safe harbor, this background

 3    principle of bankruptcy law that says gee, you can't really

 4    disadvantage the debtor, doesn't apply.

 5          Now, one could ask the question, is that a good

 6    way to write the Bankruptcy Code, or would there be a better

 7    way, but I guess I submit what the Bankruptcy Code we have,

 8    even a punitive liquidation provision would be enforceable,

 9    that said, there's no occasion for the Court to reach that

10    here, because it's plain that this provision is no such

11    thing.  This is a standard commercially reasonable

12    liquidation provision that operates the same way that many,

13    many of LBSF's ordinary liquidation provisions operate.

14          THE COURT:  Yes, but you're saying it doesn't

15    apply, and I agree with what you're saying, with respect to

16    certain specified acts.

17          MR. GOLDBLATT:  Correct.

18          THE COURT:  And those specified acts are to be

19    narrowly construed, and they provide because we've been

20    focused on the words to the liquidation termination or

21    acceleration, in this instance, of one or more swap

22    agreements --

23          MR. GOLDBLATT:  Correct.

24          THE COURT:  -- and has set off the netting that

25    you talked about.
```

1          What Mr. Slack is saying is that the right to

2     trigger an event is not the same as the right to run the

3     methodology that produces a certain calculation.  I believe

4     that is the distinction.

5          MR. GOLDBLATT:  I understand.  But, Your Honor,

6     the legislative history, not the legislative history of I'm

7     going to scour the record and find a statement in the record

8     that helps me, but the structure of the legislative history

9     here I think answers that question.

10         Because before 2005, the statute said only the

11    right to terminate.

12         THE COURT:  Right.

13         MR. GOLDBLATT:  Okay.  And one -- when it only

14    said the right to terminate you can ask the question, does

15    that just mean you can terminate, but how you go about it,

16    and the methodology for getting to what happens then is

17    disputed.

18         Now, I would have contended then, look the right

19    to terminate implies with it, the things that you have to do

20    in order to terminate, close it out, figure out how much is

21    owed, pay it.

22         And -- but one could have made a contrary argument

23    from the language that didn't say liquidate it or

24    accelerate.  It just said terminate.  But in 2005, the

25    language was amended to resolve any such ambiguity, and it's

1    safe harbors now, not just the right to terminate, but also

2    the right to terminate, liquidate, accelerate, and as Your

3    Honor refers to, the exercise of any contractual right to do

4    those things.

5          So I think the context of this is clear, and

6    addresses the question Mr. Slack raises.  And, Your Honor,

7    simply as a matter of ordinary English, what it means to

8    liquidate a swap transaction, or to liquidate any agreement

9    is to reduce the contractual right to a specified amount

10   that is due and owing, that's just ordinary English.

11   Dictionary definitions confirm that ordinary understanding,

12   and, Your Honor, unsurprisingly, the discussion of Section

13   560 and the Colliers Treatise (ph) and the applicable

14   discussion in the Gutch and Klein Treatise (ph) on

15   derivatives transactions both explain that the safe harbor

16   protects the right to reduce the amount due under a swap

17   agreement to a fixed sum.

18          Indeed, Your Honor, Lehman itself made the

19   following argument in its summary judgment papers before

20   this Court in the DNY Trustee case.  Here's what Lehman said

21   in DNY Trustee, "liquidation as that term is used in Section

22   560 of the Bankruptcy Code, specifically refers to

23   liquidation of transactions, meaning reviewing terminated

24   contracts and calculating amounts owed either way."

25          That is exactly right, and that is exactly what

Page 108

1  MSHDA here.  The heart of Mr. Slack's argument, as I

2  understand it, is that while the safe harbor protects the

3  right to liquidate, this is different because here we've

4  somehow changed the liquidation formula on account of

5  bankruptcy.  And that that change is an ancillary provision

6  that falls outside the scope of the safe harbor.  That's at

7  bottom I think what he's saying, but that's wrong with

8  respect on a number of levels.

9         In substance, Your Honor, this agreement provides

10  one methodology that's applicable for bankruptcy and failure

11  to pay, and another methodology that's applicable for other

12  events of default.

13         The liquidation methodology is therefore part and

14  parcel of the right to terminate on account of bankruptcy,

15  to impose a methodology that would apply to bankruptcy

16  defaults that is different from the one the parties

17  specified, would be simply to rewrite the agreement.  This

18  isn't something that one can just strike and otherwise give

19  effect to the intent of the parties.

20         And for that reason, the provision is really

21  wholly unlike the procedural mechanism that was found to be

22  ancillary in Calpine, the case that Mr. Slack was

23  describing, and the only case to draw the distinction on

24  which Lehman here relies.

25         Your Honor, as Collier's explains when it's

Page 109

1    discussing Calpine, the safe harbor permits the non-

2    defaulting party to engage in self-help.  Essentially, the

3    non-defaulting party can take action itself to terminate the

4    agreement.

5            Now, what's different is that in Calpine, the

6    agreement also imposed on the debtor the requirement to sort

7    of jump through the procedural hoops that Mr. Slack was

8    describing.  And what Calpine says is that when an agreement

9    does that, imposes upon the debtor an obligation to take

10   particular procedural steps, that those provisions might be

11   set aside as ancillary and default outside the scope of the

12   safe harbor, but whether that is right or wrong.

13           What we are talking about here, are the core

14   fundamental provisions that tell you how to liquidate the

15   position.

16           So the proposition that these provisions are

17   ancillary and fall outside the scope of the safe harbor is

18   really just incomprehensible in the context of this

19   agreement.

20           And nor, Your Honor, on reflection do I believe

21   that this Court's opinion in BNY helps Lehman's position, at

22   least as I have come to understand the critical passage of

23   that decision that's at issue here.

24           Okay.  Here's what this Court wrote, "Because the

25   sections of 560 deal expressly with liquidation, termination

Page 110

1      or acceleration (not the alteration of rights as they then

2      exist), and refer specifically to swap agreements, it

3      follows that the noteholder priority provisions and

4      condition 44 do not fall under the protection set forth

5      therein."

6             Now, if that passage means as Mr. Slack argues,

7      that anything that alters a party's rights on account of

8      bankruptcy falls outside the safe harbor, then he's right,

9      the passage supports their position.  But on reflection,

10     that cannot be what that passage means since that reading

11     would essentially read the safe harbor out of the Bankruptcy

12     Code entirely.

13            And on the facts of BNY Trustee, the flip clause

14     provision importantly applied only after the swap agreement

15     had been fully liquidated.  And if what this Court was

16     saying then, look once the swap has been fully terminated

17     and liquidated, a flip clause that exists in a wholly

18     separate agreement, one that would reverse the order of

19     priority of payment of the proceeds of that already fully

20     liquidated swap is not protected by the safe harbor, then

21     that position has no application at all to this case.

22            And on that view, which I now believe must be what

23     the passage in question in BNY is holding, the decision does

24     nothing to support Lehman's position.

25            Finally, Your Honor, the implications of a holding

Page 111

1  that the safe harbor does not apply here must not be

2  understated.  I think Your Honor got at some of these points

3  in your questions to Mr. Slack.

4          ISDA itself filed an amicus brief in this case,

5  and as ISDA explained in that brief, the provisions of the

6  agreement that are at issue here are mercurially the same as

7  the provisions of the ISDA master agreement.

8          It specifies that bankruptcy is an event of

9  default, and it provides a methodology for liquidating the

10  trade when bankruptcy is the event of default.

11          Other methodologies may apply to other termination

12  events.  If we cannot apply our agreement as its written,

13  then the bankruptcy termination and liquidation provisions

14  of the ISDA master itself, constitute invalid ipso facto

15  clauses.  And ISDA's own amicus brief in this case says

16  exactly that.

17          And, you know, what everyone thinks about the use

18  of various snippets of legislative history, in the statutory

19  case that is at bottom about devising what Congress intended

20  to do, the proposition that the safe harbor provisions would

21  not permit the bankruptcy termination or liquidation

22  provisions of the ISDA master to operate as they are written

23  is really simply a bridge too far.

24          The legislative history of the safe harbor

25  provisions is replete with comments making clear that their

Page 112

1    central purpose was to allow one simply and swiftly to close

2    out a swap position in the event of a counterparty's

3    bankruptcy.

4            I think -- I'm sure I didn't write down what Your

5    Honor said perfectly, but what I believe Your Honor said was

6    something like in a question to Mr. Slack, one could argue

7    that strictly enforcing a contract as it is written is

8    important to the stability of the markets.  That is exactly

9    our argument.  The point of the safe harbors is to say, you

10   can actually enforce the agreement as it's written.

11           The conclusion that this agreement is by its terms

12   unenforceable, and therefore, we have to essentially have

13   some reformation process to figure out, well, if we strike

14   this provision, what's left of the agreement, how do we make

15   sense of it, you know, apparently they said the mid-market

16   calculation applies, but the provision of the contract that

17   required them to calculate doesn't apply, so how does this

18   work, we have to redo the deal.  Here we are now five years

19   after the bankruptcy, that is the very instability,

20   confusion, delay that at bottom whatever you think about the

21   details and the scopes of the safe harbor's at bottom the

22   type of disruption that they were trying to avoid.

23           At bottom, Your Honor, I return to a question that

24   you asked of Mr. Slack, where you said to -- what does it

25   mean to cause the liquidation other than to do in accordance

Page 113

1    with the agreement.  I don't think Mr. Slack answered that

2    question, because I don't think there is an answer to that

3    question.  What it means to cause the liquidation, to

4    protect contractual rights to cause the liquidation of an

5    agreement, is to say you can apply the contractual terms

6    that tell you how to liquidate the agreement.  And that at

7    bottom is what's safe harbored.

8             So for these reasons, maybe one other sort of

9    housekeeping point, there is no intention here to play a

10   game of gotcha.  We -- our view in terms of what's at issue

11   before the Court fundamentally the most central issue is

12   this question of statutory construction.

13            And I don't think we're here to quibble with once

14   that's resolved, I'm hopeful -- I mean, in fairness, I know

15   Your Honor has admonished the parties a number of times to

16   try to work out their differences, and the fundamental --

17            THE COURT:  That's what I do in every case.

18            MR. GOLDBLATT:  I understand.  You did so here

19   with particular force and clarity.  And I guess what I mean

20   to say is I think the central point that divided the parties

21   is this, as Your Honor puts it, difficult and subtle

22   question about the meaning of the Code.  And I think with

23   that resolved, I'm hopeful that we'd be able to continue

24   discussions and work through it, so I don't want to stand on

25   ceremony or on procedure or play gotcha, that's the

Page 114

1    fundamental issue before the Court, and that's the one at

2    bottom that we are asking the Court to resolve.

3           You know, for those reasons, Your Honor, MSHDA

4    respectfully submits that it is entitled to summary judgment

5    on Lehman's counterclaims, and that Lehman's corresponding

6    motion for summary judgment on those claims should be

7    denied.

8           THE COURT:  Thank you very much.

9           MR. GOLDBLATT:  Thank you, Your Honor.

10          THE COURT:  Mr. Slack, do you have more?

11          MR. SLACK:  Thank you.

12          THE COURT:  Before you start, I'm going to make

13   this one comment, because I know we have some other matters

14   that are on for the afternoon.  I think this may be the

15   heaviest afternoon I've had since the start of

16   sequestration.  And in the rules of the Court as they have

17   been modified to deal with the fact that personnel are sent

18   home at 5 o'clock now, and being able to stay late as we did

19   five years ago, in order to accommodate an emergency, seems

20   no longer to be feasible.

21          We need to close at 5 o'clock, more or less

22   wherever we are in this process, so those who are at the

23   back end of the calendar, I don't know how long this is all

24   going to be, may have to come back another day.  And I

25   apologize for that in advance.  Hopefully we'll get through

Page 115

1     it.

2              Now, Mr. Slack.

3              MR. SLACK:  Your Honor, I'm going to try to be

4     relatively brief.

5              I want to start with the ISDA brief that was filed

6     here.  It's not clear to me what the status of that is

7     because I think the motion that they made for an amicus was

8     not properly made and they're not here.  But I do think

9     there's two points to make to the extent, Your Honor, that

10    you consider that brief.

11             The first is, that the ISDA amicus brief says

12    something which I think is important.  That brief says,

13    quote, contrary to Lehman's suggestion, no one is arguing

14    that the early termination, calculation methodology

15    provision in this swap agreement is not an ipso facto

16    provision.

17             So at least with respect to the first issue, ISDA

18    is very clear that they agree with us, that it is an ipso

19    facto.  The question is whether it's safe harbor and

20    obviously they have their view on the safe harbor.

21             THE COURT:  Mr. Goldblatt in his argument pretty

22    much said the same thing.

23             MR. SLACK:  The second issue with respect to the

24    ISDA brief, and I point this out, because I think it's -- it

25    shows the inconsistency in the interpretation of the safe

Page 116

1    harbor here, and in the Enron case, and in the Calpine case.

2         ISDA has filed a brief in the NY case in the

3    district court, and Mr. Goldblatt was the counsel on that

4    brief.  So when ISDA filed this amicus brief, they went out

5    and hired different counsel.  They hired Cadwalader.

6         Now, Cadwalader, interestingly enough and Mr.

7    Allenberg who filed that brief on behalf of ISDA, they were

8    -- Mr. Allenberg and Cadwalader were counsel for Enron in

9    the Enron case that we've been citing.

10        And when you look at the Enron brief that Mr.

11   Allenberg filed on behalf of Enron in that case, and I'd

12   like to hand it up to the Court.  May I approach, Your

13   Honor?

14        THE COURT:  Sure.

15        MR. SLACK:  And I invite the Court obviously given

16   the time to read, you know, the entire brief, which I think

17   is helpful but I'm going to turn -- if you turn to page 8,

18   and the argument that's being made by Enron and Mr.

19   Allenberg in this brief, the interpretation, when you're

20   talking about, and I'm looking at the last sentence of

21   paragraph 20 and to 21, and I'm going to read.

22        It says, "The term contractual right as defined in

23   Section 560 of the Bankruptcy Code pertains only to the

24   right to terminate a swap agreement, and permit such

25   termination under common law, in the absence of an expressed

Page 117

1     contractual right."

2          Paragraph 21 continues, "A cursory review of the

3     swap agreement definitively demonstrates that MARDA (ph)

4     indeed has a contractual right to terminate the agreement,

5     which it, in fact, exercised pursuant to December 2001

6     termination letter.  ENA (ph) does not contest the validity

7     of this termination.  It is the act of termination that

8     Section 560 allows."

9          And, of course, that's exactly our argument today,

10    Your Honor, and it's no different than was made in the Enron

11    case and made in the Calpine case.  It is the act of

12    termination, the act of liquidation, and the act of

13    acceleration, and not any ancillary rights, not any

14    methodology or how to, but simply the act, which is safe

15    harbor.

16          THE COURT:  Okay.  I understand the argument

17    you're making.  It's with respect to an earlier version of

18    560 that didn't include the term liquidation, and you're

19    saying, if you read this brief written on behalf of a client

20    by a lawyer 11 years ago, who was also counsel for ISDA on

21    the brief that you've referenced in the current case, we're

22    a lot of steps removed from what we're talking about here,

23    but I'll grant you this.

24          Assuming that the same lawyers' advocacy from 11

25    years ago were to be applied to Section 560 as it currently

1    exists, and he would adopt the same language that it means

2    the act of liquidation, the very same issue that we've been

3    debating this afternoon exists, how can you have an active

4    liquidation that doesn't respect the contractual terms that

5    provide for the liquidation?

6             MR. SLACK:  Well, again, when you say provide for

7    the liquidation, or provide for the termination, I think the

8    missing part is, there's nothing in this case, there's no

9    provision that is preventing MSHDA or any party to

10   terminate, liquidate or calculate.

11            THE COURT:  But if you have the unfettered right

12   to liquidate, how do you do it unless you follow the

13   contract that provides for the liquidation right?

14            MR. SLACK:  You do it the same way you would do

15   any other.  What you do is you look and see if there's an

16   ipso facto clause you don't apply it.  Because the --

17            THE COURT:  Everybody admits, everybody is

18   admitting now this is an ipso facto clause.

19            MR. SLACK:  Right.

20            THE COURT:  We're now limiting -- this is getting

21   very concentrated.  All of these arguments are now funneling

22   into some words in Section 560 as it presently exists, and

23   we're interpreting those words, that's the exception that is

24   swallowing the rule, at least in this instance.

25            Because -- and we'll -- first of all, you continue

Page 119

1    with your argument, and this is something I'm not going to

2    decide from the bench today, I'm going to think about it,

3    and write on it, it's an important issue, but because we're

4    talking about Mr. Allenberg, I'm going to make an

5    observation which is in the nature of a statement that I

6    might have made at the outset, but I didn't realize it was

7    going to become an issue in this oral argument.

8             I am currently co-chair of an advisory committee

9    to the commission appointed by the ABI dealing with the

10   reform of the Bankruptcy Code.  My advisory committee is the

11   advisory committee on the safe harbors.  Mr. Allenberg is a

12   member of that committee.

13            There are other members of the committee that

14   include Harvard law professor, University of Chicago law

15   professor, professionals who are involved in this field at

16   major law firms.  And so I am involved at this moment and

17   have been for the last approximately year in a thoughtful,

18   absolutely confidential analysis of the safe harbors as they

19   presently exist, and as they might constructively be

20   modified.

21            None of what we are doing affects this question,

22   and I wanted to be very clear in making the statement, that

23   there is nothing that has happened in the advisory committee

24   that deals specifically with the issue which is before the

25   Court today, and none of that private discussion will

1    influence the outcome of this hearing.  And you've given me

2    an opportunity to make that speech.

3              And I will not allow Mr. Allenberg to lobby me.

4              MR. SLACK:  Your Honor, I want to get back to the

5    question you asked, which is, how would a party go about,

6    you know, with its expectation of the parties with respect

7    to this clause if you can't apply the methodology that's in

8    the contract.  And I would posit to Your Honor that it's no

9    different than any other ipso facto question.  Let me

10   explain.

11             With respect to 2(a)(3), 2(a)(3) is in the

12   contract.  It is a provision that's there, people can read

13   it.  And when you're talking about how would a party go

14   about dealing with its rights under an ISDA when the

15   language says that you can stop paying even if there's a

16   bankruptcy.  Well, the answer is, is where there's an ipso

17   facto, the parties have to adjust their conduct according to

18   an ipso facto clause.

19             And so here, Your Honor, I would suggest that

20   there's absolutely nothing that prevents the parties from

21   calculating.  The issue is whether you use one methodology

22   or another methodology.  Either way, there's going to be a

23   calculation.  And the parties are going to reach the end,

24   and I would suggest that what the parties need to do, the

25   same way as the parties who might be the trustees looking at

Page 121

1    a change in priority clause, or counterparties looking at

2    2(a)(3), is they have to understand that where there's an

3    ipso facto clause, you don't apply the ipso facto

4    methodology.  But you can calculate.

5              And so that's what I say, Your Honor, should

6    happen here.  A couple of other points.

7              With respect to the Calpine case, I think because

8    it's a very difficult case for MSHDA, what Mr. Goldblatt

9    says is that in that case there was some kind of an

10   imposition on the debtor, and therefore, the imposition on

11   the debtor wasn't safe harbored, but if there was no

12   imposition on the debtor it might have been.

13             I would suggest, Your Honor, that there is

14   absolutely nothing in the safe harbor that makes that

15   distinction, nor is there anything in Calpine that makes

16   that distinction.  The fact is, is that you had a clause in

17   that case which was part of the process for breaching a

18   number, and the party argued theoretically without being

19   able to comply with that two day period, they were not able

20   to reach a number to net out and liquidate or, you know,

21   their position.

22             I would say that is no different than the

23   situation here.  And so, Your Honor, the distinction that

24   they make in Calpine simply wasn't made by the case.  It

25   doesn't make any sense under the safe harbor.

Page 122

1                    Another point that Mr. Goldblatt made was, as I

2       predicted, he said while the methodology here is one

3       methodology for a couple of different events of default, and

4       earlier in his argument, he suggested that the most common

5       elements of default had a market quotation, and the less

6       common had mid-market.

7                    Now, first off, there's nothing in the record that

8       suggests that.  As Your Honor probably is aware, the ISDA

9       has eight separate triggers for events of default, two of

10      which were accepted here.

11                   There's nothing about them being more common or

12      less common than any others, and had the intention here

13      been, well, LBDP needed this mid-market, but it's gone, so

14      let's just not have a mid-market.  The parties could've

15      agreed not to have a mid-market at all, they had one

16      methodology.  But that's not what they did.  They said,

17      here's the general rule, we're going to have two exceptions

18      from that general rule.

19                   And again, it is, and I think now what I'm hearing

20      is, both ISDA and MSHDA are agreeing that that is, in fact,

21      an ipso facto clause.

22                   THE COURT:  Is it your position, Mr. Slack, that

23      it is impermissible for an ISDA form to prescribe a safe

24      harbored method of calculation to liquidate collateral in

25      situations of this sort?

Page 123

1           MR. SLACK:  I believe that if you had a provision

2     that liquid -- that was in the ISDA that had a methodology

3     for liquidating collateral, it wouldn't need to be safe

4     harbored.  So the safe harbor wouldn't come into issue.

5           The only time you -- this comes into issue is when

6     you have a change in the methodology.  And what I can tell

7     you is if you look at the credit support annex, the credit

8     support annex simply says, you know, that you can liquidate

9     collateral.  And there is no methodology for liquidating the

10    collateral, because the idea is, you can't liquidate.  So

11    there is no methodology there.

12          And that's really important because ISDA isn't

13    concerned with, and the safe harbor certainly aren't, with

14    the method.  The issue here is whether you can liquidate,

15    which is safe harbor.  And so I would say to you, there's

16    nothing, there's nothing that you have to safe harbor if you

17    had a methodology.

18          THE COURT:  Okay.  Well, let's just say that

19    there's a toggle switch, and if there's no bankruptcy, it'd

20    mid-market, and if there is a bankruptcy, it's market

21    quotation.  And it says in plain English, in the event of

22    bankruptcy, market quotation methodology will apply, and

23    that is fully consistent with the safe harbor provision of

24    Section 560.  Let's just say it said that.

25          MR. SLACK:  I would say that you reading the plain

Page 124

