## STIPULATION OF FACTS

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
In re                                              Chapter 11 Case No.

LEHMAN BROTHERS HOLDINGS INC., *et al*.,           08-13555 (JMP)

                               Debtors.            Jointly Administered

----------------------------------------------------------------x


## STIPULATION OF FACTS REGARDING RSUs AND CSAs, INCLUDING THE TAX AND ACCOUNTING TREATMENT OF RSUs AND CSAs, WITH RESPECT TO DEBTORS' OMNIBUS OBJECTIONS TO PROOFS OF CLAIM


## RECITALS

A.      Between December 7, 2010 and August 24, 2012, Lehman Brothers Holdings Inc.

("LBHI") and certain affiliated Debtors, as debtors and debtors in possession herein

(collectively, the "Debtors"), and LBHI as Plan Administrator (the "Plan Administrator"), under

the *Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its*

*Affiliated Debtors* (the "Plan") for certain entities in the above-referenced chapter 11 cases, filed

fourteen Omnibus Objections to Proofs of Claims for bonus or commission compensation during

the years 2003 and 2008 as to which many claimants were granted Restricted Stock Units and

Contingent Stock Awards (collectively, the "Omnibus Objections").[1]  The Omnibus Objections

---

[1]   The Omnibus Objections are: Debtors' Seventy-Third Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 13295]; Debtors' One Hundred Eighteenth Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 15666]; Debtors' One Hundred Thirtieth Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 16115]; Debtors' One Hundred Thirty-First Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 16116]; Debtors' One Hundred Thirty-Third Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 16530]; Debtors' One Hundred Thirty-Fourth Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 16532]; Debtors' One Hundred Thirty-Fifth Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 16808]; Debtors' One Hundred Seventy-Sixth Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 19392]; Debtors' One Hundred Eighty-Fifth Omnibus Objection to Claims (Compound Claims) [ECF No. 19714]; Debtors' Two Hundred

seek to reclassify these claims as equity interests and/or subordinate them to the claims of general unsecured creditors. The claimants who oppose the Omnibus Objections and still have claims pending on the Omnibus Objections are referred to herein as the "Claimants" and their claims, to the extent subject to the Omnibus Objections, are referred to herein as the "Claims."

B.    On August 27, 2012, the Court entered an Order Establishing Discovery Procedures (ECF No. 30421), amendments to which were entered on November 28, 2012 (ECF No. 32386) and February 13, 2013 (ECF No. 34583) (collectively, the "Discovery Procedures Order"). The Claimants who are party to this stipulation are "Participants" as defined in paragraph 3(b) of the Discovery Procedures Order.

C.    Section 11 of the Discovery Procedures Order provides for a Rule 30(b)(6) deposition by Participants of LBHI.[2] A notice for the Rule 30(b)(6) deposition was served on April 22, 2013 (the "Rule 30(b)(6) Notice"). LBHI served a response to the Rule 30(b)(6) Notice on August 16, 2013. The matters set out under the Rule 30(b)(6) Notice on which testimony is sought primarily relate to the tax and accounting treatment of the RSU/CSA Awards (defined below).

D.    The parties hereto have agreed to stipulate to the facts set forth herein in lieu of examination on these subjects at the Rule 30(b)(6) deposition (the "Stipulation"). The parties agree that upon the execution of the Stipulation, the sole topics that will be covered at the Rule

---

Seventh Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 20012]; Three Hundred Thirteenth Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 28433]; Three Hundred Fourteenth Omnibus Objection to Claims (Late-Filed Claims) [ECF No. 28435]; Three Hundred Nineteenth Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 28777]; and the Three Hundred Forty Seventh Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 30357].

[2] Federal Rule of Civil Procedure 30(b)(6) allows a party to notice the deposition of a public or private corporation, a partnership, an association, a governmental agency, or other entity, and the entity is then to designate an agent or other person to testify about information known or reasonably available to the organization.

-2-

30(b)(6) deposition or addressed in a separate stipulation will be the treatment of RSUs and

CSAs by Lehman for balance sheet purposes and/or in Lehman's financial statements (Subject

for Examination No. 1(v) and No. 3), and the RSU and CSA claims that were included in the

settlement of inter-company claims between LBHI and LBI on or around February 21, 2013

(Subject for Examination No. 6).  The Stipulation and the facts set forth herein are without

prejudice to, and shall not preclude any party from presenting, any other factual points or any

legal arguments under applicable state or federal law in briefing or other papers in support of or

opposition to the Claims.

E.    While the Stipulation identifies facts that are uncontested by the parties and the

parties have agreed that the Court may consider as evidence the facts set forth in this Stipulation

and all documents attached to this Stipulation in connection with the Omnibus Objections, the

Stipulation does not constitute an admission that these facts or documents are material or

relevant to the resolution of the Omnibus Objections.  Thus, LBHI and the Participants do not

waive, and expressly reserve, any objection to the relevance or weight of the facts cited herein.

## <u>STIPULATED FACTS</u>

1.    The Claims for compensation as to which Restricted Stock Units

("<u>RSUs</u>") and/or Conditional Stock Awards ("<u>CSAs</u>") were granted pertain to the years 2003-

2008.  The Claims for compensation as to which no Restricted Stock Units or Conditional Stock

Awards were granted pertain to the 2008 fiscal year (All Restricted Stock Units and Conditional

Stock Awards concerning the Claims are referred to herein collectively as the "<u>RSUs /CSAs</u>"

and the RSUs/CSAs that are the subject to the Claims are referred to herein as the "<u>Claimants'</u>

<u>RSUs/CSAs</u>").  For years 2003-2008, bonus eligible (salaried) and production-based

(commissioned) Lehman employees in the United States were granted the RSUs, and for

-3-

overseas employees the CSAs, as a portion of the total compensation for services they performed

as employees (the "RSU/CSA Award").

2.    The 2008 "Guide to Working at Lehman Brothers" ("the U.S. Employee

Handbook") stated:

> At the Firm's option, a portion of [an employee's] total
> compensation (combined base salary, bonus and other
> compensation) may be payable in the form of conditional equity
> awards (restricted stock units ("RSUs"), stock options, or other
> equity awards) pursuant to the Firm's Equity Award Program.

LEH-RSU 0000300.[3]  The Employee Handbook for UK Employees similarly stated:

> At the Firm's discretion a portion of your total compensation under
> any discretionary bonus award may be made in the form of
> Contingent Stock Awards (CSAs) under the appropriate Lehman
> Brothers' Stock Award Program.

LEH-RSU 0001552.  Moreover, in cases where Lehman had an employment contract with a

Claimant, those contracts provide that at Lehman's discretion, a portion of the employee's

compensation may be or will be paid in RSUs or CSAs.  For example, one contract states:

> At the Firm's option, a portion of your total compensation
> (combined base salary, bonus, and other compensation) may be
> payable in the form of restricted stock units pursuant to the Firm's
> employee Stock Award Program.

Exhibit 1 (LS CLMT-RSU 5-6) (sample contract with a Claimant with identifying information

redacted).  Another contract states:

> At the Firm's discretion, a portion of your total 2007, 2008 and
> future years' total compensation (combined base salary, bonus and
> other compensation) will be payable in conditional equity awards
> (restricted stock units and/or other equity awards) pursuant to the
> Firm's employee equity award program as then in effect.

---

[3] Documents that are not referenced by Exhibit number have not been attached to the Stipulation.  However, copies
will be provided to the Court upon request.

US_ACTIVE:\44282210\18\58399.0011

Exhibit 2 (S&S CLMT-RSU 000296-97) (sample contract with a Claimant with identifying information redacted).

3.    LBHI's Consolidated Financial Statement for FY 2003, contained in its 2003 Annual Report on SEC Form 10-K, stated that "[e]ligible employees receive RSUs as a portion of their total compensation in lieu of cash," that "[t]here is no further cost to employees associated with the RSU awards," and that the awards "generally convert to unrestricted freely transferable Common Stock five years from the grant date."[4]   LBHI's Financial Statements for FY 2004 through FY 2007 similarly stated that "[e]ligible employees receive RSUs, in lieu of cash, as a portion of their total compensation," that "[t]here is no further cost to employees associated with RSU awards," and that the awards "convert to unrestricted freely-transferable common stock five years from the grant date."[5]

4.    Attached as Exhibit 3 (LEH-RSU 0015888-15902) is a true and correct copy of a brochure entitled "2003 Equity Award Program [for] Senior Vice President," which describes the Program for 2003, including the issuance of and the tax treatment of RSUs and Stock Options (the "2003 U.S. SVP Brochure").  The descriptions in this Brochure summarized below were not materially changed during the years 2003 through 2008.

5.    A grant of an RSU or CSA "represent[ed] a conditional right" for an employee "to receive one share of Lehman Brothers common stock five years after the RSU [or CSA] is granted, assuming continued employment with the Firm," subject to the terms of the

---

[4] LEH-RSU 0005539-0005634, 0006434-0006487 (LBHI 2003 Annual Report) at LEH-RSU 0005603 (Consl. Fin. Stmts., Note 15 at p. 95).

[5] LEH-RSU 0005635-0005671, 0006279-0006432 (LBHI 2004 Annual Report) at LEH-RSU 0006396 (Consl. Fin. Stmts., Note 16 at p. 116); LEH-RSU 0005672-0005697, 0005994-0006133 (LBHI 2005 Annual Report) at LEH-RSU 0006097 (Consl. Fin. Stmts., Note 14 at p. 102); LEH-RSU 0005698-0005719, 6135-6277 (LBHI 2006 Annual Report) at LEH-RSU 0006244 (Consl. Fin. Stmts., Note 15 at p. 109); LEH-RSU 0005832-0005992 (LBHI 2007 Annual Report) at LEH-RSU 0005958 (Consl. Fin. Stmts., Note 12 at p. 125).

Lehman Brothers Equity Award Program (the "Program").  *See* Exhibit 3 (2003 U.S. SVP Brochure) at 1.  The date that an RSU or CSA is granted is referred to herein as the "Grant Date."  The date that an RSU or CSA converts to LBHI Common Stock is referred to herein as the "Conversion/Issuance Date."  The Conversion/Issuance Date was a fixed date that Lehman employees could neither accelerate nor defer.  None of the Participants' RSUs or CSAs (other than RSUs issued as Neuberger Berman retention bonuses) had reached their Conversion/Issuance Date at the date this proceeding was commenced.

6.    The 2003 U.S. SVP Brochure states:

> Each RSU represents the conditional right to receive one share of
> Lehman Brothers common stock five years after the RSU is
> granted, assuming continued employment with the Firm.  On
> November 30, 2008, the restriction period will end, and you will be
> entitled to receive one share of Lehman Brothers common stock
> for each vested RSU you hold at that time.  Once your RSUs
> convert to common stock, they become freely tradable.  The RSUs
> cannot be sold, traded, pledged, or assigned before conversion.

*Id.* at 1.

7.    The conversion of RSUs and CSAs and receipt of LBHI common stock (other than RSUs issued as Neuberger Berman retention bonuses) was subject to the RSU/CSA grantee's fulfillment of certain employment-related conditions during this five-year period.  Lehman employees were advised that if these conditions were not fulfilled, the RSUs or CSAs would be forfeited and canceled.  Attached as Exhibit 4 (LEH-RSU 0015051-54), Exhibit 5 (LEH-RSU 0014329-32), Exhibit 6 (LEH-RSU 0000108-111), Exhibit 7 (LEH-RSU 0017757-61), Exhibit 8 (LEH-RSU 0000278-82), Exhibit 9 (LEH-RSU 0007228-31), Exhibit 10 (LEH-RSU 0001054-57), Exhibit 11 (LEH-RSU 0001082-85), Exhibit 12 (LEH-RSU 0019153-58) and Exhibit 13 (LEH-RSU 0000263-68) are true and correct copies of sample grant agreements from 2003 through 2007, identifying the employment-related conditions applicable to those grants.

-6-

8.      LBHI has conducted a review of its records and has not found evidence that the RSUs or CSAs granted to the Participants during the years 2003-2008 have been forfeited, as reflected on the Compensation Summaries that LBHI produced to the Participants in its Initial Disclosures pursuant to paragraph 4(b) of the Discovery Procedures Order.

9.      The U.S. SVP Brochure also noted that "[u]pon conversion to common stock, the fair market value of the shares [would] be taxed as employment income based on the closing price of Lehman Brothers common stock on the conversion date." *Id.* at 11.  The U.S. SVP Brochure also states that "[w]hen [stock] options are exercised, the difference between the Fair Market Value on the exercise date and the option exercise price will be taxed as employment income." (*id.* at 11).

10.      The terms of the Program were approved by the Compensation and Benefits Committee (the "Compensation Committee") of LBHI's Board of Directors (the "Board of Directors"), including any percentage or amount of the employees' compensation that would be paid in RSUs or CSAs (which varied from year to year) and the Grant Date for the related awards.  Employees could not elect to receive cash instead of the awards, and the terms of the Program could not be changed or varied without approval of the Compensation Committee. Various grant agreements from 2003 through 2007 with respect to RSUs state, "[t]he validity, construction, interpretation, administration, and effect of the Plan, and of its rules and regulations, and rights relating to the Plan and to this Agreement, shall be governed by the substantive laws, but not the choice of law rules, of the State of Delaware."  *See. e.g.,* Exhibit 4 at LEH-RSU 0015053; Exhibit 5 at LEH-RSU 0014331; Exhibit 6 at LEH-RSU 0000110; Exhibit 7 at LEH-RSU 0017660; Exhibit 8 at LEH-RSU 0000281.  Various award letters from 2003 through 2007 with respect to CSAs state, "[t]he validity, construction, interpretation,

administration, and effect of the Plan and of its rules and regulations and rights relating to the

Plan, and of this Letter and rights arising under it, shall be governed by the substantive laws, but

not the choice of law rules, of the State of Delaware, United States of America." *See, e.g.,*

Exhibit 9 at LEH-RSU 0007230; Exhibit 10 at LEH-RSU 0001056; Exhibit 11 at LEH-RSU

0001084; Exhibit 12 at LEH-RSU 0019156; Exhibit 13 at LEH-RSU 0000266.

      11.    In a description of 2007 amendments to outstanding equity awards, dated

November 15, 2007, Lehman explained to employees:

> New tax rules under Internal Revenue Code Section 409A
> governing deferred compensation have recently come into effect
> which impact awards granted under the Firm's Equity Award
> Program.  In order to comply with these new tax rules, the Firm
> has made changes to equity awards including Restricted Stock
> Units ("RSUs"), Contingent Stock Awards ("CSAs"), Conditional
> Equity Awards ("CEAs") granted from 2003 through the present
> and stock options granted from 2000 through the present.
>
> These changes, which primarily impact the timing of delivery of
> shares under certain circumstances . . .have been made with a view
> to assuring compliance with these new tax rules while preserving
> the original terms of the awards to the fullest extent possible.  If
> outstanding awards were not amended to comply with these rules,
> severe tax consequences – including excise taxes, penalties, and
> interest – could result to employees.

*See* LEH-RSU 0008108.  Further down on the page, Lehman explained the RSU/CSA/CEA

Amendments will "Clarify those types of bankruptcies which may result in 'Bankruptcy

Acceleration Events,' generally resulting in the acceleration of delivery of shares." *Id.*

      12.    Near the end of the years 2003 through 2008, LBHI announced to its

bonus eligible (salaried) and production-based (commissioned) employees what portion, if any,

of their compensation would be paid in RSUs/CSAs.  From 2003 through 2007 the Grant Date

occurred in late November or early December.  In an email dated July 2, 2008, Lehman stated

that changes to the Equity Award Program included "[g]ranting an equity award on July 1"

-8-

which was "meant to be an 'advance' against any full-year equity award [the employee] may receive as part of [his/her] 2008 total compensation."  *See* LEH-RSU 0014376-77.

13.    During the years 2003 through 2008, any amount of compensation that was to be paid in RSUs and CSAs was communicated to employees via face-to-face communications, and the general terms for grants of such RSU/CSA Awards were communicated to employees firm-wide via face-to-face communications, conference calls, the online bonus system "LehmanLive" (the Firm's internal computer network), and/or electronic mail.  During each of these years, preprinted packets of information containing a "Dear Colleague" letter, a summary of the material terms, and a brochure were distributed to employees.  Lehman employees were required to participate in the Program by virtue of their employment with Lehman and the implementation of Equity Award Programs by the Board.  Thus, there were no election or enrollment forms for participation in the Program.

14.    Near the end of each fiscal year 2003 through 2008, bonus-eligible (salaried) and production-based (commissioned) employees typically received a brochure with a schedule attached identifying any percentage and/or amount of an employee's bonus or commissions that would be paid in RSUs and CSAs for those years, which was based on the level of compensation and corporate title held by the employee (the "Grid").  Attached as Exhibit 14 (LEH-RSU 0000927-942) is a true and correct copy of a brochure entitled, "Questions and Answers for Bonus-Eligible and Production-Based Employees," dated July 1, 2008, which was distributed to employees in the United States (the "2008 RSU Q&A").  Exhibits B and C of the 2008 RSU Q&A (at LEH-RSU 000938-39) are examples of the Grid used for bonus-eligible and production-based employees, respectively.  Overseas employees granted CSAs typically received a similar brochure, also attaching a Grid for salaried and production-based employees.  Attached

as Exhibit 15 (LEH-RSU 0000911-926) is a true and correct copy of a brochure entitled,

"Questions and Answers for Bonus-Eligible and Production-Based Employees," dated July 1,

2008, which was distributed to employees overseas (the "2008 CSA Q&A").  Exhibits B and C

of the 2008 CSA Q&A (LEH-RSU 000922-23) are examples for bonus-eligible and production-

based employees.

15.    The U.S. Employee Handbook states that employees were paid on a "total

compensation" basis.  *See* LEH-RSU 0000300.  The U.S. Employee Handbook also states that,

"Total compensation may include base salary, cash commissions, overtime, bonus payments,

conditional equity awards (in accordance with the Lehman Brothers Equity Award Program),

and other compensation."  *Id.*  Typically, a salaried employee based in the United States was

given at or near year-end a standard form document prepared by LBHI entitled "200_ Total

Compensation Statement."  These statements set forth the employee's total compensation for that

year, which was stated to include a salary and bonus.  The statements also identified any portion

of the bonus to be paid in RSUs or CSAs.  The following is an example of the information

contained in a Total Compensation Statement issued for an employee in the United States during

the years 2003 through 2008.  The line items listed under "Compensation Type" were:

| | |
|---|---|
| Annualized Salary | $200,000 |
| Bonus | $900,000 |
| TOTAL COMPENSATION | $1,100,000 |

Lower on the page, the employees were provided with a "Payment Schedule" showing the

amount of the bonus to be paid in RSUs.  Continuing the example, the line items were:

| | |
|---|---|
| Bonus | $900,000 |
| Less RSUs | ($235,000) |
| Total Cash Payment (Before Taxes) | $665,000 |

US_ACTIVE:\44282210\18\58399.0011

Attached as Exhibit 16 (S&S CLMT-RSU 000124) is a true and correct copy of a sample of a

Total Compensation Statement (with identifying information redacted).

16.    Salaried employees stationed overseas during the years 2003 through 2008

were provided the similar information in a "Total Compensation Statement," but in a slightly

different format.  Those compensation statements contained a "Total Compensation Summary"

with the following information:

|  | GBP |
| --- | --- |
| Paid Salary | 100,000 |
| Total Bonus | 134,600 |
| Total Compensation | 234,600 |
| Total Bonus | 134,600 |
| Total Equity Award | 31,953 |
| Net Bonus Award | 102,647 |

For a sample of the Total Compensation Statement (with identifying information redacted) used

for overseas employees, *see* Exhibit 17 (S&S CLMT-RSU 000046).

17.    For the years 2003 through 2008, a production-based employee had a

portion of his/her monthly Total Sales Compensation (*i.e.,* the employee's gross commissions)

allocated to a future grant of RSUs.  Typically, each production-based employee could access

his/her compensation statement on an internal Lehman website called "LehmanLive."  The

compensation statement identified, among other things, the employee's total "Gross Production"

per month, his/her "Total Sales Compensation," the portion of  that compensation to be paid in

cash referred to as "Cash Commissions," and the portion to be paid in RSUs granted near the end

of the year, referred to as "Equity Accrual Calculated."   As illustrated by the attached Exhibits

18 and 19, the term Total Sales Compensation (fifth line from the bottom) was used to describe

the total of Cash Commissions plus Equity Accrual Calculated.  *See* Exhibits 18 and 19 (sample

compensation statements with identifying information redacted).

18.       Near the end of each fiscal year through and including 2007 (but

excluding fiscal year 2008), the total amount of the Equity Accrual Calculated for each of the

pay periods in that fiscal year was typically awarded to the employee in the form of RSUs, with

the number of RSUs based on the total Equity Accrual Calculated divided by the price of the

RSUs on the Grant Date.  *See* Exhibit 3(2003 U.S. SVP Brochure) at 7.

19.       In fiscal year 2008, for all monthly pay periods prior to September 2008, a

portion of the compensation for production-based employees accrued as part of the Equity

Accrual Calculated line item on the compensation statement.  The compensation statements for

production-based employees (other than Managing Directors of Neuberger Berman) for the fiscal

year December 1, 2007 to November 30, 2008 do not reflect any "Equity Accrual Calculated"

for September through November 2008.  *See* Exhibits 18 and 19 (sample compensation

statements with identifying information redacted).

**Taxation of RSUs and CSAs**

20.       A brochure for the FY 2003 Program Lehman Brothers distributed to U.S.

employees receiving RSUs advised them as follows:

> Tax Treatment of Restricted Stock Units
>
> Under current tax regulations, you will not be taxed on the value of your RSUs until they
> convert to common stock.  As a result, your RSUs appreciate on a pre-tax basis for the
> five-year restriction period . . . .
>
> Provided below is a summary of the U.S. taxes that are ultimately due under current tax
> law:
>
> - At the time the RSUs are awarded, there is no taxable event.

-12-

- After the restriction period for 2003 RSUs ends, on November 30, 2008, your RSUs, including any additional RSUs that you receive through dividend reinvestment, convert to common stock. Ordinary income equal to the November 30, 2008 market value of your shares will be reported to the IRS, and you will be subject to tax withholding on this amount. Since the receipt of these shares is treated as compensation paid to you, ordinary income tax rates apply, rather than the special provisions dealing with capital gains.

- On November 30, 2008, when your 2003 RSUs convert to common stock, your cost basis for tax purposes will equal the market value of your shares on that day. Any subsequent increases in value will be taxed as capital gains when the stock is sold. If the stock price is lower when you sell your shares than it was when the RSUs converted, you will have a capital loss to declare.

*See* LEH-RSU 0015954.

21.    A similar brochure for the FY 2003 Program Lehman Brothers distributed

to overseas employees receiving CSAs advised them as follows:

<u>Tax Treatment of Contingent Stock Awards</u>

Under current tax regulations, you will not be taxed on the value of your CSAs until they convert to common stock. As a result, your CSAs appreciate on a pre-tax basis for the five-year restriction period.

Provided below is a summary of the taxes that are ultimately due under current tax law:

- At the time the CSAs are awarded, there is no taxable event.

- After the restriction period for 2003 CSAs ends, on November 30, 2008, your CSAs, including any additional CSAs that you receive through dividend reinvestment, convert to common stock. The market value of the stock to which you are entitled on that date will be treated as employment income, on which tax will be payable at the prevailing income tax rates. For United States taxpayers, this income will be reported to the IRS and subject to applicable tax withholding.

- On November 30, 2008, when your 2003 CSAs convert to common stock, your cost basis for tax purposes will equal the market value of your shares on that day. Any subsequent increases in value will be taxed as capital gains when the stock is sold. If the stock price is lower when you sell your shares than it was when the CSAs converted, you will have a capital loss to declare.

*See* LEH-RSU 0007289.

-13-

22.     The 2003 U.S. SVP Brochure distributed to Senior Vice-Presidents (discussed at ¶¶ 4-9 above) receiving RSUs or CSAs, and the FY 2005 Program brochures distributed to employees receiving RSUs or CSAs advised them as follows:

<u>Tax Treatment of RSUs and Stock Options</u>

Under current tax regulations, you will not be taxed on the value of your [RSUs / CSAs] until they convert to common stock.  As a result, your [RSUs / CSAs] appreciate on a pre-tax basis for the five-year restriction period . . . .

Provided below is a summary of the taxes related to RSUs . . . .

- No taxation on the award date.

- Upon conversion to common stock, the fair market value of the shares will be taxed as employment income based on the closing price of Lehman Brothers common stock on the conversion date.

- This income will be subject to [applicable tax withholding, or tax / social security withholding in the case of CSAs in FY 2005].

- Special provisions dealing with capital gains will not apply upon conversion to common stock.

- If you retain your shares after [RSUs / CSAs] convert to common stock, the basis for capital gains is the closing price on the conversion date.

Exhibit 3 at LEH-RSU 15900; *see* LEH-RSU 0007248 (2003 brochure for CSAs awarded to SVPs); 0007273 (2003 brochure for CSAs awarded to Managing Directors), 0015680 (2003 brochure for RSUs awarded to Managing Directors), 0022619 (2005 brochure for RSUs for bonus -eligible and production-based employees, including SVPs and Managing Directors), 0022668 (2005 brochure for CSAs for bonus-eligible and production-based employees, including SVPs and Managing Directors).

23.     The FY 2006 and FY 2007 Program brochures distributed to employees receiving RSUs or CSAs advised them as follows:

-14-

Under current [U.S. Federal tax law], you will not be taxed on the value of your [RSUs / CSAs] until shares of common stock are delivered.  As a result, your [RSUs / CSAs] (including dividend reinvestment [RSUs / CSAs] . . .) appreciate on a pre-tax basis until they convert to shares of common stock.  Provided below is a summary of the taxes related to RSUs . . . .

- No taxation on the award date.

- Upon delivery of common stock, the fair market value of the shares will be taxed as employment income based on the closing price of Lehman Brothers Holdings Inc. common stock on the conversion date.

- This income will be subject to applicable tax withholding.

- Special provisions dealing with capital gains will not apply upon delivery of common stock.

- If you retain your shares after delivery, the basis for capital gains is the closing price on the conversion date.

LEH-RSU 0014264 (2006 brochure for RSUs for bonus-eligible and production-based employees including SVPs and Managing Directors); *see* 0000290-91 (2007 brochure for RSUs for bonus-eligible and production-based employees), 0000195 (2006 brochure for CSAs for bonus-eligible and production-based employees), 0023032 (2007 brochure for CSAs for bonus-eligible and production-based employees).

24.    Thus, once an RSU or CSA converted to common stock, LBHI was entitled to, and did in fact claim, a U.S. federal income tax deduction as compensation expense (subject to any other limitations as may have been required under federal, state and local income tax laws) for the then prevailing amount/value of the award in the year of payment to such employee.  The amount of such income tax deduction would be based on the market price of LBHI common stock, as quoted on the New York Stock Exchange, as of the delivery/release date and deducted in the same taxable year.

-15-

25.     In addition, once an RSU or CSA converted to common stock, LBHI commonly reduced the amount of the RSU/CSA Award by the amount of any income and employment taxes due to any federal, state, local or other taxing authority.  The only exceptions were where, when by permitted by local law, the recipient decided to pay the tax directly by remitting sufficient cash to LBHI (or the local Lehman affiliate employing the grantee).

26.     Since the Claimants' RSUs/CSAs were granted to the Claimants between 2003 and 2008, the RSUs/CSAs had not converted to common stock and no stock or shares had issued as of September 15, 2008, the date LBHI and its affiliated debtors began filing voluntary cases under chapter 11 of the Bankruptcy Code (the "Petition Date").  Therefore, as of the Petition Date, LBHI was not entitled to report the grants of the RSUs/CSAs to the Internal Revenue Service or any other tax authority as compensation income to any employee.

27.     As of the Petition Date, no Claimant-employee was required to report the grants of the Claimants' RSUs/CSAs between 2003 and 2008 to the Internal Revenue Service or any other tax authority as compensation income to such employee for income tax purposes, because the RSUs/CSAs had not converted and no common stock had issued.  An "Employee Q&A" issued by Lehman after the Petition Date stated as follows: "Q: What happens to my restricted stock units (RSUs)? A: This transaction [i.e., sale to Barclays] does not trigger an acceleration of vesting or delivery of your Lehman Brothers RSUs. They remain outstanding and subject to their original terms and conditions."  LEH-RSU 00014383.

28.     Since no shares of stock were ever issued to employees pursuant to the grants of the Claimants' RSUs/CSAs between 2003 and 2008 (other than RSUs issued as Neuberger Berman retention bonuses), LBHI did not take a federal income tax deduction for

-16-

these grants of the Claimants' RSUs/CSAs and they were never reported by the employees as compensation income to the Internal Revenue Service or any other tax authority.

29.     Dividend equivalents arising from the Claimants' RSUs/CSAs granted between 2003 and 2008 were reflected in additional RSUs/CSAs consistent with dividends of Lehman common stock and were subject to the same Program provisions as the underlying RSUs/CSAs to which they related.

30.     LBHI never reported the dividend equivalents arising from the Claimants' RSUs/CSAs granted between 2003 and 2008 as compensation income to the Internal Revenue Service or any other tax authority.

31.     No amount of the RSU/CSA Award for the years 2003-2008, and no shares of stock to be issued pursuant to the terms thereof, were ever held by LBHI in any reserve, escrow or other similar account for the benefit of a particular grantee.

32.     LBHI never purchased or reserved LBHI common stock the ownership of which was specifically attributable to a particular grantee of RSUs or CSAs.

33.     LBHI's Earnings Release Q&A for the fourth quarter of 2003 states as follows:  "RSUs and options generate a significant tax benefit once the shares are issued.  The tax benefit is derived at the price on the date the shares are issued.  Therefore, the proceeds will also be used to fund the repurchase of shares."  *See* LEH-RSU 0023181.  Similarly, LBHI's Earnings Release Q&A for the fourth quarter of 2006 states:  "RSUs and options generate a significant tax benefit once the shares are issued.  The tax benefit is derived at the price on the date the shares are issued.  Therefore, the proceeds will also be used to fund the repurchase of shares."  *See* LEH-RSU 0013577.

-17-

**Accounting Treatment of RSUs and CSAs**

34.    RSUs and CSAs issued to Lehman employees under the Program were
generally amortized for financial accounting purposes over various periods of time ranging from
the grant year (for FY 2003 through FY 2005) or the year after the grant year (for FY 2006 and
FY 2007) through the year of Conversion/Issuance five years after the Grant Date in accordance
with the terms of the Program. *See* ¶¶ 4-6 above.  The amount amortized was based on the
prevailing market price of LBHI common stock at the Grant Date, as quoted on the New York
Stock Exchange, as of the Grant Date.

35.    The compensation expense for the RSU/CSA Award granted for the years
2003 through 2008 was recognized in the financial statements of LBHI for financial accounting
purposes (but not tax purposes) over this period for the fulfillment of certain employment-related
conditions.  *Id.*  LBHI's financial statements referred to this period as the "related service
period" or for 2003, the "relevant service period."  LEH-RSU 0005585 (2003 Consl. Fin. Stmts.,
Note 1 at 77), LEH-RSU 0006370 (2004 Consl. Fin. Stmts., Note 1 at 90), LEH-RSU 0006077
(2005 Consl. Fin. Stmts., Note 1 at 82), LEH-RSU 0006221-22 (2006 Consl. Fin. Stmts., Note 1
at 86-87), LEH-RSU 0005927 (Consl. Fin. Stmts., Note 1 at 94-95).

36.    Thus, in FY 2003 the compensation expense for the RSUs and CSAs
granted in that year was recognized for financial accounting purposes (but not tax purposes),
over, for the most part, 2003 through 2008.  LBHI measured the compensation expense to be
amortized based on the market value of LBHI common stock at the Grant Date, without a
discount for resale restrictions.  *See* LEH-RSU 0005510-0005634, 0006433-0006487 (LBHI
2003 Annual Report) at LEH-RSU 0005585 (Note 1 at p. 77) and LEH-RSU 0005603 (Note 15

-18-

at p. 95); LEH-RSU 0005698-0005719, 0006134-0006277 (LBHI 2006 Annual Report) at LEH-RSU 0006244 (Note 15 at p. 109).

37.     In FY 2004 and FY 2005, a portion of the compensation expense was allocated to the year of the grant and the balance was recognized over, for the most part, the five-year period through the Conversion/Issuance Date for financial accounting purposes (but not tax purposes).  LBHI measured the compensation expense to be amortized based on the market price of LBHI's common stock at the Grant Date, less a discount of between three to eight percent per year for resale restrictions in place until the Conversion/Issuance Date.  *See* LEH-RSU 0005635-0005671, 0006278-0006432 (LBHI 2004 Annual Report) at LEH-RSU 0006370 (Note 1 at p. 90) and LEH-RSU 0006396 (Note 16 at p. 116); LEH-RSU 0005672-0005697, 0005993-0006133 (LBHI 2005 Annual Report) at LEH-RSU 0006077 (Note 1 at p. 82) and LEH-RSU 0006097 (Note 14 at p. 102).

38.     In FY 2006 and FY 2007, the compensation expense was recognized over, for the most part, a five-year period beginning the year after the year of the grant of RSUs or CSAs through the Conversion/Issuance Date for financial accounting purposes (but not tax purposes).  LBHI measured the compensation expense based on the market price of LBHI's common stock at the Grant Date, less a discount of between three to eight percent per year for resale restrictions in place until the Conversion/Issuance Date.  *See* LEH-RSU 0005698-0005719, 6134-6277 (LBHI 2006 Annual Report) at LEH-RSU 0006221-0006222 (Note 1 at pp. 86-87) and LEH-RSU 0006244 (Note 15 at p. 109); LEH-RSU 0005720-0005992 (LBHI 2007 Annual Report) at LEH-RSU 0005927-0005928 (Note 1 at pp. 94-95) and LEH-RSU 0005958 (Note 12 at p. 125).

US_ACTIVE:\44282210\18\58399.0011

39.     Attached as Exhibit 20 (LEH-RSU 0014995) is a true and correct copy of any email from Mark Gross to James Emmert, dated April 14, 2004, attaching a presentation entitled "Equity Awards Overview."  The text of the email states that it is a "'final' version." Attached as Exhibit 21 (LEH-RSU 0015001) is a true and correct copy of page 6 of the presentation attached to Mark Gross' email, which contains a chart demonstrating the amortization process from 2000 and 2003.  The chart follows the statement:  "The amortization of awards over time lowers our comp and benefits ratio.  If we were to fully expense all awards in the year of grant (including options), our comp ratio would be over 57% over the period."

US_ACTIVE:\44282210\18\58399.0011

/s/ Ralph Miller
Ralph I. Miller
Robert J. Lemons
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates*

STAMELL & SCHAGER LLP

By:    /s/ Richard J. Schager
       Richard J. Schager, Jr.
       Andrew R. Goldenberg
One Liberty Plaza - 23/F
New York, NY  10006-1404
Tel.: (212) 566-4047
Fax" (212) 566-4061

*Counsel to:  Jennifer Adler, Craig Benson,
Paola Biraschi, Karen Brewer,
William Broadbent, David Brooks,
Patrick Cremin, Michael Collier,
Joseph D'Amadeo, John Dmuchowski,
Nestor De Jesus, Steven Engel,
Louise Goldberg, Michael Gran,
Anshuman Goyal, Adrian Graves,
Sandra Hahn-Colbert, Nicholas Howard,
Julian Iragorri, Harriet Chan King,
Tal Lev Ari, Yeruchim Levilev, Sarah Lewis,
Patricia Luken, Lawrence McCarthy,
Michael McCully, Hugh McGee,
Michael Mullen, Ian Neville, Thomas
O'Sullivan, Helmut Olivier, Martin Patterson,
Michael Petrucelli, Sandy Richman Fleischman,
Barry Porter, Jack Rivkin, Alvaro Santodomingo,
Brian Seward, Ross Shapiro, Margaret Smith,
Andrea Sullivan, Stephen Snelling, Milan Veleba,
Pierluigi Volini, Jeffrey Wecker, Peter Ward,
Timothy Wilkinson, Judith Winchester*

VINSON & ELKINS LLP
Steven M. Abramowitz
666 Fifth Avenue, 26th Floor
New York, NY  10103-0040
Tel.: (212) 237-0137
Fax: (917) 849-5381

*Counsel to:  Lisa Marcus*

LAW OFFICES OF LISA M. SOLOMON

By:    /s/ Lisa M. Solomon
       Lisa M. Solomon
One Grand Central Place
305 Madison Avenue, Suite 4700
New York, NY  10165
Tel.: (212) 471-0067
Fax: (212) 980-6965

*Counsel to:  Madelyn Antoncic, Vincent
Primiano, Gordon Sweely, Charles Spero,
Timothy Burke, Jonathan Sebiri, Riccardo
Banchetti, Philippe Dufournier, Anke Parr,
Giancarlo Saronne, Harsh Shah and
Peter Hornick*

KAPLAN LANDAU LLP
Eugene Neal Kaplan
1065 Avenue of the Americas - 27/F
New York, NY  10018
Tel.: (212) 593-1700
Fax: (212) 593-1707

JULIEN & SCHLESINGER, P.C.
Michael S. Schlesinger
One Whitehall Street - 17th Floor
New York, NY  10004
Tel.: (212) 962-8020

*Counsel to:  Judith Ann Kenney, Richard
Nackenson, Seth Finkel, Richard S. Levine,
Henry Ramallo, Christian F. Reynolds,
Marvin C. Schwartz, Stephanie Stiefel,
David I Weiner and Richard Glasebrook*

RICH, MICHAELSON MAGALIFF
  MOSER LLP
Howard P. Magaliff
Robert N. Michaelson
340 Madison Avenue - 19th Floor
New York, NY  10173
Tel.:  (212) 220-9402
Fax:  (212) 913-9644
*Counsel to:  Roger Saks, Donald Boughrum,*
*Brian Monahan, Nicole Lawrence,*
*H. Morgan Lawrence, III*

LAW OFFICES OF A. JAMES BOYAJIAN
355 S. Grand Avenue, Suite 2450
Los Angeles, CA  90071
Tel.:  (424) 258-0777
Fax:  (424) 298-4377

*Counsel to:  Jeffrey Wardell*

PADUANO & WEINTRAUB LLP
Willard Knox
1251 Avenue of the Americas - 9th Floor
New York, NY  10020
Tel.:  (212) 785-9100

*Counsel to:  W. Phillip Walsh*

-23-

# EXHIBIT 1

# EXHIBIT 1

# LEHMAN BROTHERS

CONFIDENTIAL

ANTHONY J. COLLERTON
SENIOR VICE PRESIDENT
HUMAN RESOURCES

June 3, 1999

REDACTED

REDACTED

Dear

We are delighted to confirm our offer of full-time employment as the **REDACTED**
**REDACTED** at Lehman Brothers (the "Firm"). Your title of Managing Director will be
officially confirmed by the Firm's Board of Directors shortly after your start date.

Your total compensation at Lehman Brothers will consist of salary and bonus, and will be
determined at the end of each year based on your performance and contributions to the Firm
and on the Firm's overall performance. For the performance years ending November 30,
1999, and November 30, 2000, we will guarantee you a minimum total compensation of
$850,000, with your 1999 compensation prorated for the period you are employed by the
Firm. Specifically, your compensation will be paid as follows:

- Salary at the annualized rate of $200,000, payable in biweekly installments in
  accordance with our customary payroll practices.

- A 1999 annualized bonus of $650,000, with the actual bonus received calculated based
  on the actual number of days worked during performance year 1999. The bonus portion
  of your compensation will be paid to you at such time as the Firm pays its annual bonus
  distribution (on or about January 31, 2000).

- A 2000 bonus of $650,000, to be paid to you at the time the Firm pays its annual bonus
  distribution (on or about January 31, 2001).

- At the Firm's option, a portion of your total compensation (combined base salary, bonus
  and other compensation) may be payable in the form of restricted stock units pursuant to
  the Firm's employee Stock Award Program. Please understand that the grant of
  restricted stock units is subject to the standard terms and provisions of the Program.

You will also be eligible to participate in the standard employee benefits program, which will
be explained to you during your orientation session.

000005

REDACTED

June 3, 1999
Page 2



The salary and bonus amounts set forth above will be paid at the time and in the amount stated except that they will not be payable if, before the date of scheduled payment, you have voluntarily terminated your Firm employment, have died or become disabled, or have been terminated from the Firm because of misconduct, breach of Firm policies or rules, dishonesty, violation of laws or regulations material to your employment, or failure to perform employment duties or obligations satisfactorily. These amounts may be reduced in the event any authorized leave of absence during 1999 or 2000. Your compensation for 2001 and subsequent years will be determined at the Firm's discretion, based on your performance and contributions to the Firm and on the Firm's overall performance.

Please understand that the terms and conditions of your employment by our Firm are governed by standard Firm policies. Among other things, this means that this offer of employment is conditional upon the successful completion of a background investigation, including reference, credit, criminal and other checks, as well as on your satisfactorily meeting all pre-employment requirements, including passing a pre-employment drug screen and producing documentation to verify your identity and eligibility to work in the United States.

While the foregoing compensation commitments will be honored, this letter is not a contract of continuing employment. Your employment by the Firm is for no fixed term, and either you or the Firm may terminate the employment relationship at any time and for any reason.

This agreement shall be binding upon the Firm and its successors and assigns.

If you agree with the terms outlined in this letter, please acknowledge the same by signing the enclosed copy and returning it to me. Please contact me at (212) 526-3144 with any additional questions or concerns.

Sincerely,

Anthony J. Collerton

Accepted on this 4th day of June, 1999

REDACTED

cc:     M. Miskovic

# EXHIBIT 2

**EXHIBIT 2**

LEHMAN BROTHERS

DONNA ASARO
VICE PRESIDENT
HUMAN RESOURCES

May 4, 2007

REDACTED

Dear    REDACTED

We are pleased to confirm the terms we have agreed to with respect to your continued employment with the Mortgage Capital Division of Lehman Brothers Inc. (the "Firm").

For performance year 2007 (ending November 30, 2007), your compensation will be as follows:

- Bi-weekly base salary of $6,346.15, which is equivalent to $165,000 per year.

- A minimum bonus in the amount of $685,000, less applicable deductions, payable at the time the Firm pays its annual bonus distribution (on or about January 31, 2008).

For the performance year 2008 (December 1, 2007 through November 30, 2008), your compensation will be as follows:

- Bi-weekly base salary of $7,692.30, which is equivalent to $200,000 per year.

- A minimum bonus in the amount of $650,000, less applicable deductions, payable at the time the Firm pays its annual bonus distribution (on or about January 31, 2009).

The foregoing salary will be paid for all periods of your active employment with the Firm in performance years 2007 and 2008. The bonuses set forth above will be paid at the times and in the amounts stated except that such bonuses will not be payable if you have failed to obtain and/or maintain in good standing all applicable licenses and registrations or if, before the date of scheduled payment, you have resigned, or have been terminated from the Firm because of misconduct, breach of Firm policies or rules, dishonesty, violation of laws or regulations, or substantial and continuing failure to perform employment duties or obligations satisfactorily (collectively or individually, "Cause"). The above stated bonus amounts may be reduced in the event of an approved leave of absence during the applicable performance year.

At the Firm's discretion, a portion of your total 2007, 2008 and future years' total compensation (combined base salary, bonus, and other compensation) will be payable in conditional equity awards (restricted stock units and/or other equity awards) pursuant to the Firm's employee equity

CONFIDENTIAL                                    S&S CLMT-RSU 000296

award program as then in effect. The terms and conditions of the Equity Award Program, including terms and conditions relating to vesting, exercisability, and forfeiture, will be established by the Firm from time to time in its discretion.

All payments described in this letter will be subject to applicable payroll and income tax withholding and other applicable deductions. Your compensation with respect to all periods after performance year 2008 will be determined at the Firm's discretion.

Please understand that the terms and conditions of your employment by our Firm will continue to be governed by standard Firm policies.

Please understand that this letter is not a contract of continuing employment. Your employment by the Firm is for no fixed term, and either you or the Firm may terminate the employment relationship at any time for any reason subject to any applicable notice requirement. Currently, the Firm's notice policy requires officers of the Firm to provide 30 days' advance written notice of resignation, and provides for 30 days' advance notice by the Firm to its officers in the event of an involuntary termination under certain circumstances.

REDACTED , we are enthusiastic and pleased that you are going to continue to be a part of our organization. If you agree with the terms outlined in this letter, please acknowledge same by signing this letter and returning it to me. An additional copy of this letter is enclosed for your files.

Sincerely,

Donna Asaro
Vice President
Human Resources

Accepted and agreed to:

REDACTED

by:

_5/23/07_
Date

LEHMAN BROTHERS
745 7TH AVENUE, 24TH FLOOR  NEW YORK  NY  10019  TELEPHONE 212-526-1080

CONFIDENTIAL

E
X
H
I
B
I
T

3

**EXHIBIT 3**



**2003**

# EQUITY AWARD PROGRAM

*Senior Vice President*

# LEHMAN BROTHERS

CONFIDENTIAL

LEH-RSU 0015888

# 2003 EQUITY AWARD PROGRAM



*Senior Vice President*

## Contents

2003 Equity Award Program at a Glance . . . . . . . .1

How the Equity Award Program Works . . . . . . . .2

Components of the 2003 Equity Award . . . . . . .3

Equity Award Vesting
When will my RSUs vest? . . . . . . . . . . . . . . . . .3
When will my stock options
become exercisable? . . . . . . . . . . . . . . . . . . . . . .3

Salaried Members of the Firm:
2003 Equity Award Schedule . . . . . . . . . . . . . .4
Award Calculation Example . . . . . . . . . . . . . . . .4

Investment Representatives (IRs):
2003 Equity Award Schedule . . . . . . . . . . . . . .5
Calculating Your 2003 Monthly Accrual . . . . . . .6
Award Calculation Example . . . . . . . . . . . . . . . .7

Termination Provisions for RSUs
and Stock Options . . . . . . . . . . . . . . . . . . . . . . . .8

Tax Considerations . . . . . . . . . . . . . . . . . . . . . . .11

Change in Control ("CIC") Provisions . . . . . . . . .12
Payment of RSUs Upon a Friendly CIC . . . . . . .12

Dividend Equivalents . . . . . . . . . . . . . . . . . . . . . .13

Voting Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

Other Information . . . . . . . . . . . . . . . . . . . . . . . .13

This brochure describes significant features of the
Lehman Brothers Equity Award Program for 2003.
It is not intended to replace the award agreement
or other official plan documents. This brochure
should be read in conjunction with the other
award documents.

# 2003 EQUITY AWARD PROGRAM AT A GLANCE

- All eligible Senior Vice Presidents (SVPs) receive a portion of their total compensation in conditional equity awards. The amount of compensation payable in equity increases as the amount of your compensation rises.

- The equity component of total compensation is in a combination of restricted stock units (RSUs) and stock options. Seventy-five percent of your 2003 equity award was in RSUs; 25 percent was in stock options.

- Each RSU represents the conditional right to receive one share of Lehman Brothers common stock five years after the RSU is granted, assuming continued employment with the Firm. On November 30, 2008, the restriction period will end, and you will be entitled to receive one share of Lehman Brothers common stock for each vested RSU you hold at that time. Once your RSUs convert to common stock, they become freely tradable. The RSUs cannot be sold, traded, pledged, or assigned before conversion.

- Your 2003 RSUs were calculated based on the price of $53.54 per RSU (reflecting a December 10, 2003 market price of $71.39, less a 25 percent discount).

- Your 2003 stock options have an exercise price of $71.39 and will expire on November 29, 2013. The number of options you received was based on the Black-Scholes value ($27.79) of a 10-year Lehman Brothers option, less a 25 percent discount ($20.84).

**1**

*Senior Vice President*

*Your Award Summary details your 2003 award.*



CONFIDENTIAL

EQUITY AWARD PROGRAM

2

# HOW THE EQUITY AWARD PROGRAM WORKS

The Equity Award Program for Senior Vice Presidents (SVPs) was developed to recognize the important role you, as an SVP, play in the success of the Firm. Together with your colleagues, you drive revenue generation, provide quality service and technical expertise to our clients and customers, manage expenses, and provide the infrastructure support to ensure efficient and effective processes. Given the key role you play in Lehman Brothers' success, it is important for you to have a significant stake in the Firm. With this in mind, the Equity Award Program for SVPs was designed to deliver a significant portion of your compensation in conditional equity awards (restricted stock units (RSUs) and stock options), which you acquire at a substantial discount. The Program provides you with an incentive to think and act like an owner every day, and allows you to share in the Firm's financial success over time.

Your 2003 equity award was awarded to you as a portion of your 2003 compensation. Seventy-five percent of your 2003 equity award was in RSUs; 25 percent was in stock options. Each RSU represents the conditional right to receive one share of Lehman Brothers common stock five years after the grant date, on November 30, 2008. You can consider the RSUs as shares of Lehman Brothers common stock that the Firm holds on your behalf for five years, which you will be entitled to receive at that time provided you meet certain terms and conditions. The RSUs cannot be sold, traded, pledged, or assigned for that five-year period.

The stock options awarded to you in 2003 will expire on November 29, 2013. These options may not be sold, traded or pledged and may only be exercised by you (or your estate in the event of your death).

## The Size of Your Award

The Award Summary shows your 2003 equity award. The amount of each individual's award is determined according to a schedule that specifies the awards granted at each level of compensation. Under this schedule, the amount of compensation in the form of conditional equity awards (RSUs and stock options) increases as total compensation rises.

**Salaried Members of the Firm:** Your award was based on your 2003 total compensation, which includes salary earned in fiscal year 2003 plus any additional compensation with respect to the fiscal year in 2003, even if some of these payments are deferred or paid in 2004. Such compensation includes 2003 bonus, commissions, and other compensation.

**Investment Representatives (IRs):** Similar to salaried employees, you received a year-end conditional equity award as a portion of your 2003 total compensation. Your equity award accrued on a monthly basis, as a portion of your total payout on gross production during December 2002 through October 2003 (paid from January through November 2003) after all adjustments. For 2003, the portion of your total payout in cash (such as cash commissions) and the portion accrued in conditional equity awards were based on the award schedule previously communicated to you. (A copy of 2003 Equity Award Schedule appears on page 5.) The 2003 payout may have included regular grid production payout, certain special payments, and other production payout. During any period an IR is paid a draw, equity (in the form of RSUs and/or stock options) is awarded with respect to the amount of the draw. If the draw ends and the IR has earned production payout in excess of the draw, a portion of the excess ("overage") is paid in cash and a portion is accrued toward a year-end equity award (in the year in which overage is accrued).

*Note that for purposes of this brochure, all references to payout or compensation assume compensation payments that are equity eligible only.*

## The Firm-Provided Discount

The number of RSUs you received for 2003 was based on the closing price of Lehman Brothers common stock ($71.39 per share), less a 25 percent discount. With a 25 percent discount, every $100 of compensation in RSUs gives you $133 in value. A 25 percent discount really means that the Firm "grosses up" your contribution 33 percent at the outset.

The number of options you received for 2003 was based on the Black-Scholes value ($27.79) of a 10-year Lehman Brothers option on December 10, 2003, less a 25 percent discount ($20.84). These options have an exercise price of $71.39. Your 2003 options will expire approximately 10 years after the grant date, on November 29, 2013.



*The amount of compensation paid in equity increases as the amount of total compensation rises.*

LEH-RSU 0015891

# COMPONENTS OF 2003 EQUITY AWARD

## Equity Award in RSUs and Stock Options

All SVPs receive a portion of their total compensation in the form of conditional equity awards. The equity component of total compensation is in a combination of both RSUs and stock options. Seventy-five percent of your 2003 equity award was in RSUs; 25 percent was in stock options.

| Description | RSUs | Stock Options |
|---|---|---|
| Grant Date: | December 10, 2003 | December 10, 2003 |
| Market Price: | $71.39 | N/A |
| Exercise Price: | N/A | $71.39 |
| Black-Scholes Value: | N/A | $27.79 |
| Discount: | 25% | 25% |
| Cost to SVP: | $53.54 | $20.84 |
| Restriction Period: | 5 years, until 11/30/08 | N/A |
| Option Period: | N/A | 10 years, until 11/29/13 |

# EQUITY AWARD VESTING



## When will my RSUs vest?

The vesting provisions of your 2003 RSUs are consistent with last year's SVP RSUs. For purposes of discussing the vesting schedule, you should consider your RSU award as having two components: the **principal portion** and the **discount portion**. The principal portion represents the number of RSUs awarded as part of your 2003 compensation before the discount (75 percent of the award). The discount portion represents 25 percent of your RSU award.

Your RSUs will vest in two stages:
2 Years (November 30, 2005):   Principal portion
5 Years (November 30, 2008):   Discount portion

Notwithstanding the above, in the event your employment is terminated with Cause or you engage in Detrimental Activity prior to November 30, 2008, all of your RSUs will be forfeited. Please refer to page 10 for the definition of Detrimental Activity.

## When will my stock options become exercisable?

Your stock options will become exercisable consistent with the vesting schedule of your 2003 RSUs. Your stock options will become exercisable in two stages:
2 Years (November 30, 2005):   Principal portion
5 Years (November 30, 2008):   Discount portion

Notwithstanding the above, in the event your employment is terminated with Cause or you engage in Detrimental Activity prior to November 29, 2013, all of your stock options will be forfeited. Please refer to page 10 for the definition of Detrimental Activity.

Please refer to the *Termination Provisions for RSUs and Stock Options* on page 8 for a detailed explanation of how your RSUs and stock options may be affected if you leave Lehman Brothers, including the circumstances under which you may forfeit your rights to your RSUs and stock options.

*Senior Vice President*

**3**



EQUITY AWARD PROGRAM

**4**

# SALARIED MEMBERS OF THE FIRM

## 2003 Equity Award Schedule

The participation schedule for 2003 is listed below. This schedule reflects the equity portion of 2003 total compensation. An example of the calculations follows.

| Total Compensation Range | Portion of 2003 Compensation Paid Through Equity Award Program |
|---|---|
| $0 - $99,999 | 2% of 2003 total compensation |
| $100,000 - $199,999 | $2,000 plus 6% of 2003 total compensation over $100,000 |
| $200,000 - $299,999 | $8,000 plus 10% of 2003 total compensation over $200,000 |
| $300,000 - $499,999 | $30,000 plus 16.25% of 2003 total compensation over $300,000 |
| $500,000 - $749,999 | $62,500 plus 20% of 2003 total compensation over $500,000 |
| $750,000 - $999,999 | $112,500 plus 35% of 2003 total compensation over $750,000 |
| $1,000,000 - $1,499,999 | $200,000 plus 35% of 2003 total compensation over $1,000,000 |
| $1,500,000 - $1,999,999 | $375,000 plus 45% of 2003 total compensation over $1,500,000 |
| $2,000,000 - $2,499,999 | $600,000 plus 55% of 2003 total compensation over $2,000,000 |
| $2,500,000 and up | 35% of 2003 total compensation |

## Award Calculation Example

Using the equity award schedule above, your 2003 equity award was determined at year-end based on your 2003 total compensation.

EXAMPLE: As an example, we'll go through the calculation for an SVP whose 2003 total compensation was $400,000.

| | |
|---|---|
| 2003 Total Compensation: | $400,000.00 |
| Equity Award Based on 2003 Grid: | $46,250.00 |
| RSU Component: | $34,687.50   (75% of Total Equity) |
| Stock Option Component: | $11,562.50   (25% of Total Equity) |

Based on a stock price of $71.39 and a Black-Scholes option value of $27.79, the components of the 2003 equity award are as follows:

| RSU Component | | Market Price | Discount Price | Number of Shares |
|---|---|---|---|---|
| RSU Award (75%): | $34,687.50 | $71.39 | $53.54 | 648 |
| **Option Component** | | | | |
| Option Award (25%): | $11,562.50 | $27.79 (a) | $20.84 | 555 |
| Total 2003 Equity Award: | $46,250.00 | | | |

(a) Black-Scholes value

**Note to Investment Representatives (IRs):** Your 2003 equity award was accrued as a portion of your monthly payout. Please refer to the section *IRs: Calculating Your 2003 Monthly Accrual* on page 6 for an illustration of how your monthly equity award accrual was determined.



LEH-RSU 0015893

# INVESTMENT REPRESENTATIVES (IRs)

The participation schedule for 2003 is listed below. This schedule reflects the equity portion of 2003 total compensation.[*] An example of the calculations follows.

## 2003 Equity Award Schedule

| Total Compensation Range[*] | Portion of 2003 Compensation Paid Through Equity Award Program |
|---|---|
| $0 - $99,999 | 2.50% of 2003 total compensation |
| $100,000 - $199,999 | $2,500 plus 7.50% of 2003 total compensation over $100,000 |
| $200,000 - $299,999 | $10,000 plus 12.50% of 2003 total compensation over $200,000 |
| $300,000 - $499,999 | $37,500 plus 20.31% of 2003 total compensation over $300,000 |
| $500,000 - $749,999 | $78,125 plus 25.00% of 2003 total compensation over $500,000 |
| $750,000 - $999,999 | $140,625 plus 43.75% of 2003 total compensation over $750,000 |
| $1,000,000 - $1,499,999 | $250,000 plus 43.75% of 2003 total compensation over $1,000,000 |
| $1,500,000 - $1,999,999 | $468,750 plus 56.25% of 2003 total compensation over $1,500,000 |
| $2,000,000 - $2,499,999 | $750,000 plus 68.75% of 2003 total compensation over $2,000,000 |
| $2,500,000 and up | 43.75% of 2003 total compensation |

[*]For purposes of the 2003 Equity Award Program for IRs, 2003 total compensation includes only 11 months of total compensation earned during December 2002 through October 2003 (paid January through November 2003).



*Senior Vice President*

5

EQUITY AWARD PROGRAM

**6**

# Calculating Your 2003 Monthly Accrual

As an example, we'll go through the monthly calculation for an SVP IR whose 2003 total compensation earned from December 2002 through October 2003 (paid from January through November 2003) was $360,000.

| Step | Instructions | Sample Calculation | Sample Result |
|---|---|---|---|
| **Step 1** | Take YTD Total Payout for first month and annualize (multiply by 12 and divide by production month number). | $30,000 x 12 ÷ 1 | $360,000 |
| **Step 2** | Calculate equity accrual from 2003 award schedule on page 5. | $360,000 | $49,686 |
| **Step 3** | Multiply result by allocation %. Subtract previous month's YTD equity accrual from result. This is the monthly equity accrual. | ($49,686 x 8.33%) - $0 | $4,141 |
| **Step 4** | Take YTD Total Payout for second month and annualize (multiply by 12 and divide by production month number). | $65,000 x 12 ÷ 2 | $390,000 |
| **Step 5** | Calculate equity accrual from 2003 award schedule on page 5. | $390,000 | $55,779 |
| **Step 6** | Multiply result by allocation %. This is the YTD equity accrual. Subtract previous month's YTD equity accrual from result. This is the monthly equity accrual. | ($55,779 x 16.67%) - $4,141 | $5,156 |
| **Step 7** | Repeat for next month. | | |

## Example

| # | Pay Month | Monthly Total Payout($) | YTD Total Payout ($) | Annualized Total Payout ($) | Annualized Equity Award ($) | Allocation % | YTD Equity Accrual ($) | Monthly Equity Accrual ($) |
|---|---|---|---|---|---|---|---|---|
| 1 | January | 30,000 | 30,000 | 360,000 | 49,686 | 8.33% | 4,141 | 4,141 |
| 2 | February | 35,000 | 65,000 | 390,000 | 55,779 | 16.67% | 9,297 | 5,156 |
| 3 | March | 40,000 | 105,000 | 420,000 | 61,872 | 25.00% | 15,468 | 6,171 |
| 4 | April | 25,000 | 130,000 | 390,000 | 55,779 | 33.33% | 18,593 | 3,125 |
| 5 | May | 28,000 | 158,000 | 379,200 | 53,586 | 41.67% | 22,327 | 3,734 |
| 6 | June | 32,000 | 190,000 | 380,000 | 53,748 | 50.00% | 26,874 | 4,547 |
| 7 | July | 38,000 | 228,000 | 390,857 | 55,953 | 58.33% | 32,639 | 5,765 |
| 8 | August | 40,000 | 268,000 | 402,000 | 58,216 | 66.67% | 38,811 | 6,172 |
| 9 | September | 32,000 | 300,000 | 400,000 | 57,810 | 75.00% | 43,358 | 4,547 |
| 10 | October | 27,000 | 327,000 | 392,400 | 56,266 | 83.33% | 46,889 | 3,531 |
| 11 | November | 33,000 | 360,000 | 392,727 | 56,333 | 91.67% | 51,639 | 4,750 |
| 12 | December [1] | — | 360,000 | 360,000 | 49,686 | 100.00% | 49,686 | (1,953) |
| **Total** | | | | | | | | **49,686** |

[1] Note that for purposes of calculating your 2003 equity award, your December payout was assumed to be zero.



## Award Calculation Example

As an example, we'll go through the calculation for an SVP IR with payout of $360,000 for 2003. For purposes of the 2003 Equity Award Program for IRs, 2003 total compensation includes only 11 months of total compensation earned during December 2002 through October 2003 (paid January through November 2003).

| Step | Instructions | Sample Calculation | Sample Result |
|------|-------------|-------------------|---------------|
| **Step 1** | Your 2003 award was determined at year-end based on your total compensation from January through November. | Not applicable | $360,000 |
| **Step 2** | According to the schedule on page 5, the SVP in our example, with 2003 total compensation between $300,000 and $500,000 received $37,500 plus 20.31 percent of his 2003 total compensation over $300,000 in RSUs and stock options. | $37,500 + (20.31% x $60,000) | $49,686 |
| **Step 3** | The next step is to figure out how many options were awarded in 2003. The 2003 equity award was based on total payout, after all adjustments, for production months December 2002 through October 2003 (paid from January through November 2003) and the 2003 IR Equity Award Schedule on page 5. According to the schedule, the award for an IR with 2003 total payout of $360,000 is $37,500 plus 20.31 percent of 2003 total payout over $300,000, or $49,686. This amount, multiplied by 25 percent, gives us the stock option award. | [$37,500 + (20.31% x $60,000)] x 25% | $12,421.50 |
| **Step 4** | To calculate the number of options received, divide the value from step 3 by $20.84 (which represents the $27.79 Black-Scholes value of a 10-year Lehman Brothers option, less the Firm-provided 25 percent discount). | $12,421.50 ÷ $20.84 | 596 options |
| **Step 5** | The next step is to figure out how many RSUs were awarded in 2003. According to the schedule, the award for an IR with 2003 total payout of $360,000 is $37,500 plus 20.31 percent of 2003 total payout over $300,000, or $49,686. This amount, less the result in step 3 (which represents the value of the 2003 stock options), gives us the 2003 RSU award. | [($37,500 + (20.31% x $60,000)) - ($12,421.50)] | $37,264.50 |
| **Step 6** | To calculate the number of RSUs received, divided the value in step 5 by $53.54 (which represents the $71.39 price of Lehman Brothers stock on December 10, 2003, less the Firm-provided 25 percent discount). | $37,264.50 ÷ $53.54 | 696 RSUs |

**7**

*Senior Vice President*



**EQUITY AWARD** PROGRAM

**8**

# TERMINATION PROVISIONS FOR RSUs AND STOCK OPTIONS

| Reason | RSUs | Stock Options |
|---|---|---|
| **General Rules** | | |
| **Salaried Members of the Firm** | n If termination occurs prior to January 30, 2004, all RSUs will be forfeited. | n If termination occurs prior to January 30, 2004, all options will be forfeited. |
| | n If termination occurs after January 30, 2004, the disposition of the RSUs will be subject to the provisions outlined below. | n If termination occurs after January 30, 2004, the disposition of the options will be subject to the provisions outlined below. |
| **Investment Representatives** | n If termination occurs prior to November 30, 2003, the 2003 RSUs will be based on the amount of production-based compensation accrued for your 2003 equity award through the date of your termination, in accordance with Holdings' standard formula for the payout of equity-based compensation for employees at your level, multiplied by 75 percent. The disposition of the RSUs will be subject to the provisions outlined below. | n If termination occurs prior to November 30, 2003, options will be based on the amount of your production-based compensation accrued for your 2003 equity award through the date of your termination, in accordance with Holdings' standard formula for the payout of equity-based compensation for employees at your level, multiplied by 25 percent. The disposition of the options will be subject to the provisions outlined below. |
| **Voluntary Not to a Competitor** | n Entitled to the entire principal portion provided no Competitive Activity or Detrimental Activity through the Share Payment Date as defined below. | n Entitled to the entire principal portion and discount portion of the option award. |
| | n Entitled to a pro-rata portion of the discount (20 percent for each full year completed following the award date) provided no Competitive Activity or Detrimental Activity through the Share Payment Date. | n Options become exercisable six months after termination (or on the scheduled date if sooner than six months), provided no Competitive Activity or Detrimental Activity. |
| | n If termination occurs after a "Full Career" with the Firm, entitled to the entire discount portion provided you do not engage in Competitive Activity or Detrimental Activity through the Share Payment Date. "Full Career" termination means you have at least 20 years of service or your age and length of service equal at least 65, plus your age is at least 45 and you have at least ten years of service with Lehman Brothers. | n Options remain exercisable until the later of a) November 30, 2008 (five years after the award date) or b) six months after the termination date. |
| | n Any shares that remain outstanding will be issued on the Share Payment Date. The Share Payment Date is defined as the earlier of a) November 30, 2008 (five years after the award date) or b) the end of the fiscal quarter one year following the termination date. | n If termination occurs after a "Full Career" with the Firm, options remain exercisable until November 29, 2013 (ten years after the award date), provided you do not engage in Competitive Activity or Detrimental Activity. "Full Career" termination means you have at least 20 years of service or your age and length of service equal at least 65, plus your age is at least 45 and you have at least ten years of service with Lehman Brothers. |
| | | n In no event shall the options remain exercisable after November 29, 2013 (ten years after the award date). |



                                    LEH-RSU 0015897

# TERMINATION PROVISIONS FOR RSUs AND STOCK OPTIONS (cont'd)

| Reason | RSUs | Stock Options |
|---|---|---|
| **Voluntary to a Competitor** | n Forfeit entire principal portion if termination occurs prior to November 30, 2005 (two years after the award date).<br><br>n Entitled to the entire principal portion if termination occurs after November 30, 2005 (two years after the award date) provided no Detrimental Activity.<br><br>n Forfeit entire discount portion.<br><br>n Any shares that remain outstanding will be issued on the Share Payment Date. The Share Payment Date is defined as the earlier of a) November 30, 2008 (five years after the award date), or b) the end of the fiscal quarter one year following the termination date. | n Forfeit entire principal portion and discount portion if termination occurs prior to November 30, 2005 (two years after the award date).<br><br>n Forfeit options that are not exercised prior to termination date if termination occurs after November 30, 2005 (two years after the award date). |
| **Involuntary with Cause** | n Entire principal and discount portion will be forfeited immediately upon termination. | n Entire principal and discount portion will be forfeited immediately upon termination. |
| **Involuntary without Cause** | n Entitled to the entire principal portion provided no Detrimental Activity through the Share Payment Date.<br><br>n Entitled to a pro-rata portion of the discount (20 percent for each full year completed following the award date) provided no Detrimental Activity through the Share Payment Date.<br><br>n If termination occurs after a "Full Career" with the Firm, entitled to the entire discount portion provided you do not engage in Detrimental Activity through the Share Payment Date. "Full Career" termination means you have at least 20 years of service or your age and length of service equal at least 65, plus your age is at least 45 and you have at least ten years of service with Lehman Brothers.<br><br>n Any shares that remain outstanding will be issued on the Share Payment Date. The Share Payment Date is defined as the earlier of a) November 30, 2008 (five years after the award date), or b) the end of the fiscal quarter one year following the termination date. | n Entitled to the entire principal portion and discount portion of the option award.<br><br>n Options become immediately exercisable and remain exercisable until the later of a) November 30, 2008 (five years after the award date) or b) six months after termination date, provided no Detrimental Activity.<br><br>n If termination occurs after a "Full Career" with the Firm, options remain exercisable until November 29, 2013 (ten years after the award date) provided you do not engage in Detrimental Activity. "Full Career" termination means you have at least 20 years of service or your age and length of service equal at least 65, plus your age is at least 45 and you have at least ten years of service with Lehman Brothers.<br><br>n In no event shall the options remain exercisable after November 29, 2013 (ten years after the award date). |

**9**

*Senior Vice President*



**EQUITY AWARD** PROGRAM

**10**

# TERMINATION PROVISIONS FOR RSUs AND STOCK OPTIONS (cont'd)

| Reason | RSUs | Stock Options |
|---|---|---|
| **Death, Disability, Retirement** | n Entire principal portion and discount portion will vest immediately.<br><br>n Shares of Lehman Brothers common stock will be issued immediately.<br><br>n Retirement means a termination of employment which meets the criteria for retirement under Lehman Brothers Holdings Inc.'s qualified defined benefit pension plan, provided you enter into an agreement with the Firm not to engage in Competitive Activity or Detrimental Activity. | n Entire principal portion and discount portion will immediately become exercisable and remain exercisable until the expiration date (November 29, 2013).<br><br>n Retirement means a termination of employment, which meets the criteria for retirement under Lehman Brothers Holdings Inc.'s qualified defined benefit pension plan, provided you enter into an agreement with the Firm not to engage in Competitive Activity or Detrimental Activity. |

## Your Conduct With Respect to Lehman Brothers After You Leave

You may forfeit your rights to any 2003 RSUs (and related dividend reinvestment) and unexercised stock options if you engage in Competitive Activity or Detrimental Activity.

### COMPETITIVE ACTIVITY

Competitive Activity means involvement (whether as an employee, proprietor, consultant or otherwise) with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with any business carried on by Lehman Brothers Holdings Inc. or any of its subsidiaries or affiliates on the date of termination of a person's employment with the Firm, as determined in the sole discretion of the Chief Executive Officer or the Chief Operating Officer of the Firm (or their respective designees). *Please note that the determination of Competitive Activity is not based on the function that an individual performs in a company but rather the nature of the company's businesses.*

Most financial services companies, including but not limited to, all of the "bulge bracket" investment banks, many commercial banks and even small boutique-type firms are considered competitors of the Firm for purposes of the Equity Award Program. While the Firm values its client relationships with financial institutions, these relationships will not preclude companies being deemed competitors when any of their business activities may be considered competitive with the Firm. Please consult your Human Resources representative or the Compensation Department if you have questions about a particular company.

### DETRIMENTAL ACTIVITY

Detrimental Activity means at any time (i) using information received during a person's employment with Lehman Brothers Holdings Inc. or any subsidiary, their affiliates or clients, in breach of such person's undertakings to keep such information confidential; (ii) directly or indirectly persuading or attempting to persuade, by any means, any employee of Holdings or any subsidiary to terminate employment with Holdings or any subsidiary or to breach any of the terms of his or her employment with Holdings or any subsidiary; (iii) directly or indirectly making any statement that is, or could be, disparaging of Holdings, its subsidiaries or affiliates, or any of their employees (except as necessary to respond truthfully to any inquiry from applicable regulatory authorities or to provide information pursuant to legal process); or (iv) directly or indirectly engaging in any activity that is substantially injurious to the financial condition, reputation, or goodwill of Holdings or its subsidiaries or affiliates, in each case as determined in the sole discretion of the Chief Executive Officer or the Chief Operating Officer of the Firm (or their respective designees).



# **T**AX CONSIDERATIONS

## Tax Treatment of RSUs and Stock Options

Under current tax regulations, you will not be taxed on the value of your RSUs until they convert to common stock. As a result, your RSUs appreciate on a pre-tax basis for the five-year restriction period.

You will not be taxed on the value of your stock option award on the date of grant. When you exercise your options, the gain will be considered ordinary income subject to applicable tax withholding.

Provided below is a summary of the taxes related to RSUs and stock options that are ultimately due under current law.

### RSUs

- No taxation on the award date.

- Upon conversion to common stock, the fair market value of the shares will be taxed as employment income based on the closing price of Lehman Brothers common stock on the conversion date.

- This income will be subject to applicable withholding tax.

- Special provisions dealing with capital gains will not apply upon conversion to common stock.

- If you retain your shares after RSUs convert to common stock, the basis for capital gains is the closing price on the conversion date.

### Options

- No taxation on the award date.

- When options are exercised, the difference between the Fair Market Value on the exercise date and the option exercise price will be taxed as employment income. Fair Market Value is defined as a) the average of the sale prices (for a "same-day-sale" transaction) or b) the closing price of Lehman Brothers common stock on the exercise date (for a cash exercise). Please refer to the Questions and Answers for Exercising Stock Options, that has been provided to you, for a more detailed explanation of the procedures for exercising stock options.

- This income will be subject to applicable withholding tax.

- Special provisions dealing with capital gains will not apply when options are exercised.

- If you retain your shares upon exercise, the basis for capital gains is the Fair Market Value on the date of exercise.

Consult your personal tax advisor concerning the application of all federal/state/local or foreign tax laws on your RSUs and stock options.



EQUITY AWARD PROGRAM

**12**

# C HANGE IN CONTROL ("CIC") PROVISIONS

| Reason | RSUs | Stock Options |
|---|---|---|
| **Hostile** | ▪ All RSUs vest immediately.<br><br>▪ Shares of Lehman Brothers common stock will be issued immediately. | ▪ All options become immediately exercisable. |
| **Friendly** | ▪ Upon the CIC, you will receive the undiscounted award price for your RSUs in either cash or equity.<br><br>▪ The additional value of the RSUs in excess of the undiscounted RSU award price will be paid on the Payment Date, defined as the earlier of: a) two years following the CIC or b) November 30, 2008 (five years after the award date).<br><br>▪ The RSUs (or cash balance) will remain subject to the vesting and issuance restrictions (including the provisions related to Competitive Activity and Detrimental Activity) through the Payment Date. | ▪ Half of the non-exercisable options will become immediately exercisable.<br><br>▪ The remaining half will continue to be subject to all exercise provisions until the earlier of: a) two years following the CIC or b) the scheduled exercise dates (75 percent on November 30, 2005 and 25 percent on November 30, 2008). |

## Payment of RSUs Upon a Friendly CIC

EXAMPLE: Let's use as an example an SVP whose 2003 compensation was $400,000. The amount of compensation paid in RSUs was $34,688 (for 648 RSUs at a market value of $46,261). Assume there is a Change in Control and the market price for Lehman Brothers stock at that time is $100 per share.

### UNDISCOUNTED PURCHASE PRICE:

▪ Upon a Friendly Change in Control, this SVP receives a payment of shares (or cash) equivalent in value to the original award, $46,261. Assuming a market price of $100, this SVP would receive 463 shares.

### PREMIUM OVER UNDISCOUNTED PRICE:

▪ The additional value of the RSUs, in excess of the original award value, $18,539 ((648 RSUs x $100) - $46,261), will be held on the SVP's behalf in either cash or equity of the successor entity.

▪ The payment (in either cash or equity of the successor entity) will be subject to the same vesting and issuance restrictions as the RSU award.

▪ Assume the SVP leaves within two years of the Change in Control:

– The SVP will be entitled to 75 percent of the additional value of the RSUs, in excess of the original award value ($18,539 x 75% = $13,904), provided no Competitive Activity or Detrimental

Activity for a period of one year after termination date (or the second anniversary of the Change in Control, if sooner).

– The SVP will also be entitled to a pro-rata portion of the remaining 25 percent of the additional value of the RSUs (in excess of the original award value) based on the number of full years completed after the RSU award date (e.g., if termination occurs during 2006 (but before November 30, 2006), 2/5th of the remaining amount or $1,854).

– In total, the SVP will receive $15,758 ($1,854 plus $13,904) or 158 shares. In this example, the SVP receives 85 percent of the additional value of the RSUs in excess of the original award value.

▪ Please note that this value may be converted to shares of the successor entity. In this instance, the above percentages will be applied to the converted shares.



LEH-RSU 0015901

# DIVIDEND EQUIVALENTS

Dividend equivalents accrue quarterly on your RSUs and are reinvested as additional RSUs, without a discount. Dividend reinvestment RSUs are subject to the same vesting and forfeiture provisions as the underlying RSUs to which they relate. The Firm retains the discretion to change this dividend policy at any time to pay in cash rather than RSUs. Dividends will not be paid on stock option awards.

# VOTING RIGHTS

Lehman Brothers established a Trust and funded it with shares for your benefit to provide you with voting rights related to your RSU awards. You will be able to direct the voting related to shares held in the Trust in proportion to the number of RSUs you hold. You will continue to have these voting rights as long as you remain employed with the Firm.

# OTHER INFORMATION

In the event of any conflict between the plan documents (including, but not limited to, the Restricted Stock Unit award agreement, the Stock Option award agreement, the Employee Incentive Plan, and the Employee Incentive Plan Prospectus) and the information in this summary, the plan documents will govern.

Nothing in this summary or the plan documents shall be construed to create or imply any contract of employment between you and Lehman Brothers.

All references to taxation in this summary refer to U.S. Federal taxes and current tax law. You should consult your local tax authorities or personal tax consultant for details on the impact of tax laws in effect at the time your RSUs and stock options become taxable.

If you have any questions about the Program in general, your personal award statement or your award agreement, call the Compensation Department at 212-526-8346 (5-8346), or for IRs, your PCS Human Resources contact at 212-526-2921 (5-2921).

13

*Senior Vice President*



E
X
H
I
B
I
T

4

**EXHIBIT 4**

# 2003 MANAGING DIRECTOR EQUITY AWARD PROGRAM

## AGREEMENT EVIDENCING A GRANT OF RESTRICTED STOCK UNITS



## LEHMAN BROTHERS

CONFIDENTIAL

**1. GRANT OF UNITS.** Pursuant to the Lehman Brothers Holdings Inc. ("Holdings") Employee Incentive Plan (the "Plan"), you are hereby granted, as of December 10, 2003 (the "Date of Grant"), the number of Restricted Stock Units ("Units") for shares of Holdings' common stock, par value $.10 per share (the "Common Stock"), set forth on the award statement with your name on it delivered to you herewith (which number of Units may be adjusted pursuant to Paragraph 8 below).

**2. ADDITIONAL DOCUMENTS; DEFINITIONS.** You have been provided with a copy of the Plan, which is incorporated in this instrument by reference and made a part hereof, and a copy of the Plan prospectus. The Plan and the prospectus should be carefully examined. In the event of any conflict or ambiguity between this instrument and the Plan, the terms of the Plan shall govern. All capitalized terms not defined herein or on Annex A attached hereto shall have the meaning ascribed to such terms under the Plan.

**3. VESTING.** Units awarded to you hereunder shall become vested in accordance with the following vesting schedule:

- Half of the Principal Units (35% of the total award) shall become vested on November 30, 2006.

- The remaining half of the Principal Units and all of the Discount Units (65% of the total award) shall become vested on November 30, 2008.

Notwithstanding the above, in the event your employment is terminated with Cause or if you engage in Detrimental Activity prior to November 30, 2008, all of your vested and unvested Units will be forfeited and canceled.

**4. ENTITLEMENT TO RECEIVE COMMON STOCK.**
**(a) General Rule.** Unless otherwise set forth herein, you shall receive one share of Common Stock for each Unit which you hold on November 30, 2008 (the "Maturity Date"). In the event of your Termination (as defined below) for any reason or notification of termination of employment prior to January 30, 2004 or you engage in Detrimental Activity at any time prior to the Maturity Date, all Units held by you shall be forfeited and canceled. Delivery of Common Stock hereunder shall be made on, or as soon as practicable after, the Maturity Date except as specified in Paragraphs 4(b), (c), (d), (e), (f) and (g) below. For purposes of the Equity Award Program, "Termination" means the end of employment with Holdings or a subsidiary. The date of Termination and the reason for Termination are as determined in the sole discretion of an Appropriate Officer.

**(b) Voluntary Termination with Competitive Activity.** In the event of your voluntary Termination with Competitive Activity, (i) all Discount Units shall be forfeited and canceled, (ii) if such Termination occurs prior to November 30, 2006, all Principal Units shall be forfeited and canceled and (iii) if such Termination occurs on or subsequent to November 30, 2006, you shall be entitled to half of the Principal Units (35% of the total award). Such shares shall be issued to you on the Share Payment Date, provided you do not engage in Detrimental Activity through the Share Payment Date.

**(c) Voluntary Termination without Competitive Activity.** In the event of your voluntary Termination without Competitive Activity on or after January 30, 2004, you shall be entitled to receive (i) freely transferable shares of Common Stock for the Principal Units and (ii) freely transferable shares of Common Stock equal to 20% of the Discount Units multiplied by each full year of your employment with Holdings or a subsidiary after November 30, 2003 and before your Termination. However, if your Termination is a Full Career Termination (as defined in

Annex A), you will be entitled to receive all the Discount Units. Such shares shall be issued to you on the Share Payment Date, provided you do not engage in Competitive Activity or Detrimental Activity prior to the Share Payment Date. In the event of Competitive Activity prior to the Share Payment Date, the provisions specified in Paragraph 4(b) shall apply. Any Units as of the Share Payment Date not received pursuant to this Paragraph 4(c) shall be forfeited and canceled.

**(d) Involuntary Termination with Cause.** In the event of your involuntary Termination with Cause, all Principal Units and Discount Units shall be forfeited and canceled.

**(e) Involuntary Termination without Cause.** In the event of your involuntary Termination without Cause on or after January 30, 2004, you shall be entitled to receive (i) freely transferable shares of Common Stock for the Principal Units and (ii) freely transferable shares of Common Stock equal to 20% of the Discount Units multiplied by each full year of your employment with Holdings or subsidiary after November 30, 2003 and before your Termination. However, if your Termination is a Full Career Termination, you will be entitled to receive all the Discount Units. Such shares shall be issued to you on the Share Payment Date, provided you do not engage in Detrimental Activity prior to the Share Payment Date. Any Units as of the Share Payment Date not received pursuant to this Paragraph 4(e) shall be forfeited and canceled.

**(f) Retirement.** Notwithstanding the provisions of Paragraphs 4(b), (c), (d) and (e), in the event of your Retirement on or after January 30, 2004 and provided you do not engage in Competitive Activity or Detrimental Activity, all Principal Units and Discount Units shall become immediately payable. You will receive freely transferable shares of common stock for each payable Unit as soon as practicable after your Retirement. If you engage in Competitive Activity, the provisions specified in Paragraph 4(b) shall apply as of the date of your Retirement, and you shall be obligated to repay to Holdings the full gross amounts or shares received in excess of those which you would have received under Paragraph 4(b). If you engage in Detrimental Activity, you shall be obligated to repay to Holdings the full gross amounts or shares you received under this Agreement.

**(g) Occurrence of a Bankruptcy Distribution Event, Death, or Disability**. Notwithstanding the provisions of Paragraphs 4(b), (c), (d) and (e), in the event of the occurrence on or after January 30, 2004 of (i) a Bankruptcy Distribution Event, (ii) your death or Disability, (iii) your death or Disability following a Termination of employment described in Paragraphs 4(c) or (e) hereof, all outstanding Units held by you shall become immediately payable and you shall, as soon as practicable thereafter, receive freely transferable shares of Common Stock.

**(h) Affidavit.** In the event of your Termination on or after January 30, 2004, you may be requested, from time to time after your Termination, to complete and sign an affidavit with respect to Competitive Activity or Detrimental Activity, which includes representations and authorizes Holdings to verify the representations. Any failure on your part to complete, sign and return the affidavit within 60 days may cause you to forfeit all Units held by you at that time.

**5. DIVIDEND EQUIVALENTS.** With respect to each dividend or distribution paid or made on Common Stock to holders of record on or after January 30, 2004, you shall be paid cash and/or credited with a number of additional Units comparable in value to such dividend or distribution. Such additional Units shall vest and become payable at the same time as the Units to which they are attributable.

    LEH-RSU 0015052

**6. LIMITATION ON OBLIGATIONS.** Holdings' and any subsidiary's obligation with respect to the Units granted hereunder is limited solely to the delivery to you of shares of Common Stock on the date when such shares are due to be delivered hereunder, and in no way shall Holdings or any subsidiary become obligated to pay cash in respect of such obligation (except for cash paid pursuant to Paragraphs 5 and 9 hereof).

**7. NON-ASSIGNMENT.** Units may not be sold, assigned, transferred, pledged, hypothecated, or otherwise disposed of by you, except by will or the laws of descent and distribution. If you or anyone claiming under or through you attempts to violate this Paragraph 7, such attempted violation shall be null and void and without effect, and Holdings' obligation to issue any Common Stock hereunder shall terminate.

**8. EQUITABLE ADJUSTMENT.** In the event of a Change in Capitalization occurring on or after the Date of Grant specified above and prior to the Maturity Date, the number and kind of shares of Common Stock which may be issued with respect to Units shall be adjusted so as to reflect such change.

**9. CHANGE IN CONTROL.** Except as set forth below, upon the occurrence of a Hostile Change in Control, your Units shall vest immediately, the sales restrictions shall lapse and shares of Common Stock shall be issued. Except as set forth below, upon the occurrence of a Friendly Change in Control, you shall receive in the same form of consideration as that received by shareholders generally, the undiscounted market value (at the time of grant) for your Units, and the excess of the price paid by an acquirer over such undiscounted market value shall be deferred for the shorter of two years from the date of the Friendly Change in Control or the term of any remaining restrictions (the "Deferred Period"), but your Units shall remain otherwise subject to all issuance restrictions during the Deferred Period. Neither of the foregoing shall be effective to the extent you have tender or voting rights over shares of Common Stock held in Trust with respect to any Units, in which case you would only be issued Common Stock or receive the undiscounted market value in the same form of consideration as that received by shareholders generally (and after the Deferred Period, the excess price) in respect of such Units upon successful completion of a Change in Control.

**10. TREATMENT IN BANKRUPTCY.** (a) If you are an employee of Holdings, Holdings agrees to deliver, and (b) if you are an employee of a subsidiary, Holdings agrees to deliver to (or at the direction of) such subsidiary, shares of Common Stock on the date when such shares are due to be delivered under this Agreement in satisfaction of each Unit granted to you hereunder. If you are an employee of a subsidiary, Holdings' obligation in clause (b) of the preceding sentence is created expressly for the benefit of you, and you shall have the full right to enforce Holdings' obligation to deliver Common Stock as if such obligation were made directly in favor of you. All of your claims arising from, in connection with, or in any way relating to, any failure of Holdings to deliver to you, or to a subsidiary for delivery by such subsidiary to you, shares of Common Stock on the date when such shares are due to be delivered under this Agreement in satisfaction of each Unit granted to you shall be deemed, in the event of a bankruptcy of Holdings, to be claims for damages arising from the purchase or sale of Common Stock of Holdings, within the meaning of section 510(b) of the Bankruptcy Code and shall have in such bankruptcy the same priority as, and no greater priority than, common stock interests in Holdings.

**11. AMENDMENT.** The terms of this Agreement may be amended from time to time by the Committee in its sole discretion in any manner that it deems appropriate (including, but not limited to, the acceleration provisions).

**12. BINDING ACTIONS.** Any action taken or decision made by the Committee or its designees arising out of or in connection with the construction, administration, interpretation or effect of the Plan or this Agreement shall lie within its sole and absolute discretion, as the case may be, and shall be final, conclusive and binding on you and all persons claiming under or through you. By accepting this grant or other benefit under the Plan, you and each person claiming under or through you shall be conclusively deemed to have indicated acceptance and ratification of, and consent to, any action taken under the Plan by the Committee or its designees.

**13. NO RIGHT TO CONTINUED EMPLOYMENT.** The grant of Units shall not confer on you any right to be retained in the employ of Holdings or a subsidiary, or to receive subsequent Units or other awards under the Plan. The right of Holdings or any subsidiary to terminate your employment with it at any time or as otherwise provided by any agreement between Holdings and you is specifically reserved.

**14. APPLICABLE LAW.** The validity, construction, interpretation, administration, and effect of the Plan, and of its rules and regulations, and rights relating to the Plan and to this Agreement, shall be governed by the substantive laws, but not the choice of law rules, of the State of Delaware.

**15. WITHHOLDING/DEDUCTIONS.** Holdings shall have the right to deduct applicable taxes from all amounts payable to you. It shall be a condition to the obligation of Holdings to issue shares of Common Stock hereunder (a) that you (or, in event of your death, your estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of your death) pay to Holdings or its designee, upon its demand, in accordance with the Plan, such amount as may be required for the purpose of satisfying its obligation or the obligation of any other person to withhold any taxes required by law which are incurred by reason of the issuance of such shares of Common Stock, and (b) that you (or, in the event of your death, your estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of your death) provide Holdings with any forms, documents or other information reasonably required by Holdings in connection with the grant. If the amount requested for the purpose of satisfying the withholding obligation is not paid, Holdings may refuse to issue shares of Common Stock and/or related dividend equivalents or take any other action it deems necessary to fulfill the withholding obligation. Holdings shall further have the right to deduct from all amounts remaining payable to you after satisfaction of the withholding obligations described above, the amount of any deficit, debt, tax obligation or other liability or obligation of any kind which you may at that time have with respect to Holdings or any subsidiary.

## ANNEX A: DEFINITIONS

**"Appropriate Officer"** means the Chief Executive Officer or Chief Operating Officer of Holdings (or their respective designees).

**"Bankruptcy Distribution Event"** means the earlier to occur of (i) the date of, but immediately prior to, distribution to holders of claims and interests upon the substantial consummation of a confirmed plan of reorganization of Holdings in a Chapter 11 case under Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), or (ii) the date of, but immediately prior to, distribution to holders of claims and interests upon the liquidation of Holdings in a Chapter 7 case under the Bankruptcy Code.

**"Cause"** means a material breach by a person of an employment contract between the person and Holdings or any subsidiary, failure by a person to devote substantially all business time exclusively to the performance of his or her duties for Holdings or

any subsidiary, willful misconduct, dishonesty related to the business and affairs of Holdings or any subsidiary, conviction of a felony or of a misdemeanor constituting a statutory disqualification under U.S. securities laws (or failure to contest prosecution for a felony or such a misdemeanor), habitual or gross negligence in the performance of a person's duties, solicitation of employees of Holdings or any subsidiary to work at another company, improper use or disclosure of confidential information, the violation of policies and practices adopted by Holdings or any subsidiary including, but not limited to the Code of Conduct, or a material violation of the conflict of interest, proprietary information or business ethics policies of Holdings or any subsidiary, or such other circumstances as may be determined in the sole discretion of an Appropriate Officer.

"**Committee**" shall mean the Compensation and Benefits Committee of the Incumbent Board (see definition of Change in Control in the Plan).

"**Competitive Activity**" means involvement (whether as an employee, proprietor, consultant or otherwise) with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with any business carried on by Holdings or any of its subsidiaries or affiliates on the date of termination of a person's employment with Holdings and any of its subsidiaries, as determined in the sole discretion of an Appropriate Officer.

"**Detrimental Activity**" means at any time (i) using information received during a person's employment with Holdings or any subsidiary, their affiliates or their clients, in breach of such person's undertakings to keep such information confidential; (ii) directly or indirectly persuading or attempting to persuade, by any means, any employee of Holdings or any subsidiary to terminate employment with any of the foregoing or to breach any of the terms of his or her employment with the foregoing; (iii) directly or indirectly making any statement that is, or could be, disparaging of Holdings, its subsidiaries or affiliates, or any of their employees (except as necessary to respond truthfully to any inquiry from applicable regulatory authorities or to provide information pursuant to legal process); or (iv) directly or indirectly engaging in any activity that is substantially injurious to the financial condition, reputation, or goodwill of Holdings or its subsidiaries or affiliates, in each case as determined in the sole discretion of an Appropriate Officer.

"**Disability**" means a disability under both the Long-Term Disability Insurance Plan and Social Security Act.

"**Discount Units**" shall mean the number of Units (and any dividend equivalents related thereto) related to the 30% discount upon issuance of the award.

"**Friendly Change in Control**" shall mean any Change in Control, which is not a Hostile Change in Control.

"**Full Career Termination**" means a Termination when (i) a person has at least 20 years of service or (ii) a person meets all of the following criteria: (x) the person's age plus years of service with Holdings or any subsidiary equals at least 65, (y) the person is at least 45 years old, and (z) the person has at least 10 years of service with Holdings or any subsidiary.

"**Hostile Change in Control**" shall mean the occurrence of a Change in Control, without the prior approval of a majority of the independent members of the Incumbent Board.

"**Principal Units**" shall mean the number of Units (and any dividend equivalents related thereto) related to the undiscounted base portion of the award (70% of the total number of units awarded).

"**Retirement**" means a Termination of employment which meets the criteria for retirement under Holdings' qualified defined benefit pension plan, provided that the person has signed an agreement not to engage in Competitive Activity or Detrimental Activity, in a form prescribed in the sole discretion of an Appropriate Officer.

"**Share Payment Date**" means as soon as practicable after the earlier of (a) November 30, 2008 or (b) the completion of the fiscal quarter following the one-year anniversary of termination of employment.

©2003 Lehman Brothers.  All Rights Reserved.  LB10484_C1_US_RSUAgmt/MD_RSU_Agmt

LEH-RSU 0015054

E
X
H
I
B
I
T

5

**EXHIBIT 5**

## 2004 EQUITY AWARD PROGRAM

# AGREEMENT EVIDENCING A GRANT
# OF RESTRICTED STOCK UNITS

Investment Representatives



# LEHMAN BROTHERS

1. GRANT OF UNITS. Pursuant to the Lehman Brothers Holdings Inc. ("Holdings") Employee Incentive Plan (the "Plan"), you are hereby granted, as of December 9, 2004 (the "Date of Grant"), the number of Restricted Stock Units ("Units") for shares of Holdings' common stock, par value $.10 per share (the "Common Stock"), set forth on the award statement with your name on it delivered to you herewith (which number of Units may be adjusted pursuant to Paragraph 8 below).

In the event of your Termination prior to November 30, 2004, the number of Units you were awarded was based on the appropriate portion of your production-based compensation accrued for your 2004 equity award through the date of your Termination, in accordance with Holdings' standard formula for the payout of equity-based compensation for employees at your level.

2. ADDITIONAL DOCUMENTS; DEFINITIONS. You have been provided with a copy of the Plan, which is incorporated in this instrument by reference and made a part hereof, and a copy of the Plan prospectus. The Plan and the prospectus should be carefully examined. In the event of any conflict or ambiguity between this instrument and the Plan, the terms of the Plan shall govern. All capitalized terms not defined herein or on Annex A attached hereto shall have the meaning ascribed to such terms under the Plan.

3. VESTING. Subject to Paragraph 4, units awarded to you hereunder shall become vested in accordance with the following vesting schedule

■ The Principal Units (75% of the total award) shall become vested on November 30, 2006.

■ The Discount Units (25% of the total award) shall become vested on November 30, 2009.

4. ENTITLEMENT TO RECEIVE COMMON STOCK.
(a) General Rule. Unless otherwise set forth herein, you shall receive one share of Common Stock for each Unit which you hold on November 30, 2009 (the "Maturity Date") and you shall be entitled to receive freely transferable Shares of Common Stock as soon as practicable after the Maturity Date.

(b) Effect of Detrimental Activity. Notwithstanding any other provision of this Agreement if you engage in Detrimental Activity at any time prior to the Share Payment Date, all Units held by you shall be forfeited and canceled.

(c) Occurrence of Death, Disability. In the event of the occurrence of your death or Disability, all outstanding Units held by you shall become immediately payable and you shall, as soon as practicable thereafter, receive freely transferable shares of Common Stock.

(d) Voluntary Termination with Competitive Activity. In the event of your voluntary Termination with Competitive Activity, (i) all Discount Units shall be forfeited and canceled, (ii) if such Termination occurs prior to November 30, 2006, all Principal Units shall be forfeited and canceled and (iii) if such Termination occurs on or subsequent to November 30, 2006, you shall be entitled to receive freely transferable shares of Common Stock for the Principal Units.

(e) Voluntary Termination without Competitive Activity. In the event of your voluntary Termination without Competitive Activity, you shall be entitled to receive (i) freely transferable shares of Common Stock for the Principal Units and (ii) freely transferable shares of Common Stock equal to 20% of the Discount Units multiplied by each full year of your employment

with Holdings or a Subsidiary after November 30, 2004 and before your Termination. However, if your Termination is a Full Career Termination, you will be entitled to receive freely transferable shares of Common Stock for all Discount Units, provided you do not engage in Competitive Activity prior to the Share Payment Date. In the event of Competitive Activity prior to the Share Payment Date, the provisions specified in Paragraph 4(d) shall apply.

(f) Involuntary Termination with Cause. In the event of your involuntary Termination with Cause, all Principal Units and Discount Units shall be forfeited and canceled.

(g) Involuntary Termination without Cause. In the event of your involuntary Termination without Cause, you shall be entitled to receive (i) freely transferable shares of Common Stock for the Principal Units and (ii) freely transferable shares of Common Stock equal to 20% of the Discount Units multiplied by each full year of your employment with Holdings or Subsidiary after November 30, 2004 and before your Termination. However, if your Termination is a Full Career Termination, you will be entitled to receive freely transferable shares of Common Stock for all the Discount Units.

(h) Retirement. Notwithstanding the foregoing provisions of Paragraphs 4(d), (e), (f) and (g), in the event of your Retirement and provided you do not engage in Competitive Activity or Detrimental Activity, you shall be entitled to receive freely transferable shares of Common Stock for all Principal Units and Discount Units as soon as practicable following your Retirement. If you engage in Competitive Activity, the provisions specified in Paragraph 4(d) shall apply as of the date of your Retirement, and you shall be obligated to repay to Holdings the full gross amounts or shares received in excess of those which you would have received under Paragraph 4(d). If you engage in Detrimental Activity prior to the Share Payment Date, you shall be obligated to repay to Holdings the full gross amounts or shares you received under this Agreement.

(i) Occurrence of Death or Disability following Termination. Notwithstanding the foregoing provisions of Paragraph 4(e), (f) and (g), in the event of the occurrence of your death or Disability following a Termination described in Paragraph 4(e) or (g) hereof, all outstanding Units held by you shall at that time become immediately payable and you shall, as soon as practicable thereafter, receive freely transferable shares of Common Stock.

Any shares that become payable pursuant to this Paragraph 4 (other than Paragraph 4(h) or (i)) shall be issued to you on the Share Payment Date, subject to the application of Paragraph 4(b). Any remaining Units that are not payable pursuant to the provisions of the Paragraph 4(d)-(i) shall be canceled by Holdings.

(j) Affidavit. In the event of your Termination, you may be requested, from time to time after your Termination, to complete and sign an affidavit with respect to Competitive Activity or Detrimental Activity, which includes representations and authorizes Holdings to verify the representations. Any failure on your part to complete, sign and return the affidavit as required may cause you to forfeit all Units held by you at that time.

LEH-RSU 0014330

5. DIVIDEND EQUIVALENTS. With respect to each dividend or distribution paid or made on Common Stock to holders of record, you shall be paid cash and / or credited with a number of additional Units comparable in value to such dividend or distribution. Such additional Units shall vest and become payable at the same time as the Units to which they are attributable.

6. LIMITATION ON OBLIGATIONS. Holdings' and any Subsidiary's obligation with respect to the Units granted hereunder is limited solely to the delivery to you of shares of Common Stock on the date when such shares are due to be delivered hereunder, and in no way shall Holdings or any Subsidiary become obligated to pay cash in respect of such obligation (except for cash paid pursuant to Paragraphs 5 and 9 hereof).

7. NON-ASSIGNMENT. Units may not be sold, assigned, transferred, pledged, hypothecated, or otherwise disposed of by you, except by will or the laws of descent and distribution. If you or anyone claiming under or through you attempts to violate this Paragraph 7, such attempted violation shall be null and void and without effect, and Holdings' obligation to issue any Common Stock hereunder shall terminate.

8. EQUITABLE ADJUSTMENT. In the event of a Change in Capitalization occurring on or after the Date of Grant specified above and prior to the Share Payment Date, the number and kind of shares of Common Stock which may be issued with respect to Units shall be adjusted so as to reflect such change.

9. CHANGE IN CONTROL. Except as set forth below, upon the occurrence of a Change in Control without the prior approval of a majority of the independent members of the Incumbent Board, your Units shall vest immediately, the sales restrictions shall lapse and shares of Common Stock shall be issued. Except as set forth below, upon the occurrence of a Change in Control with the prior approval of a majority of the independent members of the Incumbent Board, you shall receive in the same form of consideration as that received by shareholders generally, the lesser of (a) the undiscounted market value (at the time of grant) of the shares of Common Stock underlying your outstanding Units or (b) the price paid by an acquirer for such shares of Common Stock, and the excess, if any, of the price paid by an acquirer over such undiscounted market value shall be deferred for the shorter of (x) two years following such Change in Control or (y) the term of any remaining restrictions (the "Deferred Period"), but your Units shall remain otherwise subject to all issuance restrictions during the Deferred Period. Neither of the foregoing shall be effective to the extent you have tender or voting rights over shares of Common Stock held in Trust with respect to any Units, in which case you would only be issued Common Stock or receive the undiscounted market value in the same form of consideration as that received by shareholders generally (and after the Deferred Period, the excess price) in respect of such Units upon successful completion of a Change in Control.

10. TREATMENT IN BANKRUPTCY. (a) If you are an employee of Holdings, Holdings agrees to deliver, and (b) if you are an employee of a Subsidiary, Holdings agrees to deliver to (or at the direction of) such Subsidiary, shares of Common Stock on the date when such shares are due to be delivered under this Agreement in satisfaction of each Unit granted to you hereunder. If you are an employee of a Subsidiary, Holdings' obligation in clause (b) of the preceding sentence is created expressly for the benefit of you, and you shall have the full right to enforce Holdings' obligation to deliver Common Stock as if such obligation were made directly in favor of you. All of your claims arising from, in connection with, or in any way relating to, any failure of Holdings to deliver to you,

or to a Subsidiary for delivery by such Subsidiary to you, shares of Common Stock on the date when such shares are due to be delivered under this Agreement in satisfaction of each Unit granted to you shall be deemed, in the event of a bankruptcy of Holdings, to be claims for damages arising from the purchase or sale of Common Stock of Holdings, within the meaning of section 510(b) of the Bankruptcy Code and shall have in such bankruptcy the same priority as, and no greater priority than, common stock interests in Holdings.

11. AMENDMENT. The terms of this Agreement may be amended from time to time by the Committee in its sole discretion in any manner that it deems appropriate (including, but not limited to, the acceleration provisions).

12. BINDING ACTIONS. Any action taken or decision made by the Committee or its designees arising out of or in connection with the construction, administration, interpretation or effect of the Plan or this Agreement shall lie within its sole and absolute discretion, as the case may be, and shall be final, conclusive and binding on you and all persons claiming under or through you. By accepting this grant or other benefit under the Plan, you and each person claiming under or through you shall be conclusively deemed to have indicated acceptance and ratification of, and consent to, any action taken under the Plan by the Committee or its designees.

13. NO RIGHT TO CONTINUED EMPLOYMENT. The grant of Units shall not confer on you any right to be retained in the employ of Holdings or a Subsidiary, or to receive subsequent Units or other awards under the Plan. The right of Holdings or any Subsidiary to terminate your employment with it at any time or as otherwise provided by any agreement between Holdings or any Subsidiary and you is specifically reserved.

14. APPLICABLE LAW. The validity, construction, interpretation, administration, and effect of the Plan, and of its rules and regulations, and rights relating to the Plan and to this Agreement, shall be governed by the substantive laws, but not the choice of law rules, of the State of Delaware.

15. WITHHOLDING / DEDUCTIONS. Holdings shall have the right to deduct applicable taxes from all amounts payable to you. It shall be a condition to the obligation of Holdings to issue shares of Common Stock hereunder (a) that you (or, in event of your death, your estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of your death) pay to Holdings or its designee, upon its demand, in accordance with the Plan, either in the form of cash or freely transferable shares of Common Stock such amount as may be required for the purpose of satisfying its obligation or the obligation of any other person to withhold any taxes required by law which are incurred by reason of the issuance of such shares of Common Stock, and (b) that you (or, in the event of your death, your estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of your death) provide Holdings with any forms, documents or other information reasonably required by Holdings in connection with the grant. If the amount requested for the purpose of satisfying the withholding obligation is not paid, Holdings may refuse to issue shares of Common Stock and / or related dividend equivalents or take any other action it deems necessary to fulfill the withholding obligation. Holdings shall further have the right to deduct from all amounts remaining payable to you after satisfaction of the minimum statutory withholding obligations described above, the amount of any deficit, debt, tax obligation or other liability or obligation of any kind which you may at that time have with respect to Holdings or any Subsidiary.

3

16. SECTION 409(A)(1) TAX TREATMENT. Notwithstanding any other provisions of this Agreement, if any payment otherwise due hereunder would have the effect of subjecting you to tax under the provisions of Code Section 409A(a)(1), such payment shall be postponed until the earliest date upon which the payment could be made without subjecting you to tax under the provisions of Code Section 409A(a)(1).

ANNEX A: DEFINITIONS

"Appropriate Officer" means the Chief Executive Officer or Chief Operating Officer of Holdings (or their respective designees).

"Cause" means a material breach by a person of an employment contract between the person and Holdings or any Subsidiary, failure by a person to devote substantially all business time exclusively to the performance of his or her duties for Holdings or any Subsidiary, willful misconduct, dishonesty related to the business and affairs of Holdings or any Subsidiary, conviction of a felony or of a misdemeanor constituting a statutory disqualification under U.S. securities laws (or failure to contest prosecution for a felony or such a misdemeanor), habitual or gross negligence in the performance of a person's duties, solicitation of employees of Holdings or any Subsidiary to work at another company, improper use or disclosure of confidential information, the violation of policies and practices adopted by Holdings or any Subsidiary including, but not limited to the Code of Conduct, or a material violation of the conflict of interest, proprietary information or business ethics policies of Holdings or any Subsidiary, or such other circumstances as may be determined in the sole discretion of an Appropriate Officer.

"Change in Capitalization" means the occurrence of a circumstance described in Section 14 of the Plan.

"Committee" shall mean the Compensation and Benefits Committee of the Incumbent Board (see definition of Change in Control in the Plan).

"Competitive Activity" means involvement (whether as an employee, proprietor, consultant or otherwise) with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with any business carried on by Holdings or any of its Subsidiaries or affiliates on the date of termination of a person's employment with Holdings and any of its Subsidiaries, as determined in the sole discretion of an Appropriate Officer.

"Detrimental Activity" means (i) using information received during a person's employment with Holdings or any of its Subsidiaries relating to the business affairs of Holdings or any of its Subsidiaries, affiliates or clients, in breach of such person's undertaking to keep such information confidential; (ii) directly or indirectly persuading or attempting to persuade, by any means, any employee of Holdings or any of its Subsidiaries or affiliates to terminate employment with any of the foregoing or to breach any of the terms of his or her employment with the foregoing; (iii) directly or indirectly making any statement that is, or could be, disparaging of Holdings, its Subsidiaries or affiliates, or any of their affiliates (except as necessary to respond truthfully to any inquiry from applicable regulatory authorities or to provide information pursuant to legal process); or (iv) directly or indirectly engaging in any activity that is, or could be, substantially injurious to the financial condition, reputation, or goodwill of Holdings or its subsidiaries or affiliates, in each case as determined in the sole discretion of an Appropriate Officer.

"Disability" means a disability under both the Long-Term Disability Insurance Plan and Social Security Act.

"Discount Units" shall mean the number of Units (and any dividend equivalents related thereto) related to the 25% discount upon issuance of the award.

"Full Career Termination" means a Termination when (i) a person has at least 20 years of service or (ii) a person meets all of the following criteria: (x) the person's age plus years of service with Holdings or any Subsidiary equals at least 65, (y) the person is at least 45 years old, and (z) the person has at least 10 years of service with Holdings or any Subsidiary.

"Principal Units" shall mean the number of Units (and any dividend equivalents related thereto) related to the undiscounted base portion of the award (75% of the total number of units awarded).

"Retirement" means a Termination of employment which meets the criteria for retirement under Holdings' qualified defined benefit pension plan, provided that the person has signed an agreement not to engage in Competitive Activity or Detrimental Activity, in a form prescribed in the sole discretion of an Appropriate Officer.

"Share Payment Date" means as soon as practicable after the earlier of (a) the Maturity Date or (b) the completion of the fiscal quarter following the one-year anniversary of termination of employment.

"Termination" means the end of employment with Holdings or a Subsidiary. The date of Termination and the reason for Termination are as determined in the sole discretion of an Appropriate Officer.

©2004 Lehman Brothers. All Rights Reserved.

E X H I B I T

6

**EXHIBIT 6**

2005 **MANAGING DIRECTOR** EQUITY AWARD PROGRAM

# AGREEMENT EVIDENCING A GRANT OF RESTRICTED STOCK UNITS



## LEHMAN BROTHERS

LEH-RSU 0000108

**1. GRANT OF UNITS.** Pursuant to the Lehman Brothers Holdings Inc. ("Holdings") Employee Incentive Plan (the "Plan"), you are hereby granted, as of November 30, 2005 (the "Date of Grant"), the number of Restricted Stock Units ("Units") for shares of Holdings' common stock, par value $.10 per share (the "Common Stock"), set forth on the award statement with your name on it delivered to you herewith (which number of Units may be adjusted pursuant to Paragraph 8 below).

**2. ADDITIONAL DOCUMENTS; DEFINITIONS.** You have been provided with a copy of the Plan, which is incorporated in this instrument by reference and made a part hereof, and a copy of the Plan prospectus. The Plan and the prospectus should be carefully examined. In the event of any conflict or ambiguity between this instrument and the Plan, the terms of the Plan shall govern. All capitalized terms not defined herein or on Annex A attached hereto shall have the meaning ascribed to such terms under the Plan.

**3. VESTING.** Subject to Paragraph 4, units awarded to you hereunder shall become vested in accordance with the following vesting schedule

☒ Half of the Principal Units (35% of the total award) shall become vested on November 30, 2008.

☒ The remaining half of the Principal Units and all of the Discount Units (65% of the total award) shall become vested on November 30, 2010.

**4. ENTITLEMENT TO RECEIVE COMMON STOCK.**

**(a) General Rule.** Unless otherwise set forth herein, you shall receive one share of Common Stock for each Unit which you hold on November 30, 2010 (the "Maturity Date") and you shall be entitled to receive freely transferable Shares of Common Stock as soon as practicable after the Maturity Date, but no later than December 31, 2010.

**(b) Effect of Detrimental Activity.** Notwithstanding any other provision of this Agreement if you engage in Detrimental Activity at any time prior to the Share Payment Date, all Units held by you shall be forfeited and canceled.

**(c) Occurrence of Death, Disability.** In the event of the occurrence of your death or Disability, on or after January 31, 2006, all outstanding Units held by you shall become immediately payable and you shall, on the 30th day thereafter, receive freely transferable shares of Common Stock.

**(d) Effect of Termination.** In the event of your Termination for any reason or notification of Termination prior to January 31, 2006, all Units held by you shall be forfeited and cancelled. In the event of any Termination not described in the preceding sentence, the following rules shall apply:

**(i) Voluntary Termination with Competitive Activity.** In the event of your voluntary Termination with Competitive Activity, (i) all Discount Units shall be forfeited and canceled, (ii) if such Termination occurs prior to November 30, 2008, all Principal Units shall be forfeited and canceled and (iii) if such Termination occurs on or subsequent to November 30, 2008, you shall be entitled to receive freely transferable shares of Common Stock for half of the Principal Units (35% of the total award).

**(ii) Voluntary Termination without Competitive Activity.** In the event of your voluntary Termination without Competitive Activity, you shall be entitled to receive (i) freely transferable shares of Common Stock for the Principal Units and (ii) freely transferable shares of Common Stock equal to 20% of the Discount Units multiplied by each full year of your employment with Holdings or a Subsidiary after November 30,

2005 and before your Termination. However, if your Termination is a Full Career Termination, you will be entitled to receive freely transferable shares of Common Stock for all Discount Units, provided you do not engage in Competitive Activity prior to the Share Payment Date. In the event of Competitive Activity prior to the Share Payment Date, the provisions specified in Paragraph 4(d)(i) shall apply.

**(iii) Involuntary Termination with Cause.** In the event of your involuntary Termination with Cause, all Principal Units and Discount Units shall be forfeited and canceled.

**(iv) Involuntary Termination without Cause.** In the event of your involuntary Termination without Cause, you shall be entitled to receive (i) freely transferable shares of Common Stock for the Principal Units and (ii) freely transferable shares of Common Stock equal to 20% of the Discount Units multiplied by each full year of your employment with Holdings or Subsidiary after November 30, 2005 and before your Termination. However, if your Termination is a Full Career Termination, you will be entitled to receive freely transferable shares of Common Stock for all the Discount Units.

**(v) Retirement.** Notwithstanding the foregoing provisions of Paragraphs 4(d)(i), (ii), and (iv), in the event of your Retirement and provided you do not engage in Competitive Activity or Detrimental Activity, you shall be entitled to receive freely transferable shares of Common Stock for all Principal Units and Discount Units on the 30th day following your Retirement. In the event of a voluntary Termination, if you engage in Competitive Activity prior to the Share Payment Date, the provisions specified in Paragraph 4(d)(i) shall apply as of the date of your Retirement, and you shall forfeit Units in accordance with such provision or, if you have already received shares with respect to such Units, you shall be obligated to repay to Holdings the full gross amounts or shares received in excess of those which you would have received under Paragraph 4(d)(i). In any case, if you engage in Detrimental Activity prior to the Share Payment Date, you shall forfeit all Units held by you or, if you have already received shares with respect to such Units, you shall be obligated to repay to Holdings the full gross amounts or shares you received under this Agreement.

**(vi) Occurrence of Death or Disability following Termination.** Notwithstanding the foregoing provisions of Paragraph 4(d)(i), (ii), (iii) and (iv) in the event of the occurrence of your death or Disability following a Termination described in Paragraph 4(d)(ii) or (iv) hereof, all outstanding Units held by you shall at that time become immediately payable and you shall, on the 30th day thereafter, receive freely transferable shares of Common Stock.

Any shares that become payable pursuant to this Paragraph 4(d) (other than Paragraph 4(d)(v) or (vi)) shall be issued to you on the Share Payment Date, subject to the application of Paragraph 4(b). Any remaining Units that are not payable pursuant to the provisions of Paragraph 4(d) shall be canceled by Holdings.

**(e) Affidavit.** In the event of your Termination on or after January 31, 2006, you may be requested, from time to time after your Termination, to complete and sign an affidavit with respect to Competitive Activity or Detrimental Activity, which includes representations and authorizes Holdings to verify the representations. Any failure on your part to complete, sign and return the affidavit as required may cause you to forfeit all Units held by you at that time or, in the event of Retirement, to repay to Holdings the full gross amounts or shares you received under this Agreement.

5. **DIVIDEND EQUIVALENTS.** With respect to each dividend or distribution paid or made on Common Stock to holders of record on or after January 31, 2006, you shall be credited with a number of additional Units equal in value to such dividend or distribution as of the date of such dividend or distribution, subject to Paragraph 8. Such additional Units shall vest and become payable at the same time as the Units to which they are attributable.

6. **LIMITATION ON OBLIGATIONS.** Holdings' and any Subsidiary's obligation with respect to the Units granted hereunder is limited solely to the delivery to you of shares of Common Stock on the date when such shares are due to be delivered hereunder, and in no way shall Holdings or any Subsidiary become obligated to pay cash in respect of such obligation. If the date on which shares with respect to Units are to be issued or delivered to you falls on a non-business or non-trading day, such shares shall be delivered on the immediately succeeding trading day. Whenever shares with respect to Units are required to be delivered on the 30th day following a specific triggering event, and such 30th day falls within the same tax year as the triggering event, the delivery may be made earlier, at the discretion of Holdings.

7. **NON-ASSIGNMENT.** Units may not be sold, assigned, transferred, pledged, hypothecated, or otherwise disposed of by you, except by will or the laws of descent and distribution. If you or anyone claiming under or through you attempts to violate this Paragraph 7, such attempted violation shall be null and void and without effect, and Holdings' obligation to issue any Common Stock hereunder shall terminate.

8. **EQUITABLE ADJUSTMENT.** In the event of a Change in Capitalization occurring on or after the Date of Grant specified above and prior to the date you receive shares with respect to the Units, the number and kind of shares of Common Stock which may be issued with respect to Units shall be adjusted so as to reflect such change.

9. **CHANGE IN CONTROL.** Except as set forth below, upon the occurrence of a Change in Control without the prior approval of a majority of the independent members of the Incumbent Board, your Units shall vest immediately, the sales restrictions shall lapse and shares of Common Stock shall be issued. Except as set forth below, upon the occurrence of a Change in Control with the prior approval of a majority of the independent members of the Incumbent Board, you shall receive in the same form of consideration as that received by shareholders generally, the lesser of (a) the undiscounted market value (at the time of grant) of the shares of Common Stock underlying your outstanding Units or (b) the price paid by an acquirer for such shares of Common Stock, and the excess, if any, of the price paid by an acquirer over such undiscounted market value shall be deferred for the shorter of (x) two years following such Change in Control or (y) the term of any remaining restrictions (the "Deferred Period"), but your Units shall remain otherwise subject to all issuance restrictions during the Deferred Period. Neither of the foregoing shall be effective to the extent you have tender or voting rights over shares of Common Stock held in Trust with respect to any Units, in which case you would only be issued Common Stock or receive the undiscounted market value in the same form of consideration as that received by shareholders generally (and after the Deferred Period, the excess price) in respect of such Units upon successful completion of a Change in Control.

10. **AMENDMENT.** The terms of this Agreement may be amended from time to time by the Committee in its sole discretion in any manner that it deems appropriate (including, but not limited to, the acceleration provisions).

11. **BINDING ACTIONS.** Any action taken or decision made by the Committee or its designees arising out of or in connection with

the construction, administration, interpretation or effect of the Plan or this Agreement shall lie within its sole and absolute discretion, as the case may be, and shall be final, conclusive and binding on you and all persons claiming under or through you. By accepting this grant or other benefit under the Plan, you and each person claiming under or through you shall be conclusively deemed to have indicated acceptance and ratification of, and consent to, any action taken under the Plan by the Committee or its designees.

12. **NO RIGHT TO CONTINUED EMPLOYMENT.** The grant of Units shall not confer on you any right to be retained in the employ of Holdings or a Subsidiary, or to receive subsequent Units or other awards under the Plan. The right of Holdings or any Subsidiary to terminate your employment with it at any time or as otherwise provided by any agreement between Holdings or any Subsidiary and you is specifically reserved.

13. **APPLICABLE LAW.** The validity, construction, interpretation, administration, and effect of the Plan, and of its rules and regulations, and rights relating to the Plan and to this Agreement, shall be governed by the substantive laws, but not the choice of law rules, of the State of Delaware.

14. **WITHHOLDING / DEDUCTIONS.** Holdings shall have the right to deduct applicable taxes from all amounts payable to you. It shall be a condition to the obligation of Holdings to issue shares of Common Stock hereunder (a) that you (or, in event of your death, your estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of your death) pay to Holdings or its designee, upon its demand, in accordance with the Plan, either in the form of cash or freely transferable shares of Common Stock such amount as may be required for the purpose of satisfying its obligation or the obligation of any other person to withhold any taxes required by law which are incurred by reason of the issuance of such shares of Common Stock, and (b) that you (or, in the event of your death, your estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of your death) provide Holdings with any forms, documents or other information reasonably required by Holdings in connection with the grant. If the amount requested for the purpose of satisfying the withholding obligation is not paid, Holdings may withhold shares of Common Stock and / or related dividend equivalents to fulfill the withholding obligation. Holdings shall further have the right to deduct from all amounts remaining payable to you after satisfaction of the minimum statutory withholding obligations described above, the amount of any deficit, debt, tax obligation or other liability or obligation of any kind which you may at that time have with respect to Holdings or any Subsidiary.

15. **CODE SECTION 409A.** It is intended that none of the Units or payments otherwise due hereunder shall be deferred, accelerated, extended, paid out or modified in a manner that would result in the imposition upon you of an additional tax under Section 409A of the Code; provided that neither Holdings nor any of its employees or representatives shall have any liability to you with respect to any such taxes. In the event that it is reasonably determined by the Committee that, as a result of Section 409A of the Code, payments hereunder may not be made at the time contemplated by the terms of this Agreement or the Plan, as the case may be, without causing you to be subject to taxation under Section 409A of the Code, Holdings will make such payment on the first day that would not result in your incurring any tax liability under Section 409A of the Code.

## ANNEX A: DEFINITIONS

**"Appropriate Officer"** means the Chief Executive Officer or Chief Operating Officer of Holdings (or their respective designees).

**"Cause"** means a material breach by a person of an employment

LEH-RSU 0000110

contract between the person and Holdings or any Subsidiary, failure by a person to devote substantially all business time exclusively to the performance of his or her duties for Holdings or any Subsidiary, willful misconduct, dishonesty related to the business and affairs of Holdings or any Subsidiary, conviction of a felony or of a misdemeanor constituting a statutory disqualification under U.S. securities laws (or failure to contest prosecution for a felony or such a misdemeanor), habitual or gross negligence in the performance of a person's duties, solicitation of employees of Holdings or any Subsidiary to work at another company, improper use or disclosure of confidential information, the violation of policies and practices adopted by Holdings or any Subsidiary including, but not limited to the Code of Conduct, or a material violation of the conflict of interest, proprietary information or business ethics policies of Holdings or any Subsidiary, or such other circumstances as may be determined in the sole discretion of an Appropriate Officer.

**"Change in Capitalization"** means the occurrence of a circumstance described in Section 14 of the Plan.

**"Committee"** shall mean the Compensation and Benefits Committee of the Incumbent Board (see definition of Change in Control in the Plan).

**"Competitive Activity"** means involvement (whether as an employee, proprietor, consultant or otherwise) with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with any business carried on by Holdings or any of its Subsidiaries or affiliates on the date of termination of a person's employment with Holdings and any of its Subsidiaries, as determined in the sole discretion of an Appropriate Officer.

**"Detrimental Activity"** means (i) using information received during a person's employment with Holdings or any of its Subsidiaries relating to the business affairs of Holdings or any of its Subsidiaries, affiliates or clients, in breach of such person's undertaking to keep such information confidential; (ii) directly or indirectly persuading or attempting to persuade, by any means, any employee of Holdings or any of its Subsidiaries or affiliates to terminate employment with any of the foregoing or to breach any of the terms of his or her employment with the foregoing; (iii) directly or indirectly making any statement that is, or could be, disparaging of Holdings, its Subsidiaries or affiliates, or any of their affiliates (except as necessary to respond truthfully to any inquiry from applicable regulatory authorities or to provide information pursuant to legal process); or (iv) directly or indirectly engaging in any activity that is, or could be, substantially injurious to the financial condition, reputation, or goodwill of Holdings or its Subsidiaries or affiliates, in each case as determined in the sole discretion of an Appropriate Officer.

**"Disability"** means a disability under both the Long-Term Disability Insurance Plan and Social Security Act.

**"Discount Units"** shall mean the number of Units (and any dividend equivalents related thereto) related to the 30% discount upon issuance of the award.

**"Full Career Termination"** means a Termination when (i) a person has at least 20 years of service or (ii) a person meets all of the following criteria: (x) the person's age plus years of service with Holdings or any Subsidiary equals at least 65, (y) the person is at least 45 years old, and (z) the person has at least 10 years of service with Holdings or any Subsidiary.

**"Principal Units"** shall mean the number of Units (and any dividend equivalents related thereto) related to the undiscounted base portion of the award (70% of the total number of units awarded).

**"Retirement"** means a Termination when the person's age plus years of service with Holdings or any Subsidiary equals at least 65, provided that (i) the person is at least 65 years old and has at least 5 years of service or (ii) the person is at least 55 years old and has at least 10 years of service.

**"Share Payment Date"** means the earlier of (a) the Maturity Date or (b) the 30th day after the completion of the fiscal quarter following the one-year anniversary of termination of employment.

**"Termination"** means the end of active employment with Holdings or a Subsidiary. The characterization of the circumstances of Termination is determined in the sole discretion of an Appropriate Officer.

©2005 Lehman Brothers. All Rights Reserved.

LEH-RSU 0000111

**E**

**X**

**H**

**I**

**B**

**I**

**T**

**7**

# EXHIBIT 7

## 2006 EQUITY AWARD PROGRAM

# AGREEMENT EVIDENCING A GRANT OF RESTRICTED STOCK UNITS



# LEHMAN BROTHERS

**1. GRANT OF UNITS.** Pursuant to the Lehman Brothers Holdings Inc. ("Holdings") 2005 Stock Incentive Plan (the "Plan"), you are hereby granted, as of December 8, 2006 (the "Date of Grant"), the number of Restricted Stock Units ("2006 Units") for shares of Holdings' common stock, par value $.10 per share (the "Common Stock"), set forth on the award statement with your name on it delivered to you herewith (which number of 2006 Units may be adjusted pursuant to Paragraph 8 below). A portion of your 2006 Units are classified as either "Principal Units" or "Discount Units" each as defined in the glossary attached hereto. If you are classified by Holdings or its subsidiaries as a "production-based employee" for the Company's 2006 fiscal year ended November 30, 2006 ("Production-Based Employee"), in the event of your Termination prior to November 30, 2006, the number of 2006 Units you were awarded was based on the appropriate portion of your production-based compensation accrued for your 2006 equity award through the date of your Termination, in accordance with Holdings' standard formula for the payout of equity-based compensation for employees at your level.

**2. ADDITIONAL DOCUMENTS; DEFINITIONS.** You have been provided with a copy of the Plan, which is incorporated in this instrument by reference and made a part hereof, and a copy of the Plan prospectus. The Plan and the prospectus should be carefully examined. In the event of any conflict or ambiguity between this instrument and the Plan, the terms of the Plan shall govern. All capitalized terms not defined herein or on Annex A attached hereto shall have the meaning ascribed to such terms under the Plan.

**3. VESTING.** Subject to Paragraph 4, 2006 Units awarded to you hereunder shall become vested in accordance with the vesting schedule applicable to you as described under the term "Vesting Schedule" in the glossary attached hereto.

**4. ENTITLEMENT TO RECEIVE COMMON STOCK.**

(a) **General Rule.** Unless otherwise set forth herein, you shall receive one share of Common Stock for each 2006 Unit that has become vested which you hold on November 30, 2011 (the "Share Payment Date") and which has not otherwise been terminated pursuant to the terms and conditions hereof. In such case, you shall be entitled to receive freely transferable Shares of Common Stock as soon as practicable after the Share Payment Date, but no later than December 31, 2011.

(b) **Effect of Detrimental Activity.** Notwithstanding any other provision of this Agreement if you engage in Detrimental Activity at any time prior to the date on which delivery of shares of Common Stock in respect of your 2006 Units is called for hereunder, all 2006 Units held by you, whether or not vested, shall be terminated, forfeited, cancelled, and you shall have no further right to any shares of Common Stock relating thereto.

(c) **Occurrence of Death, Disability While You Are Employed** Without limiting Paragraphs 4(b), 4(d)(ii), 7, 9, 14 and 15, in the event of the occurrence of your death or Disability while you are employed with Holdings or any Affiliate shares of Common Stock underlying all of your then outstanding 2006 Units held by you shall become immediately deliverable, and you shall, on the 30th day thereafter, receive freely transferable shares of Common Stock, provided, however, if you are not classified as a Production-Based

Employee, the foregoing shall only apply if your death or Disability occurs on or after January 31, 2007.

(d) **Effect of Termination.** Except if you are a Production-Based Employee, and subject to Paragraph 9 hereof, in the event of your Termination for any reason or notification of Termination prior to January 31, 2007, all 2006 Units held by you shall be forfeited and cancelled. In the event of any Termination not described in the preceding sentence (including, without limitation, if you are a Production-Based Employee), the following rules shall apply:

(i) **Voluntary Termination.** Except as otherwise provided for in Paragraph 4(d)(iv) or 4(d)(v) hereof, and subject to Paragraph 9 hereof, in the event of your voluntary Termination all then outstanding unvested 2006 Units shall be terminated, forfeited and be cancelled, and you shall have no further right to any shares of Common Stock relating thereto. All other terms and conditions of this Agreement and the Plan shall continue to apply to any 2006 Units not so terminated.

(ii) **Involuntary Termination with Cause.** In the event of your involuntary Termination with Cause, all 2006 Units, whether or not vested, shall be terminated, forfeited and cancelled, and you shall have no further right to any shares of Common Stock relating thereto.

(iii) **Involuntary Termination without Cause.** Except as provided in Paragraphs 4(c), 4(d)(iv) and (v), and subject to Paragraphs 4(b), 7, 14 and 15, in the event of your involuntary Termination without Cause, you shall be entitled to receive freely transferable shares of Common Stock with respect to any then outstanding 2006 Principal Units as soon as practicable after the Share Payment Date, but no later than December 31, 2011, provided however, that your entitlement to receive freely transferable shares of Common Stock with respect to such unvested outstanding 2006 Principal Units is expressly conditioned on your timely execution of a release in such form as may be required by Holdings or any Subsidiary and in accordance with Holdings' (or any Subsidiary's) policies and procedures then in effect, but all then outstanding unvested 2006 Discount Units shall be terminated, forfeited and cancelled, and you shall have no further right to any shares of Common Stock relating thereto.

(iv) **Full Career Termination.** Notwithstanding the foregoing provisions of Paragraphs 4(d)(i) and (iii), but without limiting the application of Paragraphs 4(b), 4(d)(ii), 4(d)(v), 7, 9, 14 and 15, in the event your voluntary Termination occurs at a time when you satisfy the definition of Full Career Termination, you shall become vested in all of your then outstanding 2006 Units and shares of Common Stock relating thereto shall be delivered as soon as practicable after the Share Payment Date, but no later than December 31, 2011. An express condition of your 2006 Units becoming vested and shares of Common Stock underlying such 2006 Units becoming deliverable pursuant to the immediately preceding sentence is that you not engage in Competitive Activity through and including the end of the Company's fiscal quarter following the one year anniversary of such Termination. Notwithstanding the foregoing provisions of Paragraphs 4(d)(i) and (iii), but without limiting the application of Paragraphs 4(b), 4(d)(ii),

2

LEH-RSU 0017758

4(d)(v), 7, 9, 14 and 15, in the event your involuntary Termination without Cause occurs at a time when you satisfy the definition of Full Career Termination, you shall become vested in all then outstanding 2006 Units, and shares of Common Stock relating thereto shall be delivered as soon as practicable after the Share Payment Date, but no later than December 31, 2011.

(v) **Occurrence of Death or Disability following Termination.** Without limiting the applicability of Paragraphs 4(c), 7, 9, 14 and 15 hereof and notwithstanding the foregoing provisions of Paragraph 4(d)(i), (iii) and (iv) in the event of the occurrence of your death or Disability following a Termination, all outstanding 2006 Units held by you that were vested at or by reason of your Termination shall at that time become immediately deliverable and you shall, on the 30th day thereafter, receive freely transferable shares of Common Stock, provided, however, if you are not classified as a Production Based Employee, the foregoing shall only apply if your death or Disability occurs on or after January 31, 2007.

Any shares of Common Stock that become deliverable pursuant to this Paragraph 4(d) (other than Paragraph 4(d)(v)  shall be delivered to you as soon as practicable after the Share Payment Date, but no later than December 31, 2011, subject to the application of Paragraphs 4(b), 9, and 15. Any remaining 2006 Units that are not deliverable pursuant to the provisions of Paragraph 4(d) or otherwise under this Agreement or the Plan shall be terminated, forfeited and be cancelled by Holdings, and you shall have no further right to any shares of Common Stock relating thereto.

For purposes of this Agreement, Holdings and/or the Committee, as applicable, shall determine in its sole discretion whether or not your Termination is voluntary, involuntary, or with or without Cause, whether or not you have engaged in Detrimental Activity, or whether or not you meet the definition of Disability or Full Career Termination.

(e) **Affidavit.** You may be requested, from time to time after your Termination, to complete and sign an affidavit with respect to Competitive Activity or Detrimental Activity, which includes representations and authorizes Holdings to verify the representations.  Any failure on your part to complete, sign and return the affidavit as required may cause you to forfeit all 2006 Units held by you at that time or, to repay to Holdings the full gross amounts or shares you received under this Agreement as may be applicable.

**5.  DIVIDEND EQUIVALENTS.**  With respect to each dividend or distribution paid or made on Common Stock to holders of record on or after the date of grant of your 2006 Units, with respect to each then outstanding 2006 Unit you then hold, you shall be credited with a number of additional 2006 Units equal in value to such dividend or distribution as of the date of such dividend or distribution, subject to Paragraph 8. Such additional 2006 Units shall vest and become deliverable at the same time and subject to the same conditions as the 2006 Units to which they correspond; provided however, in the event you are not classified as a Production Based Employee, no such additional 2006 Units shall be credited to you in respect of any such dividend or distribution paid or made on Common Stock to holders of record on any date prior to January 31, 2007.

**6.  LIMITATION ON OBLIGATIONS.**  Holdings' and any Subsidiary's  obligation with respect to the 2006 Units granted hereunder is limited solely to the delivery to you of shares of Common Stock on the date when such shares are due to be delivered hereunder, and in no way shall Holdings or any Subsidiary become obligated to pay cash in respect of such obligation. If the date on which shares of Common Stock with respect to 2006 Units are to be delivered to you falls on a non-business or non-trading day, such shares shall be delivered on the immediately succeeding trading day. Whenever shares with respect to 2006 Units are required to be delivered on the 30th day following a specific triggering event, and such 30th day falls within the same tax year as the triggering event, the delivery may be made earlier, at the discretion of Holdings.

**7.  NON-ASSIGNMENT.**  2006 Units may not be sold, assigned, transferred, pledged, hypothecated, or otherwise disposed of by you, except by will or the laws of descent and distribution. If you or anyone claiming under or through you attempts to violate this Paragraph 7, such attempted violation shall be null and void and without effect, and Holdings' obligation to deliver any shares of Common Stock hereunder shall terminate.

**8.  EQUITABLE ADJUSTMENT.**  In the event of a Change in Capitalization occurring on or after the Date of Grant specified above and prior to the date you receive shares with respect to the 2006 Units, the number and kind of shares of Common Stock which may be delivered with respect to 2006 Units shall be adjusted so as to reflect such change.

**9.  CHANGE IN CONTROL.**  Except as set forth below, upon the occurrence of a Change in Control without the prior approval of a majority of the independent members of the Incumbent Board, your 2006 Units shall vest immediately, the sales restrictions shall lapse and shares of Common Stock shall be delivered. Except as set forth below, upon the occurrence of a Change in Control with the prior approval of a majority of the independent members of the Incumbent Board, you shall receive in the same form of consideration as that received by shareholders generally, the lesser of (a) the "undiscounted market value" (at the time of grant) of the shares of Common Stock underlying your outstanding 2006 Units (i.e., the fair market value of your 2006 Units determined on the date of grant) or (b) the price paid by an acquirer for such shares of Common Stock, and the excess, if any, of the price paid by an acquirer over such "undiscounted market value" shall be deferred for the shorter of (x) two years following such Change in Control or (y) the term of any remaining restrictions (the "Deferred Period"), but your 2006 Units shall remain otherwise subject to all delivery restrictions during the Deferred Period. Neither of the foregoing shall be effective to the extent you have tender or voting rights over shares of Common Stock held in Trust with respect to any 2006 Units, in which case you would only be delivered shares of Common Stock or receive the "undiscounted market value" in the same form of consideration as that received by shareholders generally (and after the Deferred Period, the excess price) in respect of such 2006 Units upon successful completion of a Change in Control.

**10.  AMENDMENT.**  The terms of this Agreement may be amended from time to time by the Committee in its sole discretion in any manner that it deems appropriate (including, but not limited to, the acceleration provisions), including, without limitation, in order to satisfy applicable requirements of Sections 162(m) and Section 409A of the Code, as

3

amended from time to time, (whether or not your rights are adversely affected).

**11.  BINDING ACTIONS.** Any action taken or decision made by the Committee or its designees arising out of or in connection with the construction, administration, interpretation or effect of the Plan or this Agreement shall lie within its sole and absolute discretion, as the case may be, and shall be final, conclusive and binding on you and all persons claiming under or through you. By accepting this grant or other benefit under the Plan, you and each person claiming under or through you shall be conclusively deemed to have indicated acceptance and ratification of, and consent to, any action taken under the Plan by the Committee or its designees.

**12.  NO RIGHT TO CONTINUED EMPLOYMENT.**  The grant of 2006 Units shall not confer on you any right to be retained in the employ of Holdings or a Subsidiary, or to receive subsequent units or other awards under the Plan. The right of Holdings or any Subsidiary to terminate your employment with it at any time or as otherwise provided by any agreement between Holdings or any Subsidiary and you is specifically reserved.

**13.  APPLICABLE LAW.** The validity, construction, interpretation, administration, and effect of the Plan, and of its rules and regulations, and rights relating to the Plan and to this Agreement, shall be governed by the substantive laws, but not the choice of law rules, of the State of Delaware.

**14.  WITHHOLDING / DEDUCTIONS.** Holdings shall have the right to deduct applicable taxes from all amounts payable to you. It shall be a condition to the obligation of Holdings to deliver shares of Common Stock hereunder (a) that you (or, in event of your death, your estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of your death) pay to Holdings or its designee, upon its demand, in accordance with the Plan, either in the form of cash or freely transferable shares of Common Stock such amount as may be required for the purpose of satisfying its obligation or the obligation of any other person to withhold any taxes required by law which are incurred by reason of the delivery of such shares of Common Stock, and (b) that you (or, in the event of your death, your estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of your death) provide Holdings with any forms, documents or other information reasonably required by Holdings in connection with the grant. If the amount requested for the purpose of satisfying the withholding obligation is not paid, Holdings may withhold shares of Common Stock and / or related dividend equivalents to fulfill the withholding obligation. Holdings shall further have the right to deduct from all amounts remaining payable to you after satisfaction of the minimum statutory withholding obligations described above, the amount of any deficit, debt, tax obligation or other liability or obligation of any kind which you may at that time have with respect to Holdings or any Subsidiary.

**15. CODE SECTION 409A.** It is intended that none of the 2006 Units or payments otherwise due hereunder shall be deferred, accelerated, extended, paid out or modified in a manner that would result in the imposition upon you of an additional tax under Section 409A of the Code; provided that neither Holdings nor any of its employees or representatives shall have any liability to you with respect to any such taxes. In the event that it is reasonably determined by the Committee that, as a result of Section 409A of the

Code, payments hereunder may not be made at the time contemplated by the terms of this Agreement or the Plan, as the case may be, without causing you to be subject to taxation under Section 409A of the Code, Holdings will make such payment on the first day that would not result in your incurring any tax liability under Section 409A of the Code.

**ANNEX A: DEFINITIONS**

"**Appropriate Officer**" means the Chief Executive Officer or Chief Operating Officer of Holdings (or their respective designees).

"**Cause**" means a material breach by a person of an employment contract between the person and Holdings or any Subsidiary, failure by a person to devote substantially all business time exclusively to the performance of his or her duties for Holdings or any Subsidiary, willful misconduct, dishonesty related to the business and affairs of Holdings or any Subsidiary, conviction of a felony or of a misdemeanor constituting a statutory disqualification under U.S. securities laws (or failure to contest prosecution for a felony or such a misdemeanor), habitual or gross negligence in the performance of a person's duties, solicitation of employees of Holdings or any Subsidiary to work at another company, improper use or disclosure of confidential information, the violation of policies and practices adopted by Holdings or any Subsidiary including, but not limited to the Code of Conduct, or a material violation of the conflict of interest, proprietary information or business ethics policies of Holdings or any Subsidiary, or such other circumstances as may be determined in the sole discretion of an Appropriate Officer.  For avoidance of doubt, for purposes of the preceding sentence, a material breach of an employment contract or violation of policies would include, as applicable, the employee's violation of any policy or employment agreement relating to the obligation to provide advance notice of resignation from Holdings or any subsidiary.

"**Change in Capitalization**" means the occurrence of a circumstance described in Section 14 of the Plan.

"**Committee**" shall mean the Compensation and Benefits Committee of the Incumbent Board (see definition of Change in Control in the Plan).

"**Competitive Activity**" means involvement (whether as an employee, proprietor, consultant or otherwise) with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with any business carried on by Holdings or any of its Subsidiaries or affiliates on the date of termination of a person's employment with Holdings and any of its Subsidiaries, as determined in the sole discretion of an Appropriate Officer.

"**Detrimental Activity**" means (i) using information received during a person's employment with Holdings or any of its Subsidiaries relating to the business affairs of Holdings or any of its Subsidiaries, affiliates or clients, in breach of such person's undertaking to keep such information confidential; (ii) directly or indirectly persuading or attempting to persuade, by any means, any employee of Holdings or any of its Subsidiaries or affiliates to terminate employment with any of the foregoing or to breach any of the terms of his or her employment with the foregoing; (iii) directly or indirectly making any statement that is, or could be, disparaging of Holdings, its Subsidiaries or affiliates, or any of their affiliates (except as necessary to respond truthfully to any inquiry from applicable regulatory authorities or to provide information pursuant to legal process); or (iv) directly or indirectly engaging in any

4

activity that is, or could be, substantially injurious to the financial condition, reputation, or goodwill of Holdings or its Subsidiaries or affiliates, in each case as determined in the sole discretion of an Appropriate Officer.

"**Disability**" means a disability under both the Long-Term Disability Insurance Plan and Social Security Act.

"**Discount Units**" shall mean the number of 2006 Units (and any dividend equivalents related thereto that are not Principal Units. If you were a Managing Director of Holdings or any Subsidiary for the fiscal year ended November 30, 2006, thirty percent (30%) of your 2006 Units as of the date of grant will be Discount Units. If you are an employee other than a Managing Director of Holdings or any Subsidiary for the fiscal year ended November 30, 2006, twenty-five percent (25%) of your 2006 Units as of the date of grant will be Discount Units.

"**Full Career Termination**" means a Termination when (i) a person has at least 20 years of service, (ii) the person is at least 45 years old, and the person has at least 10 years of service; or (iii) a person meets all of the following criteria: (a) the person is at least 50 years old, and (b) the person has at least 5 years of service.

"**Principal Units**" shall mean the number of 2006 Units (and any dividend equivalents related thereto) related to the undiscounted base portion of the award. If you were a Managing Director of Holdings or any Subsidiary for the fiscal year ended November 30, 2006, seventy percent (70%) of your 2006 Units as of the date of grant will be Principal Units. If you are an employee other than a Managing Director of Holdings or any Subsidiary for the fiscal year ended November 30, 2006, seventy-five percent (75%) of your 2006 Units as of the date of grant will be Principal Units.

"**Share Payment Date**" means November 30, 2011.

"**Termination**" means the end of active employment with Holdings or a Subsidiary. The characterization of the circumstances of Termination is determined in the sole discretion of an Appropriate Officer.

"**Vesting Schedule**" means the schedule below that is applicable to you, pursuant to which your 2006 Units are scheduled to vest subject to the terms and conditions of Paragraph 3 and the other terms and conditions of the Agreement:

(a) If you were a Managing Director of Holdings or any Subsidiary for the fiscal year ended November 30, 2006 your 2006 Units are scheduled to vest as follows:

| | |
|---|---|
| Principal Units: | 50% on November 30, 2009; 50% on November 30, 2011 |
| Discount Units: | 100% on November 30, 2011. |

(b) If you were an employee of Holdings or any Subsidiary other than a Managing Director for the fiscal year ended November 30, 2006 your 2006 Units are scheduled to vest as follows:

| | |
|---|---|
| Principal Units: | 100% on November 30, 2008 |
| Discount Units: | 100% on November 30, 2011. |

©2006 Lehman Brothers. All Rights Reserved.

5

CONFIDENTIAL    LEH-RSU 0017761

E
X
H
I
B
I
T

8

# EXHIBIT 8

# 2007 EQUITY AWARD PROGRAM

LIFE @ LEHMAN

## YOUR BENEFITS AND LIFE BALANCE

Agreement Evidencing A Grant of
Restricted Stock Units

# LEHMAN BROTHERS

LEH-RSU 0000278

**1. GRANT OF UNITS.** Pursuant to the Lehman Brothers Holdings Inc. ("Holdings") 2005 Stock Incentive Plan (the "Plan"), you are hereby granted, as of December 7, 2007 (the "Date of Grant"), the number of Restricted Stock Units ("2007 Units") for shares of Holdings' common stock, par value $.10 per share (the "Common Stock"), set forth on the award statement with your name on it delivered to you herewith (which number of 2007 Units may be adjusted pursuant to Paragraph 8 below). A portion of your 2007 Units are classified as either "Principal Units" or "Discount Units" each as defined in the glossary attached hereto. If you are classified by Holdings or its subsidiaries as a "production-based employee" for the Company's 2007 fiscal year ended November 30, 2007 ("Production-Based Employee"), in the event of your Termination prior to November 30, 2007, the number of 2007 Units you were awarded was based on the appropriate portion of your production-based compensation accrued for your 2007 equity award through the date of your Termination, in accordance with Holdings' standard formula for the payout of equity-based compensation for employees at your level.

**2. ADDITIONAL DOCUMENTS; DEFINITIONS.** You have been provided with a copy of the Plan, which is incorporated in this instrument by reference and made a part hereof, and a copy of the Plan prospectus. The Plan and the prospectus should be carefully examined. In the event of any conflict or ambiguity between this instrument and the Plan, the terms of the Plan shall govern. All capitalized terms not defined herein or on Annex A attached hereto shall have the meaning ascribed to such terms under the Plan.

**3. VESTING.** Subject to Paragraph 4, 2007 Units awarded to you hereunder shall become vested in accordance with the following vesting schedule

(a) If you were a Managing Director of Holdings or any Subsidiary for the fiscal year ended November 30, 2007 your 2007 Units are scheduled to vest as follows:

| | |
|---|---|
| Principal Units: | 50% on November 30, 2010;<br>50% on November 30, 2012 |
| Discount Units: | 100% on November 30, 2012. |

(b) If you were an employee of Holdings or any Subsidiary other than a Managing Director for the fiscal year ended November 30, 2007 your 2007 Units are scheduled to vest as follows:

| | |
|---|---|
| Principal Units: | 100% on November 30, 2009 |
| Discount Units: | 100% on November 30, 2012. |

**4. ENTITLEMENT TO RECEIVE COMMON STOCK.**

**(a) General Rule.** Unless otherwise set forth herein, you shall receive one share of Common Stock for each 2007 Unit that has become vested which you hold on November 30, 2012 (the "Share Payment Date") and which has not otherwise been terminated pursuant to the terms and conditions hereof. In such case, you shall be entitled to receive freely transferable Shares of Common Stock as soon as practicable after the Share Payment Date, but no later than December 31, 2012.

**(b) Effect of Detrimental Activity.** Notwithstanding any other provision of this Agreement if you engage in Detrimental Activity at any time prior to the date on which delivery of shares of Common Stock in respect of your 2007 Units is called for hereunder, all 2007 Units held by you, whether or not vested, shall be terminated,

forfeited, and cancelled, and you shall have no further right to any shares of Common Stock relating thereto.

**(c) Occurrence of Death, Disability While You Are Employed.** Without limiting Paragraphs 4(b), 4(d)(ii), 4(e), 7, 9, 14 and 15, in the event of the occurrence of your death or Disability while you are employed with Holdings or any Affiliate, shares of Common Stock underlying all of your then outstanding 2007 Units held by you shall become immediately deliverable, and you shall, on the 30th day thereafter, receive freely transferable shares of Common Stock.

**(d) Effect of Termination.** Notwithstanding Paragraph 3 hereof, in the event of any Termination the following rules shall apply:

**(i) Voluntary Termination.** Except as otherwise provided for in Paragraph 4(d)(iv) or 4(d)(v) hereof, and subject to Paragraph 9 hereof, in the event of your voluntary Termination all then outstanding unvested 2007 Units shall be terminated, forfeited and be cancelled, and you shall have no further right to any shares of Common Stock relating thereto. All other terms and conditions of this Agreement and the Plan shall continue to apply to any 2007 Units not so terminated.

**(ii) Involuntary Termination with Cause.** In the event of your involuntary Termination with Cause, all 2007 Units, whether or not vested, shall be terminated, forfeited and cancelled, and you shall have no further right to any shares of Common Stock relating thereto.

**(iii) Involuntary Termination without Cause.** Except as provided in Paragraphs 4(c), 4(d)(iv) 4(d)(v), and 9, and subject to Paragraphs 4(b), 4(e), 7, 14 and 15, in the event of your involuntary Termination without Cause, you shall be entitled to receive freely transferable shares of Common Stock with respect to any then outstanding 2007 Principal Units as soon as practicable after the Share Payment Date, but no later than December 31, 2012, provided however, that your entitlement to receive such unvested outstanding 2007 Principal Units is expressly conditioned on your timely execution of a release in such form as may be required by Holdings or any Subsidiary and in accordance with Holdings' (or any Subsidiary's) policies and procedures then in effect. All then outstanding unvested 2007 Discount Units shall be terminated, forfeited and cancelled, and you shall have no further right to any shares of Common Stock relating thereto.

**(iv) Full Career Termination.** Notwithstanding the foregoing provisions of Paragraphs 4(d)(i) and (iii), but without limiting the application of Paragraphs 4(b), 4(d)(ii), 4(d)(v), 4(e) 7, 9, 14 and 15, in the event your voluntary Termination occurs at a time when you satisfy the definition of Full Career Termination, you shall become vested in all of your then outstanding 2007 Units and shares of Common Stock relating thereto shall be delivered as soon as practicable after the Share Payment Date, but no later than December 31, 2012. An express condition of your 2007 Units becoming vested and shares of Common Stock underlying such 2007 Units becoming deliverable pursuant to the immediately preceding sentence is that you not engage in Competitive Activity through and

2

including the end of the Company's fiscal quarter following the one year anniversary of such Termination. Notwithstanding the foregoing provisions of Paragraphs 4(d)(i) and (iii), but without limiting the application of Paragraphs 4(b), 4(d)(ii), 4(d)(v), 4(e) 7, 9, 14 and 15, in the event your involuntary Termination without Cause occurs at a time when you satisfy the definition of Full Career Termination, you shall become vested in all then outstanding 2007 Units, and shares of Common Stock relating thereto shall be delivered as soon as practicable after the Share Payment Date, but no later than December 31, 2012.

(v) **Occurrence of Death or Disability following Termination.** Without limiting the applicability of Paragraphs 4(b), 4(e), 7, 9, 14 and 15 hereof and notwithstanding the foregoing provisions of Paragraph 4(d)(i), (iii), and (iv) in the event of the occurrence of your death or Disability following a Termination, all outstanding 2007 Units held by you that were vested at or by reason of your Termination shall at that time become immediately deliverable and you shall, on the 30th day thereafter, receive freely transferable shares of Common Stock.

Any shares of Common Stock that become deliverable pursuant to this Paragraph 4(d) (other than Paragraph 4(d)(v)) shall be delivered to you as soon as practicable after the Share Payment Date, but no later than December 31, 2012, subject to the application of Paragraphs 4(b), 9, and 15. Any remaining 2007 Units that are not deliverable pursuant to the provisions of Paragraph 4(d) or otherwise under this Agreement or the Plan shall be terminated, forfeited and be cancelled by Holdings, and you shall have no further right to any shares of Common Stock relating thereto.

For purposes of this Agreement, Holdings and/or the Committee, as applicable, shall determine in its sole discretion whether or not your Termination is voluntary, involuntary, or with or without Cause, whether or not you have engaged in Detrimental Activity, or whether or not you meet the definition of Disability or Full Career Termination.

(e) **Affidavit.** You may be requested, from time to time after your Termination, to complete and sign an affidavit with respect to Competitive Activity or Detrimental Activity, which includes representations and authorizes Holdings to verify the representations. Any failure on your part to complete, sign and return the affidavit as required may cause you to forfeit all 2007 Units held by you at that time or, to repay to Holdings the full gross amounts or shares you received under this Agreement as may be applicable.

5. **DIVIDEND EQUIVALENTS.** With respect to each dividend or distribution paid or made on Common Stock to holders of record on or after the date of grant of your 2007 Units, with respect to each then outstanding 2007 Unit you then hold, you shall be credited with a number of additional 2007 Units equal in value to such dividend or distribution as of the date of such dividend or distribution, subject to Paragraph 8. Such additional 2007 Units shall vest and become deliverable at the same time and subject to the same conditions as the 2007 Units to which they correspond

6. **LIMITATION ON OBLIGATIONS.** Holdings' and any Subsidiary's obligation with respect to the 2007 Units granted

hereunder is limited solely to the delivery to you of shares of Common Stock on the date when such shares are due to be delivered hereunder, and in no way shall Holdings or any Subsidiary become obligated to pay cash in respect of such obligation. If the date on which shares of Common Stock with respect to 2007 Units are to be delivered to you falls on a non-business or non-trading day such shares shall be delivered on the immediately succeeding trading day (i.e., when shares trade regular way on the New York Stock Exchange). Whenever shares with respect to 2007 Units are required to be delivered on the 30th day following a specific triggering event, and such 30th day falls within the same tax year as the triggering event, the delivery may be made earlier, at the discretion of Holdings.

7. **NON-ASSIGNMENT.** 2007 Units may not be sold, assigned, transferred, pledged, hypothecated, or otherwise disposed of by you, except by will or the laws of descent and distribution. If you or anyone claiming under or through you attempts to violate this Paragraph 7, such attempted violation shall be null and void and without effect, and Holdings' obligation to deliver any shares of Common Stock hereunder shall terminate.

8. **EQUITABLE ADJUSTMENT.** In the event of a Change in Capitalization occurring on or after the Date of Grant specified above and prior to the date you receive shares with respect to the 2007 Units, the number and kind of shares of Common Stock which may be delivered with respect to 2007 Units shall be adjusted so as to reflect such change.

9. **CHANGE IN CONTROL.**

(a) **Vesting of Units Following a Change in Control.** Following a Change in Control, except to the extent that (i) you are entitled to earlier vesting pursuant to Paragraphs 3 and 4 or (ii) your 2007 Units are forfeited pursuant to Paragraph 4 due to your engaging in Detrimental Activity, Termination with Cause or voluntary Termination, all of your then outstanding 2007 Units shall vest upon the later of (x) 18 months following such Change in Control or (y) a date determined by the Committee that is within 15 days of November 30 of the Fiscal Year following the Fiscal Year in which the Change in Control occurs (such later date, the "Change in Control Vesting Date"). Additionally, all of your 2007 Units (including Principal and Discount Units) shall become immediately vested in the event of your involuntary Termination without Cause following the Change in Control but prior to the Change in Control Vesting Date.

(b) **Delivery of Common Stock Following a Change in Control.** Following a Change in Control, except to the extent that (i) you are entitled to receive earlier delivery of shares of Common Stock pursuant to Paragraph 4 or (ii) your 2007 Units are forfeited pursuant to Paragraph 4 due to your engaging in Detrimental Activity, Termination with Cause or voluntary Termination or by reason of Paragraphs 7 or 14, you shall receive shares of Common Stock in respect of your then outstanding 2007 Units on the Change in Control Vesting Date; provided, however, that in the event of your Termination for any reason other than due to death or Disability following the Change in Control but prior to the Change in Control Vesting Date, you shall receive shares of Common Stock in respect of your then vested 2007 Units upon the earlier of (x) the last day

3

LEH-RSU 0000280

of the fiscal quarter that ends after the first anniversary of the date of your Termination or (y) the Change in Control Vesting Date.

For purposes of this Paragraph 9, the term "Fiscal Year" shall refer to the fiscal year of Holdings.

**10.  AMENDMENT.** The terms of this Agreement may be amended from time to time by the Committee in its sole discretion in any manner that it deems appropriate (including, but not limited to, the acceleration provisions), including, without limitation, in order to satisfy applicable requirements of Sections 162(m) and Section 409A of the Code, as amended from time to time, (whether or not your rights are adversely affected).

**11.  BINDING ACTIONS.** Any action taken or decision made by the Committee or its designees arising out of or in connection with the construction, administration, interpretation or effect of the Plan or this Agreement shall lie within its sole and absolute discretion, as the case may be, and shall be final, conclusive and binding on you and all persons claiming under or through you. By accepting this grant or other benefit under the Plan, you and each person claiming under or through you shall be conclusively deemed to have indicated acceptance and ratification of, and consent to, any action taken under the Plan by the Committee or its designees.

**12.  NO RIGHT TO CONTINUED EMPLOYMENT.** The grant of 2007 Units shall not confer on you any right to be retained in the employ of Holdings or a Subsidiary, or to receive subsequent units or other awards under the Plan. The right of Holdings or any Subsidiary to terminate your employment with it at any time or as otherwise provided by any agreement between Holdings or any Subsidiary and you is specifically reserved.

**13.  APPLICABLE LAW.** The validity, construction, interpretation, administration, and effect of the Plan, and of its rules and regulations, and rights relating to the Plan and to this Agreement, shall be governed by the substantive laws, but not the choice of law rules, of the State of Delaware.

**14.  WITHHOLDING / DEDUCTIONS.** Holdings shall have the right to deduct applicable taxes from all amounts payable to you arising as a result of the grant, vesting or payment hereunder. It shall be a condition to the obligation of Holdings to deliver shares of Common Stock hereunder (a) that you (or, in event of your death, your estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of your death) pay to Holdings or its designee, upon its demand, in accordance with the Plan, either in the form of cash or freely transferable shares of Common Stock such amount as may be required for the purpose of satisfying its obligation or the obligation of any other person to withhold or satisfy any taxes required by law which are incurred by reason of or are otherwise due as a result of the grant, vesting or the delivery of such shares of Common Stock, and (b) that where determined necessary or appropriate by the Firm in its sole discretion, you direct the sale of any shares of Common Stock delivered in respect of any 2007 Units to satisfy any such amounts in Paragraph 14(a) hereof, and (c) that you (or, in the event of your death, your estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of your death) provide Holdings with any forms, documents or other information reasonably required by Holdings in connection with the

grant or vesting of the 2007 Units or delivery of shares of Common Stock hereunder. If the amount requested for the purpose of satisfying the withholding or other tax obligation is not paid, you hereby direct Holdings to withhold shares of Common Stock and / or related dividend equivalents and to otherwise sell shares of Common Stock delivered hereunder in order to fulfill any such obligation. Holdings shall further have the right to deduct from all amounts remaining payable to you after satisfaction of the minimum statutory withholding obligations described above, the amount of any deficit, debt, tax obligation or other liability or obligation of any kind which you may at that time have with respect to Holdings or any Subsidiary; provided, however, that no such right to deduct or offset shall arise or otherwise be deemed to arise until the date upon which shares of Common Stock are deliverable hereunder.

**15.  CODE SECTION 409A.** It is intended that none of the 2007 Units or payments otherwise due hereunder shall be deferred, accelerated, extended, paid out or modified in a manner that would result in the imposition upon you of an additional tax under Section 409A of the Code; provided that neither Holdings nor any of its employees or representatives shall have any liability to you with respect to any such taxes.  In the event that it is reasonably determined by the Committee that, as a result of Section 409A of the Code, payments hereunder may not be made at the time contemplated by the terms of this Agreement or the Plan, as the case may be, without causing you to be subject to taxation under Section 409A of the Code, Holdings will make such payment on the first day that would not result in your incurring any tax liability under Section 409A of the Code. If you are a "specified employee" (within the meaning of Section 409A(a)(2)(B)(i) of the Code), payments and/or deliveries of shares of Common Stock that are linked to the date of your separation from service shall not be made prior to the date which is six (6) months after the date of your separation from service Holdings and its affiliates, determined in accordance with Section 409A of the Code and the regulations promulgated thereunder.

**ANNEX A: DEFINITIONS**

**"Appropriate Officer"** means the Chief Executive Officer or Chief Operating Officer of Holdings (or their respective designees).

**"Cause"** means a material breach by a person of an employment contract between the person and Holdings or any Subsidiary, failure by a person to devote substantially all business time exclusively to the performance of his or her duties for Holdings or any Subsidiary, willful misconduct, dishonesty related to the business and affairs of Holdings or any Subsidiary, conviction of a felony or of a misdemeanor constituting a statutory disqualification under U.S. securities laws (or failure to contest prosecution for a felony or such a misdemeanor), habitual or gross negligence in the performance of a person's duties, solicitation of employees of Holdings or any Subsidiary to work at another company, improper use or disclosure of confidential information, the violation of policies and practices adopted by Holdings or any Subsidiary including, but not limited to the Code of Conduct, or a material violation of the conflict of interest, proprietary information or business ethics policies of Holdings or any Subsidiary, or such other circumstances as may be determined in the sole discretion of an Appropriate Officer.  For avoidance of doubt, for purposes of the preceding sentence, a material breach of an employment contract or violation of policies would include, as applicable, the employee's

4

violation of any policy or employment agreement relating to the obligation to provide advance notice of resignation from Holdings or any subsidiary.

**"Change in Capitalization"** means the occurrence of a circumstance described in Section 14 of the Plan.

**"Committee"** shall mean the Compensation and Benefits Committee of the Incumbent Board (see definition of Change in Control in the Plan).

**"Competitive Activity"** means involvement (whether as an employee, proprietor, consultant or otherwise) with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with any business carried on by Holdings or any of its Subsidiaries or affiliates on the date of termination of a person's employment with Holdings and any of its Subsidiaries, as determined in the sole discretion of an Appropriate Officer.

**"Detrimental Activity"** means (i) using information received during a person's employment with Holdings or any of its Subsidiaries relating to the business affairs of Holdings or any of its Subsidiaries, affiliates or clients, in breach of such person's undertaking to keep such information confidential; (ii) directly or indirectly persuading or attempting to persuade, by any means, any employee of Holdings or any of its Subsidiaries or affiliates to terminate employment with any of the foregoing or to breach any of the terms of his or her employment with the foregoing; (iii) directly or indirectly making any statement that is, or could be, disparaging of Holdings, its Subsidiaries or affiliates, or any of their affiliates (except as necessary to respond truthfully to any inquiry from applicable regulatory authorities or to provide information pursuant to legal process); or (iv) directly or indirectly engaging in any activity that is, or could be, substantially injurious to the financial condition, reputation, or goodwill of Holdings or its Subsidiaries or affiliates, in each case as determined in the sole discretion of an Appropriate Officer.

**"Disability"** means a disability under both the Long-Term Disability Insurance Plan and Social Security Act.

**"Discount Units"** shall mean the number of 2007 Units (and any dividend equivalents related thereto that are not Principal Units.  If you were a Managing Director of Holdings or any Subsidiary for the fiscal year ended November 30, 2007, thirty percent (30%) of your 2007 Units as of the date of grant will be Discount Units.  If you are an employee other than a Managing Director of Holdings or any Subsidiary for the fiscal year ended November 30, 2007, twenty-five percent (25%) of your 2007 Units as of the date of grant will be Discount Units.

**"Full Career Termination"** means a Termination when (i) a person has at least 20 years of service,  (ii) the person is at least 45 years old, and the person has at least 10 years of service; or (iii) the person is at least 50 years old, and the person has at least 5 years of service.

**"Principal Units"** shall mean the number of 2007 Units (and any dividend equivalents related thereto) related to the undiscounted base portion of the award.  If you were a Managing Director of Holdings or any Subsidiary for the fiscal year ended November 30, 2007, seventy percent (70%) of your 2007 Units as of the date of grant will be Principal Units.  If you are an employee other than a Managing Director of Holdings or any Subsidiary for the fiscal year ended November 30,

2007, seventy-five percent (75%) of your 2007 Units as of the date of grant will be Principal Units.

**"Share Payment Date"** means November 30, 2012.

**"Termination"** means the end of active employment with Holdings or a Subsidiary. The characterization of the circumstances of Termination is determined in the sole discretion of an Appropriate Officer.

©2007 Lehman Brothers. All Rights Reserved.

LEH-RSU 0000282

**E X H I B I T**

**9**

**EXHIBIT 9**

## 2003 EQUITY AWARD PROGRAM

# CONTINGENT STOCK AWARD LETTER

Pursuant to the Plan, Lehman Brothers Holdings Inc. ("Holdings") hereby grants to you (the "Participant"), as of December 10, 2003 (the "Date of Grant"), contingent rights to receive the number of Shares set forth on the award statement with your name delivered to you herewith (the "Award Shares")–which may be adjusted under section 7 of this Letter–subject to the terms of the Plan and to fulfillment of the conditions and contingencies set out in this letter (the "Letter").

This Letter will entitle the Participant to receive the Award Shares, under and on fulfillment of the contingencies and conditions specified herein. You have been provided with a copy of the Plan, which is incorporated in this Letter by reference and made a part hereof, and a copy of the Plan prospectus. The Plan and the prospectus should be carefully examined. In the event of any conflict or ambiguity between the Letter and the Plan, the terms of the Plan shall govern. All capitalized terms used herein and not defined in the Appendix to this Letter shall have the meaning ascribed to such terms under the Plan.

**1. GRANT.** The rights granted to the Participant under this Letter are a contingent entitlement to, and a right to receive, the Award Shares, and the Participant shall become entitled to receive the Award Shares on November 30, 2008 (the "Maturity Date"), subject to fulfillment of the conditions set out in this Letter.

**2. ENTITLEMENT TO RECEIVE COMMON STOCK.**

**(a) General Rule.** Subject to other provisions of this section 2, the Participant shall become entitled to receive the Award Shares on the Maturity Date, but in the event of Termination of the Participant's employment with the Group for any reason or notification of termination prior to January 30, 2004, or in the event that the Participant engages in any Detrimental Activity at any time prior to the Maturity Date, the Participant will not become entitled to any of the Award Shares and all rights hereunder shall terminate.

**(b) Voluntary Termination with Competitive Activity.** In the event of the Participant's voluntary Termination, and if the Participant engages in Competitive Activity:

(i) The Participant will not become entitled to any Discount Award Shares on the Share Payment Date; and

(ii) If such Termination occurs prior to November 30, 2005, the Participant will not become entitled to any Principal Award Shares on the Share Payment Date; and

(iii) If such Termination occurs on or subsequent to November 30, 2005, the Participant shall become entitled, on the Share Payment Date, to the Principal Award Shares provided that the Participant does not engage in Detrimental Activity prior to the Share Payment Date.

**(c) Voluntary Termination without Competitive Activity.** In the event of the Participant's voluntary Termination on or after January 30, 2004:

(i) Provided that the Participant does not engage in Competitive Activity or Detrimental Activity from the date of his Termination to the Share Payment Date, the Participant shall, on the Share Payment Date become entitled to receive all the Principal Award Shares; and

(ii) If such Termination occurs prior to November 30, 2005 and the Participant engages in Competitive Activity or Detrimental Activity prior to the Share Payment Date, the Participant shall not become entitled to any Principal Award Shares; and

(iii) If such Termination occurs on or subsequent to November 30, 2005, and the Participant engages in Competitive Activity prior to the Share Payment Date, the Participant shall become entitled, on the Share Payment Date, to the Principal Award Shares, provided that the Participant does not engage in Detrimental Activity prior to the Share Payment Date; and

(iv) Provided that the Participant does not engage in Competitive Activity or Detrimental Activity before the Share Payment Date, the Participant shall on the Share Payment Date become entitled to 20% of the Discount Award Shares multiplied by each complete year of employment with the Group after November 30, 2003 and before Termination; and

# LEHMAN BROTHERS

LEH-RSU 0007228

(v) However, if such Termination is a Full Career Termination (as defined in the Appendix), and the Participant does not engage in Competitive Activity or Detrimental Activity prior to the Share Payment Date, the Participant shall on the Share Payment Date become entitled to the entire Discount Award Shares; and

(vi) If the Participant engages in Competitive Activity or Detrimental Activity prior to the Share Payment Date, the Participant shall not become entitled to any Discount Award Shares.

**(d) Involuntary Termination with Cause.** In the event of the Participant's involuntary Termination with Cause at any time prior to the Maturity Date, the Participant shall not on that date become entitled to any Award Shares.

**(e) Involuntary Termination without Cause.** In the event of the Participant's involuntary Termination without Cause on or after January 30, 2004:

(i) Provided that the Participant does not engage in Detrimental Activity from the date of his Termination to the Share Payment Date, the Participant shall on the Share Payment Date become entitled to receive all the Principal Award Shares; and

(ii) Provided that the Participant does not engage in Detrimental Activity prior to the Share Payment Date, the Participant shall on the Share Payment Date become entitled to 20% of the Discount Award Shares multiplied by each complete year of employment with the Group after November 30, 2003 and before Termination; and

(iii) However, if such Termination is a Full Career Termination, and the Participant does not engage in Detrimental Activity prior to the Share Payment Date, the Participant shall on the Share Payment Date become entitled to the entire Discount Award Shares.

**(f) Retirement.** Notwithstanding sections 2(a) – (e) of this Letter, in the event of the Participant's Retirement on or after January 30, 2004 and provided the Participant does not engage in Competitive Activity or Detrimental Activity, the Participant shall immediately become entitled to receive all the Principal Award Shares and all the Discount Award Shares. The Participant will receive freely transferable shares of common stock for each Award Share he is entitled to receive, as soon as practicable after his Retirement. If the Participant engages in Competitive Activity, the provisions specified in section 2(b) of this Letter shall apply as of the date of his Retirement, and the Participant shall be obligated to repay to Holdings the full gross amounts or Shares received in excess of those which the Participant would have received under section 2(b). If the Participant engages in Detrimental Activity, the Participant shall be obligated to repay to Holdings the full gross amounts or Shares the Participant received under this Letter.

**(g) Occurrence of a Bankruptcy Distribution Event, Death, or Disability.** Notwithstanding sections 2(a) – (e) of this Letter, in the event on or after January 30, 2004 of:

(i) A Bankruptcy Distribution Event, the Participant shall immediately become entitled to receive all the Principal Award Shares and the Discount Award Shares; and

(ii) The Participant's death or Disability or the Participant's death or Disability following (aa) the Participant's voluntary Termination without Competitive Activity; or (bb) the Participant's involuntary Termination without Cause, the Participant shall immediately become entitled to receive any outstanding Principal Award Shares and Discount Award Shares.

**3. AFFIDAVIT.** In the event of the Termination of the Participant on or after January 30, 2004, the Participant may be requested, from time to time, after that Termination, to complete and sign an affidavit with respect to Competitive Activity or Detrimental Activity, which includes representations and authorizes Holdings to verify the representations. Any failure on the part of the Participant to complete, sign, and return the affidavit within 60 days may prevent the Participant from becoming entitled to any of the Award Shares.

**4. INTERIM PAYMENTS AND FURTHER AWARDS.** Holdings undertakes that provided, when dividends are declared and paid on any Shares on or after January 30, 2004, the Participant continues to be prospectively entitled to some or all of the Award Shares on fulfillment of the conditions or contingencies set out in section 2 of this Letter, it will, or it will procure that the Group Company employing the Participant, pay to the Participant cash amounts, or award to the Participant additional Award Shares, with a value equal to such dividends paid on a corresponding number of Shares, net of any taxes applicable thereto. The Participant shall become entitled to any such additional Award Shares and/or cash amounts at the same time or times and on fulfillment of the same conditions and contingencies as those applicable to the original Award Shares to which those additional Award Shares and/or cash amounts relate.

**5. TRANSFER OF SHARES AND LIMITATION ON OBLIGATIONS.** Subject to fulfillment of the conditions specified in section 2 of the Letter and receipt of any required taxes, Holdings or the Group Company employing the Participant shall transfer to the Participant the appropriate number of Shares and certificates therefor properly delivered on the date when such Shares are due to be delivered hereunder. The obligations of each and every Group Company shall be limited to the delivery to the Participant of Shares and in no way shall any Group Company become obligated to pay cash to the Participant, save as provided under section 4 or 8 of this Letter.

**6. NON-ASSIGNMENT.** No rights conferred by this Letter on the Participant shall be capable of being sold, transferred, assigned, pledged, hypothecated, or otherwise encumbered or disposed of, except by will or under the laws of descent and distribution. Any attempt to violate this section by the Participant or any other person claiming under or through him shall be null and void and without effect and neither Holdings nor any Group Company shall be or become obligated to issue or transfer Shares under this Letter.

**7. EQUITABLE ADJUSTMENT.** In the event of a Change in Capitalization occurring after the Date of Grant and before the Participant has become entitled to Shares under this Letter, the number and kind of Shares which may be issued to the Participant shall be adjusted so as to reflect that change.

**8. CHANGE IN CONTROL.** Except as set forth below, upon the occurrence of a Hostile Change in Control, the Participant shall become immediately entitled to all the Award Shares not already belonging to him, any sales restrictions shall lapse and Shares shall be issued. Except as set forth below, upon the occurrence of a Friendly Change in Control, the Participant shall receive, in the same form of consideration as that received by shareholders generally, the undiscounted U.S. Dollar market value (at the time of grant) for his Award Shares, and the excess of the price paid by an acquiror over such undiscounted U.S. Dollar market value shall become receivable after the earlier of two years from the date of that Friendly Change in Control or the first to occur of the dates set out under section 2 of this Letter (the ''Deferred Period''), and only if, in either case, the conditions and contingencies set out in section 2 of this Letter are

satisfied at the end of the Deferred Period. Neither of the foregoing shall be effective to the extent that the Participant is able to direct the exercise of tender or voting rights in respect of Shares held in Trust, in which case the Participant will only be issued Shares or receive such undiscounted market value, in the same form of consideration as that received by shareholders generally (and after the Deferred Period, the excess price) in respect of such Shares upon successful completion of a Change in Control.

9.  TREATMENT IN BANKRUPTCY.  (a) If the Participant is an employee of Holdings, Holdings agrees to deliver, and (b) if the Participant is an employee of a subsidiary, Holdings agrees to deliver to (or at the direction of) such subsidiary, Shares on the date on which such Shares become due to be delivered under this Letter. If the Participant is an employee of a subsidiary, Holdings' obligation in clause (b) of the preceding sentence is created expressly for the benefit of the Participant and the Participant shall have the full right to enforce Holdings' obligation to deliver Shares as if such obligation was made directly in favour of the Participant. All of the Participant's claims arising from, or in connection with, or in any way relating to, any failure of any Group Company to deliver to the Participant Shares on the date on which Shares become and are due to be delivered to the Participant under this Letter shall be deemed, in the event of a bankruptcy of Holdings, to be claims for damages arising from the purchase or sale of Shares, within the meaning of section 510(b) of the Bankruptcy Code and shall have in such bankruptcy the same priority as, and no greater priority than, a holding of Shares.

10.  AMENDMENT.  The terms of this Letter may be amended from time to time by the Committee in its sole discretion in any manner that it deems appropriate (including, but not limited to, acceleration of the entitlement of the Participant to Shares, or interim payments under section 4, of this Letter).

11.  BINDING ACTIONS.  Any action taken or decision made by the Committee or its designees arising out of or in connection with the construction, administration, interpretation, or effect of this Letter or the Plan shall lie within its sole and absolute discretion, as the case may be, and shall be final, conclusive, and binding on the Participant and all persons claiming under or through the Participant. By accepting this Letter or other benefit under the Plan, the Participant and each person claiming under or through the Participant shall be conclusively deemed to have confirmed acceptance and ratification of, and consent to, any action taken under the Plan or this Letter by the Committee or its designees.

12.  NO RIGHT TO CONTINUED EMPLOYMENT.  Neither the Letter nor the Plan nor any action taken or omitted to be taken hereunder or thereunder shall be deemed to create or confer upon the Participant any right to be retained in the employment of any Group Company, or to receive subsequent Contingent Stock Awards or other Awards under the Plan. The right of any Group Company to terminate the Participant's employment at any time, or as otherwise provided by any agreement between the Participant and any Group Company, is specifically reserved.

13.  APPLICABLE LAW.  The validity, construction, interpretation, administration, and effect of the Plan and of its rules and regulations and rights relating to the Plan, and of this Letter and rights arising under it, shall be governed by the substantive laws, but not the choice of law rules, of the State of Delaware, United States of America.

14.  SUBMISSION TO JURISDICTION.  The Participant, Holdings, and any Group Company employing the Participant agree that any issue concerning or relating to this Letter or to the acquisition or possible acquisition of Shares by the Participant

hereunder shall be referred to the courts of the State of Delaware, United States of America, for determination.

15.  STOCKHOLDER RIGHTS.

The Participant and any transferee of this Letter following his death shall have no rights as a stockholder with respect to any Share covered by this Letter until he shall have become the holder of record of such Share.

16.  TAXES/DEDUCTIONS.  It shall be a condition of the obligation of any Group Company to issue or transfer Shares under this Letter that (a) the Participant (or, in the event of his death, his estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of his death) pay to the relevant Group Company, on its demand, such amount as is required to satisfy its obligation or the obligation of any other person to account for any taxes properly payable in respect of the Shares or any interim payments under section 4 of this Letter to which the Participant becomes entitled, and (b) the Participant (or, in the event of his death, his estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of his death) provide the relevant Group Company with any duly completed and executed forms, documents or other information reasonably required by the Group Company in respect of those Shares or interim payments. If the amount required for the payment of any such taxes is not paid, the Group Company may refuse to issue or transfer the relevant Shares and/or related interim payments or take any other action they deem necessary to fulfill all obligations in respect of such taxes. Any Group Company shall further have the right to deduct from all amounts remaining payable to the Participant after satisfaction of any taxes, the amount of any deficit, debt, tax obligation or other liability or obligation of any kind which the Participant may at that time have with respect to any Group Company.

17.  COMPLIANCE WITH LAW.  Notwithstanding any of the provisions hereof, the Participant hereby agrees that the Group Company will not be obligated to issue or transfer any Shares to the Participant hereunder, if the issuance or transfer of such Shares shall constitute a violation by the Participant or any Group Company of any provisions of any law or regulation of any governmental authority applicable to the Letter. Any determination in this connection by Holdings shall be final, binding, and conclusive.

18.  ENTIRE AGREEMENT.  The Letter sets forth the entire agreement and understanding between the parties hereto and supersedes all prior agreements relating to the subject matter hereof.

APPENDIX

1.  In the Letter, these terms shall have these meanings:

"Affiliate" means any corporation or other entity, which is not a subsidiary but as to which Holdings possesses a direct or indirect ownership interest and has representation on the board of directors or any similar governing body.

"Appropriate Officer" means the Chief Executive Officer or Chief Operating Officer of Holdings (or their respective designees).

"Bankruptcy Distribution Event" means the earlier to occur of (i) the date of, but immediately prior to, distribution to holders of claims and interests upon the substantial consummation of a confirmed plan of reorganization of Holdings in a Chapter 11 case under Title 11 of the United States Code, 11 U.S.C. §§101 et seq. (the "Bankruptcy Code"), or (ii) the date of, but immediately prior to, distributions to holders of claims and interests upon the liquidation of Holdings in a Chapter 7 case under the Bankruptcy Code.

**"Beneficial Ownership"** has the same meaning as in Rule 13d-3 promulgated under the Exchange Act.

**"Board"** means the board of directors of Holdings.

**"Cause"** means a material breach by a Participant of his employment contract with any one or more of the Group Companies, failure by the Participant to devote substantially all business time exclusively to the performance of his employment with a Group Company, willful misconduct, dishonesty relating to the business and affairs of any Group Company, conviction of a criminal offense being or equivalent to a felony or a misdemeanor constituting a statutory disqualification under United States securities laws (or failure to contest prosecution for a felony or such a misdemeanor), habitual or gross negligence in the performance of the Participant's duties under his employment with a Group Company, solicitation of employees of a Group Company to work for any employer other than a Group Company, improper use or disclosure of information relating to any Group Company, its business affairs or clients, the violation of policies and practices adopted by any Group Company or a material violation of the conflict of interest, proprietary information or business ethics policies of any Group Company, or such other circumstances as may be determined in the sole discretion of an Appropriate Officer.

**"Committee"** means the Compensation and Benefits Committee of the Incumbent Board (see definition of change in control in the plan).

**"Competitive Activity"** means involvement (whether as an employee, proprietor, consultant, or otherwise) with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with any business carried on by any Group Company on the date of termination of the Participant's employment with any of the Group Companies, as determined in the sole discretion of an Appropriate Officer.

**"Detrimental Activity"** means at any time (i) using confidential information received during employment with Holdings or any other Group Company relating to the business affairs of any Group Company, any of their affiliates, or any of their clients, in breach of such Participant's undertaking to keep such information confidential; (ii) direct or indirect persuasion or any attempt to persuade by any means, any employee of any Group Company to terminate his employment with any of those corporations or entities or to breach any of the terms of his employment with any Group Company; (iii) directly or indirectly making any statement that is, or could be, disparaging of Holdings or any Group Company, or any of their employees (except as necessary to respond truthfully to any inquiry from applicable regulatory authorities or to provide information pursuant to legal process); or (iv) directly or indirectly engaging in any activity that is substantially injurious to the financial condition, reputation, or goodwill of Holdings or any Group Company, in each case as determined in the sole discretion of an Appropriate Officer.

**"Disability"** means a disability which meets the criteria under both the Long-Term Disability Insurance Plan and the United States Social Security Act.

**"Discount Award Shares"** means Shares equal in number to 25% of the Award Shares.

**"Exchange Act"** means the United States Securities Exchange Act of 1934, as later amended, modified, or substituted.

**"Friendly Change in Control"** means any Change in Control, which is not a Hostile Change in Control.

**"Full Career Termination"** means a Termination when (i) a Participant has at least 20 years of service or (ii) a Participant meets all of the following criteria: (x) the Participant's age plus years of service with Holdings or any subsidiary equals at least 65, (y) the Participant is at least 45 years old, and (z) the Participant has at least 10 years of service with Holdings or any subsidiary.

**"Group"** means Holdings and all its Subsidiaries and Affiliates, and

**"Group Company"** shall mean any entity within the Group.

**"Hostile Change in Control"** means the occurrence of a Change in Control, without the prior approval of a majority of the independent members of the Incumbent Board.

**"Person"** has the same meaning as in section 13(d) or 14(d) of the Exchange Act.

**"Plan"** means the Lehman Brothers Holdings Inc. Employee Incentive Plan.

**"Principal Award Shares"** means Shares equal in number to 75% of the Award Shares.

**"Retirement"** means a Termination of employment with all Group Companies which meets the criteria for retirement under Holdings' qualified defined benefit pension plan, provided that the person has signed an agreement not to engage in Competitive Activity or Detrimental Activity, in a form prescribed in the sole discretion of an Appropriate Officer.

**"Share"** means a vested share of Common Stock of Holdings, par value of $0.10 per share.

**"Share Payment Date"** means as soon as practicable after the earlier of (i) November 30, 2008 or (ii) the end of the fiscal quarter immediately following the first anniversary of the Participant's termination of employment.

**"Subsidiary"** means any corporation or other Person of which a majority of its voting power or its voting equity securities or equity interest is owned directly or indirectly by Holdings.

**"Termination"** means the end of employment with Holdings or any Group Company. The date of Termination and the reason for Termination are as determined in the sole discretion of an Appropriate Officer.

**"Voting Securities"** means the outstanding Shares of capital stock of Holdings having ordinary voting power in the election of directors.

**2.** In this Letter, any reference to the singular shall include the plural and vice versa and any reference to the masculine gender shall include a reference to all other genders.

©2004 Lehman Brothers. All Rights Reserved. LB10484_C1_Non_US_Agmt&Letters/CSA_Award_letter

**E**
**X**
**H**
**I**
**B**
**I**
**T**

**10**

**EXHIBIT 10**

## 2004 EQUITY AWARD PROGRAM

# CONTINGENT STOCK AWARD LETTER

Pursuant to the Plan, Lehman Brothers Holdings Inc. ("Holdings") hereby grants to you (the "Participant"), as of December 9, 2004 (the "Date of Grant"), contingent rights to receive the number of Shares set forth on the award statement with your name delivered to you herewith (the "Award Shares")—which may be adjusted under section 7 of this Letter—subject to the terms of the Plan and to fulfillment of the conditions and contingencies set out in this letter (the "Letter").

This Letter will entitle the Participant to receive the Award Shares, under and on fulfillment of the contingencies and conditions specified herein. You have been provided with a copy of the Plan, which is incorporated in this Letter by reference and made a part hereof, and a copy of the Plan prospectus. The Plan and the prospectus should be carefully examined. In the event of any conflict or ambiguity between the Letter and the Plan, the terms of the Plan shall govern. All capitalized terms used herein and not defined in the Appendix to this Letter shall have the meaning ascribed to such terms under the Plan.

**1. GRANT.** The rights granted to the Participant under this Letter are a contingent entitlement to, and a right to receive, the Award Shares, and the Participant shall become entitled to receive the Award Shares on November 30, 2009 (the "Maturity Date"), subject to fulfillment of the conditions set out in this Letter.

**2. ENTITLEMENT TO RECEIVE COMMON STOCK.**

**(a) General Rule.** Subject to other provisions of this section 2, the Participant shall become entitled to receive the Award Shares on the Maturity Date.

**(b) Effect of Detrimental Activity.** Notwithstanding any other provision of this Agreement, if the Participant engages in any Detrimental Activity at any time prior to the Share Payment Date, the Participant will not become entitled to any of the Award Shares and all rights hereunder shall terminate.

**(c) Occurrence of Death, Disability.** In the event of the occurrence of the Participant's death or Disability, all outstanding Award Shares

held by the Participant shall become immediately payable and the Participant (or, in the event of his death, his estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of his death) shall, as soon as practicable thereafter, receive freely transferable shares of Common Stock.

**(d) Effect of Termination.** In the event of Termination of the Participant's employment with the Group for any reason or notification of Termination prior to January 31, 2005, the Participant will not become entitled to any of the Award Shares and all rights hereunder shall terminate. In the event of any Termination not described in the preceding sentence, the following rules shall apply:

**(i) Voluntary Termination with Competitive Activity.** In the event of the Participant's voluntary Termination with Competitive Activity:

(i) The Participant will not become entitled to any Discount Award Shares on the Share Payment Date; and

(ii) If such Termination occurs prior to November 30, 2006, the Participant will not become entitled to any Principal Award Shares on the Share Payment Date; and

(iii) If such Termination occurs on or subsequent to November 30, 2006, the Participant shall become entitled, on the Share Payment Date, to the Principal Award Shares.

**(ii) Voluntary Termination without Competitive Activity.** In the event of the Participant's voluntary Termination without Competitive Activity:

(i) The Participant shall, on the Share Payment Date, become entitled to receive all the Principal Award Shares; and

(ii) The Participant shall on the Share Payment Date become entitled to 20% of the Discount Award Shares multiplied by each complete year of employment with the Group after November 30, 2004 and before Termination; and

# LEHMAN BROTHERS

LEH-RSU 0001054

(iii) However, if such Termination is a Full Career Termination, the Participant shall on the Share Payment Date become entitled to the entire Discount Award Shares; and

(iv) If the Participant engages in Competitive Activity prior to the Share Payment Date, the provisions specified in Paragraph 2(d)(i) shall apply.

**(iii) Involuntary Termination with Cause.** In the event of the Participant's involuntary Termination with Cause at any time prior to the Maturity Date, the Participant shall not on that date become entitled to any Award Shares.

**(iv) Involuntary Termination without Cause.** In the event of the Participant's involuntary Termination without Cause:

(i) The Participant shall on the Share Payment Date become entitled to receive all the Principal Award Shares; and

(ii) The Participant shall on the Share Payment Date become entitled to 20% of the Discount Award Shares multiplied by each complete year of employment with the Group after November 30, 2004 and before Termination; and

(iii) However, if such Termination is a Full Career Termination, the Participant shall on the Share Payment Date become entitled to the entire Discount Award Shares.

**(v) Retirement.** Notwithstanding sections 2(d)(i), (ii), (iii) and (iv) of this Letter, in the event of the Participant's Retirement and provided the Participant does not engage in Competitive Activity or Detrimental Activity, the Participant shall immediately become entitled to receive all the Principal Award Shares and all the Discount Award Shares. The Participant will receive freely transferable shares of common stock for each Award Share he is entitled to receive, as soon as practicable after his Retirement. If the Participant engages in Competitive Activity, the provisions specified in section 2(d)(i) of this Letter shall apply as of the date of his Retirement, and the Participant shall be obligated to repay to Holdings the full gross amounts or Shares received in excess of those which the Participant would have received under section 2(d)(i). If the Participant engages in Detrimental Activity prior to the Share Payment Date, the Participant shall be obligated to repay to Holdings the full gross amounts or Shares the Participant received under this Letter.

**(vi) Occurrence of Death or Disability following a Termination.** Notwithstanding sections 2(d)(i), (ii), (iii) and (iv) of this Letter, in the event of the occurrence of the Participant's death or Disability following a Termination described in Paragraph 2(d)(ii) or (iv) above, the Participant (or, in the event of his death, his estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of his death) shall at that time immediately become entitled to receive any outstanding Principal Award Shares and Discount Award Shares.

Any shares that become payable pursuant to this Paragraph 2(d) (other than Paragraph 2(d)(v) or (vi)) shall be issued to you on the Share Payment Date, subject to the application of Paragraph 2(b). Any remaining Award Shares that are not payable pursuant to the provisions of the Paragraph 2(d) shall be canceled by Holdings.

3. **AFFIDAVIT.** In the event of the Termination of the Participant on or after January 31, 2005, the Participant may be requested, from time to time, after that Termination, to complete and sign an affidavit with respect to Competitive Activity or Detrimental Activity, which includes representations and authorizes Holdings to verify the representations. Any failure on the part of the Participant to complete, sign and return the affidavit as required may prevent the Participant from becoming entitled to any of the Award Shares.

4. **INTERIM PAYMENTS AND FURTHER AWARDS.** Holdings undertakes that provided, when dividends are declared and paid on any Shares on or after January 31, 2005, the Participant continues to be prospectively entitled to some or all of the Award Shares on fulfillment of the conditions or contingencies set out in section 2 of this Letter, it will, or it will procure that the Group Company employing the Participant, pay to the Participant cash amounts, or award to the Participant additional Award Shares, with a value equal to such dividends paid on a corresponding number of Shares, net of any taxes applicable thereto. The Participant shall become entitled to any such additional Award Shares and/or cash amounts at the same time or times and on fulfillment of the same conditions and contingencies as those applicable to the original Award Shares to which those additional Award Shares and/or cash amounts relate.

5. **TRANSFER OF SHARES AND LIMITATION ON OBLIGATIONS.** Subject to fulfillment of the conditions specified in section 2 of the Letter and receipt of any required taxes, Holdings or the Group Company employing the Participant shall transfer to the Participant the appropriate number of Shares and certificates therefor properly delivered on the date when such Shares are due to be delivered hereunder. The obligations of each and every Group Company shall be limited to the delivery to the Participant of Shares and in no way shall any Group Company become obligated to pay cash to the Participant, save as provided under section 4 or 8 of this Letter.

6. **NON-ASSIGNMENT.** No rights conferred by this Letter on the Participant shall be capable of being sold, transferred, assigned, pledged, hypothecated, or otherwise encumbered or disposed of, except by will or under the laws of descent and distribution. Any attempt to violate this section by the Participant or any other person claiming under or through him shall be null and void and without effect and neither Holdings nor any Group Company shall be or become obligated to issue or transfer Shares under this Letter.

7. **EQUITABLE ADJUSTMENT.** In the event of a Change in Capitalization occurring after the Date of Grant and before the Participant has become entitled to Shares under this Letter, the number and kind of Shares which may be issued to the Participant shall be adjusted so as to reflect that change.

8. **CHANGE IN CONTROL.** Except as set forth below, upon the occurrence of a Change in Control without the prior approval of a majority of the independent members of the Incumbent Board, the Participant shall become immediately entitled to all the Award Shares not already belonging to him, any sales restrictions shall lapse and Shares shall be issued. Except as set forth below, upon the occurrence of a Change in Control with the prior approval of a majority of the independent members of the Incumbent Board, the Participant shall receive in the same form of consideration as that received by shareholders generally, the lesser of (a) the undiscounted market value (at the time of grant) of the shares of Common Stock underlying his outstanding Award Shares or (b) the price paid by an acquirer for such shares of Common Stock, and the excess, if any, of the price paid by an acquirer over such undiscounted market value shall be deferred for the shorter of (x) two years following such Change in Control or (y) the term of any remaining restrictions (the "Deferred Period"), and only if, in either case, the conditions and contingencies set out in section 2 of this Letter are satisfied at the end of the Deferred Period. Neither of the foregoing shall be effective to the extent that the Participant is able to direct the exercise of tender or voting rights in respect of Shares held in Trust, in which case the Participant will only be issued Shares or receive such undiscounted market value, in the same form of consideration as that received by shareholders generally (and after the Deferred Period, the

excess price) in respect of such Shares upon successful completion of a Change in Control.

**9. TREATMENT IN BANKRUPTCY.** (a) If the Participant is an employee of Holdings, Holdings agrees to deliver, and (b) if the Participant is an employee of a Group Company, Holdings agrees to deliver to (or at the direction of) such Group Company, Shares on the date on which such Shares become due to be delivered under this Letter. If the Participant is an employee of a Group Company, Holdings' obligation in clause (b) of the preceding sentence is created expressly for the benefit of the Participant and the Participant shall have the full right to enforce Holdings' obligation to deliver Shares as if such obligation was made directly in favour of the Participant. All of the Participant's claims arising from, or in connection with, or in any way relating to, any failure of any Group Company to deliver to the Participant Shares on the date on which Shares become and are due to be delivered to the Participant under this Letter shall be deemed, in the event of a bankruptcy of Holdings, to be claims for damages arising from the purchase or sale of Shares, within the meaning of section 510(b) of the Bankruptcy Code and shall have in such bankruptcy the same priority as, and no greater priority than, a holding of Shares.

**10. AMENDMENT.** The terms of this Letter may be amended from time to time by the Committee in its sole discretion in any manner that it deems appropriate (including, but not limited to, acceleration of the entitlement of the Participant to Shares, or interim payments under section 4, of this Letter).

**11. BINDING ACTIONS.** Any action taken or decision made by the Committee or its designees arising out of or in connection with the construction, administration, interpretation or effect of this Letter or the Plan shall lie within its sole and absolute discretion, as the case may be, and shall be final, conclusive and binding on the Participant and all persons claiming under or through the Participant. By accepting this Letter or other benefit under the Plan, the Participant and each person claiming under or through the Participant shall be conclusively deemed to have confirmed acceptance and ratification of, and consent to, any action taken under the Plan or this Letter by the Committee or its designees.

**12. NO RIGHT TO CONTINUED EMPLOYMENT.** Neither the Letter nor the Plan nor any action taken or omitted to be taken hereunder or thereunder shall be deemed to create or confer upon the Participant any right to be retained in the employment of any Group Company, or to receive subsequent Contingent Stock Awards or other Awards under the Plan. The right of any Group Company to terminate the Participant's employment at any time, or as otherwise provided by any agreement between the Participant and any Group Company, is specifically reserved.

**13. APPLICABLE LAW.** The validity, construction, interpretation, administration, and effect of the Plan and of its rules and regulations and rights relating to the Plan, and of this Letter and rights arising under it, shall be governed by the substantive laws, but not the choice of law rules, of the State of Delaware, United States of America.

**14. SUBMISSION TO JURISDICTION.** The Participant, Holdings, and any Group Company employing the Participant agree that any issue concerning or relating to this Letter or to the acquisition or possible acquisition of Shares by the Participant hereunder shall be referred to the courts of the State of Delaware, United States of America, for determination.

**15. SHAREHOLDER RIGHTS.** The Participant and any transferee of this Letter following his death shall have no rights as a stockholder with respect to any Share covered by this Letter until he shall have become the holder of record of such Share.

**16. TAXES/DEDUCTIONS.** It shall be a condition of the obligation of any Group Company to issue or transfer Shares under this Letter that (a) the Participant (or, in the event of his death, his estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of his death) pay to the relevant Group Company, on its demand, in accordance with the Plan, either in the form of cash or freely transferable shares of Common Stock, such amount as is required to satisfy its obligation or the obligation of any other person to account for any taxes properly payable in respect of the Shares or any interim payments under section 4 of this Letter to which the Participant becomes entitled, and (b) the Participant (or, in the event of his death, his estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of his death) provide the relevant Group Company with any duly completed and executed forms, documents or other information reasonably required by the Group Company in respect of those Shares or interim payments. If the amount required for the payment of any such taxes is not paid, the Group Company may refuse to issue or transfer the relevant Shares and/or related interim payments or take any other action they deem necessary to fulfill all obligations in respect of such taxes. Any Group Company shall further have the right to deduct from all amounts remaining payable to the Participant after satisfaction of any taxes, the amount of any deficit, debt, tax obligation or other liability or obligation of any kind which the Participant may at that time have with respect to any Group Company.

**17. COMPLIANCE WITH LAW.** Notwithstanding any of the provisions hereof, the Participant hereby agrees that the Group Company will not be obligated to issue or transfer any Shares to the Participant hereunder, if the issuance or transfer of such Shares shall constitute a violation by the Participant or any Group Company of any provisions of any law or regulation of any governmental authority applicable to the Letter. Any determination in this connection by Holdings shall be final, binding, and conclusive.

**18. ENTIRE AGREEMENT.** The Letter sets forth the entire agreement and understanding between the parties hereto and supersedes all prior agreements relating to the subject matter hereof.

**APPENDIX**

**1.** In the Letter, these terms shall have these meanings:

**"Affiliate"** means any corporation or other entity, which is not a subsidiary but as to which Holdings possesses a direct or indirect ownership interest and has representation on the board of directors or any similar governing body.

**"Appropriate Officer"** means the Chief Executive Officer or Chief Operating Officer of Holdings (or their respective designees).

**"Board"** means the board of directors of Holdings.

**"Cause"** means a material breach by a Participant of his employment contract with any one or more of the Group Companies, failure by the Participant to devote substantially all business time exclusively to the performance of his employment duties with a Group Company, willful misconduct, dishonesty relating to the business and affairs of any Group Company, conviction of a criminal offense being or equivalent to a felony or a misdemeanor constituting a statutory disqualification under United States securities laws (or failure to contest prosecution

for a felony or such a misdemeanor), habitual or gross negligence in the performance of the Participant's duties under his employment with a Group Company, solicitation of employees of a Group Company to work for any employer other than a Group Company, improper use or disclosure of confidential information relating to any Group Company, its business affairs or clients, the violation of policies and practices adopted by any Group Company or a material violation of the conflict of interest, proprietary information or business ethics policies of any Group Company, or such other circumstances as may be determined in the sole discretion of an Appropriate Officer.

**"Change in Capitalization"** means the occurrence of a circumstance described in Section 14 of the Plan.

**"Committee"** means the Compensation and Benefits Committee of the Incumbent Board (see definition of Change in Control in the Plan).

**"Competitive Activity"** means involvement (whether as an employee, proprietor, consultant or otherwise) with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with any business carried on by any Group Company on the date of termination of the Participant's employment with any of the Group Companies, as determined in the sole discretion of an Appropriate Officer.

**"Detrimental Activity"** means at any time (i) using confidential information received during employment with Holdings or any other Group Company relating to the business affairs of any Group Company, any of their affiliates, or any of their clients, in breach of such Participant's undertaking to keep such information confidential; (ii) direct or indirect persuasion or any attempt to persuade by any means, any employee of any Group Company to terminate his employment with any of those corporations or entities or to breach any of the terms of his employment with any Group Company; (iii) directly or indirectly making any statement that is, or could be disparaging of Holdings or any Group Company, or any of their employees (except as necessary to respond truthfully to any inquiry from applicable regulatory authorities or to provide information pursuant to legal process); or (iv) directly or indirectly engaging in any activity that is, or could be, substantially injurious to the financial condition, reputation or goodwill of Holdings or any Group Company, in each case as determined in the sole discretion of an Appropriate Officer.

**"Disability"** means a disability, which meets the criteria under both the Long-Term Disability Insurance Plan and the United States Social Security Act.

**"Discount Award Shares"** means Shares equal in number to 25% of the Award Shares.

**"Exchange Act"** means the United States Securities Exchange Act of 1934, as later amended, modified, or substituted.

**"Full-Career Termination"** means a Termination when (i) a Participant has at least 20 years of service or (ii) a Participant meets all of the following criteria: (x) the Participant's age plus years of service with Holdings or any subsidiary equals at least 65, (y) the Participant is at least 45 years old, and (z) the Participant has at least 10 years of service with Holdings or any subsidiary.

**"Group"** means Holdings and all its Subsidiaries and Affiliates, and

**"Group Company"** shall mean any entity within the Group.

**"Person"** has the same meaning as in section 13(d) or 14(d) of the Exchange Act.

**"Plan"** means the Lehman Brothers Holdings Inc. Employee Incentive Plan.

**"Principal Award Shares"** means Shares equal in number to 75% of the Award Shares.

**"Retirement"** means a Termination of employment with all Group Companies which meets the criteria for retirement under Holdings' qualified defined benefit pension plan, provided that the person has signed an agreement not to engage in Competitive Activity or Detrimental Activity, in a form prescribed in the sole discretion of an Appropriate Officer.

**"Share"** means a vested share of Common Stock of Holdings, par value of $0.10 per share.

**"Share Payment Date"** means as soon as practicable after the earlier of (i) the Maturity Date or (ii) the end of the fiscal quarter immediately following the first anniversary of the Participant's termination of employment.

**"Subsidiary"** means any corporation or other Person of which a majority of its voting power or its voting equity securities or equity interest is owned directly or indirectly by Holdings.

**"Termination"** means the end of employment with Holdings or any Group Company. The date of Termination and the reason of Termination are determined in the sole discretion of an Appropriate Officer.

**"Voting Securities"** means the outstanding Shares of capital stock of Holdings having ordinary voting power in the election of directors.

**2.** In this Letter, any reference to the singular shall include the plural and vice versa and any reference to the masculine gender shall include a reference to all other genders.

©2004 Lehman Brothers. All Rights Reserved.

# EXHIBIT 11

**EXHIBIT 11**

## 2005 EQUITY AWARD PROGRAM

# CONTINGENT STOCK AWARD LETTER

Pursuant to the Plan, Lehman Brothers Holdings Inc. ("Holdings") hereby grants to you (the "Participant"), as of November 30, 2005 (the "Date of Grant"), contingent rights to receive the number of Shares set forth on the award statement with your name delivered to you herewith (the "Award Shares")—which may be adjusted under section 7 of this Letter–subject to the terms of the Plan and to fulfillment of the conditions and contingencies set out in this letter (the "Letter").

This Letter will entitle the Participant to receive the Award Shares, under and on fulfillment of the contingencies and conditions specified herein. You have been provided with a copy of the Plan, which is incorporated in this Letter by reference and made a part hereof, and a copy of the Plan prospectus. The Plan and the prospectus should be carefully examined. In the event of any conflict or ambiguity between the Letter and the Plan, the terms of the Plan shall govern. All capitalized terms used herein and not defined in the Appendix to this Letter shall have the meaning ascribed to such terms under the Plan.

**1. GRANT.** The rights granted to the Participant under this Letter are a contingent entitlement to, and a right to receive, the Award Shares, and the Participant shall become entitled to receive the Award Shares on the Maturity Date, subject to fulfillment of the conditions set out in this Letter.

**2. ENTITLEMENT TO RECEIVE COMMON STOCK.**

(a) **General Rule.** Subject to other provisions of this section 2, the Participant shall become entitled to receive the Award Shares on the Maturity Date.

(b) **Effect of Detrimental Activity.** Notwithstanding any other provision of this Agreement, if the Participant engages in any Detrimental Activity at any time prior to the Share Payment Date, the Participant will not become entitled to any of the Award Shares and all rights hereunder shall terminate.

(c) **Occurrence of Death, Disability.** In the event of the occurrence of the Participant's death or Disability on or after January 31, 2006, all outstanding Award Shares held by the Participant shall become immediately payable and the Participant (or, in the event of his death, his estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of his death) shall, on the 30th day thereafter, receive freely transferable shares of Common Stock.

(d) **Effect of Termination.** In the event of Termination of the Participant's employment with the Group for any reason or notification of Termination prior to January 31, 2006, the Participant will not become entitled to any of the Award Shares and all rights hereunder shall terminate. In the event of any Termination not described in the preceding sentence, the following rules shall apply:

(i) **Voluntary Termination with Competitive Activity.** In the event of the Participant's voluntary Termination with Competitive Activity:

(i) The Participant will not become entitled to any Discount Award Shares on the Share Payment Date; and

(ii) If such Termination occurs prior to November 30, 2007, the Participant will not become entitled to any Principal Award Shares on the Share Payment Date; and

(iii) If such Termination occurs on or subsequent to November 30, 2007, the Participant shall become entitled, on the Share Payment Date, to the Principal Award Shares.

(ii) **Voluntary Termination without Competitive Activity.** In the event of the Participant's voluntary Termination without Competitive Activity:

(i) The Participant shall, on the Share Payment Date, become entitled to receive all the Principal Award Shares; and

(ii) The Participant shall on the Share Payment Date become entitled to 20% of the Discount Award Shares multiplied by each complete year of employment with the Group after November 30, 2005 and before Termination; and

# LEHMAN BROTHERS

LEH-RSU 0001082

(iii) However, if such Termination is a Full Career Termination, the Participant shall on the Share Payment Date become entitled to the entire Discount Award Shares; and

(iv) If the Participant engages in Competitive Activity prior to the Share Payment Date, the provisions specified in Paragraph 2(d)(i) shall apply.

**(iii) Involuntary Termination with Cause.** In the event of the Participant's involuntary Termination with Cause at any time prior to the Maturity Date, the Participant shall not on that date become entitled to any Award Shares.

**(iv) Involuntary Termination without Cause.** In the event of the Participant's involuntary Termination without Cause:

(i) The Participant shall on the Share Payment Date become entitled to receive all the Principal Award Shares; and

(ii) The Participant shall on the Share Payment Date become entitled to 20% of the Discount Award Shares multiplied by each complete year of employment with the Group after November 30, 2005 and before Termination; and

(iii) However, if such Termination is a Full Career Termination, the Participant shall on the Share Payment Date become entitled to the entire Discount Award Shares.

**(v) Retirement.** Notwithstanding sections 2(d)(i), (ii), and (iv) of this Letter, in the event of the Participant's Retirement and provided the Participant does not engage in Competitive Activity or Detrimental Activity, the Participant shall immediately become entitled to receive all the Principal Award Shares and all the Discount Award Shares. The Participant will receive freely transferable shares of common stock for each Award Share he is entitled to receive, on the 30th day after his Retirement. In the event of a voluntary Termination, if the Participant engages in Competitive Activity prior to the Share Payment Date, the provisions specified in section 2(d)(i) of this Letter shall apply as of the date of his Retirement, and the Participant shall be entitled only to such Award Shares as provided therein or, if the Participant has already received Award Shares, the Participant shall be obligated to repay to Holdings the full gross amounts or Shares received in excess of those which the Participant would have received under section 2(d)(i). In any case, if the Participant engages in Detrimental Activity prior to the Share Payment Date, the Participant shall not be entitled to any Award Shares or, if the Participant has already received Award Shares, the Participant shall be obligated to repay to Holdings the full gross amounts or Shares the Participant received under this Letter.

**(vi) Occurrence of Death or Disability following a Termination.** Notwithstanding sections 2(d)(i), (ii), (iii) and (iv) of this Letter, in the event of the occurrence of the Participant's death or Disability following a Termination described in Paragraph 2(d)(ii) or (iv) above, the Participant (or, in the event of his death, his estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of his death) shall at that time immediately become entitled to receive any outstanding Principal Award Shares and Discount Award Shares.

Any shares that become payable pursuant to this Paragraph 2(d) (other than Paragraph 2(d)(v) or (vi)) shall be issued to you on the Share Payment Date, subject to the application of Paragraph 2(b). Any remaining Award Shares that are not payable pursuant to the provisions of the Paragraph 2(d) shall be canceled by Holdings.

3. **AFFIDAVIT.** In the event of the Termination of the Participant on or after January 31, 2006, the Participant may be requested, from time to time, after that Termination, to complete and sign an

affidavit with respect to Competitive Activity or Detrimental Activity, which includes representations and authorizes Holdings to verify the representations. Any failure on the part of the Participant to complete, sign and return the affidavit as required may prevent the Participant from becoming entitled to any of the Award Shares or in the event of Retirement, may cause the Participant to repay to Holdings the full gross amounts or Shares received under this Letter.

4. **INTERIM PAYMENTS AND FURTHER AWARDS.** Holdings undertakes that provided, when dividends are declared and paid on any Shares on or after January 31, 2006, the Participant continues to be prospectively entitled to some or all of the Award Shares on fulfillment of the conditions or contingencies set out in section 2 of this Letter, it will, or it will procure that the Group Company employing the Participant award to the Participant additional Award Shares, with a value equal to such dividends paid on a corresponding number of Shares, net of any taxes applicable thereto as of the date of such dividend or distribution, subject to Paragraph 7. The Participant shall become entitled to any such additional Award Shares at the same time or times and on fulfillment of the same conditions and contingencies as those applicable to the original Award Shares to which those additional Award Shares relate.

5. **TRANSFER OF SHARES AND LIMITATION ON OBLIGATIONS.** Subject to fulfillment of the conditions specified in section 2 of the Letter and receipt of any required taxes, Holdings or the Group Company employing the Participant shall transfer to the Participant the appropriate number of Shares and certificates therefor properly delivered on the date when such Shares are due to be delivered hereunder. The obligations of each and every Group Company shall be limited to the delivery to the Participant of Shares and in no way shall any Group Company become obligated to pay cash to the Participant, save as provided under section 4 or 8 of this Letter. If the date on which shares with respect to Award Shares are to be issued or delivered to the Participant falls on a non-business or non-trading day, such shares shall be delivered on the immediately succeeding trading day. Whenever shares with respect to Award Shares are required to be delivered on the 30th day following a specific triggering event, and such 30th day falls within the same tax year as the triggering event, the delivery may be made earlier, at the discretion of Holdings.

6. **NON-ASSIGNMENT.** No rights conferred by this Letter on the Participant shall be capable of being sold, transferred, assigned, pledged, hypothecated, or otherwise encumbered or disposed of, except by will or under the laws of descent and distribution. Any attempt to violate this section by the Participant or any other person claiming under or through him shall be null and void and without effect and neither Holdings nor any Group Company shall be or become obligated to issue or transfer Shares under this Letter.

7. **EQUITABLE ADJUSTMENT.** In the event of a Change in Capitalization occurring after the Date of Grant and before the Participant has become entitled to Shares under this Letter, the number and kind of Shares which may be issued to the Participant shall be adjusted so as to reflect that change.

8. **CHANGE IN CONTROL.** Except as set forth below, upon the occurrence of a Change in Control without the prior approval of a majority of the independent members of the Incumbent Board, the Participant shall become immediately entitled to all the Award Shares not already belonging to him, any sales restrictions shall lapse and Shares shall be issued. Except as set forth below, upon the occurrence of a Change in Control with the prior approval of a majority of the independent members of the Incumbent Board, the Participant shall receive in the same form of consideration as

LEH-RSU 0001083

that received by shareholders generally, the lesser of (a) the undiscounted market value (at the time of grant) of the shares of Common Stock underlying his outstanding Award Shares or (b) the price paid by an acquirer for such shares of Common Stock, and the excess, if any, of the price paid by an acquirer over such undiscounted market value shall be deferred for the shorter of (x) two years following such Change in Control or (y) the term of any remaining restrictions (the "Deferred Period"), and only if, in either case, the conditions and contingencies set out in section 2 of this Letter are satisfied at the end of the Deferred Period. Neither of the foregoing shall be effective to the extent that the Participant is able to direct the exercise of tender or voting rights in respect of Shares held in Trust, in which case the Participant will only be issued Shares or receive such undiscounted market value, in the same form of consideration as that received by shareholders generally (and after the Deferred Period, the excess price) in respect of such Shares upon successful completion of a Change in Control.

**9. AMENDMENT.** The terms of this Letter may be amended from time to time by the Committee in its sole discretion in any manner that it deems appropriate (including, but not limited to, acceleration of the entitlement of the Participant to Shares, or interim payments under section 4, of this Letter).

**10. BINDING ACTIONS.** Any action taken or decision made by the Committee or its designees arising out of or in connection with the construction, administration, interpretation or effect of this Letter or the Plan shall lie within its sole and absolute discretion, as the case may be, and shall be final, conclusive and binding on the Participant and all persons claiming under or through the Participant. By accepting this Letter or other benefit under the Plan, the Participant and each person claiming under or through the Participant shall be conclusively deemed to have confirmed acceptance and ratification of, and consent to, any action taken under the Plan or this Letter by the Committee or its designees.

**11. NO RIGHT TO CONTINUED EMPLOYMENT.** Neither the Letter nor the Plan nor any action taken or omitted to be taken hereunder or thereunder shall be deemed to create or confer upon the Participant any right to be retained in the employment of any Group Company, or to receive subsequent Contingent Stock Awards or other Awards under the Plan. The right of any Group Company to terminate the Participant's employment at any time, or as otherwise provided by any agreement between the Participant and any Group Company, is specifically reserved.

**12. APPLICABLE LAW.** The validity, construction, interpretation, administration, and effect of the Plan and of its rules and regulations and rights relating to the Plan, and of this Letter and rights arising under it, shall be governed by the substantive laws, but not the choice of law rules, of the State of Delaware, United States of America.

**13. SUBMISSION TO JURISDICTION.** The Participant, Holdings, and any Group Company employing the Participant agree that any issue concerning or relating to this Letter or to the acquisition or possible acquisition of Shares by the Participant hereunder shall be referred to the courts of the State of Delaware, United States of America, for determination.

**14. STOCKHOLDER RIGHTS.** The Participant and any transferee of this Letter following his death shall have no rights as a stockholder with respect to any Share covered by this Letter until he shall have become the holder of record of such Share.

**15. TAXES/DEDUCTIONS.** It shall be a condition of the obligation of any Group Company to issue or transfer Shares under this Letter that (a) the Participant (or, in the event of his death, his estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of his death) pay to the

relevant Group Company, on its demand, in accordance with the Plan, either in the form of cash or freely transferable shares of Common Stock, such amount as is required to satisfy its obligation or the obligation of any other person to account for any taxes properly payable in respect of the Shares or any interim payments under section 4 of this Letter to which the Participant becomes entitled, and (b) the Participant (or, in the event of his death, his estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of his death) provide the relevant Group Company with any duly completed and executed forms, documents or other information reasonably required by the Group Company in respect of those Shares or interim payments. If the amount required for the payment of any such taxes is not paid, the Group Company may withhold the relevant Shares and/or related interim payments to fulfill all obligations in respect of such taxes. Any Group Company shall further have the right to deduct from all amounts remaining payable to the Participant after satisfaction of any taxes, the amount of any deficit, debit, tax obligation or other liability or obligation of any kind which the Participant may at that time have with respect to any Group Company.

**16. CODE SECTION 409A.** It is intended that none of the Award Shares or payments otherwise due hereunder shall be deferred, accelerated, extended, paid out or modified in a manner that would result in the imposition upon you of an additional tax under Section 409A of the Code; provided that neither Holdings nor any of its employees or representatives shall have any liability to you with respect to any such taxes. In the event that it is reasonably determined by the Committee that, as a result of Section 409A of the Code, payments hereunder may not be made at the time contemplated by the terms of this Agreement or the Plan, as the case may be, without causing you to be subject to taxation under Section 409A of the Code, Holdings will make such payment on the first day that would not result in your incurring any tax liability under Section 409A of the Code.

**17. COMPLIANCE WITH LAW.** Notwithstanding any of the provisions hereof, the Participant hereby agrees that the Group Company will not be obligated to issue or transfer any Shares to the Participant hereunder, if the issuance or transfer of such Shares shall constitute a violation by the Participant or any Group Company of any provisions of any law or regulation of any governmental authority applicable to the Letter. Any determination in this connection by Holdings shall be final, binding, and conclusive.

**18. ENTIRE AGREEMENT.** The Letter sets forth the entire agreement and understanding between the parties hereto and supersedes all prior agreements relating to the subject matter hereof.

**APPENDIX**

1. In the Letter, these terms shall have these meanings:

**"Affiliate"** means any corporation or other entity, which is not a subsidiary but as to which Holdings possesses a direct or indirect ownership interest and has representation on the board of directors or any similar governing body.

**"Appropriate Officer"** means the Chief Executive Officer or Chief Operating Officer of Holdings (or their respective designees).

**"Board"** means the board of directors of Holdings.

**"Cause"** means a material breach by a Participant of his employment contract with any one or more of the Group Companies, failure by the Participant to devote substantially all business time exclusively to the performance of his employment duties with a Group Company, willful misconduct, dishonesty relating to the business and affairs of any Group Company, conviction of a criminal offense being or equivalent to a felony or a misdemeanor constituting a statutory disqualification under United States securities laws (or failure to contest prosecution for a felony or such a misdemeanor), habitual or gross negligence in

3

the performance of the Participant's duties under his employment with a Group Company, solicitation of employees of a Group Company to work for any employer other than a Group Company, improper use or disclosure of confidential information relating to any Group Company, its business affairs or clients, the violation of policies and practices adopted by any Group Company or a material violation of the conflict of interest, proprietary information or business ethics policies of any Group Company, or such other circumstances as may be determined in the sole discretion of an Appropriate Officer.

**"Change in Capitalization"** means the occurrence of a circumstance described in Section 14 of the Plan.

**"Committee"** means the Compensation and Benefits Committee of the Incumbent Board (see definition of Change in Control in the Plan).

**"Competitive Activity"** means involvement (whether as an employee, proprietor, consultant or otherwise) with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with any business carried on by any Group Company on the date of termination of the Participant's employment with any of the Group Companies, as determined in the sole discretion of an Appropriate Officer.

**"Detrimental Activity"** means at any time (i) using confidential information received during employment with Holdings or any other Group Company relating to the business affairs of any Group Company, any of their affiliates, or any of their clients, in breach of such Participant's undertaking to keep such information confidential; (ii) direct or indirect persuasion or any attempt to persuade by any means, any employee of any Group Company to terminate his employment with any of those corporations or entities or to breach any of the terms of his employment with any Group Company; (iii) directly or indirectly making any statement that is, or could be disparaging of Holdings or any Group Company, or any of their employees (except as necessary to respond truthfully to any inquiry from applicable regulatory authorities or to provide information pursuant to legal process); or (iv) directly or indirectly engaging in any activity that is, or could be, substantially injurious to the financial condition, reputation or goodwill of Holdings or any Group Company, in each case as determined in the sole discretion of an Appropriate Officer.

**"Disability"** means a disability, which meets the criteria under both the Long-Term Disability Insurance Plan and the United States Social Security Act.

**"Discount Award Shares"** means Shares equal in number to 25% of the Award Shares.

**"Exchange Act"** means the United States Securities Exchange Act of 1934, as later amended, modified, or substituted.

**"Full Career Termination"** means a Termination when (i) a Participant has at least 20 years of service or (ii) a Participant meets all of the following criteria: (x) the Participant's age plus years of service with Holdings or any subsidiary equals at least 65, (y) the Participant is at least 45 years old, and (z) the Participant has at least 10 years of service with Holdings or any Group Company.

**"Group"** means Holdings and all its Subsidiaries and Affiliates, and **"Group Company"** shall mean any entity within the Group.

**"Maturity Date"** means as soon as practicable after November 30, 2010 but no later than December 31, 2010.

**"Person"** has the same meaning as in section 13(d) or 14(d) of the Exchange Act.

**"Plan"** means the Lehman Brothers Holdings Inc. Employee Incentive Plan.

**"Principal Award Shares"** means Shares equal in number to 75% of the Award Shares.

**"Retirement"** means a Termination when the Participant's age plus years of service with any Group Company equals at least 65, provided that (i) the Participant is at least 65 years old and has at least 5 years of service or (ii) the Participant is at least 55 years old and has at least 10 years of service.

**"Share"** means a vested share of Common Stock of Holdings, par value of $0.10 per share.

**"Share Payment Date"** means the earlier of (i) the Maturity Date or (ii) the 30th day after the end of the fiscal quarter immediately following the first anniversary of the Participant's termination of employment.

**"Subsidiary"** means any corporation or other Person of which a majority of its voting power or its voting equity securities or equity interest is owned directly or indirectly by Holdings.

**"Termination"** means the end of active employment with Holdings or any Group Company. The characterization of the circumstances of Termination is determined in the sole discretion of an Appropriate Officer.

**"Voting Securities"** means the outstanding Shares of capital stock of Holdings having ordinary voting power in the election of directors.

**2.** In this Letter, any reference to the singular shall include the plural and vice versa and any reference to the masculine gender shall include a reference to all other genders.

©2005 Lehman Brothers. All Rights Reserved.

EXHIBIT 12

**EXHIBIT 12**

## 2006 EQUITY AWARD PROGRAM

# CONTINGENT STOCK AWARD LETTER



# LEHMAN BROTHERS

CONFIDENTIAL

Pursuant to the Lehman Brothers Holdings Inc. 2005 Stock Incentive Plan (the "Plan")Lehman Brothers Holdings Inc. ("Holdings") hereby grants to you (the "Participant"), as of December 8, 2006 (the "Date of Grant"), contingent rights to receive the number of Shares set forth on the award statement with your name delivered to you herewith (the "2006 Award Shares")--which may be adjusted under section 7 of this Letter--subject to the terms of the Plan and to fulfillment of the conditions and contingencies set out in this letter (the "Letter"). A portion of the Participant's 2006 Award Shares are classified either as "Principal Award Shares" or "Discount Award Shares" as defined in the glossary attached hereto.

If the Participant is classified by Holdings or any applicable Group Company as a "production based employee" for the Company's 2006 fiscal year ended November 30, 2006 ("Production-Based Employee"), in the event of the Participant's Termination prior to November 30, 2006, the number of 2006 Award Shares the Participant was awarded was based on the appropriate portion of such Participant's production-based compensation accrued for such Participant's 2006 equity award through the date of the Participant's Termination, in accordance with Holdings' standard formula for the payout of equity-based compensation for employees at the Participant's level.

This Letter will entitle the Participant to receive the 2006 Award Shares, under and on fulfillment of the contingencies and conditions specified herein. You have been provided with a copy of the Plan, which is incorporated in this Letter by reference and made a part hereof, and a copy of the Plan prospectus. The Plan and the prospectus should be carefully examined. In the event of any conflict or ambiguity between the Letter and the Plan, the terms of the Plan shall govern. All capitalized terms used herein and not defined in the Appendix to this Letter shall have the meaning ascribed to such terms under the Plan.

**1. GRANT.** The rights granted to the Participant under this Letter are a contingent entitlement to, and a right to receive, the 2006 Award Shares and the Participant shall become entitled to receive the 2006 Award Shares and Shares related thereto  on the Share Payment Date, subject to fulfillment of the conditions set out in this Letter.  Some of the conditions set out in this Letter, such as those provided in paragraph 2(b) apply through the Share Payment Date or such other date on which the vesting of unconditional 2006 Award Shares and delivery of Shares in respect thereof is otherwise called for hereunder. In contrast to such "full conditions," other "limited" conditions, such as Paragraph 2(d) apply only over the time periods and under the circumstances provided as described in those conditions.

**2. ENTITLEMENT TO RECEIVE COMMON STOCK.**

**(a) General Rule.** Subject to other provisions of this section 2, 6, 8, 15 and 16, the Participant shall become entitled to receive vested 2006 Award Shares on the Share Payment Date. Unless otherwise set forth herein, the Participant shall receive one share of Common Stock for each 2006 Award Share which the Participant holds on November 30, 2011 (the "Share Payment  Date") and which has not otherwise been terminated pursuant to the terms and conditions hereof.  In such case, the Participant shall be entitled to receive freely transferable Shares of Common Stock as soon as practicable after the Share Payment Date, but no later than December 31, 2011.

**(b) Effect of Detrimental Activity.** Notwithstanding any other provision of this Agreement, if the Participant engages in any Detrimental Activity at any time prior to the Share Payment  Date, the Participant will not become entitled to any of the 2006 Award Shares and all rights hereunder shall terminate.

**(c) Occurrence of Death, Disability While Participant is Employed.** In the event of the occurrence of the Participant's death or Disability all outstanding 2006 Award Shares held by the Participant shall become vested and Shares relating thereto shall become immediately payable and the Participant (or, in the event of his death, his estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of his death) shall, on the 30th day thereafter, receive freely transferable shares of Common Stock provided, however, if Participant is not classified as a Production Based Employee, the foregoing shall only apply if the Participant's death or Disability occurs on or after January 31, 2007.

**(d) Effect of Termination.** Except if the Participant is a Production-Based Employee and except as prescribed in paragraph 8 hereof, in the event of Termination of the Participant's employment with Holdings or any Group Company for any reason or notification of Termination prior to January 31, 2007, the Participant will not become entitled to any of the 2006 Award Shares and all rights hereunder shall terminate.  Except as otherwise provided in this Paragraph 2(d) and Paragraph 8, the rights granted to a Participant hereunder to receive unconditional 2006 Award Shares is conditioned not only on "full conditions" such as Paragraphs 2(b), 9 and 15, without limitation, but also on the Participant remaining actively employed through the date (or dates) applicable to such Participant as described under "Service Requirements" in the glossary.  In the event of any Termination not described in the first sentence of this Paragraph 2(d)  (including without limitation, if the Participant is a Production Based Employee), the following rules shall apply:

**(i) Voluntary Termination.** Except as otherwise provided for in Paragraph 2(d)(iv) and 2(d)(v) hereof, and subject to Paragraph 8 hereof, in the event of a Participant's voluntary Termination all then outstanding 2006 Award Shares as to which the applicable Services Requirements as described in the glossary had not been met as of the date of such Termination  shall be terminated, forfeited and be cancelled, and the Participant shall have no further right to any shares of Common Stock relating thereto.   All other terms and conditions of this Agreement and the Plan shall continue to apply to any 2006 Award Shares not so terminated.

**(ii) Involuntary Termination with Cause.** In the event of the Participant's involuntary Termination with Cause at any time prior to the Share Payment Date, the 2006 Award Shares shall be terminated, forfeited and cancelled and the Participant shall not on that date become entitled to any 2006 Award Shares or any shares of Common Stock relating thereto.

**(iii) Involuntary Termination without Cause.** Except as provided in Paragraphs 2(c), 2(d)(iv) 2(d)(v), and  8, and subject to the "full conditions" of  Paragraphs 2(b), 6, 15 and 16,  in the event of a Participant's involuntary Termination without Cause, the Participant shall be entitled to receive 2006 Principal Award

2

LEH-RSU 0019154

Shares and freely transferable shares of Common Stock with respect thereto as soon as practicable after the Share Payment Date, but no later than December 31, 2011, provided, however, that your entitlement to any freely transferable shares of Common Stock underlying such outstanding 2006 Principal Award Shares as to which the applicable Service Requirements have not been met is expressly conditioned on your timely execution of a release in such form as may be required by Holdings or any Group Company and in accordance with Holdings' (or any Group Company's) policies and procedures then in effect, but all then outstanding 2006 Discount Award Shares shall be terminated, forfeited and be cancelled, and the Participant shall have no further right to any shares of Common Stock relating thereto.

**(iv) Full Career Termination.** Notwithstanding the foregoing provisions of Paragraphs 2(d)(i) and (iii), but without limiting the application of the "full conditions" of Paragraphs 2(b), 2(d)(ii), 6, 8, 15 and 16, in the event of a Participant's voluntary Termination which occurs at a time when the Participant satisfies the definition of Full Career Termination, no further Service Requirements shall need to be satisfied by the Participant in respect of all of such Participant's then outstanding 2006 Award Shares and shares of Common Stock relating thereto shall be delivered as soon as practicable after the Share Payment Date, but no later than December 31, 2011, subject to satisfaction of such other "full conditions". An express condition of no longer requiring that the Participant satisfy the Service Requirements with respect to such 2006 Award Shares and an express condition to the shares of Common Stock underlying such 2006 Award Shares becoming deliverable pursuant to the immediately preceding sentence is that the Participant not engage in Competitive Activity through and including the end of the Company's fiscal quarter following the one year anniversary of such Termination. Notwithstanding the foregoing provisions of Paragraphs 2(d)(i) and (iii), but without limiting the application of Paragraphs 2(b), 2(d)(ii), 4(d)(v), 6, 8, 15 and 16, in the event the Participant's involuntary Termination without Cause occurs at a time when the Participant satisfies the definition of Full Career Termination, no further Service Requirement shall be required of the Participant with respect to all then outstanding 2006 Award Shares and, subject to the "full conditions" described herein, such 2006 Award Shares shall vest and shares of Common Stock relating thereto shall be delivered as soon as practicable after the Share Payment Date, but no later than December 31, 2011.

**(v) Occurrence of Death or Disability following a Termination.** Without limiting the applicability of Paragraphs 2(b), 6, 8, 15 and 16 hereof and notwithstanding sections 2(d)(i), (iii) and (iv) of this Letter, in the event of the occurrence of the Participant's death or Disability following a Termination described in Paragraph 2(d)(i) or (iii) above, the Participant (or, in the event of his death, his estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of his death) shall at that time immediately become entitled to receive any outstanding Principal Award Shares and Discount Award Shares.

Any shares of Common Stock that become deliverable pursuant to this Paragraph 2(d) (other than Paragraph 2(d)(v) shall be delivered to the Participant as soon as practicable after the Share Payment Date, but no later than December 31, 2011, subject to the application of

Paragraphs 2(b), 8, 15 and 16. Any remaining 2006 Award Shares that are not deliverable pursuant to the provisions of Paragraph 2 or otherwise under this Agreement and the Plan shall be terminated, forfeited and be cancelled by Holdings, and the Participant shall have no further right to any shares of Common Stock relating thereto.

For purposes of this Agreement, Holdings and/or the Committee, as applicable, shall determine in its sole discretion whether or not the Participant's Termination is voluntary, involuntary, or with or without Cause, whether or not the Participant has engaged in Detrimental Activity, or whether or not the Participant meets the definition of Disability or Full Career Termination.

## 4. INTERIM PAYMENTS AND FURTHER AWARDS.
Holdings undertakes that provided, when dividends are declared and paid on any Shares on or after the Date of Grant, the Participant continues to be prospectively entitled to some or all of the Award Shares on fulfillment of the conditions or contingencies set out in section 2 of this Letter, it will, or it will procure that the Group Company employing the Participant award to the Participant additional Award Shares, with a value equal to such dividends paid on a corresponding number of Shares, net of any taxes applicable thereto as of the date of such dividend or distribution, subject to Paragraph 7. The Participant shall become entitled to any such additional Award Shares at the same time or times and on fulfillment of the same conditions and contingencies as those applicable to the original Award Shares to which those additional Award Shares relate, provided however, in the event the Participant is not classified as a Production Based Employee, no such additional 2006 Award Shares shall be granted to the Participant in respect of any such dividend or distribution paid or made on Common Stock to holders of record on any date prior to January 31, 2007.

## 5. TRANSFER OF SHARES AND LIMITATION ON OBLIGATIONS.
Subject to fulfillment of the conditions specified in section 2 of the Letter and receipt of any required taxes, Holdings or the Group Company employing the Participant shall transfer to the Participant the appropriate number of Shares and certificates therefor properly delivered on the date when such Shares are due to be delivered hereunder. The obligations of each and every Group Company shall be limited to the delivery to the Participant of Shares and in no way shall any Group Company become obligated to pay cash to the Participant, save as provided under section 4 or 8 of this Letter. If the date on which shares with respect to Award Shares are to be issued or delivered to the Participant falls on a non-business or non-trading day, such shares shall be delivered on the immediately succeeding trading day. Whenever shares with respect to Award Shares are required to be delivered on the 30th day following a specific triggering event, and such 30th day falls within the same tax year as the triggering event, the delivery may be made earlier, at the discretion of Holdings.

## 6. NON-ASSIGNMENT.
No rights conferred by this Letter on the Participant shall be capable of being sold, transferred, assigned, pledged, hypothecated, or otherwise encumbered or disposed of, except by will or under the laws of descent and distribution. Any attempt to violate this section by the Participant or any other person claiming under or through him shall be null and void and without effect and neither Holdings nor any Group Company shall be or become obligated to issue or transfer Shares under this Letter.

3

LEH-RSU 0019155

**7. EQUITABLE ADJUSTMENT.** In the event of a Change in Capitalization occurring after the Date of Grant and before the Participant has become entitled to Shares under this Letter, the number and kind of Shares which may be issued to the Participant shall be adjusted so as to reflect that change.

**8. CHANGE IN CONTROL.** Except as set forth below, upon the occurrence of a Change in Control without the prior approval of a majority of the independent members of the Incumbent Board, the Participant shall become immediately entitled to all the Award Shares not already belonging to him, any sales restrictions shall lapse and Shares shall be delivered. Except as set forth below, upon the occurrence of a Change in Control with the prior approval of a majority of the independent members of the Incumbent Board, the Participant shall receive in the same form of consideration as that received by shareholders generally, the lesser of (a) the "undiscounted market value" (at the time of grant) of the shares of Common Stock underlying his outstanding 2006 Award Shares (i.e. the fair market value of the Participant's 2006 Award Shares determined on the Date of Grant) or (b) the price paid by an acquirer for such shares of Common Stock, and the excess, if any, of the price paid by an acquirer over such undiscounted market value shall be deferred for the shorter of (x) two years following such Change in Control or (y) the term of any remaining restrictions (the "Deferred Period"), and only if, in either case, the conditions and contingencies set out in section 2 of this Letter are satisfied at the end of the Deferred Period. Neither of the foregoing shall be effective to the extent that the Participant is able to direct the exercise of tender or voting rights in respect of Shares held in Trust, in which case the Participant will only be delivered Shares or receive such undiscounted market value, in the same form of consideration as that received by shareholders generally (and after the Deferred Period, the excess price) in respect of such Shares upon successful completion of a Change in Control.

**9. AMENDMENT.** The terms of this Letter may be amended from time to time by the Committee in its sole discretion in any manner that it deems appropriate (including, but not limited to, acceleration of the entitlement of the Participant to Shares, or interim payments under section 4, of this Letter), including, without limitation, in order to satisfy applicable requirements of Sections 162(m) and Section 409A of the Code, as amended from time to time, (whether or not the Participant's rights are adversely affected).

**10. BINDING ACTIONS.** Any action taken or decision made by the Committee or its designees arising out of or in connection with the construction, administration, interpretation or effect of this Letter or the Plan shall lie within its sole and absolute discretion, as the case may be, and shall be final, conclusive and binding on the Participant and all persons claiming under or through the Participant. By accepting this Letter or other benefit under the Plan, the Participant and each person claiming under or through the Participant shall be conclusively deemed to have confirmed acceptance and ratification of, and consent to, any action taken under the Plan or this Letter by the Committee or its designees.

**11. NO RIGHT TO CONTINUED EMPLOYMENT.** Neither the Letter nor the Plan nor any action taken or omitted to be taken hereunder or thereunder shall be deemed to create or confer upon the Participant any right to be retained in the employment of any Group Company, or to receive subsequent Contingent Stock Awards or other Awards under the Plan. The right of any Group Company to terminate the Participant's employment at any time, or as otherwise provided by any agreement between the Participant and any Group Company, is specifically reserved.

**12. APPLICABLE LAW.** The validity, construction, interpretation, administration, and effect of the Plan and of its rules and regulations and rights relating to the Plan, and of this Letter and rights arising under it, shall be governed by the substantive laws, but not the choice of law rules, of the State of Delaware, United States of America.

**13. SUBMISSION TO JURISDICTION.** The Participant, Holdings, and any Group Company employing the Participant agree that any issue concerning or relating to this Letter or to the acquisition or possible acquisition of Shares by the Participant hereunder shall be referred to the courts of the State of Delaware, United States of America, for determination.

**14. STOCKHOLDER RIGHTS.** The Participant and any transferee of this Letter following his death shall have no rights as a stockholder with respect to any Share covered by this Letter until he shall have become the holder of record of such Share.

**15. TAXES/DEDUCTIONS.** It shall be a condition of the obligation of any Group Company to issue or transfer Shares under this Letter that (a) the Participant (or, in the event of his death, his estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of his death) pay to the relevant Group Company, on its demand, in accordance with the Plan, either in the form of cash or freely transferable shares of Common Stock, such amount as is required to satisfy its obligation or the obligation of any other person to account for any taxes properly payable in respect of the Shares or any interim payments under section 4 of this Letter to which the Participant becomes entitled, and  (b) the Participant (or, in the event of his death, his estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of his death) provide the relevant Group Company with any duly completed and executed forms, documents or other information reasonably required by the Group Company in respect of those Shares or interim payments. If the amount required for the payment of any such taxes is not paid, the Group Company may withhold the relevant Shares and/or related interim payments to fulfill all obligations in respect of such taxes. Any Group Company shall further have the right to deduct from all amounts remaining payable to the Participant after satisfaction of any taxes, the amount of any deficit, debt, tax obligation or other liability or obligation of any kind which the Participant may at that time have with respect to any Group Company.

**16. CODE SECTION 409A.** It is intended that none of the Award Shares or payments otherwise due hereunder shall be deferred, accelerated, extended, paid out or modified in a manner that would result in the imposition upon the Participant of an additional tax under Section 409A of the Code; provided that neither Holdings nor any of its employees or representatives shall have any liability to the Participant with respect to any such taxes. In the event that it is reasonably determined by the Committee that, as a result of Section 409A of the Code, payments hereunder may not be made at the time contemplated by the terms of this Agreement or the Plan, as the case may be, without causing the Participant to be subject to taxation under Section 409A of the Code, Holdings will make such payment on the first day that would not result in the Participant's incurring any tax liability under

4

Section 409A of the Code.

**17. COMPLIANCE WITH LAW.** Notwithstanding any of the provisions hereof, the Participant hereby agrees that the Group Company will not be obligated to issue or transfer any Shares to the Participant hereunder, if the issuance or transfer of such Shares shall constitute a violation by the Participant or any Group Company of any provisions of any law or regulation of any governmental authority applicable to the Letter. Any determination in this connection by Holdings shall be final, binding, and conclusive.

**18. ENTIRE AGREEMENT.** The Letter sets forth the entire agreement and understanding between the parties hereto and supersedes all prior agreements relating to the subject matter hereof.

**APPENDIX**

**1.** In the Letter, these terms shall have these meanings:

**"Affiliate"** means any corporation or other entity, which is not a subsidiary but as to which Holdings possesses a direct or indirect ownership interest and has representation on the board of directors or any similar governing body.

**"Appropriate Officer"** means the Chief Executive Officer or Chief Operating Officer of Holdings (or their respective designees).

**"Board"** means the board of directors of Holdings.

**"Cause"** means a material breach by a Participant of his employment contract with any one or more of the Group Companies, failure by the Participant to devote substantially all business time exclusively to the performance of his employment duties with a Group Company, willful misconduct, dishonesty relating to the business and affairs of any Group Company, conviction of a criminal offense being or equivalent to a felony or a misdemeanor constituting a statutory disqualification under United States securities laws (or failure to contest prosecution for a felony or such a misdemeanor), habitual or gross negligence in the performance of the Participant's duties under his employment with a Group Company, solicitation of employees of a Group Company to work for any employer other than a Group Company, improper use or disclosure of confidential information relating to any Group Company, its business affairs or clients, the violation of policies and practices adopted by any Group Company or a material violation of the conflict of interest, proprietary information or business ethics policies of any Group Company, or such other circumstances as may be determined in the sole discretion of an Appropriate Officer.  For avoidance of doubt, for purposes of the preceding sentence, a material breach of an employment contract or violation of policies would include, as applicable, the employee's violation of any policy or employment agreement relating to the obligation to provide advance notice of resignation from Holdings or any Group Company.

**"Change in Capitalization"** means the occurrence of a circumstance described in Section 14 of the Plan.

**"Committee"** means the Compensation and Benefits Committee of the Incumbent Board (see definition of Change in Control in the Plan).

**"Competitive Activity"** means involvement (whether as an employee, proprietor, consultant or otherwise) with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with any business carried on by any Group Company on the date of termination of the Participant's employment with any of the Group Companies, as determined in the sole discretion of an Appropriate Officer.

**"Detrimental Activity"** means at any time (i) using confidential information received during employment with Holdings or any other Group Company relating to the business affairs of any Group Company, any of their affiliates, or any of their clients, in breach of such Participant's undertaking to keep such information confidential; (ii) direct or indirect persuasion or any attempt to persuade by any means, any employee of any Group Company to terminate his employment with any of those corporations or entities or to breach any of the terms of his employment with any Group Company; (iii) directly or indirectly making any statement that is, or could be disparaging of Holdings or any Group Company, or any of their employees (except as necessary to respond truthfully to any inquiry from applicable regulatory authorities or to provide information pursuant to legal process); or (iv) directly or indirectly engaging in any activity that is, or could be, substantially injurious to the financial condition, reputation or goodwill of Holdings or any Group Company, in each case as determined in the sole discretion of an Appropriate Officer.

**"Disability"** means a disability, which meets the criteria under both the Long-Term Disability Insurance Plan and the United States Social Security Act.

**"Discount Award Shares"** means the number of 2006 Award Shares (and any dividend equivalents related thereto.  If Participant was a Managing Director of Holdings or any Group Company for the fiscal year ended November 30, 2006, thirty percent (30%) of Participant's 2006 Award Shares as of the date of grant will be Discount Award Shares.  If Participant is an employee other than a Managing Director of Holdings or any Group Company for the fiscal year ended November 30, 2006, twenty-five percent (25%) of Participant's 2006 Award Shares as of the date of grant will be Discount Award Shares.

**"Exchange Act"** means the United States Securities Exchange Act of 1934, as later amended, modified, or substituted.

**"Full Career Termination"** means a Termination when (i) a person has at least 20 years of service,  (ii) the person is at least 45 years old, and the person has at least 10 years of service; or (iii) a person meets all of the following criteria:  (a) the person is at least 50 years old, and (b) the person has at least 5 years of service.

**"Group"** means Holdings and all its Subsidiaries and Affiliates, and

**"Group Company"** shall mean any entity within the Group.  Holdings and/or the Committee, as applicable, shall determine in its sole discretion whether or not an entity is or is not a "Group Company" for purposes of any provision of this Agreement.

**"Person"** has the same meaning as in section 13(d) or 14(f) of the Exchange Act.

**"Plan"** means the Lehman Brothers Holdings Inc. 2005 Stock Incentive Plan.

**"Service Requirements"** means the schedule below that is applicable to the Participant, pursuant to which the Participant is required to be actively employed with the Company and/or any Group Company as described in Paragraph 2,  and which, except as provided in Paragraphs 2(c), 2(d)(i), (iii), (iv) and (v) and 8, shall be a necessary

CONFIDENTIAL

LEH-RSU 0019157

condition for the Participant to become entitled to receive both vested 2006 Award Shares and shares of Common Stock underlying such 2006 Award Shares provided the Participant otherwise satisfies the other terms and conditions hereunder:

(a) If the Participant was a Managing Director of Holdings or any Group Company for the fiscal year ended November 30, 2006, such Participant is required to remain actively employed with the Company and/or any Group Company through the date specified below in order to be eligible to receive that portion of such 2006 Award Shares (and the Shares in respect thereof) specified next to such date, subject in all cases, to the other terms and conditions herein:

|  |  |
|---|---|
| Principal Award Shares: | 50%: November 30, 2009; |
|  | 50%: November 30, 2011. |
| Discount Award Shares: | 100%: November 30, 2011. |

(b) If Participant was an employee of Holdings or any Group Company other than a Managing Director for the fiscal year ended November 30, 2006 such Participant is required to remain actively employed with the Company and/or any Group Company through the date specified in order to be eligible to receive that portion of such 2006 Award Shares (and the Shares in respect thereof) specified next to such date, subject in all cases, to the other terms and conditions herein:

|  |  |
|---|---|
| Principal Award Shares: | 100%: November 30, 2008 |
| Discount Award Shares: | 100%: November 30, 2011. |

"**Principal Award Shares**" shall mean the number of 2006 Award Shares (and any dividend equivalents related thereto) related to the undiscounted base portion of the award. If the Participant was a Managing Director of Holdings or any Group Company for the fiscal year ended November 30, 2006, seventy percent (70%) of such Participant's 2006 Award Shares as of the Date of Grant will be Principal Award Shares. If Participant is an employee other than a Managing Director of Holdings or any Group Company for the fiscal year ended November 30, 2006, seventy-five percent (75%) of such Participant's 2006 Award Shares as of the Date of Grant will be Principal Award Shares.

"**Share**" means a share of Common Stock of Holdings, par value of $0.10 per share.

"**Share Payment Date**" means November 30, 2011.

"**Subsidiary**" means any corporation or other Person of which a majority of its voting power or its voting equity securities or equity interest is owned directly or indirectly by Holdings.

"**Termination**" means the end of active employment with Holdings or any Group Company. The characterization of the circumstances of Termination is determined in the sole discretion of an Appropriate Officer.

"**Voting Securities**" means the outstanding Shares of capital stock of Holdings having ordinary voting power in the election of directors.

**2.** In this Letter, any reference to the singular shall include the plural and vice versa and any reference to the masculine gender shall include a reference to all other genders.

©2006 Lehman Brothers. All Rights Reserved.

CONFIDENTIAL                                                                 LEH-RSU 0019158

EXHIBIT 13

**EXHIBIT 13**

# 2007 EQUITY AWARD PROGRAM
## LIFE @ LEHMAN
### YOUR BENEFITS AND LIFE BALANCE

Contingent Stock Award Letter

# LEHMAN BROTHERS

LEH-RSU 0000263

Pursuant to the Lehman Brothers Holdings Inc. ("Holdings") 2005 Stock Incentive Plan (the "Plan"), Holdings hereby grants to you (the "Participant"), as of December 7, 2007 (the "Date of Grant"), contingent rights to receive the number of Shares set forth on the award statement with your name delivered to you herewith (the "2007 Award Shares")--which may be adjusted under section 7 of this Letter--subject to the terms of the Plan and to fulfillment of the conditions and contingencies set out in this Letter (the "Letter"). A portion of the Participant's 2007 Award Shares are classified either as "Principal Award Shares" or "Discount Award Shares" as defined in the glossary attached hereto.

If the Participant is classified by Holdings or any applicable Group Company as a "production-based employee" for the Company's 2007 fiscal year ended November 30, 2007 ("Production-Based Employee"), in the event of the Participant's Termination prior to November 30, 2007, the number of 2007 Award Shares the Participant was awarded was based on the appropriate portion of such Participant's production-based compensation accrued for such Participant's 2007 equity award through the date of the Participant's Termination, in accordance with Holdings' standard formula for the payout of equity-based compensation for employees at the Participant's level.

This Letter will entitle the Participant to receive the 2007 Award Shares, under and on fulfillment of the contingencies and conditions specified herein. You have been provided with a copy of the Plan, which is incorporated in this Letter by reference and made a part hereof, and a copy of the Plan prospectus. The Plan and the prospectus should be carefully examined. In the event of any conflict or ambiguity between the Letter and the Plan, the terms of the Plan shall govern. All capitalized terms used herein and not defined in the Appendix to this Letter shall have the meaning ascribed to such terms under the Plan.

**1. GRANT.** The rights granted to the Participant under this Letter are a contingent entitlement to, and a right to receive, the 2007 Award Shares and the Participant shall become entitled to receive the 2007 Award Shares and Shares related thereto on the Share Payment Date, subject to fulfillment of the conditions set out in this Letter. Some of the conditions set out in this Letter, such as those provided in paragraph 2(b) apply through the Share Payment Date or such other date on which the 2007 Award Shares become unconditional and delivery of Shares in respect thereof is otherwise called for hereunder. In contrast to such "limited conditions," other "full" conditions, such as Paragraph 2(d) apply only over the time periods and under the circumstances provided as described in those conditions.

**2. ENTITLEMENT TO RECEIVE COMMON STOCK.**

**(a) General Rule.** Subject to other provisions of this section 2, 6, 8, 15 and 16, the Participant shall become entitled to receive 2007 Award Shares on the Share Payment Date. Unless otherwise set forth herein, the Participant shall receive one Share for each 2007 Award Share which the Participant holds on November 30, 2012 (the "Share Payment Date") and which has not otherwise been terminated pursuant to the terms and conditions hereof. In such case, the Participant shall be entitled to receive freely transferable Shares as soon as practicable after the Share Payment Date, but no later than December 31, 2012.

**(b) Effect of Detrimental Activity.** Notwithstanding any other provision of this Agreement, if the Participant engages in any Detrimental Activity at any time prior to the Share Payment Date, the Participant will not become entitled to any of the 2007 Award Shares and all rights hereunder shall terminate.

**(c) Occurrence of Death, Disability While Participant is Employed.** In the event of the occurrence of the Participant's death or Disability all outstanding 2007 Award Shares held by the Participant shall become unconditional and Shares relating thereto shall become immediately payable and the Participant (or, in the event of his death, his estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of his death) shall, on the 30th day thereafter, receive freely transferable Shares.

**(d) Effect of Termination.** Except as otherwise provided in this Paragraph 2(d) and Paragraph 8, the rights granted to a Participant hereunder to receive 2007 Award Shares is conditioned not only on "limited conditions" such as Paragraphs 2(b), 9 and 15, without limitation, but also on the Participant remaining actively employed through the date (or dates) applicable to such Participant as described under "Service Requirements" in the glossary. In the event of any Termination the following rules shall apply:

**(i) Voluntary Termination.** Except as otherwise provided for in Paragraph 2(d)(iv) and 2(d)(v) hereof, and subject to Paragraph 8 hereof, in the event of a Participant's voluntary Termination all then outstanding 2007 Award Shares as to which the applicable Services Requirements as described in the glossary had not been met as of the date of such Termination shall be terminated, forfeited and be cancelled, and the Participant shall have no further right to any Shares relating thereto. All other terms and conditions of this Agreement and the Plan shall continue to apply to any 2007 Award Shares not so terminated.

**(ii) Involuntary Termination with Cause.** In the event of the Participant's involuntary Termination with Cause at any time prior to the Share Payment Date, the 2007 Award Shares shall be terminated, forfeited and cancelled and the Participant shall not on that date become entitled to any 2007 Award Shares or any Shares relating thereto.

**(iii) Involuntary Termination without Cause.** Except as provided in Paragraphs 2(c), 2(d)(iv) 2(d)(v), and 8, and subject to the "limited conditions" of Paragraphs 2(b), 3, 6, 15 and 16, in the event of a Participant's involuntary Termination without Cause, the Participant shall be entitled to receive 2007 Principal Award Shares and freely transferable Shares with respect thereto as soon as practicable after the Share Payment Date, but no later than December 31, 2012, provided, however, that the Participant's entitlement to any freely transferable Shares underlying such outstanding 2007 Principal Award Shares as to which the applicable Service Requirements have not been met is expressly conditioned on the Participant's timely execution of a release in such form as may be required by Holdings or any Group Company and in accordance with Holdings' (or any Group Company's) policies and procedures then in effect. All then outstanding 2007 Discount Award Shares shall be terminated,

2

forfeited and be cancelled, and the Participant shall have no further right to any Shares relating thereto.

**(iv) Full Career Termination.** Notwithstanding the foregoing provisions of Paragraphs 2(d)(i) and (iii), but without limiting the application of the "limited conditions" of Paragraphs 2(b), 2(d)(ii), 3, 6, 8, 15 and 16, in the event of a Participant's voluntary Termination which occurs at a time when the Participant satisfies the definition of Full Career Termination, no further Service Requirements shall need to be satisfied by the Participant in respect of all of such Participant's then outstanding 2007 Award Shares and Shares relating thereto shall be delivered as soon as practicable after the Share Payment Date, but no later than December 31, 2012, subject to satisfaction of such other "limited conditions". An express condition of no longer requiring that the Participant satisfy the Service Requirements with respect to such 2007 Award Shares and an express condition to the Shares underlying such 2007 Award Shares becoming deliverable pursuant to the immediately preceding sentence is that the Participant not engage in Competitive Activity through and including the end of the Company's fiscal quarter following the one year anniversary of such Termination. Notwithstanding the foregoing provisions of Paragraphs 2(d)(i) and (iii), but without limiting the application of Paragraphs 2(b), 2(d)(ii), 3, 4(d)(v), 6, 8, 15 and 16, in the event the Participant's involuntary Termination without Cause occurs at a time when the Participant satisfies the definition of Full Career Termination, no further Service Requirement shall be required of the Participant with respect to all then outstanding 2007 Award Shares, and subject to the "limited conditions" described herein, Shares relating thereto shall be delivered as soon as practicable after the Share Payment Date, but no later than December 31, 2012.

**(v) Occurrence of Death or Disability following a Termination.** Without limiting the applicability of Paragraphs 2(b), 3, 6, 8, 15 and 16 hereof and notwithstanding sections 2(d)(i), (iii) and (iv) of this Letter, in the event of the occurrence of the Participant's death or Disability following a Termination described in Paragraph 2(d)(i) or (iii) above, the Participant (or, in the event of his death, his estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of his death) shall at that time immediately become entitled to receive any outstanding Principal Award Shares and Discount Award Shares.

Any Shares that become deliverable pursuant to this Paragraph 2(d) (other than Paragraph 2(d)(v)) shall be delivered to the Participant as soon as practicable after the Share Payment Date, but no later than December 31, 2012, subject to the application of Paragraphs 2(b), 3, 8, 15 and 16. Any remaining 2007 Award Shares that are not deliverable pursuant to the provisions of Paragraph 2 or otherwise under this Agreement or the Plan shall be terminated, forfeited and be cancelled by Holdings, and the Participant shall have no further right to any Shares relating thereto.

For purposes of this Agreement, Holdings and/or the Committee, as applicable, shall determine in its sole discretion whether or not the Participant's Termination is voluntary, involuntary, or with or without Cause, whether or not the Participant has engaged in Detrimental Activity, or whether or not the Participant meets the definition of Disability or Full Career Termination.

**3. AFFIDAVIT.** In the event of the Termination of the Participant, the Participant may be requested, from time to time, after that Termination, to complete and sign an affidavit with respect to Competitive Activity or Detrimental Activity, which includes representations and authorizes Holdings to verify the representations. Any failure on the part of the Participant to complete, sign and return the affidavit as required may prevent the Participant from becoming entitled to any of the Award Shares or may cause the Participant to repay to Holdings the full gross amounts or Shares received under this Letter.

**4. INTERIM PAYMENTS AND FURTHER AWARDS.**

Holdings undertakes that provided, when dividends are declared and paid on any Shares on or after the Date of Grant, the Participant continues to be prospectively entitled to some or all of the Award Shares on fulfillment of the conditions or contingencies set out in section 2 of this Letter, it will, or it will procure that the Group Company employing the Participant award to the Participant additional Award Shares, with a value equal to such dividends paid on a corresponding number of Shares, net of any taxes applicable thereto as of the date of such dividend or distribution, subject to Paragraph 7. The Participant shall become entitled to any such additional Award Shares at the same time or times and on fulfillment of the same conditions and contingencies as those applicable to the original Award Shares to which those additional Award Shares relate.

**5. TRANSFER OF SHARES AND LIMITATION ON OBLIGATIONS.** Subject to fulfillment of the conditions specified in section 2 of the Letter and receipt of any required taxes, Holdings or the Group Company employing the Participant shall transfer to the Participant the appropriate number of Shares and certificates therefor properly delivered on the date when such Shares are due to be delivered hereunder. The obligations of each and every Group Company shall be limited to the delivery to the Participant of Shares and in no way shall any Group Company become obligated to pay cash to the Participant, save as provided under section 4 or 8 of this Letter. If the date on which shares with respect to Award Shares are to be issued or delivered to the Participant falls on a non-business or non-trading day, such shares shall be delivered on the immediately succeeding trading day (i.e., when shares trade regular way on the New York Stock Exchange). Whenever shares with respect to Award Shares are required to be delivered on the 30th day following a specific triggering event, and such 30th day falls within the same tax year as the triggering event, the delivery may be made earlier, at the discretion of Holdings.

**6. NON-ASSIGNMENT.** No rights conferred by this Letter on the Participant shall be capable of being sold, transferred, assigned, pledged, hypothecated, or otherwise encumbered or disposed of, except by will or under the laws of descent and distribution. Any attempt to violate this section by the Participant or any other person claiming under or through him shall be null and void and without effect and neither Holdings nor any Group Company shall be or become obligated to issue or transfer Shares under this Letter.

**7. EQUITABLE ADJUSTMENT.** In the event of a Change in Capitalization occurring after the Date of Grant and before the Participant has become entitled to Shares under this Letter, the number and kind of Shares which may be issued to the Participant shall be adjusted so as to reflect that change.

3

## 8. CHANGE IN CONTROL.

**(a)** **Expiration of Service Requirements Following a Change in Control**. Following a Change in Control, except to the extent that (i) the Participant is entitled to the earlier expiration of the Service Requirements pursuant to Paragraphs 2 or (ii) the Participant's 2007 Award Shares are forfeited pursuant to Paragraph 2 due to the Participant's engaging in Detrimental Activity, Termination with Cause or voluntary Termination, all of the Participant's then outstanding 2007 Award Shares shall cease to be subject to the Service Requirements upon the later of (x) 18 months following such Change in Control or (y) a date determined by the Committee that is within 15 days of November 30 of the Fiscal Year following the Fiscal Year in which the Change in Control occurs (such later date, the "Change in Control Service Requirement Expiration Date"). Additionally, all of the Participant's 2007 Award Shares (including Principal and Discount) shall immediately cease to be subject to the Service Requirements in the event of the Participant's involuntary Termination without Cause following the Change in Control but prior to the Change in Control Service Requirement Expiration Date.

**(b)** **Delivery of Common Stock Following a Change in Control**. Following a Change in Control, except to the extent that (i) the Participant is entitled to receive earlier delivery of Shares pursuant to Paragraph 2 or (ii) the Participant's 2007 Award Shares are forfeited pursuant to Paragraph 2 due to engaging in Detrimental Activity, Termination with Cause or voluntary Termination or by reason of Paragraphs 6 or 15, the Participant shall receive Shares in respect of the Participant's 2007 Award Shares on the Change in Control Service Requirement Expiration Date; provided, however, that in the event of the Participant's Termination for any reason other than due to death or Disability following the Change in Control but prior to the Change in Control Service Requirement Expiration Date, the Participant shall receive Shares in respect of the Participant's then Award Shares as to which the Service Requirement no longer applies upon the earlier of (x) the last day of the fiscal quarter that ends after the first anniversary of the date of the Participant's Termination or (y) the Change in Control Service Requirement Expiration Date.

For purposes of this Paragraph 9, the term "Fiscal Year" shall refer to the fiscal year of Holdings.

## 9. AMENDMENT.
The terms of this Letter may be amended from time to time by the Committee in its sole discretion in any manner that it deems appropriate (including, but not limited to, acceleration of the entitlement of the Participant to Shares, or interim payments under section 4, of this Letter), including, without limitation, in order to satisfy applicable requirements of Sections 162(m) and Section 409A of the Code, as amended from time to time, (whether or not the Participant's rights are adversely affected).

## 10. BINDING ACTIONS.
Any action taken or decision made by the Committee or its designees arising out of or in connection with the construction, administration, interpretation or effect of this Letter or the Plan shall lie within its sole and absolute discretion, as the case may be, and shall be final, conclusive and binding on the Participant and all persons claiming under or through the Participant. By accepting this Letter or other benefit under the Plan, the Participant and each person claiming under or through the Participant shall be conclusively deemed to have confirmed acceptance and ratification of, and consent to, any action taken under the Plan or this Letter by the Committee or its designees.

## 11. NO RIGHT TO CONTINUED EMPLOYMENT.
Neither the Letter nor the Plan nor any action taken or omitted to be taken hereunder or thereunder shall be deemed to create or confer upon the Participant any right to be retained in the employment of any Group Company, or to receive subsequent Contingent Stock Awards or other Awards under the Plan. The right of any Group Company to terminate the Participant's employment at any time, or as otherwise provided by any agreement between the Participant and any Group Company, is specifically reserved.

## 12. APPLICABLE LAW.
The validity, construction, interpretation, administration, and effect of the Plan and of its rules and regulations and rights relating to the Plan, and of this Letter and rights arising under it, shall be governed by the substantive laws, but not the choice of law rules, of the State of Delaware, United States of America.

## 13. SUBMISSION TO JURISDICTION.
The Participant, Holdings, and any Group Company employing the Participant agree that any issue concerning or relating to this Letter or to the acquisition or possible acquisition of Shares by the Participant hereunder shall be referred to the courts of the State of Delaware, United States of America, for determination.

## 14. STOCKHOLDER RIGHTS.
The Participant and any transferee of this Letter following his death shall have no rights as a stockholder with respect to any Share covered by this Letter until he shall have become the holder of record of such Share.

## 15. TAXES/DEDUCTIONS.
It shall be a condition of the obligation of any Group Company to issue or transfer Shares under this Letter that (a) the Participant (or, in the event of his death, his estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of his death) pay (or cause to be paid) to the relevant Group Company, on its demand, in accordance with the Plan, either in the form of cash or freely transferable Shares, such amount as is required to satisfy its obligation or the obligation of any other person to account for any taxes properly payable in respect of the grant, vesting or delivery hereunder or any interim payments under section 4 of this Letter to which the Participant becomes entitled; (b) where determined necessary or appropriate by the Firm in its sole discretion, the Participant directs the sale of any Shares delivered in respect of any 2007 Award Shares to satisfy any such amounts in Paragraph 15(a) hereof, and  (c) that the Participant (or, in the event of his death, his estate or any person who acquires the right to this award by bequest or inheritance or otherwise by reason of his death) provide the relevant Group Company with any duly completed and executed forms, documents or other information reasonably required by the Group Company in respect of those Shares or interim payments. If the amount required for the payment of any such taxes is not paid, the Participant hereby directs Holdings to withhold the relevant Shares and/or related interim payments and to otherwise sell Shares delivered hereunder to fulfill all obligations in respect of such taxes. Any Group Company shall further have the right to deduct from all amounts remaining payable to the Participant after satisfaction of any taxes, the amount of any deficit, debt, tax obligation or other

4

LEH-RSU 0000266

liability or obligation of any kind which the Participant may at that time have with respect to any Group Company provided, however, that no such right to deduct or offset shall arise or otherwise be deemed to arise until the date upon which Shares are deliverable hereunder.

**16. CODE SECTION 409A.** It is intended that none of the Award Shares or payments otherwise due hereunder shall be deferred, accelerated, extended, paid out or modified in a manner that would result in the imposition upon the Participant of an additional tax under Section 409A of the Code; provided that neither Holdings nor any of its employees or representatives shall have any liability to the Participant with respect to any such taxes. In the event that it is reasonably determined by the Committee that, as a result of Section 409A of the Code, payments hereunder may not be made at the time contemplated by the terms of this Agreement or the Plan, as the case may be, without causing the Participant to be subject to taxation under Section 409A of the Code, Holdings will make such payment on the first day that would not result in the Participant's incurring any tax liability under Section 409A of the Code.  In the case of a Participant who is a "specified employee" (within the meaning of Section 409A(a)(2)(B)(i) of the Code), payments and/or deliveries of Shares hereunder that are linked to the date of the Participant's separation from service shall not be made prior to the date which is six (6) months after the date of such Participant's separation from service from Holdings and its affiliates, determined in accordance with Section 409A of the Code and the regulations promulgated thereunder.

**17. COMPLIANCE WITH LAW.** Notwithstanding any of the provisions hereof, the Participant hereby agrees that the Group Company will not be obligated to issue or transfer any Shares to the Participant hereunder, if the issuance or transfer of such Shares shall constitute a violation by the Participant or any Group Company of any provisions of any law or regulation of any governmental authority applicable to the Letter. Any determination in this connection by Holdings shall be final, binding, and conclusive.

**18. ENTIRE AGREEMENT.** The Letter sets forth the entire agreement and understanding between the parties hereto and supersedes all prior agreements relating to the subject matter hereof.

**APPENDIX**

**1.** In the Letter, these terms shall have these meanings:

**"Affiliate"** means any corporation or other entity, which is not a subsidiary but as to which Holdings possesses a direct or indirect ownership interest and has representation on the board of directors or any similar governing body.

**"Appropriate Officer"** means the Chief Executive Officer or Chief Operating Officer of Holdings (or their respective designees).

**"Board"** means the board of directors of Holdings.

**"Cause"** means a material breach by a Participant of his employment contract with any one or more of the Group Companies, failure by the Participant to devote substantially all business time exclusively to the performance of his employment duties with a Group Company, willful misconduct, dishonesty relating to the business and affairs of any Group Company, conviction of a criminal offense being or equivalent to a felony or a misdemeanor constituting a statutory disqualification under United States securities laws (or failure to contest prosecution for a felony or such a misdemeanor), habitual or gross negligence in the performance of the Participant's duties under his employment with a Group Company, solicitation of employees of a Group Company to work for any employer other than a Group Company, improper use or disclosure of confidential information relating to any Group Company, its business affairs or clients, the violation of policies and practices adopted by any Group Company or a material violation of the conflict of interest, proprietary information or business ethics policies of any Group Company, or such other circumstances as may be determined in the sole discretion of an Appropriate Officer.  For avoidance of doubt, for purposes of the preceding sentence, a material breach of an employment contract or violation of policies would include, as applicable, the employee's violation of any policy or employment agreement relating to the obligation to provide advance notice of resignation from Holdings or any Group Company.

**"Change in Capitalization"** means the occurrence of a circumstance described in Section 14 of the Plan.

**"Committee"** means the Compensation and Benefits Committee of the Incumbent Board (see definition of Change in Control in the Plan).

**"Competitive Activity"** means involvement (whether as an employee, proprietor, consultant or otherwise) with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with any business carried on by any Group Company on the date of termination of the Participant's employment with any of the Group Companies, as determined in the sole discretion of an Appropriate Officer.

**"Detrimental Activity"** means at any time (i) using confidential information received during employment with Holdings or any other Group Company relating to the business affairs of any Group Company, any of their affiliates, or any of their clients, in breach of such Participant's undertaking to keep such information confidential; (ii) direct or indirect persuasion or any attempt to persuade by any means, any employee of any Group Company to terminate his employment with any of those corporations or entities or to breach any of the terms of his employment with any Group Company; (iii) directly or indirectly making any statement that is, or could be disparaging of Holdings or any Group Company, or any of their employees (except as necessary to respond truthfully to any inquiry from applicable regulatory authorities or to provide information pursuant to legal process); or (iv) directly or indirectly engaging in any activity that is, or could be, substantially injurious to the financial condition, reputation or goodwill of Holdings or any Group Company, in each case as determined in the sole discretion of an Appropriate Officer.

**"Disability"** means a disability, which meets the criteria under both the Long-Term Disability Insurance Plan and the United States Social Security Act.

**"Discount Award Shares"** means the number of 2007 Award Shares (and any dividend equivalents related thereto).  If Participant was a Managing Director of Holdings or any Group Company for the fiscal year ended November 30, 2007, thirty percent (30%) of Participant's 2007 Award Shares as of the date of grant will be Discount Award Shares.  If Participant is an employee other than a Managing Director of Holdings or any Group Company for the fiscal year ended November 30, 2007, twenty-five percent (25%) of Participant's 2007 Award Shares as of the date of grant will be Discount Award Shares.

5

LEH-RSU 0000267

**"Exchange Act"** means the United States Securities Exchange Act of 1934, as later amended, modified, or substituted.

**"Full Career Termination"** means a Termination when (i) a person has at least 20 years of service,  (ii) the person is at least 45 years old, and the person has at least 10 years of service; or (iii) the person is at least 50 years old, and the person has at least 5 years of service.

**"Group"** means Holdings and all its Subsidiaries and Affiliates, and

**"Group Company"** shall mean any entity within the Group.  Holdings and/or the Committee, as applicable, shall determine in its sole discretion whether or not an entity is or is not a "Group Company" for purposes of any provision of this Agreement.

**"Person"** has the same meaning as in section 13(d) or 14(d) of the Exchange Act.

**"Plan"** means the Lehman Brothers Holdings Inc. 2005 Stock Incentive Plan.

**"Service Requirements"** means the schedule below that is applicable to the Participant, pursuant to which the Participant is required to be actively employed with the Company and/or any Group Company as described in Paragraph 2,  and which, except as provided in Paragraphs 2(c), 2(d)(i), (iii), (iv) and (v) and 8, shall be a necessary condition for the Participant to become entitled to receive both 2007 Award Shares and Shares underlying such 2007 Award Shares provided the Participant otherwise satisfies the other terms and conditions hereunder:

(a) If the Participant was a Managing Director of Holdings or any Group Company for the fiscal year ended November 30, 2007, such Participant is required to remain actively employed with the Company and/or any Group Company through the date specified below in order to be eligible to receive that portion of such 2007 Award Shares (and the Shares in respect thereof) specified next to such date, subject in all cases, to the other terms and conditions herein:

| | |
|---|---|
| Principal Award Shares: | 50%: November 30, 2010; 50%: November 30, 2012 |
| Discount Award Shares: | 100%: November 30, 2012. |

(b)  If Participant was an employee of Holdings or any Group Company other than a Managing Director for the fiscal year ended November 30, 2007 such Participant is required to remain actively employed with the Company and/or any Group Company through the date specified in order to be eligible to receive that portion of such 2007 Award Shares (and the Shares in respect thereof) specified next to such date, subject in all cases, to the other terms and conditions herein:

| | |
|---|---|
| Principal Award Shares: | 100%:  November 30, 2009 |
| Discount Award Shares: | 100%:  November 30, 2012. |

**"Principal Award Shares"** shall mean the number of 2007 Award Shares (and any dividend equivalents related thereto) related to the undiscounted base portion of the award.  If the Participant was a Managing Director of Holdings or any Group Company for the fiscal year ended November 30, 2007, seventy percent (70%) of such Participant's 2007 Award Shares as of the Date of Grant will be Principal Award Shares.  If Participant is an employee other than a Managing Director of Holdings or any Group Company for the fiscal year ended November 30, 2007, seventy-five percent (75%) of such

Participant's 2007 Award Shares as of the Date of Grant will be Principal Award Shares.

**"Share"** means a share of Common Stock of Holdings, par value of $0.10 per share.

**"Share Payment Date"** means November 30, 2012.

**"Subsidiary"** means any corporation or other Person of which a majority of its voting power or its voting equity securities or equity interest is owned directly or indirectly by Holdings.

**"Termination"** means the end of active employment with Holdings or any Group Company. The characterization of the circumstances of Termination is determined in the sole discretion of an Appropriate Officer.

**"Voting Securities"** means the outstanding Shares of capital stock of Holdings having ordinary voting power in the election of directors.

**2.**  In this Letter, any reference to the singular shall include the plural and vice versa and any reference to the masculine gender shall include a reference to all other genders.

©2007 Lehman Brothers. All Rights Reserved.

6

E
X
H
I
B
I
T

14

**EXHIBIT 14**



# 2008 EQUITY AWARD PROGRAM

## L I F E  @  L E H M A N

### YOUR BENEFITS AND LIFE BALANCE

Questions and Answers for Bonus-Eligible Employees
and Production-Based Employees

*THIS DOCUMENT IS PROVIDED FOR INFORMATION PURPOSES ONLY. These Questions and Answers are intended to provide a general overview of the 2008 Equity Award Program. All terms and conditions of the 2008 Equity Award Program are subject to the applicable controlling plan documents, including but not limited to the Restricted Stock Unit Award Agreement, the 2005 Stock Incentive Plan, and the 2005 Stock Incentive Plan Prospectus. In the event of any conflict between the plan documents and the information in this document, the plan documents will govern.*

## LEHMAN BROTHERS

LEH-RSU 0000927

# TABLE OF CONTENTS

**OVERVIEW OF 2008 CHANGES**

Q1   How will the 2008 equity award differ from last year's award? ......................................4

Q2   When will I be granted my 2008 equity award? ............................................................. ..5

Q3   How will 2008 equity award levels compare to last year? ..................................................5

**JULY AWARD**

Q4   Who is eligible for a July equity award?...................................................... ...................6

Q5   How was the value of my July equity award calculated?..................................................  6

      Bonus-eligible Employees ...................................................... .............................6

      Production-based Employees...................................................... ..............................6

Q6   How many July RSUs have I been granted? ...................................................... ........7

Q7   Why is the July equity award only 20% of last year's award?..........................................7

Q8   How were the grant date and grant price for the July award determined?..........................7

Q9   What will happen to my July award if I leave the Firm prior to November 30, 2008? .......7

**YEAR-END AWARD**

Q10  Who is eligible for a 2008 Year-end equity award? ...........................................................8

Q11  How will my 2008 Year-end equity award be calculated? ..................................................8

      Bonus-eligible Employees ...................................................... .............................8

      Production-based Employees...................................................... ..............................9

**2008 VESTING AND TERMINATION PROVISIONS**

Q12  When will my 2008 RSUs vest? ...................................................... .........................9

Q13  When will my 2008 RSUs convert to shares of common stock?........................................9

Q14  What will happen to my 2008 RSUs if I resign from the Firm? ........................................9

Q15  What will happen to my 2008 RSUs if my employment is terminated?............................10

Q&A RSU 7.01.08

LEH-RSU 0000928

## GENERAL INFORMATION

Q16  Where can I find details regarding my July award and other equity awards?....................10

Q17  Do any of the changes to the 2008 program affect awards granted in prior years? ...........10

Q18  Whom do I contact if I have further questions regarding the Equity Award Program?.....10

## EXHIBITS

Exhibit A:  2007 Equity Award Schedule.......................................................  ...........................11

Exhibit B:  2008 Equity Award Schedule for Bonus-eligible Employees .................................12

Exhibit C:  2008 Equity Award Schedule for Production-based Employees.............................13

Exhibit D:  2008 Equity Award Calculation for Production-based Employees.........................14

Exhibit E:  Termination Provisions ................................................................  ...........................15

Exhibit F:  Glossary of Select Terms ...............................................................  ...........................16

Q&A RSU 7.01.08

LEH-RSU 0000929

# OVERVIEW OF 2008 CHANGES

## Q1   HOW WILL THE 2008 EQUITY AWARD DIFFER FROM LAST YEAR'S AWARD?

A1   The Firm reviews the terms of the Equity Award Program annually and based on input from many employees has decided on several changes for 2008.  These changes are designed to achieve a number of objectives, including:

- **Simplifying the program**: the Equity Award Program has been the only one among our competitors with multiple vesting schedules and deferral levels based on corporate title;

- **Aligning the program more closely with competitor programs**:  the Equity Award Program in past years has provided an equity award discount, but the awards have been subject to the longest vesting and sales restrictions among our competitors.

    - Among our major competitors, Goldman Sachs, JP Morgan, Merrill Lynch, and Morgan Stanley provide no discount on employee equity awards.

- **Preserving our ownership culture**:  as in the past, the overall objective of the Firm's Equity Award Program is to ensure multi-year alignment with shareholders through significant ownership stakes for employees.

As in prior years, 100% of the 2008 equity award will be in the form of Restricted Stock Units ("RSUs").  The 3 primary changes to the 2008 program are:

1. **Equity Discount**: Beginning with the 2008 equity award, employees will **no longer be granted RSUs at a discount** from their fair market value at the time of grant.  However, RSUs will be subject to a much shorter holding period.  See "Holding Period" below.

2. **Vesting Schedule**: Under the 2008 Equity Award Program, the vesting schedule for all employees will be the same, irrespective of corporate title:  **33% per year over 3 years** (1/3 vesting on November 30, 2009, 1/3 vesting on November 30, 2010, and 1/3 vesting on November 30, 2011, respectively).

3. **Holding Period**: In 2008, the holding period will be reduced from 5 years to **3 years**.  This means that vested 2008 RSUs will convert to shares of Lehman Brothers common stock in 2011, rather than in 2013.

Q&A RSU 7.01.08

LEH-RSU 0000930

**Q2  WHEN WILL I BE GRANTED MY 2008 EQUITY AWARD?**

A2   Eligible employees' 2008 equity award will comprise two separate grants on **two dates**: a) a grant on July 1, 2008 (the "July RSUs") and b) a grant at a date to be determined by Compensation and Benefits Committee of the Board of Directors during the fourth quarter (the "Year-end Award"). You can consider the July award, which is generally 20% of the 2007 award, as an advance on any full-year 2008 award that you may receive. The July RSUs and any Year-end Award will vest and deliver on the same schedule (see below).

This special off-cycle grant underscores our confidence in Lehman Brothers' future and provides each of us with an opportunity to take advantage of the upside potential in our stock price. Further information on the July award is provided in the "July Award" section below.

**Q3  HOW WILL 2008 EQUITY AWARD LEVELS COMPARE TO LAST YEAR?**

A3   For 2008, we have simplified the Equity Award Schedule by consolidating the 3 separate schedules (for MDs, SVPs, and employees through the VP level) into one schedule applicable to bonus-eligible employees[1] regardless of corporate title and based on total compensation levels. In general, for bonus-eligible employees the percentage of 2008 total compensation delivered in equity awards will **increase** from 2007, with the maximum percentage increasing from 50% to 65%; for employees earning $100,000 or less in total compensation, however, the percentages are about the same as in 2007.

See Exhibit A for the 2007 Equity Award Schedule and Exhibit B for the 2008 Equity Award Schedule for bonus-eligible employees.

Note that for production-based[2] and certain other employees, the schedule will be as previously communicated. See Exhibit C for the 2008 Equity Award Schedule for production-based employees.

---

[1] For purposes of this document, all references to "bonus-eligible" employees refer to employees who are not considered "production-based" (see footnote 2 below) and who would be eligible to receive a year-end 2008 discretionary bonus, assuming continued employment in accordance with the bonus policy. Note that for individuals with written compensation guarantees for 2008, the Equity Award Schedule applicable for the determination of your full-year equity award is the schedule communicated as part of your guarantee.

[2] For purposes of the Equity Award Program, "production-based" employees are those employees, like Investment Representatives, who throughout the performance year receive production-based compensation a portion of which is cash (e.g., commissions) and a portion of which represents an accrual toward a year-end equity award. "Production-based" employees typically do not receive any year-end bonus. Employees are classified as "production-based" or "bonus-eligible" in the Firm's discretion. If you have questions about your classification, please contact the Compensation Department or your Human Resources representative.

Q&A RSU 7.01.08

LEH-RSU 0000931

# July Award

### Q4   WHO IS ELIGIBLE FOR A JULY EQUITY AWARD?

A4   Employees whose employment started on or before July 1, 2008 are generally eligible for a July equity award for 2008, including employees on an approved leave of absence . Certain employees will not receive a July award, including, among others: employees currently in the Firm's formal Analyst Programs (including recently "promoted" A nalysts), certain part-time, temporary or seasonal employees, employees on long-term disability, employees who have given notice or have been notified of their termination, certain employees in proprietary trading roles, employees notified that they will not be receiving a July award, and individuals employed by certain subsidiaries.   In addition, in the case of production-ba sed employees, anyone with a 2008 equity award accrual from January 2008 through June 2008 is eligible for a July award.

### Q5   HOW WAS THE VALUE OF MY JULY EQUITY AWARD CALCULATED?

A5   **Bonus-eligible Employees**
For most employees (hired on or prior to December 1, 2006), the value of the July RSUs was calculated as 20% of the principal portion[3] of the 2007 equity award.   In other words, the July award is based on 2007 compensation applied to the 2007 Equity Award Schedule in Exhibit A, multiplied by 20%.

**If you joined the Firm during fiscal year 2007**, the July RSUs were calculated based on your 2007 annual base salary, additional eligible compensation for 2007, and any 2007 paid bonus.

**If you joined the Firm during fiscal year 2008**, the July RSUs were calculated based on your 2008 annual base salary, additional eligible compensation for 2008, and any 2008 written compensation guarantee.

The use of 2007 compensation for the purposes of calculating the July RSUs does not indicate any right or eligibility for compensation in 2008 (or 2008 compensation at any particular level or range) or to any additional equity award for the 2008 performance year.

**Production-based Employees**
Your July RSUs have been calculated based upon your **annualized** production payout and other compensation, after all adjustments, for production months December 2007 through May 2008 (relating to pay periods from January through June 2008).   See Exhibit D for examples of how the July equity award was determined.

---

[3] The principal portion of the 2007 equity award was the amount awarded as part of your 2007 total compensation (before the discount).

Q&A RSU 7.01.08

LEH-RSU 0000932

**Q6    HOW MANY JULY RSUs HAVE I BEEN GRANTED?**

A6    To determine the number of July RSUs you have been granted, simply take the value calculated using the methodology described in Question 5 above and divide it by the grant price of $20.96, the closing stock price of Lehman Brothers common stock on July 1, 2008.

**Example (for a VP hired prior to December 1, 2006):**

| 2007 Total Compensation | Principal Portion of 2007 Award | July Award (@20%) | July Grant Price | Number of July RSUs |
|---|---|---|---|---|
| $200,000 | $9,200 | $1,840 | $20.96 | 87.79 |

**Note that if the calculation results in fewer than three (3) July RSUs, then no July RSUs will be granted.**

**Q7    WHY IS THE JULY EQUITY AWARD ONLY 20% OF LAST YEAR'S AWARD?**

A7    As in prior years, equity awards are intended as part of an employee's total compensation for the full performance year, and are therefore determined and granted at the time of any year-end bonuses. Because bonus compensation is fully discretionary (unless guaranteed in writing in accordance with Firm policy), the equity portion of total compensation for 2008 cannot be determined at this time. To maintain sufficient flexibility in the determination of pay for 2008–and to minimize the risk that employee cash bonuses are not adversely impacted–the Firm decided that the July award would be based on 20% of the prior year award for most employees. Please bear in mind that a July RSU award does not indicate any right to a discretionary bonus (or any particular amount of discretionary bonus) or to any additional equity award for the 2008 performance year.

**Q8    HOW WERE THE GRANT DATE AND GRANT PRICE FOR THE JULY AWARD DETERMINED?**

A8    All equity grants to employees must be authorized and approved by the Compensation and Benefits Committee of the Board of Directors. The July 1 grant date was set by the Committee. The grant price for the July award is the closing market price of Lehman Brothers common stock on the New York Stock Exchange on that date, $20.96, and is used to determine the number of July RSUs granted to you.

**Q9    WHAT WILL HAPPEN TO MY JULY AWARD IF I LEAVE THE FIRM PRIOR TO NOVEMBER 30, 2008?**

A9    **Bonus-eligible Employees**
If your employment with the Firm ceases, for any reason, prior to November 30, 2008, you will forfeit the July RSUs. If you leave the Firm on or after November 30, 2008, your entitlement to any July RSUs, the same as any Year-end Award, will depend on when you leave, the

LEH-RSU 0000933

circumstances under which you leave, and your conduct with respect to the Firm after you leave.

**Production-based Employees**
Your entitlement to the July award will depend on when you leave the Firm, why you leave, and your conduct with respect to the Firm after you leave.

Refer to the termination provisions on Exhibit E.

# YEAR-END AWARD

**Q10  WHO IS ELIGIBLE FOR A 2008 YEAR-END EQUITY AWARD?**

A10  Employees (both bonus-eligible and production-based employees) whose employment started on or before the 2008 grant date, expected to be determined during the fourth quarter (the "Year-end Grant Date"), including employees on an approved leave of absence, are eligible to receive a year-end equity award for 2008, with the following exceptions: employees in the Firm's formal Analyst Programs, certain temporary, part-time or seasonal employees, employees on long-term disability, employees who have given notice or have been notified of their termination; and individuals employed by certain subsidiaries.  Any bonus-eligible employee whose employment terminates prior to the Year-end Grant Date, or who is otherwise not eligible for a year-end bonus, will not be eligible for a year-end equity award.  In case of termination of employment of production-based employees or individuals with a written compensation guarantee, any year-end equity awards will be treated in accordance with the relevant plan provisions or terms of the written compensation guarantee.

**Q11  HOW WILL MY 2008 YEAR-END EQUITY AWARD BE CALCULATED?**

A11  **Bonus-eligible Employees**
Your Year-end equity award will be calculated based on your 2008 total compensation and the 2008 Equity Award Schedule for bonus-eligible employees shown on Exhibit B, reduced by the grant-date value of any July award.  In no event, however, will your full-year award be less than your July Award.  Total compensation includes salary earned in fiscal year 2008 plus any bonus and additional eligible compensation for your performance in 2008, whether such amounts are deferred or paid in 2008.

Note that for individuals with written compensation guarantees for 2008, the Equity Award Schedule applicable for the determination of your full-year equity award will be the one communicated as part of your guarantee.  In all other respects, your 2008 Equity Award will be governed by the applicable 2008 Equity Award Program plan documents.

Q&A RSU 7.01.08

LEH-RSU 0000934

**Production-based Employees**

Your Year-end equity award will be calculated as above, except that it will be based on the 2008 Equity Award Schedule for production-based employees shown on Exhibit C and your actual production and other compensation, after all adjustments, for production months December 2007 through November 2008 (relating to pay periods from January through December 2008), reduced by the grant date value of any July award. In no event, however, will your full-year award be less than your July Award. Refer to Exhibit D for an illustration of how the 2008 Equity Award will be calculated for production-based employees.

Note that the 2009 Equity Award Schedule for production-based employees will be communicated no later than December 31, 2008.

# 2008 VESTING AND TERMINATION PROVISIONS

**Q12  WHEN WILL MY 2008 RSUs VEST?**

A12  The 2008 equity award (including any July RSUs) will vest in 1/3 increments on November 30, 2009, 2010 and 2011.

**Q13  WHEN WILL MY 2008 RSUs CONVERT TO SHARES OF COMMON STOCK?**

A13  Vested 2008 RSUs (including any July RSUs) will convert to shares of Lehman Brothers common stock on November 30, 2011.

**Q14  WHAT WILL HAPPEN TO MY 2008 RSUs IF I RESIGN FROM THE FIRM?**

A14  If you resign, you will forfeit all RSUs that are unvested at the time of your termination, unless you are eligible for Full Career treatment at the time of termination.

| | **% of Total Equity Award Retained** | | |
|---|---|---|---|
| | *If you resign from the Firm after November 30 of:* | | |
| | **2009** | **2010** | **2011** |
| **All Employees** | 33% | 67% | 100% |

If you resign and your termination is deemed a Full Career termination, you will be entitled to 100% of your 2008 RSUs, and shares of Lehman Brothers common stock will be delivered to you on November 30, 2011, provided you satisfy all delivery conditions in your award agreements, do not engage in Detrimental Activity through November 30, 2011, and do not engage in Competitive Activity through the earlier of: (1) the end of the fiscal quarter 1 year following your termination and (2) November 30, 2011.

**For bonus-eligible employees, note that "Full Career" treatment is not applicable for resignations occurring before November 30, 2008.** See Exhibit E for termination provisions.

Q&A RSU 7.01.08

LEH-RSU 0000935

**Q15 WHAT WILL HAPPEN TO MY 2008 RSUs IF MY EMPLOYMENT IS TERMINATED?**

A15  As in prior years, if your employment with the Firm is termi nated involuntarily without Cause, you will generally be eligible to retain your (otherwise forfeited) unvested 2008 RSUs, provided you sign a Firm-standard release agreement in accordance with Firm policy and provided you do not engage in Detrimental Activity.  Your 2008 RSUs will convert to Lehman Brothers common stock and shares will be delivered on November 30, 2011.  (If you do not sign a release agreement, you will be eligible to receive only the vested portion of your award.)

**Note that the above does not apply to terminations occurring before November 30, 2008. Bonus-eligible employees whose employment ends for any reason b efore November 30, 2008 forfeit any July RSUs and are not entitled to any Year-end Award.**

Note also that if you are terminated involuntarily with Cause, you will forfeit all outstanding RSUs.  See Exhibit E for termination provisions.

# GENERAL INFORMATION

**Q16 WHERE CAN I FIND DETAILS REGARDING MY JULY AWARD AND MY OTHER EQUITY AWARDS?**

A16  Details of your equity awards can be found on the Personal Award Sum mary of the Equity Award Program section of LehmanLive, which you can access by using keyword **equityaward** . The number of July RSUs you were awarded, if any, will be available on LehmanLive **by July 15, 2008** .

**Q17 DO ANY OF THE CHANGES TO THE EQUITY AWARD PROGRAM AFFECT AWARDS GRANTED IN PRIOR YEARS?**

A17  No.  The changes outlined here apply only to awards granted in 2008.  Thes e changes will not be retroactive to awards granted in prior years.

**Q18 WHOM DO I CONTACT IF I HAVE FURTHER QUESTIONS REGARDING THE EQUITY AWARD PROGRAM?**

A18  If you have any questions regarding the Equity Award Program, please contact the Compensation Department in New York at (212) 526-8346 or by e-mail at compensation@lehman.com .

Q&A RSU 7.01.08

LEH-RSU 0000936

## EXHIBIT A:   2007 EQUITY AWARD SCHEDULE

| Total Compensation Range | AMOUNT OF TOTAL COMPENSATION ("TC") IN EQUITY-BASED AWARDS | | |
| --- | --- | --- | --- |
| | *Employees Through Vice President Level* | *Senior Vice Presidents* | *Managing Directors* |
| $0 - $74,999 | 1.15% of 2007 TC | 2.3% of 2007 TC | 2.3% of 2007 TC |
| $75,000 - $99,999 | 2.3% of 2007 TC | 2.3% of 2007 TC | 2.3% of 2007 TC |
| $100,000 - $199,999 | $2,300 plus 6.9% of 2007 TC over $100,000 | $2,300 plus 6.9% of 2007 TC over $100,000 | $2,300 plus 6.9% of 2007 TC over $100,000 |
| $200,000 - $299,999 | $9,200 plus 11.5% of 2007 TC over $200,000 | $9,200 plus 11.5% of 2007 TC over $200,000 | $9,200 plus 11.5% of 2007 TC over $200,000 |
| $300,000 - $499,999 | $20,700 plus 17.25% of 2007 TC over $300,000 | $34,500 plus 18.687% of 2007 TC over $300,000 | $34,500 plus 18.687% of 2007 TC over $300,000 |
| $500,000 - $749,999 | $55,200 plus 23% of 2007 TC over $500,000 | $71,875 plus 23% of 2007 TC over $500,000 | $71,875 plus 23% of 2007 TC over $500,000 |
| $750,000 - $999,999 | $112,700 plus 28.75% of 2007 TC over $750,000 | $129,375 plus 40.25% of 2007 TC over $750,000 | $129,375 plus 40.25% of 2007 TC over $750,000 |
| $1,000,000 - $1,499,999 | $192,600 plus 36% of 2007 TC over $1.0 million | $240,000 plus 42% of 2007 TC over $1.0 million | $240,000 plus 52.8% of 2007 TC over $1.0 million |
| $1,500,000 - $1,999,999 | $372,600 plus 42% of 2007 TC over $1.5 million | $450,000 plus 54% of 2007 TC over $1.5 million | $504,000 plus 67.2% of 2007 TC over $1.5 million |
| $2,000,000 - $2,499,999 | $582,600 plus 48% of 2007 TC over $2.0 million | $720,000 plus 66% of 2007 TC over $2.0 million | $840,000 plus 72% of 2007 TC over $2.0 million |
| $2,500,000 and up | $822,600 plus 54% of 2007 TC over $2.5 million up to a max of 36% of 2007 TC | 42% of 2007 TC | $1,200,000 plus 75% of 2007 TC over $2.5 million to a max of 50% of 2007 TC |

11

LEH-RSU 0000937

## EXHIBIT B:    2008    EQUITY    AWARD    SCHEDULE    FOR    BONUS-ELIGIBLE EMPLOYEES

The portion of 2008 total compensation delivered in the form of an equity award for the full year will be calculated according to the schedule below.   Any Year-end Award will be determined by subtracting any July RSUs from your full-year award, but in no event will your full-year award be less than your July RSUs.

| 2008 Total Compensation Range | AMOUNT OF TOTAL COMPENSATION ("TC") IN EQUITY-BASED AWARDS[4] | | MAXIMUM % OF TC IN EQUITY-BASED AWARDS |
|---|---|---|---|
| $0 - $74,999 | 1% of 2008 TC | | 1% |
| $75,000 - $99,999 | 2% of 2008 TC | | 2% |
| $100,000 - $299,999 | $2,000 | plus 14% of 2008 TC above $100,000 | 10% |
| $300,000 - $499,999 | $30,000 | plus 35% of 2008 TC above $300,000 | 20% |
| $500,000 - $749,999 | $100,000 | plus 35% of 2008 TC above $500,000 | 25% |
| $750,000 - $999,999 | $187,500 | plus 65% of 2008 TC above $750,000 | 35% |
| $1,000,000 - $1,499,999 | $350,000 | plus 65% of 2008 TC above $1,000,000 | 45% |
| $1,500,000 - $1,999,999 | $675,000 | plus 85% of 2008 TC above $1,500,000 | 55% |
| $2,000,000 - $2,499,999 | $1,100,000 | plus 80% of 2008 TC above $2,000,000 | 60% |
| $2,500,000 and above | $1,500,000 | plus 90% of 2008 TC above $2,500,000 up to a maximum of 65% of 2008 TC | 65% |

---

[4] Subject to a 5-share minimum.

Q&A RSU 7.01.08

LEH-RSU 0000938

## EXHIBIT C:    2008 EQUITY AWARD SCHEDULE FOR PRODUCTION-BASED EMPLOYEES

The portion of 2008 total compensation delivered in the form of an equity award for the full year will be calculated according to the schedule below, which is the same as the one previously communicated. Any Year-end Award will be determined by subtracting any July award from your full-year award, but in no event will your full-year award be less than your July RSUs.

**2008 EQUITY AWARD SCHEDULE FOR PRODUCTION-BASED EMPLOYEES**

| 2008 Total Compensation Range | AMOUNT OF TOTAL COMPENSATION ("TC") IN EQUITY-BASED AWARDS[5] | | |
| --- | --- | --- | --- |
| | *Employees Through Vice President Level* | *Senior Vice Presidents* | *Managing Directors* |
| $0 - $74,999 | 1.15% of 2008 TC | 2.3% of 2008 TC | 2.3% of 2008 TC |
| $75,000 - $99,999 | 2.3% of 2008 TC | 2.3% of 2008 TC | 2.3% of 2008 TC |
| $100,000 - $199,999 | $2,300 plus 6.9% of 2008 TC over $100,000 | $2,300 plus 6.9% of 2008 TC over $100,000 | $2,300 plus 6.9% of 2008 TC over $100,000 |
| $200,000 - $299,999 | $9,200 plus 11.5% of 2008 TC over $200,000 | $9,200 plus 11.5% of 2008 TC over $200,000 | $9,200 plus 11.5% of 2008 TC over $200,000 |
| $300,000 - $499,999 | $20,700 plus 17.25% of 2008 TC over $300,000 | $34,500 plus 18.687% of 2008 TC over $300,000 | $34,500 plus 18.687% of 2008 TC over $300,000 |
| $500,000 - $749,999 | $55,200 plus 23% of 2008 TC over $500,000 | $71,875 plus 23% of 2008 TC over $500,000 | $71,875 plus 23% of 2008 TC over $500,000 |
| $750,000 - $999,999 | $112,700 plus 28.75% of 2008 TC over $750,000 | $129,375 plus 40.25% of 2008 TC over $750,000 | $129,375 plus 40.25% of 2008 TC over $750,000 |
| $1,000,000 - $1,499,999 | $192,600 plus 36% of 2008 TC over $1.0 million | $240,000 plus 42% of 2008 TC over $1.0 million | $240,000 plus 52.8% of 2008 TC over $1.0 million |
| $1,500,000 - $1,999,999 | $372,600 plus 42% of 2008 TC over $1.5 million | $450,000 plus 54% of 2008 TC over $1.5 million | $504,000 plus 67.2% of 2008 TC over $1.5 million |
| $2,000,000 - $2,499,999 | $582,600 plus 48% of 2008 TC over $2.0 million | $720,000 plus 66% of 2008 TC over $2.0 million | $840,000 plus 72% of 2008 TC over $2.0 million |
| $2,500,000 and up | $822,600 plus 54% of 2008 TC over $2.5 million up to a max of 36% of 2008 TC | 42% of 2008 TC | $1,200,000 plus 75% of 2008 TC over $2.5 million to a max of 50% of 2008 TC |

[5] Subject to a 5-share minimum.

Q&A RSU 7.01.08

LEH-RSU 0000939

# EXHIBIT D:   2008 EQUITY AWARD CALCULATION FOR PRODUCTION-BASED EMPLOYEES

Your 2008 equity award will be calculated based on your 2008 production compensation and the 2008 Equity Award Schedule shown in Exhibit C, less the portion of compensation granted as July RSUs, if any. The examples below assume an individual with production compensation for the full year 2008.

| | |
|---|---|
| Actual 2008 Production Compensation (through May production month): | $125,000 |
| Annualized 2008 Production Compensation (x 12 ÷ 6): | $250,000 |
| Annualized Equity Award (from Schedule for employees through VP level): | $14,950 |
| July Award (20% of Annualized Award): | $2,990 |
| Assumed 2008 Production Compensation: | $250,000 |
| Total 2008 Equity Award: | $14,950 |
| July Award: | $2,990 |
| 2008 Year-End Equity Award: | $11,960 |
| Total 2008 Equity Award: | $14,950 |

Q&A RSU 7.01.08

LEH-RSU 0000940

## EXHIBIT E:    TERMINATION PROVISIONS

|  | **All Employees** |
|---|---|
| **Voluntary Termination** <br> *(but not Full Career)* | Participants will forfeit all unvested July RSUs and Year-end RSUs (together, "2008 RSUs"). Any vested 2008 RSUs will convert to shares of common stock and such shares will be delivered as soon as practicable after November 30, 2011 (the "Share Payment Date") but not later than December 31, 2011, provided the participant does not engage in Detrimental Activity through that date and has not committed an act constituting Cause through the termination date. |
| **Involuntary Termination** <br> *(but not Full Career)* | **Involuntary Termination without Cause:** Participants will become entitled to 100% of their 2008 RSUs, including the unvested portion (provided the employee signs a Firm-standard release agreement). Shares will be delivered as soon as practicable after the Share Payment Date, but not later than December 31, 2011, provided the participant does not engage in Detrimental Activity through that date. <br><br> **Involuntary Termination with Cause:** Participants will forfeit 100% of their 2008 RSUs. |
| **Full Career Termination** | **Voluntary Termination:** Participants will become entitled to 100% of their 2008 RSUs on the Share Payment Date, provided they do not engage in Competitive Activity through the end of the fiscal quarter following the one year anniversary of the termination date, and do not engage in Detrimental Activity through the Share Payment Date or commit an act constituting Cause through the termination date. 2008 RSUs will convert to shares of common stock, and such shares will be delivered as soon as practicable following the Share Payment Date, but not later than December 31, 2011. <br><br> **Involuntary Termination without Cause:** Participants will become entitled to 100% of their 2008 RSUs on the Share Payment Date, provided they do not engage in Detrimental Activity through that date or commit an act constituting Cause prior to the termination date. 2008 RSUs will convert to shares of common stock, and such shares will be delivered as soon as practicable after the Share Payment Date but not later than December 31, 2011. <br><br> **Involuntary Termination with Cause**: Participants will forfeit 100% of their 2008 RSUs. |
| **Termination due to Death or Disability** | All 2008 RSUs will immediately vest, and shares will be delivered 30 days following the termination date. |

**NOTE:** Notwithstanding the above, bonus-eligible employees whose employment ends <u>for any reason</u> (voluntary or involuntary termination) prior to November 30, 2008 will forfeit all July RSUs. In such cases, "Full Career" treatment does not apply.

Q&A RSU 7.01.08

LEH-RSU 0000941

# EXHIBIT F:   GLOSSARY OF SELECT TERMS

"**Appropriate Officer**"  means the Chief Executive Officer or Chief Operating Officer of Holdings (or their respective designees).

"**Cause**"  means a material breach by a person of an employment contract between the person and Holdings or any subsidiary, failure by a person to devote substantially all business time exclusively to the performance of his or her duties for Holdings or any subsidiary, willful misconduct, dishonesty related to the business and affairs of Holdings or any subsidiary, conviction of a felony or a misdemeanor constituting a statutory disqualification under U.S. securities laws (or failure to contest prosecution for a felony or such a misdemeanor), habitual or gross negligence in the performance of a person's duties, solicitation of employees of Holdings or any subsidiary to work at another company, improper use or disclosure of confidential information, the violation of policies and practices adopted by Holdings or any subsidiary including, but not limited to the Code of Conduct, or a material violation of the conflict of interest, proprietary information or business ethics policies of Holdings or any subsidiary, or such other circumstances as may be determined in the sole discretion of an Appropriate Officer. For avoidance of doubt, for purposes of the preceding sentence, a material breach of an employment contract or violation of policies would include, as applicable, the employee's violation of any policy or employment agreement relating to the obligation to provide advance notice of resignation from Holdings or any subsidiary.

"**Competitive Activity**"  means involvement (whether as employee, proprietor, consultant or otherwise) with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with any business carried on by Holdings or any of its subsidiaries or affiliates on the date of termination of a person's employment with Holdings and any of its subsidiaries, as determined in the sole discretion of an Appropriate Officer.

"**Detrimental Activity**"  means (i) using information received during a person's employment with Holdings or any of its subsidiaries related to the business affairs of Holdings or any of its subsidiaries, affiliates or their clients, in breach of such person's undertaking to keep such information confidential; (ii) directly or indirectly persuading or attempting to persuade, by any means, any employee of Holdings or any of its subsidiaries or affiliates to terminate employment with any of the foregoing or to breach any of the terms of his or her employment with the foregoing; (iii) directly or indirectly making any statement that is, or could be, disparaging of Holdings, its subsidiaries or affiliates, or any or their employees (except as necessary to respond truthfully to any inquiry from applicable regulatory authorities or to provide information pursuant to legal process); (iv) violating policies and practices adopted by Holdings or any subsidiary; (v) materially breaching any contract between the person and Holdings or any subsidiary; or (vi) directly or indirectly engaging in any activity that is, or could be, substantially injurious to the financial condition, reputation, or goodwill of Holdings or its subsidiaries or affiliates, in each case as determined in the sole discretion of the Chief Executive Officer or Chief Operating Officer of Holdings (or their respective designees). Notwithstanding the foregoing, if following any termination of employment other than for Cause but prior to the scheduled Share Payment Date it is determined that an act constituting Cause has occurred which was not determined by Holdings (or its designee) at the time of such termination, such act shall also be deemed to constitute Detrimental Activity.

"**Disability**"  means a disability under both the Lehman Brothers Long-Term Disability Insurance Plan and the Social Security Act.

"**Full Career Termination**"  means a Termination of employment with Holdings or any subsidiary when (a) a person has at least 20 years of service; (b) the person is at least 45 years old, and the person has at least 10 years of service with Holdings or any subsidiary; or (c) the person is at least 50 years old, and the person has at least 5 years of service with Holdings or any subsidiary.

"**Restricted Stock Units (RSUs)**"  An RSU represents the conditional right to receive one share of Lehman Brothers common stock three years after the grant date, on November 30, 2011.  Generally, RSUs cannot be sold, traded, pledged or transferred during that three-year period.

"**Termination**"  means the end of employment with Holdings or a subsidiary.  The characterization of the circumstances of Termination is determined in the sole discretion of an Appropriate Officer.

Q&A RSU 7.01.08

LEH-RSU 0000942

**E**

**X**

**H**

**I**

**B**

**I**

**T**

**15**

# EXHIBIT 15



# 2008 EQUITY AWARD PROGRAM

## L I F E  @  L E H M A N

### YOUR BENEFITS AND LIFE BALANCE

Questions and Answers for Bonus-Eligible Employees
and Production-Based Employees

*THIS DOCUMENT IS PROVIDED FOR INFORMATION PURPOSES ONLY. These Questions and Answers are intended to provide a general overview of the 2008 Equity Award Program. All terms and conditions of the 2008 Equity Award Program are subject to the applicable controlling plan documents, including but not limited to the Contingent Stock Award Letter, the 2005 Stock Incentive Plan, and the 2005 Stock Incentive Plan Prospectus. In the event of any conflict between the plan documents and the information in this document, the plan documents will govern.*

# LEHMAN BROTHERS

LEH-RSU 0000911

# TABLE OF CONTENTS

**OVERVIEW OF 2008 CHANGES**

Q1   How will the 2008 equity award differ from last year's award?........................................4

Q2   When will I be granted my 2008 equity award? ................................................ ..5

Q3   How will 2008 equity award levels compare to last year? .................................5

**JULY AWARD**

Q4   Who is eligible for a July equity award?.......................................................... ...................6

Q5   How was the value of my July equity award calculated?.................................... 6

      Bonus-eligible Employees ................................................. ............................6

      Production-based Employees.................................................... ................................6

Q6   How many July CSAs have I been granted? ................................................ .......7

Q7   Why is the July equity award only 20% of last year's award?...........................7

Q8   How were the grant date and grant price for the July award determined?........................7

Q9   What will happen to my July award if I leave the Firm prior to November 30, 2008? .......7

**YEAR-END AWARD**

Q10  Who is eligible for a 2008 Year-end equity award? ...........................................8

Q11  How will my 2008 Year-end equity award be calculated? .................................8

      Bonus-eligible Employees ................................................. ............................8

      Production-based Employees.................................................... ................................9

**2008 CONDITIONS AND TERMINATION PROVISIONS**

Q12  When will my 2008 CSAs become subject to Limited Conditions? ..................9

Q13  When will my 2008 CSAs convert to shares of common stock?.........................9

Q14  What will happen to my 2008 CSAs if I resign from the Firm? .........................9

Q15  What will happen to my 2008 CSAs if my employment is terminated?...........................10

Q&A CSA 7.01.08

LEH-RSU 0000912

## GENERAL INFORMATION

Q16   Where can I find details regarding my July award and other equity awards?....................10

Q17   Do any of the changes to the 2008 program affect awards granted in prior years? ...........10

Q18   Whom do I contact if I have further questions regarding the Equity Award Program?.....10

## EXHIBITS

Exhibit A:  2007 Equity Award Schedule.......................................................  ...........................11

Exhibit B:  2008 Equity Award Schedule for Bonus-eligible Employees .................................12

Exhibit C:  2008 Equity Award Schedule for Production-based Employees............................13

Exhibit D:  2008 Equity Award Calculation for Production-based Employees........................14

Exhibit E:  Termination Provisions .......................................................  ...........................15

Exhibit F:  Glossary of Select Terms ...............................................................  .........................16

Q&A CSA 7.01.08

LEH-RSU 0000913

# OVERVIEW OF 2008 CHANGES

## Q1    HOW WILL THE 2008 EQUITY AWARD DIFFER FROM LAST YEAR'S AWARD?

A1    The Firm reviews the terms of the Equity Award Program annually and based on input from many employees has decided on several changes for 2008.  These changes are designed to achieve a number of objectives, including:

- **Simplifying the program**: the Equity Award Program has been the only one among our competitors with multiple vesting schedules and deferral levels based on corporate title;

- **Aligning the program more closely with competitor programs**: the Equity Award Program in past years has provided an equity award discount, but the awards have been subject to the longest vesting and sales restrictions among our competitors.

  - Among our major competitors, Goldman Sachs, JP Morgan, Merrill Lynch, and Morgan Stanley provide no discount on employee equity awards.

- **Preserving our ownership culture**: as in the past, the overall objective of the Firm's Equity Award Program is to ensure multi-year alignment with shareholders through significant ownership stakes for employees.

As in prior years, 100% of the 2008 equity award will be in the form of Contingent Stock Awards ("CSAs").  The 3 primary changes to the 2008 program are:

1. **Equity Discount**: Beginning with the 2008 equity award, employees will **no longer be granted CSAs at a discount** from their fair market value at the time of grant.  However, CSAs will be subject to a much shorter holding period.  See "Holding Period" below.

2. **Conditions**[1]:  Under the 2008 Equity Award Program, CSAs for all employees will be become subject to both Full and Limited Conditions for the same period, irrespective of corporate title:  **33% of CSAs will become subject to Limited Conditions each year over 3 years** (1/3 on November 30, 2009, 1/3 on November 30, 2010, and 1/3 on November 30, 2011, respectively).

3. **Holding Period**:  In 2008, the holding period will be reduced from 5 years to **3 years**.  This means that 2008 CSAs which become subject to Limited Conditions will convert to shares of Lehman Brothers common stock in 2011, rather than in 2013.

---

[1] See Glossary of Select Terms for the definition of both "Full Conditions" and "Limited Conditions".

Q&A CSA 7.01.08

LEH-RSU 0000914

**Q2   WHEN WILL I BE GRANTED MY 2008 EQUITY AWARD?**

A2   Eligible employees' 2008 equity award will comprise two separate grants on **two dates**: a) a grant on July 1, 2008 (the "July CSAs") and b) a grant at a date to be determined by Compensation and Benefits Committee of the Board of Directors during the fourth quarter (the "Year-end Award"). You can consider the July award, which is generally 20% of the 2007 award, as an advance on any full-year 2008 award that you may receive. The July CSAs and any Year-end Award will become subject to Limited Conditions and deliver on the same schedule (see below).

This special off-cycle grant underscores our confidence in Lehman Brothers' future and provides each of us with an opportunity to take advantage of the upside potential in our stock price. Further information on the July award is provided in the "July Award" section below.

**Q3   HOW WILL 2008 EQUITY AWARD LEVELS COMPARE TO LAST YEAR?**

A3   For 2008, we have simplified the Equity Award Schedule by consolidating the 3 separate schedules (for MDs, SVPs, and employees through the VP level) into one schedule applicable to bonus-eligible employees[2] regardless of corporate title and based on total compensation levels. In general, for bonus-eligible employees the percentage of 2008 total compensation delivered in equity awards will **increase** from 2007, with the maximum percentage increasing from 50% to 65%; for employees earning $100,000 or less in total compensation, however, the percentages are about the same as in 2007.

See Exhibit A for the 2007 Equity Award Schedule and Exhibit B for the 2008 Equity Award Schedule for bonus-eligible employees.

Note that for production-based[3] and certain other employees, the schedule will be as previously communicated. See Exhibit C for the 2008 Equity Award Schedule for production-based employees.

---

[2] For purposes of this document, all references to "bonus-eligible" employees refer to employees who are not considered "production-based" (see footnote 3 below) and who would be eligible to receive a year-end 2008 discretionary bonus, assuming continued employment in accordance with the bonus policy. Note that for individuals with written compensation guarantees for 2008, the Equity Award Schedule applicable for the determination of your full-year equity award is the schedule communicated as part of your guarantee.

[3] For purposes of the Equity Award Program, "production-based" employees are those employees, like Investment Representatives, who throughout the performance year receive production-based compensation a portion of which is cash (e.g., commissions) and a portion of which represents an accrual toward a year-end equity award. "Production-based" employees typically do not receive any year-end bonus. Employees are classified as "production-based" or "bonus-eligible" in the Firm's discretion. If you have questions about your classification, please contact the Compensation Department or your Human Resources representative.

Q&A CSA 7.01.08

LEH-RSU 0000915

# JULY AWARD

## Q4    WHO IS ELIGIBLE FOR A JULY EQUITY AWARD?

A4    Employees whose employment started on or before July 1, 2008 are generally eligible for a July equity award for 2008, including employees on an approved leave of absence . Certain employees will not receive a July award, including, among others: employees currently in the Firm's formal Analyst Programs (including recently "promoted" Analysts), certain part-time, temporary or seasonal employees, employees on long-term disability, employees who have given notice or have been notified of their termination, certain employees in proprietary trading roles, employees notified that they will not be receiving a July award, and individuals employed by certain subsidiaries. In addition, in the case of production-based employees, anyone with a 2008 equity award accrual from January 2008 through June 2008 is eligible for a July award.

## Q5    HOW WAS THE VALUE OF MY JULY EQUITY AWARD CALCULATED?

A5    **Bonus-eligible Employees**
For most employees (hired on or prior to December 1, 2006), the value of the July CSAs was calculated as 20% of the principal portion[4] of the 2007 equity award. In other words, the July award is based on 2007 compensation applied to the 2007 Equity Award Schedule in Exhibit A, multiplied by 20%.

**If you joined the Firm during fiscal year 2007**, the July CSAs were calculated based on your 2007 annual base salary, additional eligible compensation for 2007, and any 2007 paid bonus.

**If you joined the Firm during fiscal year 2008**, the July CSAs were calculated based on your 2008 annual base salary, additional eligible compensation for 2008, and any 2008 written compensation guarantee.

The use of 2007 compensation for the purposes of calculating the July CSAs does not indicate any right or eligibility for compensation in 2008 (or 2008 compensation at any particular level or range) or to any additional equity award for the 2008 performance year.

**Production-based Employees**
Your July CSAs have been calculated based upon your **annualized** production payout and other compensation, after all adjustments, for production months December 2007 through May 2008 (relating to pay periods from January through June 2008). See Exhibit D for examples of how the July equity award was determined.

---

[4] The principal portion of the 2007 equity award was the amount awarded as part of your 2007 total compensation (before the discount).

Q&A CSA 7.01.08

LEH-RSU 0000916

**Q6   HOW MANY JULY CSAs HAVE I BEEN GRANTED?**

A6   To determine the number of July CSAs you have been granted, simply take the value calculated using the methodology described in Question 5 above and divide it by the grant price of $20.96, the closing stock price of Lehman Brothers common stock on July 1, 2008.

**Example (for a VP hired prior to December 1, 2006):**

| 2007 Total Compensation | Principal Portion of 2007 Award | July Award (@20%) | July Grant Price | Number of July CSAs |
|---|---|---|---|---|
| $200,000 | $9,200 | $1,840 | $20.96 | 87.79 |

**Note that if the calculation results in fewer than three (3) July CSAs, then no July CSAs will be granted.**

**Q7   WHY IS THE JULY EQUITY AWARD ONLY 20% OF LAST YEAR'S AWARD?**

A7   As in prior years, equity awards are intended as part of an employee's total compensation for the full performance year, and are therefore determined and granted at the time of any year-end bonuses. Because bonus compensation is fully discretionary (unless guaranteed in writing in accordance with Firm policy), the equity portion of total compensation for 2008 cannot be determined at this time. To maintain sufficient flexibility in the determination of pay for 2008–and to minimize the risk that employee cash bonuses are not adversely impacted–the Firm decided that the July award would be based on 20% of the prior year award for most employees. Please bear in mind that a July CSA award does not indicate any right to a discretionary bonus (or any particular amount of discretionary bonus) or to any additional equity award for the 2008 performance year.

**Q8   HOW WERE THE GRANT DATE AND GRANT PRICE FOR THE JULY AWARD DETERMINED?**

A8   All equity grants to employees must be authorized and approved by the Compensation and Benefits Committee of the Board of Directors. The July 1 grant date was set by the Committee. The grant price for the July award is the closing market price of Lehman Brothers common stock on the New York Stock Exchange on that date, $20.96, and is used to determine the number of July CSAs granted to you.

**Q9   WHAT WILL HAPPEN TO MY JULY AWARD IF I LEAVE THE FIRM PRIOR TO NOVEMBER 30, 2008?**

A9   **Bonus-eligible Employees**
If your employment with the Firm ceases, for any reason, prior to November 30, 2008, you will forfeit the July CSAs. If you leave the Firm on or after November 30, 2008, your entitlement to any July CSAs, the same as any Year-end Award, will depend on when you leave, the

LEH-RSU 0000917

circumstances under which you leave, and your conduct with respect to the Firm after you leave.

**Production-based Employees**
Your entitlement to the July award will depend on when you leave the Firm, why you leave, and your conduct with respect to the Firm after you leave.

Refer to the termination provisions on Exhibit E.

# YEAR-END AWARD

**Q10   WHO IS ELIGIBLE FOR A 2008 YEAR-END EQUITY AWARD?**

A10   Employees (both bonus-eligible and production-based employees) whose employment started on or before the 2008 grant date, expected to be determined during the fourth quarter (the "Year-end Grant Date"), including employees on an approved leave of absence, are eligible to receive a year-end equity award for 2008, with the following exceptions: employees in the Firm's formal Analyst Programs, certain temporary, part-time or seasonal employees, employees on long-term disability, employees who have given notice or have been notified of their termination; and individuals employed by certain subsidiaries. Any bonus-eligible employee whose employment terminates prior to the Year-end Grant Date, or who is otherwise not eligible for a year-end bonus, will not be eligible for a year-end equity award. In case of termination of employment of production-based employees or individuals with a written compensation guarantee, any year-end equity awards will be treated in accordance with the relevant plan provisions or terms of the written compensation guarantee.

**Q11   HOW WILL MY 2008 YEAR-END EQUITY AWARD BE CALCULATED?**

A11   **Bonus-eligible Employees**
Your Year-end equity award will be calculated based on your 2008 total compensation and the 2008 Equity Award Schedule for bonus-eligible employees shown on Exhibit B, reduced by the grant-date value of any July award. In no event, however, will your full-year award be less than your July Award. Total compensation includes salary earned in fiscal year 2008 plus any bonus and additional eligible compensation for your performance in 2008, whether such amounts are deferred or paid in 2008.

Note that for individuals with written compensation guarantees for 2008, the Equity Award Schedule applicable for the determination of your full-year equity award will be the one communicated as part of your guarantee. In all other respects, your 2008 Equity Award will be governed by the applicable 2008 Equity Award Program plan documents.

Q&A CSA 7.01.08

LEH-RSU 0000918

**Production-based Employees**

Your Year-end equity award will be calculated as above, except that it will be based on the 2008 Equity Award Schedule for production-based employees shown on Exhibit C and your actual production and other compensation, after all adjustments, for production months December 2007 through November 2008 (relating to pay periods from January through December 2008), reduced by the grant date value of any July award. In no event, however, will your full-year award be less than your July Award. Refer to Exhibit D for an illustration of how the 2008 Equity Award will be calculated for production-based employees.

Note that the 2009 Equity Award Schedule for production-based employees will be communicated no later than December 31, 2008.

# 2008 CONDITIONS AND TERMINATION PROVISIONS

### Q12  WHEN WILL MY 2008 CSAs BECOME SUBJECT TO LIMITED CONDITIONS?

A12  The 2008 equity award (including any July CSAs) will become subject to Limited Conditions in 1/3 increments on November 30, 2009, 2010 and 2011.

### Q13  WHEN WILL MY 2008 CSAs SUBJECT TO LIMITED CONDITIONS CONVERT TO SHARES OF COMMON STOCK?

A13  2008 CSAs subject to Limited Conditions (including any July CSAs) will convert to shares of Lehman Brothers common stock on November 30, 2011.

### Q14  WHAT WILL HAPPEN TO MY 2008 CSAs IF I RESIGN FROM THE FIRM?

A14  If you resign, you will forfeit all CSAs that are subject to Full Conditions at the time of your termination, unless you are eligible for Full Career treatment at the time of termination.

| | **% of Total Equity Award Retained** | | |
|---|---|---|---|
| | *If you resign from the Firm after November 30 of:* | | |
| | **2009** | **2010** | **2011** |
| **All Employees** | 33% | 67% | 100% |

If you resign and your termination is deemed a Full Career termination, you will be entitled to 100% of your 2008 CSAs, and shares of Lehman Brothers common stock will be delivered to you on November 30, 2011, provided you satisfy all delivery conditions in your award agreements, do not engage in Detrimental Activity through November 30, 2011, and do not engage in Competitive Activity through the earlier of: (1) the end of the fiscal quarter 1 year following your termination and (2) November 30, 2011.

**For bonus-eligible employees, note that "Full Career" treatment is not applicable for resignations occurring before November 30, 2008.** See Exhibit E for termination provisions.

LEH-RSU 0000919

**Q15 WHAT WILL HAPPEN TO MY 2008 CSAs IF MY EMPLOYMENT IS TERMINATED?**

A15  As in prior years, if your employment with the Firm is terminated involuntarily without Cause, you will generally be eligible to retain your (otherwise forfeited) 2008 CSAs still subject to Full Conditions, provided you sign a Firm-standard release agreement in accordance with Firm policy and provided you do not engage in Detrimental Activity. Your 2008 CSAs will convert to Lehman Brothers common stock and shares will be delivered on November 30, 2011. (If you do not sign a release agreement, you will be eligible to receive only the portion of your award subject to Limited Conditions.)

**Note that the above does not apply to terminations occurring before November 30, 2008. Bonus-eligible employees whose employment ends for any reason before November 30, 2008 forfeit any July CSAs and are not entitled to any Year-end Award.**

Note also that if you are terminated involuntarily with Cause, you will forfeit all outstanding CSAs. See Exhibit E for termination provisions.

# GENERAL INFORMATION

**Q16 WHERE CAN I FIND DETAILS REGARDING MY JULY AWARD AND MY OTHER EQUITY AWARDS?**

A16  Details of your equity awards can be found on Personal Award Summary of the Equity Award Program section of LehmanLive, which you can access by using keyword **equityaward**. The number of July CSAs you were awarded, if any, will be available on LehmanLive **by July 15, 2008**.

**Q17 DO ANY OF THE CHANGES TO THE EQUITY AWARD PROGRAM AFFECT AWARDS GRANTED IN PRIOR YEARS?**

A17  No. The changes outlined here apply only to awards granted in 2008. These changes will not be retroactive to awards granted in prior years.

**Q18 WHOM DO I CONTACT IF I HAVE FURTHER QUESTIONS REGARDING THE EQUITY AWARD PROGRAM?**

A18  If you have any questions regarding the Equity Award Program, please contact the Compensation Department in New York at (212) 526-8346 or by e-mail at compensation@lehman.com .

Q&A CSA 7.01.08

LEH-RSU 0000920

## EXHIBIT A:   2007 EQUITY AWARD SCHEDULE

| Total Compensation Range | AMOUNT OF TOTAL COMPENSATION ("TC") IN EQUITY-BASED AWARDS | | |
|---|---|---|---|
| | *Employees Through Vice President Level* | *Senior Vice Presidents* | *Managing Directors* |
| $0 - $74,999 | 1.15% of 2007 TC | 2.3% of 2007 TC | 2.3% of 2007 TC |
| $75,000 - $99,999 | 2.3% of 2007 TC | 2.3% of 2007 TC | 2.3% of 2007 TC |
| $100,000 - $199,999 | $2,300 plus 6.9% of 2007 TC over $100,000 | $2,300 plus 6.9% of 2007 TC over $100,000 | $2,300 plus 6.9% of 2007 TC over $100,000 |
| $200,000 - $299,999 | $9,200 plus 11.5% of 2007 TC over $200,000 | $9,200 plus 11.5% of 2007 TC over $200,000 | $9,200 plus 11.5% of 2007 TC over $200,000 |
| $300,000 - $499,999 | $20,700 plus 17.25% of 2007 TC over $300,000 | $34,500 plus 18.687% of 2007 TC over $300,000 | $34,500 plus 18.687% of 2007 TC over $300,000 |
| $500,000 - $749,999 | $55,200 plus 23% of 2007 TC over $500,000 | $71,875 plus 23% of 2007 TC over $500,000 | $71,875 plus 23% of 2007 TC over $500,000 |
| $750,000 - $999,999 | $112,700 plus 28.75% of 2007 TC over $750,000 | $129,375 plus 40.25% of 2007 TC over $750,000 | $129,375 plus 40.25% of 2007 TC over $750,000 |
| $1,000,000 - $1,499,999 | $192,600 plus 36% of 2007 TC over $1.0 million | $240,000 plus 42% of 2007 TC over $1.0 million | $240,000 plus 52.8% of 2007 TC over $1.0 million |
| $1,500,000 - $1,999,999 | $372,600 plus 42% of 2007 TC over $1.5 million | $450,000 plus 54% of 2007 TC over $1.5 million | $504,000 plus 67.2% of 2007 TC over $1.5 million |
| $2,000,000 - $2,499,999 | $582,600 plus 48% of 2007 TC over $2.0 million | $720,000 plus 66% of 2007 TC over $2.0 million | $840,000 plus 72% of 2007 TC over $2.0 million |
| $2,500,000 and up | $822,600 plus 54% of 2007 TC over $2.5 million up to a max of 36% of 2007 TC | 42% of 2007 TC | $1,200,000 plus 75% of 2007 TC over $2.5 million to a max of 50% of 2007 TC |

Q&A CSA 7.01.08

LEH-RSU 0000921

## EXHIBIT B:    2008    EQUITY    AWARD    SCHEDULE    FOR    BONUS-ELIGIBLE EMPLOYEES

The portion of 2008 total compensation delivered in the form of an equity award for the full year will be calculated according to the schedule below.   Any Year-end Award will be determined by subtracting any July CSAs from your full-year award, but in no event will your full-year award be less than your July CSAs.

| 2008 Total Compensation Range | AMOUNT OF TOTAL COMPENSATION ("TC") IN EQUITY-BASED AWARDS[5] | | MAXIMUM % OF TC IN EQUITY-BASED AWARDS |
|---|---|---|---|
| $0 - $74,999 | 1% of 2008 TC | | 1% |
| $75,000 - $99,999 | 2% of 2008 TC | | 2% |
| $100,000 - $299,999 | $2,000 | plus 14% of 2008 TC above $100,000 | 10% |
| $300,000 - $499,999 | $30,000 | plus 35% of 2008 TC above $300,000 | 20% |
| $500,000 - $749,999 | $100,000 | plus 35% of 2008 TC above $500,000 | 25% |
| $750,000 - $999,999 | $187,500 | plus 65% of 2008 TC above $750,000 | 35% |
| $1,000,000 - $1,499,999 | $350,000 | plus 65% of 2008 TC above $1,000,000 | 45% |
| $1,500,000 - $1,999,999 | $675,000 | plus 85% of 2008 TC above $1,500,000 | 55% |
| $2,000,000 - $2,499,999 | $1,100,000 | plus 80% of 2008 TC above $2,000,000 | 60% |
| $2,500,000 and above | $1,500,000 | plus 90% of 2008 TC above $2,500,000 up to a maximum of 65% of 2008 TC | 65% |

---

[5] Subject to a 5-share minimum.

Q&A CSA 7.01.08

LEH-RSU 0000922

# EXHIBIT C:  2008 EQUITY AWARD SCHEDULE FOR PRODUCTION-BASED EMPLOYEES

The portion of 2008 total compensation delivered in the form of an equity award for the full year will be calculated according to the schedule below, which is the same as the one previously communicated. Any Year-end Award will be determined by subtracting any July award from your full-year award, but in no event will your full-year award be less than your July CSAs.

**2008 EQUITY AWARD SCHEDULE FOR PRODUCTION-BASED EMPLOYEES**

| 2008 Total Compensation Range | AMOUNT OF TOTAL COMPENSATION ("TC") IN EQUITY-BASED AWARDS[6] | | |
|---|---|---|---|
| | *Employees Through Vice President Level* | *Senior Vice Presidents* | *Managing Directors* |
| $0 - $74,999 | 1.15% of 2008 TC | 2.3% of 2008 TC | 2.3% of 2008 TC |
| $75,000 - $99,999 | 2.3% of 2008 TC | 2.3% of 2008 TC | 2.3% of 2008 TC |
| $100,000 - $199,999 | $2,300 plus 6.9% of 2008 TC over $100,000 | $2,300 plus 6.9% of 2008 TC over $100,000 | $2,300 plus 6.9% of 2008 TC over $100,000 |
| $200,000 - $299,999 | $9,200 plus 11.5% of 2008 TC over $200,000 | $9,200 plus 11.5% of 2008 TC over $200,000 | $9,200 plus 11.5% of 2008 TC over $200,000 |
| $300,000 - $499,999 | $20,700 plus 17.25% of 2008 TC over $300,000 | $34,500 plus 18.687% of 2008 TC over $300,000 | $34,500 plus 18.687% of 2008 TC over $300,000 |
| $500,000 - $749,999 | $55,200 plus 23% of 2008 TC over $500,000 | $71,875 plus 23% of 2008 TC over $500,000 | $71,875 plus 23% of 2008 TC over $500,000 |
| $750,000 - $999,999 | $112,700 plus 28.75% of 2008 TC over $750,000 | $129,375 plus 40.25% of 2008 TC over $750,000 | $129,375 plus 40.25% of 2008 TC over $750,000 |
| $1,000,000 - $1,499,999 | $192,600 plus 36% of 2008 TC over $1.0 million | $240,000 plus 42% of 2008 TC over $1.0 million | $240,000 plus 52.8% of 2008 TC over $1.0 million |
| $1,500,000 - $1,999,999 | $372,600 plus 42% of 2008 TC over $1.5 million | $450,000 plus 54% of 2008 TC over $1.5 million | $504,000 plus 67.2% of 2008 TC over $1.5 million |
| $2,000,000 - $2,499,999 | $582,600 plus 48% of 2008 TC over $2.0 million | $720,000 plus 66% of 2008 TC over $2.0 million | $840,000 plus 72% of 2008 TC over $2.0 million |
| $2,500,000 and up | $822,600 plus 54% of 2008 TC over $2.5 million up to a max of 36% of 2008 TC | 42% of 2008 TC | $1,200,000 plus 75% of 2008 TC over $2.5 million to a max of 50% of 2008 TC |

---

[6] Subject to a 5-share minimum.

Q&A CSA 7.01.08

LEH-RSU 0000923

# EXHIBIT D:   2008 EQUITY AWARD CALCULATION FOR PRODUCTION-BASED EMPLOYEES

Your 2008 equity award will be calculated based on your 2008 production compensation and the 2008 Equity Award Schedule shown in Exhibit C, less the portion of compensation granted as July CSAs, if any. The examples below assume an individual with production compensation for the full year 2008.

| | |
|---|---|
| Actual 2008 Production Compensation (through May production month): | $125,000 |
| Annualized 2008 Production Compensation (x 12 ÷ 6): | $250,000 |
| Annualized Equity Award (from Schedule for employees through VP level): | $14,950 |
| July Award (20% of Annualized Award): | $2,990 |
| | |
| Assumed 2008 Production Compensation: | $250,000 |
| Total 2008 Equity Award: | $14,950 |
| | |
| July Award: | $2,990 |
| 2008 Year-End Equity Award: | $11,960 |
| Total 2008 Equity Award: | $14,950 |

Q&A CSA 7.01.08

LEH-RSU 0000924

## EXHIBIT E:  TERMINATION  PROVISIONS

|  | **All Employees** |
|---|---|
| **Voluntary Termination** <br> *(but not Full Career)* | Participants will forfeit July CSAs and Year-end CSAs still subject to Full Conditions (together, "2008 CSAs").  Any 2008 CSAs subject to Limited Conditions will convert to shares of common stock and such shares will be delivered as soon as practicable after November 30, 2011 (the "Share Payment Date") but not later than December 31, 2011, provided the participant does not engage in Detrimental Activity through that date and has not committed an act constituting Cause through the termination date. |
| **Involuntary Termination** <br> *(but not Full Career)* | **Involuntary Termination without Cause:**  Participants will become entitled to 100% of their 2008 CSAs, including the portion subject to Full Conditions (provided the employee signs a Firm-standard release agreement).  Shares will be delivered as soon as practicable after the Share Payment Date, but not later than December 31, 2011, provided the participant does not engage in Detrimental Activity through that date. <br><br> **Involuntary Termination with Cause:**  Participants will forfeit 100% of their 2008 CSAs. |
| **Full Career Termination** | **Voluntary Termination:**  Participants will become entitled to 100% of their 2008 CSAs on the Share Payment Date, provided they do not engage in Competitive Activity through the end of the fiscal quarter following the one year anniversary of the termination date, and do not engage in Detrimental Activity through the Share Payment Date or commit an act constituting Cause through the termination date. 2008 CSAs will convert to shares of common stock, and such shares will be delivered as soon as practicable following the Share Payment Date, but not later than December 31, 2011. <br><br> **Involuntary Termination without Cause**: Participants will become entitled to 100% of their 2008 CSAs on the Share Payment Date, provided they do not engage in Detrimental Activity through that date or commit an act constituting Cause prior to the termination date.  2008 CSAs will convert to shares of common stock, and such shares will be delivered as soon as practicable after the Share Payment Date but not later than December 31, 2011. <br><br> **Involuntary Termination with Cause**: Participants will forfeit 100% of their 2008 CSAs. |
| **Termination due to Death or Disability** | All Conditions on 2008 CSAs will lapse, and shares will be delivered 30 days following the termination date. |

**NOTE:**  Notwithstanding the above, bonus-eligible employees whose employment ends <u>for any reason</u> (voluntary or involuntary termination) prior to November 30, 2008 will forfeit all July CSAs.  In such cases, "Full Career" treatment does not apply.

15                                           Q&A CSA 7.01.08

LEH-RSU 0000925

# EXHIBIT F:  GLOSSARY OF SELECT TERMS

"**Appropriate Officer**" means the Chief Executive Officer or Chief Operating Officer of Holdings (or their respective designees).

"**Cause**" means a material breach by a person of an employment contract between the person and Holdings or any subsidiary, failure by a person to devote substantially all business time exclusively to the performance of his or her duties for Holdings or any subsidiary, willful misconduct, dishonesty related to the business and affairs of Holdings or any subsidiary, conviction of a felony or a misdemeanor constituting a statutory disqualification under U.S. securities laws (or failure to contest prosecution for a felony or such a misdemeanor), habitual or gross negligence in the performance of a person's duties, solicitation of employees of Holdings or any subsidiary to work at another company, improper use or disclosure of confidential information, the violation of policies and practices adopted by Holdings or any subsidiary including, but not limited to the Code of Conduct, or a material violation of the conflict of interest, proprietary information or business ethics policies of Holdings or any subsidiary, or such other circumstances as may be determined in the sole discretion of an Appropriate Officer. For avoidance of doubt, for purposes of the preceding sentence, a material breach of an employment contract or violation of policies would include, as applicable, the employee's violation of any policy or employment agreement relating to the obligation to provide advance notice of resignation from Holdings or any subsidiary.

"**Competitive Activity**" means involvement (whether as employee, proprietor, consultant or otherwise) with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with any business carried on by Holdings or any of its subsidiaries or affiliates on the date of termination of a person's employment with Holdings and any of its subsidiaries, as determined in the sole discretion of an Appropriate Officer.

"**Contingent Stock Awards (CSAs)**" A CSA represents the conditional right to receive one share of Lehman Brothers common stock three years after the grant date, on November 30, 2011. Generally, CSAs cannot be sold, traded, pledged or transferred for that three-year period.

"**Detrimental Activity**" means (i) using information received during a person's employment with Holdings or any of its subsidiaries related to the business affairs of Holdings or any of its subsidiaries, affiliates or their clients, in breach of such person's undertaking to keep such information confidential; (ii) directly or indirectly persuading or attempting to persuade, by any means, any employee of Holdings or any of its subsidiaries or affiliates to terminate employment with any of the foregoing or to breach any of the terms of his or her employment with the foregoing; (iii) directly or indirectly making any statement that is, or could be, disparaging of Holdings, its subsidiaries or affiliates, or any or their employees (except as necessary to respond truthfully to any inquiry from applicable regulatory authorities or to provide information pursuant to legal process); (iv) violating policies and practices adopted by Holdings or any subsidiary; (v) materially breaching any contract between the person and Holdings or any subsidiary; or (vi) directly or indirectly engaging in any activity that is, or could be, substantially injurious to the financial condition, reputation, or goodwill of Holdings or its subsidiaries or affiliates, in each case as determined in the sole discretion of the Chief Executive Officer or Chief Operating Officer of Holdings (or their respective designees). Notwithstanding the foregoing, if following any termination of employment other than for Cause but prior to the scheduled Share Payment Date it is determined that an act constituting Cause has occurred which was not determined by Holdings (or its designee) at the time of such termination, such act shall also be deemed to constitute Detrimental Activity.

"**Disability**" means a disability under both the Lehman Brothers Long-Term Disability Insurance Plan and the Social Security Act.

"**Full Career Termination**" means a Termination of employment with Holdings or any subsidiary when (a) a person has at least 20 years of service; (b) the person is at least 45 years old, and the person has at least 10 years of service with Holdings or any subsidiary; or (c) the person is at least 50 years old, and the person has at least 5 years of service with Holdings or any subsidiary.

CSAs which are subject to "**Full Conditions**" are forfeited if the award recipient's employment with the Firm terminates or if the award recipient engages in Detrimental Activity.

CSAs which are subject to "**Limited Conditions**" are forfeited if the award recipient engages in Detrimental Activity.

"**Termination**" means the end of employment with Holdings or a subsidiary. The characterization of the circumstances of Termination is determined in the sole discretion of an Appropriate Officer.

Q&A CSA 7.01.08

LEH-RSU 0000926

**E
X
H
I
B
I
T

16**

**EXHIBIT 16**

**Lehman Brothers**
**2005 Total Compensation Statement**

CONFIDENTIAL

Employee :    REDACTED                                    Stock Program :   SVP

Division : Mortgage Capital Division(LBB)                     Employee Id :   REDACTED

Hire Date : September 6, 1988

**COMPENSATION**

| Compensation Type | Current - 2005 |
|---|---|
| Paid Salary | $200,000 |
| Bonus | $900,000 |
| **TOTAL COMPENSATION** | **$1,100,000** |

**EQUITY SUMMARY in USD**

| | Equity Component | Market Price | Discount Price | Shares |
|---|---|---|---|---|
| RSUs | $235,000.02 | $126.00 | $94.50 | 2,486.77 |

Your equity award was calculated based on total compensation of $1,100,000, where "total compensation" includes salary, bonus, and other forms of eligible compensation.

All terms and conditions of equity awards, including those relating to vesting and forfeiture, are subject to controlling plan documents, including the FY 2005 equity award agreements (expected to be finalized in early 2006), the Employee Incentive Plan and related Prospectus.

**PAYMENT SCHEDULE**

| | | |
|---|---|---|
| Bonus | $900,000 | |
| Less RSUs | ($235,000) | |
| Total Cash Payment (Before Taxes) | $665,000 | Payable on or about January 31, 2006 |

**ANNUAL SALARY**

Effective Fiscal Year 2006, your annual base salary will be as follows:

| | |
|---|---|
| Current Annual Salary | $200,000 |

Note: All bonus awards and equity awards are contingent on your being employed on the scheduled bonus award date (on or about January 31, 2006) and not having given or received notice of employment termination before that date.

If you are not employed on January 31, 2006, or you have received notice of employment termination before that date, you will not be eligible to receive a bonus award (including any special awards) or any equity award for fiscal year 2005.

If you have any additional questions regarding your compensation or personal data, please contact your divisional HR representative. If you have any questions regarding your equity award, please contact the Compensation Department at (212)526-8346.

12-Dec-05

# EXHIBIT 17

**EXHIBIT 17**

PRIVATE AND CONFIDENTIAL

## 2006 TOTAL COMPENSATION STATEMENT

REDACTED                                                           REDACTED

TO:

DEPT:       CORP : 49143 - Real Estate-Europe/56
FROM:       P Hohnsbeen
DATE:       December 13 2006

Please find below the details of your 2006 Total Compensation and any year-end awards:

### Total Compensation Summary

|  | GBP |
|---|---|
| Paid Salary | 100,000 |
| Total Bonus | 134,600 |
| **Total Compensation** | **234,600** |
| Total Bonus | 134,600 |
| Total Equity Award | 31,953 |
| Net Bonus Award | 102,647 |

### Equity Award Detail

| Equity Type | USD Award Value | USD Mkt Price | USD Grant Price | No. of Units |
|---|---|---|---|---|
| CSAs | 57,960 | 77.03 | 57.77 | 1,003.28 |
| **Total Equity Award** | **57,960** | | | |

Your total CSA Award is based on a Total Compensation of USD 425,540 (for the purposes of calculating the CSA Award ONLY).

When awarding the CSA award the Firm has applied a discount of 25% to the market price of $ 77.03. CSAs are subject to restrictions until 30 November 2011; they cannot be sold, traded or pledged before then.

A full summary of all your outstanding CSA Awards (including your 2006 Award) will be available on LehmanLive, keyword "equityaward", during the first quarter of 2007. All terms and conditions of the CSA Awards are subject to the controlling plan documents.

**Base Salary**

Your base salary has increased to GBP 110,000 with effect from 1 December 2006.

**Additional Information**

All terms and conditions of your employment remain unchanged.

Entitlement to your 2006 Awards are contingent on you being employed by Lehman Brothers at, and not under notice either given or received prior to, 31 January 2007.

**E**

**X**

**H**

**I**

**B**

**I**

**T**

**18**

**EXHIBIT 18**

GetSum

## Compensation Statement

Find: GSID ▾ | 10142380 | gsid | Get in Excel
Fiscal year: 2008    ☐ Show as of before EOM

Sales Org: [ REDACTED ]

Name:
From: 12/1/2007 To: 12/31/2008
Future payout trades

REDACTED

| | Year Total | 12/2008 | 11/2008 | 10/2008 | 9/2008 | 8/2008 | 7/2008 | 6/2008 | 5/2008 | 4/2008 | 3/2008 | 2/2008 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gross Production | | | | | | | | | | | | |
| Net Production | 403,316.44 | 0.00 | -29.07 | 7,961.49 | 9,365.10 | 28,522.00 | 55,760.48 | 32,336.47 | 64,695.18 | 61,118.23 | 35,434.40 | 35,218.97 |
| Demo Net Production | | | | | | | | | | | | |
| Average Rate (%) | 34.27 | 0.00 | 1.12 | 32.24 | 35.69 | 34.46 | 35.86 | 34.53 | 34.32 | 35.66 | 33.58 | 31.88 |
| Prior Months Draw/Overage | | | | | | | | | | | | |
| Adj to Net Production | -40,292.67 | -1,383.00 | 0.00 | -6,496.29 | -599.47 | -1,639.91 | -4,193.37 | -2,085.02 | -4,391.24 | -4,421.41 | -2,299.26 | -2,313.38 |
| Monthly Payout Balance | | | | | | | | | | | | |
| Draw Amount | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Total Sales Compensation | | | | | | | | | | | | |
| Cash Commissions | 306,880.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 43,727.52 | 26,395.11 | 53,526.27 | 47,898.63 | 28,739.93 | 28,553.27 |
| FID/Inv Accrual Calculated | | | | | | | | | | | | |
| Recorded Total Sales Compensation | 357,518.85 | 0.00 | 0.00 | 0.00 | 0.00 | 26,682.09 | 51,567.12 | 30,251.45 | 63,617.77 | 56,696.82 | 33,135.14 | 32,905.59 |
| Deficit/Overage | | | | | | | | | | | | |

**E
X
H
I
B
I
T

19**

**EXHIBIT 19**

Compensation Statement

REDACTED

Name:

From: 12/1/2007 To: 11/30/2008

| | Year Total | Sep-08 | Aug-08 | Jul-08 | Jun-08 | May-08 | Apr-08 | Mar-08 | Feb-08 | Jan-08 | Dec-07 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Gross Production | 4,763,621.17 | 265,665.39 | 693,562.13 | 632,710.87 | 561,868.48 | 575,650.57 | 404,012.31 | 296,370.96 | 302,838.22 | 510,852.33 | 320,491.34 |
| Net Production | 1,246,558.89 | 55,987.86 | 168,118.57 | 208,850.83 | 159,087.45 | 181,772.60 | 118,110.70 | 90,178.27 | 80,842.98 | 122,130.20 | 90,477.55 |
| Retro Net Production | 81.06 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 30.13 | 60.93 |
| Average Rate (%) | 26.17 | 21.07 | 24.24 | 25.08 | 26.88 | 31.58 | 29.49 | 22.59 | 26.71 | 23.92 | 28.23 |
| Prior Months -Deficit/Overage | | -55,582.50 | 0 | 0 | 0.01 | 0.01 | 0 | -0.01 | 0 | 0 | 0 |
| Adj to Net Production | -210,969.30 | 0 | -47,875.97 | -58,707.63 | -39,759.62 | -21,332.78 | -10,497.73 | -7,504.03 | -8,717.96 | -10,138.60 | -5,463.99 |
| Monthly Payout Balance | 0 | 405.46 | 120,242.60 | 150,143.00 | 119,327.84 | 160,439.82 | 108,663.90 | 52,674.23 | 74,125.00 | 112,020.73 | 82,013.57 |
| Draw Amount | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Minimum Compensation | 1,566.21 | 1,566.21 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Sales Compensation | 961,622.37 | 1,971.67 | 120,242.60 | 150,143.00 | 119,327.84 | 160,439.82 | 108,663.90 | 52,674.23 | 74,125.00 | 112,020.73 | 82,013.57 |
| Cash Commissions | 703,197.40 | 0 | 84,740.71 | 102,082.94 | 84,210.18 | 108,055.00 | 74,910.41 | 48,665.64 | 57,992.61 | 79,161.76 | 63,378.11 |
| Equity Accrual Calculated | 276,453.29 | 0 | 35,601.89 | 48,060.06 | 35,117.69 | 52,384.72 | 33,763.43 | 4,006.59 | 16,132.60 | 32,858.95 | 18,635.46 |
| Recorded Total Sales Compensation | 1,035,233.19 | 0 | 175,635.10 | 150,143.00 | 119,327.84 | 160,439.81 | 108,663.90 | 52,874.23 | 74,125.00 | 112,020.73 | 82,013.57 |
| -Deficit/Overage | -1,566.21 | -1,566.21 | -55,582.50 | 0 | 0 | 0.01 | 0 | 0 | 0 | -0.01 | 0 |

**E**

**X**

**H**

**I**

**B**

**I**

**T**

**20**

**EXHIBIT 20**

| | |
|---|---|
| **From:** | Gross, Mark D <mgross@lehman.com> |
| **Sent:** | Wednesday, April 14, 2004 9:07 AM |
| **To:** | Emmert, James R <jemmert@lehman.com> |
| **Subject:** | FW: Based on your most excellent feedback, Ian has made some changes to the document |
| **Attach:** | Stock Awards Overview 0413a.ppt |

"final" version

> -----Original Message-----
> From:      Gross, Mark D
> Sent: Tuesday, April 13, 2004 2:15 PM
> To:   Collerton, Anthony J; Tuininga, Chris; Arreglado, Elizabeth R;
> Wegrzyn, Boguslaw
> Subject:     FW: Based on your most excellent feedback, Ian has made
> some changes to the document
>
>
>
> -----Original Message-----
> From:      James, Mimi
> Sent: Tuesday, April 13, 2004 12:28 PM
> To:  Binkley, Tracy A
> Cc:   Gross, Mark D
> Subject:     Based on your most excellent feedback, Ian has made some
> changes to the document
>
> <<Stock Awards Overview 0413a.ppt>>
> New Page 3 ( can you make sure we are saying this right?)
> Page 7 - Options Overhang (last sentence - again could you check that
> this is correct?)
> Page 15 & 16- Potential levers - added # 6 & 7 to lever list and to
> impact list
> Next Steps page - we added "even for the EC" to no option grants
>

CONFIDENTIAL    LEH-RSU 0014995

EXHIBIT

21

**EXHIBIT 21**

# Equity Award Value To Employees

The amortization of awards over time lowers our comp and benefits ratio. If we were to fully expense all awards in the year of grant (including options), our comp ratio would be over 57% over the period.

|  | **2000** | **2001** | **2002** | **2003** |
|---|---|---|---|---|
| Revenues | $7,707 | $6,737 | $6,155 | $8,647 |
| *Comp Accrual/revenues* | *51.0%* | *51.0%* | *51.0%* | *49.9%* |
| Comp & Benefits Accrual - Reported comp | $3,931 | $3,436 | $3,139 | $4,318 |
| RSU amortization | (478) | (477) | (522) | (560) |
| PSU amortization | (43.9) | (27.3) | (19.0) | (28.0) |
| C&B expense bef amortization of equity awards | 3,409 | 2,931 | 2,598 | 3,731 |
| RSU grant value (principal + discount) | 886 | 601 | 390 | 790 |
| Options Black Scholes value | 249 | 291 | 500 | 333 |
| PSU grant value | 48.7 | 53.1 | 23.1 | 54.4 |
| Comp value to employees | 4,592 | 3,877 | 3,511 | 4,908 |
| *Comp ratio* | *59.6%* | *57.5%* | *57.0%* | *56.8%* |

6

LEHMAN BROTHERS

CONFIDENTIAL

LEH-RSU 0015001