**Hearing Date and Time:  October 23, 2013, 10:00 a.m. (Prevailing Eastern Time)**

SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-3588
Bruce E. Clark
Matthew A. Schwartz

*Attorneys for Baupost Group, LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
——————————————————————

|  |  |
|---|---|
| In re | : Chapter 11 |
|  | : |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | : Case No. 08-13555 (JMP) |
|  | : |
| Debtors. | : Jointly Administered |
|  | : |

——————————————————————

**REPLY OF BAUPOST GROUP, LLC TO DEBTORS' OPPOSITION TO**
**BAUPOST'S MOTION TO QUASH DEBTORS' SUBPOENA ISSUED UNDER**
**FEDERAL RULE OF BANKRUPTCY PROCEDURE 2004**

Baupost Group, LLC and its affiliated entities ("Baupost"), by its

undersigned counsel, hereby replies to the opposition ("Opposition") of Lehman Brothers

Special Finance ("LBSF") and Lehman Brothers Holdings, Inc. ("LBHI"; and together

with LBSF, "Debtors"), dated September 5, 2013 [Docket No. 39947], which responds to

Baupost's motion ("Motion"), dated July 23, 2013 [Docket No. 38941], to quash the

Subpoena for Rule 2004 Examination, served by Debtors on Baupost on May 24, 2013

("Subpoena").  The Subpoena seeks privileged and irrelevant discovery from Baupost,

and, to the extent that it has not already been mooted by Baupost's intervening agreement

to produce certain documents, the Court should quash it.

## INTRODUCTION

1.     Unable to contest Baupost's showing that Debtors' Subpoena seeks documents that are either (i) irrelevant to Giants Stadium LLC's ("Giants Stadium") two proofs of claim ("Claims") or (ii) facially protected by the work product doctrine, Debtors instead use their Opposition as an opportunity to attempt to "poison the well" with unfounded allegations of "bad faith" by Baupost arising out of an amendment to the Claims, despite knowing that Baupost has no economic interest in that amendment.

2.     Debtors' Opposition makes clear that the primary purpose of the Subpoena is to seek two categories of documents. First, Debtors seek documents concerning the transfer of certain interests in the Claims from Bank of America, N.A. (which had purchased those interests from Giants Stadium), to Baupost. Despite Debtors' assertion that they are confused about the circumstances of the Claims transfer, and which entity holds interests in the Claims, the Debtors knew about the nature of Baupost's economic interest in the Claims both from documents produced by Giants Stadium to Debtors and from other documents filed publicly with the Court. Nevertheless, to alleviate the Court of the burden of having to resolve this non-issue, Baupost has now agreed to produce to Debtors the underlying documents regarding the transfer of interests in the Claims to Goal Line Partners, LLC ("Goal Line"), an affiliate of Baupost, which is in all material respects identical to the transfer agreement between Giants Stadium and Bank of America previously produced to Debtors.

3.     Second, Debtors seek documents evidencing Baupost's analysis of the value of the Claims, a category of documents that is, by its nature, work-product protected and, in any event, not relevant to a determination of the objective value of the

Claims.   Baupost's valuation analysis of the Claims, which was undertaken while Baupost was advised by counsel, was prepared in anticipation of a potential dispute with the Debtors over the Claims; thus, it is the equivalent of a damages analysis, which is *prima facie* privileged and work product protected.   Indeed, ***Debtors themselves are taking precisely the same position with respect to their post-petition valuation documents*** and, on that basis, have refused to produce Debtors' post-petition valuation documents.  Suppl. Schwartz Decl. ¶¶ 11-13.[1]  Debtors' Opposition fails to articulate any reason why Baupost's valuation analysis should be treated any differently than Debtors' own valuation analysis or why Baupost should have to comply with discovery requests where Debtors themselves have taken the position that they will not produce such documents to Giants.   Accordingly, the Court should quash the Subpoena.

## <u>REPLY TO PETITIONERS' STATEMENT OF FACTS</u>

4.      Debtors mischaracterize numerous facts and events that are clearly documented or otherwise indisputable.  To clarify the record, Baupost is compelled to address the most egregious of these mischaracterizations, which also appear to be the main purported justifications behind the substance of Debtors' Opposition.

---

[1]      Exhibits A to K are attached to the Declaration of Matthew A. Schwartz, dated July 23, 2013 ("Schwartz Decl.") [Docket No. 38941].  Exhibits L to R are attached to the Supplemental Declaration of Matthew A. Schwartz, dated October 11, 2013 ("Suppl. Schwartz Decl.") and are being contemporaneously submitted with this brief.

