STROOCK & STROOCK & LAVAN LLP
Kristopher M. Hansen
Kenneth Pasquale
180 Maiden Lane
New York, New York 10038-4982
Telephone: (212) 806-5400
Facsimile: (212) 806-6006

*Counsel to CarVal Investors, LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| | : |
| In re | : Chapter 11 |
| | : |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | : Case No. 08-13555 (JMP) |
| | : |
| Debtors. | : Jointly Administered |
| | : |

**MOTION OF CARVAL INVESTORS, LLC FOR LEAVE**
**TO EXAMINE LBHI PURSUANT**
**TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 2004**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

CarVal Investors, LLC (the "Movant"), in its capacity as manager of certain funds

holding in excess of $12 billion of notional claims against Lehman Brothers Holdings Inc.

("LBHI") and its U.S. debtor affiliates, as well as in excess of £2.1 billion of notional claims

against Lehman Brothers International (Europe) (in administration) ("LBIE"), hereby moves this

Court for an order pursuant to Bankruptcy Rule 2004 and this Court's individual rules directing

that LBHI and each of the members of the Board of Directors of LBHI (the "LBHI Board")

respond to the document requests contained in Schedule 1 attached to the proposed Order

attached hereto as Exhibit A, and provide for examination of (i) LBHI's representative, or

representatives, who are most knowledgeable about the matters set forth herein; (ii) certain

members of the LBHI Board, consisting of Frederick Arnold, Robert G. Gifford, Sean O.

Mahoney, and David Pauker (the "LBHI Board Members") and (iii) Daniel J. Ehrmann of

Alvarez & Marsal.  In support of this Motion (the "Motion"), the Movant states as follows:

## PRELIMINARY STATEMENT

1.     On October 1, 2013, LBHI and its U.K. subsidiary, LB Holdings Intermediate 2

Limited (in administration) ("LBHI2" and together with LBHI, the "Lehman Sellers")

announced that they had entered into a commitment letter (the "Commitment") with Elliott

Management Corporation and King Street Capital Management, L.P. (together, the "Proposed

Purchasers") to purchase certain claims (collectively, the "Claims") that LBHI2 holds against the

estate of LBIE, including LBHI2's £1.25 billion subordinated claim against LBIE (the "Proposed

Transaction").  The press release announcing the Proposed Transaction, a copy of which is

attached hereto as Exhibit B, stated that the purchase price for the Claims will be approximately

£650 million in cash plus the right of LBHI2 to receive future contingent amounts from the

Proposed Purchasers and to share in certain claims held by the Proposed Purchasers against

LBIE.  No additional information has been disclosed to date concerning the terms of the

Proposed Transaction.  Prior to announcing the Proposed Transaction, LBHI and its UK affiliates

had received various expressions of interest from different funds, which are all large creditors of

LBHI and its affiliates, for the acquisition of the Claims.  Those funds, including Movant, then

urged the estate fiduciaries to submit the sale of the Claims to a competitive bidding process.

2.     LBHI is the indirect majority creditor and ultimate shareholder of LBHI2, and

LBHI recently estimated that it will receive 87% of all distributions made by LBHI2.  In light of

the value of the Claims, one of the largest remaining asset in these Chapter 11 cases, the

Proposed Transaction will have a material impact on the distributions to LBHI's creditors,

including Movant.  Therefore, it is imperative that the Proposed Transaction maximize value to

the LBHI estate.  Notwithstanding the fact that the information made public concerning the

Proposed Transaction is extremely limited, it appears that the transaction severely undervalues the Claims.  This view is supported by the LBIE Joint Administrators' Tenth Progress Report for the Period From 15 March 2013 to 14 September 2013 (the "LBIE 10th Progress Report"), which was distributed on October 11, 2013, eleven days after the announcement of the Proposed Transaction.  The report suggests that there is significantly more value available to creditors of LBIE than was previously recognized, and that the Claims are worth substantially more than the announced purchase price of the Proposed Transaction.  As a holder of notional claims against LBIE in excess of £2.1 billion, Movant is very familiar with the likely amount of distributions by LBIE and concurs with the views expressed in the LBIE 10th Progress Report.

3.     Beyond being the indirect majority creditor and ultimate shareholder of LBHI2, LBHI also is a party to the Proposed Transaction.  As such, it appears to be undisputed that LBHI played a major role in the negotiation of the Proposed Transaction and the acceptance of its terms by the Lehman Sellers.  Notwithstanding the value of the Proposed Transaction, Movant understands that the sale was a "closed" process where competing bids were not solicited or considered.  This process stands in stark contrast to the sale by LBHI of other material assets, such as the sale of its claims against LBI, where a competitive process was undertaken to ensure the maximization of value.  It also is inconsistent with the requirement of the *Modified Third Amended Joint Chapter 11 Plan of LBHI and its Affiliated Debtors* [Docket No. 22973] (the "Plan") that LBHI, as Plan Administrator, "maximize Distributions to holders of Allowed Claims."  Plan Section 6.1(b)(iii).  Conducting a "closed" sale process is especially questionable in this instance, where the Claims constitute one of the largest remaining assets in these Chapter 11 cases, the disposition of which will materially impact distributions to LBHI's creditors.  It is not surprising that a "closed" sale – an unorthodox approach that contradicts

fundamental tenets of the Bankruptcy Code – whose terms remain undisclosed to anyone but the Lehman Sellers and the Proposed Purchasers, may not maximize value.

4.      As a significant creditor of LBHI, Movant is rightfully concerned about the possible failure of the Proposed Transaction to maximize value and the effect that will have on distributions made by LBHI.  Without receiving information on the Proposed Transaction, it is impossible to assess whether the Proposed Transaction maximizes value to the LBHI estate, or whether an alternative transaction might yield greater value.  The need for this analysis is amplified by the fact that, based on the information publicly available regarding the purchase price and the Claims, the Proposed Transaction appears to significantly undervalue the Claims. Therefore, Movant, along with other significant creditors of LBHI, has repeatedly requested information from LBHI about the Proposed Transaction on an informal basis to assess its impact on the LBHI estate.  LBHI has responded that due to constraints imposed by the terms of the Commitment, it cannot provide any information beyond that which is contained in an October 1, 2013 press release by LBHI2.  Thus, the only means available to obtain the information required to evaluate the Proposed Transaction is through intervention of the Court.

5.      The ultimate test for whether value is being maximized is the yardstick of competing bids.  On September 30, 2013, prior to the announcement of the Proposed Transaction on October 1, 2013, Movant delivered a letter, attached hereto as <u>Exhibit C</u>, to the LBHI Board expressing that "CarVal would like the opportunity to participate in any negotiations concerning such sale and to bid to acquire the Sub-Debt Interests."  On October 3, 2013, two days after the announcement of the Proposed Transaction, the chairman of the LBHI Board responded to Movant by letter, attached hereto as <u>Exhibit D</u>, stating that, due to certain terms of the Commitment, LBHI was not at liberty to discuss the Proposed Transaction beyond the scope of

4

the October 1, 2013 press release.  The chairman's letter did not address CarVal's request to bid on the Claims.

