ARNOLD & PORTER LLP
399 Park Avenue
New York, New York 10022
Telephone: (212) 715-1000
Facsimile: (212) 715-1399
Michael J. Canning
Richard M. Alexander
Nancy G. Milburn

*Attorneys for the Federal Housing Finance Agency as
Conservator of the Federal Home Loan Mortgage Corporation*

LANDMAN CORSI BALLAINE & FORD P.C.
120 Broadway
New York, New York 10271
Telephone: (212) 238-4800
Facsimile: (212) 238-4848
Mark S. Landman

*Attorneys for the Federal Home Loan Mortgage Corporation*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 Case No. 08-13555 (JMP) |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | |
| Debtors. | Jointly Administered |

**OPPOSITION OF THE FEDERAL HOUSING FINANCE AGENCY AND THE
FEDERAL HOME LOAN MORTGAGE CORPORATION TO LEHMAN BROTHERS
HOLDINGS INC.'S MOTION TO CLASSIFY AND ALLOW THE CLAIM FILED BY
THE FEDERAL HOME LOAN MORTGAGE CORPORATION
<u>(CLAIM NO. 33568) IN LBHI CLASS 3</u>**

The Federal Housing Finance Agency ("FHFA" or "Conservator"), as Conservator of the

Federal Home Loan Mortgage Corporation ("Freddie Mac"), pursuant to the Housing and

Economic Recovery Act of 2008 ("HERA"), 12 U.S.C. § 4501, *et seq.*, and Freddie Mac, hereby

oppose (the "Opposition")[1] the *Motion to Classify and Allow the Claim Filed by the Federal*

*Home Loan Mortgage Corporation (Claim No. 33568) in LBHI Class 3* (the "Motion to

Classify") filed by Lehman Brothers Holdings Inc. ("LBHI" or the "Plan Administrator"), as

Plan Administrator under the Modified Third Amended Joint Chapter 11 Plan of Lehman

Brothers Holdings, Inc. and Its Affiliated Debtors (the "Plan"), in the Bankruptcy Court on

September 13, 2013 [Docket No. 40066].  In support of this Opposition, FHFA and Freddie Mac

respectfully represent as follows:

## PRELIMINARY STATEMENT

1.    In its Motion to Classify, LBHI seeks to have this Court (i) classify and allow as a

senior unsecured claim in LBHI Class 3 under the Plan, the priority claim timely filed against

LBHI on account of unpaid loans in an undisputed amount of $1.2 billion, plus interest thereon,

provided to LBHI by Freddie Mac (the "HERA Priority Claim")[2] less than one month before

LBHI and certain of its subsidiaries commenced with this Court voluntary cases (the "Chapter 11

Cases") under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code"), rather

than as an LBHI Class 1 Claim entitled to a priority recovery under HERA, as asserted by

Freddie Mac in its Proof of Claim; and (ii) order the release of a cash reserve of $1.2 billion that

LBHI agreed to set aside pending resolution of the HERA Priority Claim, without regard to the

fact that such reserve was established pursuant to a stipulation among the parties that was so

---

[1]    LBHI agreed to consensually extend FHFA's and Freddie Mac's time to respond to the
Motion to Classify through October 17, 2013.

[2]    The HERA Priority Claim is attached hereto as Exhibit A.

ordered by this Court and agreed to as part of the consideration for the resolution of FHFA's and

Freddie Mac's objections to the Plan and to specifically ensure payment of the HERA Priority

Claim in the event such claim is determined to be entitled to a priority recovery pursuant to

Section 4617(b)(15)(D) of HERA.

2.       Moreover, without disputing that the HERA Priority Claim is a valid claim, LBHI

erroneously asserts that although HERA may empower FHFA with a right to recover fraudulent

transfers from third-party transferees of LBHI, it does not provide for a priority recovery against

the LBHI bankruptcy estate.  LBHI also erroneously asserts that there is no intention of Congress

expressed in HERA that the Conservator should have any priority rights in respect of property of

a Chapter 11 debtor.  LBHI further asserts without basis that Freddie Mac's and FHFA's failure

to commence any avoidance action against third parties, or otherwise to prosecute their claim

under HERA, now precludes Freddie Mac and FHFA from having any superior rights, or any

entitlement to a priority recovery from property of LBHI.  Finally, LBHI claims that the

continued maintenance of the $1.2 billion reserve is unfairly prejudicial to LBHI's other

creditors.

3.       LBHI is wrong on all accounts—asserting arguments that misstate and

mischaracterize HERA, misrepresent the facts, and ignore relevant case law in this Circuit.  In

the first instance, LBHI distorts the facts as to the prosecution of the HERA Priority Claim by

suggesting that Freddie Mac and FHFA have been dilatory in their pursuit of the HERA Priority

Claim.  For more than two years, however, Freddie Mac/FHFA have reached out to LBHI and its

representatives on a continuing basis in an effort to address and resolve the HERA Priority

Claim.  Rather than engage in purposeful discussions, LBHI has instead filed the Motion to

Classify, seeking to reclassify the HERA Priority Claim and to release the $1.2 billion reserve

without regard to its prior agreements set forth in the Plan and the related stipulation, all in an effort to now avoid the merits of the HERA Priority Claim and FHFA's Congressionally-mandated priority established under HERA.

4.      In the Motion to Classify, LBHI would have the Court believe that HERA does not alter or affect the priority rights of creditors as set forth in Section 507 of the Bankruptcy Code, and that Congress did not intend for HERA to otherwise grant the Conservator a priority recovery in a bankruptcy proceeding in respect of any valid claims arising under Section 4617(b)(15)(A). That is an unsupportable interpretation. In fact, the intent of Congress could not be clearer—Section 4617(b)(15)(D) specifically provides that "[t]he rights under this paragraph of the conservator or receiver described under subparagraph (A) shall be superior to any rights of a trustee or any other party (other than any party which is a Federal agency) under title 11," and thereby grants the Conservator rights that are superior not only to a Chapter 11 trustee, but to "any other party" under title 11. Indeed, LBHI entered into an agreement with Freddie Mac and FHFA that in the event it is determined that Freddie Mac and FHFA are entitled to a claim under Section 4617(b)(15)(A) in respect of the HERA Priority Claim, they shall receive a priority recovery on account of such claim pursuant to the confirmed Plan and the order of this Court approving the Plan and related stipulation among the parties setting aside the $1.2 billion reserve that LBHI now seeks wrongfully to divert to other creditors.

5.      LBHI argues that to the extent that HERA grants the Conservator the right to a priority recovery in respect of claims found to be fraudulent as to Freddie Mac or FHFA under Section 4617(b)(15)(A), HERA merely provides the Conservator with the authority to avoid transfers made by LBHI to third-party transferees, and to recover such transfers only from such third party transferees to the extent such transfers were made by LBHI with the intent to hinder,

delay, or defraud Freddie Mac.  LBHI further erroneously suggests that because Freddie Mac and

FHFA failed to identify any specific transfers to third parties in the Proof of Claim in respect of

the HERA Priority Claim, or to initiate actions against any such third-party transferees, there are

no "superior" rights to the recovery of any property under HERA.  In fact, HERA does not limit

the Conservator's recovery to amounts transferred by a debtor of a regulated entity to third

parties.  Pursuant to Section 4617(b)(15)(A), HERA authorizes FHFA, as Conservator of Freddie

Mac, to avoid and recover not only the value of any property transferred, but also any obligation

incurred, in each case to the extent any such transfer was made or such obligation was incurred

with the intent to hinder, delay, or defraud such regulated entity or FHFA, with any such claim

recoverable from such debtor or the bankruptcy estate of such debtor.[3]  LBHI is clearly such a

party under HERA.

