**Hearing Date & Time: October 24, 2013 at 11:00 a.m. (Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Lori R. Fife

Attorneys for the Plan Administrator
on behalf of Lehman Brothers Holdings Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | Case No. 08-13555 (JMP) |
| Debtors. | (Jointly Administered) |

## OBJECTION OF PLAN ADMINISTRATOR TO MOTIONS FOR LEAVE TO EXAMINE LEHMAN BROTHERS HOLDINGS INC. PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 2004 AND JOINDERS THERETO

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("***LBHI***"), as Plan Administrator under the

Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its

Affiliated Debtors (the "***Plan***"),[1] submits this objection to the motions for leave to conduct

discovery of LBHI pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure,[2] and

joinders thereto[3] and respectfully represents as follows:

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

[2] The motions were filed by CarVal Investors, LLC ("***CarVal***") and Davidson Kempner Capital Management LLC ("***DK***" and, together with CarVal, the "***Movants***"), on October 15, 2013 [ECF No. 40469] (the "***CarVal Motion***") and October 16, 2013 [ECF No. 40532] (the "***DK Motion***" and together with the CarVal Motion, the "***Motions***").

[3] As of the date of this Objection, three joinders have been filed by the Baupost Group, L.L.C. ("***Baupost***") [ECF No. 40497], SPCP Group, LLC [ECF No. 40539], and Attestor Capital LLP [ECF No. 40543]. A statement has also been filed by the "Ad Hoc Group of Lehman Brothers Creditors" (the "***Ad Hoc Group***") [ECF No. 40520], whose current members are not disclosed. To the extent that any other party (together with Baupost and the Ad Hoc

## **Preliminary Statement**

1. The Funds seek discovery under Rule 2004 purportedly to determine whether, in their opinion, the Plan Administrator has exercised good business judgment. The Funds move under Rule 2004 for authority to (a) discover the terms and conditions of a commitment letter signed by the Plan Administrator and (b) compel production of the documents and depositions relating to the Plan Administrator's consideration of the same. The Funds' motivation purportedly is to determine whether, in their opinion, the Plan Administrator has exercised good business judgment in connection with the transaction.

2. In this case, such a use of Rule 2004 is wholly inappropriate and an abuse of process. The business judgment and acts of a post-confirmation debtor and its board of directors should not be subject to a Rule 2004 fishing expedition by creditors. Following the effective date of a chapter 11 plan, a former debtor is free to operate without the restrictions of the Bankruptcy Code or the second guessing of creditors pursuant to Bankruptcy Rule 2004. Allowing Rule 2004 discovery in these circumstances will establish a damaging precedent. Each large investor/creditor or group of investors will be encouraged to seek discovery with respect to any prospective transaction and settlement (or the failure to pursue one) that does not meet their particular expectations or investment strategy. Investors will be encouraged to question the Plan Administrator's decisions in the hopes of altering deal terms and/or in their search for new investment opportunities.

3. Neither Court nor creditor approval is required for the transaction at issue (the ***"Transaction"***). The 2004 request is an attempt to inject a process of creditor approval into the Plan Administrator's role in the Transaction that directly conflicts with the terms and the

---

Group, the "***Joinder Parties***" and together with the Movants, the ***"Funds"***) files a joinder or statement in support of the Motions, this Objection shall serve a response to such joinder or statement as well.

spirit of the Plan. The Plan was negotiated at length by creditors, including each of the Funds. Those negotiations resulted in appointment of a 7-person board of directors and the delegation to that board of the authority to administer the Debtors' assets in a manner consistent with its reasonable business judgment. The Plan expressly removed the requirements for notice or Bankruptcy Court approval of, and creditor standing to object to, proposed transactions. The motions are an attempt to reinstate this process. They should be denied.

4.      The Funds' persistent suggestions regarding "red flags" and "closed process" are an attempt to create provocative undertones, but they are misleading. Contrary to the Movants' characterization, the Transaction is substantially more complicated than the simple sale of an asset. In fact, it does not involve a sale of the Debtors' assets or a Debtors' claims at all. The Transaction primarily involves claims of LB Holdings Intermediate 2 Limited (in Administration) ("*LBHI2*"), an indirect subsidiary of LBHI in England under the control of joint administrators which are court-appointed and supervised, against Lehman Brothers International (Europe) (in Administration) ("*LBIE*"), another affiliate of LBHI in a separate administration in England under the separate control of its court-appointed joint administrators. LBHI2 is in active litigation in the English courts with LBIE and an affiliate of Elliott Management Corporation (together with certain of its affiliates, "*Elliott*") over the treatment of these claims. Because LBHI is not a direct owner of LBHI2's claims against LBIE, its involvement in those proceedings is as an ultimate beneficiary of recoveries by LBHI2 and as a litigant with standing that has been acting in support of LBHI2's claims.

