# EXHIBIT D

# LEHMAN BROTHERS

Execution Copy

<u>AMENDED AND RESTATED CONFIRMATION</u>

August 16, 2007
[FSA Insured]

<u>Insured Transaction</u>

Giants Stadium, LLC
Giants Stadium
East Rutherford, NJ 07073

Attention: Christine Procops
Telephone No.: (201) 460-2852
Facsimile No.: (201) 939-5447

Global ID: 3231739

Ladies and Gentlemen:

The purpose of this communication is to amend and restate, together with the FGIC Confirmation (as defined below), the terms and conditions of a portion of the transaction (the "Original Transaction", as amended and restated hereby, the "Transaction") originally entered into between Lehman Brothers Special Financing Inc. ("Lehman"), guaranteed by Lehman Brothers Holdings, Inc. ("Holdings"), and Giants Stadium, LLC ("Counterparty") on July 27, 2007, bearing the Global ID # 3231739. On the date hereof, Party A and Party B have entered into an Amended and Restated Confirmation (the "FGIC Confirmation") evidencing a transaction subject to the terms of the Master Agreement (FGIC-Insured), dated as of July 27, 2007, between Party A and Party B, which FGIC Confirmation amends and restates the remaining portions of the Original Transaction.

Upon the delivery of the Swap Insurance Policy with respect to this Transaction, this Transaction shall constitute an "Insured Transaction" as defined in the Master Agreement specified below and will therefore be subject to the special provisions of the Master Agreement which apply to Insured Transactions.

1.      This Confirmation is subject to, and incorporates, the 2000 ISDA Definitions (the "Definitions"), published by the International Swaps and Derivatives Association, Inc. This Confirmation supplements, forms a part of and is subject to the ISDA Master Agreement (FSA-Insured) dated as of July 27, 2007 as amended and supplemented from time to time (the "Swap Agreement") between Lehman and Counterparty. All provisions contained in, or incorporated by reference to, the Swap Agreement shall govern this Confirmation except as expressly modified below. In the event of any inconsistency between this Confirmation, the Definitions, or the Swap Agreement, as the case may be, this Confirmation will control for purposes of the Transaction to which this Confirmation relates.

2.      The terms of the Transaction to which this Confirmation relates are as follows:

Notional Amount:                          USD 53,000,000, which shall reduce in such amounts
                                          and on such dates as set forth in Annex I hereto.

Trade Date:                               July 27, 2007

NYK 1115762-4.071370.0011

| | |
|---|---|
| Effective Date: | August 16, 2007 |
| Termination Date: | April 1, 2047 |

Floating Amounts:

| | |
|---|---|
| Floating Rate Payer: | Lehman |
| Floating Rate Payer Payment Dates: | Each Interest Payment Date (as defined in the Covered Indenture) with respect to the Related Bonds (as defined below). |
| Floating Amount: | The Floating Amount shall be equal to the sum of (i) the Floating Amount (as calculated pursuant to the Definitions) plus (ii) the auction agent fees, broker-dealer fees and other fees and expenses described in Paragraph 10 hereof to the extent that such amounts are payable pursuant to such Paragraph 10; provided, however, that Lehman's obligation to pay amounts described in Paragraph 10(a) shall be deemed to be discharged upon Lehman's payment of such fees directly to the auction agent and the broker-dealer in accordance with the terms of the auction agent agreement and the broker-dealer agreement and, to the extent so paid, shall not be due from Lehman to Counterparty. |
| Floating Rate: | The actual rate of interest payable on the Related Bonds regardless of their Mode (as defined in the Covered Indenture) from time to time (the "Actual Bond Rate"); provided, however, that if the Related Bonds have not been issued on or prior to the Effective Date, the Floating Rate for the period from and including the Effective Date to but excluding the date on which the Related Bonds are issued shall be equal to USD-LIBOR-BBA (having a Designated Maturity of one month) plus 0.3815%, determined on an Actual/360 day count basis and the Floating Rate shall, from and including the date of issuance of the Related Bonds, be the Actual Bond Rate. |
| Related Bonds: | Bonds issued by Counterparty pursuant to the Covered Indenture and designated in writing as the "Related Bonds" for purposes of this Transaction, which Related Bonds shall be initially issued as auction rate bonds. The initial Related Bonds shall be the Giants Stadium LLC Project Revenue Bonds, Series 2007A-7. |
| Floating Rate Reset Dates: | The first day of each Calculation Period |
| Floating Rate Day Count Fraction: | Same as the applicable day count fraction for the Related Bonds during the applicable Calculation |

|  | Period. |
|---|---|
| Floating Rate Period End Dates: | The last day of each Interest Accrual Period (as defined in the Covered Indenture |

