# EXHIBIT E

**EXECUTION COPY**

INDENTURE OF TRUST

between

GIANTS STADIUM LLC

and

THE BANK OF NEW YORK,

As Trustee

Dated as of August 1, 2007

- i -

## TABLE OF CONTENTS

**Page**

**ARTICLE I.** DEFINITIONS AND RULES OF CONSTRUCTION ............................................ 3

Section 101.   Definitions ........................................................................... 3
Section 102.   Rules of Construction ............................................................ 40
Section 103.   Indenture to Constitute Contract ........................................... 41

**ARTICLE II.** AUTHORIZATION AND DELIVERY OF BONDS; BOND SUPPORT
FACILITIES AND QUALIFIED SWAPS ......................................................... 41

Section 201.   Authorization of Bonds ......................................................... 41
Section 202.   Securities Depository ............................................................ 41
Section 203.   Delivery of the Initial Bonds; Issuance of Initial Bonds in Multiple Series; and
Special Provisions Relating to Capital Appreciation Bonds, Deferred Income
Bonds and Balloon Bonds ................................................................... 42
Section 204.   Issuance of Additional Bonds ................................................ 47
Section 205.   Completion Bonds ................................................................ 52
Section 206.   Bond Support Facilities; Swap Insurance Policies; Qualified Swaps or Other
Similar Arrangements; Parity Obligations ........................................... 52
Section 207.   Permitted Subordinated Indebtedness ..................................... 56

**ARTICLE III.** GENERAL TERMS AND PROVISIONS OF BONDS; EXECUTION,
AUTHENTICATION AND REGISTRATION ................................................... 57

Section 301.   Medium of Payment; Form and Date; Letters and Numbers ........... 57
Section 302.   Legends ............................................................................... 57
Section 303.   Execution of Bonds; Authentication ...................................... 57
Section 304.   Bonds Mutilated, Destroyed, Stolen or Lost ............................ 58
Section 305.   Preparation of Definitive Bonds; Temporary Bonds ................... 58
Section 306.   Registration of Bonds; Persons Treated as Owners; Restriction on Transfers . 59
Section 307.   Exchange of Bonds ............................................................... 59
Section 308.   Charges for Exchange and Registration .................................. 60
Section 309.   Cancellation and Distribution of Bonds .................................. 60
Section 310.   Book Entry Bonds ................................................................ 60

**ARTICLE IV.** REDEMPTION OF BONDS ............................................................... 62

Section 401.   Redemption .......................................................................... 62
Section 402.   Privilege of Redemption and Redemption Price ......................... 62
Section 403.   Redemption at the Election or Direction of StadCo ................... 62
Section 404.   Redemption Other than at StadCo's Election or Direction ........... 63
Section 405.   Selection of Bonds to be Redeemed ......................................... 63
Section 406.   Notice of Redemption ............................................................ 63
Section 407.   Payment of Redeemed Bonds ................................................. 64
Section 408.   Extraordinary Mandatory Redemption ..................................... 64

10662025.17

- ii -

Section 409.  Mandatory Redemption or Purchase Upon Occurrence of NFL Redemption Event ............................................................................................................... 65
Section 410.  Cancellation and Destruction of Bonds ............................................. 66
Section 411.  Purchase of Bonds ............................................................................. 66
Section 412.  Certain Redemptions Prohibited During Standstill Period ............... 66

**ARTICLE V.** REVENUES AND FUNDS ........................................................................ 66

Section 501.  Establishment of Funds ..................................................................... 66
Section 502.  Construction Fund .............................................................................. 69
Section 503.  Capitalized Interest Fund .................................................................. 72
Section 504.  Operating Fund. ................................................................................. 73
Section 505.  Senior Lien Debt Service Fund and Second Lien Debt Service Fund ............. 75
Section 506.  Senior Lien Debt Service Reserve Fund ........................................... 80
Section 506A. Senior Lien Strike Reserve Fund ..................................................... 83
Section 507.  Second Lien Debt Service Reserve Fund .......................................... 85
Section 508.  Redemption Fund ............................................................................... 87
Section 509.  Trustee Revenue Fund ....................................................................... 88
Section 510.  Trustee Operating Fund ..................................................................... 92
Section 511.  Monies Held by the Trustee to Be Held in Trust .............................. 93
Section 512.  Repayment to StadCo ........................................................................ 93

**ARTICLE VI.** GENERAL COVENANTS AND PROVISIONS ........................................... 93

Section 601.  Payment of Bonds, Regularly Scheduled Swap Payments, Parity Obligations, Swap Termination Payments and Other Swap Payments ................................. 93
Section 602.  Performance of StadCo's Covenants ................................................. 94
Section 603.  Instruments of Further Assurance ...................................................... 94
Section 604.  Inspection of Stadium Books; Confidentiality Agreement ............... 95
Section 605.  Independent Engineer; Reports of Independent Engineer ................. 95
Section 606.  Reports of Trustee .............................................................................. 95
Section 607.  Representations and Warranties of StadCo ....................................... 95
Section 608.  Covenant of StadCo with Respect to Pledged Revenues ................ 101
Section 609.  Covenants of StadCo ........................................................................ 101
Section 610.  Covenants With Bond Support Facility Providers, Reserve Account Credit Facility Providers and Bond Insurers ................................................. 112
Section 611.  Recording and Filing ....................................................................... 112

**ARTICLE VII.** DEPOSITORIES AND INVESTMENT ................................................... 113

Section 701.  Depositories ..................................................................................... 113
Section 702.  Deposits ........................................................................................... 113
Section 703.  Investment of Certain Funds ........................................................... 113
Section 704.  Valuation and Sale of Investments. ................................................. 115

**ARTICLE VIII.** DISCHARGE OF LIEN .................................................................... 115

Section 801.  Discharge of Lien ............................................................................ 115

- iii -

Section 802.    Authority to Defease Bonds; Provision for Payment of Bonds ...................... 116
Section 803.    Early Termination Right of a Team ................................................................ 116

**ARTICLE IX.** DEFAULT PROVISIONS AND REMEDIES OF TRUSTEE, HOLDERS AND
BOND INSURER ....................................................................................................... 117

Section 901.    Events of Default ........................................................................................... 117
Section 902.    Acceleration .................................................................................................. 120
Section 903.    Other Remedies; Rights of Holders; Subordination ...................................... 120
Section 904.    Right of Bond Insurer and Holders to Direct Proceedings ............................ 122
Section 905.    Application of Monies .................................................................................. 123
Section 906.    Remedies Vested in Trustee ......................................................................... 125
Section 907.    Limitations on Suits ..................................................................................... 125
Section 908.    Waivers of Events of Default ........................................................................ 126
Section 909.    Unconditional Right to Receive Principal, Premium and Interest ................. 126
Section 910.    Notice of Defaults; Opportunity to Cure Defaults ........................................ 127
Section 911.    Bond Insurer as Registered Owner of Bonds Insured .................................. 127
Section 912.    NFL Requirements ........................................................................................ 127
Section 913.    Payments During Event of Default ............................................................... 128
Section 914.    Construction Rights ...................................................................................... 128
Section 915.    Defaulting Controlling Bond Insurer ............................................................ 128

**ARTICLE X.** THE TRUSTEE ......................................................................................................... 129

Section 1001.    Acceptance of Trusts .................................................................................. 129
Section 1002.    Fees, Charges and Expenses of Trustee ...................................................... 131
Section 1003.    Reserved ..................................................................................................... 132
Section 1004.    Merger or Consolidation of Trustee ........................................................... 132
Section 1005.    Resignation by Trustee ............................................................................... 132
Section 1006.    Removal of Trustee ..................................................................................... 132
Section 1007.    Appointment of Successor Trustee by the Controlling Bond Insurer or Holders;
Temporary Trustee ..................................................................................... 132
Section 1008.    Concerning any Successor Trustee .............................................................. 133
Section 1009.    Trustee Protected in Relying Upon Resolutions, etc .................................... 133
Section 1010.    Successor Trustee as Bond Registrar, Custodian of Debt Service Fund and
Paying Agent .............................................................................................. 133
Section 1011.    Notice to Rating Agencies .......................................................................... 133

**ARTICLE XI.** SUPPLEMENTAL INDENTURES ........................................................................ 134

Section 1101.    Supplemental Indentures Not Requiring Consent of Holders ....................... 134
Section 1102.    Supplemental Indentures Requiring Consent of Holders .............................. 135
Section 1103.    Opinion of Counsel ..................................................................................... 136
Section 1104.    Trustee's Obligation ................................................................................... 137

**ARTICLE XII.** AMENDMENT OF FINANCING AGREEMENTS AND CERTAIN OTHER
DOCUMENTS ........................................................................................................... 137

- iv -

Section 1201. Amendments, etc., to Financing Agreements Not Requiring Consent of Holders ........................................................................................................................ 137
Section 1202. Amendments, etc., to Financing Agreements Requiring Consent of Holders 137
Section 1203. Limitation on Amendments ............................................................... 138
Section 1204. Amendment by Unanimous Consent ................................................. 138
Section 1205. Opinion of Counsel; Consent of StadCo Required ........................... 138

**ARTICLE XIII.** MISCELLANEOUS ................................................................. 139

Section 1301. Evidence of Signatures of Holders; Consents, etc., of Holders .................... 139
Section 1302. Limitation of Rights ........................................................................... 139
Section 1303. Limitation of Liability of Officers, Directors, etc., of StadCo ..................... 139
Section 1304. Notices, etc. ....................................................................................... 139
Section 1305. Successors and Assigns ..................................................................... 140
Section 1306. Severability ........................................................................................ 140
Section 1307. Applicable Law .................................................................................. 140
Section 1308. Parties Interested Herein ................................................................... 140
Section 1309. Limitation on Recourse ..................................................................... 140
Section 1310. Preservation and Inspection of Documents ....................................... 141
Section 1311. Counterparts ...................................................................................... 141
Section 1312. Compliance by Secured Parties with NFL Agreement ...................... 141
Section 1313. Effective Date .................................................................................... 141


Exhibit A       Form of Requisition .......................................................................... A-1
Exhibit A-1     Form of IE Confirmation of Requisition ....................................... A-1-1
Exhibit B       Insurance Requirements ................................................................... B-1
Exhibit C       Form of Deposit Account Control Agreement ................................. C-1
Exhibit D       Indebtedness .................................................................................... D-1
Exhibit E       Consents and Approvals .................................................................. E-1
Exhibit F       Reserved .......................................................................................... F-1
Exhibit G       Reserved .......................................................................................... G-1
Exhibit H       Form of NFL Agreement ................................................................. H-1


Annex A         Form of Confidentiality Agreement

Schedule 1      Financing Agreements
Schedule 2      Project Real Estate Agreements

10662025.17

# INDENTURE OF TRUST

**THIS INDENTURE OF TRUST**, made and entered into as of August 1, 2007 (this "Indenture"), by and between **GIANTS STADIUM LLC**, a New Jersey limited liability company ("StadCo"), and **THE BANK OF NEW YORK**, a New York banking corporation with corporate trust offices in New York, New York, as trustee (together with any successor as trustee, the "Trustee");

## W I T N E S S E T H :

**WHEREAS**, StadCo intends to issue $650,000,000 of its Project Revenue Bonds, Series 2007 (the "Initial Bonds," as more fully defined in Section 101) under this Indenture to provide a portion of the funds necessary to demolish the existing football stadium located at the Meadowlands Sports Complex (generally known as "Giants Stadium") and to develop, construct, equip, own and operate an open-air stadium having a seating capacity of approximately 82,000 and related equipment and appurtenances (the "Stadium," as more fully defined in Section 101), including related infrastructure improvements (collectively, the "Project," as more fully defined in Section 101), for, among other purposes, the staging of athletic, concert and entertainment events, including home football games played by the National Football League franchise known as the New York Giants and home football games played by the National Football League franchise known as the New York Jets;

**WHEREAS**, New Meadowlands Stadium Company, LLC (the "JV Company"), which is presently owned 50 percent (50%) by StadCo and 50 percent (50%) by Other StadCo (defined herein), and New Jersey Sports and Exposition Authority ("NJSEA"), owner of the Meadowlands Sports Complex, have entered into a Ground Lease and Development Agreement, dated December 21, 2006 (the "Ground Lease"), under which, among other things, the JV Company, as ground lessee, (i) has the exclusive right to design, develop and construct the Project, (ii) has the exclusive right to use, occupy and exploit the Stadium and certain adjacent premises for an initial term of 40 years, subject to four options to extend the term for periods of 14.5 years each, and (iii) will make PILOT (as defined herein) and rent payments to the NJSEA, as ground lessor, in the initial aggregate amount of $6.3 million per year, subject to certain CPI Index adjustments;

**WHEREAS**, the JV Company will enter into a separate sublease (each a "StadCo Sublease," as more fully defined, with respect to StadCo, in Section 101) with each of StadCo and Other StadCo, which, among other provisions, will entitle StadCo to use the Stadium for the NFL home games of the Giants Team and Other StadCo to use the Stadium for the NFL home games of the Jets Team;

**WHEREAS**, StadCo desires to finance a portion of the development and construction of the aforementioned Project with the proceeds of bonds to be issued pursuant to this Indenture and any other amounts to be deposited by StadCo with the Trustee and to be held by the Trustee or StadCo pursuant to the terms of this Indenture;

**WHEREAS**, StadCo is authorized to enter into this Indenture, and to issue its revenue bonds and to incur other indebtedness as hereinafter provided, and to do or cause to be done all of the acts and things herein provided or required to be done as hereinafter covenanted;

**WHEREAS**, StadCo and the Trustee each has full right and lawful authority to enter into this Indenture, and to perform and observe the provisions hereof on their respective parts to be performed and observed;

**WHEREAS**, in addition to the Bonds (as defined herein), which may be issued from time to time by StadCo to finance (or refinance) a portion of the development and construction of the Project, this Indenture permits StadCo to:

(a)    issue or incur Permitted Subordinated Indebtedness (as defined herein) pursuant to the provisions of and subject to the conditions set forth in Section 207; and

(b)    authorize and issue or incur Non-Indenture Permitted Debt (as defined herein); and

**WHEREAS**, all things necessary to make the Bonds, when authenticated by the Trustee and issued as provided in this Indenture, valid, binding and legal limited obligations of StadCo and to constitute this Indenture a valid and binding agreement securing the payment of the principal of and premium, if any, and interest on the Bonds issued and to be issued hereunder, have been done and performed and the execution and delivery of this Indenture and the execution and issuance of the Bonds, subject to the terms hereof, have in all respects been duly authorized;

**NOW, THEREFORE, THIS INDENTURE FURTHER WITNESSETH:**

That StadCo, as security for payment of the principal of and premium, if any, and interest on the Bonds, payment of any related Parity Obligations, and payment of any Swap Payments (as those terms are defined herein) does hereby pledge and assign without recourse to the Trustee, and grant to the Trustee a lien on and security interest in, the following described property:

(A)    The proceeds of the Bonds;

(B)    Any Swap Payments received or receivable by StadCo under any Qualified Swap (as defined herein);

(C)    The Pledged Revenues (as defined herein);

(D)    All right, title and interest of StadCo in and to the Funds, Accounts and Subaccounts (other than the Excluded Accounts), including monies and investments therein, held by the Trustee or StadCo pursuant to the terms of this Indenture; and

(E)    Each and every other component, from time to time, of the Collateral (as defined herein);

and the Trustee and StadCo are hereby authorized to receive such property and contract rights at any time and to hold and apply the same subject to the terms hereof;

**TO HAVE AND TO HOLD** all the same with all privileges and appurtenances hereby conveyed and assigned, or agreed or intended to be conveyed and assigned, to the Trustee and its successors in such trust and their assigns forever;

**IN TRUST** for the equal benefit, protection and security of the Holders of any and all of the Bonds and Holders of Parity Obligations (as those terms are defined herein), all of which, regardless of the time or times of their authentication, issuance and delivery, or maturity, or incurrence or entering into, shall be of equal rank without preference, priority or distinction of any of the Bonds over any other Bonds, Parity Obligations over any other Parity Obligations, or Swap Payments over any other Swap Payments, except as otherwise expressly provided in or permitted by this Indenture or any Supplemental Indenture, upon the terms and conditions hereinafter stated;

**PROVIDED, HOWEVER,** that if StadCo, its successors or assigns, shall well and truly pay, or cause to be paid, or provide for the payment of, pursuant to the provisions of this Indenture, the principal of the Bonds and the interest and any redemption premium due or to become due thereon (provided, however, that payment of the principal of and interest on the Bonds by any Bond Insurer shall not constitute payment by StadCo, its successors or assigns for purposes of this paragraph), Parity Obligations and Swap Payments at the times and in the manner mentioned in such Bonds and this Indenture, according to the true intent and meaning thereof, and shall well and truly keep, perform and observe all the covenants and agreements as provided in and pursuant to the terms of this Indenture to be kept, performed and observed by it, and shall pay or cause to be paid to the Trustee all sums of money due or to become due to it in accordance with the terms and provisions hereof, then except as otherwise set forth in this Indenture, upon such performance and payments, this Indenture and the rights hereby granted shall cease, terminate and be void, otherwise this Indenture shall remain in full force and effect; and

That StadCo hereby covenants and agrees with the Trustee and with the respective owners, from time to time, of the Bonds and Holders of Parity Obligations as follows:

## ARTICLE I.
## DEFINITIONS AND RULES OF CONSTRUCTION

**Section 101.  Definitions.**  The following words and terms as used in this Indenture shall have the following meanings unless a different meaning clearly appears from the context:

"Account" or "Accounts" shall mean each account or all of the accounts designated, created or established in Article V, as the case may be.

"Accreted Value" shall mean with respect to any Capital Appreciation Bonds (i) as of any Valuation Date, the amount set forth for such date in the Supplemental Indenture authorizing such Capital Appreciation Bonds and (ii) as of any date other than a Valuation Date, the sum of (a) the Accreted Value on the preceding Valuation Date and (b) the product of (1) a fraction, the numerator of which is the number of days having elapsed from the preceding Valuation Date and

the denominator of which is the number of days from such preceding Valuation Date to the next succeeding Valuation Date and (2) the difference between the Accreted Values for such Valuation Dates. For purposes of this definition, the number of days having elapsed from the preceding Valuation Date and the number of days from the preceding Valuation Date to the next succeeding Valuation Date shall be calculated on the basis of a 360-day year of twelve 30-day months.

"ADA" shall mean the Americans with Disabilities Act of 1990, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"Additional Bonds" shall mean any Bonds issued pursuant to Section 204.

"Adjusted Debt Service Reserve Fund Requirement" shall mean, with respect to any Series of Outstanding Senior Lien Bonds, an amount equal to 10 percent (10%) of the aggregate principal amount of such Series of Senior Lien Bonds Outstanding at the time of the calculation.

"Affiliate" shall mean, with respect to a specified Person, any other Person directly or indirectly controlling, controlled by or under common control with such specified Person. For the purposes of this definition, "control" of a Person means the beneficial ownership of more than 50% of the class of securities entitled to vote for the election of members of the board of directors or similar governing body of such Person, and "controlling", "controlled by" and "under common control" shall have the corresponding meanings. For the avoidance of doubt, StadCo shall not be deemed to "control" the JV Company except during any period when it has the right pursuant to the Joint Venture Agreement to appoint, and has appointed, more than half of the Board of Managers of the JV Company.

"Amortized Value," when used with respect to Permitted Investments purchased at a premium above or a discount below par, shall mean the value as of any given time obtained by dividing the total premium or discount at which such Permitted Investments were purchased by the number of interest payments remaining on such Permitted Investment after such purchase and deducting the amount thus calculated on each interest payment date after such purchase from the purchase price in the case of a Permitted Investment purchased at a premium or adding the amount thus calculated for each interest payment date after such purchase to the purchase price in the case of a Permitted Investment purchased at a discount.

"Ancillary Development" shall mean the approximately 520,000 sq. ft. ancillary development that is contemplated by the Ground Lease. The Ancillary Development shall not be financed by StadCo with the proceeds of any Bonds.

"Annual Budget" shall mean the annual budget provided for in Section 609(r), as it may be updated from time to time pursuant to said Section.

"Annual Debt Service" shall mean the aggregate amount of Debt Service accruing and payable during a Fiscal Year.

"Applicable Law" shall mean all federal, state and local laws, rules and regulations applicable from time to time to the Project or to the Financing Agreements, the design and

development agreements or the Project Real Estate Agreements, or to the performance by StadCo of any of its obligations with respect thereto.

"Applicable Percentage" shall mean (i) 50 percent (50%), prior to the termination or expiration of the Jets Team Lease, and (ii) 100 percent (100%), after the termination or expiration of the Jets Team Lease.

"Appreciated Value" shall mean with respect to any Deferred Income Bonds (i) as of any Valuation Date, the amount set forth for such date in the Supplemental Indenture authorizing such Deferred Income Bonds, (ii) as of any date prior to the Interest Commencement Date other than a Valuation Date, the sum of (a) the Appreciated Value on the preceding Valuation Date and (b) the product of (1) a fraction, the numerator of which is the number of days having elapsed from the preceding Valuation Date and the denominator of which is the number of days from such preceding Valuation Date to the next succeeding Valuation Date and (2) the difference between the Appreciated Values for such Valuation Dates, and (iii) as of any date on and after the Interest Commencement Date, the Appreciated Value on the Interest Commencement Date. For purposes of this definition, the number of days having elapsed from the preceding Valuation Date and the number of days from the preceding Valuation Date to the next succeeding Valuation Date shall be calculated on the basis of a 360 day year of twelve (12) 30 day months.

"Assignment of Leases and Rents" shall mean the Assignment of Leases and Rents, dated as of August 16, 2007, from StadCo to the Trustee for the benefit of the owners of the Bonds and the Holders of Parity Obligations related thereto.

"Authorized Denomination" shall have the meaning provided in a Supplemental Indenture.

"Authorized Representative" shall mean the president, treasurer, chief financial officer, secretary, any vice president or manager of StadCo, or the president, treasurer, chief financial officer, secretary, any vice president or manager of the managing member of StadCo, or any other Person specified in a certificate delivered to the Trustee by an Authorized Representative.

"Average Annual Debt Service" shall mean as of any date of calculation with respect to any Series of Bonds or type of Bonds within the same Series, an amount equal to the average of the Annual Debt Service on such Outstanding Bonds for each of the then current and all future Fiscal Years.

"Balloon Bonds" shall mean Long-Term Indebtedness, 25% or more of the original principal of which matures during any 12-month period, if such maturing principal amount is not required to be amortized below such percentage by mandatory redemption or prepayment prior to such 12-month period. Balloon Bonds does not include Bonds which otherwise would be classified hereunder as Put Bonds.

"Bank Bonds" shall have the meaning provided in Section 206(d)(ii); provided, however, that Bank Bonds shall not include any Bonds issued to or held by any Bond Support Facility Provider or its designee in any other capacity.

"Beneficial Owner" shall mean any Person which (a) has the power, directly or indirectly, to vote or consent with respect to, or to dispose of ownership of, any Bonds (including Persons holding Bonds through nominees, depositories or other intermediaries), or (b) is treated as the owner of any Bonds for federal income tax purposes.

"Bond" or "Bonds" shall mean Initial Bonds, Additional Bonds, Completion Bonds and Refunding Bonds, authenticated and delivered under this Indenture.

"Bond Fees" shall mean the periodic fees of any Persons (other than employees of StadCo or any Affiliate thereof) required to facilitate any variable or auction rate program relating to the Bonds (such as an auction agent, broker-dealer, market agent or remarketing agent).

"Bondholder," "bondholder," "Holder," "holder," "Owner," or "owner" shall mean the registered owner of any Outstanding Bond.

"Bondholders' Voting Weight" shall mean, as of any date of calculation, the aggregate principal amount of Bonds then Outstanding.

"Bond Insurance Policy" shall mean collectively, a policy or policies of bond insurance insuring the payment when due of the principal of and interest on all or a portion of a Series of Bonds issued to the Trustee by one or more Bond Insurers.

"Bond Insurance Premium Agreement" shall mean an agreement by and between StadCo and a Bond Insurer in respect of the payment of the premium for a Bond Insurance Policy.

"Bond Insurer" shall mean any nationally recognized company engaged in the business of insuring bonds or providing financial guarantees or sureties which may from time to time issue a Bond Insurance Policy insuring the payment of the principal of and interest on all or any portion of the Bonds of any Series, and/or agree to provide a Swap Insurance Policy insuring Regularly Scheduled Swap Payments and/or Parity Swap Termination Payments and/or Swap Termination Payments to be made by StadCo pursuant to a Qualified Swap, and/or agree to provide a Reserve Account Surety Bond to be deposited in any Account in the Senior Lien Debt Service Reserve Fund, Second Lien Debt Service Reserve Fund or Senior Lien Strike Reserve Fund, pursuant to any provision of this Indenture, in lieu of or in substitution for monies on deposit (or to be on deposit) therein.

"Bond Proceeds Account" shall mean the Account of that name in the Construction Fund created by Section 501.

"Bond Registrar" shall mean the Trustee or any successor thereto.

"Bond Support Facility" shall mean any irrevocable letter of credit, standby bond purchase agreement, line of credit, policy of bond insurance, surety bond, guarantee or similar instrument which is obtained by StadCo and is issued by a financial, insurance or other institution and which provides security or liquidity in respect of any Bonds (and with respect to a Bond Insurance Policy guarantees the payment of principal of and interest on such Bonds when due), but not including any Reserve Account Credit Facility.

"Bond Support Facility Provider" shall mean the issuer or other provider of a Bond Support Facility.

"Book Entry Bonds" shall mean Bonds issued in book-entry only form through the Securities Depository pursuant to Section 202 hereof.

"Business Day" shall mean Monday through Friday, excluding weekends and federal holidays, from the hours of 9:00 am to 5:00 pm, prevailing Eastern Time.

"Capital Appreciation Bonds" shall mean any Bonds hereafter issued as to which interest is payable only at the maturity or prior redemption of such Bonds. For the purposes of (i) receiving payment of the Redemption Price if a Capital Appreciation Bond is redeemed prior to maturity or (ii) computing the principal amount of Bonds held by the registered owner of a Capital Appreciation Bond in giving to StadCo or the Trustee any notice, consent, request, or demand pursuant to the Indenture for any purpose whatsoever, the principal amount of a Capital Appreciation Bond shall be deemed to be its Accreted Value.

"Capitalized Interest Fund" shall mean the Capitalized Interest Fund created by Section 501.

"Closing Date" shall mean each date of delivery of a Series of Bonds.

"Club Seat(s)" shall mean those seats in the Stadium, initially expected to number approximately 9,000, that will be sold to the public as "club seats," or any other term by which such seats may be referred to in the future.

"Club Seat Premiums" shall mean all fees paid for the annual license or rental of Club Seats for Giants Home Games (excluding fees paid for personal seat licenses), minus all amounts constituting the ticket component of such fees and VTS on amounts in excess of the ticket component, and all taxes and credit card fees payable with respect to such license or rental.

"Collateral" shall mean StadCo's right, title and interest in, to and under: the Pledged Revenues; the subleasehold interest in the Stadium under the StadCo Sublease; StadCo's interest in its Giants Team Lease; any insurance proceeds or condemnation awards paid or payable to StadCo pursuant to Articles 6 and 19 of the StadCo Sublease, subject to StadCo's right to rebuild (or contribute to the rebuilding of) the Project from such proceeds in accordance with this Indenture and any rights of the NJSEA and of any leasehold mortgagee recognized by NJSEA; all proceeds of the Bonds; the Debt Service Reserve Funds and the other Funds, Accounts and Subaccounts (and all cash, securities and financial assets in such accounts) described herein, other than the Excluded Accounts; Qualified Swap(s) and any Swap Payments received or receivable by StadCo thereunder; all proceeds of the foregoing; and any and all other assets and property purported to be conveyed as collateral pursuant to any of the Collateral Documents, whether now or hereafter existing or arising or now owned or hereafter acquired and wherever located, all accessions thereto, and all proceeds and products thereof.

"Collateral Document Event of Default" shall mean the occurrence of either of the following: (i) any Event of Default described in Section 901(a) or (b) hereof; or (ii) any other

Event of Default described in Section 901 hereof, but only if the Trustee shall have exercised its rights under Section 902 hereof with respect to such other Event of Default.

"Collateral Documents" shall mean this Indenture; all Supplemental Indentures; the Leasehold Mortgage; the Assignment of Leases and Rents; the Naming Rights and Suite Sales Agreement; the Consent and Acknowledgment; the Pledge, Assignment and Security Agreement; the Non-Relocation Agreement; StadCo's Qualified Swap(s); the UCC Financing Statements; any and all Deposit Account Control Agreements; together with such other consents to assignment, instruments, agreements, documents and certificates, now or hereafter entered into, to evidence or secure StadCo's obligations hereunder.

"Combined Voting Weight" shall mean, collectively, the Bondholders' Voting Weight and the Parity Swap Holders' Voting Weight.

"Committed Amounts" shall mean (i) the proceeds of any drawings on the NFL Facility which are deposited, or are available to be deposited, in the NFL Facility Proceeds Account in the Construction Fund, (ii) the proceeds of any Completion Bonds and any unissued Initial Bonds that are available and permitted to be issued under this Indenture, (iii) the proceeds of any Permitted Subordinated Indebtedness which are deposited, or are available to be deposited, in the Other Proceeds Account in the Construction Fund, and (iv) any other monies which are deposited in the Other Proceeds Account in the Construction Fund.

"Completion Bonds" shall mean Bonds issued pursuant to Section 205.

"Completion Certificate" shall mean the certificate executed by StadCo and delivered to the Trustee and each Bond Insurer (which are the only Persons permitted to rely thereupon) to evidence either (i) the Substantial Completion of the Project, by addressing the matters set forth in the definition of "Substantial Completion," or (ii) the completion (as defined in the Supplemental Indenture relating to the Additional Bonds) of any Improvement financed with the proceeds of Additional Bonds.    The Completion Certificate evidencing the Substantial Completion (within the meaning of clause (x) of the definition of such term) of the Project shall be accompanied by an IE Confirmation. The delivery of such Completion Certificate shall not be construed to indicate that any contractor, design professional or other third party has fulfilled its obligations under any agreement in favor of StadCo or the JV Company with regard to the design, development or construction of the Project including the timely fulfillment of any substantial completion requirements.

"Confidentiality Agreement" shall mean a confidentiality agreement in the form of Annex A to this Indenture, or a written confidentiality agreement in such other form as is acceptable to StadCo.

"Consent and Acknowledgment" shall mean the Consent, Acknowledgment and Agreement, dated as of August 1, 2007, by and among the JV Company, the Controlling Bond Insurer, StadCo, Other StadCo and the Other Controlling Bond Insurer, pursuant to which the JV Company, StadCo and Other StadCo acknowledge and consent to certain contingent rights of the Controlling Bond Insurer and the Other Controlling Bond Insurer in connection with the construction of the Stadium by the JV Company.

"Construction Fund" shall mean the Construction Fund created by Section 501.

"Construction Period" shall mean the period beginning upon the Commencement of Construction (as defined in the Ground Lease) and ending upon Substantial Completion.

"Controlling Bond Insurer" shall mean, subject to Section 915 hereof, with respect to Outstanding Insured Bonds of the same lien priority, so long as any such Insured Bonds are Outstanding, the Bond Insurer that from time to time is insuring, in the aggregate, the greatest maturity amount (expressed in United States dollars) of such Insured Bonds; provided, however, that in the event that two or more Bond Insurers are insuring the same maturity amount of such Insured Bonds, and no one Bond Insurer is insuring a greater amount of such Insured Bonds, such Bond Insurers shall among themselves designate the Controlling Bond Insurer; and provided, further, that a Controlling Bond Insurer with respect to the Senior Lien Bonds shall be the Controlling Bond Insurer for all purposes under this Indenture, regardless of whether or to what extent, if any, such Bond Insurer is also then insuring Insured Bonds of any lower lien priority.

"Costs of Issuance" shall mean the items of expense incurred in connection with the authorization, sale and issuance of a Series of Bonds, which items of expense may include, but are not limited to, document printing and reproduction costs, filing and recording fees, costs of credit ratings, initial fees and charges of the Trustee or Securities Depository, legal fees and charges, professional consultants' fees, underwriting fees, fees and charges for execution, transportation and safekeeping of Bonds, premiums, fees and charges in order to obtain Bond Insurance Policies or Swap Insurance Policies, obtain, renew or extend Bond Support Facilities, Reserve Account Credit Facilities, Qualified Swaps and other similar financial arrangements, costs and expenses of refunding such Bonds and other costs, charges and fees, including those incurred by StadCo, in connection with the foregoing.

"Costs of the Project" shall mean all hard and soft costs of acquiring, developing, designing, engineering, constructing, equipping and completing the Project, whether incurred or paid prior to or after the date any Bonds are issued, and whether incurred or paid with respect to the development of the Project or any other stadium for the Giants Team or Jets Team in the New York metropolitan area; together with all contingencies, fees, costs and expenses relating thereto and all pre-development costs related to all such project and stadium development efforts, whether undertaken by the JV Company, StadCo, Other StadCo, either of the Giants Team or the Jets Team, their respective direct or indirect owners, or any Affiliates of the foregoing, including, but not limited to: (i) site preparation costs, including all testing, environmental abatement and demolition costs; (ii) all amounts payable under all design, development, and construction agreements (including the Design-Build Contract) and all project and pre-development agreements; (iii) all permit costs, licensing fees and costs of insurance; (iv) furniture, fixtures and equipment expenses and costs of materials; (v) development and predevelopment costs, fees and related salary expenses; (vi) construction management services expenses; (vii) contingencies and working capital costs; (viii) payments under any agreements relating to construction; (ix) start-up and opening costs; (x) financing, consulting and legal costs and other professional costs and fees; and (xi) taxes, insurance and any other fees, costs, expenses and funding requirements associated with the Project or the issuance of the Bonds, any Parity Obligations or any Permitted Subordinated Indebtedness, including all capitalized interest and all funding requirements for

debt service reserves required under this Indenture, any Supplemental Indenture or any related document and any other reserves StadCo determines to be reasonable or prudent.

"CPI Index" (or "Consumer Price Index") shall have the meaning assigned thereto in the Ground Lease.

"Damages" shall have the meaning set forth in Section 609(v) hereof.

"Debt Limit" shall mean "Debt Limit" as that term is defined in the NFL Agreement.

"Debt Service" shall mean, for any applicable period, without duplication (u) the aggregate payments made or required to be made in respect of the principal of, and premium, if any, and interest on Bonds and Bond Fees, if any; provided, however, that for the purposes of such calculation for any future period (except as otherwise provided in a Supplemental Indenture), (i) the interest on any Variable Interest Rate Bonds shall be calculated at the Projected Rate, (ii) the Accreted Value of Capital Appreciation Bonds and the Appreciated Value of Deferred Income Bonds shall be included at the times and in the manner provided in subsection (c) of Section 203; (iii) any Put Bonds Outstanding during such period which are secured as to payment of principal upon tender prior to maturity date by a Bond Support Facility shall be assumed to mature on the stated maturity date thereof, unless such Bond Support Facility expires within six months or less of the date of calculation in which case such Put Bonds shall be assumed to mature on the expiration date of such Bond Support Facility; (iv) any such Put Bonds Outstanding which are not so secured by a Bond Support Facility shall be assumed to mature on the next date upon which the Holder thereof may require payment thereof or on which such Bonds are required to be tendered for payment; (v) Extendible Maturity Bonds Outstanding during such period shall be deemed to mature on the later of the stated maturity date or the date to which such stated maturity date has been extended; (vi) with respect to Balloon Bonds Outstanding, it shall be assumed that (1) the Balloon Bonds mature over 30 years from the date of issuance and bear interest payable on a level annual debt service basis over a period of no more than 30 years or (2) the portion of Balloon Bonds coming due in such Fiscal Year matures according to its actual principal amortization schedule, and bears interest on the unpaid balance from time to time, but only if the payments of principal of and interest on such Balloon Bonds varies no more than 10% per year; and (vii) for any Bonds in respect of which a binding commitment, letter of credit or other credit arrangement providing for the extension of the payment of principal of and interest on such Bonds beyond the original maturity date exists, the computation of the annual amount payable on account of principal and interest on such Bonds shall, at the option of StadCo, be made on the assumption that such Bonds will be amortized in accordance with such credit arrangement so long as such credit arrangement is rated in one of the three highest Rating Categories or in the highest short term Rating Category (without regard to any gradation within such categories); *plus* (v) all premiums and similar payments paid or to be paid by StadCo in respect of Bond Insurance Policies, Reserve Account Credit Facilities, and Swap Insurance Policies; *plus* or *minus* (w) the aggregate payments made or required to be made in respect of any Parity Obligations (other than Parity Swap Termination Payments) (provided, however, that with respect to any Regularly Scheduled Swap Payments, the aggregate amount of any such payments made or to be made shall be reduced by the aggregate amount of any payments received or to be received from the applicable Qualified Swap Provider, which may result in negative aggregate payments for purposes of this clause (w)); *plus* (x) the aggregate

payments made or required to be made in respect of the principal of, and premium, if any, and interest on any Permitted Subordinated Indebtedness; *plus* (y) the aggregate payments made or required to be made in respect of the principal of, and premium, if any, and interest on any guaranteed indebtedness for which StadCo as guarantor would then have liability with respect to such applicable period; and *plus* (z) solely for purposes of calculating the Senior Lien Pro Forma Debt Service Coverage Ratio, the Second Lien Pro Forma Debt Service Coverage Ratio or the Total Pro Forma Debt Service Coverage Ratio in connection with the issuance of Additional Bonds or the incurrence of Permitted Subordinated Indebtedness pursuant to Section 204 or Section 207 hereof, respectively, StadCo's Applicable Percentage of the aggregate payments made or required to be made by the JV Company in respect of the principal of, and premium, if any, and interest on indebtedness of the JV Company incurred in accordance with Section 3(c)(ii)(y) of the Joint Venture Agreement. Notwithstanding the foregoing, the calculation of "Debt Service" shall not include (i) for purposes of the definitions of Adjusted Debt Service Reserve Fund Requirement, Debt Service Reserve Fund Requirement and Senior Lien Strike Reserve Fund Requirement, (A) any Bond Fees, or (B) any premiums or similar payments paid or to be paid by StadCo in respect of Bond Insurance Policies, Reserve Account Credit Facilities, and Swap Insurance Policies; and (ii) for all purposes, prepayments made in respect of any principal of or premium or interest on Indebtedness or on any guaranteed indebtedness for which StadCo is guarantor.

"Debt Service Fund" shall mean either of the Senior Lien Debt Service Fund and the Second Lien Debt Service Fund created pursuant to Section 501.

"Debt Service Reserve Fund" shall mean either of the Senior Lien Debt Service Reserve Fund and the Second Lien Debt Service Reserve Fund created pursuant to Section 501.

"Debt Service Reserve Fund Requirement" shall mean (a) with respect to any Series of Senior Lien Bonds, an amount equal to five percent (5%) of the original aggregate principal amount of such Series of Senior Lien Bonds; provided, however, that if (i) beginning with the first full Fiscal Year commencing after Substantial Completion, the Senior Lien Historical Debt Service Coverage Ratio is less than 1.15:1.00 in any Fiscal Year (assuming, for purposes of such first full Fiscal Year only, that Pledged Revenues for such Fiscal Year include all Pledged Revenues received on or after the Effective Date and prior to the end of such Fiscal Year), as set forth in the report required to be delivered by StadCo pursuant to Section 609(i) hereof, or (ii) there occurs and is continuing a Pending NFL Strike Risk, then the Debt Service Reserve Fund Requirement shall thereafter (except as provided below) be equal to the Adjusted Debt Service Reserve Fund Requirement; and (b) with respect to the Bonds that are Second Lien Bonds, the amount, if any, set forth in the Supplemental Indenture authorizing the issuance of such Second Lien Bonds. Notwithstanding proviso (i) above, upon delivery by StadCo of a certificate (with assumptions, if any, based upon reasonable projections) to the effect that the applicable Senior Lien Pro Forma Debt Service Coverage Ratio for the then-current and next-succeeding Fiscal Year is or is projected to be equal to or greater than 1.25:1.00, the Debt Service Reserve Fund Requirement with respect to any Series of Senior Lien Bonds shall, unless otherwise required by proviso (ii) above, be reduced to the amount required by clause (a), above. Notwithstanding proviso (ii) above, upon delivery by StadCo of a certificate to the effect that there is no continuing Pending NFL Strike Risk, the Debt Service Reserve Fund Requirement with respect

to any Series of Senior Lien Bonds shall, unless otherwise required by proviso (i) above, be reduced to the amount required by clause (a), above.

"Deferred Income Bond" shall mean any Bond (A) as to which interest accruing thereon on or prior to the Interest Commencement Date of such Bond is (i) compounded on each Valuation Date for such Deferred Income Bond and (ii) payable only at the maturity or prior redemption of such Bond and (B) as to which interest accruing after the Interest Commencement Date is payable on the first Interest Payment Date immediately succeeding the Interest Commencement Date and semi-annually thereafter on the dates specified in the Supplemental Indenture authorizing such Bond. For the purposes of (i) receiving payment of the Redemption Price if a Deferred Income Bond is redeemed prior to maturity or (ii) computing the principal amount of Bonds held by the registered owner of a Deferred Income Bond in giving to StadCo or the Trustee any notice, consent, request, or demand pursuant to the Indenture for any purpose whatsoever, the principal amount of a Deferred Income Bond shall be deemed to be its Appreciated Value.

"Deposit Account Control Agreements" shall mean each agreement in substantially the form of Exhibit C hereto (together with such changes required from time to time in light of amendments to the Uniform Commercial Code-Secured Transactions or any successor body of law of the state applicable to any individual Deposit Account Control Agreement, and any changes required by the Depository and which do not affect the Trustee's security interests thereunder), entered into among StadCo, the Trustee and the applicable Depository in accordance with Section 501 hereof.

"Depository" shall mean, subject to Section 701, any bank, trust company, national banking association, savings and loan association, savings bank or other banking association selected by StadCo as a depository of monies and/or securities held under the provisions of the Indenture and may include the Trustee.

"Design-Build Contract" means the Design-Build Services Agreement, dated as of January 23, 2007, between the JV Company and the Design-Builder, relating to the design and construction of the Stadium, including any amendments or supplements thereto in accordance with the provisions of Section 609(gg) herein.

"Design-Build Contract Parent Guaranty" shall mean the guaranty of Skanska AB, dated as of January 23, 2007, guaranteeing the obligations of the Design-Builder under the Design-Build Contract.

"Design-Builder" shall mean Skanska USA Building Inc., or its successors and assigns.

"DTC" shall have the meaning provided in Section 202 hereof.

"Early Termination Option" shall have the meaning provided in Section 803 hereof.

"Early Termination Right" shall have the meaning provided in Section 803 hereof.

"Effective Date" shall mean the date specified in Section 1313 hereof as the date of execution and delivery of this Indenture by the parties hereto.

"Equity Distribution" shall mean any transfer of cash and/or securities from the Operating Fund or the Trustee Revenue Fund, as the case may be, as permitted by this Indenture, free and clear of the lien and pledge of this Indenture. For the avoidance of doubt, Tax Distributions are not Equity Distributions.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"ERISA Affiliate" shall mean any Person that for purposes of Title IV of ERISA is a member of StadCo's controlled group, or under common control with StadCo, or is otherwise required to be treated with StadCo as a single employer, within the meaning of Section 414(b) or (c) of the Internal Revenue Code of 1986, as amended from time to time, and any successor statute.

"ERISA Event" shall mean (a) (i) the occurrence of a Reportable Event, within the meaning of Section 4043 of ERISA, with respect to any Plan unless the 30 day notice requirement with respect to such event has been waived by the PBGC, or (ii) the requirements of subsection (1) of Section 4043(b) of ERISA are met with a contributing sponsor, as defined in Section 4001(a)(13) of ERISA, of a Plan, and an event described in paragraph (9), (10), (11), (12) or (13) of Section 4043(c) of ERISA is reasonably expected to occur with respect to such Plan within the following 30 days; (b) the application for a minimum funding waiver with respect to a Plan; (c) the provision by the administrator of any Plan of a notice of intent to terminate such Plan pursuant to Section 4041(a)(2) of ERISA (including any such notice with respect to a plan amendment referred to in Section 4041(e) of ERISA); (d) the cessation of operations at a facility of StadCo or any ERISA Affiliate in the circumstances described in Section 4062(e) of ERISA; (e) the withdrawal by StadCo or any ERISA Affiliate from a Multiple Employer Plan during a plan year for which it was a substantial employer, as defined in Section 4001(a)(2) of ERISA; (f) the withdrawal by StadCo or any ERISA Affiliate from a Multiemployer Plan which has a Material Adverse Effect on StadCo; (g) the conditions for the imposition of a lien under Section 302(f) of ERISA shall have been met with respect to any Plan; (h) the adoption of an amendment to a Plan requiring the provision of security to such Plan pursuant to Section 307 of ERISA; or (i) the institution by the PBGC of proceedings to terminate a Plan or the appointment of a trustee to administer a Plan pursuant to Section 4042 of ERISA.

"Event of Default" shall mean any of the events enumerated in Section 901.

"Excluded Accounts" shall mean accounts established by StadCo pursuant to the last paragraph of Section 501, the NFL Facility Proceeds Account, the Other Proceeds Account and any subaccounts of any of the foregoing.

"Extendible Maturity Bonds" shall mean Bonds the maturities of which, by their terms, may be extended by and at the option of the Holder thereof.

"Extraordinary Trustee Fees and Expenses" shall mean the extraordinary fees and expenses of the Trustee (including legal fees) beyond its ordinary annual fees.

"Fees" shall have the meaning given to such term in Section 502(a) hereof.

"Fiduciary" or "Fiduciaries" shall mean the Trustee or any Paying Agent or any or all of them, as appropriate.

"Final Completion" shall have the meaning ascribed thereto in the Design-Build Contract.

"Financing Agreements" shall mean, collectively, those agreements identified as "Financing Agreements" in Schedule 1 attached hereto.

"First Closing Date" shall mean the date of delivery of the first Series of Bonds issued pursuant to this Indenture.

"Fiscal Year" shall mean each twelve-month period of StadCo's operations ending on March 31 of each year unless changed by the Board of Managers of StadCo; provided, that (i) for purposes of this Indenture the first Fiscal Year shall commence on the date of Substantial Completion and shall end on the next succeeding March 31 and (ii) if StadCo, each of the members of StadCo and the Teams cannot obtain the approval of the Internal Revenue Service to use a March 31 fiscal year, StadCo's fiscal year shall be the calendar year (or any other period required under applicable law).

"Force Majeure Event" shall have the meaning assigned thereto in the Ground Lease.

"Funds" shall mean each fund or all of the funds designated, created or established in Article V, as the case may be.

"GAAP" shall mean generally accepted accounting principles in the United States of America from time to time (unless otherwise specified in this Indenture or a Supplemental Indenture).

"Giants Game Day" shall mean each day on which a Giants Home Game is held (including periods after midnight for any Giants Home Game that extends past that hour).

"Giants Home Game" shall mean each NFL pre-season football game of the Giants Team, each NFL regular season football game of the Giants Team, and each NFL playoff game of the Giants Team, as the case may be, that is scheduled by the NFL to be played at the Stadium Premises. Giants Home Games shall not include any Super Bowl or other neutral site game, even if the Giants Team is designated as the "home" team.

"Giants Stadium" shall mean the open-air stadium owned and operated by NJSEA located at Meadowlands Sports Complex in existence on the date of execution of this Indenture, in which the Giants Team and Jets Team home football games are currently played, and the demolition of which is an aspect of the Project.

"Giants Team" shall mean The New York Football Giants, Inc., a member club and owner of a franchise of the NFL, including its respective successors and assigns, which will be a tenant of StadCo at the Stadium.

"Giants Team Lease" shall mean the Sublease dated as of August 16, 2007 relating to the Stadium, between StadCo as sublessor and the Giants Team as sublessee, as the same shall be amended from time to time in accordance therewith and herewith, together with a memorandum (or notice) of lease pertaining thereto.

"Government Obligations" shall mean (1) United States Treasury Certificates, Notes and Bonds (including State and Local Government Series "SLGS"); (2) Direct obligations of the United States Treasury which have been stripped by the Treasury itself, CATS, TIGRS, STRPS, and similar securities; (3) Resolution Funding Corp. (REFCORP) stripped securities. Only the interest component of REFCORP strips which have been stripped by request of the Federal Reserve Bank of New York in book entry form are acceptable; (4) Pre refunded municipal bonds rated "Aaa" by Moody's and "AAA" by S&P. If, however, the issue is only rated by S&P (*i.e.*, there is no Moody's rating), then the pre refunded bonds must have been pre refunded with cash, direct United States or United States guaranteed obligations, or "AAA" rated pre refunded municipals to satisfy this condition; (5) obligations issued by the following agencies which are backed by the full faith and credit of the United States: (a) United States Export Import Bank (Eximbank) direct obligations or fully guaranteed certificates of beneficial ownership; (b) Farmers Home Administration (FmHA) certificates of beneficial ownership; (c) Federal Financing Bank; (d) General Services Administration; (e) United States Maritime Administration Guaranteed Title XI Financings; (f) United States Department of Housing and Urban Development (HUD) project notes, local authority bonds, new communities debentures, and United States government guaranteed debentures; (g) United States public housing notes and bonds and United States government guaranteed public housing notes and bonds.

"Ground Lease" shall have the meaning assigned thereto in the recitals hereto.

"Hazardous Materials" shall mean any petroleum, petroleum products or fractions or components thereof, flammable explosives, radioactive materials, hazardous materials, hazardous wastes, hazardous or toxic substances, asbestos or any materials containing asbestos, or any other similar hazardous or toxic substance or material as defined by any Federal or state environmental law, ordinance, rule or regulation including, without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. sections 9601 et seq.), the Hazardous Materials Transportation Act, as amended (49 U.S.C. sections 5101 et seq.), the Resource Conservation and Recovery Act, as amended (42 U.S.C. sections 6901 et seq.), and the regulations adopted and related official publications promulgated pursuant thereto.

"IE Confirmation" shall mean, with respect to any certification of an Authorized Representative of StadCo pursuant to this Indenture for which IE Confirmation is required, a certificate signed by the Independent Engineer and delivered to the Trustee and the Controlling Bond Insurer no more than 30 days after the date of the Authorized Representative's certification stating that (i) the Independent Engineer has performed such inspections, analyses and other procedures as are necessary, in its reasonable judgment, for purposes of delivering its certificate to the Trustee and (ii) based on such procedures, the Independent Engineer has no reason to believe that the certifications of the Authorized Representative are not true and correct in all material respects as of the date made. The IE Confirmation shall be in such form and shall

include such explanations and reasonable qualifications as to the scope of services performed, if any, as are customary in light of industry convention and professional standards and practices.

"Improvement" shall mean any renovation, repair, addition or improvement to the Stadium the costs of which are of such nature as to be chargeable to a fixed capital account in accordance with GAAP.

"Indebtedness" shall mean, collectively, and without duplication, Senior Lien Indebtedness, Second Lien Indebtedness and Permitted Subordinated Indebtedness.

"Indemnitees" shall mean the Trustee, each Bond Insurer, and their respective current and future officers, directors, members, employees and agents and each Person, if any, who "controls" the Trustee or each Bond Insurer within the meaning of Section 15 of the Securities Act, or Section 20(a) of the Securities Exchange Act of 1934.

"Indenture" shall mean this Indenture of Trust, including any amendments or supplements hereto as herein permitted.

"Independent Engineer" shall mean Merritt & Harris Inc. or any successor, nationally recognized expert in the monitoring of the construction of sports facilities that may be selected or replaced by StadCo from time to time, subject to the approval of the Controlling Bond Insurer (provided that such approval shall not be unreasonably withheld, and that the response to any request for such approval shall not be unreasonably delayed); provided that the Controlling Bond Insurer shall have certain additional rights relating to the Independent Engineer as described in Section 605 hereof.

"Independent Member" shall mean a Person who is not at the time of such individual's appointment, has not been at any time during the five (5) years preceding such appointment, and is not at any time while serving as the Independent Member (a) an equityholder, stockholder, director, officer, trustee, manager, employee, partner, member, attorney or counsel of StadCo or any of the Affiliates of StadCo, (b) a creditor, contractor or customer of, a supplier to, or any other Person who derives any of its purchases or revenues from its activities with StadCo or any of the Affiliates of StadCo, (c) a Person controlling StadCo or any of the Affiliates of StadCo or under common control with a Person excluded from serving as Independent Member under clauses (a) or (b), or (d) a member of the immediate family by blood or marriage of any Person excluded from serving as Independent Member under clauses (a) or (b); provided, however, that (i) a natural person who satisfies the foregoing definition other than clause (b) shall not be disqualified from serving as an Independent Member of StadCo if such individual is an Independent Member provided by a nationally-recognized company that provides professional independent members (a "Professional Independent Member") and other corporate services in the ordinary course of its business and (ii) a natural person who otherwise satisfies the foregoing definition other than clause (a) by reason of being an independent director or an independent member of a "special purpose entity" affiliated with StadCo shall not be disqualified from serving as an Independent Member of StadCo if such individual is either (x) a Professional Independent Member or (y) the fees that such individual earns from serving an independent director or an independent member of Affiliates of StadCo in any given year constitute in the aggregate less than five percent (5%) of such individual's annual income for that year.

"Initial Bonds" shall mean the Bonds issued at the time of original execution and delivery of this Indenture or as provided in Section 203(b).

"Initial Requisition" shall mean the requisition request delivered at the closing for the Initial Bonds.

"Insurance and Indemnity Agreement" shall mean either (i) the Insurance and Indemnity Agreement, dated as of August 16, 2007, between StadCo and Financial Security Assurance, Inc., a New York financial guaranty insurance company, or (ii) the Insurance and Indemnity Agreement, dated as of August 16, 2007, between StadCo and Financial Guaranty Insurance Company, a New York stock insurance corporation, as the context may require.

"Insured Bonds" shall mean Bonds which are insured by a Bond Insurance Policy issued by a Bond Insurer or its successors or assigns.

"Insured Swap Payments" shall have the meaning set forth in Section 206(a) hereof.

"Intended Purpose" shall mean (i) the staging of NFL games, including home games of the Giants Team and the Jets Team; (ii) capacity at NFL games of approximately 200 fully-fitted-out Private Suites with seating for approximately 4,000 individuals and approximately 9,000 Club Seats and approximately 67,000 other seats for NFL games, subject to such reductions as may be necessary to comply with the ADA or other Applicable Laws; (iii) fully equipped and operational food and beverage facilities and other concessions and catering services to serve the Private Suites, Club Seats and other ticket holders at NFL games in the usual course of business; and (iv) reasonable access to the Stadium and reasonably adequate parking facilities for NFL games (which may include currently available satellite lots and adjustments to reflect all available public transportation), assuming in each case that the NFL game being staged at the Stadium is sold out and subject to reductions in the first full year after substantial Completion to reflect continuing construction and demolition activities.

"Interest Commencement Date" shall mean, with respect to any particular Deferred Income Bond, the date prior to the maturity date thereof specified in the Supplemental Indenture authorizing such Deferred Income Bond after which interest accruing on such Bond shall be payable on the first Interest Payment Date immediately succeeding such Interest Commencement Date and thereafter on the dates specified in such Supplemental Indenture.

"Interest Payment Date" shall mean the dates specified as such in any Supplemental Indenture or in any other applicable documents that have created an obligation of StadCo, which obligation has as an essential term the periodic payment of interest or the payment of a Regularly Scheduled Swap Payment.

"Investment Agreement" shall mean an agreement for the investment of monies with, or unconditionally guaranteed by, a Qualified Financial Institution.

"Investment Company Act" shall mean the Investment Company Act of 1940, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"Jets Game Day" shall mean each day on which a Jets Home Game is held (including periods after midnight for any Jets Home Game that extends past that hour).

"Jets Home Game" shall mean each NFL pre-season football game of the Jets Team, each NFL regular season football game of the Jets Team, and each NFL playoff game of the Jets Team, as the case may be, that is scheduled by the NFL to be played at the Stadium Premises. Jets Home Games shall not include any Super Bowl or other neutral site game, even if the Jets Team is designated as the "home" team.

"Jets Team" means New York Jets LLC, a member club and owner of a franchise of the NFL, including its respective successors and assigns, which will be a tenant of Other StadCo at the Stadium.

"Jets Team Lease" shall mean the Sublease dated as of August 16, 2007 relating to the Stadium, between Other StadCo as sublessor and the Jets Team as sublessee, as the same shall be amended from time to time in accordance therewith and herewith, together with a memorandum (or notice) of lease pertaining thereto.

"Joint Venture Advertising" means, collectively, any of the following that are sold at the Stadium Premises by the JV Company on a "permanent," exclusive, 365-day-per-year or "all events" basis: signage; designations (including, but not limited to, "pouring rights" or similar designations and rights of exclusivity and priority); displays of every kind and nature whether now existing or developed in the future, including, without limitation, permanent, non-permanent and transitory signage or advertising displayed on permanent or non-permanent advertising panels or on structures, fixtures or equipment (such as scoreboard advertising and canopy advertising); sponsor-identified projected images; advertising display items worn or carried by concessionaires or personnel engaged in the operation of any Giants Home Game or Jets Home Game; and logo, slogan or other forms of advertising affixed to or included with cups, hats or T-shirts; and advertising of concessions.

"Joint Venture Agreement" shall mean the Amended and Restated Limited Liability Company Agreement of the JV Company, dated as of August 16, 2007, by and between StadCo and Other StadCo.

"Joint Venture Inventory" shall mean, subject to the terms of the Naming Rights and Suite Sales Agreement, the Joint Venture Suites, the Naming Rights (as defined in the StadCo Sublease), the Cornerstone Sponsorships (as defined in the StadCo Sublease), and any Joint Venture Advertising.

"Joint Venture Suites" shall mean those Private Suites at the Stadium that are to be sold for both Jets Home Games and Giants Home Games.

"JV Company" shall have the meaning assigned thereto in the recitals hereof.

"JV Company's Stadium PILOT Payment" shall mean the "Tenant's Stadium PILOT Payment" as such term is used and defined in the Ground Lease.

"Leasehold Mortgage" shall mean the Leasehold Mortgage, Security Agreement and Fixture Filing, dated as of August 16, 2007, from StadCo as mortgagor, granting a first mortgage lien on and security interest in, among other things, StadCo's interest in the Stadium Premises, to the Trustee for the benefit of the owners of the Bonds and the Holders of Parity Obligations related thereto.

"Letters of Representations" shall mean the Letters of Representations from StadCo and the Trustee to the Securities Depository and any amendments thereto or any successor agreements between StadCo and the Trustee and any successor Securities Depository, relating to a book entry system to be maintained by the Securities Depository with respect to the Bonds.

"LLC Agreement" shall mean the Amended and Restated Limited Liability Agreement of StadCo dated as of August 16, 2007, as may be amended from time to time in accordance with the Indenture.

"Long-Term Indebtedness" shall mean Indebtedness having an original stated maturity or term greater than one year or renewable at the option of StadCo for a period of greater than one year from the date of original issuance.

"Material Adverse Effect" means: (1) a material adverse change in the financial condition of StadCo, taken as a whole, that could reasonably be expected to cause StadCo to be unable to pay amounts due to the Bondholders, the Bond Insurer, the Qualified Swap Provider or the Swap Insurer; or (2) any event or occurrence of whatever nature that could reasonably be expected to materially and adversely (i) affect StadCo's ability to perform its material obligations under the Collateral Documents, taken as a whole, or under the Project Real Estate Agreements, or (ii) impair the Trustee's security interests in any material portion of the Collateral.

"Material Amendment to the NFL Constitution" shall mean any change to the NFL Constitution that has a Material Adverse Effect.

"Material Change Order" means a change order delivered to the Design-Builder with respect to the Stadium that changes the physical design of the Stadium in any manner that would (1) materially adversely affect the usefulness of the Stadium for the staging of NFL football games, or (2) increase construction costs in excess of projected sources available for providing for the payment of those construction costs.

"Material Damage" shall mean damage to or destruction of the Stadium by fire or other casualty or condemnation thereof, in an amount equal to or greater than $10,000,000 adjusted on each anniversary of the effective date of the Ground Lease for inflation as measured by the CPI Index.

"Maximum Annual Debt Service" shall mean as of any date of calculation with respect to any Series of Bonds or type of Bonds within the same Series, an amount equal to the greatest amount of Debt Service with respect to such Outstanding Bonds for the then current or any future Fiscal Year.

"Meadowlands Sports Complex" has the meaning set forth in the Ground Lease.

"Moody's" shall mean Moody's Investors Service, Inc., a corporation organized and existing under the laws of the State of Delaware, its successors and their assigns, and if such corporation shall for any reason no longer perform the functions of a securities rating agency, "Moody's" shall be deemed to refer to any other nationally recognized rating agency designated by StadCo with the written consent of the Controlling Bond Insurer (provided that such consent shall not be unreasonably withheld, and that the response to any request for such consent shall not be unreasonably delayed).

"Multiemployer Plan" shall mean a multiemployer plan, as defined in Section 4001(a)(3) of ERISA, subject to Title IV of ERISA, to which StadCo or any ERISA Affiliate is making or accruing an obligation to make contributions, or within any of the preceding five plan years made or accrued an obligation to make contributions, other than a plan established or maintained by the NFL.

"Multiple Employer Plan" shall mean a single employer plan, as defined in Section 4001(a)(15) of ERISA, that (a) is maintained for employees of StadCo or any ERISA Affiliate and for the employees of any other Person or (b) was so maintained and in respect of which StadCo or any ERISA Affiliate could have liability under Section 4064 or 4069 of ERISA in the event such plan has been or were to be terminated, other than a plan established or maintained by the NFL.

"Naming Rights and Suite Sales Agreement" shall mean the Naming Rights and Suite Sales Agreement regarding Joint Venture Inventory to be executed and delivered by the parties in substantially the form of Exhibit E to the StadCo Sublease.

"Net Concessions Revenues" shall mean all Concessions revenue earned on or attributable to Giants Game Days, whether payable by a third party Concessionaire or generated by the JV Company if it acts as Concessionaire, net of all expenses, taxes and credit card fees directly attributable to the sale of Concessions and the Concession Operations on Giants Game Days (capitalized terms used in this sentence and not otherwise defined in this Indenture are defined in the StadCo Sublease). Pursuant to the StadCo Sublease, the JV Company shall pay, or cause all third party Concessionaires to pay, all Net Concessions Revenue to StadCo.

"NFL" shall mean the National Football League, a not-for-profit association having its principal executive office at 280 Park Avenue, New York, New York, and its successors and assigns.

"NFL Agreement" shall mean that certain agreement among the NFL, StadCo, the Giants Team, the JV Company, the Trustee, the Bond Insurers, the Qualified Swap Provider, the Swap Insurers and the other parties thereto made in connection with the Bonds.

"NFL CBA" shall mean a collective bargaining agreement between the NFL and the NFL Players Association, or their respective successors.

"NFL Constitution" shall have the meaning ascribed thereto in the NFL Agreement.

"NFL Facility" shall mean the loan in the principal amount of up to $150,000,000 authorized by the 2006 NFL Resolution JC-1 and evidenced by the NFL Loan Agreement.

"NFL Facility Proceeds Account" shall mean the Account of that name in the Construction Fund created by Section 501.

"NFL Loan Agreement" shall mean that certain NFL Credit Agreement, dated as of August 16, between the NFL and StadCo and relating to the NFL Facility.

"NFL Redemption Event" shall mean that the NFL shall have exercised its rights pursuant to the NFL Agreement to purchase the Bonds under the circumstances set forth in said agreement.

"NFL Resolution G-3" shall mean the resolution adopted by the member clubs of the NFL on March 15, 1999, as amended, and as supplemented by the 2006 NFL Resolution JC-1, authorizing loans from the NFL to member clubs to finance stadium construction projects.

"NFL Resolution JC-1" shall mean the 2006 NFL Resolution JC-1 adopted by the member clubs of the NFL on December 7, 2006, authorizing the NFL to extend the NFL Facility to StadCo and the Commissioner of the NFL to enter into the NFL Loan Agreement.

"NJSEA" shall have the meaning assigned thereto in the recitals hereof.

"Non-Disturbance Agreement" shall mean the Subordination, Non-Disturbance and Recognition Agreement, dated as of August 16, 2007, by and among StadCo, the JV Company and the NJSEA.

"Non-Indenture Permitted Debt" shall mean the following: (i) an unsecured working capital line in an aggregate principal amount not to exceed $10,000,000 at any one time (adjusted for inflation as measured by the CPI Index); and (ii) capitalized leases for tangible personal property relating to Stadium operations in an aggregate principal amount not to exceed $10,000,000 at any one time (adjusted for inflation as measured by the CPI Index).

"Non-Relocation Agreement" shall mean the Team Non-Relocation Agreement, dated as of August 16, 2007, among the Giants Team, the Trustee and each Bond Insurer.

"Operating and Maintenance Expenses" shall have the meaning assigned thereto in the Ground Lease.

"Operating Fund" shall mean the Operating Fund created by Section 501.

"Opinion of Counsel" shall mean a written opinion of counsel, who may be counsel for StadCo or a Bond Insurer (including, except as otherwise expressly provided in this Indenture, the in-house general counsel for StadCo or a Bond Insurer, as the case may be), and who shall be reasonably acceptable to the Trustee and, in the case of counsel to StadCo, who shall also be reasonably acceptable to the Controlling Bond Insurer.

"Other Controlling Bond Insurer" shall mean the bond insurer described by the definition of "Controlling Bond Insurer" that appears in the indenture of trust pursuant to which Other StadCo has issued bonds to provide for the payment of a portion of the Costs of the Project.

"Other Entities" shall mean the Giants Team and the JV Company.

"Other Proceeds Account" shall mean the Account of that name in the Construction Fund created by Section 501.

"Other StadCo" or "Green StadCo" shall mean Jets Stadium Development, LLC, a Delaware limited liability company, which is not a party to or the issuer of Bonds under this Indenture but which is separately issuing bonds or other indebtedness or providing other revenues to finance a portion of the Project.

"Other Swap Payments" shall mean any payments to be made by StadCo pursuant to a Qualified Swap other than Regularly Scheduled Swap Payments, Parity Swap Termination Payments and Swap Termination Payments, and shall include any other fees, expenses, indemnification payments or other payments due thereunder and shall, for the purpose of determining amounts due and amounts to be deposited in the Second Lien Debt Service Fund, include any accrued but unpaid Other Swap Payments, including any interest due on such unpaid amounts.

"Outside Substantial Completion Date" shall mean September 1, 2010; provided, that upon the occurrence of (i) a Force Majeure Event or (ii) a construction delay during which StadCo and the JV Company are diligently pursuing construction, the Outside Substantial Completion Date will be extended to the extent made necessary by such event, provided StadCo and Other StadCo demonstrate to the reasonable satisfaction of the Trustee and the Bond Insurers their ability to pay any additional costs resulting from such event.

"Outstanding" shall mean, as of any date, Bonds theretofore or thereupon being authenticated and delivered under the Indenture except:

        (i)      any Bonds canceled by any Fiduciary at or prior to such date;

        (ii)      Bonds (or portions of Bonds) for the payment or redemption of which monies, equal to the principal amount or Redemption Price thereof, as the case may be, with interest to the date of maturity or Redemption Date, shall be held in trust under the Indenture and set aside for such payment or redemption (whether at or prior to the maturity or Redemption Date), provided that if such Bonds (or portions of Bonds) are to be redeemed, notice of such redemption shall have been given or provision satisfactory to the Trustee shall have been made for the giving of such notice as provided in Article IV;

        (iii)      Bonds in lieu of or in substitution for which other Bonds shall have been authenticated and delivered pursuant to Article III or Section 407 unless proof satisfactory to the Trustee is presented that any such Bonds are held by a bona fide purchaser in due course;

        (iv)      Bonds deemed to have been paid as provided in Section 801; and

        (v)      Bonds deemed purchased in accordance with the provisions of a Supplemental Indenture in lieu of which other Bonds have been authenticated and delivered as provided in the Indenture;

provided, however, that Bonds which have been paid with proceeds of a Bond Insurance Policy shall continue to remain Outstanding for purposes of this Indenture until the applicable Bond Insurer has been paid as subrogee hereunder or reimbursed pursuant to the applicable reimbursement agreement as evidenced by a written notice from such Bond Insurer delivered to the Trustee, and such Bond Insurer shall be deemed to be the Holder of such Bonds to the extent of any payments thereon made by such Bond Insurer.

"Parity Obligations" shall mean any Parity Reimbursement Obligation, any Parity Swap Obligation and any Reserve Account Surety Obligation, in each case relating to any Bonds, provided that, Reserve Account Surety Obligations shall constitute Parity Obligations solely for purposes of securing StadCo's obligations in respect of any Reserve Account Surety Guaranty, the grant of trust for the Holders of Parity Obligations and all matters related to the enforcement of rights against the Collateral. Reserve Account Surety Obligations shall not constitute Parity Obligations for any other purpose under this Indenture, including, without limitation, Sections 505, 506, 901 and 905.

"Parity Obligation Holder" or "Holder of a Parity Obligation," or any similar terms, shall mean with respect to any Parity Obligation which is a note or a bond, any Person who shall be the bearer of any such note or bond which is outstanding and which shall at the time be registered to bearer or not registered, or the registered owner of any such note or bond which is outstanding and which shall at the time be registered other than to bearer, and with respect to any other Parity Obligation, any Person with whom StadCo has entered into a Parity Obligation which is at the time outstanding, including, without limiting the foregoing, any Qualified Swap Provider that is a party to any Parity Swap Obligation.

"Parity Reimbursement Obligation" shall have the meaning provided in Section 206(d).

"Parity Swap Early Termination Settlement Amount" shall mean the amount payable by the StadCo under each Qualified Swap constituting a Parity Swap Obligation upon the early termination thereof, as calculated pursuant to the terms of each such Qualified Swap; provided that such amount payable will be equal to zero upon the occurrence and continuance of a Qualified Swap Provider Event.

"Parity Swap Holders' Voting Weight" shall mean, as of any date of calculation, an amount equal to the greater of (a) the Parity Swap Early Termination Settlement Amount which would then be payable by the StadCo to the Qualified Swap Provider if each Qualified Swap constituting a Parity Swap Obligation were to be terminated on the date of such calculation and (b) five percent of the notional amount of the each Qualified Swap on the date of such calculation.

"Parity Swap Obligation" shall have the meaning provided in Section 206(f).

"Parity Swap Termination Payment" shall mean any payment to be made by StadCo pursuant to a Qualified Swap upon the termination thereof due to the occurrence of an event of termination or default thereunder and shall, for the purpose of determining amounts due and amounts to be deposited in the Senior Lien Debt Service Fund, include any such payments that are due and have not been paid, including any interest due on such unpaid amounts; provided,

however, that in the event such termination or default was due to the occurrence of a Qualified Swap Provider Event, such payment shall then constitute a Swap Termination Payment.

"Patriot Act" shall mean the USA PATRIOT Act (Title III of Pub. L. 107-56), as amended.

"Paying Agent" shall mean any paying agent for the Bonds or any successor and its successor or successors and any other corporation which may be appointed pursuant to Section 203.

"Payment of the Bonds" shall mean payment in full of principal of, premium, if any, and interest on the Bonds or provision for such payment sufficient to discharge this Indenture as provided herein.

"PBGC" shall mean the Pension Benefit Guaranty Corporation (or any successor).

"Pending NFL Strike Risk" shall mean, if there is in place an NFL CBA, (X) such NFL CBA terminates or expires by its terms, and (Y) such NFL CBA shall not have been extended and no new NFL CBA shall have become effective, either upon execution of a letter of intent with respect thereto or otherwise.

"Permitted Encumbrances" shall mean: (i) the Leasehold Mortgage and all other Collateral Documents; (ii) easements, licenses or rights-of-way, over, under or upon the real property on which the Stadium is located, so long as such easements, licenses or rights-of-way do not materially diminish or destroy the value or usefulness of the Stadium, and any lien, encumbrance or restriction permitted in accordance with the Leasehold Mortgage or the other Collateral Documents; (iii) liens for taxes and special assessments not then delinquent; (iv) any subleases, concessions, occupancy agreements and licenses, consistent with the obligations of StadCo under Section 609(b), except where any inconsistency cannot have a Material Adverse Effect; (v) such minor defects, irregularities, encumbrances, easements, rights-of-way, and covenants running with the land as normally exist with respect to properties similarly used and which do not materially impair the property affected thereby or the use of such property for the purpose for which it is held; (vi) one or more notices of contract filed by the general contractors under the certain contracts in compliance with the requirements of Applicable Law, provided that the general contractors comply with all requirements of said Applicable Law to furnish partial waivers and subordinations of liens and such other documents as are required by said Applicable Law; (vii) any pledge of or security interest in the Visiting Team Share or any other Shared Revenues (as defined in the NFL Agreement) securing the NFL Facility; (viii) liens securing Non-Indenture Permitted Debt referred to in clause (ii) of the definition thereof; (ix) liens on Pledged Revenues securing Permitted Subordinated Indebtedness, which liens are subordinated to the lien of this Indenture and of the Collateral Documents; (x) any Permitted Liens under (and as defined in) the Ground Lease; (xi) the pledge of the Giants Team Lease to the NJSEA pursuant to Section 15.08 of the Ground Lease; and (xii) encumbrances resulting from or created under applicable NFL rules and agreements.

"Permitted Investments" shall mean the following:

(a)    with respect to the Funds, Accounts and Subaccounts held by the Trustee:

(i)      Cash (insured at all times by the Federal Deposit Insurance Corporation);

(ii)     Obligations of, or obligations guaranteed as to principal and interest by, the U.S. or any agency or instrumentality thereof, when such obligations are backed by the full faith and credit of the U.S. including:

- U.S. treasury obligations
- All direct or fully guaranteed obligations
- Farmers Home Administration
- General Services Administration
- Guaranteed Title XI financing
- Government National Mortgage Association (GNMA)
- State and Local Government Series

Any security used for defeasance must provide for the timely payment of principal and interest and cannot be callable or prepayable prior to maturity or earlier redemption of the rated debt (excluding securities that do not have a fixed par value and/or whose terms do not promise a fixed dollar amount at maturity or call date);

(iii)    Obligations of any of the following federal agencies which obligations represent the full faith and credit of the United States of America, including:

- Export-Import Bank
- Rural Economic Community Development Administration
- U.S. Maritime Administration
- Small Business Administration
- U.S. Department of Housing & Urban Development (PHAs)
- Federal Housing Administration
- Federal Financing Bank

(iv)     Direct obligations of any of the following federal agencies which obligations are not fully guaranteed by the full faith and credit of the United States of America:

- Senior debt obligations issued by the Federal National Mortgage Association (FNMA) or Federal Home Loan Mortgage Corporation (FHLMC)
- Obligations of the Resolution Funding Corporation (REFCORP)
- Senior debt obligations of the Federal Home Loan Bank System
- Senior debt obligations of other Government Sponsored Agencies approved by the Bond Insurer;

(v)      U.S. dollar denominated deposit accounts, federal funds and bankers' acceptances with domestic commercial banks which have a rating on their short term certificates of deposit on the date of purchase of "P-1" by Moody's and "A-1" or "A-1+" by S&P and maturing not more than 360 calendar days after the date of purchase. (Ratings on holding companies are not considered as the rating of the bank);

(vi)    Commercial paper which is rated at the time of purchase in the single highest classification, "P-1" by Moody's and "A-1+" by S&P and which matures not more than 270 calendar days after the date of purchase;

(vii)    Investments in a money market fund rated "AAAm" or "AAAm-G" or better by S&P;

(viii)    Pre-refunded Municipal Obligations defined as follows: any bonds or other obligations of any state of the United States of America or of any agency, instrumentality or local governmental unit of any such state which are not callable at the option of the obligor prior to maturity or as to which irrevocable instructions have been given by the obligor to call on the date specified in the notice; and

(A)    (which are rated, based on an irrevocable escrow account or fund (the "escrow"), in the highest Rating Category of Moody's or S&P; or

(B)    (i) which are fully secured as to principal and interest and redemption premium, if any, by an escrow consisting only of cash or obligations described in paragraph (ii) above, which escrow may be applied only to the payment of such principal of and interest and redemption premium, if any, on such bonds or other obligations on the maturity date or dates thereof or the specified redemption date or dates pursuant to such irrevocable instructions, as appropriate, and (ii) which escrow is sufficient, as verified by a nationally recognized independent certified public accountant, to pay principal of and interest and redemption premium, if any, on the bonds or other obligations described in this paragraph on the maturity date or dates specified in the irrevocable instructions referred to above, as appropriate;

(ix)    Municipal Obligations rated "Aaa/AAA" or general obligations of States with a rating of "A2/A" or higher by both Moody's and S&P;

(x)    Investment agreements or guaranteed investment contracts that are in a form approved by the Controlling Bond Insurer (provided that such approval shall not be unreasonably withheld, and that the response to any request for such approval shall not be unreasonably delayed) and that are either (A) from providers whose unsecured or uncollateralized long term debt obligations are rated in at least the second highest Rating Category by the Rating Agencies, or (B) approved in writing by the Controlling Bond Insurer;

(xi)    Other obligations or securities that are non-callable and that are acceptable to each Rating Agency and the Controlling Bond Insurer; and

(xii)    Other forms of investments (including repurchase agreements) approved in writing by the Controlling Bond Insurer; and

provided, however, that with respect to monies in the Construction Fund and the Capitalized Interest Fund prior to Substantial Completion, (A)(1) no more than $325,000,000 may be invested in any single commercial bank pursuant to clause (v) above for a continuous period of

more than five Business Days, (2) no more than $50,000,000 in principal amount may be invested in commercial paper of any single issuer pursuant to clause (vi) above (unless such commercial paper has a maturity of 30 days or less and the issuer of such commercial paper is a financial institution, utility, commercial bank or other corporate issuer the long-term unsecured obligations of which are rated at least 'AA' by S&P and 'Aa2' by Moody's, in which case up to $200,000,000 in principal amount may be invested in commercial paper of such single issuer), (3) no more than $325,000,000 may be invested in any single money market fund pursuant to clause (vii) above, and (4) no more than $200,000,000 (not including capitalized interest) may be invested with any single provider of an investment agreement or guaranteed investment contract, in each of cases (1) through (4) without the prior written consent of the Controlling Bond Insurer, not to be unreasonably withheld, conditioned or delayed, and (B) fixed rate Permitted Investments in the Construction Fund and in the Capitalized Interest Fund shall have maturities that are consistent with the expected draw schedule from the Construction Fund and the Capitalized Interest Fund, as applicable, in light of the mix of Permitted Investments outstanding at any time, unless StadCo has provided reasonable assurances to the Controlling Bond Insurer that any early redemption or sale of such fixed rate Permitted Investments necessary in order to fund drawings on such expected schedule does not expose StadCo to material breakage, make-whole or other termination payments or material market risks; and

(b)     with respect to Funds, Accounts and Subaccounts held by StadCo: (i) all those items set forth in clauses (i) through (xii) of paragraph (a), above, and (ii) as long as no Event of Default has occurred and is continuing at the time any such investment is made, extended or renewed, a diversified mix of investment types having the potential to provide superior investment returns while maintaining a risk profile consistent with an overall non-speculative investment portfolio in accordance with a program to be implemented and reviewed annually by one or more independent firms, which firms are not Affiliates of StadCo, and subject to receipt of the prior written approval of such program by the Controlling Bond Insurer, which approval shall not be unreasonably withheld.

With respect to all Permitted Investments, the "Value" of such investments shall be determined as follows:

(1)     For the purpose of determining the amount in any fund, all Permitted Investments credited to such fund shall be valued at fair market value. The Trustee or StadCo, as applicable, shall determine the fair market value based on accepted industry standards and from accepted industry providers. Accepted industry providers shall include but are not limited to pricing services provided by Financial Times Interactive Data Corporation, Merrill Lynch, Citigroup Global Markets Inc., Bear Stearns, or Lehman Brothers;

(2)     As to certificates of deposit and bankers' acceptances: the face amount thereof, plus accrued interest thereon; and

(3)     As to any investment not specified above: the value thereof established by agreement among StadCo, the Trustee and the Controlling Bond Insurer.

"Permitted Subordinated Indebtedness" shall have the meaning assigned to such term in Section 207 hereof.

"Person" shall mean any individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, trust, unincorporated organization or government or agency or political subdivision thereof.

"PILOT" shall mean a payment in lieu of real property taxes made pursuant to the Ground Lease.

"Plan" shall mean a Single Employer Plan or a Multiple Employer Plan.

"Pledge, Assignment and Security Agreement" shall mean the Pledge, Assignment and Security Agreement, dated as of August 16, 2007, from StadCo to the Trustee for the benefit of the owners of the Bonds and the Holders of Parity Obligations related thereto.

"Pledged Revenues" shall mean, subject to Section 608 hereof, revenue paid or payable to StadCo with respect to (i) StadCo's Applicable Percentage of revenues attributable to the Joint Venture Inventory under the Naming Rights and Suite Sales Agreement; (ii) each of the following, to the extent arising from the playing of Giants Home Games and not included in the Joint Venture Inventory: Club Seat Premiums, StadCo Suite Premiums, and Net Concessions Revenues; (iii) all Team Rent; (iv) receipts of StadCo under the Naming Rights and Suite Sales Agreement consisting of the Applicable Percentage of any portion of monies paid to the JV Company (A) by the Design-Builder as liquidated damages or (B) by the guarantor under the Design-Build Contract Parent Guaranty, in either case to the extent such monies are not needed by the JV Company to pay Costs of the Project; (v) any proceeds of business interruption insurance received by StadCo for its own account; (vi) all Swap Payments received by StadCo (provided, however, that solely for purposes of the calculation of the Second Lien Historical Debt Service Coverage Ratio, Second Lien Pro Forma Debt Service Coverage Ratio, Senior Lien Historical Debt Service Ratio, and Senior Lien Pro Forma Debt Service Coverage Ratio, "Pledged Revenues" shall not include such Swap Payments to the extent that they are included in the calculation of Debt Service pursuant to clause (w) of the definition of that term); and (vii) earnings from the investment of amounts on deposit in the Senior Lien Debt Service Reserve Fund, in the Second Lien Debt Service Reserve Fund and in the Senior Lien Strike Reserve Fund.  Notwithstanding the foregoing, "Pledged Revenues" shall not include (a) Net Parking Revenues (as defined in the StadCo Sublease), (b) any revenues derived from advertising that is not Joint Venture Advertising, (c) any revenues (other than revenues applied to the payment of Team Rent) to which the Giants Team is entitled under the Giants Team Lease, including any revenues from media, Giants Team sponsorship rights or other Giants Team inventory rights, (d) any revenues to which the JV Company is entitled under the terms of the StadCo Sublease, or (e) the ticket component or VTS on amounts in excess of the ticket component of any Club Seat or Private Suite revenues or any other revenues to which the NFL is entitled.  If a transaction includes revenues attributable to Joint Venture Inventory and inventory of StadCo or the Giants Team, such revenues shall be allocated by the applicable parties as agreed and in accordance with any applicable restrictions in the Naming Rights and Suite Sales Agreement.

"Pledged Revenue Agreement" shall mean the Naming Rights and Suite Sales Agreement and each agreement to which StadCo is a party and under which it derives Pledged Revenues referred to in clause (ii) of the definition thereof.

"Principal Payment Date" shall mean the date or dates specified as such in the applicable documents that have created an obligation of StadCo, which obligation has as an essential term the periodic payment of principal before and at maturity or, as the case may be, the payment of principal only at maturity.

"Private Offering Memorandum" means a confidential offering memorandum relating to the issuance of the Bonds (including any and all exhibits thereto and any information incorporated by reference therein).

"Private Suite(s)" shall mean the private viewing boxes to be designed, constructed, furnished and equipped as part of the Stadium.

"Project" shall mean (a) the design, development, construction, equipping and operation of the Stadium, which will be used for Jets Home Games and Giants Home Games, and for concerts and other sports and entertainment events, (b) the construction and/or repaving of surface parking areas, (c) the demolition of Giants Stadium (as defined herein), and (d) the construction of certain underground utilities and related infrastructure.

"Project Agreements" shall mean the Design-Build Contract and the Design-Build Contract Parent Guaranty.

"Project Budget" shall mean the comprehensive budget for the Project prepared by the JV Company that StadCo shall deliver to each Bond Insurer and the Trustee, which Project Budget will identify all material categories for Costs of the Project (including contingencies) and include an estimated drawdown schedule by month. Subject to the provisions hereof with respect to Material Change Orders, StadCo shall have the right to make changes to the Project Budget in its sole discretion.

"Project Real Estate Agreements" shall mean the Ground Lease, the StadCo Sublease and the Giants Team Lease, as more specifically described in Schedule 2 hereto.

"Projected Rate" shall mean the Projected Rate specified in a Supplemental Indenture with respect to the Bonds issued pursuant thereto; provided, however, that if no Projected Rate is so specified in a Supplemental Indenture, "Projected Rate" shall mean, with respect to Variable Rate Bonds, a numerical rate of interest equal to (A) to the extent that StadCo has entered into a Qualified Swap relating to such Bonds which provides for the payment of a nominal fixed interest rate by StadCo, such nominal fixed interest rate, and (B) otherwise, the higher of (1) the historical average of Three-Month LIBOR over the thirty-six (36) calendar months ending with the month preceding the date of calculation and (2) the fixed rate that would be payable under an arm's-length swap contract between two leading dealers entered into at mid-market and in which one party pays such variable rate and one party pays a fixed rate over a term equal to the remaining average weighted life of such Variable Interest Rate Bonds, in each of cases (1) and (2) as determined by StadCo in good faith.

"Put Bonds" shall mean Bonds which may be tendered by and at the option of the Holder thereof for payment by StadCo or purchase and remarketing prior to the stated maturity thereof or which are required to be tendered for purchase or remarketing in certain events prior to the stated maturity thereof, subject to the option of the Holder thereof to retain such Bond (or a Bond issued in exchange therefor).

"Qualified Financial Institution" shall mean (i) a bank, a trust company, a national banking association, a corporation subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a domestic branch or agency of a foreign bank which branch or agency is duly licensed or authorized to do business under the laws of any state or territory of the United States of America, an insurance company or association chartered or organized under the laws of any state of the United States of America, or any Qualified Swap Provider, the unsecured or uncollateralized long-term debt obligations of which, or obligations secured or supported by a letter of credit, contract, agreement or surety bond issued by any such organization, at the time an Investment Agreement is entered into by StadCo are rated in the two (2) highest Rating Categories of any Rating Agency which rates such obligations or (ii) the Governmental National Mortgage Association or any successor thereto, the Federal National Mortgage Association or any successor thereto, or any other federal agency or instrumentality.

"Qualified Swap" shall mean, to the extent from time to time permitted by law, with respect to Bonds, any financial arrangement (i) which is entered into by StadCo with an entity that is a Qualified Swap Provider at the time the arrangement is entered into, (ii) which is a cap, floor or collar; forward rate; future rate; rate swap (such swap may be based on an amount equal either to the principal amount of such Bonds of StadCo as may be designated or a notional principal amount relating to all or a portion of the principal amount of such Bonds); basis swap, asset, index, currency swap, price or market-linked transaction or agreement; other exchange or rate protection transaction agreement; other similar transaction (however designated); or any combination thereof; or any option with respect thereto, in each case executed by StadCo for the purpose of moderating interest rate fluctuations, reducing debt service costs or creating either fixed interest rate Bonds or bonds with a Variable Interest Rate on a synthetic basis or otherwise, and (iii) which has been designated in writing to the Trustee by an Authorized Representative of StadCo as a Qualified Swap with respect to such Bonds.

"Qualified Swap Provider" shall mean, with respect to a Series of Bonds, (i) an entity regularly engaged in the business of entering into interest rate swaps whose senior unsecured long term debt obligations or claims-paying ability is rated at the time of execution of such Qualified Swap in the two (2) highest Rating Categories of any Rating Agency which rates such obligations, (ii) solely with respect to any initial Qualified Swap entered into in connection with the issuance of the Initial Bonds and any initial Qualified Swap entered into in connection with the issuance of the Completion Bonds, an affiliate of Lehman Brothers Holdings, Inc. whose obligations are guaranteed by Lehman Brothers Holdings, Inc., so long as the senior unsecured long term debt obligations or claims-paying ability of Lehman Brothers Holdings, Inc. is rated at the time of execution of such Qualified Swap in the three (3) highest Rating Categories of any Rating Agency which rates such obligations, (iii) another entity whose payment obligations under an interest rate exchange agreement are guaranteed or insured by an entity whose senior unsecured long term debt obligations or claims-paying ability are rated at the time of execution

of such Qualified Swap in the two(2) highest Rating Categories of any Rating Agency which rates such obligations, or (iv) any other entity approved by the Controlling Bond Insurer in accordance with the Insurance and Indemnity Agreement.

"Qualified Swap Provider Event" shall mean an event of default or termination event has occurred and is continuing under any Qualified Swap and the Qualified Swap Provider is the Defaulting Party or the sole Affected Party (as such terms are defined in the agreement relating to such Qualified Swap).

"Rating Agencies" shall mean S&P and Moody's.

"Rating Category" shall mean one of the generic rating categories of any Rating Agency without regard to any refinement or gradation of such rating by a numerical modifier or otherwise.

"Redemption Date" shall mean, with respect to any Bond, the date of a Sinking Fund Installment or any other redemption date established by StadCo.

"Redemption Fund" shall mean the Redemption Fund created by Section 501.

"Redemption Price" shall mean, with respect to any Bond, the principal amount thereof, plus the applicable premium, if any, payable upon redemption thereof pursuant to the Indenture and the Supplemental Indenture pursuant to which the same was issued.

"Refunding Bonds" shall mean Bonds issued pursuant to Section 204 and any applicable Supplemental Indenture.

"Regularly Scheduled Swap Payments" shall mean those payments to be made by or to StadCo at regularly scheduled intervals or on regularly scheduled dates pursuant to a Qualified Swap and shall, for the purpose of determining amounts due and amounts to be deposited in the Senior Lien Debt Service Fund or Second Lien Debt Service Fund, as applicable, include any such payments that have accrued but remain unpaid, including any interest due on such unpaid amounts.

"Reimbursement Obligations" shall have the meaning provided in Section 206(d)(iv).

"Reportable Event" shall mean any event described in Section 4043(b) of ERISA, other than an event (excluding an event described in Section 4043(b)(I) relating to tax disqualification) with respect to which the 30 day notice requirement has been waived.

"Reserve Account Credit Facility" shall mean any letter of credit, surety bond or insurance policy held for the benefit of the Senior Lien Debt Service Reserve Fund, the Second Lien Debt Service Reserve Fund, or the Senior Lien Strike Reserve Fund, and meeting the following criteria: (i) any such surety bond or insurance policy shall be issued by an insurance company or association duly authorized to do business in the State of New Jersey (or such other jurisdiction whose laws may be applicable) and either (A) the claims paying ability of such insurance company or association shall be rated at the time such surety bond or insurance policy is delivered in the highest rating category accorded by a nationally recognized insurance rating

agency or (B) obligations insured by a surety bond or an insurance policy issued by such company or companies or association shall be rated at the time such surety bond or insurance policy is delivered in the highest or second highest Rating Category by the Rating Agencies; (ii) any such letter of credit shall be issued by a bank, a trust company, a national banking association, a corporation subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provision of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provision of law, or a domestic branch or agency of a foreign bank which branch or agency is duly licensed or authorized to do business under the laws of any state or territory of the United States of America and either (A) the unsecured or uncollateralized long term debt obligations of such entity are rated at the time such letter of credit is delivered in at least the second highest Rating Category by the Rating Agencies or (B) long term obligations secured or supported by a letter of credit issued by such entity are rated at the time such letter of credit is delivered in at least the second highest Rating Category by the Rating Agencies; and (iii) in connection with the delivery of such letter of credit, surety bond or insurance policy, the Trustee, each Bond Insurer and each Reserve Account Credit Facility Provider shall have received (A) an Opinion of Counsel in customary form acceptable to the Trustee and the Controlling Bond Insurer to the effect that such letter of credit, surety bond or insurance policy has been duly authorized, executed and delivered by the provider thereof and is valid, binding and enforceable in accordance with its terms, (B) in the event such provider is not a domestic entity, an opinion of foreign counsel in form and substance reasonably satisfactory to the Trustee and the Controlling Bond Insurer, and (C) with respect to any letter of credit, an Opinion of Counsel in customary form acceptable to the Trustee and the Controlling Bond Insurer substantially to the effect that payments under such letter of credit will not constitute avoidable preferences under Section 547 of the United States Bankruptcy Code in a case commenced by or against StadCo thereunder.

"Reserve Account Credit Facility Provider" shall mean the issuer or other provider of any Reserve Account Credit Facility.

"Reserve Account Surety Bond" shall mean any surety bond issued by a Bond Insurer in favor of the Trustee which constitutes a Reserve Account Credit Facility.

"Reserve Account Surety Guaranty" shall mean a guaranty agreement or reimbursement agreement by and between StadCo and a Bond Insurer in respect of a Reserve Account Surety Bond.

"Reserve Account Surety Obligations" shall mean the obligations of StadCo under any Reserve Account Surety Guaranty.

"Restricted Materials" shall have the meaning set forth in Section 604 hereof.

"Second Lien Bonds" shall mean all bonds authenticated and delivered under this Indenture and payable from the Second Lien Bond Interest Subaccount in the Second Lien Interest Account of the Second Lien Debt Service Fund and the Second Lien Bond Principal Subaccount in the Second Lien Principal Account in the Second Lien Debt Service Fund.

"Second Lien Bond Capitalized Interest Account" shall mean the Account of that name created in the Capitalized Interest Fund.

"Second Lien Bond Redemption Account" shall mean the Account of that name created in the Redemption Fund.

"Second Lien Debt Service Fund" shall mean the Second Lien Debt Service Fund created by Section 501.

"Second Lien Debt Service Reserve Fund" shall mean the Second Lien Debt Service Reserve Fund created by Section 501.

"Second Lien Historical Debt Service Coverage Ratio" shall mean, with respect to any Fiscal Year, beginning in the first full Fiscal Year commencing after Substantial Completion, the ratio determined by dividing (a) a numerator equal to Pledged Revenues actually received less StadCo Expenses actually paid during such Fiscal Year (provided that such calculation shall be subject to the proviso appearing in the fourth sentence of Section 609(i)), by (b) a denominator equal to the sum of the Debt Service paid with respect to StadCo's Senior Lien Indebtedness and Second Lien Indebtedness for the same Fiscal Year (adjusted to give pro forma effect to any prepayment or repayment of Bonds or the termination of any related Qualified Swap after the first day of such Fiscal Year as if such prepayment, repayment or termination had occurred on such first day), in each of cases (a) and (b), as set forth in a certificate of an Authorized Representative based on StadCo's most recently available audited financial statements. For purposes of calculating the Second Lien Historical Debt Service Coverage Ratio: Pledged Revenues shall be deemed not to have included (I) Parity Swap Termination Payments, Swap Termination Payments or Other Swap Payments received by StadCo; (II) payments to StadCo from its Affiliates which are gifts or equity or capital contributions; or (III) revenue received from Affiliates of StadCo other than (A) Team Rent, and (B) other Pledged Revenues (but only to the extent that such other Pledged Revenues arise from transactions contemplated by the Naming Rights and Suite Sales Agreement or otherwise consummated on terms no more favorable to StadCo than would be obtainable in comparable arm's length transactions with unaffiliated third parties); provided, however, that the revenue identified in clause (III) above may be included in such calculation with the written consent of the Controlling Bond Insurer.

"Second Lien Indebtedness" shall mean, collectively and without duplication, Second Lien Bonds and any related Parity Obligations.

"Second Lien Interest Account" shall mean the Account of that name in the Second Lien Debt Service Fund created by Section 501.

"Second Lien Principal Account" shall mean the Account of that name in the Second Lien Debt Service Fund created by Section 501.

"Second Lien Pro Forma Debt Service Coverage Ratio" shall mean, for the then current or any future Fiscal Year, as the context requires, the ratio determined by dividing (a) a numerator equal to Pledged Revenues projected to be received less StadCo Expenses to be paid during such Fiscal Year (provided that such calculation shall be subject to the proviso appearing in the fourth sentence of Section 609(i)), by (b) a denominator equal to the sum for each such

Fiscal Year of Debt Service on all Senior Lien Indebtedness and Second Lien Indebtedness, including any Second Lien Indebtedness proposed to be issued but excluding any Second Lien Indebtedness to be refunded with the proceeds of such proposed Second Lien Indebtedness. Such calculations shall be set forth in a written statement from an Authorized Representative and accompanied by reasonable projections of Pledged Revenues and StadCo Expenses for each of the applicable Fiscal Years, which projections shall include, if applicable, any additional Pledged Revenues and StadCo Expenses expected to result from the Improvement proposed to be financed with the proceeds of such additional Second Lien Indebtedness. For purposes of calculating the Second Lien Pro Forma Debt Service Coverage Ratio: Pledged Revenues shall be deemed not to include (I) payments to StadCo from its Affiliates which are gifts or equity or capital contributions; or (II) revenue received from Affiliates of StadCo other than (A) Team Rent, and (B) other Pledged Revenues (but only to the extent that such other Pledged Revenues arise from transactions contemplated by the Naming Rights and Suite Sales Agreement or otherwise consummated on terms no more favorable to StadCo than would be obtainable in comparable arm's length transactions with unaffiliated third parties); provided, however, that the revenue identified in clause (II) above may be included in such calculation with the written consent of the Controlling Bond Insurer.

"Securities Act" shall mean the Securities Act of 1933, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"Securities Depository" shall mean initially The Depository Trust Company and any successor depository for the Bonds as provided in Section 202.

"Senior Lien Bonds" shall mean all bonds authenticated and delivered under this Indenture and payable from the Senior Lien Bond Interest Subaccount in the Senior Lien Interest Account in the Senior Lien Debt Service Fund and the Senior Lien Bond Principal Subaccount in the Senior Lien Principal Account in the Senior Lien Debt Service Fund.

"Senior Lien Bond Capitalized Interest Account" shall mean the Account of that name created in the Capitalized Interest Fund.

"Senior Lien Bond Redemption Account" shall mean the Account of that name created in the Redemption Fund.

"Senior Lien Debt Service Fund" shall mean the Senior Lien Debt Service Fund created by Section 501.

"Senior Lien Debt Service Reserve Fund" shall mean the Senior Lien Debt Service Reserve Fund created by Section 501.

"Senior Lien Historical Debt Service Coverage Ratio" shall mean, with respect to any Fiscal Year, the ratio determined by dividing (a) a numerator equal to Pledged Revenues actually received less StadCo Expenses actually paid during such Fiscal Year (provided that such calculation shall be subject to the proviso appearing in the fourth sentence of Section 609(i)), by (b) a denominator equal to the sum of the Debt Service paid with respect to StadCo's Senior Lien Indebtedness for the same Fiscal Year (adjusted to give pro forma effect to any prepayment or repayment of Bonds or the termination of any related Qualified Swap after the first day of such

Fiscal Year as if such prepayment, repayment or termination had occurred on such first day), in each of cases (a) and (b), as set forth in a certificate of an Authorized Representative to the Trustee based on StadCo's most recently available audited financial statements. For purposes of calculating the Senior Lien Historical Debt Service Coverage Ratio, Pledged Revenues shall be deemed not to have included (I) Parity Swap Termination Payments, Swap Termination Payments or Other Swap Payments received by StadCo; (II) payments to StadCo from its Affiliates which are gifts or equity or capital contributions; or (III) revenue received from Affiliates of StadCo other than (A) Team Rent, and (B) other Pledged Revenues (but only to the extent that such other Pledged Revenues arise from transactions contemplated by the Naming Rights and Suite Sales Agreement or otherwise consummated on terms no more favorable to StadCo than would be obtainable in comparable arm's length transactions with unaffiliated third parties); provided, however, that the revenue identified in clause (III) above may be included in such calculation with the written consent of the Controlling Bond Insurer.

"Senior Lien Indebtedness" shall mean, collectively and without duplication, Senior Lien Bonds and any related Parity Obligations.

"Senior Lien Interest Account" shall mean the Account of that name in the Senior Lien Debt Service Fund created by Section 501.

"Senior Lien Principal Account" shall mean the Account of that name in the Senior Lien Debt Service Fund created by Section 501.

"Senior Lien Pro Forma Debt Service Coverage Ratio" shall mean, for the then current or any future Fiscal Year, as the context requires, the ratio determined by dividing (a) a numerator equal to Pledged Revenues projected to be received less StadCo Expenses to be paid during such Fiscal Year (provided that such calculation shall be subject to the proviso appearing in the fourth sentence of Section 609(i)), by (b) a denominator equal to the sum for each such Fiscal Year of Debt Service on all Senior Lien Indebtedness, including any Senior Lien Indebtedness proposed to be issued but excluding any Senior Lien Indebtedness to be refunded with the proceeds of such proposed Senior Lien Indebtedness. Such calculations shall be set forth in a written statement from an Authorized Representative and accompanied by reasonable projections of Pledged Revenues and StadCo Expenses for each of the applicable Fiscal Years, which projections shall include, if applicable, any additional Pledged Revenues and StadCo Expenses expected to result from the Improvement proposed to be financed with the proceeds of such additional Senior Lien Bonds. For purposes of calculating the Senior Lien Pro Forma Debt Service Coverage Ratio, Pledged Revenues shall be deemed not to include (I) payments to StadCo from its Affiliates which are gifts or equity or capital contributions; or (II) revenue received from Affiliates of StadCo other than (A) Team Rent, and (B) other Pledged Revenues (but only to the extent that such other Pledged Revenues arise from transactions contemplated by the Naming Rights and Suite Sales Agreement or otherwise consummated on terms no more favorable to StadCo than would be obtainable in comparable arm's length transactions with unaffiliated third parties); provided, however, that the revenue identified in clause (II) above may be included in such calculation with the written consent of the Controlling Bond Insurer.

"Senior Lien Strike Reserve Fund" shall mean the Senior Lien Strike Reserve Fund created by Section 501.

"Senior Lien Strike Reserve Fund Requirement" shall mean, with respect to any Series of Outstanding Senior Lien Bonds, an amount equal to 5 percent (5%) of the original aggregate principal amount of such Series of Senior Lien Bonds.

"Series" or "Series of Bonds" shall mean any designated series of Bonds issued pursuant to Sections 203 and 204.

"S&P" shall mean Standard & Poor's Corporation, a corporation organized and existing under the laws of the State of New York, its successors and their assigns, and if such corporation shall for any reason no longer perform the functions of a securities rating agency, "Standard & Poor's" shall be deemed to refer to any other nationally recognized rating agency designated by StadCo with the written consent of the Controlling Bond Insurer (provided that such consent shall not be unreasonably withheld, and that the response to any request for such consent shall not be unreasonably delayed).

"Single Employer Plan" shall mean a single employer plan, as defined in Section 4001(a)(15) of ERISA, subject to Title IV of ERISA, that (a) is maintained for employees of StadCo or any ERISA Affiliate and no Person other than StadCo and the ERISA Affiliates or (b) was so maintained and in respect of which StadCo or any ERISA Affiliate could have liability under Section 4069 of ERISA in the event such plan has been or were to be terminated, other than a plan established or maintained by the NFL.

"Sinking Fund Installment" shall mean (a) with respect to a Series of Bonds, an amount so designated which is established pursuant to the Supplemental Indenture authorizing such Series of Bonds, and (b) with respect to any Parity Reimbursement Obligations, the amount due thereunder as sinking fund installments payable on a parity with the Bonds attributable to any principal on Bonds purchased or otherwise paid from a related Bond Support Facility.

"StadCo" or "Blue StadCo" shall mean Giants Stadium LLC, a New Jersey limited liability company, as identified and defined in the preamble hereof.

"StadCo Expenses" shall mean (I) all rent payable to the JV Company under the StadCo Sublease; (II) all taxes (other than Tax Distributions) payable by StadCo; (III) all mandatory capital contributions payable by StadCo under the Joint Venture Agreement; (IV) all other expenses incurred by StadCo in connection with the operation of its business; and (V) all other expenses incurred by StadCo in connection with the performance of its obligations under the Financing Agreements, including all premiums and similar payments paid or to be paid by StadCo in respect of Bond Insurance Policies, Reserve Account Credit Facilities, and Swap Insurance Policies, but excluding any Reimbursement Obligations payable thereunder. Notwithstanding the foregoing, StadCo Expenses shall not include any of the following, whether incurred directly by StadCo or indirectly through the JV Company: (i) for purposes of the definitions of Second Lien Historical Debt Service Coverage Ratio, Second Lien Pro Forma Debt Service Coverage Ratio, Senior Lien Historical Debt Service Coverage Ratio, Senior Lien Pro Forma Debt Service Coverage Ratio, or Total Pro Forma Debt Service Coverage Ratio (A) any extraordinary costs or expenses, including without limitation Costs of the Project and any other costs or expenses of reconstruction, rehabilitation, improvement, or new construction, (B) the cost of performance of major maintenance (but not routine maintenance) relating to the Stadium

and unanticipated repairs and replacements of the Stadium and replacement of the assets of the Stadium other than in the ordinary course of business, (C) any provision for depreciation, amortization or other non-cash charges, (D) all mandatory capital contributions payable by StadCo under the Joint Venture Agreement, and (E) all other expenses incurred by StadCo in connection with the performance of its obligations under the Financing Agreements, including all premiums and similar payments paid or to be paid by StadCo in respect of Bond Insurance Policies, Reserve Account Credit Facilities, and Swap Insurance Policies; and (ii) for all purposes, (A) Trustee Fees and Expenses, and (B) any payments of principal of or premium, if any, and interest on the Indebtedness, any Non-Indenture Permitted Debt, Reserve Account Surety Obligations and Swap Payments.

"StadCo Sublease" shall mean the Sublease Agreement dated as of August 16, 2007 by and between the JV Company, as sublessor, and StadCo, as sublessee, together with a memorandum (or notice) of lease pertaining thereto.

"StadCo Suite Premiums" shall mean all fees paid for the license or rental of Private Suites at the Stadium for Giants Home Games only (excluding fees paid for personal seat licenses), minus all amounts constituting the ticket component of such fees and VTS on amounts in excess of the ticket component and all taxes and credit card fees payable, with respect to such license or rental.

"Stadium" shall mean that portion of the Project consisting of an open-air stadium having a seating capacity of approximately 82,000 and related equipment and appurtenances for, among other purposes, the staging of athletic, concert and entertainment events, including home football games played by the Team.

"Stadium Premises" shall have the meaning assigned thereto in the StadCo Sublease.

"Standstill Period" shall mean, so long as the NFL Agreement is in effect, any "Standstill Period" as defined in the NFL Agreement.

"Strike" means (i) a players' strike or work stoppage called by the NFL Players Association or any successor organization, (ii) an NFL lockout of the NFL Players Association, or (iii) any other termination, suspension or cancellation of regular or post-season football games caused by the expiration or termination of an NFL CBA.

"Subaccounts" shall mean each subaccount or all of the subaccounts designated, created or established pursuant to Article V hereof and any applicable Supplemental Indenture.

"Substantial Completion" shall mean that, with respect to the development of the Project, the earlier of the following shall have occurred: (x) delivery to the Trustee and each Bond Insurer of the following items: (i) a written statement from the Design-Builder that the Project has been substantially completed in accordance with the construction plans, subject to certain incomplete, insubstantial details of construction, mechanical adjustment or decoration and other punch list items, (ii) a copy of a temporary or permanent certificate of occupancy, and (iii) to the extent required, all NFL approvals, and (y) (i) the holding of an NFL game in the Stadium and (ii)

delivery to the Trustee and the Controlling Bond Insurer of a copy of a temporary or permanent certificate of occupancy.

"Supplemental Indenture" shall mean a supplemental indenture entered into pursuant to Article XI hereof.

"Support Facility Bonds" shall have the meaning provided in Section 206(d)(i).

"Support Obligations" shall have the meaning provided in Section 206(d)(iv).

"Swap Insurance Policy" shall mean any policy of insurance, surety bond or other form of financial assurance issued by a Bond Insurer simultaneously with the issuance of a Bond Insurance Policy insuring Regularly Scheduled Swap Payments and certain of the Parity Swap Termination Payments and/or Swap Termination Payments to be made by StadCo pursuant to a Qualified Swap.

"Swap Insurance Reimbursement Obligations" shall have the meaning provided in Section 206(d)(iii).

"Swap Insurer" shall mean any Bond Insurer in its capacity as the issuer of a Swap Insurance Policy.

"Swap Payments" shall mean Regularly Scheduled Swap Payments, Parity Swap Termination Payments, Swap Termination Payments and Other Swap Payments. "Swap Payments" shall not include Upfront Swap Payments.

"Swap Termination Payments" shall mean any payments to be made by or to StadCo pursuant to a Qualified Swap upon the termination thereof due to the occurrence of an event of termination or default thereunder, and shall not include Regularly Scheduled Swap Payments, Parity Swap Termination Payments or Other Swap Payments and shall, for the purpose of determining amounts due and amounts to be deposited in the Second Lien Debt Service Fund, include any such payments that are due and have not been paid, including any interest due on such unpaid amounts.

"Tax Distribution" shall have the meaning assigned to such term in Section 504(c).

"Team" or "Teams" shall mean either or both of the Giants Team and the Jets Team, as the context so requires, each of which is a member club and franchise of the NFL, and its respective successors and assigns.

"Team Rent" shall mean "Rent" under and as defined in the Giants Team Lease in the form in existence on the date of execution of this Indenture, or as such definition may thereafter be amended with the consent of the Controlling Bond Insurer.

"Three Month LIBOR Rate" shall mean, as of any date of determination, the offered rate (rounded up to the next highest 0.001%) for deposits in U.S. dollars for a three-month period which appears on the Telerate Page 3750 at approximately 11:00 a.m., London time, on such date, or if such date is not a date on which dealings in U.S. dollars are transacted in the London

interbank market, then on the next preceding day on which such dealings were transacted in such market.

"Total Bond and Swap Voters" shall mean, as of any date of calculation, the Total Voting Strength of all of the Holders of the Bonds then Outstanding (collectively, the "Bond Voting Group") and each Qualified Swap Provider which is a party to a Qualified Swap constituting a Parity Swap Obligation (collectively, the "Parity Swap Voting Group; the Bond Voting Group and the Parity Swap Voting Group, each being a "Voting Group"). In determining the number of votes to be allotted to each such Voting Group for the purposes of Section 902, the number of votes to be allotted to the Bond Voting Group shall be the Bondholders' Voting Weight, the number of votes to be allotted to the Parity Swap Voting Group shall be the Parity Swap Holders' Voting Weight; and each dollar of Voting Weight shall be entitled to one (1) vote

"Total Pro Forma Debt Service Coverage Ratio" shall mean, for the then current and any future Fiscal Year through and including the Fiscal Year in which the maturity date of the proposed Permitted Subordinated Indebtedness to be issued occurs, the ratio determined by dividing (a) a numerator equal to Pledged Revenues actually received less StadCo Expenses actually paid during such Fiscal Year (provided that such calculation shall be subject to the proviso appearing in the third sentence of Section 609(i)), by (b) a denominator equal to the sum for such Fiscal Year of (x) Debt Service on all Indebtedness, including any Permitted Subordinated Indebtedness of StadCo proposed to be issued or incurred but excluding any Permitted Subordinated Indebtedness or other Indebtedness to be refunded with the proceeds of the proposed Permitted Subordinated Indebtedness and the aggregate payments required to be made in respect of the principal of, and premium, if any, and interest on Indebtedness. Such calculations shall be set forth in a written statement from an Authorized Representative and accompanied by reasonable projections of Pledged Revenues and StadCo Expenses for each of the Fiscal Years, which projections shall include, if applicable, any additional Pledged Revenues and StadCo Expenses reasonably expected to result from the expenditure of the proceeds of such additional Permitted Subordinated Indebtedness. For purposes of calculating the Total Pro Forma Debt Service Coverage Ratio, Pledged Revenues shall not be deemed to have included (I) payments to StadCo from its Affiliates which are gifts or equity or capital contributions; or (II) revenue received from Affiliates of StadCo related (X) to football games or activities at the Stadium, other than revenue received by StadCo (A) from the JV Company as Pledged Revenues in the normal course and (B) as Team Rent, or (Y) to the lease, license or sale of Club Seats or Private Suites at the Stadium to such Affiliates (unless any such transaction is consummated on an arm's length basis and at a price comparable to that paid by a non-affiliated Person for a comparable Club Seat or Private Suite); provided, however, that the revenue identified in clause (II) above may be included in such calculation with the written consent of the Controlling Bond Insurer. Whenever the term Total Pro Forma Debt Service Coverage Ratio is used herein and is qualified to refer to the next Fiscal Year, such ratio shall be calculated in the same manner as provided in this definition, except that the ratio shall be calculated only with regard to such next Fiscal Year.

"Total Voting Strength" shall mean the total votes that may be cast assuming that the voting groups are voting at the Combined Voting Weight.

"Trust Estate" shall mean the property, rights and interests described in the granting clauses of this Indenture.

"Trustee" shall mean The Bank of New York, as identified and defined in the preamble hereof, or its successors as Trustee hereunder.

"Trustee Fees and Expenses" shall mean the acceptance fee and annual fee and reasonable legal fees and disbursements of the Trustee.

"Trustee Operating Fund" shall mean the Trustee Operating Fund created by Section 501.

"Trustee Revenue Fund" shall mean the Trustee Revenue Fund created by Section 501.

"UCC Financing Statements" shall mean the UCC Financing Statements filed or amended at the time of the delivery of the Bonds, listing the Trustee as the secured party for the benefit of the owners of the Bonds and the Holders of Parity Obligations related thereto.

"Upfront Swap Payment" shall mean any payment made by a Qualified Swap Provider in consideration for and in connection with a Qualified Swap that is entered into for the purpose of replacing an existing Qualified Swap due a Qualified Swap Provider Event.

"Valuation Date" shall mean (i) with respect to any Capital Appreciation Bonds the date or dates set forth in the Supplemental Indenture authorizing such Bonds on which specific Accreted Values are assigned to the Capital Appreciation Bonds and (ii) with respect to any Deferred Income Bonds, the date or dates on or prior to the Interest Commencement Date set forth in the Supplemental Indenture authorizing such Bonds on which specific Appreciated Values are assigned to the Deferred Income Bonds.

"Variable Interest Rate" shall mean a variable interest rate to be borne by a Series of Bonds or any one or more maturities within a Series of Bonds. The method of computing such variable interest rate shall be specified in the Supplemental Indenture authorizing such Series of Bonds. Such Supplemental Indenture shall also specify either (a) the particular period or periods of time for which each value of such variable interest rate shall remain in effect or (b) the time or times upon which any change in such variable interest rate shall become effective.

"Variable Interest Rate Bonds" shall mean Bonds that bear interest at a Variable Interest Rate and Bonds that bear interest at a fixed interest rate but that are deemed by StadCo to be Variable Interest Rate Bonds because of a Qualified Swap entered into in connection therewith.

"Visiting Team Share" or "VTS" shall mean the percentage of the receipts derived by an NFL home team from the sale of admission tickets, including admission tickets to luxury suites, private suites and club seats (in each case net of impositions that may be deducted under the NFL rules in effect from time to time), and the sale or license of luxury suites, private suites and club seats, that are payable by the home team to the visiting team or the NFL on behalf of visiting NFL teams or any NFL loan or other program pursuant to the NFL Constitution or other NFL rules in effect from time to time.

"Voting Weight" shall mean each of the Bondholders' Voting Weight and the Parity Swap Holders' Voting Weight.

"Withdrawal Liability" has the meaning specified in Part 1 of Subtitle E of Title IV of ERISA.

**Section 102.  Rules of Construction**.  Unless the context clearly indicates to the contrary, the following rules shall apply to the construction of this Indenture:

(a)    Words importing the singular number shall include the plural number and vice versa.

(b)    Words importing the redemption or calling for redemption of Bonds shall not be deemed to refer to or connote the payment of Bonds at their stated maturity.

(c)    All accounting terms not defined herein shall be defined in accordance with GAAP.

(d)    All references herein to particular Articles or Sections are references to Articles or Sections of this Indenture unless otherwise noted.

(e)    The headings herein are solely for convenience of reference and shall not constitute a part of this Indenture nor shall they affect its meaning, construction or effect.

(f)    The words "include" "includes" and "including" shall be deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of like import.

(g)    References to a contract, agreement, instrument or document shall be construed as reference to such contract, agreement, instrument or document as it may be amended, modified or supplemented from time to time in accordance with its terms (other than any amendment, modification or supplement made in violation of the terms of this Indenture).

(h)    All references to this Indenture include the exhibits and schedules hereto.

**Section 103.  Indenture to Constitute Contract**.  In consideration of the purchase and acceptance of any and all of the Initial Bonds and any Additional Bonds, Completion Bonds or Refunding Bonds authorized to be issued hereunder by those who shall hold or own the same from time to time and the entering into of any Qualified Swap, the Indenture shall be deemed to be and shall constitute a contract between StadCo and the Holders from time to time of the Bonds and the Holders of Parity Obligations; and the pledge made in the Indenture and the covenants and agreements herein set forth to be performed on behalf of StadCo shall be for the equal benefit, protection and security of the Holders of any and all of the Bonds and the Holders of Parity Obligations, all of which, regardless of the time or times of their authentication, issuance and delivery, or maturity, or incurrence or entering into, shall be of equal rank without preference, priority or distinction of any of the Bonds over any other Bonds, Parity Obligations over any other Parity Obligations, or Swap Payments over any other Swap Payments, except as expressly provided in or permitted by this Indenture or any Supplemental Indenture.

## ARTICLE II.
## AUTHORIZATION AND DELIVERY OF BONDS; BOND SUPPORT FACILITIES AND QUALIFIED SWAPS

**Section 201.   Authorization of Bonds**.

(a)    There are hereby authorized to be issued from time to time Bonds of StadCo to be designated generally as "Project Revenue Bonds." Bonds issued under this Indenture shall either be Senior Lien Bonds or Second Lien Bonds. There is hereby further created, in the manner and to the extent provided herein, a continuing pledge and lien to secure the full and final payment of the principal and Redemption Price of, interest on, and Sinking Fund Installments for, all of the Bonds, and payment of Parity Obligations and Swap Payments. The Bonds, Parity Obligations and Swap Payments shall be special obligations of StadCo payable solely from the Collateral.

(b)    The Bonds may, if and when authorized by StadCo pursuant to one or more Supplemental Indentures, be issued in one or more Series, and the designation thereof, in addition to the name "Project Revenue Bonds" shall include such further appropriate particular designations added to or incorporated in such title for the Bonds of any particular Series as StadCo may determine. Each Bond shall bear upon its face the designation so determined for the Series to which it belongs.

**Section 202.   Securities Depository**. The Depository Trust Company ("DTC"), New York, New York, will act as Securities Depository for the Initial Bonds and any Series of Additional Bonds, Completion Bonds or Refunding Bonds, unless provided otherwise in the Supplemental Indenture relating to such Series of Bonds. StadCo and the Trustee have entered into Letters of Representations with DTC. Upon the issuance of the Initial Bonds, one fully registered Initial Bond for each maturity will be registered in the name of Cede & Co., as nominee for DTC, for such maturity. So long as Cede & Co. is the registered owner of the Initial Bonds, as nominee of DTC, references herein to the owners of the Initial Bonds or registered owners of the Initial Bonds shall mean Cede & Co. and shall not mean the Beneficial Owners of the Initial Bonds.

The interest of each of the Beneficial Owners of the Initial Bonds will be recorded through the records of a DTC participant. Transfers of beneficial ownership interests in the Initial Bonds which are registered in the name of Cede & Co. will be accomplished by book entries made by DTC and, in turn, by the DTC participants and indirect participants who act on behalf of the Beneficial Owners of Initial Bonds.

DTC may determine to discontinue providing its service with respect to the Initial Bonds at any time by giving written notice to StadCo and the Trustee and discharging its responsibilities with respect thereto under applicable law. If there is no successor Securities Depository appointed by StadCo, StadCo shall deliver Initial Bonds to the Beneficial Owners thereof. StadCo, in its sole discretion, may determine not to continue participation in the system of book entry transfers through DTC (or a successor Securities Depository) at any time by giving written notice to DTC (or the successor Securities Depository, as applicable) not less than 30 days prior to termination of such participation. In such event, StadCo will deliver Initial Bonds to the Beneficial Owners thereof.

StadCo and the Trustee shall recognize DTC or its nominee, Cede & Co., while the registered owner as the owner of the Initial Bonds for all purposes, including notices. Conveyance of notices and other communications by DTC to DTC participants and by DTC participants and indirect participants to Beneficial Owners of the Initial Bonds will be governed by arrangements among DTC, DTC participants and indirect participants, subject to any statutory and regulatory requirements as may be in effect from time to time.

Section 203.  Delivery of the Initial Bonds; Issuance of Initial Bonds in Multiple Series; and Special Provisions Relating to Capital Appreciation Bonds, Deferred Income Bonds and Balloon Bonds.

(a)   Delivery of the Initial Bonds.

StadCo is hereby authorized to issue the Initial Bonds for the purposes of financing the Costs of the Project.  The maximum amount of Initial Bonds that may be issued is $650,000,000. The maximum amount of Initial Bonds that may be issued as Senior Lien Bonds is $650,000,000.  After the issuance of the Initial Bonds, no other Bonds shall be issued under this Indenture other than Additional Bonds (including Refunding Bonds) or Completion Bonds issued pursuant to Sections 204 and 205, respectively.  Subject to the provisions of Section 203(b), the Trustee shall authenticate and deliver the Initial Bonds when there have been filed with or received by it the following:

(i)   Satisfactory evidence that StadCo (A) has obtained commitments (which may include NFL G-3 loans) and (B) has demonstrated the ability to provide equity contributions, which (A) and (B) in the aggregate are, at the time of such issuance, sufficient to pay StadCo's Applicable Percentage of all Costs of the Project set forth in the Project Budget.

(ii)   An original executed counterpart of each Supplemental Indenture authorizing each Series of such Initial Bonds, which shall, among other provisions, specify: (A) the authorized principal amount of the Initial Bonds and the amounts of such Bonds designated as Senior Lien Bonds and as Second Lien Bonds; (B) the date, and the maturity date or dates, of the Initial Bonds; (C) the interest rate or rates or the manner of determining the interest rate or rates on the Initial Bonds and the Interest Payment Dates therefor (with any Initial Bonds that are issued as Variable Interest Rate Bonds being additionally subject to the provisions of Section 203(a)(ii)(J) hereof); (D) the minimum denomination of, and the manner of dating, numbering and lettering, the Initial Bonds, provided that such Bonds shall be in denominations equal to the minimum denomination or any multiple thereof as authorized by the applicable Supplemental Indenture; (E) the Paying Agent or Paying Agents and the place or places of payment of the principal and Redemption Price, if any, of, and interest on, the Initial Bonds; (F) the Redemption Price(s), if any, and the redemption terms for the Initial Bonds; (G) the amount and due date of each Sinking Fund Installment, if any, for the Initial Bonds; (H) the application of all proceeds of the Initial Bonds, including, without limitation, the amounts to be deposited in one or more of the Funds and the amount to be paid to the Bond Insurer as the premium for the Bond Insurance Policy; (I) the forms of the Initial Bonds and the Trustee's certificate of authentication; (J) if any of the Initial Bonds are Variable Interest Rate Bonds, any applicable provisions relating to the establishment of separate accounts for such Bonds in the Senior Lien Debt Service Reserve Fund and Second Lien Debt Service Reserve Fund, as

appropriate; (K) to the extent applicable, the terms relating to any Qualified Swap entered into in connection with the issuance of the Initial Bonds, including any Regularly Scheduled Swap Payments, Parity Swap Termination Payments, Swap Termination Payments and Other Swap Payments payable thereunder, and the terms relating to any Swap Insurance Policy, including the amount to be paid to the Bond Insurer as a premium for its role as the provider of any Swap Insurance Policy with respect to such Qualified Swaps; and (L) such other matters, not contrary to or inconsistent with this Indenture, as StadCo may deem advisable or necessary in connection with the authorization, issuance, sale, or delivery of the Initial Bonds.

(iii)    Certified copies of (A) the resolution of StadCo authorizing (1) the execution and delivery of the Financing Agreements and the Project Real Estate Agreements to which it is a party and the NFL Loan Agreement and (2) the issuance, sale, execution and delivery of the Initial Bonds (with such certification being made by a duly authorized officer of StadCo on StadCo's behalf); (B) the resolution of the Giants Team authorizing the execution and delivery of the Financing Agreements and the Project Real Estate Agreements to which it is a party; (C) the resolution of the NFL authorizing the execution and delivery of the NFL Loan Agreement; (D) the resolution of the JV Company authorizing and/or ratifying, as applicable, the execution and delivery of the Design-Build Contract and the Project Real Estate Agreements, the Collateral Documents to which it is a party and the Financing Agreements to which it is a party; and (E) the resolution of NJSEA authorizing and/or ratifying, as applicable, the execution and delivery of the Ground Lease.

(iv)    Original executed or certified counterparts of (A) the Financing Agreements (including the Non-Relocation Agreement) and, if applicable, Qualified Swap documents, including delivery of the Swap Insurance Policy, (B) the Design-Build Contract, (C) the Project Real Estate Agreements, (D) the NFL Agreement and (E) the NFL Loan Agreement.

(v)    One or more (A) opinions of counsel to StadCo in customary form, and in each case subject to customary limitations (including that not all remedies will be available in all circumstances), that (I) the Initial Bonds have been duly authorized and issued, (II) the execution, delivery and performance of the Financing Agreements and the Project Real Estate Agreements to which StadCo is a party and the NFL Agreement have each been duly authorized, (III) the Initial Bonds, the Financing Agreements and the Project Real Estate Agreements to which StadCo is a party constitute valid and binding obligations of StadCo enforceable in accordance with their respective terms, and (IV) except as otherwise noted therein, all governmental consents necessary for the execution and delivery of the Financing Agreements and the Project Real Estate Agreements to which StadCo is a party and the NFL Agreement and the consummation of the transactions contemplated thereby have been obtained; (B) opinions of counsel to the Jets Team in customary form, and in each case subject to customary limitations (including that not all remedies will be available in all circumstances), that (I) execution, delivery and performance of the Jets Team Lease, the Non-Relocation Agreement, the Naming Rights and Suite Sales Agreement and the NFL Agreement have each been duly authorized, and (II) the Jets Team Lease and the Naming Rights and Suite Sales Agreement constitute valid and binding obligations of the Jets Team enforceable in accordance with their respective terms; and (C) opinions of counsel to the JV Company in customary form, and in each case subject to customary limitations (including that not all remedies will be available in all circumstances), that

(I) the execution, delivery and performance of the Financing Agreements and the Project Real Estate Agreements to which the JV Company is a party and the NFL Agreement have been duly authorized, (II) the Financing Agreements and the Project Real Estate Agreements to which the JV Company is a party constitute valid and binding obligations of the JV Company enforceable in accordance with their respective terms, and (III) except as otherwise noted therein, all governmental consents necessary for the execution and delivery of such agreements and the consummation of the transactions contemplated thereby have been obtained.

(vi)    A request and authorization of StadCo, signed by an Authorized Representative, to the Trustee to authenticate and deliver the Initial Bonds to such Person or Persons named therein upon payment to the Trustee for the account of StadCo of a specified sum plus accrued interest to the date of delivery.

(vii)    Separate certificates by each of StadCo, the Giants Team, and the JV Company, as appropriate, that all representations and warranties by it (but not any other party) contained in this Indenture, each Supplemental Indenture and the other Financing Agreements, are true and correct in all material respects as of the date made, except where any failure cannot have a Material Adverse Effect, and that, to the best of its knowledge after due inquiry, such agreements remain in full force and effect and no default by it has occurred thereunder.

(viii)    Evidence satisfactory to the Controlling Bond Insurer that, upon execution and delivery of the Collateral Documents and filing of the UCC Financing Statements, the security interest in all Collateral shall have been duly perfected and shall be a valid and enforceable first lien on the Collateral, subject to Permitted Encumbrances.

(ix)    Evidence satisfactory to the Controlling Bond Insurer that the insurance coverage described in Exhibit B relating to the period prior to Substantial Completion and required to be obtained at such time shall have been obtained and remains in full force and effect.

(x)    Evidence satisfactory to the Controlling Bond Insurer that, except for the consents and approvals described in Exhibit E which have not as of the date hereof been obtained or appealed, the consents and approvals described in Exhibit E shall have been obtained and remain in full force and effect.

(xi)    The Project Budget, construction schedule and the initial construction drawdown schedule relating to the Project.

(xii)    Satisfactory evidence of the execution and delivery of the Bond Insurance Policy.

(xiii)    Satisfactory evidence of ratings on the Bonds provided by S&P and Moody's of at least "BBB-" and "Baa3", respectively (without giving effect to any Bond Insurance Policy) and "AAA" and "Aaa", respectively (giving effect to any applicable Bond Insurance Policy).

(xiv)    Satisfactory evidence of the establishment of the Funds, Accounts and Subaccounts.

(xv)    Satisfactory litigation and UCC searches on the JV Company and StadCo.

(xvi)    Satisfactory evidence of the payment of the Costs of Issuance due and payable as of such date with respect to the Initial Bonds.

(b)    Issuance of Initial Bonds in Multiple Series.  StadCo shall have the option to issue its Initial Bonds in multiple Series, the first Series of which may be issued on the First Closing Date, with the remaining Series issued throughout the Construction Period on various dates or at various intervals, as determined by StadCo upon not less than 30 days' prior written notice to the initial purchaser thereof, each Bond Insurer and the Trustee.  Such future Series of Initial Bonds shall be on parity in right to, and subject to the same covenants and Events of Default specified in this Indenture as, the Series of Initial Bonds delivered on the First Closing Date; provided, however, that in no event shall the aggregate principal amount of Initial Bonds issued exceed $650,000,000.  Initial Bonds issued after the First Closing Date may be issued only upon receipt by the Trustee of the documents required to be delivered pursuant to Section 204(c) (it being understood that such is in respect of Initial Bonds and not Additional Bonds; except subclauses (v), (vi), (ix) and (x) thereof shall not be applicable), together with a written statement from StadCo, accompanied by an IE Confirmation:

(i)    giving an estimate of the cost of achieving Substantial Completion (including all financing and related costs) and either stating that Substantial Completion is likely to be achieved by September 1, 2010, or stating which later date on which Substantial Completion is likely to be achieved; and

(ii)    stating an opinion, based upon assumptions it believes to be reasonable at such time, that the proceeds of such Bonds, (A) together with any other monies identified and available for such purpose, and the reasonably anticipated proceeds of future Bonds, which in the aggregate with the proceeds of the Bonds previously issued and to be issued (if any) shall not exceed $715,000,000, and (B) together with monies available to Other StadCo, and the reasonably anticipated proceeds of future bonds to be issued by the Other StadCo, are reasonably expected to be sufficient to pay the cost of achieving Substantial Completion.

(c)    Special Provisions Relating to Capital Appreciation Bonds, Deferred Income Bonds and Balloon Bonds.

(i)    The Accreted Value of Capital Appreciation Bonds or the Appreciated Value of Deferred Income Bonds becoming due at maturity or by virtue of a Sinking Fund Installment shall be included in the calculations of accrued and unpaid and accruing interest or principal installments made under the definition of Annual Debt Service only from and after the date (the "Calculation Date") which is one year prior to the date on which such Accreted Value or Appreciated Value, as the case may be, becomes so due, and the principal and interest portions of such Accreted Value or Appreciated Value shall be deemed to accrue in equal daily installments from the Calculation Date to such due date.

(ii)    For purposes of (1) receiving payment of the redemption price if a Capital Appreciation Bond is redeemed prior to maturity; or (2) receiving payment of a Capital Appreciation Bond if the principal of Bonds is declared immediately due and payable following

an Event of Default, as provided in Section 902, or (3) computing the principal amount of Bonds held by the Holder of a Capital Appreciation Bond in giving to StadCo any notice, consent, request, or demand pursuant to this Indenture for any purpose whatsoever, the principal amount of such Capital Appreciation Bond shall be deemed to be its then current Accreted Value.

(iii)    For purposes of (1) receiving payment of the redemption price if a Deferred Income Bond is redeemed prior to maturity; or (2) receiving payment of a Deferred Income Bond if the principal of Bonds is declared immediately due and payable following an Event of Default, as provided in Section 902, or (3) computing the principal amount of Bonds held by the Holder of a Deferred Income Bond in giving to StadCo any notice, consent, request, or demand pursuant to this Indenture for any purpose whatsoever, the principal amount of such Deferred Income Bond shall be deemed to be its then current Appreciated Value.

(iv)    If the Bonds to be issued are Balloon Bonds, (1) StadCo shall deliver to the Trustee concurrently with such issuance (A) a binding commitment (subject only to commercially reasonable contingencies) of a Qualified Financial Institution or Bond Insurer to provide financing sufficient to pay the principal amount of such Balloon Bonds coming due in each Fiscal Year in which 25% or more of the original principal amount of such Balloon Bonds come due and (B) a certificate of an Authorized Representative to the effect that the Senior Lien Pro Forma Debt Service Coverage Ratio for each Fiscal Year until the maturity of such Balloon Bonds is equal to or exceeds 1.50:1.00, or (2) the aggregate principal amount of such Balloon Bonds issued does not exceed 10% of the Pledged Revenues of StadCo for the most recent Fiscal Year for which audited financial statements are available.

**Section 204.    Issuance of Additional Bonds.**

(a)    Subject to receipt by the Trustee of the documents listed in Section 204(c), StadCo may issue one or more Series of Bonds ("Additional Bonds") for the purposes set forth in Section 204(b).    Each such Series of Additional Bonds shall be issued pursuant to a Supplemental Indenture and shall be equally and ratably secured under this Indenture with any other Series of Bonds issued hereunder of the same lien and priority, without preference, priority or distinction of any Bonds over any other Bonds of the same lien and priority.    No Series of Additional Bonds shall have a charge and lien on Pledged Revenues, or on revenues deposited into any Fund, Account or Subaccount or on any Collateral, senior to the lien securing the Initial Bonds of the same lien and priority, except that Additional Bonds may be issued pursuant to Supplemental Indentures subsequent to the issuance of the Initial Bonds on a parity with the Initial Bonds of the same lien and priority and secured by an equal charge and lien on Pledged Revenues or on revenues deposited into any Fund, Account or Subaccount or on any Collateral (but each Series of Bonds shall be exclusively secured by the applicable accounts and subaccounts in the Senior Lien Debt Service Fund and Senior Lien Debt Service Reserve Fund and the Second Lien Debt Service Fund and Second Lien Debt Service Reserve Fund, as applicable).    Unless provided otherwise in a Supplemental Indenture, all such Additional Bonds shall be in substantially the form of the Initial Bonds, but shall bear such date or dates, bear interest at such rate or rates, mature on such dates and in such amounts, have such Redemption Dates and Redemption Prices, contain an appropriate Series designation, and be issued at such prices as shall be approved by StadCo and set forth in a Supplemental Indenture.    The Supplemental Indenture will specify the application of all proceeds of such Additional Bonds,

including without limitation, amounts to be deposited in one or more of the Funds, Accounts or Subaccounts, as applicable.

(b)    Additional Bonds may be issued (i) to pay the costs of an Improvement (including any design, development, financing or professional fees, costs or expenses associated with such Improvement), (ii) to provide a working capital line for StadCo or to pay any StadCo Expenses, (iii) to repay or refinance any of the Senior Lien Bonds or Second Lien Bonds ("Refunding Bonds"), (iv) to fund any required deposit to the Senior Lien Debt Service Reserve Fund or Second Lien Debt Service Reserve Fund, (v) to fund payments due in respect of the Senior Lien Bonds or any Second Lien Bonds or Qualified Swap(s), (vi) to purchase Other StadCo's interests in JV Company pursuant to provisions therefor in the Joint Venture Agreement upon the exercise by the Jets Team of its Early Termination Right under the Ground Lease (such Early Termination Right being more fully described in Section 803 hereof and in the Ground Lease) or (vii) for any combination of such purposes.

(c)    The Trustee shall authenticate and deliver Additional Bonds, but only upon receipt of the following:

(i)    A certificate of StadCo dated as of the date of delivery of such Series of Additional Bonds, signed by an Authorized Representative, either (1) stating that as of the date of such certificate, to the best of the signer's knowledge after due investigation, no event or condition is happening or existing which constitutes an Event of Default or (2) if any such event or condition is happening or existing, specifying such event or condition, stating that StadCo will act with due diligence to correct such event or condition after the issuance of such Additional Bonds and describing, in detail reasonably acceptable to the Trustee, the actions to be taken by StadCo toward such correction;

(ii)    A certified copy of a resolution or resolutions of StadCo authorizing the execution and delivery of a Supplemental Indenture and authorizing the issuance, sale, award, execution and delivery of such Additional Bonds;

(iii)    An original executed counterpart of a Supplemental Indenture authorizing the issuance and providing for the details of such Additional Bonds, including among other things:

(1)    the authorized principal amount, designation and Series of such Bonds and the principal amount of Bonds of each maturity and whether such Bonds are Senior Lien Bonds or Second Lien Bonds;

(2)    the purpose for which such Bonds are being issued, which shall be one or more of the purposes set forth in this Article II;

(3)    the date or dates and the maturity date or dates of the Bonds;

(4)    the interest rate or rates of the Bonds, or the manner of determining such rate or rates, and the interest payment dates therefor;

(5)     the denomination or denominations of, and the manner of dating, numbering and lettering, the Bonds;

(6)     the Paying Agent or Paying Agents, if any, and the place or places of payment of the principal and Redemption Price, if any, of, and interest on, the Bonds, or the method of determining the same;

(7)     the Redemption Price or Prices, if any, or the method of determining such Redemption Price or Prices, the amount of the interest accruing thereon to the date fixed for redemption or repayment and the source of payment thereof, the expenses incidental to such redemption or repayment and the source of payment thereof, and any other applications of the proceeds of Additional Bonds issued for the purpose of such refunding or refinancing;

(8)     the amount, if any, or the method for determining such amount, to be credited to the account established within the Capitalized Interest Fund for capitalized interest with respect to such Series of Bonds and provisions for the application thereof to the payment of all or a portion of the interest on such Bonds or any other Series of Bonds;

(9)     the amount, if any, necessary for deposit in the applicable Account of the Senior Lien Debt Service Reserve Fund or Second Lien Debt Service Reserve Fund so that the amount in such Account, after giving effect to any Reserve Account Credit Facility deposited in such Account pursuant to Section 506 or Section 507 of this Indenture, as applicable, shall equal the applicable Debt Service Reserve Fund Requirement calculated immediately after the authentication and delivery of such applicable Additional Bonds;

(10)    to the extent applicable, the provisions relating to (a) any Bond Support Facility, Qualified Swap, Reserve Account Credit Facility, Swap Insurance Policy or other similar financial arrangement entered into in connection with the issuance of the Bonds of such Series and (b) the obligations payable thereunder;

(11)    the forms of the Bonds of such Series and of the Trustee's certificate of authentication; and

(12)    such other matters required to be determined in the Supplemental Indenture authorizing such Bonds, or other matters, not contrary to or inconsistent with this Indenture, as StadCo may deem advisable or necessary in connection with the authorization, issuance, sale, or delivery of such Series of Bonds;

(iv)    Original executed counterparts of any modifications to the Financing Agreements;

(v)     If any such Additional Bonds are issued for the purpose described in Section 204(b)(i), a written statement from StadCo, accompanied by an IE Confirmation:

(1)     giving an estimate of the cost of such Improvement (including all financing and related costs) and the date on which such Improvement is likely to be completed;

10662025.17

- 49 -

(2)    stating that the requested amount will be used solely to pay the cost of such Improvement (including all financing and related costs); and

(3)    stating an opinion that the proceeds of such Additional Bonds, together with any monies identified and available for such purpose, will be sufficient to pay the cost of completing the Improvement;

(vi)    If Additional Bonds are issued for the purpose described in Section 204(b)(iii), the following:

(1)    If the Bonds to be refunded are to be redeemed, instructions to the Trustee, satisfactory to it, to give due notice of redemption of all the Bonds so to be refunded on a Redemption Date specified in such instructions, subject to the provisions of Article VIII hereof;

(2)    If the Bonds to be refunded are to be deemed paid within the meaning and with the effect expressed in Article VIII, instructions to the Trustee, satisfactory to it, to give due notice in the manner provided in Article VIII with respect to the payment of the said Bonds pursuant to said Section;

(3)    a written determination by an independent certified public accountant or other knowledgeable professional selected by StadCo that the proceeds (excluding accrued interest) of such Refunding Bonds, together with any other monies deposited with the Trustee or an escrow agent for such purpose and the investment income to be earned on the defeasance obligations held for the payment or prepayment of such Bonds, shall be sufficient to pay, whether upon prepayment of such Bonds or at maturity, the principal of and premium, if any, and interest on the Bonds to be refunded or refinanced and the estimated expenses incident to such refunding or refinancing;

(4)    If the proceeds of such Series of Refunding Bonds are to be utilized by StadCo to purchase Bonds to be delivered to the Trustee in satisfaction of a Sinking Fund Installment, a certificate of an Authorized Representative specifying (a) the principal amount, Series, maturity, interest rate and numbers of the Bonds to be so delivered, (b) the dates and Series of the Sinking Fund Installments in satisfaction of which such Bonds are to be so delivered, (c) the aggregate principal amount of the Bonds to be so delivered, and (d) the unsatisfied balance of each Sinking Fund Installment after giving effect to the delivery of the Bonds to be so delivered;

(5)    In the event that the Refunding Bonds to be issued shall be Senior Lien Bonds, either (a) the documents required to be delivered pursuant to Section 204(c)(ix) hereof or (b) a certificate of an Authorized Representative stating that (i) scheduled Debt Service in each Fiscal Year on such Refunding Bonds shall not be greater than Debt Service in each Fiscal Year on the Bonds to be refunded and (ii) the final maturity of such Refunding Bonds is no later than the final maturity of the Bonds to be refunded; provided, however, that in the event Senior Lien Bonds are being issued to refund Second Lien Bonds, StadCo must deliver to the Trustee the document(s) required by Section 204(c)(ix) hereof;

(6)    In the event that the Refunding Bonds to be issued shall be Second Lien Bonds, either (a) the document(s) required to be delivered pursuant to Section 204(c)(x) hereof or (b) a certificate of an Authorized Representative stating that (i) scheduled Debt Service in each Fiscal Year on such Refunding Bonds shall not be greater than Debt Service in each Fiscal Year on the Bonds to be refunded and (ii) the final maturity of such Refunding Bonds is no later than the final maturity of the Bonds to be refunded; and

(7)    The proceeds, including accrued interest, of the Refunding Bonds of each such Series shall be applied simultaneously with the delivery of such Bonds in the manner provided in the Supplemental Indenture authorizing such Refunding Bonds;

(vii)    An Opinion of Counsel to StadCo in customary form that the issuance of such Additional Bonds is permitted under the terms of this Indenture and has been duly authorized;

(viii)    A request and authorization of StadCo, signed by an Authorized Representative, to the Trustee to authenticate and deliver such Additional Bonds to the initial purchaser named therein upon payment to the Trustee for the account of StadCo of a specified sum;

(ix)    If the Additional Bonds are to be issued as Senior Lien Bonds (and such Additional Bonds are not Refunding Bonds), *either* (A) both (I) a certificate of an Authorized Representative on behalf of StadCo certifying his or her reasonable belief that the Senior Lien Pro Forma Debt Service Coverage Ratio will be greater than 1.50:1.00 (1) for each Fiscal Year following substantial completion of any Improvements funded with the proceeds of the Additional Bonds until the scheduled maturity date of all such Bonds, or (2) if the proceeds of the Additional Bonds will not be used to fund Improvements as described in Section 2.04(b)(i), or if the interest payable on Additional Bonds issued to fund Improvements has not been capitalized, then for each Fiscal Year following the issuance of the Additional Bonds until the scheduled maturity date of all such Bonds, and (II) written evidence that the unenhanced credit ratings for the Senior Lien Bonds, including any such Additional Bonds, are at least investment grade from each of the Rating Agencies then maintaining a credit rating on the Senior Lien Bonds; *or* (B) both (I) a certificate of an Authorized Representative on behalf of StadCo certifying his or her reasonable belief that the Senior Lien Pro Forma Debt Service Coverage Ratio will be greater than 1.75:1.00 (1) for each Fiscal Year following substantial completion of any Improvements funded with the proceeds of the Additional Bonds until the scheduled maturity date of all such Bonds, or (2) if the proceeds of the Additional Bonds will not be used to fund Improvements, or if the interest payable on Additional Bonds issued to fund Improvements has not been capitalized, then for each Fiscal Year following the issuance of the Additional Bonds until the scheduled maturity date of all such Bonds, and (II) evidence that StadCo has delivered to each Rating Agency then maintaining a credit rating on the Senior Lien Bonds at least 30 days' prior notice of the proposed issuance of such Additional Bonds, together with copies of all material agreements relating to such proposed issuance;

(x)    If the Additional Bonds are to be issued as Second Lien Bonds (and such Additional Bonds are not Refunding Bonds), (A) a certificate of an Authorized Representative on behalf of StadCo certifying his or her reasonable belief that the Second Lien Pro Forma Debt

Service Coverage Ratio will be greater than 1.25:1.00 (I) for each Fiscal Year following substantial completion of any Improvements funded with the proceeds of the Additional Bonds until the scheduled maturity date of all such Bonds, or (II) if the proceeds of the Additional Bonds will not be used to fund Improvements, or if the interest payable on Additional Bonds issued to fund Improvements has not been capitalized, then for each Fiscal Year following the issuance of the Additional Bonds until the scheduled maturity date of all such Bonds, and (B) *either* (I) written evidence that the unenhanced credit ratings for the Senior Lien Bonds are at least investment grade from each of the Rating Agencies then maintaining a credit rating on the Senior Lien Bonds assuming issuance of any such Additional Bonds; *or* (II) both (1) a certificate of an Authorized Representative on behalf of StadCo certifying his or her reasonable belief that the Senior Lien Pro Forma Debt Service Coverage Ratio will be greater than 1.75:1.00 for each Fiscal Year following the issuance of the Additional Bonds until the scheduled maturity date of all such Bonds, and (2) evidence that StadCo has delivered to each Rating Agency then maintaining a credit rating on the Senior Lien Bonds at least 30 days' prior notice of the proposed issuance of such Additional Bonds, together with copies of all material agreements relating to such proposed issuance;

(xi)    If the Additional Bonds are issued for the purpose described in Section 204(b)(vi), the written consent of the Controlling Bond Insurer (so long as the Controlling Bond Insurer is not in material default of its obligations under the Bond Insurance Policy, and provided that such consent shall not be unreasonably withheld, and that the response to any request for such consent shall not be unreasonably delayed);

(d)    StadCo may also issue Additional Bonds at any time with the written consent of the Holders of not less than 50.1 percent (50.1%) of the Bonds Outstanding and the written consent of the Controlling Bond Insurer (so long as the Controlling Bond Insurer is not in material default of its obligations under the Bond Insurance Policy).

**Section 205.  Completion Bonds**.  To the extent deemed necessary by StadCo, at any time prior to or up to two years after Substantial Completion, StadCo may issue and the Trustee shall upon such issuance authenticate and deliver one or more Series of Bonds to fund StadCo's Applicable Percentage of Costs of the Project or other obligations necessary or advisable to complete the construction of the Stadium, including for "punchlist" items, retainages, holdbacks, start-up and operating costs, consultant and other professional expenses, Costs of Issuance of any Series of Bonds, expenses to enforce its rights or the rights of the JV Company under the Project Agreements or any other agreements relating to the Project and other expenses ("Completion Bonds").  Such Completion Bonds shall be parity in right to, and subject to the same covenants and Events of Default specified in the Bond Indenture as, the Bonds and any Additional Bonds issued pursuant thereto; provided, however, that in no event shall the aggregate principal amount of Completion Bonds issued exceed $65,000,000, or such greater amount which, when added to the amount of Initial Bonds issued pursuant to Section 203, would cause the aggregate amount of Initial Bonds and Completion Bonds to exceed $715,000,000.  Completion Bonds may be issued only upon receipt by the Trustee of the amount necessary for deposit in the applicable Account of the Senior Lien Debt Service Reserve Fund or Second Lien Debt Service Reserve Fund so that the amount in such Account, after giving effect to any Reserve Account Credit Facility deposited in such Account pursuant to Section 506 or Section 507 of this Indenture, as applicable, shall equal the applicable Debt Service Reserve Fund Requirement calculated immediately after the

authentication and delivery of such Completion Bonds and the documents required to be delivered pursuant to Section 204(c) (other than subclauses (v), (vi), (ix) and (x) thereof), together with a written statement from StadCo, accompanied by an IE Confirmation (only to the extent it addresses matters necessary to achieve Substantial Completion):

(ii)    giving an estimate of the cost of achieving Substantial Completion and the date on which Substantial Completion is likely to be achieved (or, if the issuance of such Completion Bonds is after Substantial Completion, an estimate and description of the costs to be funded with the proceeds of such Completion Bonds); and

(iii)    to the extent proceeds of the Completion Bonds will be used to achieve Substantial Completion, stating an opinion, based upon assumptions it believes to be reasonable at such time, that the proceeds of such Completion Bonds, (A) together with any other monies identified and available for such purpose, together in the aggregate with the proceeds of the Bonds previously issued and to be issued (if any), shall not exceed $715,000,000, and (B) together with monies available to Other StadCo, and the reasonably anticipated proceeds of future Bonds to be issued by the Other StadCo, are reasonably expected to be sufficient to pay the costs of achieving Substantial Completion.

**Section 206.    Bond Support Facilities; Swap Insurance Policies; Qualified Swaps or Other Similar Arrangements; Parity Obligations**.

(a)    StadCo may include provisions in a Supplemental Indenture authorizing the issuance of Bonds secured by a Bond Support Facility, including provisions that, in the event that the principal, Sinking Fund Installments, if any, and Redemption Price, if applicable, and interest due on any Bonds Outstanding shall be paid under the provisions of a Bond Support Facility, all covenants, agreements and other obligations of StadCo to the holders of such Bonds shall continue to exist and such Bond Support Facility Provider shall be subrogated to the rights of such Holders in accordance with the terms of such Bond Support Facility.  StadCo may also include provisions in a Supplemental Indenture authorizing the entering into of a Qualified Swap in connection with which the obligations of StadCo are secured by a Swap Insurance Policy, as StadCo deems appropriate, including provisions that, in the event that any Regularly Scheduled Swap Payments, Parity Swap Termination Payments and/or Swap Termination Payments (the "Insured Swap Payments") shall be paid under the provisions of any agreement relating to a Swap Insurance Policy, all covenants, agreements and other obligations of StadCo to the Qualified Swap Provider shall continue to exist and such provider of a Swap Insurance Policy shall be subrogated to the rights of such Qualified Swap Provider in accordance with the terms of such Swap Insurance Policy.

(b)    In addition, a Supplemental Indenture may establish such provisions as are necessary (i) to comply with the provisions of each such Bond Support Facility and agreement relating to a Swap Insurance Policy, (ii) to provide relevant information to the Bond Support Facility Provider and the provider of a Swap Insurance Policy, (iii) to provide a mechanism for paying (A) principal of and interest on such Bonds or on reimbursement obligations related thereto under the Bond Support Facility and (B) Insured Swap Payments under the provisions of any agreement relating to a Swap Insurance Policy, and (iv) to make provision for any events of

default or for additional or improved security required by the Bond Support Facility Provider and/or the provider of any Swap Insurance Policy.

(c) StadCo may enter into such agreements with the Bond Support Facility Provider and/or the provider of any Swap Insurance Policy providing for, inter alia: (i) the payment of fees and expenses to such Bond Support Facility Provider for the issuance of such Bond Support Facility and/or such provider of a Swap Insurance Policy for the issuance of such Swap Insurance Policy; (ii) the terms and conditions of such Bond Support Facility and the Bonds, or of reimbursement obligations related thereto, affected thereby and/or such Swap Insurance Policy and the Qualified Swap affected thereby; and (iii) the security, if any, to be provided for the issuance of such Bond Support Facility and/or such Swap Insurance Policy.

(d) StadCo may secure such Bond Support Facility and/or Swap Insurance Policy by providing in the Supplemental Indenture pursuant to which the Bonds receiving the benefit of such Bond Support Facility are to be or were issued and/or the entering into of the insured Qualified Swap is authorized, that:

(i) the Bonds held by such Bond Support Facility Provider in such capacity shall be subject to such adjustments to the rate of interest, method of determining the rate of interest, maturity or redemption provisions as are specified by StadCo in, or determined as provided in, the applicable Supplemental Indenture or in any agreement referred to therein (any Bond subject to such adjusted provisions is referred to herein, for the period such adjusted provisions are in effect, as a "Support Facility Bond");

(ii) the obligation to reimburse such Bond Support Facility Provider for purchase and/or other payment of a Bond pursuant to such Bond Support Facility will be evidenced by obligations constituting a Bond of the same lien (such a Bond is referred to herein as a "Bank Bond");

(iii) the obligation to reimburse the Swap Insurer for the payment of Insured Swap Payments pursuant to such agreement relating to such Swap Insurance Policy will be evidenced by obligations of the same lien and priority as the Insured Swap Payments so paid (such obligations are referred to herein as "Swap Insurance Reimbursement Obligations"); and/or

(iv) StadCo shall enter into an agreement with the Bond Support Facility Provider and/or provider of a Swap Insurance Policy to directly reimburse such provider for amounts paid or otherwise advanced under such Bond Support Facility and/or Swap Insurance Policy, together with interest thereon (any such direct reimbursement obligations are referred to herein as "Support Obligations"; Support Facility Bonds, Bank Bonds, Swap Insurance Reimbursement Obligations and Support Obligations are collectively referred to herein as "Reimbursement Obligations").

No Reimbursement Obligation shall be treated as outstanding for purposes of making any calculation, estimation or determination under the Indenture, until amounts are paid under such Bond Support Facility or Swap Insurance Policy, as applicable.   Interest on any such Reimbursement Obligation relating to a Bond Support Facility calculated at a rate higher than the

interest rate on the related Bond and principal amortization requirements with respect to such Reimbursement Obligation, including both payments on maturity and pursuant to any redemption provisions, scheduled on a basis more accelerated than that applicable to the related Bond, and payments on any Reimbursement Obligation relating to a Swap Insurance Policy which provide for different terms than those provided for the payment of Insured Swap Payments under the related Qualified Swap, may each and all be secured by a pledge of, and a lien on, the Collateral on a parity with the pledge and lien created hereunder applicable to such related Bond and/or Qualified Swap if, and to the extent, StadCo designates such Reimbursement Obligations as a "Parity Reimbursement Obligation" (the obligation of StadCo in respect of such interest and principal amortization or payment of such Insured Swap Payments is referred to herein as a "Parity Reimbursement Obligation") in the Supplemental Indenture applicable to the Bond receiving the benefits of such Bond Support Facility and/or the Qualified Swap receiving the benefits of such Swap Insurance Policy.

A Parity Reimbursement Obligation shall be secured by such amounts on deposit in the Debt Service Reserve Fund or Account, as applicable, as secure the Bonds to which it relates. Parity Reimbursement Obligations and Reimbursement Obligations shall not include any payments of any fees, expenses, indemnification or other obligations to any such provider, which payments of fees, expenses, indemnification or other obligations shall constitute StadCo Expenses. All Parity Reimbursement Obligations shall be deemed to be either (i) a part of the Bond to which the Bond Support Facility which gave rise to such Parity Reimbursement Obligations relates or (ii) a part of the Qualified Swap to which the Swap Insurance Policy which gave rise to such Parity Reimbursement Obligations relates. Any amounts payable in respect of a Reimbursement Obligation relating to the Senior Lien Bonds or a Parity Swap Obligation of the same lien, other than amounts constituting a Parity Reimbursement Obligation, shall, as provided in a Supplemental Indenture, be paid after making all required deposits into the Senior Lien Debt Service Fund but prior to payment on the Senior Lien Bonds from any other monies of StadCo available therefor in the Redemption Fund or from any other legally available monies of StadCo and prior to payment of any required deposits into the Second Lien Debt Service Fund. Any amounts payable in respect of a Reimbursement Obligation relating to the Second Lien Bonds or a Parity Swap Obligation of the same lien, other than amounts constituting a Parity Reimbursement Obligation, shall, as provided in a Supplemental Indenture, be paid after making all required deposits into the Second Lien Debt Service Fund but prior to payment on the Second Lien Bonds from any other monies of StadCo available therefor in the Redemption Fund or from any other legally available monies of StadCo.

(e)     Any such Bond Support Facility shall be for the benefit of and secure such Bond or portion thereof as specified in the applicable Supplemental Indenture. Any such agreement relating to a Swap Insurance Policy shall be for the benefit of and secure such Regularly Scheduled Swap Payments, Parity Swap Termination Payments, Swap Termination Payments or portion thereof as specified in the applicable Supplemental Indenture.

(f)     In connection with the issuance of a Bond, or at any time thereafter so long as a Bond remains Outstanding, StadCo may, to the extent from time to time permitted pursuant to Applicable Law and with the written consent of the Controlling Bond Insurer, enter into one or more Qualified Swaps if StadCo determines that such Qualified Swap(s) will assist StadCo in more effectively managing its interest costs or in otherwise more effectively managing its

interest rate exposure or is otherwise advantageous to StadCo.  To the extent provided in the agreement relating to a Qualified Swap, StadCo's obligation to pay any Regularly Scheduled Swap Payment and any Parity Swap Termination Payments under any Qualified Swap (a "Parity Swap Obligation") shall be secured by a pledge of, and a lien on, the Trust Estate pledged hereunder on a parity with the lien created hereunder for the Bonds to which such Parity Swap Obligation relates.  A Parity Swap Obligation shall not be secured by such amounts on deposit in the Debt Service Reserve Fund or Account, as applicable, as secure the Bonds to which it relates or by amounts on deposit in the Senior Lien Strike Reserve Fund..  Parity Swap Obligations shall only include Regularly Scheduled Swap Payments and Parity Swap Termination Payments and shall not include any Swap Termination Payments or Other Swap Payments.  In the event any or all of the Bonds to which a Parity Swap Obligation relates are redeemed, defeased, refunded or otherwise paid, then such Parity Swap Obligation may remain outstanding and shall continue to constitute a Parity Swap Obligation for purposes of this Indenture.

(g)     Any amounts received by StadCo from a Qualified Swap Provider relating to a Parity Swap shall be deposited in the Operating Fund.

(h)     If at any time StadCo has issued or incurred any Parity Obligations and owes any amounts thereunder, whether or not then due and payable, all references in this Indenture or in the applicable Supplemental Indenture to such Bonds or the Holders thereof, shall be deemed to include references to such Parity Obligation and the Parity Obligation Holder thereof.   In connection with the issuance or incurrence by StadCo of any Parity Obligations, StadCo shall deliver to the Trustee:

(1)     A Supplemental Indenture for the Bonds to which such Parity Obligation relates, certified by an Authorized Representative along with any other documents required by such Supplemental Indenture to be delivered to the Trustee in connection with the issuance or incurrence of such Parity Obligation;

(2)     A certificate of an Authorized Representative certifying that such Parity Obligation meets the requirements for a Parity Reimbursement Obligation, a Parity Swap Obligation, or a Reserve Account Surety Obligation, as appropriate;

(3)     An Opinion of Counsel to StadCo in customary form that such Parity Obligation (i) meets the requirements for a Parity Reimbursement Obligation, a Parity Swap Obligation, or a Reserve Account Surety Obligation contained herein and (ii) has been duly and lawfully authorized, executed and delivered by StadCo, is in full force and effect and is valid and binding upon StadCo and is enforceable against StadCo in accordance with its terms.

**Section 207.  Permitted Subordinated Indebtedness.**   Subject to Section 609(h) hereof, StadCo reserves the right to issue or incur debt, and to guarantee any indebtedness or liability of any Person ("Permitted Subordinated Indebtedness") pursuant to other and separate resolutions, indentures or agreements of StadCo, and to incur or impose liens on Pledged Revenues to secure such debt or guarantees, provided that (a)(i) any liens against the Pledged Revenues that secure any such guarantees or indebtedness are subordinated to the liens on the Pledged Revenues securing the Senior Lien Indebtedness and Second Lien Indebtedness under the Indenture; (ii) such Permitted Subordinated Indebtedness may not be accelerated for any

reason while any Senior Lien Indebtedness or Second Lien Indebtedness is Outstanding; and (iii) no default or Event of Default shall arise under the documents evidencing such Permitted Subordinated Indebtedness solely because of the occurrence of an Event of Default with respect to the Senior Lien Bonds or Second Lien Bonds hereunder and such documents shall contain such other intercreditor arrangements as are reasonably acceptable to the Controlling Bond Insurer; and (b) the Total Pro Forma Debt Service Coverage Ratio is at least 1.25:1.00 during the Fiscal Year in which such Permitted Subordinated Indebtedness is incurred or issued and prior to issuing or incurring such Permitted Subordinated Indebtedness, StadCo shall deliver to the Trustee (A) a certificate of an Authorized Representative on behalf of StadCo certifying his or her reasonable belief that the Total Pro Forma Debt Service Coverage Ratio will be greater than 1.25:1.00 for each Fiscal Year following the issuance of such Permitted Subordinated Indebtedness, based upon reasonable assumptions with respect to price increases and renewal rates, until the scheduled maturity date of the Bonds (together with supporting calculations), and (B) *either* (I) written evidence that the unenhanced credit ratings for the Senior Lien Bonds are at least investment grade from each of the Rating Agencies then maintaining a credit rating on the Senior Lien Bonds assuming the issuance of any such Permitted Subordinated Indebtedness; *or* (II) both (1) a certificate of an Authorized Representative on behalf of StadCo certifying his or her reasonable belief that the Senior Lien Pro Forma Debt Service Coverage Ratio will be greater than 1.75:1.00 for each Fiscal Year following the issuance of the Permitted Subordinated Indebtedness until the scheduled maturity date of the Bonds, and (2) evidence that StadCo has delivered to each Rating Agency then maintaining a credit rating on the Senior Lien Bonds at least 30 days' prior notice of the proposed issuance of such Permitted Subordinated Indebtedness, together with copies of all material agreements relating to such proposed issuance.

## ARTICLE III.
## GENERAL TERMS AND PROVISIONS OF BONDS; EXECUTION, AUTHENTICATION AND REGISTRATION

### Section 301.   Medium of Payment; Form and Date; Letters and Numbers.

(a)     The Bonds shall be payable, with respect to interest, principal and Redemption Price, in any coin or currency of the United States of America which at the time of payment is legal tender for the payment of public and private debts.

(b)     The Bonds of each Series shall be issued in the form of fully registered Bonds without coupons unless otherwise authorized by the corresponding Supplemental Indenture.  The Bonds and the Trustee's certificate of authentication shall be substantially in the form provided in the corresponding Supplemental Indenture. To the extent applicable, StadCo and the Trustee, by their execution and delivery of this Indenture, expressly agree to such terms and provisions and to be bound thereby.

(c)     Each Bond shall be lettered and numbered as provided in the corresponding Supplemental Indenture so as to be distinguished from every other Bond.

(d)     Except as may be otherwise provided for any Series of Bonds in the Supplemental Indenture authorizing the Bonds of such Series, Bonds of each Series shall be dated as of the date six months preceding the Interest Payment Date next following the date of authentication thereof

by the Trustee, unless such date of authentication shall be an Interest Payment Date, in which case they shall be dated as of such date of authentication; provided, however, that if, as shown by the records of the Trustee, interest on the Bonds of any Series shall be in default, the Bonds of such Series issued in lieu of Bonds surrendered for transfer or exchange may be dated as of the date to which interest has been paid in full on the Bonds surrendered; provided, further, that if the date of authentication shall be prior to the first Interest Payment Date for the Bonds of such Series, Bonds shall be dated as provided in the Supplemental Indenture authorizing the Bonds of such Series. Bonds of each Series shall bear interest from their date.

**Section 302. Legends**. The Bonds of each Series may contain or have endorsed thereon such provisions, specifications and descriptive words not inconsistent with the provisions of the Indenture as may be necessary or desirable to comply with applicable law, custom or otherwise, as may be determined by StadCo prior to the authentication and delivery thereof and as set forth in the Supplemental Indenture authorizing such Bonds.

**Section 303. Execution of Bonds; Authentication**. The Bonds shall be executed by the manual or facsimile signature of an Authorized Representative. In case any Authorized Representative whose signature or a facsimile of whose signature shall appear on any Bond shall cease to be an Authorized Representative before the delivery of the Bonds, such signature or such facsimile shall nevertheless be valid and sufficient for all purposes as if he or she had remained in office until such delivery.

The Bonds of each Series shall bear thereon a certificate of authentication, in the form set forth in the Supplemental Indenture authorizing such Bonds, executed manually by the Trustee. Only such Bonds as shall bear thereon such certificate of authentication shall be entitled to any right or benefit under the Indenture, and no Bond shall be valid or obligatory for any purpose until such certificate of authentication shall have been duly executed by the Trustee. Such certificate of the Trustee upon any Bond executed on behalf of StadCo shall be conclusive evidence that the Bond so authenticated has been duly authenticated and delivered under the Indenture and that the Holder thereof is entitled to the benefits of the Indenture.

**Section 304. Bonds Mutilated, Destroyed, Stolen or Lost**. In case any Bond shall become mutilated or be destroyed, stolen or lost, StadCo shall execute, and thereupon the Trustee shall authenticate and deliver, a new Bond of like Series, maturity and principal amount as the Bond so mutilated, destroyed, stolen or lost, in exchange and substitution for such mutilated Bond, upon surrender and cancellation of such mutilated Bond or in lieu of and substitution for the Bond destroyed, stolen or lost, upon filing with the Trustee evidence satisfactory to StadCo and the Trustee that such Bond has been destroyed, stolen or lost and proof of ownership thereof, and upon furnishing StadCo and the Trustee with indemnity satisfactory to them and complying with such other reasonable regulations as StadCo and the Trustee may prescribe and paying such expenses as StadCo and the Trustee may incur. All Bonds so surrendered to the Trustee shall be promptly cancelled by it. Any such new Bonds issued pursuant to this Section 304 in substitution for Bonds alleged to be destroyed, stolen or lost shall constitute original additional contractual obligations on the part of StadCo, whether or not the Bonds so alleged to be destroyed, stolen or lost be at any time enforceable by anyone, and shall be equally secured by and entitled to equal and proportionate benefits with all other Bonds

- 58 -

issued under the Indenture, in any monies or securities held by StadCo or the Trustee for the benefit of the Holders.

### Section 305. Preparation of Definitive Bonds; Temporary Bonds.

(a)      Except as otherwise provided in a Supplemental Indenture applicable to a Series of Bonds, definitive Bonds of each Series shall be lithographed or printed or typewritten on steel engraved borders.  Until the definitive Bonds of any Series are prepared, StadCo may execute, in the same manner as is provided in Section 303, and, upon the request of StadCo, the Trustee shall authenticate and deliver, in lieu of definitive Bonds, but subject to the same provisions, limitations and conditions as the definitive Bonds except as to the denominations thereof and as to exchangeability for registered Bonds, one or more temporary Bonds substantially of the tenor of the definitive Bonds in lieu of which such temporary Bond or Bonds are issued, in denominations authorized by StadCo, and with such omissions, insertions and variations as may be appropriate to temporary Bonds.  StadCo at its own expense shall prepare and execute and, upon the surrender of such temporary Bonds for exchange and the cancellation of such surrendered temporary Bonds, the Trustee shall authenticate and, without charge to the Holder thereof, deliver in exchange therefor, definitive Bonds of the same aggregate principal amount and Series and maturity as the temporary Bonds surrendered.  Until so exchanged, the temporary Bonds shall in all respects be entitled to the same benefits and security as definitive Bonds authenticated and issued pursuant to the Indenture.

(b)      If StadCo shall authorize the issuance of temporary Bonds in more than one denomination, the Holder of any temporary Bond or Bonds may, at his option, surrender the same to the Trustee in exchange for another temporary Bond or Bonds of like aggregate principal amount and Series and maturity of any other Authorized Denomination or denominations, and thereupon StadCo shall execute and the Trustee shall authenticate and, in exchange for the temporary Bond or Bonds so surrendered and upon payment of the taxes, fees and charges provided for in Section 308, shall deliver a temporary Bond or Bonds of like aggregate principal amount, Series and maturity in such other Authorized Denomination or denominations as shall be requested by such Holder.

(c)      All temporary Bonds surrendered in exchange either for another temporary Bond or Bonds or for a definitive Bond or Bonds shall be promptly cancelled by the Trustee.

### Section 306. Registration of Bonds; Persons Treated as Owners; Restriction on Transfers.  The Trustee shall maintain registration books for the registration and the registration of transfer of the Bonds.  The transfer of any Bond or any beneficial interest therein shall be subject to any restrictions set forth in the applicable Supplemental Indenture and may be registered only upon the books kept by the Trustee for the registration and registration of transfer of the Bonds upon surrender thereof to the Trustee together with an assignment duly executed by the registered owner in person or by his duly authorized attorney or legal representative.  Upon any such transfer, StadCo shall execute and the Trustee shall authenticate and deliver in exchange for such bond a new registered bond or bonds of the same series, registered in the name of the transferee, of any denomination or denominations authorized by this Indenture.

Prior to due presentment for registration of transfer the Trustee shall treat the registered owner as the only Person entitled to payment of principal and the exercise of all other rights and powers of the owner, except that all interest payments shall, except as provided otherwise in a Supplemental Indenture with respect to a particular Series of Bonds, be made to the registered owner as of the fifteenth day of the month preceding each Interest Payment Date.

Furthermore, any Holder of a Book Entry Bond shall, by acceptance of such Book Entry Bond, agree that transfers of beneficial interests in such Book Entry Bond may be effected only through the book entry system maintained by the Holder of such Book Entry Bond (or its agent), and that ownership of a beneficial interest in a Book Entry Bond shall be required to be reflected in a book entry system.

Every Bond shall be subject to the restrictions on transfer provided in any legend required to be set forth on the face of each Bond pursuant to Section 302 and/or as may be set forth in an applicable Supplemental Indenture, and the restrictions set forth in this Section 306, and the Holder of each Bond, by such Holder's acceptance thereof (or interest therein), agrees to be bound by such restrictions on transfer. Any Bond authenticated and delivered upon registration of transfer of, or in exchange for, or in lieu of, any Book Entry Bond, shall also be a Book Entry Bond and bear the legend specified in Section 302 and/or as may be set forth in an applicable Supplemental Indenture.

**Section 307.  Exchange of Bonds**.  Upon surrender thereof at the principal corporate trust office of the Trustee, together with an assignment duly executed by the registered owner or his duly authorized attorney or legal representative, Bonds of any series may, at the option of the owner, be exchanged for an equal aggregate principal amount of Bonds of the same series and of the same maturity of Authorized Denominations as requested by the owner thereof or his duly authorized attorney or legal representative. StadCo shall execute and the Trustee shall authenticate any Bonds whose execution and authentication is necessary to provide for exchange of Bonds pursuant to this Section.

**Section 308.  Charges for Exchange and Registration**.  Any exchange or registration of transfer of any Bond by any owner thereof shall be at the expense of StadCo, except that the Trustee as Bond Registrar shall make a charge to any Holder requesting such exchange, registration or discharge in the amount of any tax or other governmental charge required to be paid with respect thereto.

**Section 309.  Cancellation and Distribution of Bonds**.  All Bonds which have been paid (whether at maturity, by acceleration or call for redemption or otherwise) or delivered to the Trustee by StadCo for cancellation shall not be reissued, and the Trustee shall, unless otherwise directed by StadCo, cremate, shred or otherwise dispose of such Bonds.  The Trustee shall deliver to StadCo a certificate of any such cremation, shredding or other disposition of any Bond.

**Section 310.  Book Entry Bonds**.  Anything herein to the contrary notwithstanding, Bonds may be authorized and issued as Book Entry Bonds in accordance with the Supplemental Indenture authorizing such Bonds.

Each Book Entry Bond initially shall (i) be registered in the name of the nominee of the Securities Depository, (ii) be deposited with, or on behalf of, the Securities Depository or with the Trustee, as custodian for such Securities Depository and (iii) bear such legends as may be set forth in an applicable Supplemental Indenture.

Direct and indirect participants in the Securities Depository shall have no rights under this Indenture with respect to any Book Entry Bond held on their behalf by the Securities Depository, or the Trustee as its custodian, or under such Book Entry Bond, and the Securities Depository may be treated by StadCo, the Trustee and any agent of StadCo or the Trustee as the absolute owner of such Book Entry Bond for all purposes whatsoever. Notwithstanding the foregoing, nothing herein shall prevent StadCo, the Trustee or any agent of StadCo or the Trustee from giving effect to any written certification, proxy or other authorization furnished by the Securities Depository or shall impair, as between the Securities Depository and its direct and indirect participants the operation of customary practices governing the exercise of the rights of a holder of any Bond. Interests of Beneficial Owners in a Book Entry Bond may be transferred in accordance with the applicable rules and procedures of the Securities Depository and the provisions of this Section 310 and the applicable Supplemental Indenture.

If any Book Entry Bond is to be exchanged for other Bonds or canceled in whole, it shall be surrendered by or on behalf of the Securities Depository or its nominee to the Trustee, as Bond Registrar, for exchange or cancellation as provided in this Article III. If any Book Entry Bond is to be exchanged for other Bonds or canceled in part, or if another Bond is to be exchanged in whole or in part for a beneficial interest in any Book Entry Bond, then either (i) such Book Entry Bond shall be so surrendered for exchange or cancellation as provided in this Article III or (ii) the principal amount thereof shall be reduced or increased by an amount equal to the portion thereof to be so exchanged or canceled, or equal to the principal amount of such other Bond to be so exchanged for a beneficial interest therein, as the case may be, by means of an appropriate adjustment made on the records of the Trustee, as the Bond Registrar, whereupon the Trustee in accordance with the procedures of the Securities Depository, shall instruct the Securities Depository or its authorized representative to make a corresponding adjustment to its records. Upon any surrender or adjustment of a Book Entry Bond, the Trustee shall, subject to this Section 310 and the applicable Supplemental Indenture, and as otherwise provided in this Article III, authenticate and deliver any Bonds issuable in exchange for such Book Entry Bond (or any portion thereof) to or upon the order of, and registered in such names as may be directed by, the Securities Depository or its authorized representative. Upon the request of the Trustee, StadCo shall promptly make available to the Trustee a reasonable supply of Bonds that are not in the form of Book Entry Bonds. The Trustee shall be entitled to rely upon any order, direction or request of the Securities Depository or its authorized representative which is given or made pursuant to this Article III if such order, direction or request is given or made in accordance with the procedures of the Securities Depository.

For all purposes of this Indenture, the Holder of a Book Entry Bond shall be the Securities Depository therefor and neither StadCo nor the Trustee shall have responsibility or any obligation to the Beneficial Owner of such Bond or to any direct or indirect participant in such Securities Depository. Without limiting the generality of the foregoing, neither StadCo nor the Trustee shall have any responsibility or obligation to any such participant or to the Beneficial Owner of a Book Entry Bond with respect to (i) the accuracy of the records of the Securities

Depository or any participant with respect to any beneficial ownership interest in such Bond, (ii) the delivery to any participant of the Securities Depository, the Beneficial Owner of such Bond or any other Person, other than the Securities Depository, of any notice with respect to such Bond, including any notice of the redemption thereof, or (iii) the payment to any participant of the Securities Depository, the Beneficial Owner of such Bond or any other Person, other than the Securities Depository, of any amount with respect to the principal, Sinking Fund Installment or Redemption Price of, or interest on, such Bond. StadCo and the Trustee may treat the Securities Depository therefor as the absolute owner of a Book Entry Bond for the purpose of (x) payment of the principal, Sinking Fund Installments or Redemption Price of, and interest on such Bond, (y) giving notices of redemption and of other matters with respect to such Bond, and (z) registering transfers with respect to such Bond, and for all other purposes whatsoever. The Trustee shall pay all principal, Sinking Fund Installments or Redemption Price of, and interest on, such Bond only to or upon the order of the Securities Depository, and all such payments shall be valid and effective to fully satisfy and discharge StadCo obligations with respect to such principal, Sinking Fund Installments or Redemption Price and interest to the extent of the sum or sums so paid. No Person other than the Securities Depository shall receive a Bond or other instrument evidencing StadCo's obligation to make payments of the principal, Sinking Fund Installments or Redemption Price thereof, and interest thereon.

Anything herein to the contrary notwithstanding, payment of the Redemption Price of a Book Entry Bond which is redeemed in part prior to maturity may be paid to the Securities Depository by wire transfer without surrender of such Bond to the Trustee; provided, however, that the Trustee shall maintain records as to each such payment and of the principal amount of such Bond Outstanding, which shall be binding on StadCo and the Holders from time to time of such Bond; provided, further, that payment of the principal or Redemption Price of and interest on a Book Entry Bond at the maturity date or earlier date on which such Bond has been called for redemption in whole shall only be made upon presentation and surrender of such Bond to the Trustee at its principal corporate trust office.

StadCo, in its sole discretion and without the consent of the Trustee, may terminate the services of the Securities Depository with respect to a Book Entry Bond if StadCo determines that (i) the Securities Depository is unable to discharge its responsibilities with respect to such Bonds or (ii) a continuation of the requirement that all of the Outstanding Bonds of like Series issued in book entry form be registered in the registration books of StadCo in the name of the Securities Depository is not in the best interest of the Beneficial Owners of such Bonds.

Upon the termination of the services of a Securities Depository with respect to a Book Entry Bond, or upon the resignation of a Securities Depository with respect to a Book Entry Bond, after which no substitute Securities Depository willing to undertake the functions of such Securities Depository can be found which, in the opinion of StadCo, is able to undertake such functions upon reasonable and customary terms, such Bonds shall no longer be registered in the registration books kept by the Trustee in the name of a Securities Depository, but shall be registered in the name or names as the Holders transferring or exchanging such Bonds shall designate, in accordance with the provisions of Article III hereof.

## ARTICLE IV.
## REDEMPTION OF BONDS

**Section 401.    Redemption**.  Bonds shall be subject to such mandatory and/or optional redemption at such times, at such prices and on such other terms and conditions as shall be provided in the Supplemental Indenture pursuant to which such Bonds are issued, to the extent consistent with this Article IV and subject always to Section 412, and may not otherwise be called for redemption by StadCo.

**Section 402.    Privilege of Redemption and Redemption Price**.  Bonds subject to redemption prior to maturity pursuant to a Supplemental Indenture shall be redeemable, upon notice as provided in this Article IV, at such times, at such Redemption Prices and upon such terms in addition to and consistent with the terms contained in this Article IV as may be specified in the Supplemental Indenture authorizing such Series.

**Section 403.    Redemption at the Election or Direction of StadCo**.  In the case of any redemption of Bonds at the election or direction of StadCo, StadCo shall give written notice to the Trustee and each Bond Insurer and each Reserve Account Credit Facility Provider of the following: its election or direction to redeem, the Redemption Date, the Series, and the principal amounts of the Bonds of each maturity of such Series to be redeemed (which Series, maturities and principal amounts thereof to be redeemed shall be determined by StadCo, in its sole discretion, subject to any limitations with respect thereto contained in any Supplemental Indenture).  Such notice shall be given at least 45 days prior to the Redemption Date or such shorter period as shall be acceptable to the Trustee.  In the event notice of redemption shall have been given in accordance with Section 406, StadCo shall, prior to the Redemption Date, pay to the appropriate Paying Agents an amount in cash which, in addition to any other monies held by such Paying Agents which are available therefor, will be sufficient to redeem on the Redemption Date all of the Bonds to be redeemed at the Redemption Price thereof, plus any interest accrued and unpaid to but not including the Redemption Date.  StadCo shall promptly notify the Trustee in writing of all such payments to a Paying Agent.

**Section 404.    Redemption Other than at StadCo's Election or Direction**.  Whenever by the terms of this Indenture or a Supplemental Indenture, the Trustee is required or authorized to redeem Bonds otherwise than at the election or direction of StadCo, the Trustee shall (i) select the Bonds or portions of Bonds to be redeemed, (ii) give the notice of redemption and (iii) pay out of monies available therefor the Redemption Price thereof, plus interest accrued and unpaid to the Redemption Date to the appropriate Paying Agent in accordance with the terms of this Article IV.

**Section 405.    Selection of Bonds to be Redeemed**.  Except as otherwise provided in a Supplemental Indenture authorizing the issuance of a Series of Bonds, if fewer than all of the Bonds of like maturity of any Series shall be called for prior redemption, the particular Bonds or portions of Bonds to be redeemed shall be selected by the Trustee in such manner as the Trustee in its discretion may deem fair and appropriate subject to any limitation with respect thereto contained in any Supplemental Indenture; provided, however, that for any Bond of a denomination of more than the minimum denomination specified in the Supplemental Indenture relating to such Series, the portion of such Bond to be redeemed and the portion to be retained by

the Holder thereof shall each be in a principal amount equal to such minimum denomination or a multiple thereof, and that, in selecting portions of such Bonds for redemption, the Trustee shall treat each such Bond as representing that number of Bonds of such minimum denomination which is obtained by dividing the principal amount of such Bond to be redeemed in part by the amount of such minimum denomination.

Section 406.  **Notice of Redemption**.  When the Trustee shall receive notice from StadCo of its election or direction to redeem Bonds pursuant to Section 403, and when Bonds are to be redeemed out of any Sinking Fund Installment pursuant to the corresponding Supplemental Indenture, the Trustee shall give notice, in the name of StadCo, of the redemption of such Bonds, which notice shall specify the Series and maturities of the Bonds, the Redemption Date and the place or places where amounts due upon such redemption will be payable and, if less than all of the Bonds of any like Series and maturity are to be redeemed, the letters and numbers or other distinguishing marks of such Bonds so to be redeemed, including CUSIP numbers if available, and the respective portions of the principal amount thereof to be redeemed.  Such notice shall further state that on such Redemption Date there shall become due and payable upon each Bond to be redeemed the Redemption Price thereof, or the Redemption Price of the specified portions of the principal thereof, together with interest accrued to the Redemption Date, and that from and after such date interest thereon shall cease to accrue and be payable.  Such notice shall also contain such other information or specifications as StadCo may reasonably request the Trustee to include in such notice.  Except as otherwise provided in the Supplemental Indenture authorizing the issuance of Bonds of a Series, the Trustee shall give such notice, by first-class mail, postage prepaid, not less than 30 days before the Redemption Date, to StadCo and each Bond Insurer and to the registered owners of any Bonds or portions of Bonds which are to be redeemed, at their last addresses, if any, appearing upon the registry books.  Failure of the registered owner of Bonds which are to be redeemed to receive any such notice shall not affect the validity of the proceedings for the redemption of Bonds.

If notice of redemption shall have been given as aforesaid, the Bonds of such Series called for redemption shall become due and payable on the Redemption Date.  Any notice of optional redemption given pursuant to this Section 406 may state that it is conditional upon receipt by the Trustee of monies sufficient to pay the Redemption Price of such Bonds or upon the satisfaction of any other condition, or that it may be rescinded upon the occurrence of any other event, and any conditional notice so given may be rescinded at any time before payment of such Redemption Price if any such condition so specified is not satisfied or if any such other event occurs.  Notice of such rescission shall be given by the Trustee to affected Holders and each Bond Insurer as promptly as practicable upon the failure of such condition or the occurrence of such other event.

Section 407.  **Payment of Redeemed Bonds**.  Notice having been given in the manner provided in Section 406, the Bonds or portions thereof so called for redemption shall, unless such notice is rescinded or any condition is not satisfied, become due and payable on the Redemption Date so designated at the Redemption Price, plus interest accrued and unpaid to the Redemption Date, and, upon presentation and surrender thereof at the office specified in such notice, such Bonds, or portions thereof, shall be paid at the Redemption Price plus interest accrued and unpaid to the Redemption Date.  If there shall be drawn for redemption less than all of a Bond, StadCo shall execute and the Trustee shall authenticate and the Paying Agent deliver,

upon the surrender of such Bond, without charge to the owner thereof, for the unredeemed balance of the principal amount of the registered Bond so surrendered, Bonds of like Series and maturity in any of the Authorized Denominations.  If, on the Redemption Date, monies for the redemption of all the Bonds or portions thereof of any like Series and maturity to be redeemed, together with interest to the Redemption Date, shall be held by the Paying Agents so as to be available therefor on said date, and if notice of redemption shall have been given pursuant to Section 406, then, from and after the Redemption Date interest on the Bonds or portions thereof of such Series and maturity so called for redemption shall cease to accrue and become payable.  If said monies shall not be so available on the Redemption Date, such Bonds or portions thereof shall continue to bear interest until paid at the same rate as they would have borne had they not been called for redemption.

**Section 408.  Extraordinary Mandatory Redemption**.  Unless otherwise provided in any Supplemental Indenture, the Bonds are subject to extraordinary mandatory redemption prior to maturity by StadCo in whole on any date, at a Redemption Price equal to 100% of the principal amount to be redeemed plus accrued interest, if any, to the date of redemption, if one or more of the following events shall have occurred and there shall be monies sufficient for such purpose in the Redemption Fund:

(i)    if StadCo exercises its Early Termination Option under the StadCo Sublease as a result of the exercise by the Giants Team of such Team's Early Termination Right under the Giants Team Lease and the provisions of the Ground Lease (except to the extent such Bonds are prepaid, defeased or otherwise secured by StadCo, as described in Section 803 hereof), in which case all amounts received by StadCo from the JV Company pursuant to StadCo's sale of its interests in JV Company in connection with the exercise of such Early Termination Option shall be remitted by StadCo to the Trustee to be applied, together with any other monies then held by the Trustee hereunder (other than any monies in the Excluded Accounts), to the redemption of StadCo's Bonds and to the payment of all other obligations of StadCo secured hereunder, in the order and in the manner described in Section 905 hereof; or

(ii)    prior to Substantial Completion, if the Stadium is substantially damaged, destroyed or condemned, and the JV Company does not elect to recommence construction of the Stadium within 12 months of receiving insurance proceeds or condemnation awards, in which case StadCo will use commercially reasonable efforts to cause the JV Company to distribute to StadCo its Applicable Percentage of such insurance proceeds or condemnation awards, and in such case all such amounts received by StadCo from the JV Company shall be remitted by StadCo to the Trustee to be applied, together with any other monies then held by the Trustee hereunder (other than any monies in the Excluded Accounts), to the redemption of StadCo's Bonds and to the payment of all other obligations of StadCo secured hereunder, in the order and in the manner described in Section 905 hereof; or

(iii)    upon and following Substantial Completion, if the Stadium is substantially damaged, destroyed or condemned and (A) the JV Company does not elect to rebuild, and commence rebuilding, the Stadium within 12 months of receiving insurance or condemnation proceeds, or (B) the cost of rebuilding the Stadium is less than the amount of insurance or condemnation proceeds received by the JV Company, in which case all amounts received by StadCo from the JV Company pursuant to the applicable provisions of Articles 6 and 19 of the

StadCo Sublease shall be remitted by StadCo to the Trustee to be applied (1) under the circumstances described in clause (A), above, together with any other monies then held by the Trustee hereunder (other than any monies in the Excluded Accounts), to the redemption of StadCo's Bonds and to the payment of all other obligations of StadCo secured hereunder, in the order and in the manner described in Section 905 hereof, or (2) under the circumstances described in clause (B), above, to the redemption of some or all of StadCo's Bonds and the payment of all amounts due to any Bond Insurer or Reserve Account Credit Facility Provider.

Any redemption pursuant to this Section 408 shall be made on the first date for which notice of redemption may be timely given by the Trustee as required by this Indenture.

**Section 409.   Mandatory Redemption or Purchase Upon Occurrence of NFL Redemption Event**.   Unless otherwise provided in any Supplemental Indenture, the Bonds are subject to mandatory redemption prior to maturity, in whole on any date, at a Redemption Price equal to 100% of the principal amount to be redeemed plus accrued interest, if any, to the date of redemption, upon the occurrence of an NFL Redemption Event and the receipt by the Trustee of monies from the NFL, for deposit in the Redemption Fund, sufficient to pay all of the principal of and interest on the Bonds accruing to the date of redemption.  At the option of StadCo, if so directed by the NFL, with notice to the Trustee and each Bond Insurer, StadCo shall use the monies so deposited in the Redemption Fund to purchase Bonds Outstanding at a purchase price equal to the Redemption Price provided in the preceding sentence (or such other Redemption Price as may be established pursuant to a Supplemental Indenture) and to pay any Parity Swap Termination Payment then payable. If StadCo elects to purchase Bonds in accordance with the preceding sentence, any Bonds presented for payment on or after the date of redemption, and any Bonds not presented for payment, shall be deemed to have been tendered for purchase by the holder thereof on the date of redemption; and upon such date the Bonds tendered or deemed to have been tendered for purchase on such date shall no longer be deemed Outstanding hereunder, and the holders thereof shall no longer have any rights hereunder except the right to receive payment of the purchase price therefor, such Bonds shall cease to accrue interest as of such date, and new Bonds shall be issued with new CUSIP numbers and a legend to the effect that such Bonds shall no longer be entitled to the benefit of any Bond Insurance Policy in effect prior to the date of such purchase.  Any such redemption or purchase shall be made on the first date for which notice of redemption may be timely given by the Trustee as required by this Indenture.

**Section 410.   Cancellation and Destruction of Bonds**.  All Bonds paid or redeemed, either at or before maturity, shall be delivered to the Trustee when such payment or redemption is made, and such Bonds shall thereupon be promptly canceled.   Bonds so canceled shall promptly be returned to StadCo to be destroyed.

**Section 411.   Purchase of Bonds**.  Unless otherwise consented to by each of the NFL and the Controlling Bond Insurer, any Bonds purchased in advance of their respective maturity dates by StadCo shall be delivered to the Trustee for cancellation in accordance with Section 410 hereof.

**Section 412.   Certain Redemptions Prohibited During Standstill Period**. Notwithstanding anything in this Indenture to the contrary, there shall be no redemptions of the

Bonds, other than scheduled mandatory sinking fund redemptions, while any Event of Default is continuing and the relevant Standstill Period is in effect, unless the NFL otherwise consents.

## ARTICLE V.
## REVENUES AND FUNDS

**Section 501.   Establishment of Funds**.   There are hereby established or authorized to be established the following funds, accounts and subaccounts to be maintained and held by StadCo and/or the Trustee:

1.   Construction Fund, to contain therein:

    (a)   Bond Proceeds Account;

    (b)   NFL Facility Proceeds Account; and

    (c)   Other Proceeds Account;

2.   Capitalized Interest Fund, to contain therein:

    (a)   Senior Lien Bond Capitalized Interest Account, and

    (b)   Second Lien Bond Capitalized Interest Account;

3.   Operating Fund;

4.   Senior Lien Debt Service Fund, to contain therein:

    (a)   Senior Lien Interest Account, and

    (b)   Senior Lien Principal Account;

5.   Senior Lien Debt Service Reserve Fund;

6.   Senior Lien Strike Reserve Fund;

7.   Second Lien Debt Service Fund, to contain therein:

    (a)   Second Lien Interest Account, and

    (b)   Second Lien Principal Account;

8.   Second Lien Debt Service Reserve Fund;

9.   Redemption Fund, to contain therein;

    (a)   Senior Lien Bond Redemption Account; and

    (b)   Second Lien Bond Redemption Account;

10. Trustee Revenue Fund; and

11. Trustee Operating Fund.

The Trustee has been granted hereunder a lien on each Fund, Account and Subaccount set forth above (except for the NFL Facility Proceeds Account and the Other Proceeds Account), but will only hold the Construction Fund, Capitalized Interest Fund, Senior Lien Debt Service Fund, Senior Lien Debt Service Reserve Fund, Senior Lien Strike Reserve Fund, Second Lien Debt Service Fund, Second Lien Debt Service Reserve Fund, Redemption Fund, Trustee Revenue Fund, and Trustee Operating Fund. All other Funds, Accounts and Subaccounts set forth above will be held by financial institutions selected by StadCo and (except in the case of the NFL Facility Proceeds Account and Other Proceeds Account) shall be subject to Deposit Account Control Agreements providing the Trustee the right to control disbursements from such Funds, Accounts and Subaccounts, as applicable, upon the occurrence and during the continuance of an Event of Default under Section 901(a), (b), (c) or (k) hereof, or upon the transfer of monies from any Account in the Senior Lien Debt Service Reserve Fund to any Account in the Senior Lien Debt Service Fund pursuant to Section 506(a)(ii) hereof. No Fund, Account or Subaccount subject to a Deposit Account Control Agreement shall be closed by StadCo unless any monies withdrawn therefrom, and any monies otherwise to be deposited thereto, are deposited directly into a Fund, Account or Subaccount subject to a Deposit Account Control Agreement. StadCo shall provide prior notice to the Bond Insurers of the closure of any Fund, Account or Subaccount that was subject to a Deposit Account Control Agreement.

StadCo and the Trustee are hereby each separately authorized to establish and maintain for so long as necessary other Funds, Accounts and Subaccounts under or pursuant to this Indenture for Bonds issued hereunder, including any separate Series Subaccounts within the Accounts of the Senior Lien Debt Service Fund, Senior Lien Debt Service Reserve Fund, Senior Lien Strike Reserve Fund, Second Lien Debt Service Fund and Second Lien Debt Service Reserve Fund, as applicable; provided that no such action shall affect the priority of the liens established herein for the benefit of the Senior Lien Bonds and any Parity Obligations related thereto, and the Second Lien Bonds and any Parity Obligations related thereto. Proceeds of Bonds shall be deposited in such amounts in such Funds, Accounts and Subaccounts as shall be provided in a Supplemental Indenture if not so provided in this Indenture.

Additional Funds, Accounts and Subaccounts established pursuant to this Indenture by or at the direction of StadCo in its discretion within the Funds, Accounts and Subaccounts established pursuant to this Article V shall be evidenced or directed, as applicable, by the delivery by StadCo to the Trustee of a certificate of an Authorized Representative setting forth, without limitation, the name of such Fund, Account or Subaccount and whether such Fund, Account or Subaccount shall be held and administered by StadCo or the Trustee. If such Fund, Account or Subaccount is to be held by StadCo, including any Depository on its behalf, StadCo, the Trustee and the relevant Depository shall also enter into a Deposit Account Control Agreement with respect to such Fund, Account or Subaccount prior to or concurrently with its establishment.

For each Fund, Account or Subaccount that StadCo at any time opens or maintains other than with the Trustee and that arises from, results from or relates to the Trust Estate, and prior to

the deposit of any monies in such Fund, Account or Subaccount, StadCo shall, pursuant to a Deposit Account Control Agreement, and with respect to which the Trustee shall have received a satisfactory Opinion of Counsel to the effect that such Deposit Account Control Agreement is sufficient to perfect the Trustee's interest in such Fund, Account or Subaccount, either (i) cause the Depository to agree to comply at any time with instructions from the Trustee to such Depository directing the disposition of funds from time to time credited to such Fund, Account or Subaccount, without further consent of StadCo, or (ii) arrange for the Trustee to become the customer of the Depository with respect to such Fund, Account or Subaccount, with the Depository agreeing to comply with instructions originated by the Trustee with respect to such Fund, Account or Subaccount without further consent of StadCo.  The Trustee agrees with StadCo that the Trustee shall not give any such instructions, or withhold any withdrawal rights from StadCo, unless an event described in Section 509(a) hereof has occurred and is continuing or, after giving effect to any withdrawal not otherwise prohibited by the Indenture, would occur. Upon the occurrence and during the continuance of an event described in Section 509(a) hereof, and until the provisions of Section 504 hereof shall be reinstated pursuant to Section 509(d)(ii), StadCo shall not be permitted to make any withdrawals from the Operating Fund without the express written consent of the Trustee.

Nothing in this Article V restricts StadCo from establishing, and StadCo may from time to time establish, other accounts and subaccounts with financial institutions, which accounts and subaccounts (a) will not be subject to the restrictions set forth herein, and (b) will not constitute Collateral or a part of the Trust Estate, provided that StadCo shall not at any time deposit in any such account or subaccount any Pledged Revenues, any other Collateral or the proceeds of any Collateral.  Accounts that StadCo may establish pursuant to this paragraph, the NFL Facility Proceeds Account, the Other Proceeds Account and any subaccounts of the foregoing constitute Excluded Accounts.

**Section 502.   Construction Fund**.

(a)     There is hereby created and established in the Construction Fund an account therein called the "Bond Proceeds Account."  Within the Bond Proceeds Account the Trustee shall establish a subaccount for the proceeds of the Senior Lien Bonds and a subaccount for the proceeds of the Second Lien Bonds.  StadCo shall deposit into the appropriate subaccount of the Bond Proceeds Account such amounts as shall be provided in the applicable Supplemental Indenture relating to a Series of the Initial Bonds and in any subsequent Supplemental Indenture relating to Completion Bonds or Additional Bonds.  There is also hereby created and established in the Construction Fund an account therein called the "NFL Facility Proceeds Account."  StadCo shall deposit proceeds of the NFL Facility in the NFL Facility Proceeds Account.  There is also hereby created and established in the Construction Fund an account therein called the "Other Proceeds Account."  StadCo may deposit other monies in the Other Proceeds Account.

Costs of Issuance of a Series of Bonds shall be paid from the applicable Subaccount within the Bond Proceeds Account as shall be provided in the applicable Supplemental Indenture relating to a Series of the Initial Bonds and in any subsequent Supplemental Indenture relating to Completion Bonds or Additional Bonds.  The Trustee shall pay Costs of Issuance (except for those Costs of Issuance otherwise paid from proceeds of a Series of Bonds or other monies prior to the deposit of such proceeds in the applicable Subaccount of the Bond Proceeds Account) in

accordance with a certificate or certificates of StadCo stating the names of the payees, the purpose of each payment in terms sufficient for identification and the respective amounts of each such payment. The payment of Rating Agency surveillance fees, Trustee fees, Independent Engineer fees, and premiums in respect of Bond Insurance Policies and Swap Insurance Policies in each case due on or prior to April 1, 2011 (collectively, the "Fees"), may be made from a separate Subaccount within the Bond Proceeds Account in the manner provided in the Supplemental Indenture relating to the Initial Bonds. Other than for the payment of Costs of Issuance and the Fees as aforestated, and subject to paragraph (ii) of Section 408 hereof, the Trustee shall use all monies deposited in the Construction Fund solely to pay the Costs of the Project in accordance with subsection (b) below. The amounts in the Construction Fund, except for the amounts held in the NFL Facility Proceeds Account and the Other Proceeds Account, shall be subject to a security interest, lien and charge in favor of the Trustee for the benefit of the owners of the Bonds, and Holders of any related Parity Obligations, as follows: (i) holders of Senior Lien Bonds and Holders of any Parity Obligations related thereto being secured only by amounts on deposit in the subaccount in the Bond Proceeds Account established for proceeds of the Senior Lien Bonds and not by amounts on deposit in the subaccounts in the Bond Proceeds Account established for proceeds of the Second Lien Bonds; and (ii) holders of Second Lien Bonds and Holders of any Parity Obligations related thereto being secured only by amounts on deposit in the subaccount in the Bond Proceeds Account established for proceeds of the Second Lien Bonds and not by amounts on deposit in the subaccounts in the Bond Proceeds Account established for proceeds of the Senior Lien Bonds. The Trustee shall apply the amounts in the respective accounts of the Construction Fund to the payment, or reimbursement to the extent the same have been paid by or on behalf of StadCo, of the Costs of the Project; provided, however, that in no event shall proceeds of the NFL Facility be expended on any costs other than Costs of the Project.

(b)    (i)    Disbursements from the Construction Fund shall be made by the Trustee upon receipt of (1) a requisition request in substantially the form of Exhibit A hereto signed by StadCo, and (2) an IE Confirmation in the form of Exhibit A-1 hereto as to the certification in paragraph (5) and the adequacy of the Project Budget used for purposes of the certification in paragraph (6). In the event of any dispute between StadCo and the Independent Engineer relating to such IE Confirmation, StadCo shall use commercially reasonable efforts to proceed to an arbitration with respect to such dispute conducted in accordance with the provisions of Article 26 of the StadCo Sublease as if such provisions were set forth herein. Any disbursements relating to the Initial Requisition may be made solely from the Bond Proceeds Account. After the Initial Requisition, disbursements from the Construction Fund may be made from the NFL Facility Proceeds Account (until the NFL Facility Proceeds Account shall be depleted) so long as the Private Contribution Expense Ratio (as defined in the NFL Loan Agreement) is less than or equal to 1:1; provided, however, that in no event shall proceeds of the NFL Facility be expended on any costs other than Costs of the Project (it being understood that all such other costs shall be funded by withdrawals from the Bond Proceeds Account or other sources (including the Other Proceeds Account)).

(ii)    StadCo may request funds from the Construction Fund to pay Costs of the Project or to make capital contributions to JV Company to pay Costs of the Project no more often than four times in any calendar month. In connection with each request, StadCo shall deliver to the Trustee (1) a requisition request substantially in the form of Exhibit A with all

blanks appropriately completed, and (2) an IE Confirmation in the form of Exhibit A-1 hereto as to the certification in paragraph (5) of the requisition request and the adequacy of the Project Budget used for purposes of the certification in paragraph (6) thereof (the "Requisition Procedure"). Requisitions shall be reviewed by the Trustee for compliance on their face with the terms of this subsection (b)(ii), and a copy of each such requisition shall be provided by the Trustee to the Controlling Bond Insurer, which Controlling Bond Insurer may, in its sole discretion, compel the disbursement of funds by the Trustee to pay the items set forth in a requisition if the Trustee has otherwise failed to disburse such funds promptly. Notwithstanding the foregoing, all Requisition Procedures shall be consistent with the requirements of the NFL's G-3 Loan program if, and only to the extent that, any item set forth in a requisition is to be paid (in whole or in part) with proceeds of the NFL Facility.

(iii)    Upon receipt by the Trustee of a requisition which complies with the provisions hereof or upon satisfaction of the terms of clause (v) below, the Trustee shall deliver to StadCo checks made payable to StadCo for the payment thereof or shall make arrangements for the transfer and deposit of the amount for such payment, as StadCo shall request.

(iv)    The Independent Engineer will monitor and report on a monthly basis to the Trustee and each Bond Insurer on the progress of construction. The Independent Engineer shall provide StadCo and each Bond Insurer with copies of all reports that it prepares with respect to the Project.

(v)    If StadCo is unable to provide any certification required by the Requisition Procedure, then, unless the Independent Engineer certifies that any matter precluding such certification is capable of being remedied by StadCo or Other StadCo or the JV Company through commercially reasonable methods in such a manner as to be likely to permit Substantial Completion of an NFL-quality stadium within one year of the Outside Substantial Completion Date, funding of Costs of the Project will be blocked. Notwithstanding the foregoing, the Trustee shall continue to make disbursements to StadCo to pay Costs of the Project (A) to the extent that such disbursements shall be approved by (1) the Controlling Bond Insurer, or (2) if the Controlling Bond Insurer is in material default of any of its obligations under the Bond Insurance Policy, a vote of the holders of not less than 50.1 percent (50.1%) of the aggregate principal amount of the Bonds Outstanding; or (B) if (1) the NFL continues to fund NFL G-3 Loans (provided that such requirement shall not apply after the NFL G-3 Loans have been fully funded), and (2) Other StadCo is continuing to fund its Applicable Percentage of Costs of the Project.

(c)    The Trustee shall on a monthly basis furnish to any Bond Insurer, any Qualified Swap Provider and StadCo a written statement of disbursements from each Account (or subaccount, as applicable) of the Construction Fund, enumerating, among other things, item, cost, amount disbursed, date of disbursement and the Person to whom payment was made, together with copies of all bills, invoices or other evidences submitted to the Trustee for such disbursement.

(d)    Substantial Completion of the Project, or completion of any Improvement financed with the proceeds of Additional Bonds, shall be evidenced to the Trustee and each Bond Insurer by a Completion Certificate.

(e)     Earnings on the Construction Fund not used to pay Costs of the Project shall be retained in the Construction Fund until the earlier of (i) the date of Final Completion and (ii) the date after Substantial Completion on which an Authorized Representative of StadCo certifies to the Trustee that all amounts StadCo is required to pay in connection with Final Completion have either been paid or have been adequately reserved in the Construction Fund.  Immediately thereafter, all amounts in the Construction Fund (in excess of any reserves established by StadCo) will be transferred to the Operating Fund, except for any amounts on deposit in the NFL Facility Proceeds Account, which will be transferred to the NFL to the extent required by the provisions of the NFL Loan Agreement.  Notwithstanding the foregoing, in the event that after any accounting required and performed by the NFL pursuant to the terms of the NFL Loan Agreement, there are monies owed to the NFL as a result of the fact that the Private Contribution Expense Ratio is greater than 1:1, and such amount owed cannot be satisfied and repaid in full from amounts then on deposit in the NFL Facility Proceeds Account, such amount shall be paid to the NFL from amounts remaining on deposit in the Bond Proceeds Account, prior to the transfer of such amounts to the Operating Fund; provided, however, that if such accounting takes place after the transfer of amounts on deposit in the Bond Proceeds Account to the Operating Fund, then such payment shall be made from amounts on deposit in the Operating Fund.

(f)     Subject to paragraph (ii) of Section 408, prior to Substantial Completion, any proceeds of insurance maintained pursuant to this Indenture or otherwise maintained by StadCo or by the JV Company and insuring against physical loss of or damage to the Project, or of contractors' performance bonds or other assurances of completion with respect thereto pertaining to the Construction Period, and any proceeds of condemnation awards relating to the site, and that in each case are received by StadCo from the JV Company or otherwise, shall be paid into the Bond Proceeds Account in the Construction Fund when, as and if received.

(g)     If circumstances arise which delay Substantial Completion and such circumstances also give rise to an insurance claim under the insurance maintained by StadCo pursuant to Section 609(j), or, as a result of such delay, the JV Company is entitled to liquidated damages under the Design-Build Contract and the JV Company pursues and receives proceeds in settlement, then StadCo shall vote the JV Company to pay over to StadCo and Other StadCo their respective Applicable Percentage of any such insurance proceeds or liquidated damages not applied by JV Company to the Costs of the Project, and such amounts received by StadCo shall be deposited in the Bond Proceeds Account in the Construction Fund and used to pay Costs of the Project; provided, that such proceeds shall be paid over to StadCo, free and clear of the lien and pledge of this Indenture and any such deposit obligation, in the event that StadCo delivers to the Trustee a certificate of an Authorized Representative of StadCo, together with an IE Confirmation, that, at the proposed time of such payment to StadCo, there are sufficient monies on deposit in the Construction Fund, taking into account the Committed Amounts, to pay StadCo's liabilities with respect to Costs of the Project necessary to cause the Substantial Completion of the Stadium.

**Section 503.  Capitalized Interest Fund.**  There shall be deposited in the Capitalized Interest Fund such amounts as shall be provided in the applicable Supplemental Indenture relating to a Series of the Initial Bonds and any subsequent Supplemental Indenture relating to Completion Bonds or Additional Bonds.  The Trustee shall establish an Account in the Capitalized Interest Fund for the proceeds of the Senior Lien Bonds and an Account for the

proceeds of the Second Lien Bonds. The initial amounts on deposit in the Capitalized Interest Fund and any amounts deposited therein from the proceeds of any subsequent Series of Initial Bonds, Additional Bonds or Completion Bonds shall be used to pay interest on the Bonds, Regularly Scheduled Swap Payments, if any, and Bond Fees, if any, during the Construction Period and through the Outside Substantial Completion Date. Subsequent amounts deposited in the Capitalized Interest Fund shall be used to pay interest on Additional Bonds, Regularly Scheduled Swap Payments, if any, and Bond Fees, if any, during the period of construction of any Improvement. The Trustee is hereby authorized and directed to transfer from (i) the Account in the Capitalized Interest Fund established for the Senior Lien Bonds to the applicable Subaccount within the Senior Lien Interest Account in the Senior Lien Debt Service Fund, on or before each Interest Payment Date, an amount equal to the amount necessary to pay the interest on, and Bond Fees relating to, Senior Lien Bonds becoming due on such Interest Payment Date and related Regularly Scheduled Swap Payments becoming due on or after such Interest Payment Date and prior to the next subsequent Interest Payment Date, and (ii) the Account in the Capitalized Interest Fund established for the Second Lien Bonds to the applicable Subaccount within the Second Lien Interest Account in the Second Lien Debt Service Fund, on or before each Interest Payment Date, an amount equal to the amount necessary to pay the interest on, and Bond Fees relating to, Second Lien Bonds becoming due on such Interest Payment Date and related Regularly Scheduled Swap Payments becoming due on or after such Interest Payment Date and prior to the next subsequent Interest Payment Date. Earnings from investment of the amounts on deposit in an Account of the Capitalized Interest Fund shall be retained in such Account pending disbursement in accordance with this Section. All amounts remaining in the Capitalized Interest Fund after the Substantial Completion date, and if from the proceeds of Additional Bonds issued to finance an Improvement after completion of such Improvement, will be transferred first, to the Senior Lien Debt Service Reserve Fund, if and to the extent necessary to make the amount in each Account of the Senior Lien Debt Service Reserve Fund equal the applicable Debt Service Reserve Fund Requirement, then to the Second Lien Debt Service Reserve Fund, if and to the extent necessary to make the amount in each Account of the Second Lien Debt Service Reserve Fund equal the applicable Debt Service Reserve Fund Requirement, and then any balance shall be transferred to the Operating Fund.

**Section 504.  Operating Fund**.

(a)     StadCo shall, subject to Section 506(a)(iv) and Section 507(a)(iv), deposit or cause to be deposited into the Operating Fund, within two (2) Business Days of their receipt, all Pledged Revenues however derived and whether received from the JV Company or otherwise.

(b)     StadCo shall also deposit into the Operating Fund such portion of the proceeds of any Bonds which may have been issued to pay StadCo Expenses as shall be specified pursuant to the Supplemental Indenture authorizing such Bonds.

(c)     Amounts in the Operating Fund may be paid out, accumulated or withdrawn from time to time only for the following purposes:

(i)     payment of all StadCo Expenses in accordance in all material respects with the most recent version of the Annual Budget or any other reasonable StadCo Expenses arising or incurred since the most recent version of the Annual Budget or accumulation in the

Operating Fund as a reserve (i) for working capital, (ii) for such StadCo Expenses the payment of which is not immediately required, including but not limited to amounts determined by StadCo to be required as an operating reserve, or (iii) deemed necessary or desirable by StadCo;

(ii)     payment of all taxes (calculated at the highest federal, state and local marginal tax rate applicable to individuals) reasonably projected to be payable by the direct and indirect members of StadCo as a result of the operations of StadCo or the JV Company in accordance with the most recent version of the Annual Budget or information or a statement received from any applicable taxing authority (or accumulation in the Operating Fund as a reserve for such distribution to pay taxes the payment of which is not immediately required, or as deemed necessary or desirable by StadCo) (a "Tax Distribution");

(iii)     payment of, or accumulation in the Operating Fund as a reserve for the payment of, interest on and the principal or Redemption Price of Senior Lien Indebtedness, and, without duplication, payment of Regularly Scheduled Swap Payments and Parity Swap Termination Payments under Qualified Swaps related to Senior Lien Bonds on their respective due dates or redemption dates, as the case may be;

(iv)     reimbursement of each Reserve Account Credit Facility Provider for any amounts advanced under its Reserve Account Credit Facility relating to the Senior Lien Bonds, including paying interest thereon, in accordance with the terms of such Reserve Account Credit Facility and any reimbursement agreement between StadCo and the Reserve Account Credit Facility Provider; to the extent that on any date the amounts available for such reimbursement payments are insufficient to make all such payments, including interest, the amounts actually available shall be paid, pro rata, to each Reserve Account Credit Facility Provider in proportion to the payments then due under the respective reimbursement agreements;

(v)     payment of, or accumulation in the Operating Fund as a reserve for, the amounts, if any, after giving effect to any Reserve Account Credit Facility on deposit therein, required to be deposited in the Senior Lien Debt Service Reserve Fund or the Senior Lien Strike Reserve Fund so that the amounts on deposit in the Senior Lien Debt Service Reserve Fund and the Senior Lien Strike Reserve Fund are equal to the Debt Service Reserve Fund Requirement and the Senior Lien Strike Reserve Fund Requirement, respectively;

(vi)     payment of, or accumulation in the Operating Fund as a reserve for the payment of, interest on and the principal or Redemption Price of Second Lien Indebtedness, and, without duplication, payment of Regularly Scheduled Swap Payments under Qualified Swaps related to Second Lien Bonds, as well as payment of Swap Termination Payments and Other Swap Payments under Qualified Swaps, on their respective due dates or redemption dates, as the case may be; provided, however, that no such payment shall be made (other than with respect to Swap Termination Payments and Other Swap Payments under Qualified Swaps that relate to Senior Lien Bonds) unless, at the time such payment is to be made, *both* (A) (1) the Senior Lien Historical Debt Service Coverage Ratio for the preceding 12-month period (calculated as if such 12-month period were a Fiscal Year) was at least 1.15:1.00, and (2) the Second Lien Historical Debt Service Coverage Ratio for the preceding 12-month period (calculated as if such 12-month period were a Fiscal Year) was at least 1.10:1.00, *and* (B) (1) the Senior Lien Pro Forma Debt Service Coverage Ratio for the next ensuing 12-month period (calculated as if such 12-month

period were a Fiscal Year) is at least 1.15:1.00, and (2) the Second Lien Historical Debt Service Coverage Ratio for the next ensuing 12-month period (calculated as if such 12-month period were a Fiscal Year) is at least 1.10:1.00;

(vii)    reimbursement of each Reserve Account Credit Facility Provider for any amounts advanced under its Reserve Account Credit Facility relating to the Second Lien Bonds, including paying interest thereon, in accordance with the terms of such Reserve Account Credit Facility and any reimbursement agreement between StadCo and the Reserve Account Credit Facility Provider; to the extent that on any date the amounts available for such reimbursement payments are insufficient to make all such payments, including interest, the amounts actually available shall be paid, pro rata, to each Reserve Account Credit Facility Provider in proportion to the payments then due under the respective Reserve Account Credit Facilities;

(viii)    payment of, or accumulation in the Operating Fund as a reserve for, the amounts, if any, after giving effect to any Reserve Account Credit Facility on deposit therein, required to be deposited in the Second Lien Debt Service Reserve Fund so that the amounts on deposit in the Second Lien Debt Service Reserve Fund are equal to the respective Debt Service Reserve Fund Requirements therefor;

(ix)    payment of any Permitted Subordinated Indebtedness;

(x)    subject to the provisions of Section 609(p) hereof, withdrawal for any lawful corporate purpose as determined by StadCo, including but not limited to the payment of Costs of the Project, Non-Indenture Permitted Debt, the purchase (and subsequent cancellation) or redemption of Bonds and payment of expenses in connection with the purchase (and subsequent cancellation) or redemption of such Bonds, and the accumulation of any reserves which StadCo determines shall be required for such purposes; provided, that prior to any withdrawal pursuant to this paragraph (x), StadCo shall have determined, taking into account, among other considerations, anticipated future receipts of Pledged Revenues or other monies constituting part of the Trust Estate, that the funds to be so withdrawn are not needed, and are not anticipated to be needed, for any of the purposes set forth in paragraphs (i), (ii), (iii) and (vi) above.

Amounts paid out or withdrawn pursuant to this subsection (c) shall be free and clear of the lien and pledge created by the Indenture, except to the extent paid to an Account that forms part of the Collateral.

(d)    Subject to Section 412 hereof, if at any time Bonds of any Series or maturity for which Sinking Fund Installments shall have been established are purchased or redeemed pursuant to this Section 504 or otherwise purchased by StadCo (other than as provided in Section 505 hereof), StadCo may from time to time and at any time by written notice to the Trustee specify the portion, if any, of such Bonds so purchased or redeemed and not previously applied as a credit against any Sinking Fund Installment which is to be credited against future Sinking Fund Installments. Such notice shall specify the amounts of such Bonds to be applied as a credit against each Sinking Fund Installment or Installments and the particular Sinking Fund Installment or Installments against which such Bonds are to be applied as a credit; provided, however, that none of such Bonds may be applied as a credit against a Sinking Fund Installment

to become due less than 40 days after such notice is delivered to the Trustee. All such Bonds to be applied as a credit shall be surrendered to the Trustee for cancellation on or prior to the due date of the Sinking Fund Installment against which they are being applied as a credit. The portion of any such Sinking Fund Installment remaining after the deduction of any such amounts credited toward the same (or the original amount of any such Sinking Fund Installment if no such amounts shall have been credited toward the same) shall constitute the unsatisfied balance of such Sinking Fund Installment for the purpose of calculation of Sinking Fund Installments due on a future date.

(e)     Amounts in the Operating Fund may at the discretion of StadCo be invested in, but only in, Permitted Investments. Earnings on monies and investments in the Operating Fund shall be deposited in the Operating Fund. StadCo may sell any such Permitted Investments at any time and the proceeds of such sale and of all payments of principal and interest received at maturity or upon redemption or otherwise of such Permitted Investments shall be deposited in the Operating Fund.

(f)     Amounts, if any, set aside by StadCo in one or more reserve accounts in the Operating Fund may be used by StadCo at such time or times and in such amounts as determined by StadCo for the purpose of paying all or a portion of the interest on and the principal or Redemption Price of Bonds and for the payment of Parity Obligations, on a parity basis, on their respective due dates or redemption dates, as the case may be.

**Section 505.   Senior Lien Debt Service Fund and Second Lien Debt Service Fund**.

(a)     <u>Senior Lien Debt Service Fund</u>. There are hereby created and established in the Senior Lien Debt Service Fund the Accounts described below (and, within each such Account, there shall be created from time to time separate Subaccounts for each Series of Senior Lien Bonds), which shall be held by the Trustee and which shall be used solely for the purposes of (i) paying the principal of (whether at maturity or as Sinking Fund Installments) and interest on, and any Bond Fees relating to, Senior Lien Bonds, and (ii) paying any Parity Obligations relating to Senior Lien Bonds. All monies deposited in the Senior Lien Debt Service Fund shall be disbursed and applied by the Trustee at the times and in the manner provided in this Section 505 and in Articles VIII and IX.

(b)     <u>Senior Lien Interest Account</u>.

(i)     There is hereby created and established in the Senior Lien Debt Service Fund an account therein called the "Senior Lien Interest Account." There shall be created and established in the Senior Lien Interest Account, pursuant to a Supplemental Indenture, Subaccounts therein for each Series of Senior Lien Bonds issued from time to time.

(ii)     Not less than ten (10) days prior to each Interest Payment Date for any Senior Lien Indebtedness, StadCo shall transfer from the Operating Fund to the Trustee for deposit into the appropriate Subaccount(s) of the Senior Lien Interest Account (A) the amount(s) required for the payment of the interest payable on such Interest Payment Date with respect to Senior Lien Bonds, unless the amount of such interest is to be transferred from the Capitalized Interest Fund pursuant to Section 503, (B) the amount(s) of any Bond Fees payable on such

Interest Payment Date with respect to such Senior Lien Bonds, unless the amount of such Bond Fees is to be transferred from the Capitalized Interest Fund pursuant to Section 503 and (C) the amount(s) of any Parity Obligations (including any Regularly Scheduled Swap Payments) that relate to such Senior Lien Bonds, and that are payable on or about such Interest Payment Date (other than Parity Reimbursement Obligations attributable to the principal of Senior Lien Bonds), unless the amount of such Parity Obligations is to be transferred from the Capitalized Interest Fund pursuant to Section 503. To the extent amounts available for transfer by StadCo as described above are insufficient to make on such Interest Payment Date all payments described in the foregoing clauses (A), (B) and (C), the amounts actually available shall be deposited, pro rata, to the appropriate Subaccounts within the Senior Lien Interest Account, in proportion to the payments due on such Interest Payment Date from the respective Subaccounts.

(iii)    Not less than ten (10) days prior to each Redemption Date for any Senior Lien Bonds being refunded by an issue of Refunding Bonds, StadCo shall transfer from the Operating Fund to the Trustee for deposit into the appropriate Subaccount(s) of Senior Lien Interest Account the amount(s) required for the payment of interest on such Redemption Date on the Senior Lien Bonds then to be so redeemed.

(iv)    The Trustee shall, on or before each Interest Payment Date described in paragraph (ii), above, pay out of the appropriate Subaccount within the Senior Lien Interest Account the amounts required for the payment of (A) interest payable on such Interest Payment Date with respect to Senior Lien Bonds, (B) the amount of any Bond Fees payable on such Interest Payment Date with respect to Senior Lien Bonds, and (C) the amount of any Parity Obligations (including any Parity Swap Obligations) that relate to Senior Lien Bonds, and that are payable on such Interest Payment Date (other than Parity Reimbursement Obligations attributable to the principal of Senior Lien Bonds); provided, however, if the Trustee is not the Fiduciary for any such Senior Lien Indebtedness, such amount will be paid to the Fiduciary therefor not later than one (1) Business Day prior to the applicable Interest Payment Date. The Trustee shall also pay out of the appropriate Subaccount within the Senior Lien Interest Account, on or before each Redemption Date described in paragraph (iii), above, the amount required for the payment of interest on the Senior Lien Bonds then to be so redeemed.

(c)    Senior Lien Principal Account.

(i)    There is hereby created and established in the Senior Lien Debt Service Fund an account called the "Senior Lien Principal Account." There shall be created and established in the Senior Lien Principal Account, pursuant to a Supplemental Indenture, Subaccounts therein for each Series of Senior Lien Bonds issued from time to time.

(ii)    Not less than ten (10) days prior to each Principal Payment Date for any Senior Lien Bonds, StadCo shall transfer from the Operating Fund to the Trustee for deposit into the appropriate Subaccount(s) in the Senior Lien Principal Account (A) the amount(s) required for the payment of principal becoming due on such Principal Payment Date with respect to Senior Lien Bonds, and (B) the amount(s) of any Parity Reimbursement Obligations that are attributable to the principal of Senior Lien Bonds and that are payable on such Principal Payment Date. To the extent amounts available for transfer as described above are insufficient to make on such Principal Payment Date all payments described in the foregoing clauses (A) and (B), the

amounts actually available shall be deposited, pro rata, to the appropriate Subaccounts within the Senior Lien Principal Account, in proportion to the payments due on such Principal Payment Date from the respective Subaccounts.

(iii)   Not less than ten (10) days prior to the date on which any Parity Swap Termination Payment is due, StadCo shall transfer from the Operating Fund to the Trustee for deposit in the Senior Lien Principal Account held by the Trustee the amounts required for the payment of any Parity Swap Termination Payment due on such date.

(iv)   The Trustee shall, on or before each Principal Payment Date and each payment date described in paragraphs (ii) and (iii) above, pay out of the appropriate Subaccount(s) within the Senior Lien Principal Account, the amounts required for the payment of (A) the principal becoming due on such Principal Payment Date with respect to Senior Lien Bonds, (B) the amount of any Parity Reimbursement Obligations that are attributable to the principal of Senior Lien Bonds and that are payable on such Principal Payment Date and (C) the amount of any Parity Swap Termination Payments; provided, however, if the Trustee is not the Fiduciary for any such Senior Lien Indebtedness, such amount will be paid to the Fiduciary therefor not later than one (1) Business Day prior to the applicable Principal Payment Date.

(d)   Deficiencies.   If, on the Business Day preceding an Interest Payment Date, Principal Payment Date or Redemption Date, the balances in the appropriate Subaccounts in the Senior Lien Interest Account and/or the Senior Lien Principal Account, after giving effect to any transfers thereto made pursuant to this Section 505 and to be made pursuant to Section 503, shall be insufficient for the purposes thereof on such Interest Payment Date, Principal Payment Date or Redemption Date, the Trustee shall, subject to Section 506 hereof, transfer to the appropriate Subaccounts in the Senior Lien Interest Account and then to the appropriate Subaccounts in the Senior Lien Principal Account such amounts as may be necessary therefor from the corresponding Account or Accounts within the Senior Lien Debt Service Reserve Fund.

(e)   Earnings.   Earnings from investment of the amounts held in the Senior Lien Debt Service Fund shall be transferred to the Operating Fund on the last Business Day of each calendar month (or such other dates as may be requested by StadCo from time to time by notice (made or confirmed in writing) to the Trustee).

(f)   Second Lien Debt Service Fund.   StadCo may at any time, or from time to time, issue Second Lien Bonds payable out of, and which may be secured by a pledge of, such amounts in the Second Lien Debt Service Fund as may from time to time be available for such purposes; provided, however, that (i) such Second Lien Bonds shall be issued only for any one or more of the purposes set forth in Section 204 and Section 205 and the proceeds of such Second Lien Bonds shall be applied only for such purpose or purposes, and (ii) such pledge shall be, and shall be expressed to be, subordinate in all respects to the pledge created by the Indenture as security for the Senior Lien Indebtedness.   There are hereby created and established in the Second Lien Debt Service Fund the Accounts described below (and, within each such Subaccount, there shall be created from time to time separate Subaccounts for each Series of Second Lien Bonds), which shall be held by the Trustee and which shall be used solely for the purposes of (i) paying the principal of (whether at maturity or as Sinking Fund Installments) and interest on, and any Bond Fees relating to, Second Lien Bonds, (ii) paying any Parity Obligations

relating to Second Lien Bonds, and (iii) paying all Swap Termination Payments and Other Swap Payments when due. All monies deposited in the Second Lien Debt Service Fund shall be disbursed and applied by the Trustee at the times and in the manner provided in this Section 505 and in Articles VIII and IX.

(g)    Second Lien Interest Account.

(i)    There is hereby created and established in the Second Lien Debt Service Fund an account therein called the "Second Lien Interest Account." There shall be created and established in the Second Lien Interest Account, pursuant to a Supplemental Indenture, Subaccounts therein for each Series of Second Lien Bonds issued from time to time.

(ii)    Not less than ten (10) days prior to each Interest Payment Date for any Second Lien Indebtedness, StadCo shall transfer from the Operating Fund to the Trustee for deposit into the appropriate Subaccount(s) of the Second Lien Interest Account (A) the amount(s) required for the payment of the interest payable on such Interest Payment Date with respect to Second Lien Bonds, unless the amount of such interest is to be transferred from the Capitalized Interest Fund pursuant to Section 503, (B) the amount(s) of any Bond Fees payable on such Interest Payment Date with respect to such Second Lien Bonds, unless the amount of such Bond Fees is to be transferred from the Capitalized Interest Fund pursuant to Section 503, and (C) the amount(s) of any Parity Obligations (including any Parity Swap Obligations) that relate to such Second Lien Bonds, and that are payable on or about such Interest Payment Date (other than Parity Reimbursement Obligations attributable to the principal of Second Lien Bonds) unless the amount of such Parity Obligations is to be transferred from the Capitalized Interest Fund pursuant to Section 503.

(iii)    Not less than ten (10) days prior to each Redemption Date for any Second Lien Bonds being refunded by an issue of Refunding Bonds, StadCo shall transfer from the Operating Fund to the Trustee for deposit into the appropriate Subaccount(s) of the Second Lien Interest Account held by the Trustee the amount(s) required for the payment of interest on such Redemption Date on the Second Lien Bonds then to be so redeemed.

(iv)    Not less than ten (10) days prior to the date on which any Swap Termination Payment or Other Swap Payment is due, StadCo shall transfer from the Operating Fund to the Trustee for deposit into the Second Lien Interest Account held by the Trustee the amounts required for the payment of any Swap Termination Payment or Other Swap Payment becoming due on such date.

(v)    To the extent amounts available for transfer as described in paragraphs (ii) and (iv), above, are insufficient to make, on the applicable Interest Payment Date or other date all payments described in such paragraphs (ii) and (iv), the amounts actually available for transfer from the Operating Fund shall be deposited, pro rata, to the appropriate Subaccounts within the Second Lien Bond Interest Account, in proportion to the payments to be due on such Interest Payment Date or other date from the respective Subaccounts.

(vi)    The Trustee shall, on or before each Interest Payment Date and each payment date described in paragraphs (ii) and (iv) above, pay out of the appropriate

Subaccount(s) within the Second Lien Interest Account, the amount(s) required for the payment of (A) interest payable on such Interest Payment Date with respect to Second Lien Bonds (B) the amount(s) of any Bond Fees payable on such Interest Payment Date with respect to such Second Lien Bonds, and (C) the amount(s) of any Parity Obligations (including any Parity Swap Obligations) that relate to such Second Lien Bonds, and that are payable on such Interest Payment Date (other than Parity Reimbursement Obligations attributable to the principal of Second Lien Bonds); provided, however, if the Trustee is not the Fiduciary for any such Second Lien Indebtedness, such amount will be paid to the Fiduciary therefor not later than one (1) Business Day prior to the applicable Interest Payment Date. The Trustee shall also pay out of the appropriate Subaccount(s) within the Second Lien Interest Account, on or before each Redemption Date described in paragraph (iii), above, the amount(s) required for the payment of interest on the Second Lien Bonds then to be so redeemed. The Trustee shall also, on or before each date described in paragraph (iv) above, pay out of the appropriate Subaccount within the Second Lien Interest Account the amounts required for the payment of any Swap Termination Payment or Other Swap Payment becoming due on such date.

(h)    Second Lien Principal Account.

(i)    There is hereby created and established in the Second Lien Debt Service Fund an account therein called the "Second Lien Principal Account." There shall be created and established in the Second Lien Principal Account, pursuant to a Supplemental Indenture, Subaccounts therein for each Series of Second Lien Bonds issued from time to time.

(ii)    Not less than ten (10) days prior to each Principal Payment Date for any Second Lien Bonds, StadCo shall transfer from the Operating Fund to the Trustee for deposit into the appropriate Subaccount(s) of the Second Lien Principal Account (A) the amount(s) required for the payment of principal becoming due on such Principal Payment Date with respect to Second Lien Bonds, and (B) the amount(s) of any Parity Reimbursement Obligations that are attributable to the principal of Second Lien Bonds and that are payable on such Principal Payment Date. To the extent amounts available for transfer as described above are insufficient to make on such Principal Payment Date all payments described in the foregoing clauses (A) and (B), the amounts actually available shall be deposited, pro rata, to the appropriate Subaccounts within the Second Lien Principal Account, in proportion to the payments due on such Principal Payment Date from the respective Subaccounts.

(iii)    The Trustee shall, on or before each Principal Payment Date described in paragraph (ii), above, pay out of the appropriate Subaccount(s) within the Second Lien Principal Account, the amount(s) required for the payment of (A) the principal becoming due on such Principal Payment Date with respect to a Series of Second Lien Bonds, and (B) the amount(s) of any Parity Reimbursement Obligations that are attributable to the principal of such Series of Second Lien Bonds and that are payable on such Principal Payment Date; provided, however, if the Trustee is not the Fiduciary for any such Second Lien Indebtedness, such amount will be paid to the Fiduciary therefor not later than one (1) Business Day prior to the applicable Principal Payment Date.

(i)    Deficiencies. If, on the Business Day preceding an Interest Payment Date, Principal Payment Date or Redemption Date, the balances in the appropriate Subaccounts in the

Second Lien Interest Account and/or the Second Lien Principal Account, after giving effect to any transfers thereto made pursuant to this Section 505 and to be made pursuant to Section 503, shall be insufficient for the purposes thereof on such Interest Payment Date, Principal Payment Date or Redemption Date, the Trustee shall, subject to Section 506 hereof, transfer to the appropriate Subaccounts in the Second Lien Interest Account and then to the appropriate Subaccounts in the Second Lien Principal Account such amounts as may be necessary therefor from the corresponding Account or Accounts within the Second Lien Debt Service Reserve Fund.

(j)      Earnings.  Earnings from investment of the amounts held in the Second Lien Debt Service Fund shall be transferred to the Operating Fund on the last Business Day of each calendar month (or such other dates as may be requested by StadCo from time to time by notice (made or confirmed in writing) to the Trustee).

**Section 506.   Senior Lien Debt Service Reserve Fund**.

(a)      (i)      Upon the issuance of each Series of Senior Lien Bonds for which a Debt Service Reserve Fund Requirement has been established, StadCo shall direct the Trustee to establish a separate Account for such Series in the Senior Lien Debt Service Reserve Fund, and shall deposit into such separate Account the Debt Service Reserve Fund Requirement attributable to such Series.  Each such Account established in the Senior Lien Debt Service Reserve Fund shall be solely for the benefit of the Holders of the Senior Lien Bonds of the applicable Series and any related Parity Reimbursement Obligations, and the Holders of such Senior Lien Bonds and any related Parity Reimbursement Obligations shall have no rights to, or claim on, any amounts on deposit in the Senior Lien Debt Service Reserve Fund other than the amounts on deposit in such Account.

(ii)      The Trustee shall use amounts in each Account within the Senior Lien Debt Service Reserve Fund only to make transfers to the corresponding Subaccount within the Senior Lien Interest Account or the Senior Lien Principal Account, as applicable, to the extent necessary to pay the principal of (whether at maturity or upon acceleration or redemption) and interest on, and any Bond Fees relating to, the applicable Series of Senior Lien Bonds and any Parity Reimbursement Obligations related to such Series of Senior Lien Bonds, as the same become due.  In no event shall amounts on deposit in the Senior Lien Debt Service Reserve Fund (or any separate Account therein) be used to pay principal of or interest on Second Lien Bonds, nor shall amounts therein be available to pay any Swap Payments.

(iii)      In the event the balance in any Account in the Senior Lien Debt Service Reserve Fund on any Interest Payment Date or Principal Payment Date (after any required transfers on such date) for any Series of Senior Lien Bonds shall exceed the Debt Service Reserve Fund Requirement for such Series of Senior Lien Bonds, the excess shall be transferred to the Operating Fund.

(iv)      If on any Interest Payment Date or Principal Payment Date the amount in any Account in the Senior Lien Debt Service Reserve Fund is less than the applicable Debt Service Reserve Fund Requirement solely by reason of a change in the valuation of investments therein, no transfers to such Account shall be required so long as (A) all investment earnings and

amounts in such Account remain therein and (B) on the earlier to occur of the next Interest Payment Date or Principal Payment Date as the case may be, such Account contains an amount equal to the applicable Debt Service Reserve Fund Requirement.  If such Account at that time does not contain an amount equal to the applicable Debt Service Reserve Fund Requirement, the Trustee shall notify StadCo of the amount of such deficiency and StadCo shall deposit an amount equal to the deficiency from the Operating Fund or such other Funds, Accounts and Subaccounts as permitted hereunder.

(v)     In the event that the Senior Lien Debt Service Reserve Fund is to be funded at the Adjusted Debt Service Reserve Fund Requirement, such funding at the Adjusted Debt Service Reserve Fund Requirement may be achieved through any of the methods permitted for the funding of the Debt Service Reserve Fund, except that such amounts need not be funded other than through the accumulation of Pledged Revenues pursuant to Section 504(c)(v).

(b)     (i)     In lieu of or in substitution for monies on deposit in or to be deposited in any Account in the Senior Lien Debt Service Reserve Fund pursuant to any provision of this Indenture, StadCo may deposit or cause to be deposited with the Trustee a Reserve Account Credit Facility for the benefit of the Holders of the Senior Lien Bonds secured by such Account for all or any part of the applicable Debt Service Reserve Fund Requirement.

(ii)     Notwithstanding the foregoing, if, at any time after a Reserve Account Credit Facility issued by a Reserve Account Credit Facility Provider other than any Bond Insurer has been deposited with the Trustee, the unsecured or uncollateralized long term debt obligations of such Reserve Account Credit Facility Provider, or the long term debt obligations secured or supported by a surety bond, insurance policy or letter of credit issued by such Reserve Account Credit Facility Provider, are reduced below the second highest Rating Category by any Rating Agency, StadCo shall (i) replace or cause to be replaced said Reserve Account Credit Facility with another Reserve Account Credit Facility which satisfies the requirements set forth in the definition of that term, (ii) deposit or cause to be deposited in such Account in the Senior Lien Debt Service Reserve Fund an aggregate amount of monies equal to the value of the Reserve Account Credit Facility, such deposits to be, as nearly as practicable, paid to the Trustee in ten equal semi annual installments commencing on the earlier of the April 1 and October 1 next succeeding the reduction in said ratings and on each April 1 and October 1 thereafter, or (iii) instruct the Trustee to draw on such Reserve Account Credit Facility in the amount of the applicable Debt Service Reserve Fund Requirement.

(iii)     Each such Reserve Account Credit Facility shall be payable (upon the giving of such notice as may be required thereby) on any date on which (i) monies are required to be withdrawn from such Subaccount within the Senior Lien Debt Service Reserve Fund and (ii) such withdrawal cannot be made without obtaining payment under such Reserve Account Credit Facility, or on a date not more than ten (10) days prior to the expiration date of the Reserve Account Credit Facility then in effect if no substitute Reserve Account Credit Facility meeting the requirements of this Indenture has been deposited with the Trustee.

(iv)     For the purposes of this Section 506(b), in computing the amount on deposit in any Account within the Senior Lien Debt Service Reserve Fund, a Reserve Account Credit Facility shall be valued at the amount available to be paid thereunder on the date of

computation; provided, however, that, if the unsecured or uncollateralized long term debt of the Reserve Account Credit Facility Provider thereof, or the long term debt obligations secured or supported by a surety bond, insurance policy or letter of credit of said Reserve Account Credit Facility Provider, has been reduced below the ratings required by the definition of "Reserve Account Credit Facility," said Reserve Account Credit Facility shall be valued at the lesser of (i) the amount available to be paid thereunder on the date of calculation and (ii) the difference between the amount available to be paid thereunder on the date of issue thereof and an amount equal to a fraction of such available amount the numerator of which is the aggregate number of October 1sts and April 1sts which has elapsed since such ratings were reduced and the denominator of which is ten.

(c)     Monies held for the credit of any Account within the Senior Lien Debt Service Reserve Fund shall be withdrawn by the Trustee and deposited to the credit of the corresponding Subaccount within the Senior Lien Interest Account and the Senior Lien Principal Account in the Senior Lien Debt Service Fund, respectively, at the times and in the amounts required to comply with the provisions of this Section 506, or deposited to the credit of the Redemption Fund at the times and in the amounts required to make payments therefrom in respect of the applicable Senior Lien Bonds and any related Parity Obligations, respectively; provided, however, that no payment under a Reserve Account Credit Facility on deposit in any Account within the Senior Lien Debt Service Reserve Fund shall be sought unless and until monies are not available in such Account and the amount required to be withdrawn from such Account pursuant to this subsection cannot be withdrawn therefrom without obtaining payment under such Reserve Account Credit Facility; provided, further, that, if more than one Reserve Account Credit Facility is held for the credit of any Account in the Senior Lien Debt Service Reserve Fund at the time monies are to be withdrawn therefrom, the Trustee shall obtain payment under each such Reserve Account Credit Facility, pro rata, based upon the respective amounts then available to be paid thereunder.

With respect to any demand for payment under any Reserve Account Credit Facility, the Trustee shall make such demand for payment in accordance with the terms of such Reserve Account Credit Facility at the earliest time provided therein to ensure the availability of monies on the Interest Payment Date, Principal Payment Date or the Redemption Date for which such monies are required, but in no event more than ten (10) days or less than two (2) Business Days prior to the applicable Interest Payment Date, Principal Payment Date or Redemption Date.

Each Account within the Senior Lien Debt Service Reserve Fund shall be replenished in the following order of priority: (i) principal of and interest on the Reserve Account Credit Facility shall be paid from the first available amounts deposited into such Account (provided, that if more than one Reserve Account Credit Facility was drawn upon, payment of principal of and interest on each Reserve Account Credit Facility shall be made pro rata based upon the respective amounts drawn upon each); (ii) after all such amounts are paid in full, amounts necessary to fund such Account to the required level, after taking into account the amounts available under the Reserve Account Credit Facility, shall be deposited into such Account from next available amounts. Principal of and interest on any amount drawn under any Reserve Account Credit Facility must be paid in full within two (2) years after the corresponding drawing under such Reserve Account Credit Facility was made.

(d)    Except as otherwise provided in subparagraph (a)(iv) of this Section 506, earnings from the investment of amounts on deposit to the Senior Lien Debt Service Reserve Fund shall be deposited in the Operating Fund as received.

**Section 506A. Senior Lien Strike Reserve Fund.**

(a)    Upon the issuance of each Series of Senior Lien Bonds for which a Senior Lien Strike Reserve Fund Requirement has been established, StadCo shall direct the Trustee to establish a separate Account for such Series in the Senior Lien Strike Reserve Fund, and shall deposit or cause to be deposited into such separate Account cash and/or a Reserve Account Credit Facility, including a Reserve Account Surety Bond, in an amount equal to the Senior Lien Strike Reserve Fund Requirement with respect to such Series of Senior Lien Bonds.

(b)    Monies held for the credit of the Senior Lien Strike Reserve Fund shall be withdrawn by the Trustee and deposited to the credit of the Senior Lien Interest Account and the Senior Lien Principal Account in the Senior Lien Debt Service Fund, respectively, at the times and in the amounts required to comply with the provisions of Section 505 hereof, or deposited to the credit of the Redemption Fund at the times and in the amounts required to make payments therefrom in respect of Bonds and any related Parity Obligations (other than Parity Swap Obligations), respectively; provided, however, that no transfers from the Senior Lien Strike Reserve Fund and no payment from amounts on deposit in the Senior Lien Strike Reserve Fund shall be sought unless (1) a Strike has occurred and is continuing, and (2) monies on deposit in the Senior Lien Interest Account, Senior Lien Principal Account, Senior Lien Debt Service Reserve Fund and Redemption Fund and required to be withdrawn from such Funds and Accounts have been depleted and no monies are available to be withdrawn therefrom, including under any Reserve Account Credit Facility.  In no event shall amounts on deposit in the Senior Lien Strike Reserve Fund be used to pay principal of or interest on Second Lien Bonds nor shall amounts therein be available to pay any Swap Payments.

(c)    If and to the extent that cash has been deposited in the Senior Lien Strike Reserve Fund, all such cash shall be used (or investments purchased with such cash shall be liquidated and the proceeds applied as required) prior to any drawing under any Reserve Account Credit Facility on deposit in the Senior Lien Strike Reserve Fund.  With respect to any demand for payment under any Reserve Account Credit Facility, the Trustee shall make such demand for payment in accordance with the terms of such Reserve Account Credit Facility at the earliest time provided therein to assure the availability of monies on the payment date for which such monies are required, but in no event more than ten (10) days or less than two (2) Business Days prior to the applicable Interest Payment Date, Principal Payment Date or Redemption Date.  In the event that there is more than one Reserve Account Credit Facility on deposit in the Senior Lien Strike Reserve Fund, the Trustee shall make a pro rata demand for payment on each such Reserve Account Credit Facility in proportion to the amount of such Reserve Account Credit Facility.  If more than one Reserve Account Credit Facility was drawn upon as described above, payment of principal of and interest on each such Reserve Account Credit Facility shall be made pro rata based upon the respective amounts drawn upon each.

(d)    If the unsecured or uncollateralized long term debt obligations of a Reserve Account Credit Facility Provider (other than any Bond Insurer) or the long term debt obligations

secured or supported by a surety bond, insurance policy or letter of credit of the Reserve Account Credit Facility Provider (other than any Bond Insurer) is reduced below the second highest Rating Category by any Rating Agency, StadCo shall replace or cause to be replaced said Reserve Account Credit Facility with another Reserve Account Credit Facility which satisfies the requirements of the definition of "Reserve Account Credit Facility" or instruct the Trustee to draw on such Reserve Account Credit Facility in the amount of the applicable Senior Lien Strike Reserve Fund Requirement and deposit such amounts in the Senior Lien Strike Reserve Fund.

(e)    In the event the balance in any Account in the Senior Lien Strike Reserve Fund on any Interest Payment Date or Principal Payment Date (after any required transfers on such date) for any Series of Senior Lien Bonds shall exceed the Senior Lien Strike Reserve Fund Requirement for such Series of Senior Lien Bonds, the excess shall be transferred to the Operating Fund.

(f)    If a deficiency exists in the Senior Lien Strike Reserve Fund, no later than the last Business Day of each calendar month, the Trustee shall notify StadCo of the amount of such deficiency and StadCo shall deposit, from the Operating Fund or such other Funds, Accounts and Subaccounts as permitted hereunder, the amount required for the balance on deposit in the Senior Lien Strike Reserve Fund to equal the Senior Lien Strike Reserve Fund Requirement as of the last day of such calendar month, after giving effect to any Reserve Account Credit Facility on deposit in the Senior Lien Strike Reserve Fund; provided, however, that any deficiency in the Senior Lien Strike Reserve Fund, after giving effect to any Reserve Account Credit Facility on deposit in the Senior Lien Strike Reserve Fund, may be cured by depositing into the Senior Lien Strike Reserve Fund, in each month following the determination of such deficiency, any amounts available to be so deposited such that the deficiency shall be cured by the end of the then current Fiscal Year.

(g)    Earnings from investment of the amounts on deposit in the Senior Lien Strike Reserve Fund shall be deposited in the Operating Fund, as received.

**Section 507.    Second Lien Debt Service Reserve Fund**.

(a)    (i)    Upon the issuance of each Series of Second Lien Bonds for which a Debt Service Reserve Fund Requirement has been established, StadCo shall direct the Trustee to establish a separate Account for such Series in the Second Lien Debt Service Reserve Fund and shall deposit into such separate Account the Debt Service Reserve Fund Requirement attributable to such Series.  Each such Account established in the Second Lien Debt Service Reserve Fund shall be solely for the benefit of the Holders of the Second Lien Bonds of the applicable Series and any related Parity Reimbursement Obligations, and the Holders of such Second Lien Bonds and any related Parity Reimbursement Obligations shall have no rights to, or claim on, any amounts on deposit in the Second Lien Debt Service Reserve Fund other than the amounts on deposit in such Account.

(ii)    The Trustee shall use amounts in each Account within the Second Lien Debt Service Reserve Fund only to make transfers to the corresponding Subaccount within the Second Lien Interest Account or the Second Lien Principal Account, as applicable, to the extent necessary to pay the principal of (whether at maturity or upon acceleration or redemption) and

interest on, and any Bond Fees relating to, the applicable Series of Second Lien Bonds and any Parity Reimbursement Obligations related to such Series of Second Lien Bonds as the same become due.

(iii)    In the event the balance in any Account in the Second Lien Debt Service Reserve Fund on any Interest Payment Date or Principal Payment Date (after any required transfers on such date) for any Series of Second Lien Bonds shall exceed the Debt Service Reserve Fund Requirement for such Series of Second Lien Bonds, the excess shall be transferred to the Operating Fund.

(iv)    If on any Interest Payment Date or Principal Payment Date the amount in any Account in the Second Lien Debt Service Reserve Fund is less than the applicable Debt Service Reserve Fund Requirement solely by reason of a change in the valuation of investments therein, no transfers to such Account shall be required so long as (A) all investment earnings and amounts in such Account remain therein, and (B) on the earlier to occur of the next Interest Payment Date or Principal Payment Date as the case may be, such Account contains an amount equal to the applicable Debt Service Reserve Fund Requirement. If such Account at that time does not contain an amount equal to the applicable Debt Service Reserve Fund Requirement, the Trustee shall notify StadCo of the amount of such deficiency and StadCo shall deposit an amount equal to the deficiency from the Operating Fund or such other Funds, Accounts and Subaccounts as permitted hereunder.

(b)    (i)    In lieu of or in substitution for monies on deposit in or to be deposited in any Account in the Second Lien Debt Service Reserve Fund pursuant to any provision of the Indenture, StadCo may deposit or cause to be deposited with the Trustee a Reserve Account Credit Facility for the benefit of the Holders of the Second Lien Bonds secured by such Account for all or any part of the applicable Debt Service Reserve Fund Requirement.

(ii)    Notwithstanding the foregoing, if at any time after a Reserve Account Credit Facility issued by a Reserve Account Credit Facility Provider other than the Controlling Bond Insurer has been deposited with the Trustee, the unsecured or uncollateralized long term debt obligations of the Reserve Account Credit Facility Provider or the long term debt obligations secured or supported by a surety bond, insurance policy or letter of credit issued by such Reserve Account Credit Facility Provider, are reduced below the second highest Rating Category by any Rating Agency, StadCo shall (i) replace or cause to be replaced said Reserve Account Credit Facility with another Reserve Account Credit Facility which satisfies the requirements of the definition of that term, (ii) deposit or cause to be deposited in such Account in the Second Lien Debt Service Reserve Fund an aggregate amount of monies equal to the value of the Reserve Account Credit Facility, such deposits to be, as nearly as practicable, paid to the Trustee in ten equal semi annual installments commencing on the earlier of the April 1 and October 1 next succeeding the reduction in said ratings and on each April 1 and October 1 thereafter, or (iii) instruct the Trustee to draw on such Reserve Account Credit Facility in the amount of the applicable Second Lien Debt Service Reserve Fund Requirement.

(iii)    Each such Reserve Account Credit Facility shall be payable (upon the giving of such notice as may be required thereby) on any date on which (i) monies are required to be withdrawn from such Subaccount within the Second Lien Debt Service Reserve Fund and

(ii) such withdrawal cannot be made without obtaining payment under such Reserve Account Credit Facility, or on a date not more than ten (10) days prior to the expiration date of the Reserve Account Credit Facility then in effect if no substitute Reserve Account Credit Facility meeting the requirements of this Indenture has been deposited with the Trustee.

(iv)    For the purposes of this Section 507(b), in computing the amount on deposit in any Account within the Second Lien Debt Service Reserve Fund, a Reserve Account Credit Facility shall be valued at the amount available to be paid thereunder on the date of computation; provided, however, that, if the unsecured or uncollateralized long term debt of the Reserve Account Credit Facility Provider thereof, or the long term debt obligations secured or supported by a surety bond, insurance policy or letter of credit of said Reserve Account Credit Facility Provider has been reduced below the ratings required by the definition of "Reserve Account Credit Facility," said Reserve Account Credit Facility shall be valued at the lesser of (i) the amount available to be paid thereunder on the date of calculation and (ii) the difference between the amount available to be paid thereunder on the date of issue thereof and an amount equal to a fraction of such available amount the numerator of which is the aggregate number of October 1sts and April 1sts which has elapsed since such ratings were reduced and the denominator of which is ten.

(c)    Monies held for the credit of any Account within the Second Lien Debt Service Reserve Fund shall be withdrawn by the Trustee and deposited to the credit of the corresponding Subaccount within the Second Lien Interest Account and the Second Lien Principal Account in the Second Lien Debt Service Fund, respectively, at the times and in the amounts required to comply with the provisions of this Section 507, or deposited to the credit of the Redemption Fund at the times and in the amounts required to make payments therefrom in respect of the applicable Second Lien Bonds and any related Parity Obligations, respectively; provided, however, that no payment under a Reserve Account Credit Facility on deposit in any Account within the Second Lien Debt Service Reserve Fund shall be sought unless and until monies are not available in such Account and the amount required to be withdrawn from such Account pursuant to this subsection cannot be withdrawn therefrom without obtaining payment under such Reserve Account Credit Facility; provided, further, that, if more than one Reserve Account Credit Facility is held for the credit of any Account in the Second Lien Debt Service Reserve Fund at the time monies are to be withdrawn therefrom, the Trustee shall obtain payment under each such Reserve Account Credit Facility, pro rata, based upon the respective amounts then available to be paid thereunder.

With respect to any demand for payment under any Reserve Account Credit Facility, the Trustee shall make such demand for payment in accordance with the terms of such Reserve Account Credit Facility at the earliest time provided therein to ensure the availability of monies on the Interest Payment Date, Principal Payment Date or the Redemption Date for which such monies are required, but in no event more than ten (10) days or less than two (2) Business Days prior to the applicable Interest Payment Date, Principal Payment Date or Redemption Date.

Each Account within the Second Lien Debt Service Reserve Fund shall be replenished in the following order of priority: (i) principal of and interest on the Reserve Account Credit Facility shall be paid from the first available amounts deposited into such Account (provided, that if more than one Reserve Account Credit Facility was drawn upon, payment of principal of

and interest on each Reserve Account Credit Facility shall be made pro rata based upon the respective amounts drawn upon each); (ii) after all such amounts are paid in full, amounts necessary to fund such Account to the required level, after taking into account the amounts available under the Reserve Account Credit Facility, shall be deposited into such Account from next available amounts.

(d)     Except as otherwise provided in paragraph (a)(iv) of this Section 507, earnings from the investment amounts on deposit in the Second Lien Debt Service Reserve Fund shall be deposited in the Operating Fund as received.

### Section 508.   Redemption Fund.

(a)     If at any time during a Fiscal Year the amounts on deposit in the Operating Fund, Senior Lien Debt Service Fund, or Second Lien Debt Service Fund are insufficient for the purpose of funding the disbursements to be made therefrom or Debt Service, as applicable, then the Trustee shall withdraw monies on deposit in the Redemption Fund and transfer the same to the Operating Fund, Senior Lien Debt Service Fund, or Second Lien Debt Service Fund, as applicable, in an amount sufficient to cure such deficiency or to pay any Parity Swap Termination Payments then due. Notwithstanding the foregoing and any other provision herein to the contrary, the Trustee shall only transfer monies from the Redemption Fund to the Operating Fund, Senior Lien Debt Service Fund or Second Lien Debt Service Fund to the extent that such amounts are not then required to be applied to the mandatory sinking fund redemption of Bonds for which notice of redemption shall have been given pursuant to Section 406.

(b)     To the extent not required to make up a deficiency as required by subsection (a) of this Section 508, amounts accumulated in the Redemption Fund shall be applied by the Trustee, as promptly as possible after receipt of written instructions from an Authorized Representative or after deposit of such amounts in the Redemption Fund in the case of any redemption required pursuant to this Indenture, to (i) the purchase of any Outstanding Bonds, of any Series, maturity and interest rate, (ii) the redemption at the applicable Redemption Price of such Bonds, if then redeemable by their terms, (iii) the defeasance of Bonds pursuant to Article VIII hereof and (iv) the payment of costs and expenses as provided herein. If the Bonds to be purchased are redeemable by their terms, the purchase price to be paid by StadCo shall not exceed the Redemption Price then applicable plus accrued interest, to the next Interest Payment Date. If the Bonds to be purchased are not redeemable by their terms, the price to be paid by StadCo shall not exceed the Redemption Price applicable on the first date after the purchase upon which the Bonds are subject to redemption plus accrued interest to that date. Notwithstanding the foregoing, there shall be no redemption of the Bonds, other than scheduled mandatory sinking fund redemptions, while any Event of Default is continuing and the relevant Standstill Period is in effect, unless the NFL otherwise consents.

(c)     The Trustee shall select the particular Series and maturity within each Series of Senior Lien Bonds or Second Lien Bonds, respectively, to be redeemed in accordance with subsection (b) hereof in accordance with written instructions from an Authorized Representative.

(d)    Any monies received by the Trustee from the Giants Team as liquidated damages pursuant to Section 2(b) of the Non-Relocation Agreement shall be deposited in the Redemption Fund and applied in accordance with this Sections 508 and 905 hereof.

**Section 509.    Trustee Revenue Fund**.

(a)    Following Substantial Completion, upon the occurrence of an Event of Default described in Section 901(a), (b), (c) or (k), or upon the transfer of monies from any Account in the Senior Lien Debt Service Reserve Fund to any Account in the Senior Lien Debt Service Fund pursuant to Section 506(a)(ii), the Trustee shall deliver an "Activation Notice" (in substantially the form of "Exhibit A" to Exhibit C hereto) to the applicable Depository in accordance with the applicable Deposit Account Control Agreement, and StadCo shall immediately transfer all monies held in the Operating Fund to the Trustee Revenue Fund held by the Trustee.

(b)    Subsequent to the transfer of monies required by subsection (a) of this Section, and subject to paragraph (ii) of subsection (d) of this Section, StadCo shall deposit or cause to be deposited into the Trustee Revenue Fund, within five (5) days of receipt thereof, all Pledged Revenues, however derived and whether received from StadCo, the JV Company or otherwise, together with such other amounts otherwise required by this Indenture to be deposited therein, including without limitation any amounts which prior to an Event of Default described in subsection (a) of this Section would have been required by this Indenture to be deposited into the Operating Fund; provided, however, that monies paid to the Trustee for the purchase of Bonds pursuant to any provisions hereof or for the redemption of Bonds pursuant to Section 403, 404, 408, or 409 hereof shall be deposited into the Redemption Fund, in each case without the deposit of such monies into the Trustee Revenue Fund.  Earnings from investments of monies in the Trustee Revenue Fund shall be deposited into the Trustee Revenue Fund as received.

(c)    For so long as Pledged Revenues shall be collected in the Trustee Revenue Fund, the Trustee shall make, on the first (1st) Business Day of each month, the following transfers or payments from the Trustee Revenue Fund, in the following order of priority, the requirements of each transfer or payment below to be fully satisfied, leaving no deficiencies, prior to any transfer or payment later in priority, and all transfers and payments required by paragraphs (i) through (vi) below to be fully satisfied in the order set forth, leaving no deficiencies, prior to any reiteration of such sequence:

(i)    To the Trustee Operating Fund, an amount sufficient to pay all StadCo Expenses and Tax Distributions for such month in accordance with the purposes and amounts stated in the most recent version of the Annual Budget (but in no event less than 1/12 of the total budgeted StadCo Expenses and Tax Distributions for the current Fiscal Year (the "Budgeted Annual StadCo Expenses")); provided, however, that once the cumulative amount deposited into the Trustee Operating Fund during any Fiscal Year is equal to one hundred percent (100%) of the Budgeted Annual StadCo Expenses, no further deposits into the Trustee Operating Fund shall be required to be made in such Fiscal Year pursuant to this paragraph (i); and provided, further, that in the first Fiscal Year in which the Trustee Revenue Fund begins to collect Pledged Revenues, the Budgeted Annual StadCo Expenses shall be deemed to be the amount of StadCo Expenses and Tax Distributions that are budgeted to be expended by StadCo over the remainder of such Fiscal Year, as set forth in the most recent version of the Annual Budget;

(ii)    If the balance in the Senior Lien Interest Account in the Senior Lien Debt Service Fund, prior to any withdrawal of monies from such Account to be made during such month, is less than one-third (1/3) of the sum of: (A) the amount required for the payment of interest during such Fiscal Year with respect to Senior Lien Bonds (reduced by the amount, if any, that such interest is to be paid from the Capitalized Interest Fund pursuant to Section 503), plus (B) the amount of any Bond Fees payable during such Fiscal Year with respect to such Senior Lien Bonds, plus (C) the amount of any Parity Obligations that relate to such Senior Lien Bonds and that are payable during such Fiscal Year (other than Parity Reimbursement Obligations attributable to the principal of Senior Lien Bonds) (such one-third (1/3) of the collective amounts described in clauses (A), (B) and (C) being referred to in this paragraph as the "Senior Lien Annual Interest Requirement"), then, to the Senior Lien Interest Account, the aggregate amount necessary to satisfy the applicable Senior Lien Annual Interest Requirement, which aggregate amount shall be apportioned and deposited into the appropriate corresponding Subaccounts within the Senior Lien Interest Account as provided in Section 505;

(iii)    To the Senior Lien Principal Account in the Senior Lien Debt Service Fund, (x) (1) in the first such transfer made during any Fiscal Year pursuant to this paragraph (iii), an amount equal to one-third (1/3) of the sum of: (A) the amount required for the payment of principal during such Fiscal Year with respect to Senior Lien Bonds, plus (B) the amount of any Parity Reimbursement Obligations that are attributable to the principal of Senior Lien Bonds and that are payable during such Fiscal Year (the collective amounts described in clauses (A) and (B) being referred to in this paragraph as the "Senior Lien Annual Principal") which one-third (1/3) of the Senior Lien Annual Principal shall be apportioned and deposited into the appropriate corresponding Subaccounts within the Senior Lien Principal Account as provided in Section 505, and (2) in each subsequent transfer during such Fiscal Year, an amount equal to one-twelfth (1/12) of the Senior Lien Annual Principal, which amount shall be apportioned and deposited into the appropriate corresponding Subaccounts within the Senior Lien Principal Account as provided in Section 505, *plus* (y) any amount required for the payment of any Parity Swap Termination Payment then due and payable in accordance with the terms of any Qualified Swap, which amount shall be apportioned and deposited into the appropriate corresponding Subaccounts within the Senior Lien Principal Account as provided in Section 505; provided, however, that once the cumulative amount deposited into the Senior Lien Principal Account during any Fiscal Year is equal to one hundred percent (100%) of the Senior Lien Annual Principal, no further deposits into the Senior Lien Principal Account shall be required to be made in such Fiscal Year pursuant to this paragraph (iii) except for amounts described in (y) hereof;

(iii)    To each Reserve Account Credit Facility Provider as reimbursement for any amounts advanced under its Reserve Account Credit Facility relating to Senior Lien Bonds, including paying interest thereon, in accordance with the terms of such Reserve Account Credit Facility and any reimbursement agreement between StadCo and the Reserve Account Credit Facility Provider; to the extent that on any date the amounts available for such reimbursement payments are insufficient to make all such payments, including interest thereon, the amounts actually available shall be paid, pro rata, to each Reserve Account Credit Facility Provider in proportion to the payments then due under the terms of the respective Reserve Account Credit Facilities; provided however, that if any such payment shall not result in the reinstatement of a portion of such Reserve Account Credit Facility in an amount equal to such payment (excluding the portion thereof representing interest on such advance), such reimbursement payment shall be

made only after the transfers and payments otherwise required by paragraphs (i) through (v) of this Section 509(c);

(iv)     If the balance in any Account in the Senior Lien Debt Service Reserve Fund, prior to any withdrawal of monies from such Account to be made during such month, is less than the applicable Debt Service Reserve Fund Requirement, then to such Account in the Senior Lien Debt Service Reserve Fund the amount necessary to satisfy the applicable Debt Service Reserve Fund Requirement;

(v)     If the balance in any Account in the Senior Lien Strike Reserve Fund, prior to any withdrawal of monies from such Account to be made during such month, is less than the applicable Senior Lien Strike Reserve Fund Requirement, then to such Account in the Senior Lien Strike Reserve Fund the amount necessary to satisfy the applicable Senior Lien Strike Reserve Fund Requirement;

(vi)     If the balance in the Second Lien Interest Account in the Second Lien Debt Service Fund, prior to any withdrawal of monies from such Account to be made during such month, is less than (1) one-third (1/3) of the sum of: (A) the amount required for the payment of interest during such Fiscal Year with respect to Second Lien Bonds (reduced by the amount, if any, that such interest is to be paid from the Capitalized Interest Fund pursuant to Section 503), plus (B) the amount of any Bond Fees payable during such Fiscal Year with respect to such Second Lien Bonds, plus (C) the amount of any Parity Obligations that relate to such Second Lien Bonds and that are payable during such Fiscal Year (other than Parity Reimbursement Obligations attributable to the principal of Second Lien Bonds) (such one-third (1/3) of the collective amounts described in clauses (A), (B) and (C) being referred to in this paragraph as the "Second Lien Annual Interest Requirement"), *plus* (2) any amount required for the payment of any Swap Termination Payment or Other Swap Payment due during such month, then, to the Second Lien Interest Account, the aggregate amount necessary to satisfy the applicable Second Lien Annual Interest Requirement and to pay any such Swap Termination Payment or Other Swap Payment, which aggregate amount shall be apportioned and deposited into the appropriate corresponding Subaccounts within the Second Lien Interest Account as provided in Section 505;

(vii)     To the Second Lien Principal Account in the Second Lien Debt Service Fund, (1) in the first such transfer made during any Fiscal Year pursuant to this paragraph (vii), an amount equal to one-third (1/3) of the sum of: (A) the amount required for the payment of principal during such Fiscal Year with respect to Second Lien Bonds, plus (B) the amount of any Parity Reimbursement Obligations that are attributable to the principal of Second Lien Bonds and that are payable during such Fiscal Year (the collective amounts described in clauses (A) and (B) being referred to in this paragraph as the "Second Lien Annual Principal"), which one-third (1/3) of the Second Lien Annual Principal shall be apportioned and deposited into the appropriate corresponding Subaccounts within the Second Lien Principal Account as provided in Section 505, and (2) in each subsequent transfer during such Fiscal Year, an amount equal to one-twelfth (1/12) of the Second Lien Annual Principal, which amount shall be apportioned and deposited into the appropriate corresponding Subaccounts within the Second Lien Principal Account as provided in Section 505; provided, however, that once the cumulative amount deposited into the Second Lien Principal Account during any Fiscal Year is equal to one hundred

percent (100%) of the Second Lien Annual Principal, no further deposits into the Second Lien Principal Account shall be required to be made in such Fiscal Year pursuant to this paragraph (vii);

(viii)    To each Reserve Account Credit Facility Provider as reimbursement for any amounts advanced under its Reserve Account Credit Facility relating to Second Lien Bonds, including paying interest thereon, in accordance with the terms of such Reserve Account Credit Facility and any reimbursement agreement between StadCo and the Reserve Account Credit Facility Provider; to the extent that on any date the amounts available for such reimbursement payments are insufficient to make all such payments, including interest thereon, the amounts actually available shall be paid, pro rata, to each Reserve Account Credit Facility Provider in proportion to the payments then due under the terms of the respective Reserve Account Credit Facilities; provided however, that if any such payment shall not result in the reinstatement of a portion of such Reserve Account Credit Facility in an amount equal to such payment (excluding the portion thereof representing interest on such advance), such reimbursement payment shall be made only after the transfers and payments otherwise required by paragraphs (i) through (viii) of this Section 509(c); and

(ix)    If the balance in any Account in the Second Lien Debt Service Reserve Fund, prior to any withdrawal of monies from such Account to be made during such month, is less than the applicable Debt Service Reserve Fund Requirement, then to such Account in the Second Lien Debt Service Reserve Fund the amount necessary to satisfy the applicable Debt Service Reserve Fund Requirement.

Amounts remaining on deposit in the Trustee Revenue Fund in any month after making the transfers and payments set forth in paragraphs (i) through (ix) above shall be available to be applied in accordance with subsection (d) of this Section. Any amounts not so applied in accordance with subsection (d) of this Section after making the transfers and payments set forth in paragraphs (i) through (ix) above shall be held in the Trustee Revenue Fund, and the Trustee shall apply such amounts, together with any other monies deposited in the Trustee Revenue Fund, on the first (1st) Business Day of the next subsequent month as set forth in paragraphs (i) through (ix) above.

(d)    (i)    Unless and until the Trustee shall receive a certificate from the Controlling Bond Insurer stating that the Event of Default described in subsection (a) of this Section 509 has been cured to the Controlling Bond Insurer's satisfaction, the Trustee, subject to the requirements of subsection (c) of this Section, is authorized and directed to make transfers, issue checks and wire transfer amounts from the Trustee Revenue Fund for the purposes described in Section 504 solely at the times and in the amounts directed in writing by the Controlling Bond Insurer. The Trustee shall be entitled to conclusively rely upon such written direction of the Controlling Bond Insurer.

(ii)    As soon as reasonably possible after StadCo shall have attempted to remedy any Event of Default described in subsection (a) of this Section 509, StadCo shall provide notice (a "Remedy Notice") orally by telephone and in writing by facsimile transmission or other common electronic means to the Trustee and the Controlling Bond Insurer to the effect that the same has been remedied, and that StadCo has resumed, or is then in a position to resume,

the performance of the obligations under this Indenture that would have arisen, and only those that would have arisen, had such Event of Default not occurred. Upon the receipt of such Remedy Notice, the Controlling Bond Insurer shall deliver to StadCo and the Trustee, within ten (10) Business Days, either (A) a written notice stating that such Event of Default has been cured to the Controlling Bond Insurer's reasonable satisfaction, or (B) a written notice setting forth in reasonable detail the reasons the Controlling Bond Insurer believes that such Event of Default has not been cured. Upon receipt by the Trustee of the written notice described in clause (A), above, and provided that no other Events of Default described in subsection (a) of this Section 509 have occurred and are then continuing, the Trustee shall deliver a "Deactivation Notice" (in substantially the form of "Exhibit B" to Exhibit C hereto) to the applicable Depository in accordance with the applicable Deposit Account Control Agreement and shall, to the extent directed in writing by StadCo, transfer to the Operating Fund the monies then held in the Trustee Revenue Fund, the Trustee Operating Fund, the Senior Lien Debt Service Fund and the Second Lien Debt Service Fund. Following such transfer, the provisions of Section 504 hereof shall be reinstated as if (a) such Event of Default had not occurred, and (b) the provisions of this Section 509 had not applied.

**Section 510.   Trustee Operating Fund**.

(a)     There shall be deposited in the Trustee Operating Fund such amounts as are transferred from the Trustee Revenue Fund as provided in Section 509(c)(i). Accounts and subaccounts may be established within the Trustee Operating Fund.

(b)     The amounts on deposit in the Trustee Operating Fund shall be used to pay all Rent payable to the JV Company under (and as defined in) the StadCo Sublease and all other StadCo Expenses and Tax Distributions that otherwise could have been paid under Section 504. The Trustee shall withdraw for the benefit of StadCo amounts on deposit in the Trustee Operating Fund from time to time as required to pay such foregoing items as they become due upon the submission to the Trustee by StadCo of a certificate or certificates of StadCo stating (i) the names of the payees, (ii) the purpose of each payment in terms sufficient for identification, (iii) the respective amounts of each such payment, (iv) that such amounts are a proper charge on the Trustee Operating Fund, and (v) that such disbursements were included in the Annual Budget or otherwise are permitted to be paid under Section 504, and have not been the basis of any previous withdrawal, together with any additional documentation, if any, as may be required pursuant to a Supplemental Indenture.

(c)     Earnings from investment of the Trustee Operating Fund shall be deposited in the Trustee Revenue Fund as received. Amounts deposited to the Trustee Operating Fund which the Trustee determines to be in excess of the requirements of such Fund shall be credited to the Trustee Revenue Fund.

**Section 511.   Monies Held by the Trustee to Be Held in Trust**. All monies required to be deposited with or paid to the Trustee or held by the Trustee for the account of any Fund, Account or Subaccount created under any provision of this Indenture (including any trust fund or account established pursuant to Section 501) shall be held in trust, and, except for monies deposited with or paid to the Trustee for the redemption of Bonds, notice of the redemption of

which has been duly given, monies received by the Trustee shall, while held by the Trustee, constitute part of the Trust Estate and be subject to the lien hereof.

Section 512.    Repayment to StadCo.  Following Payment of the Bonds in full and after payment of Trustee Fees and Expenses and Extraordinary Trustee Fees and Expenses, all Swap Payments, other amounts required to be paid hereunder and any amounts required to be paid to the Bond Insurer, and provided that no Qualified Swaps remain outstanding, all amounts remaining in any Fund, Account or Subaccount held by the Trustee under this Indenture (including the Trustee Revenue Fund and the Trustee Operating Fund) shall be paid to StadCo.

## ARTICLE VI.
## GENERAL COVENANTS AND PROVISIONS

Section 601.    Payment of Bonds, Regularly Scheduled Swap Payments, Parity Obligations, Swap Termination Payments and Other Swap Payments.  StadCo shall promptly pay when due the principal of (whether at maturity, by acceleration or call for redemption or otherwise), premium, if any, and interest on the Bonds at the places, on the dates, from the accounts and in the manner provided herein and in such Bonds and in the applicable Supplemental Indenture pursuant to which such Bonds are issued.  StadCo shall promptly pay when due the Regularly Scheduled Swap Payments, Parity Swap Termination Payments, Swap Termination Payments and Other Swap Payments at the places, on the dates, from the accounts and in the manner provided herein and in the Qualified Swaps pursuant to which such payments arise, including after giving effect to any subordination provisions applicable to Swap Termination Payments and Other Swap Payments.  StadCo shall promptly pay when due the Parity Obligations, and any Reserve Account Surety Obligations, at the places, on the dates, from the account and in the manner provided herein and in the agreements and instruments pursuant to which such Parity Obligations or Reserve Account Surety Obligations arise.  The obligations in this Section 601 are special obligations of StadCo but are non-recourse to any officers, directors, members or Affiliates of StadCo, and no Persons executing the Bonds or executing any Qualified Swap shall be liable personally on the Bonds or such Qualified Swap by reason of the issuance or execution thereof or any other legal or equitable theory.  THE BONDS ISSUED UNDER AND SECURED BY THIS INDENTURE AND THE SWAP PAYMENTS ARE, AND ARE TO BE, EQUALLY AND RATABLY, EXCEPT AS OTHERWISE PROVIDED HEREIN, SECURED BY A PLEDGE OF THE PLEDGED REVENUES AND OTHER FUNDS PLEDGED UNDER THIS INDENTURE AND BY THE COLLATERAL. NONE OF THE GIANTS TEAM, THE JETS TEAM, THE JV COMPANY, OTHER STADCO NOR ANY AFFILIATE THEREOF OTHER THAN STADCO SHALL BE OBLIGATED TO PAY THE BONDS, THE PREMIUM, IF ANY, OR THE INTEREST THEREON OR THE SWAP PAYMENTS OR OTHER COSTS INCIDENT THERETO.

NO COVENANT, CONDITION OR AGREEMENT CONTAINED HEREIN SHALL BE DEEMED TO BE A COVENANT, AGREEMENT OR OBLIGATION OF ANY PRESENT OR FUTURE MANAGER, DIRECTOR, OFFICER, EMPLOYEE, MEMBER OR AGENT OF STADCO IN HIS OR HER INDIVIDUAL CAPACITY, AND NEITHER THE MANAGERS OR DIRECTORS OF STADCO NOR ANY OFFICER OR MANAGER THEREOF EXECUTING THE BONDS SHALL BE LIABLE PERSONALLY ON THE BONDS OR BE SUBJECT TO ANY PERSONAL LIABILITY OR ACCOUNTABILITY BY REASON OF

THE ISSUANCE OR EXECUTION THEREOF OR ANY OTHER LEGAL OR EQUITABLE THEORY.

**Section 602. Performance of StadCo's Covenants.** StadCo shall faithfully observe and perform all covenants and agreements on its part contained in this Indenture, in every Supplemental Indenture hereto, in every Bond executed, authenticated and delivered hereunder or thereunder and in every Qualified Swap and in all of its proceedings pertaining thereto and thereto. StadCo represents that it is duly authorized under Applicable Law to issue the Bonds authorized hereby and to execute this Indenture, and to execute any Qualified Swap, enter into any Bond Support Facility, Reserve Account Credit Facility or application therefor entered into and to pledge the revenues and receipts in the manner and to the extent herein set forth; that all limited liability company action on its part for the issuance of the Bonds, the execution and delivery of this Indenture, the execution and delivery of any Qualified Swap, the entering into of any Bond Support Facility, Reserve Account Credit Facility or application therefor and the pledge of the revenues, receipts and payments thereunder has been or will be duly and effectively taken prior to the execution thereof; and that the Bonds in the hands of the owners thereof and the Qualified Swaps, Bond Support Facilities and Reserve Account Credit Facilities, if any, are and will be valid and enforceable obligations of StadCo according to the import thereof.

**Section 603. Instruments of Further Assurance.** StadCo shall do, execute, acknowledge and deliver, and cause to be done, executed, acknowledged and delivered, such Supplemental Indentures hereto and such further acts, instruments and transfers as the Trustee may reasonably require for the better assuring, transferring, conveying, pledging and assigning to the Trustee of all the rights assigned hereby and the revenues and receipts pledged hereby to the payment of the principal of, premium, if any, and interest on the Bonds and the payment of the Swap Payments. StadCo agrees that, so long as any Bonds are Outstanding, should there be an Event of Default under this Indenture, StadCo will use commercially reasonable efforts to cooperate with the Trustee and the Controlling Bond Insurer and with the Holders and Parity Obligation Holders to the end of fully protecting the rights and security of the Holders and Parity Obligation Holders.

**Section 604. Inspection of Stadium Books; Confidentiality Agreement.** All books, records, files and documents of StadCo, excluding any Restricted Material (as defined below), shall at all reasonable times be open to inspection (but not copying) by the Trustee, each Bond Insurer and their outside professional advisers on their behalf; provided, that (i) if StadCo objects to the use of particular professional advisors because of a conflict, other relationships of such advisors or for other reasons, such professional advisors will not be permitted access as described above, (ii) all information provided pursuant to this Section 604, or otherwise provided pursuant to this Indenture to each Bond Insurer, the Qualified Swap Providers and their outside professional advisers on their behalf, will be subject to the terms of a Confidentiality Agreement between StadCo and the applicable Person and (iii) the costs of such inspection shall be borne by the inspecting party other than reasonable costs incurred by the Trustee which constitute Trustee Fees and Expenses. As used herein, "Restricted Materials" means (i) any information that is subject to attorney-client or other privilege and for which substitute arrangements cannot be put in place that protect StadCo's right to continue to assert such privilege and (ii) any information which StadCo is prohibited from disclosing to any of the foregoing Persons pursuant to the terms of any confidentiality agreements entered into by StadCo, other than with an Affiliate.

**Section 605.  Independent Engineer; Reports of Independent Engineer**.  StadCo will retain, appoint and pay the Independent Engineer to provide the services required of the Independent Engineer under this Indenture.  StadCo will use commercially reasonable efforts to cause the Independent Engineer to monitor and report on a monthly basis to the Trustee and each Bond Insurer on all material aspects of the construction of the Project until Final Completion, as required by Section 502(b)(iv), and to deliver IE Confirmations as required by this Indenture. StadCo shall make each Bond Insurer a third party beneficiary of any agreement entered into between StadCo and the Independent Engineer for the provision of the services required hereunder.  Upon the reasonable request of the Controlling Bond Insurer that the Independent Engineer be replaced because of a conflict or for any other reason, StadCo shall appoint a successor Independent Engineer, subject to the approval of the Controlling Bond Insurer (provided that such approval shall not be unreasonably withheld, and that the response to any request for such approval shall not be unreasonably delayed).

**Section 606.  Reports of Trustee**.  The Trustee shall make monthly reports to StadCo and each Bond Insurer of all monies received and expended by it, including information regarding the Funds, Accounts or Subaccounts from which monies received by the Trustee from StadCo originated.  The Trustee shall furnish to StadCo upon request a statement of the aggregate principal amount of the Bonds outstanding as of the date of such request.

**Section 607.  Representations and Warranties of StadCo**.  StadCo represents and warrants to the Trustee and each Bond Insurer as of the date of this Indenture as follows:

(a)     StadCo is a limited liability company duly organized, validly existing and in good standing under the laws of the State of New Jersey, has the power and authority to enter into and perform its obligations under the Financing Agreements and the Project Real Estate Agreements to which it is a party and to issue the Bonds, and by proper action has duly authorized StadCo's execution and delivery of, and its performance under, such Financing Agreements, Project Real Estate Agreements, and all other agreements and instruments relating thereto, in each case as in effect on the date hereof.

(b)     No permit, approval or consent (that has not been duly obtained or that is not in full force and effect) on the part of any regulatory body, Federal, state or local, is required in connection with (1) the issuance and delivery of the Bonds by StadCo, (2) the execution or delivery of the Financing Agreements in effect on the date hereof and the Project Real Estate Agreements to which it is a party, or (3) the grant to the Trustee of a first priority security interest in all the Collateral, in each case except where failure to procure any such permit, approval or consent cannot have a Material Adverse Effect.  The consummation by StadCo of the transactions set forth in such (A) Financing Agreements and (B) Project Real Estate Agreements (assuming receipt by StadCo of those permits and consents which have not yet been obtained as of the date hereof and which are so identified in Exhibit E hereto as having not yet been obtained), in the manner and under the terms and conditions as provided herein will comply with all Applicable Law, except where failure to comply cannot have a Material Adverse Effect.

(c)     No litigation of any kind in or by any judicial or administrative court or agency is pending or, to its knowledge, threatened against StadCo with respect to (1) the organization and existence of StadCo, (2) its authority to execute, deliver and perform its obligations under the

Financing Agreements and the Project Real Estate Agreements to which it is a party, as each is in effect on the date hereof, (3) the validity or enforceability of any such Financing Agreements and the Project Real Estate Agreements, as each is in effect on the date hereof, or the transactions contemplated thereby, (4) the conveyance to the Trustee of a first priority security interest in the Collateral pursuant to the Collateral Documents, or (5) the ability of StadCo to use, operate or maintain the Stadium for the Intended Purpose or, to the knowledge of StadCo, the JV Company's ability to develop and construct the Stadium for the Intended Purpose, in each case that has a Material Adverse Effect.

(d)    StadCo (i) has good and marketable title to its assets and owns its subleasehold interest in the Stadium under its StadCo Sublease and its sublandlord interest in the Giants Team Lease, subject only to Permitted Encumbrances, and (ii) has not conveyed or formally or informally agreed to convey any security interest in any of the Collateral to any Person other than the Trustee.  To StadCo's knowledge, neither the JV Company nor NJSEA is in default under the Ground Lease, and no event has occurred and is continuing which, with the lapse of time or the giving of notice or both, would result in a default thereunder, in each case except where such default cannot have a Material Adverse Effect.

(e)    StadCo is not in default under or in violation of, and the execution and delivery by StadCo of the Financing Agreements and the Project Real Estate Agreements to which it is a party, each as in effect on the date hereof, and the performance by StadCo of its obligations thereunder and the consummation by StadCo of the transactions contemplated thereby do not and will not conflict with, or constitute a breach or result in a violation of or require any consent (that has not been obtained) under (1) StadCo's constituent or organizational documents, (2) any agreement or other instrument to which StadCo is a party or by which it is bound, or (3) assuming receipt by StadCo of those permits and consents as provided in Exhibit E which have not yet been obtained as of the date hereof, any constitutional or statutory provision or order, law, rule, regulation, decree or ordinance of any court, government or governmental authority having jurisdiction over StadCo or its property, and no event has occurred and is continuing which with the lapse of time or the giving of notice, or both, would constitute or result in such a default or violation, except, in the case of clauses (2) and (3), for defaults that cannot have a Material Adverse Effect.

(f)    Except for the items described in Exhibit D hereto, StadCo has no indebtedness for borrowed money.

(g)    As of the date hereof, each of StadCo and, to StadCo's knowledge, JV Company has received all permits, licenses and approvals required for the applicable stage of Project development, except where failure to obtain any such permit, license or approval cannot have a Material Adverse Effect, and StadCo has no reason to believe that other necessary permits, licenses and approvals will not be available as and when required, except where the failure to obtain any such other necessary permit, license or approval as and when required cannot have a Material Adverse Effect.

(h)    The Financing Agreements and the Project Real Estate Agreements to which StadCo is a party, each as in effect on the date hereof, have been duly authorized by StadCo, have been executed and delivered by StadCo and are valid and binding obligations or agreements

of StadCo enforceable against StadCo in all material respects in accordance with their respective terms, except as enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance, fraudulent transfer, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally and by general equitable principles (regardless of whether enforcement is sought in equity or at law), including principles regarding good faith and fair dealing, and except as set forth in the NFL Agreement.

(i)     Correct and complete copies of each Financing Agreement and each Project Real Estate Agreement, each as in effect on the date hereof, have been furnished to the Trustee and each Bond Insurer. Each Financing Agreement and each Project Real Estate Agreement is in full force and effect, to StadCo's knowledge, is the valid and binding obligation or agreement of the parties thereto other than StadCo, and to StadCo's knowledge, no such party is in default thereunder, in each case except where the failure cannot have a Material Adverse Effect.

(j)     A correct and complete copy of the Project Budget as in effect on the date of this Indenture has been furnished to the Trustee and each Bond Insurer.

(k)     Each of the Stadium, StadCo, and, to StadCo's knowledge, the JV Company complies in all respects with all applicable Federal, state and local environmental laws, rules, regulations, ordinances and other related requirements which relate to the production, storage, disposal or use of any and all Hazardous Materials, except where failure to comply cannot have a Material Adverse Effect.

(l)     With respect to each party (other than StadCo) to each Project Real Estate Agreement, StadCo has obtained and delivered to the Trustee such party's consent to the assignment thereof to the Trustee as leasehold mortgagee or no such consent is required under the terms of such contract or Applicable Law.  The Financing Agreements in effect on the date hereof that purport to grant security interests in contracts, interests or rights to the Trustee duly and properly grant security interests in the contracts, interests or rights purported to be covered thereby.

(m)     As of June 26, 2007, StadCo has no material assets, liabilities (contingent or otherwise), contracts or business, except as is related to the construction, operation, economic exploitation and management of the Project.

(n)     Assuming that the Requesting Parties (as that term is defined in the NFL Agreement) are and remain in compliance with all of the terms and conditions set forth in the NFL Agreement and subject to the continuing accuracy, after (but not on) the date hereof, of their representations and warranties set forth therein, the issuance of the Initial Bonds and the Parity Obligations related thereto and the entering into of the Qualified Swap, at the time of the issuance of the Initial Bonds and the performance of all obligations of StadCo thereunder, are in compliance in all material respects with the provisions of the NFL Constitution and all rules, regulations, resolutions and determinations of the NFL, as modified by the Debt Limit waiver obtained by StadCo from the NFL for the issuance of the Initial Bonds and the entering into of the Qualified Swap(s), at the time of the issuance of the Initial Bonds and the performance of all obligations of StadCo thereunder, pursuant to the NFL Constitution and all rules, regulations, resolutions and determinations of the NFL.

(o)    Other than the Debt Limit waiver referred to in Section 607(n) above, which has been duly obtained and is in full force and effect (assuming that the Requesting Parties are and remain in compliance with all of the terms and conditions set forth in the NFL Agreement and subject to the continuing accuracy of their representations and warranties set forth therein) and the approvals and consents reflected in the NFL Agreement, no approval or consent (that has not been duly obtained or that is not in full force and effect) on the part of the NFL is required in connection with (1) the issuance and delivery of the Bonds by StadCo, (2) the execution or delivery of and the performance by StadCo of the terms and conditions of the Financing Agreements and the Project Real Estate Agreements to which it is a party, as in effect on the date hereof or (3) the grant to the Trustee of a first priority security interest in all the Collateral.

(p)    StadCo is not in default with respect to any judgment, order, writ, injunction, decree or decision of any governmental body, except where such a default cannot have a Material Adverse Effect.  StadCo is complying with all applicable statutes and regulations, including ERISA, of all governmental bodies, except where non-compliance cannot have a Material Adverse Effect.

(q)    No ERISA Event has occurred with respect to any Plan, except where any such ERISA Event cannot have a Material Adverse Effect.

(r)    StadCo has not incurred any Withdrawal Liability.

(s)    Neither StadCo nor any ERISA Affiliate has been notified by the sponsor of a Multiemployer Plan that such Multiemployer Plan is in reorganization or has been terminated within the meaning of Title IV of ERISA, except where the scope and substance of such notice cannot have a Material Adverse Effect.

(t)    To StadCo's knowledge, pursuant to the Design-Build Contract, construction of the Stadium is scheduled to be completed and the Stadium is scheduled to be available for NFL football games no later than September 1, 2010.

(u)    StadCo and the Other Entities have received or are entitled to receive all easements, rights of way and other interests in realty necessary for the consummation of the transactions contemplated by the Financing Agreements and the Project Real Estate Agreements, except where failure to receive such rights cannot have a Material Adverse Effect.

(v)    Pursuant to this Indenture and the Collateral Documents, the Trustee has been granted a perfected, first priority security interest in all of the Collateral in which StadCo currently has rights on behalf of the Holders, Parity Obligation Holders and each Bond Insurer, subject only to Permitted Encumbrances and except as otherwise agreed in the Collateral Documents.

(w)    StadCo's financial projections included in the Offering Memorandum and the JV Company's financial projections in the Project Budget have been prepared based upon assumptions deemed reasonable by StadCo in its good faith judgment.

(x)    Since its formation, there has not been, with respect to StadCo, any Material Adverse Effect.

(y)    For federal income tax purposes, StadCo is designated as a disregarded entity.

(z)    As of December 31, 2006, StadCo has paid all taxes imposed upon it, except where failure to pay cannot have a Material Adverse Effect.

(aa)    There has been obtained with respect to the Project all insurance required to be obtained as of the date of this Indenture under the Ground Lease, the StadCo Sublease and the Giants Team Lease, and, to StadCo's knowledge, the Design-Builder has obtained all insurance required to be obtained as of the date of this Indenture under the Design-Build Contract.

(bb)    The Design-Build Contract is by its terms enforceable against the JV Company and, to the knowledge of StadCo, against the Design-Builder, except as enforceability may be limited by bankruptcy, insolvency, fraudulent conveyance, fraudulent transfer, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally and by general equitable principles (regardless of whether enforcement is sought in equity or at law), including principles regarding good faith and fair dealing.

(cc)    The JV Company is not and, to the knowledge of StadCo, the Design-Builder is not in material default under the Design-Build Contract.

(dd)    StadCo has no knowledge of any existing material adverse change in the financial condition of the Design-Builder which could reasonably be expected to cause the Design-Builder to be unable to fulfill its material obligations under the Design-Build Contract.

(ee)    StadCo is in compliance in all material respects with all provisions of each of the Investment Company Act and Patriot Act applicable to StadCo.

(ff)    Funds deposited (or to be deposited) in the Construction Fund upon the issuance of all Series of Initial Bonds (and the construction fund established by Other StadCo with respect to the Project upon the issuance of all series of its initial bonds) and available through other sources (including the issuance of Completion Bonds by StadCo and completion bonds by Other StadCo, whether or not yet issued) will be adequate to achieve Substantial Completion of the Project based upon assumptions as to Other StadCo's funds.

(gg)    (i)    The unanimous approval of StadCo's Members (as those terms are defined in the LLC Agreement) are required to approve the filing by StadCo of a voluntary bankruptcy petition under Section 301 of the Bankruptcy Code, or any successor thereto, or comparable provisions of applicable state insolvency laws.

(ii)    No suit or action is pending or, to StadCo's knowledge, threatened against any of StadCo or any of the Other Entities seeking to consolidate the assets and liabilities of two or more of StadCo and any Other Entity, or generally to impose the obligations of one on any of the others.

(iii)    StadCo has complied in all material respects with the separateness provisions contained in Schedule 2.03(b) of the LLC Agreement.

(iv)     The LLC Agreement limits StadCo's activities, generally, to the following:

(A)     leasing, operating, economically exploiting, financing, refinancing and conveying (by lease, sublease, easement, right of way or otherwise) all or any portion of the Stadium Premises, and any stadium capable of holding NFL football games that may be constructed on such premises from time to time, for use by an NFL team, both on a year-round basis and on days on which each pre-season, regular season and playoff game (other than any Super Bowl or other neutral site game) of the Giants Team is played at the Stadium Premises;

(B)     engaging in any other business endeavor that is ancillary or complementary to the foregoing activities, provided that doing so does not conflict with or violate any material term of this Indenture;

(C)     entering into and performing the Financing Agreements, the StadCo Sublease and the Giants Team Lease and any amendments thereto and any other agreements, financing arrangements or instruments of any nature in connection with the activities described in (iv)(A) and (B) above, provided that doing so does not conflict with or violate any material term of this Indenture;

(D)     owning an interest in JV Company, and entering into and performing the Joint Venture Agreement, and any amendments thereto and any other agreements or instruments necessary or desirable in connection with the activities described in (iv)(A), (B) or (C) above; and

(E)     engaging in such other activities and exercising such other powers incidental to or connected with the foregoing businesses, purposes or agreements, or as reasonably necessary to accomplish the foregoing, in each case subject to any limitations imposed by the LLC Agreement and the New Jersey Limited Liability Company Act.

(hh)     Except as otherwise described in the Ground Lease, in that certain Agreement, made as of November 22, 2006 (the "Cooperation Agreement"), by and among Other StadCo, StadCo, the JV Company, the Teams, NJSEA and the entities identified on Schedule 1 thereto, and in any documents delivered in connection therewith, neither StadCo nor the JV Company has any material obligations relating to the Xanadu Project (as defined in the Cooperation Agreement).

**Section 608.   Covenant of StadCo with Respect to Pledged Revenues.**  Subject at all times while any Bond or Parity Obligation is Outstanding to the provisions of Section 509, StadCo shall have the right to exclude from Pledged Revenues and contribute to the JV Company or assign to any other entity (including the Giants Team, provided that any such assignment to the Giants Team shall comply with the applicable requirements of Section 609(cc) hereof), any of the revenue sources identified in the definition of "Pledged Revenues" in this Indenture other than revenues attributable to Naming Rights (as defined in the StadCo Sublease), Joint Venture Suites, StadCo Suite Premiums, Club Seat Premiums and Cornerstone Sponsorships (as defined in the StadCo Sublease), in whole or in part, at any time; provided, however, that at any such time, StadCo certifies to the Trustee, each Bond Insurer, each

Qualified Swap Provider and each Swap Insurer that (x) its Senior Lien Historical Debt Service Coverage Ratio (after giving effect to the subtraction of such excluded Pledged Revenues and any planned prepayment of debt) would have been greater than 2.00:1.00 for the previous Fiscal Year (together with supporting calculations), (y) it reasonably projects that its Senior Lien Pro Forma Debt Service Coverage Ratio (determined as described in clause (x) above) will exceed 2.00:1.00 in each Fiscal Year thereafter, based upon reasonable assumptions with respect to price increases and renewal rates (together with supporting calculations), and (z) no Event of Default under this Indenture shall have occurred and be continuing; and provided, further, that no such exclusion may occur prior to the sixth anniversary of the Effective Date hereof.

**Section 609.    Covenants of StadCo.**  StadCo covenants and agrees as follows:

(a)    StadCo will use commercially reasonable efforts to cause the JV Company to pursue all commercially reasonable remedies available to the JV Company under the Design-Build Contract, and to prevent the JV Company from terminating or suspending the services of the Design-Builder thereunder without the prior written consent of the Controlling Bond Insurer (provided that such consent shall not be unreasonably withheld, and that the response to any request for such consent shall not be unreasonably delayed), and to cause the JV Company to take such other commercially reasonable efforts as are necessary to cause the Stadium to be built and available for the Intended Purpose in a timely manner.

(b)    StadCo will use commercially reasonable efforts to cause the JV Company to comply with its obligations under the StadCo Sublease and the Ground Lease (including all operation, maintenance and insurance requirements therein), and StadCo shall comply with its obligations under the StadCo Sublease and the Giants Team Lease, in each case, except where non-compliance cannot have a Material Adverse Effect.

(c)    StadCo shall use commercially reasonable efforts to cause the JV Company to construct and complete the Project with diligence and continuity.

(d)    Except as contemplated by Section 509 hereof, StadCo will cause all Pledged Revenues to be deposited in the Operating Fund within two (2) Business Days after receipt thereof and used for the purposes set forth in Section 504(c).

(e)    StadCo will use commercially reasonable efforts to cause the JV Company to operate the Stadium in a manner consistent with prevailing industry standards for NFL stadiums of similar age and design taken as a whole taking into consideration the age and intended use of the Stadium and to maintain the Stadium in good repair and condition, normal wear and tear excepted, except where the failure to do so cannot have a Material Adverse Effect.

(f)    StadCo will use commercially reasonable efforts to cause the JV Company to obtain and maintain all licenses and permits necessary to construct, manage and operate the Stadium and to manage and operate the Project and construct, manage and operate all Improvements in accordance in all respects with Applicable Law, except where any failure to do so cannot have a Material Adverse Effect.  StadCo will not pay to itself a fee for the services it renders in connection with such construction or with respect to the management and operation of the Stadium.

(g)    StadCo will pay, or will use commercially reasonable efforts to cause the JV Company to pay, when due, all taxes and assessments that may be imposed by any governmental body on the Stadium or any portion thereof other than taxes being contested in good faith and for which adequate reserves have been made, except where any failure to pay, when due, any tax or assessment cannot have a Material Adverse Effect.

(h)    StadCo will keep and maintain the assets constituting Collateral free from all mortgages, liens, security interests and encumbrances other than the lien created by the Collateral Documents and Permitted Encumbrances, and StadCo will use commercially reasonable efforts (1) to prevent the JV Company from mortgaging or pledging the Joint Venture Inventory other than pursuant to the Naming Rights and Suite Sales Agreement, and (2) to cause the JV Company to promptly discharge any lien on the JV Company's interests in the Stadium other than the lien created by the Collateral Documents and any Permitted Encumbrance.

(i)    StadCo will maintain books and records of accounts using accounting practices in conformity with GAAP (except as otherwise indicated). After the Closing Date with respect to the Initial Bonds and through Substantial Completion, StadCo will, within 45 days after the last day of each March, June, September and December, deliver to the Trustee, each Bond Insurer, any Qualified Swap Provider and each Swap Insurer quarterly unaudited financial statements (consisting of a balance sheet, income statement and statement of cash flows) prepared in accordance with GAAP (except as otherwise indicated), together with a report identifying by category all Pledged Revenues received by StadCo and deposited in the Operating Fund (or the Trustee Revenue Fund, as applicable) during such period. After Substantial Completion, StadCo will, within 45 days after the last day of each of the first three fiscal quarters of StadCo's Fiscal Year, deliver to the Trustee, each Bond Insurer, any Qualified Swap Provider and each Swap Insurer quarterly unaudited financial statements (consisting of a balance sheet, income statement and statement of cash flows) prepared in accordance with GAAP (except as otherwise indicated), together with a report identifying by category all Pledged Revenues received by StadCo and deposited in the Operating Fund (or the Trustee Revenue Fund, as applicable) during such quarter. StadCo will, within 180 days after the last day of each Fiscal Year (or, if later, within 60 days after the receipt of all necessary information from the NFL related thereto) deliver to the Trustee, each Bond Insurer, any Qualified Swap Provider and each Swap Insurer annual audited financial statements (consisting of a balance sheet, income statement and statement of cash flows) prepared in accordance with GAAP (except as otherwise indicated) and accompanied by a report of a nationally recognized firm of certified public accountants (as well as calculations of the Senior Lien Historical Debt Service Coverage Ratio and the Second Lien Historical Debt Service Coverage Ratio for such Fiscal Year; provided, however, that prior to the first calculation thereof, StadCo shall irrevocably elect the extent to which to deem Club Seat/Private Suite premiums received prior to the first day of a Fiscal Year, but which relate to games played during such Fiscal Year, to have been received on such first day for purposes of such calculations).

(j)    StadCo will comply with the insurance covenants set forth in Exhibit B and deliver an insurance certificate evidencing such compliance to each Bond Insurer annually no later than 180 days after the last day of each Fiscal Year, subject in each case to any notice and grace periods set forth in Exhibit B.

(k)     Without the prior written consent of the Controlling Bond Insurer and except as provided in Section 608, StadCo will not terminate, amend, supplement or waive any rights (or consent to any assignment of any tenant's rights) under, or permit the JV Company to terminate, amend, supplement or waive any rights (or consent to any assignment of any tenant's rights) under, (i) the Giants Team Lease, (ii) the NFL Loan Agreement or (iii) any other Project Real Estate Agreements, in each case of (i), (ii) and (iii) in any manner that has a Material Adverse Effect.

(l)     StadCo will not incur any indebtedness for borrowed money other than (i) Indebtedness incurred pursuant to this Indenture, (ii) the NFL Facility, (iii) Non-Indenture Permitted Debt, (iv) Reserve Account Surety Obligations, and (v) indebtedness incurred pursuant to Sections 206 and 207 hereof.

(m)     StadCo will not guarantee any indebtedness of any other Person except for (i) guarantees of employee home mortgages (to the extent reasonably necessary to attract and retain key employees), (ii) endorsement of checks in the ordinary course of business, (iii) guarantees of third party debt provided that at the time any such guarantee is undertaken it meets the requirements of the test for Permitted Subordinated Indebtedness set forth in Section 207, (iv) guarantees of Indebtedness of a type permitted to be incurred by StadCo under Section 609(l) so long as such guarantees are provided on an unsecured basis, (v) any joint and several liability for obligations of Affiliates of StadCo arising by operation of law or under any of the Financing Agreements or Project Real Estate Agreements, and (vi) guarantees to third parties doing business with the JV Company that StadCo will perform all of its financial obligations under the StadCo Sublease and Joint Venture Agreement or that the JV Company will perform obligations incurred to benefit StadCo.

(n)     In connection with the provisions of Section 204 and Section 803, StadCo shall not permit the Giants Team to exercise its Early Termination Right under the Team Lease unless StadCo has fulfilled the conditions precedent to such termination set forth in Section 803.

(o)     StadCo will not enter into any agreement or series of related agreements among StadCo, any Affiliate of StadCo and a third party other than (i) transactions expressly contemplated by the Project Real Estate Agreements, Joint Venture Agreement, Naming Rights and Suite Sales Agreement, NFL Agreement, NFL Loan Agreement and Design-Build Contract, (ii) transactions on terms substantially as favorable to StadCo as would be obtainable in a comparable arm's length transaction with an unaffiliated third party, and (iii) transactions involving payment of amounts that are not Pledged Revenues.

(p)     (i)     Equity Distributions shall not be made by StadCo to StadCo's direct and indirect members (or other owners) with respect to their membership or other ownership interests if:

(A)     any one or more of the following events has occurred and is continuing:

(1) (X) an Event of Default under Section 901(a), (b),(c) or (k), or (Y) the transfer of monies from any Account in the Senior Lien Debt Service Reserve Fund to any Account in the Senior Lien Debt Service Fund pursuant to Section

506(a)(ii) (for so long as the amount on deposit in such Account in the Senior Lien Debt Service Reserve Fund, after taking into account the amounts then available under any Reserve Account Credit Facility, is less than the applicable Debt Service Reserve Fund Requirement or Adjusted Debt Service Reserve Fund Requirement);

(2) a StadCo or JV Company bankruptcy, insolvency, reorganization or custody event as described in Section 901(f), (g) or (h);

(3) a Prohibited Relocation by the Giants Team under (and as defined in) the Non-Relocation Agreement; and

(4) a revocation of the NFL franchise of the Giants Team; *or*

(B)   the provisions of Section 509 are not in effect and StadCo has failed to deposit into the appropriate Account within the Senior Lien Debt Service Reserve Fund, within 90 days after the date on which such deposit is required under this Indenture, the full amount necessary:

(1) to fund such Account to the Adjusted Debt Service Reserve Fund Requirement whenever such Adjusted Debt Service Reserve Fund Requirement becomes applicable pursuant to the definition of "Debt Service Reserve Fund Requirement"; or

(2) to replenish (including through the payment of the principal of and interest on any Reserve Account Credit Facility) such Account to the pertinent Debt Service Reserve Fund Requirement or Adjusted Debt Service Reserve Fund Requirement, as applicable, following a withdrawal from or a change in the valuation of such Account pursuant to Section 506 hereof;

in each case for so long as the amount on deposit in such Account, after taking into account the amounts then available under any Reserve Account Credit Facility, is less than the applicable Debt Service Reserve Fund Requirement or Adjusted Debt Service Reserve Fund Requirement; *or*

(C)   StadCo has failed to deliver to the Trustee and to each Bond Insurer a certificate of an Authorized Representative on behalf of StadCo:

(1) stating that the Senior Lien Historical Debt Service Coverage Ratio for the preceding 12-month period (calculated as if such 12-month period were a Fiscal Year) was at least 1.15:1.00; and

(2) certifying his or her reasonable belief that the Senior Lien Pro Forma Debt Service Coverage Ratio is at least 1.15:1.00 for the next ensuing 12-month period (calculated as if such 12-month period were a Fiscal Year); *or*

(D)   any such Equity Distribution has previously been made during the current calendar month; *or*

(E)     StadCo has defaulted in its obligation to pay any required Premiums (as defined in either Insurance and Indemnity Agreement) to either Bond Insurer under the applicable Insurance and Indemnity Agreement; such Bond Insurer has notified StadCo and the Trustee of this default; and such default has continued uncured for a period of thirty (30) days.

(ii)     Notwithstanding the provisions of the foregoing paragraph (i), StadCo may make Tax Distributions from the Operating Fund or the Trustee Operating Fund with an appropriate requisition at any time in accordance with Sections 504(c) and 510(b).

(q)     StadCo will keep the Stadium free of Hazardous Materials except in compliance in all respects with all Applicable Law and shall not use or permit the Stadium to be used to generate, manufacture, refine, transport, treat, store, handle, dispose of, transfer, produce or process Hazardous Materials, except in connection with the normal construction, maintenance and operation of any portion of the Project, and except in each case where the failure cannot have a Material Adverse Effect.  StadCo shall comply, or cause there to be compliance, in all respects with all applicable Federal, state and local laws, ordinances, rules and regulations with respect to Hazardous Materials, except in each case where the failure cannot have a Material Adverse Effect.  In the event that StadCo receives any notice from any governmental agency or any lessee with regard to Hazardous Materials on, from or affecting the Project, claiming that such Hazardous Materials are not being used in compliance with Applicable Laws, StadCo shall promptly (and in any event within fifteen (15) Business Days) notify the Trustee and each Bond Insurer.  StadCo shall conduct and complete, or cause there to be conducted and completed, all investigations, studies, sampling and testing and all remedial, removal and other actions necessary to clean up and remove all Hazardous Materials on, from or affecting the Project to the extent required by applicable Federal and state laws, ordinances, rules and regulations, except in each case where the failure cannot have a Material Adverse Effect.

(r)     StadCo will prepare and, not later than 60 days after the beginning of each Fiscal Year, will furnish to the Trustee and each Bond Insurer an operating Annual Budget showing in reasonable detail (and based upon reasonable projections and assumptions) for each month of such Fiscal Year (1) Pledged Revenues and amounts to be paid from the Operating Fund, (2) Senior Lien Bonds Annual Debt Service, (3) Second Lien Bonds Annual Debt Service, and (4) Swap Payments payable during such year.

If for any reason an Annual Budget has not been adopted and furnished to the Trustee and each Bond Insurer within the time required by this section, the last previously adopted Annual Budget, increased by reference to the CPI Index, shall be deemed to provide for and regulate and control expenditures during such Fiscal Year until an Annual Budget for such Fiscal Year (or an amendment to the Annual Budget then deemed to be in effect) shall have been adopted and filed with the Trustee, the Qualified Swap Provider, each Bond Insurer and each Swap Insurer. StadCo and the JV Company may amend the Annual Budget at any time during the Fiscal Year in their sole discretion, as applicable.  Copies of all such amendments shall be filed promptly with the Trustee, the Qualified Swap Provider, each Bond Insurer and each Swap Insurer.

(s)     StadCo will not enter into any merger or consolidation, or liquidate, wind-up or dissolve (or suffer any liquidation or dissolution), discontinue its business or convey, sell,

transfer or otherwise dispose of all or substantially all of its business or property, whether now owned or hereafter acquired; provided that StadCo may do any of the foregoing in connection with a transaction in which the Giants Team transfers its NFL franchise with the consent of the NFL, in which case StadCo may assign its rights and delegate its obligations under the Financing Agreements, Project Real Estate Agreements and Collateral Documents to a successor entity that has in its governing documents limited purpose and independent manager or director provisions substantially similar to those contained in the LLC Agreement and such entity assumes all such obligations.

(t)     In the event that the Giants Team Lease is terminated, then, if and when StadCo (prior to any concurrent termination of the StadCo Sublease as required by Section 2.02(c) thereof) enters into a successor sublease relating to the Stadium with an NFL team other than the Giants Team, (1) StadCo will use commercially reasonable efforts to preserve the allocation of revenues in effect immediately preceding such termination of the Giants Team Lease, as such allocation is described in the definitions of "Pledged Revenues" and "Applicable Percentage," except that direct and indirect references in the definition of "Pledged Revenues" to the Giants Team shall be deemed to refer to such successor NFL team, and (2) the definition of "Giants Home Game" shall be deemed to refer to each NFL pre-season football game, each NFL regular season football game and each NFL playoff game, as the case may be, of such successor NFL team (but not any Super Bowl or other neutral site game, regardless of which team may be designated as the "home" team in such case) that is scheduled by the NFL to be played at the Stadium Premises.

(u)     StadCo shall comply in all respects with all applicable rules and regulations of the NFL, including the NFL Constitution, except where non-compliance cannot have a Material Adverse Effect or be reasonably expected to have a material adverse effect on the Giants Team. Additionally, StadCo shall comply with its obligation to pay over to the NFL the Visiting Team Share when due and shall not incur debt in violation of the Debt Limit of the NFL (after giving effect to the waiver embodied in the NFL Agreement) and will not seek a waiver of the Debt Limit with respect to the proposed incurrence by StadCo of any debt not otherwise permitted under this Indenture without the prior written consent of the Controlling Bond Insurer, which consent will not be unreasonably withheld.

(v)     StadCo shall at all times protect, indemnify and save harmless the Indemnitees from and against all liabilities, obligations, claims, damages, penalties, causes of action, costs and expenses (including, without limitation, reasonable counsel fees and expenses, whether incurred in a third-party action or in an action to enforce this Indenture) imposed upon or incurred by or asserted against the Indemnitees on account of (a) any failure of StadCo to comply with any of the terms of this Indenture or the Financing Agreements to which it is a party or (b) any loss or damage to property or any injury to or death of any Person that may be occasioned by any cause whatsoever pertaining to the Stadium or the use thereof, and shall further indemnify and save harmless the Indemnitees from and against all other liabilities, obligations, claims, damages, penalties, fines, losses, reasonable costs and expenses (collectively, the "Damages") including, without limitation:

(i)     all amounts paid in settlement of any litigation commenced or reasonably threatened against any Indemnitee that falls within the scope of clause (a) or (b) above, if such

settlement is effected with the written consent of StadCo (which shall not be unreasonably withheld);

(ii)    all expenses reasonably incurred in the investigation of, preparation for or defense of any litigation, proceeding or investigation of any nature whatsoever that falls within the scope of Section 609(a) or (b) above, commenced or reasonably threatened against StadCo, the Stadium or any Indemnitee;

(iii)    any judgments, penalties, fines, damages, assessments, indemnities or contributions;

(iv)    the reasonable fees of attorneys (provided that such attorneys are selected in accordance with this Section 609(v)), auditors and consultants;

provided, however, in each case that the Damages arise out of:

(1)    any failure by StadCo or its employees or agents to comply with the terms of the Financing Agreements to which StadCo is a party and/or any agreements, covenants, obligations, or prohibitions set forth therein;

(2)    any breach of any representation or warranty of StadCo set forth in the Financing Agreements to which StadCo is a party or any certificate or any letter of representation delivered by StadCo specifically pursuant thereto, and any claim that any statement, representation or warranty of StadCo in any of the foregoing documents contains or contained any untrue or misleading statement of material fact or omits or omitted to state any material fact necessary to make the statements made therein not misleading in light of the circumstances under which they were made;

(3)    any action, suit, claim, proceeding or investigation of a judicial, legislative, administrative or regulatory nature arising from or in connection with the construction, equipping, ownership, operation, occupation or use of the Stadium including the presence, escape, seepage, leakage, discharge, emission, release or threatened release, or disposal of any Hazardous Materials; or

(4)    any suit, action, administrative proceeding, enforcement action, or governmental or private action of any kind whatsoever commenced against StadCo, the Stadium or the Indemnitees which might adversely affect the validity or enforceability of the Bonds, the Financing Agreements to which StadCo is a party or the performance by StadCo of any of its obligations thereunder;

provided further, however, that such indemnity shall be effective as to any Indemnitee only to the extent of any loss that may be sustained by such Indemnitee in excess of the net proceeds received by such Indemnitee from insurance, if any, required under this Indenture or any Collateral Documents with respect to such loss and provided further that (a) each Indemnitee shall, prior to seeking indemnification hereunder, either (i) enter into arrangements satisfactory to StadCo, its insurance carrier, if any, and such Indemnitee's insurance carrier, if any, for subrogation of StadCo and/or its insurance carrier to the rights of such Indemnitee against such Indemnitee's insurance carrier in respect of any claim for Damages which is insured by such

Indemnitee or (ii) pursue any such insured claim with such Indemnitee's insurance carrier and (b) the benefits of this section shall not inure to any Person other than the Indemnitees. Nothing contained herein shall require StadCo to indemnify any Indemnitee for any claim or liability resulting from gross negligence or willful misconduct of the Indemnitee or any breach by any Indemnitee of this Indenture, any Collateral Document or any other agreement to which it is a party, including, without limitation, the NFL Agreement.

If any action, suit or proceeding is brought or reasonably threatened against any Indemnitee for any loss or damage for which StadCo is required to provide indemnification under this paragraph (v), StadCo and the Trustee, respectively, shall promptly notify the Trustee and StadCo, and StadCo shall have the right, upon request and at its expense, to resist and defend such action, suit or proceeding, or cause the same to be resisted and defended by counsel designated by StadCo and approved by such Indemnitee, which approval shall not be unreasonably withheld; provided, however, that such approval shall not be required in the case of defense by counsel designated by any insurance company undertaking such defense pursuant to any applicable policy of insurance. Each Bond Insurer and the Trustee shall each be entitled to legal counsel and StadCo shall be responsible for the reasonable fees and expenses of such counsel if each Bond Insurer or the Trustee, as the case may be, determines in its reasonable judgment that a conflict of interest exists between it and StadCo or any such insurance company undertaking such defense.

(w)     StadCo shall furnish to the Trustee and each Bond Insurer:

(1)     Promptly after StadCo knows or has reason to know that any ERISA Event has occurred, a statement of an Authorized Representative describing such ERISA Event and the action, if any, that StadCo or any ERISA Affiliate has taken and proposes to take with respect thereto and (B) on or prior to the date any records, documents or other information must be furnished to the PBGC by StadCo or an ERISA Affiliate with respect to any Plan pursuant to Section 4010 of ERISA, a copy of such records, documents and information; and

(2)     Promptly upon receipt thereof by StadCo or any ERISA Affiliate, copies of each notice from the PBGC stating its intention to terminate any Plan or to have a trustee appointed to administer any Plan; and

(3)     Promptly upon request by the Trustee or a Bond Insurer, copies of each Schedule B (actuarial information) to the annual report (Form 5500 Series) which have been filed with the U.S. Department of Labor with respect to each Plan maintained by StadCo or an ERISA Affiliate; and

(4)     Promptly upon receipt thereof by StadCo or any ERISA Affiliate from the sponsor of a Multiemployer Plan, copies of each notice concerning (A) the imposition of Withdrawal Liability by any such Multiemployer Plan which has a Material Adverse Effect on StadCo, (B) the reorganization or termination, within the meaning of Title IV of ERISA, of any such Multiemployer Plan which has a Material Adverse Effect or (C) the amount of liability incurred, or that may be incurred, by StadCo or any ERISA Affiliate in connection with any event described in clause (A) or (B);

(x)     StadCo will observe and comply with all laws (including ERISA), ordinances, orders, judgments, rules, regulations, certifications, franchises, permits, licenses, directions, and requirements of all governmental bodies, which now or at any time hereafter may be or are applicable to StadCo, except such thereof as shall be contested in good faith and by appropriate proceedings diligently conducted by StadCo and as to which appropriate reserves are being maintained and except where non-compliance cannot have a Material Adverse Effect.

(y)     StadCo will not engage in any "prohibited transaction," as such term is defined in Section 4975 of the Code or Section 406 of ERISA (other than transactions that are exempt by ERISA, its regulations or its administrative exemptions), with respect to any Plan, or incur any "accumulated funding deficiency," or terminate, or permit any ERISA Affiliate to terminate, any Plan which would reasonably likely result in any liability of StadCo to the PBGC, or permit the occurrence of any Reportable Event or any other event or condition which presents a risk of such a termination by the PBGC of any Plan, or withdraw or effect a partial withdrawal from a Multiemployer Plan, or permit any ERISA Affiliate which is an employer under such a Multiemployer Plan so to do, in each case if StadCo's liability for such event would have a Material Adverse Effect.

(z)     StadCo will take all actions or cause to be taken all actions reasonably necessary under the Collateral Documents to maintain and protect the perfected first priority security interests in the Collateral created by the Collateral Documents and this Indenture and the priority thereof. StadCo shall not hereafter make or suffer to exist any pledge or assignment of, lien on or security interest in such Collateral that ranks prior to or on a parity with the pledge, assignment, lien and security interest granted hereby, or in any financing statement describing any such pledge, assignment, lien and security interest, except Permitted Encumbrances or as otherwise expressly permitted herein or in the other Financing Agreements.

(aa)     StadCo will comply with all obligations under its Senior Lien Indebtedness and Second Lien Indebtedness and its obligations under the Financing Agreements and the Project Real Estate Agreements to which it is a party and will use commercially reasonably efforts to enforce the obligations of the other parties thereto.

(bb)     StadCo from time to time shall make, do, execute, adopt, acknowledge and deliver, and take all and every such further acts, deeds, conveyances, assignments, resolutions, transfers and assurances as may be reasonably necessary or desirable for the better assuring, conveying, granting, assigning and confirming all and singular the rights and interests of the Trustee in the Collateral, including any agreements entered into by or assigned to StadCo after the date of execution of this Indenture pursuant to which StadCo receives Pledged Revenues.

(cc)     (A)     StadCo will at all times conduct its business and affairs in accordance in all material respects with the provisions of the LLC Agreement, including the separateness provisions contained in Schedule 2.03(b) thereof, and will limit its activities to those described in Section 607(gg)(iv) hereof.  StadCo shall not amend those separateness provisions in any material respect without the prior written consent of the Controlling Bond Insurer.

(B)     If any proposed transfer of direct ownership interests in StadCo would result in any Person and its Affiliates owning eighty percent (80%) or more of the direct

ownership interests in StadCo, then, as a condition to the effectiveness of such transfer, StadCo shall (a) admit one Independent Member to StadCo and amend the LLC Agreement to provide that StadCo will not, without the consent of such Independent Member, (i) file or consent to the filing of any petition, either voluntary or involuntary, to take advantage of any applicable insolvency, bankruptcy, liquidation or reorganization statute, (ii) seek or consent to the appointment of a receiver, liquidator or any similar official or (iii) make an assignment for the benefit of creditors, and (b) deliver an Opinion of Counsel for StadCo addressing issues relating to substantive consolidation in bankruptcy with respect to StadCo and its owners in form and substance reasonably satisfactory to the Rating Agencies.

(dd)    StadCo will promptly notify the Trustee and the Controlling Bond Insurer of any Material Amendment to NFL Constitution.

(ee)    StadCo will not transfer monies or perform any other action that would constitute a "Foreclosure" as such term is defined in the NFL Agreement.

(ff)    StadCo shall use commercially reasonable efforts to enforce the obligations of the NFL to provide monies under the NFL Loan Agreement within the time necessary to provide the funds needed to achieve Substantial Completion by the Outside Substantial Completion Date pursuant to the NFL Loan Agreement.

(gg)    StadCo shall use commercially reasonable efforts to prevent the JV Company from making (and shall not consent to the making of) any material adverse change in the Design-Build Contract (provided that StadCo is not hereby required to attempt to prevent or to refuse to consent to the execution of change orders by the JV Company as permitted under the Design-Build Contract); provided, however, that the JV Company may enter into a replacement agreement with the prior written consent of the Controlling Bond Insurer (provided that such consent shall not be unreasonably withheld, and that the response to any request for such consent shall not be unreasonably delayed).

(hh)    StadCo shall pay all reasonable fees and expenses of the Independent Engineer.

(ii)    StadCo shall deliver of a copy of the temporary certificate of occupancy to the Trustee and each Bond Insurer upon Substantial Completion.

(jj)    StadCo shall cause the JV Company to make available to the Independent Engineer at the Project site copies of all construction drawings, plans, change orders, invoices and environmental reports pertinent to the Project site and any other materials necessary for issuance of the IE Confirmation.

(kk)    StadCo shall not invest any of its monies in the Operating Fund, or allow the investment of any of its monies in the Operating Fund, in investments other than Permitted Investments.

(ll)    StadCo shall not construct, own or operate the Ancillary Development itself or with Other StadCo without the consent of the Controlling Bond Insurer.

(mm)   StadCo shall have no material obligations with respect to the Xanadu Project other than as described in the Ground Lease, in the Cooperation Agreement and in any documents delivered in connection therewith.

(nn)   StadCo agrees that at all times on and after November 1, 2007 (A) a minimum of forty percent (40%) of Outstanding Senior Lien Bonds shall through the final stated maturity of such Outstanding Senior Lien Bonds either (1) bear interest at a fixed interest rate, or (2) in the case of Variable Interest Rate Bonds, bear interest at a synthetic fixed rate achieved pursuant to one or more Qualified Swaps; and (B) a minimum of sixty-seven percent (67%) of Outstanding Senior Lien Bonds shall through the fifteenth anniversary of Substantial Completion either (1) bear interest at a fixed interest rate, or (2) in the case of Variable Interest Rate Bonds, bear interest at a synthetic fixed rate achieved pursuant to one or more Qualified Swaps.

(oo)   StadCo will not permit JV Company to file a voluntary petition in bankruptcy or for reorganization, arrangement or other relief under any chapter of the Federal Bankruptcy Code or any similar law or admit insolvency in any proceeding or fail to vacate any insolvency proceeding under the Federal Bankruptcy Code or similar law.

(pp)   StadCo will promptly notify each Bond Insurer of any downgrade of its underlying rating to below investment grade.

(qq)   Without the consent of the Controlling Bond Insurer (provided that such consent shall not be unreasonably withheld, and that the response to any request for such consent shall not be unreasonably delayed), StadCo will not consent to any amendment to the Joint Venture Agreement, except where any such amendment cannot have a Material Adverse Effect, or consent to any dissolution of the JV Company.

(rr)   StadCo shall use commercially reasonable efforts to cause the JV Company to provide to each Bond Insurer, when available, the form of NMS Private Suite License Agreement, the form of NMS Club Seat License Agreement (Commercial and Consumer), the forms of other licenses from which Pledged Revenues are derived and copies of any agreements with Naming Rights Sponsors and Cornerstone Sponsors (each as defined in the StadCo Sublease).

(ss)   StadCo will use commercially reasonable efforts to cause the JV Company to comply with its limitations on indebtedness under the Joint Venture Agreement.

(tt)   If any proceedings are filed or are threatened to be filed seeking to (1) enjoin or otherwise prevent or declare invalid or unlawful the construction, occupancy, or maintenance of the Project; (2) materially adversely affect the validity or priority of the liens and security interests granted to the Trustee hereby; or (3) materially adversely affect the financial condition of the JV Company or the ability of the JV Company to complete the Project, then StadCo will promptly notify the Trustee of such proceedings upon StadCo's receipt of notice thereof.

(uu)   StadCo will provide each Bond Insurer with copies of all notices provided by StadCo to the Trustee hereunder.

(vv)    StadCo will provide each Bond Insurer with copies of all notices of default delivered to StadCo by any other party, or delivered by StadCo to any other party, under the Project Real Estate Agreements.

(ww)    StadCo agrees to do or cause to be done all acts which the Trustee reasonably deems necessary or desirable to create, perfect, maintain and protect the Trustee's first priority security interest in and lien on the Collateral.

**Section 610.    Covenants With Bond Support Facility Providers, Reserve Account Credit Facility Providers and Bond Insurers**.    StadCo may make such covenants as it may in its sole discretion determine to be appropriate with any Bond Support Facility Provider that shall agree to provide a Bond Support Facility for Bonds of any one or more Series, any Reserve Account Credit Facility Provider that shall agree to provide a Reserve Account Credit Facility to be deposited in any Debt Service Reserve Fund and any Bond Insurer agreeing to provide a Swap Insurance Policy insuring Insured Swap Payments, provided that none of such covenants conflict with this Indenture.    Such covenants may be set forth in or provided for by the applicable Supplemental Indenture and shall be binding on StadCo, the Trustee, the Paying Agent, and all the owners of Bonds the same as if such covenants were set forth in full in this Indenture.

**Section 611.    Recording and Filing**.    The security interest of the Trustee created by this Indenture and by the Collateral Documents, in the property, rights and interests herein and therein described, shall be perfected by the filing by StadCo in the Office of the Secretary of State of the State of New Jersey, and in the office of the Bergen County Clerk (Bergen County, New Jersey) of UCC Financing Statements which fully comply with the applicable Uniform Commercial Code-Secured Transactions.    Such UCC Financing Statements and continuation statements shall be filed, amended and continued and refiled by the Trustee whenever it determines, in its reasonable discretion, that such action is necessary or advisable to preserve the Lien and security interest hereof in this Indenture and the Collateral Documents.    Any such filings shall be prepared by StadCo no fewer than thirty (30) days prior to any expiration thereof, with file-stamped copies delivered thereafter to each Bond Insurer, and accompanied with any fees or requisite charges.    Without limiting the Trustee's rights hereunder, StadCo authorizes the Trustee to prepare and file financing statements and continuations and amendments thereto under the provisions of the applicable Uniform Commercial Code-Secured Transactions (or other applicable law), as amended from time to time.

All costs (including reasonable attorneys' fees) incurred in connection with the effecting of the requirements specified in this Section 611 shall be paid by StadCo.

## ARTICLE VII.
## DEPOSITORIES AND INVESTMENT

**Section 701.    Depositories**.    All moneys held by the Trustee or StadCo under the provisions of the Indenture shall constitute trust funds and the Trustee may and StadCo shall deposit such moneys with one or more Depositories in trust for said parties.    All moneys deposited under the provisions of this Indenture with the Trustee, StadCo or any Depository shall be held in trust and applied only in accordance with the provisions of this Indenture, and each of

the Funds, Accounts and Subaccounts established by this Indenture shall be a trust fund for the purposes thereof.

Each Depository shall be a bank or trust company organized under the laws of any state of the United States or a national banking association in each case having capital and surplus of $50,000,000 or more and willing and able to accept the office on reasonable and customary terms and authorized by law to act in accordance with the provisions of this Indenture.

**Section 702.   Deposits**.

(a)     All Pledged Revenues and monies held by any Depository under this Indenture shall be held in the name of the Trustee or StadCo, as the case may be, and may be placed on demand or time deposit, if and as directed by StadCo, provided that such deposits shall permit the monies so held to be available for use at the time when needed.  Any such deposit may be made in the commercial banking department of any Fiduciary which may honor checks and drafts on such deposit with the same force and effect as if it were not such Fiduciary.  All monies held by any Fiduciary, as such, may be deposited by such Fiduciary in its banking department on demand or, if and to the extent directed by StadCo and acceptable to such Fiduciary, on time deposit, provided that such monies on deposit be available for use at the time when needed.  Such Fiduciary shall allow and credit on such monies such interest, if any, as it customarily allows upon similar funds of similar size and under similar conditions or as required by law.

(b)     All monies held under this Indenture by the Trustee, StadCo or any Depository shall be either (1) fully insured by the Federal Deposit Insurance Corporation, or (2) invested in Permitted Investments.

(c)     All monies deposited with the Trustee, StadCo and each Depository shall be credited to the particular Fund or Account or Subaccount to which such monies belong and, except as provided with respect to the investment of monies in Permitted Investments in this Section 702, the monies credited to each particular Fund or Account shall be kept separate and apart from, and not commingled with, any monies credited to any other Fund or Account or Subaccount or any other monies deposited with the Trustee, StadCo or any Depository.

**Section 703.   Investment of Certain Funds**.

(a)     Monies held in each of the Debt Service Funds, in each of the Debt Service Reserve Funds and in the Senior Lien Strike Reserve Fund shall be invested and reinvested by the Trustee to the fullest extent practicable in Permitted Investments which mature not later than such times as shall be necessary to provide monies when needed for payments to be made from such Funds, and in the case of the Debt Service Reserve Funds mature not later than ten (10) years after the date of investment therein.  Monies held in the Operating Fund shall be invested by StadCo in Permitted Investments which shall mature not later than such times as shall be necessary to provide monies when needed from the Operating Fund.  Monies held in the Redemption Fund shall be invested by the Trustee in Permitted Investments which shall mature not later than such times as shall be necessary to provide monies when needed from such Funds or the Accounts therein. In any case the Permitted Investments in such Funds or in the Accounts therein shall mature not later than such times as shall be necessary to provide monies when

needed to provide payments from such Funds or Accounts. The Trustee shall make all such investments of monies held by it in accordance with this paragraph and written instructions received from any Authorized Representative. In making any investment in any Permitted Investments with monies in any Fund or Account established under this Indenture, StadCo may instruct the Trustee to combine such monies with monies, including monies held by StadCo, in any other Fund or Account, but solely for purposes of making such investment in such Permitted Investments. All such investments shall be held in the name of the Trustee.

(b)    Except as otherwise provided herein, interest (net of that which represents a return of accrued interest paid in connection with the purchase of any investment) earned on any monies or investments in such Funds and Accounts except as otherwise provided in a Supplemental Indenture, shall be applied as follows:

(i)    interest on any monies or investments in each Account and or Fund, other than the Debt Service Funds, the Debt Service Reserve Funds, and the Operating Fund, shall be transferred on the last Business Day of each month to the Operating Fund; and

(ii)    interest on any monies or investments in each Debt Service Fund and the Operating Fund shall be retained therein and applied to the purposes thereof, and interest on any monies and investments in each Debt Service Reserve Fund in excess of the Debt Service Reserve Fund Requirement shall be transferred to the corresponding Debt Service Fund.

Nothing in this Indenture shall prevent any Permitted Investments acquired as investments of or security for funds held under this Indenture from being issued or held in book entry form on the books of the Department of the Treasury of the United States.

The Trustee is hereby authorized, in making or disposing of any investment permitted by this Indenture, to deal with itself (in its individual capacity) or with any one or more of its Affiliates, whether it or such Affiliate is acting as an agent of the Trustee or for any third person or dealing as a principal for its own account so long as such dealing is in a commercially reasonable manner.

Nothing in this Indenture shall preclude the Trustee from investing or reinvesting monies through its bond department; provided, however, that StadCo may, in its discretion, direct that such monies be invested or reinvested in a manner other than through such bond department.

Monies held by the Trustee or a Depository in a Fund or Account shall be invested in Permitted Investments as directed by StadCo.

**Section 704.    Valuation and Sale of Investments.**

(a)    Investments purchased for any Fund or Account created under the provisions of this Indenture shall be deemed at all times to be a part of such Fund or Account and any profit realized from the liquidation of such investment shall be credited to such Fund or Account, and any loss resulting from the liquidation of such investment shall be charged to the respective Fund or Account.

(b)     In computing the amount in any Fund or Account created under the provisions of this Indenture for any purpose provided in this Indenture, obligations purchased as an investment of monies therein shall be valued at the amortized value thereof. The accrued interest paid in connection with the purchase of any obligation shall be included in the value thereof until interest on such obligation is paid.  Such computation shall be determined semiannually and at such other times as StadCo shall determine.

(c)     Except as otherwise provided in this Indenture, the Trustee, whenever it shall be requested in writing by an Authorized Representative so to do, or StadCo, in its discretion, shall sell at a commercially reasonable price, or present for redemption, any obligation so purchased as an investment. Whenever it shall be necessary in order to provide monies to meet any payment or transfer from any Fund or Account held by the Trustee, the Trustee shall sell at the best price obtainable or present for redemption such obligation or obligations designated by an Authorized Representative necessary to provide sufficient monies for such payment or transfer; provided, however, that if StadCo fails to provide such designation promptly after request thereof by the Trustee, the Trustee may in its discretion select the obligation or obligations to be sold or presented for redemption.

(d)     The Trustee shall not be liable or responsible for any loss resulting from any such investment, sale or presentation for investment made in the manner provided above.

## ARTICLE VIII.
## DISCHARGE OF LIEN

**Section 801.   Discharge of Lien**.  If StadCo shall pay or cause to be paid the principal of, redemption premium (if any) and interest on the Bonds, Parity Obligations and all Swap Payments, and provided that no Qualified Swap or reimbursement obligation owed to any Bond Insurer or Swap Insurer remains outstanding, then the lien hereof, these presents and the Trust Estate shall cease, determine and be discharged, and thereupon the Trustee, shall cancel and discharge this Indenture, and shall execute and deliver to StadCo such instruments in writing as shall be required by StadCo to cancel and discharge this Indenture and the Collateral Documents, and reconvey to StadCo the Trust Estate, and assign and deliver to StadCo so much of the Trust Estate as may be in its possession or subject to its control, except for monies and Permitted Investments held in the Debt Service Funds for the purpose of paying Bonds which have not yet been presented for payment; provided, however, such cancellation and discharge of the Indenture shall not terminate the powers and rights granted to the Trustee with respect to the payment, registration of transfer and exchange of the Bonds unless otherwise provided in any Supplemental Indenture.

**Section 802.   Authority to Defease Bonds; Provision for Payment of Bonds**.  The Bonds shall be deemed to have been paid within the meaning of Section 801 hereof and shall cease to be entitled to the lien of this Indenture if StadCo shall (i) deposit irrevocably with the Trustee either monies in an amount sufficient or Government Obligations and the principal of and interest on which when due, and without any reinvestment thereof, will provide monies which, together with the monies, if any, deposited at the same time, shall be sufficient, to pay when due the principal of, redemption premium (if any) and interest on, such Bonds due and to become due on and prior to the Redemption Date or maturity date thereof and to pay all

Trustee's and Paying Agent's fees and expenses due hereunder (unless provision for such payment satisfactory to the Trustee and any Paying Agents shall have been made), (ii) shall make adequate provision for any redemption of such Bonds and for the giving of notice of redemption as in this Indenture provided and (iii) deliver to the Trustee and each Bond Insurer a verification report of a firm of certified public accountants.  Neither the Government Obligations nor the monies deposited with the Trustee, as escrow agent, pursuant to this Section 802 nor the principal or interest payments on such Government Obligations shall be withdrawn, or used for any purpose other than, and shall be held in trust for, the payment of the principal of, redemption premium (if any) and interest on, such Bonds; provided that any cash receipts from such principal or interest payments on such Government Obligations deposited with the Trustee, (i) to the extent that such cash will not be required at any time for the purpose of paying the principal of, redemption premium (if any) and interest on, such Bonds, shall be paid over to StadCo as received by the Trustee, free, and clear of any trust, lien or pledge, and (ii) to the extent practicable, be reinvested in Government Obligations maturing at times and in amounts sufficient to pay when due the principal of, and redemption premium (if any) and interest on, such Bonds on and prior to such redemption date or maturity date thereof, as the case may be, and the interest earned from such reinvestment which is not required for such payments shall be paid over to StadCo as received by the Trustee, free and clear of any trust, lien or pledge. Notwithstanding the provisions of this Section 802, the Trustee shall not be required to reinvest any amount or remit any amounts to StadCo pursuant to this Section 802 or release Collateral from any escrow under this Section 802 unless it has received a report of a firm of certified public accountants, verifying the sufficiency of the receipt of such Government Obligations to fully pay the debt service on the Bonds.

Limitations elsewhere specified in this Indenture regarding the investment of monies held by the Trustee in the Debt Service Funds shall not be construed to prevent the depositing and holding in said special accounts of the Government Obligations described in the preceding paragraph for the purpose of discharging the lien of this Indenture as to Bonds which have not yet become due and payable.

**Section 803.  Early Termination Right of a Team**.  Under the Ground Lease, one of the Teams is permitted to terminate its obligation to play its NFL home games at the Stadium either at the end of the fifteenth lease year or every fifth anniversary thereafter (the "Early Termination Right"), which Early Termination Right is reflected in the Giants Team Lease. StadCo shall not permit the Giants Team to exercise this Early Termination Right under the Giants Team Lease unless and until StadCo has: (A) (i) repaid or defeased its Bonds; (ii) paid all amounts due in connection with any Qualified Swaps that have been terminated; and (iii) paid any other amounts due or to become due under this Indenture (including, but not limited to, amounts payable under any Bond Insurance Premium Agreement or Reserve Account Surety Guaranty); or (B) provided substitute collateral to the Trustee reasonably satisfactory to (i) each Bond Insurer such that each Bond Insurance Policy remains in full force and effect and (ii) each Swap Insurer or, in the event a Swap Insurer is in default under the Swap Insurance Policy or no Swap Insurer exists, each Qualified Swap Provider, such that each Swap Insurance Policy or Qualified Swap remains in full force and effect (in either case, with respect to StadCo, the "Early Termination Option").

- 117 -

# ARTICLE IX.
## DEFAULT PROVISIONS AND REMEDIES OF TRUSTEE, HOLDERS AND BOND INSURER

**Section 901. Events of Default**. Each of the following events shall be an Event of Default:

(a)    Failure to make due and punctual payment of any interest on any Bond, or of any Parity Reimbursement Obligation that is not attributable to the principal of any Bond, when the same shall become due and payable;

(b)    Failure to make due and punctual payment of the principal of or premium, if any, on any Bond, or of the amount of any Parity Reimbursement Obligation that is attributable to the principal of any Bond, when the same shall become due and payable (whether at maturity, by acceleration or call for redemption or otherwise);

(c)    Failure to make due and punctual payment of any Regularly Scheduled Swap Payment or Parity Swap Termination Payment when the same shall become due and payable;

(d)    Subject to Section 910, any representation or warranty made by StadCo in this Indenture or any of the other Financing Agreements to which it is a party shall have been incorrect when made in any respect that has a Material Adverse Effect;

(e)    Subject to Section 910, default in the observance or performance of any of the covenants or agreements of StadCo under this Indenture or any of the other Collateral Documents or Financing Agreements to which it is a party, but only if such default (other than any default in the observance or performance of Section 609(nn) hereof or Section 3.02(m) of either Insurance and Indemnity Agreement) has a Material Adverse Effect; provided, that if, prior to Substantial Completion, StadCo disputes the occurrence of such a default, StadCo shall proceed to an arbitration with respect to such dispute conducted in accordance with the provisions of Article 26 of the StadCo Sublease as if such provisions were set forth herein.

(f)    (i) StadCo or JV Company is adjudged insolvent by a court of competent jurisdiction, (ii) a petition in bankruptcy or for the insolvency of StadCo or JV Company is filed against StadCo or JV Company or a petition is filed against StadCo or JV Company seeking involuntary liquidation, reorganization or other relief in respect of StadCo or JV Company under bankruptcy or similar laws, (iii) StadCo or JV Company is adjudged as bankrupt, or (iv) an order, judgment or decree is entered by any court of competent jurisdiction appointing, without the consent of StadCo or JV Company, a receiver, custodian or trustee of StadCo or JV Company or of the whole or any part of its property and, in the case of (ii) and (iv), any of the aforesaid petitions, orders, judgments or decrees shall not be vacated or set aside or stayed within 60 days from the date of entry thereof, or StadCo or JV Company shall authorize or consent to any of the foregoing;

(g)    StadCo or the JV Company shall file a petition or answer seeking reorganization or any arrangement under the federal bankruptcy laws or any other applicable law or statute of the United States of America or any state thereof, or StadCo or the JV Company shall become unable (assuming compliance by the Trustee with its obligations hereunder), admit in writing its

inability or fail generally, to pay its debts as they become due or makes a general assignment for the benefit of creditors;

(h)  Under the provisions of any other law for the relief or aid of debtors, any court of competent jurisdiction shall assume custody or control of StadCo or JV Company or of the whole or any substantial part of its property;

(i)  Failure to fund any Account within the Senior Lien Debt Service Reserve Fund to the pertinent Adjusted Debt Service Reserve Fund Requirement as required pursuant to the definition of "Debt Service Reserve Fund Requirement" and Section 506 hereof; provided, however, that no Event of Default shall arise under this Section 901(i) to the extent that StadCo diligently and continuously applies to the required funding of such Account or Accounts all legally available Pledged Revenues of StadCo remaining after the application of Pledged Revenues to the purposes set forth in paragraphs (i), (ii), (iii) and (iv) of Section 504(c) hereof;

(j)  A draw on any Reserve Account Surety Bond deposited in any Account within the Senior Lien Debt Service Reserve Fund shall not be reimbursed within the time and in the amount provided in the third paragraph of Section 506(c) of this Indenture;

(k)  Failure to deposit monies in the amounts required by Section 505 to be deposited in the Senior Lien Debt Service Fund or the Second Lien Debt Service Fund at least ten (10) days prior to an Interest Payment Date or Principal Payment Date and such failure shall continue for five (5) Business Days after StadCo receives written notice thereof; provided, however, that no such failure shall constitute an Event of Default if there is then on deposit in the Senior Lien Debt Service Reserve Fund, the Senior Lien Strike Reserve Fund or the Second Lien Debt Service Reserve Fund, as applicable, amounts sufficient (after taking into account all amounts available under any Reserve Account Credit Facilities on deposit therein) and available under the terms of Section 506, 506A or 507 hereof, as applicable, to provide for the transfer to the Senior Lien Debt Service Fund or the Second Lien Debt Service Fund, as applicable, of any remaining amounts required to be so deposited with respect to such Interest Payment Date or Principal Payment Date;

(l)  If Substantial Completion has not been achieved by the first anniversary of the Outside Substantial Completion Date and the Trustee and the Controlling Bond Insurer have not received a certificate of an Authorized Representative on behalf of StadCo, accompanied by an IE Confirmation, certifying that on such anniversary date there are sufficient monies on deposit in the Construction Fund or in Other StadCo's construction fund or otherwise available to StadCo or the JV Company, taking into account any Committed Amounts, similar amounts committed for the benefit of the Other StadCo, and available cash, working capital and working capital commitments of the JV Company, StadCo or Other StadCo, to achieve Substantial Completion of the Stadium, and StadCo or another Person on behalf of StadCo (other than the Controlling Bond Insurer) fails to provide to the Trustee within 90 days thereafter StadCo's Applicable Percentage of monies required to be provided by the JV Company for such purpose;

(m)  StadCo shall incur liability in excess of $10,000,000 (adjusted annually for inflation as measured by the CPI Index) as a result of one or more of the following: (i) the termination of a Plan; (ii) the partial or complete withdrawal of StadCo or any of its ERISA

Affiliates from a Multiemployer Plan; (iii) the reorganization or termination of a Multiemployer Plan or (iv) any joint and several liability for obligations of Affiliates of StadCo arising by operation of law or under any of the Pledged Revenue Agreements or Project Real Estate Agreements, and such liability is not discharged or reserved against (either in cash or with a letter of credit, surety bond or insurance policy meeting the criteria for the Reserve Account Credit Facility set forth in Section 509 or otherwise reasonably acceptable to the Controlling Bond Insurer) within 60 days after receipt of notice from the Trustee;

(n)      Default in the payment of the principal of, premium, if any, or interest on any Indebtedness or Non-Indenture Permitted Debt when the same becomes due and payable, and any applicable grace period shall have expired, or an event of default as defined in any mortgage, indenture or other instrument under or pursuant to which there was issued or incurred, or by which there is secured, any such Indebtedness or Non-Indenture Permitted Debt shall have occurred and be continuing; provided, however, a default in payment or other event of default thereunder shall not constitute an Event of Default unless the unpaid principal amount of such Indebtedness or Non-Indenture Permitted Debt, together with the unpaid principal amount of all other Indebtedness or Non-Indenture Permitted Debt so in default, exceeds $10,000,000 (adjusted annually for inflation as measured by the CPI Index) and all such Indebtedness or Non-Indenture Permitted Debt has been accelerated;

(o)      There shall have occurred a "Prohibited Relocation" (as that term is defined in the Non-Relocation Agreement);

(p)      There shall be a Material Amendment to the NFL Constitution which purports by its terms to prohibit or render invalid the security interests in the Collateral granted by this Indenture or the Collateral Documents;

(q)      There shall be a failure by any of the Club Parties to comply with the terms and conditions set forth in the NFL Agreement and, as a result thereof, the NFL's consent granted in paragraph 1 thereof, is revoked in writing by the NFL, and the Controlling Bond Insurer reasonably believes such revocation will have a Material Adverse Effect;

(r)      There shall be a breach by the Club Parties of any provision of the NFL Constitution or any agreement between any such party and the NFL, and as a result thereof (i) the NFL revokes the Giants Team's Franchise (as such term is defined in the NFL Agreement) and (ii) if such revocation has been challenged by the Giants Team within ten (10) Business Days of the Giants Team's receipt of written notification from the NFL of such revocation, a court of competent jurisdiction has upheld such revocation pursuant to a final, non-appealable order;

(s)      [Reserved];

(t)      There shall occur a termination of the Ground Lease, the StadCo Sublease, the Giants Team Lease or the Design-Build Contract (except, with respect to the Design-Build Contract, as permitted pursuant to Section 609(gg) hereof); or

(u)      There shall have occurred the demise of the NFL as the league's governing body.

**Section 902. Acceleration.** Upon the occurrence of an Event of Default under (a) and (b) of Section 901, the Trustee, with the prior written consent of the Controlling Bond Insurer (which shall be required only if such Controlling Bond Insurer is not in material default of its obligations under the Bond Insurance Policy), may and at the request of such Bond Insurer (which may be made only if such Bond Insurer is not in material default of its obligations under the Bond Insurance Policy), or a majority of Total Bond and Swap Voters (if such Bond Insurer is in material default of its obligations under the Bond Insurance Policy) shall, and upon the occurrence of an Event of Default under any other subsection of Section 901, the Trustee only at the request of such Controlling Bond Insurer (which shall be required only when such Controlling Bond Insurer is not in material default of its obligations under the Bond Insurance Policy) or not less than 100% of the Total Bond and Swap Voters (if such Controlling Bond Insurer is in material default of its obligations under the Bond Insurance Policy) shall, by notice delivered to StadCo, declare the principal of all Bonds and the interest accrued to the date of such acceleration immediately due and payable, whereupon the Bonds and the interest thereon shall, without further action, become and be immediately due and payable, anything in this Indenture to the contrary notwithstanding. Upon any such acceleration, the Trustee shall also transfer all moneys from all other Funds, Accounts and Subaccounts hereunder, except for any Excluded Accounts, to the Trustee Revenue Fund. Additionally, upon any such acceleration, the Trustee shall continue to hold all moneys on deposit in the NFL Facility Proceeds Account for the benefit of the NFL.

**Section 903. Other Remedies; Rights of Holders; Subordination.**

(a)    Upon the occurrence and during the continuance of an Event of Default, the Trustee may, with the consent of the Controlling Bond Insurer (as long as the Controlling Bond Insurer is not in material default of its obligations under the Bond Insurance Policy), proceed to protect and enforce its rights and the rights of the Holders and Qualified Swap Providers by mandamus or other suit, action or proceeding at law or in equity, including an action for specific performance of any agreement herein contained, in accordance with the provisions of this Section 903.

(b)    Upon the occurrence and during the continuance of an Event of Default under (a) or (b) of Section 901, the Controlling Bond Insurer (as long as the Controlling Bond Insurer is not in material default of its obligations under the Bond Insurance Policy) and/or the Trustee, with the consent of the Controlling Bond Insurer (so long as the Controlling Bond Insurer is not in material default of its obligations under the Bond Insurance Policy) may in its own name or in the name of StadCo enforce all rights of StadCo under and pursuant to the Pledged Revenue Agreements, for and on behalf of the Holders; provided, however, that neither any Bond Insurer nor the Trustee shall have any duty or obligation to monitor the Project, other than as specifically provided herein.

(c)    If (i) an Event of Default described in Section 901(l) shall have occurred and be continuing and (ii) at such time, neither Other StadCo nor any other Person on behalf of Other StadCo (other than the Other Controlling Bond Insurer) shall have provided, in accordance with Section 10 of the Joint Venture Agreement, to the trustee under the indenture relating to Other StadCo's bonds, Other StadCo's Applicable Percentage of moneys required to be provided by the JV Company to achieve Substantial Completion, the Controlling Bond Insurer (so long as the

Controlling Bond Insurer is not in material default of its obligations under the Bond Insurance Policy) may provide to the Trustee StadCo's Applicable Percentage of moneys required to be provided by the JV Company to achieve Substantial Completion, and thereafter shall have the right to cause the JV Company, pursuant to the Consent and Acknowledgment, either independently or, if the Other Controlling Bond Insurer has cured the default of Other StadCo described in clause (ii), above, in cooperation with the Other Controlling Bond Insurer, to (x) direct and cause the Design-Builder to continue to perform all of its obligations under the Design-Build Contract and to complete the Scope of Work (as defined in the Design-Build Contract) and/or (y) otherwise cause the Project to achieve Final Completion, in each case in accordance with the Plans and Specifications reflected in the Design-Build Contract and without any Material Change Orders not approved by StadCo; provided, however, that neither the Controlling Bond Insurer nor the Trustee shall have any duty or obligation to monitor the Project, other than as specifically provided herein.

(d)     If (i) an Event of Default described in Section 901(l) shall have occurred and be continuing and (ii) Other StadCo or another Person on behalf of Other StadCo (other than the Other Controlling Bond Insurer) shall have provided, to the trustee under the indenture relating to Other StadCo's bonds, Other StadCo's Applicable Percentage of monies required to be provided by the JV Company to achieve Substantial Completion, as provided in Section 10 of the Joint Venture Agreement, the Controlling Bond Insurer (so long as the Controlling Bond Insurer is not in material default of its obligations under the Bond Insurance Policy) may provide to the Trustee StadCo's Applicable Percentage of moneys required to be provided by the JV Company to achieve Substantial Completion and thereafter, pursuant to the Consent and Acknowledgment, shall have the right to consent to any Material Change Order proposed by the JV Company to be submitted to the Design-Builder.

(e)     Upon the occurrence and during the continuance of a Collateral Document Event of Default, the Trustee at the direction of the Controlling Bond Insurer (so long as the Controlling Bond Insurer is not in material default of its obligations under the Bond Insurance Policy) and/or the Trustee, with the consent of the Controlling Bond Insurer (so long as the Controlling Bond Insurer is not in material default of its obligations under the Bond Insurance Policy), may, in addition to any other available remedy, seize and foreclose against some or all of the Collateral in its discretion.

(f)     No remedy conferred by this Indenture upon or remedy reserved to the Trustee, the Controlling Bond Insurer or to the Holders is intended to be exclusive of any other remedy, but each such remedy shall be cumulative and shall be in addition to any other remedy given to the Trustee, each Bond Insurer, any Qualified Swap Provider or to the Holders hereunder.

(g)     No delay or omission to exercise any right or power accruing upon any default or Event of Default shall impair any such right or power or shall be construed to be a waiver of any such default or Event of Default or acquiescence therein, and every such right and power may be exercised from time to time and as often as may be deemed expedient.

(h)     No waiver of any default or Event of Default, whether by the Trustee pursuant to Section 908 or by the Holders or the Controlling Bond Insurer, shall extend to or shall affect any

subsequent default or Event of Default hereunder or shall impair any rights or remedies consequent thereon.

(i)    Notwithstanding the existence of any default (including payment defaults) on the Second Lien Bonds or any related Parity Obligations and notwithstanding any rights or remedies contained in any of the Collateral Documents or any documents related to such related Parity Obligations, prior to the acceleration of the Senior Lien Bonds by the Trustee in accordance with Section 902 hereof, the Holders of Second Lien Bonds and any related Parity Obligations shall not take or threaten the taking of any of the following actions while any of the Senior Lien Bonds and any related Parity Obligations are Outstanding:

(i)    the commencement of foreclosure proceedings against the Trust Estate or the Stadium;

(ii)    the acceleration of any indebtedness or obligations represented by the Second Lien Bonds and any related Parity Obligations;

(iii)    the commencement of any suit, action or proceeding to enforce or collect payment on money due with respect to the Second Lien Bonds, related Parity Obligations or Collateral Documents; and

(iv)    the commencement of a bankruptcy, reorganization or liquidation against StadCo.

**Section 904.    Right of Bond Insurer and Holders to Direct Proceedings**.  Anything in this Indenture (other than Section 912, and subject always to the NFL Agreement) to the contrary notwithstanding, the Controlling Bond Insurer (so long as the Controlling Bond Insurer is not in material default of its obligations under the Bond Insurance Policy) or a majority of Total Bond and Swap Voters (if the Controlling Bond Insurer is in material default of its obligations under the Bond Insurance Policy), shall have the right, at any time, by an instrument or instruments in writing executed and delivered to the Trustee, with indemnity as may be required by the Trustee pursuant to Section 1001(k), to direct the method and place of conducting all proceedings to be taken in connection with the enforcement of the terms and conditions of this Indenture or for the appointment of a receiver or any other proceedings hereunder; provided, however, that such direction shall not be otherwise than in accordance with the provisions of Applicable Law and of this Indenture.   Subject to the rights of the Controlling Bond Insurer noted above in this Section 904, unless directed by 50.1 percent (50.1%) of a majority of Total Bond and Swap Voters pursuant to this Section 904, the Trustee shall have full power in the exercise of its discretion for the best interests of the owners of the Bonds and Qualified Swap Providers, to conduct, continue, discontinue, withdraw, compromise, settle or otherwise dispose of any legal or equitable action or proceeding.

**Section 905.    Application of Monies**.  Subject to the provisions of Section 509, upon the occurrence and during the continuance of an Event or Default, the Trustee may, with the consent of the Controlling Bond Insurer (so long as the Controlling Bond Insurer is not in material default of its obligations under the Bond Insurance Policy) and shall, at the direction of the Controlling Bond Insurer (so long as the Controlling Bond Insurer is not in material default

of its obligations under the Bond Insurance Policy) or if the Bonds have been accelerated pursuant to Section 902, deposit all monies held or received by the Trustee, after the payment of all unpaid fees and expenses of the Trustee and of the cost and expenses of the proceedings resulting in the collection of such monies and the creation of a reserve for anticipated fees, costs and expenses, in the Trustee Revenue Fund. Subject to the provisions of Section 509, all monies so deposited in the Trustee Revenue Fund shall be applied, upon the occurrence and during the continuance of an Event of Default, as follows:

(a)    Unless the principal of all the Bonds shall have become or shall have been declared due and payable;

First - To the payment to the Persons entitled thereto of all installments of interest then due on the Senior Lien Bonds and any amounts then due in respect of any related Parity Obligations, in the order of the maturity of the installments of such amounts; and if the amount available shall not be sufficient to pay in full any particular installment or amount then due, then to the payment ratably, according to the amounts due on such installment, to the Persons entitled thereto, without any discrimination or preference except as to any difference in the respective rates of interest specified in the Senior Lien Indebtedness;

Second - To the payment to the Persons entitled thereto of the unpaid principal or Redemption Price of any of the Senior Lien Bonds which shall have become due (other than Senior Lien Bonds called for redemption for the payment of which monies are held pursuant to the provisions of this Indenture) and any Parity Swap Termination Payments in the order of their due dates, and if the amount available shall not be sufficient to pay in full all the Senior Lien Bonds due whether at maturity or by call for redemption on any particular date and any Parity Swap Termination Payments, then first to the payment of interest ratably, according to the amount of such interest due on such date, and then to the amount of such principal and any Parity Swap Termination Payments, ratably, according to the amount of such principal or Redemption Price and any Parity Swap Termination Payments due on such date, to the Persons entitled thereto, without any discrimination or preference except as to any difference in the respective rates of interest specified in the Senior Lien Bonds and any Parity Swap Termination Payments;

Third - To the payment, pro rata, of the principal portion of any payment due as a reimbursement to a Reserve Account Credit Facility Provider in respect of a Reserve Account Credit Facility related to the Senior Lien Indebtedness;

Fourth - To the payment to the Persons entitled thereto of all installments of interest then due on the Second Lien Bonds and any amounts then due in respect of any related Parity Obligations, Swap Termination Payments and Other Swap Payments, in the order of the maturity of the installments of such amounts; and if the amount available shall not be sufficient to pay in full any particular installment or amount then due, then to the payment ratably, according to the amounts due on such installment, to the Persons entitled thereto, without any discrimination or preference except as to any difference in the respective rates of interest specified in the Second Lien Indebtedness, Swap Termination Payments and Other Swap Payments;

Fifth - To the payment to the Persons entitled thereto of the unpaid principal or Redemption Price of any of the Second Lien Bonds which shall have become due (other than Second Lien Bonds called for redemption for the payment of which monies are held pursuant to the provisions of this Indenture) in the order of their due dates, and if the amount available shall not be sufficient to pay in full all the Second Lien Bonds due whether at maturity or by call for redemption on any particular date, then first to the payment of interest ratably, according to the amount of such interest due on such date, and then to the amount of such principal, ratably, according to the amount of such principal or Redemption Price due on such date, to the Persons entitled thereto, without any discrimination or preference except as to any difference in the respective rates of interest specified in the Second Lien Bonds;

Sixth - To the payment, pro rata, of the principal portion of any payment due as a reimbursement to a Reserve Account Credit Facility Provider in respect of a Reserve Account Credit Facility related to the Second Lien Indebtedness;

Seventh - To the extent permitted by law, to the payment to the Persons entitled thereto of the unpaid interest on overdue installments of interest ratably, according to the amounts of such interest due on such date, without any discrimination or preference except as to any difference in the respective rates of interest specified in the Indebtedness and Other Swap Payments.

(b)    If the principal of all the Bonds shall have become due or shall have been declared due and payable, all such monies shall be applied first to the payment of the principal and interest then due and unpaid upon the Senior Lien Indebtedness without preference or priority of Senior Lien Indebtedness, or principal over interest or of interest over principal, or of any installment of interest over any other installment of interest, or of any Senior Lien Indebtedness over any other Senior Lien Indebtedness, ratably, according to the amounts due respectively for principal and interest and amounts due to the Persons entitled thereto, without any discrimination or privilege; second to the reimbursement of any Reserve Account Credit Facility Provider that provided a Reserve Account Credit Facility related to the Senior Lien Bonds; third to the payment of the principal and interest then due and unpaid upon the Second Lien Indebtedness, and all Swap Termination Payments and Other Swap Payments due under any Qualified Swap without preference or priority of Second Lien Indebtedness, Swap Termination Payments or Other Swap Payments, or vice versa, or principal over interest or of interest over principal, or of any installment of interest over any other installment of interest, or of any Second Lien Bond over any other Second Lien Indebtedness, or of any Swap Termination Payments over any other Swap Termination Payments, or of any Other Swap Payments over any Other Swap Payments, ratably, according to the amounts due respectively for principal and interest and amounts due under such Second Lien Indebtedness and as Swap Termination Payments or Other Swap Payments, respectively, to the Persons entitled thereto, without any discrimination or privilege; and fourth to the reimbursement of any Reserve Account Credit Facility Provider that provided a Reserve Account Credit Facility related to the Second Lien Bonds.

(c)    If the principal of all the Bonds shall have been declared due and payable, and if such declaration shall thereafter have been rescinded and annulled under the provisions of this

Article, then, subject to the provisions of subsection (b) of this Section 905 in the event that the principal of all the Bonds shall later become due or be declared due and payable, the monies shall be applied in accordance with the provisions of subsection (a) of this Section 905.

Whenever monies are to be applied pursuant to the provisions of this Section 905, such monies shall be applied at such times and from time to time as the Trustee shall determine, having due regard to the amount of such monies available for application and the likelihood of additional monies becoming available for such application in the future. Whenever the Trustee shall apply such monies, it shall fix the date (which may be an Interest Payment Date) upon which such application is to be made and upon such date interest on the amounts of principal to be paid on such dates shall cease to accrue. The Trustee shall give such other notice as it may deem appropriate of the deposit with it of any such monies and of the fixing of any such date, and shall not be required to make payment to the owner of any Bond until such Bond shall be presented to the Trustee for appropriate endorsement or for cancellation if fully paid.

Whenever the principal of and premium, if any, and interest on all Indebtedness have been paid under the provisions of this Section and all expenses and charges of the Trustee and all amounts owing to each Bond Insurer have been paid, any balance remaining in the Trustee Revenue Fund shall be paid to StadCo.

**Section 906.  Remedies Vested in Trustee**. All rights of action (including the right to file proof of claims) under this Indenture to protect the rights of the owners of the Bonds may be enforced by the Trustee without the possession of any of the Bonds or the production thereof in any trial or other proceeding relating thereto and any such suit or proceeding instituted by the Trustee may be brought in its name as Trustee without the necessity of joining as plaintiffs or defendants any owners of the Bonds, and any recovery of judgment shall be for the equal benefit of the owners of the outstanding Bonds.

**Section 907.  Limitations on Suits**. Except to enforce the rights given under Section 902 and except as provided in Section 909, no owner of any Bond shall have any right to institute a suit, action or proceeding in equity or at law for the enforcement of this Indenture or for the execution of any trust hereof or any other remedy hereunder, unless (a) a default has occurred of which the Trustee has been notified or is deemed to have notice as provided in Section 1001(h), (b) such default shall have become an Event of Default and at least a majority of the Total Bond and Swap Voters shall have made written request to the Trustee and shall have offered it reasonable opportunity either to proceed to exercise the powers hereinbefore granted or to institute such action, suit or proceeding in its own name, (c) such owners have offered to the Trustee indemnity as provided in Section 1001(k), (d) the Trustee for 60 days after such notice shall fail or refuse to exercise the powers hereinbefore granted, or to institute such action, suit or proceeding in its own name or in the name of such owners, (e) no direction inconsistent with such request has been given to the Trustee during such 60 day period by at least a majority of the Total Bond and Swap Voters, and (f) notice of such action, suit or proceeding is given to the Trustee; it being understood and intended that no one or more owners of the Bonds shall have any right in any manner whatsoever to affect, disturb or prejudice this Indenture by its, his or their action or to enforce any right hereunder except in the manner herein provided, and that all proceedings at law or in equity shall be instituted and maintained in the manner herein provided and for the equal benefit of the owners of all Bonds then Outstanding.

The notification, request and offer of indemnity set forth in the preceding paragraph, at the option of the Trustee, shall be conditions precedent to the execution of the powers and trusts in this Indenture and to any action or cause of action by the Holders for the enforcement of this Indenture or for any other remedy hereunder, except to enforce the obligations of the Trustee arising under Section 902.

Notwithstanding the preceding two paragraphs, each of the Trustee, each Bond Insurer, the Swap Insurer, the Qualified Swap Provider and the Holders of Bonds and of any Parity Obligations hereby covenants and agrees that (i) such party will not commence Foreclosure (as defined in the NFL Agreement), and (ii) such party does not have the right to commence Foreclosure, in each case unless and until a Foreclosure Notice (as defined in the NFL Agreement) has been sent in accordance with the terms of the NFL Agreement.

**Section 908.   Waivers of Events of Default**.  The Trustee may in its discretion waive any Event of Default hereunder and the consequences of such Event of Default and rescind any declaration of acceleration of maturity of principal of and interest on the Bonds under Section 902, subject in each case to the consent of, and shall do so upon the request of, the Controlling Bond Insurer (in each case so long as the Controlling Bond Insurer is not in material default of its obligations under the Bond Insurance Policy) or at least 50.1 percent (50.1%) of the Total Bond and Swap Voters (if the Controlling Bond Insurer is in material default of its obligations under the Bond Insurance Policy); provided, however, that no Event of Default shall be waived unless prior to such waiver all arrears of principal and interest on Senior Lien Bonds (other than principal or interest on the Bonds which became due and payable by declaration of acceleration), Regularly Scheduled Swap Payments, Parity Swap Termination Payments and all fees and expenses of the Trustee in connection with such Event of Default shall have been paid or provided for.  In case of any waiver or rescission described above, or in case any proceedings taken by the Trustee on account of any such Event of Default shall have been discontinued or concluded or determined adversely to the Trustee or the Holders, then and in every such case StadCo, the Trustee and the Holders shall be restored to their former positions and rights hereunder, respectively, but no such waiver or rescission shall extend to any subsequent or other Event of Default, or impair any right consequent thereon.

**Section 909.   Unconditional Right to Receive Principal, Premium and Interest**.  Except as provided in Section 912, nothing in this Indenture shall, however, affect or impair the right of any Holder to enforce, by action at law, payment of the principal of, premium, if any, or interest on any Bond at and after the maturity thereof or on the date fixed for redemption or (subject to the provisions of Section 902) upon the same being declared due prior to maturity as herein provided, or to enforce, by action at law, the obligation of StadCo to pay the principal of, premium, if any, and interest on each of the Bonds issued hereunder to the respective owners thereof at the time, place, from the source and in the manner herein and in the Bonds expressed.

**Section 910.   Notice of Defaults; Opportunity to Cure Defaults**.  The Trustee shall notify each Bond Insurer immediately upon the occurrence of any default described in Sections 901(a), (b), (c) or (k) and promptly upon the occurrence of any other default described in Section 901.  Promptly after StadCo becomes aware of the existence of any Event of Default, StadCo shall give notice of such Event of Default to the Trustee, with a copy to each Bond Insurer.  The Controlling Bond Insurer may notify the Trustee of any Event of Default, and the Trustee shall

accept such notice from the Controlling Bond Insurer. Anything contained in this Indenture to the contrary notwithstanding, no default described in Section 901(d) or (e) on the part of StadCo except for failure of StadCo to comply with Sections 504(a), 609(j), 609(n), 609(s) or 609(ww) hereof or Section 3.02(m) of the Insurance and Indemnity Agreement shall constitute an Event of Default until (a) notice of such default shall be given (1) by the Controlling Bond Insurer to StadCo (so long as the Controlling Bond Insurer is not in material default of its obligations under the Bond Insurance Policy) or (2) by at least a majority of Total Bond and Swap Voters to the Trustee and StadCo (if the Controlling Bond Insurer is in material default of its obligations under the Bond Insurance Policy), and (b) StadCo shall have had 30 days after such notice to correct such default or cause such default to be corrected, and shall not have corrected such default or caused such default to be corrected within such period; provided, however, if any default described in Section 901(d) or (e) (except for a failure of StadCo to comply with Sections 504(a), 609(j), 609(n), 609(s) or 609(ww) hereof or Section 3.02(m) of the Insurance and Indemnity Agreement) shall be such that it cannot be corrected within such period but can be corrected within 90 days thereafter, it shall not constitute an Event of Default if corrective action is instituted by StadCo within such period and diligently pursued until such default is corrected within such 90 day period.

**Section 911. Bond Insurer as Registered Owner of Bonds Insured**. As long as a Bond Insurer is not in material default of its obligations under the Bond Insurance Policy, notwithstanding anything to the contrary in this Indenture, such Bond Insurer shall be recognized as the Registered Owner of each Bond which it insures for the purposes of exercising all rights and privileges available to Holders. As long as it is not in material default of its obligations under the Bond Insurance Policy, each Bond Insurer of Senior Lien Bonds shall have the right to institute any suit, action or proceeding at law or in equity under the same terms as a Holder in accordance with the provisions of this Article IX.

**Section 912. NFL Requirements. IT IS ACKNOWLEDGED, UNDERSTOOD AND AGREED THAT, SO LONG AS THE NFL AGREEMENT IS IN EFFECT AND NOTWITHSTANDING ANYTHING IN THIS INDENTURE OR ANY OTHER OPERATIVE DOCUMENT (AS THAT TERM IS DEFINED IN THE NFL AGREEMENT) TO THE CONTRARY (INCLUDING WITHOUT LIMITATION ANY SUPPLEMENTAL INDENTURES), (A) THE EXERCISE BY THE TRUSTEE AND/OR ANY BOND INSURER OF REMEDIES UNDER ANY OPERATIVE DOCUMENT WILL BE MADE IN ACCORDANCE WITH THE TERMS AND PROVISIONS OF THE NFL AGREEMENT, THE TERMS, CONDITIONS AND PROVISIONS OF WHICH EACH OF THE PARTIES TO ANY OPERATIVE DOCUMENT (AS DEFINED IN THE NFL AGREEMENT) HAS ACCEPTED AS REASONABLE AND APPROPRIATE, AND (B) IN THE EVENT OF ANY CONFLICT OR INCONSISTENCY BETWEEN THE TERMS OF THE NFL AGREEMENT AND THE TERMS OF ANY OPERATIVE DOCUMENT (INCLUDING WITHOUT LIMITATION THIS INDENTURE AND ANY SUPPLEMENTAL INDENTURES), THE TERMS OF THE NFL AGREEMENT WILL CONTROL.**

Notwithstanding anything in this Indenture to the contrary, the NFL may, following the occurrence and during the continuance of an Event of Default, and notwithstanding the acceleration of any indebtedness or obligations issued hereunder, arrange for a Qualifying Sale

Transaction (as such term is defined in the NFL Agreement) pursuant to the NFL Agreement. In the event that such a Qualifying Sale Transaction is consummated in accordance with the NFL Agreement, then the rights, obligations and indebtedness of StadCo hereunder shall be assigned to, and assumed by, the acquiring or successor entity approved by the NFL without any further or additional amendment or modification.

**Section 913.    Payments During Event of Default**.    Whenever the Trustee shall become aware of the occurrence of an Event of Default, the Trustee (i) shall determine whether any payment or transfer received by it, if any, from StadCo while such Event of Default is continuing constitutes a Foreclosure, as defined in the NFL Agreement, and (ii) while such Event of Default is continuing and the relevant Standstill Period is in effect, shall make no payments under this Indenture other than Permitted Standstill Period Payments, as defined in the NFL Agreement.

**Section 914.    Construction Rights**.

(a)    In the event that Substantial Completion is not achieved by September 1, 2010, other than because of an Insured Event (as defined below), and the Independent Engineer has advised the Trustee and each Bond Insurer that, in its opinion, it is not likely that Substantial Completion will occur by September 1, 2011, then, in addition to the rights under Sections 502(c), 604 and 605 of this Indenture, StadCo shall cause the JV Company to meet with the Controlling Bond Insurer from time to time as requested by the Controlling Bond Insurer to discuss the status of construction and any issues that may further delay construction, and StadCo will not cause or permit there to be made any significant changes to the construction schedule or any significant decisions under the Design-Build Contract without first consulting with the Controlling Bond Insurer.

As used herein, "Insured Event" means the occurrence of any event which (i) is a Force Majeure Event and (ii) is covered by insurance such that sufficient funds exist to pay for the remainder of the construction of the Stadium and to pay principal of and interest on the Bonds, any Parity Obligations, any Reserve Account Surety Obligations, and any Swap Payments until Substantial Completion, as certified in a written statement from StadCo, accompanied by an IE Confirmation.

**Section 915.    Defaulting Controlling Bond Insurer**.    If for any reason the Controlling Bond Insurer shall be in material default of its obligations under its Bond Insurance Policy or any Reserve Account Surety Guaranty (a "Defaulting Bond Insurer") and such failure is not cured within ten (10) days after receipt from StadCo of written notice thereof, then (a) such Defaulting Bond Insurer's right to participate in the administration of, or decision-making rights related to, this Indenture or the other Financing Agreements shall be suspended during the pendency of such failure or refusal, and (b) any Bond Insurer who is not a Defaulting Bond Insurer shall have the right but not the obligation, in its respective, sole and absolute discretion, to cure the default of any Defaulting Bond Insurer. If any such material default is cured by a Bond Insurer who is not a Defaulting Bond Insurer, then such Bond Insurer shall be deemed the "Controlling Bond Insurer" for purposes of this Indenture and any applicable Financing Agreement.

## ARTICLE X.
## THE TRUSTEE

**Section 1001. Acceptance of Trusts.** By executing this Indenture, the Trustee hereby accepts the trusts and obligations imposed upon it by this Indenture and agrees to perform such trusts and obligations, but only upon and subject to the following express terms and conditions:

(a)    The Trustee, prior to the occurrence of an Event of Default and after the waiver or curing of all Events of Default which may have occurred, undertakes to perform such duties and only such duties as are specifically set forth in this Indenture and no implied agreements or obligations shall be read into this Indenture against the Trustee.  The Trustee shall not be answerable or accountable under any circumstances, except for its own willful misconduct or gross negligence, and StadCo agrees to indemnify and hold harmless the Trustee against and from any loss, liability, expense and damages which the Trustee may incur or sustain in the exercise and performance of any of its powers and duties hereunder, under the Collateral Documents and under the NFL Agreement.  If an Event of Default has occurred (which has not been cured or waived), the Trustee shall exercise such of the rights and powers vested in it by this Indenture and use the same degree of care and skill in its exercise as a prudent man would exercise or use in the circumstances in the conduct of his own affairs; provided, however, the Trustee shall be under no obligation to take any action to protect, preserve or enforce any rights or interests in the Trust Estate or otherwise, or to take any action under any of the Collateral Documents or the NFL Agreement, whether on its own motion or the request of any other person, including the NFL, unless from time to time the Trustee is provided with indemnity to its satisfaction.  None of the provisions of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur individual liability in the performance of any of its duties or in the exercise of any of its rights or powers.

(b)    The Trustee may execute any of the trusts or powers hereof and perform any of its duties by or through attorneys, agents, receivers or employees, but shall be answerable for the conduct of the same in accordance with the same standard of care specified above, and shall be entitled to act upon the reasonable opinion or advice of its counsel concerning all matters of trust hereof and the duties hereunder, and may in all cases be reimbursed hereunder for reasonable compensation paid to all such attorneys, agents, receivers and employees, as may reasonably be employed in connection with the trusts hereof.  The Trustee may rely upon an Opinion of Counsel and shall not be responsible for any loss or damage resulting from any action or non action by it taken or omitted to be taken in good faith in reliance upon such Opinion of Counsel.

(c)    The Trustee shall not be responsible for (i) any recital herein or in the Bonds (except with respect to the certificate of authentication of the Trustee endorsed on the Bonds), (ii) the filing of UCC Financing Statements or any continuation statements, (iii) insuring the Project or collecting any insurance monies or condemnation awards or to ascertain whether the property of the Trust Estate is adequately or properly insured, or to see to the payment of any tax, assessment or other governmental charge which may be levied or assessed on the Trust Estate or against StadCo, (iv) the validity of the execution by StadCo of this Indenture or of any supplements hereto or instruments of further assurance, (v) the sufficiency of, or filing of documents related to, the security for the Bonds issued hereunder or intended to be secured hereby, or (vi) the value of the Project or otherwise as to the maintenance of the security thereof,

and the Trustee shall not be bound to ascertain or inquire as to the observance or performance of any covenants, conditions or agreements on the part of StadCo or on the part of StadCo under the Financing Agreements except as otherwise provided herein or therein. The Trustee shall not be responsible or liable for any loss suffered in connection with any investment of funds made by it in accordance with Section 701, except for the Trustee's gross negligence and willful misconduct.

(d)     The Trustee shall not be accountable for the use of the proceeds of any Bonds authenticated or delivered hereunder. The Trustee shall not be concerned with or accountable to any person for the use or application of any deposited monies which shall be released or withdrawn in accordance with the provisions hereof. The bank or trust company acting as Trustee and its directors, officers, employees or agents may in good faith buy, sell, own, hold and deal in the Bonds and may join in any action which any Holder may be entitled to take with like effect as if such bank or trust company were not the Trustee. To the extent permitted by law, such bank or trust company may also receive tenders and purchase in good faith Bonds from itself, including any department, affiliate or subsidiary, with like effect as if it were not the Trustee.

(e)     The Trustee shall be protected in relying upon Opinions of Counsel and in reasonably acting upon any notice, request, consent, certificate, order, affidavit, letter, telegram or other paper or document reasonably believed by it to be genuine and correct and to have been signed or sent by the proper Person or Persons. Any action taken by the Trustee pursuant to this Indenture upon the request or authority or consent of any Person who at the time of making such request or giving such authority or consent is the owner of any Bond shall be conclusive and binding upon all future owners of the same Bond and upon Bonds issued in exchange therefor or in place thereof.

(f)     As to the existence or non existence of any fact or as to the sufficiency or validity of any instrument, paper or proceeding, the Trustee shall be entitled to rely upon a certificate signed on behalf of StadCo by an Authorized Representative, or such other Person or Persons as may be designated for such purposes by resolution of StadCo, as sufficient evidence of the facts therein contained and prior to the occurrence of a default of which the Trustee has been notified as provided in subsection (h) of this section, or of which by such subsection it is deemed to have notice, may also accept a similar certificate to the effect that any particular dealing, transaction or action is necessary or expedient, but may at its discretion secure such further evidence deemed necessary or advisable, but shall in no case be bound to secure the same. The Trustee may accept a certificate of an Authorized Representative to the effect that a resolution in the form therein set forth has been adopted by StadCo as conclusive evidence that such resolution has been duly adopted and is in full force and effect.

(g)     The permissive right of the Trustee to do things enumerated in this Indenture shall not be construed as a duty and the Trustee shall not be answerable for other than its gross negligence or willful misconduct. The immunities and exceptions from liability of the Trustee set forth in this Indenture shall extend to its officers, directors, employees and agents.

(h)     The Trustee shall not be required to take notice or be deemed to have notice of any default hereunder except for defaults specified in subsections (a) or (b) of Section 901

10662025.17                                     - 131 -

hereof, unless the Trustee shall be specifically notified in writing of such default by StadCo or by the Controlling Bond Insurer (so long as the Controlling Bond Insurer is not in material default of its obligations under the Bond Insurance Policy) or at least a majority of Total Bond and Swap Voters (if the Controlling Bond Insurer is in material default of its obligations under the Bond Insurance Policy). All notices or other instruments required to be delivered to the Trustee must, in order to be effective, be delivered at the corporate trust office of the Trustee provided herein, and in the absence of such notice so delivered the Trustee may conclusively assume there is no default or event of default except as aforesaid.

(i)     The Trustee shall not be required to give any bond or surety with respect to the execution of its rights and obligations hereunder.

(j)     Anything contained in this Indenture to the contrary notwithstanding, the Trustee shall have the right, but not the obligation, to reasonably demand, as a condition of any action by the Trustee with respect to the authentication of any Bonds, the withdrawal of any cash, the release of any property, or any action whatsoever within the purview of this Indenture, any showings, certificates, opinions, appraisals or other information or corporate action or evidence thereof in addition to that required by the terms hereof.

(k)     Before taking any action under this Indenture other than the acceleration of the Bonds as provided in Section 902, the Trustee may require that satisfactory indemnity, including a satisfactory indemnity bond or other security satisfactory to the Trustee, be furnished to it for the reimbursement of all expenses to which it may be put and to protect it against all liability by reason of any action so taken, except liability which is adjudicated to have resulted from its gross negligence or willful misconduct. The Trustee may decline to exercise any right provided by this Indenture or the Financing Agreements which, in the reasonable discretion of the Trustee based on an Opinion of Counsel, may cause the Trustee to incur corporate or personal liability under any environmental law.

(l)     All monies received by the Trustee shall, until used or applied or invested as herein provided, be held in trust in the manner and for the purposes for which they were received but need not be segregated for investment purposes from other funds except to the extent required by this Indenture or law. The Trustee shall not be under any liability for interest on any monies received hereunder except such as may be agreed upon.

**Section 1002. Fees, Charges and Expenses of Trustee.** The Trustee shall be entitled to payment of and reimbursement for reasonable fees for its services and all out of pocket expenses reasonably incurred by the Trustee hereunder and as Bond Registrar and Paying Agent for the Bonds, including the reasonable fees of its counsel. In the event the Trustee ceases to be the Paying Agent and Bond Registrar hereunder, that portion of the Trustee's fees attributable to such services shall be payable to such other entities performing such services. The obligations of StadCo under this Section 1002 and Section 1001(a) to compensate and indemnify the Trustee and to pay or reimburse the Trustee for expenses, disbursements and advances shall constitute additional indebtedness hereunder. Such additional indebtedness shall be secured by a lien prior to that of the Bonds upon all property and funds held or collected by the Trustee as such.

**Section 1003. Reserved.**

**Section 1004. Merger or Consolidation of Trustee.** Any corporation or bank into which the Trustee may be converted or merged, or with which it may be consolidated, or to which it may sell or transfer its trust business and assets as a whole or substantially as a whole, or any corporation or bank resulting from any such conversion, sale, merger, consolidation or transfer to which it is a party shall be and become successor Trustee hereunder and vested with all the trusts, powers, discretion, immunities, privileges and all other matters as was its predecessor, without the execution or filing of any instrument or any further act, deed or conveyance on the part of any of the parties hereto, anything herein to the contrary notwithstanding.

**Section 1005. Resignation by Trustee.** The Trustee and any successor Trustee may at any time resign and be discharged of the duties and obligations created by the Indenture by giving not less than 60 days' written notice to StadCo and mailing notice thereof to each Bond Insurer, each Qualified Swap Provider and each owner of Bonds then Outstanding. Such resignation shall take effect only upon the appointment of a successor Trustee by the Holders or StadCo. If no successor Trustee shall be appointed within 60 days of such notice of resignation, a temporary Trustee shall be appointed pursuant to Section 1007.

**Section 1006. Removal of Trustee.** The Trustee may be removed at any time with the consent of the Controlling Bond Insurer by an instrument or concurrent instruments in writing delivered to the Trustee and StadCo and signed by the Holders of at least 50.1 percent (50.1%) in aggregate amount of the Bonds then Outstanding and, prior to any Event of Default, by StadCo, provided that such removal, if initiated by StadCo, shall take effect only upon the appointment of a successor Trustee pursuant to Section 1007 and the payment to the Trustee of all Trustee Fees and Expenses and all Extraordinary Trustee Fees and Expenses.

**Section 1007. Appointment of Successor Trustee by the Controlling Bond Insurer or Holders; Temporary Trustee.** In case the Trustee hereunder shall resign, be removed, be dissolved, be in course of dissolution or liquidation, or otherwise become incapable of acting hereunder, or in case it shall be taken under the control of any public officer or officers or of a receiver appointed by a court, a successor may be appointed by (1) the Controlling Bond Insurer (so long as the Controlling Bond Insurer is not in material default of its obligations under the Bond Insurance Policy), (2) at least 50.1 percent (50.1%) of Total Bond and Swap Voters, with the consent of StadCo and the Controlling Bond Insurer, such consent not to be unreasonably withheld, by an instrument or concurrent instruments in writing signed by such owners or (3) StadCo, by an instrument signed by its Authorized Representative and with the consent of the Controlling Bond Insurer, such consent not to be unreasonably withheld. If no successor or temporary Trustee is appointed within 60 days of the resignation of the Trustee, the Trustee may petition a court of suitable jurisdiction at the expense of StadCo to seek the immediate appointment of a successor Trustee acceptable to the Controlling Bond Insurer. Every such Trustee appointed pursuant to this Section 1007 shall be, if there be such an institution willing, qualified and able to accept this trust upon reasonable or customary terms, a trust company or bank having a combined capital, surplus and undivided profits of not less than $100 million.

**Section 1008. Concerning any Successor Trustee.** Every successor Trustee appointed hereunder shall execute, acknowledge and deliver to its predecessor and also to StadCo an instrument in writing accepting such appointment hereunder, and thereupon such successor,

without any further act, deed or conveyance, shall become fully vested with all the properties, rights, powers, trusts, duties and obligations of its predecessor; but such predecessor shall, nevertheless, on the request of StadCo or its successor, execute and deliver an instrument transferring to such successor Trustee all the properties, rights, powers and trusts of such predecessor hereunder; and every predecessor Trustee shall deliver all securities and monies held by it as Trustee hereunder to its successor.  Should any instrument in writing from StadCo be required by any successor Trustee for more fully and certainly vesting in such successor the properties, rights, powers and duties hereby vested or intended to be vested in the predecessor, any and all such instruments in writing shall, on request, be executed, acknowledged and delivered by StadCo.  The resignation of any Trustee and the instrument or instruments removing any Trustee and appointing a successor hereunder, together with all other instruments provided for in this article shall be filed and/or recorded by the successor Trustee in each recording office where the Indenture may have been filed and/or recorded.

**Section 1009. Trustee Protected in Relying Upon Resolutions, etc**.  The resolutions, opinions, certificates and other instruments provided for in this Indenture may be accepted by the Trustee as conclusive evidence of the facts and conclusions stated therein and shall be full warrant, protection and authority to the Trustee for the release of property and the withdrawal of cash hereunder.

**Section 1010. Successor Trustee as Bond Registrar, Custodian of Debt Service Fund and Paying Agent**.  In the event of a change in the office of Trustee, the predecessor Trustee which has resigned or been removed shall cease to be Bond Registrar, custodian of the funds and amounts hereunder and Paying Agent for principal of, premium, if any, and interest on the Bonds, and the successor Trustee shall become such Bond Registrar, custodian and Paying Agent.

**Section 1011. Notice to Rating Agencies**.  The Rating Agencies shall be notified by the Trustee of the following: (a) any non required redemption of Bonds (including casualty or condemnation); (b) whenever there is a change in the Trustee; (c) whenever there shall occur an Event of Default under the Bonds; (d) whenever there shall have occurred a defeasance of the Bonds or discharge of this Indenture; (e) when all the Bonds are paid; (f) the sale or disposition of any or all of the Project or any material part thereof as permitted by the Leasehold Mortgage; (g) any draw on a Debt Service Reserve Fund or the Senior Lien Strike Reserve Fund; (h) any Material Damage to the Project or any part thereof and (i) notification of any default under the Leasehold Mortgage of which the Trustee is aware.  Each Rating Agency shall be furnished any information it requests in order to maintain the rating on the Bonds, and the Trustee shall cooperate with the Rating Agencies, including submitting any surveillance forms required by any Rating Agency.

## ARTICLE XI.
## SUPPLEMENTAL INDENTURES

**Section 1101. Supplemental Indentures Not Requiring Consent of Holders**.

(a)    StadCo and the Trustee may, without the consent of, or notice to, any of the Holders but with notice to each Bond Insurer, each Qualified Swap Provider and each Swap

Insurer enter into Supplemental Indentures as shall not be inconsistent with the terms and provisions hereof for any one or more of the following purposes:

       (i)     to cure any ambiguity or formal defect or omission in this Indenture or (ii) to correct or supplement any provision herein or the description of any property subject to the lien hereof in order to better assure, convey and confirm to the Trustee any property subject or required to be subject to the lien of this Indenture;

       (ii)     to grant to or confer upon the Trustee for the benefit of the Holders any additional rights, remedies, powers or authority that may lawfully be granted to or conferred upon the Holders or the Trustee or either of them;

       (iii)     to subject to the lien of this Indenture additional revenues, properties or collateral;

       (iv)     to modify, amend or supplement this Indenture in such manner as required to permit the qualification hereof under the Trust Indenture Act of 1939, as amended from time to time, and the regulations promulgated and rulings issued thereunder, any similar Federal statute hereafter in effect, or any state securities law, and to add to this Indenture such other terms, conditions and provisions as may be required by such Trust Indenture Act of 1939, as amended from time to time, and the regulations promulgated and rulings issued thereunder, similar Federal statute or state securities law;

       (v)     to modify, amend or supplement the Indenture in any manner, not already provided for in or pursuant to the Supplemental Indenture authorizing the related Series of Bonds in order to provide for a Bond Support Facility, Reserve Account Credit Facility, Qualified Swap or other similar arrangement with respect to any Series of Bonds, under the Indenture, so long as StadCo determines that such Supplemental Indenture does not materially adversely affect the right, security and interest of the Holders of Outstanding Bonds;

       (vi)     to provide for the issuance, sale and delivery of the Initial Bonds as contemplated by Section 203 hereof;

       (vii)     to provide for the issuance, sale and delivery of Additional Bonds as provided in and upon compliance with Section 204 or Completion Bonds as provided in and upon compliance with Section 205 and to provide for (1) the deposit and disbursement of the proceeds of such Bonds to pay the Costs of Issuance for such Bonds and the cost of all or any part of the facilities to be financed by means of such Bonds or to refund another series of Bonds, as the case may be, (2) the payment of the principal of, premium, if any, and interest on such Bonds, and (3) such other changes necessary in connection with the issuance of such Bonds as shall not, in the opinion of the Trustee, prejudice in any material respect the rights of the Holders of Outstanding Bonds; and

       (viii)     to make any other changes herein which shall not prejudice in any material respect the rights of the Holders of the Outstanding Bonds, each Bond Insurer or of any Qualified Swap Provider.

(b)    If, at any time, StadCo shall request the Trustee to enter into any Supplemental Indenture for any of the purposes of this Section 1101, the Trustee shall send to each Bond Insurer and each Qualified Swap Provider notice of the proposed execution of such Supplemental Indenture by registered or certified mail together with a copy thereof. Such notice shall briefly set forth the nature of the proposed amendment and shall state that copies thereof are on file at the principal office of the Trustee for inspection by each Bond Insurer. Upon the execution of any Supplemental Indenture as permitted and provided for in this Section 1101 and the filing of such Supplemental Indenture with the Trustee along with the opinion required by Section 1103 hereof, if any, this Indenture shall be deemed to be modified and amended in accordance therewith. A copy of the executed Supplemental Indenture and any related transcript shall be provided to each Bond Insurer.

**Section 1102. Supplemental Indentures Requiring Consent of Holders.**

(a)    Exclusive of Supplemental Indentures covered by Section 1101 and subject to the terms and provisions contained in this Section 1102, each Bond Insurer (so long as any Bond Insurer is not in material default of its obligations under the Bond Insurance Policy) or a majority of Total Bond and Swap Voters (if the Controlling Bond Insurer is in material default of its obligations under the Bond Insurance Policy) have the right from time to time to consent to and approve the execution by StadCo and the Trustee of such other Supplemental Indentures as shall be deemed necessary or desirable by StadCo for the purpose of modifying, altering, amending, adding to or rescinding, in any particular, any of the terms or provisions contained in this Indenture or in any Supplemental Indenture. Notwithstanding the foregoing, nothing in this Indenture shall permit, or be construed as permitting, except as provided in (b) below, (1) an extension of the date upon which the payment of any principal of or interest on any Bond is due, or (2) a reduction in the principal amount of, or premium, if any, on any Bond or the rate of interest thereon or the amount of interest payable thereon, or (3) a reduction in amount of any payment required by any sinking fund that may be applicable to any Bond, or (4) a privilege or priority of any Bond or Bonds over any other Bond or Bonds, except as provided herein, or (5) a change in the privileges or priorities of any Bond or Bonds over any other Bond or Bonds (other than any amendment to the proviso in Section 504(c)(vi), which shall be subject solely to the satisfaction of the requirements described in the first sentence of this Section 1102(a)), (6) a reduction in the aggregate principal amount of Bonds required for consent to any Supplemental Indenture, or (7) any amendment that materially and adversely affects the rights or obligations specific to the Qualified Swap Providers as a group or of any Qualified Swap Provider individually without the consent of each affected Qualified Swap Provider.

(b)    (i)    Anything contained in this Indenture to the contrary notwithstanding, StadCo and the Trustee may supplement this Indenture upon receipt of the consent of the Controlling Bond Insurer (so long as the Controlling Bond Insurer is not in material default of its obligations under the Bond Insurance Policy) and one hundred percent (100%) of Total Bond and Swap Voters for any purpose other than a purpose set forth in clause (7) of subsection (a) above.

(ii)    If, at any time, StadCo shall request the Trustee to enter into any Supplemental Indenture for any of the purposes of this Section 1102, the Trustee shall send to the Bond Insurer and each Qualified Swap Provider a copy of the proposed Supplemental

Indenture and to each Holder notice of the proposed execution of such Supplemental Indenture by registered or certified mail to the address of such Holder as it appears on the registration books or on file with the Trustee; provided, however, that failure to give such notice to any Holder by mailing, or any defect therein, shall not affect the validity of any proceedings pursuant hereto. Such notice shall briefly set forth the nature of the proposed Supplemental Indenture and shall state that copies thereof are on file at the principal office of the Trustee for inspection by all Holders and each Bond Insurer. If, by the date as shall be prescribed in the notice (which shall be no earlier than ten (10) Business Days from the date such notice was mailed) by the Trustee, the Controlling Bond Insurer (so long as the Controlling Bond Insurer is not in material default of its obligations under the Bond Insurance Policy) and a majority of Total Bond and Swap Voters shall have consented to the execution thereof as herein provided, no owners of any Bond shall have any right to object to any of the terms and provisions contained therein, or the operation thereof, or in any manner to question the propriety of the execution thereof, or to enjoin or restrain the Trustee or StadCo from executing the same or from taking any action pursuant to the provisions thereof. Upon the execution of any Supplemental Indenture as permitted and provided for in this Section 1102 and the filing of the opinion required by Section 1103, if any, this Indenture shall be deemed to be modified and amended in accordance therewith. A copy of the executed Supplemental Indenture and any related transcript shall be provided to each Bond Insurer.

(c)    Bonds owned or held by or for the account of StadCo or any Affiliate of StadCo shall not be deemed Outstanding for the purpose of consent or any calculation of Outstanding Bonds provided for in this Article or in Article XII. At the time of any such calculation, StadCo shall furnish the Trustee a certificate of an officer of StadCo, upon which the Trustee may rely, describing all Bonds to be so excluded.

(d)    For the purposes of this Article XI, the purchasers of the Bonds of a Series, whether purchasing as underwriters, for resale or otherwise, upon such purchase, may consent to a modification or amendment permitted by this Section 1102 in the manner provided herein and with the same effect as a consent given in accordance with Sections 1102(a) and 1102(b) hereof; provided, however, that, if such consent is given by a purchaser who is purchasing as an underwriter or for resale, the nature of the modification or amendment and the provisions for the purchaser consenting thereto shall be described in the official statement, prospectus, offering memorandum or other offering document prepared in connection with the primary offering of the Bonds of such Series.

**Section 1103. Opinion of Counsel**. In connection with any Supplemental Indenture, the Trustee may, but shall not be required to, request an Opinion of Counsel addressed to the Trustee stating that such Supplemental Indenture is authorized or permitted by this Indenture and complies with its terms.

**Section 1104. Trustee's Obligation**. The Trustee shall not unreasonably refuse to enter into any Supplemental Indenture permitted by this Article.

## ARTICLE XII.
## AMENDMENT OF FINANCING AGREEMENTS
## AND CERTAIN OTHER DOCUMENTS

**Section 1201. Amendments, etc., to Financing Agreements Not Requiring Consent of Holders.** StadCo and the Trustee shall, without the necessity of consent by or notice to the Holders but with notice to each Bond Insurer, make or consent to any amendment, change or modification of any of the Financing Agreements as may be required:

      (a)    by the provisions of the Financing Agreements or this Indenture;

      (b)    for the purpose of curing any ambiguity or formal defect or omission therein;

      (c)    in connection with the Project to identify the same more precisely;

      (d)    in connection with the issuance, sale and delivery of the Initial Bonds as provided in and in compliance with Section 203, Additional Bonds as provided in and in compliance with Section 204 and Completion Bonds as provided in and in compliance with Section 205;

      (e)    for the purpose of subordinating of record the lien of the Leasehold Mortgage and other Permitted Encumbrances to such recorded easements and/or grants of right-of-way, for access and for purposes of installing, maintaining, repairing and replacing utility equipment ("Utility Easements") as StadCo may be required to grant to utility companies and similar providers of electric, gas, water, sewer, cable, telecommunications and similar energy and utility services; provided that, no such Utility Easement may contain (i) a provision imposing a monetary lien upon the Project or the site, or (ii) a provision creating a foreclosure or similar enforcement right in favor of the holder thereof; or

      (f)    in connection with any other change therein required by StadCo which, in the opinion of the Controlling Bond Insurer, shall not prejudice in any material respect the rights, security and interest of the Holders of the Bonds then Outstanding. A copy of any executed amendment to any Financing Agreement and any related transcript shall be provided to each Bond Insurer.

**Section 1202. Amendments, etc., to Financing Agreements Requiring Consent of Holders.** Except for amendments, changes or modifications as provided in Section 1201, neither StadCo nor the Trustee shall enter into or consent to any amendment, change or modification of any of the Financing Agreements without the prior consent of (x) the Controlling Bond Insurer (so long as the Controlling Bond Insurer is not in material default of its obligations under the Bond Insurance Policy) or at least a majority of Total Bond and Swap Voters (if the Controlling Bond Insurer is in material default of its obligations under the Bond Insurance Policy) and (y) each affected Qualified Swap Provider to the extent that such amendment, change or modification materially and adversely affects the rights or obligations specific to the Qualified Swap Providers as a group or of any Qualified Swap Provider individually. If, at any time, StadCo shall request the Trustee to enter into or consent to any amendment, change or modification to any of the Financing Agreements that require the consent of the Controlling Bond Insurer or the Holders under this Section 1202, the Trustee shall send to each Bond Insurer a copy of such amendment and to each Holder notice of the proposed execution of such

amendment or Supplemental Indenture by registered or certified mail to the address of such Holder as it appears on the registration books or on file with the Trustee; provided, however, that failure to give such notice to any Holder by mailing, or any defect therein, shall not affect the validity of any proceedings pursuant hereto. Such notice shall briefly set forth the nature of the proposed amendment and shall state that copies thereof are on file at the principal office of the Trustee for inspection by all Holders. If, by the date as shall be prescribed in the notice (which shall be no earlier than five (5) Business Days and no later than fifteen (15) Business Days from the date such notice was mailed) by the Trustee, the Controlling Bond Insurer (so long as the Controlling Bond Insurer is not in material default of its obligations under the Bond Insurance Policy) or a majority of Total Bond and Swap Voters (if the Controlling Bond Insurer is in material default of its obligations under the Bond Insurance Policy) shall have consented to the execution thereof as herein provided, the Trustee shall execute such amendment and no owners of any Bond or other Person shall have any right to object to any of the terms and provisions contained therein, or the operation thereof, or in any manner to question the propriety of the execution thereof, or to enjoin or restrain the Trustee or StadCo from executing the same or from taking any action pursuant to the provisions thereof. Upon the execution of any amendment as permitted and provided for in this Section 1202 and the filing of the documents required by Section 1205, if any, such Financing Agreement shall be deemed to be modified and amended in accordance therewith. A copy of any executed amendment to any Financing Agreement and any related transcript shall be provided to each Bond Insurer.

**Section 1203. Limitation on Amendments**. No amendment, change or modification to any of the Financing Agreements may decrease the obligation of StadCo to provide Pledged Revenues in amounts sufficient to pay the principal of and premium, if any, and interest on the Indebtedness as the same become due, except as provided in Section 608. Notwithstanding anything to the contrary in Sections 1201 or 1202, StadCo shall not be required to consent to any amendment, change or modification of any of the Financing Agreements that adversely affects any rights of StadCo.

**Section 1204. Amendment by Unanimous Consent**. Anything contained in this Indenture to the contrary notwithstanding, StadCo and the Trustee may enter into any amendment, change or modification of any of the Financing Agreements upon receipt of the consent of (x) one hundred percent (100%) of Total Bond and Swap Voters and of each Bond Insurer (so long as such Bond Insurer is not in material default of its obligations under its Bond Insurance Policy), subject to Section 1203 hereof, and (y) any Qualified Swap Provider to the extent that such amendment, change or modification materially and adversely affects the rights of such Qualified Swap Provider or Swap Insurer.

**Section 1205. Opinion of Counsel; Consent of StadCo Required**. In connection with any amendment, change or modification to any of the Financing Agreements, the Trustee may, but shall not be required to, request an Opinion of Counsel addressed to the Trustee stating that such amendment, change or modification is authorized or permitted by this Indenture and complies with its terms. The Trustee shall not, without the consent of StadCo, execute any such amendment, change or modification which adversely affects any rights of StadCo.

## ARTICLE XIII.
## MISCELLANEOUS

**Section 1301. Evidence of Signatures of Holders; Consents, etc., of Holders**.  Any consent, request, direction, approval, objection or other instrument required by this Indenture to be signed and executed by the Holders may be in any number of concurrent writings of similar tenor and may be signed or executed by such Holders in Person or by agent appointed in writing. Proof of the execution of any such consent, request, direction, approval, objection or other instrument or of the writing appointing any such agent, if made in the following manner, shall be sufficient for any of the purposes of this Indenture, and shall be conclusive in favor of the Trustee with regard to any action taken under such request or other instrument.  The fact and date of the execution by any Person of any such writing may be approved by the certificate of any officer in any jurisdiction who by law has power to take acknowledgments within such jurisdiction that the Person signing such writing acknowledged before him the execution thereof, or by affidavit of any witness to such execution.

For all purposes of this Indenture and of the proceedings for the enforcement hereof, the Holder giving such a writing shall be deemed to continue to be the owner of such Bond until the Trustee shall have received notice in writing to the contrary.

**Section 1302. Limitation of Rights**.  With the exception of rights herein expressly conferred (including without limitation rights conferred on each Bond Insurer and each Qualified Swap Provider), nothing expressed or mentioned in or to be implied from this Indenture or the Bonds is intended or shall be construed to give to any Person or company other than the parties hereto, StadCo, each Bond Insurer and the owners of the Bonds and each Qualified Swap Provider, any legal or equitable right, remedy or claim under or with respect to this Indenture or any covenants, conditions and agreements herein contained, this Indenture and all of the covenants, conditions and agreements hereof being intended to be and being for the sole and exclusive benefit of the parties hereto, StadCo, each Bond Insurer, the Qualified Swap Provider and the owners of the Bonds as herein provided.

**Section 1303. Limitation of Liability of Officers, Directors, etc., of StadCo**.  No covenant, agreement or obligation contained herein shall be deemed to be a covenant, agreement or obligation of any past, present or future officer, director, manager, employee or agent of StadCo in his individual capacity, and neither the members of StadCo nor any officer thereof executing the Bonds shall be liable personally on the Bonds or be subject to any personal liability or accountability by reason of the issuance thereof.  No officer, director, manager, employee or agent of StadCo shall incur any personal liability with respect to any other action taken by him pursuant to this Indenture.

**Section 1304. Notices, etc**.  Unless otherwise provided herein, all demands, notices, approvals, consents, requests and other communications hereunder shall be in writing and shall be deemed to have been given when delivered in Person, mailed by first class registered or certified mail, postage prepaid, or delivered by telex or telecopier, and addressed (a) if to StadCo, Giants Stadium LLC, Giants Stadium, 50 East State Highway Route 120, East Rutherford, New Jersey 07073 (Attention: John K. Mara); (b) if to a Bond Insurer, to the address provided in the applicable Supplemental Indenture; (c) if to a Swap Insurer, to the address

provided in the applicable Supplemental Indenture; (d) if to S&P, Standard & Poor's Corporation, 55 Water Street, 38th Floor, New York, New York 10041; (e) if to Moody's, Moody's Investors Service, Inc., 99 Church Street, New York, New York 10004; (f) if to the Trustee, The Bank of New York, 101 Barclay Street, New York, New York 10286 (Attention: Deirdre M. Lewis, Telecopier: (212) 815-3466); and (f) if to a Qualified Swap Provider, to the address provided in the Qualified Swap agreement. A duplicate copy of each demand, notice, approval, consent, request or other communication given hereunder by either StadCo or the Trustee to the other shall be given to each Bond Insurer. StadCo, each Bond Insurer, each Swap Insurer, any Rating Agency and the Trustee may, by notice given hereunder, designate any further or different addresses to which subsequent demands, notices, approvals, consents, requests or other communications shall be sent or Persons to whose attention the same shall be directed.

Section 1305. **Successors and Assigns**. This Indenture shall be binding upon, inure to the benefit of and be enforceable by the parties and their respective successors and assigns.

Section 1306. **Severability**. If any provision of this Indenture shall be held invalid by any court of competent jurisdiction, such holding shall not invalidate any other provision hereof.

Section 1307. **Applicable Law**. This Indenture, the rights and obligations of the parties hereto and any claims or disputes relating thereto shall be governed by and construed in accordance with the laws of the State of New York (without regard to conflict of laws principles other than Sections 5-1401 and 5-1402 of the New York General Obligations Law); provided, however, that the grant of any security interests hereunder shall be governed by and construed in accordance with the laws of the State of New Jersey; and provided, further, that if by reason of mandatory provisions of law, the perfection, effect of perfection or non-perfection or the priority of the security interests of the Trustee in any of the Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New Jersey, the Uniform Commercial Code as in effect in such other jurisdiction shall govern for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

Section 1308. **Parties Interested Herein**. Nothing in this Indenture expressed or implied is intended or shall be construed to confer upon, or to give to, any Person, other than StadCo, the Trustee, any Bond Insurer, any Swap Insurer, any Reserve Account Credit Facility Provider, any Bond Support Facility Provider and the Holders of the Bonds or of any Parity Obligations or any Qualified Swap Provider, any right, remedy or claim under or by reason of the Indenture or any covenant, condition or stipulation thereof; and all covenants, stipulations, promises and agreements in the Indenture contained by and on behalf of StadCo shall be for the sole and exclusive benefit of such parties.

Section 1309. **Limitation on Recourse**. No Bond Insurer, Reserve Account Credit Facility Provider, Bond Support Facility Provider, Qualified Swap Provider or holder of any Bonds or of any Parity Obligations shall have any right or recourse to bring any action or claims for the payment of the principal of or Redemption Price, if applicable, or interest on the Bonds or any amount due in respect of any Parity Obligations or otherwise due hereunder or for any claim based thereon or on this Indenture against (a) the Giants Team or any Affiliate of StadCo, or any member, officer, director or manager of StadCo, the Giants Team or such Affiliates, or any

10662025.17

- 141 -

Person executing the Bonds, or any of their respective assets or property, or (b) any assets or property of StadCo other than the Collateral.

**Section 1310. Preservation and Inspection of Documents**. All documents received by the Trustee under the provisions of this Indenture shall be retained in its possession and shall be subject at all reasonable time to the inspection of StadCo, any other Fiduciary and the Bond Insurer.

**Section 1311. Counterparts**. This Indenture may be executed in several counterparts, each of which shall be an original and all of which together shall constitute but one and the same instrument.

**Section 1312. Compliance    by    Secured    Parties    with    NFL    Agreement**. Notwithstanding any contrary provision of this Indenture or any other Financing Document, each of the Trustee, each Bond Insurer, each Swap Insurer, the Qualified Swap Provider and the Holders of Bonds and of any Parity Obligations hereby covenants and agrees for the benefit of StadCo to comply with its respective obligations under the NFL Agreement and acknowledges and agrees that any failure by it to comply with its obligations thereunder will cause irreparable harm to StadCo for which StadCo will not have an adequate remedy at law and, accordingly, StadCo shall, in addition to any other remedy available to it at law or in equity, be entitled to temporary, preliminary and permanent injunctive relief and a decree for specific performance in the event of a breach or threatened or attempted breach, without the necessity of showing any actual damage or irreparable harm or the posting of any bond or furnishing of any security.

**Section 1313. Effective Date**. This Indenture shall be effective commencing upon its execution and delivery by the parties hereto. The date of this Indenture shall be for reference purposes only and shall not be construed to imply that this Indenture was executed on the date first above written. This Indenture was executed and delivered by the parties hereto on August 16, 2007.

[Remainder of page intentionally left blank.]

**IN WITNESS WHEREOF,** StadCo and the Trustee have caused this Indenture to be executed under seal in their respective corporate names by their duly authorized officers, all as of the date first above written.

**GIANTS STADIUM LLC**

By: _____

Name:    John K. Mara

Title:    Authorized Representative

(Signatures continued on following page)

(Signature Page to Giants Stadium LLC Indenture of Trust)

**THE BANK OF NEW YORK**, as Trustee

By: _____

Name:    Deirdre M. Lewis

Title:    Vice President

**EXHIBIT A**

Form of Requisition

**REQUISITION NO.**

TO:    _____

as Trustee

FROM:    Giants Stadium LLC

Ladies and Gentlemen:

You are requested to draw from the Construction Fund, established by Section 502 of the Indenture of Trust, dated as of August 1, 2007, as supplemented and amended (the "Indenture"), between Giants Stadium LLC (the "Company") and yourself, a check or checks, or to make a wire transfer or transfers, in the amounts, payable to the order of those persons and for the purpose of paying those costs set forth on Schedule A attached hereto. All capitalized terms used in this Requisition not otherwise defined herein shall have the meanings given such terms by the Indenture.

I hereby certify that

(1)    I am an Authorized Representative of StadCo;

(2)    the number of this Requisition is ___;

(3)    no Event of Default has occurred and is continuing under the Indenture, the Bonds, or any Parity Obligation;

(4)    the requested amount will be used solely to pay Costs of the Project or for other uses permitted by the Indenture or any Supplemental Indenture, and no part nor the whole of such amount will be taken by StadCo as a fee;

(5)    if the requisition is to pay third-party invoices from contractors, then based solely on reports received from the Design-Builder or another applicable contractor, the work for which the requisitioned funds are sought has been satisfactorily performed in all material respects in a good and workmanlike manner and according to the Design-Build Contract or other applicable contract, or if not, the amounts to be withdrawn are amounts StadCo is legally obligated to pay with respect to the current condition of the work;

(6)    to the best of StadCo's knowledge, the sum of (i) undisbursed funds in the Construction Fund, together with funds from other available sources, the remaining series of Initial Bonds not yet issued and any Completion Bonds (whether or not yet issued), and (ii) funds available to Other StadCo (including sources of Other StadCo comparable to those listed in clause (i)), are reasonably expected to be sufficient to substantially complete the Project in accordance with the Project Budget within one year of the Outside Substantial Completion Date (as the Outside Substantial Completion Date may be extended as a result of any Force Majeure Event).

10662025.17

Attached to this Requisition is a schedule of or copy of the bills, invoices or other documents evidencing and supporting this Requisition.

Dated: _____

**GIANTS STADIUM LLC**

By: _____
Name:
Title:

10662025

### SCHEDULE A TO REQUISITION NO.

| Amount | Payee (with address and, if applicable, wire instructions) | Purpose |
|--------|-----------------------------------------------------------|---------|

10662025

Receipt is hereby acknowledged of a payment in the amount of $_____ in connection with the submission of the attached Requisition.

Giants Stadium LLC


By: _____
Name:
Title:

Date: _____

**EXHIBIT A-1**

Form of IE Confirmation of Requisition

TO: _____
      as Trustee

FROM: _____
      as Independent Engineer

Ladies and Gentlemen:

    In connection with Requisition No. [ ], dated as of [ ]  (the "Requisition"), we hereby certify that (i) we have performed such inspections, analyses and other procedures as necessary, in our reasonable judgment, for the purposes of delivering this certificate to _____, as Trustee, and (ii) based on such procedures, we have no reason to believe (A) that the certifications of StadCo set forth in paragraph (5) of the Requisition are not true and correct in all material respects as of the date of the Requisition or (B) that the Project Budget used for purposes of the certifications of StadCo set forth in paragraph (6) of the Requisition is not an adequate budget for the Substantial Completion of the Project based on the facts and circumstances known to us at this time.

             Dated: _____

             _____,
             as Independent Engineer


             By: _____
               Authorized Representative

10662025

## EXHIBIT B

<u>Insurance Requirements</u>

With respect to the Project, to the extent not maintained by the JV Company, StadCo shall maintain or cause to be maintained the following types of insurance in accordance with the terms of this Exhibit B, until all obligations of StadCo pursuant to the Indenture have been fully discharged, in each case to the extent such insurance is both (a) available on commercially reasonable terms and (b) with respect to the insurances described in paragraphs 1, 2, 3, 4 and 8 of Part B covering risks that are similar in type and magnitude to the risks affecting other professional sports stadiums, typically purchased by private owners or private lessees/licensees of other professional sports stadiums.  All policies will include a waiver of the insurer's rights of subrogation against the Trustee and each Bond Insurer, and provide the Trustee, each Bond Insurer and StadCo with at least thirty (30) days prior written notice of cancellation or non-renewal.  All policies will name the Trustee, StadCo and each Bond Insurer as additional insureds, except for any policies where it is not commercially customary or practicable to so name them.  Insurance required to be provided hereunder may be effected by so-called "blanket" or umbrella policies of insurance covering the Project and other properties owned or leased by StadCo, the JV Company and/or their respective Affiliates, provided that such policies otherwise comply with the requirements set forth below and specifically allocate to the Project the amount of coverage herein required without risk of reduction or coinsurance by reason of, or damage to, such other properties insured thereunder, or by policies made available by the NFL or its Affiliates.  Insurance required by this Exhibit B will be placed only with insurers with Required Ratings (as defined below).  The Controlling Bond Insurer shall act reasonably when reviewing the request for an insurer without Required Ratings, having regard to the then current state of the insurance market.  (Capitalized terms used herein and not otherwise defined are defined in the Ground Lease.)

"Required Ratings" means, with respect to any insurance company, that such company has at the time of the placement or renewal of insurance a financial strength rating of (a) 'AA-' or better by S&P, (b) 'Aa3' or better by Moody's, or (c) both (1) 'A(IX)' or better from A.M. Best and (2) either 'A' or better by S&P, 'A2' or better by Moody's or 'AA-' or better by Fitch.

A. INSURANCE REQUIRED PRIOR TO SUBSTANTIAL COMPLETION

1.      Commercial General Liability (CGL) in an amount not less than $2,000,000 per occurrence.  The policy will cover liability arising from Premises, operations, independent contractors, products-completed operations, personal injury and advertising injury and liability assumed under an insured contract including, but not limited to, the Ground Lease.  If the policy contains a pollution exclusion, StadCo shall maintain or cause the JV Company's general contractor to maintain a separate pollution legal liability policy in such amount covering clean-up costs, bodily injury and property damage.

2.      Automobile liability insurance for all owned, non-owned and hired vehicles insuring against bodily injury, including death, and property damage in an amount not less than $1,000,000 per occurrence.

10662025.17

3.      Umbrella and/or Excess Liability insurance sufficient to provide total liability limits of $100,000,000 for General Liability, Auto Liability and Employer's Liability.  The coverage of the excess liability policy shall follow the form or otherwise correspond to the form of the primary policy.

4.      Statutory Worker's Compensation coverage including Employer's Liability limits of not less than $1,000,000 each accident for bodily injury by accident and $1,000,000 per employee for bodily injury by disease.

5.      Builder's Risk insurance covering the Improvements in an amount not less than the full completed value of the Project.  The policy shall be written on an "All Risk" form and provide coverage for the perils of flood and earthquake, separately in an aggregate amount not less than $250,000,000.  The policy shall include coverage for debris removal, demolition and increased cost of construction, interruption by civil or military authority, ingress/egress and terrorism coverage to the extent offered and available under the Federal Terrorism Risk Insurance Act (as extended under the Terrorism Risk Insurance Extension Act of 2005).

6.      Boiler & Machinery insurance covering all boilers and mechanical equipment when connected and ready for use and following electrical, hydrostatic, pneumatic or gas pressure acceptance tests, in an amount not less than $25,000,000.

7.      Owners Protective Professional Indemnity insurance with a minimum limit of $4,000,000 for each claim and annual aggregate applicable solely to the Project.  The policy shall be endorsed to provide for an extended reporting period on claims for three (3) years past the Completion Date.

B. INSURANCE REQUIRED POST-CONSTRUCTION

1.      Commercial General Liability (CGL) in an amount not less than $1,000,000 per occurrence.  CGL insurance shall cover liability arising from the Premises, operations, independent contractors, product-completed operations, personal injury and advertising injury, liquor liability and liability assumed under an insured contract including this Agreement.  If the Commercial General Liability (CGL) policy provided hereunder shall exclude pollution liability, StadCo shall furnish or caused to be furnished a separate pollution liability policy insuring against liability for bodily injury, property damage and clean-up costs.

2.      Automobile Liability insurance for all owned, non-owned and hired vehicles insuring against bodily injury, including death, and property damage in an amount not less than $1,000,000 per occurrence.

3.      Statutory Workers' Compensation coverage including Employer's Liability limits of not less than $1,000,000 each accident for bodily injury by accident and $1,000,000 per employee for bodily injury by disease.

4.      Umbrella and/or Excess Liability insurance sufficient to provide total liability limits of $100,000,000 for Commercial General Liability, Automobile Liability and Employer's Liability. The coverage of the excess liability policy shall follow the form, or otherwise correspond to the form, of the primary policy or policies.

10662025.17

5.    "All Risk of Physical Loss" property insurance on all Improvements in an amount not less than the full replacement cost (determined without regard to depreciation of any Improvements and exclusive of foundations and footings) of the insured property.  The policy shall provide coverage for loss or damage by fire, lightning, windstorm, hail, explosion, riot, civil commotion, aircraft, vehicles, smoke, other risks from time to time included under "all risk" or "extended coverage" policies, earthquake, flood (provided, that earthquake and flood coverage may be subject to an annual aggregate limit of not less than $100,000,000), certified and/or non-certified terrorism (provided that terrorism coverage may be subject to an annual aggregate limit of not less than $500,000,000), sabotage, collapse, sinkhole, subsidence and such other similar perils.  The policy shall also include coverage for debris removal, demolition and increased cost of construction, interruption by civil or military authority, and ingress/egress.

6.    Business interruption insurance shall be maintained under the property and the boiler and machinery insurance (or separate business interruption insurance shall be maintained by StadCo covering all the same risks as the property and boiler and machinery insurance) in an amount not less than Annual Fixed Expenses (as defined below), *provided* that if, at any time, the amount of Annual Fixed Expenses exceeds the difference between (a) contractually-committed Pledged Revenue for the current fiscal year minus (b) any portion of such contractually-committed Pledged Revenue that would not have been due or would have been refundable during such fiscal year assuming no games were played at the Stadium during such fiscal year because of a casualty event (such excess, the "BI Shortfall"), the minimum amount of business interruption insurance required pursuant to this paragraph 6 shall be increased by the BI Shortfall.  Under no circumstances will the minimum amount of business interruption insurance required pursuant to this paragraph 6 exceed an amount equal to 200% of Annual Fixed Expenses.  "Annual Fixed Expenses" means, at any time, 50% of the aggregate projected amount of Debt Service and operating expenses (assuming no football games are played at the Stadium) for the then current and immediately succeeding fiscal year.

7.    Boiler and Machinery Insurance, applying to the entire heating, ventilating and air-conditioning systems in an amount not less than the full replacement value of such heating, ventilating and air conditioning systems, located on any portion of the Stadium and other machinery located on such portion of the Stadium.  Such boiler and machinery insurance can be included in the all risk property policy described above.  In the event that the boiler and machinery is not included in the all risk property policy, then both the all risk property policy and the boiler and machinery policy shall contain a joint loss agreement, if applicable.

8.    Garagekeeper's liability insurance with aggregate and per occurrence limits of at least $1,000,000.

C.  PROBABLE MAXIMUM LOSS STUDY

At least six months prior to Substantial Completion, StadCo shall procure or cause to be procured a Probable Maximum Loss (PML) study from an independent third-party insurance consultant reasonably approved by the Controlling Bond Insurer to assess appropriate levels of earthquake and flood insurance.  If such study concludes that the limits or amounts required above are insufficient or excessive, then the applicable provisions of Part B of this Exhibit shall be amended accordingly.

10662025.17

## D. AVAILABILITY OF INSURANCE COVERAGE

StadCo will notify each Bond Insurer promptly in the event of any determination that it will not procure the insurance listed in Part A or Part B of this Exhibit because StadCo has concluded that such insurance is at any time (a) not available on commercially reasonable terms or (b) with respect to any insurances described in paragraphs 1, 2, 3, 4 and 8 of Part B covering risks that are similar in type and magnitude to the risks affecting other professional sports stadiums, not typically purchased by private owners or lessees of other professional sports stadiums. Upon the request of the Controlling Bond Insurer, StadCo shall (or shall cause the JV Company to) engage an independent third-party insurance consultant reasonably approved by the Controlling Bond Insurer to advise StadCo and the Controlling Bond Insurer whether such coverage is obtainable on commercially reasonable terms and/or is typically purchased by private owners or lessees of other professional sports stadiums. The advice of the independent third-party insurance consultant shall be for informational purposes and not binding on any party. Notwithstanding anything to the contrary, StadCo shall continue to be obligated to promptly obtain the maximum insurance listed in Part A or B, as applicable, that is both (a) obtainable on commercially reasonable terms and (b) with respect to any of the insurances described in paragraphs 1, 2, 3, 4 and 8 of Part B covering risks that are similar in type and magnitude to the risks affecting other professional sports stadiums, typically purchased by private owners or lessees/licensees of other professional sports stadiums.

## E.    CURE PERIOD

Notwithstanding any contrary provision of the Indenture, no failure to obtain or maintain any insurance specified in Part A or Part B of this Exhibit, or to comply with the other provisions of this Exhibit B, shall constitute an Event of Default unless such failure is material and has continued uncured for a period of 30 days.

**EXHIBIT C**

[Form of Deposit Account Control Agreement]

10662025.17

# DEPOSIT ACCOUNT CONTROL AGREEMENT

This Agreement is entered into and effective as of _____, 20__ among JETS STADIUM DEVELOPMENT, LLC, a Delaware limited liability company ("Company"), THE BANK OF NEW YORK, a New York banking corporation having an office at 101 Barclay Street, New York, New York 10286, as trustee under the Indenture (as defined below) (together with any successor trustee, the "Trustee"), and _____ ("Bank") with respect to the following:

A.    Bank has agreed to establish and maintain for Company deposit account numbers _____ (together with all cash and other items of value deposited, credited or otherwise held in such accounts and proceeds of any of the foregoing, collectively, the "Account").

B.    Company has granted to Trustee a security interest in the Account and in checks and other payment instructions ("Checks") deposited in the Account pursuant to the Pledge, Assignment and Security Agreement dated as of _____, 2007 for the Trustee's benefit and the benefit of the bondholders under that certain Indenture of Trust, dated as of _____, 2007, between the Company and the Trustee (the "Indenture").

C.    Company, Trustee and Bank are entering into this Agreement, as required by the Indenture, to perfect Trustee's security interest in the Account and such Checks and to provide for the disposition of funds in the Account.

Accordingly, Company, Trustee and Bank agree as follows:

1.    (a)    This Agreement evidences Trustee's control over the Account. Notwithstanding anything to the contrary in the agreement between Bank and Company governing the Account, Bank will comply with instructions originated by Trustee as set forth herein directing the disposition of funds in the Account without further consent of the Company.

(b)    Company represents and warrants to Trustee and Bank that it has not assigned or granted a security interest in the Account or any Check deposited in the Account, except to Trustee.

(c)    Company will not permit the Account to become subject to any other pledge, assignment, lien, charge or encumbrance of any kind, other than Trustee's security interest referred to herein.

2.    During any Activation Period (as defined below), Bank shall prevent Company from making any withdrawals from the Account. When no Activation Period is in effect, Company may operate and transact business through the Account in its normal fashion, including making withdrawals from the Account, but covenants to Trustee it will not close the Account unless the

10629859

- 2 -

provisions of Section 501 of the Indenture are complied with. Bank shall have no liability in the event Company breaches this covenant to Trustee.

Company and Trustee acknowledge and agree that Bank may debit the Account for any ACH credit entries (the "Entries") that may have been originated by Company but that have not settled at the time of Bank's receipt of any Activation Notice (defined below) or for any Entries that are subsequently returned thereafter.

Promptly following the commencement of any Activation Period and in any event within two Business Days after such date, and continuing on each Business Day thereafter until the next following Deactivation (as defined below), if any, Bank shall transfer all collected and available balances in the Account to Trustee at the following account (as also specified in the Activation Notice (as defined below)):

| | |
|---|---|
| Bank Name: | _____ |
| Bank Address: | _____ |
| ABA No.: | _____ |
| Account Name: | _____ |
| Account No.: | _____ |
| Beneficiary's Name: | _____ |

Such transfers to be made even if they result in the dishonoring by the Bank of items presented for payment from the Account or the Bank not complying with the instructions of the Company.

The "Activation Period" means the period which commences within a reasonable period of time not to exceed two Business Days after Bank's receipt of a written notice from Trustee in the form of Exhibit A (the "Activation Notice") and ends upon Bank's receipt of a written notice from Trustee in the form of Exhibit B (the "Deactivation Notice" and, such ending, "Deactivation"). A "Business Day" is each day except Saturdays, Sundays and Bank holidays. Funds are not available if, in the reasonable determination of Bank, they are subject to legal process preventing their withdrawal. Trustee covenants to Company that it will only give Bank an Activation Notice upon the occurrence and during the continuance of an event described in Section 509(a) of the Indenture; that it will immediately give Bank a Deactivation Notice upon the waiver, cure or other cessation of such event; and that it will give Company a contemporaneous copy of any such notice it gives to Bank.

Notwithstanding anything in this Agreement to the contrary, the Controlling Bond Insurer (so long as the Controlling Bond Insurer is not in material default of its obligations under the Bond Insurance Policy issued by it) may exercise any of the rights and remedies of Trustee hereunder, and shall have the right, at any time, to direct the method and place of conducting all actions to be taken by the Trustee in connection with the enforcement of the terms and conditions of this Agreement; provided, however, that such direction shall not be otherwise than in accordance with the provisions of the NFL Agreement (as defined in the Indenture), Applicable Law (as defined in the Indenture) and the Indenture.

- 3 -

3.      Bank agrees it shall not offset, charge, deduct or otherwise withdraw funds from the Account for its own benefit, except as permitted by Section 4, until it has been advised in writing by Trustee that all of Company's obligations that are secured by the Checks and the Account are paid in full.  Trustee shall notify Bank promptly in writing upon payment in full of Company's obligations.

4.      Bank is permitted to charge the Account:

            (a)      for its normal service charges or fees in connection with the Account as agreed to with Company;

            (b)      for the face amount of any Check deposited into the Account and returned unpaid for any reason; and

            (c)      for its reasonable fees and expenses in connection with the administration of this Agreement by the Bank as agreed to with Company.

5.      (a)      If the balances in the Account are not sufficient to compensate Bank for any fees or charges due Bank in connection with the Account or this Agreement as agreed to with Company, Company agrees to pay Bank on demand the amount due Bank.

            (b)      If the balances in the Account are not sufficient to compensate Bank for any returned Check, Company agrees to pay Bank on demand the amount due Bank.

6.      (a)      Bank will send information regarding deposits to the Account to the address specified below for Company or as otherwise specified in writing by Company to Bank.

            (b)      Concurrent with the original Bank statement periodically provided to Company, Bank will provide Trustee with a duplicate of such statement.

            (c)      Company authorizes Bank to provide to the Trustee any other information concerning the Account that the Bank may agree to provide to the Trustee at the Trustee's request.

7.      (a)      Bank will not be liable to Company or Trustee for any expense, claim, loss, damage or cost ("Damages") arising out of or relating to its performance under this Agreement other than those Damages which result directly from its acts or omissions constituting negligence or intentional misconduct.

            (b)      In no event will Bank be liable for any special, indirect, exemplary or consequential damages, including but not limited to lost profits.

            (c)      Bank will be excused from failing to act or delay in acting, and no such failure or delay shall constitute a breach of this Agreement or otherwise give rise to any liability of Bank, if (i) such failure or delay is caused by circumstances beyond Bank's reasonable control, including but not limited to legal constraint, emergency conditions, action or inaction of governmental, civil or military authority, fire, strike, lockout or other labor dispute, war, riot, theft, flood, earthquake or other natural disaster, breakdown of public or private or common

10629859

- 4 -

carrier communications or transmission facilities, equipment failure, or negligence or default of
Company or Trustee or (ii) such failure or delay resulted from Bank's reasonable belief that the
action would have violated any guideline, rule or regulation of any governmental authority.

(d)     Bank shall have no duty to inquire or determine whether Company's
obligations to Trustee are in default or whether Trustee is entitled to provide any Activation
Notice or Deactivation Notice to Bank. Bank may rely on notices and communications it believes
in good faith to be genuine and given by the appropriate party.

(e)     Notwithstanding any of the other provisions in this Agreement, in the event
of the commencement of a case pursuant to Title 11, United States Code, filed by or against
Company, or in the event of the commencement of any similar case under then applicable federal
or state law providing for the relief of debtors or the protection of creditors by or against
Company, Bank may act as Bank deems necessary to comply with all applicable provisions of
governing statutes and shall not be in violation of this Agreement as a result.

(f)     Bank shall be permitted to comply with any order, judgment, decree or
injunction or a restraining order or other legal process directing or prohibiting or otherwise
restricting the disposition of funds in the Account or any Check and shall not be in violation of
this Agreement for so doing.

8.     Company shall indemnify Bank against, and hold it harmless from, any and all liabilities,
claims, costs, expenses and damages of any nature (including but not limited to allocated costs of
staff counsel, other reasonable attorneys' fees and any fees and expenses) in any way arising out
of or relating to disputes or legal actions concerning Bank's provision of the services described in
this Agreement.  This section does not apply to any cost or damage attributable to the gross
negligence or intentional misconduct of Bank.  Company's obligations under this section shall
survive termination of this Agreement.

9.     Company shall pay to Bank, upon receipt of Bank's invoice, all reasonable third party
costs, expenses and attorneys' fees incurred by Bank in connection with the enforcement of this
Agreement and any instrument or agreement required hereunder, including but not limited to any
such costs, expenses and fees arising out of the resolution of any conflict, dispute, motion
regarding entitlement to rights or rights of action, or other action to enforce Bank's rights in a
case arising under Title 11, United States Code.  Company agrees to pay Bank, upon receipt of
Bank's invoice, all reasonable third party costs, expenses and attorneys' fees incurred by Bank in
the preparation and administration of this Agreement (including any amendments hereto or
instruments or agreements required hereunder).

10.    Termination and Assignment of this Agreement shall be as follows:

(a)     Trustee may terminate this Agreement by providing notice to Company and
Bank that all of Company's obligations which are secured by Checks and the Account are paid in
full. Bank may terminate this Agreement upon 30 days' prior written notice to Company, Trustee
and Controlling Bond Insurer; provided that, prior to the effective date of termination, (i) Bank (x)
transfers to Trustee all funds in the Account to the Trustee Revenue Fund established by Trustee
pursuant to the terms of the Indenture or (y) transfers all funds in the Account to an account

10629859

- 5 -

designated by the Company which is subject to a Deposit Account Control Agreement to which Trustee, Company and the relevant depository bank are parties; and (ii) Bank and Company close the Account. Company may not terminate this Agreement unless the provisions of Section 501 of the Indenture are complied with.

(b)    Notwithstanding subsection 10(a), Bank may terminate this Agreement at any time after ten (10) Business Days' written notice to Company and Trustee if either Company or Trustee breaches any of the terms of this Agreement in favor of Bank and such breach is not cured prior to the end of such ten (10) Business Day period; provided that, prior to the effective date of termination, clauses (i) and (ii) in subsection 10(a) are complied with. The Trustee shall forward to the Controlling Bond Insurer (as defined in the Indenture) a copy of the termination notice.

11.    Each party represents and warrants to the other parties that (i) this Agreement constitutes its duly authorized, legal, valid, binding and enforceable obligation; (ii) the performance of its obligations under this Agreement and the consummation of the transactions contemplated hereunder will not (A) constitute or result in a breach of its certificate or articles of incorporation or formation, by-laws or partnership, limited liability company or operating agreement, as applicable, or the provisions of any material contract to which it is a party or by which it is bound or (B) result in the violation of any law, regulation, judgment, decree or governmental order applicable to it; and (iii) all approvals and authorizations required to permit the execution, delivery, performance and consummation of this Agreement and the transactions contemplated hereunder have been obtained.

12.    (a)    This Agreement may be amended only by a writing complying with Section 1202 of the Indenture and signed by Company, Trustee and Bank.

(b)    This Agreement may be executed in counterparts; all such counterparts shall constitute but one and the same agreement.

(c)    This Agreement controls in the event of any conflict between this Agreement and any other document or written or oral statement. This Agreement supersedes all prior understandings, writings, proposals, representations and communications, oral or written, of any party relating to the subject matter hereof.

(d)    If a provision of this Agreement is held invalid or unenforceable in any respect, the validity or enforceability of the remaining provisions will not in any way be affected, it being understood that the invalidity or unenforceability of an affected provision in a particular jurisdiction will not in and of itself affect the validity or enforceability of the provision in any other jurisdiction.

(e)    This Agreement shall be governed by and interpreted in accordance with the laws of the State of _____ (without reference to conflicts of laws principles). Regardless of any provision in any other agreement, for purposes of the Uniform Commercial Code as in effect from time to time in any relevant state (the "UCC"), New Jersey shall be deemed to be the Bank's jurisdiction (within the meaning of Section 9-304 of the UCC).

- 6 -

(f)    **TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH PARTY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, CLAIM OR PROCEEDING (INCLUDING ANY COUNTERCLAIM) OF ANY TYPE ARISING OUT OF OR DIRECTLY OR INDIRECTLY RELATING TO THIS AGREEMENT.**

13.    Any written notice or other written communication to be given under this Agreement shall be addressed to each party at its address set forth on the signature page of this Agreement or to such other address as a party may specify in writing.  Except as otherwise expressly provided herein, any such notice shall be effective upon receipt.

14.    Nothing contained in the Agreement shall create any agency, fiduciary, joint venture or partnership relationship between Bank and Company or Trustee.  Company and Trustee agree that nothing contained in this Agreement, nor any course of dealing among the parties to this Agreement, shall constitute a commitment or other obligation on the part of Bank to extend credit to Company or Trustee.

15.    In the event that the Bank has or subsequently obtains by agreement, by operation of law or otherwise a security interest in the Account or any Checks, the Bank hereby agrees that such security interest shall be subordinate to the security interests of the Trustee under the Indenture and this Agreement.  Except as permitted under Section 4 of this Agreement, Checks and other items credited to the Account will not be subject to deduction, set-off, banker's lien, recoupment or any other right in favor of any person other than the Trustee.    Nothing herein shall affect Company's obligations under the Indenture to (i) keep and maintain the Account and Checks free from all liens, security interests and encumbrances other than in favor of the Trustee and as permitted by the Indenture, and (ii) to do all acts which the Trustee reasonably deems necessary or desirable to create, perfect, maintain and protect the Trustee's security interest in and lien on the Account and Checks and the priority thereof.

16.    NFL Requirements.    It is acknowledged, understood and agreed that, so long as the letter agreement, dated as of _____, 2007, by and among the NFL and Jets Stadium Development, LLC, New Meadowlands Stadium Company, LLC, Secured Party, each Bond Insurer and the other parties thereto (the "NFL Letter Agreement"; all capitalized terms used in this NFL Requirements Section and not defined in this Section are defined in the NFL Letter Agreement) is in effect, and notwithstanding anything in this document or any other Operative Document to the contrary, (a) the exercise by the Trustee of remedies with respect to the Collateral under any Operative Document will be made in accordance with the terms and provisions of the NFL Letter Agreement, the terms, conditions and provisions of which each of the parties to any Operative Document has accepted as reasonable and appropriate, and (b) in the event of any conflict or inconsistency between the terms of the NFL Letter Agreement and the terms of any Operative Document (including without limitation this Agreement), the terms of the NFL Letter Agreement will control.

[Signature Page to Deposit Account Control Agreement]

In Witness Whereof, the parties hereto have executed this Agreement by their duly authorized officers as of the day and year first above written.

**Jets Stadium Development, LLC
("Company")**


By: _____          Address for notices:
Name: Thad Sheely
Title:   Vice President and Treasurer

10629859

[Signature Page to Deposit Account Control Agreement]

In Witness Whereof, the parties hereto have executed this Agreement by their duly authorized officers as of the day and year first above written.


**The Bank of New York, as Trustee ("Trustee")**


By: _____          Address for notices:

Name: _____

Title: _____

[Signature Page to Deposit Account Control Agreement]

In Witness Whereof, the parties hereto have executed this Agreement by their duly authorized officers as of the day and year first above written.

_____

**("Bank")**

By: _____        Address for notices:
Name: _____
Title: _____

10629859

**EXHIBIT A**
**DEPOSIT ACCOUNT CONTROL AGREEMENT**

[Letterhead of Trustee]

To:    [Bank]
       [Address]
       Attention:  [Person or department]

          Re:    [Name of Company]
                Account No._____

Ladies and Gentlemen:

Reference is made to the Deposit Account Control Agreement dated _____ (the "Agreement") among Jets Stadium Development, LLC, us and you regarding the above-described account (the "Account").  Please be advised that (a) an event has occurred under Section 509(a) of the Indenture, (b) the undersigned is entitled, under the Indenture, to deliver this Activation Notice and (c) our delivery of this Activation Notice is consistent with the NFL Agreement (as defined in the Indenture).  You are hereby instructed not to accept any direction, instructions or orders with respect to the Account or the assets credited thereto from any person other than the undersigned unless otherwise ordered by a court of competent jurisdiction.  In accordance with Section 2 of the Agreement, we hereby give you notice of our exercise of control of the Account and we hereby instruct you to transfer funds to our account as follows:

Bank Name:          _____
Bank Address:       _____
ABA No.:            _____
Account Name:      _____
Account No.:         _____
Beneficiary's Name:  _____

10629859

- 11 -

Very truly yours,

THE BANK OF NEW YORK
as Trustee

By: _____
Name: _____
Title: _____

**EXHIBIT B**
**DEPOSIT ACCOUNT CONTROL AGREEMENT**


[Letterhead of Trustee]


To:     [Bank]
        [Address]
        Attention:  [Person or department]

            Re:     [Name of Company]
                    Account No._____


Ladies and Gentlemen:

        Reference is made to the Deposit Account Control Agreement dated _____
(the "Agreement") among Jets Stadium Development, LLC, us and you regarding the above-
described account (the "Account").    You are hereby notified that the Notice dated
_____ and previously delivered to you has ceased to be in effect.    Effective
immediately, you may accept direction, instructions or orders with respect to the Account or the
assets credited thereto from the Company unless and until you receive a further Notice from us.

                        Very truly yours,


                        THE BANK OF NEW YORK
                        as Trustee


                        By: _____
                        Name: _____
                        Title: _____


10629859

**EXHIBIT D**

Indebtedness

Bridge loan pursuant to a Credit Agreement, dated as of April 30, 2007, with an outstanding principal balance of $51,500,000.00 and interest thereon in the amount of $591,611.93 from Goldman Sachs Credit Partners, L.P. to Giants Stadium LLC.

**EXHIBIT E**

[Consents & Approvals]

10662025.17

NEW MEADOWLANDS STADIUM PROJECT
STATUS OF PERMITS AND APPROVALS

NMS DRAFT - August 10, 2007

| PERMIT/APPROVAL | NMSEA LEAD CONTACT | SUBMITTAL DATE TO NMSEA | REQUEST FOR MODIFICATION OR INCORPORATION OF COMMENTS FROM NMSEA | RESUBMITTAL DATE TO NMSEA | NMSEA ACCEPTANCE DATE (AGENCY SUBMITTAL) | STATUS | ISSUANCE OF PERMITS* |
|---|---|---|---|---|---|---|---|
| 1. U.S. Army Corps of Engineers, New York District (USACE) Jurisdictional Determination | John Duffy | 6/29/06 | 7/11/06 & 7/12/06 | N/A | To USACE on 7/28/06 | Site visit held with USACE 11/22/06. Formal JD letter to be issued by USACE. | No permit required |
| 2. Federal Aviation Administration (FAA) Notice of Proposed Construction or Alteration | John Duffy | 10/27/06 | 11/7/06 | N/A | To FAA on 11/13/06 | Application submitted for stadium building. Public notice issued by FAA on 12/29/06 for ongoing aeronautical study; public comment period ended 2/9/07. Application submitted for construction cranes on 7/25/07. | Determination of No Hazard to Air Navigation issued for Stadium building 2/14/07 Determination of No Hazard to Air Navigation issued for construction cranes 8/6/07 |
| 3. New Jersey Meadowlands Commission (NJMC) and New Jersey Department of Environmental Protection (NJDEP) Consultation Process | John Duffy | Various | Various | Various | PEIS to NJDEP and NJMC on 10/23/06 FEIS to NJDEP and NJMC on 2/2/07 | PEIS submitted 10/23/06. Public hearing with NJMC/NJDEP held 12/13&14/06. Public comment period 11/6/06 through 1/15/07. FEIS submitted to NJMC and NJDEP on 2/2/07. Public notice of FEIS availability issued by NJMC/NJDEP 2/16/07. Coordination meeting held with NJDEP on 2/14/07. | Hearing Officer's Report issued 4/3007 |
| 4. Master Plan Approval Process | John Duffy | Various | Various | Various | September 2006 (Preliminary Master Plan) March 2007 (Final Master Plan) | Preliminary and Final Master Plan approvals have been granted by NJMEA Board in October 2006 and April 2007 respectively. Resolution authorizing NMS to begin construction approved July 2007. Additional final submissions pending. | N/A |

| PERMIT/APPROVAL | NJSEA LEAD CONTACT | SUBMITTAL DATE TO NJSEA | REQUEST FOR MODIFICATION OR INCORPORATION OF COMMENTS FROM NJSEA | RESUBMITTAL DATE TO NJSEA | NJSEA ACCEPTANCE DATE (AGENCY SUBMITTAL) | STATUS | ISSUANCE OF PERMITS* |
|---|---|---|---|---|---|---|---|
| 5. NJDEP Stream Encroachment Permit | John Duffy | 11/22/06 | 12/6/06 & 12/15/06 | N/A | To NJDEP on 12/29/06 | Application submitted 12/29/06. Jurisdictional Determination request submitted to NJDEP concerning Waterfront Development and Coastal Zone Management Consistency Determination on 1/25/07. Meeting held with NJDEP 1/23/07. Application complete 1/2/07; under 90-day rule decision required by 4/2/07. | Stream Encroachment Permit issued 3/21/07; Jurisdictional Determination letter confirming no need for Waterfront Development permit issued 3/7/07 |
| 6. NJDEP Water Quality Management Plan Consistency Determination | John Duffy | 10/27/06 | 11/7/06 | N/A | To NJDEP on 1/4/07 | Application submitted 1/4/07. Letter from NJDEP received 3/28/07 requesting evaluation of feasibility of using wastewater recycling treatment system. | Consistency determination issued 6/1/07 |
| 7. NJDEP Remedial Action Work Plan Approval (Preliminary Assessment, Site Investigation Report, Remedial Action Work Plan, Soil Reuse Plan, Methane Investigation, HazMat Report for Giants Stadium) | John Duffy | 4/17/06 | 5/8/06 | 5/12/06 | PA, SI/RAWP, Soil Reuse Plan and Methane Investigation to NJDEP on 5/12/06 | NJDEP comment letter issued 8/9/06. Response to NJDEP letter submitted 12/12/06. Supplemental Site Investigation Report drafted; sent to NJSEA 3/1/07 for review. Perimeter Air Monitoring Plan submitted to NJDEP 4/9/07. Verbal approvals provided by NJDEP to move forward. | Approval of Remedial Action Work Plan issued 6/28/07 |
| 8. Brownfields Redevelopment Agreement Application | Ed Shea / Steve Gray | 12/15/06 | 12/20/06 | | To NJCEGTC on 1/12/07 | Agreement submitted to the NJ Commerce, Economic Growth and Tourism Commission on 1/12/07. Meeting held 2/15/07 with NJCEGTC and NJ Dept of Treasury. Amended application submitted 3/14/07. | Application approved 5/2/07 |
| 9. TWA1 – NJDEP Treatment Works Approval (TWA) for sewer line relocation for early construction | John Duffy | 8/4/06 | 8/11/06 | 9/5/06 | To NJDEP on 9/12/06 | Application completed and signed by NJSEA. Sent to NJDEP 9/12/06. Application sent to East Rutherford for endorsement on 9/12/06. Endorsement from East Rutherford obtained 2/19/07. Revised application submitted to NJDEP 4/2/07. | TWA permit issued 4/20/2007 |

| PERMIT/APPROVAL | NSEA LEAD CONTACT | SUBMITTAL DATE TO NSEA | REQUEST FOR MODIFICATION OR INCORPORATION OF COMMENTS FROM NSEA | RESUBMITTAL DATE TO NSEA | NSEA ACCEPTANCE DATE (AGENCY SUBMITTAL) | STATUS | ISSUANCE OF PERMITS* |
|---|---|---|---|---|---|---|---|
| 10. TWA2 - NJDEP TWA for additional project flows and revised sanitary collection system | John Duffy | 9/1/06 | 9/19/06 | 10/13/06 | To NJDEP on 1/19/07 | Application submitted to NJDEP on 1/19/07. Application submitted to East Rutherford for endorsement on 1/19/07. Revised application sent to East Rutherford 3/19/07. Application sent to BCUA on 3/23/07 for endorsement. East Rutherford and BCUA endorsements received 4/26/07 and sent to NJDEP. | TWA permit issued 6/21/07 |
| 11. NJDEP New Jersey Pollutant Discharge Elimination System (NJPDES) Permit and TWA for construction dewatering | John Duffy | 12/20/06 | 1/8/07 | N/A | To NJDEP 1/1/07 | NJPDES application submitted to NJDEP 1/17/07. TWA application submitted 3/8/07 to NJDEP and to East Rutherford for endorsement. Endorsement received from East Rutherford 4/26/07 and sent to NJDEP. | NJPDES permit issued 2/22/07; TWA issued 5/24/07 |
| 12. NJDEP Water Main Extension Certification | John Duffy | 10/30/06 | 11/17/06 | | To NJDEP on 1/31/07 | Application submitted to NJDEP and United Water on 1/31/07. Revised application submitted 4/5/07 to United Water. Final application submitted to NJDEP 6/15/07. | Water Main certification approval expected August 2007 |
| 13. New Jersey Department of Community Affairs (NJDCA) Boring Variation Request and Plan Approvals | John Duffy | | | | | Site utility and pile/pile cap packages submitted to DCA in March 2007; additional packages to be prepared and submitted. | DCA issued approvals for pile work and site utilities |
| 14. Bergen Soil Conservation District Soil Erosion and Sediment Control Plan Certification and NJPDES General Permit for Construction Activity Stormwater | John Duffy | 1/23/07 | 1/29/07 | N/A | | Application submitted to BCSCD 2/26/07. Revised plans submitted 3/30/07. | Certification approval issued 5/1/07 |
| 15. New Jersey Department of Transportation (NJDOT) Major Access Permit | John Duffy | | | | Application submitted to DOT 8/8/06 | Major Access Permit Application/Scope of Study documentation submitted 8/8/06 to NJDOT; revised Scope of Study submitted 11/7/06; NJDOT approved Scope of Study by letter dated 12/20/06; revised Traffic Study submitted to NJDOT 2/2/07; deed submitted. | Approval expected August 2007 |

| PERMIT/APPROVAL | NJSEA LEAD CONTACT | SUBMITTAL DATE TO NJSEA | REQUEST FOR MODIFICATION OR INCORPORATION OF COMMENTS FROM NJSEA | RESUBMITTAL DATE TO NJSEA | NJSEA ACCEPTANCE DATE (AGENCY SUBMITTAL) | STATUS | ISSUANCE OF PERMITS* |
|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |

| PERMIT/APPROVAL | LEAD CONTACT | SUBMITTAL DATE TO NJSEA | REQUEST FOR MODIFICATION OR INCORPORATION OF COMMENTS FROM NJSEA | RESUBMITTAL DATE TO NJSEA | NJSEA ACCEPTANCE DATE (AGENCY SUBMITTAL) | STATUS | ISSUANCE OF PERMITS* |
|---|---|---|---|---|---|---|---|
| 16. NJ DCA<br>Site Underground Electrical Utilities Permit | Tom Webb | 2/15/07 | | | 5/11/07 | Permit # 07-0262 | 5/11/07 |
| 17. NJ DCA<br>Pile Permit | Tom Webb | 3/16/07 | 5/4/07 | 5/10/07 | 5/21/07 | Permit #07-0262 | 5/21/07 |
| 18. NJ DCA<br>Trailer Permits – Electrical & Plumbing | Tom Webb | | | | 5/31/07 | Permits #07-0302 (Safety Trailer), 07-0296 (#1), 07-0297 (#2), 07-0298 (#3), 07-0299 (#4), 07-0300 (#5), 07-0301 (#6), 07-0361 (Conf Rm) | 5/31/07 – Offices<br>6/19/07 – Conf Rm |
| 19. NJ DCA<br>Temporary Electric Permit | Tom Webb | 5/4/07 | 5/9/07 | 5/16/07 | 6/6/07 | Permit #07-0284 | 6/6/07 |
| 20. NJ DCA<br>Footing/Foundation Permit | Tom Webb | 3/16/07 | 5/4/07 | | 6/6/07 | Permit #07-0262A | 6/6/07 |
| 21. NJ DCA<br>Building Underground Electrical Permit | Tom Webb | 3/1/07 | 4/5/07 | 4/11/07 | 6/25/07 | Permit #07-0262+B | 6/25/07 |
| 22. NJDCA<br>Building Underground Plumbing Permit | Tom Webb | 3/16/07 | Numerous, latest 8/1/07 | Numerous, latest 8/3/07 | | Ewing Cole met with Plumbing plan reviewer at DCA on 8/1/07 | Anticipated week of 8/6/07 |
| 23. NJ DCA<br>Underground Electrical Ductbank Permit | Tom Webb | | | | 6/27/07 | Permit #07-0262+C | 6/27/07 |
| 24. NJDCA<br>Escalator Demolition – Gate B | Tom Webb | | | | 6/20/07 | Permit #07-0365 | 6/20/07 |
| 25. NJDCA<br>Electrical – Rackout Switch at TSS-2 SS | Tom Webb | | | | 7/6/07 | Permit #07-0284+A | 7/6/07 |
| 26. NJDCA<br>Electrical Work – Trailer Lot | Tom Webb | | | | 7/12/07 | Permit #07-0418 | 7/12/07 |
| 27. NJDCA<br>Trailer Decks | Tom Webb | | | | 7/18/07 | Permits #07-0296 (#1), 07-0297 (#2), 07-0298 (#3), 07-0299 (#4), 07-0300 (#5), 07-0301 (#6), 07-0361 (Conf Rm) | 7/18/07 |
| 28. NJDCA<br>Structural Permit – Structural Steel | Tom Webb | 7/10/07 | | | | | |

| PERMIT/APPROVAL | LEAD CONTACT | SUBMITTAL DATE TO NJSEA | REQUEST FOR MODIFICATION OR INCORPORATION OF COMMENTS FROM NJSEA | RESUBMITTAL DATE TO NJSEA | NJSEA ACCEPTANCE DATE (AGENCY SUBMITTAL) | STATUS | ISSUANCE OF PERMITS* |
|---|---|---|---|---|---|---|---|
| PROJECTED Plan Reviews/Permits (Approx.) | | | | | | | |
| 29. NJDCA Exterior Wall (Building Envelope) | Tom Webb | 10/22/07 | | | | | |
| 30. NJDCA Building HVAC | Tom Webb | 10/01/07 | | | | | |
| 31. NJDCA Building Plumbing | Tom Webb | 10/01/07 | | | | | |
| 32. NJDCA Building Electrical | Tom Webb | 10/01/07 | | | | | |
| 33. NJDCA Specialty Interior MEP | Tom Webb | Numerous 12/1/07 – 2/1/08 | | | | | |
| 34. NJDCA Building Underground Electrical (Remainder of Site) | Tom Webb | Spring 2008 | | | | | |
| 35. NJDCA Existing Stadium Demolition | Tom Webb | Spring 2010 | | | | | |
| 36. NJDCA COO – Temporary and Permanent | Tom Webb | Spring/Summer 2010 | | | | | |

• Permit conditions and requirements will need to be addressed upon issuance of permits.

C:\Documents and Settings\dgloret\Local Settings\Temporary Internet Files\OLK20\Stadium\Project\PermitsApprovalsStatus(08 10 07).doc

**EXHIBIT F**

[Reserved]

**EXHIBIT G**

[Reserved]

**EXHIBIT H**

[Form of NFL Agreement]

10662025.17

[        ], 2007

Giants Stadium LLC (the "StadCo")
New York Football Giants, Inc. (the "Club")
John K. Mara (the "Club Controlling Owner")
John K. Mara (the "StadCo Controlling Owner")
Meadowlands Sports Complex
50 State Route 120
East Rutherford, New Jersey 07073

Financial Security Assurance, Inc. (in its capacity
as Bond Insurer and as Swap Insurer, the "Other
Insurer" and together with the Controlling Insurer,
the "Insurers")
[Address]
[Address]
Attention: [        ]

New Meadowlands Stadium Company, LLC (the
"JV Company")
Meadowlands Sports Complex
50 State Route 120
East Rutherford, New Jersey 07073

Goldman Sachs Capital Markets, L.P. (in its
capacity as a Swap Counterparty)
85 Broad Street
New York, New York 10004
Attention: Swap Operations

The Bank of New York, as trustee under the Indentur
executed by StadCo (the "Trustee")
[Address]
[Address]

Financial Guaranty Insurance Company (in its
capacity as Bond Insurer and as Swap Insurer, the
"Controlling Insurer")
[Address]
[Address]
Attention: [        ]

Lehman Brothers Special Financing Inc. (in its
capacity as a Swap Counterparty, and together with
Goldman Sachs Capital Markets, L.P., the "Swap
Counterparties")
745 Seventh Avenue, 5th Floor
New York, NY 10019
Attention: Municipal Financial Products - Middle
Office

Re:    Up to $715,000,000 in Senior Secured Bonds of StadCo

Ladies and Gentlemen:

StadCo is entering into the Indenture (as defined below) pursuant to which up to $650,000,000 in bonds
and up to $65,000,000 in Completion Bonds as necessary to fund cost overruns in accordance with the terms of
Paragraph 1(c) hereof (together, the "Bonds") may be issued by StadCo to finance, directly or through the JV
Company, Costs of the Project (as defined in the Indenture). In addition, the Swap Counterparties and StadCo
are entering into certain Qualified Swaps, and the Insurers are providing insurance in respect of certain of
StadCo's obligations under the Indenture and the Qualified Swaps. StadCo's obligations under the Indenture and
the Qualified Swaps are secured by the Security Documents (as defined below). The Requesting Parties
acknowledge and agree that the NFL is, concurrently with the execution and delivery of this Letter Agreement
and the Financing Documents (as defined below), entering into the League G-3 Loan agreement and the related
NFL Support Documents (as such terms are defined below) pursuant to which the League G-3 Loan will be made
by the NFL to StadCo in order to assist in financing the development, design and construction of the New
Stadium.

DC: 2580915-2

Requesting Parties
Page 2

## LIST OF FINANCING DOCUMENTS

      In connection therewith, the following documents are being executed and delivered, each (except as otherwise provided) dated of even date herewith (as the same may be amended, modified, supplemented, or replaced from time to time in accordance with the terms hereof, each a "<u>Financing Document</u>" and collectively the "<u>Financing Documents</u>"):

    (a)    Indenture of Trust (as amended, modified, supplemented, or replaced from time to time in accordance with the terms hereof, and including any Supplemental Indenture entered into in accordance with the terms hereof, the "<u>Indenture</u>"), by and between StadCo and the Trustee, pursuant to which StadCo may issue Bonds in an aggregate principal amount not to exceed $715,000,000 (any amount of which in excess of $650,000,000 shall be in the form of Completion Bonds as necessary to fund cost overruns pursuant to the terms of Paragraph 1(c) below);

    (b)    the Bonds;

    (c)    any Qualified Swap;

    (d)    the Leasehold Mortgage;

    (e)    the Assignment of Leases and Rents;

    (f)    the Pledge, Assignment and Security Agreement;

    (g)    the Non-Relocation Agreement;

    (h)    any Bond Support Facility, Reserve Account Credit Facility, Reserve Account Surety Bond, Reserve Account Surety Guaranty, Debt Service Reserve Surety Bond or Strike Reserve Surety Bond;

    (i)    each Insurer's Bond Insurance Policy;

    (j)    the Swap Insurance provided by each Insurer;

    (k)    each Insurer's Bond Insurance Agreement;

    (l)    the Non-Disturbance Agreement from the JV Company in favor of StadCo and the Trustee; and

    (m)    any Deposit Account Control Agreements (as each of the documents listed in clauses (b) through this clause (m) is defined in the Indenture).

      Each of the Financing Documents evidences or secures the Bonds and/or interest rate swap/protection or insurance arrangements with the Secured Parties to or for the benefit of StadCo. The aggregate principal of the Bonds outstanding at any time shall not exceed $715,000,000 (any amount of which in excess of $650,000,000 shall be in the form of Completion Bonds as necessary to fund cost overruns pursuant to the terms of Paragraph 1(c) below) and the aggregate notional amount of any Qualified Swaps outstanding at any time shall not exceed $715,000,000, in each case without (i) such consents as are required pursuant to the Financing Documents and (ii) the consent of the NFL as required hereunder, which consent the NFL may provide or withhold in its sole and absolute discretion.

Requesting Parties
Page 3

## DEFINED TERMS AND CERTAIN RELATED AGREEMENTS

Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the Indenture (or, where not defined therein, then as so defined in the relevant Financing Documents).  The following defined terms shall have the meanings specified below:

"Additional Agreements" shall mean any present and future lease, including the StadCo Sublease, the Ground Lease and the Team Sublease, and any other material license or agreement to use or occupy any building, improvement, land, training, practice or other facility, or other real property necessary for or otherwise used in the operation of the Club or the performance by the Club of NFL games or other NFL-related events and to which the JV Company or any Club Party is a party or otherwise is bound, other than any such lease, license or agreement that is: (a) not material to the financing, revenues, or other operations of the Club or the ability of the Club to play its football games in accordance with the NFL Constitution; or (b) entered into in connection with the grant of naming rights, Advertising (as such term is defined in the StadCo Sublease), or other local sponsorship rights, Suites, Club Seats and other seating rights, Concession Agreements or other similar rights to use or occupy the New Stadium during NFL games or events, or for non-NFL events, in each case in the ordinary course of the operation of the New Stadium or otherwise of the type customarily or reasonably granted by NFL member clubs or owners, operators or master lessees of stadiums in connection with the economic exploitation of their stadiums, but in each case only to the extent that the same do not interfere with the operations of the Club or the ability of the Club to admit ticketed fans and play its football games in accordance with the NFL Constitution.

"Additional Premises" shall mean those premises (other than the Existing Stadium and the New Stadium) that are the subject of any Additional Agreement.

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified. For purposes of this Letter Agreement, (a) StadCo, the JV Company and the Club, on the one hand, and the NFL, on the other hand, shall not be considered to be Affiliates of each other, (b) the member clubs of the NFL (other than the Club) and other NFL-related entities (including the Affiliated NFL Parties) shall not be considered to be Affiliates of the Club, the JV Company or StadCo, (c) the JV Company shall not be considered an Affiliate of StadCo or the Other StadCo (and accordingly StadCo shall not be considered an Affiliate of the Other StadCo) and (d) StadCo shall not be considered an Affiliate of the Club.

"Affiliated NFL Parties" shall mean, collectively, NFL Ventures, NFL Productions, NFL Enterprises, NFL Properties, NFL International, all of the NFL member clubs (except the Club), any successor or future entity that is, directly or indirectly, jointly owned and/or controlled by all or substantially all of the NFL member clubs, or owns assets that produce revenues that are required to be shared with other NFL member clubs under the NFL Constitution (including any such entity controlled by the NFL member clubs and the Club collectively) and each and all of their respective Affiliates, subsidiaries, successors and assigns, and their respective direct or indirect owners, directors, officers, agents, consultants, investment bankers, advisors, attorneys, trustees and employees (including the Commissioner of the NFL).

"Authority" shall mean the New Jersey Sports and Exposition Authority, a body corporate and politic existing under the laws of the State of New Jersey.

"Bond Insurance Termination Event" shall mean a termination by the Trustee of the Bond Insurance Policies in accordance with the terms thereof.

"Business Day" shall mean any day (other than a day which is a Saturday, Sunday or legal holiday in the State of New York) on which banks are open for business in New York City, New York.

Requesting Parties
Page 4

"City" shall mean the City of East Rutherford of the State of New Jersey.

"Club" shall mean the addressee identified above as such, which is the holder of the Franchise.

"Club Assessments" shall mean any assessments, fines, charges and other levies and payment obligations (including without limitation sharing payments of gate receipts as required under the NFL Constitution) imposed on the Club, or (to the extent so permitted by the NFL Constitution) on the JV Company, or on StadCo or any other Club Party, by the Commissioner or the NFL Management Council.

"Club Debt" shall mean the aggregate debt (as defined in NFL Finance Committee Resolution FC-3, adopted March 16, 1988, as the same may be amended from time to time) incurred directly or indirectly by:

(a)     the Club; and/or

(b)     StadCo, the Club Controlling Owner, the StadCo Controlling Owner, the JV Company and/or any other principal and/or controlling owner of the Club or StadCo (which, for purposes of this Letter Agreement shall be deemed to include the ultimate beneficial holder as well as any intermediate holders of any principal and/or controlling ownership interests in the Club or StadCo, as applicable) or other Affiliated entity of any of them, to the extent such debt incurred directly or indirectly by the principal and/or controlling owner or Affiliated entity is (A) secured, directly or indirectly, by such owner's or holder's interests in the Club, StadCo or the JV Company, (B) secured in any manner by any asset(s) of the Club or StadCo or any other Football Related Assets (including without limitation by way of a direct obligation upon, or the guaranty of such obligation by, any such Affiliated entity that owns Football Related Assets), or (C) in any manner (including by way of guaranty, suretyship or other contingent liability) a liability or obligation of the Club or StadCo or any such Affiliated entity that owns Football Related Assets.

"Club Parties" shall mean, collectively, StadCo, the Club, the Club Controlling Owner, the StadCo Controlling Owner and any other Person holding a direct or indirect ownership interest in the Club (or any direct or indirect subsidiary of the Club) or StadCo. References herein to "interests" in any Club Party (including without limitation the Club and StadCo) shall include all direct or indirect ownership interests in the applicable Club Party, including, without limitation, ownership interests in any and all intermediary entities holding direct or indirect ownership interests in such Club Party.

"Collateral" shall mean, at any time and from time to time, any and all current or future assets of, and any and all interests, direct or indirect, in StadCo, any other Club Party or the JV Company that secure or purport to secure (or are at any time or from time to time hereafter obtained in satisfaction of) any of the Obligations, including, without limitation (a) those assets and interests pledged as security to or on behalf of the Secured Parties pursuant to any of the Financing Documents and (b) any and all such interests or assets, if any, against which a lien is obtained (or which are realized against) by or on behalf of a Secured Party pursuant to a judgment lien or Judgment Order.

"Commissioner" shall mean the Office of the Commissioner of the NFL established pursuant to the NFL Constitution.

"Consent Date" shall mean the fifth (5th) Business Day following the delivery by the Trustee, the Controlling Insurer or any other Secured Party to the NFL of a Foreclosure Notice, or, in the event that neither the Trustee, the Controlling Insurer nor any other Secured Party shall have delivered such Foreclosure Notice as required by the terms of this Letter Agreement, then the fifth (5th) Business Day following the delivery by the

Requesting Parties
Page 5

NFL of a notice to the Trustee and the Controlling Insurer pursuant to Paragraph 5(c) hereof (unless the Foreclosure to which such NFL notice related shall have been cured as permitted thereby).

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Damages" shall mean any and all damages (including all charges, claims, costs, expenses, liabilities, and losses of any kind whatsoever, together with reasonable legal fees in respect of any such matters).

"Debt Limit" shall mean, at any time, the maximum aggregate principal amount of Club Debt from time to time permitted to be outstanding pursuant to the terms of the NFL Constitution, taking into account any exceptions (including without limitation that certain debt ceiling waiver contained in 2007 NFL Resolution JC-5 and referred to in Paragraph 1 of this Letter Agreement) made by the Commissioner, the NFL or any of its duly authorized committees (in each case as applicable under the NFL Constitution) to permit a particular NFL member club, its Affiliates and/or stadium company(ies) to incur Indebtedness in excess of such maximum amount or any temporary increases in such amount permitted at the discretion of the Commissioner for NFL member clubs generally.

"Default" means any event which, with the giving of notice or the lapse of time or both, could constitute an Event of Default.

"Event of Default" shall mean any Event of Default under the Indenture or any other Financing Document.

"Existing Stadium" shall mean that certain stadium known as Giants Stadium and described in the Existing Stadium Lease.

"Existing Stadium Lease" shall mean that certain Lease Agreement dated August 26, 1971, by and between the Club and the Authority, as amended by those certain First through Nineteenth Amendments thereto, dated as of June 30, 1972, October 14, 1972, November 28, 1972, December 31, 1972, February 28, 1973, March 31, 1973, May 30, 1973, June 30, 1973, July 30, 1973, September 17, 1973, September 20, 1973, October 24, 1973, November 15, 1973, December 28, 1973, October 17, 1995, October 17, 1995, September 27, 1996, November ___, 1996, and July 13, 2000, respectively, as supplemented by that certain letter agreement, dated October 17, 1995, and as further amended, restated, modified or supplemented from time to time in accordance with the terms thereof.

"Final Order" shall mean a final, non-appealable determination by a court or other entity having jurisdiction over the matter of the right of the Secured Parties to commence Foreclosure or the right of the NFL to conduct the sale process as set forth herein.

"Financing Documents" is defined in the list of Financing Documents under the heading "List of Financing Documents."

"Football Collateral" shall mean any and all Football Related Assets that may at any time or from time to time constitute Collateral, whether owned by the StadCo, the StadCo Controlling Owner, any other Club Party or the JV Company and including any and all interests, direct or indirect, in the Club, StadCo, or any other party that owns Football Related Assets that may at any time or from time to time be pledged or in any manner secure (or be obtained in satisfaction of) any of the Obligations, including such assets or interests obtained pursuant to a judgment lien.

"Football Related Assets" shall mean the Franchise and/or any and all of the assets (i) related to the operation of the Club or the performance or exhibition by the Club of NFL games in which it is a participant, or (ii) arising out of, created or issued by virtue of, as a result of, or in connection with the admission or current status of the Club as a member club of the NFL. Football Related Assets shall include, by way of example and not of limitation, all: player contracts; uniforms; playing and practice equipment; the Existing Stadium Lease; all interests in the New Stadium, including without limitation the StadCo Sublease, Team Sublease, Ground Lease, any other Additional Agreements and any agreements of the type excluded from the definition of the term Additional Agreements pursuant to clause (b) thereof that relate to the performance or exhibition by the Club of the Team's NFL games or NFL events; and any other rights of the Club Parties (or any of them) or the JV Company arising out of the use of or access to the New Stadium for the Team's games or events; ticket revenues, club seat premium revenues and suite revenues relating to NFL games or NFL events; revenues from naming rights, advertising and other local sponsorship rights relating to the Team or NFL games or NFL events; parking and concessions revenues (other than any such rights or revenues paid solely in respect of non-football events); rights to receive television, radio, online and other media distribution rights, revenues or contracts in respect of NFL games or NFL events; rights to participate in revenue sharing or other NFL programs; rights granted under any NFL collective bargaining agreements; equity interests in or rights to receive distributions from any entity that is jointly owned by all or substantially all of the NFL member clubs, or any other assets that produce revenues that are required to be shared with other NFL member clubs under the NFL Constitution. For the avoidance of doubt, the term Football Related Assets shall be deemed also to include the Club Parties' rights to use the Existing Stadium and all Additional Premises for the operation of the Club or the performance or exhibition by the Club of the Team's NFL home games or other NFL-related events, and the Club Parties' and the JV Company's interest in all Project revenues (excluding only (x) Project revenues received by the JV Company or StadCo to the extent attributable to the Other StadCo, Other Club or their respective Affiliates and (y) Project revenues attributable to non-NFL football events). "Football Related Assets" shall in no event include any rights or revenues relating solely to an Ancillary Component or the Racetrack (each as defined in the Ground Lease), which rights or revenues shall be exploited exclusively through an Ancillary Newco (as defined in the JV Company's Operating Agreement).

"Foreclosure" shall mean the foreclosure upon (including by voluntary delivery of a deed in lieu thereof), the seizure, sale of, set-off or other realization upon or against, the enforcement (or, other than in accordance with the consent given herein and each of the terms hereof, any assertion) of a security interest or other Lien on, or any other attempted disposition of or exercise of dominion or control over, or exercise of any remedies with respect to, all or any portion of the Collateral, or the commencement of an involuntary proceeding against, or the filing of an involuntary petition in a court of competent jurisdiction seeking relief under the United States Bankruptcy Code (as now constituted or hereafter amended), or any other federal or state bankruptcy, insolvency, receivership or similar law, against StadCo, or the JV Company or any other Club Party that now or hereafter owns, holds or controls any Collateral, whether pursuant to or in accordance with any Operative Document or otherwise, or any other conveyance (including without limitation a conveyance made pursuant to a lease or sublease other than the Ground Lease, StadCo Sublease or Team Sublease) of an interest in the Collateral that the Secured Parties may be entitled to effect following obtaining a judgment lien or Judgment Order or as a remedy under or in connection with any Operative Document or otherwise (including without limitation any such conveyance or other disposition as the result of the Trustee or any other Secured Party having filed an involuntary proceeding, or StadCo or the JV Company or any other Club Party that now or hereafter owns, holds or controls any Collateral having filed a voluntary petition, under any federal or state bankruptcy, insolvency, receivership or other similar law). For the avoidance of doubt:

(a)    the term "Foreclosure" shall include, without limitation:

(i)    except as otherwise expressly permitted by clause (b) of this definition, at any time, the transfer or other disposition, during any Standstill Period and whether effected by StadCo, the Trustee, at the direction of the Controlling Insurer, or by mandatory

operation of the Indenture, of the monies in any Fund to any other Fund or Account pursuant to any or all of Articles IV or V, or Sections 902, 905, or 909 of the Indenture including without limitation any mandatory redemption (other than scheduled principal amortization structured as a mandatory redemption) or any transfers by the Trustee of the monies in the Trustee Revenue Fund or out of the Trustee Operating Fund (other than in payment of the Operating Expenses of StadCo);

(ii)    except as otherwise expressly permitted by clause (b) of this definition, the exercise by the Trustee of its control rights under any Deposit Account Control Agreement (established pursuant to Section 501 of the Indenture or otherwise);

(iii)    except as otherwise expressly permitted in clause (b) of this definition, any transfers by or at the direction of StadCo pursuant to Section 503 (unless and solely to the extent that the NFL shall have expressly so consented to such transfers in respect of Improvements made after Substantial Completion, at the time of the Supplemental Indenture authorizing such Improvement), Sections 504(c)(iii) through 504(c)(x), 504(f), the funding of any deficiency in the Senior Lien Debt Service Reserve Fund from the Operating Fund of other Funds, Accounts, and Subaccounts under the Indenture, as contemplated in Sections 506(a)(iv) or (v), Section 506A(e), the funding of any deficiency in the Second Lien Debt Service Reserve Fund from the Operating Fund or other Funds, Accounts, and Subaccounts under the Indenture, as contemplated in Section 507(a)(iv), the substitution or new provision of any Reserve Account Credit Facility pursuant to Sections 506(b) or 507(b), Sections 508(b), 509(b), 509(d)(i) or 609(p)(ii), in each case during any Standstill Period, unless, as of the date of such transfer, neither the Trustee nor the Insurers shall have known of the existence of such Event of Default and provided that upon receipt of notice of such Event of Default, the Trustee shall promptly reinstate all such Funds and transfers as have been effected pursuant to such Sections since the date on which such Event of Default shall have first occurred to the extent that such Funds are in the possession of the Trustee, the Insurers or any of their respective Affiliates at the time the Trustee or the Insurers receives notice of such Event of Default;

(iv)    the exercise by the Trustee and/or the Controlling Insurer of their respective remedies (including without limitation the exercise of any right to assume control of the Project construction) pursuant to Sections 902, 903 and/or 905 of the Indenture (other than actions (x) pursuant to Section 903(a) solely to the extent necessary to assert or perfect the validity of the Trustee's interest in the Collateral, or (y) permitted pursuant to the first proviso of paragraph 2(b)(i) hereof), unless the NFL has consented to the exercise of such rights;

(v)    any exercise by the Trustee or any other Secured Party of any right to assume management or control of the construction of the Project or the operation of the New Stadium (or any portion thereof);

(vi)    any early termination (other than in connection with a refinancing approved in writing by the NFL or a voluntary prepayment or redemption of the Bonds by StadCo) or acceleration of all or any part of the Obligations; and

(vii)    subject to the express terms of Paragraph 5(r), collecting money damages from the Club for breach of the Club's obligations under the Non-Relocation Agreement; but

(b)    such term shall not include:

Requesting Parties
Page 8

(i)    Permitted Standstill Period Payments (the making of which shall not, of itself, constitute a Foreclosure hereunder); or

(ii)    any transfer of funds pursuant to the provisions of the Indenture (other than Permitted Standstill Period Payments) following the occurrence of an Event of Default of which the Trustee is unaware; provided that upon receipt of notice of such Event of Default, the Trustee shall (unless impossible) promptly reinstate all such transfers of funds among the Accounts as shall have been effected pursuant to the Indenture since the date on which such Event of Default shall have first occurred.

The term "Foreclose" shall also include any conduct or other action taken in furtherance of, or otherwise attempting to effect or cause, Foreclosure.

"Foreclosure Cure Expiration Date" shall mean the date which is the earliest to occur of (a) sixty (60) calendar days following the NFL Foreclosure Notice Date; (b) the date on which any Foreclosure Notice is delivered by a Secured Party hereunder; and (c) the date on which any of the conditions in clauses (A), (B), or (C) of Paragraph 5(c)(ii) shall no longer be met.

"Foreclosure Notice" shall mean any notice sent by or on behalf of any Secured Party to StadCo, any other Club Party, the JV Company, their counsel, or any of the other agents or representatives of StadCo or any other Club Party or the JV Company, in respect of any default (including without limitation any Default or Event of Default) with respect to the Operative Documents and setting forth such Secured Party's intention to effect a Foreclosure or other proceeding against any Collateral or otherwise against StadCo, any other Club Party or the JV Company with respect to a Default or Event of Default; provided that a notice by the Trustee or the Controlling Insurer to StadCo or another Club Party or the JV Company demanding that StadCo or the JV Company or such other Club Party perform or comply with one or more of its obligations under the Financing Documents without setting forth an intention to effect a Foreclosure or initiate another similar proceeding shall not constitute a Foreclosure Notice.

"Franchise" shall mean the membership of the Club in the NFL and any rights of the Club to be, or receive benefits as, a member club of the NFL, whether or not evidenced by a written franchise agreement (including, without limitation, the authority to operate a professional football club of the NFL in a designated city).

"Ground Lease" shall mean the Ground Lease and Development Agreement, dated December 21, 2006, by and between the JV Company and the Authority as amended from time to time in accordance with this Letter Agreement. For the avoidance of doubt, "Ground Lease" shall not include any partition, amendment or modification thereof that satisfies clause (i) of the "Permitted Transfer" definition.

"Indebtedness" of any Person shall mean, without duplication, (a) all indebtedness representing money borrowed which is created, assumed, incurred or guaranteed in any manner by such Person or for which such Person is responsible or liable (whether by guarantee of such indebtedness, agreement to purchase indebtedness of, or to supply funds to or invest in, others or otherwise), (b) all indebtedness of another entity secured by any Lien existing on property or assets owned by such Person, and (c) with respect to any NFL member club, any past due unfunded obligations of such NFL member club under the NFL Constitution with respect to the deferred compensation reserve mechanism established pursuant to the resolution of the NFL dated March 22, 1983, as amended October 23, 1984, October 20, 1992 and March 23, 1993, and as the same may be amended from time to time thereafter, together with any successor fund, account, trust or other similar mechanism established by the NFL or the NFL member clubs (individually or collectively) in substitution or replacement thereof.

Requesting Parties
Page 9

"Judgment Order" shall mean an order implementing the confession of judgment against any Club Party or the JV Company that has been signed by such Club Party or by the JV Company, respectively.

"League G-3 Loan" shall mean that certain loan facility in a principal amount not to exceed $150,000,000 (and the funds advanced and committed to be advanced from time to time to StadCo thereunder), made by the NFL for the benefit of StadCo pursuant to 1999 NFL Resolution G-3, as the same has been and may, in accordance with the terms thereof, be amended, modified, supplemented, or replaced from time to time (including by 2003 NFL Resolution JC-1), and evidenced by: (a) that certain NFL Resolution G-3 Stadium Credit Agreement, dated as of the date hereof, by and among the NFL, StadCo and the Club, as the same may, with the consent of the applicable parties thereto, be amended, modified, supplemented, or replaced from time to time; (b) any and all promissory notes executed in connection therewith by StadCo, as the same may, with the consent of the applicable parties thereto, be amended, modified, supplemented, or replaced from time to time; and (c) such other and/or successor documents, notes and/or other instruments evidencing such loan as may hereafter be executed by StadCo, the Club, the StadCo Controlling Owner, the Club Controlling Owner, the JV Company and/or any Affiliates of the Club Parties or the NFL, as the same may, with the consent of the applicable parties thereto, be amended, modified, supplemented, or replaced from time to time.

"League G-3 Support Agreement" shall mean the G-3 Loan Obligations Support Agreement described in the definition of NFL Support Documents.

"Lender" or "Lenders" shall mean the Trustee, the Controlling Insurer, the Other Insurer, the Swap Counterparties, the Beneficial Owners (as defined in the Indenture), and all other Persons (excluding the NFL, the JV Company and the Club Parties) from time to time party to the Financing Documents or otherwise having rights as an assignee of such Person, or having third-party beneficiary rights under, or otherwise having rights in any other manner as a lender, noteholder, or as a Secured Party under, any Financing Documents (including, without limitation, the Insurers, and any banks and lending institutions which may participate in any syndication of the Bond Support Facility or any other indebtedness evidenced or secured by any Financing Documents or may become a party to any Financing Documents subsequent to the date thereof, whether as additional lenders, by way of assignment or otherwise), and any and all agents thereof.

"Lien" shall mean any mortgage, leasehold mortgage, pledge, security interest, lien, attachment, levy, charge or other encumbrance.

"Material Modification" shall mean any amendment, supplement or other modification to any provision of any of the Operative Documents or the Additional Agreements which does or may be reasonably expected to:

(a)     increase the Maximum Amount;

(b)     affect any operating and/or financial covenants of the Operative Documents or the Additional Agreements;

(c)     cause StadCo to become liable under any Additional Bonds, Completion Bonds (except as expressly contemplated in the definition of the Maximum Amount and solely in the event that such Completion Bonds are issued in accordance with Paragraph 1(c) hereof), or any other additional bonds issued under any Supplemental Indenture, other than (x) the issue, pursuant to Section 204 of the Indenture, of Refunding Bonds in replacement of Bonds deemed paid upon the issue of such Refunding Bonds on terms substantially identical to the Bonds so replaced (provided that such Refunding Bonds may provide for different terms than the Bonds so replaced in respect of (i) customary call protections or the interest rate or rates of such Refunding Bonds and the manner of determining such rate or rates, (ii) ordinary course modifications relating to administration of any auction rate securities, (iii) the creation or termination of sinking funds or

Requesting Parties
Page 10

other reserves with respect to such Refunding Bonds and (iv) changes in the mix and type of debt instruments (e.g., auction rate securities, fixed rate securities, etc.) outstanding from time to time) and (y) the entry into, modification, supplement or termination of any Qualified Swap Transaction in connection with any such issue of Refunding Bonds, in each case to the extent permitted by the Indenture and the other Financing Documents;

(d)    cause any of the Requesting Parties to be in violation of the covenants and agreements set forth in this Letter Agreement;

(e)    expand or increase, in any way, the obligations of any of the Club Parties or the JV Company under any of the Operative Documents or the Additional Agreements (provided that the Club, the JV Company and StadCo may, subject always to the NFL Constitution, any applicable NFL rules and policies and any applicable restrictions set forth in the Indenture, enter into Additional Agreements on arms' length terms with the Other StadCo, the JV Company and/or the Other Club);

(f)    cause any Obligations or other obligations arising under the Operative Documents to be:

(i)    secured, directly or indirectly, by any interests in any of the Club Parties or the JV Company;

(ii)    secured in any manner by any asset(s) of the Club Parties or the JV Company, the Collateral or any other Football Related Assets; or

(iii)    in any manner recourse (including by way of guarantee, suretyship or other contingent liability) to any Club Party or the JV Company other than the primary obligor,

in each case other than the security interests in the interests in the Club Parties, the assets of StadCo and the Collateral and the obligations of the Club Parties that are expressly contemplated by the Financing Documents as in effect as of the date hereof;

(g)    effect the release of any security interest in the Collateral, including without limitation the exercise of any rights by StadCo pursuant to Section 608 of the Indenture; provided that the release of a security interest in any item of Collateral that does not constitute Football Collateral shall not constitute a Material Modification pursuant to this clause (g) if and to the extent that such non-football Collateral does not materially contribute, and has not materially contributed, to the operation of, or the financial results of condition of, the JV Company or StadCo;

(h)    permit PSL Proceeds to be used for any purpose (including distribution to owners of equity interests in StadCo or any other Club Party) other than payment or reimbursement of PSL Eligible Project Costs or repayment of the Obligations incurred in payment of PSL Eligible Project Costs or refunds of such PSL Proceeds to PSL licensees if and to the extent such PSL Proceeds will not be so applied towards the payment or reimbursement of PSL Eligible Project Costs;

(i)    permit the net proceeds of the offering of Bonds to be used other than to fund Costs of the Project or to repay or refinance Obligations;

(j)    change the Trustee (or paying, collateral or other agent, if any) under the Financing Documents (provided that the resignation or removal of the Trustee as Trustee (or other agent), under and in accordance with the Financing Documents shall not constitute a Material

Modification provided that the substitute trustee or agent shall execute and deliver to the NFL an agreement in form and substance reasonably acceptable to the NFL, assuming and agreeing to be bound by the terms of this Letter Agreement);

(k)     cause or recognize a Change of Control or Material Ownership Change (as such terms are defined in the NFL Resolution G-3 Credit Agreement executed in connection with the League G-3 Loan) of StadCo or any other Club Party or of the JV Company;

(l)     with respect to any Additional Agreement, change the amount of any rent, the length of any term (other than the exercise of any renewal term as provided under the existing terms thereof), the nature of (or the remedies in the event of) any event of default, the permitted uses under (other than in connection with increases in retail, sponsorship and entertainment space outside of the New Stadium seating bowl), and the rights and privileges granted therein;

(m)     otherwise modify any provisions of the Operative Documents or the Additional Agreements relating to payments, maturity dates, prepayments, Collateral or other security interests or defaults that are applicable during the period when the Obligations are outstanding;

(n)     amend or modify any Additional Agreement in a manner which would require the consent of the NFL or the NFL member clubs pursuant to the NFL Constitution;

(o)     amend or modify the operating agreement and other governing documents of the JV Company (other than to reflect changes in StadCo's and/or the Other StadCo's capital accounts arising out of otherwise-permitted actions); and/or

(p)     otherwise affect the provisions of the Operative Documents or Additional Agreements (including, but not limited to, the provisions thereof pertaining to any Collateral pledged as security for the Obligations, or to Events of Default) in each case in any manner materially adverse to the interests or rights of the NFL.

"Maximum Amount" shall mean $715,000,000, in the aggregate, and shall represent the maximum principal (and in the case of Qualified Swaps, notional) amount (not including accrued but unpaid interest, fees, premiums to the Insurers, reimbursable costs, other swap payments, swap termination payments or similar exposure under interest rate protection agreements, indebtedness incurred in connection with letters of credit or other sureties to fund debt service or special liquidity/work stoppage reserves, and other similar obligations, and any replacement or extension of any of the foregoing) of the Bonds and the Qualified Swaps hereafter permitted to remain outstanding under the Financing Documents at any time; provided, that any amount in excess of $650,000,000 in aggregate principal amount of such Bonds shall be solely in the form of Completion Bonds and may be issued only in compliance with the terms of the Indenture and Paragraph 1(c) below. For the avoidance of doubt, in the event that there are no such cost overruns, or the aggregate amount of any such cost overruns is less than $65,000,000, the Maximum Amount shall be reduced accordingly.

"Memoranda of New Stadium Leases" shall mean those certain Memoranda of New Stadium Leases to be separately recorded in the Bergen County Clerk's Office, Hackensack, New Jersey, in order to provide public record and notice of the Ground Lease, StadCo Sublease, and the Team Sublease.

"New Stadium" shall mean the approximately 82,000 seat, open-air stadium to be constructed on the West Side of the Meadowlands Sports Complex in East Rutherford, New Jersey.

"New Stadium Estoppel" shall mean that certain certificate to be executed by the Authority and attached hereto and made a part hereof as Exhibit E.

"NFL" shall mean the National Football League, a not-for-profit association currently having its principal executive office at 280 Park Avenue, New York, New York.

"NFL Constitution" shall mean the Constitution and Bylaws of the NFL and the Articles of Association and Bylaws of the NFL Management Council, including any amendments to either such document and any interpretations of either such document issued from time to time by the Commissioner which are in the Commissioner's jurisdiction; all operative NFL or NFL Management Council resolutions that are within the NFL's or the NFL Management Council's respective jurisdictions; any existing or future agreements entered into by the NFL or the NFL Management Council, including, without limitation, any television agreements or any collective bargaining or other labor agreements (including, without limitation, any NFL player salary guarantees and pension fund agreements), and any agreements made in settlement of any litigation against the NFL, the NFL Management Council, or the NFL member clubs (including litigation against such clubs, or agreements made by such clubs, jointly or collectively); and such other rules or policies as the NFL, the NFL Management Council, or the Commissioner may issue from time to time that are within the issuing party's jurisdiction.

"NFL Enterprises" shall mean NFL Enterprises LLC, a Delaware limited liability company, or any successor to the business of such entity.

"NFL Foreclosure Notice Date" shall mean the date on which the NFL shall have delivered to the Trustee and the Controlling Insurer, pursuant to Paragraph 5(c)(ii) hereof, written notice of the NFL's reasonable belief that a Foreclosure has commenced or occurred (which notice shall include a description of the issues giving rise to such belief).

"NFL International" shall mean NFL International LLC, a Delaware limited liability company, or any successor to the business of such entity.

"NFL Management Council" shall mean the not-for-profit association formed by the member clubs of the NFL to act as the representative of such member clubs in the conduct of collective bargaining and other player relations activities of mutual interest to such member clubs.

"NFL Priming Loans" shall mean loans by the NFL (or an Affiliated NFL Party) to StadCo or the Club for the purpose of enabling StadCo or the Club to meet their respective obligations, whether in respect of the Obligations, the operation and maintenance of the New Stadium or any Additional Premises, other expenses incurred in connection with the conduct of home games of the Team in the Existing Stadium (at any time prior to Substantial Completion), the New Stadium or any Additional Premises, or otherwise.

"NFL Productions" shall mean NFL Productions LLC, a Delaware limited liability company, or any successor to the business of such entity.

"NFL Properties" shall mean NFL Properties LLC, a Delaware limited liability company, or any successor to the business of such entity.

"NFL Standstill Period Collateral Rights" shall have the meaning set forth in Paragraph 5(c)(i)(B) hereof.

"NFL Support Documents" shall mean each and all documents executed in connection with the League G-3 Loan and/or this Letter Agreement, and such other and/or successor documents and/or instruments evidencing the obligations thereunder as may hereafter be executed by the parties thereto, including that certain G-3 Loan and VTS Obligations Support Agreement, dated as of even date herewith, by the Club in favor of the NFL in relation to the performance by StadCo of each and all of its obligations under the League G-3 Loan and the Supplementary VTS Payment Agreement, that certain Supplementary VTS Payment Agreement, dated as of even date herewith, by and among the NFL, StadCo, and the StadCo Controlling Owner, that certain Adjacency

Requesting Parties
Page 13

Guaranty Agreement, by and among the NFL, StadCo, the Club and the Club Controlling Owner and, if executed in accordance with the terms of the League G-3 Loan, any PSL Proceeds Security Agreement, by StadCo in favor of the NFL, pursuant to which the NFL is (if so executed) granted a Lien on the PSL Proceeds (subject to the release provisions set forth therein), as each of the foregoing may be amended, modified, supplemented, or replaced from time to time.

"NFL Ventures" shall mean each of NFL Ventures, Inc., a Delaware corporation, and NFL Ventures, L.P., a Delaware limited liability partnership, or any successor to the business of either such entity.

"Non-Relocation Agreement" shall have the meaning ascribed thereto in the Indenture.

"Obligations" shall mean any indebtedness or other obligations of StadCo, any of the other Club Parties or the JV Company owing to any Secured Party under any Financing Document or any other document or agreement executed in connection therewith, and any indebtedness or other obligations of the JV Company or any Club Party that are, under the terms of any such document or agreement, secured by the Liens granted for the benefit of any Secured Party thereunder, together with any commitment by any Secured Party to extend loans or other indebtedness pursuant to said documents or agreements, including, without limitation, all indebtedness and obligations in respect of principal, premium and interest under the Indenture and the other Financing Documents (including, without limitation, any Series of Bonds issued under a Supplemental Indenture).

"Operating Expenses" shall mean (a) Operating and Maintenance Expenses, as such term is defined in the Indenture, (b) all other Rent (as defined in the StadCo Sublease), (c) all capital contributions due from StadCo to the JV Company pursuant to the terms of the JV Company's Operating Agreement to the extent necessary to enable the JV Company to fund its operating expenses, and (d) such other operating expenses of StadCo as the NFL shall reasonably deem necessary and appropriate to facilitate the sound operation of the New Stadium for the continuation of the Club's football operations consistent with the customary operating standards of NFL stadiums generally.

"Operative Documents" shall mean the Financing Documents together with any and all other documents and agreements related to the indebtedness of StadCo, any other Club Party or the JV Company to any Secured Party that may be made, executed or delivered from time to time in connection with, supplementation of or in substitution for any of the Financing Documents, but for the avoidance of doubt such term shall not include this Letter Agreement, any similar NFL consent agreement relating to any other financing of the Club Parties or the JV Company, the Other StadCo Consent Letter, or any similar operative or financing documents to which the JV Company is a party and relating primarily to the Other StadCo or the Other Club, the NFL Support Documents, or any other documents relating to the League G-3 Loan (including without limitation the NFL Resolution G-3 Stadium Credit Agreement, the associated promissory note, or the other documents or agreements with the NFL or any Affiliated NFL Parties executed in connection therewith).

"Operative Project Documents" shall mean the Design-Build Consent and Acknowledgement and the Project Agreements under and as defined in the Indenture; provided that the StadCo Sublease, Team Sublease and Ground Lease shall not be deemed to be Operative Project Documents.

"Ordinary Course Sales" shall mean (a) sales of tickets, seat licenses, suite rights, concessions, inventory, advertising, naming or other sponsorship rights, and other sales of items or rights in each case in the ordinary course of the JV Company's or the selling Club Party's business, (b) sales of obsolete and/or replaced or surplus equipment that in JV Company's or StadCo's reasonable judgment (as applicable based on ownership of such equipment) is not necessary for the operation of the New Stadium, and (c) sales or licenses of other property or rights with an aggregate book value not in excess of $1,000,000 during any twelve (12) month period.

Requesting Parties
Page 14

"Other Club" shall mean New York Jets LLC, the holder of the New York Jets NFL franchise, and any successor.

"Other StadCo" shall mean Jets Stadium Development, LLC, and any successor.

"Other StadCo Consent Letter" shall mean that certain letter agreement, of even date herewith, by and among the NFL, the Trustee, the Insurers, the Swap Counterparty, the JV Company, the Other StadCo, the Other Club and the controlling owner of the Other Club and Other StadCo.

"Permitted Standstill Period Payments" shall mean the payment by StadCo (or the Trustee, as may be applicable under the terms of the Indenture) during the Standstill Period, to the extent otherwise permitted by the terms of the Indenture and the other Operative Documents, of:

(a) Operating Expenses;

(b) the initial transfer of funds from the Operating Fund to the Trustee Revenue Fund in the circumstances described in Section 509(a) and thereafter the continuing deposit of Stadium Revenues pursuant to Section 509(b) of the Indenture, other than any deposit of monies into the Redemption Fund in excess of scheduled amortization contemplated thereunder (and for the avoidance of doubt, during the Standstill Period, all such funds otherwise designated for the Redemption Fund shall instead be deposited instead to the Trustee Revenue Fund and applied as otherwise provided therein);

(c) transfers from the Trustee Revenue Fund to the Trustee Operating Fund, for payment of Operating Expenses pursuant to Section 509(c)(i) of the Indenture, and payment of Operating Expenses pursuant to Section 510(b) of the Indenture;

(d) transfers from the Trustee Revenue Fund or the Operating Fund, as applicable, to the Senior Lien Debt Service Fund or the Second Lien Debt Service Fund pursuant to Sections 509(c)(ii) and (iii) and Section 504(c)(iii); Sections 504(c)(vi), 505(b)(ii), 505(b)(iv) and 505(g)(ii) (excluding in each case any payments in respect of Swap Termination Payments or Other Swap Payments thereunder); Sections 505(c)(ii), 505(h)(ii) of the Indenture, in each case for the payment of regularly scheduled (but not accelerated) payments of principal and interest (at the applicable pre-default rate, and not at any default rate) on the Obligations, Regularly Scheduled Swap Payments (but not Swap Termination Payments or Other Swap Payments), and the associated and ordinary course fees and expenses of the Trustee and the Insurers, from funds deposited into the Senior Lien Debt Service Fund and the Second Lien Debt Service Fund, and transfers from the Senior Lien Debt Service Fund or the Second Lien Debt Service Fund, if applicable, pursuant to Section 505(b)(iv) and pursuant to Section 505(c)(iii) for the purpose of making the payments referred to above, subject to the Trustee's continuing compliance with the requirements of Sections 412 and 510(c) of the Indenture;

(e) transfers under Sections 506, 506A and 507 of the Indenture to the Senior Lien Debt Service Fund or the Second Lien Debt Service Fund for the payment of regularly scheduled (but not accelerated) payments of principal and interest (at the applicable pre-default rate, and not at any default rate) on the Obligations, and the associated and ordinary course fees and expenses of the Trustee, and the Insurers, from funds deposited prior to the initiation of the Standstill Period into the Senior Lien Debt Service Reserve Fund and the Second Lien Debt Service Reserve Fund, and transfers from the Senior Lien Debt Service Fund or the Second Lien Debt Service Fund, if applicable, for the purpose of making the payments referred to above (but not, for the avoidance of doubt, any transfers during a Standstill Period from the Operating Fund, the Trustee Revenue Fund or any other fund or account established under the Indenture fund to such Senior Lien Debt Service Reserve Fund or Second Lien Debt Service Reserve Fund);

Requesting Parties
Page 15

(f) ordinary course transfers pursuant to Section 508(a) of the Indenture;

(g) the payment (whether pursuant to Sections 504(c)(ix) or 509(d) of the Indenture) of regularly scheduled (but not accelerated) payments of principal and interest (at the applicable pre-default rate, and not at any default rate) on Permitted Subordinated Indebtedness or Non-Indenture Permitted Debt in respect of which the NFL has previously and specifically consented in writing to such payment during the Standstill Period;

in each case subject to Paragraph 5(l) hereof. For the avoidance of doubt, the term Permitted Standstill Period Payments shall not include (x) any other Trustee payment or transfer of funds from the Operating Account or the Trustee Revenue Account for the purposes set forth in Sections 504(c), 504 or 509 of the Indenture, or (y) any equity or other distributions by the Borrower to its members, except for cash distributions to the Borrower's members in respect of tax payments, to the extent otherwise permitted following a Default or Event of Default pursuant to Section 504(c)(ii) of the Indenture (but solely on dates prior to the date on which a Secured Party shall be required to deliver a Foreclosure Notice hereunder), subject always to the condition that the members receiving such distributions following and during the continuance of a Default or Event of Default shall have agreed in writing with the NFL, in a form satisfactory to the NFL, to repay to the Trustee or the Borrower, as applicable for deposit into the Trustee Revenue Fund or the Operating Fund, as applicable, the amount so distributed within fifteen (15) Business Days after receipt of notice from the NFL that a funding shortfall of other funds necessary to meet the operating expenses and/or ordinary course payment of principal and interest (as so provided in Section 504 of the Indenture) has occurred.

"Permitted Transfers" means (i) any sale, assignment or transfer by a Club Party of any assets or property that do not constitute Football Related Assets (including by means of a partition, amendment or modification of the Ground Lease), so long as such sale, assignment or transfer (A) is made to a transferee that is not a Club Party and is without recourse to any Club Party, (B) does not relate to the use of, and will not in any way prevent or hinder the exhibition and performance of NFL games or NFL events at, the New Stadium and (C) does not, at the time such sale, assignment or transfer is made, include any assets, properties or rights that materially contribute to the operation of, or the financial results of condition of, the JV Company or StadCo; and (ii) any sale, assignment or transfer of Football Related Assets by any Club Party (other than the Club) to the Club or to another Club Party that is made in accordance with Paragraph 6(b).

"Person" shall mean any natural person, corporation, business trust, joint venture, association, company, partnership or government, or any agency or political subdivision thereof.

"Project" shall mean development, design, construction and operation of the New Stadium.

"PSL" shall mean a personal seat license or other license granted for a period of years for the right to purchase (after the license grant) one or more specified seats for all Club home games (other than the Super Bowl) held in the New Stadium.

"PSL Proceeds" shall mean all payments, revenues, rents, royalties, issues, profits, fees and other proceeds paid or payable for any PSLs, net of costs of issuance or sale.

"PSL Eligible Project Costs" shall mean the costs and expenses incurred in connection with the Project and eligible for consideration in the determination of project costs under 1999 NFL Resolution G-3, 2003 NFL Resolution JC-1 and the NFL's Stadium Facility Program Guidelines, which Guidelines are attached to the League G-3 Loan Agreement. PSL Eligible Project Costs shall, subject to the preceding sentence, include hard and soft construction costs, site preparation (e.g., environmental), infrastructure improvements, financing costs specifically related to the New Stadium, other miscellaneous New Stadium

development costs (subject to any "cap" applicable to costs of such nature under the Stadium Facility Program Guidelines, as applied and interpreted by the NFL in its sole discretion), payment of taxes directly attributable to the issuance of the applicable PSLs and capitalized rent established pursuant to the Authority under the Ground Lease, subject to any deductibles and other limits established pursuant to the Stadium Facility Program Guidelines, as applied and interpreted by the NFL in its sole discretion. For the avoidance of doubt, PSL Eligible Project Costs shall not include: (1) miscellaneous New Stadium development costs in excess of any "cap" applicable to costs of such nature under the Stadium Facility Program Guidelines, as applied and interpreted by the NFL in its sole discretion; (2) any funds derived from the Obligations or otherwise that are distributed to the direct or indirect equity owners of the Club or StadCo, except and to the extent distributed to repay the applicable equity owner for PSL Eligible Project Costs previously incurred by such owner; (3) any funds derived from the Obligations or otherwise that are loaned, paid, or advanced to or for the benefit of any Affiliate of the Club or StadCo for any purpose other than the reimbursement of third-party payments directly made by the recipient Affiliate in connection with the Project prior to the date hereof or repayment to the recipient Affiliate of funds advanced by such recipient Affiliate to or for the benefit of the Club or StadCo prior to the date hereof to fund payments by the Club or StadCo for qualified Project purposes under the terms of the Stadium Facility Program Guidelines, as applied and interpreted by the NFL in its sole discretion; (4) any costs (including reimbursement obligations) associated with any letters of credit or other credit enhancements (including sureties) posted by the Club or StadCo or any Affiliate thereof in support of the Project that are subject to withdrawal or termination under the terms of the Financing Documents, regardless of whether such withdrawal or termination is subject to financial contingencies or other conditions under the Financing Documents; (5) construction costs related to non-NFL activities, team offices, excessive New Stadium amenities or furnishings and any football practice or training facility not located at the New Stadium site; or (6) any funds derived from the Obligations or otherwise that are applied to the repayment of indebtedness of the Club, StadCo or any Affiliate thereof incurred in connection (direct or indirect) with the acquisition, or the renovation prior to the date hereof, of the Existing Stadium.

"Qualifying Sale Transaction" shall mean the consolidation of StadCo with or the merger of StadCo into any other Person or the sale, conveyance, assignment, license, transfer, lease or other disposal of all or substantially all of StadCo's assets or business to any Person, whether in a single transaction or a series of related transactions and whether or not the Franchise and/or other assets of or interests in the Club shall be disposed of in connection with such transaction, provided that any such transaction shall meet the following conditions:

(i)     the Trustee shall have received notice of such transaction at least 30 days prior to the effectiveness thereof;

(ii)     the acquiring or successor entity shall be organized and validly existing under the laws of the United States of America or any state thereof or the District of Columbia;

(iii)     the acquiring or successor entity shall have the same obligations, duties, liabilities rights, powers and benefits as StadCo had with respect to the use and possession of the New Stadium under the Ground Lease, the StadCo Sublease, the Team Sublease and Operative Project Documents immediately prior to such transaction;

(iv)     upon or prior to the effectiveness of such transaction, unless all StadCo obligations, duties and liabilities under the Financing Documents are fully assumed by the acquiring or successor entity by operation of law, the acquiring or successor entity shall have executed and delivered to each party hereto an assignment and assumption agreement, in form and substance reasonably satisfactory to the Trustee and the Controlling Insurer, whereby the acquiring or successor entity assumes all of StadCo's obligations, duties and liabilities under the

Requesting Parties
Page 17

Financing Documents and Operative Project Documents and all other agreements and instruments to which StadCo is a party in connection with the transactions;

    (v)    with effect from and after giving effect to the closing of such transaction:

    (A)    any and all financial Events of Default shall have been cured;

    (B)    any and all financial damages, expenses, and other amounts to which the Secured Parties would otherwise be entitled from the Borrower arising out of any non-financial Events of Default shall have been paid to the applicable Secured Parties (or arrangements reasonably satisfactory to such Secured Parties in respect of such payments shall have been made);

    (C)    all representations and warranties made by the Borrower under the Indenture shall be made by the acquiring or successor entity to the Secured Parties and shall be true as of the date of closing of the Qualifying Sale Transaction (and thereafter as otherwise provided by the terms of the Indenture);

    (D)    as of the date of the Qualifying Sale Transaction, the acquiring or successor entity shall provide evidence reasonably satisfactory to the Controlling Bond Insurer that it can comply, and thereafter shall comply, with all conditions, covenants and other obligations of StadCo under the Indenture applicable to periods following such closing;

    (vi)    at the time of such transaction, the acquiring or successor entity shall generally be meeting its obligations as they become due;

    (vii)    StadCo and the acquiring or successor entity, as the case may be, shall have obtained all required approvals of the NFL to such transaction;

    (viii)    StadCo or the acquiring or successor entity shall have paid on or prior to the closing date of any such transaction all reasonable costs and expenses (including reasonable legal fees) incurred by any Secured Party in connection with any such transaction; and

    (ix)    the Club (or other entity then owning the Franchise) shall have reaffirmed in writing to the Trustee and the Controlling Insurer its obligations under the Non-Relocation Agreement.

"Requesting Parties" shall mean all of the undersigned parties other than the NFL.

"Secured Parties" shall exclude the NFL, but shall include (all of whom shall be bound by the terms hereof) (a) the Trustee (on behalf of and including all Lenders) and the Lenders, including without limitation the Swap Counterparties and the Insurers; (b) any Person acquiring a Lien on or any other rights to any Collateral (whether pursuant to a judgment lien or otherwise) or any other security under the Financing Documents, including without limitation any direct or indirect ownership interests in StadCo or the Club; and (c) the successors and assigns of each of the foregoing.  For the avoidance of doubt, the term Secured Parties shall include any purchaser at a Foreclosure sale with respect to any existing or future Collateral (or such purchaser's lender, trustee, agent or collateral agent therefor), but only to the extent that the Liens of the Secured Parties in the Collateral in respect of the Obligations continue in (or succeed to) the Collateral for the benefit of such purchaser, lender, trustee, agent or collateral agent, upon and following the closing date of such sale, in accordance with the Financing Documents or otherwise.

Requesting Parties
Page 18

"Security Documents" shall mean, individually or collectively as appropriate, the various documents and agreements, including without limitation the Assignment of Leases and Rents, the Leasehold Mortgage, the Pledge, Assignment and Security Agreement (as each of the same is defined in the Indenture), pursuant to which the Trustee or any other Secured Party, has obtained Liens on or security interests in the Collateral, as such documents and agreements may be amended, modified and/or supplemented from time to time.

"Shared Revenues" means the percentage of the receipts derived by the Club, StadCo, any other Club Party (or the JV Company in respect of NFL games or events involving the Club), in each case from the sale of club seats or premium seats and which are payable to the NFL on behalf of visiting NFL teams, together with the percentage of any other revenues received by the JV Company (in respect of NFL games or other events involving the Club) or any applicable Club Party which are payable to the NFL in respect of any NFL-administered shared revenue pools, in each case pursuant to the terms and conditions of the NFL Constitution in effect on the date hereof. "Shared Revenues" shall not include PSL Proceeds, provided that (and to the extent that) such PSL Proceeds are applied in accordance with Paragraph 10(b) as required hereunder.

"StadCo Sublease" shall mean that certain Sublease, dated on or about the date hereof, by and between StadCo and the JV Company.

"Stadium Interests" is defined in Paragraph 4(c).

"Standstill Period" shall mean that period beginning on the date that any Secured Party has a right under the Financing Documents to commence Foreclosure (regardless of whether a Foreclosure Notice has been delivered to the NFL on such date) and ending on the later to occur of:

(a)     the date on which the event that gave rise to such Secured Party's right to Foreclose has been cured and the Secured Parties do not otherwise have any right to Foreclose, in the event that no Secured Party has delivered to the NFL a Foreclosure Notice as contemplated in Paragraph 5(a) hereof (in which case no Foreclosure may be commenced),

(b)     the date which is one hundred eighty (180) days after any Secured Party delivers a Foreclosure Notice to the NFL in accordance with Paragraph 5 hereof (or, in the event StadCo or any other Person contests, in an appropriate proceeding, the right of the Secured Parties to commence such Foreclosure or the right of the NFL to conduct the sale process as set forth herein, then on the date which is one hundred eighty (180) days following the date that any Secured Party gives notice to the NFL of the entry of a Final Order in such proceeding) (such date, the "Standstill Period Extension Notice Deadline"), and

(c)     solely in the event that the NFL notifies the Trustee and the Controlling Insurer, on or prior to the Standstill Period Extension Notice Deadline, that the NFL will, or will cause an Affiliate or a third party acceptable to the Trustee and the Controlling Insurer in their reasonable discretion to, pay the regularly scheduled (but not accelerated) payments of principal and interest (at the applicable pre-default rate, and not at any default rate) on the Obligations during the Standstill Period (and, if the Insurers have made any regularly scheduled payment of the Obligations pursuant to the Reserve Account Surety Bond (or Reserve Account Surety Guaranty, if applicable), the Bond Insurance Policies or the Swap Insurance during the Standstill Period, to reimburse the Insurers in respect of such payments together with any interest accrued thereon during the Standstill Period under the applicable Financing Documents (at the applicable pre-default rate, and not at any default rate)), the date which is one hundred eighty five (185) days after the Standstill Period Extension Notice Deadline (the period that commences on the date after

the Standstill Period Extension Notice Deadline and that ends on such 185th day, the "Extension Period").

"Team" shall mean the New York Giants football Franchise.

"Team Financing" shall mean any secured or unsecured financing from time to time outstanding and constituting any form of Club Debt (other than the Obligations), whether incurred by the Club, the Club Controlling Owner, or any of their respective Affiliates, including without limitation any loans made under that certain Note Purchase Agreement, dated as of April 7, 2004, by and between the Football Club Term Notes 2014 Trust, as Purchaser, and certain member clubs of the NFL (including the Club), as Issuers, as such agreement may be amended, restated, modified or supplemented from time to time, together with any replacement or refinancing therefor.

"Team Sublease" shall mean that certain Sublease, dated on or about the date hereof, by and between StadCo and the Club.

"Uniform Commercial Code" shall mean the Uniform Commercial Code of the State of New Jersey, provided, that if by reason of mandatory provisions of law, the perfection, effect of perfection or non-perfection or the priority of the security interests of Secured Party in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than New Jersey, the Uniform Commercial Code as in effect in such other jurisdiction shall govern for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

## NFL CONSENT AND RELATED PROVISIONS

In consideration of (a) the NFL's agreement to permit the incurrence by the applicable Club Parties of the Obligations to the Secured Parties and the pledge of Collateral by the applicable Club Parties, in each case pursuant to the terms of the Financing Documents, (b) the mutual covenants and agreements hereinafter set forth, and (c) other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Letter Agreement, intending to be legally bound, hereby agree as follows:

1.    NFL Consent to Borrowing. (a)  The NFL and the Requesting Parties hereby agree as follows:

(i)    Provided that the Requesting Parties are and remain in compliance with all of the terms and conditions set forth herein, and subject to the continuing accuracy of the representations and warranties of the Requesting Parties set forth herein, StadCo's issuance of Bonds under the Indenture and entry into the Qualified Swaps, and the pledge, mortgage and assignment by the Club Parties of the Collateral to or for the benefit of the Secured Parties, in each case pursuant to the terms of the Financing Documents, shall not be deemed by the NFL to be a violation of the Debt Limit or the NFL Constitution and are hereby consented to by the NFL.

(ii)    The consent granted herein is in connection with the limited waiver of the Debt Limit granted to the Club pursuant to (and subject to the terms of) 2007 NFL Resolution JC-5, which is attached hereto as Exhibit A, and the NFL's consent to the transactions described herein shall not be deemed to be a waiver of any other term or provision of the NFL Constitution. The Requesting Parties acknowledge and agree that the waiver of the Debt Limit granted to the Club pursuant to 2007 NFL Resolution JC-5 is specific to the Club Controlling Owner and the StadCo Controlling Owner and that, as

a result, if either the Club or StadCo, or a controlling interest in either entity, is sold or otherwise transferred other than to a member or members of the applicable Controlling Owner's immediate family (as defined in the NFL Constitution), then such waiver of the Debt Limit shall be terminated (unless otherwise approved by the NFL in its sole and absolute discretion).

(b)    The NFL hereby confirms that it has approved the Ground Lease, the New Stadium Lease and the Team Lease as and to the extent set forth in 2007 NFL Resolution JC-5.

(c)    The issuance by StadCo of Completion Bonds pursuant to the Indenture shall not require any further consent or approval of the NFL or any amendment of this Agreement, provided that:

(i)    the aggregate principal amount of such Completion Bonds shall in no event exceed $65,000,000;

(ii)    the net proceeds of such Completion Bonds (after costs of issuance) shall be applied solely to fund cost overruns in respect of Costs of the Project that relate solely to work on the New Stadium that was to have been completed on or prior to the date of final completion of the New Stadium, which cost overruns, if so funded, shall be certified to the NFL by StadCo (and such certification shall be accompanied by such documentation relating to such work and the payments therefor as the NFL may reasonably request);

(iii)    the Completion Bonds shall be issued pursuant to Section 205 of the Indenture as in effect as of the date hereof (and as the same may be amended or modified in accordance with the terms hereof) and shall be secured on a pari passu basis by the Collateral with the other Obligations; and

(iv)    no Supplemental Indenture or other documents or agreements executed in connection with the Completion Bonds shall contain any Material Modification, except that designation of the following pursuant to a Supplemental Indenture shall not be deemed a Material Modification in connection with the issuance by StadCo of Completion Bonds pursuant to this Paragraph 1(c): (A) the authorized principal amount, designation and Series of such Completion Bonds; (B) the date or dates and the maturity date or dates of the Completion Bonds (provided that no such maturity date shall be later than 40 years following the date of issuance and in no event shall the issuance of any Completion Bonds relieve the Club Parties or the JV Company of their obligations to comply with the terms of the limited waiver of the Debt Limit provided for under 2007 NFL Resolution JC-5); (C) customary call protections and the interest rate or rates of such Completion Bonds and the manner of determining such rate or rates; (D) the Redemption Price, if any, of such Completion Bonds or the method of determining such Redemption Price; (E) the creation or termination of sinking funds or other reserves with respect to such Completion Bonds; and (F) other similar and customary provisions associated with the type of debt instrument and related Qualified Swap Transactions through which the Completion Bonds shall be issued and/or hedged and as contemplated by the terms of Sections 204 and 205 of the Indenture (including without limitation changes in the mix and type of such debt instruments (e.g., auction rate securities, fixed rate securities, etc.) so issued) and that in any event do not modify the covenants, security, agreements, events of defaults and/or remedies set forth in the Indenture or any other Financing Documents.

Requesting Parties
Page 21

The Completion Bonds, and all rights and remedies in respect thereof, shall, for the avoidance of doubt, be subject to the each of the terms and conditions of this Letter Agreement applicable to the Obligations.

     2.    Customary Security Interests; No Current Conveyance.

    (a)    Each of the Secured Parties, the Club, StadCo and the StadCo Controlling Owner hereby represents to the NFL that StadCo's pledge, assignment and mortgage of the Collateral for the benefit of the Secured Parties is intended to be a customary granting of a leasehold mortgage, security interest and Lien within the meaning of the Uniform Commercial Code and other applicable law relating to real estate or otherwise and not a present conveyance to the Trustee or the other Secured Parties that would entitle the Trustee or the other Secured Parties to any present ownership interest (other than such security interest and Lien) in or with respect to any Club Party, the JV Company, the Collateral or the NFL. The Requesting Parties acknowledge and agree that the Collateral and the security interest and Lien of the Trustee and the other Secured Parties therein are, and at all times shall be, held subject in all respects to the NFL Constitution and the terms of this Letter Agreement. Notwithstanding the foregoing, the NFL hereby agrees that in the event that the Secured Parties shall, at any time within sixty (60) days following the date on which there becomes effective a change in the NFL Constitution under which the continuation of the security interests or Liens in the Collateral granted by StadCo pursuant to the Financing Documents would be prohibited or otherwise rendered invalid under the NFL Constitution, deliver a Foreclosure Notice in respect of a Default or Event of Default under the Financing Documents premised on such change in the NFL Constitution, then, in such event, such prohibition or invalidity effected by such change in the NFL Constitution shall not be effective with respect to the Secured Parties (or the NFL) during any Standstill Period arising in connection with such Foreclosure Notice or any subsequent Foreclosure under the terms hereof.

    (b)    The Secured Parties individually, jointly and severally (other than the Insurers, whose obligations under this Paragraph shall be several from, and not joint with, the other Secured Parties) agree that they shall exercise any rights to Foreclose upon (and any other remedies in respect of) the Collateral only upon the occurrence and during the continuance of an Event of Default under the Financing Documents, and that any such exercise by the Secured Parties of such Foreclosure rights and other remedies shall be in strict accordance with each of the terms of this Letter Agreement and, during the Standstill Period, be effected solely by and through the NFL as described more fully below. The Requesting Parties further represent, warrant, covenant and agree that, without the prior written consent of the NFL (which consent may be given or not given in the NFL's sole and absolute discretion):

    (i)    the Secured Parties have no right and shall at no time hereafter (except as the NFL may agree in writing) have any right to Foreclose on any assets of, or any direct or indirect ownership interests in, any Club Party (including, without limitation, the Club and any amounts payable to or rights otherwise held by the Club under the Team Sublease) or the JV Company, other than on Collateral (x) owned by StadCo or in which StadCo has an interest due to pledge or assignment (in which case such Collateral is pledged only to the extent of StadCo's interest therein) and (y) either pledged to the Secured Parties pursuant to the Financing Documents or against which the Secured Parties have obtained a judgment lien following an Event of Default (but subject in all cases to the terms hereof, including without limitation the restrictions on any Foreclosure against any such Collateral in Paragraph 5 hereof, and where consistent herewith, the terms of the Financing Documents); provided that during the Standstill Period the Trustee or the Controlling Insurer may, to the extent permitted under the Financing Documents, bring an action against StadCo, any other Club Party or the JV Company seeking an injunction or specific performance (but no other remedy whatsoever) solely in order to (A) prevent any misappropriation or conversion by StadCo for StadCo's use (other than

to support continued construction of the New Stadium or to make payments in respect of operations of the New Stadium in the ordinary course) of funds otherwise in StadCo's control in violation of its obligations under the Financing Documents, (B) enforce against the Club the specific performance of the Club's obligations under Section 1 of the Non-Relocation Agreement, (C) exercise any of their rights under Paragraph 5(r) of this Letter Agreement or (D) preserve the right of the Trustee and/or the Controlling Insurer to exercise, following the conclusion of the Standstill Period and as otherwise expressly permitted by the terms of this Letter Agreement, such remedies as the Trustee and/or the Controlling Insurer may have against the Club, the other Club Parties or the JV Company under the terms of the Non-Relocation Agreement; and

(ii)    the Secured Parties have no right and shall continue to have no right, including following the occurrence and during the continuance of an Event of Default, to Foreclose on (and shall not have any other rights whatsoever with respect to) (A) Shared Revenues, which shall at all times be paid by StadCo and/or the Club to the NFL, on behalf of the other NFL member clubs, as and to the extent required under the NFL Constitution, (B) the proceeds of the League G-3 Loan (including without limitation any funds in the NFL Facility Proceeds Account) or (C) PSL Proceeds.

3.    <u>Default Under Financing Documents</u>.  The NFL shall not regard the mere occurrence or continuance of any Default or Event of Default under the Financing Documents as a breach of the Club's obligations to the NFL or a violation of the NFL Constitution, or as grounds for the sale, withdrawal, termination, or forfeiture of the Franchise or any interest therein, unless the act, omission, event or condition (or any consequences arising therefrom) that gives or could give rise to the Default or Event of Default would also separately and independently constitute a default by the Club of any of its obligations to the NFL or a violation by the Club of the NFL Constitution, or would allow or permit such sale, withdrawal, termination or forfeiture of the Franchise or any interest therein under the terms of the NFL Constitution.

4.    <u>No Transfer of Collateral; No Guarantees; Certain NFL Rights</u>.

(a)    Notwithstanding anything in this Letter Agreement or any Financing Document to the contrary, except for the mortgage, pledge and assignment of, and the security interest and Lien granted in, the Collateral pursuant to the Financing Documents, to which consent is being given hereby subject to the terms and conditions of this Letter Agreement, the parties agree that:

(i)    no interest in the Football Collateral, in any other Football Related Assets or in any direct or indirect ownership interests in any Club Party or the JV Company, whether present or future, contingent or unconditional (including, without limitation, any direct or indirect interest in the Club, StadCo, or any rights in or to the NFL Ventures, NFL Productions, NFL Enterprises, or NFL Properties securities), may be sold, pledged, or otherwise transferred (including, without limitation, to any Affiliate of any Club Party or the JV Company or any transfer upon a Foreclosure), and no contingent or conditional assignment may be made currently effective to convey a current ownership interest in Football Collateral, any such Football Related Assets or any such ownership interests at any time without the prior written consent of such of the NFL and the NFL member clubs as may be required under the NFL Constitution, and the parties hereto hereby agree that any proposed sale, pledge or other transfer without such prior written consent shall be deemed void *ab initio* and of no force or effect; <u>provided</u> that this clause (i) shall not prohibit Ordinary Course Sales (or ordinary course sales of tickets, seat licenses, suite rights, concessions, inventory, advertising, naming or other

sponsorship rights between or among the JV Company, StadCo and/or the Club, as applicable, made in accordance with the terms of the StadCo Sublease, the Team Sublease or the Naming Rights and Suite Sales Agreement) or the Trustee, following an Event of Default and subject to the terms of the Financing Documents, seeking a Judgment Order and/or judgment lien against any assets of StadCo (in each case other than Shared Revenues, the proceeds of the League G-3 Loan, PSL Proceeds, any funds in the NFL Facility Proceeds Account or the Other Proceeds Account and any assets against which recourse is prohibited by the Financing Documents) which do not then constitute Collateral (provided that, upon obtaining such a judgment lien, the assets subject to such lien shall constitute "Collateral" hereunder and the Secured Parties' rights with respect thereto shall be subject to the terms and restrictions contained herein, including without limitation those set forth in Paragraph 5 hereof); and

    (ii)    none of the Obligations are or will be guaranteed by, in any way a suretyship or other liability or obligation of, or secured by any assets of, the JV Company or any of the Club Parties other than StadCo (provided that the foregoing shall not be deemed to limit the Club from entering into the covenants expressly set forth in the Non-Relocation Agreement or the Club Parties from performing their obligations to the NFL hereunder).

    (b)    Under no circumstances, without the NFL's prior written consent in its sole and absolute discretion, shall the StadCo Sublease, Team Sublease, Ground Lease, or any other Additional Agreement be terminated (other than by expiry in accordance with the terms thereof), cancelled, rescinded, surrendered, or amended, abridged or otherwise modified in any manner that would constitute a Material Modification, and any such termination, cancellation, rescission, surrender, amendment, abridgement, or modification of the StadCo Sublease, Team Sublease, Ground Lease, or any other Additional Agreement without such prior written consent of the NFL shall be deemed void *ab initio* and of no force or effect, provided that this clause *(b)* shall not apply to (i) any amendment, abridgement or modification relating to the Existing Stadium Lease that does not prevent or otherwise hinder or interfere with the exhibition and performance of the Team's NFL games at the Existing Stadium at any time prior to Substantial Completion of the New Stadium, (ii) any Permitted Transfer or (iii) the exercise by the JV Company, Club and StadCo of their early termination rights under the Ground Lease, Team Sublease and StadCo Sublease, respectively, in accordance with the terms of the Ground Lease, StadCo Sublease and Team Sublease, as applicable, the Financing Documents and Paragraphs 4(s) and 32 of this Letter Agreement. Under no circumstances, without the NFL's prior written approval of the terms thereof in its sole and absolute discretion, shall the JV Company or any Club Party enter into any Additional Agreement not already approved by the NFL or approved (or, in the case of Additional Agreements between the Club or StadCo and the Other Club or Other StadCo, permitted pursuant to clause (e) of the definition of Material Modification) under this Agreement.

    (c)    Unless waived or otherwise consented to by the NFL in writing in its sole and absolute discretion (with the NFL prior to the date hereof having consented to the Club's pledge of substantially all of its assets pursuant to certain Team Financings), each of the Club Parties and the JV Company shall not, except as already created under or, in respect of Liens on future receivables and after acquired property, contemplated by the Financing Documents, create, place or permit to be created or placed, or through any act or failure to act, acquiesce in the placing of, or allow to remain, and the Secured Parties (to the extent the Secured Parties have consent rights) shall not consent to, any deed of trust, mortgage, voluntary or involuntary lien, whether contractual or by law (other than statutory liens securing liabilities that are not yet due and payable), any security interest, encumbrance or charge, or conditional sale or other title retention document (each a "Lien Restriction") against or covering any interest of such Club Parties or the JV Company, as applicable, in the StadCo Sublease, Team Sublease,

Requesting Parties
Page 24

Ground Lease, any other Additional Agreement, or any part thereof or any interest therein, including, without limitation, the rents or other revenue derived therefrom (the "Stadium Interests"), and should any of the foregoing become attached hereafter in any manner to any part of the Stadium Interests without the prior written consent of the NFL, the JV Company, the Club and StadCo shall, and the Club Controlling Owner and the StadCo Controlling Owner shall cause the Club and StadCo, respectively, to, cause the same to be promptly discharged and released at their sole expense, provided that this clause (c) shall not apply (i) to the extent that any interest of the Club Parties in the StadCo Sublease, Team Sublease, Ground Lease or other Additional Agreement has been sold, assigned or transferred pursuant to a Permitted Transfer or (ii) to any Permitted Encumbrance (as defined in the Indenture).

(d)      Under no circumstances without the NFL's prior written consent in its sole and absolute discretion, shall any Stadium Interest be sold, pledged, assigned, sublet, or otherwise transferred (other than to the Club, but subject always to the continuing validity of any Liens of the NFL and, if required pursuant to Paragraph 6(b), any applicable lender thereon as contemplated hereby), and the parties hereto hereby agree that any proposed sale, pledge, assignment, sublease, or other transfer without such prior written consent shall be deemed void *ab initio* and of no force or effect; provided that the relevant Club Parties may enter into and perform: (i) Permitted Transfers, (ii) subleases and licenses (including the sale, assignment or other transfer of the revenues derived therefrom in accordance with the terms hereof) of the New Stadium for non-NFL events in the ordinary course of the operation of the New Stadium that do not prevent or interfere with the operation of the Team or the ability of the Team to play its football games in the New Stadium; and (iii) Ordinary Course Sales.

(e)      Immediately upon the closing of the transactions contemplated herein, StadCo and the StadCo Controlling Owner shall cause the Memoranda of New Stadium Leases and the Leasehold Mortgage, to be recorded, in such order, in the appropriate public records, and shall promptly deliver to the NFL, the Trustee and the Controlling Insurer evidence of such recordation. In addition to any and all other rights of the NFL set forth herein, during the Standstill Period, following the date on which a Foreclosure Notice is delivered or required to be delivered (or is otherwise deemed to have been delivered) by the Controlling Insurer or the Trustee, the NFL shall have the right (the "NFL Standstill Period Lease Rights") to exercise the rights of the Trustee under the Leasehold Mortgage, and upon such exercise the NFL shall thereafter enjoy to the extent set forth in the Leasehold Mortgage the rights and assume the obligations of StadCo under any Additional Agreement entered into by StadCo during the period of such enjoyment, unless and until the NFL provides further notice to the contrary.

(f)      The NFL's exercise of the NFL Standstill Period Lease Rights shall not preclude the Trustee from exercising its rights under the Security Documents as otherwise permitted under and in accordance herewith; provided that, for the avoidance of doubt, during the Standstill Period no Secured Party (including the Trustee) shall have any right to effect any sale or disposal (by lease, conveyance or otherwise) of any Stadium Interests, except in respect of Ordinary Course Sales.

(g)      If the NFL elects to cure an Event of Default pursuant to the terms of Paragraph 9 below by paying the Obligations in full and acquiring the Secured Parties' interests in the Operative Documents (and/or by assuming the Obligations), then the NFL shall also have the right to exercise the NFL Standstill Period Lease Rights.

(h)      Each Club Party and the JV Company shall immediately deliver or cause to be delivered to the NFL and, to the extent required under the Indenture, to the Trustee all material notices or demands under the StadCo Sublease, Team Sublease, Ground Lease, and/or any Additional Agreement that it receives or delivers (including without limitation any notice of default, violation or failure and any other material notice or notice of a material event). The Trustee shall immediately deliver to the NFL all such notices or demands under the StadCo Sublease, Team Sublease, Ground Lease, and/or any

Requesting Parties
Page 25

Additional Agreement that the Trustee receives or delivers. If the Trustee receives a notice of the JV Company's or a Club Party's default, violation or failure under the StadCo Sublease, Team Sublease, Ground Lease, and/or any Additional Agreement and the Trustee elects not to exercise a right of the Trustee to cure such default, violation or failure, the NFL shall have the right to direct the Trustee to cure such default, violation or failure at the NFL's expense to the extent of the Trustee's rights. If the NFL exercises this right to cure at its expense, then if the Trustee exercises its rights of Foreclosure under the Leasehold Mortgage (which Foreclosure shall be subject to the restrictions contained herein), the NFL shall be entitled to payment for any costs that it incurs in curing such default, violation or failure on a *pari passu* basis with the Trustee for any costs that the Trustee may incur in curing any such default, violation or failure.

(i)    So long as any Club Party, or any Person controlling, controlled by, or under common control with any Club Party, is the holder of the Team, neither any Club Party nor the JV Company shall accept or make a voluntary surrender or cancellation of its interests in the StadCo Sublease, Team Sublease or Ground Lease without the prior written consent of the NFL in the NFL's sole and absolute discretion, other than pursuant to and in accordance with the early termination rights set forth in the Ground Lease, StadCo Sublease and Team Sublease, as applicable, the terms of the Financing Documents and Paragraphs 4(s) and 32 of this Letter Agreement.

(j)    Each of the Club and the Club Controlling Owner represents, warrants and covenants that the Team now has, and, subject to force majeure events and future breaches of the Ground Lease by the Authority over which such parties have no control, at all times until the New Stadium is available for such purpose shall have, the right to play all of its home football games at the Existing Stadium for the term set forth in the Existing Stadium Lease. The Club, the Club Controlling Owner and each Secured Party acknowledges and agrees that the NFL is a third party beneficiary of, and may enforce against the Club (including without limitation by seeking an injunction, specific performance and other equitable remedies), each of the representations, warranties, covenants, agreements and obligations of the Club under the Non-Relocation Agreement, including without limitation the Club's obligations under Section 1 thereof.

(k)    Each of the JV Company and each Club Party that is party to the applicable Additional Agreement, and each of the Club Controlling Owner and the StadCo Controlling Owner, represents and warrants that: (i) attached hereto as Exhibits B-1 to B-3, respectively, are true, complete, and accurate copies of the fully executed StadCo Sublease, Team Sublease and Ground Lease; and (ii) attached hereto as Exhibit B-4 are true, complete, and accurate copies of the fully executed Memoranda of New Stadium Leases, each of which is in recordable form (and which, in the case of the JV Company's interest in the Ground Lease, includes a negative pledge in form and substance satisfactory to the NFL).

(l)    Each of the JV Company and each Club Party that is party to the applicable Additional Agreement, and each of the Club Controlling Owner and the StadCo Controlling Owner, hereby represents and warrants that: (i) each of the StadCo Sublease, the Team Sublease and the Ground Lease is in full force and effect in accordance with its terms, no default by it has occurred thereunder, and, to the best of the JV Company's and such Club Party's knowledge, no default by any other party to such Leases has occurred thereunder; (ii) none of the StadCo Sublease, Team Lease or Ground Lease has been amended or modified except as otherwise stated herein (and as reflected in the exhibits attached hereto); (iii) such Club Party, and, to the best of its knowledge, all other parties to the StadCo Sublease, Team Sublease and Ground Lease have performed all of their obligations under such Leases that are required to be performed as of the date hereof; (iv) no facts or circumstances exist that would, but for the passage of time, the giving of notice, or both, constitute a default by the JV Company or such Club Party, or, to the best of its knowledge, any other party to the StadCo Sublease, Team Sublease or Ground Lease under such Leases; and (v) each of the StadCo Sublease, Team Sublease and Ground Lease was duly executed

Requesting Parties
Page 26

and delivered by the JV Company or such Club Party, and to the best of its knowledge, by the other parties thereto.

(m)      Immediately after the date hereof, the JV Company and each Club Party party to the applicable Additional Agreement shall cause a negative covenant to be recorded in the Bergen County Clerk's Office, Hackensack, New Jersey, which negative covenant shall provide that the JV Company and the Club Parties acknowledge and covenant that they shall not, without the NFL's prior written consent in the NFL's sole and absolute discretion (A) place or permit to be placed any Liens on the StadCo Sublease, Team Sublease or Ground Lease or any interest therein (other than Permitted Encumbrances) or (B) sublet, assign, or otherwise transfer the StadCo Sublease, Team Sublease or Ground Lease or any interest therein, other than (i) any such subletting, assignment, or other partial transfer as is expressly contemplated by the StadCo Sublease, Team Sublease or Ground Lease to permit the JV Company and the Club Parties to exploit the rights granted thereunder (but in no event any such transfer or assignment of the entire leasehold estate granted thereby) or (ii) in connection with a Permitted Transfer.

(n)      The JV Company and each undersigned Club Party hereby covenants and agrees to use its best efforts (which shall not require the payment of any compensation or other consideration (except for legal fees and related expenses) to the Authority or the City, as applicable) to do the following:

(i)      simultaneously with the entering into of any amendment, modification, or supplement to the Ground Lease, the JV Company shall enter into or consent to, as appropriate and as requested by the NFL in the NFL's sole and absolute discretion, and shall cause the Authority to enter into, a formal agreement amending the Ground Lease, each of which agreements and/or consents shall be in form satisfactory to the NFL in its sole and absolute discretion, shall be subject to NFL approval prior to execution, and shall, without limitation, provide that (A) the NFL is a third-party beneficiary under the Ground Lease, and such amendment, modification or supplement, with the power (but not the obligation) to enforce JV Company's rights and obligations thereunder; and (B) any notice or demand under the Ground Lease (including any notice of default, violation or failure and any other material notice or notice of a material event), and such amendment, modification or supplement shall be delivered simultaneously to the NFL; and

(ii)      as soon as practicable after the date hereof, cause the Authority to execute and deliver the New Stadium Estoppel.

(o)      JV Company shall not, without the NFL's prior written consent, provide any consent to the City or the Authority under Section 14.01 of the Ground Lease unless the failure to provide such consent prior to receipt of such NFL written consent would reasonably be expected to constitute a breach of the Ground Lease.

(p)      The Trustee shall not, without the NFL's prior written consent in the NFL's sole and absolute discretion, provide any consent to the Club or the Authority as a Leasehold Mortgagee under either of the StadCo Sublease (including without limitation under Section 9.03 thereof) or the Ground Lease (including without limitation under Section 16.03 thereof); provided that such NFL consent shall not be unreasonably withheld, conditioned, or delayed if the Trustee's consent under the applicable provision of the StadCo Sublease or Ground Lease, as applicable, may not be unreasonably withheld, conditioned, or delayed pursuant to the terms thereof.

Requesting Parties
Page 27

(q)        StadCo and the Trustee shall immediately deliver to the NFL a copy of any notice sent to StadCo or the Trustee pursuant to Section 9.03 of the StadCo Sublease and, upon the NFL's request, StadCo and/or the Trustee shall deliver timely to the JV Company an objection notice under the StadCo Sublease.

(r)        The JV Company and each undersigned Club Party (i) represents and warrants that, to its knowledge, no Liens, encumbrances or other exceptions to title (other than Permitted Exceptions, as defined in the Ground Lease) affecting the City's and/or the Authority's title to, or interests in, the Premises (as defined in the Ground Lease) or any portion thereof (including, without limitation, the Ground Lease, or any of the superior leases to which the City and the Authority are party with respect to the New Stadium) currently exist (except as otherwise disclosed by the Authority in the Ground Lease) and (ii) covenants and agrees that it shall (x) use commercially reasonable efforts to enforce against the Authority the provisions of the Ground Lease relating to the maintenance of the Authority's title to the Premises, including without limitation the provisions of Section 14 of such Ground Lease and (y) not consent to the encumbrance of the Authority's title to the Premises pursuant to Section 14.02 of the Ground Lease without the NFL's prior written consent (not to be unreasonably withheld or delayed) unless the failure to so consent would constitute a breach of the Ground Lease (in which event the NFL shall be provided with notice and a copy of such consent).

(s)        The JV Company and each Club Party that is party to the applicable Additional Agreement, and each of the Club Controlling Owner and the StadCo Controlling Owner, acknowledges and agrees that, so long as any Obligations are outstanding, it shall not exercise its early termination rights under the Ground Lease, StadCo Sublease or the Team Sublease relating to the New Stadium without either (i) the prior written consent of the NFL or (ii) (A) the repayment in full of the Obligations by StadCo (or the defeasance of all of the Obligations or other provision for such repayment pursuant to transactions and on such terms as may be satisfactory to the NFL in its sole and absolute discretion) and (B) the Club having secured an alternative venue for playing NFL games pursuant to a lease that has been approved by the NFL in its sole and absolute discretion. For the avoidance of doubt, the JV Company and the Club Parties further acknowledge and agree that any consent by the NFL to such an exercise of early termination rights or approval of a lease for an alternative venue shall not, unless otherwise expressly consented to by the NFL and/or such of the NFL member clubs as may be applicable under the NFL Constitution in each case in their sole and absolute discretion, constitute consent by the NFL and/or NFL member clubs to a relocation of the Team outside of its existing territory.

5.        Foreclosure and Standstill Provisions.  Any proposed Foreclosure or other proceeding by any Secured Party following a Default or Event of Default shall be subject to the terms and conditions set forth in this Paragraph 5:

(a)        If a Default or Event of Default shall have occurred and shall be continuing and a Secured Party shall have the right under the Financing Documents and shall seek to commence a Foreclosure on any Collateral or any other Football Related Assets, the Secured Parties shall, prior to the commencement of any Foreclosure, deliver a Foreclosure Notice to StadCo (and such other parties as may be required under the Financing Documents and applicable law).  In the event a Secured Party shall furnish to StadCo or any other Person any Foreclosure Notice, such Secured Party shall simultaneously furnish to the NFL a copy of such Foreclosure Notice, and each Secured Party hereby agrees that notwithstanding any provision herein or in the Financing Documents to the contrary, no such Foreclosure Notice shall be effective (and no Foreclosure shall be commenced) until such Foreclosure Notice has been delivered to the NFL in accordance with the provisions of Paragraph 16 hereof.  In connection with its delivery of any Foreclosure Notice, if reasonably requested by the NFL following an Event of Default, such Secured Party shall take any and all actions necessary to effect such Foreclosure and, without limiting the foregoing, shall file and use its reasonable efforts promptly to obtain entry of a judgment lien

Requesting Parties
Page 28

and/or a Judgment Order, including against any assets of StadCo that do not then constitute Collateral, and upon its entry by a court the Trustee and such Secured Party shall deliver a copy of evidence to the NFL that such judgment lien or Judgment Order has been obtained.

(b)    Notwithstanding the commencement and continuation of a Standstill Period, in the event that (x) the Trustee or any other Secured Party shall have the right at any time prior to Substantial Completion to deliver a Foreclosure Notice and (y) at such time, the Trustee or any other Secured Party (or any successor thereto) shall have the right, under the terms of the Financing Documents, to elect whether to complete the Project, then, in such event and without prejudice to the remaining provisions of this Letter Agreement (including without limitation Paragraph 5(n) hereof), the Trustee or such other Secured Party shall have the right, at any time thereafter, to make such election (subject to such terms as are otherwise provided under the Financing Documents and subject always to and in accordance with the terms of this Paragraph 5 and Paragraph 9 of this Letter Agreement). In the event that the Trustee or such other Secured Party shall fail so to elect, within ninety (90) days, to exercise such rights and to complete the Project, the provisions of Paragraph 5(b)(i) shall apply; provided that in the event that the JV Company and the Club Parties during such ninety (90)-day period are diligently and actively completing the Project then, in such event, such period shall be extended until the date which is thirty (30) days following the date on which the JV Company and the Club Parties shall have ceased diligently and actively completing the Project. The Secured Parties shall be deemed to have given notice to the NFL of their election not to complete the Project upon the earliest to occur of: (1) the expiration of such ninety (90)-day period (as extended by the proviso in the foregoing sentence); and (2) the delivery by the Secured Parties of a Foreclosure Notice (or the date on which a Foreclosure Notice shall be deemed to have been delivered as provided in Paragraph 5(c)(ii) in respect of a Foreclosure prior to Substantial Completion). In the event that the Trustee or such other Secured Party elects to complete the Project, the provisions of Paragraph 5(b)(ii) shall apply (provided that if, at any time following such election, the Trustee or other Secured Party abandons or otherwise fails to timely complete the Project, the provisions of Paragraph 5(b)(i) shall apply).

(i)    In the event that the Trustee and the other Secured Parties fail timely to elect to complete the Project as contemplated in this Paragraph 5(b), then not less than sixty (60) days prior to effecting any transfer (with any such transfer being made only to the extent otherwise permitted by the terms hereof and the Indenture) of any monies in the Bond Proceeds Account (and such other monies and Funds as the terms of the Financing Documents shall permit to be transferred to the Senior Lien Debt Service Fund or other applicable debt service funds or accounts) for application to the repayment of the Obligations (other than Permitted Standstill Period Payments, the payment of which shall be permitted hereunder to the extent otherwise permitted in the Indenture), the Trustee and the other Secured Parties shall give the NFL written notice of such intention not to complete the Project and to seek such transfer for application to the repayment of the Obligations; provided that such transfers shall in all cases be subject to the terms of the Financing Documents and this Letter Agreement. Upon receipt of such notice, the NFL shall have the right, at any time during the sixty (60)-day period following receipt of such notice, (x) to exercise the cure rights afforded to the NFL pursuant to Paragraph 9 hereof and to direct StadCo, the other Club Parties and the JV Company to complete the Project and/or (y) to assume the rights and obligations of StadCo under the Financing Documents (such obligations and rights (other than the maximum commitment and notional amounts, interest rates, amortization schedule and payment terms thereunder) being so modified as may be reasonably necessary to permit the NFL to perform as StadCo under the Indenture and to make the borrowings necessary under the Financing Documents to complete the Project) and to assume and exercise the rights of StadCo, the other Club Parties and the JV Company to complete the Project. Regardless of whether the NFL shall so elect to

Requesting Parties
Page 29

exercise such cure and/or assumption rights, (1) neither the Trustee nor any other Secured
Party shall effect any Foreclosure upon or other disposition of any monies in or other
properties credited to any Account except as otherwise expressly provided herein, other
than in respect of, and solely to the extent required to make Permitted Standstill Period
Payments, and in no event shall any monies in or other properties credited to any Account
be used for any other purpose or otherwise transferred or disposed of by the Trustee or
any other Secured Party and (2) in no event shall any proceeds of the League G-3 Loan
(including any such proceeds contained in the NFL Facility Proceeds Account) be applied
to repay the Obligations or otherwise Foreclosed upon by the Secured Parties.

(ii)        In the event that the Trustee or any other Secured Party elects to
complete the Project and to enforce, subject to the terms of the Financing Documents, all
rights of StadCo, the other Club Parties and the JV Company under and pursuant to any
Operative Project Documents, then, in such event:

(A)        during the Standstill Period, but only as otherwise permitted by
the terms of the Financing Documents, the Trustee shall have the right to
administer the Accounts and to apply any and all monies therein or other
properties credited thereto only to the payment of (x) Costs of the Project (but,
for the avoidance of doubt, excluding any payments of principal, interest, fees,
costs or expenses arising under any Financing Document that are not Permitted
Standstill Period Payments); provided that, for the avoidance of doubt, the
Trustee shall at no time have the right to administer or apply any proceeds of the
League G-3 Loan or any PSL Proceeds, which shall be administered and applied
during the Standstill Period, if at all, only by the NFL, and (y) Permitted
Standstill Period Payments; and

(B)        to the extent any such monies or properties are not disbursed to
pay such Costs of the Project or Permitted Standstill Period Payments, then
during the Standstill Period the Trustee shall retain the same in the Accounts and
shall not transfer or dispose of the same and the same shall remain subject to the
limitations set forth herein in respect of the Standstill Period.

(iii)        In addition to its rights with respect to the Accounts under this Paragraph
5(b), the NFL shall also have all of the rights set forth in Paragraph 5(l) below with
respect to the payment of Operating Expenses.

(iv)        In the event that the Trustee or the Controlling Insurer has the right to do
so under the terms of the Financing Documents and this Letter Agreement and shall,
following consultation in good faith with the NFL, elect to cause the issuance of
additional Bonds under the Indenture, and/or uses monies or other properties in the
Accounts to complete the Project in accordance with this Paragraph 5(b) following a
Default or Event of Default, then, in such event and notwithstanding the occurrence of a
commitment termination event under clause (d)(ii) of the definition thereof contained in
the League G-3 Loan that arises solely as a result of such Default or Event of Default
(other than such a commitment termination event that arises subsequent to or in
connection with any other commitment termination event thereunder), at the request of,
and for the benefit only of, the Insurers (but not the Club Parties, the JV Company or the
other Secured Parties), the NFL shall continue to make loans under and in accordance
with the other terms of the League G-3 Loan in an amount not to exceed the NFL's then-
remaining commitment that would otherwise have been available to StadCo under such

Requesting Parties
Page 30

League G-3 Loan) to provide funds for the completion of the Project as contemplated in this Paragraph 5(b).

(c)    The parties hereby agree that the initiation of any Foreclosure and delivery of any Foreclosure Notice shall be subject to the following terms:

(i)    During the Standstill Period, in addition to the rights provided to the NFL herein (and except as otherwise expressly provided in Paragraph 5(b) hereof):

(A)    no Secured Party shall take any steps to effect Foreclosure (except as the NFL in its sole and absolute discretion may consent); provided that the foregoing shall not prohibit the Secured Parties from delivering a Foreclosure Notice or, subject to the assumption and cure rights of the NFL hereunder, from: (w) providing a notice of acceleration to StadCo at any time or from time to time as permitted under the Financing Documents; (x) taking such other actions (e.g., filing proofs of claim, but, for the avoidance of doubt, expressly excluding the filing of an involuntary proceeding or petition) as are necessary to preserve the Secured Parties' rights to exercise their remedies under the Financing Documents upon the termination of the Standstill Period; (y) seeking a Judgment Order and/or judgment lien against any assets of StadCo (other than Shared Revenues, proceeds of the League G-3 Loan (including without limitation any funds in the NFL Facility Proceeds Account), PSL Proceeds and amounts on deposit in the Other Proceeds Account) which do not then constitute Collateral (provided that, upon obtaining such a judgment lien, the assets subject to such lien shall constitute "Collateral" hereunder and the Secured Parties' rights with respect thereto shall be subject to the terms and restrictions contained herein); or (z) bringing an action for an injunction or specific performance (but not for any money damages) under the Non-Relocation Agreement to require the Club to comply with its obligations under Section 1 thereof;

(B)    following the date on which any Secured Party shall be required hereunder to deliver a Foreclosure Notice, the NFL shall have the right to direct the Trustee and the other Secured Parties in the exercise of their rights under and in accordance with the Financing Documents (the "NFL Standstill Period Collateral Rights");

(C)    the NFL shall have the rights set forth in Paragraph 9 hereof; and

(D)    following the date on which any Secured Party shall be required hereunder to deliver a Foreclosure Notice to the NFL, the NFL shall have the exclusive and unrestricted right, subject to the terms of this Letter Agreement but without the prior consent of the Secured Parties or any other Requesting Party, to select the purchaser to whom the Collateral (or any portion thereof and, at the NFL's election, including some or all Football Related Assets not then pledged to the Secured Parties) shall be sold and to establish the terms and conditions of any sale that is consummated or agreed upon in writing within the Standstill Period, which sale will occur within a reasonable period of time thereafter.

(ii)    If at any time or from time to time the NFL shall reasonably believe that a Foreclosure has commenced, but the NFL shall not have received a Foreclosure Notice from the Secured Parties as required hereunder, then the NFL may so notify the Trustee

and the Controlling Insurer in writing and the NFL shall, for the avoidance of doubt, have all of the NFL Standstill Period Collateral Rights (and the rights under Paragraph 5(b), as applicable), except that the NFL shall not, prior to the Foreclosure Cure Expiration Date, have the right to sell the Collateral without the prior written consent of the Controlling Insurer (or, following a Bond Insurance Termination Event, the Trustee).  Upon receipt of such notice from the NFL, and subject always to (A) such Foreclosure being capable of cure (e.g., through the suspension or termination of any associated judicial proceedings, cross-acceleration, cross-defaults, or other collateral results of such Foreclosure), (B) the Controlling Insurer (or, following a Bond Insurance Termination Event, the Trustee) having undertaken reasonably diligent efforts to effect such a cure of such Foreclosure within three (3) Business Days following delivery of such notice from the NFL (and having continued such efforts thereafter), (C) the Controlling Insurer, the Trustee or any other Secured Party not having delivered a Foreclosure Notice or otherwise engaged in, undertaken, or directed the actions or other conduct leading the NFL to have issued such notice, and (D) such cure having been effected in full on or before the Foreclosure Cure Expiration Date, the Controlling Insurer (or, following a Bond Insurance Termination Event, the Trustee) shall have the right, upon timely delivery of written notice of such intention to the NFL to attempt to effect the cure of such Foreclosure.  If the Controlling Insurer (or, following a Bond Insurance Termination Event, the Trustee) shall successfully effect a cure of such Foreclosure as contemplated in clauses (A) through (D) hereof, then, in such event, such Foreclosure shall be deemed to have been avoided, and the NFL Standstill Period Collateral Rights in respect of such cured Foreclosure (but no subsequent Foreclosure) shall terminate; provided that, for the avoidance of doubt, any subsequent Foreclosure by the Controlling Insurer, the Trustee or any other Secured Party shall be subject to the terms of this Letter Agreement.

       (iii)      The parties acknowledge and agree that (A) the cure rights granted to the Secured Parties under Paragraph 5(c)(ii) shall terminate on the Foreclosure Cure Expiration Date, and (B) in the event that a Foreclosure shall have occurred and the Controlling Insurer (or, following a Bond Insurance Termination Event, the Trustee) shall not have effected such cure on or before the Foreclosure Cure Expiration Date, then for purposes of this Letter Agreement a Foreclosure Notice shall be deemed to have been delivered by the Secured Parties on such Foreclosure Cure Expiration Date.

       (iv)      In connection with an Event of Default in respect of which a Foreclosure Notice shall have been issued (or deemed to have been issued) hereunder, then, in such event, the NFL shall consult with the Controlling Insurer (or, following a Bond Insurance Termination Event, the Trustee (but not any other Secured Party)) with respect to the sales process proposed to be used by the NFL, including the role of any potential purchasers to be identified by the Secured Parties in connection therewith; will consider in good faith the use of a competitive bidding process if the Controlling Insurer (or, following a Bond Insurance Termination Event, the Trustee (but not any other Secured Party)) shall so request; will conduct any sale or other disposition of the Collateral (or any portion thereof and, if the NFL shall so elect, other Football Related Assets) in good faith; and will use reasonable efforts to keep the Controlling Insurer (or, following a Bond Insurance Termination Event, the Trustee (but not any other Secured Party)) informed with respect to the progress of any such sale.  Each Requesting Party acknowledges and agrees, to the maximum extent permitted under applicable law, that (A) any sale or other disposition of the Collateral (or any portion thereof and, at the NFL's sole option, other Football Related Assets) conducted in accordance with the procedures and policies set forth in this Paragraph 5 and the NFL's then-existing

Requesting Parties
Page 32

ownership and other policies shall be deemed to be commercially reasonable, regardless of whether any of the owners of direct or indirect interests in the Club or StadCo receive any return on equity as a result of such sale or other disposition; (B) although it is the intention of the NFL to realize reasonable value for the Collateral in any sale or other disposition by the NFL thereof, each Requesting Party acknowledges and agrees that there is a substantial possibility that, in connection with any such sale or other disposition and following distribution of the proceeds of the sale or other disposition to all parties with priority over StadCo, the other Club Parties and/or the JV Company and the application of the proceeds pursuant to the terms hereof, the Obligations may not be repaid in full and/or no amounts will be left available for distribution to the Club Parties, the JV Company and/or any other owners of the Collateral so sold or disposed of; and (C) neither the Secured Parties nor any other Requesting Party shall have the right to object to any sale or other disposition of Collateral by the NFL as aforesaid if either: (x) adequate provision for the satisfaction and settlement of the outstanding Obligations shall have been made by reasonable mutual agreement between the applicable Secured Party and the NFL, (y) the net cash proceeds therefrom payable on the closing date to the Secured Parties would be sufficient to satisfy all of the Obligations then outstanding or (z) such sale is a Qualifying Sale Transaction; provided that in any such event described in the foregoing clauses (x), (y) and (z), and regardless of any shortfall in such proceeds, the NFL shall under no circumstances be obligated (1) to accept the highest price offered for any of the Collateral; (2) to waive any then-existing NFL ownership and other policies in connection with any such sale or other disposition; (3) to sell or otherwise dispose of the Collateral to a purchaser who proposes to relocate the Franchise to another city; or (4) to sell or otherwise dispose of any portion of the Collateral in any transaction that does not also involve a sale or other disposition of all of the Collateral (together with, at the NFL's sole election, all or any portion of the other Football Related Assets held by StadCo and/or any other Club Party, including without limitation the Club and/or StadCo's interests in the JV Company).

(d)    Subject to the second sentence of Paragraph 5(c)(iv), which shall have continuing applicability following the expiration of the Standstill Period, if a sale or other disposition of the Collateral following a Foreclosure by the Trustee or any other Secured Party meeting the requirements of Paragraph 5(c) above is not agreed upon within the Standstill Period, the NFL and the Secured Parties agree to use reasonable efforts thereafter to locate a purchaser acceptable to such of the NFL or the NFL member clubs as may be applicable under the NFL Constitution for the Collateral being Foreclosed upon (and, at the NFL's sole election, other Football Related Assets designated by the NFL) and otherwise to cooperate with each other to find a purchaser for the Collateral (and such Football Related Assets, if any) acceptable to such of the NFL or the NFL member clubs as may be applicable under the NFL Constitution.

(e)    If, after the conclusion of the Standstill Period, the Trustee or any other Secured Party independently locates a prospective purchaser for the Collateral (and any other Football Related Assets designated by the NFL), the NFL will promptly consider, in accordance with the NFL Constitution and other established procedures of the NFL, a written application for the consent of such of the NFL and the NFL member clubs as may be applicable under the NFL Constitution to such proposed sale or other disposition.  The NFL shall use good faith efforts, but under no circumstances be obligated, to accept or reject such application within one hundred twenty (120) days after the NFL's receipt of such application. The NFL will use reasonable efforts to keep the Secured Parties informed with respect to the NFL's progress in reviewing such application, and will notify the Controlling Insurer (or, following a Bond Insurance Termination Event, the Trustee) promptly upon any final determination with respect thereto. The Requesting Parties acknowledge and agree that in no event shall the NFL have any obligations to

accept any such application for the sale of any portion of the Collateral in any transaction that does not also involve a sale or other disposition of all of the Collateral.

(f)    If the NFL approves a purchaser of the Collateral following the delivery of a Foreclosure Notice by a Secured Party as contemplated by Paragraph 5(c) above, and provided that provision is made for payment of all of the outstanding Obligations (or, in connection with a Foreclosure sale or other disposition of the Collateral following the termination of the Standstill Period to a party designated by a Secured Party and approved by the NFL, if either: (x) adequate provision for the satisfaction and settlement of the outstanding Obligations shall have been made by reasonable mutual agreement between the applicable Secured Party and the NFL, or (y) the net cash proceeds therefrom payable on the closing date to the Secured Parties would be sufficient to satisfy all of the Obligations then outstanding), each Secured Party shall, upon such payment of the Obligations as and to the extent contemplated in such Paragraph 5(c), release its Liens (including any judgment lien) on the Collateral (or, if such Secured Party then owns the Collateral, execute appropriate bills of sale or other conveyance documents necessary to transfer title to the Collateral), and cooperate with the NFL by taking such other steps and executing such other documents as may be reasonably requested by the NFL, to the extent necessary to permit as promptly as possible the proposed conveyance free and clear of any claims by such Secured Party (and provided that, for purposes of clarity, it is acknowledged and agreed that the Secured Parties' Liens in the Collateral shall survive a Qualifying Sale Transaction under which the Obligations are not repaid).

(g)    The JV Company and each undersigned Club Party hereby agrees that (i) on or before the Consent Date (and, if no Final Order has been reached, for so long as it does not dispute in good faith the propriety of the Foreclosure Notice), it shall deliver to the NFL executed originals of all consents, waivers, and agreements of third parties (including any Club-Affiliated or StadCo-Affiliated parties) necessary to permit the sale or other disposition by the NFL of Collateral (and other Football Related Assets designated by the NFL, if any) owned by the JV Company and/or such Club Party pursuant to this Paragraph 5, together with a certificate representing and warranting to the NFL that the consents, waivers and agreements delivered with such certificate constitute all such consents, waivers, and agreements necessary to permit such sale or other disposition, except as specifically disclosed on a disclosure schedule attached to such certificate and (ii) within five (5) business days of any request from the NFL made after the delivery of a Foreclosure Notice (and, if no Final Order has been reached, for so long as none of the JV Company and such Club Party disputes in good faith the propriety of the Foreclosure Notice), the JV Company and such Club Party shall execute and deliver such documentation to the NFL, make such filings and take such other actions as the NFL shall request in order to grant the Trustee (or other party designated by the NFL) a Lien on Football Related Assets designated by the NFL and not then constituting Collateral.  The JV Company and each undersigned Club Party further agrees that in the event that any consents, waivers, or agreements are listed on the disclosure schedule to the certificate referenced in the preceding sentence, each of them hereby irrevocably authorizes the NFL and any officer or agent thereof, from and after the Consent Date, and, if no Final Order has been reached, for so long as neither the JV Company nor a Club Party disputes in good faith the propriety of the Foreclosure Notice, to contact all necessary third parties directly and to obtain such consents, waivers, or agreements on terms and conditions satisfactory to the NFL in its sole and absolute discretion.  The JV Company and each undersigned Club Party hereby agrees (i) to defend, indemnify and hold harmless the NFL from and against any and all Damages that the NFL and any officer or agent thereof may incur or suffer as the result of any breach of the representation and warranty made in such party's certificate, or any action taken or consent given by the NFL in reliance thereon, and (ii) irrevocably to waive any claims that it may have against the NFL and any officer or agent thereof arising out of actions taken or omitted to be taken in connection with the NFL's obtaining third-party consents, waivers, and agreements as authorized by this Paragraph 5 other than, in any such event, those arising from the gross negligence or willful misconduct of the NFL or such officer or agent acting on behalf of the NFL.

Requesting Parties
Page 34

(h)    The JV Company and each undersigned Club Party hereby irrevocably appoints the NFL, and any officer or agent thereof, as its attorney-in-fact, with full authority in the place and stead of such party and in the name of such party or otherwise, from time to time in the NFL's discretion following the receipt by the NFL of a Foreclosure Notice, and, if no Final Order has been reached, for so long as such party do not dispute in good faith the propriety of the Foreclosure Notice, to take any and all actions and to execute any agreement, instrument or other assurance (including, without limitation any agreement for the pledge of Football Related Assets as contemplated in subsection (g) above or agreement of sale or related document with respect to any Collateral or Football Related Assets designated by the NFL) which the NFL may deem necessary or advisable in order to consummate a sale in accordance with the provisions of this Paragraph 5 and to otherwise carry out the terms of this Letter Agreement, including, without limitation, (i) to execute, perform and provide all such documents, acts and further assurances which such party is required to execute, perform and provide under the covenants and provisions of this Letter Agreement in order more fully to effectuate the intent of such covenants and provisions and (ii) to take all such actions as may be necessary or advisable to ensure that the business and affairs of the Club, the other Club Parties, the JV Company and any other football entity (if applicable), and the operation, construction and maintenance of the New Stadium, are continued in the ordinary course and that the Collateral and Football Related Assets of such party are maintained, preserved and protected; provided that the foregoing shall not be construed to permit the NFL or any officer or agent thereof to execute any instrument on behalf of the Club Controlling Owner or the StadCo Controlling Owner that constitutes a guaranty or suretyship by such Controlling Owner or that is not customarily executed by the controlling owner of an NFL team in a third-party sale. To the fullest extent permitted by law, each of the JV Company and the undersigned Club Parties hereby ratifies and approves all acts of any such attorney-in-fact. The foregoing power-of-attorney, being coupled with an interest, is irrevocable until the Obligations have been repaid in full. The powers conferred on the NFL and any officer or agent thereof, as its attorney-in-fact hereunder, are solely to protect its ability to fulfill the manner of sale provisions contained in this Paragraph 5 and shall not impose any duty on the NFL and any officer or agent thereof to any of the Requesting Parties to exercise such powers, or any obligation on the NFL and any officer or agent thereof beyond those expressly set forth herein, nor shall such grant of powers prevent the exercise by the Trustee or by any other Secured Party (subject always to the limitations set forth in this Letter Agreement in respect of the exercise by the Trustee and the Secured Parties of their rights under the Financing Documents), of its rights to act as the attorney-in-fact for StadCo in order to file, perfect, or maintain, or to enforce to the extent permitted under this Letter Agreement, the liens of the Secured Parties in the Collateral under the Security Documents. In connection with and in furtherance of the terms and provisions hereof, the JV Company, each undersigned Club Party and each holder of an ownership interest in the Club or StadCo has executed and delivered to the NFL an Irrevocable Proxy, dated as of the date hereof and in the form attached hereto as Exhibit G.

(i)    The Requesting Parties agree that if a Secured Party has provided a Foreclosure Notice contemplated by Paragraph 5(a) above (or is deemed to have provided a Foreclosure Notice pursuant to Paragraph 5(c)(ii) above) and more than one potential purchaser of the Collateral acceptable to the NFL under the NFL Constitution is identified by the Requesting Parties or the NFL, the right of the Requesting Parties to object to the selection by the NFL or the NFL member clubs, as the case may be, of an acceptable purchaser shall be subject to Paragraph 5(c)(iv) hereof.

(j)    Nothing herein shall affect the Secured Parties' rights, to the extent that they have such rights under the Financing Documents, to continue as the holders of a security interest in the Collateral in accordance with the terms of the Financing Documents and this Agreement consistent with then-existing NFL ownership and other policies until a purchaser for such Collateral is obtained pursuant to the provisions hereof and a Secured Party is required to release its Liens in accordance with the provisions of Paragraph 5(f) hereof; provided that to the extent the occurrence or continuance of an event

Requesting Parties
Page 35

that would permit Foreclosure by or on behalf of any Secured Party gives or could give the Secured Parties a right to select the management of the Club or otherwise make decisions with regard to the operation of the Club (including, without limitation, by the exercise of any voting rights with respect to any interests in, or the making of any determinations or decisions regarding, any of NFL Ventures, NFL Productions, NFL Properties, or NFL Enterprises), such right shall be exercised solely by the NFL or, if the NFL so determines, by a designee of the NFL, which designee shall be a Person reasonably acceptable to the Controlling Insurer (or, following a Bond Insurance Termination Event, the Trustee); and provided further, that following the date on which any Secured Party shall be required to deliver a Foreclosure Notice or otherwise exercises or attempts to exercise a right to select the management of StadCo and/or the New Stadium or otherwise to make decisions with regard to the operation of StadCo and/or the New Stadium (whether pursuant to the Financing Documents or otherwise, it being acknowledged by the Secured Parties that they do not have, and shall not assert, any right, or right of recourse, with respect to the Existing Stadium or any practice, training or other facility under the Financing Documents), the NFL shall have the right, at any time or from time to time thereafter (for so long as any Secured Party or any successor in interest thereto shall have such rights under the Financing Documents or otherwise), in the sole and absolute discretion of the NFL, to exercise, or, if the NFL so determines, to appoint a designee to exercise (which designee shall be a Person reasonably acceptable to the Controlling Insurer (or, following a Bond Insurance Termination Event, the Trustee) the Secured Party's right (to the exclusion of the Secured Party(ies)) to select such management or otherwise so to make decisions with regard to the operation of StadCo and, subject to the terms of the JV Company's Operating Agreement relating to the rights of the Other StadCo, the New Stadium.  Nothing herein shall require the Secured Parties to make further loans and advances to or for the benefit of any Club Party following a Default or Event of Default, unless otherwise required by the terms of the Financing Documents or as contemplated under Paragraph 5(b) of this Letter Agreement.

(k)     In the event of any Foreclosure or attempted Foreclosure by a Secured Party, the Secured Parties shall at all times (including at any time during the Standstill Period) cooperate with the NFL in preserving the Club's and StadCo's ability to meet their respective obligations, if any, to the NFL and the other NFL member clubs.  Notwithstanding the foregoing sentence:

(i)     such obligation to cooperate shall not require the Secured Parties to make any advances whatsoever to the Club or any advances to StadCo that are not otherwise required under the terms of the Financing Documents or contemplated in Paragraph 5(b) hereof; and

(ii)     solely as between the Secured Parties on the one hand and StadCo, the other Club Parties and the JV Company on the other, the foregoing shall not be construed to require the Secured Parties to waive any Default or Event of Default or modify the terms of any Financing Document.

(l)     In the event that the NFL shall so elect to exercise the management rights with respect to the Club and/or StadCo referred to in Paragraph 5(j) hereof:

(i)     such rights shall be exercised solely by the NFL or, if the NFL so determines, by a designee of the NFL, which designee shall be a Person reasonably acceptable to the Controlling Insurer (or, following a Bond Insurance Termination Event, the Trustee);

(ii)     the NFL or such designee shall perform its duties in a manner consistent with the NFL Constitution and this Letter Agreement, and, subject to the terms of this Letter Agreement, consistent with the rights of the Secured Parties under the Financing

Documents and the rights of the Club Parties and the JV Company under the applicable Additional Agreements;

(iii)    the NFL or such designee shall have the right to make or direct any and all payments in respect of Operating Expenses (in each case in accordance with the ordinary course of other NFL stadia or as may otherwise be reasonably required to continue operating the New Stadium in a manner consistent with the maintenance and ongoing operation of the New Stadium as a suitable venue for professional football games) and, to the extent applicable, operating expenses of the Club; and

(iv)    notwithstanding any term in the Financing Documents to the contrary, the Secured Parties, StadCo, the StadCo Controlling Owner and the Trustee shall permit the NFL, or its designee, in such capacity, to draw Operating Expenses or otherwise to direct the Trustee to make payments of Operating Expenses, from any monies from time to time contained in or other properties credited to any of the Accounts; provided that the NFL shall not have the right to withdraw funds from the Senior Lien Debt Service Reserve Fund.

(m)    Prior to an affirmative election by the NFL to manage StadCo or the New Stadium pursuant to Paragraph 5(j), in the event that any Secured Party shall have or acquire (under the Financing Documents or otherwise) management rights in respect of StadCo or the New Stadium as contemplated in Paragraph 5(j), the Trustee shall be permitted, to the extent provided in the Financing Documents, to make payments of Operating Expenses from the Accounts (other than the Construction Fund and any Accounts contained therein, unless the NFL shall otherwise consent in writing). Following such affirmative election by the NFL, the Trustee shall make such payments only as the NFL may direct.

(n)    In the event of a Default or Event of Default and the exercise by the Secured Parties of any remedy under the Financing Documents, the Team shall be permitted to continue to play its home games at the Existing Stadium or the New Stadium, as applicable, on the same terms and conditions as are contained in the Existing Stadium Lease or the Team Sublease, as applicable, as then in effect for so long as the Club complies with its obligations under such lease.

(o)    Notwithstanding any provisions of the Financing Documents to the contrary, the Requesting Parties and the Trustee hereby agree that (i) at all times, any funds in any Account may be applied as permitted, and shall be applied as required, under this Letter Agreement, (ii) during any Standstill Period, the Trustee shall disperse or withhold funds in the Accounts strictly in accordance with the terms of this Letter Agreement, and (iii) upon the exercise by the NFL of its rights to manage StadCo or the New Stadium in accordance with the terms of Paragraphs 5(j) and 5(l) of this Letter Agreement, the NFL shall have the right to direct the Trustee in writing, with a copy to the Controlling Insurer, to, and in such event the Trustee shall, transfer, apply and otherwise dispose of funds in the Accounts in accordance with the provisions of such direction and this Letter Agreement. In the event of any dispute between the NFL and the Requesting Parties over the disposition of funds in any Account or the terms of this Letter Agreement, the Trustee shall have the right to refuse to act upon any direction for the transfer or disposition of such funds until the Requesting Parties and the NFL shall agree and jointly direct the Trustee in writing or until so ordered by a court of competent jurisdiction.

(p)    The Requesting Parties hereby expressly acknowledge and agree that in the event of a sale or other disposition of any Collateral in Foreclosure or otherwise pursuant to the terms of this Agreement (other than a Qualifying Sale Transaction, with respect to which the Secured Parties shall not be entitled to receive proceeds of sale), the proceeds of such sale or disposition, whether received by the NFL or such Requesting Party, shall be applied as follows:

(i)    first, to the satisfaction of any amounts having priority at law or in equity over the amounts due to the NFL or the Secured Parties;

(ii)    second, to the satisfaction of amounts (if any) then due to the NFL from the Club Parties or the JV Company in respect of (x) Shared Revenues and (y) Club Assessments (other than Club Assessments constituting fines or other penalties imposed under the disciplinary provisions of the NFL Constitution imposed as the result of rules infractions under the NFL Constitution), provided that:

(A)    in the case of Club Assessments, such Club Assessments are generally applicable to all NFL member clubs; provided that with respect to any such Club Assessments initially imposed on the Club that the NFL seeks to collect from StadCo as contemplated hereunder:

(1)    the NFL shall first attempt to collect such Club Assessments from the Club (including the exercise of all available offset rights and remedies under standing NFL resolutions) and shall seek to collect from the Collateral the deficiency (if any) in such Club Assessments: (x) only after the exercise of such collection and remedies against the Club and (y) only after the NFL shall have determined in its reasonable discretion that the Club does not or will not have sufficient funds to pay the aggregate amount of such Club Assessments and all other obligations for which the Club is liable; and

(2)    the NFL shall assert priority under this clause (A) with respect to Club Assessments initially imposed on the Club only for that amount by which such Club Assessments exceed the amount that the NFL shall have determined as contemplated in sub-clause (x) of Paragraph 5(p)(ii)(A)(1) that the NFL is able to collect first from the Club; or

(B)    in the case of Club Assessments, such Club Assessments are specifically imposed on any Club Party or the JV Company pursuant to other non-disciplinary provisions of the NFL Constitution (e.g., assessments relating to overdue or unpaid revenue sharing obligations in respect of visiting team gate receipts and club seat premium payments),

provided that the NFL shall assert and be entitled to receive priority payment in respect of Shared Revenues and Club Assessments under this Paragraph 5(p)(ii), only to the extent and/or in the event that either: (x) the remaining available proceeds of the sale or other disposition of the Collateral shall be sufficient to satisfy in full the Obligations of StadCo to the Secured Parties as described in clauses fifth and seventh of this Paragraph 5(p), or (y) the NFL shall have conducted or otherwise caused, in connection with the sale or other disposition of the Collateral hereunder, the concurrent sale or other disposition of the Franchise and all or a substantial majority of the Football Related Assets of (or equity interests in) the Club in the same or a related and contemporaneous sale or other disposition transaction, but for the avoidance of doubt nothing herein shall be deemed to require the NFL to elect at any time (whether following a Default or Event of Default or following an event of default under any financing relating to the Club) to sell or otherwise dispose of the Collateral together with the Franchise and other Football Related Assets of (or equity interests in) the Club;

Requesting Parties
Page 38

(iii)    third, to the payment of out-of-pocket costs incurred by the NFL in conducting the sale or other disposition of the Collateral (and any other Football Related Assets sold along with such Collateral), including, without limitation, legal and accounting fees, and investment bank or other sale consultants' commissions; provided that the expenses subject to the priority in this Paragraph 5(p)(iii) shall not exceed an amount equal to three percent (3%) of the aggregate sales price (or fair market value equivalent thereof) received upon such disposition of the Collateral and other Football Related Assets, if any;

(iv)    fourth, to the satisfaction of the amounts then due to the NFL with respect to NFL Priming Loans; provided that such priority shall be limited to NFL Priming Loans with an aggregate principal amount not to exceed the sum of $50,000,000 and the amount of then accrued and unpaid interest and all reasonable related administrative costs incurred by the NFL in connection with such NFL Priming Loans; and provided further that (A) with respect to any NFL Priming Loans initially made to the Club that the NFL seeks to collect from StadCo as contemplated hereunder the NFL shall first attempt to collect such NFL Priming Loans from the Club (provided that the NFL shall not be obligated to take any actions against the Club that would reasonably be expected to directly or indirectly cause a default under any Team Financing or render the Club insolvent or otherwise unable to pay its debts as they come due) and shall seek to collect such NFL Priming Loans from StadCo only after the NFL shall have determined in its reasonable discretion that the Club does not or will not have sufficient funds to pay the aggregate amount of such NFL Priming Loans and all other obligations for which the Club is liable, and (B) the NFL shall assert priority under this clause (iv) with respect to NFL Priming Loans initially imposed on the Club only that amount by which such NFL Priming Loans exceed the amount that the NFL shall have determined as contemplated in sub-clause (A) of Paragraph 5(p)(iv) that the NFL is able to collect first from the Club;

(v)    fifth, to the satisfaction of all amounts then due to the Secured Parties with respect to the Obligations (other than any amounts payable in respect of accrued but unpaid interest at the default rate under the Financing Documents or termination payments under the Qualified Swaps, as described in clause seventh below) as provided under the Financing Documents, at law, in equity or otherwise;

(vi)    sixth, to the satisfaction of all unpaid obligations then due to the NFL in respect of the League G-3 Loan and the NFL Support Documents;

(vii)    seventh, to the satisfaction of the amounts then due with respect to termination payments then due under the Qualified Swaps and any accrued but unpaid interest at the default rate under the Financing Documents; provided that, without in any way changing the aggregate amounts payable pursuant to either clause (v) or this clause (vii), the Secured Parties may allocate amounts payable to one or more of them pursuant to such clauses in such manner as they have agreed amongst themselves in the Indenture;

(viii)    eighth, to the satisfaction of any remaining amounts then due to the NFL with respect to NFL Priming Loans;

(ix)    ninth, any other amounts then payable with respect to the NFL in respect of Club Assessments (including Club Assessments constituting fines or other penalties imposed under the disciplinary provisions of the NFL Constitution imposed as the result of rules infractions under the NFL Constitution), expenses of sale or other amounts due

from StadCo to the NFL (and not otherwise paid pursuant to clauses second, third and/or fourth above); and

        (x)    the remainder, if any, to or as directed by StadCo or as otherwise provided by law.

The JV Company and the undersigned Club Parties agree that (and, provided that in any sale or other disposition of Collateral other than in connection with a Qualifying Sale Transaction, the Obligations shall be fully satisfied from the proceeds of such sale or other disposition, the Secured Parties agree that), to the extent that Collateral is sold or otherwise disposed of along with other Football Related Assets (including, possibly, Football Related Assets pledged to other lenders), the NFL shall have sole discretion to allocate the proceeds of such sale or disposition in good faith amongst the Collateral and Football Related Assets so sold for the purposes of determining the amounts to be applied pursuant to clauses (i) through (ix) of the foregoing paragraph and any similar rules for the application of proceeds among creditors under any agreement between the NFL and one or more Club Parties or the JV Company with respect to any other financing. The NFL shall have the right, in its sole and absolute discretion, to deposit the proceeds of any such sale or disposition with a third party escrow agent or court of competent jurisdiction pursuant to an interpleader or similar proceeding if the applicable Requesting Parties and any other interested parties claiming rights in such proceeds do not agree as to the allocation of such amount among the NFL, the applicable Requesting Parties and such other party or parties. Upon the deposit of such amount with such third party escrow agent or court of competent jurisdiction, the NFL shall have no liabilities or obligations thereafter with respect to the payment of such amount to, or the apportionment of such amount among, the parties hereto or any other party claiming rights in such proceeds.

        (q)    This Letter Agreement shall not be construed to require the Secured Parties to take any action which would cause them to invalidate their Liens under applicable provisions of the Uniform Commercial Code or other applicable law relating to such Liens or prohibit the Secured Parties from taking any action which is required to maintain (but not enforce) their Liens under the Financing Documents (except upon a release of Liens as required hereunder). Without derogating the rights of the NFL or the restrictions on the Secured Parties contained herein, nothing in this Letter Agreement shall be deemed to annul the rights of the Secured Parties, solely as between StadCo and the Secured Parties, to exercise their remedies to enforce the express terms of the Financing Documents in accordance with the terms hereof, including (but subject always to, and following the applicable "Standstill Period" requirements of, Paragraph 5 hereof in respect of any such Foreclosure) the commencement of an involuntary proceeding or filing an involuntary petition in a court of competent jurisdiction seeking relief under the United States Bankruptcy Code, as now constituted or hereafter amended, or any other federal or state bankruptcy, insolvency, receivership or similar law.

        (r)    This Paragraph 5 shall not prohibit any Secured Party, whether during the Standstill Period or thereafter, from:

        (i)    filing, defending or protecting its claim under a statute or rule for the sole purpose of preserving its rights as a creditor in such proceeding (but, for the avoidance of doubt, expressly excluding the filing of an involuntary proceeding or petition) in the event that StadCo becomes subject to any proceeding under the United States Bankruptcy Code, or any similar federal or state law for the relief of debtors, as a result of any action taken by a party other than a Secured Party;

        (ii)    accelerating the Obligations of, or demanding any payment or performance from, StadCo as permitted under the Financing Documents in accordance with Paragraph 9 hereof (provided that the Secured Parties may enforce any such

acceleration or demand only to the extent otherwise permitted by, and otherwise in accordance with the terms of, this Letter Agreement);

(iii)      seeking a Judgment Order and/or judgment lien against any assets of StadCo (other than Shared Revenues and the proceeds of the League G-3 Loan (including without limitation any funds in the NFL Facility Proceeds Account)) which do not then constitute Collateral (provided that, upon obtaining such a judgment lien, the assets subject to such lien shall constitute "Collateral" hereunder and the Secured Parties' rights with respect thereto shall be subject to the terms and restrictions contained in this Letter Agreement);

(iv)      in the event of and following a sale or other disposition of the Collateral in accordance with the terms of this Letter Agreement, thereafter exercising all such rights and remedies with respect to the proceeds of such sale or disposition which are due to the Secured Parties after taking into account the application of the proceeds as contemplated herein (and provided that, if the Secured Parties are required to release their liens on such Collateral pursuant to the terms hereof upon such sale or disposition, the Secured Parties shall have no rights or remedies against the Collateral so sold or disposed of as opposed to the proceeds received with respect to such sale unless otherwise ordered by a court of competent jurisdiction or required by applicable law);

(v)      bringing an action for an injunction or specific performance (but not for any money damages) under the Non-Relocation Agreement to require the Club to comply with its obligations under Section 1 thereof; and

(vi)      in the event that the Collateral has been sold or otherwise disposed of in accordance with the terms of this Letter Agreement, the Obligations have not been paid in full, and the Club is in breach of the Non-Relocation Agreement, thereafter exercising all rights and remedies against the Club which are available to the Secured Parties as a result of such breach of the Non-Relocation Agreement, including bringing a judgment for money damages; provided that in connection with any such exercise, any Foreclosure against the Club and/or any Football Related Assets shall be subject to the terms, conditions and restrictions set forth in this Letter Agreement (including the standstill provisions set forth in this Paragraph 5).

6.      Notice of Default, Event of Default or Material Modification; Limitations on Material Modifications.

(a)      Each of the Requesting Parties agrees that it shall give prompt written notice to the NFL of the occurrence of any Default or Event of Default (whether or not waived by or on behalf of any Secured Party). Each of the Requesting Parties (other than the Controlling Insurer, which shall be required to deliver to the NFL only such notices or other written communications as the Controlling Insurer may send to any Requesting Party with respect to a Default or Event of Default under the Financing Documents) shall deliver to the NFL copies of any notices or other communications sent to any Club Party, the JV Company or any other Requesting Party regarding any Default or Event of Default (whether or not waived by the Secured Parties), or any Foreclosure, and shall promptly notify the NFL if any Default or Event of Default of which the NFL previously has been notified shall have been cured. Each of the Requesting Parties further agrees that (x) there shall be no Material Modification of any Operative Document or Additional Agreement without the prior written approval of the NFL, which approval may be withheld in the NFL's absolute and sole discretion and (y) the Requesting Parties shall promptly deliver to the NFL a copy of any amendment, supplement, waiver or other modification to any

Requesting Parties
Page 41

Operative Document or Additional Agreement which does not constitute a Material Modification. Any proposed Material Modification of any Operative Document or Additional Agreement shall (i) be notified in writing to the NFL and shall be the subject of a consent request to the NFL in respect thereof, and (ii) if not approved in writing by the NFL, shall be deemed void *ab initio* and of no force or effect. The NFL will use reasonable efforts to respond promptly to requests for consent to Material Modifications.

(b)    Without limitation of the foregoing, the Requesting Parties acknowledge and agree that, in the event that the NFL elects to provide its consent to a Material Modification that involves the release of the Secured Parties' Liens on any portion of the Football Collateral (and subject always to the terms of Paragraph 9(b)), then the applicable Football Collateral shall, if not distributed or transferred to the Club, be distributed or otherwise transferred to another Person approved by the NFL promptly upon release of such Liens pursuant to documents acceptable to the NFL (and the Club or such other Person shall thereafter hold title to such Football Collateral and any Person other than the Club receiving Football Collateral shall execute and deliver a counterpart signature page to this Letter Agreement agreeing to be bound as a "Club Party" hereunder together with such other agreements related thereto as the NFL may reasonably request). The Club Parties acknowledge and agree that, in the event of any such distribution or transfer, the applicable Football Collateral shall be held by the Club or the new Club Party subject to the NFL Constitution and, without limitation of the foregoing and unless the NFL otherwise agrees in writing, shall be subject to the Liens of the lenders in respect of any Team Financing or other applicable Club Party's financing (which financing will, in turn, be subject to an NFL debt financing consent letter containing, among other things, cure and "bundling" rights on behalf of the NFL that are substantially similar to those set forth in Paragraph 9 hereof).

7.    Default in Club Party Obligations to NFL.  In the event of a breach by any Club Party or the JV Company of any provision of the NFL Constitution or any agreement between such party and the NFL (including, without limitation, this Letter Agreement) or a default in any such party's obligations to the NFL under any of the same, the NFL shall, prior to its undertaking final action to enforce its rights or remedies with respect to any such breach or default where such proposed action would reasonably be expected materially and adversely to affect the value of the Collateral, furnish notice of such proposed action to the Trustee and the Controlling Insurer (such notice, the "NFL Notice"). To the extent permitted by the Indenture and applicable law, and provided the NFL determines that the NFL's interests and rights are not materially adversely affected and that the breach or default can be remedied by the Trustee or the Controlling Insurer without any material or adverse effect on the NFL's interests and rights, the Trustee and the Controlling Insurer shall have a period of up to thirty (30) days from and after the date on which the Trustee and the Controlling Insurer receive the NFL Notice (or such shorter period as the NFL may notify the Trustee and the Controlling Insurer in writing that the NFL deems appropriate in order to protect its interests and rights) to remedy such breach or default. If the Trustee or the Controlling Insurer elects to cure such breach or default, the NFL shall be notified as soon as practicable, but in no event later than fifteen (15) days after the Trustee or the Controlling Insurer, as applicable, receives the NFL Notice, in which event the NFL agrees not to enforce its rights and remedies with respect to the breach or default during such thirty (30)-day period (or such shorter period as may be applicable pursuant to the second sentence of this Paragraph 7); provided that the foregoing shall in no event prevent the NFL from seeking an injunction or other equitable relief. Any failure by the Trustee and the Controlling Insurer to notify the NFL within such fifteen (15)-day period of its election to use best efforts to cure such breach or default shall be deemed a waiver by the Trustee and the Controlling Insurer of their rights under this Paragraph 7.

8.    Agreement to Cooperate.  The parties agree, subject to the provisions of this Letter Agreement, to cooperate reasonably with each other (a) to enable the Secured Parties, if and when they have the right under the Financing Documents and this Letter Agreement, to dispose of the Collateral in accordance with the terms hereof and thereof, and (b) subject to Paragraph 5(k) hereof, to permit the sound operation and maintenance of the Franchise and the fulfillment of the obligations of the Club

Parties and the JV Company to the NFL (including, without limitation, the timely payment of Club Assessments), at all times while the Obligations are outstanding, including, without limitation, at any time or from time to time after Foreclosure.

     9.    <u>NFL Cure Rights</u>.

     (a)    The NFL has executed this Letter Agreement, among other things, to permit the pledge and collateral assignment of the Collateral to the Secured Parties in accordance with the Financing Documents and this Letter Agreement, and to evidence the intention of the NFL to cooperate with the Secured Parties to enable the Secured Parties to realize reasonable value in any disposition of the Collateral in accordance with the terms of this Letter Agreement. This Letter Agreement shall not be construed in any respect as a guaranty or indemnity by the NFL, or any NFL member club, of any debts, liabilities or obligations whatsoever (including, without limitation, any of the Obligations) of any Club Party, the JV Company or any other Person. Notwithstanding the foregoing, the NFL shall have the right, in its sole and absolute discretion, but shall be under no obligation:

     (i)    to elect to cure any Event of Default (whether or not waived by or on behalf of the Secured Parties) in accordance with the terms set forth below;

     (ii)    to elect to enforce the rights of StadCo and/or the JV Company in accordance with the terms set forth below and the power of attorney attached hereto as <u>Exhibit C</u> (the "<u>Power of Attorney</u>") following: (A) the occurrence and continuance of any Third Party Default (as defined in the Power of Attorney) under any of the Operative Documents (in the case of StadCo) or Operative Project Documents (in the case of the JV Company) and (B) the expiration of the thirty (30)-day period following a subsequent written notice and demand by the NFL to the applicable Club Parties and/or the JV Company as contemplated in the Power of Attorney; and/or

     (iii)    from and after the occurrence of an Event of Default (until and unless such Event of Default shall have been cured prior to the Foreclosure Cure Expiration Date in respect of such Event of Default), to elect (or to designate an Affiliated NFL Party reasonably acceptable to the Controlling Insurer) to assume the obligations of StadCo under the Qualified Swap (including future liabilities in respect of Swap Termination Payments, if any, and without regard to whether the Swap Insurance is or has been terminated); <u>provided</u> that the debt obligations of the NFL or such Affiliated NFL Party with term(s) comparable to the remaining term on the Qualified Swaps are then rated (or are promptly thereafter rated) at least BBB- by Standard & Poors (or a comparable investment grade rating by any other nationally recognized credit rating agency), and upon such election, the Swap Provider shall continue to observe its obligations under the Qualified Swaps, and StadCo (x) shall cease to have any obligations to the Qualified Swap Provider under such Qualified Swap (but, for the avoidance of doubt, all covenants, agreements and other obligations of StadCo to the Qualified Swap Provider shall continue to exist and the NFL or such Applicable NFL Party shall be subrogated to the rights of such Qualified Swap Provider in respect thereof (and the Qualified Swap Provider shall enter into such assignment or other documents as may be reasonably acceptable to the NFL or such Applicable NFL Party and the Qualified Swap Provider to evidence such subrogation)) and (y) shall not become liable for Swap Termination Payments in respect of such Event of Default.

     (b)    In the event that the NFL elects, by written notice given to the Trustee within thirty (30) days following the NFL's receipt from any Secured Party of notice of an Event of Default, to

use the NFL's best efforts to cure such Event of Default, and provided that the NFL begins its efforts to cure such Event of Default within such thirty (30)-day period and thereafter diligently continues to pursue such cure, the NFL shall be permitted forty-five (45) days (or such longer period as the NFL may reasonably request) after the date that the NFL receives notice of the Event of Default, to cure any such Event of Default (for the avoidance of doubt, notwithstanding whether the Insurers have, following such Event of Default, made any payments under the Bond Insurance Policies, Swap Insurance, any Reserve Account Surety Bond, Debt Service Reserve Surety Bond or any Strike Reserve Surety Bond or any of such policies or surety bonds has been terminated in respect of such Event of Default), and each Secured Party shall during such period refrain from initiating any Foreclosure or otherwise exercising any of its rights or remedies under the Operative Documents (other than the right solely to deliver to one or more Club Parties and the NFL a Foreclosure Notice and the right solely to take such actions in accordance with this Letter Agreement and the Financing Documents to the limited extent necessary to preserve the Secured Parties' Liens in respect of the Collateral (but, for the avoidance of doubt, such actions shall not include seeking a judgment lien or Judgment Order against StadCo, any other Club Party or the JV Company or the filing of an involuntary proceeding or petition)). Except as expressly provided herein (and in Paragraph 5(b) in respect of any such Event of Default prior to Substantial Completion), the cure rights granted to the NFL herein (and the Secured Parties' agreement to refrain from initiating Foreclosure or the exercise of such rights or remedies with respect to such Event of Default under the Operative Documents) shall not restrict or limit the right of the Secured Parties, if applicable pursuant to the terms of the Financing Documents and this Letter Agreement, to refuse to make additional loans or advances to StadCo as a result of and during the continuance of an Event of Default or, subject to the terms of this Letter Agreement (including without limitation Paragraph 5(c) hereof), to take other actions against any Club Party or the JV Company that are permitted under the Operative Documents and this Letter Agreement, including bringing an action for an injunction or specific performance (but not for any money damages) under the Non-Relocation Agreement to require the Club to comply with its obligations under Section 1 thereof and the making of Permitted Standstill Period Payments, and that do not involve any interest in the Collateral, any other direct or indirect interest in StadCo, the Club, any of the other Club Parties or the JV Company, or any asset of StadCo, the Club, the JV Company or any other Football Related Assets, as a result of and during the continuance of such Event of Default. Subject to the terms of this Letter Agreement, the exercise by the NFL of the right to effect such cure shall include the right of the NFL to assume the Obligations (or to cause the Obligations to be assumed by a designated Affiliated NFL Party) in connection with the curing of such Event of Default (in which event the NFL or its designee may elect to assume the obligations of StadCo under the Qualified Swaps, without regard to whether the Swap Insurance is or has been terminated, as and to the extent referenced in Paragraph 9(a)(iii)) and, with respect to an Event of Default prior to Substantial Completion, to complete the Project under the terms of the Operative Documents and the Operative Project Documents. Any failure by the NFL to notify the Trustee of its election to cure such Event of Default within such thirty (30)-day notice period shall be deemed a waiver by the NFL of its rights under this Paragraph 9 to cure such Event of Default.

(c)     The Secured Parties further agree that:

(i)     in the event the NFL elects to cure an Event of Default pursuant to the terms of this Paragraph 9 by providing funds for the payment of a portion of the Obligations, then such payment shall be deemed to have been made by StadCo, for the purpose of determining whether the Event of Default has been cured, but such payment shall not reduce the Obligations of StadCo and the NFL shall assume and be subrogated to the rights of the holders of such Obligations (and the Secured Parties shall enter into such assignment, participation or other documents as may be reasonably acceptable to the NFL and the Secured Parties to evidence such assumption and subrogation); provided that the obligations of the Insurers under the Bond Insurance Policies, the Swap

Requesting Parties
Page 44

Insurance, the Reserve Account Surety Bonds and the Strike Reserve Surety Bonds shall be deemed to have been satisfied to the extent of any such payment, as applicable; and

(ii)    in the event the NFL elects to cure an Event of Default pursuant to the terms of this Paragraph 9 by providing funds for the payment of the Obligations in full, or in the event that such Event of Default is incapable of being cured and the NFL otherwise elects to buy the Obligations by paying the Obligations in full, then, at the direction of the NFL in connection with such payment, each Secured Party shall (A) release or assign to the NFL or its designee its Liens on the Collateral and assign (without recourse) to the NFL, pursuant to assignment agreements reasonably acceptable to the NFL and the Secured Parties, all rights and obligations of each Secured Party in, under, and with respect to the Obligations and the Operative Documents and (B) the NFL shall have the right to exercise the NFL Standstill Period Collateral Rights following payment of all such Obligations or the purchase price of all Obligations to the Secured Parties.

(d)    Upon each and any partial or full payment of the Obligations by the NFL (as contemplated in Paragraph 9(c) hereof) upon the exercise of its cure rights as provided hereunder: (i) the Bonds shall remain Outstanding (as defined in the Indenture) for all purposes and shall not be deemed to be defeased or otherwise satisfied (except for the limited purpose of determining whether the Event of Default has been cured), and the obligations of the Insurers under the Bond Insurance Policies, the Swap Insurance, the Reserve Account Surety Bonds and the Strike Reserve Surety Bonds shall be deemed to have been satisfied to the extent of any such payment of Obligations, and (ii) the NFL shall be subrogated to and assume the rights of the Secured Parties receiving payments from funds so provided by the NFL and the assignment and pledge of the Trust Estate (as defined in the Indenture) and all covenants, agreements and other obligations of StadCo to the Secured Parties shall continue to exist and shall, to the extent of such cure, run to the benefit of the NFL and the NFL shall become the beneficial owner thereof, entitled to all of the rights and benefits of a Secured Party to the extent of such cure.

(e)    The Requesting Parties each hereby acknowledge and agree that upon any default, event of default or other similar event affecting any Team Financing or any other financing provided to StadCo or the JV Company, in each case in respect of which either (i) the lenders shall deliver a foreclosure notice to the NFL evidencing their intention to Foreclose upon assets of StadCo, the JV Company or any Club Party securing such financing (or the NFL elects to conduct any sale or other disposition of the assets of the Club, StadCo, the JV Company or other applicable Club Party in satisfaction of such financing), or (ii) the NFL elects to exercise, under the terms of any NFL debt consent letter applicable to such financing, the rights of the NFL to cure such default by its exercise of rights under the applicable financing consent letter of a substantially similar nature to those rights granted under Paragraph 5 hereof or this Paragraph 9 then, in connection with the NFL's exercise of any such rights, and notwithstanding the terms of any of the Operative Documents, the NFL shall have the further right, upon written notice to StadCo and the Trustee, (x) to pay and satisfy the Obligations in full, (y) provided that the debt obligations of the NFL (or its designated Affiliated NFL Party) having term(s) comparable to the remaining term of the Bond Insurance Policies are then rated (or are promptly thereafter rated) at least BBB- by Standard & Poors (or a comparable investment grade rating by any other nationally-recognized credit rating agency), to assume the Obligations (or to cause the Obligations to be assumed by a designated Affiliated NFL Party) in accordance with the terms of the Financing Documents and this Paragraph 9, in each case as if the exercise of any such rights of the NFL in relation to any such financing were an Event of Default under the Obligations to which the terms of this Paragraph 9 otherwise applied and/or (z) in a transaction involving the concurrent sale of assets of or interests in the Club and/or StadCo arising as a result of the NFL's exercise of its rights under any applicable NFL debt consent letter following delivery of a foreclosure notice (as defined in such other NFL debt consent letter) under the financing or other applicable obligation that is the subject of such other NFL debt consent letter, to sell or

dispose of the Collateral pursuant to this Letter Agreement as if an Event of Default has occurred and a Foreclosure Notice has been delivered hereunder; provided, that in any such sale other than a Qualifying Sale Transaction, the Obligations shall be repaid and satisfied in full and, in any Qualifying Sale Transaction, the Secured Parties' Lien in the Collateral shall survive such sale. Upon an assumption by the NFL of the Obligations under subsection (y) of the preceding sentence, StadCo and the Trustee shall provide notice of such assumption to Standard & Poors and any other applicable rating agencies.

> (f)    In the event that the NFL exercises its right pursuant to Paragraph 9(e) to assume the Obligations and to keep the Obligations outstanding in connection with any default, event of default or other similar event affecting any Team Financing or any other financing provided to StadCo, then, in such event:

>> (i)    provided that the debt obligations of the NFL (or its designated Affiliated NFL Party) having term(s) comparable to the remaining term of the Qualified Swap are then rated (or are promptly thereafter rated) at least BBB- by Standard & Poors (or a comparable investment grade rating by any other nationally-recognized credit rating agency), then the NFL (or such designated Affiliated NFL Party) shall have the right to assume all of StadCo's rights and obligations under the Qualified Swaps (including future liabilities in respect of Swap Termination Payments, if any), and the Insurers shall remain liable under the Swap Insurance and StadCo (x) shall cease to have any obligations to the Swap Provider under such Qualified Swap as and to the extent of the assumption of obligations by the NFL (but, for the avoidance of doubt, all covenants, agreements and other obligations of StadCo to the Qualified Swap Provider shall continue to exist and the NFL or such Applicable NFL Party shall be subrogated to the rights of such Qualified Swap Provider in respect thereof (and the Qualified Swap Provider shall enter into such assignment or other documents as may be reasonably acceptable to the NFL or such Applicable NFL Party and the Qualified Swap Provider to evidence such subrogation)) and (y) shall not become liable for Swap Termination Payments in respect of the Qualified Swaps so assumed by the NFL or Applicable NFL Party; and

>> (ii)    in the event, but solely in the event, that (A) the Insurers shall no longer be liable under the Swap Insurance and (B) the NFL (or a designated Affiliated NFL Party) shall not, prior to the release of the Swap Insurance, put into place arrangements, through the execution and delivery of documents and agreements, satisfactory to the applicable Swap Counterparty in its reasonable discretion as to the acceptability of the counterparty under the Qualified Swaps upon the release of the Swap Insurance, then, in such event, the Swap Counterparty upon such assumption by the NFL (or its designated Affiliated NFL Party) shall be released from its obligations under the Qualified Swaps, such agreement shall be terminated and there shall be due and owing by the NFL (or its designated Affiliated NFL Party) thereunder such termination payments as are due as a result of such termination; provided that the payment of any such termination payments shall be deferred until all of the Collateral has been sold to one or more third parties (excluding the JV Company and Affiliates of any Club Party) in accordance with the terms of this Letter Agreement and the NFL Constitution.

> (g)    For the avoidance of doubt, in any sale or other transfer of the Collateral under this Letter Agreement pursuant to a Qualifying Sale Transaction (including, without limitation, following an Event of Default under the Financing Documents (without regard to whether the Obligations have been accelerated as a result thereof) and/or in the event that the NFL exercises its right pursuant to Paragraph 9(e) to sell or dispose of the Collateral pursuant to this Letter Agreement as if an Event of Default has occurred and a Foreclosure Notice has been delivered hereunder in a transaction involving the concurrent

Requesting Parties
Page 46

sale of assets of or interests in the Club and/or StadCo arising as a result of the NFL's exercise of its
rights under any applicable NFL debt consent letter following delivery of a foreclosure notice (as defined
in such other NFL debt consent letter) under the financing or other applicable obligation that is the subject
of such other NFL debt consent letter), the acquiring person or entity in such sale shall have the right to
assume all of StadCo's rights and obligations under the Obligations, including without limitation the
Qualified Swaps, and the Insurers shall remain liable under the Swap Insurance and the Bond Insurance
Policies (and the Secured Parties' Liens in the Collateral shall survive such sale) and StadCo shall cease
to have any obligations to the Secured Parties with respect to the Obligations assumed.

      (h)      For the avoidance of doubt, this Paragraph 9 shall not prohibit the Secured
Parties from issuing a Foreclosure Notice under the terms of this Letter Agreement and as permitted under
the Financing Documents, and such Foreclosure Notice, if Foreclosure is so permitted under the
Financing Documents in such circumstances, may be issued by the Secured Parties notwithstanding the
cure rights given to the NFL under this Paragraph 9 and prior to the expiration of the cure election period
or the cure period provided herein. If any Event of Default with respect to which a Foreclosure Notice
was issued is thereafter cured (including, without limitation, by actions of the NFL), then the Standstill
Period in respect of such Event of Default shall end, and if any subsequent Event of Default shall occur
and/or any subsequent Foreclosure Notice shall be issued with respect to such subsequent Event of
Default, a new Standstill Period shall begin.

      10.      <u>Maintenance of the Franchise; Application of PSL Proceeds; Compliance With NFL Debt
Limit; Existing Stadium.</u>

      (a)      The NFL agrees that upon any sale, withdrawal, forfeiture, revocation or
termination, or other retaking of the Franchise by the NFL due to any Club Party's breach of or default in
any Club Party's obligations to the NFL, the Franchise shall, until the Obligations of StadCo are paid in
full, continue to exist so that the Club may perform its obligations under the Non-Relocation Agreement
for the benefit of the Secured Parties; <u>provided</u> that each of the Requesting Parties agrees that (i) such
Franchise shall at all times be subject to the rights of the NFL to arrange for a sale thereof as described
herein and as otherwise provided in the NFL Constitution, and (ii) this Paragraph 10(a) shall in no way
limit the rights of the NFL, its member clubs or the Commissioner to exercise their respective rights or
remedies or to take permitted disciplinary action under the NFL Constitution (or otherwise), it being
acknowledged by the parties hereto that the sole purpose of this Paragraph 10(a) is to recognize
specifically that, so long as there are Obligations of the Club Parties outstanding and the Secured Parties
are committed pursuant to the Financing Documents to make loans and advances to the Club Parties or
the Obligations remain outstanding, the Franchise shall continue to exist during the pendency of any sale,
withdrawal, forfeiture, revocation or termination, or other retaking, or action at law, suit in equity or other
appropriate proceeding in respect thereof. In the event of any final, non-appealable sale, withdrawal,
forfeiture, revocation or termination, or other retaking, of the Franchise by the NFL, and as the result of
which the Club is no longer a member club of the NFL, (A) the Club shall have the right to receive the
proceeds of any sale, reissuance or other disposition of the Franchise or any replacement franchise only
after the satisfaction (to the extent required pursuant to Section 3.8 of the NFL Constitution) of any
obligations of the Club Parties and/or the JV Company to the NFL and to the Secured Parties in
accordance with Paragraph 5(p) hereof, or to any other party or as required by law and (B) the Secured
Parties shall no longer be restricted under this Letter Agreement in the exercise or other enforcement of
any of their rights, powers, privileges, remedies and interests under the Operative Documents with respect
to the Collateral.

      (b)      The JV Company, each of the Club Parties that receives any PSL Proceeds, and
each of the Club Controlling Owner and the StadCo Controlling Owner, represents, warrants, covenants
and agrees that all PSL Proceeds received by it will be applied by it solely to the payment or

Requesting Parties
Page 47

reimbursement of PSL Eligible Project Costs (including, without limitation, to repay Bonds, the proceeds of which have been applied solely to the payment or reimbursement of PSL Eligible Project Costs and to the extent necessary to reimburse direct or indirect owners of interests in the applicable Club Parties who have incurred PSL Eligible Project Costs).

(c)    Each of the Club Parties represents, warrants and covenants that Costs of the Project relate solely to the New Stadium, the Improvements and Premises and other New Stadium development efforts as more fully set forth in the Financing Documents, and the term Costs of the Project does not and shall not include any costs in respect of the operation, financing, or debt service of (x) the practice and training facility used by the Club, and (y) any facilities or sites near or adjacent to the New Stadium (other than parking, tailgating and outdoor concessions facilities for use in connection with NFL games and other events at the Meadowlands Sports Complex) that are not primarily and directly related to the New Stadium and/or the exhibition of NFL games and NFL events at the Meadowlands Sports Complex (e.g., Xanadu or any racing facilities), and that any use of the proceeds of the Bonds for such purpose would require the prior written consent of the NFL. Nothing herein shall be deemed or construed as relieving StadCo of any liability or responsibility that StadCo may have for any breach by it of, or default by it in, any non-monetary obligations or responsibilities of StadCo to the Secured Parties that are set forth in the Financing Documents or that arise by operation of law (to the extent that the Secured Parties are damaged by such breach or default).

(d)    Each of the Club and the Club Controlling Owner agrees that it shall not amend, modify or terminate its lease with respect to the Existing Stadium in a manner that would prevent the Club from, or interfere with or otherwise hinder the Club in, playing its home NFL games at the Existing Stadium prior to Substantial Completion of the New Stadium.  Each of the Club and the Club Controlling Owner represents and warrants to the NFL that no default by the Club has occurred under the Existing Stadium Lease, and that the Existing Stadium Lease has not been amended or modified except as otherwise stated herein (and as reflected in the exhibits attached hereto).

(e)    StadCo represents and warrants to the NFL that all of the loans made pursuant to that certain Credit Agreement, dated as of April 30, 2007, as amended, between StadCo, as borrower, and the lenders signatory thereto, have been repaid and satisfied in full on or prior to the date hereof and such Credit Agreement has been terminated.

11.    Ownership of Club Parties.  Each of the undersigned Club Parties and the JV Company represents and warrants to the NFL that as of the date hereof (i) the direct and indirect ownership interests in the JV Company, the Club and each other Club Party (the "Organizational Structure") set forth on Exhibit D-1 hereto is true and complete, (ii) true and complete copies of the Operating Agreements, organizational documents and all other documents relating to the voting control of the JV Company and StadCo have been provided to the NFL on the date hereof and are attached hereto as Exhibits D-2 to D-[__], respectively (collectively, the "Organizational Documents"), (iii) each of such Club Parties and the JV Company agrees that, except in respect of ownership changes for which NFL consent is not required under the NFL Constitution, it shall not amend, and shall not agree to or otherwise permit any amendment to, the Organizational Structure, in each case without the prior written consent of the NFL, and (iv) each of the Club Parties and the JV Company further agrees that (a) except for amendments made solely to reflect ownership changes for which NFL consent is not required under the NFL Constitution, it shall not amend, and shall not agree to or otherwise permit any amendment to, the Organizational Documents of the JV Company, such Club Party or of any Club Party in which such Club Party has an ownership interest, in each case without the prior written consent of the NFL, and (b) it shall comply with all of the terms and provisions regarding distributions that are contained in such Organizational Documents.

12.     Conditions to Transfers of Football Related Assets. The Requesting Parties acknowledge and agree that any transfer of Football Related Assets (excluding Ordinary Course Sales or Permitted Transfers), or any transfer or issuance of direct or indirect equity interests in the JV Company or any Club Party at any time while the JV Company or that Club Party directly or indirectly holds any interest in Football Related Assets, requires the prior written consent of the NFL pursuant to the NFL Constitution and this Letter Agreement, which consent may be granted or withheld in the NFL's sole and absolute discretion. Accordingly the Requesting Parties further acknowledge and agree that, in connection with its determination to grant or withhold such consent the NFL may, among other things (a) impose such terms and conditions on such transfer or issuance (including without limitation terms and conditions that must be satisfied by the JV Company, the Club Parties and/or the other parties to such transfer or issuance as a condition precedent to receipt of the NFL's consent) as the NFL may require in its sole and absolute discretion and (b) require that the JV Company, the Club Parties and/or the other parties to such transfer or issuance execute and deliver such undertakings with respect to subsequent transfers of Football Related Assets or direct or indirect equity interests in Persons owning Football Related Assets as the NFL requires in its sole and absolute discretion.

13.     Operation of Stadium; Gaming.

(a)     Each of StadCo and the JV Company hereby represents to and covenants with the NFL that its business purposes are limited to the purposes set forth in (and are subject to the limitations contained in) its Limited Liability Company Agreement, as in existence on the date hereof, and that it shall not engage in any other purposes without the prior consent of the NFL. Without limitation of the foregoing and notwithstanding any provision of any such Limited Liability Company Agreement, each of the Club Parties and the JV Company acknowledges and agrees that, without the prior written consent of the NFL in its sole and absolute discretion, neither StadCo nor the JV Company will engage in any Ancillary Uses (including without limitation the development and/or operation of Xanadu (as defined in the JV Company's Operating Agreement) or form, within the Organizational Structure (i.e., as a direct or indirect owner of an interest in any Club Party or the JV Company), an Ancillary Newco (as such terms are defined in the JV Company's Operating Agreement) and that in any event no Football Related Assets may be transferred or otherwise assigned to any Ancillary Newco that is so formed. Each of StadCo and the JV Company further agrees to maintain the field and the New Stadium in a condition acceptable for the conduct of NFL games in accordance with all applicable terms of the NFL Constitution.

(b)     The JV Company and, for purposes of Paragraph 13(b)(ii), each of the Club Parties, covenants and agrees that, in the event that the Racetrack (as defined in the Ground Lease) site is at any time used for gaming activities other than pari-mutuel betting on horse races, then (i) the JV Company shall promptly notify the NFL of such activities and (ii) if so required by the NFL, to the extent that the JV Company or any of the Club Parties is entitled to any revenues relating to the site of such gaming activities, the JV Company or such Club Party will transfer or otherwise assign the right to receive such revenues to an Ancillary Newco that does not own Football Related Assets and that is not an entity within the Organizational Structure (i.e., that does not own a direct or indirect interest in any Club Party or the JV Company). Each of the JV Company, StadCo and the StadCo Controlling Owner further covenants and agrees that, to the extent that its consent is sought in connection with any such gaming activities (the NFL acknowledges that, pursuant to the Ground Lease, such consent of the Club Parties is not required), they will notify the NFL of such request and will consult in good faith with the NFL prior to responding to such request. Nothing in this Paragraph 13(b) is intended to, and each of the Club Parties and the JV Company acknowledges and agrees that it does not, in any way limit, supersede, alter or modify any provisions of the NFL Constitution or other applicable NFL rules or policies relating to restrictions on gambling activities and/or restrictions on ownership of interests in, or association with, entities engaged in gambling activities; provided that the NFL acknowledges that the NFL Constitution and other applicable NFL rules do not currently prohibit ownership of interests in, or association with, an

Requesting Parties
Page 49

entity that owns rights to advertising revenues generated through a building or racetrack in which pari-mutuel betting on horse races occurs and/or which is the site of other gaming in the form of video lottery terminals, so long as such site does not include a sports book or other sports betting.

14.  No Third Party Beneficiaries; Beneficiaries of Certain Promises; Limitation on Recourse by Secured Parties.

(a)    This Letter Agreement constitutes an agreement among the parties hereto only, and no rights, benefits, duties or obligations of any kind whatsoever are created by this Letter Agreement on behalf of any other Person except as noted in Paragraphs 20 and 24 hereof.  Further, the parties hereto acknowledge and agree that this Letter Agreement does not create and shall not be deemed to create any obligations of any nature whatsoever of (i) the Secured Parties to any Club Party, the JV Company or any Person not a party to this Letter Agreement, except as specifically provided in this Letter Agreement or (ii) except to the extent expressly set forth in this Letter Agreement, the NFL to any Requesting Party or any Person not a party to this Letter Agreement except as noted in Paragraphs 20 and 24 hereof.

(b)    The parties further agree that the restrictions and other limitations imposed by this Letter Agreement on the exercise of the rights and remedies of the Secured Parties under the terms of the Operative Documents, including without limitation the restrictions imposed during the Standstill Period, are solely for the benefit of the NFL and not for the JV Company or any of the Club Parties.

(c)    The parties further agree that all representations, warranties, covenants and obligations of the JV Company and the Club Parties in this Letter Agreement or in any other agreement with the NFL or any Affiliated NFL Parties (i) are for the sole and exclusive benefit of the NFL or such Affiliated NFL Parties, as applicable, and may not be enforced or relied upon in any manner, directly or indirectly, by any Secured Party or any other person and (ii) may be modified, amended or waived at any time and from time to time with the consent of the NFL pursuant to Section 21, but without the consent of any Secured Party or any other person.  Each Secured Party reaffirms the limited recourse nature of the Obligations of StadCo and agrees for the benefit of the NFL, the JV Company and each Club Party that (i) neither any Club Party (other than StadCo and, to the extent set forth in the Non-Relocation Agreement, the Club), nor the JV Company nor any other person shall have any liability with respect to the Obligations or any failure of the Obligations to be timely paid except to the extent of any separate contractual obligations arising under and expressly contemplated by the Financing Documents and (ii) no provision of this Letter Agreement or any other agreement with the NFL or any Affiliated NFL Parties shall be applied in a manner that would have the effect of creating directly or indirectly any recourse by or right or remedy of any Secured Party against the JV Company or any Club Party (or the assets of the JV Company or any Club Party) other than as would arise under the Financing Documents in the absence of this Letter Agreement.

(d)    Except as otherwise expressly provided herein, all representations, warranties, covenants and obligations (a) of the Requesting Parties shall be several, but not joint, (b) of the JV Company and the Club Parties or any of them shall be independent of the obligations of the Secured Parties to the NFL and/or to the JV Company or the Club Parties, (c) of the Club shall be joint and several with the Club Controlling Owner, (d) of StadCo shall be joint and several with the StadCo Controlling Owner and (e) of the Secured Parties or any of them shall be independent of the obligations of the JV Company and the Club Parties to the NFL and/or to the Secured Parties.

15.  Counterparts; Survival of Representations and Warranties; Termination.  This Letter Agreement shall be effective upon execution and delivery hereof by all the parties hereto.  This Letter Agreement may be executed in two or more counterparts, each of which may be executed by one or more of the parties hereto, but all of which when taken together shall constitute one agreement binding upon all

of the parties hereto. Delivery of an executed counterpart of a signature page of this Letter Agreement by facsimile shall be effective as delivery of a manually executed counterpart of this Letter Agreement. Each of the representations, warranties, covenants, and other agreements of the parties contained in this Letter Agreement shall survive the advance, repayment, and readvance of any funds disbursed by the Secured Parties (or by the Trustee on behalf of the Secured Parties) under the Operative Documents and shall continue in full force and effect until the Obligations (including any renewals and extensions thereof) have been fully repaid, satisfied and terminated in accordance with the terms hereof and the Operative Documents, and the commitments relating thereto have expired or been terminated and the Liens on the Collateral secured thereunder shall have been released in full, upon which the obligations of the parties under this Letter Agreement shall terminate (except as provided in the following sentence). Notwithstanding the foregoing, the provisions of Paragraphs 24 and 25 hereof shall survive the termination of this Letter Agreement. The NFL shall be under no obligation to the Requesting Parties, or any other party, to renew or replace this Letter Agreement following such repayment, satisfaction, and termination.

16.     Notices. Any notice, request, demand, or other communication permitted or required to be given hereunder shall be (a) in writing, (b) signed by the party giving it, and (c) sent by hand, first-class United States mail (postage prepaid and return receipt requested), overnight carrier, or by telex, facsimile, graphic scanning or other telegraphic communications equipment of the sender. If sent to a Requesting Party, such notice shall be sent to the address for such party set forth on the first page of (or elsewhere in) this Letter Agreement and, if sent to the NFL, such notice shall be sent to:

> National Football League
> 280 Park Avenue
> New York, New York  10017
> Attention:  Treasurer
> Facsimile:  (212) 681-7587

(or to such other address as the receiving party shall have designated by notice that has not been revoked to the other parties hereto), (d) with respect to the NFL only, deemed to have been given only when received or refused and (e) with respect to any party hereto other than the NFL, deemed to have been given only when received or the date of receipt if delivered by hand or overnight carrier service or sent by telex, facsimile, graphic scanning or other telegraphic communications equipment of the sender, or on the date five (5) Business Days after dispatch by certified or registered mail if mailed, in each case delivered, sent or mailed (properly addressed) to such party as provided in this Paragraph 16 or in accordance with the latest unrevoked direction from such party given in accordance with this Paragraph 16.

17.     Subordination of Subrogation and Reimbursement Claims. If and to the extent that any of the JV Company, the Club Parties and/or Affiliates thereof contributes any funds or other property on behalf of StadCo to any Secured Party or otherwise makes payments in satisfaction of any of StadCo's obligations under the Financing Documents (whether pursuant to a cure right or otherwise), any exercise of claims for reimbursement or other similar claim (whether by way of subrogation or otherwise) which such parties may have against StadCo by reason thereof or as they may separately agree in writing shall, in addition to the restrictions set forth herein in respect of such parties, be subject and subordinate to the same terms and conditions of this Letter Agreement as are applied to the Secured Parties. The NFL acknowledges that it would not have consented to the transactions contemplated by the Financing Documents without each of the representations, warranties and covenants of the JV Company and the Club Parties (including with respect to matters to which certain of such Club Parties would not otherwise have been responsible or legally obligated) and each of the JV Company and the Club Parties acknowledges that it will derive substantial benefit from the NFL's consent. The Club Parties affected by this Letter Agreement may agree from time to time to allocate as among themselves and their owners the

financial and other consequences of the actions of the NFL taken pursuant to this Letter Agreement, any similar agreement with the NFL, whether in connection with a Team Financing or other StadCo financing or otherwise, the NFL Constitution or otherwise, provided that no such agreement shall restrict or modify in any manner the rights of the NFL against the JV Company or the Club Parties, whether pursuant to the terms of this Letter Agreement, the NFL Constitution or otherwise.

18.    <u>Obligations Absolute</u>. Nothing contained in this Letter Agreement is intended to or shall impair, as between the Club Parties and the Secured Parties, the obligation of StadCo, which is absolute and unconditional, to pay the Secured Parties, as and when the same shall become due and payable in accordance with the provisions of the Indenture and as hereafter amended in accordance with this Letter Agreement, the principal of, interest on and other amounts due with respect to the Obligations.

19.    <u>Governing Law; Construction; Headings</u>. This Letter Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within such State. This Letter Agreement shall be interpreted neutrally and without regard to the party that drafted it and, in particular, no rule of construction shall be applied as against any party hereto that would result in the resolution of an ambiguity contained herein against the drafting party. Paragraph headings used herein are for convenience of reference only, are not part of this Letter Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Letter Agreement.

20.    <u>Successor and Assigns</u>. Whenever in this Letter Agreement reference is made to any party, such reference shall be deemed to include the successors, transferees, assigns, heirs, and legal representatives of such party and, without limiting the generality of the foregoing, all representations, warranties, covenants and other terms and provisions made by, on behalf of or for the benefit of any parties hereto in this Letter Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of such party and, in the case of the Secured Parties, to Persons which may become party to any of the Operative Documents (whether as an additional party as contemplated therein, by assignment or otherwise) subsequent to the date hereof or which otherwise succeed or are entitled to the rights or remedies of the Secured Parties under any of the Operative Documents. Notwithstanding the foregoing, this Letter Agreement may not be assigned by any of the Requesting Parties (except in connection with ordinary course transfers of Bonds among Beneficial Owners) without the prior written consent of the NFL, which consent may be withheld in the NFL's sole and absolute discretion, provided that (a) the Trustee may assign all of its rights and obligations under this Letter Agreement to a substitute trustee that is a financial institution customarily engaged to act as a trustee in financing transactions similar to those set forth in the Operative Documents in connection with a concurrent assignment of all of the Trustee's rights and obligations under all of the Operative Documents to such substitute and (b) each of the Insurers may assign all of its rights and obligations under this Letter Agreement to a substitute AAA-rated financial insurer that is customarily engaged to act as an insurer in respect of financing transactions similar to those set forth in the Operative Documents in connection with a concurrent assignment of all of such Insurer's rights and obligations under all of the Operative Documents to such substitute, provided that the substitute trustee or insurer shall execute and deliver to the NFL an agreement (containing the terms set forth in <u>Exhibit F</u> hereto) to be bound by each and every term set forth in this Letter Agreement applicable to a Secured Party (and to the Trustee, Insurer or Controlling Insurer, as the case may be) as fully as if it were a signatory hereto. The Secured Parties shall not assign any of their security interests or Liens in the Collateral (except in connection with assignment of their interests under the Operative Documents as described above) without the prior written consent of the NFL, which consent may be withheld in the NFL's reasonable discretion.

21.    <u>Amendment</u>. Each and every modification and amendment of this Letter Agreement shall be in writing and signed by the parties hereto affected thereby or their respective representatives or

Requesting Parties
Page 52

attorneys-in-fact; and each and every waiver of, and consent to any departure from, any representation, warranty, covenant or other term or provision of this Letter Agreement shall be in writing and signed by the party affected by such waiver or consent or such party's representative or attorney-in-fact.

22.   Entire Agreement; Letter Agreement Controls.  This Letter Agreement contains the entire agreement of the parties hereto with respect to the subject matter herein and supersedes all other representations, warranties, undertakings, agreements, and understandings, oral or otherwise, between the parties hereto with respect to the subject matter hereof.  In the event of any inconsistency or conflict between the various terms and provisions of any Financing Document and those contained in this Letter Agreement, the terms and provisions of this Letter Agreement shall control.

23.   Control Language.  Except as otherwise approved by the NFL, each Secured Party agrees to include the following provision on any financing or continuation statements securing the Collateral, in the Indenture (including, for the avoidance of doubt, any Supplemental Indenture), the Financing Documents and (upon request of the NFL) in the other Operative Documents related to the Obligations, and to furnish the NFL, upon request, a copy of such Operative Documents after their execution or a copy of such statements upon their filing.  Subject to Paragraph 20, each Secured Party further agrees to provide written notice (containing the terms set forth below) to any party purchasing an interest in the Obligations (other than sales of Bonds subject to an Indenture expressly incorporating such language) that the rights of each Secured Party to enforce its rights and remedies with respect to any Collateral are subject to the rights of the NFL under this Letter Agreement.

> Section ___.  NFL Requirements.  It is acknowledged, understood and agreed that, so long as the letter agreement, dated as of [        ], 2007 by and among the NFL, Giants Stadium LLC, New Meadowlands Stadium Company, LLC, New York Football Giants, Inc., and their respective Affiliates party thereto, the Trustee and the Insurers (as the same may hereafter be amended, the "NFL Letter Agreement"; all capitalized terms used in this Section and not defined are defined in the NFL Letter Agreement) is in effect and notwithstanding anything in this document or any other Operative Document to the contrary, (a) the exercise by the Secured Parties of remedies under any Operative Document will be made in accordance with the terms and provisions of the NFL Letter Agreement, the terms, conditions and provisions of which each of the parties to any Operative Document has accepted as reasonable and appropriate, and (b) in the event of any conflict or inconsistency between the terms of the NFL Letter Agreement and the terms of any Operative Document (including without limitation this document/agreement), the terms of the NFL Letter Agreement will control.

24.   No NFL Liability.  Each Requesting Party, on its own behalf and on behalf of its respective Affiliates and subsidiaries, and their heirs, executors, administrators, trustees, legal representatives, successors and assigns hereby agrees that the NFL and the Affiliated NFL Parties shall have no liability whatsoever for actions taken or omitted to be taken with respect to the subject matter of this Letter Agreement, including, without limitation, actions taken or omitted to be taken as proxy, agent, or attorney-in-fact for any Requesting Party pursuant to Paragraph 5 hereof, except to the extent such actions or omissions constitute gross negligence or willful misconduct.  In furtherance of and in addition to the foregoing, each Requesting Party, on its own behalf and on behalf of its respective Affiliates and subsidiaries, and their heirs, executors, administrators, trustees, legal representatives, successors and assigns, hereby covenants not to sue in connection with or assert, and hereby forever releases, and agrees to cause its respective Affiliates and subsidiaries not to sue in connection with or assert, any claims,

demands, causes of action or liabilities of any kind whatsoever (including, without limitation, all claims, causes of action, or liabilities, if any, arising under federal or state antitrust law), whether known or unknown, which they or any other party may now or hereafter have in connection with any actions taken or omitted to be taken by the NFL or any Affiliated NFL Party with respect to the subject matter of this Letter Agreement; provided that such actions or omissions do not constitute gross negligence or willful misconduct on the part of the NFL or the Affiliated NFL Party. Each Requesting Party represents and warrants that, in consenting to the terms contained in this Letter Agreement, including, without limitation, the terms contained in this Paragraph 24, they have proceeded voluntarily and with the advice of attorneys of their own respective choosing, that they have read the terms of this Letter Agreement, including without limitation, the terms of this Paragraph 24 and reviewed such terms with their respective attorneys, that the terms of this Letter Agreement, including, without limitation, the terms of this Paragraph 24, have been fully and completely read and explained to them by their respective attorneys, and that such terms are fully understood and voluntarily accepted by them, with no duress or coercion of any kind. The NFL hereby agrees, solely with and for the benefit of the Insurers and for no other Requesting Party or any other Person, that the release and covenant not to sue set forth in this Paragraph 24 shall not apply to the breach by the NFL of any specific covenant, obligation or undertaking set forth in this Letter Agreement, to the extent that such specific covenant, obligation or undertaking (a) is expressly set forth herein; and (b) gives rise to an obligation under which the NFL has no discretion in the performance of such obligation hereunder.

25.    Limited Review; No Waiver of NFL Constitution. Each Requesting Party acknowledges and agrees that the NFL has reviewed the Operative Documents that have been supplied to it for certain limited purposes only and that the NFL is not charged with knowledge of, or deemed to have any independent obligations under, any such documents. Each Requesting Party further acknowledges that neither the NFL's review of any of the Operative Documents and other materials submitted to the NFL in connection herewith, nor the NFL's consent to the borrowing by StadCo of monies as described herein and to the grant by StadCo of security in respect of such borrowings, (a) except to the extent expressly set forth in Paragraph 1 hereof and in 2007 Resolution JC-5 constitutes a waiver or modification of any NFL rule or policy (or the NFL Constitution), or the past, current or future applicability thereof, or affects the status of any other ruling, consent or formal or informal interpretation or agreement now or hereafter in effect between the NFL and the Club, any owner thereof, the Franchise or any other Requesting Party or any resolution or policy of the NFL now or hereafter affecting the Club, any owner thereof, the Franchise or any Requesting Party, or (b) limits, impairs or in any way affects the NFL's rights, as against such party, to enforce compliance with the NFL Constitution or impose sanctions for any violations thereof.

26.    Accurate and Complete Documents. The Requesting Parties (other than the Secured Parties) hereby represent and warrant to the NFL that the NFL, on or prior to the date hereof, has been provided with true, accurate and complete copies of all of the material Operative Documents (including, without limitation, all of the Financing Documents and any amendments to any such Financing Documents executed on or prior to the date hereof) and that there are no agreements by or among the Requesting Parties to which the Requesting Parties (other than the Secured Parties) are party, have knowledge, or should in the exercise customary due diligence have knowledge, with respect to the subject matter of the Operative Documents not reflected in such copies. The Secured Parties hereby represent and warrant to the NFL that the NFL, on or prior to the date hereof, has been provided with true, accurate and complete copies of all of the material Operative Documents (including, without limitation, all of the Financing Documents and any amendments to any such Financing Documents executed on or prior to the date hereof) to which any of them are a party or of which any of them are aware, and there are no agreements by or among the Requesting Parties with respect to the subject matter of such Financing Documents not reflected in such copies. The Requesting Parties acknowledge and agree that (a) the representations and warranties set forth in this Paragraph 26 are material inducements to the NFL to grant the consent granted hereby and (b) any Material Modification of the Operative Documents or any of the

Requesting Parties
Page 54

Obligations arising thereunder that is hereafter made without the NFL's consent or that has heretofore been made but not disclosed to the NFL in writing (or any breach of any representation or warranty set forth in this Paragraph) may, at the NFL's option, be deemed a default under this Letter Agreement and/or the NFL Constitution, as the case may be, which default shall entitle the NFL to exercise its rights and remedies against any of the Requesting Parties in respect thereof under the NFL Constitution and/or any and all applicable documents or agreements and/or withdraw its consent hereunder and/or exercise any rights that it may have hereunder with respect to any Secured Party.

27.    Additional Representations.

(a)    The NFL represents and warrants to the Secured Parties that (i) the NFL has the power and authority under the NFL Constitution to execute, deliver and perform its obligations under this Letter Agreement, the League G-3 Loan and the NFL Support Documents, (ii) this Letter Agreement, the League G-3 Loan and the NFL Support Documents have been duly authorized by all requisite action on the part of the NFL and its member clubs and duly executed and delivered by the NFL, and (iii) this Letter Agreement, the League G-3 Loan and the NFL Support Documents are valid and binding obligations of the NFL and are enforceable against the NFL in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws relating to or affecting the rights and remedies of creditors generally and to general principles of equity (regardless of whether at equity or at law).

(b)    Each of the Requesting Parties hereby represents and warrants to the NFL that (i) such Requesting Party has the individual or other capacity, power and authority under its organizational documents or otherwise under applicable law to execute, deliver and perform its obligations under this Letter Agreement and such of the NFL Support Documents as such Requesting Party is a party, (ii) this Letter Agreement, and, if such Requesting Party is a party to any NFL Support Documents, then such NFL Support Documents, have been duly authorized by all requisite action on the part of, and duly executed and delivered by, such Requesting Party, and (iii) this Letter Agreement and, in respect of any NFL Support Documents to which such Requesting Party is a party, such NFL Support Documents are valid and binding obligations of such Requesting Party enforceable against such Requesting Party in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws relating to or affecting the rights and remedies of creditors generally and to generally-applicable principles of law and equity.

28.    Other StadCo Consent Letter. Each of the Requesting Parties acknowledges that, in connection with the construction and financing of the Project, the NFL is entering into the Other Team Consent Letter concurrently with its execution of this Letter Agreement and that such Other StadCo Consent Letter provides the NFL with rights and remedies that are similar in nature to those provided to the NFL hereunder. Each of the Requesting Parties covenants and agrees that it shall use commercially reasonable efforts (a) not to take any action (or refuse to take any action that it is otherwise obligated to take, whether pursuant to the terms of this Letter Agreement or otherwise) that is intended to, or that could reasonably be expected to, interfere with any exercise by the NFL of its rights and/or remedies under the Other StadCo Consent Letter, (b) in the event that a foreclosure or other sale occurs in respect of the Other StadCo, or in the event that the NFL exercises (or directs the Trustee to exercise) any of the NFL's rights thereunder that are similar to the rights provided to the NFL in Paragraphs 4, 5 and 9 hereof, to enter into such reasonable agreements and arrangements (including without limitation agreements substituting the new owner and its Affiliates for the owner of the Other StadCo and its Affiliates, as applicable, in the JV Company and in any leases or subleases relating to the Existing Stadium, the New Stadium and any Additional Premises, as the case may be, but only to the extent a Requesting Party has applicable rights thereunder) as are deemed necessary or desirable by the NFL in connection with such sale and (c) to cooperate with the NFL in connection with any exercise by the NFL of its rights and/or

remedies under the Other StadCo Consent Letter and in the NFL's administration thereof. The NFL acknowledges that the relationship between StadCo and the Other StadCo is an arm's-length relationship between unaffiliated entities and that (i) this Section 28 shall not be construed to restrict, modify, delay, waive or estop any Club Party in connection with the exercise of any right or remedy such Club Party may have or hereafter acquire against the Other StadCo, Other Team, any successor, assign or creditor, or any of their respective assets or property (including without limitation in connection with any default under any agreement or any violation of any applicable law) or to require any Club Party to forgive, set aside, modify or agree to any extension or accommodation with respect to any rent, indebtedness or other obligation due from the Other StadCo or Other Team to such Club Party; provided, that if and to the extent that any Club Party, in the exercise of its rights or remedies against the Other StadCo, Other Team or their respective successors or assigns, obtains any Lien or other security interest against the assets of, or interests in, the JV Company, such Other StadCo, Other Team, or any successor or assign, then any foreclosure or other exercise of rights or remedies against the JV Company or such Other StadCo, Other Team, successor or assign (or its assets or interests, as applicable) in respect thereof shall be subject to each and all of the terms of the Other StadCo Consent Letter applicable to a Secured Party thereunder (and such Club Party shall execute such other documents and agreements as the NFL may request in connection therewith, including without limitation an NFL debt financing consent letter); provided, further, that the foregoing proviso shall not, subject to any applicable restrictions contained in the Indenture, preclude StadCo from being repaid directly by the JV Company on behalf of a Capital Defaulting Member as provided for under (and as such term is defined in) the JV Company's Operating Agreement in respect of a Member Loan (as defined in the JV Company's Operating Agreement) deemed made by StadCo to the Capital Defaulting Member thereunder, solely from amounts that would otherwise be distributed or paid to the Capital Defaulting Member pursuant thereto) and (ii) no Club Party shall be required to enter into any agreement or arrangement permitting any activities at the New Stadium or the performance or exhibition of games by any professional sports franchise other than the franchise of the Other Team (or an NFL-approved successor Franchise) except as it may agree in its sole and absolute discretion.

29.    Waiver of Right to Jury Trial. Each party to this Letter Agreement agrees that any suit, action, or proceeding, whether claim or counterclaim, brought or instituted by any party hereto or any successor or assignee of any party on or with respect to this Letter Agreement or which in any way relates, directly or indirectly, to the agreements of the parties or the transactions described herein shall be tried only by a court and not by a jury. **EACH PARTY HEREBY EXPRESSLY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY SUCH SUIT, ACTION OR PROCEEDING.**

30.    Injunctive Relief. The Requesting Parties acknowledge and agree that the NFL will suffer immediate and irreparable harm in the event of a breach of this Letter Agreement by any other party hereto of any of its obligations hereunder and will not have an adequate remedy at law, and therefore, the NFL shall, in addition to any other remedy available to it at law or in equity, be entitled to temporary, preliminary and permanent injunctive relief and a decree for specific performance in the event of a breach or threatened or attempted breach, without the necessity of showing any actual damage or irreparable harm or the posting of any bond or furnishing of any security.

31.    Authority of Trustee. The Trustee represents, warrants, covenants and agrees that the Indenture and the other Operative Documents fully authorize (unless and until the Trustee has been replaced pursuant to the terms of the Operative Documents) the Trustee, in its capacity as Trustee and collateral agent under the Security Documents, to take such actions on behalf of the holders of the Bonds, including, without limitation, the execution of this Letter Agreement, and, subject to the required approvals set forth in the Indenture, the granting of waivers under this Letter Agreement after the date hereof and to exercise such powers and to perform such duties as are required under the provisions of the Operative Documents, this Letter Agreement, and any other instruments or agreements referred to therein

Requesting Parties
Page 56

or as are reasonably incidental thereto.  Whether or not expressly stated in any provision of this Letter Agreement, and to the extent the Trustee is so empowered under the Operative Documents, the representations, warranties, covenants and agreements of the Trustee set forth in this Letter Agreement, shall be deemed made on behalf of, and by, each Secured Party and holder of Bonds that is not a signatory hereto, each of which shall be fully bound by the provisions of this Letter Agreement that are applicable to the Trustee.  The Trustee hereby covenants and agrees that it shall immediately provide notice to the NFL of its resignation or removal as Trustee (or as collateral agent) under any of the Operative Documents.  As a condition precedent to any Person serving as a successor trustee or agent, such Person shall execute and deliver to the NFL an agreement in form and substance reasonably acceptable to the NFL, assuming and agreeing to be bound by the terms of this Letter Agreement.

      32.    <u>No Relocation</u>.  Until the earlier of (i) the date on which occurs the end of the fifteenth regular playing season of the NFL (including any post-season playoff games in which the Club may participate in such fifteenth season) in which the Club has occupied the New Stadium for purposes of playing its NFL regular season home games, (ii) the date on which the League G-3 Loan shall have been paid or satisfied in full, and (iii) the exercise by the JV Company, the Club and StadCo of their early termination rights under the Ground Lease, Team Sublease and StadCo Sublease, respectively, in accordance with the terms of the Ground Lease, StadCo Sublease and Team Sublease, as applicable, the Financing Documents and Paragraphs 4(s) of this Letter Agreement, the Club Parties covenant and agree that the Club shall not relocate the playing of its home games from the New Stadium except due to any event that permits termination of the Ground Lease, StadCo Sublease or Team Sublease, and the NFL hereby agrees to diligently enforce such covenant as made by the Club so long as such covenant shall not have been avoided or otherwise set aside by a court of competent jurisdiction.  Nothing in this Paragraph 32 is intended to limit the obligations of the Club under the Non-Relocation Agreement.

*[Intentionally Left Blank]*

Requesting Parties
Page 57

   If the terms and conditions set forth herein are acceptable to you, please indicate your acceptance by executing and returning to me a signed and dated counterpart of this Letter Agreement.

                    Very truly yours,

                    NATIONAL FOOTBALL LEAGUE


                    Roger Goodell
                    Commissioner


          [*Intentionally Left Blank*]

The undersigned hereby agree to the foregoing terms and conditions and each undersigned Club Party also specifically agrees that the method of disposing of the Collateral contemplated in this Letter Agreement would not make a sale or other disposition of the Collateral commercially unreasonable.

GIANTS STADIUM LLC

By: _____
       Name:
       Title:

NEW YORK FOOTBALL GIANTS, INC.

By: _____
       Name:
       Title:

Club Controlling Owner:

_____
John K. Mara

StadCo Controlling Owner:

_____
John K. Mara

NEW MEADOWLANDS STADIUM COMPANY, LLC

By: _____
       Name:
       Title:

By: _____
       Name:
       Title:

[Signature Page to Giants Stadium Financing Consent Letter]

THE BANK OF NEW YORK, AS TRUSTEE

By: _____
    Name:
    Title:


FINANCIAL GUARANTY INSURANCE COMPANY, as Controlling Insurer

By: _____
    Name:
    Title:


FINANCIAL SECURITY ASSURANCE, INC., as Other Insurer

By: _____
    Name:
    Title:


GOLDMAN SACHS CAPITAL MARKETS, L.P., as Swap Counterparty

By: Goldman Sachs Capital Markets, L.L.C., its General Partner

By: _____
    Name:
    Title:


LEHMAN BROTHERS SPECIAL FINANCING INC., as Swap Counterparty

By: _____
    Name:
    Title:

EXHIBIT A

## 2007 RESOLUTION JC-5

*Whereas*, in connection with the joint undertaking of the stadium companies associated with the New York Giants and the New York Jets (each, a "Stadium Company" and together, the "Stadium Companies") to participate in a public-private partnership for the construction of a new stadium to be located in East Rutherford, New Jersey, the membership, taking into account the unique nature of the New York stadium project (including its location in the country's largest media market and the fact that two Clubs are sharing the stadium), approved in 2006 Resolution JC-1 (i) a stadium construction contribution from the League of up to $150 million per Stadium Company (up to $300 million in total for the project) pursuant to, and in accordance with, the G-3 Program and (ii) a related PSL visiting team share ("VTS") waiver, in order to support the construction of such new stadium;

*Whereas*, the Stadium Companies are in the process of finalizing financing agreements that would permit each Stadium Company to incur debt to be applied towards construction of the new stadium;

*Whereas*, in anticipation of such financing, a temporary and limited waiver of the debt ceiling has been requested to allow the Stadium Companies to incur the debt described herein; and

*Whereas*, the financial terms of (i) the Ground Lease and Development Agreement between the New Jersey Sports and Exposition Authority and New Meadowlands Stadium Company, LLC (the "JV Company"), (ii) the separate subleases between the JV Company and each of the Stadium Companies, and (iii) the separate sub-subleases between the Stadium Companies and the Clubs (collectively, the "Lease Documents") have been submitted for Executive Committee approval as required by 1988 Resolution FC-5.

Be it *Resolved*, that the financial terms of the Lease Documents for the new stadium be, and hereby are, approved, provided, however, that such approval does not constitute a waiver of or authorize noncompliance with any generally applicable gate-sharing or other League policies;

Further *Resolved*, that, again taking into account the unique nature of the New York stadium project (including its location in the country's largest media market and the fact that two Clubs are sharing the stadium) and on a non-precedential basis, the Giants and the Giants' Stadium Company be, and hereby are, granted a temporary and limited debt ceiling waiver on the terms described in presentations to the membership, including the accelerated repayment schedule that requires the debt of the Giants' Stadium Company to be reduced to not more than $575 million no later than the end of the seventh season (commencing with the first full season) of operations at the new stadium (which waiver will permit the Giants and the Giants' Stadium Company to incur debt in an aggregate amount of $865 million, which amount (i) includes $715 million of Giants Stadium Company debt ($65 million of which may be incurred solely as and to the extent necessary to fund overruns in the cost of constructing the new stadium) and (ii) is net of indebtedness incurred by the Giants' Stadium Company in connection with its delivery of letters of credit or other sureties to fund debt service or work stoppage reserves pursuant to the terms of the Giants Stadium Company's financing agreements), subject to the condition that the Giants and any of their affiliates holding football-related assets shall, no later than the end of the twenty-fifth season (commencing with the first full season) of operations at the new stadium, reduce the outstanding indebtedness of the Giants, their Stadium Company and all affiliates thereof that hold football-related assets to the lesser of (i) $350 million and (ii) the amount of the then-generally applicable League debt ceiling (compliance with such reduction (and the Giants' compliance with other League rules) to be determined on a consolidated basis for the Giants, the Giants' Stadium Company and all affiliates thereof

that hold football-related assets), but without prejudice to their right to borrow up to the debt ceiling thereafter;

Further *Resolved*, that again taking into account the unique nature of the New York stadium project (including its location in the country's largest media market and the fact that two Clubs are sharing the stadium) and on a non-precedential basis the Jets and the Jets' Stadium Company be, and hereby are, granted a temporary and limited debt ceiling waiver on the terms described in presentations to the membership, including the accelerated repayment schedule that requires the debt of the Jets' Stadium Company to be reduced to not more than $575 million no later than the end of the seventh season (commencing with the first full season) of operations at the new stadium (which waiver will permit the Jets and the Jets' Stadium Company to incur debt in an aggregate amount of $865 million, which amount (i) includes $715 million of Jets Stadium Company debt ($65 million of which may be incurred solely as and to the extent necessary to fund overruns in the cost of constructing the new stadium) and (ii) is net of indebtedness incurred by the Jets' Stadium Company in connection with its delivery of letters of credit or other sureties to fund debt service or work stoppage reserves pursuant to the terms of the Jets Stadium Company's financing agreements), subject to the condition that the Jets and any of their affiliates holding football-related assets shall, no later than the end of the twenty-fifth season (commencing with the first full season) of operations at the new stadium, reduce the outstanding indebtedness of the Jets, their Stadium Company and all affiliates thereof that hold football-related assets to the lesser of (i) $350 million and (ii) the amount of the then-generally applicable League debt ceiling (compliance with such reduction (and the Jets' compliance with other League rules) to be determined on a consolidated basis for the Jets, the Jets' Stadium Company and all affiliates thereof that hold football-related assets), but without prejudice to their right to borrow up to the debt ceiling thereafter;

Further *Resolved*, that the foregoing debt ceiling waivers are specific to the current controlling owners of the Giants and the Jets and that, as a result, if (i) either the Giants or the Giants' Stadium Company, or a controlling interest in either entity, is sold or otherwise transferred other than to a member or members of the Giants' current principal owners' immediate families (as defined in the NFL Constitution), then the debt ceiling waiver granted to the Giants pursuant to the preceding resolutions shall be terminated and (ii) either the Jets or the Jets' Stadium Company, or a controlling interest in either entity, is sold or otherwise transferred other than to a member or members of the Jets' current controlling owner's immediate family (as defined in the NFL Constitution, then the debt ceiling waiver granted to the Jets pursuant to the preceding resolutions shall be terminated (unless otherwise approved by the membership in its sole discretion);

Further *Resolved,* that the membership confirms that, in granting the debt ceiling waivers granted hereunder, it has accepted and acknowledged, and relied upon, the Clubs' representation that any further cost overruns will be funded from sources other than borrowed money (e.g., equity injections, PSL sales, other dedicated pre-sales of stadium new revenue streams);

Further *Resolved,* PSL proceeds (if any) shall be used solely and entirely to fund stadium construction (including through retirement of stadium debt) through a dedicated structure or other means satisfactory to the Commissioner and the Finance Committee and Stadium Committee, and that all PSL-related approvals are subject to the NFLPA granting Salary Cap credits and exclusions from Total Revenues attributable to the stadium project (provided that this condition shall be deemed to be satisfied if the NFLPA action does not occur solely due to, or as limited by, the "1.8%/2.3%" limit on Salary Cap credits and exclusions);

Further *Resolved*, all terms and conditions set forth in 2006 Resolution JC-1 and all G-3 Program guidelines shall remain unchanged including, but not limited to, the Club's guarantees, and the approvals herein shall not be deemed to address matters not expressly addressed herein; and

Further *Resolved*, that the terms and conditions of the approvals granted hereby (i) are subject to submission to the League Office of documentation satisfactory to the Commissioner, the Finance Committee and the Stadium Committee documenting the terms, conditions, and arrangements related to the financing agreements for the construction of the stadium (including without limitation final versions of the Lease Documents and the operating agreement and other relevant documents relating to the JV Company), and (ii) the execution of consent letters and other documents with all relevant parties acceptable in form and substance to the Commissioner, the Finance Committee and the Stadium Committee, and that the Commissioner shall execute and deliver such agreements on behalf of the League, which shall contain such additional specific terms and conditions (including League "bundling" rights and related collateral pledges on terms generally utilized and required under such consent letters and other documents) as the Commissioner, the Finance Committee or the Stadium Committee (or their respective designees) may deem necessary or appropriate (including without limitation any documentation related to the accelerated payment schedule described herein).

Exhibit B-1

New Stadco Sublease

(In this transcript as Item # 3)

Exhibit B-2

Team Sublease

(In this transcript as Item # 5)

Exhibit B-3

Ground Lease

(In this transcript as Item # 1)

Exhibit B-4

Memoranda of New Stadium Leases

(In this transcript as Items # 4 and #6)

EXHIBIT C

Power of Attorney

For value received, the undersigned hereby assigns and transfers to the National Football League (the "NFL") all rights that the undersigned may have to enforce and exercise all rights and remedies of the undersigned in and under the Operative Documents/Operative Project Documents (provided that for the avoidance of doubt, neither the StadCo Sublease nor the Team Sublease shall be deemed to be an Operative Project Document) in the event of a Third Party Default (as defined below) and the undersigned hereby irrevocably appoints the NFL as its agent and attorney-in-fact to act for the undersigned (in any way that the undersigned could act in person) to exercise such rights and remedies.

The powers of the NFL granted hereunder shall include, but not be limited to, the following powers (including such powers as they may be defined under applicable state law): (a) real estate transactions; (b) banking and other financial institution transactions; (c) stock and bond transactions; (d) tangible personal property transactions; (e) safe deposit box transactions; (f) insurance transactions; (g) claims and litigation; (h) commodity and option transactions; (i) business operations and business operation transactions; (j) borrowing transactions; (k) estate transactions; (l) tax matters relating to the foregoing and (m) all other property powers and transactions, in each case as and to the extent relating to the exercise of the rights and remedies of the undersigned under the Operative Documents/Operative Project Documents.

Terms used herein and not otherwise defined herein shall have the meaning set forth in that certain Letter Agreement, dated as of _____, 2007, among the National Football League, The Bank of New York as Trustee, Financial Security Assurance, Inc. and Financial Guaranty Insurance Company, as the Insurers, New York Football Giants, Inc. (the "Club"), Giants Stadium LLC (the "StadCo"), John K. Mara (the "Club Controlling Owner"), John K. Mara (the "StadCo Controlling Owner"), and New Meadowlands Stadium Company, LLC (the "JV Company" and, together with the Club, StadCo, the Club Controlling Owner and the StadCo Controlling Owner, the "Club Parties").

This power of attorney shall be effective upon its execution, but the rights of the NFL to exercise the rights of the Club Parties to enforce and exercise all rights and remedies of the undersigned in and under the Operative Documents/Operative Project Documents in the event of a Third Party Default (as defined below) hereunder (the "League Exercise Rights") shall be subject to the satisfaction of the following conditions on or before the date on which the NFL shall seek to exercise such power of attorney; provided that the satisfaction of these conditions with respect to one default shall not give the NFL the right to enforce remedies as to any other Third Party Default (as defined below) until the conditions applicable to that Third Party Default (as defined below) are satisfied:

1.      There shall exist a default or other breach by one or more parties (other than StadCo or any other Club Party) of one or more material obligations of such party(ies) under the Operative Documents/Operative Project Documents (a "Third Party Default");

2.      All relevant cure periods in respect of the performance by the breaching party(ies) of the relevant obligations (in respect of which a Third Party Default shall have occurred) under the Operative Documents/Operative Project Documents shall have expired;

3.      The parties to the Operative Documents/Operative Project Documents shall have failed on or before the conclusion of such cure periods to have reached agreement or other accommodation with StadCo and/or any other Club Party, as the case may be, regarding the cure of any such Third Party Default, which agreement or other accommodation shall provide for the

construction of a first-class professional football stadium with capacity and amenities substantially similar to those specified in the current design in the Project Agreements, suitable for the playing and national media broadcast of NFL games, with ground lease rights provided at not substantially less than the levels contemplated in such Operative Documents/Operative Project Documents and on a timetable reasonably consistent with the respective terms of the Operative Documents/Operative Project Documents (except for such delays in the timing of such performance as shall have occurred as the result of such Third Party Default prior to the date of such agreement or other accommodation); and

4.      StadCo and/or any other Club Party, as applicable, shall have failed, within thirty (30) days following written notice and demand from the NFL, to initiate the diligent exercise of their remedies under or in respect of the Operative Documents/Operative Project Documents with respect to such Third Party Default (or, in the event that StadCo and/or any other Club Party, as applicable, shall have initiated the exercise of such remedies, either with or without notice and demand from the NFL, StadCo or another Club Party, as the case may be, shall thereafter have ceased or otherwise failed, at any time or from time to time after receipt of such NFL notice and demand, diligently to pursue the exercise of such remedies, including, without limitation, any such rights as StadCo and/or any other Club Party, as the case may be, may have under the Operative Documents/Operative Project Documents to seek specific performance by, or other appropriate relief with respect to, the other parties thereto of their obligations under such Operative Documents/Operative Project Documents).

In the exercise of its rights pursuant to this Power of Attorney, the NFL shall have due regard for the fundamental objective of completing a first-class professional football stadium with capacity and amenities substantially similar to those specified in the Project Agreements. The NFL's power and authority hereunder with respect to any Third Party Default shall cease when the applicable Third Party Default has been remedied to the satisfaction of the NFL.

This Power of Attorney may not be amended or modified, nor may any additional Power of Attorney be granted by the undersigned Club Party in favor of the NFL and relating to the exercise of the rights of the undersigned Club Party in relation to the Operative Documents/Operative Project Documents, without the prior written consent of [COUNTERPARTY], in each to the extent so legally required.

IN WITNESS WHEREOF, the parties hereto have set their hands as of the date indicated below.

[            ]

By: _____        Date: _____
     Name:
     Title:


State of _____  )
                             ) SS.
County of_____)

      The undersigned, a notary public in and for the above county and state, certifies that
_____, known to me to be the same person whose name is subscribed as principal to the foregoing
power of attorney, appeared before me in person and acknowledged signing and delivering the instrument
as the free and voluntary act of the principal, for the uses and purposes therein set forth.

Dated:_____ (SEAL)


                                  _____
                                  Notary Public


My commission expires_____.

[          ]

By: _____          Date: _____

    Name:

    Title:

State of _____ )

                         ) SS.

County of _____ )

      The undersigned, a notary public in and for the above county and state, certifies that _____, known to me to be the same person whose name is subscribed as principal to the foregoing power of attorney, appeared before me in person and acknowledged signing and delivering the instrument as the free and voluntary act of the principal, for the uses and purposes therein set forth.

Dated:_____ (SEAL)

                                      _____

                                      Notary Public

    My commission expires_____.

EXHIBIT D-1

[Attach Organizational Structure]

EXHIBIT D-2 - D-[__]

[Attached Organizational Documents]

EXHIBIT E

[Attach New Stadium Estoppel Certificate]

EXHIBIT F

[Form of Assignment Consent]

[Name of Financial Institution] (["<u>Trustee</u>"/ "<u>Insurer</u>"]) has been provided with a copy of that certain letter agreement, dated as of [        ], by and among the National Football League, The Bank of New York as Trustee, Financial Security Assurance, Inc. and Financial Guaranty Insurance Company, as the Insurers, New York Football Giants, Inc. (the "<u>Club</u>"), Giants Stadium LLC (the "<u>StadCo</u>"), John K. Mara (the "<u>Club Controlling Owner</u>"), John K. Mara (the "<u>StadCo Controlling Owner</u>"), and New Meadowlands Stadium Company, LLC (the "<u>JV Company</u>") (the "<u>NFL Letter Agreement</u>"; all capitalized terms used herein and not defined are defined in the NFL Letter Agreement) with respect to the Operative Documents governing and/or related to the Obligations, and has been advised that such NFL Letter Agreement affects certain rights of, and imposes certain obligations on, the Secured Parties under the Operative Documents.  [Trustee/Insurer] hereby agrees that upon its acquisition of, or acceptance of an assignment in respect of the rights and obligations of the [Trustee/Insurer] in respect of the Obligations (or other acquisition or transfer to the undersigned of any interest therein), it shall be bound in all respects by each term or condition of the NFL Letter Agreement applicable to a Secured Party and to the [Trustee/Insurer/Controlling Insurer] thereunder as fully as though it were a signatory to such NFL Letter Agreement itself.

EXHIBIT G

Form of Irrevocable Proxy

This irrevocable proxy, which is coupled with an interest, is granted by the undersigned to the Commissioner of the National Football League (the "NFL") pursuant to and in connection with that certain letter agreement, dated as of the date hereof (as amended from time to time, the "NFL Letter Agreement"), by and among the NFL, The Bank of New York as Trustee, Financial Security Assurance, Inc. and Financial Guaranty Insurance Company, as the Insurers, New York Football Giants, Inc. (the "Club"), Giants Stadium LLC (the "StadCo"), John K. Mara (the "Club Controlling Owner"), John K. Mara (the "StadCo Controlling Owner"), and New Meadowlands Stadium Company, LLC (the "JV Company" and, together with the Club, StadCo, the Club Controlling Owner and the StadCo Controlling Owner, the "Club Parties"), and in furtherance of the NFL's undertakings in such NFL Letter Agreement in order, among other things, to further and protect the interests of the NFL and its member clubs in the reputation and integrity of the NFL and professional football, and to preserve and enhance the value of its member clubs. Reference is hereby made to that certain letter agreement, dated as of April 7, 2004 (as amended, modified, supplemented, replaced and/or restated from time to time, the "Club Consent Letter"), by and among the NFL, the Club, Bank of America, N.A., JPMorgan Chase Bank, New York Life Insurance Company, New York Life Insurance and Annuity Corporation and New York Life Insurance and Annuity Corporation Institutionally Owned Life Insurance Separate Account.

Capitalized terms used and not otherwise defined herein shall have the meanings set forth in the NFL Letter Agreement. In addition, for purposes of this irrevocable proxy, the term "Entities" shall mean StadCo, the Club and the JV Company, and any direct or indirect parent company or subsidiary of the same.

The undersigned is the legal and beneficial owner of [    ]% of the issued and outstanding membership interests of [            ] (the "Interests," which term shall be deemed to include all ownership interests of any Entity that, in the future, may be registered in the name of the undersigned). The undersigned hereby irrevocably appoints the Commissioner of the NFL (whoever he or she from time to time hereafter may be), as its true and lawful attorney and proxy in respect of the Interests, with all powers the undersigned possesses, and with full power of substitution:

1.    Effective immediately, to vote or express consent or dissent in the sole discretion of such proxy in respect of any or all of the Interests, to the extent the holder of the Interests is entitled to vote or express consent or dissent (whether by operation of law or otherwise), in each case with respect to the following: (i) the bankruptcy, dissolution, liquidation or reorganization of any Entity or the appointment of any conservator of, or trustee or similar official for, any Entity or any substantial part of any Entity's assets (including, in the event any of the foregoing is commenced or initiated involuntarily, consenting to such); (ii) any amendment to the limited liability company agreement, partnership agreement, bylaws, certificate of formation, certificate of limited partnership, certificate of incorporation, articles of incorporation or other organizational documents of any Entity that affects in any way the requirement of prior shareholder, manager, member or partner approval, as the case may be, with respect to the bankruptcy, dissolution, liquidation or reorganization of any Entity or the appointment of any conservator of, or trustee or similar official for, any Entity or any substantial part of any of such Entity's assets (including, in the event any of the foregoing is commenced or initiated involuntarily, consenting to such); or (iii) any amendment to the limited liability company agreement, partnership agreement, bylaws, certificate of formation, certificate of limited partnership, certificate of incorporation, articles of incorporation or other organizational documents of any Entity that alters or modifies, or purports to alter or modify, the voting or consent or dissent rights of the Interests.

2.    To vote or express consent or dissent in the sole discretion of such proxy in respect of any or all of the Interests, to the extent the holder of the Interests is entitled to vote or express consent or dissent (whether by operation of law or otherwise), in each case for any and all purposes and upon any and all subjects, matters and issues, including, without limitation, the approval of any sale of any Collateral (as defined in both the NFL Letter Agreement and the Club Consent Letter), the approval of the sale of all or any part of the assets of, or interests in, any Entity, and the removal and election of directors, officers and/or managers of any Entity, provided, however, that, as to any and all matters other than those specified in paragraph 1, the proxy shall only be entitled to vote or express consent or dissent in respect of the Interests effective immediately upon the earliest to occur of the following:

    (a)    the determination by the NFL to exercise: (i) its sale rights pursuant to Paragraphs 2 and 5 or its cure rights pursuant to Paragraph 9 of the NFL Letter Agreement or (ii) its sale rights pursuant to Paragraphs 2 and 5 or its cure rights pursuant to Paragraphs 8 and 24 of the Club Consent Letter;

    (b)    the delivery to the NFL: (i) by any Secured Party of a Foreclosure Notice pursuant to Paragraph 5(a) of the NFL Letter Agreement or (ii) by any Lender (as defined in the Club Consent Letter) of a Foreclosure Notice (as defined in the Club Consent Letter) pursuant to Paragraph 5(a) of the Club Consent Letter;

    (c)    the acceleration: (i) either automatically or at the Secured Parties' discretion, of the Obligations or (ii) either automatically or at the Lenders' (as defined in the Club Consent Letter) discretion, of the Obligations (as defined in the Club Consent Letter);

    (d)    the submission to a vote of the shareholders, managers, members or partners of any Entity of any matter permitting the proxy to exercise voting rights under Paragraph 1 hereof;

    (e)    the submission to a vote of the shareholders, managers, members or partners of any Entity of any matter permitting the proxy to exercise voting rights under Paragraph 1 of, or the occurrence of any events or circumstances that would trigger voting rights in the proxy under and pursuant to Paragraph 2 of, any of those certain Irrevocable Proxies, of even date herewith, granted by each of the other Club Parties to the Commissioner of the NFL;

    (f)    the reasonable expectation of the Commissioner of the NFL of any imminent event or occurrence that may make or render invalid or unenforceable the power or authority of the proxy hereunder to exercise any of the voting, consent or dissent rights granted herein, including, without limitation, the expiration of any statutorily prescribed period of validity without the prior delivery to the proxy of a new irrevocable proxy identical in form and substance to this irrevocable proxy except for its date of execution and delivery; or

    (g)    any challenge, directly or indirectly, by the undersigned to the validity or enforceability of this irrevocable proxy or any other irrevocable proxy granted by the undersigned to the Commissioner of the NFL.

    This proxy is irrevocable and coupled with an interest and shall survive to the maximum extent permitted by law (and is expressly intended to survive beyond the period provided in Section 212(b) of the Delaware General Corporation Law or any similar provision, whether under the Delaware Limited Liability Company Act, the New Jersey Limited Liability Company Act or otherwise). This irrevocable proxy shall terminate upon, and only upon, the date upon which (i) all of the Obligations, as defined in both the NFL Letter Agreement and the Club Consent Letter, have been irrevocably repaid in full (in each case, other than by or on behalf of the NFL), (ii) neither any Secured Party nor any Lender (as defined in

the Club Consent Letter) has any further obligations to advance funds under the Operative Documents, as defined in both the NFL Letter Agreement and the Club Consent Letter, (iii) all Liens of the Secured Parties and/or the NFL in the Collateral have been released and (iv) all Liens of the Lenders (as defined in the Club Consent Letter) and/or the NFL in the Collateral (as defined in the Club Consent Letter) have been released.  The voting, consent or dissent rights granted by this irrevocable proxy may be exercised by the proxy at any time and from time to time at any meeting or in writing or in any other form or forum permitted by law. This proxy revokes any other proxy granted by the undersigned at any time with respect to the Interests.

The undersigned represents and warrants that the undersigned is signing this irrevocable proxy exactly as the undersigned's name appears on any and all certificates representing the Interests.

*[Remainder of Page Intentionally Left Blank.]*

IN WITNESS WHEREOF, the undersigned[, by its duly authorized representative,] hereby executes and delivers this irrevocable proxy as of the __ day of _____, 2007.

[_____]


By:_____
     Name:
     Title:

**Annex A to Indenture**

[Form of Confidentiality Agreement]

Annex A
to Indenture

Form of Confidentiality Agreement

[StadCo]
[StadCo Address 1]
[StadCo Address 2]

[Date]

<u>PERSONAL AND CONFIDENTIAL</u>

[Name of Recipient] (the "<u>Recipient</u>")
[Address of Recipient]

Ladies and Gentlemen:

Reference is made to the [proposed] issuance and sale by [StadCo], a [Delaware][New Jersey] limited liability company (the "<u>Company</u>"), of Project Revenue Bonds, [Series 2007] in an aggregate principal amount of $[650,000,000] (such [proposed] issuance referred to herein as the "<u>Transaction</u>") pursuant to that certain Indenture of Trust, dated as of _____ 1, 2007, by and between the Company and _____, as trustee (the "<u>Trustee</u>") (as amended, modified or supplemented from time to time (including as supplemented by the First Supplemental Indenture of Trust, dated as of _____ 1, 2007, by and between the Company and the Trustee), the "<u>Indenture</u>"). The Company may be required, in connection with the Transaction, to provide certain information to the Recipient. In connection with the Transaction, the Company is requiring that the Recipient agree to treat such information confidentially, as set forth herein.

1. As used in this letter agreement (this "<u>Agreement</u>"), "Covered Information" means any information about the Company furnished before, on or after the date of this Agreement to the Recipient by or on behalf of the Company in connection with the Transaction and, in the case of written information furnished after the date of this Agreement, which is identified to the Recipient as confidential, and also includes any notes, analyses, compilations, studies and other materials prepared by the Recipient or its Advisors (as defined below) containing or based in whole or in part on any such information. Covered Information does not include information which (i) is already in the Recipient's possession as evidenced by written records, if such information was not provided to the Recipient by the Company prior to the date of this Agreement and is not known by the Recipient to be subject to another confidentiality agreement with the Company or another party, or (ii) becomes generally available to the public other than as a result of a disclosure by the Recipient or its Advisors, or (iii) becomes available to the Recipient on a non-confidential basis from a source other than the Company or its agents or Advisors, provided that such source has represented to the Recipient (which representation the Recipient has no reason to disbelieve) that it is entitled to disclose such information, or (iv) is generated or prepared by the Recipient or its Advisors without using the Covered Information.

2. (a) The Recipient hereby agrees that the Covered Information will be used only in connection with the Transaction, will be kept confidential by the Recipient and its officers,

-2-

employees, directors and Advisors and will not be disclosed to any other person, except as expressly permitted in this Agreement.

(b) Such disclosure may be made (i) to the Recipient's directors, officers and employees who have a reasonable need to know the contents thereof in connection with the Transaction, (ii) to the Recipient's attorneys, accountants, financial advisors, insurance advisors, regulators, rating agencies and other representatives and agents (collectively, "Advisors") who are assisting the Recipient in connection with its [proposed] relationship with the Company, (iii) subject to paragraph 3 below, to the extent such disclosure is required by applicable law, to any competent regulatory authority or governmental agency, or a court of competent jurisdiction, including, without limitation, in response to any subpoena or summons, (iv) to any insurance company, reinsurance company or other financial institution in connection with the reinsurance or proposed reinsurance of any financial guaranty insurance or surety the Recipient may provide or propose to provide in connection with the Transaction, (v) to the extent reasonably necessary to defend any legal proceeding brought against the Recipient by the Company, and (vi) to any other person to whom the Company agrees in advance in writing, provided in the cases of clauses (ii), (iv) and (vi) that such person to whom the Recipient provides Covered Information is informed by the Recipient of the confidential nature of such information and of the Recipient's obligations with respect thereto under this Agreement and such person is required by the Recipient or otherwise agrees to keep it confidential in accordance with this Agreement. The Company reserves the right to request that any such person described in clauses (ii), (iv) or (vi) above join in this Agreement directly. The Company shall have the right to hold the Recipient responsible for any breach of this Agreement by any person to whom the Recipient furnishes Covered Information, it being understood that the term "person" as used in this Agreement shall be broadly interpreted to include any entity, group or individual.

3. To the extent legally permissible, the Recipient will provide the Company with prompt written (or, if not practicable to do so, oral) notice of any legal obligation on the Recipient's part to disclose any Covered Information so the Company may, at the Company's expense, seek an appropriate protective order or otherwise take steps to minimize such disclosure.

4. The Recipient understands that, other than as may be provided in any other agreement or contract, neither the Company nor any of its representatives, agents or advisors has made or makes any representation or warranty as to the accuracy or completeness of the Covered Information and that, other than as may be provided in any other agreement or contract, they shall have no liability to the Recipient or any of the Recipient's agents or Advisors resulting from the use of the Covered Information. It is further understood and agreed that damages would not be a sufficient remedy for breach of this Agreement by the Recipient or its Advisors and that the Company shall be entitled to specific performance and/or injunctive relief as non-exclusive remedies for any such breach.

5. The Recipient agrees that no disclosure of any Covered Information to Recipient shall be deemed to create any express or implied license in favor of Recipient with respect to the Covered Information.

6. This Agreement shall terminate on the date on which all of the Company's obligations are no longer outstanding and all Covered Information held by the Recipient has been returned to the Company or destroyed.

This Agreement shall be governed by, and construed in accordance with, the laws of the State of New Jersey. This Agreement may not be amended, terminated or rescinded except pursuant to a written agreement duly executed by the parties hereto. Please indicate the Recipient's agreement to the foregoing by signing and returning one copy of this Agreement, whereupon this Agreement will constitute our entire agreement with respect to the subject matter hereof.

Very truly yours,

**[StadCo]**

By: _____
    Name:
    Title:

Accepted and Agreed:

**[NAME OF RECIPIENT]**

By: _____
    Name:
    Title:

**Schedule 1 to Indenture**

<u>Financing Agreements</u>

1.    All Collateral Documents (as defined in the Indenture).

2.    The Non-Disturbance Agreement (as defined in the Indenture).

3.    Each Insurance and Indemnity Agreement (as defined in the Indenture).

10662025.17

**Schedule 2 to Indenture**

Project Real Estate Agreements

1.      Ground Lease and Development Agreement, dated December 21, 2006 (the "Ground Lease"), by and between New Meadowlands Stadium Company, LLC  and New Jersey Sports and Exposition Authority.

2.      Sublease Agreement, dated as of August 16, 2007, by and between New Meadowlands Stadium Company, LLC and Giants Stadium LLC.

3.      Sublease Agreement, dated as of August 16, 2007, by and between Giants Stadium LLC and The New York Football Giants, Inc.