Re: Docket 40244

Response Deadline:  October 28, 2013 at 4:00 p.m. (ET)
Hearing Date: November 21, 2013 at 10:00 a.m. (ET)

KOBRE & KIM LLP
800 Third Avenue
New York, New York 10022
Tel. +1 212 488 1200
Fax +1 212 488 1220
Michael S. Kim
Danielle L. Rose
Scott K. McCulloch
Phil Huynh

*Attorneys for Federal National Mortgage Association*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————x
                                              :
In re                                         :          Chapter 11 Case No.
                                              :
LEHMAN BROTHERS HOLDINGS INC., *et al.,*      :          08-13555 (JMP)
                                              :
                      Debtors.                :          (Jointly Administered)
                                              :
———————————————————x

**FEDERAL NATIONAL MORTGAGE ASSOCIATION'S
RESPONSE IN OPPOSITION TO PLAN ADMINISTRATOR'S
OBJECTION TO CLASSIFICATION OF SECURITIES LAW PORTION
OF CLAIM OF FEDERAL NATIONAL MORTGAGE ASSOCIATION**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ......................................................................................................4

ARGUMENT..........................................................................................................9

POINT   I:   THE   PLS   CLAIM   IS   NOT   SUBJECT   TO   MANDATORY
SUBORDINATION UNDER SECTION 510(B)......................................................9

    A.   Legal Standard ...........................................................................9

    B.   The RMBS Are Not Securities "of" LBHI or SASCO ............................11

    C.   The Purported Affiliation Between SASCO, an Affiliate of the
Debtor, and the RMBS Trusts Is Irrelevant .................................14

    D.   In Any Event, SASCO Is Not Affiliated with the RMBS Trusts...............17

POINT II:   THE   PLS   CLAIM   IS   NOT   SUBJECT   TO   EQUITABLE
SUBORDINATION UNDER SECTION 510(C).................................................20

    A.   Legal Standard ...........................................................................20

    B.   Fannie Mae Engaged In No Wrongful Conduct, As Lehman
Concedes ..................................................................................21

    C.   The Relief that LBHI Seeks Would Constitute Impermissible
Categorical Subordination .......................................................22

    D.   It is Unfair to Extinguish Fannie Mae's Only Direct Claim to
Recover Its Sizeable Damages Based on Other Entirely
Speculative Indirect Recoveries................................................23

CONCLUSION.....................................................................................................26

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### <u>Cases</u>

*Chem. Bank N.Y. Trust Co. v. Kheel*, 369 F.2d 845 (2d. Cir. 1966) ..............................16

*Fed. Hous. Fin. Agency v. UBS Am., Inc.*, 858 F. Supp. 2d 306 (S.D.N.Y. 2012), motion
   to certify appeal granted (June 19, 2012), *aff'd*, 712 F.3d 136 (2d Cir. 2013) ........................23

*Flora Mir Candy Corp. v. R.S. Dickson & Co.*, 432 F.2d 1060 (2d Cir. 1970)...........................16

*In re 80 Nassau Assocs.*, 169 B.R. 832 (Bankr. S.D.N.Y. 1994).....................................25

*In re Adelphia Comm'ns Corp.*, 361 B.R. 337 (S.D.N.Y. 2007) .....................................16

*In re Am. Hous. Found.*, No. 10-02016 (RLJ), 2013 WL 1316723 (Bankr. N.D. Tex. Mar.
   30, 2013) ............................................................................................... 13-14

*In re Augie/Restivo Baking Co.*, 860 F.2d 515 (2d Cir. 1988).......................................16

*In re Basin Res. Corp.*, 190 B.R. 824 (Bankr. N.D. Tex 1996)................................12, 14

*In re Bernard L. Madoff Inv. Sec. LLC*, 458 B.R. 87 (Bankr. S.D.N.Y. 2011) ............................25

*In re BH S&B Holdings LLC*, 420 B.R. 112 (Bankr. S.D.N.Y. 2009), *aff'd*, 807 F. Supp.
   2d 199 (S.D.N.Y. 2011) ..........................................................................20, 25

*In re CIT Grp. Inc.*, 460 B.R. 633 (Bankr. S.D.N.Y. 2011), *aff'd*, 479 Fed. Appx. 393
   (2d Cir. 2012)..................................................................................10, 11

*In re E. Me. Elec. Co-op, Inc*, 121 B.R. 917 (Bankr. D. Me. 1990) ............................................13

*In re Enron Corp.*, 341 B.R. 141 (Bankr. S.D.N.Y. 2006) ............................................... 10, 12-13

*In re Enron Corp.*, 379 B.R. 425 (Bankr. S.D.N.Y. 2007) .....................................20, 25

*In re Enron Corp.*, No. 01-16034 (SAS), 2006 WL 2548592 (S.D.N.Y. Sept. 5, 2006)...............21

*In re Geneva Steel Co.*, 281 F.3d 1173 (10th Cir. 2002) .................................................13

*In re Gurney's Inn Corp. Liquidating Trust*, 215 B.R. 659 (Bankr. E.D.N.Y. 1997) ..................18

*In re Haven Eldercare, LLC*, 382 B.R. 180 (Bankr. D. Conn. 2008)..........................................17

*In re Hydrogen, L.L.C.*, 431 B.R. 337 (Bankr. S.D.N.Y. 2010) ...........................................21

*In re Intercorp Int'l, Ltd.*, 309 B.R. 686 (Bankr. S.D.N.Y. 2004) .........................................18

*In re marchFirst, Inc.*, 431 B.R. 436 (Bankr. N.D. Ill. 2010).........................................13

*In re Maruki USA Co.*, 97 B.R. 166 (Bankr. S.D.N.Y. 1988) .......................................16

*In re Med Diversified, Inc.*, 461 F.3d 251 (2d Cir. 2006)....................................... *passim*

*In re Minton Grp., Inc.*, 27 B.R. 385 (Bankr. S.D.N.Y. 1983) ............................................... 19-20

*In re Mobile Steel Co.*, 563 F.2d 692 (5th Cir. 1977)............................................. 20-21

*In re Pre-Press Graphics Co.*, 307 B.R. 65 (N.D. Ill. 2004)........................................13

*In re Rancher Energy Corp.*, No. 09-32943 (MER), 2011 WL 2604763 (Bankr. D. Colo. June 30, 2011)..................................................................................................................13

*In re Secured Equip. Trust of E. Air Lines, Inc.*, 38 F.3d 86 (2d Cir. 1994) ..........................17, 18

*In re SemCrude, L.P.*, 436 B.R. 317 (Bankr. D. Del. 2010) ........................................................15

*In re Standard Oil & Exploration of Del., Inc.*, 136 B.R. 141 (Bankr. W.D. Mich. 1992)..........14

*In re Stirling Homex Corp.*, 579 F.2d 213 (2d Cir. 1978) ...........................................................21

*In re W.T. Grant Co.*, 699 F.2d 599 (2d Cir. 1983) .....................................................................22

*In re Washington Mut., Inc.*, 462 B.R. 137 (Bankr. D. Del. 2011)...............................................19

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 1624, 185 L. Ed. 2d 576 (U.S. 2013)..................................23, 24

*Randall v. Loftsgaarden*, 478 U.S. 647 (1986) .............................................................................24

*Sure-Snap Corp. v. State Street Bank and Trust Co.*, 948 F.2d 869 (2d Cir. 1991) ....................20

*United States v. Noland*, 517 U.S. 535 (1996).............................................................3, 20, 21, 22

*United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213 (1996) ...............21

*Westinghouse Elec. Corp. v. '21' Int'l Holdings, Inc.*, 821 F. Supp. 212 (S.D.N.Y. 1993)..........24

