Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

4    In re:

5                                        08-13555(JMP)

6    LEHMAN BROTHERS HOLDINGS INC.,    (Jointly Administered)

7    et al.,

8                 Debtors.

9    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

10   In re:

11                                       08-01420(JMP)(SIPA)

12   LEHMAN BROTHERS INC.,

13                 Debtor.

14   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

15   In re:

16                                       12-10063(JMP)

17   LEHMAN BROTHERS AUSTRALIA

18   LIMITED,

19                 Debtor.

20   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

21

22

23

24

25

Page 2

```
 1    LEHMAN BROTHERS HOLDINGS

 2    INC., et al.,

 3                    Plaintiffs,

 4          v.                      12-01044(JMP)

 5    CITIBANK, N.A., et al.,

 6                    Defendants.

 7    - - - - - - - - - - - - - - - - - - - - - - - - - x

 8    LEHMAN BROTHERS HOLDINGS

 9    INC., et al.,

10                    Plaintiffs,

11          v.                      13-01431(JMP)

12    DR HC TSCHIRA BETEILIGUNGS

13    GmbH & Co. KG,

14                    Defendants.

15    - - - - - - - - - - - - - - - - - - - - - - - - - x

16    FIRST BANK PUERTO RICO,

17                    Plaintiff,

18          v.                      10-04103(JMP)

19    BARCLAYS CAPITAL, INC.,

20                    Defendant.

21    - - - - - - - - - - - - - - - - - - - - - - - - - x

22                    U.S. Bankruptcy Court

23                    One Bowling Green

24                    New York, New York

25
```

Page 3

1                    October 23, 2013

2                    10:04 AM

3

4    B E F O R E :

5    HON JAMES M. PECK

6    U.S. BANKRUPTCY JUDGE

7

8    Hearing re:  Motion of Baupost Group, LLC to Quash Debtors'

9    Subpoena Issued Under Federal Rule of Bankruptcy Procedure

10   2004 [ECF No. 38941]

11

12   Hearing re:  In re Lehman Brothers Australia Limited Status

13   Conference [Case No. 12-10063] – Status Conference

14

15   Hearing re:  Lehman Brothers Holdings Inc., et al. v.

16   Citibank, N.A., et al. [Adversary Case No. 12-01044] –

17   Motion Provisionally Allowing Claims

18

19   Hearing re:  Lehman Brothers Holdings Inc., et al. v. Dr. HC

20   Tschira Beteiligungs GmbH & Co KG [Adversary Case No. 13-

21   01431] – Pre-Trial Conference and Informal Rule 7007.1

22   Conference on Tschira's Motion for Protective Order

23

24   Hearing re:  FirstBank Puerto Rico v. Barclays Capital, Inc.

25   [Adversary Case No. 10-04103] – Motion for Civil Contempt

Page 4

1    Sanctions

2

3    Hearing re:  Motion of Fidelity National Title Insurance

4    Company to Compel Compliance with Requirements of Title

5    Insurance Policies [ECF No. 11513]

6

7    Hearing re:  Motion of Giants Stadium LLC for Leave to

8    Conduct Discovery of LBI Pursuant to Federal Rule of

9    Bankruptcy Procedure 2004 [ECF NO. 36874]

10

11    Hearing re:  Motion of Giants Stadium LLC for Authorization

12    to Issue Third-party Deposition Subpoenas Under Federal

13    Rules of Bankruptcy Procedure 2004 and 9016 [ECF No. 39898]

14

15    Hearing re:  Motion of FirstBank Puerto Rico for (1)

16    Reconsideration, Pursuant to Section 502(j) of the

17    Bankruptcy Code and Bankruptcy Rule 9024, of the SIPA

18    Trustee's Denial of FirstBank's Customer Claim, and (2)

19    Limited Intervention, Pursuant to Bankruptcy Rule 7024 and

20    Local Bankruptcy Rule 9014-1, in the Contested Matter

21    Concerning the Trustee's Determination of Certain Claims of

22    Lehman Brothers Holdings Inc. and Certain of its Affiliates

23    [LBI ECF No. 5197]

24

25    Transcribed by:  Dawn South & William J. Garling

Page 5

1    A P P E A R A N C E S :

2    WEIL, GOTSHAL & MANGES LLP

3         Attorneys for the Debtors

4         767 Fifth Avenue

5         New York, NY 10153-0119

6

7    BY:  RICHARD W. SLACK, ESQ.

8         ALFREDO R. PEREZ, ESQ.

9

10   CURTIS, MALLET-PREVOST, COLT & MOSLE LLP

11        Attorney for the Debtors

12        101 Park Avenue

13        New York, NY 10178-0061

14

15   BY:  TURNER P. SMITH, ESQ.

16

17   SULLIVAN & CROMWELL LLP

18        Attorney for Baupost

19        125 Broad Street

20        New York, NY 10004-2498

21

22   BY:  MATTHEW A. SCHWARTZ, ESQ.

23

24

25

Page 6

1   KIRKLAND & ELLIS LLP

2        Attorney for the Liquidators

3        300 North LaSalle Street

4        Chicago, IL 60654

5

6   BY:  JEFFREY W. GETTLEMAN, ESQ.

7

8   QUINN EMANUEL URQUHART & SULLIVAN, LLP

9        Attorneys for the Official Committee of Unsecured

10       Creditors

11       51 Madison Avenue, 22nd Floor

12       New York, NY 10010

13

14  BY:  SUSHELL KIRPALANI, ESQ.

15       JAMES C. TECCE, ESQ.

16

17  PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

18       Attorneys for Citibank

19       1285 Avenue of the Americas

20       New York, NY 10019-6064

21

22  BY:  STEPHEN J. SHIMSHAK, ESQ.

23       CLAUDIA HAMMERMAN, ESQ.

24       REBECCA R. COHEN, ESQ.

25

Page 7

```
 1   JONES DAY
 2        Attorney for the Debtor in No. 4
 3        222 East 41st Street
 4        New York, NY 10017-6702
 5
 6   BY:  JAYANT W. TAMBE, ESQ.
 7
 8   DECHERT LLP
 9        Attorneys for Defendants
10        1095 Avenue of the Americas
11        New York, NY 10036-6797
12
13   BY:  ALLAN BRILLIANT, ESQ.
14        DAVID A. KOTLER, ESQ.
15
16   CLEARY GOTTLIEB STEEN & HAMILTON LLP
17        Attorneys for Barclays
18        One Liberty Plaza
19        New York, NY 10006-1470
20
21   BY:  BOAZ S. MORAG, ESQ.
22        MARK E. MCDONALD, ESQ.
23        MATTHEW VANEK, ESQ.
24
25
```

Page 8

1   DICKSTEIN SHAPIRO LLP

2        1633 Broadway

3        New York, NY 10019-6708

4

5   BY:  JEFFREY A. MITCHELL, ESQ.

6        JUDITH R. COHEN, ESQ.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 9

1                    P R O C E E D I N G S

2              THE COURT:  Good morning, be seated, please.

3              Mr. Slack, how are you?

4              MR. SLACK:  Good morning, Your Honor.  The first

5    matter on for the omnibus hearing is the motion by Baupost

6    to quash the subpoena issued under 2004 by the debtors.  It

7    is Baupost's motion so I'm going to let Mr. Schwartz take

8    the lead here.

9              THE COURT:  Okay.  I'm wondering if I should say

10   your motion to quash is denied now or after you make your

11   opening remarks.  I'm not inclined to grant your motion.

12             And I think we can accelerate this process greatly

13   by my noting that I see no substantial grounds for the

14   position you've taken.

15             MR. SCHWARTZ:  Your Honor, if I could have a

16   minute or two of your time.

17             THE COURT:  Yes, I'm letting you know right now

18   that you're climbing a cliff and you don't have the proper

19   equipment.

20             MR. SCHWARTZ:  That's fine, Your Honor, I'll find

21   a rock booster if I can.

22             The subpoena has been narrowed greatly.  First of

23   all it shouldn't be under Rule 2004 anymore, it should be

24   under 26.  The debtors have just yesterday filed their

25   motion to be allowed to file their adversary proceeding

Page 10

1    under seal.

2            THE COURT:  I know that's about to be filed.

3            MR. SCHWARTZ:  Your Honor, what this motion has

4    been narrowed down to is their request for Baupost to

5    collect all of its documents post acquisition of rights in

6    the claims, go through those documents, find which documents

7    relate to the amended claim that the Giants put in in

8    December, and then go through those documents, categorize

9    them, all in a privilege log, because nowhere in their

10   motion do they contest that all of these documents are

11   covered by work product and privilege.

12           THE COURT:  How on earth do we know that really?

13   Why should I accept your bald assertion that all the

14   documents are in fact work product or otherwise privileged

15   unless and until you've actually done the work to search it

16   out?  I refuse to accept that bald assertion and so you

17   can't make that as part of your argument.

18           MR. SCHWARTZ:  Your Honor, I would just say two

19   things.

20           First of all this is the exact same assertion and

21   position that the debtors have taken with regards to all of

22   their post bankruptcy valuation documents.

23           THE COURT:  In that case it may come back to bite

24   them.

25           MR. SCHWARTZ:  Okay, Your Honor, as long as

Page 11

1      there's -- as long as there's sort of an even hand in this

2      across the parties I would understand the Court's position

3      on it.

4            They haven't contested at all that these documents

5      are all done in the midst of a litigation.  They're all

6      under the supervision of attorneys and they're all for

7      purposes of valuation, which is classic attorney work

8      product, Your Honor.  The cases are fairly clear on that.

9            We've heard absolutely no objection from the

10     debtors to that analysis of the law.  All they've said is we

11     want that massive privilege log, but these documents should

12     be prima facie protected by the attorney work product, and

13     it shouldn't be -- it shouldn't be the situation where

14     parties in the midst of litigation have a continuing

15     obligation to just put on a privilege log every single time

16     a new email is generated or a new document is generated for

17     the purposes of valuing their claims, you know, and turn

18     that over to the other side.  I mean it seems sort of the

19     classic definition of a harassing subpoena to us.

20            THE COURT:  Well, I don't know that there is a

21     classic definition of a harassing subpoena in the context of

22     a valuation dispute in which a claim jumps from

23     approximately 300 million to approximately 600 million.

24            And to the extent that your client has knowledge

25     concerning that valuation shift I think you should be

Page 12

1    turning over whatever you have that's non-privileged with

2    respect to that.

3              And since I reject the notion that every single

4    scrap of paper associated with the subpoena necessarily is

5    privileged and that all this exercise would include would be

6    creation of a voluminous and burdensome privilege log, I

7    reject the notion that you can come in and prevail with

8    respect to a motion to quash the subpoena.

9              Now there may be some other issues here unrelated

10   to your motion to quash, including what's sauce for the

11   goose being sauce for the gander in terms of issues of

12   discovery and relative privilege, but that's to be discussed

13   during compliance, not at a time when you're seeking what

14   amounts to a preemptive bar to 2004 discovery.

15             There's another related question, which is whether

16   2004 discovery will continue after the commencement of the

17   Giant Stadium litigation.

18             My recollection of the discovery protocol is that

19   discovery which has been initiated before the commencement

20   of litigation continues unabated.  I can be corrected, but

21   that's my recollection of it.

22             MR. SCHWARTZ:  I think that's correct, Your Honor,

23   and I think with moving into the adversary proceedings if

24   Your Honor recalls the reason you allowed Giant Stadium to

25   take rule 2004 discovery of the debtors, as Your Honor was

Page 13

```
 1   highly skeptical that this claim would not be objected to or

 2   that debtors would not be filing an adversary proceeding.

 3            THE COURT:  I remember, it was about a year ago.

 4   I also remember that the Giant Stadium litigation is

 5   particularly notable in the portfolio of Lehman-related

 6   litigation for being the most facetious in terms of

 7   discovery, and so you walk into that particular buzz saw.

 8   You are simply adding fuel to that fire, and that's why

 9   you're losing.

10            MR. SCHWARTZ:  Understood, Your Honor.  We will

11   probably be making a motion to compel the debtors to produce

12   the similar privilege log that we will be producing to them.

13            THE COURT:  You can predict whatever motion

14   practice you wish to predict and you can either do it or not

15   do it, I don't care.

16            MR. SCHWARTZ:  Thank you, Your Honor.  Thank you

17   for your time.

18            THE COURT:  Mr. Slack, what do you have to say for

19       yourself?

20            MR. SLACK:  Not a lot, Your Honor.

21            What I would like to say is that I think when the

22   issue comes up the position of the debtors here is that we

23   have produced valuations and -- that are not privileged.  So

24   they have valuations from the debtors.

25            There are certain valuations that we have that are
```

Page 14

1    privileged that were done in connection with the bankruptcy,

2    and I think that at the time what you will see, Your Honor,

3    is that our point on work product is that work product has

4    to be done solely for the litigation.

5            What Giant Stadium did was they did calculations

6    that were required, as Your Honor knows, under the swap

7    agreements and those -- you can't cloak those with privilege

8    just because they then become part of a proof of claim,

9    which is what they want to do.

10           And so what I think you're going to see, Your

11   Honor, is there are some stark differences between the way

12   Baupost and Giant Stadium has acted and the debtors have

13   acted here when the appropriate time comes.

14           THE COURT:  Okay.  Mr. Slack, before you sit down,

15   what happens to this discovery after commencement of the

16   adversary, which is I guess we're within hours or days of

17   the commencement of your adversary?  How does this current

18   motion practice play into a reasonable discovery protocol

19   for that litigation?

20           MR. SLACK:  Your Honor, I think what the parties

21   have essentially intended with the protocol is that we've

22   collected I think the vast majority of the documents on both

23   sides.  As Your Honor knows you gave Giant Stadium the

24   opportunity to take 2004 discovery and the debtors have

25   produced more than 400,000 pages of documents.  So there's

Page 15

1    been an exchange of most of the information.

2              I think that the 2004 discovery that's outstanding

3    is simply documents at this point, which are going to have

4    to be collected anyhow in connection with the litigation.

5              So I think what our position is, is that the

6    subpoenas out there should continue rather than issuing new

7    subpoenas and starting anew.

8              And as for the depositions I think both sides have

9    agreed to meet and confer once the adversary is filed in the

10   next hours or days and work out a discovery schedule for

11   depositions in the remainder of the case, and I'm optimistic

12   that we'll be able to do that.

13             THE COURT:  Okay.  I know that there was a failed

14   mediation.  Does the exchange of documents that you've

15   referred to make it anymore likely that if the parties were

16   to renew their efforts to work this out consensually before

17   incurring significant additional expense, is there any

18   prospect that that might be productive?

19             MR. SLACK:  I'm not sure I know how to answer that

20   other than to say that unlike, you know, some counterparties

21   there, because Baupost is well known to the estate and has a

22   number of connections so to speak because of their holdings

23   as a creditor, I think there are lines of communications

24   that are open.

25             So what I can tell you is, is that we are happy to

Page 16

1   reach out and see if there is any -- after we file the

2   complaint -- any renewed interest in resolving it.  And if

3   there is on the other side, you know, we will be willing to

4   do that as well.

5            THE COURT:  Okay.  Fine.  You can submit an

6   appropriate order.

7            MR. SLACK:  Thank you, Your Honor.  Can I be

8   excused, Your Honor?

9            THE COURT:  Yes, everybody who's associated with

10  this matter can be excused.

11           MR. PEREZ:  Good morning, Your Honor, Alfredo

12  Perez.

13           I believe the next matter is the status conference

14  on Lehman Brothers Australia.

15           THE COURT:  Good morning.

16           MR. GETTLEMAN:  Good morning, Your Honor, Jeffrey

17  Gettleman representing the liquidators of Lehman Brothers

18  Australia.

19           Your Honor, before I present the status report one

20  of the liquidators happens to be in the courtroom today, I'd

21  like your permission to introduce him to you.

22           THE COURT:  I'd be very pleased to have him come

23  forward.

24           MR. GETTLEMAN:  Mr. Marcus Ayres.

25           MR. AYRES:  Good morning, Your Honor.

1          THE COURT:  Welcome to Bowling Green.  He didn't

2     come here just to hear you make the status report I hope.

3          MR. GETTLEMAN:  No, although that would have been

4     appropriate, but --

5          THE COURT:  I'm not saying it would have been

6     inappropriate, it's just that I did read it on the docket

7     already.  But welcome to -- welcome to New York.

8          And I should also note that I have met Justice

9     Peter Jacobson in Sidney, Australia informally, unrelated to

10    anything that has gone on in the Lehman Brothers Australia

11    case other than an issue of cross border communication that

12    occurred several years ago.

13         MR. GETTLEMAN:  Your Honor, we gave our previous

14    status report about exactly a year ago, so we felt it was

15    appropriate to update the Court on what's been going on.

16         So as you know we submitted a written status

17    report and I won't repeat everything that's in the report,

18    but I'll hit highlights, which are basically that one of the

19    -- well, the principal reason why this Chapter 15 case was

20    filed was to protect proceeds of certain U.S. insurance

21    policies.

22         The liquidators have reached a settlement with

23    those insures.  Your Honor granted a motion approving the

24    settlement last March.

25         And so earlier this year, the first half of the

Page 18

1    year was spent in formulating a plan, because the condition

2    of the settlement -- one of the conditions -- was that the

3    Lehman Brothers Australia and the creditors, who would have

4    been beneficiaries under these policies, grant releases,

5    which could only be done, in the liquidator's opinion,

6    through a scheme of arrangement.

7              So they proposed a comprehensive scheme, which

8    would have wrapped up basically the entire matter, and there

9    were votes scheduled -- the creditors' vote was scheduled.

10   At the last minute there was a change of hands of one of the

11   claims and that claimant happened to have a blocking

12   position.  And so the liquidators ended up withdrawing that

13   scheme.  But the point was that they still had to provide

14   these releases.

15             And so what they did is propose formulated and

16   proposed the narrower scheme, which would basically just

17   involve these insurance proceeds.

18             So instead of resolving everything what they

19   basically did is propose the scheme where the only scheme

20   creditors would have been again these beneficiaries of the

21   insurance policies.

22             So the scheme, this narrower scheme was put to a

23   creditor vote last week, the creditors unanimously approved

24   it.

25             The next event to happen is there'll be a court

Page 19

```
1     hearing on October 31st and Justice Jacobson will hopefully

2     approve the scheme, and then the liquidation will continue

3     as far as the rest of the matters that Lehman Australia has.

4              The only other thing that I can report, which

5     wasn't in my status report because it hadn't happened yet,

6     was one of the main reasons that Mr. Ayres was here this

7     week was so we could sit down again with the Lehman U.S.

8     parties and try to resolve the handful of remaining issues

9     that we have open between us.

10             I'm happy to report that we had a productive

11    meeting and we had discussed the possibility of basically

12    submitting all four of the remaining issues to a mediation,

13    and so that's what we'll be working on going forward, Your

14    Honor.

15             THE COURT:  Sounds promising, and appreciate the

16    report.

17             And to the extent that your client will be in

18    Federal Court in Sydney at some point in the near term

19    please extend my warm personal regards to Justice Peter

20    Jacobson.

21             MR. GETTLEMAN:  Thank you, Your Honor.

22             THE COURT:  Thank you.

23             MR. PEREZ:  Your Honor, the next matter LBHI

24    versus Citibank.

25             (Pause)
```

Page 20

1            THE COURT:  Good morning.

2            MR. KIRPALANI:  Good morning, Your Honor, for the

3    record Sushell Kirpalani of Quinn Emanuel Urquhart &

4    Sullivan speaking for efficiency sake on behalf of the

5    Lehman estates, and technically we're here as counsel to the

6    committee, but we're working on behalf of both fiduciaries,

7    Your Honor.

8            It's been a long time since I had the pleasure of

9    appearing before the Court in this case, and I hope Your

10   Honor understands that I've become reengaged recently with

11   the hope of resolving some of the big last disputes.

12           With me in the courtroom are my colleagues from

13   Quinn Emanuel, but also Mr. Matt Cantor (ph), head of legal

14   affairs and a member of the board of reorganized Lehman.

15           We actually took the morning off from tending to

16   another matter, but we'll be going back to that mediation

17   after court, Your Honor, and we are here today to express

18   our sincere wish that we can bring this as well as other

19   matters to a close.  We're very focused on trying to resolve

20   and not litigate remaining big issues.

21           Frankly we had hoped -- I had hoped over a month

22   ago that we might be here on a motion to approve an interim

23   pragmatic solution to deal with an interesting, unique

24   situation where Citibank is holding $2 billion of cash and

25   saying that it doesn't have the ability to use it.

Page 21

1           So we're here today on Lehman's motion to permit

2   Citibank to take the $2 billion it has been holding and to

3   make some productive use of it thereby cutting off any

4   arguments concerning additional post-petition interest.

5           In opposition Citibank set up a fiction, namely

6   that a creditor has an absolute right to sleep peacefully at

7   night with an unconditionally allowed claim and a full

8   release of any counterclaims or else he can assert post-

9   petition interest as a secured creditor by right of setoff.

10           If Citi were right in that fiction then every

11   creditor who is owed money by an estate who's also sued by

12   the estate would be a secured creditor and be able to charge

13   post-petition interest until he gets a release.  That can't

14   be right.

15           Sure you can imagine numerous situations, Your

16   Honor, where a claim objection results in the secured

17   creditor charging post-petition interest until he actually

18   gets the money.  That would compensate the creditor for

19   being without access to the funds.

20           Where a secured creditor is owed money and not

21   given the money it would be unfair to let the debtors keep

22   it, use it while the creditor is stuck waiting.

23           And even if he has a lien on property he wouldn't

24   be permitted to liquidate that collateral and use those

25   proceeds either.  He's just stuck between a rock and a hard

Page 22

1    place and 506(b) fills in that injustice.

2            So the Bankruptcy Code gives him compensation for

3    that, but neither of those situations actually apply to this

4    unique situation for Citibank.

5            Your Honor, can I just approach, I want to give

6    you one piece of paper?  Is that --

7            THE COURT:  That's fine.

8            MR. KIRPALANI:  Okay.

9            THE COURT:  Thank you.

10           MR. KIRPALANI:  Your Honor, this is Citibank's

11   account statement, which we get one of these every month.

12   You can see it, it says this one is from June 28th, 2013,

13   it's got a QSIP, a security ID with a certain number, it

14   says in the issue name dollars on deposit cash account, and

15   then a couple of places over it says where it's held, at the

16   Citibank vault.  Okay?  Two billion plus is in there.

17           Your Honor may recall that in April 2009 there was

18   a stipulation where Citi was required to hold Lehman's cash

19   in a custodial account.  This statement in fact shows us, or

20   so we thought until we saw their opposition to this motion,

21   that the funds were sitting in the vault and really just

22   wasting away, just sitting there.  But the estate could not

23   use that money or distribute it to its creditors obviously

24   because we're probably not got for the money if we wound up

25   losing our litigation.

Page 23

```
 1              So it was basically held hostage to a variety of
 2    over inflated claims by Citi, so Citi was not going to let
 3    that money go.
 4              When Lehman emerged from bankruptcy there was a
 5    significant change of the guard at Lehman.  The main event
 6    affording a consensual global Chapter 11 plan was
 7    accomplished and the estates had been trying to wind down
 8    and clean up the affairs.
 9              Now various seasoned bankruptcy veterans joined
10    the board, assumed positions of leadership within Lehman,
11    and they asked what could be done to insure that estate
12    assets were not just wasting away somewhere?
13              So we thought cash in a vault at Citibank that
14    just sits there while Citi's, we believe, inflated claims
15    are resolved seems to be a poor use of $2 billion.
16              So we then understood that Citi is asserting,
17    despite the fact that their claims exceeded $2 billion, that
18    they may be over secured if we succeed in knocking down
19    their claims.  So that doesn't make sense either.
20              But we were never told whether Citibank was using
21    the cash or not, so the board told us at a minimum make sure
22    they start using it now so we can cut off any interest
23    arbitrage they may be playing, because we earn 0.02 percent
24    interest, and they are asserting who knows something 7
25    percent plus in post-petition interest.
```

Page 24

1          So we asked them to take the cash and we'll just

2      sue them like any counterclaim defendant.  They said no,

3      they preferred to assert a right to post-petition interest

4      for the next year and a half while we litigate the right

5      amount of their very complicated claims.

6          Of course if they're right in the way they assert

7      their claims they'd get no post-petition interest because

8      they'd be under secured.

9          But the trick is if we are right and their claims

10     are overstated then Citi laughs all the way to their own

11     vault.

12         So we filed this motion seeking to pay them down

13     but to reserve our rights to sue them if they were wrongly

14     holding our money all this time.  We'll take the credit risk

15     that Citi is good for the money.

16         THE COURT:  I think that's a good credit risk.

17         MR. KIRPALANI:  Okay.  We expected them to say

18     frankly as JPMorgan --

19         THE COURT:  I hope it's a good credit risk.

20         MR. KIRPALANI:  We expected them to say as

21     JPMorgan did, Your Honor, that yeah, that probably makes

22     sense.

23         It's not perfect, we're not saying this is the

24     perfect solution for them either, but it just makes sense

25     and it's equitable.  They can invest the money.  We thought

Page 25

1    they'd say, okay, we'll invest the money and there's no

2    point in holding that amount of cash in the vault.

3           But then look what they actually say in their

4    opposition of this motion, which frankly was a surprise to

5    everybody at Lehman.  Not only -- especially in light of the

6    one page I gave Your Honor.

