Allen G. Kadish
DICONZA TRAURIG LLP
630 Third Avenue, 7th Floor
New York, New York 10017
Tel: (212) 682-4940
Fax: (212) 682-4942
Email: akadish@dtlawgroup.com

*Counsel for BAC FLORIDA BANK*

Hearing Date: November 20, 2013
Hearing Time: 10:00 a.m.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

In re

LEHMAN BROTHERS HOLDINGS INC., *et al.*,

Debtors.

------------------------------------------------------------x

Chapter 11

Case No. 08-13555 (JMP)

(Jointly Administered)

**OBJECTION OF BAC FLORIDA BANK
TO MOTION PURSUANT TO RULE 9019 OF THE FEDERAL RULES OF
BANKRUPTCY PROCEDURE AND SECTION 105(a) OF THE BANKRUPTCY CODE
FOR APPROVAL OF (I) PARTIAL SETTLEMENT AGREEMENTS RELATING TO
CERTAIN CREDIT DEFAULT SWAP AGREEMENTS AND INDENTURES AND
(II) AMENDMENT TO SETTLEMENT AGREEMENT RELATING TO PEBBLE
CREEK LCDO 2007-3 CREDIT DEFAULT SWAP AGREEMENT AND INDENTURE**

**REDACTED IN ACCORDANCE WITH MOTION TO SEAL
DATED NOVEMBER 14, 2013.
A FULL, UNREDACTED VERSION HAS BEEN SUBMITTED
TO THE COURT *IN CAMERA*.**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 2

BACKGROUND ................................................................................................ 5

    A.   BAC Florida Bank............................................................................5

    B.   The Swap Transaction.......................................................................5

    C.   The Notes.....................................................................................7

    D.   The Dispute...................................................................................9

    E.   Communications Between the Trustee and the Noteholders................................10

    F.   The Settlement Agreement..................................................................11

OBJECTION .................................................................................................. 14

    A.   The Inter-Noteholder Subordination Provisions Must be Enforced ................................. 14

    B.   The Settlement Agreement Improperly Impairs Objecting Noteholders .......................... 20

    C.   The Fairness Opinion Demonstrates that the Settlement Agreement is Unfair ................ 20

    D.   The Negotiation of the Settlement Was Not at Arms-Length and
        Violated the Indenture................................................................................. 23

    E.   The Settlement Agreement and Motion Include an Improper Poison Pill........................ 26

CONCLUSION ................................................................................................ 26

i

# TABLE OF AUTHORITIES

**Statutes**

11 U.S.C. §105……….....…………………………………………………………………………passim

**Rules**

Bankruptcy Rule 9019 ..................................................................................... passim

**Cases**

████████████████████████████
████████████ ) .......................................................................... 22

████████████████████████████
███████████ ) .......................................................... 22

*Ellington Credit Fund LTD v. Select Portfolio Servicing, Inc.*, 837 F.Supp.2d 162, 191
(S.D.N.Y. 2011) ...................................................................................... 24

*In re Bartley Lindsay Co.*, 120 B.R. 507 at 514 n.8 (Bankr. D. Minn. 1990)............................ 19

*In re Drexel Burnham Lambert Group*, 1992 Bankr. LEXIS 423 *9 (Bankr S.D.N.Y. 1992)..... 24

*In re Enron Creditors Recovery Corp.*, 370 B.R. 64, 70 (Bankr. S.D.N.Y. 2007)...................... 15

*In re Joint Eastern and Southern Dist. Asbestos Litigation*, 129 B.R. 710 (E.D.N.Y. and
S.D.N.Y. 1991) .......................................................................................... 16, 18

████████████████████████████ ................ 22

*In re Rosenberg*, 495 B.R. 196 (Bankr. E.D.N.Y. 2010) ............................................. 24

*In re Tribune Co.*, 472 B.R. 223 (Bankr. D. Del. 2012) .............................................. 15

*Meinhard v. Salman*, 249 N.Y. 458 (1928)......................................................... 24

*Official Dalkon Shield Claimants' Committee v. Mabey (In re A.H. Robins Company, Inc.)*,
880 F.2d 769 (4th Cir. 1989)...................................................................16 - 19

Allen G. Kadish                                    Hearing Date: November 20, 2013
DICONZA TRAURIG LLP                                Hearing Time: 10:00 a.m.
630 Third Avenue, 7th Floor
New York, New York 10017
Tel: (212) 682-4940
Fax: (212) 682-4942
Email: akadish@dtlawgroup.com

*Counsel for BAC FLORIDA BANK*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

In re                                             Chapter 11

LEHMAN BROTHERS HOLDINGS INC., *et al.*,          Case No. 08-13555 (JMP)

                              Debtors.            (Jointly Administered)
------------------------------------------------------------x

**OBJECTION OF BAC FLORIDA BANK
TO MOTION PURSUANT TO RULE 9019 OF THE FEDERAL RULES OF
BANKRUPTCY PROCEDURE AND SECTION 105(a) OF THE BANKRUPTCY CODE
FOR APPROVAL OF (I) PARTIAL SETTLEMENT AGREEMENTS RELATING TO
CERTAIN CREDIT DEFAULT SWAP AGREEMENTS AND INDENTURES AND
(II) AMENDMENT TO SETTLEMENT AGREEMENT RELATING TO PEBBLE
CREEK LCDO 2007-3 CREDIT DEFAULT SWAP AGREEMENT AND INDENTURE**

To:    THE HONORABLE JAMES M. PECK,
       UNITED STATES BANKRUPTCY JUDGE:

       BAC FLORIDA BANK ("**BAC**"), by and through DICONZA TRAURIG LLP, its

undersigned counsel, hereby respectfully objects to the *Motion Pursuant to Rule 9019 of the*

*Federal Rules of Bankruptcy Procedure and Section 105(a) of the Bankruptcy Code for Approval*

*of (I) Partial Settlement Agreements Relating to Certain Credit Default Swap Agreements and*

*Indentures and (II) Amendment to Settlement Agreement Relating to Pebble Creek LCDO 2007-3*

*Credit Default Swap Agreement and Indenture,* dated October 18, 2013 [Docket No. 40573] (the

"**Motion**"), filed by Lehman Brothers Holdings Inc., as plan administrator ("**LBHI**" or the "**Plan**

**Administrator**"), on behalf of itself and Lehman Brothers Special Financing Inc. ("**LBSF**" and,

together with LBHI, "**Lehman**"). In respect of its objection, BAC respectfully sets forth as follows.[1]

# I.

## PRELIMINARY STATEMENT

Cloaked as a routine Rule 9019 settlement motion, Lehman[2] is asking the Court to grant it extraordinary and unprecedented relief under Section 105 of the Bankruptcy Code. Among other things, Lehman is seeking an order from the Court that would authorize and direct an indenture trustee to consummate and implement a settlement agreement that violates the fundamental provisions of the indenture. Lehman is also asking the Court to shield the Trustee from any claims of Noteholders related to the negotiation, consummation, and implementation of the Settlement Agreement. The Court lacks authority to grant such relief.

There are three series of Notes outstanding under the Indenture, denoted as Class B, Class C, and Class D. Under the Inter-Noteholder Subordination Provisions of the Indenture, the Class B Notes are senior to the Class C and Class D Notes, which are not entitled to any distribution until Class B Notes are paid in full. Class B is also the Controlling Class, which is entitled to direct the Trustee after the occurrence of an Event of Default. BAC holds $6,000,000 of the $16,000,000 Class B Notes. The balance of the Class B Notes are held by another single holder, which has also filed an objection to the Motion. LBSF represents that it has acquired 45.6% of the Class C Notes and all the subordinated Class D Notes. LBSF is also the Counterparty to the underlying credit default swap agreement.

Notwithstanding that Class B is the Controlling Class, the Trustee entered into settlement negotiations with LBSF without consulting or seeking direction from the Class B

---

[1] BAC objects to the portion of the Motion that seeks to settle the Exum Ridge obligations.

[2] Capitalized terms used in this section and not otherwise defined have the meanings ascribed to them below.

Controlling Class Noteholders.    BAC did not learn of the negotiations or the Settlement Agreement until the day Lehman filed the Motion.    Not only did the Trustee conduct the negotiations with LBSF without consultation with the Class B holders, but it also took direction from LBSF, purportedly "as a holder of Notes."    In other words, LBSF was on both sides of these "negotiations." These actions by the Trustee violate the terms of the Indenture, including the requirement to take direction from the Controlling Class and the express requirement that the Trustee act as fiduciary *only of the Noteholders, and not of the Counterparty.*

As a result of the conflict, no one represented the interests of the Noteholders at the negotiations.    The Trustee secured the agreement of LBSF, under the Settlement Agreement that, at the expense of the Noteholders, the Trustee's current fees and expenses would be paid first and a reserve of $█████████ would be set aside for any future Trustee fees and expenses, and the Trustee would be shielded by an order of this Court from and all claims related to the negotiation, consummation, and implementation of the Settlement Agreement.    In consideration for the foregoing, the Trustee agreed, at the expense of the Noteholders, to accept a payment to the Noteholders which yields an amount equivalent to ██% of what the Noteholders would receive if they prevailed in the underlying Litigation, notwithstanding that the Fairness Opinion obtained by the Trustee concludes that a payment of ██% or less to Noteholders would be "unreasonable." The Trustee also agreed, to the detriment of the Noteholders, to pay to LBSF any and all assets (or proceeds thereof) that, in accordance with the Indenture, the Trustee currently has available and uses to fund the litigation and which are required to be held in trust for the benefit of the Noteholders. The Settlement Agreement also disregards the Inter-Noteholder Subordination Provisions and contemplates payments to Class C Noteholders before

3

Class B Notes are paid in full.    As described in detail below, each of these provisions violates the express terms of the Indenture.    The Court lacks authority to authorize and direct the Trustee to enter into the Settlement Agreement in violation of the Indenture, and lacks authority to shield or insulate the Trustee from any claims related to the Settlement Agreement, including, without limitation, its negotiation, consummation, and implementation.

While Lehman asserts that objecting Noteholders are protected by an escrow, the purported protection is a mirage at best.    First, under the Inter-Noteholder Subordination Provisions, the senior Class B Noteholders are entitled to be paid in full prior to any funds being disbursed to subordinated Noteholders.    If the Settlement Agreement is approved, any non-objecting Class C Noteholders would receive payment from the proceeds of the Trust Collateral before Class B Noteholders (who have all objected) would receive a single dollar.    Such a result is indisputably and seriously prejudicial to Class B Noteholders, who are entitled to the benefit of their seniority not only in connection with a successful litigation, but also in any settlement agreement.    Any disbursement to Class C Noteholders (as well as the disbursement to LBSF of the balance of the Collateral under the Settlement Agreement) improperly strips the Class B Noteholders of the value of their seniority.    In addition, as noted above, the Settlement Agreement strips the Trust of its ability to fund the litigation, thereby further impairing settlement value for all objecting Noteholders even though the Trustee is obligated to litigate on behalf of the Noteholders. See Indenture §§ 5.3, 5.4, 5.15. The purported protection offered by Lehman is a ruse.

BAC requests that the Court deny the Motion as a legal matter because there is no legal basis for the relief sought by Lehman.    However, to the extent that the Court is not inclined to deny the Motion as a legal matter, BAC requests that the Motion be adjourned to permit

4

discovery as there are factual allegations in the Motion upon which Lehman relies for the relief sought, including, without limitation, the as-yet un-filed Trustee's affidavit, and the Fairness Opinion. BAC is also entitled to discovery with respect to, among other things, the conduct of the settlement negotiations.

## II.

## BACKGROUND

### A. *BAC Florida Bank*

BAC is a Florida banking corporation headquartered in Coral Gables, Florida. As of December 31, 2012, BAC and subsidiaries had over 5,500 customers, 150 employees, $1.3 billion in assets and $939 million in deposits.

### B. *The Swap Transaction*

LBSF and the Issuer entered into a credit default swap transaction (the "**Swap Transaction**") pursuant to a form ISDA Master Agreement (the "**ISDA Master Agreement**"), as amended and supplemented by a certain Schedule to ISDA Master Agreement (the "**Schedule**"), and a confirmation (the "**Confirmation**"), each dated as of May 2, 2007. LBHI guaranteed LBSF's obligations under the ISDA Master Agreement, Schedule and Confirmation (the "**Guarantee**," and together with the ISDA Master Agreement, Schedule, and Confirmation, the "**Credit Default Swap Agreement**").

Under the Credit Default Swap Agreement, LBSF agreed to make periodic payments to the Issuer in exchange for the Issuer's promise to make payments to LBSF in respect of losses incurred in respect of certain specified reference obligations. In effect, LBSF, as "Counterparty," purchased protection from the Issuer, which sold protection on the creditworthiness of the obligations referenced in the Credit Default Swap Agreement.

5

Under Section 5(a)(iii) of the Credit Default Swap Agreement, the filing of a bankruptcy case by LBHI as guarantor or Credit Support Provider (as defined in the Credit Default Swap Agreement), for LBSF constitutes an Event of Default (as defined in the Credit Default Swap Agreement) for which the Counterparty (LBSF) is the Defaulting Party (as defined in the Credit Default Swap Agreement).    On September 15, 2008, LBHI filed a bankruptcy case under Chapter 11 of the Bankruptcy Code thereby causing an Event of Default under Section 5(a)(vii) of the Credit Default Swap Agreement.    On September 17, 2008, pursuant to Section 6 of the Credit Default Swap Agreement, the Trustee sent to LBSF a "Notice of Early Termination" which terminated the Transaction as of September 17, 2008 (the **"Early Termination Date"**) based on the bankruptcy filing of LBHI.    On September 22, 2008, LBSF failed to pay the fixed amounts that were due to the indenture trustee (the **"Trustee"**) under the Credit Default Swap Agreement which resulted in a further Event of Default under Section 5(a)(i) of the Credit Default Swap Agreement (the **"Payment Default"**).    On October 3, 2013, LBSF filed a bankruptcy case under Chapter 11 of the Bankruptcy Code which constituted another Event of Default under Section 5(a)(vii) of the Credit Default Swap Agreement.    On November 28, 2008, pursuant to Section 6 of the Credit Default Swap Agreement, the Issuer sent to LBSF a duplicate "Notice of Early Termination" which terminated the Transaction as of November 28, 2008 based on the bankruptcy filing of LBHI, the bankruptcy filing of LBSF, and the Payment Default. Early termination of the Credit Default Swap Agreement would trigger provisions for distribution of the termination payments.    Under the terms of the Credit Default Swap Agreement, LBSF agreed that, upon an early termination, where LBSF is a Defaulting Party, the Trustee would pay all Noteholders in full before making any termination payments to LBSF as

Counterparty. *See, e.g.,* Credit Default Swap Agreement § 5(i) (LBSF agrees it is subject to the Priority of Payments (as defined below)).

