WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jacqueline Marcus

201 Redwood Shores Parkway
Redwood Shores, California 94065
Telephone: (650) 802-3000
Facsimile: (650) 802-3100
Christopher J. Cox

*Attorneys for Lehman Brothers Holdings Inc.*
*and Lehman Brothers Special Financing Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                                                            :
**In re**                                                   :   **Chapter 11 Case No.**
                                                            :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.***,**            :   **08-13555 (JMP)**
                                                            :
              Debtors.                                      :   **(Jointly Administered)**
                                                            :
------------------------------------------------------------x

**DECLARATION OF LAWRENCE BRANDMAN
IN SUPPORT OF MOTION PURSUANT TO RULE 9019
OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE
AND SECTION 105(a) OF THE BANKRUPTCY CODE FOR APPROVAL OF
(I) PARTIAL SETTLEMENT AGREEMENTS RELATING TO CERTAIN CREDIT
DEFAULT SWAP AGREEMENTS AND INDENTURES AND (II) AMENDMENT TO
PARTIAL SETTLEMENT AGREEMENT RELATING TO PEBBLE CREEK LCDO
2007-3 CREDIT DEFAULT SWAP AGREEMENT AND INDENTURE**

Pursuant to 28 U.S.C. § 1746, I, Lawrence Brandman, declare:

   1. I am over the age of 18 years and make these statements of my own

personal knowledge based on my personal experience, my review of business records of Lehman

Brothers Holdings Inc. ("LBHI" or the "Plan Administrator"), Lehman Brothers Special

Financing Inc. ("LBSF"), and/or certain of their affiliates (collectively, the "Chapter 11

US_ACTIVE:\44362492\3\58399.0011

Estates"), and/or my consultation with other employees of and advisors to the Chapter 11 Estates. If called to testify, I could testify to the truth of the matters set forth herein.

2. I submit this Declaration in support of the *Motion Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure and Section 105(a) of the Bankruptcy Code for Approval of (I) Partial Settlement Agreements Relating to Certain Credit Default Swap Agreements and Indentures and (II) Amendment to Partial Settlement Agreement Relating to Pebble Creek LCDO 2007-3 Credit Default Swap Agreement and Indenture*, dated October 18, 2013 [ECF No. 40573] (the "Motion").[1]

3. I am Managing Director, Derivatives Legal, Head of Bankruptcy Strategic Advisory with LBHI. One of my primary areas of responsibility is managing the Chapter 11 Estates' mediations relating to derivatives transactions. I also supervise the management of a portfolio of the Chapter 11 Estates' derivatives transactions, including with counterparties that are special purpose entities. In those roles I have independently reviewed, have become familiar with, and have personal knowledge regarding many derivatives transactions that the Chapter 11 Estates entered into before their bankruptcies, including the transactions that are the subject of the Motion. I have been the primary representative for the Chapter 11 Estates in connection with the matters set forth in the Motion, including for the ADR process and the negotiations that resulted in the entry into (i) two partial settlement agreements (the "Exum Ridge Agreements") among LBSF, LBHI, ABS LIBOR Fund, Ltd. (the "LIBOR Fund"), U.S. Bank National Association ("U.S. Bank" or the "Trustee"), solely in its capacity as trustee under the Indentures and either Exum Ridge CBO 2006-1, Ltd., as Issuer, and Exum Ridge CBO 2006-1, Corp., as Co-Issuer, or Exum Ridge CBO 2007-2, Ltd., as Issuer, and Exum Ridge CBO 2007-2, Corp., as

---

[1] Capitalized terms used herein but not defined shall have the meanings ascribed to them in the Motion.

