Hearing Date and Time: November 22, 2013 at 2:00 p.m. (Prevailing Eastern Time)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
David J. Lender
Alfredo R. Pérez

Attorneys for Lehman Brothers Holdings Inc.
and Certain of its Affiliates

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
| In re | : | Chapter 11 Case No. |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | : | 08-13555 (JMP) |
| | : | |
| Debtors. | : | (Jointly Administered) |

------------------------------------------------------------------x

# REPLY TO SECTION 510(b)
# PORTION OF FEDERAL NATIONAL MORTGAGE ASSOCIATION'S
# RESPONSE TO PLAN ADMINISTRATOR'S OBJECTION TO CLAIM

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc., as Plan Administrator under the *Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors* for the entities in the above referenced chapter 11 cases, files this reply (the "Reply") to *Federal National Mortgage Association's Response in Opposition to Plan Administrator's Objection to Classification of Securities Law Portion of Claim of Federal National Mortgage Association* (ECF No. 40244) (the "Response") and respectfully represents as follows:

## **PRELIMINARY STATEMENT**

1. Despite Fannie Mae's[1] zealous attempt at manufacturing a controversy by arguing everything from impermissible categorical subordination to implicit substantive consolidation, the issue before the Court is simple and the answer is not subject to dispute: the Private Label Securities Claim is a claim for damages arising from the purchase or sale of a security of the debtor or an affiliate of the debtor. It is, therefore, subject to mandatory subordination under section 510(b) of the Bankruptcy Code.

2. Fannie Mae has no answer for the assertion that the Lehman RMBS are securities of SASCO because—in accordance with the laws governing the Private Label Securities Claim—SASCO is the issuer of the Lehman RMBS. Fannie Mae never addresses the simple, straightforward question of what it means to be a security "of" the debtor or its affiliate—and offers no explanation of what the statute could mean, if it does not mean securities *issued by* the debtor or its affiliate. Instead, ignoring the question entirely, Fannie Mae focuses on irrelevancies and demands that the Court rewrite the Bankruptcy Code to limit subordination under section 510(b) to *equity* securities. This limitation directly conflicts with (i) the plain language of the Bankruptcy Code, which provides for an expansive definition of security; (ii) the Second Circuit's clear admonition to interpret section 510(b) broadly; and (iii) numerous opinions.

3. Fannie Mae is forced to rely on these slender reeds because the Private Label Securities Claim is precisely the type of claim that section 510(b) is intended to subordinate. Fannie Mae acquired SASCO-issued securities, assuming—among other risks—the risk of improper disclosures. Congress has opted to disfavor claims, such as the Private Label

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Objection.

2

Securities Claim, that are based on allegedly misleading RMBS disclosures. "Section 510(b) . . . represents a Congressional judgment that, as between [security holders] and general unsecured creditors, it is [security holders] who should bear the risk of illegality in the issuance of [securities] in the event the issuer enters bankruptcy." *Baroda Hill Invest., Ltd. v. Telegroup, Inc. (In re Telegroup, Inc.)*, 281 F.3d 133, 141 (3rd Cir. 2002); *see also In re Holiday Mart, Inc.*, 715 F.2d 430, 433-34 (9th Cir. 1983) ("Purchasers of [securities], like the purchasers of stock, alone assume the risk of fraud or securities act violations by the issuers of the securities they purchase, and there is no reason to ask general creditors who did not purchase [securities] to share in any part of the risk."). Allowing Fannie Mae to enhance its recoveries in this manner would be inequitable to other creditors, is contrary to the purposes of section 510(b), and should not be permitted. Accordingly, the Private Label Securities Claim should be subordinated pursuant to section 510(b).

## THE PLAN ADMINISTRATOR'S REPLY TO THE RESPONSE

4. Section 510(b) requires the subordination of claims for damages arising from the purchase or sale of a security of the debtor or an affiliate of the debtor. 11 U.S.C. §510(b). Fannie Mae does not dispute that the Private Label Securities Claim is a claim for damages arising from the purchase or sale of a security. The only issue before the Court, therefore, is whether the Lehman RMBS are securities "of the debtor or an affiliate of the debtor."

