WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ralph I. Miller
Jacqueline Marcus

Attorneys for Lehman Brothers Holdings Inc.
and Lehman Brothers Special Financing Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS HOLDINGS INC.,<br><br><br>Debtor. | Chapter 11 Case<br>No. 08-13555 (JMP)<br><br>(Jointly Administered) |
| Lehman Brothers Holdings Inc., in its capacity as Plan Administrator on behalf of Lehman Brothers Special Financing Inc.<br><br>        Plaintiff,<br><br>  v.<br><br>LCOR Alexandria L.L.C.,<br>PTO Holdings LLC, and<br>Does 1-10<br><br>        Defendants. | Adv. Proc. No. 13-_____<br><br>**ADVERSARY**<br>**PROCEEDING**<br>**COMPLAINT** |

1.      Defendant LCOR Alexandria L.L.C. ("LCOR") obtained more than $15 million

by entering into a swap that was economically identical to the swap it entered into with Plaintiff,

then LCOR diverted those funds to Defendant PTO Holdings LLC ("PTO Holdings"),

improperly manipulated its calculations related to the early termination of Plaintiff's swap, and

refused to pay any of the $42 million termination payment it owed Plaintiff.  Lehman Brothers

Holdings Inc. ("LBHI"), in its capacity as Plan Administrator (in this capacity, the "Plan

Administrator" or "Plaintiff") on behalf of Lehman Brothers Special Financing Inc. ("LBSF")

under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and

Its Affiliated Debtors (the "Plan"), alleges the following on knowledge as to LBSF's and LBHI's

own acts and upon information and belief as to all other matters against LCOR , PTO Holdings,

and Does 1-10 ("Does 1-10", and together with LCOR and PTO Holdings, "Defendants"):

## PRELIMINARY STATEMENT

2.      Plaintiff brings this action to recover more than $42 million due in 2008 when

LCOR terminated an interest rate swap transaction (the "Swap") with LBSF, plus contractual

interest of almost $41 million, for total damages of more than $83 million as of November 1,

2013.  When LCOR valued the Swap termination payment, it ignored both the provisions of the

governing ISDA Master Agreement[1] and section 562 of chapter 11 of title 11 of the United

States Code (the "Bankruptcy Code"), each of which required LCOR to value the Swap on the

Early Termination Date.  LCOR's valuation process and results were also commercially

unreasonable for numerous other reasons.

---

[1] Capitalized terms used but not defined herein shall have the meanings given them in the 1992 form (Local
Currency-Single Jurisdiction) ISDA Master Agreement, dated as of December 13, 2001 (together with all schedules,
annexes, and exhibits thereto, the "Master Agreement").

3.        Both the Master Agreement and the Bankruptcy Code require LCOR to determine Market Quotation or measure its Loss *as of* the Early Termination Date and prohibit use of an earlier date.  The Master Agreement also requires that both the procedures and results of valuation calculations must be commercially reasonable.  LCOR[2] violated these clear requirements, thus purporting to convert a multi-million dollar liability into an amount due from LBSF.  LCOR also redirected the proceeds of a virtually identical new swap, which should have been remitted promptly to LBSF, to a newly created entity, defendant PTO Holdings.  Specifically, LCOR:

- violated the plain terms and spirit of the transaction documents and section 562 of the Bankruptcy Code by (i) conducting an ineffective Market Quotation solicitation four days *after* it entered into a new swap with Barclays Bank PLC ("Barclays") and (ii) then performing an improper Loss computation four days *prior* to the Early Termination Date;

- failed to take into account the substantial gain it realized based on the present value of the net discounted cash flows to maturity from the terminated Swap;

- further distorted its Loss valuation calculation by adding over $5 million in phantom charges to magnify artificially a "Loss" that LCOR allegedly "would have" incurred had it purchased a hypothetical interest rate cap;

- entered into a swap on December 8, 2008 with Barclays for which it obtained $15.64 million (the "Barclays Swap Proceeds"), but failed to account for this gain when calculating the early termination payment due to LBSF for the Swap, even though the Barclays swap had virtually identical economic terms as the LBSF Swap and the effective date for the Barclays swap was the same as the Early Termination Date for the Swap with LBSF;

- directed Barclays to make the payment of $15.64 million to PTO Holdings, apparently in an effort to make it more difficult for LBSF to recover those funds; and, finally,

---

[2] LCOR is a special purpose entity whose managers were familiar with the valuation requirements of the Master Agreement and the Bankruptcy Code.

US_ACTIVE:\44338452\24\58399.0011

- claimed over a half million dollars in excessive expenses relating to its alleged fees – an amount that greatly exceeds reasonable expenses incurred in terminating and closing out transactions of this type.

