David S. Cohen
Nicholas A. Bassett
MILBANK, TWEED, HADLEY & McCLOY LLP
1850 K Street, NW, Suite 1100
Washington, D.C. 20006
Telephone: (202) 835-7500
Facsimile: (202) 835-7586

Attorneys for Plaintiffs
Lehman Brothers Holdings Inc. and
Lehman Brothers Special Financing Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br><br>         Debtors. | Chapter 11 Case No.<br><br>08-13555 (JMP)<br><br>(Jointly Administered) |
| Lehman Brothers Holdings Inc., as Plan Administrator, and Lehman Brothers Special Financing Inc.,<br><br>         Plaintiffs,<br><br>v.<br><br>Wellmont Health Systems, Inc.,<br><br>         Defendant. | Adv. Proc. No. 13-_____<br><br><br>**ADVERSARY COMPLAINT** |

    Plaintiffs Lehman Brothers Holdings Inc. ("LBHI"), as Plan Administrator under

the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its

Affiliated Debtors (the "Plan"), and Lehman Brothers Special Financing Inc. ("LBSF" and,

together with LBHI, the "Plaintiffs" and collectively with their affiliated debtors, the "Debtors"

or "Lehman"), allege (the "Complaint"), by their undersigned attorneys, the following against

defendant Wellmont Health Systems, Inc. ("Wellmont"):

## NATURE OF THE ACTION

1.  This lawsuit arises from Wellmont's intentional breach of its agreement

with LBSF, which breach was strategically and intentionally designed to deny LBSF the benefits

of its bargain under that agreement.  On June 1, 2006, certain Bonds (defined below) were issued

for the benefit of Wellmont.  On June 29, 2006, LBSF purchased the Bonds and simultaneously

entered into a total return swap agreement (the "TRS Agreement"), which Wellmont had

negotiated with LBSF related to those Bonds.  Under the TRS Agreement, in relevant part, LSBF

"sold" the total economic return on the Bonds, including the risk of loss, to Wellmont.  If the

price of the Bonds was below par value (*i.e.*, the total return on the Bonds was negative) at the

conclusion of the TRS, Wellmont would owe a final payment to LBSF.  Conversely, if the price

of the Bonds was above par value (*i.e.*, the total return on the Bonds was positive) at the

conclusion of the TRS, LBSF would owe a final payment to Wellmont.  The TRS Agreement

was due to mature on September 1, 2011 (the "TRS Maturity Date") prior to the maturity date of

the Bonds.

2.  As part of the TRS Agreement, Wellmont made certain certifications (the

"Certifications") to LBSF concerning Wellmont's rights and responsibilities with respect to the

TRS and the Bonds.  Among other things, Wellmont certified to LBSF that Wellmont did not

have the right to redeem the Bonds at any price prior to the TRS Maturity Date.  This protection

was fundamental to LBSF's participation in the TRS Agreement.  It both ensured the tax

treatment of the Bonds desired by Wellmont and LBSF and provided LBSF with assurances that

Wellmont would not frustrate the economic purpose of the TRS—by causing redemption of the

Bonds and thereby eliminating any payment obligation to LBSF—if the value of the Bonds moved in LBSF's favor. Without the Certifications, LBSF would not have entered into the TRS Agreement.

3.     Notwithstanding the Certifications made by Wellmont in the TRS Agreement, when the price of the Bonds declined below par and Wellmont realized that it would owe a substantial payment (estimated to be between $11.5 and $15.3 million) to LBSF, Wellmont decided to breach its agreement with LBSF. To this end, Wellmont, intentionally and for the purpose of avoiding its contractual liability to LBSF, purchased and caused the redemption of the Bonds prior to the TRS Maturity Date. Wellmont's actions directly violated the TRS Agreement and were designed to deliberately deprive LBSF of the right to receive the benefits of its bargain with Wellmont.

4.     As of the date that Wellmont improperly caused the redemption of the Bonds in violation of the TRS Agreement, Wellmont owed LBSF a payment of approximately $12,771,450. This amount remains unpaid and outstanding and continues to accrue interest at the Default Rate of the London Interbank Offered Rate ("LIBOR") plus 13.5%.

5.     Plaintiffs bring this action for the benefit of LBSF's estate seeking (a) damages for Wellmont's clear and intentional breach of the TRS Agreement; (b) an order requiring Wellmont to turn over to Plaintiffs the amount owed by Wellmont to LBSF under the TRS Agreement; (c) an order (i) declaring that Wellmont has acted in violation of section 362 of the Bankruptcy Code and (ii) awarding Plaintiffs money damages for that violation; and (d) damages for Wellmont's clear and intentional breach of the covenant of good faith and fair dealing implied in the TRS Agreement under New York law.

## PARTIES

6.    LBHI is a corporation organized and incorporated under the laws of Delaware, with its principal business address at 1271 Avenue of the Americas, New York, New York 10020.  On September 15, 2008, LBHI filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

7.    LBSF is a corporation organized and incorporated under the laws of Delaware, with its principal business address at 1271 Avenue of the Americas, New York, New York 10020.  On October 3, 2008, LBSF filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

8.    On December 6, 2011, the Court approved and entered an order confirming the Plan [ECF No. 23023].  The Plan became effective on March 6, 2012.  Pursuant to the Plan, LBHI, as Plan Administrator, is authorized to prosecute all causes of action held by the Debtors on behalf of their estates.

9.    Upon information and belief, Defendant Wellmont is a not-for-profit operator of hospitals and healthcare facilities.  Defendant Wellmont is located at 1905 American Way, Kingsport, Tennessee 37660.

## JURISDICTION AND VENUE

10.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and section 14.1 of the Plan.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b).

11.    Venue is proper under 28 U.S.C. §§ 157(a), 1408, and 1409.

12.    The statutory prerequisites for the relief requested herein are sections 105(a), 362, 541 and 542 of the Bankruptcy Code, and 28 U.S.C. § 2201.  Plaintiffs bring this adversary proceeding pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure.

## RELEVANT FACTUAL BACKGROUND

### A.  The Underlying Transactions

#### 1.  The ISDA Master Agreement

13.     On or around April 29, 2002, LBSF and Wellmont (collectively, the "Parties") entered into a 1992 ISDA Master Agreement, a schedule to the Master Agreement, and a credit support annex (the "CSA" and collectively with the Master Agreement and the schedule, the "ISDA Agreement").[1]  (*See* ISDA Agreement, attached as **Exhibit A**.)  The ISDA Agreement governed a number of derivatives transactions between the Parties, including the TRS.  As such, the ISDA Agreement provided the basic terms of the Parties' contractual relationship, but contemplated, as is industry standard, supplementation of this contractual relationship by trade confirmations and related documents that would provide the economic terms of specific transactions between the Parties.

#### 2.  The Series 2006A Tax-Exempt Bonds and the TRS

14.     On or around June 1, 2006, the Health, Educational and Housing Facilities Board of the County of Sullivan, Tennessee issued certain Tax-Exempt Series 2006A Hospital Revenue Refunding Bonds (Wellmont Health System Project) (the "Bonds") for the benefit of Wellmont.  The Bonds were initially sold to underwriter Ziegler Capital Markets Group.

15.     On or around June 29, 2006, LBSF both entered into the TRS Agreement with Wellmont and purchased the Bonds, which were the underlying security for the TRS, from Ziegler.  Lehman held the Bonds in an account at JP Morgan.

---

[1]     A 1992 ISDA Master Agreement is a form agreement developed by the International Swap Dealers Association ("ISDA") that, along with any schedules or annexes, is used to document derivatives transactions.  *See* Int'l Swap Dealers Ass'n, Inc., *User's Guide to the 1992 ISDA Master Agreements* (1993 Ed.).

16.     Upon information and belief, the Bonds were issued to raise funds for Wellmont's business operations.  Wellmont entered into the TRS with LBSF in order to reduce the cost of the capital raised by the Bonds.  The TRS provided Wellmont with a hedge of its interest rate exposure and, through a periodic payment swap with LBSF, the benefit of paying a short-term rate on the long-term Bonds.  Specifically, in exchange for LBSF's agreement to pay Wellmont an amount equal to the interest payments due on the Bonds (*i.e.*, finance the Bonds), Wellmont agreed to pay LBSF a rate (the "BMA Rate") tied to the ***short-term*** Bond Market Association Municipal Swap Index Rate.[2]  (*See* Facsimile from Wellmont to LBSF dated June 29, 2006 (the "TRS Documents"), attached as **Exhibit B**.)

17.     In addition, through the TRS, Wellmont gained exposure to and benefitted from the economic return, if positive, on the Bonds without having to own the Bonds. Accordingly, if, at the conclusion of the TRS Agreement on September 1, 2011, the price of the Bonds was above par value (*i.e.*, there was a positive economic return on the Bonds), LBSF would owe a final payment in the amount of the contractually determined "Return Amount"[3] to Wellmont.

18.     In exchange for the benefits received under the TRS, Wellmont agreed to pay Lehman, which effectively acted as secured lender to Wellmont, a return equal to the BMA Rate.  Wellmont also assumed the risk of any economic loss on the Bonds and agreed to compensate LBSF for any diminution in the value of the Bonds during the term of the TRS

---

[2]     The Bond Market Association Municipal Swap Index, now known as The Securities Industry and Financial Markets Association ("SIFMA") Municipal Swap Index is "a 7-day high-grade market index comprised of tax-exempt [Variable Rate Demand Obligations] from [Municipal Market Data's]  extensive database."  *See* SIFMA, "About the Municipal Swap Index," *available at* https://www.sifma.org/research/item.aspx?id=1690.

[3]     The "Return Amount" would be calculated with reference to the "Aggregate Principal Amount," which was defined in the TRS as "USD 76,595,000 subject to amortization as the Reference Security is redeemed." (*See* TRS Documents.)

Agreement.  Therefore, if, at the conclusion of the TRS Agreement, the price of the Bonds was below par value (*i.e.*, the value of the Bonds had diminished), Wellmont would owe the Return Amount to LBSF.

19.    A fundamental aspect of the TRS was that the interest paid on the Bonds was tax-exempt.  The tax-exempt status of the Bonds was to the mutual benefit of the Parties: Wellmont desired to finance its activities at the lower interest rates associated with tax-exempt bonds, and LBSF wanted the tax-free status of the interest payments on the Bonds, which it held at the time.

20.    In order to assure the desired tax treatment for the TRS, the Parties needed to obtain from tax counsel an opinion that the TRS was, for tax purposes, a separate agreement from the indenture governing the Bonds (the "Bond Indenture").  To obtain that tax opinion, it was critical that the term of the TRS did not extend beyond 80% of the term before the first date on which the Bonds were subject to optional redemption by Wellmont, which under both the Bond Indenture and the TRS was March 1, 2013 (the "Call Date").  Accordingly, to create the required 80-to-100% temporal relationship between the length of the TRS contract and the period before the Call Date, Wellmont and LBSF structured the TRS so that the Bonds could not and would not be redeemed prior to March 1, 2013.

21.    To ensure that it would receive the benefit of its bargain with Wellmont, Lehman required Wellmont to provide it with the Certifications.  (*See* TRS Documents, Certifications.)  Specifically, Lehman required Wellmont to certify that, among other things, Wellmont "does not have any right to purchase or call the Series 2006A Bonds at any price prior to the Call Date" and that "the term of the TRS is limited to 80% of the Non-Call Period and [Wellmont] has no right to redeem or otherwise acquire the Series 2006A Bonds prior to the Call

7

Date …"  (*See id.*, Certifications ¶¶ 1, 8.)  These Certifications provided critical assurances to LBSF that Wellmont could not and would not cause the early redemption of the Bonds and thereby jeopardize either the tax-exempt status of the Bonds or LBSF's right to the Return Amount at the TRS Maturity Date if the price of the Bonds declined below par.

