Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    - - - - - - - - - - - - - - - - - x

4    In the Matter of:

5    LEHMAN BROTHERS HOLDINGS, INC.,    CASE NO. 08-13555(JMP)

6    ET AL,                            (Jointly Administered)

7                 Debtors.

8    - - - - - - - - - - - - - - - - - x

9    In the Matter of:

10   LEHMAN BROTHERS, INC.,            CASE NO. 08-01420(JMP)

11               Debtor.        (SIPA)

12   - - - - - - - - - - - - - - - - - x

13                       U.S. Bankruptcy Court

14                       One Bowling Green

15                       New York, New York

16

17                       October 24, 2013

18                       10:01 AM

19

20   B E F O R E :

21   HON. JAMES M. PECK

22   U.S. BANKRUPTCY JUDGE

23

24

25   ECRO - K. HARRIS

Page 2

1    HEARING Re: Plan Administrator's Omnibus Objection to Claims

2    Filed by Deborah E. Focht (ECF No. 34303)

3

4    HEARING Re Motion of the Federal Housing Finance Agency and

5    the Federal Home Loan Mortgage Corporation to stay Lehman

6    Brothers Holdings, Inc.'s Motion to Classify and Allow the

7    Claim Filed by the Federal Home Loan Mortgage Corporation

8    (Claim No. 33568) in LBHI Class 3 (ECF No. 40570)

9

10   HEARING Re Motion to Classify and Allow the Claim Filed by

11   the Federal Home Loan Mortgage Corporation (Claim No. 33568)

12   in LBHI Class 3 (ECF No. 40066)

13

14   HEARING Re Motion of CarVal Investors, LLC for Leave to

15   Examine LBHI Pursuant to Federal Rule of Bankruptcy

16   Procedure 2004 (ECF Nos. 40469)

17

18   HEARING Re Motion of Davidson Kempner Capital Management

19   LLC, as Investment Advisor for Leave to Examine LBHI

20   Pursuant to Federal Rule of Bankruptcy Procedure 2004 (ECF

21   No. 40532)

22

23

24

25   Transcribed by:  Sheila Orms

```
 1    A P P E A R A N C E S :

 2    WEIL, GOTSHAL & MANGES LLP

 3         Attorneys for LBHI

 4         767 Fifth Avenue

 5         New York, NY 10153-0119

 6

 7    BY:  MAURICE HORWITZ, ESQ.

 8         ALFREDO R. PEREZ, ESQ.

 9         ZAW WIN, ESQ.

10         LORI FIFE, ESQ.

11

12    MILBANK, TWEED, HADLEY & MCCLOY LLP

13         Attorney for the Ad Hoc Committee

14         One Chase Manhattan Plaza

15         New York, NY 10005-1413

16

17    BY:  GERARD UZZI, ESQ.

18

19    ARNOLD & PORTER LLP

20         Attorneys for FHFA

21         399 Park Avenue

22         New York, NY  10022

23

24    BY:  MICHAEL J. CANNING, ESQ.

25         NANCY G. MILBURN, ESQ.
```

Page 4

1   WHITE & CASE

2        Attorneys for Attestor Capital LLC

3        1155 Avenue of the Americas

4        New York, NY   10036

5

6   BY:  RICHARD GRAHAM, ESQ.

7

8   PRYOR CASHMAN LLP

9        Attorneys for SPCP Group LLC

10        7 Times Square

11        New York, NY   10036

12

13   BY:  CONRAD K. CHIU, ESQ.

14

15   KIRLAND & ELLIS LLP

16        Attorneys for King Street and Elliot

17        555 California Street

18        San Francisco, CA   94104

19

20   BY:  MARK MCKANE, ESQ.

21

22

23

24

25

Page 5

1    KIRKLAND & ELLIS, LLP

2          Attorneys for (Not Identified)

3          601 Lexington Avenue

4          New York, NY  10022

5

6    BY:  STEPHEN E. HESSLER, ESQ.

7

8    SKADDEN, ARPS, SLATE, MEAGHEN & FLOM LLP

9          Attorneys for LBHI Broad of Directors

10          Four Times Square

11          New York, NY  10036

12

13    BY:  J. GREGORY MILMOE, ESQ.

14

15    SCHULTE ROTH & ZABEL LLP

16          Attorneys for Davidson Kempner Capital Management

17          919 Third Avenue

18          New York, NY  10022

19

20    BY:  DAVID M. HILLMAN, ESQ.

21

22

23

24

25

Page 6

1   DAVIDOFF HUTCHER & CITTRON LLP

2        Attorneys for LBHI2

3        605 Third Avenue

4        New York, NY  10156

5

6   BY:  DAVID H. WANDER, ESQ.

7

8   STROOCK & STROOCK & LAVAN, LLP

9        Attorneys for Kristopher M. Hansen for CarVal

10           Investors

11       180 Maiden Lane

12       New York, NY  10038

13

14   BY:  KENNETH PASQUALE, ESQ.

15

16   ROPES & GRAY

17       Attorneys for the Baupost Group

18       1211 Avenue of the Americas

19       New York, NY  10036

20

21   BY:  MARK I. BANE, ESQ.

22

23

24

25

Page 7

1    TELEPHONIC APPEARANCES:

2    PATRICK FITZGERALD, DOW JONES & CO

3    RAJ LYER, CANYON PARTNERS

4    TRISTA S. LYONS

5    BENJAMIN MEEKS, CLEARY GOTTLIEB STEEN & HAMILTON

6    MICHAEL NEUMEISTER, STUTMAN TREISTER & GLATT

7    EAMONN O'HAGAN, STUTMAN TREISTER & GLATT

8    JASON B. SANJANA, REORG RESEARCH

9    AUSTIN SAYPOL, SILVERPOINT CAPITAL LP

10   MITCHELL SOCKETT, KING STREET CAPITAL MANAGEMENT, LLC

11   SHAUN WONG, CREDIT SUISSE

12   SCOTT HARTMAN

13   DAVID TIOMKIN, AURELIUS CAPITAL MANAGEMENT LP

14   ADAM HARRIS, SCHULTE ROTH & ZABEL LLP

15   PIERRE BOUR

16   MARK LAWFORD, WEIL GOTSHAL & MANGES

17   MICHAEL SHEPHERD, WHITE & CASE LLP

18

19

20

21

22

23

24

25

Page 8

```
 1                    P R O C E E D I N G S
 2            THE COURT:  Be seated, please, good morning.
 3            MR. WIN:  Good morning.
 4            Good morning, Your Honor, Zaw Win, Weil Gotshal &
 5   Manges for Lehman Brothers Holdings, Inc.
 6            The first matter on today's agenda is the plan
 7   administrator's objections to the two remaining claims of
 8   Ms. Deborah Focht.  I know the Court has a busy schedule
 9   today, so before we get started, I think it might make sense
10   to just check and see if Ms. Focht is in the courtroom or on
11   the line.
12            THE COURT:  Is Deborah Focht in the courtroom or
13   is there an attorney on her behalf in the courtroom?
14       (No response)
15            THE COURT:  There's no response.  Is Deborah Focht
16   on the telephone, or is there an attorney representing
17   Deborah Focht on the telephone?
18       (No response)
19            THE COURT:  All right.  Also no response.  Please
20   proceed.
21            MR. WIN:  In that case, unless the Court has any
22   specific questions, the plan administrator would rest on its
23   papers, and just note quickly that Ms. Focht has had more
24   than an adequate opportunity to represent herself in this
25   matter.  The Court's held three hearings in which she has
```

Page 9

1    participated in, and she submitted four separate pleadings.

2            As set forth in the plan administrator's papers,

3    the plan administrator doesn't view her two remaining

4    claims, which are Claim No. 34381 against LBHI and 34380 as

5    having any merit, and so we would respectfully request that

6    the Court disallow and expunge those claims with prejudice.

7            THE COURT:  Those claims are disallowed and

8    expunged.

9            MR. WIN:  Thank you.  The next matter on the

10   agenda is being handled by Arnold & Porter.

11           MR. PEREZ:  Good morning, Your Honor, Alfredo

12   Perez on behalf of the plan administrator.  I think the next

13   matter on the agenda is a stay motion that Mr. Canning's

14   going to present.

15           THE COURT:  All right.

16           MR. CANNING:  Good morning, Your Honor.

17           THE COURT:  Welcome back.

18           MR. CANNING:  Thank you.  It's good to be here.  I

19   guess, yes, we have a couple of motions on today.  The first

20   in order would be the motion that's been made by the Federal

21   Housing Finance Authority to stay the proceedings in respect

22   to the motion to classify the claim of Freddie Mac and FFHA

23   from a Class 1 priority claim to a Class 3 claim.

24           Before we get started, I would like to introduce

25   my colleague at the table, Nancy Milburn from Arnold &

1   Porter and seated next to her is Mark Lanman, who is with

2   the Lanman Corzi firm, which is representing Freddie Mac.

3          Okay.  Your Honor, just very briefly by way of

4   background and you may be, you know, well familiar with

5   this, but on September 6th, 2008 very shortly before the

6   commencement of the Lehman bankruptcy proceedings, pursuant

7   to the authority that was granted under the HERA Act, what

8   we refer to as the HERA Act, which is the Housing and

9   Economic Recovery Act of 2008, Freddie Mac, along with

10  Fannie Mae was placed under a conservatorship of the FHFA.

11         As Your Honor is aware, the -- Freddie Mac is a

12  government sponsored enterprise that provides liquidity,

13  stability and affordability to the U.S. housing markets, and

14  frankly is critically an important centerpiece to the

15  financial health of the U.S., and it's real estate and

16  capital markets.

17         In enacting HERA and I'm certainly not going to go

18  for a long recitation of HERA, but Congress did grant the

19  FHFA very, very broad and strong powers, pursuant to its own

20  separate statutory scheme, in order to address and resolve

21  Freddie Mac and Fannie Mae.

22         Including by granting them very broad powers with

23  respect to the ability to avoid transfers made and the

24  incurrence of obligations that were made by third parties

25  with the intent to hinder delay or fraud, either the

Page 11

```
 1    regulated entities Freddie Mac and Fannie Mae or FHFA.

 2            In accordance with these powers, Freddie Mac filed

 3    a proof of claim, timely filed a proof of claim for the

 4    amount of $2.1 billion plus interest on account of two loans

 5    that were made by Freddie Mac to LBHI on August 19th and

 6    August 20th of 2008, and those loans aggregated $1.2

 7    billion.

 8            In connection with that proof of claim, Fannie Mac

 9    and FHFA is sort of the priority recovery pursuant to the

10    provisions of Section 4617(b)(15) of the HERA Act, which

11    allows for, under Subsection D for the rights of FHFA in

12    respect of any avoidable transfers of the incurrence of any

13    obligations to receive a priority recovery, and that it says

14    specifically, that the rights and powers with respect to

15    those actions are superior in all respects to the rights of

16    a Chapter 11 trustee, and any other party in a bankruptcy

17    proceeding.

18            So that notation, if you will, was put on the

19    front page of the proof of claim, and there was an

20    attachment in some specificity within to what exactly those

21    powers and rights were.

22            Also just very summarily, because it's in all of

23    our papers in connection with the confirmation of the

24    debtor's amended plan, third amended plan, there were

25    discussions held between LBHI and FHFA and Freddie Mac,
```

1    where we entered into a plan stipulation pursuant to which

2    LBHI agreed to amend their third amended plan just before

3    confirmation, to modify the definition of a priority non-tax

4    claim.  So that it reads that any creditor holding a claim

5    that's entitled to a priority under Section 507 of the

6    Bankruptcy Code or under Section 4617(b)(15) of HERA, would

7    receive a hundred percent recovery as a priority claim in

8    the bankruptcy case.

9             That agreement and the stipulation was actually

10   embedded in the plan, the plan was confirmed, and pursuant

11   to the stipulation there was simultaneously set aside $1.2

12   billion in a separate cash reserve to be held pending

13   resolution of the HERA claim and its priority.

14            Recently, and why we're here before Your Honor

15   today, is four years after we filed that claim, a little bit

16   more than four years after we filed that claim, the debtors

17   filed a motion to, in effect, reclassify this claim,

18   asserting that it should be reclassified from a Class 1 LBHI

19   priority claim to a Class 3 LBHI senior unsecured claim.

20            We take exception with that, obviously, Your

21   Honor, and that's what our opposition was in respect of that

22   motion.  And we also filed a motion to withdraw the

23   reference as to that particular motion to classify in our

24   opposition, and hence, finally long-winded get to the

25   current motion which is to stay these proceedings while the

Page 13

1   district court resolves whether the reference should be

2   withdrawn.

3            THE COURT:  May I just break in and ask you --

4            MR. CANNING:  Sure, Your Honor.

5            THE COURT:  -- a background question.

6            MR. CANNING:  Yeah.

7            THE COURT:  Prior to prosecuting the motion to

8   stay --

9            MR. CANNING:  Uh-huh.

10           THE COURT:  -- did you or others acting on behalf

11  of your client explore the possibility of some kind of

12  coordinated approach with the debtor that would avoid this

13  litigation as it relates to the stay, and be in the more

14  nature of a consensual approach to dealing with the

15  relationship between the motion to withdraw reference and

16  this particular proceeding?

17           MR. CANNING:  Yes, Your Honor.  We --

18           THE COURT:  Can you describe that, please?

19           MR. CANNING:  Sure.  There have been lots of

20  discussions ongoing over the last several years between

21  LBHI, Freddie Mac, Fannie Mae, and the FHFA on all of the

22  claims, just as a background.

23           With respect to these particular claims, we did

24  probably in the spring start engaging pretty seriously in

25  conversations to see if there was a possibility to try to

Page 14

1    resolve this claim consensually as to its priority.

2    Understanding that there is no dispute with respect to the

3    underlying obligation, and the fact that the loan was made,

4    and the funds should be repaid, and that this is a valid

5    claim.

6              But we did engage in discussions with respect to

7    seeing if we could address the priority nature and a

8    recovery in that regard.  We had certainly some meetings

9    between Mr. Perez and I, we had one or maybe two meetings

10   where representatives of the FHFA and myself attended with

11   some folks from LBHI and Mr. Perez, and ultimately decided

12   that we would try to see if we could do a meditation.

13             In that regard, we talked about timing for the

14   mediation, we talked about a mediator.  Candidly we agreed

15   upon a mediator.  There then became an issue with respect to

16   the timing of the mediation.  This was in, I think if I

17   recall, and Mr. Perez can correct me, I think it was in June

18   and sometime in June we had this discussion.  And due to

19   other, frankly other cases that the FHFA was tied up in, and

20   the need to do what we believe was sufficient discovery,

21   because we even exchanged a proposed list of informal

22   discovery to try to inform both parties to make the

23   mediation process as successful as we could.  So we did each

24   put together sort of a checklist of those items that we

25   thought we would need to exchange in discovery in order to

Page 15

1    make that productive.

2           And so in order to get all of that together and to

3    meet some other time constraints, the representative of FHFA

4    said ideally he could do it probably early in December.  FH

5    -- I'm sorry, LBHI indicated that they would like -- they

6    would prefer to do it in August or September.  We wound up,

7    I spoke directly with the agreed upon mediator to get his

8    schedule.  He had time available the last week in October

9    and the first week or so in November.  I counseled -- I went

10   back to FHFA, they were agreeable to doing it, and moving it

11   up to early November, let's say the first week in November,

12   and I communicated that back to counsel for LBHI, and

13   frankly, that's where it ended.  They indicated that they

14   were -- did not want to go forward with mediation at that

15   point.

16          Roughly 60 days went by or so, Your Honor, and

17   then we got this motion filed.  So I didn't mean again to be

18   so laborious, but that is the sequence of what happened

19   since probably the spring of this year.

20          THE COURT:  What I was actually asking you,

21   although this was a very helpful discussion, was whether you

22   had engaged in any conversations with the plan administrator

23   or its representatives in reference to the staging of these

24   proceedings --

25          MR. CANNING:  Oh, sorry, Your Honor.

Page 16

1          THE COURT:  -- as it relates to the district court

2    and a motion to withdraw reference, and having a hearing on

3    the merits of the reclassification motion take place today.

4    Because the motion for stay is effectively driven by the

5    calendaring of the coercive motion.

6          MR. CANNING:  That's correct, Your Honor.  No, in

7    fact, we have not had any specific discussions about that.

8    This is all -- happened pre -- with some rapidity over the

9    last week or two, and we really haven't discussed the timing

10   of that.

11         THE COURT:  All right.  Fine.  I'm just going to

12   interject something which is not directly related to the

13   argument, but your comment concerning other mediation

14   activity involving FHFA causes me to disclose for record

15   purposes that I have served as many may know as the plan

16   mediator in Residential Capital's bankruptcy, the case which

17   is pending currently before my colleague, Judge Glenn.  And

18   during the course of that very extensive undertaking, I did

19   have a series of meeting with representatives of FHFA.  None

20   of those meetings touched upon the issue presently before

21   the Court, nor did it deal with any issues of claim priority

22   that are before the Court today.

23         We did, however, have conversations that related

24   generally to the claims of FHFA against both Residential

25   Capital and its ultimate parent company.  I won't say more

Page 17

1    than that, except to say that I don't believe that anything

2    that I learned in the process of mediating that aspect of

3    the Res Cap disputes has any material bearing on what's

4    going on here now.

5                   MR. CANNING:  I understand.

6                   All right.  Your Honor, if I turn to the

7    sequencing, I guess I would proceed with the motion on the

8    stay, if that is what Your Honor would like, and we'll deal

9    with that first, and then based upon how Your Honor would

10   then like to proceed, we can move forward with the motion to

11   classify and the opposition.

