```
                                                        Page 1

 1    UNITED STATES BANKRUPTCY COURT

 2    SOUTHERN DISTRICT OF NEW YORK

 3    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

 4    In re:

 5                                     08-13555(JMP)

 6    LEHMAN BROTHERS HOLDINGS INC.,     (Jointly Administered)

 7    et al.,

 8               Debtors.

 9    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

10    In re:

11                                     08-01420(JMP)(SIPA)

12    LEHMAN BROTHERS INC.,

13               Debtor.

14    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

15    In re:

16                                     09-10583(JMP)

17    LEHMAN BROTHERS FINANCE AG,

18    IN LIQUIDATION,

19               Debtor.

20    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

21    EL VEASTA LAMPLEY,

22               Plaintiff,

23          v.                         Adv. Case No.

24    LEHMAN BROTHERS HOLDINGS          13-01354(JMP)

25    INC., et al.,
```

Page 2

1              Defendants.

2      - - - - - - - - - - - - - - - - - - - - - - - - - - x

3                  U.S. Bankruptcy Court

4                  One Bowling Green

5                  New York, New York

6

7                  November 20, 2013

8                  10:01 AM

9

10    B E F O R E :

11    HON JAMES M. PECK

12    U.S. BANKRUPTCY JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1    Hearing re:  Motion for an Order Pursuant to Section 105(a)

2    of the Bankruptcy Code and Bankruptcy Rule 9019, Authorizing

3    and Approving Certain Settlements Related to Variable

4    Prepaid Forward Contracts [ECF No. 56]

5

6    Hearing re:  Motion to Dismiss Adversary 13-01354

7

8    Hearing re:  Motion Pursuant to Rule 9019 of the Federal

9    Rules of Bankruptcy Procedure and Section 105(a) of the

10   Bankruptcy Code for Approval of (I) Partial Settlement

11   Agreements Relating to Certain Credit Default Swap

12   Agreements and Indentures and (II) Amendment to Partial

13   Settlement Agreement Relating to Pebble Creek LCDO 2007-3

14   Credit Default Swap Agreement and Indenture [ECF No. 40573]

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Dawn South

Page 4

1    A P P E A R A N C E S :

2    WEIL, GOTSHAL & MANGES LLP

3         Attorneys for the Debtors

4         767 Fifth Avenue

5         New York, NY 10153-0119

6

7    BY: JACQUELINE MARCUS, ESQ.

8         ZAW WIN, ESQ.

9         CANDACE ARTHUR, ESQ.

10

11   GIBSON, DUNN & CRUTCHER LLP

12        Attorney for the Debtors

13        200 Park Avenue

14        New York, NY 10166-0193

15

16   BY:  ROBERT KRAKOW, ESQ.

17

18   DICONZA TRAURIG LLP

19        Attorney for BAC Florida Bank

20        630 Third Avenue, 7th Floor

21        New York, NY 10017

22

23   BY:  ALLEN G. KADISH, ESQ.

24

25

Page 5

1    CHAPMAN AND CUTLER LLP

2         Attorney for U.S. Bank National Association, as Trustee

3         111 West Monroe Street

4         Chicago, IL 60603-4080

5

6    BY:  FRANKLIN H. TOP III, ESQ.

7

8    CLEARY GOTTLIEB STEEN & HAMILTON LLP

9         Attorney for GenRe Partners, L.P.

10        One Liberty Plaza

11        New York, NY 10006-1470

12

13   BY:  LUKE A. BAREFOOT, ESQ.

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2          THE COURT:  Be seated.  Good morning.

3          MS. MARCUS:  Good morning, Your Honor, Jacqueline

4    Marcus from Weil, Gotshal & Manges on behalf of Lehman

5    Brothers Holdings, Inc. and its affiliates.

6          The first matter on the docket, Your Honor, is in

7    relation to In re: Lehman Brothers Finance, and that's going

8    to be handled by Robert Krakow of Gibson, Dunn.

9          THE COURT:  Okay.  Thank you.

10          MR. KRAKOW:  Good morning, Your Honor.

11          THE COURT:  Good morning.

12          MR. KRAKOW:  Robert Krakow of Gibson, Dunn &

13    Crutcher for LBF in its Chapter 15 proceeding, and I am here

14    this morning to present LBF's 9019 motion to approve

15    settlement agreements it has entered into with three limited

16    partnerships, all of whom are affiliated with the Bass

17    family in Fort Worth, Texas.

