Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 08-13555 (JMP)

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6   LEHMAN BROTHERS HOLDINGS, INC., et al.,

7           Debtors.

8   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

9   CASE NO.: 08-01420 (JMP)(SIPA)

10   In the Matter of:

11   LEHMAN BROTHERS, INC.,

12           Debtor.

13   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

14               United States Bankruptcy Court

15               One Bowling Green

16               New York, New York

17

18               November 22, 2013

19               10:06 a.m.

20

21

22

23   B E F O R E :

24   HON JAMES M. PECK

25   U.S. BANKRUPTCY JUDGE

1   Notice of Status Conference for Pending Claims Related to

2   Restricted Stock Units and Contingent Stock Awards [ECF No.:

3   41210]

4

5   Debtors' One Hundred Seventeenth Omnibus Objection to Claims

6   [ECF No. 15363]

7

8   Debtors' One Hundred Seventy-Third Omnibus Objections to

9   Claims [ECF No. 19399]

10

11   Motion of Lehman Brothers Holdings Inc. for Extension of the

12   Period to File Objections to and Requests to Estimate Claims

13   [ECF No. 40939]

14

15   Caisse Des Depots Et Consignations' Second Motion for Entry

16   of An Order to Permit a Late-Filed Proof of Claim [ECF No.

17   39240]

18

19   Plan Administrators Objection to Classification of

20   Securities Law Portion of Claim of Federal National Mortgage

21   Association [ECF No. 40244]

22

23   Debtors' Ninety-Seventh Omnibus Objection to Claims

24   (Insufficient Documentation) [ECF No. 14492]

25

Page 3

1   Debtors' One Hundred Twenty-Fifth Omnibus Objection to

2   Claims (Insufficient Documentation) [ECF No. 16079]

3

4   Debtors' Objection to Proof of Claim No. 66099 Filed by

5   Syncora Guarantee, Inc. [ECF No. 20087]

6

7   Two Hundred Ninety-First Omnibus Objection to Claims (No

8   Liability Derivatives Claims) [ECF No. 27380]

9

10  Three Hundred Ninetieth Omnibus Objection to Claims (Valued

11  Derivative Claims) [ECF No. 34044]

12

13  Three Hundred Ninety-Fourth Omnibus Objection to Claims

14  (Valued Derivative Claims) [ECF No. 34728]

15

16  Objection to Claim No. 62723 of Banesco Holdings CA [ECF No.

17  37327]

18

19  Plan Administrators' Objection to Proof of Claim No. 33514

20  Filed by Frank Tolin, Jr. [ECF No. 37839]

21

22  Four Hundred Eighteenth Omnibus Objection to Claims (No

23  Liability Claims) [ECF No. 38010]

24

25

1    Four Hundred Twenty-First Omnibus Objection to Claims (No

2    Liability Derivatives Claims) [ECF No. 38018]

3

4    Plan Administrators' Objection to Proof of Claim No. 33605

5    Filed by Sanford A. and Tina A. Mohr [ECF No. 39348]

6

7    Four Hundred Thirty-Second Omnibus Objection to Claims (No

8    Liability Derivative Claims) [ECF No. 39570]

9

10   Motion of EFETnet B.V. to Authorize Late-Filed Proof of

11   Claim and/or Permit Amendment of Informal Proof of Claim

12   Against Lehman Brothers Commodity Services, Inc. [ECF No.

13   40004]

14

15   Motion to Classify and Allow the Claim Filed by the Federal

16   Home Loan Mortgage Corporation (Claim No. 33568) in LBHI

17   Class 3 [ECF No. 40066]

18

19   Plan Administrators' Objection to Proof of Claim No. 33325

20   Filed by Arthur A. Boor and Joan Boor [ECF No. 40292]

21

22   Four Hundred Fortieth Omnibus Objection to Claims

23   (Insufficient Documentation Claims) [ECF No. 40472]

24

25

Page 5

1    Four Hundred Forty-First Omnibus Objection to Claims (No

2    Liability Derivatives Claims) [ECF: 40473]

3

4    Four Hundred Forty-Third Omnibus Objection to Claims (Valued

5    Claims) [ECF No. 40475]

6

7    Four Hundred Forty-Fifth Omnibus Objection to Claims (No

8    Liability Claims) [ECF No. 40479]

9

10   Trustee's Sixty-First Omnibus Objection to General Creditor

11   Claims (No Liability Claims) [LBI ECF No. 6130]

12

13   Trustee's Sixty-Second Omnibus Objection to General Creditor

14   Claims (No Liability Claims) [LBI ECF No. 6131]

15

16   Trustee's Sixty-Sixth Omnibus Objection to General Creditor

17   Claims (No Liability Claims) [LBI ECF No. 6157]

18

19   Trustee's Seventy-Sixth Omnibus Objection to General

20   Creditor Claims (No Liability Claims) [LBI ECF No. 6295]

21

22   Trustee's Eightieth Omnibus Objection to General Creditor

23   Claims (No Liability Claims) [LBI ECF No. 6341]

24

25

Page 6

1    Trustee's Eighty-Eighth Omnibus Objection to General

2    Creditor Claims (No Liability Claims) [LBI ECF No. 6566]

3

4    Trustee's Ninety-Fifth Omnibus Objection to General Creditor

5    Claims (No Liability Claims) [LBI ECF No. 6682]

6

7    Trustee's Ninety-Seventh Omnibus Objection to General

8    Creditor Claims (No Liability Claims) [LBI ECF No. 6684]

9

10   Trustee's Ninety-Eighth Omnibus Objection to General

11   Creditor Claims (No Liability Claims) [LBI ECF No. 6699]

12

13   Trustee's One Hundred Sixth Omnibus Objection to General

14   Creditor Claims (No Liability Claims) [LBI ECF No. 6811]

15

16   Trustee's One Hundred Twelfth Omnibus Objection to General

17   Creditor Claims (Subordinated Claims) [LBI ECF No. 6847]

18

19   Trustee's One Hundred Thirteenth Omnibus Objection to

20   General Creditor Claims (Subordinated Claims) [LBI ECF No.

21   6865]

22

23   Trustee's One Hundred Fourteenth Omnibus Objection to

24   General Creditor Claims (Subordinated Claims) [LBI ECF No.

25   6866]

Page 7

1    Trustee's One Hundred Eighteenth Omnibus Objection to

2    General Creditor Claims (No Liability Claims) [LBI ECF No.

3    6906]

4

5    Trustee's One Hundred Twentieth Omnibus Objection to General

6    Creditor Claims (No Liability Claims) [LBI ECF No. 6918]

7

8    Trustee's One Hundred Twenty-FOurth Omnibus Objection to

9    General Creditor Claims (No Liability Claims) [LBI ECF No.

10   7008]

11

12   Trustee's Objection to the General Creditor Claim of

13   Lawrence Fogarazzo, et al. [LBI ECF No. 7078]

14

15   Trustee's One Hundred Thirty-Fifth Omnibus Objection to

16   General Creditor Claims (No Liability Claims) [LBI ECF No.

17   7185]

18

19   Trustee's One Hundred Thirty-Eighth Omnibus Objection to

20   General Creditor Claims (Subordinated Claims) [LBI ECF No.

21   7264]

22

23   Trustee's One Hundred Thirty-Ninth Omnibus Objection to

24   General Creditor Claims (No Liability Claims) [LBI ECF No.

25   7279]

1  Trustee's One Hundred Forty-Second Omnibus Objection to

2  General Creditor Claims (No Liability Claims) [LBI ECF No.

3  7335]

4

5  Trustee's One Hundred Forty-Third Omnibus Objection to

6  General Creditor Claims (Non-LBI Employee Claims) [LBI ECF

7  No. 7336]

8

9  Trustee's One Hundred Forty-Sixth Omnibus Objection to

10  General Creditor Claims (Insufficient Documentation Claims)

11  [LBI ECF No. 7382]

12

13  Trustee's One Hundred Forty-Seventh Omnibus Objection to

14  General Creditor Claims (Subordinated Claims) [LBI ECF No.

15  7388]

16

17  Trustee's One Hundred Forty-Eight Omnibus Objection to

18  General Creditor Claims (No Liability Claims) [LBI ECF No.

19  7399]

20

21  Trustee's Motion for an Order (I) Confirming the Trustee's

22  Denial of SIPA Customer Status to Claren Road Credit Master

23  Fund, Ltd. and (2) Subordinating the Claim [LBI ECF No.

24  7539]

25  Transcribed by:  Sherri L. Breach and William J. Garling

1  A P P E A R A N C E S :

2  WEIL, GOTSHAL & MANGES, LLP

3       Attorneys for Debtors

4       1300 Eye Street NW, Suite 900

5       Washington, DC 20005

6

7  BY:  RALPH I. MILLER, ESQ.

8

9  WEIL, GOTSHAL & MANGES, LLP

10       Attorneys for Debtors

11       767 Fifth Avenue

12       New York, New York 10153

13

14  BY:  JACQUELINE MARCUS, ESQ.

15       MAURICE HORWITZ, ESQ.

16       ERIKA DEL NIDO, ESQ.

17

18  HUGHES HUBBARD & REED, LLP

19       Attorneys for Debtors

20       One Battery Park Plaza

21       New York, New York 10004

22

23  BY:  MEAGHAN C. GRAGG, ESQ.

24

25

Page 10

1   COLE SCHOTZ

2        Attorneys for Highland CDO Opportunity Master

3        Fund, L.P.

4        Court Plaza North

5        25 Main Street

6        Hackensack, New Jersey 07601

7

8   BY:  ILANA VOLKOV, ESQ.

9

10   DECHERT, LLP

11        Attorneys for Russell

12        1095 Avenue of the Americas

13        New York, New York 10036

14

15   BY:  SHMUEL VASSER, ESQ.

16

17   HOGAN LOVELLS US, LLP

18        Attorneys for QUT Financial

19        875 Third Avenue

20        New York, New York 10022

21

22   BY:  ROBIN E. KELLER, ESQ.

23

24

25

Page 11

1   LAW OFFICES OF LISA M. SOLOMON

2         Attorney for Unspecified

3         305 Madison Avenue

4         Suite 4700

5         New York, New York 10165

6

7   BY:  LISA M. SOLOMON, ESQ.

8

9   SILVERMAN ACAMPORA

10        Attorneys for CDC

11        100 Jericho Quandrangle, Suite 300

12        Jericho, New York 11753

13

14  BY:  JAY S. HELLMAN, ESQ.

15

16  ORRICK, HERRINGTON & SUTCLIFFE, LLP

17        Attorneys for Depfa Bank

                     th
18        1152 15  Street, N.W.

19        Washington, D.C. 20005-1706

20

21  BY: JONATHAN GUY, ESQ.

22

23

24

25

Page 12

1   ALSO APPEARING:

2   RICHARD SCHAGER

3   ARTHUR KENNY

4   ANDREA HO

5   LARS JACOBSON

6   EUGENE KAPLAN

7   LISA BOGERT

8   DANIEL CARRAGHER

9   DARIAN COHEN

10  BARRY O'BRIEN

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2              THE COURT:  Good morning.  Be seated, please.

3              MR. HORWITZ:  Good morning, Your Honor.  Maurice

4    Horwitz from Weil, Gotshal & Manges on behalf of Lehman

5    Brothers Holdings, Inc. as plan administrator.

6              The first item on today's agenda is a status

7    conference relating to certain pending claims related to

8    restricted stock units and contingent stock awards.

9              For that matter I'll turn the podium over to Ralph

10   Miller.

11             THE COURT:  Mr. Miller, good morning.

12             MR. MILLER:  Good morning, Your Honor.  Ralph

13   Miller from Weil, Gotshal & Manges here on behalf of Lehman

14   Brothers Holdings, Inc. which I will call LBHI or the plan

15   administrator.

16             THE COURT:  Okay.  There are a number of attorneys

17   assembling as you're speaking.

18             MR. MILLER:  Yes, Your Honor.  With me are Denise

19   Alvarez and Theresa Brady and we -- I guess you might like

20   to take appearances or know who is here from the other

21   firms.

22             THE COURT:  I'll take appearances.  I'm also going

23   to ask for appearances for those attorneys or individuals

24   who are on the telephone and appearing telephonically at

25   this status conference.

Page 14

1        So let's start with the people who are in the

2   room.

3        MR. SCHAGER:  Good morning, Your Honor.  It's

4   Richard Schager for claimants under the RSU and CSA dispute.

5   I'm here with Lisa Solomon and Gene Kaplan from Kaplan

6   Landau, and also behind the main bench are Bob Michaelson

7   from Rich Michaelson Magaliff and my associate, Andrew

8   Goldenberg.  There are a couple of pro se's here also, Your

9   Honor, whom I will not introduce.

10        THE COURT:  Okay.  I think we should have

11   everybody identify themselves before we get started.  Those

12   people who are pro se's and in the room should just give me

13   your name, and those who are pro se's who are represented on

14   the telephone should do the same, but after we finish in the

15   courtroom.

16        So --

17        MR. SCHAGER:  And my apology -- I'm sorry.  My

18   apologies, Your Honor.  There are two other lawyers here

19   representing claimants.  Steve Abramowitz from Vinson &

20   Elkins and Will Knox from -- I'm sorry.  I've forgotten his

21   firm.

22        MR. KNOX:  Paduano & Weintraub.

23        MR. SCHAGER:   Sorry.  Paduano & Weintraub.

24        THE COURT:  Okay.  And apparently not everybody is

25   choosing to be up in the soft seats for some reason, but

1    everybody's free to sit down.

2             Do you want to enter your appearances?

3             MR. KENNY:  Arthur Kenny.  I'm a pro se claimant.

4             MS. HOU:  Andrea Hou (ph).  I'm a pro se claimant.

5             THE COURT:  Okay.  Now those who are appearing by

6    telephone.  Is there anyone appearing by --

7             MR. JACOBSON:  Lars Jacobson, pro se claimant.

8             MS. BOGERT:  Lisa Bogert (ph), pro se claimant.

9             MR. CARRAGHER:  Dan Carragher from Day Pitney

10   representing Fabio Liotti.

11            THE COURT:  Okay.  I -- I think that's everybody.

12            MR. COHEN:  Darian Cohen, pro se claimant.

13            THE COURT:  It's not everybody.  Now we have

14   everybody?

15            THE CLERK:  Mr. (indiscernible).

16            MR. O'BRIEN:  Your Honor --

17            THE COURT:  One more in the courtroom.

18            MR. O'BRIEN:  Barry O'Brien, pro se claimant.

19            THE COURT:  Okay.

20            I think we've now heard from everybody.

21            Mr. Miller, I just wanted to have a record of who

22   was participating in this status conference.

23            MR. MILLER:  Yes, Your Honor.  And the

24   introductions illustrate the first issue I wanted to discuss

25   with the Court, which is that this started with a large

Page 16

1    number of claimants in various different categories, and has

2    now been narrowed down to a very focused group.  And I

3    wanted to briefly report to the Court on the progress that

4    has been made, where we are and what we believe are the

5    three issues necessary for the Court to help us with an

6    order to get a fair and prompt resolution of what is left.

7           If I might, first, as the Court recalls, there are

8    -- were originally about 3,680 of these claims that related

9    to restricted stock units, which we call RSUs or conditioned

10   stock awards.  They're called CSAs.  They're very much the

11   same thing except the CSAs were international.

12          About 3,400 of those have been reclassified as

13   equity because of no objection.  About 236 remained after

14   the reclassification process.  The Court set up a procedure

15   by which certain of the claimants could elect to participate

16   in discovery.  About 100 chose to do so.  We call those

17   participants because they did participate in the year-long

18   discovery process we've had.  Most participants had counsel,

19   but some were pro se.  About another 130 or so did not

20   participate in discovery.  The vast majority of those are

21   pro se, but some of those have counsel.

22          So we have categories of both participants who

23   have counsel and are pro se and pro se parties who did not

24   participate and parties with counsel who did not

25   participate.

Page 17

1           LBHI has been working diligently with the

2   represented participants to build an evidentiary record as

3   the Court asked us to.  More than 30,000 pages of documents

4   were produced.  A download cite was created, system was set

5   up.  The represented participants wanted to try to negotiate

6   a stipulation.  The Court saw some correspondence about

7   that.  Between June and October we devoted substantial

8   effort to that and came up with a 20 page stipulation of

9   facts with 20 exhibits, which the Court has approved.

10          There was a day-long deposition taken under Rule

11  30(b)(6) of a witness from LBHI dealing mostly with

12  accounting, tax and other technical issues having to do with

13  RSUs and CSAs.  There have been discussions about hearing

14  procedures.  Those have evolved some because we had hoped

15  that the stipulations and other developments would narrow

16  the issues, and I believe they have.

17          There have also been some tentative settlements

18  reached with a very narrow class of these claimants.  That

19  will not substantially affect the procedure going forward.

20  But we don't believe there are further settlement prospects

21  on the horizon for a little over 200 claimants that remain,

22  and it's going to be necessary for us to agree to disagree

23  and let the Court guide us on the reclassification issue.

24          There are three main open issues for a hearing,

25  Your Honor.

Page 18

1          First, there is the question of whether some

2     claimants should be excluded from the first hearing and

3     there should be some sort of a secondary procedure where

4     other claimants who were not in the first hearing would come

5     forward.

6          This issue is the most significant and it impacts

7     the other two.  It's the position of LBHI that we ought to

8     have one hearing; that throughout this process, as I will

9     explain, the pro se parties have been given full opportunity

10    to either elect to participate in discovery or to get the

11    benefits of that discovery and they're going to have an

12    opportunity to brief, to appear and to do other things.  And

13    for administration purposes, it's really important to get

14    this all resolved at once instead of have it continue to

15    string on indefinitely.

16         That leads into the second issue, Your Honor,

17    which is when there might be a hearing set;

18         And the third issue, which is far less important,

19    is a disagreement over the time and sequence for oral

20    arguments during the hearing, an issue that I think the

21    Court might well defer until a little closer to the hearing.

22         I would like to briefly talk about these three

23    issues.

24         With regard to participation, LBHI has made every

25    effort to invite pro se claimants as well as represented

Page 19

1    claimants to either join in the discovery process, if they

2    wish to participate, or if they wish to sit out and receive

3    the benefit to have an opportunity to present their case at

4    the hearing.

