**THIS FOUR HUNDRED FIFTIETH OMNIBUS OBJECTION TO CLAIMS SEEKS TO REDUCE BUT NOT ALLOW CERTAIN FILED PROOFS OF CLAIM.  PARTIES RECEIVING THIS FOUR HUNDRED FIFTIETH OMNIBUS OBJECTION TO CLAIMS SHOULD REVIEW THE OMNIBUS OBJECTION TO SEE IF THEIR NAME(S) AND/OR CLAIM(S) ARE LOCATED IN THE OMNIBUS OBJECTION AND/OR THE EXHIBIT ATTACHED THERETO TO DETERMINE WHETHER THIS OBJECTION AFFECTS THEIR CLAIM(S).**

**IF YOU HAVE QUESTIONS, PLEASE CONTACT LEHMAN BROTHERS HOLDINGS INC.'S COUNSEL, ADAM M. LAVINE, AT 212-310-8290.**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Peter D. Isakoff
Garrett A. Fail

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | : | **08-13555 (JMP)** |
| | : | |
| Debtors. | : | **(Jointly Administered)** |

------------------------------------------------------------------x

**NOTICE OF HEARING ON THE FOUR HUNDRED FIFTIETH**
**OMNIBUS OBJECTION TO CLAIMS (PREFERRED SECURITIES CLAIMS)**

**PLEASE TAKE NOTICE** that on December 20, 2013, Lehman Brothers

Holdings Inc. ("LBHI"), as Plan Administrator under the Modified Third Amended Joint Chapter

11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors for the entities in the above

referenced chapter 11 cases, filed the four hundred fiftieth omnibus objection to claims (the

"Four Hundred Fiftieth Omnibus Objection to Claims"), and that a hearing (the "Hearing") to

consider the Four Hundred Fiftieth Omnibus Objection to Claims will be held before the

Honorable James M. Peck, United States Bankruptcy Judge, in Courtroom 601 of the United

States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York,

New York 10004, on **January 28, 2014 at 10:00 a.m. (Eastern Time)**, or as soon thereafter as

counsel may be heard.

       **PLEASE TAKE FURTHER NOTICE** that any responses to the Four Hundred

Fiftieth Omnibus Objection to Claims shall be in writing, shall conform to the Federal Rules of

Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, shall be filed with the

Bankruptcy Court (a) electronically in accordance with General Order M-399 (which can be

found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's filing system,

and (b) by all other parties in interest, on a CD-ROM, preferably in text-searchable Portable

Document Format (PDF) (with a hard copy delivered directly to Chambers), and shall be served

upon (i) the chambers of the Honorable James M. Peck, One Bowling Green, New York, New

York 10004, Courtroom 601; (ii) attorneys for LBHI, Weil, Gotshal & Manges LLP, 767 Fifth

Avenue, New York, New York 10153 (Attn: Peter D. Isakoff, Esq. and Garrett A. Fail, Esq.);

and (iii) the Office of the United States Trustee for Region 2, U.S. Federal Office Building, 201

Varick Street, Suite 1006, New York, New York 10014 (Attn: William K. Harrington, Esq.,

Susan Golden, Esq., and Andrea B. Schwartz, Esq.); so as to be so filed and received by no later

than **January 21, 2014 at 4:00 p.m. (Eastern Time)** (the "Response Deadline").

       **PLEASE TAKE FURTHER NOTICE** that if no responses are timely filed and

served with respect to the Four Hundred Fiftieth Omnibus Objection to Claims or any claim set

US_ACTIVE:\44390121\8\58399.0011

forth thereon, the Plan Administrator may, on or after the Response Deadline, submit to the

Bankruptcy Court an order substantially in the form of the proposed order annexed to the Four

Hundred Fiftieth Omnibus Objection to Claims, which order may be entered with no further

notice or opportunity to be heard offered to any party.

Dated: December 20, 2013
      New York, New York

                    /s/ Garrett A. Fail
                    Peter D. Isakoff
                    Garrett A. Fail

                    WEIL, GOTSHAL & MANGES LLP
                    767 Fifth Avenue
                    New York, New York 10153
                    Telephone: (212) 310-8000
                    Facsimile: (212) 310-8007

                    Attorneys for Lehman Brothers Holdings Inc.
                    and Certain of Its Affiliates

US_ACTIVE:\44390121\8\58399.0011

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Peter D. Isakoff
Garrett A. Fail

Attorneys for Lehman Brothers Holdings Inc.
and Certain of its Affiliates

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.*, | : | **08-13555 (JMP)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |

------------------------------------------------------------------x

**FOUR HUNDRED FIFTIETH OMNIBUS**
**OBJECTION TO CLAIMS (PREFERRED SECURITIES CLAIMS)**

---

**THIS FOUR HUNDRED FIFTIETH OMNIBUS OBJECTION TO CLAIMS SEEKS TO REDUCE BUT NOT ALLOW CERTAIN FILED PROOFS OF CLAIM.  PARTIES RECEIVING THIS FOUR HUNDRED FIFTIETH OMNIBUS OBJECTION TO CLAIMS SHOULD REVIEW THE OMNIBUS OBJECTION TO SEE IF THEIR NAME(S) AND/OR CLAIM(S) ARE LOCATED IN THE OMNIBUS OBJECTION AND/OR THE EXHIBIT ATTACHED THERETO TO DETERMINE WHETHER THIS OBJECTION AFFECTS THEIR CLAIM(S).**

**IF YOU HAVE QUESTIONS, PLEASE CONTACT LEHMAN BROTHERS HOLDINGS INC.'S COUNSEL, ADAM M. LAVINE, AT 212-310-8290.**

---

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI"), as Plan Administrator under the

Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its

Affiliated Debtors (the "Plan")[1] for the entities in the above-referenced chapter 11 cases (the

"Chapter 11 Estates"), respectfully represents as follows:

### **RELIEF REQUESTED**

1.      The portions of the proofs of claim listed on Exhibit A attached hereto (the

"Claims") assert claims against LBHI based on the "Non-cumulative Perpetual Preferred

Securities" identified by ISIN XS0215349357 and ISIN XS0229269856 (the "Preferred

Securities").  The holders of the Claims (the "Claimants") appear to have asserted claim amounts

against LBHI that equal or exceed the "face" or "notional" value of their investments in the

Preferred Securities.  As set forth herein, assuming, *arguendo*, that LBHI has liability for the

Claims, its maximum liability would be only a small fraction of the amounts asserted in the

Claims.  Accordingly, the Plan Administrator files this objection to reduce the Claims to the

maximum amounts for which LBHI could be liable to the Claimants.  The Plan Administrator

files this objection pursuant to section 502(b) of title 11 of the United States Code (the

"Bankruptcy Code"), Rule 3007(d) of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), and this Court's order approving procedures for the filing of omnibus

objections to proofs of claim filed in these chapter 11 cases (the "Procedures Order") [ECF No.

6664].

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

US_ACTIVE:\44390121\8\58399.0011

## JURISDICTION

2.        This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## BACKGROUND

### The Preferred Securities

3.        Lehman Brothers UK Capital Funding ("UK Capital Funding I") issued the Preferred Securities identified by ISIN XS0215349357 pursuant to a base prospectus dated March 29, 2005 ("Prospectus I").  Lehman Brothers UK Capital Funding II ("UK Capital Funding II") issued the Preferred Securities identified by ISIN XS0229269856 pursuant to a base prospectus dated August 30, 2005 ("Prospectus II" and together with Prospectus I, the "Prospectuses").[2]  The Preferred Securities represented equity interests in UK Capital Funding I and UK Capital Funding II (together, the "Issuers").  The Issuers were English limited partnerships that dissolved on June 22, 2010 pursuant to the terms of their respective Partnership Agreements, each of which provides for the dissolution of the Issuer when the applicable partnership no longer has at least one general partner.[3]

4.        An investment in the Preferred Securities entitled an investor to certain cash distributions from the Issuers (the "Distributions").  *See* Prospectus I at 8; Prospectus II at 6.  The Distributions were funded by the Issuers' receipt of interest on certain subordinated notes issued by Lehman Brothers Holdings Plc ("LBH Plc") and held, in turn, by the Issuers (the "Subordinated Notes").  *See* Prospectus I at 11; Prospectus II at 9.  Because the Subordinated

---

[2] Prospectus I and Prospectus II are attached hereto as Exhibit B and Exhibit C, respectively.

[3] The relevant excerpts from the Partnership Agreements have been attached hereto as Exhibit D.  LB GP No. 1 Ltd., as sole general partner of both UK Capital Funding I and UK Capital Funding II, dissolved on June 22, 2010.  A dissolution certificate for LB GP No. 1 Ltd. obtained from the official company register of the United Kingdom and Wales is attached hereto as Exhibit E.

US_ACTIVE:\44390121\8\58399.0011

Notes were the principal assets of the Issuers, Distributions were only due to the holders of the

Preferred Securities if the relevant Issuer received sufficient interest on the Subordinated Notes.

*See* Prospectus I at 8; Prospectus II at 6.

5.    LBH Plc issued guarantees related to the Preferred Securities (the "<u>LBH Plc Guarantees</u>").[4]  The LBH Plc Guarantees were limited guarantees.  They guaranteed only the

following amounts, "as and when due":

(i)    Distributions due to the holders of the Preferred Securities (*i.e.*, amounts owed because the Issuers had sufficient funds to make Distributions) (the "<u>Funded Distributions</u>");

(ii)    amounts that would have been due as Distributions to the holders of the Preferred Securities if the relevant Issuer had funds to make the Distributions (the "<u>Unfunded Distributions</u>");

(iii)    amounts due to the holders of the Preferred Securities upon the redemption of the Preferred Securities (the "<u>Redemption Amounts</u>"); and

(iv)    certain additional amounts to offset any withholding tax levied in respect of the foregoing (the "<u>Withholding</u>").

*See* Prospectuses at 28-29.  The LBH Plc Guarantees did not guarantee a return of an investor's

principal or the notional amount of an investor's Preferred Securities.  *See id*.  Each of the LBH

Plc Guarantees provided that it terminated automatically upon the dissolution of the relevant

Issuer.  *See id.* at 31.  The terms of the LBH Plc Guarantees were repeated in the Prospectuses.

*See* Prospectus I at 8, 28-32; Prospectus II at 6, 28-32.

6.    LBH Plc was incorporated with limited liability in England and Wales.

*See* Prospectus I at 7; Prospectus II at 5.  On September 15, 2008, LBH Plc was placed into an

insolvency administration in the United Kingdom.  The Plan Administrator has no control over

LBH Plc or its administration in the United Kingdom.

---

[4]  A form of the LBH Plc Guarantee related to the Preferred Securities issued by UK Capital Funding I was included with Base Prospectus I.  *See* Base Prospectus I at 28-33.  A form of the LBH Plc Guarantee related to the Preferred Securities issued by UK Capital Funding II was included with Base Prospectus II.  *See* Base Prospectus II at 28-32.

4

**The Chapter 11 Cases**

7.      Commencing on September 15, 2008, and periodically thereafter, the

Chapter 11 Estates commenced with this Court voluntary cases under chapter 11 of the

Bankruptcy Code (the "Chapter 11 Cases").  The Chapter 11 Cases have been consolidated for

procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule

1015(b).

8.      On July 2, 2009, this Court entered the Bar Date Order, which set forth

specific alternative claim filing procedures (the "Lehman Programs Securities Procedures") that

apply to the "filing of any and all claims (including claims under a related Guarantee) against the

Debtors arising from securities issued by the Debtors or any of the Debtors' affiliates outside of

the United States, solely to the extent identified on http://www.lehman-docket.com under the

heading 'Lehman Programs Securities' (any such security, a 'Lehman Program Security') . . . ."

(Bar Date Order at 12.)  The Lehman Programs Securities Procedures specifically required,

among other things, that claims for Lehman Programs Securities "include either a Euroclear

electronic instruction reference number or a Clearstream blocking reference number" (a

"Blocking Number").  (*Id.* at 13.)  Each Blocking Number issued by the applicable clearing

agency relates to a specific holder of a specific Lehman Programs Security and identifies the

notional amount of the holder's investment in that particular security.

9.      On January 14, 2010, the Court entered the Procedures Order, which

authorizes the filing of omnibus objections, on various grounds, including those set forth in

Bankruptcy Rule 3007(d) and those additional grounds set forth in the Procedures Order.

10.      On December 6, 2011, the Court entered an order confirming the Plan

[ECF No. 23023].  The Plan became effective on March 6, 2012.  Pursuant to the Plan, the Plan

5

Administrator is authorized to interpose and prosecute objections to claims filed in the Chapter 11 Cases.

**The Objections**

11.    On February 11, 2011, LBHI filed objections to certain of the Claims (the "Objections").[5]  The Objections sought to disallow and expunge those Claims on the basis that the Preferred Securities were neither issued nor guaranteed by LBHI or any other Chapter 11 Estate.  LBHI expressly reserved its rights to further object to any of the Claims included on the Objections.

12.    Many of the responses to the Objections did not state with particularity any legal basis for opposing the relief requested in the Objections.  A small minority of the responses asserted that LBHI could have liability for the Preferred Securities because LBHI may be liable as a guarantor of LBH Plc, the actual guarantor of the Preferred Securities.  A hearing on the Objections has been adjourned without date.

**THE CLAIMS SHOULD BE REDUCED**

13.    Section 502(b)(1) of the Bankruptcy Code provides, in relevant part, that a claim may not be allowed to the extent that "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law."  11 U.S.C. § 502(b)(1).  If an objection refuting at least one of the claim's essential allegations is asserted, the claimant has the burden to demonstrate the validity of the claim.  *See In re Oneida Ltd.*, 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009); *In re Adelphia Commc'ns Corp.*, No. 02-41729, 2007 Bankr. LEXIS

---

[5]  The Objections include the following: Debtors' Eighty-Sixth Omnibus Objection to Claims [ECF No. 14440]; Debtors' Eighty-Seventh Omnibus Objection to Claims [ECF No. 14442]; Debtors' Eighty-Eighth Omnibus Objection to Claims [ECF No. 14450]; Debtors' Eighty-Ninth Omnibus Objection to Claims [ECF No. 14452]; Debtors' Ninetieth Omnibus Objection to Claims [ECF No. 14453].

6

660 at *15 (Bankr. S.D.N.Y. Feb. 20, 2007); *In re Rockefeller Ctr. Props.*, 272 B.R. 524, 539

(Bankr. S.D.N.Y. 2000).

14.     It is axiomatic that if LBHI were liable as a guarantor of LBH Plc, LBHI's

liability would not exceed that of LBH Plc's.  *See, e.g.*, *Midwest Corp. v. Global Cable, Inc.*, 688

F. Supp. 872, 875 ("[T]he guarantor cannot be liable for an amount greater than that for which

the principal is liable."); *Sweeters v. Hodges*, 683 N.Y.S.2d 9 (N.Y. Sup. Ct. 1998) ("A guarantor

is liable to the creditor only for the amount of the principal obligor's default").  Therefore, even

assuming, *arguendo*, that LBHI guaranteed the obligations of LBH Plc to the Claimants, each

Claim must be disallowed and expunged to the extent such Claim seeks amounts in excess of

LBH Plc's liability under the LBH Plc Guarantees.

15.     The LBH Plc Guarantees are limited guarantees.  *See* Prospectus I at 8,

28-32; Prospectus II at 6, 28-32.  As set forth above, LBH Plc guaranteed only the Funded

Distributions, the Unfunded Distributions, the Redemption Amounts, and the Withholding.  *See*

*supra* at ¶ 5.  LBH Plc did not guarantee the notional amount of an investor's investment in the

Preferred Securities.  *See* Prospectuses at 28-32.  LBH Plc did not unconditionally guarantee a

future stream of interest or other payments.  *See id.*  In addition, LBH Plc did not guarantee any

payments owed to the holders of the Preferred Securities upon the liquidation or dissolution of

the Issuers.  *See id.*  Indeed, the Base Prospectuses specifically warned investors that "the

Guarantee will not cover payments on liquidation of the Issuer."  Prospectus I at 8; Prospectus II

at 6.

16.     LBH Plc was not liable for any Funded Distributions or Unfunded

Distributions as of the Commencement Date.  There is no evidence that the Issuers failed to

make any required Distribution through the Commencement Date.  There is no evidence that the

7

Issuers had funds sufficient to make Funded Distributions subsequent to the Commencement

Date. Accordingly, LBH Plc may be liable for Unfunded Distributions from the

Commencement Date through, at the latest, June 22, 2010, when the Issuers dissolved and the

LBH Plc Guarantees terminated. *See* Prospectuses at 28-31.

17.    LBH Plc is not liable for the Redemption Amounts. The Redemption

Amounts were due from the Issuers only in the event of a redemption of the Preferred Securities.

*See* Prospectus I at 9-10; Prospectus II at 7-8. There is no evidence that the Preferred Securities

upon which the Claims are based were ever redeemed.

18.    LBH Plc is not liable for the Withholding. There is no evidence that any

Withholding was due and owing by the Issuers as of the Commencement Date. Further, the

Issuers could only owe Withholding after the Commencement Date if the Issuers had paid

Funded Distributions or Redemption Amounts after the Commencement Date. *See* Prospectus I

at 10-11; Prospectus II at 9. There is no evidence that the Issuers made such payments.

19.    In light of the foregoing, LBH Plc's maximum liability to the Claimants is

limited to a defined amount of Unfunded Distributions. When calculated in accordance with the

Base Prospectuses, such amount of Unfunded Distributions equals $6,474,873 ("LBH Plc's

Maximum Liability").[6] *See* Declaration of Holly Clack in Support of the Four Hundred Fiftieth

Omnibus Objection to Claims (the "Clack Declaration") at ¶ 7. Any liability of LBHI to the

Claimants as a result of a purported guarantee of the obligations of LBH Plc must likewise be

limited to LBH Plc's Maximum Liability. *See Midwest Corp.*, 688 F. Supp. at 875 ("[T]he

guarantor cannot be liable for an amount greater than that for which the principal is liable.");

---

[6] As set forth on the Clack Declaration, LBH Plc's Maximum Liability was calculated in Euros in accordance with
the Prospectuses and then converted into U.S. dollars in accordance with the Bar Date Order. *See* Clack Declaration
at ¶ 7.

8

*Sweeters*, 683 N.Y.S.2d at 9 ("A guarantor is liable to the creditor only for the amount of the

principal obligor's default").

20.    Each of the Claims should be reduced to each Claimant's *pro rata* share of

LBH Plc's Maximum Liability, as indicated on Exhibit A under the column heading, "Reduced

Amount" (such amounts, the "Reduced Amounts").  As set forth more fully on the Clack

Declaration, the Plan Administrator was able to determine the Reduced Amounts using the

Blocking Numbers provided by Claimants on their Claims.  *See* Clack Declaration at ¶ 4-6.

From the Blocking Number and information provided by the clearing agencies, the Plan

Administrator was able to determine the notional amount of the Preferred Securities held by each

Claimant.  *See id.* at ¶ 4.  The Plan Administrator then multiplied these notional amounts by the

applicable interest rates set forth in the Base Prospectuses, and converted the amounts into U.S.

dollars in accordance with the Bar Date Order to arrive at the Reduced Amounts.  *See id.* at ¶ 5-

6.

21.    Resolution of the Objections and any other objection to disallow the

Claims in their entirety may require significant time, as a result of potential Claimant-specific,

factual inquiries that may require individualized discovery.  In the interim, LBHI is required by

the Plan to maintain a reserve based on the aggregate filed amount of the Claims.  Plan at ¶ 8.4.

The Claims appear to have been filed in amounts that equal or exceed the Claimants' notional

investment in the Preferred Securities: an aggregate amount in excess of $52 million.  *See* Clack

Declaration at ¶ 7.  Assuming, *arguendo*, that LBHI could be liable for the Claims, LBHI's

maximum liability for the Claims would be limited to LBH Plc's Maximum Liability: an

aggregate amount of less than $6.5 million.  *See id.*  Accordingly, the Claims are overstated by at

9

least $45.6 million.  Under such circumstances, it would be prejudicial to LBHI's allowed

creditors to require LBHI to maintain reserves based on the filed amounts of the Claims.

## RESERVATION OF RIGHTS

22.    LBHI continues to dispute that it has any liability for the Claims.  Further,

LBHI does not concede that LBH Plc's Maximum Liability represents LBH Plc's actual liability

to the Claimants.  Similarly, LBHI does not concede that if it has liability for the Claims, such

liability equals LBH Plc's Maximum Liability.  The Plan Administrator reserves its rights to

prosecute the Objections and object to any of the Claims on any other basis as to which the Court

does not grant the relief requested herein.  LBHI also reserves its rights to seek further reductions

to the Claims.

## NOTICE

23.    No trustee has been appointed in these Chapter 11 Cases.  The Plan

Administrator has served notice of this objection on (i) the United States Trustee for Region 2;

(ii) the Securities and Exchange Commission; (iii) the Internal Revenue Service; (iv) the United

States Attorney for the Southern District of New York; (v) each claimant listed on Exhibit A; and

(vi) all other parties entitled to notice in accordance with the procedures set forth in the second

amended order entered on June 17, 2010 governing case management and administrative

procedures for these cases [ECF No. 9635].  The Plan Administrator submits that no other or

further notice need be provided.

24.    No previous request for the relief sought herein has been made by the Plan

Administrator or the Chapter 11 Estates to this or any other Court.

10

WHEREFORE the Plan Administrator respectfully requests that the Court grant

the relief requested herein and such other and further relief as is just.

Dated: December 20, 2013
       New York, New York

/s/ Garrett A. Fail
Peter D. Isakoff
Garrett A. Fail

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

11

US_ACTIVE:\44390121\8\58399.0011

**<u>EXHIBIT A</u>**

IN RE LEHMAN BROTHERS HOLDINGS INC., ET AL., CASE NO: 08-13555 (JMP)

**OMNIBUS OBJECTION 450: REDUCED BUT NOT ALLOWED CLAIMS**

| | NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | ISIN** | ASSERTED AMOUNT | REDUCED AMOUNT |
|---|---|---|---|---|---|---|---|---|
| 1 | ARDENIA HOLDINGS SA | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/28/09 | 51298 | 'XS0229269856 | $28,293.88 | $3,797.09 |
| 2 | BANCA MEDIOLANUM S.P.A. | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/29/09 | 56626 | 'XS0215349357 | $288,878.63 * | $25,411.73 |
| 3 | BANCA MONTE DEI PASCHI DI SIENA S.P.A. | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/29/09 | 56130 | 'XS0215349357 | $98,218.74 * | $8,639.99 |
| | | | | | | 'XS0229269856 | $208,073.15 * | $27,978.58 |
| | | | | | | | $306,291.89 | $36,618.57 |
| 4 | BANCA POPOLARE DI MILANO S.C.A.R.L. | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/29/09 | 56295 | 'XS0215349357 | $21,665.90 | $1,905.88 |
| 5 | BANCA POPOLARE DI MILANO SOCIETA COOPERATIVE A.R.L. | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/29/09 | 56938 | 'XS0229269856 | $966,053.93 | $129,900.56 |
| 6 | BANCA POPOLARE PUGLIESE SOCIETA COOPERATIVA PER AZIONI | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/29/09 | 56935 | 'XS0229269856 | $29,724.74 | $3,996.94 |
| 7 | BANCO DE FINANZAS E INVERSIONES S.A. | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/29/09 | 56560 | 'XS0229269856 | $734,395.42 * | $98,724.43 |
| 8 | BANCO FINANTIA S.A. | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 11/02/09 | 63518 | 'XS0215349357 | $28,494.00 * | $2,541.17 |
| 9 | BANK HAPOALIM (SWITZERLAND), LTD. | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/29/09 | 55855 | 'XS0229269856 | $735,612.00 * | $103,520.75 |
| 10 | BANK JULIUS BAER & CO. LTD. | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/28/09 | 51761 | 'XS0229269856 | $100,000.00 * | $31,975.52 |
| 11 | BORREMANS, LUCIEN - DRIES, ELISA | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/07/09 | 36900 | 'XS0215349357 | $70,905.00 | $6,352.93 |
| 12 | BUYS, GRETA | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/28/09 | 51907 | 'XS0215349357 | $35,377.50 | $3,176.47 |
| 13 | CALAMANDA MANUEL PLENS | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/21/09 | 43129 | 'XS0229269856 | $19,811.40 | $2,797.86 |
| 14 | CAMPAGNER, ANTONELLA | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/09/09 | 37204 | 'XS0229269856 | $67,924.80 | $9,592.66 |

* Plus unliquidated and/or undetermined amounts.
** Only those portions of the claim related to the ISINs listed are subject to this Objection.

IN RE: LEHMAN BROTHERS HOLDINGS INC., ET AL., CASE NO: 08-13555 (JMP)

**OMNIBUS OBJECTION 450: REDUCED BUT NOT ALLOWED CLAIMS**

| | NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | ISIN** | ASSERTED AMOUNT | REDUCED AMOUNT |
|---|------|-------------|-------------|------------|---------|--------|-----------------|----------------|
| 15 | CARDOEN, MARIJKE | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/28/09 | 52368 | 'XS0215349357 | $56,604.00 | $5,082.35 |
| 16 | CAREPROVAN PRIVATE STICHTING | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/28/09 | 51621 | 'XS0215349357 | $70,755.00 | $6,352.93 |
| 17 | CARRENO, CRISTINA LURRUENA | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 09/16/09 | 13304 | 'XS0229269856 | $841,984.50 | $118,908.97 |
| 18 | CASSA CENTRALE BANCA | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/28/09 | 51876 | 'XS0229269856 | $209,587.32  * | $28,178.43 |
| 19 | CASSA DI RISPARMIO IN BOLOGNA S.P.A. | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/27/09 | 49719 | 'XS0215349357 | $83,774.80 | $7,369.40 |
| 20 | CEBRIAN, FERNANDO ENGUIDANOS & CLEMENTE, MARIA BELEN VELEZ | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/27/09 | 47998 | 'XS0229269856 | $28,302.00 | $3,996.94 |
| 21 | CESARIO, FABRIZIO | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/27/09 | 50160 | 'XS0229269856 | $21,125.00 | $4,221.77 |
| 22 | CESARIO, FABRIZIO | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/27/09 | 50161 | 'XS0229269856 | $103,875.00 | $20,759.11 |
| 23 | COHN, DAVID NATHAN AND AMELIA MORENO ROSILLO | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/12/09 | 37362 | 'XS0229269856 | $62,370.00 | $8,793.27 |
| 24 | COK, JOOP | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/28/09 | 51902 | 'XS0215349357 | $424,530.00 | $38,117.59 |
| 25 | COMERCIAL JORDI S.A. | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/01/09 | 35867 | 'XS0229269856 | $420,284.70 | $59,354.56 |
| 26 | COSTERS-VAN LEEMPUTTEN, ALFONS | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 11/02/09 | 61658 | 'XS0229269856 | $50,080.80 | $6,594.95 |
| 27 | CREDITO EMILIANO S.P.A. | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 11/02/09 | 62892 | 'XS0215349357 | $382,811.54  * | $33,670.54 |
| | | | | | | 'XS0229269856 | $14,864.35  * | $1,998.47 |
| | | | | | | | $397,675.89 | $35,669.01 |

* Plus unliquidated and/or undetermined amounts.

** Only those portions of the claim related to the ISINs listed are subject to this Objection.

IN RE: LEHMAN BROTHERS HOLDINGS INC., ET AL., CASE NO: 08-13555 (JMP)

**OMNIBUS OBJECTION 450: REDUCED BUT NOT ALLOWED CLAIMS**

| | NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | ISIN** | ASSERTED AMOUNT | REDUCED AMOUNT |
|---|---|---|---|---|---|---|---|---|
| 28 | DA SILVA FERREIRA, ANTONIO MANUEL COUTINHAS | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/29/09 | 55254 | 'XS0229269856 | $58,444.00 | $7,993.88 |
| 29 | DA SILVA FERREIRA, ANTONIO MANUEL COUTINHAS | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/29/09 | 55255 | 'XS0215349357 | $92,000.00 | $8,004.69 |
| 30 | DBS BANK LIMITED | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/27/09 | 50150 | 'XS0215349357 | Undetermined   * | 63,529.32 |
| 31 | DE BLIECK, BENOIT | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/28/09 | 52126 | 'XS0215349357 | $35,377.50 | $3,176.47 |
| 32 | DE CLEEN, WALTER AND ANDIMIGNON, VERONIQUE | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 11/02/09 | 61655 | 'XS0215349357 | $141,510.00 | $12,705.86 |
| 33 | DE LA ROSA DIAZ, JOSE ANTONIO | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/27/09 | 48715 | 'XS0229269856 | $16,352.92 | $2,198.32 |
| 34 | DE VILLE, DOMINIQUE | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/28/09 | 52125 | 'XS0215349357 | $70,755.00 | $6,352.93 |
| 35 | DE VRIES-SCHEIBERLICH, W.E. | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/28/09 | 53220 | 'XS0215349357 | $170,172.00 | $15,247.04 |
| 36 | DIAS MOURA TEIXEIRA, RUI MANUEL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/23/09 | 44686 | 'XS0215349357 | $137,234.32 | $12,070.57 |
| 37 | DOTSON INVESTMENTS, LTD | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/26/09 | 47171 | 'XS0215349357 | $653,141.31 | $57,684.62 |
| 38 | DU MORTIER-HOUYET, CHRISTIAN (MR. & MRS.) | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/28/09 | 52123 | 'XS0215349357 | $19,811.40 | $1,778.82 |
| 39 | DUMOLIN, DIDIER | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/28/09 | 51948 | 'XS0215349357 | $106,132.50 | $9,529.40 |
| 40 | DUMOLIN, PIERRE | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/28/09 | 51950 | 'XS0215349357 | $141,510.00 | $12,705.86 |
| 41 | ELI, AHARON | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/20/09 | 42706 | 'XS0229269856 | $284,860.00 | $39,969.40 |
| 42 | ELYASHIV, SHMUEL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/23/09 | 45248 | 'XS0229269856 | $71,215.00 | $9,992.35 |

* Plus unliquidated and/or undetermined amounts.

** Only those portions of the claim related to the ISINs listed are subject to this Objection.

IN RE LEHMAN BROTHERS HOLDINGS INC., ET AL., CASE NO: 08-13555 (JMP)

**OMNIBUS OBJECTION 450: REDUCED BUT NOT ALLOWED CLAIMS**

| | NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | ISIN** | ASSERTED AMOUNT | REDUCED AMOUNT |
|---|---|---|---|---|---|---|---|---|
| 43 | FLOS, GILBERTA | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/27/09 | 48716 | 'XS0215349357 | $70,755.00 | $6,352.93 |
| 44 | FONDATION JEAN PRAET A.S.B.L. | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/28/09 | 52290 | 'XS0215349357 | $56,604.00 | $5,082.35 |
| 45 | FRANCISCO FERNANDEZ ROIG | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/23/09 | 45285 | 'XS0229269856 | $164,151.60 | $23,182.25 |
| 46 | FRANCO, JOSE LUIS CAJAL & CASABELLA, CLARA LATORRE | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/14/09 | 40204 | 'XS0229269856 | $12,735.90 | $1,798.62 |
| 47 | FUNDACION RAFAEL DEL PINO | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/30/09 | 57540 | 'XS0215349357 | $2,762,457.39 | $243,952.59 |
| 48 | GALVEZ, NEUS PENA | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/21/09 | 43125 | 'XS0229269856 | $45,283.20 | $6,395.10 |
| 49 | GOLDMAN, RON AND OR ORNA | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/29/09 | 54812 | 'XS0229269856 | $135,308.50 | $18,985.47 |
| 50 | GROHS, CLAUDIA | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/02/09 | 36008 | 'XS0229269856 | $103,408.99 | $12,990.06 |
| 51 | GROOT, A.M.A. | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/23/09 | 45167 | 'XS0215349357 | $127,359.00 | $11,435.28 |
| 52 | HALEBY, HENRY MANZANO | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/06/09 | 36736 | 'XS0229269856 | $100,000.00 | $19,984.70 |
| 53 | HANDELMIJ VAN PERNIS B.V. | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/27/09 | 48996 | 'XS0215349357 | $70,755.00 | $6,352.93 |
| 54 | HIJMANS, R.A. | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/28/09 | 54693 | 'XS0215349357 | $73,585.20 | $6,607.05 |
| 55 | HONGKONG AND SHANGHAI BANKING CORPORATION LIMITED, THE | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/29/09 | 56670 | 'XS0215349357 | $1,311,144.60 * | $114,352.77 |
| | | | | | | 'XS0229269856 | $7,108,606.74 * | $947,274.85 |
| | | | | | | | $8,419,751.34 | $1,061,627.62 |

* Plus unliquidated and/or undetermined amounts.

** Only those portions of the claim related to the ISINs listed are subject to this Objection.

IN RE LEHMAN BROTHERS HOLDINGS INC., ET AL., CASE NO: 08-13555 (JMP)

**OMNIBUS OBJECTION 450: REDUCED BUT NOT ALLOWED CLAIMS**

| | NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | ISIN** | ASSERTED AMOUNT | REDUCED AMOUNT |
|---|------|-------------|-------------|-----------|---------|--------|----------------|----------------|
| 56 | HONGKONG AND SHANGHAI BANKING CORPORATION LTD, SINGAPORE BRANCH, THE | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/29/09 | 56668 | 'XS0215349357 | $1,893,875.53 * | $165,176.23 |
| | | | | | | 'XS0229269856 | $1,199,764.85 * | $159,877.61 |
| | | | | | | | $3,093,640.38 | $325,053.84 |
| 57 | HULET, ANDRE | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/29/09 | 56678 | 'XS0215349357 | $46,698.00 | $4,192.94 |
| 58 | HULET, PIERRE | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/29/09 | 56679 | 'XS0215349357 | $35,377.00 | $3,176.47 |
| 59 | INTESA SANPAOLO PRIVATE BANKING S.P.A. | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/27/09 | 49719 | 'XS0215349357 | $288,878.63 | $25,411.73 |
| 60 | INTESA SANPAOLO S.P.A. | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/27/09 | 49719 | 'XS0215349357 | $765,528.36 | $67,341.08 |
| 61 | JASO, BM | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/28/09 | 51905 | 'XS0215349357 | $70,755.00 | $6,352.93 |
| 62 | KHALIFA, SHAIKHA H. H. HALA AL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/30/09 | 58236 | 'XS0229269856 | $568,815.30 * | $75,941.87 |
| 63 | KROON, M. AND DRONK, S. | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 11/02/09 | 61636 | 'XS0215349357 | $73,586.00 | $6,352.93 |
| 64 | KUPPENS-VAN DEN BROECK | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/27/09 | 48710 | 'XS0215349357 | $42,453.00 * | $3,811.76 |
| 65 | KUX, JOHANNES | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 09/22/09 | 31134 | 'XS0229269856 | $70,755.00 | $9,992.35 |
| 66 | LEENKNECHT, NORBERT - THERESE LECLUYSE | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/28/09 | 52055 | 'XS0215349357 | $212,265.00 | $19,058.80 |
| 67 | LIESTEKRI, BM | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/28/09 | 51906 | 'XS0215349357 | $35,377.50 | $3,176.47 |
| 68 | LOPES DE SOUSA, MIGUEL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/19/09 | 41969 | 'XS0215349357 | Undetermined * | 6,352.93 |
| 69 | MARCOS, PILAR LUEJE | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/23/09 | 45172 | 'XS0229269856 | $84,737.93 | $11,391.28 |

* Plus unliquidated and/or undetermined amounts.
** Only those portions of the claim related to the ISINs listed are subject to this Objection.

IN RE: LEHMAN BROTHERS HOLDINGS INC., ET AL., CASE NO: 08-13555 (JMP)

OMNIBUS OBJECTION 450: REDUCED BUT NOT ALLOWED CLAIMS

| | NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | ISIN** | ASSERTED AMOUNT | REDUCED AMOUNT |
|---|---|---|---|---|---|---|---|---|
| 70 | MARCOS, PILAR LUEJE | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/23/09 | 45173 | 'XS0229269856 | $66,898.36 | $8,993.12 |
| 71 | MARTINEZ JIMENEZ, MARIA TERESA | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/09/09 | 37116 | 'XS0229269856 | $14,736.85 | $1,998.47 |
| 72 | MERRILL LYNCH INTERNATIONAL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/30/09 | 59489 | 'XS0229269856 | $21,980,580.00 * | $2,935,752.66 |
| 73 | MEURER, HORST & ELISABETH, DR.'S | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 08/31/09 | 9969 | 'XS0229269856 | $219,711.68 | $30,976.29 |
| 74 | MICHEL, KARIL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/28/09 | 52127 | 'XS0215349357 | $70,755.00 | $6,352.93 |
| 75 | MISSUWE, BALS | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/28/09 | 52293 | 'XS0215349357 | $70,755.00 | $6,352.93 |
| 76 | NOYEN-RUELENS, VAN | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/28/09 | 51901 | 'XS0215349357 | $70,755.00 | $6,352.93 |
| 77 | NYSSENS, ALAIN | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/28/09 | 52122 | 'XS0215349357 | $28,302.00 | $2,541.17 |
| 78 | OOSTNEDERLANDSE VERENIGING AANNEMERS RESERVEFONDS (O.V.A.R.) | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/27/09 | 49003 | 'XS0215349357 | $176,888.00 | $15,882.33 |
| 79 | PANVEST LTD | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/15/09 | 65421 | 'XS0229269856 | $298,008.35 | $39,969.40 |
| 80 | PEARSON, COLIN W. | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/27/09 | 48997 | 'XS0215349357 | $42,453.00 | $3,811.76 |
| 81 | PRIEMS-BRESSER | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/28/09 | 51908 | 'XS0215349357 | $141,510.00 | $12,705.86 |
| 82 | PRIJS, BEN | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/28/09 | 54579 | 'XS0229269856 | $16,981.20 | $2,398.16 |
| 83 | PRIJS-LIPS, J.M. | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/28/09 | 54580 | 'XS0229269856 | $12,735.90 | $1,798.62 |
| 84 | PROMIN VZW | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/28/09 | 52378 | 'XS0215349357 | $849,060.00 | $76,235.18 |

* Plus unliquidated and/or undetermined amounts.

** Only those portions of the claim related to the ISINs listed are subject to this Objection.

IN RE: LEHMAN BROTHERS HOLDINGS INC., ET AL., CASE NO: 08-13555 (JMP)

**OMNIBUS OBJECTION 450: REDUCED BUT NOT ALLOWED CLAIMS**

| | NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | ISIN** | ASSERTED AMOUNT | REDUCED AMOUNT |
|---|---|---|---|---|---|---|---|---|
| 85 | RAM, JACOB | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/20/09 | 42707 | 'XS0229269856 | $142,430.00 | $19,984.70 |
| 86 | REPER, FRANS | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/28/09 | 52124 | 'XS0215349357 | $16,981.20 | $1,524.70 |
| 87 | RUIZ-TARIADOR LARRAZABAL, JOSE-MANUEL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/27/09 | 49658 | 'XS0229269856 | $132,292.42 | $17,786.38 |
| 88 | RYCKAERT, CECILIA | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/28/09 | 52140 | 'XS0215349357 | $14,151.00 | $1,270.59 |
| 89 | SCHOOFS, JEANINE | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/28/09 | 52143 | 'XS0215349357 | $70,755.00 | $6,352.93 |
| 90 | SCHRAM-DEFONSECA | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/28/09 | 52031 | 'XS0215349357 | $141,510.00 | $12,705.86 |
| 91 | SIVAN, ALEX | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/29/09 | 56035 | 'XS0229269856 | $31,334.60 | $4,396.63 |
| 92 | SMADJA, HAIM | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/29/09 | 56036 | 'XS0229269856 | $156,673.00 | $21,983.17 |
| 93 | SMET, FRANCOIS DE | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 11/02/09 | 61530 | 'XS0215349357 | $99,057.00 | $8,894.10 |
| 94 | SOUSA, JOSE MARTINHO SILVA | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 09/30/09 | 35802 | 'XS0229269856 | $7,076.00 | $999.24 |
| 95 | SPEYER, JUAN ENRIQUE | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/12/09 | 37376 | 'XS0215349357 | $56,700.00 | $5,082.35 |
| 96 | SPINETTE-ROSE, MR. & MRS. ROBERT | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/28/09 | 52030 | 'XS0215349357 | $11,320.00 | $1,016.47 |
| 97 | STAES | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/28/09 | 51175 | 'XS0215349357 | $141,510.00  * | $12,705.86 |
| 98 | STAS-ORBAN, DOMINIQUE | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/28/09 | 51997 | 'XS0215349357 | $42,453.00  * | $3,811.76 |
| 99 | STOCKER, HANNELORE | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/19/09 | 41140 | 'XS0229269856 | $11,320.80 | $1,598.78 |

\* Plus unliquidated and/or undetermined amounts.
\*\* Only those portions of the claim related to the ISINs listed are subject to this Objection.

IN RE: LEHMAN BROTHERS HOLDINGS INC., ET AL., CASE NO: 08-13555 (JMP)

**OMNIBUS OBJECTION 450: REDUCED BUT NOT ALLOWED CLAIMS**

| | NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | ISIN** | ASSERTED AMOUNT | REDUCED AMOUNT |
|---|---|---|---|---|---|---|---|---|
| 100 | STOTT, JEAN TODD | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/28/09 | 51535 | 'XS0229269856 | $44,598.90 | $5,995.41 |
| 101 | SUBIRA, JUAN ANTONIO MARCOS | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/14/09 | 40161 | 'XS0229269856 | $35,679.13 | $4,796.33 |
| 102 | SUREKA, DEEPAK &/OR SHANKARLAL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/19/09 | 41323 | 'XS0215349357 | $213,645.00  * | $19,058.80 |
| 103 | TERMONT, ALINE | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/28/09 | 54840 | 'XS0215349357 | $56,604.00 | $5,082.35 |
| 104 | UNIONE DI BANCHE ITALIANE SCPA | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/29/09 | 56677 | 'XS0229269856 | $29,724.74 | $3,996.94 |
| 105 | VAN GORP, MARC | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/23/09 | 45332 | 'XS0215349357 | $70,755.00 | $6,352.93 |
| 106 | VAN VOORST VADER-VAN ESCH, P.W. | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/27/09 | 48951 | 'XS0215349357 | $42,453.00 | $3,811.76 |
| 107 | VANDEBROEK, ROGER | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/29/09 | 55106 | 'XS0229269856 | $327,589.00 | $45,964.81 |
| 108 | VANDEWALLE, KARIN | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/28/09 | 51996 | 'XS0215349357 | $14,151.00 | $1,270.59 |
| 109 | VOIGT, ERROL JOHN | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/30/09 | 59110 | 'XS0229269856 | $144,447.72 | $19,385.16 |
| 110 | VUKAILOVIC, ALEX | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/19/09 | 41609 | 'XS0215349357 | $20,000.00 | $2,541.17 |
| 111 | WEEMAES, CHRISTEL | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/23/09 | 45458 | 'XS0215349357 | $70,755.00 | $6,352.93 |
| 112 | WEEMAES, MONIQUE | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/23/09 | 45459 | 'XS0215349357 | $70,755.00 | $6,352.93 |
| 113 | WEEMAES, MUSSCHE | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/23/09 | 45460 | 'XS0215349357 | $35,377.50 | $3,176.47 |
| 114 | WEIGELT, MARCO | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/21/09 | 43496 | 'XS0229269856 | $4,254.00 | $599.54 |
| 115 | WEISMIES | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 11/02/09 | 61603 | 'XS0215349357 | $28,302.00 | $2,541.17 |

* Plus unliquidated and/or undetermined amounts.

** Only those portions of the claim related to the ISINs listed are subject to this Objection.

IN RE: LEHMAN BROTHERS HOLDINGS INC., ET AL., CASE NO: 08-13555 (JMP)

### OMNIBUS OBJECTION 450: REDUCED BUT NOT ALLOWED CLAIMS

| NAME | CASE NUMBER | DEBTOR NAME | FILED DATE | CLAIM # | ISIN** | ASSERTED AMOUNT | REDUCED AMOUNT |
|------|-------------|-------------|------------|---------|--------|-----------------|----------------|
| 116 XAVIER ROCHA GOMES VAN DER HART, MARIA CLARA | 08-13555 (JMP) | Lehman Brothers Holdings Inc. | 10/23/09 | 44654 | 'XS0215349357 | $70,755.00 | $6,352.93 |
| | | | | | TOTAL | $ 52,149,456.62 | $ 6,474,873.25 |

* Plus unliquidated and/or undetermined amounts.

** Only those portions of the claim related to the ISINs listed are subject to this Objection.

# **EXHIBIT B**

OFFERING CIRCULAR

# LEHMAN BROTHERS UK CAPITAL FUNDING LP

*(a limited partnership organised under the laws of England and Wales)*

€225,000,000 Fixed Rate to CMS-Linked Guaranteed Non-voting

Non-cumulative Perpetual Preferred Securities

having the benefit of a subordinated guarantee of

# LEHMAN BROTHERS HOLDINGS PLC

*(incorporated with limited liability in England and Wales with registered number 1854685)*

Issue Price: €1,000 Per Preferred Security

The €225,000,000 Fixed Rate to CMS-Linked Guaranteed Non-voting Non-cumulative Perpetual Preferred Securities (the "**Preferred Securities**"), each with a liquidation preference of €1,000, comprising limited partnership interests in Lehman Brothers UK Capital Funding LP (the "**Issuer**"), are proposed to be issued on 30th March, 2005 (the "Closing Date").

See "Investment Considerations" for a discussion of certain factors that should be considered by prospective investors.

As an English limited partnership, the Issuer will not be a legal entity separate from its partners. The Preferred Securities will benefit from a subordinated guarantee to be dated the Closing Date (the "**Subordinated Guarantee**") entered into by Lehman Brothers Holdings plc (the "**Guarantor**" or "**UK Holding**") of declared dividends and redemption amounts, all as more fully described herein under *Subordinated Guarantee*.

Application has been made to list the Preferred Securities on the Luxembourg Stock Exchange and the Official Segment of the Stock Market of Euronext Amsterdam N.V. ("**Euronext Amsterdam**"). This Offering Circular constitutes a prospectus for the purposes of the Listing and Issuing Rules (*Fondsenreglement*) of Euronext Amsterdam N.V.

Lead Manager

LEHMAN BROTHERS

Co-Managers

| | |
|---|---|
| BANCAJA | BANCO ESPÍRITO SANTO DE INVESTMENTO |
| SANTANDER CENTRAL HISPANO | CALYON CORPORATE AND INVESTMENT BANK |
| FORTIS BANK | HSBC |

ING FINANCIAL MARKETS

The date of this Offering Circular is 29th March, 2005

LB GP No. 1 Ltd. in its capacity as the General Partner (the "**General Partner**") and the Guarantor confirm, after having made all reasonable enquiries, that this Offering Circular contains all information with regard to the Issuer, the General Partner, the Guarantor and its subsidiaries (together, the "**Guarantor Group**") and the Preferred Securities which is material in the context of the issue and offer of the Preferred Securities, that the information contained or incorporated by reference in this Offering Circular is true and accurate in all material respects and is not misleading, that the opinions and intentions expressed in this Offering Circular with regards to the Issuer and the Guarantor Group are honestly held, have been reached after considering all relevant circumstances and are based on reasonable assumptions, and that there are no other facts in relation to the Issuer, the Guarantor, the Guarantor Group or the Preferred Securities the omission of which makes this Offering Circular as a whole, or any such information or the expression of any such opinion or intention, misleading in any material respect. Each of the General Partner and the Guarantor accepts responsibility accordingly.

No person is or has been authorised to give any information or to make any representation not contained or incorporated in or consistent with this Offering Circular and, if given or made, such information or representation must not be relied upon as having been authorised by the Issuer, the General Partner, the Guarantor or the Managers (as defined under "*Subscription and Sale*" below). Neither the delivery of this Offering Circular nor any subscription, sale or purchase made in connection herewith shall, in any circumstances, create any implication that there has been no change in the affairs of the Issuer, the General Partner, the Guarantor or the Guarantor Group since the date hereof. This Offering Circular may only be used for the purpose for which it has been published.

Neither this Offering Circular nor any other information supplied in connection with the Preferred Securities (i) is intended to provide the basis of any credit or other evaluation or (ii) should be considered as a recommendation by the Issuer, the General Partner, the Guarantor, the Guarantor Group or the Managers that any recipient of this Offering Circular or any other information supplied in connection with the Preferred Securities should purchase the Preferred Securities. Each prospective investor contemplating purchasing Preferred Securities should make its own independent investigation of the financial condition and affairs, and its own appraisal of the creditworthiness, of the Issuer and the Guarantor.

Prospective investors should inform themselves as to the legal requirements and tax consequences within the countries of their residence and domicile for the acquisition, holding or disposal of Preferred Securities and any foreign exchange restrictions that might be relevant to them. This Offering Circular does not constitute an offer of, or an invitation by or on behalf of, the Issuer or any of its partners, the General Partner, the Guarantor or the Managers to subscribe for or purchase any of the Preferred Securities.

Prospective investors should satisfy themselves that they understand all of the risks associated with making investments in the Preferred Securities. If a prospective investor is in any doubt whatsoever as to the risks involved in investing in the Preferred Securities, he should consult his professional advisers.

The distribution of this Offering Circular and the offering of the Preferred Securities in certain jurisdictions may be restricted by law. Persons into whose possession this Offering Circular comes are required by the Issuer, the General Partner, the Guarantor and the Managers to inform themselves about, and to observe, any such restrictions.

In respect of the United Kingdom, this Offering Circular is directed only at (a) investment professionals falling within article 14(5) of the Financial Services and Markets Act 2000 (Promotion of Collective Investment Schemes) (Exemptions) Order 2001 (the "**Promotion of CIS Order**") and article 19(5) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2001 (the "**Financial Promotion Order**"), who have professional experience of participating in unregulated schemes and of matters relating to investments; and/or (b) persons falling within article 22(2) of the Promotion of CIS Order and article 49(2) of the Financial Promotion Order; and/or (c) any other persons to whom this Offering Circular may be communicated lawfully. Preferred Securities are only available to such persons. Persons who (i) do not have such professional experience in participating in unregulated schemes and in matters relating to investments and/or (ii) do not fall within said article 22(2) and 49(2) and/or (iii) are not persons to whom this Offering Circular may be communicated lawfully should not rely on this Offering Circular.

2

No action has been taken to permit a public offering of the Preferred Securities in any jurisdiction (other than The Netherlands) where action would be required for such purpose. Accordingly, the Preferred Securities may not be offered or sold, directly or indirectly, and neither this Offering Circular nor any advertisement or other offering material may be distributed or published in any jurisdiction, except in accordance with the legal requirements applicable in that jurisdiction. In particular, the Preferred Securities have not been, and will not be, registered under the United States Securities Act of 1933, as amended (the "**Securities Act**"). The Preferred Securities may not be offered, sold or delivered within the United States or to, or for the account or benefit of, U.S. persons. A further description of certain restrictions on the offering and sale of the Preferred Securities and on the distribution of this Offering Circular is given under "*Subscription and Sale*" below.

**IN CONNECTION WITH THE ISSUE OF THE PREFERRED SECURITIES, LEHMAN BROTHERS INTERNATIONAL (EUROPE) OR ANY PERSON ACTING FOR IT MAY OVER-ALLOT OR EFFECT TRANSACTIONS WITH A VIEW TO SUPPORTING THE MARKET PRICE OF THE PREFERRED SECURITIES AT A LEVEL HIGHER THAN THAT WHICH MIGHT OTHERWISE PREVAIL FOR A LIMITED PERIOD. HOWEVER THERE MAY BE NO OBLIGATION ON LEHMAN BROTHERS INTERNATIONAL (EUROPE) OR ANY PERSON ACTING FOR IT TO DO THIS. SUCH STABILISING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME AND MUST BE BROUGHT TO AN END AFTER A LIMITED PERIOD AND IN ANY EVENT NO LATER THAN 30 DAYS AFTER THE ISSUE DATE. STABILISATION TRANSACTIONS CONDUCTED ON EURONEXT AMSTERDAM MUST BE CONDUCTED IN ACCORDANCE WITH ALL APPLICABLE LAWS AND REGULATIONS OF EURONEXT AMSTERDAM AND ARTICLE 32 (AND ANNEX 6) OF THE FURTHER REGULATIONS ON MARKET CONDUCT SUPERVISION OF THE SECURITIES TRADE 2002 (*NADERE REGELING GEDRAGSTOEZICHT EFFECTENVERKEER 2002*), AS AMENDED AND WILL END 30 DAYS AFTER THE ISSUE DATE OF THE PREFERRED SECURITIES.**

All references in this Offering Circular to "**EUR**", "**€**" and "**euro**" are to the single currency introduced at the start of the third stage of European economic and monetary union pursuant to the Treaty establishing the European Community, as amended from time to time. All references in this Offering Circular to "**US$**" and "**$**" are to United States dollars.

# TABLE OF CONTENTS

|  | Page |
|---|---|
| Documents Incorporated by Reference | 4 |
| Investment Considerations | 5 |
| Summary of the Preferred Securities and Subordinated Guarantee | 7 |
| Description of the Preferred Securities | 13 |
| Summary of Provisions Relating to the Preferred Securities in Global Form | 26 |
| Subordinated Guarantee | 28 |
| Use of Proceeds | 34 |
| Lehman Brothers UK Capital Funding LP | 35 |
| Lehman Brothers Holdings plc | 37 |
| Non-consolidated Capitalisation and Indebtedness of the Guarantor | 38 |
| Summary Financial Information of the Guarantor | 39 |
| Lehman Brothers Holdings Inc. | 40 |
| Consolidated Capitalisation and Indebtedness of LBHI | 43 |
| Summary Financial Information of LBHI | 44 |
| Taxation | 46 |
| Subscription and Sale | 49 |
| General Information | 51 |

## DOCUMENTS INCORPORATED BY REFERENCE

The annual reports (including the audited non-consolidated annual financial statements) of the Guarantor as of and for the years ended 30th November, 2003, 2002 and 2001, the Limited Partnership Agreement (as supplemented by the First Supplemental Limited Partnership Agreement) of the Issuer and the Articles of Association of the Guarantor shall be deemed to be incorporated in, and to form part of, this Offering Circular.

The Issuer will, at the specified offices of the Paying and Transfer Agents, provide, free of charge, a copy of this Offering Circular and any document incorporated by reference in this Offering Circular.

## INVESTMENT CONSIDERATIONS

*Prospective investors should carefully consider the following information in conjunction with the other information contained or incorporated by reference in this Offering Circular. Capitalised terms used but not defined in this section shall bear the respective meanings ascribed to them under the "Description of the Preferred Securities".*

### Risks Associated with the Guarantor's Financial Condition

The Issuer is a newly established limited partnership with no previous operating history or revenues. It is expected that the Issuer's sole source of funds to pay Distributions on the Preferred Securities will be payments which it receives from its investment in Subordinated Notes issued by the Guarantor or any Eligible Investments replacing the Subordinated Notes.

The rights of Holders shall be represented solely by the Subordinated Guarantee and the Preferred Securities, and under no circumstances will the rights of Holders be represented by the Subordinated Notes or any Eligible Investment replacing the Subordinated Notes nor shall Holders be entitled to receive or hold the Subordinated Notes or any Eligible Investments replacing the Subordinated Notes or any payments due in respect of the Subordinated Notes or any Eligible Investments replacing the Subordinated Notes.

The Preferred Securities are guaranteed on a limited and subordinated basis by the Guarantor pursuant to the terms of the Subordinated Guarantee. Accordingly, if the Guarantor's financial condition were to deteriorate, the Holders may suffer direct and materially adverse consequences, including non-payment of Distributions on the Preferred Securities or of payments under the Subordinated Guarantee.

### Limitations to Remedies of Holders under the Subordinated Guarantee

In the event that the Guarantor is in breach of its payment obligations under the Subordinated Guarantee, the terms of the Subordinated Guarantee do not confer rights in favour of the Holders to petition for the winding-up of the Guarantor.

### Distributions are Discretionary and Not Cumulative

Distributions on the Preferred Securities are not cumulative. The discretion of the General Partner to resolve that a Distribution should not be paid is unfettered. As set out in *"Description of the Preferred Securities"*, Distributions on the Preferred Securities will be paid on each Distribution Payment Date out of interest received by the Issuer from its investment in the Subordinated Notes and from other resources legally available, if any, and only if the General Partner has not published a No Payment Notice. If a No Payment Notice is published, the Holders will not be entitled to receive such Distributions (or any payment under the Subordinated Guarantee in respect of such Distributions) or have any claim in respect thereof.

### Perpetual Nature of the Preferred Securities

The Preferred Securities have no fixed final redemption date and Holders have no right to call for the redemption of the Preferred Securities. Although the General Partner may redeem the Preferred Securities in whole but not in part in certain circumstances, in each case at the Optional Redemption Price, there are limitations on the General Partner's ability to do so. Therefore, Holders should be aware that they may be required to bear the financial risks of an investment in the Preferred Securities for an indefinite period of time.

### Substitution

If a Trigger Event occurs and is continuing, the General Partner will, provided that (if required at such time) no relevant Supervisory Authority has objected, take all reasonable steps to cause the substitution of the Preferred Securities with depositary shares representing fully paid non-cumulative preferred stock issued directly by Lehman Brothers Holdings Inc. ("**LBHI**"). A Trigger Event shall occur (i) if LBHI is placed into bankruptcy, reorganisation, conservatorship or receivership, (ii) if following any time when LBHI becomes

5

subject to Relevant Rules, LBHI has capital adequacy levels which are less than the minimum capital adequacy levels which are imposed by the relevant Supervisory Authority or (iii) if, following any time when LBHI become subject to Relevant Rules, the relevant Supervisory Authority in its sole discretion, informs LBHI that it will not meet its minimum capital requirement in the near term.

Although LBHI has undertaken that, in the event that the Preferred Securities are substituted by depositary shares representing Substituted Preferred Stock, LBHI will apply for a listing for the Substituted Preferred Stock outside of the United States, there can be no assurance that a recognised stock exchange will agree to list any such Substituted Preferred Stock. In addition, the tax treatment for holders of Substituted Preferred Stock may be different from that for Holders of the Preferred Securities.

**No Limitation on Senior Debt**

The obligations of the Guarantor under the Subordinated Guarantee will rank junior as to payments to all liabilities to creditors of the Guarantor (including without limitation depositors, general creditors and subordinated debt holders) and claims of holders of senior ranking securities. In the event that the Guarantor is wound-up, liquidated or dissolved, the assets of the Guarantor would be available to pay obligations under the Subordinated Guarantee only after all payments have been made on such senior liabilities and claims. The Guarantor is not prohibited from issuing, guaranteeing or otherwise incurring further debt ranking *pari passu* with, or senior to, its obligations under the Subordinated Guarantee. The issue of any such debt may reduce the amount recoverable by Holders of the Preferred Securities under the Subordinated Guarantee. Accordingly, on the winding-up of the Guarantor and after payment of senior creditors, there may not be a sufficient amount to satisfy the amounts owing to the Holders of the Preferred Securities.

**Distribution and Capital Stopper**

In the event that any Distribution is not made, LBHI has undertaken not to:

(a)     declare or pay any dividend on its shares of common stock; or

(b)     repurchase or redeem any of its non-cumulative preferred stock or common stock at its option,

until such time as Distributions on the Preferred Securities have been paid in full for one year.

Although the Guarantor does not make an equivalent agreement, LBHI is the ultimate holding company of the Lehman Brothers' group of companies.

**Absence of Prior Public Markets**

The Preferred Securities constitute a new issue of securities by the Issuer. Prior to this issue, there will have been no public market for the Preferred Securities. Although application has been made for the Preferred Securities to be listed on the Luxembourg Stock Exchange and on Euronext Amsterdam, there can be no assurance that an active public market for the Preferred Securities will develop and, if such a market were to develop, the Managers are under no obligation to maintain such a market. The liquidity and the market prices for the Preferred Securities can be expected to vary with changes in market and economic conditions, the financial condition and prospects of the Guarantor and other factors that generally influence the market prices of securities.

## SUMMARY OF THE PREFERRED SECURITIES AND
## SUBORDINATED GUARANTEE

*The following summary is qualified in its entirety by the more detailed information included elsewhere in this Offering Circular. Capitalised terms used but not defined in this summary shall bear the respective meanings ascribed to them under "Description of the Preferred Securities". Prospective investors should also consider carefully, amongst other things, the factors set out under "Investment Considerations".*

| | |
|---|---|
| **Issuer:** | Lehman Brothers UK Capital Funding LP (the "**Issuer**"), an English limited partnership formed and registered under the Limited Partnerships Act 1907 (the "**Act**"). |
| | The business of the partnership, as administered by, or on behalf of, the General Partner, will include the following: |
| | • raising and providing finance and financial support to the Guarantor; |
| | • acquiring and holding the Issuer's assets; |
| | • monitoring the Issuer's assets and determining whether they continue to be suitable; and |
| | • functions necessary or incidental thereto. |
| | On the Closing Date, the Issuer's principal assets will be debt instruments issued by UK Holding (the "**Subordinated Notes**"). |
| | The Subordinated Notes will have, in all material commercial respects, pricing terms which are equivalent to the Preferred Securities. |
| **General Partner:** | LB GP No. 1 Ltd. (incorporated with limited liability in England and Wales with registered number 5355491) a wholly owned Subsidiary of Lehman Brothers Holdings Inc. ("**LBHI**"). |
| **Preferential Limited Partner:** | LB Investment Holdings Ltd. (incorporated with limited liability in England and Wales with registered number 4385277), a wholly owned Subsidiary of LBHI or any other Subsidiary of LBHI within the charge to UK corporation tax. |
| | The Preferential Limited Partner shall be entitled to receive all amounts received by the Issuer from its investment in the Subordinated Notes or Eligible Investments, as the case may be, in excess of those required to make payments in respect of the Preferred Securities. |
| **Guarantor:** | Lehman Brothers Holdings plc (incorporated with limited liability in England and Wales with registered number 1854685). |
| **Issue:** | €225,000,000 Fixed Rate to CMS-Linked Guaranteed Non-voting Non-cumulative Perpetual Preferred Securities, each with a liquidation preference of €1,000 (the "**Liquidation Preference**"), comprising interests in a limited partnership share in the Issuer. |
| **Use of Proceeds:** | The proceeds of the issue of the Preferred Securities will augment the Guarantor Group's regulatory capital base. The Issuer will use the proceeds raised from the issuance of the Preferred Securities to |

7

subscribe for the Subordinated Notes (see "*Eligible Investments*" below).

**Subordinated Guarantee:**

The Guarantor will provide a subordinated guarantee to be executed by the Guarantor on 30th March, 2005 as a deed poll (the "**Subordinated Guarantee**") in respect of:

- any declared but unpaid Distributions;

- payments on redemption of the Preferred Securities; and

- any Additional Amounts,

which will be in favour of the Holders.

The Subordinated Guarantee will rank *pari passu* with the non-cumulative perpetual preferred securities or preference shares of the Guarantor (whether or not in issue).

The Guarantee will not cover payments on liquidation of the Issuer. See "*Rights upon Liquidation*" below.

**Distribution Rate:**

The Preferred Securities will entitle Holders to receive (subject as described below) non-cumulative preferential cash distributions (the "**Distributions**").

Distributions will be payable out of the Issuer's own legally available resources annually in arrear on 30th March in each year (each a "**Distribution Payment Date**").

In respect of each Distribution Period during the period from and including the Closing Date to but excluding 30th March, 2007, Distributions will accrue on the Preferred Securities at a rate of 6.625 per cent. per annum. For each subsequent Distribution Period, Distributions will accrue on the Preferred Securities at a rate equal to the aggregate of the prevailing Reference Rate and the Margin, subject to a maximum rate of 8.00 per cent. per annum.

The "**Margin**" is 0.10 per cent. per annum.

The "**Reference Rate**" means in respect of a relevant Distribution Period, the 10-year mid-swap rate in EUR (annual, 30/360) versus 6-month EURIBOR (Semi-annual, ACT/360) which appears on Reuters Page "ISDAFIX2" under the heading "EURIBOR BASIS" and above the caption "11:00 AM CET" (as such headings and captions may appear from time to time) as of 11:00a.m. (Central European time), on the Distribution Determination Date.

The Holders will be entitled to receive Distributions only if the Issuer has received sufficient funds under the Subordinated Notes or the Eligible Investments, as the case may be.

Furthermore, notwithstanding the existence of such resources legally available for distribution by the Issuer, the Holders will not be entitled to receive Distributions if the General Partner has published a No Payment Notice in respect of such Distribution, in which case there will be no payment due under the Preferred Securities.

8

The General Partner will have the full discretion to publish the No Payment Notice in respect of any Distribution at any time and for any reason. It will use this discretion in respect of a Distribution if such payment will cause a Trigger Event.

Save as described above, Holders will have no right to participate in the profits of the Issuer or the Guarantor and in particular will have no rights to receive from the Issuer amounts paid under the Subordinated Notes or any Eligible Investments or otherwise amounts in excess of Distributions due and payable under the Preferred Securities. In the event that any amounts received by the Issuer on the Subordinated Notes or any Eligible Investments, which would otherwise have been used by the Issuer (being the holder thereof) to fund such Distribution, exceed the amount (if any) then due by way of Distribution under the Preferred Securities, the amount of such excess will be paid to the Preferential Limited Partner. Holders will have no rights in respect of such excess.

**Distribution and Capital Stopper:**    In the event that Distributions are not paid on the Preferred Securities, LBHI has undertaken that, in the event that any Distribution is not paid in full, it will not:

(a)    declare or pay any dividend on its shares of common stock; or

(b)    repurchase or redeem any of its non-cumulative preferred stock or common stock at its option,

until such time as Distributions on the Preferred Securities have been paid in full for one year.

**Trigger Event and Substituted Preferred Stock**    If a Trigger Event occurs and is continuing, then, provided that (if required at such time) any relevant Supervisory Authority has not objected, the General Partner shall take all reasonable steps to cause the substitution of the Preferred Securities by depositary shares representing Substituted Preferred Stock.

On the substitution date, each Preferred Security of €1,000 in nominal amount will be substituted for one depositary share representing Substituted Preferred Stock which will have a nominal amount of €1,000.

The General Partner will notify Holders if a Trigger Event occurs. In the notice, the General Partner will include information on the procedures for effecting the substitution.

**Optional Redemption:**    If the Subordinated Notes or the Eligible Investments, as the case may be, are redeemed pursuant to their terms, the Preferred Securities will also be redeemed by the General Partner, on the same date, each to be redeemed at the Optional Redemption Price.

Any redemption of the Preferred Securities, the Subordinated Notes or replacement Eligible Investments is subject to the consent of the relevant Supervisory Authority (if required at such time).

As a result, the relevant Supervisory Authority when granting such a consent for the redemption of the Subordinated Notes will be also granting a consent for the redemption of the Preferred Securities.

9

**Capital Disqualification Event:** If a Capital Disqualification Event occurs and is continuing, the Preferred Securities will be redeemed in whole, but not in part, by the General Partner at any time, each to be redeemed at the Optional Redemption Price.

Any redemption of the Preferred Securities is subject to the consent of the relevant Supervisory Authority (if required at such time).

**Tax Event:** If a Tax Event occurs and is continuing, the effect of which cannot be avoided by the Issuer or the Guarantor, as the case may be, taking reasonable measures available to it or if the Subordinated Notes or the Eligible Investments, as the case may be, are redeemed pursuant to their terms for tax reasons, then the Preferred Securities will be redeemed in whole, but not in part, by the General Partner, on the same date, each to be redeemed at the Optional Redemption Price.

Any redemption of the Preferred Securities, the Subordinated Notes or replacement Eligible Investments is subject to the consent of the relevant Supervisory Authority (if required at such time).

**Ranking of the Preferred Securities:** The Preferred Securities, together with the Subordinated Guarantee, are intended to provide Holders with rights on liquidation equivalent to non-cumulative preference shares of the Guarantor, whether or not issued.

Claims under the Preferred Securities in respect of any Liquidation Distributions will rank:

(i)     senior to the rights of the General Partner and the Preferential Limited Partner in respect of other partnership interests issued by the Issuer; and

(ii)    junior to the claims of creditors of the Issuer (if any).

**Rights upon Liquidation:** In the event of the dissolution of the Issuer, Holders will be entitled to receive, subject as set out below, for each Preferred Security a Liquidation Distribution out of the assets of the Issuer legally available for distribution.

LBHI has undertaken that, so long as any of the Preferred Securities is outstanding:

(a)     unless a Trigger Event occurs or LBHI is being wound up, LBHI will not take any action that would or might cause, the liquidation, dissolution or winding-up of the General Partner or the Issuer otherwise than with the prior written approval of any relevant Supervisory Authority (if required at such time); and

(b)     the General Partner will at all times be a directly or indirectly wholly owned Subsidiary of LBHI unless (I) otherwise approved by Holders in accordance with the procedure set out in the Limited Partnership Agreement or (II) after a substitution of the Preferred Securities for depositary shares representing Substituted Preferred Stock has occurred.

**Withholding Tax and Additional Amounts:** The Issuer will pay such additional amounts ("**Additional Amounts**") as may be necessary in order that the net payment received by each Holder in respect of the Preferred

Securities, after deduction or withholding of or on account of any taxes imposed by tax authorities in the United Kingdom upon payments made by or on behalf of the Issuer, will equal the amount which would have been received in the absence of any such deduction or withholding of or on account of taxes, subject to customary exceptions.

The Subordinated Guarantee will contain a similar provision.

**Administrator:**

The Issuer will appoint an administrator to perform those operational matters in relation to the Issuer required under the Financial Services and Markets Act 2000 to be performed by a person authorised by the United Kingdom Financial Services Authority to establish, operate and wind-up collective investment schemes.

**Eligible Investments:**

The proceeds raised by the Issuer of the Preferred Securities will be used by the Issuer to purchase the Subordinated Notes.

The Subordinated Notes will be issued by UK Holding, will have a maturity of 30 years and will be redeemable by UK Holding on 30th March, 2010 or any interest payment date thereafter, subject to there being no objection from any relevant Supervisory Authority.

Unless the Preferred Securities are redeemed prior to or simultaneously with the maturity of the Subordinated Notes, then on maturity of the Subordinated Notes or any replacement Eligible Investments, the General Partner will, subject to prior consent of the relevant Supervisory Authority (if required at such time), reinvest the proceeds of redemption of the Subordinated Notes or Eligible Investments in Eligible Investments (or further Eligible Investments) that will contain the same terms as the Subordinated Notes in respect of tenor, principal amount, interest payment dates and redemption (including redemption for tax reasons) and will be callable on any interest payment date. However, upon issuance of such Eligible Investments (or further Eligible Investments), the interest applicable will be the Reference Rate plus a margin. Such margin will be determined by the then prevailing market conditions for instruments of similar risk and 30 year maturity.

**Voting Rights:**

Except as described in *"Description of the Preferred Securities - Meetings"* and as provided in the Act, Holders will not be entitled to receive notice of, or attend or vote at, any meeting of partners in the Issuer or participate in the management of the Issuer.

**Form of the Preferred Securities:**

The Preferred Securities will be in registered form.

On or about the Closing Date, a single global certificate (the "**Global Certificate**") in respect of the Preferred Securities will be deposited with JPMorgan Chase Bank N.A., London Branch (the "**Common Depositary**") as common depositary for Euroclear Bank SA./N.V. as operator of the Euroclear System ("**Euroclear**") and Clearstream Banking, société anonyme ("**Clearstream, Luxembourg**"). Such certificate will be issued, and the Preferred Securities will be registered, in the name of Chase Nominees Limited (the "**Initial Limited Partner**") as nominee of the Common Depositary.

11

For so long as the Preferred Securities are deposited and registered as described above, book-entry interests in the Preferred Securities will be shown on, and transfers thereof will be effected only through, records maintained by Euroclear and Clearstream, Luxembourg.

Definitive certificates will not be made available to Holders other than in certain limited circumstances. See *"Summary of Provisions Relating to the Preferred Securities in Global Form"*.

**Listings:**    Application has been made to list the Preferred Securities on the Luxembourg Stock Exchange and Euronext Amsterdam.

**Ratings:**    The Preferred Securities are expected to be assigned, on issue, a rating of "BBB+" by Standard & Poor's, "A3" by Moody's and "A-" by Fitch IBCA. A credit rating is not a recommendation to buy, sell or hold securities and may be subject to revision, suspension or withdrawal at any time by the relevant rating organisation.

**Governing Law:**    The Limited Partnership Agreement establishing the Issuer, the Preferred Securities and the Subordinated Guarantee will be governed by, and construed in accordance with, English law.

## DESCRIPTION OF THE PREFERRED SECURITIES

*The Preferred Securities are limited partnership interests in the Issuer. The following description should be read in conjunction with, and is subject to the terms of, the Limited Partnership Agreement (as defined below), a copy of which is available for inspection as described under "General Information".*

**1.    Definitions and Interpretation**

In this description of the Preferred Securities, except to the extent that the context otherwise requires:

**"Act"** means the Limited Partnerships Act 1907, as amended and/or restated from time to time;

**"Additional Amounts"** means the additional amounts which may be payable by the Issuer in respect of the Preferred Securities as a result of the imposition of UK withholding taxes as described in paragraph 6;

**"Agency Agreement"** means the agency agreement dated 30th March, 2005 relating to the Preferred Securities between, *inter alios*, the Guarantor, the Registrar and the Paying and Transfer Agents;

**"Business Day"** means a day on which commercial banks and foreign exchange markets settle payments and are open for general business (including dealing in foreign exchange and foreign currency deposits) in London and on which the TARGET System, or any successor thereto, is operating;

A **"Capital Disqualification Event"** shall occur if:

(a)    the Preferred Securities do not qualify as regulatory capital pursuant to the Relevant Rules upon either LBHI or the Guarantor becoming subject to supervision by a relevant Supervisory Authority; or

(b)    if following any such person becoming subject to the Relevant Rules a change of such Relevant Rules results in the Preferred Securities no longer so qualifying;

**"Clearstream, Luxembourg"** means Clearstream Banking, société anonyme or its successor;

**"Closing Date"** means 30th March, 2005;

**"Distribution Determination Date"** means with respect to any Distribution Period, the second TARGET Business Day prior to the first day of such Distribution Period;

**"Distribution Payment Date"** means 30th March in each year;

**"Distribution Period"** means the period from, and including, the Closing Date to, but excluding, the first Distribution Payment Date and each period thereafter from, and including, one Distribution Payment Date to, but excluding, the next following Distribution Payment Date;

**"Distribution Rate"** means, in respect of a Distribution Period, the percentage rate determined pursuant to paragraph 2.2;

**"Distributions"** means the non-cumulative distributions in respect of the Preferred Securities as described under paragraph 2;

**"Eligible Investments"** means

(a)    subordinated debt securities (other than the Subordinated Notes) that are issued or guaranteed by a member of the Group other than UK Holding (but of a comparable rating to UK Holding at the relevant time), or

(b)    provided that (if required) the relevant Supervisory Authority has not objected, such other instruments issued by a member of the Group other than UK Holding (but of a comparable rating to UK Holding at the relevant time),

*provided that* in both cases:

13

(i)     for the avoidance of doubt, if the Eligible Investments are securities of a UK company, the Eligible Investments shall, in the event of their issuance, be the subject of an application for listing on a recognised stock exchange in accordance with section 841 of the Income and Corporation Taxes Act 1988; and

(ii)    the Preferential Limited Partner shall not be the principal obligor of the Eligible Investments;

"**Euroclear**" means Euroclear Bank S.A./N.V. as operator of the Euroclear system or its successor;

"**Euronext Amsterdam**" means the Official Segment of the Stock Market of Euronext Amsterdam N.V.;

"**Euro-zone**" means the region comprised of the member states of the European Union that have adopted the single currency in accordance with the Treaty establishing the European Community (signed in Rome on 25th March, 1957) as amended;

"**General Partner**" means LB GP No. 1 Ltd. (incorporated in England and Wales with registered number 5355491), a wholly owned Subsidiary of LBHI;

"**Group**" means LBHI and its Subsidiaries;

"**Guarantor**" means Lehman Brothers Holdings plc (incorporated in England and Wales with registered number 1854685) and its successors and assignees;

"**Holder**" means, in respect of each Preferred Security, each person registered on the Register as the limited partner holding such Preferred Security at the relevant time;

"**Initial Limited Partner**" means Chase Nominees Limited (incorporated in England and Wales with registered number 00248239);

"**Issuer**" means Lehman Brothers UK Capital Funding LP;

"**Junior Share Capital**" means the Guarantor's ordinary shares, together with any other securities or obligations of the Guarantor expressed to rank junior to the Subordinated Guarantee and the Parity Securities;

"**LBHI**" means Lehman Brothers Holdings Inc.;

"**Limited Partnership Agreement**" means an agreement dated 22nd March, 2005 between, *inter alios*, the General Partner, the Preferential Limited Partner and the Initial Limited Partner establishing the Issuer, as supplemented by a first supplemental limited partnership agreement dated 24th March, 2005 between the same parties, as the same may be amended and/or further supplemented from time to time;

"**Liquidation Distribution**" means the Liquidation Preference plus (a) any due and accrued but unpaid Distributions calculated from (and including) the immediately preceding Distribution Payment Date (or, if none, the Closing Date) to (but excluding) the date of payment and (b) any Additional Amounts, in each case in cash only;

"**Liquidation Preference**" means the liquidation preference of €1,000 per Preferred Security;

"**Margin**" means 0.10 per cent. per annum;

"**No Payment Notice**" means a notice which is published pursuant to paragraph 2.4;

"**Optional Redemption Price**" means, in respect of each Preferred Security, the Liquidation Preference plus (a) any due and accrued but unpaid Distributions calculated from (and including) the immediately preceding Distribution Payment Date (or, if none, the Closing Date) to (but excluding) the date of payment and (b) any Additional Amounts payable, in each case in cash only;

"**Parity Securities**" means any non-cumulative preference shares, non-cumulative preferred securities (other than the Preferred Securities) or other securities either (a) issued directly by the Guarantor and ranking *pari passu* with the Guarantor's obligations under the Subordinated Guarantee and includes the sterling and

14

US dollar non-cumulative preference shares of the Guarantor outstanding or (b) issued by the Issuer or any Subsidiary or other entity and entitled to the benefit of the Subordinated Guarantee or benefiting from any other guarantee or support agreement from the Guarantor ranking *pari passu* with the Subordinated Guarantee;

**"Paying and Transfer Agents"** means the Principal Paying and Transfer Agent, J.P. Morgan Bank Luxembourg S.A. and ING Bank N.V. and/or such other entities as are appointed by the General Partner on behalf of the Issuer and notified to the Holders as described under paragraph 10;

**"Permitted Reorganisation"** means a solvent reconstruction, amalgamation, reorganisation, merger or consolidation whereby all or substantially all of the business, undertaking and assets of the Guarantor are transferred to a successor entity which assumes all of the Guarantor's obligation under the Subordinated Guarantee;

**"Preferential Limited Partner"** means, on the Closing Date, LB Investment Holdings Ltd. (incorporated in England and Wales with registered number 4385277), a wholly owned Subsidiary of LBHI or any other Subsidiary of LBHI within the charge to UK corporation tax;

**"Preferred Capital Contribution"** means, in relation to the Preferred Securities, the aggregate contribution to the assets of the Issuer (being a whole multiple of €1,000) paid in cash by the Holders;

**"Preferred Securities"** means the outstanding Fixed Rate to CMS-Linked Guaranteed Non-Voting Non-Cumulative Perpetual Preferred Securities of the Issuer, originally issued on the Closing Date in the principal amount of €225,000,000, each such security representing an interest of a Holder in the Issuer attributable to each €1,000 of the Preferred Capital Contribution and including any further Preferred Securities of the Issuer of the same series issued after the Closing Date and ranking *pari passu* with the Preferred Securities as regards participation in the profits and assets of the Issuer and **"Preferred Security"** shall be construed accordingly;

**"Principal Paying and Transfer Agent"** means JPMorgan Chase Bank N.A., London Branch or such other entity as is appointed by the General Partner on behalf of the Issuer and notified to the Holders as described in paragraph 10;

**"Redemption Date"** means the date fixed for redemption under a notice given under paragraph 4.2 or 4.3;

**"Reference Rate"** means in respect of a relevant Distribution Period, the 10-year mid-swap rate in EUR (annual, 30/360) versus 6-month EURIBOR (Semi-annual, ACT/360) which appears on the Relevant Screen Page under the heading "EURIBOR BASIS" and above the caption "11:00 AM CET" (as such headings and captions may appear from time to time) as of 11:00a.m. (Central European time), on the Distribution Determination Date;

**"Relevant Screen Page"** means Reuters Page "ISDAFIX2";

**"Register"** means the register of Holders maintained outside the United Kingdom on behalf of the Issuer;

**"Registrar"** means J.P. Morgan Bank Luxembourg S.A. or such other entity appointed by the Issuer and notified to the Holders as described under paragraph 10;

**"Relevant Rules"** means at any time the regulations, requirements, guidelines and policies of any relevant Supervisory Authority relating to capital adequacy of financial institutions in the jurisdiction of such Supervisory Authority.

**"Stock Exchanges"** means the Luxembourg Stock Exchange, Euronext Amsterdam and/or such other stock exchange approved by the General Partner on which the Preferred Securities may be listed from time to time;

**"Subordinated Guarantee"** means the subordinated guarantee in respect of the Preferred Securities executed by the Guarantor on 30th March, 2005 as a deed poll;

15

"**Subordinated Notes**" means the Fixed Rate to CMS-Linked Subordinated Notes, originally issued on the Closing Date in the principal amount of €225,000,000, by UK Holding and held by the Issuer as initial partnership assets, or any Eligible Investments which are held by the Issuer as partnership assets thereafter;

"**Subsidiary**" means, in relation to any entity, any company (i) in which that entity holds a majority of the voting rights or (ii) of which that entity is a member and has the right to appoint or remove a majority of the board of directors or (iii) of which that entity is a member and controls a majority of the voting rights, and includes any company which is a Subsidiary of a Subsidiary of that entity;

"**Substituted Preferred Stock**" means fully-paid non-cumulative preferred stock issued directly by LBHI bearing a right to dividends calculated in the same manner as the Preferred Securities, having no voting rights (except as required by law) and being subject to optional redemption in the same manner as the Preferred Securities;

"**Supervisory Authority**" means in respect of any jurisdiction, any organisation or authority having supervisory responsibility for the prudential supervision of financial institutions engaged in regulated activities carried on by LBHI in such jurisdiction;

"**TARGET**" means the Trans European Real-Time Gross Settlement Express Transfer (TARGET) System;

"**TARGET Business Day**" means a day on which TARGET is operating;

"**Tax**" means any present or future taxes or duties of whatsoever nature imposed or levied by or on behalf of the United Kingdom or any political subdivision of or by any authority therein or thereof having power to tax;

"**Tax Event**" means a UK Tax Event or a US Tax Event;

"**Tier 1 Capital**" has the meaning ascribed to it in the Financial Services Authority's Guide to Banking Supervisory Policy or any successor publication replacing such guide; and

"**Trigger Event**" shall occur (i) if LBHI is placed into bankruptcy, reorganisation, conservatorship or receivership, (ii) if following any time when LBHI becomes subject to Relevant Rules, LBHI has capital adequacy levels which are less than the minimum capital adequacy levels which are imposed by the relevant Supervisory Authority or (iii) if, following any time when LBHI become subject to Relevant Rules, the relevant Supervisory Authority, in its sole discretion, informs LBHI that it will not meet its minimum capital requirement in the near term;

"**UK Holding**" means Lehman Brothers Holdings plc (incorporated in England and Wales with registered number 1854685) and its successors and assignees;

"**UK Regulator**" means the Financial Services Authority or such other national or supranational regulatory authority as may at the relevant time have responsibility for the regulation and supervision of banks in the United Kingdom (or, if the Guarantor becomes domiciled in a jurisdiction other than the United Kingdom, in such other jurisdiction);

"**UK Tax Event**" means that, as a result of any change (each a "**Relevant Change**") in, or prospective or actual amendment to, the laws of the United Kingdom or any political subdivision or authority thereof having power to tax, or any change in the application of such laws, or in the official or generally published interpretation of such laws (including the enactment of any legislation, any judicial decision or any regulatory determination in the UK), or any interpretation or pronouncement by any relevant tax authority that provides for a position with respect to such laws or regulations that differs from the previously generally accepted position in relation to similar transactions or which differs from any specific written confirmation given by a tax authority in respect of the Preferred Securities and/or the Subordinated Notes, which change or amendment becomes effective or is to take effect, on or after 29th March, 2005, there is more than an insubstantial risk that:

(i)     the Issuer or the General Partner would be subject to more than a *de minimis* amount of tax in respect of the Subordinated Notes or the Preferred Securities in the UK (except, in the case of the General

16

Partner only, for any such tax that would arise as a result of (a) profits arising to it as a result of payments received by it from the Issuer or (b) activities (if any) carried on by it other than those permitted or contemplated in the Limited Partnership Agreement in respect of the Subordinated Notes and the Preferred Securities);

(ii)    payments to Holders (including payments in respect of the Preferred Securities and the Subordinated Guarantee) would be subject to deduction or to withholding of or on account of tax in the UK or would give rise to any obligation to account for any tax in the UK;

(iii)   payments in respect of the Subordinated Notes would be subject to deduction or to withholding of or on account of tax in the UK or would give rise to any obligation to account for any tax in the UK;

(iv)    payments of interest made or accrued or treated as being made or accrued on the Subordinated Notes will be treated as "distributions" within the meaning of Section 832(1) of the Income and Corporation Taxes Act 1988 (or such other Section and/or Act as may from time to time supersede or replace Section 832(1) of the Income and Corporation Taxes Act 1988 for the purposes of such definition) for UK tax purposes or otherwise will cease to be deductible in full for the purposes of UK corporation tax; or

(v)     the Guarantor would not be entitled to surrender a deduction or other relief for interest on the Subordinated Notes to other companies with which it is grouped (or with which it would be grouped but for the Relevant Change) for applicable UK tax purposes to offset against their profits (whether under the group relief system in Sections 402 to 413 of the Income and Corporation Taxes Act 1988 current as at 29th March, 2005 or any similar system or systems having like effect as may from time to time exist); and

**"US Tax Event"** means that, as a result of (a) any amendment to, change in or announced proposed change in the laws (or any regulations thereunder whether in proposed, temporary or final form) of the United States or any political subdivision or taxing authority thereof or therein, (b) a judicial decision interpreting, applying or clarifying such laws or regulations, (c) an administrative pronouncement or action that represents an official position (including a clarification of an official position (of the governmental authority or regulatory body making such administrative pronouncement or taking such action, or (d) a threatened challenge asserted in connection with an audit of the Issuer, LBHI, or the General Partner, or a threatened challenge asserted in writing against any other taxpayer that has raised capital through the issuance of securities similar to the Subordinated Notes, Eligible Investments or the Preferred Securities, which amendment or change is adopted or which decision, pronouncement or proposed change is announced or which action, clarification or challenge occurs on or after the date of the issuance of the Preferred Securities, there is more than an insubstantial risk that:

(i)     the Issuer is or would be subject to more than a *de minimis* amount of tax or similar assessments in the United States; or

(ii)    payments to holders are or would be subject to deduction or to withholding of or on account of tax imposed by a governmental authority in the United States.

In this description of the Preferred Securities any reference to a particular time shall, unless otherwise specified, be to Central European time.

## 2.    Distributions

2.1    Subject as provided in paragraphs 2.3 and 2.4, non-cumulative distributions (the **"Distributions"**) on the Preferred Securities will accrue from the Closing Date (or, in the case of any further preferred securities issued pursuant to paragraph 8.4, from their respective dates of issue) and shall be payable out of the Issuer's own legally available resources annually in arrear on each Distribution Payment Date.

2.2    In respect of each Distribution Period during the period from and including the Closing Date to but excluding 30th March 2007 the Distribution Rate shall be 6.625 per cent. per annum. The Distribution Amount payable on 30th March, 2006 in respect of the first Distribution Period shall be €66.25 per

Preferred Security. Thereafter, the Distribution Rate will be determined by the Principal Paying and Transfer Agent for each Distribution Period on the basis of the following provisions.

On each Distribution Determination Date, the Principal Paying and Transfer Agent will determine the Reference Rate as at 11.00 a.m. (Central European time). The Distribution Rate for the relevant Distribution Period shall be the aggregate of the relevant Reference Rate plus the Margin and provided that if the Distribution Rate for any Distribution Period would otherwise be greater than 8.00 per cent. per annum, it will be deemed to be 8.00 per cent. per annum for such Distribution Period.

If the Reference Rate does not appear on the Relevant Screen Page on the relevant Distribution Determination Date, the rate for that date will be a percentage determined on the basis of the mid-market annual swap rate quotations provided by five leading swap dealers in the eurozone interbank market selected by the Principal Paying and Transfer Agent with the approval of the General Partner (the **"Reference Banks"**) at approximately 11.00 a.m. (Central European Time), on the Distribution Determination Date.

For this purpose, the **"mid-market annual swap rate"** means the arithmetic mean of the bid and offered rates for the annual fixed leg, calculated on a 30/360 day count basis, of a fixed-for-floating euro interest rate swap transaction with a 10 year maturity commencing on the first day of that Distribution Period and in an amount that is representative for a single transaction in the relevant market at the relevant time with an acknowledged dealer of good credit in the swap market, where the floating leg, calculated on an Actual/360 day count basis, is equivalent to "EUREURIBOR-Telerate", with a maturity of six months.

The Principal Paying and Transfer Agent will request the principal office of each of the Reference Banks to provide a quotation of its rate. If at least three quotations are provided, the rate for the first day of that Distribution Period will be the arithmetic mean of the quotations, eliminating the highest quotation (or, in the event of equality, one of the highest) and the lowest quotation (or, in the event of equality, one of the lowest).

The Principal Paying and Transfer Agent will, as soon as practicable after 11.00 a.m. (Central European Time) on each Distribution Determination Date, determine the Distribution Rate in respect of the relevant Distribution Period and calculate the amount of the Distribution payable per Preferred Security on the Distribution Payment Date for the relevant Distribution Period (the **"Distribution Amount"**) by applying the Distribution Rate for such Distribution Period to the Liquidation Preference, multiplying such sum by the number of days elapsed in the period using a calendar year of 360 days consisting of 12 months of 30 days each (unless (i) the last day of the Distribution Period is the 31st day of a month, in which case the month that includes that last day shall not be considered to be shortened to a 30-day month, or (ii) the last day of the Distribution Period is the last day of February, in which case, February shall not be considered to be lengthened to a 30-day month) divided by 360 and rounding the resulting figure to the nearest cent (half a cent being rounded upwards).

The Principal Paying and Transfer Agent shall cause the relevant Distribution Rate and each Distribution Amount payable in respect of the relevant Distribution Period to be notified to the Issuer, the Bank, the Stock Exchanges and the Holders of Preferred Securities (in accordance with the provisions of paragraph 10) as soon as possible after their determination but in any event not later than the second Business Day thereafter. The Distribution Amount so notified may subsequently be amended (or appropriate alternative arrangements made by way of adjustment) without notice in the event of proven or manifest error.

2.3    The Holders will be entitled to receive Distributions only if the Issuer has received sufficient funds under the Subordinated Notes or the Eligible Investments, as the case may be.

2.4    Furthermore, notwithstanding the existence of such resources legally available for distribution by the Issuer, the Holders will not be entitled to receive Distributions if the General Partner has published a No Payment Notice in respect of such Distribution, in which case there will be no payment due under the Preferred Securities.

The General Partner will have the full discretion to publish the No Payment Notice in respect of any Distribution at any time and for any reason. It will use this discretion in respect of a Distribution if such payment will cause a Trigger Event.

2.5    No Holder shall have any claim in respect of any Distribution or part thereof not payable as a result of the limitation set out in paragraph 2.4. Accordingly, such amounts will not cumulate for the benefit of Holders or entitle the Holders to any claim in respect thereof against the Issuer or against the Guarantor under the Subordinated Guarantee.

2.6    Save as described above, Holders will have no right to participate in the profits of the Issuer or the Guarantor and in particular will have no rights to receive from the Issuer amounts paid to the Issuer amounts paid under the Subordinated Notes or any Eligible Investments or otherwise amounts in excess of Distributions due and payable under the Preferred Securities. In the event that any amounts received by the Issuer on the Subordinated Notes or any Eligible Investments, exceed the amount (if any) then due by way of Distribution under the Preferred Securities, the amount of such excess will be paid to the Preferential Limited Partner. Holders will have no rights in respect of such excess.

*LBHI has undertaken that, in the event that any Distribution is not paid in full, it will not:*

(a)    *declare or pay any dividend on its shares of common stock; or*

(b)    *repurchase or redeem any of its non-cumulative preferred stock or common stock at its option,*

*until such time as Distributions on the Preferred Securities have been paid in full for one year.*

## 3.    Liquidation Distributions

3.1    In the event of the dissolution of the Issuer, the Holders will be entitled to receive the Liquidation Distribution, in respect of each Preferred Security held, out of the assets of the Issuer available for distribution to such Holders under the Act. Such entitlement will arise (a) before any payments due to the General Partner and the Preferential Limited Partner and (b) before any distribution of assets is made to the General Partner, but such entitlement will rank equally with the entitlement of the holders of all other preferred securities issued by the Issuer which rank *pari passu* with the Preferred Securities, if any.

3.2    After payment of all Liquidation Distributions, or the Relevant Proportion thereof if applicable, the General Partner will be entitled to any remaining assets of the Issuer representing proceeds of the sale or redemption of the Issuer's partnership assets and the Holders will have no right or claim to any of the remaining assets of the Issuer or the Guarantor. For the avoidance of doubt, Holders will have no right to receive the Subordinated Notes or any replacement Eligible Investment.

*LBHI has undertaken that, as long as any of the Preferred Securities is outstanding:*

(a)    *unless LBHI is being wound-up, LBHI will not take any action that would or might cause the liquidation, dissolution or winding-up of the General Partner or the Issuer otherwise than with the prior written approval of any relevant Supervisory Authority (if required at such time); and*

(b)    *the General Partner will at all times be a directly or indirectly wholly owned Subsidiary of LBHI unless (I) otherwise approved by the Holders in accordance with the procedure set out in the Limited Partnership Agreement or (II) after a substitution of the Preferred Securities for depositary shares representing Substituted Preferred Stock has occurred.*

3.3    Subject to the Act, other than in the events referred to in paragraphs 4.2, 4.3, 4.4 and 5, unless (if required at such time) the UK Regulator has not objected, the General Partner will not permit, or take any action that would or might cause, the liquidation or dissolution of the Issuer. No Holder shall have any claim (whether against the Issuer or the Guarantor) in respect of any Liquidation Distribution or part thereof not paid when it would, but for the operation of this paragraph 3.3, otherwise have become due.

**4.    Redemption**

4.1    The Preferred Securities have no fixed final redemption date and Holders have no right to call for the redemption of the Preferred Securities. Any redemption is subject to the provisions of the Act.

4.2    If the Subordinated Notes or the Eligible Investments, as the case may be, are redeemed pursuant to their terms, the Preferred Securities will also be redeemed, in whole but not in part, by the General Partner on the same date, each to be redeemed at the Optional Redemption Price.

4.3    If a Capital Disqualification Event occurs and is continuing, the Preferred Securities will be redeemed, in whole but not in part, by the General Partner at any time, each to be redeemed at the Optional Redemption Price.

4.4    If a Tax Event occurs and is continuing, the effect of which cannot be avoided by the Issuer or the Guarantor, as the case may be, taking reasonable measures available to it or if the Subordinated Notes or the Eligible Investments, as the case may be, are redeemed pursuant to their terms for tax reasons, then the Preferred Securities will also be redeemed by the General Partner on the same date, each to be redeemed at the Optional Redemption Price.

4.5    Prior to the publication of any notice of redemption pursuant to paragraph 4.3 or paragraph 4.4, the General Partner shall deliver to the Registrar a certificate signed by two members of the board of directors of the Guarantor stating that the Issuer is entitled to effect such redemption and an opinion of counsel to the Guarantor experienced in such matters to the effect that either a Tax Event has occurred (and specifying which of the clauses as set out in the definition of "Tax Event" is applicable) or a Capital Disqualification Event has occurred. Upon the expiry of such notice, the Issuer shall be dissolved and the General Partner as liquidation agent shall be bound to redeem each of the Preferred Securities accordingly by payment of an amount equal to the Optional Redemption Price.

4.6    Any redemption of the Preferred Securities, the Subordinated Notes or replacement Eligible Investments is subject to the consent of the relevant Supervisory Authority (if required at such time). As a result, the relevant Supervisory Authority when granting such a consent for the redemption of the Subordinated Notes will be also granting their consent for the redemption of the Preferred Securities. The relevant Supervisory Authority may impose conditions on any such redemption.

4.7    All Preferred Securities which are redeemed will forthwith be cancelled and accordingly may not be reissued or resold.

**5.    Substitution for Preferred Stock**

5.1    If a Trigger Event occurs, then, provided that (if required at such time) no relevant Supervisory Authority has objected, the General Partner shall take all reasonable steps to cause the substitution of the Preferred Securities by depositary shares representing Substituted Preferred Stock (the "**Preferred Securities Substitution**") on the Substitution Date, as defined below.

As soon as reasonably practicable following the occurrence of a Trigger Event, the General Partner shall cause notice (the "**Trigger Event Notice**") to be given to the Holders (in accordance with paragraph 10) and to the Stock Exchanges that the depositary shares representing Substituted Preferred Stock will be available from the date (the "**Substitution Date**") specified in the Trigger Event Notice for the purpose.

Until such time as the Trigger Event Notice is given by the General Partner (in accordance with paragraph 10), Holders will continue to be entitled to receive Distributions and/or a Liquidation Distribution in respect of the Preferred Securities but thereafter Holders will have no further rights, title or interest in or to their Preferred Securities except to have them substituted in the manner and to the persons described below.

The Trigger Event Notice will contain a form of substitution confirmation (the "**Preferred Securities Substitution Confirmation**") to be completed by each Holder (or, for so long as the Preferred

Securities are registered in the name of a nominee of a common depositary for Euroclear and Clearstream, Luxembourg, by each accountholder named in the records of Euroclear and Clearstream, Luxembourg as the holder of an interest in the Preferred Securities). The form of Preferred Securities Substitution Confirmation shall also be made available at the offices of each Paying and Transfer Agent. To receive Substituted Preferred Stock in respect of its holding of Preferred Securities, a Paying and Transfer Agent must receive from the Holder (or such accountholder, as the case may be) a Preferred Securities Substitution Confirmation together with the certificate representing the relative holding of Preferred Securities or other evidence of entitlement satisfactory to the General Partner.

Each share of Substituted Preferred Stock allotted will rank for any dividend from the immediately preceding Distribution Payment Date but otherwise will have no entitlement to any accrued Distributions or any other payment in respect of the Preferred Securities.

Upon a Preferred Securities Substitution, each Holder (or, as the case may be, accountholder) shall receive in respect of each €1,000 Liquidation Preference of Preferred Securities, one depositary share representing Substituted Preferred Stock with a nominal amount of €1,000.

No Preferred Securities Substitution will take place and the Holders will continue to hold their Preferred Securities and all their rights thereunder if prior to the Substitution Date, a winding-up of LBHI occurs.

*LBHI has undertaken that it will pay any taxes or capital duties or stamp duties payable in the UK arising on the allotment and issue of the depositary shares representing Substituted Preferred Stock. LBHI will not be obliged to pay, and each Holder (or, as the case may be, accountholder) delivering Preferred Securities and a duly completed Preferred Securities Substitution Confirmation to a Paying and Transfer Agent must pay, any other taxes, stamp duty reserves taxes and capital, stamp, issue and registration duties arising on the relevant Preferred Securities Substitution. LBHI will not be obliged to pay and each recipient must pay all, if any, taxes arising by reference to any disposal or deemed disposal of a Preferred Security in connection with such Preferred Securities Substitution.*

5.2    The General Partner will use all reasonable endeavours to procure that certificates (if any) for depositary shares representing Substituted Preferred Stock issued on a Preferred Securities Substitution will be despatched by mail free of charge (but uninsured and at the risk of the person entitled thereto) within one month after receipt of a duly completed Preferred Securities Substitution Confirmation.

## 6.    Additional Amounts

All payments in respect of the Preferred Securities by the Issuer will be made without withholding or deduction for, or on account of, any Tax, unless the withholding or deduction of such Tax is required by law. In that event, each Holder will be entitled to receive, as further distributions, such additional amounts (the "**Additional Amounts**") as may be necessary in order that the net amounts received by the Holders after such withholding or deduction shall equal the amounts which would have been receivable in respect of the Preferred Securities in the absence of such withholding or deduction; except that no such Additional Amounts will be payable to a Holder (or to a third party on his behalf) with respect to any Preferred Security:

(a)    to the extent that such Tax is imposed or levied by virtue of such Holder (or the beneficial owner) of such Preferred Security having some connection with the United Kingdom, other than merely being a Holder (or beneficial owner) of such Preferred Security; or

(b)    where such withholding or deduction is imposed on a payment to or on behalf of an individual and is required to be made pursuant to European Union Directive 2003/48/EC on the taxation of savings or any other European Union Directive on the taxation of savings implementing the conclusions of the ECOFIN Council meeting of 26th-27th November, 2000 or any law implementing or complying with, or introduced in order to conform to, such Directive; or

21

(c)   where the Holder would have been able to avoid such withholding or deduction by presenting the Preferred Securities to another Paying and Transfer Agent in a Member State of the European Union, insofar as presentation for payment is required,

and except that the Issuer's obligation to make any such payments is subject to the limitations provided in paragraphs 2 and 3.

**7.    Payments**

7.1    Distributions will be payable in accordance with the Act on the relevant Distribution Payment Date (or where any Distribution Payment Date is not a TARGET Business Day, on the next TARGET Business Day (without interest in respect of such delay)) to the Holders of record as they appear on the Register on the relevant record date, which will be five TARGET Business Days prior to the relevant Distribution Payment Date.

If the General Partner gives a notice of redemption pursuant to paragraph 4.2, 4.3 or 4.4 or in respect of the Preferred Securities, then on the relevant Redemption Date the General Partner shall procure that the Optional Redemption Price will be paid by the Registrar or by the Paying and Transfer Agents on behalf of the Issuer to the Holders. Upon such payment, all rights of Holders to participate in the assets of the Issuer or to be returned any amount in respect of the Preferred Securities (including the Preferred Capital Contribution (or any part thereof) made by or on behalf of the Holders) will be extinguished and the Holders shall thereupon cease to be limited partners of the Issuer provided their holding of Preferred Securities are redeemed in accordance with the foregoing, and the Preferred Capital Contribution will, on payment of the Optional Redemption Price, be deemed repaid.

7.2    Subject to all applicable fiscal or other laws and regulations:

7.2.1    each payment in respect of Distributions will be made by cheque and mailed to the Holder of record at such Holder's address as it appears on the Register on the relevant record date for the Preferred Securities; and

7.2.2    any payment in respect of the Optional Redemption Price or the Liquidation Distribution in respect of any Preferred Security will be made by cheque against presentation and surrender of the relevant certificate of entitlement at the office of the Registrar or a Paying and Transfer Agent,

provided, however, that a Holder may receive such payment by direct transfer if appropriate direct transfer instructions have been received by the Registrar in sufficient time prior to the relevant date of payment. Holders will not be entitled to any interest or other payment for any delay after the due date in receiving the amount due if the due date is not a TARGET Business Day, if the Holder is late in surrendering certificates (if required to do so) or if a cheque mailed in accordance with this paragraph arrives after the due date for payment.

In the event that payment of the Optional Redemption Price in respect of any Preferred Security is improperly withheld or refused and not paid by the Issuer, Distributions on such Preferred Security, subject as described in paragraphs 2.3 and 2.4, will continue to accrue, from the relevant Redemption Date to the date of actual payment of such Optional Redemption Price.

7.3    The General Partner will, and the Guarantor has undertaken in the Subordinated Guarantee that it will procure that the General Partner will, maintain at all times whilst the Preferred Securities are outstanding (a) whilst the Preferred Securities are listed on the Luxembourg Stock Exchange and the rules of the Luxembourg Stock Exchange so require, a Paying and Transfer Agent in Luxembourg, (b) whilst the Preferred Securities are listed on Euronext Amsterdam and the rules of Euronext Amsterdam so require, a Paying and Transfer Agent in Amsterdam, (c) a Registrar having its office outside the United Kingdom and (d) a Paying and Transfer Agent having a specified office in a European Union Member State other than the United Kingdom that will not be obliged to withhold or deduct tax pursuant to European Union Directive 2003/48/EC on the taxation of savings or any law implementing or complying with, or introduced in order to conform to, such Directive.

22

**8.      Meetings**

8.1     Except as described below and provided for in the Act, Holders will not be entitled to receive notice of, or attend or vote at, any meeting of partners in the Issuer or participate in the management of the Issuer.

8.2     The consent in writing of the Holders of at least a simple majority in Liquidation Preference of the outstanding Preferred Securities or the sanction of a resolution, passed by Holders of at least a simple majority in Liquidation Preference of the Preferred Securities present or represented at a separate meeting at which the quorum shall be Holders present or represented holding at least one-third in Liquidation Preference of the outstanding Preferred Securities, shall be required in order to give effect to any variation or abrogation of the rights, preferences and privileges of the Preferred Securities by way of amendment of the Limited Partnership Agreement or otherwise (unless otherwise provided in the terms of the Preferred Securities or as required by applicable law).

8.3     No such sanction shall be required if, as determined by the General Partner, the change is solely of a formal, minor or technical nature or is to correct an error or cure an ambiguity or which does not adversely affect the rights of Holders (provided that the change does not reduce the amounts payable to Holders, impose any obligation on the Holders or any modification of the terms of the Preferred Securities) in which case the General Partner shall be authorised to approve and implement such change.

8.4     Notwithstanding the foregoing, the General Partner may, without the consent or sanction of the Holders, take such action as is required in order to amend the Limited Partnership Agreement:

8.4.1   to allow an increase in the level of the Preferred Capital Contributions and the corresponding number of Preferred Securities; or

8.4.2   to authorise, create and issue one or more other series of securities or partnership interests in the Issuer ranking junior, as regards participation in the profits and assets of the Issuer, to the Preferred Securities and to admit, if relevant, new holders in respect thereof.

Thereafter the Issuer may, provided that the circumstances for non-payment of Distributions in paragraph 2.4 are not subsisting, without the consent of the Holders issue any such further securities either having the same terms and conditions as the Preferred Securities in all respects (or in all respects except for the first payment of Distributions on them) and so that such further issue shall be consolidated and form a single series with the Preferred Securities or upon such other terms as aforesaid. References herein to the Preferred Securities include (unless the context requires otherwise) any other securities issued pursuant to this paragraph and forming a single series with the Preferred Securities.

8.5     Notwithstanding the foregoing, no vote of the Holders will be required for the redemption, cancellation or substitution of the Preferred Securities or withdrawal of a Holder in accordance with the Limited Partnership Agreement.

8.6     The General Partner will cause a notice of any meeting at which Holders are entitled to vote and any voting forms to be mailed to each Holder. Each such notice will include a statement setting forth (a) the date, time and place of such meeting, (b) a description of any resolution to be proposed for adoption at such meeting on which such Holders are entitled to vote and (c) instructions for the delivery of proxies.

**9.      Covenant of the General Partner**

The General Partner undertakes not to incur any indebtedness in the name of the Issuer other than the costs and expenses incidental to creating the Preferred Securities and the Issuer and any other partnership interests in the Issuer, performing its obligations in respect of the Limited Partnership Agreement, maintaining the listing of the Preferred Securities and any other partnership interests in the Issuer (where applicable), the Register, the Registrar, the Paying and Transfer Agents and a listing agent in respect of the Preferred

23

Securities and corresponding agents (where applicable) with respect to any other partnership interests in the Issuer, the Issuer's holding of the partnership assets and any securities acquired with any other capital contributions to the Issuer or substitutions therefor and the maintenance of a custodian therefor, the exercise of the Issuer's rights in respect of the partnership assets and any securities acquired with any other capital contributions to the Issuer or substitutions therefor and the administration of the Issuer.

**10.    Notices**

All notices to the Holders will be mailed to the Holder of record and, if and for so long as the Preferred Securities are listed on the Luxembourg Stock Exchange and the rules of the Luxembourg Stock Exchange so require, in a daily newspaper of general circulation in Luxembourg, which for the time being shall be the *d' Wort* and if and for so long as the Preferred Securities are listed on Euronext Amsterdam and the rules of Euronext Amsterdam so require, in a daily newspaper of general circulation in The Netherlands, which for the time being shall be *Het Financieele Dagblad*, and in the Daily Official List (*Officiële Prijscourant*) of Euronext Amsterdam N.V. In addition, notices will be published in one English language daily newspaper of general circulation in Europe. Any mailed notice shall be deemed to have been given one clear day after the date on which it was posted and any notice published in a newspaper shall be deemed to have been given on the date of publication or, if so published more than once or on different dates, on the date of the first publication.

**11.    Transfers and Form**

The Preferred Securities will be in registered form each with a Liquidation Preference of €1,000 and multiples thereof.

If definitive certificates are made available in respect of Preferred Securities they will be available from the Registrar and from each of the Paying and Transfer Agents, and will be posted to the relevant Holders at the address shown in the Register or, as applicable, in the relevant instrument of transfer within three Business Days in London of issue, by uninsured post at the risk of such Holders. Transfers of Preferred Securities if represented by definitive certificates may be effected by presentation of the relevant certificate (with the transfer certificate attached thereto duly completed on behalf of the transferor and transferee) at the specified office of the Registrar or any Paying and Transfer Agent. Where a Holder transfers some only of the Preferred Securities represented by any such certificate he shall be entitled to a certificate for the balance without charge at the specified office of the Registrar or any Paying and Transfer Agent. All transfers of Preferred Securities by Holders must be effected in accordance with the Act and subject to the provisions of the Limited Partnership Agreement.

**12.    Replacement of Certificates**

If a certificate is damaged or defaced or alleged to have been lost, stolen or destroyed, a new certificate representing the same Preferred Securities may be issued on payment of such fee and on such terms (if any) as to evidence and indemnity and the payment of out-of-pocket expenses as the General Partner may think fit and on payment of the costs of the General Partner incidental to its investigation of the evidence and, if damaged or defaced, on delivery up of the old certificate at the office of the Registrar or any Paying and Transfer Agent.

**13.    Prescription**

Claims against the Issuer for payment of Distributions and sums in respect of the Optional Redemption Price or Liquidation Distribution of the Preferred Securities will be prescribed in accordance with English law unless made within 10 years from the date on which such payment becomes due or, if later, the date on which the Issuer makes such payment available to Holders.

24

**14.    Governing Law**

 The Limited Partnership Agreement and the Preferred Securities shall be governed by, and construed in accordance with, English law.

**15.    Additional Obligations**

If and so long as the Preferred Securities are listed on Euronext Amsterdam, the Issuer will comply with Article 2.1.20 of Schedule B of the Listing and Issuing Rules (*Fondsenreglement*) of Euronext Amsterdam N.V., as amended from time to time.

## SUMMARY OF PROVISIONS RELATING TO THE PREFERRED SECURITIES IN
## GLOBAL FORM

**Initial Issue of Preferred Securities**

The Preferred Securities will be issued in registered form and will be initially represented by interests in a Global Certificate which will be deposited with JPMorgan Chase Bank N.A., London Branch (the "**Common Depositary**") as common depositary for Euroclear and Clearstream, Luxembourg. The Preferred Securities will be registered in the name of the Initial Limited Partner, as nominee for the Common Depositary. For so long as the Preferred Securities are deposited and registered as described above, book-entry interests in the Preferred Securities will be shown on, and transfers of such interests will be effected only through, records maintained by Euroclear and Clearstream, Luxembourg.

**Exchange**

If either or both of Euroclear and Clearstream, Luxembourg is or are closed for business for a continuous period of 14 days (other than for the purposes of a public holiday) or announces an intention permanently to cease business, then a number of Preferred Securities corresponding to its book-entry interest in the Preferred Securities represented by the Global Certificate held by the Common Depositary referred to above will, subject to such reasonable requirements as the General Partner may require, be transferred to each holder of an interest in the Preferred Securities whose name is notified by the Common Depositary to the Registrar. Each such holder will be registered as a Holder in the Register and registered with the Registrar at Companies House in Cardiff on the Limited Partnerships Register accordance with the Act and will receive a certificate made out in its name. Other than in the circumstances referred to in this paragraph, definitive certificates will not be available to Holders.

**Accountholders**

So long as the Preferred Securities are registered in the name of a nominee for a common depositary for Euroclear and Clearstream, Luxembourg, the nominee for Euroclear and Clearstream, Luxembourg will be the sole registered owner or holder of the Preferred Securities represented by the Global Certificate for all purposes under the Limited Partnership Agreement. Except as set forth under "*Description of Preferred Securities – Transfers and Form*" and under "*Transfers of Interests*" below, the persons shown in the records of Euroclear, Clearstream, Luxembourg or any other clearing system as the holders of the Preferred Securities evidenced by the Global Certificate (each an "**Accountholder**") will not be entitled to have Preferred Securities registered in their names, will not receive or be entitled to receive physical delivery of definitive certificates evidencing interests in the Preferred Securities and will not be considered registered owners or holders thereof under the Limited Partnership Agreement. Accordingly, each Accountholder must rely on the rules and procedures of Euroclear and Clearstream, Luxembourg, as the case may be, to exercise any rights and obligations of an investor in Preferred Securities.

**Payment**

Each Accountholder must look solely to Euroclear or Clearstream, Luxembourg, as the case may be, for its share of each payment made by the Issuer to the registered holder of the Preferred Securities and in relation to all other rights arising under the Global Certificate, subject to and in accordance with the respective rules and procedures of Euroclear or Clearstream, Luxembourg, as the case may be. Such persons shall have no claim directly against the Issuer in respect of payments due on the Preferred Securities for so long as the Preferred Securities are represented by the Global Certificate and such obligations of the Issuer will be discharged by payment to the registered holder of the Preferred Securities in respect of each amount so paid.

**Transfers of Interests**

Accountholders will only be able to transfer their beneficial interests in the Preferred Securities in accordance with the restrictions described under *"Description of Preferred Securities – Transfers and Form"* and the rules and procedures of Euroclear or Clearstream, Luxembourg, as the case may be.

## SUBORDINATED GUARANTEE

*The following is the Subordinated Guarantee substantially in the form to be executed by the Guarantor.*

THIS DEED OF GUARANTEE (the "**Subordinated Guarantee**"), dated 30th March, 2005, is executed and delivered by Lehman Brothers Holdings plc (the "**Guarantor**") for the benefit of the Holders (as defined below).

WHEREAS the Guarantor desires to issue this Subordinated Guarantee for the benefit of the Holders, as provided herein.

NOW, THEREFORE the Guarantor executes and delivers this Subordinated Guarantee as a deed poll for the benefit of the Holders.

**1.     Definitions**

As used in this Subordinated Guarantee, capitalised terms not defined herein shall have the meanings ascribed to them in the Limited Partnership Agreement and otherwise the following terms shall, unless the context otherwise requires, have the following meanings:

"**Guaranteed Payments**" means (without duplication) collectively payments by the Guarantor in respect of an amount equal to (i) all Distributions due on the Preferred Securities, (ii) any Distributions on the Preferred Securities which would have been due had the Issuer had sufficient legally available resources but only if, and to the extent that, the Issuer did not have such legally available resources solely due to a failure by the issuer of the Subordinated Notes or Eligible Investments replacing such Subordinated Notes to pay interest thereon as and when due under the terms thereof, (iii) the Optional Redemption Price and (iv) any Additional Amounts;

"**Holder**" means, in respect of each Preferred Security, each person registered on the Register as the limited partner holding such Preferred Security at the relevant time, save that for as long as the Preferred Securities are registered in the name of a common depositary (or of a nominee for a common depositary) for Euroclear and Clearstream, Luxembourg, each person (other than Euroclear and Clearstream, Luxembourg) who is for the time being shown in the records of Euroclear and Clearstream, Luxembourg as the holder of an interest in any Preferred Securities (in which regard any certificate or other document issued by Euroclear or Clearstream, Luxembourg as to the number of Preferred Securities standing to the account of any person shall be conclusive and binding for all purposes) shall be treated by the Issuer, the Guarantor and any Paying and Transfer Agent as the holder of Preferred Securities in a nominal amount equal to such interest for all purposes other than with respect to payments, the right to which shall be vested in the name of the person appearing as the relative limited partner in the Register;

"**Junior Share Capital**" means the Guarantor's ordinary shares, together with any other securities or obligations of the Guarantor expressed to rank junior to this Subordinated Guarantee and the Parity Securities;

"**Limited Partnership Agreement**" means the Limited Partnership Agreement dated 22nd March, 2005 establishing the Issuer, as supplemented by a First Supplemental Limited Partnership Agreement dated 24th March, 2005, as the same may be amended and/or further supplemented from time to time;

"**Parity Securities**" means any non-cumulative preference shares, non-cumulative preferred securities (other than the Preferred Securities) or other securities either (a) issued directly by the Guarantor and ranking *pari passu* with the Guarantor's obligations under this Subordinated Guarantee including the sterling and US dollar non-cumulative preference shares of the Guarantor outstanding or (b) issued by the Issuer or any Subsidiary or other entity and entitled to the benefit of this Subordinated Guarantee or benefiting from any other guarantee or support agreement from the Guarantor ranking *pari passu* with this Subordinated Guarantee;

"**Preferred Securities**" means the outstanding Fixed Rate to CMS-Linked Guaranteed Non-voting Non-cumulative Perpetual Preferred Securities of the Issuer, originally issued on 30th March, 2005 in the

28

principal amount of €225,000,000, together with any further such preferred securities issued after the date of this Subordinated Guarantee, the Holders of which are entitled to the benefits of this Subordinated Guarantee as evidenced by the execution of this Subordinated Guarantee and "**Preferred Security**" shall be construed accordingly;

"**Tax**" means any present or future taxes or duties of whatsoever nature imposed or levied by or on behalf of the United Kingdom or any subdivision of or by any authority therein or thereof having power to tax;

"**Tier 1 Capital**" has the meaning ascribed to it in the Financial Services Authority's Guide to Banking Supervisor Policy or any successor publication replacing such guide; and

"**Tier 1 Securities**" mean any obligation of the Guarantor or, as the case may be, a Subsidiary or other entity which is treated, or is capable of being treated, as Tier 1 Capital of the Guarantor.

## 2.    Guarantee

2.1    Subject to the exceptions and limitations contained in the following provisions of this clause 2, the Guarantor irrevocably agrees to pay in full to the Holders the Guaranteed Payments, as and when due, to the extent that such payments shall not have been paid when due and payable by the Issuer regardless of any defence, right of set-off or counterclaim which the Issuer may have or assert. This Guarantee is continuing, irrevocable and absolute. The rights and claims of the Holders against the Guarantor under this Guarantee are subordinated as described in paragraph 2.9.

2.2    All Guaranteed Payments made hereunder will be made without withholding or deduction for or on account of any Tax, unless the withholding or deduction of such taxes, duties, assessments or governmental charges is required by law. In that event, the Guarantor will, provided that (if required at such time) the UK Regulator has not objected, pay such additional amounts (the "**Guarantor Additional Amounts**") as may be necessary in order that the net amounts received by the Holders after such withholding or deduction shall equal the amounts which would have been receivable under this Subordinated Guarantee in the absence of such withholding or deduction; except that no such Guarantor Additional Amounts will be payable to a Holder (or a third party on his behalf):

(a)    to the extent that such Tax is imposed or levied by virtue of such Holder (or the beneficial owner) of such Preferred Security having some connection with the United Kingdom, other than merely being a Holder (or beneficial owner) of such Preferred Security; or

(b)    where such withholding or deduction is imposed on a payment to or on behalf of an individual and is required to be made pursuant to European Union Directive 2003/48/EC on the taxation of savings or any other European Union Directive on the taxation of savings implementing the conclusions of the ECOFIN Council meeting of 26th-27th November, 2000 or any law implementing or complying with, or introduced in order to conform to, such Directive; or

(c)    where the Holder would have been able to avoid such withholding or deduction by presenting the Preferred Securities to another Paying and Transfer Agent in a Member State of the European Union, insofar as presentation for payment is required.

2.3    The Guarantor hereby waives notice of acceptance of this Subordinated Guarantee and of any liability to which it applies or may apply, presentment, demand for payment, protest, notice of non-payment, notice of dishonour, notice of redemption and all other notices and demands.

2.4    The obligations, covenants, agreements and duties of the Guarantor under this Subordinated Guarantee shall in no way be affected or impaired by reason of the happening from time to time of any of the following:

(a)    the release or waiver, by operation of law or otherwise, of the performance or observance by the Issuer of any express or implied agreement, covenant, term or condition relating to the Preferred Securities to be performed or observed by or on behalf of the Issuer;

29

(b)     the extension of time for the payment by or on behalf of the Issuer of all or any portion of any Distribution, the Optional Redemption Price, the Liquidation Distribution or any other sums payable under the terms of the Preferred Securities or the extension of time for the performance of any other obligation under, arising out of, or in connection with, the Preferred Securities;

(c)     any failure, omission, delay or lack of diligence on the part of Holders to enforce, assert or exercise any right, privilege, power or remedy conferred on the Holders pursuant to the terms of the Preferred Securities, or any action on the part of the Issuer granting indulgence or extension of any kind;

(d)     the voluntary or involuntary winding-up, dissolution, amalgamation, reconstruction, sale of any collateral, receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganisation, arrangement, composition or readjustment of debt of, or other similar proceedings affecting, the Issuer or any of the assets of the Issuer;

(e)     any invalidity of, or defect or deficiency in, the Preferred Securities; or

(f)     the settlement or compromise of any obligation guaranteed hereby or hereby incurred.

There shall be no obligation on the Holders to give notice to, or obtain consent of, the Guarantor with respect to the occurrence of any of the foregoing.

2.5     This Subordinated Guarantee shall be deposited with and held by the Registrar until all the obligations of the Guarantor have been discharged in full. The Guarantor hereby acknowledges the right of every Holder to the production of, and the right of every Holder to obtain a copy of, this Subordinated Guarantee from the Registrar.

2.6     A Holder may enforce this Subordinated Guarantee directly against the Guarantor, and the Guarantor waives any right or remedy to require that any action be brought against the Issuer or any other person or entity before proceeding against the Guarantor. All waivers contained in this Subordinated Guarantee shall be without prejudice to the right to proceed against the Issuer and the General Partner as permitted by the terms of the Preferred Securities. The Guarantor agrees that this Subordinated Guarantee shall not be discharged except by complete performance of all obligations of the Guarantor under this Subordinated Guarantee.

2.7     The Guarantor shall be subrogated to any and all rights of the Holders against the assets of the Issuer in respect of any amounts paid to the Holders by the Guarantor under this Subordinated Guarantee. The Guarantor shall not (except to the extent required by mandatory provisions of law) exercise any rights which it may acquire by way of subrogation or any indemnity, reimbursement or other agreement, in all cases as a result of a payment under this Subordinated Guarantee, if, at the time of any such payment, any amounts are due and unpaid under this Subordinated Guarantee. If the Guarantor shall receive or be paid any amount with respect to the Preferred Securities in violation of the preceding sentence, the Guarantor agrees to pay over such amount to the Holders.

2.8     The Guarantor acknowledges that its obligations hereunder are several and independent of the obligations of the Issuer with respect to the Preferred Securities and that the Guarantor shall be liable as principal and sole obligor hereunder to make Guaranteed Payments pursuant to the terms of this Subordinated Guarantee, notwithstanding the occurrence of any event referred to in clause 2.5.

2.9     Subject to applicable law, the Guarantor agrees that its obligations hereunder constitute unsecured obligations of the Guarantor subordinated in right of payment to Senior Creditors and will at all times rank:

(a)     junior to all liabilities of the Guarantor including subordinated liabilities (in each case other than any liability of the Guarantor which constitutes or would, but for any applicable limitation on the amount of such capital, constitute Tier 1 Capital or which is referred to in (b) or (c) below and any other liability expressed to rank *pari passu* with or junior to this Subordinated Guarantee) (the "**Senior Creditors**");

30

(b)   *pari passu* with Parity Securities, if any, issued by the Guarantor and any guarantee or support agreement of the Guarantor ranking *pari passu* with this Subordinated Guarantee and issued in respect of Parity Securities issued by the Issuer or any Subsidiary; and

(c)   senior to the Junior Share Capital of the Guarantor.

2.10   No Holder shall following any breach by the Guarantor of any of its obligations under this Subordinated Guarantee be entitled to exercise any right of set-off or counterclaim which may be available to it against amounts owing by the Guarantor to such Holder. Notwithstanding the provisions of the foregoing sentence, if any of the said rights and claims of any Holder against the Guarantor is discharged by set-off, such Holder will immediately pay an amount equal to the amount of such discharge to the Guarantor or, in the event of its winding-up, the liquidator of the Guarantor and until such time as payment is made will hold a sum equal to such amount in trust for the Guarantor, or the liquidator of the Guarantor, and accordingly any such discharge will be deemed not to have taken place.

2.11   In the event of the winding-up of the Guarantor if any payment or distribution of assets of the Guarantor of any kind or character, whether in cash, property or securities, including any such payment or distribution which may be payable or deliverable by reason of the payment of any other indebtedness of the Guarantor being subordinated to the payment of amounts owing under this Subordinated Guarantee, shall be received by any Holders, before the claims of Senior Creditors have been paid in full, such payment or distribution shall be held in trust by the Holder, as applicable, and shall be immediately returned by it to the liquidator of the Guarantor and in that event the receipt by the liquidator shall be a good discharge to the relevant Holder. Thereupon, such payment or distribution will be deemed not to have been made or received.

## 3.   Undertaking of the Guarantor

The Guarantor will procure that it will maintain at all times whilst the Preferred Securities are outstanding (a) whilst the Preferred Securities are listed on the Luxembourg Stock Exchange and the rules and regulations of the Luxembourg Stock Exchange so require, a Paying and Transfer Agent with a specified office in Luxembourg, (b) whilst the Preferred Securities are listed on Euronext Amsterdam and the rules and regulations of Euronext Amsterdam so require, a Paying and Transfer Agent with a specified office in Amsterdam (c) a Registrar having its office outside the United Kingdom and (d) a Paying and Transfer Agent having a specified office in a European Union Member State other than the United Kingdom that will not be obliged to withhold or deduct tax pursuant to European Union Directive 2003/48/EC on the taxation of savings or any other European Union Directive on the taxation of savings implementing the conclusions of the ECOFIN Council meeting of 26th-27th November, 2000 or any law implementing or complying with, or introduced in order to conform to, such Directive.

## 4.   Termination

With respect to the Preferred Securities, this Subordinated Guarantee shall terminate and be of no further force and effect upon the earliest of:

4.1   full payment of the Optional Redemption Price; or

4.2   purchase and cancellation of all Preferred Securities,

4.3   dissolution of the Issuer,

provided however that this Subordinated Guarantee will continue to be effective or will be reinstated, as the case may be, if at any time payment of any sums paid in respect of the Preferred Securities or under this Subordinated Guarantee must be restored by a Holder for any reason whatsoever.

**5.    Transfer; Amendment; Notices**

5.1    Subject to operation of law, all guarantees and agreements contained in this Subordinated Guarantee shall bind the successors, assigns, receivers, trustees and representatives of the Guarantor and shall inure to the benefit of the Holders. The Guarantor shall not transfer its obligations hereunder without (i) the prior approval of the Holders of not less than a simple majority in Liquidation Preference of the outstanding Preferred Securities (excluding any Preferred Securities held by the Guarantor or any Subsidiary of the Guarantor), or (ii) the sanction of a resolution, passed by Holders representing at least a simple majority in Liquidation Preference of the Preferred Securities present or represented at a separate meeting at which the quorum shall be Holders present or represented holding at least one-third in Liquidation Preference of the outstanding Preferred Securities and otherwise convened and held in accordance with procedures contained in Schedule 2 to the Limited Partnership Agreement and applicable law.

5.2    Except for those changes (a) required by clause 3.1 hereof; or (b) which do not adversely affect the rights of Holders (in any of which cases no agreement will be required), this Subordinated Guarantee shall be changed only by agreement in writing signed or sealed by the Guarantor with the prior approval of the Holders of not less than a simple majority in Liquidation Preference of the outstanding Preferred Securities (excluding any Preferred Securities held by the Guarantor or any Subsidiary of the Guarantor), or the sanction of a resolution, passed by Holders of at least a simple majority in Liquidation Preference of the Preferred Securities present or represented at a separate meeting at which the quorum shall be Holders present or represented holding at least one-third in Liquidation Preference of the outstanding Preferred Securities.

5.3    Any notice, request or other communication required or permitted to be given hereunder to the Guarantor shall be given in writing by delivering the same against receipt therefor or be addressed to the Guarantor, as follows, to:

Lehman Brothers Holdings plc

Address:    25 Bank Street
London E14 5LE
England

Attention:    Head of Legal Department

Telephone:   +44 20 7102 1000

The address of the Guarantor may be changed at any time and from time to time and shall be the most recent such address furnished in writing by the Guarantor to the Registrar.

Any notice, request or other communication required or permitted to be given hereunder to the Holders shall be given by the Guarantor in the same manner as notices sent on behalf of the Issuer to Holders.

5.4    This Subordinated Guarantee is solely for the benefit of the Holders and is not separately transferable from their interests in respect of the Preferred Securities.

**6.    Governing Law**

This Subordinated Guarantee is governed by, and shall be construed in accordance with, English law.

IN WITNESS WHEREOF this Subordinated Guarantee has been executed as a deed poll on behalf of the Guarantor.

EXECUTED as a DEED by                          )

LEHMAN BROTHERS HOLDINGS PLC       )
acting by                                            )
and

**USE OF PROCEEDS**

The net proceeds of the issue of the Preferred Securities, amounting to approximately €220,500,000, will augment the capital base of LBHI and the Guarantor. The Issuer will use the net proceeds of the issue of the Preferred Securities to subscribe for the Subordinated Notes.

## LEHMAN BROTHERS UK CAPITAL FUNDING LP

### Introduction

The Issuer was registered in England and Wales on 23rd March, 2005 under the Limited Partnerships Act 1907, with LB GP No. 1 Ltd. as the general partner (in such capacity, the "**General Partner**"), LB Investment Holdings Ltd. as the preferential limited partner (the "**Preferential Limited Partner**") and Chase Nominees Limited as the initial limited partner (in such capacity, the "**Initial Limited Partner**"). The General Partner, the Preferential Limited Partner and the Initial Limited Partner have, *inter alios*, entered into a limited partnership agreement on 22nd March, 2005 and a first supplemental limited partnership agreement on 24th March, 2005 (as so supplemented, the "**Limited Partnership Agreement**") for the purpose of establishing the Issuer. The Issuer is not a legal entity separate from its partners and has no subsidiaries. The Limited Partnership Agreement does not create a trust relationship between any of the partners.

The General Partner, incorporated with limited liability in England and Wales with registered number 5355491 is a wholly owned subsidiary of LBHI and is the sole general partner of the Issuer. As such, the General Partner solely manages the Issuer (subject to the appointment by the Issuer of the Administrator as described below). The Guarantor will undertake in the Subordinated Guarantee to ensure that, unless otherwise approved by a simple majority of the Holders, the General Partner will at all times be either the Guarantor itself or a directly or indirectly wholly-owned subsidiary of the Guarantor.

The Preferential Limited Partner, incorporated with limited liability in England and Wales with registered number 4385277, is a wholly owned Subsidiary of LBHI. The Preferential Limited Partner shall be entitled to receive all amounts received by the Issuer from its investment in the Subordinated Notes or Eligible Investments (each as defined herein under "*Description of the Preferred Securities*"), as the case may be, in excess of those required to make payments in respect of the Preferred Securities.

Provided that they do not become involved with the administration of the limited partnership, and subject to compliance with the provisions of the Act, the liability of persons registered as limited partners of the Issuer pursuant to the Act for the debts or obligations of the limited partnership will be limited to the amount of partnership capital which they have contributed or agreed to contribute to the partnership, i.e. €1,000 per Preferred Security.

No financial statements of the Issuer have yet been prepared. The first financial statements of the Issuer are expected to be prepared for the period ending 30th November, 2005. Thereafter, it is intended that the Issuer will prepare audited annual financial statements. It is not intended that the Issuer will publish interim financial statements.

### Activity

The business of the Issuer is generally to raise finance for the Group and is more particularly described in the Limited Partnership Agreement. The Issuer has carried out no operations since its registration other than in relation to the creation of the Preferred Securities. The capital contributions to be made by the Limited Partners will be used by the Issuer to subscribe for the Subordinated Notes.

### Administration

For UK regulatory purposes, the Issuer will be operated by the General Partner or, insofar as the General Partner is not so authorised, by an administrator (the "**Administrator**") authorised by the Financial Services Authority under the Financial Services and Markets Act 2000 (the "**FSMA**") to establish, operate and wind-up collective investment schemes. The registered office of the Issuer and the General Partner is 25 Bank Street, London E14 5LE. Neither the Initial Limited Partner nor any Holder may participate in the administration of the Issuer.

The General Partner has agreed to contribute capital from time to time to the extent required for the Issuer to meet any operating expenses which it may have. The General Partner has also agreed that it will at all

35

times maintain sole ownership, whether directly or indirectly, of its general partner interest in the Issuer, subject to the terms of the Limited Partnership Agreement. The Limited Partnership Agreement provides that all of the Issuer's business and affairs will be conducted by the General Partner save for those operational matters required to be performed by an Administrator under the FSMA. The General Partner will have unlimited liability for the debts and obligations of the Issuer to the extent that these cannot be satisfied out of partnership assets.

If the Issuer is dissolved, the Limited Partnership Agreement provides that the General Partner will only be entitled to any assets of the Issuer remaining after (i) all debts and other liabilities of the Issuer have been satisfied in full and (ii) the full Liquidation Preference to which the Holders are entitled and all other amounts to which the holders of any other partnership interests are entitled have been paid to, or irrevocably set aside for, such holders.

**Capitalisation**

In addition to the initial capital contribution by the General Partner, the initial capital contribution of €1.00 of the Preferential Limited Partner and the capital contribution of €225,000,000 to be made by the Initial Limited Partner in relation to the Preferred Securities on the date of issue of the Preferred Securities and such other capital contributions as may be made by the General Partner from time to time to meet certain operating expenses of the partnership, the General Partner may accept additional limited partners and additional capital contributions to the Issuer in accordance with the provisions of the Limited Partnership Agreement.

**Indebtedness**

Since the date of its registration, the Issuer has not had any loan capital outstanding, has not incurred any borrowings, has had no contingent liabilities, has not granted any guarantees and does not intend to have outstanding any such loan capital, incur any such borrowings, have any such contingent liabilities or grant any such guarantees other than in connection with the issue of the Preferred Securities and other partnership interests in the Issuer. The General Partner has undertaken in the Limited Partnership Agreement not to incur any indebtedness in the name of the Issuer other than the costs and expenses incidental to creating the Preferred Securities and the Issuer and any other partnership interests in the Issuer, performing its obligations in respect of the Limited Partnership Agreement, maintaining the listings of the Preferred Securities, the Register, the Registrar, the Paying and Transfer Agents and listing agents in respect of the Preferred Securities and corresponding agents (where applicable) with respect to any other partnership interests in the Issuer, the Issuer's holding of the partnership assets and any other securities acquired with any other capital contributions to the Issuer or substitutions therefor and the maintenance of any custodian therefor, the exercise of the Issuer's rights in respect of the partnership assets and any other securities acquired with any other capital contributions to the Issuer or substitutions therefor and the administration of the Issuer.

# LEHMAN BROTHERS HOLDINGS PLC

**General**

The Guarantor was incorporated in England on 11th October, 1984 (with registration number 1854685) as a private limited company for an unlimited duration under the Companies Act 1948-81 and was re-registered as a public limited company under the Companies Act 1985 on 6th August, 1986. The Guarantor is a wholly-owned subsidiary of LBHI. The Guarantor was originally organised to act as a UK holding company of LBHI's UK incorporated businesses, but in 1986 its objects were amended and since then its principal activity has been to act as a UK finance company supporting the working capital needs of a selected limited group of European subsidiaries of LBHI. The Guarantor has a number of subsidiary undertakings including wholly-owned subsidiaries Lehman Brothers International (Europe), Lehman Brothers Europe Ltd and Lehman Brothers Limited. The average number of persons employed by the Guarantor during 2004 was 7 and, as at the date of this Offering Circular, is 7.

The registered office and principal place of business of the Guarantor is at 25 Bank Street, London, E14 5LE.

**Directors of the Guarantor**

Set forth below are the names, the principal occupations and principal outside activities (if any) of the current members of the board of directors of the Guarantor.

| | Principal Occupation within the Guarantor | Principal Outside Activities |
|---|---|---|
| Ian Lowitt | Director | |
| Paolo R. Tonucci | Director | |
| Richard J.A. Amat | Director | |
| Peter A. Gamester | Director | |
| Kevin Hayes | Director | |
| Ian Jameson | Director | |
| Justin van Wijngaarden | Director | |

All of the directors of the Guarantor are executive directors.

The business address of each of the above is 25 Bank Street, London, E14 5LE, except that the business address of Ian Lowitt, is 745 Seventh Avenue, New York, NY 10019, USA.

## NON-CONSOLIDATED CAPITALISATION AND INDEBTEDNESS OF THE GUARANTOR

All of the financial information below is extracted without material adjustment from the unaudited non-consolidated financial statements of the Guarantor for the year ended 30th November, 2004.

|  | *30th November, 2004* |
|---|---:|
|  | *(unaudited) ($,000)* |
| Long-Term Indebtedness | 0 |
| Short-Term Loans | 0 |
| Commercial Paper | 0 |
| Ordinary Shares, £1.00 par value; 79,750,000 authorised: 40,021,100 allotted, called up and fully-paid | 66,266 |
| Ordinary Shares, $1.00 par value; 1,000,000,000 authorised: 653,800,000 allotted, called up and fully-paid | 653,800 |
| Ordinary B Shares, £1.00 par value; 250,000 authorised; zero called up and fully-paid | 0 |
| Preference Shares, non-cumulative, redeemable, £1.00 par value; 20,000,000 authorised: 20,000,000 allotted, called up and fully-paid | 33,116 |
| Preference Shares, non-cumulative, redeemable, $1.00 par value; $2,000,000,000 authorised: 1,210,000,000 allotted, called up and fully-paid | 1,210,000 |
| Capital reserves | 3,312 |
| Other reserves | 162,587 |
| Profit and Loss | 236,812 |
| Total capital and reserves | 2,365,893 |
| **Total indebtedness and capital and reserves** | **2,365,893** |

Notes:

(1)     On 2nd February, 2005, the Guarantor issued $50,000,000 non-cumulative redeemable preference shares.

(2)     Save as described above, there has been no material change in the non-consolidated capitalisation and indebtedness of the Guarantor since 30th November, 2004.

## SUMMARY FINANCIAL INFORMATION OF THE GUARANTOR

The following table sets forth selected non-consolidated financial information on the Guarantor as of the dates and for the periods indicated. The selected non-consolidated financial information set out are below is extracted without material adjustment from the audited non-consolidated financial statements of the Guarantor for the year ended 30th November 2003.

**Profit and Loss Account Data**

| | Year ended 30th November, 2003 | Year ended 30th November, 2002 |
|---|---|---|
| | (in U.S.$ thousands) | |
| **Operating Income** | 322,255 | 162,942 |
| Administrative expenses | (2,883) | (1,561) |
| **Operating Profit** | 319,372 | 161,381 |
| Interest receivable and similar income | 11,692 | 12,687 |
| Interest payable and similar charges | (182,706) | (158,071) |
| **Profit on Ordinary Activities before Taxation** | 148,358 | 15,997 |
| Tax on profit on ordinary activities | — | — |
| **Profit/(Loss) on Ordinary Activities after Taxation** | 148,358 | 15,997 |
| Dividend paid | — | — |
| **Profit/(Loss) Retained for the Year** | 148,358 | 15,997 |

**Balance Sheet Data**

| | Year ended 30th November, 2003 | Year ended 30th November, 2002 |
|---|---|---|
| | (in U.S.$ thousands) | |
| Total assets | 5,897,981 | 5,130,202 |
| Total current liabilities[1] | 4,535,948 | 4,173,993 |
| Long-term liabilities[1] | 3,041 | 8,968 |
| Total shareholders' funds | 1,358,992 | 947,241 |
| Total capital (shareholders' funds and long-term liabilities) | 1,362,033 | 956,209 |

Note:

1. For the years ended 30th November, 2003 and 30th November, 2002, the total liabilities of the Guarantor consist of the sum of the Total current liabilities and the Long-term liabilities.

## LEHMAN BROTHERS HOLDINGS INC.

LBHI, together with its subsidiaries (collectively, "**Lehman Brothers**" or the "**Group**"), is an innovator in global finance, serving the financial needs of corporations, governments and municipalities, institutional clients and individuals worldwide. Lehman Brothers provides a full array of equities and fixed income sales, trading and research, investment banking services and investment management and advisory services. Its global headquarters in New York and regional headquarters in London and Tokyo are complemented by offices in additional locations in North America, Europe, the Middle East, Latin America and the Asia Pacific region. The Group, through predecessor entities, was founded in 1850.

Lehman Brothers is a global market-maker in all major equity and fixed income products. To facilitate Lehman Brothers' market-making activities, it is a member of all principal securities and commodities exchanges in the United States and it holds memberships or associated memberships on several principal international securities and commodities exchanges including the London, Tokyo, Hong Kong, Frankfurt, Paris, Milan and Australian stock exchanges.

Lehman Brothers' principal business activities are investment banking, capital markets facilitation and investment management. Through its investment banking, trading, research, structuring and distribution capabilities in equity and fixed income products, Lehman Brothers continues to build on its client/customer business model which is based on Lehman Brothers' principal focus of facilitating client transactions in all major global capital markets products and services. Lehman Brothers generates customer flow revenues from institutional, corporate, government and high net worth clients/customers by (i) advising on and structuring transactions specifically suited to meet client needs; (ii) serving as a market maker and/or intermediary in the global marketplace, including having securities and other financial instrument products available to allow clients to rebalance their portfolios across different market cycles; (iii) providing investment management and advisory services; and (iv) acting as an underwriter to clients. As part of Lehman Brothers' customer flow activities, Lehman Brothers maintains inventory positions of varying amounts across a broad range of financial instruments. In addition, it also takes proprietary trading positions, the success of which is dependent on its ability to anticipate economic and market trends. The financial services industry is significantly influenced by worldwide economic conditions as well as other factors inherent in the global financial markets. As a result, revenues and earnings may vary from quarter to quarter and from year to year. Lehman Brothers believes its customer flow orientation helps to mitigate overall revenue volatility.

Lehman Brothers operates in three business segments: Investment Banking, Capital Markets and Investment Management.

Lehman Brothers is engaged primarily in providing financial services. Other businesses in which it is engaged represent less than 10 percent of each of consolidated assets, revenues and pre-tax income.

LBHI was incorporated with limited liability for an unlimited duration in the State of Delaware on 29th December, 1983. LBHI's principal executive offices are located at 745 Seventh Avenue, New York, New York 10019, U.S.A.

Several of LBHI's principal subsidiaries are subject to various capital adequacy requirements promulgated by the regulatory, banking and exchange authorities of the countries in which they operate and/or to capital targets established by various ratings agencies. The regulatory rules referred to above, and certain covenants contained in various debt agreements, may restrict LBHI's ability to withdraw capital from its subsidiaries by dividends, loans or other payments. (Further information about these requirements and restrictions is contained in "Management's Discussion and Analysis - Liquidity, Funding and Capital Resources" and in Note 17 of the Notes to Consolidated Financial Statements in LBHI's 2004 Annual Report, included in its most recent Annual Report on Form 10-K.) Additionally, the ability of LBHI to participate as an equity holder in any distribution of assets of any subsidiary is generally subordinate to the claims of creditors of the subsidiary.

**Management**

**Board of Directors of LBHI**

Set forth below are the names, the principal occupations and principal outside activities of the current members of the board of directors of LBHI, each of whose business address in their capacity as a director is at LBHI's principal place of business:

| Name | Principal Occupation | Principal Outside Activities |
|---|---|---|
| Richard S. Fuld, Jr | Chairman and Chief Executive Officer of LBHI | Trustee of the Mount Sinai Medical Center and the Mount Sinai Children's Center Foundation, member of the Executive Committee of the Partnership for New York City, Business Roundtable and The Business Council, Director of The Ronald McDonald House of New York, Trustee of Middlebury College. |
| Michael L. Ainslie | Private Investor and Former President and Chief Executive Officer of Sotheby's Holdings | Director of St. Joe Company and Lehman Brothers Bank, FSB, Trustee of Vanderbilt University, Chairman of the Posse Foundation and Director of the U.S. Tennis Association Foundation. |
| John F. Akers | Retired Chairman of International Business Machines Corporation | Director of W. R. Grace & Co., The New York Times Company, PepsiCo, Inc. and Hallmark Cards, Inc. |
| Roger S. Berlind | Theatrical Producer | Theatrical producer and principal of Berlind Productions and Governor of the League of American Theatres and Producers. |
| Thomas H. Cruikshank | Retired Chairman and Chief Executive Officer of Halliburton Company | Director of Lehman Brothers Inc. |
| Sir Christopher Gent | Non-Executive Chairman of GlaxoSmithKline plc | Director of the International Advisory Board of Hakluyt & Co. and a Senior Advisor to Bain & Company, Inc. |
| Marsha Johnson Evans | President and Chief Executive Officer of the American Red Cross | Director of The May Department Stores Company and Weight Watchers International Inc., member of the Advisory Board of the Pew Partnership for Civic Change, a project of the Pew Charitable Trusts, Director of the Naval Academy Foundation and a Presidential Appointee to the Board of Visitors of the United States Military Academy at West Point. |

41

| Name | Principal Occupation | Principal Outside Activities |
|---|---|---|
| Henry Kaufman | President of Henry Kaufman & Company, Inc. | Member (and the Chairman Emeritus) of the Board of Trustees of the Institute of International Education, a Member of the Board of Trustees of New York University, a Member (and the Chairman Emeritus) of the Board of Overseers of the Stern School of Business of New York University, a Member of the Board of Trustees of the Animal Medical Center, a Member of the Board of Trustees of the Whitney Museum of American Art, a Member of the International Advisory Committee of the Federal Reserve Bank of New York, a Member of the Advisory Committee to the Investment Committee of the International Monetary Fund Staff Retirement Plan, a Member of the Board of Governors of Tel-Aviv University and Treasurer (and former Trustee) of The Economic Club of New York. |
| John D. Macomber | Principal of JDM Investment Group | Director of AEA Investors Inc., Mettler-Toledo International, Sovereign Specialty Chemicals, Inc. and Textron Inc. Chairman of the Council for Excellence in Government and Vice Chairman of the Atlantic Council, Director of the National Campaign to Prevent Teen Pregnancy and the Smithsonian Institute and a Trustee of the Carnegie Institution of Washington and the Folger Library. |
| Dina Merrill | Director and Vice Chairman of RKO Pictures, Inc. and Actress | Vice President of the New York City Mission Society, Trustee of the Eugene O'Neill Theater Foundation, Director of Orbis International, the Juvenile Diabetes Foundation and the Museum of Television and Radio. |

**Executive Officers of LBHI**

| | |
|---|---|
| Richard S. Fuld, Jr. | Chairman and Chief Executive Officer |
| Jonathan E. Beyman | Chief of Operations and Technology |
| David Goldfarb | Chief Administrative Officer |
| Joseph M. Gregory | President and Chief Operating Officer |
| Christopher M. O'Meara | Chief Financial Officer |
| Thomas A. Russo | Executive Vice President and Chief Legal Officer |

**Employees**

As of 30th November, 2004, Lehman Brothers employed approximately 19,600 persons, including 14,100 in North America and 5,500 internationally. Lehman Brothers considers its relationship with its employees to be good.

42

## CONSOLIDATED CAPITALISATION AND INDEBTEDNESS OF LBHI

All of the financial information below is extracted without material adjustment from the audited consolidated financial statements of LBHI included in LBHI's Annual Report on Form 10-K for the twelve months ended 30th November, 2004 filed with the SEC. The following table sets forth the audited consolidated capitalisation and indebtedness of LBHI and its subsidiaries as of 30th November, 2004 and 2003[1]:

| | At 30th November, 2004 | At 30th November, 2003 |
|---|---|---|
| | *(U.S.$ millions)* | |
| **Commercial paper and short-term debt** .......................................... | 2,857 | 2,331 |
| **Long-term indebtedness:** | | |
| Senior notes ......................................................................... | 53,561 | 41,303 |
| Subordinated indebtedness[2] ...................................................... | 2,925 | 2,226 |
| Total long-term indebtedness ...................................................... | 56,486 | 43,529 |
| Total commercial paper, short- and long-term indebtedness ..................... | 59,343 | 45,860 |
| Preferred securities subject to mandatory redemption ........................... | – | 1,310 |
| **Stockholders' equity:** | | |
| Preferred Stock[2]: 38,000,000 shares authorised: | | |
| Shares issued: 848,000 and 728,000 at 30th November, 2004 and 2003, respectively ...................................................................... | 1,345 | 1,045 |
| Common Stock: $0.10 par value: 600,000,000 shares authorised: | | |
| Shares issued: 297,796,197 in 2004 and 294,575,285 in 2003; | | |
| Shares outstanding: 274,159,411 in 2004 and 266,679,056 in 2003 ................. | 30 | 29 |
| Additional paid-in capital............................................................ | 5,865 | 6,164 |
| Accumulated other comprehensive income (net of tax) ......................... | (19) | (16) |
| Retained earnings ..................................................................... | 9,240 | 7,129 |
| Other stockholders' equity, net ..................................................... | 741 | 1,031 |
| Common Stock in treasury at cost: 23,636,786 shares in 2004 and 27,896,229 shares in 2003 .............................................................. | (2,282) | (2,208) |
| Total stockholders' equity ........................................................... | 14,920 | 13,174 |
| Total commercial paper, short- and long-term indebtedness, trust preferred securities and stockholders' equity ............................................... | 74,263 | 60,344 |

Notes:
1.  There has been no material change in the capitalisation, indebtedness and contingent liabilities of LBHI since 30th November, 2004. For more information about LBHI's common stock, preferred stock, short-term financings, long-term debt and contingent liabilities, see the Notes to Consolidated Financial Statements included in LBHI's Annual Report on Form 10-K for the twelve months ended 30th November, 2004.
2.  LBHI adopted FIN 46R effective 29th February, 2004, which required us to deconsolidate trusts that issue preferred securities subject to mandatory redemption. Accordingly, at 29th February, 2004 and subsequent period ends, Subordinated indebtedness includes junior subordinated debentures that at 30th November, 2003 and prior period ends were classified as Preferred securities subject to mandatory redemption. See Accounting and Regulatory Developments and Note 9 in LBHI's Annual Report on Form 10-K for the twelve months ended 30th November, 2004.

## SUMMARY FINANCIAL INFORMATION OF LBHI

The following table sets forth selected consolidated financial information on LBHI as of the dates and for the periods indicated. The selected consolidated financial information as of and for the twelve month periods ended 30th November, 2001, 2002, 2003 and 2004 are extracted without material adjustment from the audited consolidated financial statements of LBHI included or incorporated by reference in LBHI's Annual Report on Form 10-K for the twelve month period ended 30th November, 2004, 2003, 2002 or 2001 filed with the SEC.

**Statement of Income Data**

| | Year ended 30th November, 2004 | Year ended 30th November, 2003 | Year ended 30th November, 2002 | Year ended 30th November, 2001 |
|---|---|---|---|---|
| | *(in U.S.$ millions)* | | | |
| **Revenues**: | | | | |
| Principal transactions ................................ | 5,699 | 4,272 | 1,951 | 2,779 |
| Investment banking ................................... | 2,188 | 1,722 | 1,731 | 2,000 |
| Commissions ............................................. | 1,537 | 1,210 | 1,286 | 1,091 |
| Interest and dividends ............................... | 11,032 | 9,942 | 11,728 | 16,470 |
| Other ........................................................ | 794 | 1418 | 85 | 52 |
| Total revenues .......................................... | 21,250 | 17,287 | 16,781 | 22,392 |
| Interest expense ........................................ | 9,674 | 8,640 | 10,626 | 15,656 |
| Net revenues ............................................. | 11,576 | 8,647 | 6,155 | 6,736 |
| **Non-Interest Expenses**: | | | | |
| Compensation and benefits ........................ | 5,730 | 4,318 | 3,139 | 3,437 |
| Other expenses ......................................... | 2,328 | 1,793 | 1,617 | 1,551 |
| **Total non-interest expenses** ..................... | 8,058 | 6,111 | 4,756 | 4,988 |
| Income before taxes and dividends on trust preferred securities ............................................. | 3,518 | 2,536 | 1,399 | 1,748 |
| Provision for income taxes ........................ | 1,125 | 765 | 368 | 437 |
| Dividends on trust preferred securities ...................... | 24 | 72 | 56 | 56 |
| Net income ............................................... | 2,369 | 1,699 | 975 | 1,255 |
| Net income applicable to common stock .................. | 2,297 | 1,649 | 906 | 1,161 |
| **Earnings per common share (diluted)**: ................... | 7.90 | 6.35 | 3.47 | 4.38 |

44

**Balance Sheet Data**

| | At 30th November, 2004 | At 30th November, 2003 | At 30th November, 2002 | At 30th November, 2001 |
|---|---|---|---|---|
| | *(in U.S.$ millions)* | | | |
| Total assets ................................................... | 357,168 | 312,061 | 260,336 | 247,816 |
| Net assets[1] ................................................... | 175,221 | 163,182 | 140,488 | 141,354 |
| Commercial paper and short-term debt...................... | 2,857 | 2,331 | 2,369 | 3,992 |
| Long-term debt[2] .......................................... | 56,486 | 43,529 | 38,678 | 38,301 |
| Total liabilities ................................................... | 342,248 | 297,577 | 250,684 | 238,647 |
| Total stockholders' equity ........................................... | 14,920 | 13,174 | 8,942 | 8,459 |
| Total capital[3]................................................... | 71,406 | 58,013 | 48,330 | 47,470 |

Notes:

1.  Net assets represent total assets excluding cash and securities segregated and on deposit for regulatory and other purposes, securities received as collateral, securities purchase under agreements to resell, securities borrowed and identifiable intangible assets and goodwill. LBHI believes net assets is a more useful measure than total assets to investors when comparing companies in the securities industry because it excludes certain assets considered to have a low risk profile and identifiable intangible assets and goodwill. Net assets as presented by LBHI is not necessarily comparable to similarly titled measures presented by other companies in the securities industry because of different methods of calculation.

2.  Long-term debt includes senior notes and subordinated debt and includes $1.0 billion of junior subordinated debentures at 30th November, 2004. LBHI adopted FIN 46R effective 29th February, 2004, which required us to deconsolidate trusts that issue preferred securities subject to mandatory redemption. Accordingly, at 29th February, 2004 and subsequent period ends, Subordinated indebtedness includes junior subordinated debentures that at 30th November, 2003 and prior period ends were classified as Preferred securities subject to mandatory redemption. See Accounting and Regulatory Developments and Note 9 in LBHI's Annual Report on Form 10-K for the twelve months ended 30th November, 2004.

3.  Total capital includes long-term debt (including, at 30th November, 2004, junior subordinated debt issued to trusts) and stockholders' equity.

## TAXATION

*The following is a summary of certain UK and Dutch taxation considerations relevant to persons who purchase, own and dispose of Preferred Securities. This summary addresses only the taxation consequences to holders who acquire Preferred Securities pursuant to the offering at the initial offering price and does not apply to certain classes of holders such as dealers, financial traders and certain persons who are exempt from UK taxation on their income.*

*This summary does not address the position of persons who are resident in the UK or have some connection with the UK beyond the holding of Preferred Securities.*

***This summary is for general information only based on law and practice at the date hereof in the UK and The Netherlands and is not exhaustive. Prospective investors are advised to consult with their own taxation advisers as to the taxation consequences of the purchase, ownership and disposition of Preferred Securities, including the effect of tax laws in countries other than the UK and The Netherlands.***

**United Kingdom**

(a)   **UK Taxation Treatment for Non-UK Residents**

Non-UK tax-resident corporate or individual Holders which hold their interest in Preferred Securities as an investment should be liable to UK taxation only to the extent that UK taxation is deducted at source from any payment to such a Holder made in respect of the Preferred Securities.

The same treatment should apply to a non-UK tax-resident corporate or individual Holder which holds its interest in the Preferred Securities as a trading asset, provided that the Issuer is not carrying on its business as a trade or a venture in the nature of a trade and the Holder does not otherwise carry on a trade in the UK through a branch or agency through or from which the Preferred Securities are held or the income from them arises (or, where that Holder is a company, that Holder does not carry on a trade in the United Kingdom through a permanent establishment through or from which the Preferred Securities are held or the income from them arises).

(b)   **Distributions on the Preferred Securities**

The Guarantor understands that the Issuer should be classified as a partnership for UK taxation purposes and should not constitute a "unit trust scheme" for the purposes of UK taxation. On the basis that the Issuer is treated for the purposes of UK taxation as a partnership, payments of Distributions on Preferred Securities may be made without withholding for or on account of UK taxation.

(c)   **Stamp Duty and Stamp Duty Reserve Tax ("SDRT")**

No UK stamp duty will be chargeable in respect of the issue of Preferred Securities to a Holder. Transfers of the Preferred Securities within a clearing system will not be chargeable to UK stamp duty. In practice, UK stamp duty is not likely to be chargeable in respect of a transfer of the Preferred Securities either because such a transfer is effected within a clearing system or, if the transfer is outside a clearing system, because the Issuer will invest in exempt loan capital for UK stamp duty purposes. The Guarantor understands that no liability to SDRT should arise in respect of the issue or subsequent transfer of the Preferred Securities.

**Netherlands**

(a)   **General**

The following summary describes the principal Netherlands tax consequences of the acquisition, holding, redemption and disposal of Preferred Securities and Substituted Preferred Stock for residents of The Netherlands. This summary does not purport to be a comprehensive description of all Netherlands tax considerations that may be relevant to a decision to acquire, to hold, and to dispose

46

of the Preferred Securities. This summary does not address The Netherlands tax consequences of a holder of Preferred Securities who holds, alone or together with his or her partner or certain other related persons, directly or indirectly, 5 per cent. or more of the Preferred Securities of the Issuer or the rights to acquire, directly or indirectly, such interest *(aanmerkelyk lelang)*. Each prospective holder of Preferred Securities should consult a professional adviser with respect to the tax consequences of an investment in the Preferred Securities. The discussion of certain Netherlands taxes set forth below is included for general information purposes only.

This summary is based on The Netherlands tax legislation, published case law, treaties, rules, regulations and similar documentation, in force as of the date of this Offering Circular, without prejudice to any amendments introduced at a later date and implemented with retroactive effect.

For the purpose of the principal Netherlands tax consequences described herein, it is assumed that the Issuer is neither a resident nor deemed to be a resident of The Netherlands for Netherlands tax purposes.

**(b)    Netherlands Withholding Tax**

No Netherlands withholding tax is due upon payments on the Preferred Securities or upon payments on any Substituted Preferred Stock .

**(c)    Netherlands Corporate Income Tax and Individual Income Tax**

*Residents of The Netherlands*

If the holder of Preferred Securities is subject to Netherlands corporate income tax and the Preferred Securities are attributable to its (deemed) business assets, income derived from the Preferred Securities and gains realised upon the redemption and disposal of the Preferred Securities and any gains realised on any substitution of the Preferred Securities into the Substituted Preferred Stock are generally taxable in The Netherlands.

If the holder of Preferred Securities is an individual, resident or deemed to be resident of The Netherlands for Netherlands tax purposes (including the individual holder of Preferred Securities who has opted to be taxed as a resident of The Netherlands), the income derived from the Preferred Securities and the gains realised upon the redemption and disposal of the Preferred Securities and any gains realised on the possible substitution of the Preferred Securities into the Substituted Preferred Stock are taxable at the progressive rates of the Income Tax Act 2001, if:

(i)    the holder of Preferred Securities has an enterprise or an interest in an enterprise, to which enterprise the Preferred Securities are attributable; or

(ii)    such income or gains qualify as "income from miscellaneous activities" *(resultaat uit overige werkzaamheden)* within the meaning of Section 3.4 of the Income Tax Act 2001, which include the performance of activities with respect to the Preferred Securities that exceed "regular, active portfolio management" *(normaal, actief vermogensbeheer)*.

If neither condition (i) nor condition (ii) applies to the individual holder of Preferred Securities, the actual income derived from the Preferred Securities and the actual gains realised with respect to the Preferred Securities and the gains realised on any substitution of the Preferred Securities into the Substituted Preferred Stock will not be taxable. Instead, such holder of Preferred Securities will be taxed at a flat rate of 30 per cent. on deemed income from "savings and investments" *(sparen en beleggen)* within the meaning of Section 5.1 of the Income Tax Act 2001. This deemed income amounts to 4 per cent. of the average of the individual's "yield basis" *(rendementsgrondslag)* within the meaning of article 5.3 of the Income Tax Act 2001 at the beginning of the calendar year and the individual's yield basis at the end of the calendar year, insofar the average exceeds a certain threshold. The fair market value of the Preferred Securities will be included in the individual's yield basis.

47

Tax consequences for holders of Substituted Preferred Stock after substitution with respect to income derived from the Substituted Preferred Stock or gains realised upon redemption of disposal of the Substituted Preferred Stock are the same as described above for holders of Preferred Securities.

**(d)   Netherlands Gift and Inheritance Taxes**

*Residents of The Netherlands*

Generally, gift and inheritance taxes will be due in The Netherlands in respect of the acquisition of the Preferred Securities or Substituted Preferred Stock by way of a gift by, or on the death of, a holder of Preferred Securities or Substituted Preferred Stock who is a resident or deemed to be a resident of The Netherlands for the purposes of Netherlands gift and inheritance tax at the time of the gift or his or her death.

An individual of The Netherlands nationality is deemed to be a resident of The Netherlands for the purposes of The Netherlands gift and inheritance tax, if he or she has been resident in The Netherlands during the ten years preceding the gift or his or her death. An individual of any other nationality is deemed to be a resident of The Netherlands for the purposes of The Netherlands gift and inheritance tax only if he or she has been residing in The Netherlands at any time during the twelve months preceding the time of the gift.

Treaties may limit the Dutch sovereignty to levy gift and inheritance tax.

**EU Directive on the Taxation of Savings Income**

On 3rd June, 2003, the European Council of Economics and Finance Ministers adopted a Directive on the taxation of savings income. Under the Directive Member States will (if equivalent measures have been introduced by certain non-EU countries) be required, from 1st July, 2005, to provide to the tax authorities of another Member State details of payments of interest (or similar income) paid by a person within its jurisdiction to an individual resident in that other Member State. However, for a transitional period, Belgium, Luxembourg and Austria will instead be required (unless during that period they elect otherwise) to operate a withholding system in relation to such payments (the ending of such transitional period being dependent upon the conclusion of certain other agreements relating to information exchange with certain other countries).

## SUBSCRIPTION AND SALE

Pursuant to a Subscription Agreement (the "**Subscription Agreement**") dated 29th March, 2005, Lehman Brothers International (Europe), Banco Espírito Santo de Investimento S.A., Banco Santander Central Hispano, S.A., Caja de Ahorros de Valencia, Castellon y Alicante, Bancaja, CALYON, Fortis Bank nv-sa, HSBC Bank plc and ING Belgium SA/NV (together, the "**Managers**") have jointly and severally agreed to subscribe for the Preferred Securities at a price of €1,000 per Preferred Security. The Managers will receive a combined selling, management and underwriting commission of €20 per Preferred Security. In addition, the Managers shall be reimbursed for certain of their expenses in connection with the issue of the Preferred Securities. The Managers are entitled to terminate the Subscription Agreement in certain circumstances before the issue of the Preferred Securities.

### United States

The Preferred Securities have not been and will not be registered under the Securities Act and may not be offered or sold within the United States or to, or for the account or benefit of, U.S. persons. Terms used in this paragraph have the meanings given to them by Regulation S under the Securities Act ("**Regulation S**").

Each Manager has agreed that, except as permitted by the Subscription Agreement, it will not offer, sell or deliver the Preferred Securities (i) as part of their distribution at any time or (ii) otherwise until 40 days after the later of the commencement of the offering and the Closing Date within the United States or to, or for the account or benefit of, U.S. persons and that it will have sent to each distributor, dealer or person receiving a selling concession, fee or other remuneration that purchases Preferred Securities from it during the distribution compliance period a confirmation or other notice setting forth the restrictions on offers and sales of the Preferred Securities within the United States or to, or for the account or benefit of, U.S. persons. Terms used in this paragraph have the meanings given to them by Regulation S.

In addition, until 40 days after the commencement of the offering, an offer or sale of Preferred Securities within the United States by any dealer that is not participating in the offering may violate the registration requirements of the Securities Act.

### United Kingdom

Each Manager has represented and agreed that, except as permitted by the Subscription Agreement:

(a)    it has not offered or sold, and prior to the expiry of six months from the Closing Date will not offer or sell, any Preferred Securities to persons in the United Kingdom except to persons whose ordinary activities involve them in acquiring, holding, managing or disposing of investments (as principal or agent) for the purposes of their businesses or otherwise in circumstances which have not resulted and will not result in an offer to the public in the UK within the meaning of the Public Offers of Securities Regulations 1995;

(b)    it has only offered or sold and will only offer or sell Preferred Securities to (a) investment professionals falling within article 14(5) of the Financial Services and Markets Act 2000 (Promotion of Collective Investment Schemes) (Exemptions) Order 2001 (the "**Promotion of CIS Order**") and article 19(5) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2001 (the "**Financial Promotion Order**"), who have professional experience of participating in unregulated schemes and of matters relating to investments; and/or (b) persons falling within article 22(2) of the Promotion of CIS Order and article 49(2) of the Financial Promotion Order; and/or (c) any other persons to whom this Offering Circular may be communicated lawfully;

(c)    it has in place and will have in place proper systems and procedures to prevent any person other than those persons described in (b) above from participating in the Preferred Securities;

(d)    it has only communicated or caused to be communicated and will only communicate or cause to be communicated an invitation or inducement to engage in investment activity (within the meaning of

Section 21 of the FSMA) received by it in connection with the issue of the Preferred Securities in circumstances in which Section 21(1) of the FSMA does not apply to the Guarantor; and

(e)    it has complied and will comply with all applicable provisions of the FSMA with respect to anything done by it in relation to the Preferred Securities in, from or otherwise involving the United Kingdom.

## Republic of Italy

The offering of the Preferred Securities has not been cleared by CONSOB (the Italian Securities Exchange Commission) pursuant to Italian securities legislation and, accordingly, no Preferred Securities may be offered, sold or delivered, nor may copies of this Offering Circular (in preliminary or final form) or of any other document relating to the Preferred Securities be distributed in the Republic of Italy, except:

(i)    to professional investors ("*operatori qualificati*"), as defined in Article 31, second paragraph, of CONSOB Regulation No. 11522 of 1st July, 1998, as amended; or

(ii)    in circumstances which are exempted from the rules on solicitation of investments pursuant to Article 100 of Legislative Decree No. 58 of 24th February, 1998 (the "**Financial Services Act**") and Article 33, first paragraph, of CONSOB Regulation No. 11971 of 14th May, 1999, as amended.

Any offer, sale or delivery of the Preferred Securities or distribution of copies of this Offering Circular (in preliminary or final form), Preliminary Offering Circular or any other document relating to the Preferred Securities in the Republic of Italy under (i) or (ii) above must be:

(a)    made by an investment firm, bank or financial intermediary permitted to conduct such activities in the Republic of Italy in accordance with the Financial Services Act and Legislative Decree No. 385 of 1st September, 1993 (the "**Banking Act**"), as amended; and

(b)    in compliance with Article 129 of the Banking Act and the implementing guidelines of the Bank of Italy pursuant to which the issue or the offer of securities in the Republic of Italy may need to be preceded and followed by an appropriate notice to be filed with the Bank of Italy depending, *inter alia*, on the aggregate value of the securities issued or offered in the Republic of Italy and their characteristics; and

(c)    in accordance with any other applicable laws and regulations.

## France

Each of the Managers and the General Partner on behalf of the Issuer has represented and agreed that it has not offered or sold and will not offer or sell, directly or indirectly, Preferred Securities to the public in the Republic of France, and has not distributed or caused to be distributed and will not distribute or cause to be distributed to the public in France, this Offering Circular or any other offering material relating to the Preferred Securities, and that such offers, sales and distributions have been and shall only be made in France to qualified investors (*investisseurs qualifiés*) acting for their own account as defined in and in accordance with Articles L.411-1 and L.411-2 of the *Code Monétaire et Financier* and *décret* No. 98-880 dated 1st October, 1999.

## General

No action has been or will be taken in any country or jurisdiction (other than The Netherlands) by the Issuer, the Guarantor or the Managers that would, or is intended to, permit a public offering of the Preferred Securities or possession or distribution of any offering material relating thereto, in any country or jurisdiction where any such action for that purpose is required. Persons into whose hands this Offering Circular comes are required by the Issuer, the Guarantor and the Managers to comply with all applicable laws and regulations in each country or jurisdiction in or from which they purchase, offer, sell or deliver Preferred Securities or have in their possession or distribute such offering material, in all cases at their own expense.

50

# GENERAL INFORMATION

### Authorisations

The Limited Partnership Agreement (as supplemented by the First Supplemental Limited Partnership Agreement) to establish the Issuer was duly authorised by resolutions of the board of directors of the General Partner passed on 22nd March, 2005 and 24th March, 2005.

The entering into of the Limited Partnership Agreement (as supplemented by the First Supplemental Limited Partnership Agreement), the Agency Agreement, the Administration Agreement, the Subscription Agreement and the Subordinated Guarantee by the Guarantor was authorised by resolutions of the board of directors of the Guarantor passed on 21st March, 2005 and 23rd March, 2005.

All consents, approvals, authorisations or other orders of all regulatory authorities required by the Issuer and/or the Guarantor under the laws of England and Wales have been given for the issue of the Preferred Securities and for the Issuer, the General Partner and the Guarantor, as the case may be, to undertake and perform their respective obligations as appropriate under the Limited Partnership Agreement (as supplemented by the First Supplemental Limited Partnership Agreement), the Subscription Agreement, the Agency Agreement, the Preferred Securities and the Subordinated Guarantee.

### Listings

Application has been made to list the Preferred Securities on the Luxembourg Stock Exchange. For the purposes of the Luxembourg Stock Exchange rules and regulations only, the Preferred Securities will be considered debt securities. A legal notice relating to the issue of the Preferred Securities and the constitutional documents of the Issuer are being lodged with the Registrar of Commerce and Companies in Luxembourg (*Registre du Commerce et des Sociétés*) where such documents may be examined and copies obtained. According to Chapter VI, article 3, point A/11/2 of the rules and regulations of the Luxembourg Stock Exchange the securities shall be freely transferable and therefore no transaction made on the Luxembourg Stock Exchange shall be cancelled.

Application has been made to list the Preferred Securities on Euronext Amsterdam, the Issuer will comply with the provisions set forth in Article 2.1.20, sections a-g of Schedule B of the Listing and Issuing Rules (*Fondsenreglement*) of Euronext Amsterdam N.V.

### Clearing Systems

The Preferred Securities have been accepted for clearance through Euroclear and Clearstream, Luxembourg. The ISIN for this issue is XS0215349357 and the Common Code is 021534935. The *Fondscode* on Euronext Amsterdam is 15278.

### No significant change

Save as disclosed herein, there has been no significant change in the financial or trading position of the Guarantor or the Guarantor Group since 30th November, 2003 or of the Issuer since its establishment and there has been no material adverse change in the financial position or prospects of the Guarantor or the Guarantor Group since 30th November, 2003 in the case of the Guarantor and the Guarantor Group and since its establishment in the case of the Issuer.

### Litigation

There are no legal, arbitration or administrative proceedings involving any of the Issuer, the Guarantor or any subsidiary of the Guarantor Group (and no such proceedings are pending or threatened) which may have or have had in the 12 months preceding the date of this Offering Circular a significant effect on the financial position of the Issuer, the Guarantor or any subsidiary of the Guarantor Group.

**Auditors**

The auditors of the Issuer and the Guarantor are Ernst & Young LLP, Chartered Accountants and Registered Auditors, of 1 More London Place, London SE1 2AF.

The Guarantor's auditors have made reports under Section 235 of the Companies Act 1985 on statutory accounts in respect of the Guarantor for the years ended 30th November, 2003, 2002 and 2001 which were not qualified within the meaning of Section 262 of the Companies Act 1985 and did not contain any statements made under Section 237(2) or (3) of the Companies Act 1985. The report of the Guarantor's auditors stated that to the fullest extent permitted by law, the auditors do not accept or assume responsibility to anyone other than the Issuer and the Issuer's members as a body, for their audit work, for the audit report, or for the opinions the Guarantor's auditors have formed.

The inclusion of such a statement was recommended in recent guidance issued by the Institute of Chartered Accountants in England and Wales for inclusion in all Section 235 audit reports produced by audit firms.

The Issuer is newly established and does not currently have any financial statements (see also "*Documents*" below).

**Documents**

Copies of the following financial statements will be available free of charge from the specified offices of the Paying and Transfer Agents for so long as any of the Preferred Securities remains outstanding:

(a)     the annual reports (including the audited non-consolidated financial statements) of the Guarantor in respect of the financial years ended 30th November, 2003, 2002 and 2001 (as at the date of this Offering Circular, the audited non-consolidated financial statements of the Guarantor in respect of the financial year ended 30th November, 2004 are not available); and

(b)     the most recently published annual reports (including the audited annual non-consolidated financial statements) of the Guarantor and the most recently published unaudited interim non-consolidated financial statements of the Guarantor (if any).

The Guarantor currently prepares audited non-consolidated financial statements on an annual basis. The Guarantor does not currently publish consolidated financial statements or interim financial statements.

The first financial statements of the Issuer are expected to be prepared for the period ending on 30th November, 2005. Thereafter, it is intended that the Issuer will prepare audited annual financial statements.

Copies of the most recently published annual reports (if any) and audited annual financial statements of the Issuer will be available free of charge at the offices of the Paying and Transfer Agents. It is not intended that the Issuer will publish interim financial statements.

In addition, the following documents are available for inspection at the specified offices of the Paying and Transfer Agents for so long as any of the Preferred Securities remains outstanding:

(a)     the Subscription Agreement;

(b)     the Subordinated Guarantee;

(c)     the Limited Partnership Agreement;

(d)     the Administration Agreement;

(e)     the Agency Agreement; and

(f)     the Memorandum and Articles of Association of the Guarantor.

**Notices**

Notices to the Holders of Preferred Securities, including notices for meetings of Holders of the Preferred Securities and non-payment of distributions or other amounts in relation to the Preferred Securities will be mailed to the holder of record and will be published, for so long as the Preferred Securities are listed on the Luxembourg Stock Exchange and the rules of the Luxembourg Stock Exchange so require, in a daily newspaper of general circulation in Luxembourg, which for the time being shall be the *d' Wort* and for so long as the Preffered Securities are listed on Euronext Amsterdam and the rules of Euronext Amsterdam so require, in a daily newspaper of general circulation in The Netherlands, which for the time being shall be *Het Financieele Dagblad*, and in the Daily Official List (*Officiële Prijscourant*) of Euronext Amsterdam. Any mailed notice shall be deemed to have been given one clear day after the date on which it was posted and any notice published in a newspaper shall be deemed to have been given on the date of publication or, if so published more than once or on different dates, on the date of the first publication.

**Redemption**

It is the Issuer's intention (although there is no obligation to do so nor any guarantee of future behaviour) to redeem the Preferred Securities in accordance with paragraph 4 of the *"Description of the Preferred Securities"*, in whole (but not in part) only to the extent LBHI or any of its subsidiaries has raised funds in the period of six (6) months preceding such redemption by the issuance of any securities ranking *pari passu* or junior (including any class of share capital) to the Preferred Securities, in an aggregate amount at least equal to the Liquidation Preference of the Preferred Securities.

| ISSUER | GUARANTOR |
|---|---|
| **Lehman Brothers UK Capital Funding LP** | **Lehman Brothers Holdings plc** |
| 25 Bank Street | 25 Bank Street |
| London E14 5LE | London E14 5LE |
| England | England |

### PRINCIPAL PAYING AND TRANSFER AGENT

**JPMorgan Chase Bank N.A., London Branch**
Trinity Tower
9 Thomas More Street
London E1W 1YT
England

### PAYING AND TRANSFER AGENTS

| **J.P. Morgan Bank Luxembourg S.A.** | **ING Bank N.V. Securities Services** |
|---|---|
| European Bank & Business Centre | Van Heenvlietlaan 220 |
| 6, route de Treves | 1083 CN Amsterdam |
| L-2633 Senningerberg | The Netherlands |
| Grand Duchy of Luxembourg | |

### REGISTRAR

**J.P. Morgan Bank Luxembourg S.A.**
European Bank & Business Centre
6, route de Treves
L-2633 Senningerberg
Grand Duchy of Luxembourg

### LEGAL ADVISERS

*as to English and New York law*

**Allen & Overy LLP**
One New Change
London EC4M 9QQ
England

### AUDITORS

**Ernst & Young LLP**
1 More London Place
London SE1 2AF
England

| LUXEMBOURG LISTING AGENT | AMSTERDAM LISTING AGENT |
|---|---|
| **The Bank of New York Europe Limited** | **ING Bank N.V.** |
| One Canada Square | Foppingadreef 7 |
| London E14 5AL | 1102 BD Amsterdam |
| England | The Netherlands |

# **EXHIBIT C**

PROSPECTUS

# LEHMAN BROTHERS UK CAPITAL FUNDING II LP

*(a limited partnership organised under the laws of England and Wales)*

## Euro Fixed Rate Guaranteed Non-voting Non-cumulative Perpetual Preferred Securities

having the benefit of a subordinated guarantee of

# LEHMAN BROTHERS HOLDINGS PLC

*(incorporated with limited liability in England and Wales with registered number 1854685)*

### Issue Price: €1,000 per Preferred Security

The Euro Fixed Rate Guaranteed Non-voting Non-cumulative Perpetual Preferred Securities (the "*Preferred Securities*"), each with a liquidation preference of €1,000 will comprise limited partnership interests in Lehman Brothers UK Capital Funding II LP (the "**Issuer**").

**See "Risk Factors" for a discussion of certain factors that should be considered by prospective investors.**

As an English limited partnership, the Issuer will not be a legal entity separate from its partners. The Preferred Securities will benefit from a subordinated guarantee to be dated the Closing Date (the "**Subordinated Guarantee**") entered into by Lehman Brothers Holdings plc (the "**Guarantor**" or "**UK Holding**") of declared dividends and redemption amounts, all as more fully described herein under "*Subordinated Guarantee*".

Application has been made to the Financial Services Authority in its capacity as competent authority under the Financial Services and Markets Act 2000 (the "**UK Listing Authority**") for the Preferred Securities to be admitted to the Official List of the UK Listing Authority (the "**Official List**") and to the London Stock Exchange plc for the Preferred Securities to be admitted to trading on the London Stock Exchange plc's Gilt Edged and Fixed Interest Market. The London Stock Exchange plc's Gilt Edged and Fixed Interest Market is a regulated market for the purposes of Directive 93/22/EEC (the Investment Service Directive).

This document has been approved by the UK Listing Authority as a base prospectus within the meaning of Directive 03/71/EC (the **Prospectus Directive**). Certain information will be contained in the Final Terms, see "*Summary − Final Terms*" and "*Form of Final Terms*" for details of such information.

Lead Manager

## LEHMAN BROTHERS

The date of this Prospectus is 30th August, 2005

LB GP No. 1 Ltd. in its capacity as the General Partner (the "**General Partner**") and the Guarantor together (the "**Responsible Persons**") accept responsibility for the information contained in this Prospectus. To the best of the knowledge and belief of the General Partner and the Guarantor (each having taken all reasonable care to ensure that such is the case) the information contained in this Prospectus is in accordance with the facts and does not omit anything likely to affect the important of such information.

No person is or has been authorised to give any information or to make any representation not contained or incorporated in or consistent with this Prospectus and, if given or made, such information or representation must not be relied upon as having been authorised by the Issuer, the General Partner, Chase Nominees Limited ("**CNL**"), the Guarantor or the Managers (as defined under "*Subscription and Sale*" below). Neither the delivery of this Prospectus nor any subscription, sale or purchase made in connection herewith shall, in any circumstances, create any implication that there has been no change in the affairs of the Issuer, the General Partner, the Guarantor or the Guarantor Group (as defined in the Terms and Conditions of the Preferred Securities) since the date hereof.

Neither this Prospectus nor any other information supplied in connection with the Preferred Securities (i) is intended to provide the basis of any credit or other evaluation or (ii) should be considered as a recommendation by the Issuer, the General Partner, the Guarantor, CNL, the Guarantor Group or the Managers that any recipient of this Prospectus or any other information supplied in connection with the Preferred Securities should purchase the Preferred Securities. Each prospective investor contemplating purchasing Preferred Securities should make its own independent investigation of the financial condition and affairs, and its own appraisal of the creditworthiness, of the Issuer and the Guarantor.

Prospective investors should inform themselves as to the legal requirements and tax consequences within the countries of their residence and domicile for the acquisition, holding or disposal of Preferred Securities and any foreign exchange restrictions that might be relevant to them. This Prospectus does not constitute an offer of, or an invitation by or on behalf of, the Issuer or any of its partners, the General Partner, CNL, the Guarantor or the Managers to subscribe for or purchase any of the Preferred Securities.

Prospective investors should satisfy themselves that they understand all of the risks associated with making investments in the Preferred Securities. If a prospective investor is in any doubt whatsoever as to the risks involved in investing in the Preferred Securities, he should consult his professional advisers.

The distribution of this Prospectus and the offering of the Preferred Securities in certain jurisdictions may be restricted by law. Persons into whose possession this Prospectus comes are required by the Issuer, the General Partner, the Guarantor and the Managers to inform themselves about, and to observe, any such restrictions.

In respect of the United Kingdom, this Prospectus is directed only at (a) investment professionals falling within article 14(5) of the Financial Services and Markets Act 2000 (Promotion of Collective Investment Schemes) (Exemptions) Order 2001 (the "**Promotion of CIS Order**") and article 19(5) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2001 (the "**Financial Promotion Order**"), who have professional experience of participating in unregulated schemes and of matters relating to investments; and/or (b) persons falling within article 22(2) of the Promotion of CIS Order and article 49(2) of the Financial Promotion Order; and/or (c) any other persons to whom this Prospectus may be communicated lawfully. Preferred Securities are only available to such persons. Persons who (i) do not have such professional experience in participating in unregulated schemes and in matters relating to investments and/or (ii) do not fall within said article 22(2) and 49(2) and/or (iii) are not persons to whom this Prospectus may be communicated lawfully should not rely on this Prospectus.

The Preferred Securities may not be offered or sold, directly or indirectly, and neither this Prospectus nor any advertisement or other offering material may be distributed or published in any jurisdiction, except in accordance with the legal requirements applicable in that jurisdiction. In particular, the Preferred Securities have not been, and will not be, registered under the United States Securities Act of 1933, as amended (the "**Securities Act**"). The Preferred Securities may not be offered, sold or delivered within the United States or to, or for the account or benefit of, U.S. persons. A further description of certain restrictions on the offering

and sale of the Preferred Securities and on the distribution of this Prospectus is given under "*Subscription and Sale*" below.

**IN CONNECTION WITH THE ISSUE OF THE PREFERRED SECURITIES, LEHMAN BROTHERS INTERNATIONAL (EUROPE) OR ANY PERSON ACTING FOR IT MAY OVER-ALLOT (PROVIDED THAT THE AGGREGATE PRINCIPAL AMOUNT OF THE PREFERRED SECURITIES DOES NOT EXCEED 105 PER CENT. OF THE AGGREGATE PRINCIPAL AMOUNT THE PREFERRED SECURITIES). HOWEVER, THERE IS NO ASSURANCE THAT LEHMAN BROTHERS INTERNATIONAL (EUROPE) (OR PERSONS ACTING ON BEHALF OF LEHMAN BROTHERS INTERNATIONAL (EUROPE)) WILL UNDERTAKE STABILISATION ACTION. ANY STABILISATION ACTION MAY BEGIN ON OR AFTER THE DATE ON WHICH ADEQUATE PUBLIC DISCLOSURE OF THE TERMS OF THE OFFER OF THE PREFERRED SECURITIES IS MADE AND, IF BEGUN, MAY BE ENDED AT ANY TIME, BUT IT MUST END NO LATER THAN THE EARLIER OF 30 DAYS AFTER THE CLOSING DATE AND 60 DAYS AFTER THE DATE OF THE ALLOTMENT OF THE PREFERRED SECURITIES.**

All references in this Prospectus to "**EUR**", "**€**", "**Euro**" and "**euro**" are to the single currency introduced at the start of the third stage of European economic and monetary union pursuant to the Treaty establishing the European Community, as amended from time to time. All references in this Prospectus to "**US$**" and "**$**" are to United States dollars.  All references in this Prospectus to "**£**" are to pounds sterling.

## TABLE OF CONTENTS

*Page*

Summary ............................................................................................................................. 5

Risk Factors ....................................................................................................................... 11

Description of the Preferred Securities ........................................................................... 15

Summary of Provisions Relating to the Preferred Securities in Global Form ............................ 27

Subordinated Guarantee ...................................................................................................... 28

Use of Proceeds .................................................................................................................. 33

Lehman Brothers UK Capital Funding II LP ................................................................... 34

Lehman Brothers Holdings plc .......................................................................................... 36

Summary Financial Information of the Guarantor ............................................................ 39

Lehman Brothers Holdings Inc. ......................................................................................... 40

Consolidated Capitalisation and Indebtedness of LBHI .................................................. 43

Summary Financial Information of LBHI .......................................................................... 44

Taxation .............................................................................................................................. 46

Subscription and Sale .......................................................................................................... 48

General Information ............................................................................................................ 51

Form of Final Terms ........................................................................................................... 54

Financial Statements of the Guarantor .............................................................................. F-1

# SUMMARY

**This Summary must be read as an introduction to this Prospectus and any decision to invest in any Preferred Securities should be based on a consideration of this Prospectus as a whole, including the documents incorporated by reference. Following the implementation of the relevant provisions of the Prospectus Directive in each Member State of the European Economic Area no civil liability will attach to the Responsible Persons in any such Member State in respect of this Summary (including any translation hereof required by the competent authority of any Member State where an offer to the public of the Preferred Securities may be made) unless it is misleading, inaccurate or inconsistent when read together with other parts of this Prospectus. Where a claim relating to information contained in this Prospectus is brought before a court in a Member State of the European Economic Area, the plaintiff may, under the national legislation of the Member State where the claim is brought, be required to bear the costs of translating the Prospectus before the legal proceedings are initiated.**

*Capitalised terms used but not defined in this summary shall bear the respective meanings ascribed to them under "Description of the Preferred Securities".*

| | |
|---|---|
| **Issuer:** | Lehman Brothers UK Capital Funding II LP (the "**Issuer**"), an English limited partnership formed and registered under the Limited Partnerships Act 1907 (the "**Act**"). |
| | The business of the partnership, as administered by, or on behalf of, the General Partner, will include the following: |
| | • raising and providing finance and financial support to the Guarantor; |
| | • acquiring and holding the Issuer's assets; |
| | • monitoring the Issuer's assets and determining whether they continue to be suitable; and |
| | • functions necessary or incidental thereto. |
| | On the Closing Date, the Issuer's principal assets will be debt instruments issued by UK Holding (the "**Subordinated Notes**"). |
| | The Subordinated Notes will have, in all material commercial respects, pricing terms which are equivalent to the Preferred Securities. |
| **General Partner:** | LB GP No.1 Ltd. (incorporated with limited liability in England and Wales with registered number 5355491) a wholly owned Subsidiary of Lehman Brothers Holding Inc. ("**LBHI**") which is the ultimate holding company of the Guarantor. |
| **Preferential Limited Partner:** | LB Investment Holdings Ltd (incorporated with limited liability in England and Wales with registered number 4385277), a wholly owned Subsidiary of LBHI or any other Subsidiary of LBHI within the charge to UK corporation tax. |
| | The Preferential Limited Partner shall be entitled to receive all amounts received by the Issuer from its investment in the Subordinated Notes or Eligible Investments, as the case may be, in excess of those required to make payments in respect of the Preferred Securities. |
| **Guarantor:** | Lehman Brothers Holdings plc (incorporated with limited liability in England and Wales with registered number 1854685). |

5

The Guarantor is a wholly-owned subsidiary of LBHI which is the parent company of the Lehman Brothers group of companies. The Guarantor's principal activity is to hold fixed asset investments in both subsidiary undertakings and non-subsidiary undertakings.

**Issue:**

Euro Fixed Rate Guaranteed Non-voting Non-cumulative Perpetual Preferred Securities, each with a liquidation preference of €1,000 (the "**Liquidation Preference**"), comprising interests in a limited partnership share in the Issuer.

**Use of Proceeds:**

The proceeds of the issue of the Preferred Securities will augment the Guarantor Group's regulatory capital base. The Issuer will use the proceeds raised from the issuance of the Preferred Securities to subscribe for the Subordinated Notes (see "*Eligible Investments*" below).

**Subordinated Guarantee:**

The Guarantor will provide a subordinated guarantee to be executed by the Guarantor on the Closing Date as a deed poll (the "**Subordinated Guarantee**") in respect of:

- any declared but unpaid Distributions;

- payments on redemption of the Preferred Securities; and

- any Additional Amounts,

which will be in favour of the Holders.

The Subordinated Guarantee will rank *pari passu* with the non-cumulative perpetual preferred securities or preference shares of the Guarantor (whether or not in issue).

The Guarantee will not cover payments on liquidation of the Issuer. See "*Rights upon Liquidation*" below.

**Distribution Rate:**

The Preferred Securities will entitle Holders to receive (subject as described below) non-cumulative preferential cash distributions (the "**Distributions**").

Distributions will be payable out of the Issuer's own legally available resources annually in arrear on the distribution payment date specified in the Final Terms in each year (each a "**Distribution Payment Date**"), accruing at a rate per annum specified in the Final Terms.

The Holders will be entitled to receive Distributions only if the Issuer has received sufficient funds under the Subordinated Notes or the Eligible Investments, as the case may be.

Furthermore, notwithstanding the existence of such resources legally available for distribution by the Issuer, the Holders will not be entitled to receive Distributions if the General Partner has published a No Payment Notice in respect of such Distribution, in which case there will be no payment due under the Preferred Securities.

The General Partner will have the full discretion to publish the No Payment Notice in respect of any Distribution at any time

6

and for any reason. It will use this discretion in respect of a Distribution if such payment will cause a Trigger Event.

Save as described above, Holders will have no right to participate in the profits of the Issuer or the Guarantor and in particular will have no rights to receive from the Issuer amounts paid under the Subordinated Notes or any Eligible Investments or otherwise amounts in excess of Distributions due and payable under the Preferred Securities. In the event that any amounts received by the Issuer on the Subordinated Notes or any Eligible Investments, which would otherwise have been used by the Issuer (being the holder thereof) to fund such Distribution, exceed the amount (if any) then due by way of Distribution under the Preferred Securities, the amount of such excess will be paid to the Preferential Limited Partner. Holders will have no rights in respect of such excess.

**Distribution and Capital Stopper:**
In the event that Distributions are not paid on the Preferred Securities, LBHI has undertaken that, in the event that any Distribution is not paid in full, it will not:

(a)    declare or pay any dividend on its shares of common stock; or

(b)    repurchase or redeem any of its non-cumulative preferred stock or common stock at its option,

until such time as Distributions on the Preferred Securities have been paid in full for one year.

**Trigger Event and Substituted Preferred Stock:**
If a Trigger Event occurs and is continuing, then, provided that (if required at such time) any relevant Supervisory Authority has not objected, the General Partner shall take all reasonable steps to cause the substitution of the Preferred Securities by depositary shares representing Substituted Preferred Stock.

On the substitution date, each Preferred Security of €1,000 in nominal amount will be substituted for one depositary share representing Substituted Preferred Stock which will have a nominal amount of €1,000.

The General Partner will notify Holders if a Trigger Event occurs. In the notice, the General Partner will include information on the procedures for effecting the substitution.

**Optional Redemption:**
If the Subordinated Notes or the Eligible Investments, as the case may be, are redeemed pursuant to their terms, the Preferred Securities will also be redeemed by the General Partner, on the same date, each to be redeemed at the Optional Redemption Price.

Any redemption of the Preferred Securities, the Subordinated Notes or replacement Eligible Investments is subject to the consent of the relevant Supervisory Authority (if required at such time).

As a result, the relevant Supervisory Authority when granting such a consent for the redemption of the Subordinated Notes

7

will be also granting a consent for the redemption of the Preferred Securities.

**Capital Disqualification Event:**

If a Capital Disqualification Event occurs and is continuing, the Preferred Securities will be redeemed in whole, but not in part, by the General Partner at any time, each to be redeemed at the Optional Redemption Price.

Any redemption of the Preferred Securities is subject to the consent of the relevant Supervisory Authority (if required at such time).

**Tax Event:**

If a Tax Event occurs and is continuing, the effect of which cannot be avoided by the Issuer or the Guarantor, as the case may be, taking reasonable measures available to it or if the Subordinated Notes or the Eligible Investments, as the case may be, are redeemed pursuant to their terms for tax reasons, then the Preferred Securities will be redeemed in whole, but not in part, by the General Partner, on the same date, each to be redeemed at the Optional Redemption Price.

Any redemption of the Preferred Securities, the Subordinated Notes or replacement Eligible Investments is subject to the consent of the relevant Supervisory Authority (if required at such time).

**Ranking of the Preferred Securities:**

The Preferred Securities, together with the Subordinated Guarantee, are intended to provide Holders with rights on liquidation equivalent to non-cumulative preference shares of the Guarantor, whether or not issued.

Claims under the Preferred Securities in respect of any Liquidation Distributions will rank:

(i)     senior to the rights of the General Partner and the Preferential Limited Partner in respect of other partnership interests issued by the Issuer; and

(ii)    junior to the claims of creditors of the Issuer (if any).

**Rights upon Liquidation:**

In the event of the dissolution of the Issuer, Holders will be entitled to receive, subject as set out below, for each Preferred Security a Liquidation Distribution out of the assets of the Issuer legally available for distribution.

LBHI has undertaken that, so long as any of the Preferred Securities is outstanding:

(a)    unless a Trigger Event occurs or LBHI is being wound up, LBHI will not take any action that would or might cause, the liquidation, dissolution or winding-up of the General Partner or the Issuer otherwise than with the prior written approval of any relevant Supervisory Authority (if required at such time); and

(b)    the General Partner will at all times be a directly or indirectly wholly owned Subsidiary of LBHI unless (I) otherwise approved by Holders in accordance with the procedure set out in the Limited Partnership Agreement

or (II) after a substitution of the Preferred Securities for depositary shares representing Substituted Preferred Stock has occurred.

**Withholding Tax and Additional Amounts:**

The Issuer will pay such additional amounts ("**Additional Amounts**") as may be necessary in order that the net payment received by each Holder in respect of the Preferred Securities, after deduction or withholding of or on account of any taxes imposed by tax authorities in the United Kingdom upon payments made by or on behalf of the Issuer, will equal the amount which would have been received in the absence of any such deduction or withholding of or on account of taxes, subject to customary exceptions.

The Subordinated Guarantee will contain a similar provision.

**Administrator:**

The Issuer will appoint an administrator to perform those operational matters in relation to the Issuer required under the Financial Services and Markets Act 2000 to be performed by a person authorised by the United Kingdom Financial Services Authority to establish, operate and wind-up collective investment schemes.

**Eligible Investments:**

The proceeds raised by the Issuer of the Preferred Securities will be used by the Issuer to purchase the Subordinated Notes.

The Subordinated Notes will be issued by UK Holding, will have a maturity of 30 years and will be redeemable by UK Holding on the interest payment date falling after the Closing Date to be specified in the Final Terms ("**First Call Date of Subordinated Notes**") or any interest payment date thereafter, subject to there being no objection from any relevant Supervisory Authority.

Unless the Preferred Securities are redeemed prior to or simultaneously with the maturity of the Subordinated Notes, then on maturity of the Subordinated Notes or any replacement Eligible Investments, the General Partner will, subject to prior consent of the relevant Supervisory Authority (if required at such time), reinvest the proceeds of redemption of the Subordinated Notes or Eligible Investments in Eligible Investments (or further Eligible Investments) that will contain the same terms as the Subordinated Notes in respect of tenor, principal amount, interest payment dates and redemption (including redemption for tax reasons) and will be callable on any interest payment date. However, upon issuance of such Eligible Investments (or further Eligible Investments), the Distribution Rate will be the rate per annum determined by the then prevailing market conditions for instruments of similar risk and 30 year maturity.

**Voting Rights:**

Except as described in "*Description of the Preferred Securities – Meetings*" and as provided in the Act, Holders will not be entitled to receive notice of, or attend or vote at, any meeting of partners in the Issuer or participate in the management of the Issuer.

9

| | |
|---|---|
| **Form of the Preferred Securities:** | The Preferred Securities will be in registered form. |

On or about the Closing Date, a single global certificate (the "**Global Certificate**") in respect of the Preferred Securities will be deposited with JPMorgan Chase Bank, N.A., London Branch (the "**Common Depositary**") as common depositary for Euroclear Bank SA./N.V., as operator of the Euroclear System ("**Euroclear**") and Clearstream Banking, société anonyme ("**Clearstream, Luxembourg**"). The Global Certificate will be issued, and the Preferred Securities will be registered, in the name of, Chase Nominees Limited (the "**Initial Limited Partner**") as nominee of the Common Depositary.

For so long as the Preferred Securities are deposited and registered as described above, book-entry interests in the Preferred Securities will be shown on, and transfers thereof will be effected only through, records maintained by Euroclear and Clearstream, Luxembourg.

Definitive certificates will not be made available to Holders other than in certain limited circumstances. See *"Summary of Provisions Relating to the Preferred Securities in Global Form"*.

| | |
|---|---|
| **Listings:** | Application has been made to the UK Listing Authority for the Preferred Securities to be admitted to the Official List and to the London Stock Exchange plc for the Preferred Securities to be admitted to trading on the London Stock Exchange plc's Gilt Edged and Fixed Interest Market which is a regulated market for the purposes of the Investment Services Directive. |
| **Ratings:** | The Preferred Securities are expected to be assigned, on issue ratings from Standard & Poor's, Moody's and Fitch IBCA which will be contained in the Final Terms. A credit rating is not a recommendation to buy, sell or hold securities and may be subject to revision, suspension or withdrawal at any time by the relevant rating organisation. |
| **Governing Law:** | The Limited Partnership Agreement establishing the Issuer, the Preferred Securities and the Subordinated Guarantee will be governed by, and construed in accordance with, English law. |
| **Final Terms:** | The following information will be contained in the Final Terms: |

- Distribution Payment Dates;
- Distribution Rate;
- Closing Date;
- First Call Date of Subordinated Notes;
- aggregate nominal amount;
- net proceeds;
- ratings;
- Managers;
- ISIN; and
- common code.

10

# RISK FACTORS

*Prospective investors should carefully consider the following information in conjunction with the other information contained or incorporated by reference in this Prospectus. Capitalised terms used but not defined in this section shall bear the respective meanings ascribed to them under the "Description of the Preferred Securities".*

## Risk Factors relating to the Guarantor Group

### Certain Factors Affecting the Guarantor Group's Results of Operations

The financial condition and results of operations of the Guarantor Group may be affected by uncertain or unfavourable economic, market, legal and other conditions. These conditions include but are not limited to:

### Market Risk

Changes in interest and foreign exchange rates, financial instruments and real estate valuations and increases in volatility can increase credit and market risks and may also affect customer-flow-related revenues and proprietary trading revenues as well as affect the volume of debt and equity underwritings and merger and acquisition transactions. The Guarantor Group uses derivatives and other financial contracts to hedge many of these market risks.

### Competitive Environment

All aspects of the Guarantor Group's business are highly competitive. The Guarantor Group's competitive ability depends on many factors, including its reputation, the quality of its services and advice, intellectual capital, product innovation, execution ability, pricing, and sales efforts and the talent of its personnel.

### Investor Sentiment

Accounting and corporate governance scandals in recent years have had a significant effect on investor confidence. In addition, concerns about geopolitical developments and oil prices, among other things, can affect the global financial markets.

### Liquidity

Liquidity and liquidity management are of critical importance in the Guarantor Group's industry. Liquidity could be affected by the inability to access the long-term or short-term debt, repurchase or securities-lending markets or to draw under credit facilities, whether due to factors specific to the Guarantor Group or to general market conditions. In addition, the amount and timing of uncertain events, such as unfunded commitments and contingencies, could adversely affect cash requirements and liquidity. To mitigate these risks, the liquidity and funding policies of the Guarantor Group have been conservatively designed to maintain sufficient liquid financial resources to fund continually its balance sheet and to meet all expected cash outflows, for one year in a stressed liquidity environment.

### Credit Ratings

The Guarantor Group's access to the unsecured funding markets is dependent on its credit ratings. A reduction in credit ratings could adversely affect the Guarantor Group's access to liquidity alternatives and its competitive position, and could increase the cost of funding or trigger additional collateral requirements.

### Credit Exposure

Credit exposure represents the possibility a counterparty will be unable to honour its contractual obligations. Although the Guarantor Group actively manages credit exposure daily as part of its risk management framework, counterparty default risk may arise from unforeseen events or circumstances.

11

*Operational Risk*

Operational risk is the risk of loss resulting from inadequate or failed internal or outsourced processes, people, infrastructure and technology, or from external events. The Guarantor Group minimises these risks through a strong internal control environment.

*Legal and Regulatory*

The securities and financial services industries are subject to extensive regulation in the jurisdictions in which the Guarantor Group does business. Violation of applicable regulations could result in legal and/or administrative proceedings, which may impose censures, fines, cease-and-desist orders or suspension of a firm, its officers or employees. The scrutiny of the financial services industry has increased, which has led to increased regulatory investigations and litigation against financial services firms.

Legislation and rules around the world have imposed substantial new or more stringent regulations, internal practices, procedures and controls and disclosure requirements in such areas as financial reporting, corporate governance, auditor independence, equity compensation plans, restrictions on the interaction between equity research analysts and investment banking personnel and money laundering. The trend and scope of increased compliance requirements may require the Guarantor Group to invest in additional resources to ensure compliance.

**Risk Factors relating to the Preferred Securities**

*Risks Associated with the Guarantor's Financial Condition*

The Issuer is a newly established limited partnership with no previous operating history or revenues. It is expected that the Issuer's sole source of funds to pay Distributions on the Preferred Securities will be payments which it receives from its investment in Subordinated Notes issued by the Guarantor or any Eligible Investments replacing the Subordinated Notes.

The rights of Holders shall be represented solely by the Subordinated Guarantee and the Preferred Securities, and under no circumstances will the rights of Holders be represented by the Subordinated Notes or any Eligible Investment replacing the Subordinated Notes nor shall Holders be entitled to receive or hold the Subordinated Notes or any Eligible Investments replacing the Subordinated Notes or any payments due in respect of the Subordinated Notes or any Eligible Investments replacing the Subordinated Notes.

The Preferred Securities are guaranteed on a limited and subordinated basis by the Guarantor pursuant to the terms of the Subordinated Guarantee. Accordingly, if the Guarantor's financial condition were to deteriorate, the Holders may suffer direct and materially adverse consequences, including non-payment of Distributions on the Preferred Securities or of payments under the Subordinated Guarantee.

*Limitations to Remedies of Holders under the Subordinated Guarantee*

In the event that the Guarantor is in breach of its payment obligations under the Subordinated Guarantee, the terms of the Subordinated Guarantee do not confer rights in favour of the Holders to petition for the winding-up of the Guarantor.

*Distributions are Discretionary and Not Cumulative*

Distributions on the Preferred Securities are not cumulative. The discretion of the General Partner to resolve that a Distribution should not be paid is unfettered. As set out in "*Description of the Preferred Securities*", Distributions on the Preferred Securities will be paid on each Distribution Payment Date out of interest received by the Issuer from its investment in the Subordinated Notes and from other resources legally available, if any, and only if the General Partner has not published a No Payment Notice. If a "No Payment Notice" is published, the Holders will not be entitled to receive such Distributions (or any payment under the Subordinated Guarantee in respect of such Distributions) or have any claim in respect thereof.

12

### *Perpetual Nature of the Preferred Securities*

The Preferred Securities have no fixed final redemption date and Holders have no right to call for the redemption of the Preferred Securities. Although the General Partner may redeem the Preferred Securities in whole but not in part in certain circumstances, in each case at the Optional Redemption Price, there are limitations on the General Partner's ability to do so. Therefore, Holders should be aware that they may be required to bear the financial risks of an investment in the Preferred Securities for an indefinite period of time.

### *Substitution*

If a Trigger Event occurs and is continuing, the General Partner will, provided that (if required at such time) no relevant Supervisory Authority has objected, take all reasonable steps to cause the substitution of the Preferred Securities with depositary shares representing fully paid non-cumulative preferred stock issued directly by Lehman Brothers Holding Inc. ("**LBHI**"). A Trigger Event shall occur (i) if LBHI is placed into bankruptcy, reorganisation, conservatorship or receivership, (ii) if following any time when LBHI becomes subject to Relevant Rules, LBHI has capital adequacy levels which are less than the minimum capital adequacy levels which are imposed by the relevant Supervisory Authority or (iii) if, following any time when LBHI become subject to Relevant Rules, the relevant Supervisory Authority in its sole discretion, informs LBHI that it will not meet its minimum capital requirement in the near term.

Although LBHI has undertaken that, in the event that the Preferred Securities are substituted by depositary shares representing Substituted Preferred Stock, LBHI will apply for admission to trading of the Substituted Preferred Stock on a regulated market for the purposes of the Investment Services Directive (outside the United States) there can be no assurance that, a competent authority will agree to such admission of Substituted Preferred Stock. In addition, the tax treatment for holders of Substituted Preferred Stock may be different from that for Holders of the Preferred Securities.

### *No Limitation on Senior Debt*

The obligations of the Guarantor under the Subordinated Guarantee will rank junior as to payments to all liabilities to creditors of the Guarantor (including without limitation depositors, general creditors and subordinated debt holders) and claims of holders of senior ranking securities. In the event that the Guarantor is wound-up, liquidated or dissolved, the assets of the Guarantor would be available to pay obligations under the Subordinated Guarantee only after all payments have been made on such senior liabilities and claims. The Guarantor is not prohibited from issuing, guaranteeing or otherwise incurring further debt ranking *pari passu* with, or senior to, its obligations under the Subordinated Guarantee. The issue of any such debt may reduce the amount recoverable by Holders of the Preferred Securities under the Subordinated Guarantee. Accordingly, on the winding-up of the Guarantor and after payment of senior creditors, there may not be a sufficient amount to satisfy the amounts owing to the Holders of the Preferred Securities.

### *Distribution and Capital Stopper*

In the event that any Distribution is not made, LBHI has undertaken not to:

(a)     declare or pay any dividend on its shares of common stock; or

(b)     repurchase or redeem any of its non-cumulative preferred stock or common stock at its option,

until such time as Distributions on the Preferred Securities have been paid in full for one year.

Although the Guarantor does not make an equivalent agreement, LBHI is the ultimate holding company of the Lehman Brothers' group of companies.

### *Absence of Prior Public Markets*

The Preferred Securities constitute a new issue of securities by the Issuer. Prior to this issue, there will have been no public market for the Preferred Securities. Although application has been made for the Preferred

Securities to be admitted to trading on the London Stock Exchange plc's Gilt Edged and Fixed Interest Market, there can be no assurance that an active public market for the Preferred Securities will develop and, if such a market were to develop, the Managers are under no obligation to maintain such a market. The liquidity and the market prices for the Preferred Securities can be expected to vary with changes in market and economic conditions, the financial condition and prospects of the Guarantor and other factors that generally influence the market prices of securities.

## DESCRIPTION OF THE PREFERRED SECURITIES

*The Preferred Securities are limited partnership interests in the Issuer. The following description should be read in conjunction with, and is subject to the terms of, the Limited Partnership Agreement (as defined below), a copy of which is available for inspection as described under "General Information".*

1. **Definitions and Interpretation**

In this description of the Preferred Securities, except to the extent that the context otherwise requires:

**"Act"** means the Limited Partnerships Act 1907, as amended and/or restated from time to time;

**"Additional Amounts"** means the additional amounts which may be payable by the Issuer in respect of the Preferred Securities as a result of the imposition of UK withholding taxes as described in paragraph 6;

**"Agency Agreement"** means the agency agreement dated the Closing Date relating to the Preferred Securities between, *inter alios,* the Guarantor, the Registrar and the Paying and Transfer Agents;

**"Business Day"** means a day on which commercial banks and foreign exchange markets settle payments and are open for general business (including dealing in foreign exchange and foreign currency deposits) in London and on which the TARGET System, or any successor thereto, is operating;

A **"Capital Disqualification Event"** shall occur if:

(a)    the Preferred Securities do not qualify as regulatory capital pursuant to the Relevant Rules upon either LBHI or the Guarantor becoming subject to supervision by a relevant Supervisory Authority; or

(b)    following any such person becoming subject to the Relevant Rules, a change of such Relevant Rules results in the Preferred Securities no longer so qualifying;

**"Clearstream, Luxembourg"** means Clearstream Banking, société anonyme or its successor;

**"Closing Date"** means the date specified as such in the Final Terms;

**"Distribution Payment Date"** means the date in each year specified as such in the Final Terms;

**"Distribution Period"** means the period from, and including, the Closing Date to, but excluding, the first Distribution Payment Date and each period thereafter from, and including, one Distribution Payment Date to, but excluding, the next following Distribution Payment Date;

**"Distribution Rate"** means, in respect of a Distribution Period, the percentage rate determined pursuant to paragraph 2.2;

**"Distributions"** means the non-cumulative distributions in respect of the Preferred Securities as described under paragraph 2;

**"Eligible Investments"** means

(a)    subordinated debt securities (other than the Subordinated Notes) that are issued or guaranteed by a member of the Group other than UK Holding (but of a comparable rating to UK Holding at the relevant time), or

(b)    provided that (if required) the relevant Supervisory Authority has not objected, such other instruments issued by a member of the Group other than UK Holding (but of a comparable rating to UK Holding at the relevant time),

*provided that* in both cases:

15

(i)     for the avoidance of doubt, if the Eligible Investments are securities of a UK company, the Eligible Investments shall, in the event of their issuance, be the subject of an application for listing on a recognised stock exchange in accordance with section 841 of the Income and Corporation Taxes Act 1988; and

(ii)    the Preferential Limited Partner shall not be the principal obligor of the Eligible Investments;

**"Euroclear"** means Euroclear Bank S.A./N.V. as operator of the Euroclear system or its successor;

**"Euro-zone"** means the region comprised of the member states of the European Union that have adopted the single currency in accordance with the Treaty establishing the European Community (signed in Rome on 25th March, 1957) as amended;

"**Final Terms**" means the Final Terms relating to the Preferred Securities, which will be substantially in the form set out in the Prospectus dated 30th August, 2005 relating to the Preferred Securities;

**"General Partner"** means LB GP No.1 Ltd. (incorporated in England and Wales with registered number 5355491), a wholly owned Subsidiary of LBHI;

**"Group"** means LBHI and its Subsidiaries;

**"Guarantor"** means Lehman Brothers Holding plc (incorporated in England and Wales with registered number 1854685) and its successors and assignees;

**"Guarantor Group"** means the Issuer, the General Partner, the Guarantor and its Subsidiaries;

**"Holder"** means, in respect of each Preferred Security, each person registered on the Register as the limited partner holding such Preferred Security at the relevant time;

**"Initial Limited Partner"** means Chase Nominees Limited (incorporated in England and Wales with registered number 00248239);

**"Issuer"** means Lehman Brothers UK Capital Funding II LP;

**"Junior Share Capital"** means the Guarantor's ordinary shares, together with any other securities or obligations of the Guarantor expressed to rank junior to the Subordinated Guarantee and the Parity Securities;

**"LBHI"** means Lehman Brothers Holding Inc.;

**"Limited Partnership Agreement"** means an agreement dated 25th August, 2005 between, *inter alios*, the General Partner and the Preferential Limited Partner establishing the Issuer, as the same may be amended from time to time;

**"Liquidation Distribution"** means the Liquidation Preference plus (a) any due and accrued but unpaid Distributions calculated from (and including) the immediately preceding Distribution Payment Date (or, if none, the Closing Date) to (but excluding) the date of payment and (b) any Additional Amounts, in each case in cash only;

**"Liquidation Preference"** means the liquidation preference of €1,000 per Preferred Security;

**"No Payment Notice"** means a notice which is published pursuant to paragraph 2.4;

**"Optional Redemption Price"** means, in respect of each Preferred Security, the Liquidation Preference plus (a) any due and accrued but unpaid Distributions calculated from (and including) the immediately preceding Distribution Payment Date (or, if none, the Closing Date) to (but excluding) the date of payment and (b) any Additional Amounts payable, in each case in cash only;

**"Parity Securities"** means any non-cumulative preference shares, non-cumulative preferred securities (other than the Preferred Securities) or other securities either (a) issued directly by the Guarantor and ranking *pari passu* with the Guarantor's obligations under the Subordinated Guarantee

16

and includes the sterling and US dollar non-cumulative preference shares of the Guarantor outstanding or (b) issued by the Issuer or any Subsidiary or other entity and entitled to the benefit of the Subordinated Guarantee or benefiting from any other guarantee or support agreement from the Guarantor ranking *pari passu* with the Subordinated Guarantee which on the date hereof includes the outstanding €225,000,000 Fixed Rate to CMS-Linked Guaranteed Non-voting Non-cumulative Perpetual Preferred Securities of Lehman Brothers UK Capital Funding LP;

**"Paying and Transfer Agents"** means the Principal Paying and Transfer Agent, J.P. Morgan Bank Luxembourg S.A. and/or such other entities as are appointed by the General Partner on behalf of the Issuer and notified to the Holders as described under paragraph 10;

**"Permitted Reorganisation"** means a solvent reconstruction, amalgamation, reorganisation, merger or consolidation whereby all or substantially all of the business, undertaking and assets of the Guarantor are transferred to a successor entity which assumes all of the Guarantor's obligation under the Subordinated Guarantee;

**"Preferential Limited Partner"** means, on the Closing Date, LB Investment Holdings Ltd (incorporated in England and Wales with registered number 4385277), a wholly owned Subsidiary of LBHI or any other Subsidiary of LBHI within the charge to UK corporation tax;

**"Preferred Capital Contribution"** means, in relation to the Preferred Securities, the aggregate contribution to the assets of the Issuer (being a whole multiple of €1,000) paid in cash by the Holders;

**"Preferred Securities"** means the outstanding Fixed Rate Guaranteed Non-Voting Non-Cumulative Perpetual Preferred Securities of the Issuer, originally issued on the Closing Date, each such security representing an interest of a Holder in the Issuer attributable to each €1,000 of the Preferred Capital Contribution and including any further Preferred Securities of the Issuer of the same series issued after the Closing Date and ranking *pari passu* with the Preferred Securities as regards participation in the profits and assets of the Issuer and **"Preferred Security"** shall be construed accordingly;

**"Principal Paying and Transfer Agent"** means JPMorgan Chase Bank, N.A., London Branch or such other entity as is appointed by the General Partner on behalf of the Issuer and notified to the Holders as described in paragraph 10;

**"Redemption Date"** means the date fixed for redemption under a notice given under paragraph 4.2 or 4.3;

**"Register"** means the register of Holders maintained outside the United Kingdom on behalf of the Issuer;

**"Registrar"** means J.P. Morgan Bank Luxembourg S.A. or such other entity appointed by the Issuer and notified to the Holders as described under paragraph 10;

**"Relevant Rules"** means at any time the regulations, requirements, guidelines and policies of any relevant Supervisory Authority relating to capital adequacy of financial institutions in the jurisdiction of such Supervisory Authority.

**"Stock Exchanges"** means the London Stock Exchange plc and/or such other stock exchange approved by the General Partner on which the Preferred Securities may be listed from time to time;

**"Subordinated Guarantee"** means the subordinated guarantee in respect of the Preferred Securities executed by the Guarantor on the Closing Date as a deed poll;

**"Subordinated Notes"** means the Fixed Rate Subordinated Notes, originally issued on the Closing Date in the principal amount equal to the aggregate nominal amount of the Preferred Securities, by UK Holding and held by the Issuer as initial partnership assets, or any Eligible Investments which are held by the Issuer as partnership assets thereafter;

**"Subsidiary"** means, in relation to any entity, any company (i) in which that entity holds a majority of the voting rights or (ii) of which that entity is a member and has the right to appoint or remove a

majority of the board of directors or (iii) of which that entity is a member and controls a majority of the voting rights, and includes any company which is a Subsidiary of a Subsidiary of that entity;

**"Substituted Preferred Stock"** means fully-paid non-cumulative preferred stock issued directly by LBHI bearing a right to dividends calculated in the same manner as the Preferred Securities, having no voting rights (except as required by law) and being subject to optional redemption in the same manner as the Preferred Securities;

**"Supervisory Authority"** means in respect of any jurisdiction, any organisation or authority having supervisory responsibility for the prudential supervision of financial institutions engaged in regulated activities carried on by LBHI in such jurisdiction;

**"TARGET"** means the Trans European Real-Time Gross Settlement Express Transfer (TARGET) System;

**"TARGET Business Day"** means a day on which TARGET is operating;

**"Tax"** means any present or future taxes or duties of whatsoever nature imposed or levied by or on behalf of the United Kingdom or any political subdivision of or by any authority therein or thereof having power to tax;

**"Tax Event"** means a UK Tax Event or a US Tax Event;

**"Tier 1 Capital"** has the meaning ascribed to it in the Financial Services Authority's Guide to Banking Supervisory Policy or any successor publication replacing such guide; and

**"Trigger Event"** shall occur (i) if LBHI is placed into bankruptcy, reorganisation, conservatorship or receivership, (ii) if following any time when LBHI becomes subject to Relevant Rules, LBHI has capital adequacy levels which are less than the minimum capital adequacy levels which are imposed by the relevant Supervisory Authority or (iii) if, following any time when LBHI become subject to Relevant Rules, the relevant Supervisory Authority, in its sole discretion, informs LBHI that it will not meet its minimum capital requirement in the near term;

**"UK Holding"** means Lehman Brothers Holdings plc (incorporated in England and Wales with registered number 1854685) and its successors and assignees;

**"UK Regulator"** means the Financial Services Authority or such other national or supranational regulatory authority as may at the relevant time have responsibility for the regulation and supervision of banks in the United Kingdom (or, if the Guarantor becomes domiciled in a jurisdiction other than the United Kingdom, in such other jurisdiction);

**"UK Tax Event"** means that, as a result of any change (each a "**Relevant Change**") in, or prospective or actual amendment to, the laws of the United Kingdom or any political subdivision or authority thereof having power to tax, or any change in the application of such laws, or in the official or generally published interpretation of such laws (including the enactment of any legislation, any judicial decision or any regulatory determination in the UK), or any interpretation or pronouncement by any relevant tax authority that provides for a position with respect to such laws or regulations that differs from the previously generally accepted position in relation to similar transactions or which differs from any specific written confirmation given by a tax authority in respect of the Preferred Securities and/or the Subordinated Notes, which change or amendment becomes effective or is to take effect, on or after the Closing Date, there is more than an insubstantial risk that:

(i)    the Issuer or the General Partner would be subject to more than a *de minimis* amount of tax in respect of the Subordinated Notes or the Preferred Securities in the UK (except, in the case of the General Partner only, for any such tax that would arise as a result of (a) profits arising to it as a result of payments received by it from the Issuer or (b) activities (if any) carried on by it other than those permitted or contemplated in the Limited Partnership Agreement in respect of the Subordinated Notes and the Preferred Securities);

18

(ii)    payments to Holders (including payments in respect of the Preferred Securities and the Subordinated Guarantee) would be subject to deduction or to withholding of or on account of tax in the UK or would give rise to any obligation to account for any tax in the UK;

(iii)    payments in respect of the Subordinated Notes would be subject to deduction or to withholding of or on account of tax in the UK or would give rise to any obligation to account for any tax in the UK;

(iv)    payments of interest made or accrued or treated as being made or accrued on the Subordinated Notes will be treated as "distributions" within the meaning of Section 832(1) of the Income and Corporation Taxes Act 1988 (or such other Section and/or Act as may from time to time supersede or replace Section 832(1) of the Income and Corporation Taxes Act 1988 for the purposes of such definition) for UK tax purposes or otherwise will cease to be deductible in full for the purposes of UK corporation tax; or

(v)    the Guarantor would not be entitled to surrender a deduction or other relief for interest on the Subordinated Notes to other companies with which it is grouped (or with which it would be grouped but for the Relevant Change) for applicable UK tax purposes to offset against their profits (whether under the group relief system in Sections 402 to 413 of the Income and Corporation Taxes Act 1988 current as at the Closing Date or any similar system or systems having like effect as may from time to time exist); and

"US Tax Event" means that, as a result of (a) any amendment to, change in or announced proposed change in the laws (or any regulations thereunder whether in proposed, temporary or final form) of the United States or any political subdivision or taxing authority thereof or therein, (b) a judicial decision interpreting, applying or clarifying such laws or regulations, (c) an administrative pronouncement or action that represents an official position (including a clarification of an official position) (of the governmental authority or regulatory body making such administrative pronouncement or taking such action, or (d) a threatened challenge asserted in connection with an audit of the Issuer, LBHI, or the General Partner, or a threatened challenge asserted in writing against any other taxpayer that has raised capital through the issuance of securities similar to the Subordinated Notes, Eligible Investments or the Preferred Securities, which amendment or change is adopted or which decision, pronouncement or proposed change is announced or which action, clarification or challenge occurs on or after the date of the issuance of the Preferred Securities, there is more than an insubstantial risk that:

(i)    the Issuer is or would be subject to more than a *de minimis* amount of tax or similar assessments in the United States; or

(ii)    payments to holders are or would be subject to deduction or to withholding of or on account of tax imposed by a governmental authority in the United States.

In this description of the Preferred Securities any reference to a particular time shall, unless otherwise specified, be to Central European time.

## 2.    Distributions

2.1    Subject as provided in paragraphs 2.3 and 2.4, non-cumulative distributions (the **"Distributions"**) on the Preferred Securities will accrue from the Closing Date (or, in the case of any further preferred securities issued pursuant to paragraph 8.4, from their respective dates of issue) and shall be payable out of the Issuer's own legally available resources annually in arrear on each Distribution Payment Date.

2.2    The Distribution Rate shall be the rate per annum specified in the Final Terms by the Closing Date. Where Distributions are to be calculated in respect of any period, the applicable day count fraction will be the number of days in the relevant period from and including the date from which Distributions begin to accrue to but excluding the date on which they are payable divided by the number of days in the Distribution Period comprising the relevant period or in which the relevant period falls.

2.3  The Holders will be entitled to receive Distributions only if the Issuer has received sufficient funds under the Subordinated Notes or the Eligible Investments, as the case may be.

2.4  Furthermore, notwithstanding the existence of such resources legally available for distribution by the Issuer, the Holders will not be entitled to receive Distributions if the General Partner has published a No Payment Notice in respect of such Distribution, in which case there will be no payment due under the Preferred Securities.

The General Partner will have the full discretion to publish the No Payment Notice in respect of any Distribution at any time and for any reason. It will use this discretion in respect of a Distribution if such payment will cause a Trigger Event.

2.5  No Holder shall have any claim in respect of any Distribution or part thereof not payable as a result of the limitation set out in paragraph 2.4. Accordingly, such amounts will not cumulate for the benefit of Holders or entitle the Holders to any claim in respect thereof against the Issuer or against the Guarantor under the Subordinated Guarantee.

2.6  Save as described above, Holders will have no right to participate in the profits of the Issuer or the Guarantor and in particular will have no rights to receive from the Issuer amounts paid to the Issuer amounts paid under the Subordinated Notes or any Eligible Investments or otherwise amounts in excess of Distributions due and payable under the Preferred Securities. In the event that any amounts received by the Issuer on the Subordinated Notes or any Eligible Investments, exceed the amount (if any) then due by way of Distribution under the Preferred Securities, the amount of such excess will be paid to the Preferential Limited Partner. Holders will have no rights in respect of such excess.

*LBHI has undertaken that, in the event that any Distribution is not paid in full, it will not:*

(a)  *declare or pay any dividend on its shares of common stock; or*

(b)  *repurchase or redeem any of its non-cumulative preferred stock or common stock at its option,*

*until such time as Distributions on the Preferred Securities have been paid in full for one year.*

## 3.  Liquidation Distributions

3.1  In the event of the dissolution of the Issuer, the Holders will be entitled to receive the Liquidation Distribution, in respect of each Preferred Security held, out of the assets of the Issuer available for distribution to such Holders under the Act. Such entitlement will arise (a) before any payments due to the General Partner and the Preferential Limited Partner and (b) before any distribution of assets is made to the General Partner, but such entitlement will rank equally with the entitlement of the holders of all other preferred securities issued by the Issuer which rank *pari passu* with the Preferred Securities, if any.

3.2  After payment of all Liquidation Distributions, or the Relevant Proportion thereof if applicable, the General Partner will be entitled to any remaining assets of the Issuer representing proceeds of the sale or redemption of the Issuer's partnership assets and the Holders will have no right or claim to any of the remaining assets of the Issuer or the Guarantor. For the avoidance of doubt, Holders will have no right to receive the Subordinated Notes or any replacement Eligible Investment.

*LBHI has undertaken that, as long as any of the Preferred Securities is outstanding:*

(a)  *unless LBHI is being wound-up, LBHI will not take any action that would or might cause the liquidation, dissolution or winding-up of the General Partner or the Issuer otherwise than with the prior written approval of any relevant Supervisory Authority (if required at such time); and*

(b)  *the General Partner will at all times be a directly or indirectly wholly owned Subsidiary of LBHI unless (I) otherwise approved by the Holders in accordance with the procedure set out in the Limited Partnership Agreement or (II) after a substitution of the Preferred Securities for depositary shares representing Substituted Preferred Stock has occurred.*

3.3    Subject to the Act, other than in the events referred to in paragraphs 4.2, 4.3, 4.4 and 5, unless (if required at such time) the UK Regulator has not objected, the General Partner will not permit, or take any action that would or might cause, the liquidation or dissolution of the Issuer. No Holder shall have any claim (whether against the Issuer or the Guarantor) in respect of any Liquidation Distribution or part thereof not paid when it would, but for the operation of this paragraph 3.3, otherwise have become due.

**4.    Redemption**

4.1    The Preferred Securities have no fixed final redemption date and Holders have no right to call for the redemption of the Preferred Securities. Any redemption is subject to the provisions of the Act.

4.2    If the Subordinated Notes or the Eligible Investments, as the case may be, are redeemed pursuant to their terms, the Preferred Securities will also be redeemed, in whole but not in part, by the General Partner on the same date, each to be redeemed at the Optional Redemption Price.

4.3    If a Capital Disqualification Event occurs and is continuing, the Preferred Securities will be redeemed, in whole but not in part, by the General Partner at any time, each to be redeemed at the Optional Redemption Price.

4.4    If a Tax Event occurs and is continuing, the effect of which cannot be avoided by the Issuer or the Guarantor, as the case may be, taking reasonable measures available to it or if the Subordinated Notes or the Eligible Investments, as the case may be, are redeemed pursuant to their terms for tax reasons, then the Preferred Securities will also be redeemed by the General Partner on the same date, each to be redeemed at the Optional Redemption Price.

4.5    Prior to the publication of any notice of redemption pursuant to paragraph 4.3 or paragraph 4.4, the General Partner shall deliver to the Registrar a certificate signed by two members of the board of directors of the Guarantor stating that the Issuer is entitled to effect such redemption and an opinion of counsel to the Guarantor experienced in such matters to the effect that either a Tax Event has occurred (and specifying which of the clauses as set out in the definition of "Tax Event" is applicable) or a Capital Disqualification Event has occurred. Upon the expiry of such notice, the Issuer shall be dissolved and the General Partner as liquidation agent shall be bound to redeem each of the Preferred Securities accordingly by payment of an amount equal to the Optional Redemption Price.

4.6    Any redemption of the Preferred Securities, the Subordinated Notes or replacement Eligible Investments is subject to the consent of the relevant Supervisory Authority (if required at such time). As a result, the relevant Supervisory Authority when granting such a consent for the redemption of the Subordinated Notes will be also granting their consent for the redemption of the Preferred Securities. The relevant Supervisory Authority may impose conditions on any such redemption.

4.7    All Preferred Securities which are redeemed will forthwith be cancelled and accordingly may not be reissued or resold.

**5.    Substitution for Preferred Stock**

5.1    If a Trigger Event occurs, then, provided that (if required at such time) no relevant Supervisory Authority has objected, the General Partner shall take all reasonable steps to cause the substitution of the Preferred Securities by depositary shares representing Substituted Preferred Stock (the "**Preferred Securities Substitution**") on the Substitution Date, as defined below.

As soon as reasonably practicable following the occurrence of a Trigger Event, the General Partner shall cause notice (the "**Trigger Event Notice**") to be given to the Holders (in accordance with paragraph 10) and to the Stock Exchanges that the depositary shares representing Substituted Preferred Stock will be available from the date (the "**Substitution Date"**) specified in the Trigger Event Notice for the purpose.

21

Until such time as the Trigger Event Notice is given by the General Partner (in accordance with paragraph 10), Holders will continue to be entitled to receive Distributions and/or a Liquidation Distribution in respect of the Preferred Securities but thereafter Holders will have no further rights, title or interest in or to their Preferred Securities except to have them substituted in the manner and to the persons described below.

The Trigger Event Notice will contain a form of substitution confirmation (the "**Preferred Securities Substitution Confirmation**") to be completed by each Holder (or, for so long as the Preferred Securities are registered in the name of a nominee of a common depositary for Euroclear and Clearstream, Luxembourg, by each accountholder named in the records of Euroclear and Clearstream, Luxembourg as the holder of an interest in the Preferred Securities). The form of Preferred Securities Substitution Confirmation shall also be made available at the offices of each Paying and Transfer Agent. To receive Substituted Preferred Stock in respect of its holding of Preferred Securities, a Paying and Transfer Agent must receive from the Holder (or such accountholder, as the case may be) a Preferred Securities Substitution Confirmation together with the certificate representing the relative holding of Preferred Securities or other evidence of entitlement satisfactory to the General Partner.

Each share of Substituted Preferred Stock allotted will rank for any dividend from the immediately preceding Distribution Payment Date but otherwise will have no entitlement to any accrued Distributions or any other payment in respect of the Preferred Securities.

Upon a Preferred Securities Substitution, each Holder (or, as the case may be, accountholder) shall receive in respect of each €1,000 Liquidation Preference of Preferred Securities, one depositary share representing Substituted Preferred Stock with a nominal amount of €1,000.

No Preferred Securities Substitution will take place and the Holders will continue to hold their Preferred Securities and all their rights thereunder if prior to the Substitution Date, a winding-up of LBHI occurs.

*LBHI has undertaken that it will pay any taxes or capital duties or stamp duties payable in the UK arising on the allotment and issue of the depositary shares representing Substituted Preferred Stock. LBHI will not be obliged to pay, and each Holder (or, as the case may be, accountholder) delivering Preferred Securities and a duly completed Preferred Securities Substitution Confirmation to a Paying and Transfer Agent must pay, any other taxes, stamp duty reserves taxes and capital, stamp, issue and registration duties arising on the relevant Preferred Securities Substitution. LBHI will not be obliged to pay and each recipient must pay all, if any, taxes arising by reference to any disposal or deemed disposal of a Preferred Security in connection with such Preferred Securities Substitution.*

5.2     The General Partner will use all reasonable endeavours to procure that certificates (if any) for depositary shares representing Substituted Preferred Stock issued on a Preferred Securities Substitution will be despatched by mail free of charge (but uninsured and at the risk of the person entitled thereto) within one month after receipt of a duly completed Preferred Securities Substitution Confirmation.

**6.     Additional Amounts**

All payments in respect of the Preferred Securities by the Issuer will be made without withholding or deduction for, or on account of, any Tax, unless the withholding or deduction of such Tax is required by law. In that event, each Holder will be entitled to receive, as further distributions, such additional amounts (the "**Additional Amounts**") as may be necessary in order that the net amounts received by the Holders after such withholding or deduction shall equal the amounts which would have been receivable in respect of the Preferred Securities in the absence of such withholding or deduction; except that no such Additional Amounts will be payable to a Holder (or to a third party on his behalf) with respect to any Preferred Security:

(a)     to the extent that such Tax is imposed or levied by virtue of such Holder (or the beneficial owner) of such Preferred Security having some connection with the United Kingdom, other than merely being a Holder (or beneficial owner) of such Preferred Security; or

(b)    where such withholding or deduction is imposed on a payment to or on behalf of an individual and is required to be made pursuant to European Union Directive 2003/48/EC on the taxation of savings or any law implementing or complying with, or introduced in order to conform to, such Directive; or

(c)    where the Holder would have been able to avoid such withholding or deduction by presenting the Preferred Securities to another Paying and Transfer Agent in a Member State of the European Union, insofar as presentation for payment is required,

and except that the Issuer's obligation to make any such payments is subject to the limitations provided in paragraphs 2 and 3.

## 7.    Payments

7.1    Distributions will be payable in accordance with the Act on the relevant Distribution Payment Date (or where any Distribution Payment Date is not a TARGET Business Day on the next TARGET Business Day (without interest in respect of such delay)) to the Holders of record as they appear on the Register on the relevant record date, which will be five TARGET Business Days prior to the relevant Distribution Payment Date.

If the General Partner gives a notice of redemption pursuant to paragraph 4.2, 4.3 or 4.4 or in respect of the Preferred Securities, then on the relevant Redemption Date the General Partner shall procure that the Optional Redemption Price will be paid by the Registrar or by the Paying and Transfer Agents on behalf of the Issuer to the Holders. Upon such payment, all rights of Holders to participate in the assets of the Issuer or to be returned any amount in respect of the Preferred Securities (including the Preferred Capital Contribution (or any part thereof) made by or on behalf of the Holders) will be extinguished and the Holders shall thereupon cease to be limited partners of the Issuer provided their holding of Preferred Securities are redeemed in accordance with the foregoing, and the Preferred Capital Contribution will, on payment of the Optional Redemption Price, be deemed repaid.

7.2    Subject to all applicable fiscal or other laws and regulations:

7.2.1    each payment in respect of Distributions will be made by cheque and mailed to the Holder of record at such Holder's address as it appears on the Register on the relevant record date for the Preferred Securities; and

7.2.2    any payment in respect of the Optional Redemption Price or the Liquidation Distribution in respect of any Preferred Security will be made by cheque against presentation and surrender of the relevant certificate of entitlement at the office of the Registrar or a Paying and Transfer Agent,

provided, however, that a Holder may receive such payment by direct transfer if appropriate direct transfer instructions have been received by the Registrar in sufficient time prior to the relevant date of payment. Holders will not be entitled to any interest or other payment for any delay after the due date in receiving the amount due if the due date is not a TARGET Business Day, if the Holder is late in surrendering certificates (if required to do so) or if a cheque mailed in accordance with this paragraph arrives after the due date for payment.

In the event that payment of the Optional Redemption Price in respect of any Preferred Security is improperly withheld or refused and not paid by the Issuer, Distributions on such Preferred Security, subject as described in paragraphs 2.3 and 2.4, will continue to accrue, from the relevant Redemption Date to the date of actual payment of such Optional Redemption Price.

7.3    The General Partner will, and the Guarantor has undertaken in the Subordinated Guarantee that it will procure that the General Partner will, maintain at all times whilst the Preferred Securities are outstanding (a) whilst the Preferred Securities are admitted to trading on the regulated market of any Stock Exchange, a Paying and Transfer Agent in such location as is required to maintain such admission, (b) a Registrar having its office outside the United Kingdom and (c) a Paying and Transfer Agent having a specified office in a European Union Member State other than the United Kingdom

that will not be obliged to withhold or deduct tax pursuant to European Union Directive 2003/48/EC on the taxation of savings or any law implementing or complying with, or introduced in order to conform to, such Directive.

## 8.    Meetings

8.1    Except as described below and provided for in the Act, Holders will not be entitled to receive notice of, or attend or vote at, any meeting of partners in the Issuer or participate in the management of the Issuer.

8.2    The consent in writing of the Holders of at least a simple majority in Liquidation Preference of the outstanding Preferred Securities or the sanction of a resolution, passed by Holders of at least a simple majority in Liquidation Preference of the Preferred Securities present or represented at a separate meeting at which the quorum shall be Holders present or represented holding at least one-third in Liquidation Preference of the outstanding Preferred Securities, shall be required in order to give effect to any variation or abrogation of the rights, preferences and privileges of the Preferred Securities by way of amendment of the Limited Partnership Agreement or otherwise (unless otherwise provided in the terms of the Preferred Securities or as required by applicable law).

8.3    No such sanction shall be required if, as determined by the General Partner, the change is solely of a formal, minor or technical nature or is to correct an error or cure an ambiguity or which does not adversely affect the rights of Holders (provided that the change does not reduce the amounts payable to Holders, impose any obligation on the Holders or any modification of the terms of the Preferred Securities) in which case the General Partner shall be authorised to approve and implement such change.

8.4    Notwithstanding the foregoing, the General Partner may, without the consent or sanction of the Holders, take such action as is required in order to amend the Limited Partnership Agreement:

8.4.1    to allow an increase in the level of the Preferred Capital Contributions and the corresponding number of Preferred Securities; or

8.4.2    to authorise, create and issue one or more other series of securities or partnership interests in the Issuer ranking junior, as regards participation in the profits and assets of the Issuer, to the Preferred Securities and to admit, if relevant, new holders in respect thereof.

Thereafter the Issuer may, provided that the circumstances for non-payment of Distributions in paragraph 2.4 are not subsisting, without the consent of the Holders issue any such further securities either having the same terms and conditions as the Preferred Securities in all respects (or in all respects except for the first payment of Distributions on them) and so that such further issue shall be consolidated and form a single series with the Preferred Securities or upon such other terms as aforesaid. References herein to the Preferred Securities include (unless the context requires otherwise) any other securities issued pursuant to this paragraph and forming a single series with the Preferred Securities.

8.5    Notwithstanding the foregoing, no vote of the Holders will be required for the redemption, cancellation or substitution of the Preferred Securities or withdrawal of a Holder in accordance with the Limited Partnership Agreement.

8.6    The General Partner will cause a notice of any meeting at which Holders are entitled to vote and any voting forms to be mailed to each Holder. Each such notice will include a statement setting forth (a) the date, time and place of such meeting, (b) a description of any resolution to be proposed for adoption at such meeting on which such Holders are entitled to vote and (c) instructions for the delivery of proxies.

**9.      Covenant of the General Partner**

The General Partner undertakes not to incur any indebtedness in the name of the Issuer other than the costs and expenses incidental to creating the Preferred Securities and the Issuer and any other partnership interests in the Issuer, performing its obligations in respect of the Limited Partnership Agreement, maintaining the listing of the Preferred Securities and any other partnership interests in the Issuer (where applicable), the Register, the Registrar, the Paying and Transfer Agents and a listing agent in respect of the Preferred Securities and corresponding agents (where applicable) with respect to any other partnership interests in the Issuer, the Issuer's holding of the partnership assets and any securities acquired with any other capital contributions to the Issuer or substitutions therefor and the maintenance of a custodian therefor, the exercise of the Issuer's rights in respect of the partnership assets and any securities acquired with any other capital contributions to the Issuer or substitutions therefor and the administration of the Issuer.

**10.     Notices**

All notices to the Holders will be mailed to the Holder of record in addition, if and for so long as the Preferred Securities are admitted to trading on the regulated market of a Stock Exchange, notices will be given in accordance with regulations relating to such admission. Any mailed notice shall be deemed to have been given one clear day after the date on which it was posted and any notice published in a newspaper shall be deemed to have been given on the date of publication or, if so published more than once or on different dates, on the date of the first publication.

**11.     Transfers and Form**

The Preferred Securities will be in registered form each with a Liquidation Preference of €1,000 and multiples thereof.

If definitive certificates are made available in respect of Preferred Securities they will be available from the Registrar and from each of the Paying and Transfer Agents, and will be posted to the relevant Holders at the address shown in the Register or, as applicable, in the relevant instrument of transfer within three Business Days in London of issue, by uninsured post at the risk of such Holders. Transfers of Preferred Securities if represented by definitive certificates may be effected by presentation of the relevant certificate (with the transfer certificate attached thereto duly completed on behalf of the transferor and transferee) at the specified office of the Registrar or any Paying and Transfer Agent. Where a Holder transfers some only of the Preferred Securities represented by any such certificate he shall be entitled to a certificate for the balance without charge at the specified office of the Registrar or any Paying and Transfer Agent. All transfers of Preferred Securities by Holders must be effected in accordance with the Act and subject to the provisions of the Limited Partnership Agreement.

**12.     Replacement of Certificates**

If a certificate is damaged or defaced or alleged to have been lost, stolen or destroyed, a new certificate representing the same Preferred Securities may be issued on payment of such fee and on such terms (if any) as to evidence and indemnity and the payment of out-of-pocket expenses as the General Partner may think fit and on payment of the costs of the General Partner incidental to its investigation of the evidence and, if damaged or defaced, on delivery up of the old certificate at the office of the Registrar or any Paying and Transfer Agent.

**13.     Prescription**

Claims against the Issuer for payment of Distributions and sums in respect of the Optional Redemption Price or Liquidation Distribution of the Preferred Securities will be prescribed in accordance with English law unless made within 10 years from the date on which such payment becomes due or, if later, the date on which the Issuer makes such payment available to Holders.

**14.    Governing Law**

The Limited Partnership Agreement and the Preferred Securities shall be governed by, and construed in accordance with, English law.

## SUMMARY OF PROVISIONS RELATING TO THE PREFERRED SECURITIES
## IN GLOBAL FORM

**Initial Issue of Preferred Securities**

The Preferred Securities will be issued in registered form and will be initially represented by interests in a Global Certificate which will be deposited with JPMorgan Chase Bank, N.A., London Branch (the "**Common Depositary**") as common depositary for Euroclear and Clearstream, Luxembourg. The Preferred Securities will be registered in the name of the Initial Limited Partner, as nominee for the Common Depositary. For so long as the Preferred Securities are deposited and registered as described above, book-entry interests in the Preferred Securities will be shown on, and transfers of such interests will be effected only through, records maintained by Euroclear and Clearstream, Luxembourg.

**Exchange**

If either or both of Euroclear and Clearstream, Luxembourg is or are closed for business for a continuous period of 14 days (other than for the purposes of a public holiday) or announces an intention permanently to cease business, then a number of Preferred Securities corresponding to its book-entry interest in the Preferred Securities represented by the Global Certificate held by the Common Depositary referred to above will, subject to such reasonable requirements as the General Partner may require, be transferred to each holder of an interest in the Preferred Securities whose name is notified by the Common Depositary to the Registrar. Each such holder will be registered as a Holder in the Register and registered with the Registrar at Companies House in Cardiff on the Limited Partnerships Register accordance with the Act and will receive a certificate made out in its name. Other than in the circumstances referred to in this paragraph, definitive certificates will not be available to Holders.

**Accountholders**

So long as the Preferred Securities are registered in the name of a nominee for a common depositary for Euroclear and Clearstream, Luxembourg, the nominee for Euroclear and Clearstream, Luxembourg will be the sole registered owner or holder of the Preferred Securities represented by the Global Certificate for all purposes under the Limited Partnership Agreement. Except as set forth under *"Description of Preferred Securities – Transfers and Form"* and under *"Transfers of Interests"* below, the persons shown in the records of Euroclear, Clearstream, Luxembourg or any other clearing system as the holders of the Preferred Securities evidenced by the Global Certificate (each an "**Accountholder**") will not be entitled to have Preferred Securities registered in their names, will not receive or be entitled to receive physical delivery of definitive certificates evidencing interests in the Preferred Securities and will not be considered registered owners or holders thereof under the Limited Partnership Agreement. Accordingly, each Accountholder must rely on the rules and procedures of Euroclear and Clearstream, Luxembourg, as the case may be, to exercise any rights and obligations of an investor in Preferred Securities.

**Payment**

Each Accountholder must look solely to Euroclear or Clearstream, Luxembourg, as the case may be, for its share of each payment made by the Issuer to the registered holder of the Preferred Securities and in relation to all other rights arising under the Global Certificate, subject to and in accordance with the respective rules and procedures of Euroclear or Clearstream, Luxembourg, as the case may be. Such persons shall have no claim directly against the Issuer in respect of payments due on the Preferred Securities for so long as the Preferred Securities are represented by the Global Certificate and such obligations of the Issuer will be discharged by payment to the registered holder of the Preferred Securities in respect of each amount so paid.

**Transfers of Interests**

Accountholders will only be able to transfer their beneficial interests in the Preferred Securities in accordance with the restrictions described under *"Description of Preferred Securities – Transfers and Form"* and the rules and procedures of Euroclear or Clearstream, Luxembourg, as the case may be.

## SUBORDINATED GUARANTEE

*The following is the Subordinated Guarantee substantially in the form to be executed by the Guarantor.*

THIS DEED OF GUARANTEE (the "**Subordinated Guarantee**"), dated [Closing Date will be inserted here], 2005, is executed and delivered by Lehman Brothers Holdings plc (the "**Guarantor**") for the benefit of the Holders (as defined below).

WHEREAS the Guarantor desires to issue this Subordinated Guarantee for the benefit of the Holders, as provided herein.

NOW, THEREFORE the Guarantor executes and delivers this Subordinated Guarantee as a deed poll for the benefit of the Holders.

## 1.    Definitions

As used in this Subordinated Guarantee, capitalised terms not defined herein shall have the meanings ascribed to them in the Limited Partnership Agreement and otherwise the following terms shall, unless the context otherwise requires, have the following meanings:

"**Guaranteed Payments**" means (without duplication) collectively payments by the Guarantor in respect of an amount equal to (i) all Distributions due on the Preferred Securities, (ii) any Distributions on the Preferred Securities which would have been due had the Issuer had sufficient legally available resources but only if, and to the extent that, the Issuer did not have such legally available resources solely due to a failure by the issuer of the Subordinated Notes or Eligible Investments replacing such Subordinated Notes to pay interest thereon as and when due under the terms thereof, (iii) the Optional Redemption Price and (iv) any Additional Amounts;

"**Holder**" means, in respect of each Preferred Security, each person registered on the Register as the limited partner holding such Preferred Security at the relevant time, save that for as long as the Preferred Securities are registered in the name of a common depositary (or of a nominee for a common depositary) for Euroclear and Clearstream, Luxembourg, each person (other than Euroclear and Clearstream, Luxembourg) who is for the time being shown in the records of Euroclear and Clearstream, Luxembourg as the holder of an interest in any Preferred Securities (in which regard any certificate or other document issued by Euroclear or Clearstream, Luxembourg as to the number of Preferred Securities standing to the account of any person shall be conclusive and binding for all purposes) shall be treated by the Issuer, the Guarantor and any Paying and Transfer Agent as the holder of Preferred Securities in a nominal amount equal to such interest for all purposes other than with respect to payments, the right to which shall be vested in the name of the person appearing as the relative limited partner in the Register;

"**Junior Share Capital**" means the Guarantor's ordinary shares, together with any other securities or obligations of the Guarantor expressed to rank junior to this Subordinated Guarantee and the Parity Securities;

"**Limited Partnership Agreement**" means the Limited Partnership Agreement dated 25th August, 2005 establishing the Issuer, as amended from time to time;

"**Parity Securities**" means any non-cumulative preference shares, non-cumulative preferred securities (other than the Preferred Securities) or other securities either (a) issued directly by the Guarantor and ranking *pari passu* with the Guarantor's obligations under this Subordinated Guarantee including the Sterling and US dollar non-cumulative preference shares of the Guarantor outstanding or (b) issued by the Issuer or any Subsidiary or other entity and entitled to the benefit of this Subordinated Guarantee or benefiting from any other guarantee or support agreement from the Guarantor ranking *pari passu* with this Subordinated Guarantee which on the date hereof includes the outstanding €225,000,000 Fixed Rate to CMS-Linked Guaranteed Non-voting Non-cumulative Perpetual Preferred Securities of Lehman Brothers UK Capital Funding LP;

"**Preferred Securities**" means the outstanding Euro Fixed Rate Guaranteed Non-voting Non-cumulative Perpetual Preferred Securities of the Issuer, originally issued on the Closing Date, together with any further such preferred securities issued after the date of this Subordinated Guarantee, the Holders of which are entitled to the benefits of this Subordinated Guarantee as evidenced by the execution of this Subordinated Guarantee and "**Preferred Security**" shall be construed accordingly;

"**Tax**" means any present or future taxes or duties of whatsoever nature imposed or levied by or on behalf of the United Kingdom or any subdivision of or by any authority therein or thereof having power to tax;

"**Tier 1 Capital**" has the meaning ascribed to it in the Financial Services Authority's Guide to Banking Supervisor Policy or any successor publication replacing such guide; and

"**Tier 1 Securities**" mean any obligation of the Guarantor or, as the case may be, a Subsidiary or other entity which is treated, or is capable of being treated, as Tier 1 Capital of the Guarantor.

## 2.    Guarantee

2.1    Subject to the exceptions and limitations contained in the following provisions of this clause 2, the Guarantor irrevocably agrees to pay in full to the Holders the Guaranteed Payments, as and when due, to the extent that such payments shall not have been paid when due and payable by the Issuer regardless of any defence, right of set-off or counterclaim which the Issuer may have or assert. This Guarantee is continuing, irrevocable and absolute. The rights and claims of the Holders against the Guarantor under this Guarantee are subordinated as described in paragraph 2.9.

2.2    All Guaranteed Payments made hereunder will be made without withholding or deduction for or on account of any Tax, unless the withholding or deduction of such taxes, duties, assessments or governmental charges is required by law. In that event, the Guarantor will, provided that (if required at such time) the UK Regulator has not objected, pay such additional amounts (the "**Guarantor Additional Amounts**") as may be necessary in order that the net amounts received by the Holders after such withholding or deduction shall equal the amounts which would have been receivable under this Subordinated Guarantee in the absence of such withholding or deduction; except that no such Guarantor Additional Amounts will be payable to a Holder (or a third party on his behalf):

(a)    to the extent that such Tax is imposed or levied by virtue of such Holder (or the beneficial owner) of such Preferred Security having some connection with the United Kingdom, other than merely being a Holder (or beneficial owner) of such Preferred Security; or

(b)    where such withholding or deduction is imposed on a payment to or on behalf of an individual and is required to be made pursuant to European Union Directive 2003/48/EC on the taxation of savings or any law implementing or complying with, or introduced in order to conform to, such Directive; or

(c)    where the Holder would have been able to avoid such withholding or deduction by presenting the Preferred Securities to another Paying and Transfer Agent in a Member State of the European Union, insofar as presentation for payment is required.

2.3    The Guarantor hereby waives notice of acceptance of this Subordinated Guarantee and of any liability to which it applies or may apply, presentment, demand for payment, protest, notice of non-payment, notice of dishonour, notice of redemption and all other notices and demands.

2.4    The obligations, covenants, agreements and duties of the Guarantor under this Subordinated Guarantee shall in no way be affected or impaired by reason of the happening from time to time of any of the following:

(a)    the release or waiver, by operation of law or otherwise, of the performance or observance by the Issuer of any express or implied agreement, covenant, term or condition relating to the Preferred Securities to be performed or observed by or on behalf of the Issuer;

(b)    the extension of time for the payment by or on behalf of the Issuer of all or any portion of any Distribution, the Optional Redemption Price, the Liquidation Distribution or any other sums payable under the terms of the Preferred Securities or the extension of time for the performance of any other obligation under, arising out of, or in connection with, the Preferred Securities;

(c)    any failure, omission, delay or lack of diligence on the part of Holders to enforce, assert or exercise any right, privilege, power or remedy conferred on the Holders pursuant to the terms of the Preferred Securities, or any action on the part of the Issuer granting indulgence or extension of any kind;

(d)    the voluntary or involuntary winding-up, dissolution, amalgamation, reconstruction, sale of any collateral, receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganisation, arrangement, composition or readjustment of debt of, or other similar proceedings affecting, the Issuer or any of the assets of the Issuer;

(e)    any invalidity of, or defect or deficiency in, the Preferred Securities; or

(f)    the settlement or compromise of any obligation guaranteed hereby or hereby incurred.

There shall be no obligation on the Holders to give notice to, or obtain consent of, the Guarantor with respect to the occurrence of any of the foregoing.

2.5    This Subordinated Guarantee shall be deposited with and held by the Registrar until all the obligations of the Guarantor have been discharged in full. The Guarantor hereby acknowledges the right of every Holder to the production of, and the right of every Holder to obtain a copy of, this Subordinated Guarantee from the Registrar.

2.6    A Holder may enforce this Subordinated Guarantee directly against the Guarantor, and the Guarantor waives any right or remedy to require that any action be brought against the Issuer or any other person or entity before proceeding against the Guarantor. All waivers contained in this Subordinated Guarantee shall be without prejudice to the right to proceed against the Issuer and the General Partner as permitted by the terms of the Preferred Securities. The Guarantor agrees that this Subordinated Guarantee shall not be discharged except by complete performance of all obligations of the Guarantor under this Subordinated Guarantee.

2.7    The Guarantor shall be subrogated to any and all rights of the Holders against the assets of the Issuer in respect of any amounts paid to the Holders by the Guarantor under this Subordinated Guarantee. The Guarantor shall not (except to the extent required by mandatory provisions of law) exercise any rights which it may acquire by way of subrogation or any indemnity, reimbursement or other agreement, in all cases as a result of a payment under this Subordinated Guarantee, if, at the time of any such payment, any amounts are due and unpaid under this Subordinated Guarantee. If the Guarantor shall receive or be paid any amount with respect to the Preferred Securities in violation of the preceding sentence, the Guarantor agrees to pay over such amount to the Holders.

2.8    The Guarantor acknowledges that its obligations hereunder are several and independent of the obligations of the Issuer with respect to the Preferred Securities and that the Guarantor shall be liable as principal and sole obligor hereunder to make Guaranteed Payments pursuant to the terms of this Subordinated Guarantee, notwithstanding the occurrence of any event referred to in clause 2.5.

2.9    Subject to applicable law, the Guarantor agrees that its obligations hereunder constitute unsecured obligations of the Guarantor subordinated in right of payment to Senior Creditors and will at all times rank:

(a)    junior to all liabilities of the Guarantor including subordinated liabilities (in each case other than any liability of the Guarantor which constitutes or would, but for any applicable limitation on the amount of such capital, constitute Tier 1 Capital or which is referred to in (b) or (c) below and any other liability expressed to rank *pari passu* with or junior to this Subordinated Guarantee) (the "**Senior Creditors**");

30

(b)     *pari passu* with Parity Securities, if any, issued by the Guarantor and any guarantee or support agreement of the Guarantor ranking *pari passu* with this Subordinated Guarantee and issued in respect of Parity Securities issued by the Issuer or any Subsidiary; and

(c)     senior to the Junior Share Capital of the Guarantor.

2.10    No Holder shall following any breach by the Guarantor of any of its obligations under this Subordinated Guarantee be entitled to exercise any right of set-off or counterclaim which may be available to it against amounts owing by the Guarantor to such Holder. Notwithstanding the provisions of the foregoing sentence, if any of the said rights and claims of any Holder against the Guarantor is discharged by set-off, such Holder will immediately pay an amount equal to the amount of such discharge to the Guarantor or, in the event of its winding-up, the liquidator of the Guarantor and until such time as payment is made will hold a sum equal to such amount in trust for the Guarantor, or the liquidator of the Guarantor, and accordingly any such discharge will be deemed not to have taken place.

2.11    In the event of the winding-up of the Guarantor if any payment or distribution of assets of the Guarantor of any kind or character, whether in cash, property or securities, including any such payment or distribution which may be payable or deliverable by reason of the payment of any other indebtedness of the Guarantor being subordinated to the payment of amounts owing under this Subordinated Guarantee, shall be received by any Holders, before the claims of Senior Creditors have been paid in full, such payment or distribution shall be held in trust by the Holder, as applicable, and shall be immediately returned by it to the liquidator of the Guarantor and in that event the receipt by the liquidator shall be a good discharge to the relevant Holder. Thereupon, such payment or distribution will be deemed not to have been made or received.

## 3.     Undertaking of the Guarantor

The Guarantor will procure that it will maintain, at all times whilst the Preferred Securities are outstanding and whilst the Preferred Securities are admitted to trading on the regulated market of any Stock Exchange, a Paying and Transfer Agent in such location as is required to maintain such admission to trading.

## 4.     Termination

With respect to the Preferred Securities, this Subordinated Guarantee shall terminate and be of no further force and effect upon the earliest of:

4.1     full payment of the Optional Redemption Price; or

4.2     purchase and cancellation of all Preferred Securities,

4.3     dissolution of the Issuer,

provided however that this Subordinated Guarantee will continue to be effective or will be reinstated, as the case may be, if at any time payment of any sums paid in respect of the Preferred Securities or under this Subordinated Guarantee must be restored by a Holder for any reason whatsoever.

## 5.     Transfer; Amendment; Notices

5.1     Subject to operation of law, all guarantees and agreements contained in this Subordinated Guarantee shall bind the successors, assigns, receivers, trustees and representatives of the Guarantor and shall inure to the benefit of the Holders. The Guarantor shall not transfer its obligations hereunder without (i) the prior approval of the Holders of not less than a simple majority in Liquidation Preference of the outstanding Preferred Securities (excluding any Preferred Securities held by the Guarantor or any Subsidiary of the Guarantor), or (ii) the sanction of a resolution, passed by Holders representing at least a simple majority in Liquidation Preference of the Preferred Securities present or represented at a separate meeting at which the quorum shall be Holders present or represented holding at least one-third in Liquidation Preference of the outstanding Preferred Securities and otherwise convened and

held in accordance with procedures contained in Schedule 2 to the Limited Partnership Agreement and applicable law.

5.2    Except for those changes (a) required by clause 3.1 hereof; or (b) which do not adversely affect the rights of Holders (in any of which cases no agreement will be required), this Subordinated Guarantee shall be changed only by agreement in writing signed or sealed by the Guarantor with the prior approval of the Holders of not less than a simple majority in Liquidation Preference of the outstanding Preferred Securities (excluding any Preferred Securities held by the Guarantor or any Subsidiary of the Guarantor), or the sanction of a resolution, passed by Holders of at least a simple majority in Liquidation Preference of the Preferred Securities present or represented at a separate meeting at which the quorum shall be Holders present or represented holding at least one-third in Liquidation Preference of the outstanding Preferred Securities.

5.3    Any notice, request or other communication required or permitted to be given hereunder to the Guarantor shall be given in writing by delivering the same against receipt therefor or be addressed to the Guarantor, as follows, to:

Lehman Brothers Holdings plc

Address:    25 Bank Street
London E14 5LE
England

Attention:    Head of Legal Department

Telephone:    +44 20 7102 1000

The address of the Guarantor may be changed at any time and from time to time and shall be the most recent such address furnished in writing by the Guarantor to the Registrar.

Any notice, request or other communication required or permitted to be given hereunder to the Holders shall be given by the Guarantor in the same manner as notices sent on behalf of the Issuer to Holders.

5.4    This Subordinated Guarantee is solely for the benefit of the Holders and is not separately transferable from their interests in respect of the Preferred Securities.

## 6.    Governing Law

This Subordinated Guarantee is governed by, and shall be construed in accordance with, English law.

IN WITNESS WHEREOF this Subordinated Guarantee has been executed as a deed poll on behalf of the Guarantor.

EXECUTED as a DEED by

LEHMAN BROTHERS HOLDINGS PLC

acting by

and

### USE OF PROCEEDS

The net proceeds of the issue of the Preferred Securities which will be set out in the Final Terms will augment the capital base of LBHI and the Guarantor. The Issuer will use the net proceeds of the issue of the Preferred Securities to subscribe for the Subordinated Notes.

## LEHMAN BROTHERS UK CAPITAL FUNDING II LP

**Introduction**

The Issuer was registered in England and Wales on 26th August, 2005 under the Limited Partnerships Act 1907, with LB GP No. 1 Ltd. as the general partner (in such capacity, the "**General Partner**") and LB Investment Holdings Ltd as the preferential limited partner (the "**Preferential Limited Partner**"). The General Partner, the Preferential Limited Partner and CNL have, *inter alios*, entered into a limited partnership agreement on 25th August, 2005 (the "**Limited Partnership Agreement**") for the purpose of establishing the Issuer. Pursuant to the Limited Partnership Agreement, it is intended that CNL, as the nominee company of the common depositary for Euroclear and Clearstream, Luxembourg will become a limited partner (i.e. the Initial Limited Partner) of the Issuer with effect from the Closing Date. The Issuer is not a legal entity separate from its partners and has no subsidiaries. The Limited Partnership Agreement does not create a trust relationship between any of the partners. The Issuer will be dissolved upon redemption of the Preferred Securities. The Issuer's registered office is 25 Bank Street, London E14 5LE. It has no telephone number.

The General Partner, incorporated with limited liability in England and Wales with registered number 5355491 is a wholly owned subsidiary of LBHI and is the sole general partner of the Issuer. The General Partner's registered office is 25 Bank Street, London E14 5LE. As such, the General Partner solely manages the Issuer (subject to the appointment by the Issuer of the Administrator as described below). The Issuer is a wholly controlled subsidiary undertaking of the General Partner. The General Partner fulfils a similar function for Lehman Brothers UK Capital Funding I LP. The duties and functions to the General Partner are contained in the Limited Partnership Agreement. None of such duties or function given rise to any potential conflict of interest between duties owed to the Issuer and any other interests of the General Partner. The Guarantor will undertake in the Subordinated Guarantee to ensure that, unless otherwise approved by a simple majority of the Holders, the General Partner will at all times be either the Guarantor itself or a directly or indirectly wholly-owned subsidiary of the Guarantor.

The Preferential Limited Partner, incorporated with limited liability in England and Wales with registered number 4385277 is a wholly owned Subsidiary of LBHI. The Preferential Limited Partner shall be entitled to receive all amounts received by the Issuer from its investment in the Subordinated Notes or Eligible Investments (each as defined herein under "*Description of the Preferred Securities*"), as the case may be, in excess of those required to make payments in respect of the Preferred Securities.

Provided that they do not become involved with the administration of the limited partnership, and subject to compliance with the provisions of the Act, the liability of persons registered as limited partners of the Issuer pursuant to the Act for the debts or obligations of the limited partnership will be limited to the amount of partnership capital which they have contributed or agreed to contribute to the partnership, i.e. €1,000 per Preferred Security.

No financial statements of the Issuer have yet been prepared. The first financial statements of the Issuer are expected to be prepared for the period ending 30th November, 2005. Thereafter, it is intended that the Issuer will prepare audited annual financial statements. It is not intended that the Issuer will publish interim financial statements.

**Activity**

The business of the Issuer is generally to raise finance for the Group and is more particularly described in the Limited Partnership Agreement. The Issuer has carried out no operations since its registration other than in relation to the creation of the Preferred Securities. The capital contributions to be made by the Limited Partners will be used by the Issuer to subscribe for the Subordinated Notes.

**Administration**

For UK regulatory purposes, the Issuer will be operated by the General Partner or, insofar as the General Partner is not so authorised, by an administrator (the "**Administrator**") authorised by the Financial Services Authority under the Financial Services and Markets Act 2000 (the "**FSMA**") to establish, operate and wind-up collective investment schemes. The registered office of the Issuer and the General Partner is 25 Bank Street, London E14 5LE. Neither the Initial Limited Partner nor any Holder may participate in the administration of the Issuer.

The General Partner has agreed to contribute capital from time to time to the extent required for the Issuer to meet any operating expenses which it may have. The General Partner has also agreed that it will at all times maintain sole ownership, whether directly or indirectly, of its general partner interest in the Issuer, subject to the terms of the Limited Partnership Agreement. The Limited Partnership Agreement provides that all of the Issuer's business and affairs will be conducted by the General Partner save for those operational matters required to be performed by an Administrator under the FSMA. The General Partner will have unlimited liability for the debts and obligations of the Issuer to the extent that these cannot be satisfied out of partnership assets.

If the Issuer is dissolved, the Limited Partnership Agreement provides that the General Partner will only be entitled to any assets of the Issuer remaining after (i) all debts and other liabilities of the Issuer have been satisfied in full and (ii) the full Liquidation Preference to which the Holders are entitled and all other amounts to which the holders of any other partnership interests are entitled have been paid to, or irrevocably set aside for, such holders.

**Capitalisation**

In addition to the initial capital contribution by the General Partner of €1.00, the initial capital contribution of €1.00 of the Preferential Limited Partner and the preferred capital contribution equating to the aggregate nominal amount of the Preferred Securities to be made by the Initial Limited Partner in relation to the Preferred Securities on the date of issue of the Preferred Securities and such other capital contributions as may be made by the General Partner from time to time to meet certain operating expenses of the partnership, the General Partner may accept additional limited partners and additional capital contributions to the Issuer in accordance with the provisions of the Limited Partnership Agreement. Limited partnerships do not have share capital.

**Indebtedness**

Since the date of its registration, the Issuer has not had any loan capital outstanding, has not incurred any borrowings, has had no contingent liabilities, has not granted any guarantees and does not intend to have outstanding any such loan capital, incur any such borrowings, have any such contingent liabilities or grant any such guarantees other than in connection with the issue of the Preferred Securities and other partnership interests in the Issuer. The General Partner has undertaken in the Limited Partnership Agreement not to incur any indebtedness in the name of the Issuer other than the costs and expenses incidental to creating the Preferred Securities and the Issuer and any other partnership interests in the Issuer, performing its obligations in respect of the Limited Partnership Agreement, maintaining the listings of the Preferred Securities, the Register, the Registrar, the Paying and Transfer Agents and listing agents in respect of the Preferred Securities and corresponding agents (where applicable) with respect to any other partnership interests in the Issuer, the Issuer's holding of the partnership assets and any other securities acquired with any other capital contributions to the Issuer or substitutions therefor and the maintenance of any custodian therefor, the exercise of the Issuer's rights in respect of the partnership assets and any other securities acquired with any other capital contributions to the Issuer or substitutions therefor and the administration of the Issuer.

# LEHMAN BROTHERS HOLDINGS PLC

**General**

The Guarantor was incorporated in England on 11th October, 1984 (with registration number 1854685) as a private limited company for an unlimited duration under the Companies Act 1948-81 and was re-registered as a public limited company under the Companies Act 1985 on 6th August, 1986. The Guarantor is an indirectly wholly-owned subsidiary of LBHI which is the parent company of the Lehman Brothers group of companies.

The Guarantor's memorandum of association permits it to carry out any business. It was originally organised to act as a UK holding company of LBHI's UK incorporated businesses, but since 1986 its principal activity has been to hold fixed asset investments in both subsidiary undertakings and non-subsidiary undertakings. Pursuant to the Guarantor's memorandum of association, the Guarantor's objects include, but are not limited to, borrowing and raising money and guaranteeing the performance of obligations of any person associated with the Guarantor.

The Guarantor has a number of subsidiary undertakings including wholly-owned subsidiaries, on which it depends, Lehman Brothers International (Europe), Lehman Brothers Europe Ltd and Lehman Brothers Limited. The average number of persons employed by the Guarantor during 2004 was 7 and, as at the date of this Prospectus, is 7.

The Guarantor has not made any significant investments since 30th November, 2004, being the date of its last audited accounts.

The registered office and principal place of business of the Guarantor is at 25 Bank Street, London, E14 5LE, telephone (44) 207 102 1000.

**Directors of the Guarantor and corporate governance**

The board of directors of the Guarantor are Ian Lowitt, Paolo R. Tonucci, Richard J.A. Amat, Ian Jameson, Antony J Rush, Marcus Jackson and Justin van Wijngaarden. The business address of each of the above is 25 Bank Street, London, E14 5LE.

All of the directors of the Guarantor are executive directors. Each of the directors are also employees of other members of the Lehman Brothers group of companies. None have business interests outside the Lehman Brothers group of companies which are significant with respect to the Guarantor.

There are no potential conflicts of interest between any duties to the Guarantor of the directors and their private interests and/or other duties.

The Guarantor does not have a separate audit committee.

The Guarantor complies with English corporate governance rules to the full extent applicable to it.

**Share capital of the Guarantor**

As of the date of this Prospectus, the share capital of the Guarantor is comprised as follows:

- Ordinary Shares, £1.00 par value; 79,750,000 authorised: 40,021,100 allotted, called up and fully-paid

- Ordinary Shares $1.00 par value; 1,000,000,000 authorised: 653,800,000 allotted, called up and fully-paid

- Ordinary B Shares, £1.00 par value; 250,000 authorised; zero called up and fully-paid

- Preference Shares, non-cumulative, redeemable, £1.00 par value; 20,000,000 authorised: 20,000,000 allotted, called up and fully-paid

- Preference Shares, non-cumulative, redeemable, $1.00 par value; $2,000,000,000 authorised: 1,910,000,000 allotted, called up and fully-paid

On 30th March, 2005 the Guarantor entered into a subordinated guarantee (in terms substantially identical to the Subordinated Guarantee) in respect of the €225,000,000 Fixed Rate to CMS-Linked Guaranteed Non-voting Non-cumulative Perpetual Preferred Securities of Lehman Brothers UK Capital Funding LP.

**Preference Shares of the Guarantor**

The Preference Shares of the Guarantor confer the following rights upon the holders thereof (as extracted from the Articles of Association of the Guarantor) – as referred to below, "Company" means the Guarantor.

"(A)   As regards the income and capital:

    (a)   the right to receive out of the profits of the Company available for dividend a fixed non-cumulative preferential dividend of £100 per annum; and

    (b)   the right in a winding up or other return of capital to receive out of the assets of the Company available for distribution among the Members an amount equal to the capital paid up or credited as paid up together with a sum equal to any arrears of the fixed non-cumulative preferential dividend referred to in (a) above, provided that the same shall have been declared

in priority to any payment to the holders of any other class of shares but shall confer no further right to participate in the profits or assets of the Company.

(B)   As regards voting:

The Preference Shares shall not entitle the holders to receive notice of, or to attend and vote at, any general meeting of the Company.

(C)   As regards redemption:

The Preference Shares may be redeemed upon, and subject to, the following terms and conditions:-

    (a)   The Company may at any time, subject to the provisions of the Companies Acts, redeem the Preference Shares upon giving to the holders of the Preference Shares not less than one month's previous notice in writing.

    (b)   Any notice of redemption shall specify the date fixed for redemption and the place at which the certificates for the Preference Shares are to be presented for redemption and upon such date each of the holders of the Preference Shares shall be bound to deliver to the Company at such place the certificates for such of the Preference Shares as are held by him in order that the same may be cancelled. Upon such delivery the Company shall pay to such holder the amount due to him in respect of such redemption.

    (c)   There shall be paid on each Preference Share redeemed the amount paid up or credited as paid up thereon together with an amount equal to any arrears of the fixed non-cumulative preferential dividend thereon (together with a certificate for the related tax credit) to be calculated up to and including the date fixed for redemption and to be payable provided such dividend has been declared.

    (d)   The receipt of the registered holder for the time being of any Preference Shares or in the case of joint registered holders the receipt of any of them for the moneys payable on redemption thereof shall constitute an absolute discharge to the Company in respect thereof.

    (e)   Any Preference Share redeemed pursuant to this paragraph (3) shall, by virtue of this paragraph, be converted and, if necessary, consolidated or sub-divided into Ordinary Shares each of a like nominal amount (as nearly as may be) as any Ordinary Shares then forming part of the authorised share capital of the Company or, if there are no such Ordinary Shares, of a like nominal amount (as nearly as may be) as the Ordinary Shares then in issue and the

37

Directors shall have the power to issue Ordinary Shares of such nominal amount in anticipation of redemption to the extent permitted by Section 160(5) of the Companies Act 1985.

## SUMMARY FINANCIAL INFORMATION OF THE GUARANTOR

The following table sets forth selected non-consolidated financial information on the Guarantor as of the dates and for the periods indicated. The selected non-consolidated financial information set out are below is extracted without material adjustment from the audited non-consolidated financial statements of the Guarantor for the year ended 30th November, 2004.

**Profit and Loss Account Data**

|  | Year ended 30th November, 2004 | Year ended 30th November, 2003 |
|---|---|---|
|  | $000's | $000's |
| Operating (Loss)/Income ........................................................ | (67,115) | 322,255 |
| Administrative Expenses ......................................................... | (2,788) | (2,883) |
| **Operating (Loss)/Profit** ....................................................... | (69,903) | 319,372 |
| Interest receivable and similar income.................................... | 58,162 | 11,692 |
| Interest payable and similar charges ...................................... | (119,302) | (182,706) |
| **Profit/(Loss) on Ordinary Activities before Taxation** ........ | (131,043) | 148,358 |
| Tax on profit on ordinary activities ....................................... | – | – |
| **Profit/(Loss) on Ordinary Activities after Taxation** ........... | (131,043) | 148,358 |
| Dividend paid ......................................................................... | – | – |
| **Profit/(Loss) Retained for the Year** .................................... | (131,043) | 148,358 |

**Balance Sheet Data**

|  | Year ended 30th November, 2004 | Year ended 30th November, 2003 |
|---|---|---|
|  | $000's | $000's |
| Total assets ............................................................................. | 8,106,443 | 5,897,981 |
| Total current liabilities[1]....................................................... | 5,813,594 | 4,535,948 |
| Long-term liabilities[1] ........................................................... | 0 | 3,041 |
| Total shareholders' funds ....................................................... | 2,292,849 | 1,358,992 |
| Total capital (shareholders' funds and long-term liabilities) .................. | 2,292,849 | 1,362,033 |

Note:

1.    For the years ended 30th November, 2004 and 30th November, 2003, the total liabilities of the Guarantor consist of the sum of the Total current liabilities and the Long-term liabilities.

## LEHMAN BROTHERS HOLDINGS INC.

LBHI, together with its subsidiaries (collectively, "**Lehman Brothers**" or the "**Group**"), is an innovator in global finance, serving the financial needs of corporations, governments and municipalities, institutional clients and individuals worldwide. Lehman Brothers provides a full array of equities and fixed income sales, trading and research, investment banking services and investment management and advisory services. Its global headquarters in New York and regional headquarters in London and Tokyo are complemented by offices in additional locations in North America, Europe, the Middle East, Latin America and the Asia Pacific region. The Group, through predecessor entities, was founded in 1850.

Lehman Brothers is a global market-maker in all major equity and fixed income products. To facilitate Lehman Brothers' market-making activities, it is a member of all principal securities and commodities exchanges in the United States and it holds memberships or associated memberships on several principal international securities and commodities exchanges including the London, Tokyo, Hong Kong, Frankfurt, Paris, Milan and Australian stock exchanges.

Lehman Brothers' principal business activities are investment banking, capital markets facilitation and investment management. Through its investment banking, trading, research, structuring and distribution capabilities in equity and fixed income products, Lehman Brothers continues to build on its client/customer business model which is based on Lehman Brothers' principal focus of facilitating client transactions in all major global capital markets products and services. Lehman Brothers generates customer flow revenues from institutional, corporate, government and high net worth clients/customers by (i) advising on and structuring transactions specifically suited to meet client needs; (ii) serving as a market maker and/or intermediary in the global marketplace, including having securities and other financial instrument products available to allow clients to rebalance their portfolios and diversify risks across different market cycles; (iii) providing investment management and advisory services; and (iv) acting as an underwriter to clients. As part of Lehman Brothers' customer flow activities, Lehman Brothers maintains inventory positions of varying amounts across a broad range of financial instruments. In addition, it also takes proprietary trading positions, the success of which is dependent on its ability to anticipate economic and market trends. The financial services industry is significantly influenced by worldwide economic conditions as well as other factors inherent in the global financial markets. As a result, revenues and earnings may vary from quarter to quarter and from year to year. Lehman Brothers believes its customer flow orientation helps to mitigate overall revenue volatility.

Lehman Brothers operates in three business segments: Investment Banking, Capital Markets and Investment Management.

Lehman Brothers is engaged primarily in providing financial services. Other businesses in which it is engaged represent less than 10 percent of each of consolidated assets, revenues and pre-tax income.

LBHI was incorporated with limited liability for an unlimited duration in the State of Delaware on 29th December, 1983. LBHI's principal executive offices are located at 745 Seventh Avenue, New York, New York 10019, U.S.A.

Several of LBHI's principal subsidiaries are subject to various capital adequacy requirements promulgated by the regulatory, banking and exchange authorities of the countries in which they operate and/or to capital targets established by various ratings agencies. The regulatory rules referred to above, and certain covenants contained in various debt agreements, may restrict LBHI's ability to withdraw capital from its subsidiaries by dividends, loans or other payments. (Further information about these requirements and restrictions is contained in "Management's Discussion and Analysis - Liquidity, Funding and Capital Resources" and in Note 17 of the Notes to Consolidated Financial Statements in LBHI's 2004 Annual Report, included in its most recent Annual Report on Form 10-K.) Additionally, the ability of LBHI to participate as an equity holder in any distribution of assets of any subsidiary is generally subordinate to the claims of creditors of the subsidiary.

**Management**

**Board of Directors of LBHI**

Set forth below are the names, the principal occupations and principal outside activities of the current members of the board of directors of LBHI, each of whose business address in their capacity as a director is at LBHI's principal place of business:

| Name | Principal Occupation | Principal Outside Activities |
|---|---|---|
| Richard S. Fuld, Jr | Chairman and Chief Executive Officer of LBHI | Trustee of the Mount Sinai Medical Center and the Mount Sinai Children's Center Foundation, member of the Executive Committee of the Partnership for New York City, Business Roundtable and The Business Council, Director of The Ronald McDonald House of New York, Trustee of Middlebury College. |
| Michael L. Ainslie | Private Investor and Former President and Chief Executive Officer of Sotheby's Holdings | Director of St. Joe Company and Lehman Brothers Bank, FSB, Trustee of Vanderbilt University, Chairman of the Posse Foundation and Director of the U.S. Tennis Association Foundation. |
| John F. Akers | Retired Chairman of International Business Machines Corporation | Director of W. R. Grace & Co., The New York Times Company, PepsiCo, Inc. and Hallmark Cards, Inc. |
| Roger S. Berlind | Theatrical Producer | Theatrical producer and principal of Berlind Productions and Governor of the League of American Theatres and Producers. |
| Thomas H. Cruikshank | Retired Chairman and Chief Executive Officer of Halliburton Company | Director of Lehman Brothers Inc. |
| Sir Christopher Gent | Non-Executive Chairman of GlaxoSmithKline plc | Director of the International Advisory Board of Hakluyt & Co. and a Senior Advisor to Bain & Company, Inc. |
| Marsha Johnson Evans | President and Chief Executive Officer of the American Red Cross | Director of The May Department Stores Company and Weight Watchers International Inc., member of the Advisory Board of the Pew Partnership for Civic Change, a project of the Pew Charitable Trusts, Director of the Naval Academy Foundation and a Presidential Appointee to the Board of Visitors of the United States Military Academy at West Point. |
| Henry Kaufman | President of Henry Kaufman & Company, Inc. | Member (and the Chairman Emeritus) of the Board of Trustees of the Institute of International Education, a Member of the Board of Trustees of New York University, a Member (and the Chairman Emeritus) of the Board of Overseers of the Stern School of Business of New York University, a Member of the Board of Trustees of the Animal Medical Center, a Member of the Board of Trustees of the Whitney Museum of American Art, a |

41

|  |  | Member of the International Advisory Committee of the Federal Reserve Bank of New York, a Member of the Advisory Committee to the Investment Committee of the International Monetary Fund Staff Retirement Plan, a Member of the Board of Governors of Tel-Aviv University and Treasurer (and former Trustee) of The Economic Club of New York. |
| John D. Macomber | Principal of JDM Investment Group | Director of AEA Investors Inc., Mettler-Toledo International, Sovereign Specialty Chemicals, Inc. and Textron Inc. Chairman of the Council for Excellence in Government and Vice Chairman of the Atlantic Council, Director of the National Campaign to Prevent Teen Pregnancy and the Smithsonian Institute and a Trustee of the Carnegie Institution of Washington and the Folger Library. |
| Dina Merrill | Director and Vice Chairman of RKO Pictures, Inc. and Actress | Vice President of the New York City Mission Society, Trustee of the Eugene O'Neill Theater Foundation, Director of Orbis International, the Juvenile Diabetes Foundation and the Museum of Television and Radio. |

**Executive Officers of LBHI**

| Richard S. Fuld, Jr. | Chairman and Chief Executive Officer |
| Jonathan E. Beyman | Chief of Operations and Technology |
| David Goldfarb | Chief Administrative Officer |
| Joseph M. Gregory | President and Chief Operating Officer |
| Christopher M. O'Meara | Chief Financial Officer |
| Thomas A. Russo | Executive Vice President and Chief Legal Officer |

**Employees**

As of 30th November, 2004, Lehman Brothers employed approximately 19,600 persons, including 14,100 in North America and 5,500 internationally. Lehman Brothers considers its relationship with its employees to be good.

## CONSOLIDATED CAPITALISATION AND INDEBTEDNESS OF LBHI

All of the financial information below is extracted without material adjustment from the audited consolidated financial statements of LBHI included in LBHI's Quarterly Report on Form 10-Q for the six months ended 31st May, 2005 filed with the SEC.  The following table sets forth the audited consolidated capitalisation and indebtedness of LBHI and its subsidiaries as of 31st May, 2005 and 30th November, 2004[1]:

|  | At 31st May, 2005 | At 30th November, 2004 |
|---|---|---|
|  | *(U.S.$ millions)* | |
| **Commercial paper and short-term debt** ............................................... | 2,592 | 2,857 |
| **Long-term indebtedness**: | | |
| Senior notes ........................................................................................ | 56,451 | 53,561 |
| Subordinated indebtedness[2] ................................................................ | 3,358 | 2,925 |
| Total long-term indebtedness ............................................................... | 59,809 | 56,486 |
| Total commercial paper, short- and long-term indebtedness .................... | 62,401 | 59,343 |
| **Stockholders' equity**: | | |
| Preferred Stock: | | |
|  | 1,095 | 1,345 |
| Common Stock: $0.10 par value: 600,000,000 shares authorised: | | |
| Shares issued: 300,741,868 in 2005 and 297,796,197 in 2004; | | |
| Shares outstanding: 272,470,797 in 2005 and 274,159,411 in 2004 ............ | 30 | 30 |
| Additional paid-in capital ...................................................................... | 6,312 | 5,865 |
| Accumulated other comprehensive income (net of tax) ......................... | (20) | (19) |
| Retained earnings ................................................................................. | 10,643 | 9,240 |
| Other stockholders' equity, net .............................................................. | 1,053 | 741 |
| Common Stock in treasury at cost: 28,271,071 shares in 2005 and 23,636,786 shares in 2004 ..................................................................................... | (3,235) | (2,282) |
| Total stockholders' equity ...................................................................... | 15,878 | 14,920 |
| Total commercial paper, short- and long-term indebtedness, trust preferred securities and stockholders' equity .................................................... | 78,279 | 74,263 |

_____

Notes:

1. There has been no material change in the capitalisation, indebtedness and contingent liabilities of LBHI since 30th November, 2004. For more information about LBHI's common stock, preferred stock, short-term financings, long-term debt and contingent liabilities, see the Notes to Consolidated Financial Statements included in LBHI's Annual Report on Form 10-K for the twelve months ended 30th November, 2004.

2. LBHI adopted FIN 46R effective 29th February, 2004, which required us to deconsolidate trusts that issue preferred securities subject to mandatory redemption.  Accordingly, at 29th February, 2004 and subsequent period ends, Subordinated indebtedness includes junior subordinated debentures that at 30th November, 2003 and prior period ends were classified as Preferred securities subject to mandatory redemption.  See Accounting and Regulatory Developments and Note 9 in LBHI's Annual Report on Form 10-K for the twelve months ended 30th November, 2004.

## SUMMARY FINANCIAL INFORMATION OF LBHI

The following table sets forth selected consolidated financial information on LBHI as of the dates and for the periods indicated.  The selected consolidated financial information as of and for the six month period ended 31st May, 2005 and the twelve month periods ended 30th November, 2001, 2002, 2003 and 2004 are extracted without material adjustment from the audited consolidated financial statements of LBHI included or incorporated by reference in LBHI's Annual Report on Form 10-K for the twelve month period ended 30th November, 2004, 2003, 2002 or 2001 filed with the SEC.

**Statement of Income Data**

| | Six Months ended 31st May, 2005 | Year ended 30th November, 2004 | Year ended 30th November, 2003 | Year ended 30th November, 2002 | Year ended 30th November, 2001 |
|---|---|---|---|---|---|
| | *(in U.S.$ millions)* | | | | |
| **Revenues**: | | | | | |
| Principal transactions.............................. | 3,839 | 5,699 | 4,272 | 1,951 | 2,779 |
| Investment banking ................................ | 1,262 | 2,188 | 1,722 | 1,731 | 2,000 |
| Commissions .......................................... | 832 | 1,537 | 1,210 | 1,286 | 1,091 |
| Interest and dividends ............................ | 8,338 | 11,032 | 9,942 | 11,728 | 16,470 |
| Other ...................................................... | 455 | 794 | 141 | 85 | 52 |
| Total revenues ........................................ | 14,726 | 21,250 | 17,287 | 16,781 | 22,392 |
| Interest expense ...................................... | 7,638 | 9,674 | 8,640 | 10,626 | 15,656 |
| Net revenues .......................................... | 7,088 | 11,576 | 8,647 | 6,155 | 6,736 |
| **Non-Interest Expenses**: | | | | | |
| Compensation and benefits ..................... | 3,509 | 5,730 | 4,318 | 3,139 | 3,437 |
| Other expenses......................................... | 1,260 | 2,328 | 1,793 | 1,617 | 1,551 |
| **Total non-interest expenses**.................. | 4,769 | 8,058 | 6,111 | 4,756 | 4,988 |
| Income before taxes and dividends on trust preferred securities .................... | 2,319 | 3,518 | 2,536 | 1,399 | 1,748 |
| Provision for income taxes .................... | 761 | 1,125 | 765 | 368 | 437 |
| Dividends on trust preferred securities .. | 0 | 24 | 72 | 56 | 56 |
| Net income.............................................. | 1,558 | 2,369 | 1,699 | 975 | 1,255 |
| Net income applicable to common stock | 1,520 | 2,297 | 1,649 | 906 | 1,161 |
| **Earnings per common share** (**diluted**): | 5.17 | 7.90 | 6.35 | 3.47 | 4.38 |

**Balance Sheet Data**

|  | At 31st May, 2005 | At 30th November, 2004 | At 30th November, 2003 | At 30th November, 2002 | At 30th November, 2001 |
|---|---|---|---|---|---|
|  | *(in U.S.$ millions)* | | | | |
| Total assets.................................................. | 370,595 | 357,168 | 312,061 | 260,336 | 247,816 |
| Net assets[1] ............................................... | 193,989 | 175,221 | 163,182 | 140,488 | 141,354 |
| Commercial paper and short-term debt.. | 2,592 | 2,857 | 2,331 | 2,369 | 3,992 |
| Long-term debt[2] ...................................... | 59,809 | 56,486 | 43,529 | 38,678 | 38,301 |
| Total liabilities ......................................... | 354,717 | 342,248 | 297,577 | 250,684 | 238,647 |
| Total stockholders' equity ...................... | 15,878 | 14,920 | 13,174 | 8,942 | 8,459 |
| Total capital[3] ........................................... | 75,687 | 71,406 | 58,013 | 48,330 | 47,470 |

Notes:

1.    Net assets represent total assets excluding cash and securities segregated and on deposit for regulatory and other purposes, securities received as collateral, securities purchase under agreements to resell, securities borrowed and identifiable intangible assets and goodwill. LBHI believes net assets is a more useful measure than total assets to investors when comparing companies in the securities industry because it excludes certain assets considered to have a low risk profile and identifiable intangible assets and goodwill.  Net assets as presented by LBHI is not necessarily comparable to similarly titled measures presented by other companies in the securities industry because of different methods of calculation.

2.    Long-term debt includes senior notes and subordinated debt and includes $1.0 billion of junior subordinated debentures at 30th November, 2004.  LBHI adopted FIN 46R effective 29th February, 2004, which required us to deconsolidate trusts that issue preferred securities subject to mandatory redemption.  Accordingly, at 29th February, 2004 and subsequent period ends, Subordinated indebtedness includes junior subordinated debentures that at 30th November, 2003 and prior period ends were classified as Preferred securities subject to mandatory redemption.  See Accounting and Regulatory Developments and Note 9 in LBHI's Annual Report on Form 10-K for the twelve months ended 30th November, 2004.

3.    Total capital includes long-term debt (including, at 30th November, 2004, junior subordinated debt issued to trusts) and stockholders' equity and, for the periods ended 30th November, 2001, 2002 and 2003, total capital also includes preferred securities subject to mandatory redemption.

# TAXATION

*The following is a summary of certain UK taxation considerations relevant to persons who purchase, own and dispose of Preferred Securities. This summary addresses only the taxation consequences to holders that acquire Preferred Securities pursuant to the offering at the initial offering price and does not apply to certain classes of holders such as dealers, financial traders and certain persons who are exempt from UK taxation on their income.*

*This summary does not address the position of persons who are resident in the UK or have some connection with the UK beyond the holding of Preferred Securities.*

***This summary is for general information only based on law and practice at the date hereof in the UK and is not exhaustive. Prospective investors are advised to consult with their own taxation advisers as to the taxation consequences of the purchase, ownership and disposition of Preferred Securities, including the effect of tax laws in countries other than the UK.***

## United Kingdom

**(a)    UK Taxation Treatment for Non-UK Residents**

Non-UK tax-resident corporate or individual Holders which hold their interest in Preferred Securities as an investment should be liable to UK taxation only to the extent that UK taxation is deducted at source from any payment to such a Holder made in respect of the Preferred Securities.

The same treatment should apply to a non-UK tax-resident corporate or individual Holder which holds its interest in the Preferred Securities as a trading asset, provided that the Issuer is not carrying on its business as a trade or a venture in the nature of a trade and the Holder does not otherwise carry on a trade in the UK through a branch or agency through or from which the Preferred Securities are held or the income from them arises (or, where that Holder is a company, that Holder does not carry on a trade in the United Kingdom through a permanent establishment through or from which the Preferred Securities are held or the income from them arises).

**(b)    Distributions on the Preferred Securities**

The Guarantor understands that the Issuer should be classified as a partnership for UK taxation purposes and should not constitute a "unit trust scheme" for the purposes of UK taxation. On the basis that the Issuer is treated for the purposes of UK taxation as a partnership, payments of Distributions on Preferred Securities may be made without withholding for or on account of UK taxation.

**(c)    Stamp Duty and Stamp Duty Reserve Tax ("SDRT")**

No UK stamp duty will be chargeable in respect of the issue of Preferred Securities to a Holder. Transfers of the Preferred Securities within a clearing system will not be chargeable to UK stamp duty. In practice, UK stamp duty is not likely to be chargeable in respect of a transfer of the Preferred Securities either because such a transfer is effected within a clearing system or, if the transfer is outside a clearing system, because the Issuer will invest in exempt loan capital for UK stamp duty purposes.      The Guarantor understands that no liability to SDRT should arise in respect of the issue or subsequent transfer of the Preferred Securities.

## EU Directive on the Taxation of Savings Income

Under EC Council Directive 2003/48/EC on the taxation of savings income, Member States are required, from 1st July, 2005, to provide to the tax authorities of another Member State details of payments of interest (or similar income) paid by a person within its jurisdiction to an individual resident in that other Member State. However, for a transitional period, Belgium, Luxembourg and Austria are instead required (unless during that period they elect otherwise) to operate a withholding system in relation to such payments (the ending of such transitional period being dependent upon the conclusion of certain other agreements relating

to information exchange with certain other countries). A number of non-EU countries and territories including Switzerland have agreed to adopt similar measures (a withholding system in the case of Switzerland) with effect from the same date.

## SUBSCRIPTION AND SALE

Lehman Brothers International (Europe) of 25 Bank Street, London E14 5LE together with banks and other financial institutions to be named in the Final Terms (together, the "**Managers**") will jointly and severally agree to subscribe for the entire issued amount of the Preferred Securities pursuant to a Subscription Agreement (the "**Subscription Agreement**") expected to be dated on or about the date of publication of the Final Terms at a price of €1,000 per Preferred Security. The Managers will receive a combined selling, management and underwriting commission of €20 per Preferred Security. In addition, the Managers shall be reimbursed for certain of their expenses in connection with the issue of the Preferred Securities. The total estimated expenses of the issue of the Preferred Securities are £300,000. The Managers will be entitled to terminate the Subscription Agreement in certain circumstances before the issue of the Preferred Securities.

The Issuer will only offer and allot Securities to the Managers. The selection of the Managers will be at the sole discretion of the General Partner.

The aggregate nominal amount of the issue and the initial cash distribution will be as set out in the Final Terms to be published on the date that the Subscription Agreement is entered into. A copy of the Final Terms will be made available as described under "General Information".

The Preferred Securities are a new series and carry no pre-emption rights.

## PLAN OF DISTRIBUTION

The Managers will agree in the Subscription Agreement that they will only offer the Preferred Securities in accordance with the following restrictions:

### United States

The Preferred Securities have not been and will not be registered under the Securities Act and may not be offered or sold within the United States or to, or for the account or benefit of, U.S. persons. Terms used in this paragraph have the meanings given to them by Regulation S under the Securities Act ("**Regulation S**").

Each Manager has agreed that, except as permitted by the Subscription Agreement, it will not offer, sell or deliver the Preferred Securities (i) as part of their distribution at any time or (ii) otherwise until 40 days after the later of the commencement of the offering and the Closing Date within the United States or to, or for the account or benefit of, U.S. persons and that it will have sent to each distributor, dealer or person receiving a selling concession, fee or other remuneration that purchases Preferred Securities from it during the distribution compliance period a confirmation or other notice setting forth the restrictions on offers and sales of the Preferred Securities within the United States or to, or for the account or benefit of, U.S. persons. Terms used in this paragraph have the meanings given to them by Regulation S.

In addition, until 40 days after the commencement of the offering, an offer or sale of Preferred Securities within the United States by any dealer that is not participating in the offering may violate the registration requirements of the Securities Act.

### European Economic Area

In relation to each Member State of the European Economic Area which has implemented the Prospectus Directive (each, a **Relevant Member State**), each Manager has represented and agreed that with effect from and including the date on which the Prospectus Directive is implemented in that Relevant Member State (the **Relevant Implementation Date**) it has not made and will not make an offer of Preferred Securities to the public in that Relevant Member State, except that it may, with effect from and including the Relevant Implementation Date, make an offer of Preferred Securities to the public in that Relevant Member State:

(a)    in (or in Germany, where the offer starts within) the period beginning on the date of publication of a prospectus in relation to those Preferred Securities which has been approved by the competent

authority in that Relevant Member State or, where appropriate, approved in another Relevant Member State and notified to the competent authority in that Relevant Member State, all in accordance with the Prospectus Directive and ending on the date which is 12 months after the date of such publication;

(b)    at any time to legal entities which are authorised or regulated to operate in the financial markets or, if not so authorised or regulated, whose corporate purpose is solely to invest in securities;

(c)    at any time to any legal entity which has two or more of (1) an average of at least 250 employees during the last financial year; (2) a total balance sheet of more than €43,000,000 and (3) an annual net turnover of more than €50,000,000, as shown in its last annual or consolidated accounts; or

(d)    at any time in any other circumstances which do not require the publication by the Issuer and the Guarantor of a prospectus pursuant to Article 3 of the Prospectus Directive.

For the purposes of this provision, the expression an "offer of Preferred Securities to the public" in relation to any Preferred Securities in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the Preferred Securities to be offered so as to enable an investor to decide to purchase or subscribe the Preferred Securities, as the same may be varied in that Member State by any measure implementing the Prospectus Directive in that Member State and the expression **Prospectus Directive** means Directive 2003/71/EC and includes any relevant implementing measure in each Relevant Member State.

### United Kingdom

Each Manager has represented and agreed that, except as permitted by the Subscription Agreement:

(a)    it has only offered or sold and will only offer or sell Preferred Securities to (a) investment professionals falling within article 14(5) of the Financial Services and Markets Act 2000 (Promotion of Collective Investment Schemes) (Exemptions) Order 2001 (the "**Promotion of CIS Order**") and article 19(5) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2001 (the "**Financial Promotion Order**"), who have professional experience of participating in unregulated schemes and of matters relating to investments; and/or (b) persons falling within article 22(2) of the Promotion of CIS Order and article 49(2) of the Financial Promotion Order; and/or (c) any other persons to whom this Prospectus may be communicated lawfully;

(b)    it has in place and will have in place proper systems and procedures to prevent any person other than those persons described in (a) above from participating in the Preferred Securities;

(c)    it has only communicated or caused to be communicated and will only communicate or cause to be communicated an invitation or inducement to engage in investment activity (within the meaning of Section 21 of the FSMA) received by it in connection with the issue of the Preferred Securities in circumstances in which Section 21(1) of the FSMA does not apply to the Guarantor; and

(d)    it has complied and will comply with all applicable provisions of the FSMA with respect to anything done by it in relation to the Preferred Securities in, from or otherwise involving the United Kingdom.

### France

Each of the Managers and the General Partner on behalf of the Issuer has represented and agreed that it has not offered or sold and will not offer or sell, directly or indirectly, Preferred Securities to the public in the Republic of France, and has not distributed or caused to be distributed and will not distribute or cause to be distributed to the public in France, this Prospectus or any other offering material relating to the Preferred Securities, and that such offers, sales and distributions have been and shall only be made in France to qualified investors (*investisseurs qualifiés*) acting for their own account as defined in and in accordance with Articles L.411-1 and L.411-2 of the *Code Monétaire et Financier* and *décret* No. 98-880 dated 1st October, 1998.

49

**General**

Persons into whose hands this Prospectus comes are required by the Issuer, the Guarantor and the Managers to comply with all applicable laws and regulations in each country or jurisdiction in or from which they purchase, offer, sell or deliver Preferred Securities or have in their possession or distribute such offering material, in all cases at their own expense.

## GENERAL INFORMATION

### Authorisations

The Limited Partnership Agreement, to establish the Issuer was duly authorised by a resolution of the board of directors of the General Partner passed on 22nd August, 2005.

The entering into of the Limited Partnership Agreement by the Guarantor was authorised by a resolution of the board of directors of the Guarantor passed on 22nd August, 2005. The entering into of the Agency Agreement, the Administration Agreement, the Subscription Agreement and the Subordinated Guarantee will be authorised by a resolution of the board of directors of the Guarantor prior to the Closing Date.

All consents, approvals, authorisations or other orders of all regulatory authorities required by the Issuer and/or the Guarantor under the laws of England and Wales have been, or will prior to the Closing Date be, given for the issue of the Preferred Securities and for the Issuer, the General Partner and the Guarantor, as the case may be, to undertake and perform their respective obligations as appropriate under the Limited Partnership Agreement, the Subscription Agreement, the Agency Agreement, the Preferred Securities and the Subordinated Guarantee.

### Listing

Application has been made to UK Listing Authority for the Preferred Securities to be admitted to the Official List of the UK Listing Authority and to the London Stock Exchange plc for the Preferred Securities to be admitted to trading on the London Stock Exchange plc's Gilt Edged and Fixed Interest Market. The London Stock Exchange plc's Gilt Edged and Fixed Interest Market is a regulated market for the purposes of Directive 93/22/EEC (the Investment Service Directive).

It is expected that listing and admission to trading will take place on or about the Closing Date, subject to issue of the Global Certificate.

### Clearing Systems

The Preferred Securities have been accepted for clearance through Euroclear and Clearstream, Luxembourg. The ISIN for this issue and the Common Code will be set forth in the Final Terms. The address of Euroclear is 1 Boulevard du Roi Albert III, B-1210 Belgium and the address of Clearstream, Luxembourg is 42 Avenue JF Kennedy, L-1855 Luxembourg.

### No significant change or material adverse change

There has been no significant change in the financial or trading position of the Issuer since its date of establishment.

There has been no material adverse change in the prospects of the Issuer since its date of establishment.

There has been no significant change in the financial or trading position of the Guarantor and the Guarantor Group since 30th November, 2004 (being the date of the most recent accounts of the Gurarantor and the Guarantor Group).

There has been no material adverse change in the prospects of the Guarantor or the Guarantor Group since 30th November, 2004.

### Litigation

There are no governmental, legal or arbitration proceedings (including any such proceedings which are pending or threatened of which the Issuer is aware) during the previous 12 months which may have, or have had in the recent past, significant effects on the financial position or profitability of the Issuer.

There are no governmental, legal or arbitration proceedings (including any such proceedings which are pending or threatened of which the Guarantor or any subsidiary of the Guarantor Group is aware) during the previous 12 months which may have, or have had in the recent past, significant effects on the financial position or profitability of the Guarantor or any subsidiary of the Guarantor Group.

**Accounts and Auditors**

The auditors of the Issuer and the Guarantor are Ernst & Young LLP, Chartered Accountants and Registered Auditors, of 1 More London Place, London SE1 2AF.

Ernst & Young LLP have made reports under Section 235 of the Companies Act 1985 on statutory accounts in respect of the Guarantor for the years ended 30th November, 2004, 2003 and 2002 which were not qualified within the meaning of Section 262 of the Companies Act 1985 and did not contain any statements made under Section 237(2) or (3) of the Companies Act 1985. The report of the Guarantor's auditors stated that to the fullest extent permitted by law, the auditors do not accept or assume responsibility to anyone other than the Issuer and the Issuer's members as a body, for their audit work, for the audit report, or for the opinions the Guarantor's auditors have formed.

The inclusion of such a statement was recommended in recent guidance issued by the Institute of Chartered Accountants in England and Wales for inclusion in all Section 235 audit reports produced by audit firms.

The Issuer is newly established and does not currently have any financial statements (see also "*Documents*" below).

**Documents**

Copies of the following financial statements will be available free of charge from the specified offices of the Paying and Transfer Agents for so long as any of the Preferred Securities remains outstanding:

(a)     the annual reports (including the audited non-consolidated financial statements) of the Guarantor in respect of the financial years ended 30th November, 2004, 2003 and 2002; including the audit reports on such financial statements;

(b)     the most recently published (annual reports including the audited annual non-consolidated financial statements) of the Guarantor and the most recently published unaudited interim non-consolidated financial statements of the Guarantor (if any).

The Guarantor currently prepares audited non-consolidated financial statements on an annual basis. The Guarantor does not currently publish consolidated financial statements or interim financial statements.

The Issuer is newly established as a limited partnership and has not traded or operated as at the date of this Prospectus. The first financial statements of the Issuer are expected to be prepared for the period ending on 30th November, 2005. Thereafter, it is intended that the Issuer will prepare audited annual financial statements.

Copies of the Issuer's most recently published annual reports (if any) and audited annual financial statements of the Issuer will be available free of charge at the offices of the Paying and Transfer Agents. It is not intended that the Issuer will publish interim financial statements.

In addition, the following documents are available for inspection at the specified offices of the Paying and Transfer Agents for so long as any of the Preferred Securities remains outstanding:

(a)     the Subscription Agreement;

(b)     the Subordinated Guarantee;

(c)     the Limited Partnership Agreement;

(d)     the Administration Agreement;

(e)     the Agency Agreement; and

(f)     the Memorandum and Articles of Association of the Guarantor.

**Redemption**

It is the Issuer's intention (although there is no obligation to do so nor any guarantee of future behaviour) to redeem the Preferred Securities in accordance with paragraph 4 of the "*Description of the Preferred Securities*", in whole (but not in part) only to the extent LBHI or any of its subsidiaries has raised funds in the period of six (6) months preceding such redemption by the issuance of any securities ranking *pari passu* or junior (including any class of share capital) to the Preferred Securities, in an aggregate amount at least equal to the Liquidation Preference of the Preferred Securities.

## FORM OF FINAL TERMS

### Final Terms

### Lehman Brothers UK Capital Funding II L.P.

### Fixed Rate Guaranteed Non-Voting Non-Cumulative Perpetual Preferred Securities

| | |
|---|---|
| **Closing Date:** | [*Insert*] |
| **Distribution Rate:** | [*Insert*] per cent. per annum. |
| **Distribution Payment Dates:** | [*Insert. NB the distribution payment dates will fall annually following the Closing Date.*] |
| **Aggregate Nominal Amount of the Preferred Securities:** | €[*Insert*] |
| **First Call Date of Subordinated Notes:** | [*Insert*] |
| **Net proceeds:** | €[*Insert*] |
| **Managers:** | [*Insert*] |
| **ISIN:** | XS[*Insert*] |
| **Common Code:** | [*Insert*] |
| **Ratings:** | [*Insert*] |
| **Other terms:** | [*Insert*] |

The above pricing gives a yield of [*insert details*]. Such yield is applicable as of the date of these Final Terms and may fluctuate in the future.

The date of these Final Terms is [*Insert*].

**FINANCIAL STATEMENTS OF THE GUARANTOR**

Set out below are the audited non-consolidated financial statements of the Guarantor as of, and for the years ended, 30th November, 2004 and 2003 and the audited report for each such set of financial statements.

# Lehman Brothers Holdings PLC

**Report and Financial Statements**

30 November 2003

ERNST & YOUNG

Lehman Brothers Holdings PLC

Registered No: 1854685

**Directors**
R J Amat
P A Gamester
I T Lowitt
R L O'Connell
I Jameson
K J P Hayes
J Van Wijngaarden

**Secretary**
M E Smith

**Auditors**
Ernst & Young LLP
1 More London Place
London SE1 2AF

**Registered Office**
25 Bank Street
Canary Wharf
London E14 5LE

Lehman Brothers Holdings PLC

# Directors' report

The directors present their report and financial statements for the year ended 30 November 2003.

## Results and dividends

The profit for the year of $148,357,718 (2002 - $15,996,942 profit) has been taken to reserves.  No dividend has been paid during the year and none is proposed (2002 - $nil).

## Principal activities

The principal activity of the company is to hold fixed asset investments in both subsidiary undertakings and non subsidiary undertakings.

## Review of business and future developments

The profit and loss account for the year is set out on page 5.  Both the level of business during the year and the financial position at the end of the year were satisfactory.  The company acquired a 100% investment in Preferred Holdings Ltd for an amount of $133m on 12 December 2003.

## Fixed assets

The changes in fixed assets are set out in note 7 to the financial statements.

## Charitable contributions

During the year the company made no charitable contributions (2003 - $nil).

## Creditor payment policy and practice

Payments are made to suppliers through a group company which provides administration services.  It is the policy of that company to make payments to suppliers in accordance with those terms and conditions agreed between the company and its suppliers, provided that all trading terms and conditions have been complied with.  This company has no trade creditors at 30 November 2003.

## Directors and their interests

The directors during the year and at the date of this report were:

R A Amat            (alternate to K J P Hayes)
P A Gamester
I T Lowitt
R L O'Connell
I Jameson
K J P Hayes         (appointed 18 January 2002)
N Schnadt           (resigned 19 March 2004)
J Van Wijngaarden   (appointed 8 June 2004)

There are no directors' interests requiring disclosure under the Companies Act 1985.

## Auditors

Ernst & Young LLP will be re-appointed as the company's auditor in accordance with the elective resolution passed by the company under section 386 Companies Act 1985.

On behalf of the board

Director

F-4

Lehman Brothers Holdings PLC

# Statement of directors' responsibilities in respect of the financial statements

Company law requires the directors to prepare financial statements for each financial year which give a true and fair view of the state of affairs of the company and of the profit or loss of the company for that period. In preparing those financial statements, the directors are required to:

- select suitable accounting policies and then apply them consistently;

- make judgements and estimates that are reasonable and prudent; and

- prepare the financial statements on the going concern basis unless it is inappropriate to presume that the company will continue in business.

The directors are responsible for keeping proper accounting records which disclose with reasonable accuracy at any time the financial position of the company and to enable them to ensure that the financial statements comply with the Companies Act 1985. They are also responsible for safeguarding the assets of the company and hence for taking reasonable steps for the prevention and detection of fraud and other irregularities.

ERNST & YOUNG



# Independent auditors' report
**to the members of Lehman Brothers Holdings PLC**

We have audited the company's financial statements for the year ended 30 November 2003 which comprise the Profit and Loss Account, Statement of Total Recognised Gains and Losses, Balance Sheet and the related notes 1 to 17. These financial statements have been prepared on the basis of the accounting policies set out therein.

This report is made solely to the company's members, as a body, in accordance with Section 235 of the Companies Act 1985. Our audit work has been undertaken so that we might state to the company's members those matters we are required to state to them in an auditors' report and for no other purpose. To the fullest extent permitted by law, we do not accept or assume responsibility to anyone other than the company and the company's members as a body, for our audit work, for this report, or for the opinions we have formed.

## Respective responsibilities of directors and auditors

As described in the Statement of Directors' Responsibilities the company's directors are responsible for the preparation of the financial statements in accordance with applicable United Kingdom law and accounting standards.

Our responsibility is to audit the financial statements in accordance with relevant legal and regulatory requirements and United Kingdom Auditing Standards.

We report to you our opinion as to whether the financial statements give a true and fair view and are properly prepared in accordance with the Companies Act 1985. We also report to you if, in our opinion, the Directors' Report is not consistent with the financial statements, if the company has not kept proper accounting records, if we have not received all the information and explanations we require for our audit, or if information specified by law regarding directors' remuneration and transactions with the company is not disclosed.

We read the Directors' Report and consider the implications for our report if we become aware of any apparent misstatements within it.

## Basis of audit opinion

We conducted our audit in accordance with United Kingdom Auditing Standards issued by the Auditing Practices Board. An audit includes examination, on a test basis, of evidence relevant to the amounts and disclosures in the financial statements. It also includes an assessment of the significant estimates and judgements made by the directors in the preparation of the financial statements, and of whether the accounting policies are appropriate to the company's circumstances, consistently applied and adequately disclosed.

We planned and performed our audit so as to obtain all the information and explanations which we considered necessary in order to provide us with sufficient evidence to give reasonable assurance that the financial statements are free from material misstatement, whether caused by fraud or other irregularity or error. In forming our opinion we also evaluated the overall adequacy of the presentation of information in the financial statements.

## Opinion

In our opinion the financial statements give a true and fair view of the state of affairs of the company as at 30 November 2003 and of its profit for the year then ended and have been properly prepared in accordance with the Companies Act 1985.

*Ernst & Young LLP*

Ernst & Young LLP
Registered Auditor
London

29 JUN 2004

Lehman Brothers Holdings PLC

# Profit and loss account

**for the year ended 30 November 2003**

| | Notes | 2003 $000 | 2002 $000 |
|---|---|---|---|
| ***Operating income*** | 2 | 322,255 | 162,942 |
| Administrative expenses | | (2,883) | (1,561) |
| ***Operating profit*** | | 319,372 | 161,381 |
| Interest receivable and similar income | 3 | 11,692 | 12,687 |
| Interest payable and similar charges | 4 | (182,706) | (158,071) |
| ***Profit on ordinary activities before taxation*** | | 148,358 | 15,997 |
| Tax on profit on ordinary activities | 6 | -- | -- |
| ***Profit transferred to reserves for the financial year*** | 12 | 148,358 | 15,997 |

F-7

Lehman Brothers Holdings PLC

# Statement of total recognised gains and losses
**for the year ended 30 November 2003**

|  | 2003 | 2002 |
|---|---|---|
|  | $000 | $000 |
| Profit attributable to shareholders of the company | 148,358 | 15,997 |
| Revaluation of fixed asset investment | 138,393 | (220,967) |
| Total gains and losses recognised in the year | 286,751 | (204,970) |

Lehman Brothers Holdings PLC

# Balance sheet
**at 30 November 2003**

| | Notes | 2003 $000 | 2002 $000 |
|---|---|---|---|
| **Fixed assets** | | | |
| Investments | 7 | 2,991,687 | 2,654,804 |
| **Current assets** | | | |
| Debtors | 8 | 2,906,294 | 2,475,398 |
| | | 2,906,294 | 2,475,398 |
| **Creditors:** amounts falling due within one year | 9 | (4,535,948) | (4,173,993) |
| **Net current liabilities** | | (1,629,654) | (1,698,595) |
| **Total assets less current liabilities** | | 1,362,033 | 956,209 |
| **Creditors:** amounts falling due after more than one year | 10 | (3,041) | (8,968) |
| | | 1,358,992 | 947,241 |
| **Capital and reserves** | | | |
| Called up share capital | 11 | 978,182 | 853,182 |
| Share premium account | | 3,312 | 3,312 |
| Profit and loss account | 13 | 157,707 | 9,349 |
| Other reserves | 14 | 219,791 | 81,398 |
| **Shareholders' funds** | | | |
| Equity | | 1,100,876 | 814,125 |
| Non-equity | | 258,116 | 133,116 |
| | | 1,358,992 | 947,241 |

Director

29 JUN 2004

F-9

Lehman Brothers Holdings PLC

# Notes to the financial statements
### at 30 November 2003

## 1. Accounting policies

### Basis of preparation

The financial statements have been prepared under the historical cost convention and in accordance with applicable accounting standards except as set out below.

The financial statements present information for the company as an individual entity and not about its group. Group financial statements have not been prepared as the company is a subsidiary of Lehman Brothers UK Spain Holdings Limited, a company registered in England and Wales which prepares group financial statements.

### Statement of cash flows

The directors have taken advantage of the exemption in paragraph 5(a) of Financial Reporting Standard 1 (revised) from producing a cashflow statement.

### Functional currency

The company's functional currency is US dollars as the directors consider this to be the most appropriate currency for the company's business.

### Investments in subsidiary undertakings

Investments in subsidiary undertakings are stated at underlying net asset value. Any permanent diminution in the net asset value of an investment as compared to historical cost is charged to the profit and loss account. In all other cases the difference between net asset value and historical cost is charged or credited to a revaluation reserve.

For investments in subsidiary undertakings denominated in currencies other than the functional currency of the company, historical cost and net asset value are determined with reference to the historical exchange rate at acquisition and the prevailing year end exchange rate respectively.

### Other fixed asset investments

Other unlisted fixed asset investments are stated at cost unless, in the opinion of the directors there has been a permanent diminution in value, in which case an appropriate adjustment is made. Listed investments are stated at market value.

### Deferred taxation

Deferred tax is recognised in respect of all timing differences, at the rates of taxation anticipated to apply when these differences crystallise, arising from the inclusion of items of income and expenditure in taxation computations in periods different from those for which they are included in the financial statements.

Deferred tax assets are recognised only to the extent that the directors consider that it is more likely than not that there will be suitable taxable profits from which the future reversal of the underlying timing differences can be deducted.

Provision is made for tax on gains arising from the revaluation (and similar fair value adjustments) of fixed assets, and gains on disposal of fixed assets that have been rolled over into replacement assets, only to the extent that, at the balance sheet date, there is a binding agreement to dispose of the assets concerned. However, no provision is made where, on the basis of all available evidence at the balance sheet date, it is more likely than not that the taxable gain will be rolled over into replacement assets and charged to tax only where the replacement assets are sold.

Provision is made for deferred tax that would arise on remittance of the retained earnings of overseas subsidiaries, associates and joint ventures only to the extent that, at the balance sheet date, dividends have been accrued as receivable.

Lehman Brothers Holdings PLC

# Notes to the financial statements
## at 30 November 2003

### 1. Accounting policies (continued)

#### Deferred taxation (continued)

Deferred tax is measured on an undiscounted basis at the tax rates that are expected to apply in the periods in which timing differences reverse, based on tax rates and laws enacted or substantively enacted at the balance sheet date.

#### Valuation of securities sold not yet purchased

Securities sold not yet purchased are stated at market value with all gains and losses reflected in the profit and loss account.

#### Foreign currency translation

Assets and liabilities denominated in foreign currencies are translated into US dollars at rates of exchange ruling at the balance sheet date. Transactions in foreign currencies are translated into US dollars at the rate of exchange ruling at the end of the month in which the transaction occurs. Any differences arising from translation are taken to the profit and loss account. Exchange differences arising on translation of the company's net equity interest in subsidiaries with a functional currency other than US dollar are shown as movements on reserves.

#### Dividends

Dividends are accrued when declared by subsidiaries.

### 2. Operating income

Operating income, which excludes value added tax, has been disclosed instead of turnover as this reflects more accurately the results of the company's activities. The analysis of income by geographical area has been omitted as the directors consider that it would be seriously prejudicial to disclose this information. All the company's operating income arises from continuing activities. Operating income comprises:

|  | 2003 | 2002 |
|---|---|---|
|  | $000 | $000 |
| Income from Investments | 14,923 | 21,514 |
| Profit on disposal of fixed asset investments | -- | 65,913 |
| Income from shares in group undertakings | 318,570 | 87,908 |
| Management service fees | -- | (20) |
| Other operating losses | (11,238) | (12,373) |
|  | 322,255 | 162,942 |

### 3. Interest receivable and similar income

|  | 2003 | 2002 |
|---|---|---|
|  | $000 | $000 |
| Group undertakings | 11,692 | 12,586 |
| Third party | -- | 101 |
|  | 11,692 | 12,687 |

Lehman Brothers Holdings PLC

# Notes to the financial statements
### at 30 November 2003

4. **Interest payable and similar charges**

| | 2003 $000 | 2002 $000 |
|---|---|---|
| Group undertakings | (182,706) | (154,961) |
| Third party | – | (3,110) |
| | (182,706) | (158,071) |

5. **Information regarding directors and employees**

The company has no employees. All personnel, including directors, who perform services for the company are employed and remunerated by Lehman Brothers Limited. The company is recharged employee costs incurred by Lehman Brothers Limited for services attributable to the company.

Directors' emoluments (including pension contributions) for management services to the company were $nil (2001 - $nil).

6. **Tax on profit on ordinary activities**

| | 2003 $000 | 2002 $000 |
|---|---|---|
| Profit on ordinary activities before taxation | 148,358 | 15,997 |
| Corporation tax at standard rate 30% | 44,507 | 4,799 |
| Effects of: | | |
| Expenses not deductible for tax purposes | 5,027 | 1,177 |
| Group dividend not taxable | (95,571) | (23,280) |
| Capital losses brought forward and indexation | – | (17,416) |
| Capital allowances | (3) | (4) |
| Losses available for group relief | 46,040 | 34,724 |
| Current tax charge for the period | – | – |

7. **Fixed asset investments**

| | 2003 $000 | 2002 $000 |
|---|---|---|
| Net asset value: | | |
| Investments in subsidiary undertakings | 2,912,853 | 2,576,698 |
| Other fixed asset investments | 78,834 | 78,106 |
| | 2,991,687 | 2,654,804 |

Lehman Brothers Holdings PLC

# Notes to the financial statements
**at 30 November 2003**

### 7.    Fixed asset investments (continued)

In the opinion of the directors, the aggregate value of the fixed asset investments is not less than the amount at which they are stated in the financial statements.

| | Subsidiary undertakings $000 | Listed Investments $000 | Unlisted investments $000 | Total $000 |
|---|---|---|---|---|
| **Cost:** | | | | |
| At 30 November 2002 | 2,668,550 | 54 | 78,052 | 2,746,656 |
| Additions | 197,776 | -- | 24,828 | 222,604 |
| Disposals | (14) | -- | (10,323) | (10,337) |
| Permanent diminution in value | ... | 27 | (13,804) | (13,777) |
| At 30 November 2003 | 2,866,312 | 81 | 78,753 | 2,945,146 |
| **Revaluation gains:** | | | | |
| At 30 November 2002 | (91,852) | – | – | (91,852) |
| Revaluation of fixed asset investments | 119,050 | – | – | 119,050 |
| Foreign exchange movement | 19,343 | – | – | 19,343 |
| At 30 November 2003 | 46,541 | – | -- | 46,541 |
| **Net book value:** | | | | |
| At 30 November 2003 | 2,912,853 | 81 | 78,753 | 2,991,687 |
| At 30 November 2002 | 2,576,698 | 54 | 78,052 | 2,654,804 |

ERNST & YOUNG

F-13

Lehman Brothers Holdings PLC

# Notes to the financial statements
### at 30 November 2003

### 7.  Fixed asset investments (continued)

The following information as at 30 November 2003 relates to the principal subsidiaries of Lehman Brothers Holdings PLC, all of which are registered in England and Wales and held by the company unless indicated.

| Name of company | Description of shares held by company | Proportion of nominal value and voting rights of shares held | Principal business |
|---|---|---|---|
| Lehman Brothers Limited | Ordinary | 100% | Service company |
| Lehman Brothers International (Europe) | Ordinary | 100% | Fixed income, equities, broking and trading |
| Lehman Brothers Europe Limited | Ordinary | 100% | Investment banking |
| Lehman Brothers EBS Limited | Ordinary and Preference | 100% | Holding company |
| Lehman Brothers Global Finance Limited | Ordinary | 100% | Inactive |
| Storm Funding Limited | Ordinary | 100% | Asset backed financing |
| Platform Investments | Ordinary | 100% | Investment company |
| Lehman Brothers (Indonesia) Limited | Ordinary | 100% | Investment banking |
| LB Cayman Finance Limited[a] | Ordinary | 100% | Equity financing |
| LBQ Funding (UK) Limited | Ordinary and Preference | 100% | Investment company |
| OCI Holdings Plc | Ordinary | 90% | Holding company |
| Lehman Brothers Redditch No. 1 Limited | Ordinary | 100% | Equity partnership |
| Lehman Brothers Redditch No. 2 Limited | Ordinary | 100% | Equity partnership |
| Lehman Brothers Commodities Limited[b] | Ordinary | 100% | Inactive |
| Seebreeze Funding Limited[d] | Ordinary | 49% | Investment company |
| LBO Investments Ltd | Ordinary | 100% | Investment company |
| Resetfan Ltd | Ordinary | 100% | Holding company |

ERNST & YOUNG

F-14

Lehman Brothers Holdings PLC

# Notes to the financial statements
at 30 November 2003

### 7.  Fixed asset investments (continued)

| Name of company | Description of shares held by company | Proportion of nominal value and voting rights of shares held | Principal business |
|---|---|---|---|
| Southern Pacific Mortgage Limited[b] | Ordinary | 100% | Residential mortgage lending |
| Pageant Properties Limited[c] | Ordinary and Preference | 65% | Property development |
| LB Equity (Nominees Number 7) Limited | Ordinary | 100% | Financing |
| Edgeworth Capital LLP | Ordinary | 100% | Fund management |

[a]  10% held by a subsidiary undertaking
[b]  100% held by a subsidiary undertaking
[c]  65% of ordinary shares and 85% of preference shares
[d]  This company is controlled through a power of attorney to appoint and remove directors of the company.

### 8.  Debtors

|  | 2003 $000 | 2002 $000 |
|---|---|---|
| Amounts due from: |  |  |
| Subsidiary undertakings | 2,648,846 | 2,022,597 |
| Parent and fellow subsidiary undertakings | 254,927 | 448,992 |
| Other debtors | 2,521 | 3,809 |
|  | 2,906,294 | 2,475,398 |

Included in amounts due from subsidiary undertakings and fellow subsidiary undertakings are subordinated loans of $2,304,478,608 (2002 - $2,004,056,951) and $nil (2002 - $136,694,843) respectively which are repayable at five days' notice by the borrower. For the amounts due from subsidiary undertakings regulated by the Financial Services Authority, five days' notice must be given to the Financial Services Authority, which has the right to refuse consent to repayment.

Lehman Brothers Holdings PLC

# Notes to the financial statements
### at 30 November 2003

9.  **Creditors:** amounts falling due within one year

|  | 2003 $000 | 2002 $000 |
|---|---:|---:|
| Marketable securities sold not yet purchased | 1,838,879 | 1,731,189 |
| Amounts due to: | | |
| Subsidiary undertakings | 1,695 | 2,239 |
| Parent and fellow subsidiary undertakings | 2,685,570 | 2,430,723 |
| Other creditors | 9,804 | 7,721 |
| Accruals and deferred income | – | 2,121 |
| | 4,535,948 | 4,173,993 |

Included in amounts due to parent and fellow subsidiary undertakings are subordinated loans of $2,129,000,000 (2001 - $1,709,000,000) which are repayable at one day's notice.

10. **Creditors:** amounts falling due after more than one year

|  | 2003 $000 | 2002 $000 |
|---|---:|---:|
| Other creditors | 3,041 | 8,968 |
| | 3,041 | 8,968 |

11. **Share capital**

|  | 2003 £000 | 2002 £000 |
|---|---:|---:|
| Authorised: | | |
| 79,750,000 Ordinary shares of £1 each | 79,750 | 79,750 |
| 250,000 'B' Ordinary shares of £1 each | 250 | 250 |
| 20,000,000 Non Cumulative Redeemable Preference shares of £1 each | 20,000 | 20,000 |
| | 100,000 | 100,000 |

|  | 2003 $000 | 2002 $000 |
|---|---:|---:|
| 1,000,000,000 Ordinary shares of $1 each | 1,000,000 | 1,000,000 |
| 100,000 Non Cumulative Redeemable Preference shares of $1 each | 100,000 | 100,000 |
| 900,000 Non Cumulative Redeemable Preference shares of $1 each | 900,000 | – |
| | 2,000,000 | 1,100,000 |

Lehman Brothers Holdings PLC

# Notes to the financial statements
**at 30 November 2003**

## 11. Share capital (continued)

|  | 2003 $000 | 2002 $000 |
|---|---|---|
| Allotted, called up and fully paid: | | |
| 40,021,100 Ordinary shares of £1 each | 66,266 | 66,266 |
| 20,000,000 Non Cumulative Redeemable Preference shares of £1 each | 33,116 | 33,116 |
| 100,000,000 Non Cumulative Redeemable Preference shares of $1 each | 100,000 | 100,000 |
| 125,000,000 Non Cumulative Redeemable Preference shares of $1 each | 125,000 | – |
| 653,800,000 Ordinary shares of $1 each | 653,800 | 653,800 |
|  | 978,182 | 853,182 |

The Non Cumulative Redeemable Preference shares may be redeemed at any time by the company by giving the holders of the preference shares not less than one month's notice in writing.

The Preference shares carry a fixed non cumulative preferential dividend of £100 per annum.

The rights of the Preference shares on redemption or a winding up are the amount of capital paid up together with a sum equal to any arrears of the fixed non cumulative preferential dividend provided they have been declared.

The Preference shares shall not entitle the holders to receive notice of, or to attend and vote at, any general meeting of the company.

During the year the company has authorised 900,000,000 and issued 125,000,000 non cumulative redeemable preference shares of $1 each.

## 12. Reconciliation of movements in shareholders' funds

|  | 2003 $000 | 2002 $000 |
|---|---|---|
| Profit attributable to shareholders of the company | 148,358 | 15,997 |
| Additional preference shares | 125,000 | 100,000 |
| Additional ordinary shares | – | 43,800 |
| Revaluation of fixed asset investment | 138,393 | (220,967) |
| Net movement in shareholders' funds | 411,751 | (61,170) |
| Opening shareholders' funds | 947,241 | 1,008,411 |
| Closing shareholders' funds | 1,358,992 | 947,241 |

## 13. Profit and loss account

|  | $000 |
|---|---|
| Accumulated profit at 30 November 2002 | 9,349 |
| Retained profit for the year | 148,358 |
| Accumulated profit at 30 November 2003 | 157,707 |

F-17

Lehman Brothers Holdings PLC

# Notes to the financial statements
## at 30 November 2003

### 14. Other reserves

|  | Revaluation reserve $000 | Capital reserve $000 | Total $000 |
|---|---|---|---|
| At 30 November 2002 | (91,852) | 173,250 | 81,398 |
| Revaluation of fixed asset investments | 138,393 | – | 138,393 |
| At 30 November 2003 | 46,541 | 173,250 | 219,791 |

There is no corporation tax liability in respect of items taken to the revaluation reserve.

### 15. Commitments

(a)    The company enters into interest rate swaps in the normal course of business with affiliated companies.

(b)    Investment in EBS partnership

The group is committed to invest further capital of $500,000 in EBS partnership if required.

### 16. Contingent liabilities

The company is registered with HM Customs & Excise as a member of the Lehman Brothers Limited group for VAT purposes and, as a result, is jointly and severally liable on a continuing basis for amounts owing by other members of the group in respect of unpaid VAT.

Lehman Brothers Holdings PLC has received US Government Securities as collateral against put options it holds over its preference share investment in LBQ Funding (UK) Limited. The value of the US Government Securities received at 30 November was $1,838,878,618 (2002 - 1,731,189,335).

### 17. Ultimate parent company

The ultimate parent company of Lehman Brothers Holdings PLC is Lehman Brothers Holdings Inc. which is incorporated in the State of Delaware in the United States of America.

The company has taken advantage of the exemption from disclosing transactions with related parties that are part of the Lehman Brothers Holdings Inc group.

The largest group in which the results of the company are consolidated is that headed by Lehman Brothers Holdings Inc incorporated in the United States of America. The smallest group in which they are consolidated is that headed by Lehman Brothers Spain Holdings Limited, registered in England and Wales. The consolidated financial statements of these groups are available to the public from 745 Seventh Avenue, New York, USA and from 25 Bank Street, Canary Wharf, London respectively.

*ERNST & YOUNG*

F-18

LEHMAN BROTHERS HOLDINGS PLC

Report and Financial Statements

30 November 2004

ERNST & YOUNG

## Lehman Brothers Holdings PLC

Registered No. 1854685

**DIRECTORS**
R J Amat
I T Lowitt
I Jameson
J Van Wijngaarden
M Jackson
A J Rush
P R  Tonucci

**SECRETARY**
M E Smith
E S Upton

**AUDITORS**
Ernst & Young LLP
1 More London Place
London SE1 2AF

**REGISTERED OFFICE**
25 Bank Street
Canary Wharf
London E14 5LE

## Lehman Brothers Holdings PLC

DIRECTORS' REPORT

The directors present their report and financial statements for the year ended 30 November 2004.

**RESULTS AND DIVIDENDS**
The loss for the year of $131,043,042 (2003 - $148,357,718 profit) has been taken to reserves. No dividend has been paid during the year and none is proposed (2003 - $nil).

**PRINCIPAL ACTIVITIES**
The principal activity of the company is to hold fixed asset investments in both subsidiary undertakings and non subsidiary undertakings.

**REVIEW OF BUSINESS AND FUTURE DEVELOPMENTS**
The profit and loss account for the year is set out on page 6. Both the level of business during the year and the financial position at the end of the year were as expected. The fluctuation in the company's results is due to the partial write down of its investment in Mable Commercial Funding Ltd., an investment company, to reflect its net asset value.

The company issued 985,000,000 non-cumulative preference shares of $1 each during the year to fund further acquisitions and its investments in subsidiaries.

**FIXED ASSETS**
The changes in fixed assets are set out in note 7 to the accounts.

**CHARITABLE CONTRIBUTIONS**
During the year the company made no charitable contributions (2003 - $nil).

**CREDITOR PAYMENT POLICY AND PRACTICE**
Payments are made to suppliers through a group company which provides administration services. It is the policy of that company to make payments to suppliers in accordance with those terms and conditions agreed between the company and its suppliers, provided that all trading terms and conditions have been complied with. This company has no trade creditors at 30 November 2004.

**DIRECTORS AND THEIR INTERESTS**
The directors during the year and at the date of this report were:

R A Amat
P A Gamester                (resigned  Feb 2, 2005)
I T Lowitt
R L O'Connell               (resigned Feb 2, 2005)
I Jameson
K J P Hayes                 (resigned  May 10, 2005)
J Van Wijngaarden
P R Tonucci                 (appointed Feb 2, 2005)
A J Rush                    (appointed Apr 12, 2005)
M Jackson                   (appointed  Apr 12, 2005)

There are no directors' interests requiring disclosure under the Companies Act 1985.

≣Ⅲ ERNST & YOUNG

## Lehman Brothers Holdings PLC

DIRECTORS' REPORT

**EVENTS SINCE THE BALANCE SHEET DATE**
Since the year end the company has issued shares as follows:

- 50,000,000 Non-Cumulative Preference shares of $1 each on 2 February 2005,

- 150,000,000 Non-Cumulative Preference shares of $1 each on 28 April 2005,

- 150,000,000 Non-Cumulative Preference shares of $1 each on 12 May 2005;

- 250,000,000 Non-Cumulative Preference shares of $1 each on 16 June 2005.

The proceeds of the share issues have been used to inject capital in to Lehman Brothers International (Europe).

On 23 March 2005 the company agreed to guarantee the issuance of €225,000,000 Fixed Rate to CMS linked subordinated notes by partnership Lehman Brothers UK Capital Funding UK LP.

On 18 May 2005, the company acquired 100% share capital of MBAM Investor Limited.

**AUDITORS**
Ernst & Young LLP will be re-appointed as the company's auditor in accordance with the elective resolution passed by the company under section 386 of the Companies Act 1985.

On behalf of the board

Director

28 JUN 2005

ERNST & YOUNG

Lehman Brothers Holdings PLC

STATEMENT OF DIRECTORS' RESPONSIBILITIES IN RESPECT OF THE FINANCIAL STATEMENTS

Company law requires the directors to prepare financial statements for each financial year which give a true and fair view of the state of affairs of the company and of the profit or loss of the company for that period.  In preparing those accounts, the directors are required to:

•   select suitable accounting policies and then apply them consistently;

•   make judgements and estimates that are reasonable and prudent;

•   State whether the applicable accounting standards have been followed subject to any material departures disclosed and explained in the financials statements, and ;

•   prepare the accounts on the going concern basis unless it is inappropriate to presume that the company will continue in business.

The directors are responsible for keeping proper accounting records which disclose with reasonable accuracy at any time the financial position of the company and to enable them to ensure that the financial statements comply with the Companies Act 1985.  They are also responsible for safeguarding the assets of the company and hence for taking reasonable steps for the prevention and detection of fraud and other irregularities.

ERNST & YOUNG

**ERNST & YOUNG**

**INDEPENDENT AUDITORS' REPORT TO THE MEMBERS OF LEHMAN BROTHERS HOLDINGS PLC**

We have audited the company's financial statements for the year ended 30 November 2004 which comprise the Profit and Loss Account, Statement of Total Recognised Gains and Losses, Balance Sheet and the related notes 1 to 18. These financial statements have been prepared on the basis of the accounting policies set out therein.

This report is made solely to the company's members, as a body, in accordance with Section 235 of the Companies Act 1985. Our audit work has been undertaken so that we might state to the company's members those matters we are required to state to them in an auditors' report and for no other purpose. To the fullest extent permitted by law, we do not accept or assume responsibility to anyone other than the company and the company's members as a body, for our audit work, for this report, or for the opinions we have formed.

**Respective responsibilities of directors and auditors**

As described in the Statement of Directors' Responsibilities the company's directors are responsible for the preparation of the financial statements in accordance with applicable United Kingdom law and accounting standards.

Our responsibility is to audit the financial statements in accordance with relevant legal and regulatory requirements and United Kingdom Auditing Standards.

We report to you our opinion as to whether the financial statements give a true and fair view and are properly prepared in accordance with the Companies Act 1985. We also report to you if, in our opinion, the Directors' Report is not consistent with the financial statements, if the company has not kept proper accounting records, if we have not received all the information and explanations we require for our audit, or if information specified by law regarding directors' remuneration and transactions with the company is not disclosed.

We read the Directors' Report and consider the implications for our report if we become aware of any apparent misstatements within it.

**Basis of audit opinion**

We conducted our audit in accordance with United Kingdom Auditing Standards issued by the Auditing Practices Board. An audit includes examination, on a test basis, of evidence relevant to the amounts and disclosures in the financial statements. It also includes an assessment of the significant estimates and judgements made by the directors in the preparation of the financial statements, and of whether the accounting policies are appropriate to the company's circumstances, consistently applied and adequately disclosed.

We planned and performed our audit so as to obtain all the information and explanations which we considered necessary in order to provide us with sufficient evidence to give reasonable assurance that the financial statements are free from material misstatement, whether caused by fraud or other irregularity or error. In forming our opinion we also evaluated the overall adequacy of the presentation of information in the financial statements.

**Opinion**

In our opinion the financial statements give a true and fair view of the state of affairs of the company as at 30 November 2004 and of its loss for the year then ended and have been properly prepared in accordance with the Companies Act 1985.

*Ernst & Young LLP*

Ernst & Young LLP
Registered Auditor, London

F-24

## Lehman Brothers Holdings PLC

PROFIT AND LOSS ACCOUNT
for the year ended 30 November 2004

|  | Notes | 2004 $000 | 2003 $000 |
|---|---|---|---|
| **OPERATING (LOSS)/ INCOME** | 2 | (67,115) | 322,255 |
| Administrative expenses |  | (2,788) | (2,883) |
| **OPERATING (LOSS)/PROFIT** |  | (69,903) | 319,372 |
| Interest receivable and similar income | 3 | 58,162 | 11,692 |
| Interest payable and similar charges | 4 | (119,302) | (182,706) |
| **(LOSS)/PROFIT ON ORDINARY ACTIVITIES BEFORE TAXATION** |  | (131,043) | 148,358 |
| Tax on profit on ordinary activities | 6 | -- | -- |
| **(LOSS )/PROFIT TRANSFERRED TO RESERVES FOR THE FINANCIAL YEAR** | 12 | (131,043) | 148,358 |

ERNST & YOUNG

F-25

## Lehman Brothers Holdings PLC

STATEMENT OF TOTAL RECOGNISED GAINS AND LOSSES
for the year ended 30 November 2004

| | 2004 $000 | 2003 $000 |
|---|---|---|
| (Loss)/ Profit attributable to shareholders of the company | (131,043) | 148,358 |
| Revaluation of fixed asset investment | 79,900 | 138,393 |
| Total (losses)/gains recognised in the year | (51,143) | 286,751 |

.

ERNST & YOUNG

F-26

## Lehman Brothers Holdings PLC

NOTES TO THE FINANCIAL STATEMENTS
at 30 November 2004

5.    **INFORMATION REGARDING DIRECTORS AND EMPLOYEES**

The company has no employees. All personnel, including directors, who perform services for the company are employed and remunerated by Lehman Brothers Limited. The company is recharged employee costs incurred by Lehman Brothers Limited for services attributable to the company.

Directors' emoluments (including pension contributions) for management services to the company were $nil (2003 - $nil).

6.    **TAX ON PROFIT ON ORDINARY ACTIVITIES**

|  | 2004 $000 | 2003 $000 |
|---|---|---|
| (Loss)/Profit on ordinary activities before taxation | (131,043) | 148,358 |
| Corporation tax at standard rate 30% | (39,312) | 44,507 |
| Effects of: |  |  |
| Expenses not deductible for tax purposes | 88,704 | 5,027 |
| Group dividend not taxable | (57,830) | (95,571) |
| Non group dividend receivable | (4,678) |  |
| Capital allowances | – | (3) |
| Brought forward losses utilised | (5,225) |  |
| Group relief surrendered free of charge | 18,341 | 46,040 |
| Current tax charge for the period | – | – |

A deferred tax asset of $32,313,089 (2003:$539,294) relating to losses available for taxation purposes and in respect of timing differences carried forward has not been recognised on the grounds that future profits against which to utilise the assets are not sufficiently guaranteed. The majority of the movement from 2003 to 2004 is explained by losses brought forward from 2003. These were not included in the asset for 2004 as they had been included as group relief surrendered free of charge. Subsequently, they were not surrendered.

*ERNST & YOUNG*

## Lehman Brothers Holdings PLC

NOTES TO THE FINANCIAL STATEMENTS
at 30 November 2004

7.    **FIXED ASSET INVESTMENTS**

|  | 2004 $000 | 2003 $000 |
|---|---|---|
| Net asset value: | | |
| Investments in subsidiary undertakings | 3,887,109 | 2,912,853 |
| Other fixed asset investments | 48,745 | 78,834 |
| | 3,935,854 | 2,991,687 |

In the opinion of the directors, the aggregate value of the fixed asset investments is not less than the amount at which they are stated in the accounts.

| | Subsidiary undertakings $000 | Listed Investments $000 | Unlisted investments $000 | Total $000 |
|---|---|---|---|---|
| Cost: | | | | |
| At 30 November 2003 | 2,866,312 | 81 | 78,753 | 2,945,146 |
| Additions | 1,162,203 | | 7,066 | 1,169,269 |
| Disposals | (5,125) | (81) | (19,043) | (24,249) |
| Permanent diminution in value | (262,722) | | (18,031) | (280,753) |
| At 30 November 2004 | 3,760,668 | - | 48,745 | 3,809,413 |
| Revaluation gains: | | | | |
| At 30 November 2003 | 46,541 | – | – | 46,541 |
| Revaluation of fixed asset investments | 32,153 | – | – | 32,153 |
| Foreign exchange movement | 47,747 | – | – | 47,747 |
| At 30 November 2004 | 126,441 | – | – | 126,441 |
| Net book value: | | | | |
| At 30 November 2004 | 3,887,109 | - | 48,745 | 3,935,854 |
| At 30 November 2003 | 2,912,853 | 81 | 78,753 | 2,991,687 |

ERNST & YOUNG

F-28

## Lehman Brothers Holdings PLC

NOTES TO THE FINANCIAL STATEMENTS
at 30 November 2004

7.   **FIXED ASSET INVESTMENTS (continued)**
The following information as at 30 November 2004 relates to the principal subsidiaries of Lehman Brothers Holdings PLC, all of which are registered in England and Wales and held by the company unless indicated.

| Name of company | Description of shares held by company | Proportion of nominal value and voting rights of shares held | Principal business |
|---|---|---|---|
| Lehman Brothers Limited | Ordinary | 100% | Service company |
| Lehman Brothers International (Europe) | Ordinary | 100% | Fixed income, equities, broking and trading |
| Lehman Brothers Europe Limited | Ordinary | 100% | Investment banking |
| Lehman Brothers Global Finance Limited | Ordinary | 100% | Inactive |
| Storm Funding Limited | Ordinary | 100% | Asset backed financing |
| Platform Investments | Ordinary | 100% | Investment company |
| Lehman Brothers (Indonesia) Limited | Ordinary | 100% | Investment banking |
| LB Cayman Finance Limited[a] | Ordinary | 100% | Equity financing |
| LBQ Funding (UK) Limited | Class A Preference | 57% | Investment company |
| OCI Holdings Plc | Ordinary | 90% | Holding company |
| Lehman Brothers Redditch No. 1 Limited | Ordinary | 100% | Equity partnership |
| Lehman Brothers Redditch No. 2 Limited | Ordinary | 100% | Equity partnership |
| Lehman Brothers Commodities Limited[b] | Ordinary | 100% | Inactive |
| Seebreeze Funding Limited[b] | Ordinary | 49% | Investment company |
| LBO Investments Ltd | Ordinary | 100% | Investment company |
| ResetFan Ltd | Ordinary | 100% | Holding company |

ERNST & YOUNG

## Lehman Brothers Holdings PLC

NOTES TO THE FINANCIAL STATEMENTS
at 30 November 2004

7.    **FIXED ASSET INVESTMENTS (continued)**

| Name of company | Description of shares held by company | Proportion of nominal value and voting rights of shares held | Principal business |
|---|---|---|---|
| Southern Pacific Mortgage Limited[b] | Ordinary | 100% | Residential Mortgage Lending |
| Pageant Properties Limited[c] | Ordinary and Preference | 65% | Property development |
| LB Equity (Nominees Number 7) Limited | Ordinary | 100% | Financing |

**New acquisitions during the financial year ended 30 November 2004**

| | | | |
|---|---|---|---|
| Furno & Del Castaño Capital Partners LLP (formerly Edgeworth Capital) | Ordinary | 51% | Fund management |
| Preferred Mortgages Limited | Ordinary | 100% | Mortgage Origination |
| ELQ Hypothekan NV | Ordinary | 100% | Mortgage Origination |
| Mable Commercial Funding Ltd. | Ordinary | 100% | Investment Company |

[a]    10% held by a subsidiary undertaking
[b]    PLC controls this company through power of attorney to appoint and remove directors
[c]    65% of ordinary shares and 85% of preference shares

## Lehman Brothers Holdings PLC

NOTES TO THE FINANCIAL STATEMENTS
at 30 November 2004

**8.    DEBTORS**

|  | 2004 $000 | 2003 $000 |
|---|---|---|
| Amounts due from: | | |
| Subsidiary undertakings | 3,678,880 | 2,648,846 |
| Parent and fellow subsidiary undertakings | 488,888 | 254,927 |
| Other debtors | 2,821 | 2,521 |
| | 4,170,589 | 2,906,294 |

Included in amounts due from subsidiary undertakings and fellow subsidiary undertakings are subordinated loans of $3,554,948,205 (2003 - $2,304,478,608) which are repayable at five days' notice by the borrower.  For the amounts due from subsidiary undertakings regulated by the Financial Services Authority, five days' notice must be given to the Financial Services Authority, which has the right to refuse consent to repayment.

**9.    CREDITORS: amounts falling due within one year**

|  | 2004 $000 | 2003 $000 |
|---|---|---|
| Marketable securities sold not yet purchased | 1,987,368 | 1,838,879 |
| Amounts due to: | | |
| Subsidiary undertakings | 2,275 | 1,695 |
| Parent and fellow subsidiary undertakings | 3,818,685 | 2,685,570 |
| Other creditors | 5,266 | 9,804 |
| | 5,813,594 | 4,535,948 |

Included in amounts due to parent and fellow subsidiary undertakings are subordinated loans of $3,149,000,000 (2003 - $2,129,000,000) which are repayable at one day's notice.

**10.    CREDITORS: amounts falling due after more than one year**

|  | 2004 $000 | 2003 $000 |
|---|---|---|
| Other creditors | - | 3,041 |
| | - | 3,041 |

F-31

## Lehman Brothers Holdings PLC

NOTES TO THE FINANCIAL STATEMENTS
at 30 November 2004

11. **SHARE CAPITAL**

|  | 2004 £000 | 2003 £000 |
|---|---|---|
| Authorised: | | |
| 79,750,000 Ordinary shares of £1 each | 79,750 | 79,750 |
| 250,000 'B' Ordinary shares of £1 each | 250 | 250 |
| 20,000,000 Non Cumulative Redeemable Preference shares of £1 each | 20,000 | 20,000 |
|  | 100,000 | 100,000 |

|  | 2004 $000 | 2003 $000 |
|---|---|---|
| 1,000,000,000 Ordinary shares of $1 each | 1,000,000 | 1,000,000 |
| 2,000,000,000 Non Cumulative Redeemable Preference shares of $1 each | 2,000,000 | 1,000,000 |
|  | 3,000,000 | 2,000,000 |

|  | 2004 $000 | 2003 $000 |
|---|---|---|
| Allotted, called up and fully paid: | | |
| 40,021,100 Ordinary shares of £1 each | 66,266 | 66,266 |
| 653,800,000 Ordinary shares of $1 each | 653,800 | 653,800 |
| 20,000,000 Non Cumulative Redeemable Preference shares of £1 each | 33,116 | 33,116 |
| 225,000,000 Non Cumulative Redeemable Preference shares of $1 each | 225,000 | 225,000 |
| 985,000,000 Non Cumulative Redeemable Preference shares of $1 each | 985,000 | - |
|  | 1,963,182 | 978,182 |

The Non Cumulative Redeemable Preference shares may be redeemed at any time by the company by giving the holders of the preference shares not less than one month's notice in writing.

The Preference shares carry a fixed non cumulative preferential dividend of £100 per annum.

The rights of the Preference shares on redemption or a winding up are the amount of capital paid up together with a sum equal to any arrears of the fixed non cumulative preferential dividend provided they have been declared.

The Preference shares shall not entitle the holders to receive notice of, or to attend and vote at, any general meeting of the company.

During the year the company has authorised 1,000,000,000 non cumulative redeemable preference shares of $1 and issued 985,000,000 non cumulative redeemable preference shares of $1 each .

## Lehman Brothers Holdings PLC

NOTES TO THE FINANCIAL STATEMENTS
at 30 November 2004

### 12.  RECONCILIATION OF MOVEMENTS IN SHAREHOLDERS' FUNDS

|  | 2004 $000 | 2003 $000 |
|---|---|---|
| (Loss) / Profit attributable to shareholders of the company | (131,043) | 148,358 |
| Additional preference shares | 985,000 | 125,000 |
| Revaluation of fixed asset investment | 79,900 | 138,393 |
| Net movement in shareholders' funds | 933,857 | 411,751 |
| Opening shareholders' funds | 1,358,992 | 947,241 |
| Closing shareholders' funds | 2,292,849 | 1,358,992 |

### 13.  PROFIT AND LOSS ACCOUNT

|  | $000 |
|---|---|
| Accumulated profit at 30 November 2003 | 157,707 |
| Retained loss for the year | (131,043) |
| Accumulated profit at 30 November 2004 | 26,664 |

### 14.  OTHER RESERVES

|  | Revaluation reserve $000 | Capital reserve $000 | Total $000 |
|---|---|---|---|
| At 30 November 2003 | 46,541 | 173,250 | 219,791 |
| Revaluation of fixed asset investments | 79,900 | – | 79,900 |
| At 30 November 2004 | 126,441 | 173,250 | 299,691 |

There is no corporation tax liability in respect of items taken to the revaluation reserve.

The balance shown as capital reserve is non-distributable.

### 15.  COMMITMENTS

(a)    The company enters into interest rate swaps in the normal course of business with affiliated companies.

(b)    On 23 March 2005 the company agreed to guarantee the issuance of €225,000,000 Fixed Rate to CMS linked subordinated notes by partnership Lehman Brothers UK Capital Funding UK LP.

(c)    The company has issued letters of support for several of its subsidiaries.

## Lehman Brothers Holdings PLC

NOTES TO THE FINANCIAL STATEMENTS
at 30 November 2004

**16.    CONTINGENT LIABILITIES**

The company is registered with HM Customs & Excise as a member of the Lehman Brothers Limited group for VAT purposes and, as a result, is jointly and severally liable on a continuing basis for amounts owing by other members of the group in respect of unpaid VAT.

Lehman Brothers Holdings PLC has received US Government Securities as collateral against put options it holds over its preference share investment in LBQ Funding (UK) Limited. The value of the US Government Securities received at 30 November was $1,987,368,269 (2003 - $1,838,878,618).

**17.    ULTIMATE PARENT COMPANY**

The ultimate parent company of Lehman Brothers Holdings PLC is Lehman Brothers Holdings Inc. which is incorporated in the State of Delaware in the United States of America.

The company has taken advantage of the FRS 8 exemption from disclosing transactions with related parties that are part of the Lehman Brothers Holdings Inc group.

The largest group in which the results of the company are consolidated is that headed by Lehman Brothers Holdings Inc incorporated in the United States of America. The smallest group in which they are consolidated is that headed by Lehman Brothers Spain Holdings Ltd, registered in England and Wales. The consolidated accounts of these groups are available to the public from 745 Seventh Avenue, New York, USA and from 25 Bank Street, Canary Wharf London respectively.

**18.    POST BALANCE SHEET EVENTS**

Since the year end the company has issued shares as follows:

-    50,000,000 Non-Cumulative Preference shares of $1 each on 2 February 2005,

-    150,000,000 Non-Cumulative Preference shares of $1 each on 28 April 2005,

-    150,000,000 Non-Cumulative Preference shares of $1 each on 12 May 2005;

-    250,000,000 Non-Cumulative Preference shares of $1 each on 16 June 2005.

The proceeds of the share issues have been used to inject capital in to Lehman Brothers International (Europe).

On 23 March 2005 the company agreed to guarantee the issuance of €225,000,000 Fixed Rate to CMS linked subordinated notes by partnership Lehman Brothers UK Capital Funding UK LP.

On 18 May 2005, the company acquired 100% share capital of MBAM Investor Limited.

.

ERNST & YOUNG

F-34

## Lehman Brothers Holdings PLC

### BALANCE SHEET
at 30 November 2004

|  | Notes | 2004 $000 | 2003 $000 |
|---|---|---|---|
| **FIXED ASSETS** | | | |
| Investments | 7 | 3,935,854 | 2,991,687 |
| **CURRENT ASSETS** | | | |
| Debtors | 8 | 4,170,589 | 2,906,294 |
|  | | 4,170,589 | 2,906,294 |
| **CREDITORS:** amounts falling due within one year | 9 | (5,813,594) | (4,535,948) |
| **NET CURRENT LIABILITIES** | | (1,643,005) | (1,629,654) |
| **TOTAL ASSETS LESS CURRENT LIABILITIES** | | 2,292,849 | 1,362,033 |
| **CREDITORS:** amounts falling due after more than one year | 10 | – | (3,041) |
|  | | 2,292,849 | 1,358,992 |
| **CAPITAL AND RESERVES** | | | |
| Called up share capital | 11 | 1,963,182 | 978,182 |
| Share premium account | | 3,312 | 3,312 |
| Profit and loss account | 13 | 26,664 | 157,707 |
| Other reserves | 14 | 299,691 | 219,791 |
| **SHAREHOLDERS' FUNDS** | | | |
| Equity | | 1,049,733 | 1,100,876 |
| Non-equity | | 1,243,116 | 258,116 |
|  | | 2,292,849 | 1,358,992 |

Director

28 JUN 2005

F-35

## Lehman Brothers Holdings PLC

NOTES TO THE FINANCIAL STATEMENTS
at 30 November 2004

**1.    ACCOUNTING POLICIES**

*Basis of preparation*
The financial statements have been prepared under the historical cost convention and in accordance with applicable accounting standards except as set out below.

The accounts present information for the company as an individual entity and not about its group. Group accounts have not been prepared as the company is a subsidiary of Lehman Brothers UK Spain Holdings Ltd, a company registered in England and Wales which prepares group accounts.

*Statement of cash flows*
The directors have taken advantage of the exemption in paragraph 5(a) of Financial Reporting Standard 1 (revised) from producing a cashflow statement.

*Functional currency*
The company's functional currency is US dollars as the directors consider this to be the most appropriate currency for the company's business.

*Investments in subsidiary undertakings*
Investments in subsidiary undertakings are stated at underlying net asset value. Any permanent diminution in the net asset value of an investment as compared to historical cost is charged to the profit and loss account. In all other cases the difference between net asset value and historical cost is charged or credited to a revaluation reserve.

For investments in subsidiary undertakings denominated in currencies other than the functional currency of the company, historical cost and net asset value are determined with reference to the historical exchange rate at acquisition and the prevailing year end exchange rate respectively.

*Other fixed asset investments*
Other unlisted fixed asset investments are stated at cost unless, in the opinion of the directors there has been a permanent diminution in value, in which case an appropriate adjustment is made. Listed investments are stated at market value.

*Deferred taxation*
Deferred tax is recognised in respect of all timing differences, at the rates of taxation anticipated to apply when these differences crystallise, arising from the inclusion of items of income and expenditure in taxation computations in periods different from those for which they are included in the financial statements.

Deferred tax assets are recognised only to the extent that the directors consider that it is more likely than not that there will be suitable taxable profits from which the future reversal of the underlying timing differences can be deducted.

Provision is made for tax on gains arising from the revaluation (and similar fair value adjustments) of fixed assets, and gains on disposal of fixed assets that have been rolled over into replacement assets, only to the extent that, at the balance sheet date, there is a binding agreement to dispose of the assets concerned. However, no provision is made where, on the basis of all available evidence at the balance sheet date, it is more likely than not that the taxable gain will be rolled over into replacement assets and charged to tax only where the replacement assets are sold.

Provision is made for deferred tax that would arise on remittance of the retained earnings of overseas subsidiaries, associates and joint ventures only to the extent that, at the balance sheet date, dividends have been accrued as receivable.

Deferred tax is measured on an undiscounted basis at the tax rates that are expected to apply in the periods in which timing differences reverse, based on tax rates and laws enacted or substantively enacted at the balance sheet date.

## Lehman Brothers Holdings PLC

### NOTES TO THE FINANCIAL STATEMENTS
at 30 November 2004

#### ACCOUNTING POLICIES (continued)

*Valuation of securities sold not yet purchased*
Securities sold not yet purchased are stated at market value with all gains and losses reflected in the profit and loss account.

*Foreign currency translation*
Assets and liabilities denominated in foreign currencies are translated into US dollars at rates of exchange ruling at the balance sheet date. Transactions in foreign currencies are translated into US dollars at the rate of exchange ruling at the end of the month in which the transaction occurs. Any differences arising from translation are taken to the profit and loss account. Exchange differences arising on translation of the company's net equity interest in subsidiaries with a functional currency other than US dollar are shown as movements on reserves.

*Dividends*
Dividends are accrued when declared by subsidiaries.

2. **OPERATING LOSS/ INCOME**

Operating loss/income, which excludes value added tax, has been disclosed instead of turnover as this reflects more accurately the results of the company's activities. The analysis of losses/income by geographical area has been omitted as the directors consider that it would be seriously prejudicial to disclose this information. All the company's operating losses/income arises from continuing activities. Operating loss/income comprises:

|  | 2004 $000 | 2003 $000 |
|---|---|---|
| (Loss)/Income from Investments | (270,406) | 14,923 |
| Profit on disposal of fixed asset investments | 22,489 | – |
| Income from shares in group undertakings | 192,767 | 318,570 |
| Other operating losses | (11,965) | (11,238) |
|  | (67,115) | 322,255 |

3. **INTEREST RECEIVABLE AND SIMILAR INCOME**

|  | 2004 $000 | 2003 $000 |
|---|---|---|
| Group undertakings | 58,162 | 11,692 |
|  | 58,162 | 11,692 |

4. **INTEREST PAYABLE AND SIMILAR CHARGES**

|  | 2004 $000 | 2003 $000 |
|---|---|---|
| Group undertakings | (119,302) | (182,706) |
|  | (119,302) | (182,706) |

**ISSUER**

**Lehman Brothers UK Capital Funding LP II**
25 Bank Street
London E14 5LE
England

**GUARANTOR**

**Lehman Brothers Holdings plc**
25 Bank Street
London E14 5LE
England

**PRINCIPAL PAYING AND TRANSFER AGENT**

**JPMorgan Chase Bank, N.A., London Branch**
Trinity Tower
9 Thomas More Street
London E1W 1YT
England

**PAYING AND TRANSFER AGENT and REGISTRAR**

**J.P. Morgan Bank Luxembourg S.A.**
6, route de Trèves
L-2633 Senningerberg
Luxembourg

**LEGAL ADVISERS**

*as to English and New York law*
**Allen & Overy LLP**
One New Change
London EC4M 9QQ
England

**AUDITORS**

Ernst & Young LLP
1 More London Place
London SE1 2AF
England

printed by **eprint*financial*.com**
tel: + 44 (0) 20 7613 1800   document number 3278

**FINAL TERMS**

**Lehman Brothers UK Capital Funding II L.P. (the "Issuer")**

**Fixed Rate Guaranteed Non-Voting Non-Cumulative Perpetual Preferred Securities
(the "Preferred Securities")**

**having the benefit of a subordinated guarantee of**

**Lehman Brothers Holdings plc (the "Guarantor")**

Terms used herein shall be deemed to be defined as such for the purposes of the Description of the Preferred Securities set forth in the Prospectus dated 30th August, 2005 which constitutes a base prospectus for the purposes of the Prospectus Directive (Directive 2003/71/EC) (the **Prospectus Directive**).  This document constitutes the Final Terms of the Preferred Securities described herein for the purposes of Article 5.4 of the Prospectus Directive and must be read in conjunction with the Prospectus.  Full information on the Issuer and the offer of the Preferred Securities is only available on the basis of the combination of these Final Terms and the Prospectus.  The Prospectus is available for viewing at 25 Bank Street, London E14 5LE and copies may be obtained from 25 Bank Street, London E14 5LE.

| | |
|---|---|
| **Closing Date:** | 21st September, 2005 |
| **Distribution Rate:** | 5.125 per cent. per annum payable annually in arrear |
| **Distribution Payment Dates:** | 21st September in each year, with the first Distribution Payment Date being on 21st September, 2006 |
| **Aggregate Nominal Amount of the Preferred Securities:** | €200,000,000 |
| **First Call Date of Subordinated Notes:** | 21st September 2009 |
| **Net Proceeds:** | €196,000,000 |
| **Managers:** | **Lead Manager**<br>Lehman Brothers International (Europe)<br><br>**Co-Managers**<br>Banco Espírito Santo de Investimento S.A.<br>BCP Investimento - Banco Comercial Português de Investimento, SA<br>Banco Español de Crédito, S.A.<br>DZ BANK AG Deutsche Zentrale-Genossenschaftbank, Frankfurt am Main<br>HSBC Bank plc<br>ING Belgium SA/NV |
| **ISIN:** | XS0229269856 |
| **Common Code:** | 022926985 |

|  |  |
|---|---|
| **Ratings:** | The Preferred Securities are expected to be assigned on issue the following ratings:<br><br>Moody's Investors Service Limited: A3<br>Fitch IBCA: A |

**Other terms:**

The above pricing gives a yield of 5.125 per cent. per annum.  Such yield is applicable as of the date of these Final Terms and may fluctuate in the future.  For the avoidance of doubt, upon issuance of any Eligible Investments (or further Eligible Investments) as defined in the terms of the Preferred Securities in the Prospectus, the interest rate applicable to the Eligible Investments (or further Eligible Investments) will be the fixed rate per annum determined by the then prevailing market conditions for instruments of similar risk and 30-year maturity.  This does not effect the Distribution Rate on the Preferred Securities.

The date of these Final Terms is 20th September, 2005.

**LISTING AND ADMISSION TO TRADING APPLICATION**

These Final Terms comprise the final terms required to list and have admitted to trading the issue by Lehman Brothers UK Capital Funding II L.P. of the Preferred Securities described herein.

**RESPONSIBILITY**

Each of the LB GP No. 1 Ltd (the "**General Partner**"), acting on behalf of the Issuer, and the Guarantor accepts responsibility for the information contained in these Final Terms.

Signed by LB GP No. 1 Ltd                           Signed on behalf of the Guarantor:
as General Partner,
acting on behalf of the Issuer:

By:   …………………………………          By:   ……………………………………
     *Duly authorised*                                    *Duly authorised*

# **<u>EXHIBIT D</u>**

**CONFORMED COPY**

**Dated 22nd March, 2005**

**LB GP NO. 1 LTD.**
as General Partner

and

**CHASE NOMINEES LIMITED**
as Initial Limited Partner

and

**LB INVESTMENT HOLDINGS LTD.**
as Preferential Limited Partner

and

**LEHMAN BROTHERS HOLDINGS PLC**
as Guarantor

and

**LEHMAN BROTHERS HOLDINGS INC.**

---

**LIMITED PARTNERSHIP AGREEMENT**
establishing
**LEHMAN BROTHERS UK CAPITAL FUNDING LP**

---

# ALLEN & OVERY

**ALLEN & OVERY LLP**
**LONDON**

# CONTENTS

Page No

1.     Definitions and interpretation......................................................................................2
2.     Formation, Nature and Term of the Issuer ..................................................................5
3.     Management of the Issuer ............................................................................................9
4.     Commitments ..............................................................................................................14
5.     Capital Contributions .................................................................................................15
6.     Preferred Securities ....................................................................................................17
7.     Preferential Limited Partner .......................................................................................17
8.     Registration of Partnership Interests ..........................................................................18
9.     Certificates of Preferred Securities.............................................................................18
10.    Transfer of interests in the Issuer ...............................................................................19
11.    Capital Accounts .........................................................................................................22
12.    Allocation of Income and Distributions .....................................................................22
13.    Books, Records and Accounts.....................................................................................23
14.    Withdrawal/Replacement of the General Partner........................................................23
15.    Partnership Finances ...................................................................................................24
16.    Dissolution of Partnership...........................................................................................24
17.    Partnership Meetings...................................................................................................26
18.    Undertakings of LBHI.................................................................................................30
19.    General ........................................................................................................................31
Schedule 1 - Part I Form of Global Certificate for Preferred Securities ..............................34
Schedule 1 - Part II Form of Certificate for Preferred Securities.........................................36

1

**THIS LIMITED PARTNERSHIP AGREEMENT** is made on 22nd March, 2005

**BETWEEN:**

1.    **LB GP NO. 1 LTD.,** a company incorporated in England and Wales with registered number 5355491 whose registered office is at 25 Bank Street, London E14 5LE, United Kingdom (the **General Partner**);

2.    **CHASE NOMINEES LIMITED** (the **Initial Limited Partner**), a company incorporated in England and Wales with registered number 00248239 whose registered office is at 125 London Wall, London EC2Y 5AJ;

3.    **LB INVESTMENT HOLDINGS LTD.,** a company incorporated in England and Wales with registered number 4385277 whose registered office is at 25 Bank Street, London E14 5LE (the **Preferential Limited Partner**);

4.    **LEHMAN BROTHERS HOLDINGS PLC,** a company incorporated in England and Wales with registered number 1854685 whose registered office is at 25 Bank Street, London E14 5LE (the **Guarantor**); and

5.    **LEHMAN BROTHERS HOLDINGS INC.,** a corporation established in Delaware with limited liability (**LBHI**).

**WHEREAS** the General Partner has agreed to become the general partner, the Preferential Limited Partner has agreed to become a limited partner and the Initial Limited Partner, being a nominee for a common depositary for Euroclear and Clearstream, Luxembourg (each as defined below), has agreed (acting as principal and not as agent) to become a limited partner in a limited partnership (the **Partnership**) to be formed under the Limited Partnerships Act 1907 (the **Act**) under the name Lehman Brothers UK Capital Funding LP in accordance with the terms and conditions set out in this Agreement and which is referred to herein as the **Issuer**.

**WHEREAS** neither the Guarantor nor LBHI are, nor will either of them be or become, a partner (general or limited) in the Issuer and each of the Guarantor and LBHI is a party to this Agreement solely for the purposes of acknowledging its terms, agreeing to any actions stated to be performed by the Guarantor and/or LBHI in Schedule 2 and, in the case of LBHI, clause 18.

**NOW IT IS HEREBY AGREED** as follows:

1.    **DEFINITIONS AND INTERPRETATION**

    1.1.    **Definitions**

        In this Agreement, terms defined in Schedule 2 shall have the same meaning elsewhere in this Agreement subject to the provisions of this clause and unless the context otherwise requires; and

        **Accounts** means the annual accounts of the Issuer prepared in accordance with the provisions of sub-clause 13.2;

        **Administration Agreement** means the agreement between the Guarantor, the Issuer (acting through the General Partner) and the Administrator to be dated 30th March, 2005 setting out the detailed duties of the Administrator in respect of the operation of the Partnership;

2

2.2   **Name**

(a)   Subject to sub-clause 2.2(b), the name of the Issuer shall be "Lehman Brothers UK Capital Funding LP".

(b)   Subject to the provisions of the Act or otherwise at law, the Issuer shall be called by such other name as the General Partner may specify from time to time in its absolute discretion by written notice given to the Limited Partners.

2.3   **Term of the Issuer**

The Issuer shall not be terminable by the General Partner (whether on notice or otherwise) and shall continue until the earlier of the date on which the Issuer is dissolved or terminated in accordance with the provisions of this Agreement, and the first date on which there is not at least one general partner and at least one limited partner for the purposes of the Act.

2.4   **Business**

The business of the Issuer shall be to raise and provide finance and financial support to the Guarantor and its group.  In carrying on such business, the Issuer shall do (*inter alia*) the following:

(a)   acquire and hold the Subordinated Notes;

(b)   admit (through the General Partner) new limited partners from time to time as Limited Partners;

(c)   consider from time to time and advise the Guarantor in relation to, and agree with the Guarantor how to take forward, opportunities to raise additional finance and/or provide financial support to the Guarantor;

(d)   monitor the Partnership Assets (being initially the Subordinated Notes) and dispose of and/or replace them in accordance with the terms of the Preferred Securities; and

(e)   enter into and perform (through the General Partner) any contracts and agreements, and carry on any other activities as may, in the opinion of the General Partner, be necessary or advisable for the accomplishment of the foregoing purposes and the performance of this Agreement.

The business of the Issuer shall not be carried on with a view to constituting a trading activity or an adventure in the nature of a trade.

2.5   **Principal Place of Business**

The Principal Place of Business and registered office of the Issuer shall be 25 Bank Street, London E14 5LE, England on the date on which the Issuer is registered with the Limited Partnerships Registrar on the Limited Partnerships Register and thereafter, such other place as the General Partner in its sole discretion determines, and the General Partner shall by written notice to the Limited Partners notify them of any change in the principal place or places of business or the registered office of the Issuer.

### 15.    PARTNERSHIP FINANCES

#### 15.1    Partnership Bank Accounts

The General Partner shall be authorised to open and operate one or more bank accounts in its discretion on behalf of and for the purposes of the Issuer on such terms as it thinks fit.

#### 15.2    Auditors

(a)    The initial Auditors of the Issuer shall be Ernst & Young LLP.

(b)    The Auditors may resign from office or be removed at any time by the General Partner.

(c)    Upon any such resignation or removal, unless any such resignation or removal results from a replacement of auditors as required by applicable law or the replacement of the auditors of the Guarantor, the Auditors shall be requested to send a written notice to each of the Limited Partners containing:

(1)    a statement that there are no circumstances connected with their resignation or removal which they consider should be brought to the attention of the Limited Partners; or

(2)    a statement of any such circumstances.

(d)    New Auditors, which may be the auditors of the Guarantor, shall be appointed by the General Partner who may appoint such firm of chartered accountants as it thinks fit to fill any vacancy in the office of Auditors to the Issuer.

#### 15.3    Accounting Period of the Issuer

The first accounting period of the Issuer shall begin on the date hereof and end on 30th November, 2005; thereafter, each accounting period of the Issuer shall begin on 1st December of each year and end on 30th November of that calendar year, or shall begin and/or end on such other dates as may be determined by the General Partner in its sole discretion.

### 16.    DISSOLUTION OF PARTNERSHIP

#### 16.1    Grounds for Dissolution

Except as provided in this Agreement, no Partner shall have the right to cause the dissolution of the Issuer by notice.

#### 16.2    Continuation of Partnership

The Issuer shall not be dissolved or terminated by the Incapacity of any Limited Partner, the assignment or transfer by any Limited Partner of its Preferred Securities, or the admission of a new or substituted General Partner or Limited Partner.

16.3    **Events Causing Dissolution**

Subject to the Act and the other provisions of this Agreement, the Issuer shall be dissolved and terminated and the Partnership Assets distributed in the manner provided for in sub-clause 16.5 on the occurrence of the following events:

(a)    an order being made for the bankruptcy, dissolution, liquidation or winding up of the General Partner or a special resolution of the General Partner being passed for its winding up other than in circumstances where the business of the General Partner has been transferred pursuant to sub-clause 10.2; or

(b)    an order for dissolution being made by the English Court (under Section 35 of the Partnership Act 1890); or

(c)    payment of the Capital Contribution referred to in sub-clause 5.1 hereof not having been made pursuant to the Subscription Agreement; or

(d)    as set out in sub-clause 2.3; or

(e)    an exercise of redemption or dissolution rights pursuant to Schedule 2.

16.4    **General Partner's Liability Upon Dissolution or Retirement**

Upon dissolution of the Issuer or upon the General Partner ceasing to serve as such, whether as a result of its retirement or otherwise, the General Partner shall be obliged to contribute to the capital of the Issuer the amount necessary to restore the deficit, if any, in the General Partner's Capital Account balance to zero. Other than as set forth in the foregoing sentence, the General Partner will not be personally liable for the return of all or any part of any Capital Contribution. Any such return shall be made solely from Partnership Assets (to the extent available therefor after payment of any creditors of the Issuer in accordance with the Act) and in accordance with this Agreement.

16.5    **Distribution of Assets on Dissolution**

(a)    Subject to the Act, and subject to the relevant provisions of Schedule 2 which include the non-objection of the Regulator, in the event of a dissolution of the Issuer (whether by the General Partner or such other person or persons as may be appointed by a competent court in accordance with the Act to be the person or persons responsible for the liquidation of the Issuer), the General Partner (or such other person or persons as may be appointed by a competent court in accordance with the Act to be the person or persons responsible for the liquidation of the Issuer) shall cause the Partnership Assets (to the extent remaining after payment of any creditors of the Issuer) to be applied as follows to the extent of such Partnership Assets:

(1)    first, in payment of the Liquidation Distributions or the Optional Redemption Price, as the case may be, in respect of each Preferred Security held, payable to any Limited Partners as holders of the Preferred Securities;

(2)    secondly, in payment of any amount payable to the Preferential Limited Partner in respect of its payment rights under this Agreement; and

(3)      thirdly, as to any surplus, to the General Partner.

(b)      On a dissolution of the Issuer, the Limited Partners shall not be entitled to distributions except in cash and the General Partner (or such other person or persons as may be appointed by a competent court in accordance with the Act to be the person or persons responsible for the liquidation of the Issuer) need not distribute all of the Partnership Assets at once, but may make partial distributions.

### 16.6    Liquidation Statement

Each of the Partners shall be furnished with a statement prepared by the General Partner or its delegate with respect to any winding up of the Issuer, which shall set forth the assets and liabilities of the Issuer as of the date of complete liquidation of the Partnership Assets.

## 17.    PARTNERSHIP MEETINGS

### 17.1    Convening of Meetings

The General Partner may whenever it thinks fit convene a meeting of the Partners for the purposes of consenting to any matters requiring the consent or ratification of all the Limited Partners under the Act or a meeting of the Limited Partners for the purposes of seeking the consent of those Limited Partners to any matter requiring such consent pursuant to this Agreement. The rights of Limited Partners to receive notice of, attend or vote at, any meeting of Partners is limited to the circumstances set out in this Agreement. The Limited Partners may convene a meeting of such Limited Partners in accordance with and for the purposes set out in Schedule 2.

### 17.2    Notice of Meeting

(a)      At least fourteen clear days' (or such shorter period as a simple majority of the Partners (or the Limited Partners, as the case may be) may agree in writing) notice of a meeting of Partners (or the Limited Partners, as the case may be) shall be given by the General Partner to the Partners (or the Limited Partners, as the case may be), and such notice shall be in writing and sent to the address of each Partner (or Limited Partner, as the case may be) as recorded in the Limited Partnerships Register. Such notice shall be deemed to be effective notice of a meeting. Each such notice will include a statement setting forth (i) the date, time and place of such meeting, (ii) a description of any resolution to be proposed for adoption at such meeting on which such Partners are entitled to vote and (iii) instructions for the delivery of proxies. All such meetings shall be held in London or as otherwise determined by the General Partner.

(b)      In every notice calling a meeting of Partners there shall appear with reasonable prominence a statement that a Partner entitled to attend and vote is entitled to appoint one or more proxies to attend and vote instead of him and that a proxy need not also be a Partner.

(c)      The accidental omission to give notice of a meeting to, or the non-receipt of notice of a meeting by, any person entitled to receive notice shall not invalidate the proceedings at that meeting.

26

CONFORMED COPY

**Dated 25th August, 2005**

**LB GP NO. 1 LTD.**
**as General Partner**

**and**

**CHASE NOMINEES LIMITED**

**and**

**LB INVESTMENT HOLDINGS LTD.**
**as Preferential Limited Partner**

**and**

**LEHMAN BROTHERS HOLDINGS PLC**
**as Guarantor**

**and**

**LEHMAN BROTHERS HOLDINGS INC.**

---

**LIMITED PARTNERSHIP AGREEMENT**
**establishing**
**LEHMAN BROTHERS UK CAPITAL FUNDING II LP**

---

ALLEN & OVERY

**ALLEN & OVERY LLP**
**LONDON**

# CONTENTS

Page No

1.  Definitions and interpretation ................................................................................. 2
2.  Formation, Nature and Term of the Issuer .............................................................. 6
3.  Management of the Issuer ...................................................................................... 10
4.  Commitments ......................................................................................................... 15
5.  Capital Contributions ............................................................................................ 16
6.  Preferred Securities ............................................................................................... 18
7.  Preferential Limited Partner .................................................................................. 19
8.  Registration of Partnership Interests ..................................................................... 19
9.  Certificates of Preferred Securities ....................................................................... 20
10. Transfer of interests in the Issuer ......................................................................... 21
11. Capital Accounts ................................................................................................... 23
12. Allocation of Income and Distributions ............................................................... 24
13. Books, Records and Accounts ............................................................................... 24
14. Withdrawal/Replacement of the General Partner ................................................. 25
15. Partnership Finances ............................................................................................. 25
16. Dissolution of Partnership ..................................................................................... 26
17. Partnership Meetings ............................................................................................. 27
18. Undertakings of LBHI ........................................................................................... 32
19. General ................................................................................................................... 33
Schedule 1 - Part I Form of Global Certificate for Preferred Securities ............................ 36
Schedule 1 - Part II Form of Certificate for Preferred Securities ...................................... 38
Schedule 2 - Part I Terms of the Preferred Securities ....................................................... 39
Schedule 2 - Part II Form of Final Terms .......................................................................... 50

1

**THIS LIMITED PARTNERSHIP AGREEMENT** is made on 25th August, 2005

**BETWEEN:**

1.    **LB GP NO. 1 LTD.**, a company incorporated in England and Wales with registered number 5355491 whose registered office is at 25 Bank Street, London E14 5LE, United Kingdom (the **General Partner**);

2.    **CHASE NOMINEES LIMITED** (**CNL**), a company incorporated in England and Wales with registered number 00248239) whose registered office is at 125 London Wall, London EC2Y 5AJ;

3.    **LB INVESTMENT HOLDINGS LTD.,** a company incorporated in England and Wales with registered number 4385277 whose registered office is at 25 Bank Street, London E14 5LE (the **Preferential Limited Partner**);

4.    **LEHMAN BROTHERS HOLDINGS PLC,** a company incorporated in England and Wales with registered number 1854685 whose registered office is at 25 Bank Street, London E14 5LE (the **Guarantor**); and

5.    **LEHMAN BROTHERS HOLDINGS INC.,** a corporation established in Delaware with limited liability (**LBHI**).

**WHEREAS** the General Partner has agreed to become the general partner and the Preferential Limited Partner has agreed to become a limited partner in a limited partnership (the **Partnership**) to be formed under the Limited Partnerships Act 1907 (the **Act**) under the name Lehman Brothers UK Capital Funding II LP in accordance with the terms and conditions set out in this Agreement and which is referred to herein as the **Issuer**.

**WHEREAS** it is the intention of the parties that CNL, being a nominee for a common depositary for Euroclear and Clearstream, Luxembourg (each as defined below), is to become a limited partner in the Partnership on the Closing Date (as defined below). CNL (acting as principal and not as agent) is party to this Agreement for the purpose of agreeing to become a Limited Partner (as defined below) and agreeing to be bound by the terms of this Agreement as they apply to Limited Partners on and from its admission to the Issuer in accordance with sub-clause 2.6(c), and agreeing to make its Capital Contribution (as defined below) as set out in clauses 4 and 5 on the Closing Date.

**WHEREAS** neither the Guarantor nor LBHI are, nor will either of them be or become, a partner (general or limited) in the Issuer and each of the Guarantor and LBHI is a party to this Agreement solely for the purposes of acknowledging its terms, agreeing to any actions stated to be performed by the Guarantor and/or LBHI in Schedule 2, Part 1 and, in the case of LBHI, clause 18.

**NOW IT IS HEREBY AGREED** as follows:

1.    **DEFINITIONS AND INTERPRETATION**

    1.1.    **Definitions**

        In this Agreement, terms defined in Schedule 2 shall have the same meaning elsewhere in this Agreement subject to the provisions of this clause and unless the context otherwise requires; and

        **Accounts** means the annual accounts of the Issuer prepared in accordance with the provisions of sub-clause 13.2;

2

2.        **FORMATION, NATURE AND TERM OF THE ISSUER**

2.1        **Formation and Constitution**

(a)        The General Partner and the Preferential Limited Partner hereby form a limited partnership in accordance with, and subject to, the terms and conditions of this Agreement, which shall be a limited partnership registered pursuant to the Act.

(b)        The General Partner shall, on, or as soon as practicable after execution of this Agreement and payment of the initial Capital Contributions of €1.00 by itself and the Preferential Limited Partner, respectively, as required on the date hereof pursuant to clauses 4.1 and 4.4, register the Issuer with the Limited Partnerships Registrar on the Limited Partnerships Register in accordance with the Act.

(c)        The Issuer shall be a limited partnership from the Registration Date by registration by the General Partner of the Issuer with the Limited Partnerships Registrar as a limited partnership in accordance with the Act.

(d)        On the admission of a Limited Partner subsequent to the Registration Date (including the Initial Limited Partner), the General Partner undertakes to comply with the filing and notification requirements of the Act and shall arrange for the notification forthwith of particulars of any relevant change in the constitution of the Issuer to the Limited Partnerships Registrar in the form prescribed by the Act, specifying the date and nature of such change.

2.2        **Name**

(a)        Subject to sub-clause 2.2(b), the name of the Issuer shall be "Lehman Brothers UK Capital Funding II LP".

(b)        Subject to the provisions of the Act or otherwise at law, the Issuer shall be called by such other name as the General Partner may specify from time to time in its absolute discretion by written notice given to the Limited Partners.

2.3        **Term of the Issuer**

The Issuer shall not be terminable by the General Partner (whether on notice or otherwise) and shall continue until the earlier of the date on which the Issuer is dissolved or terminated in accordance with the provisions of this Agreement, and the first date on which there is not at least one general partner and at least one limited partner for the purposes of the Act.

2.4        **Business**

The business of the Issuer shall be to raise and provide finance and financial support to the Guarantor and its group.  In carrying on such business, the Issuer shall do (*inter alia*) the following:

(a)        acquire and hold the Subordinated Notes;

(b)        admit (through the General Partner) new limited partners from time to time as Limited Partners;

15.3    **Accounting Period of the Issuer**

The first accounting period of the Issuer shall begin on the date hereof and end on30th November, 2005; thereafter, each accounting period of the Issuer shall begin on 1st December of each year and end on 30th November of that calendar year, or shall begin and/or end on such other dates as may be determined by the General Partner in its sole discretion.

## 16.    DISSOLUTION OF PARTNERSHIP

16.1    **Grounds for Dissolution**

Except as provided in this Agreement, no Partner shall have the right to cause the dissolution of the Issuer by notice.

16.2    **Continuation of Partnership**

The Issuer shall not be dissolved or terminated by the Incapacity of any Limited Partner, the assignment or transfer by any Limited Partner of its Preferred Securities, or the admission of a new or substituted General Partner or Limited Partner.

16.3    **Events Causing Dissolution**

Subject to the Act and the other provisions of this Agreement, the Issuer shall be dissolved and terminated and the Partnership Assets distributed in the manner provided for in sub-clause 16.5 on the occurrence of the following events:

(a)    an order being made for the bankruptcy, dissolution, liquidation or winding up of the General Partner or a special resolution of the General Partner being passed for its winding up other than in circumstances where the business of the General Partner has been transferred pursuant to sub-clause 10.2; or

(b)    an order for dissolution being made by the English Court (under Section 35 of the Partnership Act 1890); or

(c)    payment of the Capital Contribution referred to in sub-clause 5.1 hereof not having been made pursuant to the Subscription Agreement; or

(d)    as set out in sub-clause 2.3; or

(e)    an exercise of redemption or dissolution rights pursuant to Schedule 2, Part I.

16.4    **General Partner's Liability Upon Dissolution or Retirement**

Upon dissolution of the Issuer or upon the General Partner ceasing to serve as such, whether as a result of its retirement or otherwise, the General Partner shall be obliged to contribute to the capital of the Issuer the amount necessary to restore the deficit, if any, in the General Partner's Capital Account balance to zero. Other than as set forth in the foregoing sentence, the General Partner will not be personally liable for the return of all or any part of any Capital Contribution. Any such return shall be made solely from Partnership Assets (to the extent available therefor after payment of any creditors of the Issuer in accordance with the Act) and in accordance with this Agreement.

16.5    **Distribution of Assets on Dissolution**

(a)    Subject to the Act, and subject to the relevant provisions of Schedule 2, Part I which include the non-objection of the Regulator, in the event of a dissolution of the Issuer (whether by the General Partner or such other person or persons as may be appointed by a competent court in accordance with the Act to be the person or persons responsible for the liquidation of the Issuer), the General Partner (or such other person or persons as may be appointed by a competent court in accordance with the Act to be the person or persons responsible for the liquidation of the Issuer) shall cause the Partnership Assets (to the extent remaining after payment of any creditors of the Issuer) to be applied as follows to the extent of such Partnership Assets:

(1)    first, in payment of the Liquidation Distributions or the Optional Redemption Price, as the case may be, in respect of each Preferred Security held, payable to any Limited Partners as holders of the Preferred Securities;

(2)    secondly, in payment of any amount payable to the Preferential Limited Partner in respect of its payment rights under this Agreement; and

(3)    thirdly, as to any surplus, to the General Partner.

(b)    On a dissolution of the Issuer, the Limited Partners shall not be entitled to distributions except in cash and the General Partner (or such other person or persons as may be appointed by a competent court in accordance with the Act to be the person or persons responsible for the liquidation of the Issuer) need not distribute all of the Partnership Assets at once, but may make partial distributions.

16.6    **Liquidation Statement**

Each of the Partners shall be furnished with a statement prepared by the General Partner or its delegate with respect to any winding up of the Issuer, which shall set forth the assets and liabilities of the Issuer as of the date of complete liquidation of the Partnership Assets.

17.    **PARTNERSHIP MEETINGS**

17.1    **Convening of Meetings**

The General Partner may, whenever it thinks fit, convene a meeting of the Partners for the purposes of consenting to any matters requiring the consent or ratification of all the Limited Partners under the Act or a meeting of the Limited Partners for the purposes of seeking the consent of those Limited Partners to any matter requiring such consent pursuant to this Agreement. The rights of Limited Partners to receive notice of, attend or vote at, any meeting of Partners is limited to the circumstances set out in this Agreement. The Limited Partners may convene a meeting of such Limited Partners in accordance with and for the purposes set out in Schedule 2, Part I.

17.2    **Notice of Meeting**

(a)    At least fourteen clear days' (or such shorter period as a simple majority of the Partners (or the Limited Partners, as the case may be) may agree in

27

# **EXHIBIT E**

# DISSOLVED

05355491        LB GP NO 1 LTD

---

This Company was dissolved on 22/06/10



*D053554919*

55

dc 3062

C25C                                                                    HC003

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
In re                                                    :    Chapter 11 Case No.
                                                         :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,    :    08-13555 (JMP)
                                                         :
                        Debtors.              :    (Jointly Administered)
------------------------------------------------------------------x

**ORDER GRANTING THE FOUR HUNDRED FIFTIETH
OMNIBUS OBJECTION TO CLAIMS (NO LIABILITY CLAIMS)**

Upon the four hundred fiftieth omnibus objection to claims, dated December 20,

2013 (the "Four Hundred Fiftieth Omnibus Objection to Claims"),[1] of Lehman Brothers

Holdings Inc., as Plan Administrator under the Modified Third Amended Joint Chapter 11 Plan

of Lehman Brothers Holdings Inc. and Its Affiliated Debtors for certain entities in the above-

referenced chapter 11 cases (collectively, the "Chapter 11 Estates"), pursuant to section 502(b)

of title 11 of the United States Code (the "Bankruptcy Code"), Rule 3007(d) of the Federal Rules

of Bankruptcy Procedure, and this Court's order approving procedures for the filing of omnibus

objections to proofs of claim [ECF No. 6664] (the "Procedures Order"), seeking a partial

disallowance and expungement of the Claims, all as more fully described in the Four Hundred

Fiftieth Omnibus Objection to Claims; and due and proper notice of the Four Hundred Fiftieth

Omnibus Objection to Claims having been provided, and it appearing that no other or further

notice need be provided; and the Court having found and determined that the relief sought in the

Four Hundred Fiftieth Omnibus Objection to Claims is in the best interests of the Chapter 11

Estates, their creditors, and all parties in interest and that the legal and factual bases set forth in

---

[1] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in
the Four Hundred Fiftieth Omnibus Objection to Claims.

the Four Hundred Fiftieth Omnibus Objection to Claims establish just cause for the relief granted

herein; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the relief requested in the Four Hundred Fiftieth Omnibus

Objection to Claims is granted to the extent provided herein; and it is further

ORDERED that, pursuant to section 502(b) of the Bankruptcy Code, the Claims

listed on Exhibit 1 annexed hereto are reduced to the amounts listed under the column heading,

"Reduced Amounts," and any amounts in excess of the Reduced Amounts are disallowed and

expunged, with prejudice; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to this Order.

Dated: _____, 2013
        New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE

2