Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 08-13555 (JMP)

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6   LEHMAN BROTHERS HOLDINGS, INC., et al.,

7           Debtors.

8   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

9   CASE NO.: 08-01420 (JMP)(SIPA)

10  In the Matter of:

11  LEHMAN BROTHERS, INC.,

12          Debtor.

13  - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

14              United States Bankruptcy Court

15              One Bowling Green

16              New York, New York

17

18              December 18, 2013

19              10:02 a.m.

20

21

22

23  B E F O R E :

24  HON JAMES M. PECK

25  U.S. BANKRUPTCY JUDGE

1   Motion of Black Diamond Offshore, Ltd. and Double Black

2   Diamond Offshore, Ltd. for Leave to Conduct Limited Rule

3   2004 Discovery of Debtors and Certain Former Employees [ECF

4   No. 41112]

5

6   Lehman Brothers Holdings, Inc. v. Dr. HC Tschira

7   Beteiligungs GmbH & Co KG, et al. [Adversary Proceeding No.

8   13-01431]  Motion to Dismiss Adversary Proceeding

9

10  Motion of Fidelity National Title Insurance Company to

11  Compel Compliance with Requirements of Title Insurance

12  Policies [ECF No. 11513]

13

14  Motion of Monti Family Holding Company, Ltd for Leave to

15  Conduct Rule 2004 Discovery of Debtor Lehman Brothers

16  Holdings, Inc. and Other Entities [ECF No. 16803]

17

18  Motion of Giants Stadium, LLC for Leave to Conduct Discovery

19  of LBI Pursuant to Federal rule of Bankruptcy Procedure 2004

20  [ECF No. 36874]

21

22  Motion of Giants Stadium, LLC for Authorization to Issue

23  Third-Party Deposition Subpoenas Under Federal Rule of

24  Bankruptcy Procedure 2004 and 9016 [ECF No. 39898]

25

Page 3

1    Lehman Brothers Holdings, Inc., et al. v. Giants Stadium,

2    LLC [Adversary Proceeding No. 13-01554]  Pre-Trial

3    Conference

4

5    Motion of FirstBank Puerto Rico for (1) Reconsideration,

6    Pursuant to Section 502(j) of the Bankruptcy Code and

7    Bankruptcy Rule 9024, of the SIPA Trustee's Denial of

8    FirstBank's Customer Claim, and (2) Limited Intervention,

9    Pursuant to Bankruptcy Rule 7024 and Local Bankruptcy Rule

10   9014-1, in the Contested Matter Concerning the Trustee's

11   Determination of Certain Claims of Lehman Brothers Holdings,

12   Inc. and Certain of Its Affiliates [LBI ECF No. 5197]

13

14   Motion to Lift Stay of Yuri and Irene Belik [ECF No. 39585]

15

16   Motion Pursuant to Rule 9019 of the Federal Rules of

17   Bankruptcy Procedure and Section 105(a) of the Bankruptcy

18   Code for Approval of (I) Partial Settlement Agreements

19   Relating to Certain Credit Default Swap Agreements and

20   Indentures and (II) Amendment to Partial Settlement

21   Agreement Relating to Pebble Creek LCDO 2007-3 Credit

22   Default Swap Agreement and Indenture [ECF No. 40573]

23

24

25   Transcribed by:  Sherri L. Breach, CERT*D-397

Page 4

1    A P P E A R A N C E S :

2    WEIL, GOTSHAL & MANGES, LLP

3         Attorneys for Debtors

4         767 Fifth Avenue

5         New York, New York 10153

6

7    BY:  GARRETT A. FAIL, ESQ.

8

9    DECHERT, LLP

10        Attorneys for Tschira Beteiligungs GmbH & Co., KG

11        1095 Avenue of the Americas

12        New York, New York 10036

13

14   BY:  DAVID A. KOTLER, ESQ.

15        ALLAN S. BRILLIANT, ESQ.

16

17   JONES DAY

18        Attorneys for Debtor

19        222 East 41st Street

20        New York, New York 10017

21

22   BY:  JAYANT W. TAMBE, ESQ.

23

24

25

**Page 5**

1    REID, COLLINS & TSAI, LLP

2         Attorneys for Black Diamond Offshore, Ltd. &

3         Double Black Diamond Offshore, Ltd.

4         One Penn Plaza, 49th Floor

5         New York, New York 10119

6

7    BY:  ANGELA J. SOMERS, ESQ.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

1                    P R O C E E D I N G S

2                THE COURT:  Be seated.  Good morning.

3                MR. FAIL:  Good morning, Your Honor.  Garrett Fail

4    of Weil, Gotshal & Manges for Lehman Brothers Holdings,

5    Inc. --

6                THE COURT:  Good morning.

7                MR. FAIL:  -- as plan administrator in these

8    cases.  There are two items on the agenda this morning, one

9    in the main case and one in the adversary.  Taking them in

10   the order that they appear on the agenda, I would turn the

11   lectern over to Ms. Somers, the movant for Black Diamond in

12   the main case.

13               THE COURT:  Okay.

14               MR. FAIL:  Thanks.

15               MS. SOMERS:  Good morning, Your Honor.  Angela

16   Somers from Reid, Collins & Tsai on behalf of Black Diamond

17   Offshore, Ltd. and Double Black Diamond Offshore, Ltd.

18               These are creditors in the --

19               THE COURT:  Is Double Black Diamond a more

20   challenging fund than --

21        (Laughter)

22               THE COURT:  -- single Black Diamond?

23               MS. SOMERS:  I'm not sure, but it certainly is a

24   zippier name.

25               Your Honor, these are creditors in the Lehman case

Page 7

1    like many, many other creditors.  And the main issue here

2    is, as with many creditors, the guarantee of the holding

3    company.

4              Pursuant to Rule 2004, Black Diamond and Double

5    Black Diamond made two requests:  One for -- it was for

6    document discovery and the second was for examination of

7    persons including Cara Rappaport (ph) who we have not

8    received an objection from and an employee with knowledge of

9    Lehman.

10             THE COURT:  Before we get into this --

11             MS. SOMERS:  Yes.

12             THE COURT:  -- why is this appropriate at all?

13             MS. SOMERS:  Well --

14             THE COURT:  Why is this appropriate and why is

15   this needed?  And in terms of timing it seems not to be

16   ripe.

17             MS. SOMERS:  Your Honor, we would just like to

18   explain to you some of the things that we have done.

19             THE COURT:  Right.

20             MS. SOMERS:  We're being called a squeaky wheel

21   and, in fact, we're anything but a squeaky wheel.  We're a

22   very patient, cooperative and quiet wheel.  We were served

23   with two document requests:  One was in early 2013.  We

24   produced 711 pages of documents.  We were served with a

25   second document request in July of this year, largely

Page 8

1   duplicative of the first one.  We explained to Lehman,

2   you're asking us for the same documents.  Then we produced

3   another 44 documents.  Lehman also served us with

4   interrogatories and we answered those questions.  They've

5   asked us to produce individuals for depositions with eight

6   topics to be covered.

7          We have tried to do everything we can to

8   cooperate, to get to the bottom of what is really not this

9   all-encompassing issue.  It's a guarantee.  We have emails

10  that seem to indicate it exists.  That's the main issue

11  we're trying to get to the bottom of.

12         THE COURT:  Well, what's the main issue?

13         MS. SOMERS:  Whether the -- whether Lehman has a

14  guarantee or has documents that show that the guarantee

15  exists because our documents show that although we do not

16  have the guarantee.

17         So that's really all we're trying to do here.

18  We've tried to call and work it out and say, listen, we're

19  not asking for the moon here.  We haven't violated -- we

20  understand the dynamics of the case.  It's a massive case.

21  There are thousands of claims.  We get that.  We understand

22  that we didn't technically violate anything, and we

23  understand that the debtor is trying to keep this under

24  control.  But the balance can't be this severe.  It can't be

25  us constantly jumping through hoops with Lehman unable to

Page 9

1   answer any questions.

2          And I would just like to tell you a few of the

3   questions I asked them.  I said, do you have a road map for

4   anything that's going to happen between now and 2015?  No.

5   I have no road map; can you tell us of any actions you need

6   to take before you can -- no, we cannot tell you; can you

7   make any commitments that you'll try to do anything for us

8   or you'll look through an email file and -- no, we cannot

9   make any commitments; can you give us any information?  No,

10  we can't give you a drop of information.

11         So, basically, they have said there's a curtain.

12  We're the Wizard of Oz.  You can't get anything.  All we're

13  trying to do is create a little more of an -- a balance of

14  the equities here and say, listen, we just want to know what

15  the situation is with the guarantee.  We want a little

16  information so we can figure that out so we don't have to

17  keep going through this humungous charade of producing and

18  depositions and on and on and on.

19         And our -- the scope of what we're doing is likely

20  to be very narrow and very quick.  I mean, we're not looking

21  to, you know, bother people here.  We're just trying to get

22  to the bottom of whether there was a guarantee, get the

23  people involved in the transaction, show them an email, say,

24  here, it looks like there was a guarantee.  Do you have it;

25  do you have emails that are similar to this that show a

Page 10

1   guarantee was passed back and forth.  That's it.  That's the

2   main thing we're trying to accomplish.

3                THE COURT:  It's obviously not very complicated in

4   relative terms.  But I'm confused about the procedural

5   posture here.

6                I take it that no objection has been filed to the

7   claim.  Is that correct?

8                MS. SOMERS:  Yes.  That is correct.

9                THE COURT:  But that as part of the claims review

10   process, the plan administrator has directed discovery

11   toward your client.

12                MS. SOMERS:  Yes.  That is correct.

13                THE COURT:  And has your law firm been involved as

14   an intermediary with respect to that discovery?

15                MS. SOMERS:  Yes.

16                THE COURT:  And in that process has there been any

17   dialogue about whether your responses to the discovery would

18   lead to either the allowance of the claim or a determination

19   to object to the claim and, if so, on any particular

20   schedule?

21                MS. SOMERS:  No.  I think that the exercise here

22   is more settlement oriented.  And so without divulging any

23   --

24                THE COURT:  Please don't.

25                MS. SOMERS:  Yeah.  I mean, it's just sort of

Page 11

1    like, does this number work for you, and it's hard for my

2    client to make a judgment because they're saying -- like we

3    have minimal information.  We could know what number works

4    for us, but we can't just, you know, hit the bid if we are

5    in the dark.  And they're just trying to come to closure on

6    that.  I mean, they would love nothing more than to get a

7    group of documents, figure it out, and say, hey, we can

8    settle this at this price because it makes sense for us.

9              THE COURT:  I'm further perplexed.

10             The discovery that you seek, as I understand it,

11   is focused on whether or not there is documentation or other

12   evidence to support an LBHI guarantee --

13             MS. SOMERS:  Yes, because --

14             THE COURT:  -- of the claim, correct?

15             MS. SOMERS:  Yes, because there are emails that

16   reference it.  Yes.

17             THE COURT:  Now to the extent that's the focus of

18   the discovery, how does that discovery influence the

19   business decision relating to this back and forth on

20   possible settlement of the claim before any litigation

21   regarding the claim?

22             MS. SOMERS:  Well, certainly, if Lehman says, yes.

23   We have an execute -- a guarantee that we executed and your

24   emails refer to it and we have it in our file, here it is,

25   then our settlement number is much different than if we

Page 12

```
 1    have, you know, some evidence of the guarantee, but we're

 2    not there.  And we are trying to figure out how far there we

 3    are.  We have evidence of an email that -- reference to a

 4    guarantee, and we just want to know, what do you have.  You

 5    know, just show us what you have and then we'll review it

 6    and then we'll try to come to an agreement as to how we

 7    value, you know, this litigation and this claim like anybody

 8    else would do in a responsible manner.

 9              THE COURT:  One of the issues presented in the

10    objection by Lehman is entitlement and standing in light of

11    the confirmation of the plan.

12              And the plan administrator makes the argument that

13    the plan provides for a right to 2004 discovery for the plan

14    administrator, but for nobody else.

15              MS. SOMERS:  Well, if I could respond to that?

16              THE COURT:  Sure.

17              MS. SOMERS:  Most of the law in this area says

18    that you begin by what post-confirmation jurisdiction

19    exists.  And it's clear that Lehman has jurisdiction in this

20    court to resolve claims.  That's clear.  We're all in this

21    court to resolve claims.

22              And there are cases that say -- many cases just

23    give you a right to 2004 post-confirmation, but others do a

24    more diligent analysis of this shrunken post-confirmation

25    jurisdiction and does it relate to the 2004 examination
```

1   theory requested.

2              And, here, nothing could be more squarely on

3   point; that we're before this court to resolve claims.  We

4   are asking questions about the claim and that really is all

5   that we're seeking.  And there are cases that I have -- I

6   haven't found one that does not allow an examination under

7   these circumstances, and I don't think they cited a single

8   case for that.

9              THE COURT:  There's also a parade of horribles

10  argument --

11             MS. SOMERS:  Yes.

12             THE COURT:  -- which is -- and I'm not going to

13  use the squeaky wheel image again.  But the reference is

14  made to the recent hearing when I approved an extension of

15  the period of time for the plan administrator to object to

16  claims through September of 2015.  And there were several

17  parties that objected.  And those objections, I think, can

18  fairly be characterized as less about process and more about

19  using the opportunity of the motion to say, we would like

20  special attention, please.

21             It's now being argued that your 2004 request is an

22  alternative means to the same improper end, namely to obtain

23  special treatment in a claims reconciliation process that of

24  necessity needs to be managed by the plan administrator

25  without undue interference.

1          What's your reaction to the process point, which

2     is if you get this relief and people are paying attention to

3     the docket there will be a host of other motions for 2004

4     discovery, which will lead to potentially burdensome

5     interference with the claims process?

6          MS. SOMERS:  I might argue quite the opposite;

7     that perhaps the plan administrator has not exercised enough

8     diligence to put a process in place that fairly gives

9     creditors a way to get information, to respond, to have it

10    be somewhat of a two-way street.  I am not saying that we

11    are going to have as much freedom to ask for things as the

12    plan administrator.  But there has to be some give and take.

13         And I think here this puts the plan administrator

14    to the task of exercising some discipline and not having an

15    all-encompassing right to ask for anything they want and to

16    have creditors have no rights at all to respond.

17         For example, if we had called the plan

18    administrator's counsel and they had said, we understand

19    we've asked you for a lot of documents.  We understand

20    you're just really interested in a few things.  Let's agree

21    to a limited exchange of information.  I requested that.

22    The answer was, we cannot do anything for you.  I think

23    that's a bad dynamic in this case.

24         I mean, it's -- the balance of the equities is so

25    unfair.  I'm not saying that we are all the rights of the

Page 15

1  debtor, but give us -- or Lehman.  But give us some rights.

2  Give us some rights to get some information and to do our

3  job for our client, too.

4         THE COURT:  Okay.

5         MS. SOMERS:  Thank you, Your Honor.

6         MR. FAIL:  Good morning again, Your Honor.  For

7  the record, Garrett Fail from Weil, Gotshal & Manges.

8         We're not here this morning to determine the

9  claims of Black Diamond and Double Black Diamond, the two

10  guaranteed claims.  We're not here to resolve those today.

11         We're also not here on the motion of LBHI to

12  compel production of documents or compel sitting for

13  depositions.  We're not here for that.

14         We're not here on an objection of Black Diamond to

15  discovery requests propounded by LBHI, objections that

16  couldn't be resolved outside of this court.  That's not up

17  for discussion either.

18         What's being asked for today is discovery of LBHI,

19  an attempt to balance the playing field in -- but, really,

20  it's an attempt to have these claims resolved.  Ms. Somers

21  said they would like nothing more than to resolve the claim.

22  Yes, we understand that.  It's understandable.  There are 40

23  -- 4,274 other claims that are looking to be resolved as

24  well.

25         To suggest that the plan administrator hasn't been

Page 16

1    diligent in putting together a process that expedites the

2    claims resolution process is disingenuous when there have

3    been over 64,825 claims resolved.

4            So --

5            THE COURT:  But, Mr. Fail, let's focus on this

6    one, though.

7            I was not aware in reviewing the pleadings that

8    there had been this process in place between the plan

9    administrator and Black Diamond and Double Black Diamond

10   relating to requests for information directed to the

11   claimants by the plan administrator, information having been

12   turned over.  And it doesn't really matter how many

13   documents are involved.  They don't sound like a lot of

14   documents to me even though they're in the hundreds, but I'm

15   used to larger --

16           MR. FAIL:  It's hundreds --

17           THE COURT:  -- numbers.

18           MR. FAIL:  -- hundreds of pages, Your Honor.  It's

19   not --

20           THE COURT:  Hundreds and hundreds of pages.

21           MR. FAIL:  It's not significant.

22           THE COURT:  It's not a big deal.  But, still,

23   documents were turned over, and presumably there is a -- an

24   engagement here on the claim.  This isn't a situation of one

25   of the 4,275 claims or whatever the right number is of

Page 17

1    claims that are in the unresolved camp seeking special

2    attention because the plan administrator already is paying

3    attention to this claim.

