# EXHIBIT G

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

                       :

**In re**               :

                       :      **Case No. 13-cv-07481 (LGS)**

**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,   :

                       :

          **Debtors.**        :

                       :

---------------------------------------------------------------x

### DECLARATION OF ALFREDO R. PÉREZ
### IN SUPPORT OF LEHMAN BROTHERS HOLDINGS INC.'S
### MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION
### OF THE FEDERAL HOUSING FINANCE AGENCY AND THE FEDERAL
### HOME LOAN MORTGAGE CORPORATION TO WITHDRAW THE REFERENCE

I, Alfredo R. Pérez, under penalty of perjury, declare as follows:

1. I am a partner with the law firm Weil, Gotshal & Manges LLP, attorneys for Lehman Brothers Holdings Inc. ("LBHI"), as Plan Administrator for LBHI and certain of its affiliates under the *Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors* (the "Plan"). I submit this declaration in support of *Lehman Brothers Holdings Inc.'s Memorandum of Law in Opposition to the Motion of the Federal Housing Finance Agency and the Federal Home Loan Mortgage Corporation to Withdraw the Reference*, dated November 4, 2013.

2. A true and correct copy of the following documents cited in the accompanying memorandum of law is attached:

    Exhibit 1:     Excerpts from the Federal Housing Finance Agency Office of Inspector General's "*Case Study: Freddie Mac's Unsecured Lending to Lehman Brothers Prior to Lehman Brothers' Bankruptcy*," dated March 14, 2013

    Exhibit 2:     Excerpts from the hearing transcript in *In re Lehman Brothers Holdings Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Oct. 24, 2013)

Case 1:13-cv-03748-LGS   Document 13   Filed 11/04/13   Page 2 of 2

Exhibit 3: *Reply in Support of Motion to Classify and Allow the Claim Filed by the Federal Home Loan Mortgage Corporation (Claim No. 33568) in LBHI Class 3*, dated October 22, 2013 [Bankr. ECF No. 40630]

Exhibit 4: *Motion of the Federal Housing Finance Agency and the Federal Home Loan Mortgage Corporation to Stay Lehman Brothers Holdings Inc.'s Motion to Classify and Allow the Claim Filed by the Federal Home Loan Mortgage Corporation (Claim No. 33568) in LBHI Class 3*, dated October 18, 2013 [Bankr. ECF No. 40570]

Exhibit 5: *Objection to the Motion of the Federal Housing Finance Agency and the Federal Home Loan Mortgage Corporation to Stay Lehman Brothers Holdings Inc.'s Motion to Classify and Allow the Claim Filed by the Federal Home Loan Mortgage Corporation (Claim No. 33568) in LBHI Class 3*, dated October 22, 2013 [Bankr. ECF No. 40642]

3. I declare under penalty of perjury that the foregoing is true and correct.


Executed on: November 4, 2013
     New York, New York


           /s/ Alfredo R. Pérez
           Alfredo R. Pérez

2

# Exhibit 1

# FEDERAL HOUSING FINANCE AGENCY
# OFFICE OF INSPECTOR GENERAL

## Case Study:
## Freddie Mac's Unsecured Lending to Lehman Brothers Prior to Lehman Brothers' Bankruptcy



**EVALUATION REPORT: EVL-2013-03**          **DATED: March 14, 2013**

## Freddie Mac Loans to Lehman

Prior to the bankruptcy, Freddie Mac and Lehman had extensive business relations. Lehman sold mortgages to Freddie Mac and also served as one of Freddie Mac's investment bankers. Lehman underwrote common and preferred stock offerings for Freddie Mac as well as various debt securities offerings.

Additionally, through the first half of 2008, Freddie Mac made significant short-term unsecured loans to Lehman. Freddie Mac had been making what it described as "Fed Funds" available to Lehman on an overnight basis with a limit of $200 million since February 2005.

According to the Federal Reserve Bank of New York, "Fed Funds," or Federal Funds, are unsecured loans of reserve balances at Federal Reserve Banks that depository institutions make to one another. Participants in the Fed Funds market include commercial banks, thrift institutions, agencies, branches of foreign banks in the United States, and government securities dealers. The most common term for a Fed Funds transaction is overnight. A "true" Fed Funds transaction is between member banks of the Federal Reserve System, although the term is also used more loosely to describe any short-term, unsecured loans between financial institutions. Neither Lehman nor Freddie Mac is a member of the Federal Reserve System, and typically the maturity terms of their 2008 transactions were not overnight.[5] Nonetheless, Freddie Mac has historically been a significant supplier of funds to the Fed Funds market with member banks acting as intermediaries.

The term and the size of Freddie Mac Fed Funds loans to Lehman changed in 2008. Rather than periodically making overnight loans to Lehman as had previously been the case, the 2008 loans were made for longer terms (up to one month) and they often rolled over as they became due. Thus, the loans made in May 2008 were rolled over in June 2008; they were again rolled over in July, and then again in August. Each time the principal and interest on such loans were repaid by Lehman, the funds were re-sold (lent) by Freddie Mac to Lehman for an additional term.

The principal amount of the loans to Lehman also grew in 2008. From an initial aggregate principal amount of $800 million in January 2008, the amount increased to $1 billion in February and to $1.2 billion in April. Figure 2 shows the amount and terms of the loans made by Freddie Mac to Lehman for the period January to September 2008 (indicated by the bars on the right side of the graph), as Lehman's stock price deteriorated (indicated in the downward trending line beginning in July 2007).

---

[5] Regardless of any technical definition, this report adopts Freddie Mac's use of the phrase "Fed Funds."

Case 9:13-cv-07481-LGS   Document 43-3   Filed 11/04/13   Page 4 of 13

**Figure 2:   Lehman Stock Percentage Change and Freddie Mac's Lehman Fed Funds Exposure, July 1, 2007 – Sept. 15, 2008[6]**



The last of these transactions involved two loans totaling $1.2 billion.  The first loan was provided on August 19, 2008, for $450 million.  The second loan was executed on August 20, 2008, for $750 million.[7]  Both loans were scheduled to mature on September 15, 2008, at 9:30 a.m.

## Counterparty Credit Risk Management at Freddie Mac

The Freddie Mac staff responsible for facilitating the Fed Funds loans to Lehman worked on the Liquidity and Contingency Desk, within Freddie Mac's Investments and Capital Markets Division.[8]  These personnel are responsible for making Freddie Mac's short-term liquid investments.  Because Freddie Mac's business generates large amounts of cash from principal and interest collections, this office often has billions of dollars to invest each day.  Such investments take into consideration Freddie Mac's short-term cash disbursement needs (to ensure it always has funds available to pay its bills) as well as the safety and soundness of the

---

[6] Sources:  Yahoo Finance and Algo Research Group.

[7] The interest rate on the loans was 2.55%, the prevailing Fed Funds rate at the time.

[8] Freddie Mac's Investment and Capital Markets Division is responsible for managing Freddie Mac's retained portfolio of mortgages and securities, hedging against interest rate and other risks, and investing Freddie Mac's available cash.  This group is led by a senior vice president and includes traders and investment managers.

counterparty in which the funds are invested. The rate the counterparty is willing to pay is also a consideration.[9]

Responsibility for monitoring the safety and soundness of Freddie Mac's Fed Funds investments rests with the Counterparty Credit Risk Management (CCRM) staff of Freddie Mac's Risk Oversight Division.[10] The CCRM is headed by the Vice President, Counterparty Credit Risk Management, who reports to the Senior Vice President (SVP), Credit Risk Oversight, who, in turn, reports to the SVP and Enterprise Chief Risk Officer.

Figure 3 illustrates the responsibilities and relationships of the key offices involved in these investment decisions at Freddie Mac.

**Figure 3: Freddie Mac Investment and Credit Risk Management Offices**



---

[9] The Federal Reserve sets a target level for its Fed Funds rate, and the Federal Reserve's announcements of changes in monetary policy specify the changes in the Federal Reserve's target for that rate. According to the Federal Reserve Bank of New York, the actual Fed Funds rate is determined by market participants and is not actually "set" by the Federal Reserve.

[10] The Risk Oversight Division had responsibility for "setting counterparty specific counterparty exposure limits and certain terms of business" pursuant to Freddie Mac's Policy 11-104, *Credit Risk Oversight Corporate Policy.*

Like other companies, Freddie Mac typically invests its cash in a manner intended to ensure that such funds will be returned to it in time to pay its obligations as they become due. This requires Freddie Mac to choose counterparties that it deems reliable and capable of meeting their obligations to pay principal and interest when they are due.

Assessing reliability and capability is not only a function of the counterparty's financial condition and credit history—it is also a function of time. That is, the longer the term for which money is lent, the greater the risk (due to the possibility of intervening events) of default.

Freddie Mac relies on its Risk Oversight Division and the CCRM staff to clear suitable counterparties eligible for investments. CCRM has three primary means of managing counterparty risk: (1) determining counterparty eligibility; (2) limiting the duration of investments; and (3) limiting the size of investments. Once CCRM pre-clears a counterparty and establishes the maximum duration and size of loans that may be made to the counterparty, the Liquidity and Contingency Desk is authorized to lend to the counterparty up to the maximum amount and duration. That authorization remains in place until the Liquidity and Contingency Desk is advised otherwise by the Risk Oversight Division.

During 2008, CCRM's oversight of risk with regard to the Lehman loans focused primarily on the term of such loans; namely, whether such loans should be limited to overnight (24 hours) or longer (up to 30 days) terms. In principle, lenders of overnight loans can eliminate their credit exposure every 24 hours because once the loan ends it need not be renewed. On the other hand, the 30-day loans made by Freddie Mac to Lehman could not be called prior to their stated maturity and therefore resulted in longer credit risk exposure to the Enterprise. Indeed, in 2008, some CCRM staff questioned whether Freddie Mac should be making unsecured loans to Lehman at all based on the perceived heightened risk. However, those concerns, which would have reduced the extent of the Enterprise's exposure, were overruled at senior levels within Freddie Mac.

Lehman's financial condition in 2008 was of concern to CCRM staff. In the wake of Bear Stearns' collapse and rescue in mid-March 2008, CCRM staff indicated that they preferred that the duration of the unsecured Fed Funds loans to Lehman be shortened. They made these assertions on three separate occasions. The first such occasion was March 17, 2008, the day after Bear Stearns' rescue was publicly disclosed. On that day, CCRM staff advised personnel on the Liquidity and Contingency Desk that CCRM was limiting the duration of unsecured loans being made to Lehman from 30 days to 24 hours, once the outstanding loans matured.

Under Freddie Mac's policies and procedures, the Risk Oversight Division was responsible for limiting the amount and duration of the Lehman loans. However, it appears that business managers influenced CCRM staff because the staff reversed its position two days later. In an email from the Director of Credit Quality dated March 19, 2008, CCRM advised that, following

a meeting between Freddie Mac's Chief Business Officer and the SVP of Credit Risk Oversight,[11] the maximum 30-day terms for loans to Lehman were to be reinstated.[12]

Three months later, on June 12, 2008, CCRM staff again recommended reducing Freddie Mac's risk exposure to Lehman.  (During the preceding three weeks, the closing price of Lehman's stock had fallen by approximately 30%.)  This time, CCRM staff recommended—and requested approval from the SVP, Credit Risk Oversight, to implement—a reduction of the maximum duration from 30 days.  The SVP responded that he wanted to discuss the matter further with his business counterpart in Freddie Mac's Investment and Capital Markets Division.  Five days later, on June 17, 2008, CCRM staff followed up on its pending request, by recommending that 30-day loans be reduced to 2-week terms.[13]  That recommendation was temporarily accepted, as reflected by the fact that when the Lehman loans were rolled over later in June the duration of the loans was reduced by two weeks.

The third time CCRM staff raised concerns regarding the short-term unsecured loans to Lehman occurred in mid-July 2008.  In the absence of positive news about Lehman's financial condition, on July 11, 2008, CCRM staff downgraded the internal Freddie Mac risk rating assigned to the Lehman debt.  In a July 15, 2008, email to the SVP, Credit Risk Oversight, CCRM staff stated that they believed "a shorter term of one week (instead of 14 days) would be prudent, but it appears upper management is willing to accept this risk."  An internal Freddie Mac email dated July 30, 2008, stated that the recommendation to shorten the duration further had not been approved because "of disagreements at very high levels over terms of the Fed Funds line."

On August 19 and 20, 2008, Freddie Mac entered into two loans with Lehman for an aggregate principal amount of $1.2 billion.  The loans were set to become due on September 15, 2008, at or near the beginning of the business day.

Freddie Mac entered into conservatorship on September 6, 2008.  Three days later, on September 9, Freddie Mac's Risk Oversight Division (which included CCRM) decided to eliminate all unsecured lending to Lehman.  On that day, Freddie Mac decided that the two unsecured loans to Lehman would not be renewed when they became due at the start of the business day on September 15, 2008.  However, Lehman filed a petition under Chapter 11 of the Federal Bankruptcy Code seeking bankruptcy protection on September 15, 2008, before the business day

---

[11] The Director of Credit Quality is a member of the CCRM staff; the SVP of Credit Risk Oversight is the executive overseeing CCRM.

[12] According to interviews conducted in September 2008 by staff under the direction of Freddie Mac's Chief Auditor and Vice President of Audit, various Freddie Mac staffers recalled that when Lehman heard of CCRM's decision to limit the term, a senior person at Lehman contacted senior management at Freddie Mac and challenged the decision.

[13] On the previous day, June 16, 2008, Lehman announced second quarter losses of $3 billion.

began. That filing allowed Lehman to halt payments to all creditors, including Freddie Mac. To date, Lehman has not repaid the $1.2 billion debt owed to Freddie Mac. Figure 4 shows a timeline of the transactions between Freddie Mac and Lehman.

**Figure 4: Freddie Mac and Lehman Brothers: Countdown to Default**



It is possible that Freddie Mac could have avoided the $1.2 billion loss to Lehman if it had more effectively managed its counterparty risk. For instance, had the duration of the loans been shortened to overnight, as recommended by CCRM staff in mid-March of 2008, Freddie Mac could have halted further loans to Lehman on September 10 or shortly thereafter—potentially ahead of Lehman's September 15 bankruptcy filing. But the record shows that CCRM's risk management recommendations were influenced by Freddie Mac senior business managers.

## OFHEO's Oversight of Freddie Mac's Counterparty Risk

As noted earlier, prior to July 30, 2008, Freddie Mac was regulated by OFHEO. Prior to the Lehman bankruptcy in September 2008, no examination work had been performed by OFHEO related to capital markets counterparties. A senior FHFA official acknowledged to FHFA-OIG staff that there was "a hole in the program," referring to OFHEO's historic lack of counterparty examinations in the capital markets area. The same senior FHFA official is now committed to developing a robust examination program regarding counterparty risk.

## FHFA's Oversight and Examination of Freddie Mac's Counterparty Risk

Following the Lehman default, FHFA examiners conducted a series of targeted examinations related to counterparty credit risk management and management of Freddie Mac's liquidity and contingency portfolio. FHFA's Division of Enterprise Regulation made a number of findings regarding Freddie Mac's operations and recommended that certain actions be taken to better manage counterparty risk. Most importantly, FHFA's work led to a clarification and correction of Freddie Mac's policies to reflect the fact that Fed Funds investments do not carry with them any implied government guarantee.

At the time of the Freddie Mac-Lehman transactions, OFHEO's Division of Enterprise Regulation's supervision manual did not adequately address examination procedures pertaining to the Enterprises' liquidity and funding. Today, FHFA has developed an examination module on liquidity that has undergone field-testing and is scheduled for finalization shortly. Additionally, the Division of Enterprise Regulation has extensively revised its Examination Manual. Although still in draft form, the Credit Risk Management section lays out supervisory policies that address, among other things, establishing and measuring counterparty risk limits, the responsibilities of the board of directors and enterprise risk management, the need for on-going monitoring, and the development of an internal reporting system that rates risk exposure to counterparties based on various critical criteria.

FHFA's Examiner-in-Charge at Freddie Mac has indicated that the monitoring of counterparty risk is a priority for the Agency and that "significant resources" will be dedicated toward the examination of such risk in the 2013 Examination Plan. Additionally, during the second half of 2012, FHFA conducted several targeted examinations relating to various aspects of counterparty risk. An FHFA Freddie Mac core team examiner who was interviewed by FHFA-OIG staff added that FHFA now requires the Enterprises to report on counterparty risk (quantitatively and qualitatively) on a monthly basis. The data are reported and discussed during a subcommittee meeting held monthly at Freddie Mac.

## Freddie Mac's Amendments to Key Investment and Risk Management Policies

Following FHFA's counterparty credit risk management targeted examinations, Freddie Mac re-examined and amended two of its key business policies. First, the Liquidity and Contingency Policy was amended to reflect that its activities are consistent with FHFA and Treasury guidance. Most importantly, the amended policy currently suspends unsecured term lending. Second, the Capital Markets Counterparty Credit Risk Management Policy was revised to, among other things, more clearly define the roles and responsibilities of Freddie Mac staff involved in managing the Enterprise's counterparty credit risk program and sets out a precise definition of Fed Funds including, significantly, that Fed Funds lending in fact constitutes an unsecured investment.

## FHFA's Efforts to Recover the $1.2 Billion in the Lehman Bankruptcy Proceeding

After the Lehman bankruptcy proceeding began, Freddie Mac filed a claim as a Lehman creditor.[14] Specifically, on September 22, 2009, Freddie Mac filed a **proof of claim**, which included a priority claim for the $1.2 billion owed on the two loans (the Loans Claim) that were not repaid by Lehman. Freddie Mac is an unsecured creditor and can otherwise expect to be repaid only after secured creditors and creditors with higher priority claims are repaid, but it will be repaid before creditors with lower priority claims are repaid.

> **Proof of Claim**
> A proof of claim is a creditor's written statement filed in a bankruptcy case for purposes of showing the basis and amount of the creditor's claim against the debtor. By filing a proof of claim against Lehman, Freddie Mac made other creditors and Lehman aware of its claim and its intention to share in any distribution of Lehman's assets from the bankruptcy estate.

On March 6, 2012, Lehman emerged from bankruptcy. The Lehman bankruptcy reorganization plan recognizes $1.2 billion to be available for payment in full (exclusive of interest) of Freddie Mac's Loans Claim, if it is ultimately allowed.

## Investigations by FHFA and Freddie Mac

Soon after Lehman failed to repay the loans totaling $1.2 billion, Freddie Mac and FHFA each conducted investigations into the circumstances surrounding the default. Their goal was to

---

[14] Freddie Mac's total claims in the Lehman bankruptcy proceedings were $2.23 billion. In addition to the $1.2 billion claim for the two August loans were two claims totaling $1.03 billion under existing derivatives contracts between Freddie Mac and Lehman.

understand the events and identify credit risk management issues that led to the default. Based on the investigations, recommendations have been made and management actions have been taken in an effort to reduce the possibility of losses arising from similar circumstances in the future.

Between September 2008 and December 2009, Freddie Mac and FHFA conducted three investigations: (1) a special investigation conducted by Freddie Mac's General Auditor soon after the default occurred (the Special Investigation); (2) an FHFA assessment of the management of Freddie Mac (the FHFA Key Management Assessment); and (3) an inquiry by Freddie Mac's Operational Risk Oversight staff into the Lehman default (the Risk Oversight Inquiry).[15]

All three examinations came to similar conclusions regarding what caused the $1.2 billion default. Specifically, the examinations concluded that although Freddie Mac had taken steps to manage counterparty risk, the risk management policies and procedures in place had been overridden by senior management. As a result of those overrides, risk management staff within CCRM believed that they had been impeded from taking steps that may have eliminated or at least reduced Freddie Mac's counterparty exposure to Lehman.

