UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 Case No. 08-13555 (JMP) |
|  | : | Jointly Administered |
| LEHMAN BROTHERS HOLDINGS INC., | : |  |
| *et al.*, | : | 13 Civ. _____ |
| Debtors. | : |  |

## DECLARATION OF NANCY G. MILBURN

I, Nancy G. Milburn, declare under penalty of perjury as follows:

1.      I am a member of the firm of Arnold & Porter LLP.  I submit this declaration in support of the Motion to Withdraw the Reference by the Federal Housing Finance Agency ("FHFA") and the Federal Home Loan Mortgage Corporation ("Freddie Mac").

2.      Attached hereto as Exhibit A is a true and correct copy of the Motion to Classify and Allow the Claim Filed by the Federal Home Loan Mortgage Corporation (Claim No. 33568) in LBHI Class 3 filed by Lehman Brothers Holdings Inc. ("LBHI").

3.      Attached hereto as Exhibit B is a true and correct copy of the Opposition of the Federal Housing Finance Agency and the Federal Home Loan Mortgage Corporation to Lehman Brothers Holdings Inc.'s Motion to Classify and Allow the Claim Filed by the Federal Home Loan Mortgage Corporation (Claim No. 33568) in LBHI Class 3 [Docket No. 40550].

4.      Attached hereto as Exhibit C is a true and correct copy of Proof of Claim No. 33568.

5.      Attached hereto as Exhibit D is a true and correct copy of the Statement of FHFA Director James B. Lockhart, dated September 7, 2008.

6.      Attached hereto as Exhibit E is a true and correct copy of excerpts from the Report of Anton Valukas, Examiner, dated March 11, 2010.

7.      Attached hereto as Exhibit F is a true and correct copy of the Stipulation and

Agreement By and Among Fannie Mae, Freddie Mac and the Debtors Regarding the Debtors'

Third Amended Plan, So Ordered and Entered by the Bankruptcy Court on December 6, 2011

[Docket No. 22998].

8.      Attached hereto as Exhibit G is a true and correct copy of an excerpt from the

Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its

Affiliated Debtors , which is Exhibit A to the Confirmation Order [Docket No. 23023].

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 18, 2013

                                        Nancy G. Milburn
                                  _____
                                        Nancy G. Milburn

# EXHIBIT A

HEARING DATE AND TIME: October 24, 2013 at 10:00 a.m. (Eastern Time)
OBJECTION DATE AND TIME: October 15, 2013 at 4:00 p.m. (Eastern Time)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
David J. Lender
Lori R. Fife
Alfredo R. Perez

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
In re                                                    :    Chapter 11 Case No.
                                                         :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,   :    08-13555 (JMP)
                                                         :
                      Debtors.                     :    (Jointly Administered)
-----------------------------------------------------------------x

## NOTICE OF MOTION TO
## CLASSIFY AND ALLOW THE CLAIM FILED BY THE FEDERAL
## HOME LOAN MORTGAGE CORPORATION (CLAIM NO. 33568) IN LBHI CLASS 3

**PLEASE TAKE NOTICE** that on September 13, 2013, Lehman Brothers

Holdings Inc. ("LBHI" or the "Plan Administrator"), as Plan Administrator under the Modified

Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated

Debtors, filed the annexed motion (the "Motion"), seeking to classify and allow proof of claim

number 33568 filed by the Federal Home Loan Mortgage Corporation in LBHI Class 3, and that

a hearing to consider the Motion will be held before the Honorable James M. Peck, United States

Bankruptcy Judge, in Courtroom 601 of the United States Bankruptcy Court for the Southern

District of New York, One Bowling Green, New York, New York 10004 (the "Bankruptcy

Court"), on **October 24, 2013 at 10:00 a.m. (Eastern Time)**, or as soon thereafter as counsel

may be heard (the "Hearing").

**PLEASE TAKE FURTHER NOTICE** that objections to the Motion, if any, shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, shall set forth the name of the objecting party, the basis for the objection and the specific grounds thereof, shall be filed with the Bankruptcy Court (a) electronically in accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's filing system, and (b) by all other parties in interest, on a CD-ROM or 3.5 inch disk, preferably in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers), and shall be served upon: (i) the chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004, Courtroom 601; (ii) attorneys for LBHI, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: David J. Lender, Esq., Lori R. Fife, Esq., and Alfredo R. Perez, Esq.); (iii) the Office of the United States Trustee for Region 2, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, New York 10014 (Attn: Tracy Hope Davis, Esq., Susan Golden, Esq., and Andrea B. Schwartz, Esq.); (iv) all parties who have requested notice in these chapter 11 cases; and (v) all parties with a particularized interest in the Motion, so as to be so filed and received by no later than **October 15, 2013 at 4:00 p.m. (Eastern Time)** (the "Objection Deadline").

**PLEASE TAKE FURTHER NOTICE** that if an objection to the Motion is not filed and received by the Objection Deadline, the relief requested in the Motion shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

US_ACTIVE:\44323860\8\58399.0011

**PLEASE TAKE FURTHER NOTICE** that objecting parties are required to

attend the Hearing, and failure to appear may result in relief being granted or denied upon

default.

Dated: September 13, 2013
New York, New York

/s/ Alfredo R. Perez
David J. Lender
Lori R. Fife
Alfredo R. Perez

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

US_ACTIVE:\44323860\8\58399.0011

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
David J. Lender
Lori R. Fife
Alfredo R. Perez

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.,* | : | **08-13555 (JMP)** |
| | : | |
| Debtors. | : | **(Jointly Administered)** |

-------------------------------------------------------------------x

**MOTION TO CLASSIFY AND ALLOW THE CLAIM FILED BY THE FEDERAL**
**HOME LOAN MORTGAGE CORPORATION (CLAIM NO. 33568) IN LBHI CLASS 3**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI" or the "Plan Administrator"), as Plan

Administrator under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers

Holdings Inc. and Its Affiliated Debtors (the "Plan")[1] for the entities in the above-referenced

chapter 11 cases (the "Chapter 11 Estates"), respectfully represents as follows:

**PRELIMINARY STATEMENT**

1.        The Federal Home Loan Mortgage Corporation ("Freddie Mac") filed a proof of

claim against LBHI asserting a claim in the approximate amount of $1.2 billion (the "Claim")

based upon LBHI's failure to repay two short-term unsecured loans made by Freddie Mac to

---

[1]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

LBHI in August 2008. LBHI does not dispute that Freddie Mac holds a general unsecured prepetition claim against LBHI for unpaid principal and interest in an amount that approximates $1.2 billion.

2.      Freddie Mac, however, asserts in its proof of claim that the Claim is entitled to a "priority recovery" under LBHI's confirmed plan of reorganization. Freddie Mac's assertion of a priority treatment is unfounded. Title 11 of the United States Code (the "Bankruptcy Code") specifically identifies claims entitled to priority treatment. The Claim does fall within any priority claim classification under the Bankruptcy Code.

3.      Notwithstanding the plain language of the Bankruptcy Code, Freddie Mac has refused to agree to LBHI's offer to allow the claim as a general unsecured prepetition claim in the amount asserted. Unless the Court grants the relief requested herein, LBHI will continue to be required to maintain, on an interim basis, a reserve of over $1.2 billion in cash on account of the Claim (the "Priority Reserve"), pursuant to the Plan and a stipulation with Freddie Mac.[2] The Priority Reserve is prejudicial to the thousands of creditors holding allowed claims against LBHI. Indeed, these creditors are being deprived of their *pro rata* share of the hundreds of millions of dollars that would be made available for distribution upon proper classification of the Claim and the elimination of the excess from the Priority Reserve.

4.      The rationale behind Freddie Mac's assertion of a priority claim is at best unclear. Freddie Mac appears to be arguing that under 12 U.S.C. § 4617(b)(15)(A)-(D), which was enacted as part of the Housing and Economic Recovery Act of 2008 ("HERA"):

- subparagraph (A) authorizes the Federal Housing Finance Agency (the "FHFA"), as conservator for Freddie Mac (the "Conservator"), to commence an avoidance

---

[2] LBHI reserves its rights to object to the validity, amount, classification, and/or priority of the Claim on any basis to the extent that the relief requested herein is not granted and to seek any other relief in respect of the Claim or the Priority Reserve.

2

action to avoid transfers allegedly made *by* LBHI with the intent to hinder, delay, or defraud Freddie Mac;

- subparagraph (D) grants the Conservator a "superior" statutory right that allegedly entitles the Conservator to a "priority recovery" with respect to any amounts avoided by the Conservator; and

- thus, the Claim is entitled to priority treatment under LBHI's plan of reorganization.

(*See* Claim at ¶ 3).

5.      Although HERA may empower the FHFA with certain rights in respect of the recovery of actual fraudulent transfers, it does not provide Freddie Mac with a priority claim against LBHI under the Bankruptcy Code. If Freddie Mac is successful in avoiding transfers made by LBHI to third parties prior to LBHI's bankruptcy filing, Freddie Mac would have a right of recovery under HERA from the third-party transferees – not from LBHI, the alleged transferor. 12 U.S.C. § 4617(b)(15)(B). If Congress intended for this provision of HERA to alter the priorities established by the Bankruptcy Code for claims asserted against a debtor, it would have provided for that change under the Bankruptcy Code and/or indicated that intent in the HERA statute. It did neither.

6.      In addition, Freddie Mac has not commenced an avoidance action or avoided any transfers as a result of such an action and, therefore, Freddie Mac has no "superior" rights to the recovery of any property under HERA, and certainly no "priority right" to the recovery of property from LBHI. Indeed, in its proof of claim, Freddie Mac does not even identify a single transfer or obligation that would be capable of avoidance by the Conservator or qualify for a priority recovery from LBHI or allege a single fact that would support a contention that LBHI made such a transfer or incurred such an obligation with the actual intent to hinder, delay, or defraud Freddie Mac. Instead, Freddie Mac merely "checked the box" alleging a priority.

3

7.      The Claim, which is based on two prepetition unsecured loans, is not a priority

claim and Freddie Mac has not – and cannot – allege any facts to support its contention that the

Claim should be classified as a priority claim.  Accordingly, the Plan Administrator requests

that the Court classify the Claim in LBHI Class 3 in accordance with the Plan and allow such

claim pursuant to sections 502, 1122(a), 1142(b), and 105 of the Bankruptcy Code and Rule

3013 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## JURISDICTION

8.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157

and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## BACKGROUND

### A.      Chapter 11 Case Background

9.      Commencing on September 15, 2008 (the "Commencement Date") and

periodically thereafter, LBHI and certain of its subsidiaries commenced with this Court

voluntary cases (the "Chapter 11 Cases") under chapter 11 of the Bankruptcy Code.  The

Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly

administered pursuant to Bankruptcy Rule 1015(b).

10.      On January 19, 2009, the United States Trustee for Region 2 (the "U.S. Trustee")

appointed Anton R. Valukas as Examiner in the Chapter 11 Cases (the "Examiner") and by

order, dated January 20, 2009 [ECF No. 2583], the Court approved the U.S. Trustee's

appointment of the Examiner.  The Examiner has filed his report pursuant to section 1106(b) of

the Bankruptcy Code [ECF No. 7531] (the "Examiner's Report").  The Examiner's Report

includes a section titled, *"Examiner's Analysis of Lehman's Debt to Freddie Mac."*  According

to the Examiner's Report, the Examiner included this section because the FHFA "requested the

4

Examiner's assistance in investigating [the $1.2 billion unsecured loan from Freddie Mac to LBHI]." (Examiner's Report at 1951.)

11.    On December 6, 2011, the Court entered an order confirming the Plan [ECF No. 23023] (the "Confirmation Order"). The Plan became effective on March 6, 2012. The Plan classifies Senior Unsecured Claims in LBHI Class 3 and defines the term "Senior Unsecured Claims" as claims against LBHI that are entitled to contractual rights of priority in payment over claims against LBHI that were filed in respect of certain subordinated securities. (Plan at §§ 1.145, 3.1.)

**B.    The Prepetition Lending Relationship Between Freddie Mac and LBHI**

12.    As detailed in the FHFA's Office of Inspector General's *"Case Study: Freddie Mac's Unsecured Lending to Lehman Brothers Prior to Lehman Brothers' Bankruptcy,"* dated March 14, 2013 (the "FHFA Report"), Freddie Mac had been making significant overnight and short-term loans to LBHI since February 2005.[3] *See* FHFA Report at 8. Beginning in January 2008, the loans were made for terms of up to one month, and they often rolled over as they became due. *Id.* For example, as stated in the FHFA Report, "the loans made in May 2008 were rolled over in June 2008; they were again rolled over in July, and then again in August. Each time the principal and interest on such loans were repaid by [LBHI], the funds were re-sold (lent) by Freddie Mac to [LBHI] for an additional term." *Id.* Since April 2008, Freddie Mac had been making these monthly loans in the aggregate principal amount of $1.2 billion, and each loan had an interest rate of 2.55%, the prevailing "Fed Funds" rate at the time. *Id.* at 8-9.

---

[3] A copy of the FHFA Report is attached hereto as Exhibit A.

US_ACTIVE:\44323860\8\58399.0011

13.     The monthly loans that were outstanding on the Commencement Date were made on August 19th and 20th in the amounts of $450,000,000 and $750,000,000, respectively (together, the "Unsecured Loans"). As noted in the Examiner's Report, despite the magnitude of the Unsecured Loans, they "were not governed by a formal written agreement. Rather, LBHI documented the transactions with 'screenshots' from its accounting system . . . . Freddie Mac also maintained minimal trading records for these transactions." (Examiner's Report at 1954.)

14.     According to certain trade tickets for the Unsecured Loans, which were attached as exhibits to the Claim, the Unsecured Loans were due to be repaid on an "early return" basis at 9:30 a.m. on September 15, 2008. (Claim at Exh. A). Because LBHI commenced its Chapter 11 Case at approximately 2:00 a.m. on the morning of September 15, 2008, the Unsecured Loans were not repaid.

**C.     The Claim**

15.     On September 6, 2008, the FHFA was appointed as Conservator for Freddie Mac pursuant to HERA. On September 22, 2009, Freddie Mac filed the Claim against LBHI in the aggregate liquidated amount of $1,202,241,875.00 based upon the Unsecured Loans.[4] The amount of $1,202,241,875.00 represents the $1.2 billion principal amount of the Unsecured Loans plus $2,241,875.00 in accrued interest.[5]

16.     Despite the unsecured nature of the Unsecured Loans, in its proof of claim, Freddie Mac asserted the Claim as a priority claim. In support of its claimed priority status, Freddie Mac reserved its rights under subparagraph 4617(b)(15)(A) of HERA, which grants the Conservator the right to avoid certain transfers or obligations if they were made or incurred by a

---

[4] A copy of the Claim is attached hereto as Exhibit B.

[5] LBHI retains the right to audit the interest calculation.

6

debtor of Freddie Mac with the actual "intent to hinder, delay, or defraud" Freddie Mac. (Claim
at ¶ 3.) In addition, Freddie Mac reserved its rights under subparagraph 4617(b)(15)(D) of
HERA and stated that under this subparagraph, "the Conservator's power to avoid a fraudulent
transfer is 'superior to any rights of a trustee or any other party (other than any party which is a
Federal Agency) under Title 11.'" (*Id.* (quoting 12 U.S.C. § 4617(b)(15)(D)).)

17.    The reservation of rights contained in the Claim suggests that Freddie Mac is
potentially interested in avoiding certain unidentified transfers allegedly made by LBHI "with
the intent to hinder or delay the 'early return' payment of the $1.2 billion due and owing to
Freddie Mac on September 15, 2008." *Id.*  However, the Claim does not contain one fact or
other description – whether by sworn affidavit or otherwise -- that would support the avoidance
of any transfer made by LBHI.

18.    Moreover, HERA makes clear that a right of recovery that Freddie Mac may
have, if any, would be against the transferee, not against LBHI, the alleged transferor.
Therefore, even if Freddie Mac had alleged facts to support all of the required elements of a
fraudulent transfer claim under HERA, it still would have no right to a priority recovery from
LBHI under HERA.

**D.    The Stipulation Between LBHI and Freddie Mac**

19.    In connection with confirmation of the Plan, Freddie Mac and LBHI entered into
a stipulation [ECF No. 22998] (the "Stipulation"). Among other things, the Stipulation
provided that LBHI would establish cash reserves on account of the Claim in the amount of
$1,202,241,875.00. To ensure that LBHI would only have to reserve $1,202,241,875.00 in cash
on an interim basis, the Stipulation includes a broad reservation of rights section that expressly

7

permits LBHI to contest, among other things, the asserted priority of the Claim.  (Stipulation at

¶ 3.)

## THE COURT SHOULD CLASSIFY AND ALLOW THE CLAIM IN LBHI CLASS 3

### A.    The Claim Is Not Entitled to Priority Under the Bankruptcy Code

20.    The Claim, which is based on LBHI's failure to repay the Unsecured Loans, is not

a priority claim under the Bankruptcy Code.  The Supreme Court has held that claims are

entitled to priority treatment only if the Bankruptcy Code expressly provides for such treatment.

*See Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.*, 547 U.S. 651, 655 (2006) ("preferential

treatment of a class of creditors is in order only when clearly authorized by Congress");

*Nathanson v. N.L.R.B.*, 344 U.S. 25, 29 (1952) ("[I]f one claimant is to be preferred over others,

the purpose should be clear from the [Bankruptcy Act].").  Further, both the Supreme Court and

the Second Circuit have directed courts to narrowly construe the priorities established by the

Bankruptcy Code because doing so promotes the Bankruptcy Code's main aim: "to secure equal

distribution among creditors."  *Howard Delivery*, 547 U.S. at 655; *accord Trs. of Amalgamated

Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 100 (2d Cir. 1986) ("Because the presumption in

bankruptcy cases is that the debtor's limited resources will be equally distributed among his

creditors, statutory priorities are narrowly construed.").  Section 507 of the Bankruptcy Code

lists the claims and expenses that are entitled to priority treatment.  11 U.S.C. § 507.  Claims

based on the Conservator's avoidance powers are not listed in section 507, nor are they

mentioned in any other section of the Bankruptcy Code.  Accordingly, the Claim is not entitled

to priority treatment under the Bankruptcy Code.  *See Howard Delivery*, 547 U.S. at 655;

*Amalgamated*, 789 F.2d at 100.

21.    This conclusion is supported by the Examiner's Report.  At the FHFA's request,

the Examiner conducted an extensive investigation into both the origination of the Unsecured

8

Loans and LBHI's failure to repay the Unsecured Loans. (Examiner's Report at 1951.) Like the Plan Administrator, the Examiner concluded that he was "not aware of any basis to treat the Claim as anything other than an unsecured claim that is not contingent, not unliquidated, and not disputed – as indicated on the Debtor's Schedule F (Creditors Holding Unsecured Nonpriority Claims). (Examiner's Report at 1955-56.) Given that Freddie Mac lacks a basis for asserting that the Claim should be treated as something other than an unsecured claim based on two unsecured loans, it is not surprising that Freddie Mac fails to provide any explanation as to why its claim is entitled to priority and, instead, merely reserves its alleged right to a "priority recovery" under HERA. (*See* Claim at ¶¶ 2-3.)

**B.     Section 4617(b)(15) of HERA Does Not Elevate the Priority of the Claim**

22.     Section 4617(b)(15) of HERA provides, in pertinent part, as follows:

a.   subparagraph (A) grants the Conservator the authority to avoid certain fraudulent transfers made with the actual "intent to hinder, delay, or defraud" Freddie Mac, the Conservator, or the FHFA;

b.   to the extent a transfer is avoided by the Conservator pursuant to subparagraph (A), subparagraph (B) grants the Conservator the right to recover "the property transferred, or, if a court so orders, the value of such property," but only from "the initial transferee" or "any immediate or mediate transferee";

c.   subparagraph (C) states that the Conservator may not recover under subparagraph (B) from any good faith transferee that has taken the property transferred for value or from any immediate or mediate good faith transferee of such transfer; and

d.   subparagraph (D) states that "the rights under this paragraph of the conservator or receiver described under subparagraph (A) shall be superior to any rights of a trustee or any other party (other than any party which is a Federal agency) under Title 11."

12 U.S.C. § 4617(b)(15). Nothing in subparagraphs (A) – (D) elevates claims asserted by the Conservator to priority status in a chapter 11 case, and the Bankruptcy Code was not amended at the time of HERA's enactment to provide for such priority treatment of claims asserted by the Conservator.

9

23.    Freddie Mac has argued that HERA grants it a priority right to commence an avoidance action and recover any amounts avoided. In its proof of claim, Freddie Mac suggests that certain unidentified transfers it might seek to avoid were allegedly made by LBHI with the intent to hinder or delay the repayment of the Unsecured Loans. The Claim states that:

> the Conservator, on behalf of Freddie Mac, reserves all its rights [to pursue an avoidance action], including with respect to the transfer of any property in which [LBHI] had an interest *to the extent such transfer was made with the intent to hinder or delay the "early return" payment of the $1.2 billion due and owing to Freddie Mac on September 15, 2008.*

(*Id.* at ¶ 3 (emphasis added).) This reservation of rights represents the only instance in the Claim in which Freddie Mac hints at the kinds of transactions the Conservator might eventually seek to avoid. Regardless of Freddie Mac's reservation of rights, nothing in section 4617 of HERA purports to alter the priority scheme established by the Bankruptcy Code for claims asserted against a debtor in a chapter 11 case.

## C.    HERA Does Not Grant Freddie Mac a Right of Recovery Against LBHI Because LBHI Was Not a "Transferee"

24.    Even assuming, *arguendo*, that Freddie Mac is able to avoid a transfer made by LBHI on the basis that it was made with the intent to hinder or delay the repayment of the Unsecured Loans, Freddie Mac is not entitled to a right of recovery from LBHI under HERA's express terms. *See* 12 U.S.C. § 4617(b)(15)(B). Section 4617(b)(15)(B) of HERA provides as follows:

> (B) Right of recovery
>
> To the extent a transfer is avoided under subparagraph (A), the conservator or receiver may recover, for the benefit of [Freddie Mac], the property transferred, or, if a court so orders, the value of such property (at the time of such transfer) *from* –
>
> > (i)    *the initial transferee* of such transfer or the entity-affiliated party or person for whose benefit such transfer was made; or

10

          (ii) *any immediate or mediate transferee of any such initial transferee*

*Id.* (emphasis added). This provision grants the Conservator a right of recovery only from a "transferee," not from an alleged transferor, such as LBHI. Accordingly, even if Freddie Mac successfully prosecutes an action to avoid a transfer made by LBHI, Freddie Mac will not have a right of recovery against LBHI. Therefore, contrary to Freddie Mac's suggestion, HERA does not grant Freddie Mac a priority claim against LBHI. *Id.*

        25.     In addition, Freddie Mac has neither commenced an avoidance action nor avoided any transfers as a result of such an action. Therefore, Freddie Mac has no "superior" rights to the recovery of any property under HERA. *Id.* at § 4617(b)(15)(D). As stated, Freddie Mac has failed to identify any transfer that is potentially avoidable by the Conservator – *i.e.*, a transfer allegedly made with the intent to hinder, delay, or defraud Freddie Mac. Indeed, the Claim contains no documentation or other factual allegations to support Freddie Mac's alleged right to avoid a transfer made by LBHI. The Claim merely reserves the Conservator's right to commence an avoidance action at some point in the future against an unknown defendant and in respect of an unidentified transfer.

**D.**    **The Claim Should Be Allowed As a Senior Unsecured Claim In LBHI Class 3**

        26.     For the reasons discussed above, the Claim is not a priority claim and should not be allowed as such under the Plan. Instead, the Claim should be allowed as an LBHI Class 3 Claim under the Plan. Under the Plan, "Senior Unsecured Claims" are classified in LBHI Class 3. The Plan defines the term "Senior Unsecured Claims" as "any Claim against LBHI that is entitled to a contractual right of priority in payment to all Subordinated Claims . . . other than a Senior Affiliate Claim, Senior Affiliate Guarantee Claim and a Senior Third-Party-Guarantee Claim." (Plan at §§ 1.145 and 3.1.) The term "Subordinated Claims" is defined by the Plan to

11

include claims based on various subordinated securities.  (*See, e.g.*, Plan at § 1.161, 1.24, 1.25, and 1.26.)

27.    The Plan Administrator has determined that Freddie Mac is entitled to a contractual right of priority in payment to Subordinated Claims and that the Claim is not a Senior Affiliate Claim, Senior Affiliate Guarantee Claim, or a Senior Third-Party-Guarantee Claim.  Accordingly, the Claim is a Senior Unsecured Claim, and should be allowed as such under the Plan.

28.    By classifying and allowing the Claim in LBHI Class 3, Freddie Mac will receive an initial payment in excess of $166 million, and the remainder of the Priority Reserve will be made available for distribution to LBHI's other creditors.  In contrast, absent the relief requested herein, the Plan Administrator will be forced to continue to maintain the Priority Reserve for a claim that is properly classified in LBHI Class 3.

29.    The continued maintenance of the Priority Reserve is clearly prejudicial to LBHI's other creditors.  This is especially true given that (i) Freddie Mac has failed to substantiate its right to a priority recovery in any way, (ii) over five years have passed since the Commencement Date, and yet, Freddie Mac has still failed to commence an avoidance action, which is a necessary prerequisite to Freddie Mac's alleged right to a "priority recovery" under HERA, and (iii) even if Freddie Mac were to commence an avoidance action, HERA would not grant Freddie Mac a right of recovery from LBHI with respect to the transfers that Freddie Mac would apparently seek to avoid – *i.e.*, transfers allegedly made by LBHI to third parties with the actual intent to hinder, delay, or defraud Freddie Mac.

30.    Accordingly, to avoid prejudice to LBHI's other creditors, and in accordance with the terms of the Plan, the Court should classify the Claim in LBHI Class 3.

12

## RESERVATION OF RIGHTS

31.    In addition to reserving the right to audit the interest calculation, the Plan Administrator reserves its rights to object to the validity, amount, classification, and/or priority of the Claim on any basis to the extent that the relief requested herein is not granted.  Further, the Plan Administrator reserves its rights to request that the Court estimate the Claim for all purposes, including for purposes of allowance, distributions, or establishing reserves.  The Plan Administrator also reserves its rights to supplement this motion and to file additional pleadings, or seek any other relief, in respect of the Claim in this or any other court.  The Plan Administrator reserves all its rights under Article 8 of the Plan, including its right to assert that, to the extent that Freddie Mac recovers any amounts as a result of the Conservator's exercise of its avoidance powers, such recovery must reduce, in whole or in part, the allowed (or allowable) amount of the Claim or any distributions made thereon.

## NOTICE

32.    No Trustee has been appointed in these Chapter 11 Cases.  The Plan Administrator has served notice of this objection and motion on (i) the U.S. Trustee; (ii) the Securities and Exchange Commission; (iii) the United States Attorney for the Southern District of New York; (iv) FHFA and Freddie Mac; and (v) all other parties entitled to notice in accordance with the procedures set forth in the second amended order entered on June 17, 2010 governing case management and administrative procedures for these Chapter11 Cases [ECF No. 9635].  The Plan Administrator submits that no other or further notice need be provided.

33.    No previous request for the relief sought herein has been made by the Plan Administrator or LBHI to this or any other court.

13

WHEREFORE the Plan Administrator respectfully requests entry of an order

granting the relief requested herein and such other and further relief as is just.

Dated: September 13, 2013
      New York, New York

                      /s/ Alfredo R. Perez
                      David J. Lender
                      Lori R. Fife
                      Alfredo R. Perez

                      WEIL, GOTSHAL & MANGES LLP
                      767 Fifth Avenue
                      New York, New York 10153
                      Telephone: (212) 310-8000
                      Facsimile: (212) 310-8007

                      Attorneys for Lehman Brothers Holdings Inc.
                      and Certain of Its Affiliates

14

# EXHIBIT A

# FEDERAL HOUSING FINANCE AGENCY
# OFFICE OF INSPECTOR GENERAL

## Case Study:
## Freddie Mac's Unsecured Lending to Lehman Brothers
## Prior to Lehman Brothers' Bankruptcy



EVALUATION REPORT: EVL-2013-03                    DATED:  March 14, 2013



# FEDERAL HOUSING FINANCE AGENCY
## OFFICE OF INSPECTOR GENERAL

# AT A GLANCE

## Case Study: Freddie Mac's Unsecured Lending to Lehman Brothers Prior to Lehman Brothers' Bankruptcy

## Why FHFA-OIG Did This Evaluation

On September 6, 2008, the Federal Home Loan Mortgage Corporation (Freddie Mac or Enterprise) entered into a conservatorship overseen by its regulator, the Federal Housing Finance Agency (FHFA). That was done after it was determined that Freddie Mac and the Federal National Mortgage Association (Fannie Mae) (collectively, the Enterprises) faced billions of dollars in losses as a result of the collapse of the housing market.

In August 2008, just weeks prior to conservatorship, Freddie Mac provided to Lehman Brothers Holdings Inc. (Lehman) two short-term unsecured loans totaling $1.2 billion. The loans were the last of a series of loans Freddie Mac had been making to Lehman since January 2008.

The August loans were due and payable on September 15, 2008. On that day, however, Lehman filed for bankruptcy and defaulted on its repayment obligation. This resulted in Freddie Mac recording a loss of the entire $1.2 billion.

This report examines the circumstances surrounding Lehman's unsecured loans and the steps Freddie Mac and FHFA have taken—including efforts to recover the loans through the bankruptcy process—in response to Lehman's default. It seeks to identify the lessons learned from these events in an effort to prevent similar problems in the future.

## What FHFA-OIG Found

FHFA-OIG found that in the months following Lehman's default, Freddie Mac determined that a failure of corporate culture at Freddie Mac allowed management to override its counterparty risk management policies, which would have altered the terms of the loans and, in turn, reduced the Enterprise's risk.

Since the default, FHFA and Freddie Mac have taken steps to improve the Enterprise's corporate governance environment and to correct its risk management failures. In addition,

FHFA, acting as Freddie Mac's conservator, is actively engaged in recovering the $1.2 billion loss from Lehman, based on FHFA's determination that Lehman's improper conduct was the direct cause of the loss. (This report does not analyze Lehman's risk management and control systems; nor does it make findings regarding Lehman's conduct or legal liability.)

Clearly, FHFA and Freddie Mac must follow through on their remedial initiatives. In particular, FHFA should continue to: (1) monitor Freddie Mac's implementation of its counterparty risk management policies and procedures, including (a) ensuring that the independence and decisions of the Enterprise's risk management staff are not overridden by business management staff, and (b) directing Freddie Mac Internal Audit to audit the Counterparty Credit Risk Management function annually; (2) pursue all possible avenues to recover the $1.2 billion in the Lehman bankruptcy proceeding; and (3) develop an examination program and procedures encompassing Enterprise-wide risk exposure to all of Freddie Mac's counterparties.

## What FHFA-OIG Concludes

This case study provides several important lessons that must be followed in order to avoid recurrence of Freddie Mac's serious missteps preceding Lehman's bankruptcy: corporate culture cannot be allowed to override or negate protections afforded by formal controls; key voices, such as risk management officials, must not be marginalized in favor of opportunistic business decisions; and policies and procedures should be adhered to and enforced. Corporate culture is a critical element in effective governance and risk management. Therefore, it needs to be the target of vigilance and oversight, specifically with respect to risk management. Corporate leaders must set the tone at the top.

Further, regulatory oversight, including robust examination and audit programs, is essential to reinforce even the most fundamental and widely embraced controls.

---

Evaluation Report: EVL-2013-03                                     Dated: March 14, 2013

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................. 3

ABBREVIATIONS ...................................................................................................................... 4

PREFACE ...................................................................................................................................... 5

BACKGROUND ........................................................................................................................... 6

    Freddie Mac Loans to Lehman ................................................................................................. 8

    Counterparty Credit Risk Management at Freddie Mac .......................................................... 9

    OFHEO's Oversight of Freddie Mac's Counterparty Risk ................................................... 14

    FHFA's Oversight and Examination of Freddie Mac's Counterparty Risk .......................... 14

    Freddie Mac's Amendments to Key Investment and Risk Management Policies................. 15

    FHFA's Efforts to Recover the $1.2 Billion in the Lehman Bankruptcy Proceeding ........... 15

    Investigations by FHFA and Freddie Mac............................................................................. 15

        2008 Freddie Mac Special Investigation ......................................................................... 16

        FHFA Key Management Assessment .............................................................................. 17

        Freddie Mac Risk Oversight Inquiry ............................................................................... 17

FINDINGS................................................................................................................................... 19

RECOMMENDATIONS ............................................................................................................. 21

CONCLUSION ............................................................................................................................ 22

OBJECTIVE, SCOPE, AND METHODOLOGY ....................................................................... 23

APPENDIX A:  FHFA'S COMMENTS ON FINDINGS AND
RECOMMENDATIONS ............................................................................................................. 25

ADDITIONAL INFORMATION AND COPIES ........................................................................ 26

# ABBREVIATIONS

CCRM .................................................................. Counterparty Credit Risk Management

Enterprises.................................................................. Fannie Mae and Freddie Mac

Fannie Mae.................................................................. Federal National Mortgage Association

FHFA or Agency.................................................................. Federal Housing Finance Agency

FHFA-OIG .................................... Federal Housing Finance Agency Office of Inspector General

Freddie Mac .................................................................. Federal Home Loan Mortgage Corporation

HERA.................................................................. Housing and Economic Recovery Act of 2008

Lehman .................................................................. Lehman Brothers Holdings Inc.

OFHEO .................................................................. Office of Federal Housing Enterprise Oversight

OG.................................................................. Office of Governance

PSPAs .................................................................. Senior Preferred Stock Purchase Agreements

SVP .................................................................. Senior Vice President

Treasury .................................................................. U.S. Department of the Treasury

**Federal Housing Finance Agency**
**Office of Inspector General**
Washington, DC

---

# PREFACE

FHFA-OIG was established by the Housing and Economic Recovery Act of 2008 (HERA),[1] which amended the Inspector General Act of 1978.[2] FHFA-OIG is authorized to conduct audits, investigations, and other studies of the programs and operations of FHFA; to recommend policies that promote economy and efficiency in the administration of such programs and operations; and to prevent and detect fraud and abuse in them.

This report is intended to promote the economy and efficiency of FHFA's programs. It examines the steps taken by Freddie Mac and FHFA to remediate corporate governance issues that may have contributed to losses on unsecured loans made by Freddie Mac to Lehman in the period leading up to Lehman's bankruptcy. It seeks to identify the lessons learned from these events in an effort to prevent similar problems in the future.

As of the publication of this report, FHFA is actively engaged in recovering the loss from Lehman, based on FHFA's determination that Lehman's improper conduct was the direct cause of the loss. This report does not analyze Lehman's risk management and control systems; nor does it make any findings regarding legal liability of the firm or any of its employees.

This report was prepared by an FHFA-OIG interdisciplinary team consisting of: David P. Bloch, Director, Division of Mortgage, Investments, and Risk Analysis; Christopher G. Poor, Investigative Counsel; David Z. Seide, Director of Special Projects; and Robert C. Hinkley, Attorney Advisor. FHFA-OIG appreciates the assistance of FHFA and Enterprise staff in completing this report. It has been distributed to Congress, the Office of Management and Budget, and others and will be posted on FHFA-OIG's website, www.fhfaoig.gov.

*George Grob*

George Grob
Deputy Inspector General for Evaluations

---

[1] Pub. Law No. 110-289.

[2] Pub. Law No. 95-452.

# BACKGROUND

The enactment of HERA on July 30, 2008, established FHFA as supervisor and regulator of Fannie Mae and Freddie Mac. Prior to the enactment of HERA, the Enterprises were regulated by the Office of Federal Housing Enterprise Oversight (OFHEO).

By August 2008, the housing crisis had taken a significant toll on the American economy and financial institutions, which were absorbing billions of dollars in losses on defaulted loans with insufficient collateral. The Federal Reserve had already bailed out the investment bank Bear Stearns in March and government regulators were concerned with the health of the entire domestic financial system.

On September 6, 2008, Fannie Mae and Freddie Mac entered into **conservatorships** supervised by FHFA out of concern that the deteriorating financial conditions of the Enterprises threatened the stability of the financial markets. At the same time, the U.S. Department of the Treasury (Treasury) began to provide financial support to the Enterprises to prevent their insolvency. Nine days later, Lehman filed for bankruptcy protection.

**Conservatorship**
A conservatorship is the legal process in which a person or entity is appointed to establish control and oversight of a company to put it in a sound and solvent condition. In a conservatorship, the powers of the company's directors, officers, and shareholders are transferred to the designated conservator.

Under the conservatorships, FHFA may "take such action as may be necessary to put the regulated entity in a sound and solvent condition" or carry out the business to preserve and conserve the assets of the regulated entity. To date, Treasury has invested $71.3 billion to maintain Freddie Mac's solvency.

Leading up to the financial crisis in 2008, Freddie Mac and the investment bank Lehman were two of the largest participants in the financing of the U.S. housing market. Freddie Mac is a government-sponsored enterprise whose mission is to keep money flowing to mortgage lenders in support of homeownership.[3] To carry out its function, Freddie Mac purchases mortgages from banks and securitizes them, issuing residential mortgage-backed securities. For a fee, the Enterprise guarantees these securities, which are sold to investors around the world.

Prior to its bankruptcy filing in September 2008, Lehman was the fourth largest investment bank in the United States with $639 billion in assets. Lehman traded and underwrote stocks and bonds, traded commodities, was active in the credit derivatives market, and became a major player in both commercial and residential securitization markets.

---

[3] *See* 12 U.S.C. § 1451.

In 2007, Lehman underwrote more mortgage-backed securities than any other firm. Its $85 billion mortgage-backed portfolio was equal to approximately four times its shareholders' equity. Thus, Lehman's high degree of leverage—the ratio of total debt to equity—made it vulnerable to the increasing losses it was incurring in its residential housing and commercial property investments. On June 9, 2008, Lehman announced a $2.8 billion loss for its second fiscal quarter ending May 31, 2008. On September 10, 2008, Lehman posted a third-quarter loss of $3.9 billion, after a $5.6 billion write-down on toxic mortgages in its investment portfolio.

The effect of Lehman's increasing losses, its exposure to the mortgage markets, and its deteriorating financial condition were reflected in the decreasing price of shares of its common stock, as shown in Figure 1.

**Figure 1:  Lehman Brothers Closing Stock Price Jan. 2008 – Sept. 2008[4]**



By Thursday, September 11, 2008, Lehman had only $1 billion in cash on hand and was actively seeking assistance from the federal government to avoid bankruptcy. Over the weekend of September 13-14, talks were held among the Federal Reserve, Treasury, and a consortium of banks in an effort to rescue Lehman. But, the talks produced no rescue, and on September 15, 2008, Lehman filed for bankruptcy protection, the largest bankruptcy case in United States history. On the day Lehman filed, it owed Freddie Mac $1.2 billion—the result of short-term unsecured loans made less than a month earlier.

---

[4] Source:  Bloomberg.

**Freddie Mac Loans to Lehman**

Prior to the bankruptcy, Freddie Mac and Lehman had extensive business relations. Lehman sold mortgages to Freddie Mac and also served as one of Freddie Mac's investment bankers. Lehman underwrote common and preferred stock offerings for Freddie Mac as well as various debt securities offerings.

Additionally, through the first half of 2008, Freddie Mac made significant short-term unsecured loans to Lehman. Freddie Mac had been making what it described as "Fed Funds" available to Lehman on an overnight basis with a limit of $200 million since February 2005.

According to the Federal Reserve Bank of New York, "Fed Funds," or Federal Funds, are unsecured loans of reserve balances at Federal Reserve Banks that depository institutions make to one another. Participants in the Fed Funds market include commercial banks, thrift institutions, agencies, branches of foreign banks in the United States, and government securities dealers. The most common term for a Fed Funds transaction is overnight. A "true" Fed Funds transaction is between member banks of the Federal Reserve System, although the term is also used more loosely to describe any short-term, unsecured loans between financial institutions. Neither Lehman nor Freddie Mac is a member of the Federal Reserve System, and typically the maturity terms of their 2008 transactions were not overnight.[5] Nonetheless, Freddie Mac has historically been a significant supplier of funds to the Fed Funds market with member banks acting as intermediaries.

The term and the size of Freddie Mac Fed Funds loans to Lehman changed in 2008. Rather than periodically making overnight loans to Lehman as had previously been the case, the 2008 loans were made for longer terms (up to one month) and they often rolled over as they became due. Thus, the loans made in May 2008 were rolled over in June 2008; they were again rolled over in July, and then again in August. Each time the principal and interest on such loans were repaid by Lehman, the funds were re-sold (lent) by Freddie Mac to Lehman for an additional term.

The principal amount of the loans to Lehman also grew in 2008. From an initial aggregate principal amount of $800 million in January 2008, the amount increased to $1 billion in February and to $1.2 billion in April. Figure 2 shows the amount and terms of the loans made by Freddie Mac to Lehman for the period January to September 2008 (indicated by the bars on the right side of the graph), as Lehman's stock price deteriorated (indicated in the downward trending line beginning in July 2007).

---

[5] Regardless of any technical definition, this report adopts Freddie Mac's use of the phrase "Fed Funds."

**Figure 2:  Lehman Stock Percentage Change and Freddie Mac's Lehman Fed Funds Exposure, July 1, 2007 – Sept. 15, 2008[6]**



The last of these transactions involved two loans totaling $1.2 billion.  The first loan was provided on August 19, 2008, for $450 million.  The second loan was executed on August 20, 2008, for $750 million.[7]  Both loans were scheduled to mature on September 15, 2008, at 9:30 a.m.

## Counterparty Credit Risk Management at Freddie Mac

The Freddie Mac staff responsible for facilitating the Fed Funds loans to Lehman worked on the Liquidity and Contingency Desk, within Freddie Mac's Investments and Capital Markets Division.[8]  These personnel are responsible for making Freddie Mac's short-term liquid investments.  Because Freddie Mac's business generates large amounts of cash from principal and interest collections, this office often has billions of dollars to invest each day.  Such investments take into consideration Freddie Mac's short-term cash disbursement needs (to ensure it always has funds available to pay its bills) as well as the safety and soundness of the

---

[6] Sources:  Yahoo Finance and Algo Research Group.

[7] The interest rate on the loans was 2.55%, the prevailing Fed Funds rate at the time.

[8] Freddie Mac's Investment and Capital Markets Division is responsible for managing Freddie Mac's retained portfolio of mortgages and securities, hedging against interest rate and other risks, and investing Freddie Mac's available cash.  This group is led by a senior vice president and includes traders and investment managers.

counterparty in which the funds are invested. The rate the counterparty is willing to pay is also a consideration.[9]

Responsibility for monitoring the safety and soundness of Freddie Mac's Fed Funds investments rests with the Counterparty Credit Risk Management (CCRM) staff of Freddie Mac's Risk Oversight Division.[10] The CCRM is headed by the Vice President, Counterparty Credit Risk Management, who reports to the Senior Vice President (SVP), Credit Risk Oversight, who, in turn, reports to the SVP and Enterprise Chief Risk Officer.

Figure 3 illustrates the responsibilities and relationships of the key offices involved in these investment decisions at Freddie Mac.

**Figure 3: Freddie Mac Investment and Credit Risk Management Offices**



---

[9] The Federal Reserve sets a target level for its Fed Funds rate, and the Federal Reserve's announcements of changes in monetary policy specify the changes in the Federal Reserve's target for that rate. According to the Federal Reserve Bank of New York, the actual Fed Funds rate is determined by market participants and is not actually "set" by the Federal Reserve.

[10] The Risk Oversight Division had responsibility for "setting counterparty specific counterparty exposure limits and certain terms of business" pursuant to Freddie Mac's Policy 11-104, *Credit Risk Oversight Corporate Policy.*

Like other companies, Freddie Mac typically invests its cash in a manner intended to ensure that such funds will be returned to it in time to pay its obligations as they become due. This requires Freddie Mac to choose counterparties that it deems reliable and capable of meeting their obligations to pay principal and interest when they are due.

Assessing reliability and capability is not only a function of the counterparty's financial condition and credit history—it is also a function of time. That is, the longer the term for which money is lent, the greater the risk (due to the possibility of intervening events) of default.

Freddie Mac relies on its Risk Oversight Division and the CCRM staff to clear suitable counterparties eligible for investments. CCRM has three primary means of managing counterparty risk: (1) determining counterparty eligibility; (2) limiting the duration of investments; and (3) limiting the size of investments. Once CCRM pre-clears a counterparty and establishes the maximum duration and size of loans that may be made to the counterparty, the Liquidity and Contingency Desk is authorized to lend to the counterparty up to the maximum amount and duration. That authorization remains in place until the Liquidity and Contingency Desk is advised otherwise by the Risk Oversight Division.

During 2008, CCRM's oversight of risk with regard to the Lehman loans focused primarily on the term of such loans; namely, whether such loans should be limited to overnight (24 hours) or longer (up to 30 days) terms. In principle, lenders of overnight loans can eliminate their credit exposure every 24 hours because once the loan ends it need not be renewed. On the other hand, the 30-day loans made by Freddie Mac to Lehman could not be called prior to their stated maturity and therefore resulted in longer credit risk exposure to the Enterprise. Indeed, in 2008, some CCRM staff questioned whether Freddie Mac should be making unsecured loans to Lehman at all based on the perceived heightened risk. However, those concerns, which would have reduced the extent of the Enterprise's exposure, were overruled at senior levels within Freddie Mac.

Lehman's financial condition in 2008 was of concern to CCRM staff. In the wake of Bear Stearns' collapse and rescue in mid-March 2008, CCRM staff indicated that they preferred that the duration of the unsecured Fed Funds loans to Lehman be shortened. They made these assertions on three separate occasions. The first such occasion was March 17, 2008, the day after Bear Stearns' rescue was publicly disclosed. On that day, CCRM staff advised personnel on the Liquidity and Contingency Desk that CCRM was limiting the duration of unsecured loans being made to Lehman from 30 days to 24 hours, once the outstanding loans matured.

Under Freddie Mac's policies and procedures, the Risk Oversight Division was responsible for limiting the amount and duration of the Lehman loans. However, it appears that business managers influenced CCRM staff because the staff reversed its position two days later. In an email from the Director of Credit Quality dated March 19, 2008, CCRM advised that, following

a meeting between Freddie Mac's Chief Business Officer and the SVP of Credit Risk Oversight,[11] the maximum 30-day terms for loans to Lehman were to be reinstated.[12]

Three months later, on June 12, 2008, CCRM staff again recommended reducing Freddie Mac's risk exposure to Lehman. (During the preceding three weeks, the closing price of Lehman's stock had fallen by approximately 30%.) This time, CCRM staff recommended—and requested approval from the SVP, Credit Risk Oversight, to implement—a reduction of the maximum duration from 30 days. The SVP responded that he wanted to discuss the matter further with his business counterpart in Freddie Mac's Investment and Capital Markets Division. Five days later, on June 17, 2008, CCRM staff followed up on its pending request, by recommending that 30-day loans be reduced to 2-week terms.[13] That recommendation was temporarily accepted, as reflected by the fact that when the Lehman loans were rolled over later in June the duration of the loans was reduced by two weeks.

The third time CCRM staff raised concerns regarding the short-term unsecured loans to Lehman occurred in mid-July 2008. In the absence of positive news about Lehman's financial condition, on July 11, 2008, CCRM staff downgraded the internal Freddie Mac risk rating assigned to the Lehman debt. In a July 15, 2008, email to the SVP, Credit Risk Oversight, CCRM staff stated that they believed "a shorter term of one week (instead of 14 days) would be prudent, but it appears upper management is willing to accept this risk." An internal Freddie Mac email dated July 30, 2008, stated that the recommendation to shorten the duration further had not been approved because "of disagreements at very high levels over terms of the Fed Funds line."

On August 19 and 20, 2008, Freddie Mac entered into two loans with Lehman for an aggregate principal amount of $1.2 billion. The loans were set to become due on September 15, 2008, at or near the beginning of the business day.

Freddie Mac entered into conservatorship on September 6, 2008. Three days later, on September 9, Freddie Mac's Risk Oversight Division (which included CCRM) decided to eliminate all unsecured lending to Lehman. On that day, Freddie Mac decided that the two unsecured loans to Lehman would not be renewed when they became due at the start of the business day on September 15, 2008. However, Lehman filed a petition under Chapter 11 of the Federal Bankruptcy Code seeking bankruptcy protection on September 15, 2008, before the business day

---

[11] The Director of Credit Quality is a member of the CCRM staff; the SVP of Credit Risk Oversight is the executive overseeing CCRM.

[12] According to interviews conducted in September 2008 by staff under the direction of Freddie Mac's Chief Auditor and Vice President of Audit, various Freddie Mac staffers recalled that when Lehman heard of CCRM's decision to limit the term, a senior person at Lehman contacted senior management at Freddie Mac and challenged the decision.

[13] On the previous day, June 16, 2008, Lehman announced second quarter losses of $3 billion.

began. That filing allowed Lehman to halt payments to all creditors, including Freddie Mac. To date, Lehman has not repaid the $1.2 billion debt owed to Freddie Mac. Figure 4 shows a timeline of the transactions between Freddie Mac and Lehman.

**Figure 4: Freddie Mac and Lehman Brothers: Countdown to Default**



It is possible that Freddie Mac could have avoided the $1.2 billion loss to Lehman if it had more effectively managed its counterparty risk. For instance, had the duration of the loans been shortened to overnight, as recommended by CCRM staff in mid-March of 2008, Freddie Mac could have halted further loans to Lehman on September 10 or shortly thereafter—potentially ahead of Lehman's September 15 bankruptcy filing. But the record shows that CCRM's risk management recommendations were influenced by Freddie Mac senior business managers.

## OFHEO's Oversight of Freddie Mac's Counterparty Risk

As noted earlier, prior to July 30, 2008, Freddie Mac was regulated by OFHEO. Prior to the Lehman bankruptcy in September 2008, no examination work had been performed by OFHEO related to capital markets counterparties. A senior FHFA official acknowledged to FHFA-OIG staff that there was "a hole in the program," referring to OFHEO's historic lack of counterparty examinations in the capital markets area. The same senior FHFA official is now committed to developing a robust examination program regarding counterparty risk.

## FHFA's Oversight and Examination of Freddie Mac's Counterparty Risk

Following the Lehman default, FHFA examiners conducted a series of targeted examinations related to counterparty credit risk management and management of Freddie Mac's liquidity and contingency portfolio. FHFA's Division of Enterprise Regulation made a number of findings regarding Freddie Mac's operations and recommended that certain actions be taken to better manage counterparty risk. Most importantly, FHFA's work led to a clarification and correction of Freddie Mac's policies to reflect the fact that Fed Funds investments do not carry with them any implied government guarantee.

At the time of the Freddie Mac-Lehman transactions, OFHEO's Division of Enterprise Regulation's supervision manual did not adequately address examination procedures pertaining to the Enterprises' liquidity and funding. Today, FHFA has developed an examination module on liquidity that has undergone field-testing and is scheduled for finalization shortly. Additionally, the Division of Enterprise Regulation has extensively revised its Examination Manual. Although still in draft form, the Credit Risk Management section lays out supervisory policies that address, among other things, establishing and measuring counterparty risk limits, the responsibilities of the board of directors and enterprise risk management, the need for on-going monitoring, and the development of an internal reporting system that rates risk exposure to counterparties based on various critical criteria.

FHFA's Examiner-in-Charge at Freddie Mac has indicated that the monitoring of counterparty risk is a priority for the Agency and that "significant resources" will be dedicated toward the examination of such risk in the 2013 Examination Plan. Additionally, during the second half of 2012, FHFA conducted several targeted examinations relating to various aspects of counterparty risk. An FHFA Freddie Mac core team examiner who was interviewed by FHFA-OIG staff added that FHFA now requires the Enterprises to report on counterparty risk (quantitatively and qualitatively) on a monthly basis. The data are reported and discussed during a subcommittee meeting held monthly at Freddie Mac.

## Freddie Mac's Amendments to Key Investment and Risk Management Policies

Following FHFA's counterparty credit risk management targeted examinations, Freddie Mac re-examined and amended two of its key business policies. First, the Liquidity and Contingency Policy was amended to reflect that its activities are consistent with FHFA and Treasury guidance. Most importantly, the amended policy currently suspends unsecured term lending. Second, the Capital Markets Counterparty Credit Risk Management Policy was revised to, among other things, more clearly define the roles and responsibilities of Freddie Mac staff involved in managing the Enterprise's counterparty credit risk program and sets out a precise definition of Fed Funds including, significantly, that Fed Funds lending in fact constitutes an unsecured investment.

## FHFA's Efforts to Recover the $1.2 Billion in the Lehman Bankruptcy Proceeding

After the Lehman bankruptcy proceeding began, Freddie Mac filed a claim as a Lehman creditor.[14] Specifically, on September 22, 2009, Freddie Mac filed a **proof of claim**, which included a priority claim for the $1.2 billion owed on the two loans (the Loans Claim) that were not repaid by Lehman. Freddie Mac is an unsecured creditor and can otherwise expect to be repaid only after secured creditors and creditors with higher priority claims are repaid, but it will be repaid before creditors with lower priority claims are repaid.

**Proof of Claim**
A proof of claim is a creditor's written statement filed in a bankruptcy case for purposes of showing the basis and amount of the creditor's claim against the debtor. By filing a proof of claim against Lehman, Freddie Mac made other creditors and Lehman aware of its claim and its intention to share in any distribution of Lehman's assets from the bankruptcy estate.

On March 6, 2012, Lehman emerged from bankruptcy. The Lehman bankruptcy reorganization plan recognizes $1.2 billion to be available for payment in full (exclusive of interest) of Freddie Mac's Loans Claim, if it is ultimately allowed.

## Investigations by FHFA and Freddie Mac

Soon after Lehman failed to repay the loans totaling $1.2 billion, Freddie Mac and FHFA each conducted investigations into the circumstances surrounding the default. Their goal was to

---

[14] Freddie Mac's total claims in the Lehman bankruptcy proceedings were $2.23 billion. In addition to the $1.2 billion claim for the two August loans were two claims totaling $1.03 billion under existing derivatives contracts between Freddie Mac and Lehman.

understand the events and identify credit risk management issues that led to the default. Based on the investigations, recommendations have been made and management actions have been taken in an effort to reduce the possibility of losses arising from similar circumstances in the future.

Between September 2008 and December 2009, Freddie Mac and FHFA conducted three investigations: (1) a special investigation conducted by Freddie Mac's General Auditor soon after the default occurred (the Special Investigation); (2) an FHFA assessment of the management of Freddie Mac (the FHFA Key Management Assessment); and (3) an inquiry by Freddie Mac's Operational Risk Oversight staff into the Lehman default (the Risk Oversight Inquiry).[15]

All three examinations came to similar conclusions regarding what caused the $1.2 billion default. Specifically, the examinations concluded that although Freddie Mac had taken steps to manage counterparty risk, the risk management policies and procedures in place had been overridden by senior management. As a result of those overrides, risk management staff within CCRM believed that they had been impeded from taking steps that may have eliminated or at least reduced Freddie Mac's counterparty exposure to Lehman.

### 2008 Freddie Mac Special Investigation

The Freddie Mac Special Investigation was led by Freddie Mac's Chief Auditor and Vice President of Audit at the direction of the Enterprise's then-newly installed CEO, David Moffett.[16]

The Special Investigation reached a number of conclusions, including that *de facto* approval was required from senior business management before risk managers could change the amount or duration of Lehman loans. According to Freddie Mac internal corporate policy, the Risk Oversight Division alone had responsibility for setting counterparty-specific exposure limits and certain terms of business.[17] However, the investigation found that, in practice, significant decisions related to changing existing counterparty credit limits and terms required the "approval" of senior business managers before such changes could be implemented. The investigative report acknowledged that credit decisions could not be made in a vacuum and without input from other senior management (including senior managers in Investments and Capital Markets), but the report emphasized that Freddie Mac's policy was predicated on the independence, good judgment, and fortitude of the SVP, Credit Risk Oversight, and others in the

---

[15] To date, the conclusions of these investigations have not been made public.

[16] CEOs of both Enterprises were replaced by FHFA at the inception of the conservatorships.

[17] Freddie Mac Policy 11-104, *Credit Risk Oversight Corporate Policy*.

Risk Oversight Division. The report found those qualities absent with respect to the loans made in 2008 to Lehman.

### FHFA Key Management Assessment

On September 26, 2008, FHFA's Office of Governance (OG) produced a Freddie Mac Key Management Assessment to gauge the effectiveness of Freddie Mac's management and discern what management failures contributed to Freddie Mac entering into conservatorship.[18] Although this assessment was not directly related to the handling of the Lehman loans, it uncovered significant problems with Freddie Mac's leadership that may have had an impact.

Notably, Freddie Mac senior business executives fostered a corporate culture in which the most senior person in the Risk Oversight Division, the Chief Enterprise Risk Officer, was excluded and his team's advice was disregarded. In particular, OG found that multiple senior business executives had disregarded direct advice concerning the risks inherent with the Lehman short-term unsecured loans. Moreover, OG discovered evidence of deliberate efforts by executives to exclude credit risk management officers from participating in key investment decisions and to restrict credit risk management personnel from interacting with Freddie Mac's previous CEO. Many Freddie Mac business personnel who were criticized in the Key Management Assessment left the Enterprise after the report's issuance.

### Freddie Mac Risk Oversight Inquiry

Freddie Mac further examined the Lehman loss in a second investigation conducted in late 2008. Freddie Mac found: (1) a failure of corporate culture—including the tone from the top of the management structure—resulted in counterparty credit decisions made by risk management personnel being inappropriately overridden by business personnel; (2) a lack of sufficient independence between Credit Risk Oversight and Investments and Capital Markets; and (3) a lack of transparency regarding risk, which resulted in inadequate review of risks, inadequate understanding of risks, and inadequate involvement by higher-level decision makers concerning those risks.

With regard to the failure of corporate culture, the report found that executive management's views on lending to Lehman were neither documented nor clearly communicated. Furthermore, Risk Oversight Division personnel improperly perceived communications through others as factual executive direction when executive management provided no such direction. Risk management was also ineffective because of the perception of staff in Credit Risk Oversight that senior management would override their decisions. Finally, the inquiry cited the absence of

---

[18] A key management assessment of each Enterprise is required under HERA.

documentation of escalation to senior credit and business managers of the differing opinions concerning the Enterprise's exposure to Lehman.

Finally, the report found that Freddie Mac had taken a number of steps to prevent losses of a similar nature from recurring. These steps included: (1) the CEO reinforcing (in the fourth quarter of 2008) the authority of the Chief Credit Officer to determine specific exposure limits for counterparties; (2) establishing a Senior Executive Credit Committee; and (3) assigning to that committee the responsibility for making explicit credit decisions based on CCRM staff's independent review.

# FINDINGS

1. *Corporate Governance/Culture.* **Former senior business managers at Freddie Mac decided to disregard recommendations made by the Enterprise's risk management staff to reduce the duration of the loans from one month to overnight.**

The $1.2 billion loss on the Lehman loans was facilitated by a corporate culture at Freddie Mac that overrode existing written policies and procedures. This left those responsible for credit risk oversight within the Enterprise reluctant to move forcefully in this direction, due to the perception that their decisions to reduce the amount or duration of the Lehman loans would be overridden. As a consequence, Freddie Mac did not move to revoke Lehman's short-term unsecured credit with the Enterprise until Lehman filed for bankruptcy and it was too late.[19]

2. *Corrective Action.* **FHFA and Freddie Mac have taken appropriate steps to remediate the corporate governance/culture issues identified in this report.**

FHFA has made progress in its efforts to stabilize the corporate governance/culture environment at Freddie Mac. The individuals responsible for the governance failures discussed in this report are no longer employed by Freddie Mac. FHFA has worked to ensure that credit risk management is now an independent organization within Freddie Mac that no longer seeks advice/approval from the business units (including Investments and Capital Markets) before making risk management decisions, and the Senior Executive Team has been replaced by a Senior Executive Credit Committee.

3. *Risk Management.* **FHFA has taken steps to enhance Freddie Mac's counterparty risk and operational risk management, but ongoing enforcement must be maintained.**

FHFA and Freddie Mac have taken a number of steps outlined in this report to remediate the counterparty credit risk management failures that may have contributed to the $1.2 billion default. Both will need to remain vigilant to ensure policies and procedures in this area are enforced and the corporate culture does not override such enforcement.

---

[19] FHFA-OIG is continuing to review the circumstances that led Freddie Mac senior business managers to disregard recommendations made by the risk management staff.

**4.  *Recovery of Funds*.  FHFA has made potentially helpful efforts to recover the $1.2
billion from the Lehman bankruptcy estate.**

To its credit, FHFA, through the Office of General Counsel, has worked to improve the chances
of Freddie Mac's recovery in the Lehman bankruptcy proceeding.  In particular, it is possible
that Freddie Mac may ultimately recover $1.2 billion; on the other hand, Freddie Mac stands to
recover no less than $251 million.

# RECOMMENDATIONS

FHFA and Freddie Mac have already taken steps to address the shortcomings in Freddie Mac's risk management and control systems discussed in this report. Clearly, they need to follow through on these remedial initiatives. In particular, FHFA should:

1. Continue to monitor Freddie Mac's implementation of its counterparty risk management policies and procedures:

    a. ensuring that the independence and decisions of the Enterprise's risk management staff are not overridden by business management staff, and

    b. directing Freddie Mac Internal Audit to audit the CCRM function annually.

2. Continue to pursue all possible avenues to recover the $1.2 billion in the Lehman bankruptcy proceedings.

3. Continue to develop an examination program and procedures encompassing Enterprise-wide risk exposure to all of Freddie Mac's counterparties.[20]

---

[20] On September 18, 2012, FHFA-OIG issued an audit report concerning FHFA's oversight of the Enterprises' management of their mortgage sales and servicing counterparties. *See* FHFA-OIG, *FHFA's Oversight of the Enterprises' Management of High-Risk Seller/Servicers* (AUD-2012-007) (Sept. 18, 2012). That report recommended that FHFA issue standards for the Enterprises to develop comprehensive contingency plans for high-risk and high-volume seller/servicers, and that the Agency finalize its examination guidance regarding contingency planning. FHFA agreed, and its implementation of the contingency planning recommendation will help to prevent a future Lehman-like event from recurring.

# CONCLUSION

Much can be learned from the events that led up to the serious missteps at Freddie Mac preceding the Lehman bankruptcy, the dysfunctional corporate culture at the time of the bankruptcy, and the aggressive and systematic responses by Freddie Mac and FHFA executives in its wake. The lessons learned are applicable to Freddie Mac, Fannie Mae, their counterparties, and FHFA.

The lessons are:

- Corporate culture cannot be allowed to override or negate the formal controls put into place to provide protections.

- Marginalization of key voices can have significant adverse impacts, especially the subordination of risk management to opportunistic business decisions.

- Policies and procedural requirements should be adhered to and enforced.

- Regulatory oversight, including robust examination and audit programs, are essential to re-enforce even the most fundamental and widely embraced controls.

Corporate culture itself is a critical element in effective governance and risk management. Corporate leaders must set the tone at the top. There needs to be constant vigilance and oversight by such leaders to ensure that the culture supports the governance and risk management functions rather than undermines them.

# OBJECTIVE, SCOPE, AND METHODOLOGY

The objective of this evaluation was to assess what actions FHFA has taken to:

1. Assess the causes of the $1.2 billion loss due to Lehman's default;

2. Assess the measures put in place to prevent a recurrence of such losses in the future;

3. Recover the $1.2 billion from the Lehman bankruptcy estate;

4. Remediate the corporate governance issues identified in the wake of the $1.2 billion loss; and

5. Enhance Freddie Mac's counterparty and operational risk management.

To address its objective, FHFA-OIG interviewed senior FHFA officials who were responsible for monitoring and examining Freddie Mac at the time of the controversial loans to Lehman as well as officials from FHFA's Office of General Counsel. FHFA-OIG staff also interviewed senior personnel in Freddie Mac's Internal Audit Department.

FHFA-OIG reviewed documents related to the Lehman loans including, but not limited to: Lehman's bankruptcy pleadings, the report of the examiner in the Chapter 11 proceedings, and a database of documents collected from Freddie Mac and other custodians. Additionally, FHFA-OIG examined Freddie Mac Liquidity and Contingency policies and Counterparty Credit Risk Management policies that were in effect during the pendency of the Lehman transactions and afterwards. Likewise, FHFA-OIG examined FHFA's revised policies and examination modules addressing Counterparty Credit Risk Management for the Liquidity and Contingency portfolio of Freddie Mac and a series of written communications between FHFA and Freddie Mac following the conclusion of examination work conducted by the Agency.

FHFA-OIG also reviewed FHFA written materials such as a key management assessment, findings memoranda, reports of examinations for the credit risk and capital markets groups, Freddie Mac audit reports, and Freddie Mac's preliminary Special Investigation.

FHFA-OIG also reviewed Office of Management and Budget Circular A-123 provisions and requirements relating to management control systems as a benchmark for assessing Freddie Mac's controls relevant to these transactions.

As of the publication of this report, FHFA is actively engaged in recovering the $1.2 billion loss from Lehman, based on FHFA's determination that Lehman's improper conduct was the direct cause of the loss. This report does not analyze Lehman's risk management and control systems; nor does it make any findings regarding legal liability of the firm or any of its employees.

This evaluation was conducted under the authority of the Inspector General Act, and is in accordance with the *Quality Standards for Inspection and Evaluation* (January 2012), which was promulgated by the Council of the Inspectors General on Integrity and Efficiency. These standards require FHFA-OIG to plan and perform an evaluation that obtains evidence sufficient to provide reasonable bases to support the findings and recommendations made herein. FHFA-OIG believes that the findings and recommendations discussed in this report meet these standards.

The performance period for this evaluation was from August 2011 to November 2012.

# APPENDIX A:
# FHFA's Comments on Findings and Recommendations

 **Federal Housing Finance Agency**

## MEMORANDUM

TO:        George Grob, Deputy Inspector General for Evaluations

FROM:      Jon D. Greenlee, Deputy Director, Division of Enterprise Regulation
           Alfred Pollard, General Counsel

SUBJECT:   FHFA Response – *Freddie Mac's Unsecured Lending to Lehman Brothers Prior to
           Lehman's Bankruptcy* (EVL 2012-019)

DATE:      February 21, 2013

This memorandum transmits the Federal Housing Finance Agency's (FHFA or Agency)
management responses to the recommendations in the FHFA-OIG's draft report, *Case Study:
Freddie Mac's Unsecured Lending to Lehman Brothers Prior to Lehman's Bankruptcy*, EVL
2012-019. We appreciated the opportunity to provide feedback on this report and the FHFA-
OIG findings in the critical area of counterparty risk management.

The draft report describes events that resulted in the $1.2 billion unsecured loan made from
Freddie Mac to Lehman Brothers in 2008, which was not yet due at the time of Lehman's entry
into bankruptcy protection on September 15, 2008, and no portion of it has been repaid. We
agree with the critical importance of a strong risk management function at the Enterprises, and
will continue to focus on issues raised in the draft report. We have no additional comments on
the report's audit recommendations.

cc:    Edward DeMarco, Acting Director
       Richard Hornsby, Chief Operating Officer
       Bruce Crandlemire, Senior Advisor for IG Operations
       John Major, Internal Controls and Audit Follow-Up Manager

08-13555-mg   Doc 42025-2   Filed 01/10/14   Entered 01/10/14 18:56:48   Exhibit 2
Pg 47 of 210
08-13555-jmp   Doc 40066   Filed 09/13/13   Entered 09/13/13 17:01:43   Main Document
Pg 44 of 68

# ADDITIONAL INFORMATION AND COPIES

For additional copies of this report:

    Call FHFA-OIG at: 202-730-0880

    Fax your request to: 202-318-0239

    Visit the FHFA-OIG website at: www.fhfaoig.gov


To report alleged fraud, waste, abuse, mismanagement, or any other kind of criminal or noncriminal misconduct relative to FHFA's programs or operations:

    Call our Hotline at: 1-800-793-7724

    Fax your written complaint to: 202-318-0358

    Email us at: oighotline@fhfaoig.gov

    Write to us at:  FHFA Office of Inspector General
                  Attn: Office of Investigations – Hotline
                  400 Seventh Street, S.W.
                  Washington, DC 20024

# EXHIBIT B

| United States Bankruptcy Court/Southern District of New York | | **PROOF OF CLAIM** |
|---|---|---|

Lehman Brothers Holdings Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5076
New York, NY 10150-5076

| In Re:<br>Lehman Brothers Holdings Inc., et al.<br>Debtors. | Chapter 11<br>Case No. 08-13555 (JMP)<br>(Jointly Administered) |
|---|---|
| Name of Debtor Against Which Claim is Held<br>**Lehman Brothers Holdings Inc.** | Case No. of Debtor<br>**08-13555** |

**UNIQUE IDENTIFICATION NUMBER: 1000221282**

Filed: USBC - Southern District of New York
Lehman Brothers Holdings Inc., Et Al.
08-13555 (JMP)    0000033568

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503. Additionally, this form should not be used to make a claim for Lehman Programs Securities (See definition on reverse side.)

T

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)

LBH (CREDITOR.DBF,CREDNUM)CREDNUM # 1000221282******
FEDERAL HOME LOAN MORTGAGE CORPORATION
ATTN: MARK LANDMAN
LANDMAN, CORSI, BALLAINE & FORD P.C.
120 BROADWAY
NEW YORK, NY 10271

Telephone number: 212-238-4800     Email Address: mlandman@lcbf.com

☐ Check this box
this claim amends a previously filed claim.

**Court Claim Number:** _____
(If known)

Filed on: _____

Name and address where payment should be sent (if different from above)
George Kielman, Esq.
Federal Home Loan Mortgage Corporation
8200 Jones Branch Dr. - MS 202
McLean, VA  22102          George Kielman@
Telephone number: 703-903-2640   Email Address: freddiemac.com

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

1. **Amount of Claim as of Date Case Filed:** $ 1,202,241,875 (interest as of 9/15/08)
   If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete item 4.
   If all or part of your claim is entitled to priority, complete Item 5.
   If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete item 6.
   ☐ Check this box if all or part of your claim is based on a Derivative Contract.*
   ☐ Check this box if all or part of your claim is based on a Guarantee.*
   *IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.
   ☑ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is a based on a Derivative Contract or Guarantee.

2. **Basis for Claim:** see attached Addendum and exhibits
   (See instruction #2 on reverse side.)

3. **Last four digits of any number by which creditor identifies debtor:** _____
   3a. Debtor may have scheduled account as: _____
   (See instruction #3a on reverse side.)

4. **Secured Claim (See instruction #4 on reverse side.)**
   Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
   Nature of property or right of setoff: ☐ Real Estate   ☐ Motor Vehicle   ☐ Other
   Describe: _____
   Value of Property: $_____   Annual Interest Rate _____%
   Amount of arrearage and other charges as of time case filed included in secured claim, if any:
   $_____   Basis for perfection: _____
   Amount of Secured Claim: $_____   Amount Unsecured: $_____

6. **Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9):** $_____
   (See instruction #6 on reverse side.)

7. **Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.
8. **Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest. *(See definition of "redacted" on reverse side.)* If the documents are voluminous, attach a summary.
   DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
   If the documents are not available, please explain:

5. **Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.**

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

**Amount entitled to priority:**

$_____

*See attached re 12 USC 4617(b)(15) priority

FOR COURT USE ONLY

FILED
U.S. BANKRUPTCY COURT
S.D.N.Y.
2009 SEP 22   P 1:07

| Date:<br>9-18-09 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.<br>Raymond G. Romano, EVP<br>Chief Credit Officer     Raymond G. Romano |
|---|---|

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

## INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, there may be exceptions to these general rules.*

### Items to be completed in Proof of Claim form

**Name of Debtor, and Case Number:**
YOU MUST INDICATE THE SPECIFIC DEBTOR AGAINST WHICH YOUR CLAIM IS ASSERTED, INCLUDING THE NAME OF THE DEBTOR AND THE RELATED CASE NUMBER (DEBTORS AND CASE NUMBERS LISTED BELOW), IN THE SPACE ALLOTTED AT THE TOP OF THE CLAIM FORM.

| | | | |
|---|---|---|---|
| 08-13555 | Lehman Brothers Holdings Inc. | 08-13905 | CES Aviation LLC |
| 08-13600 | LB 745 LLC | 08-13906 | CES Aviation V LLC |
| 08-13885 | Lehman Brothers Commodity Services Inc. | 08-13907 | CES Aviation IX LLC |
| 08-13888 | Lehman Brothers Special Financing Inc. | 08-13908 | East Dover Limited |
| 08-13893 | Lehman Brothers OTC Derivatives Inc. | 09-10108 | Luxembourg Residential Properties Loan Finance S.a.r.l. |
| 08-13899 | Lehman Brothers Derivative Products Inc. | 09-10137 | BNC Mortgage LLC |
| 08-13900 | Lehman Commercial Paper Inc. | 09-10558 | Structured Asset Securities Corporation |
| 08-13901 | Lehman Brothers Commercial Corporation | 09-10560 | LB Rose Ranch LLC |
| 08-13902 | Lehman Brothers Financial Products Inc. | 09-12516 | LB 2080 Kalakaua Owners LLC |
| 08-13904 | Lehman Scottish Finance L.P. | 08-13664 | PAMI Statler Arms LLC |

If your Claim is against multiple Debtors, complete a separate form for each Debtor.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the Bankruptcy filing. Follow the instructions concerning whether to complete items 4, 5 and 6. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Use this space to report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**4. Secured Claim:**
Check the appropriate box and provide the requested information if the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See DEFINITIONS, below.) State the type and the value of property that secures the claim, attach copies of lien documentation, and state annual interest rate and the amount past due on the claim as of the date of the bankruptcy filing.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. §507(a).**
If any portion of your claim falls in one or more of the listed categories, check the appropriate box(es) and state the amount entitled to priority. (See DEFINITIONS, below.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9)**
State the value of any goods received by the debtor within 20 days before the date of commencement in which the goods have been sold to the debtor in the ordinary course of the debtor's business.

**7. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**8. Documents:**
Attach to this proof of claim form redacted copies documenting the existence of the debt and of any lien securing the debt. You may also attach a summary. You must also attach copies of documents that evidence perfection of any security interest. You may also attach a summary. FRBP 3001(c) and (d). Do not send original documents, as attachments may be destroyed after scanning.

**Date and Signature:**
The person filing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2), authorizes courts to establish local rules specifying what constitutes a signature. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. Attach a complete copy of any power of attorney. Criminal penalties apply for making a false statement on a proof of claim.

---

## _DEFINITIONS_

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**
A creditor is the person, corporation, or other entity owed a debt by the debtor on the date of the bankruptcy filing.

**Claim**
A claim is the creditor's right to receive payment on a debt that was owed by the debtor on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the Claims Agent at the following address:

Lehman Brothers Holdings Claims Processing
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, PO Box 5076
New York, NY 10150-5076

**Secured Claim Under 11 U.S.C. §506(a)**
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien. A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. §507(a)**
Priority claims are certain categories of unsecured claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor should redact and use only the last four digits of any social-security, individual's tax-identification, or financial-account number, all but the initials of a minor's name and only the year of any person's date of birth.

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

**Derivative Contract**
A contract that is any of (i) a "swap agreement" as such term is defined in section 101(53B) of the Bankruptcy Code or (ii) a "forward contract" as such term is defined in section 101(25) of the Bankruptcy Code. A cash-market purchase or sale of a security or loan (i.e. any purchase or sale of a security or loan for settlement within the standard settlement cycle for the relevant market), exchange-traded future or option, securities loan transaction, repurchase agreement in respect of securities or loans, and any guarantee or reimbursement obligations which would otherwise be included in the definition of such terms in the Bankruptcy Code shall not be considered a Derivative Contract for the purposes of this definition nor shall any notes, bonds, or other securities issued by the Debtors or their affiliates (including, but not limited to, Lehman Brothers Holdings Inc., Lehman Brothers Treasury Co. B.V., Lehman Brothers Bankhaus AG, Lehman Brothers Holdings plc, Lehman Brothers Securities N.V., and Lehman Brothers (Luxembourg) Equity Finance S.A.).

**Guarantee**
A promise, representation or agreement to answer for the payment of some debt or the performance of some duty in case of the failure of another person or entity who is liable in the first instance.

**Lehman Programs Securities**
Lehman Programs Securities means those securities included on the Lehman Programs Securities list available on http://www.lehman-docket.com as of July 27, 2009.

---

## _INFORMATION_

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim, or you may access the Claims Agent's system (http://www.lehman-docket.com) to view your filed proof of claim.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 *et seq.*), and any applicable orders of the bankruptcy court.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

In re                                              Chapter 11 Case No.
                                                   08-13555 (JMP)

LEHMAN BROTHERS HOLDINGS INC., et al.,             (Jointly Administered)

                        Debtors.

-----------------------------------------------------------x

## ADDENDUM TO PROOF OF CLAIM OF
## FEDERAL HOME LOAN MORTGAGE CORPORATION

1.      Federal Home Loan Mortgage Corporation in conservatorship (hereinafter

referred to as "Freddie Mac") is a government-sponsored enterprise that not only plays a critical

role in the United States mortgage finance market but also is inextricably interwoven into the

nation's financial system.  On September 6, 2008, the Federal Housing Finance Agency

("FHFA"), an independent agency of the United States Government, was appointed as Freddie

Mac's conservator (the "Conservator").  The goal of the conservatorship is to restore confidence

in Freddie Mac, enhance its capacity to fulfill its mission and mitigate the systemic risk that has

contributed to the instability in the current market.  Freddie Mac is filing this proof of claim in

these chapter 11 cases at the direction of the Conservator.

2.      In August 2008, Freddie Mac made two separate transactions for the transfer of

funds totaling $1.2 billion through the Federal Reserve System from Freddie Mac's account at

the Federal Reserve Bank of New York to Lehman Brothers Holdings Inc.'s ("LBHI," or the

"Debtor") account with Citibank.  The transactions were executed on August 19th and August

20th in the amounts of $450,000,000 and $750,000,000, respectively, and brokered through

Tullet Prebon, an interdealer broker.  A copy of the supporting documents is attached hereto as

Exhibit A.  Pursuant to the terms of the transaction, LBHI was scheduled to repay the funds on an "early return" basis; that is, prior to the opening of the capital markets, together with accrued interest on September 15, 2008.  In order to effect an "early return" repayment of the loan, LBHI was to set aside the repayment amount and request the requisite wire transfer prior to September 15, 2008 so that the transfer could be made on an "early return" basis prior to the opening of the capital markets on September 15, 2008.  Such transfer was not initiated, however, and, to date, Freddie Mac has not received payment of the $1.2 billion plus $2,241,875.00 in accrued interest. See Exhibit B.  Accordingly, Freddie Mac is asserting a claim for $1,202,241,875.00 which includes interest as of September 15, 2008.[1]

3.       Pursuant to 12 U.S.C. § 4617(b), as amended by P.L. 110-289, the Conservator has the powers necessary to locate and protect Freddie Mac's assets, which as a matter of law, have been taken over by the Conservator.  Pursuant to 12 U.S.C. § 4617(b)(15)(A), the Conservator is authorized to "avoid a transfer of any interest of an entity-affiliated party, or any person determined by the conservator ... to be a debtor of the regulated entity, in property, or any obligation incurred by such party or person that was made within 5 years of the date on which the Agency was appointed conservator ..., if such party or person voluntarily or involuntarily made such transfer or incurred such liability with the intent to hinder, delay, or defraud the regulated entity, the Agency, the conservator, or receiver."  Section 4617(b)(15)(D) further states that the Conservator's power to avoid a fraudulent transfer is "superior to any rights of a trustee or any other party (other than any party which is a Federal agency) under Title 11."  Therefore, the Conservator, on behalf of Freddie Mac, reserves all its rights pursuant to its

---

[1] Freddie Mac has filed a separate Proof of Claim for $885,839,087.33 related to derivative transactions and loan servicing related obligations.

statutory authorization, including with respect to the transfer of any property in which the Debtor had an interest to the extent such transfer was made with the intent to hinder or delay the "early return" payment of the $1.2 billion due and owing to Freddie Mac on September 15, 2008, for which claim is made hereunder, with any recovery on account of such claim being entitled to a priority recovery under Section 4617(b)(15)(D).

4.    In addition to the foregoing, by way of this Proof of Claim, Freddie Mac adopts and reasserts each and every claim scheduled by the Debtor as payable to Freddie Mac.

5.    Freddie Mac is filing this proof of claim in anticipation of the claims bar date (the "Bar Date"), which has been set as September 22, 2009, pursuant to the Court's July 2, 2009 Order pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) Establishing the Deadline for Filing Proofs of Claim, Approving the Form and Manner of Notice Thereof and Approving the Proof of Claim Form. Freddie Mac reserves the right to amend, modify, and/or supplement this proof of claim at any time, including, without limitation, for the purpose of asserting additional claims, whether arising from the transactions or documents described in Freddie Mac's proof of claim, this attachment, or otherwise. Freddie Mac also reserves its rights to assert any and all rights of setoff that it may have against the Debtor in respect of its claims, including, without limitation, the right to set off its claims against any claims that the Debtor (or any successor, assignee or person claiming through the Debtor, as the case may be) may assert against Freddie Mac or its successors or assigns, whether or not arising under the transactions set forth in this proof of claim. Freddie Mac also reserves its right to pursue claims (including, but not limited to, the claims described herein) against the Debtor based upon additional or alternative legal theories, and reserves the right to assert administrative expense claims.

6.    Freddie Mac further reserves its right to seek to have the reference withdrawn with respect to the subject matter of these claims, any objection or other proceedings commenced with respect thereto, or any other proceedings commenced in this case or otherwise involving Freddie Mac.  By filing this proof of claim, neither Freddie Mac nor the Conservator intends to submit to the jurisdiction of the Bankruptcy Court for any purpose other than the allowance of this claim for purposes of these chapter 11 cases.

```
TID                                          08192008-003463
Account Id                                   MS FED FUNDS
Status String                                PROC_DLVR/CONF
Txn Class                                    Funds Delivers
Type Code                                    1600
Amount                                       $450,000,000.00
(3000) Adj Reason Code
(3000) As of Adj Date
(3100) Sender's ABA                          021039513
(3100) Sender's Tele Name                    FHLMC INVESTOR PI
(3320) Sender Reference                      08192008 003463
(3400) Receiver's ABA                        021000089
(3400) Receiver's Tele Name                  CITIBANK NYC
(3600) Business Function Code
(3600) SWIFT Transaction Type Code           FFS
(3700) Charges: Detail
(3700) Charges: Currency Code 1
(3700) Charges: Senders Charges 1
(3700) Charges: Currency Code 2
(3700) Charges: Senders Charges 2
(3700) Charges: Currency Code 3
(3700) Charges: Senders Charges 3
(3700) Charges: Currency Code 4
(3700) Charges: Senders Charges 4
(3710) Inst Amt: Currency Code 1
(3710) Inst Amt: Amount
(3720) Exchange Rate
(4000) Intermediary's FI Id Code
(4000) Intermediary's FI Ident
(4000) Intermediary's FI Name
(4000) Intermediary's FI Addr
(4100) Benef's FI Id Code
(4100) Benef's FI Ident
(4100) Benef's FI Name
(4100) Benef's FI Addr
(4200) Beneficiary Id Code                   D
(4200) Beneficiary Ident                     40615202
(4200) Beneficiary Name                      LEHMAN BROTHERS HOLDING
(4200) Beneficiary Addr
(4320) Ref for Beneficiary
(4400) Acct Db Drwdown Id Code
(4400) Acct Db Drwdown Ident
(4400) Acct Db Drwdown Name
(4400) Acct Db Drwdown Addr
(5000) Originator Id Code                    D
(5000) Originator Ident                      487100
(5000) Originator Name                       FM HSA FED FUNDS
(5000) Originator Addr
(5100) Origin's FI Id Code
(5100) Origin's FI Ident
(5100) Origin's FI Name
(5100) Origin's FI Addr
(5200) Instructing FI Id Code
(5200) Instructing FI Ident
(5200) Instructing FI Name
(5200) Instructing FI Address
(5400) Account Cr in Drwdown
(6000) Origin. to Benef. info                OVERNIGHT FED FUNDS
(6100) Receiver's FI Info
(6110) Drwdown Db Acct Adv Code
(6110) Drwdown Db Acct Adv Info
(6200) Intermediary FI Info
(6210) Intermediary's FI Adv Code
(6210) Intermediary's FI Adv Info
(6300) Benef's FI Info
(6310) Benef's FI Adv Code
(6310) Benef's FI Adv Info
(6400) Beneficiary Info
(6410) Beneficiary Adv Code
(6410) Beneficiary Adv Info
(6420) Beneficiary MOP
(6420) Beneficiary Mop Info
(6430) Payment Limitation
(6500) FI to FI Info
(9000) Free Text
IMAD                                         20080819B1Q8283C000105
Message Disposition
Acceptance Timestamp
OMAD
Error field
Cost Center                                  NA
GL Account Cash                              NA
GL Account Offset                            NA
Group Id
Trade ID
XRef No.                                     ALAD.487  .-1762   .8
Repetitive ID                                MS LBHC CI
Counterparty ID
Settlement Date                              08/19/2008
Process Date                                 08/19/2008
Priority                                     5
```

```
MEMO                08/19/08 14:15:18.836 PEND_DLVR/HOLD Created
SAFEID              08/19/08 17:14:49.266 PEND_DLVR Released
F354356             08/19/08 17:14:54.346 PROC_DLVR/UNACK Delivered
F354356             08/19/08 17:16:02.410 PROC_DLVR/CONF Confirmed, IMAD:20080819B1Q8263C000105
safeid
```

```
Compliance Audit
08192008 17:14:54 OFAC Rules Passed {4200} Beneficiary Name          BROTHERS|(90000006)*LEHMAN:OCCURS;
```

```
TID                                   08202008-004807
Account Id                            MS FED FUNCS
Status String                         PROC_DLVR/CONF
Txn Class                             Funds Delivers
Type Code                             1600
Amount                                $750,000,000.00
(3000) Adj Reason Code
(3000) As of Adj Date
(3100) Sender's ABA                   021039513
(3100) Sender's Tele Name             FNLMC INVESTOR PI
(3320) Sender Reference               08202008 004807
(3400) Receiver's ABA                 021000089
(3400) Receiver's Tele Name           CITIBANK NYC
(3600) Business Function Code         FFS
(3600) SWIFT Transaction Type Code
(3700) Charges: Detail
(3700) Charges: Currency Code 1
(3700) Charges: Senders Charges 1
(3700) Charges: Currency Code 2
(3700) Charges: Senders Charges 2
(3700) Charges: Currency Code 3
(3700) Charges: Senders Charges 3
(3700) Charges: Currency Code 4
(3700) Charges: Senders Charges 4
(3710) Inst Amt: Currency Code 1
(3710) Inst Amt: Amount
(3720) Exchange Rate
(4000) Intermediary's FI Id Code
(4000) Intermediary's FI Ident
(4000) Intermediary's FI Name
(4000) Intermediary's FI Addr
(4100) Benef's FI Id Code
(4100) Benef's FI Ident
(4100) Benef's FI Name
(4100) Benef's FI Addr
(4200) Beneficiary Id Code            D
(4200) Beneficiary Ident              40615202
(4200) Beneficiary Name               LEHMAN BROTHERS HOLDING
(4200) Beneficiary Addr
(4320) Ref for Beneficiary
(4400) Acct Db Drwdown Id Code
(4400) Acct Db Drwdown Ident
(4400) Acct Db Drwdown Name
(4400) Acct Db Drwdown Addr
(5000) Originator Id Code             D
(5000) Originator Ident               487100
(5000) Originator Name                FM MSA FED FUNDS
(5000) Originator Addr
(5100) Origin's FI Id Code
(5100) Origin's FI Ident
(5100) Origin's FI Name
(5100) Origin's FI Addr
(5200) Instructing FI Id Code
(5200) Instructing FI Ident
(5200) Instructing FI Name
(5200) Instructing FI Address
(5400) Account Cr in Drwdown
(6000) Origin. to Benef. info         OVERNIGHT FED FUNDS
(6100) Receiver's FI Info
(6110) Drwdown Db Acct Adv Code
(6110) Drwdown Db Acct Adv Info
(6200) Intermediary FI Info
(6210) Intermediary's FI Adv Code
(6210) Intermediary's FI Adv Info
(6300) Benef's FI Info
(6310) Benef's FI Adv Code
(6310) Benef's FI Adv Info
(6400) Beneficiary Info
(6410) Beneficiary Adv Code
(6410) Beneficiary Adv Info
(6420) Beneficiary MOP
(6420) Beneficiary Mop Info
(6430) Payment Limitation
(6500) FI to FI Info
(9000) Free Text
IMAD                                  20080820B1Q8284C000032
Message Disposition
Acceptance Timestamp
OMAD
Error field
Cost Center                           NA
GL Account Cash                       NA
GL Account Offset                     NA
Group Id
Trade ID
XRef No.                              ALAD.487  .-1767   .S
Repetitive ID                         MS LBNC CI
Counterparty ID
Settlement Date                       08/20/2008
Process Date                          08/20/2008
Priority                              S
```

```
MEMO
SAFEID          08/20/08 10:52:51.513 PEND_DLVR/HOLD Created
F351598         08/20/08 11:40:19.356 PEND_DLVR Released
F351598         08/20/08 11:41:16.513 PROC_DLVR/UNACK Delivered
safeid          08/20/08 11:42:26.250 PROC_DLVR/CONF Confirmed, IMAD:20080820B1Q8284C000032

Compliance Audit
08202008 11:41:16 OPAC Rules Passed (4200) Beneficiary Name          BROTHERS[(90000006)*LEHMAN:OCCURS;
```



ATTN: TOMMY FUQUA
A/C FREDDIE MAC FED FUNDS
1551 PARK RUN DR
MAIL STOP D5N
MCLEAN, VA 22102-3110

Invoice Date :   ████████   Page :   1

Reference :   24404/15/28/00/0808-137695

**The following deals were arranged by the EURODOLLAR CASH division.**

| Date | Deal # | Counterparty | From | To | Days | Rate | Notional Amount | | Amount |
|------|--------|--------------|------|-----|------|------|-----------------|---|--------|
| 01-Aug-08 | 73130 | SOCIETE GENERALE-NEW YORK. | 8/01/08 | 8/15/08 | 14 | 2.28000 LN | 250,000,000.00 | US | 2,100.00 |
| 05-Aug-08 | 75243 | RBS CITIZENS BANK NA - RI | 8/05/08 | 8/15/08 | 10 | 2.28000 LN | 300,000,000.00 | US | 1,800.00 |
| 20-Aug-08 | 86093 | US CENTRAL CU-LENEXA | 8/20/08 | 9/15/08 | 26 | 2.50000 LN | 500,000,000.00 | US | 7,800.00 |
| 21-Aug-08 | 86985 | UNION BK OF CAL-L.A. | 8/21/08 | 9/15/08 | 25 | 2.43000 LN | 200,000,000.00 | US | 3,000.00 |
| 25-Aug-08 | 88685 | BK OF IRELAND-STAMFORD | 8/25/08 | 9/15/08 | 21 | 2.37500 LN | 200,000,000.00 | US | 2,520.00 |
| 26-Aug-08 | 89518 | NATIXIS - NY | 8/26/08 | 9/15/08 | 20 | 2.35000 LN | 150,000,000.00 | US | 1,800.00 |
| 28-Aug-08 | 91244 | BCO BILBAO VIZ ARG SA-NY | 8/28/08 | 9/15/08 | 18 | 2.77000 LN | 250,000,000.00 | US | 2,700.00 |
| 29-Aug-08 | 92082 | WESTERN CORP FCU-SAN DIMAS | 8/29/08 | 9/15/08 | 17 | 2.37000 LN | 400,000,000.00 | US | 4,080.00 |

SHORT DATES          BROKERAGE SUBTOTAL :   44,790.00

BROKERAGE TOTAL IN USD :   44,790.00

# Freddie Mac

| **Freddie Mac** | NEW TRADE | | *signature* | | *signature* | |
|---|---|---|---|---|---|---|
| **MSA-FRB** | | | PMG: | AMM | Trade Ops: | JSL |
| Trade No. 1080, Vs. 1 | | | | | | |
| Aug 19, 2008 18:05:07 GMT | **LEND** | **LBHC CASH/FEDF** | | | **2.55000 Sep 15, 2008** | |

| Asset ID: | B5A0703R7 | | Payment Delay: | 0 | | Trade Date: | Aug 19, 2008 |
|---|---|---|---|---|---|---|---|
| Ticker: | LBHC | | Date Convention: | ACT/360 | | Settle Date: | Aug 19, 2008 |
| Coupon: | 2.55000 | | Accrual Date: | Aug 19, 2008 | | Counterparty: | LBHC |
| Coupon Type: | MAT | | First Coupon Date: | Sep 15, 2008 | | LEHMAN BROTHERS HOLDINGS INC. | |
| Frequency: | ZERO | | Next Pay Date: | Sep 15, 2008 | | Counterparty Cont | MARTIN WALSH |
| Reset Term: | | | Odd First Pmt: | ☐ Yes ☑ No | | | |
| Maturity Date: | Sep 15, 2008 | | AMT: | ☐ Yes ☑ No | | Original Par: | 450,000,000.000 |
| Issue Date: | Aug 19, 2008 | | ERISA: | ☐ Yes ☐ No | | Factor: | 1.000000000 |
| Min Trade Size: | N/A | | 144A: | ☐ Yes ☑ No | | Factor Date: | |
| Min Trade Increment: | N/A | | Notional: | ☐ Yes ☑ No | | Current Par: | 450,000,000.000 |

**General Use**
  Early Return for Trust
**Delivery Instructions**
  FEDFUND/MS LBHC CI
  BANK NAME:            CITIBANK NYC
  ABA#:                 021000089
  A/C#:                 40815202
  A/C NAME:             LEHMAN BROTHERS HOLDING
  BANK TO BANK:         OVERNIGHT FED FUNDS
**Miscellaneous Information**
  TrdPurpose:           MSA
**Fifo Information**

| trade | relation | amount |
|---|---|---|
| 710 | SPEC | -450,000,000.00 |

| | |
|---|---|
| **Price:** | **100.000** |
| | 100.000000000 |
| **Principal:** | **(450,000,000.00)** |
| **Interest:** | **0.00** |
| **Total Charges:** | **0.00** |
|   Broker Commission: | (7,290.00) |
| **Net Money:** | **(450,000,000.00)** |
| **Currency:** | USD |
| **Net Cash Flow:** | **OUT** |

| | |
|---|---|
| Exchange rate: | |
| Discount: | |
| Option Type: | |

| | |
|---|---|
| Prepay: | 100.00 |
| Yield: | 2.550 |
| YTC: | |
| Duration: | 0.07406 |
| Convexity: | 0.00000 |

| S & P | Moody | DBRS |
|---|---|---|
| | | |
| **Fitch** | **NAIC** | |
| | | |

| | | |
|---|---|---|
| Discretionary: | ☐ Yes | ☑ No |
| Liquid: | ☑ Yes | ☐ No |
| Segregate: | ☑ Yes | ☐ No |
| Release: | ☐ Yes | ☑ No |

| | |
|---|---|
| Exec: | 2008-08-19 17:35:38 GMT |
| Exec Source: | Auth Time |
| Executing Broker: | PREB |
| | PREBON |

*(vertical text, right margin)* Mortgage Securities Account (MSA-FRB)   Trade No. 1080, Vs. 1   FreddieMac

*(vertical text, left margin)* Created: Sep 15, 2008 16:25:29 GMT

| A/C# NA | Copyright © 2008 BlackRock Inc. All Rights Reserved. | NO CUSTODIAN |
|---|---|---|

# Freddie Mac   NEW TRADE

| PMG: | rm_mat | Trade Ops: | rm_mat |

**MSA-FRB**
Trade No. 710, Vs. 1
Sep 12, 2008 22:30:48 GMT

## MAT   LBHC
CASH/FEDF

**2.55000 Sep 15, 2008**

| Asset ID: | B5A0703R7 | Payment Delay: | 0 | Trade Date: | Sep 15, 2008 |
|---|---|---|---|---|---|
| Ticker: | LBHC | Date Convention: | ACT/360 | Settle Date: | Sep 15, 2008 |
| Coupon: | 2.55000 | Accrual Date: | | Broker: | |
| Coupon Type: | MAT | First Coupon Date: | Sep 15, 2008 | | UNKNOWN |
| Frequency: | ZERO | Next Pay Date: | | Broker Contact: | rm_mat |
| Reset Term: | | Odd First Pmt: | ☐ Yes ☑ No | | |
| Maturity Date: | Sep 15, 2008 | AMT: | ☐ Yes ☑ No | Original Par: | 450,000,000.000 |
| Issue Date: | Aug 19, 2008 | ERISA: | ☐ Yes ☐ No | Factor: | 1.000000000 |
| Min Trade Size: | N/A | 144A: | ☐ Yes ☑ No | Factor Date: | |
| Min Trade Increment: | N/A | Notional: | ☐ Yes ☑ No | Current Par: | 450,000,000.000 |

**Fifo Information**

| trade | relation | amount |
|---|---|---|
| 1080 | SPEC | -450,000,000.00 |

| Price: | 100.000 |
|---|---|
| | 100.000000000 |
| Principal: | 450,000,000.00 |
| Interest: | 0.00 |
| Commission: | 0.00 |
| Net Money: | 450,000,000.00 |
| Currency: | USD |
| Net Cash Flow: | IN |

| Exchange rate: | |
|---|---|
| Discount: | |
| Option Type: | |

| Prepay: | 0.00 |
|---|---|
| Yield: | |
| YTC: | |
| Duration: | 0.00000 |
| Convexity: | 0.00000 |

| S & P | Moody | DBRS |
|---|---|---|
| Fitch | NAIC | |

| Discretionary: | ☐ Yes ☑ No |
|---|---|
| Liquid: | ☑ Yes ☐ No |
| Segregate: | ☐ Yes ☑ No |
| Release: | ☑ Yes ☐ No |

| Exec: | 2008-09-12 22:30:48 GMT |
|---|---|
| Exec Source: | Auth Time |

Mortgage Securities Account (MSA-FRB)
Trade No. 710, Vs. 1

FreddieMac

Created Sep 15, 2008 16:23:39 GMT

A/C# NA

Copyright © 2008 BlackRock Inc. All Rights Reserved.

NO CUSTODIAN

| **Freddie Mac** | NEW TRADE | A. Dow D'Henry | Thoms E. Fogan |
|---|---|---|---|

**MSA-FRB**
Trade No. 1084, Vs. 1
Aug 20, 2008 14:45:31 GMT

PMG:          AMM    Trade Ops:       TEF

**LEND  LBHC**
**CASH/FEDF**                     **2.55000 Sep 15, 2008**

| | | |
|---|---|---|
| **Asset ID:** B5A070KA5 | **Payment Delay:** 0 | **Trade Date:** Aug 20, 2008 |
| **Ticker:** LBHC | **Date Convention:** ACT/360 | **Settle Date:** Aug 20, 2008 |
| **Coupon:** 2.55000 | **Accrual Date:** Aug 20, 2008 | **Counterparty:** LBHC |
| **Coupon Type:** MAT | **First Coupon Date:** Sep 15, 2008 | LEHMAN BROTHERS HOLDINGS INC. |
| **Frequency:** ZERO | **Next Pay Date:** Sep 15, 2008 | **Counterparty Cont** MARTY WALSH |
| **Reset Term:** | **Odd First Pmt:** ☐ Yes ☑ No | |
| **Maturity Date:** Sep 15, 2008 | **AMT:** ☐ Yes ☑ No | **Original Par:** 750,000,000.000 |
| **Issue Date:** Aug 20, 2008 | **ERISA:** ☐ Yes ☑ No | **Factor:** 1.000000000 |
| **Min Trade Size:** N/A | **144A:** ☐ Yes ☑ No | **Factor Date:** |
| **Min Trade Increment:** N/A | **Notional:** ☐ Yes ☑ No | **Current Par:** 750,000,000.000 |

**General Use**
  Early Return for Trust
**Delivery Instructions**
  FEDFUND/MS LBHC CI
  **BANK NAME:** CITIBANK NYC
  **ABA#:** 021000089
  **A/C#:** 40615202
  **A/C NAME:** LEHMAN BROTHERS HOLDING
  **BANK TO BANK:** OVERNIGHT FED FUNDS
**Miscellaneous Information**
  TrdPurpose: MSA
**Fifo Information**

| trade | relation | amount |
|---|---|---|
| 711 | SPEC | -750,000,000.00 |

| | |
|---|---|
| **Price:** | 100.000 |
| | 100.000000000 |
| **Principal:** | (750,000,000.00) |
| **Interest:** | 0.00 |
| **Total Charges:** | 0.00 |
| Broker Commission: | (11,700.00) |
| **Net Money:** | (750,000,000.00) |
| **Currency:** | USD |
| **Net Cash Flow:** | OUT |

| | |
|---|---|
| **Exchange rate:** | |
| **Discount:** | |
| **Option Type:** | |

| | |
|---|---|
| **Prepay:** | 100.00 |
| **Yield:** | 2.550 |
| **YTC:** | |
| **Duration:** | 0.07132 |
| **Convexity:** | 0.00000 |

| S & P | Moody | DBRS |
|---|---|---|
| | | |
| **Fitch** | **NAIC** | |
| | | |

| | |
|---|---|
| **Discretionary:** | ☐ Yes ☑ No |
| **Liquid:** | ☑ Yes ☐ No |
| **Segregate:** | ☑ Yes ☐ No |
| **Release:** | ☐ Yes ☑ No |

| | |
|---|---|
| **Exec:** | 2008-08-20 13:49:44 GMT |
| **Exec Source:** | Auth Time |
| **Executing Broker:** | PREB |
| | PREBON |

Mortgage Securities Account (MSA-FRB)
Trade No. 1084, Vs. 1

FreddieMac

Created: Sep 15, 2008 18:25:48 GMT

A/C# NA

Copyright © 2008 BlackRock Inc. All Rights Reserved.

NO CUSTODIAN

# Freddie Mac | NEW TRADE

**MSA-FRB**
Trade No. 711, Vs. 1
Sep 12, 2008 22:30:48 GMT

PMG:                    rm_mat    Trade Ops:    rm_mat

## MAT    LBHC
CASH/FEDF                              2.55000 Sep 15, 2008

| | | | |
|---|---|---|---|
| Asset ID: | B5A070KA5 | Payment Delay: | 0 |
| Ticker: | LBHC | Date Convention: | ACT/360 |
| Coupon: | 2.55000 | Accrual Date: | |
| Coupon Type: | MAT | First Coupon Date: | Sep 15, 2008 |
| Frequency: | ZERO | Next Pay Date: | |
| Reset Term: | | Odd First Pmt: | ☐ Yes ☑ No |
| Maturity Date: | Sep 15, 2008 | AMT: | ☐ Yes ☑ No |
| Issue Date: | Aug 20, 2008 | ERISA: | ☐ Yes ☐ No |
| Min Trade Size: | N/A | 144A: | ☐ Yes ☑ No |
| Min Trade Increment: | N/A | Notional: | ☐ Yes ☑ No |

| Trade Date: | Sep 15, 2008 |
|---|---|
| Settle Date: | Sep 15, 2008 |
| Broker: | |
| | UNKNOWN |
| Broker Contact: | rm_mat |
| Original Par: | 750,000,000.000 |
| Factor: | 1.000000000 |
| Factor Date: | |
| Current Par: | 750,000,000.000 |

**Fifo Information**

| trade | relation | amount |
|---|---|---|
| 1084 | SPEC | -750,000,000.00 |

| | |
|---|---|
| Price: | 100.000 |
| | 100.000000000 |
| Principal: | 750,000,000.000 |
| Interest: | 0.00 |
| Commission: | 0.00 |
| Net Money: | 750,000,000.00 |
| Currency: | USD |
| Net Cash Flow: | IN |

| | |
|---|---|
| Exchange rate: | |
| Discount: | |
| Option Type: | |

| | |
|---|---|
| Prepay: | 0.00 |
| Yield: | |
| YTC: | |
| Duration: | 0.00000 |
| Convexity: | 0.00000 |

| S & P | Moody | DBRS |
|---|---|---|
| | | |
| Fitch | NAIC | |
| | | |

| | |
|---|---|
| Discretionary: | ☐ Yes ☑ No |
| Liquid: | ☑ Yes ☐ No |
| Segregate: | ☐ Yes ☑ No |
| Release: | ☑ Yes ☐ No |

| | |
|---|---|
| Exec: | 2008-09-12 22:30:48 GMT |
| Exec Source: | Auth Time |

Created: Sep 15, 2008 16:24:05 GMT

Mortgage Securities Account (MSA-FRB)
Trade No. 711, Vs. 1

FreddieMac

A/C# NA

Copyright © 2008 BlackRock Inc. All Rights Reserved.

NO CUSTODIAN

09/17/2008  13:53   281-557-5982          TULLETT PREBON                    PAGE  01/02

```
                                                                              S2
 TLR0012        85363 V.00          DETAILS
eal date:   8/19/08  Val date:  8/19/08  Due date:  9/15/08   Ent date:  8/19/08
eal number: 85363   Batch #:  999  Section #: 15   Type: 74   Chg date:  8/19/08
umber of Days   27
ELLER  FREDDIE MAC MSA FED FUNDS        BUYER    LEHMAN BROS HLDG INC (NY)
urr1:  US            Thru1:  PYN        Curr2:              Thru2: PYN
                  Dsk 20 EURODOLLAR     Bro:                  Dsk 27 FED FUNDS
ro:                                     Broker 20257       FARMER,KEVIN
roker 20052       WALSH, MARTIN         Rebate:            .00  RD 000
ebate:            .00  RD 000           Broker
roker                                   Corres BRO:           .00  Swap#
orres BRO:          .00                 Code:              Old deal#:
ate:  000255        Amount:     450,000,000              BPrice:
Rate:               SPrice:             BRate:
el amt:                                 Del amt:
ay FEDERAL RESERVE BK-N.Y.              Repay FEDERAL RESERVE BK-N.Y.
nstruction ACC FHLMC INVESTOR PI        Instruction
/C FREDDIE MAC MSA FED FUNDS            A/C CITIBANK NA-NY
nstruction ABA 0210-3951-3 ACC 487100   Instruction ABA 0210-0008-9
AV .                                    FAV LEHMAN BROS HLDG INC (NY)
nstruction *EARLY RETURN BY 9:30AM      Instruction ACC 40615202
pecial instr.
 F9=NO RE-TLX                                        F10=Pay Ins.
                                        F6=Retlx F7=Tlx mnt F8=Tlx Inq
```

09/17/2008  13:53    201-557-5902         TULLETT PREBON                    PAGE  02/02
86087 V.00              DETAILS                                       S2
**Deal date:**  8/20/08   **Val date:**  8/20/08  **Due date:**   9/15/08   **Ent date:**   8/20/08
**Deal number:** 86087   **Batch #:**  999  **Section #:** 15  **Type:** 74  **Chg date:**   8/20/08
**Number of Days**   26
**SELLER**  FREDDIE MAC MSA FED FUNDS          **BUYER**   LEHMAN BROS HLDG INC (NY)
**Curr1:**  US              **Thru1:**  PYN    **Curr2:**            **Thru2:** PYN
**Bro:**                    Dsk 20 EURODOLLAR   **Bro:**             Dsk 27 FED FUNDS
Broker 20052        WALSH, MARTIN              Broker 20257        FARMER,KEVIN
**Rebate:**         .00  RD 000               **Rebate:**        .00  RD 000
Broker                                        Broker
**Corres BRO:**          .00                  **Corres BRO:**          .00  **Swap#**
**Rate:**    000255      **Amount:**      750,000,000  **Code:**          **Old deal#:**
**SRate:**              **SPrice:**          **BRate:**                **BPrice:**
**Del amt:**                                  **Del amt:**
**Pay** FEDERAL RESERVE BK-N.Y.               **Repay** FEDERAL RESERVE BK-N.Y.
**Instruction** ACC FHLMC INVESTOR PI         **Instruction**
**A/C** FREDDIE MAC MSA FED FUNDS             **A/C** CITIBANK NA-NY
**Instruction** ABA 0210-3951-3 ACC 487100    **Instruction** ABA 0210-0008-9
**FAV** .                                     **FAV** LEHMAN BROS HLDG INC (NY)
**Instruction** *EARLY RETURN BY 9:30AM       **Instruction** ACC 40615202
**Special instr.**
 F9=NO RE-TLX

                                              F10=Pay Ins.
                                              F6=Retlx F7=Tlx mnt F8=Tlx Inq



| Fund | Td Num | CUSIP | Ticker/Coupon/Maturity | Counterparty | Tran Type | Orig Face | Net Money | Group/Type | Trade Price | Trade Date | Settle Date | Int @ Mat | Maturity |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MSA-FRB | 1090 | B54070367 | LBHC 2.550 09/15/2008 | LBHC | LEND | 450,000,000.00 | -450,000,000.00 | CASH/FEDF | 100 | 8/19/2008 | 8/19/2008 | -860,625.00 | 9/15/2008 |
| MSA-FRB | 1094 | B54070605 | LBHC 2.550 09/15/2008 | LBHC | LEND | 750,000,000.00 | -750,000,000.00 | CASH/FEDF | 100 | 8/20/2008 | 8/20/2008 | -1,381,250.00 | 9/15/2008 |

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x
                                :

In re                           :    Chapter 11 Case No.
                                :

LEHMAN BROTHERS HOLDINGS INC., *et al.*,   :    08-13555 (JMP)
                                :

           Debtors.           :    (Jointly Administered)
                                :
                                :
------------------------------------------------------------------x

**ORDER PURSUANT TO SECTIONS 105(a), 502, 1122(b), AND 1142(b)
OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3013
CLASSIFYING AND ALLOWING THE CLAIM FILED BY THE FEDERAL
HOME LOAN MORTGAGE CORPORATION (CLAIM NO. 33568) IN LBHI CLASS 3**

Upon the motion, dated September 13, 2013 (the "Motion"),[1] of Lehman Brothers

Holdings Inc., as Plan Administrator under the Modified Third Amended Joint Chapter 11 Plan

of Lehman Brothers Holdings Inc. and Its Affiliated Debtors (the "Plan"), pursuant to sections

105(a), 502, 1122(a), and 1142(b) of title 11 of the United States Code and Rule 3013 of the

Federal Rules of Bankruptcy Procedure, seeking to classify and allow proof of claim number

33568 filed by the Federal Home Loan Mortgage Corporation (the "Claim") in LBHI Class 3, as

more fully set forth in the Motion; and the Court having jurisdiction to consider the Motion and

the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Amended

Standing Order of Reference M-431, dated 31, 2012 (Preska, C.J.); and consideration of the

Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b);

and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and

proper notice of the Motion having been provided in accordance with the procedures set forth in

the second amended order entered June 17, 2010 governing case management and administrative

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion.

procedures [ECF No. 9635]; and it appearing that no other or further notice need be provided; and the Court having found and determined that the relief sought in the Motion is in the best interests of the Chapter 11 Estates, their creditors, and all parties in interest and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is:

ORDERED that the relief requested in the Motion is granted to the extent provided herein; and it is further

ORDERED that the Claim shall (i) be allowed against LBHI in the fixed, liquidated amount of [$1,202,241,875.00]; and (ii) be classified as an unsecured claim under the Plan in LBHI Class 3; and it is further

ORDERED that LBHI shall no longer be required to maintain the reserve for the Claim required by paragraph 2 of the Stipulation and the Claim shall be treated in accordance with section 8.4 of the Plan and the *Order Authorizing Use of Non-Cash Assets in Lieu of Available Cash as Reserves for Disputed Claims Pursuant to Section 8.4 of the Debtors' Confirmed Joint Chapter 11 Plan* [ECF No. 25641]; and it is further

ORDERED that this Court shall retain jurisdiction with respect to all matters arising from or related to this Order.

Dated: [ ], 2013
    New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE

2

# EXHIBIT B

Hearing Date and Time: October 24, 2013 at 10:00 a.m. (Eastern Time)

ARNOLD & PORTER LLP
399 Park Avenue
New York, New York  10022
Telephone:  (212) 715-1000
Facsimile:  (212) 715-1399
Michael J. Canning
Richard M. Alexander
Nancy G. Milburn

*Attorneys for the Federal Housing Finance Agency as*
*Conservator of the Federal Home Loan Mortgage Corporation*

LANDMAN CORSI BALLAINE & FORD P.C.
120 Broadway
New York, New York 10271
Telephone:  (212) 238-4800
Facsimile:  (212) 238-4848
Mark S. Landman

*Attorneys for the Federal Home Loan Mortgage Corporation*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 Case No. 08-13555 (JMP) |
|  | : |  |
| LEHMAN BROTHERS HOLDINGS INC., | : |  |
| *et al.*, | : |  |
|  | : | Jointly Administered |
| Debtors. | : |  |

**OPPOSITION OF THE FEDERAL HOUSING FINANCE AGENCY AND THE
FEDERAL HOME LOAN MORTGAGE CORPORATION TO LEHMAN BROTHERS
HOLDINGS INC.'S MOTION TO CLASSIFY AND ALLOW THE CLAIM FILED BY
THE FEDERAL HOME LOAN MORTGAGE CORPORATION
(CLAIM NO. 33568) IN LBHI CLASS 3**

The Federal Housing Finance Agency ("FHFA" or "Conservator"), as Conservator of the Federal Home Loan Mortgage Corporation ("Freddie Mac"), pursuant to the Housing and Economic Recovery Act of 2008 ("HERA"), 12 U.S.C. § 4501, et seq., and Freddie Mac, hereby oppose (the "Opposition")[1] the *Motion to Classify and Allow the Claim Filed by the Federal Home Loan Mortgage Corporation (Claim No. 33568) in LBHI Class 3* (the "Motion to Classify") filed by Lehman Brothers Holdings Inc. ("LBHI" or the "Plan Administrator"), as Plan Administrator under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings, Inc. and Its Affiliated Debtors (the "Plan"), in the Bankruptcy Court on September 13, 2013 [Docket No. 40066]. In support of this Opposition, FHFA and Freddie Mac respectfully represent as follows:

## PRELIMINARY STATEMENT

1.    In its Motion to Classify, LBHI seeks to have this Court (i) classify and allow as a senior unsecured claim in LBHI Class 3 under the Plan, the priority claim timely filed against LBHI on account of unpaid loans in an undisputed amount of $1.2 billion, plus interest thereon, provided to LBHI by Freddie Mac (the "HERA Priority Claim")[2] less than one month before LBHI and certain of its subsidiaries commenced with this Court voluntary cases (the "Chapter 11 Cases") under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code"), rather than as an LBHI Class 1 Claim entitled to a priority recovery under HERA, as asserted by Freddie Mac in its Proof of Claim; and (ii) order the release of a cash reserve of $1.2 billion that LBHI agreed to set aside pending resolution of the HERA Priority Claim, without regard to the fact that such reserve was established pursuant to a stipulation among the parties that was so

---

[1]    LBHI agreed to consensually extend FHFA's and Freddie Mac's time to respond to the Motion to Classify through October 17, 2013.

[2]    The HERA Priority Claim is attached hereto as Exhibit A.

ordered by this Court and agreed to as part of the consideration for the resolution of FHFA's and Freddie Mac's objections to the Plan and to specifically ensure payment of the HERA Priority Claim in the event such claim is determined to be entitled to a priority recovery pursuant to Section 4617(b)(15)(D) of HERA.

2.    Moreover, without disputing that the HERA Priority Claim is a valid claim, LBHI erroneously asserts that although HERA may empower FHFA with a right to recover fraudulent transfers from third-party transferees of LBHI, it does not provide for a priority recovery against the LBHI bankruptcy estate.  LBHI also erroneously asserts that there is no intention of Congress expressed in HERA that the Conservator should have any priority rights in respect of property of a Chapter 11 debtor.  LBHI further asserts without basis that Freddie Mac's and FHFA's failure to commence any avoidance action against third parties, or otherwise to prosecute their claim under HERA, now precludes Freddie Mac and FHFA from having any superior rights, or any entitlement to a priority recovery from property of LBHI.  Finally, LBHI claims that the continued maintenance of the $1.2 billion reserve is unfairly prejudicial to LBHI's other creditors.

3.    LBHI is wrong on all accounts—asserting arguments that misstate and mischaracterize HERA, misrepresent the facts, and ignore relevant case law in this Circuit.  In the first instance, LBHI distorts the facts as to the prosecution of the HERA Priority Claim by suggesting that Freddie Mac and FHFA have been dilatory in their pursuit of the HERA Priority Claim.  For more than two years, however, Freddie Mac/FHFA have reached out to LBHI and its representatives on a continuing basis in an effort to address and resolve the HERA Priority Claim.  Rather than engage in purposeful discussions, LBHI has instead filed the Motion to Classify, seeking to reclassify the HERA Priority Claim and to release the $1.2 billion reserve

without regard to its prior agreements set forth in the Plan and the related stipulation, all in an effort to now avoid the merits of the HERA Priority Claim and FHFA's Congressionally-mandated priority established under HERA.

4.    In the Motion to Classify, LBHI would have the Court believe that HERA does not alter or affect the priority rights of creditors as set forth in Section 507 of the Bankruptcy Code, and that Congress did not intend for HERA to otherwise grant the Conservator a priority recovery in a bankruptcy proceeding in respect of any valid claims arising under Section 4617(b)(15)(A). That is an unsupportable interpretation. In fact, the intent of Congress could not be clearer—Section 4617(b)(15)(D) specifically provides that "[t]he rights under this paragraph of the conservator or receiver described under subparagraph (A) shall be superior to any rights of a trustee or any other party (other than any party which is a Federal agency) under title 11," and thereby grants the Conservator rights that are superior not only to a Chapter 11 trustee, but to "any other party" under title 11. Indeed, LBHI entered into an agreement with Freddie Mac and FHFA that in the event it is determined that Freddie Mac and FHFA are entitled to a claim under Section 4617(b)(15)(A) in respect of the HERA Priority Claim, they shall receive a priority recovery on account of such claim pursuant to the confirmed Plan and the order of this Court approving the Plan and related stipulation among the parties setting aside the $1.2 billion reserve that LBHI now seeks wrongfully to divert to other creditors.

5.    LBHI argues that to the extent that HERA grants the Conservator the right to a priority recovery in respect of claims found to be fraudulent as to Freddie Mac or FHFA under Section 4617(b)(15)(A), HERA merely provides the Conservator with the authority to avoid transfers made by LBHI to third-party transferees, and to recover such transfers only from such third party transferees to the extent such transfers were made by LBHI with the intent to hinder,

3

delay, or defraud Freddie Mac. LBHI further erroneously suggests that because Freddie Mac and FHFA failed to identify any specific transfers to third parties in the Proof of Claim in respect of the HERA Priority Claim, or to initiate actions against any such third-party transferees, there are no "superior" rights to the recovery of any property under HERA. In fact, HERA does not limit the Conservator's recovery to amounts transferred by a debtor of a regulated entity to third parties. Pursuant to Section 4617(b)(15)(A), HERA authorizes FHFA, as Conservator of Freddie Mac, to avoid and recover not only the value of any property transferred, but also any obligation incurred, in each case to the extent any such transfer was made or such obligation was incurred with the intent to hinder, delay, or defraud such regulated entity or FHFA, with any such claim recoverable from such debtor or the bankruptcy estate of such debtor.[3] LBHI is clearly such a party under HERA.

6.    Additionally, and not in lieu of the Conservator's right to recover from a debtor of a regulated entity in respect of a claim under Section 4617(b)(15)(A), HERA also grants the Conservator the permissive right under Section 4617(b)(15)(B) to seek recovery directly from any third-party transferee, or any immediate or mediate transferee, that received a transfer from a debtor of a regulated entity, to the extent such transfer gives rise to a claim under Section 4617(b)(15)(A). This additional right to proceed against third parties is not the exclusive remedy available to FHFA, however, but supplements the Conservator's right under subparagraph (A) to avoid any transfers and obligations fraudulently made or incurred, and to recover the amount of the avoided debt or funds transferred from the offending debtor of the regulated entity or its bankruptcy estate.

---

[3]    The rights of FHFA in this regard are also applicable with respect to any transfers made or obligations incurred by an entity-affiliated party pursuant to Section 4617(b)(15)(A).

7.     LBHI's unfounded suggestion that Freddie Mac and FHFA have been dilatory in
that they should have identified fraudulent transfers and initiated separate, direct actions against
third-party transferees some time ago is inapposite of the guidance and direction provided by the
Second Circuit in *In re Colonial Realty Co.* 980 F.2d 125 (2d Cir. 1992).  Specifically, in
addressing the interaction between a debtor and a government agency with respect to the
recovery of transfers that were potentially fraudulent as to both the debtor and the government
agency, the Second Circuit, in interpreting the Financial Institutions Regulation and Reform Act
("FIRREA")—a statute similar to HERA—found that if a debtor uses procedures provided in the
Bankruptcy Code to address the recovery of an applicable transfer, and such transfer was
ultimately determined to be fraudulent as to the government agency under FIRREA, the
government agency would be entitled to a priority recovery in respect of such transfer.  Here,
under a similar statutory provision, that is precisely the protocol the Conservator has followed, as
the Debtors have previously recovered funds on account of pre-petition transfers or, in some
cases, are currently engaged in litigation seeking to recover such transfers, and Freddie Mac and
FHFA have been monitoring such recovery efforts while pursuing the HERA Priority Claim.[4]

8.     Finally, in the Motion to Classify, LBHI asserts that it is pursuing the Motion to
Classify so as to avoid prejudice to other creditors occasioned by the continued maintenance of
the $1.2 billion reserve previously agreed to by the parties and so ordered by this Court.  In fact,
the only meaningful impact on other creditors is a potential delay in recovery, which ironically is
largely a result of LBHI's failure to engage in meaningful discussions to resolve the HERA
Priority Claim.  In stark contrast, an improper, premature release of the reserve would impose

---

[4]    Notwithstanding that FHFA has not initiated its own actions to date, FHFA retains the
discretion granted by Congress to pursue its rights, powers, and remedies in accordance with
HERA.

irreparable harm upon and prejudice to Freddie Mac and the Conservator by eliminating the agreed upon reserve prior to a final resolution in respect of the HERA Priority Claim, a result that could leave insufficient funds remaining in the Debtors' estate to pay the HERA Priority Claim.

9.    As LBHI has failed to show any legitimate entitlement to the relief it seeks, the Motion to Classify should be denied.

## BACKGROUND AND FACTS

10.    Freddie Mac is a government-sponsored enterprise that provides liquidity, stability and affordability to the United States housing market by purchasing mortgage loans and mortgage-related securities for investment, and by pooling mortgages purchased from banks and issuing guaranteed mortgage-backed securities to institutional investors.[5]  In this regard, Freddie Mac plays a critical role in the mortgage finance market in the United States, and is inextricably interwoven into the nation's financial system.

11.    Congress enacted HERA on July 30, 2008, in response to the national economic crisis.[6]  HERA created FHFA as an "independent agency of the Federal Government" vested with the responsibility of regulating and supervising Freddie Mac and the Federal National Mortgage Association ("Fannie Mae"), two government-sponsored entities that, in view of the nationwide economic crisis at the time HERA was enacted, were anticipated to experience difficulties.[7]

---

[5]    *See* Case Study:  Freddie Mac's Unsecured Lending to Lehman Brothers Prior to Lehman Brothers' Bankruptcy; FHFA, Office of Inspector General (Mar. 14, 2013) (the "FHFA Report"), at 6 (a copy of the FHFA Report is attached to the Motion to Classify as Exhibit A thereto).

[6]    *See* Housing and Economic Recovery Act of 2008, Pub. L. No. 110-289, 122 Stat. 2654 (2008).

[7]    *See* H.R. Rep. No. 109-171, pt. 1, at 81 (2005).

12.     On September 6, 2008, pursuant to the authority granted under HERA, and after determining that Freddie Mac and Fannie Mae could not "continue to operate safely and soundly and fulfill their critical public mission," the Director of FHFA placed Freddie Mac and Fannie Mae under the conservatorship of FHFA.[8]  Upon being appointed Conservator, FHFA "immediately succeeded to all rights, titles, powers, and privileges of [Fannie Mae and Freddie Mac]," and was empowered to "preserve and conserve assets and property" of the government sponsored entities, to "collect all obligations and money due to the regulated entity," and to "take such action as may be . . . necessary to put [Freddie Mac and Fannie Mae] in a sound and solvent condition."[9]  To that end, Congress granted FHFA special powers to accomplish its statutory mission.

13.     Freddie Mac collects billions of dollars each month on account of principal and interest payments made by mortgagors, and subsequently distributes such funds to the holders of such mortgages or the beneficiaries of the securities backed by such mortgages.  In the interim period between when Freddie Mac receives the applicable principal and interest payments on the underlying mortgages and when it is required to distribute such funds to the applicable holders or beneficiaries thereof, Freddie Mac invests such funds (the "<u>Invested Funds</u>") in short-term financial instruments, or makes loans to creditworthy counterparties, with such loans generally repayable immediately prior to the time when Freddie Mac is required to make payment to the holders or beneficiaries of the applicable mortgages or mortgage-backed securities. With respect to these investment activities, Freddie Mac maintains a counterparty credit risk management

---

[8]     Statement of FHFA Director James B. Lockhart, at 5 (Sept. 7, 2008), *available at* http://www.fhfa.gov/webfiles/23/FHFAStatement9708final.pdf.

[9]     *See* 12 U.S.C. §§ 4617(b)(2)(A), (b)(2)(B)(ii), (b)(2)(B)(iv), and (b)(2)(D)(i).

group within its Investments and Capital Markets Division.[10]  This group is charged with continually assessing the safety and soundness of potential counterparties with whom Freddie Mac invests the Invested Funds.[11]

14.    Between January and August 2008, Freddie Mac made monthly loans ranging from $1 billion to $1.2 billion to LBHI,[12] which LBHI used to meet its liquidity needs.  These loans were generally made during the third week of the applicable month and repayable on or about the middle of the following month.

15.    Following the collapse of Bear Stearns in March 2008, key credit officers within the counterparty credit risk management group at Freddie Mac raised concerns regarding the creditworthiness and liquidity of LBHI.[13]  Indeed, on at least two occasions during the summer of 2008, Freddie Mac initiated and participated in separate, direct discussions with LBHI to inquire specifically as to LBHI's financial stability, creditworthiness, and liquidity.  In each instance, without regard to the actual facts and circumstances of LBHI's financial condition, as subsequently established by the Examiner Report and other sources, Freddie Mac was assured that LBHI was in a strong financial condition, with ample liquidity.  FHFA intends to demonstrate that, in fact, LBHI made significant misrepresentations concerning LBHI's financial health and liquidity position, and that LBHI had significantly less liquidity than was affirmatively represented to Freddie Mac.  Moreover, FHFA believes that it is now clear that at the time of the incurrence of the subject loans, LBHI knew that it was facing a liquidity crisis

---

[10]    FHFA Report, at 9.

[11]    Id. at 9-10.

[12]    See Report of Anton Valukas, Examiner, Mar. 10, 2010 (the "Examiner Report"), at 1952 [Docket No. 7531].

[13]    FHFA Report, at 11.

arising from a loss of market confidence, making it impossible for LBHI to continue its businesses and satisfy its funding requirements in the ordinary course.[14]

16.    Based on LBHI's repeated assurances as to its financial creditworthiness and liquidity, and unaware of the actual financial crisis and insolvency then facing LBHI, despite direct inquiry of LBHI in this regard, on August 19, 2008, Freddie Mac loaned LBHI $450,000,000, and on August 20, 2008, Freddie Mac loaned LBHI another $750,000,000 (collectively, the "August Loans").[15] Although Freddie Mac and LBHI generally referred to these loans as "Fed Funds," the August Loans, like all previous loans, were not in fact true Fed Funds transactions between member banks and the Federal Reserve System, but were short-term unsecured loans between two financial institutions.[16] The August Loans were scheduled to be repaid on September 15, 2008, on an "early return" basis—meaning that repayment would be completed before the markets opened on September 15, 2008.[17]

17.    Unknown to Freddie Mac, almost immediately after the incurrence of the August Loans, LBHI began transferring assets to other parties at a time when, Freddie Mac and FHFA assert, LBHI knew that a necessary consequence of such actions would be its inability to timely repay the August Loans. Indeed, during the two-three week period immediately prior to the commencement of the Chapter 11 Cases, LBHI transferred literally billions of dollars to third parties, including to financial institutions such as JP Morgan and CitiBank, all as set forth in the

---

[14]    *See* Examiner Report, at 10, 645, 717.

[15]    *See id.* at 1952.

[16]    *See id.* at 1952 n.7231.

[17]    *See* HERA Priority Claim.

9

Examiner Report,[18] the result of which, FHFA and Freddie Mac assert, was to leave LBHI unable to pay its obligations to Freddie Mac as they came due.

18.    Then, even though FHFA will demonstrate that LBHI initially took certain steps required to prepare for the repayment of the August Loans on Friday, September 12, 2008, and issued the requisite wire instructions to that effect, the repayment process was inexplicably halted over the weekend of September 12-15, 2008, notwithstanding the fact that LBHI continued to withdraw funds from the account used to repay Freddie Mac and transfer such funds to other institutions and counterparties,[19] all without regard to the fact that in doing so there would be insufficient funds available to repay the August Loans on the morning of September 15, 2008.

19.    On September 15, 2008 (the "Petition Date"), LBHI and certain of its subsidiaries (collectively, the "Debtors") commenced the Chapter 11 Cases under the Bankruptcy Code.[20]

20.    Thereafter, on September 22, 2009, Proof of Claim No. 33568 in the amount of $1,202,241,875 was timely filed. On the Proof of Claim itself, in paragraph 5, Freddie Mac noted "see attached re: 12 USC 4617(b)(15) priority," and, in the Addendum to the Proof of Claim, Freddie Mac stated, "the Conservator, on behalf of Freddie Mac, reserves all its rights pursuant to its statutory authorization, including with respect to the transfer of any property in which [LBHI] had an interest to the extent such transfer was made with the intent to hinder or delay the 'early return' payment of the $1.2 billion due and owing to Freddie Mac on

---

[18]    *See generally* Examiner Report, Vols. 4 -5.

[19]    *See id.* at 1955 n.7429, and sources cited therein.

[20]    Although Freddie Mac was one of LBHI's largest creditors at the time of LBHI's bankruptcy filing, Freddie Mac inexplicably was not listed among its 30-largest unsecured creditors, and, thus did not receive crucial notice of critical motions in the early days of the Chapter 11 Cases.

September 15, 2008, for which claim is made hereunder, with any recovery on account of such claim being entitled to a priority recovery under Section 4617(b)(15)(D)."[21]

21.    On or about July 1, 2011, the Debtors filed their second amended plan and a related disclosure statement [Docket No. 18205]. Freddie Mac, together with FHFA as Conservator thereof, thereupon raised objections to the disclosure statement directly with counsel to the Debtors on the grounds that, *inter alia*, the disclosure statement failed to provide adequate disclosure regarding the priority being sought with respect to the HERA Priority Claim.[22] Specifically, the disclosure statement and the plan failed to acknowledge the priority being asserted in respect of the HERA Priority Claim, and the effect on the confirmability of the plan and the estimated recoveries to creditors if it was ultimately determined that Freddie Mac and FHFA were entitled to a priority recovery on account of the HERA Priority Claim due to the rights, titles, powers, and privileges of FHFA under HERA.

22.    After considerable discussions among counsel to each of the Debtors, Freddie Mac, and FHFA, the parties agreed on language to be included in the disclosure statement approved by the Court on September 1, 2011 (the "Disclosure Statement"):  (i) addressing the HERA Priority Claim and the associated priority being asserted with respect thereto under HERA; and (ii) reserving the parties' respective rights, including, specifically, FHFA's rights, titles, powers, and privileges under HERA as the Conservator.[23]

---

[21]    *See* Proof of Claim No. 33568, at ¶ 3.

[22]    *See* Stipulation and Agreement By and Among Fannie Mae, Freddie Mac and the Debtors Regarding the Debtors' Third Amended Plan, So Ordered and Entered by the Bankruptcy Court on December 6, 2011(the "Plan Stipulation"), at 8 [Docket No. 22998].  The Plan Stipulation is attached hereto as Exhibit B.

[23]    *See* Disclosure Statement, at 53 [Docket No. 19629].

23.    Prior to confirmation of the Plan on December 6, 2011, Freddie Mac and FHFA also informally raised objections with the Debtors with respect to, *inter alia*, the classification and priority treatment of the HERA Priority Claim.[24]  Specifically, Freddie Mac and FHFA informally objected to the confirmation of the Plan to the extent that it failed to provide any class for recovery on account of the HERA Priority Claim to the extent such claim was ultimately determined to be entitled to a priority recovery under HERA.[25]

24.    In order to resolve Freddie Mac's and FHFA's objection that the failure to provide treatment for a validly asserted priority claim could result in the non-confirmability of the Plan, the Debtors proposed to amend the definition of "Priority Non-Tax Claim" in the Plan so as to provide an appropriate treatment in respect of any claims entitled to a priority recovery under HERA.  To that end, in connection with the confirmation of the Plan, the Debtors amended the definition of "Priority Non-Tax Claim[s]" in the Plan to "mean[] any Claim, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment under section 507(a) of the Bankruptcy Code *or under 12 U.S.C. § 4617(b)(15).*"[26]

25.    In furtherance of the agreement reached among the Debtors, Freddie Mac and FHFA as to the treatment that would be accorded to the HERA Priority Claim to the extent it was ultimately determined that such claim was entitled to a priority recovery under HERA, at the hearing on the confirmation of the Plan, on December 6, 2011, the Court "So Ordered" the Plan Stipulation among the parties, which provided, *inter alia*, for the establishment of a cash reserve

---

[24]    *See* Plan Stipulation, at 9.

[25]    *See id.*

[26]    *See* Plan, §1.127, Ex. A to the Confirmation Order [Docket No. 23023] (emphasis added).
In comparison, the definition of "General Unsecured Claim" was defined in the Plan to mean "any Claim *other than* an Administrative Expense Claim, a Priority Tax Claim, a Priority Non-Tax Claim, a Secured Claim . . . ." *Id.* at § 1.60 (emphasis added).

in respect of the HERA Priority Claim in the amount of $1.2 billion and otherwise reserved all of the statutory rights, titles, powers, and privileges of FHFA under HERA.[27] Specifically, the Plan Stipulation provides, among other things, that in order to ensure that Freddie Mac and/or FHFA "shall receive any priority recovery under or in respect of the Third Amended Plan determined to be payable on account of all or any portion of the [HERA Priority Claim] . . . the Debtors shall establish cash reserves on account of the . . . [HERA Priority Claim] in the amount of $1,202,241,875.00," and that, "[n]othing in this Stipulation, the Third Amended Plan (or any amendments, exhibits, supplements, or agreements filed or entered into incident thereto, or the confirmation thereof), the Confirmation Order, or any other pleadings or documents filed in connection therewith, shall affect, limit, enjoin or otherwise prejudice FHFA's rights, titles, powers, and privileges under HERA as the Conservator, including, without limitation the rights of Fannie Mae and/or Freddie Mac, or FHFA as Conservator thereof, to seek priority status and recovery in respect of the [claim of Freddie Mac], and nothing in the Third Amended Plan or Confirmation Order shall be construed to restrain or limit any applicable regulatory or enforcement action that may be taken by FHFA, or to confer exclusive jurisdiction of the Bankruptcy Court over matters in respect of Fannie Mae, Freddie Mac, or FHFA as Conservator thereof."[28]

26.    Immediately following the effective date of the Plan, which occurred on March 6, 2012 (the "Effective Date"), Freddie Mac, Fannie Mae and FHFA engaged in extensive discussions with LBHI regarding the resolution and allowance of all of the claims filed by each of Freddie Mac and Fannie Mae in the Chapter 11 Cases, including, specifically, the HERA

---

[27]    See Plan Stipulation, at ¶ 2.
[28]    See id. at ¶¶ 2, 4.

13

Priority Claim. Indeed, as part of this effort, Freddie Mac and Fannie Mae provided the Debtors with access to significant relevant underlying data, expert reports and samplings, as applicable, in an effort to reach consensual resolution of these claims.

27.    In late summer of 2012, however, LBHI generally disengaged from such discussions with Freddie Mac, Fannie Mae and FHFA regarding their claims filed in the Chapter 11 Cases. Although the parties thereafter engaged in periodic discussions throughout the summer of 2013, to Freddie Mac's and FHFA's surprise, LBHI once again essentially disengaged in the early fall and, after two months of silence, filed the Motion to Classify.

## ARGUMENT

28.    LBHI's Motion to Classify raises two fundamental objections to the HERA Priority Claim, both requiring a Court to interpret Section 4617(b)(15) of HERA. Specifically, LBHI argues that (i) HERA does not grant a priority recovery in respect of the HERA Priority Claim, and (ii) if Freddie Mac and FHFA are, in fact, entitled to a priority recovery under Section 4617(b)(15) of HERA related to the HERA Priority Claim, such recovery is limited only to recoveries from third-party transferees and not against property of LBHI.

### 1.    The Housing and Economic Recovery Act of 2008

29.    In July 2008, Congress passed HERA. *See* Pub. L. No. 110-289, 122 Stat. 2654 (2008). As the Second Circuit has explained, "Congress . . . created FHFA in response to the housing and economic crisis, precisely because it wanted to address the dire financial condition of Fannie Mae and Freddie Mac." *See Fed. Hous. Fin. Agency v. UBS Americas Inc.*, 712 F.3d 136, 142 (2d Cir. 2013). Pursuant to Congress's enactment of HERA, FHFA has the responsibility, *inter alia*, to ensure the safety and soundness of Fannie Mae and Freddie Mac, and to protect the U.S. housing market. Congress accorded FHFA broad powers to fulfill its

14

statutory mandate by permitting the Director to appoint FHFA as Conservator, and by providing

the Conservator with the authority to "preserve and conserve assets" of the government

sponsored entities, including by commencing lawsuits on behalf of Freddie Mac, "collect[ing] all

obligations and money due to the regulated entity," and recovering fraudulent transfers. *See,*

*e.g.,* 12 U.S.C. § 4617(b)(2); *accord Town of Babylon v. FHFA*, 790 F. Supp. 2d 47, 50

(E.D.N.Y. 2011) ("In its capacity as a conservator, FHFA is charged by statute with the

responsibility of, *inter alia*, identifying and minimizing further financial risk to the GSE's to

ensure their future economic safety and viability."), *aff'd*, 669 F.3d 221 (2d Cir. 2012).[29]

      30.    Moreover, in conferring these broad powers upon the Conservator to "preserve

and conserve [the GSEs'] assets and property," Congress gave FHFA the right to "take such

action as may be . . . necessary to put the [GSEs] in a sound and solvent condition." *See* 12

U.S.C. § 4617(b)(2)(D);[30] *see also Natural Res. Def. Council, Inc. v. FHFA*, 815 F. Supp. 2d

630. 642 (S.D.N.Y. 2011) ("Under HERA, the FHFA has the authority to preserve and conserve

the assets of the Enterprises, as well as take any action to put the Enterprises in a sound and

solvent condition."), *aff'd*, 699 F.3d 221 (2d Cir. 2012); *accord UBS Americas Inc.*, 712 F.3d at

142 (same) (citing 12 U.S.C. § 4617(b)(2)(B)(ii), (D)); *Town of Babylon*, 790 F. Supp. 2d at 50

(noting that, "[a]dditionally, as conservator, FHFA is broadly entitled to 'take any action

---

[29]    After the passage of HERA, it quickly became apparent that Freddie Mac and Fannie Mae could not continue to operate without infusions of billions of taxpayer dollars by the U.S. Department of Treasury ("Treasury"). Treasury entered into Preferred Stock Purchase Agreements with the Conservator, which was acting on behalf of Freddie Mac and Fannie Mae, to ensure that they maintained positive net worths and avoided receivership, which would have worsened the financial crisis. The Conservator is authorized to draw on that Agreement at the end of each quarter to make up any deficiency in Freddie Mac's and Fannie Mae's net worth. Through September 30, 2013, Treasury has advanced $188 billion to the regulated entities through the Conservator's draws. *See* http://www.fhfa.gov/webfiles/25343/TSYSupport%2020130702.pdf.

[30]    In addressing FHFA's powers as Conservator, Congress specifically referenced FHFA's right to "collect all obligations and money due to [Fannie Mae and Freddie Mac]." 12 U.S.C. § 4617(b)(2)(B)(ii).

authorized by [the federal banking statute], which [it] determines is in the best interests of the [GSE's] or the FHFA.'") (quoting 12 U.S.C. § 4617(b)(2)(J)(ii)).

31.    Relevant to the Motion to Classify, Section 4617(b)(15) grants FHFA, as conservator, the explicit power to avoid transfers made or obligations incurred by any person that is a debtor of Freddie Mac, to the extent such transfers are made or such obligations are incurred with the intent to hinder, delay, or defraud Freddie Mac, such that the Conservator may recover assets and money on behalf of and for the benefit of Freddie Mac. In addition, pursuant to Section 4617(b)(15)(D), the statute expressly gives FHFA a priority right of recovery over any party under the Bankruptcy Code (other than another Federal agency). These broad powers granted to FHFA as Conservator, and the concomitant priority right of recovery under HERA, are crucial to fulfilling the purpose and Congressional mandate of HERA. In fact, to fulfill this critical mission and to ensure that FHFA has all the powers necessary to act as Conservator, Congress included an anti-injunction provision in HERA, which prohibits any court from interfering with the Conservator's exercise of its authority. *See* 12 U.S.C. § 4617(f) (providing that, except for limited circumstances, "no court may take any action to restrain or affect the exercise of powers or functions of the [FHFA] as a conservator or a receiver"); *accord Town of Babylon*, 699 F.3d at 227 ("Judicial review of 'the exercise of powers or functions of the [FHFA] as a conservator' is prohibited '[e]xcept as provided in [Section 4617].'"); *Kuriakose v. FHFA*, 674 F. Supp. 2d 483, 494 (S.D.N.Y. 2009) ("FHFA is well within its statutory authority to enforce the contracts of Freddie Mac and take any other action it determines to be in the best interest of Freddie Mac. HERA clearly provides that this Court does not have the jurisdiction to interfere with such authority [pursuant to the anti-injunction provision]."); *Esther Sadowsky Testamentary Trust v. Syron*, 639 F. Supp. 2d 347, 351 (S.D.N.Y. 2009) ("This ban [*i.e.*, the anti-

injunction provision] is an essential part of HERA's comprehensive scheme for conservatorships and receiverships."), *aff'd*, 412 F. App'x 361 (2d Cir. 2011).

32.     In all cases requiring that a court construe a statute, "we begin with the language of the statute." *Barnhart v. Sigmon Coal Co., Inc.,* 534 U.S. 438, 450 (2002). "The first step 'is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.'" *Id.* (quoting *Robinson v. Shell Oil Co.,* 519 U. S. 337, 340 (1997)). The inquiry ceases "if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'" *Id.; see also United States v. Ron Pair Enters.,* 489 U.S. 235, 240 (1989). HERA Section 4617(b)(15) was modeled upon, and is identical to, 12 U.S.C. § 1821(d)(17),[31] a provision that was added to the Federal Deposit Insurance Act by FIRREA, and that authorizes the Federal Deposit Insurance Corporation ("FDIC") to recover assets and money on behalf of and for the benefit of banks for whom FDIC acts.

33.     With respect to the FDIC's authority under Section 1821(d)(17), courts have noted that the purpose of such broad powers is to avoid burdening the American taxpayer with

---

[31]     Courts that have analyzed FHFA's authority and obligations under the recently-enacted HERA have relied on cases invoking similar or identical provisions of FIRREA. *See, e.g., UBS Americas Inc.,* 712 F. 3d at 142 n.2 ("In drawing on FIRREA's language, Congress intended for § 4617(b)(12) of HERA to serve a similar purpose with respect to FHFA"); *In re Fed. Home Loan Mortg. Corp. Derivative Litig.,* 643 F. Supp. 2d 790, 795 (E.D. Va. 2009) ("[T]he Court is persuaded by decisions that have reached the same conclusion when interpreting [FIRREA], whose provisions regarding the powers of federal bank receivers and conservators are substantially identical to those of HERA."); *aff'd sub nom. La. Mun. Police Emps. Ret. Sys. v. FHFA,* 434 F. App'x 188 (4th Cir. 2011); *see also* H.R. Rep. No. 110-142 at 90 (2007) ("The conservatorship and receivership provisions were modeled after similar provisions in the Federal Deposit Insurance Act that apply to federally insured depository institutions."); *Legislative Proposals on GSE Reform: Hearing before the Subcomm. on Capital Mkts., Ins., & Gov't Sponsored Enters. of the Comm. on Fin. Servs.,* 110th Cong., at 2 (2007) ("Any safety and soundness regulator for the housing GSEs needs to have enforcement powers on par with other Federal banking regulators."); *Legislative Proposals on Gov't-Sponsored Enter. (GSE) Reform: Hearing before the Comm. on Fin. Servs.,* 110th Cong., at 18 (2007) ("[T]he new GSE regulator's authorities should be similar to those of bank regulators. Reform must be built on the bank regulator model. The new regulator must have regulatory, supervisory, and enforcement powers equivalent to the bank regulators, including receivership powers.").

losses incurred by a regulated entity as a result of fraudulent transfers or obligations fraudulently incurred by their counterparties.[32] By providing these same powers to FHFA, Congress was effecting an identical purpose for FHFA in regard to the entities that it regulates (and for which it now acts as conservator).[33] Section 4617(b)(15)(A) provides:

> In general. The Agency, as conservator or receiver, <u>may avoid a transfer of</u> any interest of an entity-affiliated party, or any person determined by the conservator or receiver to be <u>a debtor of the regulated entity</u>, in property, or any obligation incurred by such party or person, that was made within 5 years of the date on which the Agency was appointed conservator or receiver, <u>if such party or person voluntarily or involuntarily made such transfer or incurred such liability with the intent to hinder, delay, or defraud the regulated entity, the Agency, the conservator, or receiver.</u>

Section 4617(b)(15)(A) (emphasis added).

34.    Thus, where a party or person that is a debtor of Freddie Mac, such as LBHI, incurs obligations or transfers property, whether voluntarily or involuntarily, Section 4617(b)(15)(A) grants FHFA the right to avoid and recover against such debtor any such obligation or transfer upon a showing that such transfer was made, or such obligation was incurred, with the intent to hinder, delay, or defraud Freddie Mac or FHFA.

35.    In granting FHFA the right to avoid transfers made and obligations incurred with the intent to hinder, delay or defraud FHFA, the rights and powers Congress granted FHFA are broader and more sweeping than any granted to a bankruptcy debtor or trustee. Thus, for example, while the Bankruptcy Code grants a bankruptcy trustee the power to avoid only transfers and obligations incurred by the debtor whose estate the bankruptcy trustee administers,

---

[32]    See FDIC v. Cafritz, 762 F. Supp. 1503, 1509 (D.D.C. 1991) ("[T]he statute 'further expands the power of conservators, receivers or liquidating agents to void fraudulent transfers' . . . . Thus, even this sparse legislative history evidences Congress' seriousness of purpose in protecting taxpayers' interests . . . . Congress has given the FDIC a green light to use aggressive tactics in protecting taxpayers' interests.") (emphasis omitted).

[33]    See n.31, supra.

Congress granted FHFA the right to avoid and recover transfers made and obligations incurred by a debtor of the regulated entity upon a finding that <u>any</u> transfers were made or obligations were incurred by such debtor of the regulated entity with the intent to hinder, delay, or defraud such regulated entity or FHFA.

36.    In addition to granting the Conservator the express right to avoid and recover any transfers made or obligations incurred by a debtor of a regulated entity with the intent to hinder, delay, or defraud such regulated entity, if such debtor is also a bankruptcy debtor under title 11 of the Bankruptcy Code, HERA expressly confers upon FHFA rights under Section 4617(b)(15)(D) in respect of such transfers or obligations incurred that are "superior to <u>any</u> rights of a trustee or any other party (other than any party which is a Federal agency) under title 11," such that the Conservator is entitled to a priority recovery in respect of any such transfer or obligation avoided under Section 4617(b)(15)(A) (emphasis added).

37.    Finally, in respect of any transfer made by a person that is a debtor of a regulated entity, HERA further grants the Conservator a separate, permissive right to seek recovery of the transfer, once avoided under subparagraph (A), directly from the initial transferee or immediate or mediate transferee of such transfer.  Specifically, Section 4617(b)(15)(B) provides:

> Right of recovery.  To the extent a transfer is avoided under subparagraph (A), the conservator or receiver may recover, for the benefit of the regulated entity, the property transferred, or, if a court so orders, the value of such property (at the time of such transfer) from—(i) the initial transferee of such transfer or the entity-affiliated party or person for whose benefit such transfer was made; or (ii) any immediate or mediate transferee of any such initial transferee.

**2.    HERA Grants a Priority Recovery in the Chapter 11 Cases**

38.    LBHI argues, without any authority, and contrary to the express statutory language, that "nothing in subparagraphs (A) - (D) [of Section 4617(b)(15)] elevates claims asserted by the Conservator to priority status in a chapter 11 case." Mot. to Classify, at § 22.  In this regard, LBHI clearly misconstrues the statute.

39.    By making FHFA's rights under Section 4617(b)(15) superior to <u>any</u> rights of a trustee or any other party under title 11, HERA requires that FHFA's right to avoid and recover transferred property (or its equivalent) not be subordinate to any other competing rights in a bankruptcy proceeding.[34]  To the contrary, it follows from this, necessarily, that if they are successful in establishing the predicates of the HERA Priority Claim under Section 4617(b)(15)(A), Freddie Mac and FHFA shall be entitled to a 100% recovery on such claim, together with any interest payable thereon.  Indeed, pursuant to the Plan Stipulation, LBHI acknowledged Freddie Mac's and FHFA's right to a priority recovery if the HERA Priority Claim is determined to be valid under HERA by amending the Plan to specifically include such claim in the definition of "Priority Non-Tax Claim," which claims are entitled to a 100% recovery under the Plan.  Were FHFA's recovery under Section 4617(b)(15) limited to that of a senior unsecured creditor (as LBHI now argues), FHFA's rights would only be equal to those of other senior unsecured creditors in the Chapter 11 Cases, which was clearly not the intent of

---

[34]    The "superior right" under Section 4617(b)(15)(D) extends to all rights under Section 4617(b)(15). *See Jahn v. FDIC*, 828 F. Supp. 2d 305, 313 (D.D.C. 2011) (analyzing the identical superior rights granted to the FDIC under 12 U.S.C. § 1821(d)(17)(D) and finding that "by the language of the statute, the FDIC's superior rights extend to all rights 'under this paragraph'— *i.e.*, all rights under Section 1821(d)(17)—and not merely to the right of recovery set forth in Subparagraph (B).").

Congress in enacting the HERA statute, as such a reading would render subparagraph (D) meaningless.[35]

40.    Giving full effect to the express statutory grant of a priority recovery to Freddie Mac and FHFA with respect to transfers made and obligations incurred with the intent to hinder, delay, or defraud Freddie Mac is consistent with the legislative purpose and intent of HERA, as allowing FHFA to recover on a priority basis directly from the person, or the bankruptcy estate of the person, that engaged in transactions giving rise to the fraud on Freddie Mac avoids burdening taxpayers with losses suffered by Freddie Mac as a result of such transactions. This is clearly consistent with the "green light" given by Congress to the FDIC, and to FHFA under HERA. *See Cafritz,* 762 F. Supp. at 1509; *see also* H.R. Rep. No. 110-142, at 139 (2007) (the intent of Congress in enacting HERA was to enable FHFA to "take such action as may be necessary to put the regulated entity into a sound and solvent condition, and to carry out the business of the entity").

41.    In its Motion to Classify, LBHI further argues that the Conservator does not have any right to a priority recovery under Section 4617(b)(15) because the Conservator's alleged superior rights are not among the claims or expenses entitled to priority treatment under Section 507 of the Bankruptcy Code. As shown above, however, the language of Section 4617(b)(15)(D) is clear in granting the Conservator rights that are "superior to rights of a trustee or any other party . . . under title 11," and the law is clear that "[w]hen Congress enacts legislation, it is presumed to act with knowledge of the 'existing law and judicial concepts.'" *In re VistaCare Grp.,* LLC, 678 F.3d 218, 226 (3d Cir. 2012) (citation omitted). Thus, in enacting

---

[35]    "Courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: the judicial inquiry is complete." *Conn. Nat'l Bank v. Germain,* 503 U.S. 249, 253-54 (1992) (internal citations and quotation marks omitted).

HERA, including its express provision granting the Conservator rights that are superior to the rights of any party in a bankruptcy proceeding, Congress is presumed to have been well aware of the Bankruptcy Code and the priority scheme of Section 507 of the Bankruptcy Code, and fully intended that the superior rights granted to the Conservator in a bankruptcy case would not be interpreted so as to render such rights meaningless by reason of their non-inclusion in Section 507. Moreover, Congress did not grant to FHFA a right "equal to" the rights of other unsecured creditors; FHFA's rights under Section 4617(b)(15) are "superior" to the rights of any other party, including other creditors, in a bankruptcy proceeding. Once again, LBHI acknowledged the co-existence of the priority rights of recovery that exist under Section 507 of the Bankruptcy Code and the Conservator's priority rights under HERA by amending the Plan to specifically include all of such rights, together, under the definition of "Priority Non-Tax Claim."[36]

### 3.    A Priority Right to Recovery under HERA Is Not Limited to Claims Against Transferees

42.    LBHI does not dispute that Freddie Mac is entitled to an allowed claim in the full amount asserted in the HERA Priority Claim—the entire $1.2 billion. LBHI argues only that Freddie Mac's and FHFA's recovery from the LBHI bankruptcy estate on account of such claim should be as a senior unsecured creditor under the Plan, without regard to the Congressionally mandated priority established under HERA. LBHI further argues that to the extent that Freddie Mac and FHFA are, in fact, entitled to a priority recovery under HERA, any such priority recovery must be realized only from transferees of LBHI in accordance with Section

---

[36]    Once again, the definition of "Priority Non-Tax Claim[s]" in the Plan "means any Claim, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment under section 507(a) of the Bankruptcy Code *or under 12 U.S.C. § 4617(b)(15)*" (emphasis added).

4617(b)(15)(B) of HERA, and not from LBHI's bankruptcy estate, and that, in this regard, LBHI is not a "transferee" for purposes of Section 4617(b)(15)(B). To reach this conclusion, however, LBHI misconstrues HERA as limiting Freddie Mac's and FHFA's recovery "only" to recoveries from LBHI's transferees. This interpretation is incorrect.

43.    Once again, the plain language of HERA authorizes FHFA to recover directly from a debtor of the regulated entity if the claim at issue arises from a transfer that was made, or an obligation that was incurred, with the intent to hinder, delay, or defraud the regulated entity or FHFA.[37] Section 4617(b)(15)(A) does not limit recovery by FHFA to recovery from transferees, providing instead that FHFA may avoid transfers or obligations incurred by "any person determined by the conservator or receiver to be a debtor of the regulated entity." (emphasis added).

44.    Indeed, far from limiting FHFA's rights under subparagraph (A), Section 4617(b)(15)(B) actually expands FHFA's authority, by allowing FHFA to recover not only directly from a debtor of the regulated entity who hindered, delayed, or defrauded such regulated entity, but also from transferees of such debtor who may have improperly received transferred assets or funds. As Section 4617(b)(15)(B) provides that FHFA "may" recover from such transferees, subparagraph (B) is clearly a grant of additional authority to the Conservator to follow the money. Nowhere in HERA does Congress limit FHFA, as LBHI urges, to recovering "only" from transferees of a debtor of the regulated entity.

---

[37]    In seeking the Court's allowance of Freddie Mac's claim as a senior unsecured claim, LBHI has conceded that Freddie Mac is owed money by LBHI, thus making LBHI a debtor of Freddie Mac for purposes of 12 U.S.C. § 4617. *Cf. Jahn*, 828 F. Supp. 2d at 314-15 (finding, for purposes of Section 1821(d)(17), the counterparty of bank in receivership to be a "debtor" of an institution regulated by the FDIC even absent agency action).

45.    Moreover, if the intent of HERA was only to grant FHFA the right and power to seek recovery from third party transferees of transfers made by a debtor of the regulated entity with the intent to hinder, delay, or defraud such regulated entity, and that the regulated entity and FHFA would otherwise simply be general unsecured creditors of such debtor (or such debtor's bankruptcy estate), as LBHI argues, it would eviscerate the overarching purpose and intent of Section 4617(b)(15) of HERA. To the contrary, the intent of Congress, as evidenced by a plain reading of HERA, is that where a debtor of a regulated entity hinders, delays, or defrauds the regulated entity or FHFA, the Conservator's right to avoid and recover any such transfers or obligations is paramount to the rights of all other parties as to the recovery of the assets or funds at issue. LBHI's assertions are directly contrary to the express intent of Congress, and there is no basis for such a strained reading of HERA.[38]

46.    Here, if LBHI is determined to have engaged in conduct with the intent to hinder, delay, or defraud Freddie Mac by inducing Freddie Mac to make the August Loans, FHFA, as Conservator, is granted the power and authority under Section 4617(b)(15)(A) of HERA to avoid the incurrence of such obligation and recover $1.2 billion plus interest from the LBHI bankruptcy estate, and the Conservator's right to such recovery is statutorily superior to the rights of LBHI and any other party in the Chapter 11 Cases. Moreover, the fundamental purpose of any statute that provides remedies for conduct engaged with the intent to hinder, delay or defraud is to return the wronged party to the position it was in before such conduct occurred, and gives rise to a claim to that effect. To the extent such prohibited conduct is perpetrated against a regulated entity of FHFA, such as Freddie Mac, Section 4617(b)(15)(D) of HERA elevates the

---

[38]    Indeed, courts should avoid statutory interpretations that render portions of the statute "meaningless." *PT United Can Co. Ltd. v. Crown Cork & Seal Co., Inc.*, No. 96 Civ. 3669 (JGK), 1997 WL 31194, at *3 (S.D.N.Y. Jan. 28, 1997), *aff'd*, 138 F.3d 65 (2d Cir. 1998).

right of recovery on account of such conduct to a priority status as against other creditors. Thus, if LBHI engaged in conduct with the intent to hinder, delay or defraud Freddie Mac in connection with the incurrence of the August Loans, HERA mandates that LBHI must repay Freddie Mac and FHFA $1.2 billion, plus interest thereon, on a priority basis in order to return Freddie Mac to its status before LBHI fraudulently incurred such obligations. The Conservator need not look to third-party transferees of LBHI to recover such funds, as it is the LBHI estate that must return the fraudulently obtained funds.

47.    Separately, if the billions of dollars intentionally delivered by LBHI to various financial institutions during the weeks leading up to the Petition Date—most particularly during the last three days prior to the commencement of LBHI's bankruptcy proceeding—were transferred to such institutions with the knowledge that LBHI was then insolvent, or that in doing so it would be rendered insolvent (which the Debtors appear to acknowledge in pleadings filed in separate adversary proceedings against JPMorgan Chase and Citibank in the Chapter 11 Cases),[39] such that LBHI would be unable to repay the August Loans when due, it follows that LBHI intentionally hindered, delayed or defrauded Freddie Mac and the Conservator in the repayment of the August Loans, and Freddie Mac and FHFA are entitled to recover funds on account of the August Loans from the LBHI bankruptcy estate pursuant to subparagraph (D) of HERA. Again, the Conservator's rights in this regard are superior to the rights of all other creditors in the Chapter 11 Cases, and the Conservator is not required to seek recovery only from the recipients of such transfers.

---

[39]    *See* First Am. Compl. at ¶¶ 52, 54, *Lehman Brothers Holdings Inc. v. Citibank, N.A.*, Adv. Pr. No. 12-01044-JMP (Bankr. S.D.N.Y. Nov. 16, 2012) [Docket No. 13]; *see also* First Am. Compl. at ¶¶ 29-30, 60, 66, *Lehman Brothers Holdings Inc. v. JPMorgan Chase Bank*, N.A., Adv. Pr. No. 10-03266-JMP (Bankr. S.D.N.Y. Sept. 15, 2010) [Docket No. 19].

48.    In addition, subparagraph (B) of HERA grants FHFA an additional, permissive right of recovery, stating that FHFA "may" seek recoveries from transferees of a debtor of a regulated entity with respect to any transfer avoided under subparagraph (A), and such right does not constitute the exclusive remedy available to FHFA in respect of actions or transactions found to be fraudulent as to Freddie Mac under subparagraph (A).

49.    The interpretation of HERA argued by LBHI would necessarily lead to absurd and clearly unintended results. *See United States v. Turkette*, 452 U.S. 576, 580 (1981); *see also Troll Co. v. Uneeda Doll Co.*, 483 F.3d 150, 160 (2d Cir. 2007). Thus, for example, under LBHI's interpretation of HERA, if a person defrauded a regulated entity but kept the ill-gotten gains and never transferred the applicable funds to a third party, the Conservator would be without any remedy to recover such funds on a priority basis, including in any resulting bankruptcy proceeding of such third party, thereby rendering subparagraph (D) irrelevant and meaningless. Similarly, if such a person used the fraudulently obtained funds only to pay good faith transferees—*e.g.*, buy equipment for a business, pay for a child's education, or make a gift to a charity—LBHI would have this Court believe that the Conservator would be unable to assert any right of recovery on account of such funds because the Conservator's only right of recovery would be against transferees other than good faith transferees, and there would be none. Such results would be absurd and were clearly never intended by Congress.

### 4.    In All Events, Any Priority Recovery on Account of the HERA Priority Claim Should Come from the LBHI Bankruptcy Estate

50.    The Debtors have recovered or are currently in litigation seeking to recover many of the transfers identified in the Examiner Report as potentially fraudulent as to the Debtors, and

potentially fraudulent as to Freddie Mac and FHFA.[40] As stated by the Second Circuit in *Colonial Realty* in addressing transfers that were asserted to be fraudulent as to both a bankruptcy debtor and a government agency having rights and powers superior to such bankruptcy debtor under FIRREA (as is the case under HERA), an appropriate protocol in such circumstances, and one the Conservator has followed in the Chapter 11 Cases, is to allow the bankruptcy debtor to use the well-established procedures of the Bankruptcy Code to pursue the recovery of such transfers, and thereby avoid the chaos that would necessarily ensue if the debtor and the government agency engaged in a competition to see which entity could recover the transfers first, and if it is ultimately determined that the acts and conduct of the bankruptcy debtor were fraudulent as to the FDIC, the FDIC would have the benefit of its superior rights granted under FIRREA. *See generally* 980 F.2d at 131-34. Here, the Debtors have been engaged in recovery efforts against third party transferees for some time while being well aware of the Conservator's asserted rights in respect of any such recoveries, and Freddie Mac and the Conservator have closely and continuously monitored LBHI's efforts in order to protect their rights in respect of the HERA Priority Claim, even to the point of entering into a separate tolling agreement with a transferee where the Debtors' recovery action against such transferee has not yet been resolved.[41]

51.    Upon the Debtors' completion of the recovery process, any recovered funds will be held by the Debtors' bankruptcy estate. Accordingly, if it is ultimately determined that LBHI hindered, delayed, or defrauded Freddie Mac in respect of either the incurrence or repayment of

---

[40]    *See generally Lehman Brothers Holdings Inc. v. Citibank, N.A.*, Adv. Pr. No. 12-01044-JMP (Bankr. S.D.N.Y.); *Lehman Brothers Holdings Inc. v. JPMorgan Chase Bank, N.A.*, Adv. Pr. No. 10-03266-JMP (Bankr. S.D.N.Y.).

[41]    Notwithstanding that FHFA has not initiated its own actions to date, FHFA retains the discretion granted by Congress to pursue its rights, powers, and remedies in accordance with HERA.

the August Loans, the Conservator's right to a priority recovery, as required under Section 4617(b)(15)(D) and the Debtors' confirmed Plan, must in all events be paid by the LBHI bankruptcy estate as required by the Plan, as there is no interpretation of HERA, or any alternative theory, that would suggest that any third-party transferee of a fraudulent transferee should be required to disgorge and return funds twice.

### 5.    The HERA Priority Claim Has Been Properly Asserted

52.    In its Motion to Classify, LBHI also asserts that Freddie Mac and FHFA, by having failed to identify specific transfers in the HERA Priority Claim, or commence independent actions against third parties, have somehow forfeited their right to receive a priority recovery, even in the event that upon a proper review and determination of the merits of the HERA Priority Claim it is determined that LBHI did, in fact, hinder, delay, or defraud Freddie Mac in respect of the incurrence of the August Loans and/or the failure to repay the August Loans in a timely manner.  Once again, there is no basis for this assertion.

53.    The deadline to file proofs of claims for these Chapter 11 Cases—September 22, 2009—was fully six months before the Examiner Report was issued, when, for the first time, specifics regarding the breadth, extent and circumstances surrounding the Debtors' prepetition transfers were fully disclosed.[42]  To suggest that Freddie Mac and FHFA alone should have somehow been able to identify unknown transfers as being fraudulent before the facts and circumstances surrounding such transfers were made public is incredulous.

54.    As noted above, Freddie Mac timely filed the HERA Priority Claim—the underlying validity of which LBHI does not dispute—and pointedly asserted therein the right to a priority recovery under HERA.  Thereafter, Freddie Mac and FHFA continuously sought to

---

[42]    *See* Examiner Report, Volumes 4 & 5 (dated Mar. 11, 2010, discussing and analyzing prepetition transfers).

engage LBHI in an effort to resolve the HERA Priority Claim, including by means of mediation, and put a tolling agreement in place with LBHI over two years ago to foster constructive discussions in the hopes of reaching a consensual resolution.

55.    Freddie Mac and FHFA have diligently pursued the HERA Priority Claim, while protecting their rights and powers under HERA, and in all respects in a manner consistent with HERA, the Bankruptcy Code, orders of this Court and the Second Circuit. *See Colonial Realty,* 980 F.2d at 131-35. LBHI's attempt to criticize Freddie Mac's and FHFA's conduct and actions in this regard, and its assertion that Freddie Mac and FHFA have forfeited their superior rights, are entirely misplaced.

56.    LBHI's Motion to Classify is merely an attempt to avoid addressing the underlying merits of Freddie Mac's and FHFA's claim for a priority recovery on account of the HERA Priority Claim.

**6.    Prejudice to Freddie Mac and FHFA**

57.    In the Motion to Classify, LBHI argues that the continued maintenance of the $1.2 billion reserve is "clearly prejudicial" to LBHI's other creditors. Motion to Classify, at § 29. It is Freddie Mac's and FHFA's understanding, however, that literally thousands of claims are yet to be resolved in the Chapter 11 Cases, and the Debtors have indicated that they will continue to make distributions semi-annually for years to come.[43] Indeed, the most recent operating report filed by the Debtors indicates that there remains in excess of $12 billion of assets and cash awaiting the final resolution and allowance of all remaining claims before a final distribution to creditors may be made.[44] Thus, it is not credible that any prejudice is currently

---

[43]    *See* Plan, at § 8.3 (providing that the Debtors will make distributions of available cash semi-annually on March 30 and September 30 of each year).

[44]    *See* August 2013 Post-Effective Operating Report [Docket No. 40226].

being imposed on LBHI's other creditors by the continued maintenance of the $1.2 billion reserve while the HERA Priority Claim is being finally resolved. Indeed, if there is any prejudice, it is only one of delay until the HERA Priority Claim is finally resolved and the proper distribution of the $1.2 billion reserve is applied accordingly, and, frankly, any delay is of LBHI's own making. To release such reserve at this time, prior to an appropriate, final determination of the priority status of the HERA Priority Claim, would impose irreparable harm upon and prejudice to Freddie Mac and the Conservator.

## CONCLUSION

58.    The Plan defines "Priority Non-Tax Claims" to include any claim entitled to priority under HERA, and the Plan Stipulation evidences the parties' agreement that until such time as the merits and priority status of the HERA Priority Claim have been determined, the $1.2 billion shall be retained in a separate cash reserve to ensure payment on account of such claim.

59.    HERA clearly sets forth the intent of Congress that where a person that is a debtor to a regulated entity has made transfers, incurred obligations or otherwise engaged in actions or transactions that hinder, delay, or defraud a regulated entity, the Conservator is entitled to recover the value thereof on a priority basis and, in a bankruptcy proceeding, with rights that are superior to those of a trustee or any other party in such proceedings. Further, HERA does not limit the Conservator only to recoveries from third-party transferees of the debtor of the regulated entity, but allows the regulated entity and FHFA to avoid and recover such transfers or obligations directly from the debtor of the regulated entity, and grants a supplemental right to recover fraudulent transfers from third-party transferees.

60.    Here, where Freddie Mac and FHFA have asserted a claim predicated on transfers made and obligations incurred by LBHI with the intent to hinder, delay, or defraud Freddie Mac

or FHFA, and the rights of the Conservator to a priority recovery in respect of such claim are clearly provided for under HERA and acknowledged under the Plan, the merits of the HERA Priority Claim should be addressed and the $1.2 billion reserve should be preserved as agreed to and so ordered by this Court in the Plan Stipulation.

WHEREFORE, Freddie Mac and FHFA respectfully request that the Court deny the Motion to Classify and grant such other and further relief as is just and proper.

Dated: New York, New York
       October 17, 2013

                      /s/ Michael J. Canning
                      Michael J. Canning
                      Richard M. Alexander
                      Nancy G. Milburn

                      ARNOLD & PORTER LLP
                      399 Park Avenue
                      New York, New York  10022
                      Telephone:  (212) 715-1000
                      Facsimile:  (212) 715-1399

                      *Attorneys for the Federal Housing Finance Agency as Conservator of the Federal Home Loan Mortgage Corporation*

                      /s/ Mark S. Landman
                      Mark S. Landman

                      LANDMAN CORSI BALLAINE & FORD P.C.
                      120 Broadway
                      New York, New York  10271
                      Telephone:  (212) 238-4800
                      Facsimile:  (212) 238-4848

                      *Attorneys for the Federal Home Loan Mortgage Corporation*

# EXHIBIT A

**United States Bankruptcy Court/Southern District of New York**
Lehman Brothers Holdings Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5076
New York, NY 10150-5076

# PROOF OF CLAIM

In Re:
Lehman Brothers Holdings Inc., et al.,
Debtors.

Chapter 11
Case No. 08-13555 (JMP)
(Jointly Administered)

UNIQUE IDENTIFICATION NUMBER: 1000221282

Name of Debtor Against Which Claim is Held
Lehman Brothers Holdings Inc.

Case No of Debtor
08-13555

Filed: USBC - Southern District of New York
Lehman Brothers Holdings Inc., Et Al.
08-13555 (JMP)    0000033568

**NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503. Additionally, this form should not be used to make a claim for Lehman Programs Securities (See definition on reverse side).**

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)
LBH (CREDITOR.DBF,CREDNUM # 1000221282******
FEDERAL HOME LOAN MORTGAGE CORPORATION
ATTN: MARK LANDMAN
LANDMAND, CORSI, BALLAINE & FORD P.C.
120 BROADWAY
NEW YORK, NY 10271

☐ Check this box to indicate that this claim amends a previously filed claim.

Court Claim Number: _____ (if known)

Filed on: _____

Telephone number: 212-238-4800    Email Address: mlandman@lcbf.com

Name and address where payment should be sent (if different from above)
George Kielman, Esq.
Federal Home Loan Mortgage Corporation
8200 Jones Branch Dr. - MS 202
McLean, VA  22102
Telephone number: 703-903-2640    Email Address: freddiemac.com
George Kielman@

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

**1.** Amount of Claim as of Date Case Filed: $ 1,202,241,875 (interest as of 9/15/08)
If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete item 4.
If all or part of your claim is entitled to priority, complete Item 5.
If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete Item 6.
☐ Check this box if all or part of your claim is based on a Derivative Contract.*
☐ Check this box if all or part of your claim is based on a Guarantee.*

*IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.

☒  Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is a based on a Derivative Contract or Guarantee.

**2.** Basis for Claim:  see attached Addendum and exhibits
(See instruction #2 on reverse side.)

**3.** Last four digits of any number by which creditor identifies debtor: _____
3a. Debtor may have scheduled account as: _____
(See instruction #3a on reverse side.)

**4.** Secured Claim (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
Nature of property or right of setoff:  ☐ Real Estate    ☐ Motor Vehicle    ☐ Other
Describe: _____
Value of Property: $ _____    Annual Interest Rate _____ %
Amount of arrearage and other charges as of time case filed included in secured claim, if any:
$ _____    Basis for perfection: _____
Amount of Secured Claim: $ _____    Amount Unsecured: $ _____

**6.** Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9): $ _____
(See instruction #6 on reverse side.)

**7.** Credits: The amount of all payments on this claim has been credited for the purpose of making this proof of claim.
**8.** Documents: Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest. (See definition of "redacted" on reverse side.) If the documents are voluminous, attach a summary.
DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

Date:
9-18-09

Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.
Raymond G. Romano, EVP
Chief Credit Officer
Raymd G Romano

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

**5.** Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.
Specify the priority of the claim:
☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).
☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).
☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).
☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(____).

Amount entitled to priority:
$ _____

*See attached re 12 USC 4617(b)(15) priority.

FOR COURT USE ONLY
FILED
S.D.N.Y.
2009 SEP 22 P 1:07
U.S. BANKRUPTCY COURT

## INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, there may be exceptions to these general rules.*

**Items to be completed in Proof of Claim form**

**Name of Debtor, and Case Number:**
YOU MUST INDICATE THE SPECIFIC DEBTOR AGAINST WHICH YOUR CLAIM IS ASSERTED, INCLUDING THE THE NAME OF THE DEBTOR AND THE RELATED CASE NUMBER (DEBTORS AND CASE NUMBERS LISTED BELOW), IN THE SPACE ALLOTTED AT THE TOP OF THE CLAIM FORM.

| | | | |
|---|---|---|---|
| 08-13555 | Lehman Brothers Holdings Inc. | 08-13905 | CES Aviation LLC |
| 08-13600 | LB 745 LLC | 08-13906 | CES Aviation V LLC |
| 08-13885 | Lehman Brothers Commodity Services Inc. | 08-13907 | CES Aviation IX LLC |
| 08-13888 | Lehman Brothers Special Financing Inc. | 08-13908 | East Dover Limited |
| 08-13893 | Lehman Brothers OTC Derivatives Inc. | 09-10108 | Luxembourg Residential Properties Loan Finance S.a.r.l. |
| 08-13899 | Lehman Brothers Derivative Products Inc. | 09-10137 | BNC Mortgage LLC |
| 08-13900 | Lehman Commercial Paper Inc. | 09-10558 | Structured Asset Securities Corporation |
| 08-13901 | Lehman Brothers Commercial Corporation | 09-10560 | LB Rose Ranch LLC |
| 08-13902 | Lehman Brothers Financial Products Inc. | 09-12516 | LB 2080 Kalakaua Owners LLC |
| 08-13903 | Lehman Scottish Finance L.P. | 08-13664 | PAMI Statler Arms LLC |

If your Claim is against multiple Debtors, complete a separate form for each Debtor.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the Bankruptcy filing. Follow the instructions concerning whether to complete items 4, 5 and 6. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Use this space to report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**4. Secured Claim:**
Check the appropriate box and provide the requested information if the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See DEFINITIONS, below.) State the type and the value of property that secures the claim, attach copies of lien documentation, and state annual interest rate and the amount past due on the claim as of the date of the bankruptcy filing.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. §507(a).**
If any portion of your claim falls in one or more of the listed categories, check the appropriate box(es) and state the amount entitled to priority. (See DEFINITIONS, below.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9)**
State the value of any goods received by the debtor within 20 days before the date of commencement in which the goods have been sold to the debtor in the ordinary course of the debtor's business.

**7. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**8. Documents:**
Attach to this proof of claim form redacted copies documenting the existence of the debt and of any lien securing the debt. You may also attach a summary. You must also attach copies of documents that evidence perfection of a security interest. You may also attach a summary. FRBP 3001(c) and (d). Do not send original documents, as attachments may be destroyed after scanning.

**Date and Signature:**
The person filing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2), authorizes courts to establish local rules specifying what constitutes a signature. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. Attach a complete copy of any power of attorney. Criminal penalties apply for making a false statement on a proof of claim.

---

## DEFINITIONS

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**
A creditor is the person, corporation, or other entity owed a debt by the debtor on the date of the bankruptcy filing.

**Claim**
A claim is the creditor's right to receive payment on a debt that was owed by the debtor on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the Claims Agent at the following address:
Lehman Brothers Holdings Claims Processing
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, PO Box 5076
New York, NY 10150- 5076

**Secured Claim Under 11 U.S.C. §506(a)**
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien. A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. §507(a)**
Priority claims are certain categories of unsecured claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information.
A creditor should redact and use only the last four digits of any social-security, individual's tax identification, or financial-account number, all but the initials of a minor's name and only the year of any person's date of birth.

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

**Derivative Contract**
A contract that is any of (i) a "swap agreement" as such term is defined in section 101(53B) or (ii) a "forward contract" as such term is defined in section 101(25) of the Bankruptcy Code. A cash-market purchase or sale of a security or loan (i.e. any purchase or sale of a security for settlement within the standard settlement cycle for the relevant market), exchange-traded future or option, securities loan transaction, repurchase agreement in respect of securities or loans, and any guarantee or reimbursement obligation which would otherwise be included in the definition of such terms in the Bankruptcy Code shall not be considered a Derivative Contract for the purposes of this definition nor shall any notes, bonds, or other securities issued by the Debtors or their affiliates (including, but not limited to, Lehman Brothers Holdings Inc., Lehman Brothers Treasury Co. B.V., Lehman Brothers Bankhaus AG, Lehman Brothers Holdings plc, Lehman Brothers Securities N.V., and Lehman Brothers (Luxembourg) Equity Finance S.A.).

**Guarantee**
A promise, representation or agreement to answer for the payment of some debt or the performance of some duty in case of the failure of another person or entity who is liable in the first instance.

**Lehman Programs Securities**
Lehman Programs Securities means those securities included on the Lehman Programs Securities list available on http://www.lehman-docket.com as of July 27, 2009.

## INFORMATION

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim, or you may access the Claims Agent's system (http://www.lehman-docket.com) to view your filed proof of claim.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 et seq.), and any applicable orders of the bankruptcy court.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

In re                                                   Chapter 11 Case No.
                                                        08-13555 (JMP)

LEHMAN BROTHERS HOLDINGS INC., et al.,                  (Jointly Administered)

                              Debtors.

-------------------------------------------------------------x

## ADDENDUM TO PROOF OF CLAIM OF
## FEDERAL HOME LOAN MORTGAGE CORPORATION

1.      Federal Home Loan Mortgage Corporation in conservatorship (hereinafter

referred to as "Freddie Mac") is a government-sponsored enterprise that not only plays a critical

role in the United States mortgage finance market but also is inextricably interwoven into the

nation's financial system.  On September 6, 2008, the Federal Housing Finance Agency

("FHFA"), an independent agency of the United States Government, was appointed as Freddie

Mac's conservator (the "Conservator").  The goal of the conservatorship is to restore confidence

in Freddie Mac, enhance its capacity to fulfill its mission and mitigate the systemic risk that has

contributed to the instability in the current market.  Freddie Mac is filing this proof of claim in

these chapter 11 cases at the direction of the Conservator.

2.      In August 2008, Freddie Mac made two separate transactions for the transfer of

funds totaling $1.2 billion through the Federal Reserve System from Freddie Mac's account at

the Federal Reserve Bank of New York to Lehman Brothers Holdings Inc.'s ("LBHI," or the

"Debtor") account with Citibank.  The transactions were executed on August 19th and August

20th in the amounts of $450,000,000 and $750,000,000, respectively, and brokered through

Tullet Prebon, an interdealer broker.  A copy of the supporting documents is attached hereto as

Exhibit A.  Pursuant to the terms of the transaction, LBHI was scheduled to repay the funds on an "early return" basis; that is, prior to the opening of the capital markets, together with accrued interest on September 15, 2008.  In order to effect an "early return" repayment of the loan, LBHI was to set aside the repayment amount and request the requisite wire transfer prior to September 15, 2008 so that the transfer could be made on an "early return" basis prior to the opening of the capital markets on September 15, 2008.  Such transfer was not initiated, however, and, to date, Freddie Mac has not received payment of the $1.2 billion plus $2,241,875.00 in accrued interest.  See Exhibit B.  Accordingly, Freddie Mac is asserting a claim for $1,202,241,875.00 which includes interest as of September 15, 2008.[1]

3.      Pursuant to 12 U.S.C. § 4617(b), as amended by P.L. 110-289, the Conservator has the powers necessary to locate and protect Freddie Mac's assets, which as a matter of law, have been taken over by the Conservator.  Pursuant to 12 U.S.C. § 4617(b)(15)(A), the Conservator is authorized to "avoid a transfer of any interest of an entity-affiliated party, or any person determined by the conservator ... to be a debtor of the regulated entity, in property, or any obligation incurred by such party or person that was made within 5 years of the date on which the Agency was appointed conservator ..., if such party or person voluntarily or involuntarily made such transfer or incurred such liability with the intent to hinder, delay, or defraud the regulated entity, the Agency, the conservator, or receiver."  Section 4617(b)(15)(D) further states that the Conservator's power to avoid a fraudulent transfer is "superior to any rights of a trustee or any other party (other than any party which is a Federal agency) under Title 11."  Therefore, the Conservator, on behalf of Freddie Mac, reserves all its rights pursuant to its

---

[1] Freddie Mac has filed a separate Proof of Claim for $885,839,087.33 related to derivative transactions and loan servicing related obligations.

statutory authorization, including with respect to the transfer of any property in which the Debtor
had an interest to the extent such transfer was made with the intent to hinder or delay the "early
return" payment of the $1.2 billion due and owing to Freddie Mac on September 15, 2008, for
which claim is made hereunder, with any recovery on account of such claim being entitled to a
priority recovery under Section 4617(b)(15)(D).

4.      In addition to the foregoing, by way of this Proof of Claim, Freddie Mac adopts
and reasserts each and every claim scheduled by the Debtor as payable to Freddie Mac.

5.      Freddie Mac is filing this proof of claim in anticipation of the claims bar date (the
"Bar Date"), which has been set as September 22, 2009, pursuant to the Court's July 2, 2009
Order pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3)
Establishing the Deadline for Filing Proofs of Claim, Approving the Form and Manner of Notice
Thereof and Approving the Proof of Claim Form.  Freddie Mac reserves the right to amend,
modify, and/or supplement this proof of claim at any time, including, without limitation, for the
purpose of asserting additional claims, whether arising from the transactions or documents
described in Freddie Mac's proof of claim, this attachment, or otherwise.  Freddie Mac also
reserves its rights to assert any and all rights of setoff that it may have against the Debtor in
respect of its claims, including, without limitation, the right to set off its claims against any
claims that the Debtor (or any successor, assignee or person claiming through the Debtor, as the
case may be) may assert against Freddie Mac or its successors or assigns, whether or not arising
under the transactions set forth in this proof of claim.  Freddie Mac also reserves its right to
pursue claims (including, but not limited to, the claims described herein) against the Debtor
based upon additional or alternative legal theories, and reserves the right to assert administrative
expense claims.

487410.1 DocsNY                                        3

6.      Freddie Mac further reserves its right to seek to have the reference withdrawn with respect to the subject matter of these claims, any objection or other proceedings commenced with respect thereto, or any other proceedings commenced in this case or otherwise involving Freddie Mac. By filing this proof of claim, neither Freddie Mac nor the Conservator intends to submit to the jurisdiction of the Bankruptcy Court for any purpose other than the allowance of this claim for purposes of these chapter 11 cases.

| Field | Value |
|---|---|
| TID | 08192008-003463 |
| Account Id | MS FED FUNDS |
| Status String | PROC_DLVR/CONF |
| Txn Class | Funds Delivers |
| Type Code | 1600 |
| Amount | $450,000,000.00 |
| (3000) Adj Reason Code | |
| (3000) As of Adj Date | |
| (3100) Sender's ABA | 021039513 |
| (3100) Sender's Tele Name | FHLMC INVESTOR PI |
| (3320) Sender Reference | 08192008 003463 |
| (3400) Receiver's ABA | 021000089 |
| (3400) Receiver's Tele Name | CITIBANK NYC |
| (3600) Business Function Code | FFS |
| (3600) SWIFT Transaction Type Code | |
| (3700) Charges: Detail | |
| (3700) Charges: Currency Code 1 | |
| (3700) Charges: Senders Charges 1 | |
| (3700) Charges: Currency Code 2 | |
| (3700) Charges: Senders Charges 2 | |
| (3700) Charges: Currency Code 3 | |
| (3700) Charges: Senders Charges 3 | |
| (3700) Charges: Currency Code 4 | |
| (3700) Charges: Senders Charges 4 | |
| (3710) Inst Amt: Currency Code 1 | |
| (3710) Inst Amt: Amount | |
| (3720) Exchange Rate | |
| (4000) Intermediary's FI Id Code | |
| (4000) Intermediary's FI Ident | |
| (4000) Intermediary's FI Name | |
| (4000) Intermediary's FI Addr | |
| (4100) Benef's FI Id Code | |
| (4100) Benef's FI Ident | |
| (4100) Benef's FI Name | |
| (4100) Benef's FI Addr | |
| (4200) Beneficiary Id Code | D |
| (4200) Beneficiary Ident | 40615202 |
| (4200) Beneficiary Name | LEHMAN BROTHERS HOLDING |
| (4200) Beneficiary Addr | |
| (4320) Ref for Beneficiary | |
| (4400) Acct Db Drwdown Id Code | |
| (4400) Acct Db Drwdown Ident | |
| (4400) Acct Db Drwdown Name | |
| (4400) Acct Db Drwdown Addr | |
| (5000) Originator Id Code | D |
| (5000) Originator Ident | 487100 |
| (5000) Originator Name | FM MSA FED FUNDS |
| (5000) Originator Addr | |
| (5100) Origin's FI Id Code | |
| (5100) Origin's FI Idenc | |
| (5100) Origin's FI Name | |
| (5100) Origin's FI Addr | |
| (5200) Instructing FI Id Code | |
| (5200) Instructing FI Ident | |
| (5200) Instructing FI Name | |
| (5200) Instructing FI Address | |
| (5400) Account Cr in Drwdown | |
| (6000) Origin. to Benef. info | OVERNIGHT FED FUNDS |
| (6100) Receiver's FI Info | |
| (6110) Drwdown Db Acct Adv Code | |
| (6110) Drwdown Db Acct Adv Info | |
| (6200) Intermediary FI Info | |
| (6210) Intermediary's FI Adv Code | |
| (6210) Intermediary's FI Adv Info | |
| (6300) Benef's FI Info | |
| (6310) Benef's FI Adv Code | |
| (6310) Benef's FI Adv Info | |
| (6400) Beneficiary Info | |
| (6410) Beneficiary Adv Code | |
| (6410) Beneficiary Adv Info | |
| (6420) Beneficiary MOP | |
| (6420) Beneficiary Mop Info | |
| (6430) Payment Limitation | |
| (6500) FI to FI Info | |
| (9000) Free Text | |
| IMAD | 20080819B1Q8283C000105 |
| Message Disposition | |
| Acceptance Timestamp | |
| OMAD | |
| Error field | |
| Cost Center | |
| GL Account Cash | NA |
| GL Account Offset | NA |
| Group Id | NA |
| Trade ID | |
| XRef No. | ALAD.487   .-1762   .8 |
| Repetitive ID | MS LBHC CI |
| Counterparty ID | |
| Settlement Date | 08/19/2008 |
| Process Date | 08/19/2008 |
| Priority | 5 |

```
MEMO
SAFEID              08/19/08 14:15:18.836 PEND_DLVR/HOLD Created
F364356             08/19/08 17:14:49.266 PEND_DLVR Released
F354356             08/19/08 17:14:54.346 PROC_DLVR/UNACK Delivered
safeid              08/19/08 17:16:02.410 PROC_DLVR/CONF Confirmed, IMAD:20080819B1Q8263C000105

Compliance Audit
08192008 17:14:54 OFAC Rules Passed {4200} Beneficiary Name          BROTHERS|(30000006)'LEHMAN:OCCURS;
```

```
TID                                    06202008-004807
Account Id                             MS FED FUNCS
Status String                          PROC_DLVR/CONF
Txn Class                              Funds Delivers
Type Code                              1600
Amount                                 $750,000,000.00
(3000) Adj Reason Code
(3000) As of Adj Date
(3100) Sender's ABA                    021039513
(3100) Sender's Tele Name              FHLMC INVESTOR PI
(3320) Sender Reference                06202008 004807
(3400) Receiver's ABA                  021000089
(3400) Receiver's Tele Name            CITIBANK NYC
(3600) Business Function Code          FFS
(3600) SWIFT Transaction Type Code
(3700) Charges: Detail
(3700) Charges: Currency Code 1
(3700) Charges: Senders Charges 1
(3700) Charges: Currency Code 2
(3700) Charges: Senders Charges 3
(3700) Charges: Currency Code 3
(3700) Charges: Senders Charges 3
(3700) Charges: Currency Code 4
(3700) Charges: Senders Charges 4
(3710) Inst Amt: Currency Code 1
(3710) Inst Amt: Amount
(3720) Exchange Rate
(4000) Intermediary's FI Id Code
(4000) Intermediary's FI Ident
(4000) Intermediary's FI Name
(4000) Intermediary's FI Addr
(4100) Benef's FI Id Code
(4100) Benef's FI Ident
(4100) Benef's FI Name
(4100) Benef's FI Addr
(4200) Beneficiary Id Code             D
(4200) Beneficiary Ident               40615202
(4200) Beneficiary Name                LEHMAN BROTHERS HOLDING
(4200) Beneficiary Addr
(4320) Ref for Beneficiary
(4400) Acct Db Drwdown Id Code
(4400) Acct Db Drwdown Ident
(4400) Acct Db Drwdown Name
(4400) Acct Db Drwdown Addr
(5000) Originator Id Code              D
(5000) Originator Ident                487100
(5000) Originator Name                 FM MSA FED FUNDS
(5000) Originator Addr
(5100) Origin's FI Id Code
(5100) Origin's FI Ident
(5100) Origin's FI Name
(5100) Origin's FI Addr
(5200) Instructing FI Id Code
(5200) Instructing FI Ident
(5200) Instructing FI Name
(5200) Instructing FI Address
(5400) Account Cr in Drwdown
(6000) Origin. to Benef. info          OVERNIGHT FED FUNDS
(6100) Receiver's FI Info
(6110) Drwdown Db Acct Adv Code
(6110) Drwdown Db Acct Adv Info
(6200) Intermediary FI Info
(6210) Intermediary's FI Adv Code
(6210) Intermediary's FI Adv Info
(6300) Benef's FI Info
(6310) Benef's FI Adv Code
(6310) Benef's FI Adv Info
(6400) Beneficiary Info
(6410) Beneficiary Adv Code
(6410) Beneficiary Adv Info
(6420) Beneficiary MOP
(6420) Beneficiary Mop Info
(6430) Payment Limitation
(6500) FI to FI Info
(9000) Free Text
IMAD                                   20080820B1Q8284C000032
Message Disposition
Acceptance Timestamp
OMAD
Error field
Cost Center                            NA
GL Account Cash                        NA
GL Account Offset                      NA
Group Id
Trade ID
XRef No.                               ALAD.487  .-1767   .S
Repetitive ID                          MS LBHC CI
Counterparty ID
Settlement Date                        08/20/2008
Process Date                           08/20/2008
Priority                               5
```

```
NEMO
SAFKID             05/20/08 10:52:51.513 PEND_DLVR/HOLD Created
F351598            08/20/08 11:40:19.356 PEND_DLVR Released
F351598            08/20/08 11:41:16.513 PROC_DLVR/UNACK Delivered
safcid             08/20/08 11:42:26.250 PROC_DLVR/CONF Confirmed, IMAD:20080820B1Q8284C000032

Compliance Audit
08202008 11:41:16 OFAC Rules Passed (4200) Beneficiary Name        BROTHERS|(30000006)*LEHMAN:OCCURS;
```



ATTN: TOMMY FUQUA
A/C FREDDIE MAC FED FUNDS
1551 PARK RUN DR
MAIL STOP D5N
MCLEAN, VA 22102-3110

Invoice Date :        Page :    1

Reference :        24404/15/28/00/0808-117695

The following deals were arranged by the EURODOLLAR CASH division.

| Date | Deal # | Counterparty | From | To | Days | Rate | Notional Amount | | Amount |
|------|--------|--------------|------|-----|------|------|-----------------|---|--------|
| 01-Aug-08 | 73130 | SOCIETE GENERALE-NEW YORK. | 8/01/08 | 8/15/08 | 14 | 2.28000 LN | 250,000,000.00 | US | 2,100.00 |
| 05-Aug-08 | 75243 | RBS CITIZENS BANK NA - RI | 8/05/08 | 8/15/08 | 10 | 2.20000 LN | 300,000,000.00 | US | 1,800.00 |
| 20-Aug-08 | 86093 | US CENTRAL CU-LENEXA | 8/20/08 | 9/15/08 | 26 | 2.50000 LN | 500,000,000.00 | US | 7,800.00 |
| 21-Aug-08 | 86915 | UNION BK OF CAL-L.A. | 8/21/08 | 9/15/08 | 25 | 2.43000 LN | 200,000,000.00 | US | 3,000.00 |
| 25-Aug-08 | 88685 | BK OF IRELAND-STAMFORD | 8/25/08 | 9/15/08 | 21 | 2.37500 LN | 200,000,000.00 | US | 2,520.00 |
| 26-Aug-08 | 89518 | NATIXIS - NY | 8/26/08 | 9/15/08 | 20 | 2.35000 LN | 150,000,000.00 | US | 1,800.00 |
| 28-Aug-08 | 91244 | BCO BILBAO VIZ ARG FR-NY | 8/29/08 | 9/15/08 | 18 | 2.37000 LN | 250,000,000.00 | US | 2,700.00 |
| 29-Aug-08 | 92082 | WESTERN CORP FCU-SAN DIMAS | 8/29/08 | 9/15/08 | 17 | 2.37000 LN | 400,000,000.00 | US | 4,080.00 |
| | | | | | EIGHT DATES | | BROKERAGE SUBTOTAL : | | 44,790.00 |
| | | | | | | | BROKERAGE TOTAL IN USD : | | 44,790.00 |

| Freddie Mac | NEW TRADE | A. David McKeary | [signature] | |
|---|---|---|---|---|
| **MSA-FRB** | | PMG: | AMM | Trade Ops: | JSL |
| Trade No. 1080, Vs. 1 | | | | |
| Aug 19, 2008 18:05:07 GMT | **LEND** | **LBHC** **CASH/FEDF** | | **2.55000 Sep 15, 2008** |

| | | | | | |
|---|---|---|---|---|---|
| Asset ID: | B5A0703R7 | Payment Delay: | 0 | Trade Date: | Aug 19, 2008 |
| Ticker: | LBHC | Date Convention: | ACT/360 | Settle Date: | Aug 19, 2008 |
| Coupon: | 2.55000 | Accrual Date: | Aug 19, 2008 | Counterparty: | LBHC |
| Coupon Type: | MAT | First Coupon Date: | Sep 15, 2008 | LEHMAN BROTHERS HOLDINGS INC. | |
| Frequency: | ZERO | Next Pay Date: | Sep 15, 2008 | Counterparty Cont | MARTIN WALSH |
| Reset Term: | | Odd First Pmt: | ☐ Yes ☑ No | | |
| Maturity Date: | Sep 15, 2008 | AMT: | ☐ Yes ☑ No | Original Par: | 450,000,000.000 |
| Issue Date: | Aug 19, 2008 | ERISA: | ☐ Yes ☐ No | Factor: | 1.000000000 |
| Min Trade Size: | N/A | 144A: | ☐ Yes ☑ No | Factor Date: | |
| Min Trade Increment: | N/A | Notional: | ☐ Yes ☑ No | Current Par: | 450,000,000.000 |

| | | |
|---|---|---|
| **General Use** | | Price: | 100.000 |
| Early Return for Trust | | | 100.000000000 |
| **Delivery Instructions** | | Principal: | (450,000,000.00) |
| FEDFUND/MS LBHC CI | | Interest: | 0.00 |
| BANK NAME: | CITIBANK NYC | Total Charges: | 0.00 |
| ABA#: | 021000089 | Broker Commission: | (7,290.00) |
| A/C#: | 40615202 | Net Money: | (450,000,000.00) |
| A/C NAME: | LEHMAN BROTHERS HOLDING | Currency: | USD |
| BANK TO BANK: | OVERNIGHT FED FUNDS | Net Cash Flow: | OUT |
| **Miscellaneous Information** | | | |
| TrdPurpose: | MSA | Exchange rate: | |
| | | Discount: | |
| **Fifo Information** | | Option Type: | |

| trade | relation | amount |
|---|---|---|
| 710 | SPEC | -450,000,000.00 |

| | |
|---|---|
| Prepay: | 100.00 |
| Yield: | 2.550 |
| YTC: | |
| Duration: | 0.07406 |
| Convexity: | 0.00000 |

| S & P | Moody | DBRS |
|---|---|---|
| Fitch | NAIC | |
| | | |

| | | |
|---|---|---|
| Discretionary: | ☐ Yes ☑ No |
| Liquid: | ☑ Yes ☐ No |
| Segregate: | ☑ Yes ☐ No |
| Release: | ☐ Yes ☑ No |

| | |
|---|---|
| Exec: | 2008-08-19 17:35:38 GMT |
| Exec Source: | Auth Time |
| Executing Broker: | PREB |
| | PREBON |

Mortgage Securities Account (MSA-FRB)    Trade No. 1080, Vs. 1

FreddieMac

Created: Sep 15, 2008 16:25:29 GMT

A/C# NA

Copyright © 2008 BlackRock Inc. All Rights Reserved.

NO CUSTODIAN

# Freddie Mac | NEW TRADE

**MSA-FRB**
Trade No. 710, Vs. 1
Sep 12, 2008 22:30:48 GMT

PMG:                    rm_mat | Trade Ops:        rm_mat

## MAT    LBHC
CASH/FEDF                                    **2.55000 Sep 15, 2008**

| | | | | |
|---|---|---|---|---|
| Asset ID: | B5A0703R7 | Payment Delay: | 0 | |
| Ticker: | LBHC | Date Convention: | ACT/360 | |
| Coupon: | 2.55000 | Accrual Date: | | |
| Coupon Type: | MAT | First Coupon Date: | Sep 15, 2008 | |
| Frequency: | ZERO | Next Pay Date: | | |
| Reset Term: | | Odd First Pmt: | ☐ Yes ☑ No | |
| Maturity Date: | Sep 15, 2008 | AMT: | ☐ Yes ☑ No | |
| Issue Date: | Aug 19, 2008 | ERISA: | ☐ Yes ☑ No | |
| Min Trade Size: | N/A | 144A: | ☐ Yes ☑ No | |
| Min Trade Increment: | N/A | Notional: | ☐ Yes ☑ No | |

| Trade Date: | Sep 15, 2008 |
|---|---|
| Settle Date: | Sep 15, 2008 |
| Broker: | UNKNOWN |
| Broker Contact: | rm_mat |
| Original Par: | 450,000,000.000 |
| Factor: | 1.000000000 |
| Factor Date: | |
| Current Par: | 450,000,000.000 |

**Fifo Information**

| trade | relation | amount |
|---|---|---|
| 1080 | SPEC | -450,000,000.00 |

| Price: | 100.00 |
|---|---|
| | 100.000000000 |
| Principal: | 450,000,000.00 |
| Interest: | 0.00 |
| Commission: | 0.00 |
| Net Money: | 450,000,000.00 |
| Currency: | USD |
| Net Cash Flow: | IN |

| Exchange rate: | |
|---|---|
| Discount: | |
| Option Type: | |

| Prepay: | 0.00 |
|---|---|
| Yield: | |
| YTC: | |
| Duration: | 0.00000 |
| Convexity: | 0.00000 |

| S & P | Moody | DBRS |
|---|---|---|
| | | |
| Fitch | NAIC | |
| | | |

| Discretionary: | ☐ Yes ☑ No |
|---|---|
| Liquid: | ☑ Yes ☐ No |
| Segregate: | ☐ Yes ☑ No |
| Release: | ☑ Yes ☐ No |

| Exec: | 2008-09-12 22:30:48 GMT |
|---|---|
| Exec Source: | Auth Time |

Created: Sep 15, 2008 16:23:39 GMT

Mortgage Securities Account (MSA-FRB)
Trade No. 710, Vs. 1

FreddieMac

A/C# NA                    Copyright © 2008 BlackRock Inc. All Rights Reserved.                    NO CUSTODIAN



# Freddie Mac | NEW TRADE

**MSA-FRB**
Trade No. 1084, Vs. 1
Aug 20, 2008 14:45:31 GMT

PMG:    AMM    Trade Ops:    TEF

## LEND    LBHC    CASH/FEDF    2.55000 Sep 15, 2008

| | | | |
|---|---|---|---|
| Asset ID: | B5A070KA5 | Payment Delay: | 0 |
| Ticker: | LBHC | Date Convention: | ACT/360 |
| Coupon: | 2.55000 | Accrual Date: | Aug 20, 2008 |
| Coupon Type: | MAT | First Coupon Date: | Sep 15, 2008 |
| Frequency: | ZERO | Next Pay Date: | Sep 15, 2008 |
| Reset Term: | | Odd First Pmt: | ☐ Yes ☑ No |
| Maturity Date: | Sep 15, 2008 | AMT: | ☐ Yes ☑ No |
| Issue Date: | Aug 20, 2008 | ERISA: | ☐ Yes ☐ No |
| Min Trade Size: | N/A | 144A: | ☐ Yes ☑ No |
| Min Trade Increment: | N/A | Notional: | ☐ Yes ☑ No |

**Trade Date:** Aug 20, 2008
**Settle Date:** Aug 20, 2008
**Counterparty:** LBHC
LEHMAN BROTHERS HOLDINGS INC.
**Counterparty Cont** MARTY WALSH

**Original Par:** 750,000,000.000
**Factor:** 1.000000000
**Factor Date:**
**Current Par:** 750,000,000.000

**General Use**
Early Return for Trust
**Delivery Instructions**
FEDFUND/MS LBHC Ci
*BANK NAME:* CITIBANK NYC
*ABA#:* 021000089
*A/C#:* 40615202
*A/C NAME:* LEHMAN BROTHERS HOLDING
*BANK TO BANK:* OVERNIGHT FED FUNDS
**Miscellaneous Information**
TrdPurpose: MSA

**Fifo information**

| trade | relation | amount |
|---|---|---|
| 711 | SPEC | -750,000,000.00 |

**Price:** 100.000
100.000000000
**Principal:** (750,000,000.00)
**Interest:** 0.00
**Total Charges:** 0.00
Broker Commission: (11,700.00)
**Net Money:** (750,000,000.00)
**Currency:** USD
**Net Cash Flow:** OUT

**Exchange rate:**
**Discount:**
**Option Type:**

**Prepay:** 100.00
**Yield:** 2.550
**YTC:**
**Duration:** 0.07132
**Convexity:** 0.00000

| S & P | Moody | DBRS |
|---|---|---|
| | | |
| Fitch | NAIC | |
| | | |

**Discretionary:** ☐ Yes ☑ No
**Liquid:** ☑ Yes ☐ No
**Segregate:** ☑ Yes ☐ No
**Release:** ☐ Yes ☑ No

**Exec:** 2008-08-20 13:49:44 GMT
**Exec Source:** Auth Time
**Executing Broker:** PREB
PREBON

*Mortgage Securities Account (MSA-FRB)* Trade No. 1084, Vs. 1

FreddieMac

Created Sep 15, 2008 18:25:46 GMT

A/C# NA

Copyright © 2008 BlackRock Inc. All Rights Reserved.

NO CUSTODIAN

# Freddie Mac | NEW TRADE

**MSA-FRB**
Trade No. 711, Vs. 1
Sep 12, 2008 22:30:48 GMT

**PMG:** rm_mat    **Trade Ops:** rm_mat

## MAT  LBHC
## CASH/FEDF                              2.55000 Sep 15, 2008

| | | | |
|---|---|---|---|
| Asset ID: | B5A070KA5 | Payment Delay: | 0 |
| Ticker: | LBHC | Date Convention: | ACT/360 |
| Coupon: | 2.55000 | Accrual Date: | |
| Coupon Type: | MAT | First Coupon Date: | Sep 15, 2008 |
| Frequency: | ZERO | Next Pay Date: | |
| Reset Term: | | Odd First Pmt: | ☐ Yes ☑ No |
| Maturity Date: | Sep 15, 2008 | AMT: | ☐ Yes ☑ No |
| Issue Date: | Aug 20, 2008 | ERISA: | ☐ Yes ☑ No |
| Min Trade Size: | N/A | 144A: | ☐ Yes ☑ No |
| Min Trade Increment: | N/A | Notional: | ☐ Yes ☑ No |

**Trade Date:** Sep 15, 2008
**Settle Date:** Sep 15, 2008
**Broker:** UNKNOWN
**Broker Contact:** rm_mat
**Original Par:** 750,000,000.000
**Factor:** 1.000000000
**Factor Date:**
**Current Par:** 750,000,000.000

### Fifo Information

| trade | relation | amount |
|---|---|---|
| 1084 | SPEC | -750,000,000.00 |

**Price:** 100.000
100.000000000
**Principal:** 750,000,000.00
**Interest:** 0.00
**Commission:** 0.00
**Net Money:** 750,000,000.00
**Currency:** USD
**Net Cash Flow:** IN

**Exchange rate:**
**Discount:**
**Option Type:**

**Prepay:** 0.00
**Yield:**
**YTC:**
**Duration:** 0.00000
**Convexity:** 0.00000

| S & P | Moody | DBRS |
|---|---|---|
| | | |
| Fitch | NAIC | |

**Discretionary:** ☐ Yes ☑ No
**Liquid:** ☑ Yes ☐ No
**Segregate:** ☐ Yes ☑ No
**Release:** ☑ Yes ☐ No

**Exec:** 2008-09-12 22:30:48 GMT
**Exec Source:** Auth Time

Mortgage Securities Account (MSA-FRB)
Trade No. 711, Vs. 1

FreddieMac

Created: Sep 15, 2008 16:24:05 GMT

A/C# NA

Copyright © 2008 BlackRock Inc. All Rights Reserved.

NO CUSTODIAN



```
09/17/2008  13:53   201-557-5902          TULETT PREBON                    PAGE  01/02
                                                                            S2
  TLR0012          85363 V.00          DETAILS
eal date:   8/19/08   Val date:   8/19/08  Due date:   9/15/08   Ent date:   8/19/08
eal number:  85363   Batch #:  999  Section #: 15   Type: 74   Chg date:   8/19/08
umber of Days   27
ELLER  FREDDIE MAC MSA FED FUNDS        BUYER   LEHMAN BROS HLDG INC (NY)
urrl:  US                Thru1:  PYN    Curr2:                  Thru2: PYN
ro:                  Dsk 20 EURODOLLAR  Bro:                 Dsk 27 FED FUNDS
roker 20052          WALSH, MARTIN      Broker 20257         FARMER,KEVIN
ebate:               .00  RD 000        Rebate:              .00  RD 000
roker                                   Broker
orres BRO:           .00                Corres BRO:          .00  Swap#
ate:   000255        Amount:            450,000,000  Code:   Old deal#:
Rate:                SPrice:            BRate:               BPrice:
el amt:                                 Del amt:
ay FEDERAL RESERVE BK-N.Y.              Repay FEDERAL RESERVE BK-N.Y.
nstruction ACC FHLMC INVESTOR PI        Instruction
/C FREDDIE MAC MSA FED FUNDS            A/C CITIBANK NA-NY
nstruction ABA 0210-3951-3 ACC 487100   Instruction ABA 0210-0008-9
AV .                                    FAV LEHMAN BROS HLDG INC (NY)
nstruction *EARLY RETURN BY 9:30AM      Instruction ACC 40615202
pecial instr.
 F9=NO RE-TLX                                F10=Pay Ins.
                                        F6=Retlx F7=Tlx mnt F8=Tlx Inq
```

```
09/17/2008  13:53   201-557-5902               TULLETT PREBON                    PAGE  02/02
                    86087 V.00            DETAILS                                        S2
Deal date:   8/20/08  Val date:   8/20/08  Due date:   9/15/08   Ent date:   8/20/08
Deal number: 86087   Batch #:   999   Section #: 15   Type: 74   Chg date:   8/20/08
Number of Days    26
SELLER  FREDDIE MAC MSA FED FUNDS       BUYER   LEHMAN BROS HLDG INC (NY)
Curr1:   US              Thru1:  PYN    Curr2:                Thru2: PYN
Bro:                 Dsk 20 EURODOLLAR  Bro:                Dsk 27 FED FUNDS
Broker 20052         WALSH, MARTIN      Broker 20257        FARMER,KEVIN
Rebate:        .00  RD 000              Rebate:        .00  RD 000
Broker                                  Broker
Corres BRO:        .00                  Corres BRO:        .00  Swap#
Rate:   000255       Amount:            Code:             Old deal#:
SRate:               SPrice: 750,000,000 BRate:           BPrice:
Del amt:                                Del amt:
Pay FEDERAL RESERVE BK-N.Y.             Repay FEDERAL RESERVE BK-N.Y.
Instruction ACC FHLMC INVESTOR PI       Instruction
A/C FREDDIE MAC MSA FED FUNDS           A/C CITIBANK NA-NY
Instruction ABA 0210-3951-3 ACC 487100  Instruction ABA 0210-0008-9
FAV .                                   FAV LEHMAN BROS HLDG INC (NY)
Instruction *EARLY RETURN BY 9:30AM     Instruction ACC 40615202
Special instr.
 F9=NO RE-TLX
                                              F10=Pay Ins.
                                          F6=Retlx F7=Tlx mnt F8=Tlx Inq
```

| Fund | Td Num | CUSIP | Ticker/Coupon/Maturity | Counterparty | Tran Type | Orig Face | Net Money | Group/Type | Trade Price | Trade Date | Settle Date | Int @ Mat | Maturity |
|------|--------|-------|------------------------|--------------|-----------|-----------|-----------|------------|-------------|------------|-------------|-----------|----------|
| MSA-FRB | 1080 | B5A07003D7 | LBHC 2.550 09/15/2008 | LBHC | LEND | 450,000,000.00 | -450,000,000.00 | CASH/FEDF | 1.00 | 8/19/2008 | 8/19/2008 | -850,625.00 | 9/15/2008 |
| MSA-FRB | 1094 | B5A070K45 | LBHC 2.550 09/15/2008 | LBHC | LEND | 750,000,000.00 | -750,000,000.00 | CASH/FEDF | 1.00 | 8/20/2008 | 8/20/2008 | -1,381,250.00 | 9/15/2008 |

# EXHIBIT B

08-13555-mg    Doc 42025-2    Filed 01/10/14    Entered 01/10/14 18:56:48    Exhibit 2
Pg 129 of 210
08-13555-jmp    Doc 40550-1    Filed 10/17/13    Entered 10/17/13 16:05:23    Exhibit A
and B    Pg 24 of 40
08-13555-jmp    Doc 22998    Filed 12/06/11    Entered 12/06/11 14:40:21    Main Document
Pg 1 of 17

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC, *et. al.* | Case No. 08-13555 (JMP) |
| Debtors. | Jointly Administered |

## STIPULATION AND AGREEMENT BY
## AND AMONG FANNIE MAE, FREDDIE MAC AND THE
## DEBTORS REGARDING THE DEBTORS' THIRD AMENDED PLAN

This stipulation ("**Stipulation**") is entered into as of this 29th day of November 2011, by and among (i) the Federal National Mortgage Association ("**Fannie Mae**"), (ii) the Federal Home Loan Mortgage Corporation ("**Freddie Mac**," and together with Fannie Mae, the "**GSEs**"), and (iii) Lehman Brothers Holdings Inc. ("**LBHI**") and its affiliated debtors and debtors-in-possession (collectively with LBHI, the "**Debtors**," and together with Fannie Mae and Freddie Mac, the "**Parties**," and each of them, a "**Party**") in the jointly administered chapter 11 bankruptcy cases captioned In re Lehman Brothers Holdings Inc., et al., Case No. 08-13555 (JMP) (the "**Bankruptcy Cases**") pending in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").

### RECITALS

WHEREAS, on September 6, 2008, the Federal Housing Finance Agency ("**FHFA**") was appointed conservator for Fannie Mae and Freddie Mac (the "**Conservator**"), and granted all rights, titles, powers and privileges as Conservator thereof, pursuant to 12 U.S.C. § 4617, as amended by P.L. 110-289, which was enacted as part of the Housing and Economic Recovery Act of 2008 ("**HERA**");

08-13555-mg    Doc 42025-2    Filed 01/10/14    Entered 01/10/14 18:56:48    Exhibit 2
Pg 130 of 210
08-13555-jmp    Doc 40550-1    Filed 10/17/13    Entered 10/17/13 16:05:23    Exhibit A
and B    Pg 25 of 40
08-13555-jmp    Doc 22998    Filed 12/06/11    Entered 12/06/11 14:40:21    Main Document
Pg 2 of 17

WHEREAS, LBHI and certain of the Debtors commenced the Bankruptcy Cases on September 15, 2008, with additional chapter 11 petitions filed thereafter for certain of the other Debtors. The Debtors are authorized to operate their businesses and manage their properties as debtors-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, on July 2, 2009, the Bankruptcy Court entered an *Order Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) Establishing the Deadline for Filing Proofs of Claim, Approving the Form and Manner of Notice Thereof and Approving the Proof of Claim Form* (Docket No. 4271), which, among other things set September 22, 2009, as the general bar date for filing proofs of claim in the Bankruptcy Cases;

WHEREAS, on September 1, 2011, the Debtors filed the Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors (together with any supplements, amendments and exhibits thereto, and as each may be further modified from time to time, collectively, the "**Third Amended Plan**") and a related disclosure statement (the "**Disclosure Statement**"). On September 1, 2011, the Bankruptcy Court entered the order approving the adequacy of the information in the Disclosure Statement (the "**Disclosure Statement Order**");

WHEREAS, on October 25, 2011, the Debtors filed their Plan Supplement to the Third Amended Plan (the "**Plan Supplement**"), which Plan Supplement includes "Exhibit 2, Part D – Residential Real Estate Agreements";[1]

---

[1]    Exhibit 2, Part D of the Plan Supplement states, in part:

> The Debtors intend to assume all loan servicing contracts relating to residential mortgage loans and real estate owned properties ("REO") owned by the Debtors, including, but not limited to, loan servicing contracts that may be contained within and severable from other contracts that the Debtors do not seek to assume. To the extent any such contracts do not appear on Exhibit 2, Part D, for any reason, such

Footnote continued on next page

2

08-13555-mg    Doc 42025-2    Filed 01/10/14    Entered 01/10/14 18:56:48    Exhibit 2
Pg 131 of 210
08-13555-jmp    Doc 40550-1    Filed 10/17/13    Entered 10/17/13 16:05:23    Exhibit A
and B    Pg 26 of 40
08-13555-jmp    Doc 22998    Filed 12/06/11    Entered 12/06/11 14:40:21    Main Document
Pg 3 of 17

## Fannie Mae Claims

WHEREAS, Fannie Mae timely filed the below proofs of claim in the Bankruptcy Cases

(collectively, the "**Fannie Mae Claims**"):[2]

| Claim Number | Debtor | Filed Claim Amount | Basis for Claim |
|---|---|---|---|
| 29556 (amended and superseded by 40611) | LBSF | Unliquidated | • Derivative Contract |
| 29557 (the "**Fannie Mae LBHI Claim**") | LBHI | $19.058 billion | • Guarantee of Derivative Contract<br>• LBHI's obligation to repurchase mortgage loans and participation interests<br>• LBHI's breach of representations and warranties<br>• Material misstatements or omissions in connection with LBHI's sale of certain bonds to Fannie Mae<br>• Violations by LBHI of Sections 11 and 12 of the Securities Act of 1933 in connection with LBHI's sale of certain notes to Fannie Mae |

Footnote continued from previous page

contracts shall be treated as if they were listed herein and assumed as of the Effective Date and the required cure amounts for such contracts shall be zero.

The Debtors have not listed on Exhibit 2, Part D, any contracts pursuant to which the Debtors have retained mortgage loan servicing rights or a retained fee interest, either through exclusion or affirmative conveyance, in connection with residential mortgage loans and/or REO currently or previously owned by the Debtors, because of their conclusion that such contracts are not executory. In the event that the Bankruptcy Court determines that such contracts are executory contracts, then all such contracts shall be treated as if they were listed herein and assumed as of the Effective Date and the required cure amounts for such contracts shall be zero.

[2]   The descriptions of the Fannie Mae Claims contained in this Stipulation are for reference only, and are subject in all respects to the terms and conditions of the Fannie Mae Claims, as more specifically set forth therein and, except to the extent any of the Fannie Mae Claims have previously been separately allowed by an order of the Bankruptcy Court or agreement by the Parties, does not represent any admission by the Debtors in any respect.

08-13555-mg    Doc 42025-2    Filed 01/10/14    Entered 01/10/14 18:56:48    Exhibit 2
Pg 132 of 210
08-13555-jmp    Doc 40550-1    Filed 10/17/13    Entered 10/17/13 16:05:23    Exhibit A
and B    Pg 27 of 40
08-13555-jmp    Doc 22998    Filed 12/06/11    Entered 12/06/11 14:40:21    Main Document
Pg 4 of 17

WHEREAS, pursuant to a settlement agreement, Claim Number 40611 and a portion of

Claim Number 29557 were allowed (i) against Lehman Brothers Special Financing Inc.

("**LBSF**") as a general, non-priority unsecured claim in the amount of $110 million (the

"**Allowed Fannie Mae LBSF Claim**"); and (ii) against LBHI as a general, non-priority

unsecured claim in the amount of $110 million (the "**Allowed Fannie Mae LBHI Claim**," and

together with the Allowed Fannie Mae LBSF Claim, the "**Allowed Fannie Mae Claims**");

### Freddie Mac Claims

WHEREAS, Freddie Mac timely filed the below proofs of claim in the Bankruptcy Cases

(collectively, the "**Freddie Mac Claims**", and together with the Fannie Mae Claims, the

"**Claims**")[3]:

| Claim Number | Debtor | Filed Claim Amount | Basis for Claim |
|---|---|---|---|
| 33568 (the "**Freddie Mac Priority Claim**") | LBHI | $1,202,241,875.00 | • Two (2) loans made by Freddie Mac to LBHI on August 19 and August 20, 2008, in the amounts of $450,000,000 and $750,000,000, respectively |
| 33569 | LBSF | $17,239,087.33 | • Derivative Contract |
| 33576 (the "**Freddie Mac LBHI Claim**") | LBHI | $885,839,087.33 | • Guarantee of Derivative Contract<br>• Seller/servicer related obligations |

WHEREAS, pursuant to that certain Termination Agreement, dated July 27, 2011, Claim

Number 33569 and a portion of Claim Number 33576 were allowed (i) against LBSF as a

general, non-priority unsecured claim in the amount of $16,394,310.08 (the "**Allowed Freddie**

---

[3]    The descriptions of the Freddie Mac Claims contained in this Stipulation are for reference only, and
are subject in all respects to the terms and conditions of the Freddie Mac Claims, as more specifically set
forth therein and, except to the extent any of the Freddie Mac Claims have previously been separately
allowed by an order of the Bankruptcy Court or agreement by the Parties, does not represent any
admission by the Debtors in any respect.

08-13555-mg   Doc 42025-2   Filed 01/10/14   Entered 01/10/14 18:56:48   Exhibit 2
Pg 133 of 210
08-13555-jmp   Doc 40550-1   Filed 10/17/13   Entered 10/17/13 16:05:23   Exhibit A
and B   Pg 28 of 40
08-13555-jmp   Doc 22998   Filed 12/06/11   Entered 12/06/11 14:40:21   Main Document
Pg 5 of 17

Mac LBSF Claim"); and (ii) against LBHI as a general, non-priority unsecured claim in the amount of $16,100,024.63 (the "**Allowed Freddie Mac LBHI Claim**", and together with the Allowed Freddie Mac LBSF Claim, the "**Allowed Freddie Mac Claims**");

### Priority Claims

WHEREAS, pursuant to the Fannie Mae Claims and the Freddie Mac Claims, the GSEs and FHFA as Conservator have asserted that the claims are entitled to priority "superior to any rights of a trustee or any other party (other than any party which is a Federal agency) under Title 11 [of the United States Code]," pursuant to 12 U.S.C. § 4617(b)(15)(D);

WHEREAS, subsequent to the filing of the Fannie Mae Claims, and as of the date hereof, Fannie Mae, and FHFA as Conservator thereof, have determined that Fannie Mae and FHFA will not assert any priority under 12 U.S.C. § 4617(b)(15)(D) with respect to approximately $16 billion of the amounts sought in the Fannie Mae LBHI Claim. Fannie Mae, and FHFA as Conservator thereof, continue to assert the statutory priority with respect to approximately a $2.7 billion portion of the Fannie Mae LBHI Claim (the "**Fannie Mae Priority Claim**");

WHEREAS, subsequent to the filing of the Freddie Mac Claims, Freddie Mac, and FHFA as Conservator thereof, determined that Freddie Mac and FHFA will not assert any priority under 12 U.S.C. § 4617(b)(15)(D) as to the Freddie Mac LBHI Claim, but they continue to assert a priority under 12 U.S.C. § 4617(b)(15)(D) as to the full amount of the Freddie Mac Priority Claim (the Freddie Mac Priority Claim, together with the Fannie Mae Priority Claim, the "**Priority Claims**");

### Mortgage Servicing Rights

WHEREAS, LBHI has historically been a seller/servicer of portfolios of residential mortgage loans to each of Fannie Mae and Freddie Mac (the "**GSE Loans**"), and designated

08-13555-mg    Doc 42025-2    Filed 01/10/14    Entered 01/10/14 18:56:48    Exhibit 2
Pg 134 of 210
08-13555-jmp    Doc 40550-1    Filed 10/17/13    Entered 10/17/13 16:05:23    Exhibit A
and B    Pg 29 of 40
08-13555-jmp    Doc 22998    Filed 12/06/11    Entered 12/06/11 14:40:21    Main Document
Pg 6 of 17

Aurora Bank FSB (the "**Bank**") and/or Aurora Loan Services, LLC ("**Aurora**") as subservicer of such loans. In its capacity as seller of such residential mortgage loans, LBHI has certain obligations, including representations and warranties regarding the status of the loans, such as the regularity of the loan documents and compliance with all applicable GSE guidelines and requirements (collectively, the "**Seller Obligations**"). In addition, any transfer by LBHI of any mortgage servicing rights with respect to any GSE Loans requires the approval of the applicable GSE, and, unless otherwise agreed to by such GSE, any transfer of the applicable mortgage servicing rights is subject to the assumption of the Seller Obligations by the new servicer;

WHEREAS, pursuant to certain Orders entered on July 15, 2010 (Docket No.10222) (the "**July 15 Order**") and on September 23, 2010 (Docket No. 11566) (the "**September 23 Order**," and together with the July 15 Order, the "**Aurora Settlement Orders**"), the Bankruptcy Court approved certain settlements reached among the Debtors, the Bank and certain of their respective affiliated entities, including Aurora (collectively, the "**Aurora Settlement**").[4] In connection with the Aurora Settlement, LBHI agreed to transfer to Aurora all right, title and interest of LBHI in and to all residential mortgage servicing rights (including any mortgage servicing agreements under which LBHI has any such right) with a GSE (either for loans directly owned by such GSE or held in a securitization sponsored by such GSE) owned by LBHI in partial resolution and satisfaction of the Bank's claims against the Debtors, but only to the extent that the loans subject to such mortgage servicing rights were then currently being serviced by Aurora, either as master servicer, servicer or subservicer. LBHI agreed to transfer such mortgage servicing rights, free and clear of all liens and encumbrances; provided, however, that in the

---

[4]    The description of the Aurora Settlement and the Aurora Settlement Orders are for reference purposes only and subject in all respect to the terms and conditions of the Aurora Settlement and the Aurora Settlement Orders.

08-13555-mg    Doc 42025-2    Filed 01/10/14    Entered 01/10/14 18:56:48    Exhibit 2
Pg 135 of 210
08-13555-jmp    Doc 40550-1    Filed 10/17/13    Entered 10/17/13 16:05:23    Exhibit A
and B    Pg 30 of 40
08-13555-jmp    Doc 22998    Filed 12/06/11    Entered 12/06/11 14:40:21    Main Document
Pg 7 of 17

event that an applicable GSE failed to approve the transfer of any such mortgage servicing rights to Aurora, LBHI agreed to transfer and assign to Aurora all income attributable to or derived from such excluded mortgage servicing rights from and after the closing date of the Aurora Settlement until such time as such GSE provided the requisite approval of the transfer of such mortgage servicing rights to Aurora;

### Transfer of Fannie Mae Mortgage Servicing Rights

WHEREAS, as set forth in (i) that certain letter agreement, dated July 9, 2010, among Fannie Mae, the Bank and Aurora (the "**Fannie Mae/Aurora Letter Agreement**"); (ii) the Aurora Settlement Orders; and (iii) those agreements, documents and undertakings entered into among, inter alia, Fannie Mae, LBHI and certain of the other Debtors, in furtherance of the Aurora Settlement, the Fannie Mae/Aurora Letter Agreement and the Aurora Settlement Orders (such agreements, Aurora Settlement Orders and related documents and undertakings, in the aggregate, the "**Fannie Mae MSR Transfer Agreements**"), Fannie Mae agreed and consented to the transfer all of LBHI's mortgage servicing rights related to Fannie Mae sponsored residential mortgage loans, mortgages owned or pooled by Fannie Mae, and mortgage loans contained in certain REMIC Trusts (such mortgage servicing rights being collectively referred as the "**Fannie Mae Mortgage Servicing Rights**"), in each case serviced by LBHI or Aurora as the designated subservicer of such mortgage loans, to the Bank or Aurora, as contemplated in the Aurora Settlement and the Fannie Mae MSR Transfer Agreements, without requiring the assumption of responsibility of such assignee of the applicable Seller Obligations;

7

08-13555-mg    Doc 42025-2    Filed 01/10/14    Entered 01/10/14 18:56:48    Exhibit 2
Pg 136 of 210
08-13555-jmp    Doc 40550-1    Filed 10/17/13    Entered 10/17/13 16:05:23    Exhibit A
and B    Pg 31 of 40
08-13555-jmp    Doc 22998    Filed 12/06/11    Entered 12/06/11 14:40:21    Main Document
Pg 8 of 17

### Transfer of Freddie Mac Mortgage Servicing Rights

WHEREAS, notwithstanding the Aurora Settlement Orders and LBHI's authorization and agreement to transfer to the Bank or Aurora all mortgage servicing rights owned by LBHI related to the portfolio of Freddie Mac residential mortgage loans (such mortgage servicing rights, including, without limitation, pursuant to the terms and conditions set forth in a certain Master Commitment, dated as of April 26, 2005 (the "**Master Commitment**"), being collectively referred to as the "**Freddie Mac Mortgage Servicing Rights**"), Freddie Mac has not agreed or consented to the transfer of the Freddie Mac Mortgage Servicing Rights to the Bank or Aurora incident to the Aurora Settlement. Specifically, in connection with the approval of the Aurora Settlement and the entry of the September 23 Order, LBHI stipulated on the record that it had not yet received Freddie Mac's consent to the transfer of the Freddie Mac Mortgage Servicing Rights, and that it would not assign any income received or receivable by the Debtors attributable to or derived from the Freddie Mac Mortgage Servicing Rights without Freddie Mac's consent for a period of at least 120 days, which stipulated period has been extended from time to time by further agreement between Freddie Mac and LBHI, and remains in full force and effect (the "**Servicing Rights Stipulation**");

### Third Amended Plan

WHEREAS, prior to the Court's approval of the Disclosure Statement, the GSEs and FHFA informally raised certain objections to the disclosure related to the asserted priority of the Fannie Mae Priority Claim and the Freddie Mac Priority Claim, and the rights, titles, powers, and privileges of FHFA, in its statutory capacity under HERA as Conservator, with respect to such claims;

8

08-13555-mg    Doc 42025-2    Filed 01/10/14    Entered 01/10/14 18:56:48    Exhibit 2
Pg 137 of 210
08-13555-jmp    Doc 40550-1    Filed 10/17/13    Entered 10/17/13 16:05:23    Exhibit A
and B    Pg 32 of 40
08-13555-jmp    Doc 22998    Filed 12/06/11    Entered 12/06/11 14:40:21    Main Document
Pg 9 of 17

WHEREAS, the GSEs and FHFA have informally raised certain objections to the Third Amended Plan, including, without limitation, in respect of the classification and treatment of the Priority Claims, the amount to be reserved on account of any Priority Claim, the assumption/treatment of the agreements and documents giving rise to each of the Fannie Mae Mortgage Servicing Rights (collectively, the "**Fannie Mae Mortgage Servicing Agreements**") and the Freddie Mac Mortgage Servicing Rights, including, without limitation, the Master Commitment (collectively, the "**Freddie Mac Mortgage Servicing Agreements**") and the assignability of such mortgage servicing rights, and the reservation of the rights, titles, powers, and privileges of FHFA, in its statutory capacity under HERA as Conservator, including specifically in respect of the Third Amended Plan (the "**Potential Plan Objections**");

WHEREAS, the Debtors agreed to extend the deadline by which the GSEs and FHFA were required to file any objections to the Third Amended Plan (the "**Plan Objection Deadline**") in order to allow the parties additional time to engage in discussions regarding the Potential Plan Objections;

WHEREAS, in order to resolve the Objection of the GSEs and FHFA, in respect of the classification and treatment of the Priority Claims, the Debtors have amended the definition of Priority Non-Tax Claim in the Third Amended Plan as follows: "Priority Non-Tax Claim means any Claim, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment under section 507(a) of the Bankruptcy Code or Claims under 12 U.S.C. § 4617(b)(15)"; and

WHEREAS, the Parties have agreed that it is in their mutual interests to enter into this Stipulation in order to consensually address and resolve the remaining Potential Plan Objections, and to preserve all rights, claims and defenses of each of the Parties, and FHFA as Conservator,

08-13555-mg    Doc 42025-2    Filed 01/10/14    Entered 01/10/14 18:56:48    Exhibit 2
Pg 138 of 210
08-13555-jmp    Doc 40550-1    Filed 10/17/13    Entered 10/17/13 16:05:23    Exhibit A
and B    Pg 33 of 40
08-13555-jmp    Doc 22998    Filed 12/06/11    Entered 12/06/11 14:40:21    Main Document
Pg 10 of 17

in respect thereof, including specifically the rights, titles, powers and privileges of FHFA, as

Conservator, under HERA.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants, agreements and

conditions contained herein, and for other good and valuable consideration, the receipt and

sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, upon the

foregoing recitals, which are incorporated herein in all respects, the Parties enter into this

Stipulation for purposes of addressing the remaining Potential Plan Objections, and to that end,

agree as follows:

### Effectiveness of Stipulation

1.    This Stipulation shall become effective on the date (the "**Stipulation Effective**

**Date**") that the Stipulation has been (i) executed by each of the Parties; (ii) approved by entry of

an Order of the Bankruptcy Court, which Order may be entered by the Bankruptcy Court "so

ordering" this Stipulation; and (iii) entry of a final Order of the Bankruptcy Court confirming the

Third Amended Plan (the "**Confirmation Order**").

### Reserves For Distribution Purposes

2.    In order to ensure that Fannie Mae and/or Freddie Mac, or FHFA, as applicable, shall

receive any priority recovery under or in respect of the Third Amended Plan determined to be

payable on account of all or any portion of the Fannie Mae Priority Claim and/or the Freddie

Mac Priority Claim, the Debtors shall establish cash reserves on account of the Priority Claims

(i) on account of the Freddie Mac Priority Claim in the amount of $1,202,241,875.00; and (ii) on

account of the Fannie Mae Priority Claim in such amount as agreed upon among Fannie Mae,

and FHFA as Conservator thereof, on the one hand, and LBHI, on the other hand; <u>provided,</u>

08-13555-mg    Doc 42025-2    Filed 01/10/14    Entered 01/10/14 18:56:48    Exhibit 2
Pg 139 of 210
08-13555-jmp    Doc 40550-1    Filed 10/17/13    Entered 10/17/13 16:05:23    Exhibit A
and B    Pg 34 of 40
08-13555-jmp    Doc 22998    Filed 12/06/11    Entered 12/06/11 14:40:21    Main Document
Pg 11 of 17

however, that in the event that Fannie Mae, FHFA and LBHI fail to reach agreement on the

amount to be reserved on account of the Fannie Mae Priority Claim, either Fannie Mae or LBHI

may petition the Bankruptcy Court on shortened notice for a hearing on or before January 15,

2012 seeking a determination as to the proper amount to be reserved on account of the Fannie

Mae Priority Claim.

### Reservation of Rights

3.    Except to the extent of the Allowed Freddie Mac Claims and the Allowed Fannie Mae

Claims, the Parties hereby reserve all rights of the Parties and FHFA relating to the amount,

allowance, classification and/or priority of the Claims for all purposes, including in connection

with any distributions under the Third Amended Plan or otherwise in respect of these Bankruptcy

Cases, and nothing in this Stipulation, the Third Amended Plan (or any amendments, exhibits,

supplements, or agreements filed or entered into incident thereto, or the confirmation thereof),

the Confirmation Order, or any other pleadings or documents filed in connection therewith, shall

(i) have any effect on or prejudice the Debtors in respect of the Claims, including the amount,

allowance, classification and/or priority of such Claims, or in respect of distributions on account

thereof, and nothing herein shall be deemed an admission, release or waiver of the Debtors'

rights with respect to such Claims, nor (ii) have any effect on, enjoin, or otherwise prejudice the

rights of the GSEs and FHFA in respect of the Claims, including the amount, allowance,

classification and/or priority of such Claims, or in respect of distributions on account thereof,

including their right to assert that the Fannie Mae Priority Claim and the Freddie Mac Priority

Claim are entitled to be treated as priority claims based on the rights, titles, powers, and

privileges of FHFA under HERA, and all rights of the GSEs and FHFA under HERA, are fully

reserved in that regard, and nothing herein, or in the Third Amended Plan or the Confirmation

08-13555-mg    Doc 42025-2    Filed 01/10/14    Entered 01/10/14 18:56:48    Exhibit 2
Pg 140 of 210
08-13555-jmp    Doc 40550-1    Filed 10/17/13    Entered 10/17/13 16:05:23    Exhibit A
and B   Pg 35 of 40
08-13555-jmp    Doc 22998    Filed 12/06/11    Entered 12/06/11 14:40:21    Main Document
Pg 12 of 17

Order, shall be deemed an admission, release or waiver of the rights of, or otherwise prejudice, the GSEs and FHFA with respect to such Claims. In addition, nothing in this Stipulation, or in the Third Amended Plan or the Confirmation Order, shall affect, limit or otherwise prejudice FHFA's rights, titles, powers and privileges under HERA, as Conservator.

4. Nothing in this Stipulation, the Third Amended Plan (or any amendments, exhibits, supplements, or agreements filed or entered into incident thereto, or the confirmation thereof), the Confirmation Order, or any other pleadings or documents filed in connection therewith, shall affect, limit, enjoin or otherwise prejudice FHFA's rights, titles, powers, and privileges under HERA as the Conservator, including, without limitation the rights of Fannie Mae and/or Freddie Mac, or FHFA as Conservator thereof, to seek priority status and recovery in respect of the Fannie Mae Priority Claim and/or the Freddie Mac Priority Claim, and nothing in the Third Amended Plan or Confirmation Order shall be construed to restrain or limit any applicable regulatory or enforcement action that may be taken by FHFA, or to confer exclusive jurisdiction of the Bankruptcy Court over matters in respect of Fannie Mae, Freddie Mac, or FHFA as Conservator thereof.

5. With respect to the Fannie Mae Mortgage Servicing Agreements and the Fannie Mae Mortgage Servicing Rights, nothing in this Stipulation, the Third Amended Plan (or any amendments, exhibits, supplements, or agreements filed or entered into incident thereto, or the confirmation thereof), the Confirmation Order, or any other pleadings or documents filed in connection therewith, shall affect, limit or otherwise modify the agreements reached among Fannie Mae and the Debtors in respect of the Fannie Mae Mortgage Servicing Agreements and the Fannie Mae Mortgage Servicing Rights, all as set forth in the Fannie Mae MSR Transfer Agreements, or otherwise affect, enjoin, limit or otherwise prejudice the rights of Fannie Mae,

08-13555-mg    Doc 42025-2    Filed 01/10/14    Entered 01/10/14 18:56:48    Exhibit 2
Pg 141 of 210
08-13555-jmp    Doc 40550-1    Filed 10/17/13    Entered 10/17/13 16:05:23    Exhibit A
and B    Pg 36 of 40
08-13555-jmp    Doc 22998    Filed 12/06/11    Entered 12/06/11 14:40:21    Main Document
Pg 13 of 17

FHFA or the Debtors in respect thereof, including, without limitation, with respect to the transfer

and assignment of the Fannie Mae Mortgage Servicing Rights and the requirement for Fannie

Mae's consent to any such transfer and assignment, and all rights of the parties are hereby

reserved in all such respects.

6.    With respect to the Freddie Mac Mortgage Servicing Agreements and the Freddie

Mac Mortgage Servicing Rights, nothing in this Stipulation, the Third Amended Plan (or any

amendments, exhibits, supplements, or agreements filed or entered into incident thereto, or the

confirmation thereof), the Confirmation Order, or any other pleadings or documents filed in

connection therewith, shall affect, limit or otherwise modify the agreements reached among

Freddie Mac and the Debtors in respect of the Freddie Mac Mortgage Servicing Agreements and

the Freddie Mac Mortgage Servicing Rights, including as set forth and provided for in the

Aurora Settlement and the September 23 Order, or otherwise affect, enjoin, limit or otherwise

prejudice the rights of Freddie Mac, FHFA or the Debtors in respect thereof, including, without

limitation, with respect to the transfer and assignment of the Freddie Mac Mortgage Servicing

Rights and the requirement for Freddie Mac's consent to any such transfer and assignment, and

all rights of the Parties and FHFA are hereby reserved in all such respects.

### Deferred Rejection Deadline

7.    In connection with the Freddie Mac Mortgage Servicing Agreements, including,

without limitation, the Master Commitment, and the Debtors' possible assumption or rejection of

such agreements, Freddie Mac has asserted that the Master Commitment is an executory contract

among Freddie Mac and one or more of the Debtors that must be assumed or rejected by the

Debtors, and that the assumption of the Master Commitment by the Debtors and the cure of all

pre-petition and post-petition defaults thereunder are preconditions to the transferability of the

08-13555-mg    Doc 42025-2    Filed 01/10/14    Entered 01/10/14 18:56:48    Exhibit 2
Pg 142 of 210
08-13555-jmp    Doc 40550-1    Filed 10/17/13    Entered 10/17/13 16:05:23    Exhibit A
and B    Pg 37 of 40
08-13555-jmp    Doc 22998    Filed 12/06/11    Entered 12/06/11 14:40:21    Main Document
Pg 14 of 17

Freddie Mac Mortgage Servicing Rights. To the extent, if any, that the Debtors fail to pay post-petition amounts in the ordinary course of business, Freddie Mac reserves the right to assert claims for such amounts. The Debtors have asserted that the Master Commitment (and any retained master servicing rights) is not an executory contract or otherwise contains severable obligations and, as set forth in the last paragraph of Exhibit 2, Part D, of the Plan Supplement, the Freddie Mac Mortgage Servicing Rights are, in fact, retained rights not requiring assumption or rejection by the Debtors. In addition, the Debtors have also asserted that nothing shall ever convert any prepetition claims of Freddie Mac based on alleged Seller Obligations to cure payments under the Third Amended Plan. In this regard, nothing in this Stipulation, the Third Amended Plan (or any amendments, exhibits, supplements, or agreements filed or entered into incident thereto, or the confirmation thereof), the Confirmation Order, or any other pleadings or documents filed in connection therewith, shall affect, limit or otherwise modify the Master Commitment or convert any prepetition claims of Freddie Mac based on alleged Seller Obligations to postpetition cure payments under the Third Amended Plan or prejudice the rights of Freddie Mac, FHFA and the Debtors in respect thereof or otherwise, and all rights of the parties are hereby reserved in all such respects; provided, however, that in the event that Freddie Mac and the Debtors fail to resolve their disputes in respect of the Master Commitment prior to the Confirmation Hearing, Freddie Mac and the Debtors hereby agree that, notwithstanding anything in this Stipulation, the Third Amended Plan or the Confirmation Order to the contrary, upon execution of this Stipulation by the Parties hereto, the date by which the Debtors shall be required to elect to either assume or reject the Freddie Mac Mortgage Servicing Agreements, including, without limitation, the Master Commitment, or seek a determination that the Master Commitment is not an executory contract or otherwise contains severable obligations, shall be

14

08-13555-mg    Doc 42025-2    Filed 01/10/14    Entered 01/10/14 18:56:48    Exhibit 2
Pg 143 of 210
08-13555-jmp    Doc 40550-1    Filed 10/17/13    Entered 10/17/13 16:05:23    Exhibit A
and B    Pg 38 of 40
08-13555-jmp    Doc 22998    Filed 12/06/11    Entered 12/06/11 14:40:21    Main Document
Pg 15 of 17

extended until such date that is ten (10) business days after either Freddie Mac or LBHI shall provide written notice to the other party that consensual agreement is not likely to be reached with respect to the Master Commitment and the rights of the parties in respect thereof, and the Debtors failure to make any such election or seek any such determination prior to the expiration of said ten (10) business day period shall constitute the Debtors' election to treat the Freddie Mac Mortgage Servicing Agreements, including the Master Commitment, as executory contracts rejected by the Debtors, subject to the right of Freddie Mac to file any claim on account of rejection damages within thirty (30) days after such deemed rejection.

## **Miscellaneous**

8.  The Parties further agree that the Confirmation Order shall include a decretal paragraph ordering the approval and incorporation of this Stipulation.

9.  Fannie Mae and Freddie Mac each agree that, subject to the occurrence of the Stipulation Effective Date, and except as otherwise provided in this Stipulation, it will not participate in the formulation of, file, prosecute, consent to or support any objection to the Third Amended Plan, or take any other action to alter, delay or impede the confirmation and consummation of the Third Amended Plan.

10. Each Party acknowledges that (a) this Stipulation was drafted jointly by the Parties, (b) it has consulted with attorneys of its choosing and fully understands the terms hereof, (c) it has received legal advice regarding the advisability of entering into this Stipulation, and (d) it is executing this Stipulation voluntarily.  This Stipulation shall not be strictly construed against any Party on the grounds that the rules for the construction of contracts require the resolution of any ambiguity against the Party that drafted the document.

08-13555-mg    Doc 42025-2    Filed 01/10/14    Entered 01/10/14 18:56:48    Exhibit 2
Pg 144 of 210
08-13555-jmp    Doc 40550-1    Filed 10/17/13    Entered 10/17/13 16:05:23    Exhibit A
and B    Pg 39 of 40
08-13555-jmp    Doc 22998    Filed 12/06/11    Entered 12/06/11 14:40:21    Main Document
Pg 16 of 17

11. This Stipulation shall apply to and be binding upon and inure to the benefit of each Party and their respective agents, employees, successors (including the Debtors' bankruptcy estates and including any trustee appointed to administer the Bankruptcy Cases or any subsequent chapter 7 case(s)) and assigns, and any entity into which such Party may be merged or consolidated.

12. Each individual signing this Stipulation on behalf of any Party hereto acknowledges and, with respect to his or her own signature below, warrants and represents that he/she is authorized to execute this Stipulation in his/her representative capacity, as reflected below and on behalf of the Party indicated.

13. The provisions of this Stipulation are severable, and the illegality or unenforceability of any part or provision shall not affect the enforceability of any other part or provision, and this Stipulation shall be construed as if such illegal or unenforceable part or provision were omitted but only to the extent of such illegality or unenforceability.

14. This Stipulation may be signed in counterparts and by fax signature or in portable document format (PDF), each of which shall be deemed an original but all of which together shall constitute one and the same instrument, and it shall constitute sufficient proof of this Stipulation to present any copy, copies or facsimiles signed by the Parties.

15. Notwithstanding Bankruptcy Rule 6004 or otherwise, this Stipulation shall be effective immediately upon entry of an Order approving this Stipulation.

16. This Stipulation contains the entire agreement between the Parties hereto regarding the subject matter hereof and may not be modified other than by a signed writing executed by all Parties and delivered to each Party.

08-13555-mg    Doc 42025-2    Filed 01/10/14    Entered 01/10/14 18:56:48    Exhibit 2
Pg 145 of 210
08-13555-jmp    Doc 40550-1    Filed 10/17/13    Entered 10/17/13 16:05:23    Exhibit A
and B    Pg 40 of 40
08-13555-jmp    Doc 22998    Filed 12/06/11    Entered 12/06/11 14:40:21    Main Document
Pg 17 of 17

IN WITNESS WHEREOF, THIS STIPULATION HAS BEEN READ AND SIGNED IN

DUPLICATE ORIGINALS BY EACH OF THE PARTIES:

WEIL, GOTSHAL & MANGES LLP                    WINSTON & STRAWN LLP


/s/ Alfredo R Pérez                          /s/ David Neier
Alfredo R. Pérez                             David Neier
700 Louisiana, Suite 1600                    200 Park Avenue
Houston, Texas 77002-2755                    New York, New York 10166-4193
(713) 546-5040                               (212) 294-6700

*Attorneys for the Debtors and Debtors-in-*  *Attorneys for Federal National Mortgage*
*Possession*                                 *Association*



                                             LANDMAN CORSI BALLAINE & FORD
                                             P.C.

                                             /s/ Mark S. Landman
                                             Mark S. Landman
                                             120 Broadway
                                             New York, New York 10271
                                             (212) 238-4800

                                             *Attorneys for Federal Home Loan Mortgage*
                                             *Corporation*


SO ORDERED:

Dated: New York, New York
       December 6, 2011


                                             _s/ James M. Peck_
                                             United States Bankruptcy Judge

# EXHIBIT C

*United States Bankruptcy Court/Southern District of New York*
Lehman Brothers Holdings Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5076
New York, NY 10150-5076

# PROOF OF CLAIM

| In Re: <br> Lehman Brothers Holdings Inc., et al. <br> Debtors. | Chapter 11 <br> Case No. 08-13555 (JMP) <br> (Jointly Administered) |
|---|---|

UNIQUE IDENTIFICATION NUMBER: 1000221282

| Name of Debtor Against Which Claim is Held | Case No. of Debtor |
|---|---|
| **Lehman Brothers Holdings Inc.** | **08-13555** |

Filed: USBC - Southern District of New York
Lehman Brothers Holdings Inc., Et Al.
08-13555 (JMP)        **0000033568**

**NOTE:** This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503. Additionally, this form should not be used to make a claim for Lehman Programs Securities (See definition on reverse side.)

T

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)

LBH (CREDITOR.DBF,CREDNUM)CREDNUM # 1000221282******
FEDERAL HOME LOAN MORTGAGE CORPORATION
ATTN: MARK LANDMAN
LANDMAND, CORSI, BALLAINE & FORD P.C.
120 BROADWAY
NEW YORK, NY 10271

Telephone number: 212-238-4800    Email Address: mlandman@lcbf.com

☐ Check this box this claim amends a previously filed claim.

Court Claim Number: _____
*(If known)*

Filed on: _____

Name and address where payment should be sent (if different from above)

George Kielman, Esq.
Federal Home Loan Mortgage Corporation
8200 Jones Branch Dr. - MS 202
McLean, VA  22102
Telephone number: 703-903-2640    Email Address: freddiemac.com
George Kielman@

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

**1.** Amount of Claim as of Date Case Filed: $ 1,202,241,875 (interest as of 9/15/08)
If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete item 4.
If all or part of your claim is entitled to priority, complete Item 5.
If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete Item 6.
☐  Check this box if all or part of your claim is based on a Derivative Contract.*
☐  Check this box if all or part of your claim is based on a Guarantee.*
***IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.**
☒  Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is a based on a Derivative Contract or Guarantee.

**2.** Basis for Claim:  see attached Addendum and exhibits
(See instruction #2 on reverse side.)

**3.** Last four digits of any number by which creditor identifies debtor: _____
3a. Debtor may have scheduled account as: _____
(See instruction #3a on reverse side.)

**4.** Secured Claim (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
Nature of property or right of setoff: ☐ Real Estate    ☐ Motor Vehicle    ☐ Other
Describe: _____
Value of Property: $_____  Annual Interest Rate _____%
Amount of arrearage and other charges as of time case filed included in secured claim, if any:
$_____  Basis for perfection: _____
Amount of Secured Claim: $_____    Amount Unsecured: $_____

**6.** Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9): $_____
(See instruction #6 on reverse side.)

**7.** Credits: The amount of all payments on this claim has been credited for the purpose of making this proof of claim.
**8.** Documents: Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest. *(See definition of "redacted" on reverse side.)* If the documents are voluminous, attach a summary.
DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

| Date: <br> 9-18-09 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any. <br> Raymond G. Romano, EVP <br> Chief Credit Officer    Raymond G. Romano |
|---|---|

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

**5.** Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(____).

Amount entitled to priority:

$_____

*See attached re 11 USC 4617(b)(15) priority

FOR COURT USE ONLY

FILED BANKRUPTCY COURT S.D.N.Y. 22 P 1:07

# INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, there may be exceptions to these general rules.*

## Items to be completed in Proof of Claim form

**Name of Debtor, and Case Number:**
YOU MUST INDICATE THE SPECIFIC DEBTOR AGAINST WHICH YOUR CLAIM IS ASSERTED, INCLUDING THE NAME OF THE DEBTOR AND THE RELATED CASE NUMBER (DEBTORS AND CASE NUMBERS LISTED BELOW), IN THE SPACE ALLOTTED AT THE TOP OF THE CLAIM FORM.

| | | | |
|---|---|---|---|
| 08-13555 | Lehman Brothers Holdings Inc. | 08-13905 | CES Aviation LLC |
| 08-13600 | LB 745 LLC | 08-13906 | CES Aviation V LLC |
| 08-13885 | Lehman Brothers Commodity Services Inc. | 08-13907 | CES Aviation IX LLC |
| 08-13888 | Lehman Brothers Special Financing Inc. | 08-13908 | East Dover Limited |
| 08-13893 | Lehman Brothers OTC Derivatives Inc. | 09-10108 | Luxembourg Residential Properties Loan Finance S.a.r.l. |
| 08-13899 | Lehman Brothers Derivative Products Inc. | 09-10137 | BNC Mortgage LLC |
| 08-13900 | Lehman Commercial Paper Inc. | 09-10558 | Structured Asset Securities Corporation |
| 08-13901 | Lehman Brothers Commercial Corporation | 09-10560 | LB Rose Ranch LLC |
| 08-13902 | Lehman Brothers Financial Products Inc. | 09-12516 | LB 2080 Kalakaua Owners LLC |
| 08-13904 | Lehman Scottish Finance L.P. | 08-13664 | PAMI Statler Arms LLC |

If your Claim is against multiple Debtors, complete a separate form for each Debtor.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the Bankruptcy filing. Follow the instructions concerning whether to complete items 4, 5 and 6. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Use this space to report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**4. Secured Claim:**
Check the appropriate box and provide the requested information if the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See DEFINITIONS, below.) State the type and the value of property that secures the claim, attach copies of lien documentation, and state annual interest rate and the amount past due on the claim as of the date of the bankruptcy filing.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. §507(a).**
If any portion of your claim falls in one or more of the listed categories, check the appropriate box(es) and state the amount entitled to priority. (See DEFINITIONS, below.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9)**
State the value of any goods received by the debtor within 20 days before the date of commencement in which the goods have been sold to the debtor in the ordinary course of the debtor's business.

**7. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**8. Documents:**
Attach to this proof of claim form redacted copies documenting the existence of the debt and of any lien securing the debt. You may also attach a summary. You must also attach copies of documents that evidence perfection of any security interest. You may also attach a summary. FRBP 3001(c) and (d). Do not send original documents, as attachments may be destroyed after scanning.

**Date and Signature:**
The person filing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2), authorizes courts to establish local rules specifying what constitutes a signature. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. Attach a complete copy of any power of attorney. Criminal penalties apply for making a false statement on a proof of claim.

---

# DEFINITIONS

## Debtor
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

## Creditor
A creditor is the person, corporation, or other entity owed a debt by the debtor on the date of the bankruptcy filing.

## Claim
A claim is the creditor's right to receive payment on a debt that was owed by the debtor on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured.

## Proof of Claim
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the Claims Agent at the following address:

Lehman Brothers Holdings Claims Processing
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, PO Box 5076
New York, NY 10150-5076

## Secured Claim Under 11 U.S.C. §506(a)
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien. A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

## Unsecured Claim
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

## Claim Entitled to Priority Under 11 U.S.C. §507(a)
Priority claims are certain categories of unsecured Claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

## Redacted
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor should redact and use only the last four digits of any social-security, individual's tax identification, or financial-account number, all but the initials of a minor's name and only the year of any person's date of birth.

## Evidence of Perfection
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

## Derivative Contract
A contract that is any of (i) a "swap agreement" as such term is defined in section 101(53B) of the Bankruptcy Code or (ii) a "forward contract" as such term is defined in section 101(25) of the Bankruptcy Code. A cash-market purchase or sale of a security or loan (i.e. any purchase or sale of a security or loan for settlement within the standard settlement cycle for the relevant market), exchange-traded future or option, securities loan transaction, repurchase agreement in respect of securities or loans, and any guarantee or reimbursement obligations which would otherwise be included in the definition of such terms in the Bankruptcy Code shall not be considered a Derivative Contract for the purposes of this definition nor shall any notes, bonds, or other securities issued by the Debtors or their affiliates (including, but not limited to, Lehman Brothers Holdings Inc., Lehman Brothers Treasury Co. B.V., Lehman Brothers Bankhaus AG, Lehman Brothers Holdings plc, Lehman Brothers Securities N.V., and Lehman Brothers (Luxembourg) Equity Finance S.A.).

## Guarantee
A promise, representation or agreement to answer for the payment of some debt or the performance of some duty in case of the failure of another person or entity who is liable in the first instance.

## Lehman Programs Securities
Lehman Programs Securities means those securities included on the Lehman Programs Securities list available on http://www.lehman-docket.com as of July 27, 2009.

---

# INFORMATION

## Acknowledgment of Filing of Claim
To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim, or you may access the Claims Agent's system (http://www.lehman-docket.com) to view your filed proof of claim.

## Offers to Purchase a Claim
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 *et seq.*), and any applicable orders of the bankruptcy court.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

In re                                          Chapter 11 Case No.
                                               08-13555 (JMP)

LEHMAN BROTHERS HOLDINGS INC., et al.,         (Jointly Administered)

                    Debtors.

------------------------------------------------------------x

## ADDENDUM TO PROOF OF CLAIM OF
## FEDERAL HOME LOAN MORTGAGE CORPORATION

1.    Federal Home Loan Mortgage Corporation in conservatorship (hereinafter

referred to as "Freddie Mac") is a government-sponsored enterprise that not only plays a critical

role in the United States mortgage finance market but also is inextricably interwoven into the

nation's financial system.  On September 6, 2008, the Federal Housing Finance Agency

("FHFA"), an independent agency of the United States Government, was appointed as Freddie

Mac's conservator (the "Conservator").  The goal of the conservatorship is to restore confidence

in Freddie Mac, enhance its capacity to fulfill its mission and mitigate the systemic risk that has

contributed to the instability in the current market.  Freddie Mac is filing this proof of claim in

these chapter 11 cases at the direction of the Conservator.

2.    In August 2008, Freddie Mac made two separate transactions for the transfer of

funds totaling $1.2 billion through the Federal Reserve System from Freddie Mac's account at

the Federal Reserve Bank of New York to Lehman Brothers Holdings Inc.'s ("LBHI," or the

"Debtor") account with Citibank.  The transactions were executed on August 19th and August

20th in the amounts of $450,000,000 and $750,000,000, respectively, and brokered through

Tullet Prebon, an interdealer broker.  A copy of the supporting documents is attached hereto as

Exhibit A. Pursuant to the terms of the transaction, LBHI was scheduled to repay the funds on an "early return" basis; that is, prior to the opening of the capital markets, together with accrued interest on September 15, 2008. In order to effect an "early return" repayment of the loan, LBHI was to set aside the repayment amount and request the requisite wire transfer prior to September 15, 2008 so that the transfer could be made on an "early return" basis prior to the opening of the capital markets on September 15, 2008. Such transfer was not initiated, however, and, to date, Freddie Mac has not received payment of the $1.2 billion plus $2,241,875.00 in accrued interest. See Exhibit B. Accordingly, Freddie Mac is asserting a claim for $1,202,241,875.00 which includes interest as of September 15, 2008.[1]

3.    Pursuant to 12 U.S.C. § 4617(b), as amended by P.L. 110-289, the Conservator has the powers necessary to locate and protect Freddie Mac's assets, which as a matter of law, have been taken over by the Conservator. Pursuant to 12 U.S.C. § 4617(b)(15)(A), the Conservator is authorized to "avoid a transfer of any interest of an entity-affiliated party, or any person determined by the conservator … to be a debtor of the regulated entity, in property, or any obligation incurred by such party or person that was made within 5 years of the date on which the Agency was appointed conservator …, if such party or person voluntarily or involuntarily made such transfer or incurred such liability with the intent to hinder, delay, or defraud the regulated entity, the Agency, the conservator, or receiver." Section 4617(b)(15)(D) further states that the Conservator's power to avoid a fraudulent transfer is "superior to any rights of a trustee or any other party (other than any party which is a Federal agency) under Title 11." Therefore, the Conservator, on behalf of Freddie Mac, reserves all its rights pursuant to its

---

[1] Freddie Mac has filed a separate Proof of Claim for $885,839,087.33 related to derivative transactions and loan servicing related obligations.

statutory authorization, including with respect to the transfer of any property in which the Debtor had an interest to the extent such transfer was made with the intent to hinder or delay the "early return" payment of the $1.2 billion due and owing to Freddie Mac on September 15, 2008, for which claim is made hereunder, with any recovery on account of such claim being entitled to a priority recovery under Section 4617(b)(15)(D).

4.      In addition to the foregoing, by way of this Proof of Claim, Freddie Mac adopts and reasserts each and every claim scheduled by the Debtor as payable to Freddie Mac.

5.      Freddie Mac is filing this proof of claim in anticipation of the claims bar date (the "Bar Date"), which has been set as September 22, 2009, pursuant to the Court's July 2, 2009 Order pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) Establishing the Deadline for Filing Proofs of Claim, Approving the Form and Manner of Notice Thereof and Approving the Proof of Claim Form. Freddie Mac reserves the right to amend, modify, and/or supplement this proof of claim at any time, including, without limitation, for the purpose of asserting additional claims, whether arising from the transactions or documents described in Freddie Mac's proof of claim, this attachment, or otherwise. Freddie Mac also reserves its rights to assert any and all rights of setoff that it may have against the Debtor in respect of its claims, including, without limitation, the right to set off its claims against any claims that the Debtor (or any successor, assignee or person claiming through the Debtor, as the case may be) may assert against Freddie Mac or its successors or assigns, whether or not arising under the transactions set forth in this proof of claim. Freddie Mac also reserves its right to pursue claims (including, but not limited to, the claims described herein) against the Debtor based upon additional or alternative legal theories, and reserves the right to assert administrative expense claims.

6.    Freddie Mac further reserves its right to seek to have the reference withdrawn with respect to the subject matter of these claims, any objection or other proceedings commenced with respect thereto, or any other proceedings commenced in this case or otherwise involving Freddie Mac. By filing this proof of claim, neither Freddie Mac nor the Conservator intends to submit to the jurisdiction of the Bankruptcy Court for any purpose other than the allowance of this claim for purposes of these chapter 11 cases.

```
TID
Account Id                              08192008-003463
Status String                           MS FED FUNDS
Txn Class                               PROC_DLVR/CONF
Type Code                               Funds Delivers
Amount                                  1600
                                        $450,000,000.00
(3000) Adj Reason Code
(3000) As of Adj Date
(3100) Sender's ABA                     021039513
(3100) Sender's Tele Name               FHLMC INVESTOR PI
(3320) Sender Reference                 08192008 003463
(3400) Receiver's ABA                   021000089
(3400) Receiver's Tele Name             CITIBANK NYC
(3600) Business Function Code           FFS
(3600) SWIFT Transaction Type Code
(3700) Charges: Detail
(3700) Charges: Currency Code 1
(3700) Charges: Senders Charges 1
(3700) Charges: Currency Code 2
(3700) Charges: Senders Charges 2
(3700) Charges: Currency Code 3
(3700) Charges: Senders Charges 3
(3700) Charges: Currency Code 4
(3700) Charges: Senders Charges 4
(3710) Inst Amt: Currency Code 1
(3710) Inst Amt: Amount
(3720) Exchange Rate
(4000) Intermediary's FI Id Code
(4000) Intermediary's FI Ident
(4000) Intermediary's FI Name
(4000) Intermediary's FI Addr
(4100) Benef's FI Id Code
(4100) Benef's FI Ident
(4100) Benef's FI Name
(4100) Benef's FI Addr
(4200) Beneficiary Id Code              D
(4200) Beneficiary Ident               40615202
(4200) Beneficiary Name                LEHMAN BROTHERS HOLDING
(4200) Beneficiary Addr
(4320) Ref for Beneficiary
(4400) Acct Db Drwdown Id Code
(4400) Acct Db Drwdown Ident
(4400) Acct Db Drwdown Name
(4400) Acct Db Drwdown Addr
(5000) Originator Id Code               D
(5000) Originator Ident                487100
(5000) Originator Name                 FM MSA FED FUNDS
(5000) Originator Addr
(5100) Origin's FI Id Code
(5100) Origin's FI Ident
(5100) Origin's FI Name
(5100) Origin's FI Addr
(5200) Instructing FI Id Code
(5200) Instructing FI Ident
(5200) Instructing FI Name
(5200) Instructing FI Address
(5400) Account Cr in Drwdown
(6000) Origin. to Benef. info           OVERNIGHT FED FUNDS
(6100) Receiver's FI Info
(6110) Drwdown Db Acct Adv Code
(6110) Drwdown Db Acct Adv Info
(6200) Intermediary FI Info
(6210) Intermediary's FI Adv Code
(6210) Intermediary's FI Adv Info
(6300) Benef's FI Info
(6310) Benef's FI Adv Code
(6310) Benef's FI Adv Info
(6400) Beneficiary Info
(6410) Beneficiary Adv Code
(6410) Beneficiary Adv Info
(6420) Beneficiary MOP
(6420) Beneficiary Mop Info
(6430) Payment Limitation
(6500) FI to FI Info
(9000) Free Text
IMAD                                    20080819B1Q8283C000105
Message Disposition
Acceptance Timestamp
OMAD
Error field
Cost Center                             NA
GL Account Cash                         NA
GL Account Offset                       NA
Group Id
Trade ID
XRef No.                                ALAD.487   .-1762    .8
Repetitive ID                           MS LBHC CI
Counterparty ID
Settlement Date                         08/19/2008
Process Date                            08/19/2008
Priority                                5
```

```
WSMO
SAFEID          08/19/08 14:15:18.836 PEND_DLVR/HOLD Created
F354356         08/19/08 17:14:49.266 PEND_DLVR Released
F354356         08/19/08 17:14:54.346 PROC_DLVR/UNACK Delivered
safeid          08/19/08 17:16:02.410 PROC_DLVR/CONF Confirmed, IMAD:20080819B1Q8263C000105
```

Compliance Audit
08192008 17:14:54 OFAC Rules Passed (4200) Beneficiary Name          BROTHERS|(90000006)*LEHMAN:OCCURS;

```
TID                                  08202008-004807
Account Id                           MS FED FUNDS
Status String                        PROC_DLVR/CONF
Txn Class                            Funds Delivers
Type Code                            1600
Amount                               $750,000,000.00
(3000) Adj Reason Code
(3000) As of Adj Date
(3100) Sender's ABA                  021039513
(3100) Sender's Tele Name            FHLMC INVESTOR PI
(3320) Sender Reference              08202008 004807
(3400) Receiver's ABA                021000089
(3400) Receiver's Tele Name          CITIBANK NYC
(3600) Business Function Code        FFS
(3600) SWIFT Transaction Type Code
(3700) Charges: Detail
(3700) Charges: Currency Code 1
(3700) Charges: Senders Charges 1
(3700) Charges: Currency Code 2
(3700) Charges: Senders Charges 2
(3700) Charges: Currency Code 3
(3700) Charges: Senders Charges 3
(3700) Charges: Currency Code 4
(3700) Charges: Senders Charges 4
(3710) Inst Amt: Currency Code 1
(3710) Inst Amt: Amount
(3720) Exchange Rate
(4000) Intermediary's FI Id Code
(4000) Intermediary's FI Ident
(4000) Intermediary's FI Name
(4000) Intermediary's FI Addr
(4100) Benef's FI Id Code
(4100) Benef's FI Ident
(4100) Benef's FI Name
(4100) Benef's FI Addr
(4200) Beneficiary Id Code           D
(4200) Beneficiary Ident             40615202
(4200) Beneficiary Name              LEHMAN BROTHERS HOLDING
(4200) Beneficiary Addr
(4320) Ref for Beneficiary
(4400) Acct Db Drwdown Id Code
(4400) Acct Db Drwdown Ident
(4400) Acct Db Drwdown Name
(4400) Acct Db Drwdown Addr
(5000) Originator Id Code            D
(5000) Originator Ident              487100
(3000) Originator Name               FM MSA FED FUNDS
(5000) Originator Addr
(5100) Origin's FI Id Code
(5100) Origin's FI Ident
(5100) Origin's FI Name
(5100) Origin's FI Addr
(5200) Instructing FI Id Code
(5200) Instructing FI Ident
(5200) Instructing FI Name
(5200) Instructing FI Address
(5400) Account Cr in Drwdown
(6000) Origin. to Benef. info        OVERNIGHT FED FUNDS
(6100) Receiver's FI Info
(6110) Drwdown Db Acct Adv Code
(6110) Drwdown Db Acct Adv Info
(6200) Intermediary FI Info
(6210) Intermediary's FI Adv Code
(6210) Intermediary's FI Adv Info
(6300) Benef's FI Info
(6310) Benef's FI Adv Code
(6310) Benef's FI Adv Info
(6400) Beneficiary Info
(6410) Beneficiary Adv Code
(6410) Beneficiary Adv Info
(6420) Beneficiary MOP
(6420) Beneficiary Mop Info
(6430) Payment Limitation
(6500) FI to FI Info
(9000) Free Text
IMAD                                 20080820B1Q8284C000032
Message Disposition
Acceptance Timestamp
OMAD
Error field
Cost Center                          NA
GL Account Cash                      NA
GL Account Offset                    NA
Group Id
Trade ID
XRef No.                             ALAD.487    .-1767    .S
Repetitive ID                        MS LBHC CI
Counterparty ID
Settlement Date                      08/20/2008
Process Date                         08/20/2008
Priority                             S
```

```
MEMO
SAFEID              08/20/08 10:52:51.513 PEND_DLVR/HOLD Created
F351598             08/20/08 11:40:19.356 PEND_DLVR Released
F351598             08/20/08 11:41:16.513 PROC_DLVR/UNACK Delivered
safeid              08/20/08 11:42:26.250 PROC_DLVR/CONF Confirmed, IMAD:20080820B1Q8284C000032
```

```
Compliance Audit
08202008 11:41:16 OPAC Rules Passed [4200] Beneficiary Name          BROTHERS|(90000006)*LEHMAN:OCCURS;
```



ATTN: TOMMY FUQUA
A/C FREDDIE MAC FED FUNDS
1551 PARK RUN DR
MAIL STOP D5N
MCLEAN, VA 22102-3110

Invoice Date : ░░░░░░░      Page :    1

Reference :      24404/15/28/00/0808-117695

**The following deals were arranged by the EURODOLLAR CASH division.**

| Date | Deal # | Counterparty | From | To | Days | Rate | Notional Amount | | Amount |
|------|--------|-------------|------|-----|------|------|-----------------|---|--------|
| 01-Aug-08 | 73130 | SOCIETE GENERALE-NEW YORK | 8/01/08 | 8/15/08 | 14 | 2.28000 LN | 250,000,000.00 | US | 2,100.00 |
| 05-Aug-08 | 75243 | RBS CITIZENS BANK NA - RI | 8/05/08 | 8/15/08 | 10 | 2.20000 LN | 300,000,000.00 | US | 1,800.00 |
| 20-Aug-08 | 86093 | US CENTRAL CU-LENEXA | 8/20/08 | 9/15/08 | 26 | 2.50000 LN | 500,000,000.00 | US | 7,800.00 |
| 21-Aug-08 | 86985 | UNION BK OF CAL-L.A. | 8/21/08 | 9/15/08 | 25 | 2.43000 LN | 200,000,000.00 | US | 3,000.00 |
| 25-Aug-08 | 88685 | BK OF IRELAND-STAMFORD | 8/25/08 | 9/15/08 | 21 | 2.37500 LN | 200,000,000.00 | US | 2,520.00 |
| 26-Aug-08 | 89518 | NATIXIS - NY | 8/26/08 | 9/15/08 | 20 | 2.35000 LN | 150,000,000.00 | US | 1,800.00 |
| 28-Aug-08 | 91244 | BCO BILBAO VIZ ARG SA-NY | 8/28/08 | 9/15/08 | 18 | 2.37000 LN | 250,000,000.00 | US | 2,700.00 |
| 29-Aug-08 | 92082 | WESTERN CORP FCU-SAN DIMAS | 8/29/08 | 9/15/08 | 17 | 2.37000 LN | 400,000,000.00 | US | 4,080.00 |

SHORT DATES          BROKERAGE SUBTOTAL :          44,790.00

BROKERAGE TOTAL IN USD :          44,790.00

# Freddie Mac | NEW TRADE

**MSA-FRB**
Trade No. 1080, Vs. 1
Aug 19, 2008 18:05:07 GMT

PMG:                AMM    Trade Ops:           JSL

## LEND    LBHC CASH/FEDF                2.55000 Sep 15, 2008

| | | | |
|---|---|---|---|
| Asset ID: | **B5A0703R7** | Payment Delay: | 0 |
| Ticker: | **LBHC** | Date Convention: | ACT/360 |
| Coupon: | 2.55000 | Accrual Date: | Aug 19, 2008 |
| Coupon Type: | MAT | First Coupon Date: | Sep 15, 2008 |
| Frequency: | ZERO | Next Pay Date: | Sep 15, 2008 |
| Reset Term: | | Odd First Pmt: | ☐ Yes ☑ No |
| Maturity Date: | Sep 15, 2008 | AMT: | ☐ Yes ☑ No |
| Issue Date: | Aug 19, 2008 | ERISA: | ☐ Yes ☐ No |
| Min Trade Size: | N/A | 144A: | ☐ Yes ☑ No |
| Min Trade Increment: | N/A | Notional: | ☐ Yes ☑ No |

| | |
|---|---|
| Trade Date: | Aug 19, 2008 |
| Settle Date: | Aug 19, 2008 |
| Counterparty: | LBHC |
| LEHMAN BROTHERS HOLDINGS INC. | |
| Counterparty Cont | MARTIN WALSH |
| Original Par: | 450,000,000.000 |
| Factor: | 1.000000000 |
| Factor Date: | |
| Current Par: | 450,000,000.000 |

**General Use**
  Early Return for Trust
**Delivery Instructions**
  FEDFUND/MS LBHC CI
  BANK NAME:          CITIBANK NYC
  ABA#:                021000089
  A/C#:                40815202
  A/C NAME:            LEHMAN BROTHERS HOLDING
  BANK TO BANK:        OVERNIGHT FED FUNDS
**Miscellaneous Information**
  TrdPurpose:          MSA
**Fifo Information**

| trade | relation | amount |
|---|---|---|
| 710 | SPEC | -450,000,000.00 |

| | |
|---|---|
| Price: | 100.000 |
| | 100.000000000 |
| Principal: | (450,000,000.00) |
| Interest: | 0.00 |
| Total Charges: | 0.00 |
|   Broker Commission: | (7,290.00) |
| Net Money: | (450,000,000.00) |
| Currency: | USD |
| Net Cash Flow: | OUT |

| | |
|---|---|
| Exchange rate: | |
| Discount: | |
| Option Type: | |

| | |
|---|---|
| Prepay: | 100.00 |
| Yield: | 2.550 |
| YTC: | |
| Duration: | 0.07406 |
| Convexity: | 0.00000 |

| S & P | Moody | DBRS |
|---|---|---|
| | | |
| **Fitch** | **NAIC** | |
| | | |

| | |
|---|---|
| Discretionary: | ☐ Yes ☑ No |
| Liquid: | ☑ Yes ☐ No |
| Segregate: | ☑ Yes ☐ No |
| Release: | ☐ Yes ☑ No |

| | |
|---|---|
| Exec: | 2008-08-19 17:35:38 GMT |
| Exec Source: | Auth Time |
| Executing Broker: | PREB |
| | PREBON |

*Mortgage Securities Account (MSA-FRB)*
*Trade No. 1080, Vs. 1*

FreddieMac

Created: Sep 15, 2008 16:25:29 GMT

A/C# NA

Copyright © 2008 BlackRock Inc. All Rights Reserved.

NO CUSTODIAN

# Freddie Mac | NEW TRADE

**MSA-FRB**
Trade No. 710, Vs. 1
Sep 12, 2008 22:30:48 GMT

**MAT**  LBHC
CASH/FEDF

PMG:                rm_mat    Trade Ops:        rm_mat

2.55000 Sep 15, 2008

| | | | |
|---|---|---|---|
| Asset ID: | B5A0703R7 | Payment Delay: | 0 |
| Ticker: | LBHC | Date Convention: | ACT/360 |
| Coupon: | 2.55000 | Accrual Date: | |
| Coupon Type: | MAT | First Coupon Date: | Sep 15, 2008 |
| Frequency: | ZERO | Next Pay Date: | |
| Reset Term: | | Odd First Pmt: | ☐ Yes ☑ No |
| Maturity Date: | Sep 15, 2008 | AMT: | ☐ Yes ☑ No |
| Issue Date: | Aug 19, 2008 | ERISA: | ☐ Yes ☐ No |
| Min Trade Size: | N/A | 144A: | ☐ Yes ☑ No |
| Min Trade Increment: | N/A | Notional: | ☐ Yes ☑ No |

| Trade Date: | Sep 15, 2008 |
|---|---|
| Settle Date: | Sep 15, 2008 |
| Broker: | |
| | UNKNOWN |
| Broker Contact: | rm_mat |
| Original Par: | 450,000,000.000 |
| Factor: | 1.000000000 |
| Factor Date: | |
| Current Par: | 450,000,000.000 |

**Fifo Information**

| trade | relation | amount |
|---|---|---|
| 1080 | SPEC | -450,000,000.00 |

| Price: | 100.000 |
|---|---|
| | 100.000000000 |
| Principal: | 450,000,000.00 |
| Interest: | 0.00 |
| Commission: | 0.00 |
| Net Money: | 450,000,000.00 |
| Currency: | USD |
| Net Cash Flow: | IN |

| Exchange rate: | |
|---|---|
| Discount: | |
| Option Type: | |

| Prepay: | 0.00 |
|---|---|
| Yield: | |
| YTC: | |
| Duration: | 0.00000 |
| Convexity: | 0.00000 |

| S & P | Moody | DBRS |
|---|---|---|
| Fitch | NAIC | |

| Discretionary: | ☐ Yes ☑ No |
|---|---|
| Liquid: | ☑ Yes ☐ No |
| Segregate: | ☐ Yes ☑ No |
| Release: | ☑ Yes ☐ No |

| Exec: | 2008-09-12 22:30:48 GMT |
|---|---|
| Exec Source: | Auth Time |

Mortgage Securities Account (MSA-FRB)
Trade No. 710, Vs. 1

FreddieMac

Created: Sep 15, 2008 16:23:39 GMT

A/C# NA

Copyright © 2008 BlackRock Inc. All Rights Reserved.

NO CUSTODIAN



# Freddie Mac

## NEW TRADE

**MSA-FRB**
Trade No. 1084, Vs. 1
Aug 20, 2008 14:45:31 GMT

PMG:      AMM   Trade Ops:      TEF

## LEND    LBHC
## CASH/FEDF          2.55000 Sep 15, 2008

| | | | | |
|---|---|---|---|---|
| Asset ID: | B5A070KA5 | Payment Delay: | 0 | |
| Ticker: | LBHC | Date Convention: | ACT/360 | |
| Coupon: | 2.55000 | Accrual Date: | Aug 20, 2008 | |
| Coupon Type: | MAT | First Coupon Date: | Sep 15, 2008 | |
| Frequency: | ZERO | Next Pay Date: | Sep 15, 2008 | |
| Reset Term: | | Odd First Pmt: | ☐ Yes ☑ No | |
| Maturity Date: | Sep 15, 2008 | AMT: | ☐ Yes ☐ No | |
| Issue Date: | Aug 20, 2008 | ERISA: | ☐ Yes ☐ No | |
| Min Trade Size: | N/A | 144A: | ☐ Yes ☐ No | |
| Min Trade Increment: | N/A | Notional: | ☐ Yes ☑ No | |

Trade Date: Aug 20, 2008
Settle Date: Aug 20, 2008
Counterparty: LBHC
LEHMAN BROTHERS HOLDINGS INC.
Counterparty Cont MARTY WALSH

Original Par: 750,000,000.000
Factor: 1.000000000
Factor Date:
Current Par: 750,000,000.000

**General Use**
  Early Return for Trust
**Delivery Instructions**
  FEDFUND/MS LBHC CI
  BANK NAME:      CITIBANK NYC
  ABA#:      021000089
  A/C#:      40615202
  A/C NAME:      LEHMAN BROTHERS HOLDING
  BANK TO BANK:      OVERNIGHT FED FUNDS
**Miscellaneous Information**
  TrdPurpose:    MSA
**Fifo Information**

| trade | relation | amount |
|---|---|---|
| 711 | SPEC | -750,000,000.00 |

Price: 100.000
100.000000000
Principal: (750,000,000.00)
Interest: 0.00
Total Charges: 0.00
  Broker Commission: (11,700.00)
Net Money: (750,000,000.00)
Currency: USD
Net Cash Flow: OUT

Exchange rate:
Discount:
Option Type:

Prepay: 100.00
Yield: 2.550
YTC:
Duration: 0.07132
Convexity: 0.00000

| S & P | Moody | DBRS |
|---|---|---|
| Fitch | NAIC | |

Discretionary: ☐ Yes ☑ No
Liquid: ☑ Yes ☐ No
Segregate: ☑ Yes ☐ No
Release: ☐ Yes ☑ No

Exec: 2008-08-20 13:49:44 GMT
Exec Source: Auth Time
Executing Broker: PREB
PREBON

Mortgage Securities Account (MSA-FRB)
Trade No. 1084, Vs. 1

Created: Sep 15, 2008 18:25:48 GMT

FreddieMac

A/C# NA          Copyright © 2008 BlackRock Inc. All Rights Reserved.          NO CUSTODIAN

# Freddie Mac | NEW TRADE

**MSA-FRB**
Trade No. 711, Vs. 1
Sep 12, 2008 22:30:48 GMT

**MAT** | **LBHC CASH/FEDF**

PMG:          rm_mat | Trade Ops:          rm_mat

**2.55000 Sep 15, 2008**

| | | | | |
|---|---|---|---|---|
| **Asset ID:** | **B5A070KA5** | Payment Delay: | 0 | |
| Ticker: | LBHC | Date Convention: | ACT/360 | |
| Coupon: | 2.55000 | Accrual Date: | | |
| Coupon Type: | MAT | First Coupon Date: | Sep 15, 2008 | |
| Frequency: | ZERO | Next Pay Date: | | |
| Reset Term: | | Odd First Pmt: | ☐ Yes ☑ No | |
| Maturity Date: | Sep 15, 2008 | AMT: | ☐ Yes ☑ No | |
| Issue Date: | Aug 20, 2008 | ERISA: | ☐ Yes ☐ No | |
| Min Trade Size: | N/A | 144A: | ☐ Yes ☑ No | |
| Min Trade Increment: | N/A | Notional: | ☐ Yes ☑ No | |

| | |
|---|---|
| Trade Date: | Sep 15, 2008 |
| Settle Date: | Sep 15, 2008 |
| Broker: | |
| | UNKNOWN |
| Broker Contact: | rm_mat |
| | |
| Original Par: | 750,000,000.000 |
| Factor: | 1.000000000 |
| Factor Date: | |
| Current Par: | 750,000,000.000 |

**Fifo Information**

| trade | relation | amount |
|---|---|---|
| 1084 | SPEC | -750,000,000.00 |

| | |
|---|---|
| **Price:** | **100.000** |
| | 100.000000000 |
| **Principal:** | **750,000,000.000** |
| **Interest:** | **0.00** |
| **Commission:** | **0.00** |
| **Net Money:** | **750,000,000.000** |
| **Currency:** | **USD** |
| **Net Cash Flow:** | **IN** |

| | |
|---|---|
| Exchange rate: | |
| Discount: | |
| Option Type: | |

| | |
|---|---|
| Prepay: | 0.00 |
| Yield: | |
| YTC: | |
| Duration: | 0.00000 |
| Convexity: | 0.00000 |

| S & P | Moody | DBRS |
|---|---|---|
| Fitch | NAIC | |

| | |
|---|---|
| Discretionary: | ☐ Yes ☑ No |
| Liquid: | ☑ Yes ☐ No |
| Segregate: | ☐ Yes ☑ No |
| Release: | ☑ Yes ☐ No |

| | |
|---|---|
| Exec: | 2008-09-12 22:30:48 GMT |
| Exec Source: | Auth Time |

Created Sep 15, 2008 16:24:05 GMT

A/C# NA

Copyright ©2008 BlackRock Inc. All Rights Reserved.

NO CUSTODIAN

Mortgage Securities Account (MSA-FRB)
Trade No. 711, Vs. 1

FreddieMac



```
    09/17/2008  13:53    201-557-5902              TULLETT PREBON              PAGE 01/02
                                                                                    S2
  TLR0012          85363 V.00          DETAILS        Due date:  9/15/08   Ent date:  8/19/08
 eal date:  8/19/08  Val date:  8/19/08  Due date:  9/15/08   Chg date:  8/19/08
 eal number: 85363   Batch #:  999  Section #: 15  Type: 74   Chg date:  8/19/08
 umber of Days    27
 ELLER  FREDDIE MAC MSA FED FUNDS          BUYER    LEHMAN BROS HLDG INC (NY)
 urr1:  US                   Thru1: PYN   Curr2:                  Thru2: PYN
 ro:                Dsk 20 EURODOLLAR      Bro:                Dsk 27 FED FUNDS
 roker 20052       WALSH, MARTIN           Broker 20257       FARMER, KEVIN
 ebate:             .00  RD 000            Rebate:             .00  RD 000
 roker                                     Broker
 orres  BRO:          .00                  Corres BRO:          .00  Swap#
 ate:  000255         Amount:    450,000,000  Code:            Old deal#:
 Rate:                SPrice:              BRate:                BPrice:
 el amt:                                   Del amt:
 ay FEDERAL RESERVE BK-N.Y.                Repay FEDERAL RESERVE BK-N.Y.
 nstruction ACC FHLMC INVESTOR PI          Instruction
 /C FREDDIE MAC MSA FED FUNDS              A/C CITIBANK NA-NY
 nstruction ABA 0210-3951-3 ACC 487100     Instruction ABA 0210-0008-9
 AV .                                      FAV LEHMAN BROS HLDG INC (NY)
 nstruction *EARLY RETURN BY 9:30AM        Instruction ACC 40615202
 pecial instr.
 F9=NO RE-TLX
                                                    F10=Pay Ins.
                                              F6=Retlx F7=Tlx mnt F8=Tlx Inq
```

```
09/17/2008  13:53   201-557-5902          TULLETT PREBON              PAGE 02/02
                    86087 V.00            DETAILS                              S2
Deal date:  8/20/08  Val date:  8/20/08  Due date:   9/15/08  Ent date:  8/20/08
Deal number: 86087   Batch #:  999  Section #: 15  Type: 74  Chg date:  8/20/08
Number of Days    26
SELLER  FREDDIE MAC MSA FED FUNDS        BUYER   LEHMAN BROS HLDG INC (NY)
Curr1:  US                Thru1:  PYN    Curr2:                Thru2:  PYN
Bro:                      Dsk 20 EURODOLLAR  Bro:              Dsk 27 FED FUNDS
Broker 20052        WALSH, MARTIN       Broker 20257      FARMER, KEVIN
Rebate:          .00  RD 000            Rebate:        .00  RD 000
Broker                                  Broker
Corres BRO:            .00              Corres BRO:          .00  Swap#
Rate:   000255       Amount:           Code:             Old deal#:
SRate:               SPrice:    750,000,000  BRate:               BPrice:
Del amt:                                Del amt:
Pay FEDERAL RESERVE BK-N.Y.             Repay FEDERAL RESERVE BK-N.Y.
Instruction ACC FHLMC INVESTOR PI       Instruction
A/C FREDDIE MAC MSA FED FUNDS           A/C CITIBANK NA-NY
Instruction ABA 0210-3951-3 ACC 487100  Instruction ABA 0210-0008-9
FAV .                                   FAV LEHMAN BROS HLDG INC (NY)
Instruction *EARLY RETURN BY 9:30AM     Instruction ACC 40615202
Special instr.
 F9=NO RE-TLX

                                            F10=Pay Ins.
                                        F6=Retlx F7=Tlx mnt F8=Tlx Inq
```

| Fund | Td Num | CUSIP | Ticker/Coupon/Maturity | Counterparty | Tran Type | Orig. Face | Net Money | Group/Type | Trade Price | Trade Date | Settle Date | Int @ Mat. | Maturity |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MSA-FR8 | 1080 | B54070XG7 | LBHC 2.550 09/15/2008 | LBHC | LEND | 450,000,000.00 | -450,000,000.00 | CASH/FEDF | 100 | 8/19/2008 | 8/19/2008 | -860,625.00 | 9/15/2008 |
| MSA-FR8 | 1084 | B54070XG5 | LBHC 2.550 09/15/2008 | LBHC | LEND | 750,000,000.00 | -750,000,000.00 | CASH/FEDF | 100 | 8/20/2008 | 8/20/2008 | -1,381,250.00 | 9/15/2008 |

# EXHIBIT D

# FEDERAL HOUSING FINANCE AGENCY



## STATEMENT

|  |  |  |
|---|---|---|
| **Contact:** | Corinne Russell | (202) 414-6921 |
|  | Stefanie Mullin | (202) 414-6376 |

For Immediate Release
September 7, 2008

## ****EMBARGOED UNTIL 11 a.m. ****

## STATEMENT OF FHFA DIRECTOR JAMES B. LOCKHART

Good Morning

Fannie Mae and Freddie Mac share the critical mission of providing stability and liquidity to the housing market. Between them, the Enterprises have $5.4 trillion of guaranteed mortgage-backed securities (MBS) and debt outstanding, which is equal to the publicly held debt of the United States. Their market share of all new mortgages reached over 80 percent earlier this year, but it is now falling. During the turmoil last year, they played a very important role in providing liquidity to the conforming mortgage market. That has required a very careful and delicate balance of mission and safety and soundness. A key component of this balance has been their ability to raise and maintain capital. Given recent market conditions, the

1

balance has been lost. Unfortunately, as house prices, earnings and capital have continued to deteriorate, their ability to fulfill their mission has deteriorated. In particular, the capacity of their capital to absorb further losses while supporting new business activity is in doubt.

Today's action addresses safety and soundness concerns. FHFA's rating system is called GSE Enterprise Risk or G-Seer. It stands for Governance, Solvency, Earnings and Enterprise Risk which includes credit, market and operational risk. There are pervasive weaknesses across the board, which have been getting worse in this market.

Over the last three years OFHEO, and now FHFA, have worked hard to encourage the Enterprises to rectify their accounting, systems, controls and risk management issues. They have made good progress in many areas, but market conditions have overwhelmed that progress.

The result has been that they have been unable to provide needed stability to the market. They also find themselves unable to meet their affordable housing mission. Rather than letting these conditions fester and worsen and put our markets in jeopardy, FHFA, after painstaking review, has decided to take action now.

2

Key events over the past six months have demonstrated the increasing challenge faced by the companies in striving to balance mission and safety and soundness, and the ultimate disruption of that balance that led to today's announcements. In the first few months of this year, the secondary market showed significant deterioration, with buyers demanding much higher prices for mortgage backed securities.

In February, in recognition of the remediation progress in financial reporting, we removed the portfolio caps on each company, but they did not have the capital to use that flexibility.

In March, we announced with the Enterprises an initiative to increase mortgage market liquidity and market confidence. We reduced the OFHEO-directed capital requirements in return for their commitments to raise significant capital and to maintain overall capital levels well in excess of requirements.

In April, we released our Annual Report to Congress, identifying each company as a significant supervisory concern and noting, in particular, the deteriorating mortgage credit environment and the risks it posed to the companies.

In May OFHEO lifted its 2006 Consent Order with Fannie Mae after the company completed the terms of that order. Subsequently, Fannie Mae successfully raised $7.4 billion of new capital, but Freddie Mac never completed the capital raise promised in March.

Since then credit conditions in the mortgage market continued to deteriorate, with home prices continuing to decline and mortgage delinquency rates reaching alarming levels. FHFA intensified its reviews of each company's capital planning and capital position, their earnings forecasts and the effect of falling house prices and increasing delinquencies on the credit quality of their mortgage book.

In getting to today, the supervision team has spent countless hours reviewing with each company various forecasts, stress tests, and projections, and has evaluated the performance of their internal models in these analyses. We have had many meetings with each company's management teams, and have had frank exchanges regarding loss projections, asset valuations, and capital adequacy. More recently, we have gone the extra step of inviting the Federal Reserve and the OCC to have some of their senior mortgage credit experts join our team in these assessments.

4

The conclusions we reach today, while our own, have had the added benefit of their insight and perspective.

After this exhaustive review, I have determined that the companies cannot continue to operate safely and soundly and fulfill their critical public mission, without significant action to address our concerns, which are:

- the safety and soundness issues I mentioned, including current capitalization;
- current market conditions;
- the financial performance and condition of each company;
- the inability of the companies to fund themselves according to normal practices and prices; and
- the critical importance each company has in supporting the residential mortgage market in this country,

Therefore, in order to restore the balance between safety and soundness and mission, FHFA has placed Fannie Mae and Freddie Mac into conservatorship. That is a statutory process designed to stabilize a troubled institution with the

5

objective of returning the entities to normal business operations. FHFA will act as the conservator to operate the Enterprises until they are stabilized.

The Boards of both companies consented yesterday to the conservatorship. I appreciate the cooperation we have received from the boards and the management of both Enterprises. These individuals did not create the inherent conflict and flawed business model embedded in the Enterprises' structure.

The goal of these actions is to help restore confidence in Fannie Mae and Freddie Mac, enhance their capacity to fulfill their mission, and mitigate the systemic risk that has contributed directly to the instability in the current market. The lack of confidence has resulted in continuing spread widening of their MBS, which means that virtually none of the large drop in interest rates over the past year has been passed on to the mortgage markets. On top of that, Freddie Mac and Fannie Mae, in order to try to build capital, have continued to raise prices and tighten credit standards.

FHFA has not undertaken this action lightly. We have consulted with the Chairman of the Board of Governors of the Federal Reserve System, Ben Bernanke, who was appointed a consultant to FHFA under the new legislation. We

6

have also consulted with the Secretary of the Treasury, not only as an FHFA Oversight Board member, but also in his duties under the law to provide financing to the GSEs. They both concurred with me that conservatorship needed to be undertaken now.

There are several key components of this conservatorship:

First, Monday morning the businesses will open as normal, only with stronger backing for the holders of MBS, senior debt and subordinated debt.

Second, the Enterprises will be allowed to grow their guarantee MBS books without limits and continue to purchase replacement securities for their portfolios, about $20 billion per month without capital constraints.

Third, as the conservator, FHFA will assume the power of the Board and management.

Fourth, the present CEOs will be leaving, but we have asked them to stay on to help with the transition.

7

Fifth, I am announcing today I have selected Herb Allison to be the new CEO of Fannie Mae and David Moffett the CEO of Freddie Mac. Herb has been the Vice Chairman of Merrill Lynch and for the last eight years chairman of TIAA-CREF. David was the Vice Chairman and CFO of US Bancorp. I appreciate the willingness of these two men to take on these tough jobs during these challenging times. Their compensation will be significantly lower than the outgoing CEOs. They will be joined by equally strong non-executive chairmen.

Sixth, at this time any other management action will be very limited. In fact, the new CEOs have agreed with me that it is very important to work with the current management teams and employees to encourage them to stay and to continue to make important improvements to the Enterprises.

Seventh, in order to conserve over $2 billion in capital every year, the common stock and preferred stock dividends will be eliminated, but the common and all preferred stocks will continue to remain outstanding. Subordinated debt interest and principal payments will continue to be made.

Eighth, all political activities -- including all lobbying -- will be halted immediately. We will review the charitable activities.

8

Lastly and very importantly, there will be the financing and investing relationship with the U.S. Treasury, which Secretary Paulson will be discussing. We believe that these facilities will provide the critically needed support to Freddie Mac and Fannie Mae and importantly the liquidity of the mortgage market.

One of the three facilities he will be mentioning is a secured liquidity facility which will be not only for Fannie Mae and Freddie Mac, but also for the 12 Federal Home Loan Banks that FHFA also regulates. The Federal Home Loan Banks have performed remarkably well over the last year as they have a different business model than Fannie Mae and Freddie Mac and a different capital structure that grows as their lending activity grows. They are joint and severally liable for the Bank System's debt obligations and all but one of the 12 are profitable. Therefore, it is very unlikely that they will use the facility.

During the conservatorship period, FHFA will continue to work expeditiously on the many regulations needed to implement the new law. Some of the key regulations will be minimum capital standards, prudential safety and soundness standards and portfolio limits. It is critical to complete these regulations so that any new investor will understand the investment proposition.

9

This decision was a tough one for the FHFA team as they have worked so hard to help the Enterprises remain strong suppliers of support to the secondary mortgage markets. Unfortunately, the antiquated capital requirements and the turmoil in housing markets over-whelmed all the good and hard work put in by the FHFA teams and the Enterprises' managers and employees. Conservatorship will give the Enterprises the time to restore the balances between safety and soundness and provide affordable housing and stability and liquidity to the mortgage markets. I want to thank the FHFA employees for their work during this intense regulatory process. They represent the best in public service. I would also like to thank the employees of Fannie Mae and Freddie Mac for all their hard work. Working together we can finish the job of restoring confidence in the Enterprises and with the new legislation build a stronger and safer future for the mortgage markets, homeowners and renters in America.

Thank you and I will now turn it back to Secretary Paulson.

# EXHIBIT E

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x
                                           :
In re                                      :    Chapter 11 Case No.
                                           :
LEHMAN BROTHERS HOLDINGS INC.,             :    08-13555 (JMP)
*et al.*,                                  :
                                           :    (Jointly Administered)
                              Debtors.      :
------------------------------------------------------- x


### REPORT OF
### ANTON R. VALUKAS, EXAMINER




Jenner & Block LLP
353 N. Clark Street
Chicago, IL 60654-3456
312-222-9350

919 Third Avenue
37th Floor
New York, NY  10022-3908
212-891-1600

March 11, 2010                    *Counsel to the Examiner*


### VOLUME 1 OF 9

**Sections I & II:  Introduction, Executive Summary & Procedural Background**

**Section III.A.1:  Risk**

pledges.[36]  By September 12, two days after it publicly reported a $41 billion liquidity pool, the pool actually contained less than $2 billion of readily monetizable assets.[37]

Months earlier, on June 9, 2008, Lehman pre-announced its second quarter results and reported a loss of $2.8 billion, its first ever loss since going public in 1994.[38] Despite that announcement, Lehman was able to raise $6 billion of new capital in a public offering on June 12, 2008.[39] But Lehman knew that new capital was not enough. Treasury Secretary Henry M. Paulson, Jr., privately told Fuld that if Lehman was forced to report further losses in the third quarter without having a buyer or a definitive survival plan in place, Lehman's existence would be in jeopardy.[40]

On September 10, 2008, Lehman announced that it was projecting a $3.9 billion loss for the third quarter of 2008.[41]  Although Lehman had explored options over the summer, it had no buyer in place; its only announced survival plan was to spin off

---

[36] *Id.*

[37] See Lehman, Liquidity Pool Table Listing Collateral and Ability to Monetize (Sept. 12, 2008) [LBEX-WGM 784607] (listing $1.4 billion of assets as "high ability to monetize" and $934 million of assets as "mid ability to monetize").

[38] Lehman Brothers Holdings Inc., Press Releases (Mar. 14, 2007, June 12, 2007, Sept. 18, 2007, Dec. 13, 2007, Mar. 18, 2008 and June 9, 2008).

[39] Lehman Brothers Holdings Inc., Press Release (June 12, 2008); Lehman Brothers Holdings Inc., Press Release (June 16, 2008).

[40] Fuld does not recall that warning.  Examiner's Interview of Richard S. Fuld, Jr., Sept. 30, 2009, at p. 3, but Paulson told the Examiner that he consistently communicated to Fuld how dire Lehman's situation was and that he pointedly urged Fuld to find a buyer after Lehman announced a $2.8 billion loss for the second quarter of 2008, Examiner's Interview of Henry M. Paulson, June 25, 2009, at pp. 11-15.

[41] Final Transcript of Lehman Brothers Holdings Inc. Third Quarter 2008 Preliminary Earnings Call (Sept. 10, 2008), at p. 8; Lehman Brothers Holdings Inc., Press Release (Sept. 10, 2008), at p. 1 [LBHI_SEC07940_042866].

require Lehman to value thousands of rapidly devaluing commercial real estate positions.

### (i)  Equity Hole

To establish SpinCo as a viable independent entity and to avoid consolidation with Lehman, Lehman would have to capitalize SpinCo with substantial equity, amounting to at least 20 to 25 percent of SpinCo's net asset value.[2339]  Providing that equity from Lehman's own cash capital would leave a corresponding "hole" in Lehman's capital structure, which already was depleted by write-downs and losses.[2340] Indeed, when McGee floated the "good bank/bad bank" concept in early June 2008, Larry Wieseneck, Lehman's Global Head of Risk Solutions, responded that Goldfarb and Lehman's Global Real Estate Group had "rejected" the idea because it "required too much equity beneath it."[2341]

---

[2339] *See* e-mail from Daniel Kashdin, Lehman, to Daniel Kerstein, Lehman, *et al.* (July 11, 2008) [LBHI_SEC07940_401374] ("To preclude consolidation, there will need to be a substantial amount of equity in the deal"); e-mail from David Goldfarb, Lehman, to Richard S. Fuld, Jr., Lehman (July 21, 2008) [LBEX-DOCID 1224222] ("There is a minimum of capital needed to de-consolidate which is approx $6 billion and obviously we would like to raise much more to reduce our ongoing financing of Spinco"). *Accord* Examiner's Interview of Richard S. Fuld, Jr., May 6, 2009, at p. 7; Examiner's Interview of Hugh E. McGee, III, Aug. 12, 2009, at p. 23.

[2340] *See, e.g.,* e-mail from Gerard Reilly, Lehman, to Martin Kelly, Lehman (July 19, 2008) [LBEX-DOCID 2117905] ("I have heard as much as 14b of equity needed on 35b of assets.  Does not leave remaining co w much."); e-mail from Eric Felder, Lehman, to Paolo R. Tonucci, Lehman (Aug. 10, 2008) [LBHI_SEC07940_538151] ("We are too small post spinco in my opinion").

[2341] E-mail from Larry Wieseneck, Lehman, to Hugh E. McGee, III,  Lehman (June 11, 2008) [LBHI_SEC07940_398653]; *see also* e-mail from Daniel Kerstein, Lehman, to Larry Wieseneck, Lehman (July 22, 2008) [LBHI_SEC07940_404505] ("Have been thinking this through and coming to conclusion we won't do spin because too much equity and financing won't work for the spinco"); e-mail from Timothy Lyons, Lehman, to Alex Kirk, Lehman (July 22, 2008) [LBHI_SEC07940_174554] ("Given your views on the likelihood of spinco, I think we need to move hard down the path of Plan B"); e-mail from Eric Felder,

may have discussed the possibility of bankruptcy with Fuld in July 2008.[2780]  Paulson told the Examiner that, at the very least, he made clear to Fuld that the Government would not provide a bailout for Lehman.[2781]  On the other hand, Fuld told the Examiner that while Paulson never gave him any assurance or reason to believe that the Government would provide assistance, Paulson also never said anything that ruled out the possibility of Government assistance.[2782]

A September 11, 2008 discussion between Geithner and Fuld may have played a role in leading Fuld to believe that a federal bailout was possible.  On Thursday, September 11, Baxter called Russo and suggested that Fuld step down from the Board of the FRBNY.[2783]  Fuld told the Examiner that after Russo told Fuld about the conversation, Fuld called Geithner.[2784]  Geithner asked Fuld to step down from the Board "in case we have to do something for you or with you this weekend."[2785] Geithner told the Examiner that he could not recall making the statement, but he was certain he was careful not to imply that Lehman could expect the Federal Reserve's support.[2786]  Fuld reported that he walked away from his conversation with Geithner

[2780] Examiner's Interview of Henry M. Paulson, Jr., June 25, 2009, at pp. 14-15.
[2781] Id.
[2782] Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 11; Examiner's Interview of Richard S. Fuld, Jr., Sept. 30, 2009, at p. 21.
[2783] Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 11; Examiner's Interview of Thomas Baxter, Jr., Aug. 31, 2009.
[2784] Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 11.
[2785] Id.
[2786] Examiner's Interview of Treasury Secretary Timothy F. Geithner, Nov. 24, 2009, at p. 9.

Finally, in analyzing LBHI's ASAP activity with LBSF, the Examiner observed that in the 2008 period of analysis, LBHI transferred a net amount of roughly $650 million on behalf of LBSF on September 11, almost immediately prior to LBHI's bankruptcy. The Examiner found this single net transfer particularly notable in view of the fact that it comprised almost 90% of the activity for the entire six-week period.

### 7.    Examiner's Analysis of Lehman's Debt to Freddie Mac

The Federal Housing Finance Agency ("FHFA"), Conservator for the Federal Home Loan Mortgage Corporation ("Freddie Mac"), requested the Examiner's assistance in investigating certain transactions between Freddie Mac and LBHI.[7229] Pursuant to the eighth bullet of paragraph 2 of the Examiner Order, the Examiner's investigation extends to "transactions . . . among the debtors and the pre-chapter 11 lenders and/or financial participants."[7230]   In this Section, the Examiner reports on his investigation concerning unsecured loans from Freddie Mac to LBHI in 2008 that LBHI did not repay.

---

[7229] *See* Letter from Alfred M. Pollard, FHFA, to Anton R. Valukas, Jenner & Block, re: In re Lehman Brothers Holdings, Inc., *et al.* (Feb. 23, 2009), at p. 2. As Conservator for Freddie Mac, FHFA holds "all rights, titles, powers, and privileges" of Freddie Mac. 12 U.S.C. § 4617(b)(2). Further, FHFA has the authority to avoid certain fraudulent transactions related to Freddie Mac. *See id.* § 4617(b)(15). FHFA claims superpriority to the proceeds of such transactions. *See id.* § 4617(b)(15)(D). The Examiner makes no legal conclusions as to FHFA's priority.

[7230] Further, the Examiner Order provides that "[t]he Examiner shall cooperate fully with any governmental agencies." Order Directing Appointment of an Examiner Pursuant to Section 1104(c)(2) of the Bankruptcy Code, at p. 6 (¶ 8), Docket No. 2569, *In re Lehman Bros. Holdings, Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Jan. 16, 2009).

Beginning in early 2008, Freddie Mac engaged in a series of privately negotiated short-term funding transactions with LBHI, typically advancing between $1 billion and $1.2 billion for approximately one month at a time.[7231] Steven Engel, Lehman's Global Head of Funding, described LBHI's transactions with Freddie Mac as "plain vanilla:" Engel or another trader from Lehman's funding desk would speak with a broker, typically Tullett Prebon, which would indicate that Freddie Mac was looking to lend money and ask whether Lehman was interested in borrowing that money.[7232] Lehman borrowed from Freddie Mac to take advantage of an attractive rate, and it would seek to roll the transaction when the rate was favorable.[7233]

On August 19, 2008, Freddie Mac transferred $450 million to LBHI and on August 20, 2008, Freddie Mac transferred $750 million to LBHI.[7234] Both transfers were due to be repaid on the morning of September 15 – the day LBHI filed for bankruptcy –

---

[7231] Letter from David A. Felt, FHFA, to Anton R. Valukas, Jenner & Block, re: In re: Lehman Brothers Holdings, Inc., et al. (Apr. 17, 2009), at p. 2 & Attach. 2; Examiner's Interview of Steven J. Engel, Oct. 30, 2009, at p. 4. Although FHFA and Lehman sometimes described these transactions as "fed funds" transactions, Steven Engel, Lehman's Global Head of Funding, explained that these transactions, though made through a fed funds broker, were not strictly fed funds transactions because LBHI was not a bank. Examiner's Interview of Steven J. Engel, Oct. 30, 2009, at pp. 7-8.

[7232] Examiner's Interview of Steven J. Engel, Oct. 30, 2009, at p. 4.

[7233] Id. Engel never spoke with Freddie Mac directly about these transactions. Id. Richard Fuld interacted with Richard Syron, CEO of Freddie Mac, as a banking client, but Fuld had no recollection of discussing these transactions with Syron. Examiner's Interview of Richard S. Fuld, Jr., Apr. 28, 2009, at p. 14. According to FHFA, Syron also did not recall speaking with Fuld concerning these transactions. Letter from David A. Felt, FHFA, to Anton R. Valukas, Jenner & Block, re: In re: Lehman Brothers Holdings, Inc., et al. (Apr. 17, 2009), at p. 4. Although it appears that a call was scheduled among Lehman's Paolo Tonucci and others with Freddie Mac on August 1, 2008 "to discuss liquidity," e-mail from Daniel Malone, Lehman, to Paolo Tonucci, Lehman, et al. (July 31, 2008) [LBHI_SEC07940_53324], Tonucci could not recall whether the call took place, Examiner's Interview of Paolo Tonucci, Sept. 16, 2009, at p. 28.

[7234] See e-mail from Kevin Farmer, Tullett Prebon, to David Forsyth, Lehman, et al. (Aug. 19, 2008) [LBEX-DOCID 450084]; e-mail from Kevin Farmer, Tullett Prebon, to David Forsyth, Lehman, et al. (Aug. 20, 2008) [LBEX-DOCID 450083].

but never were.  The trades were executed through Tullett Prebon, at an interest rate of

2.55%, and the funds were initially placed into an LBHI account at Citibank.[7235]  This

Citibank account was the cash account to which LBHI typically issued payment

instructions.[7236]  Thus, the funds from Freddie Mac were not segregated from other

LBHI funds and, upon receipt, they were managed as part of LBHI's liquidity pool.[7237]

Because Freddie Mac was due to be repaid on the morning of Monday,

September 15, preparations for repayment should have occurred on Friday, September

12.[7238]  There is conflicting evidence as to whether preparations for repayment took place

on September 12.  Engel explained that in order to prepare for repayment LBHI would

have had to invest part of its liquidity pool Friday night in a product that would repay

by Monday morning.  He did not think that such preparations were made on September

12.[7239]  In a letter dated October 16, 2008, Lehman's counsel stated that LBHI did not

issue wire instructions to repay Freddie Mac on September 15.[7240]  However, Alvarez &

Marsal has indicated that "[t]he payment request to repay this loan was systematically

---

[7235] E-mail from Kevin Farmer, Tullett Prebon, to David Forsyth, Lehman, *et al.* (Aug. 19, 2008) [LBEX-DOCID 450084]; e-mail from Kevin Farmer, Tullett Prebon, to David Forsyth, Lehman, *et al.* (Aug. 20, 2008) [LBEX-DOCID 450083]; Examiner's Interview of Steven J. Engel, Oct. 30, 2009, at p. 5.

[7236] Examiner's Interview of Steven J. Engel, Oct. 30, 2009, at p. 5.

[7237] *Id.* at pp. 5-6.

[7238] *Id.* at p. 6.

[7239] *Id.*

[7240] Letter from Diane Harvey, Weil, Gotshal & Manges, to Karen Wagner, Davis, Polk & Wardwell, re: Federal Home Loan Mortgage Corporation Funds Transfers (Oct. 16, 2008), at p. 2 (attached to Declaration of George Kielman in Supp. of Mot. of Federal Home Loan Mortgage Corp. for Leave to Conduct Rule 2004 Discovery, Docket No. 1181, *In re Lehman Bros. Holdings, Inc.*, No. 08-13555 (Bankr. S.D.N.Y. Oct. 22, 2008)).

generated and waiting to be released to the bank on Monday, 9/15/08."[7241]  Moreover,

some documentation over the course of the weekend indicated that Lehman planned to

repay Freddie Mac on September 15.[7242]

Despite the magnitude of Lehman's transactions with Freddie Mac, the

transactions were not governed by a formal written agreement.[7243]  Rather, LBHI

documented the transactions with "screenshots" from its accounting system.[7244]  In

addition, the broker Tullett Prebon would sometimes send Lehman e-mails confirming

the transactions and their basic terms.[7245]  Freddie Mac also maintained minimal trading

---

[7241] E-mail from Lauren Sheridan, Alvarez & Marsal, to Jerome L. Epstein, Jenner & Block, et al. (Oct. 20, 2009).  These wire instructions were issued by TWS (Treasury Workstation), an application used by LBHI to manage its treasury functions.  See e-mail from Lauren Sheridan, Alvarez & Marsal, to Heather D. McArn, Jenner & Block, et al. (Dec. 2, 2009); TWS Freddie Mac Payment Details [LBEX-AM 5640797]; see also supra Section III.B.2.c (discussing TWS).

[7242] See e-mail from Tamir Shafer, Lehman, to Daniel J. Fleming, Lehman, et al. (Sept. 13, 2008) [LBEX-DOCID 051810], attaching Spreadsheet [LBEX-DOCID 059347] (showing repayment to Freddie Mac scheduled for 9:00 a.m.); e-mail from Tamir Shafer, Lehman, to Christopher Tsuboi, FRBNY, et al. (Sept. 14, 2008) [LBEX-AM 049457], attaching Spreadsheet [LBEX-AM 049458] (showing repayment to Freddie Mac scheduled for 5:30 p.m.).

[7243] See e-mail from Lauren Sheridan, Alvarez & Marsal, to Heather D. McArn, Jenner & Block, et al. (Oct. 18, 2009); Examiner's Interview of Steven J. Engel, Oct. 30, 2009, at p. 5.  The Estate does not dispute the existence of these transactions.  Although Freddie Mac was not included on Lehman's initial list of its largest unsecured creditors, see Voluntary Petition, at Sched. 1, Docket No. 1, In re Lehman Bros. Holdings, Inc., No. 08-13555 (Bankr. S.D.N.Y. Sept. 15, 2008), it was later listed on Schedule F as a creditor holding an unsecured claim; that claim was listed as not contingent, not unliquidated, and not disputed, see Schedules, at p. 235, Docket No. 3078, In re Lehman Bros. Holdings, Inc., No. 08-13555 (Bankr. S.D.N.Y. Mar. 12, 2009).  According to Alvarez & Marsal, Freddie Mac's exclusion from the initial list was inadvertent.  See e-mail from Lauren Sheridan, Alvarez & Marsal, to Jerome L. Epstein, Jenner & Block, et al. (Oct. 20, 2009).

[7244] See e-mail from Lauren Sheridan, Alvarez & Marsal, to Heather D. McArn, Jenner & Block, et al. (Oct. 18, 2009); Facsimile from Scott Alvey, Lehman, to Howard Comet, Weil, Gotshal & Manges (Oct. 30, 2008), at p 2 [LBEX-SE 000001] (screenshot of August 20, 2008 transaction); Lehman, Screenshot of Aug. 19, 2008 Transaction [LBEX-AM 5640789].

[7245] See, e.g., e-mail from Kevin Farmer, Tullett Prebon, to David Forsyth, Lehman, et al. (June 25, 2008) [LBEX-WGM 648915]; Examiner's Interview of Steven J. Engel, Oct. 30, 2009, at p. 5.

records of these transactions.[7246]    Engel could not speak to whether such minimal
documentation was typical from Lehman's perspective, as Lehman did not engage in
similar transactions with other entities.[7247]

Although the Examiner is aware of multiple possible reasons that Freddie Mac
was not repaid on September 15,[7248] the critical fact is that LBHI had filed for bankruptcy
protection early on the morning of September 15 and thus did not have to make the
payment.[7249]  The Examiner is not aware of any basis to treat the Freddie Mac claim as
anything other than an unsecured claim that is not contingent, not unliquidated, and

---

[7246] Letter from David A. Felt, FHFA, to Anton R. Valukas, Jenner & Block, re: In re: Lehman Brothers
Holdings, Inc., *et al.* (Apr. 17, 2009), at Attach. 4-5.

[7247] Examiner's Interview of Steven J. Engel, Oct. 30, 2009, at p. 5.

[7248] LBHI could not make wire transfers on September 15 because banks shut down its cash accounts. *See
supra* Section III.B.2. In October 2008, however, Lehman's counsel offered a different reason for the
nonpayment – that LBHI's Citibank account did not have sufficient funds to repay Freddie Mac on
September 15. Letter from Diane Harvey, Weil, Gotshal & Manges, to Karen Wagner, Davis, Polk &
Wardwell, re: Federal Home Loan Mortgage Corporation Funds Transfers (Oct. 16, 2008), at pp. 1-2
(attached to Declaration of George Kielman in Supp. of Mot. of Federal Home Loan Mortgage Corp. for
Leave to Conduct Rule 2004 Discovery, Docket No. 1181, *In re Lehman Bros. Holdings, Inc.,* No. 08-13555
(Bankr. S.D.N.Y. Oct. 22, 2008)).  Alvarez & Marsal, in turn, explained that "[t]he loan was not repaid
because of the bankruptcy filing." E-mail from Lauren Sheridan, Alvarez & Marsal, to Jerome L. Epstein,
Jenner & Block, *et al.* (Oct. 20, 2009); Examiner's Interview of Steven J. Engel, Oct. 30, 2009, at p. 7.

[7249] It is true that a substantial amount of funds were withdrawn from LBHI's Citibank account on Friday,
September 12, to meet JPMorgan's September 11 request for $5 billion cash collateral. *See supra* Section
III.A.5.b.1.k.  For a discussion of an avoidance analysis concerning Lehman's transactions with JPMorgan,
*see supra* Section III.B.3.g.5.a.  LBHI also appears to have transferred $500 million from its Citibank
account to  LBI late on Sunday, September 14.  E-mail from Julius Silbiger, Citigroup, to Thomas
Obermaier, Citigroup, *et al.* (Sept. 14, 2008) [CITI-LBHI-EXAM 00104189] (stating that the $500 million
had moved by 9:42 p.m. that evening); e-mail from Roger Barnes, Citigroup, to Naresh N. Kumar,
Citigroup, *et al.* (Sept. 14, 2008) [CITI-LBHI-EXAM 00104189] (explaining that Citichecking opened at 9
p.m. that evening so the transfer could be made then); e-mail from Thomas Fontana, Citigroup, to
Christopher M. Foskett, Citigroup, *et al.* (Sept. 14, 2008) [CITI-LBHI-EXAM 00101129] (approving the
transfer).  An account statement, however, lists the transfer date as September 15.  Lehman Brothers Inc.
Account Report (Oct. 1, 2008), at p. 1033 [CITI-LBI 00024142] (account statement confirming that the
transaction transferred $500 million from Lehman Brothers Holdings Main Open Account 4061-5202 to
Lehman Brothers Inc. account 3054-4658). See Sections III.C.5.c..1.d.iii and III.B.3.g.5.b for further
discussion of this transfer.

not disputed – as indicated on the Debtor's Schedule F (Creditors Holding Unsecured

Nonpriority Claims).

# EXHIBIT F

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>LEHMAN BROTHERS HOLDINGS INC, *et. al.*<br><br>Debtors. | Chapter 11<br><br>Case No. 08-13555 (JMP)<br><br>Jointly Administered |

### STIPULATION AND AGREEMENT BY
### AND AMONG FANNIE MAE, FREDDIE MAC AND THE
### DEBTORS REGARDING THE DEBTORS' THIRD AMENDED PLAN

This stipulation ("**Stipulation**") is entered into as of this 29th day of November 2011,

by and among (i) the Federal National Mortgage Association ("**Fannie Mae**"), (ii) the Federal

Home Loan Mortgage Corporation ("**Freddie Mac**," and together with Fannie Mae, the

"**GSEs**"), and (iii) Lehman Brothers Holdings Inc. ("**LBHI**") and its affiliated debtors and

debtors-in-possession (collectively with LBHI, the "**Debtors**," and together with Fannie Mae and

Freddie Mac, the "**Parties**," and each of them, a "**Party**") in the jointly administered chapter 11

bankruptcy cases captioned In re Lehman Brothers Holdings Inc., et al., Case No. 08-13555

(JMP) (the "**Bankruptcy Cases**") pending in the United States Bankruptcy Court for the

Southern District of New York (the "**Bankruptcy Court**").

### RECITALS

WHEREAS, on September 6, 2008, the Federal Housing Finance Agency ("**FHFA**") was

appointed conservator for Fannie Mae and Freddie Mac (the "**Conservator**"), and granted all

rights, titles, powers and privileges as Conservator thereof, pursuant to 12 U.S.C. § 4617, as

amended by P.L. 110-289, which was enacted as part of the Housing and Economic Recovery

Act of 2008 ("**HERA**");

WHEREAS, LBHI and certain of the Debtors commenced the Bankruptcy Cases on September 15, 2008, with additional chapter 11 petitions filed thereafter for certain of the other Debtors. The Debtors are authorized to operate their businesses and manage their properties as debtors-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, on July 2, 2009, the Bankruptcy Court entered an *Order Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) Establishing the Deadline for Filing Proofs of Claim, Approving the Form and Manner of Notice Thereof and Approving the Proof of Claim Form* (Docket No. 4271), which, among other things set September 22, 2009, as the general bar date for filing proofs of claim in the Bankruptcy Cases;

WHEREAS, on September 1, 2011, the Debtors filed the Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors (together with any supplements, amendments and exhibits thereto, and as each may be further modified from time to time, collectively, the "**Third Amended Plan**") and a related disclosure statement (the "**Disclosure Statement**"). On September 1, 2011, the Bankruptcy Court entered the order approving the adequacy of the information in the Disclosure Statement (the "**Disclosure Statement Order**");

WHEREAS, on October 25, 2011, the Debtors filed their Plan Supplement to the Third Amended Plan (the "**Plan Supplement**"), which Plan Supplement includes "Exhibit 2, Part D – Residential Real Estate Agreements";[1]

---

[1]    Exhibit 2, Part D of the Plan Supplement states, in part:

The Debtors intend to assume all loan servicing contracts relating to residential mortgage loans and real estate owned properties ("REO") owned by the Debtors, including, but not limited to, loan servicing contracts that may be contained within and severable from other contracts that the Debtors do not seek to assume. To the extent any such contracts do not appear on Exhibit 2, Part D, for any reason, such

Footnote continued on next page

## Fannie Mae Claims

WHEREAS, Fannie Mae timely filed the below proofs of claim in the Bankruptcy Cases

(collectively, the "**Fannie Mae Claims**"):[2]

| Claim Number | Debtor | Filed Claim Amount | Basis for Claim |
|---|---|---|---|
| 29556 (amended and superseded by 40611) | LBSF | Unliquidated | • Derivative Contract |
| 29557 (the "**Fannie Mae LBHI Claim**") | LBHI | $19.058 billion | • Guarantee of Derivative Contract<br>• LBHI's obligation to repurchase mortgage loans and participation interests<br>• LBHI's breach of representations and warranties<br>• Material misstatements or omissions in connection with LBHI's sale of certain bonds to Fannie Mae<br>• Violations by LBHI of Sections 11 and 12 of the Securities Act of 1933 in connection with LBHI's sale of certain notes to Fannie Mae |

---

Footnote continued from previous page

    contracts shall be treated as if they were listed herein and assumed as of the Effective Date and the required cure amounts for such contracts shall be zero.

    The Debtors have not listed on Exhibit 2, Part D, any contracts pursuant to which the Debtors have retained mortgage loan servicing rights or a retained fee interest, either through exclusion or affirmative conveyance, in connection with residential mortgage loans and/or REO currently or previously owned by the Debtors, because of their conclusion that such contracts are not executory. In the event that the Bankruptcy Court determines that such contracts are executory contracts, then all such contracts shall be treated as if they were listed herein and assumed as of the Effective Date and the required cure amounts for such contracts shall be zero.

[2]    The descriptions of the Fannie Mae Claims contained in this Stipulation are for reference only, and are subject in all respects to the terms and conditions of the Fannie Mae Claims, as more specifically set forth therein and, except to the extent any of the Fannie Mae Claims have previously been separately allowed by an order of the Bankruptcy Court or agreement by the Parties, does not represent any admission by the Debtors in any respect.

WHEREAS, pursuant to a settlement agreement, Claim Number 40611 and a portion of Claim Number 29557 were allowed (i) against Lehman Brothers Special Financing Inc. ("**LBSF**") as a general, non-priority unsecured claim in the amount of $110 million (the "**Allowed Fannie Mae LBSF Claim**"); and (ii) against LBHI as a general, non-priority unsecured claim in the amount of $110 million (the "**Allowed Fannie Mae LBHI Claim**," and together with the Allowed Fannie Mae LBSF Claim, the "**Allowed Fannie Mae Claims**");

**Freddie Mac Claims**

WHEREAS, Freddie Mac timely filed the below proofs of claim in the Bankruptcy Cases (collectively, the "**Freddie Mac Claims**", and together with the Fannie Mae Claims, the "**Claims**")[3]:

| Claim Number | Debtor | Filed Claim Amount | Basis for Claim |
|---|---|---|---|
| 33568 (the "**Freddie Mac Priority Claim**") | LBHI | $1,202,241,875.00 | • Two (2) loans made by Freddie Mac to LBHI on August 19 and August 20, 2008, in the amounts of $450,000,000 and $750,000,000, respectively |
| 33569 | LBSF | $17,239,087.33 | • Derivative Contract |
| 33576 (the "**Freddie Mac LBHI Claim**") | LBHI | $885,839,087.33 | • Guarantee of Derivative Contract<br>• Seller/servicer related obligations |

WHEREAS, pursuant to that certain Termination Agreement, dated July 27, 2011, Claim Number 33569 and a portion of Claim Number 33576 were allowed (i) against LBSF as a general, non-priority unsecured claim in the amount of $16,394,310.08 (the "**Allowed Freddie**

---

[3]    The descriptions of the Freddie Mac Claims contained in this Stipulation are for reference only, and are subject in all respects to the terms and conditions of the Freddie Mac Claims, as more specifically set forth therein and, except to the extent any of the Freddie Mac Claims have previously been separately allowed by an order of the Bankruptcy Court or agreement by the Parties, does not represent any admission by the Debtors in any respect.

4

**Mac LBSF Claim**"); and (ii) against LBHI as a general, non-priority unsecured claim in the amount of $16,100,024.63 (the "**Allowed Freddie Mac LBHI Claim**", and together with the Allowed Freddie Mac LBSF Claim, the "**Allowed Freddie Mac Claims**");

### Priority Claims

WHEREAS, pursuant to the Fannie Mae Claims and the Freddie Mac Claims, the GSEs and FHFA as Conservator have asserted that the claims are entitled to priority "superior to any rights of a trustee or any other party (other than any party which is a Federal agency) under Title 11 [of the United States Code]," pursuant to 12 U.S.C. § 4617(b)(15)(D);

WHEREAS, subsequent to the filing of the Fannie Mae Claims, and as of the date hereof, Fannie Mae, and FHFA as Conservator thereof, have determined that Fannie Mae and FHFA will not assert any priority under 12 U.S.C. § 4617(b)(15)(D) with respect to approximately $16 billion of the amounts sought in the Fannie Mae LBHI Claim. Fannie Mae, and FHFA as Conservator thereof, continue to assert the statutory priority with respect to approximately a $2.7 billion portion of the Fannie Mae LBHI Claim (the "**Fannie Mae Priority Claim**");

WHEREAS, subsequent to the filing of the Freddie Mac Claims, Freddie Mac, and FHFA as Conservator thereof, determined that Freddie Mac and FHFA will not assert any priority under 12 U.S.C. § 4617(b)(15)(D) as to the Freddie Mac LBHI Claim, but they continue to assert a priority under 12 U.S.C. § 4617(b)(15)(D) as to the full amount of the Freddie Mac Priority Claim (the Freddie Mac Priority Claim, together with the Fannie Mae Priority Claim, the "**Priority Claims**");

### Mortgage Servicing Rights

WHEREAS, LBHI has historically been a seller/servicer of portfolios of residential mortgage loans to each of Fannie Mae and Freddie Mac (the "**GSE Loans**"), and designated

Aurora Bank FSB (the "**Bank**") and/or Aurora Loan Services, LLC ("**Aurora**") as subservicer of

such loans.  In its capacity as seller of such residential mortgage loans, LBHI has certain

obligations, including representations and warranties regarding the status of the loans, such as

the regularity of the loan documents and compliance with all applicable GSE guidelines and

requirements (collectively, the "**Seller Obligations**").  In addition, any transfer by LBHI of any

mortgage servicing rights with respect to any GSE Loans requires the approval of the applicable

GSE, and, unless otherwise agreed to by such GSE, any transfer of the applicable mortgage

servicing rights is subject to the assumption of the Seller Obligations by the new servicer;

WHEREAS, pursuant to certain Orders entered on July 15, 2010 (Docket No.10222) (the

"**July 15 Order**") and on September 23, 2010 (Docket No. 11566) (the "**September 23 Order**,"

and together with the July 15 Order, the "**Aurora Settlement Orders**"), the Bankruptcy Court

approved certain settlements reached among the Debtors, the Bank and certain of their respective

affiliated entities, including Aurora (collectively, the "**Aurora Settlement**").[4]  In connection

with the Aurora Settlement, LBHI agreed to transfer to Aurora all right, title and interest of

LBHI in and to all residential mortgage servicing rights (including any mortgage servicing

agreements under which LBHI has any such right) with a GSE (either for loans directly owned

by such GSE or held in a securitization sponsored by such GSE) owned by LBHI in partial

resolution and satisfaction of the Bank's claims against the Debtors, but only to the extent that

the loans subject to such mortgage servicing rights were then currently being serviced by Aurora,

either as master servicer, servicer or subservicer.  LBHI agreed to transfer such mortgage

servicing rights, free and clear of all liens and encumbrances; provided, however, that in the

---

[4]    The description of the Aurora Settlement and the Aurora Settlement Orders are for reference
purposes only and subject in all respect to the terms and conditions of the Aurora Settlement and the
Aurora Settlement Orders.

event that an applicable GSE failed to approve the transfer of any such mortgage servicing rights to Aurora, LBHI agreed to transfer and assign to Aurora all income attributable to or derived from such excluded mortgage servicing rights from and after the closing date of the Aurora Settlement until such time as such GSE provided the requisite approval of the transfer of such mortgage servicing rights to Aurora;

### Transfer of Fannie Mae Mortgage Servicing Rights

WHEREAS, as set forth in (i) that certain letter agreement, dated July 9, 2010, among Fannie Mae, the Bank and Aurora (the "**Fannie Mae/Aurora Letter Agreement**"); (ii) the Aurora Settlement Orders; and (iii) those agreements, documents and undertakings entered into among, inter alia, Fannie Mae, LBHI and certain of the other Debtors, in furtherance of the Aurora Settlement, the Fannie Mae/Aurora Letter Agreement and the Aurora Settlement Orders (such agreements, Aurora Settlement Orders and related documents and undertakings, in the aggregate, the "**Fannie Mae MSR Transfer Agreements**"), Fannie Mae agreed and consented to the transfer all of LBHI's mortgage servicing rights related to Fannie Mae sponsored residential mortgage loans, mortgages owned or pooled by Fannie Mae, and mortgage loans contained in certain REMIC Trusts (such mortgage servicing rights being collectively referred as the "**Fannie Mae Mortgage Servicing Rights**"), in each case serviced by LBHI or Aurora as the designated subservicer of such mortgage loans, to the Bank or Aurora, as contemplated in the Aurora Settlement and the Fannie Mae MSR Transfer Agreements, without requiring the assumption of responsibility of such assignee of the applicable Seller Obligations;

### Transfer of Freddie Mac Mortgage Servicing Rights

WHEREAS, notwithstanding the Aurora Settlement Orders and LBHI's authorization and agreement to transfer to the Bank or Aurora all mortgage servicing rights owned by LBHI related to the portfolio of Freddie Mac residential mortgage loans (such mortgage servicing rights, including, without limitation, pursuant to the terms and conditions set forth in a certain Master Commitment, dated as of April 26, 2005 (the "**Master Commitment**"), being collectively referred to as the "**Freddie Mac Mortgage Servicing Rights**"), Freddie Mac has not agreed or consented to the transfer of the Freddie Mac Mortgage Servicing Rights to the Bank or Aurora incident to the Aurora Settlement. Specifically, in connection with the approval of the Aurora Settlement and the entry of the September 23 Order, LBHI stipulated on the record that it had not yet received Freddie Mac's consent to the transfer of the Freddie Mac Mortgage Servicing Rights, and that it would not assign any income received or receivable by the Debtors attributable to or derived from the Freddie Mac Mortgage Servicing Rights without Freddie Mac's consent for a period of at least 120 days, which stipulated period has been extended from time to time by further agreement between Freddie Mac and LBHI, and remains in full force and effect (the "**Servicing Rights Stipulation**");

### Third Amended Plan

WHEREAS, prior to the Court's approval of the Disclosure Statement, the GSEs and FHFA informally raised certain objections to the disclosure related to the asserted priority of the Fannie Mae Priority Claim and the Freddie Mac Priority Claim, and the rights, titles, powers, and privileges of FHFA, in its statutory capacity under HERA as Conservator, with respect to such claims;

8

WHEREAS, the GSEs and FHFA have informally raised certain objections to the Third Amended Plan, including, without limitation, in respect of the classification and treatment of the Priority Claims, the amount to be reserved on account of any Priority Claim, the assumption/treatment of the agreements and documents giving rise to each of the Fannie Mae Mortgage Servicing Rights (collectively, the "**Fannie Mae Mortgage Servicing Agreements**") and the Freddie Mac Mortgage Servicing Rights, including, without limitation, the Master Commitment (collectively, the "**Freddie Mac Mortgage Servicing Agreements**") and the assignability of such mortgage servicing rights, and the reservation of the rights, titles, powers, and privileges of FHFA, in its statutory capacity under HERA as Conservator, including specifically in respect of the Third Amended Plan (the "**Potential Plan Objections**");

WHEREAS, the Debtors agreed to extend the deadline by which the GSEs and FHFA were required to file any objections to the Third Amended Plan (the "**Plan Objection Deadline**") in order to allow the parties additional time to engage in discussions regarding the Potential Plan Objections;

WHEREAS, in order to resolve the Objection of the GSEs and FHFA, in respect of the classification and treatment of the Priority Claims, the Debtors have amended the definition of Priority Non-Tax Claim in the Third Amended Plan as follows: "Priority Non-Tax Claim means any Claim, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment under section 507(a) of the Bankruptcy Code or Claims under 12 U.S.C. § 4617(b)(15)"; and

WHEREAS, the Parties have agreed that it is in their mutual interests to enter into this Stipulation in order to consensually address and resolve the remaining Potential Plan Objections, and to preserve all rights, claims and defenses of each of the Parties, and FHFA as Conservator,

in respect thereof, including specifically the rights, titles, powers and privileges of FHFA, as

Conservator, under HERA.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants, agreements and

conditions contained herein, and for other good and valuable consideration, the receipt and

sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, upon the

foregoing recitals, which are incorporated herein in all respects, the Parties enter into this

Stipulation for purposes of addressing the remaining Potential Plan Objections, and to that end,

agree as follows:

### Effectiveness of Stipulation

1. This Stipulation shall become effective on the date (the "**Stipulation Effective
Date**") that the Stipulation has been (i) executed by each of the Parties; (ii) approved by entry of

an Order of the Bankruptcy Court, which Order may be entered by the Bankruptcy Court "so

ordering" this Stipulation; and (iii) entry of a final Order of the Bankruptcy Court confirming the

Third Amended Plan (the "**Confirmation Order**").

### Reserves For Distribution Purposes

2. In order to ensure that Fannie Mae and/or Freddie Mac, or FHFA, as applicable, shall

receive any priority recovery under or in respect of the Third Amended Plan determined to be

payable on account of all or any portion of the Fannie Mae Priority Claim and/or the Freddie

Mac Priority Claim, the Debtors shall establish cash reserves on account of the Priority Claims

(i) on account of the Freddie Mac Priority Claim in the amount of $1,202,241,875.00; and (ii) on

account of the Fannie Mae Priority Claim in such amount as agreed upon among Fannie Mae,

and FHFA as Conservator thereof, on the one hand, and LBHI, on the other hand; provided,

however, that in the event that Fannie Mae, FHFA and LBHI fail to reach agreement on the amount to be reserved on account of the Fannie Mae Priority Claim, either Fannie Mae or LBHI may petition the Bankruptcy Court on shortened notice for a hearing on or before January 15, 2012 seeking a determination as to the proper amount to be reserved on account of the Fannie Mae Priority Claim.

## Reservation of Rights

3.    Except to the extent of the Allowed Freddie Mac Claims and the Allowed Fannie Mae Claims, the Parties hereby reserve all rights of the Parties and FHFA relating to the amount, allowance, classification and/or priority of the Claims for all purposes, including in connection with any distributions under the Third Amended Plan or otherwise in respect of these Bankruptcy Cases, and nothing in this Stipulation, the Third Amended Plan (or any amendments, exhibits, supplements, or agreements filed or entered into incident thereto, or the confirmation thereof), the Confirmation Order, or any other pleadings or documents filed in connection therewith, shall (i) have any effect on or prejudice the Debtors in respect of the Claims, including the amount, allowance, classification and/or priority of such Claims, or in respect of distributions on account thereof, and nothing herein shall be deemed an admission, release or waiver of the Debtors' rights with respect to such Claims, nor (ii) have any effect on, enjoin, or otherwise prejudice the rights of the GSEs and FHFA in respect of the Claims, including the amount, allowance, classification and/or priority of such Claims, or in respect of distributions on account thereof, including their right to assert that the Fannie Mae Priority Claim and the Freddie Mac Priority Claim are entitled to be treated as priority claims based on the rights, titles, powers, and privileges of FHFA under HERA, and all rights of the GSEs and FHFA under HERA, are fully reserved in that regard, and nothing herein, or in the Third Amended Plan or the Confirmation

11

Order, shall be deemed an admission, release or waiver of the rights of, or otherwise prejudice,

the GSEs and FHFA with respect to such Claims. In addition, nothing in this Stipulation, or in

the Third Amended Plan or the Confirmation Order, shall affect, limit or otherwise prejudice

FHFA's rights, titles, powers and privileges under HERA, as Conservator.

4.    Nothing in this Stipulation, the Third Amended Plan (or any amendments, exhibits,

supplements, or agreements filed or entered into incident thereto, or the confirmation thereof),

the Confirmation Order, or any other pleadings or documents filed in connection therewith, shall

affect, limit, enjoin or otherwise prejudice FHFA's rights, titles, powers, and privileges under

HERA as the Conservator, including, without limitation the rights of Fannie Mae and/or Freddie

Mac, or FHFA as Conservator thereof, to seek priority status and recovery in respect of the

Fannie Mae Priority Claim and/or the Freddie Mac Priority Claim, and nothing in the Third

Amended Plan or Confirmation Order shall be construed to restrain or limit any applicable

regulatory or enforcement action that may be taken by FHFA, or to confer exclusive jurisdiction

of the Bankruptcy Court over matters in respect of Fannie Mae, Freddie Mac, or FHFA as

Conservator thereof.

5.    With respect to the Fannie Mae Mortgage Servicing Agreements and the Fannie Mae

Mortgage Servicing Rights, nothing in this Stipulation, the Third Amended Plan (or any

amendments, exhibits, supplements, or agreements filed or entered into incident thereto, or the

confirmation thereof), the Confirmation Order, or any other pleadings or documents filed in

connection therewith, shall affect, limit or otherwise modify the agreements reached among

Fannie Mae and the Debtors in respect of the Fannie Mae Mortgage Servicing Agreements and

the Fannie Mae Mortgage Servicing Rights, all as set forth in the Fannie Mae MSR Transfer

Agreements, or otherwise affect, enjoin, limit or otherwise prejudice the rights of Fannie Mae,

FHFA or the Debtors in respect thereof, including, without limitation, with respect to the transfer
and assignment of the Fannie Mae Mortgage Servicing Rights and the requirement for Fannie
Mae's consent to any such transfer and assignment, and all rights of the parties are hereby
reserved in all such respects.

6.    With respect to the Freddie Mac Mortgage Servicing Agreements and the Freddie
Mac Mortgage Servicing Rights, nothing in this Stipulation, the Third Amended Plan (or any
amendments, exhibits, supplements, or agreements filed or entered into incident thereto, or the
confirmation thereof), the Confirmation Order, or any other pleadings or documents filed in
connection therewith, shall affect, limit or otherwise modify the agreements reached among
Freddie Mac and the Debtors in respect of the Freddie Mac Mortgage Servicing Agreements and
the Freddie Mac Mortgage Servicing Rights, including as set forth and provided for in the
Aurora Settlement and the September 23 Order, or otherwise affect, enjoin, limit or otherwise
prejudice the rights of Freddie Mac, FHFA or the Debtors in respect thereof, including, without
limitation, with respect to the transfer and assignment of the Freddie Mac Mortgage Servicing
Rights and the requirement for Freddie Mac's consent to any such transfer and assignment, and
all rights of the Parties and FHFA are hereby reserved in all such respects.

## Deferred Rejection Deadline

7.    In connection with the Freddie Mac Mortgage Servicing Agreements, including,
without limitation, the Master Commitment, and the Debtors' possible assumption or rejection of
such agreements, Freddie Mac has asserted that the Master Commitment is an executory contract
among Freddie Mac and one or more of the Debtors that must be assumed or rejected by the
Debtors, and that the assumption of the Master Commitment by the Debtors and the cure of all
pre-petition and post-petition defaults thereunder are preconditions to the transferability of the

Freddie Mac Mortgage Servicing Rights.  To the extent, if any, that the Debtors fail to pay post-petition amounts in the ordinary course of business, Freddie Mac reserves the right to assert claims for such amounts.  The Debtors have asserted that the Master Commitment (and any retained master servicing rights) is not an executory contract or otherwise contains severable obligations and, as set forth in the last paragraph of Exhibit 2, Part D, of the Plan Supplement, the Freddie Mac Mortgage Servicing Rights are, in fact, retained rights not requiring assumption or rejection by the Debtors.  In addition, the Debtors have also asserted that nothing shall ever convert any prepetition claims of Freddie Mac based on alleged Seller Obligations to cure payments under the Third Amended Plan.  In this regard, nothing in this Stipulation, the Third Amended Plan (or any amendments, exhibits, supplements, or agreements filed or entered into incident thereto, or the confirmation thereof), the Confirmation Order, or any other pleadings or documents filed in connection therewith, shall affect, limit or otherwise modify the Master Commitment or convert any prepetition claims of Freddie Mac based on alleged Seller Obligations to postpetition cure payments under the Third Amended Plan or prejudice the rights of Freddie Mac, FHFA and the Debtors in respect thereof or otherwise, and all rights of the parties are hereby reserved in all such respects; provided, however, that in the event that Freddie Mac and the Debtors fail to resolve their disputes in respect of the Master Commitment prior to the Confirmation Hearing, Freddie Mac and the Debtors hereby agree that, notwithstanding anything in this Stipulation, the Third Amended Plan or the Confirmation Order to the contrary, upon execution of this Stipulation by the Parties hereto, the date by which the Debtors shall be required to elect to either assume or reject the Freddie Mac Mortgage Servicing Agreements, including, without limitation, the Master Commitment, or seek a determination that the Master Commitment is not an executory contract or otherwise contains severable obligations, shall be

14

extended until such date that is ten (10) business days after either Freddie Mac or LBHI shall provide written notice to the other party that consensual agreement is not likely to be reached with respect to the Master Commitment and the rights of the parties in respect thereof, and the Debtors failure to make any such election or seek any such determination prior to the expiration of said ten (10) business day period shall constitute the Debtors' election to treat the Freddie Mac Mortgage Servicing Agreements, including the Master Commitment, as executory contracts rejected by the Debtors, subject to the right of Freddie Mac to file any claim on account of rejection damages within thirty (30) days after such deemed rejection.

### Miscellaneous

8. The Parties further agree that the Confirmation Order shall include a decretal paragraph ordering the approval and incorporation of this Stipulation.

9. Fannie Mae and Freddie Mac each agree that, subject to the occurrence of the Stipulation Effective Date, and except as otherwise provided in this Stipulation, it will not participate in the formulation of, file, prosecute, consent to or support any objection to the Third Amended Plan, or take any other action to alter, delay or impede the confirmation and consummation of the Third Amended Plan.

10. Each Party acknowledges that (a) this Stipulation was drafted jointly by the Parties, (b) it has consulted with attorneys of its choosing and fully understands the terms hereof, (c) it has received legal advice regarding the advisability of entering into this Stipulation, and (d) it is executing this Stipulation voluntarily. This Stipulation shall not be strictly construed against any Party on the grounds that the rules for the construction of contracts require the resolution of any ambiguity against the Party that drafted the document.

11. This Stipulation shall apply to and be binding upon and inure to the benefit of each Party and their respective agents, employees, successors (including the Debtors' bankruptcy estates and including any trustee appointed to administer the Bankruptcy Cases or any subsequent chapter 7 case(s)) and assigns, and any entity into which such Party may be merged or consolidated.

12. Each individual signing this Stipulation on behalf of any Party hereto acknowledges and, with respect to his or her own signature below, warrants and represents that he/she is authorized to execute this Stipulation in his/her representative capacity, as reflected below and on behalf of the Party indicated.

13. The provisions of this Stipulation are severable, and the illegality or unenforceability of any part or provision shall not affect the enforceability of any other part or provision, and this Stipulation shall be construed as if such illegal or unenforceable part or provision were omitted but only to the extent of such illegality or unenforceability.

14. This Stipulation may be signed in counterparts and by fax signature or in portable document format (PDF), each of which shall be deemed an original but all of which together shall constitute one and the same instrument, and it shall constitute sufficient proof of this Stipulation to present any copy, copies or facsimiles signed by the Parties.

15. Notwithstanding Bankruptcy Rule 6004 or otherwise, this Stipulation shall be effective immediately upon entry of an Order approving this Stipulation.

16. This Stipulation contains the entire agreement between the Parties hereto regarding the subject matter hereof and may not be modified other than by a signed writing executed by all Parties and delivered to each Party.

IN WITNESS WHEREOF, THIS STIPULATION HAS BEEN READ AND SIGNED IN

DUPLICATE ORIGINALS BY EACH OF THE PARTIES:

WEIL, GOTSHAL & MANGES LLP                WINSTON & STRAWN LLP

/s/ Alfredo R Pérez                              /s/ David Neier
Alfredo R. Pérez                                  David Neier
700 Louisiana, Suite 1600                      200 Park Avenue
Houston, Texas 77002-2755                    New York, New York 10166-4193
(713) 546-5040                                  (212) 294-6700

*Attorneys for the Debtors and Debtors-in-*      *Attorneys for Federal National Mortgage*
*Possession*                                       *Association*


                                                LANDMAN CORSI BALLAINE & FORD
                                                P.C.

                                                /s/ Mark S. Landman
                                                Mark S. Landman
                                                120 Broadway
                                                New York, New York 10271
                                                (212) 238-4800

                                                *Attorneys for Federal Home Loan Mortgage*
                                                *Corporation*


SO ORDERED:

Dated: New York, New York
        December 6, 2011


                                                    *s/ James M. Peck*
                                                United States Bankruptcy Judge

# EXHIBIT G

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                      :

In re                                :        Chapter 11 Case No.

                                     :

LEHMAN BROTHERS HOLDINGS INC., *et al.*,   :      08-13555 (JMP)

                                     :

                  Debtors.         :        (Jointly Administered)

                                     :
------------------------------------------------------------x

## MODIFIED THIRD AMENDED JOINT CHAPTER 11 PLAN OF
## LEHMAN BROTHERS HOLDINGS INC. AND ITS AFFILIATED DEBTORS

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Tel: (212) 310-8000
Fax: (212) 310-8007

Attorneys for Debtors and
Debtors in Possession

Dated: New York, New York
       December 5, 2011

1.127    Priority Non-Tax Claim means any Claim, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment under section 507(a) of the Bankruptcy Code or 12 U.S.C. § 4617(b)(15).

1.128    Priority Tax Claim means any Claim of a Governmental Unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.129    Property of the Estate means all property of a Debtor pursuant to section 541 of the Bankruptcy Code.

1.130    Pro Rata Share means with respect to an Allowed Claim or Equity Interest (a) within the same Class, the proportion that an Allowed Claim or Equity Interest bears to the sum of all Allowed Claims and Disputed Claims or Allowed Equity Interests and Disputed Equity Interests within such Class, or (b) among all Classes, the proportion that a Class of Allowed Claims bears to the sum of all Allowed Claims and Disputed Claims; provided, however, that Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, Secured Claims, Convenience Claims, Convenience Guarantee Claims and Section 510(b) Claims shall not be considered for purposes of "Pro Rata Share" among all Classes; provided, further, however, that only the following Claims shall be considered in the determination of "Pro Rata Share" among all Classes with respect to the following Distributions:

(i)    Available Cash in the case of LBHI:  Senior Unsecured Claims, Senior Affiliate Claims, Senior Affiliate Guarantee Claims, Senior Third-Party Guarantee Claims, General Unsecured Claims, Affiliate Claims, Third-Party Guarantee Claims and Subordinated Claims.

(ii)    Available Cash in the case of a Subsidiary Debtor:  General Unsecured Claims and Affiliate Claims.

(iii)    LBSF Settlement Amount: General Unsecured Claims against LBSF other than Claims of any of the Racers Trusts.

(iv)    LBSF Additional Settlement Amount: (1) General Unsecured Claims against LBSF other than Claims of any of the Racers Trusts, and (2) Affiliate Claims against LBSF other than Claims of any of the Participating Debtors.

(v)    LCPI Settlement Amount:  General Unsecured Claims against LCPI other than Claims of any Designated Entity.

(vi)    Plan Adjustment:  Senior Unsecured Claims against LBHI and General Unsecured Claims against LBHI.

(vii)    Subordinated Class 10A Distribution:  Senior Unsecured Claims and Senior Affiliate Claims.

(viii)    Subordinated Class 10B Distribution:  Senior Unsecured Claims, Senior Affiliate Claims, Senior Affiliate Guarantee Claims and Senior Third-Party Guarantee Claims.