**HELLRING LINDEMAN GOLDSTEIN & SIEGAL LLP**
One Gateway Center, 8th Floor
Newark, New Jersey 07102-5386
Telephone: 973-621-9020
Facsimile: 973-621-7406

**Stephen L. Dreyfuss, Esq.**
Email: sldreyfuss@hlgslaw.com
**Richard B. Honig, Esq.**
Email: rbhonig@hlgslaw.com
**Matthew E. Moloshok**
Email: mmoloshok@hlgslaw.com

**Attorneys for the Van der Hart Creditors**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------------x   Chapter 11
In re

LEHMAN BROTHERS HOLDINGS, INC., et al.     Case No. 08-13555 (JMP)

                                           (Jointly Administered)
                            Debtors.

--------------------------------------------------------------------x

### RESPONSE AND OPPOSITION OF THE VAN DER HART CREDITORS TO THE FOUR HUNDRED FIFTIETH OMNIBUS OBJECTIONS TO CLAIMS (PREFERRED SECURITIES CLAIMS)

This response is submitted by the following Creditors –

      a.    Maria Clara Xavier Rochas Gomes Van der Hart ("Van der Hart");

      b.    Antonio Manuel Coutinhas ("Coutinhas");

      c.    Rui Manuel Dias Moura Teixeira ("Teixeira");

      d.    Fundacion Rafel del Pino ("Fundacion"); and

      e.    Miguel Lopes de Sousa ("Sousa"),

(collectively the "Van der Hart Creditors"), in Opposition to the Debtors' Four Hundred Fiftieth

Omnibus Objection to Claims (Preferred Securities Claims)("the Objection"). The Van der Hart

Creditors also request the opportunity to take discovery from the Debtors and their affiliates as to the issues raised by the Objection and this Opposition.

      1.      The Van der Hart Creditors' Claims are listed on Exhibit A to the Objection at lines 28, 29, 36, 47, 68, and 117.[1] As shown there, each of the Van Der Hart Creditors purchased securities of issued by Lehman Brothers UK Capital Funding L.P. (ISIN XS0215349357) ("Capital Funding"). One of the Van der Hart Creditors, Antonio Manuel Coutinhas Da Silva Ferreira, also purchased securities issued by Lehman Brothers UK Capital Funding II, L.P. (ISIN XS022969856) ("Capital Funding II").[2]

      2.      In the Objection, LBHI admits that LBHI's subsidiary Lehman Brothers Holdings plc ("LBH Plc") issued guarantees to the holders of the Issuers' Preferred Securities, such as the Van der Hart Creditors. LBHI also concedes for purposes of the motion that LBHI guaranteed the LBH Plc guarantee. LBHI argues, however, that Prospectus I and Prospectus II alerted investors that LBH Plc's guarantees were "limited," that the guarantees given by LBHI of LBH Plc's guarantee were thus similarly limited, and that investor claims, such as those filed by the Van der Hart Creditors, should be reduced in amount to fit within those limits.

      3.      For the reasons below, LBH Plc's and LBHI's guarantees did cover the face amount of the securities. Further, their alleged limitation of the guarantees was not effectively communicated to the Van der Hart Creditors and likely to hundreds of other investors.

---

[1] We also represent Antonio Manuel Coelho Affonso De Barros ("Affonso de Barros"), Claim No. 49837, concerning the Preferred Securities. It does not appear that LBHI listed his claim in the Objection.

[2] Following the lead of the Debtor, we refer to Capital Funding and Capital Funding II collectively as "the Issuers," to the securities issued by the Issuers collectively as the "Preferred Securities," and to their respective offering circulars as "Prospectus I" and "Prospectus II."

2

4.      We begin with the second point: in ordinary parlance a guarantee means that the party offering the guaranty will pay or perform an obligation of its principal if the principal has not done so. If the guarantee is something short of that, the limitations should have been communicated.

5.      LBHI asserts the limitations were disclosed in Prospectus I and Prospectus II, but, as set out in their accompanying Declarations, Creditors Coutinhas, Affonso de Barros, Teixeira and Van der Hart did not receive a prospectus, acting instead based on the recommendation of their bank or brokers. Their only information about the offering was that the securities were guaranteed by LBH plc which in turn had the backing of and was guaranteed by the ultimate parent, LBHI.

