# EXHIBIT #1

08-13555-mg    Doc 42111-1    Filed 01/21/14    Entered 01/21/14 12:23:13    Exhibit #1 to #3    Pg 2 of 14



# Attention to the Complaints and Enquiries of Investors
## Annual Report 2009



Comisión Nacional del Mercado de Valores
Serrano, 47
28001 Madrid

Passeig de Grácia, 19
08007 Barcelona

© Comisión Nacional del Mercado de Valores

The content of this publication may be copied or otherwise reproduced, provided the source is mentioned.

The CNMV spreads its reports and other publications via the website www.cnmv.es

ISSN: 1989-2071

#### 4.1.1.4   Incidents in securities accounts under co-ownership

As a rule, excepting specific arrangements for community property or other types of mutual agreement, the ownership of a book-entry marketable security will be deemed to lie with the holder of the securities account where it is deposited. This account, on other words, has a registration function and takes effect against third parties. Joint ownership and any usufruct rights are therefore formally established in the securities account mandate, and entities have no place altering property or usufruct regimes without the corresponding certification.

Further, a joint and several disposition regime between co holders may be set aside at the formal quest of any one signatory.

Errors in this category gave rise to cases of securities dispositions which should never have been accepted.

#### 4.1.1.5   Other incidents

Incidents were also reported with the execution of conditional orders (as regards both the information supplied and the terms in which they were filled) and the processing of takeover bid acceptance orders (misinformation from the custodian on alternative ways the transaction could be settled or restrictions on which media could be used to place instructions).

Order deficiencies were a regular cause of complaint: execution of trades without proof that they had been expressly ordered by the account holder; execution of trades without procuring reliable ID from the originator, in the case of telephone orders; or in the case of order record-keeping, failure to produce a signed purchase form.

### 4.1.2   Customer information

#### 4.1.2.1   Information relative to product acquisitions

Many 2009 complaints concerned the acquisition and ownership of financial products, structured or otherwise, issued by Lehman Brothers subsidiaries and Icelandic banks, whose respective insolvency and intervention by the home-country supervisor occasioned heavy losses to a fair number of Spanish investors.

In the vast majority of cases, complaints turned on the pre-sale information supplied to clients regarding the characteristics and risks of the securities, although they also extended to the information given by custodians before and even after bankruptcy was declared.

It bears mention that the incidents referred to took place both before and after the MiFID directive was written into Spanish law, and this is reflected in both the conclusions issued and their argumentation.

The finding in many cases was that when selling or marketing this kind of instrument, entities had failed to gather information on the customer's investment experience (in cases where a product's characteristics placed it in the risky category) and his financial situation and investment goals (when it could be shown or inferred

*Reports Favourable to Complainants*

37

CNMV
Attention to the Complaints and Enquiries of Investors.
Annual Report 2009

that the disputed investment was framed by an investment advisory relationship) to check that the product was right for the prospective buyer.

Before placing a risky product, entities should gather enough information on the client to decide whether it fits well with his experience and investor profile; with this information to hand, entities can, where necessary, warn the customer that he may be investing in a product whose risk level exceeds the bounds of his tolerance.

This requirement was amply defined and developed by the MiFID and subsequently written into Spanish law, such that certain investment services became subject to appropriateness and suitability testing as of 19 December 2007.

As to information on products, it was usually not possible to judge the verbal information given to clients for lack of objective evidence. Also, when a complainant denies having received written information and there is no evidence to the contrary (a signed receipt or similar), entities are deemed to have omitted this step, except when the purchase document itself carries details of the product's risks and characteristics.

Entities must also keep customers supplied with the minimum information needed to track the performance of their investments. In the case of financial product buy or sell orders, the customer should receive a confirmation post-execution setting out the conditions of the trade (amount, date, time, venue and itemised fees and expenses). At least once a year, entities should send their customers a clear and specific statement showing the balance of their securities or financial instruments.

Given the importance of keeping customers informed of the value of their portfolios, it is remiss for periodic statements not to identify the issuer of each security, the type of securities held and the cash, market or estimated value of portfolio instruments on the observation date.

In the event of issuer insolvencies, custodian entities should inform their customers in a timely manner, detailing the options available to them to defend their rights.

This report reserves a section for the incidents detected in the marketing of products issued by entities in the Lehman group, in view of the volume and importance of the complaints received.

Space is also devoted to complaints alleging the mis-selling of financial swaps. In the disputed cases, the CNMV resolved that entities were obliged to give customers clear and specific indication of the costs incurred by early termination, along with the method of their calculation. By the same token, on receiving a request for early termination, entities should perform the calculations and give the client the results before any order is placed.

