# EXHIBIT A

Execution Copy

## LEHMAN BROTHERS HOLDINGS INC.

Medium-Term Notes, Series I

### U.S. STRUCTURED NOTES PURCHASE AGREEMENT

March 9, 2007

Lehman Brothers Holdings Inc.
Lehman Brothers Inc.
745 Seventh Avenue
New York, New York 10019

Ladies and Gentlemen:

Lehman Brothers Holdings Inc., a Delaware corporation (the "Company"), has previously entered into a Distribution Agreement dated May 30, 2006 (the "Distribution Agreement"), between the Company and Lehman Brothers Inc. (the "Primary Agent"), with respect to the issue and sale by the Company of its Medium Term Notes, Series I (the "Securities"), pursuant to an Indenture dated as of September 1, 1987, as amended, between the Company and Citibank, N.A., as Trustee.  The Distribution Agreement permits the Company to enter into an agreement with the Primary Agent and/or one or more additional persons to purchase Securities as principals.

The undersigned (the "Purchaser") agrees to purchase certain structured Securities (the "Designated Securities") from the Primary Agent, at the purchase price and terms as set forth in the applicable Terms Agreement (as defined herein).

Subject to the terms and conditions stated herein and subject to the reservation by the Company of the right to sell Securities (including Designated Securities) directly on its own behalf at any time, to any person, and the right to enter into agreements substantially identical hereto with other principals or agents, the Company hereby agrees that whenever the Primary Agent determines to sell Designated Securities pursuant to this Agreement, such Designated Securities shall be sold pursuant to a Terms Agreement (as defined herein) relating to such sale in accordance with the provisions of Section 1 herein between the Company, the Primary Agent and the Purchaser, pursuant to which the Purchaser shall purchase such Designated Securities as principal for resale to an Investor (as defined below) or for resale to one or more of the other agents or Sub-Distributors (as defined herein), each of whom will purchase as principal for resale to Investors or to other dealers, as further set forth in this Agreement.  This Agreement shall only apply to sales of the Designated Securities and not to sales of any other securities or evidences of indebtedness of the Company and only on the specific terms set forth herein.

1

In accordance with Section 11(a) of the Distribution Agreement (as amended by this Agreement to allow for purchases of Designated Securities directly from the Primary Agent), the Purchaser hereby confirms that, except as set forth in this Agreement, with effect from the date hereof solely in respect of each issue of Designated Securities pursuant to a Terms Agreement (each an "Issue"), the Purchaser shall become a party to the Distribution Agreement, vested with all the authority, rights and powers, and subject to all representations, warranties, duties and obligations of the Primary Agent as if originally named as an Agent (as defined below) under the Distribution Agreement.

Such appointment is limited to each Issue and is not for any other issue of Securities of the Company pursuant to the Distribution Agreement.

Except as otherwise expressly provided herein, all terms used herein which are defined in the Distribution Agreement shall have the same meanings as in the Distribution Agreement, except that (i) the term "Agent," as used in the Distribution Agreement, shall be deemed to refer, where applicable and for purposes of this Agreement, only to the Purchaser and (ii) any reference to the Registration Statement or the Prospectus shall be deemed to refer to such documents as amended or supplemented as of the date of this Agreement and as of the Settlement Date, including any supplement relating to the Designated Securities and containing the name of the Purchaser. For purposes of Section 12 of the Distribution Agreement, the Purchaser confirms that its notice details are as set forth immediately beneath its name.

SECTION 1.  Purchaser as Principal.

The Purchaser's obligation to purchase Designated Securities hereunder is subject to the accuracy, as of the Settlement Date, of the Company's representations and warranties contained in the Distribution Agreement and to the Company's performance and observance of all applicable covenants and agreements contained therein, and the satisfaction of all conditions precedent contained therein, including, without limitation, those pursuant to Sections 5, 6 and 7 thereof.

(i) Each sale of Designated Securities shall be made in accordance with the terms of this Agreement and a separate agreement to be entered into between the Company, the Primary Agent and the Purchaser which will provide for the sale of such Designated Securities to, and the purchase of and reoffering thereof by, the Purchaser as principal (a "Terms Agreement"). Each such Terms Agreement shall be substantially in the form attached hereto as Exhibit A or in such other form as the Primary Agent, the Company and the Purchaser may agree. Each Terms Agreement shall describe the Designated Securities to be purchased pursuant thereto by the Purchaser as principal, and shall specify, among other things, the principal amount of Designated Securities to be purchased, the interest rate and maturity date of such Designated Securities, the interest payment dates, the Offering Price, the Agent's Concession (as defined below), the Dealers' Concession (as defined below), the Reallowance (as defined below), if any, the net proceeds to the Company, the Applicable Time for such Designated Securities, the time of delivery of and payment for such Designated Securities (the "Settlement Date"), whether the Designated Securities are redeemable or repayable, and on what terms and conditions, whether there are any additional conditions precedent to the obligations of the Purchaser under such Terms Agreement and any other relevant terms.

2

(ii) Upon the closing of the sale of any Designated Securities sold by the Primary Agent to the Purchaser pursuant to a Terms Agreement as a result of a solicitation made by the Purchaser, the Purchaser agrees to purchase the Designated Securities at the purchase price (equal to the Offering Price less the Agent's concession (the "Agent's Concession") as set forth in the applicable Terms Agreement and pricing supplement setting forth the terms of each issuance of Designated Securities (the "Pricing Supplement").

(iii) The Purchaser shall purchase from the Primary Agent as principal for resale to Investors, or to Sub-Distributors as set forth in Section 2(ix) below, such aggregate principal amount of Designated Securities with respect to which it has communicated offers to purchase to the Primary Agent (the "Commitment Amount").  The Purchaser agrees to deliver to the Company or the Primary Agent, if specified by the Company, on the Settlement Date (or on such later date as may be specified by the Primary Agent) and at the place specified by the Primary Agent immediately available funds, payable to the order of the Company, for an amount equal to the Offering Price, less the Agent's Concession in respect of its Commitment Amount.  The Company or the Primary Agent will deliver to the Purchaser the Designated Securities paid for by the Purchaser.  If the Primary Agent has determined that transactions in the Designated Securities are to be settled through the facilities of DTC or another clearinghouse facility, payment for and delivery of Designated Securities purchased by the Purchaser shall be made through such facilities, if the Purchaser is a member, or, if the Purchaser is not a member, settlement shall be made through its ordinary correspondent who is a member.

SECTION 2. Purchaser's Representations, Warranties and Agreements.

The Purchaser hereby represents, warrants, agrees and undertakes to the Company that:

(i) this Agreement has been duly executed and delivered by it and constitutes or will constitute a legal, valid and binding obligation, enforceable against it in accordance with its terms, except as the enforceability thereof may be limited by bankruptcy, insolvency, reorganization or similar laws relating to or affecting creditors' rights generally, by general equitable principles (regardless of whether such enforceability is considered in a proceeding in equity or at law);

(ii) the execution of this Agreement and the performance of its obligations and any activities contemplated hereunder are within its corporate powers, and are lawful under the laws of the jurisdiction of its incorporation and the jurisdiction in which it operates (if different) and that any Purchase and holding of the Designated Securities will not contravene any law, rule (including the rules of any exchange), regulation or regulatory policy applicable to it;

(iii) it has taken all corporate action required to approve any such purchase of the Designated Securities by it and the proposed terms thereof;

(iv) the execution, delivery and performance by it of this Agreement will not conflict with or cause a breach under any other agreement to which it is party, except in each case where such breach would not, individually or in the aggregate, have a material adverse effect on its business or its ability to perform its obligations under this Agreement;

3

(v) it is solely responsible for deciding to purchase the Designated Securities, in making such decision it will rely solely on its own financial, legal, tax, accounting or other advisers and it has not relied upon the Company, any of the Company's affiliates or any of the Company's or its affiliates' officers, employees or representatives (collectively "Representatives") in making any such decision;

(vi) it will comply with all applicable selling, offering or distribution restrictions (howsoever described) in respect of the Designated Securities both (i) as described in the Pricing Disclosure Package and (ii) as required under the laws and regulations in force in any jurisdiction to which it and such sales are subject or in which it makes or is deemed to make such offers, purchases, sales, markets or arrangements and will obtain any consent, approval or permission that is required for the offer, purchase, sale, marketing or arrangement thereof by it or procure the same in relation to any affiliate through which it may sell the Designated Securities;

(vii)  it has implemented and currently maintains (and shall maintain for so long as it is a party to this Agreement) an anti-money laundering ("AML") program (including, without limitation, an effective customer identification program) that satisfies the requirements of (i) Section 326 of the USA PATRIOT Act (Pub. L. 107-56) and the regulations promulgated thereunder and (ii)  all applicable laws, rules and regulations of its own jurisdiction including, where applicable, the Bank Secrecy Act (as amended by the USA PATRIOT Act of 2001 (the "Act")).  The Purchaser further represents that it will adopt appropriate policies, procedures and internal controls to be fully compliant with any additional laws, rules or regulations, including the Bank Secrecy Act, to which it may become subject in any relevant jurisdiction;

(viii) it has taken or will take all necessary steps to ensure that (i) all purchases by it and (ii) all sales of the Designated Securities purchased from the Company comply with the rules, regulations and requirements of any relevant regulatory authority, relevant regulated trading market or relevant stock exchange, whether statutory or otherwise;

(ix) if offering, selling or marketing the Designated Securities in the United States, it is registered as a broker-dealer  under the Exchange Act;

(x) prior to the time an Investor commits to purchase any Security to be purchased from the Purchaser pursuant to this Agreement and re-sold by the Purchaser to such investor, it shall, in accordance with applicable law or regulation, provided that such material has been made available to the Purchaser in a timely manner by the Company, deliver to investors a copy of any relevant Pricing Disclosure Package materials relating to the Designated Securities to such investor.  (An "Investor" means, where the Purchaser re-sells or intends to re-sell Designated Securities, such persons to whom the Purchaser may sell or arrange for the sale of Designated Securities in accordance with the terms of this Agreement.);

(xi) in connection with the resale of the Designated Securities purchased, the Purchaser may engage the services of Sub-Distributors.  In any case where it shall sell the Designated Securities to any investor that is in turn re-selling to third parties (a "Sub-Distributor"), the Purchaser shall ensure that the Sub-Distributor is aware of, and complies with, the obligations of the Purchaser under this Agreement, as if applicable to such Sub-Distributor with respect to the offers and sales of Designated Securities by such Sub-Distributor;

4

(xii) it may sell Designated Securities to a Sub-Distributor at a price not less than the Offering Price less the applicable concession to dealers set forth in the applicable Pricing Supplement (the "Dealers' Concession");

(xiii) that any Sub-Distributor it may engage will agree that (i) such Sub-Distributor will offer the Designated Securities to Investors at the Offering Price and (ii) such Sub-Distributor will not reallow a discount on sales to other dealers in an amount in excess of the reallowance set forth in the applicable Pricing Supplement, if any (the "Reallowance").

(xiv) it shall comply with all applicable law and regulations (including, without limitation, (i) the U. S. and other countries' securities laws, (ii) NASD Rules 2730, 2740, 2750 and 2790 and in the case of a non-member broker-dealer in a foreign country, Rule 2420, as well as all other relevant NASD rules, and (iii) the rules of any relevant stock or other exchange or any like organization) and shall be solely responsible for the publication and contents of any marketing material published by it in relation to the Designated Securities and any and all other marketing activities in connection with its offering and selling activities;

(xv) in connection with re-sales of new issues of the Designated Securities purchased from the Company, it shall not provide any information or make any representations other than those contained in the Pricing Disclosure Package;

(xvi) neither it nor any of its affiliates, subsidiaries, their respective representatives, partners, officers, employees or agents shall use the name of "Lehman Brothers" or any other name registered by the Lehman Brothers group of companies or any part thereof in any statements (oral or written), marketing material or documentation in relation to its or their products without having first obtained the prior written consent of the Company;

(xvii) if at any time during the term of this Agreement, the Purchaser is informed or information comes to its attention that it is or may be in violation of any applicable law or regulations in connection with the purchase by it or on-sale of the Designated Securities, the Purchaser shall (i) immediately provide notice to Company or the Primary Agent of such information, (ii) immediately cease all offering, selling and marketing activities with respect to any Designated Securities, (iii) take all appropriate steps to remedy such violation and comply with such applicable law or regulations in all respects and (iv) upon the consent of Company or the Primary Agent, resume such offering, selling or marketing activities only after all such violations have been cured.  Further, the Purchaser shall establish and maintain all proper records (particularly, but without limitation, accounting records) required by any law, code of practice or corporate policy applicable to it from time to time; and

(xviii) if at any time during the term of this Agreement, the Purchaser is informed or information comes to its attention that any Sub-Distributor is or may be in violation of any applicable law or regulations in connection with the purchase or on-sale of the Designated Securities, the Purchaser shall (i) immediately provide notice to the Company or the Primary Agent of such information, (ii) immediately cease all offering, selling and marketing activities with such Sub-Distributor with respect to any Designated Securities and (iii) upon the consent of the Company or the Primary Agent, resume such offering, selling or marketing activities with such Sub-Distributor.

5

SECTION 3.  Suitability.

The Purchaser acknowledges and agrees to the following:

(i) it is a sophisticated institutional client and has such knowledge and experience in financial and business matters as to be capable of evaluating the risks and merits of an investment in the Designated Securities;

(ii) it is solely responsible for evaluating all information provided to it related to and in respect of the Designated Securities and it has not relied upon advice from the Company, any of its affiliates or any of their Representatives regarding the suitability of the Designated Securities as an investment for its investors and to the extent applicable, itself; and

(iii) it will determine whether any Designated Securities sold to an Investor are a suitable investment for such Investor, and that the Purchaser has not relied upon advice from the Company or any affiliate regarding such determination.

SECTION 4. Additional Indemnification by the Purchaser.

The Purchaser agrees to indemnify and hold harmless the Company and any entity within the Lehman Brothers group of companies, from and against all actual or alleged actions, claims, demands, proceedings, investigations, liabilities or judgments (collectively, "Claims") and any and all losses, damages, costs, charges and expenses (including all costs, expenses, and fees connected with investigating, preparing or defending any such Claims) of whatever nature and in whatever jurisdiction, and which arise directly or indirectly from (i) any breach by the Purchaser (or any of its Sub-Distributors) of any warranty, representation or agreement, or its failure to perform any of its respective obligations hereunder, (ii) the performance by the Purchaser (or any of its Sub-Distributors) of any activity in connection with the marketing, promotion, offer, sale, resale, distribution or transfer of the Designated Securities, (iii) the failure by the Purchaser (or any of its Sub-Distributors) to comply with any law or regulation applicable to the Purchaser (or any of its Sub-Distributors) in respect of such distribution activities; and (iv) the contents of any marketing material or statement produced, published, made or distributed or statements made by the Purchaser (or any of its Sub-Distributors) in connection with the marketing, promotion, offer, sale, resale, distribution  or transfer of the Designated Securities (except, with respect to (i) – (iv), to the extent that the claim for which the Company seeks indemnification relates to information supplied by the Company).

SECTION 5. Miscellaneous.

Subparagraph A of the subsection entitled Settlement Procedures of the General Procedures Section of the Administrative Procedures attached as Exhibit A to the Distribution Agreement (the "Administrative Procedures") is hereby amended by permitting the Agent to advise the Company and the Trustee by telephone in addition to in writing, by telex or facsimile.

The subsection entitled Acceptance and Rejection of Offers of the Special Administrative Procedures for Book-Entry Notes Issuance Section of the Administrative Procedures is hereby amended by permitting the Agent, unless otherwise instructed by the Company, to advise the Company by e-mail as well as telephone.

Subparagraph A of the subsection entitled Settlement Procedures of the Special Administrative Procedures for Book-Entry Notes Issuance Section of the Administrative Procedures is hereby amended by permitting the Agent to advise the Company and the Trustee by telephone in addition to in writing, by telex or facsimile.

The undersigned agrees to perform its duties and obligations specifically provided to be performed by the Purchaser in accordance with the terms and provisions of the Distribution Agreement, as amended or supplemented hereby.

This Agreement shall be subject to the termination provisions of Section 10 of the Distribution Agreement.

This Agreement shall be governed by and construed in accordance with the laws of New York. This Agreement may be executed in one or more counterparts and the executed counterparts taken together shall constitute one and the same agreement.

7

If the foregoing correctly sets forth the agreement among the parties hereto, please indicate your acceptance hereof in the space provided for that purpose below.

UBS FINANCIAL SERVICES INC.

By: _____
    Name: Eric Glicksman
    Title: Managing Director

UBS FINANCIAL SERVICES INC.

By: _____
    Name: Jorge Ramirez
    Title: Executive Director

Notice Information:
UBS Financial Services Inc.
1200 Harbor Boulevard
Weehawken, New Jersey 07086
Attn: Office of the General Counsel

Accepted: March 9, 2007

LEHMAN BROTHERS HOLDINGS INC.

By _____
    Name:
    Title:

LEHMAN BROTHERS INC.

By _____
    Name:
    Title:

053137-0169-10049-NY03.2491841.14

If the foregoing correctly sets forth the agreement among the parties hereto, please indicate your acceptance hereof in the space provided for that purpose below.

UBS FINANCIAL SERVICES INC.

By: _____
    Name:
    Title:

UBS FINANCIAL SERVICES INC.

By: _____
    Name:
    Title:

Notice Information:
UBS Financial Services Inc.
1200 Harbor Boulevard
Weehawken, New Jersey 07086
Attn: Office of the General Counsel

Accepted: March 9, 2007

LEHMAN BROTHERS HOLDINGS INC.

By _____
    Name: Andrew M.W. Yeung
    Title: Vice President

LEHMAN BROTHERS INC.

By _____
    Name:
    Title:

053137-0169-10049-NY03.2491841.14

If the foregoing correctly sets forth the agreement among the parties hereto, please indicate your acceptance hereof in the space provided for that purpose below.

UBS FINANCIAL SERVICES INC.

By: _____
    Name:
    Title:

UBS FINANCIAL SERVICES INC.

By: _____
    Name:
    Title:

Notice Information:
UBS Financial Services Inc.
1200 Harbor Boulevard
Weehawken, New Jersey 07086
Attn: Office of the General Counsel

Accepted:  March 9, 2007

LEHMAN BROTHERS HOLDINGS INC.

By _____
    Name:
    Title:

LEHMAN BROTHERS INC.

By _Christina D Sfaklanis_
    Name: _Christina D Sfaklanis_
    Title: _SVP_

053137-0169-10049-NY03.2491841.14

EXHIBIT A

# LEHMAN BROTHERS HOLDINGS INC.

## U.S. Structured Notes

FORM OF TERMS AGREEMENT

_____ ___, 20___

Lehman Brothers Holdings Inc.
Lehman Brothers Inc.
745 Seventh Avenue
New York, New York  10019
Attention: Treasurer

Lehman Brothers Holdings Inc., a Delaware corporation (the "Company") and Lehman Brothers Inc., a Delaware corporation (the "Primary Agent"), have previously entered into a U.S. Structured Notes Purchase Agreement dated [__], 2007 (the "Purchase Agreement"), among the Company, the Primary Agent and UBS Financial Services Inc. (the "Purchaser"), with respect to the issue and sale by the Company of certain of its structured securities (the "Designated Securities"), pursuant to an Indenture dated as of September 1, 1987, as amended between the Company and Citibank, N.A., as Trustee.  The Purchase Agreement provides that sales of Designated Securities shall be made pursuant to the Purchase Agreement and a separate agreement between the Company, the Primary Agent and the Purchaser as principal.

The Purchaser agrees to purchase from the Primary Agent, at the purchase price (equal to the Offering Price less the Agent's Concession set forth in the Term Sheet), $_____ principal amount of Designated Securities.  The Designated Securities have the terms indicated in the Term Sheet attached as Schedule I hereto.

The term "Applicable Time" means _____ [a.m.][p.m.] (New York City time) on the date of this Agreement.

The Purchaser's obligation to purchase Designated Securities hereunder is subject to the accuracy, as of the Settlement Date, of the Company's representations and warranties contained in the Distribution Agreement and to the Company's performance and observance of all applicable covenants and agreements contained therein, and the satisfaction of all conditions precedent contained therein.

Except as otherwise expressly provided herein, all terms used herein which are defined in the Distribution Agreement shall have the same meanings as in the Distribution Agreement.

A-1

The undersigned agrees to perform its duties and obligations specifically provided to be performed by the Purchaser in accordance with the terms and provisions of the Purchase Agreement and the procedures, as amended or supplemented hereby.

This Agreement shall be subject to the termination provisions of Section 10 of the Distribution Agreement.

This Agreement shall be governed by and construed in accordance with the laws of New York.  This Agreement may be executed in one or more counterparts and the executed counterparts taken together shall constitute one and the same agreement.

053137-0169-10049-NY03.2491841.14

If the foregoing correctly sets forth the agreement among the parties hereto, please indicate your acceptance hereof in the space provided for that purpose below.

UBS FINANCIAL SERVICES INC.

By:_____
    Name:
    Title:

UBS FINANCIAL SERVICES INC.

By:_____
    Name:
    Title:

Accepted: _____ ___, 20____

LEHMAN BROTHERS HOLDINGS INC.

By:_____
    Name:
    Title:

LEHMAN BROTHERS INC.

By:_____
    Name:
    Title:

A-3

SCHEDULE I

[Term Sheet]

053137-0169-10049-NY03.2491841.14

Execution Copy

# LEHMAN BROTHERS HOLDINGS INC.

Medium-Term Notes, Series I

U.S. STRUCTURED NOTES PURCHASE AGREEMENT
AMENDMENT 1

November 5, 2007

Lehman Brother Holdings Inc.
Lehman Brothers Inc.
745 Seventh Avenue
New York, New York 10019

Ladies and Gentlemen:

Reference is made to the purchase agreement dated March 9, 2007 (the "Purchase Agreement") among Lehman Brothers Holdings Inc., Lehman Brothers Inc. and UBS Financial Services Inc.  Except as otherwise expressly provided herein, capitalized terms used but not defined herein shall have the same meanings ascribed to such terms in the Purchase Agreement or the Distribution Agreement (as defined in the Purchase Agreement), as applicable.

Section 2 of the Purchase Agreement is amended:

(1) By adding a new clause (xix) as follows:

"(xix) in connection with any offering by the Purchaser of any Designated Securities:

(a) it has not and will not use, authorize use of, refer to, or participate in the planning for the use of, any written communication relating to any offer of Designated Securities that would constitute a "free writing prospectus" (as defined in Rule 405 of the Rules and Regulations) without the prior written consent of the Company and the Primary Agent (which consent is deemed to have been given with respect to any Issuer Free Writing Prospectus provided to the Purchaser by the Company and the Primary Agent with respect to such Designated Securities), other than any free writing prospectus that (i) does not contain any "issuer information" (as defined in Rule 433(h)(2) of the Rules and Regulations)

that was not included in a previously filed Issuer Free Writing Prospectus with respect to such Designated Securities or in the Prospectus (ii) contains only information with respect to such Designated Securities (including information as to the final terms of any Designated Securities) included in an Issuer Free Writing Prospectus provided to the Purchaser by the Company and the Primary Agent with respect to such Designated Securities, and (iii) does not and will not require filing with the Commission pursuant to Rule 433 of the Rules and Regulations; and

(b) it will comply with the requirements of Rule 433 of the Rules and Regulations with respect to any free writing prospects prepared in accordance with clause (a) above.

(2) By amending clause (xvi) to insert the following provision at the end thereof:

"; *provided*, however, that consent of the Company is deemed to have been given with respect to any free writing prospectus prepared by the Purchaser in compliance with clause (xix) hereof

The undersigned agrees to perform its duties and obligations specifically provided to be performed by the Purchaser in accordance with the terms and provisions of the Purchase Agreement and the procedures, as amended or supplemented hereby. Except as expressly amended or supplemented hereby, the provisions of the Purchase Agreement shall remain in full force and effect and the Purchase Agreement shall be read and construed as one document with this Amendment 1.

This Agreement shall be subject to the termination provisions of Section 10 of the Distribution Agreement.

This Agreement shall be governed by and construed in accordance with the laws of New York. This Agreement may be executed in one or more counterparts and the executed counterparts taken together shall constitute one and the same agreement.

If the foregoing correctly sets forth the agreement among the parties hereto, please indicate your acceptance hereof in the space provided for that purpose below.

UBS FINANCIAL SERVICES INC.

By:_____
    Name:
    Title:


UBS FINANCIAL SERVICES INC.

By:_____
    Name:
    Title:


Accepted:  November 5, 2007


LEHMAN BROTHERS HOLDINGS INC.


By:_____
    Name:
    Title:

LEHMAN BROTHERS INC.


By:_____
    Name:
    Title:

LEHMAN BROTHERS

March 9, 2007

UBS Financial Services Inc.
800 Harbor Boulevard, Third Floor
Weehawken, NJ 07086
Attention: Structured Products Group

Dear Sirs/Mesdames:

Pursuant to the Purchase Agreement, dated the date hereof, you are becoming an Agent under the Distribution Agreement, dated as of May 30, 2006, between our parent company, Lehman Brothers Holdings Inc. (the "Company"), and us Lehman Brothers Inc. (the "Primary Agent") with respect to the sale from time to time by the Primary Agent of the Company's Medium-Term Notes, Series I (the "Notes"). In order to induce you to act as an Agent under the Distribution Agreement, we agree to use our reasonable efforts (i) to create, participate in and maintain a secondary market for the Notes offered through you in order to provide a liquid market into which investors may dispose of such Notes so long as such Notes remain outstanding and (ii) to provide to you each trading day bid and asked prices for any outstanding Notes offered through you; provided, however, that (1) the foregoing shall not constitute a commitment to purchase or sell, or to offer to purchase or sell, Notes at any particular price or in unlimited quantities and (2) we may refrain from any such activities as and when necessary in our reasonable opinion to comply with applicable laws, regulations and requirements of self-regulatory organizations, including but not limited to Regulation M.

Very truly yours,

LEHMAN BROTHERS INC.

By: _Christine I Zlakianis_
Name: _Christina A Zlakianis_
Title: _SVP_

Acknowledged and agreed:

UBS FINANCIAL SERVICES INC.

By:_____
   Name:
   Title:

By:_____
   Name:
   Title:

UBS FINANCIAL SVCS    Fax:2012722628    Mar 9 2007 14:01    P.03

08-13555-mg   Doc 42124-2   Filed 01/22/14   Entered 01/22/14 12:09:42   Exhibits A
through E to Crowley Declaration   Pg 20 of 156

# LEHMAN BROTHERS

March 9, 2007

UBS Financial Services Inc.
800 Harbor Boulevard, Third Floor
Weehawken, NJ 07086
Attention: Structured Products Group

Dear Sirs/Mesdames:

Pursuant to the Purchase Agreement, dated the date hereof, you are becoming an Agent under the Distribution Agreement, dated as of May 30, 2006, between our parent company, Lehman Brothers Holdings Inc. (the "Company"), and us Lehman Brothers Inc. (the "Primary Agent") with respect to the sale from time to time by the Primary Agent of the Company's Medium-Term Notes, Series I (the "Notes"). In order to induce you to act as an Agent under the Distribution Agreement, we agree to use our reasonable efforts (i) to create, participate in and maintain a secondary market for the Notes offered through you in order to provide a liquid market into which investors may dispose of such Notes so long as such Notes remain outstanding and (ii) to provide to you each trading day bid and asked prices for any outstanding Notes offered through you; provided, however, that (1) the foregoing shall not constitute a commitment to purchase or sell, or to offer to purchase or sell, Notes at any particular price or in unlimited quantities and (2) we may refrain from any such activities as and when necessary in our reasonable opinion to comply with applicable laws, regulations and requirements of self-regulatory organizations, including but not limited to Regulation M.

Very truly yours,

LEHMAN BROTHERS INC.

By:_____
    Name:
    Title:

Acknowledged and agreed:

UBS FINANCIAL SERVICES INC.

By:_____
  Name: Eric Glicksman
  Title: Managing Director

By:_____
  Name: Jorge Ramirez
  Title: Executive Director

# EXHIBIT B

LEHMAN BROTHERS HOLDINGS INC.

Medium-Term Notes, Series I

DISTRIBUTION AGREEMENT

May 30, 2006

Lehman Brothers Inc.
745 Seventh Avenue
New York, New York 10019

Ladies and Gentlemen:

Lehman Brothers Holdings Inc., a Delaware corporation (the "Company"), confirms its agreement with you (the "Agent") with respect to the issue and sale by the Company of its Medium-Term Notes, Series I (the "Medium-Term Notes" or the "Securities"). The Securities are to be issued pursuant to an indenture, dated as of September 1, 1987, as amended and supplemented to date (as amended, the "Indenture"), between the Company and Citibank, N.A., as trustee (the "Trustee").

Subject to the terms and conditions stated herein and subject to the reservation by the Company of the right to sell Securities directly on its own behalf at any time, and to any person, the Company hereby appoints the Agent as the exclusive agent of the Company for the purpose of soliciting offers to purchase the Securities from the Company by others. This Agreement shall only apply to sales of the Securities and not to sales of any other securities or evidences of indebtedness of the Company and only on the specific terms set forth herein.

SECTION 1    Representations and Warranties. The Company represents and warrants to the Agent as of the date hereof, as of the Closing Date referred to in Section 2(e) hereof, and as of the times referred to in Section 6(a) hereof (the Closing Date and each such time being hereinafter sometimes referred to as a "Representation Date"), as follows:

(a)    An "automatic shelf effective registration statement" (as defined in Rule 405 ("Rule 405") under the Securities Act of 1933, as amended (the "Securities Act")) relating to the Securities (i) has been prepared by the Company in conformity with the requirements of the Securities Act and the rules and regulations (the "Rules and Regulations") of the Securities and Exchange Commission (the "Commission") thereunder; (ii) has been filed with the Commission under the Securities Act not earlier than the date that is three years prior to the date hereof; and (iii) is effective under the Securities Act.  Copies of such registration statement and any amendment thereto have been delivered by the Company to you as the Agent.  As used in this Agreement:

(i)    "Applicable Time" means the time and date set forth in the Purchase Agreement (as defined below) for an issue of Securities or, when not otherwise agreed to between the Company and the Agent, the time and date when

1

053137-0169-10049-NY03.2491841.14

UBSFS_SDNY1083332

the Agent first conveys to purchasers the pricing terms of an issue of Securities
set forth in the applicable Term Sheet for such issue of Securities;

(ii)    "Base Prospectus" the base prospectus filed as part of such
registration statement, in the form in which it has most recently been filed with
the Commission on or prior to the date of this Agreement;

(iii)    "Effective Date" means any date as of which any part of such
registration statement relating to the Securities became, or is deemed to have
become, effective under the Securities Act in accordance with the Rules and
Regulations (including pursuant to Rule 430B of the Rules and Regulations);

(iv)    "Issuer Free Writing Prospectus" means each "issuer free writing
prospectus" (as defined in Rule 433 of the Rules and Regulations ("Rule 433")) in
connection with the offering of the Securities;

(v)    "Preliminary Prospectus" means any preliminary prospectus
relating to the Securities, including the Base Prospectus and any prospectus
supplement thereto relating to the Securities, as filed with the Commission
pursuant to Rule 424(b) of the Rules and Regulations ("Rule 424(b)");

(vi)    "Pricing Disclosure Package" means, as of the Applicable Time for
an issue of Securities, the most recent Preliminary Prospectus, together with each
Issuer Free Writing Prospectus filed or used by the Company on or before the
Applicable Time and any Term Sheet prepared and filed pursuant to Section 3(a)
hereof;

(vii)    "Prospectus" means the final prospectus relating to the Securities,
including the Base Prospectus and any prospectus supplement thereto relating to
the Securities, as filed with the Commission pursuant to Rule 424(b); and

(viii)    "Registration Statement" means, collectively, the various parts of
such registration statement, each as amended as of the Effective Date for such
part, including any Preliminary Prospectus or Prospectus deemed to be a part
thereof pursuant to Rule 430B of the Rules and Regulations, and all exhibits to
such registration statement.

Any reference to the "most recent Preliminary Prospectus" shall be deemed to refer to the latest
Preliminary Prospectus included in the Registration Statement or filed pursuant to Rule 424(b)
on or prior to the date hereof.  Any reference to any Preliminary Prospectus or the Prospectus
shall be deemed to refer to and include any documents incorporated by reference therein
pursuant to Form S-3 under the Securities Act as of the date of such prospectus.  Any reference
to any amendment or supplement to any Preliminary Prospectus or the Prospectus shall be
deemed to refer to and include any post-effective amendment to the Registration Statement, any
prospectus supplement relating to the Securities filed with the Commission pursuant to Rule
424(b) and any document filed under the Securities Exchange Act of 1934, as amended (the
"Exchange Act"), and incorporated by reference in such prospectus, in each case after the date of
such prospectus; and any reference to any amendment to the Registration Statement shall be
deemed to include any annual report of the Company on Form 10-K filed with the Commission

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL    UBSFS_SDNY1083333

pursuant to Section 13(a) or 15(d) of the Exchange Act after the Effective Date that is incorporated by reference in the Registration Statement.

The Commission has not issued any order preventing or suspending the use of any Preliminary Prospectus, any Issuer Free Writing Prospectus or the Prospectus or suspending the effectiveness of the Registration Statement, and no proceeding or examination for such purpose has been instituted or, to the Company's knowledge, threatened by the Commission.  The Commission has not notified the Company of any objection to the use of the form of the Registration Statement pursuant to Rule 401(g)(2) of the Rules and Regulations.

(b)  The Company has been since the time of initial filing of the Registration Statement and continues to be a "well-known seasoned issuer" eligible to use Form S-3 for the offering of the Securities, including not having been an "ineligible issuer" (as such terms are defined in Rule 405) at any such time or date.

(c)  The Registration Statement conforms, and the Prospectus and any further amendments or supplements to the Registration Statement or the Prospectus will conform in all material respects to the requirements of the Securities Act and the Rules and Regulations; the Registration Statement and any post-effective amendments thereto do not and will not, as of the applicable effective date or dates, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading; and the Prospectus and any amendment or supplement thereto will not, as of its date, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading; *provided*, *however*, that this representation or warranty shall not apply to statements or omissions made in reliance upon and in conformity with written information furnished to the Company by or through the Agent specifically for inclusion therein or to any statements in or omissions from the statement of eligibility and qualification on Form T-1 of the Trustee under the Trust Indenture Act ("Form T-1").  The documents incorporated by reference into any Preliminary Prospectus and the Prospectus, at the time they were or are filed with the Commission, conform, conform or will conform, as the case may be, in all material respects with the requirements of the Securities Act and the Rules and Regulations and the Exchange Act and the rules and regulations adopted by the Commission thereunder, and did not or will not, as the case may be, include an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

(d)  The Pricing Disclosure Package for any issue of Securities will not, as of the Applicable Time for such issue of Securities, contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; *provided* that no representation or warranty is made as to (i) information contained in or omitted from the Pricing Disclosure Package in reliance upon and in conformity with written information furnished to the Company by or through the Agent specifically for inclusion therein, (ii) any statements in or omissions from the Form T-1, or (iii) any other information listed on Schedule III to the Purchase Agreement or otherwise agreed to between the Company and the Agent.

(e)  The Company has not made any written communication relating to the Securities that would constitute an Issuer Free Writing Prospectus (other than the Term Sheet

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083334

prepared and filed pursuant to Section 3(a) hereof) without the prior consent of the Agent; the Company has complied and will comply with the requirements of Rule 433 with respect to any such Issuer Free Writing Prospectus; any such Issuer Free Writing Prospectus will not, as of its issue date and through the time the Securities are delivered pursuant to Section 3 hereof, include any information that conflicts with the information contained in the Registration Statement and the Prospectus; and any such Issuer Free Writing Prospectus, when taken together with the information contained in the Registration Statement and the Prospectus, did not, when issued or filed pursuant to Rule 433, and does not contain an untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; *provided, however*, that this representation or warranty shall not apply to statements or omissions made in reliance upon and in conformity with written information furnished to the Company by or through the Agent specifically for inclusion therein.

(f)    The nationally recognized independent registered public accounting firm whose report appears in the Company's most recent Annual Report on Form 10-K, which is incorporated by reference in the Prospectus, are independent registered public accountants as required by the Securities Act and the Rules and Regulations. In the event that a report of a nationally recognized independent registered public accounting firm regarding historical financial information with respect to any entity acquired by the Company is required to be incorporated by reference in the Prospectus, such independent registered public accountants were independent public accountants, as required by the Securities Act and the Rules and Regulations, during the period of their engagement to examine the financial statements being reported on and at the date of their report.

(g)    The audited consolidated financial statements of the Company included in the Prospectus and the Registration Statement present, and will present, as of the applicable Representation Date and during each period during which solicitations of offers to purchase Securities have not been suspended or during which, in the opinion of counsel to the Agent, a prospectus relating to the Securities is required to be delivered under the Securities Act (or required to be delivered but for Rule 172 of the Rules and Regulations) (each a "Marketing Period"), fairly on a consolidated basis the financial position, the results of operations, changes in common stock and stockholder's equity and cash flows of the Company and its subsidiaries as of the respective dates and for the respective periods indicated, all in conformity with generally accepted accounting principles applied on a consistent basis throughout the periods involved. The unaudited consolidated financial statements of the Company, if any, included in the Prospectus and the Registration Statement and the related notes are, and will be, as of the applicable Representation Date and during each Marketing Period, true, complete and correct, subject to normally recurring changes resulting from year-end audit adjustments, and prepared in accordance with Regulation S-X of the Rules and Regulations.

(h)    Except as described in or contemplated by the Registration Statement and the Prospectus, there has not been any material adverse change in, or any adverse development which materially affects, the business, properties, financial condition or results of operations of the Company or the Company and its subsidiaries taken as a whole from the dates as of which information is given in the Registration Statement and the Prospectus.

(i)    The Securities conform to the description thereof contained in the Prospectus, are duly and validly authorized, and, when validly authenticated, issued and delivered in

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083335

accordance with the Indenture and sold as provided in this Agreement, will be validly issued and outstanding obligations of the Company entitled to the benefits of the Indenture.

(j)  The Indenture has been duly and validly authorized, executed and delivered by the Company and is a valid and binding agreement of the Company enforceable against the Company in accordance with its terms, except as the enforceability thereof may be limited by bankruptcy, insolvency, reorganization or similar laws relating to or affecting creditors' rights generally and by general equitable principles (regardless of whether such enforceability is considered in a proceeding in equity or at law).  The Indenture (i) has been duly qualified under the Trust Indenture Act of 1939, as amended (the "Trust Indenture Act"), (ii) complies as to form with the requirements of the Trust Indenture Act and (iii) conforms to the description thereof in the Prospectus.

(k)  This Agreement has been duly authorized, executed and delivered by the Company and constitutes the valid and binding agreement of the Company enforceable against the Company in accordance with its terms, except as the enforceability thereof may be limited by bankruptcy, insolvency, reorganization or similar laws relating to or affecting creditors' rights generally and by general equitable principles (regardless of whether such enforceability is considered in a proceeding in equity or at law).  The execution, delivery and performance of this Agreement and the consummation of any related transactions described in the Registration Statement will not (i) conflict with, result in the creation or imposition of any lien, charge or encumbrance upon any of the assets of the Company or any of its Significant Subsidiaries pursuant to the terms of, or constitute a default under, any agreement, indenture or instrument, (ii) result in a violation of the organizational documents of the Company or any of its Significant Subsidiaries or (iii) result in the violation of any statute or any order, rule or regulation of any court or governmental agency having jurisdiction over the Company, any of its Significant Subsidiaries or their property, except in the case of clauses (i) and (iii) above for such conflict or violation that would not reasonably be expected, individually or in the aggregate, to have a material adverse effect on the business, condition or properties of the Company and its subsidiaries taken as a whole (a "Material Adverse Effect"). Except as set forth in the Prospectus or as required by the Securities Act, the Exchange Act, the Trust Indenture Act and applicable state securities laws, no consent, authorization or order of, or filing or registration with, any court or governmental agency is required for the execution, delivery and performance of this Agreement. "Significant Subsidiary" means any subsidiary of the Company with assets greater than or equal to 7.5% of the assets of the Company and its subsidiaries determined on a consolidated basis in accordance with GAAP (the "Consolidated Assets").  For the purposes of this definition, the Consolidated Assets at any time shall be determined on the basis of the financial statements in the Company's most recent Quarterly Report on Form 10-Q or Annual Report on Form 10-K, as the case may be, filed with the Commission.

(l)  Each of the Company and the Significant Subsidiaries have been duly organized, are validly existing and in good standing under the laws of their respective jurisdictions of formation, are duly qualified to do business and in good standing as foreign corporations and are duly registered as a broker-dealer, broker, dealer or investment advisor, as the case may be, in each jurisdiction in which their respective ownership of property or the conduct of their respective businesses requires such qualification or registration, except for such jurisdictions in which the failure to qualify, to be in good standing or to register would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect. Each

5

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083336

of the Company and the Significant Subsidiaries holds all licenses, permits, and certificates from governmental authorities necessary for the conduct of its business and owns, or possesses adequate rights to use, all rights necessary for the conduct of such business and has not, to the Company's knowledge, received any notice of conflict with the asserted rights of others in respect thereof, except in each case where the failure to do so would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect; and each of the Company and the Significant Subsidiaries has the power and authority necessary to own or hold its properties and to conduct the businesses in which it is engaged. Neither the Company nor any of the Significant Subsidiaries is in violation of its organizational documents or in default under any agreement, indenture or instrument, the effect of which violation or default would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect. Except as may be disclosed in the Registration Statement and the Prospectus, all outstanding shares of capital stock of the Significant Subsidiaries have been duly authorized and are validly issued and outstanding, fully paid and non-assessable and, except for directors' qualifying shares, are owned by the Company, directly or indirectly through subsidiaries, free and clear of any lien, pledge and encumbrance or any claim of any third party.

(m)  Except as described in the Registration Statement and the Prospectus, there is no litigation or governmental proceeding pending or, to the knowledge of the Company, threatened against the Company or any of its subsidiaries which might reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect or which is required to be disclosed in the Registration Statement and the Prospectus.

(n)  The Company is not, after giving effect to the offering and sale of the Securities and the application of the proceeds thereof as described in the Prospectus, an "investment company" within the meaning of the Investment Company Act of 1940, as amended (the "1940 Act").

(o)  The certificates delivered pursuant to paragraph (d) of Section 5 hereof and all other documents delivered by the Company or its representatives in connection with the issuance and sale of the Securities were on the dates on which they were delivered, or will be on the dates on which they are to be delivered, in all material respects true and complete.

(p)  Any certificate signed by any officer of the Company and delivered to one or more Purchasers (as hereinafter defined) or to counsel for the Purchasers in connection with an offering of the Securities to one or more Purchasers as principal or through the Agent or an Additional Agent as agent shall be deemed a representation and warranty by the Company to such Purchasers, Agent or Additional Agents (as the case may be) as to the matters covered thereby on the date of such certificate and, unless subsequently amended or supplemented, at each Representation Date subsequent thereto.

SECTION 2    Solicitations as Agent

. (a)    On the basis of the representations and warranties contained herein, but subject to the terms and conditions herein set forth, the Agent agrees, as exclusive agent of the Company, to use its reasonable best efforts to solicit offers to purchase the Securities upon the terms and conditions set forth in the Prospectus. The Agent shall not otherwise employ, pay or compensate any other person to solicit offers to purchase the Securities or to perform any of its functions as agent without the prior written consent of the Company. The Company reserves the

6

CONFIDENTIAL

UBSFS_SDNY1083337

right, in its sole discretion, to suspend solicitation of offers to purchase the Securities commencing at any time for any period of time or permanently. Upon receipt of at least one business day's prior notice from the Company, the Agent will forthwith suspend solicitation of offers to purchase Securities from the Company until such time as the Company has advised the Agent that such solicitation may be resumed. For the purpose of the foregoing sentence, "business day" shall mean any day which is not a Saturday or Sunday and which in New York City is not a day on which banking institutions are generally authorized or obligated by law to close. The Agent is authorized to solicit offers to purchase the Securities only in denominations of $1,000 or any amount in excess thereof which is an integral multiple of $1,000, at a purchase price equal to 100% of the principal amount thereof, or such other denominations or purchase price as shall be specified by the Company. The Agent shall communicate to the Company, orally or in writing, each reasonable offer to purchase Securities received by it as Agent. The Company shall have the sole right to accept offers to purchase the Securities and may reject any such offer in whole or in part. The Agent shall have the right, in its discretion reasonably exercised without advising the Company, to reject any offer to purchase the Securities received by it in whole in part, and any such rejection shall not be deemed a breach of its agreement contained herein.

(b)  Promptly upon the closing of the sale of any Securities sold by the Company as a result of a solicitation made by the Agent, the Company agrees to pay the Agent a commission agreed to between the Company and the Agent.

(c)  The Agent represents and warrants to, and agrees with, the Company that it has not made, and will not make, any offer relating to the Securities that would constitute a "free writing prospectus" (as defined in Rule 405), without the prior written consent of the Company, other than one or more free writing prospectuses relating to the Securities containing customary information not inconsistent with the Term Sheet (as defined in Section 3(a) below) prepared and filed by the Company pursuant to Section 3(a) hereof.

(d)  Administrative procedures respecting the sale of each of the Securities shall be agreed upon from time to time by the Agent and the Company (the "Procedures"). The Procedures initially shall include those procedures set forth in Exhibit A hereto. The Agent and the Company agree to perform the respective duties and obligations specifically provided to be performed by each of them herein and in the Procedures.

(e)  The documents required to be delivered by Section 5 hereof shall be delivered at the offices of Lehman Brothers Inc., 745 Seventh Avenue, New York, New York 10019, no later than 10:00 A.M., New York City time, on the date of this Agreement or at such later time as may be mutually agreed by the Company and the Agent, which in no event shall be later than the time at which the Agent commences solicitation of purchasers of Securities hereunder, such time and date be herein called the "Closing Date."

SECTION 3    Covenants of the Company. The Company covenants and agrees with the Agent that it will furnish (to the extent it has not already done so) to each of the Agent and Simpson Thacher & Bartlett LLP, counsel to the Agent, a copy of the Registration Statement, including all exhibits, in the form it became effective and all of the amendments thereto and that:

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083338

(a)  Unless otherwise notified by the Agent, the Company will prepare a final term sheet (a "Term Sheet") relating to each offering of Securities, containing only information that describes the final terms of the Securities or the offering, in the form consented to by the Agent (which, in the case of any issue of Securities to be sold pursuant to a Purchase Agreement, will be in the form set forth in Schedule IV to such Purchase Agreement), and will file such Term Sheet pursuant to and in the time period required by Rule 433(d) of the Rules and Regulations ("Rule 433(d)").

(b)  The Company will prepare, with respect to any Securities to be sold through or to the Agent pursunt to this Agreement, a pricing supplement with respect to such Securities in the form agreed to by the Agent and will file such pricing supplement with the Commission prusuant to Rule 424(b) not later than the time specified by such rule.

(c)  The Company shall advise the Agent promptly (i) of any proposal to amend or supplement the Registration Statement or the Prospectus and will afford the Agent a reasonable opportunity to comment on any such proposed amendment or supplement and will advise the Agent of the filing of any such amendment or supplement; (ii) of any request or proposed request by the Commission for an amendment or supplement to the Registration Statement, the Prospectus, to any document incorporated by reference in any of the foregoing or for additional information; (iii) of the issuance by the Commission of any stop order preventing or suspending the use of the Prospectus, any Preliminary Prospectus or any Issuer Free Writing Prospectus, or the effectiveness of the Registration Statement or any part thereof or the initiation or threat of any stop order proceeding and will use its best efforts to prevent the issuance of any stop order and to obtain as soon as possible its lifting, if issued; (iv) of receipt by the Company of any notification by the Commission of any objection to the use of the form of the Registration Statement pursuant to Rule 401(g)(2) of the Rules and Regulations and (v) of the receipt by the Company of any order with respect to the suspension of the qualification of the Securities for sale in any jurisdiction or the initiation or threat of any proceeding for that purpose. The Company will use its best efforts to prevent the issuance of any order referred to in clause (iii) or (v) and, if issued, to obtain as soon as possible the withdrawal thereof.  In the event of its receipt of any notification referred to in clause (iv), the Company will promptly take such steps including, without limitation, amending the Registration Statement or filing a new registration statement, at its own expense, as may be necessary to permit offers and sales of the Securities by the Agent (and references herein to the "Registration Statement" shall include any such amendment or new registration statement).

(d)  If, during any Marketing Period, any event occurs as a result of which the Prospectus would include an untrue statement of a material fact or omit to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, or if it is necessary at any time to amend the Prospectus to comply with the Securities Act, the Company will notify the Agent promptly to suspend solicitation of purchases of the Securities; and if the Company shall decide to amend or supplement the Registration Statement or the Prospectus, it will promptly advise the Agent by telephone (with confirmation in writing) and will promptly prepare and file with the Commission an amendment or supplement which will correct such statement or omission or an amendment which will effect such compliance and will use its reasonable best efforts to cause any amendment of the Registration Statement containing an amended Prospectus to be made effective as soon as possible.

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL                                                                                       UBSFS_SDNY1083339

(e)  The Company will not make any offer relating to the Securities that would constitute an Issuer Free Writing Prospectus (other than the Term Sheet prepared and filed pursuant to Section 3(a) hereof) without the prior written consent of the Agent.

(f)  The Company will file promptly all material required to be filed by the Company with the Commission pursuant to Rule 433(d), will retain in accordance with Rule 433(g) of the Rules and Regulations all Issuer Free Writing Prospectuses not required to be filed pursuant to the Rules and Regulations; and if at any time after the date hereof any events shall have occurred as a result of which any Issuer Free Writing Prospectus, as then amended or supplemented, would conflict with the information in the Registration Statement or the Prospectus or would include an untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, or, if for any other reason it shall be necessary to amend or supplement any Issuer Free Writing Prospectus, to notify the Agent and, upon its request, to file such document and to prepare and furnish without charge to the Agent as many copies as the Agent may from time to time reasonably request of an amended or supplemented Issuer Free Writing Prospectus that will correct such conflict, statement or omission or effect such compliance.

(g)  As soon as practicable, but not later than 18 months, after the date of each acceptance by the Company of an offer to purchase Securities hereunder, the Company will make generally available to its security holders an earnings statement which will satisfy the provisions of Section 11(a) of the Securities Act and Rule 158 of the Rules and Regulations under the Securities Act.

(h)  The Company will furnish to the Agent without charge written and electronic copies of the Registration Statement, including all exhibits, the Prospectus and all amendments and supplements to such documents, and any Issuer Free Writing Prospectus in each case as soon as available and in such quantities as are reasonably requested.

(i)  The Company will furnish such information, execute such instruments and take such actions as may be required to qualify the Securities for offering and sale under the laws of such jurisdictions as the Agent may designate and will maintain such qualifications in effect so long as required for the sale of the Securities; provided, however, that the Company shall not be required to qualify to do business in any jurisdiction where it is not now so qualified or to take any action which would subject it to general or unlimited service of process in any jurisdiction where it is not now so subject.

(j)  The Company will pay the required Commission filing fees relating to the Securities within the time period required by Rule 456(b)(1) of the Rules and Regulations without regard to the proviso therein and otherwise in accordance with Rules 456(b) and 457(r) of the Rules and Regulations.

(k)  If required by Rule 430B(h) of the Rules and Regulations, the Company will prepare a prospectus in a form approved by the Agent and to file such prospectus pursuant to Rule 424(b) not later than may be required by such Rule; and the Company will make no further amendment or supplement to such prospectus that will be disapproved by the Agent promptly after reasonable notice thereof.

9

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083340

SECTION 4    Payment of Expenses

. The Company will pay (i) the costs incident to the authorization, issuance, sale and delivery of the Securities and any taxes payable in that connection, (ii) the costs incident to the preparation, printing and filing under the Securities Act of the Registration Statement and any amendments and exhibits thereto, (iii) the costs incident to the preparation, printing and filing of any document and any amendments and exhibits thereto required to be filed by the Company under the Exchange Act, (iv) the costs of distributing the Registration Statement, as originally filed, and each amendment and post-effective amendment thereof (including exhibits), any Preliminary Prospectus in any of the foregoing documents, the Prospectus, any Issuer Free Writing Prospectus and any amendments thereof or supplements thereto, (v) the fees and disbursements of the Trustee and its counsel, (vi) the cost of any filings with the National Association of Securities Dealers, Inc., (vii) the fees and disbursements of counsel to the Company and the Company's accountants, (viii) the fees paid to rating agencies in connection with the rating of the Securities, (ix) the fees and expenses of qualifying the Securities under the securities laws of the several jurisdictions as provided in Section 3(h) hereof and of preparing and printing a Blue Sky Survey and a memorandum concerning the legality of the Securities as an investment (including fees and expenses of the Agent's counsel in connection therewith) and (x) all other costs and expenses incident to the performance of the Company's obligations under this Agreement. In addition, the Company agrees to reimburse the Agent for the fees and disbursements of its legal counsel.

SECTION 5    Conditions of Obligations. The obligation of the Agent, as agent of the Company, under this Agreement to solicit offers to purchase the Securities is subject to the accuracy in all material respects, on each Representation Date, of the representations and warranties on the part of the Company contained herein, to the accuracy of any material statements of officers of the Company made in any certificates, opinions, affidavits, written statements or letters furnished to the Agent or counsel to the Agent pursuant to the provisions hereof, to the performance by the Company of its obligations hereunder, and to each of the following additional conditions precedent:

(a)  No order suspending the effectiveness of the Registration Statement or preventing or suspending the use of the Prospectus or any Issuer Free Writing Prospectus, or suspending the qualification of the Indenture shall be in effect and no proceedings for such purpose shall be pending before or threatened by the Commission; no notice of objection of the Commission to use the Registration Statement or any post-effective amendment thereto pursuant to Rule 401(g)(2) of the Rules and Regulations shall be have been received by the Company; and any requests for additional information on the part of the Commission (to be included in the Registration Statement or the Prospectus or otherwise) shall have been complied with to the reasonable satisfaction the Agent.

(b)  At the Closing Date, the Company shall have furnished to the Agent the opinion of the Chief Legal Officer, General Counsel or an Associate General Counsel of the Company, addressed to the Agent and dated the Closing Date, to the effect that:

(i)  The Company has been duly incorporated and is validly existing and in good standing as a corporation under the law of the jurisdiction of its incorporation and has full corporate power to conduct the businesses in which it is engaged as described in the Prospectus. Each of the Significant Subsidiaries that is incorporated under the laws of

10

053137-0169-10049-NY03.2491841.14

the United States or any State or territory thereof (a "Domestic Significant Subsidiary") is a duly incorporated and validly existing corporation in good standing under the law of its jurisdiction of incorporation, and has full corporate power and authority to conduct its business as described in the Prospectus. Each of the Company and the Domestic Significant Subsidiaries is duly qualified to do business as a foreign corporation, is in good standing in its jurisdiction of incorporation and is duly registered as a broker-dealer, broker, dealer or investment advisor, as the case may be, in each jurisdiction in which the nature of the business conducted by it or in which the ownership or holding by lease of the properties owned or held by it requires such qualification or registration, except for such jurisdictions where the failure to so qualify, to be in good standing or to register would not have a Material Adverse Effect.

(ii)  All the outstanding shares of capital stock of the Domestic Significant Subsidiaries have been duly authorized and are validly issued and outstanding and are fully paid and non-assessable and, except for directors' qualifying shares, are owned by the Company or a subsidiary of the Company free and clear of any claims, liens, encumbrances and security interests.

(iii)  The Securities and the Indenture conform in all material respects to the descriptions thereof contained in the Prospectus.

(iv)  The Indenture has been duly authorized, executed and delivered by the Company, has been duly qualified under the Trust Indenture Act and constitutes a valid and legally binding instrument enforceable against the Company in accordance with its terms; and the Securities have been duly authorized, executed and issued by the Company, and, when executed and authenticated as specified in the Indenture and delivered against payment therefor in accordance with this Agreement, will constitute valid and legally binding obligations of the Company entitled to the benefits of the Indenture, provided, however, that the foregoing is subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally from time to time in effect, to general equitable principles (whether considered in a proceeding at law or in equity) and to an implied covenant of good faith and fair dealing).

(v)  No consent, approval, authorization, order, registration or qualification of any court or governmental agency or body is required for the consummation of the transactions contemplated in this Agreement, except for (1) such consents, approvals, authorizations, orders registrations or qualifications as have been obtained under the Securities Act and such as may be required under the Exchange Act, under state securities laws and Blue Sky laws of any jurisdiction, and (2) the qualification of the Indenture under the Trust Indenture Act, which has been obtained.

(vi)  Such counsel does not know of any contracts or other documents that are required to be filed as exhibits to the Registration Statement by the Securities Act or by the Rules and Regulations which have not been filed as exhibits to the Registration Statement or incorporated therein by reference as permitted by the Rules and Regulations.

11

053137-0169-10049-NY03.2491841.14

                                                    UBSFS_SDNY1083342

(vii)  Except as described in the Registration Statement and the Prospectus, such counsel does not know of any litigation or any governmental proceeding pending or threatened against the Company or any of its subsidiaries that might reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect or that is required to be disclosed in the Registration Statement and the Prospectus.

(viii)  To such counsel's knowledge, neither the Company nor any of the Domestic Significant Subsidiaries is in violation of its corporate charter or by-laws, nor in default under any agreement, indenture or instrument known to such counsel, which violation or default might reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

(ix)  This Agreement has been duly authorized, executed and delivered by the Company; the execution, delivery and performance of this Agreement by the Company will not conflict with, or result in the creation or imposition of any lien, charge or encumbrance upon any of the assets of the Company or the Domestic Significant Subsidiaries pursuant to the terms of, or constitute a default under, any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument known to such counsel and to which the Company or the Domestic Significant Subsidiaries is a party or bound, or result in a violation of the corporate charter or by-laws of the Company or the Domestic Significant Subsidiaries or any statute, rule, regulation or any order known to such counsel of any court or governmental agency having jurisdiction over the Company, the Domestic Significant Subsidiaries or any of their respective properties, the effect of which conflict, violation or default might reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect;

(x)  The Registration Statement has become effective under the Securities Act, and, to the best knowledge of such counsel, no stop order suspending the effectiveness of the Registration Statement has been issued and no proceeding for that purpose has been instituted or threatened by the Commission, and no notice of objection of the Commission to the use of the Registration Statement or any post-effective amendment thereto pursuant to Rule 401(g)(2) of the Rules and Regulations has been received by the Company.

(xi)  The Registration Statement and the Prospectus (except that no opinion need be expressed as to the financial statements and notes thereto or the schedules or other financial or statistical data or the Form T-1 included or incorporated by reference therein), comply as to form in all material respects with the requirements of the Securities Act and the Rules and Regulations.

Such counsel shall also have furnished a statement that although such counsel is not passing upon and does not assume any responsibility for the accuracy, completeness or fairness of the statements contained in the Registration Statement and the Prospectus (except as to those matters stated in paragraph (iii) of this subsection (b)), such counsel has no reason to believe that (A) the Registration Statement, as of the latest Effective Date, contained any untrue statement of a material fact or omitted to state any material fact required to be stated therein or necessary in order to make the statements therein not misleading or (B) the Prospectus as of its date and as of the Closing Date contains any untrue statement of a material fact or omits to state any material fact necessary in order to make the statements therein, in light of the circumstances under which

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083343

they were made, not misleading, (except, with respect to (A) or (B) above, that no statement need be made as to the financial statements and notes thereto or the schedules or other financial or statistical data or the Form T-1 included or incorporated by reference therein). In rendering such opinion and statement, such counsel may rely upon opinions of local counsel satisfactory to the Agent for matters not governed by New York law and may rely as to matters of fact, to the extent he or she deems proper, upon certificates or affidavits of officers of the Company, the Trustee and public officials. Such counsel may rely on a certificate of the Trustee with respect to the execution of the Securities by the Company and the authentication thereof by the Trustee.

(c)    At the Closing Date, the Agent shall have received from counsel to the Agent such opinion or opinions, dated the Closing Date, with respect to the issuance and sale of the Securities, the Registration Statement and the Prospectus and other related matters as the Agent may reasonably require, and the Company shall have furnished to such counsel such documents as they request for the purpose of enabling them to pass upon such matters.

(d)    The Company shall have furnished to the Agent on the Closing Date a certificate of its Chief Executive Officer, President, Chief Operating Officer, Chief Administrative Officer, any Executive Vice President, Senior Vice President or Vice President, and its Chief Financial Officer, its Treasurer, its Financial Controller or its Global Head of Asset Liability Management (or other officer performing substantially the same function), dated the day of the Closing Date, to the effect that the signers of such certificate have carefully examined the Registration Statement, the Prospectus and this Agreement, and that, to the best of their knowledge, after due inquiry:

(i)    The representations and warranties of the Company in this Agreement are true and correct in all material respects on and as of the Closing Date with the same effect as if made on the Closing Date, and the Company has complied with all the agreements and satisfied all the conditions on its part to be performed or satisfied at or prior to the Closing Date.

(ii)    No stop order suspending the effectiveness of the Registration Statement has been issued and no proceedings for that purpose have been instituted or threatened; and no notice of objection of the Commission to the use of the Registration Statement or any post-effective amendment thereto pursuant to Rule 401(g)(2) of the Rules and Regulations has been received by the Company.

(iii)    (i) the Registration Statement does not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading, (ii) the Prospectus does not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, and (iii) since the effective date of the Registration Statement there has not occurred any event required to be set forth in an amended or supplemented Prospectus which has not been so set forth.

(e)    At the Closing Date, a nationally recognized independent registered public accounting firm shall have furnished to the Agent a letter, dated the day of the Closing Date, confirming that they are independent auditors with respect to the Company within the meaning of the Securities Act and in form and substance satisfactory to the Agent, stating in effect that:

13

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083344

(i)  In their opinion, the consolidated financial statements of the Company and its subsidiaries, and the supporting schedules, included in the Registration Statement and the Prospectus and audited by them comply as to form in all material respects with the applicable accounting requirements of the Securities Act and the Exchange Act and the related published rules and regulations thereunder.

(ii)  On the basis of a reading of the unaudited consolidated financial statements of the Company and its subsidiaries, if any, included in the Registration Statement and the Prospectus and of the latest unaudited consolidated financial statements made available by the Company and Lehman Brothers Inc., carrying out certain specified procedures (but not an audit in accordance with generally accepted auditing standards), a reading of the minutes of the meetings of the directors of the Company and Lehman Brothers Inc., and inquiries of certain officials of the Company who have responsibility for financial and accounting matters of the Company and its subsidiaries, as to transactions and events subsequent to the date of the most recent audited consolidated financial statements included in the Registration Statement and the Prospectus, nothing came to their attention that caused them to believe that:

(A)      any material modifications should be made to the unaudited consolidated financial statements of the Company and its subsidiaries, if any, included in the Registration Statement and the Prospectus, for them to be in conformity with generally accepted accounting principles; and such financial statements do not comply as to form in all material respects with the applicable accounting requirements of the Securities Act and the published instructions, rules and regulations thereunder;

(B)      the unaudited capsule information of the Company and its subsidiaries, if any, included in the Registration Statement and the Prospectus does not agree with the amounts set forth in the unaudited consolidated financial statements of the Company from which it was derived or was not determined on a basis substantially consistent with that of the corresponding financial information in the latest audited financial statements of the Company included in the Registration Statement and the Prospectus;

(C)      (I) as of the latest date as of which the Company and its subsidiaries have monthly financial statements, as compared to amounts shown in the most recent consolidated financial statements of the Company and its subsidiaries included in the Registration Statement and the Prospectus, there was any change in the capital stock (other than issuances of common stock upon the exercise of options or employee awards and the repurchase of common stock in the ordinary course of business to provide for common stock to be issued pursuant to the exercise of options or employee awards), or increase in long-term indebtedness, or decrease in net assets or stockholders' equity of the Company and its subsidiaries and (II) from the date of the most recent consolidated financial statements of the Company and its subsidiaries included in the Registration Statement and the Prospectus to the latest date as of which the Company and its subsidiaries have monthly financial statements, there was any consolidated loss from operations before taxes or consolidated net loss of the Company and its subsidiaries; or

14

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083345

(D)      as of a specified date no more than three business days prior to the date of the letter, as compared to the date of the most recent consolidated financial statements of the Company and its subsidiaries included in the Registration Statement and Prospectus, there was any change in capital stock (other than issuances of common stock upon the exercise of options or employee awards and the repurchase of common stock in the ordinary course of business to provide for common stock to be issued pursuant to the exercise of options or employee awards), or increase in long-term indebtedness, or decrease in net assets or stockholders' equity of the Company and its subsidiaries;

except in all instances for changes, increases or decreases set forth in such letter, in which case the letter shall be accompanied by an explanation by the Company as to the significance thereof, unless said explanation is not deemed necessary by the Agent.

(iii)  If pro forma financial statements are included in the Registration Statement or the Prospectus, (x) they have read such pro forma financial statements, (y) they have made inquiries of certain officials of the Company who have responsibility for financial and accounting matters of the Company as to the basis for their determination of the pro forma adjustments and whether such pro forma financial statements comply as to form in all material respects with the applicable accounting requirements of Rule 11-02 of Regulation S-X and (z) they have proved the arithmetic accuracy of the application of the pro forma adjustments to the historical amounts; and as a result thereof, nothing came to their attention that caused them to believe that such pro forma financial statements do not so comply with Rule 11-02 of Regulation S-X and that such pro forma adjustments have not been properly applied to the historical amounts in the compilation of those statements.

(iv)  They have performed certain other specified procedures as a result of which they determined that certain information of an accounting, financial or statistical nature (which is expressed in dollars, or percentages derived from dollar amounts, and has been obtained from the general accounting records of the Company) set forth in the Registration Statement, as amended, and the Prospectus, as amended or supplemented, and in Exhibit 12 to the Registration Statement, including specified information, if any, included or incorporated from the Company's Annual Report on Form 10-K incorporated therein or specified information, if any, included or incorporated from any of the Company's Quarterly Reports on Form 10-Q or its Current Reports on Form 8-K incorporated therein, agrees with the accounting records of the Company and its subsidiaries or computations made therefrom, excluding any questions of legal interpretation.

(f)  Subsequent to the execution and delivery of this Agreement (i) no downgrading shall have occurred in the rating accorded the Company's debt securities by any "nationally recognized statistical rating organization", as that term is defined by the Commission for purposes of Rule 436(g)(2) of the Rules and Regulations and (ii) no such organization shall have publicly announced that it has under surveillance or review, with possible negative implications, its rating of any of the Company's debt securities.

(g)  Since the date of the latest audited financial statements included in the Prospectus there shall not have been any change in the capital stock  or long-term debt of the

15

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083346

Company or any of its subsidiaries or any change, or any development involving a prospective change, in or affecting the general affairs, management, financial position, stockholders' equity or results of operations of the Company and its subsidiaries, otherwise than as set forth or contemplated in the Prospectus, the effect of which is, in the judgment of the Agent, so material and adverse as to make it impracticable or inadvisable to proceed with the offering or the delivery of the Securities being delivered on such Delivery Date on the terms and in the manner contemplated in any Prospectus.

(h)  Prior to the Closing Date, the Company shall have furnished to the Agent such further information, certificates and documents as the Agent or counsel to the Agent may reasonably request.

If any of the conditions specified in this Section 5 shall not have been fulfilled when and as required by this Agreement, or if any of the certificates or opinions furnished to the Agent or to counsel to the Agent pursuant to this Section 5 shall not be in all material respects reasonably satisfactory in form and substance to the Agent and to counsel to the Agent, this Agreement and all obligations of the Agent hereunder may be cancelled by the Agent. Notice of such cancellation shall be given to the Company in writing, or by telegraph confirmed in writing.

SECTION 6    Additional Covenants of the Company. The Company covenants and agrees that:

(a)  Each acceptance by it of an offer for the purchase of Securities shall be deemed to be an affirmation that the representations and warranties of the Company contained in this Agreement are true and correct in all material respects at the time of such acceptance and an undertaking that such representations and warranties will be true and correct in all material respects at the time of delivery to the purchaser or his agent of the Securities relating to such acceptance as though made at and as of each such time (and it is understood that such representations and warranties shall relate to the Registration Statement and the Prospectus as amended or supplemented to each such time).

(b)  During each Marketing Period, each time that the Registration Statement or the Prospectus shall be amended or supplemented or the Company shall file with the Commission any document incorporated by reference into the Prospectus (other than by filing with the Commission of an exhibit to the Registration Statement or Prospectus that does not relate to the Securities, a prospectus supplement not relating to the Securities or an amendment or supplement providing solely for a change in the interest rates, redemption provisions, amortization schedule or maturities of the Securities or a change in the principal amount of Securities remaining to be sold or other information contemplated by the Prospectus to be filed in a pricing supplement related to the Securities or similar changes, or any other change that the Agent reasonably deems immaterial), the Company shall, (i) within two (2) business days after such amendment, supplement or filing or (ii) if such amendment, supplement or filing was not filed during a Marketing Period, within two (2) business days after the first day of the next succeeding Marketing Period, furnish the Agent with a certificate of the Chairman of the Board, any Vice Chairman, the Chief Executive Officer, any Executive Vice President or any Vice President and the Treasurer, the Chief Financial Officer or the Senior Vice President and Director of Global Asset and Liability Management of the Company in form satisfactory to the Agent to the effect that the statements contained in the certificate referred to in Section 5(d) hereof which was last furnished to the Agent are true and correct at the time of such amendment

16

053137-0169-10049-NY03.2491841.14

or supplement or filing, as the case may be, as though made at and as of such time (except that such statements shall be deemed to relate to the Registration Statement and the Prospectus as amended and supplemented to such time) or, in lieu of such certificate, a certificate of the same tenor as the certificate referred to in said Section 5(d), modified as necessary to relate to the Registration Statement and the Prospectus as amended and supplemented to the time of delivery of such certificate. If requested by the Lead Manager (which term shall have the meaning specified in the Purchase Agreement (as hereinafter defined), or, if there is only a single Purchaser, shall mean such Purchaser), in its sole discretion, pursuant to Section 11(a) of this Agreement in connection with the purchase of Securities from the Company by the Agent or one or more other Purchasers as principal, the Company shall deliver to the Lead Manager on behalf of the Purchasers on the Settlement Date (as defined in the applicable Purchase Agreement) a certificate of the type described in the previous sentence.

(c)  During each Marketing Period, each time that the Registration Statement or the Prospectus shall be amended or supplemented or the Company shall file with the Commission any document incorporated by reference into the Prospectus (other than by filing with the Commission of an exhibit to the Registration Statement or Prospectus that does not relate to the Securities, an amendment or supplement to or document incorporated by reference in the Registration Statement or Prospectus setting forth only financial statements or other financial information (including any press release announcing earnings), a prospectus supplement not relating to the Securities or an amendment or supplement providing solely for a change in the interest rates, redemption provisions, amortization schedule or maturities of the Securities or a change in the principal amount of Securities remaining to be sold or other information contemplated by the Prospectus to be filed in a pricing supplement related to the Securities or similar changes, or any other change that the Agent reasonably deems immaterial), the Company shall, (i) within two (2) business days after such amendment, supplement or filing or (ii) if such amendment, supplement or filing was not filed during a Marketing Period, within two (2) business days after the first day of the next succeeding Marketing Period, furnish the Agent with the written opinion of an Associate General Counsel to the Company, addressed to the Agent and dated the date of delivery of such opinion, in form satisfactory to the Agent, of the same tenor as the opinion referred to in Section 5(b) hereof, but modified, as necessary, to relate to the Registration Statement and the Prospectus as amended or supplemented to the time of delivery of such opinion; provided, however, that in lieu of such opinion, such counsel may furnish the Agent with a letter to the effect that the Agent may rely on a prior opinion delivered under Section 5(b) or this Section 6(c) to the same extent as if it were dated the date of such letter authorizing reliance (except that statements in such prior opinion shall be deemed to relate to the Registration Statement and the Prospectus as amended or supplemented to the time of delivery of such letter authorizing reliance). If requested by the Lead Manager, in its sole discretion, pursuant to Section 11(a) of this Agreement in connection with the purchase of Securities from the Company by the Agent or one or more other Purchasers as principal, the Company shall deliver to the Lead Manager on behalf of the Purchasers on the Settlement Date an opinion of counsel of the type described in the previous sentence.

(d)  During each Marketing Period, each time that the Registration Statement or the Prospectus shall be amended or supplemented to include additional financial information or the Company files with the Commission any document incorporated by reference into the Prospectus which contains additional financial information (other than information that the Agent reasonably deems immaterial), the Company shall cause the Company's auditors to

17

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083348

furnish the Agent, (i) within two (2) business days after such amendment, supplement or filing or (ii) if such amendment, supplement or filing was not filed during a Marketing Period, within two (2) business days after the first day of the next succeeding marketing Period, a letter, addressed to the Agent and dated the date of delivery of such letter, in form and substance satisfactory to the Agent, of the same tenor as the letter referred to in Section 5(e) hereof but modified to relate to the Registration Statement and Prospectus, as amended and supplemented to the date of such letter, with such changes as may be necessary to reflect changes in the financial statements and other information derived from the accounting records of the Company; provided, however, that if the Registration Statement or the Prospectus is amended or supplemented solely to include financial information as of and for a fiscal quarter, the Company's auditor may limit the scope of such letter to the unaudited financial statements included in such amendment or supplement unless there is contained therein any other accounting, financial or statistical information that, in the Agent's reasonable judgment, should be covered by such letter, in which event such letter shall also cover such other information. If requested by the Lead Manager, in its sole discretion, pursuant to Section 11(a) of this Agreement in connection with the purchase of Securities from the Company by the Agent or one or more other Purchasers as principal, the Company shall deliver to the Lead Manager on behalf of the Purchasers on the Settlement Date a letter of the type described in the previous sentence.

SECTION 7    Indemnification and Contribution

. (a)  The Company shall indemnify and hold harmless the Agent, its officers and employees and each person, if any, who controls the Agent within the meaning of the Securities Act, from and against any loss, claim, damage or liability, joint or several, or any action or pending action in respect thereof (including, but not limited to, any loss, claim, damage, liability or action relating to purchases and sales of Securities), to which the Agent, officer, employee or controlling person may become subject, under the Securities Act or otherwise, insofar as such loss, claim, damage, liability, action or pending action arises out of, or is based upon, (i) any untrue statement or alleged untrue statement of a material fact contained in (A) the Registration Statement, as originally filed or in any amendment thereof, or in any Preliminary Prospectus, Prospectus or in any amendment or supplement thereto, (B) any Issuer Free Writing Prospectus or in any amendment or supplement thereto or (C) any "issuer information" filed or required to be filed pursuant to Rule 433(d) used or referred to in any "free writing prospectus" (as defined in Rule 405) with the consent of the Company and used or referred to by the Agent, or (ii) the omission or alleged omission to state therein any material fact required to be stated  therein or necessary to make the statements therein not misleading,  and shall reimburse the Agent and each such officer, employee or controlling person promptly upon demand for any legal or other expenses reasonably incurred by the Agent, officer, employee or controlling person in connection with investigating or defending or preparing to defend against any such loss, claim, damage, liability, action or pending action as such expenses are incurred; provided, however, that the Company  shall not be liable in any such case to the extent that any such loss,  claim, damage, liability, action or pending action arises out of, or is based upon, any untrue statement or alleged untrue statement or omission or alleged omission made therein in reliance upon and in conformity with  written information concerning the Agent furnished to the Company by or on behalf of the Agent specifically for use in connection with the preparation thereof. The foregoing indemnity agreement is in addition to any liability that the Company may otherwise have to the Agent or to any officer, employee or controlling person of the Agent.

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083349

(b)  The Agent shall indemnify and hold harmless the Company, its officers,
employees, each of its  directors, and  each person, if any, who controls the Company within the
meaning of the Securities Act, from and against any loss, claim, damage or liability, joint or
several, or any action or pending action in respect thereof, to which the Company or any such
director, officer or controlling person may become subject, under the Securities Act or otherwise,
insofar as such loss, claim, damage, liability, action or pending action arises out of, or is based
upon, (i) any untrue statement or alleged untrue statement of a material fact contained  in (A) the
Registration Statement, as originally filed or in any amendment thereof, or in any Preliminary
Prospectus, Prospectus or in any amendment or supplement thereto or (B) any Issuer Free
Writing Prospectus or in any amendment or supplement thereto, or (ii) the omission  or alleged
omission to state therein any  material fact required to be stated therein or necessary to make the
statements therein not misleading, but in each case only to the extent that the untrue statement or
alleged untrue statement or omission or alleged omission was made in reliance upon and in
conformity with written information concerning the Agent furnished to the Company by or on
behalf of the Agent specifically for inclusion therein, and shall reimburse the Company and any
such director, officer or controlling person for any legal or other expenses reasonably incurred by
the Company or any such director, officer or controlling person in connection with investigating
or defending or preparing to defend against any such loss, claim, damage, liability, action or
pending action as such expenses are incurred.  The foregoing indemnity agreement is in addition
to any liability that the Agent may otherwise have to the Company or any such director, officer,
employee or controlling person.

(c)  Promptly after receipt by an indemnified party under this Section 7 of notice
of any claim or the commencement of any action, the indemnified party shall, if a claim in
respect thereof is to be made against the indemnifying party under this Section 7, notify the
indemnifying party in writing of the claim or the commencement of that action; provided,
however, that the failure to notify the indemnifying party shall not relieve it from any liability
which it may have under this Section 7 except to the extent it has been materially prejudiced by
such failure and, provided further, that the failure to notify the indemnifying party shall not
relieve it from any liability which it may have to an indemnified party otherwise than under this
Section  7.  If any such claim or action shall be brought against an indemnified party, and it shall
notify the indemnifying party thereof, the indemnifying party shall be entitled to participate
therein and, to the extent that it wishes, jointly with any other similarly notified indemnifying
party, to assume the defense thereof with counsel satisfactory to such indemnified party;
provided, however, if the defendants in any such action include both the indemnified party and
the indemnifying party and either (i) the indemnifying party or parties and the indemnified party
or parties mutually agree or (ii) representation of both the indemnifying party or parties and the
indemnified party or parties by the same counsel is inappropriate under applicable standards of
professional conduct due to actual or potential differing interests between them, the indemnified
party or parties shall have the right to select separate counsel to assume such legal defenses and
to otherwise participate in the defense of such action on behalf of such indemnified party or
parties.  After notice from the indemnifying party to the indemnified party of its election to
assume the defense of such claim or action, the indemnifying party shall not be liable to the
indemnified party under this Section 7 for any legal or other expenses subsequently incurred by
the indemnified party in connection with the defense thereof unless (i) the indemnified party
shall have employed counsel in connection with the assumption of legal defenses in accordance
with the proviso to the next preceding sentence (it being understood, however, that the
indemnifying party shall not be liable for the expenses of more than one separate counsel,

19

053137-0169-10049-NY03.2491841.14

approved by the Agent in the case of subparagraph (a) representing the indemnified parties under subparagraph (a), as the case may be, who are parties to such action), (ii) the indemnifying party shall not have employed counsel satisfactory to the indemnified party to represent the indemnified party within a reasonable time after notice of commencement of the action or (iii) the indemnifying party has authorized the employment of counsel for the indemnified party at the expense of the indemnifying party.  No indemnifying party shall (i) without the prior written consent of the indemnified parties (which consent shall not be unreasonably withheld), settle or compromise or consent to the entry of any judgment with respect to any pending or threatened claim, action, suit or proceeding in respect of which indemnification or contribution may be sought hereunder (whether or not the indemnified parties are actual or potential parties to such claim or action) unless such settlement, compromise or consent includes an unconditional release of each indemnified party from all liability arising out of such claim, action, suit or proceeding, or (ii) be liable for any settlement of any such action effected without its written consent (which consent shall not be unreasonably withheld), but if settled with the consent of the indemnifying party or if there be a final judgment of the plaintiff in any such action, the indemnifying party agrees to indemnify and hold harmless any indemnified party from and against any loss or liability by reason of such settlement or judgment.

(d)  If the indemnification provided for in this Section  7 shall for any  reason be unavailable to or insufficient to hold harmless an indemnified party under Section  7(a) or 7(b) in respect of any loss, claim, damage or liability, or any  action or pending action in respect thereof, referred to therein, then each indemnifying party shall, in lieu of indemnifying such indemnified party, contribute to the amount paid or payable by such indemnified party as a result of such loss, claim, damage or liability, action or pending action in respect thereof, (i) in such proportion as shall be appropriate to reflect the relative benefits received by the Company  on the one hand and the Agent on the other from the offering of the Securities or (ii) if the allocation provided by clause (i) above is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (i) above but also the relative fault of the Company  on the one hand and the Agent on the other with respect to the statements or omissions that resulted in such loss, claim, damage or liability, action or pending action in respect thereof, as well as any other relevant equitable considerations.  The relative benefits received by the Company on the one hand and the Agent on the other with respect to such offering shall be deemed to be in the same proportion as the total net proceeds from the offering of the Securities purchased under this Agreement (before deducting expenses) received by the Company, on the one hand, and the total underwriting discounts and commissions received by the Agent with respect to the Securities purchased under this Agreement, on the other hand, bear to the total gross proceeds from the offering of the Securities under this Agreement, in each case as set forth in the table on the cover page of the Prospectus.  The relative fault shall be determined by reference to whether the untrue or alleged untrue statement of a material fact or omission or alleged omission to state a material fact relates to information supplied by the Company or the Agent, the intent of the parties and their relative knowledge, access to information and opportunity to correct or prevent such statement or omission.  The Company and the Agent agree that it would not be just and equitable if contributions pursuant to this Section were to be determined by pro rata allocation or by any other method of allocation that does not take into account the equitable considerations referred to herein.  The amount paid or payable by an indemnified party as a result of the loss, claim, damage or liability, or action in respect thereof, referred to above in this Section shall be deemed to include, for purposes of this Section  7(d), any legal or other expenses reasonably incurred by such indemnified party in connection with

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083351

investigating or defending any such action or claim.  Notwithstanding the provisions of this Section 7(d), no Agent shall be required to contribute any amount in excess of the amount by which the total price at which the Securities purchased by it exceeds the amount of any damages which the Agent has otherwise paid or become liable to pay by reason of any untrue or alleged untrue statement or omission or alleged omission.  No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation.

(e)  The Agent confirms and the Company acknowledges and agrees that, with respect to any issue of Securities, the names of the Agents on the cover of the Prospectus, the concession and reallowance figures in the Pricing Supplement for such Securities and the paragraphs relating to stabilization by the Agent appearing under the caption "Plan of Distribution" in the Base Prospectus are correct and constitute the only information concerning the Agent furnished in writing to the Company specifically for inclusion therein.

SECTION 8    Status of the Agent. In soliciting offers to purchase the Securities from the Company pursuant to this Agreement (other than offers to purchase pursuant to Section 11(a)), the Agent is acting solely as agent for the Company and not as principal. The Agent will make reasonable efforts to assist the Company in obtaining performance by each purchaser whose offer to purchase Securities from the Company has been solicited by the Agent and accepted by the Company but the Agent shall have no liability to the Company in the event any such purchase is not consummated for any reason. If the Company shall default in its obligations to deliver Securities to a purchaser whose offer it has accepted, the Company shall (i) hold the Agent harmless against any loss, claim or damage arising from or as a result of such default by the Company and (ii), in particular, pay to the Agent any commission to which it would be entitled in connection with such sale.

SECTION 9    Representations and Warranties to Survive Delivery. All representations and warranties of the Company contained in this Agreement, or contained in certificates of officers of the Company submitted pursuant hereto, shall remain operative and in full force and effect, regardless of the termination or cancellation of this Agreement or any investigation made by or on behalf of the Agent or any person controlling the Agent or by or on behalf of the Company, and shall survive each delivery of and payment for any of the Securities.

SECTION 10    Termination.  (a)  This Agreement may be terminated for any reason, at any time, by either party hereto upon the giving of one day's written notice of such termination to the other party hereto. The provisions of Sections 3(h), 3(i), 4, 7, 8 and 9 hereof shall survive any termination of this Agreement.

(b)  The obligations of the Agent hereunder or under any Purchase Agreement may be terminated by the Agent by notice given to and received by the Company prior to delivery of and payment for any issue of Securities if, prior to that time, (i) trading in securities generally on the New York Stock Exchange or the American Stock Exchange or in the over-the-counter market, or trading in any securities of the Company on any exchange or in the over-the-counter market, shall have been suspended or the settlement of such trading generally shall have been materially disrupted or minimum prices shall have been established on any such exchange or such market by the Commission, by such exchange or by any other regulatory body or governmental authority having jurisdiction, (ii) a banking moratorium shall have been declared by Federal or state authorities, (iii) the United States shall have become engaged in hostilities,

21

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083352

there shall have been an escalation in hostilities involving the United States or there shall have been a declaration of a national emergency or war by the United States or (iv) there shall have occurred such a material adverse change in general economic, political or financial conditions, including without limitation as a result of terrorist activities after the date hereof, or the effect of international conditions on the financial markets in the United States shall be such as to make it, in the judgment of the Agent, impracticable or inadvisable to proceed with the public offering or delivery of the Securities being delivered on such date on the terms and in the manner contemplated in the Prospectus. The provisions of Sections 3(h), 3(i), 4, 7, 8 and 9 hereof shall survive any termination of a Purchase Agreement.

SECTION 11  (a)  Purchases as Principal. From time to time the Agent or one or more additional financial institutions experienced in the distribution of securities similar to the Securities (each a "Purchaser"), may agree with the Company to purchase Securities from the Company as principal. Such agreement (a "Purchase Agreement"), if with the Agent only, may be oral (in which case a written confirmation of terms shall be delivered by the Agent to the Company) or may be made in accordance with the terms of a separate written agreement to be entered into between the Agent and/or the other Purchasers and the Company, substantially in the form attached hereto as Exhibit B or in such other form as the company and the Agent and/or the other Purchasers may agree. Each Purchaser executing a written Purchase Agreement shall become a party to this Agreement, vested with all the authority, rights and powers and subject to all the duties and obligations of the Agent when purchasing Securities as a principal, as if originally named as an Agent hereunder, but solely in connection with and for the purposes of the issue of Securities identified in such Purchase Agreement. At the time of each purchase of Securities from the Company by the Agent or one or more other Purchasers as principal, the Lead Manager, in its sole discretion, shall specify the requirements for the officers' certificate, opinion of counsel and comfort letter pursuant to Sections 5(b), 5(c), 5(d) and 5(e) hereof.

(b)  Additional Agents. Subject to Section 11(a) and notwithstanding Section 2(a) above, the Company may from time to time appoint one or more additional financial institutions experienced in the distribution of securities similar to the Securities (each such additional institution herein referred to as an "Additional Agent") as agent(s) hereunder on an issue by issue basis, pursuant to a letter (an "Agent Accession Letter") substantially in the form of Exhibit C to this Agreement, whereupon each such Additional Agent shall, subject to the terms and conditions of this Agreement and the Agent Accession Letter, become a party to this Agreement as an agent, vested with all the authority, rights and powers and subject to all the duties and obligations of an Agent as if originally named as an Agent hereunder, but solely in connection with and for the purposes of the issue of Securities identified in such Agent Accession Letter.

SECTION 12  Notices. Except as otherwise provided herein, all notices and other communications hereunder shall be in writing and shall be deemed to have been duly given if mailed or transmitted by any standard form of telecommunication. Notices to the Agent shall be directed to it as follows: Lehman Brothers Inc., 745 Seventh Avenue, New York, New York 10019, Attention: Fixed Income Syndicate; notices to the Company shall be directed to it as follows: Lehman Brothers Holdings Inc., 745 Seventh Avenue, New York, New York 10019, Attention: Treasurer.

SECTION 13  Research Analyst Independence.  The Company acknowledges that the Agent's research analysts and research departments are required to be independent from their respective investment banking divisions and are subject to certain regulations and internal

22

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083353

policies, and that such Agent's research analysts may hold views and make statements or investment recommendations and/or publish research reports with respect to the Company and/or the offering that differ from the views of their respective investment banking divisions. The Company hereby waives and releases, to the fullest extent permitted by law, any claims that the Company may have against the Agent with respect to any conflict of interest that may arise from the fact that the views expressed by their independent research analysts and research departments may be different from or inconsistent with the views or advice communicated to the Company by such Agent's investment banking divisions. The Company acknowledges that the Agent is a full service securities firm and as such from time to time, subject to applicable securities laws, may effect transactions for its own account or the account of its customers and hold long or short positions in debt or equity securities of the companies that may be the subject of the transactions contemplated by this Agreement.

SECTION 14  <u>No Fiduciary Duty</u>.  The Company acknowledges and agrees that in connection with this offering, sale of the Securities or any other services the Agent may be deemed to be providing hereunder, notwithstanding any preexisting relationship, advisory or otherwise, between the parties or any oral representations or assurances previously or subsequently made by the Agent:  (i) no fiduciary or agency relationship between the Company and any other person, on the one hand, and the Agent, on the other, exists; (ii) the Agent is not acting as advisor, expert or otherwise, to the Company, including, without limitation, with respect to the determination of the public offering price of the Securities, and such relationship between the Company, on the one hand, and the Agent, on the other, is entirely and solely commercial, based on arms-length negotiations; (iii) any duties and obligations that the Agent may have to the Company shall be limited to those duties and obligations specifically stated herein; and (iv) the Agent and its respective affiliates may have interests that differ from those of the Company. The Company hereby waives any claims that the Company may have against the Agent with respect to any breach of fiduciary duty in connection with this offering.

SECTION 15  <u>Binding Effect; Benefits</u>. This Agreement shall be binding upon the Agent, the Company, and their respective successors. This Agreement and the terms and provisions hereof are for the sole benefit of only those persons, except that (a) the representations, warranties, indemnities and agreements of the Company contained in this Agreement shall also be deemed to be for the benefit of the person or persons, if any, who control the Agent within the meaning of Section 15 of the Securities Act, and (b) the indemnity agreement of the Agent contained in Section 7 hereof shall be deemed to be for the benefit of directors of the Company, officers of the Company who have signed the Registration Statement and any person controlling the Company. Nothing in this Agreement is intended or shall be construed to give any person, other than the person referred to in this Section, any legal or equitable right, remedy or claim under or in respect of this Agreement or any provision contained herein.

SECTION 16  <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of New York. This Agreement may be executed in counterparts and the executed counterparts shall together constitute a single instrument.

23

CONFIDENTIAL

UBSFS_SDNY1083354

        If the foregoing correctly sets forth our agreement, please indicate your acceptance hereof in the space provided for that purpose below.

                                    Very truly yours,

                                    LEHMAN BROTHERS HOLDINGS INC.

                                    By: _____
                                         Name:  Barrett S. DiPaolo
                                         Title:  Vice President

CONFIRMED AND ACCEPTED,
as of the date first above written:


LEHMAN BROTHERS INC.


By: _____
     Name:  Martin Goldberg
     Title:  Senior Vice President


                                    24

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL                                                        UBSFS_SDNY1083355

EXHIBIT A

Lehman Brothers Holdings Inc.

Medium-Term Notes, Series I

ADMINISTRATIVE PROCEDURES

## I.  General Procedures

Medium-Term Notes, Series I (the "Notes") are to be offered on a continuing basis by Lehman Brothers Holdings Inc. (the "Company"). Lehman Brothers Inc., as agent (the "Agent"), has agreed to use its reasonable best efforts to solicit offers to purchase the Notes. The Notes are being sold pursuant to a Distribution Agreement between the Company and the Agent dated May 30, 2006 (the "Distribution Agreement") to which these administrative procedures are attached as an exhibit. Terms defined in the Distribution Agreement shall have the same meaning when used in this exhibit.

Administrative responsibilities, document control and record-keeping functions to be performed by the Company will be performed by its Treasury Department. Administrative procedures for the offering are explained below.

Each Note will be represented by a Global Security (as defined hereinafter) delivered to the Trustee, as agent for the Depository Trust Company ("DTC"), and recorded in the book-entry system maintained by DTC (a "Book-Entry Note"). An owner of a Book-Entry Note will not be entitled to receive a certificate representing such Note. In connection with the qualification of the Book-Entry Notes for eligibility in the book-entry system maintained by DTC, the Trustee will perform the custodial, document control and administrative functions described below, in accordance with its respective obligations under a Letter of Representation from the Company and the Trustee to DTC dated as of the date hereof and a Medium-Term Note Certificate Agreement between the Trustee and DTC dated October 31, 1988, and its obligations as a participant in DTC, including DTC's Same-Day Funds Settlement System ("SDFS"). Except as otherwise set forth in this Exhibit B, Book-Entry Notes will be issued in accordance with the administrative procedures set forth below.

**Price to Public**

Each Note will be issued at 100% of principal amount, unless otherwise determined by the Company.

**Date of Issuance**

Each Note will be dated and issued as of the date of its authentication by the Trustee.

B-1

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL                                                                   UBSFS_SDNY1083356

**Maturities**

Each Note will mature on a Business Day (as defined below) selected by the purchaser and agreed upon by the Company, such date generally being more than three months from the date of issuance.

"Business Day" shall have the meaning as set forth in the prospectus supplement unless otherwise indicated in the pricing supplement.

**Denominations**

The Notes will be issued in the denomination of $1,000 and any larger denomination which is an integral multiple of $1,000, unless otherwise indicated in the applicable Pricing Supplement.

**Registration**

Notes will be issued only in fully registered form.

**Interest Payments**

Each Note bearing interest at a fixed rate will bear interest from its issue date at the annual rate stated on the face thereof. Unless otherwise indicated in the applicable Pricing Supplement, interest will be payable on February 15 and August 15 of each year (the "Interest Payment Dates") and at maturity. Interest will be calculated and paid on the basis of a 360-day year of twelve 30-day months or, in the case of an incomplete month, the number of days elapsed. Interest will be payable to the person in whose name such Note is registered at the close of business on the February 1 or August 1, or such other dates as set forth in the applicable Pricing Supplement (the "Record Dates"), next preceding the respective Interest Payment Date; provided, however, that interest payable on a maturity date will be payable to the person to whom principal shall be payable. The first payment of interest on any Note originally issued between a Record Date and an Interest Payment Date will be made on the Interest Payment Date following the next succeeding Record Date. All interest payments (excluding interest payments made at maturity) will be made by wire transfer by the Trustee or by check mailed by the Trustee to the person entitled thereto as provided above.

On the fifth Business Day immediately preceding each Interest Payment Date, the Trustee will notify the Company as to the total amount of the interest payments to be made on such Interest Payment Date. The Trustee (or any duly selected paying agent) will provide monthly to the Company's Treasury Department a list of the principal and interest to be paid on Notes maturing in the next succeeding month. The Company will provide to the Trustee not later than the payment date sufficient moneys to pay in full all principal and interest payments due on such payment date. The Trustee will assume responsibility for withholding taxes on interest paid as required by law.

For special provisions relating to Floating Rate Notes, see Appendix A hereto.

B-2

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083357

**Acceptance and Rejection of Offers**

The Company shall have the sole right to accept offers to purchase Notes and may reject any such offer in whole or in part. The Agent shall promptly communicate to the Company, orally or in writing, each reasonable offer to purchase Notes from the Company received by it other than those rejected by the Agent. The Agent shall have the right, in its discretion reasonably exercised, without notifying the Company, to reject any offers in whole or in part.

**Settlement**

The receipt of immediately available funds by the Company in payment for a Note (less the applicable commission) and the authentication and issuance of such Note shall, with respect to such Note, constitute "Settlement". All offers accepted by the Company will be settled from one to five Business Days from the date of acceptance by the Company pursuant to the timetable for Settlement set forth below unless the Company and the purchaser agree to Settlement on a later date; provided, however, that the Company will notify the Trustee of any such later date on or before the Business Day immediately prior to the Settlement date. Except as otherwise may be agreed to by the Company and the Agent, no Settlement of a Note will occur between a Record Date and an Interest Payment Date for that Note.

**Settlement Procedures**

In the event of a purchase of Notes by the Agent or another Purchaser or Purchasers, as principal, appropriate Settlement details will be set forth in the applicable Purchase Agreement to be entered into between the Agent and the Company pursuant to the Distribution Agreement.

Settlement procedures with regard to each Note sold through the Agent shall be as follows:

A.  The Agent will advise the Company and the Trustee by telephone or in writing, by telex or facsimile, of the following Settlement information:

   1.  Exact name in which Note is to be registered ("Registered Owner").

   2.  Exact address of the Registered Owner and address for payment of principal and interest, if any.

   3.  Taxpayer identification number of the Registered Owner.

   4.  Principal amount of the Note (and, if multiple Notes are to be issued, denominations thereof).

   5.  Settlement date.

   6.  Maturity date.

B-3

CONFIDENTIAL

UBSFS_SDNY1083358

7.      Interest rate:

      a.      Fixed Rate Notes:

            i.      interest rate

      b.      Floating Rate Notes:

            i.      base rate
            ii.      initial interest rate
            iii.      spread or spread multiplier, if any
            iv.      interest reset dates
            v.      interest payment dates
            vi.      index maturity
            vii.      maximum and minimum interest rates, if any

8.      If applicable, the date on or after which the Notes are redeemable at the option of the Company and other terms of redemption.

9.      If applicable, the date on or after which the Notes are terminable at the option of the holder.

10.      Agent's Commission (to be paid in the form of a discount from the proceeds remitted to the Company upon Settlement).

B.      The Company will confirm the above Settlement information to the Trustee by telephone (confirmed in writing), telex or facsimile, and the Trustee will assign a Note number to the transaction. If the Company rejects an offer, the Company will promptly notify the Agent and the Trustee by telephone.

C.      The Agent will deliver to the purchaser a copy of the most recent Prospectus applicable to the Note with or prior to any written offer of Notes and the confirmation and payment by the purchaser for the Note.

**Settlement Procedures Timetable**

For offers accepted by the Company, Settlement procedures "A" through "C" set forth above shall be completed, as applicable, to the extent practicable on or before the respective times set forth below:

B-4

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083359

| Settlement Procedure | Time (New York City) |
|---|---|
| A | 2 PM on date of sale |
| B | 3 PM on date of sale |
| C | 3 PM on the Settlement date |

**Fails**

In the event that a purchaser of a Note shall either fail to accept delivery of or make payment for a Note on the date fixed by the Company for Settlement, the Agent will immediately notify the Trustee and the Company's Treasurer by telephone, confirmed in writing, of such failure and return the Note to the Trustee. Upon the Trustee's receipt of the Note from the Agent, the Company will promptly return to the Agent an amount of immediately available funds equal to any amount previously transferred to the Company in respect of the Note pursuant to advances made by the Agent. Such returns will be made on the Settlement date, if possible, and in any event not later than 12 noon (New York City time) on the Business Day following the Settlement date. The Company will reimburse the Agent on an equitable basis for its loss of the use of the funds during the period when the funds were credited to the account of the Company. Upon receipt of the Note in respect of which the default occurred, the Trustee will mark the Note "cancelled", make appropriate entries in its records and deliver the Note to the Company with an appropriate debit advice. The Agent will not be entitled to any commission with respect to any Note which the purchaser does not accept or make payment for.

**Maturity**

Upon presentation of each Note at maturity the Trustee (or any duly appointed Paying Agent) will pay the principal amount thereof, together with accrued interest due at maturity. Such payment shall be made in immediately available funds, provided that the Note is presented to the Trustee (or any such Paying Agent) in time for the Trustee (or such Paying Agent) to make payments in such funds in accordance with its normal procedures. The Company will provide the Trustee (and any such Paying Agent) with funds available for immediate use for such purpose. Notes presented at maturity will be cancelled by the Trustee as provided in the Indenture.

**Procedure for Rate Changes**

The Company will establish interest rates from time to time for the Notes then being offered and when a decision has been reached to change the interest rates of the Notes being sold by the Company, the Company will promptly advise the Agent, which will forthwith suspend solicitation of offers. The Agent will telephone the Company with recommendations as to the changed interest rates.

**Suspension of Solicitation; Amendment or Supplement**

If, at any time when a prospectus relating to the Securities is required to be delivered under the Act, any event occurs as a result of which the Prospectus would include an untrue statement of a material fact or omit to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083360

misleading, or if it is necessary at any time to amend the Prospectus to comply with the Act, the Company will notify the Agent promptly to suspend solicitation of purchases of the Securities and the Agent shall suspend its solicitations of purchases of securities; and if the Company shall decide to amend or supplement the Registration Statement or the Prospectus, it will promptly advise the Agent by telephone (with confirmation in writing) and will promptly prepare and file with the Commission an amendment or supplement which will correct such statement or omission or an amendment which will effect such compliance and will use its reasonable best efforts to cause any amendment of the Registration Statement containing an amended Prospectus to be made effective as soon as possible. Upon the Agent's receipt of such amendment or supplement and advice from the Company that solicitations may be resumed, the Agent will resume solicitations of purchases of the Securities.

In addition, subject to its representations, warranties and covenants contained in the Distribution Agreement, the Company may instruct the Agent to suspend solicitation of offers to purchase at any time for a period of time or permanently. Upon receipt of such instructions the Agent will forthwith (but in any event within one Business Day) suspend solicitation of offers to purchase from the Company until such time as the Company has advised it that solicitation of offers to purchase may be resumed. If the Company decides to amend or supplement the Registration Statement or the Prospectus relating to the Notes (other than to change interest rates), it will promptly advise the Agent and the Trustee and will furnish the Agent and the Trustee with copies of the proposed amendment or supplement.

In the event that at the time the Agent, at the direction of the Company, suspends solicitation of offers to purchase from the Company there shall be any orders outstanding which have not been settled, the Company will promptly advise the Agent and the Trustee whether such orders may be settled and whether copies of the Prospectus as theretofore amended or supplemented as in effect at the time of the suspension may be delivered in connection with the Settlement of such orders. The Company will have the sole responsibility for such decision and for any arrangements which may be made in the event that the Company determines that such orders may not be settled or that copies of such Prospectus may not be so delivered.

**Delivery of Prospectus**

The Agent will, to the extent required by applicable law, rule or regulation (including Rule 172 of the Rules and Regulations), provide a copy of the relevant Prospectus, appropriately amended or supplemented, which must accompany or precede each written offer of a Note, if any, by the Agent, each written confirmation of a sale sent to a purchaser or his agent by the Agent and each Note delivered to a purchaser or his agent.

**Authenticity of Signatures**

The Company will cause the Trustee to furnish the Agent from time to time with the specimen signatures of each of the Trustee's officers, employees and agents who have been authorized by the Trustee to authenticate Notes, but the Agent will have no obligation or liability to the Company or the Trustee in respect of the authenticity of the signature of any officer, employee or agent of the Company or the Trustee on any Note.

B-6

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083361

**Advertising Costs**

The Company will determine with the Agent the amount and nature of advertising that may be appropriate in offering the Notes. Advertising expenses in connection with solicitation of offers to purchase Notes from the Company will be paid by the Company.

**II.  Special Administrative Procedures for Book-Entry Notes Issuance**

On any date of settlement (as defined under "Settlement" below) for one or more Fixed Rate Book-Entry Notes, the Company will issue a single global security in fully registered form without coupons (a "Global Security") representing up to each $500,000,000 principal amount of all of such Notes that have the same original issuance date, interest rate, optional redemption dates and Stated Maturity. Similarly, on any settlement date for one or more Floating Rate Book-Entry Notes, the Company will issue a single Global security representing up to each $500,000,000 principal amount of all of such Notes that have the same interest rate basis, original issuance date, Initial Interest Rate, Interest Payment Dates, Index Maturity, Spread, Spread Multiplier, minimum interest rate (if any), maximum interest rate (if any), optional redemption dates (if any), Stated Maturity and other terms. Each Global Security will be dated and issued as of the date of its authentication by the Trustee. No Global Security will represent both Fixed Rate and Floating Rate Book-Entry Notes.

**Identification Numbers**

The Company will arrange, on or prior to commencement of a program for the offering of Book-Entry Notes, with the CUSIP Service Bureau of Standard & Poor's Credit Market Services (the "CUSIP Service Bureau") for the reservation of a series of CUSIP numbers (including tranche numbers), consisting of approximately 900 CUSIP numbers and relating to Global Securities representing the Book-Entry Notes. The Company has or will obtain from the CUSIP Service Bureau a written list of such series of reserved CUSIP numbers and will deliver to the Trustee and DTC such written list of 900 CUSIP numbers of such series. The Trustee will assign CUSIP numbers to Global Securities as described below under Settlement Procedure "B". The Company will notify the CUSIP Service Bureau periodically of the CUSIP numbers that the Trustee has assigned to Global Securities. The Trustee will notify the Company at any time when fewer than 100 of the reserved CUSIP numbers remain unassigned to Global Securities, and if it deems necessary, the Company will reserve additional CUSIP numbers for assignment to Global Securities representing Book-Entry Notes. Upon obtaining such additional CUSIP numbers the Company shall deliver such additional CUSIP numbers to the Trustee and DTC.

**Registration**

Each Global Security will be registered in the name of Cede & Co., as nominee for DTC, on the Securities Register maintained under the Indenture. The

B-7

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083362

beneficial owner of a Book-Entry Note (or one or more indirect participants in DTC designated by such owner) will designate one or more participants in DTC (with respect to such Note, the "Participants") to act as agent or agents for such owner in connection with the book-entry system maintained by DTC, and DTC will record in book-entry form, in accordance with instructions provided by such Participants, a credit balance with respect to such Note in the account of such Participants. The ownership interest of such beneficial owner in such Note will be recorded through the records of such Participants or through the separate records of such Participants and one or more indirect participants in DTC.

**Transfers**

Transfers of a Book-Entry Note will be accomplished by book entries made by DTC and, in turn, by Participants (and in certain cases, one or more indirect participants in DTC) acting on behalf of beneficial transferors and transferees of such Note.

**Consolidation and Exchange**

The Trustee may deliver to DTC and the CUSIP Service Bureau at any time a written notice of consolidation specifying (i) the CUSIP number of two or more Outstanding Global Securities that represent (A) Fixed Rate Book-Entry Notes having the same interest rate, optional redemption dates (if any) and Stated Maturity and with respect to which interest has been paid to the same date or (B) Floating Rate Book-Entry Notes having the same interest rate basis, optional redemption dates (if any), Initial Interest Rate, Interest Payment Dates, Index Maturity, Spread and/or Spread Multiplier, minimum interest rate (if any), maximum interest rate (if any) and with respect to which interest has been paid to the same date, (ii) a date, occurring at least 30 days after such written notice is delivered and at least 30 days before the next Interest Date for such Book-Entry Notes, on which such Global Securities shall be exchanged for a single replacement Global Security and (iii) a new CUSIP number, obtained from the Trustee, to be assigned to such replacement Global Security. Upon receipt of such a notice, DTC will send to its participants (including the Trustee) a written reorganization notice to the effect that such exchange will occur on such date. Prior to the specified exchange date, the Trustee will deliver to the CUSIP Service Bureau a written notice setting forth such exchange date and the new CUSIP number and stating that, as of such exchange date, the CUSIP numbers of the Global Securities to be exchanged will no longer be valid. On the specified exchange date, the Trustee will exchange such Global Securities for a single Global Security bearing a new CUSIP number and dated the last Interest Payment Date to which interest has been paid or duly provided for on the exchanged Global Securities, and the CUSIP numbers of the exchanged Global Securities will, in accordance with CUSIP Service Bureau procedures, be cancelled and not immediately reassigned. Notwithstanding the foregoing, if the Global Securities to be exchanged exceed $500,000,000 in aggregate principal amount, one Global Security will be authenticated and issued to represent each $500,000,000 of

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083363

principal amount of the exchanged Global Securities and an additional Global
Security will be authenticated and issued to represent any remaining principal
amount of such Global Securities (see "Denominations" below).

**Maturities**

Each Book-Entry Note generally will mature on a date not less than three months
after the settlement date for such Note. A Floating Rate Book Entry Note will
mature only on an Interest Payment Date for such Note.

**Denominations**

Book-Entry Notes will be issued in principal amounts of $1,000 or any amount in
excess thereof that is an integral multiple of $1,000. Global Securities will be
denominated in principal amounts not in excess of $500,000,000. If one or more
Book-Entry Notes having an aggregate principal amount in excess of
$500,000,000 would, but for the preceding sentence, be represented by a single
Global Security, then one Global security will be issued to represent each
$500,000,000 principal amount of such Book-Entry Note or Notes and an
additional Global Security will be issued to represent any remaining principal
amount of such Book-Entry Note or Notes. In such a case, each of the Global
Securities representing such Book-Entry Note or Notes shall be assigned the same
CUSIP number.

**Interest**

*General*. Interest on each Book-Entry Note will accrue from and including the last
Interest Payment Date, except in the case of Floating Rate Notes which reset daily
or weekly. Each payment of interest on a Book-Entry Note will include interest
accrued through the day preceding, as the case may be, the Interest Payment Date
or Maturity, except in the case of Floating Rate Book-Entry Notes which reset
daily or weekly. In the case of Floating Rate Book-Entry Notes which reset daily
or weekly, interest payments will include accrued interest from and including the
original issuance date or from and including the last date in respect of which
interest has been paid, as the case may be, to, and including the Record Date
immediately preceding the applicable Interest Payment Date, provided that at
Maturity the interest payable will include interest accrued from and including the
original issuance date or from and including the last date in respect of which
interest has been paid through the day preceding Maturity. Interest payable at the
Maturity of a Book-Entry Note will be payable to the Person to whom the
principal of such Note is payable. Standard & Poor's Credit Market Services will
use the information received in the pending deposit message described under
Settlement Procedure "C" below in order to include the amount of any interest
payable and certain other information regarding the related Global Security in the
appropriate weekly bond report published by Standard & Poor's Credit Market
Services.

B-9

CONFIDENTIAL                                                                      UBSFS_SDNY1083364

Promptly after each Interest Determination Date (as defined in Appendix A hereto) for Floating Rate Notes, the Calculation Agent will notify the Trustee after confirmation with the Company, and the Trustee in turn will notify Standard & Poor's Credit Market Services, of the interest rates determined on such Interest Determination Date.

**Payments of Principal and Interest**

*Payments of Interest Only*. Promptly after each Regular Record Date, the Trustee will deliver to the Company and DTC a written notice specifying by CUSIP number the amount of interest to be paid on each Global Security on the following Interest Payment Date (other than an Interest Payment Date coinciding with maturity) and the total of such amounts. DTC will confirm the amount payable on each Global Security on such Interest Payment Date by reference to the daily bond reports published by Standard & Poor's Credit Market Services. The Company will pay to the Trustee, as paying agent, the total amount of interest due on such Interest Payment Date (other than at Maturity), and the Trustee will pay such amount to DTC at the times and in the manner set forth below under "Manner of Payment".

*Payments at Maturity*. On or about the first Business Day of each month, the Trustee will deliver to the Company and DTC a written list of principal and interest to be paid on each Global Security maturing in the following month. The Company, the Trustee and DTC will confirm the amounts of such principal and interest payments with respect to each such Global Security on or about the fifth Business Day preceding the Maturity of such Global Security, except for Notes with a daily reset period in which case the Company, the Trustee and DTC will confirm the amount of the principal payable with respect to each such Global Security on or about the fifth Business Day preceding Maturity and the amount of interest payable with respect to such Global Security two Business Days preceding the maturity of such Global Security. The Company will pay to the Trustee, as the paying agent, the principal amount of such Global Security, together with interest due at such Maturity. The Trustee will pay such amount to DTC at the times and in the manner set forth below under "Manner of Payment".

Promptly after payment to DTC of the principal and interest due at the Maturity of such Global Security, the Trustee will cancel such Global Security and deliver it to the Company with an appropriate debit advice.

*Manner of Payment*. The total amount of any principal and interest due on Global Securities on any Interest Payment Date or at Maturity shall be paid by the Company to the Trustee in funds available for use by the Trustee as of 9:30 A.M. (New York City time) on such date. The Company will make such payment on such Global Securities by instructing the Trustee to withdraw funds from an account maintained by the Company at the Trustee. The Company will confirm such instructions in writing to the Trustee. For maturity, redemption or any other principal payments: prior to 10 A.M. (New York City time) on such date or as

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083365

soon as possible thereafter, the Trustee will make such payments to DTC in same day funds in accordance with DTC's Same Day Funds Settlement Paying Agent Operating Procedures. For interest payments: the Trustee will make such payments to DTC in accordance with existing arrangements between DTC and the Trustee. DTC will allocate such payments to its participants in accordance with its existing operating procedures. Neither the Company nor the Trustee shall have any direct responsibility or liability for the payment by DTC to such Participants of the principal of and interest on the Book-Entry Notes.

*Withholding Taxes*. The amount of any taxes required under applicable law to be withheld from any interest payment on a Book-Entry Note will be determined and withheld by the Participant, indirect participant in DTC or other Person responsible for forwarding payments and materials directly to the beneficial owner of such Note.

**Acceptance and Rejection of Offers**

Unless otherwise instructed by the Company, the Agent will advise the Company promptly by telephone or e-mail of all offers to purchase Book-Entry Notes received by the Agent, other than those rejected by it in whole or in part in the reasonable exercise of its discretion. Unless otherwise agreed by the Company and each of the Agent, the Company has the sole right to accept offers to purchase Book-Entry Notes and may reject any such offer in whole or in part.

**Settlement**

The receipt by the Company of immediately available funds in payment for a Book-Entry Note and the authentication and issuance of the Global Security representing such Note shall constitute "settlement" with respect to such Note. All orders accepted by the Company will be settled from one to five Business Days from the date of acceptance by the Company pursuant to the timetable set forth below unless the Company and the purchaser agree to settlement on a later date.

**Settlement Procedures**

Settlement Procedures with regard to each Book-Entry Note sold by the Company through the Agent, as agent, shall be as follows:

A.   The Agent will advise the Company and the Trustee by telephone or in writing, by telex or facsimile, the following Settlement information:

  1.   Exact name in which Note is to be registered ("Registered Owner").

  2.   Exact address of the Registered owner and address for payment of principal and interest, if any.

  3.   Taxpayer identification number of the Registered Owner.

B-11

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083366

4.      Principal amount of the Note (and, if multiple Notes are to be issued, denominations thereof)

5.      Settlement date.

6.      Maturity date.

7.      Interest rate:

      a.      Fixed Rate Notes

            i.      interest rate

      b.      Floating Rate Notes:

            i.      base rate,

            ii.      initial interest rate,

            iii.      interest reset period or interest reset dates,

            iv.      interest payment dates,

            v.      index maturity,

            vi.      maximum and minimum interest rates, if any,

            vii.      spread or spread multiplier, if any,

            viii.      if the note is a LIBOR note, any index currency, and

            ix.      any other terms relating to the particular method of calculating the interest rate for the note and whether and how the spread or spread multiplier may be changed prior to stated maturity.

8.      If applicable, the date on or after which the Notes are redeemable at the option of the Company and other terms of redemption.

9.      If applicable, the date on or after which the Notes are terminable at the option of the holder.

10.      Agent's Commission (to be paid in the form of a discount from the proceeds remitted to the Company upon Settlement).

B.      The Company will confirm the above Settlement information to the Trustee by telephone (confirmed in writing), telex or facsimile, and the Trustee will assign a Note number to the transaction. If the Company rejects an offer, the Company will promptly notify the Agent and the Trustee by telephone.

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083367

C.      The Company shall communicate with the Trustee and Agent and each such communication by the Company shall constitute a representation and warranty by the Company to the Trustee and the Agent that (i) such Note is then, and at the time of issuance and sale thereof will be, duly authorized for issuance and sale by the Company and (ii) such Note, and the Global Security representing such Note, will conform with the terms of the Indenture pursuant to which such Note and Global Security are issued.

D.      The Trustee will assign a CUSIP number to the Global Security representing such Note and then advise the Company by telephone (confirmed in writing at any time on the same date) or electronic transmission of such CUSIP number.

E.      The Trustee will enter a pending deposit message through DTC's Participant Terminal System, providing the following settlement information to DTC, the Agent and Standard & Poor's Credit Market Services:

    1.      The information set forth in Settlement Procedure "A".

    2.      Identification as a Fixed Rate Book-Entry Note or a Floating Rate Book-Entry Note.

    3.      Initial Interest Payment Date for such Note, number of days by which such date succeeds the related "DTC Record Date" (which term means the Regular Record Date except in the case of Floating Rate Notes which reset daily and weekly in which case it means the date 5 calendar days immediately preceding the Interest Payment Date) and amount of interest per $1,000 principal amount payable on such Interest Payment Date.

    4.      Frequency of interest payments (monthly, semiannually, quarterly, etc.).

    5.      CUSIP number of the Global Security representing such Note.

    6.      Whether such Global Security will represent any other Book-Entry Note (to the extent known at such time).

F.      The Trustee will complete the preprinted Global Security representing such Note, the form of which was previously approved by the Company, the Agent and the Trustee.

G.      The Trustee will authenticate the Global Security representing such Note.

H.      DTC will credit such Note to the Trustee's participant account at DTC.

I.      The Trustee will enter an SDFS deliver order through DTC's Participant Terminal System instructing DTC to (i) debit such Note to the Trustee's participant account and credit such Note to the Agent's participant account and (ii) debit the Agent's settlement account and credit the Trustee's settlement account for an amount equal to the price of such Note less the Agent's commission. The entry of such a

B-13

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083368

deliver order shall constitute a representation and warranty by the Trustee to DTC that (i) the Global Security representing such Book-Entry Note has been issued and authenticated and (ii) the Trustee is holding such Global Security pursuant to the Medium-Term Note Certificate Agreement between the Trustee and DTC (the "Certificate Agreement").

J.    The Agent will enter an SDFS deliver order through DTC's Participant Terminal System instructing DTC (i) to debit such Note to the Agent's participant account and credit such Note to the participant accounts of the Participants with respect to such Note and (ii) to debit the settlement accounts of such Participants and credit the settlement account of the Agent for an amount equal to the price of such Note.

K.    Transfers of funds in accordance with SDFS deliver orders described in Settlement Procedures "I" and "J" will be settled in accordance with SDFS operating procedures in effect on the settlement date.

L.    The Trustee will credit to an account of the Company maintained at the Trustee funds available for immediate use in the amount transferred to the Trustee in accordance with Settlement Procedure "I".

M.    Monthly, the Trustee will send to the Company a statement setting forth the principal amount of Book-Entry Notes Outstanding as of that date under the Indenture and setting forth a brief description of any sales of which Company has advised the Trustee but which have not yet been settled.

N.    The Agent will, to the extent required by applicable law, rule or regulation (including Rule 172 of the Rules and Regulations), deliver to the purchaser a copy of the most recent Prospectus applicable to the Note with or prior to any written offer of Notes and the confirmation and payment by the purchaser of the Note.

O.    The Agent will confirm the purchase of such Note to the purchaser either by transmitting to the Participants with respect to such Note a confirmation order or orders through DTC's institutional delivery system or by mailing a written confirmation to such purchaser.

**Settlement Procedures Timetable**

For orders of Book-Entry Notes solicited by the Agent, as agent, and accepted by the Company for settlement on the first Business Day after the sale date, Settlement Procedures "A" through "N" set forth above shall be completed as soon as possible but not later than the respective times (New York City time) set forth below:

**Settlement Procedure Time**

| | |
|---|---|
| A-C | 11:00 A.M. on the sale date |
| D, E | 2:00 P.M. on the sale date |
| F | 9:00 A.M. on settlement date |

B-14

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083369

| | |
|---|---|
| G, H | 10:00 A.M. on settlement date |
| I,J | 2:00 P.M. on settlement date |
| K | 4:45 P.M. on settlement date |
| L,N | 5:00 P.M. on settlement date (or earlier to the extent required by applicable law, rule or regulation) |

If a sale is to be settled more than one Business Day after the sale date, Settlement Procedures "A" "B" "C" "D" and "E" shall be completed as soon as practicable but no later than the times specified above on the first Business Day after the sale date. If the initial interest rate for a Floating Rate Book-Entry Note has not been determined at the time that Settlement Procedure "A" is completed, Settlement Procedures "B" "C", "D" and "E" shall be completed as soon as such rate has been determined but no later than the times specified above on the second Business Day before the settlement date. Settlement Procedure "K" is subject to extension in accordance with any extension of Fedwire closing deadlines and in the other events specified in the SDFS operating procedures in effect on the settlement date.

If settlement of a Book-Entry Note is rescheduled or cancelled, the Trustee will deliver to DTC, through DTC's Participant Terminal System, a cancellation message to such effect by no later than 2:00 P.M. on the Business Day immediately preceding the scheduled settlement date.

**Failure to Settle**

If the Trustee has not entered an SDFS delivery order with respect to a Book-Entry Note pursuant to Settlement Procedure "I", the Trustee shall immediately notify the Company thereof. Thereafter, upon written request of the Company (which may be evidenced by facsimile transmission), the Trustee shall deliver to DTC, through DTC's Participant Terminal System, as soon as practicable a withdrawal message instructing DTC to debit such Note to the Trustee's participant account. DTC will process the withdrawal message, provided that the Trustee's participant account contains a principal amount of the Global Security representing such Note that is at least equal to the principal amount to be debited. If a withdrawal message is processed with respect to all the Book-Entry Notes represented by a Global Security, the Trustee will mark such Global Security "cancelled", make appropriate entries in the Trustee's records and send such cancelled Global Security to the Company. The CUSIP number assigned to such Global Security shall, in accordance with CUSIP Service Bureau procedures, be cancelled and not immediately reassigned. If a withdrawal message is processed with respect to one or more, but not all, of the Book-Entry Notes represented by a Global Security, the Trustee will exchange such Global Security for two Global Securities, one of which shall represent such Book-Entry Note or Notes and shall be cancelled immediately after issuance and the other of which shall represent the

B-15

CONFIDENTIAL

UBSFS_SDNY1083370

other Book-Entry Notes previously represented by the surrendered Global Security and shall bear the CUSIP number of the surrendered Global Security.

If the purchase price for any Book-Entry Note is not timely paid to any Participant with respect to such Note by the beneficial purchaser thereof (or a Person, including an indirect participant in DTC, acting on behalf of such purchaser), such Participant may enter a deliver order through DTC's Participant Terminal System debiting such Note to such Participant's participant account and crediting such Note free to the participant account of the Trustee and shall notify the Trustee and the Company thereof. Thereafter, the Trustee, (i) will immediately notify the Company thereof, once the Trustee has confirmed that such Note has been credited to its participant account, and the Company shall immediately transfer by Fedwire (immediately available funds) to such Participant an amount equal to the price of such Note which was previously credited to the account of the Company maintained at the Trustee in accordance with Settlement Procedure "L" and (ii) the Trustee will deliver the withdrawal message and take the related actions described in the preceding paragraph.

Notwithstanding the foregoing, upon any failure to settle with respect to a Book-Entry Note, DTC may take any actions in accordance with its SDFS operating procedures then in effect. In the event of a failure to settle with respect to one or more, but not all, of the Book-Entry Notes to have been represented by a Global Security, the Trustee will provide, in accordance with Settlement Procedures "F" and "G", for the authentication and issuance of a Global Security representing the other Book-Entry Notes to have been represented by such Global Security and will make appropriate entries in its records.

B-16

CONFIDENTIAL

UBSFS_SDNY1083371

APPENDIX A

**Special Provisions Relating to Floating Rate Notes**

**Interest Rate**

Interest on Floating Rate Notes will be determined by reference to an "Interest Rate Basis", which shall be the "CD Rate" ("CD Rate Notes"), the "Commercial Paper Rate" ("Commercial Paper Rate Notes"), the "Federal Funds (Effective) Rate" ("Federal Funds (Effective) Rate Notes"), the "Federal Funds (Open) Rate" ("Federal Funds Open Rate"), "LIBOR" ("LIBOR Notes"), "EURIBOR" ("EURIBOR Notes") the "Treasury Rate" ("Treasury Rate Notes"), the "Prime Rate" ("Prime Rate Notes"), the Eleventh District Cost of Funds Rate ("Eleventh District Cost of Funds Rate"), the CMS Rate ("CMS Rate") or such other interest rate formula as may be designated in a Pricing Supplement, based upon the Index Maturity and adjusted by a Spread and/or Spread Multiplier, if any, as specified in the applicable Pricing Supplement setting forth the terms of each issuance of Notes (the "Pricing Supplement"). The "Index Maturity" is the particular maturity of the type of instrument or obligation from which the Interest Rate Basis is calculated (e.g., in the case of commercial paper, 30-day rather than 90-day commercial paper). The "Spread" is the number of basis points (100 basis points equals one percent) above or below the Interest Rate Basis applicable to such Floating Rate Note, and the "Spread Multiplier" is the percentage of the Interest Rate Basis applicable to the interest rate for such Floating Rate Note. The Spread, Spread Multiplier, Index Maturity and other variable terms as described below are subject to change by the Company from time to time, but no such change will affect any Floating Rate Note theretofore issued or as to which an offer has been accepted by the Company.

A Floating Rate Note may also have either or both of the following: (i) a maximum limit, or ceiling ("Maximum Interest Rate"), on the rate of interest which may apply during any Interest Period (as defined below) and (ii) a minimum limit, or floor ("Minimum Interest Rate"), on the rate of interest which may apply during any Interest Period. In addition to any Maximum Interest Rate which may be applicable to any Floating Rate Note pursuant to the above provisions, the interest rate on the Floating Rate Notes will in no event be higher than the maximum rate permitted by New York law, as the same may be modified by United States law of general application.

The applicable Pricing Supplement will specify for each Floating Rate Note the following terms: Interest Rate Basis, optional redemption dates (if any), rate of interest for the initial Interest Period (the "Initial Interest Rate"), Issue Date, Interest Determination Dates (as defined below), Interest Reset Dates (as defined below), Interest Payment Dates (as defined below), Index Maturity, Maturity Date, Maximum Interest Rate and Minimum Interest Rate, if any, and the Spread and/or Spread Multiplier, if any.

A-1

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083372

**Interest Payment Dates**

Unless otherwise indicated in the applicable Pricing Supplement, interest on Floating Rate Notes will be payable as set forth in the Basic Prospectus, as supplemented by the prospectus supplement dated May 30, 2006 relating to the Medium-Term Notes (the "MTN Prospectus"). Each date on which interest is payable on a Floating Rate Note is referred to herein as an "Interest Payment Date."

**Interest Reset Date**

Unless otherwise indicated in the applicable Pricing Supplement, the rate of interest on each Floating Rate Note will be reset as provided in the MTN Prospectus (each date an "Interest Reset Date").

**Interest Determination Date**

Unless otherwise indicated in the applicable Pricing Supplement, the "Interest Determination Date" pertaining to an Interest Reset Date for a Floating Rate Note shall be as set forth in the MTN Prospectus.

**CD Rate Notes**

A CD Rate Note will bear interest at the interest rate (calculated with reference to the CD Rate and the Spread and/or Spread Multiplier and will be subject to the minimum interest rate or the maximum interest rate, if any) specified in the CD Rate Note and in the applicable Pricing Supplement.  Unless otherwise indicated in the applicable Pricing Supplement, the "CD Rate" shall be calculated as set forth in the MTN Prospectus.

**Commercial Paper Rate Notes**

A Commercial Paper Rate Note will bear interest at the interest rate (calculated with reference to the Commercial Paper Rate and the Spread and/or Spread Multiplier and will be subject to the minimum interest rate or the maximum interest rate, if any) specified in the Commercial Paper Rate Note and in the applicable Pricing Supplement.

Unless otherwise indicated in the applicable Pricing Supplement, the "Commercial Paper Rate" shall be calculated as set forth in the MTN Prospectus.

**Federal Funds (Effective) Rate Notes**

A Federal Funds (Effective) Rate Note will bear interest at the interest rate (calculated with reference to the Federal Funds (Effective) Rate and the spread and/or Spread Multiplier and will be subject to the minimum interest rate or the maximum interest rate, if any) specified in the Federal Funds (Effective) Rate Note and in the applicable Pricing Supplement.

A-2

053137-0169-10049-NY03.2491841.14

UBSFS_SDNY1083373

Unless otherwise indicated in the applicable Pricing Supplement, the "Federal Funds Effective Rate" shall be calculated as set forth in the MTN Prospectus.

**Federal Funds (Open) Rate Notes**

A Federal Funds Open Rate Note will bear interest at the interest rate (calculated with reference to the Federal Funds Open Rate and the spread and/or Spread Multiplier and will be subject to the minimum interest rate or the maximum interest rate, if any) specified in the Federal Funds Open Rate Note and in the applicable Pricing Supplement.

Unless otherwise indicated in the applicable Pricing Supplement, the "Federal Funds Open Rate" shall be calculated as set forth in the MTN Prospectus.

**LIBOR Notes**

A LIBOR Note will bear interest at the interest rate (calculated with reference to LIBOR and the Spread and/or Spread Multiplier and will be subject to the minimum interest rate or the maximum interest rate, if any) specified in the LIBOR Note and in the applicable Pricing Supplement.

Unless otherwise indicated in the applicable Pricing Supplement, LIBOR shall be calculated as set forth in the MTN Prospectus.

**EURIBOR Notes**

A EURIBOR Note will bear interest at the interest rate (calculated with reference to EURIBOR and the Spread and/or Spread Multiplier and will be subject to the minimum interest rate or the maximum interest rate, if any) specified in the EURIBOR Note and in the applicable Pricing Supplement.

Unless otherwise indicated in the applicable Pricing Supplement, EURIBOR shall be calculated as set forth in the MTN Prospectus.

**Treasury Rate Notes**

A Treasury Rate Note will bear interest at the interest rate (calculated with reference to the Treasury Rate and the Spread and/or Spread Multiplier and will be subject to the minimum interest rate or the maximum interest rate, if any) specified in the Treasury Rate Note and in the applicable Pricing Supplement.

Unless otherwise indicated in the applicable Pricing Supplement, the "Treasury Rate" or "CMT Rate" shall be calculated as set forth in the MTN Prospectus.

**Prime Rate Notes**

A Prime Rate Note will bear interest at the interest rate (calculated with reference to the Prime Rate and the Spread and/or Spread Multiplier and will be subject to

053137-0169-10049-NY03.2491841.14

A-3

UBSFS_SDNY1083374

the minimum interest rate or the maximum interest rate, if any) specified in the Prime Rate Note and in the applicable Pricing Supplement.

Unless otherwise indicated in the applicable Pricing Supplement, the "Prime Rate" shall be calculated as set forth in the MTN Prospectus.

### Eleventh District Cost of Funds Rate Notes

A Eleventh District Cost of Funds Rate Note will bear interest at the interest rate (calculated with reference to the Eleventh District Cost of Funds Rate and the Spread or Spread Multiplier and will be subject to the minimum interest rate or the maximum interest rate, if any) specified in the Eleventh District Cost of Funds Rate Note and in the applicable Pricing Supplement.

Unless otherwise indicated in the applicable Pricing Supplement, the "Eleventh District Cost of Funds Rate" shall be calculated as set forth in the MTN Prospectus.

### CMS Rate Notes

A CMS Rate Note will bear interest at the interest rate (calculated with reference to the CMS Rate and the spread and/or Spread Multiplier and will be subject to the minimum interest rate or the maximum interest rate, if any) specified in the CMS Rate Note and in the applicable Pricing Supplement.

Unless otherwise indicated in the applicable Pricing Supplement, the "CMS Rate" shall be calculated as set forth in the MTN Prospectus.

### Record Dates

Unless otherwise indicated in the applicable Pricing Supplement, interest payments on Floating Rate Notes will be made on the Interest Payment Dates to the registered owners at the close of business on the date 15 calendar days prior to such Interest Payment Date (the "Regular Record Date"). Interest payable at maturity will be paid to the same person to whom principal is payable. Interest will begin to accrue (except in the case of Floating Rate Notes which reset daily or weekly) on the Issue Date of a Note for the first interest period and from and including the last Interest Payment Date. Each payment of interest (except in the case of Floating Rate Notes which reset daily or weekly) shall include interest accrued from and including the next preceding Interest Payment Date in respect of which interest has been paid (or, if none, from and including the Issue Date) to but excluding the next Interest Payment Date (an "Interest Period"). In the case of Floating Rate Notes that reset daily or weekly, interest payments will include accrued interest from and including the Issue Date or from and including the last date in respect of which interest has been paid, as the case may be, to, and including the Regular Record Date immediately preceding the applicable Interest Payment Date, providing that at maturity the interest payable will include interest accrued from and including the Issue Date or from and including the last date in

A-4

CONFIDENTIAL

UBSFS_SDNY1083375

respect of which interest has been paid, as the case may be, to, but excluding, the date of maturity. The initial interest payment on Notes issued between a Regular Record Date and the Interest Payment Date immediately following such Regular Record Date will be made on the second Interest Payment Date following such issue (however, except as may otherwise be agreed to by the Company and the Agent, no Floating Rate Notes will be sold between a Regular Record Date and an Interest Payment Date).

**Accrued Interest**

Unless otherwise indicated in the applicable Pricing Supplement, accrued interest shall be calculated as set forth in the MTN Prospectus.

A-5

CONFIDENTIAL

UBSFS_SDNY1083376

EXHIBIT B

LEHMAN BROTHERS HOLDINGS INC.

Medium-Term Notes, Series I

PURCHASE AGREEMENT

[_____], 20__

Lehman Brothers Holdings Inc.
745 Seventh Avenue
New York, New York 10019

Attention: Treasurer

Lehman Brothers Holdings Inc., a Delaware corporation (the "Company"), has previously entered into a Distribution Agreement dated May 30, 2006 (the "Distribution Agreement"), between the Company and Lehman Brothers Inc. (the "Agent"), with respect to the issue and sale by the Company of its Medium Term Notes, Series I ("Securities"), pursuant to an Indenture dated as of September 1, 1987, as amended, between the Company and Citibank, N.A., as Trustee. The Distribution Agreement permits the Company to enter into an agreement with the Agent and/or one or more additional persons to purchase Securities as principals.

[The undersigned] [Each of the purchasers identified on Schedule I attached hereto] ([the] [each a] "Purchaser") agrees[, severally and not jointly,] to purchase, at the purchase price (equal to the Issue Price less the Agents' Commission) set forth in the Pricing Supplement dated _____ __ , 20_, attached as Schedule II hereto (the "Pricing Supplement"), [$_____ principal amount] [the principal amount] of Securities described below [set forth next to such Purchaser's name on Schedule I attached hereto].

The Securities have the terms set forth in the Pricing Supplement.

The term "Applicable Time" means _____ [a.m.][p.m.] (New York City time) on the date of this Agreement.

Each Purchaser's obligation to purchase Securities hereunder is subject to the accuracy, as of the Settlement Date, of your representations and warranties contained in the Distribution Agreement and to your performance and observance of all applicable covenants and agreements contained therein, and the satisfaction of all conditions precedent contained therein, including, without limitation, those pursuant to Sections 5, 6 and 7 thereof. Each Purchaser's obligation to purchase Securities hereunder is subject to the further condition precedent that the Company shall have furnished to each Purchaser copies of the most recent documents (including any prior documents referred to therein) previously delivered to the Agent pursuant to Sections 5

C-1

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083377

and 6 of the Distribution Agreement and such further information, certificates and documents as the Lead Manager, in its sole discretion, or counsel to Purchasers may reasonably request.

The "Lead Manager" for the Securities described in this Agreement is [insert lead manager's name]. [Pursuant to the last sentence of Section 11(a) of the Distribution Agreement, the Lead Manager hereby requests the delivery of, and it is hereby agreed that there shall be delivered, documents pursuant to Section[s] [5(b)][5(c)][5(d)][5(e)] of the Distribution Agreement.] [In addition to the opinion delivered pursuant to Section 5(b) of the Distribution Agreement, the Chief Legal Officer, General Counsel or an Associate General Counsel of the Company shall furnish a statement that such counsel has no reason to believe that the Preliminary Prospectus, together with the final term sheet in the form attached hereto as Schedule IV and/or any Issuer Free Writing Prospectus(es) set forth on a schedule to such opinion acceptable to counsel to the Agent, as of the Applicable Time, [except for the information listed on Schedule III], contained any untrue statement of a material fact or omitted to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.]

In accordance with Section 11(a) of the Distribution Agreement, each Purchaser (other than Lehman Brothers Inc.) hereby confirms that, with effect from the date hereof solely in respect of the issue of the Securities described above (the "Issue"), each Purchaser shall become a party to, and an Agent under, the Distribution Agreement, vested with all the authority, rights and powers, and subject to all duties and obligations of an Agent as if originally named as such under the Distribution Agreement.

Such appointment is limited to the Issue and is not for any other issue of Securities of the Company pursuant to the Distribution Agreement, and such appointment will terminate upon issue of the Securities comprising the Issue, but without prejudice to any rights, duties or obligations which have arisen prior to such termination.

Except as otherwise expressly provided herein, all terms used herein which are defined in the Distribution Agreement shall have the same meanings as in the Distribution Agreement, except that (i) the term "Securities" shall mean only the Securities that are part of the Issue, (ii) the term "Agent," as used in the Distribution Agreement, shall be deemed to refer, where applicable and for purposes of this Agreement, only to the Purchasers (except for references in the Distribution Agreement to Agent where such Agent has discretion, in which case Agent shall mean the Lead Manager) and (ii) any reference to the Registration Statement or the Prospectus shall be deemed to refer to such documents as amended or supplemented as of the date of this Agreement and as of the Settlement Date, including any supplement relating to the Securities and containing the name of the Purchasers. [For purposes of Section 12 of the Distribution Agreement, the Lead Manager confirms that its notice details are as set forth immediately beneath its name].

[IF THE OFFERING IS A GLOBAL OFFERING:

**European Economic Area**

In relation to each Member State of the European Economic Area which has

C-2

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

implemented the Prospectus Directive (each, a "Relevant Member State"), the Agent has represents and agrees, and each Agent agrees, that with effect from and including the date on which the Prospectus Directive is implemented in that Relevant Member State (the "<u>Relevant Implementation Date</u>") it has not made and will not make an offer of Securities to the public in that Relevant Member State except that it may, with effect from and including the Relevant Implementation Date, make an offer of Securities to the public in that Relevant Member State:

> (a) in (or in Germany, where the offer starts within) the period beginning on the date of publication of a prospectus in relation to those Securities which has been approved by the competent authority in that Relevant Member State or, where appropriate, approved in another Relevant Member State and notified to the competent authority in that Relevant Member State, all in accordance with the Prospectus Directive and ending on the date which is 12 months after the date of such publication;

> (b) at any time to legal entities which are authorised or regulated to operate in the financial markets or, if not so authorised or regulated, whose corporate purpose is solely to invest in securities;

> (c) at any time to any legal entity which has two or more of (1) an average of at least 250 employees during the last financial year; (2) a total balance sheet of more than €43,000,000 and (3) an annual net turnover of more than €50,000,000, as shown in its last annual or consolidated accounts; or

> (d) at any time in any other circumstances which do not require the publication by the Company of a prospectus pursuant to Article 3 of the Prospectus Directive.

For the purposes of this provision, the expression an "offer of Securities to the public" in relation to any Securities in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the Securities to be offered so as to enable an investor to decide to purchase or subscribe the Securities, as the same may be varied in that Member State by any measure implementing the Prospectus Directive in that Member State and the expression Prospectus Directive means Directive 2003/71/EC and includes any relevant implementing measure in each Relevant Member State.

**United Kingdom**

The Agent has represents and agrees, and any Agent will be required to represent and agree, that:

> (a) in relation to any Securities which have a maturity of less than one year, (i) it is a person whose ordinary activities involve it in acquiring, holding, managing or disposing of investments (as principal or agent) for the purposes of its business and (ii) it has not offered or sold and will not offer or sell any Securities other than to persons whose ordinary activities involve them in acquiring, holding, managing or disposing of investments (as principal or as agent) for the purposes of their businesses or who it is reasonable to expect will acquire, hold, manage or dispose of investments (as principal or agent) for the purposes of their businesses where the issue of the Securities would otherwise constitute a contravention of Section 19 of the FSMA by the Company;

C-3

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083379

(b) it has only communicated or caused to be communicated and will only communicate or cause to be communicated an invitation or inducement to engage in investment activity (within the meaning of Section 21 of the FSMA) received by it in connection with the issue or sale of any Notes in circumstances in which Section 21(1) of the FSMA does not apply to the Company; and

(c) it has complied and will comply with all applicable provisions of the FSMA with respect to anything done by it in relation to any Securities in, from or otherwise involving the United Kingdom.

The Agent will have agreed that it, to the best of its knowledge after due inquiry, will comply with all applicable laws and regulations in force in any jurisdiction in which it offers or sells the Securities or possesses or distributes the Prospectus, any Preliminary Prospectus or any Issuer Free Writing Prospectus or any other offering material and will obtain any consent, approval or permission required by it for the offer or sale by them of the Securities under the laws and regulations in force in any jurisdiction to which they are subject or in which they make such offers or sales.]

[The undersigned] [Each of the Purchasers] agrees to perform its duties and obligations specifically provided to be performed by [each of] the Purchasers in accordance with the terms and provisions of the Distribution Agreement and the Procedures, as amended or supplemented hereby.

This Agreement shall be subject to the termination provisions of Section 10 of the Distribution Agreement.

[If one or more of the Purchasers shall fail at the Settlement Date to purchase the Securities which it or they are obligated to purchase (the "Defaulted Securities"), then the non-defaulting Purchasers (the "non-defaulting Purchasers") shall have the right, within 24 hours thereafter, to make arrangements for one or more of them to purchase all, but not less than all, of the Defaulted Securities in such amounts as may be agreed upon and upon the terms herein set forth; provided, however, that if such arrangements shall not have been completed within such 24-hour period, then:

(A)  if the aggregate principal amount of Defaulted Securities does not exceed 9.09% of the aggregate principal amount of Securities to be so purchased hereunder on the Settlement Date, the non-defaulting Purchasers shall be obligated, severally and not jointly, to purchase the full amount thereof in the proportions that their respective initial underwriting obligations bear to the underwriting obligations of all non-defaulting Purchasers; or

(B)  if the aggregate principal amount of Defaulted Securities exceeds 9.09% of the aggregate principal amount of Securities to be so purchased hereunder on the Settlement Date, this agreement shall terminate without liability on the part of any non-defaulting Purchaser.

C-4

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083380

No action taken pursuant to this paragraph shall relieve any defaulting Purchaser from liability in respect of its default. In the event of any such default which does not result in a termination of this agreement, either the non-defaulting Purchasers or the Company shall have the right to postpone the Settlement Date for a period not exceeding seven days in order to effect any required changes in the Registration Statement, the Prospectus Supplement, the Pricing Supplement or any other documents or arrangements.]

[Notwithstanding anything in the Distribution Agreement to the contrary, the obligations of the Purchasers under Section 7 of the Distribution Agreement are several and not joint, and in no case shall any Purchaser (except as may be provided in any agreement among them) be responsible under Section 7(d) to contribute any amount by which the total price at which the Securities purchased by it exceeds the amount of any damages which the Purchaser has otherwise paid or become liable to pay with respect to the Securities purchased by such Purchaser hereunder.]

This Agreement shall be governed by and construed in accordance with the laws of New York. This Agreement may be executed in one or more counterparts and the executed counterparts taken together shall constitute one and the same agreement.

C-5

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083381

If the foregoing correctly sets forth the agreement among the parties hereto, please indicate your acceptance hereof in the space provided for that purpose below.

[NAME OF LEAD MANAGER]
[As Representative of the Purchasers named in Schedule I annexed hereto]

By: _____
    Name:
    Title:

Accepted: _____ ____, 20___

LEHMAN BROTHERS HOLDINGS INC.

By _____
    Name:
    Title:

C-6

CONFIDENTIAL

UBSFS_SDNY1083382

SCHEDULE I

| Purchaser | Principal Amount of Securities |
|-----------|-------------------------------|
|           | $                             |
| Total     | $                             |

C-7

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083383

SCHEDULE II

[Pricing Supplement]

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083384

SCHEDULE III

[Exceptions to, if any, to Section 1(d) of the Distribution Agreement]

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083385

SCHEDULE IV

**FORM OF FIXED RATE TERM SHEET**

[To be modified as appropriate and completed prior to execution of this Purchase Agreement]

| | |
|---|---|
| **Issuer:** | Lehman Brothers Holdings Inc. |
| **Ratings:** | |
| **Principal Amount:** | $ |
| | [Re-opening to become fungible with $___Notes due 20__] |
| **Security Type:** | Medium-Term Notes (Senior Notes) |
| **Settlement Date:** | _____, 20__ |
| **Maturity Date:** | _____, 20__ |
| **Issue Price:** | __% |
| **Coupon:** | __% |
| **Benchmark Treasury:** | __% due _____ __, 20__ |
| **Spread to Benchmark:** | __ basis points (__%) |
| **Treasury Strike:** | __% |
| **All-in Yield:** | __% |
| **Interest Payment Dates:** | Semi-annually on _____ and _____, commencing on _____, 20__ |
| **[Redemption Provisions:]** | |
| **[Call dates and price:** | On____, 20__ [and each Interest Payment Date thereafter] at |
| **[Make-whole call:** | [At any time] at a discount rate of Treasury plus __basis |
| **[Other Provisions:]** | |
| **Denominations:** | $ |
| **Underwriters:** | Lehman Brothers (__%) (bookrunner) |
| | [Others]        (__%) |

**The issuer has filed a registration statement (including a prospectus) with the U.S. Securities and Exchange Commission (SEC) for this offering.  Before you invest, you should read the prospectus for this offering in that registration statement, and other documents the issuer has filed with the SEC for more complete information about the issuer and this offering.  You may get these documents for free by searching the SEC online database (EDGAR®) at *www.sec.gov*.  Alternatively, you may obtain a copy of the prospectus from Lehman Brothers Inc. by calling 1-888-603-5847.**

053137-0169-10049-NY03.2491841.14

UBSFS_SDNY1083386

## FORM OF FLOATING RATE TERM SHEET

[To be modified as appropriate and completed prior to execution of this Purchase Agreement]

**Issuer:** Lehman Brothers Holdings Inc.

**Ratings:**

**Principal Amount:** $

[Re-opening to become fungible with ___Notes due 20_]

**Security Type:** Medium-Term Notes (Senior Notes)

**Issue Price:** __% of principal amount

**Settlement Date:** _____, 20__

**Maturity Date:** _____ _, 20__

**Coupon:** [_____]

**Interest Payment Dates:** [___, ___, ___, commencing on____, 200_] [_____]

**Interest Reset Dates:** [_____]

**[Valuation Date]:** [_____]

**Day Count Convention/** Actual/360; Modified Following, Adjusted

**Business Day Convention:**

**[Redemption Provisions:]**

    **[Call Dates and Price:** [On____, 20__ [and each Interest Payment Date thereafter] at [100]%]]
[_____]

**Denominations:** $

**[Other Provisions:]**

**Underwriters:** Lehman Brothers (__%) (bookrunner)

[Others]        (__%)

**The issuer has filed a registration statement (including a prospectus) with the U.S. Securities and Exchange Commission (SEC) for this offering. Before you invest, you should read the prospectus for this offering in that registration statement, and other documents the issuer has filed with the SEC for more complete information about the issuer and this offering. You may get these documents for free by searching the SEC online database (EDGAR®) at *www.sec.gov*. Alternatively, you may obtain a copy of the prospectus from Lehman Brothers Inc. by calling 1-888-603-5847.**

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083387

EXHIBIT C

LEHMAN BROTHERS HOLDINGS INC.

Medium-Term Notes, Series I

AGENT ACCESSION LETTER


[Name of Agent
Address of Agent]

Ladies and Gentlemen:

Lehman Brothers Holdings Inc., a Delaware corporation (the "Company"), has previously entered into a Distribution Agreement dated May 30, 2006 (the "Distribution Agreement"), between the Company and Lehman Brothers Inc. (the "Existing Agent"), with respect to the issue and sale by the Company of its Medium Term Notes, Series I pursuant to an Indenture dated as of September 1, 1987, as amended between the Company and Citibank, N.A., as Trustee. The Distribution Agreement permits the Company to appoint one or more additional persons to act as agent with respect to the Securities, on terms substantially the same as those contained in the Distribution Agreement.  A copy of the Distribution Agreement, including the Procedures with respect to the issuance of the Securities attached thereto as Exhibit B, is attached hereto.

In accordance with Section 11(b) of the Distribution Agreement we hereby confirm that, with effect from the date hereof, solely in respect of the issue of _____ Notes due _____ (the "Issue"), you shall become a party to, and an Agent under, the Distribution Agreement, vested with all the authority, rights and powers, and subject to all duties and obligations of an Agent in relation to the Issue as if originally named as such under the Distribution Agreement. The undersigned agrees that it is acting as agent (not as principal) in connection with the Issue.

Such appointment is limited to the Issue and is not for any other issue of Securities of the Company pursuant to the Distribution Agreement, and such appointment will terminate upon issue of the Securities comprising the Issue but without prejudice to any rights, duties or obligations which have arisen prior to such termination.

Except as otherwise expressly provided herein, all terms used herein which are defined in the Distribution Agreement shall have the same meanings as in the Distribution Agreement, except that (i) the terms "Agent," "Agents" and "Additional Agents" as used in the Distribution Agreement, shall be deemed to refer, where applicable and for purposes of this Agreement, only to you, (ii) your obligation to act as Agent hereunder shall subject to you having received copies of the most recent documents (including any prior documents referred to therein) previously delivered to the Existing Agent pursuant to Sections 5 and 6 of the Distribution Agreement, and (iii) any reference to the Registration Statement or the Prospectus shall be deemed to refer to such documents as amended or supplemented as of the date of this Agreement and as of the Settlement Date, including any supplement relating to the Securities and/or containing the name of the Agent and/or Additional Agents. By your signature below, you

D-1

053137-0169-10049-NY03.2491841.14

2

confirm that such documents are to your satisfaction. For purposes of Section 11 of the Distribution Agreement, you confirm that your notice details are as set forth immediately beneath your signature.

Each of the parties to this letter agrees to perform its respective duties and obligations specifically provided to be performed by each of the parties to in accordance with the terms and provisions of the Distribution Agreement and the Procedures, as amended or supplemented hereby.

[Notwithstanding anything in the Distribution Agreement to the contrary, the obligations of the Agent and Additional Agents under Section 7 of the Distribution Agreement are several and not joint, and in no case shall any Agent or Additional Agent (except as may be provided in any agreement among them) be responsible under Section 7(d) to contribute any amount by which the total price at which the Securities purchased by it exceeds the amount of any damages which the Purchaser has otherwise paid or become liable to pay from the offering of the Securities.]

This Agreement shall be governed by the laws of the State of New York. This Agreement may be executed in one or more counterparts and the executed counterparts taken together shall constitute one and the same agreement.

D-2

CONFIDENTIAL

UBSFS_SDNY1083389

3

       If the foregoing correctly sets forth the agreement among the parties hereto, please indicate your acceptance hereof in the space provided for that purpose below.

Very truly yours,

LEHMAN BROTHERS HOLDINGS INC.


By: _____
     Name:
     Title:


CONFIRMED AND ACCEPTED, as of
the date first above written

[Insert name of Additional Agent and information
pursuant to Section 12 of the Distribution Agreement]

By: _____
     Name:
     Title:

Notice information pursuant to Section 12 of the Distribution Agreement:

Name:
Address:
Contact Person:
Telephone:
Facsimile:

D-3

053137-0169-10049-NY03.2491841.14

CONFIDENTIAL

UBSFS_SDNY1083390

# EXHIBIT C

08-13555-mg    Doc 42124-2    Filed 01/22/14    Entered 01/22/14 12:09:42    Exhibits A
through E to Crowley Declaration    Pg 82 of 156
Case 5:09-md-02014-JW-GWG    Document 127    Filed 03/08/13    Page 4 of 23

# EXHIBIT A
## LIST OF STRUCTURED PRODUCTS

| Product Code | Issue Date | CUSIP | Description | Issue Price Per Note | Estimated Value Per Note as of 10/31/08[1] |
|---|---|---|---|---|---|
| 01 | March 30, 2007 | 52520W564 524908VP2 | 100% Principal Protection Notes Linked to a Global Index Basket | $10.00 | $1.33 |
| 02 | March 30, 2007 | 52520W556 524908VQ0 | Performance Securities with Partial Protection Linked to a Global Index Basket | $10.00 | $1.33 |
| 03 | April 30, 2007 | 52517PY21 | 100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates | $1,000.00 | $133.38 |
| 04 | April 30, 2007 | 52517PX63 | 100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates | $1,000.00 | $133.38 |
| 05 | April 30, 2007 | 52520W549 | 100% Principal Protection Notes Linked to a Currency Basket | $10.00 | $1.33 |
| 06 | April 30, 2007 | 52520W515 | Performance Securities with Partial Protection Linked to a Global Index Basket | $10.00 | $1.33 |
| 07 | May 31, 2007 | 52517PY62 | 100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates | $1,000.00 | $133.38 |
| 08 | May 31, 2007 | 52517PY70 | 100% Principal Protection Callable Daily Range Accrual Notes with Interest Linked to the 10-Year Constant Maturity U.S. Treasury Rate | $1,000.00 | $133.38 |

[1] Because reliable pricing data was not available for any of the Structured Products after Lehman's bankruptcy on September 15, 2008, the average closing prices for five other Lehman senior unsecured notes (CUSIP Nos. 52517P4C2, 52517P5X5, 52517P5Y3, 5252M0BZ9 and 5252M0FD4), for which reliable pricing data was available, was used to estimate value per note of the Structured Products as of October 31, 2008. October 31, 2008 is the date on which the first lawsuit asserting claims on behalf of investors in the Structured Products was filed.

**EXHIBIT A**
**LIST OF STRUCTURED PRODUCTS**

| Product Code | Issue Date | CUSIP | Description | Issue Price Per Note | Estimated Value Per Note as of 10/31/08[1] |
|---|---|---|---|---|---|
| 09 | May 31, 2007 | 52520W440 | 100% Principal Protection Notes Linked to a Currency Basket | $10.00 | $1.33 |
| 10 | June 22, 2007 | 52522L202 | 100% Principal Protection Notes Linked to a Global Index Basket | $10.00 | $1.33 |
| 11 | June 29, 2007 | 52517P2P5 | 100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates | $1,000.00 | $133.38 |
| 12 | June 29, 2007 | 52520W390 | 100% Principal Protection Notes Linked to an Asian Currency Basket | $10.00 | $1.33 |
| 13 | July 31, 2007 | 52517P3H2 | 100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates | $1,000.00 | $133.38 |
| 14 | July 31, 2007 | 52520W358 | Performance Securities with Partial Protection Linked to a Global Index Basket | $10.00 | $1.33 |
| 15 | August 31, 2007 | 52522L129 | Performance Securities with Contingent Protection Linked to the S&P 500 Index | $10.00 | $1.33 |
| 16 | August 31, 2007 | 52522L137 | Performance Securities with Contingent Protection Linked to the Dow Jones EURO STOXX 50 Index | $10.00 | $1.33 |
| 17 | August 31, 2007 | 52522L145 | Performance Securities with Contingent Protection Linked to the Nikkei 225 Index | $10.00 | $1.33 |
| 18 | August 31, 2007 | 52522L186 | 100% Principal Protection Notes Linked to an International Index Basket | $10.00 | $1.33 |
| 19 | August 31, 2007 | 52522L889 | 100% Principal Protection Notes Linked to a Global Index Basket | $10.00 | $1.33 |

08-13555-mg   Doc 42124-2   Filed 01/22/14   Entered 01/22/14 12:09:42   Exhibits A
through E to Crowley Declaration    Pg 84 of 156
Case 5:09-md-02017-LAK-GWG   Document 127   Filed 03/03/14   Page 45 of 123

# EXHIBIT A
## LIST OF STRUCTURED PRODUCTS

| Product Code | Issue Date | CUSIP | Description | Issue Price Per Note | Estimated Value Per Note as of 10/31/08[1] |
|---|---|---|---|---|---|
| 20 | September 18, 2007 | 52522L251 | Autocallable Optimization Securities with Contingent Protection Linked to the S&P 500 Financials Index | $10.00 | $1.33 |
| 21 | September 28, 2007 | 52522L236 | Return Optimization Securities Linked to an International Index Basket | $10.00 | $1.33 |
| 22 | September 28, 2007 | 52522L244 | Performance Securities with Partial Protection Linked to a Global Index Basket | $10.00 | $1.33 |
| 23 | September 28, 2007 | 52517P5K3 | 100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates | $1,000.00 | $133.38 |
| 24 | October 31, 2007 | 52520W341 | Medium-Term Notes, Series I, 100% Principal Protection Notes Linked to an Asian Currency Basket | $10.00 | $1.33 |
| 25 | October 31, 2007 | 52522L400 | 100% Principal Protection Barrier Notes Linked to FTSE/Xinhua China 25 Index | $10.00 | $1.33 |
| 26 | October 31, 2007 | 52522L293 | 100% Principal Protection Absolute Return Barrier Notes Linked to the S&P 500 Index | $10.00 | $1.33 |
| 27 | October 31, 2007 | 52522L301 | Return Optimization Securities Linked to an Index | $10.00 | $1.33 |
| 28 | October 31, 2007 | 52522L319 | Return Optimization Securities Linked to an Index | $10.00 | $1.33 |
| 29 | October 31, 2007 | 52522L327 | Return Optimization Securities Linked to an Index | $10.00 | $1.33 |
| 30 | October 31, 2007 | 52522L335 | Return Optimization Securities Linked to an Index | $10.00 | $1.33 |

3

# EXHIBIT A
## LIST OF STRUCTURED PRODUCTS

| Product Code | Issue Date | CUSIP | Description | Issue Price Per Note | Estimated Value Per Note as of 10/31/08[1] |
|---|---|---|---|---|---|
| 31 | October 31, 2007 | 52522L384 | Return Optimization Securities with Partial Protection Linked to the S&P 500 Financials Index | $10.00 | $1.33 |
| 32 | November 7, 2007 | 52522L418 | Return Optimization Securities with Partial Protection Linked to the S&P 500 Index | $10.00 | $1.33 |
| 33 | November 14, 2007 | 52522L426 | Performance Securities with Partial Protection Linked to an International Index Basket | $10.00 | $1.33 |
| 34 | November 26, 2007 | 52522L475 | Performance Securities with Partial Protection Linked to a Global Index Basket | $10.00 | $1.33 |
| 35 | November 30, 2007 | 52520W333 | 100% Principal Protection Notes Linked to an Asian Currency Basket | $10.00 | $1.33 |
| 36 | November 30, 2007 | 52522L376 | 100% Principal Protection Absolute Return Barrier Notes Linked to the MSCI EAFE Index | $10.00 | $1.33 |
| 37 | November 30, 2007 | 52522L392 | Return Optimization Securities Linked to an International Index Basket | $10.00 | $1.33 |
| 38 | November 30, 2007 | 52522L459 | Return Optimization Securities with Partial Protection Linked to the S&P 500 Index | $10.00 | $1.33 |
| 39 | December 31, 2007 | 52522L483 | Return Optimization Securities Linked to an International Index Basket | $10.00 | $1.33 |
| 40 | December 31, 2007 | 52522L491 | Return Optimization Securities with Partial Protection Linked to the S&P 500 Index | $10.00 | $1.33 |
| 41 | December 31, 2007 | 52522L533 | Performance Securities with Partial Protection Linked to a Global Basket Consisting of Indices and an Index Fund | $10.00 | $1.33 |

4

# EXHIBIT A
## LIST OF STRUCTURED PRODUCTS

| Product Code | Issue Date | CUSIP | Description | Issue Price Per Note | Estimated Value Per Note as of 10/31/08[1] |
|---|---|---|---|---|---|
| 42 | January 31, 2008 | 52517P4N8 | 100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates | $1,000.00 | $133.38 |
| 43 | January 31, 2008 | 52520W325 | 100% Principal Protection Notes Linked to an Asian Currency Basket | $10.00 | $1.33 |
| 44 | January 31, 2008 | 52522L525 | 100% Principal Protection Absolute Return Barrier Notes Linked to the S&P 500 Index | $10.00 | $1.33 |
| 45 | February 8, 2008 | 52522L657 | Autocallable Optimization Securities with Contingent Protection Linked to the S&P 500 Financials Index | $10.00 | $1.33 |
| 46 | February 13, 2008 | 52522L673 | Return Optimization Securities with Partial Protection | $10.00 | $1.33 |
| 47 | February 13, 2008 | 52522L699 | Return Optimization Securities with Partial Protection | $10.00 | $1.33 |
| 48 | February 13, 2008 | 52522L707 | Return Optimization Securities with Partial Protection | $10.00 | $1.33 |
| 49 | February 13, 2008 | 52522L715 | Return Optimization Securities with Partial Protection | $10.00 | $1.33 |
| 50 | February 13, 2008 | 52522L723 | Return Optimization Securities with Partial Protection | $10.00 | $1.33 |
| 51 | February 29, 2008 | 5252M0CZ8 | 100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates | $1,000.00 | $133.38 |
| 52 | February 29, 2008 | 52522L632 | Performance Securities Linked to an Asian Currency Basket | $10.00 | $1.33 |

08-13555-mg   Doc 42124-2   Filed 01/22/14   Entered 01/22/14 12:09:42   Exhibits A
through E to Crowley Declaration    Pg 87 of 156
Case 1:09-md-02017-LAK-GWG   Document 127   Filed 08/08/13   Page 52 of 123

**EXHIBIT A**
**LIST OF STRUCTURED PRODUCTS**

| Product Code | Issue Date | CUSIP | Description | Issue Price Per Note | Estimated Value Per Note as of 10/31/08[1] |
|---|---|---|---|---|---|
| 53 | February 29, 2008 | 52522L574 | Return Optimization Securities with Partial Protection Notes Linked to the S&P 500 Index | $10.00 | $1.33 |
| 54 | February 29, 2008 | 52522L582 | Return Optimization Securities with Partial Protection | $10.00 | $1.33 |
| 55 | February 29, 2008 | 52522L566 | 100% Principal Protection Absolute Return Barrier Notes Linked to the Russell 2000 Index | $10.00 | $1.33 |
| 56 | February 29, 2008 | 52522L772 | Securities Linked to the Relative Performance of the Consumer Staples Select Sector SPDR Fund vs. the Consumer Discretionary Select Sector SPDR Fund | $10.00 | $1.33 |
| 57 | February 29, 2008 | 52523J412 | 100% Principal Protection Notes Linked to an Asian Currency Basket | $10.00 | $1.33 |
| 58 | March 7, 2008 | 52523J420 | 100% Principal Protection Notes Linked to an Asian Currency Basket | $10.00 | $1.33 |
| 59 | March 19, 2008 | 52523J115 | 100% Principal Protection Absolute Return Barrier Notes Linked to the SPDR S&P Homebuilders ETF | $10.00 | $1.33 |
| 60 | March 25, 2008 | 52523J149 | Bearish Autocallable Optimization Securities with Contingent Protection Linked to the Energy Select Sector SPDR Fund | $10.00 | $1.33 |
| 61 | March 28, 2008 | 52523J131 | Performance Securities with Partial Protection Linked to a Global Index Basket | $10.00 | $1.33 |
| 62 | March 31, 2008 | 5252M0EK9 | 100% Principal Protection Callable Spread Daily Accrual Notes with Interest Linked to the Spread between the 30-year and the 2-year Swap Rates | $1,000.00 | $133.38 |

6

08-13555-smg Doc 42124-2 Filed 01/22/14 Entered 01/22/14 12:09:42 Exhibits A
through E to Crowley Declaration    Pg 88 of 156
Case 1:09-md-02017-LAK-GWG Document 1277 Filed 06/08/12 Page 53 of 123

# EXHIBIT A
# LIST OF STRUCTURED PRODUCTS

| Product Code | Issue Date | CUSIP | Description | Issue Price Per Note | Estimated Value Per Note as of 10/31/08[1] |
|---|---|---|---|---|---|
| 63 | March 31, 2008 | 52523J438 | 100% Principal Protection Notes Linked to an Asian Currency Basket | $10.00 | $1.33 |
| 64 | March 31, 2008 | 52522L806 | Return Optimization Securities with Partial Protection Notes Linked to the S&P 500 Index | $10.00 | $1.33 |
| 65 | March 31, 2008 | 52522L814 | Return Optimization Securities with Partial Protection Notes Linked to the MSCI EM Index | $10.00 | $1.33 |
| 66 | March 31, 2008 | 52522L871 | Bearish Autocallable Optimization Securities with Contingent Protection Linked to the Energy Select Sector SPDR Fund | $10.00 | $1.33 |
| 67 | March 31, 2008 | 5252M0EV5 | 100% Principal Protection Accrual Notes with Interest Linked to the Year-Over-Year Change in the Consumer Price Index | $1,000.00 | $133.38 |
| 68 | March 31, 2008 | 52522L798 | 100% Principal Protection Absolute Return Barrier Notes Linked to the Russell 2000 Index | $10.00 | $1.33 |
| 69 | April 4, 2008 | 52522L848 | Return Optimization Securities Linked to a Basket of Global Indices | $10.00 | $1.33 |
| 70 | April 4, 2008 | 52522L830 | 100% Principal Protection Absolute Return Barrier Notes Linked to a Basket of Global Indices | $10.00 | $1.33 |
| 71 | April 23, 2008 | 52523J172 | Return Optimization Securities with Partial Protection Linked to a Basket of Global Indices | $10.00 | $1.33 |
| 72 | April 30, 2008 | 52523J156 | 100% Principal Protection Absolute Return Barrier Notes Linked to the Russell 2000 Index | $10.00 | $1.33 |
| 73 | May 12, 2008 | 52523J503 | Return Optimization Securities with Partial Protection | $10.00 | $1.33 |

08-13555-mg    Doc 42124-2    Filed 01/22/14    Entered 01/22/14 12:09:42    Exhibits A
through E to Crowley Declaration    Pg 89 of 156
Case 5:09-md-02014-LAK-GWG    Document 127    Filed 03/08/13    Page 54 of 123

# EXHIBIT A
## LIST OF STRUCTURED PRODUCTS

| Product Code | Issue Date | CUSIP | Description | Issue Price Per Note | Estimated Value Per Note as of 10/31/08[1] |
|---|---|---|---|---|---|
| 74 | May 15, 2008 | 52523J206 | Return Optimization Securities with Partial Protection Linked to the S&P 500 Financials Index | $10.00 | $1.33 |
| 75 | May 16, 2008 | 52523J222 | Return Optimization Securities with Partial Protection Linked to a Portfolio of Common Stocks | $10.00 | $1.33 |
| 76 | May 21, 2008 | 52523J214 | Performance Securities with Partial Protection Linked to a Global Index Basket | $10.00 | $1.33 |
| 77 | May 30, 2008 | 52523J230 | Return Optimization Securities with Partial Protection Linked to the S&P 500 Financials Index | $10.00 | $1.33 |
| 78 | June 16, 2008 | 52520W283 | 100% Principal Protection Absolute Return Notes Linked to the Euro/U.S. Dollar Exchange Rate | $10.00 | $1.33 |
| 79 | June 20, 2008 | 5252M0FU6 | 100% Principal Protection Notes with Interest Linked to the Year-Over-Year Change in the Consumer Price Index | $1,000.00 | $133.38 |
| 80 | June 30, 2008 | 5252M0CD7 | 100% Principal Protection Notes with Interest Linked to the Year-Over-Year Change in the Consumer Price Index | $1,000.00 | $133.38 |
| 81 | June 30, 2008 | 52523J263 | Return Optimization Securities with Partial Protection Linked to the PowerShares WilderHill Clean Energy Portfolio | $10.00 | $1.33 |
| 82 | June 30, 2008 | 524935129 | Return Optimization Securities with Partial Protection | $10.00 | $1.33 |

8

08-13555-mg    Doc 42124-2    Filed 01/22/14    Entered 01/22/14 12:09:42    Exhibits A
Case 1:09-md-02017-LAK-GWG  Document 1277  Filed 08/08/13  Page 53 of 123
through E to Crowley Declaration    Pg 90 of 156

**EXHIBIT A**
**LIST OF STRUCTURED PRODUCTS**

| Product Code | Issue Date | CUSIP | Description | Issue Price Per Note | Estimated Value Per Note as of 10/31/08[1] |
|---|---|---|---|---|---|
| 83 | June 30, 2008 | 52523J248 | 100% Principal Protection Absolute Return Barrier Notes | $10.00 | $1.33 |
| 84 | June 30, 2008 | 52523J255 | 100% Principal Protection Absolute Return Barrier Notes | $10.00 | $1.33 |

9

# EXHIBIT D

08-13555-mg    Doc 42124-2    Filed 01/22/14    Entered 01/22/14 12:09:42    Exhibits A through E to Crowley Declaration    Pg 92 of 156

ARBITRATIONS

| | Lexida ID | Forum | Service | Answer |
|---|---|---|---|---|
| 1 | 43341435-2011-46 | FINRA  Arb # 11-03370 | 9/13/2011 | 10/31/2011 |
| 2 | 43341435-2012-20 | FINRA Arb # 12-00487 | 2/21/2012 | 4/9/2012 |
| 3 | 43341435-2012-19 | FINRA Arb # 12-00443 | 2/21/2012 | 4/5/2012 |
| 4 | 43341435-2012-26 | FINRA Arb # 12-00865 | 3/15/2012 | 5/1/2012 |
| 5 | 43341435-2012-25 | FINRA Arb # 12-00813 | 3/15/2012 | 5/2/2012 |
| 6 | 43341435-2012-24 | FINRA Arb $ 12-00756 | 3/13/2012 | 4/30/2012 |
| 7 | 43341435-2012-29 | FINRA Arb # 12-00958 | 3/27/2012 | 5/14/2012 |
| 8 | 43341435-2012-32 | FINRA Arb # 12-01279 | | |
| 9 | 43341435-2012-33 | FINRA Arb # 12-1361 | 4/26/2012 | 6/11/2012 |
| 10 | 43341435-2012-34 | FINRA Arb # 12-01538 | 5/14/2012 | 6/27/2012 |
| 11 | 43341435-2012-38 | FINRA Arb # 12-01430 | 5/17/2012 | 7/3/2012 |
| 12 | 43341435-2012-41 | FINRA Arb # 12-01626 | 5/29/2012 | 7/12/2012 |
| 13 | 43341435-2012-44 | FINRA Arb #12-01917 | 6/1/2012 | 7/1/2012 |
| 14 | 43341435-2012-45 | FINRA Arb # 12-02072 | 6/12/2012 | 7/30/2012 |
| 15 | 43341435-2012-47 | FINRA Arb # 12-02238 | 8/10/2012 | 6/26/2012 |
| 16 | 43341435-2012-50 | FINRA Arb # 12-02337 | 7/3/2012 | 8/20/2012 |
| 17 | 43341435-2012-51 | FINRA Arb # 12-02425 | 7/9/2012 | 8/24/2012 |
| 18 | 43341435-2012-53 | FINRA Arb # 12-02436 | 7/9/2012 | 8/27/2012 |
| 19 | 43176861-2012-41 | FINRA Arb # 12-02522 | 7/19/2012 | 9/4/2012 |
| 20 | 43341435-2012-54 | FINRA Arb # 12-02018 | 7/20/2012 | 9/4/2012 |
| 21 | 43341435-2012-55 | FINRA Arb # 12-02543 | 7/23/2012 | 9/6/2012 |
| 22 | 43341435-2012-59 | FINRA Arb # 12-02401 | 8/13/2012 | 10/1/2012 |
| 23 | 43341435-2012-60 | FINRA Arb # 12-02869 | 8/20/2012 | 10/2/2012 |
| 24 | 43341435-2012-61 | FINRA Arb # 12-02787 | 8/24/2012 | 10/9/2012 |
| 25 | 43341435-2012-62 | FINRA Arb # 12-03076 | 9/4/2012 | 10/19/2012 |
| 26 | 43341435-2012-64 | FINRA Arb # 12-02945 | 9/21/2012 | 11/8/2012 |
| 27 | 43341435-2012-66 | FINRA Arb # 12-03311 | 9/27/2012 | 11/13/2012 |
| 28 | 43341435-2012-67 | Finra Arb # 12-03405 | 10/1/2012 | 11/16/2012 |
| 29 | 43341435-2012-68 | FINRA Arb # 12-03352 | 10/3/2012 | 11/19/2012 |
| 30 | 43341435-2012-70 | FINRA Arb # 12-03588 | 10/22/2012 | 12/6/2012 |
| 31 | 43341435-2012-72 | FINRA Arb # 12-03575 | 10/25/2012 | 12/12/2012 |
| 32 | 43341435-2013-1 | FINRA Arb # 12-04221 | 1/3/2013 | 2/12/2013 |
| 33 | 43341435-2013-2 | FINRA Arb # 12-04128 | 12/26/2012 | 2/6/2013 |
| 34 | 43341435-2013-3 | FINRA Arb # 12-04310 | 1/7/2013 | 2/22/2013 |
| 35 | 43341435-2013-4 | FINRA Arb # 13-00249 | 2/4/2013 | 3/25/2013 |
| 36 | 43115415-2013-7 | FINRA Arb # 13-00485 | 2/25/2013 | 4/12/2013 |
| 37 | 43341435-2013-8 | FINRA Arb # 13-00380 | 2/28/2013 | 4/6/2013 |
| 38 | 43341435-2013-9 | FINRA Arb # 13-00621 | 3/11/2013 | 4/26/2013 |
| 39 | 43341435-2013-10 | FINRA Arb # 13-00622 | 3/11/2013 | 4/25/2013 |
| 40 | 43341435-2013-11 | FINRA Arb # 13-00647 | 3/11/2013 | 4/25/2013 |
| 41 | 43341435-2013-12 | FINRA Arb # 13-00558 | 3/7/2013 | 4/22/2013 |
| 42 | 43341435-2013-13 | FINRA Arb # 13-00656 | 3/18/2013 | 5/1/2013 |
| 43 | 43341435-2013-14 | FINRA Arb #13-00659 | 3/18/2013 | 5/2/2013 |
| 44 | 43341435-2013-15 | FINRA Arb # 13-00725 | 3/20/2013 | 5/7/2013 |
| 45 | 43341435-2013-16 | FINRA Arb # 13-00706 | 3/21/2013 | 5/7/2013 |
| 46 | 43341435-2013-17 | FINRA Arb # 13-00755 | 3/27/2013 | 5/10/2013 |
| 47 | 43341435-2013-20 | FINRA Arb # 13-00713 | 4/9/2013 | 6/5/2013 |
| 48 | 43341435-2013-24 | FINRA Arb # 01194 | 5/6/2013 | 6/20/2013 |
| 49 | 43341435-2013-25 | FINRA Arb # 13-01227 | 5/13/2013 | 6/27/2013 |
| 50 | 43341435-2013-26 | FINRA Arb # 13-00789 | 5/13/2013 | 6/26/2013 |
| 51 | 43341435-2013-28 | FINRA Arb # 13-01537 | 6/6/2013 | 7/19/2013 |
| 52 | 43341435-2013-29 | FINRA Arb # 13-01210 | 6/7/2013 | 7/23/2012 |
| 53 | 43341435-2013-33 | FINRA Arb # 13-01773 | 6/24/2013 | 8/8/2013 |
| 54 | 43341435-2013-36 | FINRA Arb # 13-01772 | 6/28/2013 | 8/13/2013 |
| 55 | 43341435-2013-42 | FINRA Arb # 13-02167 | | |
| 56 | 43341435-2013-45 | FINRA ARB # 13-01817 | 8/20/2013 | 10/1/2013 |

**ARBITRATIONS**

| | Lexida ID | Forum | Service | Answer |
|---|---|---|---|---|
| | | | | |
| | **CLOSED  CASES** | | | |
| | | | | |
| 1 | 43124983-2009-94 **- CLOSED -** | FINRA Arb # 09-03767 | 7/6/2009 | 8/18/2009 |
| 2 | 43129483-2009-63 **- CLOSED -** | FINRA Arb #09-02530 | 5/11/2009 | 6/29/2009 |
| 3 | 43129483-2009-58 - CLOSED - | FINRa Abr # 09-02320 | 5/4/2009 | 6/19/2009 |
| 4 | 4312948-2008-71 **- CLOSED** | FINRA - ARB #08-04179 | 1/5/2009 | |
| 5 | 43129483-2009-117 **- CLOSED -** | FINRA Arb # 09-04461 | 8/10/2009 | 9/22/2009 |
| 6 | 43129483-2009-35 **- CLOSED -** | FINRA Arb # 09-01382 | 3/23/2009 | 5/7/2009 |
| 7 | 43177906-2009-1 **- CLOSED -** | FINRA Arb # 08-05022 | 1/6/2009 | 1/29/2009 |
| 8 | 43129483-2009-11  **- CLOSED** | FINRA Arb # 09-00237 | 1/12/2009 | 3/9/2009 |
| 9 | 43177906-2009-8 **- CLOSED** | FINRA Arb # 09-00025 | 1/27/2009 | 3/16/2009 |
| 10 | 43132588-2009-14     **- CLOSED -** | FINRA Arb # 09-00690 | 2/17/2009 | 4/6/2009 |
| | | | | |
| 11 | 43160301-2008-39 **- CLOSED** | FINRA Arb #08-04356 | 11/25/2008 | 1/12/2008 |
| 12 | 43177906-2009-35 **- CLOSED -** | FINRA Arb # 09-02377 | 5/4/2009 | 6/19/2009 |
| 13 | 4312948-2008-70 - CLOSED - | FINRA    ARB #08-04152 | 1/2/2009 | |
| 14 | 43206540-2009-6 **- CLOSED -** | FINRA Arb # 09-00147 | 1/21/2009 | 3/6/2009 |
| 15 | 43129483-2009-25 **- CLOSED -** | FINRa Arb #09-00582 | 2/13/2009 | 3/31/2009 |
| 16 | 43176861-2009-25 **- CLOSED -** | FINRA Arb # 09-02027 | 4/20/2009 | 6/8/2009 |
| 17 | 43132588-2009-82  **- CLOSED** | FINRA Arb #  09-04729 | 9/3/2009 | 10/19/2009 |
| 18 | 43176861-2009-9 **- CLOSED -** | FINRA Arb #09-00717 | 2/17/2009 | 4/3/2009 |
| 19 | 43132588-2008-66 **- CLOSED** | FINRA Arb # 08-04662 | 12/16/2008 | 1/30/2009 |
| 20 | 43206540-2008-16  **- CLOSED -** | FINRA Arb # 08-04630 | 12/17/2008 | 1/30/2008 |
| 21 | 43132588-2009-31 **- CLOSED -** | FINRA Arb # 09-01173 | 4/3/2009 | 5/19/2009 |
| 22 | 43176861-2009-1 **- CLOSED  -** | FINRA Arb # 08-05021 | 1/6/2009 | 2/19/2009 |
| 23 | 43160301-2009-22 **- CLOSED -** | FINRA Arb # 09-02335 | 5/4/2009 | 6/19/2009 |
| 24 | 43206540-2008-5 **- CLOSED -** | FINRA Arb # 08-04927 | 1/7/2009 | feb.-09 |
| 25 | 43129483-2009-6 **- CLOSED -** | FINRA Arb # 08-04935 | 1/7/2009 | 2/19/2009 |
| 26 | 43129483-2009-19 **- CLOSED** | FINRA Arb # 09-00429 | 2/3/2009 | 3/23/2009 |
| 27 | 43167837-2009-11  **- CLOSED -** | FINRA Arb #09-00679 | 2/17/2009 | 4/6/2009 |
| 28 | 43157660-2009-21 **- CLOSED -** | FINRA Arb $09-02956 | 6/1/2009 | 7/17/2009 |
| 29 | 43132588-2009-21 **- CLOSED -** | FINRA Arb # 09-01014 | 3/9/2009 | 4/23/2009 |
| 30 | 43129483-2009-37 **- CLOSED -** | FINRA Arb #09-01456 | 3/26/2009 | 5/11/2009 |
| 31 | 43129483-2009-82 **- CLOSED -** | FINRA Arb # 09-03316 | 6/15/2009 | 7/29/2009 |
| 32 | 43160301-2008-31 **- CLOSED -** | AAA Arb #50-181-T-00391-08 | UBS filed 9/25/08 | |
| | | | | |
| 33 | 43129483-2008-79 **- CLOSED -** | FINRA Arb # 08-04695 | 12/22/2008 | 2/4/2009 |
| 34 | 43141447-2009-2 **- CLOSED -** | FINRA Arb  #09-00223 | 1/21/2009 | 3/9/2009 |
| 35 | 43206540-2009-3  -  **CLOSED -** | FINRA Arb #08-05003 | 1/6/2008 | 2/19/2009 |
| 36 | 43129483-2009-42 **- CLOSED -** | FINRA Arb # 09-01594 | 4/2/2009 | 5/18/2009 |
| 37 | 43167837-2009-13   **- CLOSED -** | FINRA Arb # 09-00851 | 2/23/2009 | 4/13/2009 |
| 38 | 43132588-2009-88 **- CLOSED -** | FINRA Arb. #09-04906 | 9/10/2009 | 10/23/2009 |
| 39 | 43176861-2009-15 **- CLOSED -** | FINRA Arb # 09-00897 | 3/17/2009 | 4/29/2009 |
| 40 | 43167837-2009-33 **- CLOSED -** | FINRA Arb # 09-02840 | 6/26/2009 | 8/12/2009 |
| 41 | 43167837-2009-29 **- CLOSED -** | FINRA Arb # 09-02628 | 5/18/2009 | 7/2/2009 |
| 42 | 43129483-2009-77 **- CLOSED -** | FINRA Arb # 09-03034 | 6/8/2009 | 7/22/2009 |
| 43 | 43176861-2008-28 **- CLOSED -** | FINRA -  Arb #08-03994 | 11/4/2008 | 12/22/2008 |
| 44 | 43115415-2009-10 **- CLOSED -** | Finra Arb # 09-00390 | 1/30/2009 | 3/18/2009 |
| 45 | 43115415-2009-19 **- CLOSED -** | FINRA- Arb #08-04212 | 1/5/2009 | |
| 46 | 43115415-2008-22 **- CLOSED -** | FINRA Arb #08-04757 | 12/22/2009 | 2/5/2009 |
| 47 | 43206540-2008-14 **- CLOSED -** | FINRA Arb # 08-04463 | 12/8/2008 | 1/21/2009 |
| 48 | 43129483-2009-30 **- CLOSED -** | FINRA Arb # 09-01524 | 3/30/2009 | 5/13/2009 |

ARBITRATIONS

| | Lexida ID | Forum | Service | Answer |
|---|---|---|---|---|
| 49 | 43206540-2009-4 **- CLOSED -** | FINRA Arb # 08-04986 | 1/7/2009 | 2/23/2009 |
| 50 | 43141447-2009-7 **- CLOSED -** | FINRA Arb # 09-02876 | 6/1/2009 | 7/17/2009 |
| 51 | 43132588-2009-22 **- CLOSED -** | FINRA Arb # 09-01034 | 3/9/2009 | 4/23/2009 |
| 52 | 43176861-2009-26 **- CLOSED -** | FINRA Arb # 09-01776 | 4/24/2009 | 6/10/2009 |
| 53 | 43160301-2009-26 **- CLOSED -** | FINRA Arb # 09-03495 | 6/19/2006 | 8/5/2009 |
| 54 | 43129483-2009-113 **- CLOSED -** | FINRA Arb #09-04416 | 8/3/2009 | 9/18/2009 |
| 55 | 43132588-2009-17 **- CLOSED -** | FINRA Arb # 09-00971 | 3/2/2009 | 4/20/2009 |
| 56 | 43132588-2009-18 **- CLOSED -** | FINRA Arb # 09-00409 | 3/5/2009 | 4/22/2009 |
| 57 | 43129483-2009-196 **- CLOSED -** | FINRA Arb # 09-05660 | 12/18/2010 | 2/3/2010 |
| 58 | 43132588-2009-11 **- CLOSED -** | FINRA Arb #09-00490 | 2/9/2009 | 3/25/2009 |
| 59 | 43176861-2009-12 **- CLOSED -** | FINRA Arb. # 09-00641 | 2/23/2009 | 4/9/2009 |
| 60 | 43132588-2009-48 **- CLOSED -** | FINRA Arb # 09-01614 | 5/11/2009 | 6/25/2009 |
| 61 | 43129483-2009-3 **- CLOSED -** | FINRA Arb # 08-04809 | 1/6/2009 | 2/9/2009 |
| 62 | 43129483-2009-50 **- CLOSED -** | FINRA Arb # 09-01966 | 4/17/2009 | 6/4/2009 |
| 63 | 43129483-2009-53 **- CLOSED -** | FINRa Arb 09-02167 | 4/27/2009 | 6/12/2009 |
| 64 | 43141447-2009-8 **- CLOSED -** | FINRA Arb # 09-02775 | 6/22/2009 | 8/10/2009 |
| 65 | 43176861-2009-4 **- CLOSED -** | FINRA Arb # 08-04964 | 1/7/2009 | 2/18/2009 |
| 66 | 43176861-2009-17 **- CLOSED -** | FINRA Arb #09-01453 | 3/26/2009 | 5/12/2009 |
| 67 | 43132588-2009-26 **- CLOSED -** | FINRA Arb # 09-01267 | 3/17/2009 | 5/1/2009 |
| 68 | 43132588-2009-49 **- CLOSED -** | FINRA Arb # 09-02488 | 5/12/2009 | 6/26/2009 |
| 69 | 43160301-200915 **- CLOSED -** | FINRA Arb # 09-01571 | 3/30/2009 | 5/14/2009 |
| 70 | 43176861-2009-35 | FINRA Arb # 09-03018 | 6/8/2009 | 7/22/2009 |
| 71 | 43129483-2009-84 **- CLOSED -** | FINRA Arb # 09-03531 | 6/19/2009 | 8/5/2009 |
| 72 | 43129483-2009-66 **- CLOSED -** | FINRA #09-02252 | 5/18/2009 | 7/6/2009 |
| 73 | 43129483-2009-111 **- CLOSED -** | FINRA Arb #09-04360 | 7/31/2009 | 9/16/2009 |
| 74 | 43129483-2009-46 **- CLOSED -** | FINRA Arb # 09-01793 | 4/14/2009 | 5/27/2009 |
| 75 | 43160301-2009-9 **- CLOSED -** | FINRA Arb # 09-00773 | 2/23/2009 | 4/9/2009 |
| 76 | 43115415-2009-43 | FINRA Arb # 09-04151 | 7/17/2009 | 9/3/2009 |
| 77 | 43167837-2009-22 | FINRA Arb #09-02228 | 4/27/2009 | 6/12/2009 |
| 78 | 43176861-2009-42 | FINRA Arb # 09-03997 | 7/10/2009 | 8/27/2009 |
| 79 | 43115415-2009-33 | FINRa Arb # 09-02750 | 5/26/2009 | 7/9/2009 |
| 80 | 43160301-2009-5 | FINRA Arb # 09-00075 | 1/27/2009 | 3/12/2009 |
| 81 | 43129483-2010-13 | FINRA Arb # 09-07001 | 2/2/2010 | 3/19/2010 |
| 82 | 43176861-2009-50 | FINRA Arb # 09-04390 | 8/12/2009 | 9/29/2009 |
| 83 | 43129483-2009-99 | FINRA Arb # 09-03887 | 7/13/2009 | 8/25/2009 |
| 84 | 43129483-2009-137 | FINRA Arb #09-05221 | 9/21/2009 | 11/5/2009 |
| 85 | 43132588-2009-55 | FINRA Arb # 09-02941 | 6/1/2009 | 7/20/2009 |
| 86 | 43167837-2009-26 | FINRA Arb # 09-02312 | 5/1/2009 | 6/17/2009 |
| 87 | 43129483-2009-127 **- CLOSED -** | FINRA Arb #09-04877 | 8/28/2009 | 10/14/2009 |
| 88 | 43167837-2009-35 **- CLOSED -** | FINRA Arb # 09-04128 | 7/17/2009 | 9/28/2009 |
| 89 | 43129483-2009-130 | FINRA Arb #09-04974 | 9/9/2009 | 10/20/2009 |
| 90 | 43129483-2009-172 | FINRA Arb #09-06063 | 11/2/2009 | 12/16/2009 |
| 91 | 43167837-2009-19 **- CLOSED -** | FINRA Arb # 09-01675 | 4/6/2009 | 5/21/2009 |
| 92 | 43177906-2009-63 | FINRA Arb #09-05124 | 9/10/2009 | 10/26/2009 |
| 93 | 43129183-2009-144 | FINRA Arb #09-05499 | 10/1/2009 | 11/17/2009 |
| 94 | 43176861-2009-23 | FINRA Arb # 09-01989 | 4/20/2009 | 6/4/2009 |
| 95 | 43176861-2009-43 | FINRA Arb # 09-03235 | 7/20/2009 | 9/4/2009 |
| 96 | 43177906-2009-47 | FINRA Arb # 09-03226 | 6/29/2009 | 8/13/2009 |
| 97 | 43202704-2009-6 | FINRa Arb # 6460 | 11/23/2009 | 1/8/2010 |
| 98 | 43160301-2009-21 | FINRa Arb # 09-02285 | 5/4/2009 | 6/18/2009 |
| 99 | 43132588-2009-60 | FINRA Arb # 09-02679 | 6/8/2009 | 7/24/2009 |
| 100 | 43176861-2009-51 | FINRa Arb # 09-04720 | 8/17/2009 | 10/2/2009 |
| 101 | 43132588-2009-77 **- CLOSED -** | FINRA Arb #09-04076 | 7/31/2009 | 9/15/2009 |
| 102 | 43176861-2009-3 **- CLOSED** | FINRA Arb # 08-04923 | 1/6/2009 | 2/17/2009 |

08-13555-mg   Doc 42124-2   Filed 01/22/14   Entered 01/22/14 12:09:42   Exhibits A
through E to Crowley Declaration   Pg 95 of 156

ARBITRATIONS

| | Lexida ID | Forum | Service | Answer |
|---|---|---|---|---|
| 103 | 43129483-2009-12 | FINRA Arb # 09-00231 | 1/21/2009 | 3/9/2009 |
| 104 | 43132588-2009-42 - **CLOSED -** | FINRA Arb # 09-02183 | 4/28/2009 | 6/15/2009 |
| 105 | 43129483-2009-83 - **CLOSED -** | FINRA Arb # 09-02788 | 6/22/2009 | 8/6/2009 |
| 106 | 43176861-2008-35 - **CLOSED -** | FINRA Arb # 08-04578 | 12/11/2008 | 1/26/2009 |
| 107 | 43129483-2009-148 | FINRA Arb # 09-05458 | 10/5/2009 | 11/16/2009 |
| 108 | 43167837-2009-21 - **CLOSED -** | FINRA Arb # 09-01507 | 4/20/2009 | 6/3/2009 |
| 109 | 43177906-2010-4 - **CLOSED -** | FINRA Arb # 09-07214 | 1/11/2010 | 2/23/2010 |
| 110 | 43132588-2009-57 - **CLOSED -** | FINRA Arb #09-02662 | 6/1/2009 | 7/20/2009 |
| 111 | 43129483-2009-110 - **CLOSED -** | FINRA Arb #09-04343 | 7/31/2009 | 9/15/2009 |
| 112 | 43132588-2009-64 - **CLOSED -** | FINRA Arb # 09-03642 | 6/29/2009 | 8/13/2009 |
| 113 | 43176861-209-61 - **CLOSED -** | FINRA Arb # 09-05371 | 10/5/2009 | 11/20/2009 |
| 114 | 43129483-2009-120 - **CLOSED _** | FINRA Arb # 09-04617 | 8/13/2009 | 9/29/2009 |
| 115 | 43129483-2009-136 - **CLOSED -** | FINRA #09-05189 | 9/21/2009 | 11/4/2009 |
| 116 | 43124983-2009-140 - **CLOSED -** | FINRA Arb #09-05346 | 9/24/2009 | 11/10/2009 |
| 117 | 43132588-2009-65 | FINRA Arb #09-02184 | 6/29/2009 | 8/12/2009 |
| 118 | 43167837-2009-20 - **CLOSED** | FINRA Arb #09-00923 | 4/13/2009 | 5/29/2009 |
| 119 | 43160301-2009-25 - **CLOSED -** | FINRA Arb # 09-03085 | 6/15/2009 | 7/31/2009 |
| 120 | 43132588-2009-100 - **CLOSED -** | FINRA Arb #09-05770 | 10/26/2009 | 12/10/2009 |
| 121 | 43115415-2009-26 - CLOSED | FINRA Arb # 09-01944 | 5/4/2009 | 6/17/2009 |
| 122 | 43129483-2009-122 - CLOSED | FINRA Arb # 09-04701 | 8/17/2009 | 10/5/2009 |
| 123 | 43167837-2009-43 - CLOSED | FINRA Arb #09-03900 | 8/14/2009 | 9/30/2009 |
| 124 | 43167837-2009-44 - **CLOSED -** | FINRA Arb #09-04849 | 8/24/2009 | 10/12/2009 |
| 125 | 43129483-2010-15 - **CLOSED -** | FINRA Arb # 10-00225 | 2/16/2010 | 4/1/2010 |
| 126 | 43132588-2010-25 - CLOSED | FINRA Arb # 10-00754 | 3/8/2010 | 4/23/2010 |
| 127 | 43129483-2010-23 - CLOSED | FINRA Arb # 10-00747 | 3/2/2010 | 4/19/2010 |
| 128 | 43129483-2010-21 - CLOSED | FINRA Arb # 10-00748 | 3/1/2010 | 4/15/2010 |
| 129 | 43132588-2009-104 - CLOSED | FINRA Arb # 09-06012 | 10/29/2009 | 12/16/2009 |
| 130 | 43129483-2010-29 - CLOSED | FINRA Arb # 10-01131 | 3/23/2010 | 2/3/2009 |
| 131 | 43167837-2009-40 - CLOSED | FINRA Arb # 09-04605 | 8/10/2009 | 10/9/2009 |
| 132 | 43160301-2009-16 - CLOSED - | FINRA Arb # 09-01694 | 4/2/2009 | 5/19/2009 |
| 133 | 43129483-2010-3 - **CLOSED -** | FINRA Arb # 09-07022 | 12/30/2009 | 2/12/2010 |
| 134 | 43177906-2009-64 | FINRA Arb #09-05173 | 9/15/2009 | 10/30/2009 |
| 135 | 43160301-2009-20 | FINRA Arb # 09-02061 | 4/20/2009 | 6/8/2009 |
| 136 | 43160301-2009-28 | FINRA Arb #09-03658 | 6/29/2009 | 8/12/2009 |
| 137 | 43160301-2009-36 | FINRA Arb #09-04452 | 8/3/2009 | 9/21/2009 |
| 138 | 43176861-2009-59 | FINRA Arb #09-05182 | 9/15/2009 | 11/2/2009 |
| 139 | 43160301-2009-33 | FINRA Arb # 09-04177 | 7/20/2009 | 9/4/2009 |
| 140 | 43167783-2009-30 | FINRA Arb #09-02925 | 5/29/2009 | 7/15/2009 |
| 141 | 43115415-2009-15 | FINRA Arb # 09-00995 | 3/6/2009 | 4/21/2009 |
| 142 | 43115415-2008-21 | FINRA - ARB# 08-04357 | 12/1/2008 | 1/12/2009 |
| 143 | 43176861-2010-7 - CLOSED - | FINRA Arb # 10-00596 | 2/22/2010 | 4/7/2010 |
| 144 | 43115415-2010-67 | FINRA Arb # 10-03711 | 9/27/2010 | 11/11/2010 |
| 145 | 43115415-2010-43 | FINRA Arb # 10-03245 | 7/28/2010 | 9/14/2010 |
| 146 | 43115415-2010-35 | FINRA Arb #  10-03100 | | |
| 147 | 43115415-2009-27 | FINRA Arb # 09-02276 | 5/1/2009 | 6/17/2009 |
| 148 | 43167837-2009-47 | FINRA Arb #09-05167 | 9/15/2009 | 11/2/2009 |
| 149 | 43132588-2009-79 | FINRa Arb 09-04712 | 8/17/2009 | 10/2/2009 |
| 150 | 43132588-2010-2 | FINRA Arb # 09-06829 | 12/24/2009 | 2/9/2010 |
| 151 | 43115415-2010-63 | FINRA Arb # 10-03933 | 9/20/2010 | 11/2/2010 |
| 152 | 43132588-2009-81 | FINRa Arb #09-04469 | 8/20/2009 | 10/6/2009 |
| 153 | 43132588-2010-79 - **CLOSED -** | FINRa Arb # 10-01755 | 5/17/2010 | 7/6/2010 |
| 154 | 43129483-2009-51 | FINRA Arb $09-02087 | 4/20/2009 | 6/8/2009 |
| 155 | 43129483-2009-142 | FINRA Arb #09-05417 | 9/28/2009 | 11/13/2009 |
| 156 | 43177906-2010-5 | FINRA Arb # 10-00116 | 1/19/2010 | 3/4/2010 |

ARBITRATIONS

| | Lexida ID | Forum | Service | Answer |
|---|---|---|---|---|
| 157 | 43129483-2009-186 | FINRA Arb # 09-06548 | 11/30/2009 | 1/12/2010 |
| 158 | 43167837-2009-27 | FINRA Arb # 09-02466 | 5/11/2009 | 6/25/2009 |
| 159 | 43141447-2009-1 | FINRA Arb # 09-00048 | 1/12/2009 | 2/26/2009 |
| 160 | 43129483-2009-167 | FINRA ARb # 09-05614 | 10/26/2009 | 12/9/2009 |
| 161 | 43115415-2010-30 | FINRa Arb # 10-02728 | 6/28/2010 | 8/12/2010 |
| 162 | 43177906-2009-70 | FINRA Arb #09-05319 | 10/13/2009 | 11/27/2009 |
| 163 | 43160301-2009-45 | FINRA Arb #09-05644 | 10/9/2009 | 11/25/2009 |
| 164 | 43129483-2009-185 | FINRA Arb # 09-06549 | 11/27/2009 | 1/12/2010 |
| 165 | 43160301-2010-4 | FINRA Arb # 10-00443 | 2/16/2010 | 3/30/2010 |
| 166 | 43129483-2010-17 | FINRA Arb # 10-00650 | 2/22/2010 | 4/8/2010 |
| 167 | 43129483-2010-1 | FINRA Arb # 09-07028 | 12/28/2009 | 2/11/2010 |
| 168 | 43132588-2010-11 | FINRA Arb # 09-06901 | 1/28/2010 | 3/16/2010 |
| 169 | 43129483-2010-44 | FINRA Arb # 10-01660 | 4/21/2010 | 6/7/2010 |
| 170 | 43115415-2010-34 | FINRA ARB # 10-02995 | 7/13/2010 | 8/30/2010 |
| 171 | 43115415-2010-108 | FINRa Arb # 10-03093 | 11/9/2010 | 12/27/2010 |
| 172 | 43115415-2011-4 | FINRA Arb # 10-05613 | 12/30/2010 | 2/14/2011 |
| 173 | 53115415-2010-51 | FINRA Arb # 10-03560 | 8/16/2010 | 9/30/2010 |
| 174 | 43176861-2009-46 | FINRA Arb #09-04451 | 8/3/2009 | 10/21/2009 |
| 175 | 43176861-2010-5 | FINRa Arb # 10-00298 | 2/1/2010 | 3/19/2010 |
| 176 | 43132588-2009-107 | FINRA Arb # 09-06010 | 10/30/2009 | 12/15/2009 |
| 177 | 43132588-2009-91 | FINRA Arb #09-04911 | 9/21/2009 | 11/6/2009 |
| 178 | 43202704-2010-3 | FINRA Arb # 10-00006 | 1/8/2010 | 2/25/2010 |
| 179 | 43129483-2010-48 | FINRA Arb #10-01789 | 5/4/2010 | 6/16/2010 |
| 180 | 43129483-2010-55 | FINRA Arb # 10-02269 | 5/25/2010 | 7/9/2010 |
| 181 | 43129483-2010-2 | FINRa Arb # 09-06983 | 12/28/2009 | 2/10/2010 |
| 182 | 43132588-2010-41 | FINRA Arb # 10-00800 | 3/26/2010 | 5/11/2010 |
| 183 | 43176861-2009-57 | FINRA Arb. #09-05066 | 9/14/2009 | 10/26/2009 |
| 184 | 43167837-2010-14 | FINRA Arb # 10-02254 | 6/1/2010 | 7/13/2010 |
| 185 | 43129483-2010-24 | FINRA ARb # 10-00522 | 3/5/2010 | 4/20/2010 |
| 186 | 43177906-2010-7 | FINRa Arb# 10-00306 | 2/4/2010 | 3/17/2010 |
| 187 | 43115415-2010-64 | FINRA Arb # 10-03984 | 9/22/2010 | 11/4/2010 |
| 188 | 43115415-2010-113 | FINRA ARB #10-04840 | 11/18/2010 | 1/5/2011 |
| 189 | 43115415-2011-22 | FINRA Arb # 00344 | 1/31/2011 | 3/21/2011 |
| 190 | 43115415-2010-71 | FINRA Arb # 10-04108 | 9/24/2010 | 11/9/2010 |
| 191 | 43129483-2010-46 | FINRA Arb # 10-01736 | 4/27/2010 | 6/10/2010 |
| 192 | 43129483-2010-57 | FINRA Arb # 10-02352 | 6/2/2010 | 7/15/2010 |
| 193 | 43115415-2010-110 | FINRA Arb # 10-04751 | 11/8/2010 | 12/22/2010 |
| 194 | 43202704-2010-10 | FINRA Arb # 10-00831 | 3/3/2010 | 4/20/2010 |
| 195 | 43115415-2010-54 | FINRA Arb # 10-03683 | 8/30/2010 | 10/13/2010 |
| 196 | 43132588-2010-30 | FINRA Arb # 10-00959 | 3/19/2010 | 5/4/2010 |
| 197 | 43132588-2010-54 | FIRNA Arb # 10-01594 | 4/15/2010 | 6/1/2010 |
| 198 | 43167837-2010-6 | FINRA Arb # 10-00387 | 2/22/2010 | 4/5/2010 |
| 199 | 43129483-2009-93 | FINRA Arb # 09-03832 | 7/6/2009 | 8/19/2009 |
| 200 | 43132588-2010-8 | FINRA Arb # 09-07233 | 1/13/2010 | 3/1/2010 |
| 201 | 43132588-2010-23 | FINRA Arb # 10-00713 | 3/1/2010 | 4/13/2010 |
| 202 | 43167837-2010-9 | FINRA Arb # 10-01103 | 3/15/2010 | 4/30/2010 |
| 203 | 43160301-2009-41 | FINRA Arb  #09-05171 | 9/15/2009 | 10/30/2009 |
| 204 | 43115451-2010-33 | FINRA Arb # 10-03015 | 7/8/2010 | 8/25/2010 |
| 205 | 43115415-2010-27 | FINRA Arb # 10-02634 | 6/14/2010 | 7/30/2010 |
| 206 | 43115415-2010-104 | FINRA Arb #10-04637 | 11/2/2010 | 12/15/2010 |
| 207 | 43115415-2010-79 | FINRA Arb # 10-04136 | 9/30/2010 | 11/17/2010 |
| 208 | 43115415-2010-78 | FINRA Arb # 10-04141 | 9/29/2010 | 11/16/2010 |
| 209 | 43176861-2009-31 | FINRA Arb # 09-02304 | 5/4/2009 | 6/19/2009 |
| 210 | 43132588-2010-19 | FINRA Arb # 10-00293 | 2/1/2010 | 3/18/2010 |
| 211 | 43202704-2010-2 | FINRA Arb # 09-07083 | 1/4/2010 | 2/16/2010 |
| 212 | 43115415-2010-55 | FINRA Arb # 10-03457 | 8/30/2010 | 10/14/2010 |

**ARBITRATIONS**

| | Lexida ID | Forum | Service | Answer |
|---|---|---|---|---|
| 213 | 43129483-2010-12 | FINRA Arb # 10-00361 | 2/2/2010 | 3/22/2010 |
| 214 | 43132588-2010-22 | FINRA Arb # 10-00785 | 2/25/2010 | 4/14/2010 |
| 215 | 43115415-2011-72 | FINRA Arb # 11-01503 | 4/26/2011 | 6/9/2011 |
| 216 | 43129483-2010-34 | FINRA Arb # 10-01400 | 4/5/2010 | 5/20/2010 |
| 217 | 43115415-2010-87 | FINRA Arb # 10-04256 | 10/5/2010 | 11/19/2010 |
| 218 | 43115415-2010-52 | FINRA Arb # 10-03495 | 8/19/2010 | 10/4/2010 |
| 219 | 43115415-2010-70 | FINRA Arb # 10-04121 | 9/24/2010 | 11/9/2010 |
| 220 | 43115415-2010-109 | FINRA Arb # 10-04772 | 11/8/2010 | 12/22/2010 |
| 221 | 43115415-2011-25 | FINRA Arb # 11-00588 | 2/22/2011 | 2/23/2011 |
| 222 | 43115415-2010-112 | FINRA Arb 310-05006 | 11/15/2010 | 12/30/2010 |
| 223 | 43115415-2010-114 | FINRA Arb # 10-04736 | 11/22/2010 | 1/5/2011 |
| 224 | 43176861-2010-12 | FINRA Arb # 10-01551 | 4/12/2010 | 5/28/2010 |
| 225 | 43115415-2010-57 | FINRA Arb# 10-03803 | 9/3/2010 | 10/21/2010 |
| 226 | 43176861-2010-52 | FINRA Arb #10-03193 | 8/9/2010 | 9/24/2010 |
| 227 | 43115415-2010-98 | FINRA Arb # 10-04539 | 10/25/2010 | 12/7/2010 |
| 228 | 43132588-2010-61 | FINRA Arb # 10-01724 | 4/23/2010 | 6/9/2010 |
| 229 | 43115415-2010-41 | FINRA Arb # 10-02899 | 7/21/2010 | 9/7/2010 |
| 230 | 43115415-2010-99 | FINRa Arb # 10-04550 | 10/22/2010 | 12/6/2010 |
| 231 | 43115415-2010-56 | FINRA Arb # 10-03816 | 9/7/2010 | 10/20/2010 |
| 232 | 43341435-2011-23 | FINRA Arb # 11-02548 | 7/5/2011 | 8/19/2011 |
| 233 | 43341435-2011-9 | FINRA Arb # 11-02102 | 6/6/2011 | 7/25/2011 |
| 234 | 43115415-2011-69 | FINRA Arb # 11-01368 | 4/11/2011 | 5/27/2011 |
| 235 | 43115415-2010-42 | FINRA Arb # 10-03234 | 7/28/2010 | 9/10/2010 |
| 236 | 43115415-2010-94 | FINRA Arb # 10-04460 | 10/18/2010 | 12/2/2010 |
| 237 | 43129483-2010-28 | FINRA Arb # 10-00964 | 3/16/2010 | 4/28/2010 |
| 238 | 43115415-2010-124 | FINRA Arb # 10-05579 | 12/21/2010 | 2/7/2011 |
| 239 | 43115415-2010-119 | FINRA Arb # 10-5489 | 12/13/2010 | 1/31/2011 |
| 240 | 43176861-2010-116 | FINRA Arb # 10-04774 | 12/23/2010 | 11/9/2010 |
| 241 | 43160301-2009-44 | FINRA Arb # 09-05521 | 10/5/2009 | 11/19/2009 |
| 242 | 43115415-2010-85 | FINRA Arb # 10-04242 | 10/5/2010 | 11/18/2010 |
| 243 | 43129483-2009-171 | FINRA Arb # 09-06092 | 11/2/2009 | 12/18/2009 |
| 244 | 43132588-2009-101 | FINRA Arb # 09-05828 | 10/26/2009 | 12/11/2009 |
| 245 | 43132588-2010-7 | FINRA Arb # 09-07232 | 1/12/2010 | 2/26/2010 |
| 246 | 43132588-2010-32 | FINRA Arb # 10-00985 | 3/23/2010 | 5/6/2010 |
| 247 | 43115415-2010-25 | FINRA Arb # 10-02205 | 6/7/2010 | 7/26/2010 |
| 248 | 43115415-2010-88 | FINRA Arb # 10-04212 | 10/1/2010 | 11/16/2010 |
| 249 | 43115415-2011-77 | FINRA Arb # 11-01292 | 5/9/2011 | 6/23/2011 |
| 250 | 43115415-2009-52 | FINRA Arb - not served yet- | not served yet | |
| 251 | 43115415-2010-45 | FINRA Arb #10-03488 | 8/2/2010 | 9/29/2010 |
| 252 | 43177906-2010-10 | FINRa Arb #10-01864 | 4/30/2010 | 6/15/2010 |
| 253 | 43115451-2010-49 | FINRA Arb #10-03093 | 8/6/2010 | 9/22/2010 |
| 254 | 43176861-2010-71 | FINRA Arb # 10-03741 | 9/2/2010 | 10/19/2010 |
| 255 | 43115415-2010-105 | FINRA Arb # 10-04802 | 11/3/2010 | 12/21/2010 |
| 256 | 43115415-2010-97 | FINRA Arb # 10-04625 | 10/25/2010 | 12/9/2010 |
| 257 | 43115415-2010-115 | FINRA Arb # 10-04801 | 11/29/2010 | 1/11/2011 |
| 258 | 43115415-2010-117 | FINRA Arb # 10-05255 | 11/29/2010 | 1/13/2011 |
| 259 | 43115415-2010-29 | FINRA Arb # 10-02740 | 6/24/2010 | 8/10/2010 |
| 260 | 43202704-2010-1 | FINRA Arb # 09-07077 | 12/28/2009 | 2/12/2010 |
| 261 | 43115415-2010-73 | FINRA Arb # 10-04153 | 9/27/2010 | 11/11/2010 |
| 262 | 43115415-2011-2 | FINRA Arb # 10-05470 | 12/30/2010 | 2/10/2011 |
| 263 | 43115415-2011-9 | FINRA Arb # 10-05829 | 1/19/2011 | 3/2/2011 |
| 264 | 43167837-2010-1 | FINRA Arb # 10-00062 | 1/11/2010 | 2/26/2010 |
| 265 | 43115415-2010-31 | FINRA Arb # 10-02658 | 6/28/2010 | 8/13/2010 |
| 266 | 43115415-2010-83 | FINRA Arb # 10-04140 | 10/1/2010 | 11/17/2010 |
| 267 | 43115415-2010-89 | FINRA Arb # 10-04255 | 10/4/2010 | 11/18/2010 |
| 268 | 43115415-2010-72 | FINRA Arb # 10-04162 | 9/27/2010 | 11/11/2010 |

ARBITRATIONS

| | Lexida ID | Forum | Service | Answer |
|---|---|---|---|---|
| 269 | 43115415-2010-50 | FINRA Arb #10-03478 | 8/11/2010 | 9/28/2010 |
| 270 | 43176861-2010-15 | FINRA Arb # 10-01685 | 5/10/2010 | 6/24/2010 |
| 271 | 43115415-2010-61 | FINRA RAB # 10-03929 | 9/10/2010 | 10/28/2010 |
| 272 | 43176861-2010-82 | FINRA Arb :10-03957 | 9/20/2010 | 11/7/2010 |
| 273 | 43132588-2009-10 | FINRA Arb #09-00488 | 2/9/2009 | 3/26/2009 |
| 274 | 43115415-2011-8 | FINRA Arb # - served 2/22/11 - | not served yet | |
| 275 | 43115415-2011-57 | FINRA Arb # 11-01113 | 3/31/2011 | 5/17/2011 |
| 276 | 43115415-2010-101 | FINRA Arb # 10-04668 | 10/26/2010 | 12/13/2010 |
| 277 | 43115415-2011-17 | AAA Arb # n/a | 2/7/2011 | |
| 278 | 43115415-2010-60 | FINRA Arb # 10-03811 | 9/8/2010 | 10/25/2010 |
| 279 | 43341435-2011-58 | FINRA Arb # 11-03518 | 10/3/2011 | 11/17/2011 |
| 280 | 43341435-2011-65 | FINRA Arb # 11-03972 | 10/25/2011 | 12/12/2011 |
| 281 | 43115415-2011-37 | FINRA Arb # 11-00702 | 2/28/2011 | 4/15/2011 |
| 282 | 43115415-2011-3 | FINRA Arb # 11-05693 | 12/31/2010 | 2/16/2011 |
| 283 | 43115415-2011-35 | FINRA Arb # 11-00761 | 2/28/2011 | 4/18/2011 |
| 284 | 43115415-2010-46 | FINRA Arb # 10-03382 | 8/11/2010 | 9/27/2010 |
| 285 | 43115415-2010-69 | FINRA Arb # 10-04055 | 9/24/2010 | 11/9/2010 |
| 286 | 43115415-2010-26 | FINRA Arb # 10-02646 | 6/15/2010 | 7/19/2010 |
| 287 | 43176861-2010-85 | FINRA Arb # 10-04019 | 9/24/2010 | 11/8/2010 |
| 288 | 43115415-2010-82 | FINRA Arb # 10-03912 | 9/30/2010 | 11/17/2010 |
| 289 | 43115415-2011-6 | FINRA Arb # 11-00008 | 1/11/2011 | 2/28/2011 |
| 290 | 43115415-2011-59 | FINRA Arb # 11-01222 | 4/6/2011 | 5/24/2011 |
| 291 | 43115415-2010-96 | FINRA Arb # 10-04522 | 10/20/2010 | 12/3/2010 |
| 292 | 43115415-2010-116 | FINRa Arb # 10-05249 | 11/30/2010 | 1/13/2011 |
| 293 | 43115415-2010-123 | FINRA Arb # 10-05448 | 12/21/2010 | 2/7/2011 |
| 294 | 43115415-2011-13 | FINRA Arb # 11-00214 | 1/24/2011 | 3/14/2011 |
| 295 | 43115415-2010-75 | FINRA Arb # 10-04138 | 9/27/2010 | 11/15/2010 |
| 296 | 43115415-2010-111 | FINRA Arb # 10-04896 | 11/9/2010 | 12/27/2010 |
| 297 | 43176861-2009-41 | FINRA Arb # 09-03943 | 7/6/2009 | 8/21/2009 |
| 298 | 43115415-2010-74 | FINRA Arb # 10-04116 | 9/24/2010 | 11/9/2010 |
| 299 | 43115415-2010-81 | FINRA Arb # 10-04131 | 9/30/2010 | 11/17/2010 |
| 300 | 43115415-2011-42 | FINRA Arb # 11-00797 | 3/8/2011 | 4/25/2011 |
| 301 | 43202704-2009-7 | FINRA Arb # 09-06228 | 11/27/2009 | 1/13/2010 |
| 302 | 43115415-2010-95 | FINRA Arb # 10-04502 | 10/20/2010 | 12/2/2010 |
| 303 | 43115415-2011-5 | FINRA Arb # 10-0564 | 1/7/2011 | 2/22/2011 |
| 304 | 43115415-2011-78 | FINRA Arb # 11-01598 | 5/2/2011 | 6/15/2011 |
| 305 | 43341435-2011-64 | FINRA Arb # 11-03919 | 10/25/2011 | 12/9/2011 |
| 306 | 43115415-2010-65 | FINRA Arb # 10-04004 | 9/22/2010 | 11/8/2010 |
| 307 | 43115415-2010-76 | FINRA Arb # 10-04132 | 9/27/2010 | 11/12/2010 |
| 308 | 43115415-2011-45 | FINRA Arb # 11-00843 | 3/11/2011 | 4/27/2011 |
| 309 | 43115415-2011-66 | FINRA Arb # 11-01295 | 4/11/2011 | 5/25/2011 |
| 310 | 43115415-2011-83 | FINRA Arb # 11-01935 | 5/24/2011 | 7/8/2011 |
| 311 | 43115415-2011-28 | FINRA Arb # 10-02708 | 6/23/2010 | 8/9/2010 |
| 312 | 43115415-2010-44 | FINRa Arb # 10-02998 | 8/2/2010 | 9/15/2010 |
| 313 | 43115415-2011-26 | FINRA Arb # 11-00547 | 2/22/2011 | 4/8/2011 |
| 314 | 43115415-2010-62 | FINRA Arb # 10-03997 | 9/16/2010 | 11/2/2010 |
| 315 | 43115415-2011-36 | FINRA Arb # 11-00643 | 2/28/2011 | 4/14/2011 |
| 316 | 43115415-2011-53 | FINRA Arb # 11-01095 | 3/29/2011 | 5/13/2011 |
| 317 | 43115415-2011-67 | FINRA Arb # 11-01120 | 4/1/2011 | 5/17/2011 |
| 318 | 43341435-2011-3 | FINRA Arb #11-01983 | 5/31/2011 | 7/13/2011 |
| 319 | 43341435-2012-16 | FINRA Arb # 12-00021 | ProSe | 1/30/2012 |
| 320 | 43115415-2010-120 | FINRA Arb # 10-05383 | 12/10/2010 | 1/25/2011 |
| 321 | 43115415-2011-44 | FINRA Arb # 11-00794 | 3/14/2011 | 4/29/2011 |
| 322 | 43341435-2012-18 | FINRA Arb # 12-00318 | 2/13/2012 | 3/29/2012 |
| 323 | 43115415-2011-31 | FINRa Arb # 11-00689 | 2/28/2011 | 4/15/2011 |
| 324 | 43115415-2011-40 | FINRA Arb # 11-00355 | 3/7/2011 | 4/25/2011 |

08-13555-mg   Doc 42124-2   Filed 01/22/14   Entered 01/22/14 12:09:42   Exhibits A through E to Crowley Declaration   Pg 99 of 156

ARBITRATIONS

| | Lexida ID | Forum | Service | Answer |
|---|---|---|---|---|
| 325 | 43115415-2011-14 | FINRA Arb # 11-00209 | 1/31/2011 | 3/16/2011 |
| 326 | 43115415-2011-51 | FINRA Arb # 11-01096 | 3/25/2011 | 5/12/2011 |
| 327 | 43341435-2011-21 | FINRA Arb #11-02238 | 6/27/2011 | 8/10/2011 |
| 328 | 43341435-2012-22 | FINRA Arb # 12-00277 | 2/21/2012 | 4/9/2012 |
| 329 | 43115415-2011-46 | FINRA Arb # 11-00844 | 3/11/2011 | 4/27/2011 |
| 330 | 43115415-2010-93 | FINRA Arb # 10-04274 | 10/18/2010 | 12/1/2010 |
| 331 | 43115415-2011-23 | FINRA Arb # 11-00463 | 2/18/2011 | 4/4/2011 |
| 332 | 43115415-2011-49 | FINRA Arb # 11-01005 | 3/23/2011 | 5/9/2011 |
| 333 | 43115415-2011-47 | FINRA Arb #11-00976 | 3/17/2011 | 5/3/2011 |
| 334 | 43115415-2010-84 | FINRA Arb # 10-04139 | 9/29/2010 | 11/16/2010 |
| 335 | 43341435-2011-18 | FINRA Arb #11-02349 | 6/24/2011 | 8/9/2011 |
| 336 | 43115415-2010-22 | FINRA Arb # 10-02584 | 6/7/2010 | 7/26/2010 |
| 337 | 43341435-2011-28 | FINRA Arb # 11-02554 | 7/11/2011 | 8/26/2011 |
| 338 | 43341435-2011-36 | FINRA Arb #11-02823 | 8/16/2011 | 9/28/2011 |
| 339 | 43341435-2011-39 | FINRA Arb # 11-02994 | 8/16/2011 | 9/30/2011 |
| 340 | 43176861-2009-47 | FINRA Arb # 09-03454 | 8/3/2009 | 10/19/2009 |
| 341 | 43115415-2010-102 | FINRA Arb # 10-04638 | | |
| 342 | 43115415-2011-29 | FINRA Arb # 11-00569 | 2/24/2011 | 4/11/2005 |
| 343 | 43341435-2011-59 | FINRA Arb # 11-03365 | 10/11/2011 | 11/25/2011 |
| 344 | 43341435-2012-27 | FINRA Arb # 12-00863 | 3/16/2012 | 5/3/2012 |
| 345 | 43115415-2010-68 | FINRA Arb # 04137 | 9/29/2010 | |
| 346 | 43115415-2011-79 | FINRA Arb #11-01747 | 5/13/2011 | 6/28/2011 |
| 347 | 43341435-2011-12 | FINRA Arb# 11-02117 | 6/13/2011 | 7/26/2011 |
| 348 | 43116905-2011-1 | FINRA Arb # 11-02658 | 7/18/2011 | 9/2/2011 |
| 349 | 43202704-2010-14 | FINRA Arb # 10-01348 | 4/21/2010 | 6/7/2010 |
| 350 | 43115415-2010-77 | FINRA Arb # 10-04135 | 9/29/2010 | 11/16/2010 |
| 351 | 43115415-2010-100 | FINRA Arb # 10-04133 | 10/25/2010 | 12/8/2010 |
| 352 | 43115415-2011-54 | FINRA Arb # 11-01097 | 3/29/2011 | 5/13/2011 |
| 353 | 43115415-2011-64 | FINRA Arb # 11-01361 | 4/11/2011 | 5/31/2011 |
| 354 | 43115415-2011-76 | FINRA Arb # 11-00959 | 5/9/2011 | 6/21/2011 |
| 355 | 43341435-2011-2 | FINRA Arb # 11-02012 | 5/26/2011 | 7/12/2011 |
| 356 | 43341435-2011-66 | FINRA Arb # 11-03995 | 10/31/2011 | 12/15/2011 |
| 357 | 43115415-2011-24 | FINRA Arb # 11-00580 | 2/23/2001 | 4/7/2011 |
| 358 | 43115415-2011-52 | FINRa Arb # 11-01041 | 3/28/2011 | 5/6/2011 |
| 359 | 43341435-2011-80 | FINRA Arb # 11-04561 | 12/22/2011 | 2/6/2012 |
| 360 | 43115415-2010-80 | FINRA Arb # 10-04134 | 9/30/2010 | 11/17/2010 |
| 361 | 43115415-2010-103 | FINRa Arb# 10-04639 | 11/11/2010 | 12/15/2010 |
| 362 | 43115415-2011-50 | FINRA Arb # 11-01063 | 3/23/2011 | 5/9/2011 |
| 363 | 43341435-2011-52 | FINRA Arb #11-03537 | 9/26/2011 | 11/10/2011 |
| 364 | 43341435-2011-53 | FINRA Arb #11-03535 | 9/26/2011 | 11/9/2011 |
| 365 | 43341435-2011-72 | FINRA Arb # 11-04110 | 11/7/2011 | 12/21/2011 |
| 366 | 43115415-2011-65 | FINRa Arb # 11-01364 | 4/11/2011 | 5/27/2011 |
| 367 | 43115415-2011-70 | FINRa Arb # 11-00940 | 4/20/2011 | 5/31/2011 |
| 368 | 43115415-2011-80 | FINRA Arb # 11-01864 | 7/5/2011 | 5/19/2011 |
| 369 | 43341435-2012-1 | FINRA Arb # 11-04560 | 12/23/2011 | 2/3/2012 |
| 370 | 43341435-2012-6 | FINRA Arb # 11-04744 | 1/3/2012 | 2/17/2012 |
| 371 | 43115415-2010-32 | FINRA Arb #10-02941 | 7/6/2010 | 8/20/2010 |
| 372 | 43115415-2011-68 | FINRA Arb # 11-01132 | 4/1/2011 | 5/18/2011 |
| 373 | 43341435-2011-49 | FINRA Arb # 11-03390 | 9/16/2011 | 10/31/2011 |
| 374 | 43115415-2011-71 | FINRA Arb # 11-01539 | 4/25/2011 | 6/9/2011 |
| 375 | 43341435-2012-42 | FINRA Arb # 12-01910 | 5/31/2012 | 7/18/2012 |
| 376 | 43341435-2011-14 | FINRA Arb # 11-01999 | 6/13/2011 | 7/27/2011 |
| 377 | 43341435-2011-10 | FINRA Arb# 11-02153 | 6/10/2011 | 7/26/2011 |
| 378 | 43341435-2011-30 | FINRA Arn # 11-02566 | 7/19/2011 | 9/6/2011 |
| 379 | 43115415-2011-60 | FINRA Arb # 11-01182 | 4/5/2011 | 5/23/2011 |
| 380 | 43341435-2011-22 | FINRa Arb # 11-01998 | 6/27/2011 | 8/12/2011 |

08-13555-mg   Doc 42124-2   Filed 01/22/14   Entered 01/22/14 12:09:42   Exhibits A through E to Crowley Declaration   Pg 100 of 156

ARBITRATIONS

| | Lexida ID | Forum | Service | Answer |
|---|---|---|---|---|
| 381 | 43341435-2011-16 | FINRA Arb #11-02003 | 6/23/2011 | 8/9/2011 |
| 382 | 43115415-2011-56 | FINRA Arb # 11-00851 | 4/1/2011 | 5/19/2011 |
| 383 | 43341435-2011-29 | FINRA Arb # 11-02480 | 7/5/2011 | 8/18/2011 |
| 384 | 43341435-2011-38 | FINRA Arb # 11-02817 | 8/23/2011 | 10/10/2011 |
| 385 | 43341435-2011-60 | FINRA Arb # 11-03700 | 10/6/2011 | 11/22/2011 |
| 386 | 43341435-2011-74 | FINRA Arb # 11-04188 | 11/21/2011 | 1/4/2012 |
| 387 | 43341435-2012-5 | FINRA Arb # 11-04573 | 12/23/2011 | 2/7/2012 |
| 388 | 43341435-2011-20 | FINRA Arb # 11-02363 | 6/27/2011 | 8/10/2011 |
| 389 | 43115415-2011-75 | FINRA Arb # 11-01377 | 5/2/2011 | 6/15/2011 |
| 390 | 43341435-2011-24 | FINRA Arb # 11-02558 | 7/5/2011 | 8/19/2011 |
| 391 | 43341435-2011-35 | FINRA Arb #11- 02794 | 8/2/2011 | 9/19/2011 |
| 392 | 43341435-2011-73 | FINRA Arb # 11-04065 | 11/21/2011 | 1/9/2012 |
| 393 | 43115415-2011-82 | FINRA Arb # 11-01872 | 5/24/2011 | 7/8/2011 |
| 394 | 43341435-2011-27 | FINRA Arb # 11-02392 | 7/11/2011 | 8/24/2011 |
| 395 | 43341435-2011-34 | FINRA Arb #11-02795 | 8/1/2011 | 9/15/2011 |
| 396 | 43341435-2011-63 | FINRA Arb # 11-03741 | 10/21/2011 | 12/8/2011 |
| 397 | 43115415-2011-28 | FINRA Arb # 11-00648 | 4/11/2011 | 4/11/2011 |
| 398 | 43115415-2011-30 | FINRA Arb # 11-00701 | 2/28/2011 | 4/15/2011 |
| 399 | 43115415-2011-58 | FINRa Arb # 11-01265 | 4/11/2011 | 5/26/2011 |
| 400 | 43341435-2011-15 | FINRA Arb # 11-02205 | 6/20/2011 | 8/2/2011 |
| 401 | 43341435-2011-51 | FINRA Arb # 11-03526 | 9/20/2011 | 11/4/2011 |
| 402 | 43341435-2012-12 | FINRA Arb # 11-04218 | 1/17/2012 | 3/1/2012 |
| 403 | 43341435-2011-26 | FINRA Arb # 11-02276 | 7/5/2011 | 8/17/2011 |
| 404 | 43341435-2011-31 | FINRA Arb #11-02799 | 7/29/2011 | 9/14/2011 |
| 405 | 43115415-2011-55 | FINRA Arb # 11-01103 | 4/5/2011 | 5/20/2011 |
| 406 | 43115415-2011-27 | FINRA Arb # 11-00585 | 2/22/2011 | 4/7/2011 |
| 407 | 43341435-2012-9 | FINRA Arb # 12-00036 | 1/11/2012 | 2/28/2012 |
| 408 | 43341435-2012-40 | FINRA Arb # 12-01830 | 5/29/2012 | 7/16/2012 |
| 409 | 43341435-2011-25 | FINRA Arb # 11-02512 | 7/5/2011 | 8/19/2011 |
| 410 | 43341435-2011-32 | FINRA Arb #11-02821 | 8/1/2011 | 9/16/2011 |
| 411 | 43341435-2011-48 | FINRA Arb # 11-03436 | 9/15/2011 | 11/1/2011 |
| 412 | 43115415-2011-63 | FINRA Arb # 11-01255 | 4/8/2011 | 5/25/2011 |
| 413 | 43341435-2011-1 | FINRA Arb # 11-01976 | 5/31/2011 | 7/14/2011 |
| 414 | 43115415-2011-48 | FINRA Arb # 11-01066 | 3/23/2011 | 5/10/2011 |
| 415 | 43341435-2011-57 | FINRA Arb # 11-03511 | 10/3/2011 | 11/21/2011 |
| 416 | 43115415-2011-18 | FINRA Arb # 11-00395 | 2/7/2011 | 3/25/2011 |
| 417 | 43341435-2011-7 | FINRA ARB #11-02002 | 5/31/2011 | 7/15/2011 |
| 418 | 43341435-2011-11 | FINRA Arb #11-02209 | 6/13/2011 | 7/28/2011 |
| 419 | 43341435-2011-37 | FINRA Arb #11-03063 | 8/16/2011 | 9/29/2011 |
| 420 | 43341435-2011-45 | FINRA Arb # 11-03264 | 9/3/2011 | 10/19/2011 |
| 421 | 43341435-2012-35 | FINRA Arb # 12-01609 | 5/15/2012 | 7/2/2012 |
| 422 | 43341435-2011-75 | FINRA Arb # 11-04278 | 11/25/2011 | 1/10/2012 |
| 423 | 43341435-2012-39 | FINRA Arb $ 12-01761 | 5/22/2012 | 7/9/2012 |
| 424 | 43341435-2012-48 | FINRA Arb # 12-02301 | 8/13/2012 | 6/26/2012 |
| 425 | 43341435-2011-13 | FINRA Arb # 11-02149 | 6/13/2011 | 7/29/2011 |
| 426 | 43341435-2012-8 | FINRA Arb #11-04542 | 1/9/2012 | 2/24/2012 |
| 427 | 43341435-2011-62 | FINRA Arb # 11-03680 | 10/17/2011 | 12/2/2011 |
| 428 | 43115415-2011-62 | FINRA Arb # 11-00481 | 4/5/2011 | 5/19/2011 |
| 429 | 43341435-2012-21 | FINRA Arb # 12-00362 | 2/15/2012 | 4/3/2012 |
| 430 | 43341435-2011-43 | FINRA Arb # 11-03244 | 9/6/2011 | 10/19/2011 |
| 431 | 43115415-2011-61 | FINRA Arb # 11-01242 | 4/4/2011 | 5/23/2011 |
| 432 | 43341435-2011-47 | FINRA Arb # 11-03260 | 9/7/2011 | 10/20/2011 |
| 433 | 43341435-2011-61 | FINRA Arb # 11-03775 | 10/11/2011 | 11/28/2011 |
| 434 | 43341435-2012-36 | FINRA Arb # 12-01557 | 5/14/2012 | 6/28/2012 |
| 435 | 43341435-2011-4 | FINRA Arb #11-02000 | 5/31/2011 | 7/14/2011 |
| 436 | 43341435-2011-16 | FINRA Arb # 11-02351 | 6/22/2011 | 8/8/2011 |

**ARBITRATIONS**

|  | Lexida ID | Forum | Service | Answer |
|---|---|---|---|---|
| 437 | 43341435-2012-2 | FINRA Arb # 11-04792 | 1/3/2012 | 2/21/2012 |
| 438 | 43341435-2012-13 | FINRA Arb # 12-00079 | 1/20/2012 | 3/8/2012 |
| 439 | 43341435-2011-33 | FINRA Arb #11-02790 | 7/29/2011 | 9/13/2011 |
| 440 | 43341435-2011-44 | FINRA Arb #11-03271 | 9/6/2011 | 10/19/2011 |
| 441 | 43341435-2011-67 | FINRA Arb # 11-03531 | 10/31/2011 | 12/14/2011 |
| 442 | 43341435-2011-41 | FINRA Arb # 11-03256 | 8/29/2011 | 10/13/2011 |
| 443 | 43341435-2012-4 | FINRA Arb # 11-4768 | 1/3/2012 | 2/21/2012 |
| 444 | 43341435-2012-58 | FINRA Arb #12-02721  **- SIMPLIFIED -** | 8/13/2012 | 9/25/2012 |
| 445 | 43341435-2011-5 | FINRA Arb # 11-02059 | 5/31/2011 | 7/18/2011 |
| 446 | 43341435-2011-68 | FINRA Arb # 11-03552 | 10/31/2011 | 12/14/2011 |
| 447 | 43341435-2011-69 | FINRa Arb # 11-04004 | 11/1/2011 | 12/16/2011 |
| 448 | 43341435-2011-70 | FINRA Arb # 11-03464 | 10/31/2011 | 12/14/2011 |
| 449 | 43341435-2011-71 | FINRA Arb # 11-03917 | 11/7/2011 | 12/23/2011 |
| 450 | 43341435-2011-81 | FINRA Arb # 11-04624 | 12/22/2011 | 2/7/2012 |
| 451 | 43341435-2012-17 | FINRa Arb # 12-00316 | 2/10/2012 | 3/27/2012 |
| 452 | 43341435-2011-76 | FINRA Arb # 11-04378 | 11/30/2011 | 1/17/2012 |
| 453 | 43341435-2012-49 | FINRA Arb # 12-02260 | 8/14/2012 | 6/28/2012 |
| 454 | 43341435-2011-56 | FINRA Arb #11-03546 | 9/27/2011 | 11/10/2011 |
| 455 | 43341435-2012-35 | FINRA Arb # 12-01611 | 5/14/2012 | 6/28/2012 |
| 456 | 43341435-2011-79 | FINRA Arb # 11-04152 | 11/5/2011 | 1/23/2012 |
| 457 | 43341435-2012-46 | FINRA Arb # 12-01995 | 6/11/2012 | 7/30/2012 |
| 458 | 43341435-2012-10 | FINRA Arb # 11-04812 | 1/10/2012 | 2/24/2012 |
| 459 | 43341435-2012-28 | FINRA Arb # 12-00891 | 3/19/2012 | 5/3/2012 |
| 460 | 43341435-2011-42 | FINRA Arb # 11-02688 | 8/31/2011 | 10/17/2011 |
| 461 | 43341435-2012-14 | FINRA Arb # 12-00155 | 1/23/2012 | 3/9/2012 |
| 462 | 43341435-2011-8 | FINRA Arb # 11-01930 | 6/3/2011 | 7/20/2011 |
| 463 | 43341435-2012-23 | FINRA Arb # 12-00744 | 3/9/2012 | 4/26/2012 |
| 464 | 43341435-2011-40 | FINRA Arb # 11-03186 | 8/23/2011 | 10/10/2011 |
| 465 | 43341435-2012-15 | FINRA Arb # 12-00217 | 1/30/2012 | 3/19/2012 |
| 466 | 43341435-2012-30 | FINRA Arb # 12-00928 | 3/23/2012 | 5/9/2012 |
| 467 | 43341435-2011-54 | FINRA Arb # 11-03530 | 9/26/2011 | 11/9/2011 |
| 468 | 43341435-2011-55 | FINRA Arb #11-03564 | 9/26/2011 | 11/8/2011 |
| 469 | 43341435-2012-43 | FINRA Arb # 12-01546 | 6/4/2012 | 7/20/2012 |
| 470 | 43341435-2012-11 | FINRA Arb #11-04577 | 1/17/2012 | 3/1/2012 |
| 471 | 43341435-2012-63 | FINRA Arb # 12-03112 | 9/14/2012 | 10/31/2012 |
| 472 | 43115415-2010-53 | FINRA Arb # 10-03534 | 8/30/2010 | 10/12/2010 |
| 473 | 43341435-2011-78 | FINRA Arb # 11-04327 | 11/5/2011 | 1/17/2012 |
| 474 | 43341435-2012-3 | FINRA Arb # 11-04665 | 12/27/2011 | 2/9/2012 |
| 475 | 43115415-2011-41 | FINRA Arb # 11-00472 | 2/22/2011 | 4/4/2011 |
| 476 | 43341435-2012-7 | FINRA Arb # 12-00002 | 1/9/2012 | 2/23/2012 |
| 477 | 43341435-2012-74 | FINRA Arb# 12-04142 | 12/17/2012 | 2/1/2013 |
| 478 | 43341435-2011-50 | FINRA Arb # 11-03140 | 9/20/2011 | 11/4/2011 |
| 479 | 43341435-2012-73 | FINRA Arb # | 11/15/2012 | 12/24/2012 |
| 480 | 43341435-2012-57 | FINRA Arb # 12-02715 | 8/6/2012 | 9/20/2012 |
| 481 | 43341435-2012-69 | FINRA Arb # 12-03377 | 10/4/2012 | 11/19/2001 |
| 482 | 43341435-2012-31 | FINRA Arb # 12-01276 | 4/16/2012 | 6/1/2012 |

# EXHIBIT E

**PROOF OF CLAIM**

United States Bankruptcy Court/Southern District of New York
Lehman Brothers Holdings Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5076
New York, NY 10150-5076

| In Re: Lehman Brothers Holdings Inc., et al., Debtors. | Chapter 11 Case No. 08-13555 (JMP) (Jointly Administered) |
|---|---|
| Name of Debtor Against Which Claim is Held | Case No. of Debtor: |
| Lehman Brothers Holdings Inc. | 08-13888 |

Filed: USBC - Southern District of New York
Lehman Brothers Holdings Inc., Et Al.
08-13555 (JMP)    0000017889

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503. Additionally, this form should not be used to make a claim for Lehman Programs Securities (See definition on reverse side.)

**THIS SPACE IS FOR COURT USE ONLY**

Name and address of Creditor; (and name and address where notices should be sent if different from Creditor)

**UBS Financial Services Inc.**
1200 Harbor Boulevard
Weehawken, NJ 07086-6791
Att'n: Daniel Goldberg, Esq.
Tel.: 201.352.3449
Email:

with copy to:
Bingham McCutchen LLP
399 Park Avenue
New York, NY 10022
Att'n: Joshua Dorchak, Esq.
212.705.7784
joshua.dorchak@bingham.com

☐ Check this box to indicate that this claim amends a previously filed claim.

Court Claim Number: _____
(If known)

Filed on: _____

Name and address where payment should be sent (if different from above)

UBS Financial Services Inc. (see above)

Telephone number:          Email Address:

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

**1.    Amount of Claim as of Date Case Filed: To be determined - see Appendix**

If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete item 4.

If all or part of your claim is entitled to priority, complete Item 5.

If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete Item 6.

☐ Check this box if all or part of your claim is based on a Derivative Contract.*

☐ Check this box if all or part of your claim is based on a Guarantee.*

*IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.

☒ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is a based on a Derivative Contract or Guarantee.

**2.    Basis for Claim:  Indemnity, contribution, fraudulent misrepresentation - see Appendix**
(See instruction #2 on reverse side.)

**3.    Last four digits of any number by which creditor identifies debtor: _____**
3a. Debtor may have scheduled account as: _____
(See instruction #3a on reverse side.)

**4.    Secured Claim (See instruction #4 on reverse side.)**
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
Nature of property or right of setoff:  ☐ Real Estate  ☐ Motor Vehicle  ☐ Other
Describe: _____
Value of Property: $_____  Annual Interest Rate _____%
Amount of arrearage and other charges as of time case filed included in secured claim, if any:
$_____  Basis for perfection: _____

Amount of Secured Claim:  $_____  Amount Unsecured:  $_____

**6.    Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9): $_____**
(See instruction #6 on reverse side.)

**7.    Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

**8.    Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest. (See definition of "redacted" on reverse side.) If the documents are voluminous, attach a summary.
DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

**5.    Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.**

Specify the priority of the claim.

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $10,950) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. §507(a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(___).

Amount entitled to priority:
$_____

| Date: Sept. 17, 2009 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any. | FOR COURT USE ONLY |
|---|---|---|

FILED / RECEIVED
SEP 18 2009
EPIQ BANKRUPTCY SOLUTIONS, LLC

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

David L. Goldberg, Head of Litigation, Home Office, Products and Services

A/73142206.2

### Appendix

This Proof of Claim (the "Claim") is filed by UBS Financial Services Inc. ("Claimant") against Lehman Brothers Holdings Inc. ("Debtor"). Claimant has contingent claims against Debtor for, among other things, indemnity, contribution, breach of contract, and intentional or negligent misrepresentation, as described below.

Claimant has been named as a defendant in a consolidated class action pending in the United States District Court for the Southern District of New York, captioned *In re Lehman Brothers Equity/Debt Securities Litigation*, No. 08 Civ. 5523 (LAK), and as a respondent in a number of customer arbitration proceedings, in which the claimants allege that Claimant, as an underwriter or seller of securities issued by Debtor, made misrepresentations in registration statements, prospectuses, and other offering materials. The information allegedly misrepresented by Claimant includes information that was contained in registration statements, prospectuses, and offering materials issued by Debtor, or provided to Claimant by representatives of Debtor. Debtor represented and warranted to Claimant that such information conformed in all material respects to the requirements of the Securities Act of 1933 and did not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading. Claimant reasonably relied on the truth of the information provided by Debtor in approving the relevant registration statements, prospectuses, and offering materials, and in continuing to sell securities issued by Debtor. If, as the plaintiffs and claimants allege, the information was false and misleading, and if Claimant is found liable to the plaintiffs or claimants or otherwise suffers losses or incurs costs or expenses as a result, Debtor is liable to Claimant for all or a portion of the losses. At present, the potential amount of this claim is unknown.

### Reservation of Rights

This Claim is filed under the compulsion of the bar date established in these chapter 11 proceedings and is filed to protect Claimant from forfeiture of claims by reason of said bar date. Claimant reserves its right to amend and/or supplement this Claim for the purposes and to the extent permitted by applicable law.

Claimant reserves all of its rights and defenses, whether under title 11 of the United States Code or other applicable law, as to any claims that may be asserted against Claimant by the Debtor, including, without limitation, any rights of setoff and/or recoupment not expressly asserted above. Claimant further reserves all of its rights as against the other debtors in these chapter 11 proceedings.

Claimant further reserves all rights accruing to it, and the filing of this Claim is not and shall not be deemed or construed as (i) a waiver, release, or limitation of Claimant's rights against any person, entity, or property (including, without limitation, the Debtor or any other person or entity that is or may become a debtor in a case pending in this Court); (ii) a consent by Claimant to the jurisdiction or venue of this Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving Claimant; (iii) a waiver, release, or limitation of Claimant's right to trial by jury in this Court or any other court in any proceeding as to any and all matters so triable herein, whether or not the same be designated legal or private rights or in any case, controversy, or proceeding related hereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial right is pursuant to statute or the U.S. Constitution; (iv) a consent by Claimant to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy, or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise; (v) a waiver, release, or limitation of Claimant's right to have any and all final orders in any and all non-core matters or proceedings entered only after *de novo* review by a U.S. District Court Judge; (vi) a waiver of the right to move to withdraw the reference with respect to the subject matter of this Claim, any objection thereto or other proceeding which may be commenced in this case against or otherwise involving Claimant; (vii) an election of remedies; or (viii) a consent to the final determination or adjudication of any claim or right pursuant to 28 U.S.C. § 157(c).

H
A
N
D

D
E
L
I
V
E
R
Y

_NMR_

RECEIVED BY:

9/18/09

DATE

4:31

TIME

# Exhibit 1

(Multicurrency—Cross Border)

*orig to file*
*cc: Lou De Luca*
*Art Landkman*
*file*

*B8334o*

# ISDA®

**International Swaps and Derivatives Association, Inc.**

# MASTER AGREEMENT

dated as of
**July 13, 2004**

|  |  |  |
|---|---|---|
| **UBS AG** | **and** | **LEHMAN BROTHERS INC.** |
| **("Party A")** |  | **("Party B")** |

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:

**1.      Interpretation**

(a)      *Definitions.*  The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)      *Inconsistency.*  In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

(c)      *Single Agreement.*  All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

**2.      Obligations**

(a)      *General Conditions.*

(i)      Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)      Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency.  Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii)      Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright © 1992 by International Swap Dealers Association, Inc.

(b)    *Change of Account.*  Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    *Netting.*  If on any date amounts would otherwise be payable:—

(i)    in the same currency; and

(ii)    in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction.  The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)    *Deduction or Withholding for Tax.*

(i)    *Gross-Up.*  All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect.  If a party is so required to deduct or withhold, then that party ("X") will:—

(1)    promptly notify the other party ("Y") of such requirement;

(2)    pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

(3)    promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

(4)    if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

(A)    the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

(B)    the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

ISDA®1992
NYB 1082184

(ii)   *Liability*. If:—

    (1)   X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

    (2)   X does not so deduct or withhold; and

    (3)   a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)   *Default Interest; Other Amounts.*  Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate.  Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.  If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

## 3.    Representations

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:—

(a)   *Basic Representations.*

    (i)   *Status.*  It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

    (ii)   *Powers.*  It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorize such execution, delivery and performance;

    (iii)   *No Violation or Conflict.*  Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

    (iv)   *Consents.*  All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

    (v)   *Obligations Binding.*  Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

ISDA®1992
NYB 1082184

(b)    *Absence of Certain Events.* No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)    *Absence of Litigation.* There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)    *Accuracy of Specified Information.* All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)    *Payer Tax Representation.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)    *Payee Tax Representations.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

## 4.    Agreements

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)    *Furnish Specified Information.* It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:—

(i)    any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

(ii)    any other documents specified in the Schedule or any Confirmation; and

(iii)    upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)    *Maintain Authorisations.* It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)    *Comply with Laws.* It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)    *Tax Agreement.* It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)    *Payment of Stamp Tax.* Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated, organized,

ISDA®1992
NYB 1082184

managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

### 5.    Events of Default and Termination Events

(a)    *Events of Default.*  The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

    (i)    *Failure to Pay or Deliver.*  Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

    (ii)    *Breach of Agreement.*  Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

    (iii)    *Credit Support Default.*

        (1) Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

        (2) the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

        (3) the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

    (iv)    *Misrepresentation.*  A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

    (v)    *Default under Specified Transaction.*  The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

    (vi)    *Cross Default.*  If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of

ISDA®1992
NYB 1082184

being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) **Bankruptcy.** The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:—

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) **Merger Without Assumption.** The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer:—

(1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)    **Termination Events.** The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

(i)    **Illegality.** Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party):—

6

ISDA®1992
NYB 1082184

(1) to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

(2) to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

(ii) *Tax Event.* Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

(iii) *Tax Event Upon Merger.* The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

(iv) *Credit Event Upon Merger.* If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

(v) *Additional Termination Event.* If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c) *Event of Default and Illegality.* If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

## 6. Early Termination

(a) *Right to Terminate Following Event of Default.* If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b) *Right to Terminate Following Termination Event.*

ISDA®1992
NYB 1082184

(i)   **Notice.**  If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)   **Transfer to Avoid Termination Event.**  If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii)   **Two Affected Parties.**  If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iv)   **Right to Terminate.**  If:—

(1)   a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2)   an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)   **Effect of Designation.**

(i)   If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)   Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)   **Calculations.**

(i)   **Statement.**  On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation

ISDA®1992
NYB 1082184

obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)    *Payment Date.* An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)    *Payments on Early Termination.*    If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss," and a payment method, either the "First Method" or the "Second Method."  If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method," as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)    *Events of Default.* If the Early Termination Date results from an Event of Default:—

(1)    *First Method and Market Quotation.*    If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2)    *First Method and Loss.*    If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3)    *Second Method and Market Quotation.*    If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4)    *Second Method and Loss.*    If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii)    *Termination Events.* If the Early Termination Date results from a Termination Event:—

(1)    *One Affected Party.*    If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2)    *Two Affected Parties.*    If there are two Affected Parties:—

(A)    if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half

ISDA®1992
NYB 1082184

of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B)   if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)   *Adjustment for Bankruptcy.*   In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)   *Pre-Estimate.*   The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

7.   **Transfer**

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that:—

(a)   a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)   a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

8.   **Contractual Currency**

(a)   *Payment in the Contractual Currency.*   Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)   *Judgments.*   To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to

ISDA®1992
NYB 1082184

the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)    *Separate Indemnities.*  To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)    *Evidence of Loss.*  For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

9.    **Miscellaneous**

(a)    *Entire Agreement.*  This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)    *Amendments.*  No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)    *Survival of Obligations.*  Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)    *Remedies Cumulative.*  Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)    *Counterparts and Confirmations.*

(i)    This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(ii)    The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)    *No Waiver of Rights.*  A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)    *Headings.*  The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

10.    **Offices; Multibranch Parties**

11

(a)    If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organization of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office.  This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b)    Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c)    If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

**11.    Expenses**

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

**12.    Notices**

(a)    *Effectiveness.*  Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

   (i)    if in writing and delivered in person or by courier, on the date it is delivered;

   (ii)    if sent by telex, on the date the recipient's answerback is received;

   (iii)    if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

   (iv)    if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

   (v)    if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)    *Change of Addresses.*  Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

**13.    Governing Law and Jurisdiction**

(a)    *Governing Law.*  This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)    *Jurisdiction.*  With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

   (i)    submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District

ISDA®1992
NYB 1082184

Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

(ii)    waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)    *Service of Process.*  Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)    *Waiver of Immunities.*  Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

## 14.    Definitions

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

(a)    in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)    in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)    is respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)    in all other cases, the Termination Rate.

13

ISDA®1992
NYB 1082184

*"Burdened Party"* has the meaning specified in Section 5(b).

*"Change in Tax Law"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

*"Consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-

ISDA®1992
NYB 1082184

of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Office"* means a branch or office of a party, which may be such party's head or home office.

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

*"Relevant Jurisdiction"* means, with respect to a party, the jurisdictions (a) in which the party is incorporated organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

*"Scheduled Payment Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Set-off"* means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

*"Settlement Amount"* means, with respect to a party and any Early Termination Date, the sum of:—

ISDA®1992
NYB 1082184

(a)    the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)    such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

*"Specified Entity"* has the meaning specified in the Schedule.

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Stamp Tax"* means any stamp, registration, documentation or similar tax.

*"Tax"* means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

*"Tax Event"* has the meaning specified in Section 5(b).

*"Tax Event Upon Merger"* has the meaning specified in Section 5(b).

*"Terminated Transactions"* means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

*"Termination Currency"* has the meaning specified in the Schedule.

*"Termination Currency Equivalent"* means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

*"Termination Event"* means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

ISDA®1992
NYB 1082184

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

ISDA®1992
NYB 1082184

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

**UBS.A.G.**

By: _____
Name:     Jeffrey Liflien
Title:      Director and Counsel
Date:     Legal Americas Region
          Fixed Income Section  9-2-8

By: _____
Name:     Catherine J. du Preez
Title:      Director
Date:     Region Americas Legal
          Fixed Income Section  9-2-04

**LEHMAN BROTHERS, INC.**

By: _____
Name:     ALLYSON M CARINE
Title:      
Date:     VICE PRESIDENT

ISDA®1992
NYB 1082184

**EXECUTION COPY**

**SCHEDULE**
to the Master Agreement
dated as of  July 13, 2004

between

**UBS AG**, a bank organized        And        **LEHMAN  BROTHERS  INC.,**  a
under the laws of Switzerland                                corporation  organized  under  the  laws
                                                            of the State of Delaware
("Party A")                                                    ("Party B")

**Part 1**
**Termination Provisions**

In this Agreement:

(a)        *"Specified Entity"* means in relation to Party A for the purpose of:

| | |
|---|---|
| Section 5(a)(v), | UBS  Securities  LLC,  UBS  Financial  Services Inc., or any of its successors. |
| Section 5(a)(vi), | NONE |
| Section 5(a)(vii), | NONE |
| Section 5(b)(iv), | NONE |

and in relation to Party B for the purpose of:

| | |
|---|---|
| Section 5(a)(v), | Lehman  Brothers  Commercial  Corporation ("LBCC"),  Lehman  Brothers  Finance  S.A. ("LBF") and Lehman Brothers Special Financing Inc. ("LBSF") |
| Section 5(a)(vi), | LBCC, LBSF and LBF |
| Section 5(a)(vii), | LBCC, LBSF and LBF |
| Section 5(b)(iv), | LBCC, LBSF and LBF |

(b)        *"Specified Transaction"* means (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party), which is not a Transaction under this Agreement but (i) which is a rate swap transaction, swap option, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, precious metals transactions,cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option, credit protection transaction, credit swap, credit default swap, credit default option, total return swap, credit spread transaction, repurchase or reverse repurchase transaction, securities lending agreements, forward contracts (including, for the avoidance of doubt, mortgage forward contracts) or other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction indentified as a Specified Transaction in this Agreement or the relevant Confirmation.

Section 5(a)(v) of this Agreement is amended by inserting the following at the end thereof:

"Notwithstanding the foregoing, in the case of any Specified Transaction that is a repurchase transaction or a reverse repurchase transaction, an Event of Default shall not occur under either (1) or (2) above if the default is a failure to perform an obligation to make a payment or delivery and, as demonstrated to the reasonable satisfaction of the other party: (a) such failure was caused by an error or omission of an administrative or operational nature and (b) such party has taken all steps necessary for it to take in order to cause such delivery or payment to be made and has the requisite funds or securities required to make such delivery or payment, on the scheduled delivery or payment date."

(c)    The *"Cross Default"* provisions of Section 5(a)(vi) of this Agreement, as modified below, will apply to Party A and to Party B.  Section 5(a)(vi) of this Agreement is hereby amended by the addition of the following at the end thereof:

"provided, however, that notwithstanding the foregoing, an Event of Default shall not occur under either (1) or (2) above if, as demonstrated to the reasonable satisfaction of the other party, (a) the event or condition referred to in (1) or the failure to pay referred to in (2) is a failure to pay caused by an error or omission of an administrative or operational nature; and (b) funds were available to such party to enable it to make the relevant payment when due; and (c) such relevant payment is made within three Business Days following receipt of written notice from an interested party of such failure to pay."

If such provisions apply:

**Specified Indebtedness**  "Specified Indebtedness" means any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) for the repayment of borrowed money or for the payment of any obligation relating to any Derivative Transactions.

For purposes of determining whether the aggregate amount of Specified Indebtedness exceeds the applicable Threshold Amount: (1) with respect to any Derivative Transaction (other than any Repo Transaction), the relevant amount shall equal the aggregate of the net replacement value and any other unpaid amounts with respect to each Derivative Transaction (other than any Repo Transaction) that are payable by the relevant party, and (2) with respect to any Repo Transaction, the relevant amount shall equal the Aggregate Deficit Amount of such Repo Transactions(s).

As used herein:

"Aggregate Deficit Amount" shall mean, at any time, the amount, after giving effect to any applicable netting provisions, by which (i) the aggregate amount of payment obligations for which the party in question is then liable under its Repo Transactions with one or more counterparties (other than subsidiaries of such party) exceeds (ii) the aggregate value of the collateral then securing all such payment obligations.

"Derivative Transaction" means (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party), which is not a Transaction under this Agreement which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, repurchase transaction, reverse repurchase transaction, precious metals transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option, credit protection transaction, credit swap, credit default swap, credit default option, total return swap, credit spread transaction, repurchase transaction,

reverse repurchase transaction, buy/sell-back transaction, securities lending transaction, or any other similar transaction (including any option with respect to any of these transactions); and (b) any combination of these transactions.

"Repo Transaction" means repurchase agreement, reverse repurchase agreement, sale buyback or buy sellback agreement or securities lending and borrowing agreement.

In addition, an Event of Default under Section 5(a)(vi) shall not have occurred if a party (the "Specified Party") refrains from performing any payment obligation relating to any Specified Indebtedness that is a Derivative Transaction due to a bona fide dispute with a third party (a "Bona Fide Dispute") and, as demonstrated to the reasonable satisfaction of the other party (a) such Bona Fide Dispute occurred because the Specified Party had a good faith basis for disputing (i) the amount of the relevant obligation, (ii) whether all conditions relevant to the performance of such obligation(s) have been satisfied or (iii) whether any other action (including any default) by the relevant third party has given the Specified Party the legal right to withhold performance with respect to the relevant obligation(s) and (b) the Specified Party is capable of performing each obligation with respect to the Bona Fide Dispute as and when such obligation(s) is due to be performed.

*"Threshold Amount"* means:

    (i)    with respect to Party A, an amount equal to 2% of shareholders' equity (howsoever described) of Party A or the relevant Specified Entity as shown on the most recent annual audited financial statements of Party A or the relevant Specified Entity and

    (ii)    with respect to Party B, an amount equal to 2% of shareholders' equity (howsoever described) of Party B or the relevant Specified Entity as shown on the most recent annual audited financial statements of Party B or the relevant Specified Entity.

(d)    The *"Credit Event Upon Merger"* provisions of Section 5(b)(iv) will apply to Party A and Party B, amended as follows:

"'Credit Event Upon Merger' shall mean that a Designated Event (as defined below) occurs with respect to a party, any Credit Support Provider of the party or any applicable Specified Entity (any such party or entity, "X"), and such Designated Event does not constitute an event described in Section 5(a)(viii) but the creditworthiness of X, or, if applicable, the successor, surviving or transferee entity of X, is materially weaker than that of X immediately prior to such event. In any such case the Affected Party shall be the party with respect to which, or with respect to the Credit Support Provider or Specified Entity of which, the Designated Event occurred, or, if applicable, the successor, surviving or transferee entity of such party. For purposes hereof, a Designated Event means that, after the date hereof:

    (i)    X consolidates, amalgamates with or merges with or into, or transfers all or substantially all its assets to, or receives all or substantially all the assets or obligations of, another entity; or

    (ii)    any person or entity acquires directly or indirectly the beneficial ownership of equity securities having the power to elect a majority of the board of directors of X or otherwise acquires directly or indirectly the power to control the policy-making decisions of X."

For purposes of **"Credit Event Upon Merger"** provisions of <u>Section 5(b)(iv)</u> will apply to Party A and Party B; provided, however, that the term "materially weaker" means, with respect to Party B fails to maintain a senior subordinate rating of at least Baa3 as determined by Moody's Investors Service, Inc.

(or any Specified Entity of the other party), and to execute, arrange for any required certification of, and deliver to the other party (or such Specified Entity) (or to such government or taxing authority as the other party (or such Specified Entity) reasonably directs), any form or document that may be required or reasonably requested in order to allow the other party (or such Specified Entity) to make a payment under this Agreement (or a Credit Support Document of the other party or a Specified Entity thereof) without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate, promptly upon the earlier of (i) reasonable demand by the other party (or such Specified Entity) and (ii) learning that the form or document is required.

| Party required to deliver Document | Form/Document/Certificate | Date by which to be delivered |
|---|---|---|
| Party A and Party B | Forms and or documents described in Section 4(a)(iii) of this Agreement | (i) Promptly upon reasonable demand by the other party. |

(b)    Other documents to be delivered are:

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party A and Party B | Evidence of the authority and true signatures of each official or representative signing this Agreement or, as the case may be, a Confirmation, on its behalf. | On or before execution of this Agreement and each Confirmation forming a part of this Agreement. | Yes |
| Party A and Party B | Credit Support Document(s) described in Part 4(f). | On or before execution of this Agreement. | No |
| Party B | Certified copy of the resolution of Party B's Board of Directors (or equivalent authorizing documentation) authorizing the execution and delivery of this Agreement and each Confirmation and performance of its obligation hereunder. | On or before execution of this Agreement. | Yes |
| Party A and Party B | Annual audited financial statement it being understood that the delivery requirement relating to any such report may be satisfied by electronic filing of such document with the party's applicable regulatory authority (in English) on a publicly accessible site | Upon reasonable request by either Party A or Party B | Yes |

**Part 4**
**Miscellaneous**

(a)     *Addresses for Notices.* For the purposes of Section 12(a) of this Agreement:

(i) All notices or communications to Party A shall, with respect to a particular Transaction, be sent to the address, telex number, or facsimile number reflected in the Confirmation of that Transaction, and any notice for purposes of Sections 5 or 6 shall be sent to:

| | |
|---|---|
| Address: | UBS AG, Stamford Branch |
| | 677 Washington Boulevard |
| | Stamford, CT 06912-0300 |
| Attention: | Legal Affairs |
| Facsimile: | (203) 719-0680 |
| Telephone: | (203) 719-3000 |

With a simultaneous copy to:

| | |
|---|---|
| Address: | UBS AG, Stamford Branch |
| | 677 Washington Boulevard |
| | Stamford, CT 06912-0300 |
| Attention: | Risk Control - Documentation |
| Facsimile: | (203) 719-5627 |
| Telephone: | (203) 719-3000 |

(ii) All notices or communications to Party B shall be sent to the address, or facsimile number reflected below:

| | |
|---|---|
| Address: | Lehman Brothers Inc. |
| | Transaction Management |
| | 745 Seventh Avenue, 28th Floor |
| | New York, New York 10019 |
| Attention: | Documentation Manager |
| Facsimile No.: | (212) 526-7672 |
| Telephone No.: | (212) 526-7187, For all purposes. |

(b)     *Process Agent.* For the purpose of Section 13(c) of this Agreement:

Party A appoints as its Process Agent: UBS Investment Bank, 299 Park Ave., New York, N.Y. 10171, Attention: Legal Affairs

Party B appoints as its Process Agent: Not Applicable

(c)     *Offices.* The provisions of Section 10(a) of this Agreement will apply to Party A and Party B.

(d)     *Multibranch Party.* For the purpose of Section 10(c) of this Agreement:

(i) Party A is a Multibranch Party and may act through its branches in any of the following territories or countries: England and Wales, France, Hong Kong, United States of America, Singapore, Sweden and Switzerland.

(ii) <u>Party B</u> is not a Multibranch Party and may act only through its New York Office.

(e)    ***Calculation Agent.***  The Calculation Agent is Party A, unless (i) otherwise specified in a Confirmation in relation to the relevant Transaction, or (ii) an Event of Default with respect to Party A has occurred and is continuing in which case Party B shall be the Calculation Agent.

(f)    ***Credit Support Document.***  The Credit Support Annex is a Credit Support Document with respect to Party A and Party B for all purposes hereunder and is incorporated herein by this reference..

(g)    ***Credit Support Provider.***  Credit Support Provider means with respect to Party B:  Not Applicable.

(h)    ***Governing Law.***  **This Agreement will be governed by and construed in accordance with the laws of the State of New York. (without reference to choice of law doctrine thereof other than Sections 5-1401 and 5-1402 of the General Obligations Law of the State of New York)**

(i)    ***Netting of Payments.***  Subparagraph (ii) of Section 2(c) of this Agreement will apply, except the following groups of Transactions:  (1) foreign exchange transactions and currency options, in which case subparagraph (ii) of Section 2(c) of this Agreement will not apply.

(j)    ***"Affiliate"*** will have the meaning specified in Section 14 of this Agreement.

**Part 5**
**Other Provisions**

(a)    <u>***Set-off.***</u>  Without affecting the provisions of the Agreement requiring the calculation of certain net payment amounts, all payments under this Agreement will be made without set-off or counterclaim;  provided, however, that upon the designation of any Early Termination Date, in addition to and not in limitation of any other right or remedy (including any right to set off, counterclaim, or otherwise withhold payment or any recourse to any Credit Support Document) under applicable law the Non-defaulting Party or Non-affected Party (in either case, "X") may without prior notice to any person set off any sum or obligation (whether or not arising under this Agreement and whether matured or unmatured, whether or not contingent and irrespective of the currency, place of payment or booking office of the sum or obligation) owed by the Defaulting Party or Affected Party (in either case, "Y") to X or any Affiliate of X against any sum or obligation (whether or not arising under this Agreement, whether matured or unmatured, whether or not contingent and irrespective of the currency, place of payment or booking office of the sum or obligation) owed by X or any Affiliate of X to Y and, for this purpose, may convert one currency into another at a market rate determined by X.  If any sum or obligation is unascertained, X may in good faith estimate that sum or obligation and set-off in respect of that estimate, subject to X or Y, as the case may be, accounting to the other party when such sum or obligation is ascertained.

(b)    <u>***Representations.***</u>  Section 3(a) is amended by adding the following paragraphs:

(vi)    ***No Agency.***  It is entering into this Agreement and each Transaction as principal (and not as agent or in any other capacity, fiduciary or otherwise).

(vii)    ***Eligible Contract Participant.***  It is an "eligible contract participant" under, and as defined in, the Commodity Futures Modernization Act of 2000 and was not formed solely for the purposes of constituting an "eligible contract participant."

(viii)    *Non Public Information.*    Each party represents and warrants that, in effecting a Transaction referenced to a security, its trading personnel (including all persons executing such Transaction and approving or authorizing such Transaction) will not be aware of any material non-public information or non-public price sensitive information with respect to any security related to a Transaction that, under applicable securities laws, it would have to disclose in advance to a party effecting a purchase or sale with the offeree of such security.

(ix)    *Securities Act Representations.*    If any Transaction and/or the instrument underlying a Transaction is not otherwise exempt from the registration requirements of the United States Securities Act of 1933, as amended (the "Securities Act"), then each party makes the following representations, warranties and covenants with respect to such Transaction, and such representation, warranties and covenants shall remain in full force and effect whenever the offeree or buyer of the Transaction and/or the offeree or buyer of the instrument underlying the Transaction (the "Offeree") shall enter into a Transaction, or make any payment or delivery relating to a Transaction:

(A)    Each party is entering into the Transaction for its own account as principal, and not with a view to, or for, resale, distribution or fractionalization thereof, in whole or in part;

(B)    Each party acknowledges its understanding that the offer and sale of any Transaction with the other party is intended to be exempt from registration under the Securities Act, by virtue of Section 4(2) of the Securities Act. In furtherance thereof, each party represents and warrants to the other party that (i) it has the financial ability to bear the economic risk of its investment, including a loss of its entire investment, and (ii) it is an "accredited investor" as that term is defined under Regulation D under the Securities Act, (iii) it has the knowledge and experience of investing in instruments similar to the Transaction and is capable of evaluating the risks and merits of the Transaction and has, or has had an opportunity to request, such information as it deemed necessary to make such evaluation; and

(C)    Each party understands that the Transaction has not been, and is not intended to be, registered under the Securities Act or under the securities laws of certain states and, therefore, cannot be resold, pledged, assigned or otherwise disposed of unless an exemption for such resale, pledge, assignment or disposition is available. Neither party is obliged to register the Transaction or to assist the Offeree in complying with any exemption from registration under the Securities Act or state securities laws.

(x)    *Physical Delivery.*    In respect of any physically settled Transactions, it will, at the time of delivery, be the legal and beneficial owner, free of liens and other encumbrances, of any securities or commodities it delivers to the other party.

(c)    *Relationship Between Parties*. Each party will be deemed to represent to the other party on the date on which it enters into a Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for that Transaction):

(i) *Non-Reliance*. It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations

related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of that Transaction.

(ii) *Assessment and Understanding*. It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

(iii) *Status of Parties*. The other party is not acting as a fiduciary for or an adviser to it in respect of that Transaction.

(d)     *Waiver of Jury Trial*. EACH PARTY HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY TRANSACTION AND ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO THE OTHER PARTY'S ENTERING INTO THIS AGREEMENT.

(e)     *Consent to Recording*. Each Party (i) consents to the recording of all telephone conversations between trading, operations and marketing personnel of the parties and their Affiliates in connection with this Agreement or any potential Transaction; (ii) agrees to give notice to such personnel of it and its Affiliates that their calls will be recorded; and (iii) agrees that in any Proceedings, it will not object to the introduction of such recordings in evidence on grounds that consent was not properly given.

(f)     *Scope of Agreement*. Upon the effectiveness of this Agreement, unless otherwise agreed to in writing by the parties to this Agreement with respect to specific Specified Transactions, all Specified Transactions then outstanding or any future Specified Transactions between Offices of the parties listed in Part 4(d) shall be subject to the terms hereof.

(g)     *ISDA Definitions*.   Unless otherwise specified in a Confirmation, this Agreement and each Transaction between the parties shall be subject to the 2000 ISDA Definitions (the "2000Definitions"), or the 1998 FX and Currency Option Definitions (the "FX Definitions") (as published by the International Swaps and Derivatives Association, Inc., the Emerging Markets Traders Association and the Foreign Exchange Committee) (the "1998 FX Definitions") are hereby incorporated in their entirety and shall (unless, in relation to a particular Transaction, as otherwise specified in the relevant Confirmation) apply to any FX Transaction or Currency Option entered into by the parties hereto. In relation to any such FX Transaction or Currency Option and in the event of any inconsistency between the provisions of the 1998 FX Definitions and the provisions of the 1992 ISDA FX and Currency Option Definitions as published by the International Swaps and Derivatives Association, Inc. (the "1992 FX Definitions"), the 1998 FX Definitions shall prevail (such 1992 FX Definitions and 1998 FX Definitions collectively referred to herein as the "FX Definitions").

(h)     *Prior Agreements*. This Agreement shall supersede all Agreements between the parties entered into prior to the date of execution of this Agreement governing the terms of any Specified Transactions between the parties including without limitation the ISDA Master Agreement dated as of September 5, 1997 and all confirmations relating to such Specified Transactions shall supplement, form part of, and be subject to this Agreement, such confirmations shall be Confirmations hereunder and such Specified Transactions shall be Transactions hereunder.

(i)     *Escrow Payments*. If by reason of the time difference between the cities in which payments are to

be made, it is not possible for simultaneous payments to be made on any date on which both parties are required to make payments hereunder, either party may at its option and in its sole discretion notify the other party that payments on that date are to be made in escrow. In this case the deposit of the payment due earlier on that date shall be made by 2:00 p.m. (local time at the place for the earlier payment) on that date with an escrow agent selected by the party with a minimum credit rating of at least A- giving the notice, accompanied by irrevocable payment instructions (i) to release the deposited payment to the intended recipient upon receipt by the escrow agent of the required deposit of the corresponding payment from the other party on the same date accompanied by the irrevocable payment instructions to the same effect or (ii) if the required deposit of the corresponding payment is not made on that same date, to return the payment deposited to the party that paid it into escrow. The party that elects to have payments made in escrow shall pay the costs of the escrow arrangements and shall cause those arrangements to provide that the intended recipient of the payment due to be deposited first shall be entitled to interest on that deposited payment for each day in the period of its deposit at the rate offered by the escrow agent for that day for overnight deposits in the relevant currency in the office where it holds that deposited payment (at 11:00 am. local time on that day) if that payment is not released by 5:00 p.m. on the date it is deposited for any reason other than the intended recipients' failure to make the escrow deposit it is required to make hereunder in a timely fashion.

(j)    *"Shareholders' Equity"* means with respect to an entity, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles consistently applied.

(k)    *Accuracy of Specified Information*. Section 3(d) is hereby amended by adding in the third line thereof after the word "respect" and before the period the words "or", in the case of audited or unaudited financial statements or balance sheets, a fair presentation of the financial condition of the relevant person."

(l)    *Notices*. For the purposes of subsections (iii) and (v) of Section 12(a), the date of receipt shall be presumed to be the date sent if sent on a Local Business Day or, if not sent on a Local Business Day, the date of receipt shall be presumed to be the first Local Business Day following the date sent.

(m)    *Service of Process*. The penultimate sentence of Section 13(c) shall be amended by adding the following language at the end thereof: "if permitted in the jurisdiction where the proceedings are initiated and in the jurisdiction where service is to be made.

(n)    *Transfer*. The parties agree that either party may transfer its rights and obligations under the Agreement, in whole but not in part, to any of its respective Affiliates; provided that, with respect to Party B, effective as of the date of transfer, Party B, as the transferring party, will provide Party A, the non-transferring party, with a guarantee issued by Lehman Brothers Holding Inc. in form and substance acceptable to the non-transferring party.

The right of either party to transfer its rights and obligations pursuant to this provision is subject to the conditions that (i) such transfer does not give rise to an Event of Default or Termination Event with respect to any party, any Credit Support Provider, or any Specified Entity, (ii) such transfer is not for the purpose of avoiding any obligations hereunder, (iii) such transfer will not result in the non-transferring party either (A) being required to pay to the transferee an additional amount in respect of an Indemnifiable Tax under section 2(d)(i)(4) of this Agreement greater than the amount which would have been required to have been paid in the absence of such transfer, or (B) receiving a payment from the transferee from which an amount has been deducted or withheld for or on account of any Tax (whether or not such Tax is an Indemnifiable Tax) which results in the amount of such payment being less than the amount that would have been received in the absence of such transfer, (iv) Party A, Party B, and the transferee shall execute an agreement

in writing in which the transferee, among other things, legally and effectively accepts all the interests and assumes all the obligations of the transferring party so transferred, (v) the transferee and the other party shall amend their respective Tax Representations and shall provide the necessary tax forms as may be appropriate to reflect the jurisdiction of incorporation of the transferee and/or the location of the Office through which the transferee shall act, (vi) such transfer will be to an entity legally incorporated in one of the G-7 countries.

"G-7 Countries" mean for purpose of the above provision, the following countries: United States, Japan, Germany, France, Britain, Italy and Canada.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below
with effect from the date specified on the first page of this document.

**UBS AG**

("Party A")

By: _____

Name: Jeffrey Lillien

Title: Director and Counsel

Date: Legal Americas Region
      Fixed Income Section 9-2-04

By: _____

Name: Catherine J. du Preez    9-2-04

Title: Director

Date: Region Americas Legal
      Fixed Income Section

**LEHMAN BROTHERS INC.**
("Party B")

By: _____

Name: Allison M. Carline

Title: VICE PRESIDENT

Date:

**(Bilateral Form)**          **(ISDA Agreements Subject to New York Law Only)**

# ISDA ®

International Swaps and Derivatives Association, Inc.

# CREDIT SUPPORT ANNEX

to the Schedule to the

ISDA Master Agreement

dated as of  July 13, 2004

between

and

|  |  |
|---|---|
| **UBS AG**<br>(**"Party A"**) | **LEHMAN BROTHERS INC.**<br>(**"Party B"**) |

This Annex supplements, forms part of, and is subject to, the above-referenced Agreement, is part of its Schedule and is a Credit Support Document under this Agreement with respect to each party.

Accordingly, the parties agree as follows:—

## Paragraph 1. Interpretation

(a) *Definitions and Inconsistency.* Capitalized terms not otherwise defined herein or elsewhere in this Agreement have the meanings specified pursuant to Paragraph 12, and all references in this Annex to Paragraphs are to Paragraphs of this Annex. In the event of any inconsistency between this Annex and the other provisions of this Schedule, this Annex will prevail, and in the event of any inconsistency between Paragraph 13 and the other provisions of this Annex, Paragraph 13 will prevail.

(b) *Secured Party and Pledgor.* All references in this Annex to the "Secured Party" will be to either party when acting in that capacity and all corresponding references to the "Pledgor" will be to the other party when acting in that capacity; *provided, however,* that if Other Posted Support is held by a party to this Annex, all references herein to that party as the Secured Party with respect to that Other Posted Support will be to that party as the beneficiary thereof and will not subject that support or that party as the beneficiary thereof to provisions of law generally relating to security interests and secured parties.

## Paragraph 2. Security Interest

Each party, as the Pledgor, hereby pledges to the other party, as the Secured Party, as security for its Obligations, and grants to the Secured Party a first priority continuing security interest in, lien on and right of Set-off against all Posted Collateral Transferred to or received by the Secured Party hereunder. Upon the Transfer by the Secured Party to the Pledgor of Posted Collateral, the security interest and lien granted hereunder on that Posted Collateral will be released immediately and, to the extent possible, without any further action by either party.

## Paragraph 3. Credit Support Obligations

(a) *Delivery Amount.* Subject to Paragraphs 4 and 5, upon a demand made by the Secured Party on or promptly following a Valuation Date, if the Delivery Amount for that Valuation Date equals or exceeds the

Copyright © 1994 by International Swaps and Derivatives Association, Inc.

Pledgor's Minimum Transfer Amount, then the Pledgor will Transfer to the Secured Party Eligible Credit Support having a Value as of the date of Transfer at least equal to the applicable Delivery Amount (rounded pursuant to Paragraph 13). Unless otherwise specified in Paragraph 13, the *"Delivery Amount"* applicable to the Pledgor for any Valuation Date will equal the amount by which:

     (i)     the Credit Support Amount

     exceeds

     (ii)     the Value as of that Valuation Date of all Posted Credit Support held by the Secured Party.

(b) *Return Amount.* Subject to Paragraphs 4 and 5, upon a demand made by the Pledgor on or promptly following a Valuation Date, if the Return Amount for that Valuation Date equals or exceeds the Secured Party's Minimum Transfer Amount, then the Secured Party will Transfer to the Pledgor Posted Credit Support specified by the Pledgor in that demand having a Value as of the date of Transfer as close as practicable to the applicable Return Amount (rounded pursuant to Paragraph 13). Unless otherwise specified in Paragraph 13, the *"Return Amount"* applicable to the Secured Party for any Valuation Date will equal the amount by which:

     (i)     the Value as of that Valuation Date of all Posted Credit Support held by the Secured Party

     exceeds

     (ii)     the Credit Support Amount.

*"Credit Support Amount"* means, unless otherwise specified in Paragraph 13, for any Valuation Date (i) the Secured Party's Exposure for that Valuation Date plus (ii) the aggregate of all Independent Amounts applicable to the Pledgor, if any, minus (iii) all Independent Amounts applicable to the Secured Party, if any, minus (iv) the Pledgor's Threshold; *provided, however,* that the Credit Support Amount will be deemed to be zero whenever the calculation of Credit Support Amount yields a number less than zero.

**Paragraph 4. Conditions Precedent, Transfer Timing, Calculations and Substitutions**

(a) *Conditions Precedent.* Each Transfer obligation of the Pledgor under Paragraphs 3 and 5 and of the Secured Party under Paragraphs 3, 4(d)(ii), 5 and 6(d) is subject to the conditions precedent that:

     (i)     no Event of Default, Potential Event of Default or Specified Condition has occurred and is continuing with respect to the other party; and

     (ii)     (ii) no Early Termination Date for which any unsatisfied payment obligations exist has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the other party.

(b) *Transfer Timing.* Subject to Paragraphs 4(a) and 5 and unless otherwise specified, if a demand for the Transfer of Eligible Credit Support or Posted Credit Support is made by the Notification Time, then the relevant Transfer will be made not later than the close of business on the next Local Business Day; if a demand is made after the Notification Time, then the relevant Transfer will be made not later than the close of business on the second Local Business Day thereafter.

(c) *Calculations.* All calculations of Value and Exposure for purposes of Paragraphs 3 and 6(d) will be made by the Valuation Agent as of the Valuation Time. The Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) of its calculations not later than the Notification Time on the Local Business Day following the applicable Valuation Date (or in the case of Paragraph 6(d), following the date of calculation).

ISDA®1994

(d) *Substitutions.*

    (i) Unless otherwise specified in Paragraph 13, upon notice to the Secured Party specifying the items of Posted Credit Support to be exchanged, the Pledgor may, on any Local Business Day, Transfer to the Secured Party substitute Eligible Credit Support (the "Substitute Credit Support"); and

    (ii) subject to Paragraph 4(a), the Secured Party will Transfer to the Pledgor the items of Posted Credit Support specified by the Pledgor in its notice not later than the Local Business Day following the date on which the Secured Party receives the Substitute Credit Support, unless otherwise specified in Paragraph 13 (the "Substitution Date"); *provided* that the Secured Party will only be obligated to Transfer Posted Credit Support with a Value as of the date of Transfer of that Posted Credit Support equal to the Value as of that date of the Substitute Credit Support.

**Paragraph 5. Dispute Resolution**

If a party (a "Disputing Party") disputes (I) the Valuation Agent's calculation of a Delivery Amount or a Return Amount or (II) the Value of any Transfer of Eligible Credit Support or Posted Credit Support, then (1) the Disputing Party will notify the other party and the Valuation Agent (if the Valuation Agent is not the other party) not later than the close of business on the Local Business Day following (X) the date that the demand is made under Paragraph 3 in the case of (I) above or (Y) the date of Transfer in the case of (II) above, (2) subject to Paragraph 4(a), the appropriate party will Transfer the undisputed amount to the other party not later than the close of business on the Local Business Day following (X) the date that the demand is made under Paragraph 3 in the case of (I) above or (Y) the date of Transfer in the case of (II) above, (3) the parties will consult with each other in an attempt to resolve the dispute and (4) if they fail to resolve the dispute by the Resolution Time, then:

    (i)    In the case of a dispute involving a Delivery Amount or Return Amount, unless otherwise specified in Paragraph 13, the Valuation Agent will recalculate the Exposure and the Value as of the Recalculation Date by:

        (A) utilizing any calculations of Exposure for the Transactions (or Swap Transactions) that the parties have agreed are not in dispute;

        (B) calculating the Exposure for the Transactions (or Swap Transactions) in dispute by seeking four actual quotations at mid-market from Reference Market-makers for purposes of calculating Market Quotation, and taking the arithmetic average of those obtained; *provided* that if four quotations are not available for a particular Transaction (or Swap Transaction), then fewer than four quotations may be used for that Transaction (or Swap Transaction); and if no quotations are available for a particular Transaction (or Swap Transaction), then the Valuation Agent's original calculations will be used for that Transaction (or Swap Transaction); and

        (C) utilizing the procedures specified in Paragraph 13 for calculating the Value, if disputed, of Posted Credit Support.

    (ii)    In the case of a dispute involving the Value of any Transfer of Eligible Credit Support or Posted Credit Support, the Valuation Agent will recalculate the Value as of the date of Transfer pursuant to Paragraph 13.

Following a recalculation pursuant to this Paragraph, the Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) not later than the Notification Time on the Local Business Day following the Resolution Time. The appropriate party will, upon demand following that notice by the Valuation Agent or a resolution pursuant to (3) above and subject to Paragraphs 4(a) and 4(b), make the appropriate Transfer.

ISDA®1994

**Paragraph 6. Holding and Using Posted Collateral**

(a) *Care of Posted Collateral.* Without limiting the Secured Party's rights under Paragraph 6(c), the Secured Party will exercise reasonable care to assure the safe custody of all Posted Collateral to the extent required by applicable law, and in any event the Secured Party will be deemed to have exercised reasonable care if it exercises at least the same degree of care as it would exercise with respect to its own property. Except as specified in the preceding sentence, the Secured Party will have no duty with respect to Posted Collateral, including, without limitation, any duty to collect any Distributions, or enforce or preserve any rights pertaining thereto.

(b) *Eligibility to Hold Posted Collateral; Custodians.*

    (i)    *General.* Subject to the satisfaction of any conditions specified in Paragraph 13 for holding Posted Collateral, the Secured Party will be entitled to hold Posted Collateral or to appoint an agent (a "Custodian") to hold Posted Collateral for the Secured Party. Upon notice by the Secured Party to the Pledgor of the appointment of a Custodian, the Pledgor's obligations to make any Transfer will be discharged by making the Transfer to that Custodian. The holding of Posted Collateral by a Custodian will be deemed to be the holding of that Posted Collateral by the Secured Party for which the Custodian is acting.

    (ii)    *Failure to Satisfy Conditions.* If the Secured Party or its Custodian fails to satisfy any conditions for holding Posted Collateral, then upon a demand made by the Pledgor, the Secured Party will, not later than five Local Business Days after the demand, Transfer or cause its Custodian to Transfer all Posted Collateral held by it to a Custodian that satisfies those conditions or to the Secured Party if it satisfies those conditions.

    (iii)    *Liability.* The Secured Party will be liable for the acts or omissions of its Custodian to the same extent that the Secured Party would be liable hereunder for its own acts or omissions.

(c) *Use of Posted Collateral.* Unless otherwise specified in Paragraph 13 and without limiting the rights and obligations of the parties under Paragraphs 3, 4(d)(ii), 5, 6(d) and 8, if the Secured Party is not a Defaulting Party or an Affected Party with respect to a Specified Condition and no Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Secured Party, then the Secured Party will, notwithstanding Section 9-207 of the New York Uniform Commercial Code, have the right to:

(i) sell, pledge, rehypothecate, assign, invest, use, commingle or otherwise dispose of, or otherwise use in its business any Posted Collateral it holds, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor; and

(ii) register any Posted Collateral in the name of the Secured Party, its Custodian or a nominee for either. For purposes of the obligation to Transfer Eligible Credit Support or Posted Credit Support pursuant to Paragraphs 3 and 5 and any rights or remedies authorized under this Agreement, the Secured Party will be deemed to continue to hold all Posted Collateral and to receive Distributions made thereon, regardless of whether the Secured Party has exercised any rights with respect to any Posted Collateral pursuant to (i) or (ii) above.

(d) *Distributions and Interest Amount.*

    (i) *Distributions.* Subject to Paragraph 4(a), if the Secured Party receives or is deemed to receive Distributions on a Local Business Day, it will Transfer to the Pledgor not later than the following Local Business Day any Distributions it receives or is deemed to receive to the extent that a Delivery Amount would not be created or increased by that Transfer, as calculated by the

4

ISDA®1994

Valuation Agent (and the date of calculation will be deemed to be a Valuation Date for this purpose).

(ii) *Interest Amount.* Unless otherwise specified in Paragraph 13 and subject to Paragraph 4(a), in lieu of any interest, dividends or other amounts paid or deemed to have been paid with respect to Posted Collateral in the form of Cash (all of which may be retained by the Secured Party), the Secured Party will Transfer to the Pledgor at the times specified in Paragraph 13 the Interest Amount to the extent that a Delivery Amount would not be created or increased by that Transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed to be a Valuation Date for this purpose). The Interest Amount or portion thereof not Transferred pursuant to this Paragraph will constitute Posted Collateral in the form of Cash and will be subject to the security interest granted under Paragraph 2.

## Paragraph 7. Events of Default

For purposes of Section 5(a)(iii)(1) of this Agreement, an Event of Default will exist with respect to a party if:

(i)    that party fails (or fails to cause its Custodian) to make, when due, any Transfer of Eligible Collateral, Posted Collateral or the Interest Amount, as applicable, required to be made by it and that failure continues for two Local Business Days after notice of that failure is given to that party; (ii) that party fails to comply with any restriction or prohibition specified in this Annex with respect to any of the rights specified in Paragraph 6(c) and that failure continues for five Local Business Days after notice of that failure is given to that party; or

(ii)    that party fails to comply with or perform any agreement or obligation other than those specified, in Paragraphs 7(i) and 7(ii) and that failure continues for 30 days after notice of that failure is given to that party.

## Paragraph 8. Certain Rights and Remedies

(a) *Secured Party's Rights and Remedies.* If at any time (1) an Event of Default or Specified Condition with respect to the Pledgor has occurred and is continuing or (2) an Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Pledgor, then, unless the Pledgor has paid in full all of its Obligations that are then due, the Secured Party may exercise one or more of the following rights and remedies:

(i)    all rights and remedies available to a secured party under applicable law with respect to Posted Collateral held by the Secured Party;

(ii)    any other rights and remedies available to the Secured Party under the terms of Other Posted Support, if any;

(iii)    the right to Set-off any amounts payable by the Pledgor with respect to any Obligations against any Posted Collateral or the Cash equivalent of any Posted Collateral held by the Secured Party (or any obligation of the Secured Party to Transfer that Posted Collateral); and

(iv)    the right to liquidate any Posted Collateral held by the Secured Party through one or more public or private sales or other dispositions with such notice, if any, as may be required under applicable law, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor (with the Secured Party having the right to purchase any or all of the Posted Collateral to be sold) and to apply the proceeds (or the Cash equivalent thereof) from the liquidation of the Posted Collateral to any amounts payable by the Pledgor with respect to any Obligations in that order as the Secured Party may elect.

5

ISDA®1994

Each party acknowledges and agrees that Posted Collateral in the form of securities may decline speedily in value and is of a type customarily sold on a recognized market, and, accordingly, the Pledgor is not entitled to prior notice of any sale of that Posted Collateral by the Secured Party, except any notice that is required under applicable law and cannot be waived.

(b) *Pledgor's Rights and Remedies.* If at any time an Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Secured Party, then (except in the case of an Early Termination Date relating to less than all Transactions (or Swap Transactions) where the Secured Party has paid in full all of its obligations that are then due under Section 6(e) of this Agreement):

<ul>
<li>(i)    the Pledgor may exercise all rights and remedies available to a pledgor under applicable law with respect to Posted Collateral held by the Secured Party;</li>
<li>(ii)    the Pledgor may exercise any other rights and remedies available to the Pledgor under the terms of Other Posted Support, if any;</li>
<li>(iii)    the Secured Party will be obligated immediately to Transfer all Posted Collateral and the Interest Amount to the Pledgor; and</li>
<li>(iv)    to the extent that Posted Collateral or the Interest Amount is not so Transferred pursuant to (iii) above, the Pledgor may:</li>
</ul>

<ul>
<li>(A)    Set-off any amounts payable by the Pledgor with respect to any Obligations against any Posted Collateral or the Cash equivalent of any Posted Collateral held by the Secured Party (or any obligation of the Secured Party to Transfer that Posted Collateral); and</li>
<li>(B)    to the extent that the Pledgor does not Set-off under (iv)(A) above, withhold payment of any remaining amounts payable by the Pledgor with respect to any Obligations, up to the Value of any remaining Posted Collateral held by the Secured Party, until that Posted Collateral is Transferred to the Pledgor.</li>
</ul>

(c) *Deficiencies and Excess Proceeds.* The Secured Party will Transfer to the Pledgor any proceeds and Posted Credit Support remaining after liquidation, Set-off and/or application under Paragraphs 8(a) and 8(b) after satisfaction in full of all amounts payable by the Pledgor with respect to any Obligations; the Pledgor in all events will remain liable for any amounts remaining unpaid after any liquidation, Set-off and/or application under Paragraphs 8(a) and 8(b).

(d) *Final Returns.* When no amounts are or thereafter may become payable by the Pledgor with respect to any Obligations (except for any potential liability under Section 2(d) of this Agreement), the Secured Party will Transfer to the Pledgor all Posted Credit Support and the Interest Amount, if any.

**Paragraph 9. Representations**

Each party represents to the other party (which representations will be deemed to be repeated as of each date on which it, as the Pledgor, Transfers Eligible Collateral) that:

<ul>
<li>(i)    it has the power to grant a security interest in and lien on any Eligible Collateral it Transfers as the Pledgor and has taken all necessary actions to authorize the granting of that security interest and lien;</li>
<li>(ii)    it is the sole owner of or otherwise has the right to Transfer all Eligible Collateral it Transfers to the Secured Party hereunder, free and clear of any security interest, lien, encumbrance or other restrictions other than the security interest and lien granted under Paragraph 2;</li>
<li>(iii)    upon the Transfer of any Eligible Collateral to the Secured Party under the terms of this Annex, the Secured Party will have a valid and perfected first priority security interest therein (assuming that any central clearing corporation or any third-party financial intermediary or other entity not within the control of the Pledgor involved in the Transfer of that Eligible Collateral gives the notices and takes the action required of it under applicable law for perfection of that interest); and</li>
</ul>

6

(iv)    the performance by it of its obligations under this Annex will not result in the creation of any security interest, lien or other encumbrance on any Posted Collateral other than the security interest and lien granted under Paragraph 2.

## Paragraph 10. Expenses

(a) *General.* Except as otherwise provided in Paragraphs 10(b) and 10(c), each party will pay its own costs and expenses in connection with performing its obligations under this Annex and neither party will be liable for any costs and expenses incurred by the other party in connection herewith.

(b) *Posted Credit Support.* The Pledgor will promptly pay when due all taxes, assessments or charges of any nature that are imposed with respect to Posted Credit Support held by the Secured Party upon becoming aware of the same, regardless of whether any portion of that Posted Credit Support is subsequently disposed of under Paragraph 6(c), except for those taxes, assessments and charges that result from the exercise of the Secured Party's rights under Paragraph 6(c).

(c) *Liquidation/Application of Posted Credit Support.* All reasonable costs and expenses incurred by or on behalf of the Secured Party or the Pledgor in connection with the liquidation and/or application of any Posted Credit Support under Paragraph 8 will be payable, on demand and pursuant to the Expenses Section of this Agreement, by the Defaulting Party or, if there is no Defaulting Party, equally by the parties.

## Paragraph 11. Miscellaneous

(a) *Default Interest.* A Secured Party that fails to make, when due, any Transfer of Posted Collateral or the Interest Amount will be obligated to pay the Pledgor (to the extent permitted under applicable law) an amount equal to interest at the Default Rate multiplied by the Value of the items of property that were required to be Transferred, from (and including) the date that Posted Collateral or Interest Amount was required to be Transferred to (but excluding) the date of Transfer of that Posted Collateral or Interest Amount. This interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(b) *Further Assurances.* Promptly following a demand made by a party, the other party will execute, deliver, file and record any financing statement, specific assignment or other document and take any other action that may be necessary or desirable and reasonably requested by that party to create, preserve, perfect or validate any security interest or lien granted under Paragraph 2, to enable that party to exercise or enforce its rights under this Annex with respect to Posted Credit Support or an Interest Amount or to effect or document a release of a security interest on Posted Collateral or an Interest Amount.

(c) *Further Protection.* The Pledgor will promptly give notice to the Secured Party of, and defend against, any suit, action, proceeding or lien that involves Posted Credit Support Transferred by the Pledgor or that could adversely affect the security interest and lien granted by it under Paragraph 2, unless that suit, action, proceeding or lien results from the exercise of the Secured Party's rights under Paragraph 6(c).

(d) *Good Faith and Commercially Reasonable Manner.* Performance of all obligations under this Annex, including, but not limited to, all calculations, valuations and determinations made by either party, will be made in good faith and in a commercially reasonable manner.

(e) *Demands and Notices.* All demands and notices made by a party under this Annex will be made as specified in the Notices Section of this Agreement, except as otherwise provided in Paragraph 13.

(f) *Specifications of Certain Matters.* Anything referred to in this Annex as being specified in Paragraph 13 also may be specified in one or more Confirmations or other documents and this Annex will be construed accordingly.

## Paragraph 12. Definitions

ISDA®1994

As used in this Annex:—

*"Cash"* means the lawful currency of the United States of America.

*"Credit Support Amount"* has the meaning specified in Paragraph 3.

*"Custodian"* has the meaning specified in Paragraphs 6(b)(i) and 13.

*"Delivery Amount"* has the meaning specified in Paragraph 3(a).

*"Disputing Party"* has the meaning specified in Paragraph 5.

*"Distributions"* means with respect to Posted Collateral other than Cash, all principal, interest and other payments and distributions of cash or other property with respect thereto, regardless of whether the Secured Party has disposed of that Posted Collateral under Paragraph 6(c). Distributions will not include any item of property acquired by the Secured Party upon any disposition or liquidation of Posted Collateral or, with respect to any Posted Collateral in the form of Cash, any distributions on that collateral, unless otherwise specified herein.

*"Eligible Collateral"* means, with respect to a party, the items, if any, specified as such for that party in Paragraph 13.

*"Eligible Credit Support"* means Eligible Collateral and Other Eligible Support.

*"Exposure"* means for any Valuation Date or other date for which Exposure is calculated and subject to Paragraph 5 in the case of a dispute, the amount, if any, that would be payable to a party that is the Secured Party by the other party (expressed as a positive number) or by a party that is the Secured Party to the other party (expressed as a negative number) pursuant to Section 6(e)(ii)(2)(A) of this Agreement as if all Transactions (or Swap Transactions) were being terminated as of the relevant Valuation Time; *provided* that Market Quotation will be determined by the Valuation Agent using its estimates at mid-market of the amounts that would be paid for Replacement Transactions (as that term is defined in the definition of "Market Quotation").

*"Interest Amount"* means, with respect to an Interest Period, the aggregate sum of the amounts of interest calculated for each day in that Interest Period on the principal amount of Posted Collateral in the form of Cash held by the Secured Party on that day, determined by the Secured Party for each such day as follows:

(x) the amount of that Cash on that day; multiplied by

(y) the Interest Rate in effect for that day; divided by

(z) 360.

*"Interest Period"* means the period from (and including) the last Local Business Day on which an Interest Amount was Transferred (or, if no Interest Amount has yet been Transferred, the Local Business Day on which Posted Collateral in the form of Cash was Transferred to or received by the Secured Party) to (but excluding) the Local Business Day on which the current Interest Amount is to be Transferred.

*"Interest Rate"* means the rate specified in Paragraph 13.

*"Local Business Day"*, unless otherwise specified in Paragraph 13, has the meaning specified in the Definitions Section of this Agreement, except that references to a payment in clause (b) thereof will be deemed to include a Transfer under this Annex.

*"Minimum Transfer Amount"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

8

ISDA®1994

*"Notification Time"* has the meaning specified in Paragraph 13.

*"Obligations"* means, with respect to a party, all present and future obligations of that party under this Agreement and any additional obligations specified for that party in Paragraph 13.

*"Other Eligible Support"* means, with respect to a party, the items, if any, specified as such for that party in Paragraph 13.

*"Other Posted Support"* means all Other Eligible Support Transferred to the Secured Party that remains in effect for the benefit of that Secured Party.

*"Pledgor"* means either party, when that party (i) receives a demand for or is required to Transfer Eligible Credit Support under Paragraph 3(a) or (ii) has Transferred Eligible Credit Support under Paragraph 3(a).

*"Posted Collateral"* means all Eligible Collateral, other property, Distributions, and all proceeds thereof that have been Transferred to or received by the Secured Party under this Annex and not Transferred to the Pledgor pursuant to Paragraph 3(b), 4(d)(ii) or 6(d)(i) or released by the Secured Party under Paragraph 8. Any Interest Amount or portion thereof not Transferred pursuant to Paragraph 6(d)(ii) will constitute Posted Collateral in the form of Cash.

*"Posted Credit Support"* means Posted Collateral and Other Posted Support.

*"Recalculation Date"* means the Valuation Date that gives rise to the dispute under Paragraph 5; *provided, however,* that if a subsequent Valuation Date occurs under Paragraph 3 prior to the resolution of the dispute, then the "Recalculation Date" means the most recent Valuation Date under Paragraph 3.

*"Resolution Time"* has the meaning specified in Paragraph 13.

*"Return Amount"* has the meaning specified in Paragraph 3(b).

*"Secured Party"* means either party, when that party (i) makes a demand for or is entitled to receive Eligible Credit Support under Paragraph 3(a) or (ii) holds or is deemed to hold Posted Credit Support.

*"Specified Condition"* means, with respect to a party, any event specified as such for that party in Paragraph 13.

*"Substitute Credit Support"* has the meaning specified in Paragraph 4(d)(i).

*"Substitution Date"* has the meaning specified in Paragraph 4(d)(ii).

*"Threshold"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

*"Transfer"* means, with respect to any Eligible Credit Support, Posted Credit Support or Interest Amount, and in accordance with the instructions of the Secured Party, Pledgor or Custodian, as applicable:

(i)     in the case of Cash, payment or delivery by wire transfer into one or more bank accounts specified by the recipient;

(ii)    in the case of certificated securities that cannot be paid or delivered by book-entry, payment or delivery in appropriate physical form to the recipient or its account accompanied by any duly executed instruments of transfer, assignments in blank, transfer tax stamps and any other documents necessary to constitute a legally valid transfer to the recipient;

(iii)   in the case of securities that can be paid or delivered by book-entry, the giving of written instructions to the relevant depository institution or other entity specified by the recipient,

ISDA®1994

together with a written copy thereof to the recipient, sufficient if complied with to result in a legally effective transfer of the relevant interest to the recipient; and

(iv)    in the case of Other Eligible Support or Other Posted Support, as specified in Paragraph 13.

*"Valuation Agent"* has the meaning specified in Paragraph 13.

*"Valuation Date"* means each date specified in or otherwise determined pursuant to Paragraph 13.

*"Valuation Percentage"* means, for any item of Eligible Collateral, the percentage specified in Paragraph 13.

*"Valuation Time"* has the meaning specified in Paragraph 13.

*"Value"* means for any Valuation Date or other date for which Value is calculated and subject to Paragraph 5 in the case of a dispute, with respect to:

(i)    Eligible Collateral or Posted Collateral that is:

(A) Cash, the amount thereof; and

(B) a security, the bid price obtained by the Valuation Agent multiplied by the applicable Valuation Percentage, if any;

(ii) Posted Collateral that consists of items that are not specified as Eligible Collateral, zero; and

(iii) Other Eligible Support and Other Posted Support, as specified in Paragraph 13.

[End of page]

10

ISDA®1994

EXECUTION COPY

**ISDA**

**CREDIT SUPPORT ANNEX**

to the Schedule

to the Master Agreement

dated as of July 13, 2004

between

**UBS AG**                    **And**                    **LEHMAN BROTHERS INC.**

**Paragraph 13. Elections and Variables**

(a)    *Security Interest for "Obligations."*  The term *"Obligations"* as used in this Annex includes the following additional obligations:

With respect to Party A:  None
With respect to Party B:  None

(b)    *Credit Support Obligations.*

    (i)    *Delivery Amount, Return Amount and Credit Support Amount.*

        (A)    *"Delivery Amount"* has the meaning specified in Paragraph 3(a).

        (B)    *"Return Amount"* has the meaning specified in Paragraph 3(b).

        (C)    *"Credit Support Amount"* has the meaning specified in Paragraph 3.

    (ii)    *Eligible Collateral.*  The following items will qualify as *"Eligible Collateral"* for the party specified:

| | | Party A | Party B | Valuation Percentage |
|---|---|:---:|:---:|:---:|
| (A) | Cash | X | X | 100% |
| (B) | negotiable debt obligations (other than interest-only securities) issued by the U.S. Treasury Department having a remaining maturity at issuance of not more than one year | X | X | 99% |
| (C) | negotiable debt obligations (other than interest-only securities) issued by the U.S. Treasury Department having a remaining maturity at issuance of more than one year but not more than 10 years | X | X | 97% |

| | | | | |
|---|---|---|---|---|
| (D) | negotiable debt obligations (other than interest-only securities) issued by the U.S. Treasury Department having a remaining maturity of more than 10 years | X | X | 95% |

(iii) **Other Eligible Support.** The following items will qualify as *"Other Eligible Support"* for the party specified:    None

(iv) **Thresholds.**

(A)    *"Independent Amount"* means with respect to Party A:  $ 0
    *"Independent Amount"* means with respect to Party B:  $ 0

(B)    *"Threshold"* means, with respect to Party A and Party B, the amount set forth below opposite the lower of the ratings in effect on any Valuation Date for (i) the unsubordinated, unsecured, long-term indebtedness of Party A; and (ii) in the case of Party B, the senior subordinate indebtedness of Party B:

| Rating by Standard & Poor's Ratings Services | Rating by Moody's Investors Service, Inc. | Collateral Threshold |
|---|---|---|
| AAA | Aaa | USD 20,000,000 |
| AA+ | Aa1 | USD 20,000,000 |
| AA | Aa2 | USD 15,000,000 |
| AA- | Aa3 | USD 15,000,000 |
| A+ | A1 | USD 10,000,000 |
| A | A2 | USD 10,000,000 |
| A- | A3 | USD 5,000,000 |
| BBB+ | Baa1 | USD 1,000,000 |
| BBB | Baa2 | USD 1,000,000 |
| BBB- or below or not rated | Baa3 or below or not rated | 0 |

If either Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("S&P") or Moody's Investors Service, Inc. ("Moody's") ceases to be in the business of rating debt securities and such business is not continued by a successor or assign of such entity (the "Discontinued Agency"), the parties shall jointly select a nationally recognized credit rating agency in substitution thereof and agree on the rating level issued by such substitute agency that is equivalent to the ratings specified herein of the Discontinued Agency, whereupon such substitute agency and equivalent rating shall replace the Discontinued Agency and the rating level thereof for purposes of this Agreement.

(C)    *"Minimum Transfer Amount"* means with respect to Party A and Party B: $250,000, provided, that if (i) an Event of Default has occurred and is continuing, or (ii) the Threshold Amount of a Party is zero, then the Minimum Transfer Amount with respect to such party shall be zero.

(D)    *Rounding.* The Delivery Amount and the Return Amount will be up and down to the nearest integral multiple of $10,000 respectively.

(c)     *Valuation and Timing.*

    (i)    *"Valuation Agent"* means, for the purposes of Paragraphs 3 and 5, the party making the demand under Paragraph 3, and, for the purposes of Paragraphs 4(d) and 6(d), the Secured Party.

    (ii)    *"Valuation Date"* means each Local Business Day.

    (iii)    *"Valuation Time"* means the close of business on the Local Business Day before the Valuation Date or date of calculation, as applicable; *provided* that the calculations of Value and Exposure will be made as of approximately the same time on the same day.

    (iv)    *"Notification Time"* means 1:00 p.m. New York time on a Local Business Day.

(d)     *Conditions Precedent and Secured Party's Rights and Remedies.* The following Termination Event will be a *"Specified Condition"* for both parties: Illegality, Tax Event, Tax Event Upon Merger, Additional Termination Event and Credit Event Upon Merger.

(e)     *Substitution.*

    (i)    *"Substitution Date"* has the meaning specified in Paragraph 4(d)(ii).

    (ii)    *Consent.* If specified here as applicable, then Pledgor must obtain the Secured Party's consent for any substitution pursuant to Paragraph 4(d):  N/A

(f)     *Dispute Resolution.*

    (i)    *"Resolution Time"* means 1:00 p.m., New York time, on the Local Business Day following the date on which the notice of the dispute is given under Paragraph 5.

    (ii)    *Value.* For the purpose of Paragraphs 5(i)(C) and 5(ii), the Value of Posted Credit Support of the type described in Paragraph 13(b)(ii)(B), (C) or (D) (referred to herein as "Government Obligations") will  equal the Valuation Percentage multiplied by the sum of (A) either (1) the mean of the high bid and low asked prices quoted on such date by any principal market maker for such Government Obligations, which market maker shall be selected by the Disputing Party in good faith and in a commercially reasonable manner, or (2) if no quotations are available from a principal market maker for such date, the mean of such high bid and low asked prices as of the day next preceding such date, on which such quotations were available, and (B) accrued interest on such Government Obligations (except to the extent included in the applicable price referred to in clause (A) above).

    (iii)    *Alternative.* The provision of Paragraph 5 will apply.

(g)     *Holding and Using Posted Collateral.*

    (i)    *Eligibility to Hold Posted Collateral; Custodians.* Either party and its Custodian will be entitled to hold Posted Collateral pursuant to Paragraph 6(b); *provided* that the following conditions applicable to it are satisfied:

        (A)    Party A or Party B, as applicable:  Such party is not a Defaulting Party.

        (B)    Any Custodian appointed by a party must be a commercial bank or trust company organized under the laws of the United States or a political subdivision thereof or a

U.S. branch of a bank organized under the laws of Switzerland, having assets of at least $10 billion and a long term debt or deposit rating of at least "A3" from Moody's and "A-" from S&P.

(C)    Posted Collateral may only be held in one or more accounts in the United States and any account established by Party A or Party B, as applicable, or its Custodian to hold Posted Collateral shall be established and maintained for the sole purpose of receiving deliveries of and holding Posted Collateral.

(D)    If a party itself or a Custodian appointed by it at any time may not hold Posted Collateral consistent with this Paragraph 13(g) or elects not to do so, such party shall promptly give notice to the other party.

Initially, the *Custodian* for Party A is:  N/A.

Initially, the *Custodian* for Party B is:  N/A.

(ii)    **Use of Posted Collateral.**  The provisions of Paragraph 6(c) will apply to Party A and Party B.

(h)    **Distributions and Interest Amount.**

(i)    **Interest Rate.**  The **"Interest Rate"** will be the rate per annum equal to the overnight Federal Funds Rate for each day cash is held by the Secured Party as reported in Federal Reserve Publication H.15-519.

(ii)    **Transfer of Interest Amount.**  The Transfer of the Interest Amount will be made on the first Local Business Day of each calendar month.

(iii)    **Alternative to Interest Amount.**  The provisions of Paragraph 6(d)(ii) will apply.

(i)    **Additional Representation(s).**  None.

(j)    **Other Eligible Support and Other Posted Support.**

(i)    **"Value"** shall have no meaning with respect to Other Eligible Support.
(ii)    **"Transfer"** shall have no meaning with respect to Other Eligible Support.

(k)    **Demands and Notices.**  Any demand, specification or notice under this Annex (each, a "Notice"), other than  a Notice pursuant to Paragraph 4(d), may be delivered orally, including by telephone.  If such Notice is delivered orally, such oral Notice shall be confirmed promptly in writing (a "Notice Confirmation") by tested telex, facsimile  or  actual  delivery.    Failure  to  provide  that  Notice Confirmation will not affect the validity of that oral Notice.  All Notices shall be delivered to the following addresses:

with respect to Party A:

UBS AG, Stamford Branch
Collateral Management
677 Washington Boulevard, Stamford, CT, 06901
Attention:  Margin Specialist
Telephone:  (203) 719-6116; Telecopier:  (203) 719-4955

with respect to Party B

Lehman Brothers Inc.
Transaction Management
745 Seventh Avenue, 28th Floor
New York, New York 10019

Attention:          Documentation Manager
Telephone No.:     (212) 526-7187
Facsimile No.:      (212) 526-7672;  For all purposes.

(l)     ***Addresses for Transfers.***  Addresses for Transfers of Collateral for each party shall be supplied on or before the date of initial Transfer hereunder.

With respect to Party A:

(a)  for Collateral consisting of cash:  UBS AG, ABA #026007993, Acct. #101-WA-14007-000, UBS AG London Account, Attn:  Dan Cushing

(b)  for Collateral consisting of securities:  JPMChase/UBSCUSTCOLLABA# 021000021

With respect to Party B:

(a)  Cash USD, credit HSBC USA BANK, ABA # 021-001-088, A/C # 000-107794, Lehman Brothers Inc., FFC (Counterparty Name), A/C # (Counterparty A/C #).

(b)  Securities or obligations issued or guaranteed by the government of the United States of America or any of its agencies or instrumentalities, credit Chase NYC/CCNS, ABA # 021-000-021, Acct. LWQ, FFC (Counterparty Name), A/C # (Counterparty A/C #), Attention: Derivative Margin Group, Lehman Brothers, 745 Seventh Avenue, 16th Floor, New York, NY 10019.

(m)     ***Other Provisions***.

**Paragraph 5.  Dispute Resolution.**  Paragraph 5 of the Credit Support Annex is hereby amended by deleting clause (2) in its entirety and inserting in lieu thereof the following:

"(2) subject to Paragraph 4(a), the appropriate party will Transfer the undisputed amount to the other party not later than (X) the time delivery otherwise would have been due if no dispute had existed in the case of (I) above, or (Y) the close of business on the Local Business Day following the date of Transfer in the case of (II) above,"

**Paragraph 12.  Definitions.**  Paragraph 12 of the Credit Support Annex is hereby amended as follows:

The definition of **"Local Business Day"** is hereby amended by inserting the following in lieu thereof: **"Local Business Day** means a day on which commercial banks in New York City are open for business (including dealings in foreign exchange and foreign currency deposits)";

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

**UBS AG**
**(Party A)**

By: _____

Name: Jeffrey Lillien
Title: Director and Counsel
Date: Legal Americas Region
Fixed Income Section  9-2-0⁴

By: _____

Name:
Title:                                    9-2-04
Date: Catherine J. du Preez
Director
Region Americas Legal
Fixed Income Section

**LEHMAN BROTHERS INC.**
**(Party B)**

By: _____

Name: ALLYSON M. CARNS
Title: VICE PRESIDENT
Date:

 **UBS** Investment Bank

**UBS AG**
677 Washington Boulevard
Stamford, CT  06901
Tel. (203) 719-1000

www.ubs.com

May 22, 2009

**By Courier and by fax**
Lehman Brothers Inc.
Transaction Management
745 Seventh Avenue, 28th Floor
New York, New York  10019
Attention:  Documentation Manager
Telecopy:  212-526-7672

Ladies and Gentlemen:

We are writing to you with respect to the ISDA Master Agreement, dated as of July 13, 2004, between UBS AG ("UBS") and Lehman Brothers Inc. ("Counterparty"), as amended (the "Master Agreement"). Capitalized terms not otherwise defined in this letter shall have the meanings set out in the Master Agreement.

Further to our letter to you dated September 16, 2008, UBS has determined the amount payable in respect of the Early Termination Date pursuant to Section 6(e) of the Master Agreement.  As required by Section 6(d)(i) of the Master Agreement, we hereby notify you that the amount payable under Section 6(e) of the Master Agreement is $94,101,862.41, such amount being the amount that UBS has reasonably determined in good faith to be its total losses and costs in connection with the Agreement, which is payable by Counterparty to UBS.  This reflects a Loss calculated for the Agreement of $94,101,862.41 – the information in Annex A provides more detail on how the Loss has been calculated.

In addition to the amount described above, under Section 11 of the Master Agreement, Counterparty owes UBS for the reasonable out-of-pocket expenses incurred by UBS by reason of the early termination of the Transactions under the Master Agreement. As of the current date, UBS has incurred approximately $300,000 of such out-of-pocket expenses.  This amount is in addition to the amounts otherwise owed by Counterparty under the Agreement.  If further costs are incurred, UBS will advise you of such amounts.

As of the Early Termination Date, UBS was holding Posted Collateral under the Credit Support Annex to the Master Agreement in the amount of $170,220,221.32.  Pursuant to Section 8(a)(iii) of the Credit Support Annex to the Master Agreement, we have exercised the contractual right to set off such amount against the Loss calculated above. We have also exercised the contractual right to set off against the Loss calculated above the amount of UBS's out-of-pocket expenses incurred to date, pursuant to Section 11 of the Master Agreement.  The net amount remaining after our exercise of those rights is $75,818,358.91.

Section 5(a) of the Schedule to the Master Agreement provides that UBS may set off any amounts it owes to Counterparty under the Master Agreement against any amounts due from Counterparty to any Affiliate of UBS, "whether or not arising under [the Master Agreement] and … whether or not contingent …."  Amounts are due from Counterparty to UBS and its Affiliates as follows (collectively, the "Section 5(a) Amounts"):

- An amount is due from Counterparty to UBS Securities LLC ("UBSS"), an Affiliate of UBS, under the Master Securities Loan Agreement, dated as of August 7, 2000, between Counterparty and UBSS. The amount due is $4,494,380.47.

- An aggregate amount of not less than $19,055,287.87 is due from Counterparty to UBSS in respect of commissions for exchange traded derivatives and listed options, syndicate fees and losses incurred by UBSS as a result of Counterparty failing to perform on securities transactions, and other similar

 **UBS** Investment Bank

Page 2

items.  Attached in Annex A is a list of the items that make up this amount (although such list is not exhaustive and we reserve the right to add additional items at a later date).

- An amount is due to UBS Financial Services, Inc. ("UBS-FS"), an Affiliate of UBS, and to UBSS relating to claims (the "Claims") against Counterparty arising from Counterparty's sale to UBS-FS and to UBSS of certain structured notes and other securities issued by Lehman Brothers Holdings Inc.  UBS-FS and UBSS intend to pursue the Claims in Counterparty's pending liquidation proceedings under the Securities Investor Protection Act ("SIPA").  UBSS and UBS-FS in good faith estimate that the Claims have a value substantially in excess of $53,000,000.

Accordingly, pursuant to the Master Agreement and in accordance with section 553 of the Bankruptcy Code, made applicable by section 78fff(b) of SIPA, UBS has the right to set off the $77,647,451.65 that otherwise might be payable to Counterparty under the Master Agreement against the Section 5(a) Amounts (subject, in the case of the Claims, to UBS accounting to Counterparty when the Claims become fixed and liquidated). As a result, any payment that may be due from UBS to Counterparty under the Master Agreement at this time is subject to such setoff rights, which are hereby expressly reserved.

This letter is not a demand for payment or any action by you. This letter advises you of certain calculations that have been performed pursuant to the Master Agreement and applicable law.

Nothing contained herein will be deemed to be a waiver or modification by UBS of any of our rights under the Master Agreement or under applicable law.

If you have any questions regarding the foregoing please contact Bert Fuqua at 203-719-4038 or David Kelly at 203-719-5427.

Very truly yours,
UBS AG

By:_____
Name:    James B. Fuqua
Title:    Managing Director and Counsel
Region Americas Legal

By:_____
Name:
Title:
Karen A. Wendell
Managing Director and Counsel
Region Americas Legal

 UBS Investment Bank

Page 3

## ANNEX A

| Group of Transactions | Loss |
|---|---|
| FX (Cash) | $91,193,469.41 |
| Fixed Income | $2,908,393.00 |
| Loss under the ISDA Master Agreement | $94,101,862.41 |

Additional information in respect of the foregoing calculations is set out below.

## FOREIGN EXCHANGE PORTFOLIO

| Group of Transactions (by currency) | Loss |
|---|---|
| ARS | $2,214.12 |
| AUD | ($333,507,512.85) |
| CAD | $89,153,973.81 |
| CHF | ($557,161,459.07) |
| CNY | $171,098.63 |
| COP | $6,417.80 |
| CZK | ($4,506,073.50) |
| EUR | ($5,525,409,488.53) |
| GBP | ($696,252,097.58) |
| HKD | $104,880,877.16 |
| HUF | ($35,249,253.42) |
| IDR | $23,054.51 |
| ILS | $50,321,886.98 |
| INR | $112,359.97 |
| JPY | $694,998,340.06 |
| KRW | $71,727.47 |
| MXN | $81,815,181.81 |
| MYR | $30,938.04 |
| NOK | $111,110,045.77 |
| NZD | $264,446,955.99 |
| PHP | $27,748.79 |
| PLN | $223,410,853.12 |
| RON | ($13,826,944.41) |
| RUB | ($23,682,453.58) |
| SAR | $57,989.55 |
| SEK | ($28,421,056.35) |
| SGD | ($34,818,852.24) |
| SGX | ($119,722,279.14) |
| THB | $14,163,509.15 |
| TRY | ($245,243,296.58) |
| TWD | $73,105.77 |
| USD | $6,295,882,020.40 |
| ZAR | ($221,766,062.24) |
| | **$91,193,469.41** |

## FIXED INCOME PORTFOLIO

| Group of Transactions | Loss |
|---|---|
| Fixed Income (JPY/USD) | $2,908,393.00 |

## OPERATIONAL ITEMS FOR SETOFF

| Amount | Source |
|---|---|
| $48,180.00 | ETD commissions due to UBS Sec LLC |
| $41,379.00 | ETD commissions due to UBS Sec LLC |
| $41,607.00 | ETD commissions due to UBS Sec LLC |
| $1,440.00 | CMTA receivables (re: listed options) / April 2008 |
| $500.00 | CMTA receivables (re: listed options) / May 2008 |

**UBS** Investment Bank

| | |
|---|---|
| $73,125.00 | CMTA receivables (re: listed options) / July 2008 |
| $183,248.00 | CMTA receivables (re: listed options) / August 2008 |
| $141,857.00 | CMTA receivables (re: listed options) / Sept 2008 |
| $1,613,149.93 | Payment made in error to customer acct at Lehman |
| $839,071.94 | Payment made in error to customer acct at Lehman |
| $1,160,000.00 | Loss on fail by LBI on purchase of $4mm Claires bonds |
| $82,449.00 | Loss on fail by LBI on purchase of $1.08mm of AIG bonds |
| $8,754,019.00 | ECMG receivable (Chesapeak Energy) |
| $4,378,444.00 | ECMG receivable (XTO Energy) |
| $350,024.00 | ECMG receivable (PetroHawk Energy) |
| $829,331.00 | ECMG receivable (Teppco Partners) |
| $3,720.00 | ECMG receivable (Energy Transfer) |
| $384,750.00 | DCMG receivable (XTO Energy) |
| $128,993.00 | DCMG receivable (Deutsche Telekom) |
| **$19,055,287.87** | |