```
 1    words of 365(b)(1), you can't change a debtor's rights based

 2    on the bankruptcy.  And --

 3              THE COURT:  But are we really changing the

 4    debtor's rights if what we're talking about is a market

 5    based commercially reasonable means to convert assets to

 6    cash and reconcile balances?

 7              MR. SLACK:  I guess I would tell you this, Your

 8    Honor.  When you have a clause that, in fact, changes the

 9    rights, I mean, we can -- you can look at it in the

10    abstract, but the truth is, is that this clause in fact

11    changed the rights, and there's no dispute about it, of the

12    debtor in this case.

13              And hypothetically we can all talk about why

14    parties might want to have clauses like this.  There's

15    certainly nothing in the record that suggested what's going

16    on here is the parties had a rationale reason other than a

17    change in the rights of the debtor in making these kinds of

18    provisions.  The same way, frankly again, you know, you had

19    in 2(a)(3), you had a concept of a number of different

20    events of default, and you had a clause that changed the

21    rights of the debtor as a result of it.

22              It's the same thing here.  The rights are

23    definitely being changed.  And if you look at what happened

24    here, you had $20 million that's been taken out of the

25    debtor's pockets because the methodology changed here.  So,
```

Page 125

1    in fact, there was a change in the debtor's rights.  And I

2    think that's what the safe harbor, and I should say the ipso

3    facto provision, 365(b)(1) deals with.

4              THE COURT:  Okay.

5              MR. SLACK:  Thank you, Your Honor.

6              THE COURT:  Thank you.  Mr. Goldblatt, do you have

7    anything more?

8              MR. GOLDBLATT:  Very brief, Your Honor.  I mean,

9    at bottom, we appreciate all of the Court's time, and don't

10   want to take up more of it than necessary.  We think it's a

11   straight forward case.  The safe harbor protects the

12   contractual right to liquidate or terminate so that's what

13   happened.

14             THE COURT:  All right.

15             MR. GOLDBLATT:  Let me --

16             THE COURT:  If it's a straight forward case, we've

17   taken all afternoon discussing it.

18             MR. GOLDBLATT:  If I can just pose one scenario

19   that I think exposes the illogic with respect of Mr. Slack's

20   position.

21             You could imagine an agreement that said, because

22   his whole argument depends on the notion that this agreement

23   as constructed, was designed so that the debtor was worse

24   off in the event of bankruptcy.  His whole argument turns on

25   that.

Page 126

1           We don't dispute that as things turned out, the

2     bankruptcy termination provision, as it turned out after the

3     fact, had language that would leave us better off.  Imagine

4     you had an agreement that said, there are three different

5     events with three different methodologies.  And one was

6     event A, one was bankruptcy, and one was event C.  And the

7     contract said, D applies in bankruptcy, that turned out to

8     be the middle scenario.  Would you say there, but it was

9     worse than one, but better than another?  Would that change

10    the debtor's rights on account of the bankruptcy?

11          That's sort of our question, change compared to

12    what?  That doesn't mean it's not an ipso facto clause, it's

13    all triggered by bankruptcy, so it's ipso facto.  But the

14    notion that there's some baseline here, which is your

15    baseline rights, and the bankruptcy termination provision

16    changed them to make them worse just doesn't make sense in

17    this context.

18          Here, there was a provision that applied in

19    bankruptcy.  There was another provision that was different.

20    There was never a change to the bankruptcy provision, that's

21    the one that was specified.  And in order to make what is

22    otherwise a complicated matter simple, the thing to do is to

23    say, as I think the statutory language provides, where

24    there's a contractual provision, even if it's an ipso facto

25    clause that says, here's what happens in the event of

Page 127

1    bankruptcy with respect to how you liquidate or terminate

2    the provision, you can apply that agreement as its written.

3    That's a simple plain language approach to the statute that

4    avoids the market uncertainty, and I think is the outcome of

5    the statute and the law requires.

6            I appreciate the Court's time.

7            THE COURT:  Thank you very much.

8            MR. SLACK:  May I take 30 seconds and respond to

9    this?

10           THE COURT:  You can take 30 seconds.

11           MR. SLACK:  That's all I'm going to take.

12           THE COURT:  I don't have a second hand on my

13   watch, I'm just going to do what feels right.  So when it

14   feels like 30 seconds have run, you're done.

15           MR. SLACK:  No, not yet.

16           Your Honor, the argument that was just made goes

17   to whether it's an ipso facto, and there was the comment,

18   well, it is an ipso facto.  Well, if it is an ipso facto,

19   the only issue is whether it's safe harbored, and none of

20   the issues that Mr. Goldblatt just raised go to the safe

21   harbor point.  They only go to whether there was a change,

22   and i.e., whether it's an ipso facto.

23           So I think there's -- I thought I heard a

24   concession both from ISDA and MSHDA originally, and now I

25   think they're trying to say that it is an ipso facto.

Page 128

1          THE COURT:  No, I -- without extending this any

2     longer, these are my 30 seconds now, you can sit down, Mr.

3     Slack.

4          I think I've understood everybody's argument, and

5     I think it is as I stated at the outset, a subtle issue that

6     requires thoughtful attention, and I appreciate the very

7     effective briefing and oral argument this afternoon.  And

8     I'll decide this in due course, thank you.

9          MR. SLACK:  Thank you, Your Honor.

10         MR. GOLDBLATT:  Thank you, Your Honor.

11         THE COURT:  If anybody wishes to leave at this

12    point, that's fine.

13         UNIDENTIFIED:  Thank you, Your Honor.

14       (Pause)

15         MR. WIN:  Good afternoon, Your Honor, Zaw Win,

16    Weil Gotshal & Manges for Lehman Brothers Holdings, Inc.

17         The next matter on the agenda is in the adversary

18    proceeding, Lehman Brothers Holdings, Inc. versus Intel

19    Corp.  It's adversary Case No. 13-1340, and I'll turn the

20    podium over to the parties that are handling that matter.

21         THE COURT:  Thank you.

22         Oh, you're back for this one?

23         MR. GOLDBLATT:  Fortunately Mr. Buckley has the

24    lead, Your Honor.

25         MR. BUCKLEY:  Good afternoon, Your Honor, I'm John

Page 129

1   Buckley from Williams & Connolly on behalf of Intel

2   Corporation.

3           We're here on our motion to ask for a

4   determination from the Court that Count I of the complaint,

5   which is a breach of contract count is non-core, and to

6   dismiss Count II, the turnover count, and Count III, the

7   automatic stay violation count for failure to state a claim.

8           I'd like to go over some of the chronology of the

9   case.  We think it's very important, particularly important

10  in addressing the issues with regard to the turnover and

11  automatic stay.

12          THE COURT:  I'm happy to have you do that, but you

13  should assume for these purposes that I've read the papers,

14  and I have a fairly clear recollection of what I expect

15  you're about to say.

16          MR. BUCKLEY:  Okay.  Thank you.

17          So this case arises out of a corporate share and

18  purchase program, in which the issuer Intel would buy back

19  its own shares, and such corporations, of course, when

20  they're in possession of material non-public information

21  can't do that directly, so we would indirectly in accordance

22  with the provisions of the securities laws.

23          And it was in that situation that in August 2008,

24  Intel turned to Lehman Brothers of DC derivatives, also

25  known as LOTC or LOTC to accomplish the repurchase of its

Page 130