**A.   Baupost Is a Post-Petition Investor with a Capped Interest in the Claims.**

5.     As Debtors well know, Baupost is a post-petition investor with a partial economic interest in the Claims, while Giants Stadium is the original creditor that also retains a partial economic interest in the Claims.

6.     Specifically, on April 27, 2009, Giants Stadium transferred certain economic interests in the Claims to Bank of America.  A Rule 3001(e)(2) transfer notice that attaches a certification of that transfer was filed on the public docket [Docket Nos. 18784 and 18785].  Suppl. Schwartz Decl., Ex. L.  Giants Stadium has produced to Debtors documents detailing the negotiations as well as the executed transfer agreement ("BOA Transfer Agreement").   Schwartz Decl., Ex. B-4, at GStad_LB_0063360-GStad_LB_0063381 (executed BOA Transfer Agreement); Suppl. Schwartz Decl., Exs. M-1 to M-3, at GStad_LB_0049261; GStad_LB_0049450-GStad_LB_0049453; GStad_LB_0059262-GStad_LB_0059263.  **[REDACTED]**

7.     Further, as evidenced by the Rule 3001(e)(2) transfer notice, filed on the public docket [Docket Nos. 18801 and 18802], Bank of America subsequently transferred its entire interest in the Claims to Goal Line, an entity owned and advised by Baupost. Suppl. Schwartz Decl., Ex. N.  That notice states that all of Bank of America's "right, title and interest in and to the [C]laims" were transferred to Goal Line. *Id.*  Thus, Debtors knew that Baupost acquired the same rights in the Claims that Bank of America purchased from Giants Stadium.

**B.   Baupost Did Not Amend the Claims in "Bad Faith".**

8.     Knowing the economics of Baupost's limited economic interest in the Claims, Debtors nevertheless wrongfully accuse Baupost of "improperly inflat[ing] the

-4-

Giants Stadium claim" (Opp. ¶ 6) in a transparent attempt to argue the merits of their anticipated adversary complaint under the guise of a discovery dispute.  **[REDACTED]**

9.      Furthermore, Debtors have long been fully aware of the basis for the value of the amended Claims filed by Giants Stadium (amount stated therein, "Amended Claim Amount") [Claim Nos. 67782 and 68103].  Suppl. Schwartz Decl., Ex. O.  The original proofs of claim—filed on the public docket before Baupost became involved in any way with the Claims [Claim Nos. 64070 and 64071],  Suppl. Schwartz Decl., Ex. P—detailed Giants Stadium's calculation of the $301,828,087.35 figure for the Claims, and clearly explained that the figure was not final and could be increased later based on additional categories of charges, interest, and/or expenses not yet included in the calculation:

> ***Please note that this calculation of Loss does not include important and bargained for benefits of the Transaction to the Non-Defaulting Party***, including without limitation (i) the option value inherent in floating rate conversion mechanics of the Transaction, which permitted the Non-Defaulting Party to convert the Transaction into a fixed floating interest rate swap at a predetermined rate at any time during its term, (ii) the absence of significant termination events, collateral triggers or covenants relating to the Non-Defaulting Party or its insurer, which we do not expect to be able to achieve again with any replacement counterparty and have a significant commercial and credit benefit to the Non-Defaulting Party, (iii) the fact that any replacement swap is likely to involve a significant credit charge and a significant premium payable to the counterparty over and above the fixed rate corresponding to expected future payments on the auction rate securities, (iv) the additional losses and costs involved in addressing issues of replacement funding on an accelerated time schedule in the middle of significant dislocation in the credit markets, and (v) the commercial and ancillary effects of the loss of the critical Transaction during the construction period for the stadium and potential reactions by contractual and financing counterparties, rating agencies, the NFL, the New York Football Giants, Jets Stadium LLC, the New York Jets, the State of New Jersey and others***. We continue to work expeditiously to determine the full extent of our Loss and, in the event that the value of these benefits can be adequately ascertained with further analysis; we reserve the right to deliver a supplemental statement for incremental amounts.***

*Id.* (emphasis added).  This proviso, by its terms, makes clear that Giants Stadium was, at that time, still analyzing, and had not yet finalized its calculation of the value of the Claims.