6.      Also on October 3, 2013, Movant, together with other managers of funds holding substantial claims against LBHI, made an offer by letter to the one of the joint administrators of LBHI2, attached hereto as <u>Exhibit E</u>, to purchase the Claims for £700 million in cash – £50 million more than the announced Proposed Transaction purchase price – and other contingent consideration.  The offer was not subject to any financing or diligence contingency.  The joint administrator responded by letter dated October 4, 2013, attached hereto as <u>Exhibit F</u>, that he was not in a position to consider the offer.  The joint administrator also stated that he had "consulted with LBHI, who indirectly, are the majority creditor of LBHI2 and they support the transaction [with the Proposed Purchasers]."

7.      On October 14, 2013, following the publication of the LBIE 10th Progress Report, Movant sent a letter to the joint administrators of LBHI2, attached hereto as <u>Exhibit G</u>, with a copy to a member of the LBHI Board, which contained an offer for the Claims of **£900 million** plus future contingent consideration and certain of Movant's rights against LBIE, without any financing conditions.  The fact that Movant has offered to **pay £250 million pounds more** for the Claims than the announced purchase price of the Proposed Transaction – a premium of almost 40% – strongly suggests that value is not being maximized through the Proposed Transaction for the LBHI estate.  At the very least, Movant's offer demonstrates the need for disclosure of the terms and the underlying facts of the Proposed Transaction so that the necessity and appropriateness of further relief can be determined.

8.      As discussed further below, Movant and several other large creditors attempted to obtain on a consensual basis the information necessary to evaluate the Proposed Transaction.  To

that end, Movant and several other large creditors of LBHI requested a meeting with the LBHI

Board to discuss the terms of the Proposed Transaction.  Although the LBHI Board agreed to the

meeting, the Board indicated that it could not – and ultimately it did not – discuss the terms of

the Proposed Transaction beyond the scope of the October 1, 2013 press release.  Moreover, on

October 9, 2013, another large creditor provided LBHI's counsel with a draft request for

information pursuant to Rule 2004; no information regarding the Prioposed Transaction was

provided in response.  Thus, without a Court order directing the production of the requested

information, LBHI and the LBHI Board will not provide any further information about the

Proposed Transaction or the facts and circumstances leading to the execution of the

Commitment.

       9.      It is Movant's understanding that the Proposed Transaction has not closed.

Movant, however, cannot attest to when the Proposed Transaction is scheduled to close because

LBHI has indicated in response to queries from Movant and other significant creditors that,

under the terms of the Commitment, LBHI cannot disclose that information.  Movant

respectfully submits that it is imperative that LBHI provide, prior to the closing of the Proposed

Transaction, the information necessary to determine whether value to the LBHI estate and its

creditors has been maximized.

## RELIEF REQUESTED

      10.      By this Motion, Movant requests entry of an order pursuant to Bankruptcy Rule

2004 authorizing and directing (i) the production, on an expedited basis, of documents by LBHI

and the LBHI Board Members in response to the document requests attached as Schedule 1 to

the proposed Order attached hereto as Exhibit A; (ii) the deposition of the representative, or

representatives, of LBHI who is most knowledgeable about the subject matters set forth in this

Motion; (iii) the deposition of certain of the LBHI Board Members and Daniel J. Ehrmann of

6

Alvarez & Marsal; (iv) the issuance of one or more subpoenas compelling such document

production and attendance at such deposition in the manner provided in Bankruptcy Rule 9016;

and (v) granting such other and further relief as the Court deems appropriate and just.

## JURISDICTION AND VENUE

11.     The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157

and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper

in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicate for the relief

requested in this Motion is Bankruptcy Rule 2004.  Article XIV of the Plan provides that the

Court retains exclusive jurisdiction of the matters requested in this Motion.

## PROCEDURAL BACKGROUND

12.     On September 15, 2008, LBHI filed a voluntary petition for relief under chapter

11 of title 11 of the United States Code.  LBHI's chapter 11 case is being jointly administered

with the cases of certain of its subsidiaries pursuant to Bankruptcy Rule 1015(b).

13.     On January 14, 2009, LBHI2 and certain other affiliates of LBHI were placed into

administration under the laws of England and Wales.  LBHI2 is currently being operated by joint

administrators appointed to manage its affairs (the "Joint Administrators").  LBHI is the ultimate

shareholder and indirect significant majority creditor of LBHI2.

14.     On December 6, 2011, the Court approved and entered an order confirming the

Plan.  The Plan became effective on March 6, 2012.

15.     The Plan appointed LBHI to serve as the Plan Administrator (the "Plan

Administrator") and to implement the provisions of the Plan, including controlling the wind

down and sale of assets of LBHI and LBHI's controlled entities as necessary to "maximize

Distributions to holders of Allowed Claims" against LBHI and its affiliated debtors.  Plan § 6.1

(a), (b)(iii).

16.     The Plan also provides that, subsequent to Plan confirmation, the LBHI Board is responsible for instructing and supervising LBHI, as the Plan Administrator, with respect to LBHI's responsibilities under the Plan.  Plan § 7.2(c)(i).

## FACTUAL BACKGROUND

17.     Movant manages funds that hold in excess of $12 billion of notional claims against LBHI and its U.S. debtor affiliates, as well as significant claims against LBHI's non-debtor affiliates.  Any value realized from the sale or other disposition of the Claims will have a material impact on distributions that creditors of LBHI, including Movant, will receive on account of their allowed claims against LBHI.

18.     On October 1, 2013, LBHI2's Joint Administrators issued the press release attached hereto as Exhibit B, which announced LBHI and LBHI2's entry into the Commitment and related terms.  Movant does not believe that competing bids were solicited or considered in connection with the Proposed Transaction.

19.     As stated in the press release, in addition to being a party to the Agreement, LBHI "is the ultimate shareholder and indirect significant majority creditor of LBHI2."  It does not appear to be disputed that LBHI, as Plan Administrator, Commitment counterparty, and LBHI2 shareholder and indirect majority creditor, played a significant part in the negotiation of the Proposed Transaction and the entry into the Commitment by the parties.

20.     The press release further states that, in connection with the Proposed Transaction, LBHI2 will receive an initial payment of approximately £650 million in cash plus the right to receive future contingent amounts and to share in certain claims against LBIE held by the Proposed Purchasers.  No further information is publicly available concerning the Proposed Transaction.

21.     On September 30, 2013, prior to the announcement of the Proposed Transaction on October 1, 2013, Movant delivered a letter to LBHI's Board expressing that "CarVal would like the opportunity to participate in any negotiations concerning such sale and to bid to acquire the Sub-Debt Interests."  On October 3, 2013, two days after the announcement of the Proposed Transaction, the chairman of the LBHI Board responded to Movant by letter stating that, due to certain terms of the Commitment, LBHI was not at liberty to discuss the Proposed Transaction beyond the scope of the October 1, 2013 press release.  The chairman's letter did not address Movant's request to bid on the Claims.

22.     On October 2, 2013, Movant, together with other managers of funds holding substantial claims against LBHI, sent a letter to the Joint Administrators of LBHI2 offering to purchase the Claims for £700 million in cash – £50 million more than the announced Proposed Transaction purchase price – and other contingent consideration.  The offer was not subject to any financing or diligence contingency.

23.     On October 3, 2013, the Movant, together with other managers of funds holding substantial claims against LBHI, sent a letter, attached hereto as Exhibit H, to the LBHI Board (i) reiterating their objections to the Proposed Transaction sale process, (ii) expressing their view that their offer of October 2, 2013 would result in significantly greater distributions to creditors of LBHI's estate, and (iii) requesting a meeting with the LBHI Board to discuss the Proposed Transaction and related sale process.