      6.     Additionally, and not in lieu of the Conservator's right to recover from a debtor of

a regulated entity in respect of a claim under Section 4617(b)(15)(A), HERA also grants the

Conservator the permissive right under Section 4617(b)(15)(B) to seek recovery directly from

any third-party transferee, or any immediate or mediate transferee, that received a transfer from a

debtor of a regulated entity, to the extent such transfer gives rise to a claim under Section

4617(b)(15)(A).  This additional right to proceed against third parties is not the exclusive remedy

available to FHFA, however, but supplements the Conservator's right under subparagraph (A) to

avoid any transfers and obligations fraudulently made or incurred, and to recover the amount of

the avoided debt or funds transferred from the offending debtor of the regulated entity or its

bankruptcy estate.

---

[3]    The rights of FHFA in this regard are also applicable with respect to any transfers made or
obligations incurred by an entity-affiliated party pursuant to Section 4617(b)(15)(A).

7.      LBHI's unfounded suggestion that Freddie Mac and FHFA have been dilatory in that they should have identified fraudulent transfers and initiated separate, direct actions against third-party transferees some time ago is inapposite of the guidance and direction provided by the Second Circuit in *In re Colonial Realty Co.* 980 F.2d 125 (2d Cir. 1992). Specifically, in addressing the interaction between a debtor and a government agency with respect to the recovery of transfers that were potentially fraudulent as to both the debtor and the government agency, the Second Circuit, in interpreting the Financial Institutions Regulation and Reform Act ("FIRREA")—a statute similar to HERA—found that if a debtor uses procedures provided in the Bankruptcy Code to address the recovery of an applicable transfer, and such transfer was ultimately determined to be fraudulent as to the government agency under FIRREA, the government agency would be entitled to a priority recovery in respect of such transfer. Here, under a similar statutory provision, that is precisely the protocol the Conservator has followed, as the Debtors have previously recovered funds on account of pre-petition transfers or, in some cases, are currently engaged in litigation seeking to recover such transfers, and Freddie Mac and FHFA have been monitoring such recovery efforts while pursuing the HERA Priority Claim.[4]

8.      Finally, in the Motion to Classify, LBHI asserts that it is pursuing the Motion to Classify so as to avoid prejudice to other creditors occasioned by the continued maintenance of the $1.2 billion reserve previously agreed to by the parties and so ordered by this Court. In fact, the only meaningful impact on other creditors is a potential delay in recovery, which ironically is largely a result of LBHI's failure to engage in meaningful discussions to resolve the HERA Priority Claim. In stark contrast, an improper, premature release of the reserve would impose

---

[4]    Notwithstanding that FHFA has not initiated its own actions to date, FHFA retains the discretion granted by Congress to pursue its rights, powers, and remedies in accordance with HERA.

irreparable harm upon and prejudice to Freddie Mac and the Conservator by eliminating the agreed upon reserve prior to a final resolution in respect of the HERA Priority Claim, a result that could leave insufficient funds remaining in the Debtors' estate to pay the HERA Priority Claim.

9.    As LBHI has failed to show any legitimate entitlement to the relief it seeks, the Motion to Classify should be denied.

## BACKGROUND AND FACTS

10.    Freddie Mac is a government-sponsored enterprise that provides liquidity, stability and affordability to the United States housing market by purchasing mortgage loans and mortgage-related securities for investment, and by pooling mortgages purchased from banks and issuing guaranteed mortgage-backed securities to institutional investors.[5]    In this regard, Freddie Mac plays a critical role in the mortgage finance market in the United States, and is inextricably interwoven into the nation's financial system.

11.    Congress enacted HERA on July 30, 2008, in response to the national economic crisis.[6]    HERA created FHFA as an "independent agency of the Federal Government" vested with the responsibility of regulating and supervising Freddie Mac and the Federal National Mortgage Association ("Fannie Mae"), two government-sponsored entities that, in view of the nationwide economic crisis at the time HERA was enacted, were anticipated to experience difficulties.[7]

---

[5]    *See* Case Study:  Freddie Mac's Unsecured Lending to Lehman Brothers Prior to Lehman Brothers' Bankruptcy; FHFA, Office of Inspector General (Mar. 14, 2013) (the "FHFA Report"), at 6 (a copy of the FHFA Report is attached to the Motion to Classify as Exhibit A thereto).

[6]    *See* Housing and Economic Recovery Act of 2008, Pub. L. No. 110-289, 122 Stat. 2654 (2008).

[7]    *See* H.R. Rep. No. 109-171, pt. 1, at 81 (2005).

12.    On September 6, 2008, pursuant to the authority granted under HERA, and after determining that Freddie Mac and Fannie Mae could not "continue to operate safely and soundly and fulfill their critical public mission," the Director of FHFA placed Freddie Mac and Fannie Mae under the conservatorship of FHFA.[8]  Upon being appointed Conservator, FHFA "immediately succeeded to all rights, titles, powers, and privileges of [Fannie Mae and Freddie Mac]," and was empowered to "preserve and conserve assets and property" of the government sponsored entities, to "collect all obligations and money due to the regulated entity," and to "take such action as may be . . . necessary to put [Freddie Mac and Fannie Mae] in a sound and solvent condition."[9]  To that end, Congress granted FHFA special powers to accomplish its statutory mission.

13.    Freddie Mac collects billions of dollars each month on account of principal and interest payments made by mortgagors, and subsequently distributes such funds to the holders of such mortgages or the beneficiaries of the securities backed by such mortgages.  In the interim period between when Freddie Mac receives the applicable principal and interest payments on the underlying mortgages and when it is required to distribute such funds to the applicable holders or beneficiaries thereof, Freddie Mac invests such funds (the "Invested Funds") in short-term financial instruments, or makes loans to creditworthy counterparties, with such loans generally repayable immediately prior to the time when Freddie Mac is required to make payment to the holders or beneficiaries of the applicable mortgages or mortgage-backed securities. With respect to these investment activities, Freddie Mac maintains a counterparty credit risk management

---

[8]    Statement of FHFA Director James B. Lockhart, at 5 (Sept. 7, 2008), *available at* http://www.fhfa.gov/webfiles/23/FHFAStatement9708final.pdf.

[9]    *See* 12 U.S.C. §§ 4617(b)(2)(A), (b)(2)(B)(ii), (b)(2)(B)(iv), and (b)(2)(D)(i).

group within its Investments and Capital Markets Division.[10]  This group is charged with continually assessing the safety and soundness of potential counterparties with whom Freddie Mac invests the Invested Funds.[11]

14.    Between January and August 2008, Freddie Mac made monthly loans ranging from $1 billion to $1.2 billion to LBHI,[12] which LBHI used to meet its liquidity needs.  These loans were generally made during the third week of the applicable month and repayable on or about the middle of the following month.

15.    Following the collapse of Bear Stearns in March 2008, key credit officers within the counterparty credit risk management group at Freddie Mac raised concerns regarding the creditworthiness and liquidity of LBHI.[13]  Indeed, on at least two occasions during the summer of 2008, Freddie Mac initiated and participated in separate, direct discussions with LBHI to inquire specifically as to LBHI's financial stability, creditworthiness, and liquidity.  In each instance, without regard to the actual facts and circumstances of LBHI's financial condition, as subsequently established by the Examiner Report and other sources, Freddie Mac was assured that LBHI was in a strong financial condition, with ample liquidity.  FHFA intends to demonstrate that, in fact, LBHI made significant misrepresentations concerning LBHI's financial health and liquidity position, and that LBHI had significantly less liquidity than was affirmatively represented to Freddie Mac.  Moreover, FHFA believes that it is now clear that at the time of the incurrence of the subject loans, LBHI knew that it was facing a liquidity crisis

---

[10]    FHFA Report, at 9.