5.      The Transaction is comparable to a multi-level joint venture. Its design, among other features, reflects the complex web of UK-based litigation and other challenges which LBHI2 confronts. LBHI2, Elliott and King Street Capital Management, L.P. and certain

US_ACTIVE:\44346672\23\58399.0011

of its affiliates ("**King Street**") will contribute certain claims and then participate in recoveries on account of those claims.  In addition, Elliott and King Street will make a payment of £650 million to LBHI2, providing a minimum recovery on account of LBHI2's claims against LBIE.

6.      Complex transactions of this type do not naturally fit an "auction" format. The circumstances strongly argued for a negotiated transaction which optimized LBHI2's positioning to maximize recoveries within a complex environment, rather than a broad-based public auction.   The board of directors of LBHI (the "**Board**") is authorized to make these judgments on a case-by-case basis after assessing the unique features of each transaction situation.

7.      The Board, as clearly authorized by the Plan, employed its business judgment in determining that this Transaction served the best interests of LBHI's creditors, taken as a whole.  Prior to committing to the Transaction, the Plan Administrator determined that the likely improvements to timing, certainty, and total amount of distributions provided by the Transaction strongly supported a focused negotiation process.  In reaching this decision, the Plan Administrator formulated a business judgment based upon, among other things, the likelihood of various outcomes of multiple litigations and insolvency proceedings pending in England, the timing of the resolution of those disputes, assessments of likely distributions in the LBIE case, and the likely reactions and motivations of LBIE creditors in response to the Transaction, which could result in an attempt by the LBIE administrators to settle those disputes.  The Transaction, in other words, is a multi-dimensional transaction that has developed in a dynamic environment. Having evaluated all of the foregoing factors, the Plan Administrator determined that the greater certainty of the timing and amount of distributions provided by the Transaction justified the process.

4

8.    At this time, the Plan Administrator's ability to provide disclosure of the Transaction's relevant terms beyond what has been disclosed is restricted by agreement among the parties. The Plan Administrator's agreement to the confidentiality provisions was necessary to induce parties to commit to the Transaction. The Commitment Letter represents a valid exercise of the Plan Administrator's use of its reasonable business judgment and authority under the Plan with the goal of maximizing distributions to LBHI's creditors.

9.    In addition to curiosity, gamesmanship among various hedge funds is the primary driver of the Rule 2004 motion and the related pleadings. Apparently, the Funds' investments and related hedges did not anticipate the Transaction negotiated among the Plan Administrator and other parties and they fear it may create unexpected outcomes for them in the administration of LBIE. Such matters should not be the concern of this Court. Clearly, the appropriate forum for the Movants to seek any relief with respect to the Transaction would be the English courts where the administrations of, and litigation between, LBHI2 and LBIE are pending.

10.    Notwithstanding the authority clearly granted to the Plan Administrator under the Plan, the Funds filed the Motions and Joinders along with extensive document requests. The document requests seek to obtain the Commitment Letter, which is confidential and commercially sensitive. The Funds also seek depositions and additional information about the Plan Administrator's negotiation and evaluation of transaction documents and the Transaction. The Funds – many of which are also significant creditors of LBIE, with interests adverse to LBHI and LBHI2 in LBIE's administration – do not need this information to evaluate the Transaction. Nor do the Funds need such information to prepare a competing offer, as is their stated intention. But disclosure of this information could place the Plan Administrator and

5

LBHI2 at a severe competitive disadvantage in subsequent negotiations over the assets related to the Transaction.

11.     Even if the Funds could demonstrate good cause for a Rule 2004 examination, providing such material information to only one subset of creditors would be prejudicial to all the other creditors of LBHI.  The information that the Funds seek is "commercial information" under section 107 of the Bankruptcy Code and therefore not subject to discovery at all under Rule 2004.  Further, the Plan Administrator's business judgment with respect to the Transaction was based in large part on its evaluation of the many complex legal issues involved and on advice received from the Plan Administrator's legal professionals.  Accordingly, virtually all of the discovery sought involves privileged information, such as assessments of likely outcomes of pending or future litigation.