Fixed Amounts:

| Fixed Rate Payer: | Counterparty |
|---|---|
| Fixed Rate Payer Payment Dates: | Quarterly on the first day of each January, April, July and October, commencing on October 1, 2007 and terminating on the Termination Date, subject to adjustment in accordance with the Following Business Day Convention. |
| Fixed Rate: | 6.1885% |
| Fixed Rate Day Count Fraction: | 30/360 |
| Fixed Rate Period End Dates: | Not adjusted. |
| Business Days: | New York |

3.  *Option to Terminate in Whole or in Part with Cash Settlement*

In connection with this Transaction, Counterparty shall have the right to early terminate, cancel and cash settle this Transaction, in whole or in part, effective on any Business Day after the Trade Date (the "Optional Termination Date"). This right may be exercised by written, telex or facsimile notice delivered to Lehman no later than two (2) Business Days prior to the Optional Termination Date (the "Notification Date"), which notice shall only be effective upon actual receipt by Lehman and shall be irrevocable. Following any such early termination and cancellation and payment of the Cash Settlement Amount (calculated as described below), the parties shall be relieved of all further payment obligations hereunder except for (i) payment of all accrued but yet unpaid amounts calculated to but excluding the Optional Termination Date (unless otherwise included in the Cash Settlement Amount as calculated below) and (ii) payment of amounts under the remaining portion of this Transaction in the case of partial cancellation. If this Transaction is cancelled in part, all payment calculations following the Optional Termination Date will be based on the remaining portion of this Transaction after giving effect to such partial cancellation, as set forth in a partial termination Confirmation to be provided by Lehman.

Notwithstanding anything to the contrary contained herein, Counterparty may not exercise its right to early terminate this Transaction, if following such termination, a Cash Settlement Amount would be payable by Counterparty to Lehman unless Counterparty provides evidence reasonably satisfactory to Lehman and the Insurer that: (i) such Cash Settlement Amount will be made by Counterparty on or before the second Business Day immediately following the Optional Termination Date, and (ii) such Cash Settlement Amount will not cause Counterparty to be in violation of, or in default of, any material obligation under any material agreement of Counterparty.

Upon the occurrence of an Optional Termination Date, Lehman will determine, in a commercially reasonable manner, a U.S. Dollar value for the terminated portion of this Transaction (the "Cash Settlement Amount") based on its estimate of the mid-market valuation of such terminated portion. If such Cash Settlement Amount is not mutually acceptable to Lehman and Counterparty, the parties shall determine a Cash Settlement Amount with respect to this Transaction in accordance with Section 6(e)(ii)(1) (Market Quotation applies) of the Swap Agreement, where (A) both parties are Affected Parties and this Transaction is the sole Affected Transaction and (B) the Reference Market-makers providing quotations are acceptable to both Lehman and Counterparty. In all events, the Cash Settlement Amount shall be determined in accordance with Paragraph 5 hereof.

4.    *Lehman's Right to Request Conversion or Refinancing of Bonds.* Lehman may, at any time, request that Counterparty (a) convert the Related Bonds from Auction Rate Securities to Floating Rate Securities pursuant to the Covered Indenture or (b) refinance, remarket or replace the Related Bonds with another series of securities of identical maturity, with all costs and expenses of any conversion, refinancing, remarketing or replacement being for the account of Lehman. Counterparty shall consider any request in good faith and not withhold its consent unreasonably, it being understood that it will be deemed reasonable, without limitation, for Counterparty to withhold its consent if it concludes that such conversion, refinancing, remarketing or replacement will (i) result in any additional cost, risk or loss of financial or business flexibility or (ii) require the preparation of disclosure materials during a period of time when the Counterparty concludes in its sole discretion that the preparation of disclosure materials is inappropriate or inconvenient (which the issuer may determine for a period of no more than 180 days in any 360 day period).

5.    *Floating Rate Option For Termination Payments.* Except with respect to the circumstances described in Paragraph 6(A) or 6(B) below, notwithstanding anything in the Agreement or this Confirmation to the contrary, if the Floating Rate at the time of the early termination of this Transaction is the Actual Bond Rate, (a) the Floating Rate shall, for all purposes (including, without limitation, the calculation of amounts payable upon such termination) be deemed to be USD-LIBOR-BBA (having a Designated Maturity of one month) plus 0.3815%, calculated on an Actual/360 basis, with respect to all amounts that would be payable after the early termination date if no such termination had occurred and (b) the Settlement Amount shall, in all events, be determined pursuant to Section 6(e)(ii) as if both parties are Affected Parties.