## Statutes

11 U.S.C. § 101(2) ............................................................................................................ *passim*

11 U.S.C. § 101(9) ......................................................................................................17, 18

11 U.S.C. § 101(41) ............................................................................................................17

11 U.S.C. § 1145 ................................................................................................................14

11 U.S.C. § 510(b) ............................................................................................................ *passim*

11 U.S.C. § 510(c) ............................................................................................................ *passim*

11 U.S.C. § 77b....................................................................................................................14

12 U.S.C. § 4617(b) ............................................................................................................22

## Rules

Fed. R. Bankr. P. 1015......................................................................................................4

## Other Authorities

John J. Slain & Homer Kripke, *The Interface Between Securities Regulation and Bankruptcy—Allocating the Risk of Illegal Securities Issuance Between Securityholders and the Issuer's Creditors*, 48 N.Y.U. L. Rev. 261, 268 (1973) ....................10

The Federal National Mortgage Association ("Fannie Mae") hereby opposes the objection dated September 27, 2013 [Docket No. 40244] (the "Objection") by Lehman Brothers Holdings Inc., as Plan Administrator ("LBHI" or the "Plan Administrator"), to Fannie Mae's claim against Lehman Brothers Holdings Inc. ("LBHI") related to the offer and sale of certain residential mortgage-backed securities (the "PLS Claim"), and respectfully states as follows:

## PRELIMINARY STATEMENT

1.      LBHI violated the securities laws through material misstatements and omissions in the offering materials of certain residential mortgage-backed securities ("RMBS") to Fannie Mae.  LBHI faces virtually strict liability for its misconduct.  Recognizing that it has almost no defenses to Fannie Mae's securities law claims, LBHI resorts to trying to extinguish Fannie Mae's claim under Bankruptcy Code Section 510.   But LBHI ignores binding precedent interpreting Section 510, otherwise rewrites the statute to serve its arguments, and intentionally confuses key concepts—all in an impermissible attempt to "clothe a general creditor in the garb of a shareholder," as the Second Circuit put it in *In re Med Diversified, Inc.*, 461 F.3d 251, 258 (2d Cir. 2006), the Second Circuit's seminal decision on Section 510(b).  LBHI's Objection must be denied.

2.      *First*, Fannie Mae's PLS Claim is not subject to mandatory subordination. Section 510(b) applies solely to claims arising out of the purchase or sale of the securities *of* the debtor (LBHI) or the debtor's affiliate (here, LBHI identifies Structured Asset Securities Corporation ("SASCO") as the relevant affiliate).  Under the applicable Second Circuit case law, a claimant may be subordinated only if it either (i) took on the risk and return expectations of a shareholder in LBHI; or (ii) seeks to recover a contribution to the equity pool that other creditors

1

likely relied upon in deciding to extend credit to LBHI. *Med Diversified*, 461 F.3d at 256. Fannie Mae's PLS Claim does not fit into either category:

3.      *No shareholder risk and return.*  The performance of the RMBS did not track whatsoever the unrelated performance of LBHI or SASCO.  Rather, it turned on the quality of the mortgage loans underlying the RMBS.  If LBHI or SASCO prospered, Fannie Mae did not stand to gain by holding the RMBS.  Indeed, Fannie Mae and its Conservator, the Federal Housing Finance Agency ("FHFA"), would be pursuing the very same PLS Claim against LBHI if LBHI were not in bankruptcy, as reflected by the numerous lawsuits that FHFA has filed on Fannie Mae's behalf against profitable and financially stable banks arising out of substantially similar material misrepresentations in the offer or sale of similar securities.

4.      *No contribution to the "equity cushion."*  Likewise, in investing in the RMBS trusts (the "RMBS Trusts"), Fannie Mae did not contribute to any LBHI or SASCO equity pool on which creditors relied in extending credit to LBHI or SASCO.  That LBHI or SASCO may have earned revenues in connection with the RMBS Trusts is no different from any other revenue-generating activity that either undertook.  Fannie Mae did not contribute directly to any equity pool in the sense intended by Congress and the Second Circuit.

5.      Further, the Plan Administrator's attempt to expand Section 510(b) by arguing that SASCO was "affiliated" with the RMBS Trusts must be rejected as a matter of law.  Fannie Mae's PLS Claim was filed solely against LBHI, and the LBHI and SASCO bankruptcy proceedings have not been substantively consolidated.  Section 510(b) applies solely to claims related to securities "of the debtor or of an affiliate of *the* debtor" (emphasis added)—meaning here LBHI or its affiliate SASCO.  On its face, Section 510(b) does not capture purported

affiliates of SASCO.  In any event, the RMBS Trusts were *not* affiliated with SASCO under

Bankruptcy Code Section 101(2).

6. *Second*, Fannie Mae's Proof of Claim cannot be subordinated on "equitable"

grounds.  As LBHI concedes, Fannie Mae has not engaged in any misconduct, and LBHI cannot

identify a single case where a court has subordinated a claim in similar circumstances.

7. Further, the U.S. Supreme Court's decision in *United States v. Noland*, 517 U.S.

535 (1996) independently requires this Court to reject LBHI's equitable subordination argument

because the relief LBHI seeks would subordinate the entire category of certificateholder claims

based on RMBS investments.  Such categorical subordination, as in *Noland*, "runs directly

counter to Congress's policy judgment." *Id.* at 541.

8. Finally, subordination here would be *in*equitable.  LBHI cannot extinguish its

own virtually strict liability by dictating that Fannie Mae abandon direct statutory claims in favor

of entirely speculative recoveries on indirect contract claims that the third-party RMBS trustees

may or may not be pursuing, and on which LBHI may have more compelling defenses.  Those

indirect, third-party contract claims have not yet even been allowed.  And, even if those claims

were allowed, LBHI cannot show that Fannie Mae would recover its losses through those claims.

9. Fannie Mae has sustained huge losses on the RMBS.  It has sold and written off

certain RMBS for substantial losses, which Fannie Mae, as a former certificateholder, cannot

recover through RMBS trustee putback claims.  Further, the RMBS that Fannie Mae continues to

hold have plunged in value, reflecting the market's judgment that such RMBS will not pay

principal and interest going forward.  LBHI cannot seriously believe that Fannie Mae will

recover those losses through the as-yet unallowed and still contested third-party RMBS trustee

claims (which may be primarily directed at SASCO, with its limited distributable assets).  In

short, should there be any legitimate concern that Fannie Mae could somehow recover a "windfall," any such concerns should be addressed in due course through subsequent proceedings.

## BACKGROUND

*Fannie Mae's Proof of Claim*

10.    On September 22, 2009, Fannie Mae filed a timely proof of claim against LBHI. As to its PLS Claim—which is the only claim that LBHI seeks to subordinate here—Fannie Mae claimed that the RMBS offering materials, including the prospectuses and prospectus supplements, contained untrue statements of material facts or omitted to state material facts necessary in order to make the statements not misleading. Fannie Mae sought rescission or, in the alternative, damages under the Securities Act of 1933. *See* Fannie Mae Proof of Claim [Claim No. 29557], Exhibit A, at 3-5.[1]

11.    As LBHI acknowledges, Fannie Mae did not file a proof of claim against LBHI's affiliate, SASCO, which had commenced a separate Chapter 11 case on February 9, 2009. *See* LBHI Obj. ¶¶ 7-8. The LBHI and SASCO Chapter 11 cases have been procedurally—but not substantively—consolidated, and are being jointly administered pursuant to Bankruptcy Rule 1015(b). *Id.* ¶ 7. Therefore, as to Fannie Mae's Proof of Claim, LBHI is "the debtor."[2]

---

[1] Fannie Mae's Proof of Claim remains subject to FHFA's rights, titles, powers and privileges under the Housing and Economic Recovery Act.