7           Not only do they admit that they want the interest

8    rate arbitrage, because Lehman deserves punishment for

9    spending all of its energy on global issues these past few

10   years rather than caring about Citibank's entitlement to get

11   paid, but this is really quite shocking, that there's no

12   money in the vault at all.

13          But what did they do with the cash?  They say they

14   never sought to lift the automatic stay, they say they never

15   sought permission to setoff, but what did they do that we

16   don't know, it's really of no moment, we don't think, but we

17   think they took the cash, they put down their marker

18   instead, and they've enjoyed the use of the cash probably

19   since April 2009 since that stipulation.

20          And so that's why they come to court now and they

21   say giving us the cash does nothing for it, it serves us no

22   benefit, because they've already been enjoying that benefit.

23          And they submit some affidavit, Your Honor, which

24   I don't think we're going to be getting into in detail,

25   saying that there's a bunch of accounting rules that I don't

Page 26

1    think have any place in this courtroom about how a creditor

2    accounts for its risks and reserves, and frankly that's up

3    to each creditor.  Every creditor that's sued by an estate

4    has to deal with taking reserves against what they think is

5    appropriate and what they think management believes is

6    reasonable.

7            But what they're saying in essence is we don't get

8    anything by exchanging our we're holding your money hostage

9    setoff right for a pay down because we already treat the

10   money as our own and we do with it as we please.  And that

11   was news when we read the affidavit.

12           But until and unless you release us from potential

13   claims they say or give us a peaceful night sleep they say

14   we will assert we are owed post-petition interest and that's

15   going cost you at least $400,000 a day.

16           This is inequitable to the creditors of Lehman,

17   Your Honor, so we request -- we respectfully request that

18   our motion be granted.

19           I'd like to just touch briefly on the -- some of

20   the points in the motion, I know Your Honor and I know your

21   staff has reviewed our authorities, but I'm going to be

22   perfectly blunt and frank, Your Honor, there are no

23   significant controlling -- certainly no controlling

24   authorities, and there really aren't that many significant

25   authorities for this fact pattern.

Page 27

1          Calpine we do think --

2          THE COURT:  Can I break in no a second --

3          MR. KIRPALANI:  Uh-huh.

4          THE COURT:  -- because I have looked at the

5    Calpine order from 2006 and the Calpine transcript attached

6    to your most recently filed papers, and I'm also generally

7    familiar, although it's certainly not an authority, it's

8    just my experience as a mediator in another major case which

9    is currently pending in this district, where issues relating

10   to the pay down of significant cash owed to a creditor

11   constituency represented one possible way to deal with a

12   claim for post-petition interest.

13          And so I'm not talking in code for purposes of the

14   transcript, I'm referring to the Rescap bankruptcy case and

15   the current dispute with holders of junior secured notes.

16   That matter is currently on trial before Judge Glenn.

17          And so I recognize that there is a convention -- I

18   wouldn't call it precedent, in major bankruptcy cases for

19   parties in interest, especially unsecured creditors, to make

20   the business judgment, together with the trustee or debtor

21   in possession, to pay down undisputed secured obligations so

22   as to stop the running of interest that may be ticking away

23   at significantly high rates thereby making the pay down a

24   prudent business judgment.

25          The situation we're in now is probably

1    unprecedented in that it's about five years after the

2    posting of $2 billion in cash collateral that I understand

3    was placed in a Nassau branch of Citi, I don't know what

4    happened to that cash thereafter, I don't know that I need

5    to know that for these purposes, but Mr. Shimshak, if he

6    wishes, can tell me about it.

7             And I am reminded of other comparable situations

8    in this case, some of which have ripened into litigation or

9    some of which have ripened into stipulations.

10            One comparable situation involved JPMorgan Chase,

11   a stipulation relating to the treatment of their claim.

12            Another comparable situation involves Bank of

13   America where we had litigation over the posting of half a

14   billion dollars in an account in the Cayman Islands and a

15   determination that I made that there was a stay violation in

16   offsetting those funds.

17            I don't know to what extent there are any reserved

18   rights on the part of the estate in reference to what Citi

19   has done with the $2 billion, and I'm not predicting nor

20   suggesting that anything needs to be done, but I recognize

21   the possibility that certain claims might be made.

22            So with that background, recognizing that there is

23   authority that can be looked to by analogy, I think we're

24   probably dealing with a unprecedented set of facts.

25            MR. KIRPALANI:  I agree with that, Your Honor.

Page 29

```
 1              And I want to just address one legal issue and

 2     then I think I'll sit down and Your Honor can hear what the

 3     opposition is.  It's the 105(a) argument.  I actually argued

 4     the New England Dairies case in the Second Circuit, it's my

 5     rare opportunities to do that.

 6              New England Dairies doesn't say that 105(a)

 7     doesn't have any import.  What it says is it's supposed to

 8     fix the play and the joints.  It can't stand alone.  It

 9     needs to be coupled with something.

10              So I'm sure Mr. Shimshak is going to attack us on

11     what's it's coupled with.  He'll say Section 363 doesn't

12     apply, he'll say we're post-confirmation, he'll say we're

13     post-effective, he'll say there's no estate, he'll say all

14     of those things, but the one thing he can't say is that 502

15     still applies.

16              And I think as Your Honor knows -- and I know Your

17     Honor does -- if Your Honor looks at 502 in its totality

18     there's a lot of play in the joints.

19              There's a 502(c) play in the joins, and this isn't

20     contingent or unliquidated, it's a disputed claim, and I

21     can't really creditably argue, I did think at it, of this is

22     going to unduly delay the administration of the estate

23     because that's a bit of a stretch, we are past confirmation

24     and we have gone effective, so I didn't want to pursue that

25     line.
```

Page 30

1       502(j) is another one.  You can allow a claim,

2   Your Honor can, and then subject to reconsideration of it

3   later.

4       And we looked at the case law there and it wasn't

5   favorable, because in order to reconsider I'd have to show

6   what you usually show for reconsideration type of things.

7       But I don't think that means that 105(a) does not

8   provide authority combined with 502 to fix the play in the

9   joints from this really unprecedented and unique situation.

10      So that's what we'll submit, Your Honor, as our

11  statutory basis.

12      I agree with the Court that there is no actual

13  precedent for this and it was not an easy motion to us to

14  bring on, but we do have a constituency.  Shame on us, shame

15  on me if we didn't think of it years ago, but we do have a

16  constituency that is continuing to suffer and we have to do

17  something about it at some point and so the some point is

18  now.

19      THE COURT:  I wasn't ever thinking shame on you or

20  shame on your colleagues, but I'll admit I was thinking what

21  took so long?

22      MR. KIRPALANI:  Yeah, you know, Your Honor, I

23  don't have a good answer.  Don't have a good answer.

24      THE COURT:  Okay.

25      MR. KIRPALANI:  Thank you.

Page 31

```
 1              MR. SHIMSHAK:  Good morning.

 2              THE COURT:  Good morning.

 3              MR. SHIMSHAK:  I may need this periodically

 4    because I'm getting over a cold, so.

 5              THE COURT:  It's very nice, it's like an ad for

 6    Avian Water.

 7              MR. SHIMSHAK:  Before I get started we'd like to

 8    engage in a little housekeeping.

 9              We have prepared some demonstratives for the

10    Argument, which I would like to hand up to you.

11              MR. KIRPALANI:  Now we know where the money in the

12    vault is going.

13              THE COURT:  Okay.  At least we're not dealing with

14    projection equipment.

15              MR. SHIMSHAK:  We'll get to that in a moment.

16              I'd also like to introduce my colleague, Claudia

17    Hammerman.  For purposes of the argument today we've divided

18    it.  I will address the relief requested, the basis for the

19    relief requested, and the many ways that the relief

20    requested violates the terms of Lehman's plan.

21    Ms. Hammerman, who has been living with the case for five

22    years and living with the adversary proceeding for over 20

23    months, will address any questions that the Court may have

24    about this history and about the derivative claims and

25    interest rates and things of that sort, but she's going to
```

Page 32

```
 1    be focusing primarily on the equitable arguments that are

 2    made, to the extent those are relevant for the Court's

 3    consideration.

 4              THE COURT:  That's fine.  I'm going to ask you an

 5    impertinent question to start.

 6              MR. SHIMSHAK:  Of course.

 7              THE COURT:  You were expecting it.

 8              MR. SHIMSHAK:  No, but go ahead.

 9              THE COURT:  Okay.  It's been five years, more than

10    five years actually since Citibank and other big banks

11    deemed themselves insecure in the period leading up to

12    Lehman's bankruptcy filing and exercised self-help remedies.

13              It's now many years later, we have a confirmed

14    plan, we have late term litigation involving JPMorgan Chase,

15    we have most of the other big banks that were involved in

16    major derivative disputes that have settled with this

17    estate, and Citibank is conspicuous in being an outlier in

18    terms of now saying yes to anything.

19              My question is this.  I'm certainly prepared to

20    make a ruling that's courageous that will be disadvantageous

21    to you, and I think you come in knowing that that's at least

22    a possibility, notwithstanding the fact that we're dealing

23    with an unprecedented set of facts and circumstances, and

24    Mr. Kirpalani acknowledged that during our discussion.

25              But why can't you and the estate reach an
```

Page 33

1   agreement comparable to an agreement that was reached in

2   2009 with JPMorgan Chase regarding what amounts to

3   provisional allowance of a claim with all rights reserved?

4            MR. SHIMSHAK:  Let me speak to that and this gets

5   into what I would say -- and I don't mean this critically --

6   the mischaracterization of the legal relationship between

7   the parties as it relates to the deposit and when that the

8   properly understood you will understand that the relief that

9   they're offering us is completely illusory and confers no

10  benefit on us whatsoever.

11           So while I can't speak to what JPMorgan was

12  thinking, I do know that there were evident -- evident in

13  the record and evident in the pleadings in connection with

14  that matter benefits associated with the relief they were

15  getting.

16           Specifically they were being relieved of the

17  burden of managing securities and the risk that they would

18  be accused of mismanaging those securities.  So they were

19  relieved of another potential liability.  They were given

20  over $500 million of cash rather than having to liquidate

21  and realize on those securities.

22           So that transaction had its own independent

23  motivations.  It's completely different from the situation

24  that we find ourself in properly understood.

25           So let me elaborate on what I mean and let's start

Page 34

1   because I think when we're talking about deposit accounts

2   and we're talking about setoff rights we have to be very

3   precise in understanding this problem and understanding the

4   relationships of the parties -- and the starting point is

5   the deposit account itself.  I

6              On -- on June 12th --

7              THE COURT:  But before you get into --

8              MR. SHIMSHAK:  Uh-huh.

9              THE COURT:  -- your -- your main argument --

10             MR. SHIMSHAK:  Uh-huh.

11             THE COURT:  -- recognizing that we're not making a

12  direct comparison between this situation and the JPMorgan

13  Chase situation from 2009, are you telling me that you are

14  incapable of working out some kind of consensual arrangement

15  with the estate that avoids a coercive outcome that I create

16  for you?

17             MR. SHIMSHAK:  Incapable, I can't say incapable,

18  you have to be able to negotiate.  If there was -- if there

19  was a -- if there was a solution that was fully protective

20  of our rights of course we're prepared to entertain that and

21  to negotiate that.

22             THE COURT:  Okay.

23             MR. SHIMSHAK:  The proposal that's been made is

24  not that proposal.

25             So let's start with the $2 billion deposit which

Page 35

1    was created in June of 2008.  That deposit has always been

2    and always will be nothing more than a debt that we owe

3    Lehman.  We have owed Lehman $2 billion absent anything else

4    since June 12th, 2008 when that deposit was created.

5          And the nature of a deposit account is the first

6    tab, Your Honor.  This has been recognized at the Supreme

7    Court level in the Strouth (ph) decision which dealt with

8    the application of the administrative freeze.  It's the

9    leading case on the administrative freeze.  And that case

10   states that no matter how people think of it, no matter how

11   you and I think of putting money in the bank and having cash

12   in the bank, in fact a deposit account is nothing more than

13   a debt that the bank owes to the depositor.

14         So when you start with that proposition that we've

15   owed them a debt you then move to what our claims are

16   against that debt.  And what we claim are offsetting rights.

17         In other words, we say we have claims that enable

18   us to say to Lehman we owe you $2 billion but we don't have

19   to pay it.  We owe you $2 billion but you can't instruct us

20   what to do in respect of that debt until the issues of our

21   offsetting claims are resolved.  And the Bankruptcy Code

22   cannot be clearer on that.

23         Section 542(b) makes clear that we don't have to

24   turn over, to the extent we assert rights of setoff, and

25   Section 553 fully protects rights of setoff from any other

Page 36

1   provision of the Bankruptcy Code.

2           So when you think of this situation in its correct

3   substantive terms that we owe them a debt, but we are saying

4   we don't have to pay it, the proposal that they're making

5   immediately becomes illusory and of absolutely no benefit to

6   Citi.

7           Because here's what they're saying.  That debt you

8   owe us we'll step back and we'll say we're not going to

9   characterize it anymore as a special versus general account,

10  and those claims you're asserting against the account you

11  are free to offset them.  Because that's all we can do.  We

12  don't get money, we only reduce our own exposure to the

13  extent of our offsetting claims.

14          But when they tell us to provisionally allow the

15  claims and exercise the right of offset and couple that with

16  their preservation of rights provision they are saying the

17  following things.  That simultaneously you no longer owe us

18  the debt, but you continue to owe us the debt.  You can

19  reduce the debt, but you can't reduce the debt.  Your claims

20  are valid for purposes of reducing the debt, but your claims

21  are still in dispute for purposes of reducing the debt.

22  That gives us absolutely nothing.  It confers no benefit on

23  us whatsoever and it takes away from us our protected rights

24  under section 506(b) and under the bankruptcy -- under the

25  plan and other provisions of the Bankruptcy Code to recover

Page 37

1    post-petition interest and post-confirmation interest to the

2    extent we don't think they will, but to the extent Lehman

3    succeeds in dramatically reducing our claims.

4           The notion of a litigation arbitrage as they call

5    it is really a quarrel with Congress about the ability of an

6    unsecured creditor to have the benefit of -- excuse me -- an

7    oversecured creditor to have the benefit of excess

8    collateral.

9           But -- so that is why the provision is completely

10   illusory, it's offering us nothing.

11          THE COURT:  But I hear your argument.  The

12   argument assumes to some extent the existence of a fund

13   doesn't it?

14          MR. SHIMSHAK:  No, it assumes the existence of a

15   debt.

16          THE COURT:  Well, I know your argument is that

17   this is just a deposit account so you have an obligation

18   ultimately to pay over the $2 billion that was deposited

19   with you subject to offset.

20          MR. SHIMSHAK:  It's more than an argument.  That

21   is the reality of the relationships between the parties.

22          They gave us $2 billion, we maintained in the

23   litigation this was a general deposit.  They argue only that

24   it was a special deposit for limited purposes.  That issue

25   will be resolved in the adversary proceeding.

Page 38

1              THE COURT:  Isn't that very similar to the issue

2      that was litigated in the Bank of America case?

3              MR. SHIMSHAK:  The -- there are similarities

4      between those -- between those two cases, yes, but we

5      believe on all the points of comparison with that litigation

6      our position is much, much stronger than Bank of America's

7      in litigating that with you.  That boiled down -- before you

8      -- that boiled down to issues about how that arrangement

9      went into place and the construction of the operative

10     documents between the parties.

11             THE COURT:  Understood.  But one of the things

12     that I'm concerned about, just so I understand your

13     argument, is what happened to this money?  It's debtor money

14     which is deposited with Citibank and it ends up, as I

15     understand it, in an offshore account, correct?

16             MR. SHIMSHAK:  No, well this --

17             THE COURT:  Was there not an offshore account

18     here?

19             MR. SHIMSHAK:  No, there was originally a Bahamian

20     account, but I'm sorry to interrupt the Court, but I want to

21     be clear about this because this is very fundamental to what

22     banking is.

23             When someone makes a deposit they give the bank

24     the money.  The money doesn't -- the money doesn't sit in a

25     box in the bank, whether it's in the Bahamas, whether it's

Page 39

1    in New York, whether it's in Switzerland, where it's any

2    place else.  They give the bank the money, and in exchange

3    they're saying I will take your credit risk and I will take

4    an interest factor on that.  The bank then goes, uses the

5    money, does whatever it wants to do.  It still has that debt

6    to the creditor -- to the depositor, and it has an

7    obligation to pay interest if the account carries an

8    interest feature.  But that other money belongs to the bank.

9    That was the essence of the contract that was made at the

10   time of the deposit.

11           So there's not dollars sitting around that

12   represent the deposit, it is only an obligation of the bank

13   that is owed to that depositor.

14           THE COURT:  Okay.  But in the ordinary course of

15   being a secured creditor you're able to look to an

16   identified asset and claim a security interest in that

17   asset.  That's one of the reasons why in lending cash

18   collateral accounts are set up, why possession is such an

19   important part of the notion of a security interest.

20           And my understanding is that this money has

21   basically filtered into the Citibank system and there is no

22   identified deposit account.

23           MR. SHIMSHAK:  There --

24           THE COURT:  At this point.

25           MR. SHIMSHAK:  No, what has happened -- what

Page 40

1    happened was that the movie -- excuse me -- the money was

2    moved to New York and then by agreement a separate account

3    arrangement was opened up with Lehman.  But those are just

4    different book entries.  That's not -- that's not a box of

5    $2 billion --

6              THE COURT:  I understand.

7              MR. SHIMSHAK:  -- moving from one place to

8    another.

9              THE COURT:  I understand that we're not talking

10   about a box with $2 billion in it.  It would be interesting

11   to actually observe such a box some day, but --

12             MR. SHIMSHAK:  Your Honor, I'd like to make one

13   other point too, because in many ways issues -- issues

14   concerning setoff, because setoff is treated as a secured

15   claim under the Bankruptcy Code, there's no question of

16   that, it's expressed in Section 506, but the issues are

17   unique when one thinks of it, and you cannot start

18   analogizes to your traditional understandings of collateral

19   in the sense of having property of the debtor.

20             When the property of the debtor is an obligation

21   that is owed to the debtor it's basically a receivable and

22   you're talking about what defenses you have, that's what

23   setoff is, defenses to the payment of that receivable.  That

24   again goes to what is fundamentally flawed and illusory

25   about this relief.

Page 41

1        Because they're saying to us pay yourself, which

2   they can't do any way, we're not obligated to follow their

3   instructions, they're saying all right we'll step back from

4   the $2 billion deposit and surrender it to you, but that has

5   only one meaning in this circumstance given the relationship

6   between the parties.  We are free to reduce the payment

7   obligation to Lehman by our claims, but they are

8   simultaneously saying without interruption your obligation

9   to pay us that same $2 billion and your ability to reduce it

10  by your claims remains in dispute.

11        So nothing from our perspective has been

12  accomplished.  There's been no benefit to us of this

13  arrangement, there's only been the curtailment of existing

14  rights.

15        THE COURT:  Well, one of the existing rights that

16  you assert and insist on preserving is the right to claim

17  post-petition interest, and this is mostly about that I

18  think.  This is mostly about your insistence upon being able

19  to assert an interest claim that is significantly burdensome

20  to the estate and its creditors, because as it clicks away

21  at seven and a half percent or whatever the right number

22  is --

23        MR. SHIMSHAK:  That's not the right number, but --

24        THE COURT:  Well, what is the right number?

25        MR. SHIMSHAK:  The right number for the cost of

```
 1    funds by analogy to another situation, and I'm straying into

 2    Ms. Hammerman's area right now, is under five --

 3               THE COURT:  It's okay.  Just because --

 4               MR. SHIMSHAK:  -- under five --

 5               THE COURT:  Just because you wanted to --

 6               MR. SHIMSHAK:  Under five percent.

 7               THE COURT:  -- set a neat division doesn't mean

 8    that I did.

 9               MR. SHIMSHAK:  No, but it's -- this is the kind of

10    that lawyers do.

11               Lehman has been out there insisting on a 14

12    percent rate in -- for its own derivative-related claims.

13    We made -- we made the mistake in retrospect of saying the

14    rate we are seeking is less than half of what they are

15    seeking.  So they immediately tag us with seeking seven

16    percent.  But in fact the rate is below five percent.

17               Now, on the post-petition interest point let me

18    address that.  Here's the dynamic.  We think our claims are

19    -- exceed the $2 billion deposit and in that case we'd

20    exhaust it, there wouldn't -- there wouldn't be an issue of

21    post-petition interest.

22               Lehman is focused on a very narrow situation.

23    Lehman maintains that we have grossly inflated our claims,

24    that we're dragging our feet in the litigation, and you

25    know, a bunch of stuff related to the process and the
```

Page 43

1    dynamic that we're involved in now.  And they're saying to

2    themselves if we're wildly successful and we were right and

3    we push Citi's claims way down it's a pyrrhic victory

4    because they're an oversecured creditor at that point as a

5    result of our reducing their claims and they're therefore

6    going to make a claim for post-petition interest at whatever

7    rate they're going to make that claim.  And they're

8    dissatisfied with that result.

9              I have two responses to that.

10             The first response is that is a normal incident of

11    the claims allowance process.  Parties assert claims, they

12    have claims reduced, and if they have additional protection

13    and collateral or an additional right of setoff that right

14    is recognized.  It's not -- it should not be punitive that

15    as a result of the claims allowance process and you find

16    yourself with the smaller claim but more protection you're

17    able to recover post-petition interest.  That shouldn't be

18    taken away from you.

19             But to the extent there is an element of fault or

20    wrong doing that Lehman is asserting, that it's really

21    bothered by this potential, they've already protected

22    themselves against that possibility.

23             Their adversary proceeding complaint contains

24    allegations that we inflated our derivative claims, that the

25    inflated derivative claims have been harmful to the estate,

Page 44

1    and they seek the remedy of equitable subordination.

2           So there is the remedy in that circumstance if

3    they're considered -- if they can prove up the equitable

4    subordination standards.  There is the remedy if we've

5    engaged in any kind of misconduct.

6           But it should not be cutting off our statutorily

7    created rights and our rights reserved under the plan in a

8    circumstance of us finding ourselves with derivative claims

9    that are less than we believe them to be but sufficient to

10   offset in combination with interest our payment obligation.

11   That's a protected right.  That's not -- that's not

12   something that can be taken away from a creditor.

13           THE COURT:  Okay.

14           MR. SHIMSHAK:  Now, Mr. Kirpalani was right when

15   he said I was going to get up in addition to talking about

16   the nature of the relief -- relief sought.  And by the way,

17   I want to make one other point, because this goes to the

18   dynamic between the parties in your talking to us about

19   whether something could be worked out.

20           When this motion was filed -- when this concept

21   was introduced we said to Lehman, please explain to us how

22   we're getting any benefit out of this?  We never got an

23   explanation.

24           As the situation advanced we then said to Lehman,

25   not only does what you're saying make no sense, it's

Page 45

1    internally inconsistent that you can both dispute and allow

2    a claim, you can both owe and not owe a debt.  Not only does

3    that make any common sense, as a matter of accounting, and

4    we included the last exhibit in here, the relevant account

5    standard, this setoff can't be taken.  You can't make a bank

6    take a setoff and then tell the bank that it still owes the

7    debt and that the claims that it used to offset are still in

8    dispute.  It just can't be done under the applicable

9    accounting standard.

10           We asked Lehman, please, tell us if we're wrong

11   about this accounting treatment, -- if we're wrong about

12   this accounting treatment please explain to us why we're

13   wrong.

14           We also said to them, we will make our accounting

15   personnel available for a deposition.  You can take their

16   deposition, you can hear from -- they'll educate you about

17   why what you're saying as an accounting matter is

18   impermissible.  They refused to take the deposition.

19           They then in their response say this accounting

20   issue is a Citi specific issue, which is itself an

21   accounting conclusion by the way, an unsubstantiated

22   accounting conclusion.

23           And they then go on to say -- they cite some cases

24   which have nothing to do with the application of the

25   generally accepted accounting principals on the FAZBI (ph)

Page 46

1   provisions that we've identified to them.

2           So it's a complete -- it's a complete nonsense

3   from the standpoint of its internal contradictions and an

4   accounting impossibility.

5           But putting all of that aside they have to have --

6   they have to come to you for authority to impose this on us

7   and they have to have a statutory basis for it.  They have

8   to have a statutory basis for it.  They know that.

9           They talk about four statutes.  363(b).  Let's

10  talk about 363(b).

11          We're not being cute when we say 363(b) no longer

12  applies, all the assets have vested in the debtor, it's no

13  longer property of the estate.  That's a provision of their

14  own plan.  Section 13.1 of their own plan says that.

15          And when I saw Lehman's response I was really

16  curious, I was thinking why is Lehman taking the position

17  that Section 363(b) still applies for non-ordinary course

18  transactions?  Why would a debtor with a confirmed plan ever

19  want to be out there in the world dealing with third parties

20  now and having them uncertain as to whether or not there was

21  a need to run back to Your Honor to get approval for

22  something?  It made no sense.

23          So we went to the docket.  And Your Honor is

24  intimately familiar with the Archstone transaction.  Can

25  someone help me?  What tab is that?