C. *The Notes*

The Issuer issued various classes of notes (the "**Notes**") under the Indenture (the "**Indenture**") and preference shares under a shares paying agency agreement (the "**Preference Shares**" and, together with the Notes, the "**Securities**"). The Notes are secured by a pool of collateral (the "**Collateral**") that also secured the Credit Default Swap Agreement. There is an aggregate of approximately $43,750,000 of Notes issued and outstanding in three classes, B, C and D. The Indenture also contemplates a series of Class A Notes, however, the Class A Notes were never funded and there are none outstanding. *See Exum Ridge CBO 2007-2, Ltd. Note Valuation Report as of 9/20/2013* (the "**9/20/13 Trustee Report**"), p. 1. A true copy of the 9/20/13 Trustee Report is attached as Exhibit "A."

Under the Indenture, the rights of holders of Class C Notes and Class D Notes to payment and to the Collateral (including any payment from proceeds of the Collateral) are subordinate and junior to the Class B Notes, and, upon occurrence of an event of default, a payment default, or otherwise, principal of and interest on the Class B Notes must be paid in full in cash before any further payment or distribution is made on account of the Class C or Class D Notes (the "**Inter-Noteholder Subordination Provisions**"). *See* Indenture §§ 5.9, 11.1 13.1. There is even a clawback provision in the Indenture that requires that any monies paid to the Class C or Class D Notes prior to payments on the Class B Notes must be returned to the Trustee for distribution in accordance with the Inter-Noteholder Subordination Provisions. *See* Indenture § 13.1(d).

BAC holds $6,000,000 out of a total of $16,000,000 of the senior Class B Notes issued and outstanding. The remaining $10,000,000 of Class B Notes are held by Babson Capital

Management LLC as advisor to ESP Funding I, LTD ("**Babson**"). Babson has objected to the Motion and the Settlement Agreement.[3]

LBSF represents that it owns 100% of the Class A Notes, *see* Settlement Agreement § 1(a). However, there are no Class A Notes outstanding, the Class A Notes were never funded and have zero principal balance. LBSF also represents that, through a series of purchases, it holds 45.6% of the $14,250,000 Class C Notes and 100% of the $13,500,000 Class D Notes but does not disclose the terms or value at which it purchased these subordinated notes.[4] *See* Settlement Agreement § 1(a). Thus LBSF is both a holder of Notes and the Swap Counterparty under the Credit Default Swap Agreement. BAC and Babson together hold more than 67% of the outstanding Notes that are not held by LBSF (the "**Non-Conflicted Notes**"). A summary of current Exum Ridge Note holdings, in their relatively priority, is set forth on Exhibit "B" hereto.

Under Section 5(1)(j) of the Indenture, an event of default ("**Event of Default**") includes, *inter alia*, an early termination under the Credit Default Swap Agreement. Moreover, multiple other Events of Default exist under the Indenture. *See* Indenture §§ 5.1(a), 5.1(c), 5.1(f). Under Section 1.1 of the Indenture, Class B is the controlling class ("**Controlling Class**") where, as here, there are no outstanding Class A Notes.[5] Under Section 5.13 of the Indenture, in the case

---

[3] *See* Limited Objection of Babson to the Motion. [Docket No. 41035].

[4] Nor does Lehman disclose whether it considered the subordination of the Class C and Class D Notes in determining the acquisition price, or whether it purchased the Notes post-petition and if so, by what authority.

[5] The Indenture provides that the Class A Notes are not outstanding for any purpose under the Indenture if "the Class A Notes Commitments have been reduced to zero (and there is no funded outstanding principal balance on the Class A Notes"). *See* p. 30 of Indenture.   There is no dispute that there is no funded outstanding principal balance on the Class A Notes. With respect to the Commitments, Lehman Brothers International ("**LBI**"), as the Class A Noteholder, no longer has any obligation to fund any Commitments due to its own bankruptcy. Moreover, since the Exum Ridge transaction is now subject to multiple Events of Default, the maturity date of the Notes is in 2014 and there is no possibility that the Events of Default will be rescinded prior to the maturity date of the Notes, LBI will never have any obligation to fund any Commitments even if it were not in bankruptcy. Accordingly, the Class A Commitments have been reduced to zero, the Class A Notes are not Outstanding under the Indenture, and the Controlling Class is the Class B Notes whose Noteholders, unlike the Class A Noteholders, have expended funds for the purchase of their Notes and have outstanding principal balances due on their Notes.

8

of an Event of Default, the Controlling Class has the right to direct the Trustee in the conduct of any proceedings. BAC and Babson collectively hold 100% of the Notes in the Controlling Class.

Under the Indenture, the Trustee is required to apply payment proceeds in accordance with a "waterfall" provision (the "**Waterfall Provision**"). See Indenture § 11. Under Section 11.1(B)(i) clause "third" and Section 11.1(B)(vi)-(xv) of the Indenture, if the Counterparty is a Defaulting Party, the Trustee is required to pay distributions to the Noteholders first, and only to the Counterparty (LBSF) after the Noteholders have been paid in full. Accordingly, as LBSF is a Defaulting Party, the Trustee is obligated to pay all Noteholders in full before making any termination payments to LBSF as Counterparty. Nonetheless, due to various actions taken by LBSF, as of the date hereof, the Trustee has not made any payments to the Noteholders.

D. *The Dispute*

On April 20, 2010, LBSF commenced Derivatives ADR No. 157. On June 4, 2010, the Trustee served an ADR Response on LBSF pursuant to the Court's ADR Procedures Order. On September 14, 2010, LBSF filed a complaint against, among others, the Trustee and the Issuer (the "**Litigation**"), seeking, among other things, a declaratory judgment that the Waterfall Provision is unenforceable as an *ipso facto* clause. On October 20, 2010, the Court entered the *Order Staying Certain Related Relief Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 7004(a)(1)* [Docket No. 12199], which stayed, among other things, the Litigation. The Court has extended the stay a number of times, most recently until January 20, 2014 by order dated July 18, 2013 [Docket No. 38806]. As a result of the stay, the Issuer and the Trustee have not answered or otherwise moved for any relief in the Litigation.

On April 1, 2011, LBSF submitted an SPV Derivatives ADR Election pursuant to which LBSF recommenced the ADR process under the SPV ADR Procedures Order. The Trustee

served an amended ADR Response on June 13, 2011, and LBSF served its ADR Reply on July 5, 2011. In December 2012, mediation sessions (the "**Mediation**") took place pursuant to the ADR process, but were unsuccessful. As of the date hereof, in accordance with the terms of the Indenture, all the costs and expenses incurred by the Trustee in connection with the dispute, including, *inter alia*, the Litigation, the ADR, and the Mediation have been funded and paid from the assets of the Trust.

E.  *Communications Between the Trustee and the Noteholders*

Following the Chapter 11 filings of the movants, the Trustee communicated with the Noteholders from time to time by convening a few conference calls to apprise them of key notices that it received from movants. BAC participated in all the Noteholder calls; these calls were also attended by other Noteholders. BAC also participated in person in the Mediation. When the Mediation concluded, BAC understood from conversations that it and its counsel had with the Trustee and its counsel that the Trustee would keep BAC apprised of all developments related to the Notes and the dispute with the movants, including that the Trustee would (i) notify BAC of, *inter alia*, any communications of any kind relating to the transaction with the movants, the mediator, or the Bankruptcy Court; and (ii) provide BAC in advance with any notices or written communications relating to the transaction with the movants, the mediator, or the Bankruptcy Court. In addition, it was the understanding of BAC that the Trustee would involve BAC in any decision by the Trustee that would have any impact on the Noteholders. BAC communicated these understandings in an email from BAC and BAC's attorney to the Trustee and the Trustee's attorney (the "**BAC-Trustee Understanding**"). See Exhibit "C" hereto.

In the same communications, BAC and its counsel further asked the Trustee and its counsel to inform BAC if the Trustee felt that it was in a conflicted position, so that BAC could

take steps to appoint a co-trustee on behalf of the Class B Noteholders. BAC was assured by the Trustee that such a step was not necessary. Notwithstanding the BAC-Trustee Understanding and the obligations of the Trustee under the Indenture, the Trustee did not communicate with BAC or convene any Noteholder conference calls after the Mediation except in a single instance to inform BAC's counsel by email on January 4, 2013 that an Avoidance Action Stay Motion was pending before the Bankruptcy Court to be heard on January 16, 2013. The Trustee did not seek any direction from BAC regarding its settlement discussions with the movants or provide any notifications to BAC of its settlement discussions with the movants. BAC was not even aware that settlement discussions with Lehman were ongoing, and only learned that a settlement had been entered into when it received a notice from the Trustee upon the filing of the Motion.

## F. *The Settlement Agreement*

The Settlement Agreement was entered into by the Trustee at the direction of LBSF, purportedly "as Noteholder," but actually as Counterparty to the Credit Default Swap Agreements. *See* Settlement Agreement § 6. The salient terms of the Settlement include:

a. Contrary to the express terms of the Indenture, the Trustee would liquidate the Collateral. *See* Indenture § 5.5.

b. On the effective date of the Settlement Agreement (the "**Effective Date**"),[6] contrary to the Inter-Noteholder Subordination Provisions of the Indenture (which subordinate any payment of the Class C Notes until payment in full of the Class B Notes), from the proceeds of the Collateral (the "**Trust Collateral**"), the Trustee would pay $▮▮▮ per $▮▮▮ original principal amount plus interest accrued as of the Effective Date to holders of Class B and Class C Notes who did not object to the Motion or Settlement Agreement (the "**Non-Objecting Noteholders**") in satisfaction of such Noteholders' claims (the "**Non-Complying Distributions**"). Settlement Agreement §§ 1(b), 1(d)(iii). The payment of the Non-Complying Distributions

---

[6] The Effective Date would occur when an order of the Bankruptcy Court granting the Motion becomes final or the parties to the Settlement Agreement agree that the order is sufficient. Settlement Agreement § 12.

is subject to the condition that the Trustee has received a fairness opinion (the **"Fairness Opinion"**) that is sufficient in the sole discretion of the Trustee with respect to the fairness and reasonableness of the Settlement Agreement. Settlement Agreement § 1(n). The Trustee has received such a Fairness Opinion.

c.  The Trustee would place in an account (the "**Escrow Account**") maintained by the Trustee an amount (the "**Escrow Amount**") equal to ███% of the original principal amount plus the interest accrued as of the Effective Date of all Notes held by Noteholders who objected to the Settlement Agreement or Motion (the "**Objecting Noteholders**"). Settlement Agreement § 1(d)(v).

d.  Contrary to the terms of the Indenture, the Trustee would set aside a reserve amount of $████████ (the "**Reserve Amount**") which the Trustee could use to pay its fees and expenses, in its sole discretion at any time or times, without notice. Settlement Agreement § 1(d)(iv). *See, e.g.*, Indenture § 6.7

e.  Within three days of the Effective Date, contrary to the terms of the Indenture including the Waterfall Provisions, after application of the foregoing (b) - (d) and payment of the outstanding fees and expenses of the Trustee and the Trustee's professionals, the Trustee would pay to LBSF all remaining Trust Collateral (the "**LBSF Distribution**"). Settlement Agreement § 1(d)(vi). *See, e.g.*, Indenture §§ 5.5, 5.4(a), 5.18, 7.7(d), 7.10. (expressly prohibiting the release of any monies from the Trust Estate after the occurrence of an Event of Default without the written consent of the Noteholders).

f.  Contrary to the terms of the Indenture and the Trustee's practice, the Trustee would require that Objecting Noteholders fund any litigation or recovery efforts themselves, including the Litigation. In addition, the Trustee will not assert and/or defend any litigation, claim, or dispute (including the Litigation) unless the Trustee determines, in its sole discretion, that it has the duty or explicit obligation to do so. Settlement Agreement § 1(e). *See, e.g.*, Indenture §§ 5.3, 5.4, 5.6, 5.8.

g.  If the Objecting Noteholders prevail on the merits of the Litigation, they would be entitled to be reimbursed for their reasonable costs and expenses of such Litigation from the Reserve Amount, but only after payment of current and future Trustee fees. Settlement Agreement § 1(e).

h.  LBSF would indemnify, among others, the Trustee from any and all losses, costs, expenses, fees, and claims in connection with or resulting from, *inter alia*, (i) the Trustee's execution and delivery of the Settlement Agreement, or any action taken pursuant to the

12

Settlement Agreement, and (ii) any claims brought by an Objecting Noteholder in any way related to the Indenture. Settlement Agreement §§ 6, 7, 8.

Under cover of a Rule 9019 settlement motion, the movants ask the Court to grant extraordinary and unprecedented relief under Section 105 of the Bankruptcy Code. Without any legal basis, the movants ask the Court to authorize and direct the Trustee to violate fundamental provisions of the Indenture and to insulate the Trustee from any claims in connection with such actions (and the Trustee's actions in entering into the Settlement Agreement). The movants contend that the Court should grant this extraordinary relief because the Trustee allegedly made numerous attempts to contact Noteholders for direction and the Noteholders did not respond "adequately." *See* Motion ¶ 19.[7]

Even if this were true (and it is not), such a fact would not provide a basis for the Court to grant the relief requested. In the Motion, the movants do not represent that any Noteholders (other than LBSF) participated in the negotiation of the Settlement Agreement or provided any input to the Trustee regarding the negotiations or the terms of the Settlement Agreement. Nor do the movants represent that any Noteholders (other than LBSF) support the Settlement Agreement or the Motion. On the other hand, as of the date hereof, 100% of the senior Class B Notes – the Controlling Class – (representing more than 67% of all the Non-Conflicted Notes) are on record objecting to the Settlement Agreement and the Motion. On information and belief, not a single Non-Conflicted Noteholder has stated its support for the Settlement Agreement or the Motion. The effectiveness of the Settlement Agreement is not conditioned on the support or acceptance of any Noteholders. Indeed, under the Settlement Agreement, the Trustee would not pay a single

---

[7] The movants state that the Trustee would file an affidavit detailing its attempts to contact Noteholders in support of the Motion. As of the date hereof, no such affidavit has been filed. The Noteholders are prejudiced by the delay in filing the affidavit and BAC reserves its rights to full discovery in connection with the Motion, including, without limitation, with respect to the affidavit, the Fairness Opinion, and the conduct of the negotiations of the Settlement Agreement.

penny to Noteholders while liquidating the Trust Collateral, paying its own fees, reserving for its future fees, making a distribution of approximately $██ million to the Counterparty, and stripping the Trust of the assets required to fund the Litigation and which are required to be held in trust for the benefit of the Noteholders. *See* Indenture §§ 5.4(a), 5.5, 5.18, 7.7(d) and 7.10. The Court lacks authority to authorize or direct such actions by the Trustee or to insulate the Trustee from the legal consequences of such actions.