2

Co-Issuer; and (ii) the amendment to the partial settlement agreement, dated as of March 8, 2013 (the "Initial Pebble Creek Agreement"), among LBHI, LBSF, the LIBOR Fund, Pebble Creek LCDO 2007-3, Ltd., as Issuer, and Pebble Creek LCDO 2007-3, Corp., as Co-Issuer, and the Trustee, solely in its capacity as trustee under the Indenture, dated as of July 19, 2007, among Pebble Creek LCDO 2007-3, Ltd., as Issuer, Pebble Creek LCDO 2007-3, Corp., as Co-Issuer, and U.S. Bank (as supplemented from time to time, the "Pebble Creek Indenture"), which was approved by the Court on April 23, 2013 [ECF No. 36763] (the "Amended Pebble Creek Agreement" and, together with the Exum Ridge Agreements, the "Settlement Agreements").

4.   I am thus fully familiar with the facts underlying the Motion, which I approved prior to its filing. I adopt the representations contained in the Motion, as if set forth in full and at length in this Declaration.

**The Exum Ridge Credit Default Swap Agreements and The Exum Ridge Indentures**

5.   It is my understanding that LBSF and each Issuer identified in the Exum Ridge Agreements (each an "Exum Ridge Issuer"), entered into a credit default swap transaction (each an "Exum Ridge Transaction") pursuant to a form ISDA Master Agreement (the "ISDA Master Agreement"), as amended and supplemented by a certain Schedule to ISDA Master Agreement (the "Schedule"), and a confirmation (the "Confirmation"). LBHI guaranteed LBSF's obligations under each ISDA Master Agreement, Schedule and Confirmation (the "Guarantee" and, together with each ISDA Master Agreement, Schedule, and Confirmation, an "Exum Ridge Credit Default Swap Agreement").[2]

6.   It is also my understanding that under each Exum Ridge Credit Default Swap Agreement, LBSF agreed to make periodic payments to the Exum Ridge Issuer in

---

[2] A description of the Credit Default Swap Agreements is set forth on Exhibit B of the Motion.

exchange for the Exum Ridge Issuer's promise to make payments to LBSF in respect of losses incurred in respect of certain specified reference obligations. In effect, LBSF, as the "Swap Counterparty," purchased protection from the Exum Ridge Issuer, which sold protection on the creditworthiness of the obligations referenced in the applicable Exum Ridge Credit Default Swap Agreement.

7. It is my further understanding that each Exum Ridge Issuer issued various classes of notes (the "Notes") under its respective Indenture and preference shares under a shares paying agency agreement (the "Preference Shares" and, together with the Notes, the "Securities"). The Notes were secured by a pool of collateral (the "Collateral") that also secured the Exum Ridge Credit Default Swap Agreement. Through a series of note purchases, LBSF is now both a holder of certain of the Notes and the Swap Counterparty under each Exum Ridge Credit Default Swap Agreement (in such latter capacity, the "Swap Counterparty"). Each Exum Ridge Issuer pledged the Collateral to the Trustee for the benefit and security of the holders of the Notes (the "Noteholders"), which now include LBSF, and to LBSF, in its capacity as Swap Counterparty. The Trustee continues to hold the Collateral under the Indenture for the benefit of the holders of the Notes (including LBSF) and LBSF as Swap Counterparty.

8. I understand that under the Granting Clause of each Exum Ridge Indenture, the Exum Ridge Issuer granted to the Trustee, for the benefit and security of the secured parties, all of its right, title and interest, whether now owned or hereafter acquired, in, to and under, *inter alia*, the Exum Ridge Issuer's rights under the Exum Ridge Credit Default Swap Agreement, the Collateral, and substantially all other assets of the Exum Ridge Issuer.

9. It is my understanding that under the terms of the Exum Ridge Indentures, the Trustee applies payment proceeds received generally in accordance with a "waterfall"

4

provision. *See* Exum Ridge Indentures § 11.1. Section 11.1(B)(i) clause "third" of the Indenture provides that a termination payment owed to LBSF as Swap Counterparty will be paid in advance of any distributions to Noteholders unless, *inter alia*, LBSF is the defaulting party under the Transaction. *See id.* § 11.1(B)(i). Under clause "second" of Section 11.1(B)(xiv), if, *inter alia*, LBSF is the defaulting party under the Exum Ridge Transaction, the termination payment owed to LBSF is paid after the Noteholders and before the holders of Preference Shares (the "Preference Shareholders"). *See id.* § 11.1(B)(xiii).[3] As a result, Section 11.1(B)(i) clause "third" and Section 11.1(B)(xiv) clause "second" of the Exum Ridge Indentures (the "Waterfall Provisions") purport to provide that LBSF will receive termination payments before any distributions are made to Noteholders unless, *inter alia*, LBSF is the defaulting party under the Exum Ridge Transaction.