1. **The Lehman RMBS Are Securities of SASCO**

5. The common theme to Fannie Mae's arguments opposing reference to the Securities Act for the definition of "issuer" is one of exasperation that the plain language of section 510(b) does not support the policies that Fannie Mae seeks to promote. Section 510(b)

3

provides for the subordination of claims arising from the purchase or sale of securities generally, when Fannie Mae would prefer that it only applied to equity securities. Similarly, section 510(b) applies to securities of an affiliate of the debtor, while Fannie Mae believes that it would be more equitable if 510(b) only applied to securities of the debtor itself. However, the plain language of section 510(b), not Fannie Mae's policy preferences, will ultimately determine whether the Private Label Security Claim is subject to mandatory subordination under section 510(b). *See Radlax Gateway Hotel, LLC v. Amalgamated Bank*, 132 S.Ct. 2065, 2073 (2012). SASCO is the issuer of the Lehman RMBS and it is an affiliate of LBHI. The Private Label Securities Claim, therefore, is a claim arising from the purchase or sale of securities of an affiliate (SASCO) of the debtor (LBHI) and is subject to mandatory subordination under section 510(b).

6.      Courts have generally found that securities "of the debtor or an affiliate of the debtor" include securities *issued* by the debtor or an affiliate of the debtor. *See* Objection, ¶27. The Securities Act and related regulations, which form the basis for the Private Label Securities Claim, provide the necessary guidance for determining whether LBHI or SASCO issued the Securities—particularly where, as here, the securities are asset backed securities. Since its inception, the Securities Act has mandated that

> with respect to . . . certificates of interest or shares in an unincorporated investment trust not having a board of directors . . . the term "issuer" means the person or persons performing the acts and assuming the duties of depositor or manager pursuant to the provisions of the trust or other agreement or instrument under which the securities are issued.

Securities Act §2(a)(4), 15 U.S.C. §77b(a)(4). Moreover, as discussed in the Objection, Regulation AB and Rule 191 eliminate any possible confusion as to whether this definition includes depositors for RMBS—it does. Objection, ¶¶28-31. Fannie Mae cannot ask the Court to overrule this statutory scheme and create new rights for Fannie Mae merely because LBHI and

4

SASCO are now in bankruptcy—but by asking the Court to disregard the securities law definition of issuer, it is doing just that.

7. Fannie Mae does not—and cannot—contest that, under the Securities Act, SASCO, as the depositor for each of the Trusts, is deemed to be the issuer of the Lehman RMBS. *See* Objection, ¶¶28-32. Nor does Fannie Mae dispute the fact that SASCO is an affiliate of LBHI. The section 510(b) analysis ends abruptly with these two facts. The Private Label Securities Claim is a claim for damages arising from the purchase of securities (the Lehman RMBS) of an affiliate (SASCO) of the debtor (LBHI). As such, it is subject to mandatory subordination under section 510(b).

8. Instead of addressing this issue, and ignoring the plain language of the statute and applicable case law, Fannie Mae seeks to limit subordination under section 510(b) to claims arising from the purchase of sale of *equity* securities. *See* Objection, ¶¶28-32. Stretching to achieve this impermissible revision of section 510(b), Fannie Mae demands that this Court import a "test" allegedly adopted by the Second Circuit in *Rombro v. Dufrayne (In re Med Diversified)*, 461 F.3d 251 (2d Cir. 2006). What Fannie Mae fails to recognize, however, is that the *Med Diversified* court did not face the question of who *issued* the securities. Instead, its only concern was whether a claim *arose from* the purchase or sale of a security—a very different question than the one currently before the Court. *Id*. at 254-55. And not only does Fannie Mae disregard how inapposite *Med Diversified* is to the question of whether the securities are of the debtor or an affiliate of the debtor, it then completely misreads the only portion of the case the provides helpful guidance: "those who conclude the bargain to become *investors* or shareholders should be treated as such." *Id*. at 257 (emphasis added).