4.      LCOR directed Barclays to transfer all of the Barclays Swap Proceeds to PTO Holdings, making PTO Holdings complicit in LCOR's improper actions.  PTO Holdings knew, or should have known, that the Barclays Swap Proceeds were wrongly transferred to it. Nevertheless, PTO Holdings has retained ownership and control over the Barclays Swap Proceeds, or has further distributed them to Does 1– 10, thus depriving LBSF's estate of its right to these funds for over five years.  PTO Holdings, or its transferees, designated as Does 1-10, owe LBSF the Barclays Swap Proceeds and are required to turn over those funds, plus interest, to LBSF's estate.

## JURISDICTION AND VENUE

5.      On September 15, 2008, and periodically thereafter, LBHI and certain of its subsidiaries, including LBSF, commenced in this Court voluntary cases under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").

6.      This adversary proceeding is filed pursuant to Rules 7001 and 7003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), as well as sections 105(a), 362, 562, 541(c), 542(a) and 542(b) of the Bankruptcy Code, and New York law, which governs the Agreement pursuant to Part 4(h) of the Schedule.

7.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334.

8.      The Court has personal jurisdiction over Defendants LCOR and PTO Holdings.

9.      This adversary proceeding constitutes a core proceeding under 28 U.S.C. § 157(b)(2).

10.      Venue is proper in this Court under 28 U.S.C. § 1409(a) because the Chapter 11 Cases are pending in this district.

3

## THE PARTIES

11.    LBHI is a corporation organized and incorporated under the laws of the state of Delaware, with its current principal business address at 1271 Sixth Avenue, New York, New York 10020.  On December 6, 2011, the Court approved and entered an order confirming the Plan.  The Plan became effective on March 6, 2012.  Pursuant to the Plan, LBHI, as Plan Administrator, is authorized to prosecute actions on behalf of the estate of LBSF.

12.    LBSF is a corporation organized and incorporated under the laws of the state of Delaware, with its current principal business address at 1271 Sixth Avenue, New York, New York 10020.

13.    LCOR Alexandria L.L.C. is a limited liability company organized in Delaware, with its principal place of business located at 6701 Democracy Boulevard, Suite 711, Bethesda, Maryland 20817.

14.    PTO Holdings is a limited liability company organized in Delaware, with its principal place of business located at c/o The Related Companies, 60 Columbus Circle, New York, New York 10023, and its registered agent for service of process located at 2711 Centerville Road Suite 400, Wilmington, Delaware 19808.

15.    Does 1-10 are unknown individuals, entities, and/or groups of individuals or entities who may have received distributions of the Barclays Swap Proceeds from PTO Holdings.

## BACKGROUND FACTS

### A.    The Master Agreement and the Swap

16.    The Master Agreement provides the basic terms for the parties' contractual relationship.  The Fourth Amended and Restated Confirmation, dated as of March 30, 2005, [3]

---

[3] The original confirmation dated December 13, 2001 was amended and restated on July 14, 2004, October 14, 2004, November 19, 2004, and finally on March 30, 2005.

US_ACTIVE:\44338452\24\58399.0011

sets forth the specific economic details of the parties' insured interest rate Swap, in which LCOR

paid a fixed rate of 6.8005%, and LBSF paid a floating rate based on three-month LIBOR.

17.     The Swap had a maturity date of September 15, 2032 and an initial notional

amount of $60,200,000, presumably tied to LCOR's floating interest-rate exposure on its Series

2001 E Floating Rate Bonds backed by the lease of the United States Patent and Trademark

Office (the "USPTO") of a five building office complex in Alexandria, Virginia.  LCOR was

created as a vehicle to facilitate the design, development, construction and leasing of the

USPTO.

18.     Several years after LBSF and LCOR entered into the Swap, The Related

Companies, a sophisticated, global real estate development company, facilitated the purchase of

equity interests in LCOR by a group of investors and began to exercise influence over its

operations.

19.     On September 15, 2008, LBHI filed its chapter 11 petition.   LBSF filed its

chapter 11 petition on October 3, 2008.  About two months later on December 9, 2008, LCOR

hand-delivered to LBSF a termination notice (the "Early Termination Notice") citing LBSF's

bankruptcy filing and LBHI's credit downgrading as Events of Default, designating December

16, 2008 as the "Early Termination Date" under the Master Agreement, and effectively

terminating the Swap.  The Master Agreement provides the Non-defaulting Party with the

discretion to designate an "Early Termination Date" of its choosing following the occurrence of

an Event of Default.  *See* Master Agreement §§ 5, 6.