22.    Wellmont did reserve certain rights to redeem the Bonds prior to the Call Date but only ***at the conclusion of the TRS***.  (*Id.* ¶ 8 ("While it reserves the right to do so, any decision regarding the acquisition of the Series 2006A bonds at the end of the TRS will be based on the economic, financial and credit circumstances at the time") (emphasis added); *see also id.* ¶ 7 ("Upon termination of the TRS, [Wellmont] will continue to be obligated to pay interest [on the Bonds] . . . until the [Bonds] are redeemed or retired.").)  ***Wellmont did not reserve any right to purchase the Bonds prior to the conclusion of the TRS***; any such reservation of right would have been inconsistent with the Parties' agreement under TRS Agreement.  (*See id.* ¶ 1.)

23.    The Certifications were executed by Wellmont on the same day as, and sent to LBSF along with, the TRS trade confirmation (the "<u>TRS Confirmation</u>").  The TRS Agreement, thus, consisted of two interrelated documents: the TRS Confirmation and the Certifications.  (*See* TRS Documents.)

24.    The Certifications were fundamental to the TRS Agreement and reflected the reasonable expectations and intent of the Parties in entering into the TRS Agreement that the Bonds would survive the term of the TRS.

### B.  Lehman's Bankruptcy Filing

25.    On September 15, 2008, LBHI, LBSF's parent and its "Credit Support Provider" under the CSA,[4] voluntarily commenced a case under chapter 11 of the Bankruptcy Code.  Under the terms of the ISDA Agreement, LBHI's bankruptcy filing constituted an Event of Default that permitted, but did not require, Wellmont to terminate any transactions thereunder, including the TRS.  (*See* ISDA Agreement §§ 5(a)(vii), 6(a).)

26.    On October 31, 2008, Wellmont sent a letter to LBSF indicating that an Event of Default had occurred, citing LBHI's bankruptcy filing.  Despite noticing the default, Wellmont purposefully chose not to terminate any transactions under the ISDA Agreement.  The TRS, therefore, remained a live transaction between the Parties.

27.    Shortly after the Lehman bankruptcy filings, in the latter part of September 2008, JP Morgan seized the Bonds in satisfaction of a lien that JP Morgan purportedly held against the account in which the Bonds were held.  Several months later, JP Morgan resold the Bonds to unrelated third parties.

### C.  Wellmont's Attempt to Avoid Its Liability to LBSF Under the TRS

28.    As September 1, 2011 approached, the price of the Bonds had declined relative to par.  Thus, it became clear to Wellmont that it would be obligated to make a significant payment to LBSF at the end of the TRS.

29.    In January 2011, concerned about this potential liability, Wellmont began discussions with its financial advisors, including Bank of America Merrill Lynch ("BAML") and Ponder & Co., to consider ways to avoid its obligations under the TRS.  Wellmont's financial advisors proposed a strategy under which Wellmont would purchase the Bonds and cause their

---

[4]    As the Credit Support Provider under the CSA, LBHI effectively guaranteed LBSF's obligations under the transactions entered into between the Parties under the ISDA Agreement.

redemption prior to the TRS Maturity Date in an attempt to reduce the Aggregate Principal

Amount—and, thus, the Return Amount—to zero.  This strategy of avoiding Wellmont's

payment obligation to LBSF through the voluntary early redemption of the Bonds was in direct

contravention of Wellmont's promises, both express and implied, under the TRS Agreement.

      30.     In considering this strategy, Wellmont understood that its actions would

undermine LBSF's contractual expectations and could result in a costly legal battle with

Lehman.  In fact, Wellmont's financial advisors specifically warned Wellmont of the litigation

risk that the strategy posed.  Nevertheless, on March 15, 2011, Wellmont launched a tender offer

(the "Tender Offer") to buy all of the outstanding Bonds from their holders.

      31.     At and around the same time as the Tender Offer, Wellmont and Lehman

were actively engaged in negotiations related to the TRS and certain other transactions under the

ISDA Agreement.  In relevant part, the Parties were discussing the possibilities of assigning

Lehman's position in the transactions to a replacement counterparty or of entering into a final

settlement for the termination of all transactions, including the TRS.  During these discussions, it

would have been highly relevant for Wellmont to inform Lehman of the Tender Offer and

Wellmont's plan to redeem the Bonds because those actions would negatively impact LBSF's

economic position both under the TRS and in its negotiations with Wellmont.  Wellmont,

however, never mentioned the Tender Offer to Lehman.  Instead, Wellmont concealed its actions

from Lehman and intentionally misled Lehman by indicating that the TRS should not be

terminated and should be carved out from any settlement or assignment.

      32.     The Tender Offer was successful and Wellmont repurchased the Bonds

from their holders on May 5, 2011 at Wellmont's tender offer of approximately $96.88.  This

price was significantly above the fair market value estimate (*i.e.*, the price at which the Bonds

should have traded on the open market) of approximately $83.63 provided by Wellmont's own financial advisor BAML.

33.    On the same day that the Bonds were tendered, Wellmont delivered the Bonds to the bond indenture trustee for immediate redemption.  Wellmont's actions caused the redemption of the Bonds prior to September 1, 2011, thereby breaching the TRS Agreement and depriving LBSF of the benefit of its bargain thereunder.

34.    Also on May 5, 2011, after causing redemption of the Bonds, Wellmont sent a letter to LBSF finally informing Lehman of the Tender Offer for and subsequent redemption of the Bonds.  In the May 5 letter, Wellmont asserted that because Wellmont had reduced the Bonds' face value to zero, it owed nothing to LBSF under the TRS.

35.    LBSF responded on May 18, explaining that Wellmont's actions were impermissible under the terms of the Parties' agreement and, therefore, did not eliminate Wellmont's payment obligation to LBSF.

36.    On May 24, Wellmont responded to LBSF asserting that nothing in the documents governing the TRS Agreement prevented Wellmont from purchasing or causing redemption of the Bonds prior to the Call Date.  Wellmont's response, however, ignored entirely the Certifications that Wellmont made to LBSF, including that Wellmont did not have the right to purchase the Bonds prior to the TRS Maturity Date (*see* ¶¶ 21-22, *supra*).  These Certifications, on which LBSF reasonably relied, formed the reasonable expectations and mutual understanding of the Parties when entering into the TRS Agreement.

37.    On August 14, 2012, LBSF notified Wellmont that "under Section 5(a)(ii) of the Master Agreement, Wellmont has breached the Agreement by effecting an early redemption of the Reference Security under the Total Return Swap before the Termination Date

of September 1, 2011" and further, that if such breach was not remedied within 30 days, it would

constitute an Event of Default under the ISDA Agreement.  Wellmont failed to take any action to

remedy its breach and, thus, is in default under the ISDA Agreement.

## COUNT I
### *Breach of Contract*

38.      Plaintiffs repeat, reallege, and incorporate by reference the allegations

contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of

action.

39.      On or around June 29, 2006, for valuable consideration exchanged,

Wellmont and LBSF agreed to enter into the TRS Agreement.

40.      Under the TRS Agreement, LBSF agreed to pay, on a periodic basis, the

interest due on the Bonds to Wellmont, and Wellmont agreed to pay, also on a periodic basis, the

BMA Rate to LBSF.  On the TRS Maturity Date, if the price of the Bonds was below par value,

Wellmont agreed to pay LBSF the Return Amount.

41.      As an integral part of the TRS Agreement, Wellmont made certain

Certifications to LBSF.  The Certifications were executed together with and specifically refer to

the TRS.  The Certifications and the TRS Confirmation were intended to be read together as a

single contract.

42.      In relevant part, Wellmont certified to LBSF that Wellmont did not have

the right to and would not purchase or cause the redemption of the Bonds prior to September 1,

2011.

43.      The Certifications made by Wellmont evidence that the Parties intended,

agreed and reasonably expected that Wellmont would not purchase or cause the redemption of

the Bonds prior to September 1, 2011.  As such, the Certifications provided a critical protection

of LBSF's right to payment under the TRS Agreement.

44.    On or around March 15, 2011, Wellmont launched the Tender Offer to

purchase the Bonds.  On or around May 5, 2011, Wellmont caused the redemption of the Bonds.

45.    Wellmont's purchase and redemption of the Bonds prior to September 1,

2011 constituted a material breach of the Certifications in the TRS Agreement.

46.    But for Wellmont's breach, the TRS would have concluded by its terms on

September 1, 2011, and LBSF would have been entitled to a substantial payment from Wellmont

on that date.

47.    As of May 5, 2011, when Wellmont's breach occurred, Wellmont would

have been obligated to pay LBSF approximately $12,771,450.

48.    Accordingly, and by reason of the foregoing, Wellmont breached its

agreement with LBSF, and LBSF is entitled to an award of money damages in an amount to be

determined at trial, but not less than $12,771,450, plus applicable interest calculated at the

Default Rate of LIBOR plus 13.5%.

## COUNT II
### *Turnover of Return Amount to Plaintiffs Pursuant to Section 542(b) of the Bankruptcy Code*

49.    Plaintiffs repeat, reallege, and incorporate by reference the allegations

contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of

action.

50.    Section 542(b) of the Bankruptcy Code provides, in relevant part, that "an

entity that owes a debt that is property of the estate and that is matured, payable on demand, or

payable on order, shall pay such debt to, or on the order of, the trustee."  11 U.S.C. § 542(b).

51.     Wellmont and LBSF entered into the TRS Agreement on or around June 29, 2006.  Pursuant to the TRS Agreement, Wellmont and LBSF each agreed and promised to make certain payments, including a final payment equal to the Return Amount.

52.     Wellmont had the opportunity to terminate the TRS Agreement upon the bankruptcy filing of LBHI, but chose not to do so.  The TRS therefore remained a live transaction through its maturity on September 1, 2011.

53.     Under the terms of the TRS Agreement, Wellmont had no right to purchase or cause the redemption of the Bonds prior to the TRS maturing on September 1, 2011.

54.     The TRS Agreement did not allow Wellmont to effect an early retirement of the Bonds that would reduce the Aggregate Principal Amount or the Return Amount to zero prior to the conclusion of the TRS on September 1, 2011.

55.     On September 1, 2011, both the TRS and Wellmont's obligation to LBSF thereunder matured.  The debt owed to LBSF by Wellmont under the TRS Agreement as of September 1, 2011 is property of LBSF's estate under section 541(a) of the Bankruptcy Code.  *See* 11 U.S.C. § 541(a).  Wellmont is required to pay the Return Amount (based on the Bonds outstanding prior to the improper "redemption" on May 5, 2011) to the Plaintiffs for the benefit of LBSF's estate pursuant to section 542(b) of the Bankruptcy Code.  *See* 11 U.S.C. § 542(b).

56.     Accordingly, and by reason of the foregoing, Plaintiffs request an order compelling and directing Wellmont to turn over to Plaintiffs the Return Amount (based on the Bonds outstanding prior to the improper "redemption" on May 5, 2011) owed to LBSF under the TRS Agreement as of September 1, 2011, plus applicable interest calculated at the Default Rate of LIBOR plus 13.5%.

## COUNT III

### *Declaratory Judgment that Wellmont is Willfully Violating the Automatic Stay under Section 362 of the Bankruptcy Code*

57.     Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

58.     Section 362(a)(3) of the Bankruptcy Code provides that the filing of a voluntary case under chapter 11 of the Bankruptcy Code operates to stay "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate" absent an order of the Bankruptcy Court granting relief from the stay.  11 U.S.C. § 362(a)(3).

59.     As fully stated above, Wellmont owes LBSF a termination payment under the TRS Agreement in the amount of no less than $12,771,450, plus applicable interest calculated at the Default Rate of LIBOR plus 13.5%.

60.     The failure of Wellmont to pay LBSF the amount due under the TRS Agreement constitutes an "act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate" within the meaning of section 362(a)(3) of the Bankruptcy Code.  *Id.*

61.     Under section 105(a) of the Bankruptcy Code, this Court may "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

62.     As set forth above, there is an actual controversy between the Parties with respect to the amount owed by Wellmont to LBSF under the TRS Agreement.  *See* 28 U.S.C. § 2201.