12                  THE COURT:  That's fine.  And why don't you just

13   proceed.

14                  MR. CANNING:  Okay.  Well, Your Honor, just to

15   step back a little bit, as set forth in the motion to

16   withdraw the reference, FHFA and Freddie Mac believes that

17   the withdrawal of the reference is, in fact, mandatory under

18   157(d) of Title 28.  To the extent that that provision

19   requires that the district court shall withdraw a proceeding

20   if the resolution of the proceeding requires consideration

21   of Title 11 and other federal laws of the U.S., other non-

22   bankruptcy federal laws.

23                  In this regard, Your Honor, I want to note first

24   that Freddie Mac and FHFA's motion to withdraw was certainly

25   not filed for any strategic or tactical purpose.  This is

Page 18

1    not a Stern v Marshall request if you will, for lack of a

2    better way to characterize it.  It was done specifically

3    because the limited issues that were posed in the motion to

4    classify, the debtors, LBHI's motion, the specific limited

5    issues are first the interpretation of HERA, and what are

6    the rights and powers under HERA that have been granted to

7    FHFA.  So it's really the interpretation of a non-bankruptcy

8    federal statute.

9              THE COURT:  Let me ask you this question, however.

10             MR. CANNING:  Yes, uh-huh.

11             THE COURT:  It is my understanding that the

12   statutory provisions in question are substantially similar

13   in form and content to provisions of the Bankruptcy Code

14   and/or to applicable law typically construed by bankruptcy

15   court.  In what respect, does it make sense for there to be

16   a mandatory withdrawal of the reference as to matters that

17   are almost uniquely within the expertise of the bankruptcy

18   bench in this district?

19             MR. CANNING:  Your Honor, I think it -- and this

20   in part is similar to the response that I -- that LBHI posed

21   to our motion, which was that, you know, Section 507 simply

22   doesn't provide a priority and the Bankruptcy Code is clear,

23   if you want a priority, it needs to be under Section 507.

24   And if it's not, then there's no priority.  So therefore,

25   there's no need to interpret the HERA statute, there's no

Page 19

1   need to address the intersection between the Bankruptcy Code

2   and the HERA statute, because it's all resolved, it's all

3   within the four corners of the Bankruptcy Code.

4            Your Honor, I think that FHFA's view is that

5   that's a simplistic approach.  In enacting HERA, much as

6   they did when they enacted FIRREA which was an almost

7   identical statute, only was in respect of the oversight of

8   federal insured banks, as opposed to Fannie and Freddie, but

9   they also set up a separate statutory regime or scheme to

10   deal with the resolution of banks.

11            Just like in our case, they set up a separate

12   statutory scheme to deal with the resolution, addressing and

13   resolving Freddie Mac and Fannie Mae.  It's, if you will,

14   almost like a specialized insolvency regime.

15            THE COURT:  Yes, that's true, but that specialized

16   insolvency regime filed a proof of claim in the largest

17   bankruptcy case in history, which has been pending here for

18   over five years, participated in the confirmation process,

19   and entered into the stipulation that you referred to modify

20   the plan.  And so everything that we're talking about is

21   almost uniquely subject to this Court's jurisdiction, and

22   the history of case administration that leads up to today's

23   argument.

24            MR. CANNING:  Well, indeed, Your Honor, but what

25   we're really talking about is does Section 4617(b)(15)(D)

Page 20

```
1    which is a non-bankruptcy federal statute, does that

2    independently give FHFA a right to a recovery in respect of

3    transfers made or obligations incurred, and that right to

4    recover that property is superior to the rights by statute,

5    superior to the rights of a Chapter 11 trustee and a debtor.

6            And I don't take exception with the fact that Your

7    Honor has dealt with a lot of situations that may be

8    similar, but nevertheless, the rule is pretty clear under

9    157(d) if it's a question of interpretation of a non-

10   bankruptcy federal statute, or the intersection of the

11   rights and powers under the Bankruptcy Code in that statute,

12   which this issue clearly is, you know, we didn't pose this

13   issue.  They posed this issue the way they posed it.

14           They said without regard to the Bankruptcy Code,

15   without regard to the plan, without regard to the

16   stipulations, in our view, this claim should be reclassified

17   now.  It should now be a Class 3 senior unsecured claim and

18   not a priority claim.  That goes directly to the heart of

19   what does Subsection D mean of the HERA statute.

20           THE COURT:  Well, does it?  I'm not so sure that

21   it does, and I invite you to explore that assertion further.

22   It seems to me that there is a fundamental distinction in

23   terms of the purpose of the mandatory withdrawal of the

24   reference, as between a non-bankruptcy statute that is

25   arcane or foreign to the jurisdictional activities of the
```

Page 21

1    bankruptcy court.  In other words, statutes that are more

2    typically construed by district courts, tax issues,

3    environmental law issues, issues that may relate to the

4    securities laws, I'm simply providing some random examples,

5    where those issues predominate.

6         But here, we have a fully developed claim

7    reconciliation process that has been ongoing in this

8    bankruptcy case for at least four years, in a case that has

9    been pending for over five years, in which every single

10   claim of every description you can imagine has been

11   subjected to the same regime.

12        Moreover, the non-bankruptcy law that you are

13   describing to me is completely familiar to me in terms of

14   the precepts that are to be construed.  There is nothing

15   about this law that I find strange or difficult to construe.

16        And so I wonder out loud to you, and you can now

17   respond, whether there is, in fact, a likelihood of success

18   that you will achieve a mandatory withdrawal of the

19   reference, given this history and fact pattern, particularly

20   since in the history of this bankruptcy case, to my

21   knowledge, there has never been a withdrawal of the

22   reference, despite various efforts to achieve that over the

23   last five years.

24        So that pattern of failure is one that I think

25   you're going to have to at least consider as you touch the

Page 22

1   likelihood of success prong on your motion for stay.

2           MR. CANNING:  I understand, Your Honor, I

3   certainly do.  And I don't take exception with the quality

4   of the duration of the claims process.  And I know, and I

5   know from my own observations that you have indeed dealt

6   with every type of claim almost imaginable in this

7   bankruptcy.

8           I do think, just to say, that this isn't

9   necessarily related to a claim and whether there is a claim

10  or whether there is not a claim.  It is uniquely whether or

11  not there is a priority to which the government is entitled

12  by reason of Congress' intent as expressed in the HERA

13  statute.  And that isn't -- doesn't fall within the claims

14  process, and the procedures, and the like, and it's not tax,

15  and it's not environmental.  And I certainly understand

16  that.

17          But nevertheless, it is a case of first

18  impression.  It is a substantial issue.  It's a material

19  issue, and it's one that we think, and again, this is not

20  tactical, but we think that 157(d) does mandate that the

21  reference be withdrawn.

22          Now, we said that, I guess I need to touch upon

23  the likelihood of our success, which I understand there's a

24  challenge here of what you just said about the history of

25  failures here.  But --

```
 1              THE COURT:  I'd like to modify what I said,

 2     because there is one exception.  There is a case which is

 3     currently pending in the district court before District

 4     Judge Berman, that involves certain disputes with the

 5     Internal Revenue Service.  That case was commenced here as

 6     an adversary proceeding, and all parties stipulated --

 7              MR. CANNING:  I see.

 8              THE COURT:  -- that the matter should be referred

 9     back to the district court.  I might add that that case has

10     been pending, I believe, for four years.  So I am quite

11     pleased actually that I haven't had to deal with it.

12              MR. CANNING:  Okay.  Well, as Your -- I mean, as

13     Your Honor is aware, and this touches upon what I said

14     earlier about the separate statutory scheme, banks can't go

15     into bankruptcy, hence the FDIC has FIRREA, while similarly

16     Freddie Mac and Fannie Mae can't go into bankruptcy, and

17     Congress created the HERA statute, and the regime that's

18     imposed upon that process under the HERA statute.

19              So we do think there is a separate statutory

20     scheme for resolving these federal instrumentalities that is

21     separate from and the rights and powers granted under that

22     statute and pursuant to that scheme are separate from the

23     powers under the Bankruptcy Code.  And again, under

24     4617(b)(15)(D) are superior to the Bankruptcy Code, and the

25     rights of all parties in a bankruptcy proceeding, with
```

Page 24

1    respect to certain activities, such as the avoidance of

2    claims and recoveries and respect thereof.

3           Now, LBHI makes a big point about, we don't need

4    to interpret the HERA statute because it's all decided under

5    507, and if it's not under 507, there's no priority, and

6    that's the end of it.  And they cite in support of that the

7    fact that pursuant to the Crime Control Act of 1990,

8    Congress did a couple of things.  And one thing they did is

9    they imposed a new provision into FIRREA which was Section

10   1821(d)(17) which is virtually identical to the Section

11   4617(b)(15) in HERA, with respect to the avoidance of claims

12   and the right to pursue permissively transferees and the

13   superior rights in that regard under Subsection D of that

14   provision.

15          And separately, but under the same bill in the

16   Crime Control Bill, they amended 507 of the Bankruptcy Code

17   to put in (a)(9), and their point, obviously is suggesting

18   that Congress was well aware of how to amend 507 and the

19   importance of 507, and if they wanted to grant the FDIC a

20   priority recovery in respect to those avoidance claims, that

21   they could've done that and they didn't.  And therefore,

22   there was no intent that Congress expressed to provide any

23   priority over any other priority claimants under 507.

24          Your Honor, we think frankly that LBI -- LBHI

25   misses the point there.  They didn't otherwise -- Congress

Page 25

1    didn't otherwise amend 507 because they really didn't need

2    to.  Once again it -- the FD -- the FIRREA statute sets its

3    own statutory scheme for banks, much like HERA does for

4    Fannie and Freddie.

5           And with respect to priority regarding recoveries

6    in respect of transfers made and obligations incurred to the

7    extent that those were undertaken with the intent to hinder,

8    delay, or defraud, the applicable regulated entity would be

9    at the bank under FIRREA or Freddie Mac under HERA.  If that

10   occurs, then it's got its own built in rights and powers,

11   which is to recover those funds and those rights are

12   superior to the rights of any other party in a bankruptcy.

13          As to 507, what they did in (a)(9) was different.

14   507(a)(9) as Your Honor is well aware is to provide almost

15   within the corollary bankruptcy of the bank holding

16   companies that owned the federally insured institution that

17   whereas it being resolved under FIRREA, that to the extent

18   that that bank holding company had defaulted in connection

19   with the capital maintenance agreement prior to bankruptcy,

20   and then even in the bankruptcy, didn't cure it under 365(o)

21   of the Bankruptcy Code.

22          That that resulting claim, that that resulting

23   claim because of that default under the executory contract

24   would be accorded a statutory priority under 507; that claim

25   doesn't require any bad intent or no hindrance or delay or

Page 26

1    defrauding of FDIC, it just -- it's just a claim that arises

2    by means of a default on an executory obligation, that

3    Congress wanted to impose in the Bankruptcy Code to protect

4    the taxpayers and the safety and soundness of financial

5    institutions.

6            So, in our view, Your Honor, what the Crime

7    Control Act demonstrates is that Congress decided it needed

8    to do two things in order to protect the taxpayers and the

9    safety and solvency of federally insured institutions.

10           On the one hand, to put a new section in FIRREA,

11   which gave these very broad powers to the FDIC to go after

12   third parties, this isn't like a debtor recovering its own

13   transfers or avoiding its own incurrence of obligations, it

14   gave them the party to go after third parties who hindered,

15   delayed, or defrauded the federally insured bank, in order

16   to get recoveries for the benefit of the agency, and you

17   know, for the government.

18           In addition, in addition to importing its own

19   rights and powers with statutory priorities over the

20   Bankruptcy Code, it separately amended 507 to add (a)(9) so

21   that it could also get the other end of the spectrum, it

22   could go after the bank holding company to the extent that

23   it defaulted on its capital maintenance obligations to the

24   institution.

25           And it determined on balance that those two

Page 27

1    changes implemented simultaneously, separate powers, broad

2    powers to the FDIC, and a priority recovery against a bank

3    holding company that is in bankruptcy.  Again, the

4    institution -- banks can't go into bankruptcy, that that

5    together was sufficient protections and that's what they

6    wanted to implement as a scheme to facilitate addressing and

7    resolving those financial institutions.

8            So, I mean, in our view, we think we're going to

9    prevail because we think that is, in fact, what is intended

10   by FIRREA and similarly intended under the HERA statute, and

11   the fact that they amended a 507(a)(9) in that case, and

12   they didn't in HERA because Freddie doesn't have a holding

13   company that's got a capital maintenance agreement or

14   anything like that.  There was no need to address a

15   complimentary change under 507.

16           All they had to do is put in those rights and

17   powers, those broad rights and powers under 4617(b)(15)(D)

18   that gives them priority rights, as against a Chapter 11

19   trustee or any other party in a bankruptcy case.

20           So to the contrary, we don't think you can just

21   simply say, oh, it's not in 507 of the Bankruptcy Code, if

22   it's not 507 of the Bankruptcy Code, it can't be a priority.

23   I mean, some of the cases that they cite were really dealing

24   with types of claims, and were they -- did they fit under

25   one of the categories under 507, not whether there is a --

Page 28

1    sort of a parallel statutory scheme that Congress has

2    intended to have broad powers to protect the government and

3    the taxpayers and that those rights are secured.

4         THE COURT:  Understood, Mr. Canning, but we're in

5    a bankruptcy case, and whichever court is construing the

6    question of the proper classification of the FHFA claim will

7    be construing the priority scheme of the Bankruptcy Code.

8         What you'll be arguing presumably is that

9    notwithstanding the fact that 507 doesn't include an

10   expressed priority that somehow you're entitled to trump

11   other creditors on the strength of applicable non-bankruptcy

12   law, but can you cite me any case in which a bankruptcy

13   court or a district court sitting as a bankruptcy court, has

14   found that a creditor is entitled to priority other than

15   pursuant to the priority scheme of the Bankruptcy Code?

16        MR. CANNING:  Well, Your Honor, I mean, this is a

17   case of first impressions.  I mean, there are circumstances

18   where, in effect, priorities are granted.  Look, I mean, if

19   this -- if they had reorganized and emerged as opposed to a

20   ten year liquidation or however long it's going to take --

21        THE COURT:  Some might say they have emerged, and

22   some might say they have reorganized, and some might say

23   they're actually one of the largest financial enterprises on

24   the planet today.

25        MR. CANNING:  Absolutely, absolutely.  But

Page 29

1    technically if they were a reorganized corporate debtor, and

2    if they had obtained money from the government under false

3    pretenses, false financials, and false misrepresentations,

4    that under 1141 of the Code, and 523 of the Code, they may

5    have been denied a discharge.  And if that was the case

6    because we assert that they borrowed the $1.2 billion with

7    false financials, direct false misrepresentations and that's

8    how they got the money.

9           Now, if that happened, and we were able to prove

10   that, if we were given an opportunity to prove that, that

11   they hindered or delayed, or defrauded the government

12   because they obtained money under false pretenses, and they

13   were a reorganized corporate debtor they might be denied a

14   discharge.  In which event, we could go over to 6th Avenue

15   and give us $1.2 billion, even though the unsecured

16   creditors only got 20 cents on the dollar.

17          So I understand that it's not under 507, but it's

18   not as if there's no circumstances under which a particular

19   type of creditor given particular facts can't ultimately get

20   a greater recovery than pro rata share of a pot of money.

21          THE COURT:  But even in your examples, Mr.

22   Canning, you cite to principles of bankruptcy juris

23   prudence.

24          MR. CANNING:  My point only there, Your Honor, is

25   a concept that if you defraud the government and get money,

```
 1    the concept that Congress intends to have a scheme in place

 2    to allow that money to be recovered is not so foreign, it's

 3    not so alien.  That is the intent of Congress.  Now, I

 4    understand --

 5               THE COURT:  Okay.  But --

 6               MR. CANNING:  -- it's not as neat and clean as I

 7    would like it to be.

 8               THE COURT:  Okay.  But when you use words like

 9    defraud the government in an argument about claim priority,

10    five years after the transaction in question without having

11    ever asserted with particularity the grounds on which you

12    might be able to establish such alleged fraud, you put a

13    bunny in the hat, and there's no hat, and there's no bunny.

14               MR. CANNING:  Well, I -- look, I understand, Your

15    Honor.  I mean, we could revisit a lot of the facts of the

16    last couple of years and discussions that we've had and

17    frankly, we are respectful of the claims process that's in

18    place.  And as you know, under the Bankruptcy Code, that you

19    file a claim and it's the debtor that gets to object to that

20    claim.

21               And we are frankly, in many respects, glad that

22    we're finally here, and we're finally getting at it.  There

23    -- the --

24               THE COURT:  Well, the we're getting at it, you

25    recognize in the context of a motion that you're now arguing
```

1   to stay the proceedings --

2            MR. CANNING:  I understand, Your Honor.

3            THE COURT:  -- here so that you can move forward

4   in the district court on a motion to withdraw reference.  So

5   while we're talking about all this, as if it's substantive,

6   it's not.  It's purely procedural at the moment.

7            MR. CANNING:  I understand.  This would not have

8   been the way, and we were frankly surprised, particularly in

9   light of what I was referring to earlier about where we

10  thought we were in the process, that this is how it's come

11  to the table.

12           And indeed, Your Honor, and we touch upon this in

13  our papers, but at some level, we find this all pretty

14  troublesome because the plan, the confirmed plan, by its

15  language, Class 1 says, any creditor that's entitled to a --

16  that has a -- entitled to a priority under either 507 or

17  under 4617 of HERA will get paid a hundred cents on the

18  dollar.