18          The motion was timely noticed for hearing today

19    and for objections have been filed.

20          The background to this motion is as follows.

21          LBF entered into variable prepaid forward

22    contracts with each of the partnerships.  Four contracted

23    with GenRe Partners, one contract each with NRC Partners and

24    BRK Investors.

25          The contracts were all entered into in the 2006 to

Page 7

1    2008 time frame, and under each of the contracts LBF made an

2    upfront payment to the partnership, and the partnership

3    agreed that at some specified future maturity date it would

4    settle the contract either by way of a cash settlement

5    payment or by delivering Berkshire Hathaway Class A shares

6    in amounts to be calculated pursuant to the agreements.

7             In each contract the partnerships secured its

8    obligations to LBF by pledging Berkshire Hathaway Class A

9    shares.  NRC pledged 116 shares, BRK 363, and GenRe under

10   the four contracts pledged a total of 1988 shares.

11            LBF perfected its security interest in the shares

12   by depositing them with Libby in the cases of NRC and BRK

13   and with LBI in the case of GenRe.

14            For most, but not all of the contracts, LBF posted

15   cash collateral to secure its own obligations under the

16   agreements.

17            The maturity dates for the contracts range from

18   2009 until 2011, but one of the contracts, the BRK contract,

19   had an automatic early termination date that was triggered

20   by Lehman's bankruptcy filing in September 2008.

21            For each of the six contracts the partnerships

22   elected the cash settlement route, which in turn required

23   LBF to return to Berkshire Hathaway shares that it held as

24   collateral, but this became problematic for two different

25   reasons.

1            For NRC and BRK it was learned post bankruptcy

2    that Libby at some point in time had rehypothecated the

3    shares and they were thus lost to LBF.

4            In the case of LBI we learned in roughly early

5    2011 that the LBI trustee had the shares, but he was taking

6    the position that there was no obligation to return the

7    shares to LBF because a customer property claim had not been

8    timely filed.

9            Thus as to all six of the contracts LBF was not in

10   a position to return the shares.

11           We began meetings with counsel for the

12   partnerships in 2011.  They informed us that they believed

13   they had two types of claims against LBF.  One was a

14   straight direct claim for the failure to return the shares,

15   which they said should be calculated by taking the

16   difference between the cash settlement values for each

17   contract and the current market value of those shares.

18           They also said they would have a claim for

19   consequential damages for tax liabilities likely to result

20   from the failure to return the shares, because if the shares

21   were not returned the IRS was likely to treat the original

22   contracts as sales contracts for the shares.

23           LBF conceded that it was liable for failing to

24   return the shares, we had a debate as to at what point in

25   time one should measure the market value to calculate those

Page 9

1    damages, and we disputed whether or not LBF could be liable

2    for the consequential damages, the tax liabilities that

3    would ensue.

4           But we put those differences aside and began

5    negotiating a settlement structure that was designed to

6    limit the tax liabilities of the partnerships and thus limit

7    the potential exposure that LBF would have for those claims.

8           And the basic idea was to take -- that each of the

9    partnerships would pay into escrow the cash settlement

10   amounts that were due under the contracts.  LBF would match

11   those cash deposits in its own escrow accounts, and any cash

12   collateral that had been posted by LBF would also go into

13   the LBF escrow.  The escrow agent would then take the LBF

14   cash deposits, plus the escrow amounts, buy as many

15   replacement shares of Berkshire Hathaway as possible,

16   deliver them to the partnerships, and then the cash

17   settlement amounts would be delivered back to LBF to

18   reimburse it for the cash outlays.

19          Under this approach the partnerships would receive

20   most, but not all of the shares, and thus substantially

21   reduce the tax liability.

22          While those negotiations were ongoing we, on

23   behalf of LBF, were engaged in settlement negotiations with

24   LBI on a whole array of issues, one of which was the return

25   of the 1988 shares.

Page 10

1           And in October of last year we reached an

2    agreement that was approved by this Court in November of

3    last year that the LBI trustee would return 65 percent of

4    those shares or 1292 shares total, and we agreed at that

5    time, in an order that you entered, that we would hold those

6    shares in a segregated account pending a resolution of our

7    differences with GenRe or some other order of the Court.