5            Our proposed hearing protocol would allow briefing

6    in which the parties with lawyers, the represented

7    participants, would file their briefs first.  There would be

8    a delay.  Pro se claimants who wish to join in some of those

9    or want to add special facts would have an opportunity to do

10   that.  LBHI would respond.  The briefing would eventually

11   have the input from everyone.

12           At the hearing we have proposed that although the

13   represented participants who have the best understanding of

14   the evidentiary record would put on their case initially

15   after the opening by LBHI and the framing of the objections.

16   The pro se claimants who wish to would have an opportunity

17   to participate.  At the conclusion we believe there would be

18   a complete record and the Court would be able to make a

19   decision on the reclassification issue.

20           We recognize that a somewhat different procedure

21   arguably was followed in the case known as the TBD case

22   which was an LBI proceeding and I believe Mr. Schager may

23   try to address that.

24           We believe that's distinguishable, Your Honor.

25   We've set out in a letter to the Court some of the

Page 20

```
 1    distinctions.  But, briefly, those were pre-selected cases.

 2    They were matters where there was not a full evidentiary

 3    record and the hearing was not open to all parties to

 4    participate.  In that case, the Court allowed subsequent

 5    submissions.  I understand there actually weren't any, but

 6    from parties who wanted to add something to the record.

 7             We don't believe that that procedure fits the

 8    facts and circumstances here because we do have a full

 9    evidentiary record, as the Court asked us to develop it, and

10    everyone has had an opportunity to participate.  We believe

11    that we can effectively do the hearing.

12             The claimants had indicated they would like two

13    days.  We hope it can be done more quickly than that, but

14    certainly if two days are allowed, there ought to be ample

15    time with the Court's management and guidance to get

16    whatever input you want from all the participants.

17             If there is one two-day hearing, we believe it is

18    most efficient for plan administration if that could

19    possibly be scheduled by no later than early February.  I

20    mean, the Court has two dates in late January and two dates

21    in early February which are fine with LBHI and we believe

22    the briefing can be completed before those dates.

23             The represented claimants favor February 25 and

24    26.  Although this may not seem like much time delay, it

25    does have an impact on the fifth distribution which comes
```

Page 21

1    out near the end of March and has to be calculated in the

2    middle of March, essentially.  And if there is a hearing in

3    early February and the Court takes several weeks to resolve

4    it, and if the Court should find that some or all of the

5    remaining claims should be reclassified as equity, there

6    would then be time for the 14 day appellate time to run.

7            And assuming that some or all of those were not

8    appealed, there would then be a group of these claims that

9    would come back as equity and they would free up funds that

10   are now being held back in reserve that can't be used in the

11   fifth distribution.  There's about a little over $25 million

12   of cash.  The reserves are much larger because there are

13   multiple of that that's being held back for the possibility

14   these are not reclassified.

15           We don't believe that that's practical and so,

16   essentially, that $25 million is locked up for at least

17   another six months till the following distribution, if this

18   is delayed much beyond early February.

19           So that's why we think that a hearing date is

20   important in early February, if possible.

21           The third issue is really a question of who opens

22   and who closes.  We don't think there is much doubt about

23   the fact that LBHI has the prima facie obligation to frame

24   its objection and should at least open.  We recognize that

25   all parties should put on their evidence.  We think that

Page 22

1   LBHI should also close, but, frankly, the way the Court

2   would handle closing is something we think the Court could

3   determine when you've heard the evidence, you've seen how

4   the hearing has played out and you decide what you want.

5   I'm sure, based on the Court's experience, you'll give

6   everybody an opportunity to rebut and have their say and

7   there will be a full and fair explanation of the arguments

8   that people want to make.

9           We have submitted a hearing protocol, Your Honor.

10   We would ask that you make any modifications that you may

11   feel are appropriate and enter an order that would give us

12   guidance.  We do think that a single hearing is the most

13   important issue and that there's a practical way to do that.

14   And we hope that that single hearing can be set no later

15   than starting on February the 4th.

16           I would be happy to take any questions, Your

17   Honor.  Otherwise that's I think the status as LBHI sees it.

18           THE COURT:  Okay.  I think it makes sense to

19   consider question one; in other words, whether there should

20   be one or two hearings as a threshold item for scheduling

21   because one hearing on one or two days may be different from

22   a case management perspective than two hearings on one or

23   two days.

24           And so I would like to understand a little bit

25   more about LBHI's position as to why it makes the most sense

Page 23

1    administratively and is also fair to all the claimants for

2    this to be a one-day -- or a one-hearing process, however

3    many days it takes.

4              MR. MILLER:  Well, Your Honor, would you like for

5    me to respond --

6              THE COURT:  Yes.

7              MR. MILLER:  -- to that question?

8              THE COURT:  I would like you to.

9              MR. MILLER:  Yes.  I would be happy to, Your

10   Honor.

11             This is actually a relatively simple legal issue

12   which has to exist in a factual background.  We think the

13   discovery has not shown essentially any differentiation

14   between the way claimants have been treated as far as the

15   information they received, the way the RSUs and the CSAs

16   were presented to them, the way they were accounted for.

17             We think -- and I don't want to argue the issue,

18   Your Honor, but we think that all the -- all the facts show

19   that this has always been treated as equity.  It was part of

20   an equity awards program.  It was accounted for under the

21   accounting rules that deal with equity awards.  The

22   recipients actually had rights to vote as equity in certain

23   circumstances.  The value was always keyed to changes in

24   stock value.  We think that's common to all the parties.

25             And under those circumstances, we don't think that

Page 24

1    there is any need to have individualized proof of what

2    people thought or were told or believed or wished for

3    because, frankly, everything was done through plan

4    documents.  And there's quite a lot of tax overlay that

5    these plans have to be administered uniformly in order to

6    receive the tax treatment that they receive.  And a very

7    scrupulous effort was made to publish all of the guidance.

8    There was a committee that helped with this.

9         And we believe that the fact stipulation that has

10   been entered, which is largely a stipulation on documents,

11   says this plan was adopted on such and such a day.  It says

12   this, it says that.  Here's a true copy.  It is essentially

13   giving the Court a complete evidentiary record and, of

14   course, it's available to all the parties.

15        Under those circumstances, we think that these

16   individual claimants have very little differentiation.  We

17   know of essentially known that is going to require them to

18   put on individualized cases.

19        And we think that it -- it's a difficult issue to

20   understand, and if you separate it between some people who

21   hear the entire story and have the sophistication that the

22   represented claimants do have at this point, who

23   participated in discovery, if that explanation is not

24   provided to people in a secondary hearing, there's going to

25   be a great deal of confusion and great inefficiency.

1          So having everyone together at one time to see the

2     briefing, to submit the briefing to the Court, and for those

3     who want to participate pro se, many of whom are not

4     lawyers, to sit through and understand what the lawyers who

5     are acting for claimants have presented and to see what

6     issues the Court is asking, that's going to simplify the

7     case.  And, frankly, it's hard for us to believe that many

8     pro se claimants are going to have a whole lot that they're

9     going to be able to add or change or do about that because

10    we think the issues have been framed fully and completely.

11          If they do, we're happy to have an opportunity to

12    do that and those can be broken out and can be dealt with.

13          But setting aside a separate hearing day, time and

14    schedule, essentially from the standpoint of plan

15    administration, creates a major issue because we then don't

16    know how those are going to be resolved and we don't know,

17    and it's not clear if the Court's going to want to rule on

18    just the issues when it's heard one part of the hearing or

19    whether the ruling would be deferred until there are two

20    hearings.

21          But since I suppose somebody might make an

22    argument different in the second hearing than the first

23    hearing, there's a real possibility that the major legal

24    issue would not be resolved.  And, of course, the major

25    legal issue, as you framed it before, is whether the Enron

Page 26

1   case is going to be followed and whether there's anything

2   that distinguishes these restricted stock units and

3   conditional stock awards from the stock options that were at

4   issue in that case.  We believe there's not, but we believe

5   that really is not a claimant specific issue.  We believe

6   that that's an issue that has to do with the programs.

7            So for --

8            THE COURT:  Okay.

9            MR. MILLER:  -- those reasons, we think it's one

10  question.  It's one set of facts.  The facts vary little

11  from year to year and so on, but it's essentially one common

12  story, Your Honor, and we think it makes no sense to cut it

13  into pieces.

14           And we think the -- frankly, in terms of fairness,

15  we think the reason that the parties may want to cut it into

16  pieces is that some believe that they may receive some

17  advantage by going first and perhaps not having the

18  distraction or issue of having others with them.

19           We don't think that's going to be the case, by the

20  way.  We think everybody will have a full and fair

21  opportunity to present their case.

22           We also think from a standpoint of the fairness

23  sense for the pro se claimants, they ought to feel like

24  they've had to -- an opportunity to participate in the real

25  hearing, the big hearing, the first hearing, the whole

```
 1    process.  And we're concerned that if you -- if you relegate

 2    them to a secondary process, they may not have the

 3    experience of participating in it.

 4              And as Your Honor knows, these are all former

 5    employees of the Lehman Brothers' various entities.  Many

 6    were not employees of LBHI because LBHI was the only one

 7    that had the stock.  So you couldn't issue LBI stock or LBL

 8    stock or whatever.  So LBHI had to have a program.  It was

 9    -- it actually sold the stock as the record now shows to

10    subsidiaries in the form of -- there was actually inter-

11    company purchase of the RSUs by the subsidiaries.

12              But in any event, there's really no distinction.

13    It was a unitary program and LBHI would like for its former

14    employees and for the former employees of its affiliates to

15    feel that they were treated fairly.

16              THE COURT:  Okay.

17              MR. MILLER:  Anything else, Your Honor, for LBHI?

18              THE COURT:  Well, let me just react to something

19    that you said.

20              It's my recollection from long ago when we had

21    hearings on the RSUs and the CSAs and any number of pro se

22    claimants came forward and spoke to me that each of them had

23    a slightly different story to tell.  And so one of the

24    fundamental questions I have, because I'm not privy to the

25    discovery that has taken place and I have not addressed the
```

Page 28

1    stipulation of fact so I'm not sure if it's been filed with

2    the Court or if I've had -- I have access to it.  But I can

3    tell you I haven't read it.  So I am at a disadvantage in

4    knowing what the facts show that the parties have agreed to.

5          But part of your presentation today tells me --

6    others may disagree with what you've said -- that if you

7    look at the factual record as it has developed over time, at

8    least from LBHI's perspective, individual differentiation of

9    stories, claims, circumstances, whatever that may be has no

10   bearing on the governing legal question of treatment of

11   these claims, at least from LBHI's perspective.

12          So several questions:

13          First, does this suggest the possibility of

14   dispositive motion practice with regard to all of these

15   claims that would avoid an evidentiary hearing, or because

16   of the presence of pro se claimants, is that procedure

17   unworkable?  That's question one.

18          And question two, if we were to have a single

19   evidentiary hearing would it be possible in the estimation

20   of LBHI to resolve all class claims at once, whether they're

21   represented or unrepresented, regardless of where the

22   employees may have been employed simply on the basis of

23   legal argument, or are there factual distinctions applicable

24   to individual claimants that would lead to different

25   outcomes based upon the facts presented for each such

Page 29

1    claimant?

2            MR. MILLER:  Well, Your Honor, I would like to --

3    might I have a moment to consult with my partner, Ms.

4    Marcus, and others, particularly on your first question.

5            As far as the second question, which I think I can

6    -- can address, that requires a digression into one issue

7    that was very prominent in the hearing that you had which we

8    believe has been largely resolved by this partial settlement

9    offer and arrangement that was made.

10           There are some claimants who spent a good deal of

11   time talking at the first hearing on this about the fact

12   that in 2008 commissioned salespeople had withholdings from

13   their pay which -- for which RSUs were never issued.  There

14   was a partial issue of RSUs in 2008.  Usually they're issued

15   at the end of the year, but some were issued during the

16   year.

17           The settlement that was offered was to that

18   category of individuals who had withholdings for which RSUs

19   were not issued.  And these settlements are tentative.  They

20   have not been finalized by documents yet.  I can tell you

21   that all of the -- and some of the represented participants

22   were not in that category.  Unless someone was a

23   commissioned salesperson who worked there in 2008, then they

24   didn't have any claims in this category.

25           I -- without going into settlement

Page 30

1   confidentiality, all of the -- all of the represented

2   claimants that we've heard from and the participants who

3   were in that category have accepted one of the two

4   settlement options that we gave.  So we think at least that

5   issue is going to be greatly reduced.  We have at least one

6   that is still unclear as to whether it's going to be

7   accepted or not.  It has counsel.  And we have some pro se's

8   who didn't respond.

9          So that issue is now much less prominent in the

10   case.  There's actually, I think, nine or ten claimants that

11   may have something on that issue.

12          If that issue remains and needs to be litigated,

13   it has some individual component to it as we see it, and

14   that's one of the reasons we made an offer and tried to deal

15   with that issue as we felt it was a separate question.

16          Outside of that question and having to do with a

17   -- the people who got RSUs and got CSAs we really don't

18   think there's any individual distinction.  And in terms of

19   whether you could resolve this, we think that this issue

20   that deals with sort of the very tail end of the program,

21   sort of when the music stopped who had a chair, if you will,

22   in 2008, we think that should be pushed until the rest of

23   the issues are considered.

24          And we think that they can -- all issues can be

25   resolved in one hearing, including that issue if it's

 1    necessary for the Court to address it at that time, which

 2    LBHI still very much believes it comes -- it follows,

 3    essentially, the resolution of the first one.  If the RSUs

 4    and CSAs were always equity, then we think a promise to get

 5    equity in the form of an RSU and CSA is still equity.  But,

 6    nonetheless, that has some -- has some distinctions to it.

 7            And so to explain the single hearing concept, we

 8    think that there is no doubt that by far the most important

 9    issue and the one that -- that the Court should - that we

10    need really guidance on is whether the issued RSUs and the

11    issued CSAs should be reclassified as equity.  And we think

12    that can certainly be resolved in a single hearing and we

13    think that these other issues ought to be resolved in a

14    single hearing largely based on what some pro se's we

15    haven't heard from may say or do.  That's a very small

16    number left in terms of the amounts in controversy at this

17    point.

18            THE COURT:  Sounds like it's one and a half

19    hearings.

20            MR. MILLER:  All right, Your Honor.  If that's

21    helpful in number two.

22            As far as number one, I will say we can always try

23    motion practice.  The issue, of course, is if someone tries

24    to file a declaration, say they want to create a fact issue,

25    I mean, we've -- we've spent a lot of time and effort.  The

Page 32

1    Court suggested that you wanted evidence and we've tried to

2    get evidence.  I realize evidence could be presented in this

3    form through the stipulation and other things.  But with the

4    overlay of the pro se's who it's difficult to know whether

5    somebody is going to hurl in affidavits or something else

6    that would make a summary judgment type procedure difficult

7    to manage.

8              I think -- my personal belief, having spent time

9    with it, that it's easier to set aside two days and maybe

10   it's a day and a half, Your Honor -- it's like your hearing

11   and a half -- and just kind of let everything come in, let

12   the Court have the full record and see if we can't get this

13   behind us.

14             But if you want us to do it with motion practice,

15   obviously we will try to do that, Your Honor.

16             THE COURT:  No.  No.  I'm not -- I'm not promoting

17   it at all.  I'm rather trying to understand what I've heard.

18   And one of the things that you said was based upon an agreed

19   factual record and evidence that should not be controversial

20   because it should all be admissible and could be the subject

21   of declarations and submissions, that very often is the

22   basis for a summary judgment motion and argument.

23             But I'm also hearing you say that given the nature

24   of the dispute and the nature of the claimants and their

25   composition -- some being represented, some being pro se,

Page 33

1    some being commissioned salespeople, some working for

2    different Lehman entities -- that it may be more

3    administratively convenient, not only for the parties, but

4    for the Court to have an evidentiary hearing in which all

5    parties can simply appear and be heard on the basis of some

6    record that's already admitted.  Is that my understanding of

7    the position?

8            MR. MILLER:  Well, Your Honor, we think that

9    certainly that option should be preserved, and I think you

10   should hear from some of the claimants' counsel.

11           THE COURT:  I --

12           MR. MILLER:  One of the things that they have told

13   us that I'm aware of -- and I don't want to speak for him --

14   is that some of their clients want to testify live and tell

15   you their story.  And we don't really think -- we didn't

16   take any depositions.  We didn't think any discovery was

17   necessary.  We don't think that's going to change anything.

18   But if people have a strong urge to do that, you know,

19   that's a factor.

20           I -- it's always dangerous to suggest a procedure

21   that has not been fully vetted, but let me propose to the

22   Court that one option might be that LBHI could certainly

23   file a motion for summary judgment or, in the alternative, a

24   trial brief and support it with the record that LBHI thinks

25   it has, and then everybody could be called upon to try to

1   respond to that and see -- if they think it shouldn't be a

2   summary judgment, they can say why and if they think it

3   should be a summary judgment, but it should be decided in

4   their favor, they can say why.  And all that could be

5   briefed to coincide with the hearing schedule.

6            And if the Court looks at that and decides you've

7   got a summary judgment, you can cancel the hearing,

8   obviously as -- hopefully a little bit in advance so that

9   people won't have to travel and resolve it as a summary

10  judgment, then at that time you'll know who's responded,

11  whether you have contested issues of fact, whether the

12  summary judgment process has been followed as you might set

13  it up, or you can go ahead and say, okay, we'll go ahead and

14  have the hearing, or you can have a hearing on whatever is

15  left.

16           I mean, in that sense you could find out what

17  could be submitted by motion.  I've certainly had trials in

18  federal district court, for example, where the parties both

19  file summary judgments and we went to trial and the Court

20  said, I'm going to consider the summary judgments, and the

21  Courts granted summary judgments sometimes halfway through

22  trial.

23           So, I mean, it is possible to have a summary

24  judgment procedure before the Court and also have a hearing

25  scheduled.

1           And then one way or the other we're going to be

2    done.  Either the summary judgment works and you get to

3    resolve it on summary judgment or the hearing is concluded.