4         So one of my questions becomes, what's the

5    problem, assuming you're already engaged in dealing with

6    this claim, in completing the process?  And why does it have

7    to be by 2004 if that creates an adverse precedent?  Why

8    can't you just say, okay, we have these documents.  We're

9    going to sit on them, versus we have these documents and

10   we're going to deal with your claim.  I don't understand why

11   we're making this all about the claims process instead of

12   making this about, let's get this claim resolved.  We've

13   already focused on it.

14        MR. FAIL:  Sure.  A couple of points, Your Honor,

15   in response.

16        Ms. Somers started this, and I think you began the

17   question regarding conversations in a back and forth.  The

18   conversations Ms. Somers eluded to began less than 36 hours

19   ago when she reached out to me after we filed our response

20   and then she wanted to know, why don't we just give her the

21   information.

22        So to resolve the 2004 motion our choice was to

23   produce documents and give discovery, to put these claims

24   ahead of others.

25        Could we commit to -- if we pushed this off could

Page 18

1    we commit to doing what she wanted?  In other words, if we

2    didn't get a ruling against us, would we none the less

3    concede to do discovery.  We didn't want to set that

4    precedent to encourage other people to take the same steps.

5              And could we give any other information,

6    basically, can you just tell me -- can you just give me the

7    discovery.

8              So three ways to get to the same result.

9              Another point, Your Honor, yes, the plan

10   administrator has taken -- has sought discovery from Black

11   Diamond, but not solely Black Diamond.  The plan

12   administrator files notices of every subpoena that it issues

13   pursuant to the Rule 2004 order and authority of the court.

14   It has issued subpoenas for over a thousand claims.  It

15   could be well in excess of over a thousand claims that are

16   still outstanding.  The review is ongoing.  The plan

17   administrator is multi-tracking and multi-tasking to get

18   through the number of claims that have yet to be resolved.

19             Most of the claims, if not all of the claims, have

20   been looked at by the plan administrator, and we're working

21   and the plan administrator is working on multiple claims at

22   multiple times.  And so I don't believe it is correct to

23   assume that just because the plan administrator has sought

24   discovery or received documentation that the process is

25   resolved.

Page 19

1          We're hopeful that we don't have to invoke the

2    judicial process and the court's time with an objection to

3    all the remaining claims, and we've been successful in

4    avoiding discovery disputes thus far.  But to suggest that

5    we haven't worked with Black Diamond over the course of the

6    last year -- it's been a year since we issued the subpoenas

7    -- is also disingenuous.

8          We granted extensions, Your Honor, with at least -

9    - it's three extensions and we then were faced with this

10   motion after granting the last one.  We granted three

11   extensions, didn't file a motion to enforce this.  We've

12   worked with every other creditor on it.  There were hundreds

13   or thousands of subpoenas outstanding with respect to

14   claims.  This is the first time that we're here.  It's five

15   years and three months into this case.  So --

16          THE COURT:  Well, there's a first time for

17   everything.

18          Let me just make these observations, and it's not

19   just about this particular dispute, but about the claims

20   process more broadly.

21          When we had the hearing last month on the

22   extension of the period for objecting to claims and we

23   talked about the importance of an orderly process, I raised

24   the idea of a protocol of some sort that the plan

25   administrator might develop so that creditors like Black

Page 20

1    Diamond and Double Black Diamond would have more

2    transparency into the process that counsel describes as

3    something akin to the Wizard of Oz.  And whether that's a

4    fair characterization or not, it's at least a vivid one.

5              And I don't know what progress, if any, has been

6    made in reference to that understandable protocol such that

7    parties like Black Diamond and Double Black Diamond would be

8    able to know in the ordinary course of human events when it

9    could anticipate receiving information and engaging in a

10   process that would either lead to an agreed resolution of

11   the claim or an objection to the claim.

12             So there is a general process concern that I have

13   that you yourself brought to my attention in your papers.

14   And that's connected to this particular motion, perhaps

15   connected to this particular motion because you said it was.

16             But then there's also this other related concern,

17   and that is even with a protocol that's understandable and

18   hopefully acceptable to all parties, there will inevitably

19   be creditors like Black Diamond and Double Black Diamond

20   that will feel that this shouldn't be a one-way street of

21   information sharing, and that if they're turning over

22   information, that's great.  But they need some information,

23   too, in order to be able to engage in a constructive

24   discussion about claim resolution.

25             So that then leads to the question, is discovery

Page 21

1    only a one-way street and is that, in fact, the right

2    procedure to set in concrete for the rest of the claims

3    process, not only for this claimant, but for others who may

4    follow?

5            So it seems to me there are at least two issues we

6    need to talk about before resolving this today:

7            One is the status of efforts to develop a more

8    transparent understanding as to how the plan administrator

9    will be addressing the large class of unresolved claims.

10   And I say that with all respect to the process that has been

11   run to date, which has been heroic in resolving such a

12   substantial number of claims; and

13           Secondly, what do we do with claimants like this

14   who are looking for targeted information so that this

15   process can run efficiently?

16           Those are two questions I think we need to deal

17   with.

18           MR. FAIL:  Thank you, Your Honor.  And I think

19   they're related and they do tie back to this motion because

20   the standard for taking 2004 discovery is good cause, which

21   is that it's either necessary to establish their claim or

22   denial would cause the examiner, the person that's

23   requesting it, undue hardship or injustice.

24           Here, discovery at this time is neither necessary

25   to establish the claim, because there has been no objection

1    filed, and denial would not cause undue hardship which ties

2    to your question, is this the right procedure; is discovery

3    only a one-way street.

4           It isn't a permanent injunction.  There is no

5    permanent injunction on discovery.  It's when -- as and when

6    needed and a mustering and a direction of resources, of

7    limited resources.

8           And is this the right procedure?  The plan

9    administrator believes it currently is because discovery

10   will be available if settlement fails.  If additional

11   information is beneficial to the process in negotiations,

12   the plan administrator can voluntarily negotiate through ADR

13   or otherwise or outside the process with claimants, and it

14   has done so.

15          The question is, should any claimant or anyone of

16   the pending claimants say, now it's my turn, focus on me,

17   just give me this, which as Your Honor knows, sometimes is

18   simple, but sometimes is not in a case where information is

19   scattered, information isn't necessarily readily available,

20   information is expensive to determine if it is available.

21   And then to collect it, to take it from tapes and turn it

22   into something that could be searched, then can be examined

23   for production, then can be produced.

24          Here we're talking about underlying claims that

25   are $11.2 million in guaranteed claims for that.  There are,

Page 23

1       I think, $130 billion of unresolved claims.

2               So to allow an individual creditor to determine

3       that now is the time to spend or focus on discovery with

4       respect to its claim, I was -- just isn't the right

5       approach.  The plan administrator is dealing with large and

6       small claims at the same time and has resolved large and

7       small claims.  This morning we'll be presenting an order to

8       reduce the IRS's claims, I think, by $1.8 billion.

9               At the same time there was a withdrawal of a less

10      than a million dollar claim yesterday.  So we're multi-

11      tasking, but to suggest that discovery should be prompted by

12      the creditor, every creditor's claim is important to that

13      creditor.  We suggest that the -- that it's not ripe, as

14      Your Honor said and as we've said in our papers.

15              It may be necessary -- it will be available if we

16      can't reach a resolution, but the plan administrator

17      shouldn't be negotiating from a position with a gun to its

18      head.  And if there are issues with discovery propounded by

19      the debtors, we have to date and -- or we will continue to

20      work to resolve that with individual creditors on an

21      individual basis.  But that's not what we're here for today.

22              THE COURT:  Okay.  I've -- I appreciate everything

23      you've said.

24              MR. FAIL:  And I didn't -- I'm sorry, Your Honor.

25      I didn't respond to your other question about --

Page 24

```
 1              THE COURT:  Well, I'm about to --

 2              MR. FAIL:  -- the status --

 3              THE COURT:  I'm about to move toward that with a

 4    suggested modification to my question.

 5              Is it conceivable that the protocol which I have

 6    described in the most general terms because I truly don't

 7    understand all that is involved in developing a truly

 8    intelligent work plan for the resolution of the remaining

 9    claims.

10              But let's just assume that inside that black box

11    of procedures there may be a set of procedures relating to

12    the sharing of information once a claim has reached the

13    front of the queue.  Is there or is there not a current set

14    of procedures short of outright claim objection, thereby

15    creating the discovery rights of a contested matter, for

16    claimants to obtain the information that they need to engage

17    in the back and forth that is the essential ingredient of

18    bargaining?

19              MR. FAIL:  Your Honor, based on the comments at

20    last month's hearing, LBHI and the plan administrator is

21    working on presenting an update on where things stand and

22    working within the parameters of Your Honor's statements

23    last month to protect privilege, to protect litigation

24    strategy, to protect the interests of the estates for the

25    benefit of all creditors allowed in and disputed to figure
```

Page 25

1   out what we can do to shed light on the current process.

2   Rather than committing to a particular protocol with how to

3   move forward, it has evolved over the last years as claims

4   get resolved and focuses are redirected.

5           And to suggest that any one plan developed would

6   be static or that any timeline could be rigidly followed,

7   we're looking into what we can set forth to provide

8   information to creditors in terms of a timeline, a realistic

9   timeline and our efforts to date and going forward.  Our

10  intention is to go forward.

11          In terms of can the -- can LBHI provide

12  information?  Yes, LBHI can.  Yes, LBHI has.  LBHI has been

13  successful in resolving claims to date.  We have back and

14  forth through ADR.  We have been without information back

15  and forth.

16          And so LBHI, in its discretion and in the best

17  business judgment for the benefit of all creditors, has

18  worked.  Does that mean that efforts would be directed or

19  should be directed to conduct discovery for every claimant

20  that wants it?  We don't believe so at this -- you know, at

21  the time chosen by that creditor.  In -- at some point, yes,

22  if it can't be resolved or the debtors don't feel it should

23  be resolved in another way.  There will be that opportunity.

24          So we are working to present to the Court an

25  update and our outlook on going forward.

Page 26

```
 1              THE COURT:  Okay.  So let's look at Black Diamond
 2   and Double Black Diamond for a moment because this is the
 3   particular issue that forces us to confront the general
 4   question.
 5              Is it possible for the time being at least to
 6   either defer or deflect the question of creditor entitlement
 7   to 2004 relief on a scheduled determined by that creditor,
 8   which is part of the problem here, by resolving this without
 9   making a 2004 determination?
10              In other words, is it desirable in your view so as
11   to avoid adverse precedent, especially before you've had a
12   chance to disclose the general approach to this, to defer
13   resolution of the 2004, but in the process of deferring it
14   also consider voluntary sharing of information without
15   coercion?
16              And would that work for everybody, because one of
17   the things that concerns me is the parade of horribles.  And
18   while Black Diamond and Double Black Diamond talk about this
19   in benign terms, that we're just seeking some information so
20   that we can further engage on a process that has already
21   begun, in hearing the plan administrator's response I now
22   understand that Black Diamond is part of a large class of
23   claimants that have received discovery requests that are
24   allowing the plan administrator to do its job in evaluating
25   those claims.
```

Page 27

```
 1              In part for that reason I am, frankly, very

 2    concerned about the consequence of granting this benign

 3    relief only to have 2004 requests made by some subset of the

 4    thousand, or let's just say it really is a parade of

 5    horribles, all one-thousand that have already received

 6    discovery because that's obviously disruptive.  And somebody

 7    has to be in charge of this process and it has been set up

 8    that the plan administrator is.

 9              So this is a somewhat convoluted way of saying I'm

10    not granting the 2004 request, but I'm concerned about the

11    issues that the 2004 request brings to my attention.  And

12    it, in effect, becomes a second bite at the same apple that

13    we talked about last month.  How do we more fairly, from the

14    perspective of creditors, deal with this huge workload so

15    that parties on the outside understand how their claims are

16    being addressed.

17              And at least in the case of information sharing I

18    would like to know whether or not there is any organized

19    procedure for sharing information prior to the filing of

20    objections to claims.  If this is happening in the

21    discretion of the plan administrator, that may be okay,

22    except to the extent that somebody is adversely selected out

23    of getting the information that they want.

24              So there needs to be some set of understandable

25    standards that apply to information sharing and to
```

Page 28

1    determining the order in which unresolved claims will be

2    addressed.  And if the answer is -- and I'm not looking for

3    it now -- we have a big pile of papers on a desk somewhere

4    and we're dealing with the claims in whatever order they

5    happen to end up in that pile, that's at least an answer.

6            If the answer is, we have all the claims in a

7    database and the claims are spit out randomly and we address

8    the claims in the random order in which they are presented

9    to us, that's an answer.

10           If the answer is, we have the claims stacked by

11   size and we're dealing with the most material claims first,

12   another answer.

13           If it's by category, type of claim, again, another

14   answer.

15           If it is you pointed out the most extreme example

16   of multi-tasking and a lot of things are happening

17   simultaneously because different people have

18   responsibilities, that, too, would be an answer.

19           And it may be that none of the examples I've

20   provided is an apt one.  But I think at this stage of the

21   case, particularly as it is now widely known that I'm not

22   going to be sitting in this seat handling it after January

23   31, it's important that there be a legacy of consistency and

24   fairness that applies to the claims reconciliation process,

25   something that works for the plan administrator, but that

1    also makes sense from the perspective of creditors and gives

2    those creditors who are now waiting some understanding of

3    the process.

4                I mean, even when we buy Powerball tickets, we

5    know what the process is.  We don't expect that we're going

6    to win, but we buy the tickets anyway.

7                And so while that may not be exactly what's

8    happening here, in effect, there's a lottery aspect to this

9    in which claimants don't know when their number is going to

10   come up.  Now that may be a necessary feature of dealing

11   with so many claims.  But if there were a way to provide

12   greater transparency into this process, I think that would

13   be desirable.

14               And as to Black Diamond and Double Black Diamond

15   in particular, I'm denying the 2004 request, but I'm doing

16   so with the suggestion that rather than deal with 2004

17   issues again, we might wrap this kind of concern into the

18   process that I'm asking the plan administrator to develop.

19               MR. FAIL:  Thank you, Your Honor.

20               LBHI believes that the legacy of fairness has

21   already begun and exists over the past two-and-a-half years

22   since confirmation, and even before then over the past five

23   years of the whole process.

24               I think that's spoken for by the few outliers, the

25   two instances recently in the past month of a creditor

1    raising an issue and with respect to both of those

2    creditors, those were creditors that had been in touch and

3    involved with the plan administrator.

4            But we look forward to working to put something

5    forward that could shed light on the work streams, the work

6    that's been done, and LBHI's outlook for going forward.

7            THE COURT:  Okay.

8            MR. FAIL:  Thank you, Your Honor.

9            MS. SOMERS:  Your Honor, if I could just make a

10   suggestion.  I understand that you're not granting our

11   motion today, but I would suggest that it be adjourned for a

12   period of 30 days so we could see what process it puts into

13   place; that we not be sent home without any idea of what's

14   going to happen.  If nothing is filed on time, then we're in

15   the same position we always have been.

16           THE COURT:  Well --

17           MR. FAIL:  Well, Your Honor, I -- if I may?

18           THE COURT:  Uh-huh.

19           MR. FAIL:  LBHI believes it's incredibly important

20   to have an order denying this motion, not adjourning it.

21   The burden on a movant for 2004 is not -- is an affirmative

22   one to show cause and not just to show that it wouldn't be

23   harmful to the person who they're -- from whom they're

24   seeking discovery.

25           Black Diamond has not met that standard, either

Page 31

```
 1    prong.  It is not necessary to determine its claim, and it
 2    would not cause undue hardship to wait until the moment that
 3    it's necessary and then take discovery from electronic
 4    archives.
 5             THE COURT:  I'm denying the 2004 request without
 6    prejudice to its being re-urged at some future date based
 7    upon either a demonstrated need for such discovery or a
 8    showing that the procedures, as they are applied by the plan
 9    administrator, are prejudicial and that this kind of
10    procedure is appropriate.
11             In saying that, I am not in any way modifying the
12    legal standards applicable to the grant of a 2004 motion at
13    this juncture, and note in particular that it is intrusive
14    and disruptive to an orderly process for any individual
15    creditor to seek to alter the scheme by which the plan
16    administrator is administering claims, even if that scheme
17    is not apparent to the creditor.
18             Okay.
19             MR. FAIL:  Thank you very much, Your Honor.
20             MS. SOMERS:  Thank you, Your Honor.
21             MR. FAIL:  Your Honor, may we be excused from the
22    court?
23             THE COURT:  Yes.
24             MR. FAIL:  Thank you.
25         (Pause)
```

Page 32

```
 1              MR. TAMBE:  Good mroning, Your Honor.  Jay Tambe
 2      from Jones Day for the debtor on the --
 3              THE COURT:  Let's --
 4              MR. TAMBE:  -- adversary proceeding.
 5              THE COURT:  Let's just give everybody a chance to
 6      assemble.
 7              MR. TAMBE:  I'm just going to introduce Mr.
 8      Brilliant who is going to -- it's his motion, so --
 9              THE COURT:  Right.
10              MR. TAMBE:  -- he's going to be speaking.
11              THE COURT:  Okay.
12              MR. TAMBE:  Thank you, Your Honor.
13         (Pause)
14              THE COURT:  Be -- before we get into the merits of
15      the motion to dismiss, there's a matter that we discussed in
16      reference to this adversary proceeding in an off the record
17      chambers conference, and I've heard nothing further with
18      respect to the subject matter of that conference.
19              I have a question for the parties, which is
20      whether there is anything to report and, if there is,
21      whether you would like to report that now or after the
22      argument.  And if you would like to report it to the Court,
23      would you like to do so in camera off the record or are you
24      prepared to do it on the record?
25              MR. TAMBE:  I think, Your Honor -- this Jay Tambe
```

Page 33

1    for the debtor.  There are some developments to report.  I

2    believe the preference of the parties at least would be to

3    do it off the record, not on the record, and we're happy to

4    do it either before or after the argument.