### 2008 Freddie Mac Special Investigation

The Freddie Mac Special Investigation was led by Freddie Mac's Chief Auditor and Vice President of Audit at the direction of the Enterprise's then-newly installed CEO, David Moffett.[16]

The Special Investigation reached a number of conclusions, including that *de facto* approval was required from senior business management before risk managers could change the amount or duration of Lehman loans. According to Freddie Mac internal corporate policy, the Risk Oversight Division alone had responsibility for setting counterparty-specific exposure limits and certain terms of business.[17] However, the investigation found that, in practice, significant decisions related to changing existing counterparty credit limits and terms required the "approval" of senior business managers before such changes could be implemented. The investigative report acknowledged that credit decisions could not be made in a vacuum and without input from other senior management (including senior managers in Investments and Capital Markets), but the report emphasized that Freddie Mac's policy was predicated on the independence, good judgment, and fortitude of the SVP, Credit Risk Oversight, and others in the

---

[15] To date, the conclusions of these investigations have not been made public.

[16] CEOs of both Enterprises were replaced by FHFA at the inception of the conservatorships.

[17] Freddie Mac Policy 11-104, *Credit Risk Oversight Corporate Policy.*

Risk Oversight Division. The report found those qualities absent with respect to the loans made in 2008 to Lehman.

### FHFA Key Management Assessment

On September 26, 2008, FHFA's Office of Governance (OG) produced a Freddie Mac Key Management Assessment to gauge the effectiveness of Freddie Mac's management and discern what management failures contributed to Freddie Mac entering into conservatorship.[18] Although this assessment was not directly related to the handling of the Lehman loans, it uncovered significant problems with Freddie Mac's leadership that may have had an impact.

Notably, Freddie Mac senior business executives fostered a corporate culture in which the most senior person in the Risk Oversight Division, the Chief Enterprise Risk Officer, was excluded and his team's advice was disregarded. In particular, OG found that multiple senior business executives had disregarded direct advice concerning the risks inherent with the Lehman short-term unsecured loans. Moreover, OG discovered evidence of deliberate efforts by executives to exclude credit risk management officers from participating in key investment decisions and to restrict credit risk management personnel from interacting with Freddie Mac's previous CEO. Many Freddie Mac business personnel who were criticized in the Key Management Assessment left the Enterprise after the report's issuance.

### Freddie Mac Risk Oversight Inquiry

Freddie Mac further examined the Lehman loss in a second investigation conducted in late 2008. Freddie Mac found: (1) a failure of corporate culture—including the tone from the top of the management structure—resulted in counterparty credit decisions made by risk management personnel being inappropriately overridden by business personnel; (2) a lack of sufficient independence between Credit Risk Oversight and Investments and Capital Markets; and (3) a lack of transparency regarding risk, which resulted in inadequate review of risks, inadequate understanding of risks, and inadequate involvement by higher-level decision makers concerning those risks.

With regard to the failure of corporate culture, the report found that executive management's views on lending to Lehman were neither documented nor clearly communicated. Furthermore, Risk Oversight Division personnel improperly perceived communications through others as factual executive direction when executive management provided no such direction. Risk management was also ineffective because of the perception of staff in Credit Risk Oversight that senior management would override their decisions. Finally, the inquiry cited the absence of

---

[18] A key management assessment of each Enterprise is required under HERA.

documentation of escalation to senior credit and business managers of the differing opinions concerning the Enterprise's exposure to Lehman.

Finally, the report found that Freddie Mac had taken a number of steps to prevent losses of a similar nature from recurring.  These steps included:  (1) the CEO reinforcing (in the fourth quarter of 2008) the authority of the Chief Credit Officer to determine specific exposure limits for counterparties; (2) establishing a Senior Executive Credit Committee; and (3) assigning to that committee the responsibility for making explicit credit decisions based on CCRM staff's independent review.

# FINDINGS

1. *Corporate Governance/Culture.* **Former senior business managers at Freddie Mac decided to disregard recommendations made by the Enterprise's risk management staff to reduce the duration of the loans from one month to overnight.**

The $1.2 billion loss on the Lehman loans was facilitated by a corporate culture at Freddie Mac that overrode existing written policies and procedures. This left those responsible for credit risk oversight within the Enterprise reluctant to move forcefully in this direction, due to the perception that their decisions to reduce the amount or duration of the Lehman loans would be overridden. As a consequence, Freddie Mac did not move to revoke Lehman's short-term unsecured credit with the Enterprise until Lehman filed for bankruptcy and it was too late.[19]

2. *Corrective Action.* **FHFA and Freddie Mac have taken appropriate steps to remediate the corporate governance/culture issues identified in this report.**

FHFA has made progress in its efforts to stabilize the corporate governance/culture environment at Freddie Mac. The individuals responsible for the governance failures discussed in this report are no longer employed by Freddie Mac. FHFA has worked to ensure that credit risk management is now an independent organization within Freddie Mac that no longer seeks advice/approval from the business units (including Investments and Capital Markets) before making risk management decisions, and the Senior Executive Team has been replaced by a Senior Executive Credit Committee.

3. *Risk Management.* **FHFA has taken steps to enhance Freddie Mac's counterparty risk and operational risk management, but ongoing enforcement must be maintained.**

FHFA and Freddie Mac have taken a number of steps outlined in this report to remediate the counterparty credit risk management failures that may have contributed to the $1.2 billion default. Both will need to remain vigilant to ensure policies and procedures in this area are enforced and the corporate culture does not override such enforcement.

---

[19] FHFA-OIG is continuing to review the circumstances that led Freddie Mac senior business managers to disregard recommendations made by the risk management staff.

4. ***Recovery of Funds***.  **FHFA has made potentially helpful efforts to recover the $1.2 billion from the Lehman bankruptcy estate.**

To its credit, FHFA, through the Office of General Counsel, has worked to improve the chances of Freddie Mac's recovery in the Lehman bankruptcy proceeding.  In particular, it is possible that Freddie Mac may ultimately recover $1.2 billion; on the other hand, Freddie Mac stands to recover no less than $251 million.

# Exhibit 2

```
 1   UNITED STATES BANKRUPTCY COURT

 2   SOUTHERN DISTRICT OF NEW YORK

 3   - - - - - - - - - - - - - - - - - x

 4   In the Matter of:

 5   LEHMAN BROTHERS HOLDINGS, INC.,    CASE NO. 08-13555(JMP)

 6   ET AL,                            (Jointly Administered)

 7            Debtors.

 8   - - - - - - - - - - - - - - - - - x

 9   In the Matter of:

10   LEHMAN BROTHERS, INC.,            CASE NO. 08-01420(JMP)

11            Debtor.          (SIPA)

12   - - - - - - - - - - - - - - - - - x

13                    U.S. Bankruptcy Court

14                    One Bowling Green

15                    New York, New York

16

17                    October 24, 2013

18                    10:01 AM

19

20   B E F O R E :

21   HON. JAMES M. PECK

22   U.S. BANKRUPTCY JUDGE

23

24

25   ECRO - K. HARRIS
```

1    participated in, and she submitted four separate pleadings.

2           As set forth in the plan administrator's papers,

3    the plan administrator doesn't view her two remaining

4    claims, which are Claim No. 34381 against LBHI and 34380 as

5    having any merit, and so we would respectfully request that

6    the Court disallow and expunge those claims with prejudice.

7           THE COURT:  Those claims are disallowed and

8    expunged.

9           MR. WIN:  Thank you.  The next matter on the

10   agenda is being handled by Arnold & Porter.

11          MR. PEREZ:  Good morning, Your Honor, Alfredo

12   Perez on behalf of the plan administrator.  I think the next

13   matter on the agenda is a stay motion that Mr. Canning's

14   going to present.

15          THE COURT:  All right.

16          MR. CANNING:  Good morning, Your Honor.

17          THE COURT:  Welcome back.

18          MR. CANNING:  Thank you.  It's good to be here.  I

19   guess, yes, we have a couple of motions on today.  The first

20   in order would be the motion that's been made by the Federal

21   Housing Finance Authority to stay the proceedings in respect

22   to the motion to classify the claim of Freddie Mac and FFHA

23   from a Class 1 priority claim to a Class 3 claim.

24          Before we get started, I would like to introduce

25   my colleague at the table, Nancy Milburn from Arnold &

1    Porter and seated next to her is Mark Lanman, who is with

2    the Lanman Corzi firm, which is representing Freddie Mac.

3            Okay.  Your Honor, just very briefly by way of

4    background and you may be, you know, well familiar with

5    this, but on September 6th, 2008 very shortly before the

6    commencement of the Lehman bankruptcy proceedings, pursuant

7    to the authority that was granted under the HERA Act, what

8    we refer to as the HERA Act, which is the Housing and

9    Economic Recovery Act of 2008, Freddie Mac, along with

10   Fannie Mae was placed under a conservatorship of the FHFA.

11           As Your Honor is aware, the -- Freddie Mac is a

12   government sponsored enterprise that provides liquidity,

13   stability and affordability to the U.S. housing markets, and

14   frankly is critically an important centerpiece to the

15   financial health of the U.S., and it's real estate and

16   capital markets.

17           In enacting HERA and I'm certainly not going to go

18   for a long recitation of HERA, but Congress did grant the

19   FHFA very, very broad and strong powers, pursuant to its own

20   separate statutory scheme, in order to address and resolve

21   Freddie Mac and Fannie Mae.

22           Including by granting them very broad powers with

23   respect to the ability to avoid transfers made and the

24   incurrence of obligations that were made by third parties

25   with the intent to hinder delay or fraud, either the

1    regulated entities Freddie Mac and Fannie Mae or FHFA.

2            In accordance with these powers, Freddie Mac filed

3    a proof of claim, timely filed a proof of claim for the

4    amount of $2.1 billion plus interest on account of two loans

5    that were made by Freddie Mac to LBHI on August 19th and

6    August 20th of 2008, and those loans aggregated $1.2

7    billion.

8            In connection with that proof of claim, Fannie Mac

9    and FHFA is sort of the priority recovery pursuant to the

10   provisions of Section 4617(b)(15) of the HERA Act, which

11   allows for, under Subsection D for the rights of FHFA in

12   respect of any avoidable transfers of the incurrence of any

13   obligations to receive a priority recovery, and that it says

14   specifically, that the rights and powers with respect to

15   those actions are superior in all respects to the rights of

16   a Chapter 11 trustee, and any other party in a bankruptcy

17   proceeding.

18           So that notation, if you will, was put on the

19   front page of the proof of claim, and there was an

20   attachment in some specificity within to what exactly those

21   powers and rights were.

22           Also just very summarily, because it's in all of

23   our papers in connection with the confirmation of the

24   debtor's amended plan, third amended plan, there were

25   discussions held between LBHI and FHFA and Freddie Mac,

1    where we entered into a plan stipulation pursuant to which

2    LBHI agreed to amend their third amended plan just before

3    confirmation, to modify the definition of a priority non-tax

4    claim.  So that it reads that any creditor holding a claim

5    that's entitled to a priority under Section 507 of the

6    Bankruptcy Code or under Section 4617(b)(15) of HERA, would

7    receive a hundred percent recovery as a priority claim in

8    the bankruptcy case.

9            That agreement and the stipulation was actually

10   embedded in the plan, the plan was confirmed, and pursuant

11   to the stipulation there was simultaneously set aside $1.2

12   billion in a separate cash reserve to be held pending

13   resolution of the HERA claim and its priority.

14           Recently, and why we're here before Your Honor

15   today, is four years after we filed that claim, a little bit

16   more than four years after we filed that claim, the debtors

17   filed a motion to, in effect, reclassify this claim,

18   asserting that it should be reclassified from a Class 1 LBHI

19   priority claim to a Class 3 LBHI senior unsecured claim.

20           We take exception with that, obviously, Your

21   Honor, and that's what our opposition was in respect of that

22   motion.  And we also filed a motion to withdraw the

23   reference as to that particular motion to classify in our

24   opposition, and hence, finally long-winded get to the

25   current motion which is to stay these proceedings while the

```
 1   district court resolves whether the reference should be
 2   withdrawn.
 3             THE COURT:  May I just break in and ask you --
 4             MR. CANNING:  Sure, Your Honor.
 5             THE COURT:  -- a background question.
 6             MR. CANNING:  Yeah.
 7             THE COURT:  Prior to prosecuting the motion to
 8   stay --
 9             MR. CANNING:  Uh-huh.
10             THE COURT:  -- did you or others acting on behalf
11   of your client explore the possibility of some kind of
12   coordinated approach with the debtor that would avoid this
13   litigation as it relates to the stay, and be in the more
14   nature of a consensual approach to dealing with the
15   relationship between the motion to withdraw reference and
16   this particular proceeding?
17             MR. CANNING:  Yes, Your Honor.  We --
18             THE COURT:  Can you describe that, please?
19             MR. CANNING:  Sure.  There have been lots of
20   discussions ongoing over the last several years between
21   LBHI, Freddie Mac, Fannie Mae, and the FHFA on all of the
22   claims, just as a background.
23             With respect to these particular claims, we did
24   probably in the spring start engaging pretty seriously in
25   conversations to see if there was a possibility to try to
```

1    resolve this claim consensually as to its priority.

2    Understanding that there is no dispute with respect to the

3    underlying obligation, and the fact that the loan was made,

4    and the funds should be repaid, and that this is a valid

5    claim.

6         But we did engage in discussions with respect to

7    seeing if we could address the priority nature and a

8    recovery in that regard.  We had certainly some meetings

9    between Mr. Perez and I, we had one or maybe two meetings

10   where representatives of the FHFA and myself attended with

11   some folks from LBHI and Mr. Perez, and ultimately decided

12   that we would try to see if we could do a meditation.

13        In that regard, we talked about timing for the

14   mediation, we talked about a mediator.  Candidly we agreed

15   upon a mediator.  There then became an issue with respect to

16   the timing of the mediation.  This was in, I think if I

17   recall, and Mr. Perez can correct me, I think it was in June

18   and sometime in June we had this discussion.  And due to

19   other, frankly other cases that the FHFA was tied up in, and

20   the need to do what we believe was sufficient discovery,

21   because we even exchanged a proposed list of informal

22   discovery to try to inform both parties to make the

23   mediation process as successful as we could.  So we did each

24   put together sort of a checklist of those items that we

25   thought we would need to exchange in discovery in order to

1    make that productive.

2         And so in order to get all of that together and to

3    meet some other time constraints, the representative of FHFA

4    said ideally he could do it probably early in December.  FH

5    -- I'm sorry, LBHI indicated that they would like -- they

6    would prefer to do it in August or September.  We wound up,

7    I spoke directly with the agreed upon mediator to get his

8    schedule.  He had time available the last week in October

9    and the first week or so in November.  I counseled -- I went

10   back to FHFA, they were agreeable to doing it, and moving it

11   up to early November, let's say the first week in November,

12   and I communicated that back to counsel for LBHI, and

13   frankly, that's where it ended.  They indicated that they

14   were -- did not want to go forward with mediation at that

15   point.

16        Roughly 60 days went by or so, Your Honor, and

17   then we got this motion filed.  So I didn't mean again to be

18   so laborious, but that is the sequence of what happened

19   since probably the spring of this year.

20        THE COURT:  What I was actually asking you,

21   although this was a very helpful discussion, was whether you

22   had engaged in any conversations with the plan administrator

23   or its representatives in reference to the staging of these

24   proceedings --

25        MR. CANNING:  Oh, sorry, Your Honor.

1          THE COURT:  -- as it relates to the district court

2     and a motion to withdraw reference, and having a hearing on

3     the merits of the reclassification motion take place today.

4     Because the motion for stay is effectively driven by the

5     calendaring of the coercive motion.

6          MR. CANNING:  That's correct, Your Honor.  No, in

7     fact, we have not had any specific discussions about that.

8     This is all -- happened pre -- with some rapidity over the

9     last week or two, and we really haven't discussed the timing

10    of that.

11         THE COURT:  All right.  Fine.  I'm just going to

12    interject something which is not directly related to the

13    argument, but your comment concerning other mediation

14    activity involving FHFA causes me to disclose for record

15    purposes that I have served as many may know as the plan

16    mediator in Residential Capital's bankruptcy, the case which

17    is pending currently before my colleague, Judge Glenn.  And

18    during the course of that very extensive undertaking, I did

19    have a series of meeting with representatives of FHFA.  None

20    of those meetings touched upon the issue presently before

21    the Court, nor did it deal with any issues of claim priority

22    that are before the Court today.

23         We did, however, have conversations that related

24    generally to the claims of FHFA against both Residential

25    Capital and its ultimate parent company.  I won't say more

1    than that, except to say that I don't believe that anything

2    that I learned in the process of mediating that aspect of

3    the Res Cap disputes has any material bearing on what's

4    going on here now.

5            MR. CANNING:  I understand.

6            All right.  Your Honor, if I turn to the

7    sequencing, I guess I would proceed with the motion on the

8    stay, if that is what Your Honor would like, and we'll deal

9    with that first, and then based upon how Your Honor would

10   then like to proceed, we can move forward with the motion to

11   classify and the opposition.

12           THE COURT:  That's fine.  And why don't you just

13   proceed.

14           MR. CANNING:  Okay.  Well, Your Honor, just to

15   step back a little bit, as set forth in the motion to

16   withdraw the reference, FHFA and Freddie Mac believes that

17   the withdrawal of the reference is, in fact, mandatory under

18   157(d) of Title 28.  To the extent that that provision

19   requires that the district court shall withdraw a proceeding

20   if the resolution of the proceeding requires consideration

21   of Title 11 and other federal laws of the U.S., other non-

22   bankruptcy federal laws.

23           In this regard, Your Honor, I want to note first

24   that Freddie Mac and FHFA's motion to withdraw was certainly

25   not filed for any strategic or tactical purpose.  This is

1 not a Stern v Marshall request if you will, for lack of a

2 better way to characterize it.  It was done specifically

3 because the limited issues that were posed in the motion to

4 classify, the debtors, LBHI's motion, the specific limited

5 issues are first the interpretation of HERA, and what are

6 the rights and powers under HERA that have been granted to

7 FHFA.  So it's really the interpretation of a non-bankruptcy

8 federal statute.

9     THE COURT:  Let me ask you this question, however.

10    MR. CANNING:  Yes, uh-huh.

11    THE COURT:  It is my understanding that the

12 statutory provisions in question are substantially similar

13 in form and content to provisions of the Bankruptcy Code

14 and/or to applicable law typically construed by bankruptcy

15 court.  In what respect, does it make sense for there to be

16 a mandatory withdrawal of the reference as to matters that

17 are almost uniquely within the expertise of the bankruptcy

18 bench in this district?

19    MR. CANNING:  Your Honor, I think it -- and this

20 in part is similar to the response that I -- that LBHI posed

21 to our motion, which was that, you know, Section 507 simply

22 doesn't provide a priority and the Bankruptcy Code is clear,

23 if you want a priority, it needs to be under Section 507.

24 And if it's not, then there's no priority.  So therefore,

25 there's no need to interpret the HERA statute, there's no

1    need to address the intersection between the Bankruptcy Code

2    and the HERA statute, because it's all resolved, it's all

3    within the four corners of the Bankruptcy Code.

4         Your Honor, I think that FHFA's view is that

5    that's a simplistic approach.  In enacting HERA, much as

6    they did when they enacted FIRREA which was an almost

7    identical statute, only was in respect of the oversight of

8    federal insured banks, as opposed to Fannie and Freddie, but

9    they also set up a separate statutory regime or scheme to

10   deal with the resolution of banks.

11        Just like in our case, they set up a separate

12   statutory scheme to deal with the resolution, addressing and

13   resolving Freddie Mac and Fannie Mae.  It's, if you will,

14   almost like a specialized insolvency regime.

15        THE COURT:  Yes, that's true, but that specialized

16   insolvency regime filed a proof of claim in the largest

17   bankruptcy case in history, which has been pending here for

18   over five years, participated in the confirmation process,

19   and entered into the stipulation that you referred to modify

20   the plan.  And so everything that we're talking about is

21   almost uniquely subject to this Court's jurisdiction, and

22   the history of case administration that leads up to today's

23   argument.