6.      These disclosures failures are the direct responsibility of the Debtors. Each Prospectus shows that "Lehman Brothers" served as the lead manager for the offerings of the Preferred Securities, with their selected co-managers Banco Espirito Santo and Santander Banco Centrale or their securities affiliates. Many of the Van der Hart Creditors obtained the securities from these co-managers or their affiliated banks. In the circumstances, LBHI should not be able to hide behind a limitation that it and its co-managers should have communicated but failed to communicate.[3]

7.      The information that the Van der Hart Creditors received instead reflected no limitations upon the guarantees. Creditor Sousa was shown and kept a copy of a "screen grab" of

---

3  This problem seems widespread in sales of LBHI's affiliated securities in some European countries – *e.g.*, as to Spain, *see* Commission Nacional del Mercado de Valores, ATTENTION TO THE COMPLAINTS AND ENQUIRIES OF INVESTORS, ANNUAL REPORT 2009, available at
http://www.cnmv.es/DocPortal/Publicaciones/Informes/MR2009weben.pdf (relevant excerpts annexed as Exhibit 1 hereto) at 37, §4.1.2.1, ("Many 2009 complaints concerned the acquisition and ownership of financial products, structured or otherwise, issued by Lehman Brothers subsidiaries and Icelandic banks …. In the vast majority of

information assembled by Bloomberg, which called the securities a "Structured Note," collateralized by a "Company Guaranty" which he understood to be from LBHI. *See* accompanying Sousa Declaration; the "screen grab" is attached as Exhibit A to the Sousa Declaration.

8. Even creditors such as the Fundacion, which had a larger investment, was not aware of a limitation to the guarantees – it understood the securities were backed by LBH Plc and LBHI. *See* accompanying Eusebio Vida-Ribas Marti Declaration.

9. In short, the issuers and underwriters did not effectively communicate the claimed limitations and instead left the ordinary impression – that the guarantor would pay if the Issuers did not.

10. The Court should also deny the Objection because it incorrectly asserts that LBH Plc's guarantee contract covered only "Unfunded Distributions," rather than full repayment of the face or notional amount of the Preferred Securities.

11. The Van der Hart Creditors respectfully submit that a Capital Disqualification Event occurred, which required that the Issuers redeem the Preferred Securities at their original face amounts of €1,000 per unit, plus the amount of any unpaid Distributions.

12. The Court should not grant the Objection without first affording the opportunity for discovery of the Debtor and its affiliates as to the issue of whether a Capital Disqualification Event occurred, requiring redemption. More particularly:

13. LBHI admits that the LBH Plc guarantees required payment to the holders of the Preferred Securities of all Funded Distributions, the Unfunded Distributions, the Redemption

---

cases, complaints turned on the pre-sale information supplied to clients regarding the characteristics and risks of the securities ….")

4

Amounts, and the Withholding. Objection ¶¶ 5 and 15. It argues, however, that they owe only the amounts payable as Unfunded Distributions, *id.* ¶¶ 16-19, denying owing a Redemption Amount. *Id.* ¶ 17.

14. The Issuers had to redeem the Preferred Securities if a so-called Capital Disqualification Event occurred. For example Prospectus I (Objection, Exhibit A) states in § 4.3 (at p. 20) that "<u>If a Capital Disqualification Event occurs</u> and is continuing, <u>the Preferred Securities will be redeemed</u>, in whole but not in part, by the General Partner ... at the Optional Redemption Price." (Emphasis supplied.) Notably this provision did not require that any party or governmental regulator declare that the Capital Disqualification Event had occurred; it only required that the Capital Disqualification Event actually occur, and made redemption mandatory in that situation.

15. Prospectus I, for example, defined a Capital Disqualification Event as occurring when "... (a) the Preferred Securities do not qualify as regulatory capital pursuant to the Relevant Rules upon either LBHI or the Guarantor becoming subject to supervision by a relevant Supervisory Authority." *Id.* at p. 13.

16. LBHI informed the investing public that, effective December 1, 2005, LBHI became regulated by the SEC as a consolidated supervised entity, and as such, LBHI became subject to group-wide supervision and examination by the SEC, including the obligation to minimum capital requirements on a consolidated basis. *See, e.g.*, Jan 4. 2007 prospectus for Lehman Brothers UK Capital Funding IV LP at p. 14, relevant excerpts annexed as <u>Exhibit 2</u> to this Opposition. This implied that it indeed had an obligation to maintain qualifying regulatory capital. What would that have entailed?