#### 4.1.2.2  Information on execution of guarantees and liquidation of positions

A number of complaints concerned the execution of the resolutory conditions written into loan agreements, the liquidation of open positions in margin trading or the execution of guarantees in respect of derivatives trading To the extent that the resolutory condition was not automatically executed but simply optional under the terms of the contract, it was resolved that entities should advise the customer of the intention to liquidate all or part of his portfolio, indicating how he could regularise the situation and the time available to do so.

# EXHIBIT #2

# LEHMAN BROTHERS UK CAPITAL FUNDING IV LP

*(a limited partnership organised under the laws of England and Wales)*

Euro Fixed Rate Enhanced Capital Advantaged
Preferred Securities (Euro ECAPS$^{SM}$)

having the benefit of a subordinated guarantee of

# LEHMAN BROTHERS HOLDINGS INC.

*(incorporated with limited liability in the State of Delaware)*

The Euro Fixed Rate Enhanced Capital Advantaged Preferred Securities (the Euro ECAPS$^{SM}$ or the Preferred Securities), each with a liquidation preference of €1,000, will comprise limited partnership interests in Lehman Brothers UK Capital Funding IV LP (the Issuer).

Holders of the Preferred Securities will receive (subject as described herein under "*Description of the Preferred Securities*") non-cumulative preferential cash distributions (the Distributions) payable annually in arrear on the date specified in the Final Terms referred to herein in each year at the fixed rate per annum specified in the Final Terms referred to herein, all as more fully described herein under "*Description of the Preferred Securities*".

See "Risk Factors" for a discussion of certain factors that should be considered by prospective investors, including certain United States federal income tax conseqences.

As an English limited partnership, the Issuer will not be a legal entity separate from its partners. The Preferred Securities will benefit from a subordinated guarantee to be dated the Closing Date (the Subordinated Guarantee) entered into by Lehman Brothers Holdings Inc. (LBHI) of declared dividends and redemption amounts, all as more fully described herein under "*Subordinated Guarantee*".

Application has been made to the Financial Services Authority in its capacity as competent authority under the Financial Services and Markets Act 2000 (the UK Listing Authority) for the Preferred Securities to be admitted to the Official List of the UK Listing Authority (the Official List) and to the London Stock Exchange plc for the Preferred Securities to be admitted to trading on the London Stock Exchange plc's Gilt Edged and Fixed Interest Market.

Application will also be made to Euronext Amsterdam N.V. (Euronext Amsterdam) for the Preferred Securities to be admitted to trading on Eurolist by Euronext Amsterdam. The London Stock Exchange's Gilt Edged and Fixed Interest Market and Euronext Amsterdam are regulated markets for the purposes of Directive 93/22/EC (the Investment Services Directive).

This document has been approved by the UK Listing Authority as a base prospectus within the meaning of Directive 2003/71/EC (the Prospectus Directive). Certain information relating to the Preferred Securities will be contained in the Final Terms, see "*Summary – Final Terms*" and "*Form of Final Terms*" for details of such information.

Lead Manager

# LEHMAN BROTHERS

The date of this Base Prospectus is 4 January 2007

ECAPS$^{SM}$ is a service mark of Lehman Brothers

could adversely affect cash requirements and liquidity. To mitigate these risks, the liquidity and funding policies of the Group have been conservatively designed to maintain sufficient liquid financial resources to continually fund its balance sheet and to meet all expected cash outflows, for one year in a stressed liquidity environment.

*Credit Ratings*

The Group's access to the unsecured funding markets is dependent on its credit ratings. A reduction in credit ratings could adversely affect the Group's access to liquidity alternatives and its competitive position, and could increase the cost of funding or trigger additional collateral requirements.

*Credit Exposure*

Credit exposure represents the possibility that a counterparty will be unable to honour its contractual obligations. Although the Group actively manages credit exposure daily as part of its risk management framework, counterparty default risk may arise from unforeseen events or circumstances.

*Operational Risk*

Operational risk is the risk of loss resulting from inadequate or failed internal or outsourced processes, people, infrastructure and technology, or from external events. The Group seeks to minimise these risks through an effective internal control environment.

*Legal, Regulatory and Reputational Risk*

The securities and financial services industries are subject to extensive regulation under both federal and state laws in the US and under the laws of the many other jurisdictions in which the Group does business. The Group is also regulated by a number of self-regulatory organisations such as the National Association of Securities Dealers, the Municipal Securities Rulemaking Board and the National Futures Association, and by national securities and commodities exchanges, including the New York Stock Exchange. As of 1 December 2005, LBHI became regulated by the SEC as a consolidated supervised entity, and as such, LBHI are subject to group-wide supervision and examination by the SEC, and accordingly, LBHI are subject to minimum capital requirements on a consolidated basis. Violation of applicable regulations could result in legal and/or administrative proceedings, which may impose censures, fines, cease-and-desist orders or suspension of a firm, its officers or employees. The scrutiny of the financial services industry has increased over the past several years, which has led to increased regulatory investigations and litigation against financial services firms.