```
1   shares.  And the fundamental provisions in the agreement
2   were as follows.  That first on August 29th, 2008, Intel
3   would pay $1 billion to LOTC to LOTC, and on the same date,
4   in return, LOTC would pay $1 billion cash collateral to
5   Intel for Intel to hold.
6           THE COURT:  Can I ask you one question about this
7   because --
8           MR. BUCKLEY:  Yes.
9           THE COURT:  -- this actually puzzled me as I was
10  looking at this.  Was there actually a wire transfer --
11          MR. BUCKLEY:  Yes.
12          THE COURT:  -- in which a billion dollars went one
13  way and a billion dollars went another way --
14          MR. BUCKLEY:  Yes.
15          THE COURT:  -- or did people just say, okay, you
16  have a billion, we have a billion, let's just say that your
17  billion is my billion, and your billion is my billion?
18          MR. BUCKLEY:  No, I think the form was observed.
19  I think that in terms of the agreement, the billion dollars
20  due from LOTC to Intel is not payable until Intel had paid
21  the billion dollars to LOTC.  So I think that formally, yes,
22  there were two transfers of funds at that time.
23          THE COURT:  So there is no doubt that LOTC funds
24  were being held by your client.
25          MR. BUCKLEY:  Yes.
```

Page 131

1          THE COURT:  Okay.  That's a very helpful

2   acknowledgement.

3          MR. BUCKLEY:  Okay.  Thank you.

4          THE COURT:  For the debtor.

5          MR. BUCKLEY:  Well, I think not, but I'll get to

6   that in a minute.

7          THE COURT:  Well, I'll tell you why I think it is

8   later.

9          MR. BUCKLEY:  Okay.  Good.

10         Then in terms of how the (indiscernible) was to

11  unfold, then on -- after this exchange was made on August

12  29th, then the next important event was to be September

13  26th, when LOTC was to deliver a combination of shares and

14  possibly cash to Intel, based on a formula that was routed

15  in the average volume or the volume weighted average price

16  of Intel stock during that 21-day calculation period that

17  ended on September 26th.

18         And at that time, based on what's called the VWAP

19  formula, LOTC was to deliver cash -- I'm sorry, shares and

20  again, possibly cash.

21         Now, what in fact happened, was of course, there

22  was on August the 29th the exchange of funds, and then

23  further on September 15th, Lehman Brothers Holdings, Inc.

24  filed for bankruptcy at that time.  However, LOTC did not

25  file for bankruptcy, instead as the complaint alleges, they

Page 132

1    continued to perform under the contract, and continued to

2    acquire shares for eventual delivery to Intel.

3            Next event was September 26th, which was the end

4    of the calculation period.  And at that time, Intel sent a

5    letter to LOTC advising that based on Intel's own

6    calculation of what the VWAP had been during the calculation

7    period, Intel was owed approximately 50.5 million shares by

8    LOTC, which were due the next business day, which was

9    September 29th by the close of business that day by 4:30

10   p.m.

11           At the same time that letter, again sent on

12   September 26th, Intel noted that there had been an event of

13   default on September 15th, when LBHI which was the credit

14   support provider for LOTC under the credit support annex had

15   filed for bankruptcy, but Intel said it reserved its rights

16   in that regard.

17           On September 29th, which was the delivery date, no

18   shares were delivered, and of course, no cash was paid as

19   well.  So after 4:30 p.m. that day, Intel wrote a letter to

20   LOTC saying that, in light of the event of default which had

21   occurred September 15th and was still occurring, and in

22   light of the failure to deliver any shares or cash that day,

23   Intel was declaring an early termination date under the

24   agreement.

25           Intel went on to calculate its loss, because the

Page 133

1   agreement provided for second method and loss, not market

2   quotation, meaning that Intel was entitled, reasonably in

3   good faith, to determine the amount of its loss.  And Intel

4   did that calculation, and concluded that its loss was $1

5   billion, which among other things, was the value of the

6   shares that would have been -- that should have been

7   delivered on September 29th, as measured by the agreed price

8   in the contract, which was the VWAP price.  That is to say a

9   billion dollars applied against the VWAP price over the 21-

10  day calculation period would have resulted in a billion

11  dollars and 50.5 million shares.

12          So the loss in dollar terms was a billion dollars

13  plus the interest had accrued from the time of the inception

14  of the transaction.

15          That amount then because there had been a

16  declaration of an early termination date was then due and

17  payable from LOTC to Intel.  It was not paid.

18          So the next day, September 30th, Tuesday, Intel

19  again wrote to LOTC informing that in light of the failure

20  by LOTC to make any payment, Intel had that day, set off

21  against its losses which again it had calculated previously

22  in its letter of the 29th against the posted collateral, and

23  applied it in full.  So that the loss was a billion dollars

24  plus interest, and the collateral was a billion dollars plus

25  the interest that had accrued, so they equaled each other.

Page 134

1              So at that time, the collateral -- I'm sorry, the

2       claim that Intel had was set off fully against the

3       collateral, and the collateral was taken in and applied by

4       Intel at that time, so the collateral did not exist after

5       September 29th.

6              On October 3rd, that's when LOTC filed its

7       petition for bankruptcy.  So that's the basic sequence of

8       events.

9              Let me turn to the first ground or -- for

10      dismissal.

11             THE COURT:  Before you do that, can you explain to

12      me how your client came up with a damage calculation that

13      managed to exhaust the entire billion dollars, given the

14      fact that it's my understanding that the value of

15      approximately 50.5 million shares under the VWAP approach

16      was something materially less than a billion dollars.

17             MR. BUCKLEY:  I think Your Honor is mistaken in

18      that regard, and let me explain.

19             THE COURT:  That's why I'm asking you the

20      question.

21             MR. BUCKLEY:  Okay.

22             THE COURT:  This is your opportunity to --

23             MR. BUCKLEY:  Okay.

24             THE COURT:  -- make your first best impression.

25             MR. BUCKLEY:  Thank you.  The reason is as

Page 135

1    follows, so several reasons are the contract, why the proper

2    amount was a billion dollars.  But let me begin by pointing

3    out that the contract provided by second method and loss,

4    not for market quotation approach.

5           So that Intel was entitled to determine its loss,

6    as long as it did so reasonably and in good faith.  And

7    there were several provisions in the contract that indicated

8    that the appropriate amount of loss was $1 billion.

9           The first provision was the exposure provision in

10   the contract, which said that Intel's exposure during the

11   course of the contract would be a billion dollars.  It was a

12   fixed amount.  But as -- it would not fluctuate with the

13   market value of Intel stock, it would not fluctuate with the

14   number of shares that LOTC happened to acquire over the

15   course of its performance, instead it was fixed and constant

16   throughout.

17          And as we've explained in our submission, the

18   exposure amount represents the amount that would be payable,

19   in the event of a default under the ISDA master agreement,

20   and the context where it was a no fault default, if I can

21   use that terminology.

22          So a billion dollars was Intel's exposure

23   throughout, and the amount that it expected to be paid if

24   there were complete default on the agreement; that's one

25   provision.

Page 136

```
 1              The next provision pertains to the so-called

 2      agreed value of the shares, that is, in the event of a

 3      default, the contract provided that the shares that were to

 4      be delivered were to be valued according to what was called,

 5      this is in quotation marks, the agreed value, which was the

 6      VWAP price, so that whatever shares were to be delivered,

 7      they were not to be valued at market, what the stock market

 8      was on delivery date, but rather to the contract price, the

 9      agreed VWAP price.

10              So applying that formula, and again, we haven't

11      briefed this in detail, because it didn't seem appropriate

12      at this stage to do so, but applying that approach under the

13      agreement, leads to the conclusion that if you applied the

14      agreed price, the result is a billion dollars, and we've

15      done the calculation in our brief, and we've also

16      contemporaneously at the time, when Intel sent its notice of

17      an early termination date in calculating its loss, it did

18      the calculation as part of the complaints, and attachment to

19      the complaint as well.

20              So $50.5 million times the VWAP price, which was

21      approximately $19 a share equals $1 billion.  So that was

22      the contractually specified means of determining what the

23      value was of the (indiscernible) at that time.