10.    In December 2011, Giants Stadium filed on the public docket a detailed explanation of its amended calculation of the value of the Claims (*i.e.*, the Amended Claim Amount) of $585,210,327.94.  Suppl. Schwartz Decl., Ex. O.  As detailed in that explanation, Giants Stadium corrected "a mathematical error . . . relat[ing] to the inclusion of principal payments in the floating rate payments to be made on April 1, 2028 and April 1, 2029."  *Id.*  This error led Giants Stadium to *reduce* the value of its Claim by $12,094,377.49.  *Id.*  Giants Stadium then elected to claim supplemental amounts for a credit charge and a capital charge pursuant to its reservation of rights in the original proofs of claim, interest from September 18, 2008 to October 2, 2008, and reimbursable expenses authorized under Section 9 of the ISDA Master Agreements.  *Id.* (identifying each of the aforementioned amounts).  Giants Stadium did not, as Debtors disingenuously contend, "double" the Claims or increase their value without cause.  Thus, neither the amendment of the Claims nor the basis for the increased claim amount should have been a surprise to Debtors, and the allegation that the amendment was made by anyone in "bad faith" is unfounded.

### C.    Baupost Has Never Taken a "Just Say No" Position.

11.    Debtors' characterization of Baupost's position at the meet and confer of June 24, 2013 as "just say no" (Opp. ¶ 1.)  is revisionist history.  When Baupost's counsel expressed its concern to Debtors during the meet and confer that the heart of Debtors' requests—the request for valuation documents—are *per se* privileged and protected by

the work product doctrine, Debtors' counsel responded only that it would be a "short meet and confer." Suppl. Schwartz Decl. ¶ 9.   Debtors never addressed Baupost's position that the valuation documents sought are work product protected or irrelevant to the merits of the Claims.   Schwartz Decl. ¶ 20; Suppl. Schwartz Decl. ¶ 10.   Nor did Debtors offer to limit their requests to only those categories of documents not otherwise protected from discovery.   Schwartz Decl. ¶ 20; Suppl. Schwartz Decl. ¶ 10.

12.     In fact, all attempts by Baupost to discuss the merits of its Objections were completely dismissed by Debtors.     Specifically, Debtors never raised their "confusion" over ownership of the Claims or suggested that they needed more complete claim transfer documentation to resolve such supposed confusion.   When Baupost raised the burden of creating a privilege log, noting that the Discovery Protocol Agreement specifically provides that privilege logs are not required for document productions between Giants Stadium and Debtors, Schwartz Decl., Ex. F ¶ 1, Debtors' counsel simply responded by asking whether Baupost would be filing a motion to quash.   Suppl. Schwartz Decl. ¶ 10; *see also* Schwartz Decl. ¶ 20.

## ARGUMENT

13.     Despite the plain language of the Subpoena and the broadly worded requests therein, Debtors purport to narrow the scope of the Subpoena in their Opposition.[2]   It now appears that the relevant documents sought by the Subpoena

---

[2]     (*See* Opp. ¶ 40 ("[T]he documents sought are material and relevant to understanding the basic information concerning the ownership of the Claims, the circumstances surrounding the amendment, and the reasons behind and reasonableness of the calculations made in the amendment."); *id.* ¶ 2 ("The Subpoena is limited in scope and contains only five requests for documents (the 'Requests') that principally concern (i)

*(footnote continued . . .)*

principally concern (1) "basic information" concerning ownership of the Claims; and (2) the circumstances surrounding and reasonableness (including valuation) of the amendment of the Claims.  Following receipt of Debtors' Opposition, Baupost has agreed to produce the underlying documents regarding the transfer of interests in the Claims to Goal Line, Suppl. Schwartz Decl. ¶ 13, thereby satisfying Debtors' request for "basic information" concerning ownership of the Claims.  As explained below, Baupost continues to withhold documents responsive to the second category of documents sought by Debtors—Baupost's valuation documents—as this category of requests seeks work product protected and irrelevant discovery and thus constitutes an improper use of the Rule 2004 discovery process.

---

(*...continued footnote*)

the purchase or sale of Giants Stadium's claims to Baupost and (ii) the valuation of two substantially identical interest rate swaps between Giants Stadium and LBSF (the 'Swaps') that were the basis for the claims, including any valuations leading up to and in connection with the amendments of such claims, which were filed after Baupost purportedly purchased them."); *id.* ¶ 39 ("Here, the Requests easily would meet Rule 26's relevancy requirements.  Each of Lehman's narrowly-tailored Requests bear directly on the proper valuation of the Swaps in the Amended Claims, the propriety of the amendment of the Claims, and the holding of claims by the parties involved.").)