24.     On October 4, 2013, the LBHI Board responded by letter, attached hereto as Exhibit I, to the October 3, 2013 letter of Movant and managers of other funds.  The LBHI Board agreed to meet but indicated that, because of restrictions in the Commitment, the LBHI Board "will not be at liberty to discuss the terms of the transaction and related matters at the upcoming

meeting due to certain provisions of the commitment letter LBHI has entered into." The LBHI

Board also acknowledged that it "supported LBHI2's commitment decision, and also committed

LBHI to this transaction, because we believed it to be in the best interests of the Lehman estate

and its creditors."

25.    On October 14, 2013, Movant sent a letter to the joint administrators of LBHI2,

with a copy to a member of the LBHI Board, which contained an offer for the Claims of **£900**

**million** plus future contingent consideration and certain of Movant's rights against LBIE,

without any financing conditions.  Movant's offer is **£250 million pounds greater** than the

announced purchase price of the Proposed Transaction, which represents a premium of almost

40%.  This offer demonstrates that a competitive sale process is likely to increase value realized

by the LBHI estate on account of the Claims.

## ARGUMENT

26.    Bankruptcy Rule 2004(a) provides that "[o]n motion of any party in interest, the

court may order the examination of any entity." Fed. R. Bankr. P. 2004(a).  Bankruptcy Rule

2004(b) further provides that the scope of the examination may relate to "the acts, conduct, or

property or to the liabilities and financial condition of the debtor, or to any matter which may

affect the administration of the debtor's estate, or to the debtor's right to a discharge." Fed. R.

Bankr. P. 2004(b).

27.    The purpose of a Bankruptcy Rule 2004 examination is to assist a party in interest

in determining the nature and extent of the bankruptcy estate, revealing assets, and examining

transactions. *In re Recoton Corp.*, 307 B.R. 751, 755 (Bankr. S.D.N.Y. 2004) (granting Rule

2004 motion and stating that any third party who has relationship with a debtor is subject to Rule

2004 investigation).  Courts have consistently emphasized that the scope of a Bankruptcy Rule

2004 examination is extremely broad, broader than discovery available under the Federal Rules

of Civil Procedure, and can legitimately be in the nature of a "fishing expedition." *See, e.g., In re Hughes*, 281 B.R. 224, 226 (Bankr. S.D.N.Y. 2002) ("[I]t is well settled that the scope of examination allowed under Rule 2004 is broader than discovery allowed under the Federal Rules of Civil Procedure and may be in the nature of a 'fishing expedition'"); *see also In re Lehman Bros. Inc.*, 2008 WL 5423214 (Bankr. S.D.N.Y. 2008) ("The broad scope of Rule 2004 is well recognized."); *Recoton Corp.*, 307 B.R. at 756 ("The scope of Rule 2004 examination is very broad, broader even than discovery under the Federal Rules of Civil Procedure."). As such, a Bankruptcy Rule 2004 motion need not be tied to specific factual allegations at issue between parties. *See In re Symington*, 209 B.R. 678, 683 (Bankr. D. Md. 1997) (stating that Bankruptcy Rule 2004 permits "examination of any party without the requirement of a pending adversary proceeding or contested matter"). Moreover, Bankruptcy Rule 2004 can be employed after confirmation of a plan of reorganization to investigate matters related to the "administration of the case post-confirmation." *In re Express One Int'l*, 217 B.R. 215, 217 (Bankr. E.D. Tex. 1998) (granting post-confirmation Rule 2004 examination) (citing *In re Cinderella Clothing Indus., Inc.*, 93 B.R. 373 (Bankr. E.D. Pa. 1988).

28.     Movant is concerned that the Proposed Transaction will not maximize value for the LBHI estate, thereby reducing potential distributions to creditors. This concern is particularly justified following the recent issuance of the LBIE 10th Progress Report, which suggests that the Proposed Transaction significantly undervalues the Claims and results in a windfall to the Proposed Purchasers. In addition, the fact that Movant itself is willing to pay **£900 million** for the Claims – **£250 million more** than, and almost 40% above, the purchase price of the Proposed Transaction – suggests that the "closed" bidding process did not maximize value for the Claims. Upon information and belief, other significant creditors of LBHI are also

interested in bidding on the Claims in a competitive sale process, which may result in even greater value to the estate. It is incumbent on LBHI, as Plan Administrator, to endeavor to realize that value for the benefit of the LBHI estate and its creditors, consistent with its obligations under the Plan to maximize distributions on account of allowed claims.

29.    Movant, along with a number of other large creditors of LBHI, have made every possible attempt to obtain the information on the Proposed Transaction necessary to determine whether value has been maximized. Despite these efforts, it is clear that information will not be forthcoming absent intervention of this Court. The need for disclosure is especially warranted where, as here, a "closed" sale process has been conducted for one of the largest remaining assets in these Chapter 11 cases, without the solicitation or consideration of competing bids. The consideration of alternative offers for the sale of a major asset is the norm in bankruptcy, not the exception. To wit, LBHI has conducted robust, competitive processes for previous sales of material assets, including claims against affiliates such as LBI. It is unclear why LBHI has chosen to support the Proposed Transaction without market-testing its reasonableness. Even absent further analysis, a "closed" sale is not designed to yield the greatest value for the Claims. A "closed" sale for the Claims is a radical departure from the norm – and from fundamental tenets of the Bankruptcy Code – and is therefore an appropriate subject for Rule 2004 examination.

30.    In addition, the Plan is clear that, in exercising its authority, the Plan Administrator shall act "as necessary to maximize Distributions to holders of Allowed Claims." Plan Section 6.1(b)(iii). There is ample reason to believe that distributions are not being maximized through the Proposed Transaction. LBHI, as Plan Administrator, should seek to realize that value for the benefit of creditors, and its failure to do so calls its compliance with

12

Section 6.1(b)(iii) of the Plan into question.  Enforcing plan compliance is a central component of post-confirmation case administration.  One of the primary purposes, if not the primary purpose, of the Plan is to provide a mechanism to liquidate assets to maximize distributions for creditors holding allowed claims.  In this context, a proposed transaction in excess of $1 billion that will significantly impact LBHI creditor recoveries is undeniably an appropriate subject for inquiry and examination.  Moreover, to the extent the Proposed Transaction satisfies the Plan's mandate of maximizing value, it is unclear why the Lehman Sellers and the Proposed Purchasers would resist disclosing the information necessary to establish that fact.  Disclosure of the limited information sought through this Motion would either dispel any doubts concerning the Proposed Transaction or pave the way for an alternative transaction.

31.    The requested examination is limited to information regarding the administration of LBHI under the Plan and the liquidation of the Claims post-confirmation.  It is narrowly tailored to information necessary to analyze the Proposed Transaction and any alternative transactions considered by the LBHI Board, the impact on creditor recoveries, the availability of alternatives and the extent to which the Commitment has prohibited LBHI from supporting the solicitation of competing bids.  These issues are precisely the type of discovery Bankruptcy Rule 2004 permits.  In the event that LBHI, the LBHI Board or their respective advisors believe that they will not be able to respond to all of the requests immediately, Movant requests that LBHI and the LBHI Board produce documents on a rolling basis, beginning with the Commitment and any transaction documents and analyses concerning the Proposed Transaction that are readily available.  Movant respectfully submits that there would be no undue hardship to LBHI in allowing the requested examination. Any costs incurred by LBHI will be modest relative to the value of the Claims to LBHI's estate and its creditors.