[11]    *Id.* at 9-10.

[12]    *See* Report of Anton Valukas, Examiner, Mar. 10, 2010 (the "Examiner Report"), at 1952 [Docket No. 7531].

[13]    FHFA Report, at 11.

arising from a loss of market confidence, making it impossible for LBHI to continue its businesses and satisfy its funding requirements in the ordinary course.[14]

16.    Based on LBHI's repeated assurances as to its financial creditworthiness and liquidity, and unaware of the actual financial crisis and insolvency then facing LBHI, despite direct inquiry of LBHI in this regard, on August 19, 2008, Freddie Mac loaned LBHI $450,000,000, and on August 20, 2008, Freddie Mac loaned LBHI another $750,000,000 (collectively, the "August Loans").[15]  Although Freddie Mac and LBHI generally referred to these loans as "Fed Funds," the August Loans, like all previous loans, were not in fact true Fed Funds transactions between member banks and the Federal Reserve System, but were short-term unsecured loans between two financial institutions.[16]  The August Loans were scheduled to be repaid on September 15, 2008, on an "early return" basis—meaning that repayment would be completed before the markets opened on September 15, 2008.[17]

17.    Unknown to Freddie Mac, almost immediately after the incurrence of the August Loans, LBHI began transferring assets to other parties at a time when, Freddie Mac and FHFA assert, LBHI knew that a necessary consequence of such actions would be its inability to timely repay the August Loans.  Indeed, during the two-three week period immediately prior to the commencement of the Chapter 11 Cases, LBHI transferred literally billions of dollars to third parties, including to financial institutions such as JP Morgan and CitiBank, all as set forth in the

---

[14]    *See* Examiner Report, at 10, 645, 717.
[15]    *See id.* at 1952.
[16]    *See id.* at 1952 n.7231.
[17]    *See* HERA Priority Claim.

Examiner Report,[18] the result of which, FHFA and Freddie Mac assert, was to leave LBHI unable to pay its obligations to Freddie Mac as they came due.

18.    Then, even though FHFA will demonstrate that LBHI initially took certain steps required to prepare for the repayment of the August Loans on Friday, September 12, 2008, and issued the requisite wire instructions to that effect, the repayment process was inexplicably halted over the weekend of September 12-15, 2008, notwithstanding the fact that LBHI continued to withdraw funds from the account used to repay Freddie Mac and transfer such funds to other institutions and counterparties,[19] all without regard to the fact that in doing so there would be insufficient funds available to repay the August Loans on the morning of September 15, 2008.

19.    On September 15, 2008 (the "Petition Date"), LBHI and certain of its subsidiaries (collectively, the "Debtors") commenced the Chapter 11 Cases under the Bankruptcy Code.[20]

20.    Thereafter, on September 22, 2009, Proof of Claim No. 33568 in the amount of $1,202,241,875 was timely filed. On the Proof of Claim itself, in paragraph 5, Freddie Mac noted "see attached re: 12 USC 4617(b)(15) priority," and, in the Addendum to the Proof of Claim, Freddie Mac stated, "the Conservator, on behalf of Freddie Mac, reserves all its rights pursuant to its statutory authorization, including with respect to the transfer of any property in which [LBHI] had an interest to the extent such transfer was made with the intent to hinder or delay the 'early return' payment of the $1.2 billion due and owing to Freddie Mac on

---

[18]    *See generally* Examiner Report, Vols. 4 -5.

[19]    *See id.* at 1955 n.7429, and sources cited therein.

[20]    Although Freddie Mac was one of LBHI's largest creditors at the time of LBHI's bankruptcy filing, Freddie Mac inexplicably was not listed among its 30-largest unsecured creditors, and, thus did not receive crucial notice of critical motions in the early days of the Chapter 11 Cases.

September 15, 2008, for which claim is made hereunder, with any recovery on account of such claim being entitled to a priority recovery under Section 4617(b)(15)(D)."[21]

21.    On or about July 1, 2011, the Debtors filed their second amended plan and a related disclosure statement [Docket No. 18205]. Freddie Mac, together with FHFA as Conservator thereof, thereupon raised objections to the disclosure statement directly with counsel to the Debtors on the grounds that, *inter alia*, the disclosure statement failed to provide adequate disclosure regarding the priority being sought with respect to the HERA Priority Claim.[22] Specifically, the disclosure statement and the plan failed to acknowledge the priority being asserted in respect of the HERA Priority Claim, and the effect on the confirmability of the plan and the estimated recoveries to creditors if it was ultimately determined that Freddie Mac and FHFA were entitled to a priority recovery on account of the HERA Priority Claim due to the rights, titles, powers, and privileges of FHFA under HERA.

22.    After considerable discussions among counsel to each of the Debtors, Freddie Mac, and FHFA, the parties agreed on language to be included in the disclosure statement approved by the Court on September 1, 2011 (the "Disclosure Statement"): (i) addressing the HERA Priority Claim and the associated priority being asserted with respect thereto under HERA; and (ii) reserving the parties' respective rights, including, specifically, FHFA's rights, titles, powers, and privileges under HERA as the Conservator.[23]

---

[21]    *See* Proof of Claim No. 33568, at ¶ 3.

[22]    *See* Stipulation and Agreement By and Among Fannie Mae, Freddie Mac and the Debtors Regarding the Debtors' Third Amended Plan, So Order and Entered by the Bankruptcy Court on December 6, 2011(the "Plan Stipulation"), at 8 [Docket No. 22998]. The Plan Stipulation is attached hereto as Exhibit B.

[23]    *See* Disclosure Statement, at 53 [Docket No. 19629].

23.    Prior to confirmation of the Plan on December 6, 2011, Freddie Mac and FHFA also informally raised objections with the Debtors with respect to, *inter alia*, the classification and priority treatment of the HERA Priority Claim.[24] Specifically, Freddie Mac and FHFA informally objected to the confirmation of the Plan to the extent that it failed to provide any class for recovery on account of the HERA Priority Claim to the extent such claim was ultimately determined to be entitled to a priority recovery under HERA.[25]

24.    In order to resolve Freddie Mac's and FHFA's objection that the failure to provide treatment for a validly asserted priority claim could result in the non-confirmability of the Plan, the Debtors proposed to amend the definition of "Priority Non-Tax Claim" in the Plan so as to provide an appropriate treatment in respect of any claims entitled to a priority recovery under HERA. To that end, in connection with the confirmation of the Plan, the Debtors amended the definition of "Priority Non-Tax Claim[s]" in the Plan to "mean[] any Claim, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment under section 507(a) of the Bankruptcy Code *or under 12 U.S.C. § 4617(b)(15)*."[26]

25.    In furtherance of the agreement reached among the Debtors, Freddie Mac and FHFA as to the treatment that would be accorded to the HERA Priority Claim to the extent it was ultimately determined that such claim was entitled to a priority recovery under HERA, at the hearing on the confirmation of the Plan, on December 6, 2011, the Court "So Ordered" the Plan Stipulation among the parties, which provided, *inter alia*, for the establishment of a cash reserve

---

[24]    *See* Plan Stipulation, at 9.