12.     For all the foregoing reasons, the Motions should be denied.

### Background

**I.     The Chapter 11 Cases and Consummation of the Plan**

13.     On September 15, 2008 and periodically thereafter, the Debtors commenced with this Court voluntary cases under the chapter 11 of title 11 of the Bankruptcy Code.  On December 6, 2011, the Court approved and entered an order confirming the Plan (the "***Confirmation Order***") [ECF No. 23023], and the Plan became effective on March 6, 2012.  The Plan and its confirmation were supported by each of the Funds.[4]  Indeed, certain of the Funds

---

[4] *See* Plan Schedule 4; *see also* [ECF No. 21578] (evidencing Baupost's support for the plan); [ECF No. 21702] (evidencing DK's support for the plan); [ECF No. 22199] (evidencing CarVal's support for the Plan); [ECF No. 22827] (evidencing the Ad Hoc Group's support for the Plan).

received reimbursement from the Debtors of costs and expenses incurred as a result of their

substantial contribution to the formulation of the Plan.[5]

14.    Unlike a chapter 11 debtor, the Plan Administrator is not required to

disclose or obtain Court approval of transactions before they occur.  In contrast, the Plan does

require the Plan Administrator to obtain Court approval of settlements of claims against the

Debtors above a certain dollar amount.

15.    The Plan – which was rigorously negotiated between the Debtors and their

creditors –  provides that LBHI shall serve as Plan Administrator for each of the Debtors, Plan §

6.1(a), and that

> *the Plan Administrator shall have the authority and right* . . .
> *without the need for Bankruptcy Court approval* . . . to carry out
> and implement all provisions of the Plan, including, without
> limitation, to:
>
>> . . . *exercise its reasonable business judgment* to direct and
>> control the wind down, liquidation, sale and/or abandoning of
>> assets of the Debtors and/or Debtor-Controlled Entities under
>> the Plan and in accordance with applicable law as necessary to
>> maximize Distributions to holders of Allowed Claims . . . .

*Id.* § 6.1(b) (emphasis added).  Section 13.1 of the Plan further provides authority for the

Debtors, acting through the Plan Administrator to:

> take any action, including, without limitation . . . the . . . sale . . . of
> property, and the entry into transactions, agreements,
> understandings or arrangements, whether in or other than in the
> ordinary course of business, and execute, deliver, implement, and
> fully perform any and all obligations, instruments, documents and
> papers or otherwise in connection with any of the foregoing, *free*
> *of any restrictions of the Bankruptcy Code or the Bankruptcy*
> *Rules and in all respects as if there were no pending cases under*

---

[5] *See* [ECF No. 31062] (approving $3,306,125.58 for the Ad Hoc Group of Holders of Notes Issued by Lehman
Brothers Treasury Co. B.V. and Guaranteed by Lehman Brothers Holdings, Inc., of which Silverpoint Capital LP
was a member); [ECF No. 31310] (approving $12,710,343 for the Lehman Brothers Special Financing Inc. Working
Group, of which Silver Point Finance, LLC was a member); [ECF Nos. 31603 & 31480] (approving $12,343,520.44
for the Ad Hoc Group).

US_ACTIVE:\44346672\23\58399.0011

*any chapter or provision of the Bankruptcy Code,* except as explicitly provided herein.

*Id.* § 13.1 (emphasis added); *see also* Confirmation Order ¶ 39.

16.    Consistent with this broad grant of authority, the Plan required only limited, discretionary, post-Effective Date reporting, including schedules of monthly cash flows to be filed 30 days after a month end and quarterly balance sheets to be filed within 120 days after a quarter end. *See* Plan § 15.6.  Likewise, management discussion and analysis of known events or commitments that have, or are reasonably likely to have, a material effect on the Debtors' financial condition or cash flow and any description of significant settlements or sales were to be reported quarterly, within 120 days after a quarter end. *Id.*  However, none of this need be disclosed if the Plan Administrator determines in its reasonable discretion that to do so would be unduly burdensome or "could place the Debtor(s) in a competitive or negotiation disadvantage, *or such disclosure is precluded by confidentiality limitations*."  *Id.* § 15.6 (emphasis added).

17.    Notably, the Confirmation Order specifically preserves the Debtors' rights under Rule 2004 and the Court's *Order Granting the Debtors Authority to Issue Subpoenas for the Production of Documents and Authorizing the Examination of Persons and Entities* [ECF No. 5910] (the "*2004 Order*"), following the Effective Date and through the Closing Date. Confirmation Order ¶ 65.  Neither the Plan nor the Confirmation Order preserves any rights of third parties to obtain discovery after the Effective Date pursuant to Bankruptcy Rule 2004.