6.    *Termination Upon Lehman Downgrade or Default.* If, at any time that the Floating Rate is the Actual Bond Rate, (A) this Transaction is terminated as a result of the occurrence of the Additional Termination Event described in Part 1(k) of the Schedule or (B) this Transaction is terminated as a result of the occurrence of an Event of Default with respect to which Lehman is the Defaulting Party, the Settlement Amount will be determined pursuant to Section 6(e)(ii) of the Agreement as if Lehman were the sole Affected Party, provided that the Market Quotation with respect to this Transaction will be calculated as follows:

(a)    Prior to the Early Termination Date, Counterparty and Lehman shall each designate two (2) Reference Market-makers (each, a "Designated Dealer"), each having outstanding long term senior debt securities rated at least (1) "Aa3" or higher as determined by Moody's and (2) "AA-" or higher as determined by S&P.

(b)      On the Early Termination Date, Lehman shall solicit quotations from the Designated Dealers. Each quotation will be for an amount, if any, that would be paid to Counterparty or by Counterparty in consideration of an agreement between Counterparty and the quoting Designated Dealer to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for Counterparty the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of this Transaction that would, but for the termination by Counterparty, have been required after that date. For this purpose, Unpaid Amounts in respect of this Transaction are to be excluded but, without limitation, any payment or delivery that would, but for the Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as Counterparty and the Reference Market-maker may, in good faith, agree. Each Designated Dealer shall certify in writing that such Designated Dealer is prepared to enter into a Replacement Transaction based on their quotation.

(c)      The Market Quotation in connection with the termination of this Transaction pursuant to this Paragraph 6 shall be the amount of the lowest quotation received. If such quotations are expressed as an amount that would be payable from Counterparty to the Designated Dealer, the Market Quotation shall be expressed as a positive number and if such quotations are expressed as an amount that would be payable from the Designated Dealer to Counterparty, the Market Quotation shall be expressed as a negative number.

7.      ***Broker-Dealer and Auction Agent.*** Counterparty and Lehman Brothers Inc. ("LBI"), an affiliate of Lehman, will enter into a broker-dealer agreement in customary form pursuant to which LBI agrees to serve as broker-dealer for the Related Bonds during the term of the Related Bonds in return for compensation not to exceed 0.15% per annum based on the outstanding principal amount of the Related Bonds from time to time. Counterparty shall have the right to terminate the services of LBI under such broker-dealer agreement at any time upon reasonable notice, provided that Counterparty shall not terminate the services of LBI thereunder with respect to any portion of the Related Bonds that are in an Auction Mode and with respect to which the Floating Rate payable by Lehman under this Transaction is the Actual Bond Rate. Counterparty will enter into an agreement with Wilmington Trust Company ("WTC") in customary form reasonably acceptable to Lehman pursuant to which WTC agrees to act as auction agent with respect to the Related Bonds so long as they are in Auction Mode in return for compensation not to exceed .0015% per annum based on the outstanding principal amount of the Related Bonds from time to time. Counterparty shall have the right to terminate the services of WTC under such auction agent agreement at any time upon reasonable notice, provided that Counterparty shall not terminate the services of WTC thereunder with respect to any portion of the Related Bonds that are in an Auction Mode and with respect to which the Floating Rate payable by Lehman under this Transaction is the Actual Bond Rate without the prior written consent of Lehman.

The parties agree that in the event that WTC is replaced as auction agent for any reason with the consent of Lehman, the Fixed Rate payable to Lehman with respect to Related Bonds that are in Auction Mode and with respect to which the Floating Rate payable by Lehman under this Transaction is the Actual Bond Rate shall be (a) increased to the extent that the replacement auction agent's compensation payable by Lehman under Paragraph 9 below is greater than .0015% per annum based on the outstanding principal amount of the Related Bonds (subject to a maximum increase in such Fixed Rate of .0085% per annum) or (b) decreased to the extent that the replacement auction agent's compensation payable by Lehman under Paragraph 9 below is less than .0015% per annum based on the outstanding principal amount of the Related Bonds.