[2] In 2011, Lehman reported that LBHI had approximately US $43.712 billion in net distributable assets, whereas SASCO had approximately US $319 million in net distributable assets. *See* Debtors' Disclosure Statement for Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors Pursuant to Section 1125 of the Bankruptcy Code, dated August 31, 2011 [Docket No. 19629].

*The RMBS Certificates*

12.     The PLS Claim and LBHI's Objection thereto involve certificates that Fannie Mae purchased in the RMBS Trusts.  Those certificates were issued by New York trusts and backed by residential mortgage loans.  *See*, *e.g.*, Ex. B to Declaration of Zachary Trumpp annexed to LBHI's Obj. ("Trumpp Decl."), Prospectus Supplement ("Supp.") to SASC 2006-BC2, S-i ("The certificates will represent interests in the issuing entity only and will not represent interests in or obligations of the sponsor, the depositor or any of their affiliates or any other entity."); *id.* at S-4 ("The certificates represent ownership interests in a trust fund, the assets of which will consist primarily of conventional, adjustable and fixed rate, fully amortizing, dual amortization and balloon, first and second lien, residential mortgage loans . . ."); *id.* at S-i, S-3 (identifying "Structured Asset Securities Corporation Mortgage Loan Trust 2006-BC2" as the "Issuing Entity").

13.     As a holder of the RMBS, Fannie Mae is entitled to receive principal and interest payments from the loan pool.  The RMBS Trusts, and no other entity, are responsible for those payments.  For example, as one prospectus supplement annexed to LBHI's Objection explained, the RMBS "certificates represent ownership interests in a trust fund" and, therefore, "[t]he only sources of cash available to make interest and principal payments on the certificates will be the assets of the trust fund and the supplemental interest trust."  Ex. E to Trumpp Decl., Prospectus Supp. to SASC 2007-WF1, at S-4, S-9.  As a result, "[n]o other entity will be required or expected to make any payments on the certificates."  *Id.* at S-9.

14.     The level of risk inherent in holding the RMBS is, therefore, a function of the credit quality of the underlying mortgages (*i.e.*, the risk that the underlying mortgages will become delinquent or default) and the seniority of the certificate (there are generally a number of different tranches).  If there are substantial delinquencies or defaults in the loans constituting the

5

pool, the certificateholders will bear the losses (with more junior tranches bearing the losses first and eventually the more senior tranches also experiencing losses). *See*, *e.g.*, Ex. B to Trumpp Decl., Prospectus Supp. to SASC 2006-BC2, at S-103 ("[i]f the assets of the Trust Fund are insufficient to pay the Certificateholders all principal and interest owed, holders of some or all classes of Certificateholders will not receive all of their expected payments of interest and principal and will suffer a loss.").

15.    RMBS trusts typically have, however, credit enhancement features to protect against such losses and enable more senior classes of certificates to receive regular distributions of principal and interest.  These features may include, among others, excess interest and the application of excess cashflow, overcollateralization, loss allocation and limited cross-collateralization features, primary mortgage insurance, and an interest rate swap agreement.  Ex. B to Trumpp Decl., Prospectus Supp. to SASC 2006-BC2, at S-11.

16.    The performance of entities involved in offering or selling the RMBS does not protect the certificateholders.  If, for example, the stock price of the entity acting as the RMBS depositor soars, the RMBS certificateholders will not receive any benefit.  In short, the risks and rewards related to holding RMBS are entirely distinct from the risks and rewards associated with owning securities of entities, such as the depositor, involved in the RMBS offering or sale.

*Trustee Putback Claims and Certificateholder Securities Act Claims*

17.    Certain entities, such as the depositor, involved in the securitization make loan-level representations and warranties with respect to the mortgage loans that comprise the primary assets of the trusts.  Under applicable law, if such representations and warranties prove materially false, the trustees of the RMBS Trusts (the "RMBS Trustees") have the right to demand, on behalf of the RMBS Trusts, that the entity bearing contractual responsibilities for the

representations and warranties either cure the breach in all material respects or repurchase the loan from the RMBS Trust. This repurchase right is also often referred to as a "putback" right.

18.    LBHI claims that "certain" RMBS Trustees filed proofs of claim against LBHI and SASCO in order to pursue such contractual putback claims. LBHI Obj. ¶ 20. LBHI does not say how many putback claims were filed against LBHI (as compared to SASCO). LBHI notably does not state that any RMBS Trustee putback claim has been allowed. And, in fact, none has been; LBHI and SASCO appear to be vigorously contesting those claims. Further, LBHI has not shown how such claims would make Fannie Mae "whole" in any event.[3]

19.    The entities involved in offering or selling the securities, such as the issuers, underwriters, and the persons who control them, make (or are responsible for) separate representations to prospective investors in the offering materials. Those representations (typically made in the prospectuses and prospectus supplements) concern the underwriting standards used in originating the loans, the re-underwriting standards used in acquiring the loans, the loan characteristics, and the ratings of the certificates.

20.    Fannie Mae, as a certificateholder, brought separate claims under the Securities Act because, here, the offering materials contained untrue statements of material facts and/or omitted to state required material facts.

---

[3] LBHI identifies only two putback claims (one against SASCO and another against LBHI) filed by RMBS Trustees, Claim Nos. 20532-33. LBHI Obj. ¶ 20. Neither claim has been allowed.

*LBHI's Objection*

21.     LBHI's Objection pertains solely to Fannie Mae's PLS Claim.  LBHI seeks to subordinate under Section 510(b) Fannie Mae's PLS Claim to Class 11.  In the alternative, LBHI seeks to subordinate Fannie Mae's PLS Claim under Section 510(c) below Class 7.  *Id*. ¶ 4.[4]

22.     With respect to mandatory subordination, LBHI does not maintain that the RMBS Trusts are securities of LBHI.  Rather, claiming that Section 510(b) is ambiguous (*see* LBHI Obj. ¶¶ 26, 28, n.7), Lehman asserts that the RMBS Trusts are securities of LBHI's affiliate, SASCO, because SASCO acted as the depositor for such Trusts and, under the Securities Act and related rules, a depositor is an "issuer."  *Id*. ¶¶ 26-32.  Though Section 510(b) does not use the term "issuer," LBHI insists that, because Fannie Mae is pursuing claims under the Securities Act, this Court should import the definition of "issuer" from the Securities Act into Section 510(b).  *Id*. ¶ 28, n.7.

23.     In the alternative, LBHI rewrites Section 510(b) in an attempt to create some statutory significance from SASCO's purported affiliation with the RMBS Trusts.  Though Section 510(b) applies solely to "securit[ies] of the debtor or of an affiliate of *the* debtor,"— meaning, here, securities of LBHI or LBHI's affiliate (SASCO)—LBHI claims that Section 510(b) applies because the securities of "*a* debtor" (here, SASCO) are purportedly affiliated with the RMBS Trusts.  *See id*. ¶¶ 23, 25.

24.     As a final resort, acknowledging that "technically" Section 510(b) may not apply here (*see id.* ¶ 49), LBHI seeks equitable subordination under Section 510(c).  LBHI says,

---

[4] LBHI seeks subordination through a claim objection rather than an adversary proceeding.  In responding to LBHI's Objection, Fannie Mae reserves its right to insist on an adversary proceeding and does not concede that LBHI's Objection is procedurally proper.  Further, Fannie Mae does not respond to LBHI's purported substantive defenses to the PLS Claim that LBHI listed by footnote.  LBHI Obj. at ¶ 5, n.2.  Those defenses have no merit, as Fannie Mae will demonstrate as necessary in subsequent proceedings.

without factual support, that equitable subordination is necessary to prevent Fannie Mae from recovering more than its actual losses and recouping a "windfall." *Id.* ¶ 45. LBHI claims that Fannie Mae has suffered and will sustain only paltry losses which the RMBS Trustees can easily remediate through the (as-yet unallowed) putback claims against LBHI and SASCO. *Id.* LBHI does not identify which claims were lodged against LBHI and which were lodged against SASCO. LBHI calculates Fannie Mae's losses based on examining the purported payments Fannie Mae has received to date on the RMBS, even though damages under the securities laws— the claims actually at issue here—turn on the securities' value, not the income received to date.