Page 47

```
 1                MS. HAMMERMAN:  It's 6.

 2                MR. SHIMSHAK:  Tab 6.  Your Honor, look at tab 6

 3      of -- no, no, that's not tab 6.  Yeah, look at tab 6 of your

 4      materials.

 5                As you recall there was an issue concerning the

 6      ability to exercise a right of first out offer regarding

 7      certain securities of Archstone, and that issue emerged in

 8      the period between confirmation of the plan and the

 9      effective date.

10                And what was Lehman's position on that?  Well, as

11      you can see from the highlighted language the plan has not

12      yet gone effective.  Consequently the debtors are continuing

13      to operate as debtors in possession as to which court-

14      approval is required for transactions out of the ordinary

15      course.

16                Then a footnote, "The debtors reserve the right to

17      withdraw the motion if the plan effective date occurs prior

18      to the hearing on this motion."

19                So clearly at that time Lehman was recognizing two

20      things.  The need for 363(b) approval in this gap period as

21      to transactions outside the ordinarily course, and

22      recognizing under the terms of their own plan in 13.1 that

23      when the effective date occurred that was not going to be

24      necessary.

25                But -- so this matter is the first instance to my
```

Page 48

1    knowledge.

2              THE COURT:  I think you're overstating it.  It's a

3    reserved right.  It's not an acknowledgment of legal

4    position.

5              MR. SHIMSHAK:  But this was -- this is the first

6    instance to my knowledge that despite 13.1, which says that

7    all of the property of the estate is vested in the

8    reorganized debtors, it is unqualified, that Lehman has

9    taken the position that somehow 363(b) has continued

10   vitality.  I do not -- you know, this is the first instance.

11             But to see if this marked a change of position as

12   recently as Monday in the next tab in a dispute involving a

13   2004 examination where the challengers -- where the parties

14   bringing the 2004 examination were questioning actions that

15   the plan administrator had taken under the authority granted

16   him under the plan and seeking to involve the Court in

17   reviewing those actions Lehman responded by saying it's no

18   longer in bankruptcy, it's free to -- free to negotiate and

19   enter into transactions involving its assets free of any

20   restrictions of the Bankruptcy Code or rule -- rules.

21             So what does Lehman say in response to our

22   argument about 363(b) not being available as a basis for

23   granting them the relief requested?

24             They simply say a complete non sequitur, well,

25   there are continuing jurisdiction provisions in the case.

Page 49

```
 1    The Court has continuing jurisdiction over the adversary
 2    proceeding.  And therefore what?  And therefore Section
 3    363(b) applies?  The one doesn't follow from the other.  The
 4    fact of continuing jurisdiction does not revest or recreate
 5    the estate and property of the estate for purposes of
 6    invoking section 363(b).
 7              The statement itself is not even legal argument,
 8    it's really an ipsi Dickson in which they're just saying,
 9    well, see these continuing jurisdiction provisions, that
10    means 363(b) still applies.  No it doesn't.  It doesn't mean
11    that at all.
12              502.  Let's talk about 502.  It's section 502(b).
13              What does section 502(b) actually say?  Section
14    502(b) says, "Claims somebody allowed unless ..." and then
15    there are enumerated basis for not allowing claims.  That is
16    the function of Section 502(b).  To allow -- it does not say
17    anything about provisional allowance, it just says the Court
18    shall allow claims unless one of these enumerated conditions
19    occur.
20              There's nothing in there remotely reassembling the
21    issues that are being presented by this motion.
22              Section 502(c) deals with estimation.  But
23    estimation for what purpose?  For purposes of allowance.
24    Not provisional allowance, purposes of allowance so you can
25    get a distribution.
```

Page 50

1          So 502(c) by -- you know, has no application.

2          There was such a wonderful phrase in their brief.

3    Oh, this is where they're trying to say, you know, they can

4    breathe into Section 502 enough substance for you to do what

5    they're proposing that you do.  They have this wonderful

6    phrase in there.

7          They're asking the Court to exercise its equitable

8    powers within the confines of Section 502(b) to facilitate

9    the estate's reconciliation of the subject claims.

10          Your Honor, I must have read that 10 times.  This

11   will make the eleventh.  I still have -- I have no idea what

12   that -- what that phrase means.  I have no idea what that

13   phrase means.

14          502(b) is very clear, it's very clear on what it's

15   purpose is, it's very clear on what it's mechanic is.  It

16   has nothing to do with the facilitating the estate's

17   reconciliation of the subject claims.

18          Their argument for 502(b) -- their argument for

19   502(b), let's call it what it is.  It is a gloss that they

20   want you to impose on the statute.  But I -- to allow you to

21   provisionally allow claims when there's nothing in that

22   provision that allows the provisional allowance of claims.

23   It's a gloss that they want to put on 502(b), and I would

24   maintain that it is a gloss that completely obscures and

25   deviates from the stated purpose of the statute.

Page 51

1          So in simple terms 363(b) is not available, 502(b)

2     is not available.  They refer to 509.  509 is the not a

3     basis for relief, because 509 presumes the outcome.  It

4     presumes that claims have been paid and fully satisfied

5     before you can get to 509.  So 509 could never have

6     application here because we're never going to be fully paid

7     under the -- by the terms of their own order.

8          But that doesn't stop them.  When you look at the

9     terms of their proposed order -- when you look at the terms

10    of their proposed order they actually say that as a

11    consequence of the provisional allowance they are fully

12    subrogated to our rights.

13         So that means when we get paid from some other

14    estate because of this provisional allowance of our claim,

15    this nonpayment payment we have to turn the money over to

16    them.  That's the effect of that order.  That seems to be an

17    enormous overreach.  And in fact in trying to get to that

18    overreach they even misconstrue the statute.

19         We have one of the parties -- one of the parties

20    that owes us money is a Lehman entity that is not a debtor

21    here.  Lehman Brothers Commercial Creditor -- Commercial

22    Corp. Asia, it's in a liquidation proceeding in Hong Kong.

23    They owe us -- this is what we refer to as the Hong Kong

24    loan.  They owe us about $300 million and Lehman guaranteed

25    that obligation.  509 says, "An entity that is liable with

Page 52

1    the debtor is entitled to subrogation."  Well LBCCA is not a

2    debtor.  Lehman can't assert subrogation rights through

3    Section 509 because of -- for a LBCCA payment.  But that's

4    not the way the order reads.  That's not the way the order

5    reads.

6              So the implication of 509 is the a complete

7    overreach.

8              So let's reprise where we are.  The relief makes

9    no sense.  It doesn't offer us anything.  All this talk

10   about how it's fair, how it's balanced, how we have a

11   benefit.  There's no benefit to us.  We end up being in the

12   exact same place.  We can't do it as an accounting matter,

13   and they have not, despite our invitation, demonstrated that

14   we can.  There is no statutory basis for the relief.

15             363(b) is not available.  502(b) is not available.

16   509 has nothing to do with it.  And 105, which supplements

17   all of them, can't even be invoked if the underlying

18   statutes aren't operative.

19             But that's not enough.  That's not enough.  What

20   they propose also violates the terms of their own plan.

21             Now their argument in response to this was, well,

22   there's nothing in the plan that says we can't provisionally

23   allow claims.  Well, all right, those words don't literally

24   appear anywhere in the plan.  But certainly -- certainly

25   it's the case, and no one would dispute this, that a Chapter

Page 53

1   11 plan is in essence a contract between the debtor and its

2   creditors as to the resolution of the claims.  It creates

3   rights.  It creates procedural rights and it creates

4   substantive rights.  It tells us how we're going to be

5   treated, it tells us how we're going to get finality, and it

6   describes the process under which we will get all of those

7   issues resolved.

8            What does their plan provide?  Their plan provides

9   that they cannot make any payments, make any distributions

10  on claims that are disputed.  Our claims are always disputed

11  under this arrangement.  Yet they're purporting to make a

12  distribution.  Distributions that are made are supposed to

13  be free of all claims, liens, and encumbrances.  The

14  distribution that we're getting through this provisional

15  allowance is coming with the entire litigation attached to

16  it.  It's by no means a permissible distribution within the

17  plan.

18           It says that rights of setoff are fully protected.

19  What are the rights of setoff that we're asserting?  It's

20  the right to assert the full extent of our claim, including

21  claims for post-petition interest and post-confirmation

22  interest against our payment obligation to Lehman.

23           This is an attempt to cut back on that right

24  outside of the plan, and I would argue and I maintain in

25  derogation of the plan.

Page 54

1           Now, you know, they may say that it's not

2    prohibited by the plan, but every creditor has the right to

3    expect that their conduct is going to be consistent with the

4    plan and it is not going to reduce the rights that are

5    available to us under the plan.  But that is the effect of

6    this proposal.

7           It doesn't work substantively, it doesn't work

8    from an accounting perspective, there's no basis for the

9    relief, and it violates the terms of their own plan.  That's

10   why we think this motion is improper, that's why we think it

11   should be denied.

12          If Lehman wants to continue to discuss with us

13   some arrangement that is protective of our rights under the

14   Bankruptcy Code, under Section 553, and under the plan we're

15   always open to discuss that.

16          Our questions to them, please explain how this

17   works for us, please explain how this can be done from an

18   accounting perspective.  Evidence is our willingness to have

19   a dialogue with them.  It's the opposite.  They cut off the

20   discussions, they would not respond, they ran into court to

21   get this relief from you.  We think it's improper, we think

22   the motion should be denied.

23          At this point I'm prepared to yield the podium to

24   Ms. Hammerman to talk a little bit about the equities.

25          THE COURT:  Okay.  Thank you, Mr. Shimshak.

Page 55

```
1            MS. HAMMERMAN:  Your Honor, Claudia Hammerman from

2    Paul, Weiss.

3            I -- I am the master of the facts, I have been

4    dealing and living with this case for five years and that's

5    why I think Mr. Shimshak ceded this portion of the argument

6    to me.  So I'd like to address some of the factual questions

7    that you raised initially with Mr. Shimshak and he bravely

8    tried to counter.

9            In one question you had is how is this different

10   from B of A?  In the B of A situation -- and this is -- this

11   is, you know, way beyond this motion, but I understand

12   you're trying to figure out why this is a different

13   situation from others that you have faced.

14           In the B of A situation there was an agreement.

15   There was a security agreement that covered a deposit and it

16   limited the definition of indebtedness, and that definition

17   of indebtedness was limited to clearing and was -- and Your

18   Honor found that there was no reservation of common law

19   rights to go broader than clearing.

20           Now here there is no security agreement covering

21   this deposit.  In fact there is no written agreement at all.

22           This is a deposit in the same way that you and I

23   deposit money in the bank, we all use the colloquial terms

24   that there's money in the bank.  In fact there's no money in

25   the bank.
```

Page 56

1           You asked what did Citibank do with this money?

2    Citibank treated this as a general deposit, the same way

3    whenever Lehman had to park its funds at night extra funds

4    to earn interest on them Citi commingled these with its own

5    funds and Citi views itself as having a contract, a debt to

6    pay this back subject to the negotiated rate of interest.

7           You also asked whether the relief sought here is

8    impossible.  And we submit based on consultations with

9    senior accountants at Citibank that it is impossible, and we

10   offered those senior Citibank accountants in the accounting

11   policy group at Citibank, we offered them up for deposition.

12          Our understanding, and you can look all though the

13   last tab in the binder, our understanding is that even a

14   layperson looking at the conditions for setoff would

15   absolutely see why as a matter of prudent accounting during

16   this hard fought litigation Citi cannot take the setoff.

17          So Your Honor could I guess -- well, as

18   Mr. Shimshak described, we don't think there's a legal basis

19   for Your Honor to cut off our rights to post-petition

20   interest, we think it's in violation of the plan, but

21   putting those problems aside Your Honor could I guess issue

22   an order that says no interest will accrue on Citibank's

23   claims.  But you can't -- and you could say for purposes of

24   this proceeding those have been provisionally satisfied

25   until they're allowed.  But Citi would not be able to do

Page 57

1      anything with the $2 billion debt it owes and the

2      countervailing debts that Citi says Lehman owes.

3              Now you asked about another precedent, which was

4      Calpine.  And you know that's very interesting, because at

5      the time of the arguments before the -- before the

6      Bankruptcy Court and before the Appellate Court there was no

7      hint that the payments that were being made were disputed

8      payments at the exact time they were being made.

9              All of the briefing in those cases makes clear

10     that this is a debt that's owed and the reservation of

11     rights -- the reservation of rights are with respect to the

12     make whole.

13              And the question that was presented is can the

14     judge allow payment of the principal and accrued interest up

15     to that moment but not permit -- but not decide the question

16     of the make whole and whether it also needed to be paid at

17     the same time?

18              The question of whether those were inextricably

19     intertwined and whether it abridged any rights by permitting

20     payment of one but not the other, that was the -- that was

21     the situation before the Bankruptcy Court and before the

22     Appeals Court.

23              Now it is absolutely true as Lehman has noted that

24     later on in the bankruptcy proceeding the creditors'

25     committee asked for permission to actually challenge the

Page 58

1    secured status of those claims and the debtor opposed that,

2    and the debtor argued that -- and I think we have that at a

3    tab, maybe you can do we the favor, Steve, of telling which

4    tab it is -- but the debtor -- the debtor opposed the

5    motion.  The debtor said there is no colorable basis --

6                MR. SHIMSHAK:  Tab 11.

7                MS. HAMMERMAN:  -- to argue --

8                MR. SHIMSHAK:  Tab 11, Claudia.

9                MS. HAMMERMAN:  I'm sorry, tab 11.

10               The debtor argued that there is no colorable claim

11   that this is not a secured debt.  In fact the debtor had

12   always referred to it as first lien debt, so had the UCC in

13   their previous submissions, and the only reservation of

14   rights in their previous submissions both to the Bankruptcy

15   Court and the court of -- and the District Court were with

16   respect to the make whole provision and certain professional

17   fees.

18               Now --

19               MR. SHIMSHAK:  Oh, tab 10.  I'm sorry, tab 10.

20               MS. HAMMERMAN:  Apologies.

21               MR. SHIMSHAK:  My apologies.

22               MS. HAMMERMAN:  It's tab 10.

23               THE COURT:  I enjoyed reading the other tab any

24   way.

25               MS. HAMMERMAN:  Okay.

Page 59

1           MR. SHIMSHAK:  Thank you, Your Honor.

2           MS. HAMMERMAN:  So in tab 10 you can see that the

3      debtors state that there was no colorable basis.

4           As things are wont to do in Bankruptcy Court the

5      dispute was settled and by stipulation the authority was

6      granted to the UCC to bring that claim later.  But it

7      doesn't change the fact that when Calpine, the decision that

8      they referred to as the basis for what they're seeking here,

9      at the time that was decided there was not a hint that there

10     would be any dispute to the -- to the claims that were being

11     paid with those monies.

12          So we submit that there is no authority, no

13     analogous situation where claimants would -- I'm sorry --

14     where the debtors force the creditors to provisionally

15     satisfy a claim that is disputed.

16          I think there was also discussion with

17     Mr. Shimshak about the rate and what rate applies -- would

18     apply here.

19          Now we have been accused of charging exorbitant

20     rates, those were the words repeated over and over again in

21     the brief.  The highest interest rate that Citi is seeking

22     is under the industry standard is the master agreement, that

23     calls for Citibank's cost of funds plus one percent.

24          In our opposition we -- we reflected the fact that

25     Lehman itself is seeking post-petition interest or seeking

Page 60

1    interest under the selfsame provision.  We also noted that

2    there are public reports that the amount that it is seeking

3    is as much as 14 percent.  There was no dispute about either

4    of those two statements in the reply papers.  But what the

5    in fact the reply papers didn't touch that.

6            Instead what they looked at, they argued that Citi

7    is seeking at least seven percent and Mr. Kirpalani repeated

8    that before Your Honor.

9            And we respectfully submit that that is simply

10   disingenuous.  It's disingenuous as a matter of mathematics,

11   because what we said in our opposition where they claim to

12   have derived this at least seven percent from our

13   opposition, what we said there was that Citibank's rate of

14   interest or the rate of interest applicable to Citibank as

15   an A-rated financial institution is going to be

16   substantially -- and what's amazing is that actually in

17   their reply papers Lehman quotes this exact language in

18   footnote 39 I believe.  They -- what we said is

19   substantially less than half of what Lehman is claiming.

20           So 14 percent -- substantially less than half of

21   14 percent is not at least 7 percent.

22           But the problem that we have with the -- with the

23   claims that have been made with respect to this seven

24   percent go beyond that.

25           As we stated in our papers, Citi is assiduously

Page 61

1    trying to collect from other obligors on the claims that it

2    is making against LBHI.

3              In one of those proceedings Citi has filed

4    publicly an estimation of its cost of funds over an

5    analogous period.  That estimation was 4.65.  So it would be

6    4. -- what Citi would claim it's owed here is it's cost to

7    funds plus would you be percent.

8              Now Lehman is absolutely familiar with this

9    litigation, they have been following it, and in fact they

10   recently served us with a discovery request asking for all

11   documents produced by either side in that litigation.

12             So it's not clear what Your Honor will determine

13   Citi's cost to funds is, Citi has estimated it, but the cost

14   to funds plus 1 percent can be no more than 5.6 percent, and

15   Citi would essentially be judicially estopped from

16   estimating it at a higher rate.  So we don't think this

17   amount is exorbitant at all.

18             The other thing that Lehman has suggested, they've

19   suggested that Citi is using the accrual of post-petition

20   interest as leverage and as litigation arbitrage.

21             Now we find that accusation ironic, because this

22   situation isn't like the situation Your Honor faced where

23   derivative's counterparties to the debtor were making those

24   kind of allegations in connection with the flip clause

25   litigation.

Page 62

1           In the flip clause litigation Lehman is seeking

2    interest under this selfsame provision, perhaps as much as

3    14 percent, they didn't respond to the public report, and

4    they are simultaneously seeking stays -- lengthy stays of

5    that litigation.  By our count now they have sought two

6    years worth of stays.

7           So we can at least sympathize and understand why

8    the derivative's counterparties are saying that that is

9    litigation arbitrage and using the threat of interest as

10   leverage.

11          Now we will concede that in any litigation – in

12   any litigation at all where interest can be paid that

13   exasserts some amount of leverage on the parties.  That just

14   is part of their cost benefit calculus.  And that's the

15   situation here.

16          Citi maintains that by contract under bankruptcy

17   law and under the plan it's entitled to full post-petition

18   interest to the extent of its collateral at the time its

19   claims are allowed.  And that is our legal position.

20          Plaintiffs try to suggest that Citibank could only

21   access that collateral for purposes of post-petition

22   interest if Citi has behaved wrongfully here and has grossly

23   inflated its claim, and that is simply untrue as a matter of

24   fact.

25          As we stated in our papers Citibank is assiduously

Page 63

1    pursuing other sources of recovery here.  It has already

2    recovered $200 million on the claims that it is making

3    against LBHI.  It stands to recover hundreds of millions of

4    dollars more.

5            Moreover, we have pointed to other sources of

6    collateral that Citi faces with respect to these claims.

7    And Citi has unsecured claims against LBSF and the

8    underlying debtors here.

9            So it is simply not the case that Citibank will

10   only have post-petition interest if Citi has wrongfully,

11   grossly inflated its claim.

12           In fact right now if Citibank recovers everything,

13   every penny of the claim that it is seeking there would

14   still be substantial room for post-petition interest through

15   2014.

16           Now is Citibank using this as leverage?  I think

17   the -- our position is that the law has given us this right.

18   This right exists and it should -- you know, it will be part

19   of the calculus that debtors have to make as to whether they

20   want to make a reasonable offer in terms of settling this

21   dispute.

22           And we would -- we would also note that the --

23           THE COURT:  Do you have a provisional calculation

24   of how much interest we're talking about?

25           MS. HAMMERMAN:  I'm afraid that I don't have that

Page 64

1    right here, Your Honor, but we have done the calculations at

2    least to the extent that I can stand up here and say that it

3    is possible under the interest rates we're claiming for us

4    still if we recover against the other estates for us to

5    continue to get post-petition interest on these claims.  And

6    in fact the interest rate that you would apply in doing

7    those calculations, that's not set either.

8            We have our position as to what the contractual

9    rate is, that we're entitled to the contractual rate under

10   506 pre plan, and post-effective date we argue that the plan

11   gives us our full amount of our claim, and that would

12   include the contractual interest up to the limit of our

13   security.  But Your Honor will decide that at the

14   appropriate time.

15           And so it's simply -- since the variables are

16   unknown here, will Citibank recover from all of the primary

17   obligors and thus have a lot of room in -- in its security

18   for further post-petition interest, what interest rate will

19   ultimately apply since Lehman has made clear that they will

20   challenge that interest as to -- as grossly inflated?

21           But the other point if we're going to talk about

22   grossly inflated claims, and I certainly, you know, don't

23   mean the fling mud, but this claim objection started out

24   challenging Citi's claims as overstated by $1 billion, and

25   we vigorously contest that.

1          But Lehman -- and I think this does factor into

2     the equities here -- Lehman decided to double down on that

3     claim.  Lehman now claims that our derivative's claims are

4     overstated by more than 2.2 billion and to the extent that

5     Citi now owes money to Lehman.

6          So this -- and in fact I think in their counts 18

7     and 24 on a combined basic under the derivative's claims

8     they are asking -- they claim that Citi owes them

9     $230 million.

10         So this motion and Citi's right to post-petition

11    interest only makes sense if Lehman has grossly inflated its

12    claim objection, has grossly inflated the amount that it

13    calculates Citi is due under these derivative's claims -- or

14    correcting that what Citi now owes Lehman.

15         So the impossibility of canceling out Citi's debt

16    to Lehman of $2 billion and canceling out the claims Citi

17    owes I think you can see why that would not be prudent

18    accounting in the circumstances.

19         I think that in addition all we would note is

20    Lehman does claim to be giving something up here.  We submit

21    that Citi has no benefit, but maybe fairness is that they're

22    giving something up.

23         They claim that under the 2009 stipulation, April

24    2009, which they have attached as Exhibit A to their reply

25    papers, that they have the benefit under that stipulation of

Page 66

1    FDIC protection on the $2 billion account.

2         Well in fact that FDIC protection, if you look at

3    the stipulation itself, that FDIC protection is provided

4    under the temporary liquidity guaranteed program, and the

5    TLGP by its terms was temporary, it was expected to be

6    temporary, it was a temporary response to the acute moments

7    of the crisis, and it lapsed, it lapsed long ago, and the

8    debtors can see that if they look on the FDIC website.

9         So long ago the debtors faced and fully absorbed

10   this is what they say they're giving up -- they're going to

11   absorb the collection risk from Citibank.  They've always

12   had that risk.

13        So I guess while I understand that Your Honor

14   has expressed some discomfiture with Citi continuing to

15   accrue interest here, Citi claims that is their right under

16   the law.

17        Citi would also submit that the equities here do

18   not favor Lehman.  Lehman has not tried to simplify and

19   settle this case.  If anything they've expanded it.  They

20   have controlled the timing of the litigation, the pace of

21   the litigation, but also the scope of the litigation.

22        As we stated in our papers, Lehman could have

23   easily decided to satisfy -- resolve and satisfy those

24   portions of the -- of Citibank's claims as to which they had

25   no reasonable dispute, and we submit there are plenty of

Page 67

1    those, and we have given examples in our papers to Your

2    Honor in the opposition, and the reply papers from

3    plaintiffs do not address that.  They simply do not address

4    that.

5           So while the injury that they're claiming is we

6    say a product of the legal regime here and is simply what

7    they had to figure into their calculations in suing an

8    oversecured creditor, we also submit that to a certain

9    extent this is a self-inflicted injury.  Because to the

10   extent they could see themselves clear to acknowledging that

11   there's a large portion of Citibank's claim as to which they

12   have no conceivable argument they could cut off that

13   principal which would be accruing post-petition interest.

14          So in closing, Your Honor, and thank you very much

15   for being patient with a long-winded argument, we submit

16   that there's no legal basis under the -- under the

17   Bankruptcy Code for Your Honor to grant this motion.  That

18   granting this motion would abridge Citi's settled

19   expectations and vested rights under the plan.  And that in

20   these circumstances there is -- it would simply be

21   inequitable to Citi and it would remove the one -- the one

22   little amount of leverage -- and I'll accept leverage --

23   that Citi has in moving this case along to an appropriate

24   resolution.

25          We will note, and Your Honor pointed out, that

Page 68

1    JPMC agreed to give up post-petition interest.  They got a

2    whole lot of other benefits, but they agreed to give it up.

3    That -- in that case -- that case the initial scheduling

4    order has now slipped and the scheduling order that exists

5    now it's two years later.

6            So we submit that the equities do not favor

7    granting this motion, not that any free floating appeal to

8    equity could be a basis for this motion, and I thank you

9    very much for hearing me.

10           THE COURT:  Okay, thank you.

11           Mr. Kirpalani, you have a lot to respond to.

12           MR. KIRPALANI:  Yeah, I'm not sure I'm going to be

13   able to respond to everything that was said, Your Honor, but

14   I'm going do my best.

15           The first thing I want to start with is counsel I

16   believe said I think wrongly that in the Calpine decision,

17   and I think I did acknowledge that it's not on all fours,

18   and it's certainly not controlling precedent, and that it is

19   analogous I do believe, but there's a factual statement that

20   was made that is wrong.  I believe she said that there was

21   not a hint that the debtors might have claims, that it just

22   came as a surprise, nobody realized.  So I just want to read

23   from the transcript, which is attached to our papers.