**III.**

**OBJECTION**

By the Motion, Lehman is requesting that, pursuant to Section 105 of the Bankruptcy Code, the Court authorize and direct the Trustee to consummate the Settlement Agreement and to perform all its obligations thereunder, including where such obligations are contrary to the terms of the Indenture, and including, *inter alia,* making distributions to certain Noteholders in flagrant violation of the Inter-Noteholder Subordination Provisions. In addition, Lehman is effectively asking the Court to amend or override the Indenture so as to make it difficult – if not impossible – for any Noteholders to litigate the merits of the dispute in the Litigation. Finally, Lehman is asking the Court to impose a penalty on any Objecting Noteholder by excluding such Noteholder from Litigation funding and participating in distributions from the Trust Collateral. The Court should not direct and does not have authority to order such relief.

A. *The Inter-Noteholder Subordination Provisions Must be Enforced*

In the Motion, Lehman fails to disclose that under the Inter-Noteholder Subordination Provisions of the Indenture, the Class B Notes are senior to Class C Notes, and the Class C Notes are not entitled to any payments from the Trustee until the Class B Notes are paid in full.[8] Thus

---

[8] It is troubling that the movants chose not to file the Settlement Agreement or make any effort to provide it to Noteholders. Nor does the Motion disclose the salient terms of the Settlement Agreement that would be required for

if the Inter-Noteholder Subordination Provisions were adhered to, BAC and other senior Class B

holders would have to be paid in full before any subordinate Notes were paid anything.

Under the Settlement Agreement, LBSF proposes that from the Trust Collateral the Non-

Conflicted Notes would receive approximately ██% of principal plus accrued interest and LBSF

would receive the balance of the Trust Collateral after payment of fees of the Trustee and the

Trustee's professionals. However, such a distribution does *not* provide Noteholders with ██% of

what they would receive if they prevailed in the Litigation, in which case they would receive

$██████ (the total outstanding principal) plus interest and legal fees. If all the Non-

Conflicted Noteholders participated in the settlement, they would receive payments aggregating

approximately $██████ (██% of their aggregate holdings) which amounts to only ██% of

what Noteholders would receive if they prevailed in the Litigation.

In accordance with the Inter-Noteholder Subordination Provisions, however, such a

distribution (which amounts to less than the $16,000,000 principal plus accrued interest owed to

the Class B Notes) must be paid on a *pro rata* basis first to holders of the senior Class B Notes.

The junior Class C Notes would not be entitled to any portion of the distribution. The Inter-

Noteholder Subordination Provisions are enforceable in bankruptcy and the Court does not have

authority to alter or ignore those provisions. 11 U.S.C. § 510(a) ("A subordination agreement is

enforceable in a case under this title to the same extent that such agreement is enforceable under

applicable non-bankruptcy law"). *See In re Enron Creditors Recovery Corp.*, 370 B.R. 64, 70

(Bankr. S.D.N.Y. 2007) ("It is well-established that if an agreement is a subordination

agreement, it must be enforced according to its terms"); *see also In re Tribune Co.*, 472 B.R. 223

---

any Noteholder to make an informed decision. In addition to failing to disclose the violation of the Inter-Noteholder Subordination Provision, the Motion does not disclose, among other things, the *amount* of the purported settlement.

(Bankr. D. Del. 2012) (holding that indenture subordination provisions apply to any distribution of settlement proceeds and creditors' trust proceeds).

Lehman fails to disclose to the Court that, buried in the relief it seeks, it is asking the Court to authorize and direct the Trustee to make distributions in violation of the Inter-Noteholder Subordination Provisions. Without identifying the "deviations," Lehman argues generally and incorrectly that the Court has authority under Section 105(a) to authorize and direct the Trustee to take any actions to consummate the Settlement Agreement, including any actions that deviate from the terms of the Indenture. In support of this extraordinary proposition, the Debtor cites two mass tort trust cases: (1) *Official Dalkon Shield Claimants' Committee v. Mabey (In re A.H. Robins Company, Inc.)*, 880 F.2d 769 (4th Cir. 1989), and (2) *In re Joint Eastern and Southern Dist. Asbestos Litigation*, 129 B.R. 710 (E.D.N.Y. and S.D.N.Y. 1991). These cases are inapposite. Neither case provides any support for Lehman's theory.

In *A.H. Robins*, the Fourth Circuit Court of Appeals considered an appeal by the general unsecured creditors' committee of the order entered by the district court, confirming the plan of reorganization, conditioned on the court's continuing jurisdiction over the personal injury trust funds created under the plan (the **"Robins Trusts"**). The Court of Appeals held that the continuing supervision of the Robins Trusts was proper as long as the actions taken by the court did not interfere with the powers and duties of the trustees and were necessary to ensure that the plan was feasible. *A.H. Robins*, 880 F.2d at 769-77. The Fourth Circuit stated that "[i]t is apparent from the language of the Plan and the Trust that the court has certain powers and responsibilities after confirmation of the Plan and during the life of the Trust." *Id.* at 776. "[W]e conclude that the challenged actions of the district court do not exceed its powers and do not amount to monitoring the day-to-day operations of the Trusts or result in usurpation of or

16

interference with the powers and duties of the Trustees." *Id.* at 777. The Fourth Circuit did not

rely on Section 105 of the Bankruptcy Code. Rather, it observed:

> The fact that a proceeding is equitable does not give the judge a
> free-floating discretion to redistribute rights in accordance with his
> personal views of justice and fairness, however enlightened those
> views may be.

*Id., citing In the Matter of Chicago, Milwaukee, St. Paul and Pacific Railroad Company,* 791

F.2d 524, 528 (7th Cir. 1986). The Fourth Circuit also determined that the district court acted in

the best interest of all the trust beneficiaries.[9] *A.H. Robins,* 880 F.2d at 777.

In the instant case, the pre-petition Indenture was not created by the Lehman plan, the

proposed action of the Trustee is not in aid of a plan-created trust; the Indenture is not a creature

of the court, and this Court lacks jurisdiction and authority to rewrite it. There is no authority in

the Trust (or the Lehman plan) that would provide the Court with the powers over the Trustee

and the Trust beneficiaries that the Motion asks this Court to exercise. In addition, the actions

that the movants are asking the Court to authorize would not be in the best interests of all the

beneficiaries of the Indenture Trust as, among other things, disregarding the Inter-Noteholder

Subordination Provisions would be indisputably detrimental to the Class B Noteholders, who are

the Controlling Class and make up more than 67% of the Non-Conflicted Noteholders. Finally,

ordering and authorizing the Trustee to disregard the Inter-Noteholder Subordination Provisions

in the Indenture would alter the authority of the Trustee set out in the Indenture and go well

beyond the actions approved by the district court in *A.H. Robins*. *A.H. Robins* provides no

support for the movants' request that the Court authorize the Trustee to make distributions or

take any other action contrary to the terms of the Indenture, based on Section 105 or any other

authority.

---

[9] In *Robins*, unlike the instant case, the objecting party was *not* a trust beneficiary.

In the second case cited by the movants, *Joint Eastern*, the Court considered, *inter alia*, objections to a class action settlement that included the modification of certain provisions of the Manville Personal Injury Trust established under the Manville confirmed plan. The objecting parties argued that amendments to the Manville Trust required amending the Manville plan. In addressing the objection, the court first considered its jurisdiction, stating that a "bankruptcy court continues to have the power post-confirmation to resolve fundamental questions of interpretation and effectuation of a plan. The need to settle disputes concerning the administration of the reorganization necessitates maintaining jurisdiction." *Joint Eastern*, 129 B.R. at 795 (internal citation omitted). In addition, the court noted that the Fourth Circuit Court of Appeals in affirming the Robins plan explicitly approved the district court's retention of jurisdiction over the personal injury trust created under the Robins plan as long as the actions taken by the court did not interfere with the power and duties of the trustees and were necessary to ensure that the plan was feasible. *Joint Eastern*, 129 B.R. at 795.

The *Joint Eastern* court held that the amendments to the Manville trust did not require amending the Manville plan, because the Manville plan and the Manville trust – both creatures of the bankruptcy court -- provided for such amendment. *Id.* at 844. Specifically, the court pointed out that the "[t]he Trust Agreement states that Manville and the Trustees after consultation with the Select Counsel for the Beneficiaries may 'modify, supplement or amend' the Trust Agreement 'in any respect' with certain limited exceptions that are not affected by the revisions encompassed in the Settlement." *Id.* *Joint Eastern* does not even mention Section 105 of the Bankruptcy Code in its discussion of the amendments. The movants misstate the court's conclusion in stating that it is a "holding that section 105(a) authorizes the federal courts in bankruptcy cases to approve a settlement modifying distributions, obligations, and payment

18

procedures under a trust." The Robins and Manville trusts were creatures of the bankruptcy court which included the authority to amend. This Court has no such authority over the Indenture; the citation to the two mass tort post-confirmation trust cases is inapposite and misleading.

In support of applying the Court's Section 105 powers, the movants also cite to similar relief that the Court has granted several times. Motion ¶ 31. However, there were no substantive objections filed to those motions.[10] Orders issued on uncontested motions should have little if any precedential value. *See, e.g., In re Bartley Lindsay Co.*, 120 B.R. 507 at 514 n.8 (Bankr. D. Minn. 1990). In addition, none of those motions disclosed that the terms of the applicable settlement agreement included numerous serious violations to the terms of an underlying indenture, or that, by entering into the proposed settlement, the Court would be authorizing a trustee to disregard the priority scheme in an indenture including subordination provisions, to the detriment of the senior holders. Rather than providing any precedential support for the Motion, the entry of the uncontested orders in similar situations may give the Court pause inasmuch as the relief provided may have gone beyond what the Court understood it was granting, and the question is raised whether the holders were truly informed of the actual, meaningful consequences of their settlements.

B.  *The Settlement Agreement Improperly Impairs Objecting Noteholders*

Lehman contends incorrectly in the Motion that the Settlement Agreement protects the interests of Objecting Noteholders. That is just not so. The Settlement Agreement seriously impairs the rights of Objecting Noteholders including BAC.

---

[10] In one instance, the applicable indenture trustee filed a form objection with a bare statement that one noteholder objected. It was not clear whether the statement constituted merely an opt-out request or an objection to the 9019 motion. In any event, the statement contained no substance or any explanation for the basis of the "objection."

In addition to the distribution of Trust Collateral to subordinated Class C Noteholders in violation of the terms of the Inter-Noteholder Subordination Provisions, under the Settlement Agreement the Trust is stripped of the assets that it could – and should -- use to fund the Litigation and related proceedings.   Instead, contrary to the terms of the Indenture and the practice of the Trustee, the Settlement Agreement provides that the Objecting Noteholders must fund any litigation themselves.   Moreover, the Settlement Agreement further provides that the Trustee has the sole discretion to proceed with any litigation, notwithstanding that it would be funded by the Objecting Noteholders.   Finally, the Settlement Agreement provides that, if the Objecting Noteholders prevail in the Litigation, they will be entitled to reimbursement of their legal fees *only to the extent of funds remaining in the Reserve after payment of any and all fees and expenses and future fees and expenses of the Trustee.*   As the Reserve would only contain $▒▒▒▒▒ initially, it is uncertain whether Objecting Noteholders would be reimbursed any legal fees and expenses even if they prevail.   These terms hobble the ability of Objecting Noteholders to continue to pursue the Litigation as is their right and would leave the Objecting Noteholders in a legal limbo.   As discussed above, the Court lacks authority to authorize or direct the Trustee to take such actions in contravention of the Indenture.

## C. *The Fairness Opinion Demonstrates that the Settlement Agreement is Unfair*

The Motion suggests that the Trustee is relying on the Fairness Opinion for the fairness of the Settlement Agreement.   *See* Settlement Agreement § 1(n).   ▒▒▒▒▒▒▒▒▒▒

▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒

▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒

▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒

▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒







Accordingly, the Fairness Opinion does not provide support for the Motion or the Section 105 relief sought therein. To the contrary, the Fairness Opinion provides further evidence that the Court cannot – and should not – approve the Motion or authorize and/or direct the Trustee to take any actions in connection with, or related to, the Settlement Agreement.[12]

### D. *The Negotiation of the Settlement Was Not at Arms-Length and Violated the Indenture*

Under the Indenture, the Trustee is required to act as a fiduciary only of the Noteholders, "and the Trustee shall have no fiduciary duty to" the Counterparty. *See* Indenture § 6.16. In addition, the Indenture provides that after an Event of Default, the Controlling Class – here Class B – has the right to direct the Trustee. Nonetheless, on information and belief, in negotiating the Settlement Agreement, the Trustee did not consult *any* Noteholders. Contrary to the express BAC-Trustee Understanding, the Trustee never even informed BAC of the settlement negotiations, and BAC only learned of the Settlement Agreement on the day that the movants filed the Motion. In addition to not consulting with BAC, we question whether the Trustee consulted with Babson, who is the only other Class B Noteholder, and who, together with BAC, owns 100% of the Controlling Class and senior Notes. Rather, the Trustee negotiated exclusively with LBSF which, purportedly "as a holder of Notes, direct[ed] and instruct[ed] the Trustee enter into [the] Settlement Agreement and to take all actions necessary to consummate [its] terms." *See* Settlement Agreement § 6. These actions by the Trustee violated the terms of the Indenture and its fiduciary duty.

---

[12] The confidential nature of the Fairness Opinion is troublesome as well. Noteholders who do not agree to confidentiality have no right to the Fairness Opinion which informs, arguably, against the settlement.

Beneficiaries are entitled to the highest duty of protection. "Not honesty alone, but the punctilio of an honor the most sensitive is then the standard of behavior." *Meinhard v. Salman*, 249 N.Y. 458 (1928) (Cardozo, J.) (on fiduciary duties). A trustee "owes a fiduciary duty to act with undivided loyalty and administer the trust solely in the interest of the beneficiaries." *Ellington Credit Fund LTD v. Select Portfolio Servicing, Inc.*, 837 F.Supp.2d 162, 191 (S.D.N.Y. 2011) (citations omitted). An indenture sets forth the specific rights and duties of the trustee and the terms of the relationship between trustee and beneficiary and are "strictly defined" and limited to the terms thereof. *Id.* (citations omitted); *see also In re Drexel Burnham Lambert Group*, 1992 Bankr. LEXIS 423 *9 (Bankr S.D.N.Y. 1992) (citations omitted). This Court lacks authority under Rule 9019 and Section 105(a) to shield the Trustee from the consequences of its breaches of duty. *See, e.g., In re Rosenberg*, 495 B.R. 196 (Bankr. E.D.N.Y. 2010) (compromise and settlement that would abrogate bankruptcy trustee's duties cannot be approved).[13] Accordingly, the Court should not grant the Motion.