## The Dispute

10. Since the Commencement Date, neither LBSF as Swap Counterparty nor the Trustee has paid any amounts that have become due under the Exum Ridge Indentures and the Exum Ridge Credit Default Swap Agreements. On November 25, 2008, the Trustee received a letter from LBSF's counsel advising, *inter alia*, that (a) any action taken to exercise remedies with respect to the Notes would violate the automatic stay and, therefore, any actions to make distributions to Noteholders would violate the stay, and (b) any provision subordinating any termination payment due LBSF would be unenforceable. On November 28, 2008, each Issuer identified in the Settlement Agreements (collectively, the "Issuers") sent to LBSF a "Notice of Early Termination" which terminated each applicable Transaction (as defined below) as of

---

[3] In the Exum Ridge Indenture, dated as of May 2, 2007, among Exum Ridge CBO 2007-2, Ltd., as Issuer, Exum Ridge CBO 2007-2, Corp., as Co-Issuer, and U.S. Bank National Association, as trustee, as supplemented from time to time, the applicable section is Section 11.1(B)(xi).

November 28, 2008.  As a result of LBSF's dispute regarding, among other things, the enforceability of the Waterfall Provisions (the "Payment Dispute"), none of the parties to any Exum Ridge Credit Default Swap Agreement has paid any amounts (including termination payments) that became due to the other applicable parties on or after November 28, 2008.

11. On April 20, 2010, LBSF commenced Derivatives ADR No. 157 by serving an ADR Notice upon the Trustee and each Issuer pursuant to the ADR Procedures Order.  On June 4, 2010, the Trustee served an ADR Response upon LBSF as required by the ADR Procedures Order.

12. On September 14, 2010, LBSF filed a complaint against, among others, the Trustee and each Issuer.  See Adversary Proceeding No. 10-03542-JMP (the "Litigation").  At issue in Derivatives ADR No. 157 and in the Litigation is the Payment Dispute, including questions as to the proper interpretation of the Exum Ridge Credit Default Swap Agreements and the Exum Ridge Indentures.  The Litigation relates to the instant Payment Dispute among the parties to the Settlement Agreements, as well as other similar disputes involving other issuers and trustees.

13. In the Litigation, LBSF seeks a declaratory judgment that provisions purporting to modify LBSF's economic rights to a termination payment premised on the bankruptcy filing of either LBHI or LBSF constitute unenforceable *ipso facto* clauses that inappropriately modify a debtor's interest in property, in violation of sections 365(e)(1) and 541(c)(1) of the Bankruptcy Code.  LBSF also seeks a declaratory judgment that effectuation of the Waterfall Provisions violates the automatic stay under section 362(a)(3) of the Bankruptcy Code because it involves an improper exercise of control over property of LBSF's estate.  In the alternative, LBSF seeks a declaratory judgment that, if the Waterfall Provisions ultimately are

found to be enforceable in whole or in part, they constitute either (i) a preferential transfer of an interest of LBSF in property that may be avoided under section 547 of the Bankruptcy Code, recovered under section 550 of the Bankruptcy Code, and preserved for the benefit of LBSF's estate under section 551 of the Bankruptcy Code; (ii) a constructive fraudulent transfer of an interest of LBSF in property that may be avoided under section 548(a)(1)(B) of the Bankruptcy Code, recovered under section 550 of the Bankruptcy Code, and preserved for the benefit of LBSF's estate under section 551 of the Bankruptcy Code; or (iii) an unauthorized postpetition transfer of property of LBSF's estate that may be avoided under section 549 of the Bankruptcy Code, recovered under section 550 of the Bankruptcy Code, and preserved for the benefit of LBSF's estate under section 551 of the Bankruptcy Code.  The positions advanced by LBSF in the Litigation are not those of the Trustee.