5

9. In determining whether the claim before it *arose from* the purchase or sale of a security, the *Med Diversified* court applied a test considering whether the claimant "(1) took on the risk and return expectations of a shareholder, rather than a creditor, or (2) seeks to recover a contribution to the equity pool presumably relied upon by creditors in deciding whether to extend credit to the debtor." *Id.* at 256. Fannie Mae ignores the limited scope of this test and insists that it is mandated for every application of section 510(b). Fannie Mae boldly argues that, because purchasers of non-equity securities did not take "on the risk and return expectations of a shareholder," claims arising from the purchase or sale of such securities can *never* be subject to subordination under section 510(b). *See* Objection, ¶34.

10. Fannie Mae's unprecedented expansion of *Med Diversified* is mistaken. On its face, section 510(b) applies to claims arising out of the purchase or sale of *securities.* No limitation is placed on the type of security that is subject to section 510(b) and, as described above, the Bankruptcy Code defines the term "security" broadly to include both equity securities and non-equity securities such as bonds, notes and debentures that share many characteristics with debt. *See* 11 U.S.C. §101(49)(A). Under Fannie Mae's theory, claims related to any of these types of securities would not be subject to section 510(b) because these instruments do not share the risk/return characteristics of equity. Fannie Mae offers no support for, or explanation of, its repudiation of the plain language of section 510(b).

11. Moreover, if Congress had intended to limit subordination under section 510(b) to equity securities, it could easily have done so by making the limitation explicit. But, section 510(b) itself demonstrates unequivocally that Congress was aware of the difference between the genus "securities" and the species "equity securities" and chose not to distinguish between them for the purposes of section 510(b):

6

>
> (b) [A] claim . . . for damages arising from the purchase or sale of [a security of the debtor or an affiliate of the debtor] . . . shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, *except that if such security is common stock, such claim has the same priority as common stock*.

11 U.S.C. §510(b) (emphasis added); *see also Jacobs v. New York Foundling Hosp.*, 577 F.3d 93, 99 (2d Cir. 2009) (quoting *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001)) ("It is 'a cardinal principle of statutory construction that a statute ought, upon the whole, to be so constructed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'").

12. Further, courts addressing the issue have explicitly held that section 510(b) applies to non-equity securities. *See, e.g., Del Biaggio v. Freeman (In re Del Biaggio)*, 2012 WL 5467754, slip op. at *3 (Bankr. N.D.Cal. Nov. 8, 2012) ("[S]ection 510([b])[2] applies to claims arising from the purchase or sale of any security of the debtor or its affiliate, not just claims related to equity securities."); *In re Coronet Capital Co.*, 1995 U.S. Dist. Lexis 10175 (S.D.N.Y. July 12, 1995) ("Appellants appear to argue that §510(b) should be restricted to claims involving equity securities. However, this argument is not supported by the Code. Section 510(b) refers to 'security', and §101(49)(A)(i) of the Code defines 'security' to include 'note.'"). Accordingly, Fannie Mae's argument that subordination under section 510(b) is limited to claims arising from the purchase or sale of equity securities lacks any merit.

13. Fannie Mae's second line of defense relates to the second prong of the *Med Diversified* test—a prong the Second Circuit dismissed as irrelevant. *See* Objection, ¶32; *Med Diversified*, 461 F.3d at 258-59. Merely because the purchaser of a security of an affiliate of the debtor would not have contributed to the equity pool of the *debtor* does not mean that the

---

[2] The quoted language references section 510(a) of the Bankruptcy Code. This must be a clerical error because the decision involves the application of section 510(b) (section 510(a) is not otherwise mentioned) and the referenced language is clearly drawn from section 510(b).