20.     The Schedule to the Master Agreement provides that the payment owed upon

early termination will be calculated based upon the "Second Method" and the "Market

Quotation" measure.  *See* Master Agreement at Schedule at Part 1(c)(i)).  The "Second Method"

US_ACTIVE:\44338452\24\58399.0011

provides for the Non-defaulting Party (here LCOR) to pay "the absolute value" of its net gain or loss under the Transaction to the Defaulting Party.  *See* Master Agreement section 6(e)(i).  In other words, the party that is "in the money" on the Early Termination Date – here LBSF – has a right to an early termination payment even if it is the Defaulting Party.  Thus, these termination payment provisions selected in the Master Agreement are not designed to punish the Defaulting Party or deprive it of the benefits accrued under the Transactions.

21.     The Master Agreement also provides that "'Market Quotation' means . . . an amount determined on the basis of quotations from Reference Market-makers" and defines Reference Market-makers as "four leading dealers in the relevant market." *Id.* §12.  The Master Agreement further provides that "[t]he party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) *on or as soon as reasonably practicable after* the relevant Early Termination Date." *Id.* (defining "Market Quotation") (emphasis added).

22.     When Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result, the Master Agreement requires reversion to the Loss measure to value the terminated Swap.  *See id.* §12 (definition of "Settlement Amount").  "Loss" means a reasonable and good faith determination of LCOR's total loss or gain as a result of the early termination; in other words, it includes the gain or loss to LCOR based on the present value of the net discounted cash flows to maturity from the terminated Swap.  If the amount of Loss is a positive number, it would be payable *to* the Non-defaulting Party, but where it is a negative number, the absolute value of such number would be payable *to* the Defaulting Party *by* the Non-defaulting Party.  Of critical

6

importance to this dispute, the Master Agreement also provides that in calculating Loss, a "party will determine its Loss *as of the relevant Early Termination Date*, or, if that is not reasonably practicable, as of the earliest date *thereafter* as is reasonably practicable." *Id.* § 12 (emphasis added).

23.    Here, because LBSF was "in the money" on the terminated Swap according to standard industry valuation methods – meaning that the present value of LCOR's expected future payments from and after the Early Termination Date under the Swap were much greater than the present value of LBSF's expected future payments – LBSF was entitled to an early termination payment from LCOR consisting of (i) "Unpaid Amounts"[4] *plus* (ii) a "Settlement Amount," representing the value of the terminated Swap as determined on the basis of Market Quotation (or Loss, if Market Quotation failed or did not produce a commercially reasonable result). *See id.* §§ 6(e)(i), 12 (definition of "Settlement Amount").

## B.    LCOR Enters into the Barclays Swap

24.    On December 8, 2008, the day before delivering the Early Termination Notice to LBSF (when the Swap was still a "live trade"), and *eight days prior to* the Early Termination Date that LCOR later designated, LCOR entered into a new swap with Barclays (the "Barclays Swap").  Barclays paid LCOR $15,640,000 up front for the Barclays Swap in exchange for the opportunity effectively to step into LBSF's shoes in the terminated Swap by agreeing to the same terms that would have applied had the Swap not been terminated.

25.    The terms of the Barclays Swap plainly state that LCOR elected to negotiate the terms of the swap with Barclays rather than "solicit competitive bids for the execution" of a new

---

[4] "Unpaid Amounts" are the net periodic payments that had already become payable at the end of the typical payment cycle (monthly or quarterly) before the Early Termination Date and which remained unpaid as of the Early Termination Date under the Transaction.

US_ACTIVE:\44338452\24\58399.0011

swap transaction.  *See* LCOR/Barclays Muni Swap Insured Confirmation dated December 8, 2008, § 7(iv).   As this provision reveals, the Barclays Swap was not a competitive transaction and, therefore, not indicative of the most favorable terms that LCOR could have obtained for a swap on that day.  *See id.* §7.  Consequently, even if the Barclays Swap Proceeds had been remitted to LBSF – as they should have been – LCOR would still have failed to fully satisfy its obligations to LBSF.

26.    In fact, the mid-market value of the Swap at the close of business on December 8, 2008 was $39,561,804.  Therefore, the amount of the Barclays Swap Proceeds is not a commercially reasonable indicator of the value of the terminated Swap between LCOR and LBSF.  Nevertheless, at a minimum, the magnitude of the Barclays Swap Proceeds demonstrates that the terminated Swap was valuable and significantly "in the money" to LBSF.

27.    Three days prior to executing the Barclays Swap, on December 5, 2008, LCOR (or its agents) organized a new limited liability company in the State of Delaware called PTO Holdings.  The Barclays Swap provides that the $15.64 million Barclays Swap Proceeds would be paid on behalf of LCOR to a Bank of America account held in the name of PTO Holdings.  Presumably LCOR inserted this provision to ensure the Barclays Swap Proceeds would be diverted to PTO Holdings in an effort to frustrate and delay LBSF's collection efforts.