63.     Accordingly, and by reason of the foregoing, pursuant to 28 U.S.C. § 2201 and Bankruptcy Rule 7001, Plaintiffs are entitled to (i) a declaration that Wellmont has acted in violation of section 362 of the Bankruptcy Code; and (ii) pursuant to section 105(a) of the Bankruptcy Code, an award of money damages in an amount to be proven at trial and including, but not limited to, Plaintiffs' actual damages, costs, attorneys' fees and expenses, as well as accrued interest calculated at the Default Rate of LIBOR plus 13.5%, on account of Wellmont's knowing and willful violation of the automatic stay.

### COUNT IV
### *Breach of the Implied Covenant of Good Faith and Fair Dealing*

64.     Plaintiffs repeat, reallege, and incorporate by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

65.     Under New York law, all contracts imply a covenant of good faith and fair dealing in the course of performance.  The implied covenant of good faith and fair dealing encompasses any promises that a reasonable person would be justified in understanding were part of the contract and prohibits either party from acting in a way that would destroy or frustrate the rights of the other party to receive the benefits of its bargain.

66.     The Certifications made by Wellmont evidence that the Parties intended, agreed and reasonably expected that Wellmont would not purchase or cause the redemption of the Bonds prior to September 1, 2011.  The Certifications provided a critical protection of LBSF's right to payment under the TRS Agreement and reflected LBSF's reasonable expectation that Wellmont would honor its payment obligation under the TRS Agreement.

67.     By purchasing the Bonds and causing their redemption prior to September 1, 2011 for the purpose of eliminating its contractual liability to LBSF, Wellmont acted in a

16

manner that deliberately deprived LBSF of the right to receive the benefits of its bargain under the TRS Agreement. Wellmont, thus, breached the covenant of good faith and fair dealing implied in the TRS Agreement.

68. Accordingly, and by reason of the foregoing, Wellmont violated the covenant of good faith and fair dealing implied in its agreement with LBSF, and LBSF is entitled to an award of money damages in an amount to be determined at trial, but not less than $12,771,450, plus applicable interest calculated at the Default Rate of LIBOR plus 13.5%.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court grant the following relief:

A.  On Count I, a judgment that Wellmont breached its agreement with LBSF and LBSF is entitled to an award of money damages in an amount to be determined at trial, but not less than $12,771,450, plus applicable interest calculated at the Default Rate of LIBOR plus 13.5%;

B.  On Count II, an order compelling and directing Wellmont to turn over to Plaintiffs for the benefit of LBSF's estate the Return Amount (based on the Bonds outstanding prior to the improper "redemption" on May 5, 2011) owed to LBSF under the TRS Agreement as of September 1, 2011, plus applicable interest calculated at the Default Rate of LIBOR plus 13.5%;

C.  On Count III, (1) a declaration that Wellmont has acted in violation of section 362 of the Bankruptcy Code; and (2) pursuant to section 105(a) of the Bankruptcy Code, an award of money damages in an amount to be

proven at trial and including, but not limited to, Plaintiffs' actual damages,

costs, attorneys' fees and expenses, as well as accrued interest calculated

at the Default Rate of LIBOR plus 13.5%, on account of Wellmont's

knowing and willful violation of the automatic stay;

D.     On Count IV, a judgment that Wellmont violated the covenant of good

faith and fair dealing implied in its agreement with LBSF and, therefore,

LBSF is entitled to an award of money damages in an amount to be

determined at trial, but not less than $12,771,450, plus applicable interest

calculated at the Default Rate of LIBOR plus 13.5%; and

E.     Any such other and further relief as the Court deems just, including costs

and attorneys' fees.

[REMAINDER LEFT INTENTIONALLY BLANK]

Respectfully submitted,


___/s/ David S. Cohen_____
David S. Cohen
Nicholas A. Bassett
MILBANK, TWEED, HADLEY & McCLOY LLP
1850 K Street, NW, Suite 1100
Washington, D.C. 20006
Telephone: (202) 835-7500
Facsimile: (202) 835-7586

*Attorneys for Debtors and Plaintiffs*
*Lehman Brothers Holdings Inc. and*
*Lehman Brothers Special Financing Inc.*


Dated:      Washington, DC
            November 26, 2013

**<u>Exhibit A</u>**

(Local Currency-Single Jurisdiction)



International Swaps and Derivatives Association, Inc.

# MASTER AGREEMENT

dated as of April 29, 2002

LEHMAN BROTHERS SPECIAL FINANCING INC. and WELLMONT HEALTH SYSTEM have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement (the "Master Agreement"), which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:—

**1.      Interpretation**

(a)      *Definitions*.  The terms defined in Section 12 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)      *Inconsistency*.  In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail.  In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

(c)      *Single Agreement*.  All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

**2.      Obligations**

(a)      *General Conditions*.

(i)      Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)      Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency.  Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii)      Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

this Agreement.

(b)      *Change of Account.*  Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)      *Netting.*  If on any date amounts would otherwise be payable:—

(i)            in the same currency; and

(ii)           in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction.  The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date).  This election may be made separately for different groups of Transactions and will apply separately to each pairing of branches or offices through which the parties make and receive payments or deliveries.

(d)      *Default Interest; Other Amounts.*  Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.  If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

3.      **Representations**

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into) that:—

(a)      *Basic Representations.*

(i)            *Status.*  It is duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation and, if relevant under such laws, in good standing;

(ii)           *Powers.*  It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorize such execution, delivery and performance;

(iii)          *No Violation or Conflict.*  Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv)     *Consents*.  All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v)     *Obligations Binding*.  Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(b)     *Absence of Certain Events*.  No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)     *Absence of Litigation*.  There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)     *Accuracy of Specified Information*.  All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

**4.     Agreements**

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)     *Furnish Specified Information*.  It will deliver to the other party any forms, documents or certificates specified in the Schedule or any Confirmation by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)     *Maintain Authorizations*.  It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)     *Comply with Laws*.  It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

**5.     Events of Default and Termination Events**

(a)     *Events of Default*.  The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

(i)     *Failure to Pay or Deliver*.  Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(d) required to be made by it if such failure is not remedied

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

on or before the third Local Business Day after notice of such failure is given to the party;

(ii)  **Breach of Agreement.**  Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(d) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii)  **Credit Support Default.**

(1)  Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2)  the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3)  the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

(iv)  **Misrepresentation.**  A representation made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v)  **Default under Specified Transaction.**  The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi)  **Cross Default.**  If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii)  **Bankruptcy.**  The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:—

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption*.  The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer:—

 (1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

 (2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b) *Termination Events*.  The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, and, if specified to be applicable, a Credit Event Upon Merger if the event is specified pursuant to (ii) below or an Additional Termination Event if the event is specified pursuant to (iii) below:—

(i) *Illegality*.  Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party):—

 (1) to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

 (2) to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

(ii)    *Credit Event Upon Merger.* If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

(iii)    *Additional Termination Event.* If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)    *Event of Default and Illegality.* If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

6.    **Early Termination**

(a)    *Right to Terminate Following Event of Default.* If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)    *Right to Terminate Following Termination Event.*

(i)    *Notice.* If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)    *Two Affected Parties.* If an Illegality under Section 5(b)(i)(1) occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iii)    *Right to Terminate.* If:—

(1)    an agreement under Section 6(b)(ii) has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2)    an Illegality other than that referred to in Section 6(b)(ii), a Credit Event Upon Merger or an Additional Termination Event occurs,

either party in the case of an Illegality, any Affected Party in the case of an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)     *Effect of Designation.*

(i)     If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)     Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(d) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)     *Calculations.*

(i)     *Statement.* On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)     *Payment Date.* An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment), from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)     *Payments on Early Termination.* If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss," and a payment method, either the "First Method" or the "Second Method." If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method," as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)     *Events of Default.* If the Early Termination Date results from an Event of Default:—

(1)     *First Method and Market Quotation.* If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Unpaid Amounts owing to the Non-defaulting Party over (B) the Unpaid Amounts owing to the Defaulting Party.

(2)     *First Method and Loss.* If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3)     *Second Method and Market Quotation.* If the Second Method and Market Quotation

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Unpaid Amounts owing to the Non-defaulting Party less (B) the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4)    *Second Method and Loss*.  If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement.  If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii)    *Termination Events*.  If the Early Termination Date results from a Termination Event:—

(1)    *One Affected Party*.  If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2)    *Two Affected Parties*.  If there are two Affected Parties:—

(A)    if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Unpaid Amounts owing to X less (II) the Unpaid Amounts owing to Y; and

(B)    if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)    *Adjustment for Bankruptcy*.  In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)    *Pre-Estimate*.  The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty.  Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

7.    **Transfer**

Neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that:—

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

8.    **Miscellaneous**

(a)    *Entire Agreement.*  This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)    *Amendments.*  No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)    *Survival of Obligations.*  Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)    *Remedies Cumulative.*  Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)    *Counterparts and Confirmations.*

(i)    This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(ii)    The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise).  A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement.  The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)    *No Waiver of Rights.*  A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)    *Headings.*  The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

9.      **Expenses**

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

10.     **Notices**

(a)     *Effectiveness.* Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

> (i)      if in writing and delivered in person or by courier, on the date it is delivered;

> (ii)     if sent by telex, on the date the recipient's answerback is received;

> (iii)    if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

> (iv)    if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

> (v)     if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)     *Change of Addresses.* Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

11.     **Governing Law and Jurisdiction**

(a)     *Governing Law.* This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)     *Jurisdiction.* With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

> (i)      submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

> (ii)     waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)    *Waiver of Immunities.*  Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

**12.    Definitions**

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person.  For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

(a)    in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)    in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)    in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)    in all other cases, the Termination Rate.

*"consent"* includes a consent, approval, action, authorization, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

11

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iii).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"law"* includes any treaty, law, rule or regulation and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 9. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

*"Scheduled Payment Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Set-off"* means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

*"Settlement Amount"* means, with respect to a party and any Early Termination Date, the sum of:—

      (a)      the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

      (b)      such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

*"Specified Entity"* has the meaning specified in the Schedule.

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Terminated Transactions"* means with respect to any Early Termination Date (a) if resulting from a Termination

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

*"Termination Event"* means an Illegality or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the fair market values reasonably determined by both parties.

          IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

LEHMAN BROTHERS SPECIAL FINANCING INC.          WELLMONT HEALTH SYSTEM

By:_____          By:_____
Name:    T. Courtney Jenkins                             Name:
Title:     Vice President                                        Title:
Date:      April 29, 2002                                       Date:

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

(Local Currency-Single Jurisdiction)

# ISDA ®

### International Swaps and Derivatives Association, Inc.

# MASTER AGREEMENT

### dated as of April 29, 2002

LEHMAN BROTHERS SPECIAL FINANCING INC. and WELLMONT HEALTH SYSTEM have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement (the "Master Agreement"), which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:—

1.      Interpretation

(a)      *Definitions.*  The terms defined in Section 12 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)      *Inconsistency.*  In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

(c)      *Single Agreement.*  All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

2.      Obligations

(a)      *General Conditions.*

(i)      Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)      Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii)      Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

05/14/02  TUE 13:50 FAX
05/09/2002   16:22   LEHMAN → 916467581594                    NO.003  D01

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Terminated Transactions"* means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

*"Termination Event"* means an Illegality or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(e)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.