19           There's no equivocation about that.  It doesn't

20  say -- Your Honor, it doesn't say, in the event that a claim

21  under HERA is determined to be a priority under 507, that

22  the creditor will get a hundred cents on the dollar.  What

23  it says in the confirmed plan is, if you have a claim either

24  under 507 or under HERA, you get a hundred percent recovery.

25           So we find it, you know, two years later out of

1    the blue, we get this motion to classify or reclassify, to

2    say, oh, well, you don't have a -- there is no priority.

3    They come in and say it doesn't exist, there is no priority.

4            Well, that's what the plan says.  If we have that

5    claim, we get a hundred cents on the dollar.  So again, I'm

6    not happy that we're here under these circumstances.  We

7    thought we were trying to get at the merits, we thought we

8    were trying to get at finding out if there was any monies

9    borrowed with the intent to hinder, delay, or defraud, or

10   were there any transfers made that prevented our repayment,

11   in a manner that was intended to hinder, delay, or defraud

12   FHFA and Freddie Mac, but we haven't got there.

13           Now, we're in a position where they want to

14   release the reserve, and they want us to have a Class 3

15   claim which -- I mean, even that's puzzling to the extent

16   that they seem to acknowledge that in the worst of all

17   world, we have priority recoveries with respect to transfers

18   perhaps.  And yet, all the transfers, they've either

19   recovered them or in the process of litigating with counter

20   parties to get that money.

21           And so then if they get that money we go back to

22   the plan, you look at Class 3 and Class 3 just says, we're

23   allocating pro rata all the proceeds among the holders of

24   allowed Class 3 claims.

25           So I mean, there's a lot of issues here that we

Page 33

1   take exception with, Your Honor, but I --

2           THE COURT:  Let me ask you a follow up question in

3   reference to the argument you just made about the treatment

4   in the plan that provides alternative treatment, either

5   under a 507 scheme or HERA.

6           MR. CANNING:  Right.

7           THE COURT:  Is there anything about the fact that

8   this treatment is provided in a plan confirmed in the

9   bankruptcy court, that is a relevant consideration to be

10  taken into account in determining mandatory withdrawal of

11  the reference?  Because it seems to me that since we're

12  dealing with plan provisions --

13          MR. CANNING:  Uh-huh.

14          THE COURT:  -- the bankruptcy court is necessarily

15  the proper forum to decide questions of priority regardless

16  of which scheme is being applied.

17          MR. CANNING:  I understand, Your Honor, and I

18  didn't really raise that in our motion.

19          THE COURT:  I'm raising it now.

20          MR. CANNING:  No, I understand, I understand.  I

21  understand.

22          Well, I mean, to the extent that they have

23  expressed as the reason why the withdrawal won't occur,

24  despite the fact that 157(d) we think says it's mandatory

25  that it be withdrawn, is because they're convinced they're

Page 34

1    going to win; that they don't really need to get into all of

2    this.  That it's resolved in the bankruptcy to the extent

3    that they say under 507 it's not listed, so it's not a

4    priority.

5            Well, I guess it's relevant to me at least that to

6    the extent that if you're going to say well, there's no

7    issue here because it's resolved in the bankruptcy; well,

8    there is the plan out there, which if you actually go look

9    at the plan in the bankruptcy, the plan says no, there is a

10   priority.

11           And so if that's going to be decided, and you're

12   going to decide what are they applicable and respect of

13   rights, under the Bankruptcy Code and HERA may be informed

14   by the plan, that all of that goes to the fact that it's an

15   intersection between the Bankruptcy Code, the bankruptcy

16   process and HERA, a non-bankruptcy federal statute and the

17   Bankruptcy Code, and again, no strategic move here, but we

18   think that that requires a mandatory withdrawal.

19           THE COURT:  I would suggest that that intersection

20   may suggest that it doesn't require a mandatory withdrawal,

21   but let's proceed with the other standards that you may wish

22   to put on the record with regard to your motion for stay,

23   because we've been focused on only one point.

24           MR. CANNING:  Right, Your Honor.

25           Well, I guess the other point that LBHI makes with

1   respect to the other standards is, there's significant harm

2   to LBHI and the creditors, and there's no harm to FHFA.

3   And, you know, we just see that as entirely just the

4   opposite.

5            If the stay is not imposed, if the proceeding

6   proceeds and it's possible, it's certainly very possible

7   that some time before the ultimate determination of this

8   issue, because it is a -- I mean, it is a Nelsome (ph)

9   issue.

10           Before the ultimate determination of that issue,

11  if the consequence of this is that the $1.2 billion is

12  released and it's made available to all creditors at this

13  point, and then down the road it is ultimately determined

14  that indeed FHFA and Freddie Mac do have a priority, and

15  they're entitled to a hundred percent recovery on that

16  priority, it's possible if there's then insufficient funds

17  left in the estate, that we would irreparably harmed.

18           And in some respects, it's not just, it's not just

19  Freddie Mac and FHFA.  I suppose conceptually if they took

20  the $1.2 billion and they distributed it all, and they wind

21  up in effect, over distributing to creditors, and there are

22  still, as we understand it, thousands of claimants that are

23  still out there to be resolved, and it's going to take a

24  long time to happen.

25           So there could be harm not only to FHFA and

1    Freddie Mac, to the extent that there were insufficient

2    funds in the absolute left, but there might also not be

3    sufficient funds to pay us in full because the plan still

4    says that ultimately if we have that priority claim we get

5    paid in full, then maybe there will be other creditors that

6    might be impacted a near term release of the funds as well.

7          And to the contrary, it's really difficult for me

8    to understand how there could be any harm to LBHI and other

9    creditors.  I mean, again, and you pointed out, Your Honor,

10   we're five years into the case, four years since we filed a

11   proof of claim, two years since confirmation, and there's no

12   other distribution scheduled until March of next year.

13         So to have a short stay, while this issue can be

14   sorted in an orderly fashion, we think the harm versus

15   reward weighs in the favor of FHFA and Freddie Mac in that

16   regard.

17         I mean, the other items that are sometimes

18   relevant, Your Honor, I mean certainly we think that a stay

19   will also assist -- avoid inconsistent rulings maybe

20   unnecessary in avoidable appeals, resolve these ancillary

21   litigation expense when you're operating in two -- I'm

22   sorry, in --

23         THE COURT:  Can I stop you on --

24         MR. CANNING:  Sure.

25         THE COURT:  -- just the reference to consistent

Page 37

1   rulings?

2           Because the most logical way to obtain a

3   consistent ruling is for the bankruptcy court to decide

4   this, largely because the bankruptcy court has decided every

5   other claim issue in the case.

6           So one way to almost guarantee the potential for

7   an inconsistent ruling is to proceed with your stay, and if

8   you prevail, a motion for withdrawal of the reference with

9   the case ending up before a judge, who I expect will be

10  fully competent to deal with these issues, but will have

11  none of the context or history.

12          MR. CANNING:  That's a fair observation, Your

13  Honor, I don't take strong exception with that.

14          Nevertheless, we think that, you know, on balance

15  when you look at all of the requirements that need to be met

16  in connection with the withdrawal of the reference and now

17  with respect to imposing a stay in that regard, we do think

18  that we have satisfied the criteria.  We do think this is

19  mandatory to withdraw.  We do think opposing the stay

20  imposes no harm at all on LBHI and the other creditors.

21          And potentially has significant harm, maybe

22  irreparable harm to FHFA and Freddie Mac, and we would ask

23  that the motion be granted.

24          THE COURT:  All right.

25          MR. CANNING:  Thank you.

```
 1              THE COURT:  Thank you very much, Mr. Canning.

 2              MR. LEMAN:  Your Honor, Mark Leman (ph) on behalf

 3      of Freddie Mac, may I just add one other point?

 4              THE COURT:  I didn't realize we were double

 5      teaming, but it's okay.

 6              MR. LEMAN:  Okay.  Very briefly.

 7              Your Honor, just with respect to the issue of

 8      whether or not FHFA and Freddie Mac have a likelihood of

 9      success on merits with regard to the withdrawal motion, we

10      think first of all that there's over 50 pages of briefs

11      submitted by the parties, all arguing over what the HERA

12      statute means.  Clearly that's going to require a court to

13      interpret the HERA statute.

14              And there is a case right on point, demonstrating

15      that we have a high likelihood of success on the merits, and

16      that is the 2nd Circuit decision in the Colonial Realty case

17      versus Hirsch.  And at page 128 -- the case is 980 F.2d 125.

18      At 128, note footnote 5, the 2nd Circuit noted when it was

19      construing the FIRREA FDIC statute which has virtually

20      identical language to the HERA statute, stated as follows.

21              "Although the issue is moot at this juncture, it

22      would appear that FDIC's motion should've been granted

23      pursuant to Section 157(d) in view of the FDIC's timing

24      motion and the asserted conflict between provisions of the

25      Bankruptcy Code and other federal statutes."
```

1            It then goes on to cite 157(d), and then says,

2    "This provision was not cited to the district court until

3    after it denied the withdrawal motion, and the bankruptcy

4    court had ruled in favor of the trustee on his motion."

5            And later on in the decision, at page 134 they

6    again once again refer to FDIC's remedies and said they

7    could've filed a withdrawal motion or could in the future,

8    and they refer back to footnote 5.  Thank you, Your Honor.

9            THE COURT:  Thanks for the footnote reference, but

10   this is not a situation of conflict between the Bankruptcy

11   Code and the HERA statute.  This is simply a question of a

12   stipulation which includes alternative grounds for priority

13   in a plan that was confirmed.

14           So thanks for the reference, but I think it's

15   inapposite.

16           MR. LEMAN:  Okay.  Thank you, Your Honor.

17           MR. PEREZ:  Thank you, Your Honor, good morning.

18   I'll be brief.

19           Your Honor, while I kind of hate to talk out of

20   school, but I think that the rendition of what happened and

21   why we didn't end up going to mediation just couldn't be

22   further from the truth.  So if you'll indulge me for one

23   minute.

24           Ever since Mr. Canning came on board, it was

25   decided that this was one of the top priorities to try to

1    get resolved.  We thought we were at the lip of the cup

2    trying to get a consensual resolution going to mediation,

3    when all of a sudden, not only was the rug pulled out from

4    under us when we thought we were going to mediation in

5    August or September, but they said December, but basically

6    said, we're not going to go to this until you resolve the

7    other claims that we have with our other people.

8             He spent countless hours doing this, so to the

9    extent that Mr. Canning gets up here and says it's not

10   tactical or strategic, that just could not be further from

11   the truth.

12            So having said that, Your Honor, let me focus on

13   the stay factors.

14            And, Your Honor, I think there are probably three

15   or four cases that are controlling that, in essence,

16   determine the stay.  First of all, Your Honor, if you look

17   at the Court's Texaco case, which is a district court

18   opinion that adopts Judge Schwartzberg's opinion, it in

19   essence, it says, you know, when you have a threshold

20   bankruptcy issue, that's all you need to decide.  And here,

21   I think you have a threshold bankruptcy issue, which is the

22   treatment under 507.

23            And Mr. Canning can argue what he can about what

24   the plan says.  He can also argue about what the stipulation

25   pursuant to which that provision was inserted in the plan,

Page 41

1    which clearly says, that we challenge the priority,

2    classification and everything.  So it shouldn't come as any

3    surprise to him that there would be a motion to classify

4    this claim.

5            So, Your Honor, that's in essence the first point.

6    The second point, Your Honor, is that as it relates to

7    priorities, I think the Supreme Court could not have been

8    clearer, Congress could not have been clearer that

9    priorities, priority claims, not necessarily priorities, but

10   priority claims under the Bankruptcy Code are narrowly

11   construed.

12           And if you look at what Howard Delivery says, it

13   says, provisions allowing for preferences are tightly

14   construed, and then it goes on to quote Colliers, which says

15   priorities under the Code are narrowly construed.

16           So there's no issue here about what we're looking

17   at.  If you're looking at a priority under 507 of the

18   Bankruptcy Code, those are narrowly construed.

19           So finally, I guess their argument is, is that

20   somehow the HERA either amended by implication, dealt by

21   implication, or did something by implication, not directly

22   because it's certainly not in 507, not directly.  And again,

23   Your Honor, there is no basis, there's actually no basis to

24   conclude that.

25           We have the example of the change that was made to

1    FIRREA under the Crime Control Act.  And the Colonial case,

2    which Mr. Lanman (ph) cited, which I think frankly is our --

3    is the strongest case for us on this issue, basically says

4    that you can't have this implicit withdrawal.

5            There, they were dealing with whether FIRREA

6    somehow implicitly amended 362, which I think is a much

7    closer question because you don't have the overlay of 507

8    and Supreme Court juris prudence that says you narrowly

9    construe it.

10           So what you have is, you know, the -- Colonial

11   basically says, in the absence of an affirmative showing of

12   an intention to repeal, you can't change it.  And then they

13   go through and at page 132 and 133 it says, basically, you

14   know, Congress is presumed to legislate with knowledge of

15   former statutes, and will expressly designate provisions

16   whose application it wishes to suspend, rather than leave

17   the consequences and uncertainties of implications

18   compounded by the vagaries of the judicial system.

19           And then it goes on to show which sections were

20   amended pursuant to the Crime Control Act to change the

21   priority scheme, including adding 365(o) and 507(a)(9), and

22   basically says, given this careful attention to harmonizing

23   with the Bankruptcy Codes, it becomes especially implausible

24   to conclude that they did it in essence sub salento.

25           So, Your Honor, again, we have the example of this

Page 43

1    similar statute under FIRREA.  There's no question that if

2    had Congress intended to change the priority section of the

3    Bankruptcy Code, it could have done so because, in fact, it

4    did under FIRREA.

5            And finally, Your Honor, the issues that are

6    raised in their proof of claim and in our motion are

7    precisely the issues that this Court deals with all the

8    time.  And, in fact, the John versus FDIC case, the district

9    court there basically says that the comparison to the

10   similar section in FIRREA is identical to the comparison of

11   548 and 550 under the Bankruptcy Code.  So it's something

12   that this Court has absolute knowledge of.

13           THE COURT:  I accept that.  I understand this

14   stuff.  Let's just accept the fact that I've been doing this

15   for five years in Lehman, and longer in other cases,

16   including Mr. Canning's case Quebecor, where we had, and

17   continue to have a vast claims reconciliation process that

18   is ongoing.

19           That's not the issue.  The issue is whether or not

20   withdrawal of the reference is mandatory because this Court

21   or the district court needs to construe an applicable non-

22   bankruptcy federal law in order to determine the resolution

23   of the dispute.

24           And the real issue that I think we need to

25   confront today, notwithstanding my colloquy with Mr. Canning

1   that led up to this, because I do believe that this is a

2   bankruptcy issue.

3         MR. PEREZ:  Absolutely, Your Honor.

4         THE COURT:  I do believe that there's a question

5   of plan interpretation, and I do believe that the non-

6   bankruptcy federal law in question is uniquely analogous to

7   Bankruptcy Code provisions that I am familiar with, so that

8   to the extent there is a policy reason underlying mandatory

9   withdrawal of the reference, that policy reason would not be

10   implicated here.

11         But the long question doesn't talk about the

12   policy.  And so we have to interpret the words, to what

13   extent is withdrawal of the reference mandatory simply

14   because in order to resolve this, people are going to be

15   talking about the HERA statute, and I'm going to be asked to

16   make some judgments as to how it applies to this situation.

17         MR. PEREZ:  Your Honor, I don't think it is

18   mandatory.  And I think that the Texaco case basically says

19   it's not mandatory; because in that circumstance, you look

20   first to the Bankruptcy Code, and it's really an

21   interpretation of 507 of the bankruptcy court.  And we're

22   not asking the Court to determine what priority may exist

23   under HERA.  What we're really asking the Court to

24   determine, is there a Bankruptcy Code priority.

25         So we don't believe that under the Texaco case,

Page 45

1      that there is a mandatory withdrawal to the reference

2      necessary.

3                    THE COURT:  Let me ask you a little bit about Mr.

4      Canning's expressed concern that if the $1.2 billion

5      currently set aside to secure this claim is released, that

6      there is some potential risk to FHFA, and potentially other

7      creditors as well associated with the loss of that reserve,

8      and presumably the distribution of those funds to creditors

9      holding allowed claims.

10                    MR. PEREZ:  Your Honor, I think the concern in our

11     mind is illusory.  We've had four distributions.  We have

12     ongoing -- the Court is fully aware of the nature of the

13     claims process in this case.  It's going to take a while.

14                    We have bi-yearly distributions, every six months

15     we have distributions.  The Board determines exactly how

16     much it things it can distribute or not distribute.  So

17     that's number one.  So I don't think that that is a real

18     issue whatsoever.

19                    Second, Your Honor, and as we've said in our

20     papers, and frankly the Court is aware of the RESCAP

21     situation, and if you look at FHFA's papers in RESCAP, what

22     they're basically saying is, they have a priority to be able

23     to go out after some of those cases.  And the John case

24     clearly says, that normally the FHFA has to assert their

25     claims against third parties for these recoveries.

Page 46

1        So that's not -- I don't think that's in dispute.

2   So to the extent that they have those rights, I don't think

3   anything that we say or do in our papers is going to take

4   those rights away from them.