8           Within the past 90 days the 1292 shares have been

9    returned by the LBI trustee to LBF which has since then held

10   those shares in a segregated account.  And that has paved

11   the way for the settlement that we now present to you.

12          The basic outlines of the settlement are similar

13   to the structure that I told you about before.  In each

14   settlement both the relevant partnership and LBF are going

15   to establish escrow accounts with Bank of America.  For the

16   BRK and NRC settlements those partnerships will pay into

17   escrow the cash settlement amounts owed under the contracts.

18   For BRK it's 39.3 million, for NRC 11.9 million.  LBF will

19   pay corresponding amounts into each of its escrow accounts.

20   And in the case of BRK 4.7 million of LBF cash collateral

21   will also be deposited in the LBF escrow account.

22          Bank of America, as escrow agent, will, acting

23   through it affiliate, Merrill Lynch, will use the funds in

24   the LBF escrow accounts to purchase as many Berkshire

25   Hathaway shares as possible and will then deliver them to

Page 11

1   the partnerships and deliver to LBF the cash in the NRC and

2   BRK escrow accounts.

3            Because the number of replacement shares delivered

4   will be less than the number LBF is obligated to deliver

5   under the contracts LBF has agreed to grant allowed

6   unsecured claims in its Swiss bankruptcy proceedings of

7   $3 million U.S. to NRC and 6.2 million U.S. to BRK to be

8   calculated pursuant to a conversion to Swiss francs.

9            All other claims held by the parties against each

10  other will be released.

11           For the four GenRe contracts the structure is

12  somewhat different due to the fact that we have recovered

13  the 1292 shares.

14           Under the GenRe settlement the deposits will work

15  as follows.

16           GenRe will pay into its escrow accounts the

17  approximately $207 million of cash settlement payments under

18  the contracts.  LBF will deposit into its escrow account

19  approximately $72 million, plus the 1292 shares.  The

20  parties will also cause approximately 26.5 million of cash

21  collateral to be paid into the LBF escrow account.

22           The 72 million, plus half of the cash collateral,

23  will be used by the escrow agent to acquire as many

24  replacement shares of Berkshire Hathaway as possible.  Those

25  replacement shares, plus the 1292 shares, will be delivered

Page 12

1    to GenRe.

2              The balance of the cash collateral, the other

3    13 million plus, plus the 207 million in the GenRe escrow

4    account, will be delivered to LBF.

5              When all is said and done GenRe will recover most,

6    but not all, of the 1988 shares, and LBF will net

7    $147.5 million for its creditors.

8              GenRe will have no claim in LBF Swiss proceedings

9    and the parties will release all other claims they may have

10   against each other.

11             Your Honor, these settlements are the product of

12   extensive arms length negotiations between knowledgeable and

13   sophisticated parties and reflect good faith compromises of

14   the issues in dispute.

15             As detailed in pages 8 through 14 of the 9019

16   motion we believe these settlements reflect a fair and

17   reasonable resolution and that the results are as good or

18   better that LBF could reasonably expect to obtain through

19   litigation.

20             We believe these settlements are a true win/win,

21   because by helping the partnerships reduce their tax

22   liability we've at the same time been able to reduce LBF's

23   potential exposure for that liability and would bring

24   substantial additional value now into the LBF estate for the

25   benefit of its creditors.

Page 13

1          There are several conditions precedent to the

2    effectiveness of these agreements.

3          The first obviously is a final and non-appealable

4    order from this Court approving the 9019 motion.

5          The second is agreed upon escrow agreements.  And

6    we actually now have those.  They're not signed yet, but

7    they are fully negotiated and ready for execution not only

8    between LBF and the partnerships but also Bank of America

9    and Merrill Lynch.

10          And we require the approval of LBF's creditors'

11   committee.  The settlements have been presented to them and

12   I expect we will have those approvals by the end of this

13   week.

14          For NRC and BRK only there are two additional

15   conditions because of the claims that they are being allowed

16   in Switzerland.

17          There needs to be a publication of the settlement

18   plan in Switzerland and either no objections filed to what's

19   known as the realization plan or a final order overruling

20   any such objections, and there needs to be an offer of

21   assignment of LBF's rights with respect to these agreements.