4           But, again, I've not had a chance to vet that with

5    my colleagues or my clients.  But if the Court were

6    interested in that, it seems to me, based on what I know

7    about the facts in the record, that would be a practical

8    thing that we could do.

9           THE COURT:  Well, what I'm interested in -- and

10   I'm going to hear from parties who are opposed to the notion

11   of one hearing in a moment.  But what I'm interested in is a

12   procedure that works for this unique class of claimants and

13   that also provides a mechanism for orderly disposition of

14   the legal issues presented.  I'm not trying to propose

15   anything to make it more complicated.  Instead, I'm just

16   asking a question as to whether there's a way to make it

17   less complicated.

18          And what I think I've heard you say is that

19   conceivably there could be a summary judgment process here,

20   but it's one that in all likelihood would prompt objections,

21   factual assertions not in the stipulation, and requests for

22   live testimony.

23          If that's all true, even before hearing from

24   counsel for the claimant group, I see no reason to start a

25   process that will not produce a ready outcome.

Page 36

1          I'm simply -- I raised the question in the first

2     place because you made references to legal issues that would

3     govern the outcome more or less regardless of particular

4     facts that might be asserted by individual claimants.  In

5     other word, a governing standard that would apply no matter

6     what a claimant came in and said.  That's what I was

7     understanding you to be saying.

8          MR. MILLER:  Well, Your Honor, I don't believe

9     that the -- that we think there's any competent way that a

10    claimant can vary the terms of the plans, all of which said

11    they couldn't be varied.  And so we don't know what the

12    claimants are going to say.

13         I will stress, Your Honor, LBHI has always thought

14    this was pretty simple.  We think the Enron case controls it

15    and we think this looks like equity.  It was treated as

16    equity.  It functions as equity.  It's equity.

17         The claimants have raised -- and this is their job

18    -- a lot of the issues to try to make that more complicated

19    and say, maybe it shouldn't be treated as equity, maybe it

20    should be treated as something else.  It's not clear to us,

21    frankly, what different claimants are going to say it should

22    be treated as or exactly how they're going to argue this

23    because we don't have comprehensive briefing after their

24    evidentiary record from the various represented claimants.

25    We have nothing from the pro se claimants.

1          THE COURT:  I know what they're going to say

2     because I remember what they said last time.  Many of them

3     are going to say they had no choice in the matter.  This was

4     part of their compensation.  It was a given that these RSUs

5     represented part of what they worked for and their lawyers

6     argue that it should be treated as employee compensation.

7          I understand what your argument is; that it's just

8     equity and needs to be treated as equity.  But I have a

9     strong sense that the individuals who experienced what it

10    was to be an employee of Lehman Brothers prior to the

11    bankruptcy have a need to be heard, not just a need to

12    respond to summary judgment papers or to submit letters.

13    And that part of what this process is about is

14    reconciliation on a personal level for those employees who

15    feel that the bankruptcy rendered them victims.

16          I mean, there are plenty of creditor victims

17    around the world, but the employees in question for the most

18    part did not participate in any of the decisions of Lehman

19    Brothers that led to its bankruptcy.  In that sense, I

20    recognize the psychological benefit to them, and perhaps

21    also the ultimate legal benefit to them in having their day

22    in court.

23          So I withdraw the reference to summary judgment or

24    summary disposition.  I don't think it's going to work here.

25    But I'll certainly hear what counsel for the group has to

Page 38

1   say on the subject and what any individuals wish to add.

2           MR. MILLER:  Your Honor, I -- obviously, I don't

3   want to speak for the claimants, but certainly we have

4   received a message similar to what you just expressed in our

5   dealing with them.  And, again, LBHI will do this any way

6   the Court wants us to do it.  We are happy to submit a

7   summary judgment conditionally, but we do believe that going

8   through say a three or four-month discovery -- a summary

9   judgment process, if it fails and then trying to get a

10  hearing set is not in the best interest of plan

11  administration.

12          A great deal of expense has been devoted by the

13  estate to building this evidentiary record and to giving the

14  claimants their day in court and the opportunity to develop

15  their position.  And while we tried to be economical about

16  that, the fact that there are differing counsel and people

17  without counsel has made that -- has made that more

18  challenging.

19          And so the plan administrator would like to go

20  ahead and sort of stop the bleeding in terms of the expense

21  and also get resolution because, as Your Honor knows, there

22  is -- there is an issue about extending the claims deadline.

23  We're trying to get as many claims processed as fast as we

24  can.  This is a chunk that is not only taking time to get

25  handled from an accounting standpoint, but it's taking

Page 39

1    resources from the people who can handle claims calculating

2    these things.  Just a small settlement segment we did took a

3    lot of calculating resources to try to get that done.

4           So the plan administrator would like to get a --

5    sort of a surer certain exit path to the discovery, to the

6    cost, to the process, and we think a hearing is a way to do

7    that and let people express their views.

8           So we appreciate that, Your Honor.

9           THE COURT:  Okay.  Let's give those who wish to

10   speak regarding a one-hearing or two-hearing process and

11   also my comments regarding summary disposition a chance to

12   present their positions.

13          MR. SCHAGER:  Thank you, Your Honor.  Richard

14   Schager for some of the claimants here who I won't identify,

15   but I will say there are 48 that my firm represents out of

16   the total of 78 claimants who are represented by counsel.

17          Your Honor, I appreciate your time today.  I think

18   we can already tell that the time taken today will come back

19   in terms of a more efficient hearing or procedure that we

20   follow.  So thank you for this.

21          I was going to address the issue of the hearing

22   day first, Your Honor.  One thing on which we agree are the

23   three issues that were open today.  But if Your Honor

24   prefers, I'll go directly to the issue of the participation

25   of the pro se's.

Page 40

1          THE COURT:  Well, actually, what I was dealing

2     with, and it may be that it's the wrong order, but it's the

3     one that I picked, is whether we're talking about one

4     hearing or two hearings.  And once I know if we're dealing

5     with one or two, we can then talk about dates.

6          MR. SCHAGER:  Very good, Your Honor.  And I will

7     say this; that I think there is one sequence here that is --

8     will illustrate the issues that we have.  I think at the

9     outset I would say that the lawyers who represent claimants

10    don't have a personal stake in whether the pro se's

11    participate in the hearing or not.  Some of us feel that it

12    would be a more efficient hearing without the participation

13    of the pro se's and others think that the pro se's should

14    participate.  As a group I'm afraid we don't have a

15    position.

16          I think Your Honor knows from my correspondence

17    that as one firm representing a certain number of claimants

18    I have always felt that the hearing would be more

19    efficiently done with just the represented parties as sort

20    of a test case, if you would like, and I use that phrase

21    "test case" advisably.  The language that was -- that Mr.

22    Miller quoted that was our so-called position, Your Honor is

23    familiar with that language, of course, because we drew it

24    from -- from your decision.  And we thought that was an

25    approach that the Court may wish to pursue.

Page 41

1            In addition to that, Your Honor, I think it's fair

2      to say that there was the representation that we have been

3      negotiating this order for months.  The fact is that we made

4      a proposal at the end of July and there was no response

5      until the very end of October.  So over three months passed.

6      There was even an interim memo from me to Lehman's counsel

7      saying, hey, if you want a distribution in the spring, you

8      better get on the ball and respond to this, and nothing

9      happened.

10            So the three months passed and then a proposed

11      order comes out saying, okay, here you go.  Your brief is

12      due in a week.  Now you can smile and say, well, that's how

13      lawyers deal with each other, but that statement also

14      applied to the pro se's and that's really why I mention it

15      now.  To come out with an order on October 30 saying, pro

16      se, your brief is due in a week is not a fair approach.

17            Now what's our concern about that, again, we

18      obviously don't represent parties appearing pro se.  But I

19      think it's fair to say that we were not prepared to be part

20      of a stipulated submission to the Court treating the pro

21      se's this way.

22            So as much as I can say, Your Honor, is that some

23      of us think the hearing would be run more efficiently

24      without the participation of the pro se's.  It's already

25      complex by a couple of different groups represented and a

Page 42

1    couple of different issues presented.  And we have someone

2    ready to speak to that.

3           The second issue, Your Honor, is that with a good

4    number of pro se's out there saying that they're going to

5    present their case in two hours, I think, is just not being

6    fair to them.  On that issue, Your Honor, I think I would

7    defer to a couple of the pro se people who are here today.

8           I hate to beg the question, Your Honor, but we --

9    yes, we did raise the issue of how the pro se's would

10   participate in the hearing.  We did that largely because of

11   the way the Court addressed the issue, we believe, in

12   December of 2011 and we didn't want to be a party to

13   something that was basically ramming something down the

14   throats of the pro se's.  But we don't represent the pro

15   se's and we are inclined to let them speak for themselves

16   and to be guided by the Court's approach.

17           THE COURT:  Okay.

18           MR. SCHAGER:  Is that a fair statement, Your

19   Honor?

20           THE COURT:  Well, maybe I should -- maybe I should

21   hear from certain of the pro se's because they're the ones

22   who are most directly affected by the one hearing versus two

23   hearing structure that we're discussing.

24           I'm hearing you say that you believe it would be

25   more efficient for there to be a hearing in which only the

Page 43

1    represented claimants participate, presumably the pro se's

2    would be physically present because they would be very

3    interested in the outcome.  And you would then have a

4    further hearing when they would appear and be heard,

5    presumably having been educated by sitting through a process

6    in which counsel has presented evidence and argument.

7            Therefore, from the perspective of the pro se's it

8    seems to me this is a somewhat either burdensome or

9    beneficial process depending upon how they view it because

10   they either get to study in what amounts to the phase one

11   approach of represented parties, go home, think about what

12   they've heard and come back having been educated, so some

13   may say that's a benefit, or some may say  why should we be

14   treated differently.  The evidence is being presented at one

15   time.

16           From the Court's perspective, the Court really

17   needs to hear all the evidence within this not quite class

18   action because it's just a bunch of individuals that are not

19   really represented by counsel, and the finder of fact trying

20   to deal with what Mr. Miller describes as one governing

21   legal question presumably has to wait until the last witness

22   has spoken in the second hearing, thereby burdening

23   everybody equally.

24           So I think we have an imperfect structure no

25   matter how this is to be decided.  But I would be interested

Page 44

1    in knowing how the pro se's who wish to be heard on this

2    issue feel about it because they are the ones most directly

3    impacted it seems to me.

4            The Court is going to hear it all in any event,

5    whether it's heard in one or two days as one hearing or

6    whether it's heard in one, two or four days as part of a

7    longer bifurcated process.  But, in effect, what you're

8    really talking about, whether it's one hearing or two, is an

9    order in which the proof and argument is being presented.

10           Effectively, it doesn't matter to me.  I'm

11   indifferent as long as the parties approve the structure and

12   believe it to be fair because it's the same impact from my

13   perspective.

14           What do the -- can I hear from some pro se's who

15   wish to be heard on this?  And if nobody has anything to

16   say, I'll just decide it myself.

17           MR. KENNY:  Arthur Kenny, Your Honor.

18           The -- I'm a commissioned salesman so I was kind

19   of lumped together, you know, with the opening statements

20   from counsel that you're talking about RSUs and CSAs, and

21   then under questioning from Your Honor he acquiesced to the

22   fact that, yes, there was another category, the commissioned

23   salespeople who had commissions withheld.  And so I'm in

24   that category.  And I just want to make sure that there is a

25   differentiation which wasn't differentiated in the opening

1    statement by counsel this morning.

2              So, you know, I want to make sure that I'm heard.

3    I want to -- you know, I'm very sensitive to the efficiency

4    of the Court and while I've attended I've tried to, you

5    know, be a fly on the wall and observe and learn, yet I

6    still want to be heard as to the classification that I have

7    for my particular situation which is similar to those of the

8    other commissioned salespeople.

9              So, you know --

10             THE COURT:  Are your claims part of this

11   settlement that has been referenced by Mr. Miller?

12             MR. KENNY:  I received an offer which was -- you

13   had to respond --

14             THE COURT:  I don't need to know the specifics of

15   it.

16             MR. KENNY:  No.  I know the specifics, but there

17   was a certain date which has expired.  So if you didn't

18   respond then you're -- you're continuing to go along.

19             Now --

20             THE COURT:  Does that mean that you've rejected

21   the proposal or does that mean --

22             MR. KENNY:  I've rejected --

23             THE COURT:  -- you just haven't gotten around --

24             MR. KENNY:  Rejected --

25             THE COURT:  -- to thinking about it?

Page 46

1          MR. KENNY:  No.  Well, I've rejected the proposal

2    in the sense that if I didn't respond by a certain time,

3    then it was rescinded.  Okay.

4          THE COURT:  Don't you think it might be renewed if

5    you were interested?

6          MR. KENNY:  Well, renewed, you know, I didn't find

7    it an acceptable settlement.

8          THE COURT:  All right.  Fine.

9          MR. KENNY:  So it -- that was the case.

10         And the situation is that part of the settlements,

11   there was two parts to a settlement.  Without getting into

12   particulars, but claimants would still go on even if they

13   accepted the second part of the settlement.  So it wasn't

14   that they were extinguished and went to equity.  Okay.

15   There was a second part which would continue going forward.

16         THE COURT:  It sounds to me -- and I don't need to

17   know the specifics -- that part of the proposal deals with

18   the withholdings; is that right?

19         MR. KENNY:  Yes.

20         THE COURT:  Okay.

21         MR. KENNY:  Yes.  Exactly.

22         THE COURT:  So what do you think about one hearing

23   versus two hearings?

24         MR. KENNY:  I -- I honestly don't know.  I mean, I

25   just want to be heard in the efficiency of the Court.  I'm

Page 47

1    --

2              THE COURT:  You don't care?

3              MR. KENNY:  I really don't care.  I want to be

4    heard, but whether it's one or two, you know, I would, you

5    know, leave it to the lawyers here who do have

6    representation of other clients in my category.

7              THE COURT:  Right.

8              MR. KENNY:  So --

9              THE COURT:  Okay.  Are there --

10             MR. KENNY:  -- they would be better judges.

11             THE COURT:  Since you're indifferent --

12             MR. KENNY:  No.  No disrespect, sir.

13             THE COURT:  Okay.  Fine.  Thank you very much.

14             MR. KENNY:  Yes.

15             THE COURT:  Since you're indifferent on the point,

16   are there any pro se's who are present in court who care

17   about this issue?

18             MS. HOU:  Andrea Hou, Your Honor.

19             I guess what's important from a pro se's point of

20   view is that, you know, we get the benefit of being better

21   educated and also being heard.  Again, it doesn't matter

22   whether you have two day or four day or one day hearings.

23   But I think it's important to keep in mind that there are

24   197 constituents and that these constituents are probably

25   those with the least resources to help themselves through

1    the process.   So we appreciate Your Honor's emphasis on

2    making sure that, you know, we're educated -- better

3    educated and heard through the process.  That's -- that's, I

4    guess, what's important.

5              THE COURT:  Okay.  Are there any pro se's on the

6    telephone who wish to be heard on the issue?

7              MR. JACOBSON:  Yes.  Lars Jacobson, Your Honor.

8              You know, my gut feeling -- and my apologies if I

9    speak freely here, but my gut feeling is I prefer to have a

10   one-hearing format.  My concern is in a bifurcated format is

11   that we could very well be in a situation where the estate's

12   counsel uses techniques that -- legal techniques that we're

13   all unfamiliar with to, you know, muddle up the process, if

14   you will.  That concerns me.

15             Just as an example anecdotally -- well, not

16   anecdotally, but just an example, I got my settlement offer

17   Thursday of last week with the deadline being on Monday.  I

18   actually had a child on Tuesday, so it didn't really work.

19   I had to do a number of different things to take a look at

20   it, but that is just an example of what I perceive to be,

21   you know, legal muddling, if you want to call it that.

22             So from my perspective, I would like to just kind

23   of throw my hat in and say I would like one -- you know, one

24   hearing, I guess, for everybody.

25             THE COURT:  Okay.  Anybody else on the telephone?

1              Okay.  Here's what I think.

2              I think that it makes sense for there to be one

3      hearing that is well coordinated.  In practice it may turn

4      out that the one hearing occurs in a Part A and a Part B,

5      but we're going to have one hearing.  Effectively, this

6      structure is going to be one in which as issues are being

7      presented by counsel in reference to represented claimants

8      that touch on the interests of similarly situated pro se

9      claimants, it would be most sensible for all of those

10     factual issues to be heard at once rather than in parts.

11             And while I recognize that this imposes something

12     of a burden on counsel for the represented group, counsel

13     probably will need to think about how to coordinate

14     presentations not only for their represented clients, but

15     also with those pro se's that may be in the same class or

16     that may have aligned interests so that there can be a

17     coherent and efficient presentation of the record evidence.

18             So there will be one hearing and I impose what

19     amounts to an extraordinary burden on all parties, including

20     those represented and unrepresented, to work together so

21     that you don't step on each other's toes.

22             Okay.  Now we get to scheduling.  And I have an

23     observation that really goes to one of the things mentioned

24     by Mr. Miller earlier.

25             I think it highly unlikely that a hearing in late

Page 50

1    January or early February will result in a ruling that

2    allows for freeing up the $25 million in reserve.  And I

3    think it is much more realistic to assume that that $25

4    million will be held for another six months.  And so I don't

5    believe that should be a factor that plays into scheduling,

6    particularly since we are having a single hearing that

7    requires a high degree of planning and coordination.

8             If that helps the parties reach agreement as to

9    when the hearing should be scheduled, I suggest that the

10   parties simply agree on that rather than have me decide the

11   question.  It should be a date that realistically accounts

12   for the time needed to prepare, the time needed to

13   coordinate, and briefing.

14            MR. KAPLAN:  Your Honor, also as I recall when I

15   spoke to chambers -- Eugene Kaplan.  I represent the

16   Newberger (ph) claimants.

17            When I spoke to chambers when I was given the

18   dates in late February, there were three days actually

19   available at that time.  So it may be most efficient if Your

20   Honor does have those three days, since we're now having

21   this hearing with the pro se's to have the extra day

22   available in case -- in case we spill over rather than at

23   some other -- at some other point.