5              THE COURT:  Is that true for you, Mr. Brilliant,

6    as well?

7              MR. BRILLIANT:  Yes, Your Honor.  We're prepared

8    to do it on the record if Your Honor prefers.  I don't know

9    -- I don't think there's any -- you know, we don't view it

10   as being, you know, confidential.  But we're prepared to do

11   it off the record as well if that's what LBHI prefers.

12             And if we're going to do it off the record, we

13   would suggest, unless Your Honor wants to take a short

14   recess now, then we would suggest doing it after the

15   argument.

16             THE COURT:  Okay.  Let's do it that way.

17             MR. BRILLIANT:  Good morning, Your Honor.  Allan

18   Brilliant on behalf of the defendants, the Tschira entities,

19   and I'm joined at counsel table with my partner, David

20   Kotler.

21             As Your Honor knows, we're here on our motion to

22   dismiss all of the counts of LBI's complaint.

23             As Your Honor knows, under the complaint LBI seeks

24   to avoid the transfer of 100 million Euros of collateral

25   that was transferred to the Tschira entities to secure

Page 34

1    obligations that LBF had to the Tschira entities under

2    certain ISDA agreements.

3              Your Honor, I'm going to divide my argument into

4    three different sections.

5              First, I'm going to discuss the safe harbor

6    provisions of Section 546.  The strict application of

7    Section 546 of the Bankruptcy Code, Your Honor, is going to

8    require that the preference constructive fraudulent transfer

9    and the state law actual fraud claims be dismissed.  Your

10   reasoning in the LBHI JPMorgan decision is equally powerful

11   here and it's a mandate to dismissal of such claims at this

12   time.

13             Second, Your Honor, I'm going to demonstrate to

14   the Court that under any pleading standard the complaint

15   does not plead facts to establish a plausible claim or

16   actual fraud, much less raise a strong inference of

17   fraudulent intent to state a cause of action for actual

18   intent, hinder delay or defraud under Section 548(a)(1)(A).

19   Here, where there transfer was made of collateral, made to

20   parties that were not insiders, made to parties that had no

21   special relationship or leverage over the -- over LBHI, it's

22   just not plausible to say that such transfers were made with

23   actual fraudulent intent.

24             And then finally, Your Honor, we're going to show

25   Your Honor that the three state law causes of action --

Page 35

1    unjust enrichment, constructive trust and fraud -- should

2    also be dismissed as a matter of law for failure to state a

3    cause of action.

4          Your Honor has ruled, you know, at least twice in

5    the Lehman JP Morgan case as well as in the Quebecor case in

6    connection with Section 546(e).  So I think you're very

7    familiar with the statute.  In order for us to show that the

8    safe harbor applies, all we need to show is that there was a

9    transfer; that it was made by or to or for the benefit of,

10   among others, a forward contract merchant, a stockbroker, a

11   financial institution or a financial participant.

12         And I'm going to call the whole group of parties,

13   you know, qualified, you know, parties for purposes of the

14   argument.  And we'll talk about the individual, you know,

15   definitions here.  But when I talk about them collectively

16   I'm going to talk about them as qualified parties.

17         Third, we just need to show that the transfer was

18   made in connection with the securities' contract as defined

19   in the Bankruptcy Code or a swap agreement as defined in the

20   Bankruptcy Code, or, as Your Honor knows, you know, the

21   statute also provides a safe harbor for all margin payments

22   or settlement payments that are made by or to or for the

23   benefit of a qualified party.

24         As the Court recognized in the JPMorgan decision,

25   to protect the expectations of the marketplace, it is

Page 36

1    imperative to dismiss a complaint on the basis of the safe

2    harbor at the earliest possible stage, including, when

3    appropriate, at the time of the motion to dismiss.

4           Now, Your Honor, since it's the easiest of all of

5    the tests I'm going to talk about, you know, transfers in

6    connection with a securities contract first.

7           Now LBHI doesn't dispute that there was a

8    transfer; that the two, you know, payments here that were

9    made with -- which aggregate 100 million Euros, they don't

10   dispute that those were transfers.  And, of course, they

11   couldn't because it clearly meets the definition of a

12   transfer under 101(54).  It was a transfer of cash to the

13   entities, you know, here.

14          They also don't dispute that the transfers were

15   made by, to or for the benefit of a qualified party.  And,

16   again, they really can't dispute that.  Clearly, the party

17   who made the transfers, LBHI, has a financial institution.

18   It's a financial participant.  It's a -- you know, forward

19   contract merchant. LBF, who they say in their complaint is

20   who the party -- who the transfers were made on behalf of is

21   also a financial institution and a financial participant and

22   a forward contract merchant.

23          So there's no doubt that these parties were made

24   by, you know, to or on behalf of qualified parties.  And as

25   we show, you know, in our papers, in our motion to dismiss,

Page 37

```
 1    Your Honor, you know, just based upon these particular, you

 2    know, transactions, the two Tschira entities, each of them

 3    had over a billion dollars outstanding of transactions and,

 4    therefore, they qualify, you know, as financial

 5    participants.

 6           So I don't think there's any -- they don't

 7    challenge that these transfers were made by, to or on behalf

 8    of a qualified party.  In each of the three, you know, tests

 9    there -- we only have to show one, but each of the three

10    tests are met there as well.

11           You know, third, Your Honor, they don't dispute

12    that the ISDA agreements and all the, you know, other

13    agreements, you know, that make up the transactions here,

14    that they're security contracts.  You know, and nor could

15    they, you know, dispute that as well.

16           As Your Honor knows, the definition of security

17    contracts is very broad.  You know, it's defined in Section

18    741(7)(a) and it's just very broad and it includes all

19    contracts for the purchase and sale of securities.

20           And here, as Your Honor knows, that the agreement

21    that was entered into, you know, via LBF and the Tschira

22    entities provided for the -- you know, the future sale

23    through, you know, puts (sic) and calls and various other

24    arrangements at various prices of shares in the publicly

25    traded company, SAP.  So there's just no doubt here that
```

Page 38

1    this is a securities' contract.

2           And then also, Your Honor, what's notable is that

3    LBI -- LBHI also doesn't dispute that the contracts are swap

4    agreements, as that term is used in 546 -- you know, 546(9).

5           Now LBHI -- I'm sorry, 546(g), Your Honor.

6           Now LBHI does dispute, you know, as to whether or

7    not the agreements were forward contracts.  You know, given

8    that the -- you know, that this was made in connection with

9    a securities agreement and a swap agreement, you know, I

10   don't think it really matters that much.  I'm not going to

11   spend a lot of time on it.  But these are, you know, forward

12   contracts as defined in the Bankruptcy Code, you know, and

13   they're just wrong about that.

14          And when -- if Your Honor, you know, looks at the

15   definition of a commodity in connection the Commodity

16   Exchange Act, you know, it's very clear that a commodity --

17   which is the reason they say that this is not a forward

18   contract because it's not a commodity -- is -- that a

19   commodity also includes a good or a right.  And clearly

20   these agreements, which provide for the -- you know, the

21   future sale of a security, the ASP shares are goods and

22   rights under the statute and, therefore, they are

23   commodities and, therefore, this is a forward -- you know, a

24   forward contract.  I don't think there's, you know, any

25   doubt with respect to that.

1                So the issue, Your Honor, that they do raise is

2     whether or not these transactions were in connection,

3     whether they were in connection, you know, with the

4     securities contracts, whether they were in connection with

5     the swap agreements, whether they were, you know, in

6     connection, you know, with a forward contract.

7                Now, Your Honor, most of the arguments, you know,

8     they raise are the same arguments that LBHI raised in the

9     JPMorgan case and that Your Honor already, you know,

10    rejected.  They do raise a couple of new ones.  We're going

11    to deal with all of them here.

12                Now as Your Honor found and as the Second Circuit,

13    you know, has held, you know, that the definition of in

14    connection, you know, is to be interpreted liberally and

15    that it means, related to.  It's a very broad, you know,

16    definition.

17                And if you read the complaint, Your Honor, they

18    make it very clear that these transfers were made in

19    connection with the amendments to the credit support

20    agreement, which was part of the -- you know, the

21    transactions, you know, for the -- under the ISDAs.

22                So under their complaint itself they make it very

23    clear that this was made, you know, in connection with the

24    amendment that was entered into, you know, by LBF.  And

25    throughout the whole complaint they talk about the fact that

Page 40

```
 1    LBF entered into the agreement and then, you know, they
 2    provided, you know, the funding on behalf of LBF.  So I
 3    don't think there's any doubt that the way they've pled
 4    their complaint that this is in connection with or related
 5    to the -- you know, to the agreements.
 6          Now they -- and under the agreement it's very
 7    clear that the monies that were transferred were going to be
 8    considered to be, you know, independent amounts under the
 9    credit support, you know, annexes, collateral, you know, for
10    the obligations, you know, under the, you know, obligations
11    that LBF would have in connection with the -- you know, the
12    security contracts.
13          Now they made a similar argument in connection
14    with the JP, you know, MC case, Your Honor, which Your Honor
15    rejected where they basically said, you know, because the
16    parties were over secured at the time and that it was a --
17    you know, that it was a pretext for seeking to have, you
18    know, the monies, you know, applied, you know, in connection
19    with the -- you know, as -- you know, saying that it was in
20    connection.  And, Your Honor, you know, rejected that and
21    that's at page 442, you know, of Your Honor's opinion.
22          And Your Honor wrote there, which is equally true
23    here:
24          "Given this liberal interpretation of in
25    connection with the disputed collateral transfers
```

Page 41

1    necessarily relate to safe harbored securities contracts.

2    For example, the amended complaint itself points out that

3    JPMC demanded the disputed collateral transfers under the

4    September agreements.  See first amended complaint,

5    paragraph 62, noting that the September collateral requests

6    were made pursuant to the September agreements, but arguing

7    that such a purported connection to clearance activity was a

8    pretext and a sham."

9           You know, and then you, you know, cite another

10   section of their complaint, which I'm not going to read, and

11   then you went:

12          "Furthermore, the agreements themselves expressly

13   reference safe harbor derivative transactions and safe

14   harbor clearing advances."

15          I'm going to skip the doubt.  I'm going to skip

16   the -- your cites there, Your Honor, and then you conclude

17   with:

18          "Without doubt, the disputed transfer of

19   collateral related to the safe harbored clearance agreement,

20   the September security agreement and the September

21   guarantee."

22          And there's no difference here, Your Honor.  They

23   plead the complaint the same way that they did in connection

24   with the JPMC, you know, complaint.  They make the same

25   argument here that somehow this free collateral that existed

Page 42

1    was -- they say in their complaint was just implicitly, it

2    was made in connection with that.  But the reality is, Your

3    Honor, this was collateral that was put in place, an

4    independent amount under the credit support annex in

5    connection with the securities -- you know, the securities

6    agreements, the same pleadings and the same types of facts

7    that Your Honor rejected in the JP, you know, Morgan case.

8         You know, additionally, Your Honor, you know, they

9    raise the same argument that we were over secured at the

10   time or that, you know, from a market to market prospective

11   at the time that the transfers occurred that -- you know,

12   that there was no monies outstanding and, therefore, you

13   know, it couldn't be, you know, be collateral.

14        You know, the same argument that Lehman, LBHI,

15   made in connection with the JPMorgan case and Your Honor

16   rejected that as well.  You know, actually in the following

17   paragraph also on page 42 where Your Honor says:

18        "Additionally, the suggestion that there should be

19   demonstrable exposure as a condition to satisfying the in

20   connection with language of Section 546(e) advocated by

21   plaintiffs would make it difficult to assure safe harbor

22   protections without making an impractical and burdensome

23   inquiry as to the status of countless derivative positions

24   at arbitrary points in time in the multiple dealings between

25   counterparties.  Such a focus is not well-suited to

Page 43

1    analyzing liabilities under complex financial relationships

2    with exposures that change materially and rapidly with

3    movements of the markets.

4            "Therefore, the Court concludes that the disputed

5    collateral transfers are within the scope of 546(e)," and

6    then Your Honor dismissed, you know, those counts.

7            And that applies equally here as well, Your Honor.

8    You know, there -- the -- there's nothing in the statute

9    that requires that a party be under secured at the time the

10   transfer is made.  As long as there's a transfer, you know,

11   to a qualified party, to -- by, to or for the benefit of a

12   qualified party in connection with a securities contract,

13   the safe harbor, you know, applies.

14           And, clearly, all of those elements are met and

15   there's nothing in the statute that requires that a party,

16   you know, be over -- under secured at the time or that -- in

17   order for it to be considered to be, you know, a transfer or

18   for it to be considered to be, you know, in connection, you

19   know, with a transfer.

20           Your Honor, the only case that's cited by LBHI,

21   you know, in connection with their argument that somehow

22   some portion of the transfers were, you know, in connection

23   with the free assets, you know, is they cite, you know, a

24   Calyon case from the Bankruptcy Court in the District of

25   Delaware and that case does not involve Section 546(e), but

Page 44

1    instead involves other safe harbors.  You know, the safe

2    harbor, you know, from -- for the stay in connection with --

3    you know, with repos.  And the case has nothing to do with

4    this situation, nothing to do with an interpretation, you

5    know, of 546.

6            Even if they were right, which they are not, and

7    when you look at the documents, Your Honor, it's -- and it's

8    absolutely clear that this transfer was made, you know, in

9    connection and can only be used as collateral in connection

10   with the security contracts.  But even -- so there's no

11   question that they're just wrong as a matter, you know, of

12   fact and they're just trying to mischaracter -- they're just

13   trying to characterize and spin, you know, what this

14   transaction was done in a way that's different than what's

15   in the complaint.

16           But even if they were right, the reality is that

17   under Section 546 as long as it was -- relates to the

18   securities contract, you know -- and relates as Your Honor

19   says is very broad.  You know, so it's almost in connection

20   -- then the safe harbor applies.  It doesn't -- it wouldn't

21   matter if there were other reasons as well. They say it was

22   implicitly done, you know, in connection with the free

23   assets.

24           I think that's just wrong and it's contrary to

25   their own pleading.  But even if that were right, it still

Page 45

1    wouldn't change the result because it still relates to the

2    securities contract and therefore -- therefore 546, you

3    know, would mandate dismissal of the -- of those counts.

4         Your Honor, they also, you know, claim that in

5    connection with -- that the transfers weren't made pursuant,

6    you know, to a contractual agreement, again, because, you

7    know, there's argument, you know, that we weren't entitled

8    to any additional collateral because, you know, we were in

9    the money at that point in time.

10        Again, Your Honor, you know, that's rejected.

11   Your Honor rejected that in connection with the JPMorgan

12   decision.  And, you know, the argument and the reasoning

13   that Your Honor had there, I think, you know, applies

14   equally here.  And even I think a little more powerfully

15   here than in that case where Your Honor had to deal with not

16   just the issue of whether the transfers themselves were

17   covered by Section 546(e), but also had to go a little bit

18   further and determine whether or not the creation of

19   obligations, whether or not additional parties who became

20   guarantors, whether or not, you know, that was covered.  And

21   Your Honor ultimately concluded it was.

22        But here they have -- they were the credit support

23   party.  LBHI was the credit support party.  They had signed

24   a guarantee here, which in and of itself is also, you know,

25   a securities, you know, contract under the definition of --

1    in the Bankruptcy Code.

2              But here they were already a party.  They had

3    agreed to provide the credit support.  So it -- there was a

4    contract in place.  But, again, you know, that's not really

5    relevant.  It doesn't matter.  It was a transfer, whether or

6    not they were required to make the transfer or whether they

7    were contractually bound to make the transfer, whether it

8    was a prudent thing, you know, to make the transfer is not

9    really relevant here.

10             THE COURT:  Okay.  Part of the mystery here, Mr.

11   Brilliant, is not really the contractual provisions and not

12   really the words of 546, not really the language of the

13   JPMorgan decision, which obviously I am familiar with, and

14   it pleases me every time you quote from the decision.

15        (Laughter)

16             THE COURT:  This is a confusing fact pattern.  And

17   the more you argue about the facts, the more confused I

18   become reading your papers and, frankly, reading the Lehman

19   papers.