24        MR. CANNING:  Well, indeed, Your Honor, but what

25   we're really talking about is does Section 4617(b)(15)(D)

 1    which is a non-bankruptcy federal statute, does that

 2    independently give FHFA a right to a recovery in respect of

 3    transfers made or obligations incurred, and that right to

 4    recover that property is superior to the rights by statute,

 5    superior to the rights of a Chapter 11 trustee and a debtor.

 6         And I don't take exception with the fact that Your

 7    Honor has dealt with a lot of situations that may be

 8    similar, but nevertheless, the rule is pretty clear under

 9    157(d) if it's a question of interpretation of a non-

10    bankruptcy federal statute, or the intersection of the

11    rights and powers under the Bankruptcy Code in that statute,

12    which this issue clearly is, you know, we didn't pose this

13    issue.  They posed this issue the way they posed it.

14         They said without regard to the Bankruptcy Code,

15    without regard to the plan, without regard to the

16    stipulations, in our view, this claim should be reclassified

17    now.  It should now be a Class 3 senior unsecured claim and

18    not a priority claim.  That goes directly to the heart of

19    what does Subsection D mean of the HERA statute.

20         THE COURT:  Well, does it?  I'm not so sure that

21    it does, and I invite you to explore that assertion further.

22    It seems to me that there is a fundamental distinction in

23    terms of the purpose of the mandatory withdrawal of the

24    reference, as between a non-bankruptcy statute that is

25    arcane or foreign to the jurisdictional activities of the

1     bankruptcy court.  In other words, statutes that are more

2     typically construed by district courts, tax issues,

3     environmental law issues, issues that may relate to the

4     securities laws, I'm simply providing some random examples,

5     where those issues predominate.

6           But here, we have a fully developed claim

7     reconciliation process that has been ongoing in this

8     bankruptcy case for at least four years, in a case that has

9     been pending for over five years, in which every single

10    claim of every description you can imagine has been

11    subjected to the same regime.

12          Moreover, the non-bankruptcy law that you are

13    describing to me is completely familiar to me in terms of

14    the precepts that are to be construed.  There is nothing

15    about this law that I find strange or difficult to construe.

16          And so I wonder out loud to you, and you can now

17    respond, whether there is, in fact, a likelihood of success

18    that you will achieve a mandatory withdrawal of the

19    reference, given this history and fact pattern, particularly

20    since in the history of this bankruptcy case, to my

21    knowledge, there has never been a withdrawal of the

22    reference, despite various efforts to achieve that over the

23    last five years.

24          So that pattern of failure is one that I think

25    you're going to have to at least consider as you touch the

```
 1    likelihood of success prong on your motion for stay.

 2         MR. CANNING:  I understand, Your Honor, I

 3    certainly do.  And I don't take exception with the quality

 4    of the duration of the claims process.  And I know, and I

 5    know from my own observations that you have indeed dealt

 6    with every type of claim almost imaginable in this

 7    bankruptcy.

 8         I do think, just to say, that this isn't

 9    necessarily related to a claim and whether there is a claim

10    or whether there is not a claim.  It is uniquely whether or

11    not there is a priority to which the government is entitled

12    by reason of Congress' intent as expressed in the HERA

13    statute.  And that isn't -- doesn't fall within the claims

14    process, and the procedures, and the like, and it's not tax,

15    and it's not environmental.  And I certainly understand

16    that.

17         But nevertheless, it is a case of first

18    impression.  It is a substantial issue.  It's a material

19    issue, and it's one that we think, and again, this is not

20    tactical, but we think that 157(d) does mandate that the

21    reference be withdrawn.

22         Now, we said that, I guess I need to touch upon

23    the likelihood of our success, which I understand there's a

24    challenge here of what you just said about the history of

25    failures here.  But --
```

```
 1              THE COURT:  I'd like to modify what I said,

 2    because there is one exception.  There is a case which is

 3    currently pending in the district court before District

 4    Judge Berman, that involves certain disputes with the

 5    Internal Revenue Service.  That case was commenced here as

 6    an adversary proceeding, and all parties stipulated --

 7              MR. CANNING:  I see.

 8              THE COURT:  -- that the matter should be referred

 9    back to the district court.  I might add that that case has

10    been pending, I believe, for four years.  So I am quite

11    pleased actually that I haven't had to deal with it.

12              MR. CANNING:  Okay.  Well, as Your -- I mean, as

13    Your Honor is aware, and this touches upon what I said

14    earlier about the separate statutory scheme, banks can't go

15    into bankruptcy, hence the FDIC has FIRREA, while similarly

16    Freddie Mac and Fannie Mae can't go into bankruptcy, and

17    Congress created the HERA statute, and the regime that's

18    imposed upon that process under the HERA statute.

19              So we do think there is a separate statutory

20    scheme for resolving these federal instrumentalities that is

21    separate from and the rights and powers granted under that

22    statute and pursuant to that scheme are separate from the

23    powers under the Bankruptcy Code.  And again, under

24    4617(b)(15)(D) are superior to the Bankruptcy Code, and the

25    rights of all parties in a bankruptcy proceeding, with
```

1    respect to certain activities, such as the avoidance of

2    claims and recoveries and respect thereof.

3          Now, LBHI makes a big point about, we don't need

4    to interpret the HERA statute because it's all decided under

5    507, and if it's not under 507, there's no priority, and

6    that's the end of it.  And they cite in support of that the

7    fact that pursuant to the Crime Control Act of 1990,

8    Congress did a couple of things.  And one thing they did is

9    they imposed a new provision into FIRREA which was Section

10   1821(d)(17) which is virtually identical to the Section

11   4617(b)(15) in HERA, with respect to the avoidance of claims

12   and the right to pursue permissively transferees and the

13   superior rights in that regard under Subsection D of that

14   provision.

15         And separately, but under the same bill in the

16   Crime Control Bill, they amended 507 of the Bankruptcy Code

17   to put in (a)(9), and their point, obviously is suggesting

18   that Congress was well aware of how to amend 507 and the

19   importance of 507, and if they wanted to grant the FDIC a

20   priority recovery in respect to those avoidance claims, that

21   they could've done that and they didn't.  And therefore,

22   there was no intent that Congress expressed to provide any

23   priority over any other priority claimants under 507.

24         Your Honor, we think frankly that LBI -- LBHI

25   misses the point there.  They didn't otherwise -- Congress

 1    didn't otherwise amend 507 because they really didn't need

 2    to.  Once again it -- the FD -- the FIRREA statute sets its

 3    own statutory scheme for banks, much like HERA does for

 4    Fannie and Freddie.

 5         And with respect to priority regarding recoveries

 6    in respect of transfers made and obligations incurred to the

 7    extent that those were undertaken with the intent to hinder,

 8    delay, or defraud, the applicable regulated entity would be

 9    at the bank under FIRREA or Freddie Mac under HERA.  If that

10    occurs, then it's got its own built in rights and powers,

11    which is to recover those funds and those rights are

12    superior to the rights of any other party in a bankruptcy.

13         As to 507, what they did in (a)(9) was different.

14    507(a)(9) as Your Honor is well aware is to provide almost

15    within the corollary bankruptcy of the bank holding

16    companies that owned the federally insured institution that

17    whereas it being resolved under FIRREA, that to the extent

18    that that bank holding company had defaulted in connection

19    with the capital maintenance agreement prior to bankruptcy,

20    and then even in the bankruptcy, didn't cure it under 365(o)

21    of the Bankruptcy Code.

22         That that resulting claim, that that resulting

23    claim because of that default under the executory contract

24    would be accorded a statutory priority under 507; that claim

25    doesn't require any bad intent or no hindrance or delay or

1    defrauding of FDIC, it just -- it's just a claim that arises

2    by means of a default on an executory obligation, that

3    Congress wanted to impose in the Bankruptcy Code to protect

4    the taxpayers and the safety and soundness of financial

5    institutions.

6            So, in our view, Your Honor, what the Crime

7    Control Act demonstrates is that Congress decided it needed

8    to do two things in order to protect the taxpayers and the

9    safety and solvency of federally insured institutions.

10           On the one hand, to put a new section in FIRREA,

11    which gave these very broad powers to the FDIC to go after

12    third parties, this isn't like a debtor recovering its own

13    transfers or avoiding its own incurrence of obligations, it

14    gave them the party to go after third parties who hindered,

15    delayed, or defrauded the federally insured bank, in order

16    to get recoveries for the benefit of the agency, and you

17    know, for the government.

18           In addition, in addition to importing its own

19    rights and powers with statutory priorities over the

20    Bankruptcy Code, it separately amended 507 to add (a)(9) so

21    that it could also get the other end of the spectrum, it

22    could go after the bank holding company to the extent that

23    it defaulted on its capital maintenance obligations to the

24    institution.

25           And it determined on balance that those two

1    changes implemented simultaneously, separate powers, broad

2    powers to the FDIC, and a priority recovery against a bank

3    holding company that is in bankruptcy.  Again, the

4    institution -- banks can't go into bankruptcy, that that

5    together was sufficient protections and that's what they

6    wanted to implement as a scheme to facilitate addressing and

7    resolving those financial institutions.

8         So, I mean, in our view, we think we're going to

9    prevail because we think that is, in fact, what is intended

10   by FIRREA and similarly intended under the HERA statute, and

11   the fact that they amended a 507(a)(9) in that case, and

12   they didn't in HERA because Freddie doesn't have a holding

13   company that's got a capital maintenance agreement or

14   anything like that.  There was no need to address a

15   complimentary change under 507.

16        All they had to do is put in those rights and

17   powers, those broad rights and powers under 4617(b)(15)(D)

18   that gives them priority rights, as against a Chapter 11

19   trustee or any other party in a bankruptcy case.

20        So to the contrary, we don't think you can just

21   simply say, oh, it's not in 507 of the Bankruptcy Code, if

22   it's not 507 of the Bankruptcy Code, it can't be a priority.

23   I mean, some of the cases that they cite were really dealing

24   with types of claims, and were they -- did they fit under

25   one of the categories under 507, not whether there is a --

1    sort of a parallel statutory scheme that Congress has

2    intended to have broad powers to protect the government and

3    the taxpayers and that those rights are secured.

4         THE COURT:  Understood, Mr. Canning, but we're in

5    a bankruptcy case, and whichever court is construing the

6    question of the proper classification of the FHFA claim will

7    be construing the priority scheme of the Bankruptcy Code.

8         What you'll be arguing presumably is that

9    notwithstanding the fact that 507 doesn't include an

10   expressed priority that somehow you're entitled to trump

11   other creditors on the strength of applicable non-bankruptcy

12   law, but can you cite me any case in which a bankruptcy

13   court or a district court sitting as a bankruptcy court, has

14   found that a creditor is entitled to priority other than

15   pursuant to the priority scheme of the Bankruptcy Code?

16        MR. CANNING:  Well, Your Honor, I mean, this is a

17   case of first impressions.  I mean, there are circumstances

18   where, in effect, priorities are granted.  Look, I mean, if

19   this -- if they had reorganized and emerged as opposed to a

20   ten year liquidation or however long it's going to take --

21        THE COURT:  Some might say they have emerged, and

22   some might say they have reorganized, and some might say

23   they're actually one of the largest financial enterprises on

24   the planet today.

25        MR. CANNING:  Absolutely, absolutely.  But

1     technically if they were a reorganized corporate debtor, and

2     if they had obtained money from the government under false

3     pretenses, false financials, and false misrepresentations,

4     that under 1141 of the Code, and 523 of the Code, they may

5     have been denied a discharge.  And if that was the case

6     because we assert that they borrowed the $1.2 billion with

7     false financials, direct false misrepresentations and that's

8     how they got the money.

9              Now, if that happened, and we were able to prove

10    that, if we were given an opportunity to prove that, that

11    they hindered or delayed, or defrauded the government

12    because they obtained money under false pretenses, and they

13    were a reorganized corporate debtor they might be denied a

14    discharge.  In which event, we could go over to 6th Avenue

15    and give us $1.2 billion, even though the unsecured

16    creditors only got 20 cents on the dollar.

17             So I understand that it's not under 507, but it's

18    not as if there's no circumstances under which a particular

19    type of creditor given particular facts can't ultimately get

20    a greater recovery than pro rata share of a pot of money.

21             THE COURT:  But even in your examples, Mr.

22    Canning, you cite to principles of bankruptcy juris

23    prudence.

24             MR. CANNING:  My point only there, Your Honor, is

25    a concept that if you defraud the government and get money,

1    the concept that Congress intends to have a scheme in place

2    to allow that money to be recovered is not so foreign, it's

3    not so alien.  That is the intent of Congress.  Now, I

4    understand --

5             THE COURT:  Okay.  But --

6             MR. CANNING:  -- it's not as neat and clean as I

7    would like it to be.

8             THE COURT:  Okay.  But when you use words like

9    defraud the government in an argument about claim priority,

10   five years after the transaction in question without having

11   ever asserted with particularity the grounds on which you

12   might be able to establish such alleged fraud, you put a

13   bunny in the hat, and there's no hat, and there's no bunny.

14            MR. CANNING:  Well, I -- look, I understand, Your

15   Honor.  I mean, we could revisit a lot of the facts of the

16   last couple of years and discussions that we've had and

17   frankly, we are respectful of the claims process that's in

18   place.  And as you know, under the Bankruptcy Code, that you

19   file a claim and it's the debtor that gets to object to that

20   claim.

21            And we are frankly, in many respects, glad that

22   we're finally here, and we're finally getting at it.  There

23   -- the --

24            THE COURT:  Well, the we're getting at it, you

25   recognize in the context of a motion that you're now arguing

1    to stay the proceedings --

2            MR. CANNING:  I understand, Your Honor.

3            THE COURT:  -- here so that you can move forward

4    in the district court on a motion to withdraw reference.  So

5    while we're talking about all this, as if it's substantive,

6    it's not.  It's purely procedural at the moment.

7            MR. CANNING:  I understand.  This would not have

8    been the way, and we were frankly surprised, particularly in

9    light of what I was referring to earlier about where we

10   thought we were in the process, that this is how it's come

11   to the table.

12           And indeed, Your Honor, and we touch upon this in

13   our papers, but at some level, we find this all pretty

14   troublesome because the plan, the confirmed plan, by its

15   language, Class 1 says, any creditor that's entitled to a --

16   that has a -- entitled to a priority under either 507 or

17   under 4617 of HERA will get paid a hundred cents on the

18   dollar.

19           There's no equivocation about that.  It doesn't

20   say -- Your Honor, it doesn't say, in the event that a claim

21   under HERA is determined to be a priority under 507, that

22   the creditor will get a hundred cents on the dollar.  What

23   it says in the confirmed plan is, if you have a claim either

24   under 507 or under HERA, you get a hundred percent recovery.

25           So we find it, you know, two years later out of

1    the blue, we get this motion to classify or reclassify, to

2    say, oh, well, you don't have a -- there is no priority.

3    They come in and say it doesn't exist, there is no priority.

4          Well, that's what the plan says.  If we have that

5    claim, we get a hundred cents on the dollar.  So again, I'm

6    not happy that we're here under these circumstances.  We

7    thought we were trying to get at the merits, we thought we

8    were trying to get at finding out if there was any monies

9    borrowed with the intent to hinder, delay, or defraud, or

10   were there any transfers made that prevented our repayment,

11   in a manner that was intended to hinder, delay, or defraud

12   FHFA and Freddie Mac, but we haven't got there.

13         Now, we're in a position where they want to

14   release the reserve, and they want us to have a Class 3

15   claim which -- I mean, even that's puzzling to the extent

16   that they seem to acknowledge that in the worst of all

17   world, we have priority recoveries with respect to transfers

18   perhaps.  And yet, all the transfers, they've either

19   recovered them or in the process of litigating with counter

20   parties to get that money.

21         And so then if they get that money we go back to

22   the plan, you look at Class 3 and Class 3 just says, we're

23   allocating pro rata all the proceeds among the holders of

24   allowed Class 3 claims.

25         So I mean, there's a lot of issues here that we

```
 1    take exception with, Your Honor, but I --

 2            THE COURT:  Let me ask you a follow up question in

 3    reference to the argument you just made about the treatment

 4    in the plan that provides alternative treatment, either

 5    under a 507 scheme or HERA.

 6            MR. CANNING:  Right.

 7            THE COURT:  Is there anything about the fact that

 8    this treatment is provided in a plan confirmed in the

 9    bankruptcy court, that is a relevant consideration to be

10    taken into account in determining mandatory withdrawal of

11    the reference?  Because it seems to me that since we're

12    dealing with plan provisions --

13            MR. CANNING:  Uh-huh.

14            THE COURT:  -- the bankruptcy court is necessarily

15    the proper forum to decide questions of priority regardless

16    of which scheme is being applied.

17            MR. CANNING:  I understand, Your Honor, and I

18    didn't really raise that in our motion.

19            THE COURT:  I'm raising it now.

20            MR. CANNING:  No, I understand, I understand.  I

21    understand.

22            Well, I mean, to the extent that they have

23    expressed as the reason why the withdrawal won't occur,

24    despite the fact that 157(d) we think says it's mandatory

25    that it be withdrawn, is because they're convinced they're
```

```
 1    going to win; that they don't really need to get into all of
 2    this.  That it's resolved in the bankruptcy to the extent
 3    that they say under 507 it's not listed, so it's not a
 4    priority.
 5           Well, I guess it's relevant to me at least that to
 6    the extent that if you're going to say well, there's no
 7    issue here because it's resolved in the bankruptcy; well,
 8    there is the plan out there, which if you actually go look
 9    at the plan in the bankruptcy, the plan says no, there is a
10    priority.
11           And so if that's going to be decided, and you're
12    going to decide what are they applicable and respect of
13    rights, under the Bankruptcy Code and HERA may be informed
14    by the plan, that all of that goes to the fact that it's an
15    intersection between the Bankruptcy Code, the bankruptcy
16    process and HERA, a non-bankruptcy federal statute and the
17    Bankruptcy Code, and again, no strategic move here, but we
18    think that that requires a mandatory withdrawal.
19           THE COURT:  I would suggest that that intersection
20    may suggest that it doesn't require a mandatory withdrawal,
21    but let's proceed with the other standards that you may wish
22    to put on the record with regard to your motion for stay,
23    because we've been focused on only one point.
24           MR. CANNING:  Right, Your Honor.
25           Well, I guess the other point that LBHI makes with
```

1    respect to the other standards is, there's significant harm

2    to LBHI and the creditors, and there's no harm to FHFA.

3    And, you know, we just see that as entirely just the

4    opposite.

5          If the stay is not imposed, if the proceeding

6    proceeds and it's possible, it's certainly very possible

7    that some time before the ultimate determination of this

8    issue, because it is a -- I mean, it is a Nelsome (ph)

9    issue.

10          Before the ultimate determination of that issue,

11    if the consequence of this is that the $1.2 billion is

12    released and it's made available to all creditors at this

13    point, and then down the road it is ultimately determined

14    that indeed FHFA and Freddie Mac do have a priority, and

15    they're entitled to a hundred percent recovery on that

16    priority, it's possible if there's then insufficient funds

17    left in the estate, that we would irreparably harmed.

18          And in some respects, it's not just, it's not just

19    Freddie Mac and FHFA.  I suppose conceptually if they took

20    the $1.2 billion and they distributed it all, and they wind

21    up in effect, over distributing to creditors, and there are

22    still, as we understand it, thousands of claimants that are

23    still out there to be resolved, and it's going to take a

24    long time to happen.

25          So there could be harm not only to FHFA and

 1    Freddie Mac, to the extent that there were insufficient

 2    funds in the absolute left, but there might also not be

 3    sufficient funds to pay us in full because the plan still

 4    says that ultimately if we have that priority claim we get

 5    paid in full, then maybe there will be other creditors that

 6    might be impacted a near term release of the funds as well.

 7            And to the contrary, it's really difficult for me

 8    to understand how there could be any harm to LBHI and other

 9    creditors.  I mean, again, and you pointed out, Your Honor,

10    we're five years into the case, four years since we filed a

11    proof of claim, two years since confirmation, and there's no

12    other distribution scheduled until March of next year.