17. Consolidated supervised entities ("CSEs") were obligated to comply with standards of "the Basel Committee," as implemented by the Board of Governors of the Federal Reserve System ("Federal Reserve"). The Federal Reserve Standards are set out in its Regulation Y, 12 C.F.R. Part 225, and its appendices.

18. The Preferred Securities were understood in the financial community to be guaranteed "structured notes," not equity capital. *See* Exhibit A to the Sousa Declaration where Bloomberg described them as such (emphasis added). *Investopedia* defines a "structured note" as "[a] debt obligation that also contains an embedded derivative component with characteristics that adjust the security's risk/return profile. The return performance of a structured note will track that of the underlying debt obligation and the derivative embedded within it." http://www.investopedia.com/terms/s/structurednote. (Emphasis added.)

19. Indeed, Bloomberg listed LBHI affiliates as having issued "… more than 1,100 distinct debt instruments outstanding at the time of Lehman's collapse," which Bloomberg identified as including the interests in Capital Funding. *See* Stephen J. Lubben & Sarah P. Woo, *Re-Conceptualizing Lehman*, NELLCO Legal Scholarship Repository, at pp. 12-13 (relevant pages attached as Exhibit 3 to this Opposition).

20. The 1,100 debt instruments including Capital Funding factor into the Examiner's Report in this case, available at http://jenner.com/lehman/VOLUME%205.pdf, showing that the market value of LBHI's actual equity, as a percentage of the market value of its assets, ran between approximately +2.5% (1 to 40) and – 0.8% between May 2008 and August 2008. (A chart depicting this is reproduced in Lubben & Woo, Exhibit 2 to this Opposition, at p. 12.)

21.     To be sure, under some circumstances, the Federal Reserve allows certain hybrid instruments, some preferred securities and some subordinated debt obligations to qualify as Regulatory Capital – but subject to stringent conditions. *See, e.g.,* Regulation Y, 12 C.F.R. Part 225, Appendix A.  But the Preferred Securities would not have met those requirements – indeed, no government would have approved or permitted the inclusion of the Preferred Securities as Regulatory Capital had the true state of LBHI, LBH Plc, and the LBHI's and its consolidated group's finances and accounting conventions been fully and truthfully disclosed to them. *Cf.* 12 CFR Part 225, Appendix A (deeming a bank holding company structured as LBHI to be making excessive use of subordinated debt and preferred securities in regulatory capital, resulting in the ineligibility of those securities).

22.     Certainly by May 2008, as the data from the Examiner's Report summarized by Lubben & Woo shows, LBHI on a consolidated basis had stretched its borrowings, including the Preferred Securities at issue here, far beyond any permissible use of preferred securities and subordinated debt for regulatory capital.  As a result, the Preferred Securities could have no longer have qualified as Regulatory Capital, if they ever did.

23.     Moreover, LBHI's overreliance on hybrid capital, preferred securities and subordinated debt was made worse by the poor quality of its underlying assets. For example, LBHI as a group had a huge exposure to collateralized mortgage obligations yet, as the Examiner's Report in this bankruptcy case shows, LBHI substantially overvalued its collateralized mortgage securities (in two examples studied in the Examiner's report, the Examiner estimated the values were half and one thirtieth respectively of LBHI's valuation). Examiner's Report, Vol. 2 at pp. 559-560.  LBHI also misled its regulators under the CSE

program by unsound or at least undisclosed reporting practices in respect to repurchase transactions, that it used to massage its "net leverage ratio calculation" (*id.*, Vol. III at pp. 754 and following), in light of the poor quality of the Lehman assets, caused by its excessive "exposure to sticky assets like Mortgages and Real Estate." *Id* at p. 805.

24.   All those attributes, if truthfully disclosed, should have prevented the Preferred Securities serving or remaining as eligible regulatory capital. Under the Basel standards, regulators are to condition acceptance of regulatory capital not only with a view to absolute ratios but also based upon evaluation of the capital's soundness.[4]  It appears that a significant reason the SEC, as the responsible U.S. government regulator, did not pull the plug on the Preferred Securities and other items LBHI contended were its "regulatory capital" was that the SEC did not receive the needed information to evaluate their quality from LBHI, as the SEC was relying on LBHI and its auditors to self-report.[5]

25.   Debtors' argument that "[t]here is no evidence that the Preferred Securities were ever redeemed," Objection at ¶¶ 8 & 17, is therefore rather beside the point.  If the Preferred