Legislation and rules adopted both in the US and around the world have imposed substantial new or more stringent regulations, internal practices, capital requirements, procedures and controls and disclosure requirements in such areas as financial reporting, corporate governance, auditor independence, equity compensation plans, restrictions on the interaction between equity research analysts and investment banking employees and money laundering.

The trend and scope of increased compliance requirements has increased costs necessary to ensure compliance. Our reputation is critical in maintaining our relationships with clients, investors, regulators and the general public, and is a key focus in our risk management efforts.

The Group is involved in a number of judicial, regulatory and arbitration proceedings concerning matters arising in connection with the conduct of its business, including actions brought against the Group and others with respect to transactions in which the Group acted as an underwriter or financial advisor, actions arising out of its activities as a broker or dealer in securities and actions brought on behalf of various classes of claimants against many securities firms and lending institutions, including the Group.

See Part I, Item 1A, Risk Factors, in the annual report pursuant to Section 13 or 15(d) of the Exchange Act for the fiscal year ended 30 November 2005 of LBHI filed with the SEC on Form 10-K for additional information about these and other risks inherent in our business.

# EXHIBIT #3

# NELLCO
# NELLCO Legal Scholarship Repository

New York University Public Law and Legal Theory Working Papers

New York University School of Law

7-1-2013

# Re-conceptualizing Lehman

Stephen J. Lubben
*Seton Hall Law School*, stephen.lubben@shu.edu

Sarah P. Woo
*NYU School of Law*, sarahwoo@nyu.edu

Follow this and additional works at: http://lsr.nellco.org/nyu_plltwp

 Part of the Banking and Finance Commons, and the Bankruptcy Law Commons

Recommended Citation

Lubben, Stephen J. and Woo, Sarah P., "Re-conceptualizing Lehman" (2013). *New York University Public Law and Legal Theory Working Papers.* Paper 414.
http://lsr.nellco.org/nyu_plltwp/414

This Article is brought to you for free and open access by the New York University School of Law at NELLCO Legal Scholarship Repository. It has been accepted for inclusion in New York University Public Law and Legal Theory Working Papers by an authorized administrator of NELLCO Legal Scholarship Repository. For more information, please contact tracy.thompson@nellco.org.

**Re-conceptualizing Lehman**
Stephen J. Lubben* & Sarah Pei Woo**

> *From a risk management perspective, we have maintained a conservative risk appetite that has remained consistent...*
>
> – Lehman Brothers 2004 Annual Report, Letter From the Chairman.

Lehman is about systemic risk. Lehman is about liquidity. Lehman is about fickle regulators.[1] Lehman is about complexity. Lehman is about interconnectedness. Or maybe Lehman is about...

The simplifying stories that can be told about Lehman Brothers' collapse in September 2008 are myriad, and often somewhat unhelpful.[2] In particular, the focus on interconnectedness stories seems to hide as much as it reveals.

In short, in the summer of 2008, Lehman's clients and counterparties lost faith in Lehman's ability to survive.[3] Repo market participants were increasingly unwilling to take Lehman's mortgage-backed securities, and when they would take them they imposed increasingly larger haircuts.[4] Hedge funds began to move accounts elsewhere, and Lehman's principal banker imposed increasingly onerous terms as

---

* Harvey Washington Wiley Chair in Corporate Governance & Business Ethics, Seton Hall University School of Law.  This paper was in early draft in Spring 2011 when Sarah began to experience the health problems that ultimately lead to her untimely death.  *See* 99 Geo. L.J. 1613 (2011).  As such, the responsibility for any errors is my own.  The concept of the paper, however, is very much Sarah's.  I can only hope I've done it justice.
** Assistant Professor of Law & Business, New York University School of Law and Stern School of Business.  Many thanks to Matthias Goldmann for his helpful work as Sarah's research assistant on this project.  Thanks also to Douglas Arner, Anna Gelpern, Jochem Hummelen, Kristen Johnson, Frank Medina, Mike Simkovic, and Kenneth Wee for their comments on drafts of the paper.
[1] *E.g.,* Stephen M. Davidoff & David Zaring, *Regulation by Deal: The Government's Response to the Financial Crisis*, 61 Admin. L. Rev. 463 (2009).
[2] *See generally* Adam J. Levitin, *Foreword, The Crisis Without a Face: Emerging Narratives of the Financial Crisis*, 63 U. Miami L. Rev. 999 (2009).
[3] Karl S. Okamoto, *After the Bailout: Regulating Systemic Moral Hazard*, 57 UCLA L. Rev. 183, 197 (2009); David Zaring, *A Lack of Resolution*, 60 Emory L.J. 97, 103 (2010).
[4] *See* Patricia A. McCoy et al., *Systemic Risk Through Securitization: The Result of Deregulation and Regulatory Failure*, 41 Conn. L. Rev. 1327, 1360 (2009).