24              Further, there's a provision in the default

25      remedies section of the contract that states that -- it
```

Page 137

1   might be useful for me to actually quote from this, that

2   Intel has no obligation to return the posted collateral

3   unless and until the promised shares are delivered, that is

4   the requisite number of shares are delivered to Intel, Intel

5   has a right to hold on to the collateral.

6           If you take a broader view, going back to the

7   contractual provisions themselves, this was a situation in

8   which Intel paid a billion dollars for a performance, that

9   is the acquisition of shares in the marketplace, and most

10  importantly, the delivery of those shares upon the

11  maturation of the contract.

12          Intel paid a billion dollars and got nothing in

13  return.  So it's a situation where there's been a

14  fundamental breach of the contract as well.  It paid a

15  billion dollars for shares that were to be priced according

16  to the VWAP formula, it got nothing in return.

17          So on that analysis as well, a billion dollars

18  Intel believed was the appropriate amount.  There are other

19  provisions of the contract they relied upon as well, but we

20  didn't brief them for you, at the appropriate time can point

21  them out.  But those are not the only sections of the

22  contract for which we rely.  So we think that just in terms

23  of reasonableness and good faith.  This was a reasonable

24  approach and at the appropriate time be able to justify the

25  actual calculation.

Page 138

1          But in terms of helping the Court, if I can to

2     understand what the reasoning was behind it, that was the

3     reason.

4          THE COURT:  All right.  Thank you.

5          MR. BUCKLEY:  Okay.  So let me turn to, for the

6     first question is, which is whether the breach of contract

7     claim was a core claim or not.  And I would point out to you

8     that it is not disputed that there was -- that's a default,

9     not disputed that there was a failure to deliver any shares

10    or return any of the cash.  Not disputed that Intel had a

11    right to determine its loss reasonably in good faith, and

12    it's not disputed that Intel had a right to set off its loss

13    so determine against the collateral, and not disputed that

14    it did so in full.

15         The debate here, if you will, is that the

16    plaintiffs contend that Intel did not correctly calculate

17    the amount of the loss, it overstated a loss in its view,

18    and that it took too much of the collateral, that's the

19    debate.  And they claim that that is a breach of contract.

20         So the first question we have is, is this a core

21    claim, or is it a non-core claim.  Statutorily and

22    constitutionally I would submit it's a non-core claim.

23    First looking at the statute, Section 157 there are three

24    types of jurisdiction.  There is --

25         THE COURT:  Can I --

Page 139

1           MR. BUCKLEY:  -- arising under -- I know this is

2    very familiar territory with you.

3           THE COURT:  Can I just break in?

4           MR. BUCKLEY:  Sure.

5           THE COURT:  One way to look at what you're seeking

6    to do here is to oust bankruptcy court jurisdiction and that

7    while this is a technical argument about core/non-core on

8    your first count, and an argument on dismissal of the

9    bankruptcy counts, turn over property and stay violation, if

10   you get what you're seeking as a preliminary matter, what

11   you really get is an opportunity to find a new tribunal.

12   Isn't that what you're seeking?

13          MR. BUCKLEY:  Well --

14          THE COURT:  Otherwise, why would you be doing this

15   right now?

16          MR. BUCKLEY:  For a number of reasons.

17          THE COURT:  This is forum shopping, isn't it?

18          MR. BUCKLEY:  No, it's not.

19          THE COURT:  Well, I knew you'd say that, but isn't

20   it forum shopping?

21          MR. BUCKLEY:  No, I think it's -- the statute

22   invites the motion at the outset because I think the party

23   has a right to determine and to learn what the role of the

24   Court is going to be, and it varies whether it's core or

25   non-core.  If it's a core determination, then Your Honor has

Page 140

1    the ability to enter a final judgment on these matters.

2    Non-core --

3            THE COURT:  I understand the jurisprudence, and I

4    certainly know Mr. Goldblatt knows the jurisprudence in this

5    area quite well, but the real question here is for me,

6    regardless of the disposition of your motion as to core/non-

7    core and the timing of the disposition, would you consent to

8    have this court deal with a non-core Count I, or are you in

9    fact, seeking to move this entire dispute elsewhere?

10           MR. BUCKLEY:  That is a decision to be made by the

11   client, and the client hasn't taken a decision on that right

12   now.  So what we're trying to do is to clarify what is the

13   basis for the Court's jurisdiction.  We don't contest

14   relating to jurisdiction, and all we're seeking to determine

15   is, that is the nature of the jurisdiction, that it's non-

16   core (indiscernible) jurisdiction.

17           And I said, I think the statute -- as I said at

18   the outset, it brings clarity to the proceeding, and we're

19   trying as well with respect to our motion aimed at turnover

20   and automatic stay violation, to clarify that this is claims

21   not arised (sic) under the Bankruptcy Code, which will have,

22   you know, will have consequences in terms of what the relief

23   and remedy and what the procedure is.

24           So in order to sort of define what the case is

25   about, what the nature of the jurisdiction is, what is the

Page 141

1    claim, under what is it proceeding, what is the relief

2    that's available to the plaintiffs, this is the appropriate

3    motion just to bring clarity to the situation.  It does not

4    sail to the Court that it's the -- it's Intel's intention if

5    the Court were to grant these motions to move this matter to

6    a different court.  I apologize if somehow that impression

7    is being created, but that's not a determination, that's not

8    --

9           THE COURT:  Well, it wasn't an impression created

10    as much as an inference drawn.

11           MR. BUCKLEY:  Okay.  But I can just say that the

12    client has not made any decision on that, and this is not a

13    forum shopping.  We're not trying to oust the Court, we

14    agree the Court has (indiscernible) jurisdiction.  We have

15    no problem in that, and there are many reasons why the case

16    may well remain here with the Court, even if it's only relay

17    (ph) in two jurisdictions.  So I don't want to prejudge what

18    the decision will be, if any on that regard, but I think

19    there are other reasons to bring this motion now at this

20    time, in order to learn where we are jurisdictionally and

21    where we are in terms of the claims.

22           THE COURT:  I'll try to provide that guidance

23    promptly.

24           MR. BUCKLEY:  Appreciate it.

25           THE COURT:  But let's get into the merits of the

Page 142

1    argument.

2              MR. BUCKLEY:  Okay.  So with respect to the -- the

3    question was core/non-core, clearly this is not a claim

4    brought under the Bankruptcy Code, it's brought under a

5    contract, and therefore under the state law.

6              The next, is there a rising under jurisdiction

7    here, and I think clearly there is not.  The test for that

8    was spelled out in the 5th Circuit's decision in Wood versus

9    Wood, an opinion that's widely cited by Judge Wisdom, that

10   arising in jurisdiction pertains to only those

11   administrative matters which could occur, only in a

12   bankruptcy case.

13             And, Your Honor, in your decision on the extended

14   stay case said the same that if the claim could arise

15   outside of bankruptcy, then it doesn't qualify for a rising

16   in jurisdiction.

17             This claim here clearly could arise outside of

18   bankruptcy.  It's simply a breach of contract claim, and

19   therefore, I think statutorily, it's plainly a non-core

20   case.

21             Now, what is the argument that they make for

22   saying that it is a court case, mainly because the event of

23   default was the bankruptcy of LBHI, but that I will submit

24   is irrelevant.

25             First, this claim did not arise in the bankruptcy

Page 143

1    of the counterparty to this contract, LOTC, in fact, all of

2    the events occurred well before LOTC filed for bankruptcy on

3    October 3rd.  Every event leading to the claim for breach of

4    contract, both the declaration of an early determination

5    date, and the announcement that Intel was setting off the

6    collateral and applying the collateral.  All that occurred

7    on the 29th and 30th of September, well before LOTC's

8    bankruptcy, so --

9              THE COURT:  I wouldn't call that well before.

10             MR. BUCKLEY:  Several days before, but enough

11   before.

12             THE COURT:  Four days before.

13             MR. BUCKLEY:  Right.  So it's a prepetition claim

14   that is when that matured prepetition, and matured in full

15   before LOTC's bankruptcy.

16             Let me turn to LBHI's bankruptcy.  LBHI was not a

17   party to the contract.  Its relevance here, if any, is

18   merely as the referenced entity in the credit support

19   agreement.  And it's pretty clear, I would submit in other

20   cases, particularly including his Honor's decision in

21   extended stay, that merely because the triggering event for

22   an obligation happens to be the bankruptcy of a debtor, that

23   does not make it a core proceeding.

24             An extended stay, you may recall, there was a

25   guarantee at issue there.  The guarantee was triggered by

Page 144

1    the bankruptcy of the debtor, and therefore, there was an

2    argument put forward that a claim on the guarantee had to be

3    a core bankruptcy proceeding, and Your Honor rejected that,

4    saying it was irrelevant that the bankruptcy of the debtor

5    had triggered the liability under the guarantee.

6           And if the rule were otherwise then, for example,

7    every bankruptcy filing by referenced entity under default

8    swap agreements gives rise to the argument that a contract

9    dispute between parties to the contract was -- it was a core

10   matter in bankruptcy court.  And I think bankruptcy courts

11   have been very vigilant in warning against allowing parties

12   inventively to expand the scope of bankruptcy court

13   jurisdiction by dressing up what are common law claims or

14   what are breach of contract claims, to making them appear as

15   if they're a claim under the Bankruptcy Code, or that

16   they're arising into jurisdiction.

17          So I think that that -- the relevance of the fact

18   that the triggering event was the bankruptcy of LBHI doesn't

19   change anything.

20          Turning to the constitutional issue, I think under

21   Stern v Marshall the rule is now absolutely certain, that

22   is, unless -- that is in cases like here, where the claim is

23   based on a private right, it's not a claim that can be

24   determined by a non-Article 3 court.  And a breach of

25   contract claim is squarely a claim based on a private right,

Page 145

1    so both statutorily and constitutionally, this is a non-core

2    claim, and we have to ask Your Honor to so determine that

3    the only jurisdiction here is the relating to jurisdiction.

4         If I can now turn to the Count II, which is the

5    turnover count.  And the claim here is that Intel is in

6    possession of property of the estate, which should be turned

7    over.

8         THE COURT:  Well, let me stop you for a second,

9    and harken back to that little question and answer we had

10   right at the beginning of the argument, in which you

11   clarified that as this transaction was handled from a

12   mechanical perspective, LOTC cash migrated into --

13        MR. BUCKLEY:  Right.

14        THE COURT:  -- the possession of Intel.

15        MR. BUCKLEY:  Uh-huh.

16        THE COURT:  And let's assume for the sake of this

17   discussion only, you don't have to accept the truth of the

18   proposition otherwise --

19        MR. BUCKLEY:  Uh-huh.

20        THE COURT:  -- that the grab of Intel with respect

21   to the fund although based on what you assert was a

22   reasonable and good faith determination, in fact is, just to

23   pick a number $127 million off.

24        MR. BUCKLEY:  Uh-huh.

25        THE COURT:  And that, in fact, you seized debtor

Page 146

1    property that may be 127 or 300 something million dollars,

2    depending on calculations that I've read in the debtor's

3    papers.  Aren't you, in that instance, wrongfully holding,

4    if they're right, aren't you wrongfully holding debtor

5    property, and aren't you, as a result, subject to a

6    turnover?

7            MR. BUCKLEY:  No.

8            THE COURT:  Why?

9            MR. BUCKLEY:  For the following reasons.  First,

10   as I've indicated, the contract allows for a set off, that

11   is in the event of default, Intel was entitled to calculate

12   its loss, and then to apply the posted collateral to that

13   loss, which had been so fully here.

14            If Intel miscalculated its loss, or if it set off

15   too much of the collateral, that would give rise to a breach

16   of contract claim, but it doesn't change the fact that the

17   collateral was set off against the obligation.

18            And so particularly in the context of our

19   discussion of the automatic stay, we've set forth the cases,

20   and we've also set forth the contractual provisions showing

21   that Intel had a right to do that.  And just in terms of the

22   case law with respect to set offs, the case law with respect

23   to set offs is that if a prepetition obligation is set off

24   against a prepetition debt, that terminates the debtor's

25   property interest in the property.  And that a subsequent

Page 147

```
 1    bankruptcy does not make that collateral which was set off

 2    the property of the estate, it was cited in the Quaid (ph)

 3    case, here in the Southern District of New York to that

 4    effect, and that reflects the general law with respect to

 5    set offs.

 6              If there's been sort of an over set off, too much

 7    has been set off, all that does is gives rise to a breach of

 8    contract claim, and not otherwise.  And the same law or the

 9    same principle, for example, applies in the cases of

10    foreclosure.

11              So we cited the 2nd Circuit's opinion in Rogers

12    versus County of Monroe, where there was real estate that

13    was foreclosed upon in connection with a tax lien, and there

14    was a contention that it was improper to foreclose upon the

15    property, and that the property was worth more than the

16    amount of the lien.  And the Court there said that does not

17    give rise -- does not mean that that property is the

18    property of the debtor, no.  Once there's been a

19    foreclosure, that becomes the property or the foreclosing

20    property, and the allegedly wronged party, if there was over

21    foreclosure, if you will, or wrongful foreclosure, that

22    gives rise to a breach of contract action.