I.      **THE SUBPOENA SEEKS INAPPROPRIATE DISCOVERY AND THUS VIOLATES RULE 2004.**

A.      **Baupost's Valuation Documents Are Facially Protected from Debtors' Subpoena and Are Irrelevant.[3]**

14.     Debtors fault Baupost for declining to produce its valuations on the grounds that such documents are irrelevant and protected by the work product doctrine, even though Debtors have taken and are taking the exact same position with respect to *their* post-petition valuations, which were created during the very same period.  Schwartz Decl. ¶¶ 18-19.  This is simply not credible.  There is no principled justification to apply a different rule for the discoverability of valuations to Baupost than Debtors apply to themselves in the same action.

1.      **Baupost's Valuation Documents Are Categorically Work Product.**

15.     Like Debtors, Baupost asserts that all documents concerning Baupost's valuation of the Claims, including the amended Claims and "the reasons behind and reasonableness of the calculations made in the amendment" (Opp. at ¶ 40),[4] are categorically work product.   Debtors' Opposition does not directly dispute the proposition that these documents *can be* shielded from disclosure by the work product

---

[3]      This section addresses the Subpoena's request for documents "both prior to and following" September 18, 2008 concerning "the value of the claims (and amended claims) filed by Giants Stadium in the Lehman Bankruptcy," the "valuation of the Transactions" and the "valuation of the Bonds."  Schwartz Decl., Ex. A, Request Nos. 1-2, and 4.

[4]      As previously noted, Giants Stadium disclosed the basis for the value of the amended Claims on the public docket in December 2011.  *See supra* ¶¶ 9-10.

doctrine (Motion ¶¶ 27-29), but, for the avoidance for doubt, Baupost will address the issue once again.

16.     A bankruptcy is "considered litigation for the purpose of the work product privilege," *In re Quigley Co., Inc.*, No. 04-15739 SMB, 2009 WL 9034027, at *6-7 (Bankr. S.D.N.Y. Apr. 24, 2009), *supplemented*, 2009 WL 2913450 (Bankr. S.D.N.Y. June 19, 2009), and thus documents created in anticipation of or triggered by a bankruptcy filing are protected from disclosure by the work product doctrine. *See, e.g., id.*; *In re MarketXT Holdings Corp.*, No. 04-12078 ALG, 2009 WL 7216076, n.12 (Bankr. S.D.N.Y. Mar. 4, 2009); *In re Circle K Corp.*, 199 B.R. 92, 99 (Bankr. S.D.N.Y. 1996), *aff'd*, 96 CIV. 5801 (JFK), 1997 WL 31197 (S.D.N.Y. Jan. 28, 1997).   In particular, damages analysis such as the valuations at issue here are *prima facie* privileged and work product protected.  *See, e.g.*, *United States EEOC* v. *Venator Group*, 2000 U.S. Dist. LEXIS 12153 (S.D.N.Y. July 10, 2000) ("[M]uch of the information desired would be protected under the Work Product Doctrine in any event, and the same arguments can be made regarding the defendant's request for information as to the nature and calculation of damages.").

17.     Here, Baupost's valuation documents are categorically work product.  It was clear from the beginning of Debtors' bankruptcy proceedings that Debtors would likely contest both the validity of counterparties' termination of derivative contracts and counterparties' claims for liability arising out of such terminated derivative contracts. Indeed, as early as November 13, 2008—long before Baupost acquired a limited economic interest in the Claims—Debtors moved this Court for an order authorizing Debtors to establish procedures for the settlement of claims by "Counterparties [which]

have purported to have exercised their rights to terminate Derivative Contracts" as "Debtors might not agree with the Counterparties' valuation process and assertion of liability under the terminated Derivative Contracts" [Docket No. 1498], and the Court entered such Order on December 16, 2008  [Docket No. 1498].[5]

18.    Not surprisingly, Baupost's own conduct demonstrates that it too anticipated litigation over the Claims.  For example, the transfer agreement between Bank of America and Baupost ("Baupost Transfer Agreement"), which Baupost has agreed to produce to Debtors upon appropriate agreement between the parties regarding confidentiality, Suppl. Schwartz Decl., ¶ 13, makes clear that the potential acquisition of the Claims by Baupost was done in contemplation of litigation.  **[REDACTED]**  Also, Baupost engaged Ropes & Gray LLP bankruptcy litigators no later than February 2009 to represent its anticipated interest in the Claims against the Debtors,  Declaration of D. Ross Martin, dated October 10, 2013 ("Martin Decl."), ¶ 2, and later entered into a joint defense agreement with Giants Stadium and retained Sullivan & Cromwell LLP.  Martin Decl. ¶ 5.