13

32.    Movant respectfully submits that the disclosure of information on the terms of the

Proposed Transactions, and of the facts and circumstances that gave rise to the Proposed

Transaction, will enable LBHI's stakeholders to determine whether value is being maximized

and whether alternative transactions should be considered.  Transparency will also dispel

concerns that value is not being captured.  An opaque sale process will reduce the likelihood of

obtaining the best sale price and raise concerns about the fulfillment of the Plan's mandate.

**NO PRIOR REQUEST**

33.    No prior Motion for the relief requested herein has been made to this or any other

court.

**NOTICE**

34.    Pursuant to the Court's individual rules as set forth on the Court's website,

"[r]equests for 2004 orders may be submitted ex parte, but the Court, in its discretion, may

require notice and a hearing."  Movant has nonetheless provided courtesy copies of the Motion

(by email upon counsel) to LBHI and the LBHI Board.

*[remainder of page left blank by intention]*

## CONCLUSION

**WHEREFORE**, for the reasons stated herein, Movant respectfully requests that the Court enter an Order, pursuant to Bankruptcy Rule 2004, in the form attached hereto as <u>Exhibit A</u>:  (i) requiring the production of documents from LBHI and the LBHI Board Members responsive to the document requests attached as <u>Schedule 1</u> to the proposed Order; (ii) requiring LBHI to produce the representative, or representatives, for examination who are most knowledgeable about the subject matters set forth in this Motion; (iii) authorizing the deposition of certain of the LBHI Board Members and Daniel J. Ehrmann of Alvarez & Marsal; (iv) authorizing the issuance of one or more subpoenas compelling such document production and appearance for examination; and (v) granting such other and further relief as the Court deems just and proper.

Dated: New York, New York
October 15, 2013

**STROOCK & STROOCK & LAVAN LLP**

By:   /s/ Kenneth Pasquale
      Kristopher M. Hansen
      Kenneth Pasquale
      180 Maiden Lane
      New York, New York 10038-4982
      Telephone: (212) 806-5400
      Facsimile: (212) 806-6006

      *Counsel to CarVal Investors, LLC*

15

# EXHIBIT  A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| | : | |
| In re | : | Chapter 11 |
| | : | |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | : | Case No. 08-13555 (JMP) |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | |

### ORDER GRANTING MOTION OF CARVAL INVESTORS, LLC FOR LEAVE TO EXAMINE LBHI PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 2004

Upon consideration of the motion (the "Motion")[1] of CarVal Investors, LLC ("CarVal")

seeking an order, pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), granting CarVal leave to obtain documents from and examine under oath

Lehman Brothers Holdings Inc. ("LBHI") and the members of the Board of Directors of LBHI

(the "LBHI Board"), as more fully described in the Motion; and the Court having jurisdiction to

consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and

1334; and the Court having found and determined that the relief sought in the Motion is in the

best interests of the Debtors, their estates, creditors and other parties in interest, and that the legal

and factual bases set forth in the Motion establish just cause for the relief granted herein; and

after due deliberation and sufficient cause appearing therefor, it is

  1.  The Motion is GRANTED.

  2.  LBHI and each of the members of the LBHI Board shall respond to the document

requests contained in Schedule 1 attached hereto on or before October __, 2013 on a rolling

basis; *provided*, *that*, (i) the Commitment and (ii) any transaction documents and analyses

---

[1]  Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the
Motion.

concerning the Proposed Transaction that are readily available be produced to Movant immediately.

3.      LBHI and the LBHI Board Members shall designate an individual or individuals with knowledge of the matters and documents described in <u>Schedule 1</u> and produce such individual(s), as well as Daniel J. Ehrmann of Alvarez & Marsal, to be examined by CarVal under oath and in accordance with Bankruptcy Rule 2004 on such date and time and at such location as may be designated in writing by CarVal.

4.      CarVal may issue discovery requests and subpoenas as may be necessary to accomplish the discovery authorized by this Order.

5.      To the extent necessary, CarVal's rights are reserved to request additional documents and depositions under Bankruptcy Rule 2004 based on any information that may be revealed as a result of the documents provided pursuant to this Order.

6.      This Court retains jurisdiction to resolve all matters arising under or related to this Order, including any disputes regarding discovery, or any subpoena issued pursuant to this Order, that may arise between or among the parties, and to interpret, implement and enforce the provisions of this Order.

Dated: _____, 2013
      New York, New York

                                        _____
                                        HONORABLE JAMES M. PECK
                                        UNITED STATES BANKRUPTCY JUDGE

## **SCHEDULE 1**

Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure, CarVal Investors, LLC hereby requests that on or before October __, 2013 Lehman Brothers Holdings, Inc. ("LBHI") and each member of the LBHI Board (as defined below) produce for examination, inspection, or copying all documents in each of their possession, custody, or control that are responsive to the following requests for the production of documents (the "Requests") to Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, New York 10038 (Attn: Kristopher M. Hansen, Esq. and Kenneth Pasquale, Esq.), counsel to CarVal Investors, LLC.

## **DEFINITIONS**

The following definitions apply with respect to these Requests.  If a term in these Requests is not explicitly defined, it shall have the commonly accepted definition of the term.  In addition to the terms previously defined herein, the following terms used herein shall have the meanings set forth below:

1.    "Advisors" means lawyers, financial advisors (including, but not limited to, investment banks), accountants, brokers, consultants, or any other agents or representatives employed by LBHI or LBHI2 (as defined below) to evaluate, advise, or analyze the transfer or financial value of the Claims and Interests (as defined below), the terms and nature of the Proposed Transaction (as defined below), or the terms and nature of any other bids or expressions of interest for the Claims and Interests.

2.    "Claims and Interests" means, collectively, all claims of LBHI2 against, or interests of LBHI2 in, the estate of LBIE (as defined below), any interests in any such claims, or any portion of such claims, that are subject to the Proposed Transaction (as defined below). Claims and Interests as defined in these Requests shall include, but shall not be limited to, the subordinated notes between LBHI2 and LBIE, and any interest thereon.

3.    "Communication" means every manner of transmitting, receiving, or recording any transmission or receipt of facts, ideas, inquiries, or otherwise, including, but not limited to, oral or written statements or exchanges of words, thoughts, or ideas, conveyed or made by one person to another, whether in person, by telephone, letter, facsimile, e-mail, or by another process, electric, electronic, digital or otherwise and any documents delivered by one person to another.

4.    "Concerning" means relating to, referring to, describing, evidencing, or constituting.

5.    "Contingent Rights" means the right to receive future contingent rights, sums, or other consideration with respect to any of Claims and Interests.

6.    "Document" means "documents or electronically stored information" as used in Rule 34(a)(1)(A) of the Federal Rules of Civil Procedure.  A draft or non-identical copy of a Document is a separate Document within the meaning of this term.

7.    "Due Diligence Materials" means all Documents related to the process by which LBHI or LBHI2 (or their Advisors) provided information to any third parties (or their Advisors) for use in evaluating, analyzing, or considering the Claims and Interests for purchase, as well as

any Communications with any third parties (or their Advisors) that occurred in connection with that process.