[25]    *See id.*

[26]    *See* Plan, §1.127, Ex. A to the Confirmation Order [Docket No. 23023] (emphasis added).
        In comparison, the definition of "General Unsecured Claim" was defined in the Plan to mean "any Claim *other than* an Administrative Expense Claim, a Priority Tax Claim, a Priority Non-Tax Claim, a Secured Claim . . . ." *Id.* at § 1.60 (emphasis added).

in respect of the HERA Priority Claim in the amount of $1.2 billion and otherwise reserved all of the statutory rights, titles, powers, and privileges of FHFA under HERA.[27] Specifically, the Plan Stipulation provides, among other things, that in order to ensure that Freddie Mac and/or FHFA "shall receive any priority recovery under or in respect of the Third Amended Plan determined to be payable on account of all or any portion of the [HERA Priority Claim] . . . the Debtors shall establish cash reserves on account of the . . . [HERA Priority Claim] in the amount of $1,202,241,875.00," and that, "[n]othing in this Stipulation, the Third Amended Plan (or any amendments, exhibits, supplements, or agreements filed or entered into incident thereto, or the confirmation thereof), the Confirmation Order, or any other pleadings or documents filed in connection therewith, shall affect, limit, enjoin or otherwise prejudice FHFA's rights, titles, powers, and privileges under HERA as the Conservator, including, without limitation the rights of Fannie Mae and/or Freddie Mac, or FHFA as Conservator thereof, to seek priority status and recovery in respect of the [claim of Freddie Mac], and nothing in the Third Amended Plan or Confirmation Order shall be construed to restrain or limit any applicable regulatory or enforcement action that may be taken by FHFA, or to confer exclusive jurisdiction of the Bankruptcy Court over matters in respect of Fannie Mae, Freddie Mac, or FHFA as Conservator thereof."[28]

26.    Immediately following the effective date of the Plan, which occurred on March 6, 2012 (the "Effective Date"), Freddie Mac, Fannie Mae and FHFA engaged in extensive discussions with LBHI regarding the resolution and allowance of all of the claims filed by each of Freddie Mac and Fannie Mae in the Chapter 11 Cases, including, specifically, the HERA

---

[27]    *See* Plan Stipulation, at ¶ 2.
[28]    *See id.* at ¶¶ 2, 4.

Priority Claim. Indeed, as part of this effort, Freddie Mac and Fannie Mae provided the Debtors with access to significant relevant underlying data, expert reports and samplings, as applicable, in an effort to reach consensual resolution of these claims.

27.    In late summer of 2012, however, LBHI generally disengaged from such discussions with Freddie Mac, Fannie Mae and FHFA regarding their claims filed in the Chapter 11 Cases. Although the parties thereafter engaged in periodic discussions throughout the summer of 2013, to Freddie Mac's and FHFA's surprise, LBHI once again essentially disengaged in the early fall and, after two months of silence, filed the Motion to Classify.

## ARGUMENT

28.    LBHI's Motion to Classify raises two fundamental objections to the HERA Priority Claim, both requiring a Court to interpret Section 4617(b)(15) of HERA. Specifically, LBHI argues that (i) HERA does not grant a priority recovery in respect of the HERA Priority Claim, and (ii) if Freddie Mac and FHFA are, in fact, entitled to a priority recovery under Section 4617(b)(15) of HERA related to the HERA Priority Claim, such recovery is limited only to recoveries from third-party transferees and not against property of LBHI.

### 1.    The Housing and Economic Recovery Act of 2008

29.    In July 2008, Congress passed HERA. *See* Pub. L. No. 110-289, 122 Stat. 2654 (2008). As the Second Circuit has explained, "Congress . . . created FHFA in response to the housing and economic crisis, precisely because it wanted to address the dire financial condition of Fannie Mae and Freddie Mac." *See Fed. Hous. Fin. Agency v. UBS Americas Inc.*, 712 F.3d 136, 142 (2d Cir. 2013). Pursuant to Congress's enactment of HERA, FHFA has the responsibility, *inter alia*, to ensure the safety and soundness of Fannie Mae and Freddie Mac, and to protect the U.S. housing market. Congress accorded FHFA broad powers to fulfill its

statutory mandate by permitting the Director to appoint FHFA as Conservator, and by providing

the Conservator with the authority to "preserve and conserve assets" of the government

sponsored entities, including by commencing lawsuits on behalf of Freddie Mac, "collect[ing] all

obligations and money due to the regulated entity," and recovering fraudulent transfers. *See,*

*e.g.*, 12 U.S.C. § 4617(b)(2); *accord Town of Babylon v. FHFA*, 790 F. Supp. 2d 47, 50

(E.D.N.Y. 2011) ("In its capacity as a conservator, FHFA is charged by statute with the

responsibility of, *inter alia*, identifying and minimizing further financial risk to the GSE's to

ensure their future economic safety and viability."), *aff'd*, 669 F.3d 221 (2d Cir. 2012).[29]

30.    Moreover, in conferring these broad powers upon the Conservator to "preserve

and conserve [the GSEs'] assets and property," Congress gave FHFA the right to "take such

action as may be . . . necessary to put the [GSEs] in a sound and solvent condition." *See* 12

U.S.C. § 4617(b)(2)(D);[30] *see also Natural Res. Def. Council, Inc. v. FHFA*, 815 F. Supp. 2d

630, 642 (S.D.N.Y. 2011) ("Under HERA, the FHFA has the authority to preserve and conserve

the assets of the Enterprises, as well as take any action to put the Enterprises in a sound and

solvent condition."), *aff'd*, 699 F.3d 221 (2d Cir. 2012); *accord UBS Americas Inc.*, 712 F.3d at

142 (same) (citing 12 U.S.C. § 4617(b)(2)(B)(ii), (D)); *Town of Babylon*, 790 F. Supp. 2d at 50

(noting that, "[a]dditionally, as conservator, FHFA is broadly entitled to 'take any action

---

[29]    After the passage of HERA, it quickly became apparent that Freddie Mac and Fannie Mae
could not continue to operate without infusions of billions of taxpayer dollars by the U.S.
Department of Treasury ("Treasury"). Treasury entered into Preferred Stock Purchase
Agreements with the Conservator, which was acting on behalf of Freddie Mac and Fannie Mae,
to ensure that they maintained positive net worths and avoided receivership, which would have
worsened the financial crisis. The Conservator is authorized to draw on that Agreement at the
end of each quarter to make up any deficiency in Freddie Mac's and Fannie Mae's net worth.
Through September 30, 2013, Treasury has advanced $188 billion to the regulated entities
through the Conservator's draws. *See*
http://www.fhfa.gov/webfiles/25343/TSYSupport%2020130702.pdf.

[30]    In addressing FHFA's powers as Conservator, Congress specifically referenced FHFA's
right to "collect all obligations and money due to [Fannie Mae and Freddie Mac]." 12 U.S.C.
§ 4617(b)(2)(B)(ii).

authorized by [the federal banking statute], which [it] determines is in the best interests of the [GSE's] or the FHFA.'") (quoting 12 U.S.C. § 4617(b)(2)(J)(ii)).