## II.    The Transaction

18.    On October 1, 2013, LBHI2 issued a press release (the "*Press Release*") announcing its entry into a commitment letter and related "Heads of Terms" (the "*Commitment Letter*") with Elliott, King Street, and LBHI.  Elliott and King Street are significant holders of

claims against LBIE.  As disclosed in the Press Release, the Commitment Letter provides terms

for Elliott and King Street to acquire rights with respect to all of LBHI2's claims against LBIE

(the "*Claims*");[6] LBHI2 would receive, in exchange, approximately £650 million plus future

contingent sums and would share in certain claims against LBIE held by Elliott and King Street.

Through certain subsidiaries, LBHI is a majority creditor of LBHI2.  But none of the assets

subject to the Transaction is an asset of LBHI.  The terms of the Commitment Letter restrict the

Plan Administrator's ability to disclose details beyond what those disclosed in the Press Release.

### III.    Longstanding Proceedings and Issues in England and Recent Fund Action Adverse to LBHI Interests

19.    A myriad of issues surrounding the English administrations of the LBIE

and LBHI2 estates have been publicly known and have long fostered the speculative trading in

claims against both LBIE and LBHI.

20.    In February 2013, LBIE, LBHI2, and the joint administrators of another

English non-controlled affiliate, Lehman Brothers Limited (in administration) ("*LBL*"), filed an

application in the English court (the "*Litigation*"), with LBHI as the respondent, to resolve

certain of the issues.  Among them are the entitlement to priority of payment from LBIE as

between statutory interest and the Subordinated Claims, complicated issues surrounding

LBHI2's and LBL's subordinated and unsubordinated claims in LBIE's administration, and

potential liability of LBHI2 and LBL to LBIE as contributories (because LBIE is an unlimited

liability company).

---

[6] LBHI2 holds subordinated claims against LBIE in the amount of £1,254,165,598.48 plus interest (the "*Subordinated Claims*").

21.     An affiliate of Elliott was subsequently added as a party to the Litigation. The Litigation application was amended by Elliott to include two additional questions relating to claimants who allegedly incurred a loss due to the currency conversion of their claims.

22.     The recoveries that LBIE's creditors, including LBHI2, are likely to realize from LBIE's administration are dependent upon the outcome of each of these issues, among other things.  Given the number of variables involved, including the value of LBIE's assets, the outcome is impossible to predict.  The Transaction is intended to reduce these risks for LBHI2.

23.     Having learned about the Transaction, and perhaps fearing the potentially adverse outcomes that it may cause for their positions in the LBIE estate, on October 11, 2013, CarVal and Baupost made an application before the English court to be joined as parties to the Litigation.  CarVal and Baupost sought to be in a position in the Litigation to oppose LBHI2 and maximize their recoveries in LBIE's estate to the detriment of LBHI2.  The English court denied the application.  The English court found that CarVal and Baupost had only made their application after learning of the Transaction, and that in light of their desire to purchase the Claims, their joinder to the Litigation would be inappropriate.

## IV.    LBHI's Responsiveness to the Funds

24.     Notwithstanding that the Litigation has been pending since February 2013, and the issues involved have been well known to LBIE's creditors for years, none of the Funds ever delivered a fully formulated and credible offer to LBHI or LBHI2 with respect to the Claims prior to LBHI's entry into the Commitment Letter on September 30, 2013.

25.     After LBHI signed the Commitment Letter, CarVal sent a letter to LBHI (the "*CarVal Letter*") stating that it "would like the opportunity to participate in any negotiations

US_ACTIVE:\44346672\23\58399.0011

concerning" a sale of the Claims.  (CarVal Mot. Ex. C.)  Notwithstanding the fact that LBHI is

not the owner of the Claims, LBHI responded to the CarVal Letter on October 3, promptly after

the Press Release was issued, explaining that due to the provisions of the Commitment Letter,

LBHI could not discuss the Transaction beyond what was stated in the Press Release.  (*Id.* Ex.

D.)

      26.     On October 3, 2013, CarVal, together with certain of the other Funds, sent

a letter to LBHI (the "***Expression of Interest***") that included a nominal purchase price for the

Claims, but actually stated only the amount of an initial payment, and contained none of the

other material terms that would be necessary to evaluate whether the letter constituted a real

offer.  In other words, the letter from the Funds was an expression of interest rather than a

binding offer.  The Expression of Interest requested additional information regarding the

Transaction.  The Plan Administrator responded by letter the following day and again informed

the Funds of its intention to comply with all of its obligations under the Commitment Letter.