In the event that LBI is, at any time, terminated or replaced in its capacity as broker-dealer with respect to Related Bonds that are in Auction Mode and with respect to which the Floating Rate payable by Lehman under this Transaction is the Actual Bond Rate, Counterparty shall, immediately and without further action by any party, be deemed to have exercised its conversion option pursuant to Paragraph 9 below with respect to all of the Related Bonds that are then in Auction Mode and the Fixed Rate and the Floating Rate shall thereafter be deemed to have been modified as provided therein and Lehman shall have no further obligation to pay auction agent fees or broker-dealer fees pursuant to Paragraph 9.

8.      *Failure to Issue the Related Bonds or Procure Swap Insurance Policy.*

(a)      If the Related Bonds are not issued on or prior to October 1, 2007, this Transaction shall terminate, effective as of October 1, 2007, without further action by any party. No termination or other payments shall be payable by the parties hereto in connection with any such termination and following such termination, the parties shall have no further obligations hereunder and no Floating Rate Amounts or Fixed Rate Amounts shall be deemed to have accrued notwithstanding the Effective Date of August 14, 2007.

(b)      If Party B fails to deliver to Party A, on or prior to the date on which the Related Bonds are issued, a Swap Insurance Policy (as defined below), this Transaction shall terminate, effective as of the date of issuance of the Related Bonds, without further action by any party. No termination or other payments shall be payable by the parties hereto in connection with any such termination and following such termination, the parties shall have no further obligations hereunder and no Floating Rate Amounts or Fixed Rate Amounts shall be deemed to have accrued notwithstanding the Effective Date of August 14, 2007.

For purposes of this clause (b), the term "Swap Insurance Policy" means a swap insurance policy issued by Financial Security Assurance Inc. (the "Insurer") with respect to Counterparty's regularly scheduled payment obligations under the Agreement with respect to this Transaction and with respect to certain Settlement Amounts due from Counterparty under the Agreement, as specified in the swap insurance policy, which swap insurance policy shall otherwise be in form and substance reasonably acceptable to Lehman.

9.      *Counterparty Option to Convert Floating Rate.* Counterparty may from time to time, by providing Lehman with not less than five (5) Business Days' prior written notice, convert the Floating Rate from the Actual Bond Rate to a rate based on USD-LIBOR-BBA with respect to a notional amount of this Transaction (the "Converted Notional Amount") corresponding to all or any portion of the Related Bonds identified by Counterparty, such conversion to be effective on the next succeeding Floating Rate Payer Period End Date (the "Conversion Date") with respect to Calculation Periods commencing on and after such Conversion Date. In the event that Counterparty elects to so convert the Floating Rate, (a) the Fixed Rate with respect to the Converted Notional Amount shall, from and including the Conversion Date, be deemed to be 5.807%, and (b) the Floating Rate with respect to the Converted Notional Amount shall, from and including the Conversion Date, be deemed to have the following terms:

| Floating Rate Payer Payment Dates: | Monthly, on the day of each calendar month corresponding to the Conversion Date (or, if any calendar month does not include such date, the last day of such calendar month), commencing on such day of the first calendar month immediately following the Conversion Date and terminating on the Termination Date, subject to adjustment in accordance with the Following Business Day Convention. |
|---|---|

| | |
|---|---|
| Floating Rate Payer Period End Dates: | Monthly, on the day of each calendar month corresponding to the Conversion Date (or, if any calendar month does not include such date, the last day of such calendar month), commencing on such day of the first calendar month immediately following the Conversion Date and terminating on the Termination Date. No Adjustment shall apply to Floating Rate Payer Period End Dates. |
| Floating Rate: | USD-LIBOR-BBA |
| Designated Maturity: | One month. |
| Reset Date: | The Conversion Date and thereafter each Floating Rate Payer Period End Date. |
| Floating Rate Day Count Fraction: | Actual/360 |
| Method of Averaging: | Inapplicable |

With respect to any Converted Notional Amount, the reductions in Notional Amount set forth in Annex I shall be applied to such Converted Notional Amount and the unconverted Notional Amount on a pro rata basis or on such other basis as the Counterparty may specify in the applicable conversion notice.