25.    LBHI concedes that Fannie Mae has not engaged in any wrongful conduct. *Id.* ¶ 47. LBHI claims that it is not seeking categorical subordination (*i.e.*, on grounds that apply equally against all RMBS certificateholders based on RMBS holdings) because the "Plan Administrator's request for subordination under [S]ection 510(c)(1) applies only to the Private Label Securities Claim" rather than Fannie Mae's entire claim against LBHI. *Id.* ¶ 46, n.10. LBHI does not explain why this distinction is meaningful, and it is not (as shown below).

## ARGUMENT

## POINT I

## THE PLS CLAIM IS NOT SUBJECT TO MANDATORY SUBORDINATION UNDER SECTION 510(B)

A.    Legal Standard

26.    Section 510(b) subordinates claims based on the purchase or sale of securities of either the debtor or the debtor's affiliates. The statute states, in relevant part:

> [A] claim arising from rescission of a purchase or sale of a security *of the debtor or of an affiliate of the debtor*, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security . . .

9

27.     In the event of any ambiguities in Section 510(b), as LBHI concedes exist here (*see* LBHI Obj. ¶¶ 26, 28, n.7), the Second Circuit has directed that courts interpret Section 510(b) consistent with its legislative history.   The Second Circuit has held that the key considerations in applying Section 510(b) are whether (i) the party to be subordinated "took on the risk and return expectations of a shareholder [in the debtor], rather than a creditor;" or (ii) whether that party "seeks to recover a contribution to the equity pool presumably relied upon by creditors in deciding whether to extend credit to the debtor."   *Med Diversified*, 461 F.3d at 256.   The first prong of the test is more important.   *Id.* at 258-9; *see also In re CIT Grp. Inc.*, 460 B.R. 633, 643 (Bankr. S.D.N.Y. 2011), *aff'd*, 479 Fed. Appx. 393 (2d Cir. 2012).[5]

28.     The risk-allocation rationale recognizes that shareholders, who "enjoy the right to unlimited residual profits from an enterprise[,] should bear the greater risk from insolvency" by recovering at a lower priority than creditors, consistent with the absolute priority rule.   *See In re CIT Grp. Inc.*, 460 B.R. at 640.   This rationale applies also to subordinated debt holders who, like shareholders, have secured greater rewards than general creditors for taking on higher risk (for example, higher interest payments for agreeing to recover at a lower priority than general creditors).   *See* John J. Slain & Homer Kripke, *The Interface Between Securities Regulation and Bankruptcy—Allocating the Risk of Illegal Securities Issuance Between Securityholders and the Issuer's Creditors*, 48 N.Y.U. L. Rev. 261, 268 (1973) (noting that, while "focused upon the rescinding stockholder," "the discussion is equally applicable to holders of subordinated debentures and to other creditors whose debt securities are contractually subordinated").

---

[5] While the Plan Administrator contends that "[t]he Second Circuit has directed courts to interpret section 510(b) broadly as a remedial provision" (LBHI Obj. at 10, n.6), in *Med Diversified*, the case on which LBHI relies, the Second Circuit held that Section 510(b) has "outer boundaries" and cannot be used, as LBHI tries here, to subordinate a general creditor by "cloth[ing]" it "in the garb of a shareholder."   461 F.3d at 258-259.

29.     The related equity-cushion rationale simply recognizes that, "as a consequence of the absolute priority rule, creditors can rely on securityholders to provide an equity cushion." *In re Enron Corp.*, 341 B.R. 141, 165 (Bankr. S.D.N.Y. 2006).  That is, because the debtor will pay any amounts due to lower priority holders of equity and subordinated debt only after satisfying the general creditors' claims, those holders' contributions create a cushion for general creditors against the debtor's inability to pay.

30.     The Second Circuit has not sanctioned, in the event of Section 510(b) ambiguity, a litigant plucking a term, which might be analogous but not even used in Section 510(b), from a different federal statute and then importing such separate statutory definition into Section 510(b).

B.    The RMBS Are Not Securities "of" LBHI or SASCO

31.     Under applicable Second Circuit law, the RMBS can be securities only "of" the RMBS Trusts.  *Med Diversified*, 461 F.3d at 256.  By investing in RMBS, Fannie Mae did not take on the risk and return allocation of an LBHI shareholder or subordinated debt holder.  The RMBS did not entitle Fannie Mae to claim, alongside shareholders, "unlimited residual profits," *CIT Grp.*, 460 B.R. at 640, in LBHI as a business.  Rather, the RMBS entitled Fannie Mae solely to payments from the RMBS trusts.  *See supra* Background, ¶ 13.  Nor do the RMBS represent subordinated debt obligations of LBHI in which Fannie Mae contractually agreed to subordinate itself to other LBHI creditors.  Further, while the *Med Diversified* test looks solely to the debtor, the above analysis applies with equal force to SASCO:  Fannie Mae did not take on any risk and return expectations of a SASCO shareholder or subordinated debt holder.

32.     The equity-cushion rationale likewise does not apply here.  The "classic equity cushion" is "composed of cash paid for common stock."  *CIT Grp.*, 460 B.R. at 644.  Here, Fannie Mae did not buy any LBHI common stock and therefore is not seeking to recover any

"shareholder investment" in LBHI on which LBHI creditors could have relied. *Med Diversified*, 461 F.3d at 256. Nor did Fannie Mae contribute subordinated debt that those creditors could have expected would have a lower priority than their claims in this bankruptcy. For these same reasons, to the extent that LBHI earned any money from Fannie Mae acquiring RMBS, such funds could not have constituted any "cushion" under Second Circuit law.[6] To the contrary, here, other persons extending credit to LBHI should properly have considered, as part of assessing LBHI's risk of insolvency, the potential for liability stemming from illegality in security offerings. And those creditors should have likewise anticipated that such liability would constitute competing claims on the debtor's assets in case of insolvency. Again, while outside the *Med Diversified* test, this analysis applies with equal force to SASCO.

33.    LBHI's effort to import the definition of "issuer" from the securities laws into Section 510(b) must be rejected. *See* LBHI Obj. ¶¶ 26-32.

34.    *First*, contrary to LBHI's assertion, this method of statutory interpretation is not "undoubtedly appropriate." LBHI Obj. ¶ 28, n.7. Rather, it directly contravenes the Second Circuit's direction with respect to resolving Section 510(b) ambiguity: to determine the appropriate scope of Section 510(b), courts must examine that statute's twin rationales and apply the controlling two-prong test for mandatory subordination. *Med Diversified*, 461 F.3d at 256. LBHI does not even attempt to show how it satisfies this test—and, indeed, it cannot.