24           On June 21 of 2006 before the Honorable Judge

25   Lifland counsel for the debtors said, I quote, "As we set

Page 69

1    forth in our papers of course we are reserving all of our

2    other rights, and I don't suggest we are waiving any rights,

3    including the right to ultimately attack or challenge the

4    first lien holder's liens."  And then it goes on to talk

5    about, "and of course we're going to challenge the make

6    whole too."  So I just think that is an incorrect statement.

7             However, I also want to caution that we are not

8    suggesting that Calpine is on all fours.  Calpine for the

9    record and for Your Honor's clarity does rely on 105 coupled

10   with 363(b).

11            I accept Mr. Shimshak's statements.  Mistake, it

12   is not a Section 363 issue before the Court here.

13            We do believe that 105 and 502 does give Your

14   Honor enough play in the joints to accomplish a just and

15   equitable outcome.

16            I'd just like to read a provision from the Calpine

17   appeal in the District Court where the Court noted, "A

18   bankruptcy" -- quote, at page 593, "A Bankruptcy Court's

19   exercise of its equitable authority is reviewed for abuse of

20   discretion.

21            Abuse of discretion is one, a decision resting on

22   an error of law such as application of the wrong legal

23   principal or a clearly erroneous factual finding, or two, a

24   decision that, though not necessarily the product of a legal

25   error or a clearly erroneous factual finding, cannot be

Page 70

1   located within the range of permissible decisions."   End

2   quote.

3          "Moreover, to further the purposes of Chapter 11

4   reorganization a bankruptcy judge must have substantial

5   freedom to tailor his or her orders to meet differing

6   circumstances and the citation as to integrated resources,

7   and to the Second Circuit's decision in Lyonell (ph)."

8          And what we would submit, Your Honor, is this is

9   an entirely unique situation.  We're getting a tutorial from

10  Mr. Shimshak about the way banks work.  We're getting a

11  tutorial about how this is their God-given right to assert a

12  setoff claim.  And somehow as a setoff creditor they are a

13  secured creditor under 506, and even though it seems

14  inequitable on these facts they're entitled to assert it,

15  admittedly, as leverage the post-petition interest.

16         But, Your Honor, they also talk about -- I almost

17  I thought I heard Ms. Hammerman say that if Your Honor

18  thought -- rather than forcing a setoff or a provisional

19  allowance that would disrupt their accounting mechanics I

20  thought I heard her say -- but I don't want to misstate it

21  that Your Honor could always if you thought it was unfair

22  just not do that but stop the accrual of post-petition

23  interest, just on the equities, it doesn't seem right.

24         We'd be fine with that, Your Honor.  It's not the

25  mechanic that we're thrilled with or trying to push down

1   anybody's throat, it is the inequitable situation that we're

2   stuck with.

3            And I -- again, I'm concerned about the integrity

4   of the court, I'm concerned about, you know, making an

5   argument that Your Honor takes away and then later finds

6   out, you know, that was an improper thing for me to try to

7   persuade you on.  So I'm not doing that.

8            I'm not going to tell you, Your Honor, that 506(b)

9   gives you discretion to determine interest rates, no matter

10  what.  I can't do that.  I can't do that.  I am stuck with

11  what the case law provides.

12           But I do think, Your Honor, you definitely have

13  the power under 1059a) and 502 to provisionally allow, if

14  they're not comfortable with that result and they would

15  prefer for their internal purposes to simply accept that

16  from today forward we can argue about what happened in the

17  past and what the reasonable rate was or what they're

18  charging, from today forward in order to accomplish their

19  legitimate accounting integrity issues and the interests and

20  needs of creditors of Lehman we can stop the burn of

21  interest.  And they are obviously using the cash in a

22  productive way.

23           It is very disanalogous from a situation of a

24  secured creditor who is really being precluded and injured

25  by the automatic stay and not being able to move on with

Page 72

1    life.  They are making good use of the funds, which they

2    should be doing.  But they shouldn't be charging the estate

3    at the same time.

4            Another area, Your Honor, that I'd like to cover

5    is Mr. Shimshak said our plan.  We got a tutorial on what

6    our plan provides.

7            But what I would like to point out is the issue

8    that they simply can't or chose not to respond to is

9    Mr. Shimshak said we have a contract, the plan is a contract

10   and it creates rights, and they told us how the plan works.

11           There's another contract that Mr. Shimshak didn't

12   mention, and that's the stipulation on reserves.  The

13   stipulation on reserves with Citi specifically cites

14   Section 8.4 as applying to their claims.

15           Section 8.4 of the plan says, rather than contract

16   rate or applicable law we're no longer in the pendency

17   interest world of petition date to effective date, Supreme

18   Court says that's dependency interest world, we're not in

19   there.  After that you have to look to what the plan says.

20           They say Section 8.4, which limits interest post-

21   confirmation to whatever Lehman's estate is earning on the

22   money to prevent this exact problem.  It says that's all

23   they get.

24           So what's their answer as to why that doesn't seem

25   to work?  That's the contract, the plan that they say they

Page 73

1    accept, and they have another contract, their stipulation,

2    which specifically says 8.4 governs their claims.

3            Their answer is, well the plan says elsewhere that

4    we're entitled to get all, we're entitled to it be paid in

5    full.  Quote/unquote.  And so they jam into the words in

6    full this reading that they're entitled to do what the

7    Supreme Court says stops at the effective date and get post-

8    petition interest at whether it's five percent or what have

9    you, with the compounding this is hundreds of millions of

10   dollars.  Even from March 2012, the effective date till

11   today, it's probably $250 million.

12           So if Your Honor -- if we can get a decision from

13   the Court that even the plan, Section 8.4, does stop the

14   alleged 506(b) interest that they are asserting and now it's

15   governed by the plan I think Your Honor certainly has the

16   power to interpret the plan and the confirmation order, the

17   contract, and that would be a result that would be of great

18   value to testate, and it was alternatively sought in our

19   motion, Your Honor.  It does not have to be the mechanic

20   that we came up with.  Just because JPMorgan seemed to be

21   able to be comfortable with it we don't understand why Citi

22   is not.

23           I will tell Your Honor that JPMorgan, there was

24   cash that they also applied on disputed claims.  So it's not

25   entirely different the way Citibank makes it seem.

Page 74

1          I think --

2          THE COURT:  Mr. Kirpalani let me ask you

3     something.

4          MR. KIRPALANI:  Uh-huh.

5          THE COURT:  It's been a very interesting argument.

6     And one of the thoughts that occurs to me now is that it may

7     be premature.  One of the issues that bubbled up in my mind

8     as I was hearing the argument about the calculation of

9     interest and the fact that interest was being used as a form

10    of leverage, in fact Ms. Hammerman acknowledged that it was

11    a form of leverage, but a permissible form of leverage and

12    one that Lehman and the plan administrator has been using

13    apparently successfully in ongoing negotiations in the

14    mediation and ADR process.

15         My thought is this.  I don't even know at this

16    point whether interest even applies, because the dispute is

17    not really ripe for determination unless the parties choose

18    to settle it, and at some point in the future there may in

19    fact be a litigation in which there's a determination made

20    one way or the other as to whether Citi is or is not over

21    secured.  Only then really is the question of entitlement to

22    interest ripe for determination, and at that point,

23    presumably, parties will be making arguments as to what the

24    rate should be, what the entitlement is, why the facts and

25    the law justify such an outcome.

1          As I've been thinking about the argument I've been

2   characterizing it in my own mind as an incredibly

3   interesting and novel argument both on the part of the plan

4   administrator, the committee, the estate, whoever it is you

5   represent right now, and Citi arguing a whole host of

6   largely theoretical propositions, which admittedly would

7   require, if I were to grant you the relief that you seek, me

8   to make a number of leaps.  I don't know that those leaps

9   would constitute an abuse of discretion.

10          But as I'm thinking about this and the exercise of

11   my discretion I'm questioning why I need to do it now.  And

12   the fact that you have waited this long to bring this to my

13   attention is something of a double-edged sword.

14          It suggests on the one hand that perhaps the

15   estate or the plan administrator had not focused on the

16   negative impact of the hypothetical interest accrual or it

17   may reflect a desire on the part of the plan administrator

18   now to seek to tilt the playing field a little bit in

19   ongoing negotiations by removing the ongoing accrual of

20   post-petition interest as part of the calculation to be made

21   in thinking about how to settle this, if as and when the

22   parties do that.

23          To the extent that may be, and I'm simply thinking

24   out loud with you, to the extent that may be one of the

25   motivations for doing this I begin to question whether

Page 76

1  that's a place I should choose to tread at this point in the

2  exercise of discretion.  Because regardless of the merits of

3  the various legal arguments that have been made the real

4  economic issue seems to be, and don't think I'm disparaging

5  you when I say this, something of a shell game in which

6  there's a provisional allowance of a claim with all rights

7  reserved around that, but it's not happening in 2009, it's

8  not happening leading up to the confirmation of the plan,

9  it's happening almost two years after confirmation of the

10 plan while active litigation is pending between your clients

11 and Citi.

12          And so I end up thinking, not knowing everything

13 that's behind the curtains, because there's always something

14 behind the curtains that you don't see in court, well, why

15 is this being presented to me for determination today as

16 opposed to three years ago or two years from now?

17          And so one of my questions to you in this long-

18 winded musing is why do I need to do it now and is it really

19 ripe, and it is appropriate for me to do it if it has an

20 impact upon negotiations that may take place in the future

21 to hopefully bring this dispute to a conclusion?

22          MR. KIRPALANI:  Thank you, Your Honor.

23          I think the easiest and most direct way to answer

24 the Court's question is as Your Honor knows from your work

25 as a mediator it's very, very difficult to engage in any

Page 77

```
 1    attempt to resolve big ticket litigation where you're

 2    talking about billions of dollars when every single day the

 3    bookends are moving further apart.

 4            So I don't even mean to disparage Citibank about

 5    the interest rate arbitrage, it's a fact of life.  And if

 6    the purpose of the bankruptcy is to get claims resolved, and

 7    that is in fact the core function of a Bankruptcy Court to

 8    resolve them using equitable means, to do so and to stop

 9    wasting so much behemoth (ph) money back and forth, the

10    debtors, the plan administrator, the creditors' committee

11    plead in that vein for equitable powers to be used to stop

12    the bookends from moving.  Every day they move in one

13    direction and it's making it more and more difficult to get

14    to resolution.

15            In terms of the equities on the other side they

16    Have, and we've only learned through this process,

17    Mr. Shimshak would say I should have gone to better law

18    school or something if I don't understand the debt

19    relationship between banks and deposits -- I did think there

20    was cash sitting somewhere.  I did.

21            So this became an illuminating fact for us that

22    now they've actually had full use -- full enjoyment of

23    $2 billion for five years, and yet at the same time they

24    have asserted they will be charging -- I'm not going pick

25    the interest rate because I didn't follow it -- some amount
```

Page 78

1    of interest that is definitely hundreds of thousands of

2    dollars a day, and that that's going to happen every day,

3    because under the stipulation that they entered in April in

4    2009 they only have to pay us two basis points.

5         From the estate's perspective whatever equity the

6    estate has into this collateral, i.e., the setoff right, the

7    deposit, is wasting and diminishing.

8         And so in the interest of getting the litigation

9    resolved we believe, and I would actually challenge Citibank

10   to disagree, we believe eliminating some of the moving

11   pieces is a good thing, and that's our position, Your Honor.

12        This is a moving piece.  We thought about frankly

13   making a motion for partial summary judgment in the

14   adversary over the interest issue, and that may be something

15   that we seek permission to do if Your Honor is not inclined

16   to do this on an equitable basis, but it is an issue that

17   although there are a bunch of theoreticals embedded in it,

18   and we appreciate that, it's very difficulty even for us to

19   get our arms around this and we live this, there are certain

20   principals that should apply.  And cutting off the post-

21   petition burn, certainly post-effective date, when Citibank

22   has had the full use and enjoyment of the cash, subject to

23   the credit risk that they have to pay us $2 billion, you

24   know, at some point if we're right, suggests to us that it

25   is ripe for determination and that is the basis of the

Page 79

1    motion.

2            THE COURT:  Let me ask you this follow-up question

3    with particular reference to your suggestion that one of the

4    alternatives you thought about was maybe seeking leave to

5    bring a motion for partial summary judgment that I presume

6    would seek a determination as a matter of law that post-

7    petition interest or post-confirmation interest should not

8    be accruing any longer.

9            One way to look then at this pending motion is

10   that it is in effect the functional equivalent of a motion

11   for partial summary judgment with respect to the right to

12   continue to accrue post-confirmation interest, because if I

13   were to grant you the extraordinary relief that you seek

14   under 105 dealing with those moving parts of 502 the impact

15   of this would be that henceforth there would be no ongoing

16   interest accrual.

17           Now, I'm questioning in my own mind whether it's

18   appropriate for this to be what amounts to a -- an

19   unconventional alternative to that kind of substantive

20   motion, which would be record-based based on the law and

21   presumably would not be a 105 motion, because I've never

22   seen a 105 motion for summary judgment.  Maybe you have, but

23   I haven't.

24           So you've given me another reason to sit back a

25   little bit in my chair and think twice about whether or not

Page 80

1    this is the right thing to be doing now.  Quite apart from

2    whether or not someone is sitting here courageously might

3    stake out a claim for advancing jurisprudence along the

4    lines that you've suggested.  I'm not saying it's

5    impermissible, although Mr. Shimshak has said that, but it

6    may be unwise.

7            Mr. Shimshak, do you wish to say something?

8            MR. SHIMSHAK:  Yes, Your Honor, I have a number of

9    comments, and I want to come to the introductory comments

10   that you made in the last exchange about this potentially

11   being not ripe, but I want to clear some other things away

12   first and then focus on that, because that's very important.

13           Lehman said that a determination of the

14   appropriate rate of interest was one of the alternative

15   forms of relief that it had sought on this motion.  I

16   believe that's what we just heard.

17           I'm looking at page 1 where -- of their motion

18   where they outline the forms of relief they're seeking.

19   That is not one of the forms of relief.

20           So the statement that determining the appropriate

21   rate of interest is one of the forms of relief they've been

22   seeking on this motion is belied by the bullet points that

23   outline the relief they're seeking.

24           Second, there was a -- there was a discussion

25   about the stipulation of reserve stipulation that went into

Page 81

1      -- that went into place.  The amended stipulation

2      establishing distribution reserve.  And there was the

3      suggestion that there was a conspicuous silence on our part

4      in not addressing the supposed or the perceived impact of

5      that reserve on the interest rate.  But the reserve itself

6      states that the reserve, and I quote, "In the event that the

7      Bankruptcy Court by a final, non-appealable order determines

8      that any of Citibank's claims identified in the stipulation

9      are allowed unsecured claims."

10             The purpose of the reserve -- the purpose of the

11     reserve stipulation was a mechanic that took place at the

12     time of the confirmation of the plan -- or the submission of

13     the plan.  Because we had potentially large claims and we

14     had this $2 billion reserve or this debt that we owe Lehman.

15     And the negotiation was, well, if it's determined that you

16     have unsecured claims that would be one of the places that

17     you'll look.  Effectively you'll be able to reduce your

18     claims even though unsecured by offset against that --

19     against the $2 billion obligation, so that Lehman did not

20     have to put more cash into the cash reserve for the benefit

21     of our potentially unsecured claims.  So that's what the

22     stipulation did.

23             I was gratified to hear that Lehman has abandoned

24     any effort to bring this within Section 363(b).  I think

25     that's long overdue.  It was evident from the filing of the

Page 82

1   motion that 363(b) was not an available form of relief and

2   one would assume familiarity with their own plan.

3            The discussion about Calpine is equally irrelevant

4   in that regard, because Calpine -- one thing Calpine was,

5   was relief granted under Section 363(b).  It's right on the

6   face of Judge Sheindlin's decision.

7            There was also reference somewhat sarcastically to

8   our God-given rights of setoff.  No, they're not God-given,

9   their congressionally given though.  Section 553 is

10  explicit.  It says in 553(a) except for enumerated

11  exceptions, "Nothing in this title …" meaning all of title

12  11, "… shall affect the right of setoff."

13           I would submit that includes section 502(b) if it

14  is diminishing our right of setoff in any fashion.

15           There was again reference to the fact that we've

16  had this $2 billion and it's really unfair for us now to be

17  seeking post-petition interest if the claim is reduced to a

18  level where that becomes a meaningful consideration, that

19  that's somehow inequitable.

20           But what that argument really means is even though

21  we've caused you independent economic harm as evidenced by

22  the claims that you have asserted against us, the derivative

23  claims that we've asserted, the Hong Kong loan guarantee

24  claim, which they haven't paid, the derivative claims that

25  they haven't paid, even though we've caused you separate and

Page 83

1    independent economic harm you're not entitled to be

2    compensated for that harm through the passage of time.  That

3    argument makes no sense.

4              We're entitled under the Bankruptcy Code and as a

5    matter of substantive law to protection of our setoff right

6    to the full extent permitted and we maintain that includes

7    post-petition interest and post-confirmation interest.

8              553 can't be tampered with.

9              You can't use 502(b) to put a gloss on

10   Section 363.

11             Nothing in Title 11 can reduce those rights.

12             Then there was a retreat to 502(b) again.  And,

13   Your Honor, you will have to decide, if you decide this to

14   go forward with this at this point or at some later point,

15   whether your equitable powers to enforce the provisions, to

16   implement the provisions of an expressed statute -- a

17   provision of a statute which talks about allowance of claims

18   except in enumerated circumstances where claims are

19   disallowed -- whether that provision allows you to breathe

20   in to Section 502(b) through Section 105, the ability to cut

21   off a creditor with a setoff right that creditor's

22   entitlement to post-petition interest.

23             Now let me come back to the introductory comment

24   about ripeness.

25             I certainly can't quarrel with that proposition,

Page 84

1    it's one we've made in our papers, that this entire

2    controversy is not ripe for determination at that time.

3    There are a million things that can happen between now and

4    the point where this issue should be legitimately addressed,

5    and that anything right now is purely hypothetical, purely

6    speculative, and the other word for that is purely advisory.

7    There are not a ripe set of issues before you.  The claims

8    have not been --

9              THE COURT:  Excuse me.

10             MR. SHIMSHAK:  -- the claims have not been

11   determined, the interest rate has not been determined, the

12   litigation outcome in its entirety has not been determined.

13   All of these matters should await another day.

14             And depending on the facts -- depending on the

15   facts as I said in our earlier comments, the means exist to

16   deal with the situation.

17             You can rule straight up on the law on that point

18   to the extent of our secured rights and our rights of

19   setoff, you can deal with their claim that we've done

20   something wrong through the count of their complaint that

21   seeks equitable subordination.

22             The moving goal posts that were described as Your

23   Honor correctly observed are nothing more than the

24   consequence of the inner play between our rights -- our

25   rights -- our protected rights and a litigation that they

Page 85

1    brought and that is lasting a long time, and that's

2    regrettable that it has to last as long as it has.  As

3    Ms. Hammerman indicated, that's not a matter that's been

4    within our control.  We would love to see the scope of

5    discovery narrowed.  We would love to see the litigation

6    move at a better -- at a better pace.  We would have loved

7    to have been in settlement discussions with them.  They

8    discontinued the settlement discusses.

9            So the notion that this is inequitable, that the

10   moving goal post is somehow inequitable is tantamount to

11   saying that a creditor's rights with setoff rights in the

12   event that his claim is oversecured it's inequitable for him

13   to get what the Bankruptcy Code has prescribed.

14           I liked your description of this as tilting the

15   field, I think that's what this boils down to.  That's what

16   we've been maintaining, that this is really an attempt to

17   tilt the field in Lehman's favor through extraordinary

18   relief that's not available to bring us to a negotiation

19   with having lost or having lost substantive rights to which

20   we're entitled.

21           I think the whole matter is premature, it should

22   it should not be decided, there's no basis even I would

23   maintain for the kind of provisional determination of the

24   appropriate interest rate because that issue too is not ripe

25   at this time.

Page 86

1           Thank you, Your Honor.

2           MR. KIRPALANI:  Thirty seconds, I promise.

3           You've given us a lot of Your Honor's and your

4    staff's time, and I just want to be very brief.

5           First, the reason why we didn't choose to proceed

6    by writing a letter requesting permission to file a motion

7    for summary judgment or partial summary judgment was not

8    because we didn't think it was ripe, but rather I don't

9    believe Your Honor has had the opportunity to fully

10   understand what this lawsuit has been doing to the estate,

11   and I thought -- we thought that a letter seeking partial

12   summary judgment without any background would look like we

13   are trying to tilt the playing field, if Your Honor will.

14   We're not trying to tilt the playing field, we're trying to

15   even the playing field so we can have a rational discussion.

16          And I won't go into any back and forth discussions

17   that have taken place, but we thought this was an

18   appropriate way to address the Court as to the current

19   inequitable situation facing the estate and its creditors

20   when there is absolutely no injury on either side, rather

21   what we would call almost a gotcha situation by a very

22   powerful creditor.

23          That's it, Your Honor.

24          THE COURT:  Okay.  Thank you.

25          I almost left the bench during the last three

Page 87

1    minutes of Mr. Shimshak's argument because I was choking,

2    but it had nothing to do --

3              MR. SHIMSHAK:  I'm the one with the cold.

4              THE COURT:  -- but it had nothing to do -- it had

5    nothing to do with his argument.

6              This is a very challenging and innovative argument

7    and I'd say that applies on both sides.  And the estate has

8    made what I consider to be a very creative argument and a

9    persuasive one relative to the ability in concept to

10   provisionally allow the secured claim.  But of course it's

11   not a secured claim.

12             And as I was reading the papers I will confess I

13   did not have a full appreciation of the nature of the

14   relationship that existed between Citi and the estate.  And

15   for that reason what Mr. Kirpalani has characterized as the

16   tutorial was actually quite helpful.

17             I will note however that I am generally familiar

18   with how banks work, that's not to say that I'm specifically

19   aware of how each espoke (sic) arrangement may work between

20   a depositor and a financial institution.

21             In this instance Citi, through counsel, has made a

22   coherent argument about preservation of rights, and that is

23   in effect the essence of their position here.  It is an

24   argument based upon rights of setoff preserved under the

25   Bankruptcy Code, and I'm familiar with how that works and

Page 88

1    have written on that topic.

2            So the question really becomes one of whether or

3    not it is appropriate for this Bankruptcy Court in this

4    extraordinary bankruptcy case to do something unprecedented.

5    And I believe even the movants would concede that what we're

6    talking about here has never been done before.

7            There are a couple of ways to analyze this.

8            One is just because it has never been done before

9    doesn't mean it isn't permissible to do, assuming that it's

10   the right thing to do.

11           Another is in a case of this global prominence is

12   it appropriate after the plan has been confirmed and while

13   significant litigation is pending to take action such as

14   this that would have the economic effect of depriving a

15   major creditor of substantive economic rights?

16           I conclude that the latter alternative is what

17   applies here and that it would be an inappropriate exercise

18   of this Court's discretion in the present context to

19   provisionally allow a claim with all rights reserved if the

20   economic impact of so doing would be to cut off a claim for

21   post-confirmation interest.

22           In saying that I do not wish to dignify that

23   claim.  That claim may for other substantive reasons not be

24   allowable as a matter of law or not be allowable as a matter

25   of fact or not be appropriate given the equities of the

Page 89

1    case, and as to that issue or series of issues the Court

2    reserves all judgment for future hearings.

3            I'm also motivated in reaching this conclusion by

4    the mental impression earlier described that this is not the

5    right time to deal with this question.

6            As Mr. Kirpalani has pointed out in his argument,

7    while this case has been pending for quite some time this is

8    really the first major proceeding that has taken place in

9    the case that has involved significant interaction between

10   counsel and the Court.

11           Unlike other adversary proceedings that are

12   pending on my docket in the Lehman case this one has been

13   running silent and running deep in the sense that it hasn't

14   surfaced as a dispute that has required by attention.

15           I'll contrast it with an earlier matter on the

16   docket, Giant Stadium.  I've heard all too much from them

17   and so I have a pretty good understanding as to what that

18   dispute is about.

19           That's another reason why I believe it is unwise

20   for the Court to exercise what would be a truly unusual,

21   unprecedented, and extraordinary reach of 105 coupled with

22   502 power to preemptively cut off legal rights of Citi.

23           This is all without prejudice of course to

24   reconsidering the question at some future date, and I would

25   consider today to be a marker of sorts.  This is the date

1        when the Court could have cut off the running of post-

2        petition interest, and as a result it might be argued by

3        somebody in the future, to the extent that the facts and

4        legal argument might support the proposition that the

5        effective date for cutting off interest might be today.

6                    Thank you for the argument, we'll move on to the

7        next matter.

8                    MR. SHIMSHAK:  Thank you, Your Honor.

9                    MR. KIRPALANI:  Thank you, Your Honor.

10                   MR. SHIMSHAK:  Your Honor, may we have permission

11       to leave?

12                   THE COURT:  Everyone who's involved or interested

13       in the matter that was just argued may be excused.

14                   MR. SHIMSHAK:  Thank you.

15           (Pause)

16                   THE COURT:  Now, before we start, I've been at

17       this now for two and a quarter hours.  I'm assuming that

18       this matter involving the litigation against Tschira --

19                   MR. TAMBE:  That's right, Your Honor.

20                   THE COURT:  -- will not be particularly time

21       consuming unless you tell me otherwise.

22                   MR. TAMBE:  I don't anticipate it will be, Your

23       Honor.  I think it'll be relatively short, but Mr. Brilliant

24       may have something to say about that.