In addition, it is absurd for the Trustee to contend that in the negotiations, LBSF was wearing two hats and simultaneously acting both as the Counterparty and as a Noteholder. It is evident from the terms of the Settlement Agreement that LBSF was acting solely as Counterparty while the Trustee was acting on its own behalf, and not as a fiduciary for the Noteholders who were unrepresented in the negotiations. As discussed above, under the Settlement Agreement, the Trustee agreed to pay to the Noteholders from the Trust Collateral an aggregate amount of no more than $█████ that is approximately ██% of the amount that Noteholders would receive if they prevailed in litigation of the dispute — ███████████ ███████████████████████████████████████████████████████████

---

[13] Although the *Rosenberg* case deals with a statutory, not indenture, trustee, the principle should apply.

24

███████████ It is also notable that under the Inter-Noteholder Subordination Provisions, a

$██████ distribution must be paid *only* to the senior Class B Noteholders. Thus, any

suggestion by LBSF that it is relinquishing its own distribution as Noteholder would be wrong,

as none of its Notes would be entitled under the Indenture to receive any payment on account of

the Settlement.

However, it is apparent that the Trustee was not really focused on its duty to the

Noteholders; rather, it appears the Trustee was focused on getting its current and future fees paid,

and being shielded from liability.    So, in return for its agreement, at the expense of the

Noteholders, to accept ██% from the Counterparty, the Trustee negotiated with LBSF its

agreement, also at the expense of the Noteholders, for the expedited payment of all the Trustee's

fees and expenses, the reserve of $██████ for its future fees and expenses, and the entry of an

order shielding the Trustee from any claims in connection with the Trustee's entry into the

Settlement Agreement and its actions thereunder. The Non-Conflicted Noteholders would be left

with an admittedly unreasonably small payment and a defunding of the Trust, crippling the

ability of the Noteholders to continue to pursue the Litigation, with no recourse against the

Trustee. This depletion of the Trust violates multiple provisions of the Indenture which requires

that the Collateral be held in trust for the benefit of the Noteholders. *See* Indenture §§ 5.4(a),

5.5, 5.18, 7.7(d) and 7.10. The Court has no authority under Section 105 or Rule 9019, and

should not bless – or shield the Trustee from the consequences of – the Trustee's self-serving

actions which violate the terms of the Indenture to the serious detriment of the Non-Conflicted

Noteholders.

E. *The Settlement Agreement and Motion Include an Improper Poison Pill*

Under the terms of the Settlement Agreement, a Noteholder that objects to the Motion is not entitled to a distribution from the Trust Collateral; rather, such Objecting Noteholder is placed in the legal limbo discussed above (the "**Poison Pill Provision**").  Under the Bankruptcy Code, a party in interest has right to object and to be heard on a motion filed in a Chapter 11 case.  Here, the Poison Pill Provision would improperly penalize a Noteholder who files an objection, thereby impairing the right of all Noteholders to be heard.  Here, the Court cannot know whether there are additional Noteholders who, but for the Poison Pill Provision, would have objected to the Settlement Agreement.[14]  The movants fail to cite any statutory or other authority to support approval of the Poison Pill Provision.  A search of the case law did not uncover a single case where the Court approved (or even considered) a settlement agreement with a provision similar to the Poison Pill Provision here.  Accordingly, the Court should not grant the Motion.

## IV.

## CONCLUSION

BAC respectfully requests that the Court deny the Motion as a legal matter because there is no legal basis for the relief sought by the movants.  The relief sought is in contravention of the law and the Indenture.

To the extent that the Court is not inclined to deny the Motion as a legal matter, BAC requests that the Motion be adjourned to permit discovery as there are factual allegations and issues raised in the Motion upon which the movants rely for the relief sought, including, without

---

[14] For example, if a Noteholder opposes the Settlement Agreement and the Motion, but believes it would be better off with the proposed distribution than the alternative of indefinite legal limbo and required to fund the legal fees if the Trustee decides to defend the Litigation, such a Noteholder might seriously be dis-incentivized from filing an objection to the Motion.

limitation, the as-yet un-filed Trustee Affidavit, and the Fairness Opinion. BAC is also entitled

to discovery with respect to, among other things, the conduct of its Trustee and the settlement

negotiations.

For the reasons set forth above, BAC respectfully requests that the Court deny the relief

sought in the Motion, and grant such other and further relief as is just and proper.

Dated:   New York, New York
         November 14, 2013

DICONZA TRAURIG LLP

By: _____
         Allen G. Kadish
         630 Third Avenue, 7th Floor
         New York, New York 10017
         Tel: (212) 682-4940
         Fax: (212) 682-4942
         Email: akadish@dtlawgroup.com

         Counsel for BAC FLORIDA BANK

## Exhibits

| | |
|---|---|
| A | Note Valuation Report, September 20, 2013 |
| B | Note Holdings--Exum Ridge 2007-02 |
| C | BAC-Trustee Understanding |

**EXHIBIT A**

**US bank.**
Five Star Service Guaranteed ®

# EXUM RIDGE CBO 2007-2, Ltd.
## Note Valuation Report
### As of 9/20/2013

Donald F. Higgins
Assistant Vice President
(617)603-6717
donald.higgins@usbank.com

Mark Weisheipl
Analyst
(617)603-6403
mark.weisheipl@usbank.com

**US bank.**
Five Star Service Guaranteed

# EXUM RIDGE CBO 2007-2, Ltd.

## TABLE OF CONTENTS

| Name of Report | Page Number |
| --- | --- |
| Voucher | 1 |
| Schedule of Payments | 2 |
| Schedule of Administrative Expenses | 8 |
| Summary | 9 |
| Detail of Assets | 10 |
| Rating and Industry Detail | 13 |
| Ratings Stratification | 16 |
| Industry Stratification | 17 |
| Credit Event Details | 18 |
| Overcollateralization Ratio Tests | 19 |
| Interest Coverge Ratio Tests | 20 |
| Diversity Score Report | 21 |
| Ratings Change Report | 22 |
| Account Balances | 23 |
| Weighted Average Spread Report | 24 |
| Weighted Average Recovery Rate | 25 |
| Weighted Average Rating Factor | 26 |

**usbank.**

# VOUCHER

**AGGREGATE VOUCHER**

Elsan Ridge CBO 2007-2, Ltd.

| | |
|---|---|
| Payment Date | 9/23/13 |
| Period: Interest Accrual Period: | 6/24/2013 |
| Number of Days in Current Period using Actual/360 basis: | 91 |

Maturity Date: 9/22/2011 — 9/22/2013

LIBOR rate:   0.27255%

| | |
|---|---|
| Class A, Interest Rate (Act/360): | 0.58053% |
| Class B, Interest Rate (Act/360): | 2.32255% |
| Class C, Interest Rate (Act/360): | 3.77255% |
| Class D (Act/360): | 4.77255% |
| Pref Shares: | N/A |

The following amounts represent balances and payments in units of 1,000:

| CLASS | BEGINNING BALANCE PER UNIT | PRINCIPAL PAYABLE PER UNIT | INTEREST DUE THIS PERIOD PER UNIT | INTEREST DEFERRED PER UNIT | INTEREST PAYABLE PER UNIT | COMMITMENT FEE DUE PER UNIT | COMMITMENT FEE DEFAULTED PER UNIT | COMMITMENT FEE PAYABLE PER UNIT | ENDING BALANCE PER UNIT | FACTOR |
|---|---|---|---|---|---|---|---|---|---|---|
| Class A | $1,000 | $0.000000 | 0.000000 | 0.000000 | 0.000000 | 0.163176 | 0.163176 | 0.342489 | 1,000000 | 1.000000 |
| Class B | $1,000 | $0.000000 | 5.818113 | 0.000000 | 0.000000 | 0.000000 | 0.000000 | 0.000000 | 1,000.000000 | 1.000000 |
| Class C | $1,208.204990 | $0.000000 | 11.497622 | 11.497622 | 0.000000 | 0.000000 | 0.000000 | 0.000000 | 1250.029312 | 1.250000 |
| Pref Shares | $1,301.902856 | $0.000000 | 15.790063 | 15.790063 | 0.000000 | 0.000000 | 0.000000 | 0.000000 | 1317.692739 | 1.317000 |
| | 1 | $0.000000 | 0.000000 | 0.000000 | 0.000000 | 0.000000 | 0.000000 | 0.000000 | 1.000000 | 1.000000 |

The following amounts represent balances and payments for the entire issue:

| CLASS | BEGINNING PRINCIPAL BALANCE | PRINCIPAL PAYABLE | INTEREST DUE THIS PERIOD | INTEREST DEFERRED | INTEREST PAYABLE | COMMITMENT FEE DUE | COMMITMENT FEE DEFAULTED | COMMITMENT FEE PAYABLE | TOTAL AMOUNT | ENDING PRINCIPAL BALANCE |
|---|---|---|---|---|---|---|---|---|---|---|
| Class A | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $777,193.61 | $777,193.61 | $777,463.54 | $777,463.54 | $0.00 |
| Class B | $10,000,000.00 | 0.00 | $98,896.80 | $1,893,604.91 | $0.00 | $0.00 | $0.00 | $0.00 | | $16,000,000.00 |
| Class C | $17,844,706.11 | 0.00 | $196,202.88 | $196,202.88 | $0.00 | $0.00 | $0.00 | $0.00 | | $17,912,966.99 |
| Pref Shares | $17,275,635.86 | 0.00 | $212,032.12 | $212,032.12 | $0.00 | $0.00 | $0.00 | $0.00 | | $17,787,717.98 |
| | 35,000 | 0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | | $35,000.00 |
| **TOTAL** | $51,230,341.97 | 0.00 | $470,184.80 | $2,295,899.91 | $0.00 | $177,193.61 | $1,449,723.54 | $777,463.54 | $777,463.54 | $51,635,684.97 |

**US bank** — Five Star Service Guaranteed

**U.S. Bank Corporate Trust Services**
**CDO Administration Unit**
**10.5 (b) Payment Date Accounting (9)**
**Distribution of Monies from Collection Account**

## Interest Proceeds with respect to related Due Period

**(A) On each Payment Date, Interest Proceeds received during the related Due Period shall be applied as follows:**

(i) to the payment of taxes and registration and filing fees, if any, of the Co-issuers;

$    -      86,203.54

(ii) to the amounts due and payable (if any) to the following parties in the following order: first, the Trustee pursuant to the Indenture; second, the Collateral Administrator pursuant to the Collateral Administration Agreement; third, the Class A Note Agent pursuant to the Class A Note Purchase Agreement; fourth, the Shares Paying Agent pursuant to the Shares Paying Agency Agreement, in each case, including any payments made in the period between Payment Dates, in an aggregate principal amount not to exceed the Administrative Expense Cap;

$    -      86,203.54

(iii) to the payment or reimbursement of the accrued and unpaid Fees and Expenses of the Issuer in the order set forth in the definition of Administrative Expenses, in an amount up to the excess of (a) the Administrative Expense Cap, over (b) the amount paid pursuant to subclause (ii) of this Section 11.1(A) above;

$    8,720.00      77,483.54

(iv) to the payment pro rata of (x) accrued and unpaid interest on the Class A Notes (including Defaulted Interest on the Class A Notes, if any, and interest on any such Defaulted Interest) in accordance with amounts then due and payable and (y) the Class A Commitment Fee and any interest accrued on any Class A Commitment Fee which was not paid on prior Payment Dates;

$    -      77,483.54

(v) to the payment of accrued and unpaid interest on the Class B Notes (including Defaulted Interest on the Class B Notes, if any, and interest on any such Defaulted Interest in accordance with amounts then due and payable;

$    77,483.54      0.00



**U.S. Bank Corporate Trust Services**
**CDO Administration Unit**
**10.5 (b) Payment Date Accounting (9)**
**Distribution of Monies from Collection Account**

(vi) if either of the Class B Coverage Tests is not satisfied on the related Determination Date, **first**, to the payment of principal of the Class A Notes in accordance with the funded outstanding principal balance of the Class A Notes until the Class B Coverage Test is satisfied on the related Determination Date (or, if sooner, the funded outstanding principal balance of the Class A Notes is reduced to zero), **second** to make a deposit to the Class A CDS Reserve Account in an amount such that the Class B Coverage Tests are satisfied on the related Determination Date (or, if sooner, up to the amount sufficient to reduce the Class A Commitments to zero), and **third**, to the payment of principal of the Class B Notes until the Class B Coverage Tests are satisfied on the related Determination Date (or, if sooner, the outstanding principal balance of the Class B Notes is reduced to zero);                                      $    -                        0.00

(vii) to the payment of accrued and unpaid interest on the Class C Notes (including Defaulted Interest on the Class C Notes, if any, and interest on any such Defaulted Interest and accrued and unpaid interest on Class C Deferred Interest but excluding any such applicable Class C Deferred Interest) in accordance with amounts then due and payable;                    $    -                        0.00

(viii) to the payment of accrued and unpaid Class C Deferred Interest, if any;                    $    -                        0.00

(ix) if either of the Class C Coverage Tests is not satisfied on the related Determination Date, up to 100% of the remaining Interest Proceeds to pay the principal of the Class C Notes in an amount such that the Class C Coverage Tests are satisfied on the related Determination Date (or, if sooner, up to the amount sufficient to reduce the outstanding principal balance of the Class C Notes to zero);                    $    -                        0.00

(x) to the payment of accrued and unpaid interest on the Class D Notes (including Defaulted Interest on the Class D Notes, if any, interest on any such Defaulted Interest and accrued and unpaid interest on Class D Deferred Interest, but excluding any such Class D Deferred Interest) in accordance with amounts then due and payable;                    $    -                        0.00

(xi) to the payment of accrued and unpaid Class D Deferred Interest, if any;                    $    -                        0.00

(xii) if either of the Class D Coverage Tests is not satisfied on the related Determination Date, up to 100% of the remaining Interest Proceeds to pay the principal of the Class D Notes in an amount such that the Class D Coverage Tests are satisfied on the related Determination Date (or, if sooner, up to the amount sufficient to reduce the outstanding principal balance of the Class D Notes to zero);                    $    -                        0.00



U.S. Bank Corporate Trust Services
CDO Administration Unit
10.5 (b) Payment Date Accounting (9)
Distribution of Monies from Collection Account