        14.    On October 20, 2010, the Court entered the *Order Staying Avoidance Actions and Granting Certain Related Relief Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 7004(a)(1)* [ECF No. 12199], thereby staying, among other things, certain adversary proceedings, including the Litigation, to allow parties to the Litigation and other similar actions time to explore the possibility of resolving their disputes without the need for litigation (the "Stay").  I have also been informed that the Stay has been subsequently extended by orders of the Court, most recently pursuant to the *Order Extending Stay of Avoidance Actions and Granting Certain Related Relief Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 7004(a)(1)*, dated July 18, 2013 [ECF No. 38806], which extended the Stay until January 20, 2014.  Accordingly, as a result of the Stay, the Issuers and the Trustee have not answered or otherwise moved for any relief in the Litigation.

15. On April 1, 2011, LBSF submitted an SPV Derivatives ADR Election pursuant to which LBSF recommenced the ADR process under the SPV ADR Procedures Order. The Trustee served an amended ADR Response on June 13, 2011, and LBSF served its ADR Reply on July 5, 2011. LBSF and the Trustee participated in mediations pursuant to the ADR process on and after December 7, 2012. At various junctures following the commencement of the Litigation and through and including the mediation, LBSF and the Trustee have engaged in settlement discussions.

16. I understand that throughout the course of its settlement negotiations with LBSF and its participation in the Litigation, the Trustee has made numerous attempts to contact Noteholders and Preference Shareholders for direction regarding the Payment Dispute and the application of proceeds from the sale of the Collateral. However, with limited exceptions, Noteholders and Preference Shareholders have not adequately responded to the Trustee's communications. As a result, the Trustee has advised LBSF that it is prepared to enter into the Exum Ridge Agreements, provided the Court approves of the terms of the Exum Ridge Agreements pursuant to the terms of Bankruptcy Rule 9019. Entry of an order by this Court, in the form annexed to the Motion, is a condition precedent to the effectiveness of the Settlement Agreements.

### The Initial Pebble Creek Agreement

17. The credit default swap transaction relating to Pebble Creek LCDO 2007-3, Ltd. and Pebble Creek LCDO 2007-3, Corp. (the "Pebble Creek Transaction" and, together with the Exum Ridge Transactions, the "Transactions"), is described more fully in the motion seeking approval of the Initial Pebble Creek Agreement [ECF No. 35813]. The Pebble Creek Transaction has waterfall provisions that are similar to the Exum Ridge Transactions and that are

8

also subject of the Litigation. The Initial Pebble Creek Agreement partially resolved disputes relating to the Pebble Creek Transaction by authorizing the Trustee to make distributions to LBSF in respect of all the Notes that LBSF had acquired, and providing for an escrow account for amounts relating to Notes not owned by LBSF. In May 2013, LBSF received distributions owing under the Initial Pebble Creek Agreement.

18. Based on the most recent negotiations between LBSF and the Trustee, LBHI, LBSF, the Trustee, Pebble Creek LCDO 2007-3, Ltd. and Pebble Creek LCDO 2007-3, LLC, have agreed to amend the Initial Pebble Creek Agreement to provide a more comprehensive settlement with respect to the Pebble Creek Transaction. The revised settlement reflected in the Amended Pebble Creek Agreement includes terms that are similar to the Exum Ridge Agreements, as well as other more recent settlements relating to credit default swap transactions. The Amended Pebble Creek Agreement provides LBSF with the means to settle its dispute with Noteholders, which will likely provide LBSF with an additional distribution from the Pebble Creek escrow account.

## The Settlement Agreements[4]

19. The Settlement Agreements compromise certain of the legal disputes between the parties. Although the terms of each Exum Ridge Agreement are virtually identical, each Exum Ridge Agreement is separate from the other. As a result, the reserve and escrow accounts described below will be separate for each Exum Ridge Transaction. Likewise, the conditions to effectiveness may be satisfied to one Exum Ridge Transaction and not the other.