related claim is exempt from section 510(b).  On its face, section 510(b) plainly applies to claims "arising from the purchase or sale of a security of the debtor or an *affiliate of the debtor*." *See* 11 U.S.C. §510(b) (emphasis added).  Thus, Fannie Mae's second argument is equally unavailing. *See Del Biaggio*, 2012 WL 5467754, at *3 ("[T]he claim against the debtor is subordinated when it relates to either a security of the debtor or the security of an affiliate of the debtor."); *O'Cheskey v. Templeton (In re Am. Hous. Found.),* 2013 WL 1316723, slip op. at *17-19 (Bankr. N.D. Tex. Mar. 30, 2013) (subordinating claims based on claimant's limited partnership interests in affiliates of the debtor).[3]

        14.     As its final—and equally futile—line of defense, Fannie Mae argues that if Congress intended for the definition of "issuer" to be imported from the Securities Act, it would have included a specific reference to the Securities Act in section 510(b), as it did in section 1145 of the Bankruptcy Code.  *See* Response, ¶37.  An explicit reference to the Securities Act in section 1145 does not mean that the Securities Act is irrelevant to the interpretation of the remaining provisions of the Bankruptcy Code.  Indeed, quite the opposite: section 1145 addresses the rare instance when the Bankruptcy Code will override the registration requirements that would otherwise be applicable under the Securities Act.  *See* 11 U.S.C. § 1145(a).  An explicit reference to section 2(a)(11) of the Securities Act was included in section 1145 because Congress wanted to clarify that, under certain circumstances, the issuance of securities by a

---

[3] Fannie Mae's reliance on *In re Enron*, 341 B.R. 141 (Bankr. S.D.N.Y. 2006), is similarly misplaced. While the court in *Enron* did not find it useful to consult the Securities Act in connection with its analysis of the term "arising from," it certainly did not find that reference to the Securities Act would never be appropriate in connection with the analysis of other aspects of the Bankruptcy Code.  341 B.R. at 159 ("This is not to say that there could be no reason to harmonize these two statutes, only that there is no evidence that such harmony was intended or required" in connection with the court's analysis of the term "arising from").

8

debtor in possession to raise funds for a going enterprise is exempt from the Securities Act's registration requirements.  *See* H.R. REP. No. 595, 95th Cong., 1st Sess. 237 (1977).

15. Such specificity in connection with section 510(b) was not necessary or desirable, as section 510(b) is intended to be broadly applicable to claims arising from the purchase or sale of a wide variety of securities of the debtor or an affiliate of the debtor—not merely asset backed securities, as would have been the case if section 510(b) expressly incorporated the definition of "issuer" contained in Rule 191 and Regulation AB.  *See KIT digital, Inc. v. Invigor Group Limited (In re KIT digital, Inc.)*, 497 B.R. 170, 182 (Bankr. S.D.N.Y. 2013) (citing *Rombro v. Dufrayne (In re Med Diversified)*, 461 F.3d 251, 254-59 (2d Cir. 2006)).[4]

16. In sum, Fannie Mae has failed to contradict the conclusion that the Lehman RMBS are securities of SASCO because—in accordance with the laws governing the Private Label Securities Claim—SASCO is the issuer of the Lehman RMBS.  Accordingly, the Private Label Securities Claim is a claim for damages arising from the purchase or sale of securities of an affiliate of the debtor and is subject to mandatory subordination under section 510(b).

---

[4] *In the Matter of Standard Oil & Exploration of Delaware, Inc.*, 136 B.R. 141 (Bankr. W.D. Mich. 1992), does not, as Fannie Mae suggests, stand for the proposition that courts generally refuse to import terms from the securities laws.  *See* Objection, ¶37.  The *Standard Oil* court merely found that incorporating into section 1145 the full definition of issuer set forth in section 2(11) of the Securities Act would lead to an absurd result because it would swallow the exception that section 1145 was intended to create.  *Id.* at 149-50.  The *Standard Oil* court did not, however, find that the definition of "issuer" contained in the Securities Act is inapplicable to the Bankruptcy Code, nor did it even attempt to address Rule 191 or Regulation AB.