28.    A few weeks later on December 22, 2008, Richard O'Toole, a vice president at The Related Companies, filed a W-9 form Request for Taxpayer Identification Number and Certification with the United States Department of the Treasury Internal Revenue Service listing "PTO Holdings LLC" as the name of the entity, "LCOR Alexandria LLC" as the "Business name," and listing The Related Companies' address at 60 Columbus Circle, New York, New York 10023.

US_ACTIVE:\44338452\24\58399.0011

29.     The facts and circumstances of PTO Holdings' organization indicate that it was created for the express purpose of receiving the Barclays Swap Proceeds.  PTO Holdings knew or should have known that:

- The $15.64 million it received represented the Barclays Swap Proceeds;

- This payment evidenced the significant gain to LCOR in connection with the termination of the Swap with LBSF;

- LCOR would owe LBSF an early termination payment for the Swap; and

- PTO Holdings' receipt and continued possession of the Barclays Swap Proceeds interfered with, and deprived LBSF of, its rightful property interest in funds that could have been used to make part of the early termination payment due to LBSF.

## C.    LCOR's Flawed Valuation Process and Calculation of the Early Termination Payment

30.     Despite having already entered into the Barclays Swap on December 8, 2008, LCOR retained a financial advisor, Chatham Financial ("Chatham"), to assist it in conducting a Market Quotation process, which Chatham purported to undertake four days later on December 12, 2008.  Chatham did not receive any quotations from the four Reference Market-makers it solicited, and thus, LCOR reverted to the Loss measure to calculate the early termination payment.

31.     About ten days after delivering the Early Termination Notice, LCOR provided LBSF with a letter dated December 19, 2008 containing a calculation statement (the "Calculation Statement"), purportedly prepared under section 6(d)(i) of the Master Agreement.  The Calculation Statement asserted that, based on Loss, LBSF owed LCOR a payment of $6,712,965.06 as a result of LCOR's early termination of the Swap, including payment for legal fees and expenses totaling $549,030 and alleged Unpaid Amounts owed to LCOR by LBSF of $463,935.06.  Additionally, the Calculation Statement included approximately $5.7 million in hypothetical charges LCOR allegedly would have incurred if it had entered into an interest rate

US_ACTIVE:\44338452\24\58399.0011

cap.  Notably, LCOR never filed a proof of claim against LBHI or LBSF for its alleged loss.

Presumably, if LCOR truly believed that it had suffered a loss of well over $6 million, it would

have pursued recovery in the Chapter 11 Cases.

32.    LCOR's solicitation of Market Quotations prior to the Early Termination Date

and subsequent calculation of the early termination payment under Loss were commercially

unreasonable, failed to comply with Master Agreement or governing New York law, and

violated section 562 of the Bankruptcy Code.

33.    LCOR's solicitation (through Chatham) of Market Quotations four days prior to

the Early Termination Date was entirely improper under the Master Agreement, which provides

that "[t]he party making the [Market Quotation] determination (or its agent) will request each

Reference Market-maker to provide its quotation to the extent reasonably practicable *as of the

same day and time . . . on or as soon as reasonably practicable after* the Early Termination

Date."  Master Agreement § 12 (emphasis added).  Soliciting quotes from dealers for a

replacement transaction to value the LBSF Swap was a pointless exercise by LCOR (other than

to disguise the actual gain LCOR realized) given that it had already entered into the Barclays

Swap, and may have contributed to LCOR's failure to receive any bids during its Market

Quotation process.

34.    The Master Agreement also provides in the definition of Loss that a "party will

determine its Loss *as of the relevant Early Termination Date*, or, if that is not reasonably

practicable, as of the earliest date thereafter as is reasonably practicable."  *Id.*  The primary

motivation for this time constraint requiring the non-defaulting party to determine Market

Quotation or Loss *as of* the Early Termination Date or as soon as reasonably practicable

US_ACTIVE:\44338452\24\58399.0011

thereafter is to prevent an inaccurate valuation.  *See* GOOCH & KLEIN, DOCUMENTATION FOR DERIVATIVES 253 (4th ed. 2002).

35.    These strict date requirements in the Master Agreement under both "Market Quotation" and Loss" accord with section 562 of the Bankruptcy Code, which also requires that a terminated swap be valued as of the termination date.  Section 562 is even more protective of a chapter 11 debtor in that it expressly places the burden on the non-debtor swap participant (here, LCOR) to show that commercially reasonable determinants of value were not available on the Early Termination Date before it will be permitted to use a later date.  Specifically, section 562 provides as follows:

> (a)  If the trustee rejects a swap agreement . . . or if a . . . swap participant liquidates, terminates, or accelerates such . . . agreement, *damages shall be measured as of the earlier of—*
>
> (1)  the date of such rejection; or
>
> (2)  *the date or dates of such liquidation, termination, or acceleration*.