LEHMAN BROTHERS SPECIAL FINANCING INC.          WELLMONT HEALTH SYSTEM

By: _T. Cathey Je____                             By: _Edwin J. Ollie____
Name:  T. Courtney Jenkins                         Name:  EDWIN J. OLLIE
Title:   Vice President                            Title:  EVP FINANCE & OPERATIONS
Date:   April 29, 2002                             Date:

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

14

SCHEDULE
to the
MASTER AGREEMENT
dated as of April 29, 2002
between
**LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A"),**
a corporation organized under the laws of the State of Delaware

and

**WELLMONT HEALTH SYSTEM**
a Tennessee nonprofit corporation ("Party B")

**Part 1.        Termination Provisions.**

In this Agreement:—

(a)    *"Specified Entity"* means in relation to Party A for the purpose of:—

| | |
|---|---|
| Section 5(a)(v) (Default under Specified Transaction), | Lehman Brothers Holdings Inc. ("Holdings"). |
| Section 5(a)(vi) (Cross Default), | Holdings. |
| Section 5(a)(vii) (Bankruptcy), | Holdings. |
| Section 5(b)(ii) (Credit Event Upon Merger), | Holdings. |

and in relation to Party B for the purpose of:—

| | |
|---|---|
| Section 5(a)(v) (Default under Specified Transaction), | Not applicable. |
| Section 5(a)(vi) (Cross Default), | Not applicable. |
| Section 5(a)(vii) (Bankruptcy), | Not applicable. |
| Section 5(b)(ii) (Credit Event Upon Merger), | Not applicable. |

(b)    *"Specified Transaction"* will have the meaning specified in Section 12 of this Agreement.

(c)    The *"Cross Default"* provisions of Section 5(a)(vi) will apply to Party A and Party B.

The following provisions apply:—

*"Specified Indebtedness"*    for Party A will have the meaning specified in Section 12 of this Agreement.

For Party B will mean the $75,000,000 Health, Educational and Housing Facilities Board of the County of Sullivan, Tennessee Hospital Revenue Bonds, Series 2002 (Wellmont Health System Project)

*"Threshold Amount"* means two percent (2%) of the Stockholders' Equity of Holdings, in the case of Party A and Holdings (or its equivalent in any other currency), and $2,000,000 in the case of Party B.

(d)    The *"Credit Event Upon Merger"* provisions of Section 5(b)(ii) will apply to Party A and Party B.

(e)    The *"Automatic Early Termination"* provisions of Section 6(a) will not apply to either Party A or Party B.

(f)    *Payments on Early Termination.* For the purpose of Section 6(e) of this Agreement, Market Quotation and the Second Method will apply.

Notwithstanding anything in this Agreement to the contrary, in the event (i) of an Event of Default with respect to Party A as the Defaulting Party or a Termination Event with respect to Party A as the sole Affected Party and (ii) a Market Quotation for each Terminated Transaction can be determined, Party A shall have the option to either:

(i)    pay to Party B, or receive from Party B, as the case may be, an amount equal to the highest quotation received, in the case of a payment to Party B, or the lowest quotation received, in the case of a payment from Party B, each as the Settlement Amount; or

(ii)    assign its rights and obligations under this Agreement to the Reference Market-maker that provided the highest quotation, in the case of payment to be made to Party B, or to the Reference Market-maker who provided the lowest quotation, in the case of a payment received from Party B, as the case may be; provided that (A) such Reference Market-maker has one or more outstanding issues of rated, unsecured, unenhanced senior debt and such issues are rated higher than or equal to the higher of the ratings of Holdings on the date of such assignment and (i) A3 as determined by Moody's Investors Service, Inc. ("Moody's"), and (ii) A- as determined by Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("S&P") and (B) no Event of Default or Termination Event will occur as a result of such assignment to such Reference Market-maker, provided further that, an assignment agreement mutually satisfactory to Party A and Party B is executed in connection with such assignment.

Notwithstanding anything in this Agreement to the contrary, in the event (i) of an Additional Termination Event that is a Voluntary Termination or an Illegality with respect to which Party B is the sole Affected Party and (ii) a Market Quotation for each Terminated Transaction can be determined, Party A shall have the option to either:

(i)    pay to Party B, or receive from Party B, as the case may be, an amount equal to the highest quotation received, in the case of a payment to Party B, or the lowest quotation received, in the case of a payment from Party B, each as the Settlement Amount; or

(ii)    require Party B to assign its rights and obligations under this Agreement to the Reference Market-maker that provided the highest quotation, in the case of a payment to be made to Party B, or to the Reference Market-maker who provided the lowest quotation, in the case of a payment received from Party B, as the case may be; provided that, no Event of Default or Termination Event will occur as a result of such assignment to such Reference Market-maker; provided further that, an assignment agreement mutually satisfactory to Party A and Party B is executed in connection with such assignment.

Party A and Party B hereby acknowledge and agree that Party B shall select the Reference Market-

makers and Party A shall have the right to consent (which consent shall not be unreasonably withheld) to the Reference Marker-makers providing a Market Quotation in the events described in this Part 1(f).

(g)  *Additional Termination Event* will apply.  The following shall constitute Additional Termination Events:—

(i)     Party B provides notice to Party A of its desire to cause the voluntary termination hereof. Provision of such notice (a "Voluntary Termination") shall constitute an Additional Termination Event and such notice shall be provided in writing at least five (5) Business Days, and no more than twenty (20) Business Days, prior to the date being designated by Party B (the "Voluntary Termination Date").  If Party B designates a Voluntary Termination Date, Party B shall be the Affected Party and the Floating Rate Option (as defined in the relevant Confirmation) shall be used for purposes of determining the Settlement Amount hereunder.

Part 2.     Agreement to Deliver Documents.

For the purpose of Section 4(a) of this Agreement, each party agrees to deliver the following documents, as applicable:—

| Party required to deliver document | Form/Document/Certificate | Date by which to be Delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party A | A guarantee of Holdings in the form of Exhibit B to this Schedule. | Upon execution of this Agreement. | Yes |
| Party A | An opinion of counsel to Party A substantially in the form of Exhibit C to this Schedule. | Upon execution of this Agreement. | Yes |
| Party A and Party B | A copy of the most recent publicly available annual report (and each annual report thereafter) of (a) Party A and its Credit Support Provider (if any), with respect to Party A, and (b) Party B, with respect to Party B, in each case containing in all cases audited consolidated financial statements for each fiscal year during which this Agreement is in effect certified by an outside auditor and prepared in accordance with generally accepted governmental accounting principles in the United States or in the country in which such party is organized. | Promptly after request by the other party. | Yes |
| Party A and Party B | A copy of the unaudited consolidated financial statements of (a) Party A and its Credit Support Provider (if any), with | Promptly after request by the other party. | Yes |

3

| Party required to deliver document | Form/Document/Certificate | Date by which to be Delivered | Covered by Section 3(d) |
|---|---|---|---|
| | respect to Party A, and (b) Party B, with respect to Party B, in each case for each fiscal quarter during which this Agreement is in effect prepared in accordance with generally accepted accounting principles in the United States or in the country in which such party is organized. | | |
| Party B | An opinion of counsel to Party B in the form of Exhibit D to this Schedule. | Upon execution of this Agreement. | Yes |
| Party B | An incumbency certificate with respect to the signatory of this Agreement. | Upon execution of this Agreement. | Yes |
| Party B | A certified copy of the resolution or resolutions (or the equivalent thereof) of the governing body of Party B, certified by an appropriate official of Party B, pursuant to which Party B is authorized to enter into this Agreement and each Transaction, substantially in the form of Exhibit E to this Schedule. | Upon execution of this Agreement. | Yes |

**Part 3.    Miscellaneous.**

(a)   *Addresses for Notices.*  For the purpose of Section 10(a) to this Agreement:—

Address for notices or communications to Party A:—

Address:    745 Seventh Avenue, 5th Floor New York, NY 10019
            Attention: Municipal Financial Products - Middle Office
            Facsimile: 646-758-2938
            Telephone:  212-526-2240

Address for notices or communications to Party B:—

Address:    1905 American Way, Kingsport, TN 37660
            Attention:  President & CEO
            Facsimile:  423-230-8213
            Telephone:  423-230-8224

Address:    B.C. Ziegler and Company, 1185 Avenue of the Americas, New York, NY 10036
            Attention:  Peter Bruton
            Facsimile:  212-730-1095
            Telephone:  212-512-0455

4

(b) *Calculation Agent.* The Calculation Agent is Party A, unless Party A is a Defaulting Party, in which case Party B, or its agent, shall be the Calculation Agent.

(c) *Credit Support Document.* Details of any Credit Support Document:—

In the case of Party A, a guarantee of Party A's obligations hereunder in the form annexed hereto as Exhibit B and the ISDA Credit Support Annex incorporated by reference herein.

In the case of Party B, none.

(d) *Credit Support Provider.* Credit Support Provider means in relation to Party A: Holdings. In the case of Party B, none.

(e) *Governing Law.* This Agreement will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine).

(f) *Netting of Payments.* Subparagraph (ii) of Section 2(c) of this Agreement will not apply to all Transactions.

(g) *Definitions.* Section 12 of this Agreement is hereby amended to add or amend, as applicable, the following definitions in their appropriate alphabetical order:-

    (i)    *"Affiliate"* will have the meaning specified in Section 12 of this Agreement.

    (ii)    *"Default Rate"* means USD-LIBOR-BBA (with a Designated Maturity of one month) plus 1%. Terms used in this definition shall have the meanings ascribed thereto in the 1992 ISDA U.S. Municipal Counterparty Definitions (as published by the International Swaps and Derivatives Association, Inc.).

    (iii)    *"Non-default Rate"* means a rate per annum equal to the cost to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

    (iv)    *"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers with an unsecured long-term credit rating of at least A3 or A- from Moody's or Standard & Poor's, as applicable, and which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

    (v)    *"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost to each party (as certified by such party) if it were to fund of or of funding such amounts.

## Part 4.    Other Provisions.

(a) *Obligations.* Section 2(a)(iii) of this Agreement is hereby amended to read in its entirety as follows:—

"(iii) Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default, Potential Event of Default or Incipient Illegality with respect to the other party

has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement."

(b)    *Representations.*

(i)    The introductory clause of Section 3 of this Agreement is hereby amended to read in its entirety as follows:—

"Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(a) and 3(e), at all times until the termination of this Agreement) that:—".

(ii)    Section 3(a)(ii) of this Agreement is hereby amended to read in its entirety as follows:—

"(ii) *Powers.* It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action and made all necessary determinations and findings to authorize such execution, delivery and performance;".

(iii)    Section 3(b) of this Agreement is hereby amended to read in its entirety as follows:—

"(b) *Absence of Certain Events.* No Event of Default or Potential Event of Default or Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party."

(iv)    Section 3 of this Agreement is hereby amended by adding the following subsection "(e)" thereto, which subsection shall only apply to Party B:—

"(e) *Non-Speculation.* This Agreement has been, and each Transaction hereunder will be (and, if applicable, has been), entered into for purposes of managing its borrowings or investments and not for purposes of speculation."

(c)    *Early Termination.*

Section 6(d)(i) of this Agreement the second sentence is hereby amended to read in its entirety as follows:—

In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation, absent manifest error.

6

Miscellaneous:

(f)   Confirmation. A form of Confirmation is set forth as Exhibit A hereto.

(g)   "Stockholders' Equity" means with respect to Holdings, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles.

(h)   This Agreement is hereby amended by adding the following Section "13" hereto:—

"13.   **Relationship Between Parties**

Each party will be deemed to represent to the other party on the date on which it enters into a Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for that Transaction):—

(a)   *Non-Reliance*. It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisors as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction. It has not received from the other party any assurance or guarantee as to the expected results of that Transaction.

(b)   *Assessment and Understanding*. It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

(c)   *Status of Parties*. The other party is not acting as a fiduciary for or as an advisor to it in respect of that Transaction."

7

The parties executing this Schedule have executed the Master Agreement and have agreed as to the contents of this Schedule.

LEHMAN BROTHERS SPECIAL FINANCING INC.

By: _____

Name: T. Courtney Jenkins

Title:   Vice President

WELLMONT HEALTH SYSTEM

By:_____

Name:

Title:

The parties executing this Schedule have executed the Master Agreement and have agreed as to the contents of this Schedule.

LEHMAN BROTHERS SPECIAL FINANCING INC.

By: _____

Name: T. Courtney Jenkins

Title:  Vice President

WELLMONT HEALTH SYSTEM

By: _____

Name: EDWIN J. OLLIE

Title:  EVP FINANCE & OPERATIONS

EXHIBIT A to Schedule

Form of Confirmation

[Date]

TRANSACTION

[Counterparty]
[address]

Re:

Ladies and Gentlemen:

The purpose of this letter agreement is to set forth the terms and conditions of the Transaction entered into between us on the Trade Date specified below (the "Transaction"). This letter agreement constitutes a "Confirmation" as referred to in the Master Agreement specified below.