5        THE COURT:  Okay.  Now, I have a question for you

6   about timing.  We have a dust up here, which is one of the

7   plan administrator's own creation, in a sense, because the

8   scheduling of claims matters tends to be within the plan

9   administrator's discretion, or the scheduling needs of

10  parties that have objected and they need some more time to

11  talk about a possible resolution by consent or some of these

12  matters are complicated and may go to mediation such as this

13  one might have.  But this one didn't go to mediation.  And

14  the plan administrator pulled the trigger, suggesting to a

15  casual observer like me that this is also tactical.  I'm a

16  little concerned about that, and I'd like you to address it.

17       MR. PEREZ:  Absolutely, Your Honor.  I mean,

18  certainly the Court can have that view.  At some point, Your

19  Honor, the plan administrator has to determine whether it

20  thinks that continued negotiations are appropriate and

21  should go forward, or whether at some point you really need

22  to start the process.

23       And, Your Honor, we're not here lightly.  I mean,

24  we spent a year and a half trying to do that, to the point

25  where there was just no -- in our mind, there's just no

Page 47

1  coming back.  There's just no light at the end of that

2  tunnel.

3         So to deal with what I view as a fairly narrow

4  legal issue, we filed another motion, again a fairly narrow

5  legal issue that's set for hearing next month.  I don't

6  believe that that's in the least bit tactical, but the plan

7  administrator has to have some leeway to determine that

8  negotiations have gone on long enough, and at this point,

9  they're being counter-productive, and what we really need to

10  do is move on to the next state reluctantly.

11         So if the Court considers that to be tactical, I

12  don't think that the plan administrator would be discharging

13  its obligations if it didn't make that determination.

14         THE COURT:  I'm not suggesting that the word

15  tactical is a dirty word either.  I'm simply identifying the

16  fact that few things happen in this courtroom by accident

17  unless I've done it myself.

18         So with that said, do you have any more to say on

19  the question of the stay?

20         MR. PEREZ:  Well, no, Your Honor.  I -- number

21  one, I don't think that they're likely to succeed on the

22  merits, and with respect to the harm, I just don't think

23  that they're really going to suffer any harm.  And by the

24  same token, this is a pot of cash that would be otherwise

25  available.  Most of it is going to go to them by the way,

1    because they're going to get their catch-up distributions as

2    a Class 3 creditor.  Thank you, Your Honor.

3                THE COURT:  Okay.  Anything more, Mr. Canning?

4                MR. CANNING:  No, I think on the stay, Your Honor,

5    I think that's all.

6                THE COURT:  All right.  This is an interesting and

7    difficult question, and when this was first presented to my

8    attention within the last week or so, my immediate reaction

9    was well, isn't this unusual.  This is the first example, at

10   least in my experience of a motion to stay being brought in

11   the context of an ordinary course claim objection, in order

12   to allow the claimant, in this case FHFA and Freddie Mac to

13   proceed with a mandatory motion to withdraw reference in the

14   district court.  It's certainly one of a kind in my

15   experience, and maybe in the experience of everybody else in

16   the room.

17                And so the immediate reaction you have to

18   something like this is, to ask yourself, well, why is this

19   happening.  And what's the obligation of the Court to deal

20   with the motion.

21                This has been an illuminating argument, and I

22   appreciate the contributions of counsel, both in terms of

23   the briefing and oral argument.  But in the end, the

24   question before the Court comes down to the fundamentals of

25   whether or not a stay is appropriate, and the stay standards

Page 49

1    are the very same standards that Court routinely apply in

2    deciding whether or not to grant a stay, for example, of a

3    confirmation order pending appeal.  It's the very same set

4    of four familiar standards.

5            To me, the most important standard is the

6    likelihood of success on the merits of the pending motion to

7    withdraw reference.  And we spent a lot of time discussing

8    that.  I view this as not a black and white question, but a

9    nuanced one.

10           I see it as a gray area in which it is not at all

11   clear that withdrawal of the reference is mandatory

12   notwithstanding the fact that I am being asked directly or

13   indirectly to consider both Bankruptcy Code priority

14   principles and principles of priority under an applicable

15   non-bankruptcy federal statute, the HERA statute.

16           I think I've been fairly transparent during the

17   colloquy that we've had, as to my views, but I'll restate

18   them briefly now.

19           I consider the claims process in the Lehman

20   bankruptcy cases to be somewhat unique, in that they have

21   been pending now for a number of years with a regular

22   omnibus hearings scheduled in this courtroom on a monthly

23   basis.  We have had more claims resolved in this case than I

24   think have ever been resolved in any other case.

25           At the commencement of the bankruptcy case, when a

Page 50

1    bar date was set, no one really knew what the claims side of

2    the ledger would look like.  This is an approximation, but

3    something in the neighborhood of $1.3 trillion of claims

4    were filed.

5           The plan that was confirmed in December of 2011,

6    happens to be one of the most remarkable bankruptcy results

7    that I think has ever been achieved in any insolvency case

8    anywhere.  That result was possible in part because of the

9    ability to both reconcile claims that were in dispute, but

10   also to come up with a set of procedures that were

11   regularized, systematic and also transparent to deal with

12   the ongoing resolution, and sometimes disallowance of

13   claims.

14           I think that this fact pattern coupled with the

15   fact that at confirmation, FHFA was an objector, whose

16   objection was resolved by means of a stipulation, which

17   stipulation provided for reserved rights on the parts of the

18   debtor to object to the classification of the claim, takes

19   this dispute out of the category of mandatory withdrawal of

20   the reference.

21           Not only is that true because of the case history

22   that I am roughly reciting, but it is also true because the

23   provisions of the HERA statute are not arcane or unusual

24   from the perspective of a bankruptcy tribunal.  Whether

25   we're dealing with an application of HERA or dealing with

Page 51

1    priorities under Section 507 of the Bankruptcy Code, we are

2    dealing with claim priority questions, and in the case of

3    the HERA statute itself, we're dealing with priorities

4    associated with avoidance powers.

5            In that sense, the non-bankruptcy federal law in

6    question is very closely analogous to bankruptcy law.  I

7    believe for that reason, that this is one of those

8    circumstances where mandatory withdrawal of the reference

9    makes no sense.

10           I am not deciding that question, however.  I am

11   simply concluding that I believe it more likely than not,

12   that a district court considering the pending motion to

13   withdraw the reference will conclude that under the

14   circumstances of the Lehman bankruptcy case in particular,

15   the bankruptcy tribunal is the most logical place for claims

16   to be resolved, even claims that involve the potential

17   application of the HERA statute.

18           Accordingly, I conclude that the motion for stay,

19   while prosecuted in good faith, and the motion to withdraw

20   reference, while being prosecuted in good faith, both are

21   lacking in merit.

22           For that reason, I deny the motion for stay, and I

23   do not intend any of my comments to influence the district

24   court one way or the other in considering the motion to

25   withdraw reference.

Page 52

1              I'll make one last comment.  I incorporate by

2      reference the point that I made to counsel for Freddie Mac

3      with regard to footnote 5.  I believe footnote 5 is

4      inapplicable.

5              Now what?

6              MR. PEREZ:  Well, Your Honor, the next motion

7      would be the motion to classify, which is my motion.  I

8      don't know if you want to take the other matter and then

9      come back to this, or do you want to go forward with this?

10     I'm happy to argue because we've already argued it already.

11             THE COURT:  Well, there has been a substantive

12     argument cloaked in a motion to stay, but one of the

13     problems with what happens next, and we have a scheduling

14     problem here, I know that there are parties who are

15     participating in this hearing through court call.  There

16     were a number of parties who understood there was an 11

17     o'clock calendar and may have dialed in for that calendar.

18     I'm not sure if they're on the line or not.  There are any

19     number of people who have filed into the courtroom while we

20     have been dealing with the current argument.  Their

21     appearances will need to be entered before we start that.

22             And so just a question I have for counsel, I'm not

23     sure which matter is longer, but it appears to me that there

24     are more lawyers involved in the other one.  And so my sense

25     of judicial economy, to the extent it relates to the hourly

Page 53

1    rates of the lawyers who are involved, may be to take a ten

2    minute break, allow there to be a shifting of seats, so that

3    people who are taking the lead in the 11 o'clock calendar

4    can take those seats.

5           Those parties who intend to have speaking roles in

6    that argument can enter their appearance with the ECRO

7    reporter, and we can then start with the 11 o'clock calendar

8    at say 11:30.

9           And with respect to those who have been arguing

10   the motion for stay, I'll simply ask that you wait until we

11   conclude the 11 o'clock calendar, and I'm sure you'll find

12   it very interesting.

13           MR. PEREZ:  Thank you, Your Honor.

14           THE COURT:  We'll take a short adjournment till

15   11:30.

16       (Recessed at 11:17 a.m.; reconvened at 11:32 a.m.)

17           THE COURT:  Be seated.  Let's proceed.

18           There are some parties who are appearing

19   telephonically, and just so I can understand what to expect

20   as we proceed, I'd like to know if there's anybody who is

21   appearing by telephone that anticipates saying anything, as

22   opposed to just listening in.

23       (No response)

24           THE COURT:  I conclude from the silence, that the

25   only speakers will be in the courtroom.  Please proceed.

Page 54

1            MR. PASQUALE:  Good morning, Your Honor, Ken

2    Pasquale from Stroock and Stroock and Lavan for one of the

3    movant, CarVal Investors LLC.

4            Your Honor, I want to kind of take a step back

5    from the various papers you've read and kind of just put

6    this in context.  There's a lot of discussion, especially in

7    the plan administrator's papers about fiduciary duties and

8    claims and all of that.  This a Rule 2004 examination.

9            We're here requesting information.  The reason we

10   are in this position of being before the Court is the debtor

11   signed a commitment letter, in which we are told, they are

12   bound by a non-disclosure arrangement.  This Court can order

13   disclosure under Rule 2004.

14           THE COURT:  Why would I do at this time in this

15   proceeding, given what I've read and what you've read too?

16           MR. PASQUALE:  Well, Your Honor, first of all, the

17   Court has the authority to do it, and we've cited cases

18   that --

19           THE COURT:  I have all kinds of authority, but I

20   also have the discretion not to exercise it.

21           MR. PASQUALE:  Yes, of course, you do, Your Honor.

22   Why would you do it here?  There is a -- again, let's take a

23   step back.  The claims at issue being held by LBHI2 in which

24   LBHI is the primary creditor, primary beneficiary to the

25   tune of about 87 percent of recoveries to LBHI2 are worth

Page 55

1    face value, 1.25 billion pounds, plus interest, which would

2    take that number up to about 1.8 billion pounds.

3            The transaction that is proposed, Exhibit B to our

4    motion is the press release, which is the only information

5    available, provides for a $650 million cash payment, right

6    to receive future contingent sums, and a share in certain

7    claims.  That's all we know.

8            THE COURT:  Okay.  Let's assume for the sake of

9    discussion that we have a black box.  We don't know what's

10   inside of it exactly, but we have prudent managers of the

11   reorganized debtor's affairs who have asserted that they

12   have the discretion and the business judgment to do what is

13   best for the estate.  And they say not only trust us, but

14   we're doing everything we can to maximize value, this is a

15   value maximizing transaction, and the parties who are

16   seeking 2004 discovery are wrongfully abusing process in

17   order to gain access to information to which they have no

18   right with respect to a proceeding that is complicated and

19   in litigation in the high court in London.

20           Let's just assume all that's true.  And if you

21   assume that's true, why would I ever grant you relief?

22           MR. PASQUALE:  Perhaps if those were -- if that

23   was the situation, Your Honor, you might not, but that's not

24   the situation.

25           THE COURT:  Why is it not the situation?  Because

Page 56

1   I have concluded based upon what I've reviewed that this is

2   the situation.  So I'm letting you and others aligned with

3   you know right now that to the extent that this is a

4   tentative ruling, you have lost.

5           MR. PASQUALE:  I appreciate that up front, Your

6   Honor, so let me try to convince the Court otherwise.

7           The requests that are being made here in this

8   court are solely to the plan administrator.  None of the

9   requests, if you read them, have anything to do with the UK

10  proceeding.

11          My client carve out holds $12 billion of claims

12  against LBHI.  Whatever else is going on in the UK, has

13  nothing to do with the claim recovery in this case.

14          THE COURT:  Understood, but let's just understand

15  something else.  This is not a plan that has an important

16  hedge fund creditor's advisory committee as part of its

17  governing structure.  And so the plan doesn't provide that

18  you have any right to know or interfere, and one of my

19  conclusions is that this process that you have undertaken

20  that others have joined in, and I understand that there are

21  a lot of very significant financial players in the case that

22  have interests aligned with you, so I recognize this is an

23  important issue.

24          But from my perspective, it looks very much like

25  an attempt to either second guess the decision or to take

Page 57

1   away an opportunity for your economic benefit, because you'd

2   like to overbid.

3           MR. PASQUALE:  Well, at this point, Your Honor, we

4   don't know what we're second guessing.  The debtors have put

5   in papers, no sworn testimony, nothing.  So we're really at

6   a loss to say what the transaction is, what's actually

7   happened; again, that's the basis for the request.

8           THE COURT:  I understand your curiosity, but it

9   leads me to say so what.

10          MR. PASQUALE:  The two --

11          THE COURT:  There are all kinds of people who

12  don't know about this transaction, and based upon what has

13  been represented to me, you don't really have a need to know

14  until later when presumably there will be an opportunity for

15  more fulsome disclosure.

16          But you also have no particular right to

17  disclosure except pursuant to 2004, and it is the debtors'

18  position, now the plain administrator's position that 2004

19  is inapplicable when a debtor such as this is no longer a

20  ward of the court.

21          MR. PASQUALE:  Well, I want to go -- if I may,

22  Your Honor, go back to the Court's prior statement and come

23  back to that.  You mentioned using the information for

24  purposes of increasing an offer.  Certainly true that CarVal

25  has put in an offer, in fact, more than one, one -- with

Page 58

1    other creditors one by itself for 900 million pounds.  But

2    as we've set forth in our papers, CarVal was willing to step

3    back from that, and said, not be involved in that bidding

4    process at all, as long as there is a process.

5          So I think the imputing of that motivation is

6    misplaced, and that is not my client's intent.  My client's

7    intent, in bringing this application and trying to get the

8    information, is to ensure that the recoveries for creditors

9    of LBHI here are maximized.

10          THE COURT:  Don't you assume right now, as I do,

11    that the board of directors and managers of reorganized LBHI

12    are committed to getting the most they can out of the assets

13    that they have to manage, and don't you agree with me,

14    because I think this is true, that up to this point, they

15    have done an admirable job.  And don't you agree with me

16    that ultimately you have no say in this question at this

17    point because you are simply an economic player that is

18    interested, but you really have no role.

19          MR. PASQUALE:  I certainly have no criticism of

20    what's transpired to date, and in fact, that is one of the

21    reasons this situation is so strange.

22          Why -- with the information available, the other

23    offers that were made, the LBIE status report which

24    indicates information as to the increased value on the LBIE

25    estate, why would this deal be entered into.  I think it

Page 59

1    raises, as we've called it in our motion, these significant

2    questions, significant red flags.

3              THE COURT:  I know about the red flags, inquiring

4    minds want to know, but so what.  We have a fully

5    reorganized debtor that is operating without bankruptcy

6    court oversight of the transactions that it enters into,

7    pursuant to a plan that was confirmed I gather with your

8    client's support, because it was overwhelmingly supported by

9    major creditor interests.  And what reason do you have to

10   question that this transaction is, in fact, a value

11   maximizing transaction in the best interests of all

12   creditors?

13             MR. PASQUALE:  Well, I don't believe, Your Honor,

14   that the plan does preclude creditors from seeking the

15   Court's intervention in matters.  This Court retained

16   jurisdiction.

17             THE COURT:  That wasn't my question.  My question

18   was --

19             MR. PASQUALE:  Sorry, I thought was answering.

20             THE COURT:  -- what reason do you have to question

21   that this transaction is a value maximizing transaction?

22             MR. PASQUALE:  Oh, Your Honor --

23             THE COURT:  I didn't ask you whether or not you

24   had the right to do what you're doing.  I concede you have

25   the right to do what you're doing.

1            MR. PASQUALE:  Thank you, Your Honor.  The reason

2    is as we've expressed in our papers.  We do not have

3    information as to the terms.  We do not have information as

4    to the value.  We have indications of value far and above

5    what appears to be the terms of the proposed transaction, as

6    set forth in the press release.

7            We have the LBIE joint administrator's report,

8    issued just 11 days after this commitment letter was signed

9    by LBHI.  These are significant indications that something

10   is fishy with respect to this transaction.  We simply don't

11   know what that is, Your Honor.

12           And I do think the fact that, yes, LBHI as a plan

13   administrator, its post confirmation, but there are rights

14   as I said a moment ago, that creditors have.  This is not,

15   as much as LBHI would like to say so, like a company that

16   was never in bankruptcy.  The situation is different.

17           This Court has retained jurisdiction over certain

18   aspects, and this frankly is one of those aspects, where the

19   issue pertains to distributions, maximizing distributions,

20   excuse me, to creditors of LBHI.

21           So we think it's very important that there be

22   transparency as to the information in this deal.  What are

23   we going to do with that information when we get it?  First,

24   Your Honor, as we've said in our papers, and I think all the

25   other creditors here, they can speak for themselves, but I'm

Page 61

1    sure they would agree, there's no issue of maintaining

2    confidentiality.  We will enter a confidentiality agreement.

3            But by having the information, we then can

4    evaluate a) the terms; b) the value; and c) -- letter C, we

5    will be able to see these other aspects that don't have a

6    number value on them.  Again, the debtor says -- excuse me,

7    LBHI has spoken about them in their papers, but they haven't

8    disclosed anything as to what the value of the sharing in

9    claims is, or these possible contingent recoveries.  We

10   don't know that, Your Honor.