22          And it's necessary that within some specified time

23   no creditor accepts that offer of assignment, which would

24   require a substantial payment into the LBF estate to

25   effectuate.

1          So assuming those two things -- two hurdles are

2     cleared then the NRC and BRK agreements can go final.

3          So approving -- assuming approval by this Court we

4     think the GenRe settlement can go effective in early

5     December, but the NRC and BRK settlements will take a little

6     bit longer.

7          Again, there are no objections to the motion and

8     I'm happy to answer any questions the Court has, but

9     otherwise we would respectfully request that the Court grant

10    the 9019 motion.

11         THE COURT:  That was very well presented

12    considering the complexity of this.  And someone appears

13    ready to say something or I don't know if it's to me or to

14    you that that person has risen to say something.

15         MR. BAREFOOT:  Your Honor, just one point of

16    classification on the record, that's all.

17         THE COURT:  Before you identify yourself for the

18    record as to who you represent and who you are and give that

19    point of clarification I just have a question.

20         MR. KRAKOW:  Sure.

21         THE COURT:  It seems to me that this is a

22    substantially tax driven set of structures in consequence of

23    alleged tax liability associated with the failure to deliver

24    the Berkshire Hathaway shares.  Has that tax liability been

25    quantified in terms of what it might be if there were no

Page 15

1    settlement, and to what extent is that tax liability

2    contested by LBF, and to what extent does the allowed claims

3    for BRK and NRU (sic) reflect a recognition of that tax

4    liability?

5             MR. KRAKOW:  Yes, Your Honor.

6             The -- the partnerships have told us what they

7    believe the tax liability is, and we have had our tax people

8    look at it, and it appears to be in the range of what they

9    are talking about.

10             And for NRC and BRK, and we detail some of this in

11   the motion, we have -- the basic question with respect to

12   the tax liability is whether a Swiss court applying U.S. law

13   would find that LBF could be liable for consequential

14   damages, and that's a question that a New York court would

15   have a fair amount of discretion in deciding in terms of the

16   reasonable probability that this tax liability would have

17   resulted and the awareness of that at the time of the

18   contract, how a Swiss court would evaluate, how a U.S. court

19   was going to rule is a little difficult to assess.

20             We have for purposes of our analysis assumed a 50

21   percent likelihood that LBF would be liable in the amounts

22   of tax liability that the partnerships say they would be

23   facing, and we factored that in in coming up with the

24   settlement amounts that have been agreed to for the claim

25   amounts with BRK and NRC.

1            THE COURT:  Okay.  Thank you.  And I won't press

2      you for the quantum of the alleged tax liability, you've

3      given me enough.  Thank you.

4            MR. KRAKOW:  And that is in the 9019 motion.

5            THE COURT:  Okay.

6            MR. KRAKOW:  Thank you, Your Honor.

7            MR. BAREFOOT:  Good morning, Your Honor, Luke

8      Barefoot from Cleary Gottlieb for the GenRe Partners and the

9      other Bass affiliates who are counterparty to the

10     settlement.

11           Just very briefly one note of clarification in

12     relation to Mr. Krakow's presentation on the consequential

13     damages font of liability that if this were not settled the

14     Bass family entities would have asserted.

15           I believe he mentioned that the -- that it was the

16     Bass family's position that the IRS would potentially take

17     the position that the original contract of -- the prepaid

18     forward contracts would have represented contracts of sale

19     of the shares.

20           It's not our position that the original contract

21     would have represented a sale of the securities at the time

22     of entry into the contract, but rather that if subsequently

23     it became clear that LBF was not going to perform its

24     obligations to redeliver the shares that only at that point

25     and in that taxable year would there be a disposition of the

Page 17

1    shares that would potentially trigger tax liability.

2              THE COURT:  Okay.

3              MR. BAREFOOT:  Thank you, Your Honor.

4              THE COURT:  It's approved.

5              MR. KRAKOW:  Thank you, Your Honor.

6              THE COURT:  I have one question though before you

7    all depart unrelated to this, and it may be that this is the

8    wrong time and place to ask the question, but because LBF is

9    present through counsel and I'm interested in what's going

10   on this may be an invitation for a chamber's conference at

11   some point between now and the end of the year in reference

12   to the status of the settlement which has been objected to

13   by the Tschira entities.