24            They were the -- it was the 24th, 25th and 26th or

25   the 25th, 26th and 27th, I forget.  But it was -- I was told

```
 1    by your clerk that there was -- it was a three-day block

 2    there rather than a two-day block that was available.

 3            MR. SCHAFFER:  But, Your Honor, if I -- if I may

 4    comment there, my recollection is from Mr. Kaplan's

 5    correspondence that the Court said either the 25th and 26th

 6    of February or the 4th, 5th and 6th of March.  It was the --

 7    the three-day block was --

 8            MR. KAPLAN:  It was in March?

 9            MR. SCHAFFER:  -- in the first week of March.

10            MR. KAPLAN:  It was March?

11            THE COURT:  My suggestion is that parties not

12    fixate on these dates.  They were provided by my courtroom

13    deputy not in consultation with me, and those dates do not

14    necessarily represent reality in any event.

15            I think the parties should use their best judgment

16    as to when it would be most convenient for a hearing to be

17    held, and my courtroom deputy, in cooperation with others in

18    the court, will endeavor to accommodate those dates.

19            Is there more on scheduling?  There was -- I think

20    what I would like the parties to do is to simply meet and

21    confer and to develop an agreement.

22            And then what about opening and closing as an

23    issue?  That needs to be resolved now.

24            MR. SCHAFFER:  Your Honor, Richard Schaffer

25    speaking once again.
```

Page 52

```
 1              I think some of us, myself included, were

 2      surprised that this was be -- had become such a major issue.

 3              MR. SCHAEFFER:  Your Honor, Richard Schaeffer

 4      speaking once again.  I think some of us, myself included,

 5      were surprised that this has become such an issue.  I would

 6      remind the Court that there has been substantial -- were

 7      there omnibus objections.  Lehman had at least two briefs in

 8      support of the omnibus objections as a group, as well as the

 9      documents that went in with each objection individually.

10      We've had responses -- it's hard to categorize these things

11      as motions at this point.  It seemed to us that they're

12      opening their case moving for basically reclassification,

13      which is effectively a dismissal and when it came to

14      closing, especially if they're taking one hour to address

15      the pro se issues, which are, as the Court has noted,

16      similar to the issues that are being raised by the

17      represented parties, they don't need one hour for each.

18      They can consolidate those two closing arguments into one,

19      do that first and, we do believe that we should go second.

20      It's not a jury trial, Your Honor, so the dramatic impact of

21      closing second may not be enormous, but I think it's

22      appropriate under the circumstances.

23              Having said that, Your Honor, I don't think that

24      anyone's going to disagree with whatever the Court --

25      whatever approach the Court wishes to take on that issue.
```

Page 53

1          THE COURT:  Yeah, I think we'll just reserve on

2     that and I don't think it needs to be decided right now

3     unless the parties find that it would be useful to have

4     guidance.

5          MR. SCHAEFFER:  Okay.

6          THE COURT:  Mr. Miller, do you have a position on

7     this that you want to express as to the importance to the

8     process in having guidance on the question of who opens and

9     who closes at this status conference?

10          MR. MILLER:  Well, Your Honor, I think there's

11    more importance as to who opens than there is as to how the

12    closing is handled, as I think I suggested before.  It does

13    seem to us that LBHI has been charged with trying to

14    structure and put together this reclassification process and

15    we ought to have an opportunity to present a -- sort of our

16    refined thinking at that point on where we are, what the

17    issues are and to organize it.  So I think opening is

18    important, and I don't frankly think there's much

19    disagreement that LBHI should be allowed to open.  I don't

20    think that is the question.

21          I think the question is how the closing would be

22    handled and I think there the issue is more one of rebuttal.

23    I think that certainly if there's going to be arguments

24    particularly by the pro ses, as well as the represented

25    claimants following the evidence that LBHI should have some

Page 54

1    opportunity to speak to those and not simply have them

2    present a long closing and not have some kind of rebuttal.

3    But in terms of whether that is structured to say a 45-

4    minute closing by LBHI and an hour and a half or two hours

5    by the claimants and 15 minutes of rebuttal or whether it's

6    split in some other fashion, I think that is a fashion that

7    could be determined later.

8              THE COURT:  I think it should be determined later

9    and at least in my experience in matters that have been

10   heavily litigated within the Lehman bankruptcy cases, it

11   doesn't matter because one way or another everything gets

12   said and very frequently more gets said than needs to be

13   said.

14             So the order in which it's presented is of no

15   particular consequence, although it is obvious that after

16   the claimants have had a chance to say whatever it is they

17   choose to say at the end of the evidentiary hearing, there

18   will be an opportunity for LBHI to respond because they will

19   be hearing arguments made by a group that includes

20   experienced counsel, but also some individuals that will be

21   presenting argument for the first time and it's conceivable

22   that some things may be said that will require clarification

23   or rejoinder of some sort.  So let's worry about that in

24   2014.

25             Now, before I let you all go, the correspondence

Page 55

1   mentioned one of my favorite words: mediation.  To what

2   extent, if at all, are the matters that are presented here

3   susceptible to the efficient use of mediation or in light of

4   Mr. Miller's comments about being at least notionally

5   prepared to proceed by dispositive motion, is mediation

6   simply not a workable concept in a setting in which LBHI

7   takes the position that no matter what the facts, these

8   claims all should be reclassified as equity.

9           MR. KAPLAN:  Your Honor, Eugene Kaplan for the

10  Neuberger claimants.  We submitted settlement proposals to

11  LBHI last spring.  They responded by saying that while our

12  proposals were not something they could accept, that they

13  provided a basis for discussion.  We met with them in July

14  to discuss them.  We provided them with additional

15  information thereafter and low and behold, one day late in

16  October Mr. Miller called and said that we're not -- we're

17  only going to make settlement proposals to the -- that

18  limited group of 2008 commissioned salespeople and nobody

19  else, without any discussion, without any further

20  discussion, without any response to our proposals or

21  anything of the like.

22          Frankly, I don't believe that they conducted these

23  settlement negotiations as negotiations agree fairly or

24  anything else, but I believe there is basis for mediation.

25  I believe that unless -- and maybe it is Mr. Miller's

Page 56

1    position that under no circumstance will they pay out on any

2    of these claims other than to these limited commission

3    salesmen in 2008 -- unless that's his position, I think that

4    mediation would be fruitful because the issues are, at this

5    point, are clear, and I think that perhaps a neutral can

6    make some progress, but obviously we were not able to make

7    progress on our own.

8              MR. SOLOMON:  Your Honor, Lisa Solomon.

9              I join in those comments and I would add that

10   while Enron is certainly a very relevant case, we have made

11   various arguments as to why there's no basis for

12   subordination of the claims here.  Arguments that were not

13   raised in the Enron case, and they were arguments that we

14   presented to Weil Gotshal and their client at the July

15   luncheon and we have not received any response.  We believe

16   that there's a very cogent basis to distinguish this case

17   from the Enron case as a matter of law, as well as on the

18   facts, because as a matter of law because we have legal

19   arguments that were not presented, nor considered in the

20   Enron case.  And I think in light of those arguments and the

21   consideration of both sides with regard to a settlement

22   earlier on IE because of a luncheon, that it would be

23   something that should be given serious consideration, a

24   mediation, as to a possible resolution in this matter.

25             MR. SCHAEFFER:  May I one comment?  Your Honor,

Page 57

```
 1    I'm sorry, but I'll make a very brief comment.  Mr. Miller

 2    has alluded several times to a distribution that is planned

 3    for April or late March and I know that the Court has

 4    expressed some skepticism that we could get this done in

 5    time for that distribution.  Underlying Mr. Miller's

 6    comments is the assumption that this will free up the

 7    reserve.  We also have an interest in a March distribution

 8    because we think when this is resolved that we will

 9    participate in it and that's why we pushed, frankly, for a

10    hearing back in December back in July, the big three-month

11    gap where we never got a response.

12              If there's a mutual interest in trying to

13    accomplish nothing a spring distribution, I think an

14    accelerated mediation process could be the only way to get

15    to that end.

16              THE COURT:  Okay.  Thank you.

17              The debtor is the plan administrator throughout

18    these cases have been advocates of alternative dispute

19    resolution procedures and they have worked remarkably well,

20    and so I must conclude that if Mr. Miller says he is not in

21    favor of mediation, it means that the plan administrator

22    believes as a matter of law that there's no obligation to

23    this class, and as a result will offer nothing unless it's

24    something designed to produce a pragmatic resolution of the

25    reserve.
```

Page 58

1          MR. MILLER:  Your Honor, as anticipated, I think

2     some of the response I have to give -- first of all, let me

3     say, personally, I am a huge fan of the alternative dispute

4     resolution and mediations, and I believe that where there is

5     a -- where there are uncertain legal issues, where there are

6     differences in facts, where matters have had a scaler

7     variable, mediation is an extremely powerful and effective

8     tool and I am a great supporter and I know that the estate

9     is a great supporter as well.  And frankly, I'm always very

10    reluctant to say that I believe that mediation does not have

11    a place.  I think effectively we've had much through the

12    process of mediation.  We've had several -- a number, I

13    remember at least two or three face-to-face meetings dealing

14    with settlement with parties.  I think we have laid out the

15    position of the estate.  It's not been terribly welcomed,

16    but the position of the estate has been pretty simple and

17    pretty consistent and that is that the Enron case controls

18    and the sort of undefined distinctions that Ms. Solomon

19    referred to do not make a difference.

20         And there have been a large number of equity

21    holders in the Lehman estates who are in the equity class

22    and 3400 of the 3600 original RSU claimants agreed that they

23    were in the equity class and there are 200 or so -- a little

24    over 200 -- of the claimants who chose to go forward and try

25    to get a result.  The estate has tried to look at those

Page 59

1    claims objectively.  We did see a difference that was

2    somewhat scaler with regard to the category of people that I

3    mentioned in 2008 who had withholdings for commissions and

4    never got RSUs.  And after thinking about that and looking

5    at it, we decided to make a two-option settlement proposal

6    which has been largely accepted by those who -- one of the

7    other options was accepted.  Some of the pro se claimants

8    did not accept it as you heard it or didn't respond.

9          We do not -- as far as I'm advised, a real

10   internal analysis was done of this issue because it's large

11   enough that it went up to the highest levels in the Lehman

12   organization and the determination was that when you go into

13   a mediation, there is inherent representation, at least as

14   far as the estate is concerned, that there is a way to offer

15   something in the mediation which will induce people to go

16   away and we felt that might be the case with regard to this

17   subcategory and we made those offers.  I think the estate's

18   belief is that there's -- based on the message we've

19   received from those who are represented that what they are

20   seeking is not a, you know, the cost of what the hearing

21   would be spread over 200 claimants, which I would frankly be

22   happy to talk with them about if they'd like to when we're

23   finished, but a significant monetary payment on something

24   that we believe, from a legal standpoint is equity, and

25   monetary payments have not been made on things that were

Page 60

1    equity at any time in these estates and it's a matter of

2    principle that LBHI doesn't see itself able to suggest that

3    we believe that a mediation is going to change that at all

4    or other alternate substitute resolution procedure.

5            Obviously, we will do whatever the Court asks us

6    to do and if the Court feels that if an ADR is useful, we

7    will go through that cost.  I might add that the estate does

8    not believe that this is when it ought to pay all the costs

9    up.  Where the estate thinks that the ADR is worthwhile, it

10   has borne all the costs in the other ADR processes.

11           THE COURT:  Okay.

12           MR. MILLER:  If the claimants want to contribute

13   money and try to have an ADR, we'll certainly consider that,

14   but we don't think that we should be directed to go to an

15   ADR and bear the costs.

16           THE COURT:  I'm not directing anything; I was just

17   asking the question.

18           MR. MILLER:  All right.  Thank you, Your Honor.

19           THE COURT:  And based upon the responses, it

20   appears that some of the claimants, through counsel, believe

21   that mediation could be a useful process to pursue.  I read

22   Mr. Miller's comments as indicating support and a strong

23   belief in the efficacy of mediation, but a belief that in

24   this instance mediation is not likely to be useful because

25   the estate adheres to a particular view as to applicable law

Page 61

1    and as to the appropriate treatment of these claims.

2              And so, under the circumstances, I believe it to

3    the parties, if they wish to talk or to move some or all of

4    this to mediation, but I'm certainly not going to direct it.

5              Is there anything more for the status conference?

6              MR. MILLER:  LBHI has nothing further, Your Honor.

7              MR. SCHAEFFER:  Just one brief point, Your Honor,

8    which is that I tried to describe in my letter to the Court

9    yesterday, the structure that we have for the evidentiary

10   hearing procedures order under discussion.  I did point out

11   that there was some briefing that was not strictly in

12   accordance with the Court's chamber's rules in lieu of a

13   pre-trial order.  The order provides for pre-trial briefs

14   and opposition briefs by each party.  I did want to call

15   that to the Court's attention in case the Court had some

16   contrary guidance it wanted to offer.

17             THE COURT:  As far as I'm concerned, the parties

18   should do this on an ad hoc bespoke basis so that you're

19   dealing with the specific needs of this dispute and we don't

20   need to worry about adherence to other general procedures.

21             MR. SCHAEFFER:  Thank you, Your Honor.

22             I have nothing further.

23             THE COURT:  We'll move on to the next agenda item

24   and those who are involved in this may be excused.

25             UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

Page 62

1          UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

2          MR. HORWITZ:  Your Honor, Maurice Horowitz, Weil

3    Gotshal & Manges, on behalf of the plan administrator.

4          The first two contested matters on this morning's

5    agenda are the debtors' 117th omnibus objection to claims

6    and 173rd omnibus objection to claims.  The planned

7    administrator is proceeding with respect to only certain

8    claims identified on a notice of hearing that was filed on

9    those two objections.  Ralph Miller will be handling these

10   together.

11         MR. MILLER:  Your Honor, Ralph Miller again for

12   LBHI, the planned administrator.  With me, at the counsel

13   table is my colleague, Erika del Nido.  I'm not certain that

14   I have seen counsel for the claimants in the courtroom and

15   would like to -- there has been a response filed, so there's

16   a response, but I mean to determine whether he's present or

17   dialed in or here or not.

18         THE COURT:  Is we're dealing with the debtors'

19   117th omnibus objection to claims and the responses of

20   Shashank Agrawal, Joanna Baricevic and William Connors, is

21   that right?

22         MR. MILLER:  There are six, Your Honor.  Was that

23   six names?  I'll get those for you, Your Honor, if there's a

24   question.

25         THE COURT:  I'm just looking at the agenda.  I'm

Page 63

1    just trying to understand what we're trying to ascertain as

2    represented or not represented at the moment.

3                MR. MILLER:  Yes, Your Honor.  That is correct.

4                On the agenda, it describes them correctly, Your

5    Honor.  And the same counsel represents the parties on the

6    173rd omnibus objection.

7                THE COURT:  Is there anyone here in connection

8    with the 173rd omnibus objection, other than Mr. Miller?

9                Is there anyone on the telephone?

10               There's no response.

11               Mr. Miller, how do you wish to proceed?

12               MR. MILLER:  Well, Your Honor, the reason that we

13   had presented these to the Court is because there was

14   agreement that this was a legal issue and there is a

15   response.  We would like to go ahead and present the legal

16   issue to the Court and see if we can get some guidance on it

17   because it is a legal issue that is common to a number of

18   other claims; however, it is not as clean in many of those

19   other claims as it was presented in the responses that we

20   have here where the responses were expressly agreed that

21   this was a matter that could be resolved as a matter of law.

22   I would like to go ahead, frankly, and present a very short

23   argument and then suggest that Court could decide it on the

24   papers and our argument.

25               THE COURT:  Have you had any dialogue with counsel

Page 64

1    for the claimants?  I mean this has been -- this has been

2    hanging around for more than two years, so one question I

3    have is whether there's there has adequate and actual notice

4    to the claimants that this is going to be heard this

5    morning.

6            MR. MILLER:  Well, first of all, Your Honor, there

7    have been a couple of other matters that have been set with

8    this counsel and there was dialogue with him on those and I

9    think that ultimately he decided to withdraw some of those

10   claims which were similar to these.

11           With regards to this particular set of claims, I'm

12   advised by my colleague that several voice messages were

13   left with him about the hearing; that we did not get a

14   response from him on those voice messages and we've had no

15   communication from him indicating he had any objection to

16   the hearing date.  In the case of the others, he decided to

17   affirmatively tell us that he was not going to pursue those

18   other objections, or that his clients decided not to pursue

19   them.  So I believe that --

20           THE COURT:  I'm confused as to the current status.

21   You certainly are free to make whatever arguments you want

22   to make right now in very summary fashion, but I'm

23   uncomfortable granting relief without greater clarity as to

24   an agreement with counsel for the claimant to be heard this

25   morning and this is largely a concern based upon an issue

Page 65

1    that I suppose will come up later in the calendar having to

2    do with the timing and management of the claims resolution

3    process in the case.

4             MR. MILLER:  Well, I --

5             THE COURT:  I don't understand how this popped up

6    today as a contested matter to be heard.  I don't know why

7    there's a need for it to be heard today and I don't know

8    whether it's appropriate for it to be heard today unless I

9    know that the attorney that represents this group, in

10   effect, is aware of it and consents to it because it seems

11   as though we have a due process issue, at least from my

12   perspective.  I don't view phone mail messages unreturned as

13   being the equivalent to the actual notice.  The attorney

14   could be on a trip to Europe.

15            MR. MILLER:  Your Honor, maybe -- we've been going

16   to awhile -- maybe we can adjourn and I could gather all the

17   information.  I've got a couple of different notes that are

18   not completely consistent on the efforts to notify him.  One

19   of which states that we had spoken to him once about this

20   matter, and the other possibility is that we might call him

21   in the break and see if we were able to reach him.

22            THE COURT:  Why is this even a matter of pressing

23   urgency for this morning?  Why is this even on the calendar

24   this morning?  Why are we dealing with this now?

25            MR. MILLER:  Your Honor, this issue has to do with

Page 66

1  the claim that employees of LBI can assert compensation

2  claims against LBHI based on a generalized alter ego theory.

3          THE COURT:  Well, we know that that's a

4  preposterous notion.  We don't have to spend a lot of time

5  on that.