20             A rational observer would say, why on earth would

21   LBHI, at a time of extraordinary financial crisis that is

22   well-documented, transfer a hundred-million Euros in

23   connection with an obligation that primarily is LBF's for

24   the ultimate benefit of your client.  What connection does

25   this all have to what Lehman refers to as the free assets

Page 47

1    that were pledged to LBIE in London, and what coercion, if

2    any, may have caused senior level people within the Lehman

3    enterprise to do something that no rational party would do

4    at that time because part of what makes this transfer so

5    hard to figure out from the perspective of a neutral

6    observer is that it took place at all.

7              And so it becomes somewhat clinical to talk about

8    this as a transfer covered by the safe harbors in a context

9    in which the transfer itself is so hard to understand.

10             And I wanted you to know that that's one of the

11   problems I'm having with the argument at this juncture.

12             MR. BRILLIANT:  Sure.

13             THE COURT:  It doesn't mean that the argument may

14   not have significant merit at a later stage in the

15   bankruptcy case.

16             MR. BRILLIANT:  Can I address that, Your Honor?

17             THE COURT:  Sure.

18             MR. BRILLIANT:  Sure.

19             Your Honor, I think what -- Your Honor points out,

20   you know, something which is very important here.  The

21   context we're here on today is in connection with a motion

22   to dismiss.  They filed a complaint.  You have -- and we're

23   here to determine whether the complaint itself, as a matter

24   of law, you know, states a cause of action and whether, as a

25   matter of law, Section 546(e) provides a safe harbor, at

Page 48

1    least with respect to certain of the claims that are raised

2    here.

3           Now Your Honor points out something which is very

4    important.  You say it's confusing to you because there's no

5    indication in the complaint as to what the motive was as to

6    why this transfer was made, and you can't figure out from

7    reading the complaint why it is that a party would do this.

8    You say that, you know, it just doesn't make sense given

9    what you know about what was going on at that point in time.

10          But, Your Honor, the point is that you have to

11   look at the complaint and determine whether or not the safe

12   harbor applies based on the complaint and you -- and when

13   you analyze the actual fraud counts and various other

14   things, you have to look at that.

15          So you say you're concerned as to why they would

16   do this, you know, what coercion occurred.  Your Honor, if

17   there was coercion you could be certain they would have

18   included it, you know, in the complaint.

19          THE COURT:  Well, I don't mean to focus on that.

20   And you're quite right that we look at the complaint and we

21   assume that the allegations in the complaint are true for

22   purposes of the motion to dismiss.

23          But this is a little different, at least in terms

24   of all the pleadings that I've reviewed from a clean motion

25   to dismiss.  Bear with me when I try to define what I mean

Page 49

1    by clean.

2          A clean motion to dismiss is one in which the

3    complaint, on its face, fails to state a claim upon which

4    any relief can be granted and, in effect, it doesn't matter

5    if you admit all the facts.

6          But in the very carefully and thoughtfully

7    prepared papers that I've reviewed, both your papers and the

8    Lehman papers, this is a very confusing set of

9    circumstances, even for someone like myself who is quite

10   familiar with the circumstances of Lehman in the days before

11   filing.

12          As you may know, and as certainly counsel for

13   Lehman knows, I spent weeks, months in the 60(b) trial

14   learning about what was going on in the period leading up to

15   Lehman's bankruptcy filing on September 15th of 2008.  And

16   so I have a very detailed and fact-based understanding of

17   that period of time.

18          This complaint deals with that very period of

19   time, but deals with it in a way that's completely separate

20   from all the facts that I otherwise know because it

21   describes a transfer not made to a major financial

22   institution.  And I've dealt with those cases.  The Bank of

23   America litigation, the JPMorgan litigation are examples of

24   that.  And the transfers that were made to other financial

25   institutions to improve their positions in the summer of

Page 50

1   2008 are detailed in the examiner's report.

2           What makes this unfamiliar is that it's a transfer

3   that seems inexplicable.  It doesn't improve liquidity.  It

4   doesn't incentivize a third party to provide needed

5   services.  It diminishes liquidity at a time of extreme

6   liquidity constraint, and seems designed not to benefit any

7   party other than either your client or LBF.

8           And so I look at this and I'm completely mystified

9   by it, not just as a neutral observer, but as a neutral

10  observer with a lot of information in my head as I'm reading

11  about this.

12          MR. BRILLIANT:  Right.

13          THE COURT:  In part for that reason, one of my

14  conclusions, especially since the parties are engaged in

15  discovery, is that the legal issues that you properly raise

16  -- and I believe they are properly raised as legal issues to

17  consider -- are difficult to address in a motion to dismiss

18  where the facts are quite as convoluted as they seem to be

19  here.

20          And so I raise this question with you.  Inasmuch

21  as you are engaged in discovery, and I recognize that you

22  are looking for a clean kill with respect to the complaint.

23  But since you've also read the JPMorgan decision, you should

24  be of the view that that's highly improbable if not

25  impossible to achieve on a motion to dismiss.  What harm

Page 51

1    would there be if the very same legal issues you're now

2    arguing with respect to the safe harbors were deferred until

3    a later date when those arguments could be made in a

4    dispositive motion supported by a factual record?

5           That's my essential question.

6           MR. BRILLIANT:   Okay.  All right.  Well, you know,

7    first, Your Honor, with respect to -- now we're just talking

8    about the safe harbors right now.  I think there's a strong

9    public policy -- Your Honor pointed out in connection with

10   the JPMorgan case -- of making sure that parties who receive

11   safe harbored and protected transfers have that resolved at

12   the earliest, you know, possible time.  And when, on the

13   face of the complaint, there is, you know, an opportunity to

14   dismiss it, Your Honor should do that.  That creates

15   certainty for people in the marketplace.

16          Your Honor not granting this, you might say, well,

17   you know, in connection with your complaint it doesn't have

18   any affect.  But as Your Honor and the -- you know, the

19   Second Circuit in connection with the Enron case, you know,

20   has recognized, the safe harbor and the comfort that parties

21   get for it affects pricing, you know, for securities

22   transactions, you know, and other issues.

23          And Your Honor denying us on the -- we're at this

24   point in time -- I understand that Your Honor says you

25   acknowledge outside of this complaint and when you bring --

Page 52

1    you bring that with you when you come into the -- you know,

2    come into the courtroom.  But the reality is on this

3    complaint, you know, we've established that as a matter of

4    law, you know, we're entitled to have the safe harbor

5    applied and to have those, you know, counts dismissed.

6           As Your Honor knows, we sought to stay discovery

7    as we believed that this complaint is not -- is ill-founded.

8    And I know Your Honor says that with respect to the JPMorgan

9    case, you know, we shouldn't be surprised if you -- you

10   know, if Your Honor doesn't dismiss the non-safe harbor

11   issues.

12          But the issue here, Your Honor, is very different.

13   In the JPMorgan case they point out a lot of economic

14   coercion.  And Your Honor, I think, properly describes that

15   complaint as a question as to under what circumstances a --

16   you know, it becomes actionable where there's economic

17   coercion, you know, by a party, you know, during the midst

18   of a financial crisis.  And, also, that involves, you know,

19   90 counts and the parties had voluntarily agreed to

20   discovery, et cetera.

21          We, as Your Honor knows, have -- you know, did not

22   voluntarily agree to discovery and that the Supreme Court

23   has pointed out in Iqbal and Twombly the reason for a motion

24   to dismiss is to limit parties' expenses from having to go

25   through, you know, a process of discovery, you know, et

Page 53

1    cetera when the complaint, as a matter of law, you know,

2    doesn't --

3              THE COURT:  Mr. Brilliant, I hear you, but let's

4    see this in the context in which it arises because while I

5    must look at the complaint and determine its legal merit in

6    the context of your motion to dismiss, I'm not blind to the

7    context in which this arises and, indeed, the papers

8    themselves advert to the context in which this arises,

9    namely there is a settlement with LBF in the Swiss

10   proceeding that your client has objected to.  There was

11   litigation before me with reference to proofs of claim

12   objected to by Lehman.  Those proofs of claim were filed by

13   the Tschira entities, ultimately withdrawn in a litigated

14   setting in which the preclusive impact of the withdrawal

15   remains an issue today.

16              I am aware, both from pleadings and from the

17   comments of counsel, that this is a litigation that is but

18   one relatively small part of a global litigation involving

19   the Tschira entities in Switzerland, in the U.K. and here.

20              So it becomes very difficult for you to talk about

21   the costs of an adverse safe harbor determination at the

22   motion to dismiss phase in reference to what is really not a

23   safe harbor case at all.  This is a safe harbor defense

24   being made to a transaction that is but one part of a

25   massively complicated dispute between your client and

Page 54

1    different Lehman affiliates.

2         That context is inescapably in my brain.

3         MR. BRILLIANT:  Okay.  Can I address that, Your

4    Honor?  I want to --

5         THE COURT:  Absolutely.

6         MR. BRILLIANT:  -- make sure that I gave you -- I

7    don't want to cut you off, but, Your Honor, we are here --

8    the only thing that is pending in front of this Court, that

9    is pending between these parties in the United States of

10   America and pending in front of this Court is this adversary

11   complaint.

12        THE COURT:  That's true.

13        MR. BRILLIANT:  And we are here in connection with

14   our motion to dismiss under 12(b)(6), the adversary

15   complaint.  It is absolutely clear what Your Honor is

16   supposed to do in connection with analyzing that.  You're

17   supposed to look at the complaint and determine whether or

18   not, as a matter of law, it states a cause of action for

19   which relief can be granted, taking into account, you know,

20   the controlling precedent of the Supreme Court in Iqbal and

21   Twombly and the Second Circuit, and with respect to the safe

22   harbor, you know, provisions.

23        I recognize, Your Honor, that LBF and our -- and

24   my clients have a dispute that is being litigated in

25   Switzerland, and I also recognize that they have a dispute

Page 55

1   that's being litigated in the United Kingdom.  But that has

2   nothing to do with what is pending here.  A lawsuit was

3   filed.  It does not state a cause of action.

4              As a matter of law -- and Your Honor should look

5   at the complaint itself and analyze it.  And I understand

6   that you have all this other knowledge as to what's going on

7   --

8              THE COURT:  Yes, but I have this knowledge from

9   your papers.

10             MR. BRILLIANT:  No, Your Honor --

11             THE COURT:  Yes.

12             MR. BRILLIANT:  -- Your Honor --

13             THE COURT:  You pointed out in your papers that

14   the transfers ended up being credited --

15             MR. BRILLIANT:  Uh-huh.

16             THE COURT:  -- and that they were part of the

17   European proceeding; that there should be no right to relief

18   in any event because I think it was 52 and 48 or 54 and 46

19   million Euros -- I forget the two transfers, but it was

20   something like that -- ended up being credited over there.

21   It -- you in your motion to dismiss didn't make this a clean

22   argument about what's in the complaint, but provided me with

23   context so that I would better understand --

24             MR. BRILLIANT:  Right.

25             THE COURT:  -- what's going on.

1           It's not just what I know, it's what you've told

2     me.

3           MR. BRILLIANT:  Right.  But, Your Honor, but in --

4     look, there's two issues here, right, Your Honor?  One is

5     the issue of the settlement and the objection to the

6     settlement, which you're well aware of and you referred to

7     earlier.  Okay.  And we did not put that in our papers.  You

8     know, LBHI did.

9           You know, the issue with respect to, you know, the

10    -- you know, what's going on and the fact that this is

11    being, you know, litigated is relevant for the state law

12    claims.  It is not relevant for the 546(e) claims and we

13    don't raise it in connection with the 546(e) and (g) claims.

14    It's only, you know, relevant, you know, in connection with

15    the unjust enrichment and constructive, you know, trust

16    argument.

17          The issue as to where the money would go back, you

18    know, that it would go back to LBF, is in the amendment

19    which is, you know, discussed, you know, throughout the

20    entire pleading here.

21          But, Your Honor, what -- regardless of what is

22    going on outside the United States does not change the fact

23    that when one looks at this complaint and looks at the

24    agreements, the ISDA agreement, the credit support annex,

25    the amendment and the other documents that the safe harbors

Page 57

1    clearly apply as a matter of law.

2            The only issue that -- Your Honor, there's really

3    three issues here.  You know, they only raise three issues

4    in their papers:  One, as to whether or not the transfers

5    were in connection with the -- you know, the securities

6    contract.  You know,  as I -- you know, their raised three

7    arguments that Your Honor already rejected in the JPMorgan

8    case and, you know, the same should go on here.

9            If anything, Your Honor, given that they do not

10   claim in their complaint any economic coercion on behalf of

11   our clients, but the opposite; they say we were not mission

12   critical, you know, to -- you know, to their business, there

13   shouldn't be, you know, any distinction between, you know,

14   the analysis that you had in your prior decision and this

15   one with respect to that.

16           They then raise two additional issues, Your Honor.

17   One is this Ponzi scheme exception.  They somehow say that

18   there is a -- you know, the Ponzi scheme, you know,

19   exception that Judge Rakoff, you know, has found in

20   connection with the Madoff case, you know, which is limited

21   to a -- just a very small portion of people who knew, who

22   knew that there were no legitimate securities transactions

23   going on, that somehow that should be expanded broadly to

24   subsume all of 546(e).

25           And, Your Honor, you know, that's just not right.

Page 58

1    That's -- you know, Judge Rakoff's decision is very narrow

2    and limited and it's very clear based upon his other

3    decisions where he does apply 546 to people who didn't know

4    that there were not legitimate securities transactions going

5    on.  It just doesn't apply here.  There's no doubt that

6    Lehman Brothers entered into, you know, real security

7    transactions.  LBF entered into a real security transaction

8    under the agreements.

9           And then the last issue, Your Honor, is the issue

10   of res judicata which, quite frankly, Your Honor, has

11   clearly a question of law and, you know, doesn't apply in

12   this context.  As we point out in our papers, you know, it's

13   a -- they never -- first of all, it's not a compulsory

14   counterclaim to -- you know, to file an avoidance action to

15   a proof of claim.  They never raised it as part of that.

16   But if somehow our claim, you know, is barred because it

17   could have been raised in that claim, then they're

18   fraudulent conveyance claims would have to be -- you know,

19   would have to be barred as well.

20          And then the second thing, Your Honor, is as much

21   as they would like to make an issue as to whether or not we

22   were in the money or out of the money as of the date of the

23   -- you know, the bankruptcy filing, which was relevant for

24   the guarantee claim, it clearly is not relevant for a

25   fraudulent, you know, transfer claim.  It was a transfer of

Page 59

1    collateral.  If you were over -- if we were over -- if we

2    got monies and we were over secured, then we were over

3    secured.  If it turns out that we were under secured, then

4    we were under secured.

5           But, Your Honor, on this complaint, that -- I

6    understand that you say, well, the complaint raises an issue

7    for me.  It's confusing to me.  There's no -- I don't

8    understand why they would give the money.  Why would they do

9    that?  Well, it's their burden, you know, to plead why they

10   would do that.  It's their burden to show what the motive

11   was.  It's their burden, you know, to allege what they think

12   the connection was such that, you know, LBHI would have

13   given, you know, this money at that point in time.

14          There are a lot of benign possibilities, you know,

15   that -- at the time.  They thought that they were going to

16   be saved and they wanted to maintain a good relationship

17   with LBF and with our clients.

18          THE COURT:  Okay.  Well, let's refocus on the

19   question that led us down this path.

20          Assume for the sake of argument right now that I'm

21   not going to grant your motion to dismiss in its entirety,

22   and assume for the sake of discussion right now that the

23   parties are engaged in a discovery effort such that you will

24   be able, at some point, assuming the facts support your

25   position, to re-urge the very same defenses to this

Page 60

1    complaint that relate to 546(e) and the safe harbored

2    claims.

3              In what respect, if at all, is Tschira harmed by

4    deferring a determination of the 546 safe harbored claims to

5    a later date in the proceeding when the confusing facts at

6    issue can be resolved with clarity?

7              MR. BRILLIANT:  You know, again, Your Honor, you

8    know, by not narrowing the issues you open us up to, you

9    know, more expansive discovery.

10             THE COURT:  Isn't it the same discovery?  Aren't

11   the --

12             MR. BRILLIANT:  No.  No, Your Honor.

13             THE COURT:  Aren't the transfers in question

14   absolutely identical?  The only issue, it seems to me, is

15   whether you have actual or constructive, preference or no

16   preference.  It seems to me that the discovery relating to

17   the underlying facts is identical.

18             MR. BRILLIANT:  Your Honor, you know, having this

19   lawsuit hanging out -- you know, hanging out there obviously

20   is not a good thing for -- you know, for any party.  It is a

21   -- it does involve a lot of money.  The issues of the state

22   law, you know, claims are much more narrow.  The issue with

23   respect to the actual fraud and the fraudulent conveyance

24   complaints, you know, go to some extent as to the -- you

25   know, the knowledge of what was going on at JPMorgan chasing

Page 61

1    down former officers and, you know, potentially, you know,

2    directors of the -- of JPMorgan -- I mean, I'm sorry, Lehman

3    Brothers around -- you know, around the world.  That's an

4    expensive, you know, difficult undertaking.