13            So to have a short stay, while this issue can be

14    sorted in an orderly fashion, we think the harm versus

15    reward weighs in the favor of FHFA and Freddie Mac in that

16    regard.

17            I mean, the other items that are sometimes

18    relevant, Your Honor, I mean certainly we think that a stay

19    will also assist -- avoid inconsistent rulings maybe

20    unnecessary in avoidable appeals, resolve these ancillary

21    litigation expense when you're operating in two -- I'm

22    sorry, in --

23            THE COURT:  Can I stop you on --

24            MR. CANNING:  Sure.

25            THE COURT:  -- just the reference to consistent

1    rulings?

2            Because the most logical way to obtain a

3    consistent ruling is for the bankruptcy court to decide

4    this, largely because the bankruptcy court has decided every

5    other claim issue in the case.

6            So one way to almost guarantee the potential for

7    an inconsistent ruling is to proceed with your stay, and if

8    you prevail, a motion for withdrawal of the reference with

9    the case ending up before a judge, who I expect will be

10   fully competent to deal with these issues, but will have

11   none of the context or history.

12           MR. CANNING:  That's a fair observation, Your

13   Honor, I don't take strong exception with that.

14           Nevertheless, we think that, you know, on balance

15   when you look at all of the requirements that need to be met

16   in connection with the withdrawal of the reference and now

17   with respect to imposing a stay in that regard, we do think

18   that we have satisfied the criteria.  We do think this is

19   mandatory to withdraw.  We do think opposing the stay

20   imposes no harm at all on LBHI and the other creditors.

21           And potentially has significant harm, maybe

22   irreparable harm to FHFA and Freddie Mac, and we would ask

23   that the motion be granted.

24           THE COURT:  All right.

25           MR. CANNING:  Thank you.

1           THE COURT:  Thank you very much, Mr. Canning.

2           MR. LEMAN:  Your Honor, Mark Leman (ph) on behalf

3    of Freddie Mac, may I just add one other point?

4           THE COURT:  I didn't realize we were double

5    teaming, but it's okay.

6           MR. LEMAN:  Okay.  Very briefly.

7           Your Honor, just with respect to the issue of

8    whether or not FHFA and Freddie Mac have a likelihood of

9    success on merits with regard to the withdrawal motion, we

10   think first of all that there's over 50 pages of briefs

11   submitted by the parties, all arguing over what the HERA

12   statute means.  Clearly that's going to require a court to

13   interpret the HERA statute.

14          And there is a case right on point, demonstrating

15   that we have a high likelihood of success on the merits, and

16   that is the 2nd Circuit decision in the Colonial Realty case

17   versus Hirsch.  And at page 128 -- the case is 980 F.2d 125.

18   At 128, note footnote 5, the 2nd Circuit noted when it was

19   construing the FIRREA FDIC statute which has virtually

20   identical language to the HERA statute, stated as follows.

21          "Although the issue is moot at this juncture, it

22   would appear that FDIC's motion should've been granted

23   pursuant to Section 157(d) in view of the FDIC's timing

24   motion and the asserted conflict between provisions of the

25   Bankruptcy Code and other federal statutes."

```
 1              It then goes on to cite 157(d), and then says,

 2      "This provision was not cited to the district court until

 3      after it denied the withdrawal motion, and the bankruptcy

 4      court had ruled in favor of the trustee on his motion."

 5              And later on in the decision, at page 134 they

 6      again once again refer to FDIC's remedies and said they

 7      could've filed a withdrawal motion or could in the future,

 8      and they refer back to footnote 5.  Thank you, Your Honor.

 9              THE COURT:  Thanks for the footnote reference, but

10      this is not a situation of conflict between the Bankruptcy

11      Code and the HERA statute.  This is simply a question of a

12      stipulation which includes alternative grounds for priority

13      in a plan that was confirmed.

14              So thanks for the reference, but I think it's

15      inapposite.

16              MR. LEMAN:  Okay.  Thank you, Your Honor.

17              MR. PEREZ:  Thank you, Your Honor, good morning.

18      I'll be brief.

19              Your Honor, while I kind of hate to talk out of

20      school, but I think that the rendition of what happened and

21      why we didn't end up going to mediation just couldn't be

22      further from the truth.  So if you'll indulge me for one

23      minute.

24              Ever since Mr. Canning came on board, it was

25      decided that this was one of the top priorities to try to
```

```
 1    get resolved.  We thought we were at the lip of the cup

 2    trying to get a consensual resolution going to mediation,

 3    when all of a sudden, not only was the rug pulled out from

 4    under us when we thought we were going to mediation in

 5    August or September, but they said December, but basically

 6    said, we're not going to go to this until you resolve the

 7    other claims that we have with our other people.

 8           He spent countless hours doing this, so to the

 9    extent that Mr. Canning gets up here and says it's not

10    tactical or strategic, that just could not be further from

11    the truth.

12           So having said that, Your Honor, let me focus on

13    the stay factors.

14           And, Your Honor, I think there are probably three

15    or four cases that are controlling that, in essence,

16    determine the stay.  First of all, Your Honor, if you look

17    at the Court's Texaco case, which is a district court

18    opinion that adopts Judge Schwartzberg's opinion, it in

19    essence, it says, you know, when you have a threshold

20    bankruptcy issue, that's all you need to decide.  And here,

21    I think you have a threshold bankruptcy issue, which is the

22    treatment under 507.

23           And Mr. Canning can argue what he can about what

24    the plan says.  He can also argue about what the stipulation

25    pursuant to which that provision was inserted in the plan,
```

1    which clearly says, that we challenge the priority,

2    classification and everything.  So it shouldn't come as any

3    surprise to him that there would be a motion to classify

4    this claim.

5           So, Your Honor, that's in essence the first point.

6    The second point, Your Honor, is that as it relates to

7    priorities, I think the Supreme Court could not have been

8    clearer, Congress could not have been clearer that

9    priorities, priority claims, not necessarily priorities, but

10   priority claims under the Bankruptcy Code are narrowly

11   construed.

12          And if you look at what Howard Delivery says, it

13   says, provisions allowing for preferences are tightly

14   construed, and then it goes on to quote Colliers, which says

15   priorities under the Code are narrowly construed.

16          So there's no issue here about what we're looking

17   at.  If you're looking at a priority under 507 of the

18   Bankruptcy Code, those are narrowly construed.

19          So finally, I guess their argument is, is that

20   somehow the HERA either amended by implication, dealt by

21   implication, or did something by implication, not directly

22   because it's certainly not in 507, not directly.  And again,

23   Your Honor, there is no basis, there's actually no basis to

24   conclude that.

25          We have the example of the change that was made to

1    FIRREA under the Crime Control Act.  And the Colonial case,

2    which Mr. Lanman (ph) cited, which I think frankly is our --

3    is the strongest case for us on this issue, basically says

4    that you can't have this implicit withdrawal.

5         There, they were dealing with whether FIRREA

6    somehow implicitly amended 362, which I think is a much

7    closer question because you don't have the overlay of 507

8    and Supreme Court juris prudence that says you narrowly

9    construe it.

10         So what you have is, you know, the -- Colonial

11   basically says, in the absence of an affirmative showing of

12   an intention to repeal, you can't change it.  And then they

13   go through and at page 132 and 133 it says, basically, you

14   know, Congress is presumed to legislate with knowledge of

15   former statutes, and will expressly designate provisions

16   whose application it wishes to suspend, rather than leave

17   the consequences and uncertainties of implications

18   compounded by the vagaries of the judicial system.

19         And then it goes on to show which sections were

20   amended pursuant to the Crime Control Act to change the

21   priority scheme, including adding 365(o) and 507(a)(9), and

22   basically says, given this careful attention to harmonizing

23   with the Bankruptcy Codes, it becomes especially implausible

24   to conclude that they did it in essence sub salento.

25         So, Your Honor, again, we have the example of this

1    similar statute under FIRREA.  There's no question that if

2    had Congress intended to change the priority section of the

3    Bankruptcy Code, it could have done so because, in fact, it

4    did under FIRREA.

5         And finally, Your Honor, the issues that are

6    raised in their proof of claim and in our motion are

7    precisely the issues that this Court deals with all the

8    time.  And, in fact, the John versus FDIC case, the district

9    court there basically says that the comparison to the

10   similar section in FIRREA is identical to the comparison of

11   548 and 550 under the Bankruptcy Code.  So it's something

12   that this Court has absolute knowledge of.

13        THE COURT:  I accept that.  I understand this

14   stuff.  Let's just accept the fact that I've been doing this

15   for five years in Lehman, and longer in other cases,

16   including Mr. Canning's case Quebecor, where we had, and

17   continue to have a vast claims reconciliation process that

18   is ongoing.

19        That's not the issue.  The issue is whether or not

20   withdrawal of the reference is mandatory because this Court

21   or the district court needs to construe an applicable non-

22   bankruptcy federal law in order to determine the resolution

23   of the dispute.

24        And the real issue that I think we need to

25   confront today, notwithstanding my colloquy with Mr. Canning

 1   that led up to this, because I do believe that this is a

 2   bankruptcy issue.

 3            MR. PEREZ:  Absolutely, Your Honor.

 4            THE COURT:  I do believe that there's a question

 5   of plan interpretation, and I do believe that the non-

 6   bankruptcy federal law in question is uniquely analogous to

 7   Bankruptcy Code provisions that I am familiar with, so that

 8   to the extent there is a policy reason underlying mandatory

 9   withdrawal of the reference, that policy reason would not be

10   implicated here.

11            But the long question doesn't talk about the

12   policy.  And so we have to interpret the words, to what

13   extent is withdrawal of the reference mandatory simply

14   because in order to resolve this, people are going to be

15   talking about the HERA statute, and I'm going to be asked to

16   make some judgments as to how it applies to this situation.

17            MR. PEREZ:  Your Honor, I don't think it is

18   mandatory.  And I think that the Texaco case basically says

19   it's not mandatory; because in that circumstance, you look

20   first to the Bankruptcy Code, and it's really an

21   interpretation of 507 of the bankruptcy court.  And we're

22   not asking the Court to determine what priority may exist

23   under HERA.  What we're really asking the Court to

24   determine, is there a Bankruptcy Code priority.

25            So we don't believe that under the Texaco case,

1    that there is a mandatory withdrawal to the reference

2    necessary.

3              THE COURT:  Let me ask you a little bit about Mr.

4    Canning's expressed concern that if the $1.2 billion

5    currently set aside to secure this claim is released, that

6    there is some potential risk to FHFA, and potentially other

7    creditors as well associated with the loss of that reserve,

8    and presumably the distribution of those funds to creditors

9    holding allowed claims.

10             MR. PEREZ:  Your Honor, I think the concern in our

11   mind is illusory.  We've had four distributions.  We have

12   ongoing -- the Court is fully aware of the nature of the

13   claims process in this case.  It's going to take a while.

14             We have bi-yearly distributions, every six months

15   we have distributions.  The Board determines exactly how

16   much it things it can distribute or not distribute.  So

17   that's number one.  So I don't think that that is a real

18   issue whatsoever.

19             Second, Your Honor, and as we've said in our

20   papers, and frankly the Court is aware of the RESCAP

21   situation, and if you look at FHFA's papers in RESCAP, what

22   they're basically saying is, they have a priority to be able

23   to go out after some of those cases.  And the John case

24   clearly says, that normally the FHFA has to assert their

25   claims against third parties for these recoveries.

1          So that's not -- I don't think that's in dispute.

2     So to the extent that they have those rights, I don't think

3     anything that we say or do in our papers is going to take

4     those rights away from them.

5          THE COURT:  Okay.  Now, I have a question for you

6     about timing.  We have a dust up here, which is one of the

7     plan administrator's own creation, in a sense, because the

8     scheduling of claims matters tends to be within the plan

9     administrator's discretion, or the scheduling needs of

10    parties that have objected and they need some more time to

11    talk about a possible resolution by consent or some of these

12    matters are complicated and may go to mediation such as this

13    one might have.  But this one didn't go to mediation.  And

14    the plan administrator pulled the trigger, suggesting to a

15    casual observer like me that this is also tactical.  I'm a

16    little concerned about that, and I'd like you to address it.

17         MR. PEREZ:  Absolutely, Your Honor.  I mean,

18    certainly the Court can have that view.  At some point, Your

19    Honor, the plan administrator has to determine whether it

20    thinks that continued negotiations are appropriate and

21    should go forward, or whether at some point you really need

22    to start the process.

23         And, Your Honor, we're not here lightly.  I mean,

24    we spent a year and a half trying to do that, to the point

25    where there was just no -- in our mind, there's just no

```
 1   coming back.  There's just no light at the end of that
 2   tunnel.
 3         So to deal with what I view as a fairly narrow
 4   legal issue, we filed another motion, again a fairly narrow
 5   legal issue that's set for hearing next month.  I don't
 6   believe that that's in the least bit tactical, but the plan
 7   administrator has to have some leeway to determine that
 8   negotiations have gone on long enough, and at this point,
 9   they're being counter-productive, and what we really need to
10   do is move on to the next state reluctantly.
11         So if the Court considers that to be tactical, I
12   don't think that the plan administrator would be discharging
13   its obligations if it didn't make that determination.
14         THE COURT:  I'm not suggesting that the word
15   tactical is a dirty word either.  I'm simply identifying the
16   fact that few things happen in this courtroom by accident
17   unless I've done it myself.
18         So with that said, do you have any more to say on
19   the question of the stay?
20         MR. PEREZ:  Well, no, Your Honor.  I -- number
21   one, I don't think that they're likely to succeed on the
22   merits, and with respect to the harm, I just don't think
23   that they're really going to suffer any harm.  And by the
24   same token, this is a pot of cash that would be otherwise
25   available.  Most of it is going to go to them by the way,
```

1      because they're going to get their catch-up distributions as

2      a Class 3 creditor.  Thank you, Your Honor.

3                   THE COURT:  Okay.  Anything more, Mr. Canning?

4                   MR. CANNING:  No, I think on the stay, Your Honor,

5      I think that's all.

6                   THE COURT:  All right.  This is an interesting and

7      difficult question, and when this was first presented to my

8      attention within the last week or so, my immediate reaction

9      was well, isn't this unusual.  This is the first example, at

10     least in my experience of a motion to stay being brought in

11     the context of an ordinary course claim objection, in order

12     to allow the claimant, in this case FHFA and Freddie Mac to

13     proceed with a mandatory motion to withdraw reference in the

14     district court.  It's certainly one of a kind in my

15     experience, and maybe in the experience of everybody else in

16     the room.

17                  And so the immediate reaction you have to

18     something like this is, to ask yourself, well, why is this

19     happening.  And what's the obligation of the Court to deal

20     with the motion.

21                  This has been an illuminating argument, and I

22     appreciate the contributions of counsel, both in terms of

23     the briefing and oral argument.  But in the end, the

24     question before the Court comes down to the fundamentals of

25     whether or not a stay is appropriate, and the stay standards

1    are the very same standards that Court routinely apply in

2    deciding whether or not to grant a stay, for example, of a

3    confirmation order pending appeal.  It's the very same set

4    of four familiar standards.

5            To me, the most important standard is the

6    likelihood of success on the merits of the pending motion to

7    withdraw reference.  And we spent a lot of time discussing

8    that.  I view this as not a black and white question, but a

9    nuanced one.

10           I see it as a gray area in which it is not at all

11   clear that withdrawal of the reference is mandatory

12   notwithstanding the fact that I am being asked directly or

13   indirectly to consider both Bankruptcy Code priority

14   principles and principles of priority under an applicable

15   non-bankruptcy federal statute, the HERA statute.

16           I think I've been fairly transparent during the

17   colloquy that we've had, as to my views, but I'll restate

18   them briefly now.

19           I consider the claims process in the Lehman

20   bankruptcy cases to be somewhat unique, in that they have

21   been pending now for a number of years with a regular

22   omnibus hearings scheduled in this courtroom on a monthly

23   basis.  We have had more claims resolved in this case than I

24   think have ever been resolved in any other case.

25           At the commencement of the bankruptcy case, when a

1    bar date was set, no one really knew what the claims side of

2    the ledger would look like.  This is an approximation, but

3    something in the neighborhood of $1.3 trillion of claims

4    were filed.

5            The plan that was confirmed in December of 2011,

6    happens to be one of the most remarkable bankruptcy results

7    that I think has ever been achieved in any insolvency case

8    anywhere.  That result was possible in part because of the

9    ability to both reconcile claims that were in dispute, but

10   also to come up with a set of procedures that were

11   regularized, systematic and also transparent to deal with

12   the ongoing resolution, and sometimes disallowance of

13   claims.

14           I think that this fact pattern coupled with the

15   fact that at confirmation, FHFA was an objector, whose

16   objection was resolved by means of a stipulation, which

17   stipulation provided for reserved rights on the parts of the

18   debtor to object to the classification of the claim, takes

19   this dispute out of the category of mandatory withdrawal of

20   the reference.

21           Not only is that true because of the case history

22   that I am roughly reciting, but it is also true because the

23   provisions of the HERA statute are not arcane or unusual

24   from the perspective of a bankruptcy tribunal.  Whether

25   we're dealing with an application of HERA or dealing with

1    priorities under Section 507 of the Bankruptcy Code, we are

2    dealing with claim priority questions, and in the case of

3    the HERA statute itself, we're dealing with priorities

4    associated with avoidance powers.

5         In that sense, the non-bankruptcy federal law in

6    question is very closely analogous to bankruptcy law.  I

7    believe for that reason, that this is one of those

8    circumstances where mandatory withdrawal of the reference

9    makes no sense.

10        I am not deciding that question, however.  I am

11   simply concluding that I believe it more likely than not,

12   that a district court considering the pending motion to

13   withdraw the reference will conclude that under the

14   circumstances of the Lehman bankruptcy case in particular,

15   the bankruptcy tribunal is the most logical place for claims

16   to be resolved, even claims that involve the potential

17   application of the HERA statute.

18        Accordingly, I conclude that the motion for stay,

19   while prosecuted in good faith, and the motion to withdraw

20   reference, while being prosecuted in good faith, both are

21   lacking in merit.

22        For that reason, I deny the motion for stay, and I

23   do not intend any of my comments to influence the district

24   court one way or the other in considering the motion to

25   withdraw reference.

```
 1          I'll make one last comment.  I incorporate by

 2   reference the point that I made to counsel for Freddie Mac

 3   with regard to footnote 5.  I believe footnote 5 is

 4   inapplicable.

 5          Now what?

 6          MR. PEREZ:  Well, Your Honor, the next motion

 7   would be the motion to classify, which is my motion.  I

 8   don't know if you want to take the other matter and then

 9   come back to this, or do you want to go forward with this?

10   I'm happy to argue because we've already argued it already.

11          THE COURT:  Well, there has been a substantive

12   argument cloaked in a motion to stay, but one of the

13   problems with what happens next, and we have a scheduling

14   problem here, I know that there are parties who are

15   participating in this hearing through court call.  There

16   were a number of parties who understood there was an 11

17   o'clock calendar and may have dialed in for that calendar.

18   I'm not sure if they're on the line or not.  There are any

19   number of people who have filed into the courtroom while we

20   have been dealing with the current argument.  Their

21   appearances will need to be entered before we start that.

22          And so just a question I have for counsel, I'm not

23   sure which matter is longer, but it appears to me that there

24   are more lawyers involved in the other one.  And so my sense

25   of judicial economy, to the extent it relates to the hourly
```

1    rates of the lawyers who are involved, may be to take a ten

2    minute break, allow there to be a shifting of seats, so that

3    people who are taking the lead in the 11 o'clock calendar

4    can take those seats.

5          Those parties who intend to have speaking roles in

6    that argument can enter their appearance with the ECRO

7    reporter, and we can then start with the 11 o'clock calendar

8    at say 11:30.

9          And with respect to those who have been arguing

10   the motion for stay, I'll simply ask that you wait until we

11   conclude the 11 o'clock calendar, and I'm sure you'll find

12   it very interesting.

13         MR. PEREZ:  Thank you, Your Honor.

14         THE COURT:  We'll take a short adjournment till

15   11:30.