---

[4] *See e.g.,* Article 84 of the DIRECTIVE 2006/48/EC OF THE EUROPEAN PARLIAMENT AND OF THE COUNCIL of 14 June 2006 relating to the taking up and pursuit of the business of credit institutions (recast), L 177/1, available at http://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=OJ%3AL%3A2006%3A177%3A0001%3A0001%3AEN%3APDF which allows competent authorities to permit credit institutions to utilize capital secured by its own credit assets based on internal ratings of risk "… only if the competent authority is satisfied that the credit institution's systems for the management and rating of credit risk exposures are sound and implemented with integrity and, in particular, that … the credit institution's rating systems provide for a meaningful assessment of obligor and transaction characteristics, [and] a meaningful differentiation of risk and accurate and consistent quantitative estimates of risk...."

[5] *See, e.g.,* Testimony Concerning the Lehman Brothers Examiner's Report by Chairman Mary L. Schapiro U.S. Securities and Exchange Commission Before the House Financial Services Committee, April 20, 2010, available at http://www.sec.gov/news/testimony/2010/ts042010mls.htm ("As discussed in the Examiner's Report, regulators (including Commission staff), rating agencies and the Lehman Board, were unaware of Lehman's use of Repo 105 transactions. For purposes of the CSE program, the Commission did not perform an audit of Lehman's balance sheet. Instead, the Commission depended on the integrity of the balance sheet information provided by Lehman's management.")(fn. Omitted).

Securities were not, or no longer, properly qualified as regulatory capital this required their redemption. Under the traditional equitable maxim by which "Equity regards as done what ought to have been done," the Preferred Securities were redeemed at the moment the Capital Disqualification Event occurred, and the Issuers' obligation to pay the Redemption Amount immediately sprang into existence at that same moment.

26. The Issuers' failure to redeem and pay for the Preferred Securities in the case of a Capital Disqualification Event was exactly the type of breach against which the guarantees were supposed to protect investors.

27. In this regard, Debtors trumpet that LBH Plc "... did not guarantee any payments owed to the holders of the Preferred Securities upon the liquidation or dissolution of the Issuers." Objection ¶ 15. That argument is foreclosed by the express terms of the guarantees themselves: The deed of guarantee in Prospectus I, for example, states at pp. 29-30, § 2.4(d), that the obligation of the guarantor shall not be affected or impaired by "the voluntary or involuntary winding-up, dissolution, …[or] insolvency … of … the Issuer …."

28. The guarantor's obligation to pay the Redemption Amount here derives from the occurrence of the Capital Disqualification Event. Based on the data in the Examiner's Report, that event occurred by no later than May 2008 -- long before the Issuers' general partner was dissolved or the Issuers, their general partner, LBH Plc or LBHI entered liquidation. And once the event occurred, the subsequent liquidation or dissolution did not undo the obligation to pay the Redemption Amount.

29. To the extent any of these issues are disputed by LBHI, then discovery should be permitted and the matter should proceed as a contested matter.

30. Prospectus I and Prospectus II show that the redemption price payable in this situation would have been the "Optional Redemption Amount," which is to say, the "Liquidation Preference" plus accrued Distributions.  *See, e.g.,* Prospectus I at 14, defining "Optional Redemption Amount."  The Liquidation Preference was the face value of the limited partnership interests, €1000 per unit. *Id.*

31. It follows, then, that LBH Plc's guarantee of the Redemption Amount in fact did require that LBH Plc pay the face or notional amounts of the securities, and the investors, such as the Van der Hart Creditors, had the right to rely upon the guarantors to pay the full Redemption Amount, and not simply the Unfunded Distributions.

WHEREFORE, the Court should deny the Four Hundred Fiftieth Omnibus Objection.

Dated: Newark, New Jersey
January 21, 2014

              HELLRING LINDEMAN GOLDSTEIN & SIEGAL LLP
              One Gateway Center, 8th Floor
              Newark, New Jersey 07102-5386
              Telephone:  (973) 621-9020
              Facsimile:   (973) 621-7406

              By:    /s/ Stephen L. Dreyfuss
                    STEPHEN L. DREYFUSS

              By:    /s/ Matthew E. Moloshok
                    MATTHEW E. MOLOSHOK

Stephen L. Dreyfuss
Richard B. Honig
Matthew E. Moloshok