Lehman had experienced tremendous growth in the decade before its collapse, and particularly in the year just before its collapse.[36] Indeed, revenues had been growing at about 26% per year on the eve of the collapse.[37]

As shown in the next set of illustrations, that growth was largely achieved by taking on increasing amounts of debt, and using that debt to buy more assets. Lehman got bigger with leverage.



*Source: Bloomberg*

Because Lehman had increased its size with a good bit of leverage and little capital, the firm was often skating near the edge of insolvency. The following graphic, prepared by the Lehman Examiner,[38] shows Lehman's solvency or lack thereof during the course of 2008:

---

[36] *Report Of Anton R. Valukas, Examiner,* In re Lehman Brothers Holding, Inc. et al., Case No. 08-13555 (JMP), at 4.
[37] 26.32%. Source: Bloomberg, Equity ISSD screen accessed on September 30, 2011.
[38] http://jenner.com/lehman/VOLUME%205.pdf



Bloomberg lists more than 1,100 distinct debt instruments outstanding at the time of Lehman's collapse, which actually undercounts the degree of borrowing, since repo transactions would not appear on Bloomberg. Bloomberg identifies the issuers on these debt instruments as follows:

| Issuer Name | Frequency |
| --- | --- |
| Lehman Brothers Treasury Co BV | 533 |
| *Lehman Brothers Holdings Inc.* | 471 |
| RACERS | 77 |
| Corporate-Backed Trust Certificates | 16 |
| Blue Point CDO | 4 |
| Anthracite Investments Cayman Ltd | 3 |
| Lehman Brothers Securities NV | 3 |
| TRAINS | 3 |
| Lehman Brothers Bankhaus AG | 2 |
| Lehman Brothers Holdings Capital Trust V | 2 |
| *Lehman Brothers Holdings Inc/Great Britain* | 2 |
| **Lehman Brothers Inc.** | 2 |
| Lehman Brothers UK Capital Funding III L | 2 |
| Lehman Brothers Bankhaus AG/London | 1 |

12

| | |
|---|---|
| Lehman Brothers Holdings E-Capital Trust | 1 |
| Lehman Brothers Holdings PLC | 1 |
| Lehman Brothers UK Capital Funding IV LP | 1 |
| Lehman Brothers UK Capital Funding LP | 1 |
| Lehman Brothers UK Capital Funding V LP | 1 |
| Variable Funding Trust 2007-1 | 1 |

The US holding company is in italics. The U.S. broker-dealer in bold. LBIE is nowhere to be found, although its immediate parent appears once.

The RACERS ("Restructured Asset Certificates with Enhanced Returns") transactions, the third most frequent type of debt instrument listed on the table, centered on a trust.[39] The trust would receive a large sum from an investor in exchange for ownership interests in the trust, called RACER certificates.

The trust would then sell credit protection to Lehman Brothers Special Financing Inc. ("LBSF"), Lehman's main swap counterparty in exchange for a single, upfront payment that also went into the trust. If the swap was never triggered during the life of the transaction, the entire trust proceeds would return to the investor. Essentially the transactions allowed Lehman to purchase credit protection from an SPV that it had created, and in some cases funded. These are the securities that Lehman's own internal emails referred to as "goat poo."[40]

But more interesting is the name at the top of the list: Lehman's Dutch affiliate, Lehman Brothers Treasury Co BV ("LBT"), the issuer on more than 530 debt instruments.[41]

On October 8, 2008, this entity was declared bankrupt by the Amsterdam district court and two trustees were appointed.[42] Thus it comprises one of Lehman's "80 independent but related foreign insolvency proceedings around the globe."[43]

---

[39] Lehman Brothers Special Financing Inc., Plaintiff, v. Harrier Finance Limited, a.k.a. Rathgar Capital Corporation, Defendant (In re Lehman Brothers Holdings Inc., et al.), 2009 WL 1430616 (Bankr. S.D.N.Y.).

[40] http://www.reuters.com/article/2011/02/18/jpmorgan-idUSN1829544020110218?WT.tsrc=Social%20Media&WT.z_smid=twtr-reuters_%20com&WT.z_smid_dest=Twitter

[41] There are apparently different ways to count debt issuances. LBT's trustee reports 3,789 series of notes outstanding, which were in turn split in an estimated 3 million separate tradable instruments.

[42] http://www.lehmanbrotherstreasury.com/

[43] *Debtors' Amended Response To Objections To Approval Of Proposed Disclosure Statement,* In re Lehman Brothers Holding, Inc. et al., Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Aug. 24, 2011) (Docket No. 19487).