23              So I think if you look at the law with respect to

24    set off, the law is very clear, and the plaintiffs have not

25    cited a single case to the contrary to question that.
```

Page 148

1          Also there are provisions in the contract itself

2     here that bear on this very question.  There were

3     restrictions initially on the types of investments to which

4     Intel could put the collateral.  But the contract says

5     clearly, that upon -- in the (indiscernible) of the default

6     remedies, those restrictions on the use of the collateral no

7     longer apply.

8          Further, under paragraph H of the credit support

9     agreement, it says, where a party has declared an early

10    termination date and invoked its remedies, that's entitled

11    -- now I'm reading from paragraph 8, from paragraph 8(a)

12    subsection I, it's entitled to, "all rights and remedies

13    available to a secured party under applicable law, with

14    respect to the posted collateral held by the secured party."

15         So all rights and remedies under applicable law,

16    and I've cited to you the law as set forth in the

17    (indiscernible) Quaid decision, that if there's a

18    prepetition obligation to the petitioning debtor, are set

19    off when it gets the other, that extinguishes the ownership

20    interest of the debtor in the property completely.

21         And there's simply no cases to the contrary.  The

22    law I think is crystal clear in that regard.

23         Let me go with respect to paragraph 8.  So that's

24    one remedy at law available to Intel under paragraph 8(a) of

25    the credit support agreement.

1           Then there's Section triple I of paragraph 8(a)

2    which says, that the right to set off amounts payable by the

3    pledge or with respect to any obligation against the posted

4    collateral.  In other words, it expressly provides for the

5    right to set up off the collateral.

6           And then lastly, and I think very significantly,

7    there's section Romanet 4 of paragraph 8(a) of the credit

8    support agreement with regard to the secured parties

9    disposition of the collateral.  It says as follows, it says,

10   that the disposition of the collateral terminates "any claim

11   or right of any nature whatsoever of the pledgor, including

12   any equity or right of redemption by the pledgor."

13          So it just cuts off the right totally as a matter

14   of contract.  The only cases that plaintiffs could conjure

15   up here were two cases involving the seizure of a vehicle.

16   It was one case involving GMAC seizure, and another case

17   also involved a seizure of a vehicle.

18          And both of the cases, there was a right of

19   redemption on the vehicle owner.  In other words, the car

20   was seized for non-payment of a loan, but there was a

21   redemption right in the contract or as a matter of state

22   law, whereas the debtor could redeem the vehicle, and the

23   debtor there was invoking those rights, redemption or had a

24   -- still had an ownership interest.

25          So we have two car cases on the one hand, against

Page 150

1    an unbroken line of authority, going back to In Re Quaid,

2    going back to all the foreclosure cases of Rogers, both 2nd

3    Circuit went back to the language I pointed to you that are

4    essentially in the contract, in the credit support annex,

5    giving Intel the right to do the set off.

6         But once -- but the law is, once a set off occurs,

7    that transfers ownership to the party that's performing the

8    set off and cuts off the ownership rights of the party that

9    previously owned any of the property.

10        THE COURT:  And is that true even if

11   hypothetically Intel was not acting reasonably and not

12   acting in good faith, and in fact, was acting with some kind

13   of evil motive to seize property belonging to LOTC?

14        MR. BUCKLEY:  It doesn't matter.

15        THE COURT:  You're saying motive and bad intent

16   and maybe even criminal conduct doesn't override this.

17        MR. BUCKLEY:  Well, criminal conduct is not

18   unalleged (ph), but --

19        THE COURT:  I'm not suggesting for a minute that

20   it could be alleged.

21        MR. BUCKLEY:  Okay.

22        THE COURT:  I'm just having a hypothetical

23   conversation with you.

24        MR. BUCKLEY:  What I'm saying is that the cases

25   don't say, well, if it's done willfully there's a different

Page 151

1     rule, or if it was done with bad faith there's a different

2     rule.  They're establishing clear lines here so that parties

3     can act accordingly, not blurry lines.

4             And the clear lines are the rule of set off.  And

5     again --

6             THE COURT:  And I'm raising the issue of wrongful

7     set off.

8             MR. BUCKLEY:  Well, wrongful in the sense it was

9     reasonable, unreasonable, or in bad faith, those are the

10    provisions of the contract.  So you'd have a breach of

11    contract claim, but there's no residual right in the

12    property once it's been set off.  It's posted as collateral,

13    it's there to be set off against, it was set off against.

14    If the (indiscernible) was misapplied, then it was breached,

15    and you have a claim for money damages under the contract

16    and whatever amount you're entitled to.

17            But what you don't have is a claim for turnover,

18    and you don't have a claim for a violation of the automatic

19    stay.  And again, diligent counsel canvassing the entirety

20    of the case law with freedom to point to any analogies that

21    they wished could come up with nothing except the vehicle

22    cases where there was a right of redemption, or by

23    contractor statute, a residual ownership interest, which is

24    not the case here because the contract rules out any right

25    of redemption.

Page 152

1           The contract says as well that Intel has all

2    rights under applicable law.  So I go back to the Quaid

3    decision, which says again, that if it's a prepetition

4    obligation, it gets a prepetition debt, but that affects the

5    transfer of the ownership of the property, and that is a --

6    if there are Bright-Line rules, that is a Bright-Line rule.

7    Otherwise, every time a creditor exercises a right of set

8    off against posted collateral, it would be open to the

9    argument that it was done in bad faith.

10           And so the right would be meaningless, because

11   people would just file bad faith actions, and alleged

12   criminal conduct, willfulness, and that would obviously have

13   an effect upon the terms of credit that the parties are

14   willing to extend, if they felt that they were not able to

15   go against the collateral per the contract, it would be very

16   unsettling I think to relationships between creditors and

17   debtors, where there was collateral posted for a reason.

18           I mean, to undermine the rule in that way would

19   make the posting of the collateral a meaningless event, and

20   would put everyone at jeopardy, particularly in the context

21   of a subsequent bankruptcy of the debtor, where people could

22   bring turnover claims or claims for willful violation of the

23   automatic stay provision, and expose the party to all kinds

24   of remedies that one never expected, including statutory

25   remedies of attorney's fees and so forth, which would be

Page 153

1    really a parade of horribles.

2            And that's why the Courts have adopted these

3    Bright-Line rules.  Let me also add that there's no

4    allegation in the complaint that post set off, post

5    application of the funds to satisfy the obligation that LOTC

6    owned Intel, that the cash collateral was kept in a

7    segregable account, that it's identifiable, that it's

8    traceable in any way.  I mean, this is cash, we're talking

9    about cash.

10           And even under the contract, even prior to the

11   invocation of default remedies, per the contract, Intel had

12   the right to commingle the cash with its own assets, so the

13   thought that it was being kept separate and apart and not

14   commingled is wrong.  It had a right to commingle.  Then it

15   exercised its right of set off, and as I've indicated under

16   the provisions of the contract, that's what entitled Intel

17   to do.

18           And if misstepped in terms of, oh, your loss was

19   less, and so forth, that isn't an answer, because the

20   ownership right was extinguished at the time of the set off.

21           With respect to turnover, I'd also point out that

22   turnover only applies where the debtors right to the

23   property is undisputed.  The overwhelming weight of

24   authority is to that effect.  There are very few cases that

25   suggest to the contrary, and that's the rule that the courts

Page 154

1    invariable file -- follow.

2            And here the complaint itself so there's a

3    controversy with regard to this very question.  In paragraph

4    73 the plaintiffs, in fact, allege that there is an actual

5    controversy between the parties regarding whether the swap

6    agreement requires Intel to return to LOTC the unlawfully

7    withheld collateral.

8            So they admit it's disputed, and we've also

9    pointed out in our papers cases to the effect that the

10   burden is on the plaintiff to show that it has an undisputed

11   claim or right to the property.

12           And in -- a well pled complaint must contain an

13   allegation that the right of the property is undisputed,

14   that's acknowledged.  And here, rather than contending such

15   a contention, the opposite is said, that there's a

16   controversy with regard to the entitlement, the plaintiff's

17   entitlement to the money.

18           I could add they're also internally having a

19   debate over how much they're entitled to.  One number

20   they've thrown out is about $127 million, the other number

21   is $300 million.  So they're expressing uncertainty as to

22   what the actual loss was, and how much they may or may not

23   be able to recover in damages under their claims.

24           All that leads to the conclusion that this is a

25   disputed claim where -- if there's still any question about

1    that, we could turn to the contract itself.

2          THE COURT:  Not necessarily a disputed claim,

3    maybe a disputed or uncertain way to calculate the claim.

4          MR. BUCKLEY:  Well, if there's -- one thing one

5    could not deny is that there's a good faith real and

6    substantial debate here over whether this collateral, which

7    has been set off and doesn't exist anymore is still somehow

8    in some kind of hypothetical sense, theoretical sense, the

9    property of the estate.

10          THE COURT:  That indeed is out there.  That's part

11    of this argument.

12          MR. BUCKLEY:  Right.  No one could deny that this

13    is a good faith dispute as to that.

14          And so we're saying in terms of turnover, there is

15    a debate, there is a dispute and turnover is not available

16    in the context where there's dispute over the claim.  It has

17    to be an acknowledged claim, because it's a summary

18    proceeding, and if there's real doubt as to whether or not

19    the plaintiffs are entitled to recover, the claim fails.

20          With regard to automatic stay, I think in my

21    colloquy with you, I think I've covered the points there.

22    The automatic stay, everything depends on the plaintiffs

23    showing that post set off, post application of the

24    collateral that that was still the property of the estate.

25    But I've pointed to you the case law with regard to set off,

Page 156

1    which is again clear case law.  I've pointed you to the

2    foreclosure cases.  I've pointed out as well that there's no

3    identifiable segregable cash separate and apart, it's not

4    alleged to be here that exists.  In any event, the contract

5    provides that Intel had all the rights under applicable law,

6    in the event of an early termination date to set off its

7    losses against the collateral, and that's what it did.

8            So for those reasons, I would ask you to dismiss

9    the turnover count, and to dismiss the automatic stay

10   violation count, and to also determine that the breach of

11   contract claim is a non-core claim, and it only relates to,

12   or comes -- arises under these sort of relating to

13   jurisdiction, not under the arising under or arising in.

14   Thank you, Your Honor.

15           THE COURT:  Okay.  Thanks very much.

16           Mr. Gaffey, I want to welcome you back to our

17   refurbished courtroom.  I bet you don't recognize it.

18           MR. GAFFEY:  I was quite surprised when I got

19   here, Your Honor.

20           THE COURT:  You barely recognized it.

21           MR. GAFFEY:  It's quite an upgrade.

22           THE COURT:  It is quite an upgrade, and I'm amazed

23   myself.

24           Before we get into your argument, I was told at

25   around 2 o'clock when I came out here, that our ECRO

Page 157

```
 1    operator has a 4:30 cut off, correct?

 2              ECRO:  Yes, sir.

 3              THE COURT:  So what I think makes sense is for us

 4    to take maybe a five minute break right now before you

 5    start, and my courtroom deputy is going to take over, and

 6    we'll be able to cover the recording of your argument, and

 7    additional proceedings through 5 o'clock.

 8              MR. GAFFEY:  Sure, Your Honor.

 9              THE COURT:  Okay.  We'll take a five minute break.

10         (Recessed at 4:14 p.m.; reconvened at 4:24 p.m.)

11              THE COURT:  I can tell you're -- oh, be seated,

12    please.  I can tell you're asking to be excused.

13              UNIDENTIFIED:  Yes, Your Honor, Mr. Gaffey said it

14    was okay if we just asked you if we could be excused.  We

15    are up next, but it looks like we'll not be able to finish

16    today or start today, so we're available to come back at the

17    next omnibus, if that's okay with Your Honor.

18              THE COURT:  That's fine with me.  And I'm sorry

19    that you had to sit through the entire afternoon, but you

20    have to admit it was pretty interesting.