19.    It is precisely in this context—when all participants in the Lehman bankruptcy (Debtors and creditors alike) reasonably anticipated that significant claims, like the Claims at issue here, would likely be litigated by creditors and the Debtors—that

---

[5]    Then, on July 20, 2009, Debtors moved this Court for an order establishing alternative dispute resolution procedures for certain derivative contracts, including counterparties to derivative transactions with Debtors who have "purportedly terminated" their agreements [Docket No. 4453].  This Court entered such an order on September 17, 2009 [Docket No. 5207]—a clear signal to all counterparties to such "terminated" derivative contracts that such claims would potentially be subject to Court ordered mediation and/or litigation.

Baupost prepared documents, including analyses, valuations, and other materials that were necessarily both informed by, and reflective of, advice from counsel relating to the litigation strategy around the assertion of claims against the Debtors' bankruptcy estates and, as such, are protected by the work product doctrine. Martin Decl. ¶ 6.

> ### 2.     Debtors Improperly Seek to Circumvent the Protected Status of Baupost's Valuation Documents.

20.     As previously discussed, Debtors' request for valuation documents from Baupost seeks a class of documents that is, by definition, protected by the work product doctrine. *See supra* ¶¶ 15-18. This status alone—which is entirely consistent with the position that Debtors are taking with respect to their own post-petition valuation documents, Suppl. Schwartz Decl. ¶¶ 11-13[6]—is a sufficient ground to quash the Subpoena as to those requests.

21.     Permitting Debtors to invade Baupost's work product valuations is particularly inappropriate here, where Baupost, Giants Stadium, and Debtors will be back at the table on the very issue of valuation, either in the context of mediation, settlement, or litigation. To require Baupost to produce its valuation documents when Baupost and Giants Stadium have not been provided with similar information created by Debtors,

---

[6]     Debtors exaggerate the type of showing required for Baupost to make a *per se* objection to a request based on work-product and/or privilege. (Opp. ¶¶ 41-42.) In *In re Countrywide Home Loans, Inc.*, 384 B.R. 373 (Bankr. W.D. Pa. 2008), the court found that the *per se* objections were inadequate because there appeared to be "no basis for any of these objections," not because the objections were unsupported by specific evidence. The court invited the objecting party to make objections as to specific documents with specific evidence only to give the objecting party an opportunity to demonstrate privilege. Furthermore, as noted above, Debtors themselves are making precisely the same *per se* privilege assertion as to their valuation materials.

would clearly give Debtors an unfair advantage in any subsequent mediation and/or negotiation.  *See, e.g., Grand Metropolitan PLC* v. *Pillsbury Co., C.A.*, No. 10319, 10323, 1988 WL 130637, at*2 (Del. Ch. Nov. 22, 1988); *Vitro, Sociedad Anonima, C. Holdings Corp.* v. *Anchor Glass Container Corp., C.A.*, No. 11016, 1989 WL 108406, at *1 (Del. Ch. Sept. 20, 1989).

22.    Contrary to the Debtors' position in their Opposition, Baupost's assertion of the work-product doctrine on a categorical—rather than a document-by-document—basis is not only proper, it is encouraged by the local rules of this District.  Local Rules of the United States District Courts for the Southern and Eastern District of New York § 26.2(c) ("[W]hen asserting privilege on the same basis with respect to multiple documents, it is presumptively proper to provide the information required by this rule by group or category.")  Debtors' request boils down to a request for Baupost to review all post-petition documents and, because all valuation-related documents are protected from discovery, create and deliver to Debtors a large privilege log, a task that would be costly and burdensome for Baupost but would not result in any relevant information for Debtors.    Further, Debtors have exempted themselves in the Discovery Protocol Agreement from the requirement to prepare a privilege log with respect to discovery exchanged with Giants Stadium.  Schwartz Decl., Ex F, at ¶ 1.  For Debtors to insist on pursuing valuation documents under these circumstances is the epitome of abusive discovery and warrants quashing the Subpoena, at minimum to the extent it seeks a privilege log from Baupost.