8.      "Identify" means when referring to a person means to give, to the extent known, the person's full name, present or last known address, and present or last known place of employment.  Once a person has been identified in accordance with this paragraph, only the name of that person need be listed to a subsequent interrogatory requesting the identification of that person.  When referring to a Document, Identify means to give, to the extent known, the (i) type of Document; (ii) general subject matter; (iii) date of the Document; and (iv) its author(s), addressee(s), and recipient(s).

9.      "LBHI Board" means the Board of Directors of Lehman Brothers Holdings Inc.

10.     "LBHI2" means LB Holdings Intermediate 2 Limited (in Administration).

11.     "LBHI2 Joint Administrators" means the administrators of LHBI2, namely AV Lomas, SA Pearson, DA Howell, JG Parr, and GE Bruce.

12.     "LBIE" means Lehman Brothers International (Europe) (in Administration).

13.     "October 1 Press Release" means the press release issued on October 1, 2013, by LBHI2 announcing the Proposed Transaction.

14.     "Proposed Transaction" means the pending transaction between LBHI2 and the Purchasing Entities (as defined below) for the transfer of interests in the Claims and Interests, any future contingent sums and claims of the Purchasing Entities against LBIE, Concerning which the October 1 Press Release was issued, and any related transactions.

15.     "Purchasing Entities" means King Street Capital Management, Elliott Management Corporation, their relevant respective affiliates, and any other entity that is a party to any agreement Concerning the Proposed Transaction.

16.     The singular form of a word shall be interpreted as the plural form of the word, and the plural shall be interpreted as singular as necessary to give the word the broadest possible meaning.

## <u>INSTRUCTIONS</u>

1.      The Requests shall be deemed continuing in nature.  Any responsive Document later obtained or located shall promptly be produced.

2.      All Documents are to be produced as they are maintained in the normal course of business.  Documents attached to each other (physically or via electronic mail) should not be separated.

3.      Documents should be produced in a form as listed below in order of preference:

    a.      provide Documents in native electronic format (*e.g.*, Word (.doc), Excel (.xls) files) unmodified with all format information, equation(s) (mathematical or otherwise), metadata, and logical information intact;

    b.      provide Documents not available in native electronic format as described above in a searchable and printable electronic format such as .TIFF image file or Adobe PDF files, along with a certifying statement that the Documents being provided are not available in the electronic format described above; and

    c.      provide Documents not available in the electronic formats described above in hard copy.

4.      If there are no Documents responsive to any particular Request, please so state in a written response to that Request.

5.      Where a claim of privilege is asserted to withhold responsive Documents, Identify the nature of the privilege (including work product) that is being claimed and, if the privilege is governed by a particular state or country law, indicate the state's or country's privilege rule being invoked.  The following information shall also be provided in the objection unless divulgence of such information would cause disclosure of the allegedly privileged information:

    a.      For Documents:

        i.      the type of Document (*e.g.*, letter or memorandum);

        ii.      the general subject matter of the Document;

        iii.      the date of the Document; and

        iv.      the author of the Document, the addressees of the Document, and any other recipients, and, where not apparent, the relationship of the author, addressees, and recipients to each other.

    b.      For oral Communications:

        i.      the name of the person making the Communication and the names of persons present while the Communication was made and, where not apparent, the relationship of the persons present to the person making the Communication;

        ii.      the date and place of the Communication; and

        iii.      the general subject matter of the Communication.

6.      If a portion of an otherwise responsive Document contains information subject to a claim of privilege, those portions of the Document subject to the claim of privilege shall be

redacted from the Document, the instructions in the preceding paragraph shall be applicable and the rest of the Document shall be produced.

7.      If a Document called for by a Request has been lost, destroyed, or otherwise disposed of, please state in the written response to that Request (i) the author of the Document; (ii) each addressee and recipient of the Document; (iii) the date on which the Document was prepared; (iv) the date(s) on which the Document was received, and by whom in each instance; (v) a description of the Document's contents and subject matter; (vi) the date and manner of the Document's loss or destruction; (vii) the reason for its loss, destruction or disposal; (viii) if destroyed or disposed of, the name, title, and address of the person authorizing its destruction or disposal; (ix) the name, title, and address of the person who lost, destroyed, or disposed of the Document; and (x) a description of efforts undertaken to locate the Document (including any copies, whether in hard copy or electronic form).

8.      The following rules of construction apply to all Requests:

   a.      All/Any/Each:  The terms "all," "any" and "each" shall each be construed as encompassing any and all.

   b.      And/Or:  The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the Request all responses that might otherwise be construed to be outside of its scope.

   c.      Number:  The use of the singular form of any word includes the plural and vice versa.

9.      If you claim not to understand all or part of any Request, Definition or Instruction, please advise CarVal's counsel immediately so that any lack of understanding may promptly be corrected.

10.     Unless otherwise stated, these Requests cover Documents effective on or generated on or after January 1, 2013 through the date of LBHI's response to these Requests.

## REQUESTS FOR PRODUCTION

1.      All Documents Concerning any contract or other agreement between LBHI and/or LBHI2 and the Purchasing Entities.  This Request includes, but is not limited to, contracts or other agreements Concerning the Proposed Transaction.

2.      All minutes of each formal or informal meeting of the LBHI Board and/or any relevant committee of the LBHI Board at which the Proposed Transaction or any other bids or expressions of interest for the Claims and Interests were discussed.

3.      For any formal or informal meeting of the LBHI Board and/or any relevant committee of the LBHI Board at which the Proposed Transaction or any other bids or expressions of interest for the Claims and Interests were discussed: (i) all Documents created or

distributed Concerning such meeting(s); (ii) all Documents made available to the LBHI directors at such meeting(s); and (iii) all Documents distributed to participants following such meeting(s).

4.      All financial analyses prepared by LBHI or LBHI2 (or their Advisors) Concerning the impact of the Proposed Transaction or any other bids or expressions of interest for the Claims and Interests on the LBHI estate or LBHI creditor recoveries.

5.      All analyses prepared by LBHI or LBHI2 (or their Advisors) Concerning the terms and conditions of the Proposed Transaction or any other bids or expressions of interest for the Claims and Interests.

6.      All Documents provided by any of LBHI's or LBHI2's Advisors to LBHI or LBHI2 Concerning that Advisor's evaluation or review of the Proposed Transaction or any other bids or expressions of interest for the Claims and Interests.

7.      All Documents reviewed by the LBHI Board, any LBHI officer or executive, or the LBHI2 Joint Administrators in connection with reviewing the Proposed Transaction or any other bids or expressions of interest for the Claims and Interests.

8.      All Documents Concerning any bids or indications of interest received by LBHI or LBHI2 in connection with the Claims and Interests, the Proposed Transaction, or any other bids or expressions of interest for the Claims and Interests.

9.      All Documents Concerning any analysis prepared by LBHI or LBHI2 (or their Advisors) Concerning the expected recovery on any Contingent Rights LBHI or LBHI2 expects to obtain in connection with the Proposed Transaction, including, but not limited to, any analysis of the value of the "future contingent sums" referenced in the October 1 Press Release.

10.     Documents reflecting the precise terms and conditions of any rights LBHI or LBHI2 expects to obtain with respect to "certain claims against the LBIE estate held by the [Purchasing Entities]," as referenced in the October 1 Press Release.  This Request includes, but is not limited to, the amounts and nature of the "certain claims" referenced in the October 1 Press Release.

11.     All Documents Concerning any analysis prepared by LBHI or LBHI2 (or their Advisors) Concerning the expected recovery on any rights LBHI or LBHI2 expects to obtain with respect to "certain claims against the LBIE estate held by the [Purchasing Entities]," as referenced in the October 1 Press Release.