31.     Relevant to the Motion to Classify, Section 4617(b)(15) grants FHFA, as conservator, the explicit power to avoid transfers made or obligations incurred by any person that is a debtor of Freddie Mac, to the extent such transfers are made or such obligations are incurred with the intent to hinder, delay, or defraud Freddie Mac, such that the Conservator may recover assets and money on behalf of and for the benefit of Freddie Mac.  In addition, pursuant to Section 4617(b)(15)(D), the statute expressly gives FHFA a priority right of recovery over any party under the Bankruptcy Code (other than another Federal agency).  These broad powers granted to FHFA as Conservator, and the concomitant priority right of recovery under HERA, are crucial to fulfilling the purpose and Congressional mandate of HERA.  In fact, to fulfill this critical mission and to ensure that FHFA has all the powers necessary to act as Conservator, Congress included an anti-injunction provision in HERA, which prohibits any court from interfering with the Conservator's exercise of its authority.  *See* 12 U.S.C. § 4617(f) (providing that, except for limited circumstances, "no court may take any action to restrain or affect the exercise of powers or functions of the [FHFA] as a conservator or a receiver"); *accord Town of Babylon*, 699 F.3d at 227 ("Judicial review of 'the exercise of powers or functions of the [FHFA] as a conservator' is prohibited '[e]xcept as provided in [Section 4617].'"); *Kuriakose v. FHFA*, 674 F. Supp. 2d 483, 494 (S.D.N.Y. 2009) ("FHFA is well within its statutory authority to enforce the contracts of Freddie Mac and take any other action it determines to be in the best interest of Freddie Mac.  HERA clearly provides that this Court does not have the jurisdiction to interfere with such authority [pursuant to the anti-injunction provision]."); *Esther Sadowsky Testamentary Trust v. Syron*, 639 F. Supp. 2d 347, 351 (S.D.N.Y. 2009) ("This ban [*i.e.*, the anti-

16

injunction provision] is an essential part of HERA's comprehensive scheme for conservatorships and receiverships."), *aff'd*, 412 F. App'x 361 (2d Cir. 2011).

32.    In all cases requiring that a court construe a statute, "we begin with the language of the statute." *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 450 (2002). "The first step 'is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.'" *Id.* (quoting *Robinson v. Shell Oil Co.*, 519 U. S. 337, 340 (1997)). The inquiry ceases "if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'" *Id.; see also United States v. Ron Pair Enters.*, 489 U.S. 235, 240 (1989). HERA Section 4617(b)(15) was modeled upon, and is identical to, 12 U.S.C. § 1821(d)(17),[31] a provision that was added to the Federal Deposit Insurance Act by FIRREA, and that authorizes the Federal Deposit Insurance Corporation ("FDIC") to recover assets and money on behalf of and for the benefit of banks for whom FDIC acts.

33.    With respect to the FDIC's authority under Section 1821(d)(17), courts have noted that the purpose of such broad powers is to avoid burdening the American taxpayer with

---

[31]    Courts that have analyzed FHFA's authority and obligations under the recently-enacted HERA have relied on cases invoking similar or identical provisions of FIRREA. *See, e.g., UBS Americas Inc.*, 712 F. 3d at 142 n.2 ("In drawing on FIRREA's language, Congress intended for § 4617(b)(12) of HERA to serve a similar purpose with respect to FHFA"); *In re Fed. Home Loan Mortg. Corp. Derivative Litig.*, 643 F. Supp. 2d 790, 795 (E.D. Va. 2009) ("[T]he Court is persuaded by decisions that have reached the same conclusion when interpreting [FIRREA], whose provisions regarding the powers of federal bank receivers and conservators are substantially identical to those of HERA."); *aff'd sub nom. La. Mun. Police Emps. Ret. Sys. v. FHFA*, 434 F. App'x 188 (4th Cir. 2011); *see also* H.R. Rep. No. 110-142 at 90 (2007) ("The conservatorship and receivership provisions were modeled after similar provisions in the Federal Deposit Insurance Act that apply to federally insured depository institutions."); *Legislative Proposals on GSE Reform: Hearing before the Subcomm. on Capital Mkts., Ins., & Gov't Sponsored Enters. of the Comm. on Fin. Servs.*, 110th Cong., at 2 (2007) ("Any safety and soundness regulator for the housing GSEs needs to have enforcement powers on par with other Federal banking regulators."); *Legislative Proposals on Gov't-Sponsored Enter. (GSE) Reform: Hearing before the Comm. on Fin. Servs.*, 110th Cong., at 18 (2007) ("[T]he new GSE regulator's authorities should be similar to those of bank regulators. Reform must be built on the bank regulator model. The new regulator must have regulatory, supervisory, and enforcement powers equivalent to the bank regulators, including receivership powers.").

losses incurred by a regulated entity as a result of fraudulent transfers or obligations fraudulently

incurred by their counterparties.[32]  By providing these same powers to FHFA, Congress was

effecting an identical purpose for FHFA in regard to the entities that it regulates (and for which it

now acts as conservator).[33]  Section 4617(b)(15)(A) provides:

> In general.  The Agency, as conservator or receiver, *may avoid a*
> *transfer of* any interest of an entity-affiliated party, or any person
> determined by the conservator or receiver to be *a debtor of the*
> *regulated entity,* in property, or any obligation incurred by such
> party or person, that was made within 5 years of the date on which
> the Agency was appointed conservator or receiver, *if such party or*
> *person voluntarily or involuntarily made such transfer or incurred*
> *such liability with the intent to hinder, delay, or defraud the*
> *regulated entity, the Agency, the conservator, or receiver.*

Section 4617(b)(15)(A) (emphasis added).

34.    Thus, where a party or person that is a debtor of Freddie Mac, such as LBHI,

incurs obligations or transfers property, whether voluntarily or involuntarily, Section

4617(b)(15)(A) grants FHFA the right to avoid and recover against such debtor any such

obligation or transfer upon a showing that such transfer was made, or such obligation was

incurred, with the intent to hinder, delay, or defraud Freddie Mac or FHFA.

35.    In granting FHFA the right to avoid transfers made and obligations incurred with

the intent to hinder, delay or defraud FHFA, the rights and powers Congress granted FHFA are

broader and more sweeping than any granted to a bankruptcy debtor or trustee.  Thus, for

example, while the Bankruptcy Code grants a bankruptcy trustee the power to avoid only

transfers and obligations incurred by the debtor whose estate the bankruptcy trustee administers,

---

[32]    *See FDIC v. Cafritz,* 762 F. Supp. 1503, 1509 (D.D.C. 1991) ("[T]he statute 'further
expands the power of conservators, receivers or liquidating agents to void fraudulent transfers'
. . . . Thus, even this sparse legislative history evidences Congress' seriousness of purpose in
protecting taxpayers' interests . . . . Congress has given the FDIC a green light to use aggressive
tactics in protecting taxpayers' interests.") (emphasis omitted).

[33]    *See* n.31, *supra.*

Congress granted FHFA the right to avoid and recover transfers made and obligations incurred by a debtor of the regulated entity upon a finding that <u>any</u> transfers were made or obligations were incurred by such debtor of the regulated entity with the intent to hinder, delay, or defraud such regulated entity or FHFA.

36.    In addition to granting the Conservator the express right to avoid and recover any transfers made or obligations incurred by a debtor of a regulated entity with the intent to hinder, delay, or defraud such regulated entity, if such debtor is also a bankruptcy debtor under title 11 of the Bankruptcy Code, HERA expressly confers upon FHFA rights under Section 4617(b)(15)(D) in respect of such transfers or obligations incurred that are "superior to <u>any</u> rights of a trustee or any other party (other than any party which is a Federal agency) under title 11," such that the Conservator is entitled to a priority recovery in respect of any such transfer or obligation avoided under Section 4617(b)(15)(A) (emphasis added).