      27.     At the request of the Funds, members of the Board of Directors of LBHI

promptly met with certain representatives of the Funds on October 8, 2013 (the "***October 8***

***Meeting***").  Board representatives reiterated the fact that the Board is restricted in the disclosures

it was permitted to make regarding the Transaction.  However, Board representatives assured the

Funds that the Board had faithfully executed its duties to exercise reasonable business judgment

with the goal of maximizing distributions to LBHI's creditors.  Board representatives reiterated

LBHI's commitment to its creditors and explained that this commitment motivated its

determinations regarding the Transaction.  Board representatives also stated that it was hopeful

that, when the opportunity came for the material terms of the Transaction to be disclosed, the

Funds would agree with the Board's determination regarding the Transaction.

US_ACTIVE:\44346672\23\58399.0011

28.     On October 14, 2013, CarVal sent a letter to LBHI2 that included a higher initial payment than was in the Expression of Interest, but still lacked any supporting details relating to contingent payment rights or the structure of a proposed multi-dimensional transaction, which would take into account the complex and interrelated issues considered by the Board when evaluating the Transaction.  Accordingly, the letter from CarVal was, like the Expression of Interest, an expression of interest rather than a comprehensive, non-contingent offer.

## The Motions Should Be Denied

### I.     The Funds Are Not Entitled To Use Rule 2004

#### A.  LBHI Is No Longer a Ward of the Bankruptcy Court

29.     LBHI is no longer in bankruptcy.  Like any other corporation, LBHI is free to negotiate and enter into transactions involving its assets "free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules."  Plan § 13.1; *see also* Confirmation Order ¶ 39. Creditors may no longer run to this Court every time that they do not approve of the decisions of the Plan Administrator or the Board.

30.     The permitted uses of Rule 2004 post-confirmation are extremely limited. It is for this reason that the Plan Administrator's rights under the 2004 Order have been explicitly preserved pursuant to the Confirmation Order.  No such reservation of rights under Rule 2004 exists for any other party.  The Funds have not provided any support for the use of Rule 2004 to examine a post-confirmation debtor's exercise of its business judgment or other clear authority that it has been granted under a plan of reorganization.[7]  It is simply preposterous and

---

[7] The cases cited by the Movants relate either to the debtor's entry into an asset sale before a chapter 11 plan became effective, and that was never disclosed in the plan's disclosure statement (*Cinderella Clothing Indus., Inc.*, 93 B.R. 373 (Bankr. E.D. Pa. 1988)), or to the debtor's ability to satisfy an administrative claim, the approval of which was

US_ACTIVE:\44346672\23\58399.0011

unsupportable by any authority for the Funds to argue that the business judgment and acts of a

post-confirmation debtor or its board could be subject to a fishing expedition or harassment

under Rule 2004 by a particular group of dissatisfied creditors.

31.    The terms of the Plan, which were highly negotiated among many

significant creditors of the Debtors (including each of the Funds) clearly grant the Plan

Administrator and its Board the authority to enter into the Commitment Letter without Court

approval or advance notice to creditors – either *en masse* or to a self-selected few.  Clearly, the

right to oversee and approve the exercise of the Plan Administrator's business judgment was not

a right that the Funds bargained for.

32.    The Board is free to devise and implement processes which, in its

reasonable business judgment, pursue the goal of maximizing the value of Plan distributions

without being required to consult with or obtain the approval of anybody.  The Plan – which all

of the Funds supported and accepted – delegated to the Board, hand-picked through an arduously

negotiated process, the responsibility for making the business judgments about liquidating the

estate.  Granting the Motion will subject the Plan Administrator to a level of scrutiny that is

simply not required by the Plan and not conducive to enabling the Plan Administrator to

negotiate effectively in the marketplace in order to maximize future distributions to creditors.[8]

B.    The Funds Cannot Identify Any Breach of the Plan Administrator's Duties

33.    The relief sought through the Motion is particularly inappropriate because

the Funds have not identified any aspect of the Transaction that could even suggest a breach of

the Plan Administrator's duties under the Plan.  The Funds rely heavily upon the vaguely

---

pending before the bankruptcy court (*In re Express One Int'l, Inc.*, 217 B.R. 215, (Bankr. E.D. Tex. 1998)).  Both cases are wholly inapposite to the present circumstances.