10.    *Auction and Broker-Dealer Fees*. Lehman agrees that, while the Related Bonds remain in Auction Mode and unless LBI has been terminated or replaced as the broker-dealer for the Related Bonds, it shall be obligated to pay (a) directly to the auction agent and the broker-dealer for the Related Bonds, the auction agent and broker-dealer fees with respect to the Related Bonds and (b) to Counterparty, any and all other fees, costs and expenses payable by Counterparty and relating to Auctions (as defined in the Covered Indenture) with respect to the Related Bonds. In the case of payments specified in clause (a) above, such payments shall be due and payable on the dates and in the amounts specified in the related broker-dealer agreement and auction agent agreement.   In the case of payments specified in clause (b) above, such payments shall be due and payable in arrears on each Floating Rate Payer Payment Date to the extent paid by Counterparty during the related Calculation Period; provided, however, that any such amount paid prior to the Effective Date hereof shall be deemed to have been paid in the initial Calculation Period. Lehman shall have no obligation to pay any amounts specified in clause (a) or clause (b) above in the event that (i) the Related Bonds are in any mode other than Auction Mode, or (ii) if LBI has been terminated or replaced as the broker-dealer for the Related Bonds or (iii) with respect to Related Bonds corresponding to any Converted Notional Amount.   Amounts payable by Lehman pursuant to this Paragraph 10 shall, for all purposes, be deemed to be payments required pursuant to Section 2(a)(i) of the Agreement.

11.    *Transfer or Procurement of Credit Enhancement by Lehman.* Notwithstanding Section 7 of the Agreement (but subject to Part 1(l)(v) of the Schedule to the Agreement), Lehman may, at any time, without the consent of Counterparty, either (a) transfer its rights and obligations with respect to this Transaction to any dealer in the relevant market having a long-term debt rating (or whose obligations are guaranteed by an entity having a long-term debt rating) of "AA-" or higher from S&P or "Aa3" or higher from Moody's or (b) enter into an agreement with any dealer in the relevant market (a "Replacement Credit Support Provider") having a long-term debt rating of "AA-" or higher from S&P or "Aa3" or higher from Moody's pursuant to which such Replacement Credit Support Provider agrees to guarantee or

otherwise insure all of the payment obligations of Lehman hereunder, including, without limitation, the obligation of Lehman to make any payments upon the early termination hereof. During such time that any arrangement specified in clause (b) above is in effect, the Replacement Credit Support Provider shall be deemed to be Lehman's Credit Support Provider with respect to any provision of this Confirmation or the Agreement relating to the debt ratings of Lehman's Credit Support Provider to the extent that such ratings are higher than those of Lehman Brothers Holdings Inc.

12.    *Credit Support Annex.* Notwithstanding anything contained in the Credit Support Annex to the Agreement to the contrary, at any time that the Floating Rate payable by Lehman under this Transaction is the Actual Bond Rate, Exposure shall be calculated in all events as if this Transaction were to be terminated pursuant to the terms of Paragraph 5 hereof.

13.    *Payment Instructions:*

      Payments to Party A:

          JPMorgan Chase
          ABA: 021000021
          for the Account of Lehman Brothers Special Financing Inc.
          Account No. 066 143 543

      Payments to Party B:

      To be provided in writing by Party B on or prior to the Effective Date.

14.    *Amended and Restated Confirmation.* This Confirmation, together with the FGIC Confirmation, amends and restates the Original Transaction which shall be of no further force or effect.

Please check this Confirmation carefully and immediately upon receipt so that errors or discrepancies can be promptly identified and rectified. Please confirm that the foregoing correctly sets forth the terms of the agreement between Lehman and Counterparty with respect to the particular Transaction to which this Confirmation relates by signing in the space provided below and immediately returning a copy of the executed Confirmation to Lehman.

Very truly yours,

LEHMAN BROTHERS SPECIAL FINANCING INC.

By: _____

Name:   T. Courtney Jenkins
Title:   Vice President

Agreed and Accepted By:
GIANTS STADIUM, LLC

By: _____
Name: Christine Procops
Title: Vice President &CFO

Please check this Confirmation carefully and immediately upon receipt so that errors or discrepancies can be promptly identified and rectified. Please confirm that the foregoing correctly sets forth the terms of the agreement between Lehman and Counterparty with respect to the particular Transaction to which this Confirmation relates by signing in the space provided below and immediately returning a copy of the executed Confirmation to Lehman.

Very truly yours,

LEHMAN BROTHERS SPECIAL FINANCING INC.

By: _____
Name:
Title:


Agreed and Accepted By:
GIANTS STADIUM, LLC

By: _____
Name:
Title:              John K. Mara
             Authorized Representative

9

ANNEX I
to Confirmation, dated August 16, 2007
between Lehman Brothers Special Financing Inc. and
Giants Stadium, LLC

| Notional Amount Reduction Date | Notional Amount Reduction |
|---|---|
| 4/1/2046 | 500,000.00 |
| 4/1/2047 | 52,500,000.00 |