35.    *Second*, the Securities Act definitions are not instructive in any event. No form of the word "issuer" appears anywhere in Section 510(b), and the Securities Act and Section 510(b) have entirely different purposes. Significantly, this Court has itself already held that Securities Act definitions should *not* be imported into Bankruptcy Code Section 510(b), given that the

---

[6] In any event, according to LBHI's own declaration, any funds that Fannie Mae paid for the RMBS went to LBHI's wholly-owned subsidiary, Lehman Brothers Inc. *See* Trumpp Decl. ¶ 25.

statutes have entirely different purposes and use different terms. In *Enron*, this Court rejected a litigant's attempt to determine the scope of Section 510(b) by reference to the Securities Act and the Securities Exchange Act. The Court found that "the Bankruptcy Code and the Securities Acts create two distinct regulatory schemes." 341 B.R. at 159. It held:

> Whether or not comparative statutory analyses are valuable in other contexts, a comparative analysis of Rule 10(b)–5 and the Securities Acts does not appear fruitful here. The phrases "in connection with" [the Securities Acts terminology] and "arising from" [the Section 510(b) terminology] are clearly different . . . Moreover, there is nothing to suggest that the Securities Acts and section 510(b) were intended to constitute a complementary whole.

*Id*. at 158-59. The Second Circuit in *Med Diversified* lauded the *Enron* decision as "extraordinarily thorough." 461 F.3d at 257. *See also In re E. Me. Elec. Co-op, Inc*., 121 B.R. 917, 929-30 (Bankr. D. Me. 1990) (finding that the statutory definitions of the securities laws "may well be inadequate" for the Bankruptcy Code because the "paramount objectives [of the securities laws] are to provide broad investor protection through disclosure and deterrence of fraud" in contrast to the reorganizational goals of the Bankruptcy Code).

36.    Moreover, none of the out-of-Circuit cases that LBHI cites support the conclusion that this Court should "assume," contrary to Second Circuit directives and this Court's prior decision, that Section 510(b) was meant to cover any securities "issued" by the debtor, "whether or not such securities are included in the debtor's capital structure," as LBHI argues. LBHI Obj. ¶ 27. None of those cases involved securities (such as the RMBS at issue here) that were outside the capital structure of both the debtor and its affiliate. *See In re Geneva Steel Co.*, 281 F.3d 1173, 1175 (10th Cir. 2002) (bond debt in the debtor); *In re Rancher Energy Corp.*, No. 09-32943 (MER), 2011 WL 2604763, at *6 (Bankr. D. Colo. June 30, 2011) (debtor's common stock); *In re Pre-Press Graphics Co.*, 307 B.R. 65, 79 (N.D. Ill. 2004) (debtor's stock); *In re marchFirst, Inc.*, 431 B.R. 436, 439 (Bankr. N.D. Ill. 2010) (debtor's common stock); *see also In*

*re Am. Hous. Found.,* No. 10-02016 (RLJ), 2013 WL 1316723, at \*17-19 (Bankr. N.D. Tex. Mar. 30, 2013) (equity interests in affiliate); *In re Basin Res. Corp.*, 190 B.R. 824, 826-27 (Bankr. N.D. Tex 1996) (interests in affiliate joint ventures).

37.    *Third*, if Congress had wanted to import the definition of "issuer" from the securities laws, it would have done so expressly, as Congress has done in another section of the Bankruptcy Code.  Bankruptcy Code Section 1145(b) expressly incorporates the definition of issuer from Section 2(a)(11) of the Securities Act, which includes the very same definition of "issuer" that LBHI attempts to use here.  *See* 11 U.S.C. § 1145(b); 11 U.S.C. § 77b.  Section 1145 allows, under certain circumstances, the sale of a debtor's securities without the burden of meeting certain registration requirements of the securities laws, unless the seller is an "underwriter," which includes "issuers."  11 U.S.C. § 1145.  Moreover, even then, courts have refused to import the meaning of "issuer" from the securities laws where doing so would frustrate bankruptcy purposes.  *See In re Standard Oil & Exploration of Del., Inc*., 136 B.R. 141, 148-50 (Bankr. W.D. Mich. 1992) (finding the term "issuer," though defined in Section 1145 by reference to the Securities Act definition, had to be read to exclude the debtor) (listing cases).

C.    The Purported Affiliation Between SASCO, an Affiliate of the Debtor, and the RMBS Trusts Is Irrelevant

38.    The Plan Administrator does not allege that the RMBS Trusts are affiliates of LBHI, and any purported affiliation between SASCO and the RMBS Trusts is irrelevant. Section 510(b) mandates subordination only for claims "arising from . . . a purchase or sale of a security of the debtor or of an affiliate *of the debtor*" (emphasis added); it does not mandate subordination based on purported affiliations with the debtor's affiliate.

39.    LBHI's argument—regarding the purported SASCO-RMBS Trust affiliation— hinges on LBHI changing impermissibly a single, vital word in the statute.  LBHI paraphrases

14

510(b) to capture the securities of "an affiliate of *a* debtor" (LBHI Obj. ¶¶ 23, 25) (emphasis added), even though the statute actually applies solely to securities of "an affiliate of *the* debtor" (emphasis added).

40.     LBHI makes this quiet modification because, as LBHI acknowledges, Fannie Mae filed its PLS Claim against one debtor—LBHI—and the bankruptcies of LBHI and SASCO have not been substantively consolidated.  LBHI Obj. ¶¶ 7-8.  *See also* SASCO Docket No. 7, Feb. 18, 2009 Order Pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure Directing Joint Administration of the Recently Filed Chapter 11 Cases ("nothing contained in this Order shall be deemed or construed as directing or otherwise effecting the substantive consolidation of any of the above-captioned cases.").  Consequently, as to Fannie Mae's PLS Claim, "the debtor" is LBHI.

41.     LBHI does not even attempt to argue that LBHI is affiliated with the RMBS Trusts.  Nor could it.  Bankruptcy Code Section 101(2) sets out four categories of entities that are debtor "affiliates" for Title 11 purposes:

> [an] entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor . . .;

> [a] corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor, or by an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor . . .;

> [a] person whose business is operated under a lease or operating agreement by a debtor, or person substantially all of whose property is operated under an operating agreement with the debtor; or

> [an] entity that operates the business or substantially all of the property of the debtor under a lease or operating agreement.

42.     The RMBS Trusts are not LBHI affiliates under any of these categories. Moreover, because the Title 11 definition of "affiliate" is unambiguous, it is strictly applied.

15

*See, e.g., In re SemCrude, L.P.*, 436 B.R. 317, 321-22 (Bankr. D. Del. 2010) (where issuer was a debtor "affiliate" in the colloquial sense but not under 101(2), court refused to subordinate claim because debtors did not identify "any relevant ambiguity in the text of sections 510(b) or 101(2) which would allow the [c]ourt to look beyond the terms of the relevant statutes."); *In re Maruki USA Co.*, 97 B.R. 166, 168-69 (Bankr. S.D.N.Y. 1988) (strictly applying 101(2) and rejecting debtor's argument that legislative history supported a broader reading).

43.    In changing "*the* debtor" to "*a* debtor," LBHI tries to accomplish, in contravention of applicable law, an implicit substantive consolidation as to one creditor's claim. The Third Amended Plan proposed by LBHI and ordered into effect by the Court was predicated on the lack of substantive consolidation; indeed, the order confirming that Plan cites the risks of litigation regarding consolidation as a justification for approving the negotiated Plan. *See* Order Confirming Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors, dated December 6, 2011 [Docket No. 23023], at 8, 13-14.

44.    Further, as the Second Circuit has repeatedly held, consolidation "is no mere instrument of procedural convenience . . . but a measure vitally affecting substantive rights." *In re Augie/Restivo Baking Co.*, 860 F.2d 515, 518 (2d Cir. 1988). Because consolidation could lead to "unfair treatment of creditors of a corporate debtor," courts should use the "power to consolidate . . . sparingly." *Chem. Bank N.Y. Trust Co. v. Kheel*, 369 F.2d 845, 847 (2d. Cir. 1966); *see also Flora Mir Candy Corp. v. R.S. Dickson & Co.*, 432 F.2d 1060, 1062-63 (2d Cir. 1970).