25                   MR. BRILLIANT:  What do you mean by -- I mean

Page 91

1    clearly it won't be as long as the last one, Your Honor, it

2    may take --

3                THE COURT:  No, that's not my -- that's not my

4    point -- that's not my point of reference.  My point of

5    reference is whether -- and if that's your point of

6    reference we are really not speaking the same language.

7                We've been here to the point that it's almost the

8    lunch break and I want to excuse those lawyers who are here

9    on FirstBank Puerto Rico versus Barclays, because whatever

10   happens in that argument I'm going to take a lunch break and

11   return at 2 o'clock.  So those of you who are here on

12   FirstBank Puerto Rico, and I apologize for the fact that

13   this is now the second time that you're having to come back,

14   but you'll make come back at 2 o'clock.  And if you're

15   interested in what's happening now you're welcome to stay,

16   but you're also free to go and come back at 2:00.

17               MR. BRILLIANT:  Your Honor, and I don't know if

18   you want more of a response to that, but I think counsel and

19   I have a disagreement about what -- you know, what the

20   nature of this hearing is.

21               It's the, you know, first initial pretrial in

22   connection with the -- you know, the filing of the adversary

23   complaint.

24               THE COURT:  Well, we can talk about that

25   disagreement right now, but all I'm -- this was purely

Page 92

1    housekeeping.  I was excusing lawyers as a courtesy to them

2    and I was excusing others who might be in the gallery as a

3    courtesy to them who might only be interested in the

4    FirstBank Puerto Rico matter, because I'm not going to hear

5    that before taking a lunch break.  That's the only thing I

6    was doing.

7            MR. BRILLIANT:  Okay, I am sorry, Your Honor.

8            THE COURT:  I was also seeking some guidance as to

9    whether you guys are going to be time consuming and

10   burdensome, because if you are I'm going to take a lunch

11   break now.

12           So I'm giving you fair warning that I have limited

13   patience at this moment for a long-winded argument, and if

14   you would like a more patient bench you'll come back after

15   lunch too.  But if this is going to be a 20-minute event

16   lest let's just go for it.  Up to you.

17           MR. TAMBE:  I expect it to be no more than 20

18   minutes, Your Honor.

19           THE COURT:  Fine.

20           MR. TAMBE:  Jay Tambe from Jones Day on behalf of

21   the debtor, and this is the adversary complaint that was

22   filed by Lehman against the Tschira entities.

23           I think Your Honor is familiar generally with the

24   relationship of the KTS entities as we refer to them.

25           THE COURT:  I am.

Page 93

1            MR. TAMBE:  And Lehman.

2            There are two matters I think that are really up

3    for today.  One is the briefing schedule on a motion to

4    dismiss that was filed by the defendants.  They filed that

5    motion on Monday -- this past Monday the 21st.  We have

6    agreed with them on a briefing schedule.  We will be

7    responding to that motion on the 4th of November, and I

8    believe they will be putting in their reply two weeks

9    thereafter on the 18th of November.

10           If Your Honor would like to schedule oral argument

11   I think we're generally available thereafter for oral

12   argument.

13           We're also perfectly happy with the motion being

14   disposed of on the papers.

15           We don't believe the motion really raises any

16   novel legal issues.  I think most of what's being addressed

17   in the motion is well-trod ground from the JPM decision.

18           This case involves a transfer of 100 million euros

19   on the 12th of September from LBHI to the Tschira entities.

20   I don't think there's any dispute that the money in fact did

21   move.  We outline in the complaint the circumstances under

22   which it moved, and we believe there was an actual

23   fraudulent intent to gratuitously transfer money to the KTS

24   entities, to have them hold that money just for a period of

25   one week to get over what they perceived at the time to be

Page 94

1   problems, credit worthiness issues with the Lehman entities.

2            We think we have pleaded all the requisite

3   elements of the various claims we make.  We make nine

4   separate claims.  They disagree with us on some of those

5   claims.  I think in the briefing we'll sort that out and we

6   can move forward.

7            The other issue other than the briefing on the

8   motion to dismiss is what happens to discovery in the

9   interim?

10            We have sought to meet and confer with them to

11   agree upon a schedule.  They -- their position is that no

12   discovery should take place until the motion to dismiss is

13   resolved.

14            Given the history and this Court's familiarity and

15   prior decisions we don't think there is a good basis for

16   this Court to exercise its discretion and stay all

17   discovery.

18            Whether some claims are dismissed or not it's

19   clear to us that there is in light of the JPM decision a

20   strong likelihood that in fact we have stated claims with

21   respect to actual fraudulent intent as well as the common

22   law claims.  Those claims are going to proceed.  The

23   discovery is common to all claims.  Discovery should

24   proceed.

25            We have proposed a discovery schedule.  Their

Page 95

1    position again is that it's premature to consider a

2    discovery schedule, and that's really the one point of

3    disagreement for today's purposes is whether discovery

4    should go forward while the motion to dismiss is pending.

5                    THE COURT:  Okay.

6                    MR. BRILLIANT:  Your Honor, Allan Brilliant on

7    behalf of the Tschira defendant entities from Dechert LLP.

8                    Your Honor, you know, counsel is right, we -- we

9    have agreed on a schedule with respect to the -- you know,

10   the briefing of the motion to dismiss, but we think that

11   it's a very strong motion to dismiss, that there's only nine

12   counts to it.  It's very different than the JPMorgan

13   complaint that Your Honor has dealt with previously.

14                    There are five counts that we believe will be

15   dismissed consistent with JPMorgan, you know, based upon the

16   safe harbor provisions of the Bankruptcy Code.

17                    That's going to leave, you know, the actual fraud

18   claim under 548, you know, (a)(1), which is not expressly

19   eliminated by that, and then there's three other common law

20   claims.  One is a claim for unjust enrichment, one is a

21   claim for constructive fraud, and one is a claim they're

22   alleging fraud on behalf of the Tschira entities in getting

23   the collateral.

24                    Your Honor, unlike the JPMorgan case they do not

25   claim that we're insiders or that we had any ability to

Page 96

1    control the business of the company or that there was any

2    justification, you know, that the Tschira entities had over

3    the operations of the business of the company.  In fact they

4    concede in their complaint, you know, that none of those

5    factors, you know, are here.  So this is very different than

6    the JPMorgan situation.

7            They're claiming that they transferred

8    $100 million as collateral, not a permanent, irrefutable,

9    irrevocable transaction, but just as collateral $100 million

10   in connection with a derivative transaction and that they

11   did it with actual intent to hinder, delay, or defraud.

12           But in their claimant they don't say who it was,

13   who intended to defraud the debtors, and they don't come

14   anywhere close to pleading the type of specificity that Your

15   Honor dealt with in the JPMorgan case.

16           So our sense is unlike the JPMorgan case Your

17   Honor is going to dismiss the actual fraud claim here.

18           As for the other three counts, Your Honor, there's

19   a very different scenario here as well than the JPMorgan

20   situation.

21           LBHI was the guarantor of the LBF, you know, the

22   Lehman Brother Finances obligations here, and the contract

23   was between LBF and the Tschira entities.  And the only

24   contract that existed here was the contract -- was a

25   guarantee from LBHI.

Page 97

1          Now LBHI provided, you know, the collateral, they

2    were the guarantor and the credit support, but if the money

3    were to come back under the contract it would go to LBF.

4    And in fact in the LBF proceedings the Swiss --

5          THE COURT:  Why do I feel that I'm hearing an

6    argument on the motion to dismiss?

7          MR. BRILLIANT:  Well because, Your Honor --

8          THE COURT:  Because I am aren't I?

9          MR. BRILLIANT:  No, you're not, Your Honor.  The

10   issue --

11         THE COURT:  Yes, I am, that's what I'm hearing.  I

12   don't want to hear it anymore.  That's what I'm telling you.

13   Stop it.

14         MR. BRILLIANT:  Okay.  Then let me -- all right.

15   So, Your Honor, here's where we are today.  I don't know how

16   familiar you are with the pleadings that have been filed.

17         THE COURT:  I'm reasonably familiar.

18         MR. BRILLIANT:  Okay.

19         THE COURT:  Familiar enough to be able to deny you

20   request to stay discovery.  So that request is denied.

21         MR. BRILLIANT:  Can I have a moment to go through

22   the law and, you know --

23         THE COURT:  No.

24         MR. BRILLIANT:  Okay.

25         THE COURT:  The request is denied.  I've given it

Page 98

1   full consideration.  It's -- particularly in light of my

2   knowledge of the case before you arrived and other issues

3   that relate to your client.

4             MR. BRILLIANT:  Can I have an opportunity, Your

5   Honor, to --

6             THE COURT:  You're just going to let me finish

7   what I'm saying before you seek an opportunity to respond to

8   what I'm saying.

9             MR. BRILLIANT:  Yes, Your Honor.

10             THE COURT:  Wouldn't you think that's fair?

11             MR. BRILLIANT:  Yes, Your Honor.

12             THE COURT:  That I speak, then you speak?

13             MR. BRILLIANT:  Yes, Your Honor.

14             THE COURT:  Okay.  So please don't interrupt me in

15   the future.

16             MR. BRILLIANT:  I will not, Your Honor.

17             THE COURT:  Thank you.

18             Particularly because of my familiarity with the

19   history of the relationship between your client and LBF and

20   your client and LBHI and positions that your client has

21   taken through other counsel as recently as a few months ago

22   I don't believe this is anywhere near as simple as you would

23   suggest or try to argue and this is going to be treated like

24   any other case.

25             You have a right to dismiss, you agree to a

Page 99

1    briefing schedule, such discovery as the parties wish to

2    take will be taken and will not be stayed, and there will be

3    oral argument.

4            MR. BRILLIANT:  I'm sorry, Your Honor, did --

5            THE COURT:  And there will be oral argument.

6            MR. BRILLIANT:  There will be oral argument.

7    Okay, thank you, Your Honor.

8            THE COURT:  Now you can say whatever you want to

9    say.

10           MR. BRILLIANT:  Yes.  Your Honor, I guess the --

11   you know, the first thing is, you know, the issue, you know,

12   is a discovery schedule if there's going to, you know, going

13   to be one.

14           THE COURT:  Work out the schedule.

15           MR. BRILLIANT:  Okay.

16           THE COURT:  Work out the schedule, I don't do that

17   for you.  It's like any other case.  If you're trying to

18   make this special and exit early it's not happening.

19   There's nothing special about your motion to dismiss.

20   Nothing whatsoever.  I reviewed it last night.

21           MR. BRILLIANT:  Thank you, Your Honor.

22           THE COURT:  Is there anything more?

23           MR. TAMBE:  No, Your Honor, I think we're done.

24   Thank you.

25           THE COURT:  Thank you.  We're adjourned until

Page 100

1    2 o'clock.

2         (Recess)

3              MR. MORAG:   Good afternoon, Your Honor.

4              Boaz Morag of Cleary Gottlieb Steen & Hamilton for

5    Barclays Capital, Inc.

6              We're here this afternoon for a hearing that we've

7    given FirstBank any number of opportunities to avoid having.

8    We're here on a motion for a determination that FirstBank is

9    in contempt of this Court's sale order injunction and has

10   been since December of 2009 when it filed this lawsuit, that

11   it continued to prosecute this lawsuit and continues to

12   prosecute this lawsuit to this day for suing Barclays to

13   recover purchased assets that Your Honor explicitly enjoined

14   in the sale order injunction.  Barclays is entitled to all

15   of the immunities and protections of that sale order, which

16   in this circumstance include compensation for the damages

17   Barclays has incurred in the form of attorney's fees to

18   defend this action.

19              If I may approach, I have just a short hand out

20   with some timelines on it.

21              THE COURT:   That's fine.

22              MR. MORAG:   The first page is simply a chronology

23   of events, but I think the Court is aware of the summary

24   judgment decision, virtually all of these events were

25   recounted there.  But what you have here is a situation

Page 101

1    where FirstBank had one actual notice of a sale order.

2    Indeed in the September, 2009, letter that FirstBank sent to

3    Barclays before filing suit, three months before filing

4    suit, they acknowledged studying the sale order, the assets

5    purchase agreement, the clarification letter, and understood

6    and assumed in that letter that the securities that had been

7    transferred to Barclays on September 18th, 2008, were in

8    connection with the very repo that was discussed in that

9    letter and deemed by the parties to be purchased assets.

10   And in that letter, they said they were attaching the list

11   of CUSIPs so that we could get back to them and confirm one

12   way or the other, but they never attached the list.

13          So we wrote back in September of 2009 and said,

14   you didn't give us the list, but what we can tell you is, if

15   you're right that we got these in the repo, they're

16   purchased assets for the following reasons, put them on

17   notice of the injunction and of the Uniform Commercial Code

18   defenses.

19          They never sent the list of CUSIPs.  They took

20   three months and filed suit in the District Court, and asked

21   at his deposition why they never sent the CUSIPs, the

22   general counsel of FirstBank acknowledged, because it

23   doesn't matter at that point because whether these

24   securities were listed on schedule A or not listed on

25   schedule A, they were going to file suit anyway because it's

Page 102

1    always been their position that these assets should not be

2    purchased assets even if the parties agreed that they were,

3    even if the documentation provided that they were.

4           On that point, the second element of the test, the

5    sale order was unambiguous with respect to the inclusion of

6    the disputed assets -- securities, as purchased assets.

7    Your Honor held that the 20 possessions were inescapably and

8    indisputably purchased assets and that the sale order

9    unambiguously protects Barclays from claims like these;

10   that's at page 414 and 17 of your decision.

11          And perhaps equally important, the third and

12   fourth prongs of this -- of the test for willful contempt,

13   FirstBank was admittedly able to comply with the sale order

14   and did not make any good faith effort to comply and

15   FirstBank did not seek to have the sale order modified in

16   any way as it could have done or pursued any of the

17   alternatives that it had to avoid contempt.

18          The whole point of the sale order, Your Honor, was

19   to provide a remedy for parties that claimed to be in

20   FirstBank's position of claiming an interest in securities

21   and other assets that were transferred to Barclays.  The

22   remedy was not to sue Barclays -- that's the one thing they

23   couldn't do -- but Your Honor specifically provided, is done

24   in 363 sales, for the remedy of a claim against the

25   proceeds.  That was there for the benefit of parties like

Page 103

1    FirstBank.  That was something they could have done and,

2    instead, in fact should have done, when for four years or

3    five years, they've been telling the world their position is

4    that these assets were never property of the estate.

5            If these assets were never property of the estate,

6    they should have brought a motion before you or an adversary

7    proceeding against the holder of the proceeds, LBI, the

8    trustee, and LBHI, claiming they received proceeds that

9    they're not entitled to because their collateral was never

10   part of the estate.  They never did that.  They never

11   brought an action against the LBI trustee for a declaration

12   of whether these were purchased assets.

13           There were any number of things that they could

14   have done.  They contact -- as Your Honor found in the

15   summary judgment, a decision.  It was undisputed that by

16   July, 2009, they had notice that Barclays had received these

17   securities, notice they had gotten from J.P. Morgan.  They

18   could have filed a rule 60 motion by the deadline of

19   September 20th, 2009 for that sort of relief.

20           They've been on notice and proceeding as if

21   this -- and accepting the risk that ultimately that someone

22   would disagree with their reading of these documents and

23   that someday came in May when you rendered your summary

24   judgment decision.

25           So, Your Honor, we think it's very clear and I

Page 104

1    don't really have much more to say on the issues before the

2    Court.  We think that from the outset of this suit, they've

3    been in contempt.  They took the one action that clearly

4    violates the sale order, which is suing Barclays and they've

5    had any number of opportunities to avoid this result.  We

6    are not claiming that because they sued in December, 2009,

7    as of -- after that they could do nothing to avoid this

8    sanction.

9            As Your Honor knows, others have sued and no one

10   else has been the object of a contempt motion.

11           THE COURT:  What is it that makes is case

12   different in what is the last clear chance, if that's the

13   right way to term it, that they had to avoid sanctions and

14   what did they do to fail to do that?

15           MR. MORAG:  In my view, the last clear chance was

16   on April 15, 2010 -- excuse me -- 2010, yes, when as Your

17   Honor noted in your summary judgment decision that they were

18   formally provided with a copy of schedule A that showed

19   their CUSIPs were on this list.  Before then, they had the

20   opportunity that Your Honor gave them through an order

21   entered by this Court on December 17, 2008, to get a copy of

22   schedule A and B to the clarification letter simply by

23   signing a confidentiality agreement.  They didn't do that.

24           When we pointed it out to them, they said they

25   were sending us a list of their specific CUSIPs and asking

Page 105

1    us to confirm whether we received them -- pointed out that

2    they hadn't sent us a list.  They didn't send us the list

3    when they realized that error.

4         So -- but if Your Honor wants to say a date, it's

5    April 15, 2010.  Everything that happened thereafter, and I

6    will address, in a minute, the significance and lack of

7    significance of the District Court's partial denial of the

8    motion to dismiss.  Everything that happened after that was

9    simply confirmatory of what was the ultimate outcome in the

10   summary judgment decision.

11        The summary judgment decision looked at the

12   documents and said these are, on their face, purchased

13   assets.  They are listed on the schedule.  The agreement

14   provides that the assets transferred to Barclays in that

15   repo are purchased assets.  Not only are they explicitly

16   defined as purchased assets, but they're explicitly defined

17   as not being excluded assets.

18        There was no possible way to read it any

19   differently.  They had their theories and it is indelibly

20   the case that litigants can act in subjective good faith

21   even if they disagree, but that is not a defense recognized

22   at all to a contempt motion such as this.  They were on

23   notice of the facts that they needed.

24        Now, with respect to the Judge Daniels' decision

25   in May of 2010 to deny, in part, the motion to dismiss, I

Page 106

1   would like to address that because I know that's a main

2   feature of their opposition and it's an important point.

3            Your Honor, I think you've already considered this

4   when you noted in footnote one to your opinion, Judge

5   Daniels had to assume the facts alleged in their complaint

6   was true.  Their complaint alleged categorically these --

7   our securities were not purchased assets.  They didn't

8   bother to list the CUSIPs in their complaint.  They didn't

9   incorporate any documents that would let him look into is

10  that.

11           He said precisely to us, as we've noted in our

12  papers, Mr. Morag, you're making a nice argument for summary

13  judgment, but we're here on a motion to dismiss.  So what he

14  decided was that based on that allegation, he could not

15  dismiss all claims.  That just means he had to follow

16  Rule 12(b)(6); was not permitted to consider extraneous

17  documents; was not permitted under the case law to make

18  factual findings; was never asked to make any factual

19  findings.

20           They posit that this denial of the motion to

21  dismiss was based on a finding that this agreement was

22  ambiguous.  There was some uncertainty that let them have

23  license to pursue this claim with some sort of dispensation

24  or immunity from anyone later saying they're in contempt.

25  They never asked for such an application.  They never made

Page 107

```
1    such an application.  They never presented that issue to the
2    judge.  They never acknowledged the injunction before Judge
3    Daniels.  They always thought, and they continue to think,
4    that they are right; that we're misreading the agreement;
5    Your Honor is respectfully misreading the agreement and that
6    if the District Court won't figure that out, maybe the
7    Second Circuit will.
8            But this is -- so they've never sought to comply
9    with this injunction.  They never asked Judge -- they never
10   to Judge Daniels, we're concerned about this argument that
11   the other side is raising; we think we're entitled to go
12   forward and we would like some clarity on that.  They've
13   construed this one-line order the way they would like to
14   construe it, but there's no legal or factual support for
15   that.
16           Now, with respect to -- and I reason I say there's
17   no legally, factually, again, nothing was raised beforehand.
18   We, in fact, in our motion to dismiss, reserved the right to
19   say that this was contemptuous and to seek contempt
20   sanctions later.  They've never doubted or denied that
21   they've been on notice from before we filed suit that this
22   was our position and that we were going to pursue contempt
23   sanctions.
24           And --
25           THE COURT:  Just one second.
```

Page 108

1          I don't mean to break into your argument, but

2    you've distinguished the FirstBank case from other unnamed

3    situations where third parties have either pursued claims

4    formally or informally against Barclays as purchaser of the

5    purchased assets and one case that I have in mind is

6    Evergreen Solar.  You, personally, were involved in that

7    case, as I recall.

8          MR. MORAG:  I was.

9          THE COURT:  And that case resulted in a judgment

10   in Barclays' favor, but it didn't include a request for

11   sanctions.

12         MR. MORAG:  That's true.

13         THE COURT:  Can you explain to me the distinction,

14   if there is one, between Barclays' decision to pursue

15   contempt sanctions against FirstBank and its decision not to

16   pursue comparable sanctions as to Evergreen Solar?

17         MR. MORAG:  It was simply, Your Honor, that

18   Evergreen Solar, we made a motion to dismiss.  It was

19   brought properly before Your Honor as an adversary

20   proceeding in this court.  We brought that before you and

21   Your Honor ultimately granted that motion after resolving

22   the Rule 60 issues and the challenges to the sale order.

23         The point there was that Evergreen Solar did sue

24   Barclays, but it was resolved in a way that did not incur

25   anywhere near the amount of expense that this case has

Page 109

1    incurred.  And the other point that we would make that this

2    is a cumulative issues.  We pointed out that the Evergreen

3    Solar decision to Mr. Mitchell and his client a couple of

4    days after it came down and said, look, the judge has

5    considered the same repo and has said that all of these

6    assets were intended to be purchased assets.  Your assets

7    are no different.  The response was, our assets are

8    different because Evergreen Solar was share lending

9    agreement and we're a repo -- we're a swaps collateral.

10   They've -- so we didn't make the business decision -- also

11   at that point in time, it was after a year after they made

12   the motion to -- that we made the motion to dismiss that

13   Your Honor was able to resolve it on the same day as the

14   Rule 60 and, frankly, at that time, very close to that time,

15   Evergreen Solar was filing Chapter 11 in Delaware.

16          It was simply not -- we're not out for retribution

17   here; it's a matter of considering the amount that it has

18   taken to get to this point.  We urged FirstBank when the

19   case was referred to you to tee up this issue.  We urged

20   them to avoid the expense of expert discovery and tee up the

21   issue before we embarked on that expense and they said no.

22   And, indeed, the first question you asked us when we got

23   here on the summary judgment hearing was, do I have even

24   consider these summary -- expert reports and we both said

25   no.

1        So we've given them any number of opportunities to

2    avoid this day and this result and -- but consistent with

3    their position, they -- this is the cost of taking their

4    position.  They've never tried to protect themselves from

5    the very finding that you made, that, yes, indeed, this is

6    purchased assets.  They've never felt the need to protect

7    themselves from the risk that they would have to pay

8    anyone's attorney's fees but their own and that is simply

9    not appropriate when every sign there was telling them that

10   they should be really concerned about this risk.

11        After Judge Daniels said at the motion to dismiss

12   hearing, the key question will be whether these were

13   intended to be purchased assets.  Well, by that point, they

14   knew that they were on the list of schedule A.  They then,

15   in the referral order said, I find -- when I now consider

16   things outside the pleading that these assets were

17   ostensibly transferred under the sale order and now you're

18   going to have to go to the Bankruptcy Court as a core

19   matter, because this arises in that sale order, to figure

20   out what rights, if any, that you have here.  That was a

21   clear sign that they were on ice, on thin ice, in the sense

22   of if they prevail, fine, of course there's no contempt

23   sanction; but if they don't, what argument is there that

24   they are not on notice, not going in with their eyes open

25   that they were at risk of being found to have done the act

Page 111

1    that was enjoined.

2              THE COURT:  Did you or did anybody on Barclays'

3    behalf ever indicate to counsel for Evergreen Solar that

4    there might be a risk of contempt sanctions if they pursued

5    the litigation?

6              MR. MORAG:  We may have, and I honestly can't

7    remember.  We may have in the briefing which noted that

8    these were enjoined claims.

9              But the point is -- another point that I would

10   make here is Your Honor found in summary judgment order that

11   because this is a single case, all of the decisions that

12   come before it are part of the law of the case, and so

13   Evergreen Solar is part of what informs the outcome of the

14   summary judgment decision in this case, just like the Rule

15   60 informed the summary judgment in this case.

16             The other difference is, Your Honor, in the -- the

17   other difference is that Evergreen Solar -- and this is

18   important, now that you remind me of focusing on that

19   case -- Evergreen Solar joined the Rule 60 motion of the

20   debtors and the trustee and the creditors committee and,

21   indeed, I was here on the first day of the evidentiary

22   hearing on that case where the lawyer for Evergreen Solar

23   stood up and said we're here to join it and that's all we

24   have to say, we're leaving it so everyone else.  But it was

25   a -- they had filed the paper, filed the joinder and that, a

Page 112

1    Rule 60 motion, timely made is one of the things that you

2    can do in the face of a sale order, if you have a good faith

3    argument that it needs modification for some reason.  That's

4    one of the things that we say they could have done and

5    should have done, and so that is another difference between

6    this situation and Evergreen Solar.

7            THE COURT:  This is one of those situations where

8    a big bank, Barclays is seeking to shift to a smaller bank,

9    FirstBank, the costs of litigation in derogation of the

10   injunction and the sale order.  What are we talking about in

11   terms of the shift of costs that would be imposed on

12   FirstBank in the event that I were to grant your motion?

13           MR. MORAG:  Your Honor, we have not -- we know the

14   totals and we know from the beginning, but we haven't done

15   it as of other various dates.  At the rates that have been

16   approved by this Court in this and other matters, it's cost

17   Barclays three million dollars to defend this case over four

18   years, and we're not necessarily seeking that.  We are --

19   the last thing we really want is litigation over the amount

20   of the fees.