(xiii) to the payment of any remaining Administrative Expenses of the Co-Issuers (without regard to the Administrative Expense Cap), in the order and to the extent not paid under subclause (i), (ii) or (iii) as a result of the Administrative Expense Cap or otherwise;                                                                                    $                —

(xiv)   all remaining Interest Proceeds for deposit to the Preference Share Distribution Account for distribution to the Holders of the Preference Shares as a dividend thereon or as a final distribution in redemption thereof, as applicable                                                                                    $                —

(B) On each Payment Date and upon an acceleration following an Event of Default, Principal Proceeds shall be applied in the following order of priority:

(i) first, to pay the Credit Swap Counterparty any Cash Settlement Amounts owed by the Issuer (if any) under the Credit Swap Agreement on the Scheduled Termination Date, second, on or after the Maturity Date, to make a deposit of the Maturity Date Amount into the Maturity Date Account (to the extent that Principal Proceeds are not sufficient to make deposits into the Maturity Date Account, such deposits will be made in accordance with Section 10.4) and third, unless the Credit Swap Counterparty is the sole Affected Party or a Defaulting Party, to pay any termination payments owed to Credit Swap Counterparty;                                                                                    $                —

(ii) to the payment of the amounts specified in subclauses (i) through (vii) of clause (A) above (and in the same manner and order of priority), but only to the extent not paid in full after the application of Interest Proceeds provided for thereunder;                                                                                    $             0.00

(iii) to the payment of the amounts specified in subclause (x) of clause (A) above, but only to the extent not paid in full after application of Interest Proceeds provided for thereunder;                                                                                    $             0.00



**U.S. Bank Corporate Trust Services**
CDO Administration Unit
10.5 (b) Payment Date Accounting (9)
Distribution of Monies from Collection Account

(iv) (a) if the Notes are to be redeemed on such Payment Date in connection with a Tax Event or an Optional Redemption, to the payment of the Total Redemption Amount (as defined herein), including the Redemption Price (without duplication of any payments received by any Class of Notes pursuant to clause (A) above or subclauses (II), (III) and (IV) of this clause (B)) payable with respect to each Class of Notes, or (b) on any Payment Date on or after the Notes have been paid in full, if the Preference Shares are to be redeemed on such Payment Date in connection with an Optional Redemption, the remaining funds after payment of all amounts payable prior to the Preference Shares in accordance with the Priority of Payments will be deposited to the Preference Share Distribution Account for distribution to the Holders of the Preference Shares in redemption thereof;                                                                                      $        -           0.00

(v) [Reserved]                                                                                                          $        -           0.00

(vi) first, to the payment of principal of the Class A Notes in accordance with the aggregate funded outstanding principal balance of the Class A Notes until the funded outstanding principal balance of the Class A Notes have been paid in full and second, to make a deposit to the Class A CDS Reserve Account up to the amount sufficient to reduce the Class A Commitments to zero;                                                                                                                            $        -           0.00

(vii) first, to the payment of principal of the Class B Notes until the aggregate outstanding principal amount of the Class B Notes has been reduced to zero;                                      $        -           0.00

(viii) to the payment of the amounts specified in subclause (viii) of clause (A) above (and in the same manner and order of priority), but only to the extent not paid in full after the application of Interest Proceeds provided for thereunder;                                                                   $        -           0.00

(ix) to the payment of principal of the Class C Notes until the aggregate outstanding principal amount of the Class C Notes has been reduced to zero.                                          $        -           0.00

(x) to the payment of the amounts specified in subclause (xi) of clause (A) above (and in the same manner and order of priority), but only to the extent not paid in full after the application of Interest Proceeds provided for thereunder;                                                                   $        '           0.00

(xi) to the payment of principal of the Class D Notes until the aggregate outstanding principal amount of the Class D Notes has been reduced to zero;                                            $        -           0.00



**U.S. Bank Corporate Trust Services**
CDO Administration Unit
10.5 (b) Payment Date Accounting (9)
Distribution of Monies from Collection Account

as of 9/20/2013
Page 6

(xii) [Reserved]                                                                                    $            -          0.00

(xiii) [Reserved]                                                                                   $            -          0.00

(xiv) first, to the payment of the amounts specified in subclause (xiii) of clause (A) above (and in
the same manner and order of priority), but only to the extent not paid in full after the application
of Interest Proceeds provided for thereunder, and second, to the payment of any termination
payments to the Credit Swap Counterparty if it is the sole Affected Party or a Defaulting Party;
and

(xv)  all remaining Principal Proceeds for deposit to the Preference Share Distribution Account
for distribution to the Holders of the Preference Shares as a dividend thereon or as a final
distribution in redemption thereof, as applicable.                                                  $            -          0.00

**For the avoidance of doubt, no Principal Proceeds will be applied to any Class of Notes in
accordance with the Priority of Payments on any Payment Date if, after giving effect to
such payment, any Overcollateralization Ratio Test of a more senior Class of Notes would
have failed.**

[C]  On the Maturity Date, after calculation of the Maturity Date Amount, in order to determine
which Classes of Notes have a Deferred Maturity Date, the following comparison is required
where Principal Proceeds are applied: (X) assuming that the Maturity Date Amount is equal to
the actual Maturity Date Amount, and (Y) assuming that the Maturity Date Amount is equal to
zero.  After a comparison of (X) and (Y), to the extent that certain Classes of Notes would
remain due and unpaid under scenario (X) but would be paid in full or to a greater extent under
scenario (Y), such Classes of Notes shall have a Deferred Maturity Date.  The Deferred Maturity
Date shall only apply to the portion of the principal balance that would be paid under scenario (Y)
but would not be paid under scenario (X).                                                            $            -          0.00

(D)  On the Deferred Maturity Date, any remaining amounts in the Maturity Date Account, will be
applied in the following:

(i)  to pay any amounts owed to the Credit Swap Counterparty to the extent not paid under
subclause (I) of clause (B) above;                                                                   $            -          0.00



**U.S. Bank Corporate Trust Services**
**CDO Administration Unit**
**10.5 (b) Payment Date Accounting (9)**
**Distribution of Monies from Collection Account**

(i)  to pay interest and principal on any Class of Notes in order of seniority but only to the extent not paid in full after the application of Principal Proceeds under subclauses (ii), (iii), (vi), (vii), (viii), (ix), (x), and (xi) of clause (B) above;    $    -    0.00

(iii)  to the payment of the amounts specified in subclause (xiv) of clause (B) above (and in the same manner and order of priority); and;    $    -    0.00

(iv)  all remaining amounts for deposit to the Maturity Date Account for distribution to the Holders of the Preference Shares as a final distribution in redemption therof.    $    -    0.00



# Exum Ridge CBO 2007-2, Ltd.

## Schedule of Administrative Expenses

as of 9/20/2013
Page 8

| | Amount Due | Amount Paid | Outstanding |
|---|---|---|---|
| US Bank (Legal Fees) | 8,720.00 | 8,720.00 | - |
| Pricewaterhouse Coopers LLP (Agreed-Upon Procedures Report) | 2,563.11 | - | 2,563.11 |
| Pricewaterhouse Coopers LLP (PFIC) | 6,325.35 | - | 6,325.35 |
| Puglisi & Associates (Annual Fee) | 11,150.00 | - | 11,150.00 |
| Moody's (Annual Monitoring Fee) | 30,000.00 | - | $30,000.00 |
| Total | 58,758.46 | 8,720.00 | 50,038.46 |



EXUM RIDGE CBO 2007-2, Ltd.

SUMMARY

as of 9/20/2013
Page 9

## Notes

| | Balance | Interest Rate |
|---|---|---|
| Class A | | |
| Class A Commitment | 226,124,427 | 0.31% |
| Class A Advances | - | 0.58% |
| Class B | 16,000,000 | 2.22% |
| Class C | 17,644,706 | 3.77% |
| Class D | 17,575,686 | 4.77% |
| Preference Shares | 30,000 | 0.00% |

## Assets

| | |
|---|---|
| Eligible Investments | $67,119,797.97 |
| Aggregate Reference Entity Calculation Amount | $293,370,000.00 |

## Tests and Statistics

| | Initial | Prior | Current | Trigger | Result |
|---|---|---|---|---|---|
| Class A/B Overcollateralization Ratio Test | 121.10% | 121.16% | 121.16% | 113.00% | PASS |
| Class C Overcollateralization Ratio Test | 114.37% | 112.93% | 112.93% | 109.00% | PASS |
| Class D Overcollateralization Ratio Test | 108.66% | 105.78% | 105.78% | 105.50% | PASS |
| Class A/B Interest Coverage Ratio Test | 686.27% | 1.00% | 2.93% | 125.00% | FAIL |
| Class C Interest Coverage Ratio Test | 409.88% | 0.96% | 2.82% | 120.00% | FAIL |
| Class D Interest Coverage Ratio Test | 287.69% | 0.91% | 2.68% | 110.00% | FAIL |
| Diversity Score | 41 | 41 | 41 | N/A | FAIL |
| Weighted Average Rating Factor | 2452 | 3443 | 3443 | N/A | N/A |
| Weighted Average Spread | 3.31% | 3.31% | 3.31% | N/A | N/A |
| Weighted Average Recovery | 37.8% | 37.8% | 37.8% | N/A | N/A |



EXUM RIDGE CBO 2007-2, Ltd.

DETAIL OF ASSETS

as of 9/20/2013
Page 10

| Reference Entity | Amount | Calculation Percentage | Reference Spread | Jurisdiction | Restructuring Applicable | Benchmark Obligation | Coupon | Maturity |
|---|---|---|---|---|---|---|---|---|
| ABITIBI-CONSOLIDATED INC. | $6,000,000.00 | 2.05% | 5.45% | CA | N | US035956AJ70 | 8.38% | 9/22/2014 |
| ADVANCED MICRO DEVICES, INC. | $6,000,000.00 | 2.05% | 4.20% | US | N | US007903AJ68 | 7.75% | 9/22/2014 |
| American Axle & Manufacturing, Inc. | $4,000,000.00 | 1.36% | 3.00% | US | Y | US02406FAE07 | 5.25% | 9/22/2014 |
| AnnTaylor, Inc. | $5,000,000.00 | 1.70% | 3.45% | US | N | US043535AA92 | 8.75% | 9/22/2014 |
| AVAGO TECHNOLOGIES Holding Pte. Ltd. | $1,000,000.00 | 0.34% | 3.90% | US | N | US05536XAC56 | 11.88% | 9/22/2014 |
| Avis Budget Car Rental | $4,000,000.00 | 1.36% | 2.25% | US | N | US05536XAC56 | 8.38% | 9/22/2014 |
| Basell AF S.C.A. | $6,000,000.00 | 2.05% | 3.60% | US | N | US05373AA835 | 7.75% | 9/22/2014 |
| BOMBARDIER INC. | $3,000,000.00 | 1.02% | 2.15% | CA | Y | USL67302AA46 | 8.38% | 9/22/2014 |
| BON-TON Stores Inc. | $6,000,000.00 | 2.05% | 3.05% | US | N | USC10802AG20 | 6.75% | 9/22/2014 |
| BOYD GAMING CORPORATION | $5,000,000.00 | 1.70% | 2.50% | US | N | US097678NAA00 | 10.25% | 9/22/2014 |
| CELESTICA INC. | $6,000,000.00 | 2.05% | 4.90% | CA | N | US15101QAB41 | 6.75% | 9/22/2014 |
| CINCINNATI BELL INC. | $6,000,000.00 | 2.05% | 2.50% | US | N | US171871AE66 | 7.88% | 9/22/2014 |
| Clear Channel Communications, Inc. | $2,000,000.00 | 0.68% | 2.50% | US | N | US184502AD42 | 8.38% | 9/22/2014 |
| CSC Holdings, Inc. | $6,000,000.00 | 2.05% | 2.30% | US | N | US12503AAP98 | 6.88% | 9/22/2014 |
| Deluxe Corp | $1,000,000.00 | 0.34% | 2.79% | US | N | US12504AAP98 | 7.63% | 9/22/2014 |
| DIRECTV Holdings LLC | $4,000,000.00 | 1.36% | 2.05% | US | N | US25459HAB15 | 5.00% | 9/22/2014 |
| Dole Food Company, Inc. | $4,000,000.00 | 1.36% | 6.00% | US | N | US25459HAB15 | 8.38% | 9/22/2014 |
| DOMTAR INC. | $1,000,000.00 | 0.34% | 2.00% | CA | N | US25756AA29 | 8.88% | 9/22/2014 |
| EchoStar DBS Corporation | $1,000,000.00 | 0.34% | 1.75% | US | N | US25756VAU43 | 7.88% | 9/22/2014 |
| EMI Group plc | $2,000,000.00 | 0.68% | 2.65% | GB | N | US27876GAV44 | 6.63% | 9/22/2014 |
| EMMIS Comms Corp. | $1,000,000.00 | 0.34% | 2.75% | US | N | XS0171748107 | 8.63% | 9/22/2014 |
| Expedia Inc. | $6,000,000.00 | 2.05% | 1.80% | US | N | US2915157AB75 | 6.88% | 9/22/2014 |
| FAIRFAX FINANCIAL HOLDINGS LIMITED | $6,000,000.00 | 2.05% | 3.35% | CA | N | US303712PAA30 | 7.46% | 9/22/2014 |
| FelCor Lodging Limited Partnership | $1,000,000.00 | 0.34% | 1.85% | US | N | US303001AG75 | 7.38% | 9/22/2014 |
| FLEXTRONICS INTERNATIONAL LTD | $4,000,000.00 | 1.36% | 1.85% | US | N | US31430QAL14 | 8.50% | 9/22/2014 |
| Ford Motor Company | $5,000,000.00 | 1.70% | 6.30% | US | N | US33383BEAH09 | 6.50% | 9/22/2014 |
| FORD MOTOR CREDIT COMPANY | $6,000,000.00 | 2.05% | 3.50% | US | N | US34537DCA64 | 7.45% | 9/22/2014 |
| Freescale Semiconductor, Inc. | $4,000,000.00 | 1.36% | 4.65% | US | N | US34538TTZ65 | 7.00% | 9/22/2014 |
| GENERAL MOTORS CORPORATION | $6,000,000.00 | 2.05% | 4.65% | US | N | US35687NAL19 | 8.88% | 9/22/2014 |
| Georgia-Pacific Corporation | $2,000,000.00 | 0.68% | 2.30% | US | N | US3704428534 | 7.13% | 9/22/2014 |
| Harrah's Entertainment, Inc. | $5,000,000.00 | 1.70% | 2.85% | US | N | US37358BBR83 | 7.75% | 9/22/2014 |
| HCA Inc. | $6,000,000.00 | 2.05% | 3.75% | US | Y | US404119AE97 | 6.95% | 9/22/2014 |
| Hertz Corporation | $6,000,000.00 | 2.05% | 3.75% | US | N | US404130TAN01 | 5.38% | 9/22/2014 |
| Host Hotels & Resorts LP | $3,000,000.00 | 1.02% | 2.50% | US | N | US428040BY46 | 10.50% | 9/22/2014 |
| Huntsman International LLC | $3,000,000.00 | 1.02% | 1.53% | US | N | US44108EAS72 | 7.13% | 9/22/2014 |
| INEOS GROUP HOLDINGS PLC | $4,000,000.00 | 1.36% | 3.40% | GB | N | US44701QAH56 | 7.38% | 9/22/2014 |
| Intelsat, Ltd. | $6,000,000.00 | 2.05% | 4.65% | GB | N | XS0242943587 | 7.88% | 9/22/2014 |
| K Hovnanian Enterprises, Inc. | $2,000,000.00 | 0.68% | 4.10% | US | N | US45820EAH53 | 6.50% | 9/22/2014 |
| Kinder Morgan Inc. | $5,000,000.00 | 1.70% | 3.75% | US | N | US49424BAQ54 | 6.50% | 9/22/2014 |
| Koninklijke Ahold N.V. | $4,000,000.00 | 1.36% | 1.30% | US | N | US49424BBA60 | 6.50% | 9/22/2014 |
| | $1,000,000.00 | 0.34% | 0.85% | NL | Y | XS0140280644 | 5.88% | 9/22/2014 |