---

[4] In keeping with the confidentiality provisions of the Parties' partial settlement, and due to LBHI's and LBSF's desire to keep the economic terms of the settlement confidential, the Settlement Agreements were not included as exhibits to the Motion. The descriptions of documents set forth herein are being provided as summaries only. In the case of an inconsistency between the summary herein and the documents, the terms of the documents shall control.

20.     Pursuant to each Exum Ridge Agreement, upon its effective date, the Exum Ridge Issuer and the Trustee shall take such actions as shall be necessary to cause certain assets held in respect of the Collateral to be redeemed or otherwise liquidated, and to cause the net proceeds thereof to be deposited with the Trustee (the "Investment Proceeds").  The Trustee shall distribute and apply the Investment Proceeds, as well as certain other amounts as set forth in each Exum Ridge Agreement, in accordance with the order, priority and procedures set forth in the respective Exum Ridge Agreement.  Specifically, the Trustee is authorized under each Exum Ridge Agreement to:  (a) pay the outstanding fees and expenses of the Trustee; (b) provided the Noteholder Settlement Amount Condition is met, pay an amount equal to the Settlement Offer in satisfaction of the claims of Noteholders other than LBSF that do not object to the Exum Ridge Agreement or the Motion; (c) place into an interest-bearing account an amount to be held in respect of a reserve, which the Trustee may use for the fees and expenses set forth in the Exum Ridge Agreement; (d) place into an account with the Trustee an amount to be used to satisfy the claims of Noteholders other than LBSF that timely object to the Exum Ridge Agreement or the Motion (an "Objecting Noteholder") if the Noteholder Settlement Amount Condition is met, or sufficient to secure payment of the claims of all Noteholders other than LBSF if the Noteholder Settlement Amount Condition is not met (the "Escrow Amount"); and (e) pay the remaining amount to LBSF upon LBSF's delivery of its Notes to the Trustee. LBSF retains all rights as Noteholder or Swap Counterparty except as otherwise explicitly set forth in each Exum Ridge Agreement, and, to the extent that LBSF subsequently purchases Notes from Objecting Noteholders that it does not currently hold, commensurate *pro rata* amounts will be deducted from the Escrow Amount and paid to LBSF.  Distribution of any

10

remaining Escrow Amount and any remaining Reserve Amount to LBSF will be subject to certain conditions set forth in each Exum Ridge Agreement.

21. LBSF, solely in its capacity as Noteholder, agrees not to assert that it is entitled to be paid on a senior or *pari passu* basis with the Notes that it does not hold (but LBSF reserves the right to assert that it is entitled to be paid amounts owing under the Notes it owns on a junior basis to the Notes it does not own and in an amount not to exceed the lesser of (a) the unpaid amount of principal and interest due on the Notes that LBSF owns (after taking into account the Settlement Payment or applicable Subsequent Settlement Payment, as the case may be, to the extent any such payment is deemed to be a payment under the Notes that LBSF owns, as the case may be), or (b) the then remaining Escrow Amount).

22. LBSF and the Plan Administrator acknowledge and agree that they, and any agents and assigns thereof, as applicable, will only seek payment for damages and other relief, including interest thereon, with respect to or in connection with each Exum Ridge Transaction (including, without limitation, any termination payment), the Notes, the Preference Shares, the Exum Ridge Indentures and/or the Exum Ridge Credit Default Swap Agreements in the Litigation, in an aggregate amount not greater than the then remaining Escrow Amount.

23. Pursuant to the Amended Pebble Creek Agreement,[5] the Trustee shall distribute and apply the Investment Proceeds, as well as certain other amounts as set forth in the Amended Pebble Creek Agreement, in accordance with the order, priority and procedures set forth in the Amended Pebble Creek Agreement. Specifically, the Trustee is authorized to: (a) pay the outstanding fees and expenses of the Trustee; (b) provided the Noteholder Settlement Amount Condition is met, pay an amount equal to the Noteholder Settlement Amount in

---

[5] Unless otherwise defined herein, capitalized terms utilized in this paragraph shall have the same meanings ascribed to such terms in paragraph 20 herein, except that they shall refer to the Pebble Creek Transaction.