9

**2.     Even if the Court Finds that the Lehman RMBS Are Securities of the Trusts, the Private Label Securities Claim Is Still Subject to Mandatory Subordination Under Section 510(b) Because the Trusts Are Affiliates of LBHI and SASCO**

17.     Fannie Mae finds all manner of impropriety in the Plan Administrator's argument that subordination of the Private Label Securities Claim is mandated even if the Court finds that the Lehman RMBS are securities of the Trusts. These histrionics include allegations that the Plan Administrator is covertly seeking to rewrite the Bankruptcy Code or achieve an "implicit substantive consolidation" of the estates of LBHI and SASCO. *See* Response, ¶¶39-40, 43-45. Fannie Mae's allegations are without merit.

18.     The Bankruptcy Code defines affiliate, in pertinent part, as a "person substantially all of whose property is operated under an operating agreement with the debtor." 11 U.S.C. §101(2)(C). The term "person" is defined as, among other things, a corporation and the definition of "corporation" includes "business trusts." 11 U.S.C. §§ 101(9), (41). As set forth in detail in the Objection, the Trusts are "business trusts," meaning that they are "corporations" and, therefore, "persons" for the purposes of the Bankruptcy Code. This conclusion is based on the fact that substantially all of the Trusts' property (the residential mortgage loans) is operated under an operating agreement (the Trust Agreements) with the debtor—SASCO and LBHI are each signatories to the Trust Agreements.[5] Thus, the Trusts are affiliates of SASCO and LBHI for all purposes under the Bankruptcy Code, including section 510(b).

19.     Fannie Mae relies heavily on *In re Secured Equip. Trust of Eastern Air Lines, Inc.*, 38 F.3d 86 (2d Cir. 1994), a case involving a collateral trust that differs markedly

---

[5] While LBHI is not listed on the face of the Trust Agreements, it is a signatory thereto for certain purposes. *See, e.g.*, SASCO 2007-WF1 Trust Agreement, p. 205 of the pdf attached as Exhibit F to the Trumpp Declaration.

from the Trusts. *See* Objection, ¶¶47-50. Importantly, the focal point of the Second Circuit's analysis in *Eastern* was the fact that the collateral trust was not established to generate a profit, evidenced by the fact that "any payments in excess of amounts due were to be returned to Eastern." *Id*. at 90. In contrast, excess revenues generated by the Trusts are not returned to SASCO, but instead accrue to the benefit of holders of the residual interests in the Trusts. These excess amounts are, for practical purposes, profits and the potential for such profits likely factored into the economic calculations made by acquirers of the residual interests. And, in any event, the *Eastern* court also recognized that a trust *not* designed to generate a profit may nonetheless be a business trust, suggesting that although the profit motive is an important factor, it is not determinative. *See Id*.

20. Furthermore, unlike the collateral trust in *Eastern*, the Trusts clearly *are* engaged in business. The *res* of each Trust is comprised of thousands of residential mortgage loans, each of which must be carefully monitored and managed to maximize value for the holders of the Lehman RMBS. Thus the Trusts, through their various agents, are required to collect payments of interest and principal from each mortgage loan, aggregate such payments, and make distributions to the various interest holders pursuant to complex waterfall provisions set forth in the Trust Agreements. *See* Trumpp Declaration, ¶16. They are also required to proactively administer each mortgage loan portfolio by ensuring (i) that appropriate insurance is maintained for each property, *see, e.g*., SASC 2007-WF1 TA §9.16; (ii) that defaults are addressed fairly and in a timely manner, *see, e.g*., *id*. at §9.04; (iii) compliance with tax and other reporting obligations, *see, e.g*., *id*. at §10.01(e); (iv) that the appropriate swap agreements and other hedging instruments are in place, *see, e.g*., *id*. at §5.09; and (v) that breaches of representations and warranties by the depositors are identified and that appropriate action is

11

taken to enforce the Trusts' rights with respect to such breaches. *See, e.g*., *id*. at §9.04. Accordingly, the Trusts are engaged in the business of managing residential mortgage loans for the benefit of their interest holders.