11 U.S.C. § 562(a) (emphases added).  Under no circumstances is the non-defaulting party permitted to use a date prior to the Early Termination Date.  LCOR should have solicited Market Quotations on the Early Termination Date, as the Master Agreement and section 562 require, and should have measured its Loss as of that date.  By failing to do so, LCOR harmed LBSF and breached the Master Agreement.

36.    The timeline below evidences the key dates relating to LCOR's termination and valuation of the Swap, and PTO Holdings' role in depriving LBSF of the Barclays Swap Proceeds:

- **September 15, 2008**:  LBHI commences its Chapter 11 Case.

- **October 3, 2008**:  LBSF commences its Chapter 11 Case.

US_ACTIVE:\44338452\24\58399.0011

- **December 5, 2008**: PTO Holdings is formed in Delaware.

- **December 8, 2008**: LCOR enters into the Barclays Swap, which has an effective date of December 16, 2008.

- **December 9, 2008**: LCOR delivers to LBSF the Early Termination Notice designating December 16, 2008 as the Early Termination Date.

- **December 10, 2008**: Barclays pays the Barclays Swap Proceeds to PTO Holdings.

- **December 12, 2008**: LCOR commences its Market Quotation Process.

- **December 12-16, 2008:** The market moves further in LBSF's favor as interest rates fall, increasing the value of the Swap to LBSF by over $2 million.

- **December 16, 2008**: The Swap is terminated pursuant to the Early Termination Notice. LBSF's calculation of the value of the Swap on Early Termination Date, chosen at LCOR's sole discretion, is $41,720,650 in LBSF's favor.

- **December 19, 2008**: LCOR provides LBSF with its Calculation Statement, alleging that LBSF owes LCOR $6,712,965.06 under the Loss measure.

- **December 22, 2008**: Richard O'Toole of The Related Companies submits the W-9 Request for Taxpayer Identification Number and Certification for PTO Holdings listing LCOR as the "Business name."

- **September 22, 2009**: The bar date for filing claims occurs and LCOR fails to file a proof of claim.

37.    LCOR not only initiated its valuation process prematurely, it also utilized a flawed methodology in performing its Loss valuation. LCOR's calculation of the early termination payment under Loss was not commercially reasonable because LCOR failed to take into account the substantial gain it realized based on the present value of the net discounted cash flows to maturity from the terminated Swap. The gain to LCOR from its termination of the Swap as measured on the proper date is $41,720,650, plus Unpaid Amounts of $559,541, plus accrued interest to the Early Termination Date on the Unpaid Amounts of $212, for a total (rounded to the nearest dollar) of $42,280,402.

US_ACTIVE:\44338452\24\58399.0011

38.    LCOR contrived its Loss calculation to result in a receivable by claiming
approximately $5.7 million in hypothetical charges LCOR allegedly would have incurred if it
had entered into an interest rate cap.  LCOR never purchased such an interest rate cap and hence
never incurred these charges.  It is improper under the express terms of the Master Agreement,
governing New York contract law, and the Bankruptcy Code to include charges that were never
incurred in a Loss calculation.  Imposing such charges on LBSF here is particularly egregious
considering LCOR received over $15 million by entering into a virtually identical swap with
Barclays just *prior to* the Early Termination Date.

39.    LCOR's Calculation Statement also included improper expenses totaling over a
half million dollars relating to its purported legal and advisory fees.  This is not commercially
reasonable and far exceeds reasonable termination expenses for similar transactions.  Any
advisory expenses LCOR incurred as a result of its improper attempt to avoid paying LBSF the
appropriate termination payment are clearly not subject to reimbursement.

40.    Upon early termination, section 6(e) of the Master Agreement required LCOR to
value the termination payment on the Early Termination Date that it designated.  LCOR has
defaulted on its obligations under section 6(e) of the Master Agreement.  As a result, it owes
interest to LBSF at the Default Rate as provided in the Master Agreement.  *See* Master
Agreement § 6 (providing that "an amount calculated as being due in respect of any Early
Termination Date under section 6(e) will be payable on the day that notice of the amount payable
is effective . . . .  Such amount will be paid together with . . . interest thereon . . . from (and
including) the relevant Early Termination Date to (but excluding) the date such amount is paid,
at the Applicable Rate § 6(d)(ii).").  Section 12 of the Master Agreement provides that the
"Applicable Rate" is the "Termination Rate" for the period of time between the Early

13

Termination Date and provision of the Calculation Statement.  *Id.* §12.  Thereafter, the

"Applicable Rate" is the "Default Rate" for the period of time from the date of receipt of the

Calculation Statement until the date when payment is made.  *Id.* § 12.  Here, this means that

Default Rate interest began accruing on December 19, 2008 and continues to accrue until LCOR

pays LBSF in full.

**D.**      **The Parties Attempt Mediation**

41.      Since November 2009, LBSF has been engaged in settlement discussions with

LCOR without success.  Part of those efforts included a mediation between the parties pursuant

to this Court's Alternative Dispute Resolution Procedures Order for Affirmative Claims of

Debtors Under Derivatives Contracts, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sept. 17,

2009) [ECF No. 5207], which occurred on March 12, 2012 and which failed to produce a

settlement.

**COUNT I**

**Breach of the Master Agreement**

(*Against Defendant LCOR*)

42.      Plaintiff repeats, realleges, and incorporates by reference the allegations contained

in Paragraphs 1-41 of this Complaint as though fully set forth in this cause of action.

43.      On the Early Termination Date, LBSF was the party "in-the-money" and thus

entitled to receive a substantial termination payment from LCOR.

44.      The Master Agreement provides that valuation of the early termination payment

should occur on the Early Termination Date or on the earliest date thereafter, regardless of

whether the Market Quotation or the Loss measure was chosen.  Therefore, LCOR should have

valued the early termination payment on December 16, 2008.

14

45.     By valuing the Swap prior to the designated Early Termination Date and otherwise failing to use reasonable valuation practices, LCOR breached the Master Agreement. As a result, LBSF has been damaged in an amount to be proven at trial, but no less than $42,280,402, representing the value of the Swap on the Early Termination Date (plus the Unpaid Amounts), plus interest of $40,905,396 as of November 1, 2013, for a total of $83,185,798, together with additional interest at the Default Rate until final payment is made to LBSF.

## COUNT II

### Breach of the Master Agreement Based on LCOR's Breach of the Implied Covenant of Good Faith and Fair Dealing

*(Against Defendant LCOR)*

46.     Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1-45 of this Complaint as though fully set forth in this cause of action.

47.     On the Early Termination Date, LBSF was the party "in-the-money" and thus entitled to receive a substantial termination payment from LCOR.

48.     LCOR manipulated its computations to achieve a windfall when it improperly calculated the early termination payment under Loss.  Specifically, as described above, by failing to account for its gain that exceeded $41 million due to the early termination of the Swap, and by imposing hypothetical and excessive charges on LBSF, LCOR breached the agreement.

49.     By refusing to pay LBSF a properly calculated, commercially reasonable termination payment in accordance with the Loss measure in the Master Agreement, LCOR violated the covenant of good faith and fair dealing implicit in all contracts governed by New York law.

50.     As a result of this breach, LBSF has been damaged in an amount to be proven at trial, but no less than $42,280,402, an amount representing the value of the Swap on the Early

US_ACTIVE:\44338452\24\58399.0011

Termination Date (plus the Unpaid Amounts), plus interest of $40,905,396 as of November 1, 2013 for a total of $83,185,798, together with additional interest at the Default Rate until final payment is made to LBSF.

## COUNT III

### Violation of Section 562 of the Bankruptcy Code

*(Against Defendant LCOR)*

51.     Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1-50 of this Complaint as though fully set forth in this cause of action.

52.     Section 562 of the Bankruptcy Code requires that a terminated swap be valued as of the Early Termination Date unless no commercially reasonable determinants of value are available on that date, and places a burden on the Non-defaulting Party – here, LCOR –to show that commercially reasonable determinants of value were not available on that date.

53.     LCOR, however, solicited Market Quotations and measured its Loss at least four days prior to the Early Termination Date in express contravention of section 562.  Therefore, LCOR violated the express terms of section 562.

54.     LBSF has been damaged by LCOR's violation in an amount to be proven at trial, but no less than $42,280,402, an amount representing the value of the Swap on the Early Termination Date (plus the Unpaid Amounts), plus interest of $40,905,396 as of November 1, 2013, for a total of $83,185,798, together with additional interest at the Default Rate until final payment is made to LBSF.

16

## COUNT IV

### Turnover of LBSF's Property Interest in the Properly Calculated Termination Payment Pursuant to Section 542(b) of the Bankruptcy Code

*(Against Defendant LCOR)*

55.     Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1-54 of this Complaint as though fully set forth in this cause of action.

56.     Section 542(b) of the Bankruptcy Code expressly provides that ". . . an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor."  11 U.S.C. § 542(b).

57.     As fully alleged above, LCOR was obligated to pay LBSF a properly calculated early termination payment under the Master Agreement, plus interest.  The amount due to LBSF from LCOR as of December 16, 2008, the Early Termination Date, is property of LBSF's estate under section 541(a) of the Bankruptcy Code.

58.     The termination value of the Swap on the Early Termination Date (plus Unpaid Amounts) under the Loss measure was $42,280,402, which represents the payment LCOR owed to LBSF as of that date.

59.     LCOR has failed to pay LBSF that amount and continues to do so, making the early termination payment a matured debt.

60.     Accordingly, pursuant to section 542(b) of the Bankruptcy Code, Plaintiff requests an order compelling and directing LCOR to turn over to LBSF $42,280,402, plus interest of $40,905,396 as of November 1, 2013, for a total of $83,185,798, together with additional interest at the Default Rate until final payment is made to LBSF.

17

## COUNT V

### Alternatively, Turnover of the Barclays Swap Proceeds
### Pursuant to Section 542(b) of the Bankruptcy Code

(*Against Defendant LCOR*)

61.     Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1-60 of this Complaint as though fully set forth in this cause of action.

62.     Section 542(b) of the Bankruptcy Code expressly provides that ". . . an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor."  11 U.S.C. § 542(b).

63.     LCOR entered into the Barclays Swap on December 8, 2008, for which Barclays paid LCOR $15,640,000 in exchange for Barclays' opportunity effectively to step into LBSF's shoes in the soon-to-be-terminated Swap.

64.     The Barclays Swap Proceeds represent a portion of its "gain" on early termination of the Swap that LCOR is required to pay to LBSF under the Master Agreement.  Therefore, upon LCOR's constructive receipt of the Barclays Swap Proceeds, LCOR had a matured debt to LBSF in the amount of $15.64 million.

65.     Accordingly, pursuant to section 542(b) of the Bankruptcy Code, Plaintiff requests an order compelling and directing LCOR to turn over $15.64 million to LBSF, plus interest of $15,131,370 as of November 1, 2013, together with additional interest at the Default Rate until final payment is made to LBSF.

US_ACTIVE:\44338452\24\58399.0011

## COUNT VI

**Turnover of the Barclays Swap Proceeds
Pursuant to Section 542(a) of the Bankruptcy Code**

*(Against Defendant PTO Holdings and Does 1-10)*

66.    Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1-65 of this Complaint as though fully set forth in this cause of action.

67.    Section 542(a) of the Bankruptcy Code expressly provides that ". . . an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate."  11 U.S.C. § 542(a).

68.    The Barclays Swap Proceeds constitute property of LBSF's estate under section 541(a) of the Bankruptcy Code.  By accepting receipt and retaining and exercising wrongful control over the Barclays Swap Proceeds, PTO Holdings obtained custody and exercised control over property of LBSF's estate that LBSF could use, sell or lease under section 363 of the Bankruptcy Code.  To the extent that PTO Holdings distributed this property to Does 1 – 10, Plaintiff is entitled to turnover of those funds.

69.    Accordingly, pursuant to section 542(a) of the Bankruptcy Code, Plaintiff requests an order compelling and directing PTO Holdings and Does 1 – 10 to turn over the $15.64 million to LBSF, plus prejudgment interest.

19

## COUNT VII

### Conversion

*(Against Defendants PTO Holdings and Does 1-10)*

70.     Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1-69 of this Complaint as though fully set forth in this cause of action.

71.     Instead of paying LBSF a properly calculated, commercially reasonable termination payment in accordance with the Loss measure as required by the Master Agreement, LCOR directed that Barclays pay the Barclays Swap Proceeds to PTO Holdings.

72.     PTO Holdings knew or should have known the facts described above in paragraph 29.

73.     PTO Holdings' possession of the Barclays Swap Proceeds directly interfered with LBSF's ability to possess them.  Alternatively, possession of the Barclays Swap Proceeds by Does 1 – 10 also directly interfered with LBSF's ability to possess them.  Thus, PTO Holdings and Does 1 – 10 wrongfully deprived LBSF of the use of, and its property interest in, the Barclays Swap Proceeds.

74.     As a result of PTO Holdings' retention of the Barclays Swap Proceeds, or the retention of those proceeds by Does 1 – 10, LBSF has been damaged in an amount to be proven at trial, but no less than $15.64 million, an amount representing the full value of the Barclays Swap Proceeds, which must be paid over to LBSF, plus prejudgment interest.

## COUNT VIII

### Unjust Enrichment

*(Against Defendants PTO Holdings and Does 1-10)*

75.     Plaintiff repeats, realleges, and incorporates by reference the allegations contained in 1-74 of this Complaint as though fully set forth in this cause of action.

20

76.     As a result of LCOR's breach of its obligations to LBSF under the Master Agreement and transfer of the Barclays Swap Proceeds to PTO Holdings, PTO Holdings and Does 1 – 10 obtained an unjust windfall at the expense of LBSF.

77.     PTO Holdings and Does 1 – 10 have been improperly and unjustly enriched at LBSF's expense as a result of LCOR's actions.  LBSF's entire interest in the Barclays Swap Proceeds was wrongly transferred to PTO Holdings and Does 1 – 10.  LBSF received nothing in return.  Equity and good conscience require that PTO Holdings and Does 1 – 10 return to LBSF $15.64 million, plus prejudgment interest.

## COUNT IX

### Default Interest

*(Against Defendant LCOR)*

78.     Plaintiff repeats, realleges, and incorporates by reference the allegations contained in 1-77 of this Complaint as though fully set forth in this cause of action.

79.     LCOR not only owes LBSF a termination payment of $42,280,402, but also interest thereon in the amount of $40,905,396.

80.     By failing to value the Swap properly on the termination date and make the payment due to LBSF, LCOR breached the Master Agreement and, therefore must pay accrued interest at the Default Rate on the amount it owes to LBSF, which interest continues to accrue until payment to LBSF in full.

81.     The Master Agreement explicitly provides that the proper default rate is the receiving party's cost of funds "without proof or evidence of any actual cost" and "as certified by it."  Master Agreement § 12.  The Master Agreement executed by LCOR precludes any challenge to the Default Rate because LBSF has certified its cost of funds.

US_ACTIVE:\44338452\24\58399.0011

08-13555-mg    Doc 41233    Filed 11/21/13    Entered 11/21/13 17:01:13    Main Document
Pg 23 of 24


82.     Consequently, as of November 1, 2013, the interest owed on the $42,280,402 early termination payment to which LBSF is entitled began to accrue (i) at the Termination Rate from and including December 16, 2008, to but excluding December 19, 2008, for a total of $44,533 in interest at the Termination Rate, and (ii) at the Default Rate from and including December 19, 2008 to but excluding November 1, 2013 for a total of $40,860,863 in interest at the Default Rate, with interest continuing to accrue at the Default Rate until payment to LBSF in full.

## CONDITIONS PRECEDENT

All conditions precedent have occurred, been performed, or been waived or excused.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that judgment be entered:

(1)     Against Defendant LCOR as follows:

A.     As to Counts I, II, and III, awarding LBSF damages from LCOR in an amount to be determined at trial, but in all events, no less than $42,280,402, representing the value of the Swap on the Early Termination Date (plus Unpaid Amounts), plus interest of $40,905,396 as of November 1, 2013, together with additional interest at the Default Rate until final payment is made to LBSF;

B.     As to Count IV, an order compelling and directing LCOR to turn over the properly-calculated Settlement Amount to LBSF, which LBSF has calculated to be $42,280,402, plus interest of $40,905,396 as of November 1, 2013, together with additional interest at the Default Rate until final payment is made to LBSF;

C.     As to Count V, an order compelling and directing LCOR to turn over the Barclays Swap Proceeds to LBSF, plus interest of $15,131,370 as of November 1, 2013, together with additional interest at the Default Rate until final payment is made to LBSF;

22

US_ACTIVE:\44338452\24\58399.0011

(2)    <u>Against Defendant PTO Holdings and Does 1 – 10 as follows:</u>

D.    As to Count VI, an order compelling and directing PTO Holdings and Does 1 – 10 to turn over the Barclays Swap Proceeds to LBSF, plus prejudgment interest;

E.    As to Count VII and VIII, awarding LBSF damages from PTO Holdings and Does 1 – 10 in an amount to be determined at trial, but in all events, no less than $15.64 million, an amount representing the full value of the Barclays Swap Proceeds, plus prejudgment interest;

(3)    <u>Against Defendants LCOR, PTO Holdings, and Does 1 – 10 as follows:</u>

F.    Pre-judgment and post-judgment interest; and

G.    Such other and further relief, including interest, costs, and attorneys' fees, as the Court deems just and proper.

Dated: November 21, 2013
       New York, New York

                              By:  /s/ Ralph I. Miller
                                   Ralph I. Miller
                                   Jacqueline Marcus

                                   WEIL, GOTSHAL & MANGES LLP
                                   767 Fifth Avenue
                                   New York, New York 10153
                                   Telephone: (212) 310-8000
                                   Facsimile: (212) 310-8007

                                   *Attorneys for Lehman Brothers Holdings Inc.
                                   and Lehman Brothers Special Financing Inc.*

23