The definitions and provisions contained in the 1992 ISDA U.S. Municipal Counterparty Definitions (as published by the International Swaps and Derivatives Association, Inc.) (the "Definitions"), are incorporated into this Confirmation. In the event of any inconsistency between those Definitions and this Confirmation, this Confirmation will govern.

1.    This Confirmation supplements, forms part of, and is subject to the Master Agreement dated as of _____ (the "Agreement") between you and us. All provisions contained in the Agreement govern this Confirmation except as expressly modified below.

2.    The terms of the particular Transaction to which this Confirmation relates are as follows:—

Party A:                          LEHMAN BROTHERS SPECIAL FINANCING INC.
Party B:                          [COUNTERPARTY]
Notional Amount:

Trade Date:

Effective Date:

Termination Date:

FIXED AMOUNTS:

Fixed Rate Payer:                 [Party A/B]
Fixed Rate Payer Payment Dates:   [              ], subject to adjustment in accordance with
                                  the [Following] Business convention, with respect to a
                                  _____    Banking    Day    and    a
                                  _____    Banking    Day    [with    No
                                  Adjustment of Period End Dates]

EXHIBIT A
Page 1

Fixed Amount:

Fixed Rate:

Fixed Rate Day Count Fraction:

FLOATING AMOUNTS:

Floating Rate Payer:                                    [Party B/A]

Floating Rate Payer Payment Dates:            [              ], subject to adjustment in accordance with
                                                       the [Following] Business convention, with respect to a
                                                       _____.    Banking     Day     and     a
                                                       _____    Banking    Day    [with    No
                                                       Adjustment of Period End Dates]

Floating Rate Day Count Fraction:

Reset Dates:

Method of Averaging:                                   Weighted Average
Calculation Agent:

   3.    Account Details

      Payments to Party A


      Payments to Party B

    Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the
copy of this Confirmation enclosed for that purpose and returning it to us.

                Yours sincerely,

                LEHMAN BROTHERS SPECIAL FINANCING INC.

                By:_____
                Name:
                Title:

Confirmed as of the
date first written

_____


By:_____
Name:
Title:

                    EXHIBIT A
                    Page 2

**EXHIBIT B to Schedule**

**GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.**

LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A") and _____ ("Party B") have entered into a Master Agreement dated as of _____, pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement. For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a)    Guarantor hereby unconditionally guarantees to Party B the due and punctual payment of all amounts payable by Party A under each Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement. In case of the failure of Party A to pay punctually any such amounts, Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b)    Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c)    Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of the Agreement against Party A (other than as a result of the unenforceability thereof against Party B), the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defense of payment or statute of limitations, neither of which are waived); provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligation under the Agreement or to set off, counterclaim or withhold payment in respect of any Event of Default or potential Event of Default in respect of Party B or any Affiliate, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to all such Transactions without the taking of further action by the Guarantor.

(d)    Guarantor shall be subrogated to all rights of Party B against Party A in respect of any amounts paid by Guarantor pursuant to the provisions of this Guarantee; provided, however, that Guarantor shall not be entitled to enforce or to receive any payments arising out of, or based upon, such right of subrogation until all amounts then due and payable by Party A under the Agreement, shall have been paid in full.

(e)    Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in Section 5(a)(vii) of the Agreement affecting Party A or Guarantor.

(f)     Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

Guarantor makes the same representations to and agreements with Party B as those made by Party A pursuant to Sections 3 and 4 of the Agreement, at the times set forth therein, except that references therein to "the party" will be deemed to be references to "the Guarantor" and references therein to "the Agreement" will be deemed to be references to "the Guarantee." Section 11 of the Agreement is incorporated by reference in this Guarantee except that references therein to "the Agreement" will be deemed to be references to "the Guarantee."

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York, without reference to choice of law doctrine. All capitalized terms not defined in this Guarantee are defined in the Agreement.

Any notice hereunder will be sufficiently given if given in accordance with the provisions for notices under the Agreement and will be effective as set forth therein. All notices hereunder shall be delivered to Lehman Brothers Holdings Inc., Attention: Treasurer, at 3 World Financial Center, 24th Floor, New York, New York 10285 (Fax: 212-526-1466) with a copy to Lehman Brothers Special Financing Inc., Attention: Municipal Financial Products - Middle Office at 3 World Financial Center, 8th Floor, New York, New York 10285 (Fax: 212-526-7372).

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed in its corporate name by its duly authorized officer as of the date of the Agreement.

LEHMAN BROTHERS HOLDINGS INC.

By:_____

Title:_____

EXHIBIT C to Schedule

[Form of Opinion of Counsel to
Lehman Brothers Special Financing Inc. and
Lehman Brothers Holdings Inc.]

[Date]

[Counterparty]
[Address]

Re:

Ladies and Gentlemen:

I have acted as counsel to Lehman Brothers Special Financing Inc., a Delaware corporation ("Party A") and Lehman Brothers Holdings Inc., a Delaware corporation ("Guarantor"), and am familiar with matters pertaining to the execution and delivery of the Master Agreement (the "Master Agreement") dated as of _____ between Party A and _____ ("Party B") and the guarantee of Guarantor (the "Guarantee") delivered in connection with the Master Agreement. The Master Agreement is to be supplemented by confirmations of transactions to be entered into by Party A and Party B from time to time (each a "Confirmation") and the Master Agreement together with all such Confirmations shall constitute one agreement.

In connection with this opinion, I have examined, or have had examined on my behalf, an executed copy of each of the Master Agreement, the Guarantee, certificates and statements of public officials and officers of Party A and Guarantor and such other agreements, instruments, documents and records as I have deemed necessary or appropriate for the purposes of this opinion.

Based upon the foregoing but subject to the assumptions, exceptions, qualifications and limitations hereinafter expressed, I am of the opinion that:

1. Each of Party A and Guarantor is a corporation duly incorporated, validly existing and in good standing under the laws of Delaware.

2. The execution, delivery and performance of the Master Agreement, in the case of Party A, and the Guarantee, in the case of Guarantor, are within its corporate power, have been duly authorized by all necessary corporate action and do not conflict with any provision of its certificate of incorporation or by-laws.

3. Each of the Master Agreement, in the case of Party A, and the Guarantee, in the case of Guarantor, has been duly executed and delivered and constitutes, a legal, valid and binding obligation, enforceable against it in accordance with its terms.

The foregoing opinions are subject to the following assumptions, exceptions, qualifications and limitations:

A. My opinion in paragraph 3 above is subject to the effect of any bankruptcy, insolvency,

EXHIBIT C
Page 1

reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally (including, without limitation, the effect of statutory or other laws regarding fraudulent or other similar transfers) and general principles of equity, regardless of whether enforceability is considered in a proceeding in equity or at law.

B.      I am a member of the Bar of the State of New York and render no opinion on the laws of any jurisdiction other than the laws of the State of New York, the United States of America and the General Corporation Law of the State of Delaware.

C.      My opinions are limited to the present laws and to the facts as they presently exist. I assume no obligation to revise or supplement this opinion should the present laws of the jurisdictions referred to in paragraph B above be changed by legislative action, judicial decision or otherwise.

D.      This letter is rendered to you in connection with the Master Agreement and the Guarantee and the transactions related thereto and may not be relied upon by any other person or by you in any other context or for any other purpose. This letter may not be quoted in whole or in part, nor may copies thereof be furnished or delivered to any other person, without the prior written consent of Party A and Guarantor, except that you may furnish copies hereof (i) to your independent auditors and attorneys, (ii) to any United States, state or local authority having jurisdiction over you or over Part A or Guarantor, (iii) pursuant to the order of any legal process of any court of competent jurisdiction or any governmental agency, and (iv) in connection with any legal action arising out of the Master Agreement or the Guarantee.

E.      I have assumed with your permission (i) the genuineness of all signatures by each party other than Party A or Guarantor, (ii) the authenticity of document submitted to me as originals and the conformity to authentic original documents of all documents submitted to me as copies, and (iii) the due execution and delivery, pursuant to due authorization, of the Master Agreement by each party other than Party A.

Very truly yours,

EXHIBIT C
Page 2

EXHIBIT D to Schedule

[Form of Opinion of Counsel to Party B]

[Date]

Lehman Brothers Special Financing Inc.
New York, NY

Lehman Brothers Holdings Inc.
New York, NY

Re:

Gentlemen:

      We have acted as counsel to _____, a _____ of the State of _____ ("Party B") in connection with the execution and delivery of the Master Agreement (the "Master Agreement") dated as of _____ between Lehman Brothers Special Financing Inc. ("Party A") and Party B. The Master Agreement is to be supplemented by confirmations of Transactions to be entered into by Party A and Party B from time to time (each a "Confirmation") and the Master Agreement together with all such Confirmations shall constitute one agreement.

      In connection with this opinion, we have examined an executed copy of the Master Agreement and the form of Confirmation attached thereto and such documents and records of Party B, certificates of public officials and officers of Party B and such other documents as we have deemed necessary or appropriate for the purposes of this opinion. In such opinion, we have assumed the genuineness of all the signatures, the authenticity of all documents submitted to us as originals and the conformity to authentic original documents of all documents submitted to us as certified, conformed or photostatic copies.

      Based upon the foregoing, we are of the opinion that:

      1.    Party B is a _____ of the State of _____ duly organized and validly existing under the laws of the State of _____.

      2.    Party B is authorized under [specify statutory and/or regulatory authority] to enter into the Master Agreement and to perform its obligations thereunder and under the Confirmation entered into pursuant to and which form a part of the Master Agreement.

      3.    Party B has taken all necessary action required to be taken to ensure that the Master Agreement and the Confirmation entered into pursuant to and which form a part of the Master Agreement comply in all respects with [specify statutory and/or regulatory authority].

      4.    The Master Agreement has been duly executed and delivered by Party B and constitutes, and each Confirmation, upon due execution and delivery by Party B, will constitute, a legally valid and binding obligation of Party B enforceable against Party B in accordance with its terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether

enforcement is sought in a proceeding in equity or at law)).

5.      To the best of our knowledge, no consent, authorization, license or approval of, or registration or declaration with, any governmental authority is required in connection with the execution, delivery and performance of the Master Agreement and each Confirmation by Party B.

Very truly yours,

EXHIBIT E to Schedule

Form of Resolutions

RESOLVED that (i) _____ ("_____") enter into interest rate swap and any similar transactions and (ii) the form, terms and provisions of the Master Agreement (the "Agreement") dated as of _____ between Lehman Brothers Special Financing Inc. ("Lehman") and _____, in the form previously presented to (with such changes, not inconsistent with the intent of these resolutions and the intent of the Board of Directors as the officer(s) executing the same, as evidenced by their execution thereof, shall deem necessary or desirable), and the actions contemplated thereby (including the entry by _____ into Transactions with Lehman evidenced by confirmations thereof) be, and they hereby are, in all respects approved, authorized, adopted, ratified and confirmed.

RESOLVED that _____ is hereby authorized to enter into the Agreement, in substantially the form presented to this meeting and, from time to time, one or more interest rate swap transactions and agreements terminating any such interest rate swap transaction, pursuant to the Agreement and the documents (each a "Confirmation") exchanged between the parties confirming such interest rate swap transactions. The terms of each interest rate swap transaction, including interest rate, term, Notional Amount (as defined in the Agreement) and options as to commencement and termination of payments, and each termination agreement shall be as described in the Agreement and as provided in the related Confirmation, as approved from time to time by the officers of _____ authorized to execute the Confirmation. The aggregate Notional Amount, as defined in the Agreement, of such interest rate swap transactions outstanding at any one time, net of offsetting interest rate swap transactions, shall not exceed $_____ and each such interest rate swap transaction shall terminate not exceeding _____ years after its effective date. The aggregate Notional Amount of all such interest rate swap transactions as of any time shall be determined on a net basis, i.e., where any such transaction is entered into to offset or reverse an earlier transaction, to the extent of the offsetting or reversing effect, the Notional Amounts of such offsetting or reversing interest rate swap transactions shall not be included in the aggregate total.

RESOLVED that the actions contemplated in the Agreement, and each Confirmation, are hereby in all respects approved, authorized, adopted, ratified and confirmed.

RESOLVED that all officers or officials of _____ be, and each of them hereby is, authorized to execute and deliver (i) the Agreement in the name and on behalf of _____ and if necessary or advisable under its corporate seal (which may be attested by the [Secretary or any Assistant Secretary or the equivalent thereof] of _____) or otherwise and (ii) such other agreements and documents as are contemplated by the Agreement or are otherwise necessary in connection with entering into interest rate swap and any similar transactions, as any such officer or official shall deem appropriate, including without limitation, officer certificates, legal opinions and credit support documents.

RESOLVED that all officers or officials of _____ and its agents and counsel be, and each of them hereby is, authorized to take all such further actions, to execute and deliver such further instruments and documents in the name and on behalf of _____ and if necessary or advisable under its corporate seal (which may be attested by the [Secretary or any Assistant Secretary or the equivalent thereof] of _____) or otherwise to pay all such expenses as in his judgment shall be necessary or advisable in order fully to carry out the purposes of the foregoing resolutions.

RESOLVED that all actions previously taken or that will be taken by any director, officer, official, employee or agent of _____ in connection with or related to the matters set forth in or reasonably contemplated by the foregoing resolutions be, and each of them hereby is, adopted, ratified, confirmed and approved in all respects as the acts and deeds of _____.

# ISDA®

### International Swaps and Derivatives Association, Inc.

# CREDIT SUPPORT ANNEX

### to the Schedule to the

### ISDA MASTER AGREEMENT

### dated as of April 29, 2002

### between

### LEHMAN BROTHERS SPECIAL FINANCING INC.

### ("Party A")

### and

### WELLMONT HEALTH SYSTEM

### ("Party B")

This Annex supplements, forms part of, and is subject to, the above-referenced Agreement, is part of its Schedule and is a Credit Support Document under this Agreement with respect to each party.

Accordingly, the parties agree as follows:

**Paragraph 1.   Interpretation**

(a)      *Definitions and Inconsistency.*  Capitalized terms not otherwise defined herein or elsewhere in this Agreement have the meanings specified pursuant to Paragraph 12, and all references in this Annex to Paragraphs are to Paragraphs of this Annex. In the event of any inconsistency between this Annex and the other provisions of this Schedule, this Annex will prevail, and in the event of any inconsistency between Paragraph 13 and the other provisions of this Annex, Paragraph 13 will prevail.

(b)      *Secured Party and Pledgor.*  All references in this Annex to the "Secured Party" will be to either party when acting in that capacity and all corresponding references to the Pledgor will be to the other party when acting in that capacity; *provided, however,* that if Other Posted Support is held by a party to this Annex, all references herein to that party as the Secured Party with respect to that Other Posted Support will be to that party as the beneficiary thereof and will not subject that support or that party as the beneficiary thereof to provisions of law generally relating to security interests and secured parties.

**Paragraph 2.   Security Interest**

Each party, as the Pledgor, hereby pledges to the other party, as the Secured Party, as security for its Obligations and grants to the Secured Party a first priority continuing security interest in, lien on and right of Set-off against all Posted Collateral Transferred to or received by the Secured Party hereunder. Upon the Transfer by the Secured Party to the Pledgor of Posted Collateral, the security interest and lien granted hereunder on that Posted Collateral will be released immediately and, to the extent possible, without any further action by either party.

**Paragraph 3.   Credit Support Obligations**

Time on the Local Business Day following the applicable Valuation Date (or in the case of Paragraph 6(d), following the date of calculation).

(d)    *Substitutions.*

    (i)    Unless otherwise specified in Paragraph 13, upon notice to the Secured Party specifying the items of Posted Credit Support to be exchanged, the Pledgor may, on any Local Business Day, Transfer to the Secured Party substitute Eligible Credit Support (the "Substitute Credit Support"); and

    (ii)    subject to Paragraph 4(a), the Secured Party will Transfer to the Pledgor the items of Posted Credit Support specified by the Pledgor in its notice not later than the Local Business Day following the date on which the Secured Party receives the Substitute Credit Support, unless otherwise specified in Paragraph 13 (the "Substitution Date"); *provided* that the Secured Party will only be obligated to Transfer Posted Credit Support with a Value as of the date of Transfer of that Posted Credit Support equal to the Value as of that date of the Substitute Credit Support.

**Paragraph 5.    Dispute Resolution**

If a party (a "Disputing Party") disputes (I) the Valuation Agent's calculation of a Delivery Amount or a Return Amount or (II) the Value of any Transfer of Eligible Credit Support or Posted Credit Support, then (1) the Disputing Party will notify the other party and the Valuation Agent (if the Valuation Agent is not the other party) not later than the close of business on the Local Business Day following (X) the date that the demand is made under Paragraph 3 in case of (I) above or (Y) the date that the demand is made under Paragraph 3 in the case of (I) above or (Y) the date of Transfer in the case of (II) above, (2) subject to Paragraph 4(a), the appropriate party will Transfer the undisputed amount to the other party not later than the close of business on the Local Business Day following (X) the date that the demand is made under Paragraph 3 in the case of (I) above or (Y) the date of Transfer in the case of (II) above, (3) the parties will consult with each other in an attempt to resolve the dispute and (4) if they fail to resolve the dispute by the Resolution Time, then:

(i)    In the case of a dispute involving a Delivery Amount or Return Amount, unless otherwise specified in Paragraph 13, the Valuation Agent will recalculate the Exposure and the Value as of the Recalculation Date by:

    (A)    utilizing any calculations of Exposure for the Transactions (or Swap Transactions) that the parties have agreed are not in dispute;

    (B)    calculating the Exposure for the Transactions (or Swap Transactions) in dispute by seeking four actual quotations at mid-market from Reference Market-makers for purposes of calculating Market Quotation, and taking the arithmetic average of those obtained; *provided* that if four quotations are not available for a particular Transaction (or Swap Transaction), then fewer than four quotations may be used for that Transaction (or Swap Transaction); and if no quotations are available for a particular Transaction (or Swap Transaction), then the Valuation Agent's original calculations will be used for that Transaction (or Swap Transaction);

    (C)    utilizing the procedures specified in Paragraph 13 for calculating the Value, if disputed, of Posted Credit Support.

(ii)    In the case of a dispute involving the Value of any Transfer of Eligible Credit Support or Posted Credit Support the Valuation Agent will recalculate the Value as of the date of Transfer pursuant to Paragraph 13.

3

(d)    *Distributions and Interest Amount.*

(i)    *Distributions.*  Subject to Paragraph 4(a), if the Secured Party receives or is deemed to receive Distributions on a Local Business Day, it will Transfer to the Pledgor not later than the following Business Day any Distributions it receives or is deemed to receive to the extent that a Delivery Amount would not be created or increased by that Transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed to be a Valuation Date for this purpose).

(ii)    *Interest Amount.*  Unless otherwise specified in Paragraph 13 and subject to Paragraph 4(a), in lieu of any interest, dividends or other amounts paid or deemed to have been paid with respect to Posted Collateral in the form of Cash (all of which may be retained by the Secured Party), the Secured Party will Transfer to the Pledgor at the times specified in Paragraph 13 the Interest Amount to the extent that a Delivery Amount would not be created or increased by that Transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed to be a Valuation Date for this purpose).  The Interest Amount or portion thereof not Transferred pursuant to this Paragraph will constitute Posted Collateral in the form of Cash and will be subject to the security interest granted under Paragraph 2.

**Paragraph 7.  Events of Default**

For purposes of Section 5(a)(iii)(1) of this Agreement, an Event of Default will exist with respect to a party if:

(i)    that party fails (or fails to cause its Custodian) to make, when due, any Transfer of Eligible Collateral, Posted Collateral or the Interest Amount, as applicable, required to be made by it and that failure continues for two Local Business Days after notice of that failure is given to that party;

(ii)    that party fails to comply with any restriction or prohibition specified in this Annex with respect to any of the rights specified in Paragraph 6(c) and that failure continues for five Local Business Days after notice of that failure is given to that party; or

(iii)    that party fails to comply with or perform any agreement or obligation other than those specified in Paragraphs 7(i) and 7(ii) and that failure continues for 30 days after notice of that failure is given to that party.

**Paragraph 8.  Certain Rights and Remedies**

(a)    *Secured Party's Rights and Remedies.*  If at any time (1) an Event of Default or Specified Condition with respect to the Pledgor has occurred and is continuing or (2) an Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Pledgor, then, unless the Pledgor has paid in full all of its Obligations that are then due, the Secured Party may exercise one or more of the following rights and remedies:

(i)    all rights and remedies available to a secured party under applicable law with respect to Posted Collateral held by the Secured Party;

(ii)    any other rights and remedies available to the Secured Party under the terms of Other Posted Support, if any;

(iii)    the right to Set-off any amounts payable by the Pledgor with respect to any Obligations against any Posted Collateral or the Cash equivalent of any Posted Collateral held by the Secured Party (or any obligation of the Secured Party to Transfer that Posted Collateral); and

5

(i)       it has the power to grant a security interest in and lien on any Eligible Collateral it Transfers as the Pledgor and has taken all necessary actions to authorize the granting of that security interest and lien;

(ii)      it is the sole owner of or otherwise has the right to Transfer all Eligible Collateral it Transfers to the Secured Party hereunder, free and clear of any security interest, lien, encumbrance or other restrictions other than the security interest and lien granted under Paragraph 2;

(iii)     upon the Transfer of any Eligible Collateral to the Secured Party under the terms of this Annex, the Secured Party will have a valid and perfected first priority security interest therein (assuming that any central clearing corporation or any third-party financial intermediary or other entity not within the control of the Pledgor involved in the Transfer of that Eligible Collateral gives the notices and takes the action required of it under applicable law for perfection of that interest); and

(iv)      the performance by it of its obligations under this Annex will not result in the creation of any security interest, lien or other encumbrance on any Posted Collateral other than the security interest and lien granted under Paragraph 2.

**Paragraph 10. Expenses**

(a)       *General.* Except as otherwise provided in Paragraphs 10(b) and 10(c), each party will pay its own costs and expenses in connection with performing its obligations under this Annex and neither party will be liable for any costs and expenses incurred by the other party in connection herewith.

(b)       *Posted Credit Support.* The Pledgor will promptly pay when due all taxes, assessments or charges of any nature that are imposed with respect to Posted Credit support held by the Secured Party upon becoming aware of the same, regardless of whether any portion of that Posted Credit Support is subsequently disposed of under Paragraph 6(c), except for those taxes, assessments and charges that result from the exercise of the Secured Party's rights under Paragraph 6(c).

(c)       *Liquidation/Application of Posted Credit Support.* All reasonable costs and expenses incurred by or on behalf of the Secured Party or the Pledgor in connection with the liquidation and/or application of any Posted Credit Support under Paragraph 8 will be payable, on demand and pursuant to the Expenses Section of this Agreement, by the Defaulting Party or, if there is no Defaulting Party, equally by the parties.

**Paragraph 11. Miscellaneous**

(a)       *Default Interest.* A Secured Party that fails to make, when due, any Transfer of Posted Collateral or the Interest Amount will be obliged to pay the Pledgor (to the extent permitted under applicable law) an amount equal to interest at the Default Rate multiplied by the Value of the items of property that were required to be Transferred, from (and including) the date that the Posted Collateral or Interest Amount was required to be Transferred to (but excluding) the date of Transfer of that Posted Collateral or Interest Amount. This interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(b)       *Further Assurances.* Promptly following a demand made by a party, the other party will execute, deliver, file and record any financing statement, specific assignment or other document and take any other action that may be necessary or desirable and reasonably requested by that party to create, preserve, perfect or validate any security interest or lien granted under Paragraph 2, to enable that party to exercise or enforce its rights under this Annex with respect to Posted Credit Support or an Interest

7

*"Interest Amount"* means, with respect to an Interest Period, the aggregate sum of the amounts of interest calculated for each day in that Interest Period on the principal amount of Posted Collateral in the form of Cash held by the Secured Party on that day, determined by the Secured Party for each such day as follows:

    (x)    the amount of Cash on that day; multiplied by

    (y)    the Interest Rate in effect for that day; divided by

    (z)    360.

*"Interest Period"* means the period from (and including) the last Local Business Day on which an Interest Amount was Transferred (or, if no Interest Amount has yet been Transferred, the Local Business Day on which Posted Collateral in the form of Cash was Transferred to or received by the Secured Party) to (but excluding) the Local Business Day on which the current Interest Amount is to be Transferred.

*"Interest Rate"* means the rate specified in Paragraph 13.

*"Local Business Day,"* unless otherwise specified in Paragraph 13, has the meaning specified in the Definitions Section of this Agreement, except that references to a payment in clause (b) thereof will be deemed to include a Transfer under this Annex.

*"Minimum Transfer Amount"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

*"Notification Time"* has the meaning specified in Paragraph 13.

*"Obligations"* means, with respect to a party, all present and future obligations of that party under this Agreement and any additional obligations specified for that party in Paragraph 13.

*"Other Eligible Support"* means, with respect to a party, the items, if any, specified as such for that party in Paragraph 13.

*"Other Posted Support"* means all Other Eligible Support Transferred to the Secured Party that remains in effect for the benefit of that Secured Party.

*"Pledgor"* means either party, when that party (i) receives a demand for or is required to Transfer Eligible Credit Support under Paragraph 3(a) or (ii) has Transferred Eligible Credit Support under Paragraph 3(a).

*"Posted Collateral"* means all Eligible Collateral, other property, Distributions, and all proceeds thereof that have been Transferred to or received by the Secured Party under this Annex and not Transferred to the Pledgor pursuant to Paragraph 3(b), 4(d)(ii) or 6(d)(i) or released by the Secured Party under Paragraph 8. Any Interest Amount or portion thereof not Transferred pursuant to Paragraph 6(d)(ii) will constitute Posted Collateral in the form of Cash.

*"Posted Credit Support"* means Posted Collateral and Other Posted Support.

*"Recalculation Date"* means the Valuation Date that gives rise to the dispute under Paragraph 5; *provided, however,* that if a subsequent Valuation Date occurs under Paragraph 3 prior to the resolution of the dispute, then the "Recalculation Date" means the most recent Valuation Date under Paragraph 3.

*"Resolution Time"* has the meaning specified in Paragraph 13.

*"Return Amount"* has the meaning specified in Paragraph 3(b).

*"Secured Party"* means either party, when that party (i) makes a demand for or is entitled to receive Eligible Credit Support under Paragraph 3(a) or (ii) holds or is deemed to hold Posted Credit Support.

With respect to Party B: Not applicable.

(b)    *Credit Support Obligations.*

    (i)    *Delivery Amount, Return Amount and Credit Support Amount.*

        (A)    *"Delivery Amount"* has the meaning specified in Paragraph 3(a).

        (B)    *"Return Amount"* has the meaning specified in Paragraph 3(b).

        (C)    *"Credit Support Amount"* means, for any Valuation Date (1) 103% of the Secured Party's Exposure for that Valuation Date plus (ii) the aggregate of all Independent Amounts applicable to the Pledgor, if any minus (iii) the Pledgor's Threshold; provided, however, that (x) in the case where the sum of the Independent Amounts applicable to Pledgor exceed zero, the Credit Support Amount will not be less than the sum of all Independent Amounts applicable to the Pledgor and (y) in all other cases, the Credit Support Amount will be deemed to be zero whenever the calculation of Credit Support Amount yields an amount less than zero.

    (ii)    *Eligible Collateral.* The following items will qualify as "Eligible Collateral" for the party specified:

| Collateral Type | Party A | Party B | Valuation Percentage |
|---|---|---|---|
| (A) Cash, in the form of U.S. Dollars | [X] | [X] | 100% |
| (B) negotiable debt obligations issued by the U.S. Treasury Department having remaining maturities of not more than one year. ("Treasury Bills") | [X] | [X] | 100% |
| (C) negotiable debt obligations issued by the U.S. Treasury Department having remaining maturities of not more than one year but not more than ten years ("Treasury Notes") | [X] | [X] | 100% |
| (D) negotiable debt obligations issued by the U.S. Treasury Department having remaining maturities of not more than ten years ("Treasury Bonds") | [X] | [X] | 100% |
| (E) Other: negotiable debt obligations issued by the Federal National Mortgage Association, the Government National Mortgage Corporation the Federal Home Loan Mortgage Corporation, provided, however, that such securities may not be (a) multi-class or multi-branch securities or (b) paying interest or principal only ("Agency Securities") | [X] | [X] | 100% |

    (iii)    *Other Eligible Support.* The following items will qualify as "Other Eligible Support" for the party specified: Not applicable.

    (iv)    *Thresholds.*

11

Local Business Day plus any two (2) additional Local Business Days during each month selected by a party hereto.

(iii)    *"Valuation Time"* means 1:00 p.m., New York time (or earlier in the day if the markets relevant to such determination end business earlier on such day); provided that the calculations of Value and Exposure will be made as of approximately the same time on the same date.

(iv)    *"Notification Time"* means by 3:00 p.m., New York time, on a Local Business Day.

(d)    *Conditions Precedent and Secured Party's Rights and Remedies.* The following Termination Event(s) will be a "Specified Condition" for the party specified (that party being the Affected party if the Termination Event occurs with respect to that party);

|  | Party A | Party B |
|---|---|---|
| Illegality | [X] | [X] |
| Credit Event Upon Merger | [X] | [X] |

(e)    *Substitution*

(i)    *"Substitution Date"* has the meaning specified in Paragraph 4(d)(ii), unless otherwise specified here: Not later than two (2) Local Business Days following the Secured Party's receipt of Substitute Credit Support.

(ii)    *Consent.* The Pledgor need not obtain the Secured Party's consent for any substitution pursuant to Paragraph 4(d).

(f)    *Dispute Resolution*

(i)    *"Resolution Time"* means 1:00 p.m. New York time on the fifth Local Business Day following the time at which notice is given that gives rise to a dispute under Paragraph 5.

(ii)    *"Value."* For the purpose of Paragraph 5(i)(c) and 5(ii), the Value of Posted Credit Support other than Cash will be calculated as follows:

With respect to any Treasury Bills, Treasury Notes, Treasury Bonds or Agency Securities (referred to herein as "Government Obligations") the sum of (I)(x) the mean of the high bid and low asked prices quoted on such date by any principal market maker for such Government Obligations chosen by the Disputing Party, or (y) if no quotations are available from a principal market maker for such date, the mean of such high bid and low asked prices as of the day, next preceding such date, on which such quotations were available, plus (II) the accrued interest on such Government Obligations (except to the extent Transferred to a party pursuant to this Agreement or included in the applicable price referred to in (I) of this Clause) as of such date.

(iii)    *Alternative.* Not Applicable.

(g)    *Holding and Using Posted Collateral.*

(i)    *Eligibility to Hold Posted Collateral; Custodians.*

Party A and or its Custodian will be entitled to hold Posted Collateral pursuant to Paragraph 6(b), provided that the following conditions applicable to it are satisfied:

13

Lehman Brothers Inc., as agent for Party A (in telegraphic abbreviation, CHASE NYC/LEHMAN, ABA #021000021).

Party B:

[indicate delivery instructions]

(m)    *Other Provisions.*

None

## **Exhibit B**

## CERTIFICATIONS OF THE CORPORATION CONCERNING TRS

The undersigned, Wellmont Health System (the "Corporation"), hereby delivers the following certifications to Lehman Brothers Special Financing Inc. (the "Swap Provider") in regard to that certain Total Return Transaction (Global 2572263) dated June 29, 2006, made by and between the Corporation and Swap Provider:

WHEREAS, the Corporation has entered into a Loan Agreement dated as of June 1, 2006 with The Health, Educational and Housing Facilities Board of the County of Sullivan, Tennessee (the "Issuer") providing for the Issuer's issuance of $98,475,000 aggregate principal amount of Hospital Revenue Refunding Bonds, Series 2006 (Wellmont Health System), consisting of Series 2006A Bonds in the aggregate principal amount of $76,595,000 (the "Series 2006A Bonds") and Series 2006B Bonds in the aggregate principal amount of $21,880,000;

WHEREAS, The following documents have been entered into between the Corporation and the Swap Provider: (i) an ISDA Master Agreement dated April 29, 2002 (the "ISDA Agreement"), (ii) a Schedule to the Master Agreement (the "Schedule") dated April 29, 2002, (iii) a Credit Support Annex (the "Credit Support Annex") dated April 29, 2002 and (iv) Confirmation to the ISDA Master Agreement dated June 28, 2006 (the "Confirmation" and, together with the ISDA Agreement, the Schedule and the Credit Support Annex, the "TRS") relating to the Series 2006A Bonds;

WHEREAS, the interest rate on the Series 2006A Bonds will be reset monthly based on changes to the "AAA" Municipal Market Data Index ("MMD") for long-term bonds published by Thomson Financial Services, as described in more detail in the Limited Offering Memorandum dated June 23, 2006 (the "MMD Adjusted Rate"). The first date on which the Series 2006A Bonds are subject to optional redemption is March 1, 2013 (the "Call Date");

WHEREAS, the TRS will terminate no later than September 1, 2011 (the "Final Termination Date") so that the term of the TRS does not exceed 80% of the period between the date of issuance of the Series 2006A Bonds and the Call Date (the "Non-Call Period");

WHEREAS, the Series 2006A Bonds were sold to Ziegler Capital Markets Group (the "Underwriter") which in turn has sold the Bonds to Lehman Brothers Inc. (the "Purchaser"); and

WHEREAS, the Purchaser will sell the Series 2006A Bonds to a tender option bond trust;

NOW THEREFORE, the Corporation certifies as follows:

1.    The Corporation (nor any person related to the Corporation or acting on its behalf) does not have any right to purchase or call the Series 2006A Bonds at any price prior to the Call Date. The Corporation (nor any person related to the Corporation or

Jun. 29. 2006 8:25AM                   No. 1187  P. 3
08-13555-mg   Doc 41329   Filed 11/26/13   Entered 11/26/13 12:32:16   Main Document
Pg 65 of 73

acting on its behalf) has not entered into any agreement, formal or informal, that would give it the unconditional right to purchase or redeem the Series 2006A Bonds prior to the Call Date

2.     The Series 2006A Bonds were sold to the Underwriter in an arm's length transaction pursuant to a Bond Purchase Agreement dated June 23, 2006 (the "Bond Purchase Agreement"). The Bond Purchase Agreement has substantially the same terms as the Corporation would have negotiated had the TRS not been entered into.

3.     Based on consultations with and representations of the Underwriter, the initial interest rate for the Series 2006A Bonds, as set forth in the Limited Offering Memorandum with respect to the Series 2006A Bonds, represents an on-market rate of interest of the Series 2006A Bonds on the date that the Bond Purchase Agreement was executed without regard to the possibility that the TRS will be executed.

4.     The TRS was negotiated in an arm's length transaction with terms that would have been acceptable to the Corporation had the Series 2006A Bonds not been purchased by the Purchaser.

5.     The Corporation (nor any person related to the Corporation or acting on its behalf) has not entered into any agreement, formal or informal, that requires the Swap Provider or any affiliate of the Swap Provider, or the purchaser of the Series 2006A Bonds or any affiliate of the purchaser of the 2006A Bonds, to own the Series 2006A Bonds or any interest therein.

6.     The Series 2006A Bonds may be traded separately from the TRS and the TRS may be traded separately from the Series 2006A Bonds. Thus, the obligations of the Corporation in respect of the Series 2006A Bonds are separate from and not contingent on any payments made or received with respect to the TRS.

7.     Upon termination of the TRS, the Corporation will continue to be obligated to pay interest on its Series 2006 Obligation, issued as collateral for the Series 2006A Bonds, at the MMD Adjusted Rate until the Series 2006A Bonds are redeemed or retired.

8.     The Corporation understands that, because the term of the TRS is limited to 80% of the Non-Call Period and the Corporation has no right to redeem or otherwise acquire the Series 2006A Bonds prior to the Call Date, the terms of the Bonds have economic significance to the Corporation separate from the TRS either because the Series 2006A Bonds will remain outstanding for a substantial period after the termination of the TRS, or because the terms of the Series 2006A Bonds will have a substantial impact on their price in a negotiated or tender purchase of the Series 2006A Bonds, or because the terms of the Series 2006A Bonds will substantially affect the ability of the Corporation to advance refund the Series 2006A Bonds. While it reserves the right to do so, any decision regarding the acquisition of the Series 2006A Bonds at the end of the TRS will be based on the economic, financial and credit circumstances at that time, which are

largely beyond the control of the Corporation. The debt management policies of the Corporation do not preclude issuing bonds with these terms.

9.    Based on consultations with and representations of the Underwriter, the Corporation has determined that it is unlikely that the Corporation would be able to obtain the issuance of adjustable rate bonds with a short-term interest rate at an all-in cost that would be more favorable to the Issuer and the Corporation than the all-in cost of the Series 2006A Bonds and the TRS. The Corporation is entering into the TRS in order to achieve a lower cost of funds equivalent to a weekly variable rate of interest to which it likely would not otherwise have access.

10.    Except for the TRS, there is no other hedging arrangement of any type being entered into or contemplated by the Corporation or, to its knowledge, the Issuer.

11.    There is no agreement or formalized plan between the Corporation and any other party that obligates any party to refinance the Series 2006A Bonds or alter the terms of the Series 2006A Bonds, after the termination of the TRS.

Except to the extent that any of the certifications set forth herein are materially inaccurate, nothing contained herein shall be construed to impose upon the Corporation any financial obligation, responsibility or other risk in regard to the tax-exempt status of the interest accruing on the Series 2006A Bonds.

**IN WITNESS WHEREOF**, the Corporation has caused this instrument to be executed by its duly authorized corporate representative as of June 29, 2006.

**WELLMONT HEALTH SYSTEM**

By: _____

Title: CFO. _____

OHS Draft 6/23/06

Date:   June [ ], 2006

To:     Wellmont Health System
        1905 American Way
        Kingsport, Tennessee 37660
        Attention: Executive Vice President Finance and
        Chief Financial Officer
        Telephone: (423) 230-8204
        Facsimile: (423) 224-5424

From:   Lehman Brothers Special Financing Inc.
        745 Seventh Avenue
        New York, NY 10019
        Telephone: 212-526-2240
        Facsimile: 646-758-2938

## SUBJECT: TOTAL RETURN TRANSACTION (Global _____)

The purpose of this communication is to set forth the terms and conditions of the swap transaction entered into on the Trade Date referred to below (the "Swap Transaction"), between Lehman Brothers Special Financing Inc. ("Party A") and Wellmont Health System ("Party B"). This communication constitutes a "Confirmation" as referred to in the Swap Agreement specified below.

This Confirmation supplements, forms part of, and is subject to, the 1992 ISDA Master Agreement, including the Schedule and Credit Support Annex thereto, each dated as of April 29, 2002 as amended and supplemented from time to time, between Party A and Party B (the "Swap Agreement"). All provisions contained in, or incorporated by reference to, such Swap Agreement shall govern this Confirmation except as expressly modified below.

Party A and Party B each represents that (i) entering into the Swap Transaction has been duly authorized by it and does not violate any laws of its jurisdiction of organization or residence or the terms of any agreement to which it is a party; (ii) it is not relying on the other party in connection with its decision to enter into this Swap Transaction, and it is not acting as an advisor to or fiduciary of the other party in connection with this Swap Transaction regardless of whether the other party provides it with market information or its views; (iii) it understands the risks of the Swap Transaction and any legal, regulatory, tax, accounting and economic consequences resulting therefrom; and (iv) it has determined based upon its own judgment and upon any advice received from its own professional advisors as it has deemed necessary to consult that entering into the Swap Transaction is appropriate for it in light of its financial capabilities and objectives.

This Confirmation incorporates the definitions and provisions contained in the 2000 ISDA Definitions and for terms not defined therein, the 1992 ISDA U.S. Municipal Counterparty Definitions, each as published by the International Swaps and Derivatives

Association, Inc. (the "Definitions"). In the event of any inconsistency between the Definitions and this Confirmation, this Confirmation will govern.

The terms of the particular Swap Transaction to which this communication relates are as follows:

| | |
|---|---|
| Trade Date: | June [ ], 2006 |
| Effective Date: | June 29, 2006 |
| Termination Date: | September 1, 2011 |

**Definitions –**

| | |
|---|---|
| Aggregate Principal Amount: | USD 76,595,000 subject to amortization as the Reference Security is redeemed. |
| Reference Security: | The Health, Educational and Housing Facilities Board of the County of Sullivan, Tennessee Hospital Revenue Refunding Bonds (Wellmont Health System Project), Tax-Exempt Series 2006A (Cusip 865293AB0) |
| Swap Price$_1$: | 100% |
| Swap Price$_2$: | The Ending Price for the Reference Security. On the second Business Day prior to the Termination Date (the "Price Determination Date"), the Market Agent shall obtain a firm bid quotation (expressed as a percentage) for the Reference Security for settlement on the Termination Date from each of three market-makers in the Reference Security. One such market-maker shall be an affiliate of Party A, and the parties shall agree on two others. The highest quotation from any market-maker, which will be expressed as a percentage and will include any accrued interest, shall be deemed to be the "Ending Price" for the Reference Security. |

**Party B Fixed Amounts -**

| | |
|---|---|
| Fixed Amount: | 0.25% of the Aggregate Principal Amount |
| Fixed Amount Payment Date: | The Effective Date, subject to adjustment in accordance with the Following Business Day Convention. |

-2-

**Party B Floating Amounts -**

Calculation Amount:

On any date the product of (a) the Aggregate Principal Amount multiplied by (b) Swap Price$_1$.

Payment Date:

Each Interest Payment Date (as such term is defined in the Bond Trust Indenture dated as of June 1, 2006 between The Health, Educational and Housing Facilities Board of the County of Sullivan, Tennessee and The Bank of New York Trust Company, N.A.) on the Reference Security, and any Early Termination Date or Termination Date, as applicable, subject to adjustment in accordance with the Following Business Day Convention.

Floating Rate Option:

USD-BMA Municipal Swap Index;

Reset Dates:

Each Thursday, or if any Thursday is not a U.S. Government Securities Business Day, the next succeeding U.S. Government Securities Business Day.

Method of Averaging:

Weighted Average.

Spread:

Plus .85 %

Floating Rate Day Count Fraction:

Actual/Actual

Period End Dates:

Each Interest Payment Date on the Reference Security, and any Early Termination Date or Termination Date, as applicable, without adjustment.

**Party A Floating Amounts -**

All interest payments that both accrue and are made on the Reference Security during the Term of the Swap Transaction.

Payment Date:

Each Interest Payment Date, and any Early Termination Date or Termination Date, as applicable, subject to adjustment in accordance with the Following Business Day Convention.

**Return Amount:**

The difference of (x) the product of (a) the Aggregate Principal Amount multiplied by (b) Swap Price$_1$ minus (y) the product of (a) the Aggregate Principal Amount multiplied by (b) Swap Price$_2$

-3-

Should the Return Amount be a positive number, Party B shall pay such amount to Party A. Should the Return Amount be a negative number, Party A shall pay the absolute value of such amount to Party B.

Payment Date:

The Termination Date, subject to adjustment in accordance with the Following Business Day Convention.

**Market Disruption Event:**

The occurrence or existence on the Price Determination Date, in the sole determination of the Market Agent, of any of the following events or conditions shall be a Market Disruption Event, and to the extent such event or condition occurs or exists with respect to the Reference Security, such Reference Security shall be deemed an "Affected Security" for the purpose of this provision:

(i) the Market Agent, in good faith, is not able to obtain both bid and ask quotations generally from Reference Market-makers which are recognized as regular market participants and which deal in institutional transactions for the Reference Security or the bid and asked prices provided are not, in the reasonable judgment of the Market Agent, commercially reasonable or reflective of the value of the Reference Security under normal market conditions; or

(ii) the Market Agent, in good faith, is not able to obtain both bid and ask quotations from Reference Market-makers for the Reference Security, as a result of natural disaster or other catastrophic event which affects the Issuer of the Reference Security or the market in which the Reference Market-makers are located; or

(iii) the adoption of any law, rule, regulation or statute by any governmental or judicial authority affecting the Reference Security which has the effect of imposing any material exchange controls or limitations or restrictions on, convertibility of currency as required under its terms.

-4-

If, on the Price Determination Date, a Market Disruption Event occurs or exists, the Market Agent shall as soon as reasonably practical notify the parties of the existence or occurrence of a Market Disruption Event. The Price Determination Date for the Affected Security shall be the next following Business Day during which there is no Market Disruption Event. If such an event has occurred and is continuing for two Business Days following the original Price Determination Date, then the Price Determination Date for the Affected Security shall be deemed to be that second Business Day following the original Price Determination Date. The Market Agent, in good faith, shall determine the Ending Price of the Affected Security based on any single available firm executable bid or the most recent publicly quoted price for the Reference Security.

**Additional Termination Events:**   Default under Other Agreements. The occurrence of the any event described in clauses (i), (ii) and (iii) of this paragraph shall constitute an Additional Termination Event with respect to this Transaction, in which case Party B shall be the sole Affected Party: (i) a Default, as such term as defined in the Loan Agreement (the "Loan Agreement"), dated as of June 1, 2006, between The Health, Educational and Housing Facilities Board of the County of Sullivan, Tennessee and Party B, (ii) an Event of Default, as such term as defined in the Master Trust Indenture (the "Master Trust Indenture") dated as of May 1, 1991, as amended and supplemented, among Party B, Wellmont Hawkins County Memorial Hospital, Inc., Wellmont, Inc., Wellmont Foundation and Wachovia Bank, National Association, as Master Trustee, and (iii) an event shall have occurred which with the passage of time or the giving of notice, or both, would constitute a Default under the Loan Agreement and/or an Event of Default under the Master Trust Indenture. Upon the occurrence of an Additional Termination Event described in this paragraph (an "Operative Document Termination Date"), Party A shall have the right to terminate this Transaction immediately in which case the Return Amount shall be determined on the second Business Day prior to such Operative Document Termination Date. If the Return Amount is a positive number, then Party B shall pay such

-5-

|  | amount to Party A, and if the Return Amount is a negative number, then Party A shall pay the absolute value of such amount to Party B.  Further, the accrued Party B Floating Amount shall be paid by Party B. |
|---|---|
| **Other Provisions:** | The Parties hereto agree and acknowledge that Party A is not obligated to own the Reference Security at any time. |
| **Calculation Agent:** | Party A |
| **Market Agent:** | Lehman Brothers Inc. |
| **Business Days:** | New York |
| **Governing Law:** | New York, without reference to choice of law doctrine. |
| **Account for Payment to Party A in USD :** | [ ] |
| **Account for Payment to Party B in USD :** | [ ] |

US_EAST:160021173.6

Please confirm that the foregoing correctly sets forth the terms of our agreement with respect to the Swap Transaction by signing in the space provided below and sending a copy of the executed Confirmation by telecopier (646-758-1594) to Transactions Management at Lehman Brothers Special Financing Inc.

Yours sincerely,
LEHMAN BROTHERS SPECIAL FINANCING INC.

By:_____
Name:
Title:


Agreed & Accepted by:
WELLMONT HEALTH SYSTEM

By:
Name:
Title:

-7-