11           And how can a creditor put a check on the plan

12   administrator, which we are entitled to do under the terms

13   of the plan, without having disclosure of a very significant

14   transaction.  Again, this is probably -- if it's not the

15   largest, it's certainly one of the largest assets remaining

16   of this matter, the LBHI estate.

17           So I hope that answered Your Honor's question.

18           THE COURT:  It does, but I have some very serious

19   concerns as to the appropriateness of a 2004 process to

20   interdict business decisions that are being made, I presume,

21   in the utmost of good faith by the stewards of the asset

22   base, and I have real questions as to whether, from a

23   process perspective, it is good precedent and good practice

24   for large and influential investment funds, such as the

25   group you represent, to run into court whenever they see

Page 62

1    something that they want to know more about, both because

2    they are interested in their capacity as a creditor, and

3    also interested opportunistically as a potential investor.

4            MR. PASQUALE:  Well, this Court certainly has the

5    authority and discretion to handle those matters, if and

6    when they would come up.

7            Again, this particular matter, this isn't a

8    regular event.  It has not been.  This is again, a huge

9    transaction.

10           THE COURT:  Well, I know it's a huge transaction,

11   but it's also a transaction in which your client is not just

12   interested in its capacity as a creditor, but at least

13   originally was interested in its capacity as a potential

14   purchaser of the very same assets.  Correct?

15           MR. PASQUALE:  As a result --

16           THE COURT:  That's a yes or no.

17           MR. PASQUALE:  No, it's correct, Your Honor.

18           THE COURT:  Okay.

19           MR. PASQUALE:  And it's as a result of the

20   information that was disclosed in the press release, and

21   seeing what appears on the face to be far less value than we

22   believe should be attributed to the assets, to the claims.

23           Let me go back to one of Your Honor's prior

24   questions, I believe.  We have the benefit of being here in

25   bankruptcy court that we don't have to shoot first and ask

Page 63

1    questions later.  If LBHI had never been in bankruptcy, and

2    this were a business judgment question as a corporation

3    operating outside of, you know, any bankruptcy involvement

4    whatsoever, I think our remedy would have to be, are there

5    claims, can we bring a TRO to stop this transaction, seek a

6    preliminary injunction, basically shoot first and ask the

7    questions later.

8           Here, because of -- because we are here in

9    bankruptcy court, because we have the opportunity to seek

10   the Court's order with respect to Rule 2004, we can ask the

11   questions first, and try to attain the information.  And if

12   everything LBHI is telling us is true, there is nothing

13   else.  But if there are questions remaining after that

14   information is available to us, we then get to decide

15   whether there are appropriate claims to bring in this court.

16   Whether this is a basis for an injunction.

17          We have that benefit here that doesn't exist

18   elsewhere, Your Honor.

19          THE COURT:  Okay.  Well, it raises, at least to my

20   mind, and interesting question of transparency.  One of the

21   guiding principles of the Chapter 11 cases up to the point

22   of the plan going effective in early 2012, was that there

23   was a remarkably high degree of information sharing,

24   including discovery protocols that were put in place,

25   leading up to the plan process that resulted in the

Page 64

1    compromised plan that was ultimately confirmed.

2              And in my mind, I draw a distinction between the

3    transparency that is a necessary attribute of case

4    administration for a company before the effective date of

5    its plan, and the desire for information which is what

6    underlies the 2004 requests today.

7              And it seems to me that there is a fair

8    distinction to be drawn.  You're not entitled to know

9    everything, and I see no reason why I should be receptive to

10   your request, other than the fact that this is a

11   particularly conspicuous transaction that major players in

12   the case, including CarVal and Baupost and Paulson have

13   expressed an interest in, and were another major player in

14   the case, Elliot, King Street already inside the tent.

15             So that from the perspective of the Court, this

16   takes on a character of an almost intramural battle of

17   investment funds with regard to a transaction that may or

18   may not be a prized transaction, that carries with it some

19   policy overtones, as to what the proper role really is, if

20   any, of individual claimholders regardless of their size

21   post effective date.  And whether it is a proper use of the

22   Rule 2004 procedure to come to court, in this instance, and

23   perhaps others that may arise, to intervene and maybe

24   interfere in the administration of the post reorganization

25   estate assets.

Page 65

1           So I think it's a very important set of questions.

2     For me the question at hand is, have you shown sufficient

3     cause under the circumstances to do something that I view is

4     extraordinary, and maybe even unprecedented.

5           MR. PASQUALE:  Well, if I may, Your Honor, I --

6     we've cited cases, so I don't think it's unprecedented

7     for --

8           THE COURT:  Well, there are plenty of cases that

9     involve Rule 2004.

10          MR. PASQUALE:  Post confirmation.

11          THE COURT:  I don't think there are any cases that

12    involve an attempt to investigate by indirect means a

13    transaction that is occurring if it occurs pursuant to the

14    law of Inland and Wales with reference to two separate

15    proceedings in administration in the UK where the true

16    information in question doesn't involve US based assets, but

17    foreign assets, I would suggest this is a one-off situation.

18          MR. PASQUALE:  Well, ultimately I think, Your

19    Honor, if I may, the issue does involve claims in this court

20    against LBHI.  Again --

21          THE COURT:  I know they're derivative.  I mean,

22    you don't -- you actually don't have to explain that, and I

23    understand it.

24          MR. PASQUALE:  So I'm just trying --

25          THE COURT:  But the --

1          MR. PASQUALE:  I'm sorry, Your Honor.

2          THE COURT:  But that's an end run around what's

3    really going on, which is an attempt to understand what's

4    happening in the UK, because that's where the value is.

5          MR. PASQUALE:  My client can take whatever action

6    is appropriate in the UK, has done so already.  Again,

7    that's not why we're here today.  It is not about the UK.

8    It's about this proceeding, Your Honor, and remember LBHI is

9    a party to this commitment letter.  It's not standing

10   outside the transaction.  It is part of the transaction.

11         So I do think there is a very close tie to this

12   court, separate and apart having nothing to do with what's

13   going on in the UK.

14         THE COURT:  That's true, but the information that

15   you seek relates to the transaction that is to be affected

16   with respect to the UK administration proceedings.

17         MR. PASQUALE:  Certainly the LBIE and LBHI2 are

18   involved in that, but as is LBHI in this court.  So, yes,

19   it's intertwined.  Those parties are intertwined.  It is a

20   transaction involving all of those, absolutely.

21         I'd like to make -- if I can, Your Honor --

22         THE COURT:  So why is this an appropriate use of

23   Rule 2004?

24         MR. PASQUALE:  Well, again, as Your Honor knows,

25   there hasn't been any disclosure.  In order for my client

1    and the other creditors in this room to consider whether

2    there are any appropriate actions to be taken, that

3    information is necessary.  And I use the vernacular earlier,

4    you know, of being able to not have to shoot first and ask

5    questions later.  I think that's a very important

6    consideration.  Without it, the creditors standing on this

7    side of the courtroom will have to consider what do we do.

8    Do we have to bring some kind of litigation without knowing

9    the details.

10            It may very well be, and I think we have to ask

11   ourselves, why the secrecy here.  Because it's not been the

12   course before, Your Honor.  Your Honor, you're absolutely

13   right in noting that.  But it is here.  And why is that?

14            So we may see the information as I said a moment

15   ago, and say, okay, now we understand it.  But that is not

16   the case right now.  And as we see it right now, there are

17   significant issues with respect to the value or what appears

18   to be far lower value than should be.

19            Let me, if I may, Your Honor, just make one last

20   point, and I'll see if my colleagues want to try to answer

21   Your Honor's questions as well.

22            LBHI with respect to its objections says, okay, we

23   need to balance the interest here, and I've spent time

24   answering Your Honor's questions as to what our interest is.

25   What's not said in LBHI's papers is, what happens if they do

Page 68

1    disclose the information.  We know they have a contractual

2    obligation not to, that's what we've been told.  They've not

3    told us that Elliot and King Street will walk away from this

4    transaction if the information is disclosed.

5            And frankly even if they did, my client and the

6    other creditors here have before, and I'm sure will again,

7    be willing to step into that void.

8            The only other prejudice that LBHI's side is with

9    respect to commercial information, and again, a

10   confidentiality agreement takes care of that issue.  So I

11   think when we look at the balancing of interests here, that

12   weighs in our favor, in favor of granting the application

13   and disclosing the information.  By doing so, it answers all

14   these questions, Your Honor.

15           It's answers the question of value, it answers the

16   question of process, it answers the question of the terms of

17   the transaction, and frankly, it puts an end to why we're

18   all here today.

19           THE COURT:  It answers all those questions

20   perhaps, but you assume something which is that you have an

21   entitlement to know the answers to those questions, and that

22   it's appropriate for you to invoke Rule 2004 as a procedural

23   device to in effect invade the province of case management

24   that belongs to the plan administrator.

25           MR. PASQUALE:  But -- sorry, Your Honor.

1          THE COURT:  That's the policy question here that

2     overrides this debate.

3          MR. PASQUALE:  And I, on a couple of occasions,

4     tried to answer that for the Court by citing to some of the

5     case law, and Your Honor has noted that some of the

6     differences here.  But the fact here, like those cases, is

7     the Court has retained jurisdiction, and the 2004

8     examination that we're seeking, and I'm going to quote from

9     the Express One case if I may,

10         "Is a legitimate post confirmation inquiry to

11    determine whether Express One," in that case, "is acting in

12    conformity with the purpose of the plan."

13         It's exactly the situation we have here, Your

14    Honor.  We are entitled, I believe, under the case law, and

15    for the reasons we've been discussing to 2004 examinations

16    to confirm, to ask those questions in this situation is LBHI

17    conforming with the provision of the plan, which is to

18    maximize distributions to creditors of this -- these estates

19    here, Your Honor.

20         THE COURT:  I'll disagree with your use of the

21    word entitled.  The case law does not give you any

22    entitlement.  The case law --

23         MR. PASQUALE:  Court's discretionary in the court.

24         THE COURT:  -- provides certain analogous

25    precedent that may or may not be applicable, and your

Page 70

1   entitlement, if any, is solely within my discretion to

2   grant.

3           MR. PASQUALE:  Absolutely, Your Honor, I didn't

4   mean --

5           THE COURT:  Okay.

6           MR. PASQUALE:  -- to speak otherwise.  Thank you.

7           THE COURT:  Thank you.

8           MR. BANE:  Good morning, Your Honor, Mark Bane,

9   Ropes & Gray on behalf of the Baupost Group.

10          I appreciate Your Honor giving us a road map as to

11  the Court's concerns, and I'd like to summarize as I

12  understand three overall categories that the Court has put

13  on the table to be responded to.

14          Number one is, aren't the movants and the joinders

15  tainted, aren't they tainted either by virtue of the fact

16  that they're really just disgruntled counter bidders that

17  are being precluded from making money on an opportunity, or

18  perhaps maybe they're tainted because really they're LBIE

19  creditors, who are looking as the debtors suggest, to take a

20  bigger role in the LBIE case, and therefore, are using their

21  small interest in LBHI to exploit what is a much greater

22  opportunity at LBIE.

23          I'd like to address that.  Number two, as I

24  understand the Court is very concerned that what right do

25  you have to this information to begin with; the plan was

Page 71

1    negotiated heavily, the creditors were very informed in

2    those negotiations, in fact, the movants and the joinders

3    who are here today were involved in those negotiations, and

4    we negotiated away the rights to review.  And therefore,

5    what are you doing here, the plan doesn't provide for this

6    opportunity.  In fact, you've negotiated it away.

7              I'd like to address that as well.

8              And finally you raise the very legitimate

9    question.  Until now, there has never been a reason to

10   suspect the LBI management, administrator was doing anything

11   other than trying to maximize value.  The administrator and

12   his counsel are telling the Court that it would like to

13   retain this confidentiality, what right does the Court to

14   have to second-guess a very legitimate and trustworthy and

15   integrity based board of directors and administrators, and

16   I'd like to address that as well.

17             The first topic is the taint.  And Your Honor

18   would be perhaps correct if the only movants were movants

19   who were looking to bid.  We have a large group of movants

20   and joinders.  Some put in bids, some did not.  Some are

21   purely here because they're worried about recoveries as

22   creditors, and frankly I believe, Your Honor, that my

23   client, as well as CarVal, as well as all the others who did

24   put in an interest to bid, are not here because they want to

25   bid.  Are actually here because they believe that the LBI --

Page 72

1    the LBHI estate is deprived of true value.  That's the

2    intent.  That's the reason they're here, and that's, as Mr.

3    Pasquale noted, CarVal is prepared to withdraw its bid and

4    say it will not bid.  Which I don't think is a ploy, because

5    if it was really the only motivation, what would they get

6    out of that ploy.  The answer is, because everyone on our

7    side of the table is convinced that there's enormous value

8    being deprived to the LBHI creditors.

9              And number two is, there's a suggestion well, as

10   LBHI mentioned in their objection that, we're all tainted

11   because we're really here for our LBIE claims.

12             As CarVal put into their papers and as I'm

13   prepared to represent, we may have LBIE claims, we have much

14   great LBHI claims.  And not only do we have much greater

15   LBHI claims, but the magnitude of discovery, the scope of

16   recovery is far, far greater not only in dollar amount in

17   claims, but in dollar availability, GAAP in LBHI, and

18   moreover, as I said with regard to bidding, there are

19   members of our group, movants or joinders, who don't have

20   significant LBIE claims.

21             Why would they be interested in joining this group

22   in seeking this recovery if it's detrimental to LBHI, if

23   they don't have LBIE claims, and the only reason we're doing

24   it is to benefit LBIE.  The answer is because that's not the

25   motivation.

1            The motivation is, and I beg Your Honor to take us

2    at our word, our motivation is we believe that there is a

3    mistake being made, a transaction is being pursued that is

4    going to deprive the LBIE creditors of true value.

5            Next, Your Honor, say, well, that may be true, but

6    who are you to show up here, and expect the Court to give us

7    an opportunity to see the answers.  You negotiated away that

8    right under the plan.  And Your Honor is correct, and the

9    debtor LBHI has conceded that this was a very, very complex

10   plan, heavily negotiated, with the involvement of the very

11   parties who are seeking the relief today.

12           But not only was there a provision deleted that

13   said, okay, you don't have a right to notice and hearing on

14   every motion as you would in a Chapter 11 case.

15           There was also another provision that was heavily

16   negotiated.  If Your Honor will recall, there were a long

17   series of plans of reorganization filed before the Court.

18   And only after the third plan was filed did the creditors

19   who are appearing here as movants emerge as part of a

20   negotiation process with LBHI.  That process began after the

21   third plan was filed with the Court.

22           And low and behold, Your Honor will note, as we

23   put in our reply papers, there is a very big distinction

24   between the third plan and the fourth plan.  The plan before

25   when the negotiations took place, and the plan after the

Page 74

1    negotiation took place.  The plan before the creditors were

2    committed to support the plan, and after the creditors were

3    committed to support the plan.

4           And that was the insertion of the following

5    language, that one of the duties of the plan administrator

6    knowing that there is no notice in hearing obligation under

7    the terms, has an obligation to exercise its reasonable

8    business judgment, truth, to direct, control, wind down,

9    liquidate, sell, which is a word that was not in the first

10   three versions, because we were worried about sales that

11   would be taking place, and/or abandon of the assets of the

12   debtor, and of debtor controlled entities, and what one of

13   the issues that we would like to go into in our discovery is

14   to find out the relationship between LBHI and LBHI2.

15          But now comes the most important words that were

16   added that were not there before.  "Under the plan as

17   necessary to maximize distributions to the holders of

18   allowed claims."  On the first three, there was no language

19   that.  Under the fourth and subsequent confirmed plan, there

20   is language like that.

21          Why was that language added?  The reason is

22   because it was a heavily negotiated plan.  And once the

23   creditors forfeited the right to notice and hearing, they

24   needed to balance that out.  They couldn't say, okay, now,

25   you can do whatever you want, you can just -- you hide

Page 75

1    behind a business judgment rule that gives you carte blanche

2    to do anything particularly when you're indemnified by the

3    very source of our recoveries to begin with, so you may make

4    decisions that are erroneous, whether it's deliberate or by

5    error, and we need to have some kind of protection.

6            And therefore, we negotiated, and LBHI agreed, to

7    add language that imposed this duty, an affirmative duty

8    outside of the business judgment rule, in addition to the

9    business judgment rule to maximize value.

10           THE COURT:  Let me break in, I know you're on a

11   roll, but I'm going to do it anyway.

12           What's the remedy?

13           MR. BANE:  The remedy is a couple of

14   possibilities.  Number one is, as we've noted in our papers,

15   we have a suspicion, and it's -- all of this is really based

16   on a valuation analysis of what is worth here.  We believe

17   that this may very well be a fraudulent conveyance.  We

18   believe LBHI is certainly insolvent, the claims are not

19   discharged until the end of the process, so it's insolvent,

20   and we believe that evidence will show that there's an

21   enormous amount of value not being realized on the transfer

22   of these assets.

23           THE COURT:  Okay.  Well, let me just break in

24   again.  Which I guess you recognize not only from this

25   hearing, but others, is my habit.  It seems to me that the

Page 76

1    provision creates a standard of care or a standard of

2    performance for the plan administrator with respect to

3    transactions that it chooses to enter into.  They're not

4    just reasonably prudent business transactions, they're

5    transactions that qualify as value maximizing.

6            The plan administrator has represented, even

7    though you don't know the facts, that this transaction fits

8    that definition.  You and others like you question that.

9    Assuming for the sake of discussion that I were to permit

10   the 2004 discovery, and you were to get information through

11   a discovery process, which you would look at and then ask

12   questions about, and then either satisfy yourselves, confirm

13   that this is a value maximizing transaction, or second

14   guess.  To say, wait a minute, this could be different; wait

15   a minute, that could be different.

16           What happens then?  Is it your anticipation that

17   you then become part of the process of governance at

18   reorganized Lehman?

19           MR. BANE:  Absolutely not, Your Honor, under no

20   circumstance are we suggesting that that should be the

21   result or the intent of this process.

22           THE COURT:  But isn't it, in effect, the indirect

23   impact of what you seek because there are only two outcomes

24   it seems to me in granting the discovery requests.

25           Outcome one is that you learn information,

Page 77

1  satisfying that curiosity, and determine that the

2  transaction is value maximizing.  There may be other

3  transactions that could be value maximizing, but this is one

4  that fits that definition.

5          Or alternatively, you conclude, that it's a

6  transaction that is not value maximizing, or at least you

7  argue that it's not, because you say even though you're not

8  trying to be a participant that's getting in the way of what

9  Elliot and King Street are doing, there may be others that

10 would choose to do that.  And say, wait a minute, we'll pay

11 more, or wait a minute, we have another idea.

12         Isn't the consequence of alternative two

13 necessarily that you're interfering in the business judgment

14 of the plan administrator?  You're getting in the way.  And

15 isn't that a horrific precedent, because you end up creating

16 a precedent in which the plan administrator is almost always

17 at risk of ex post review.  That's not what this plan is

18 about.

19         MR. BANE:  Your Honor, two points.  The first

20 point is, if there is not an opportunity to review the

21 decisions made by the plan administrator, then what value is

22 there in language in a plan that imposes a duty?  In

23 position of a duty must be correlating with an opportunity

24 to test actions, and determine whether the duty has been

25 violated or not.

```
 1              THE COURT:  Ordinarily when a duty is violated, it

 2    leads to litigation risk.  Ordinarily when a duty is

 3    violated, somebody brings a lawsuit, and says, you breached

 4    a duty.  Or they make a claim in a letter, and then the

 5    board says, we didn't breach the duty, you're wrong, let's

 6    talk.

 7              But there isn't, to use a First Amendment term,

 8    prior restraint.  And what you're seeking is prior

 9    restraint, and I think that is what offends me.

10              MR. BANE:  Your Honor, let me put on the table an

11    alternative way for the Court to look at this transaction,

12    and I'm not suggesting it's the case, but I'm suggesting

13    that we don't have enough information to know that it's not

14    the case.

15              A completely different way to look at what's going

16    in front of Your Honor today, maybe what happened today, the

17    two bidders, the two potential purchasers came to the debtor

18    and to LBHI2 and said, we're interested in the following

19    transaction, and we're willing to pay what you're going to

20    think is a pretty good price, and a pretty good set of terms

21    for your deal.

22              And LBHI says, well, they need my consent, they

23    need my involvement, let me see whether I should do that or

24    not.  And they say to themselves, well, look, you know,

25    that's a pretty good deal, maybe there's better out there,
```

1    maybe not, let's go test the market.  And then the bidders

2    say, no, no, no, no, hold on, I'm giving you an offer on the

3    condition you don't test the market, because if you test the

4    market, we're taking our bid off the table.

5           And then a judgment is made, well, you know what,

6    I'm not willing to take the risk that they're going to walk

7    away, I'll agree to those terms.  But maybe that same

8    administrator who's looking to maximize value said to

9    himself the following, number one is I know that as a plan

10   administrator I have a fiduciary out, and therefore, if

11   someone else comes in and bids higher, I have an inherent

12   obligation to take that better deal.  I'm a plan

13   administrator, I'm here only under the terms of the plan;

14   and therefore, fiduciary outs are inherent in my role.

15          So the plan administrator says to himself, I know

16   I'm making a commitment, as is the case in every bidding

17   process in Chapter 11, saying I'm getting this floor, I'm

18   getting this guarantee, but I know I have a fiduciary out.

19   So the bidders say, hey, I know this guy has a fiduciary

20   out, so how do I protect myself against that, aw, I have

21   another term.

22          You're not allowed to tell anybody what the terms

23   of this deal until the transaction is consummated, and

24   therefore, no one could bid against it.  Because as the LBHI

25   keeps on saying, it's a very complicated transaction with

Page 80

1    many dimensions.  And therefore, if other parties don't know

2    what those dimensions are, they can't bid against it,

3    because it's behind the veil.

4           So the plan administrator says, okay, I know now

5    that they're trying to frustrate my fiduciary out, because

6    no one's going to be able to bid against it.  But the plan

7    administrator says to themself, well, you know, this term

8    that is being imposed upon me to restrict the sharing of

9    information is only if the Court does not opt -- order me

10   otherwise.

11          If the Court orders me to give the information, I

12   have to give the information.  Here LBHI says to himself,

13   the administrator, with a full commitment to maximized

14   value, I could have the best of all worlds.  I could get

15   this floor and commitment by these purchasers, and they have

16   no way of getting out of their commitment.  And I know that

17   if these opposing parties go to the courts and have the

18   judge agree to force me to give this information, I'll have

19   to give it.  And I still have the purchasers bound, and now

20   I have a fiduciary out potential, maybe someone will bid

21   higher, so I have the best of all worlds.

22          And the only obstacle to that is Your Honor giving

23   the debtor, LBHI an opportunity to get better bids.  I'm

24   saying to myself, why would LBHI be here today trying to

25   frustrate an opportunity to maximize value.  The answer is,

Page 81

1    the primary reason they give, they have a contractual duty

2    not to.  But they have never told the Court that if they

3    violate it, the purchaser walks away.

4              And frankly, Your Honor, I think they have a duty

5    to argue against our process.  I think they're going to have

6    a duty to make any argument they can, and therefore you

7    can't turn to them and say, is this really true, do you

8    really want me to give this out?  Of course, they can't say

9    that, that would be violating the contract.

10             But they're saying to themselves, they know that

11   Your Honor will realize that's the charade that's going on,

12   they're trying to create this floor, but the Court knows

13   that there's a fiduciary out, and the Court knows that this

14   limitation of sharing information is only until the Court

15   orders otherwise.  And the only step that has to be imposed

16   to close the loop, maximize value for the estates, give

17   everybody an opportunity to see how to bid against this

18   transaction, is to grant our motion.

19             Your Honor keeps on asking, well, what happens if

20   you get the information.  And the answer is not governance,

21   not intrusive, but an opportunity for other parties to bid,

22   and allow the LBHI to exercise its fiduciary out and get the

23   most value here.

24             And that I think is what the -- is expected of the

25   Court to allow LBHI to do what it really wants to do,

Page 82

1    although it is barred as it said, by the terms of the

2    contract from asking the Court to do so.  And therefore, I

3    ask the Court to accommodate this opportunity, which has no

4    real downside to LBHI, unless they come in and tell the

5    Court that the provisions are if the Court orders

6    information, the two purchasers have a right to walk, and

7    then we have to readdress it.

8              THE COURT:  Mr. Bane, you're making a very

9    different argument from the argument that Mr. Pasquale made

10   earlier.

11             My impression from his argument was that this was

12   an inquiring minds want to know kind of argument, and

13   because of the red flags in the transaction, various parties

14   who had said they were no longer interested in participating

15   in a bidding process were still interested in getting the

16   2004 discovery, in order to verify that this was, in fact, a

17   value maximizing transaction.

18             You're saying something quite different, and in

19   your rhetoric, which is interesting for me, I'm engaged,

20   you're postulating what I'll describe as facts not in

21   evidence.  You are postulating that what is really going on

22   here is a charade of sorts, in which a transaction has

23   occurred with lock-ups all over it, with the plan

24   administrator not wanting to give up that transaction

25   because of an independent judgment made that, in fact, it is

Page 83

```
 1   value maximizing, because unless that were the case, they

 2   couldn't proceed with the transaction.

 3            And that what you're suggesting is that they're

 4   going to go through this attempt to block with a half-

 5   hearted attempt your efforts to get 2004, and they will then

 6   have the best of all possible worlds; the ability to

 7   preserve the locked-up transaction, and the ability to start

 8   negotiating with people like your client, who will say,

 9   we'll pay you more, we'll do better, this is complicated,

10   but we're smart, we'll figure out how to make this better

11   for you.

12            Is that what you're telling me?

13            MR. BANE:  Yes, Your Honor, and I'm suggesting

14   when the --

15            THE COURT:  What's the basis for that hypothesis?

16            MR. BANE:  The basis is, how absurd this process

17   was in the context of this company LBHI's behavior until

18   now.

19            The absurdity of not testing the market at all,

20   the absurdity of knowing that there is a whole array of

21   parties out there who would be more than eager to engage in

22   discussions, and not even reach out to them, it's so absurd

23   as to compel the Court to realize that this alternative

24   scenario has to be there.

25            Now, you're asking well, you don't know that
```

Page 84

1    there's a fiduciary out; you don't know that this is

2    (indiscernible).  You know why I don't know?  Because we

3    don't have access to the documents, and that was a

4    deliberate effort made by the purchaser to make sure I

5    wouldn't know.

6            But to allow the purchasers to hamstring the

7    debtor, LBHI, to preclude them from exercising their

8    fiduciary out, to preclude them from giving the documents

9    which, and I'm saying -- I don't say it's half-hearted, I

10   think they're doing a very aggressive strong effort to

11   preclude us, because that's their obligation, and they're

12   very good at what they do.  And they can't do it half-

13   hearted because that would make them vulnerable to the

14   purchasers arguing they're breaching their contract, and

15   that they will continue to act vociferously in favor of

16   opposing our motions.

17           But the reason they were able to conclude that is

18   value maximizing, is because they knew that it was just

19   going to be a floor, and they had the fiduciary out, and

20   there would be a scenario in which others could bid against

21   it.  And what is the downside to them in doing that.  What

22   is the downside of accepting my hypothesis, that maybe I'm

23   right, because Your Honor doesn't know, and I don't know,

24   and no one in the court knows except for the purchasers and

25   LBHI and LBHI2 whether all of these facts are true.

1              And we don't know because they're not allowing us

2     to know.  Allow us to know.  Allow somebody to know.  And

3     then we could see whether this is really what the LBHI

4     wanted the conclusion to be this morning, or they were

5     really hoping, because they want to maximize value to give

6     the best of all worlds to the estate.  And that's what I

7     think we're trying to find out.

8              THE COURT:  Okay.  There were three points you

9     wanted to make, I want you to finish making the points, and

10    then I want you to sit down.

11             MR. BANE:  Okay.  Absolutely, Your Honor.

12             So I've addressed the issue of the taintedness of

13    our -- of the movants and the joinders.  I'm addressing the

14    entitlement to get this information, and I think I just

15    addressed the third issue, which is, why do we have a reason

16    to second guess.  And the reason we have to second guess is

17    because we think that that's part of the ploy.  That's part

18    of the process that was anticipated, and notwithstanding the

19    protestations that LBHI will make, from Your Honor's

20    perspective, it's readily apparent, that will only be in

21    their interest for that result to take place.  Thank you.

22             THE COURT:  Okay.  Thank you very much.  Mr.

23    Hillman.

24             MR. HILLMAN:  Good afternoon, Your Honor.  David

25    Hillman, Schulte, Roth and Zabel on behalf of Davidson

Page 86

1    Kempner Capital Management.

2              I don't think it's necessary for me to repeat the

3    comments that you've heard from counsel who have appeared

4    before you in this case, advocating the issues that I'm

5    advocating as well.

6              But you raised some very important and basic

7    threshold issues that are troubling you, so I just wanted to

8    identify two points.  This is the least efficient, least

9    desirable way for us to work constructively with the

10   reorganized debtors and their management.  All right.

11             And this is not how the parties have dealt with

12   other issues that they've faced since the debtors have

13   reorganized.  They have a strong working relationship with

14   the debtors and their management.

15             But the issue that's troubling Your Honor is, if I

16   understand correctly, it's not power, can you do it, it's

17   why should you do it.  You're concerned about exercising

18   your discretion.

19             And so I think when you take a step back, and I

20   heard you say this at the last hearing, I was in the

21   audience in the gallery, you said, why is this happening.  I

22   think that's very important to ask why is this happening.

23   Why are some of the largest creditors of LBHI holding

24   multiple billions of notional amount of allowed claims here

25   before you, what's going on.

1           That's a -- that in and of itself, if you had one

2     party who you thought was trying to get some strategic

3     advantage, maybe you shut that down.  I think you need to

4     consider the fact that you have so many significant holders

5     each coming before Your Honor asking for information about

6     this transaction.

7           So then you've said to counsel, you have no

8     entitlement.  What is your entitlement?  Well, I think Mr.

9     Bane actually hits that issue quite clearly.  If there's a

10    duty to maximize in the plan, and it's clearly set forth in

11    6.1(a), there's got to be a beneficiary of that duty.

12           And we're not asking for oversight or control, but

13    it can't be read to be a meaningless duty to maximize.  And

14    here, in light of all the red flags, in light of the

15    vociferous opposition by a number of parties just for

16    information, there's something amiss here.

17           And our goal is to maximize the distribution to

18    creditors.  You asked Mr. Bane, aren't there really two

19    outcomes, right, either you learn the information and you're

20    satisfied, or you're not satisfied and you're looking to

21    then get into the role of the debtor's management.  I don't

22    think that's the case.

23           I think the third outcome, and the one that I'm

24    most optimistic for, is that the parties then will work

25    together in a collaborative spirit to figure out how to do

Page 88

1    one thing, maximize the distribution to the holders of

2    allowed claims of LBHI.  That's the single objective here.

3              THE COURT:  I understand what you're saying, Mr.

4    Hillman, but at least as to your spin on the second

5    alternative, which is you get information, your group meets,

6    analyzes it, maybe hires a financial advisor to review it,

7    maybe it's an advisor in the UK, along with an advisor here,

8    you noodle over the information, and you find, as you must,

9    with that kind of an effort, something that could be

10   improved, something that might be different, some way to

11   tweak or perhaps in a major way restructure the transaction.

12             And the consequence of that, in your collaborative

13   meeting, is that creditors are marching in to some office

14   and meeting with officers of reorganized Lehman and

15   professionals for reorganized Lehman, and the Board for

16   reorganized Lehman, and saying, I don't know you could've

17   entered into this transaction, it's not a value maximizing

18   transaction, don't you see that all of our advisors, and all

19   of these creditors, we don't mean to gang up on you now,

20   think that there's a much better way to approach this.  And

21   by the way, a subset of our group will be happy to step into

22   the role formerly played by Elliot and King Street, because

23   that's what's going to happen.

24             And if that happens, isn't that this group as a

25   cabal coming in to not only second-guess, but to take over

1    particular opportunity?  That's what's going on here, and

2    that's the consequence of Mr. Bane's argument as well, and

3    that's what I don't like.

4              MR. HILLMAN:  If that happens, I guess I look at

5    it as a good day for the reorganized debtor, right.  They'll

6    have an opportunity for choice.

7              THE COURT:  It's a good day when they're

8    surrounded by a bunch of enemies?

9              MR. HILLMAN:  Hold on.  I don't think it would be

10   fair to describe them as enemies.  They are the largest

11   constituents in the case, so they are akin to shareholders

12   with shares --

13             THE COURT:  They are also akin to plaintiffs.

14             MR. HILLMAN:  But can I just finish this one last

15   point in response, and then I'll take my seat, and you can

16   hear from the others?

17             If, as you suggest, the reorganized debtor is

18   presented with an alternative, that in fact, is executable,

19   and allows the plan administrator to achieve greater value,

20   and the plan administrator has a choice of executable

21   options, which will yield value to the estate, I would say

22   that for the holders of allowed claims, that's good for the

23   plan administrator to have the optionality on executable

24   plans that gives them the ability to return more to

25   creditors.

Page 90

1           I know that you've looked at the papers, but I

2     just want to highlight one last fact, and I'll sit down.

3     The claim being purchased is in the face amount of 1.25

4     billion pounds.  The sale was for 600 million pounds, plus

5     additional consideration.  And the offer that one of the

6     parties made was 250 million pounds more.  It just -- it's a

7     red flag.  Why not engage in some discussion about it?

8     That's all we want, is just to engage in discussion about

9     it.

10          And the plan administrator may conclude, after

11    engaging in discussion, the existing deal on the table makes

12    more sense.  But we're just looking for information, and I

13    would just end on a note that I know is important to Your

14    Honor, because you've referenced it several times in this

15    hearing, and the hearing before, some level of transparency.

16    There's zero information being shared, and that hasn't been

17    the case while this plan administrator has assumed its

18    duties.  This is aberrational.

19          Again, they've enjoyed a strong working

20    relationship.  So when you ask yourself about whether you

21    have the power, because I think we've established that you

22    have the power, but whether or not you should exercise your

23    discretion to use it, think about the red flags, think about

24    the number of creditors who are appearing today to be heard,

25    and think about the options that it could afford the plan

1    administrator sharing -- and we don't want to do this in

2    depositions and discovery, that's not what we want.  We want

3    to sit down and talk like we've done in other instances.

4            That's it.  Thank you, Your Honor.

5            THE COURT:  Understood, thank you.

6            MR. UZZI:  Good afternoon, Your Honor --

7            THE COURT:  This feels like old times.

8            MR. UZZI:  It feels like old times, although I

9    know it's a new courtroom.

10           THE COURT:  It's the same courtroom in a new

11   dress.

12           MR. UZZI:  It looks great, Your Honor.

13           THE COURT:  Thank you.

14           MR. UZZI:  For the record, Gerard Uzzi on behalf

15   of the ad hoc group.

16           Although it's been almost two years now post

17   emergence, the ad hoc group, in fact, continues to be

18   active.  It's not as formal as it used to be, Your Honor.

19   We do send out periodic updates to everybody that was on my

20   list prior to the emergence, but really for the purposes

21   here today, I'd just like to make some disclosures so it's

22   clear where we stand from.

23           I take direction essentially from three funds,

24   it's Paulson, Canyon, Taconic, they collective hold in

25   excess of $10 billion of LBHI claims.  They hold less than

Page 92

1    400 million of Libby claims.  So whether you look at

2    notional amounts or fair market value, it's clear I think

3    where our economic interests are.

4          One fund, Paulson, did participate in some of the

5    prepetition offer -- I'm sorry, pre-today offers that were

6    made, but both on an amount and number, the other funds did,

7    so I stand here solely as a representative of funds who are

8    looking out for their interests in LBHI.

9          I also want to make clear, I think it was clear

10   from our papers, and I don't think anybody else suggests

11   otherwise, but we don't have a complaint about the debtor's

12   conduct, either generally or with respect to this

13   transaction, nobody's suggesting that there's a lack of good

14   faith on behalf of the debtors.

15         What we have, and I think our group has -- and

16   we've been using the term group here today in this

17   proceeding.  As I refer to the group, I refer only to my

18   clients, I don't purport to speak on behalf of anybody else.

19   We've worked constructively with the debtors for years now.

20   Notwithstanding that, we've had our disagreements with them

21   from time to time, and we've been before you on some of

22   those disagreements.

23         Today, what's important is, we have a potential

24   disagreement on a transaction and that's it.  And I'm not

25   going to hit the slippery slope comments, Your Honor, I

Page 93

1    think other people have addressed that.  What I will say,

2    Your Honor, and it's meant to be just semantics, we didn't

3    file a joinder.  We filed a statement.  And that's a reason

4    for that, is that I struggled with, we struggled with

5    whether 2004 was appropriate here, and whether it's the

6    right mechanism.

7          But we struggled more with the fact that there has

8    to be some sort of mechanism here for material stakeholders

9    to come in to a case like this under the facts and

10   circumstances of the broader case, and the facts and

11   circumstances of this particular transaction.

12         It may very well be unprecedented, Your Honor, to

13   use 2004 for something like this.  It's certainly unusual.

14   But this case is as unprecedented as any case, so you know,

15   I think that there's always a first time for everything.

16         I am concerned, and I think the debtor is

17   appropriately concerned, and the Court is appropriately

18   concerned about the policy questions here, and what that

19   introduces.  But I also think it's balanced by the fact that

20   we have an unprecedented case.

21         We've also been two years into this case, and

22   where this is the only time anybody's been in front of the

23   Court on something like this.  So I don't see the floodgate

24   opening up and the second-guessing.

25         In the particular transaction we have, though,

1    there's no dispute that this is a material transaction.  I

2    mean, after all, they filed the press release.  I mean, the

3    debtor's side, it's actually LBHI2 that filed the press

4    release, but they filed the press release.  They felt it

5    important enough to file a press release, that put in very

6    limited facts on the transaction, that caused on everybody

7    on this side of the table, which is tens of billions of

8    dollars of claims.  And I think the analogy to shareholders

9    is a pretty good analogy.  To call up and say, wait, this

10   doesn't seem right to us.

11          And what we were told is that well, we can't talk

12   to you about it.  So there was a negotiation that occurred

13   in secret, and I don't mean that pejoratively, it was a

14   negotiation that occurred in a -- you know, again, I'm

15   trying to avoid pejorative words, a negotiation that nobody

16   knew about, that led to a transaction that nobody can talk

17   about.

18          And the reason why it can't be talked about is

19   because the other side of the transaction requires it as

20   part of their transaction.  That's the red flag, Your Honor.

21   That's the red flag.

22          If it's a value maximizing transaction, our

23   friends over at Elliot and King Street should care less

24   about the disclosure of the terms.  They're the ones that I,

25   at least I understand, they are the ones that are demanding

Page 95

```
 1    that the terms not be disclosed.

 2           So what do we do about it?  You know, I don't know

 3    whether 2004 is the appropriate remedy, but I don't accept

 4    that there's no remedy here.

 5           And, you know, what do we want, my group?  We

 6    would just like information.  We would like some

 7    transparency, we think it's really unfortunate that parties

 8    would have to resort to formal discovery.

 9           But if parties have to do that, that's only

10    because the other side is forcing the parties into a

11    position where they have to resort to formal discovery.

12           So while I appreciate and I'm very cognizant of

13    the policy issues here, and the second guessing and all the

14    rest is that they've invited this, Your Honor.  This is not

15    just -- this is not a -- I noted with interest your comment

16    about an intramural dispute among, you know, huge hedge

17    funds.  And I'm not going to tell you that doesn't go on, I

18    think you're well aware that does goes on.

19           THE COURT:  I am well aware of that.

20           MR. UZZI:  And we have lived through that

21    together, Your Honor, but this is not a situation of

22    information and balance.  This is not a situation where, oh,

23    King Street and Elliot has better information than everybody

24    else, we want to get information, that's what we're here

25    for.
```

Page 96

```
 1            No.  This is a situation about a serious concern

 2      about whether this transaction, which is a material

 3      transaction, they issued the press release, is truly a value

 4      maximizing transaction for LBHI creditors.  This is a

 5      liquidating estate.  This isn't a reorganized entity.  It's

 6      a liquidating estate.  I'm not sure the same rules apply to,

 7      you know, as apply if it weren't a liquidating estate.

 8            And it's with that, Your Honor, that we're before

 9      the Court asking the Court for some assistance in confirming

10      that it's a value maximizing transaction.  I will say, Your

11      Honor, your prediction of what's likely going to happen,

12      it's my prediction too, Your Honor, because we suspect that

13      it's not, in fact, a value maximizing transaction.  So we do

14      expect that somebody else will offer more money.

15            And I think the point is well taken, that okay, it

16      may be ugly how we get there, but that's actually a pretty

17      good outcome if that happens.  That's it, Your Honor, unless

18      you have questions for me.

19            THE COURT:  I don't.

20            MR. UZZI:  Thank you, Your Honor.

21            THE COURT:  Thank you.  Are there others who wish

22      to speak to the right to either 2004 discovery or some other

23      assistance of the Court to gain access to information which

24      is now shrouded?

25            (No response)
```

1          THE COURT:  Mr. Miller, it's your turn, you're up.

2          MR. MILLER:  Thank you, Your Honor, good

3     afternoon.

4          THE COURT:  Good afternoon.

5          MR. MILLER:  Harvey Miller from Weil, Gotshal &

6     Manges on behalf of the reorganized debtors.

7          I think it's interesting, Your Honor, that Mr.

8     Pasquale and others fully agreed with your comments earlier

9     on, that the board of directors of the reorganized debtors

10    and plan administrator have acted with integrity, diligence,

11    and proper discharge of duties.  And then suddenly Mr.

12    Pasquale says, but there's something fishy here.  Now,

13    that's in conflict with his agreement with Your Honor's

14    comment.

15          The issue is whether it's appropriate in the

16    context of post effective date reorganized debtor being

17    subjected to 2004 examinations, which as Mr. Uzzi says, is

18    very atypical.  And the cases that are cited are really not

19    on point in connection with this transaction.

20          And there's certain things we should remember,

21    Your Honor.  We are talking about post effective date

22    reorganized debtors.  We are talking about a transaction

23    which is taking place in administration proceedings in the

24    United Kingdom, by the administrators of LBHI2 and in

25    negotiations with that -- those joint administrators have

Page 98

1    had with King Street and Elliot.

2            Just for clarification, Your Honor, the plan

3    administrator never issued a press release.  The press

4    release that was issued was by the joint administrators of

5    LBHI2.

6            So we have reorganized debtors, Your Honor, who as

7    Your Honor characterized it, for debtors who are no longer

8    wards of the bankruptcy court.  And if we refer, Your Honor,

9    to the Chapter 11 plan, which was confirmed with

10   unbelievable support, Your Honor, and as we have cited in

11   our papers, and I just want to cite Section 13.1 of the

12   plan, which provides authority for the debtors acting

13   through the plan administrator to take any action, including

14   without limitation, the sale of property and the entry into

15   transactions, agreements, understandings, or arrangements

16   whether in or other than in the ordinary course of business,

17   and execute, deliver, implement, and fully perform any and

18   all obligations as to instruments, documents, and papers, or

19   otherwise in connection with any of the foregoing, free of

20   any restrictions of the Bankruptcy Code, or the bankruptcy

21   rules, and in all respects as if there were no pending cases

22   under chapter or provision of the Bankruptcy Code, except as

23   explicitly provided in the plan.

24           Now, my adversaries, Your Honor, have eluded to

25   this heavily, heavily negotiated plan.  Yes, it was heavily

1    negotiated.  There's no doubt about that, Your Honor.  And

2    these provisions were put in the plan as a result of that

3    heavy negotiation.

4            Was it ever contemplated that there would be 2004

5    examinations to question decisions made by the plan

6    administrator, and to authorize a fishing expedition?  The

7    confirmation order, Your Honor, does address 2004.  And it

8    says in paragraph 65, the debtors, the debtors shall retain

9    following the effective date, the same rights they had prior

10   to the effective date under Bankruptcy 2004, and this

11   Court's order granting the debtor's authority to issue

12   subpoenas for the production of documents, and authorizing

13   the examination of persons and entities, shall remain in

14   full force and effect following the effective date until the

15   closing date.

16           There is no provision any place, Your Honor, that

17   talks about a reservation that claimants under the plan to

18   use 2004.  This is a very atypical process, Your Honor,

19   particularly in the context of a transaction in which the

20   reply -- the objection filed by the joint administrators

21   describes LBHI, the planned administrator as a nominal party

22   to the transaction.

23           We are an -- we, I mean plan administrator, Your

24   Honor, is an indirect creditor of LBHI2.  Not a direct

25   creditor.  And are there multiple issues which are at stake

Page 100

1    in the UK administration proceeding that are very complex,

2    that may be rolled into this transaction.  It's simply not a

3    purchase of a claim, Your Honor.  It's a complex transaction

4    that was heavily negotiated by the joint administrators.

5              THE COURT:  Mr. Miller, let me ask you a couple of

6    things, and you may not know the answers of your own

7    personal knowledge, which is fine, you can just tell me

8    that.

9              Do you know why this transaction is cloaked in

10   secrecy?

11             MR. MILLER:  No, I do not, Your Honor.

12             THE COURT:  Do you know who insisted on the

13   provisions that are in dispute today, that relate to the

14   non-disclosure of material information concerning the

15   transaction?

16             MR. MILLER:  I do not have any personal knowledge,

17   Your Honor.

18             THE COURT:  Did you, or did anyone from your firm

19   participate in the underlying negotiations?

20             MR. MILLER:  If I can confer with Ms. Fife, Your

21   Honor, I would be happy to answer that.

22             MS. FIFE:  Yes.  Yes, of course.

23             UNIDENTIFIED:  Yes.

24             THE COURT:  Did -- Ms. Fife, are you the likely

25   suspect?

Page 101

1          MS. FIFE:  Not actually, Your Honor.  All of the

2     negotiations took place in the UK, so it was our London

3     partners.

4          THE COURT:  But your London partners did

5     participate?

6          MS. FIFE:  Oh, yes, very heavily, uh-huh.

7          THE COURT:  Okay.  All right.

8          MS. FIFE:  Yes.

9          THE COURT:  Thank you.

10         MR. MILLER:  I would also point out to Your Honor

11    that under the plan there are certain reporting obligations

12    on the part of the plan administration -- administrator,

13    although vested with broad authority and discretion in

14    dealing with the debtor's assets, there is a reporting

15    requirement as provided in Section 15.6 of the plan.

16         However, the plan administrator need not, in the

17    exercise of its reasonable discretion, file any reports

18    that, and I'm quoting, could place the debtors in a

19    competitive or negotiating disadvantage, or such disclosure

20    is precluded by confidentiality limitations.

21         I would assume, Your Honor, the confidentiality

22    and limitations were heavily negotiated between King Street,

23    Elliot, and the LBHI2 administrators.

24         The use of Rule 2004, Your Honor, in these

25    circumstances in an abuse of process.  It is a pure

Page 102

1    unmitigated attempt by the movant's hedge funds to

2    circumvent the English administration proceedings and

3    leverage their positions.

4            Rule 2004 is not an appropriate remedy in the

5    circumstances here, Your Honor.  If the hedge funds are

6    dissatisfied with the transaction, they have other remedies.

7            As Your Honor pointed out, in a normal course of

8    Chapter 11 when a company emerges, and is outside of

9    bankruptcy, and there's a claim, a breach of fiduciary

10   duties, there's litigation.  There is no authority in those

11   situations to use the 2004 fishing expedition ability to go

12   and do some kind of discovery to assist in creating a

13   lawsuit, or otherwise engage the reorganized debtors in very

14   expensive negotiations, examinations, production of

15   documents.  That's not contemplated under this claim either,

16   Your Honor.

17           THE COURT:  Mr. Miller, I have a question that I

18   think is going to be a hard one for you to answer, but I'm

19   going to ask it anyway.

20           Mr. Bane in his argument has postulated that you

21   would like nothing more than to fight the good fight, in

22   order to protect the transaction and its confidentiality,

23   and more importantly, the protect your client, the plan

24   administrator, from intrusive inquiries.  But if you were to

25   lose, and some discovery were to be compelled, and the

Page 103

1    result of that discovery was another transaction that was

2    even better, in terms of ultimate realization for the LBHI

3    estate and its creditors, that would be the best of all

4    worlds for you.  Is that true?

5            MR. MILLER:  No, sir.  We're talking here, Your

6    Honor, about basic process.  We have a very heavily

7    negotiated plan, which set up a process for administering

8    these assets.

9            If we lose this motion, Your Honor, we are setting

10   the precedent for every single transaction to be second-

11   guessed by maybe these creditors, maybe other creditors.  It

12   is contrary to the basic premise of this plan, Your Honor,

13   and basic premise, I would say of Chapter 11.  We negotiated

14   in good faith, and we expect to honor our obligations.

15           And implicit in this, as Your Honor pointed out,

16   the assumption has to be that this board of directors acted

17   with prudence, and made the determination that this was

18   value maximizing.  Actually what's happening here, Your

19   Honor, somebody referred to the subordinated debt claim that

20   the LBHI2 administrators have against LBIE.  There is a

21   dispute in the English proceedings, Your Honor, as to the

22   waterfall of distributions coming out of Libby.

23           The Libby administrators take the position that

24   subordinated debt claim doesn't get any distributions until

25   the holders of all allowed claims are paid interest at the

Page 104

```
 1    statutory rate.
 2              King Street -- I'm sorry, Elliot takes the
 3    position it's not at the statutory rate, we're entitled to a
 4    lot more interest, based on our ISDA contracts.  Well, if
 5    that happens, Your Honor, that subordinated debt claim may
 6    have the very remote chance of any significant
 7    distributions.
 8              What this transaction does is give down side
 9    protection.  It provides 650 million pounds, which I guess
10    is pretty close to a billion dollars in today's currency
11    evaluations, plus there are a lot of other terms and
12    conditions.  This is a very complex deal.  It's still
13    subject to documentation.  But when that documentation is
14    completed, the joint administrators have the right to go
15    forward under the UK insolvency law, without any further
16    ado.  So --
17              THE COURT:  One further question.
18              MR. MILLER:  Yes.
19              THE COURT:  Do you know why confidentiality is so
20    critically important in this transaction?
21              MR. MILLER:  I can only guess, Your Honor.
22              THE COURT:  I don't want you guessing.
23              MR. MILLER:  Okay.
24              THE COURT:  Okay.  Please proceed with your
25    argument.
```

Page 105

1           MR. MILLER:  I don't want to belabor it, Your

2    Honor, but the concession here is that this plan

3    administrator, the board of directors of this reorganized

4    company in the two years since confirmation, and the almost

5    two years since the effective date, have performed

6    admirably.

7           And they've done that, Your Honor, in consistency

8    with the plan, and the objective of maximizing value.  That

9    has been the guiding theme of the extensive work that's been

10   done by this board of directors.  And there should be a

11   deference to the decisions of this board of directors

12   without the overlay and the possibility of the kind of

13   examinations that are contemplated by 2004, which are very

14   atypical in the context of a confirmed Chapter 11, an

15   administration that is proceeding, that is making

16   distributions.

17          In addition to that, Your Honor, as I said before,

18   this is a transaction that is taking place under the English

19   insolvency laws.  The joint administrators of LBHI2 have

20   filed an objection, they are opposed to these 2004

21   examinations, which may or may not include them.  And I

22   believe, Your Honor, there has to be some deference of --

23   according to the joint administrators in their position, as

24   well as the conclusion and assumption that this board of

25   directors has acted properly, and in this, Judge, of its

Page 106

1    fiduciary duties.

2           If they, the movants disagree with that, they have

3    other remedies, Your Honor.  And to give them the broad

4    authority to pursue 2004 examinations, which as Your Honor

5    knows, is a fishing expedition, and doesn't produce

6    admissible evidence, it can only be used to impeach

7    witnesses, this is just an overlay that is contrary to the

8    very essence of the Chapter 11 plan that was confirmed and

9    the order of confirmation, Your Honor.  And these motions

10   should be denied.

11          THE COURT:  Okay.  Thank you.  Mr. Wander.

12          MR. WANDER:  Good afternoon, Your Honor.  David

13   Wander of Davidoff Hutcher & Citron, counsel for the joint

14   administrators of LB Holdings Intermediary 2 Limited, which

15   we were referring to as LBHI2.

16          Your Honor, I'm going to be relatively brief

17   because it's clear Your Honor has read the papers and is

18   very familiar with what's in the papers that we filed our

19   objection, and it's also clear from listening to Your Honor

20   that Your Honor knows what's going on really behind these

21   motions.

22          The bottom line is, the movants want this Court to

23   enjoin a transaction of a company in administration in

24   England, and somehow schedule a 363(b) sale of the assets of

25   the English company.

Page 107

1          I'm going to briefly address two issues Your Honor

2    raised.  One, value maximizing of this transaction, and two,

3    a dangerous precedent that granting the motions might result

4    in.

5          First, with regard to value maximization.  As I

6    believe Your Honor gleamed from the papers, and as Mr.

7    Miller has discussed, this is a very complex transaction.

8    It's not just a sale of subordinated debt, a transaction, a

9    sale of an asset where you can have one party say what'll I

10   bid for this, do I hear a higher and better bid.  There are

11   a lot of components in this that are described in the

12   papers.  There are other assets of LBHI2, and there are

13   other considerations that the administrators of LBHI2 have

14   taken into account, and that Mr. Miller briefly addressed

15   that have to deal with the LBIE entity, and how its

16   distributions may impact on the LBHI2 entity.

17          And next to the carve out motion, as Exhibit F, is

18   a letter dated October 4, 2013 by Mr. Howell to the various

19   hedge funds represented by the movant parties.  And I just

20   want to quote snippets from that, Your Honor.

21          THE COURT:  I've read it, you don't have to quote

22   it, unless you want to make it as part of your argument, but

23   I understand what the letter says.

24          MR. WANDER:  Then I'm not going to read it,

25   because Your Honor's aware that this has been reviewed,

Page 108

1    analyzed by the administrators of LBHI2.

2            What the movants almost entirely ignore in their

3    papers, and as Your Honor is well aware, is we're dealing

4    with the assets of an English company that's in

5    administration, and there are procedures for challenging the

6    transaction in the English high court, and we submit, that

7    is the jurisdiction that any issue with respect to the

8    transaction should take place.

9            THE COURT:  Well, Mr. Wander, I'm now going to ask

10   you a question that may make you sorry you brought that up.

11   I gather that the administrators of Lehman Brothers Holdings

12   Intermediate 2 are not bound by any value maximizing

13   provisions in the LBHI plan.  And that those provisions only

14   apply to the reorganized debtors; is that correct?

15           MR. WANDER:  That's correct, but they are bound by

16   the provisions that govern them and their conduct in

17   England.  And I submit, that they're basically the same, in

18   that they have duties to their estate to maximize value for

19   their estate, and the ultimate beneficiary of that would be

20   the debtor before Your Honor.

21           THE COURT:  Well, I understand that certainly one

22   of the beneficiaries will be LBHI, but I don't know if you

23   know the answer to this question, do you know whether or not

24   the clients that you represent in the UK have, in effect,

25   been guided by the same value maximizing principles that are

Page 109

1    embedded in the plan?

2            MR. WANDER:  Your Honor, I did refer to in our

3    papers the pertinent provisions of the English Insolvency

4    Act of 1986.  And I believe, Your Honor, that again the

5    standards that they are governed by and any challenge to it,

6    and if anyone who has standing in the English courts

7    believes there is something untoward about this transaction,

8    they can move in the English high court for relief.  And any

9    aggrieved party can do that.

10           I believe -- I don't know the specific answer to

11   Your Honor's question, vis a vis the standards of the plan,

12   but I do believe under the English law, that the

13   administrators have their fiduciary duties to their estate,

14   and that there is a certain similarity in interest between

15   what's happening with respect to the LBHI2 estate and what

16   would hopefully eventually result in this case.

17           THE COURT:  Okay.  Thank you.  I've read your

18   papers, so I'm familiar with your position.  Is there more

19   you wish to add?

20           MR. WANDER:  No, that's all, Your Honor.

21           THE COURT:  All right.  Thank you.  Is there

22   anyone else who wishes to be heard?

23           MR. BANE:  I'd like to respond to a couple of

24   points if there's no one else on the objector's side.

25           THE COURT:  Okay.  You can fill the void.

Page 110

1           MR. BANE:  Very, very briefly, Your Honor, and I'm

2      sorry to elongate the session.  First, I'd like to address

3      two red herrings that were just thrown out on behalf -- by

4      counsel to LBHI2.  Number one is, the concept -- and the

5      LBHI objection also raised it, that this is too complex for

6      an auction, this doesn't lend itself to putting people in a

7      room and I bid this, and I bid that.

8           Your Honor, there are other ways of testing the

9      market other than an auction.  And it's true, it may be

10     complex, we don't know, because we don't know its

11     provisions.  But as Your Honor yourself noted in your

12     questions to me, there could very well be a better deal, and

13     not only a better deal, but an incredibly better deal, which

14     is the only reason we're making a fuss about it, because we

15     think there's an incredibly better deal that the market

16     would justify.

17          Number two is, the issue of whether this hearing

18     belongs in the UK or in the United States, the motions are

19     only related to LBHI.  If LBHI was not important to this

20     transaction, it should not have been a signatory to the

21     transaction.

22          The press release and everything else in front of

23     the Court indicates that LBHI is critical to the

24     transaction.  And they're critical to the transaction means

25     that LBHI holds a power to determine whether this

Page 111

1    transaction should go forward or not.  If they're not

2    critical, then they could walk away from it.

3           But we believe based on the information being

4    given that they are critical, and therefore, they are making

5    a decision whether this transaction is in the best interests

6    of their creditors, as reflected by their agreement to sign,

7    and that belongs in front of Your Honor.

8           I'd like to go now to Mr. Miller's argument, and

9    I'd like to point out that Your Honor's questions to him are

10   incredibly telling.  Number one, who asked for the

11   confidentiality provisions, and the answer was, I don't

12   know.

13          Number two, why was the confidentiality so

14   important, I don't know.  Those go to the heart of my point.

15   Unless Your Honor knows that there is a suffering by the

16   estate, rather than for the benefit of the purchasers, why

17   would Your Honor not lift that confidentiality?  Because all

18   Your Honor cares about is the benefit to the estates.

19          Therefore, there are two questions that need to be

20   asked, and Your Honor, frankly it would not bother me if

21   they were asked in chambers without the movants there,

22   number one is, can King Street and Elliot walk out of the

23   transaction if the motions are granted today.  Do they have

24   a right to say, we want to terminate if the motion is

25   granted.  That would certainly be an argument that the

Page 112

1    debtors could make to say that we would be hurt as an

2    estate, and we haven't heard that.  Maybe it exists, but

3    Your Honor certainly needs to know that.

4              Number two is, in LBHI's view, if they would get

5    an offer today that would clearly be more valuable to the

6    LBHI estate by a significant amount, do they believe that

7    they have a duty and a right to take that better offer.

8              Now, if the answer to these two questions are,

9    number one, that Elliot and King Street cannot walk away,

10   and number two is if they got a better offer they would take

11   it, because that's their fiduciary duty, then I can't see

12   how Your Honor would not want to grant our motion and allow

13   us to create that opportunity.  Thank you.

14             THE COURT:  Okay.  Thank you.

15             It's 1 o'clock in the afternoon.  Has everybody

16   spoken who wishes to speak?

17             UNIDENTIFIED:  Yes, sir.

18             THE COURT:  Okay.  I'm curiously reminded of

19   proceedings that took place in this courtroom at the end of

20   Lehman week when I was asked on very short notice to approve

21   the sale to Barclays Capital.  Now, this is not the same

22   situation, but it is the same courtroom.  And I was sitting

23   in the same spot.

24             And parties in interest at the very beginning of

25   this historic case stood up to say, in one form or another,

Page 113

1    we don't know enough about this transaction, we need more

2    information, we need more time to test the value

3    proposition.  Those of you who were here that evening recall

4    all that.

5           And the circumstances were different because we

6    were dealing with a once in a lifetime emergency.  This is a

7    different set of circumstances, but I'll tell you in a

8    moment why I'm reminded of that evening.

9           I have a group of well represented, well

10   positioned, I believe well intentioned investors in the

11   capital structure of reorganized Lehman, who are, as far as

12   I can tell, genuinely troubled by the fact that the

13   transaction in question is opaque.

14          Moreover, they are troubled by the fact that they

15   know based upon what's in their own wallets, that notional

16   values might be increased if the confidentiality

17   restrictions that have been imposed on this transaction

18   could be lifted.

19          And so looking for a means to an end, namely

20   access to the information that is being withheld in

21   reference to Elliot and King Street and LBHI2, they come

22   before the Court, and they seek information by invoking the

23   tried and true discovery remedy of 2004 discovery.

24          It really doesn't apply in this situation.

25   Although I think the parties who have moved for that

1    discovery have done so with legitimate desire to obtain

2    relevant information for two purposes.  First, to evaluate

3    whether the transaction in question is, in fact, a volume

4    maximizing transaction.  And second, to consider whether or

5    not an alternative and more favorable transaction might be

6    structured that would be truly value maximizing, because it

7    would involve more consideration to the LBHI estate.

8            From the argument and from the papers, I

9    understand that to be the principal motivation that underlie

10   the various motions.  Balanced against that, is the argument

11   made by the estate that it would be intrusive and

12   inappropriate, and an abuse of process for these well

13   positioned influential and important creditor constituencies

14   to use Rule 2004 discovery, to interfere with the decision-

15   making process of the plan administrator, and to use that

16   discovery for any purpose.  Because it would be a dangerous

17   precedent to set, certainly one that could lead to further

18   instances of large and influential creditors seeking to

19   obtain information and perhaps also to interfere in the

20   decision-making process of the plan administrator.

21           As a result, I understand this to be a principled

22   dispute that involves more than just the transaction before

23   the Court today.

24           It raises the question as to whether it is truly

25   appropriate in a case such as this one, a truly one of a

Page 115

1    kind bankruptcy case, for creditors to have the ability to

2    use Rule 2004 to probe transactions before they have closed.

3              In effect, what these creditors seek is the

4    ability before it is too late, to interdict a pending

5    transaction and to propose alternatives that may be more

6    favorable to the LBHI estate.

7              On the one hand, that's a good thing.  On the

8    other hand, that's a bad thing.  Here's why it's a bad

9    things.

10             The plan has been structured in a manner that

11   delegates authority to a professional and experienced board

12   of directors.  That board, consistent with class corporate

13   governance principles, has since the effective date made

14   business decisions consistent with the prescriptions in the

15   plan that transactions be value maximizing.

16             There has been no showing that the transaction in

17   question is anything other than value maximizing.  Instead,

18   we have references to confidentiality, red flags, and the

19   fact that certain self-interested members of the group

20   seeking discovery have themselves indicated an interest in

21   paying more.

22             But because we don't know what's inside the

23   transaction structure, it is impossible to know whether

24   outsiders can actually pay more.  It is impossible to know

25   whether or not this is truly a situation in which

Page 116

1    competitive bidding makes any sense at all.

2            Additionally, we are dealing with proceedings in

3    London that involve two separate estates in administration,

4    the estate of LBI2 and the estate of LBIE.  I don't know,

5    and I'm not in a position to judge the standards that are

6    being applied by the administrators of the estate of LBI2.

7    And I do not accept Mr. Wander's representation as to the

8    English Insolvency Law of 1986, as being the functional

9    equivalent of a carefully negotiated plan provision that

10   calls for value maximizing transactions.

11           But I do know from my experience, that

12   administrators of UK insolvency cases tend to be very

13   jealous of their prerogatives, and also tend to be very

14   careful not to do anything that might give rise to potential

15   liability.

16           In part for that reason, but certainly not based

17   on that, I have no factual basis on which to make an

18   adjudication one way or the other, that there is anything

19   about this transaction that is truly suspect.  No facts have

20   been presented, only suspicions.

21           For that reason, and also because I don't know

22   what the consequence truly will be in breaching the

23   confidentiality that currently cloaks the existing

24   transaction, I am not prepared to grant the 2004 requests

25   that are pending.

1           I believe that the parties are not without remedy,

2      however.  This transaction, which has been outlined in a

3      press release, the details of which I know virtually nothing

4      about either will close or it won't.  The conditions to the

5      transaction, whatever they may be, will either be fulfilled,

6      or they won't.

7           This is one albeit significant transaction in the

8      portfolio of significant transactions that make up the

9      history of this bankruptcy case.  I am not prepared today to

10     create a precedent that I think is unwise.

11          Creditors will have their remedy if, as and when

12     the transaction closes, assuming they are able to establish

13     that there has been any material deviation from the plan

14     standard, that the transaction be value maximizing.

15          I believe on reflection that it is a much better

16     structure for the company to be managed by its board, for

17     transactions to be entered into consistent with traditional

18     notions of corporate governance as modified by plan

19     provisions, and for the parties in interest who may later

20     question whether or not those standards have been met, to

21     exercise such remedies as are available to them.

22          The alternative is for parties in interest to

23     being engaged in what I have earlier described as prior

24     restraint, an effort through discovery and colloquy to

25     influence the decisions of the board.  In my judgment, that

Page 118

1    is entirely inappropriate.

2           For the reasons stated, the motions are denied.

3    Now, I'll tell you why I think this is very much like what

4    happened on the night of September 19.

5           As today, parties argued we don't know enough.  It

6    is not my job to know everything, because I can't.  It is my

7    job to exercise discretion based upon what's presented, and

8    to try to apply a Hippocratic oath kind of structure upon

9    what we do here, first do no harm.

10           Because in the case of the Barclays transaction,

11    there was no other transaction, it would have caused harm to

12    delay that transaction.  Here, to open up discovery causes

13    potential harm both to the existing transaction and to the

14    governing structures that are in place in this very

15    successful bankruptcy case.

16           I choose to do no harm.  And for that reason, have

17    exercised discretion in the manner just described.

18           Now, I have another matter from the morning

19    calendar.  I'm going to suggest that we take a ten minute

20    break, and I will see everybody from the first matter at

21    1:30 to discuss what happens next.

22       (Recessed at 1:17 p.m.; reconvened at 1:30 p.m.)

23           THE COURT:  Be seated, please.

24           Let me tell you what I've concluded.  Today has

25    been a somewhat longer than anticipated day for me, and as

Page 119

1    some of you know, I have an important chambers conference

2    this afternoon at 3 o'clock, that will require some

3    preparation.

4              I have determined that it makes the most sense for

5    this motion to reclassify the claim to be adjourned to the

6    November hearing date.  The November hearing date on claims

7    is currently scheduled to be November 21, but that date

8    needs to change.  And it will be November 22.

9              In deciding that I have the authority both to deny

10   a motion to stay, and also to control my docket, I am

11   hopeful that the parties might be able to use the time

12   between now and the next hearing to explore what might have

13   been explored in the mediation described by Mr. Canning,

14   that was to have taken place in November coincidentally.

15             That doesn't mean that I'm directing that the

16   parties go to mediation, they can do that if they wish, or

17   they can talk on their own if they wish, or you can choose

18   to be respectful to one another, but not talk, it's entirely

19   up to you.  And I hope you do talk.

20             MR. PEREZ:  Thank you, Your Honor.  I'm sure we'll

21   talk.

22             THE COURT:  Okay.  So I'll see you next on the

23   22nd of November, assuming that works for the parties.

24             MR. PEREZ:  It works for us, Your Honor.

25             MR. CANNING:  Yes, that's fine, Your Honor.

1              MR. PEREZ:  Thank you.

2              THE COURT:  Okay.  Thank you.  And some of you I

3    think I will see at 3 o'clock.

4    (Proceedings concluded at 1:32 PM)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           I N D E X

2

3                         R U L I N G S

4       IDENTIFICATION                                PAGE

5       Plan Administrator's Omnibus Objection to      9

6       Claims Filed by Deborah E. Focht (ECF No.

7       34303)

8

9       Motion of the Federal Housing Finance Agency   48

10      and the Federal Home Loan Mortgage Corporation

11      to stay Lehman Brothers Holdings, Inc.'s Motion

12      to Classify and Allow the Claim Filed by the

13      Federal Home Loan Mortgage Corporation

14      (Claim No. 33568) in LBHI Class 3 (ECF No.

15      40570)

16

17      Motion of CarVal Investors, LLC for Leave to    112

18      Examine LBHI (ECF Nos. 40469)

19

20      Motion of Davidson Kempner Capital Management   112

21      LLC, as Investment Advisor for Leave to Examine

22      LBHI (ECF No. 40532)

23

24

25

Page 122

1              C E R T I F I C A T I O N

2

3

       I, Sheila G. Orms, certify that the foregoing is a

4    correct transcript from the official electronic sound

5    recording of the proceedings in the above-entitled matter.

6

7    Dated:  October 26, 2013

8
     Sheila Orms    Digitally signed by Sheila Orms
                    DN: cn=Sheila Orms, o, ou,
9                   email=digital1@veritext.com, c=US
                    Date: 2013.10.29 17:26:15 -04'00'

10   Signature of Approved Transcriber

11

     Veritext

12

     200 Old Country Road

13

     Suite 580

14

     Mineola, NY 11501

15

16

17

18

19

20

21

22

23

24

25