14              I have had some litigation here involving those

15   entities both with respect to certain claim issues and

16   certain affirmative litigation issues that are being handled

17   by Jones Day.

18              It is a black box to me however as to what is

19   going on in Switzerland, and parties in litigation with

20   Tschira have requested a pretrial conference regarding

21   discovery and scheduling.  That will happen some time in the

22   near term.  But that's in my view the tip of the iceberg

23   from my perspective is to what, if anything, the going on

24   more fundamentally to try to reconcile what seems to be a

25   broader-based business dispute that impacts the

Page 18

1      effectiveness of the settlement previously approved.

2              So question one is, are you in a position to tell

3      me what's going on in Switzerland with that settlement

4      and/or any objections to the settlement lodged by the

5      Tschira entities?  And if not are you at least in a position

6      to talk to the right people so that we can set up a

7      chamber's conference and I can gain greater visibility as to

8      what's really happening?

9              MR. ROSENTHAL:  Your Honor, may I answer that?

10     Michael Rosenthal, from Gibson --

11             THE COURT:  Yes.

12             MR. ROSENTHAL:  Your Honor, we -- I can give you a

13     very quick summary, but I do think that we should talk to

14     our client in Switzerland, and it probably would be better

15     handled in a chamber's conference.

16             But what is now available is that the Tschira

17     entities did file an objection in Switzerland to the LBF,

18     LBHI settlement.  The Swiss Financial Markets Association,

19     FINMA (ph), has recently issued an order denying all of the

20     aspects of the objection, and there -- that came out

21     Thursday -- Wednesday or Thursday of last week I believe,

22     and there is now a 30-day appeal period on that.

23             THE COURT:  Okay.

24             MR. ROSENTHAL:  So that's what I can tell the

25     Court.

Page 19

```
 1              THE COURT:  Okay.  That's very helpful.  Thank
 2    you.
 3              MR. ROSENTHAL:  And if the Court -- should we
 4    contact chambers about setting up a chamber's conference if
 5    that's --
 6              THE COURT:  Yes.  And so my thinking on this can
 7    be clearly expressed to others involved.  I am really
 8    interested in discussing not only the short-term discovery
 9    and case management issues in the litigation in which you
10    are not directly involved but also the prospects of some
11    mediated resolution of all issues as between the Tschira
12    entities and Lehman affiliates of all sorts, including LBF,
13    with the goal toward promoting global peace.
14              MR. ROSENTHAL:  We will communicate that, Your
15    Honor.
16              THE COURT:  Okay.
17              MR. ROSENTHAL:  Thank you very much.
18              THE COURT:  Thank you.
19              MR. KRAKOW:  Your Honor, I have a copy of the
20    order on our motion, it was attached to the motion, but I'm
21    happy to present another copy if you'd like.
22              THE COURT:  If it's on a piece of paper it's going
23    to do me no good.
24              MR. KRAKOW:  Okay.
25              THE COURT:  I need it electronically.
```

1             MR. KRAKOW:  Okay.

2             THE COURT:  So --

3             MR. KRAKOW:  We'll take care of that.

4             THE COURT:  So you're welcome to hand it to one of

5     my law clerks, but we'll -- we'll probably shred it.

6         (Laughter)

7             MR. KRAKOW:  I'll save them the probably.

8             THE COURT:  Okay.  Thank you.

9             MR. KRAKOW:  Thank you, Your Honor.  May we be

10    excused?

11            THE COURT:  You may be excused.

12            MR. KRAKOW:  Thank you.

13            UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

14            MR. WIN:  Good morning, Your Honor.

15            THE COURT:  Good morning.

16            MR. WIN:  Zaw Win, Weil, Gotshal & Manges for

17    Lehman Brothers Holdings, Inc.

18            The next matter on the agenda is in adversary

19    proceeding 13-01354, which is El Veasta Lampley versus LBHI.

20            This matter was commenced on May 23rd of this

21    year, and on July 8th the debtors filed -- or excuse me --

22    Lehman Brothers Holdings, Inc. filed a motion to dismiss.

23            There were two status conferences held in this

24    adversary proceeding both involving scheduling of the

25    hearing of the debtors' motion to dismiss.  And on

Page 21

1    October 15th this Court entered an order establishing a

2    briefing schedule.  Pursuant to that order Ms. Lampley's

3    response deadline was November 5th and she did not file

4    anything nor did she serve anything on the debtors in

5    response to the debtors' motion to dismiss.

6         So at this point she has not responded to the

7    motion to dismiss and the debtors would request that the

8    Court enter that motion and dismiss the adversary

9    proceeding.

10        THE COURT:  Just a question about any contact that

11   you may have had or that others in your office may have had

12   with Ms. Lampley.

13        Between the time of our last hearing when we set

14   the schedule and today has anyone been in contact with the

15   plaintiff or has the plaintiff been in contact with anyone

16   at Weil, Gotshal or at Lehman Brothers Holdings?

17        MR. WIN:  Your Honor, I sent the plaintiff several

18   emails.  I forwarded her the order, I reached out to her at

19   the beginning of this week to inquire whether or not she was

20   going to appeal at this hearing.  I emailed her again

21   yesterday a copy of the agenda for today's hearing with

22   another request to let us know if she was planning to

23   appear, and I haven't gotten any responses from her.

24        THE COURT:  I take it those emails did not bounce

25   back, they apparently were delivered as far as you can tell?

1           MR. WIN:  As far as I can tell.  And I have

2    communicated with her at that email address previously and

3    received responses.  That would have been over the summer.

4           THE COURT:  All right.

5           MR. WIN:  Or in September maybe.

6           THE COURT:  The adversary proceeding number

7    13-01354 brought my Ms. Lampley against Lehman Brothers

8    Holdings, Inc. is dismissed.

9           MR. WIN:  Thank you, Your Honor.

10          The next matter on the agenda will be handled by

11    my colleague, Jackie Marcus.

12          MS. MARCUS:  Good morning again, Your Honor.

13    Jacqueline Marcus from Weil, Gotshal & Manges.

14          The last matter on the agenda for today, docket

15    number 40573, is the motion pursuant to Rule 9019 and

16    Section 105 of the Bankruptcy Code for approval of partial

17    settlement agreements relating to two credits default swaps

18    and indentures and an amount to a partial settlement

19    agreement that was previously approved.

20          We have filed the declaration of Larry – Lawrence

21    Brandman in support of the motion at ECF number 41174,

22    Mr. Brandman is present in court this morning.

23          In addition U.S. Bank, the trustee under Rule 3

24    deals has filled affidavits, ECF numbers 41095 and 41124

25    regarding the notice provided to noteholders in all these

Page 23

1    transactions.

2            We have received three objections to the proposed

3    motion.  I've been authorized to advise the Court that one

4    of the objectors, the Whaleback Foundation, has withdrawn

5    its objection to the amended settlement agreement regarding

6    the Pebble Creek transaction.  That means that all three

7    objections relate to the Exum Ridge 2007-2 settlement

8    agreement.

9            Two of the objecting parties, the Whaleback

10   Foundation and ESP Funding I have not objected to the

11   substance of the proposed relief but have elected to be

12   treated as objecting noteholders under the terms of the

13   settlement agreement.

14           The third objecting party, BAC Florida Bank, has a

15   more substantive objection.

16           As reflected on the docket the plan administrator

17   has adjourned the hearing with respect to Exum Ridge 2007-2,

18   to the next omnibus hearing which will be held on

19   December 18th.  We hope to have discussions with BAC Florida

20   Bank in the interim and hopefully resolve their objection.

21           THE COURT:  Do I understand that if that objection

22   of BAC Florida Bank can you resolved through conversations

23   between now and December 18 that that will then go forward

24   in a substantially uncontested mode because the other

25   objections are not to the merits of the settlement?

Page 24

1            MS. MARCUS:  That's -- that's correct.

2            THE COURT:  Okay.

3            MS. MARCUS:  The other -- the way we described it

4    the other objecting parties have opted out of the settlement

5    but have not objected to the Court entering the order.

6            THE COURT:  Right, understood.

7            MS. MARCUS:  I'd like to quote a very, very brief

8    summary of the relief requested in the motion with respect

9    to Exum Ridge 2006-1 and Pebble Creek.

10           The settlement agreement with respect to Exum

11   Ridge 2006-1 is similar to other settlements that have been

12   approved by the Court previously.

13           The agreement effectively provides for a

14   settlement of the flip clause dispute as to this

15   transaction.

16           The collateral held by the trustee will be

17   liquidated or redeemed and will be distributed as agreed by

18   the parties.

19           The outstanding fees and expenses of the trustee

20   will be paid.

21           The noteholder settlement amount, which is

22   confidential, will be paid to the holders of all notes who

23   have not objected to the proposed settlement.

24           In this case if any objectors had objected to the

25   proposed settlement then we would have placed funds in an

1   escrow account to secure payment of their claims.  However,

2   since no noteholders have objected there will be not be an

3   escrow account with respect to Exum Ridge 2006-1.

4          Certain additional funds will be set aside for

5   payment of additional fees and expenses of U.S. Bank, and

6   the balance of the funds on hand will be paid to LBSF.

7          Upon distribution of all the amounts in the escrow

8   amount and any remaining proofs of claim filed by the --

9   excuse me -- any remained proofs of claims filed by the

10  trustee or the issuer or the co-issuer will be withdrawn.

11         As no noteholders have objected to the Exum Ridge

12  2006-1 transaction and U.S. Bank has obtained the fairness

13  opinion contemplated by the settlement agreement, approval

14  of the Exum Ridge 2006-1 settlement agreement will result in

15  a resolution of all pending matters with respect to this

16  deal.

17         The amend Pebble Creek agreement amends a

18  settlement agreement that was previously approved by the

19  Court on April 23rd, 2013.

20         Under the initial agreement the trustee made

21  distributions to LBSF with respect to all notes that LBSF

22  had acquired and establish an escrow account with respect to

23  notes not held by LBSF.

24         The proposed amendment to the Pebble Creek

25  settlement agreement will allow LBSF to free up additional

Page 26

1   cash by effecting a settlement on behalf of all noteholders

2   who did not object and releasing any cash remaining in the

3   escrow account to LBSF.

4           In essence, as amended, the Pebble Creek

5   settlement agreement parrots the structure of the Exum Ridge

6   2006-1 settlement agreement and preserves the rights of

7   objecting noteholders to opt out.

8           However again in this case there are no objecting

9   noteholders with respect to Pebble Creek and approval of the

10  amended Pebble Creek settlement agreement will also effect a

11  complete resolution of this matter.

12          The plan administrator therefore requests that the

13  Court grant the motion as to Exum Ridge 2006-1 and Pebble

14  Creek 2007-3.

15          I have a black line copy of the proposed order,

16  Your Honor, because what we've done is we've carved out the

17  one adjourned settlement agreement from the ambit of the

18  order.

19          THE COURT:  Okay, I'll take a look at that.

20          MS. MARCUS:  If I may approach?

21          THE COURT:  Sure.  Thank you.

22          MS. MARCUS:  And for the Court's convenience what

23  we've done is we've redefined the term settlement agreement

24  so that the term settlement agreement as used in this order

25  applies only to the Exum Ridge 2006 agreement and the Pebble

Page 27

```
 1    Creek amended agreement, and we've also included language at

 2    the end of the order which makes it very clear that nothing

 3    in this order applies to the Exum Ridge 2007-2 settlement

 4    agreement.

 5              Mr. Kadish is in the courtroom, he has been

 6    provided this morning -- well actually last night -- with a

 7    copy of the black lined order.  I don't know if he has any

 8    comments.

 9              THE COURT:  Okay.  Any comments on this?

10              MR. KADISH:  Good morning, Your Honor.  Allen

11    Kadish, DiConza Traurig.

12              I wasn't going to appear, my purpose today was to

13    make sure that the Exum Ridge 2007-2 deal was carved out of

14    discussions or relief today.

15              We've seen a black line, it looks simple enough.

16    Counsel has represented, and I think the order is clear

17    enough that anything, Your Honor, that you do today with

18    respect to the uncontested settlements has nothing to do

19    with 2007-2, which is contested, and we'll be back to see

20    you on December 18th.

21              THE COURT:  Okay.  That's clear.  Thank you.

22              Are there any other parties who wish to be heard?

23              MR. TOP:  Frank Top, Your Honor, from Chapman and

24    Cutler on behalf of U.S. Bank National Association.

25              I just wanted to confirm the fact that the
```

Page 28

1        Whaleback Foundation did indeed withdraw their

2    objection with respect to Pebble Creek 2007-3.

3            And so Your Honor is aware, you know, we do obtain

4    a fairness opinion with respect to each of these settlements

5    from a -- from a law professor just to make sure that the,

6    you know, confidential noteholder payments seem fair and

7    reasonable to this particular person.

8            THE COURT:  Is a law professor actually qualified

9    to give such opinions?

10           MR. TOP:  He's a business and bankruptcy expert.

11           THE COURT:  I'm not going to go there, I'm -- and

12    you can do whatever you think best to protect your -- your

13    client's interests, and --

14           MR. TOP:  In any event we also --

15           THE COURT:  -- that's fine.

16           MR. TOP:  -- just to make sure that these

17    settlements are fair and reasonable kicked the tires on

18    Lehman's calculation of the termination payment just to make

19    sure that -- not that it's exactly correct, but that it's

20    within a range such that these settlements work properly.

21           And with that I have nothing further to say.

22           THE COURT:  Okay.  I see that Mr. Brandman is

23    here.  Good morning.  I've read his declaration and I think

24    there's no reason for me to ask any questions of him.

25           This is a consensual arrangement which follows the

Page 29

1   format at least of an earlier settlement in Pebble Creek

2   where I asked for certain information to be provided off the

3   record to me.

4            I don't know to what extent it would be desirable

5   before finally approving this to clear the courtroom of

6   observers that should not be present when confidential

7   information is provided to the Court to simply give me some

8   added assurances with regard to the economic significance of

9   this settlement to the debtors in particular.

10           One of the aspects of this that is at least to me

11  a little opaque is the congruence of no purchases and

12  settlements with respect to the flip clause dispute that on

13  a blended basis no doubt produces a certainly realization to

14  the estate.

15           I think I understand generally what's going on,

16  but it would be helpful to me in a private session, not a

17  public session, to have certain questions answered.

18           But I'm certainly prepared to approve the

19  transaction today with respect to Exum Ridge 2006-1 and

20  amended Pebble Creek 2007-3 on a purely uncontested and

21  consensual basis.

22           MS. MARCUS:  Would you like to do that now, Your

23  Honor --

24           THE COURT:  Yes.

25           MS. MARCUS:  -- we're finished I think with the

1    agenda --

2            THE COURT:  Yes.

3            MS. MARCUS:  -- so we're fine with that.

4            THE COURT:  We can do it right now by just kicking

5    certain people out.

6            MS. MARCUS:  That's correct.

7            THE COURT:  And you'll tell me who should be

8    kicked out.

9        (Pause)

10           THE COURT:  It would have been more polite to say

11   by excusing certain people.

12       (Laughter)

13           MS. MARCUS:  So are we off the record?

14           THE COURT:  Let's go off the record now.

15       (Whereupon the designation of record was concluded at

16   10:36 AM)

17

18

19

20

21

22

23

24

25

1                          I N D E X

2

3                          RULINGS

4                                            Page      Line

5     Motion for an Order Pursuant to Section

6     105(a) of the Bankruptcy Code and Bankruptcy

7     Rule 9019, Authorizing and Approving Certain

8     Settlements Related to Variable Prepaid

9     Forward Contracts [ECF No. 56]              17        4

10

11    Motion to Dismiss Adversary 13-01354        22        8

12

13    Motion Pursuant to Rule 9019 of the Federal

14    Rules of Bankruptcy Procedure and Section

15    105(a) of the Bankruptcy Code for Approval

16    of (I) Partial Settlement Agreements Relating

17    to Certain Credit Default Swap Agreements

18    and Indentures and (II) Amendment to Partial

19    Settlement Agreement Relating to Pebble Creek

20    LCDO 2007-3 Credit Default Swap Agreement and

21    Indenture [ECF No. 40573]                   29        18

22

23

24

25

Page 32

1                    C E R T I F I C A T I O N

2

3      I, Dawn South, certify that the foregoing transcript is a

4      true and accurate record of the proceedings.

5

6      Dawn South

Digitally signed by Dawn South
DN: cn=Dawn South, o=Veritext,
ou, email=digital@veritext.com,
c=US
Date: 2013.11.25 12:07:54 -05'00'

7

8

9      AAERT Certified Electronic Transcriber CET**D-408

10

11     Veritext

12     330 Old Country Road

13     Suite 300

14     Mineola, NY 11501

15     Date:   November 25, 2013

16

17

18

19

20

21

22

23

24

25