6          MR. MILLER:  Well, Your Honor, if we know that's a

7  preposterous notion --

8          THE COURT:  I know that's a preposterous notion

9  and I know it requires due process and it has been out there

10 for years as an issue.  So my question to you is why are we

11 dealing with it today in absence of the attorney who's

12 pressing the claim?

13         MR. MILLER:  Well, Your Honor, it certainly was

14 not our intention to have it dealt with in the absence of

15 the attorney.  We were surprised.

16         THE COURT:  Obviously true, but I don't know why

17 we are going forward without greater clarity and an

18 opportunity for that attorney to appear and be heard or to

19 say, you know what, I've given up on that point.

20         MR. MILLER:  All right.  Well, Your Honor, again,

21 if we might have a little time to investigate this further,

22 perhaps, if you want to go forward with the other agenda

23 items --

24         THE COURT:  Let's go forward with the other agenda

25 items.

1          MR. MILLER:  -- we can come back.

2          THE COURT:  This one has waited for several years.

3    It can probably wait for another month.

4          MR. MILLER:  All right, Your Honor.

5          So if that's the direction, Your Honor, we will --

6          THE COURT:  No, it's not a direction.  You're free

7    to reach out and try to find out what's going on.  It may be

8    that he's not pursuing the issue at all, but it requires

9    communication.

10         MR. MILLER:  All right.  Thank you, Your Honor.

11         We'll try to find out more.

12         THE COURT:  Okay.

13         MS. MARCUS:  Good morning, Your Honor.

14         Jacqueline Marcus, Weil Gotshal & Manges, on

15    behalf of Lehman Brothers Holdings, Inc. as planned

16    administrator.  That brings us to item number four on this

17    morning -- maybe it's afternoon -- almost afternoon agenda.

18    It's the motion of Lehman Brothers Holdings, Inc. for

19    extension of the period to file objections to and request to

20    estimate claims, ECF number 40939.

21         On November 20th, Your Honor, we also filed the

22    declaration of Thomas Banke in support of the motion.

23    Mr. Banke is the senior director of Alvarez & Marsal, and

24    has headed the claims reconciliation process.  Mr. Banke is

25    present in court this morning.

1          Pursuant to Section 9.1 of the modified third

2     amended joint Chapter 11 plan, the plan administrator's

3     right to object to claims or request estimation of claims is

4     due to expire on March 6th, 2014, which is the second

5     anniversary of the effective date or such later date as the

6     Court may fix for cause shown.  Pursuant to the motion, the

7     plan administrator has requested an 18-month extension of

8     the claims objection deadline without prejudice to its right

9     to seek further extensions upon cause shown.

10          In the motion, as well as Mr. Banke's declaration,

11     we set forth a lot of facts and figures regarding the

12     astronomical amount and number of claims that have been

13     claimed against LBHI and its affiliates.  Your Honor has

14     commented frequently over these past five years that these

15     cases are like nothing else that has come before and that's

16     most certainly true with respect to the claims matters, as

17     well.

18          Yet despite the monumental size of the task, the

19     plan administrator has made amazing progress in the claims

20     reconciliation process.  Creditors filed approximately

21     69,000 proofs of claim asserting approximately $1.3 trillion

22     dollars in liabilities.  As of September 30, 2013, the plan

23     administrator had resolved more than 64,500 claims that

24     abrogate more than $1.2 trillion dollars.

25          Another metric that the Court might find useful is

Page 69

1    that to date, the plan administrator as distributed more

2    than $62.8 billion dollars to holders of more than 25,000

3    allowed claims.  As of the date the motion was filed, the

4    plan administrator had reconciled 61 percent of the claims

5    that were unresolved as of the effective date and 93 percent

6    of the total claims asserted against the debtors.

7         Since the motion was filed, additional claims have

8    been reconciled resulting in the further reduction of

9    disputes claims by $3.2 billion dollars.  We believe that

10   the results achieved to date demonstrate that the plan

11   administrator has worked diligently and effectively on the

12   claims reconciliation process and that extension of the

13   objection deadline is appropriate.  In addition, an

14   extension of the objection deadline would benefit all

15   creditors who after all bear the professional fees of these

16   estates, because it will enable the plan administrator and

17   its team to continue to focus on the more efficient

18   consensual resolution of claims rather than litigation.

19        We've laid out in the motion, Your Honor, that the

20   Court has ample authority under various provisions of the

21   plan, as well as the Bankruptcy Code to grant the requested

22   extension.  The term of the extension, 18 months, we believe

23   is appropriate because we cannot be sure that we will be

24   able to sustain the current pace of claims resolution.  As

25   you can imagine, we have weeded out many of the disputes

Page 70

1   that were easier to deal with and as we move forward over

2   the next year, we'll be moving with some of the more complex

3   and difficult claims issues which are likely to work

4   through.  The requested extension will not prejudice the

5   rights of creditors holding disputes claims that have not

6   yet be objected to because pursuant to Section 8.4 of the

7   plan, the plan administrator maintains reserves for

8   liquidated disputes claims pending resolution.

9           Your Honor, we've laid out in the reply the way

10  that we've categorized the objections.  There are eight

11  objections that have been filed.  We've categorized them as

12  type one objections and type two objections.  There are five

13  type one objections and the description of type one

14  objections, these are creditors whose claims have already

15  been objected to, so technically, the relief that we seek

16  doesn't even apply to them, but they basically responded --

17  and if I can summarize -- basically say this process is

18  taking too long, why can't you process our claim?

19          The relief for requests -- excuse me -- basically,

20  these objectors are collaterally attacking the claims

21  procedures order rather than the motion or the proposed

22  order that the debtors are seeking today, Your Honor.  We

23  recognize that everybody would like to have their claims

24  resolved as soon as possible.  We're making our best efforts

25  to do that, but obviously, these things take time.

Page 71

1            We believe that the type one, five objections

2    should be overruled and for the benefit of the Court, those

3    objectors are QVT Fund, LP and several pro se claimants, Ann

4    Judd, K -- and I apologize to the pronunciation --

5    Sayhimovan (ph), Barry O'Brian, who I believe is in the

6    court today, and Charles W. Showner (ph).

7            With respect to the type two objections, Your

8    Honor, there are there objections listed on the docket.

9    Those objections are Highland Capital, Depfa Bank and

10   Russell Investments.  We've responded to the specifics of

11   each of these objections in our reply.  Suffice it to say

12   that none of these objections asserts a legitimate basis for

13   denial of the requested relief.  Each one of these parties

14   essentially says, my claim is easy to deal with, why do you

15   need 18 months to deal with my claim?

16           What they fail to recognize is that there are

17   holders of 4500 claims that feel the same way and everybody

18   can't go first.  In ruling on the motions we believe that

19   it's incumbent upon the Court to take into account the

20   interests of all creditors and the estates as a whole.  When

21   viewed in that perspective, the extension requested by the

22   plan administrator is very reasonable.

23           If the objection deadline is not extended and the

24   plan administrator is required to file objections to the

25   remaining unreconciled claims, then the reconciliation

1    process will be slower and more costly for the estates which

2    will harm all creditors.  Consequently, for the reasons set

3    forth in the motion and in the declaration of Mr. Banke, the

4    plan administrator requests that the Court enter an order

5    extending the claims objection deadline to September

6    6th, 2015.

7              Your Honor, before I answer any of your questions,

8    and you have the opportunity to hear from the objecting

9    parties, I'm also mention that we did get an inquiry, rather

10   than an objection from an additional creditors, that was

11   Giants Stadium.  Giants Stadium requested that they be

12   carved out of the proposed order.  As Your Honor is aware,

13   the debtors and Giants Stadium have been involved in a

14   dispute for a long time.  We've been before you numerous

15   times with discovery disputes in other matters.

16             On October 23rd, the debtors commenced an

17   adversary proceeding against Giants Stadium seeking to

18   recover approximately $94 million plus interest in

19   connection with a derivatives contract.  After careful

20   consideration and in view of the fact that they intend to

21   file an objection to the Giants Stadium claim shortly and

22   conduct discovery regarding the complaint and the objection

23   contemporaneously, the plan administrator has agreed to

24   carve out Giants Stadium from the proposed relief which

25   will -- and the three Giants Stadium claims will remain

Page 73

1   subject to the existing claims objection deadline.

2          We've revised a proposed order and submitted it --

3   or sent it to Giants Stadium's counsel.  They've approved

4   the form of the order and at the appropriate time, I can

5   hand up a blacklined copy of the order.

6          THE COURT:  I'm not inclined to disagree with any

7   understandings that you've reached with Giants Stadium, but

8   I think it's preposterous to use that word again, that any

9   claimant would seek a carve out.  That's not what this is

10  about.  We're engaged in an argument about appropriate case

11  administration on a global basis.  I'm not inclined to grant

12  the request even though you have said yes to it, and since

13  it's my order, they're not to be excluded.

14         If there are adverse consequences to your dealings

15  with Giants Stadium as a result of my remarks, I'll

16  reconsider them, so I need more argument as to why any party

17  should be excluded from a broad based case administration

18  order of this sort.  I think it's an outrageous request.

19         MS. MARCUS:  With respect, Your Honor, to Giants

20  Stadium and whether this adversely affects our

21  relationship -- I don't know if we can use that term --

22         THE COURT:  It's a pretty toxic relationship as it

23  is, so it's hard to imagine how anything could make it

24  worse.

25         MS. MARCUS:  Your Honor, even if the Court does

1    not carve out Giants Stadium -- obviously, it's your

2    prerogative to do that -- we would still have the ability to

3    file the objection sooner rather than later, right?

4              THE COURT:  You could file the objection today.

5              MS. MARCUS:  Exactly.

6              I don't know if Giants Stadium's counsel is

7    present in the courtroom or not.

8              THE COURT:  Fine.  I'm not carving out Giants

9    Stadium.  I'm not carving out anybody, and I don't think

10   that any party in interest should ever be incentivized to

11   seek separate treatment, especially when there's a pending

12   adversary proceeding and the parties are fully engaged.  I

13   view it as an example of overlawyering, not to be

14   encouraged.

15             MS. MARCUS:  That's all I got, Your Honor.  We

16   request that you grant the motion.

17             THE COURT:  It's really a shame that nobody from

18   Sullivan & Cromwell is here for purposes of that little

19   speech.  Maybe there's an associate who took notes?

20             Okay.

21             MS. KELLER:  Your Honor, may I be heard?

22             THE COURT:  Sure.

23             MS. KELLER:  Your Honor, respectfully, I'm Robin

24   Keller from Hogan Lovells representing QVT Financial, which

25   is a New York based hedge fund manager for investment funds,

Page 75

1   QVT Fund, Quintessence Fund, Piney Branch Fund.

2   Collectively, the QVT Funds had over half a billion dollars

3   of exposure to various Lehman entities around the world and

4   in the U.S., their primary claims are complex derivatives

5   termination damages claims of over a quarter billion dollars

6   in amount, particularly involving preferred securities

7   default swaps with LBSF, which were guaranteed by LBHI.

8         Your Honor, QVT has managed to stay out of this

9   court for five years, but at this point, we need two or

10  three minutes of Your Honor's time in attention to this

11  matter, because QVT believes it is being subjected to

12  abusive discretion by the estate representatives and

13  arbitrary treatment in the manner in which the claims

14  resolution process is being applied to it.  We believe that

15  we are impacted by the motion to extend time because that

16  request permits the debtor to assert additional objections

17  to claims that have already been objected to which the QVT

18  claims have been.

19        THE COURT:  Ms. Keller, let me just break in and

20  ask you one question.  In the plan administrator's opening

21  presentation, various claimants were put into so-called type

22  one or type two.  You acknowledge that you're a type one?

23        MS. KELLER:  We're a type one.

24        THE COURT:  So issue has been enjoined?

25        MS. KELLER:  Correct, Your Honor.

Page 76

1                THE COURT:  Then why is this an issue for you?

2                MS. KELLER:  Let me explain briefly.

3                QVT filed a number of claims, all the supporting

4       documentation.  Those claims were objected to two and a half

5       years ago in 2011.  QVT filed responses to the objections at

6       which point they were adjourned indefinitely by the debtors;

7       however, QVT was approached by the debtors to engage in

8       informal review and negotiation of the claims in early 2010,

9       over three years ago and since then, QVT has devoted

10      extensive time and effort to producing full transparent

11      comprehensive back up to the estate representatives

12      supporting the calculations of its damage claims including

13      providing 13 different packages of analysis presenting its

14      positions on different aspects of its claims responding to

15      Lehman's questions and comments and receiving minimal

16      substantive feedback from Lehman in support of itself

17      conflicting calculations.

18                There have been more than a does phone calls and

19      meetings between QVT representatives and the estate

20      representatives over this time period, including a

21      presentation by QVT's expert witness Professor Paul

22      Flighterer (ph) to the Lehman negotiating team.

23                As I said, our claims were objected to two and a

24      half years ago but with no substantive basis put forward by

25      Lehman other than the claims were too high.  So literally

1    after years of discussion without resolution the estate

2    representatives approached QVT earlier this summer to work

3    out an ad hoc mediation approach, and on July 13th of 2013,

4    QVT confirmed in writing to those representatives its

5    agreement to the mediation process proposed, which it

6    expected to commence in the third quarter of this year.

7              After a lengthy period of silence, the estate

8    representatives asked for yet another conference on the

9    claim, claims which occurred in early October, without any

10   resolution, and to date, they have failed to respond to

11   QVT's calls about getting the mediation process started.

12             Your Honor, Lehman characterizes QVT as one of the

13   claimants seeking to compel the plan administrator to

14   resolve objections to particular creditor claims, quote,

15   immediately.  They call QVT's complaint about the way it's

16   being treated a collateral attack on the claims procedures

17   and state that QVT should not be allowed to skip to the head

18   of the line.  These generic responses are simply not

19   applicable to QVT's situation.  QVT recognizes that the

20   debtor has to have discretion in how it manages a claims

21   portfolio of this size, but there is also such a thing as an

22   abuse of discretion, and we submit that deliberately or not,

23   QVT has become the victim of such abuse.

24             It is not fair and equitable exercise of

25   discretion to put a claimant through a never-ending process

Page 78

1    of having to explain and justify and support its claims with

2    no prospect for resolution unless it gives in to what it

3    believes is a mismarked book and an unjust valuation for its

4    damages.  QVT has no recourse under the procedures approved

5    by this Court unless the Court orders the plan administrator

6    to stop stringing QVT along with its start and stop

7    approaches.

8              THE COURT:  Ms. Keller, let me just break in for a

9    second.  It's already more than the three minutes that

10   you've asked for.

11             This is an order requested by the debtor that I've

12   already indicated is designed for general application to all

13   4500 claimants that have not been resolved to this point, if

14   that's the correct number.  It's at least a good

15   approximation for the number and you have an unresolved

16   claim.  Your argument feels like it's very parochial,

17   understandably you're representing a client and you're being

18   opportunistic by taking this opportunity to object to

19   something as a means to call attention to your unresolved

20   claim.

21             Let's just say for the sake of discussion that I'm

22   sympathetic to the fact that you and certain other claimants

23   have had to wait awhile, but there's a big "so what" that

24   follows that because there's nothing that special about QVT,

25   other than it happens to be your client.  It's one of a

Page 79

```
 1    class of, as yet, unresolved claims, presumably with some
 2    complexity, because I'm guessing that derivatives are
 3    involved in one fashion or another, and so how do you make
 4    this a sympathetic argument when it's being raised in a
 5    context of a case administration motion that I've already
 6    said in the context of the requests by Giants Stadium for
 7    special treatment will not involve special treatment for
 8    anyone?
 9             That was a shot across every objector's bow, as
10    well as a direct shot at Giants Stadium that at least
11    throughout this period of maybe three years as been very
12    actively involved in difficult litigation and should know
13    better than to inject itself into a broad-based case
14    administration order such as this, but that's a detail.  The
15    general proposition is I recognize that parties raise their
16    hand and say what about me all the time and there's
17    absolutely nothing wrong with raising and objection and
18    seeking special attention if you can get it, but what does
19    that have to do with the pending motion?
20             This isn't a motion to compel attention to your
21    claim, but that's the effect of your objection.
22             MS. KELLER:  Your Honor, if I may respond.  We are
23    not seeking to be carved out of the objection, but given --
24    we're not asking to be moved to the head of the line, but
25    we're asking not to be pushed to the back of the line in an
```

1    order Your Honor is being asked to enter which is a blanket

2    approach to dealing with thousands of remaining claims.

3         Your Honor, this plan, as you know, was confirmed

4    over 18 months ago and a lot of money is being held back for

5    QVT pending the resolution of disputes over its claim which

6    QVT would rather have in hand and be able to invest.  And

7    the point is that QVT has been a good citizen.  They've done

8    a lot of work to help the debtors understand.  They've

9    participated in the process throughout.  They've been more

10   than patient and they've been offered the opportunity to

11   mediate, which you said previously is one of your favorite

12   words, and we want to mediate.  We're ready to mediate.

13   Lehman knows everything about our claim situation, but can't

14   seem to close the gap with us.

15        And I don't think it's fair that they've given a

16   blank check to invite counter parties to the table and say,

17   oh, nevermind, we'll see you in 18 months or two years.  It

18   is an abuse of process, Your Honor, and that's what we're

19   here to raise.

20        THE COURT:  Well, let's --

21        MS. KELLER:  And so we raise this objection, but

22   we ask that you ask the debtor or advise the debtor to stop

23   playing games and stringing us along.

24        THE COURT:  Well, you're the first to stand up, so

25   this becomes an opportunity for me to provide some

Page 81

1    foreshadowing as to anybody else who might stand up.  This

2    seems to be -- pardon me of my use of the term -- a

3    misappropriation of this motion practice to obtain

4    preferential treatment or, if not preferential treatment, to

5    try to gain a procedural advantage relative to timing all in

6    the context of a motion that simply pushes out an end date,

7    that in the context of the confirmed plan, has proven to be

8    too tight, consistent with the orderly resolution of all of

9    the as yet unresolved claims.

10           So while I understand the motivation on your part

11   and the part of the other objectors, I'm quite unsympathetic

12   at least in this context.  I understand the desire of each

13   claimant that does not yet have a resolved claim to be

14   processed, if I can use that term, and to fall into the

15   class of the claimants that will then have an entitlement to

16   catch up distributions and future distributions and the

17   amounts involved are quite apparently significant.  But the

18   amounts that are significant include not only the dollars

19   involved, but the unfinished work that needs to be done and

20   everyone in that category presumably has cause to assert a

21   personal priority and ask what about me?

22           You sat through the somewhat lengthy proceeding

23   that we started with today involving RSUs and CSAs and

24   represented claimants and unrepresented claimants and the

25   somewhat difficult process then being discussed for dealing

1    with these claims.  That is but one example that anecdotally

2    happens to be today's example of the complexities of this

3    case, and so I'm granting the motion.  I'm not carving

4    anybody out from the motion, but I'm suggesting that those

5    parties that cared enough to file objections or to complain

6    about process continue to do just that, continue pressing

7    for resolution.  And particularly where a party like your

8    client is interested in mediation and has, according to your

9    comments and your papers, a right of claim for resolution,

10   maybe there's another way to get this resolved.

11          MS. KELLER:  Your Honor, we would love to know

12   what that is because procedurally, we find ourselves in a

13   real Catch-22 here.  Our claims were objected to, but

14   adjourned indefinitely.  We're not on the calendar.

15          THE COURT:  I understand.

16          MS. KELLER:  We've asked for mediation.  We can't

17   get mediation, and we don't know when we will ever get to

18   resolution.  I understand others feel the same way, but

19   we've invested a lot of time and effort in trying to make it

20   as easy as possible for the estate to resolve this

21   substantial claim.

22          THE COURT:  I understand, and one of the things

23   that also happened this morning is that we had a contested

24   matter relating to alter ego claims of employees arguing

25   that claims against LBI were actually claims against LBHI

Page 83

1    under some doctrine.  That's when I first used the word

2    preposterous today, and one of the things that is somewhat

3    opaque from the Court's perspective, and I presume also from

4    the perspective of parties who are objecting to this relief

5    is that largely because so much of what goes on in case

6    administration occurs outside the courtroom, it is never

7    clear to me until a day or two before we have a hearing,

8    whether it's on claims or on general matters, what the plan

9    administrator is going to dishing out for the Court to deal

10   with.  That's just the way it works.

11        It's not my job to micromanage the administration

12   of any case that's assigned to me, but it is my job to deal

13   with matters that are presented to me.  I don't determine

14   the priorities: the parties do.  I don't know if there's a

15   procedure or if there should be a procedure for determining

16   who comes first.  And Ms. Marcus made the comment in her

17   opening presentation and it's true everybody wants to be

18   first, so I have a suggestion and it's not in the nature of

19   the granting of any relief.  It would be more desirable if

20   this process were more transparent in offering parties

21   within the class of not yet allowed claims or not yet

22   disallowed claims to understand how determinations are being

23   made as to who comes first or who gets earlier treatment or

24   who gets deferred because while I have heard your argument

25   about abuse of process, there's no record here to support

Page 84

1   that argument and I don't find based on my own experience in

2   administering this case that there's been any abuse by the

3   debtor and the plan administrator, but that's not to say

4   that some party might not be able to make such an assertion

5   and that's not to say that there might not be an instance

6   where a finder of fact might be persuaded that that is true.

7           So I'm letting everybody know that it's my

8   intention to grant the relief in this procedures motion.

9   It's purely procedural.  The impact, however, of extending

10  the time to September of 2015 remains to be seen.  I don't

11  know how the plan administrator intends to proceed with

12  ordering this massive workload, this still massive workload,

13  nor do I know what's really in the pipeline in terms of

14  claims that have been previously objected to, the time one

15  claims, that may be susceptible to mediation or some sort of

16  agreed resolution as opposed to having contested matters

17  decided by the Court.

18          So what I'm going to suggest in the context of

19  granting this relief is that there also be a better window

20  into the process so that parties who are anxious to have

21  their claims resolved might have some ability to understand

22  why it's not yet timely for their claim to be resolved or it

23  may be timely and for there to be some broad-based work plan

24  available for public dissemination or private dissemination

25  with confidentiality to the extent that this may be

Page 85

1   sensitive information, as to how the plan administrator

2   intends, over the period of time between March of 2014 and

3   September, 2015, to use that time in an efficient and fair

4   way.

5              Now, no one has asked for that because everybody's

6   objection is what about me.  My response to it is this is a

7   process-based motion and there should be a process-based

8   response to it, not only for those who have objected, but

9   for anybody who may feel aggrieved.  So I'm going to propose

10  that the debtor, plan administrator, with counsel and

11  advisors come up with -- if they don't already have it -- a

12  plan.  I don't know if such a plan exactly exists as we

13  speak it may, it may not, but if it doesn't exist, it

14  should; otherwise, we're simply dealing with a squeaky wheel

15  concept of case administration and that's, in effect, what

16  your objection is.

17             So there's no reason, just because you're a

18  squeaky wheel for you to get the grease, but there should be

19  a process in which parties within classes and categories

20  have reasonable expectations as to how their claims are

21  going to be addressed over time.  So I think I've actually

22  disposed of everybody's objection and I hope that the

23  process that I am encouraging is helpful not only to the

24  parties, but also to the debtor plan administrator.

25             Does anyone else wish to be heard on this?

1           MS. KELLER:  Thank you.  We welcome that

2    transparency and understand that should we wish to pursue a

3    claim of abuse of process, we would have to bring a record

4    before Your Honor, and so I would hope that that would not

5    be necessary --

6           THE COURT:  I would hope that that would not be

7    necessary, too.

8           MS. KELLER:  -- and we will get everything

9    resolved.  Thank you, Your Honor.

10           THE COURT:  Okay.  Thank you.

11           MR. GUY:  Thank you, Your Honor.  Jonathan Guy for

12    Depfa Bank, Orrick Herrington & Sutcliffe.

13           I understand the Court has ruled and we respect

14    that ruling and we understand that this is based upon it's a

15    process.  We want to make clear that Depfa was not objecting

16    and saying that we want to be carved out.  We were saying

17    there are categories of claims that are different and

18    exactly what Your Honor just said is understanding why

19    certain categories of claims which can be objected to, where

20    they've been through mediation, where the parties understand

21    the disputes, where are they in the queue, but we're not

22    asking for a specific carve out.

23           THE COURT:  Okay.

24           MR. GUY:  We didn't believe they showed cause as

25    to those categories, but we understand the Court has ruled,

Page 87

1    Your Honor.

2              THE COURT:  Okay.  Thank you.

3              MR. GUY:  Thank you.

4              THE COURT:  Anyone else wish to be heard?

5              Mr. Vasser?

6              MR. VASSER:  Good afternoon, Your Honor.

7              Shmuel Vasser, Dechert, for Russell Investments.

8    And I understand that Your Honor ruled.  Fairly few short

9    comments, one is that we are type two.  Our claims have not

10   objected to and we actually -- why we can't represent

11   everybody of the 4500 claimants whose claims are still open,

12   we actually did not ask to be ahead of the line.  We didn't

13   ask for any particular relief for us.  We just expressed

14   Russell's view, which may be misguided, but Russell's view

15   that the process takes too long and giving the debtors an

16   additional 18 months without -- with an open option for

17   extension is just too long.

18             So I understand that Your Honor is going to grant

19   the motion.  I'm just putting it on the record because I

20   suspect in 18 months I'm going to be here again and making

21   maybe a similar argument that may be received the same or

22   differently in 18 months.

23             The second point I just wanted to make the Court

24   aware of is that in the response to our objection, they

25   noted that two of your claims are marked as accepted as

Page 88

1    filed and therefore resolved.  We actually knew that, but

2    when we called the claims agent and we asked what does that

3    mean, they told us it really doesn't mean anything because

4    as long as the claim is not allowed, the debtors can still

5    object to it as long as the deadline runs.

6            I asked LBHI to confirm to me that what it means,

7    accepted as filed, actually means that they viewed this

8    claim as allowed and I got this confirmation, but I know

9    that there are many others, many other claims on the claims

10   docket that are marked accepted as filed, but nobody knows

11   what that means.  And I think if their view is that claims

12   that are marked on the claims register as send as filed are

13   allowed, then they need to mark the docket appropriately.

14   Thank you very much.

15           THE COURT:  Okay.  Thank you.

16           Ms. Marcus?

17           MS. MARCUS:  Your Honor, just very briefly.

18           We've heard your comments and we will work with

19   primarily, I guess, Mr. Banke on a plan.  I'm sure that he

20   has his plan -- it is nothing that I've seen and I will try

21   to develop something that will be user friendly that we can

22   share with people who make inquiries.  I must say that I

23   take umbrage at the suggestion that there's been an abuse of

24   process here because that's just simply not the case.  In

25   fact, the facts referred to by Ms. Keller in her objection

Page 89

1    reflect that we have engaged with QVT over an extended

2    period of time, but I guess that's for another day.

3              We will submit the original order, I suppose,

4    right?

5              THE COURT:  The original order?

6              MS. MARCUS:  Without the carve out?

7              THE COURT:  Without the carve out.

8              MS. MARCUS:  Okay.

9              THE COURT:  It's a no carve out order, but it's

10   a -- with some effort to clarify in a way that is observable

11   by claimants the process and procedures that will be applied

12   on a go forward basis to resolving the 4500, as yet,

13   unresolved claims.

14             MS. VOLKOV:  Your Honor, would that be a provision

15   in the order?

16             THE COURT:  It's simply part of the record.

17             MS. MARCUS:  Okay.  Thank you, Your Honor.

18             MS. VOLKOV:  Your Honor, Ilana Volkov for

19   Highland.  I was not going to get up, but it just occurred

20   to me -- I'm wondering whether to help the transparency it

21   makes sense to have a status conference sometime down the

22   road so that aggrieved party can be heard to the extent that

23   the transparency is not as transparent as the parties would

24   like it to be and just to keep the process moving along.

25             THE COURT:  I don't think that's a terrible idea

Page 90

1    because it provides some accountability as to how this

2    concept will be, in fact, implemented, and my suggestion is

3    that we simply have a status conference on claims procedures

4    and priorities as an agenda item, say in three months.

5            MS. MARCUS:  That's fine, Your Honor.  We have no

6    problem with that.

7            The one thing I do want to caution, I guess

8    everybody, about is this plan we're going to be sure not to

9    disclose things that are attorney-client issues.

10           THE COURT:  Of course.  I'm talking about a broad

11   concept that gives parties some sense as to the rationality

12   of the work plan for dealing with the, as yet, unresolved

13   claims to that parties have an ability to, in effect,

14   calendar, when in the reasonable future their claim might be

15   the subject of either a motion or negotiations to resolve

16   it.

17           MS. KELLER:  Your Honor, it would also be really

18   helpful if there was a person identified at the plan

19   administrator that would be responsible for this and who we

20   could talk to about where we might fit in.

21           THE COURT:  That might be absolutely true, but I'm

22   not going to be drafting this today, so parties can send

23   letters to Ms. Marcus, who I think will end up as the

24   clearinghouse as suggestions.  I'm not trying in this

25   suggestion to create a burden or significant incremental

Page 91

1    work, rather, I am proposing a procedure that will enable

2    those whose claims remain unresolved to better understand

3    why they are waiting and when they can reasonably anticipate

4    the claims within a certain category.  For all I know, it

5    may be alphabetical.  I have no idea how we're dealing with

6    priorities will be heard -- I'm not suggesting, by the way,

7    in that little aside, that I think an alphabetical order

8    makes sense -- but people tend to organize information in

9    rationale ways or like my desk, stuff is just thrown on it,

10   but I know how to find it, mostly.

11            MS. MARCUS:  I tell people that too.

12            THE COURT:  So my point is that there's either a

13   rational approach to organizing this data or there's an

14   irrational one which also works, but -- and I'm not telling

15   you how to do it -- I'm just asking you to make it clear to

16   third parties what's going on.

17            MS. MARCUS:  That's fine, Your Honor, and just to

18   point out in terms of a contact person, every single omnibus

19   objection that we filed -- obviously, this only applies to

20   people whose claims have already been objected to -- but

21   every single bus omnibus objection has the name of a Weil

22   Gotshal associate and a phone number to contact them and

23   it's amazing how many people don't look at the objection and

24   call somebody else, but if those people are contacted, they

25   are the best people to be able to respond to status or to

Page 92

1    follow-up and get an answer for somebody.  I think we'll

2    deal with that in the plan.

3              THE COURT:  Okay.

4              MS. MARCUS:  Thank you, Your Honor.

5              THE COURT:  Thank you.

6              MS. MARCUS:  The next matter will be handled by

7    Mr. Horwitz.

8              THE COURT:  Okay.  And everybody who's involved in

9    that last matter can be excused.

10             MR. HORWITZ:  Your Honor, before we go into the

11   last matter on the contested -- or on this morning's agenda,

12   I wanted to report that my colleague, Erika del Nido has had

13   an opportunity to speak to the counsel for the two veil

14   piercing objections and is able to report at least to the

15   Court what that attorney would like to do.

16             THE COURT:  All right.

17             MS. DEL NIDO:  Good afternoon, Your Honor.

18             Erika del Nido, Weil Gotshal & Manges for Lehman

19   Brothers Holdings, Inc. Your Honor, well in advance of this

20   hearing, my colleague, Maurice Horwitz, and I spoke to

21   Mr. Bruce Duke.  He is counsel representing those six

22   claimants to try and set a hearing date.  We told him about

23   the November hearing.  He raised no objection.  He said that

24   he desired to follow up with the claimants that he was

25   representing.

1          Subsequent to that, we left him several voice

2     messages to follow up to see the status.  At the brief

3     intermission today, Your Honor, I spoke to Mr. Duke on his

4     cell phone explaining what was going on today.  He informed

5     me that he desires to go forward on his papers alone.  He

6     does not wish to make any additional oral argument and he

7     would like to stand on what he has submitted.

8          THE COURT:  All right.

9          MS. DEL NIDO:  Thank you, Your Honor.

10          THE COURT:  Mr. Miller, on that basis, to you wish

11     to press your argument today?

12          MR. MILLER:  Your Honor, we would like to try to

13     get a ruling.  I think you've already characterized these

14     claims, but we have a number of people who are making this

15     same argument and you've alluded to the difficulty of claims

16     administration, getting some clear guidance on this issue

17     will assist with claims administration, so we would like to

18     go forward with the papers, if we could.

19          If I could have two minutes to just point out the

20     important things in the papers.

21          THE COURT:  Why don't you proceed, and as to the

22     last matter on the agenda that is coming back after about 18

23     months of unexplained absence, I'm inclined to adjourn that

24     until 2:00 because it may take a little time and it's now

25     almost 12:30.  So my understanding is that the 2:00 calendar

Page 94

1   has cleared.  My courtroom deputy told me that we received a

2   call indicating that the Fannie Mae matter is being

3   adjourned to another date.  I just want to clarify that to

4   make sure that we have time at 2:00 for the Caisse Des

5   Deposts Et Consignations.  It sounds a little sexy.

6            MR. MILLER:  So, Your Honor, can we go ahead and

7   submit the 117th and 173rd objection issue briefly before we

8   adjourn?

9            THE COURT:  Let's deal with the matter at hand

10  before we adjourn and then the renewal of the issue of the

11  late filed proof of claim can be heard at 2:00 if that's

12  okay with everybody?

13           MR. MILLER:  That certainly works with LBHI, Your

14  Honor.

15           UNIDENTIFIED SPEAKER:  That's fine, Your Honor.

16           THE COURT:  If you wish, you can be excused and

17  come back at 2:00.  It's up to you.

18           MR. MILLER:  I can make this very brief, Your

19  Honor: papers that the respondent wants to rely on makes

20  only one objection or response to the objection and it is

21  quote, submit it is submitted by claimants that LBHI is the

22  alter ego of LBI and as such, LBHI is ultimately responsible

23  for the obligations of LBI, including those of claimants.

24  LBHI's attempting to construct an artificial distinction

25  between it and LBI in order to avoid legitimate compensation

Page 95

1   claims of payment of claimants.  That's in paragraph 12 of

2   the response in issue to the 117th omnibus objection and

3   paragraph 10, identical paragraph, to the 173rd.

4           The three claimants in each of those that are the

5   subject of this particular hearing have all identified

6   themselves as, quote, claimants are all former employees of

7   LBHI through one of its wholly owned subsidiaries, LBI, or

8   an affiliate of LBI.

9           Now, the Court can, of course, take judicial

10  notice of the fact that LBI is the subject of proceeding

11  before it under those Securities Investors Protection Act

12  and it is a debtor in solvency proceeding.  The Court is

13  also take judicial notice of the fact that there are

14  numerous representations in that it's a Delaware

15  corporation.  LBI is in a Second Circuit in a landmark

16  decision by Judge Pollak held that a claim alleging that a

17  debtor or bankrupt is the alter ego of its controlling

18  stockholder constitutes property of the bankruptcy estate or

19  the debtor in possession and it can only be asserted by the

20  trustee or the debtor in possession, and that's the call

21  Vorhees case, 8 fed 3rd 130 at 132.  The doctrine was

22  reaffirmed and applied to a Delaware corporation like LBI by

23  Judge Gonzalez in Duke Energy Trading and Marketing v Enron,

24  a 2003 case, that we cited to the Westlaw cite in the brief.

25  Judge Gonzalez wrote, based on the fact that Delaware law

1    allows a subsidiary to maintain an action against a

2    corporate parent, Courts have found that a Delaware Court

3    would permit a debtor corporation to assert a claim to

4    pierce its own corporate veil, and there are some citations.

5            He then said, thus, the trustee or debtor in

6    possession would have an exclusive standing to maintain a

7    Delaware corporations alter ego claim of a general nature.

8            All of the elements of that holding apply here.

9    The response also said, and I think it's been reconfirmed by

10   the information reported, quote, a hearing is not required

11   to dispose of an objection, rather, this Court may apply a

12   summary judgment especially when as in the case sub judice

13   there are no genuine issues of material fact.  That's what

14   the response said in paragraph 13 of the response at issue

15   in 117th in paragraph 11 of the response to the 173rd.

16           So this has been submitted.  The facts are clear.

17   This is a generalized alter ego claim.  There is a sound

18   policy raised which is apparent to the Court for gathering

19   the value of an alter ego claim into a debtor like LBI so it

20   can be distributed throughout the rest of its creditors, all

21   of its creditors, and not by individual creditors can assert

22   an alter ego claim for a debtor.

23           And in this particular case, the system has worked

24   just like it was supposed to because in the record that the

25   Court has is the fact that a settlement was achieved between

Page 97

1   LBI and LBHI and one of the claims that was released was the

2   possibility of alter ego claims.  The unredacted version of

3   that has been provided to the Court.

4          If there is any value in a claim that LBHI

5   improperly dominated its subsidiary, that value should have

6   passed through such a settlement to LBI and claimants who

7   are making the claims that these parties are and claims like

8   it that they were employees of LBI, they had compensation

9   claims against LBI, if they recover on those compensation

10  claims against LBI and the LBI estate now has more value in

11  it because of its settlement with LBHI hypothetically, then

12  they will get the benefit of that value and share it with

13  all of the rest of the creditors.

14         So the system has worked here the way that it was

15  supposed to work.  And the proposed orders that we have

16  submitted would rely solely on the standing issue and they

17  would make it clear that for these generalized alter ego

18  claims where somebody -- and we've got these claims

19  disbursed through a lot of other claims, usually mixed with

20  other things -- that there is not standing for employees of

21  LBI to assert compensation claims, and frankly, we think it

22  may apply to broader contexts but that's the context before

23  the Court.

24         Under the Second Circuit ruling in Cobb and other

25  cases that follow it and especially the explanation of that

Page 98

1   by Judge Gonzalez in Duke Energy Trading and that's, Your

2   Honor, what we would like to have established, if at all

3   possible, for clarity and to assist us going forward.

4           I'd be happy to take any questions, Your Honor,

5   but that's the issue that's been submitted.

6           THE COURT:  I have no questions.  The outcome here

7   is clear.  These individual former employees of LBI do not

8   have standing to pursue claims against LBHI on an alter ego

9   theory.  I will enter the order that so provides and would

10  simply observe the obvious.  The LBI estate is being

11  separately administered by Mr. Giddon (ph) as SIPA trustee.

12  The LBHI estate has been separately administered as a

13  Chapter 11 case that resulted in a confirmed plan in

14  December of 2011.

15          The estates are distinct and will always remain

16  so.  The employees of LBI have whatever rights they have in

17  that proceeding.  They have no rights in the LBHI case

18  unless, of course, they have other grounds to assert claims

19  other than their status as LBI employees.

20          MR. MILLER:  Thank you, Your Honor.

21          We have submitted the orders, I believe, already,

22  and we have discs -- we have them on disc.

23          THE COURT:  Fine, then we'll return at 2:00.

24  We're adjourning for lunch.

25          MR. MILLER:  Thank you for your time, Your Honor.

Page 99

1            THE COURT:  Thank you.

2        (Recess at 12:31 p.m.)

3            THE COURT:  Be seated, please.

4            Good afternoon.

5            Do you want to proceed?

6            MR. HELLMAN:  Thank you, Your Honor.

7            Good afternoon, Jay Hellman, Silverman Acampora

8   for the movant for purposes of the motion today, so I'll

9   have to ask the Court to excuse my French, if I can refer to

10  my client as CDC, I would appreciate that.  I think it would

11  be easy on all of us if we could do that.

12           THE COURT:  We'll refer to your client as CDC.

13           MR. HELLMAN:  Thank you, Judge.

14           Your Honor, before the Court is CDC's second

15  motion for allowance of a late file claim.  The Court may

16  recall that the last time around that CDC had made the

17  motion for permission to file a late claim and the Court had

18  denied that motion without prejudice subject to our coming

19  back with answers to certain questions and we took that

20  directive very seriously, Judge.

21           THE COURT:  Well, let's talk a little bit about

22  that because I don't think all the questions have been

23  answered and I'd like to start out with just some

24  explanation as to why it took so long to deliver so little.

25           MR. HELLMAN:  Well, Judge, we went back to the

Page 100

```
1    client, which is a French-speaking client and explained to

2    them the reasons for the Court's denial of the motion the

3    first time around.

4              THE COURT:  Just so we're around on representing a

5    French-speaking client --

6              MR. HELLMAN:  Yes, Judge?

7              THE COURT:  -- I expect I'm not the only person in

8    the room who's been to Paris and I expect that I'm not the

9    only person in the room to know that certainly in the

10   commercial world English is the lingua Franca of Europe.

11   Everybody who's involved in business in Europe speaks

12   English to one-on-one another.  It's esperanto for business

13   in Europe, so the argument -- I'm just letting you know

14   right now that we're dealing with a French-speaking

15   client -- isn't going to take you very far.

16             MR. HELLMAN:  I understand, Judge, and I'm not

17   making that as -- I'm not suggesting that as any type of

18   excuse.  I'm simply putting it out there to explain that to

19   the Court.

20             Yeah, at the higher levels I think there is some

21   English -- there are some English-speaking individuals --

22             THE COURT:  There are plenty of people in this

23   organization of 76,000 people who speak fluent business

24   English and who understand that mail needs to be opened and

25   read.
```

Page 101

1            MR. HELLMAN:  Well, here's the situation, Judge.

2      We went back and we asked the client -- actually told the

3      client that we're not coming back here unless we get as much

4      information as we possibly could from them in order to

5      answer the Court's questions, and yes, admittedly, there,

6      are some blanks, but we did the best we could to fill them

7      in.

8            THE COURT:  Who is the individual who is

9      responsible for this transaction and why is that individual

10     not here or why is that individual not submitted to a

11     deposition and why is it that your papers, after such a long

12     period of time, provide absolutely no incremental

13     information that goes to the question of excusable neglect?

14           MR. HELLMAN:  Well, because there's not one

15     particular individual involved in the transaction.  As the

16     Court can see from the papers, there are three or four

17     different divisions that were involved in these -- in the

18     master agreement transactions, okay.

19           To the extent that the mail was returned, which is

20     what took us so long to find out, you know, who was

21     responsible to sending that back, it turns out that it's

22     nobody, Judge.  Really, they have this central mail

23     division, if you will, where everything goes to that

24     division and the mail is sorted there by folks who don't

25     necessarily speak English.  Maybe they do speak a little bit

Page 102

1    of English but maybe they don't speak English.

2              THE COURT:  It almost doesn't matter.

3              MR. HELLMAN:  But we couldn't find the individual

4    responsible for that.

5              THE COURT:  But it almost doesn't matter because

6    regardless of the language that is spoken in the mailroom,

7    presumably, there are procedures that are regularly followed

8    by the personnel of the mailroom for dealing with mail such

9    as this and for mail that is designated as important or even

10   if the person who received the mail isn't sure that it's

11   important, the procedure of just sending it back is just

12   inexcusable to me.

13             And since your principle argument made a year and

14   a half ago was that this is a vast organization that gets

15   thousands of pieces of mail a week and that it's incredibly

16   important to track mail that it be specially addressed, I

17   have to think that lots of mail comes that isn't specially

18   addressed, so one of the questions that hasn't been answered

19   but was asked last time is what procedures apply to the

20   processing of mail so that mistakes such as this don't occur

21   on a routine basis and you haven't provided any of that

22   information.

23             MR. HELLMAN:  The answer to that question, Judge,

24   is I think that why it highlights why it's so important that

25   the debtor should have addressed that envelope to that

Page 103

1    department because what happens, Judge, is --

2            THE COURT:  Wrong answer to the wrong question,

3    and I understand that you're being an advocate here.

4            I've asked specific questions that haven't been

5    answered, so it's unreasonable to the point of being fool-

6    hearty for any large organization, especially one entrusted

7    with pension funds, to assume that it can rely upon third

8    parties to correct deficiencies in its own organization.

9    There needs to be procedures in the organization that are

10   effectively idiot-proof, that allow for mail, regardless of

11   how it's addressed, to get to the right place within the

12   organization or there will be something akin to malpractice,

13   and that's what this is.

14           MR. HELLMAN:  Well, unfortunately, Judge, and it's

15   part of getting to your answer to the question, what I was

16   saying is that it's so important to that have particular

17   address, and that's why the master agreement had that

18   particular address.

19           THE COURT:  But the master agreement, with

20   respect, does not trump bankruptcy notes provisions, nor

21   should it ever --

22           MR. HELLMAN:  You see, that's where I --

23           THE COURT:  You can disagree with me on this but

24   you're going to lose on this.  I take an emphatic position.

25   You can't take notice provisions in an instant agreement and

Page 104

1    make them govern a bar date order.  The bar date order

2    speaks for itself, needs to be complied with and it also

3    appears to me that your client having terminated this

4    transaction took ownership of the breakage from that point

5    forward.  They could not do nothing.  They can't rely upon

6    the fact that they didn't get actual notice when actual

7    notice was mailed to three addresses and you haven't

8    provided to me with any explanation as to how your client

9    actually functions, other than to say lots of addresses, ten

10   different addresses in Paris, 76,000 employees, very

11   important that mail be specially addressed, but there has

12   been no acknowledgment of responsibility and accountability

13   for the problem.

14          Had there been more of that in the second motion,

15   it would have been different from the first, but actually

16   it's just late and saying the same thing again.

17          MR. HELLMAN:  Well, actually, Judge, to the extent

18   that the mail is not properly addressed and they can't

19   figure out which department it goes to, unfortunately, it

20   gets returned as undeliverable.  That is why --

21          THE COURT:  Unopened and returned?

22          MR. HELLMAN:  Unopened and returned.

23          THE COURT:  Don't you think that's a pretty stupid

24   set of procedures for an organization that's entrusted with

25   fiduciary responsibilities for retirees in France?  Don't

Page 105

1    you think that it amounts to something that's almost

2    actionable negligence per se?

3          MR. HELLMAN:  No, that's why they have in these

4    documents, such as the master agreement, the very specific

5    notice provisions.

6          THE COURT:  Very specific notice provisions do not

7    trump an obligation on the part of a swap counterpart party

8    to act commercially reasonable ways and the from moment that

9    your client terminated the swap on September 18th, I

10   believe, 2008, it took ownership of the termination.

11   Somebody in authority messed up.  Somebody in authority made

12   a business decision to write letters in English to Lehman to

13   terminate the swap and then relies upon the fact that they

14   aren't English speakers to say, well, a document that comes

15   to us in our mailroom that isn't properly addressed and that

16   we return does not constitute due process under the

17   constitution, hardly.

18          Under our procedures, properly mailed notices that

19   actually are delivered constitute actual notice and I

20   completely disagree with your argument and I find that your

21   papers a year and a half late offer me absolutely nothing to

22   distinguish them from the first set.  You had denial without

23   prejudice and then came back with more of the same.

24          MR. HELLMAN:  Judge, if I may, there are a few

25   cases that were cited in our papers, National Union Fire

Page 106

1    Insurance Company, I believe.

2              THE COURT:  The debtor distinguishes those cases.

3              MR. HELLMAN:  That says if you contract for a

4    particular type of notice, then that trumps whatever notice

5    you get, whether it be by notification by publication or

6    notice to a different address or anything else.

7              So, I understand where the Court is coming from in

8    terms of the position that the Bankruptcy Code trumps

9    anything that the parties can agree to, but I think that

10   those cases speak to a different -- or to a whole

11   differently.

12             THE COURT:  Let's oh before we get to the cases, I

13   need to understand a couple of things.

14             MR. HELLMAN:  Sure.

15             THE COURT:  One, why did it take as long as it did

16   to remit this motion because the delay almost seems

17   inexcusable to me and I'd like an explanation --

18             MR. HELLMAN:  Sure.

19             THE COURT:  -- other than you have a French-

20   speaking client, and two, why weren't you able to provide

21   more information to answer the questions that were quite

22   plainly on the record last time?

23             MR. HELLMAN:  Well, to answer the first question,

24   Judge, again, we took Your Honor's -- I don't want to say

25   directive -- but inquiry very seriously and we spent

Page 107

1    considerable time and effort trying to find the answer to

2    the question of who sent that back and, you know, months

3    later after investigating, we found that, well, we couldn't

4    find the individual who sent it back.  It was somebody from

5    this central mail division, and, you know, we tried to

6    inquire about, well, how does that work and what happens.

7            Their answer is well, we get thousands of pieces

8    of mail a day that we specifically require people to address

9    mail to a particular location because we have so many of

10   them and if it's not, unfortunately, it doesn't get opened

11   and it gets sent back, return to sender, and that seems to

12   be what happened in this case.

13           And as we're preparing the papers and drafting the

14   papers, we have more and more questions about what's going

15   on, but even before that, Judge, there's still other issues

16   concerning folks from the CDC who had left that we were

17   dealing with, the personnel.  So new personnel came in.

18   It's a quasi-governmental agency where, yes, it's not the

19   most efficient entity in the world, but we had to deal with

20   those folks and catch them up to speed.  We had to get

21   authority to file a second motion, so it did take some time.

22   We had to get retained for a second time with respect to the

23   second motion, so it did take some time, no question.

24           But, you know, I was here listening to some of the

25   arguments and we're not trying to get first in line like

Page 108

1    some of the others, but the Court had given the debtors

2    until, I think, September, maybe, but certainly 2015, some

3    point in 2015.

4              THE COURT:  September, 2015.

5              MR. HELLMAN:  Okay.  So, yes, there may have been

6    a delay in terms of being able to file this second motion,

7    and maybe even the first motion because they really didn't

8    know what to do at that juncture, but it doesn't have any

9    effect on the debtors.  We're talking about a very small --

10   yes, three or four million dollars is a lot of money -- but

11   we're talking about a very small sum of money given the

12   context of this monstrosity of a case where there's millions

13   if not billions of dollars involved in claims.  There's

14   really no downside to the debtors to allow this claim to

15   save three or four million dollars of money for civil

16   servants in France, you know, their pension funds.

17             So, yes, there was delay.  I think from CDC's

18   side, there's no question, and I can't deny that, but I

19   think in the context of the overall case, there's really no

20   prejudice to the debtors on this.

21             THE COURT:  Well, that's a different argument,

22   though.  What I'm struggling with in my two-part question is

23   the reason for the delay and I think the short answer is it

24   took too long, didn't it, but nobody's prejudiced in your

25   argument.

Page 109

1           But the second part of the question is what's

2     different in this motion from the first one?  What questions

3     have been answered about whose responsibility it was?  Who

4     takes ownership of this trade, including the decision to

5     terminate it?  Who, if anybody, paid attention to it after

6     it was terminated?  Who, if anybody, paid any attention to

7     the fact that Lehman Brothers was in bankruptcy after it was

8     terminated?  Who, if anybody, supervised the mailroom, and

9     takes ownership for the procedures that are followed there?

10    What if anything can be said about excusable neglect in

11    setting that appears to be supine negligence?

12           MR. HELLMAN:  Well, I don't know if there's any

13    singular individual.  I mean I've seen some of the documents

14    that have been submitted by the debtors, but there a few

15    folks who sent letters saying, you know, we're terminating

16    this master agreement, which, by the way, Judge, you know, I

17    know that the Court had said that once it's terminated,

18    somebody has to seek responsibility for that, but the notice

19    provisions still survived the termination of the agreement,

20    so I just wanted to make that clear.

21           THE COURT:  As to the notice provision issue, just

22    so it's clear, if you think about what you're advocating and

23    you take it to its logical extreme in a case such as this

24    that involves significant complexity in the documentation,

25    notice provisions that are buried inside agreements are

Page 110

1   probably much more important for the non-defaulting party to

2   give notice to the defaulting party than it is for the

3   defaulting party to give notice to the non-defaulting party

4   because in the world of derivatives and swaps, parties that

5   have in the money claims are expected commercially to take

6   appropriate steps to protect their interests and your client

7   did nothing.

8           And your second motion offers for evidence on

9   diligence on the part of your client to pay any attention to

10  this.  It appears to have completely slipped off the radar

11  screen of your client.  Now, you try to argue that they

12  didn't need to do that because Lehman had an obligation in

13  giving notice of the proof of claim bar date to follow

14  special notice provisions in the ISDA, but they followed

15  notice provisions adequately for purposes of the proof of

16  claim notice provisions themselves.

17          To apply your rule in a case such as this would

18  mean that the debtor would need to examine every single

19  operative document that might include a special notice

20  provision in the context of sending out bar date notices to

21  the world.

22          MR. HELLMAN:  And to some degree, Judge, I think

23  they did that because CDC did get all the correspondence

24  from the debtors.

25          THE COURT:  As a result, you acknowledge that

Page 111

1   there was notice sufficient for due process under applicable

2   U.S. law.

3           MR. HELLMAN:  I don't think so, Judge.  I think

4   for a note -- let's agree on a couple things.  CDC was a

5   known creditor.  They were listed on the schedules, so

6   publication is not going to save the day for the debtor.

7   The only issue I think they can raise with respect to notice

8   is number one, they had served CDC Capital, which by the

9   name they served that notice, it was no longer affiliated

10  with CDC and the notice requirements in the contract said,

11  with respect to CDC Capital, only with respect to disputes

12  or transactions involving CDC Capital would notice be

13  sufficient to them and that didn't constitute notice to CDC

14  proper and they sent it to some other address in Paris which

15  was not part of this operative agreement which had specific

16  notice provisions.

17          But the debtor knew that there were specific

18  notice provisions because they sent notices and other

19  letters and correspondence to CDC using the very specific

20  required notice provisions in the ISDA agreement.

21          THE COURT:  That's not the point.  The point is as

22  to this particular notice, it was correctly addressed and it

23  went to the central mailroom and it was then kicked back,

24  return to sender.  Does that pattern establish actual notice

25  of the bar date as a matter of law?

1            And the answer is yes.  Tell me why I'm wrong --

2            MR. HELLMAN:  Well --

3            THE COURT:  -- because the answer is yes.

4    Consistent with my view, and you can convince me I'm wrong

5    now, this is your opportunity -- ISDA special notice

6    provisions do not trump general notice provisions.  General

7    notice provisions were calculated to provide actual notice

8    to your client and everybody else that received notice of

9    the bar date.  In this instance, a properly addressed letter

10   was delivered, by your own admission to the central mailroom

11   and the central mailroom then acted negligently.

12           MR. HELLMAN:  Well, that's where I think we

13   disagree, Judge.  I think the central mailroom acted in

14   accordance with whatever procedures the central mailroom

15   has.

16           THE COURT:  Those procedures are exactly what I

17   wanted to know more about --

18           MR. HELLMAN:  Which is --

19           THE COURT:  Let me just finish.

20           MR. HELLMAN:  Sure.

21           THE COURT:  Between the last hearing and this

22   hearing, now a year and a half later.  Those procedures seem

23   to me inexcusable.  Inexcusable because it is set up to

24   almost ensure the properly addressed mail doesn't get

25   delivered just because it doesn't include some special kind

Page 113

1    of notice.  There should be some kind of system to direct

2    mail to proper locations within the organization and you've

3    offered me nothing.  You've offered me nothing to indicate

4    what, if any, procedures exist, other than that they don't

5    exist.

6            MR. HELLMAN:  Without the tension line, without

7    the specific direction as to where the mail should go,

8    there's no way for them to tell where it's supposed to go.

9            THE COURT:  That's absolutely untrue.  We live in

10   a world of Google.  We live in a world in which documents

11   are routinely scanned into systems and with encryption

12   software, people are able to write to almost every

13   organization on the planet with not necessarily directions

14   to send it to a particular office and for a little bit of

15   investment, a big organization is able to deal with mail.

16   If you were to write to the White House, Washington, D.C.,

17   with a letter of some complaint about what's going on in

18   Washington right now, more likely than not that letter won't

19   get to President Barrack Obama, but it will get to somebody

20   who's responsible for dealing with it.

21           What is maddening to me -- and that's what makes

22   your argument so difficult -- is that nobody opened the

23   letter.  Nobody opened the letter, thought about its

24   contents, gave any consideration to what it said and

25   attended to it.  It's a sign of complete and utter

Page 114

1   negligence.  And it doesn't matter whether it's France,

2   Germany, the United States or some other country on the

3   planet, especially a large organization that presumes to act

4   on behalf of third parties in a fiduciary capacity has an

5   obligation to conduct itself at a higher level.  This, to

6   me, indicates complete and utter lack of attention to

7   detail.

8           MR. HELLMAN:  And so, how, then, Judge, do we set

9   apart the National Union cases where this very situation

10  occurred where mail was sent to a large organization -- a

11  private organization, I might add, so it's probably a little

12  bit easier for them to have some type of internal control --

13  and it's not addressed to -- but it's a specific attention

14  line, and the Court in those cases said it doesn't

15  constitute actual notice because it has to go to that

16  specific address, to that specific attention line and it

17  didn't.

18          And in those cases, the Court said the notice was

19  not quote, unquote, actual notices for purposes of the bar

20  date.  We're talking about a very similar, if not the same

21  exact situation here, and I understand the Court's criticism

22  of CDC.  Perhaps there's something that CDC could do, should

23  have done, I'm not sure, Judge.  They have a massive quasi-

24  governmental agency where, you know, they have whatever

25  implementation or policies they have with respect to mail,

Page 115

1    again, which is why they have these specific, very specific

2    addresses in all of their agreements, and if they don't have

3    that specific address in that specific agreement, it's going

4    to be in some sort of central, lost in the sauce, mailroom,

5    if you will, and they're going to say, where do we send it?

6    We don't really know.  It doesn't have the attention line,

7    it's going to get returned to sender and then maybe sender

8    will then say I'm going to send it back.

9           I'm going to say, you know, why'd this come back

10    to me?  And I think there's no effort on epic's part or

11    debtor's part to say why'd this come back, let's see if we

12    have a correct address.  Let's see -- you know, we know

13    we're sending mail to this address attention this back

14    office, but we didn't do it on this envelope, so let's

15    resend it, but that didn't happen either.

16           I understand that there's issues on each side of

17    the case, but the case law, per National Union, says, well,

18    if you contract for a specific notice at a specific location

19    using a specific attention line, that you're entitled to get

20    notice at that specific address with that specific attention

21    line, and if you don't, it's not actual notice and that's

22    really where we come out, Judge.  And to the extent that

23    there's a known creditor, publication is not going to help

24    and to the extent that they're going to send it to other

25    places where these entities aren't involved in the

Page 116

1    transaction and there's a specific days agreement that

2    controlled substance where notices are supposed to go, that

3    doesn't constitute actual notice and that's really where we

4    come out, Judge.

5              THE COURT:  That's pretty much the same argument

6    that was made the last time, though, and I still don't

7    understand why you haven't been able to supplement with more

8    information about your client's diligence and attention to

9    this particular transaction because to the extent that we're

10   going to the question of excusable neglect -- and let's just

11   say that's where we're going, let's say for the sake of a

12   hypothetical --

13             MR. HELLMAN:  Sure.

14             THE COURT:  -- that the document in question, the

15   notice of the bar date was addressed exactly in accordance

16   with the ISDA agreement, was delivered to the mailroom and

17   one of two things happened.  Either the mailroom mistakenly

18   sentenced it to the wrong department where it is buried in a

19   stack of papers and nobody attends to it or it is sent to

20   the right department and somebody gets the document and then

21   forgets to deal with it, just forgets it or there's some

22   personal emergency and that person leaves the office for six

23   months and misses the bar date.  In that instance, no issue

24   of notice, it's an issue of excusable neglect.

25             Here, what's your excusable neglect argument?

Page 117

1            MR. HELLMAN:  Well, I think it's different than

2    the hypotheticals than Your Honor has posed.

3            THE COURT:  But you're talking to me about a

4    three-million dollar claim --

5            MR. HELLMAN:  Yes, Judge.

6            THE COURT:  -- almost five and a half years into

7    the Lehman case.  It's almost December.  We're two years --

8    we're about two years after the confirmation of the plan and

9    more than five years after the commencement of the case and

10   everybody in the world knows that Lehman went into

11   bankruptcy.  I don't think that there's a person alive in

12   any civilized jurisdiction who doesn't know that fact.

13           MR. HELLMAN:  That's probably true.

14           THE COURT:  And so all kinds of people all over

15   this organization in France, speaking French, admittedly,

16   some speaking English, I'm sure.

17           MR. HELLMAN:  Yes, that's how they're

18   communicating with us at the higher level, yes.

19           THE COURT:  And so they know that there's a

20   bankruptcy and they know that they've terminated a swap

21   agreement.  I don't understand and it's one of the things

22   that I was asking for last time, who was responsible for

23   this?

24           MR. HELLMAN:  And again, I don't think it's any

25   one particular individual in terms of who's responsible.

1          THE COURT:  It could be a group responsible for

2     it.  For example, I had an accident, it was insured, and I

3     had a claim number and every time I called the insurance

4     company somebody else picked up the file just by coding in

5     the claim.

6          So can be a group that's responsible for the

7     management of certain matters; it doesn't have to be one

8     person.  Presumably, they're people that are all part of

9     some organized group that has managements and procedures and

10    tickler lists and follow-ups and things that people in

11    offices are familiar with to avoid malpractice and it seems

12    to me that this is a situation of gross negligence.

13          MR. HELLMAN:  Well, as much as we dug to try and

14    find out that answer for the Court, there was no real answer

15    to that specific individual who's responsible for the ISDA

16    agreement.

17          THE COURT:  So let's just say for the sake of

18    discussion that a properly addressed letters gets delivered

19    to the department that is referenced in the special address

20    line of the ISDA agreement.  I presume there are a suite of

21    offices and that there's a door or there's a cubicle or a

22    set of cubicles and that there are people who work in a

23    particular department of the organization responsible for

24    managing derivative trades and derivative transactions; is

25    there such a department?

1              MR. HELLMAN:  I don't know if there's such a

2     department, but there are -- set forth in the papers, there

3     is the legal department, the financial department, and the

4     mailroom that deals with these -- well, the mailroom is its

5     own separate, you know, large-scale mailings.

6              THE COURT:  I'm not talking about the mailroom,

7     right now.  I'm talking about the people who are charged

8     with the responsibility to monitor performance under

9     derivative transactions.

10             MR. HELLMAN:  I'm sure there are -- there are

11    departments, and I know that, again, counsel, for the

12    debtors has included in one of its submissions, the letters

13    written by the people who decided, you know what, there's a

14    bankruptcy, you're in default under the ISDA agreement,

15    we're, you know, we're calling default.

16             Yes, from there, Judge, in terms of who monitors

17    and who follows and what happens, do they go to the mailroom

18    where there's a thousand pieces of mail being delivered and

19    say, did I get notice of the bar date or did I get some

20    notice from Lehman?  You know, I'm sure it doesn't happen

21    that way.

22             THE COURT:  No, I'm not asking --

23             MR. HELLMAN:  Is anybody responsible for following

24    the bankruptcy?

25             THE COURT:  I'm not actually asking that question.

Page 120

1           The question I'm asking has nothing to do with

2     supervision of the mailroom by either the legal department

3     or people who work in the finance department.

4           MR. HELLMAN:  Right.

5           THE COURT:  But rather people who work in the

6     legal department and the finance department who have it

7     within their assigned responsibility making sure that these

8     transactions are properly handled and presumably, although

9     nobody has told me this, at the time that Lehman went into

10    bankruptcy, certain people who speak English and who

11    understand derivative transactions wrote the letters that

12    have been cited to me by the debtor and they were cited to

13    me because they are written in English and they are written

14    in good English, apparently by someone familiar with the

15    protocol for terminating transactions of this sort.

16          So someone made the business decision to

17    terminate.  What happened next?  Who, if anybody, took

18    responsibility for the resulting claim?  Who, if anybody,

19    monitored the Lehman bankruptcy?  Who, if anybody, engaged

20    counsel or chose not to engage counsel to deal with this

21    issue?  In other words, the question on the floor has less

22    to do with mail and more to do be management or

23    mismanagement, as the case may be.

24          MR. HELLMAN:  And I don't know that we were able

25    to locate any particular voyage who said they were

1    particularly responsible for following up in the context of

2    the bankruptcy case, and I understand the Court's inquiry,

3    and I don't mean to make light of it, but in a Chapter 11

4    situation, they, under the prevailing law don't necessarily

5    have to, right?  They don't have to say, well, where's my

6    bar date notice?  Or pick up the phone and say, what's going

7    on with the bankruptcy?  In a Chapter 11 it's presumed that

8    the debtor has the obligation to provide whatever the

9    applicable notice is.

10              And I understand the Court's view on the issue.

11              THE COURT:  Well, what I'm searching for, as I did

12    about a year and a half ago, is something that shows more

13    than has already been shown that goes to the question of

14    performance and excuse and to simply say that we didn't know

15    takes you only so far when a properly addressed letter was

16    delivered and then not properly processed.

17              MR. HELLMAN:  Well, and I guess the question

18    comes, what's properly addressed?  Yes, it was addressed to

19    the location.

20              THE COURT:  It was received.

21              MR. HELLMAN:  It was received, but it sufficiently

22    addressed such that it would have made its way to the proper

23    location.

24              THE COURT:  It would have -- it would have

25    presumably, if the mailroom opened the letter instead of

Page 122

1    stamping it return to sender and then hand delivered the

2    contents to a supervisor or some employee that had the

3    capacity to direct the letter within the organization to a

4    place that would deal with so much things, like a help desk,

5    the kinds of things that people who deal with large

6    organizations expect all the time, just mature user-friendly

7    behavior in a commercial world that's largely linked.

8              And you've said nothing to indicate that the

9    mailroom did anything other than act mechanically and

10   without thought.

11             MR. HELLMAN:  And I don't mean to degrade those

12   who are working in the mailroom, but I don't know that they

13   have any authority to do anything other than try to find the

14   correct location, and if they can't without opening the

15   mail, because that's not their charge, they have to send it

16   back, return to sender, and I would have hoped, also, that

17   the debtor would have said, gee, you didn't get notice of my

18   bar date at this address and double-check it and see that

19   they've sent this mail to a particular -- to that address,

20   but to a particular attention line and send it back.  Make

21   another effort.

22             THE COURT:  Why don't we hear what Mr. Horwitz has

23   to say about this situation and then if you have more, we

24   can come back.

25             MR. HELLMAN:  Thank you, Judge.

Page 123

1           MR. HORWITZ:  Good morning, Your Honor.

2           Maurice Horwitz from Weil Gotshal & Manges.

3           THE COURT:  It's the afternoon.

4           MR. HORWITZ:  I'm sorry, afternoon.

5           It's all a blur to me at this point, Your Honor.

6           THE COURT:  Right.

7           MR. HORWITZ:  On behalf of the plan administrator,

8    Your Honor, I have prepared remarks for this hearing but the

9    Court has really already pointed out most of what I was

10   going to say.  This Court already denied the motion that was

11   filed, now it's almost four years ago and there isn't very

12   much in the second motion that has added to that first

13   motion.  So while I could point out that the debtor's notice

14   of the bar date was sufficient, as this Court has pointed

15   out, it was sufficient on due process grounds.  It was

16   sufficient under the bankruptcy rules, most importantly, it

17   was perfectly in accordance with the bar date order.  The

18   purpose of which was, in part, to establish some -- with

19   some certainty what proper notice of the bar date would be.

20           CDC had its address listed on the debtor's

21   schedules and the debtors served notice of the bar date on

22   that address.  There is nothing about the master agreement

23   that trumps this Court's -- the bar date order in this case.

24           THE COURT:  What's your position on the National

25   Union case that has been cited by CDC?

Page 124

1          MR. HORWITZ:  Well, that is the big -- that is the

2     main distinguishing factor between this case and the

3     National Union cases.  There wasn't, in those cases, an

4     order already determining and establishing what proper

5     notice is.  There is that order here.  That order was

6     entered well before or well after the CDC had terminated its

7     contract with LBSF.  CDC had always had the opportunity to

8     correct the debtors' schedules.  It was actually CDC's

9     responsibility to do so.  It did not do so.

10          In addition, Your Honor, those cases deal with

11    providing notice of the commencement of an individual's

12    Chapter 7 case to National Union.  There's no way that this

13    subsidiary of AIG would ever have known that one

14    individual's Chapter 7 had been commenced and that is really

15    another reason why it was appropriate for National Union to

16    an another opportunity to point out in those cases that a

17    certain debt was not dischargeable.

18          Here, it is established that CDC knew about the

19    bankruptcy and reacted to the bankruptcy by terminating its

20    contract with LBSF.  The National Union cases are completely

21    absent in this situation.

22          I don't have anything further to add unless the

23    Court has any questions?

24          THE COURT:  I don't.

25          Anything more?

Page 125

1          MR. HELLMAN:  No, Your Honor.

2          THE COURT:  Nothing's really changed between the

3    first motion by CDC for an order permitting a late-filed

4    proof of claim and this second motion and for the very same

5    reasons articulated on the record last time, the Court finds

6    that no cause has been shown to permit a late-filed claim.

7          CDC is a large and sophisticated organization

8    described by counsel as a quasi-governmental enterprise that

9    is purportedly is responsible for the administration of the

10   pension funds of French civil servants.  The letter that

11   were exchanged shortly after the commencement of the

12   bankruptcy case in September of 2008 demonstrate a level of

13   sophistication on the part of CDC comparable to that of

14   other counterparties to derivative transactions, many of

15   whom exercised the right to seek early termination of these

16   transactions in September.  The correspondence demonstrates

17   that someone in authority had to have been thinking about

18   this transaction at the time of termination and was aware of

19   the Lehman bankruptcy, not only aware of it, but taking

20   action in response to it.

21          The letter containing the notice of bar date

22   admittedly was received by CDC at an address contained

23   within the ISDA agreement.  The only thing missing being the

24   special address provision that according to CDC would have

25   enabled the mailroom to deliver the proof of claim to the

Page 126

1    department or departments within CDC responsible for this

2    transaction.

3              Nonetheless, in both the first motion and the

4    second motion, no evidence has been presented as to the

5    individuals who work within this department, their

6    responsibilities within CDC, where they sit, whether in the

7    finance group or in the legal department, whether they are

8    still employed by CDC and what, if any, diligence or action

9    was taken by any of these individuals in recognition of the

10   Lehman bankruptcy claims.

11             The fact that this letter containing the notice of

12   bar date was in fact delivered to the mailroom and then

13   mishandled there represents adequate notice of the bar date

14   consistent with the bar date order.  Nothing has been

15   presented in the second motion to explain why CDC did

16   nothing to protect its interests after terminating this

17   derivative transaction.  That lack of evidence makes it easy

18   for the Court to deny the second motion this time with

19   prejudice.

20             We're adjourned.

21             (Whereupon these proceedings were concluded at

22   2:49 p.m.)

23

24

25

1                          I N D E X

2

3                          RULINGS

4    DESCRIPTION                            PAGE      LINE

5    Debtors' One Hundred Seventeenth        98        15

6    Omnibus Objection to Claims [ECF No.

7    15363]

8

9    Debtors' One Hundred Seventy-Third      98        15

10   Omnibus Objections to Claims [ECF No.

11   19399]

12

13   Motion of Lehman Brothers Holdings Inc.  84        8

14   for Extension of the Period to File

15   Objections to and Requests to Estimate

16   Claims [ECF No. 40939]

17

18   Caisse Des Depots Et Consignations' Second  126    18

19   Motion for Entry of An Order to Permit a

20   Late-Filed Proof of Claim [ECF No. 39240]

21   Trustee's One Hundred Forty-Second Omnibus

22   Objection to General Creditor Claims (No

23   Liability Claims) [LBI ECF No. 7335]

24

25

Page 128

```
1                    C E R T I F I C A T I O N

2

3    I, Sherri L. Breach, CERT*D-397, certified that the

4    foregoing transcript is a true and accurate record of the

5    proceedings.

6
     Sherri Breach     Digitally signed by Sherri Breach
7                       DN: cn=Sherri Breach, o=Veritext, ou,
                        email=digital@veritext.com, c=US
                        Date: 2013.11.25 15:52:01 -05'00'
8

9    SHERRI L. BREACH

10   AAERT Certified Electronic Reporter & Transcriber

11   CERT*D-397

12

13

14

15

16

17

18   Veritext

19   330 Old Country Road

20   Suite 300

21   Mineola, New York 11501

22

23   Date: November 23, 2013

24

25
```