5            The other claims that are here, Your Honor, you

6    know are the fraud claim by Tschira which, again, I would

7    submit to you there's no allegation, you know, that -- you

8    know, that -- in this complaint that would show that there

9    was any, you know, misrepresentation here, you know, that --

10   you know, to allow that claim to go forward.  You know, the

11   only allegation is that, you know, at the time they entered

12   into the contract they didn't intend to comply with it as a

13   matter of law, under New York law.  That just doesn't state,

14   you know, a cause of action.

15           And then there's unjust enrichment and there's,

16   you know, constructive trust.  Constructive trust, you know,

17   the only issue there, Your Honor, or one of the main issues

18   is whether or not there was any kind of fiduciary

19   relationship.  They don't allege a fiduciary relationship

20   with our client.  This is not the -- a situation where we

21   were their -- you know, their clearing bank or their, you

22   know, primary lender.

23           So, you know, Your Honor, you know, the -- how are

24   we prejudiced, Your Honor?  I think is the safe harbor

25   provision is the -- you know, I think the marketplace is

Page 62

1    prejudiced, you know, immensely.  We're prejudiced by having

2    additional, you know, discovery.  It adversely affects, you

3    know, our ability to limit the scope of the discovery and

4    to, you know, have this case resolved, you know, quickly and

5    efficiently.

6         THE COURT:  Are you saying that the marketplace is

7    prejudiced by the procedural setting in which a court

8    resolves a safe harbor defense because if you look at the

9    Quebecor case, for example, that arose in the context of

10   summary judgment.  The JPMorgan Chase, which we're talking

11   about a lot, obviously, was on a motion to dismiss.

12        But does it really matter?  Does it really matter

13   whether a court ultimately decides a safe harbor defense,

14   which by the way is a much criticized provision of the

15   Bankruptcy Code because of its breadth of application at the

16   moment.  But does it truly matter whether a court decides

17   that as a motion to dismiss or as a subsequently broad

18   dispositive motion following the completion of appropriate

19   discovery?

20        MR. BRILLIANT:  Yes, Your Honor, and it does

21   because I think the expectation is that when there are safe

22   harbors, you know, that as a matter of law, you know, should

23   be granted, the policy is that they should be granted to

24   give, you know, parties comfort that they're not going to

25   have to go through discovery and expense and delay in order

Page 63

1    to get rid of the claim.

2              You know, the Iqbal case, Your Honor, you know, is

3    a case that involves a safe harbor, as Your Honor knows.

4    And Congress, you know, has recognized this by allowing

5    interlocutory appeals with respect to, you know, the denial

6    of safe harbors as a matter, you know, of law in connection

7    with, you know, these types of issues.

8              And Iqbal, as Your Honor knows, involved, you

9    know, two members of the federal government who claim that

10   they were immune from suit, you know, by a former prisoner

11   who was held in connection with 9/11-related issues.  And,

12   you know, it went up on appeal on the motion to dismiss

13   because of, you know, the denial of the immunity, you know,

14   by the Bankruptcy Court.

15             And the key, you know, issue there, Your Honor, is

16   that the public policy, when you have safe harbor provisions

17   and immunities from suit like this, is to make sure that

18   that's what it is.  It's a safe harbor and a immunity from

19   suit, not that you have to go through, you know, delay and

20   costly discovery and the inconvenience associated with that

21   before the application.  And that's what the securities

22   industry expects with respect to 546(e).

23             And, Your Honor, you're right that in some

24   respects there are people out there who criticize, you know,

25   the statute in connection with whether it should be applied

Page 64

1    to LBOs and private securities and redemption, you know, of

2    debt, et cetera.  But there is no doubt here that this is

3    the type of situation that Congress had in mind when it

4    created, you know, 546.  We're dealing with shares of a

5    publicly traded, you know, stock; monies that were

6    transferred from one financial institution, you know, to

7    another; you know, the two banks who received monies as

8    conduits from the Tschiras.

9            And, also, you know, to the Tschiras who were a

10   financial participant; you know, two entities that had

11   substantial amounts of assets and money invested in the

12   marketplace and, therefore, at a time of crisis like at the

13   time that JPMorgan filed bankruptcy, you know, Congress had

14   decided that they're entitled to certain, you know,

15   protections and immunities.

16           Your Honor, it would be -- you know, it would be

17   one thing, Your Honor, if there was a real issue here.  But,

18   again, you know, leaving aside the issues here, you know,

19   the Madoff exception they claim, you know, that's just --

20   that just doesn't apply, Your Honor.  That's not -- and

21   clearly it's a question of law in this situation, not a

22   factual question.

23           Then we have the -- you know, the issue of res

24   judicata.  Again, legal question.

25           So then the question is -- like I said, the only

1    thing that's left is this question of in connection with.

2    And Your Honor, you know, in the JPMorgan case under -- you

3    know, dealt with very similar issues and on a motion to

4    dismiss, you know, dismissed it.  There -- as a matter of

5    law these transfers which were made pursuant to an amendment

6    that called -- you know, that made them, the monies

7    independent amounts under the ISDA.  You know, given the

8    broad -- you know, even if you had a narrow interpretation

9    of in connection with, it's absolutely clear that it was

10   made in -- as a matter of law that it was made in connection

11   with.

12       So, Your Honor, it -- there's no fact-finding that

13   needs to be, you know, done for summary judgment.  All Your

14   Honor -- by putting this over to summary judgment all you do

15   is encourage parties to come up with, you know, frivolous

16   arguments in order to deny parties entitled to a safe harbor

17   from the safe harbor that they're entitled to, you know, in

18   order to get settlement benefit, which is the exact opposite

19   of what the safe harbor is designed to do.

20           THE COURT:  Well, let me just say the following.

21   Your argument, I think, is absolutely appropriate in a

22   standard safe harbor transaction.

23           But here as I understand the facts, an amendment

24   was put together literally overnight and literally on the

25   eve of bankruptcy.  And the transfers in question were

Page 66

1    pursuant to that amendment, which was never signed by your

2    client.  You raise questions in your reply papers as to

3    whether that's even a material fact because you've

4    acknowledged the amendment by conduct, or words to that

5    effect.

6              But unlike the general proposition you've just

7    advanced, there really are facts in question here as to the

8    integrity of the transaction pursuant to which the transfers

9    occurred.

10             MR. BRILLIANT:  Judge, 546 doesn't say that if it

11   occurs the day before the -- you know, the bankruptcy filing

12   that 546(e) or (g) doesn't apply.  You know, the opposite.

13   And Your Honor made that very clear in your two, you know,

14   previous rulings.  There's no temporal requirement here as

15   to when it occurred.

16             THE COURT:  No.  But what I'm --

17             MR. BRILLIANT:  That's --

18             THE COURT:  -- raising is that there are facts

19   relating to the amendment itself, how it came into being,

20   whether or not it is a legally binding and enforceable

21   document that are at issue here, it seems to me.

22             MR. BRILLIANT:  Your Honor, they are not.  They

23   are not.  The issue today is whether or not this complaint,

24   as a matter of -- you know, as a matter of law, you know,

25   cannot be brought because of the safe harbor complaint.  If

Page 67

1    you read the complaint, Your Honor, they say the transfers

2    were made in connection with the amendment.  It is only in

3    their opposition papers that they say that it may not have

4    been binding.

5            But the question, Your Honor, is whether or not

6    the complaint states a cause of action.  Now, Your Honor, if

7    you want to dismiss the complaint and give them an

8    opportunity, you know, to amend it and have them change it,

9    they will be subject to, you know, Rule 11 if it turns out

10   that they make allegations that are inappropriate.

11           But the issue is whether or not these transfers

12   were in connection with securities contracts, swap

13   agreements, and the answer is, Your Honor, that they clearly

14   were.  Whether the contract was binding and valid isn't the

15   point.  The question is, as a matter of law was it related

16   to these agreements.  Clearly it was, whether the agreement

17   was binding or not.

18           But whether it's binding or not is also not

19   relevant, Your Honor, because they say in their complaint

20   that the transfers were made in connection with the

21   amendments.  They can't amend their complaint as part of

22   their response for -- you know, from a motion to dismiss.

23           Your Honor, you're -- you're letting the smoke and

24   the cloud that they're trying to create here get in the way

25   of an analysis of the complaint.  And when you read the

1   complaint there is no interpretation of this that you can

2   have from the complaint that the transfers weren't in

3   connection with the -- or related to the securities

4   contracts.

5        The other thing, you know, Your Honor, is they

6   don't dispute the fact that the payments were margin

7   payments or settlement payments, you know, as well.  They --

8   you know, the -- it's -- what they're trying to do, Your

9   Honor, in their complaint is move -- you know, ignore what

10  they've already said, which is what we're here to discuss,

11  whether -- and try to create a new set of reality.

12       And Your Honor should not allow them to do that.

13  And Your Honor also should not bring into, you know, this

14  analysis your own concerns as to why this happened based on

15  other things.  All that matters is what does their complaint

16  allege and the complaint doesn't allege anything with

17  respect to that that's relevant.

18       Your Honor, I would like to move on and talk about

19  some of the other causes of action.  Do you want to discuss

20  more on the safe harbor or --

21            THE COURT:  No.

22            MR. BRILLIANT:  No.

23            THE COURT:  I don't want to talk about the safe

24  harbors anymore, but I do have some concern as to how much

25  time we're taking.

```
 1              MR. BRILLIANT:  Okay.

 2              THE COURT:  It -- how much more time do you have

 3      in your principal argument?

 4              MR. BRILLIANT:  Probably another 15 minutes, Your

 5      Honor, at the most.

 6              THE COURT:  Okay.

 7              MR. BRILLIANT:  All right, Your Honor.  So let's

 8      talk about the question of actual, you know, intent to

 9      defraud.

10              You know, the complaint, Your Honor, under any

11      standard doesn't meet the test here.  They do not allege

12      that the Tschira entities were insiders.  They do not allege

13      that they had any kind of special relationship with the

14      company.  They do not allege that they somehow had any kind

15      of leverage or other ability to adversely affect or to

16      coerce LBHI or LBF into taking any, you know, in appropriate

17      actions.  They don't allege any motive as to why it would be

18      that LBHI would, you know, make transfers with actual intent

19      to enter delay or defraud creditors to the Tschira entities.

20              The other thing is that the transfer was a

21      transfer of collateral, so it wasn't as if, you know, they

22      were transferring, you know, money outside of the estate

23      that could not be recovered at least to LBF pursuant to the

24      contract if it turned out that the Tschira entities were

25      over secured.
```

Page 70

```
 1              Your Honor, with respect to the point in time of

 2      the transactions, there was billions of dollars of SAP

 3      shares that were being held by LBIE, and under the terms of

 4      the agreement if the company didn't file bankruptcy then,

 5      you know, the funds would have been returned to LBF, you

 6      know, in seven days.

 7              Your Honor, there's -- these are just not the type

 8      of facts, you know, that lead a court to, you know, conclude

 9      that this was -- that there was actual, you know, intent to

10      defraud.  This case is not that dissimilar to the Market XT

11      decision that Judge Gropper wrote.  And I quote from, you

12      know, page 396, you know, because here basically what

13      they're saying is our -- is that the Tschira entities

14      insisted on having additional collateral that they weren't

15      entitled to.  And Judge Gropper said:

16              "There is little or no support for the proposition

17      that a creditor's insistence on its right to payment

18      constitutes a prima facie scheme to hinder or delay other

19      creditors with -- in the meaning of the fraudulent

20      conveyance laws.  In any event, intent of the transferee is

21      imputed to the transferer only when the transferee is in a

22      position to control the debtor's disposition."

23              And then Judge -- I'm going to skip a little bit,

24      but then Judge Gropper goes on to look at the badges of

25      fraud and see whether or not, you know, you can infer actual
```

Page 71

1    intent based on badges of fraud.  And he says:

2            "The badges of fraud on which plaintiffs rely

3    demonstrate, you know, the parties' actual fraudulent intent

4    are also inadequate badges of fraud."

5            And I'm going to skip a little bit, but then he

6    says:

7            "Here, there are no familial or personal

8    relationships between the parties.  On the contrary, the

9    allegations in the complaint evidence an adversarial or at

10   least an arm's length relationship.  Nothing was done in

11   secret.  The allegations that the transfers at issue lacked

12   adequate consideration are discussed below in connection

13   with accounts claiming constructive fraud.  It is alleged

14   that SoftBank (ph) demanded payment in full in preference to

15   other creditors and engaged in a series of transactions,

16   including the lock up and payoff agreements to obtain

17   payment.

18           "However, these allegations do not support a claim

19   of intent to defraud.  For purposes of the actual fraud

20   cause of action, the complaint fails to allege sufficiently

21   specific facts and support the proposition that the

22   transfers to SoftBank were intentionally fraudulent."

23           And it's the same thing here, Your Honor.  They

24   allege that we asked for the money and that we were entitled

25   to it, and they gave it to us.  But they don't allege

Page 72

1    anything more than that to suggest that there was a motive

2    or a relationship, some other inappropriate reason why they

3    would give us, you know, the funds.  And consequently, you

4    know, they just don't meet the burden of proof here.

5         You know, the Ninth Circuit in -- you know, in May

6    in connection with the Fitness Holdings case, which we cited

7    in our brief, you know, reached a similar result in

8    connection with the case that in many respects has some

9    analogous facts as well where they basically say that it's

10   -- when a party conveys a security interest to another

11   party, it's just not actual intent.  There's not -- you

12   know, without something more than that, you know, there's

13   just -- it doesn't meet the standard of showing that a

14   plausible claim for -- you know, for actual intent.

15        The badges of fraud that they point out, Your

16   Honor, really boil down to two things:  Lack of adequate

17   consideration, which as we know is the basis of a

18   constructive fraudulent transfer, and then they say the fact

19   that it was done -- you know, it was done quickly and

20   hastily.  But that in and of itself, Your Honor, the two of

21   them do not provide for a strong inference of -- you know,

22   of actual intent to defraud.

23        THE COURT:  In haste at a time when the Lehman

24   enterprise was about to fall apart -- we know it did fall

25   apart -- and at a time when your client appeared to be

Page 73

1    concerned about its assets in Europe.  That's all part of at

2    least this picture.

3            So the -- it's not quite as benign as you suggest.

4            MR. BRILLIANT:  Well, Your Honor, but, again, our

5    client may have had some concerns and Lehman may have been

6    failing, but the real question is are there sufficient facts

7    to give a strong inference of intent to defraud.  And the

8    courts say, you know, in order to have that you need to show

9    some kind of motive, some kind of relationship, some kind

10   of, you know, motive.  There's no --

11           THE COURT:  The alleged motive was to prop up the

12   European affiliates at a time when there was concern that

13   LBIE was going to go into a proceeding in the U.K.

14           And one of the things that makes this more

15   esoteric than your average U.S. bankruptcy case is that to

16   the extent there is motivation here, it is motivation of a

17   European entity, your client, with respect to significant

18   collateral held by a Lehman affiliate in the U.K. with

19   respect to transactions in which LBF is a direct party.

20           So this is not, at least as I understand it, a

21   garden variety anything.

22           MR. BRILLIANT:  Your Honor, even if you want to

23   (indiscernible) out of the complaint, you know, contentions

24   that this was done in order to prop up LBIE or LBF, which

25   the complaint doesn't say, but even if you were to do that,

Page 74

1    that, again, does not infer intent to defraud.  It -- it's

2    not just that they -- it has to be some kind of improper

3    motive, Your Honor.

4            We're not talking about constructive fraud here.

5    We're talking about -- at this point the constructive fraud

6    claims, there's a safe harbor for that.  Congress has

7    decided that between, you know, constructive fraud or a

8    fraudulent transfer.  In the securities markets it's less

9    important for an equal distribution of creditors and more

10   important to protect systemic risk.  And so they created

11   546(e).

12           With respect to actual fraud, which is the only

13   exception to the safe harbor provisions, there has to be an

14   improper motive, some kind of actual intent to hinder a

15   delay, to hurt creditors, take money outside.  And usually

16   what you have there is either -- you know, which -- like

17   with the JPMorgan case some kind coercion such that an

18   improper motive of a financial institution is imputed to the

19   debtor because they control the debtor or have the ability

20   to harm the debtor in some way that they didn't cede to

21   their demands.

22           But, you know -- or you have some relationship

23   with some party such that, you know, a transfer to an

24   affiliate, a transfer to a friend, you know, retaining where

25   somebody, you know, transfers something and retains back

Page 75

1    some kind of interest.

2            We don't have that here, Your Honor.  There's no

3    allegations in the complaint, you know, that suggest that.

4    The only two badges of fraud that they suggest are that it

5    was done quickly and it was lack of consideration.

6            And, you know, as Judge Gropper in Market XT says,

7    that's just not enough.  You know, obviously constructive --

8    the constructive fraud deals with lack of reasonably

9    equivalent value.  You have to have more for actual, you

10   know, intent.

11           Your Honor, with respect to the other, you know,

12   common law claims, they claim that, you know, the Tschira

13   entities somehow defrauded Lehman.  As I mentioned earlier,

14   you know, that fails for several reasons.

15           One, they don't plead, you know, under (9)(b)

16   sufficient allegations of fraud.  They don't plead what the

17   misrepresentation was, what reliance.

18           Also, the existence of the contract, you know,

19   undermines that.

20           To the extent, you know, the contract itself, you

21   know, specifically says that the monies would have been

22   returned to LBF and they acknowledge in their complaint only

23   if there wasn't a bankruptcy filing.  So, you know, how --

24   one could say that, you know, that that's fraud is

25   nonsensical on these facts.

Page 76

1              They also, you know, purport to, you know, base

2      their fraud claim on the misrepresentation that they

3      intended not to comply with the contract.  You know, as we

4      point out, you know, in our moving papers, you know,

5      intention -- you know, that if you have a contract, the

6      terms of the contract comply.  The claim is breach of

7      contract.  It's not fraud.  Even if you can allege or prove,

8      which I don't think they can do here, but even if they can

9      allege or prove that there was no intention, you know, to

10     comply.

11             You know, with respect to the constructive trust

12     claim, they don't claim any kind of fiduciary relationship

13     and there's no unjust enrichment, you know, here.   You

14     know, as Your Honor knows, and this is why we point it out,

15     you know, there's litigation as to -- between, you know, LBF

16     and the Tschira entities as to who owes who, you know, in

17     connection with the ISDA agreements.

18             And, ultimately, you know, if it turns out that we

19     were, you know, we're supposed to pay and that's determines

20     by the -- you know, the appropriate court, that will be paid

21     to LBF.  So there are just an army of claims.

22             Now, Your Honor, I understand, you know, from the

23     debtors' perspective, you know, that they look at this and

24     they say, we transferred a hundred million Euros on the eve

25     of bankruptcy.  Somehow we should be, you know, entitled to

Page 77

1    get that back.  There should be some kind of claim.  And

2    that somehow it seems unfair that they can't get it back.

3            But, you know, Your Honor, there's a couple of

4    things going on, you know, here.

5            One is that the party -- and they say this -- that

6    the party who the transfer was made on behalf of was LBF.

7    And presumably they have a claim against LBF and they've

8    filed that claim and, you know, as part of any settlement

9    they have with LBF that will be taken care of.  And that's

10   just the nature of a guarantor.  When a guarantor, you know,

11   guarantees debt and it pays, it has a claim, you know,

12   against the original obligor.

13           So they have whatever they have there.

14           Now with respect to the transfers that they made

15   in connection with the -- you know, the ISDA agreements, the

16   -- by providing the additional collateral and increasing the

17   independent amount, Congress has just decided that that's

18   just not something, you know, that can be avoided in a

19   bankruptcy case.

20           And so that is just what -- you know, just the way

21   it is.  It's not -- it's just -- you know, it's not -- you

22   know, Congress has made that decision.  The statute is very

23   clear.  As Your Honor has said, it needs to be, you know,

24   strictly applied on its facts.

25           So, you know, Your Honor, I understand that given

1    the safe harbor provisions here, you know, they tried to

2    figure out some way of casting this as actual fraud or some

3    state law type of claim.  But the reality is on the facts of

4    this situation, you know, it just doesn't apply.

5            I understand how Your Honor could say, if I take

6    into account all of these other things that are going on in

7    Switzerland and the U.K., somehow it doesn't seem fair, and

8    if I don't -- if I dismiss this case that somehow that's

9    going to take away, you know, leverage from LBHI in

10   connection with some of these other things.

11           But, Your Honor, that's not what we're here for

12   today.

13           THE COURT:  That's not what I said nor is it what

14   I think.  What I said earlier was that I didn't understand

15   procedurally how your client would be adversely affected by

16   a decision with regard to each of the arguments you make in

17   the motion to dismiss at a later stage of the litigation

18   when everything that you are now asserting can be supported

19   by a credible, factual record.

20           This is not about negotiating leverage from my

21   perspective.  It may be about negotiating leverage from the

22   perspective of LBHI and it may be about that from the

23   perspective of your client which seems to be taking a global

24   approach to the litigation.

25           Indeed, I will take judicial notice of the fact

Page 79

1    that prior to the time that an order was entered disposing

2    of the claims made in this bankruptcy case, Tschira took the

3    position through its then counsel, Skadden Arps, that I, as

4    the bankruptcy judge, then presiding over a claim dispute

5    that was square in the middle of this bankruptcy case, that

6    I should stay those proceedings so that Tschira could

7    proceed to litigate issues in the Swiss courts.

8           If any party in this case is gaming the world

9    judiciary it is your client.  So let's not talk about

10   motivation --

11          MR. BRILLIANT:  Okay.

12          THE COURT:  -- when it comes to procedural moves.

13   Your procedural move is an undisguised attempt to blow out

14   this part of the litigation that is, in relative terms, not

15   the major part of the litigation.  And the only reason

16   you're here is that there was a reserved right at the time

17   of dismissal for LBHI to litigate with you here.

18          If you hadn't withdrawn the claim, there would be

19   no question you would be here, and there would be no

20   question that I would be dealing with safe harbors

21   potentially to your client's disadvantage.  So your client

22   made the tactical judgment to leave dodge city.  Well,

23   you're in dodge city again, this time with a different

24   advocate.

25          But don't tell me what I'm thinking when it comes

Page 80

1    to relative leverage when I have actual knowledge that your

2    client is not just gaming the process here, but gaming the

3    process in Switzerland and in the U.K.  Don't make such

4    suggestions in future arguments, please.  You don't know

5    what I'm thinking.

6              MR. BRILLIANT:  I -- you know, I apologize if I

7    implied what you're thinking, Your Honor.  But I, you know

8    -- and obviously, you know, for the record I disagree that

9    our clients are gaming the system.  It's --

10             THE COURT:  You don't have to disagree with it.  I

11   have drawn the conclusion based upon what I've seen in this

12   court that your client is motivated to litigate what it

13   wants to litigate where it prefers.  It's that simple and

14   you can't deny that.  That's why you're pressing a motion to

15   dismiss.

16             MR. BRILLIANT:  Well, Your Honor, we're pressing

17   the motion to dismiss because we believe it's meritorious.

18             THE COURT:  I understand that's what you believe

19   as counsel, and I'm going to tell you right now I'm not

20   granting it.

21             You can sit down.

22             MR. BRILLIANT:  Thank you, Your Honor.

23             MR. TAMBE:  Good morning, Your Honor.  Jay Tambe

24   for --

25             THE COURT:  We're going to take a five-minute

Page 81

1    break.

2                MR. TAMBE:  That's fine, Your Honor.

3                (Recess taken at 12:02 p.m.; resumed at 12:10

4    p.m.)

5                THE CLERK:  All rise.

6                THE COURT:  Okay.  Let's proceed.

7                MR. TAMBE:  Good afternoon, Your Honor.  Jay Tambe

8    from Jones Day for the debtor.

9                We're largely going to rest on our papers, but I

10   do want to address some of the points raised by Mr.

11   Brilliant in light of the comments the Court has made as

12   well.

13               The confusion that Your Honor eluded to and that

14   Mr. Brilliant seemed to embrace I don't think actually helps

15   the Tschira entities.

16               The precise reason that we have talked in our

17   complaint and alleged in our complaint, the existence of

18   these multiple arrangements, the custody agreement which was

19   between LBF, LBIE and the Tschira entities on the one hand

20   and then the swap agreements which were between Tschira and

21   LBF, guaranteed by LBHI on the other hand is because as

22   alleged in our complaint as I've stated in our opposition

23   brief, we believe that this grab for money that occurred on

24   the 11th and 12th of September initiated by the Klaus

25   Tschira entities, it was papered and documented in a way

Page 82

1  that was pretextual.  There was no good faith bas for that.

2  It was done as a pretext.

3          What the Klaus Tschira entities were really

4  concerned about was LBIE.  They had no exposure to LBF or

5  LBHI.

6          THE COURT:  Can I stop you for a second though?

7          MR. TAMBE:  Yes.

8          THE COURT:  What's the basis for that assertion?

9  What's the basis for the assertion that the documentation is

10  a pretext?

11          MR. TAMBE:  The basis is how that -- is the

12  investigation that we've done, the documents that we have

13  looked at, which suggests that what began -- the

14  conversation or the discussion began with the publication of

15  the LBHI financial statements, which I believe occurred on

16  the 10th of September.

17          And immediately following that, is when these

18  discussions began, and the demand was made by KTS for 400

19  million Euros.  Not tethered to any exposure under the swap

20  agreement, not tethered to do anything having to do with the

21  custody agreement.  It was simply turn over $400 million --

22  400 million Euros.

23          I know the question was, how do you make that

24  happen in such a way that they can hold onto it.  It was a

25  pretext of paper in such a way that they could hold on to

Page 83

1    this money, which they had absolutely no right to demand

2    under any of the existing agreements.

3           THE COURT:  Well, part of what makes this entire

4    saga difficult to unravel at the motion to dismiss stage, is

5    that the complaint which Tschira challenges, doesn't say

6    everything you're now saying.  And the defenses raised by

7    Tschira and your response, expand this seemingly simple

8    dispute between LBHI and Tschira into a global scam.

9           And you are raising in the context of opposing the

10   motion to dismiss a series of arguments that are not plain

11   from a reading of the complaint itself.

12          MR. TAMBE:  If I could speak to that?

13          THE COURT:  Yes.

14          MR. TAMBE:  We do allege specifically in the

15   complaint the existence of the custody agreement, as well as

16   the swap agreement.  We allege specifically in the complaint

17   that there existed under the custody agreement, what we

18   referred to as the free shares.  The shares that weren't --

19   that had deposited with --

20          THE COURT:  Yes.

21          MR. TAMBE:  -- LBIE, that weren't there to bind

22   any obligation of LBF -- of KTS to LBF.  They were

23   additional.  They were surplusage.

24          There was no basis for those shares to be held

25   pursuant to either the swap agreement or the custody

Page 84

1   agreement.  They'd simply been deposited and they were being

2   held.  That's what we've alleged, Klaus Tschira was

3   concerned about.  Klaus Tschira was concerned about the

4   health of the LBHI empire as a whole, was concerned about

5   the fact, as Mr. Brilliant said, there were billions of

6   dollars of SAB shares deposited and held in custody by LBIE.

7           Now, for reasons that we don't yet know, and we

8   don't allege in the complaint, they did not get those shares

9   back, or seek to get those shares back from LBIE on the 11th

10  and 12th of December.  What they instead did was, contacted

11  LBF and demanded 400 million Euros, and got the 100 million

12  Euros the next day.

13          We -- and that's why we allege, this is a set of

14  facts that is different from the vast, vast majority of

15  commodity transactions, forward purchase transactions, swap

16  transactions that the estate has confronted.

17          And as Your Honor fully knows, we take safe

18  harbors very seriously.  We have not challenged the

19  application of safe harbors, but billions upon billions of

20  dollars' worth of transfers that took place in the ordinary

21  course that were in connection with and related to those

22  safe harbor transactions.  This is a different kettle of

23  fish, Your Honor.

24          THE COURT:  Do you have a theory of your case as

25  to why this 100 million Euro transfer took place at all?

1          MR. TAMBE:  I do.  I'm not sure to what extent I

2     can fully share that with you, but I do believe, and we do

3     allege in the complaint, that there was somewhat of a

4     special relationship between the Klaus Tschira entities and

5     LBF, and in particular, certain bankers at LBF.  That's what

6     got this done, at a time when, as Your Honor said, it made

7     very little sense, if any, for this quantity of money to be

8     moving out of Lehman Brothers.

9          THE COURT:  To what extent is your actual intent

10    to defraud and your fraud claim dependent upon this special

11    relationship with LBF personnel and personnel of Tschira?

12         MR. TAMBE:  I don't think it has to be.  I don't

13    think it has to be based on existence of the special

14    relationship.  I think it'll provide a motivation, but there

15    well may be other motivations.  Purposes of pleading, and as

16    Your Honor has recognized, that JPM and other cases have

17    recognized, what we confronted on September 15th and

18    thereafter, is all of the folks at LBHI, LBF, LBIE that you

19    could, in the ordinary course of business, sit down and talk

20    to and say, why did you make this transfer.  We don't have

21    access to those people anymore.

22         So what we're going by is what we have in our

23    books and records, what information we can glean from those

24    people that we can speak with, and which is why, the courts

25    have said, and Your Honor has said, you can plead the actual

Page 86

1    intent aspect of the fraudulent conveyance claim, by

2    pointing to badges of fraud.  And that's what we've pleaded.

3            We've pleaded a series of batches of fraud, as to

4    why this was different, this was unique, this was rushed,

5    not in the ordinary course, and why that gives us a basis to

6    allege this was done with an actual intent to hinder or

7    delay or defraud other creditors of Lehman.

8            THE COURT:  Okay.

9            MR. TAMBE:  If I could speak about the safe harbor

10   issue.

11           It's an affirmative defense.  It's one they have

12   to make out.  We have alleged, again, what we believe are,

13   the elements of a constructive fraudulent conveyance action.

14   I've heard Mr. Brilliant say a couple of times in his

15   argument that in reality what happened was W, Y and Z.

16   That's a factual argument.  That's a factual argument.

17           We have not alleged in the complaint, and in fact,

18   did not know until Mr. Brilliant and KTS appended to their

19   moving papers, the unsigned amendment agreement.  And the

20   master agreement is quite clear, the amendment is simply not

21   effective if it is not signed by both parties.

22           This goes to a couple of places.  It goes -- it

23   suggests how quickly and speedily this was done, didn't

24   follow the usual formalities, for a significant amount of

25   money to move on the 12th of September.  But it also goes

Page 87

1    to, and again, a fact pattern that's probably not been

2    presented in the other cases, which is, what do you do --

3    you know, in effect, you have a gratuitous transfer.  You

4    don't have an enforceable contract tethered to anything for

5    the transfer of this money.

6            That's a factual question, and that confusion

7    doesn't help them.  It hurts them, because they have the

8    burden to make out, at this stage of the proceeding, that

9    the safe harbors must apply and the case should be dismissed

10   on the basis of the safe harbors.

11           THE COURT:  Okay.  Mr. Tambe, let me ask you to

12   focus on something.  Just before the break, I indicated that

13   I was not inclined to grant the motion to dismiss.  That

14   doesn't mean that I believe that you have a clear ability to

15   assert claims that appear to be subject to safe harbor

16   defenses.

17           My reason for saying that I wasn't inclined to

18   grant the motion actually was foreshadowed not in my

19   culminating remarks, but in my colloquy with Mr. Brilliant,

20   in which I was raising questions, as to the harm, if any, to

21   his client associated with differing disposition of the

22   legal issues raised by the motion to dismiss, until such

23   time as a factual record could be presented that would

24   support summary disposition.

25           He responded that as a matter of policy, it is

Page 88

1    unwise for a court to defer dealing with claims, that as a

2    matter of law, should not be pursued.  And if one looks at

3    the JPMorgan motion to dismiss opinion, it's consistent with

4    that.

5           From your perspective, what are the defenses to

6    the claims asserted by Tschira to be subject to the safe

7    harbors?  In other words, what distinguishes your claims

8    that would otherwise appear to be subject to a safe harbor

9    defense from the very same claims that I dismissed at the

10   motion to dismiss stage in JPMorgan?

11          MR. TAMBE:  Right.  So a couple of points, I think

12   we alleged in the complaint, we explained it in the

13   opposition brief.  First and foremost, we say for the facts

14   that gave rise to this transfer, that the money that was

15   transferred, the 100 million that was transferred was not,

16   in fact, transferred in connection with the swap agreements.

17   That's what the piece of paper that the parties passed

18   between each other purported to be.  But that's what makes

19   this a different situation than many other situations, where

20   someone is demanding collateral, or additional protection.

21          Under an agreement which both sides say, yeah,

22   that's what it was there for.  We're challenging the very

23   heart, the very formation of that agreement, that's one.

24          Two, we now know that agreement really never came

25   into being, as a matter of the ISDA master agreement itself,

1    the unsigned amendment, it's annulity.  It's nothing.  So

2    now you have money moving, not pursuant to even an amendment

3    agreement, it's just moving gratuitously, which is why we

4    made that comment in the opposition papers.

5            Third we'd say, and we have raised this issue, and

6    it's a legal issue, and arguably Your Honor could decide it

7    now or wait for the factual development which is, what is

8    the claim preclusive effect of the fact of which these same

9    share entities were before Your Honor on their affirmative

10   claims, withdrew those claims, and whatever else -- whatever

11   other effects that might have, we know that that's res

12   judicata as between LBHI and the KTS entities, with respect

13   to claims that were litigated or could have been litigated

14   in that setting.

15           And so that's an additional reason, we'd say

16   that's another reason why we have defenses to the safe

17   harbors of interest.

18           THE COURT:  Okay.  In reference to that claim

19   proceeding --

20           MR. TAMBE:  Uh-huh.

21           THE COURT:  -- one of the things that occurs to

22   me, and I would simply like your clarification on this, is

23   it the issues that are presented by the adversary proceeding

24   now might have been part of the contested claim proceedings

25   relating to the Tschira claims against LBHI which were later

Page 90

1   withdrawn.

2         It is not entirely clear to me, however, as to

3   whether the allegations of the adversary complaint relating

4   to the hundred million Euros, in fact, were part of or could

5   have been part of the original claim objection.  Can you

6   clarify that point for me?

7         MR. TAMBE:  If I followed your question, I'll try

8   my best.  In the claims, as originally filed, what the share

9   entities sought was, it sought 600 million Euros, which was

10   their valuation as of October 2008.

11         We had objected and said the right date for

12   valuation is September 15th, 2008.

13         THE COURT:  I recall it.

14         MR. TAMBE:  And one of the issues that came up in

15   -- if we had litigated those issues is, what do we do about

16   the hundred million Euros that had been transferred.  We

17   never got to that stage.  And arguably, there would've been

18   a discussion at that point in time, and some development

19   factually and in the record of was that -- how do we treat

20   that hundred million.  Is it a transfer that should be

21   avoided, is it simply something that LBF and therefore LBHI

22   gets credit for when you do the valuation exercise.

23         But that's how we would've played -- that's how we

24   could have and would have played into the litigation on the

25   claim, on the contested claims.

1              THE COURT:  Okay.  Let's unpack some of these

2      issues --

3              MR. TAMBE:  Okay.

4              THE COURT:  -- just for purposes of clarity.  And

5      I realize that Mr. Brilliant and his colleagues from Dechert

6      were not involved on Tschira's behalf at the time.  But as

7      he well knows, I clearly remember what happened.

8              And I just want to be attentive to the

9      relationship, if any, between what took place in respect of

10     the claim objection, and what's occurring now.  Not only

11     because it plays into your res judicata argument, but

12     because it actually lays out the timeline of what brings us

13     to court today.

14             As I understand the facts, Lehman objected to

15     significant claims made by Tschira in the bankruptcy case

16     arising out of the termination of a swap arrangement, which

17     was measured in terms of its termination value by the market

18     value of SAP shares, that materially declined in value

19     between September 15, the date of commencement of LBHI's

20     case, and a certain date in October which was the date when

21     the transaction was replaced by Tschira.

22             Is that correct so far?

23             MR. TAMBE:  Except for the last five words I

24     believe.  I don't believe Klaus Tschira ever replaced the

25     transaction.  I think Klaus Tschira chose to value it as of

Page 92

1    that October date.  That's a very minor --

2              THE COURT:  Okay.  What I --

3              MR. TAMBE:  -- correction, but I do want to make

4    sure --

5              THE COURT:  -- generally remember is that there

6    was a dispute, and that's why this is so ironic, a dispute

7    with respect to the proper application of Section 562 of the

8    Bankruptcy Code, relating to a commercially available

9    determinance of value in respect of the transaction.

10             And it's also my belief and recollection that we

11   argued through George Zimmerman as counsel for Tschira

12   whether or not 562 issues could or could not be applied

13   extraterritorially in Swiss proceedings, we ended up with a

14   very accelerated schedule for trial on the issues presented

15   by the claim objection, in which as I recall, we attempted

16   to develop an expedited discovery and trial schedule that

17   would generally get us to a point of a hearing before the

18   end of September.

19             Because it was represented to me that there were

20   issues in Switzerland, which were time critical relating to

21   the settlement approved in the Lehman cases here, and also

22   approved in Switzerland.  And that Tschira had objected to

23   that settlement in Switzerland.

24             That's the background that led to one of the

25   strangest hearings that I can recall, in which Tschira

Page 93

1    sought to withdraw its claim, and Lehman objected to the

2    withdrawal of the claim unless it had preclusive effect.

3    And indeed we had two forms of order.  A simple order

4    relating to the withdrawal of the claim as proposed by then

5    counsel for Tschira, and a fairly lengthy and detailed

6    proposed form of order that you submitted.

7              In that form of order, you sought absolutely

8    expressed determinations that the dismissal and withdrawal

9    of the claim would have res judicata impact and would

10   resolve any and all matters in dispute.  That's what we

11   litigated in the sense that people filed papers, we had a

12   hearing, and ultimately I indicated that I was going to

13   enter a plain vanilla order, and the parties would later

14   have the ability to argue what the effect of the order might

15   be as a matter of law.

16             Do you disagree with my rendition of at least this

17   timeline to this point?

18             MR. TAMBE:  With immaterial details, I agree

19   with --

20             THE COURT:  Okay.

21             MR. TAMBE:  -- the rendition, Your Honor.

22             THE COURT:  Okay.  Given the fact that the order

23   in question that led to the withdrawal of the Tschira claim,

24   was deliberately fashioned to finesse the question of its

25   ultimate preclusive effect, and given the fact that the

1   litigation claims that you now press as to Tschira were not

2   explicitly the subject of your earlier claim objection,

3   explain to me how, as a matter of law, the order disposing

4   of those claims now precludes Tschira from raising the

5   defenses that have been raised in the motion to dismiss?

6          MR. TAMBE:  In a couple of ways, but let's start

7   with the first concept, which is the fact that the Klaus

8   Tschira entities withdrew their claims against LBHI, that's

9   all that was before Your Honor, that has some res judicata

10   effect as between LBHI and the Tschira entities.

11          What we had sought by way of our proposed order,

12   because there was the possibility that that order might play

13   some role in a foreign proceeding is some clarity for the

14   benefit of foreign courts, as to what that means.  What does

15   it mean in the U.S. system of justice when someone withdraws

16   their claim with prejudice, and what does it mean to be --

17   to have res judicata effect.

18          And I believe what we had sought were specific

19   findings, that may or may not have been relevant, and may or

20   may not have been considered and given some weight in some

21   foreign court, on the types of issues that were being

22   litigated there.

23          What the proposed order did not contemplate, and I

24   think what the order finally entered obviously did not

25   address specifically was, what do you do about claims not

Page 95

1   expressly raised, and therefore, not expressly addressed in

2   any of the proceedings.  That's really where we are right

3   now because we're not telling you that the claim that we're

4   now pressing was actually raised before.  It wasn't.

5          It might have been if we had proceeded because the

6   hundred million Euros would've become an issue as you looked

7   at valuation and who got what money when, and who should get

8   what claim.  We haven't gotten to that stage, but I can tell

9   you right now, it wasn't actually raised.  But that's not

10  the standard for res judicata.  The standard is, its claims

11  not only litigated and decided, but as to all relevant

12  issues which could have been, but were not raised and

13  litigated in the suit.

14         And the argument we've made in this proceeding is,

15  amongst the claims that could have been raised, but were

16  not, that could have been raised before, were claims related

17  to whether or not this transfer of 100 million from LBHI to

18  KTS was a voidable transfer.

19         Now, as an aside, at the point in time all this

20  was going on, we had a standstill agreement with the Klaus

21  Tschira entities entered into shortly before the two year

22  anniversary of the Lehman filing, similar to agreements we

23  entered into with a lot of other recipients of transfers,

24  where we said, look, a transfer had been made to you, we're

25  coming up on the two year anniversary, give us some time to

Page 96

```
1     figure out what we're going to do with this, let's enter

2     into a tolling agreement.  And we have a tolling agreement.

3              It was only after we terminated that tolling

4     agreement, that we free after 30 days to commence this

5     proceeding.  But it was not raised before.

6              And so I'm not going to suggest that it was

7     expressly contemplated by the order you entered, nor am I

8     going to say to Your Honor that we expressly provided for

9     that in the long form order that we proposed to the Court.

10    What we are relying on is that body of res judicata law and

11    jurisprudence that says, it's res judicata, not just with

12    respect to issues actually litigated, but that could have

13    been litigated.

14             And certainly if you look at the facts that were

15    cited by the parties in the pleadings that were filed, the

16    hundred million featured in that, that was part of the

17    factual recitation of how we got to where we got to.

18             THE COURT:  Okay.  Now, recognizing that I'm not

19    inclined to decide this issue today, if you were to prevail

20    in arguing that res judicata applies, what would the

21    consequence be to the 546 safe harbor arguments?  Because it

22    seems to me, and this is just a theoretical conversation

23    we're having, that res judicata cannot nullify congressional

24    policy expressed in the safe harbors.

25             I mean, in effect, an immune transaction if, in
```

Page 97

1    fact, it's an immune transaction remains an immune

2    transaction.

3            MR. TAMBE:  If we're talking theoretical --

4            THE COURT:  We're talking theoretical.

5            MR. TAMBE:  -- let me suggest a response.  The

6    safe harbors exist, but they don't -- they're not

7    automatically self-enforceable.  You have to invoke the safe

8    harbor, and I believe the case law suggests that burden of

9    demonstrating the applicability of the safe harbor rests

10   with the parties seeking to invoke the safe harbor.

11           That same party, under well accepted Supreme Court

12   precedent and any kind of precedent, can waive and be

13   estopped from asserting rights that it otherwise might have

14   as a matter of legislation or policy.

15           When they chose to walk away and dismiss the

16   claims with prejudice, not a dismissal without prejudice, a

17   dismissal with prejudice, and we had a very heated

18   discussion and debate about you're dismissing with

19   prejudice, folks, and this is going to have some impact,

20   it's going to have some res judicata impact, and they were

21   perfectly prepared to accept that consequence.  I don't

22   think that's in conflict with any congressional policy or

23   congressional intent.  It's their right to invoke, it's

24   their right to raise.  They walked away from all rights, and

25   under res judicata principles agreed to be bound on all

Page 98

1    claims that were litigated or could have been litigated.

2            I think that's their right to give up and they

3    gave it up.

4            THE COURT:  Okay.  Well, I'm not going to make any

5    judgment in the context of this motion to dismiss as to the

6    applicability of your res judicata argument in the context

7    of this litigation, but I'm not taking that argument away

8    from you.  You still have it.

9            But there is a great deal of irony in all this

10   because it is my belief, and nobody has to agree with it or

11   disagree with it, that part of what was happening from the

12   perspective of Tschira at the time that it elected to

13   withdraw its claims in its bankruptcy case with prejudice,

14   is that it wanted to avoid an adjudication by this court as

15   to the applicability of Section 562 principles to its claim.

16           And so we have what I was adverting to in my

17   remarks to Mr. Brilliant at the end of the last session, I

18   called it a gaming of the system on a global scale, we have

19   a party that chooses to withdraw from the bankruptcy court,

20   in order to avoid the consequences of one of the safe

21   harbors, who has acknowledged that it is subject to service

22   of process in the bankruptcy court in the context of

23   withdrawing those claims, who now relies upon the safe

24   harbors, in an effort to eliminate at least some of the

25   claims in the complaint.

1            At least for me, this is an ironic moment.

2            MR. TAMBE:  I fully share that, Your Honor.

3            THE COURT:  Now, that having been said, I believe

4    the strongest arguments made by Tschira, in their motion to

5    dismiss, relate to the safe harbors.  So let's turn around

6    again to the distinguishing factors that would blunt the

7    effect of the safe harbors as to your constructive

8    fraudulent conveyance claims, for example.

9            You are, in effect, telling me that these are not

10   transfers made in connection with securities contracts or

11   forward contracts or any other qualified transaction under

12   the Bankruptcy Code, but rather purported transfers that are

13   made to appear to be consistent with those provisions, that

14   were designed by the parties, in effect, to escape detection

15   when what was really going on was that for purposes

16   completely unrelated to the safe harbors, Tschira was

17   seeking to bolster its position in Europe, relative to LBF

18   and LBIE.

19           MR. TAMBE:  Precisely, that's --

20           THE COURT:  That's your theory.

21           MR. TAMBE:  That's our theory.

22           THE COURT:  Okay.

23           MR. TAMBE:  And that's what we've alleged in the

24   complaint, that's what we argue in the opposition papers.

25   Now, I think it's up to -- it is a different fact pattern in

Page 100

1     some respects than what you were facing in JPM.  And it's

2     probably a different fact pattern that's presented in the

3     vast majority of other swap related transfers.

4               THE COURT:  Now, here's the problem I'm having.

5               MR. TAMBE:  Uh-huh.

6               THE COURT:  Now, here's the problem I'm having.

7     While I was saying to Mr. Brilliant that I was not inclined

8     to grant the motion to dismiss because of a fact pattern

9     that from the papers appeared to be confusing and complex,

10    what you've just agreed to, in terms of my formulation of

11    what your theory is --

12              MR. TAMBE:  Uh-huh.

13              THE COURT:  -- is not playing from a reading of

14    the complaint, at least I don't think it is.  I figured that

15    out as a result of reading pleadings, reading the papers,

16    and today's argument.  Can you point to me -- point me to a

17    part of the complaint --

18              MR. TAMBE:  Sure.

19              THE COURT:  -- where you say that this is, in

20    effect, a ruse?

21              MR. TAMBE:  Okay.  I think it showed up in two

22    places, because the ruse aspect of it goes not to just

23    whether or not the safe harbors probably should apply, but

24    the ruse factor obviously plays a big role in the actual

25    intent to defraud, that it was all a ruse.  So the factual

Page 101

1    allegations are all a ruse.

2            So let's start with the background, which is in

3    paragraphs 12, 13 through 16, which sets out this notion of

4    three assets, and in 16, sets out the concern the defendants

5    have about the viability of not just LBHI, but LBF and LBI.

6            18 talks about the fact that what they're really

7    concerned about is the viability of LBIE and its ability to

8    perform its obligations under the custody agreement, not the

9    swap agreements that they point to, the custody agreement,

10   with the three assets in there.

11           We talk about the fact they contact us and demand

12   the money.  We then talk about the fact that the way the

13   defendants do it, all right, 21 and 22 says, there's nothing

14   under the existing credit support annex that supports this

15   demand for 400 million Euros or 100 million Euros.  22 days,

16   the way they do it, is they amend the existing credit

17   support annex, to effectively require this threshold amount,

18   which is an independent amount.  Which is not tethered to

19   the valuation of anything, it's just a sum of money.

20           So it is putting into the vehicle this credit

21   support annex amendment.  What they really want, which is

22   they want to hold on to a bunch of cash for one week.

23           So we could have summed that all up and put it

24   into a conclusory paragraph saying, therefore, the sum of

25   all this is, this was just a ruse, but the factual predicate

Page 102

1    and the allegations that we base our theory on, there's no

2    -- I don't think there's any confusion as to what our theory

3    is of liability here, are all laid out in the complaint.

4            THE COURT:  Okay.  Thank you.

5            MR. TAMBE:  And just on the public policy issue,

6    if Your Honor wants anymore color on that, we do allege in

7    the complaint, and this was discussed between yourself and

8    Mr. Brilliant earlier, the market -- what is the public

9    policy concern here, is that there is some certainty in the

10   markets.

11           I don't think those public policy concerns and the

12   smooth functioning of the markets, I don't think those

13   public policy concerns are implicated in the least by this

14   set of circumstances with these facts.  And again, when you

15   view that in the context of Lehman bankruptcy and the types

16   of transactions where a challenge has been brought, and the

17   vast, vast majority of transactions where no challenge has

18   been brought.

19           In fact, the safe harbors functioned extremely

20   well through the Lehman bankruptcy.  I think that's what the

21   full record is of -- if there are public policy concerns

22   about how this Court and the estate have addressed the

23   public policy implications behind the safe harbors.  I think

24   the record is overwhelmingly that the safe harbors have been

25   respected, have given great certainty to the markets.

Page 103

1        But when you are faced with a unique and

2   convoluted fact pattern as we are here, I think there's

3   nothing in public policy that says you can't take a harder

4   look in what was really going on.  There's nothing in the

5   public policy that says, you must decide that issue on a

6   motion to dismiss where factual questions have been raised,

7   and where there's some lack of clarity as to exactly what

8   was going on.

9        THE COURT:  Can you identify any case in which

10  other than the Madoff case --

11        MR. TAMBE:  Uh-huh.

12        THE COURT:  -- in which a transaction that

13  purports to be governed by a safe harbored transfer --

14        MR. TAMBE:  Uh-huh.

15        THE COURT:  -- is not treated as a safe harbor

16  transfer because it's in effect a ruse or a manipulation of

17  the process designed to take advantage of a provision where

18  it doesn't apply, because in effect, we're recharacterizing

19  the transaction as a safe harbored transaction.

20        Let me try that a little -- with fewer words.  If

21  I understand your theory, it is money transferred for a

22  particular purpose that had nothing to do with the safe

23  harbors, but was nonetheless documented as a safe harbored

24  transaction on its face --

25        MR. TAMBE:  Yeah, sought to be documented as.

Page 104

1           THE COURT:  -- is there any authority for the

2     proposition that such a transaction wouldn't be safe

3     harbored anyway, other than Madoff?

4           MR. TAMBE:  Yeah, when I think about the ruse fact

5     pattern, I think the Madoff type cases are the only cases

6     that I am aware of.  I will note, however, the mere fact

7     that a party asserts the existence of a safe harbor doesn't

8     mean that the issue gets decided at the motion to dismiss

9     level.  And Your Honor pointed to the Quebecor case where

10    that issue actually got litigated and decided on a fully

11    developed factual record, and ultimately the safe harbors

12    prevailed there.  But it was for the benefit of knowing

13    exactly what was going on with that set of parties and that

14    set of transactions.

15          But in direct response to your question, I think

16    outside of the Madoff-type, Ponzi-type cases, where the ruse

17    issue comes up I guess most frequently, I'm not aware of

18    other cases where that has been raised to defeat a safe

19    harbor implication.

20          THE COURT:  Okay.

21          MR. TAMBE:  And if after we go back to the office,

22    we locate one or two, we'll be happy to supplement the

23    record.

24          THE COURT:  I can say that I'm generally familiar

25    with most of the safe harbor cases that have ever been

Page 105

1    decided and I'm not aware of one.

2              MR. TAMBE:  As I've said before to Your Honor, it

3    might be unprecedented, but it's not unprincipled.  It makes

4    sense if you have the right set of facts to take a look at

5    that issue to see if something is being documented as a safe

6    harbored transaction when, in fact, it isn't.  Otherwise,

7    the exception would simply swallow the rule.

8              I would rest on our papers with respect to the

9    common law claims.  If the Court has any questions, I'm

10   happy to answer them.

11             THE COURT:  Okay.

12             MR. TAMBE:  Thank you, Your Honor.

13             THE COURT:  Thank you.  Mr. Brilliant, do you have

14   anything more?

15             MR. BRILLIANT:  I'll be very brief, Your Honor.

16             Again for the record, Allan Brilliant on behalf of

17   the Tschira entities.  Your Honor, I'm just going to point

18   out a few points.  The theory, you know, that Mr. Tambe, you

19   know, described is, you know, their -- you know, their

20   theory is to -- you know, this ruse, isn't contained

21   anywhere, you know, in the complaint.

22             And, in fact, the key paragraph here, in

23   connection with the transfer is paragraph 20 of the

24   complaint, where it says, "upon information and belief on

25   September 11, 2008, Chemrilander (ph) contacted

Page 106

1    representatives of Lehman and requested an additional 3 to

2    400 million Euros in collateral.  Chemrilander was assured

3    that transferring additional collateral to defendants was a

4    top priority and the transfer of collateral would be done as

5    fast as possible."

6              And, you know, in 21, they go back into this

7    theory that, you know, under the -- you know, the credit

8    support annex, they weren't entitled to it.  But nowhere

9    does it say that they sought -- you know, they sought

10   monies, not as collateral for the transactions that existed,

11   but in connection with the three assets.  It just doesn't

12   say that in the complaint, and it's not -- it's just not a

13   fair interpretation for them to reach that conclusion.

14             And if you read the entire complaint, including

15   the sections that Mr. Tambe referred to in his argument,

16   again, none of them, you know, talk about a ruse or that it

17   was documented in a way to be deceptive.  And, in fact, as

18   he freely acknowledged to you that the way it was

19   documented, it ultimately is collateral for the securities

20   contracts.

21             The standard -- the statute talks about in

22   connection with, related to.  This clearly is in connection

23   with/related to, and Your Honor is right, there is no

24   precedent for saying that if something was transferred in

25   connection with the securities agreement, or related to a

Page 107

1    securities agreement, but there were ulterior purposes, you

2    know, for having it, that somehow it creates a different

3    interpretation.

4            You know, the other thing I'd point out, Your

5    Honor, is they -- although I'm not going to dispute the fact

6    that they do say that --

7            THE COURT:  I'm just going to break in.

8            MR. BRILLIANT:  Sure.

9            THE COURT:  I remember a case that may actually

10   apply by analogy.  In Lehman Brothers versus Bank of

11   America, I concluded that the 362(b)(17) safe harbor did not

12   apply, and that it was a stay violation for Bank of America

13   to have set off certain collateral in an account that had

14   been created to support overdraft exposure with respect to

15   certain securities clearing relationships between Lehman and

16   BofA prepetition.

17           I found that the 362(b)(17) provision did not

18   apply because there was no connection between that

19   collateral and derivatives transactions.  In effect, and I'm

20   just thinking about this on the spot, and will be corrected

21   by anybody who actually reads the code section and my

22   opinion and is able to make reference to it, but my

23   recollection is that that purported connection to a

24   derivative transaction was overridden by the facts.

25           In that respect, although it's not on all fours,

Page 108

1    there is some precedent for the proposition that a safe

2    harbor needs to actually fit the circumstances.  And I

3    mention it only for purposes of clarity.

4            MR. TAMBE:  If I may, Your Honor, just on that

5    point.

6            If you move the proposition from the ruse

7    proposition to does the safe harbor actually fit, we do cite

8    the Calyon and (indiscernible) Home Mortgage case, where

9    say, where we otherwise may not have a safe harbored

10   transaction, there were aspects of that transaction that

11   were not safe harbored.

12           So determining the parameters of the safe harbor

13   is appropriate, and there is precedent for that.

14           THE COURT:  Okay.  And there's the Calpine

15   transaction which deals with certain alleged safe harbored

16   provisions that were actually outside the scope of the safe

17   harbor.

18           MR. TAMBE:  Right.

19           THE COURT:  In the interpretation of the safe

20   harbors, there's all -- there's some subtlety.  So it's not

21   a blunt instrument.  That having been said -- please

22   proceed.

23           MR. BRILLIANT:  Yeah, no, I think, Your Honor, as

24   I already mentioned, the Calyon decision doesn't -- really

25   isn't analogous.  There was an issue there as to servicing

Page 109

1   rights and mortgages, and the question was whether or not

2   the stay was lifted to allow, you know, the, you know, the

3   lender, you know, to foreclose on the servicing rights.  The

4   Court, you know, Judge Sontchi there, obviously not binding

5   on this court doesn't involve 546(e) said no, the statute

6   only allows the stay to be lifted with respect to, you know,

7   that which is dealt with under the safe harbor.

8          Here, Your Honor, it's not disputed that the

9   monies were transferred as collateral in connection with the

10  ISDAs.  You know, whether they say, you know, they grab

11  money -- the complaint doesn't say this, but whether they

12  want to say in their argument, they grabbed money any place

13  they could, you know, could get the money, you know, to have

14  collateral.  But that the reality is, the collateral was

15  transferred as an independent amount under the ISDA

16  agreement, and the credit support annex.

17          It was collateral for these agreements, and

18  therefore, it doesn't matter whether they had other ulterior

19  motives, you know, for getting the money, which is not

20  what's really, you know, alleged in the complaint.  All that

21  matters is that it was transferred as collateral in

22  connection with the securities contract.  And Mr. Tambe

23  admitted that in his argument, that it was done that way,

24  but he says it was a ruse.

25          Well, it doesn't matter whether or not it was a

Page 110

```
 1    ruse, that was the only way they could legally use the money

 2    was in connection with that transaction.  For them to say

 3    it's not related to or in connection with a securities

 4    contract just doesn't fit in with Your Honor's decisions,

 5    and the other decisions from other courts in connection with

 6    the safe harbor.

 7              And -- but, Your Honor, what this really comes

 8    down to is if they have a theory of their case now, you

 9    know, which is very different than their complaint.  And,

10    you know, we don't believe that, you know, under Rule 11

11    they would be able to amend their complaint, you know, in a

12    way to have it, you know, create a, you know, a cause of

13    action.

14              But Your Honor should dismiss, you know, the

15    complaint and give them an opportunity to replead it if they

16    can.  We don't believe that they would -- you know, based

17    on, you know, the actual evidence, that they can claim that

18    this was, you know, a ruse, because it's just not true.

19              But if you read the complaint, it's very clear

20    that the Tschiras were concerned about the solvency of the

21    company and then they say, you know, in paragraph 18, they

22    were similarly, you know, concerned about the viability of

23    LBI and its ability to, you know, to perform.

24              And then when you read paragraph 20, which is the,

25    you know, the operative, you know, paragraph here, it's
```

Page 111

```
1    clear that the -- they do not allege that they took this as

2    a ruse, but instead, took it as collateral for the

3    transactions they had.

4             The other thing, Your Honor, I want to point out,

5    is that Mr. Tambe says that in the complaint, you know, they

6    have allegations of the special relationship.  There are no

7    allegations of a special relationship.  The only allegation

8    that's in here and it's not in the general part of the --

9    you know, the complaint, the only allegation, and it is a --

10   just a conclusion of law, which Your Honor should not give

11   any effect to, is just that there is a close, you know,

12   relationship in connection with the constructive trust

13   agreement.

14            Paragraph 99 says that in the context of the close

15   and confidential relationship between defendants and LBF,

16   defendants demanded, and that appears in 20 -- in paragraph

17   99, which is the last cause of action, I'm sorry, the next

18   to last cause of action, the last one is the fraud cause of

19   action.  And the way the complaint is set up, that provision

20   doesn't apply to previous -- any of the previous, you know,

21   paragraphs in the complaint.  Each count only, you know,

22   relies upon the -- you know, the counts that come before it.

23            So there is -- that in and of itself, Your Honor,

24   is just a -- you know, it's just a legal conclusion which

25   Your Honor should not give any effect to.  But there is no
```

Page 112

1       allegation anywhere in the complaint that there's a special

2       relationship, a close relationship.

3               The bottom line is -- Your Honor, is the complaint

4       isn't just well pled.  Now, whether they can amend it under

5       their new theory, you know, here to, you know, withstand a

6       motion, you know, to dismiss is very unclear to me.  But the

7       reality is, you know, given where we are at this point, you

8       know, in time, their complaint doesn't withstand, you know,

9       scrutiny and needs to be dismissed.

10              I understand Your Honor's view that if there's --

11      if you're not going to dismiss it at all, then why should

12      you dismiss, you know, any of the -- the issues with respect

13      to 546(e).  And I guess what I would say to you, Your Honor,

14      is that that's just a law.  I mean, the fact that, you know,

15      a party, you know, may not be -- you know, maybe -- may not

16      be inconvenienced in any great way by not dismissing, you

17      know, an account that is ripe for dismissal under law, you

18      know, is not really relevant.

19              The question is just whether or not as a matter of

20      law it states a claim, whether or not as a matter of law,

21      the safe harbors apply.  And based upon, you know, the

22      briefs and the argument, it's pretty clear that we've

23      established that, and that they should be dismissed.

24              THE COURT:  Okay.  Thank you.  Anything more?

25              MR. TAMBE:  Nothing further, Your Honor, thank

Page 113

1    you.

2              THE COURT:  Okay.  I think what I'm going to

3    suggest is that we take a lunch break and return at 2

4    o'clock, and I'll provide a bench ruling at that time, and

5    then we'll go into a chambers conference.  So I'll see you

6    at 2.

7         (Recessed at 1:03 p.m.; reconvened at 2:03 p.m.)

8              THE COURT:  Be seated, please.  I really have

9    telegraphed my decision with the comments made during the

10   argument.  But I'm going to put those comments in context.

11             This is not an easy motion to dismiss in a couple

12   of respects.  First, it looks very much like the JPMorgan

13   case where I granted a motion to dismiss with respect to 546

14   safe harbored claims, and denied that motion as to the other

15   claims based on actual intent and state law causes of

16   action.

17             One possible outcome here is to simply replicate

18   that.  Another advocated by the Tschira defendants would be

19   to dismiss the entire complaint, as failing to state claims,

20   and give Lehman an opportunity to amend, not only as to the

21   safe harbors, but as to all claims in the complaint.

22             A third alternative, and the alternative that I'm

23   adopting, is to deny the motion to dismiss without prejudice

24   with the recognition that the legal issues presented here

25   inevitably will be reasserted at a later point in the case

Page 114

1    after the completion of discovery or the development of an

2    agreed record to support a dispositive motion.

3         That third alternative in the present setting is

4    the correct alternative in my judgment.  Although for the

5    reasons I have just stated, each of the alternatives noted

6    might be permissible.  This complaint is not the clearest

7    for identifying claims against Tschira, but it is clear

8    enough to withstand the current motion.

9         As I noted in colloquy earlier, I did not fully

10   recognize the theory for overriding the safe harbor defenses

11   until today.  The notion of a misuse of the derivative

12   agreements to transfer 100 million Euros was not clear to me

13   from reading the complaint.  It was only today that I

14   recognize that the somewhat flexible approach to the

15   pleading adopted by Lehman here, meant to convey the notion

16   that these transfers which appeared to be made in connection

17   with a protected contract were according to Lehman, being

18   made for another purpose.

19        That theory leads to the rhetorical question so

20   what, and does that really matter.  Because if sophisticated

21   parties are making transfers that purport to be in

22   connection with protected financial contracts, that may be

23   all that the law requires.

24        Every day of the week in every major business

25   center in the world, parties to transactions make decisions

Page 115

1    to structure those transactions either as secured loans that

2    would not be subject to safe harbor protection, or as repos

3    that are protected.

4           Just because the transactional purpose is

5    effectuated by means of a safe harbored transaction, doesn't

6    render the transaction any less subject to the safe harbors.

7    But there is more going on here and it is really for that

8    reason that I have determined for today to deny the motion

9    in all respects, again without prejudice.

10          As the discussion this morning demonstrates, there

11   is some tension between reviewing the complaint and its

12   allegations and isolation for purposes of a 12(b)(6)

13   analysis, and considering this litigation in the broader

14   context in which it arises.

15          In the bankruptcy court, as noted during the

16   argument, this litigation was commenced following the

17   withdrawal with prejudice of certain proofs of claim that

18   had been filed against LBHI against the Tschira parties.

19   That withdrawal followed litigation relating to objections

20   to the claim, based upon Section 562 of the Bankruptcy Code.

21          It is very clear to the Court based upon that

22   experience, that Tschira, for its own reasons, and within

23   its rights, elected to avoid that battle and present its

24   arguments regarding its claims in Switzerland.  I do not

25   fault Tschira for doing that.

1            But this procedural history makes it very

2    difficult for the Court to view this motion to dismiss as

3    anything other than a procedural gambit, a device, a

4    permissible one, but a device designed to cleanly exit the

5    U.S. Bankruptcy Court.  That may happen, but not today.

6            The reason for the delay is that the facts here

7    are simply too convoluted, confusing, and interrelated with

8    other proceedings for me to confidently make rulings on the

9    merits of the motion today.

10           As I read the papers, I became increasingly

11   convinced that the relationships between and among Tschira

12   on the one hand and various Lehman affiliates on the other,

13   are so complex that they cannot be fairly understood and

14   characterized without the benefit of facts.  Facts that go

15   beyond simply assuming the truth of the facts alleged in the

16   complaint.

17           For that reason, and in no way being predictive of

18   how the bankruptcy court will rule on these legal issues

19   when next they are presented, I'm denying the motion to

20   dismiss without prejudice.  And note, that if the parties

21   proceed through discovery and determine that the complaint

22   lacks the specificity needed to truly state the necessary

23   causes of action that are established by such discovery, the

24   parties may take appropriate action at that time, either by

25   agreement, by means of a final pretrial order, or by

Page 117

1  appropriate motion practice in which Lehman seeks to amend

2  its pleadings.

3          Moreover, mere formulas in here doesn't really

4  count.  Tschira, in light of its active involvement in

5  litigation in Switzerland and in the United Kingdom,

6  certainly understands these transactions very well, and has

7  an intimate knowledge of the circumstances.  In that

8  respect, any deficiency in the complaint is not a source of

9  current prejudice.

10          For the reasons stated, the motion is denied, and

11  I'll accept an appropriate order, and we will convert this

12  afternoon's proceeding into a status conference that at the

13  request of at least Lehman, is off the record, and to that

14  extent, I would ask that those parties who should be excused

15  from a chambers conference leave the courtroom, and if

16  everybody who is here is actually a person who would be

17  present during a chambers conference, that's fine too.

18  (Proceedings concluded at 2:20 PM)

19                          * * * * *

20

21

22

23

24

25

1                        I N D E X

2

3                           RULINGS

4    DESCRIPTION                                    PAGE

5    Motion of Black Diamond Offshore, Ltd. and        29

6    Double Black Diamond Offshore, Ltd. for

7    Leave to Conduct Limited Rule 2004

8    Discovery of Debtors and Certain Former

9    Employees [ECF No. 41112]

10

11   Lehman Brothers Holdings, Inc. v. Dr. HC         113

12   Tschira Beteiligungs GmbH & Co KG, et al.

13   [Adversary Proceeding No. 13-01431]

14   Motion to Dismiss Adversary Proceeding

15

16

17

18

19

20

21

22

23

24

25

Page 119

1                    C E R T I F I C A T I O N

2

3    I, Sherri L. Breach, CERT*D-397, certified that the

4    foregoing transcript is a true and accurate record of the

5    proceedings.

6    Sherri L Breach *Digitally signed by Sherri L Breach DN: cn=Sherri L Breach, o, ou, email=digital1@veritext.com, c=US Date: 2013.12.20 17:45:34 -05'00'*

7    SHERRI L. BREACH

8    AAERT Certified Electronic Reporter & Transcriber

9    CERT*D-397

10

11

          I, Sheila G. Orms, certify that the foregoing is a

12    correct transcript from the official electronic sound

13    recording of the proceedings in the above-entitled matter.

14

15    Dated:  December 20, 2013

16    Sheila Orms *Digitally signed by Sheila Orms DN: cn=Sheila Orms, o, ou, email=digital1@veritext.com, c=US Date: 2013.12.20 17:46:07 -05'00'*

17

18    Signature of Approved Transcriber

19

      Veritext

20

      330 Old Country Road

21

      Suite 300

22

      Mineola, New York 11501

23

24

      Date: December 20, 2013

25