16   (Recessed at 11:17 a.m.; reconvened at 11:32 a.m.)

17         THE COURT:  Be seated.  Let's proceed.

18         There are some parties who are appearing

19   telephonically, and just so I can understand what to expect

20   as we proceed, I'd like to know if there's anybody who is

21   appearing by telephone that anticipates saying anything, as

22   opposed to just listening in.

23   (No response)

24         THE COURT:  I conclude from the silence, that the

25   only speakers will be in the courtroom.  Please proceed.

# Exhibit 3

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
David J. Lender
Lori R. Fife
Alfredo R. Perez

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.*, | : | **08-13555 (JMP)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |

-------------------------------------------------------------x

### REPLY IN SUPPORT OF MOTION TO
### CLASSIFY AND ALLOW THE CLAIM FILED BY THE FEDERAL
### HOME LOAN MORTGAGE CORPORATION (CLAIM NO. 33568) IN LBHI CLASS 3

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI" or the "Plan Administrator"), as Plan

Administrator under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers

Holdings Inc. and Its Affiliated Debtors (the "Plan") files this reply to the objection (the

"Objection") interposed by the Federal Housing Finance Agency (the "FHFA" or "Conservator")

and the Federal Home Loan Mortgage Corporation ("Freddie Mac" and together with the FHFA,

the "Objectors") to the motion of the Plan Administrator, dated September 13, 2013 [ECF No.

40066] (the "<u>Motion</u>"),[1] seeking to classify and allow proof of claim number 33568 (the

"<u>Claim</u>") in LBHI Class 3 and respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      The Objection filed by the FHFA and Freddie Mac fails to address the key

arguments in the Motion while disingenuously addressing others – often conflating concepts

and reading words into the Bankruptcy Code and 12 U.S.C. § 4617 ("<u>HERA</u>") that do not exist.

2.      First, nowhere do the Objectors address the fundamental flaw in their argument

that section 4617(b)(15) of HERA does not create a priority claim under the Bankruptcy Code.

When Congress wanted to create a priority claim under the Bankruptcy Code, it amended

section 507 to provide for such a priority.  For instance, Congress amended section 507 by

adding section 507(a)(9), which grants a priority to any "allowed unsecured claims based upon

any commitment by the debtor to a Federal depository institutions regulatory agency (or

predecessor to such agency) to maintain the capital of an insured depository institution."

11 U.S.C. § 507(a)(9).  A plain reading of the Bankruptcy Code reveals no such priority for a

claim based on section 4617(b)(15) of HERA.  The Court does not need to go any further to

grant the relief requested in the Motion.

3.      Second, assuming the Objectors can overcome the plain language of the

Bankruptcy Code, section 4617(b)(15) of HERA does not help in creating a priority claim

against LBHI.  Similar to section 548(a) (avoidance) of the Bankruptcy Code, subparagraph

4617(b)(15)(A) (avoidance) provides: "The [FHFA] may avoid a transfer of . . . a debtor

[LHBI] of the regulated entity [Freddie Mac] . . . or any obligation incurred by such party or

person, . . . if such party or person . . . made such transfer or incurred such liability with the

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

2

intent to hinder, delay, or defraud the regulated entity . . . ."  Similar to section 550(a)

(recovery) of the Bankruptcy Code, subparagraph 4617(b)(15)(B) (recovery) provides: "To the

extent a transfer is avoided under subparagraph (A), the [FHFA] may recover, for the benefit of

the regulated entity, the property transferred, or, if a court so orders, the value of such property

(at the time of such transfer) . . . ."  Then, subparagraph 4617(b)(15)(D) states that the rights of

the FHFA described in subparagraph (A) (avoidance) shall be superior to any rights of a trustee

or any other party under title 11.  Again, whatever superior rights subparagraph 4617(b)(15)(D)

creates with respect to the avoidance powers of the Conservator, it does not create a priority

claim under the Bankruptcy Code against LBHI.

4.        Third, the Objectors disingenuously argue that "[P]ursuant to the Plan Stipulation,

LBHI acknowledged Freddie Mac's and FHFA's right to a priority recovery if the HERA

Priority Claim is determined to be valid under HERA by amending the Plan to specifically

include such claim in the definition of "Priority Non-Tax Claim. . . ."  Objection at ¶ 39.  This

argument conveniently ignores the page-long reservation of rights in the Plan Stipulation[2] in

which the amount, allowance, classification, and/or priority of the Claim was reserved for all

purposes, including in connection with any distributions under the Plan.  Again, Freddie Mac's

argument does not create a priority claim under the Bankruptcy Code against LBHI.

5.        Fourth, the Objectors, again disingenuously, read words into HERA that do not

exist.  For instance, the Objectors argue: "[s]ection 4617(b)(15)(A) grants FHFA the right to

avoid *and recover* against such debtor any such *obligation or transfer* . . . ."  Objection at ¶ 34

(emphasis added).  The term "recover" is not mentioned anywhere in subparagraph (A) and no

section of the statute grants the Conservator a recovery right in respect of avoided *obligations*.

---

[2]  The Plan Stipulation was attached as <u>Exhibit B</u> to the Objection.

3

Instead, the Conservator's recovery rights are provided exclusively in subparagraph (B), which grants the Conservator a recovery right only to the extent of avoided *transfers* and only against *transferees*. Again, reading words into HERA that do not exist does not create a priority claim under the Bankruptcy Code against LBHI.

6.      Finally, contrary to Freddie Mac's assertions, granting the relief requested in the Motion will not prejudice Freddie Mac. A determination that the Claim should be classified in LBHI Class 3 will not affect Freddie Mac's right to commence avoidance actions. Moreover, to the extent that HERA grants Freddie Mac a "superior" right to commence such actions and/or recover the proceeds of such actions ahead of other parties, Freddie Mac will retain these rights even if the Claim is classified in LBHI Class 3.

7.      Accordingly, the Plan Administrator requests that the Court classify the Claim in LBHI Class 3 in accordance with the Plan and allow such claim pursuant to sections 502, 1122(a), 1142(b), and 105 of the Bankruptcy Code and Rule 3013 of the Bankruptcy Rules.

## FACTUAL BACKGROUND

8.      The Claim, which was filed in the aggregate liquidated amount of $1,202,241,875.00, seeks a recovery from LBHI in respect of the Unsecured Loans that were made by Freddie Mac to LBHI in August 2008 but were never repaid as a result of LBHI's bankruptcy filing. In its proof of claim, Freddie Mac asserted the Claim as a priority claim and, in support of its claimed priority status, reserved its rights under HERA to avoid certain unidentified transfers made by LBHI "to the extent such transfer[s] [were] made with the intent to hinder or delay the 'early return' payment of the [Unsecured Loans]." Claim at ¶ 3.

9.      Now, Freddie Mac asserts that it intends to avoid not only certain unspecified transfers made by LBHI, but also the transfer of funds to LBHI as part of the Unsecured Loans. Freddie Mac has still not provided LBHI with any theory to support or suggest that LBHI ever

4

made a transfer or incurred an obligation with the actual "intent to hinder, delay, or defraud"

Freddie Mac.[3]  Meanwhile, an investigatory report prepared by the FHFA's Office of the

Inspector General (the "FHFA Report")[4] concluded that the origination of the Unsecured Loans

did not involve fraud.  FHFA Report at 19.  Indeed, in a section titled "Findings," the FHFA

Report stated: "[t]he $1.2 billion loss on the Lehman loans was facilitated by a corporate culture

at Freddie Mac that overrode existing written policies and procedures. . . .  As a consequence,

Freddie Mac did not move to revoke Lehman's short-term unsecured credit with [Freddie Mac]

until Lehman filed for bankruptcy and it was too late."  *Id.*

10.     Notwithstanding the lack of a factual or legal basis for its assertion of a priority

claim, Freddie Mac continues to pursue the Claim against LBHI and has refused to agree to a

consensual release of the Priority Reserve.

### THE CLAIM SHOULD BE CLASSIFIED AND ALLOWED IN LBHI CLASS 3

**A.      Neither the Bankruptcy Code
        Nor HERA Grants Freddie Mac a Priority Claim in LBHI's Chapter 11 Case**

11.     The Claim is not entitled to priority treatment under the Bankruptcy Code.

Section 507 of the Bankruptcy Code lists the claims that are entitled to priority treatment in

cases under title 11.  11 U.S.C. § 507.  Claims based on the Conservator's avoidance powers are

not listed in section 507, nor are they mentioned in any other section of the Bankruptcy Code.

On this basis alone, the Claim should be classified as an unsecured, non-priority claim.  This

conclusion is consistent with binding precedent, holding that claims are entitled to priority

---

[3] Freddie Mac misleadingly suggests that "Freddie Mac and Fannie Mae provided the Debtors with access to
significant relevant underlying data, expert reports and samplings, as applicable, in an effort to reach consensual
resolution of these claims."  Objection at ¶ 26.  In fact, no such data has ever been provided on the Claim.  The only
data and documents provided by Freddie Mac and Fannie Mae relate to claims that are *unrelated* to the Claim.

[4] The FHFA Report was attached as Exhibit A to the Motion.

5

treatment in a bankruptcy case *only if* the Bankruptcy Code expressly provides for such

treatment. *See Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.*, 547 U.S. 651, 655 (2006)

("preferential treatment of a class of creditors is in order only when clearly authorized by

Congress"); *Nathanson v. NLRB*, 344 U.S. 25, 29 (1952) ([I]f one claimant is to be preferred

over others, the purpose should be clear from the [Bankruptcy Act]."); *Trs. of Amalgamated Ins.

Fund. v. McFarlin's, Inc.*, 789 F.2d 98, 100 (2d Cir. 1986) ("Because the presumption in

bankruptcy cases is that the debtor's limited resources will be equally distributed among his

creditors, statutory priorities are narrowly construed").

12.     In their Objection, the Objectors ignore the fact that the Bankruptcy Code does

not grant the Claim priority status.  The Objectors similarly ignore the decisions of the Supreme

Court and Second Circuit cited above, which hold that claims are not entitled to priority

treatment unless the Bankruptcy Code explicitly provides for such treatment.  Instead, the

Objectors argue, without support, that HERA implicitly altered the priority scheme established

by the Bankruptcy Code when it granted the Conservator its avoidance powers.  Specifically,

the Objectors argue as follows:

> Congress is presumed to have been well aware of the Bankruptcy
> Code and the priority scheme of section 507 of the Bankruptcy
> Code, and fully intended that the superior rights granted to the
> Conservator in a bankruptcy case would not be interpreted so as to
> render such rights meaningless by reason of their non-inclusion in
> section 507.

Objection at ¶ 41.

13.     This argument must fail.  When Congress wants to grant claims priority treatment

under the Bankruptcy Code, it expressly amends section 507 to provide for such priority

treatment.  For example, as part of the Comprehensive Crime Control Act of 1990, Congress

amended section 507 by adding section 507(a)(9), which granted a priority to any "allowed

6

unsecured claims based upon any commitment by the debtor to a Federal depository institutions

regulatory agency (or predecessor to such agency) to maintain the capital of an insured

depository institution."  11 U.S.C. § 507(a)(9); *see* Comprehensive Crime Control Act of 1990,

H.R. Rep. No. 681(I) (1990), *reprinted in* 1990 U.S.C.C.A.N. 6472, 6584-90 (amending section

507 of the Bankruptcy Code).  Significantly, the Crime Control Act of 1990 also granted the

Federal Deposit and Insurance Corporation (the "<u>FDIC</u>"), when acting a conservator for an

insured depository institution (the "<u>FDIC Conservator</u>"), avoidance powers that are nearly

identical to the avoidance powers of the Conservator.  *See* H.R. Rep. No. 681(I) (1990),

*reprinted in* 1990 U.S.C.C.A.N. 6472, 6584-90.  Had Congress intended for the FDIC

Conservator's avoidance powers to result in the FDIC obtaining a priority claim, Congress

would have amended section 507, as it did with respect to the FDIC's claims for capital

maintenance commitments.  Similarly, had Congress wanted HERA to grant the Conservator a

priority claim against debtors under chapter 11, it would have done so expressly by amending

section 507.  Section 507, however, was never amended to provide the Conservator with the

priority status that it now claims.

14.     Moreover, nothing in section 4617(b)(15), entitled "Fraudulent transfers,"

purports to alter the priority scheme established by the Bankruptcy Code for claims asserted

against a debtor in a chapter 11 case.  Instead, section 4617(b)(15) grants the Conservator, at

most, certain "superior" rights in respect of avoidance actions.  As plainly stated *by the

Conservator* in a pleading filed in the *Residential Capital, LLC* case:

> . . . [HERA grants the FHFA] first priority, ahead of all
> stakeholders, to recoveries of certain estate avoidance actions
> preserved under the Plan.
> . . .

7

> . . . To the extent the Preserved Avoidance Actions constitute
> actions to avoid actual fraudulent conveyances made by the
> Subject Debtors, FHFA is entitled to priority recovery therefrom.
> . . .
> . . . even if the Debtors succeed in subordinating FHFA's Proofs of
> Claim, FHFA nonetheless is entitled to first recoveries, ahead of all
> other stakeholders, from Preserved Avoidance Actions covered by
> . . . HERA.

Objection of the Federal Housing Finance Agency to Approval of Proposed Disclosure
Statement for the Joint Chapter 11 Plan Proposed by Residential Capital, LLC, *et al.* and the
Official Committee of Unsecured Creditors at ¶¶ 15-24, *In re Residential Capital, LLC*, Case No.
12-12020 (MG) (Bankr. S.D.N.Y. Aug. 13, 2013), ECF No. 4587 (the "FHFA's Res. Cap.
Objection").

15.     As illustrated by the foregoing excerpts, the FHFA has previously conceded that
HERA grants it "superior" rights *only* in respect of the proceeds of avoidance actions.  Having a
"priority" right to recover proceeds of an avoidance action is vastly different than having a
"priority claim" against a debtor in a chapter 11 case.  The FHFA recognized this distinction
when it stated that "even if the Debtors succeed in *subordinating* FHFA's Proofs of Claim,
FHFA nonetheless is entitled to first recoveries . . . from Preserved Avoidance Actions." *Id.* at
¶ 24 (emphasis added).  In other words, the FHFA recognized that its bankruptcy claims in *In re
Residential Capital, LLC* might be subordinated – *i.e.*, might lack priority under the Bankruptcy
Code – and yet the Conservator would still retain certain "superior" rights under HERA.

16.     Here, LBHI is seeking to classify the Claim as a senior unsecured, non-priority
claim in LBHI Class 3.  Such a classification is entirely consistent with, and will not affect, the
"superior" rights asserted by the FHFA in the *Residential Capital* case because the Conservator
will retain all of its rights to commence avoidance actions and recover the proceeds of such

8

avoidance actions in accordance with HERA. As such, classifying the Claim in LBHI Class 3 will not render section 4617(b)(15)(D) meaningless as suggested by the Objectors.

**B.      The Plan Stipulation Does Not Preclude Classification of the Claim in LBHI Class 3**

17.      In support of their argument that HERA grants Freddie Mac a priority claim in LBHI's chapter 11 case, the Objectors also argue, disingenuously, that "pursuant to the Plan Stipulation, LBHI acknowledged Freddie Mac's and FHFA's right to a priority recovery if the HERA Priority Claim is determined to be valid under HERA by amending the Plan to specifically include such claim in the definition of 'Priority Non-Tax Claim,' which claims are entitled to a 100% recovery under the Plan." Objection at ¶ 39. The Objectors' reading of the Plan Stipulation conveniently ignores a page-long reservation of rights section wherein the parties broadly reserved all their rights with respect to the Claim, including LBHI's right to challenge the asserted priority of the Claim.

18.      For example, the reservation of rights section of the Plan Stipulation provided as follows:

> [T]he Parties hereby reserve all rights of the Parties and FHFA relating to the amount, allowance, *classification, and/or priority* of the Claims for all purposes, including in connection with any distributions under the Third Amended Plan or otherwise in respect of these Bankruptcy Cases. . . . [N]othing in this Stipulation, the [Plan], the Confirmation Order, or any other pleadings or documents filed in connection therewith, *shall (i) have any effect on or prejudice [LBHI] in respect of the Claims*, including the amount, allowance, *classification and/or priority* of such Claims, or in respect of distributions on account thereof, and nothing herein shall be deemed an admission, release or waiver of [LBHI's] rights with respect to such Claims.

Plan Stipulation at ¶ 3 (emphasis added). Similarly, in the disclosure statement filed in respect of the Plan, LBHI stated:

> The Debtors intend to challenge and dispute that [the Claim] is entitled to be treated as a priority claim. Notwithstanding anything

9

in this section V.G. or in the Plan to the contrary, nothing herein or
in the Plan or the order confirming the Plan shall have any impact
on the validity or classification of the Freddie Mac Claim.

Debtors' Disclosure Statement For Third Amended Joint Chapter 11 Plan Of Lehman Brothers

Holdings Inc. and its Affiliated Debtors Pursuant to Section 1125 of the Bankruptcy Code at 53,

*In re Lehman Bros. Holdings, Inc.*, Ch. 11 Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Aug. 31,

2011), ECF No. 19629 (the "Disclosure Statement").

19.     Both the Plan Stipulation and the Disclosure Statement confirm the intent of the

parties; namely, that the Plan does not preclude classification of the Claim in LBHI Class 3.

## C.     HERA Does Not Grant the Conservator a Right of Recovery Against LBHI, And, Therefore, Freddie Mac Does Not Have a Priority Claim Against LBHI

20.     Even assuming, *arguendo*, that the Objectors can overcome the plain language of

section 507 of the Bankruptcy Code, HERA does not grant the Conservator any right of

recovery against LBHI, and, therefore, Freddie Mac does not have a priority claim against

LBHI.  The language of section 4617(b)(15)(A) is clear and unambiguous: the Conservator may

avoid transfers only if (i) they are made by an "entity-affiliated party," such as a director or

officer of Freddie Mac,[5] with the actual "intent to hinder, delay, or defraud" Freddie Mac, or

(ii) they are made by a debtor of Freddie Mac, such as LBHI, with the actual "intent to hinder,

delay, or defraud" Freddie Mac.  The Objectors do not allege that an "entity-affiliated party"

made a transfer with the requisite fraudulent intent.  Presumably, they do not do so because

FHFA's own internal investigation of the origination of the Unsecured Loans did not conclude

that the loans were fraudulently made.  FHFA Report at 19.  Therefore, the only transfers that

the Conservator may target for avoidance under subparagraph (A) are the alleged transfers from

---

[5] The term "entity-affiliated party" is defined to include, among others, "any director, officer, employee, or
controlling stockholder of, or agent for, a regulated entity."  12 U.S.C. § 4502 (11).

10

LBHI to certain third parties prior to the Commencement Date.  Even assuming, *arguendo*, that

the Conservator could prove all the necessary elements to avoid such transfers – which it

cannot – the plain and unambiguous terms of subparagraph (B) provide that the Conservator has

a right of recovery only from the third-party transferees – not a right of recovery from LBHI,

the alleged transferor.

21.    The Objectors assert that subparagraph (A) also grants the Conservator the power

to avoid LBHI's incurrence of the obligation to repay the Unsecured Loans.  *See, e.g.*, Objection

at ¶ 46 ("[FHFA] is granted the power and authority under section 4617(b)(15)(A) of HERA to

avoid the incurrence of such obligation and recover $1.2 billion plus interest from the LBHI

bankruptcy estate. . . .").  LBHI does not dispute the fact that subparagraph (A) grants the

Conservator the right to avoid obligations incurred by a debtor of Freddie Mac if such

obligations were incurred with the requisite fraudulent intent.  However, both the plain terms of

HERA and well-established case law from the bankruptcy context are clear: the avoidance of an

obligation does not grant a party such as the Conservator any right to recover property.  Instead,

the avoidance of an obligation renders the obligation unenforceable.  *See, e.g.*, *U.S. Bank Nat'l*

*Ass'n v. Verizon Commc'ns. Inc.*, No 3:10-1842, 2012 WL 3100778, at *4 (N.D. Tex. July 31,

2012) ("While a debtor can recover under section 550 for a transfer of property, it cannot

recover under section 550 for an obligation incurred"); *In re Asia Global Crossing Ltd.*, 333

B.R. 199, 202 (Bankr. S.D.N.Y. 2005) ("If . . . he avoids an obligation, the obligation is

rendered unenforceable, there is nothing to return, and § 550 affords no remedy.").

22.    Accordingly, regardless of whether the Conservator succeeds in avoiding LBHI's

alleged transfers to third parties or LBHI's incurrence of the obligation to repay the Unsecured

US_ACTIVE:\44346335\12\58399.0011

Loans, HERA does not grant the Conservator a right of recovery against LBHI.  The plain and unambiguous language of HERA cannot be read any other way.

### 1)  The Objectors ignore HERA's clear and unambiguous language

23.    In cases involving statutory interpretation, the Supreme Court has directed courts to "begin with the language of the statute."  *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002).  "The first step is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case."  *Id.* (citation and internal quotation marks omitted).   If the statute is unambiguous, "the inquiry ceases."  *Id.*

24.    Although the Objectors perfunctorily cite the foregoing instructions from the Supreme Court, they then proceed to ignore such instructions by reading words into HERA that do not exist.  Specifically, the Objectors argue (i) that subparagraph (A) grants the Conservator both a right to avoid *and a right to recover*, and (ii) that the Conservator may recover property transferred, even where the Conservator merely avoids the incurrence of an obligation.  *See* Objection at ¶ 46.  Neither of these arguments is supported by the plain language of HERA.

25.    The plain and unambiguous terms of subparagraph (A) grant the Conservator only a right of avoidance, not a right of recovery.  Subparagraph (A) reads, in pertinent part, as follows:

> The Agency, as conservator or receiver, may *avoid* a transfer of any interest of an entity-affiliated party, or any person determined by the conservator or receiver to be a debtor of the regulated entity, in property, or any obligation incurred by such party or person . . . if such party or person voluntarily or involuntarily made such transfer or incurred such liability with the intent to hinder, delay, or defraud the regulated entity . . . .

12 U.S.C. § 4617(b)(15)(A) (emphasis added).  The terms "recover" or "recovery" are not found anywhere in subparagraph (A).  Nevertheless, the Objectors inappropriately read these terms into subparagraph (A) when they argue that "[s]ection 4617(b)(15)(A) grants FHFA the right to avoid

12

*and recover* against such debtor any such obligation or transfer . . . ."  Objection at ¶ 34

(emphasis added).  Had Congress wanted to grant the Conservator a right of recovery in

subparagraph (A), it would have done so explicitly.

26.     Subparagraph (B) – and only subparagraph (B) – grants the Conservator a right of

recovery.  Subparagraph (B) reads, in pertinent part, as follows:

> *Right of recovery*.  *To the extent a transfer is avoided* under
> subparagraph (A), the conservator or receiver may recover, for the
> benefit of the regulated entity, *the property transferred*, or if a
> court so orders, the value of such property (at the time of such
> transfer) from – (i) the *initial transferee* of such transfer . . . or (ii)
> any *immediate or mediate transferee* of any such initial transferee.

12 U.S.C. § 4617(b)(15)(B) (emphasis added).  Subparagraph (B), which is aptly titled, "Right of

recovery," is the only subparagraph of section 4617(b)(15) that contains the terms "recover" or

"recovery."  As such, the plain and unambiguous terms of HERA are clear: subparagraph (A)

grants a right of avoidance; subparagraph (B) grants a right of recovery.

27.     The Objectors' reading of subparagraphs (A) and (B) is not only inconsistent with

the plain language of the statute, but it is also inconsistent with courts' interpretations of

12 U.S.C. § 1821(d)(17) and sections 548(a) and 550(a) of the Bankruptcy Code – the statutory

provisions upon which the Conservator's avoidance powers are modeled.  Numerous courts

have held that a bankruptcy trustee's powers of avoidance are addressed in section 548(a),

whereas the bankruptcy trustee's separate and distinct powers of recovery are addressed

exclusively in section 550(a).  *See, e.g.*, *Diaz-Barba v. Kismet Acquisition, LLC*, No. 08-1446,

2010 WL 2079738, at *6 (S.D. Cal. May 20, 2010) ("[A] court's avoidance of a transfer of real

property under § 548 is distinct from a court's subsequent recovery of that property under

§ 550."); *Leonard v. Mountainwest Fin. Corp.* (*In re Whaley*), 229 B.R. 767, 772 (Bankr. D.

Minn. 1999); *see also Suhar v. Burns* (*In re Burns*), 322 F.3d 421, 427 (6th Cir. 2003); *Savage*

US_ACTIVE:\44346335\12\58399.0011

& *Assocs., P.C. v. BLR Servs. SAS* (*In re Teligent, Inc.*), 307 B.R. 744, 749 (Bankr. S.D.N.Y.

2004); *SIPC v. Stratton Oakmont, Inc.*, 234 B.R. 293, 312 (Bankr. S.D.N.Y. 1999) (Once the

grounds for setting aside a transfer have been shown, the Trustee faces the second hurdle of

establishing a means of recovery under § 550(a), the remedies section, which requires the

Trustee to identify a specific category of persons from whom recovery of the fraudulent transfer

may be had.").

28.     Subparagraph (A) of section 4617(b)(15) is analogous to section 548(a) and

subparagraph (B) is analogous to section 550(a).  Viewed as such, it is clear that Congress

intended for subparagraph (A) to grant the Conservator only the power to avoid and for

subparagraph (B) – and only subparagraph (B) – to grant the Conservator the power to recover.

Indeed, Congress is presumed to be aware of courts' interpretations of sections 548 and 550 of

the Bankruptcy Code.  *See In re VistaCare Grp., LLC*, 678 F.3d 218, 226 (3d Cir. 2012)

("When Congress enacts legislation, it is presumed to act with knowledge of the existing law

and judicial concepts.") (citation and internal quotation marks omitted).  If Congress had

wanted section 4617(b)(15) to work differently than sections 548 and 550, Congress would have

made that intent clear.  It did not.

29.     Further, the District Court for the District of Columbia has determined that the

FDIC Conservator's avoidance powers are addressed exclusively in subparagraph (A), whereas

the FDIC Conservator's recovery rights are addressed exclusively in subparagraph (B).  *See

Jahn v. FDIC*, 828 F. Supp. 2d 305, 312-13 (D.D.C. 2011).  In reaching this conclusion, the

District Court cited to cases from the bankruptcy context and observed that the FDIC

Conservator's avoidance powers under subparagraph (A) are analogous to a bankruptcy

trustee's avoidance rights under section 548(a), whereas the FDIC Conservator's recovery

14

powers under subparagraph (B) are analogous to a bankruptcy trustee's recovery rights under
section 550(a). *See id.* ("[A] comparison with a bankruptcy trustee's powers to avoid transfers
and recover property is instructive because section 1821(d)(17) parallels the fraudulent transfer
avoidance and recovery provisions of the Bankruptcy Code."). Given the nearly identical
wording of 12 U.S.C. § 1821(d)(17) and 12 U.S.C. § 4617(b)(15), it follows that subparagraph
(A) of section 4617(d)(15) is analogous to section 548(a) and subparagraph (B) of section
4617(d)(15) is analogous to section 550(a).[6] Accordingly, it is clear from the text of the statute
and from the persuasive authority cited above that Congress intended for subparagraph (A) to
grant the Conservator only the power to avoid and for subparagraph (B) – and only
subparagraph (B) – to grant the Conservator the power to recover.

30.     Notwithstanding the foregoing, the Objectors attempt to paint subparagraph (B) as
an "additional" or "permissive" grant of authority to recover property by focusing on the
statute's use of the term "may." Objection at ¶ 44. According to the Objectors, because
"section 4617(b)(15)(B) provides that FHFA 'may' recover from such transferees, subparagraph
(B) is clearly a grant of additional authority to the Conservator to follow the money." *Id.* The
Objectors' reliance on the term "may" is misplaced. Section 550(a) of the Bankruptcy Code,
which is analogous to subparagraph (B), also contains the word "may." 11 U.S.C. § 550.
Courts have not interpreted Congress's use of the term "may" in section 550(a) to mean that this
section grants the Conservator a right to recover property which is in addition to recovery rights
found elsewhere in the Bankruptcy Code. To the contrary, courts have universally held that
section 550(a) provides the exclusive means to recover property that was avoided. *See, e.g.*,

---

[6] Again, Congress is presumed to be aware of court precedent, including with respect to the District Court's reading
of *Jahn*. *See VistaCare*, 678 F.3d at 226. If Congress had wanted 4617(b)(15) to work differently than the District
Court's interpretation of section 1821(d)(17), Congress would have made that intent clear. It did not.

15

US_ACTIVE:\44346335\12\58399.0011

*Stratton Oakmont,* 234 B.R. at 312; *Cassirer v. Sterling Nat'l Bank & Trust Co.* (*In re Schick*), 223 B.R. 661, 664 (Bankr. S.D.N.Y. 1998). This Court should similarly hold that the term "may" does not imply that the right of recovery in subparagraph (B) is in addition to the alleged recovery rights contained elsewhere, particularly because no other subparagraph of section 4617(b)(15) even contains either the word "recover" or "recovery."

31.     Finally, HERA is also clear and unambiguous in that the Conservator's right of recovery under subparagraph (B) applies only "to the extent *a transfer* is avoided under subparagraph (A)." 12 U.S.C. § 4617(b)(15)(B) (emphasis added). In other words, the Conservator has no right to recover property if it avoids *an obligation* incurred by a debtor of Freddie Mac. This reading of subparagraph (B) is not only required by the plain text of the statute, but it is also consistent with well-established case law that interprets section 550 of the Bankruptcy Code. Indeed, courts have universally held that the avoidance of an obligation does not grant a bankruptcy trustee any rights to recover property under section 550 of the Bankruptcy Code. *See, e.g.*, *U.S. Bank*, 2012 WL 3100778, at *4; *Asia Global*, 333 B.R. at 202 ("If . . . he avoids an obligation, the obligation is rendered unenforceable, there is nothing to return, and § 550 affords no remedy."). Consistent with the notion that the Conservator may only recover property if it avoids a transfer, (as opposed to an obligation), subparagraph (B) also unambiguously provides that the Conservator may only recover "from (i) the initial *transferee of such transfer* . . . or (ii) any immediate or mediate *transferee*." 12 U.S.C. § 4617(b)(15)(B) (emphasis added).

32.     As stated above, Freddie attempts to (i) read a right of recovery into subparagraph (A) where none exists, and (ii) concoct a right of recovery in respect of avoided obligations

16

where none exists.  However, neither the language of the statute nor case law from the

bankruptcy or FDIC contexts supports the Objectors' interpretation of HERA.

### 2) The Conservator cannot recover the funds initially transferred to LBHI in respect of the Unsecured Loans

33.     The Unsecured Loans involved both a transfer of funds by Freddie Mac to LBHI

and the incurrence of an obligation by LBHI to repay the Unsecured Loans.  With respect to the

transfer of funds, under the plain and unambiguous terms of HERA, the Conservator has the

right to avoid the transfer to LBHI only if such transfer was made by an "entity-affiliated party"

– *i.e.*, an officer, director, or employee of Freddie Mac – with the intent to hinder, delay, or

defraud Freddie Mac or the Conservator.[7]  Indeed, subparagraph (A) provides, in pertinent part:

> The Agency, as conservator or receiver, may avoid *a transfer of
> any interest of an entity-affiliated party* . . . in property . . . if such
> *party* or person voluntarily or involuntarily *made such transfer* . . .
> with the intent to hinder, delay, or defraud the regulated entity . . . .

12 U.S.C. § 4617(b)(15)(A) (emphasis added).  This right to avoid transfers made by an "entity-

affiliated party" is modeled after a similar right granted to the FDIC Conservator to avoid

transfers made by "institution-affiliated parties."  In the FDIC context, this right, which was

granted to the FDIC Conservator in the wake of the savings and loan crisis, was designed to

recover assets that were fraudulently transferred by a bank's directors, officers, or employees for

the benefit of an insolvent bank's customers and creditors.  *See* H.R. Rep. No. 681(I) (1990),

*reprinted in* 1990 U.S.C.C.A.N. 6472, 6584-90.

34.     Here, the Objectors do not allege that any "entity-affiliated party" made the

transfer of $1.2 billion in funds to LBHI with the actual "intent to hinder, delay, or defraud"

---

[7] The Conservator may also target for avoidance transfers made by a debtor of Freddie Mac, but it is undisputed that the initial transfer of funds from Freddie Mac to LBHI, by definition, did not involve a transfer made by a debtor of Freddie Mac.

US_ACTIVE:\44346335\12\58399.0011

Freddie Mac.  Accordingly, the Conservator cannot avoid and, therefore, cannot recover the initial transfer of funds from Freddie Mac to LBHI.  As such, HERA cannot grant Freddie Mac a priority claim against LBHI in respect of the initial transfer of funds from Freddie Mac.

35.    Notwithstanding the foregoing, the Objectors allege, without any support, that LBHI incurred the obligation to repay the Unsecured Loans with the intent to defraud Freddie Mac and that the avoidance of this obligation grants the Conservator a recovery right against LBHI under subparagraph (A).  Even assuming, *arguendo*, that Freddie Mac were able to prove that LBHI fraudulently incurred the obligation to repay the Unsecured Loan – which it did not – Freddie Mac would not have a recovery right against LBHI.  First, as discussed above, subparagraph (A) does not grant the Conservator <u>any</u> recovery right, let alone a recovery right in respect of avoided obligations.  *See supra* at ¶¶ 26-31.  Second, subparagraph (B) does not grant Freddie Mac the right to recover property from LBHI as a result of the avoidance of an obligation.  *See supra* at ¶ 32.  Rather, subparagraph (B) expressly limits the Conservator's recovery rights to situations in which "*a transfer* is avoided under subparagraph (A)."
12 U.S.C. 4617(b)(15)(B) (emphasis added).  Such a reading of the statute is consistent with courts' interpretations of 12 U.S.C. § 1821(d)(17) and sections 548 and 550 of the Bankruptcy Code.  *See supra* at ¶ 32.  As such, HERA cannot grant Freddie Mac a priority claim against LBHI in respect of LBHI's incurrence of the obligation to repay the Unsecured Loans.

36.    The Objectors argue that the foregoing interpretation of HERA would lead to unintended results because it would allow a third party, which fraudulently induced Freddie Mac into making a loan, to keep the loan proceeds, so long as the third party did not transfer those proceeds to another party.  This argument must fail because even in the hypothetical presented by the Objectors, the fraudulent actor would not necessarily be permitted to keep the

18

ill-gotten gains.  For example, Freddie Mac would still be able to pursue any number of

statutory or common law remedies against the fraudulent actor in order to recover the property

transferred, or its value, including causes of action for fraudulent inducement.

37.      Freddie Mac and the FHFA urge this Court to look to the broad scope and overall

purpose of HERA and suggest that the goal of protecting taxpayers and the financial markets

cannot be squared with LBHI's reading of HERA.  LBHI's reading of HERA is premised on the

plain language of the statute.  This Court is prohibited from altering the plain and unambiguous

meaning of HERA to accommodate the policy objectives of the FHFA.  *See Barnhart*, 534 U.S.

at 462 ("We will not alter the [statutory] text in order to satisfy the policy preferences of the

Commissioner [of Social Security].  These are battles that should be fought among the political

branches and the industry.  Those parties should not seek to amend the statute by appeal to the

Judicial Branch").  Indeed, as stated by the Second Circuit, "[i]t is axiomatic that the plain

meaning of a statute controls its interpretation and that judicial review must end at the statute's

unambiguous terms."  *Lee v. Bankers Trust Co.*, 166 F.3d 540, 544 (2d Cir. 1999) (internal

citation omitted).

### 3) With respect to the allegedly fraudulent transfers made by LBHI to certain third parties, HERA only grants Freddie Mac a right of recovery against the third parties

38.      Even assuming, *arguendo*, that the Conservator is able to avoid a transfer made

by LBHI on the basis that it was made with the "intent to hinder, delay, or defraud" Freddie

Mac, the Conservator is not entitled to a right of recovery from LBHI under HERA's express

terms.  Section 4617(b)(15)(B) of HERA provides as follows:

> Right of recovery.  To the extent a transfer is avoided under
> subparagraph (A), the conservator or receiver may recover, for the
> benefit of [Freddie Mac], the property transferred, or, if a court so
> orders, the value of such property (at the time of such transfer)
> *from* – (i) *the initial transferee* of such transfer or the entity-
> affiliated party or person for whose benefit such transfer was

19

> made; or (ii) *any immediate or mediate transferee of any such initial transferee*.

*Id.* (emphasis added). Under its plain and unambiguous terms, subparagraph (B) grants the Conservator a right of recovery only from a "transferee," not from an alleged transferor, such as LBHI. No other provision of HERA grants the Conservator a right of recovery. *See supra* at ¶¶ 26-31. Accordingly, even if the Conservator successfully prosecutes an action to avoid a transfer made by LBHI, the Conservator will not have a right of recovery under HERA against LBHI, but merely will retain its underlying LBHI Class 3 claim. Therefore, contrary to the Objectors' suggestion, HERA does not grant Freddie Mac a priority claim against LBHI in respect of LBHI's allegedly fraudulent transfers to third parties.

### 4) LBHI's Position Does Not Render the Conservator's "Superior" Rights Meaningless

39.     Contrary to the Objectors' position, LBHI's interpretation of HERA does not render meaningless the superior rights granted to the Conservator in subparagraph (D) of section 4617(b)(15). Under LBHI's interpretation of HERA, if the Conservator proves that an "entity-affiliated party" or a debtor of Freddie Mac made a transfer with the "intent to hinder, delay, or defraud" Freddie Mac, subparagraph (D) grants the Conservator the right to recover such property, or its value, directly from the transferee, notwithstanding any competing rights provided to another party by title 11.

40.     This interpretation of the "superior" rights of the Conservator is entirely consistent with the reading of HERA espoused by the FHFA when it objected to the disclosure statement filed in the *Residential Capital, LLC* case. The FHFA's objection reads as follows:

> . . . [HERA grants the FHFA] first priority, ahead of all stakeholders, to recoveries of certain estate avoidance actions preserved under the Plan.
> . . .
> Section 4617(b)(15) of HERA provides FHFA with explicit authority to avoid intentional fraudulent transfers made by debtors

20

of Freddie Mac and to recover such transfers or their value.
Moreover, the statute expressly gives FHFA priority over any party
under the Bankruptcy Code (other than another Federal agency)
with respect to such recovery . . .

In *In re Colonial Realty Co.*, the Second Circuit –
evaluating the Federal Deposit Insurance Corporation's ("FDIC")
rights under 12 U.S.C. § 1821(d)(17), which is nearly identical to
section 4617(b)(15) of HERA – held that where a bankruptcy
estate's claims overlap with those of the FDIC, the FDIC retains a
*superior* right to receive *first recoveries* of the proceeds thereof. . .

As set forth in the Disclosure Statement, estate avoidance
actions against parties other than the Debtor Released Parties will
be preserved under the Plan (the "Preserved Avoidance Actions")
and may be brought by the Liquidating Trust for the benefit of
unsecured Creditors (excluding FHFA). To the extent the
Preserved Avoidance Actions constitute actions to avoid actual
fraudulent conveyances made by the Subject Debtors, FHFA is
entitled to priority recovery therefrom.
. . .

. . . even if the Debtors succeed in subordinating FHFA's
Proofs of Claim, FHFA nonetheless is entitled to first recoveries,
ahead of all other stakeholders, from Preserved Avoidance Actions
covered by . . . HERA.

FHFA's Res. Cap. Objection at ¶¶ 15-24 (emphasis in original). As stated by the FHFA in

*Residential Capital*, subparagraph (D) grants the Conservator "superior" rights in respect of

avoidance actions that seek to recover transfers made by a debtor of the regulated entity to third

parties. *Id.* Contrary to the Objectors' position in this case, however, no provision in section

4617(b)(15) grants Freddie Mac a priority claim under the Bankruptcy Code. In addition, no

provision of section 4617(b)(15) grants the Conservator the right to recover property from a

debtor of Freddie Mac in the event that the Conservator avoids an obligation fraudulently

incurred by the debtor.

**D.      Freddie Mac Will Not Be Prejudiced By a Release of the Priority Reserve**

41.     The Objectors finally argue that the release of the Priority Reserve will cause it

irreparable harm by eliminating the Priority Reserve prior to a final resolution in respect of the

21

Claim, "a result that could leave insufficient funds remaining in the Debtors' estate to pay the [Claim]." Objection at ¶ 8. The irreparable harm alleged by the Objectors is imaginary.

42.        As discussed above, section 507 of the Bankruptcy Code does not provide Freddie Mac with a priority claim against LBHI, and HERA does not alter, whether explicitly or implicitly, the priority scheme established by the Bankruptcy Code for claims asserted against a debtor in a chapter 11 case. If the Court determines that the Claim should be classified in LBHI Class 3 based on the foregoing, it necessarily follows that Freddie Mac will not be harmed by a release of the Priority Reserve because Freddie Mac would have no entitlement to a 100% recovery on its Claim from LBHI.

43.        Moreover, even if the Claim is classified in LBHI Class 3, to the extent that HERA grants Freddie Mac a "superior" right to commence avoidance actions and/or recover the proceeds of such actions ahead of other parties, Freddie Mac will retain any such rights. For example, Freddie Mac may commence avoidance actions against LBHI's third-party transferees, such as JPMorgan Chase Bank, N.A. Indeed, the Objection reveals that Freddie Mac and the FHFA have entered into a "tolling agreement with a transferee where the Debtors' recovery action against such transferee has not yet been resolved." Objection at ¶ 51. As noted by the District Court for the District of Columbia in *Jahn*, the FDIC Conservator must typically institute an avoidance action to recovery property pursuant to its avoidance powers. *See Jahn*, 828 F. Supp. at 314 ("In a more typical case, the FDIC would need to bring an action for both avoidance and recovery"). Here, irrespective of the classification of the Claim, the Conservator retains all its rights to bring such an action against third-party transferees, and the Conservator is free to assert, as part of such actions, that HERA grants it a right of avoidance and/or

22

recovery that is "superior" to the rights of LBHI.  As such, there will be no prejudice to Freddie Mac if the Claim is classified in LBHI Class 3.

44.     Whereas the relief requested in the Motion would not prejudice Freddie Mac in any way, the continued maintenance of the Priority Reserve would be prejudicial to the thousands of creditors holding allowed claim against LBHI.  Indeed, these creditors are being deprived of their *pro rata* share of the hundreds of millions of dollars that would be made available for distribution upon proper classification of the Claim and the elimination of the excess from the Priority Reserve.

## <u>CONCLUSION</u>

WHEREFORE, for the reasons discussed above and in the Motion, the Plan Administrator respectfully requests that the Court overrule the Objection, enter the Order, and grant the Plan Administrator such other and further relief as is just.

Dated: October 22, 2013
       New York, New York

                              /s/ Alfredo R. Perez
                              David J. Lender
                              Lori R. Fife
                              Alfredo R. Perez

                              WEIL, GOTSHAL & MANGES LLP
                              767 Fifth Avenue
                              New York, New York 10153
                              Telephone: (212) 310-8000
                              Facsimile: (212) 310-8007

                              Attorneys for Lehman Brothers Holdings Inc.
                              and Certain of Its Affiliates

US_ACTIVE:\44346335\12\58399.0011

# Exhibit 4

ARNOLD & PORTER LLP
399 Park Avenue
New York, New York 10022
Telephone: (212) 715-1000
Facsimile: (212) 715-1399
Michael J. Canning
Richard M. Alexander
Nancy G. Milburn

*Attorneys for the Federal Housing Finance Agency as*
*Conservator of the Federal Home Loan Mortgage Corporation*

LANDMAN CORSI BALLAINE & FORD P.C.
120 Broadway
New York, New York 10271
Telephone: (212) 238-4800
Facsimile: (212) 238-4848
Mark S. Landman

*Attorneys for the Federal Home Loan Mortgage Corporation*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 Case No. 08-13555 (JMP) |
|  | : |  |
| LEHMAN BROTHERS HOLDINGS INC., | : |  |
| *et al.*, | : | Jointly Administered |
| Debtors. | : |  |
|  | : |  |

**MOTION OF THE FEDERAL HOUSING FINANCE AGENCY AND THE FEDERAL
HOME LOAN MORTGAGE CORPORATION TO STAY LEHMAN BROTHERS
HOLDINGS INC.'S MOTION TO CLASSIFY AND ALLOW THE CLAIM FILED
BY THE FEDERAL HOME LOAN MORTGAGE CORPORATION
(CLAIM NO. 33568) IN LBHI CLASS 3**

The Federal Housing Finance Agency ("FHFA" or "Conservator"), as Conservator of the Federal Home Loan Mortgage Corporation ("Freddie Mac"), under the Housing and Economic Recovery Act of 2008 ("HERA"), 12 U.S.C. § 4501, *et seq.*, and Freddie Mac, hereby move this Court (the "Stay Motion"), pursuant to Rule 5011(c) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Bankruptcy Rule 5011-1, for the entry of an order staying consideration of the *Motion to Classify and Allow the Claim Filed by the Federal Home Loan Mortgage Corporation (Claim No. 33568) in LBHI Class 3* (the "Motion to Classify")[1] filed by Lehman Brothers Holdings Inc. ("LBHI" or the "Plan Administrator"), as Plan Administrator under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors (the "Plan"), in the Bankruptcy Court on September 13, 2013 [Docket No. 40066], pending consideration of FHFA's and Freddie Mac's motion to withdraw the reference (the "Motion to Withdraw the Reference")[2] to the Bankruptcy Court so as to be heard by the United States District Court for the Southern District of New York (the "District Court"). In support of this Stay Motion, FHFA and Freddie Mac respectfully represent as follows:

## PRELIMINARY STATEMENT

1. By this Stay Motion, FHFA and Freddie Mac respectfully request that the Bankruptcy Court exercise its equitable powers to issue a stay, pursuant to Bankruptcy Rule 5011(c), of any matters relating to the Motion to Classify, pending the District Court's decision on the Motion to Withdraw the Reference. Specifically, FHFA and Freddie Mac

---

[1]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in FHFA's and Freddie Mac's Opposition to the Motion to Classify (the "Opposition") [Docket No. 40550].

[2]   A copy of the Memorandum in Support of the Motion to Withdraw the Reference, which is being filed simultaneously with this Stay Motion, is attached hereto as Exhibit A.

request that the Bankruptcy Court stay any proceedings against FHFA and Freddie Mac concerning, *inter alia*, (i) the Motion to Classify regarding the priority treatment of the HERA Priority Claim (defined below), which claim relates to two unpaid loans that aggregate approximately $1.2 billion, plus interest thereon, that LBHI failed to repay Freddie Mac prior to the commencement of the Chapter 11 Cases, and (ii) the release of the cash reserve of $1.2 billion that is currently being held in a separate account pursuant to the Plan Stipulation (defined below).

2.      LBHI has styled its objection to the priority treatment asserted under HERA as a "Motion to Classify," and has made unsupported assertions of law and fact in order to mask the well-founded factual and statutory basis for the HERA Priority Claim.  The issues raised in the Motion to Classify and the Opposition require the interpretation of Section 4617(b)(15) of HERA—specifically, whether Freddie Mac and FHFA are entitled to a priority recovery under Section 4617(b)(15)(D) of HERA from the LBHI bankruptcy estate in respect of the HERA Priority Claim.  Therefore, because the issues raised in LBHI's Motion to Classify and the Opposition require significant interpretation of Section 4617(b)(15) of HERA, a non-bankruptcy federal statutory provision that has never been analyzed by another federal court, withdrawal of the reference is mandatory pursuant to 28 U.S.C. § 157(d).

3.      A stay of LBHI's Motion to Classify is appropriate because, *inter alia*, (i) FHFA's and Freddie Mac's pending Motion to Withdraw the Reference is likely to be successful, in view of the significant and novel federal non-bankruptcy law issues that the Motion to Classify and the Opposition raise; (ii) considerations of judicial economy counsel in favor of permitting the District Court to determine the Motion to Withdraw the Reference prior to consideration of LBHI's Motion to Classify; (iii) LBHI will not be prejudiced by a stay

- 2 -

pending the outcome of the Motion to Withdraw the Reference; and (iv) consideration by the
Bankruptcy Court of LBHI's Motion to Classify while the Motion to Withdraw the Reference is
pending before the District Court will be harmful and prejudicial to FHFA and Freddie Mac.

### BACKGROUND AND FACTS[3]

4.     Freddie Mac is a government-sponsored enterprise that provides liquidity,
stability, and affordability to the United States housing market by purchasing mortgage loans and
mortgage-related securities for investment, and by pooling mortgages purchased from banks and
issuing guaranteed mortgage-backed securities to institutional investors.  In this regard, Freddie
Mac plays a critical role in the mortgage finance market in the United States, and is inextricably
interwoven into the nation's financial system.

5.     On September 6, 2008, pursuant to the authority granted under HERA, the
Director of FHFA placed Freddie Mac under the conservatorship of FHFA.  Upon being
appointed Conservator, FHFA "immediately succeeded to . . . all rights, titles, powers, and
privileges of [Freddie Mac]," and was accorded broad powers under HERA to "preserve and
conserve the assets and property" of Freddie Mac, to "collect all obligations and money due to
the regulated entity," and to "take such action as may be . . . necessary to put [Freddie Mac] in a
sound and solvent condition."[4]

6.     In enacting HERA, Congress gave FHFA, as Conservator of Freddie Mac, the
right to avoid and recover not only any transfer of property, but also the incurrence of any
obligation, in each case to the extent that such transfer was made or such obligation was incurred
by an entity that is a debtor of a regulated entity with the intent to hinder, delay, or defraud the

---

[3]    For a fuller discussion of the background and facts relating to the HERA Priority Claim, *see*
pp. 6-14 of the Opposition.

[4]    12 U.S.C. §§ 4617(b)(2)(A), (b)(2)(B)(ii), (b)(2)(B)(iv), and (b)(2)(D)(i).

regulated entity or FHFA.[5]  Under the express language of HERA, this right is "superior" to the

"rights of a trustee or any other party" under Title 11.  *See generally* 12 U.S.C. § 4617(b)(15).

   7.      On September 15, 2008, LBHI and certain affiliated entities (collectively, the

"Debtors") filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States

Code, as amended, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the Bankruptcy Court

(the "Chapter 11 Cases").

   8.      Thereafter, on September 22, 2009, Proof of Claim No. 33568 in the amount of

$1,202,241,875 (the Proof of Claim form, together with the Addendum attached thereto, the

"HERA Priority Claim") was timely filed by Freddie Mac in respect of two separate transactions

that occurred in mid-August 2008, whereby Freddie Mac transferred funds totaling $1.2 billion

(the "August Loans") to LBHI.

   9.      As more specifically set forth in the HERA Priority Claim, in addition to asserting

the $1.2 billion claim amount, together with interest thereon, the HERA Priority Claim asserted a

priority right to recovery under HERA.  Specifically, on the Proof of Claim itself, in paragraph 5,

Freddie Mac noted, "see attached re:  12 USC 4617(b)(15) priority," and in the Addendum to the

Proof of Claim, Freddie Mac stated, "the Conservator, on behalf of Freddie Mac, reserves all its

rights pursuant to its statutory authorization, including with respect to the transfer of any

property in which [LBHI] had an interest to the extent such transfer was made with the intent to

hinder or delay the 'early return' payment of the $1.2 billion due and owing to Freddie Mac on

September 15, 2008, for which claim is made hereunder, with any recovery on account of such

claim being entitled to a priority recovery under Section 4617(b)(15)(D)." [6]

---

[5]    The rights of FHFA in this regard are also applicable with respect to any transfers made or
obligations incurred by an entity-affiliated party pursuant to Section 4617(b)(15)(A).

[6]    Proof of Claim, at § 3.

10.    On or about August 31, 2011, the Debtors filed the Plan and a related disclosure

statement (the "Disclosure Statement").  Freddie Mac, together with FHFA, as Conservator

thereof, had previously raised objections to the Disclosure Statement and the Plan directly with

counsel to the Debtors.  With respect to the Disclosure Statement, after considerable discussions

among counsel to each of the Debtors, Freddie Mac and FHFA, the parties agreed, *inter alia,* on

language to be included in the Disclosure Statement addressing the HERA Priority Claim and the

associated priority being asserted with respect thereto.  As to the Plan, in order to resolve Freddie

Mac's and FHFA's objection that the failure to provide treatment for a validly asserted priority

claim could result in the non-confirmability of the Plan, the Debtors agreed to amend the

definition of "Priority Non-Tax Claim"[7] in the Plan so as to provide that any claim entitled to a

priority under HERA would receive payment of 100% under the Plan.

11.    At the hearing on the confirmation of the Plan, on December 6, 2011, the Court

"so ordered" a stipulation (the "Plan Stipulation") regarding, *inter alia,* the treatment of the

HERA Priority Claim and the establishment of a cash reserve in the amount of $1.2 billion to

secure the HERA Priority Claim [Docket No. 22998].  In addition, the Plan Stipulation also fully

reserved all of the statutory rights, titles, powers, and privileges of FHFA under HERA.

12.    On September 13, 2013, LBHI filed the Motion to Classify seeking to classify and

allow the HERA Priority Claim as a senior unsecured claim, rather than as a priority claim

entitled to a priority recovery under HERA.  In the Motion to Classify, LBHI does not dispute

that the HERA Priority Claim is a valid claim.  Instead, LBHI seeks only:  (i) a determination by

this Court that the HERA Priority Claim is not entitled to a priority recovery, or if it is entitled to

---

[7]    The amended definition of "Priority Non-Tax Claim[s]" in the Plan "means any Claim, other
than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment
under section 507(a) of the Bankruptcy Code *or under 12 U.S.C. § 4617(b)(15)*." (emphasis
added).  Third Am. Plan, §1.127, Ex. A to the Confirmation Order [Docket No. 23023].

a priority recovery, such recovery is limited to the right to recover from transferees of LBHI; and
(ii) authority to release the $1.2 billion cash reserve that LBHI agreed to set aside pursuant to the
Plan Stipulation pending resolution of the priority recovery asserted by Freddie Mac and FHFA
under HERA in respect of the HERA Priority Claim.

13.     In connection with the filing of this Stay Motion, FHFA and Freddie Mac filed
the Opposition to LBHI's Motion to Classify, wherein FHFA and Freddie Mac demonstrate that
if LBHI incurred the August Loans or failed to timely repay such amount, in either case with the
intent to hinder, delay, or defraud Freddie Mac or FHFA, then HERA expressly grants FHFA the
power to avoid the incurrence of such obligations or any transfers made in respect thereof, and,
pursuant to Section 4617(b)(15)(D), a priority recovery in respect of any such obligation or
transfer avoided under Section 4617(b)(15)(A).  The Opposition also demonstrates that the $1.2
billion cash reserve set aside pursuant to the Plan Stipulation was intended by the parties to
secure Freddie Mac's and FHFA's potential recovery in respect of the HERA Priority Claim, and
any release of such reserve prior to the final determination of the priority recovery asserted by
Freddie Mac and FHFA would impose irreparable harm and prejudice to Freddie Mac and
FHFA.

## ARGUMENT

### THE COURT SHOULD EXERCISE ITS DISCRETION TO GRANT THE MOTION TO STAY PENDING A DECISION ON THE MOTION TO WITHDRAW THE REFERENCE

### A.   The Bankruptcy Court Has Discretion to Stay These Proceedings, Pending Determination of the Motion to Withdraw the Reference

14.     Bankruptcy Rule 5011(c) provides, in relevant part, that "the bankruptcy judge may stay, on such terms and conditions as are proper, proceedings pending disposition of [a] motion [to withdraw the reference]." Fed. R. Bankr. P. 5011(c).

15.     In considering a motion to stay pursuant to Bankruptcy Rule 5011(c) pending a decision by the district court on a motion to withdraw the reference, courts follow "the same standards as any motion for stay." *See* 9-5011 Collier on Bankruptcy P. 5011.03[2][b]; *see also Eagle Enters., Inc. v. Vigilant Ins. Co.*, 259 B.R. 83, 86-87 (Bankr. E.D. Pa. 2001). Specifically, courts consider whether the movant has demonstrated the following: "the likelihood of prevailing on the merits, *i.e.*, that the pending motion will be granted; that movant will suffer irreparable injury if the stay is denied; that the other party will not be substantially harmed by the stay; and that the public interest will be served by granting the stay." *Id.*[8]

16.     As set forth below, because each of the elements for granting the stay requested herein is satisfied, FHFA and Freddie Mac respectfully submit that the Court should stay determination of the Motion to Classify pending the District Court's resolution of the Motion to Withdraw the Reference.

---

[8]     *Cf. In re St. Johnsbury Trucking Co., Inc.*, 185 B.R. 687, 688 (S.D.N.Y. 1995) (setting forth the same factors in context of approving a motion to stay an order approving Chapter 11 confirmation and any distributions pursuant to such plan pending appeal); *In re Issa Corp.*, 142 B.R. 75, 77 (Bankr. S.D.N.Y. 1992) (setting forth the same factors in context of approving a motion to stay an order denying application to assume stipulation of settlement entered into by parties in lessor's eviction proceeding pending appeal).

- 7 -

**B.    FHFA and Freddie Mac Are Likely to Prevail on the Merits of the Motion to Withdraw the Reference**

17.    As discussed more fully in the Motion to Withdraw the Reference, withdrawal of the reference is *mandatory* where, as is the case in this matter, "substantial and material consideration of non-Bankruptcy Code federal statutes is necessary for the resolution of the proceeding." *In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 995 (2d Cir. 1990) (internal quotation marks and citations omitted); *see also City of New York v. Exxon Corp.*, 932 F.2d 1020, 1026 (2d Cir. 1991) (requiring mandatory withdrawal where court must "engage in significant interpretation, as opposed to simple application, of federal laws apart from the bankruptcy statutes"). Courts have thus withdrawn the reference in cases that would require the bankruptcy judge to engage in "'more than routine application of [federal laws] outside the Bankruptcy Code.'" *Picard v. JPMorgan Chase & Co.*, 454 B.R. 307, 315 (S.D.N.Y. 2011) (quoting *Enron Power Mktg., Inc. v. Cal. Power Exch. Corp.*, No. 04 Civ. 8177 (RCC), 2004 WL 2711101, at *2 (S.D.N.Y. Nov. 23, 2004)).

18.    In its Motion to Classify, LBHI argues that "nothing in subparagraphs (A)-(D) [of Section 4617(b)] elevates claims asserted by the Conservator to priority status in a chapter 11 case," and contends that Section 4617(b)(15)(D) does not provide for a priority recovery in LBHI's bankruptcy proceedings because "[c]laims based on the Conservator's avoidance powers are not listed" in the Bankruptcy Code. Mot. to Classify, at ¶¶ 20, 22. In responding to this argument in the Opposition, FHFA and Freddie Mac demonstrate that LBHI misconstrues the HERA statute. It is apparent that the legal positions espoused in both LBHI's Motion to Classify and Freddie Mac's and FHFA's Opposition will require substantial and material consideration of HERA, and will require the Court to interpret the powers granted to the Conservator under HERA.

19.     Moreover, the parties' respective positions regarding the issues are founded upon an analysis and construction of Section 4617(b)(15) of HERA, and such analysis of HERA will require precisely the type of "substantial and material consideration" of a federal non-bankruptcy statute that courts hold must be undertaken by an Article III judge. *See, e.g., In re Dana,* 379 B.R. 449, 455-58 (S.D.N.Y. 2007) (finding withdrawal of the reference was mandatory where it was "undisputed" that the resolution of certain issues would require "careful and significant consideration of CERCLA"); *see also Am. Tel. & Tel. v. Chateauguay*, 88 B.R. 581, 584-88 (S.D.N.Y. 1988) (same).

20.     Case law further counsels that withdrawal is mandatory where, as here, the action presents issues at the intersection of bankruptcy law and another federal, non-bankruptcy statute. *See, e.g., Koch Supply & Trading LP v. Giddens*, 484 B.R. 18, 25 (S.D.N.Y. 2012); *Picard v. Avellino*, 469 B.R. 408, 412 (S.D.N.Y. 2012).   Indeed, there can be little question that the resolution of the HERA Priority Claim and the Motion to Classify will require both "significant interpretation" of HERA, as well as reconciling HERA with the Bankruptcy Code. *See, e.g., In re Dana,* 379 B.R. at 459 (withdrawal of the reference required where there was "arguably" a conflict between CERCLA and the Bankruptcy Code); *Bear, Stearns Sec. Corp. v. Gredd*, No. 01 Civ. 4379 (NRB), 2001 WL 840187, at *2 (S.D.N.Y. July 25, 2001) (withdrawing the reference to address, in part, the provision of Section 546(e) of the Bankruptcy Code that "arguably conflicts with other federal regulations in this area").

21.     In a case involving a conflict between a similar fraudulent transfer provision in another federal non-bankruptcy statute, FIRREA, 12 U.S.C. § 1821(j), and the Bankruptcy Code, the Second Circuit recognized that the reference should have been withdrawn to the district court. *See In re Colonial Realty Co.,* 980 F.2d 125, 128 n.5 (2d Cir. 1992) (where the Second

- 9 -

Circuit stated that "[a]lthough the issue is moot at this juncture, it would appear that the FDIC's motion [to withdraw the reference] should have been granted, pursuant to § 157(d), in view of the FDIC's timely motion and the asserted conflict between provisions of the Bankruptcy Code and other federal statutes").

22.    Here, any resolution of LBHI's Motion to Classify and Freddie Mac's and FHFA's Opposition in respect of HERA will require substantial and material consideration of such federal non-bankruptcy statute, as well as resolving issues relating to the intersection of bankruptcy law and such federal statute, a resolution of the parties' respective rights in this regard should be decided in a District Court, and, accordingly, Freddie Mac and FHFA are likely to succeed on the merits of the Motion to Withdraw the Reference.

**C.    The Remaining Stay Factors Weigh in Favor of Granting the Motion to Stay Pending the District Court's Consideration of the Motion to Withdraw the Reference**

23.    This Court should also grant the Motion to Stay because the remaining factors— *i.e.*, the public interest and the balance of the equities between the parties—favor the granting of a stay.

24.    Were this Court to proceed with consideration of the Motion to Classify while the Motion to Withdraw the Reference is pending, it could unnecessarily burden both the District Court and the Bankruptcy Court with significant motion practice and briefing, with the avoidable end result that the Bankruptcy Court and the District Court could reach conflicting conclusions in regards to Section 4617(b)(15) of HERA, a statutory provision as to which there is currently no case authority.  In addition, such duplicative review of the Motion to Classify and Opposition will result in the expenditure of judicial resources that could otherwise be avoided by granting a stay.

25.    In this case, there is no reason not to stay the proceedings to allow the District

Court to first resolve the Motion to Withdraw the Reference.  Indeed, the Motion to Classify

represents the only pleading filed by LBHI in respect of the HERA Priority Claim, with the

Opposition just filed in response thereto.  *See In re Eagle Enters.*, 259 B.R. at 88-89 (granting

the stay to avoid, in part, duplicative costs, and noting that "[p]laintiffs would sustain minimal

harm if the Complaint were stayed" as the case was relatively new and discovery had not yet

commenced); *see also In re Beach First Nat'l Bancshares, Inc.*, Bankr. No. 10–03499–DD,

Adversary No. 10–80143–DD, 2011 WL 2441501, at *2 (Bankr. D.S.C. Jan. 21, 2011) (granting

the stay and finding that "[n]o harm will be suffered by waiting until the District Court rules on

the Withdrawal Motion," as "[the] adversary proceeding is in the very early stages of the

proceedings").  Thus, imposing a stay to allow sufficient time for LBHI to respond to the Motion

to Withdraw the Reference, and the District Court to resolve such motion, will not impose

prejudice on any party, but instead will allow the District Court to resolve the withdrawal request

unimpeded by any competing proceedings.

26.    Indeed, it has been over five years since the commencement of the Chapter 11

Cases, and over four years since the filing of the HERA Priority Claim, with LBHI having only

just recently objected to the HERA Priority Claim.  Thus, it would not be credible for LBHI to

now argue that it would be prejudiced by the requested stay.

27.    In contrast, if the Motion to Classify is not stayed pending resolution of the

Motion to Withdraw the Reference, not only would there be an otherwise avoidable misuse of

judicial resources, each of FHFA, Freddie Mac and LBHI will be required to incur the

considerable cost and expenses that will be attendant to litigation in two forums regarding the

same issues for an undetermined period of time—which, in the case of Freddie Mac and FHFA,

- 11 -

will be at the direct expense of U.S. taxpayers. This collective waste of resources and incurrence of needless expenses alone constitutes sufficient harm to stay the proceeding. *In re Eagle Enters.*, 259 B.R. at 88 ("Were we not to stay the Complaint pending the District Court's ruling on the Withdrawal Motion, [the party] would suffer harm in the form of duplicative costs of litigating in this Court and in New York."). In addition to the incurrence of unnecessary expenses, dual-track proceedings related to the interpretation of HERA, including specifically FHFA's right to a priority recovery in respect of the HERA Priority Claim, may also inevitably lead to unnecessary appeals, which could be protracted, thereby impeding the ultimate resolution of the HERA Priority Claim.

28.    Finally, in the Motion to Classify, LBHI asserts that it is pursuing the Motion to Classify so as to avoid prejudice to other creditors occasioned by the continued maintenance of the $1.2 billion reserve previously agreed to by the parties and so ordered by this Court. In fact, the only meaningful impact on other creditors is a potential delay in recovery, which ironically is largely a result of LBHI's failure to engage in meaningful discussions to resolve the HERA Priority Claim. In contrast, an improper, premature release of the reserve would impose irreparable harm and prejudice to Freddie Mac and the Conservator by eliminating the agreed upon reserve prior to a final resolution in respect of the HERA Priority Claim, a result that could leave insufficient funds remaining in the Debtors' estate to pay the HERA Priority Claim. A stay to allow the District Court sufficient time to determine the proper forum to address the Motion to Classify and the rights and powers of FHFA under HERA, including specifically FHFA's asserted priority recovery, will best facilitate a timely and efficient resolution of the HERA Priority Claim and the administration of the LBHI bankruptcy estate.

- 12 -

## CONCLUSION

29.    For the reasons stated above, the Court should grant the Motion to Stay, as to do so is in the best interests of all parties. *First*, a stay will mitigate against the potential for inconsistent rulings by the Bankruptcy Court and the District Court with respect to the HERA Priority Claim and the priority asserted thereunder, and thereby promote uniformity and efficiency. *Second*, a stay pending a determination on the Motion to Withdraw the Reference will avoid the misuse of resources and the incurrence of needless expenses by all parties. *Third*, a stay ensures that the cash reserve of $1.2 billion established pursuant to the Plan Stipulation— which is currently being held in a separate account pending resolution of the HERA Priority Claim—remains in place until a proper determination of the HERA Priority Claim and FHFA's entitlement to a priority recovery under HERA, which is in the best interests of all creditors. *Finally*, a stay is consistent with the Congressional mandate in respect of HERA:  that the Conservator shall be entitled to take all actions necessary to preserve and conserve the assets and property of Freddie Mac while pursuing the HERA Priority Claim, consistent with the broad powers, privileges, and rights to supervise and rehabilitate Freddie Mac granted the Conservator under HERA.  Accordingly, FHFA and Freddie Mac respectfully submit that the stay requested herein is appropriate and warranted by the facts and circumstances.

WHEREFORE, for all the foregoing reasons, FHFA and Freddie Mac request entry of an

order granting (i) FHFA's and Freddie Mac's Motion to Stay the Motion to Classify, and (ii)

such other and further relief as is just.

Dated: New York, New York
       October 18, 2013


                                    /s/ Michael J. Canning
                                    Michael J. Canning
                                    Richard M. Alexander
                                    Nancy G. Milburn

                                    ARNOLD & PORTER LLP
                                    399 Park Avenue
                                    New York, New York 10022
                                    Telephone: (212) 715-1000
                                    Facsimile: (212) 715-1399

                                    *Attorneys for the Federal Housing Finance Agency
                                    as Conservator of the Federal Home Loan
                                    Mortgage Corporation*


                                    /s/ Mark S. Landman
                                    Mark S. Landman

                                    LANDMAN CORSI BALLAINE & FORD P.C.
                                    120 Broadway
                                    New York, New York 10271
                                    Telephone: (212) 238-4800
                                    Facsimile: (212) 238-4848

                                    *Attorneys for the Federal Home Loan Mortgage
                                    Corporation*

# Exhibit 5

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
David J. Lender
Lori R. Fife
Alfredo R. Pérez

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x
| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | : | **08-13555 (JMP)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |

-----------------------------------------------------------------x

**OBJECTION TO THE MOTION OF THE**
**FEDERAL HOUSING FINANCE AGENCY AND THE FEDERAL HOME LOAN**
**MORTGAGE CORPORATION TO STAY LEHMAN BROTHERS HOLDINGS INC.'S**
**MOTION TO CLASSIFY AND ALLOW THE CLAIM FILED BY THE FEDERAL**
**HOME LOAN MORTGAGE CORPORATION (CLAIM NO. 33568) IN LBHI CLASS 3**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI" or the "Plan Administrator"), as Plan

Administrator under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers

Holdings Inc. and Its Affiliated Debtors (the "Plan") files this objection to the motion [ECF No.

40570] (the "Stay Motion") of the Federal Housing Finance Agency (the "FHFA" or

"Conservator") and the Federal Home Loan Mortgage Corporation ("Freddie Mac" and together

with the FHFA, the "Movants") seeking to stay LBHI's *Motion to Classify and Allow the Claim*

*Filed by the Federal Home Loan Mortgage Corporation (Claim No. 33568) in LBHI Class* 3

[ECF No. 40066] (the "<u>Classification Motion</u>")[1] pending consideration of Freddie Mac's motion

to withdraw the reference [ECF No. 40567] (the "<u>Motion to Withdraw the Reference</u>") and

respectfully represents as follows:

## **PRELIMINARY STATEMENT**

1.    At the eleventh hour, and less than one week before the hearing on the

Classification Motion, Movants filed the Stay Motion in an attempt to further delay the

straightforward adjudication of the Classification Motion.  Although LBHI was provided with

insufficient time to properly respond to the Stay Motion, LBHI submits this objection to the

Stay Motion and reserves all rights to further supplement its objection.

2.    Movants have failed to overcome their burden of demonstrating that a stay of the

hearing on the Classification Motion is warranted.  Fatally, Movants have failed to demonstrate

that they are likely to prevail on the merits of the Motion to Withdraw the Reference because

they have not shown that the adjudication of the Classification Motion requires application of

non-bankruptcy law.  To the contrary, the Classification Motion requires a straightforward

application of section 507 of the Bankruptcy Code.  Furthermore, a balancing of harms favors

denial of the Stay Motion because Movants have not shown that they would be harmed, whereas

LBHI, its creditors, and the public interest would be harmed by the delay of distributions caused

by the stay.

3.    Accordingly, the Plan Administrator requests that the Court deny the Stay

Motion.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the
Classification Motion.

2

## FACTUAL BACKGROUND

4.      On September 6, 2008, the FHFA was appointed as Conservator for Freddie Mac

pursuant to the Housing and Economic Recovery Act of 2008 ("HERA").  On September 22,

2009, Freddie Mac filed claim number 33568 against LBHI in the aggregate liquidated amount

of $1,202,241,875 (the "Claim").

5.      On September 13, 2013, LBHI filed the Classification Motion seeking to classify

and allow the claim in LBHI Class 3 setting it for hearing on October 24, 2013, six weeks later.

On October 17, 2013, the Movants filed an objection to the Classification Motion [ECF No.

40550].  On October 18, 2013, the Movants filed (i) the Motion to Withdraw the Reference,

seeking to withdraw the litigation of the Classification Motion to the United States District

Court for the Southern District of New York (the "District Court") and (ii) the Stay Motion,

seeking to stay the hearing on the Classification Motion pending a decision on the Motion to

Withdraw the Reference.  On October 22, 2013, LBHI filed a reply in support of the

Classification Motion [ECF No. 40630], attached hereto as Exhibit A.

## THE STAY MOTION SHOULD BE DENIED

6.      In order to prevail on the Stay Motion, Movants bear the burden of demonstrating

that (i) they are likely to prevail on the merits of the Motion to Withdraw the Reference, (ii)

they will suffer irreparable harm if the stay is denied, (iii) LBHI will not be substantially

harmed by the stay, and (iv) the public interest will be served by granting the stay.  *See In re*

*Chrysler, LLC, et al.,* No. 09-50002 (AJG), 2009 WL 7386569, at *1 (Bankr. S.D.N.Y. May 20,

2009).  For the reasons set forth below, Movants have failed to meet their burden for each of

these factors.

3

### A. Movants are not likely to prevail on the merits of the Motion to Withdraw the Reference.

7.      Once again, Movant's presumptions prove fatal to their arguments.  In order to adjudicate the Classification Motion, the Court need not look any further than the Bankruptcy Code.  Section 507 of the Bankruptcy Code provides an exhaustive list of the types of claims that are entitled to priority.  Claims arising from HERA-related recovery actions are not included.

8.      Historically, Congress has amended section 507 of the Bankruptcy Code when it sought to entitle additional types of claims to priority classification.  For example, Congress amended section 507 of the Bankruptcy Code by adding section 507(a)(9), which grants a priority to any "allowed unsecured claims based upon any commitment by the debtor to a Federal depository institutions regulatory agency (or predecessor to such agency) to maintain the capital of an insured depository institution." 11 U.S.C. 507(a)(9); *see* Comprehensive Crime Control Act of 1990, H.R. Rep. No. 681(I) (1990), *reprinted in* 1990 U.S.C.C.A.N. 6472, 6584-90 (amending section 507 of the Bankruptcy Code).  Significantly, the Crime Control Act of 1990 also granted a conservator acting on behalf of an insured depository institution avoidance powers that are identical to the avoidance powers asserted by the FHFA in this case. *Compare* 12 U.S.C. § 4617(b)(15) *with* 12 U.S.C. § 1821(d)(17).  Had Congress intended for the FDIC conservator's avoidance powers to result in the FDIC obtaining a priority claim, Congress would have amended section 507, as it did with respect to the FDIC's claims for capital maintenance commitments.  Similarly, had Congress wanted HERA to grant the FHFA a priority claim against debtors under chapter 11, it would have done so expressly by amending section 507.   Section 507, however, was never amended to provide the FHFA with the priority status that it now claims.

4

9.      Furthermore, the Movants ignore the decisions of the Supreme Court and Second Circuit, which hold that claims are not entitled to priority treatment unless the Bankruptcy Code explicitly provides for such treatment.  *See Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.*, 547 U.S. 651, 655 (2006) ("preferential treatment of a class of creditors is in order only when clearly authorized by Congress"); *Nathanson v. N.L.R.B.*, 344 U.S. 25, 29 (1952) ("[I]f one claimant is to be preferred over others, the purpose should be clear from the [Bankruptcy Act]."); *Trs. of Amalgamated Ins. Fund. v. McFarlin's, Inc.*, 789 F.2d 98, 100 (2d Cir. 1986) ("Because the presumption in bankruptcy cases is that the debtor's limited resources will be equally distributed among his creditors, statutory priorities are narrowly construed").

10.     The plain language of the Bankruptcy Code <u>alone</u> resolves all disputes arising under the Classification Motion in LBHI's favor.  Because Freddie Mac is not entitled to a priority claim based on the plain language of the Bankruptcy Code, the Movant's insistence that the Court must substantively analyze HERA to adjudicate the Classification Motion fails as a matter of law.

11.     Movants are correct that "[t]he district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce."  28 U.S.C. 157(d).  However, resolution of the proceeding requires consideration of title 11 alone, and as such, the District Court will likely deny the Motion to Withdraw the Reference.

12.     Having failed to overcome their burden of demonstrating that the Motion to Withdraw the Reference is likely to prevail on the merits, the first factor weighs in favor of denying the Stay Motion.

US_ACTIVE:\44352884\5\58399.0011

**B.**       **Movants will not suffer irreparable harm if the stay is denied.**

13.       "In order to succeed, the movant must demonstrate that 'irreparable injury is

*likely* in the absence of an injunction." *In re Chrysler, LLC, et al.,* 2009 WL at *2 (citations

omitted) (emphasis in original).  Freddie Mac has failed to show that any harm — let alone

irreparable harm — likely would result from failure to stay litigation of the Classification

Motion.

14.       Movants' allegation that release of the Priority Reserve would harm Freddie Mac

is unfounded.  If the Court determines that the Claim should be classified in LBHI Class 3, it

necessarily follows that Freddie Mac will not be harmed by a release of the Priority Reserve

because Freddie Mac would have no entitlement to a 100% recovery on its Claim from LBHI.

15.       Moreover, irrespective of the classification of the Claim, the Conservator retains

all its rights under HERA, including its right to commence an avoidance action and recover

property for the benefit of Freddie Mac.  To the extent a transfer was made with the actual intent

to hinder, delay or defraud Freddie Mac, the Conservator is free to assert, as part of such

actions, that HERA grants it a right of avoidance and/or recovery that is "superior" to the rights

of LBHI, notwithstanding the Claim's classification in LBHI Class 3.  As such, there will be no

prejudice to Freddie Mac if the Claim is classified in LBHI Class 3 and if the Priority Reserve is

released.

16.       Additionally, the circumstances under which Movant argues that judicial

resources could be wasted in the absence of a stay — a simultaneous litigation of the

Classification Motion in both the Bankruptcy Court and District Court — are highly unlikely to

occur.  Even if the District Court granted the Motion to Withdraw the Reference, the District

Court would likely send this matter back to the Bankruptcy Court for adjudication and the

US_ACTIVE:\44352884\5\58399.0011

issuance of a report and recommendation.  Therefore, no additional judicial or governmental resources would be expended absent a stay, and Movants would not suffer any harm.

17.     Movants have not overcome their burden of demonstrating that they are likely to suffer irreparable harm if the stay is denied, and, therefore, the second factor weighs in favor of denying the Stay Motion.

**C.     LBHI will be substantially harmed by the stay and granting the stay will not serve the public interest.**

18.     "In the bankruptcy context, a court must concern itself not only with harm to the nonmovant from a stay, but harm to the interests of the entire bankruptcy estate." *In re Chrysler, LLC, et al.*, 2009 WL at *2 (citations omitted).  Whereas the relief requested in the Motion would not prejudice Movants in any way, the continued maintenance of the Priority Reserve would be prejudicial to the thousands of creditors holding allowed claims against LBHI.  Indeed, these creditors are being deprived of their *pro rata* share of the hundreds of millions of dollars that would be made available for distribution upon proper classification of the Claim and the elimination of the excess from the Priority Reserve.

7

19.     Movants have not overcome their burden of demonstrating that LBHI will be
substantially harmed by the stay and granting the stay will not serve the public interest.  Thus,
the third and fourth factors weigh in favor of denying the Stay Motion.

## CONCLUSION

WHEREFORE, for the reasons discussed above, the Plan Administrator
respectfully requests that the Court overrule the Stay Motion and grant the Plan Administrator
such other and further relief as is just.

Dated: October 22, 2013
        New York, New York

/s/ Alfredo R. Pérez
David J. Lender
Lori R. Fife
Alfredo R. Pérez

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

8