21              UNIDENTIFIED:  It was.

22              THE COURT:  Okay.  I'll see you next time.

23              MR. GAFFEY:  May I proceed, Your Honor?

24              THE COURT:  Please.

25              MR. GAFFEY:  For the record, Robert Gaffey from
```

1    Jones Day for the debtor.

2           Your Honor, I'd like to start in addressing what I

3    think is my sense of what Intel is trying to achieve here

4    overall and the relationship between the three counts in the

5    complaint.

6           I'll talk a little about a few things that Mr.

7    Buckley had to say in his argument on the extinguishment of

8    the property, the alleged distinguishment of the property

9    and then moving to some details about core and non-core,

10   which I think we ought to sort of cover the realm.

11          I think overall what the Court is -- what I'm

12   seeing, and what I hope the Court sees in Intel's approach

13   to this case is an attempt to by separating its component

14   parts, dismantle it, and then call it a garden variety

15   contract suit, and then seek to have it sent away.

16          By moving for the dismissal of the turnover claim,

17   by moving for the dismissal of the automatic stay claim,

18   based on the essential premise as I understand it, that the

19   property rights of the debtor disappeared because of various

20   reasons, the contract itself or the filing of LOTC, which

21   that point alone, just by the way, disregards this Court's

22   fairly repeated pronouncements that the Lehman bankruptcies

23   are viewed as an integrated series of bankruptcies.

24          THE COURT:  I believe I used the term a singular

25   event.

Page 159

1              MR. GAFFEY:  A singular event, and that's given

2      the complexity of the bankruptcies and complexity of the

3      company, and Your Honor stressed that in Bank of New York,

4      and in Ballyrock, which were mentioned in the argument

5      earlier, and as recently as Ford Globawitz (ph), it's a

6      pronouncement the Court has made very clear.

7              The attempt to make the property disappear is an

8      attempt to turn this into a breach of contract action, and

9      then walk into cases like Your Honor's decision in Extended

10     Stay.  The fact of the matter is, the Extended Stay decision

11     while it does have the holding that Intel cites, that in

12     that case, the fact that a bankruptcy filing was a trigger,

13     what Your Honor called in that case a bad boy clause was

14     essentially incidental to everything else about that case.

15     That was a case by one non-debtor against another non-debtor

16     concerning a guarantee of the debts of the distant not

17     involved obligor, the debtor.  Very different from this

18     case.

19             Here the debtor is a party.  Here the debtor's

20     rights to its property under the Bankruptcy Code itself are

21     at issue, that's why there's a turnover claim, that's why

22     there's an automatic stay claim.

23             And a lot of what Intel does here revolves in one

24     form or another around the notion that LOTC's property

25     rights and collateral in a flat amount, it did not fluctuate

Page 160

1    over the course of the transaction magically disappeared as

2    soon as it was able to exercise its valuation of its loss

3    under the agreement.

4              And Mr. Buckley offered a few of Intel's reasons

5    for that, and I'd like to just go through a few of them.

6              One is the suggestion that the definition of

7    exposure in the agreement somehow leads to the conclusion

8    that the loss here was by coincidence exactly the same

9    amount of the entire pot of collateral that was seized.

10             Well, to use that definition as a proxy for loss,

11   is simply to write out of the agreement the fact that the

12   parties made express agreements as to how loss would be

13   measured, if and when shares were not delivered, and

14   surprisingly, that's in the definition of the word loss,

15   which is incorporated in the loss second method that the

16   parties expressly agreed to, and both parties agree that

17   that's the reason for calculating a loss.

18             It is not the measure of loss after a failure to

19   deliver by LOTC, it is merely the measure of what the

20   collateral was, and what the WVAP, what the weighted

21   variable average price mechanism was to determine not how

22   much Intel lost, but how many shares were to be delivered.

23             Once no shares are delivered, then the loss

24   calculation comes into play, and Intel has an obligation

25   under the agreement to calculate it in good faith.  The

Page 161

1    complaint alleges they did not do that, and that's what

2    needs to be litigated, and that's why it's a viable claim,

3    and that's why it can't be dismissed at this stage.

4          The open question is, is it -- did they operate in

5    good faith when they calculated loss and it happened to come

6    out to exactly the same amount as the collateral.

7          THE COURT:  Were the 50.5 million shares ever

8    delivered?

9          MR. GAFFEY:  I beg your pardon, Your Honor?

10         THE COURT:  Were the 50.5 million shares ever

11   delivered?

12         MR. GAFFEY:  No, they were not.  And that's

13   relevant.

14         THE COURT:  Isn't that a problem?

15         MR. GAFFEY:  It's a problem in the sense they

16   didn't get the shares that they were supposed to get.  It is

17   not a problem in terms of the legal analysis here.

18         When the shares are not delivered, when the shares

19   are not delivered, Intel is entitled to call an early

20   termination, and it does.  It -- but it bases the early

21   termination, it bases its call of termination on the filing

22   of LBHI.  It doesn't declare an early termination date until

23   the 29th of September.

24         The remedy that Intel is entitled to under the

25   agreement, if there is a failure to deliver the shares, is

Page 162

1    to be compensated for its loss.  Its loss is calculated by

2    loss second method, with reference to the definition of

3    loss.  Nothing in there, nothing in that contractual path

4    transforms the collateral into a measurement of Intel's loss

5    into a substitute for a good faith calculation of what its

6    loss is in the manner that the contract requires.

7              Nobody disputes here that LOTC was required to

8    deliver shares, and nobody disputes that they did not.  But

9    the issue here is, what's the appropriate measure of loss,

10   and the issue here as Your Honor I think -- the term Your

11   Honor used, I think is the right one is, was it a wrongful

12   set off.

13             Intel will suggest that this is a dispute about

14   LOTC's property rights in the collateral.  It is not.  We

15   concede their right to set off in a correct amount.  We

16   concede that that right to set off arose on the failure to

17   deliver the shares.

18             What we sue for, what we don't concede, is for the

19   excess over an appropriate set off.  This is a case about

20   wrongful seizure of the rest of the collateral, and that's

21   an amount of either 127 or $312 million depending on whether

22   the Court would ultimately take into account the blackout

23   period that prohibited Intel from purchasing.

24             THE COURT:  Let me ask you a question, which is a

25   derivative of the question I asked Intel's counsel right at

Page 163

1    the beginning.  And that is, a billion dollars moved from

2    Intel to LOTC and a billion dollars moved from LOTC to

3    Intel.  Correct?

4                THE COURT:  Yes.

4                MR. GAFFEY:  Yes.

5                THE COURT:  At the moment that they terminated the

6    agreement on September 29, and then proceeded to set off

7    either justifiable or unjustifiably as the case may be,

8    there were also out of pocket a billion dollars.

9                So one way to look at this is that they took their

10   billion dollars back.

11               MR. GAFFEY:  That's exactly what Mr. Buckley said

12   they did, and it is a way to look at it, but it's not the

13   way loss is measured under the contract.

14               The contract provides how their loss is to be

15   measured.  They get to put forth a reasonable calculation

16   under the loss second method -- mechanism of calculating

17   damages.  That's by reference to market prices.  There's no

18   provision in the contract that says, we get our original

19   price back.  There's no provision -- because, among other

20   things, it makes sense, they could mitigate.  They have an

21   opportunity to go out and buy with the money that they set

22   off, and they get the difference.

23               So it's not as if they're completely out of

24   pocket.  They have their set off rights, and it's not as if

25   the contract did not provide for how their loss would be

Page 164

1   measured.  It provides expressly for how their loss should

2   be measured.

3           So they don't need to resort to self-help, and to

4   say, well, we're just going to keep our purchase price, and

5   that's not the reason for the exchange.  As Your Honor

6   noted, there was an actual or asked and learned, there was

7   an actual exchange here, and that goes to Intel's suggestion

8   that because cash is fungible, what was collateral turned

9   out not to be collateral, and LOTC has no right to get it

10  back.

11          Well, again, the contract has provisions that cut

12  directly against that contention.  The contract provided,

13  just as you would expect with collateral, that LOTC is the

14  sole owner of the collateral.  It says that in paragraph 9

15  of the credit support annex.

16          Intel has the duty of reasonable care with regard

17  to the property while it is being held as collateral.

18  That's the credit support annex paragraph 6.  Permitted

19  investments or something you do with someone else's

20  property, they were limited, the investments they could make

21  with the collateral.  They were required by the contract to

22  report to LOTC on income earned on the collateral because

23  LOTC would have tax issues.

24          And Mr. Buckley made a point of saying that the

25  contract did not require Intel to segregate the cash.  But

1     what the contract actually says if Intel did not segregate

2     the property, it's required to maintain what the contract

3     calls separate notional accounts if it commingles the funds

4     on its own treasury records.  So it has to annotate it to

5     us.

6              Now, with regard to their argument that this

7     property is gone, it's cash, it's fungible, they rely on

8     their papers on Schrempf (ph) the Supreme Court decision

9     which involves a banking deposit.  Well, as we know, and as

10    the Court explained in Schrempf, this is -- the reason that

11    the result in Schrempf was what it was, because the

12    depositor in a bank does not have a property interest in

13    specific property or property interest at all, it has a

14    contractual right to get money on demand of the bank, that's

15    the difference between banking and depositing collateral.

16             Had that money been put in a safe deposit box, had

17    that cash been put in a safe deposit box to be held by the

18    bank pending next event, the demand of its return, wouldn't

19    have that issue.  So Schrempf just simply doesn't apply

20    here, and I think the fact that Intel has gone so far as to

21    rely on it demonstrates why they too understand this

22    argument is very weak.  They're trying to make what LOTC is

23    LOTC's property disappear.

24             And the reason they want to do that is they want

25    to translate this into where I think Your Honor's question

Page 166

1    was going, into a measurement of damages in a contract case.

2           The turnover provision is because we -- the estate

3    wants its money back.  The automatic stay claim is because

4    to the extent the collateral exceeds their loss properly

5    calculated, they are holding onto estate property in

6    violation of the automatic stay.

7           We don't, we agree, the parties agree, we don't

8    contend the automatic stay applies to that rightfully

9    withheld, but it does continue to apply to that wrongfully

10   withheld.

11          I'm not sure that addresses Your Honor's question,

12   but I think it does.  I think it goes to this point of why

13   aren't they just getting their money back, and the short

14   answer is because that's not what the contract gives them,

15   the contract gives them express remedies.

16          THE COURT:  Understood that that's your position,

17   but I was -- what I was getting at and it's beyond the

18   procedural scope of the motion to dismiss is some attempt to

19   understand the fairness of LOTC having a billion dollars,

20   having went into the -- I guess they went into the market,

21   and they acquired shares consistent with the agreement under

22   this highly structured strategy to accommodate Intel's

23   desire to purchase its own shares even though it couldn't do

24   so directly.  The shares were acquired, they were not

25   delivered.  That means that the billion dollars posted by

Page 167

1   Intel with LOTC was used to acquire shares presumably they

2   were with a billion or they were less than a billion at the

3   time that they were purchased for Intel's account.

4          So that from the perspective of LOTC's side of the

5   ledger, they have undelivered shares and to the extent

6   there's excess cash, cash.  Intel has nothing.  Except the

7   right to exercise remedies with respect to the billion

8   dollars.

9          MR. GAFFEY:  But look at what the remedy is, and I

10  think that remedy is the concern.

11         THE COURT:  My concern is that I'm going beyond

12  the scope of the motion practice here into the -- I hate to

13  even use the term equities of the case, I'm trying to

14  understand the nature of the claim that you're making,

15  because it seems as if Intel did what any ordinary course

16  party in the same circumstance would do, they took their

17  billion dollars back.

18         MR. GAFFEY:  Let's look at what Intel purchased,

19  what it bought, what it wanted, what it was entitled to get

20  out of the contract.  Intel agreed, Your Honor, that what it

21  wanted delivered to it was a certain amount of shares.

22         THE COURT:  50 --

23         MR. GAFFEY:  Not a certain value.

24         THE COURT:  50.552 million I think.

25         MR. GAFFEY:  As it turned out, it was 50.552

Page 168

1    million.  The reason it turned out it was 50.552 million is

2    the contract had a formula that said, on the termination

3    day, which here is September 26th, which is the day it was

4    to be determined how many shares it would get, you would

5    take the weighted variable average price, you would apply

6    the formula that was in the contract, it was $19 or such a

7    share on that Friday, it would tell you how many shares they

8    were entitled to get.

9            The shares were to be delivered the next business

10   day.  The next business day is Monday, the 29th.  They are

11   not delivered, no dispute about that.  What is Intel

12   entitled to under the contract, 50.552 million shares, not

13   the amount it was used to value, not the amount that it paid

14   at the beginning, but what it bargained for, 50.552 billion

15   (sic) shares.

16           By Monday, the 29th of September, the price of the

17   shares, in reference to Bloomberg, had dropped from about 19

18   bucks a share to about 17 bucks a share.  I forget what the

19   prices were.

20           What that means is, if on Monday the 29th, when it

21   did not get the 50.552 million shares it was entitled to

22   receive, on the market those 50.552 million could have been

23   bought for less than the Friday amount, and less than the

24   billion that Intel paid.

25           But what Intel paid a billion dollars for back on

Page 169

1    August 29th was the right to have an amount of shares

2    delivered to it.  It wasn't with regard to their market

3    value, it was with regard to the amount of shares.

4            If you look at the first letter that Intel sent in

5    that sequence that Mr. Buckley describes, that's what they

6    say, we're entitled to 50.552 million shares.  When they

7    write their second letter on the 29th, this is when what we

8    believe is the incorrect nature of their petition begins to

9    emerge, now they say a billion U.S. in Intel shares.  That

10   is not what they bargained for.

11           They agreed to pay a price of a billion, they

12   agreed to get an amount measured by a formula, that amount

13   wasn't delivered, their loss -- the loss mechanisms of the

14   contract will compensate them for what that specific amount

15   of shares would have cost on the 29th.

16           If you take the black-out period into account, and

17   this is again probably something that will be I hope

18   resolved here down the road, if you take out the black-out

19   period into account, what happens in between September 29th

20   and November 4th when the black-out period is lifted, is the

21   price of the shares drops even further, hence the bigger

22   difference between what it would cost to replace them and

23   the billion dollar in collateral that was deposited.

24           Now, that's a risk that Intel took.  I don't have

25   a specific answer for Your Honor as to which one to take,

Page 170

1    the 127 or the 312, but I do have a specific answer I think

2    to the question about the equities of the contract.

3           The contract provided for delivery of a specific

4    number of shares, the loss mechanism gave them the money

5    they would've needed to replace what was not delivered.

6    Those things match up equally, there's no inequity in that.

7           What Intel is attempting to do here is to be

8    opportunistic and walk past the loss measurement provisions

9    in the master agreement in paragraph 6, and instead choose

10   provisions of the agreement that are not about measuring its

11   loss, that are about measuring other things.

12          Another provision that Mr. Buckley mentioned, and

13   it has a tantalizing name, agreed value.  So that sort of

14   sounds like it ought to be a damage provision, that's not

15   what this was for.  The agreed value provision relates to

16   what value the parties would have put on hedging positions

17   had they been delivered, in terms of doing the overall math

18   it did, Intel got what it bargained for.

19          No hedging positions were delivered, that

20   provision of the contract is irrelevant.  Mr. Buckley also

21   said at one point I think that Intel was entitled to hang on

22   to the billion dollars because at paragraph H(c) of the

23   agreement.  Well, H(c) of the agreement -- and that again,

24   goes to Your Honor's equities' questions, why can't they

25   just keep the billion.

1          Well, H(c) says that after set off, after set off,

2     any proceeds, and I'm leaving out some phrases here, any

3     proceeds remaining after satisfaction in full of the amounts

4     payable by the pledger have to be returned to the pledgor,

5     LOTC.

6          Translation, you get to keep out of the billion

7     what you're entitled to in set off, but you must return the

8     rest, you must return the rest.  There's nothing in this

9     contract that says, Intel gets to keep a billion dollars.

10    It's not a liquidated damages clause, it's not a penalty

11    provision.  It's not a setting of what their loss will be,

12    it goes to Your Honor's question, they don't just get their

13    original money back.  The contract provided exactly how they

14    were to be compensated.

15         Now, one other point that I want to raise with

16    regard to the cash is fungible point, or actually to the

17    Schrempf case to Mr. Buckley's argument that the automatic

18    stay, on the turnover claims can't apply to cash.  I think

19    the Court's decision in MedAvante undercuts that.  Cash is

20    property of the debtor.  It doesn't cease to be property of

21    the debtor because it's cash or it's turned into cash or

22    it's a right to cash.  There's no magical difference.

23         So the lynch pin of their case being to try to

24    make the property disappear doesn't work.  It remains LOT's

25    property to the extent that it was withheld over and above

Page 172

1    rightful set off and it is a wrongful seizure.

2            THE COURT:  Okay.  But Mr. Buckley made an

3    argument based on a line of cases, and he said that your

4    case is only related to a couple of automobiles that when

5    you set off, as a secured party setting off, you effectively

6    obliterate the property interest of the party that had

7    pledged the collateral.

8            And he cited real estate foreclosure as an

9    example, and this is another example.  How do you overcome

10   that argument?

11           MR. GAFFEY:  I think the Court needs to look at a

12   fact that both parties agree it's so and each argue

13   differently from it, and that is the fact that the billion

14   dollar collateral pot never fluctuated over the course of

15   the transaction.

16           There are swaps similar to this where the

17   collateral is valued daily to try and make an approximate

18   what the value of the shares to be delivered would be.  But

19   here, the parties agreed it stayed at a billion dollars.

20           So in those cases where there's a right of

21   redemption, in those cases where the property is deemed to

22   be subsumed by the set off and in full, there are cases

23   where the value of the property is related to the value of

24   the loan in a mortgage case, or the loan in a car case.  The

25   value of the performance to be delivered.

Page 173

1           There's nothing in this contract, and in fact, it

2    is to the contrary, because the billion stays flat no matter

3    what happens to the value of the shares over the course of

4    the transaction, that equates the value of the collateral

5    with the value of the shares.

6           Now, that's a subpart of the bigger theme that I'm

7    pursuing here, which is that there's no -- that the billion

8    dollars is not a proxy for loss, not a proxy for damages,

9    it's not even a proxy for value of the undelivered shares.

10          It's a way to help protect Intel in the event of a

11   breach of a default of a failure to deliver, but what would

12   Intel say to Your Honor if the fact of the matter was, their

13   loss, as properly measured under paragraph 6 of the master

14   agreement exceeded a billion dollars, if share prices had

15   moved differently, and even -- a billion dollars wasn't

16   enough to cover it?

17          I find it hard to imagine Intel would be at this

18   podium saying, well, you know what, the collateral is a

19   replacement for that, and it would've been subsumed, that's

20   what we get, we don't get anymore, we don't have a claim to

21   bring.  That wouldn't be so.

22          So the fact that the collateral stays at that flat

23   level without daily marking or daily valuation to make it

24   equate the value of the collateral, I think is what that

25   makes that fair, it's the risk that everybody took.  Intel

Page 174

1    said a billion ought to do it, they knew they could set off

2    against it, if it was more, they have a right to go against

3    LOTC, but if it's less, LOTC has a right to go get back the

4    difference.  That's an equitable deal.

5              And it cuts against the cases that Mr. Buckley

6    relies on where the collateral for a loan is subsumed by the

7    failure to pay the debt in full and in total.

8              THE COURT:  Okay.  Let me ask you a slightly

9    different question.  Assume for the sake of this argument

10   that not only were the 50.522 million shares purchased, but

11   they were delivered, and that the 50.552 million shares

12   proved to have a value for the sake of argument of $900

13   million instead of a billion dollars.  Who gets to keep the

14   extra $100 million under my hypothetical that was pledged --

15   that was delivered by Intel to LOTC?

16             MR. GAFFEY:  In effect, and at the end, LOTC, but

17   because of the way -- I'm going to answer this question, the

18   whole billion goes back to the debtor, the whole billion

19   goes back.  There's no accounting done against the

20   collateral.

21             On delivery of 50.552 million shares, which is

22   what Intel was entitled to, that amount of shares, the

23   entire collateral pot is delivered back to the estate.

24             THE COURT:  I understand, but I'm actually asking

25   a different question.

Page 175

1          I'm asking what happens to any excess of the

2     billion dollars that was delivered by Intel to LOTC.

3               MR. GAFFEY:   Intel doesn't get any of that back,

4     because what Intel paid for, Intel paid a billion dollars

5     for a specific number of shares.  There won't be a true-up

6     at the end where you say, all right, what were the -- what

7     did they actually cost as against the billion I advanced,

8     that's the price.

9               THE COURT:   Okay.  So the profit in the

10    transaction from the perspective of Lehman's side is they

11    get a billion dollars, they get to use a billion dollars to

12    buy shares in the market over a period of time, and deliver

13    those shares, and then they get their billion dollars in

14    collateral back after they have performed, but they get to

15    keep -- if the market was favorable during that period of

16    time, they get to keep the excess over the actual cost of

17    buying the shares and the billion dollars that was delivered

18    by Intel, is that how this works?

19              MR. GAFFEY:   Yeah, if the market is favorable to

20    Lehman during the course of the transaction from the 29th to

21    -- of August through this 26t of September, and such that

22    Lehman is able to accumulate shares at prices so favorable

23    that it cost them less total than a billion dollars to get

24    the amount of shares that are to be delivered, it -- that's

25    the benefit of the bargain, that's what it gets to keep.

Page 176

1          THE COURT:  And what happens if it costs an extra

2     hundred million dollars to execute these trades, and it's a

3     billion one?

4          MR. GAFFEY:  Then Lehman's lost out on the trade

5     because Lehman's obligation is to deliver a shares in an

6     amount, sir.  Over the course of the transaction, it costs

7     Lehman more than the billion to accumulate the shares it was

8     required to deliver, and therefore, it doesn't do well, it

9     loses on the transaction.  That's where the risk is here.

10         THE COURT:  Okay.

11         MR. GAFFEY:  And that's why a billion flat, as

12    collateral, is not in any sense a proxy for any of these

13    things, it's just what it says, it's collateral.  The

14    billion dollars is -- that Intel pays to Lehman is the price

15    paid, the billion in collateral is to protect Intel against

16    an unrecoverable loss because it will set off rights.

17         THE COURT:  It's a nice round number.

18         MR. GAFFEY:  On core/non-core -- well, it's --

19    yes, it is a nice round number, Your Honor.

20         On core/non-core, let me just, if I may spend a

21    little bit of time on that.  As I said, I think that Intel's

22    reliance on Your Honor's decision in Bank of America against

23    Lifestone, the extended stay decision is inapt because the

24    cases are distinguishable.  And I think the fact that they

25    put so much weight on that case, demonstrates that what they

Page 177

1    really are trying to do is reconfigure this case so they can

2    call it non-core.

3            There's really no way to litigate this action

4    without dealing with the turnover provisions in 542, the

5    automatic stay provisions in 362, there -- it's a good bet

6    there will be reference to at least in factual development

7    to safe harbor provisions, because obviously there are

8    strategies related to safe harbors that would be taken into

9    account.

10           The debtor is the party here.  This is different

11   from Lighthouse where it's two non-debtors.  That case lined

12   up as non-core, there is no debtor involvement there.

13   There's just no way to litigate this case without those

14   pervasively involved Bankruptcy Code provisions.

15           They are inextricably entwined with the breach of

16   contract claim, so it's not a garden variety contract claim

17   as Intel would have it.  It's a contract claim that's

18   inextricably related to bankruptcy issues.  It is core for

19   that reason.

20           Intel says in their papers that it did not arise

21   in the bankruptcy, and to do that, it separates out the

22   filing date on September 15th, 2008 of LBHI and the October

23   3rd filing date of LOTC, but as I've said, I think that

24   that's dealt with by Your Honor's -- the position Your Honor

25   has espoused and the decisions you've made in Bank of New

Page 178

1    York and in Ballyrock and the other cases, where you've

2    addressed the singular nature of the Lehman bankruptcy.

3          THE COURT:  Well, let's deal with that, because I

4    think it's an important issue, and we didn't discuss it

5    during Mr. Buckley's argument, and I'm certainly going to

6    give him an opportunity to respond to this before the day is

7    over, although we're getting close to the end of the day.

8          I think we're talking about something different.

9    And I want to give it some more thought, but when I said,

10   and I don't remember the precise words, that the Lehman

11   filing was, in effect, a singular event, and I believe I

12   reference this in a footnote in the BNY corporate trustee

13   decision which I call perpetual, I was referencing the fact

14   that this is really one of the most unusual bankruptcy cases

15   that has ever been in part because on September 15 when LBHI

16   filed for Chapter 11 relief here, it was a completely

17   unplanned event, and the only entity that could file was

18   LBHI, and even then, it filed with incomplete papers.

19         I don't believe that Weil Gotshal at any time in

20   its history, even when it was a much smaller firm, and

21   practically a bankruptcy boutique, filed any bankruptcy

22   cases with so spare a set of first day papers.  And that was

23   a sign that we were dealing with the kind of emergency that

24   we all confronted in the weeks and months thereafter.

25         In part for that reason, I was able to articulate

Page 179

1    what I believed to be true in this instance, the filing of

2    LBHI ordained the filing of a whole bunch of other

3    affiliates that would have been filed at the very same time

4    had there been adequate opportunity to plan.

5           And that was the notion underlying what I think

6    was a footnote.  And I'm not by any means by saying these

7    things, seeking to influence any of the issues that are

8    currently being litigated in the Ballyrock case.

9           But I think it becomes very difficult for us today

10   to be talking about well, what about that gap period between

11   September 15 and October 3 as it relates to now, another

12   material date, September 29, 2008.  And contractual rights

13   that were perfected as of that moment in time, which as to

14   the counterparty were non-bankruptcy contractual rights.

15          And the essence of the Intel argument with respect

16   to non-core, as I understand it, is that if you look at the

17   calendar for 2008, you'll find that September 29 was a date

18   when LOTC was not in a Chapter 11 case.  It preceded the

19   filing by four days.

20          And so for that reason, to the extent that there

21   are contractual claims back and forth in reference to that

22   moment in time, those claims do not arise within the LOTC

23   bankruptcy case.  They arose before it.

24          And so what we're confronting here I think is the

25   question of whether or not those claims are non-core, which

Page 180

```
 1    is what they want me to tell you.

 2              MR. GAFFEY:  I absolutely agree that's what we're

 3    confronting, Your Honor.  Let me just add in a few

 4    considerations that I think go to the sequence.  As Your

 5    Honor noted in the Bank of New York decision, and I was

 6    looking to see if I had the exact language, I don't, but the

 7    Court said there, and have said in Ballyrock, they should be

 8    viewed as an integrated set, or a uniformed set, and it

 9    described that history, what you just said, it was

10    preordained that the affiliates were so closely linked with

11    Lehman would themselves file, and not long after.

12              Well, let's look at what's alleged in the

13    complaint here and what will be the facts of the case.  It's

14    not as if these two bankruptcies in reality in this deal are

15    completely separate.  The event of default is the filing of

16    LBHI, the credit support provider of the collateral is LBHI.

17              When Intel wrote to Lehman Brothers OTC

18    derivatives, and this is Exhibit 5 of the complaint, and

19    said, pursuant to the terms of the confirmation, the number

20    of shares to be delivered is 50.552943 shares and cash

21    delivery amount is zero, in other words, it came to the

22    50.552.

23              They go on to say, we note that Lehman is required

24    to deliver the number of shares at 4:30 on the 29th, and

25    then they go on to say, in light of recent events with
```

Page 181

```
 1    respect to Lehman Brothers Holdings, Inc., and its

 2    subsidiaries, and given the absence of communications from

 3    our contacts at Lehman, please let us know as soon as

 4    possible if Lehman will be performing under the terms of the

 5    confirmation.

 6              Now, that last piece is not dispositive of the

 7    concern that Your Honor has raised, I wouldn't suggest that.

 8    But I would say it's relevant to it.

 9              It's an artificial construct to look back and say,

10    because a certain of number of days exists between the 15th

11    of September when LBHI filed, and the 3rd of October, when

12    LOTC filed, they must be analyzed entirely separately for

13    the purposes of core/non-core.  Does it arise in the

14    bankruptcy?

15              With documents like this, with facts like that,

16    and with the shortness of time, and with the sentiments that

17    Your Honor has expressed in perpetual, it's arising in the

18    Lehman bankruptcies, it's arising in the set of

19    bankruptcies, albeit by some separate, although close in

20    time filings, beginning with Holdings and working through

21    the affiliates, and what the Courts say about what is core

22    and non-core those concerns are addressed.  It doesn't rise

23    or fall on some nicety of this day or that day.

24              And I think the benefit of the perpetual decision

25    is it looks in realistic terms of what realistically
```

1   happened at what this bankruptcy and set of bankruptcies

2   realistically is.  And I would suggest that that moves the

3   argument to the side of finding this to be a core

4   proceeding.

5          And again, I don't think that's a lynch pin

6   argument, I don't think it disposes of it, but I think it is

7   compelling toward that conclusion.

8          I don't think core can be at core, non-core could

9   be analyzed here without taking into account the view that

10  this is a single integrated bankruptcy.  And I know that

11  issue is being litigated, Ballyrock will go where it goes.

12  And one thing Your Honor noted in another proceeding, which

13  I remember as Ford Global, and I'm afraid I don't have the

14  quote there either, he said, apart from anything else, it

15  might not be appropriate to cite it at this stage of the

16  proceedings, there will be factual development.  We'll see

17  through discovery, we'll see through depositions how

18  involved the -- how this arose out of the bankruptcy, how

19  the real dispute here, or the defense of it arose out of the

20  bankruptcy.  It may not be a decision that needs to be made

21  now.

22          Unless the Court has other questions for me, I'm

23  prepared to sit and thank the Court for its time.

24          THE COURT:  What do you say to the argument, which

25  actually nobody has made orally today, that the bankruptcy

Page 183

1    claims relating to turnover of property and automatic stay

2    are, in fact, redundant of the first count for breach of

3    contract?

4              MR. GAFFEY:  They're not redundant, Your Honor,

5    and we addressed this in our opposition pages in a separate

6    paragraph or two.  They're not redundant if for any other

7    reason than there's very different remedies that flow from

8    it.  Breach of contract would entitle the estate to a

9    damages remedy, a finding that there's a violation of the

10   automatic stay would result in explicit orders that property

11   be turned over, two different remedies.

12             There are provisions, and I have to admit, Your

13   Honor, I forget whether it's in the automatic stay provision

14   or the turnover provision for recovery of attorney's fees.

15   So they're not redundant one or the other, they are about

16   the same thing obviously, all claims certainly in the

17   alternative are about the same set of facts, but they lead

18   to different conclusions with different enforcement

19   mechanisms, so they're not redundant in that sense.

20             THE COURT:  Okay.  All right.  Mr. Gaffey, thank

21   you.

22             MR. GAFFEY:  Thank you, Your Honor.

23             MR. BUCKLEY:  With regard to whether all of the

24   bankruptcy should be regarded as a singular event, on the

25   relevant date, as Your Honor has pointed out, LOTC was not

Page 184

1    in bankruptcy, moreover, the allegation in the complaint is,

2    that following the bankruptcy filing of LBHI, LOTC continued

3    to perform under the contract, and continued to acquire

4    shares.  So the allegation here is that notwithstanding the

5    bankruptcy filing of the ultimate parent company, LOTC

6    continued to perform, and continued to acquire shares under

7    the contract.

8             So it should be treated as a separate entity, and

9    all other relevant events with regard to the breach of

10   contract claim matured, occurred, transpired prior to the

11   bankruptcy of LOTC.  There's nothing in the breach of

12   contract claim that relates to events subsequent to that

13   filing.

14            With regard to the $1 billion collateral, is that

15   an arbitrary amount, it's not an arbitrary amount.  I mean,

16   the basic fact is that Intel transferred a billion dollars

17   to LOTC and got back collateral in the same amount, a

18   billion dollars to secure LOTC's performance.

19            Mr. Gaffey is incorrect in describing the deal the

20   contract is one where Intel at the outset decided upon its

21   specific number of shares.  It did not.  What it decided to

22   do is it wanted the billion dollars to be spent acquiring

23   Intel shares, it wanted a billion dollars' worth of Intel

24   shares.  The question was, how do you price the shares, how

25   do you determine how many shares, and the formula said,

Page 185

1    we'll value them at VWAP.  So what the number of shares

2    determined by a billion dollars divided by the VWAP price.

3               So when, under the contract, Intel would have

4    received whatever number of shares it would have been, it

5    would have been a billion dollars' worth of shares, because

6    it would have been essentially, the number of shares times

7    the VWAP price.

8               THE COURT:  So it would always be a billion --

9               MR. BUCKLEY:  It would always --

10              THE COURT:  -- it would just be -- but the number

11   of --

12              MR. BUCKLEY:  It would always --

13              THE COURT:  -- shares would vary depending --

14              MR. BUCKLEY:  Yes.

15              THE COURT:  -- on a pricing formula --

16              MR. BUCKLEY:  Right.

17              THE COURT:  -- that's prospective, and so it

18   couldn't be determined --

19              MR. BUCKLEY:  Yeah.

20              THE COURT:  -- at the onset of the agreement.

21              MR. BUCKLEY:  Right.  And the contract also

22   addressed the situation where there was we'll say partial

23   performance.

24              Let's say here on the delivery date, Lehman had

25   delivered 50 million shares, but was short a half million

Page 186

1    shares.  There will be a question of how you evaluate its

2    performance, that's where we get into the use of the term

3    agreed price.  The deliverables, that is the shares actually

4    delivered to Intel on the due date September 29th were per

5    the contract, valued at the agreed, that is the VWAP price.

6           Then there was a cash component that was also due,

7    because that was not a billion dollars' worth.  How was it

8    determined?  It was determined very simply.  You take the

9    number of shares, say 50 million at the VWAP price, you come

10   up with a value, and then you subtract that value from the

11   billion dollars.  And the shortfall would be in the form of

12   an additional payment from LOTC to Intel, to equate to a

13   billion dollars.

14          The exposure amount, which again we've cited the

15   ISDA user's guide as to what an exposure amount means under

16   an ISDA agreement, that's the amount that will be payable to

17   Intel in the event of a no fault termination of the

18   contract.  That's what it says, and we've cited it in our

19   papers.

20          One other provision I didn't have time to mention

21   before was Section 6(d)(C) of the confirmation which says

22   that under the contract Intel "shall have no obligation to

23   return any of the posted credit support until such time as

24   the early delivery amount or final delivery amount, or a

25   portion thereof, consisting of the number of shares to be

Page 187

1    delivered shall have been delivered."

2              In other words, the billion dollars was being held

3    as against the delivery of shares at the VWAP price that

4    equated with a billion dollars.  So there was a perfect

5    coherence, it was not an arbitrary amount.  It was the

6    amount that for a billion dollars, we're paying you, we're

7    getting a billion dollars' worth of shares back at the VWAP

8    price, it was perfect harmony in the use of a billion

9    dollars.  It was not some number just made up as a comfort

10   number, it was the value of the deliverable that it should

11   have been.  And that's we say a billion dollars was a

12   reasonable amount.

13             I would note Mr. Gaffey did not really address the

14   law of set off.  I cited a couple of cases.  I had mentioned

15   the Quaid case (indiscernible) we also cite, these -- the

16   Quaid case involved funds, so it was not a property

17   foreclosure, it was actual funds in the possession of the

18   creditor, applied to set off a prepetition debt, and that's

19   where the Court in that case said, it's a Southern District

20   of New York decision, to the extent a creditor sets off for

21   prepetition debt against prepetition obligation, prior to

22   the bankruptcy case having been commenced, such set off

23   does, in fact, effectuate a transfer that prevents the

24   specific property from becoming property of the estate, and

25   qed, that's the result here.

Page 188

1              And we've cited foreclosure cases by analogy,

2       we've cited other cases -- we've cited provisions of the

3       contract that lead to the same result, and I would point out

4       that one of those provisions I cited was paragraph 8(a)(IV)

5       of the credit support annex which says that in the event

6       that Intel exercises default remedies and declares an early

7       termination date, that Intel's disposition of the

8       collateral, it says, terminates the property rights of

9       Lehman, in effect, to the collateral to LOTC, and it shall

10      have no right in equity or at law of redemption.

11              So I think the wording of the contract is quite

12      clear, that's a cut off.  But it's in harmony in what the

13      common law would have provided even absent the specific

14      contractual provision in the (indiscernible) contract.

15              I know the hour is late and Your Honor is very

16      gracious in extending beyond 5 o'clock, so I just would

17      think just to wrap up with one comment about whether this is

18      core or non-core.

19              The test is the same one that you stated in

20      Extended Stay for arising under.  Could this claim exist

21      outside of the bankruptcy world, clearly it could, and

22      there's nothing about this claim, if the set off was

23      excessive, you miscalculated the loss, and so forth, you

24      took too much collateral, there's nothing in bankruptcy

25      specific or unique about that.  And therefore, it fails the

Page 189

```
 1   test under the statute.

 2            But even beyond that, if you look at Stern -- the

 3   Stern decision.  There, the Supreme Court laid down a very

 4   clear rule about the nature of the claim being the

 5   determinant.  That is, the nature of the claim is what

 6   matters.  And where it's a matter of private right then,

 7   it's not a matter for a non-Article 3 court to render a

 8   final judgment on.  So in other words, it's a non-core case.

 9            And in the monograph put out by the American

10   Bankruptcy Institute, views from the bench, Your Honor was I

11   noticed one of the participants, we've cited it in our

12   papers and attached it as an exhibit --

13            THE COURT:  It's shocking to see stuff that I've

14   done cited back to me.  I guess I was --

15            MR. BUCKLEY:  Well --

16            THE COURT:  -- doing views from the bench that

17   year, and I'm doing them again this year.

18            MR. BUCKLEY:  I think you'll find some comfort in

19   what was said in the monograph is consistent with what all

20   the courts have said with regard to what the impact of the

21   Stern case was.

22            And that is, cases before it, for example, like

23   United States Lines has been turned on its head by Stern,

24   and it doesn't matter how important the claim might be to

25   the administration of the bankruptcy estate, it's the nature
```

Page 190

1    of the claim that controls or is it a matter of private

2    right, then that's a non-core claim, as a matter of

3    constitutional law.  That's what we argued here.

4            With regard to loss, I'll just add one

5    clarification.  Loss is different from market quotations, so

6    you can have two different systems.  Market quotation, you

7    go out and you try to get bids from the market.  Loss

8    doesn't look to market quotation.  Loss allows here, the

9    creditor, the secured party to determine its loss, as long

10   as it does so reasonably in good faith, it can apply any

11   system or any approach that it wants.

12           Aside from all the technical aspects of the

13   contract I've given you, this boils down to a very simple

14   matter, and Your Honor I think began his inquiry with Mr.

15   Gaffey with making the same point.

16           You know, Intel did not give something in exchange

17   for nothing.  Intel gave a billion dollars for a billion

18   dollars' worth of performance, and that VWAP times number of

19   shares equals a billion dollars.  It got nothing back.

20           So this is a case where you would say it was a

21   fundamental breach of the agreement, and even under

22   principles of restitution, which could apply under a loss

23   analysis because it would be reasonable to apply restitution

24   principles, when there's been a complete failure of

25   performance.  I gave a billion dollars, it went into a black

Page 191

1    box, I don't know what happened, I got nothing out of it.

2    One it's entitled to restart and get the billion dollars

3    back, the billion dollars that you gave and you got nothing

4    in exchange, and you can look to the collateral.  That's why

5    it's there, to secure that performance.  Thank you, Your

6    Honor.

7              THE COURT:  Thank you very much.  Mr. Gaffey, do

8    you have anything more?

9              MR. GAFFEY:  Just one thing, Your Honor.  I just

10   got nothing back, it has a billion dollars, 800 -- we agree

11   they have a right of set off, they got plenty of that, I

12   just don't want to end the argument with the notion that we

13   have both billions.  They are -- they set off their loss, so

14   I --

15             THE COURT:  I know you don't have both billions.

16             MR. GAFFEY:  Okay.  Thank you, Your Honor.

17             THE COURT:  But you do have the first billion plus

18   to the extent that you performed by going into the market

19   and acquiring shares that were worth something at the time,

20   and are probably worth more today, sounds like it balances

21   out to me.

22             MR. GAFFEY:  But part of the balance is, they have

23   the collateral, and they have a right to set off.  It's not

24   something for nothing.  The question is how much their loss

25   is and you measure that by loss under paragraph 6.

1          THE COURT:  I understand.  What we have before the

2    Court today is a purely procedural question that doesn't go

3    to the merits, and we've been addressing the merits in ways

4    that have been informative to me, but in no way will

5    influence the decision on the procedural questions

6    presented.  I think there's sufficiently complicated, that

7    while I could take a stab at a bench ruling right now, I

8    think it makes better sense for me to take this under

9    advisement.

10         Meanwhile the parties recognize that this is not a

11   dispositive motion to dismiss in any event, but merely a

12   motion designed to trim two counts, and to declare that the

13   first count is non-core, that means the parties will be

14   dealing in this forum or some other forum in any event with

15   the fundamental issues that are presented by the complaint,

16   and I presume as a result that while awaiting this decision,

17   you'll proceed to handle the case in a responsible manner,

18   and deal with discovery and such issues.

19         And I believe that -- is there a discovery

20   stipulation?

21         MR. BUCKLEY:  Discovery is moving ahead.

22         MR. GAFFEY:  It's afoot.

23         THE COURT:  It's afoot.  That's fine.

24         MR. GAFFEY:  It's afoot or ahead one or the other.

25         THE COURT:  Well, it's -- that's fine.

Page 193

1          So I appreciate the argument and the time that

2   everybody's been here today.  It's been a long day for all

3   of us, especially for me, having been here from 10 o'clock

4   on Lehman matters.  And I think it's a suitable way to

5   recognize the fifth anniversary of the filing.  The case has

6   not gone away.

7          And with that, we're adjourned and I'll provide a

8   ruling in due course.

9   (Proceedings concluded at 5:16 PM)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                            I N D E X

2

3                            RULINGS

4                                               Page       Line

5     Motion of Retirement Housing Foundation and

6     Its Affiliates for a Determination that the

7     Automatic Stay Does Not Bar Commencement of

8     Certain Litigation Against the Debtors

9     related to Post-Petition Claims and/or

10    Granting Relief from the Automatic Stay to

11    Permit Commencement of Such Litigation; and

12    Separately, to Grant RHF Relief from the

13    Automatic Stay to Litigate the Tort Claim in

14    the California State Court [ECF No. 39291]     46          2

15

16    Motion of RBC Dominion Securities Inc. to

17    Compel Lehman Brothers Holdings, Inc. to

18    Reissue Checks for Allowed Claim [ECF No.

19    39062]                                         66          5

20

21    Trustee's Motion to Establish Supplemental

22    Procedures for Remaining Customer

23    Distributions Pursuant to SIPA Section

24    78fff-(2)(b) [LBI ECF No. 7144]                69          6

25

Page 195

1                    C E R T I F I C A T I O N S

2

3    I, Dawn South and Sheila Orms, certify that the foregoing

4    transcript is a true and accurate record of the proceedings.

5        Dawn            Digitally signed by Dawn South
                         DN: cn=Dawn South, o, ou,
6        South           email=digital1@veritext.com,
                         c=US
7                        Date: 2013.09.20 15:07:20 -04'00'

8    AAERT Certified Electronic Transcriber CET**D-408

9

     Dated:  September 20, 2013

10       Sheila          Digitally signed by Sheila Orms
                         DN: cn=Sheila Orms, o, ou,
11       Orms            email=digital1@veritext.com,
                         c=US
12                       Date: 2013.09.20 15:08:00
                         -04'00'

     Signature of Approved Transcriber

13

14

     Veritext

15

     200 Old Country Road

16

     Suite 580

17

     Mineola, NY 11501

18

19

20

21

22

23

24

25