23.    Debtors' offer to "accept . . . documents on a non-waiver basis" and "thus obviat[e] the need to produce a privilege log" (Opp. ¶ 44) is an absurd and entirely

unworkable suggestion, not a meaningful effort at compromise, and does not disturb

Baupost's clear showing that the Subpoena is nothing more than a naked attempt to

invade the work product protection for the impermissible purpose of ascertaining details

about Baupost's litigation strategy.  Debtors' offer makes no sense, and undermines the

entire purpose of having the work product protection and attorney-client privilege,

particularly with respect to Baupost's valuations.  Indeed, the fact that Debtors would be

unable to use the documents as evidence in this case only underscores the fact that

Debtors are not looking for information relevant to the Claims at all.  Rather, Debtors

seek only to uncover Baupost's litigation strategy in order to gain an unfair and

significant advantage, either in subsequent litigation, mediation or negotiation.

**B.      Baupost Has Agreed to Produce The Claim Transfer Documents Sought in the Subpoena.[7]**

24.    Debtors assert that they do not know who "really" owns the Claims and

therefore deserve expansive discovery into that question—not only from Giants Stadium,

but also from Baupost.  (Opp. ¶¶ 8, 15, 20, 27.)  Yet, Debtors have been provided with

ample documentation of who owns interests in the Claims and the economic relationship

between Giants Stadium and Goal Line as it relates to the Claims.  *See supra* ¶¶ 6-7.

25.    Beginning in 2010, Giants Stadium produced numerous documents

detailing the negotiation and ultimate transfer of limited economic interests in the Claims

to Bank of America.  Suppl. Schwartz Decl. ¶ 14.  The fact that Goal Line subsequently

---

[7]    This section addresses the Subpoena's request for documents concerning "the purchase or transfer of Giants Stadium's [C]laims in the Lehman Bankruptcy by or to Baupost, Bank of America, and/or Goal Line" and "the respective roles of Giants Stadium and Baupost with respect to the pursuit of claims in the Lehman Bankruptcy in connection with the [Actual Rate Swaps]."  Schwartz Decl., Ex. A, Request Nos. 3 and 5.

stepped into Bank of America's shoes is hardly a secret—a transfer notice was filed nearly two years ago on the public docket, [Docket Nos. 18801 and 18802], with a certification of the transfer of all of Bank of America's rights in the Claim to Goal Line. This information was made public well before the parties began settlement negotiations in October 2011, and indeed, Goal Line's presence at those negotiations came as no surprise to Debtors.

26.     Nevertheless, on October 9, 2013, Baupost agreed to produce the Baupost Transfer Agreement, as located through a reasonable search for responsive documents, upon appropriate agreement between the parties regarding confidenitality.    Suppl. Schwartz Decl. ¶ 13.    Baupost believes Debtors already had sufficient documents by which to understand the "ownership of the Claims," including the Transfer Agreement and the Rule 3001(e)(2) transfer notice.  It was not until receiving Debtors' Opposition, which clarified the two specific categories of relevant documents sought by the Subpoena, that Baupost understood that Debtors sought the production of the transfer agreement governing its acquisition of Bank of America's interest in the Claims, a document which Baupost would have been happy to produce to Debtors in the first instance.  Debtors request for "basic information" concerning ownership of the Claims has been satisfied.

**C.    The Other Documents Sought by the Subpoena Are Irrelevant and Unnecessary to Debtors' Rule 2004 Investigation or Their Defenses Against the Claims.**

27.    Although Debtors attempt to appear reasonable by purporting to narrow the scope of the Subpoena in its Opposition to documents concerning the Claims transfer and the valuation of the Claims, *see supra* note 2, Debtors nevertheless fail to actually withdraw the Subpoena's remaining document requests.  Debtors, however, fail to articulate any reason why documents sought by the Subpoena, but which do not fall within the two categories of documents principally sought in their Opposition, are relevant or useful to Debtors.  Accordingly, Baupost also requests that the Court quash the Subpoena to the extent it seeks documents other than those concerning the Claims transfer and the valuation of the Claims.

## CONCLUSION

28.    For the reasons stated herein, Baupost respectfully requests that the Court enter an Order, pursuant to Rules 2004 and 9016 of the Federal Rules of Bankruptcy Procedure and Rule 45 of the Federal Rules of Civil Procedure, in the form attached to the Motion as Exhibit A, (i) quashing the Subpoena and (ii) granting such other and further relief as the Court deems just and proper.

Dated:  New York, New York
       October 11, 2013

Respectfully submitted,

**SULLIVAN & CROMWELL LLP**

By:     /s/_____

       Bruce E. Clark
       Matthew A. Schwartz
       SULLIVAN & CROMWELL LLP
       125 Broad Street
       New York, New York  10004
       Telephone:  (212) 558-4000
       Facsimile:  (212) 558-3588

       *Attorneys for Baupost Group, LLC*