12.     All Documents Concerning any appraisal, valuation, opinion, or analysis conducted by LBHI or LBHI2 (or their Advisors) Concerning the current or future value of any or all of the Claims and Interests.

13.     Documents reflecting any Communications between LBIE (or anyone acting on LBIE's behalf) and LBHI and/or LBHI2 (or anyone acting on their behalf) Concerning the current or future value of the Claims and Interests.

14.        Documents reflecting any Communications between LBIE (or anyone acting on LBIE's behalf) and LBHI and/or LBHI2 (or anyone acting on their behalf) Concerning the Proposed Transaction or any other bids or expressions of interest for the Claims and Interests.

15.        Documents reflecting any Communications between LBHI, any member of the LBHI Board of Directors, LBHI2, the LBHI2 Joint Administrators, or LBIE, on the one hand, and any of the Purchasing Entities, on the other, Concerning the Claims and Interests.

# EXHIBIT  B



**pwc**

---

*Press Release*

*Date*                    **For immediate release, 1 October 2013**

## Lehman administrators announce £650m agreement which will benefit creditors

The joint administrators of LB Holdings Intermediate 2 Limited (in Administration) (**LBHI2**) today announced that LBHI2 has entered into a commitment letter and head of terms (the **Transaction**) with Elliott Management Corporation and certain of its affiliates (**Elliott**), King Street Capital Management, L.P. and certain of its affiliates (**King Street**) and Lehman Brothers Holdings Inc. (**LBHI**) in connection with the claims of LBHI2 in the estate of Lehman Brothers International (Europe) (in administration) (**LBIE**).

The Transaction provides for an initial payment to LBHI2 of approximately £650,000,000 along with the right to receive future contingent sums. In turn Elliott and King Street, alongside LBHI2 will acquire rights with respect to all of LBHI2's claims against LBIE.

The Transaction also provides for LBHI2 to share in certain claims against the LBIE estate held by Elliott and King Street.

Commenting on the announcement Derek Howell, joint administrator of LBHI2 said:

"I believe that the Transaction represents an excellent outcome for the creditors of LBHI2. Working closely with Elliott and King Street, I am hopeful that it will lead to an early resolution of the outstanding issues between LBHI2, Lehman Brothers Limited (in Administration) (LBL) and LBIE which, in turn, may serve to expedite the final resolution of all three administrations."

LBHI2 is the holder of the subordinated debt in LBIE. LBHI is the ultimate shareholder and indirect significant majority creditor of LBHI2. Elliott and King Street are significant creditors of LBIE.

### Ends

### About PwC

PwC helps organisations and individuals create the value they're looking for. We're a network of firms in 158 countries with more than 180,000 people who are committed to delivering quality in assurance, tax and advisory services. Tell us what matters to you and find out more by visiting us at www.pwc.com.

PwC refers to the PwC network and/or one or more of its member firms, each of which is a separate legal entity. Please see www.pwc.com/structure for further details.

2013 PricewaterhouseCoopers. All rights reserved

*PricewaterhouseCoopers LLP, 1 Embankment Place, London, WC2N 6RH*
*T: +44 (0)207 213 47 27 , www.ukmediacentre.pwc.com*

# **EXHIBIT  C**



September 30, 2013

**<u>Via Federal Express and Electronic Mail</u>**

Lehman Brothers Holdings Inc.
Attn: Board of Directors
1271 Avenue of the Americas
New York, New York 10020

To the Board of Directors of Lehman Brothers Holdings Inc:

We write on behalf of CarVal Investors ("CarVal") with respect to that certain €3.0 billion Long Term Subordinated Loan Facility, that certain $4.5 billion Long Term Subordinated Loan Facility, and that certain $8.0 billion Short Term Subordinated Loan Facility (collectively, the "Sub-Debt Facilities") between LB Holdings Intermediate 2 Limited ("LBHI2") and Lehman Brothers International (Europe) ("LBIE").

It is our understanding that LBHI2 is considering selling its rights and interests (the "Sub-Debt Interests") in the Sub-Debt Facilities. We further understand that Lehman Brothers Holdings Inc. ("LBHI") anticipates receiving in excess of 87% of all distributions made by LBHI2. As such, we understand that LBHI has significant input into any decisions made by LBHI2 with respect to the Sub-Debt Facilities.

CarVal would like the opportunity to participate in any negotiations concerning such sale and to bid to acquire the Sub-Debt Interests. CarVal holds substantial claims against Lehman Brothers Holdings Inc. and its affiliated entities (the "Lehman Brothers Group") and has participated in the insolvency proceedings of the Lehman Brothers Group from their inception.

Therefore, CarVal is in a position to make a credible and competitive bid for the Sub-Debt Interests that will maximize value for LBHI2 and all stakeholders.

Please contact Ryan Morrell at 952-984-4350 with respect to CarVal's request to bid on the Sub-Debt Interests. This request also has been made by letter to the Joint Administrators of LBHI2.

Sincerely,
John Brice
President

cc:    Daniel J. Ehrmann
        Alvarez & Marsal

CarVal Investors
9320 Excelsior Boulevard, 7th Floor
Hopkins, Minnesota 55343

www.carvalinvestors.com
PH +1 952 984 3774
FX +1 952 984 3905

# __EXHIBIT  D__

October 3, 2013

To:     John Brice, CarVal Investors
From:   Sean Mahoney, Lehman Brothers Holdings Inc.
Re:     LBIE Sub-Debt

---

John,

Thank you for your letter, dated September 30, 2013 (the "Letter"), expressing an interest in the purchase of certain claims (the "Claims") held by LBHI2 against LBIE based on the Sub-Debt Facilities (as defined in the Letter). I write to you in response to your Letter and on behalf of the Board of Directors of LBHI.

As you may be aware, LBHI2 issued a press release on October 1, 2013 in which it was announced that LBHI2 and LBHI have signed a commitment letter with Elliott Management Corporation and certain of its affiliates ("Elliott") and King Street Capital Management, L.P. and certain of its affiliates ("King Street") in connection with the Claims. As stated in the press release (enclosed herein), the contemplated transaction provides for an initial payment to LBH12 of £650 million along with the right to receive future contingent sums.

Due to certain provisions of the commitment letter agreed to by the parties (including LBHI), LBHI is not currently at liberty to discuss the contemplated transaction and related matters beyond the scope of the press release. I also confirm here that we received an additional letter from your firm and others this afternoon requesting a meeting on this topic, and our board will respond soon, most likely tomorrow, to that additional letter.

With best regards,

Sean Mahoney
Chairman
Lehman Brothers Holdings Inc.

cc:     F. Arnold, R. Gifford, T. Knott, D. Pauker, R. Tanemura, O. Thomas

# EXHIBIT  E

FAO:  Derek Howell (as Joint Administrator),
      LB Holdings Intermediate 2 Limited (in administration) ("**LBHI2**"),
      c/o PricewaterhouseCoopers LLP,
      Plumtree Court,
      London EC4A 4HT

Dear Derek,

**The sale of LBHI2's c.£1.25 billion subordinated claim against Lehman Brothers International
(Europe) (in administration) ("LBIE") (the "Claim")**

We refer to your recent public statement that you have entered into a commitment letter and heads of
terms with Elliott Management Corporation and certain of its affiliates ("**Elliott**"), King Street Capital
Management, L.P. and certain of its affiliates ("**King Street**") and Lehman Brothers Holdings Inc.
("**LBHI**") in connection with a sale of the Claim (the "**Sale**").

We understand that the Sale provides for an initial payment to LBHI2 of approximately £650 million,
together with the right to receive future contingent sums. In turn Elliott and King Street will acquire
all of LBHI2's rights in relation to the Claim.

We are deeply concerned that the agreed consideration for the Sale severely undervalues the Claim.
As you are no doubt aware, the Joint Administrators of LBHI2 are under a duty to get the best price
reasonably obtainable for the assets. In particular, in the current situation it is incumbent on the Joint
Administrators to run a robust, thorough sales process for the Claim in order to maximise returns for
all creditors. However, on the current facts, it is difficult to see how this has been achieved.

In light of the above, we would strongly recommend that you should invite further offers for the
Claim on a closed-bid process with final bids to be submitted within a relatively short timeframe.

Notwithstanding the above, however, we are nevertheless prepared to make an offer for the Claim on
the following basis:

- The cash consideration for a sale of the Claim to us would be an initial £700 million, together
  with (i) the right to receive certain future contingent sums under the Claim, and (ii) certain of
  our rights against LBIE post-sale (such rights to be discussed and agreed between ourselves in
  due course);

- Completion of the sale would occur no later than 6 p.m. on the business day falling seven (7)
  days after our offer is formally accepted; and

- We confirm that the above offer is not subject to any financing contingency nor any
  requirements for us to seek any prior internal approvals in order to conclude the transaction.

To the extent that you are not already familiar with our organisations and our track record as a
counterparty, we would be happy to provide you with such details.

We believe that the above offer maximises value for LBHI2's key stakeholders (specifically its
creditors as a whole). In particular, we are confident that we can structure a deal that offers the Joint
Administrators returns above those contemplated in the Sale.

The above offer is subject to documentation being formally agreed (however, we recognise that such
documentation would be based on terms customary for administration sales) and, as such, nothing in
this letter shall give rise to any legal obligation on any party other than in respect of confidentiality
issues as set out below.

This offer is strictly confidential and neither its existence nor any of its contents may, without our prior written consent, may be disclosed by you (except to your advisors or as required by law).

This letter shall be governed by, and construed in accordance with, English law.

Yours sincerely,

Attestor Capital

Carval Investors

Paulson & Co

The Baupost Group

# **EXHIBIT  F**

## LB Holdings Intermediate 2 Limited (in administration)

Attestor Capital, Carval Investors, Paulson & Co,
Davidson Kempner Capital Management and The
Baupost Group (together "The Group")

LB Holdings Intermediate 2 Limited
(in administration)
Level 23
25 Canada Square
London
E14 5LQ

**4 October 2013**

Dear Sirs,

**The sale of LBHI2's circa £1.25 billion subordinated claim against Lehman Brothers International (Europe) (in administration) ("LBIE") (the "Claim")**

Thank you for your letters of 2nd and 4th October 2013. I confirm that certain arrangements have been entered into with Elliott, King Street and LBHI as referred to in the public statement.

You will appreciate that the terms of the arrangement are such that I am not at liberty to disclose any greater detail about that arrangement. However, I can say that it is an extremely complex arrangement negotiated over many weeks and has a number of constituent parts. It is not a simple sale of debt. Moreover, there were special circumstances related, in part, to the existing holdings of debt by Elliott and King Street which made the arrangement achievable.

With regard to the duties of the administrators, you will appreciate that my obligation is to determine what is in the best interests of the creditors of LBHI2 - not the Lehman Estate generally. In determining whether a transaction is in the best interests of the creditors, administrators will, of course, look at the best price obtainable but also have to have regard to whether the proposal is deliverable. I am satisfied that the transaction that has been announced is in the best interests of LBHI2's creditors. Moreover, I have consulted with LBHI who, indirectly, are the majority creditor of LBHI2 and they support the transaction.

Therefore, I regret to say that I am not in a position to consider the Group's proposal at this juncture. However, if, for any reason, the present transaction does not proceed to completion, I would be happy to engage with you then.

Yours faithfully

D A Howell
For LB Holdings Intermediate 2 Limited (in Administration)
Joint Administrator

*AV Lomas, SA Pearson, DA Howell, GE Bruce and JG Parr were appointed as Joint Administrators of LB Holdings Intermediate 2 Limited to manage its affairs, business and property as agents without personal liability. AV Lomas, SA Pearson, DA Howell, GE Bruce and JG Parr are licensed in the United Kingdom to act as insolvency practitioners by the Institute of Chartered Accountants in England and Wales.*

*The Joint Administrators are Data Controllers of personal data as defined by the Data Protection Act 1998. PricewaterhouseCoopers LLP will act as Data Processor on their instructions. Personal data will be kept secure and processed only for matters relating to the Administration.*

# **EXHIBIT  G**



October 14, 2013

LB Holdings Intermediate 2 Limited (In Administration) (*LBHI2*)
Level 23
25 Canada Square
London, E14 5LQ

**Attn: AV Lomas, SA Pearson, DA Howell, JG Parr and GE Bruce as Joint Administrators (the *Joint Administrators*)**

To the Joint Administrators:

We refer to the announcement on October 1, 2013 that "[t]he Joint Administrators of LB Holdings Intermediate 2 Limited (in Administration) … today announced that LBHI2 has entered into a commitment letter and head of terms (the Transaction) with Elliott Management Corporation and certain of its affiliates (Elliott), King Street Capital Management, L.P. and certain of its affiliates (King Street) and Lehman Brothers Holdings Inc. (LBHI) in connection with the claims of LBHI2 in the estate of Lehman Brothers International (Europe) (in administration) (LBIE)" (the *Assets*).

We further understand from the announcement that the Transaction provides for an initial payment to LBHI2 of approximately £650,000,000 along with the right to receive future contingent sums and that "Elliott and King Street, alongside LBHI2 will acquire rights with respect to all of LBHI2's claims against LBIE." Further, the Transaction also provides for LBHI2 to share in certain claims against the LBIE estate held by Elliott and King Street.

Following the release of the LBIE 10th Administrator's Report, we believe that it is clear that there is substantially more value available to creditors of LBIE than previously recognized and that the agreed consideration for the transaction with Elliott and King Street **severely undervalues the Assets**.

In light of the above, CarVal is putting forth a higher offer to purchase the Assets on the following basis:

- The cash consideration for a sale of the Assets would be an initial £900,000,000, together with (i) the right to receive certain future contingent sums received by Carval in respect of the Assets, and (ii) certain of our rights against LBIE (such rights to be discussed and agreed between ourselves);
- Completion of the sale would occur no later than 6 p.m. on the business day falling seven (7) days after our offer is agreed;
- The above offer is not subject to any financing contingency, but is subject to contract;

Please contact Andrea Zambelli at 020-7292-7717 with respect to CarVal's request to bid on the Assets.

This letter is to be construed and governed by the laws of England and Wales.

Sincerely,

John R.S. Brice
President

---

9320 Excelsior Boulevard, 7th Floor
Hopkins, MN 55343

www.carvalinvestors.com
PH +1 952 984 3900
FX +1 952 984 3905

# EXHIBIT  H

October 3, 2013

TO THE BOARD OF DIRECTORS OF LEHMAN BROTHERS HOLDINGS INC.:

As you are probably aware, each of the undersigned is, or is the manager of funds that are, a substantial creditor or creditors of Lehman Brothers Holdings Inc. ("LBHI"). On Tuesday, October 1, 2013, the joint administrators of LB Holdings Intermediate 2 Limited (in Administration) ("LBHI2") announced that LBHI2 had entered into a commitment letter and head of terms (the "Proposed Transaction") with LBHI and certain other entities (the "Purchasing Entities") regarding the transfer to the Purchasing Entities of interests in the claims of LBHI2 against the estate of Lehman Brothers International (Europe) (in Administration) ("LBIE") (such claims being the "Claims"). As noted in this announcement, in addition to being a party to the Proposed Transaction, LBHI, "is the ultimate shareholder and indirect significant majority creditor of LBHI2." As such, it seems clear that LBHI (as Plan Administrator) and its Board of Directors (the "LBHI Board") played a substantial role in the Proposed Transaction and the process by which it came about.

We are writing at this time to set forth our strong objections, to the closed, "one bid" process that led to the Proposed Transaction and to the LBHI Board's decision to enter into what amounted to exclusive negotiations with the Purchasing Entities. In addition, we request an immediate meeting with the LBHI Board to discuss the details and substance of the Proposed Transaction, the process that led to the Proposed Transaction, the reasoning behind the Board's selection of that process, and any other matters relevant to our understanding of the appropriateness of the Proposed Transaction and the related process selected by the LBHI Board. To the extent possible, we would prefer to obtain this information consensually, without having to resort to more formal proceedings before the bankruptcy court (such as moving for examinations under Bankruptcy Rule 2004), but reserve all of our rights to do so. In light of the imminence of the Proposed Transaction, we ask that this meeting take place within the next 24 hours.

Some background will help place our concerns in prospective. On September 27, 2013, The Baupost Group ("Baupost") wrote to the LBHI Board to express Baupost's concern regarding the then-rumored sale of the Claims. This past Monday, Carval Investors ("Carval") sent a letter to the LBHI Board expressing Carval's interest in participating in negotiations for a purchase of the Claims. Baupost received a wholly unsatisfactory response to its letter, and Carval received no response at all.

Importantly, there has never been a denial of the fact that the LBHI Board (and LBHI, as Plan Administrator) would have a central and controlling role to play in any disposition of the Claims held by LBHI2. This is not surprising, since LBHI is the primary economic stakeholder in LBHI2. Meanwhile, it appears that the Plan Administrator and LBHI Board were proceeding with what can only be described as an extraordinary process (particularly for a billion dollar asset) – a closed, "one-bid" process, admitting of no other offers, that resulted in the proposed transaction. This

1

process seems to fall far short of the standard of conduct imposed on the Plan Administrator under the confirmed Plan of Reorganization.

The Plan makes it clear that, in exercising its authority, the Plan Administrator is subject to a far more demanding standard than some generic "business judgment" test. Section 6.1 of the Plan, which appoints LBHI as the Plan Administrator, states in Section 6.1(b)(iii) that the Plan Administrator shall:

> (iii) exercise its reasonable business judgment to direct and control the wind down, liquidation, sale and/or abandoning of the assets of the Debtors and/or Debtor-Controlled Entities under the Plan and in accordance with applicable law **as necessary to maximize Distributions to holders of Allowed Claims**;

(emphasis added).

In light of the substantial economic interest of LBHI in the value to be realized from the Claims held by LBHI2, there can be no serious question that this realized value will be a significant component of the "Distributions to Holders of Allowed Claims" against LBHI. Based on the facts currently available, it does not appear that LBHI, as Plan Administrator, acted to "maximize" those Distributions, as required by the Plan, when it entered into the Proposed Transaction through a closed bidding process. Because of this closed process, no one other than the Purchasing Entities was given an opportunity to submit a proposal for the Claims.

Now that the intention to sell interests in the Claims has been publicly disclosed, all of the undersigned other than DK Partners have submitted a proposal (in which DK plans to join) (the "Competing Proposal") to the LBHI2 joint administrators respecting the Claims. A copy of the Competing Proposal is attached. The undersigned believe that the Competing Proposal is demonstrably higher and better than the Proposed Transaction and would result in a significantly greater distribution to holders of Allowed Claims. As such, LBHI is under an affirmative duty under the terms of the confirmed Plan to consider the Competing Proposal so as to maximize Distributions to Holders of Allowed Claims.

We would like to conclude by reiterating the urgency with which we view this matter (again, involving the disposition of a billion dollar asset) and the need for an immediate meeting with the LBHI Board. If possible, we would prefer to resolve our concerns on a consensual basis with the LBHI Board, but each of us reserves all of our respective rights and remedies.

Thank you for your prompt attention to this very important matter.

Very truly yours,

Attestor Capital

CarVal Investors

Davidson Kempner Capital
Management LLC

Paulson & Co. Inc.

The Baupost Group

cc:    Lori R. Fife – Weil Gotshal & Manges LLP

# **EXHIBIT  I**

October 4, 2013

To: Attestor Capital, CarVal Investors, Davidson Kempner C.M. LLC, Paulson & Co. Inc., The Baupost Group

Dear Ladies and Gentlemen:

On behalf of the LBHI board, I am writing in response to your letter dated October 3, 2013, requesting a meeting with the board.   The board is very open to hearing the views of the estate's creditors, and we are prepared to schedule a meeting with you early next week.   A number of directors live out of town or have prior commitments, but we will ensure that a delegation of at least three directors, including myself and David Pauker, is available for this meeting.   Regarding timing of the meeting, I can assure you that waiting until next week to have the meeting will not prejudice you.

I think it is important to share several thoughts in advance.  First, although we look forward to a fuller discussion at some future date, we will not be at liberty to discuss the terms of the transaction and related matters at the upcoming meeting due to certain provisions of the commitment letter which LBHI has entered into.  As a result, we hope you will understand that the board members attending the meeting will be listening to your views, but will not be in a position to answer questions or provide comments on the transaction beyond the scope of the recent LBH12 press release.  Our counsel will be in attendance at the meeting, and we welcome having your counsel attend as well.  Please note that, with apologies for any inconvenience, all participants for the meeting should be present in person, and we will not be able to include participants by video or teleconference.

Second, although we cannot comment on specifics at this time, please be assured that this contemplated transaction is the result of very substantial work, careful consideration, and extensive review over an extended time period.  The LBHI board is extraordinarily sensitive to the estate's mission, and to our duties as stewards for the interests of the estate's creditors.  In this spirit, and after thorough consideration, we supported LBH12's commitment decision, and also committed LBHI to this transaction, because we believed it to be in the best interests of the Lehman estate and its creditors.  We look forward to discussing the details and rationale for the transaction in more detail in the future, once we are at liberty to do so.

We appreciate that this response and meeting format are not ideal from your perspective.  We hope you will understand that our approach reflects our strong desire to keep the lines of communication open with the estate's creditors, while also being mindful of the commitments LBHI has undertaken with respect to the proposed transaction.

Please let me know your potential availability on Monday and Tuesday to meet, as well as the likely creditor attendees, and we will organize the details on our end.

Very truly yours,



Sean Mahoney

Chairman

Lehman Brothers Holdings Inc.

Cc: F. Arnold, D. Pauker, R. Gifford, T. Knott, R. Tanemura, O. Thomas