37.    Finally, in respect of any transfer made by a person that is a debtor of a regulated entity, HERA further grants the Conservator a separate, permissive right to seek recovery of the transfer, once avoided under subparagraph (A), directly from the initial transferee or immediate or mediate transferee of such transfer.  Specifically, Section 4617(b)(15)(B) provides:

> Right of recovery.  To the extent a transfer is avoided under subparagraph (A), the conservator or receiver may recover, for the benefit of the regulated entity, the property transferred, or, if a court so orders, the value of such property (at the time of such transfer) from—(i) the initial transferee of such transfer or the entity-affiliated party or person for whose benefit such transfer was made; or (ii) any immediate or mediate transferee of any such initial transferee.

2.     **HERA Grants a Priority Recovery in the Chapter 11 Cases**

38.     LBHI argues, without any authority, and contrary to the express statutory language, that "nothing in subparagraphs (A) - (D) [of Section 4617(b)(15)] elevates claims asserted by the Conservator to priority status in a chapter 11 case." Mot. to Classify, at § 22. In this regard, LBHI clearly misconstrues the statute.

39.     By making FHFA's rights under Section 4617(b)(15) superior to <u>any</u> rights of a trustee or any other party under title 11, HERA requires that FHFA's right to avoid and recover transferred property (or its equivalent) not be subordinate to any other competing rights in a bankruptcy proceeding.[34] To the contrary, it follows from this, necessarily, that if they are successful in establishing the predicates of the HERA Priority Claim under Section 4617(b)(15)(A), Freddie Mac and FHFA shall be entitled to a 100% recovery on such claim, together with any interest payable thereon. Indeed, pursuant to the Plan Stipulation, LBHI acknowledged Freddie Mac's and FHFA's right to a priority recovery if the HERA Priority Claim is determined to be valid under HERA by amending the Plan to specifically include such claim in the definition of "Priority Non-Tax Claim," which claims are entitled to a 100% recovery under the Plan. Were FHFA's recovery under Section 4617(b)(15) limited to that of a senior unsecured creditor (as LBHI now argues), FHFA's rights would only be equal to those of other senior unsecured creditors in the Chapter 11 Cases, which was clearly not the intent of

---

[34]     The "superior right" under Section 4617(b)(15)(D) extends to all rights under Section 4617(b)(15). *See Jahn v. FDIC*, 828 F. Supp. 2d 305, 313 (D.D.C. 2011) (analyzing the identical superior rights granted to the FDIC under 12 U.S.C. § 1821(d)(17)(D) and finding that "by the language of the statute, the FDIC's superior rights extend to all rights 'under this paragraph'— *i.e.*, all rights under Section 1821(d)(17)—and not merely to the right of recovery set forth in Subparagraph (B).").

Congress in enacting the HERA statute, as such a reading would render subparagraph (D) meaningless.[35]

40.     Giving full effect to the express statutory grant of a priority recovery to Freddie Mac and FHFA with respect to transfers made and obligations incurred with the intent to hinder, delay, or defraud Freddie Mac is consistent with the legislative purpose and intent of HERA, as allowing FHFA to recover on a priority basis directly from the person, or the bankruptcy estate of the person, that engaged in transactions giving rise to the fraud on Freddie Mac avoids burdening taxpayers with losses suffered by Freddie Mac as a result of such transactions.  This is clearly consistent with the "green light" given by Congress to the FDIC, and to FHFA under HERA.  *See Cafritz*, 762 F. Supp. at 1509; *see also* H.R. Rep. No. 110-142, at 139 (2007) (the intent of Congress in enacting HERA was to enable FHFA to "take such action as may be necessary to put the regulated entity into a sound and solvent condition, and to carry out the business of the entity").

41.     In its Motion to Classify, LBHI further argues that the Conservator does not have any right to a priority recovery under Section 4617(b)(15) because the Conservator's alleged superior rights are not among the claims or expenses entitled to priority treatment under Section 507 of the Bankruptcy Code.  As shown above, however, the language of Section 4617(b)(15)(D) is clear in granting the Conservator rights that are "superior to rights of a trustee or any other party . . . under title 11," and the law is clear that "[w]hen Congress enacts legislation, it is presumed to act with knowledge of the 'existing law and judicial concepts.'"  *In re VistaCare Grp.*, LLC, 678 F.3d 218, 226 (3d Cir. 2012) (citation omitted).  Thus, in enacting

---

[35]    "Courts must presume that a legislature says in a statute what it means and means in a statute what it says there.  When the words of a statute are unambiguous, then, this first canon is also the last: the judicial inquiry is complete."  *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) (internal citations and quotation marks omitted).

HERA, including its express provision granting the Conservator rights that are superior to the rights of any party in a bankruptcy proceeding, Congress is presumed to have been well aware of the Bankruptcy Code and the priority scheme of Section 507 of the Bankruptcy Code, and fully intended that the superior rights granted to the Conservator in a bankruptcy case would not be interpreted so as to render such rights meaningless by reason of their non-inclusion in Section 507. Moreover, Congress did not grant to FHFA a right "equal to" the rights of other unsecured creditors; FHFA's rights under Section 4617(b)(15) are "superior" to the rights of any other party, including other creditors, in a bankruptcy proceeding. Once again, LBHI acknowledged the co-existence of the priority rights of recovery that exist under Section 507 of the Bankruptcy Code and the Conservator's priority rights under HERA by amending the Plan to specifically include all of such rights, together, under the definition of "Priority Non-Tax Claim."[36]

### 3.    A Priority Right to Recovery under HERA Is Not Limited to Claims Against Transferees

42.    LBHI does not dispute that Freddie Mac is entitled to an allowed claim in the full amount asserted in the HERA Priority Claim—the entire $1.2 billion. LBHI argues only that Freddie Mac's and FHFA's recovery from the LBHI bankruptcy estate on account of such claim should be as a senior unsecured creditor under the Plan, without regard to the Congressionally mandated priority established under HERA. LBHI further argues that to the extent that Freddie Mac and FHFA are, in fact, entitled to a priority recovery under HERA, any such priority recovery must be realized only from transferees of LBHI in accordance with Section

---

[36]    Once again, the definition of "Priority Non-Tax Claim[s]" in the Plan "means any Claim, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment under section 507(a) of the Bankruptcy Code *or under 12 U.S.C. § 4617(b)(15)*" (emphasis added).

4617(b)(15)(B) of HERA, and not from LBHI's bankruptcy estate, and that, in this regard, LBHI is not a "transferee" for purposes of Section 4617(b)(15)(B). To reach this conclusion, however, LBHI misconstrues HERA as limiting Freddie Mac's and FHFA's recovery "only" to recoveries from LBHI's transferees. This interpretation is incorrect.

43.    Once again, the plain language of HERA authorizes FHFA to recover directly from a debtor of the regulated entity if the claim at issue arises from a transfer that was made, or an obligation that was incurred, with the intent to hinder, delay, or defraud the regulated entity or FHFA.[37] Section 4617(b)(15)(A) does not limit recovery by FHFA to recovery from transferees, providing instead that FHFA may avoid transfers or obligations incurred by "any person determined by the conservator or receiver to be a debtor of the regulated entity." (emphasis added).

44.    Indeed, far from limiting FHFA's rights under subparagraph (A), Section 4617(b)(15)(B) actually expands FHFA's authority, by allowing FHFA to recover not only directly from a debtor of the regulated entity who hindered, delayed, or defrauded such regulated entity, but also from transferees of such debtor who may have improperly received transferred assets or funds. As Section 4617(b)(15)(B) provides that FHFA "may" recover from such transferees, subparagraph (B) is clearly a grant of additional authority to the Conservator to follow the money. Nowhere in HERA does Congress limit FHFA, as LBHI urges, to recovering "only" from transferees of a debtor of the regulated entity.

---

[37]    In seeking the Court's allowance of Freddie Mac's claim as a senior unsecured claim, LBHI has conceded that Freddie Mac is owed money by LBHI, thus making LBHI a debtor of Freddie Mac for purposes of 12 U.S.C. § 4617. *Cf. Jahn*, 828 F. Supp. 2d at 314-15 (finding, for purposes of Section 1821(d)(17), the counterparty of bank in receivership to be a "debtor" of an institution regulated by the FDIC even absent agency action).

45.    Moreover, if the intent of HERA was only to grant FHFA the right and power to seek recovery from third party transferees of transfers made by a debtor of the regulated entity with the intent to hinder, delay, or defraud such regulated entity, and that the regulated entity and FHFA would otherwise simply be general unsecured creditors of such debtor (or such debtor's bankruptcy estate), as LBHI argues, it would eviscerate the overarching purpose and intent of Section 4617(b)(15) of HERA.  To the contrary, the intent of Congress, as evidenced by a plain reading of HERA, is that where a debtor of a regulated entity hinders, delays, or defrauds the regulated entity or FHFA, the Conservator's right to avoid and recover any such transfers or obligations is paramount to the rights of all other parties as to the recovery of the assets or funds at issue.  LBHI's assertions are directly contrary to the express intent of Congress, and there is no basis for such a strained reading of HERA.[38]

46.    Here, if LBHI is determined to have engaged in conduct with the intent to hinder, delay, or defraud Freddie Mac by inducing Freddie Mac to make the August Loans, FHFA, as Conservator, is granted the power and authority under Section 4617(b)(15)(A) of HERA to avoid the incurrence of such obligation and recover $1.2 billion plus interest from the LBHI bankruptcy estate, and the Conservator's right to such recovery is statutorily superior to the rights of LBHI and any other party in the Chapter 11 Cases.  Moreover, the fundamental purpose of any statute that provides remedies for conduct engaged with the intent to hinder, delay or defraud is to return the wronged party to the position it was in before such conduct occurred, and gives rise to a claim to that effect.  To the extent such prohibited conduct is perpetrated against a regulated entity of FHFA, such as Freddie Mac, Section 4617(b)(15)(D) of HERA elevates the

---

[38]    Indeed, courts should avoid statutory interpretations that render portions of the statute "meaningless."  *PT United Can Co. Ltd. v. Crown Cork & Seal Co., Inc.*, No. 96 Civ. 3669 (JGK), 1997 WL 31194, at *3 (S.D.N.Y. Jan. 28, 1997), *aff'd*, 138 F.3d 65 (2d Cir. 1998).

right of recovery on account of such conduct to a priority status as against other creditors. Thus, if LBHI engaged in conduct with the intent to hinder, delay or defraud Freddie Mac in connection with the incurrence of the August Loans, HERA mandates that LBHI must repay Freddie Mac and FHFA $1.2 billion, plus interest thereon, on a priority basis in order to return Freddie Mac to its status before LBHI fraudulently incurred such obligations. The Conservator need not look to third-party transferees of LBHI to recover such funds, as it is the LBHI estate that must return the fraudulently obtained funds.

47.    Separately, if the billions of dollars intentionally delivered by LBHI to various financial institutions during the weeks leading up to the Petition Date—most particularly during the last three days prior to the commencement of LBHI's bankruptcy proceeding—were transferred to such institutions with the knowledge that LBHI was then insolvent, or that in doing so it would be rendered insolvent (which the Debtors appear to acknowledge in pleadings filed in separate adversary proceedings against JPMorgan Chase and Citibank in the Chapter 11 Cases),[39] such that LBHI would be unable to repay the August Loans when due, it follows that LBHI intentionally hindered, delayed or defrauded Freddie Mac and the Conservator in the repayment of the August Loans, and Freddie Mac and FHFA are entitled to recover funds on account of the August Loans from the LBHI bankruptcy estate pursuant to subparagraph (D) of HERA. Again, the Conservator's rights in this regard are superior to the rights of all other creditors in the Chapter 11 Cases, and the Conservator is not required to seek recovery only from the recipients of such transfers.

---

[39]    *See* First Am. Compl. at ¶¶ 52, 54, *Lehman Brothers Holdings Inc. v. Citibank, N.A.*, Adv. Pr. No. 12-01044-JMP (Bankr. S.D.N.Y. Nov. 16, 2012) [Docket No. 13]; *see also* First Am. Compl. at ¶¶ 29-30, 60, 66, *Lehman Brothers Holdings Inc. v. JPMorgan Chase Bank*, N.A., Adv. Pr. No. 10-03266-JMP (Bankr. S.D.N.Y. Sept. 15, 2010) [Docket No. 19].

48.    In addition, subparagraph (B) of HERA grants FHFA an additional, permissive right of recovery, stating that FHFA "may" seek recoveries from transferees of a debtor of a regulated entity with respect to any transfer avoided under subparagraph (A), and such right <u>does not</u> constitute the exclusive remedy available to FHFA in respect of actions or transactions found to be fraudulent as to Freddie Mac under subparagraph (A).

49.    The interpretation of HERA argued by LBHI would necessarily lead to absurd and clearly unintended results. *See United States v. Turkette*, 452 U.S. 576, 580 (1981); *see also Troll Co. v. Uneeda Doll Co.*, 483 F.3d 150, 160 (2d Cir. 2007). Thus, for example, under LBHI's interpretation of HERA, if a person defrauded a regulated entity but kept the ill-gotten gains and never transferred the applicable funds to a third party, the Conservator would be without any remedy to recover such funds on a priority basis, including in any resulting bankruptcy proceeding of such third party, thereby rendering subparagraph (D) irrelevant and meaningless. Similarly, if such a person used the fraudulently obtained funds only to pay good faith transferees—*e.g.*, buy equipment for a business, pay for a child's education, or make a gift to a charity—LBHI would have this Court believe that the Conservator would be unable to assert any right of recovery on account of such funds because the Conservator's only right of recovery would be against transferees other than good faith transferees, and there would be none. Such results would be absurd and were clearly never intended by Congress.

### 4.    In All Events, Any Priority Recovery on Account of the HERA Priority Claim Should Come from the LBHI Bankruptcy Estate

50.    The Debtors have recovered or are currently in litigation seeking to recover many of the transfers identified in the Examiner Report as potentially fraudulent as to the Debtors, and

potentially fraudulent as to Freddie Mac and FHFA.[40] As stated by the Second Circuit in

*Colonial Realty* in addressing transfers that were asserted to be fraudulent as to both a

bankruptcy debtor and a government agency having rights and powers superior to such

bankruptcy debtor under FIRREA (as is the case under HERA), an appropriate protocol in such

circumstances, and one the Conservator has followed in the Chapter 11 Cases, is to allow the

bankruptcy debtor to use the well-established procedures of the Bankruptcy Code to pursue the

recovery of such transfers, and thereby avoid the chaos that would necessarily ensue if the debtor

and the government agency engaged in a competition to see which entity could recover the

transfers first, and if it is ultimately determined that the acts and conduct of the bankruptcy

debtor were fraudulent as to the FDIC, the FDIC would have the benefit of its superior rights

granted under FIRREA. *See generally* 980 F.2d at 131-34. Here, the Debtors have been

engaged in recovery efforts against third party transferees for some time while being well aware

of the Conservator's asserted rights in respect of any such recoveries, and Freddie Mac and the

Conservator have closely and continuously monitored LBHI's efforts in order to protect their

rights in respect of the HERA Priority Claim, even to the point of entering into a separate tolling

agreement with a transferee where the Debtors' recovery action against such transferee has not

yet been resolved.[41]

     51.    Upon the Debtors' completion of the recovery process, any recovered funds will

be held by the Debtors' bankruptcy estate. Accordingly, if it is ultimately determined that LBHI

hindered, delayed, or defrauded Freddie Mac in respect of either the incurrence or repayment of

---

[40]    *See generally Lehman Brothers Holdings Inc. v. Citibank, N.A.*, Adv. Pr. No. 12-01044-JMP (Bankr. S.D.N.Y.); *Lehman Brothers Holdings Inc. v. JPMorgan Chase Bank, N.A.*, Adv. Pr. No. 10-03266-JMP (Bankr. S.D.N.Y.).

[41]    Notwithstanding that FHFA has not initiated its own actions to date, FHFA retains the discretion granted by Congress to pursue its rights, powers, and remedies in accordance with HERA.

the August Loans, the Conservator's right to a priority recovery, as required under Section

4617(b)(15)(D) and the Debtors' confirmed Plan, must in all events be paid by the LBHI

bankruptcy estate as required by the Plan, as there is no interpretation of HERA, or any

alternative theory, that would suggest that any third-party transferee of a fraudulent transferee

should be required to disgorge and return funds twice.

### 5.     The HERA Priority Claim Has Been Properly Asserted

52.     In its Motion to Classify, LBHI also asserts that Freddie Mac and FHFA, by

having failed to identify specific transfers in the HERA Priority Claim, or commence

independent actions against third parties, have somehow forfeited their right to receive a priority

recovery, even in the event that upon a proper review and determination of the merits of the

HERA Priority Claim it is determined that LBHI did, in fact, hinder, delay, or defraud Freddie

Mac in respect of the incurrence of the August Loans and/or the failure to repay the August

Loans in a timely manner.  Once again, there is no basis for this assertion.

53.     The deadline to file proofs of claims for these Chapter 11 Cases—September 22,

2009—was fully six months before the Examiner Report was issued, when, for the first time,

specifics regarding the breadth, extent and circumstances surrounding the Debtors' prepetition

transfers were fully disclosed.[42]  To suggest that Freddie Mac and FHFA alone should have

somehow been able to identify unknown transfers as being fraudulent before the facts and

circumstances surrounding such transfers were made public is incredulous.

54.     As noted above, Freddie Mac timely filed the HERA Priority Claim—the

underlying validity of which LBHI does not dispute—and pointedly asserted therein the right to

a priority recovery under HERA.  Thereafter, Freddie Mac and FHFA continuously sought to

---

[42]   *See* Examiner Report, Volumes 4 & 5 (dated Mar. 11, 2010, discussing and analyzing prepetition transfers).

engage LBHI in an effort to resolve the HERA Priority Claim, including by means of mediation, and put a tolling agreement in place with LBHI over two years ago to foster constructive discussions in the hopes of reaching a consensual resolution.

55.     Freddie Mac and FHFA have diligently pursued the HERA Priority Claim, while protecting their rights and powers under HERA, and in all respects in a manner consistent with HERA, the Bankruptcy Code, orders of this Court and the Second Circuit. *See Colonial Realty,* 980 F.2d at 131-35. LBHI's attempt to criticize Freddie Mac's and FHFA's conduct and actions in this regard, and its assertion that Freddie Mac and FHFA have forfeited their superior rights, are entirely misplaced.

56.     LBHI's Motion to Classify is merely an attempt to avoid addressing the underlying merits of Freddie Mac's and FHFA's claim for a priority recovery on account of the HERA Priority Claim.

**6.     Prejudice to Freddie Mac and FHFA**

57.     In the Motion to Classify, LBHI argues that the continued maintenance of the $1.2 billion reserve is "clearly prejudicial" to LBHI's other creditors. Motion to Classify, at § 29. It is Freddie Mac's and FHFA's understanding, however, that literally thousands of claims are yet to be resolved in the Chapter 11 Cases, and the Debtors have indicated that they will continue to make distributions semi-annually for years to come.[43] Indeed, the most recent operating report filed by the Debtors indicates that there remains in excess of $12 billion of assets and cash awaiting the final resolution and allowance of all remaining claims before a final distribution to creditors may be made.[44] Thus, it is not credible that any prejudice is currently

---

[43]    *See* Plan, at § 8.3 (providing that the Debtors will make distributions of available cash semi-annually on March 30 and September 30 of each year).

[44]    *See* August 2013 Post-Effective Operating Report [Docket No. 40226].

being imposed on LBHI's other creditors by the continued maintenance of the $1.2 billion reserve while the HERA Priority Claim is being finally resolved. Indeed, if there is any prejudice, it is only one of delay until the HERA Priority Claim is finally resolved and the proper distribution of the $1.2 billion reserve is applied accordingly, and, frankly, any delay is of LBHI's own making. To release such reserve at this time, prior to an appropriate, final determination of the priority status of the HERA Priority Claim, would impose irreparable harm upon and prejudice to Freddie Mac and the Conservator.

## CONCLUSION

58.    The Plan defines "Priority Non-Tax Claims" to include any claim entitled to priority under HERA, and the Plan Stipulation evidences the parties' agreement that until such time as the merits and priority status of the HERA Priority Claim have been determined, the $1.2 billion shall be retained in a separate cash reserve to ensure payment on account of such claim.

59.    HERA clearly sets forth the intent of Congress that where a person that is a debtor to a regulated entity has made transfers, incurred obligations or otherwise engaged in actions or transactions that hinder, delay, or defraud a regulated entity, the Conservator is entitled to recover the value thereof on a priority basis and, in a bankruptcy proceeding, with rights that are superior to those of a trustee or any other party in such proceedings. Further, HERA does not limit the Conservator only to recoveries from third-party transferees of the debtor of the regulated entity, but allows the regulated entity and FHFA to avoid and recover such transfers or obligations directly from the debtor of the regulated entity, and grants a supplemental right to recover fraudulent transfers from third-party transferees.

60.    Here, where Freddie Mac and FHFA have asserted a claim predicated on transfers made and obligations incurred by LBHI with the intent to hinder, delay, or defraud Freddie Mac

or FHFA, and the rights of the Conservator to a priority recovery in respect of such claim are clearly provided for under HERA and acknowledged under the Plan, the merits of the HERA Priority Claim should be addressed and the $1.2 billion reserve should be preserved as agreed to and so ordered by this Court in the Plan Stipulation.

WHEREFORE, Freddie Mac and FHFA respectfully request that the Court deny the

Motion to Classify and grant such other and further relief as is just and proper.

Dated:  New York, New York
        October 17, 2013


    /s/ Michael J. Canning
Michael J. Canning
Richard M. Alexander
Nancy G. Milburn

ARNOLD & PORTER LLP
399 Park Avenue
New York, New York  10022
Telephone:  (212) 715-1000
Facsimile:  (212) 715-1399

*Attorneys for the Federal Housing Finance Agency
as Conservator of the Federal Home Loan
Mortgage Corporation*


    /s/ Mark S. Landman
Mark S. Landman

LANDMAN CORSI BALLAINE & FORD P.C.
120 Broadway
New York, New York  10271
Telephone:  (212) 238-4800
Facsimile:  (212) 238-4848


*Attorneys for the Federal Home Loan Mortgage
Corporation*