[8] The independent Board structure is consistent with any Delaware corporation operating outside of bankruptcy, in contrast to the process of Creditor Committee and Court approval, which is the norm during a bankruptcy.

US_ACTIVE:\44346672\23\58399.0011

formulated premise that a "closed" sale is "unorthodox" and contradictory to "the fundamental tenets of the Bankruptcy Code." (CarVal Motion at ¶ 3; DK Motion at ¶6.)  These conclusory statements fly in the face of the fact that LBHI is no longer operating in bankruptcy.  As such, the Funds' reliance on an auction process as the supposed "norm in bankruptcy" (Motion ¶ 29) is totally misplaced.  Even in bankruptcy, not every sale needs to be conducted by an auction process.[9]  Clearly, under corporate law, a sale does not need to be subject to an auction process.  The mere fact that the Transaction is the result of a "closed process" as compared to public auction does not, *per se*, mean that the Plan Administrator or the Board has improperly exercised its authority under the Plan.

34.    More importantly, the Funds' facile comparison of the Transaction to the sale of other assets, even the commoditized claims against Lehman Brothers Inc., is patently incongruous and disingenuous at best.  It entirely fails to consider the association between the Transaction and the Litigation.  From LBHI2's perspective, and thus, indirectly, LBHI's, the Transaction sharply reduces the risks to LBHI2 that it will never realize a recovery in respect of the Subordinated Claims because of the Litigation and other issues in the LBIE administration.  It is a highly bespoke transaction targeted at resolving a complex web of disputes that could delay distributions to LBHI2 for years, if they are ever realizable at all.  The concept that such a

---

[9] Although no longer applicable to LBHI, Bankruptcy Rule 6004(f)(1) provides that "[a]ll sales not in the ordinary course of business may be by private sale or by public auction." Courts often allow a chapter 11 debtor to sell assets outside the ordinary course of business by private sale when the debtor demonstrates that the sale is permissible pursuant to section 363(b) of the Bankruptcy Code. *See, e.g.,* *In re Loral Space & Communications Ltd., et al.*, Case No. 03-41710 (RDD) (Bankr. S.D.N.Y. Sep. 30, 2005); *In re International Wire Group, Inc., et al.*, Case No. 04-11991 (BRL) (Bankr. S.D.N.Y. June 10, 2004); *Palermo v. Pritam Realty, Inc.* (*In re Pritam Reality, Inc.*), 233 B.R. 619 (D.P.R. 1999) (upholding the bankruptcy court's approval of a private sale conducted by a chapter 11 debtor); *In re Wieboldt Stores, Inc.*, 92 B.R. 309 (N.D. Ill. 1988) (affirming right of chapter 11 debtor to transfer assets by private sale); *In re Condere Corp.*, 228 B.R. 615 (Bankr. S.D. Miss. 1998) (approving a private sale of a chapter 11 debtor's assets where the standards of section 363(b) were met).

US_ACTIVE:\44346672\23\58399.0011

transaction could be marketed through an auction process is overly simplistic, and even ludicrous, in this specific case.

35.    The Funds also conveniently ignore that the "asset" being "sold" (or participated in) as part of the Transaction is not an asset of LBHI.  LBHI is, indirectly, a majority creditor of LBHI2, but the Claims would not have constituted property of LBHI's estate prior to the Effective Date, and would have been subject neither to the protections (such as the automatic stay) nor the burdens of the Bankruptcy Code.  Moreover, the Claims are indisputably the property of LBHI2, and their sale would be subject to the rules and norms of asset sales in English administrations.  And it is, in fact, commonplace for administrators of English entities to sell assets without a public auction process and for such sales to be subject to confidentiality provisions.  Therefore, for LBHI2 – the English entity that both owns the Claims and has the ultimate power to decide whether and how to sell them – the decision not to conduct a public auction process is also entirely consistent with typical English practice and should not be questioned by a foreign court.

C.    Recourse to Rule 2004 in These Circumstances Is an Abuse of Process

36.    It is inappropriate to grant the Funds authority to seek any information relating to LBHI2 (the actual owner of the Claims).  Rule 2004 certainly does not apply to LBHI2, an entity in a separate insolvency proceeding in England.  The Funds are not creditors of LBHI2.  Having recognized (correctly) that they have no right to bring any such action against LBHI2, the Funds are seeking information from LBHI so that they may indirectly examine LBHI2.  This use of Rule 2004 to interfere with the administration of a foreign insolvency proceeding is improper and should be rejected by this Court.

37.    The use of Rule 2004 is also inappropriate to the extent that the Funds are seeking recourse in this Court to leverage their position in the Litigation and the outcome of

15

LBIE's administration.  Most of the Funds hold substantial claims against LBIE.  Because of the nature of their claim holdings, the Funds' interests are adverse to those of LBHI2 in the administration of LBIE and in the Litigation.  To the benefit of LBHI2, the Transaction could substantially alter the dynamics of the LBIE administration.

38.    Motivated by these shifting dynamics and having failed to obtain the leverage they sought from the English court in the Litigation, CarVal and Baupost, together with the other Funds, should not be permitted recourse in this Court merely to influence the outcome of a foreign insolvency proceeding and litigation in a completely separate, sovereign court.  The Court should reject this abuse of process and deny the relief sought in the Motion and Joinders.

## II.    Much of the Information That the Funds Seek Is Improper and Unnecessary

39.    "Rule 2004 is not intended to be used as a vehicle for gathering confidential information for which no reasonable need is shown."  *In re Cont'l Forge Co., Inc.*, 73 B.R. 1005, 1006 (Bankr. W.D. Pa. 1987) (motion denied where information requested was irrelevant to pending cause of action, and where objecting party argued that request was "solely to gain a competitive advantage").

40.    Beyond seeking information about the economic terms of the Transaction, the Funds seek depositions and documents relating to the Plan Administrator's own internal analysis and negotiation of the Transaction.  Such requests are overly broad and also improper. The Funds neither need, nor are entitled to obtain, such a broad scope of documents and information.

41.    It is also improper to use Rule 2004 as a backdoor means to enable a party to decide if it wants to formulate and submit a competing bid, as is the Funds' stated intention. Nothing prevented the Funds or other creditors from formulating a credible, well-developed offer and providing it to LBHI2 and the Plan Administrator.  On the other hand, obtaining LBHI's

16

internal analyses of the Transaction and information about the negotiations would provide the

Funds with an unfair information advantage in such circumstances.[10]

### III.    Even If They Were Entitled to Use Rule 2004, the Funds Have Not Demonstrated Good Cause for Relief

42.    Before a motion seeking discovery under Rule 2004 may be granted, the

moving party must first establish good cause.  *In re Enron*, 281 B.R. 836, 840 (Bankr. S.D.N.Y.

2002).  Good cause is generally shown "if the examination is necessary to establish the claim of

the party seeking the examination, or if denial of such request would cause the examiner undue

hardship or injustice."  *See ePlus, Inc. v. Katz (In re Metiom, Inc.)*, 318 B.R. 263, 268 (S.D.N.Y.

2004) (internal citations omitted); *see also In re Youk-See*, 450 B.R. 312, 320 (Bankr. D. Mass.

2011) ("Good cause is established if the party in interest seeking the Rule 2004 examination has

shown that such an examination is reasonably necessary for the protection of its legitimate

interests.").

43.    In determining whether good cause exists, a court must "balance the

competing interests of the parties, weighing the relevance of and necessity of the information

sought by examination."  *In re Drexel Burnham Lambert Group, Inc.*, 123 B.R. 702, 712 (Bankr.

S.D.N.Y. 1991); *see also In re Countrywide Home Loans, Inc.*, 384 B.R. 373, 392 (Bankr. W.D.

Pa. 2008) (holding that Rule 2004 is not intended to permit discovery based on nothing more

than curiosity of a party in interest and that "good cause" must be evaluated using a balancing

test).  The party seeking an examination pursuant to Rule 2004 "bears the burden of proving that

good cause exists for taking the requested discovery."  *Metiom*, 318 B.R. at 268; *see also Drexel

Burnham*, 123 B.R. at 712 ("The burden of showing good cause is an affirmative one . . . .").

---

[10] Similarly recognizing the possibility that they may have ulterior motives – *i.e.*, the desire to formulate a
competing bid for the Claims – the English Court denied the attempt of CarVal and Baupost to join the Litigation.

US_ACTIVE:\44346672\23\58399.0011

44.     Here, the balance of interests weighs against granting the Motion.  As stated above, the Plan Administrator is constrained by the confidentiality provisions of the Commitment Letter and unable to provide the Funds with any additional information about its terms.  While compliance with the Plan Administrator's obligations under the Commitment Letter may not be satisfactory from the Funds' perspective, the Plan Administrator is authorized under Section 6.1(b) of the Plan to exercise its business judgment when deciding how best to maximize the value of the Debtors' assets.  In the circumstances surrounding the Commitment Letter, the Plan Administrator determined that it was necessary to agree to certain confidentiality obligations in order to obtain the benefits of the Transaction.

45.     Granting the Motion will not only cause the Plan Administrator to disclose confidential information about the Transaction, but also hamper the Plan Administrator's ability to exercise its authority under the Plan in future transactions.  It is critical for the Plan Administrator to have the ability to exercise its business judgment and negotiate in good faith in the marketplace.  If the Court grants the Motion and requires the Plan Administrator to provide the Funds with information that the Plan Administrator has undertaken to maintain confidential, the Plan Administrator's credibility – and, consequently, its ability to negotiate with counterparties in the future and obtain the best possible outcome for the Debtors' creditors – will be undermined.

46.     Granting the Motion will also signal to other parties that seeking discovery under Rule 2004 during the Plan Administrator's negotiation of future transactions is a viable means of obtaining information about, and perhaps influencing the terms of such transactions. Encouraging parties to make use of the 2004 discovery process as a means of evaluating the Plan Administrator's exercise of business judgment will only result in increased litigation costs and

impede the Plan Administrator's ability to exercise its authority under the Plan. The mere

possibility that future transactions may be subject to influence through Rule 2004 discovery and

related litigation tactics because they involve the Debtors' assets will create a chilling effect on

the Plan Administrator's ability to negotiate freely with counterparties.

## IV.  Rule 2004 May Not Be Used to Gain Access to Commercial Information

47.  Pursuant to the Plan, the Plan Administrator may withhold from public

disclosure information that a Debtor determines in its reasonable discretion would be unduly

burdensome, or "could place the Debtor(s) in a competitive or negotiation disadvantage, or such

disclosure is precluded by confidentiality limitations." *See* Plan § 15.6.

48.  A party may not employ Rule 2004 to obtain commercial information

within the meaning of section 107(b)(1) of the Bankruptcy Code. *In re Almatis B.V.*, No. 10-

12308 (MG), 2010 WL 4877868, at *4 (Bankr. S.D.N.Y. Nov. 24, 2010). Protecting commercial

information "protects parties from the release of information that could . . . give competitors an

unfair advantage." *See In re Anthracite Capital, Inc.*, 492 B.R. 162, 178 (Bankr. S.D.N.Y.

2013).

49.  "Commercial information has been defined as information that would

cause 'an unfair advantage to competitors by providing them information as to the commercial

operations of the debtor.'" *Video Software Dealers Ass'n v. Orion Pictures Corp. (In re Orion

Pictures Corp.)*, 21 F.3d 24, 27 (2d Cir. 1994). It "includes situations where a bankruptcy court

may reasonably determine that allowing such disclosure would have a chilling effect on business

negotiations . . . ." *In re Borders Group, Inc.*, 462 B.R. 42, 47 (Bankr. S.D.N.Y. 2011) (denying

disclosure of information in share purchase agreement that, if disclosed, could give an unfair

advantage to competitors); *see also Gowan v. Westford Asset Mgmt. LLC (In re Dreier LLP)*, 485

B.R. 821, 823 (Bankr. S.D.N.Y. 2013) (denying disclosure of information relating to how hedge fund makes strategic decisions constitutes commercial information).

50.    The information that the Funds seek constitutes commercial information. The information includes the Plan Administrator's internal communications and analysis of the Transaction, and the litigation strategy of LBHI and LBHI2 in the Litigation.  Disclosure of this information would be harmful to LBHI's interests in the Transaction and the Litigation.  From this perspective, the Funds' demands speak volumes about their motives.  In the interest of ensuring that no party is given an unfair advantage, the Plan Administrator requests that the Court deny the Motion.[11]

---

[11] To the extent that the Court determines that it is appropriate to grant the Motion, the Plan Administrator intends to file a Motion requesting the entry of a protective order to ensure that no commercial information is disclosed.

US_ACTIVE:\44346672\23\58399.0011

## **<u>Reservation of Rights</u>**

51.     The Plan Administrator reserves all of its rights to (i) object to any

specific request for documents or examination pursuant to Rule 2004, (ii) submit its own request

for documents or examination pursuant to the 2004 Order, (iii) seek additional disclosure from

the Funds pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure; and (iv) seek

protective orders.

**WHEREFORE** the Plan Administrator respectfully requests the Court deny the

Motion and grant such other and further relief as is just and proper.

Dated:     October 21, 2013
          New York, New York


/s/ Lori R. Fife
Lori R. Fife

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for the Plan Administrator on behalf of
Lehman Brothers Holdings Inc.