45.    Under this standard, as various courts in this Circuit have recognized, LBHI's 510(b) objection based on a purported SASCO-RMBS Trust affiliation argument must be rejected. *See In re Adelphia Comm'ns Corp.*, 361 B.R. 337, 359-62 (S.D.N.Y. 2007) (rejecting

16

reorganization plan because, among other faults, it worked an implicit substantive consolidation and failed to respect the debtors' distinct estates); *In re Haven Eldercare, LLC*, 382 B.R. 180, 184, n.4 (Bankr. D. Conn. 2008) (noting in a fee dispute context that "[i]t is not appropriate for this Court to engage, *sua sponte*, a legal fiction by treating these jointly administered cases as if they had been substantively consolidated.").

D.    In Any Event, SASCO Is Not Affiliated with the RMBS Trusts

46.    In any event, contrary to LBHI's arguments, the RMBS trusts are not "affiliates" of SASCO.  LBHI predicates its arguments on the affiliate definition applicable to a "person substantially all of whose property is operated under an operating agreement with the debtor." LBHI Obj. ¶ 34 (citing 11 U.S.C. § 101(2)(C)).  But, under this definition, there is still no affiliation between SASCO and the RMBS Trusts.

47.    *First*, the RMBS Trusts are not "person[s]" because they are not "business trusts," which the Bankruptcy Code recognizes as "persons."  *See* 11 U.S.C. §§ 101(41) (defining a "person" to include a "corporation"); 101(9)(A)(v) (defining a "corporation" to include a "business trust").  The Second Circuit has held that trusts holding collateral for the benefit of certificateholders, as the RMBS Trusts do, are not business trusts because they are not engaged in any business.  *See In re Secured Equip. Trust of E. Air Lines, Inc*., 38 F.3d 86, 90-91 (2d Cir. 1994).

48.    LBHI's arguments to the contrary fail.  LBHI's assertion—that the RMBS trustees' management of the mortgage loans constitutes the transaction of business, making the RMBS Trusts "business trusts" (LBHI Obj. ¶ 38)—is wrong.  The Second Circuit has held that the management of collateral does not constitute business.  *See Secured Equip. Trust* at 88 (holding that it was not the transaction of business when "the Collateral Trustee, pursuant to powers enumerated in the Indenture, began actively managing, maintaining, marketing, leasing,

17

and selling certain Collateral Pool equipment" and "retained counsel, accountants, and an aviation consultant to assist in the stewardship of the entrusted property"). And in any event, the Second Circuit has cautioned that "while a trust must engage in business-like activities to qualify as a business trust, such activity, without more, does not necessarily demonstrate that a trust is a business trust." *Id.* at 89.

49.    Further, the RMBS Trusts were not established to generate a profit in the manner of a business, but to secure payment for the Trust certificateholders. Here, there is the potential for excess amounts to be retained by residual interests in the RMBS Trusts because the Trusts' structure includes credit enhancements (for example, overcollateralization and excess interest) to further ensure payment to certificateholders (*see* Background, *supra* ¶ 15)—not because the RMBS Trusts generate profit for residual interests. These protections serve to "protect and preserve the [trust] res," consistent with "the purpose of a non-business trust," rather than to "carry[] on some kind of business." *Secured Equip. Trust*, 38 F.3d at 89; *see also In re Gurney's Inn Corp. Liquidating Trust*, 215 B.R. 659, 669 (Bankr. E.D.N.Y. 1997) (holding that a trust owning a mortgage loan and collecting and distributing income from that loan was not a business trust because its purpose was merely to "protect and preserve the value of the mortgage for the Trust beneficiaries").[7]

---

[7] LBHI incorrectly suggests that the RMBS Trusts are "corporations" within the meaning of the Bankruptcy Code—even if they are not "business trusts"—because they are "association[s] having a power or privilege that a private corporation, but not an individual or partnership, possess[]." LBHI Obj. ¶ 39, n.9; 11 U.S.C. § 101(9)(A)(i). But such a non-business trust is not a "corporation" under the Bankruptcy Code. *See*, *e.g.*, *In re Intercorp Int'l, Ltd.*, 309 B.R. 686, 691 (Bankr. S.D.N.Y. 2004) (finding "non-business trust" not to be a corporation under the Bankruptcy Code). Indeed, in determining whether a trust is a business trust, courts already "look[] to see whether the trust at issue has the attributes of a corporation." *Secured Equip. Trust*, 38 F.3d at 89. A non-business trust lacks too many of these attributes to otherwise qualify as a corporation. *See*, *e.g.*, *Gurney's*, 215 B.R. at 664, 669 (finding that a trust was not a business trust even though it had "freely transferrable" certificates).

50.    *Second*, the RMBS Trust agreements here do not constitute "operating agreements."  RMBS trust agreements, which generally share the same basic terms and are often called Pooling and Servicing Agreements, have been found not to constitute "operating agreements" within the meaning of the Bankruptcy Code.  *See In re Washington Mut., Inc.*, 462 B.R. 137, 145-46 (Bankr. D. Del. 2011) ("The Court finds that the Debtors have not adequately proven that the Pooling and Servicing Agreements constitute an operating agreement under the plain meaning of the statute [§ 101(2)(C) of the Code, which defines "affiliate"].").

51.    *Finally*, substantially all of the RMBS Trusts' property is not "operated under an operating agreement" with SASCO.  To the extent that the mortgage loans from which the RMBS Trusts drew their income were "operated" at all, the RMBS Trustees, not SASCO, operated them.  In the supplemental prospectus for LXS 2006-8, for example, the Trustee has certain core duties, including:  receiving funds collected by the master servicer and distributing such funds to certificateholders, preparing various reports for investors, exercising remedies upon events of default, removing the master servicer in appropriate circumstances, and acting as successor master servicer in the event of the resignation or removal of the master servicer.  *See* Ex. C to Trumpp Decl., Prospectus Supp. to LXS 2006-8, S-70, S-71.  Thus, while the LBHI-affiliated master servicer had responsibilities towards the issuing entity, the Trustee was the true "operator" of the issuing entity, if there even was one.

52.    Even if the servicers operated the RMBS Trusts' property, SASCO, the depositor, did not, and the RMBS Trusts were therefore not SASCO affiliates.  While the statute speaks in terms of property being operated under an operating agreement "with the debtor," 11 U.S.C. § 101(2)(C), to trigger affiliate status under Section 101(2)(C), the debtor cannot merely be a party to the operating agreement, but also must be the person doing the operating.  *See In re Minton*

*Grp., Inc.*, 27 B.R. 385, 389 (Bankr. S.D.N.Y. 1983) (holding that a limited partnership was an affiliate where *the debtor* operated all of the partnership's property).  Where, as here, SASCO performed the minimal duties of a depositor and did not operate the RMBS Trusts' mortgage loans, the RMBS Trusts are not SASCO affiliates.

### POINT II

### THE PLS CLAIM IS NOT SUBJECT TO EQUITABLE SUBORDINATION UNDER SECTION 510(C)

A.   Legal Standard

53.     Section 510(c) is a "drastic and unusual remedy" that "should be applied only to the extent necessary to offset specific harm that creditors have suffered on account of the inequitable conduct."  *In re Enron Corp.*, 379 B.R. 425, 434, 443 (Bankr. S.D.N.Y. 2007) (quotations omitted).

54.     To apply Section 510(c), this Court would need to determine that Fannie Mae engaged in some type of inequitable conduct.  *In re Mobile Steel Co.*, 563 F.2d 692, 699-700 (5th Cir. 1977); *Sure-Snap Corp. v. State Street Bank and Trust Co.*, 948 F.2d 869, 876 (2d Cir. 1991) (citing the *Mobile Steel* factors as applied by the Ninth Circuit); *see also Enron*, 379 B.R. at 433 ("[e]ven after the enactment of section 510(c), the vast majority of courts have continued to apply the *Mobile Steel* test, as recognized by the Supreme Court.").  Where the claimant is a non-insider like Fannie Mae, the misconduct must be "egregious and severely unfair" before it can trigger equitable subordination, "tantamount to fraud, misrepresentation, overreaching or spoliation."  *In re BH S&B Holdings LLC*, 420 B.R. 112, 156 (Bankr. S.D.N.Y. 2009), *aff'd*, 807 F. Supp. 2d 199 (S.D.N.Y. 2011) (quotations omitted).

55.     Further, under *Noland*, 517 U.S. at 543, the Supreme Court's key decision addressing equitable subordination, a court cannot subordinate an entire category of claims,

based on its own "equitable" determination under Section 510(c), because such determination would ignore the policy choices that Congress itself made in enacting the Bankruptcy Code and would effectively amount to legislation.  *Id.*; *see also United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213, 228-29 (1996) (discussing *Noland*).

### B. Fannie Mae Engaged In No Wrongful Conduct, As Lehman Concedes

56.    LBHI's request for equitable subordination must be rejected because Fannie Mae has not engaged in any inequitable conduct—much less the egregious misconduct required for a non-insider.  LBHI effectively admits the point.  *See* LBHI Obj. ¶ 47.  Without a showing of unfair conduct by Fannie Mae, Section 510(c) subordination is unavailable.  *See*, *e.g.*, *In re Hydrogen, L.L.C*., 431 B.R. 337, 360-62 (Bankr. S.D.N.Y. 2010) (applying *Mobile Steel* and requiring showing of creditor misconduct).

57.    Contrary to LBHI's assertion, in the Second Circuit, equitable subordination does not just "often" involve a showing that a creditor has engaged in inequitable conduct.   LBHI Obj. ¶ 47.  Section 510(c) is specifically meant to address, and requires a powerful showing of, such misconduct.  The Second Circuit has never recognized any exception to the unfair conduct requirement.   And even those (two) exceptions recognized in other jurisdictions—for stock redemption claims and tax penalties—plainly do not apply here.  *Cf. In re Enron Corp.*, No. 01-16034 (SAS), 2006 WL 2548592, at *6 (S.D.N.Y. Sept. 5, 2006) (noting established exceptions).[8]

---

[8] LBHI incorrectly asserts, albeit in a footnote, that the Second Circuit has permitted "no-fault equitable subordination."  LBHI Obj. ¶ 47, n.11.  But *In re Stirling Homex Corp.*, 579 F.2d 213 (2d Cir. 1978) dealt with the subordination of equity interests now governed by Section 510(b)—not Section 510(c)—and in fact cited the draft Section 510(b) legislation already circulating at the time the decision was handed down as well as the famous Slain and Kripke article.  *Id.* at 214-15.  *In re Stirling* has no application to Section 510(c) subordination in these circumstances.

58.     Further, contrary to LBHI's insinuation, a creditor's "parochial" pursuit of claim recoveries (LBHI Obj. ¶ 49) does not justify equitable subordination.  A creditor's job in a bankruptcy is to recover to the maximum extent permitted by law.  Indeed, the Second Circuit has recognized that, apart from obtaining a voidable preference or fraudulent conveyance (which is not an issue here), a creditor is permitted to take steps to recover on its claims.  *See In re W.T. Grant Co.*, 699 F.2d 599, 609-10 (2d Cir. 1983).  Here, Congress has mandated that the assets of Fannie Mae be conserved and preserved as part of its conservatorship status.  Moreover, it is clear that Congress intended that money obligations owed to Fannie Mae be pursued.  *See* 12 U.S.C. § 4617(b)(2)(B).

## C.  The Relief that LBHI Seeks Would Constitute Impermissible Categorical Subordination

59.     LBHI's equitable subordination argument also fails because it seeks to subordinate all securities claims of RMBS certificateholders.  LBHI argues that if Fannie Mae's PLS claim cannot "technically" be subordinated under Section 510(b) (LBHI Obj. ¶ 49), this Court should cure through Section 510(c) the loophole that LBHI perceives that Congress mistakenly left open in enacting Section 510(b).   But LBHI seeks to lead this Court into error.

60.     To permit equitable subordination in these circumstances—targeted at all securities claims of RMBS certificateholders—where Section 510(b) does not "technically" apply, requires revisiting the policy choices that Congress made in drafting the Bankruptcy Code.   The Supreme Court's *Noland* decision prohibits this.

61.     LBHI's attempt to disclaim categorical subordination must be rejected.   That LBHI seeks equitable subordination against only Fannie Mae's PLS Claim (and not the other claims Fannie Mae made in its Proof of Claim), *see* LBHI Obj. ¶ 46, n.10, misses the point.   By

focusing on characteristics of the claim, rather than the claimant, LBHI does not identify any fact-specific subordination grounds that could conceivably fall within Section 510(c)'s strictures.

D.    It is Unfair to Extinguish Fannie Mae's Only Direct Claim to Recover Its Sizeable Damages Based on Other Entirely Speculative Indirect Recoveries

62.    Finally, LBHI's equitable subordination request must be rejected because it seeks an inequitable outcome.  The fact that the RMBS Trustees are purportedly pursuing putback claims against SASCO and, in at least one case, LBHI, does not somehow make it fair to snuff out legitimate and substantial Fannie Mae direct claims against LBHI.  The Bankruptcy Code does not enable the debtor to mandate that a claimant rely on third parties to obtain partial and indirect relief from another debtor.  And for good reason.

63.    LBHI may have more compelling defenses to the RMBS Trustee contract claims as compared to Fannie Mae's Securities Act claims.  The Securities Act creates virtually strict liability for the PLS Claim.  *See*, *e.g.*, *Fed. Hous. Fin. Agency v. UBS Am., Inc.*, 858 F. Supp. 2d 306, 329 (S.D.N.Y. 2012), motion to certify appeal granted (June 19, 2012), *aff'd*, 712 F.3d 136 (2d Cir. 2013) ("[L]iability under the Securities Act is strict liability."); *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 148 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 1624, 185 L. Ed. 2d 576 (U.S. 2013) ("Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 impose essentially strict liability for material misstatements contained in registered securities offerings.").

64.    By contrast, among other defenses, LBHI may argue that the RMBS Trustee can enforce putback obligations solely as to specific loans and cannot recover damages across the entire securitization.  LBHI may also say that, unless LBHI made or expressly took on the specific loan-level representations and warranties, no putback claim is proper against LBHI—

meaning that certain RMBS Trustee putback claims are available solely against SASCO, which has far more limited assets available for recovery.  *See supra*, n.2.

65.     LBHI's double-recovery arguments are also predicated on a wild mischaracterization of the appropriate loss analysis.  LBHI claims that Fannie Mae has suffered minimal losses because Fannie Mae's senior RMBS certificates have purportedly paid to date. LBHI Obj. ¶¶ 2, 45.  But the damages Fannie Mae has sustained on its Securities Act claims turn on the value of the RMBS certificates—not payments to date.  *See*, *e.g.*, *Westinghouse Elec. Corp. v. '21' Int'l Holdings, Inc.*, 821 F. Supp. 212, 220 (S.D.N.Y. 1993) (holding that Section 12(2) rescissionary damages require the court to calculate difference between purchase and disposal prices); *NECA-IBEW Health*, 693 F.3d at 165 (holding that Section 11 damages are calculated by reference to the security's value at the time of suit or price at which it was sold).[9]

66.     Contrary to LBHI's assertion, Fannie Mae is sustaining very significant losses as a result of purchasing and selling the RMBS.  As reflected in the annexed affidavit of David Bealmear, Fannie Mae's Vice President for Capital Markets Pricing and Price Verification, at least three independent pricing services have determined that the value of nearly all Fannie Mae's currently-held RMBS has plunged.  *See* Exhibit A, Bealmear Affidavit, ¶¶ 7-11.  This reflects the market's judgment that Fannie Mae will not receive the income on its RMBS certificates going forward.  *Id.* ¶ 10.  Moreover, Fannie Mae has already sustained significant losses as a result of selling certain mezzanine bonds in December 2009 and being forced to write off its certificates in another RMBS.  *Id.* ¶¶ 4-5.

67.     Given those losses and that LBHI is contesting the as-yet unallowed RMBS Trustee putback claims (which may, in any event, be directed primarily at SASCO, with its

---

[9]  The payments made to date on the RMBS are relevant only to reduce the quantum of rescissionary damages.  *See Randall v. Loftsgaarden*, 478 U.S. 647, 656 (1986).

limited assets), LBHI cannot realistically worry that Fannie Mae will be made whole—much less

that it will recover *more* than its actual losses—through the RMBS Trustee putback claims.  In

any event, if through the claims process there is any legitimate concern that Fannie Mae could

recover a "windfall," the Court can address such a situation at the appropriate time and make

appropriate adjustments.

68.    Controlling authority, in addition to common sense and fairness, mandate that this

Court not just subordinate Fannie Mae's PLS claim.  Subordination is confined to offsetting

"specific harm that creditors have suffered on account of the inequitable conduct" and "is

remedial, not penal."  *In re Bernard L. Madoff Inv. Sec. LLC*, 458 B.R. 87, 121 (Bankr. S.D.N.Y.

2011) (quotations omitted); *see also BH S&B Holdings LLC*, 420 B.R. at 156 (claim may be

"subordinated only to the extent necessary to offset the harm which the bankrupt and its creditors

suffered on account of the inequitable conduct[, which] sets the limit of the remedy regardless of

the nature of the claimant's conduct") (quotations omitted); *Enron*, 379 B.R. at 434 (same); *In re

80 Nassau Assocs.*, 169 B.R. 832, 840 (Bankr. S.D.N.Y. 1994) (same).  Where neither the debtor

nor any other creditor has been harmed by the purely theoretical double recovery, there is

nothing to remediate.[10]

---

[10] LBHI relies on Zachary Trumpp's declaration for certain factual assertions.  *See* LBHI Obj.
Ex. A.  Due process requires that Fannie Mae be afforded an opportunity for discovery and an
evidentiary hearing prior to any determination with respect to the PLS Claim.

## <u>CONCLUSION</u>

For the foregoing reasons, Fannie Mae respectfully requests that the Court deny LBHI's

Objection.

Dated: October 28, 2013
      New York, New York

/s/ Danielle L. Rose

KOBRE & KIM LLP

Michael S. Kim
Danielle L. Rose
Scott K. McCulloch
Phil Huynh

800 Third Avenue
New York, New York 10022
Tel. +1 212 488 1200
Fax +1 212 488 1220

*Attorneys for Federal National
Mortgage Association*

# EXHIBIT A

KOBRE & KIM LLP
800 Third Avenue
New York, New York 10022
Tel: (212) 488-1200
Fax: (212) 488-1220
Michael S. Kim
Danielle L. Rose
Scott K. McCulloch
Phil Huynh

*Attorneys for Federal National Mortgage Association*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————x
                                                    :
In re                                               :         Chapter 11 Case No.
                                                    :
LEHMAN BROTHERS HOLDINGS INC., *et al.,*             :         08-13555 (JMP)
                                                    :
                            Debtors.                :         (Jointly Administered)
                                                    :
————————————————————x

**DECLARATION OF DAVID BEALMEAR IN OPPOSITION TO THE LEHMAN PLAN
ADMINISTRATOR'S OBJECTION TO CLASSIFICATION OF SECURITIES LAW
PORTION OF CLAIM OF FEDERAL NATIONAL MORTGAGE ASSOCIATION**

I, David Bealmear, declare as follows pursuant to 28 U.S.C. § 1746 to the best of my knowledge,

information, and belief:

    1.      I am the Vice President for Capital Markets Pricing and Price Verification at the

Federal National Mortgage Association ("Fannie Mae") and submit this declaration in response

to the Lehman Plan Administrator's Objection to Classification of Securities Law Portion of

Claim of Federal National Mortgage Association.

    2.      On September 22, 2009, Fannie Mae filed a proof of claim

against debtor Lehman Brothers Holdings, Inc. (the "Proof of Claim").   The Proof of Claim

includes, among others, claims based on violations of the federal securities laws in connection with the offer and sale of certain private label securities backed by residential mortgages (the "PLS Claim").  The PLS Claim is set out in Exhibit A to Fannie Mae's Proof of Claim.  *See* Exhibit A ("Claims Arising Under Federal Securities Laws – Private Label Securities") at 3-5; Schedule 3.

3.      My job responsibilities at Fannie Mae include supervising Fannie Mae's pricing and price verification process for residential mortgage-backed securities generally.  These responsibilities include pricing the specific residential mortgage-backed securities for which Fannie Mae has sustained losses here (the "RMBS").

4.      In December 2009, Fannie Mae sustained losses when it sold its holdings in mezzanine tranches 1M1, 1M2, 1M3, 1M4 and 1M5 of the SASC 2007-BC3 securitization.

5.      In January 2013, Fannie Mae further sustained losses when Fannie Mae was forced to write off its holdings in the LXS 2006-8 trust.  In that case, the trustee determined, under that trust agreement, that the certificates had to be written off and essentially canceled the certificates.

6.      The value of the RMBS that Fannie Mae continues to hold has also dropped substantially.  There is sometimes debate regarding the current value of these securities.  Unlike, for example, exchange-traded equities, there is not a fixed, clear price for such RMBS.  Because the market for the RMBS is often illiquid, market participants, like Fannie Mae, often seek the input of pricing services to value the securities.

7.      Fannie Mae uses three independent third-party pricing vendors: Standard & Poor's, PricingDirect, and Thomson Reuters (together, the "Independent Pricing Services").  Those Independent Pricing Services provide pricing "marks" for the RMBS.  This means that the

2

Independent Pricing Services assign a value to the position held in each such security based on the current market price for the security or similar securities.  Fannie Mae requests marks for the currently-held RMBS on a monthly basis.

8.    Exhibit 1 to my declaration sets out in chart form the prices each Independent Pricing Service provided for the currently-held RMBS as of September 30, 2013.    The Independent Pricing Services are identified on Exhibit 1 as Vendor 1, Vendor 2, and Vendor 3.

9.    RMBS prices are quoted as a percentage of the unpaid principal balance ("UPB") of the certificate.  Thus, a certificate with a $1,000,000 of current UPB priced at 97 would cost $970,000.  With the exception of one security (LXS 2007-17H, which Fannie Mae acquired for 99.17), Fannie Mae purchased the RMBS at 100 (*i.e.*, 100% of UPB).

10.    As reflected on Exhibit 1, the marks provided by the Independent Pricing Services for the currently-held RMBS reflect that nearly all such RMBS have plunged in value.  This drop in value reflects the market's assessment that these securities are *not* expected to pay the full principal and interest in the future.

11.    For example, according to the Independent Pricing Services, the price for the SASC 2007-BC3 1A4 Security dropped from 100 to a range of 8.13 to 32.22, the price for the SAIL 2006-BNC3 A1 Security fell from 100 to a range of 40.85 to 45.65, and the price for the SAIL 2006-4 A1 Security dropped from 100 to a range of 46.99 to 51.99.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on October 28, 2013.

/s/ David Bealmear
David Bealmear

3