21           Our hope was to be in a position like it was in

22   the Bank of America case, once Your Honor ruled of the

23   entitlement to the fees, as part and parcel of the summary

24   judgment ruling there, you, in effect found -- it's really

25   the same procedural posture.  You had a case that was filed;

Page 113

1   you had discovery; you had an evidentiary hearing there that

2   you didn't need to have here; you ruled simultaneously that

3   the arguments against the violation of the automatic stay

4   were not persuasive to you.

5           There was a violation of the automatic stay and

6   the consequence of that is that Bank of America had to pay,

7   as a matter of the automatic stay law, the estate's fees.

8   The parties were able to go off and negotiate that number

9   because that's what professional attorneys can sometimes do.

10  That's our hope here.  We're not looking to have a

11  litigation over the fees; it will be partly based on the --

12  we'll give them the data, they can tell us what they thought

13  was unreasonable and we can hopefully come to an agreed

14  number so they can appeal the merits, the summary judgment

15  decision they want to appeal -- they presumably would appeal

16  this contempt -- but hopefully not an issue over the amount

17  of the fees.

18          THE COURT:  Okay.  Just to review the procedural

19  posture, for a moment, particularly as it relates to the

20  contempt motion that we're dealing with now, my

21  understanding is that whatever the outcome today may be will

22  be made part of an appeal to Judge Buchwald --

23          MR. MORAG:  Yes.

24          THE COURT:  -- of the summary judgment decision

25  and, in effect, will be part of a consolidated appeal; is

Page 114

1    that correct?

2             MR. MORAG:  Yes.

3             THE COURT:  Now, assuming for the sake of

4    argument, that I were to agree with you on the sanctions,

5    but I'm not assessing damages respect to the sanctions

6    because I'm hoping that reasonable people can meet and

7    confer and perhaps reach an understanding as to what that

8    award might be if we could reduce it to dollars, is that

9    something that the parties are prepared to do under that

10   hypothetical or would I be giving Judge Buchwald, should you

11   be unable to agree, the added burden of having to deal with

12   the amount of the contempt award?

13            MR. MORAG:  Certainly, Barclays would be willing

14   to have that meet and confer and try to agree an amount to

15   date or to whatever point in time.  Our position is that

16   these attorney's fees are continuing and whether they

17   continue through the District Court level, through the

18   Second Circuit, that's someone else's issue, but the point

19   is that in terms of what's been incurred to date, we would

20   hope to achieve an agreement on a number that would be part

21   of a judgment that Your Honor would enter that would be then

22   final for purposes of appeal and then she would simply deal

23   with the merits of the issues.

24            And if we couldn't do that, I don't know that we

25   would be -- I don't know that we would be saddling her; they

1    might come back to you.

2            THE COURT:  Let me tell you what I'd like to

3    consider procedurally, and I don't want to jump too far

4    ahead of where we are now, but assuming for the sake of this

5    discussion that I were to agree with you that you're

6    entitled to sanctions, contempt sanctions in this instance,

7    I will either assess that or the parties will agree and, in

8    effect, stipulate to that, so the matter that goes up on

9    appeal is complete.

10            MR. MORAG:  Right.

11            THE COURT:  It seems to me that it becomes

12    procedurally awkward for that to be a loose end that the

13    District Court might then have to address.

14            MR. MORAG:  We agree completely, Your Honor.

15            And again, one of the things that we said in our

16    motion, and they didn't object in terms of the procedure is

17    you tell us the date as of when the attorney's fees start

18    and we go try to work it out.  That's what we were hoping

19    to -- that's why we teed up for today the issue of the

20    entitlement and the date.

21            THE COURT:  Now, let me express another concern

22    that occurs to me as we're having this conversation.  This

23    is an award that by your own characterization of it has the

24    potential of growing over time because your approximate

25    three-million dollar claim for attorney's fees associated

Page 116

1   with defending this litigation arguably may grow by a factor

2   of 50 percent or more -- I'm just being completely

3   hypothetical in saying that -- so that instead a

4   three-million-dollar award, maybe over time, depending on

5   outcome, it might be four and a half or five million

6   dollars, particularly if it ends up going to the Circuit.

7           And here's the policy concern that I have, which

8   I'm going to address, in effect, by granting you your

9   contempt sanctions in the Bankruptcy Court with the

10  understanding that they may grow, that becomes something of

11  a weapon in your hands because it provides a strong

12  disincentive for FirstBank to pursue its subjective good

13  faith belief that it has a meritorious, even though you

14  don't think they have a meritorious case, and I don't think

15  they have a meritorious case, because my ruling makes that

16  clear.

17          As a matter of jurisprudence in this district, do

18  you think it is inappropriate policy outcome for there to be

19  this kind of strong disincentive that applies to FirstBank

20  under these circumstances?  That's a soft ball.

21          MR. MORAG:  I do believe there should be the

22  incentive to comply with the injunction, and they've, again,

23  done nothing in these papers to suggest any respect for this

24  injunction.  If they want to -- Your Honor doesn't have to

25  make findings, with respect to things that haven't happened

Page 117

1    yet in terms of arguments before the District Court, let

2    alone the Circuit Court.  It could be up to those courts to

3    decide, whether A, they affirm, and B, whether on-going

4    contempt for the period of time that the case was before

5    them is appropriate.

6              So I think it's really an issue for others,

7    potentially, to make.  We are in the situation where we know

8    that they want to continue.  Remember, one of our last clear

9    chance letters was right before the summary judgment, which

10   said you now have all the discovery.  There's nothing more

11   you could need.  We will agree to every party bears its own

12   costs if you dismiss this case with prejudice and they said

13   no.

14             So they've had the opportunity to cut the -- to

15   stop the meter running at any number of points and I think

16   you should decide as to what's been before you, let Judge

17   Buchwald decide as to fees incurred in the District Court,

18   and if they go to the Second Circuit, the Second Circuit is

19   well-able to decide that issue and direct the District Court

20   to do one thing or the other.

21             THE COURT:  Now, I'm not paying close attention to

22   Barclays' profits and losses, but I'm assuming that Barclays

23   is doing just fine, or at least doing well enough.  Barclays

24   doesn't need the three million dollars.  I'm sure it would

25   be happy to have the three million dollars, but in some

Page 118

1    respects, as an institution, it is not necessarily the most

2    sympathetic party to request this kind of sanction.

3           My interpretation of your motion is that you are

4    seeking to police in an orderly and disciplined way, the

5    protections afforded to you under the sale order that was

6    entered five years ago, and that in some respects, this is

7    not just about FirstBank, but about laying down a marker to

8    point out that the sale order is important to your client

9    and needs to be strictly construed and enforced.

10          Do I understand that correctly?

11          MR. MORAG:  Absolutely, Your Honor.

12          That is the motivation.  We are not -- we have yet

13   time before the running of statutes and limitations.  There

14   are hundreds, if not thousands, of creditors out there who

15   could make an argument like FirstBank if they chose to do so

16   and would be encouraged, perhaps, to do so if there is no

17   consequence to them, other than what they want to spend on a

18   lawyer to bring the claim.

19          And I think that in this circumstance we have

20   simply, just as was the position with respect to the Rule 60

21   and the importance of finality here, this was a situation

22   where, again, it would be one thing -- it would be one thing

23   if this action were brought in the middle -- towards the end

24   of September, 2008, when you had the fog of Lehman week.

25   But this is not the fog of the month or the year of Lehman.

Page 119

1  This was a suit brought 15 months afterwards that they could

2  have -- that they had another two years to drop at any point

3  in time without any consequence to them once they saw the

4  evidence, once they saw that it was all confirmatory.

5       And I think in that circumstance there does need

6  to be some sort of statement by the Court that precisely as

7  said in the summary judgment decision, the injunction is a

8  critical element to a 363 sale.  It will affect Barclays'

9  ability or interest in bidding for assets out of the next

10 bankruptcy if we know that there's going to be a potential

11 for millions of dollars of litigation over something that

12 really is supposed to be not pursued against the buyer at

13 all because -- specifically because there are these remedies

14 against Lehman.  There was nothing wrong with an action

15 against the estate for the proceeds.  If their theories were

16 right, that would have given them 100 cents on the dollar.

17 It didn't give them the right to sue Barclays and do that,

18 as they claim their customer claim is, which is, of course,

19 a totally different animal requiring them to make a totally

20 different showing.

21      But the point is that they had a remedy and

22 they're only here because they were so stubborn in terms of

23 not pursuing the claim against the -- not filing a proof of

24 claim against their contractual counterparty for the return

25 of contractual collateral.  Not filing a proof of claim

Page 120

1    against LBHI for not being the guarantor of their

2    counterparty and contractual collateral.

3         This will all -- they need to hear and the rest of

4    the community needs to hear that this is not how sale orders

5    should be treated because it risks too much undermining of

6    their finality and their protections for the buyer and the

7    creditors of the estate that's selling and that's precisely

8    what's at state here.  Because, again, not one penny in this

9    litigation did we spend because we wanted to.  At every time

10   we tried to avoid any additional costs -- you don't need

11   those depositions; are you sure this is all for your

12   account; are you sure that you want to take those additional

13   depositions.  We've spent only what we've been forced to by

14   this action; this is not a profit-making enterprise.  And so

15   in those circumstances, we think it entirely appropriate.

16        And we've been, obviously, as I've said, we've had

17   reasons why not to pursue in Evergreen Solar and we

18   hopefully will never have this issue again.  But that

19   doesn't change where we are.  It doesn't change the options

20   that they had open to them.  This isn't some sort of gotcha.

21   This has been going on for four or five years with their

22   eyes wide open, and their refusal to consider the

23   possibility that they've actually wrong on the law and the

24   facts.  That's the only explanation for this.

25        And lastly, I just want to leave you with one

Page 121

1   point that comes from the Second Circuit's decision that

2   we've cited to you, the Weber case, it's the May 2013,

3   Second Circuit decision on the automatic stay, which they

4   don't contest that the law in the automatic stay for a

5   willful violation is similar to the standard for a contempt

6   of a sale order injunction or a discharge injunction.  And

7   that case is important because in that case what you had on

8   the subjective good faith point is even better than perhaps

9   FirstBank's position and it ties into this argument that

10  they relied on Judge Daniels never mentioning the word

11  contempt.

12         But in there, what you had is a secured creditor,

13  as you know, who was following Northern District of New York

14  precedent, an 11-year-old precedent that said that if you

15  are in possession of a debtor's automobile, you don't have

16  to return it after the filing until there's a turnover

17  order.  That, in fact, was the Alberto case that Judge

18  Heard, at the time, reversed a finding of violation of the

19  automatic stay and this creditor did the exact same thing

20  that they had been doing in the Northern District for 12

21  years and it goes up to the Second Circuit and the Second

22  Circuit says SEFCU, that's the secured creditor, asserts

23  that even if its actions violated section 362, it's

24  violation was not quote, "willful," closed quote, within the

25  meaning of 362(k) and, therefore, the Court may not require

Page 122

1     it to pay Weber's damages, costs or attorney's fees or to

2     impose any sanction.

3                 SEFCU asserts primarily that because it relied in

4     good faith on the Alberto decision and the rule and custom

5     of the Northern District of New York, any violation that it

6     committed should not be deemed willful under section

7     362(k) and the Second Circuit explicitly rejected that

8     argument.

9                 Litigants to get to rely on courts unless they

10    specifically ask the Court the question and gotten an

11    answer, and this is exactly what they're trying to do with

12    Judge Daniels' partial denial of the motion to dismiss.  It

13    is inappropriate and it just has no support, certainly not

14    after the SEFCU decision in the Second Circuit.

15                I'll reserve my time to respond.

16                THE COURT:  Fine, thank you.

17                MR. MITCHELL:  Good afternoon, Your Honor.

18                THE COURT:  Good afternoon.

19                MR. MITCHELL:  Jeffrey Mitchell, from Dickstein

20    Shapiro.

21                I want to start by making something clear to the

22    Court from the outset.  We respect the judicial process.  We

23    lost the summary judgment motion.  We understand what the

24    Court's decision is and we understand why we lost, based on

25    the Court's decision.  That was obviously always a risk of

Page 123

1    any litigation, Plaintiff and Defendant, there's always a

2    risk of losing a case.  That does mean the case is not

3    brought in good faith.  It does not mean that the arguments

4    made by counsel are not made in good faith, and it doesn't

5    mean that the claims asserted by a party are not claims that

6    are not asserted in good faith.

7            What we have here is something completely

8    different:  This is a contempt motion.  And it's not for

9    violation of the automatic stay; it's for the violation of a

10   court order, the sale order, and the standards that apply to

11   contempt are what apply here, the standards of good faith,

12   the standards of assertions of claims in good faith and the

13   record of this case.

14           But first, what Barclays looks to hold FirstBank

15   in contempt for is pursuit of the claims made by FirstBank

16   in this case through discovery and judgment.  Precisely the

17   same claims the District Court said, when it denied

18   Barclays' motion to dismiss, that FirstBank had a right to

19   pursue in this case, not like the Weber case where there's

20   precedent; it's in this case.

21           Now, this is an unusual case, I think, in

22   connection with the Lehman bankruptcy to the following

23   extent.  Your Honor, this case came to you from the District

24   Court on referral, so it has embedded in it a pre-existing

25   decision of the District Court, with respect to the claims.

Page 124

1    Most significant is that Barclays did claim before Judge

2    Daniels and did provided copies to Judge Daniels, of the

3    sale order, schedule A, and the clarification letter and

4    argued to Judge Daniels in point one of its brief to dismiss

5    that this case was enjoined, and it used the word enjoined.

6             The District Court found otherwise.  Now,

7    obviously, if the District Court had believed, based upon

8    review of the documents that the case was clearly enjoined,

9    it never would have allowed the case to proceed; it would

10   have dismissed.  Now, the issue after denial of the motions

11   to dismiss is whether the sale order applied to the

12   FirstBank collateral and that issue is presented to this

13   case following the motion to dismiss as a question of fact

14   and law briefed fully to the Court, and we have a decision

15   on a summary judgment motion of May, 2013.

16            So the open issue that left the District Court in

17   an order on the record in this case has now been resolved by

18   the Court's summary judgment decision.  There were four

19   court appearances in this case.  Throughout the entire -- I

20   heard this morning you were talking about cases in which a

21   lot of people, you know, cases are under the radar or over

22   the radar.  This was one of those cases, I would say the

23   Court probably knew nothing about until we filed our motions

24   for summary judgment, notwithstanding that we did have one

25   appearance here.  We had two appearances in the District

Page 125

1    Court; one on the motion to dismiss and one on the referral

2    motion, and two appearance in this court, one in November,

3    2010, and the other in January, 2013.

4           The summary judgment is decided in May, 2013, and

5    I would suggest to the Court that if that is the operative

6    date on which there is now a definitive rule to which the

7    District Court said FirstBank was entitled as to what this

8    Court's interpretation is of the sale order, the

9    clarification letter, the schedule A, as it applies

10   specifically to FirstBank's collateral.  This issue, as it

11   related specifically to FirstBank's collateral, had never

12   been previously addressed in this court.

13          Now, Barclays looks to distinguish the District

14   Court decision by saying it was not on the merits, but it is

15   on the merits to the following extent.  Judge Daniels didn't

16   rule against Barclays based solely on the allegations in the

17   complaint.  He had before him the sale order, the asset

18   purchase agreement, the clarification letter, and schedule

19   A.  It is clear from the transcript that he relied on those

20   transcripts as well, and did not believe that facially, it

21   was clear that it was intended that FirstBank's securities

22   were purchased assets.

23          And on reply in that case, Barclays had provided

24   schedule A and argued to the Court that the assets were

25   listed on schedule A.  So his decision is more than simply

Page 126

1     taking the allegations of the client as true, he found that

2     pursuit of FirstBank's claims to judgment was not barred

3     expressly by the language of the sale order and that there

4     needed to be a determination on the facts as to whether

5     FirstBank's securities in particular were purchased assets.

6     This was not a 60(b) case in FirstBank's estimation was

7     FirstBank was not looking to subvert the sale order;

8     FirstBank was looking for a determination whether or not the

9     sale order applied because if these were not purchased

10    assets, then the sale order did not apply to them; that was

11    the own issue for the case.

12            So I ask the Court, how then, in the face of a

13    decision in this case that pursuit of this case is

14    authorized, can that pursuit ultimately result in a contempt

15    citation against the party whose claim was not dismissed?

16    The claims that survived dismissal were precisely the claims

17    that this Court ruled upon.

18            No different, Your Honor, than presumably -- the

19    case comes in a strange posture only because the motion to

20    dismiss was decided by the District Court by consent of the

21    parties before referral, but it would be akin to this Court

22    if Your Honor had issued the ruling saying that the case can

23    proceed and then later holding a party in contempt for

24    proceeding with a claim that you did not dismiss because

25    it's part of the docket of this case, in the scheme of the

Page 127

1    case.

2              THE COURT:  Let's think about that for a second

3    because that's an interesting -- it's an interesting

4    structural anomaly.  We have Judge Daniels in the District

5    Court, in effect, giving you what you would call a green

6    light to proceed with litigation.  You proceed with the

7    litigation, but you do so knowing that Barclays' legal

8    position is that you are skirting a contempt motion, in

9    fact, you are going to be held accountable for pursuing that

10   litigation because it is their legal position -- and they

11   tell you that -- that the sale order applies to these assets

12   as purchased assets.  It enjoins the action that you're

13   pursuing and that notwithstanding the fact that the motion

14   to dismiss was not granted in full, that you're proceeding

15   at your own risk.

16              Is it your position that the decision made by the

17   District Court in ruling on Barclays' motion to dismiss

18   immunizes you from the present contempt claim?

19              MR. MITCHELL:  Yes, Your Honor.

20              And if it was to change, it would have changed

21   here, and let me explain to you what I mean.  We have a

22   motion to dismiss directed specifically at these assets and

23   the claim that these assets were not purchased under the

24   operative documents, pursuant to which Barclays claims

25   protection.  The District Court possessed of those

Page 128

1    documents, reviews them, understands the claims of the

2    parties -- I have the transcript here, we presented it as an

3    exhibit from Judge Daniels.  It's clear that he looked at

4    the face of those documents and said we need to have a

5    determination whether or not they were purchased assets,

6    notwithstanding the fact that they were on schedule A and

7    notwithstanding the fact that there's a claim that the sale

8    order covers it.

9           And keep in mind that the sale order itself does

10   not say that the FirstBank securities are purchased assets.

11   Even the asset purchase agreement doesn't say that the

12   FirstBank's securities are purchased assets; that's only in

13   the clarification letter which is the one document, because

14   it came up with the Court issued its 60(b) decision -- when

15   this Court issued the 60(b) decision, Your Honor even

16   commented on it, that Your Honor was unaware of many things

17   that were in that clarification letter.

18          So this case really is, through the sale order

19   down to the clarification letter, a question of

20   interpretation of how that was supposed to work in the

21   clarification letter.  And the District Court said, looking

22   at the face of those documents, that we need a determination

23   on that.  This Court has now made that determination in May

24   of this year, solidifying the issue of this Court's view of

25   how the sale order worked, vis-a-vis, the FirstBank's

Page 129

1    securities.  That is what we were entitled to in this case,

2    pursuant to the decision of the District Court, and can't be

3    held in contempt for that as a matter of law.

4            There is no case, no case that we found we

5    reported anywhere in the United States, where a party

6    survived the motion to dismiss and was later held in

7    contempt of any order of a court for pursuing the case that

8    was not dismissed, and there are many orders at issue.

9    There are injunctions in other circuits -- this is

10   effectively an injunction -- and there injunction cases all

11   over and there are cases which question the scope of an

12   injunction, the extent to which an injunction enjoins

13   certain conduct, and there are cases where that dispute is

14   resolved by a Court clarifying what it is that is enjoined

15   and that suit itself, surviving motions to dismiss, cannot

16   result in sanctions because you're authorized to get that

17   decision.

18           As this case progresses facts are developed.  We

19   believe facts were developed that this Court was unaware of.

20   We did not know what Your Honor's view would be of those

21   facts when they were presented to you and we obviously know

22   what Your Honor's view of those facts are in light of your

23   decision, but we believe that once the District Court issued

24   its decision saying the case could proceed, that at that

25   point forward, until there is some either change in the

Page 130

1   order or a final decision of this court clarifying what it

2   is or how it applied to the FirstBank collateral, we can't

3   be held in contempt for getting that decision.

4           Now, I go a step further, interestingly in the

5   procedural posture which is curious in this case, perhaps,

6   in a way, because at the same time that Barclays filed its

7   motion to dismiss, it also sent a letter to Judge Daniels

8   asking that the case be referred to the Bankruptcy Court.

9   And the way it worked out is that we got to Judge Daniels

10  first on the motion to dismiss before the referral decision

11  and Mr. Morag at the outset -- if you look at the

12  transcript -- at the outset of that argument on the summary

13  judgment motion, Mr. Morag is asked by Judge Daniels about

14  the referral request and Mr. Morag says, clearly you have

15  jurisdiction, Your Honor, and we have no problem with you

16  deciding the motion to dismiss.

17          Upon the conclusion of the argument and the

18  decision by Judge Daniels, Mr. Morag then says, of course,

19  the Bankruptcy Court will then be bound by your decision and

20  it's a plain statement by Mr. Morag, so we know now that the

21  case becomes governed by, at the consent of Barclays, the

22  decision of Judge Daniels.

23          The first act happens or the first event that

24  happens when we come back, we then have the referral motion.

25  The matter is now referred to this court and we come to this

Page 131

1    court for a scheduling conference, so that's in November,

2    2010.  Now, the posture again is -- this is -- this is where

3    I think the fatal law in the logic of the argument of

4    contempt in this circumstance, we now are in front of the

5    Court that Barclays not only belonged in, but the judge who

6    signed the sale order, and we come for a conference to set a

7    scheduling order.  Nowhere in that conference does Barclays

8    raise the issue of contempt -- if you take their argument,

9    Mr. Morag said we were in contempt the moment we filed the

10   lawsuit in December, 2009.

11          So now we're in front of the Court in November of

12   2010 and it's now out of Judge Daniels' court.  The motion

13   to dismiss has been denied, but the judge who signed the

14   sale order is now, you know, running a conference at the

15   beginning of the case.  Does Mr. Morag say that FirstBank is

16   standing before Your Honor in contempt of this Court and in

17   contempt of the sale order?  Does Mr. Morag ask for a ruling

18   from this Court -- you know they're proceeding in this case

19   in complete violation of Your Honor's order?

20          Not a word.  We agreed with discovery schedule.

21   Your Honor inquired of the parties -- and the transcript of

22   that, we've provided a copy of that transcript -- you

23   inquired of the parties whether ADR, mediation, something

24   might be beneficial.  Both parties responded to Your Honor

25   that it was premature, and at the conclusion, Mr. Morag also

Page 132

1    said that he believed that he needed discovery as well for

2    purpose of the case plainly in the transcript.  We then

3    don't appear before Your Honor, again, until we argue the

4    summary judgment motion in January, 2013.

5            Now, if something changed -- let's take the

6    Evergreen Solar decision -- obviously -- I've been

7    practicing law for 30 years, so I've had many adversaries

8    and many adversaries have made many threats against me over

9    many years on a variety of cases; your case has no merit;

10   your case is no good.  There are ways to deal with that.  In

11   fact, the threatening letters that Mr. Morag always

12   threatened that he was going to take prompt action on

13   whatever it was that he was threatening and then he never

14   took any action.  He just sent the letters -- it said

15   clearly in the letters that I'm going to take prompt action

16   and they don't do anything.

17           So let's take the Evergreen Solar decision, let's

18   assume for the moment -- and I said that the posture of the

19   case is different because Evergreen Solar is a case to

20   dismiss.  They did put in a footnote that they reserved the

21   right to seek sanctions in their brief in the Evergreen

22   Solar case, but did not pursue them.  But the Evergreen

23   Solar case is a motion to dismiss on the same -- counsel

24   said it's the same day, I don't recall the same day -- but

25   clearly around the same time as Your Honor's 60(b) decision,

Page 133

1    which we found things in Your Honor's 60(b) decision that we

2    thought were beneficial to our case and I can explain that.

3            But nonetheless -- and that was the nature of our

4    conversation with each other.  In Your Honor's 60(b)

5    decision, you reference collateral, and there's an

6    assumption in your decision towards the end that if

7    collateral transferred to Barclays, presumably it

8    transferred along with the obligation, and we read that to

9    apply, or at least we thought that that certainly gave us

10   hope in connection with our case with you in establishing

11   the facts of this case that you might rule similarly in our

12   case because ours was also collateral.

13           I'm not quibbling with the Court's decision on the

14   summary judgment motion, I'm simply saying is what our

15   thought process was and why it is not bad faith.  But let's

16   assume for the moment that Barclays really believed that the

17   Evergreen Solar decision changed everything.  There is a way

18   to bring that before Your Honor, which is to renew the

19   motion to dismiss based on new law.  Upon renewal, the Court

20   could consider or reconsider the motion to dismiss, in which

21   event this Court could have acted upon, changed or made a

22   different ruling than Judge Daniels.

23           But Barclays was satisfied to leave Judge Daniels'

24   as the only operative decision governing the future progress

25   of this case.  They never brought that to Your Honor.  They

Page 134

1    never at any time raised the issue of contempt with Your

2    Honor and this is another interesting fact, and what I find

3    about Barclays' motion for contempt is it's a creative

4    attempt, in my opinion, to get around the fact that you

5    don't get costs and attorney's fees ordinarily in a

6    litigation, its use of contempt as a vehicle to do it.

7             But think about the notion of injunctions.  An

8    injunction enjoins a party from doing something.  All

9    injunctions do, sale order injunctions, any kind of

10   injunction.  Barclays claims to be a party entitled to the

11   absolute, unfettered clear right to an injunction based upon

12   the sale order and argues that signs 2009, that FirstBank

13   has been in violation of that injunction.  Not only that,

14   we're in front of the very judge who signed the order that

15   contains the injunction.

16            I have never seen a case in my years where

17   somebody's arguably in violation of an injunction and the

18   case is pending before the judge who signed the injunction,

19   where for three and a half years the party never says a word

20   to the judge.  Your Honor, we have the benefit of an

21   injunction here, please enforce it.  Enjoined -- they're not

22   allowed to pursue the case.

23            And they would say, well, they were proceeding at

24   their own risk.  Think about what they're saying -- about

25   what they're not saying is Barclays voluntarily, for no good

Page 135

1   reason, took the risk of loss in this case rather than go to

2   Your Honor and say, Your Honor, there is an injunction that

3   enjoins prosecution of this case.  Because there's always a

4   risk that can lose, why would you ever subject yourself to

5   the possibility of losing a dispute if the claims or the

6   case in which that dispute is brought, why would you ever

7   take that risk if it doesn't have to be brought at all and

8   it's completely enjoined.  That makes no sense.

9          THE COURT:  Are you suggesting by that argument

10   that Barclays, in effect, induced you into believing that

11   there was no material risk associated with on-going

12   prosecution of the litigation?

13          MR. MITCHELL:  No, I'm suggesting that Barclays

14   knew what the import of what Judge Daniels' order was.

15   Barclays knew and understood that the case was not enjoined,

16   and what Barclays was doing was simply saving its motion for

17   contempt if it won.

18          THE COURT:  Let me parse what you just said a

19   little bit finer.  You're saying that it was the decision of

20   Judge Daniels, with respect to the motion to dismiss, that

21   when read together with the sale order, in effect, suspends

22   the injunction of the sale order?  I'm trying to understand

23   what you're saying.

24          MR. MITCHELL:  What the Court is saying is that

25   it's a question of fact whether or not the sale order

Page 136

1    applies to your assets and that question of fact is a

2    question of fact that is to be resolved in this case.

3    Because based upon the -- he's not saying that -- he's not

4    making any decision with respect to what the sale order

5    says, he's simply saying that with respect to these

6    particular assets, based upon the plain language of the

7    documents, I cannot tell from the face of these documents

8    whether or not they are purchased assets.

9            And he heard the arguments of both sides, the

10   allegations of the complaint -- or the allegations that we

11   pursued to judgment on both sides, including the answer, and

12   that was what -- so, the case is to determine whether the

13   scope of the sale order is broad enough to encompass or

14   whether the -- whether -- let me say it differently.

15           The way he used an example, if you read his

16   transcript, his question was, what did you purchase, and he

17   used the question of dolls and balls.  And he said let's say

18   I bought a box of -- and I don't remember if he used dolls

19   or balls -- but the example was I bought a box of dolls from

20   you and there was a ball in the box, do I own the ball?  And

21   then -- or -- so he viewed the question as one whether in

22   reading the documents, did you buy everything in the box or

23   did you simply buy a box of dolls?

24           And the issue was, in looking at that, what does

25   purchased assets mean; that was the critical component.  And

Page 137

1   does the FirstBank -- excuse me -- does FirstBank

2   collateral, does that qualify as a purchased asset?  That

3   was -- and if you look at the transcript, he goes through

4   that example of the balls and the dolls.  He had another

5   one, if I sold you a car and there was something in the

6   trunk, and I only told you the car -- and that's how he was

7   viewing what this case was.

8          And the determination of this Court on the summary

9   judgment motion is that it was intended, that it was -- I

10  can't use the box of dolls and balls analogy necessarily,

11  because you didn't use that, but essentially whatever it was

12  that Barclays bought included these assets and this Court's

13  determination was based principally on the fact that they

14  were used in the repo, and that's how -- you know, it's not

15  as if the Court said we don't -- I don't see where, you

16  know, ISDAs were excluded or all the other things.  We fall

17  down to the, it was used in the repo and that's the reason.

18         That was an issue that was an issue in the motion

19  to dismiss, which was, was it an asset of the estate; was it

20  something that was included in the asset sale?  And the

21  Judge -- Judge Daniels said that we were entitled to

22  discovery and a ruling on the merits.

23         So I would say to Your Honor, what we have now is

24  subsequent to May of 2013 with Your Honor's definitive

25  ruling under the sale order and the operative documents

Page 138

1    incorporated by reference, that we now have this Court's

2    interpretation, absent reversal, absent change.  Anything we

3    would do in derogation of that order clearly would be

4    contempt because we now have Your Honor's specific ruling

5    with respect to our collateral.

6            But until that ruling is made, and nothing's

7    stopped Barclays from seeking that ruling at any time, but

8    until that ruling is made, we don't have the decision to

9    which Judge Daniels said we were entitled.  So, the sale

10   order is modified to a degree, no in its enforcement as

11   against the world, but in connection with this litigation to

12   give us the ability and authority to proceed with your

13   claims to judgment.

14           It's not a violation of the stay case; it's a

15   lawsuit.  We didn't engage in self-help, so it's not one of

16   those things -- the case, the Weber case, which is different

17   in many respects, one, it's a violation of the automatic

18   stay, A; B, it's an individual, as opposed to a company, and

19   the standard for contempt for violation of the automatic

20   stay, with respect to an individual is lower.  Good faith

21   does not come into play and that's a significant distinction

22   of the Weber case.

23           There are -- there is no close -- there is no case

24   that Barclays has cited that in the case itself, in any

25   case, where in the case itself the motion to dismiss is

Page 139

1    denied by the Court, the case proceeds, and pursuit of that

2    particular case is then contempt.  There no case.  There no

3    case in the United States that's ever said such a thing.

4    The closest they have is in Weber.  They relied on precedent

5    somewhere else; that's completely distinguishable.

6             Now, if you look at the -- Barclays case is

7    really -- they contend that because they won the summary

8    judgment motion, ipso facto, FirstBank was in contempt from

9    the moment it first brought the case and, therefore,

10   Barclays is entitled to retroactive application of your

11   summary judgment decision back to the beginning of the case;

12   that's really their argument and I don't think they deny

13   that.

14            Even if you look at their timeline -- even in the

15   timeline they handed to Your Honor, there's no mention of

16   the timeline of Judge Daniels' denial of the motion to

17   dismiss; it's not in their timeline, which I think is an

18   interesting omission.  It's not there.  But they do have the

19   referral order.  They just ignore the -- as if that doesn't

20   mean anything.

21            I don't see how a motion to dismiss or the denial

22   of a motion to dismiss by a federal district judge in the

23   face of these documents can have no meaning and a party

24   could be in contempt subsequent to that for proceeding with

25   a case that is not dismissed.

Page 140

1          Now, I think if you look at this, the linchpin of

2   Barclays' position is that the motion to dismiss did not

3   resolve the issue of whether or not FirstBank could

4   ultimately be held in contempt later down the road for

5   proceeding with its claims.  And it's simply argued, is

6   because FirstBank didn't ask for such a ruling, none should

7   be implied.  I don't believe that's true.  As I said before,

8   FirstBank -- Barclays did not move just on the pleadings.

9          I'm going to read to you from Judge Daniels', you

10  know, the transcript, page 97, starting at line 17.

11         He says quote, "I think the protections of the UCC

12  may apply in this case, but I believe that it is a factual

13  determination that I cannot resolve on the pleadings alone

14  or on the pleadings and the documents that are incorporated

15  by reference, including schedule A, and an interpretation of

16  this stage of the proceeding of whether schedule A clearly

17  excludes or defines or includes this property as assets

18  purchased and approved included in the approval granted by

19  the Bankruptcy Court and defined as purchased as part of the

20  purchased assets."

21         So it's clear from the transcript that Judge

22  Daniels considered far more than the allegations of the

23  complaint.  He was reading the operative documents and he

24  couldn't tell, facially, himself whether it was enjoined,

25  and he did not at that point rule.  Obviously, no district

Page 141

1    judge is going to allow enjoined claims to proceed.

2            I would say, Your Honor, the motion to dismiss and

3    the argument on the motion to dismiss that the claimed were

4    enjoined was precisely the motion that Barclays made; that

5    was point one in their brief, and that shouldn't be missed

6    because there's no way that Judge Daniels could have missed

7    it, and no federal district judge is going to allow enjoined

8    claims to go forward.

9            So the denial of the motion to dismiss has to be a

10   finding that FirstBank was entitled to proceed with its case

11   to a decision on the merits, what else could it be?  Whether

12   its securities were purchased assets under the APA and

13   clarification letter, documents that were extrinsic to the

14   sale order.  That was the ultimate issue to be decided in

15   this case which Your Honor has now decided.

16           I mentioned before, but it's important to expand a

17   little bit, Barclays voluntarily submitted its motion to

18   dismiss to the District Court.  It could have done it the

19   other way.  Judge Daniels gave Barclays the option to tee up

20   whichever motion first.  He would have considered the

21   referral motion before the decision -- before he decided the

22   motion to dismiss, but Barclays told the District Court it

23   was fine for the District Court to hear the motion to

24   dismiss.  And he said, Mr. Morag said there's no question

25   that he jurisdiction to decide it.  So we now have an order

Page 142

1   that comes down to this court that guides the case from that

2   point forward.

3            THE COURT:  Let me ask you a question, it's a

4   question in two parts.  Sometimes Courts, myself included,

5   deny motions to dismiss because you just don't know.  You

6   have subjective uncertainty as to whether or not the claims

7   are good claims or bad claims, and so more often than not,

8   the benefit of the doubt goes to the Plaintiff, because to

9   grant the motion to dismiss knocks the Plaintiff out of

10  court.

11           If the motion to dismiss is based upon that kind

12  of standard, it's really not a green light, it's an amber

13  light.  That's question one, I'd like you to comment on

14  that.

15           And question two relates to what happens next in

16  this proceeding, do you acknowledge that as of May 10, 2013,

17  all further litigation activity of FirstBank is subject to

18  on-going sanctions regardless of what happens prior to that

19  date?

20           MR. MITCHELL:  Okay.  Let me first deal with the

21  amber light.  You do not violate the law for passing an

22  amber light; you proceed with caution.  We did outline in

23  our brief to the Court the facts that we adduced during

24  discovery that led us to believe in good faith that we had a

25  claim, based on facts Your Honor, we thought had been

Page 143

1    previously unaware of, based upon the record that we

2    observed in this bankruptcy proceeding, that you could rule

3    in our favor.

4              I understand completely having stood before you on

5    the oral argument, and I also recall the oral argument.  I

6    understand Your Honor's view on that, but I was not -- my

7    only appearance before Your Honor prior to that argument was

8    at a very uncontentious preliminary conference in November

9    of 2010, where even Your Honor suggested potentially ADR or

10   mediation.  So there was no indication, and Your Honor

11   said -- even at the conference, Your Honor said that, you

12   know, you don't have great familiarity with the case, but

13   you understood the claims.  There was nothing in at least

14   that appearance, the only other appearance that we had prior

15   to the summary judgment argument, to lead us to believe that

16   our case would receive the decision that it did.  I

17   understand why it did, but I'm not -- I understand that.

18             So it's not that we're on notice that the Court is

19   saying that we're proceeding with an amber light.  There's

20   no light at all.  Even counsel was saying in the transcript

21   we all need discovery, so that's certainly not amber.  We

22   believe --

23             THE COURT:  Let's change the metaphor slightly.

24             MR. MITCHELL:  Okay.

25             THE COURT:  Assume it's an uncontrolled

Page 144

1    intersection.  There are no stop signs.  There are no

2    traffic lights, but it's an intersection and you're

3    approaching it, and Barclays is there as a crossing guard

4    and saying to you that if you enter this intersection, we're

5    holding you responsible for contempt because we're putting

6    you on notice that now you're on-going progress will, in

7    fact, be in contempt of the sale order and we're a purchaser

8    of assets in the biggest bankruptcy in history and we are

9    entitled to be protected by that order, so you're proceeding

10   at your own risk.  That's essentially what happened here.

11          MR. MITCHELL:  I would temper that a bit.  I think

12   they made that argument to -- I believe they made that

13   argument to Judge Daniels, and I believe that Judge Daniels,

14   when presented with that argument, said otherwise.  So I

15   believe that what happens is -- see, I don't believe that

16   that's an uncontrolled intersection.  I would quibble with

17   the Court that once we had a District Court order, prior to

18   referral, that that's an uncontrolled intersection.  At some

19   level of control, somebody's looked at the case and made a

20   determination, and that determination was that the case can

21   proceed.

22          In order to turn that into an amber light or a red

23   light, it shouldn't be the ordinary colloquy between counsel

24   that exists in every case where lawyers represent clients

25   and advocate their clients' positions to each other.  Maybe

Page 145

1    make threats -- there are a series of rules that apply to

2    that.

3            If the claim is that the case is no longer viable

4    because something changed to make Judge Daniels' decision no

5    longer controlling, then that's something that needs to come

6    to this court, be brought to the attention of this Court,

7    and this Court could then issue a warning to FirstBank that

8    you now proceed at your peril from this point forward.

9            But lawyers threatening each other with, you

10   proceed at your peril, I'm going to act promptly if you

11   don't withdraw your claim, and then they don't file

12   anything -- if you read the letter, it says we're going to

13   act promptly -- and they don't do anything, we certainly

14   expected Barclays to do something and to bring it before

15   Your Honor and we would have been before Your Honor to

16   discuss it.  They did nothing.

17           So I don't think anything happened to change what

18   I would say is a controlled intersection giving us the

19   authority to proceed.  Barclays took no steps to stop that

20   control that had been turned I would say green -- I don't

21   even think it's amber, it's green -- I don't think that a

22   lawyer writing a letter to another lawyer has the authority

23   to say what a judge said or didn't say -- only judges can

24   say what judges say and only judges can interpret their own

25   orders, and that didn't happen here.

Page 146

1          So I think -- and there were certainly procedures

2     to do that.  I can think of two very easily -- and certainly

3     the easiest one certainly would be a motion to renew the

4     motion to dismiss.  That's certainly easy.  That's certainly

5     teeing up the issue of whether or not we're proceeding at

6     our peril by conference or otherwise.  It could have been:

7     It wasn't.

8          THE COURT:  Let me ask you a slight variation of

9     the same hypothetical.  Let's assume for the sake of

10    discussion that you believe subjectively that Judge Daniels'

11    decision, with respect to the motion to dismiss, constitutes

12    permission for you to proceed, but let's also assume,

13    because I believe this is true, that you are provided with a

14    copy of schedule A that highlights the 20 positions in

15    question and that when read in conjunction with the

16    clarification letter, leads a reasonably prudent lawyer to

17    conclude that there is a risk of contempt sanctions in

18    proceeding with the litigation recognizing that claim by

19    Barclays.

20         Does the fact that counsel has the ability to draw

21    its own legal conclusion, that there is an appreciable risk

22    of contempt sanctions for a willful violation of the sale

23    order change anything?

24         MR. MITCHELL:  I have to -- I'm not sure -- I have

25    to clarify a fact here because prior to the argument before

Page 147

1    Judge Daniels, schedule A was provided to both FirstBank and

2    Judge Daniels and we -- and the content of schedule A was

3    part of the motion to dismiss hearing.  So in your

4    hypothetical, Your Honor, I'm not clear exactly why counsel

5    would believe that Judge Daniels didn't consider that issue

6    in finding that the case is not enjoined from proceeding

7    know that the securities were listed on schedule A.  I'm not

8    following the Court's logic.

9              THE COURT:  Maybe I didn't make it clear.

10             I'm drawing a distinction between treating the

11   decision on the motion to dismiss as permission and couple's

12   independent obligation to determine whether or not it's safe

13   to proceed.

14             MR. MITCHELL:  Unless I'm missing something, I

15   believe that's a separate -- there's separate rules on that,

16   which I think what Your Honor is saying is, does there reach

17   a point where there's no longer a good faith belief in your

18   claim?  Is that the thrust of whatever is saying?

19             THE COURT:  No, I think you may have a good faith

20   belief in your claim and you may believe that it's worth

21   pursuing the claim and you may believe it's consistent with

22   zealous advocacy, but you also believe there's an

23   appreciable risk that you're going to be attacked with

24   sanctions because there's a risk that you're going to be

25   found to be violating the sale order.

Page 148

1           And we're particularly concerned here because

2    we're talking about a bankruptcy sale order that's entitled

3    to a great deal of cross-border respect.  We're talking

4    about the largest sale in the history of bankruptcy, and if

5    purchasers can't be secure in their purchase decision, those

6    orders aren't very good.

7           MR. MITCHELL:  I understand.

8           Your Honor, I would say to you that we took

9    comfort in the decision of Judge Daniels on the motion to

10   dismiss and proceeded based upon that decision and we

11   understood and interpreted that decision to authorize us, by

12   court order, to proceed with this case to a determination on

13   the merits unless something changed and nothing changed that

14   order.  It didn't subvert the sale order.  It didn't

15   challenge the authority of the Bankruptcy Court to issue the

16   sale order.

17          It simply said, were our assets included.  We had

18   paper and documents and communications that led us to

19   believe that I was sent to Barclays by mistake.  So that is

20   what the case was.  We were simply trying to get our

21   property back because we thought that it was sent in error.

22   And it certainly came out in documents when we looked at the

23   examiner's report.  I even got it from depositions that

24   there were assets that transferred by mistake that were sent

25   back.  So it's not that some assets -- everything that

Page 149

1    Barclays received they didn't keep.  There's deposition

2    testimony that there was a period of time when they were

3    inventorying what they had and sending things back and

4    keeping other things and that's how that proceeded.

5            So with respect to the clarity of the position, I

6    would say to the Court, you know, we're a stranger to the

7    operative documents and obviously the case proceeded in that

8    very quickly and there were other things at play here

9    besides protecting or necessarily considering all of the

10   permutations of the -- of what was being transferred because

11   speed was important.

12           But here we are now, it's five years later, the

13   principles to that document, Barclays and Lehman are still

14   litigating with each other over what the -- what the

15   clarification letter means.  It's still in the Second

16   Circuit.  So here are the parties that should know

17   exactly -- because what is happening here is in the context

18   of this contempt proceeding, it's almost as if the standard

19   to which FirstBank is being held, with the benefit of a

20   District Court order saying that the case can proceed, is

21   higher than the parties what actually negotiated that

22   document themselves and they're still litigating over what

23   it means, and that's up in the Second Circuit.

24           So if the parties who sat around the table and

25   negotiated with each other still can't decide five years

Page 150

1    later what all the terms mean, I think that there is not,

2    what I would call, the level of finality sufficient to say

3    that our claim to determine, you know, our claim against

4    Barclays' with respect to what we had, that that claim as to

5    whether it was actually a purchase asset, is something that

6    rises to the level of contempt.

7            On the record of this case -- because keep in mind

8    this is about the record of this case -- it's before the

9    Bankruptcy Court, but it's between two parties that are not

10   in Bankruptcy Court.  It's Barclays seeking the protection

11   of a court order; it's the sale order, but it is a court

12   order, that has been the subject of so much litigation and

13   dispute over the last five years even between the principals

14   of that document, that for FirstBank to have a definitive

15   ruling from a Court, yes, your property was taken, a

16   significant amount of our property -- Barclays -- maybe not

17   for Barclays, but for FirstBank -- a significant amount of

18   your property did disappear in the vacuum of what happened

19   during that week.

20           FirstBank has shareholders.  It reports to its

21   shareholders.  A definitive ruling that it was appropriately

22   taken and that it does, in fact, belong to the party that is

23   in possession of it is not an unreasonable thing to get in

24   light of these circumstances.  This Court had never

25   considered, prior to our case, FirstBank's assets

Page 151

1   specifically.  It's not as if -- in the ordinary case you'd

2   have, what, 60, 90 days, you'd have a considerable amount of

3   time before you'd issue a sale order.  You know, a lot of

4   people would have the opportunity to come in and be heard.

5   It's not a situation where FirstBank appeared before the

6   Court and the Court made the decision.

7           Another one -- the other issue is the cases they

8   cite which is those cases -- they've got a divorce case,

9   I've forgot the names of some of these cases, but they cited

10  a divorce case -- so the parties have being fighting with

11  each other in court for a long period of time and then the

12  wife went off and sued for something in another state.  And

13  the Court said, well, you've been in front of me before and

14  I've made rulings before and you understand my rulings

15  because you stood in the well of my court and heard those

16  rulings.

17          That's not this case.  This case, that never

18  happened.  So the only ruling that exists specifically, with

19  respect to whether or not the FirstBank's securities are

20  purchased assets, is Your Honor's decision to make.

21          Now, the second part of your question, Your Honor,

22  was, do I -- what's my position with respect to from May

23  forward on appeal.  I don't think it's any different than

24  any other case.  Within the confines of the case, we have

25  rights of appeal.  I think you're Mr. Morag isn't it a

Page 152

1     disincentive for me to make a ruling for them to pursue an

2     appeal.

3              I think in the B of A case, by the way, and we

4     cited it in a footnote of our papers, Your Honor declined

5     because there was an appeal to consider the sanctions

6     motion.  You felt it was premature.  You recognized that B

7     of A -- and that's a violation of the automatic stay case --

8     again, not akin to this.  So it's a much different -- it's a

9     self-help case.  This is not a self-help case.

10             And I think very important for the Court to

11    remember that it's not a self-help case.  There is a

12    District Court decision that precedes this case being

13    referred, but Your Honor said in that case, Mr. Morag said

14    things that were outside of the record.  I have no idea what

15    happened after that.  It's not in the record in this

16    proceeding.

17             But what Your Honor said and what did happen in

18    that case is Your Honor declined to consider the sanctions

19    motion because Your Honor said that B of A has a right to

20    appeal and it very well -- things may change on appeal.

21    Even if the Court -- even if the District Court affirms the

22    decision, there are things that could come out of an

23    affirmance of a decision that might influence this Court on

24    a sanctions motion.

25             THE COURT:  Well, just for clarity of this record,

Page 153

1    my best recollection of what happened there is that the

2    parties met and conferred, avoided the need for a further

3    hearing with regard for determining the sanctions.  Reached

4    an agreement as to what the sanctions would be.  The appeal

5    was taken to the District Court and while it was pending,

6    and I believe even before briefing, the matter was settled.

7              MR. MITCHELL:  Okay.  Your Honor, the record

8    available to us shows that Your Honor declined.  Your Honor

9    thought it was --

10             THE COURT:  It's part of the oral history of the

11   case.

12             MR. MITCHELL:  Okay.  I think it's -- you know, I

13   think what's important, because we're talking about

14   contempt, you know, we're not talking about contempt where

15   it's automatic; it's contempt where is there -- was there a

16   good faith basis for a party to do what it was the party was

17   doing, that is alleged to be the act of contempt.

18             And I do not believe that it's possible to find a

19   party in contempt for proceeding with a claim in the face of

20   denial of a motion to dismiss.  There is no authority

21   anywhere that that could ever be contempt, whether it's in

22   Bankruptcy Court, District Court, Circuit Court, anywhere,

23   there's no authority for that and they do not cite any

24   authority.  And I'm sure, that Barclays with its three

25   million dollars in legal fees and the amount of lawyers that

Page 154

1    they put on their cases, if that case existed, they would

2    have it, and it's not cited anywhere in the briefs.

3            Your Honor observed during oral argument -- I

4    thought -- and I'm not trying to hold Your Honor to the

5    statement, but I know, Your Honor, we had a long oral

6    argument.  I thought at oral argument that you at least

7    accepted the notion that there was a good faith dispute

8    between the parties about how the facts -- and there was a

9    series of stipulated facts.  Your Honor didn't have to make

10   findings of fact because through the discovery process,

11   counsel, to streamline the case for you, were able to

12   stipulate to most of the operative facts.

13           THE COURT:  Right.

14           MR. MITCHELL:  That's not -- that doesn't mean

15   that those facts were all known prior to discovery; it just

16   simply means that we all heard the same thing and we agreed

17   on what the facts were that were adduced during discovery.

18           Your decision and what you said at oral argument,

19   I believe that's what Your Honor did with that decision, was

20   to take the documents, the undisputed facts that the parties

21   agreed to, and apply them to the circumstances of this case.

22   And you believed, I thought, that we were at least arguing

23   our position, vis-a-vis, the documents and the evidence to

24   you in good faith.

25           Your Honor said at page 89 of the record, quote,

Page 155

1    "There isn't much that in life that's really clear."  So

2    especially when parties have been involved in good faith

3    litigation where the facts were largely stipulated, but the

4    legal conclusions were diametrically opposite, it's not

5    helpful for me to say that something is clear when the

6    reality is that there's a good faith dispute as to what the

7    right answer is.  I completely agree with that statement of

8    Your Honor.

9           THE COURT:  Sounds like something I was saying to

10   chastise you for arguing something was absolutely clear.

11   But it may be that it came up at a different point in the

12   transcript.

13          MR. MITCHELL:  Yeah, I'm just -- all I'm

14   suggesting to Your Honor is --

15          THE COURT:  I think I remember that I did chastise

16   you at one point for trying to argue that something was

17   crystal clear, and I believe that's when I started going off

18   and said, well, there's very little in life that's really

19   that clear.

20          MR. MITCHELL:  But even just taking that, I agree

21   with Your Honor --

22          THE COURT:  I had no idea that that would be

23   quoted back to me.

24          MR. MITCHELL:  I'm not looking to -- Your Honor,

25   I'm simply stating -- look, I had -- I would say to you

Page 156

1    until this litigation or this motion was brought on, I had

2    no issue with the professionalism, with the decorum and with

3    the manner in which Mr. Morag presented his case.  We

4    disagreed with each other on what the application of the

5    facts should be to the operative documents.  We had a

6    District Court order that said we were entitled to a

7    decision on the merits to determine whether we had purchased

8    assets under the operative documents.

9         The contempt motion, in reading the briefing,

10   especially the reply brief is so over the top.  It takes

11   bits and pieces, here and there, strings it together in what

12   I think is intended to be the most egregious

13   misrepresentation of the litigation that ensued in this

14   case, that on a professional level, I was personally

15   offended.  That was not the nature of my relationship with

16   Mr. Morag until that motion was filed.

17        Yes, he said you're wrong.  Yes, he said we're

18   going to sue you for sanctions.  I said, fine, please bring

19   it to Judge Peck.  We had conversations about it.  Please

20   bring it to the Court.  I'm happy to have you bring it to

21   the Court, but if you don't bring it to the Court, we have

22   the decision of Judge Daniels.

23        I really fundamentally believe that this is simply

24   a creative attempt to retroactively apply your summary

25   judgment decision in order to make it fit into what looks

Page 157

1    like contempt, when in fact, on this record in this

2    particular case it can't be contempt because there's no

3    legal support for issuing an order of contempt for

4    proceeding with a case that's not dismissed.  The only way

5    it could be contempt is if Judge Daniels had dismissed the

6    case because it was enjoined by the sale order and then we

7    had taken action in derogation of that order after that

8    motion to dismiss was granted and that was not by way of

9    appeal.

10              I think you have an absolute right as a litigant

11   in this country to pursue a case without fear and risk of

12   having to pay the other side's costs and attorney's fees

13   unless there's a contractual provision or a statutory

14   authority to do so.  And I think the use of contempt in this

15   circumstance, the retroactive application of a summary

16   judgment decision resolving the open issue in a case that's

17   allowed to proceed by denial of the motion to dismiss is

18   just a very, very creative attempt to recover costs and

19   attorney's fees.  It's not to make a grand statement to

20   anyone.

21              This case is limited to the facts of this

22   particular case.  It's a claim between two non-bankrupt

23   parties over whether or not those assets were sold.

24              THE COURT:  I think I've heard enough about your

25   argument, but I'm going to ask you a question, so that means

Page 158

1    I'm going to hear a little bit more.  You said that this is

2    the retroactive application of the Court's decision of May

3    10, but if we disregard the date of that decision, what I

4    think Barclays is really saying is that they put you and

5    your client on notice early in this process that the on-

6    going pursuit of claims in this litigation in derogation of

7    the sale order would result in a motion for contempt

8    sanctions.

9           So the issue here is not just this Court's

10   decision on a motion for summary judgment, but rather

11   everything that led up to that which included notice to you

12   not to proceed.  So, in effect, we're living today not just

13   with what happened in May, but everything that's on

14   Barclays' timeline that was handed to me, in effect, all

15   these signals given to FirstBank to say, don't tread on me,

16   we're Barclays.

17           MR. MITCHELL:  Was that a question -- may I

18   respond?

19           The only way I can respond to Your Honor is that

20   on a fully briefed and hotly disputed motion to dismiss, a

21   District Court spoke and Mr. Morag thought Judge Daniels'

22   decision was wrong.  He always expressed to me that he

23   thought it was wrong, and he disagreed with it.  Anytime or

24   everything he said thereafter was in the context of his

25   belief that Judge Daniels' decision was not a controlling

Page 159

1   decision in this case and my response to him consistently

2   was, there is a decision in the District Court that allows

3   that case to proceed and you made those arguments,

4   specifically point one -- I think I have it here -- point

5   one in their reply brief, "All securities transferred to

6   Barclays were purchased assets and thus covered by the sale

7   order which precludes this lawsuit."  That was point one in

8   their reply brief.

9          After -- and along with that, they provided

10  schedule A.  Along with that, they argued the operative

11  documents and they argued all of that.  So that particular

12  argument is resolved by Judge Daniels.  Not on the merits to

13  the extent of the summary judgment, but the merits that

14  apply as -- what I'll call loosely law of the case in this

15  particular case -- that we have, not an amber light, but a

16  green light to proceed with the case unless something

17  changes.  Mr. Morag's opinion about the correctness or lack

18  of correctness of Judge Daniels' decision or his belief in

19  his preference to have the case ultimately decided in this

20  court because he felt, perhaps, that Your Honor might agree

21  with him down the road, that doesn't change something that

22  happened in this case by ruling of the Court where that

23  issue was resolved.

24          So I would say, Your Honor, that putting somebody

25  on notice that you disagree with a standing decision of a

Page 160

1    district judge that guides the parties' conduct in that

2    litigation is not meaningful.  You need to do something

3    else, and I come back to this because I think it's

4    important, Your Honor, they succeeded immediately after this

5    decision in having this case referred to Your Honor.  I

6    think it's important just to -- this is from the record, you

7    know, we come to the pre-trial conference on November 17,

8    2010, right.  Mr. Morag disagrees with the decision.  We

9    know that.  Promptly has the case referred to Your Honor, so

10   let's take their argument at face value.

11           I stood before Your Honor on November 10th --

12   November 17th, 2010, in contempt of court or my client stood

13   in front of you in contempt of court.  Not only contempt of

14   the sale order, but clearly and willfully because that's

15   necessary for a contempt citation, clearly and willfully in

16   contempt of the sale order and I stand before the very judge

17   who signed the sale order.  Now, normally, obviously, denial

18   of a motion to dismiss is not appealable and this was, and

19   we're talking about among the most respected counsel in the

20   world, Cleary, this was a very creative opportunity if

21   Barclays chose to take it to effectively appeal Judge

22   Daniels' decision to Your Honor or appeal to your own view

23   of the sale order, yet at the conference, Barclays'

24   Mr. Morag says nothing to you about standing before Your

25   Honor in violation or in contempt of court.  All we had was

Page 161

1   pro forma scheduling discussions after that.  Never came to

2   Your Honor.

3           This is what happened -- this is what -- this is

4   the statement -- this is the colloquy in the record --

5           THE COURT:  I'm going to cut this off right now

6   because I actually remember this conference that you refer

7   to and if Mr. Morag or anybody else sitting in that chair

8   was standing up where you're standing during the midst of

9   adversary proceeding pre-trial said, Judge, I just want you

10  to know something:  We think that Judge Daniels made a

11  terrible mistake, that this litigation shouldn't proceed,

12  and that we want you, preemptively, to cut off everything in

13  this case right now because we want to renew our motion to

14  dismiss before you, I would think that somebody had lost

15  their senses.  That's simply not permissible conduct, but

16  for the fact that you may have left to go to lunch, I had a

17  similar sort of experience this morning just before the

18  lunch break with respect to a pre-trial in which I cut off

19  discussion fairly abruptly.

20          So I hear what you're saying.  This is a unique

21  set of facts and I think that I understand your position,

22  but I also don't think that the Barclays' position is that

23  Judge Daniels is a problem.  Their position is that

24  FirstBank is the problem.

25          MR. MITCHELL:  I understand.

Page 162

1           I agree with you, I think that is their position,

2   but I think what the Court has to address is that there is

3   in no case and no cited authority to this Court, any

4   authority to hold a party in contempt for proceeding with a

5   case that's not dismissed on a motion to dismiss.  There is

6   just no authority.

7           And I think that one thing Your Honor can take

8   judicial notice of because Barclays has appeared before Your

9   Honor many times:  They're very well prepared; they research

10  extremely thoroughly and they leave no stone unturned.  If

11  such a case existed, directly on point, I presume it would

12  have been presented to this Court.

13          THE COURT:  I'm sure you're right.

14          MR. MITCHELL:  Thank you.

15          THE COURT:  You I'm reminded of the old saying,

16  beware of any adversary who compliments you.

17          MR. MORAG:  Your Honor, very briefly.

18          With respect to the reasons why we didn't renew

19  the motion, it's precisely as Your Honor said.  When we

20  wrote to FirstBank and said now that there's the Evergreen

21  Solar case, let's go back to Judge Peck, this will be more

22  efficient.  If you're right; you're right, but if you're

23  wrong, we'll all know now.  The argument was this is law of

24  the case.  There is no legal basis for Judge Peck to rule on

25  the exact same record that was before Judge Daniels.

Page 163

1            And it is an interesting Article 3 question about

2    what the relationship between Your Honor and the District

3    Court that we did not think it was appropriate to burden you

4    with the additional decision of having to decide whether you

5    could decide that at this point.  Every other case that we

6    had seen involved the determination at the end of the matter

7    who was right and who was wrong, and if the Plaintiff was

8    wrong and, in fact, violated an injunction or an automatic

9    stay or discharge injunction, that's when they found out

10   whether they got sanctioned or not.  The only point was to

11   put FirstBank on notice that it was at risk.  We had done

12   that; that's undisputed.

13            There's one case that I think comes closest, if

14   you will to this issue that Mr. Mitchell keeps saying there

15   is no case.  Obviously there was no case for lots of things

16   Your Honor heard today; this is one of the things that there

17   is no case directly on point.

18            THE COURT:  I specialize in cases for which there

19   are no cases.

20            MR. MORAG:  Right.

21            But we do have to think about first principles and

22   what a motion to dismiss is.  I don't know that we're going

23   to be able to convince you, but you certainly shouldn't be

24   convinced by Mr. Mitchell.  You have the transcript of the

25   oral argument on the motion to dismiss.  You have the

Page 164

1    briefs.  You also have, and I'll just refer you to it, it's

2    Exhibit 78 to my affidavit, page 12 where the judge

3    specifically said, "I can't consider some of these documents

4    on a motion to dismiss."  That doesn't mean that have you

5    license to go forward and there are no consequences to you

6    if you turn out to be wrong.

7           All we're saying is that Judge Daniels did not

8    give any dispensation, any get-out-of-contempt-free card.

9    What he said was I can't resolve this on this record, just

10   like Your Honor couldn't resolve in Bank of America whether

11   the party had a right to engage in a setoff before you heard

12   all of the evidence.  But at the same time, you heard the

13   evidence, you didn't say, okay, so if Bank of America from

14   here on out continues to adhere to its position, then there

15   will be sanctions.  It's always looking backward.

16          Every single case that we cited in our papers

17   involves a determination made at the end.  The Plaintiff is

18   wrong or in violation of an injunction and it is

19   sanctionable, it is contemptuous.  You don't go -- you don't

20   look from May 10, 2013, forward.  You look from whatever

21   date is appropriate for Your Honor to decide that they

22   willfully acted.

23          What is this business about they didn't engage in

24   self-help and that's what the distinguishing feature of the

25   automatic stay case is.  They didn't brief any of that, but

Page 165

1    the point is, what is filing a lawsuit?  Who did that?  They

2    did.  That is the one -- that is the thing that is enjoined

3    in this injunction.  That is self-help in the sense that

4    they, in the face of an injunction, took the very act that

5    is enjoined, not to file an action against the estate for

6    the proceeds or even a declaratory judgment action.  Is this

7    purchased asset -- is this security a purchased asset

8    because we do not want to violate the injunction.  They

9    didn't do that and that's what we are saying are the

10   opportunities that they had.

11         I'm -- simply on the standard, this good faith, we

12   heard that many times from Mr. Mitchell.  That is not part

13   of the willful contempt standard.  We cited to you on page

14   16 of our opening brief numerous cases from intellectual

15   property area that are nothing to do with automatic stay;

16   it's simply not an element.  It's -- what you need is a

17   clear order, proof of noncompliance, and the contemnor has

18   not diligently attempted to comply in a reasonable manner.

19         The willful cases from the automatic stay area and

20   the discharge injunction are opposite.  They are all related

21   to the rights that protect parties in bankruptcy and there

22   really is no ability to distinguish.

23         And let me just close with the closest thing that

24   I think we have in terms of ability to rely on the judge in

25   the very case.  Okay.  First of all, there is no principle

Page 166

1    that until they decide that they are satisfied that you have

2    given them a ruling, that they are -- only then and

3    thereafter can they be said to be in contempt.

4         This is the Weitzman case, Weitzman v Stein,

5    98 F.3d 717.  This was a case in which you had a district

6    judge -- the same case -- the district judge deciding this

7    conduct before me is not contemptuous.  The Second Circuit

8    reverses.  On remand, the judge is asked to impose

9    attorney's fees for that appeal that they had to take, that

10   the Plaintiff had to take to reverse the district judge.

11        The district judge says, you know what, that is

12   not on the Defendant, that appeal, that was on me.  In fact,

13   the statement is the direct judge reasoned that the fees and

14   costs from appellant's first appeal were attributable to

15   Defendant's attorney's -- excuse me -- were not attributable

16   to Defendant attorney's wrongful conduct because the appeal

17   was caused by, quote, "This Court's shortsighted view of the

18   law in the circuit, not the Defendant's actions."  The

19   Second Circuit reversed on that point.

20        Anything -- it's the Defendant's problem.  It's

21   FirstBank -- it's exactly what you said, it's FirstBank that

22   caused the situation, not Judge Daniels, and whether he got

23   it wrong or got it right, the point is that he did not give

24   the license that they are saying, and it's not fair to put

25   on Judge Daniels this responsibility and just as this judge

Page 167

1    in the Weitzman case thought it wasn't fair to put on the

2    Defendant the responsibility for his own error, the Second

3    Circuit says that's not the way the system works.  We will

4    not -- you do not have the discretion to do that.  That was

5    an abuse of discretion for the judge to deny those fees

6    because he's the one that made the mistake and necessitated

7    the appeal.

8            THE COURT:  Let's assume something just for the

9    sake of discussion.  Assume that this was an adversary

10   proceeding that was originally commenced in the Bankruptcy

11   Court and was assigned to me because there was a

12   determination made much like the determination made by

13   counsel in Evergreen Solar, that the case belonged in the

14   Bankruptcy Court to begin with.  And there's a motion to

15   dismiss, brought by Barclays and I scratch my head and say

16   on a motion to dismiss standard, I'm just not sure and you

17   proceed to complete discovery and then move for summary

18   judgment and then on May 13th I decide in your favor.

19           In that circumstance, instead of having Judge

20   Daniels at the District Court level considering documents

21   without the benefit of having been present during the time

22   of the sale hearing, hypothetically, I'm considering the

23   clarification letter and I'm saying, you know, for purposes

24   of a motion to dismiss, I'm just not sure, but I become sure

25   later.

Page 168

1              Is everything sanctionable?

2              MR. MORAG:  Your Honor, I would say -- I would say

3      two things.  First of all, in Evergreen Solar, we did not

4      have that situation, because if you recall, the first thing

5      that Evergreen Solar did was brought on a preliminary

6      injunction motion to stop --

7              THE COURT:  I remember it.

8              MR. MORAG:  Right.  And in the course of that, you

9      appropriately considered evidence that was submitted by

10     witnesses and affidavits, which largely was the evidence

11     that then becomes -- was part of the motion to dismiss

12     record.  Not because they had it all attached to their

13     complaint, but because it was part of the case already.

14             THE COURT:  Just as an aside, because we know the

15     company ended up in bankruptcy, it was, as I recall, a

16     remarkably pathetic example of the collateral damage caused

17     by the Lehman bankruptcy filing because we had a company

18     that was incapable, so it claimed, of financing itself

19     because of the pledge arrangements made for its own shares.

20     I remember it very well.

21             But I also had no difficulty, despite the sympathy

22     that I had for their position, in finding in your favor.

23             MR. MORAG:  Right.  Now, I do think that the Bank

24     of America litigation is relevant here to our position on

25     this particular issue.  What happened there is finally, Bank

Page 169

1  of America filed it's adversary complaint to get an

2  adjudication that they were entitled to do the setoff that

3  they had already done.

4         Now, what does the debtor do?  Okay, the debtor

5  doesn't say, move to dismiss that complaint.  Of course you

6  couldn't do what you did and here are all the reasons why.

7  They file an answer that says deny, deny, deny, we have

8  affirmative defenses.  They go through the discovery phase.

9  They thought they were done when they did all their

10  discovery cross-motions for summary judgment.  You decided

11  that you wanted to hear a witness or two, they came in for

12  that and you had the full record.

13         Could you possibly argue -- what is the

14  distinction between the LBHI's position in that case and

15  this situation?  LBHI acquiesced in discovery in letting

16  this go through their normal process until you were in a

17  position to make a decision.  We were faced with Judge

18  Daniels' decision.  We thought it was simply on the basis

19  of, as Your Honor said, of having to assume the correctness

20  of the facts.  This notion that he would never have let an

21  enjoined case go forward, well, you know, within a few

22  months, as they note, he issued his referral order.  And in

23  the referral order he said something different from what he

24  said in the motion to dismiss hearing.

25         What he said in the referral order was that when

Page 170

1    he was able to consider all the documents, including the

2    clarification letter and schedule A, he observed that the

3    oral argument, as we quoted in our papers, that sitting here

4    today, I have no doubt that Judge Peck thinks that these

5    were purchased assets, that's why I need to send this to

6    him, quote, "Because the sale order did ostensibly transfer

7    the collateral at issue from Lehman to Barclays, and any

8    right the Defendant would have to the collateral would be

9    established in the sale order; moreover, any remaining

10   rights the Plaintiff has in the collateral would need to be

11   determined by analyzing the effect of the Bankruptcy Court's

12   sale order."

13          So he's already, at that point, on the

14   understanding that this is -- looks like, very well, it's

15   covered by the sale order, the only question is, do they

16   have some sort of remedy nonetheless?

17          So, I don't think that Judge Daniels locked

18   himself in, obviously, and certainly by the time of

19   September 7, 2010, if you're looking for another date, was

20   of the view that this was core because it arose in the sale

21   order.  If he had accepted their argument that there is no

22   Bankruptcy Court jurisdiction here, they didn't consent to

23   this referral, they fought it vigorously because why,

24   because it's not a purchased assets, so it's not covered by

25   the sale order.  Well, this says it's core because it arises

Page 171

1    in the sale order.

2            Finally, Your Honor, all of these arguments about

3    attempting to retroactively apply summary judgment, that has

4    no basis.  In fact, again, we put them on notice repeatedly,

5    and the point was we knew from what they told us that if we

6    made a motion to you, their position before you would be

7    that it should be deferred until after summary judgment,

8    not, oh, sure, we'd love for Your Honor to decide this now

9    because we think it will save the parties some money and

10   expense if we turn out to be wrong.  They've never worried

11   about being wrong.

12           So we did file the motion for contempt before we

13   had your summary judgment ruling and the argument of the

14   contempt motion was that it is undisputed.  It should be

15   undisputed.  You will find that it's undisputed.  You will

16   see that it's undisputed when you resolve the summary

17   judgment, and that's what happened.

18           And what happened the moment that we filed the

19   contempt motion?  Will you stipulate to putting off the

20   briefing on the contempt until after summary judgment?  Yes,

21   we agreed, not because we thought we were prejudicing

22   ourselves, not because we thought that we were giving up

23   anything, but because we thought Your Honor, in light of all

24   the cases that have come before it would think that that is

25   the logical way to do these things.  And that's all we've

Page 172

1    ever tried to do in this case, is the logical way of doing

2    things, and rather than present more work to Your Honor on

3    am I yet in a position to make a decision, then I'm going to

4    have to actually side with the issue that you're presenting

5    to me.

6             Our point all along is they've borne the risk.

7    They've understood this risk.  They resisted any attempt to

8    come to you and say, we know that you're the author of the

9    sale order.  We know that you're the one that signed it.

10   Look, we don't want to be in a position to find out years

11   later that we violated it.  They weren't willing to come

12   with us to you and ask you and say it's appropriate for you

13   to make this determination.  That's in the letters; that's

14   all before you.  So we had no opportunity to do that.

15            THE COURT:  Thank you.

16            MR. MITCHELL:  Your Honor, may I respond just

17   briefly?

18            THE COURT:  Very briefly, please.

19            MR. MITCHELL:  All right.  First of all, Your

20   Honor, counsel did not answer the question that you asked.

21   You said, if the motion had been presented to Your Honor and

22   you had said I'm just not sure based upon the pleading, and

23   I think he didn't answer the question for a reason because

24   if you're not sure, that means that you would not believe

25   the sale order was sufficiently clear on its face for you to

Page 173

1    make a determination on a motion to dismiss that the case

2    was enjoined.  So that would be a clear indication from this

3    Court as to what your view was of the facial clarity of the

4    sale order on a motion to dismiss to cover the claims in a

5    particular case, and that is all Judge Daniels did, and

6    that's how the case proceeds thereafter.

7              Subsequent to that, it needs to be brought back to

8    Your Honor to change that if something changes.  Counsel

9    prefers to think ostensibly -- the reason this was referred

10   back to the Court was because it concerned the sale order.

11   Obviously counsel argued that all of these documents

12   reflected that this was a purchased asset.  We alleged that

13   we did not believe it was a purchased asset.  The ostensibly

14   means that the language of the document seems to refer to

15   it, but Judge Peck has to decide whether, in fact, it was a

16   purchased asset.  That's all the word ostensibly means in

17   that circumstance.

18             With respect to putting FirstBank on notice,

19   Mr. Morag's Exhibits 83 and 84, the exhibits to Mr. Morag's

20   affidavit, 83 and 84, you'll see a letter in which counsel

21   took the position was the Evergreen Solar decision, changed

22   everything, and now in light of the Evergreen Solar

23   decision, we should withdraw the case, and then says, quote,

24   "Barclays will seek properly from the Court to enforce the

25   sale order injunction," closed quote, as part of that letter

Page 174

1    and then never acted on it.

2            And it was our response to Mr. Morag that if he

3    believed that the Evergreen Solar case changed everything,

4    we believed your 60(b) decision had language that controlled

5    what we were -- controlled more specifically the facts of

6    our case, that that should be brought to your by motion to

7    renew the motion to dismiss; that would be the procedure.

8    If there's new law, bring new law to the Court's attention

9    and if that changes the decision, that changes the decision.

10           Your Honor, I just -- in closing, this is not --

11   this is not the same.  The standard here is not the same as

12   the standard on a motion for summary judgment.  This is a

13   question of the behavior of a party through the process of

14   litigation to obtain a decision the Court said it was

15   entitled to.  All we did, though the Court took time, was

16   production of documents, maybe eight depositions, and then

17   presented a summary judgment motion to Your Honor.  We

18   didn't try a case in this court.  It was presented on

19   papers, mostly by stipulated fact.

20           I do not think obtaining an order in light of the

21   denial of a motion to dismiss on such a concise and clear

22   and defined record stipulated by parties to obtain Your

23   Honor's ruling on whether, in fact, our securities were

24   included is evidence of contemptuous conduct sufficient for

25   the Court to sanction our client.  Thank you.

Page 175

1              THE COURT:  Okay.  Much longer argument than I

2      expected and we managed to fill most of the afternoon.  I'm

3      going to take this under advisement and I'll issue a

4      memorandum decision promptly.

5              MR. MITCHELL:  Thank you, Your Honor.

6              THE COURT:  We're adjourned.

7              (Whereupon, these proceedings were concluded at

8      3:59 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 176

```
 1                        I N D E X

 2

 3                        RULINGS

 4                                          Page      Line

 5   Motion of Baupost Group, LLC to Quash

 6   Debtors' Subpoena Issued Under Federal Rule

 7   of Bankruptcy Procedure 2004 [ECF No. 38941]   9        10

 8

 9   Lehman Brothers Holdings Inc., et al. v.

10   Citibank, N.A., et al. [Adversary Case No.

11   12-01044] – Motion Provisionally Allowing

12   Claims                                       87         6

13

14   Lehman Brothers Holdings Inc., et al. v. Dr.

15   HC Tschira Beteiligungs GmbH & Co KG

16   [Adversary Case No. 13-01431] – Pre-Trial

17   Conference and Informal Rule 7007.1

18   Conference on Tschira's Motion for

19   Protective Order                             97        19

20

21

22

23

24

25
```

Page 177

1                     C E R T I F I C A T I O N

2

3     I, Dawn South, certify that the foregoing transcript is a

4     true and accurate record of the proceedings.

5

6     Dawn     Digitally signed by Dawn South
              DN: cn=Dawn South, o, ou,
              email=digital1@veritext.com,
7     South    c=US
              Date: 2013.10.25 16:09:06 -04'00'

8

9     AAERT Certified Electronic Transcriber CET**D-408

10

11    I, William J. Garling, certify that the foregoing transcript

12    is a true and accurate record of the proceedings.

13

14    William   Digitally signed by William
               Garling
               DN: cn=William Garling, o, ou,
15    Garling   email=digital1@veritext.com,
               c=US
               Date: 2013.10.25 16:09:41 -04'00'

16

17    AAERT Certified Electronic Transcriber CET**D-543

18

19

20    Veritext

21    200 Old Country Road

22    Suite 580

23    Mineola, NY 11501

24

25    Date:  October 24, 2013