**EXUM RIDGE CBO 2007-2, Ltd.**
DETAIL OF ASSETS

as of 9/20/2013
Page 11

| Reference Entity | Amount | Calculation Percentage | Reference Spread | Jurisdiction | Restructuring Applicable | Benchmark Obligation | Coupon | Maturity |
|---|---|---|---|---|---|---|---|---|
| Las Vegas Sands Corp. | $1,000,000.00 | 0.34% | 2.30% | US | N | US551785X4B36 | 6.38% | 9/22/2014 |
| Levi Strauss & Co. | $1,000,000.00 | 0.34% | 2.95% | US | N | US52736RAN26 | 12.25% | 9/22/2014 |
| LIN Television Corporation | $2,000,000.00 | 0.68% | 2.25% | US | N | US52275BAJ03 | 6.50% | 9/22/2014 |
| Louisiana-Pacific Corporation | $3,000,000.00 | 1.02% | 1.45% | US | N | US546347AB19 | 8.88% | 9/22/2014 |
| MGM MIRAGE | $4,000,000.00 | 1.36% | 2.60% | US | Y | US54634SAC52 | 8.88% | 9/22/2014 |
| Mirant North America LLC | $1,000,000.00 | 0.34% | 2.90% | US | N | US5528S2AC52 | 9.75% | 9/22/2014 |
| NAVISTAR INTERNATIONAL CORPORATION | $1,000,000.00 | 0.34% | 2.05% | US | N | US60046TAA54 | 7.38% | 9/22/2014 |
| Nortel Networks Corporation | $1,000,000.00 | 0.34% | 2.90% | US | N | US63934EAH18 | 7.50% | 9/22/2014 |
| NOVA CHEMICALS CORPORATION | $5,000,000.00 | 1.70% | 3.20% | CA | N | US66986BAB83 | 4.25% | 9/22/2014 |
| NTL Cable PLC | $5,000,000.00 | 1.70% | 3.20% | GB | Y | US66977WAF68 | 6.50% | 9/22/2014 |
| NXP BV | $4,000,000.00 | 1.36% | 4.15% | GB | Y | XS0190005688 | 8.75% | 9/22/2014 |
| Omnicare Inc. | $2,000,000.00 | 0.68% | 3.95% | US | N | US68194DAG30 | 9.50% | 9/22/2014 |
| Owens-Illinois Inc. | $2,000,000.00 | 0.68% | 2.05% | US | N | US69007B8BF28 | 6.13% | 9/22/2014 |
| Peabody Energy Corporation | $1,000,000.00 | 0.34% | 3.10% | US | N | US704549AA29 | 7.80% | 9/22/2014 |
| PolyOne Corporation | $2,000,000.00 | 0.68% | 1.20% | US | N | US73179PAB22 | 6.88% | 9/22/2014 |
| PRIMEDIA Inc. | $5,000,000.00 | 1.70% | 4.60% | US | N | US74157KAF94 | 8.88% | 9/22/2014 |
| Qwest Corporation | $3,000,000.00 | 1.02% | 2.40% | US | N | US74837TAN33 | 8.88% | 9/22/2014 |
| Qwest Corporation | $2,000,000.00 | 0.68% | 1.45% | US | N | US912820AL99 | 8.88% | 9/22/2014 |
| RH Donnelley Corp | $1,000,000.00 | 0.34% | 2.65% | US | N | US749505AA83 | 7.20% | 9/22/2014 |
| ROYAL CARIBBEAN CRUISES LTD. | $1,000,000.00 | 0.34% | 1.10% | US | N | US74965WAG42 | 8.88% | 9/22/2014 |
| Sabre Holdings Corporation | $6,000,000.00 | 2.05% | 3.65% | US | N | US78601SAP78 | 8.88% | 9/22/2014 |
| Saks Incorporated | $1,000,000.00 | 0.34% | 2.50% | US | N | US80015SAA43 | 7.35% | 9/22/2014 |
| Sanmina-SCI Corporation | $6,000,000.00 | 2.05% | 5.10% | US | N | US800907AJ63 | 8.88% | 9/22/2014 |
| Sears Roebuck Acceptance Corp. | $1,000,000.00 | 0.34% | 1.30% | US | N | US812404EK62 | 7.00% | 9/22/2014 |
| SERVICE CORPORATION INTERNATIONAL | $2,000,000.00 | 0.68% | 1.30% | US | Y | US81756SAP96 | 7.70% | 9/22/2014 |
| Sinclair Broadcast Group Inc. | $1,000,000.00 | 0.34% | 2.40% | US | N | US82922SAM12 | 8.00% | 9/22/2014 |
| Six Flags, Inc. | $3,000,000.00 | 1.02% | 6.40% | US | N | US83001PAF62 | 9.75% | 9/22/2014 |
| Smurfit-Stone Container Enterprises, Inc. | $5,000,000.00 | 1.70% | 3.55% | US | N | US47508XAD75 | 7.50% | 9/22/2014 |
| Solectron Corporation | $2,000,000.00 | 0.68% | 2.55% | US | N | US83418XAB55 | 8.00% | 9/22/2014 |
| Standard Pacific Corp. | $4,000,000.00 | 1.36% | 4.15% | US | N | US85375CAN11 | 6.88% | 9/22/2014 |
| Starwood Hotels & Resorts Worldwide, Inc. | $5,000,000.00 | 1.70% | 1.50% | US | N | US85590XAD53 | 7.88% | 9/22/2014 |
| STATION CASINOS, INC. | $4,000,000.00 | 1.36% | 2.90% | US | N | US85766RAV53 | 6.00% | 9/22/2014 |
| SunGard Data Systems Inc. | $6,000,000.00 | 2.05% | 1.47% | US | N | US85767BAK90 | 10.25% | 9/22/2014 |
| SUPERVALU INC. | $1,000,000.00 | 0.34% | 4.52% | US | Y | US86863SAH44 | 7.50% | 9/22/2014 |
| TENET HEALTHCARE CORPORATION | $3,000,000.00 | 1.02% | 0.95% | US | N | US88033GAY61 | 7.38% | 9/22/2014 |
| Tesoro Corporation | $1,000,000.00 | 0.34% | 1.35% | US | N | US881609AQ40 | 6.25% | 9/22/2014 |
| The Gap, Inc. | $3,000,000.00 | 1.02% | 1.35% | US | N | US364750AG36 | 9.80% | 9/22/2014 |
| The Goodyear Tire & Rubber Company | $2,000,000.00 | 0.68% | 2.05% | US | N | US382550AU49 | 7.86% | 9/22/2014 |
| The Neiman Marcus Group, Inc. | $2,000,000.00 | 0.68% | 2.30% | US | N | US640204AE35 | 7.88% | 9/22/2014 |
| The Williams Companies, Inc. | $1,000,000.00 | 0.34% | 1.35% | US | N | US969457BF63 | 7.13% | 9/22/2014 |
| Toys 'R' Us, Inc. | $2,000,000.00 | 0.68% | 5.15% | US | Y | US88233SAL43 | 7.38% | 9/22/2014 |



**EXUM RIDGE CBO 2007-2, Ltd.**

DETAIL OF ASSETS

as of 9/20/2013
Page 12

| Reference Entity | Amount | Calculation Percentage | Reference Spread | Jurisdiction | Restructuring Applicable | Benchmark Obligation | Coupon | Maturity |
|---|---|---|---|---|---|---|---|---|
| Travelport Inc. | $1,000,000.00 | 0.34% | 3.10% | US | N | US87238CAB00 | 9.88% | 9/22/2014 |
| Triad Hospitals, Inc. | $3,000,000.00 | 1.02% | 1.85% | US | N | US89579KAE91 | 7.00% | 9/22/2014 |
| Tribune Company | $5,000,000.00 | 1.70% | 4.05% | US | Y | US89647JAF41 | 5.25% | 9/22/2014 |
| TRW Automotive Inc. | $2,000,000.00 | 0.68% | 2.40% | US | N | US87264QAM24 | 9.38% | 9/22/2014 |
| Unisys Corporation | $5,370,000.00 | 1.83% | 3.50% | US | N | US909214BK33 | 8.50% | 9/22/2014 |
| United Rentals (North America), Inc. | $6,000,000.00 | 2.05% | 3.40% | US | N | US911365AJ30 | 7.75% | 9/22/2014 |
| UNITED STATES STEEL CORPORATION | $2,000,000.00 | 0.68% | 0.55% | US | N | US912909AA63 | 9.75% | 9/22/2014 |
| Univision Communications Inc | $6,000,000.00 | 2.05% | 4.90% | US | Y | US914906AB87 | 7.85% | 9/22/2014 |
| VNU Group B.V. | $2,000,000.00 | 0.68% | 4.05% | NL | Y | XS0168516713 | 5.63% | 9/22/2014 |
| WDAC Subsidiary Corp. | $4,000,000.00 | 1.36% | 3.88% | LU | Y | XS0206614702 | 8.50% | 9/22/2014 |



**EXUM RIDGE CBO 2007-2, Ltd.**
**RATINGS AND INDUSTRY DETAIL**

as of 9/20/2013
Page 13

| Reference Entity | Calculation Percentage | Type | Recovery | Moody's Rating | S&P Rating | Moody's Industry | S&P Industry |
|---|---|---|---|---|---|---|---|
| ABITIBI-CONSOLIDATED INC. | 2.05% | BOND | 45.00% | Ca | D | Printing and Publishing | Forest Products |
| ADVANCED MICRO DEVICES, INC. | 2.05% | BOND | 45.00% | C | D | Electronics | Electronics/electric |
| American Axle & Manufacturing, Inc. | 1.36% | BOND | 45.00% | B3 | BB- | Automobile | Automobile |
| AnviilMentor, Inc. | 1.70% | BOND | 45.00% | B3 | B- | Automobile | Automotive |
| AVAGO TECHNOLOGIES Holding Pte. Ltd. | 0.34% | BOND | 22.50% | B | B | Electronics | Automotive |
| Avis Budget Car Rental | 1.36% | BOND | 45.00% | B2 | B- | Electronics | Electronics/electric |
| Basell AF S.C.A. | 2.05% | BOND | 45.00% | B2 | B+ | Electronics | Electronics/electric |
| BOMBARDIER INC. | 2.05% | BOND | 20.00% | B3 | B+ | Diversified/Conglomerate Service | Leisure goods/activities/movies |
| BOMBARDIER INC. | 1.02% | BOND | 45.00% | Caa1 | D | Chemicals, Plastics and Rubber | Chemical/Plastics |
| BON-TON Stores Inc. | 2.05% | BOND | 45.00% | Ba2 | B- | Aerospace and Defense | Aerospace and Defense |
| BOYD GAMING CORPORATION | 1.70% | BOND | 22.50% | Caa2 | B- | Retail Stores | Retailers (except food and drug) |
| CELESTICA INC. | 2.05% | BOND | 22.50% | B1 | B- | Lodging and Casinos | Lodging and Casinos |
| CINCINNATI BELL INC. | 2.05% | BOND | 22.50% | Caa1 | B | Hotels, Motels, Inns and Gaming | Electronics |
| CINCINNATI BELL INC. | 0.68% | BOND | 22.50% | B1 | BB | Electronics | Electronics/electric |
| Clear Channel Communications, Inc. | 2.05% | BOND | 45.00% | Ca | B | Telecommunications | Telecommunications/cellular communications |
| CSC Holdings, Inc. | 0.34% | BOND | 45.00% | Ba3 | BB- | Broadcasting and Entertainment | Broadcast / Radio and Television |
| Deluxe Corp | 1.36% | BOND | 45.00% | B1 | B+ | Broadcasting and Entertainment | Cable and satellite television |
| DirecTV Holdings LLC | 0.68% | BOND | 45.00% | Baa2 | BBB | Diversified/Conglomerate Service | Cable and satellite television |
| Dole Food Company, Inc. | 1.36% | BOND | 45.00% | B3 | B | Beverage, Food and Tobacco | Food Products |
| DOW FAR INC. | 0.34% | BOND | 45.00% | B2 | B | Printing and Publishing | Forest Products |
| EchoStar DBS Corporation | 0.34% | BOND | 45.00% | Baa3 | BBB- | Broadcasting and Entertainment | Cable and satellite television |
| EMI Group plc | 0.68% | BOND | 45.00% | Ba3 | B- | Broadcasting and Entertainment | Leisure goods/activities/movies |
| EMMIS Comms Corp. | 0.34% | BOND | 20.00% | B3 | CCC- | Leisure, Amusement, Entertainment | Broadcast/Radio and Television |
| Expedia Inc. | 2.05% | BOND | 22.50% | Caa3 | CCC | Broadcasting and Entertainment | Leisure goods/activities/movies |
| FAIRFAX FINANCIAL HOLDINGS LIMITED | 2.05% | BOND | 45.00% | Ba1 | BBB- | Personal Transportation | Insurance |
| FilmCo Lodging Limited Partnership | 0.34% | BOND | 45.00% | Ba3 | B+ | Insurance | Lodging and Casinos |
| FLEXTRONICS INTERNATIONAL LTD | 1.36% | BOND | 45.00% | B3 | B+ | Buildings and Real Estate | Electronics/electric |
| FORD MOTOR CREDIT COMPANY | 1.36% | BOND | 22.50% | Ba1 | BBB- | Electronics | Automotive |
| Ford Motor Company | 1.70% | BOND | 45.00% | B2 | B | Automobile | Automotive |
| Freescale Semiconductor, Inc. | 1.36% | BOND | 45.00% | Ba3 | B | Electronics | Electronics/electric |
| GENERAL MOTORS CORPORATION | 2.05% | BOND | 45.00% | Caa1 | B- | Banking | Automotive |
| Georgia-Pacific Corporation | 0.68% | BOND | 45.00% | B | B- | Electronics | Electronics/electric |
| Harrah's Entertainment, Inc. | 0.68% | BOND | 45.00% | Caa2 | B- | Automobile | Automotive |
| HCA Inc. | 1.70% | BOND | 45.00% | B3 | B- | Personal, Food and Miscellaneous Services | Personal, Food and Miscellaneous Services |
| Hertz Corporation | 2.05% | BOND | 45.00% | Caa1 | B | Hotels, Motels, Inns and Gaming | Forest Products |
| Host Hotels & Resorts LP | 0.34% | BOND | 22.50% | B | B+ | Healthcare, Education and Childcare | Lodging and Casinos |
| Huntsman International LLC | 1.02% | BOND | 45.00% | B3 | B | Personal Transportation | Healthcare |
| INEOS GROUP HOLDINGS PLC | 1.36% | BOND | 22.50% | Ba2 | B- | Buildings and Real Estate | Lodging and Casinos |
| Intelsat, Ltd. | 2.05% | BOND | 20.00% | B | B- | Chemicals, Plastics and Rubber | Equipment leasing |
| K Hovnanian Enterprises, Inc. | 0.68% | BOND | 45.00% | Caa1 | B | Chemicals, Plastics and Rubber | Chemical/Plastics |
| Kinder Morgan Inc. | 1.70% | BOND | 45.00% | Ba2 | CCC+ | Telecommunications | Telecommunications/cellular communications |
| Koninklijke Ahold N.V. | 1.36% | BOND | 45.00% | Baa3 | BB | Buildings and Real Estate | Building and development |
| | 0.34% | BOND | 20.00% | Baa3 | BBB | Oil and Gas | Oil and Gas |



**EXUM RIDGE CBO 2007-2, Ltd.**
**RATINGS AND INDUSTRY DETAIL**

as of 9/20/2013
Page 14

| Reference Entity | Calculation Percentage | Type | Recovery | Moody's Rating | S&P Rating | Moody's Industry | S&P Industry |
|---|---|---|---|---|---|---|---|
| Las Vegas Sands Corp. | 0.34% | BOND | 45.00% | Ba2 | BB+ | Hotels, Motels, Inns and Gaming | Lodging and Casinos |
| Levi Strauss & Co. | 0.34% | BOND | 45.00% | Ba3 | B+ | Textiles and Leather | Clothing/Textiles |
| LIN Television Corporation | 0.68% | BOND | 22.50% | B2 | B+ | Broadcasting and Entertainment | Broadcast Radio and Television |
| Louisiana-Pacific Corporation | 1.02% | BOND | 45.00% | Ba3 | BB | Buildings and Real Estate | Building and development |
| MGM MIRAGE | 1.36% | BOND | 45.00% | B1 | B+ | Buildings and Real Estate | Building and development |
| Mirant North America LLC | 0.34% | BOND | 45.00% | Ba3 | B+ | Hotels, Motels, Inns and Gaming | Lodging and Casinos |
| NAVISTAR INTERNATIONAL CORPORATION | 0.34% | BOND | 45.00% | Caa1 | CCC+ | Cargo Transport | Automotive |
| Nortel Networks Corporation | 0.34% | BOND | 45.00% | D | D | Telecommunications | Telecommunications |
| NOVA CHEMICALS CORPORATION | 1.70% | BOND | 45.00% | D | D | Chemicals, Plastics and Rubber | Chemicals/Plastics |
| NTL Cable PLC | 1.70% | BOND | 22.50% | Caa1 | B+ | Broadcasting and Entertainment | Broadcast Radio and Television |
| NXP BV | 1.36% | BOND | 22.50% | B2 | B+ | Electronics | Electronics/electric |
| Omnicare Inc. | 0.68% | BOND | 45.00% | Ba3 | BB+ | Healthcare, Education and Childcare | Healthcare |
| Owens-Illinois Inc. | 0.34% | BOND | 45.00% | B1 | BB | Containers, Packaging and Glass | Containers and Glass Products |
| Peabody Energy Corporation | 0.68% | BOND | 45.00% | B3 | B- | Chemicals, Plastics and Rubber | Utilities |
| PolyOne Corporation | 1.70% | BOND | 45.00% | B2 | BB | Chemicals, Plastics and Rubber | Chemicals/Plastics |
| PRIMEDIA Inc. | 1.02% | BOND | 45.00% | Baa1 | BBB- | Printing and Publishing | Publishing |
| Qwest Corporation | 0.68% | BOND | 45.00% | B2 | B | Telecommunications | Telecommunications/cellular communications |
| RH Donnelley Corp | 0.34% | BOND | 45.00% | B | CCC+ | Printing and Publishing | Publishing |
| ROYAL CARIBBEAN CRUISES LTD. | 1.02% | BOND | 45.00% | Ba1 | BB | Leisure, Amusement, Entertainment | Leisure goods/activities/movies |
| Sabre Holdings Corporation | 2.05% | BOND | 22.50% | Ca | CCC+ | Printing and Publishing | Publishing |
| Saks Incorporated | 0.34% | BOND | 45.00% | B3 | B+ | Leisure, Amusement, Entertainment | Retailers (except food and drug) |
| Sanmina-SCI Corporation | 2.05% | BOND | 45.00% | Ba2 | B+ | Personal Transportation | Electronics/electric |
| Sears Roebuck Acceptance Corp. | 0.34% | BOND | 22.50% | Ba3 | B- | Retail Stores | Retailers (except food and drug) |
| SERVICE CORPORATION INTERNATIONAL | 0.68% | BOND | 45.00% | Ba3 | BB | Personal, Food and Miscellaneous Services | Personal Transportation |
| Sinclair Broadcast Group Inc. | 1.02% | BOND | 22.50% | B1 | B- | Broadcasting and Entertainment | Broadcast Radio and Television |
| Six Flags, Inc. | 0.68% | BOND | 45.00% | B2 | BB- | Leisure, Amusement, Entertainment | Leisure, Amusement, Entertainment/Movies |
| SmurfitStone Container Enterprises, Inc. | 1.70% | BOND | 45.00% | B3 | B- | Containers, Packaging and Glass | Forest Products |
| Solectron Corporation | 1.36% | BOND | 45.00% | B1 | BB | Electronics | Electronics/electric |
| Standard Pacific Corp. | 1.70% | BOND | 22.50% | B3 | B- | Buildings and Real Estate | Building and development |
| Starwood Hotels & Resorts Worldwide, Inc. | 1.36% | BOND | 45.00% | Caa1 | B+ | Hotels, Motels, Inns and Gaming | Lodging and Casinos |
| STATION CASINOS, INC. | 2.05% | BOND | 22.50% | Ba1 | BB- | Hotels, Motels, Inns and Gaming | Lodging and Casinos |
| SunGard Data Systems Inc. | 0.34% | BOND | 22.50% | B1 | B+ | Electronics | Business Equipment and Services |
| SUPERVALU INC. | 0.34% | BOND | 45.00% | B2 | BB | Grocery | Food/drug retailers |
| TENET HEALTHCARE CORPORATION | 1.02% | BOND | 45.00% | B1 | B | Healthcare, Education and Childcare | Healthcare |
| Tesoro Corporation | 0.34% | BOND | 45.00% | B1 | B+ | Oil and Gas | Oil and Gas |
| The Gap, Inc. | 0.34% | BOND | 45.00% | Caa1 | B | Retail Stores | Retailers (except food and drug) |
| The Goodyear Tire & Rubber Company | 1.02% | BOND | 45.00% | B | B | Automobile | Automotive |
| The Neiman Marcus Group, Inc. | 0.68% | BOND | 22.50% | Caa2 | B+ | Retail Stores | Retailers (except food and drug) |
| The Williams Companies, Inc. | 0.68% | BOND | 45.00% | Baa3 | BBB | Utilities | Utilities |
| Toys "R" Us, Inc. | 0.34% | BOND | 45.00% | B1 | B | Retail Stores | Retailers (except food and drug) |



## EXUM RIDGE CBO 2007-2, Ltd.
## RATINGS AND INDUSTRY DETAIL

as of 9/20/2013
Page 15

| Reference Entity | Calculation Percentage | Type | Recovery | Moody's Rating | S&P Rating | Moody's Industry | S&P Industry |
|---|---|---|---|---|---|---|---|
| Travelport Inc. | 0.34% | BOND | 22.50% | Caa1 | CCC | Leisure, Amusement, Entertainment | Leisure goods/activities/movies |
| Triad Hospitals, Inc. | 1.02% | BOND | 45.00% | B3 | B+ | Healthcare, Education and Childcare | Healthcare |
| Tribune Company | 1.70% | BOND | 45.00% | Ba3 | BB- | Printing and Publishing | Publishing |
| TRW Automotive Inc. | 0.68% | BOND | 45.00% | Ba2 | BBB- | Automobile | Automotive |
| Unisys Corporation | 1.83% | BOND | 22.50% | B2 | B- | Electronics | Business Equipment and Services |
| United Rentals (North America), Inc. | 2.05% | BOND | 45.00% | B3 | B+ | Buildings and Real Estate | Equipment leasing |
| UNITED STATES STEEL CORPORATION | 0.68% | BOND | 45.00% | Ba2 | BB- | Mining, Steel, Iron and Non-Precious Metals | Steel |
| Univision Communications Inc | 2.05% | BOND | 20.00% | Caa2 | B | Broadcasting and Entertainment | Broadcast Radio and Television |
| VNU Group B.V. | 0.68% | BOND | 20.00% | Caa1 | B- | Printing and Publishing | Publishing |
| WDAC Subsidiary Corp. | 1.36% | BOND | 30.00% | C | D | Printing and Publishing | Publishing |

**US bank.**

# EXUM RIDGE CBO 2007-2, Ltd.
## RATINGS STRATIFICATION

as of 9/20/2013
Page 16

### Moody's Rating Stratification

| Moody's Rating | Number of Reference Entities | Calculation Percentage |
|---|---|---|
| Aaa | 0 | 0.00% |
| Aa1 | 0 | 0.00% |
| Aa2 | 0 | 0.00% |
| Aa3 | 0 | 0.00% |
| A1 | 0 | 0.00% |
| A2 | 0 | 0.00% |
| A3 | 0 | 0.00% |
| Baa1 | 1 | 0.68% |
| Baa2 | 1 | 0.68% |
| Baa3 | 0 | 0.00% |
| Ba1 | 7 | 6.82% |
| Ba2 | 10 | 6.48% |
| Ba3 | 6 | 9.20% |
| B1 | 10 | 8.86% |
| B2 | 8 | 10.57% |
| B3 | 12 | 11.37% |
| Caa1 | 13 | 16.70% |
| Caa2 | 11 | 13.29% |
| Caa3 | 4 | 6.48% |
| Ca | 1 | 2.39% |
| C | 2 | 5.45% |
| D | 3 | 0.34% |
| SD | 1 | 0.00% |
| WR | 0 | 0.00% |
| Total | 90 | 100.00% |

### S&P Rating Stratification

| S&P Rating | Number of Reference Entities | Calculation Percentage |
|---|---|---|
| AAA | 0 | 0.00% |
| AA+ | 0 | 0.00% |
| AA | 0 | 0.00% |
| AA- | 0 | 0.00% |
| A+ | 0 | 0.00% |
| A | 0 | 0.00% |
| A- | 0 | 0.00% |
| BBB+ | 0 | 0.00% |
| BBB | 0 | 0.68% |
| BBB- | 4 | 2.05% |
| BB+ | 8 | 10.57% |
| BB | 7 | 5.79% |
| BB- | 11 | 11.93% |
| B+ | 14 | 15.47% |
| B | 15 | 17.04% |
| B- | 15 | 17.38% |
| CCC+ | 3 | 5.79% |
| CCC | 5 | 4.77% |
| CCC- | 1 | 0.34% |
| CC | 1 | 0.68% |
| C | 0 | 0.00% |
| D | 1 | 0.34% |
| SD | 5 | 7.84% |
| NR | 0 | 0.00% |
| Total | 90 | 100.00% |



**EXUM RIDGE CBO 2007-2, Ltd.**

**INDUSTRY STRATIFICATION**

as of 9/20/2013
Page 17

**Moody's Industry Stratification**

| Moody's Industry | Number of Reference Entities | Calculation Percentage |
|---|---|---|
| Aerospace and Defense | 1 | 1.02% |
| Automobile | 6 | 6.82% |
| Banking | 1 | 1.36% |
| Beverage, Food and Tobacco | 1 | 1.36% |
| Broadcasting and Entertainment | 9 | 9.20% |
| Buildings and Real Estate | 6 | 7.84% |
| Cargo Transport | 1 | 0.34% |
| Chemicals, Plastics and Rubber | 5 | 8.86% |
| Containers, Packaging and Glass | 2 | 2.05% |
| Diversified/Conglomerate Service | 2 | 2.73% |
| Electronics | 10 | 14.78% |
| Grocery | 2 | 0.68% |
| Healthcare, Education and Childcare | 4 | 4.77% |
| Hotels, Motels, Inns and Gaming | 6 | 8.52% |
| Insurance | 2 | 2.05% |
| Leisure, Amusement, Entertainment | 4 | 2.73% |
| Mining, Steel, Iron and Non Precious Metals | 1 | 0.68% |
| Oil and Gas | 2 | 1.70% |
| Personal Transportation | 3 | 4.43% |
| Personal, Food and Miscellaneous Services | 2 | 1.36% |
| Printing and Publishing | 7 | 7.50% |
| Retail Stores | 6 | 5.11% |
| Telecommunications | 4 | 2.39% |
| Textiles and Leather | 1 | 0.34% |
| Utilities | 3 | 1.36% |
| **Total** | **90** | **100.00%** |

**S&P Industry Stratification**

| S&P Industry | Number of Reference Entities | Calculation Percentage |
|---|---|---|
| Aerospace and Defense | 1 | 1.02% |
| Automotive | 8 | 8.52% |
| Broadcast Radio and Television | 6 | 7.84% |
| Building and development | 3 | 4.43% |
| Business Equipment and Services | 4 | 5.68% |
| Cable and satellite television | 3 | 1.36% |
| Chemical/Plastics | 5 | 8.86% |
| Clothing/Textiles | 1 | 0.34% |
| Containers and Glass Products | 1 | 0.34% |
| Electronics/electric | 8 | 12.61% |
| Equipment leasing | 2 | 2.39% |
| Food Products | 1 | 1.36% |
| Food/drug retailers | 1 | 1.36% |
| Forest Products | 2 | 4.77% |
| Healthcare | 5 | 5.45% |
| Insurance | 1 | 2.05% |
| Leisure goods/activities/movies | 6 | 6.14% |
| Lodging and Casinos | 8 | 9.89% |
| Oil and Gas | 2 | 1.70% |
| Publishing | 5 | 5.11% |
| Retailers (except food and drug) | 6 | 5.11% |
| Steel | 1 | 0.68% |
| Telecommunications/cellular communications | 4 | 2.39% |
| Utilities | 3 | 1.36% |
| **Total** | **90** | **100.00%** |



**EXUM RIDGE CBO 2007-2, Ltd.**
CREDIT EVENT DETAILS

| Reference Entity | Credit Event Notice Date | Reference Entity Calculation Amount | Reference Obligation | Final Price | Recovery Amount | Cash Settlement Amount |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |



**EXUM RIDGE CBO 2007-2, Ltd.**

**OVERCOLLATERALIZATION RATIO TESTS**

as of 9/20/2013
Page 19

| | Calculation | Ratio | Minimum | Result |
|---|---|---|---|---|
| Class B Overcollateralization | A/(B+C) | 121.16% | 113.00% | PASS |
| Class C Overcollateralization | A/(B+C+D) | 112.93% | 109.00% | PASS |
| Class D Overcollateralization | A/(B+C+D+E) | 105.78% | 105.50% | PASS |

**Notes:**

Sum of Reference Entity Calculation Amount
(excluding defaults)                                        $293,370,000.00

Plus:
Default Obligations OC                                      $0.00

**Net Collateral Principal Balance:**                       $293,370,000.00 (A)

**Collateral:**

Aggregate Outstanding Amount of Class A Notes               $226,124,426.67 (B)

Aggregate Outstanding Amount of Class B Notes               $16,000,000.00 (C)

Aggregate Outstanding Amount of Class C Notes               $14,250,000.00
Class C Deferred Interest                                   $3,394,706.09
                                              Total:        $17,644,706.09 (D)

Aggregate Outstanding Amount of Class D Notes               $13,500,000.00
Class D Deferred Interest                                   $4,075,685.86
                                              Total:        $17,575,685.86 (E)



**EXUM RIDGE CBO 2007-2, Ltd.**

**INTEREST COVERAGE RATIO TESTS**

as of 9/20/2013
Page 20

| | Calculation | Ratio | Minimum | Result |
|---|---|---|---|---|
| Class B | A/(B+C) | 2.93% | 125.00% | FAIL |
| Class C | A/(B+C+D) | 2.82% | 120.00% | FAIL |
| Class D | A/(B+C+D+E) | 2.86% | 110.00% | FAIL |

**Add:**

Actual:    Interest Received on Eligible Investments in Collection Accounts    $86,203.54

Subtotal:    $86,203.54

Projected:    Projected Interest to be Received on Eligible Investments    $39,972.94

Subtotal:    $39,972.94

**Less:**

Section 11.1(A)(i)    $8,720.00

Subtotal:    $8,720.00

**Net Interest Balance:**    $117,456.48 (A)

**Divided By:**

Scheduled Interest on Class A    $0.00

Accrued and unpaid Class A Commitment Fee    $177,193.61

Class A Defaulted Interest    $1,847,012.79

Accrued Interest on Class A Defaulted Interest    $2,718.83

Total:    $2,026,926.23 (B)

Scheduled Interest on Class B    $89,889.80

Class B Defaulted Interest    $1,875,070.57

Accrued Interest on Class B Defaulted Interest    $10,534.36

Total:    $1,975,494.73 (C)

Scheduled Interest on Class C    $135,890.39

Class C Defaulted Interest    $0.00

Accrued Interest on Class C Deferred Interest    $32,372.49

Total:    $168,262.88 (D)

Scheduled Interest on Class D    $162,863.27

Class D Defaulted Interest    $0.00

Accrued Interest on Class D Deferred Interest    $49,168.85

Total:    $212,032.12 (E)



EXUM RIDGE CBO 2007-2, Ltd.

DIVERSITY SCORE REPORT

as of 9/20/2013
Page 21

| Industry | Diversity Score | Diversity Score |
|---|---|---|
| Aerospace and Defense Total | 1.0000 | 0.90 |
| Automobile Total | 1.3068 | 2.60 |
| Banking Total | 6.0678 | 2.60 |
| Beverage, Food and Tobacco Total | 5.1475 | 1.00 |
| Broadcasting and Entertainment Total | 0.3068 | 1.00 |
| Buildings and Real Estate Total | 8.6136 | 3.02 |
| Cargo Transport Total | 5.0000 | 2.70 |
| Chemicals, Plastics and Rubber Total | 0.6136 | 0.30 |
| Containers, Packaging and Glass Total | 1.3068 | 2.67 |
| Diversified/Conglomerate Service Total | 2.0000 | 1.15 |
| Electronics Total | 8.6136 | 1.50 |
| Grocery Total | 0.6136 | 3.65 |
| Healthcare, Education and Childcare Total | 3.4542 | 0.60 |
| Hotels, Motels, Inns and Gaming Total | 5.3068 | 2.17 |
| Insurance Total | 1.0000 | 2.77 |
| Leisure, Amusement, Entertainment Total | 2.4542 | 1.00 |
| Mining, Steel, Iron and Non Precious Metals Total | 0.6136 | 1.75 |
| Oil and Gas Total | 1.3068 | 0.60 |
| Personal Transportation Total | 2.3068 | 1.15 |
| Personal, Food and Miscellaneous Services Total | 1.2271 | 1.65 |
| Printing and Publishing Total | 5.1475 | 1.10 |
| Retail Stores Total | 3.7610 | 2.70 |
| Telecommunications Total | 2.1475 | 2.27 |
| Textiles and Leather Total | 0.3068 | 1.55 |
| Utilities Total | 1.2271 | 0.30 |
| | | 1.10 |

Diversity Score:      41

Total:                        41



**EXUM RIDGE CBO 2007-2, Ltd.**

**RATINGS CHANGE REPORT**

as of 9/20/2013
Page 22

| Reference Entity | Moody's Rating | Prior Rating | Action Type | Change Date | S&P Rating | Prior Rating | Action Type | Change Date |
|---|---|---|---|---|---|---|---|---|
| **Moody's** | | | | | | | | |
| **S&P** | | | | | | | | |
| Ford Motor Company | | | | | BBB- | BB+ | Upgrade | 9/6/2013 |
| FORD MOTOR CREDIT COMPANY | | | | | BBB- | BB+ | Upgrade | 9/6/2013 |
| LIN Television Corporation | | | | | B+ | B | Upgrade | 9/10/2013 |
| Saks Incorporated | | | | | B+ | BB | Downgrade | 9/20/2013 |
| Peabody Energy Corporation | | | | | BB | BB+ | Downgrade | 8/26/2013 |
| TRW Automotive Inc. | | | | | BBB- | BB+ | Upgrade | 9/13/2013 |



**EXUM RIDGE CBO 2007-2, Ltd.**

**ACCOUNT BALANCES**

as of 9/20/2013
Page 23

| Account Name | Principal | Interest | Total | Projected Reinvestment Income |
|---|---|---|---|---|
| Class A Noteholder Collateral Account | $0.00 | $0.00 | $0.00 | $0.00 |
| Class A CDS Reserve Account | $125,914.84 | $0.00 | $125,914.84 | $0.00 |
| Contingent Class A Funding Account | $0.00 | $0.00 | $0.00 | $0.00 |
| Credit Swap Issuer Account | $208,085.45 | $0.00 | $208,085.45 | $0.00 |
| Interest Collection Account | $0.00 | $86,203.54 | $86,203.54 | $39,972.94 |
| Maturity Date Account | $0.00 | $0.00 | $0.00 | $0.00 |
| Payment Account | $0.00 | $0.00 | $0.00 | $0.00 |
| Principal Collection Account | $0.00 | $0.00 | $0.00 | $0.00 |
| Specific Investment Proceeds Account | $67,119,797.97 | $0.00 | $67,119,797.97 | $0.00 |
| **Total** | $67,453,798.26 | $86,203.54 | $67,540,001.80 | $39,972.94 |

| | # of Shares | NAV | Market Value |
|---|---|---|---|
| ABS Enhanced LIBOR | 67,327.84 | $861.76 | $58,020,440.26 |



**EXUM RIDGE CBO 2007-2, Ltd.**

**WEIGHTED AVERAGE SPREAD**

| | |
|---|---|
| Sum of Weighted Spreads of Reference Entities (excluding Defaults) | 9,713,450.00 |
| Aggregate Reference Entity Calculation Amount (excluding Defaults) | 293,370,000.00 |
| Weighted Average Spread | 3.31% |



as of 9/20/2013
Page 25

**EXUM RIDGE CBO 2007-2, Ltd.**

**WEIGHTED AVERAGE RECOVERY RATE**

| | |
|---|---|
| Sum of Weighted Recoveries of Reference Entities (excluding Defaults) | 110,958,250.00 |
| Aggregate Reference Entity Calculation Amount (excluding Defaults) | 293,370,000.00 |
| **Weighted Average Recovery Rate** | **37.8%** |



EXUM RIDGE CBO 2007-2, Ltd.

WEIGHTED AVERAGE RATING FACTOR

as of 9/20/2013
Page 26

| | |
|---|---|
| Sum of Weighted Moody's Rating Factor of Reference Entities (excluding Defaults) | 1,009,932,400,000.00 |
| Aggregate Reference Entity Calculation Amount (excluding Defaults) | 293,370,000.00 |
| Weighted Average Rating Factor | 3443 |

**EXHIBIT B**

Exum Ridge CBO 2007-02
Note Holdings - Summary

| Class | ($) Amount | Holders | ($) Amount | % |
|-------|-----------|---------|-----------|---|
| A | -0- | LBSF | -0- | 100.0 |
| B | 16,000,000 | BAC<br>Babson | 6,000,000<br>10,000,000<br>16,000,000 | 37.5<br>62.5<br>100.0 |
| C | 14,250,000 | LBSF<br>Others (unknown) | 6,498,000<br>7,752,000<br>14,250,000 | 45.6<br>54.4<br>100.0 |
| D | 13,500,000 | LBSF | 13,500,000 | 100.0 |

bac objection to lehman 9019 11-14-13

**<u>EXHIBIT C</u>**

**From:** Lina A Campos [mailto:LCampos@bacflorida.com]
**Sent:** Friday, January 04, 2013 4:02 PM
**To:** donald higgins
**Cc:** Durham, Sylvie (Shld-NY-CP)
**Subject:** Follow Up

*Don, For your information, I am forwarding to you the email that our counsel sent to yours as a follow up to our mediation hearing last month. Please let us know if you disagree with anything that our counsel has written below. Otherwise, we will assume that we are all in accord. Thank you for all your help.*

**BAC Florida Bank**

Lina Campos                    Tel: (305) 789-8071
CFO & Treasurer                Fax: (305) 569-1557
BAC Florida Bank               lcampos@bacflorida.com
169 Miracle Mile, R-10         www.bacflorida.com
Coral Gables, Florida 33134

---

**From:** Durham, Sylvie (Shld-NY-CP)
**Sent:** Wednesday, January 02, 2013 11:28 AM
**To:** 'Frank Top'
**Subject:** Follow Up

Frank,

It was a pleasure to meet with you last month. I hope you and your family had a happy holiday season. This email is a follow up to our meeting with you and US Bank last month. First, we wanted to thank you and US Bank for all of your efforts on behalf of the Noteholders and BAC.

Secondly, we just wanted to reiterate our understanding with U.S. Bank Trust going forward. As we discussed after the mediation hearing last month, BAC wants to be kept posted of all developments relating to the Exum 2007-2 transaction. This would include being notified of any communications with Lehman, the mediator or the Bankruptcy Court regarding this transaction and any other notices received by US Bank Trust relating to this transaction. We would also like to receive in advance any notices or written communications that US Bank Trust is planning to send relating to this transaction to Lehman, the mediator or the Bankruptcy Court. We would also like to reiterate that BAC would also want to be involved in any decision that is made that has any impact on the Noteholders so that it can determine how to proceed. If this does not reflect your understanding of our conversations, please let us know. Otherwise, we will assume that we will proceed as we discussed and as set forth in this email.

1

We appreciate that US Bank Trust is being put in a conflicted position and is receiving tremendous pressure from Lehman as holder of multiple tranches of the Notes. Thus, if at any time, US Bank Trust feels that it is being put in legal jeopardy by this conflicted role, we ask that you notify us so that we can take appropriate steps to protect BAC's interests without causing liability to US Bank Trust. As you know, we could consider the appointment of a co-trustee to mitigate any liability to which US Bank feels that it is being exposed due to this unfortunate situation. I'm sure that there are other remedies that we can discuss with you as well to protect US Bank Trust while preserving BAC's interests if this situation arises. We do understand that US Bank Trust has already been put in an undesirable position on these transactions and we do not want to do anything that you or US Bank feel would cause liability to the Bank so please notify us if anything of this nature occurs.

Thank you again for all of your help. Wishing you and your family a very happy and healthy New Year.

Best,

Sylvie

**Sylvie Durham**
Greenberg Traurig, LLP | MetLife Building | 200 Park Avenue | New York, NY 10166
Tel 212.801.6923 | Fax 212.805.9308
DurhamS@gtlaw.com | www.gtlaw.com

Confidentiality Note: The information contained in this e-mail and any attachments hereto are intended only for the person or entity to which it is addressed and may contain information that is legally privileged, confidential, proprietary or otherwise protected from disclosure. Dissemination, distribution or copying of this e-mail or the information herein by anyone other than the intended recipient, or an employee or agent responsible for delivering the message to the intended recipient, is strictly prohibited. If you have received this e-mail in error, please notify the sender immediately and destroy the original message and all copies.

Tax Advice Disclosure: To ensure compliance with requirements imposed by the IRS under Circular 230, we inform you that any U.S. federal tax advice contained in this communication (including any attachments), unless otherwise specifically stated, was not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code; or (2) promoting, marketing or recommending to another party any matters addressed herein.

**GT** GreenbergTraurig

If you are not an intended recipient of confidential and privileged information in this email, please delete it, notify us immediately at postmaster@gtlaw.com, and do not use or disseminate such information. Pursuant to IRS Circular 230, any tax advice in this email may not be used to avoid tax penalties or to promote, market or recommend any matter herein.