satisfaction of the claims of Noteholders other than LBSF that do not object to the Amended Pebble Creek Agreement or the Motion; (c) leave in the existing Escrow Account, an amount to secure payment of the claims of any such Objecting Noteholder; provided, however, that if the Noteholder Settlement Amount Condition is not met, the Escrow Amount shall be an amount sufficient to secure payment of the claims of any and all Noteholders other than LBSF; (d) pay any remaining amount to LBSF. Upon release of the remaining Escrow Amount, the Pebble Creek Indenture shall be deemed discharged and terminated, and each of the Issuer and Co-Issuer shall undertake its dissolution. LBSF retains all rights as Noteholder or Swap Counterparty under the Pebble Creek Swap Agreement, except as otherwise explicitly set forth in the Initial Pebble Creek Agreement or the Amended Pebble Creek Agreement.

24. It is my understanding that each Settlement Agreement provides that, upon distribution of the remaining Escrow Amount, any proof of claim filed by the Trustee, the respective Issuer or the Co-Issuer that is related to the applicable Transaction and subject to the Settlement Agreement shall be withdrawn.

**The Partial Settlements Are in LBSF's Best Interests and Should Be Approved**

25. The use of the Court's equitable authority to approve the Settlement Agreements is justified and appropriate. First, LBSF is entitled to the Settlement Amount in each Transaction either in its capacity as Swap Counterparty or in its capacity as Noteholder and, as a result, payment of the Settlement Amount to LBSF is appropriate regardless of the outcome of the Payment Dispute. Second, the Settlement Agreements protect the interests of other Noteholders by providing for the reservation of the Escrow Amount, which the Plan Administrator and LBSF believe is sufficient to pay the claims of the Objecting Noteholders, if the Noteholder Settlement Amount Condition is met or waived, or the claims of all Noteholders

other than LBSF, if the Noteholder Settlement Amount Condition is not met or waived. In addition, the Settlement Agreements provide for the reservation of the Reserve Amount, which the Trustee may use for fees and expenses as enumerated in each Settlement Agreement. Third, regardless of the outcome of the Payment Dispute, the payment rights of the Preference Shareholders will be subordinated to those of both the Noteholders and LBSF, as Swap Counterparty; as a result, the Preference Shareholders should be indifferent to the approval of the Settlement Agreements because they will not receive a payment under the waterfall under any scenario. Moreover, any interested parties that may object to the terms of the Settlement Agreements will have the opportunity to lodge an objection with and be heard by this Court.

26. Each Exum Ridge Settlement Agreement will benefit LBSF and its creditors by allowing LBSF to capture a substantial amount of the value of each Exum Ridge Transaction and the Notes that it owns for its estate. Additionally, the Amended Pebble Creek Agreement puts in place a mechanism virtually identical to the one set forth in each Exum Ridge Agreement. The Amended Pebble Creek Agreement will afford LBSF the ability to implement a further settlement of the underlying dispute in the Litigation and to receive an additional distribution from the Pebble Creek Escrow Account, while continuing to preserve the rights of any Noteholders who object to the Amended Settlement Agreement or this Motion.

27. The Settlement Agreements will not resolve the Payment Dispute: LBSF retains the right to maintain its positions in respect of the Payment Dispute in the Litigation or elsewhere, subject to the limitations as to the amount of its recovery set forth in the Settlement Agreements. Regardless, for the reasons set forth above, I and my colleagues involved in the management of the Chapter 11 Estates, as well as counsel to the Chapter 11 Estates, have concluded, in our considered business judgment, that the compromises set forth in the Settlement

13

Agreements are "fair and equitable," are well within the "range of reasonableness," and are in the best interests of LBSF's estate and its creditors. We believe the Settlement Agreements were entered into in good faith and negotiated at arm's length. Therefore, the Motion, which seeks approval of the Settlement Agreements, should be granted.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed on this 19th day of November 2013.

/s/ Lawrence Brandman
Lawrence Brandman