21.     Fannie Mae also cites *In re Washington Mutual, Inc.*, 462 B.R. 137 (Bankr. D. Del. 2011), for the proposition that Pooling and Servicing Agreements do not qualify as operating agreements, but this citation is, at best, misleading. What the court in *Washington Mutual* actually found, without discussion, was that the "Debtors *have not adequately proven* that the Pooling and Servicing Agreements constitute . . . operating agreement[s]." *Id*. at 145-46 (emphasis added). The *Washington Mutual* decision gives no information as to what evidence, if any, was presented or what aspects of the operation of the trusts were governed by the Pooling and Servicing Agreements. The Trust Agreements, in contrast, govern all operative aspects of the Trusts, including how the principal and interest payments will be distributed and the Trustee's reporting obligations, not merely how the underlying loans will be aggregated and serviced.

22.     Fannie Mae's final argument, that the Trusts' property is not operated by the debtor under the Trust Agreements, is similarly unavailing. Section 101(2)(C) requires that substantially all of the affiliate's property be "operated under an operating agreement *with* the debtor." 11 U.S.C. §101(2)(C) (emphasis added). There can be little doubt that the Trusts' property is operated under the Trust Agreements. Similarly, the Trust Agreements are unquestionably "with" LBHI and SASCO. Both debtors signed the Trust Agreements and substantially all of the Trust's property is operated under the Trust Agreements. The Trusts, therefore, are affiliates of LBHI and SASCO under section 101(2)(C).

23. Fannie Mae's argument that the debtor must operate the property is based on a misreading of the statute. *See* Response, ¶¶51-52. The second clause of section 101(2)(C) defines an affiliate as a "person substantially all of whose property is operated under an operating agreement *with* the debtor." 11 U.S.C. §101(2)(C) (emphasis added). The debtor, therefore, is merely required to be a signatory to the operating agreement and is not, as Fannie Mae argues, required to be the entity responsible for the operation of the property. Had Congress intended such a requirement, it would have drafted the clause to provide for the operation of the property *by* the debtor. Indeed, the first clause of section 101(2)(C) contains just such a requirement: "The term 'affiliate' means— (c) person whose business is operated under a lease or operating agreement by a debtor." *Id*. (emphasis added). Under Fannie Mae's interpretation of section 101(2)(C), therefore, the two clauses would be virtually identical, rendering one of the clauses a surplusage. *See Duncan v. Walker*, 533 U.S. 167, 174 (2001) ("We are . . . reluctant to treat statutory terms as surplusage in any setting.") (internal quotation marks and brackets omitted).

24. The Trusts are affiliates of SASCO and LBHI because they are persons substantially all of whose property is operated under an operating agreement with the debtor. Thus, even if the Court finds that the Lehman RMBS are securities of the Trusts, the Private Label Securities Claim is still subject to mandatory subordination under section 510(b) because it is a claim for damages arising from the purchase or sale of a security of an affiliate of the debtor.

## RESERVATION OF RIGHTS

25. In the event that the Court does not grant the relief requested herein and in the Objection, the Plan Administrator reserves its right to object to the Private Label Securities

13

Claim for any reason other than the request for subordination pursuant to section 510(b) of the Bankruptcy Code set forth herein.

## CONCLUSION

WHEREFORE, for the reasons set forth above and in the Objection, the Plan Administrator respectfully requests that the Court enter an order subordinating the Private Label Securities Claim in its entirety and granting such other and further relief as is just.

Dated: November 20, 2013
      New York, New York

/s/ Alfredo R. Pérez
David J. Lender
Alfredo R. Pérez

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates